IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | |
| CITY OF CLEVELAND | ) | |
| | ) | **MOTION RECOMMENDING** |
| Defendant. | ) | **APPROVAL OF REVISED USE OF** |
| | ) | **FORCE POLICIES OF THE** |
| | ) | **CLEVELAND DIVISION OF POLICE** |

Pursuant to Paragraphs 49 through 83 and 341 through 349 of the Consent Decree, and the First-Year Monitoring Plan, in the above-captioned matter, the Cleveland Division of Police ("CPD" or the "Division") has revised its policies relating to the use of force.  The revised policies were finalized after constructive discussions with and direct input from CPD officers, the Division's command staff, the Department of Justice ("DOJ"), City of Cleveland (the "City"), the Community Police Commission ("CPC" or the "Commission"), community organizations, and residents from throughout Cleveland, as well as the Monitoring Team.

The policy revisions include important changes to: (1) CPD's General Police Order ("GPO") regarding Use of Force – General, which outlines clear use of force principles and specific expectations about when CPD authorizes officers to use force (attached hereto as Exhibit A); (2) a Use of Force – Definitions GPO, which defines commonly used terms in the various force policies (attached hereto as Exhibit B); (3) a Use of Force – De-escalation GPO, which requires that officers use affirmative strategies and tactics aimed toward ensuring officer and subject safety while reducing the need for or the severity of force to be used (attached hereto as Exhibit C); (4) a Use of Force – Intermediate Weapons GPO, which provides specific guidance on the use of less-than-lethal force tools, such as the Taser, OC Spray, and baton (attached hereto as Exhibit D); and (5) a Use of Force – Reporting GPO, which addresses the requirement that officers report force when used (attached hereto as Exhibit E) (collectively, the "Use of Force policies").

The Monitoring Team has closely reviewed the updated policies.  For the reasons set forth below, the Monitor concludes that the policies are consistent with the Consent Decree because they promote officer and public safety, enhance effective and proactive law enforcement, and advance constitutional policing in a manner consistent with the values of Cleveland's communities as articulated by those communities during extensive community outreach and engagement on the force policies.  Subject to the conditions outlined in Section V, the Monitor therefore approves the CPD's new Use of Force policies and requests that this Court order them effective upon CPD's successful completion of upcoming use of force training.

## I.     SUMMARY OF CONSENT DECREE REQUIREMENTS REGARDING USE OF FORCE POLICIES

Following an investigation in 2014, the United States found reasonable cause to believe that there was a pattern and practice of excessive force within the Cleveland Division of Police in

violation of the U.S. Constitution and federal law.  The United States and City of Cleveland entered into an agreement, the Court-ordered Consent Decree, in which the City and CPD agreed to make a host of important reforms and changes.  Dkt. 7-1.

On the fundamental issue of use of force, the Consent Decree requires CPD to "revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force is used in accordance with the Constitution and laws of the United States . . ." (Dkt. 7-1 ¶ 45).  The updated force policies must be "designed with the goal of ensuring that officers use techniques other than force to effect compliance with police orders whenever feasible; use force only when necessary, and in a manner that avoids unnecessary injury to officers and civilians; de-escalate the use of force at the earliest possible moment; and accurately and completely report all uses of force."  *Id.*  Specifically, all such force policies must "incorporate" the Decree's enumerated "use of force principles," *id.* ¶ 46, specific provisions relating to the use of firearms and other intermediate weapons, *id.* ¶ 50, and requirements involving the uniform reporting of incidents where officers use force.  *Id.* ¶ 46.

## A.      Use of Force Principles

The Consent Decree requires that CPD's policies are consistent with, embody, and promote a number of foundational use of principles to ensure that CPD and its officers routinely comply with the U.S. Constitution, and federal and state law.  At the same time, the Decree requires the Division to ensure effective law enforcement that prioritizes both community and officer safety. Dkt. 7-1 ¶ 46.  Among other things, the principles provide that officers should:

- "[A]llow individuals the opportunity to submit to arrest before force is used";

- "[U]se de-escalation techniques whenever possible and appropriate

- "[N]ot use force against persons who are handcuffed or otherwise restrained"

- "[N]ot use force against persons who only verbally confront them"

- Not use "retaliatory force" or neck holds.  (*Id.*)

Further, the policies must allow CPD "to account for, review, and investigate every reportable use of force and reduce any improper uses of force." *Id.* ¶ 47.  Any use of force deemed to be unreasonable or excessive under the new policies "will subject officer to the disciplinary process, possible criminal prosecution, and/or possible civil liability." *Id.* ¶ 49.

**B.       Force Instrument-Specific Policies**

The Consent Decree also outlines specific requirements for the use of various force instruments, including firearms and less-lethal or intermediate weapons.  For example, as to firearms, pointing a firearm at an individual is prohibited unless there is a reasonable belief that lethal force may be necessary, and the pointing of a firearm at a subject is in most circumstances a reportable use of force that must be reported by officers and put through an administrative review by the Division.  Officers may not fire warning shots, must consider their surroundings before discharging their firearms so as to avoid unnecessary risk to others, and may not fire a gun at a moving vehicle except in exceptional circumstances.  *Id*. ¶¶ 55–60.

With respect to the use of Electronic Control Weapons ("ECW"s), also known as Tasers, officers must, for example, "determine the reasonableness of ECW use based upon all the relevant circumstances, including a subject's apparent age, size, physical, and mental condition." *Id.*  ¶ 65.  The agreement also requires officers be annually certified on the use of ECWs and receive training on medical assistance/interventions after applying the intermediate weapon on an individual.  *Id.* ¶¶ 71, 74.

4

Similarly, OC Spray, also referred to as pepper spray, may be used only when necessary and reasonable to protect an officer, individual and/or third party from physical harm or as a means of dispersing crowds. *Id.* ¶ 77.  The Consent Decree provides that each separate spray must be justified as reasonable and cannot generally be used on individuals who are handcuffed or otherwise restrained.  *Id.* ¶¶ 78, 79.

## C.     Reporting

The Consent Decree requires that CPD officers notify supervisors when force is used and uniformly document the details and circumstances of such force.  *Id.* ¶ 87.  The degree and detail of the specific reporting requirements directly correspond with the level, general degree, or outcome of the force used.

Specifically, the Consent Decree classifies force into three Levels, with "[e]ach level of force…requir[ing] increasingly rigorous reporting."  *Id.* ¶ 87.  Level 1 force is relatively low-level force "that is expected to cause only transient pain and/or disorientation during its application . . . but that is not reasonably expected to cause injury, does not result in an actual injury, and does not result in a complaint of injury."  *Id.* ¶ 87(a).  This would, for instance, "include[e] pressure point compliance and joint manipulation techniques" but would "not include escorting, touching, or handcuffing a person with no or minimal resistance."  *Id.*

Level 2 force "is force that causes an injury" to a subject, "could reasonably be expected to cause any injury," or "results in a complaint of an injury" and does not rise to the severity of Level 3 force.  *Id.* ¶ 87(b).  This generally includes the deployment of intermediate weapons and a variety of defensive techniques and maneuvers that do not involve weapons.  *Id.*

Level 3 force includes lethal force, force that results in death or serious physical injury, force resulting in admission to a hospital, all neck holds, force resulting in loss of consciousness, canine bites, and, more than three applications of an ECW on an individual during one single incident. *Id.* ¶ 87(c).

**D.      Forthcoming Work & Additional Force Requirements**

The First-Year Monitoring Plan charged CPD with the task of crafting policies related to CPD officers' use, deployment, or application of force on subjects and the immediate responsibilities of officers after they use such force.  Dkt. 43-1.  Accordingly, much of the work in the next year of the Consent Decree process will focus on how CPD responds to, investigates, analyzes, and reviews force incidents when they do occur – and on how, if force was found to be applied improperly, the Division addresses deficiencies in officer performance.

**II.     PROCEDURAL HISTORY AND THE PROCESS USED TO DEVELOP FORCE POLICIES**

The Consent Decree requires that the revisions of the Use of Force policies be developed with input from officers, the CPC, the community, and the Parties.  *Id*.  ¶¶ 15, 17, 18, 341–49. Consequently, the stakeholders created and the First-Year Monitoring Plan codified a process for resident participation, community involvement, and public input without precedent in federal consent decree processes.  *See generally* Dkt. 43.  As discussed below, the City and CPD have actively and genuinely engaged with community stakeholders – both "early in the process, when the Community Police Commission and Division of Police gather[ed] views, values, experiences, and expectations from the community that inform[e]d the initial drafting of new policies and

processes" and "later on, when the Monitor work[ed] with stakeholders to get real, direct, and substantive feedback about" the proposed force policies."  Dkt. 65 at 6.  This section describes the City and CPD's extensive engagement with the community on the Use of Force policies.

### A.     Pre-Policy Drafting Engagement

#### 1.   CPC

Consistent with the First-Year Monitoring Plan, CPD consulted the CPC regarding their revised Use of Force policies.  Dkt. 43-1 at 8.  Specifically, the Consent Decree directs the CPC to make recommendations related to CPD "policies and practices related to use of force."  Dkt. 7-1 ¶ 18.

The CPC engaged in an intensive process to gather community input on use of force and to distill the experiences, comments, feedback, input, histories, values, and experiences of Cleveland residents into substantive recommendations about the Use of Force policies.  The CPC's community engagement and feedback process started in February 24, 2016 when it held a full meeting on the topic of use of force.  The Commission then hosted a separate town hall and held special meetings with individual organizations from across Cleveland, such as the Black Shield Police Association, Cuyahoga Metropolitan Housing Authority ("CMHA") residents, 100 Black Men, local clergy, and members of the Consent-Decree-created Mental Health Advisory Committee ("MHAC").  At the same time, CPC developed a use of force questionnaire in which community members could provide direct, anonymous input.

Based on the totality of community engagement and feedback related to force, the Commission proposed a set of recommendations to the CPD and other Consent Decree stakeholders (attached hereto as Exhibit F).  These recommendations focused on a broad range of

topics including emphasizing "life preservation" in policy, providing "updated state-of-the-art training" and ensuring the policies are "aligned with community values and expectations." Ex. F at 7–8. The Monitor has previously praised "the final, written work product of the CPC addressing force" as reflecting "a very high level of quality." Dkt. 65 at 25.

### 2, The City of Cleveland's Engagement

In March, 2016, the City's Community Relations Board conducted a separate, informal feedback process on use of force issues. A total of 1,092 residents completed a questionnaire in some capacity, whether online, by paper and pencil, or otherwise. Although the City's survey did not secure a random statistically-significant sample that would permit the findings to be considered as representative in any particular way to the Cleveland community as a whole, the City's outreach efforts were noteworthy and yielded valuable findings.

### 3.   CPD's Engagement

The Division itself engaged in a significant process for gathering input directly from CPD officers about the former Use of Force policies. In partnership with the leadership of the Cleveland Police Patrolmen's Association ("CPPA"), Fraternal Order of Police ("FOP"), and other police officer organizations, CPD conducted several forms of officer outreach and engagement, including a non-scientific online officer survey, focus group discussions, anonymous written submissions, and a series of meetings with union and officer organization leadership. Among other things, the anonymous, online survey for officers found that:

- Most officers who completed the feedback form did not believe that force types and categories in CPD's current force policies are sufficiently clear.

- Officers appeared to want clearer definitions of key terms used in the force policy, with fewer than 40 percent of officers saying that the prior definitions made that previous policy more understandable.

- Fewer than one-third (31 percent) of responding officers believed that the current CPD policy reflected a priority on using techniques other than force to effectuate law enforcement objectives.

- Of officers who had experience using the Taser, nearly two-thirds (65 percent) of respondents found the less-lethal very effective or effective.

Data from CPD (Mar. 31, 2016).

**B.    The Collaborative Policy Drafting Process**

After receiving input from the CPC, the City, and its own members, the Division drafted revised Use of Force policies.  During that process, the Division evaluated the practices of other police departments (such as the Seattle Police Department and Las Vegas Metropolitan Police Department), consulted the officer and community feedback, and crafted specific policy provisions consistent with the Consent Decree.  Accordingly, CPD attempted to draft the policies in light of sound, real-world practices and then tailored such practices to the Cleveland community through an engagement process that included the community, including the Division's officers.

Beginning in March of 2016, Consent Decree stakeholders met regularly to discuss and collaborate on various iterations of the drafts.  During this period, the Monitoring Team provided real-time technical assistance to CPD on how to comply with the Consent Decree's requirements. In doing so, the Monitoring Team drew upon the force and force-related policies of other jurisdictions, model policies from police officer organizations such as the International

Association of Chiefs of Police ("IACP") and the Police Executive Research Forum ("PERF"), and the recommendations of recent blue-ribbon task forces. [1]  Consequently, the updated policies were not based on CPD's speculation or conjecture, nor were they invented from thin air.

On September 8, 2016, the Parties agreed on draft versions of four Use of Force policies – the general policy on when officers may and may not use force, a policy defining key terms throughout the force policies, a policy outlining specific guidelines for intermediate weapons, and a standalone de-escalation policy — that were sufficiently well-developed to benefit from community review and comment.  The versions of the policies made available for community-wide input and engagement were not the final policies; however, they did reflect a sufficient amount of the necessary, substantive detail for community input to be worthwhile.

### C.      The Monitoring Team's Engagement

Starting on September 8, 2016 the Monitoring Team, working closely with the City of Cleveland, CPD, the Department of Justice, and the CPC, coordinated the solicitation of public input on the CPD's proposed Use of Force policies.  Between September 8 and November 4, 2016, the Parties engaged in a comprehensive feedback process.  The Monitoring Team made several resources available, including:

---

[1] *See, e.g.*, President's Task Force on 21st Century Policing, Final Report (2015) [hereinafter President's Task Force on 21st Century Policing ] (emphasizing comprehensive and clear and concise use of force policies); Bureau of Justice Assistance, Understanding Community Policing (1994) 9 (discussing the positive impact of community engagement on substantive policy); *Guiding Principles on Use of Force*, POLICE EXECUTIVE RESEARCH FORUM at 34 (2016) [hereinafter "PERF Guiding Principles"] (recommending police departments "stress the sanctity of human life in their mission and policy statements").

- A video overview presentation, with Monitor Matthew Barge and Deputy Monitor Charles Ramsey, about the proposed new Use of Force policies, produced in conjunction with Cuyahoga Community College;

- A four-page summary of the most important provisions of CPD's new Use of Force policies;

- A one-page summary of the key differences between CPD's prior Use of Force policy and the new proposed policy; and

- The complete, proposed Use of Force policies themselves – including the General Policy, Definitions, De-Escalation Policy, and Intermediate Weapons Policy – were made available online, along with a brief summary of key policy changes.

To gather community feedback on the new policies, the City, CPC, CPD, DOJ, and Monitoring Team all collaborated on two community roundtable events. More than 195 residents from across the Cleveland community gathered at these events to discuss, in small group environments facilitated by representatives of the various stakeholders, their views, opinions, and feedback on the proposed force policies. The forums were structured to facilitate open intimate conversations and also link ideas to the large group. Community members were offered an opportunity to engage directly with a small group of fellow community members and residents, see what others thought, and compare their own individual perspective to their small group perspective – and then report out their small group recommendations to the full group. Cleveland residents have continued to discuss the impact of having a Consent Decree stakeholder in the small groups, actively engaging in and listening to what individual residents were saying. Several community members have represented to the Parties and/or Monitor that they believed that they were heard in a unique way during the forums.

Further, a single, unified online feedback form with various questions about the policies was available on the Monitoring Team's website, and linked to or advertised by other Consent Decree stakeholders.  Several community organizations, such as the Schubert Center for Child Studies at Case Western Reserve University and the American Civil Liberties Union, sent the Parties and Monitoring Team thoughtful, written feedback about the versions of the policies made public.

Overall, community members were generally supportive of the new policy.  The Parties and Monitor heard consistently that the were a "great start" in transforming the relationship between the community and the Division by providing clarity – for community members and individual officers alike – on when officers may and may not use force.  In particular, a number of community members at the community forums endorsed the express inclusion of the concepts of necessity and proportionality in the policies.

Many of the small-group discussions at the community forums focused on the importance of effective communication between officers and residents during police interactions.  Community members expressed substantial support for officers using tactical de-escalation techniques – from strategic communication to the proactive use of distance, cover, concealment, and time – when safe and feasible to do so.

Community members also made a number of constructive and important suggestions about how the policies could be further strengthened.  Key findings and recommendations from the community following the Community Roundtables can be found in Exhibit G.

At the same time, the Community Police Commission evaluated the proposed force policies.  The CPC made a number of suggestions about how that organization's original recommendations on force – informed by its community outreach and engagement in early 2016

– could be more fully incorporated into the policies.  CPD made a number of important changes to the policies to reflect the community discussion on those policies.  *See* Ex. F.

### D. Incorporation of Community Feedback into Final Policies

Following the Community Roundtables, the City, DOJ, CPD, and the Monitoring Team met to discuss ways to incorporate the community feedback into the new policies. The CPD revised the force policies to make a number of important, substantive changes or additions that reflect the extensive community outreach on force.  These specific changes are outlined in Part IV, below.

## III. STANDARD OF REVIEW

"As an agent of the Court," a primary duty of the Monitor and the Monitoring Team is to "assess and report whether the requirements" of the Consent Decree "have been implemented." Dkt. 7-1 ¶ 351; *accord id.* ¶ 352 (requiring the Monitor to "review CDP policies, procedures, practices, training curricula, and programs developed and implemented under" the Decree).  The task of the Monitor here is to determine whether the policies that CPD developed and that the City submits comply with the Consent Decree's requirements on use of force.  *Id.* ¶¶ 45–83, 87–92.

In some instances, the evaluation of whether the policies include what the Decree requires is relatively mechanical.  For example, the Consent Decree requires that "[n]o officer . . . carry any weapon that is not authorized or approved by CDP."  *Id.* ¶ 52.  Section III-A of the proposed Use of Force: General policy provides that "Officers shall not . . . [c]arry weapons that are not authorized or approved by the Division."  Ex. A at 4, Procedures III(A)(8).  Consequently, the Monitoring Team can readily determine that the Use of Force: General policy is consistent with the Consent Decree.

However, in other instances, the policies must comply with more general provisions or provide more significant detail than the Consent Decree provides.  The Consent Decree includes specific requirements for the policies, but such a document could not outline every particular policy provision of the required policies.  Accordingly, a good deal of the work within the Division and among the stakeholders was spent determining how to adhere to the Consent Decree while providing clear and specific guidance for Cleveland officers and residents.

For example, the Consent Decree requires that CPD officers "use force only when necessary."  Dkt. 7-1 ¶ 45.  The proposed CPD policies attempt to provide greater specificity and clarity to CPD officers about precisely when force may be considered necessary by outlining the five classes of situations in which the use of force may be considered to have "a lawful objective."  Ex. A at 1, Principles (II) (C)(5).  Consequently, the task of the Monitor is to determine whether this additional material is consistent with the Consent Decree's overriding guidelines, requirements, and principles.

The Monitoring Team's assessment of the force policies also draws upon the review of CPD's policies in light of the force and force-related policies of other jurisdictions, model policies from police officer organizations such as the International Association of Chiefs of Police ("IACP") and the Police Executive Research Forum ("PERF"), the recommendations of recent blue-ribbon task forces, and the substantial experience of the careers of the five former law enforcement professionals on the Monitoring Team.[2]  Consequently, the Monitor's evaluation of the force policies is not based on speculation, conjecture, or invented benchmarks but, rather, the real-world experience of other law enforcement agencies and professionals.

---

[2] *Id.*

14

The Monitor notes here that the force policies represent an important, early milestone in compliance with the Consent Decree.  Still, the Decree requires that the force policies are not only developed and adopted but also "implement[ed]," Dkt. 7-1 ¶ 45.  That is, the policies must exist not simply on paper but in practice such that CPD officers affirmatively comply with them, day in and day out, on the streets of Cleveland.  This requires the completion of high-quality training for officers on the force policies and the substantial and effective implementation of a host of processes, procedures, policies, and systems for reviewing, investigating, and evaluating use of force incidents.  *Id.* ¶¶ 84–86, 93–130.

## IV.    ANALYSIS OF THE FINAL PROPOSED FORCE POLICIES

CPD provided completed, proposed Use of Force policies on November 8, 2016.  Those policies consist of five related CPD "General Police Orders":

- **Use of Force: General.**  This is the core CPD policy that outlines when officers may and may not use force.  That is, incorporating the Consent Decree's use of force principles, into a policy that governs officer performance on the streets of Cleveland. The other four policies build from, correspond to, or explain this core policy.  *See* Ex. A.

- **Use of Force: Definitions.**  This policy provides the meaning of specialized or key terms used throughout the other force policies.  *See* Ex. B.

- **Use of Force: De-Escalation.**  Although an officer's duty to de-escalate situations where it is safe and feasible to do so is contained within the General policy, the De-Escalation policy goes into greater detail about this important requirement.  *See* Ex. C.

- **<u>Use of Force: Intermediate Weapons</u>**.  This policy contains a number of regulations about particular types of force instruments or tools that officers use, such as the baton, OC (pepper) spray, and Taser that are less-lethal instruments.  *See* Dkt. 7-1 ¶¶ 55–60; Ex. D.

- **<u>Use of Force Reporting</u>**. This policy outlines the obligation of officers to report when they use force and what officers can expect about CPD's administrative response to force, which depends on the nature and severity of the force used.  *See* Ex. E.

The following discussion provides a non-exhaustive summary of the new policies and details some of the ways that feedback from CPD officers and Cleveland residents have been expressly incorporated into the new Use of Force policies.

### A.    Use of Force: General

At the outset, the new force policy emphasizes the Division's "commitment to carry out its duties with a reverence for the sanctity of human life."  Ex. A at 1.  This express commitment is responsive to feedback from the Use of Force Community Roundtables.  "Several groups suggested the policies include statements such as 'reverence for life' and 'respect for all individuals.'"  Ex. G at 7.  It also addresses CPC's recommendation that "the sanctity and preservation of all human life" and commitment to treating people with dignity and respect be highlighted in the Use of Force policy.  The specific language also aligns CPD's policy with its new, Court-approved mission statement.  Dkt. 74.  Additionally, it comports with the policies of other law enforcement agencies and recommendations of major police officer organizations.  *See, e.g.*, Philadelphia Police Department Directive 10.1 at Section 1-A ("It is the policy of the Philadelphia Police Department[] that officers hold the highest regard for the sanctity of human

life . . . . "); New Orleans Police Department, Operations Manual, Chapter 1.3, Use of Force Policy Statement ("The policy of the New Orleans Police Department is to value and preserve human life when using lawful authority to use force."); PERF Guiding Principles No. 3 at 34 ("The sanctity of human life should be at the heart of everything an agency does.").

After outlining the purpose of the policy, the General GPO articulates the policy's four fundamental requirements: that force be used only when it is (1) necessary, (2) proportional, and (3) objectively reasonable, and that officers (4) use strategic de-escalation tactics and strategies when it is safe and feasible to do so. Ex. A at 3, Principles (V). The inclusion of necessity, proportionality, and de-escalation is a notable shift from CPD's prior force policy. Ex. H. The previous, fifteen-page policy – which a majority of CPD officers told the Division was unclear and gave them insufficient guidance on when precisely force can and cannot be used – prohibited "excessive force," without defining precisely what would be excessive, and situated authorized force in terms of force "that is objectively reasonable to bring an incident under control." Ex. H at 2.

By requiring all force to be necessary and proportional, the new policy matches community expectations and best practices. *See, e.g.*, Seattle Police Department, Manual Section 8.000 ("An officer shall use only the degree of force that is objectively reasonable, necessary under the circumstances, and proportional to the threat or resistance of a subject."); PERF Guiding Principles No. 2 and No. 3 at 35-40.

The fourth principle, de-escalation, is now required before officers resort to the use of force. Although the CPD has a separate de-escalation policy, the Division has included de-escalation as one of the major principles in the general policy. Ex. A at 3, Principles (V). This

serves to reiterate and highlight the important expectation that officers employ de-escalation techniques.

The new policy also provides thirteen specific factors or circumstances that "[o]fficers shall consider" during an incident and that, by "impair[ing] a subject's ability to comply with officer commands or affect the nature or degree of the threat presented," impact the objective reasonableness of using force in a given situation.  Ex. A at 2, Principles (IV).  For instance, officers are instructed to consider the subject's "proximity or access to weapons," "[t]he officer's distance from the subject(s)," the subject's "[l]imited English proficiency or other language barrier," and "differences between the officer's and subject's age."  *Id.*

Many Community Roundtable participants expressed concern that the proposed policies failed to address how officers should interact with community residents with mental disabilities. The Parties responded to this feedback by adding, in the list of "officer/subject factors and circumstances" that must be considered "when choosing a force response," that officers should consider "[k]nown or reasonably apparent mental illness, developmental disability, or crisis incident" and "[k]nown or reasonably apparent physical disability or other medical or physical condition, including visual or hearing impairment," when choosing a force response. Ex. A at 2-3, Principles (IV).

The new policy provides specific guidance as to when deadly force may be authorized, Ex. A at 4, Procedures (II).  It also provides a specific list of actions in which, "[c]onsistent with the principles of necessity, proportionality, objective reasonableness, and e-escalation, Officers shall not" engage.  Ex. A at 4-5, Procedures (III).  These actions include using force against subjects "who only verbally confront officers," applying force to those "who are handcuffed or otherwise restrained" except in very limited circumstances, using "neck holds," and using "head strikes with

hard objects." *Id.*  This prohibited activity list also follows many of the CPC's recommendations, including prohibiting the "use of force against those who are exercising their First Amendment rights." Ex. A at 5, Procedures (III)(A)(7).; Ex. F at 12.  It also prohibits officers from "reaching into, or placing themselves in the path of a vehicle" Ex. A at 5, Procedures (III)(A)(7); Dkt. 7-1 ¶ 59.

No law, court, or policy can prescribe specific rules that can apply to every conceivable circumstance involving all possible police encounters under any possible permutation of circumstances.  Linda S. Miller, et al, *Community Policing: Partnerships for Problem Solving* 46 (11th ed. 2011) ("Police use discretion because no set of policies and procedures can prescribe what to do in every circumstance.").  Indeed, CPD was mindful that any force policy "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  Consequently, the policy provides that "[i]n rare and exceptional circumstances" where deadly force would be authorized, the subject's actions "constitute an immediate danger and grave threat to the officer or others," and "no other force options, techniques, tactics, or choices consistent with the Division's policy are available, it may be necessary for an officer to take extraordinary or unanticipated actions in order to overcome the threat" that might resemble approaches that are prohibited in nearly every other circumstance by CPD's policy.  Ex. A at 5, Procedures (III)(B).  The expectation of the Parties and Monitor are that this "immediate danger and grave threat" policy provision would apply exclusively "[i]n rare and exceptional situations," Ex. A at 5, Procedures (III)(B), that CPD's policy will be routinely and fairly applied "without regard to" an officers "underlying intent or motivation," *Graham v. Connor*, 490 U.S. 386, 397 (1989), and that "[t]he officer's actions" in such exceptional circumstances "shall be subject to

strict review." Ex. A at 5, Procedures (III)(B). Indeed, it is the hope and expectation of all stakeholders that no Cleveland officer or resident will find themselves in the type of dangerous encounter with a subject where an officer's options are so severely limited that a safe resolution of the incident is only possible by using otherwise prohibited force techniques.

The General policy outlines two important duties related to the use of force: the duty to intervene and the duty to provide medical attention. The duty to intervene provides that "[e]ach officer at the scene of a use of force incident has a duty to intervene by taking all reasonable actions to stop any use of force that is perceived to be unauthorized by this policy." Ex. A at 5, Procedures (III)(A)(7). The duty to provide medical aid is an affirmative duty for officers themselves. CPD's prior policy required only that officers "ensure medical care was provided." Ex. H at 4.

The General policy outlines CPD's new commitment to providing training on use of force "at least yearly." Ex. A at 6, Procedures (VI). Separate policies, procedures, and specific curricula on force will be forthcoming and submitted to the Court for review and approval.

Some community comments focused on the need for officers to tailor their responses to young people in a manner consistent with their age, maturity, and relative development. The Monitor understands that CPD is working closely with the Schubert Center for Child Studies at Case Western Reserve to craft a standalone GPO about officer interactions with youth. To the extent that any Use of Force policy cannot exhaustively detail the particular knowledge that officers should have about young people, the Team applauds the Division's forward-looking focus on the specific issues that relate to interacting with children and juveniles in various stages of physical and cognitive development. To the extent that this protocol on addressing young subjects is successful, other such protocols might be developed to address the disabled or those with

language barriers.  *See* Ex. F at 6 (recommending "specific protocols for dealing with those with physical . . . conditions, . . . differently abled, and language barriers").

Some community comments focused on issues relating to holding officers accountable with complying with the requirements of the force policy or on actions not squarely within the realm of use of force.  For instance, the CPC suggested that the force policy address issues related to "verbal abuse, intimidation, . . . sexual favors," sexual violence, and retaliation.  Ex. F at  2, 7.  The importance of each of these subjects demands a full treatment in a separate General Police Order, both to make clear that professional obligations and standards relating to such areas apply not just when force is used but across officer interactions with the public and to ensure that CPD's revised General Use of Force policy maintains the focus and clarity that officers and community members routinely urged.

Similarly, a number of community recommendations focused on issues relating to use of force data, investigations, accountability, transparency, body cameras, and the role of the Office of Professional Standards ("OPS") in reviewing force incidents.  *See, e.g.*, Ex. F at 12–14.  The Monitoring Team concurs that these issues, which are all addressed in the Consent Decree, are squarely related to force and the long-term ability of the Division to implement the Use of Force policy in practice.  Because the General Use of Force policy focuses on when officers may and may not use force on the streets of Cleveland, these topics will be subsequently addressed in the Consent Decree process in other General Police Orders and Operation Manuals.

**B. Use of Force: Definitions**

Common definitions of frequently-used terms that apply throughout the force-related policies are located in the newly revised Definitions policy.  These definitions provide a common

framework for officers, and the public, that can be used to create clarity, fairness, and accountability. The three-page Definitions policy defines thirteen terms, three levels of force, and three levels of subject resistance.  Ex. B.  CPD's prior force policy only defined force, deadly force, less lethal force, objectively reasonable force, intermediate weapons, and types of subject resistance.  Ex. H at 1-3.

The revised policy directly responds to feedback from CPD officers.  One of the key findings from the electronic survey that the Division conducted was that "officers appeared to want clearer definitions of key terms used in the force policy, with fewer than 40 percent of officers saying that current definitions make the current policy more understandable."  Dkt. 43-1 at 33.  Consequently, CPD endeavored to make the new definitions both concise and precise – so that policy provisions using the defined terms are readily understandable.  For instance, "neck hold" is defined as "a hold around the neck that may restrict the follow of oxygen or blood through the neck."  Ex. B at 3; *see also*, Ex. F at 11 (recommending prohibition against any maneuver "that restricts the blood or oxygen flow through the neck").  Because the General policy prohibits the use of neck holds, officers must clearly understand what is prohibited by the Division through this and other definitions.  Similarly, the new policy defines "necessary" as ". . . us[ing] physical force only when no reasonably effective alternative appears to exist, and only then to the degree which is reasonable to effect a lawful purpose."  Ex. B at 3.  This definition provides a specific meaning that governs the use of the term throughout the document and conforms to longstanding conceptions of necessity in the use of force context.  *See*, U.S. Department of Justice, Policy Statement, Use of Deadly Force 14 (last visited Nov. 14, 2016), *available at* https://www.justice.gov/ag/attorney-general-october-17-1995-memorandum-resolution-14-attachment-1.

22

The Definitions section also outlines the three Levels of force discussed.  *See supra* Part (I)(C).  It should be noted that, consistent with the Decree, Dkt. 7-1 ¶ 56, low-level, Level 1 reportable force now includes "un-holstering a firearm and pointing it at a subject." Ex. B at 2.  This is directly responsive to the CPC recommendation that the policy "[i]ncorporate in GPO Definitions, explicit language regarding pulling out and pointing of firearms—even when not fired." Ex. F at 2.  The Monitor observes that an officer's activity becomes a Level 1, reportable force when the officer has both unholstered a firearm *and* pointed it *at* a subject.  Accordingly, any suggestion that this requirement will either prevent officers from having their weapon out and in a "low ready" or "sul" position, where required and consistent with training on addressing certain subjects in higher-risk encounters, or will bury officers in paperwork would not be consistent with the tailored definition of Level 1 reportable force.

**C.     Use of Force: De-Escalation**

De-escalation is the use of affirmative and strategic techniques to preserve a greater array of tactical options, thereby increasing the likelihood that a subject will voluntarily comply while minimizing the likelihood that force will need to be used during an incident and/or reducing the severity of force that is used.  A number of police departments require that police officers de-escalate situations, when feasible and safe – including Dallas, New York, Salt Lake City, San Francisco, San Antonio, Seattle, and Washington, D.C.  Additionally, a focus on de-escalation in policy and training has been emphasized by several groups of law enforcement professionals.  *See e.g.,* President's Task Force on 21st Century Policing at 20; PERF Guiding Principles No. 17 at 54;

CPD's revised policies now impose an affirmative duty on police officers to de-escalate situations unless it is not safe or not feasible for them to do so.  The concept has been set forth both in a distinct policy section and as a requirement in the General Use of Force policy.  *See*, Ex. C (emphasizing the significant breadth of the duty and the primary importance of de-escalation in the Division's approach to policing and using force going forward);  *see also*, Ex. F at 15-16 (recommending that CPD's policies "[a]ffirm de-escalation as the preferred approach").

In an informal survey conducted by the City's Community Relations Board, residents indicated that CPD's use of de-escalation tactics would address fairness in use of force issues.  Dkt 43-1 at 33.  Thus, as recommended by the CPC, de-escalation has become a "core theme" and officers are expected to have the skill set and intention to not escalate situations themselves.  The De-escalation policy reinforces that officers should de-escalate rather than escalate: "Officers should avoid taking unnecessary actions that may escalate the need to use force, e.g. aggressive body language, proximity, harsh level of voice and tone, officer's own stress level or excitement." Ex.  C; *see also* Ex. F at 8.

CPD's stated intent of having both a separate, standalone De-escalation policy and incorporating de-escalation expressly into the General Use of Force policy is to clarify that officers understand that "the guidelines relative to de-escalating situations in order to gain voluntary compliance and reduce the need to use force" apply to all encounters, regardless of whether force is ultimately required to resolve the situation or not.  Ex. C at 1; *see also* Dkt. 7-1 ¶ 36.  Further, the De-escalation policy describes a host of "de-escalation tactics, verbal persuasion and warnings and tactical de-escalation techniques, such as slowing down the pace of an incident, waiting out subjects, creating distance (and thus the reactionary gap) between the officer and the threat, and requesting additional resources. . ." Dkt. 7-1 ¶ 46(b); *see also* Ex. F at 8.

During the Use of Force Community Roundtables, many community members discussed the importance of incorporating specific protocols for de-escalating individuals with mental health conditions. Ex. G at 6. Consistent with this feedback, the de-escalation policy requires officers to consider whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comprehend and/or comply based on "[k]nown or reasonably apparent mental illness, developmental disability, or crisis incident or [k]nown or reasonably apparent physical disability or other medical or physical condition, including visual or hearing impairment. Ex. C at 1, Procedures (D). Additionally, and consistent with policies and training related specifically to interacting with individuals experiencing behavioral crisis that the City will soon submit to the Monitor and Court for review, the policy provides specific protocol officers must follow if it is determined the subject is in a mental health/behavioral crisis. Ex. C at 2, Procedures (I)(F)

### D. Use of Force: Intermediate Weapons

Intermediate weapons, sometimes called less-lethal weapons, can be an important tool used by officers to gain control of a subject posing a threat without needing to use more deadly force. The appropriate use of less-lethal weapons has been associated with a lower rate of injuries to both officers and civilians. *See e.g.*, John M. MacDonald, et al, "The Effect of Less-Lethal Weapons on Injuries in Police Use-of-Force Events," 99 *Am. J. Pub. Health* 2268 (2009) (concluding that "[i]ncidence of . . . injuries can be reduced dramatically when law enforcement agencies responsibly employ less-lethal weapons in lieu of physical force").

CPD previously did not have a separate policy section or manual specifically dedicated to intermediate weapons. Ex. H. Instead, different rules applied to different intermediate weapons, and all were contained in the Division's single force policy. Indeed, the only guideline that applied

to all intermediate weapons was that officers were not permitted to use an intermediate weapon against someone who was passively resisting. Ex. H. at 6, Procedures (IV). Thus, consistent with feedback from Division officers, the Parties concluded that CPD should have a more robust set of policies to provide specific guidance to officers on the use of various intermediate weapons.

The revised Intermediate Weapons policy focuses on four authorized intermediate weapons: (1) ASP Baton/Riot Baton/Impact Weapons; (2) Oleoresin Capsicum (OC) Spray; (3) Conducted Electrical Weapon ("CEW" or "Tasers"); and (4) and the beanbag shotgun. The new policy sets out clear provisions that apply to all intermediate weapons, regardless of type, including when officers are and are not authorized to use *any* intermediate weapon. Ex. D at 1-2, Procedures (I). Under the revised policy, officers are required to carry at least two intermediate weapons, which ensures that officers will have multiple less-lethal options immediately available to them. Ex. D at 1, Procedures (I)(A)(2).

The policy also provides force-instrument-specific guidelines – or particular policy provisions that apply to the specific nature of the instrument and the risks associated to each to officers and subjects. Ex. D at 2-8, Procedures (II-V). Because OC Spray and CEW are purportedly to be more widely carried and used by CPD officers, the guidelines for those instruments are discussed in detail. Ex. D at 3-7, Procedures (III-IV).

Specifically, the policy guidelines related to OC Spray is designed to provide more clarity about when and how to use OC Spray. Officers may use OC Spray "only (a) [w]hen such force is reasonable to protect the officer, the subject, or another party from physical harm and lesser means would be ineffective; or (b) [f]or crowd dispersal or protection and other means would be more intrusive or less effective." Ex. D at 3, Procedures (III)(A)(1). The revised policy also now urges officers to be "aware of the risks of using OC spray in confined or enclosed environments" – a

provision that CPD specifically added in response to community feedback and aligned with the policies of other law enforcement agencies.  Ex. D at 3, Procedures (III)(A)(3), Ex. F at 26.

The Decree also details the guidelines and protocols officers must follow when using CEWs, or Tasers.  The Intermediate Weapons policy is consistent with the Decree's provisions and, in some instances, provides additional information and instruction in an effort to provide greater clarity to officers.  For example, the manufacturer of the Taser indicates that officers must deploy the CEW at specific target zones on a subject's body in order for the application to be effective and to avoid undue risk or injury to the subject.  TASER International, TASER Handheld CEW Warnings, Instructions, and Information: Law Enforcement 3 (March 1, 2013) [*hereinafter* "TASER Handheld CEW Warnings"] (instructing officers to "[u]se preferred target areas" of below the neck and lower center mass and "[a]void sensitive areas").  Though the Consent Decree prohibits the use of CEWs to a subject's head, neck, or genitalia,  the newly revised GPO provides additional clarity by specifically identifying the preferred target zones for Tasers, specifically, "the lower center mass of the body on the front of the body and below the neckline of the back upper body." Dkt. 7-1 ¶ 68; Ex. D at 4, Procedures (IV)(A)(2); *accord* TASER Handheld CEW Warnings at 3.

Further, consistent with the Taser manufacturer's instructions, officers must "[l]imit each CEW cycle to 5 seconds" and "[u]se the minimum number of 5-second CEW cycles necessary to gain control of the subject.  Ex. D at 5, Procedures (IV)(A)(2)(d)-(e); *accord* TASER Handheld CEW Warnings at 2 ("Minimize the number and duration of CEW exposures.").  "If after three CEW applications the subject has not become compliant . . . , the officer shall assume that the CEW is ineffective and shall reassess and seek to transition to alternative control measures."  Ex. D at 5, Procedures IV(A)(2)(j); *accord* TASER Handheld CEW Warnings at 2 ("If a CEW

deployment is ineffective in incapacitating a subject or achieving compliance[,] consider alternative control measures . . . . ”).  Pursuant to community feedback and the CPC's recommendation, the final Intermediate Weapons policy now indicates that officers must "[r]eevaluate the situation after each CEW application" to consider alternative tactics, which might "include other less-lethal instruments and force techniques of the same or lesser Level and are not, therefore, limited to the application of higher-Level force."  Ex. D at 4, Procedures (IV)(A)(i); *see* Ex. F at 19 (noting that "ineffective CEW deployment does not mean an officer should immediately resort to a firearm").

### E.    Officer Use of Force Reporting

Finally, the Division's Officer Use of Force Reporting policy is consistent with the requirements of the Consent Decree and incorporates community feedback. Dkt. 7-1 ¶¶ 87–99. This policy outlines what officers must do to notify supervisors after force has been used, what they must be prepared to do in terms of describing and reporting what happened, and the administrative response from the Division that officers can expect to be followed immediately after a use of force incident.

The proposed policy captures the affirmative duty placed on all witness officers to report such force in writing. The Division has created a Witness-Officer Narrative Statement, which requires officers who are bystanders or witnesses to the use of force by a CPD officer to provide, among other things: (l) detailed account of the incident from the witness-officer's perspective; (2) the reason for the initial police presence; (3) a specific description of the acts that led to the use of force; (4) the level of resistance encountered; and (5) a complete and accurate description of every type of force used or observed. Dkt. 7-1 ¶ 88; Ex. E at 1, Procedures (III).

As described previously, in Part (I)(C) each use of force is now classified into one of three Levels, with each category of force "trigger[ing] a specific administrative response, investigation, and review of a force incident after it occurs."  Dkt. 43-1 at 35.

The comments of the CPC and other community organizations focused on how force reports would be evaluated, reviewed, and made public.  Specifically, in a separate document reviewing the reporting policy, attached hereto as Exhibit I, the CPC indicated that "Use of Force Reports need to be consistently evaluated for departmental values and integrity of reporting of the facts of the case," and that "Use of Force . . . be reported out to the community . . . on a monthly or quarterly basis."  Ex. I at 1.  The Monitoring Team agrees.  However, the Officer Use of Force Reporting Officer applies to officers.  The response of supervisors to use of force incidents, the administrative inquiries and reviews of force, and the Department's tracking of data about use of force will all be the subjects of subsequent GPOs that will be separately completed, made available for wider review, and submitted to this Court.

## V.      CONDITIONS TO APPROVAL OF THE FORCE POLICIES

The Monitor's approval of CPD's revised Use of Force policies are subject to three specific conditions.

### A.  CPD Will Submit Its Policies, Procedures, Manuals, and Documentation Relating to All Canine Deployments Not Later Than April 15, 2017.

During conversations among Consent Decree stakeholders, it became apparent that CPD has been operating without a comprehensive, rigorous set of policies, procedures, manuals, and documentation governing all canine deployments.  Under the revised Use of Force policies, a canine deployment amounts to reportable force when it can be considered a "canine apprehension", e.g. "[w]hen a canine is deployed and plays a clear role in the capture of a person."  Ex. B at 1;

*accord* Dkt. 7-1 ¶ 408. Because police canines can effectuate a seizure for the purposes of the Fourth Amendment, the Parties and Monitor have agreed that CPD should create clearer, codified policies for all canine deployments – whether they ultimately constitute reportable force or not – and should ensure that all such deployments are tracked in an electronic database. Consequently, the Monitor approves the new Use of Force policies on the condition that CPD provides to this Court its revised policies, procedures, manuals, and documentation relating to all canine deployments not later than April 15, 2017 for review and approval.

**B. CPD Will Have Implemented an Electronic System or Systems That Permits the Tracking of Instances Where Officers Unholster Their Firearms in the Context of Other Incidents, Interactions, or Events That Trigger a Reporting or Data Collection Requirement Not Later Than January 31, 2018.**

The general rule is that only unholstering a firearm and/or having a firearm in the "sul" or low ready in a manner consistent with training for various high-risk encounters is not, unless or until the firearm is pointed at a subject, reportable force. Importantly, however, the Consent Decree provides that "[i]f an officer unholsters a firearm during an incident, interaction, or event that would otherwise trigger a reporting or data collection requirement, officers will document that a firearm was unholstered," with CPD "annually collect[ing] and analyz[ing] this data." Dkt. 7-1 ¶ 55. Currently, CPD is in the process of implementing an electronic data tracking system that will track a host of officer performance and basic information, including those instances in which officers unholster their weapons during the course of effectuating their duties.

Because CPD will need to provide officers on guidance about what incidents are subject to standard reporting or data collection requirements and how specific information, including information about when an officer unholsters his or her firearm, is documented to comply with the Consent Decree, the Monitoring Team's approval of CPD's revised force policies are premised on CPD implementing an electronic database system or systems not later than January 31, 2018 that

track instances, which would otherwise trigger a reporting or data collection requirement, in which officers unholster their weapon.

### C. The Monitoring Team Will Conduct a Review of the Force Policies and Report to the Court Not Later Than 550 Days After the Court Approves the Policies as to Whether the Policies Are Providing Effective Direction to CPD Personnel.

CPD's new force policies will only be successful to the extent that they promote officer and public safety, effective law enforcement, and constitutional policing across Cleveland's diverse communities. Although CPD has taken care to base its policies on real-world practices of other police agencies, guidance from law enforcement organizations, and feedback from the Cleveland community, it is possible that some refinement may be necessary in the future to ensure that the force policies are adequately fulfilling the requirements and objectives of the Consent Decree.

Consequently, the Monitor's approval of the force policies is conditioned on the Monitoring Team conducting a review, no later than 550 days after this Court approves the force policies, as to whether the policies continue to provide effective direction to CPD personnel and remain consistent with the purpose and requirements of the Consent Decree and current law. If adjustments appear necessary based on the review of officer performance data and in-depth assessments of force incidents, the Monitoring Team and Parties will work to revise the policies as appropriate at that time.

## VI.    CONCLUSION

The task of the Monitor was to duly consider whether the updated CPD Use of Force policies sufficiently reflect, embody, and adhere to the requirements of the Consent Decree. The Monitor and the Monitoring Team have determined that the policies attached here adequately do

so.  Accordingly, the Monitor approves the CPD's new Use of Force policies subject to the conditions outlined in Section V and requests that this Court order them effective upon CPD's successful completion of upcoming Use of Force training.

Respectfully submitted,

/s/  Matthew Barge

MATTHEW BARGE
Monitor
234 5th Avenue, Suite 314
New York, New York 10001
Tel: (202) 257-5111
Email:  matthewbarge@parc.info

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 15, 2016, I served the foregoing document entitled Motion Recommending Approval of Revised Use of Force Policies of the Cleveland Division of Police via the court's ECF system to all counsel of record.


/s/  Matthew Barge
MATTHEW BARGE