# EXHIBIT D




# GENERAL POLICE ORDER
# CLEVELAND DIVISION OF POLICE

| ORIGINAL EFFECTIVE DATE : | REVISED DATE: 2016-11-08 | NO. PAGES: 1 of 8 | NUMBER: |
|---|---|---|---|
| SUBJECT: USE OF FORCE: INTERMEDIATE WEAPONS ||||
| ASSOCIATED MANUAL: | RELATED ORDERS: |||
| CHIEF OF POLICE: ||||

**PURPOSE:** To establish guidelines for officers of the Cleveland Division of Police relative to the use of force when deploying intermediate weapons, while providing direction and clarity, in those instances when a subject's actions require a use of force response.

**POLICY:** Intermediate weapons are used to interrupt a subject's threatening behavior so that officers may take control of the subject with less risk of injury to the subject or officer than posed by greater force applications. Intermediate weapons may be used when objectively reasonable, necessary, proportional, and permitted under this policy.

**PROCEDURES:**

**I.  General**

    A.    Intermediate Weapons: Requirements to Carry and Qualify
        1.    Officers shall carry only weapons that are issued by the Division.
        2.    Officers are required to successfully complete annual mandatory training which includes scenario based training, meet the Division's proficiency standards, and requalify, as set forth by the Training Section, in order to be issued and carry intermediate weapons on duty and while engaged in secondary employment.  (See Training GPO TBD)
        3.    Uniformed officers shall carry the Conducted Electrical Weapon (CEW), if qualified, and a second intermediate weapon: ASP baton or Oleoresin Capsicum (OC) Spray.  If not CEW qualified, officers shall carry both approved intermediate weapons: ASP baton and OC Spray. Officers may elect to carry all three intermediate weapons.
        4.    All intermediate weapons shall be worn only on the officer's duty belt.
        5.    Officers and supervisors assigned to specialized units may carry intermediate weapons as dictated by their responsibilities. The Officer-in Charge of each Unit will provide guidance and direction in this area to Unit members according to the Unit's manual.

    B.    Intermediate Weapons: When Authorized
        1.    Intermediate weapons shall be used in accordance with the Division's policies including those related to the Use of Force: General (GPO TBD), De-escalation (GPO TBD) and training.

    2. Prior to the use of any approved intermediate weapon, when feasible and appropriate, the officer shall communicate to the subject, other officers, and bystanders that the use of the weapon is imminent and allow the subject an opportunity to comply. An opportunity to comply typically means a reasonable amount of time to comply.

    3. Officers shall be mindful that in some instances a subject's disability or condition may limit or restrict their ability to comply with an officer's direction. See General Use of Force Policy (GPO TBD)

    4. Before using intermediate weapons on children and juveniles, officers must consider the following factors: body mass, physical build, perceived age, and emotional condition. Officers shall use appropriate responses for children and juveniles at all times.

C. Intermediate Weapons: When Prohibited
1. Officers shall not use intermediate weapons on subjects who are passively resisting.
2. Officers shall not use intermediate weapons to prevent the destruction of evidence.
3. Officers shall not use intermediate weapons against small children, the elderly, individuals who are visibly frail, or women visibly or known to be pregnant, except where deadly force is authorized.
4. Officers shall not use intermediate weapons on subjects who are handcuffed or otherwise restrained, unless the subject is displaying aggressive physical resistance AND lesser means would be ineffective or have been tried and failed.
5. Officers shall not use less-lethal tools to prod individuals.
6. Officers shall not use intermediate weapons on subjects who are under control or complying with police direction.

D. Intermediate Weapons: Reporting
1. Officers shall report the use of intermediate weapons in accordance with the Use of Force-Reporting (GPO TBD)

## II. ASP Baton/Riot Baton/Impact Weapons

A. ASP Baton/Riot Baton/Impact Weapons: Guidelines
1. Officers are authorized to deploy the ASP baton when such force is objectively reasonable, necessary, and proportional to protect the officer or another party from physical harm and lesser means would be ineffective.
2. Officers shall consider each separate ASP baton strike as a separate use of force that officers must individually justify and report as objectively reasonable, necessary, and proportional.
3. The use of riot batons is authorized only during field force deployments.

B. ASP Baton/Riot Baton/Impact Weapons: When Prohibited
1. Officers shall not intentionally target ASP baton strikes to sensitive tissue areas, such as the head, neck, spine or genitalia. Baton strikes to the head and neck constitute deadly force. Preferred target areas are the arms, legs and torso.
2. Impact weapons other than the ASP Baton, or in field force deployments the riot baton, are prohibited by the Division unless extreme circumstances require their use to gain compliance from aggressively resistant subjects.

      3. Officers shall not use head strikes with hard objects, except where deadly force is justified. Officers shall be trained that a strike to the head with any hard object could result in death.

      4. Officers shall not use their firearm as an impact weapon, due to the possibility of unintentional discharge and/or the possibility that it could result in the death of the officer, the subject, or others.

  C. Medical Attention After the Use of the ASP Baton/Riot Baton/Impact Weapons

      1. Officers shall request Emergency Medical Services (EMS) after striking a subject to the head, neck, spine or genitalia with an ASP baton or any other impact weapon for an examination. See also GPO TBD General Use of Force Section: V. C (Duty to provide Medical Attention) for additional requirements to provide medical attention.

## III. Oleoresin Capsicum (OC) Spray

  A. OC Spray: Guidelines

      1. Officers are authorized to deploy OC Spray only:
          a. When such force is reasonable to protect the officer, the subject, or another party from physical harm and lesser means would be ineffective; or
          b. For crowd dispersal or protection and other means would be more intrusive or less effective.

      2. Officers shall be aware of the risks of positional asphyxia and shall use restraint techniques that do not impair the subject's respiration following an OC Spray application.

      3. Officers shall be aware of the risks of using OC spray in confined or enclosed environments.

      4. Officers shall direct OC Spray at the specific subject(s) who are posing a threat, attempting to minimize exposure to non-targeted subjects or parties.

      5. Officers shall consider each one-second application as a separate use of force that the officer shall individually justify and report as objectively reasonable, necessary, and proportional.

      6. Officers shall discontinue use if a subject does not comply after two one-second bursts of OC Spray that successfully contact the target.

      7. The use of OC Spray on a dangerous animal is permissible to deter an attack or to prevent injury to persons present. Documentation shall be provided in the related incident report.

  B. OC Spray: When Prohibited

      1. Officers shall not use OC Spray on subjects with a known respiratory condition unless it is an extreme and articulable situation.

  C. Medical Attention After the Use of OC Spray

      1. As soon as practicable, but no later than 20 minutes after establishing control of the scene, the officer shall make a reasonable effort to relieve the subject's OC Spray discomfort by washing OC Spray from the subject's eyes with cool water. If the subject was exposed in a confined space, officers will remove the subject as soon as possible from the contaminated area and expose the individual to fresh air.

  2. Officers shall monitor exposed subjects for changes in their condition while in police custody and request medical attention as needed.
  3. Officers shall immediately request that EMS respond for any of the following circumstances:
    a. Symptoms other than mild, last beyond 45 minutes.
    b. The subject has or indicates that they have difficulty breathing or loses consciousness.
    c. The subject indicates they have a pre-existing condition (such as asthma, emphysema, bronchitis, or heart ailment) that may be aggravated by chemical spray.
    d. The officer believes that the subject needs medical attention regardless if the subject requests it or not.
    e. The officer is made aware that the OC Spray was used on a child, or elderly, pregnant, physically disabled or mentally ill subject.

## IV. Conducted Electrical Weapon (CEW)

  A. CEW Guidelines
    1. The CEW **shall** only be used in either of the following situations:
     a. Where grounds for arrest or detention are present and the subject is actively or aggressively resisting and lesser means would be ineffective.
     b. Where such force is necessary to protect the officer, the subject, or another party from immediate physical harm and lesser means would be ineffective or have been tried and failed.
    2. Officers **shall**:
     a. Carry the CEW in a Division issued holster, on the opposite side of the firearm, to reduce the chances of accidentally drawing and/or firing a firearm.
     b. Deploy the CEW at the preferred target zones which include the lower center mass of the body on the front of the body and below the neck line of the back upper body. When encountering subjects wearing heavy or loose clothing on the upper body, officers may consider the legs as targets.
     c. Determine the reasonableness of the CEW use and probe placement based on all the relevant circumstances, including the subject's apparent age, size, physical, and mental condition and the feasibility of lesser force options.
     d. Limit each CEW cycle to 5 seconds.
     e. Use the minimum number of 5-second CEW cycles necessary to gain control of the subject.
     f. Consider each CEW application (i.e., 5 second cycle) as a separate use of force that officers shall individually justify and report as objectively reasonable*,* necessary, and proportional.
     g. Consider that exposure to the CEW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury.
     h. Immediately after a CEW application, attempt to handcuff or restrain the subject if compliance has been gained and it is tactically safe to do so.
     i. Reevaluate the situation after each CEW application to determine if subsequent cycles are reasonable, considering a subject may not be able to

        respond to commands during or immediately following a CEW application. Alternatives to a CEW include other less-lethal instruments and force techniques of the same or lesser Level and are not, therefore, limited to the application of higher-Level force.

    j.    If after three CEW applications the subject has not become compliant, even temporarily, the officer shall assume that the CEW is ineffective and shall reassess and seek to transition to alternative control measures.

    k.    Use caution when dealing with exhausted subjects exhibiting symptoms of physical or mental distress and be aware that certain subjects may be at a heightened risk for serious physical injury or death when subjected to CEW applications.

    l.    Avoid using restraint techniques that impair a subject's respiration following a CEW application.

    m.    Consider a CEW in the hands of a subject a deadly weapon when no other officer is present to provide deadly force cover. If multiple officers are present, the CEW in the hands of a subject is not a deadly weapon unless it can be clearly articulated that an officer or innocent party was in imminent danger of serious physical injury or death due to the subject's possession of a CEW.

3.    If an initial CEW shot does not make contact or is ineffective, the same or another officer may attempt additional shots as needed or practical in order to make successful contact on a subject.

4.    The use of the CEW on a dangerous animal is permissible to deter an attack or to prevent injury to persons present. Documentation shall be provided in the related incident report.

B.    CEW: When Prohibited
1.    Officers **shall not** use the CEW:
    a.    In drive stun mode solely for pain compliance. The CEW is only to be used in drive stun mode to supplement the probe mode in order to complete the incapacitation circuit or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option.
    b.    On fleeing subjects who do not pose a threat of physical harm to the officer, bystanders, or themselves.
    c.    If the subject represents a lethal threat unless a second officer is present and prepared to deploy deadly force.

2.    Officers shall not intentionally target the CEW at a subject in sensitive tissue areas, such as the head, neck, or genitalia.

3.    Except where deadly force is authorized, officers shall not use the CEW in situations where:
    a.    A deployment may cause serious physical injury or death from situational hazards, including but not limited to: falling, losing control of a moving vehicle, or becoming ignited from the presence of potentially explosive or flammable materials or substances, including OC Spray.
    b.    The subject has obviously low body mass or is in apparent medical crisis.

4.    Officers shall not intentionally activate more than one CEW at a time against a subject.

5.    An officer shall not hold both a CEW and a firearm at the same time.

C. CEW Exceptional Circumstances
1. Absent rare and exceptional circumstances, officers shall not exceed three 5-second CEW cycles in total on any one subject during a single incident unless the following apply:
    a. the officer reasonably believes that the initial CEW applications have been effective in gaining the subject's temporary compliance, but the subject continues to actively or aggressively resist;
    b. the subject's continuing non-compliance presents a threat of imminent physical harm to the officer or others;
    c. no other less lethal technique, tactic or choice consistent with Division policy would be effective; and
    d. the use of the CEW beyond a third cycle will prevent resorting to deadly force options.
2. Each CEW application shall be independently justifiable and shall be weighed against other force options.
3. More than three applications of a CEW on an individual during a single interaction, regardless of the mode or duration of the application, and regardless of whether the applications are by the same or different officers, or a CEW application for longer than 15 seconds, whether continuous or consecutive, shall be reported and investigated as a Level 3 use of force.

D. Medical Attention After the Use of the CEW
1. After deployment of the CEW, officers **shall**:
    a. Call EMS to the scene without unnecessary delay to evaluate a subject who has been exposed to a CEW shock. EMS personnel or medical personnel at a medical facility shall remove probes penetrating sensitive areas (e.g. head, face, neck, groin, or breast areas). While it is preferred that medical personnel remove penetrating probes, a CEW-qualified officer may remove probes penetrating non-sensitive areas (e.g. buttocks, thighs) if it is reasonable to do so.
    b. Inform medical personnel of all subjects who have been subjected to multiple CEW applications, including prolonged applications (more than 15 seconds); or who appear to be under the influence of drugs or exhibiting symptoms associated with physical or mental distress; or who were kept in prone restraints after CEW use.
    c. Request that EMS transport the subjects to the hospital in any of the following circumstances:
        1. The officer is made aware that the CEW was deployed on a child or elderly, pregnant, physically disabled or mentally ill subject.
        2. The subject experiences or complains of difficulty breathing, chest pains, or loss of consciousness.
        3. The officer believes the subject requires medical attention (whether or not the subject requests attention).
        4. The officer becomes aware afterward of a medical condition (e.g., epilepsy or heart ailment) that a CEW may aggravate.

      d.    Monitor the subject for signs of medical distress for as long as the subject is in Division custody, paying particular attention to indicators of positional asphyxia.

      e.    Notify the Corrections Officer when booking a prisoner *who* was exposed to a CEW shock. The same notification shall be made when transporting or transferring the prisoner to any entity outside of the Division.

   2.    In extreme circumstances when EMS is unable to transport or is delayed and if the officer reasonably believes medical attention is necessary without delay, the officer may transport the subject to the hospital using the zone car.

## V. Beanbag Shotgun

   A.    Beanbag Shotgun: Guidelines

      1.    The beanbag shotgun shall only be deployed by qualified officers (Supervisors/SWAT officers). Beanbag shotguns inspections will be conducted on an annual basis to ensure that all are operable and perform any necessary maintenance or repairs.

      2.    The beanbag shotgun may be deployed when a subject presents an imminent risk of serious physical harm to an officer or others, de-escalation and other force options have proven ineffective and the subject is within safe range of the beanbag shotgun.

      3.    The optimal range for effective deployment while minimizing risk is 21 to 50 feet.

          a.    Deployment at less than 21 feet increases the risk of serious injury or death.

          b.    At over 50 feet, the effect and accuracy of the beanbag shotgun are diminished to the point that this option will not achieve its purpose.

      4.    If the subject represents a lethal threat, a second officer prepared to deploy deadly force shall be present when deploying a beanbag shotgun.

      5.    All beanbag shotguns must be clearly marked so as to make them instantly distinguishable from a weapon firing live rounds.

      6.    Officers **shall** request via Communication Control Section (CCS) a beanbag shotgun equipped supervisor respond to the scene, when circumstances exist that meet the guidelines for deployment.

      7.    Supervisors **shall**:

          a.    Use equivalent standard precautions as used with all firearms per GPO TBD in order to protect others from the harm of a misdirected beanbag round.

          b.    Avoid the body's center mass, head, neck, and groin.

          c.    Consider each discharged beanbag round as a separate use of force that officers shall individually justify and report as objectively reasonable, necessary, and proportional.

   B.    Beanbag Shotgun: When Prohibited

      1.    Officers **shall not**:

          a.    Subject themselves or others to undue risk while waiting for the arrival of a supervisor with a beanbag shotgun. The situation must be continually assessed and other appropriate action must be taken if the risk to self or others demands immediate attention.

      2.    Supervisors **shall not**:

      a.    Use the beanbag shotgun as a substitute for notifying the SWAT Unit when circumstances warrant that unit's deployment.

      b.    Fire more than two beanbag shotguns simultaneously. In the event that four rounds have proven to be ineffective, officers shall consider the beanbag shotgun ineffective and exercise other options.

C. Medical Attention After the Use of a Beanbag Shotgun
1. Officers **shall**:
   a. Notify EMS via CCS to respond and convey subject(s) struck by a beanbag round, to the hospital for medical treatment/evaluation.
   b. When booking a prisoner who was struck by a beanbag round notify the Corrections Officer that the prisoner was struck with a beanbag round. The same notification shall be made when transporting or transferring the prisoner to any entity outside of the Division.

## VI. Intermediate Weapons Approved For Use By The SWAT Unit

A. Intermediate weapons approved for usage by the SWAT Unit shall be used in accordance with the Division Use of Force policies and the SWAT Unit manual.