IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | |
| CITY OF CLEVELAND, | ) | |
| | ) | **MOTION REGARDING CLEVELAND** |
| Defendant. | ) | **DIVISON OF POLICE PROPOSED** |
| | ) | **WEARABLE CAMERA SYSTEM** |
| | ) | **POLICY** |

Pursuant to Paragraphs 337 to 340 of the Consent Decree, a number of the Decree's other substantive requirements, and the Updated First-Year Monitoring Plan in the above-captioned matter, the Monitor has reviewed a proposed revised policy submitted by the City of Cleveland (the "City") for the Cleveland Police Department ("CPD" or "CDP") on "wearable camera systems" ("WCS"), also referred to herein as "body cameras" or "body-worn cameras," attached hereto as Exhibit A (the "Proposed Policy"). Pursuant to the Consent Decree, "[i]f CDP chooses to use body worn cameras, CDP will provide clear guidance and training on

their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals." Dkt. 7-1 ¶ 337.

As the Monitor has previously indicated, the CPD has recently joined numerous other police departments in using body cameras in some capacity. Dkt. 65 at 64 ("All CPD patrol officers are equipped with body cameras, with specialty units (such as personnel working at the Cleveland Hopkins International Airport) slated to be equipped with units in the near future.") Accordingly, because the CPD has undertaken this commendable effort, the Consent Decree requires that the Monitoring Team review the policy in order "to confirm that the body-worn camera policy appropriately incorporates community comment, conforms to the Decree's specific requirements, and sufficiently promotes the Decree's other objectives." *Id.* at 65.

As described in greater detail below, the CPD crafted their body-worn camera policy in mid-2015, resulting in General Police Order 3.2.20. The Department of Justice and Monitoring Team have reviewed that policy and provided multiple rounds of feedback, and the Division has subsequently provided revisions of the policy, responding to the concerns, to the Department of Justice. Substantial progress has been made in many areas in the revisions to the Proposed Policy, and there are a number of components that are consistent with the Consent Decree and the policies of forward-looking police organizations.

There are, however, three provisions of the policy that, for the reasons summarized below, cannot receive the Monitor's approval at this time. First, the Monitor cannot endorse the Division's refusal to mandate that officers be required to use body-worn cameras and be subject to the Proposed Policy when they are engaging in secondary employment. Second, with respect

to provisions relating to officers viewing body-worn camera footage, the Monitor defers approval or disapproval pending the City's subsequent work on policies and manuals relating to use of force investigations. Third, with respect to provisions relating to camera footage being provided to the public, the Monitoring Team finds that the provisions are better suited for a more comprehensive policy relating to the transparency of CPD information and data.

The Monitor recommends that the Court approve the Proposed Policy with the exceptions of Section V in its entirety, Section I-G, and Section VII-G. The Monitor requests that the Court convene a status conference to address the issue of officers wearing and using cameras while employed in law-enforcement-related secondary employment positions. The Monitor suggests that the Court direct that those at the CPD with expertise in the technology of the WCS, as well as in related storage and cost issues, be required to attend the conference. The Monitor requests that the Court defer approval or disapproval of Section I-G until policies and manuals relating to force and internal investigations are completed. Finally, the Monitor requests that the Court direct CPD and the City to draft a separate, standalone policy relating to public access to and disclosure of CPD data and information – encompassing but not limited to captured body camera footage – for its review and approval.

I.  **SUMMARY OF CONSENT DECREE REQUIREMENTS REGARDING BODY-WORN CAMERAS**

CPD has elected to join the more than 6,000 estimated police departments across the United States that are using body cameras.[1]  Agencies are continuing to adopt the technology

---

[1] Katie Delong, *One-third of United States police departments using body cameras: They're expensive, so are they worth it?*, FOX6NOW.COM (Mar. 2, 2015), http://fox6now.com/2015/03/02/one-third-of-united-states-police-departments-using-body-cameras-theyre-expensive-so-are-they-worth-it/ (last visited Dec.19. 2016).

because it promotes officer safety, public safety, and police accountability. In San Diego, for instance, the use of body cameras led complaints to fall by 40.5 percent and officer use of "personal body" force – or officers going "hands-on" with subjects, which are circumstances that typically lead to a higher rate of injuries to officers – to fall by some 46.5 percent.[2] Similarly, in Mesa, Arizona, officers using body cameras had 65 percent fewer complaints than non-users – and saw a 60 percent decline in their own number of complaints as compared to the year before beginning to use the cameras.[3] Many other jurisdictions report similar benefits.

The "use of body worn cameras is not required" by the Consent Decree. Dkt 7-1 ¶ 337. However, "[i]f CPD chooses to use body worn cameras," a number of requirements are activated. First, the Decree requires that the Division "provide clear guidance and training on their use . . . to foster transparency, increase accountability, and build trust . . . . " *Id.* The Division must likewise implement protocols for "testing equipment," *id.* ¶¶ 337, 339 and preserving recordings, ¶ 337. The Decree outlines CPD supervisor responsibilities for viewing recorded incidents and "conduct[ing] adequate random and directed audits of body-worn camera recordings. . . to confirm compliance with C[PD] policy." *Id.* ¶¶ 338-39. The CPD must also ensure that officers are "subject to the disciplinary process for intentional or otherwise unjustified failure to activate" cameras in accordance with CPD policy. *Id.* ¶ 340.

---

[2] Tony Perry, *San Diego police body camera report: Fewer complaints, less use of force*, L.A. TIMES Mar. 18, 2015, http://www.latimes.com/local/lanow/la-me-ln-body-cameras-20150318-story.html.
[3] Michael D. White, *Police Officer Body-Worn Cameras: Assessing the Evidence,* OFFICE OF JUSTICE PROGRAMS DIAGNOSTIC CENTER, U.S. DEP'T. OF JUSTICE, 21 (2014) https://ojpdiagnosticcenter.org/sites/default/files/spotlight/download/Police%20Officer%20Body-Worn%20Cameras.pdf (summarizing Mesa Police Department's 2013 On-Officer Body Camera System: Program Evaluation and Recommendations).

## II. PROCEDURAL HISTORY

The Court-approved First-Year Monitoring Plan provided that the Monitor would "review and assess CPD's current body-worn camera policies and practices," which would "include the collection of input from" a host of community stakeholders "about CPD's current body-worn camera policies and practices." Dkt. 44-1 at 53. In March and April 2016, the Monitoring Team met with police officers, received input from community organizations such as the American Civil Liberties Union (ACLU), and talked with residents who were knowledgeable about the Division's prior process for developing the body-worn camera policy. On April 11, 2016, the Monitoring Team circulated a memorandum to CPD and the City regarding the Division's Body-Worn Camera (Wearable Camera System) Policy, General Police Order Number 3.2.20. Stakeholder focus subsequently shifted to work on new policies related to force, new policies and protocols for crisis intervention, operational manuals for the Office of Professional Standards and Police Review Board, and on the City's preparation for the Republican National Convention in July 2016.

Pursuant to revised deadlines in the Updated First-Year Monitoring Plan, Dkt. 80-1 at 19, CPD and the Parties continued work on revising the body-worn camera policy in October 2016. The Monitoring Team affirmed its original comments and recommendations, from its April 11 memorandum, on October 18, 2016. The Department of Justice provided detailed comments on October 19, 2016. CPD provided a revised version of the policy on November 1, 2016. The Monitoring Team circulated specific edits and comments, along with the Team's prior memorandum of recommendations, to CPD on November 2, 2016. The Division circulated another draft on November 23, 2016. Between November 23, 2016 and December 16, 2016, the

Parties, CPD, and Monitoring Team discussed potential further refinements of the policy. The deadline for the Monitor to "recommend[] approval or disapproval of the Final Draft Body Worn Cameras Policy to the Court, either in whole or in part" is, with the Parties and Monitor agreeing that a seven-day extension of the deadline was "warranted and acceptable," December 19, 2016. Dkt. 80-1 at 3, 19.

## III. STANDARD OF REVIEW

"As an agent of the Court," the Monitoring Team must "assess and report whether the requirements" of the Consent Decree "have been implemented." Dkt. 7-1 ¶ 351; *accord id.* ¶ 352 (requiring the Monitor to "review . . . policies, procedures, practices, training curricula, and programs developed and implemented under" the Decree). The task of the Monitor here is to determine whether the most recent revised proposed policy on body-worn cameras dated December 16, 2016 complies with the Consent Decree's requirements. *Id.* ¶¶ 337-340. "[I]n some instances, the evaluation of whether the policies include what the Decree requires is relatively mechanical." Dkt. 83 at 14. The Monitor needs to determine, for example, whether the policy complies with the fairly specific requirements laid out in the Decree for supervisor review of recordings and random audits, *id.* ¶ 339, and whether the policy provides for adequate discipline for failure to activate a camera consistent with the policy, *id.* ¶ 340.

"However, in other instances, the [policies] must comply with more general provisions or provide more significant detail than the Consent Decree provides." Dkt. 83 at 14. Because the provisions of the Consent Decree regarding the body-worn camera are not necessarily as comprehensive or detailed as other provisions in the Decree, the review of the body-worn camera policy falls broadly within this type of analysis. Accordingly, "the task of the Monitor is to

6

determine whether this additional material is consistent with the Consent Decree's overriding guidelines, requirements, and principles." *Id.* at 14. As always, the Monitoring Team's assessment of these elements is informed substantially by the policies of other police departments across the country that have implemented body-worn camera technology; the resources and work of national organizations including the Department of Justice's Community Oriented Policing Services (COPS) Office and the Police Executive Research Forum (PERF); and the experience and technical backgrounds of Monitoring Team experts.

As the Monitor has noted previously, the Decree requires that all policies are not only developed but also are effectively implemented. Dkt. 83 at 13; Dkt 7-1 ¶ 351. Policies "must exist not simply on paper but in practice such that" officers are "affirmatively comply[ing] with them, day in and day out." Dkt. 83 at 13. Here, the Monitoring Team observes that CPD's prior Wearable Camera System policy, General Police Order 3.2.20, "has been in effect since February 2, 2015." Cleveland Division of Police Divisional Notice Number 16-372 (Dec. 1, 2016). However, it has only been since December 1, 2016 – 22 months after being initially published – that "members found to be in violation" of the camera policy "shall be subject to disciplinary action." *Id*. Thus, it is not clear whether any policy related to body cameras could fairly be considered effective in practice within CPD at this time.

## III. ANALYSIS OF THE POLICY ON WEARABLE CAMERA SYSTEMS

This section summarizes the main provisions of the proposed policy on wearable camera systems, including describing various provisions which have been revised to comply with the Monitor's recommendations and which the Monitor now deems sufficient. It then addresses the

specific problems with regard to the Policy's continued failure to require that officers use body-worn cameras while engaging in secondary employment.

  A. **<u>Summary of Proposed Body-Worn Camera Policy</u>**

The Proposed Policy "establish[es] guidelines for the use, management, storage, retrieval, and supervision regarding the [WCS]." Ex. A at 1. It sets forth that the policy of the Department is that "WCS shall be deployed to ensure transparency and foster trust in our community." *Id.* at 1. It then sets forth clear and straightforward guidance regarding when the WCS must be activated, *id.* ¶ I-A – that is, placed into "event mode" from "buffering mode," in which ongoing footage is captured but "recorded over" in a security-camera-style recording loop of approximately thirty seconds or so. The Proposed Policy provides that, if placing the camera in "event mode" is "not feasible due to an immediate risk to the safety" to the officer or others, the officer shall activate it "as soon as the immediate threat has been addressed." *Id*. ¶ I-B. The Proposed Policy then gives a non-exhaustive list of examples for when the camera must be deployed, *id*. ¶ II-B-1-a, and sets forth those circumstances in which the camera can be returned to buffering mode, primarily to protect citizens' privacy or in situations where consent is needed to record and is not given. *Id*. ¶ II-C. This is a substantial improvement on earlier versions of the Proposed Policy which contained convoluted and unnecessarily confusing language governing when to place the BWC unit into event mode. The Proposed Policy prohibits officers from editing, deleting, or altering the recordings, *id.* ¶ I-C, has a number of other provisions regarding officers' responsibilities for handling their cameras, *id.* ¶¶ I-C, I-E, I-F, and also requires comprehensive and continuous training, *id.* ¶ IX. Although the Monitoring Team still believes that the exceptions to the "default rule" regarding when cameras must be activated could

8

be further streamlined and structured, it finds that, overall, the Proposed Policy succeeds in "provid[ing] clear guidance and training on their use," as required by the Consent Decree. Dkt. 7-1 ¶ 337.

The Proposed Policy further sets forth that officers "shall be subject to the disciplinary process for intentional, repeated or otherwise unjustified failure to activate their WCS in violation" of the policy, ¶ I.I, consistent with the Consent Decree's requirement that "[o]fficers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy." Dkt. 7-1 ¶ 340. It properly requires documentation of the reason that the camera "has been returned to buffering mode" from event mode. Ex. A, ¶ II-B-h. It also delineates the responsibilities of supervisors, satisfying the Consent Decree's requirements that supervisors "review recordings" in various situations, Dkt. 7-1 ¶ 338, Ex. A ¶ III-A-5, and "conduct adequate random and directed audits" of recordings. Dkt 7-1 ¶ 339; Ex. A ¶ IV. Finally, the Proposed Policy sets forth various rules regarding the retention and storage of the recordings. Ex. A ¶ VIII.

Collectively, the Monitoring Team concludes that, with the exceptions of Sections I-G, V, and VII-G, the provisions and requirements of the Proposed Policy represent substantial progress toward meeting the Consent Decree's requirement that, having chosen to use body-worn cameras, CPD "will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals." Dkt. 7-1, ¶ 337.

B.  **The Proposed Secondary Employment Provision Does Not Satisfy the Consent Decree.**

Section V of the Proposed Policy fails to satisfy the Consent Decree because it does not require that officers engaged in secondary employment use WCS consistent with the Proposed Policy. Under the Proposed Policy, the "[u]se of WCS while working authorized secondary employment is recommended but not required." Ex. A ¶ V. "Secondary employment" means "any occupation, vocation, profession, trade or business (other than Division employment) for which wages or anything of value is received." *Id.* at 2. Thus, the Proposed Policy sets up two different sets of rules: one for officers wearing the uniform and carrying City-issued equipment when they are working a City shift and another for officers wearing the uniform and carrying City-issued equipment when they are working for private employers.

There are a number of reasons that it is necessary – and indeed essential – that officers engaged in law-enforcement-related secondary employment be required to wear body-worn cameras consistent with the requirements of any consistent and transparent body-worn camera policy. First of all, the Department mandates that "[t]he rules and regulations of the Division govern its members when engaged in secondary employment," and Division personnel are required to "carry their Division issued" equipment when working secondary employment. *See* GPO 1.1.25 at 1. Even though they are not directly working for the CPD, officers engaged in secondary employment – for example, serving as security at sporting events or in other public venues – are subject to the same rules regarding carrying firearms and wearing their uniforms as they would be when serving as officers. There is no logical reason to carve out the use of something as important as WCS from these requirements.

Second, a system where one set of rules applies to officers working a City shift while another set of rules applies to officers working for a private employer fosters confusion, not confidence, among the Cleveland community. To members of the public, it is not apparent whether the officer is serving in his or her capacity as an officer employed by the CPD, or is an officer of the CPD engaged in secondary employment. Indeed, the Monitoring Team suspects that relatively few Cleveland residents know that the officers wearing their CPD uniforms and carrying their CPD-issued equipment at Cavaliers and Browns games are typically being paid by those organizations – not the City.

Moreover, when engaged in secondary employment, officers are often called upon to exercise their law enforcement responsibilities – including exercising the use of force as appropriate. Indeed, that ability to demonstrate, and if necessary exercise, the authority of law enforcement is a significant reason that private employers want to hire officers. Under the Division's Proposed Policy, uses of force, "investigative or enforcement contacts with the public," or "other contact[s] . . . that may or do[] become adversarial" are required to be filmed by body cameras. *Id.* ¶ I-A. The public is not able to differentiate between an officer serving as an officer and an officer engaged in secondary employment. If an officer engaged in secondary employment were to, for example, use force (as has happened on occasion), the public would not be aware that that officer – in uniform, carrying a Department-issued firearm – was actually not serving as an officer but was in fact off the job and engaged in secondary employment. The failure of that officer to be using a body-worn camera in such circumstances and the absence of such footage would foster confusion and ultimately detract from the goals of transparency, accountability and trust that are at the heart of the Proposed Policy and the Consent Decree. Ex.

11

A at 1; Dkt. 7-1 ¶ 337. Given that the line between an officer acting as an officer or acting in secondary employment is blurry at best to the public, it is simply not possible to draw a line between the two with regard to policies regarding the use of body-worn cameras, at least not if the purpose of the body-worn cameras is to "foster transparency, increase accountability, and build trust while protecting the privacy rights of individuals." Dkt 7-1, ¶ 337.

There are also no legitimate policy reasons *not* to include secondary employment in the Proposed Policy. As noted above, most of the Division's other rules and regulations typically apply to officers engaged in secondary employment, for good reason – since they are offered such employment precisely because they are law enforcement. Numerous other departments require their officers to comply with their body-worn camera policies while engaged in secondary employment.[4] The City argues that, in at least some of the jurisdictions where officers must wear and use body cameras when engaged in law-enforcement-related secondary employment, the secondary employment programs are centralized, administered, and overseen by the department or city itself. Accordingly, the City says that a requirement to wear and use cameras during secondary employment is not feasible because the City has no relationship with the secondary employer. However, the Monitoring Team understands that the Cleveland Police Patrolmen's Association has been supportive of a system of administering secondary employment more centrally, along the lines of how secondary employment works within the

---

[4] These departments include, but are not limited to: Louisville, Kentucky; Mount Rainier, Marlyand; Prince George's County, Maryland; Queen Anne County, Maryland; Minneapolis, Minnesota; Asheville, North Carolina; Concord, North Carolina; Durham, North Carolina; Greensboro, North Carolina; Oklahoma, City, Oklahoma; Pittsburgh, Pennsylvania; Murphy, Texas; and Suffolk, Virginia.

Columbus Division of Police.[5] Thus, if the centralization or lack of centralization of secondary employment is a significant enough issue to impose a barrier on implementing a body camera requirement – which the Monitoring Team does not believe – the City, CPD, its officers, and secondary employers desiring the skills of CPD personnel might make changes in the way that secondary employment works within the Division. Further, although the Division's secondary employment is not centrally administered or overseen, the Chief of Police and Director of Public Safety have ultimate oversight, as they are able both to authorize original secondary employment requests and "revoke authorization to work secondary employment based upon the operational needs of the Division." GPO 1.1.25 at 1. Thus, the Chief and Public Safety Director can put secondary employers, and CPD officers, on notice that body camera use while working such jobs is now a practical, community, and operational need of CPD.

Importantly, the use of body-worn cameras in secondary employment does not present any serious logistical complications. The main concerns with regard to mandating the use of cameras on secondary employment that the City and CPD have identified are: (1) the possibility that the officer may have to spend time categorizing, tagging, and uploading the video from the secondary employment shift and ensuring that the camera is sufficiently charged and powered up before the officer is required to use the camera on a shift with the Department, and (2) the need to provide storage space for that video. The City and the CPD do not want to be responsible for compensating the officer for time taken to do these activities in connection with the video from the secondary employment or for absorbing the costs of storage.

---

[5] *See* COLUMBUS POLICE DIVISION DIRECTIVE 9.15, (2015), http://www.columbuspolice.org/ FormsPublications/Directives/Directives/DirectivesNew2015/9.15.pdf.

These granular logistical and extremely limited budgetary implications, while important, are not so critical as to justify creating a gap in the use of body-worn cameras that will impede the transparency, accountability and trust that the Proposed Policy, and the Consent Decree, are designed to foster. First, there is no indication that time and costs will be prohibitive. The filming, tagging, and uploading of video will not be required after every secondary employment stint but, instead, only when the camera had to be activated pursuant to the Proposed Policy – or, in other words, in connection with "investigative or enforcement contacts with the public, or other contact with the public that may or does become adversarial after the initial contact." Ex. A ¶ I-A. It is not clear how often such circumstances occur, but none of the CPD, City, Department of Justice, or Monitoring Team have reason to think that they happen on every or even on most secondary employment jobs. More importantly, and regardless of how often they happen, these are circumstances in which the officer is expressly pivoting to law enforcement activity – and which could result in potential use of force, which is unambiguously the subject of the Consent Decree. These are, as well, the exact situations in which the public will view the officer, though engaged in secondary employment, as in fact a law enforcement officer. In turn, these are the exact circumstances in which body-worn cameras are essential to ensuring public trust and accountability in the CPD. The Monitoring Team believes that, although the uniform use of cameras during secondary employment shifts would be a change from past practice within CPD, the City of Cleveland and the Division should explore proactive and creative ways to address the logistical issues that they say make a secondary employment BWC requirement impossible. The Monitor suspects that it may be possible, for instance, for the City and CPD to assist its members in ensuring that secondary employers get the skills and experience of CPD

14

officers while minimizing any potential costs to the City. Because private employers derive tremendous benefits from hiring CPD officers, hire them precisely because they are CPD officers, and have to be approved by the CPD to do so, the Monitoring Team suspects that many secondary employers will believe it eminently sensible to absorb the minimal costs associated with time for officers to tag and log incidents captured during their shift.

In short, the Monitoring Team believes that the same rules must apply to officers engaged in secondary employment as on their regular shifts with the CPD with regard to using body-worn cameras. Such uniformity will minimize public confusion and mistrust when officers engaged in secondary employment exercise law enforcement authority or use force. The availability of video regardless of the nature of the officer's employment will ensure that the CPD's body-worn camera policy is employed to maximize public trust, accountability, and transparency – and that use of force and other critical incidents will be captured on video, regardless of what employer is paying a CPD officer for their services.

The Monitoring Team must emphasize here that it is expressly not attempting to make it more challenging or problematic for officers to work jobs outside of CPD. Indeed, the Team is aware that the current salaries and wages paid to CPD personnel – which is lower than the compensation of most nearby police departments and of similarly-situated urban police departments nationally – make it necessary for many officers to work second jobs to provide for themselves and families. Nothing about the opportunity for CPD personnel to work second jobs, given those opportunities are vetted and approved by the Division to ensure against conflicts of interest or job duties that would conflict with the Division's rules, is inherently problematic. G.P.O. 1.1.25 at 1 (requiring "written permission by the Chief of Police and the Director of

Public safety" to "engage in secondary employment if the work does not interfere with Division employment and there is no conflict of interest between the work and the Division"); *see* Richard B. Weinblatt, *"Managing Off-Duty Jobs: A Clear Policy Is the Key to Success,"* 47 LAW & ORDER 84 (1999) ("Given that police officers view off-duty employment as essential, particularly in locales where officer pay is low, law enforcement managers are responsible for ensuring that clear policies and guidelines for such employment are in place."). Instead, the Monitor only contends that CPD's officers should be able to benefit from the same technology, tools, and standardized understanding that the Division's rules apply to them regardless of who is paying them or under what circumstances they are wearing the uniform.

C. **The Proposed Policy's Treatment of When Officers May and May Not View Captured Video Is Premature.**

Section I-G of the Proposed Policy outlines rules and regulations relating to when officers may and may not view video. That issue is important. However, because the Consent Decree process has only just begun to focus on policies and manuals relating to use of force incidents and internal investigations, any definitive conclusions about how video and force investigations simply cannot be definitive at the current juncture. Consequently, the Monitoring Team neither approves nor disapproves of Section I-G of the Proposed Policy at this time, pending approval by this Court of policies and manuals relating to force investigations and internal investigations.

D. **The Proposed Policy's Treatment of Public Access and Disclosure Issues Is Better Suited for a More Specific and Comprehensive Policy on Public Disclosure Of, and Access To, CPD Information and Data.**

Section VII-G of the Proposed Policy addresses how the Cleveland community may be able to view incidents captured on body-worn cameras. The Monitoring Team finds the uniform

mechanism of a public disclosure request to be overly formal, time-consuming, inefficient, onerous, and insufficiently consistent with the Consent Decree's express objective of "increas[ing] transparency." Dkt. 7-1 at 1. The Monitoring Team observes that other departments and other cities have extensive, standalone policies and protocols governing the release to the media, individuals, and the general public of captured video. Although the Monitoring Team agrees that public access and disclosure issues must be addressed by CPD and City policy, the Monitoring Team concludes that the provisions are better suited for a more specific, comprehensive policy relating to the transparency of CPD information and data. Consequently, the Monitoring Team recommends approval of the Proposed Policy without the inclusion of Section VII-G.

## VII. CONCLUSION

The task of the Monitor was to duly consider whether the City's submitted proposed policy on WCS satisfies the terms of the Consent Decree. The Monitoring Team concludes that, with three exceptions, it does.

First, because it does not mandate the use of body-worn cameras pursuant to the Proposed Policy while officers are engaged in secondary employment, Section V of the Proposed Policy does not meet the Consent Decree's requirements of fostering transparency, accountability, and trust. The Monitoring Team requests that this Court convene a public

hearing to explore this deficiency and determine a specific process and timetable for the City to comply with the terms of the Decree.

Second, because work on policies and manuals relating to force and internal investigations needs to be completed before parameters as to when officers may and may not view video may be definitively determined, the Monitoring Team neither approves nor disapproves of Section I-G of the Proposed Policy at this time – but expects that the Proposed Policy will be revised in light of the proposed policies and manuals on force and internal investigations. The Monitor recommends that the Court neither approve nor disapprove of Section I-G until it can consider those policies and manuals.

Finally, because CPD and the City of Cleveland's protocols on public access and disclosure to captured video must be substantially more comprehensive, the Monitoring Team recommends approval of the Proposed Policy without the inclusion of Section VII-G and requests that the Court direct the City and CPD to develop a separate, standalone policy on public access to, and disclosure of, CPD information and data – including but not limited to body camera footage – for its approval.

Respectfully submitted,

/s/ Matthew Barge

MATTHEW BARGE
Monitor
234 5th Avenue, Suite 314
New York, New York 10001

Tel: (202) 257-5111
Email: matthewbarge@parc.info

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2016, I served the foregoing document entitled Motion Regarding Cleveland Division of Police Wearable Camera System Proposed Policy via the court's ECF system to all counsel of record.

/s/ Matthew Barge
MATTHEW BARGE