IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | |
| CITY OF CLEVELAND | ) | |
| | ) | **MOTION REGARDING CLEVELAND** |
| Defendant. | ) | **DIVISION OF POLICE EQUIPMENT &** |
| | ) | **RESOURCE PLAN** |
| | ) | |


Pursuant to Paragraphs 291 through 299 of the Consent Decree, a host of the Decree's other substantive requirements, and the Updated First-Year Monitoring Plan in the above-captioned matter, the City of Cleveland (the "City") has submitted an Equipment and Resource Plan (the "Plan") to the Monitor, attached hereto as Exhibit A. Following the completion of a study of the Cleveland Division of Police's ("CPD" or "CDP") current equipment and resources (the "Equipment and Resource Study" or "Study"), attached hereto as Exhibit B, the obligation of the City and CPD is to "develop an effective, comprehensive Equipment and Resource Plan

that is consistent with [CPD's] mission and that will allow it to satisfy the requirements of this Agreement." Dkt. 7-1 ¶ 292–93. The many interrelated requirements include specific resources or systems, including an adequate number of computers, cars, in-car computers with contemporary law enforcement tools for officer use, and first aid kits in cars. *Id.* ¶ 293(a)–(d). The Plan must allow CPD to collect a host of information and data about officer performance in an electronic database system which, before the Consent Decree, it did not. *Id.* ¶¶ 326–36; 257–68; 367. It must also "ensure that CDP" "properly maintain[] and seek to continuously improve upon existing equipment and technology" and "is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." *Id.* ¶ 293(e)–(f).

As the Monitor has previously indicated to the Court, the objective of the Monitoring Team's assessment of CPD's equipment and the City's Plan is "to ensure that CPD provides the basic tools and technology foundation for officers to be able to effectively and efficiently keep the public and themselves safe." Dkt. 65 at 56. Numerous of the technologies and resources discussed in the City's Plan address the types of fundamental deficiencies that the City of Cleveland would have needed to address whether or not the City entered into a Consent Decree.

A satisfactory Equipment and Resource Plan must, in a strategic and comprehensive manner, supply a detailed process for providing CPD's officers the tools that they need to do their jobs safely and effectively. For too long, the men and women of the Division have not received the equipment, resources, technology, and infrastructure support required to deliver the type and level of police services that the Cleveland community requires and values. In many instances, officers – lacking in-car computers or contemporary computer-aided dispatch – must log basic information about emerging incidents on a pen and paper while talking to a dispatcher over the radio rather than receiving real-time updates on locations and subjects while en route to

a call or incident.  Officers must leave the field and go back to the station to manually write

incident reports – and ride in aged, crumbling police cars when they return to patrol.  In short,

patrol officers and first-line supervisors need to benefit from the practical tools and basic

technological platforms that departments in other major urban cities have used for some time.

CPD is several decades behind where it should be, and the Equipment and Resource Plan is a

significant opportunity to permanently fix that.

It is the duty of the Monitor to report as to whether the City's most recently submitted

Equipment and Resource Plan "is appropriate, effective, and consistent with the requirements" of

the Consent Decree.  *Id.* ¶ 295; Dkt. 80-1 at 19.  Because it does not specifically, strategically,

and comprehensively provide CPD officers with the tools they need to do their jobs, the Monitor

cannot approve the current Equipment and Resource Plan.  The Monitor requests that the Court

address the Plan's deficiencies at the previously-scheduled January 6, 2017 status conference and

provide a specific process for the City, with the assistance of other Consent Decree stakeholders,

to comply with the provisions of the Consent Decree by generating a detailed, high-quality, and

comprehensive Equipment and Resource Plan.


I.   **SUMMARY OF CONSENT DECREE REQUIREMENTS REGARDING EQUIPMENT & RESOURCES**

The Department of Justice's 2014 investigation concluded that:

CDP's failure to appropriately allocate resources – including staffing and
equipment – contributes to the pattern or practice of unconstitutional force.  In
addition, Cleveland police officers are not given the basic equipment, the physical
structures, and the technology required to perform their jobs safely and
effectively.

U.S Dep't of Justice, Civil Rights Div. & U.S. Att'y Office Nor. Dist. of Ohio, Findings

Letter on Investigation of the Cleveland Division of Police (Dec. 4, 2014) [hereinafter

2014 FINDINGS LETTER] at 54. It noted that the lack of "adequate technology" and "a sufficiently professional workspace" ultimately "is dangerous to the officer, undermines public safety and is unfair." *Id.* at 54–55. "As much as any building, stadium, or other public works project, a well-run, professional and constitutional police presence is the foundation of a healthy city in our democracy." *Id.* at 55.

Consequently, the Consent Decree required that CPD "complete a comprehensive equipment and resource study to assess its current needs and priorities to perform the functions necessary for CDP to fulfill its mission and satisfy the requirements" of the Decree. Dkt. 7-1 ¶ 292. After completing that study, the City needed to "develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." *Id.*

The Plan needed to address a number of different requirements. First, the Plan "will provide for necessary equipment including, at least . . . an adequate number of computers; an adequate number of operable and safe zone cars; zone cars with reliable, functioning computers that provide officers with up-to-date technology, including" mobile computer-aided dispatch, access to the Division's records management system, and access to law enforcement databases; and "zone cars equipped with first-aid kits . . . ." Dkt. 7-1 ¶ 293. These requirements stemmed, to at least some relevant extent, from the Department of Justice's observation that it found "not enough computers at the district stations" and a patrol car fleet that was "old and in poor repair." 2014 FINDINGS LETTER at 56–57.

Second, the Plan must address how the Division will "satisfy the requirements of this Agreement," including the Decree's many other substantive requirements. *Id.* ¶ 292. For instance, CPD will need to collect information and data about investigatory stops, *id.* ¶¶ 160–75,

and "calls and incidents involving individuals in crisis." *Id.* ¶ 157. The Division is required to "develop and implement a single, uniform, reporting system" to effectuate the Decree's use of force reporting requirements. *Id.* ¶ 87. "[A]ll relevant information from [a] completed [Internal Affairs] investigation" must be "provided electronically to the [involved] officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator . . . ." *Id.* ¶ 188. "CDP supervisors" must "regularly use . . . data to evaluate the performance of CDP officers across all ranks, units, and shifts." *Id.* ¶ 327. To adequately "modify its Officer Intervention Program," CPD must utilize "a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide and for each officer regarding" a host of specific performance data. *Id.* ¶ 328. These and numerous, similar Consent Decree provisions require that CPD embrace a host of new or upgraded technologies, resources, and equipment.

Third, the Plan must "ensure that CDP" both "properly maintains and seeks to continuously improve upon existing equipment and technology" and "is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." *Id.* This relates to DOJ's determination that the City's "failure to thoughtfully assess the Division's needs and prioritize effectively affects officers' and supervisors' ability to do their jobs . . . ." 2014 FINDINGS LETTER at 57.


## II. PROCEDURAL HISTORY

Under the First-Year Monitoring Plan, CPD needed to complete "a comprehensive equipment and resource study that assesses its current needs and priorities" by April 21, 2016. Dkt. 43-1 at 46. CPD provided the attached Equipment and Resource Study on that date. Ex. B.

Originally, the Monitoring Team was to have provided and presented to CPD, the City, and other Consent Decree stakeholders an Equipment and Resource Gap Analysis – which would "identify the current state of CPD technology, equipment, and related resources and identifies what will be necessary for CPD to comply with the Settlement Agreement" by June 13, 2016. Dkt. 43-1 at 46. However, to permit the Division to focus on its necessary security preparations for the Republican National Convention in mid-July 2016, the Parties and Monitoring Team agreed that the Team would postpone its delivery of the findings of its Gap Analysis to September 13, 2016. Representatives of the City, Community Police Commission ("CPC"), CPD, Department of Justice, and police officer organizations participated in the September 13 discussion, during which the Monitoring Team outlined a host of specific recommendations, including assessments and specific recommendations as to achievable deliverables, due dates, and potential cost implications.

On October 3, 2016, the City met with the Monitoring Team to discuss the Gap Analysis and the City's proposed Equipment and Resource Plan. On October 16, 2016, the City circulated a document entitled "Equipment & Technology City Response" (the "City Response") that summarized the issues discussed at the October 3 meeting. On November 3, 2016, the Monitoring Team transmitted to the City a 17-page memorandum discussing the City Response. That memorandum observed that the City's document did not address a host of critical issues, provided vague or no deadlines, failed to describe the current operational status of various projects, and provided vague milestones or deliverables. The document provided specific feedback on all major areas that the City Response discussed, and it noted that the Monitoring Team would continue to stand at the ready to provide additional technical assistance at the request of the City.

The City was to "submit to the Parties, Monitor, and community Police Commission a Final Draft Equipment and Resource Plan that conforms to the objectives, discussions, and decisions of" preceding discussion among Consent Decree stakeholders relating to the Plan by November 18, 2016. Dkt. 80-1 at 19. The City transmitted its final Plan on November 25, 2016, utilizing the seven-day "grace period" that the Monitoring Plan provides. Dkt. 80-1 at 3. Pursuant to Paragraph 294 of the Consent Decree, the Community Police Commission ("CPC") provided input and feedback on the Plan on December 13, 2016, attached hereto as Exhibit C.

## III.     STANDARD OF REVIEW[1]

"As an agent of the Court," the Monitoring Team must "assess and report whether the requirements" of the Consent Decree "have been implemented." Dkt. 7-1 ¶ 351; *accord id.* ¶ 352 (requiring the Monitor to "review . . . policies, procedures, practices, training curricula, and programs developed and implemented under" the Decree). The task of the Monitor here is to determine whether the Cleveland Division of Police Equipment and Resource Plan submitted to the Monitoring Team on November 25, 2016 complies with the Consent Decree's requirements and demands.

As the Monitor has previously outlined, "in some instances, the evaluation of" policies or plans created to comply with the Consent Decree "is relatively mechanical." Dkt. 83 at 14. For instance, "[a]mong other items," the Equipment and Resource Plan needed to ensure that its "zone cars [are] equipped with first-aid kits . . . . " Dkt. 7-1 ¶ 293(d). Because the City has,

---

[1] Some elements of this discussion are adapted from a Memorandum by Matthew Barge, et al to Marty Flask, et al re: Draft Cleveland Safety Forces Recruitment Policy & Strategic Recruitment Plan (Mar. 14, 2016).

some time ago, purchased and distributed first-aid kids to its vehicles, this is relatively straightforward to verify.

"However, in other instances," those plans "must comply with more general provisions or provide more significant detail than the Consent Decree provides." Dkt. 83 at 14. With respect to the Equipment and Resource Plan, this is especially true. For one thing, the specific technology types that the Decree references are situated in terms of a general standard, not a specific number of units or scope of deployment. For instance, the Plan must outline a process for ensuring that CPD has "an adequate number of operable and safe zone cars." Dkt. 7-1 ¶ 293(b). Thus, the Plan is sufficient only if it "provide[s] for" an "adequate number" of cars – with "adequate" situated in terms of the volume of resources generally sufficient for CPD to fulfill its core functions and to implement the Consent Decree's requirements. *See* "adequate," MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/adequate (last visited Dec. 17, 2016).

Additionally, a number of necessary equipment and technology requirements are not specifically detailed in the Consent Decree. For example, the Decree requires that officers "articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports." Dkt. 7-1 ¶ 168. To comply with this provision and ensure effective policing, Dkt. 7-1 at 1, a system for logging such information must be efficient and, likely, electronically accessible to officers in the field. Likewise, under the use of force policies filed with this Court, Dkt. 83, officers are now required to carry at least two intermediate weapons, which must be "issued by the Division." Dkt. 83-4 at 2. The Division therefore must ensure that it has a plan for ensuring well-functioning intermediate weapons for all officers going forward. Across these and other similar dimensions, the task of the Monitoring Team is to evaluate

whether the City's Equipment and Resource Plan sufficiently considers and addresses, where necessary, the host of Consent Decree provisions that may have technological, equipment, or other resource implications.

The Monitoring Team's analysis of the Plan is significantly informed by the Monitoring Team's experience with substantial technology and equipment initiatives in other major American police departments. It is also informed by familiarity with generally-accepted approaches in the fields of information technology, project management, and strategic planning.

Successful compliance with the Consent Decree will require that the City and CPD successfully execute the implementation of numerous distinct but interrelated equipment, resource, and technology projects. For purposes of the instant filing, "project" refers to "a temporary endeavor undertaken to produce a unique product, service, or result." JAMES P. LEWIS, FUNDAMENTALS OF PROJECT MANAGEMENT 2 (3d ed. 2007). Similarly, "project management" is "a system of avoiding missed deadlines, vague expectations and budget overspending." WILLIAM FOX AND GERRIT VAN DER WALDT, A GUIDE TO PROJECT MANAGEMENT 8 (2008).

"In the process of planning" to manage and successfully execute such a project, "projects should be properly defined and divided into logical, progressive steps." *Id.* at 44. Any successful project plan needs to provide overall objectives in clear terms that can be measured:

> Objectives are quantifiable criteria used to measure project success. They describe the 'what' you're trying to do, accomplish, or produce. Quantifiable criteria should at least include schedule, cost, and quality measures . . . .

KIM HELDMAN ET AL, PMP PROJECT MANAGEMENT PROFESSIONAL EXAM STUDY GUIDE 107 (7th ed. 2007). Generally, project management literature contends that objectives should be specific,

measurable, accurate (e.g., precise), realistic, and time-bound or time-limited (e.g., have a time frame with an end date assigned to them).[2]

Further, a project plan needs to be specific about how the various broader components of the plan will be successfully implemented over time. Specifically, the plan needs to identify specific deliverables that "translate [the] project mission . . . into actionable realities." JACK FERRARO, PROJECT MANAGEMENT FOR NON-PROJECT MANAGERS 172 (2012). For "every deliverable that will be produced, the date [by which] it will be produced" also needs to be identified in concrete terms. PAULA MARTIN & KAREN TATE, GETTING STARTED IN PROJECT MANAGEMENT 128 (2002).

With specific respect to planning for the strategic implementation of a number of IT-related projects, organizations "that excel in project delivery . . . clearly define what needs to be done in a project, by whom, when, and how" – "carefully select[ing] tools, align[ing] them with project and business goals, link[ing] them to metrics, and provid[ing] them to project managers to deliver positive results." KATHY SCHWALBE, INFORMATION TECHNOLOGY PROJECT MANAGEMENT 16–17 (2015). "The most common reason for [IT] project failure [i]s poor planning," including a "weak" project plan. Brenda Whittaker, *What Went Wrong? Unsuccessful Information Technology Projects*, 7 INFORMATION MANAGEMENT & COMPUTER SECURITY 21, 24–25 (1999).

Finally, it must be noted that the Monitoring Team's technical assistance in the area of technology, equipment, resources, and the present Plan relating to them has been ongoing and

---

[2] *See, e.g.*, JASON WESTLAND, THE PROJECT MANAGEMENT LIFE CYCLE 32 (2007); JAMES P. LEWIS, FUNDAMENTALS OF PROJECT MANAGEMENT 51 (2007); MARK RESCH, STRATEGIC PROJECT MANAGEMENT TRANSFORMATION: DELIVERING MAXIMUM ROI & SUSTAINABLE BUSINESS 111 (2011); RICHARD JONES, PROJECT MANAGEMENT SURVIVAL: A PRACTICAL GUIDE TO LEADING, MANAGING AND DELIVERING CHALLENGING PROJECTS 59–61 (2007).

substantial. Especially since March 2016, numerous Monitoring Team experts – including Deputy Monitor Chuck Ramsey, former Commissioner of the Philadelphia Police Department; Maggie Goodrich, Chief Information Officer of the Los Angeles Police Department (LAPD); Chief Timothy Longo (retired), former Chief of Police of Charlottesville, Virginia; and numerous others – have spent significant time in the field and Districts with officers, as well as meeting with City and CPD IT personnel. The Team provided technical assistance with respect to addressing problems with the upgrade to the LERMS record management system, has observed initial planning sessions about field reporting, and has discussed the status of the Division's implementation of the Blue Team / IA Pro software platform regularly. The Monitor provided CPD and the City with a detailed set of specific recommendations of the types of specific technological considerations that the Equipment and Resource Plan should consider in early September 2016. The Monitoring Team has engaged in several follow-up conversations, both in person and by telephone. The Monitoring Team most recently provided an extensive, written memorandum to the City about the issues and problems with a prior version of the Plan. Thus, the issues and concerns that the remainder of this discussion raises have all been previously addressed with the City and Division in previous in-person conversations, documents, telephone calls, email messages, and other forms of communication.

## IV.  ANALYSIS OF THE EQUIPMENT & RESOURCE PLAN

The section summarizes some, but by no means all, of the Monitor's significant concerns about the City's Equipment and Resource Plan, as a filing that inventoried all outstanding issues would risk being prohibitively lengthy. Accordingly, this discussion first outlines some significant global problems identified across a number of various elements. It then highlights

specific problems in some substantive areas that are representative of the issues that will need to be remedied for the Plan to comply with the Decree.

## A.    Global Problems

### 1.  The Plan Lacks Specific, Well-Supported Deadlines.

The Plan uniformly situates "project milestone completion dates" not in terms of actual dates but as references to general, quarter-year time periods.  These overly broad, 90-day "deadlines" combine the worst of overly rigid project management with the worst of insufficiently detailed management approaches.  On the one hand, because the deadlines are fixed time units, rather than relational to other internal milestones, small delays or unexpected events may substantially complicate project execution.  *See, e.g.*, Stephen Leybourne and Eugene Sadler-Smith, *The Role of Intuition and Improvisation in Project Management,* 24 INT'L J. PROJECT MANAGEMENT 483 (2006) (describing need for project managers to be flexible and objective-oriented).  For instance, the Plan describes efforts to install in-car video systems in all patrol vehicles, which the Monitoring Team supports.  Ex. A at 33.  The Plan lists the deadlines for both the completion of the camera project's "scope of work and project plan" and of "[i]nstallation of [the] In-Car Dash Camera systems for the Bureau of Traffic" as "1st Quarter 2017."  *Id.*  If the scope of work and project plan is not completed until the 89th day of a 90-day quarter, this would leave just one day for installation to be completed so that the project could be kept "on track."  A better approach might be to detail the amount of time currently contemplated to complete installation of the in-car dash cameras and make the deadline that certain unit of time after completion of the scope of work and project plan.

At the same time, the broad time periods ensure that there is no specific date certain by which particular projects can be expected to have been finished or major milestones reached – just a span of twelve to thirteen weeks over which the progress might be made. For example, the Plan notes that, to date, the Division has tracked what equipment is being used by what officers via "paper[-]based equipment sign-in/out Log Books." Ex. A at 5. Indeed, multiple sets of logbooks can be found throughout just one District, as different types of equipment are tracked in separate logbooks. Given the manual and diffuse documentation of officer equipment, command staff and administrative coordinators alike cannot know, without substantial labor, what equipment is being used where and by whom. Encouragingly, the Plan proposes a fix: "using the Inventory module within the LERMS application to track . . . equipment that is utilized by the Police Officer as part of their Tour of Duty." Ex. A at 5. Problematically, the deadlines for multiple deliverables are simply "1st Quarter 2016," with others listed as "2nd Quarter 2017." These three-month-long deadline windows make the determination of the sufficiency of the Plan, the City implementation of the Plan, and all stakeholders holding the City accountable for adhering to the Plan unacceptably problematic. Given the accepted "importance of deadlines and time urgency for focusing attention on nonroutine behavior" of organizations, some specific time parameters must be established and enforced. Nancy Satudenmayer et al, *Time to Change: Temporal Shifts as Enablers of Organizational Change*, 13 ORGANIZATION SCIENCE 583, 584 (2002); *accord* Ex. C at 2 (noting that "[e]ach component of the Equipment & Resource Plan . . . should have an accompanying management control [and] accountability").

Further, the deadlines offered are not adequately supported, defended, or explained. Especially because social science and organizational behavior literature establishes that "[p]eople underestimate their own . . . [task] completion times," the deadlines that are included need to be

situated in terms of the underlying work, resources, and effort necessary to complete a given deliverable or reach a particular milestone. Roger Buehler et al, *Exploring the 'Planning Fallacy': Why People Underestimate Their Task Completion Times*, 67 J. PERSONALITY & SOCIAL PSYC. 366, 371 (1994). For example, the Monitoring Team has previously flagged that CPD's current work flow for using the Blue Team / IA Pro platform – a software system that tracks a host of information on officer performance – will cause events to "trigger" CPD's early intervention system well after the date of the incident. This means that supervisors will not be able to base their management decisions on up-to-date information. To address the issue, the City proposes re-engineering the business process workflow. Ex. A at 52. One deliverable, due by the second quarter of 2017, is a "Business Process workflow review of Blue Team entry and approvals." *Id.* Another, due by the third quarter of 2017, is to "[c]reate Blue Team entry and approval process baseline." *Id.* The Plan gives no description as to the nature of these milestones, nor, more importantly, why (and in light of who is actually tasked with doing the work) each step would take somewhere on the order of three months rather than a shorter or longer period.

### 2. The Plan Fails to Identify Specific Actors Responsible for Various Deliverables.

"A successful project requires that the project team participate (at some level) in the planning process . . . and be responsible for completion of assignments . . . . Project team members need to be accountable for the effective performance of their assignments." California Office of the State Chief Information Officer Archives, *Project Management Overview: Roles and Responsibilities* at 1 (Jan. 1997). Although some primary actors, business owners, or stakeholders are identified as responsible for some of the major project milestones, most deliverables are not attached to any specific entity, person, or City representative. For example,

the Plan outlines the City's efforts to secure and implement a Learning Management System, which will provide an electronic environment for training and professional development activities. Although a Business Owner is specifically identified, the Plan does not describe precisely who has been reviewing proposals from vendors, has been viewing vendor demonstrations, will be selecting the system, and will be coordinating the in-field implementation and training (of some undefined set) of officers.

### 3. The Plan Summarily Rejects the Need for Outside Experts.

The Monitor's First Semiannual Report outlined the five-year odyssey involved to "upgrade" CPD's record management system software, which "is the main storage system that the police department depends on for data storage and retrieval of critical information." Dkt. 83 at 56. The Monitoring Team identified significant basic IT governance and project management problems as a critical cause of the problems with the system's implementation. "These technological, business practice, and project management problems are not simply technical or bureaucratic – they have real-world ramifications for Cleveland's officers and the Cleveland community," with incident reports becoming backlogged for entry into the struggling new system, called LERMS. *Id.* at 57. Indeed, the City concedes that "[t]he LERMS project failed due to a lack of project management structure, governance, documentation, executive sponsorship and oversight." Ex. A at 12.

Accordingly, the Monitoring Team has repeatedly recommended to the City and CPD that it engage with outside consultants to assist it in revamping its overall IT governance structure, implementing major new platforms, and dramatically enhance the capacity of the City and CPD to "properly maintain[] and . . . continuously improve upon existing equipment and technology," "identify[] equipment needs," and "utilize, as appropriate, emerging technologies."

Dkt. 7-1 ¶ 293(e)–(f). The City declines. Instead, the Plan vaguely observes that the Project management Office "currently utilizes outside consultants in the implementations of various citywide IT projects." Ex. A at 12.

Assuming the City's assertions are true, and without knowing what consultants may be available for what types of projects encompassed by the Plan, the possibility for the City to secure outside help and experts is undoubtedly positive. However, even if consultants are already on retainer to help the Project Management Office with particular IT projects, those consultants are, by the City's own admission, not assisting the City or CPD in overhauling the approach used to equipment, resource, and technology problems; strategically planning for immediate and long-term needs; and thoughtfully implementing changes in systems and processes that are ripe with interdependencies.

The City's Plan appears to argue that the five years of problems with LERMS was an isolated or exceptional circumstance. It says that individuals "involved with the original LERMS project" will not be a part of at least the field-based reporting initiative. Ex. A at 12. Additionally, "when the initial LERMS project was started," there "was no Chief Information Officer of the City of Cleveland" and "[n]o project management approach . . . in place." *Id.*

Although the City's current candor about the LERMS implementation is admirable, it simply is not clear that new systems, processes, and habits are, in fact, in place to manage major, future projects in a new, better, and more resource-efficient way. Further, if the City's current law enforcement IT approach apparently cannot manage to get 105 computers deployed to the field so that officers can use them in a timely manner, *see infra* Sec. B.1., the Monitoring Team is highly skeptical of the approach's ability to massively overhaul CPD's reporting, dispatch, and other core systems.

To this end, the Monitoring Team requests that the Court address the possibility of the City hiring an outside consultant, with responsibility for overseeing the construction and execution of the Equipment and Resource Plan and restructuring IT governance with respect to the Division of Police, to serve as a kind of "IT Czar." The City's encouraging, recent hire of an outside consultant to serve as a Data Analysis Coordinator across CPD and City functions for purposes of the Consent Decree might serve as a template for engaging the kind of outside assistance that can build long-term capacity within CPD and the City with respect to IT.

4. **The Plan Fails to Address the Decree's Requirements Related to Identifying Equipment Needs, Maintaining and Improving Upon Existing Technology, and Utilizing Emerging Technologies.**

As described in Section II, *supra*, the Consent Decree requires that the Plan "ensure that CDP" "properly maintains and seeks to continuously improve upon existing equipment and technology" and "is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." Dkt. 7-1 ¶ 293(e)–(f). Especially because the City declines to consider utilizing an outside consultant to assist it in improving its law enforcement IT governance and project management, the Plan does not comply with these maintenance and improvement requirements of the Consent Decree. *See* Ex. C at 3 ("The plan should outline how the securing of new technologies and equipment will occur, and develop a plan that includes the community when developing use and accountability policies.").

For this Monitoring Team to be in a position to approve an Equipment and Resource Plan from the City, it needs to have confidence that the processes and habits that have given Cleveland a five-year implementation of a software program, an approaching one-year-long process for deploying desktop computers to District stations, and a generally under-resourced

police department have been addressed – such that CPD never again finds itself several decades behind its peers with respect to the tools available for police officers to do their jobs.

**5. The Plan Fails to Meaningfully Account for Project Interdependencies.**

A number of the City's timelines with respect to specific projects fail to adequately account for the interdependencies across other projects. Indeed, the overall structure of the Plan – with a litany of specific projects listed in isolation and without cross-reference to the timelines or initiatives in other, related projects – suggests that the City has not adequately identified how the rate of progress on some initiatives may impact the rate of progress in others.

For example, the Plan provides some proposed details on CPD "migrating from its legacy AVL [Automated Vehicle Locator] system" to one used across Cleveland agencies. Ex. A at 35. Although CPD "has migrated 126 Patrol Vehicles onto" the new system, allowing CPD to see where all cars are at all times, other vehicles "require[e] new modems or expansion ports" to allow the new system to run. Ex. A at 35–36. The Plan outlines a timetable in which vehicles lacking the equipment necessary for the new system would receive such equipment between the first and third quarters of 2017. Ex. A at 36. However, the Plan elsewhere notes that "criteria for when vehicles will be scrapped out due to age and/or mileage" might affect whether other equipment (e.g., installation of in-car computers) might be installed. Ex. A at 9. Indeed, the Plan references a proposed Patrol Vehicle Modernization Plan that would address CPD's deficient, aging vehicle fleet. Ex. A at 57–59; *see* Section IV(B)(3), *infra.* Thus, although the installation of some equipment necessary in vehicles would seem to take into account the fact that a certain number of cars will soon need to be replaced, other equipment installation, such as the modems or expansion ports necessary for the vehicle locator system, would not seem to

provide such a structure for ensuring that new equipment is not installed into old cars slated imminently for decommission.

**B.    Specific Issues**

**1.   The Plan's Treatment of Precinct-Based Computers for Officers is Inadequate.**

According to CPD's own Equipment and Resource Study, one-third (or 36 percent) of CPD's total "working computers" are housed in the Division's five patrol Districts.  Ex. B at 4.  One out of ten (11 percent) of working PD computers are available to CPD patrol personnel, rather than to supervisors, command staff, or administrative personnel.  *Id.* at 4–5.

The City's Plan does not provide any sense of what "an adequate number of computers" under the Consent Decree is.  Dkt. 7-1 ¶ 293(a).  Although it contends that the current ratio of computers to personnel are 1: 2.24 and that the addition of 105 computers secured by an Ohio state grant would bring the ratio to 1: 1.92, without describing the numbers on which such ratios are based, the Plan likewise does not outline a mechanism, method, or process for identifying what an adequate number of computers in fact would be – or specifically how CPD and the City will ensure that the number is "properly maintain[ed]."  Dkt. 7-1 ¶ 293(e).

The Plan observes that computers purchased through an Ohio state grant will be deployed in 2017.  Not only does the Plan fail to note that the computers have been sitting in City storage since at least early 2016, it does not provide for any process of identifying whether *more* than the previously-purchased 105 computers are necessary for current staffing, current and anticipated use needs, or current and anticipated use volume.  To the extent that the City and CPD might "identify the number of Computers to be deployed at each District" as more than 105, no process

or timeline is provided for identifying the number, purchasing the computers, and deploying them to the field. Ex. A at 4.

Additionally, the Monitor notes that the Plan suggests that the 105 "new" computers are intended "for Field Based Reporting." Ex. A at 4. Generally, the phrase "in the field" means "[a]way from the laboratory, office, or studio . . . ." "in the field" OXFORD LIVING DICTIONARY, https://en.oxforddictionaries.com/definition/in_the_field (last visited Dec. 17, 2016). In law enforcement, "field reporting" generally refers to front-line officers providing data and information from the neighborhoods where they work on a mobile platform. *See* Larry T. Hoover, *From Police Administration to a Police Science: The Development of a Police Academic Establishment in the United States*, 8 POLICE QUARTERLY 44 (2005). A police station is not the field, and "In-Station Reporting" is not field reporting – leaving the Monitoring Team substantially confused about how the 105 computers have anything to do with true "field reporting." Ex. A at 7. The Monitoring Team has outlined these concerns to the City, most recently in its November 3, 2016 memorandum. The Community Police Commission has also emphasized the need for officers to have dynamic, real-time access to databases that might contain information about a subject, such as if the individual is known to face mental health challenges. Ex. C at 1–2.

### 2. The Plan's Treatment of the Necessary Computer-Aided Dispatch Upgrade Is Inadequate.

Computer-aided dispatch ("CAD") systems "allow public safety operations and communications to be augmented, assisted, or partially controlled by an automated system." Bureau of Justice Assistance, U.S. Department of Justice, *Standard Functional Specifications for Law Enforcement Computer Aided Dispatch (CAD) Systems* at viii. "CDP dispatch" currently uses one such CAD system "for call handling, assignments and field notifications," and the

implementation of a CAD system to CPD officers "will provide an accurate and consistent picture of an incident in progress for personnel in the field." Ex. A at 14.

Cleveland implemented the current CAD platform in 2005. *Id.* The City "upgraded the CAD system to include Silent Dispatching[,] which allows for the dispatcher to dispatch calls for service via the Mobile Data Terminal instead of over the . . . radio . . . . " *Id.* Cleveland's EMS and Fire elected to use Silent Dispatching. *Id.* The Division of Police declined to do so. As such, CPD's radio is among the busiest and loudest that this Monitoring Team has observed – and officers must track, for themselves, information provided by communications and dispatch on their own notepads or on their personal cell phones rather than having the information displayed on an in-car computer. *See* Ex. C at 3 (raising the issue of whether "new equipment and technology capacity [will] result in the decommissioning of use of private cell phones and other technologies by police officers in the carrying out of their official duties").

The City indicates that "[f]unding is currently in place to order and install the recommended number of Mobile Data Terminals need[ed] to outfit the Patrol Vehicle fleet." Ex. A at 15. Assumedly to ensure that new computers are not placed in old cars that will soon need to be decommissioned, the Plan indicates that a Police Vehicle Replacement Plan would be "developed to identify when vehicles will be scrapped out due to age and/or mileage." Ex. A at 15. Given that the Equipment and Resource Plan being reviewed was submitted to the Monitoring Team on November 25, 2016, it is unclear why the instant Plan does not include more detailed information about the implications of vehicle fleet modernization on MDT installation and CAD implementation.

   **3. The Plan Fails to Substantively and Specifically Address CPD's Inadequate Number of Patrol Cars.**

CPD currently has an insufficient number of patrol cars overall. CPD reports to have 358 marked zone cars, spread throughout the Districts, Downtown Services Unit, Bureau of Traffic, CLE Hopkins International Airport, and other locations. CPD reports that "[a] source of frustration by all personnel is the lack of vehicles," especially due to slow "turnaround time" while "waiting to be serviced or repaired at Motor Vehicle Maintenance." Ex. B at 18. CPD reports that its current benchmark for marked vehicles is 394 – leaving CPD at a deficit of nearly 10 percent (9.2 percent), even before considering those staffing changes that will be necessary to effectuate the Decree's other requirements.

Further, the condition of the insufficient number of patrol cars that CPD does have in service is poor. More than one-third (38 percent) of CPD patrol cars have over 90,000 miles. Nearly one out of ten (8 percent) of total CPD vehicles were out for maintenance in July 2016 – a process that takes too long, is inefficient, and may be too expensive. Indeed, Monitoring Team personnel have been surprised by the incredibly poor condition of many individual cars in CPD's fleet. Despite these problems with CPD vehicles, CPD and the City have not, to date, had a plan for vehicle inventory replacement. CPD itself correctly notes that "[a]s it stands today, 38% of the fleet could be replaced around the same time," which "will be costly to the City of Cleveland if the fleet is not managed and maintained." Ex. B at 18. Thus, the City of Cleveland does not have enough patrol cars for its officers, and the ones that it has are in poor condition and will soon need to be replaced – but the City has not, to date, had any plan to remedy the problem.

The Consent Decree requires that "CDP's Equipment and Resource Plan . . . provide for necessary equipment including . . . an adequate number of operable and safe zone cars . . . with reliable, functioning computers that provide officers with up-to-date technology." Dkt. 7-1 ¶ 293. The Plan that the City submits fails to provide for an adequate number of operable and safe

cars. It engages in no effort to estimate, benchmark, or otherwise determine how many cars are necessary. It outlines only a short-term, one-shot process for coming up with a Patrol Vehicle Modernization Plan – not a process for ensuring that the fleet remains modern nor, even more fundamentally, a process for actually procuring the vehicles.

CPD contends that the Plan does not contain specifics about the number of cars that will be procured or the timeline for such procurement because other City stakeholders, including City Council and Motor Vehicle Maintenance, need to take independent action. Although the Monitoring Team understands those realities, it assumes that all City stakeholders and Cleveland residents would benefit from a realistic and specific appraisal of how many cars are necessary to procure to ensure that officers have enough high-quality vehicles in which to patrol Cleveland's neighborhoods and respond to calls for service. Although the Monitor could approve an ultimate Equipment and Resource Plan that included a specific process for benchmarking the number of patrol cars needed given the Division's current staffing and deployment, a specific deadline for determining the number of cars necessary, and a specific deadline for those cars to be procured, the Monitor cannot approve an Equipment and Resource Plan that lacks specifics or in which "the budget," which "is to be determined," is the exclusive driver of how well-supported CPD's personnel may be. Ex. A at 59.

## VII. CONCLUSION

The task of the Monitor was to duly consider whether the City's submitted Equipment and Resource Plan satisfies the terms of the Consent Decree. Although the Plan does represent some commendable work and engagement on a number of important issues and sub-issues relating to the technology and infrastructure that CPD's officers require, the Monitoring Team

cannot approve the Plan its current form. The Team requests that this Court explore the Plan's deficiencies at the previously-scheduled January 6, 2017 and determine a specific process and timetable for the City complying with the terms of the Decree and requirements of the Updated First-Year Monitoring Plan related to the Equipment and Resource Plan.

Meanwhile, the Monitoring Team remains at the ready to assist the City in developing a Plan that can fully address the Consent Decree's requirements while providing the Division's officers with the tools and support that they need to keep the public and themselves safe while solving problems in dynamic partnership with the community that they serve.

Respectfully submitted,

/s/  Matthew Barge

MATTHEW BARGE
Monitor
234 5th Avenue, Suite 314
New York, New York 10001
Tel: (202) 257-5111
Email:  matthewbarge@parc.info

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2016, I served the foregoing document entitled

Motion Regarding Cleveland Division of Police Equipment and Resource Plan via the court's

ECF system to all counsel of record.

/s/ Matthew Barge
MATTHEW BARGE