IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| CITY OF CLEVELAND, | ) | |
| | ) | **CITY OF CLEVELAND'S** |
| Defendant. | ) | **FOURTH STATUS REPORT** |

## I.      Introduction

The City of Cleveland's fourth semi-annual status report is being provided

pursuant to Paragraph 387 of the Settlement Agreement/Consent Decree, which directs

that "the City will file a status report every six months thereafter while this Agreement is

in effect."  The City's fourth status report follows its prior filing of the "Third

Semiannual Report" on January 24, 2017. (Dkt. 104)  As with its earlier status reports

the City's fourth report follows the format contained in Section 387:

> This report will delineate the steps taken by CDP during the reporting
> period to comply with this Agreement; CDP's Assessment of the Status of
> its progress; plans to correct any problems; and response to concerns
> raised in the Monitor's previous semi-annual report.

During this reporting period the City and CDP continued to work in a collaborative

fashion with the Monitor Team, the Department of Justice ("DOJ"), the Cleveland

Community Police Commission ("CPC"), and other stakeholders to advance the reforms

that were agreed to in reaching the Settlement Agreement/Consent Decree.

### A.      Second Year Monitoring Plan

The Court approved a "Second Year Monitoring Plan" (hereafter "Plan") (Dkt.

123) which was put into place for the period February 1, 2017 to January 31, 2018. As was noted in the Monitor's recently filed Third Semiannual Report,[1] the Plan retained a necessary flexibility that would allow ongoing reform efforts to adapt to changed circumstances and operational realities. (See Dkt. 135, p. 8). The Plan contemplates ongoing review and provides that a modified, updated plan be submitted by August 11, 2017. The Monitor noted in its recent report that "the baton" had been passed "to the City and [CDP] going forward with respect to the fashioning of a project implementation plan." (Dkt. 135, p. 8) The City and CDP have accepted the passing of the plan implementation "baton," and are currently finalizing the draft of a proposed modified Plan for the balance of the second monitoring period that takes into account ongoing circumstances and operational realities. The City anticipates following discussion and review of the CDP's proposed revisions, the Monitor will submit a modified Plan covering the balance of the second year reporting period to the Court.

**B.      Summary Assessments**

For the first time the Monitor's Third Semiannual Report included informal overview "summary assessments" of progress to date for the various sections covered by the Consent Decree.[2] With respect to progress, the Monitor's remarks make clear that to provide "sound project management structure" *** "some elements of the Consent Decree…must be focused on more immediately while others will receive focus further along in the process." (Dkt. 135, p. 10) The Monitor's use of the summary assessment

---

[1] Dkt 135, Notice Submitting Monitoring Team's Third Semiannual Report
[2] As the Monitor noted: "The assessments are informal to the extent that not all of them are necessarily informed by the type of exhaustive compliance and outcome measurements that are a critical component of the consent decree…" (Dkt. 135, p. 11).

terms "Non-Compliance," "Evaluation Deferred," "Partial Compliance," "Operational

Compliance," and "General Compliance" were not understood, at this point, to present a

qualitative, informed report card grade regarding effort and accomplishment to date, but,

rather, were more intended to provide the reader with a snapshot of where the focus of

work undertaken to date has been placed:

> [A] designation of "Non-Compliance" or "Partial Compliance" does not
> necessarily or in itself mean that the lack of progress is something that the
> monitoring team finds problematic under the circumstances. In some
> instances it does. However, the Monitoring Team has previously pointed
> out that "even good-faith attempts to do everything that is required under
> the Consent Decree simultaneously and without sound project
> management structure would only ensure that little is accomplish[ed] at
> the level of quality…that the Consent Decree requires."

(Dkt. 135, p. 10, quoting First Semiannual Report at 16.)  The "summary assessments"

should be read within the context of the Monitor's underlying and detailed descriptive

remarks for an understanding of where effort has been directed to date, where ongoing

efforts continue to be addressed, and where future efforts will be undertaken.

**II.**     **Steps Taken by the Cleveland Division of Police and the City of
Cleveland During the Reporting Period.**

As with the City's previous reports, the activities and milestone events addressed

during this reporting period are identified under nine topic areas:

A.     Community and Problem-Oriented Policing,
B.     Use of Force,
C.     Crisis Intervention,
D.     Officer Training,
E.     Accountability
F.     Equipment and Resources,
G.     Data Collection and Analysis,
H.     Bias Free Policing, and
I.     Compliance and Outcome Assessments and Reporting.

A.      <u>**Community and Problem-Oriented Policing**</u>

      1.      **Community and Problem-Oriented Policing Work Plan**

The Consent Decree requires the development and implementation of a comprehensive and integrated community and problem-oriented policing ("CPOP") model to promote and strengthen partnerships within the community, ensure collaborative problem solving, and increase confidence in the CDP. (Dkt. 7-1, Sec. 27).  Partnership with the community is a prominent principle of community and problem-oriented policing, and as such is reflected in the CDP's new Mission Statement:

> The mission of the Cleveland Division of Police is to serve as guardians of the Cleveland community by enforcing the law, maintaining order, and protecting the lives, property, and rights of all people, as guided by the Constitution.  We shall carry out our duties with a reverence for human life in partnership with members of the community through professionalism, respect, integrity, dedication and excellence in policing. (Dkt. 72).

In February the Monitor Team filed a "Motion Recommending Approval of Community Engagement Framework for Community and Problem Oriented Policing Plan and Bias-Free Policing Policy." (Dkt. 111).  The Motion was approved by the Court on March 6, 2017. (Dkt. 113).  The Community Engagement Framework establishes an agreed upon "process for coordinating, reviewing, and synthesizing feedback" from the community that "ensures community members have multiple avenues to provide input and promotes community confidence in the Division" as CDP develops its CPOP Plan and new BFP Policy. (Dkt. 111, p.2).  The approved Framework provides a calendar that outlines direct and collaborative community engagement efforts to be undertaken.

CDP Commander Johnny Johnson heads the Division's Bureau of Community Policing ("BCP").  Commander Johnson and CDP's five District Commanders have

worked with the Monitor, the DOJ, CPC, and other stakeholders during this fourth reporting period to engage the community and gather input and feedback on CPOP issues as CDP works toward formalizing a community plan that clearly emphasizes the necessary and ongoing partnership between the police and the community being served. In conjunction with the Monitor, the CPC, the DOJ and other stakeholders, the CDP assisted in the preparation of discussion materials and participated in two large Community Roundtable discussions events that were held in March. Community members were engaged in guided discussions with the CDP, the Monitor Team, the DOJ, the CPC and other stakeholders in a forum that allowed for a frank and direct exchange of ideas on a number of issues that involve community interests and values. Commander Johnson and the BCP have also worked during this reporting period to survey CDP officers regarding knowledge and understanding of "community policing."

In addition to CDP's direct engagement with the community as a whole through the roundtable discussions, Commander Johnson and CDP's District Commanders have further worked with the Monitor, the DOJ, the City's Community Relations Board, and the CPC to address and encourage greater participation of community residents with the five District Policing Committees ("DPC's"), (formerly known as "Community Relations Committees") addressed in the Consent Decree. (Dkt. 7-1, see generally ¶¶ 23-26).  The Consent Decree provides each of the DPC's with an expanded role in addressing localized strategies, concerns, and recommendations to the public. Each DPC is to make a presentation to the CPC on these issues, with an officer working with each of the DPC's then presenting CDP's assessment of ways to address and barriers to implementation of the DPC identified strategies, concerns, and recommendations

CDP is presently finalizing a proposed CPOP Plan. Using the Court approved framework, the CDP believes it is on track to reach an agreed upon CPOP Plan in the second half of the years that fully takes into account the feedback and values of the communities being served.

### 2. Cleveland Police Commission

The CPC lost one of its original co-chairs when Dr. Rhonda Williams resigned, effective May 31, 2017, from the Commission because of an academic career opportunity that will see her relocating from her role as a professor at Case Western Reserve University Vanderbilt University in Nashville, Tennessee. "Dr. Rhonda's" position on the Commission will be filled pursuant to the application process outlined in paragraph 16 of the Consent Decree. The Selection Panel authorized therein will review applications received from the public and will then recommend an individual to be appointed as a replacement for Dr. Rhonda.

On June 12, 2017 Mr. Jason Goodrick was hired as the first Executive Director for the CPC. Additionally, Ms. Chinenye Nkemere Thompson has been hired to fill a Community Engagement Coordinator position. The office for the CPC's executive staff for the CPC has been temporarily located at Burke Lakefront Airport while a more permanent location is located. The CPC has recently elected Rev. Dr. V. Yvonne Conner and Ms. LaToya Logan as the new Commission co-chairs going forward.

### B. Use of Force —Policies

### 1. General

On January 17, 2017 the Court entered an order that approved with conditions five revised use of force policies that were a major focus of CDP effort during the period of

the First Year Monitoring Plan. (Dkt. 101). The Court approved policies included (1) Use of Force—General, (2) Use of Force—Definitions, (3) De-Escalation (4) Use of Force—Intermediate Weapons, and (5) Use of Force—Reporting.  The Court noted with its order that "The new policies will become effective upon the Cleveland Division of Police's successful completion of Use of Force Training." (*Id*.)   Use of Force Training will be discussed in Section II(D) of this report.

In addition to use of force policies that effect officers in the performance of their enforcement law duties, CDP is also tasked with developing force related policies that address supervisory investigations and review of officer uses of force.

## 2.       Investigation and Review

As was addressed in the Monitor's Third Report, the finalization and anticipated approval of CDP policies addressing the investigation and review of uses of force were scheduled for the second half of the current Monitor Plan.  The Monitor's comments at pages 31-32 of the Third Report concerning progress on force investigation and review policies makes clear that the summary status assessment provided does not reflect on CDP effort or commitment to reform, but rather reflects where the Plan has placed the emphasis to date and where the focus will be in the second half of this period.

> "The City and CDP have indicated their full commitment to ensuring the full and comprehensive implementation of new structures and processes for reviewing the use of force so that it aligns with the requirements of the Consent Decree and builds from the insights, best practices and lessons learned from other jurisdictions…" (Dkt. 135, p. 32).

The level of scrutiny or investigation to be undertaken following an officer's use of force is related directly to the level and outcome of the force used.  In this regard CDP has prepared and submitted drafts of proposed policies that will govern investigations for

each of the three levels of force, the creation of a Force Investigation Team ("FIT"), and a

separate policy relating to the creation of a Force Review Board ("FRB").[3]  The final

agreed upon language of these separate policies is subject to further discussion and

review.  As was noted in the Monitor's Third Report progress continues and:

> [B]y the end of 2017, it is anticipated that CDP will at least have in place
> the policies, procedures, and mechanisms that will allow it to
> comprehensively analyze the application of force so that officer training,
> professional development, and risk management may all be continually
> enhanced. (Dkt. 132, p. 32).

## C.   Crisis Intervention

On January 19, 2017 the Monitor filed a "Motion Regarding Cleveland Division

of Police Crisis Intervention Policy and Procedures" recommending the Court approve

the CDP's proposed Crisis Intervention Policy.  (Dkt. 103, Motion). In recommending

approval the Monitor recognized not only the quality of the policy, but also the spirit of

compromise and cooperation with the Community exhibited by CDP in the creation of

the policy:

> The Monitoring Team also observes here that the attached crisis intervention
> policy was developed by a process that allowed for the community to partner
> closely and directly with CPD. Those discussions were productive,
> thoughtful, and respectful of all involved. CPD was engaged and considered
> community suggestions seriously. When some community requests were not
> able to be met or feedback not able to be addressed, CPD explained the
> rationale for the decision and attempted to reach a compromise that was
> acceptable to all those involved. Consequently, it is fair to conclude that not
> only were the specific substantive requirements of the Consent Decree but
> also that the City moved closer to upholding its commitments to "provide for
> civilian participation in and oversight of the police" and "increase
> transparency." Dkt. 7-1 at 1. Thus, both the crisis intervention policies

---

[3] A more detailed explanation concerning the requirements of the Consent Decree and the
policies under development that address investigation and review, to include the
distinctions associated with the three levels of force and the roles of the FIT and FRB was
contained in the City's third status report (Dkt. 104) at pages 7-10.

themselves and the collaborative manner by which they were created
represent critical milestones for the Division, the City, and the Cleveland
community.
(Dkt. 103, pp. 12-13).

Based on the period of the last six months, the Monitor's Third Semiannual Report noted:

The cooperative relationship established between advocates, healthcare
professionals and CDP worked well in developing a consensus policy to
address the needs of the individual in crisis without compromising the safety
of the officer or the Cleveland community. As a result, the policy presents a
new comprehensive strategy for responding to individuals in a behavioral
crisis. (Dkt. 135, p. 34).

Further work during the first six months of the Plan involved CDP's attention to
fulfilling the development of the Specialized Crisis Intervention Plan that was agreed to
with the Consent Decree ((Dkt. 7-1, ¶ 152).  The goal of this intervention plan is to
"ensure that a specialized CIT officer is available to respond to all calls and incidents that
appear to involve an individual in crisis." (*Id*.) A draft Specialized Crisis Intervention
Plan was prepared in consultation with the Mental Health Response Advisory Committee
(MHRAC)[4] as anticipated by the Plan, and was submitted for feedback to the Monitor
and DOJ.  Feedback was received and the Specialized Crisis Intervention Plan is currently
being revised and will be submitted for final review, with anticipated final approval of the
plan occurring in August.

Additionally, CDP submitted a draft plan for assessing the fitness of CDP officers
to serve as the specialized CIT officer envisioned in the Specialized Crisis Intervention
Plan. After receiving feedback the CDP submitted a revised plan for approval on July 17.

---

[4]  The MHRAC was established as an advisory Committee to the Department of Public
Safety and CDP on behavioral health issues and crisis intervention.  The committee is
made up of representatives of behavioral health and social service agencies, criminal
justice agencies, advocacy groups, community members, and members of CDP.

### D.     Officer Training

#### 1.     Use of Force

The Consent Decree requires that CDP "provide all current officers use of force training that is adequate in quality, quantity, scope, and type."( Dkt. 7-1, ¶ 84). As was noted above, the Court approved Use of Force policies will only become effective once CDP's officers have successfully completed the training developed for the policies. At the time of the City's third semi-annual report last January CDP was engaged in the process of working collaboratively with the Monitor and DOJ to finalize the curriculum for the required 16 hours of in-service Use of Force training to be provided to all officers.

On June 5, 2017 the Monitor filed a "Memorandum Submitting Initial Officer Use of Force Training." (Dkt. 133). The Monitor's memorandum detailed the nature of the proposed use of force training and found it to be adequate in quality, quantity, and in scope (*Id.* at pp. 12-13). After viewing a walk-through of the proposed instruction, the Monitor informed the Court:

> The Monitoring Team was tremendously impressed by the level of the training demonstrated and the clear commitment of the instructors to the overriding objectives of the Division's Use of Force Training initiative. This interactive, immersive training is a far distance from the rote "Death by PowerPoint" style that, for some police departments, has served as the default method. Having now reviewed the finalized training curriculum materials, the Monitoring Team believes that the training appropriately takes advantage of new instructional approaches and is geared toward providing officers with practical, day-to-day skills and an ability to practice application of the new force policy in realistic settings.
> (*Id.* at p. 12).

#### 2.     Crisis Intervention

The Consent Decree requires that CDP provide officers with at least eight hours of initial and annual in-service training on responding to individuals in crisis. The training

is to be "adequate in quality, quantity, type, and scope, and will include the circumstances in which a specialized CIT officer should be dispatched or consulted and how situations involving individuals in crisis should be addressed if a specialized CIT officer is not immediately available." (Dkt. 7-1, ¶ 143).

On May 22, 2017 the Monitor filed a "Motion Regarding All-Officer, Eight Hour Crisis Intervention Training" recommending approval of the training plan submitted to meet the requirements of the Consent Decree. The quality of the training plan to be provided is evidenced by the Monitor's remarks in the motion:

> [T]he training that the Division, Advisory Committee, and representatives of the Cleveland community have collaboratively developed represents some of the strongest and best training on basic crisis intervention issues that the Monitoring Team's experts have seen across the country. The Monitor commends the extraordinary progress and high-quality work product that the Advisory Committee has generated to date. Since the City has submitted a training curriculum that has met both the requirements and intent of the Consent Decree, the Monitoring Team recommends approval of the Curriculum. (Dkt. 129).

**3.     Training Progress**

To date CDP has completed eight training sessions addressing the new Use of Force and Crisis Intervention policies that have been attended by 299 officers.  While the 24 hours of instruction necessary to complete training on the two topics requires significant instructional and coordination efforts, CDP anticipates that the training as currently scheduled should be finalized on these policies by the end of October.

**4.     Recruitment and Hiring**

Much effort has gone into the area of recruiting during the fourth reporting period. On June 22, 2017 the City submitted a draft proposed Safety Forces Recruitment Plan for review by the Monitor and DOJ.

In addition to recruiting candidates for CDP, the new plan includes guidelines associated for the recruitment of candidates for the City's Division of Fire and Division of Emergency Medical Services. The proposed plan establishes a permanent Public Safety Recruitment Team and it incorporates three (3) Programmatic Goals that have been designed to attract qualified applicants for the City's safety forces:

1. Attract and hire a diverse group of qualified individuals that more closely align with the makeup of the Cleveland communities.

2. Create and maintain sustained relationships with community stakeholders to support and enhance recruitment efforts.

3. Employ the best practices in our hiring process that are effective in identifying applicants who are familiar with the different neighborhoods of Cleveland, who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community.

City efforts during the reporting period to attract diverse and qualified applicants have been proactive. From March to June the recruitment team participated in 15 job fairs and collected the names of over 1200 interested potential applicants and provided them with guidance as to the application process.  For the first time the City through the efforts of the public safety recruiting team was a featured employer at the ADAMHS (Alcohol, Drug Addiction, and Mental Health Services) Behavioral and Human Services Job fair. Radio One in partnership with the City has initiated a monthly "Guardian of the Land" campaign that utilizes members of the City's public safety forces to record their stories of how they became a public safety employee and the benefits associated with their jobs. The vignettes have been run on local stations and have been provided to the City's public information office to distribute to media outlets.  In May Chief Calvin Williams and a diverse group of CDP officers recorded radio and video spots that encouraged community members to consider

12

a career with the City's Division of Police. The Chief and other officers described their journeys toward service in law enforcement and how they use their skills to serve the community on a daily basis. In addition to broadcast spots, the City's recruiters have distributed materials throughout the City, to include areas as diverse as fitness gyms, barbershops, beauty supply shops, laundromats, restaurants, hospitals, clothing stores, cell phone stores, and city recreation centers.

In further engaging with the City's communities the recruiting team has attended local District Police Committee in all five Districts, handing out informational flyers for distribution to interested persons, answering questions, and collecting information. The City has established a recruiting team Facebook page that has reached almost 8,000 people. The Facebook page provides contact information and allows interactive responses to inquiries. The recruiting team is attempting to use the City Council offices to obtain assistance in getting recruiting information out to their constituents. In June the recruiting team assisted Global Cleveland at a naturalization ceremony for new citizens in further attempting to ensure all members of the local community are aware of opportunities to serve.

Cleveland graduated two classes of new CDP officers from the Police Academy during the fourth reporting period. CDP Police Academy Class No. 136, a class for new recruits, graduated 47 officers. These new officers underwent eight weeks of training in Cleveland and six months of training at the Ohio State Highway Patrol Training Academy.  The next basic class for new recruits, Police Academy Class No. 138, begins in August, with 65 recruits having been selected to attend.

13

Police Academy Class No. 137 provided training to 20 lateral transfer officers in the fourth reporting period. This class was conducted for officers who had been accepted to join CDP from their positions with other law enforcement agencies. CDP requires officers who have been accepted as lateral transfers to complete a ten week course of instruction at the CDP's Police Academy.

Recruiting remains focused on attracting a diverse group of qualified individuals for future hire. The most recent application period for potential new CDP recruits closed on July 15, 2017.  The City received close to 1100 applications. Testing for the new pool of applicants is underway and will end on July 31. A statistical review of the applicants shows they identified themselves as Hispanic (10.8%), African-Americans (37.3 %), and White (44.6%); with the  balance of applicants identifying themselves as Asian (1%), Pacific Islander (0.1%) , Native American (0.6%), being of two or more races (4.5%), and not specifying a race (1.1%). Female applicants make up approximately 26% of those who submitted applications.

**E.**     **Accountability**

    **1.**     **Internal Affairs**

 Historically the head of Internal Affairs ("IA")  has been a police officer who serves as the Commander of CDP's Bureau of Integrity Control.  The Consent decree provides going forward that "Internal Affairs will be headed by a qualified civilian who is not a current or former employee of CDP, and who is not a current or retired law enforcement officer." (Dkt. 7-1, ¶ 178).  The application process began during the period of the First Year Monitoring plan. Recruiting efforts were continued into 2017 and remained ongoing during the fourth reporting period. To assist in finding qualified

candidates, the City made a request to the Monitor and DOJ that the pool of potential

candidates be expanded to allow retired former prosecutors, federal investigators and

former officers from police departments other than CDP to be considered for the position.

This change has been agreed to and the IA application process has been extended through

July.  The goal is to begin interviews in the very near future, with the anticipation that the

new position be filled in the second half of this year.

The Monitor conducted a quality analysis of IA investigations by reviewing 45

cases from 2015.  The CDP received the results of the Monitor's analysis concurrent with

the release of the Monitor's Third Semiannual Report in June, which discusses the review

in detail.   While the CDP has questions concerning the weight of factors included in the

Monitor's quality assessments, CDP will continue to work with the Monitor to address

areas of concern raised in the review and analysis.[5]

### 2.      Office of Professional Standards and the Civilian Police Review Board

On November 29, 2016 the Monitor filed a motion recommending that the Court

approve new manuals for both the Office of Professional Standards ("OPS") and

Cleveland's Civilian Police Review Board ("PRB"). (Dkt. 86).  After some further

amendments to the manuals the Court entered an Order on May 6, 2017 approving both

the OPS and PRB manuals. (Dkt. 114). The OPS manual outlines the process for

interacting with the public, receiving, evaluating, and timely investigating complaints,

and making presentations and recommendations to the PRB. The PRB manual details the

procedures that will be followed by the PRB in receiving, reviewing and deliberating

---

[5] The Monitor's analysis concluded that 77 percent of the files reviewed ranged from fair
to very good.  (Dkt. 135, p. 43).

upon OPS investigations and recommendations.

A Charter amendment was passed in November, 2016 that increased the size of the number of the PRB to nine members. Following a designated period for applications, the City Council voted 15-0 at the public meeting on February 6, 2017 to fill one existing vacancy and to appoint the two new members authorized by the Charter Amendment. The three Council appointments brought the size of the CPRB to nine (9) members as now required by the Charter.

As was acknowledged in the City's third status report, 2017 has presented a challenging year for OPS as it continues to place effort on reducing the backlog of unfinished investigations. In addition to increasing the number of permanent employee investigators in 2016, the City has now hired six (6) temporary investigators to assist in the reduction effort. On May 3, 2017 the Monitor filed a status report that addressed a revised team structure within the OPS for the purpose of reducing the backlog going forward. (Dkt. 126). The City will continue to work with the Monitor and DOJ in addressing the investigation backlog. The City remains committed to ensuring future operations that are in accord with reasonable public expectations and the agreed to language of the Consent Decree.

**F.**    **Equipment and Resources**

      **1.**    **Equipment and Resources Plan**

The City and the Monitor continue to address the Consent Decree requirement that the CDP "develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." (Dkt. 7-1, Section 292). The City believes it has presented a substantive

Equipment Plan that addresses CDP's multiple equipment and resource issues within the requirements of the Consent Decree. The City, however, continues to work positively with the Monitor and appreciates the technical advice provided to date. The City continues to exercise "best efforts to implement the Equipment and Resource Plan over the period of time set forth in the approved plan." (See Dkt.7-1, ¶ 295).  Significant accomplishments have occurred during this reporting period.

The electrical systems each of the five District stations were upgraded during the reporting period to provide for the increased bandwidth necessary for the effective use of 105 computers that have now been deployed to the districts as CDP transitions to Field Based Reporting ("FBR"). Field Based Reporting provides CDP officers with real time access to the Law Enforcement Record Management System (LERMS), thereby enabling fast and convenient data entry and support submission.  The reduction in paper-based reporting accomplished with FBR will increase efficiency and will assist in the timely submission of reports. The final adjustments to FBR forms and final functional testing of the system are being completed and FBR should go live for all CDP shifts (Platoons A, B, and C) during the second half of 2017.

Initial configuration testing for CDP's new Computer Aided Dispatch ("CAD") system was completed during the fourth reporting period. CAD will provide CDP more efficient incident management for call handling by allowing the dispatch of calls to officers through silent transmission to vehicle based computer Mobile Data Terminals instead of radio communication over the airwaves. CAD increases the accuracy of location identification for a specific assignment through the use of Geographic Information System (GIS) mapping, will increase field communication efficiency, and

will provide data reporting and analysis.  The second half of 2017 will see final configuration and issue resolution as the CAD system goes active. It is currently anticipated that deployment of CAD will be completed by December.

The City's 2017 CDP vehicle plan included 65 vehicles being ordered. The period of this fourth report saw 35 new marked police passenger cars (zone cars) and 10 marked SUV's received and configured with required technology upgrades for introduction into the field. The existing fleet was inventoried to determine the number of vehicles that need to be upgraded and equipped with Mobile Data Terminals. Work is ongoing to ensure that the installation of MDT's in CDP's existing vehicle fleet is completed by the end of 2017.

### 2.  Body Worn Cameras

The CDP's Body Worn Camera (Wearable camera System) Policy has been approved by the Court in large part (Dkt. 101, Order), with approval not yet achieved regarding the issue of whether officers should be required to wear their cameras while engaged in secondary employment.  The City's policy as drafted encourages such use but does not mandate that cameras be worn by officers during secondary employment. The City previously addressed its concerns with instituting a policy that mandated the use of cameras while an officer is engaged in secondary employment (e.g. a common example is officers providing security in uniform but off-duty at a grocery store) with the Court in January. (Dkt. 96, Response to Monitor's Motion Regarding Cleveland Division of Police Proposed Wearable Camera System Policy).  This element of the City's wearable camera policy has been the subject of much discussion between the parties and the Monitor.

The City is modifying its camera policy to further encourage officers to voluntarily use their cameras while engaged in secondary employment. CDP is expectant

that the policy modifications will result in more officers voluntarily using cameras during secondary employment. It is hoped that data generated during the second half of the year concerning the logistics and costs associated with the use of cameras during secondary employment will reasonably inform the ongoing discussions concerning this aspect of the City's camera policy.

**G.**      <u>**Data Collection and Analysis**</u>

The City reported in its Third Status Report that CDP was believed to be close to filling the Data Collection and Analysis Coordinator position established in the Settlement Agreement. The position was created to coordinate the creation, collection, and maintenance of multiple data and records required by the Decree. This fourth report addresses in detail the current status of ongoing activities to provide the Court and the community with an understanding the myriad ongoing efforts in this important area.

     **1.**      **Data Collection and Analysis Coordination Team**

Significant progress has been made in the area of data collection, analysis and reporting since the City's Third Status Report in January 2017. The Settlement Agreement provides that:

> CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad public access to information related to CDP's decision making and activities. To achieve this outcome, CDP will designate an individual or individuals as the "Data Collection and Analysis Coordinator" (Dkt. 7-1, ¶ 257).

This progress has included the hiring of a Data Analyst by the City and entering into a contract with The Begun Center at Case Western Reserve University (Begun Center) to assist with data coordination, analysis and reporting.

An exhaustive recruitment effort was completed to identify potential candidates for the Data Collection and Analysis Coordinator ("Data Coordinator") and the Data Analyst position (Data Analyst). These recruitment efforts included posting both positions on multiple employment websites and retaining an employment headhunting firm. A Data Analyst hired in June 2017 and the Begun Center began work in February 2017. A potential candidate for the Data Coordinator position was interviewed in June 2017 and was offered the position. Unfortunately the candidate withdrew from consideration.

As of June 2017, Mr. Rodney Thomas, a Senior Research Associate from the Begun Center, has been serving as the Acting Data Coordinator ("ADC") until the City is able to successfully hire a fulltime Data Coordinator. Mr. Thomas has extensive experience managing large state and county wide evaluation projects and is well versed in providing technical assistance to law enforcement agencies and youth-serving agencies around data collection, analysis and reporting. Mr. Thomas is responsible for coordinating the data collection and analysis activities set forth in the Settlement Agreement (Dkt. 7-1, ¶¶259-266). In that role Mr. Thomas is responsible for meeting with CDP, IT and other project staff. Mr. Thomas has been participating in all Compliance Committee meetings, IAPro Trainings, Field-Based Reporting system development meetings, COMPSTAT meetings, Data Planning Committee meetings, and has been providing technical assistance on data collection efforts for all Settlement Agreement data areas. The examples provided below illustrate the progress that has been achieved in activities listed in Settlement Agreement paragraphs 259-266.

The Begun Center team also includes Dr. Daniel Flannery (Principal Investigator) and Chase Klingenstein (Research Assistant). Dr. Flannery is the Begun Professor and Director of the Dr. Semi J. and Ruth W. Begun Center for Violence Prevention Research & Education. A licensed clinical psychologist, he previously served as Professor of Criminal Justice Studies and Public Health at Kent State University where he was founding director of the Institute for the Study and Prevention of Violence. Dr. Flannery has extensive experience working with local and federal law enforcement agencies and with juvenile and adult justice systems. As Principal Investigator, Dr. Flannery is responsible for the overall conduct of the project, but especially coordinating law enforcement and justice system data collection strategies, and ensuring that project findings are applicable to policy and practice. He will participate in the preparation of project reports, presentations, and all project related dissemination materials.

**2.    Technical Assistance on IAPro and Blueteam Documents and Data Collection Systems.**

Specifically, the Settlement Agreement provides that:

> The Data Analysis and Collection Coordinator will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials, including: a. officers' use of force reports; b. supervisor's use of force investigations; c. force investigations by the Force Investigation Team; d. force investigations by the Office of Professional Standards; e. force reviews conducted by the Force Review Board; f. investigations conducted by Internal Affairs; and all supporting documentation and materials, including relevant ECW downloads, supporting audio-visual recordings, including witness and officer interviews, and any relevant camera downloads, including from body worn cameras. (Dkt. 7-1, ¶258).

Progress towards this objective includes the fact that officers' use of force reports, supervisor's use of force investigations, force investigations by the Force Investigation Team, force investigations by the Office of Professional Standards, and investigations

conducted by Internal Affairs are available in IAPro. As the City's ADC Mr. Thomas has been trained on IAPro software and is able to access, download and analyze all available Use of Force data and forms in IAPro and Blueteam databases, and he will continue to provide technical assistance to CDP on IAPro and Blueteam documents. Mr. Thomas has not yet accessed Evidence.Com for supporting documentation and materials related to Internal Affairs investigations.

In addition, the Settlement Agreement provides that the "Data Analysis and Collection Coordinator will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents,…" (Dkt. 7-1, ¶ 259). Progress towards this objective includes the successful populating of numerous data fields in IAPro, with the ADC having the ability to access, download, analyze and report out on the vast majority of these data points. As ADC, Mr. Thomas is now able to access, download and analyze all available Use of Force data in IAPro and Blueteam databases. Mr. Thomas provides ongoing technical assistance on IAPro data collection and data fields. Progress to date also includes the current development of routine Use of Force Data Briefs for key stakeholders such as the CDP Chief of Police, Deputy Chiefs, Commanders, and other police officers.

### 3. Field-Based Reporting ("FBR") Technical Assistance.

The Settlement Agreement provides that:

The Data Collection and Analysis Coordinator will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation. This system will allow the information to be searched and summarized electronically. Data is not required to be collected for social contacts and encounters that are voluntary and consensual. CDP's stop and search data collection system will be subject to

review and approval by the Monitor and DOJ, and will require officers to document the following: a. the officer's name and badge number; b. date and time of the stop; c. location of the stop; d. duration of the stop; e. subject(s)'s actual or perceived race, ethnicity, age, and gender; f. if a vehicle stop, the presence and number of any passengers; g. if a vehicle stop, whether the driver or any passenger was required to exit the vehicle, and the reason for doing so; h. reason for the stop, including a brief description of the facts creating reasonable suspicion; i. whether any individual was asked to consent to a search and whether such consent was given; j. whether a pat-down, frisk, or other non-consensual search was performed on any individual or vehicle, including a brief description of the facts justifying the action; k. a full description of any contraband or evidence seized from any individual or vehicle; and l. disposition of the investigatory stop, including whether a citation or summons was issued to, or an arrest made of any individual, including the charge(s). (¶260).

Progress towards this objective includes the participation of the Acting Data Coordinator in CAD/MPS database development meetings and conference calls. Mr. Thomas met multiple times with the software developer and CDP staff to review individual data fields to be used with the MPS field-based reporting system. Mr. Thomas is providing ongoing technical assistance and guidance on data field names and values, and the potential impact on subsequent data management and analysis. Mr. Thomas is working as part of the project team with the CDP and IT Division staff to provide technical assistance on issues related to FBR data migration and integration. Mr. Thomas is providing technical assistance on how to resolve data quality issues potentially encountered during FBR data migration or integration, as well as collaborate with CDP, IT and other stakeholders to ensure that FBR data gathered will ultimately translate to database design with minimal problems.

### 4.    Routine Reporting to Key Stakeholders.

The Settlement Agreement provides that "The Data Analysis and Collection Coordinator will be responsible for the routine reporting of relevant data to the Chief of

Police, FRB, Training Review Committee, OPS, the Commission, and the Police Inspector General." (Dkt. ¶ 261).  Progress towards this objective includes the development of the Consent Decree Data Report Needs Assessment template. This document was created as a mechanism for informing the development of use of force reports for key stakeholders involved with the Settlement Agreement listed above in paragraph 261. The first column of the template contains use of force variables of interest set forth in the Consent Decree. Variables in the second column are grouping variables that will allow for cross-tabulations with variables of interest. After reviewing both types of data, key stakeholders are asked to refer to the Use of Force Report Builder on page 3 of the template.

The purpose of this section is to begin to identify the focus of each report, as well as the frequency and timeframe of analyses. It is recognized that since this is an initial exercise, report content and format may change due to available data and ever changing areas of interest. Key stakeholders are encouraged to add other variables of interest that, perhaps, are not listed in this document. This document is a starting point in the development of useful and targeted reports that will be provided to key stakeholders. After key stakeholders complete the report builder document, the Data Coordinator meets with individual key stakeholders to review and finalize the completed document. The first use of this template is just underway to develop a Use of Force Data Brief for the Chief. It is anticipated that other briefs and reports will be added in the coming year.

### 5.    Annual Assessment of Forms and Data Collection Systems.

The Settlement Agreement provides that:

> The Data Analysis and Collection Coordinator will be responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection. This assessment will be provided to the Monitor. (Dkt. 7-1, ¶ 262).

Progress towards this objective includes the ongoing participation of the Acting Data Coordinator in all discussions around the appropriate data fields and forms for IAPro and field-based reporting data collection systems. The Acting data Coordinator is involved in the ongoing assessment of all data collection forms related to Community Engagement, MPS Vehicle Form, MPS Person Form and MPS CIT Form and Use of Force. Mr. Thomas will provide an annual assessment of all forms to the Monitor including any major revisions to forms, gaps in data collection for forms, and for all fields in each form.

### 6. Data Analysis Protocol.

> The Settlement Agreement provides that:

> Within 365 days of the Effective Date, the Data Collection and Analysis Coordinator will develop a protocol to accurately analyze the data collected and allow for the assessments required below. This protocol will be subject to the review and approval of the Monitor and DOJ. (Dkt. 7-1, ¶263).

Progress towards this objective includes the development of a Data Analysis Protocol by the Acting Data Coordinator. The fourth revision of the Data Analysis Protocol was provided to the Monitor on June 9, 2017. The City received feedback from the Monitor, including DOJ comments, on July 10th, 2017. The Acting Data Coordinator made revisions and returned the revised Data Analysis Protocol back to the Monitors on July 12, 2017. It is anticipated that the Data Analysis Protocol will be finalized shortly and thereafter filed by the Monitor with the Court.

### 7. Stop, Search and Arrest Data Report.

The Settlement Agreement provides that:

> Within 90 days of development of the protocol, and annually thereafter, CDP
> will conduct an assessment and issue a report summarizing its investigatory
> stop, search, and arrest data. The report will identify significant trends in
> compliance with the Fourth Amendment of the Constitution, identify which
> practices are most effective and efficient in increasing public safety and
> community confidence in CDP, and the steps taken to correct problems and
> build on successes. The report will be publicly available. (Dkt. 7-1, ¶264).

Progress towards this objective going forward is dependent on the successful

implementation of the above mentioned FBR data collection systems and the ability of

the Acting Data Coordinator to receive stop, search and arrest data.

### 8.    Year 1 Annual Report.

The Settlement Agreement provides that:

> Within 150 days of development of the protocol, and annually thereafter,
> CDP will conduct an assessment and issue a report of all activities, including
> use of force, arrests, motor vehicle and investigatory stops, and misconduct
> complaints alleging discrimination, to determine whether CDP's activities are
> applied or administered in a way that discriminates against individuals on the
> basis of race, ethnicity, gender, disability, sexual orientation, or gender
> identity. This report will be based on data the City is obligated to collect, and
> is not an independent data collection requirement. CDP's report will identify
> which practices are most effective and efficient in increasing public safety
> and community confidence in CDP, and identify steps taken to correct
> problems and build on successes. CDP will make this report publicly
> available. (Dkt. 7-1, ¶ 265).

Progress towards this objective presently includes the Acting Data Coordinator beginning

to outline the Year 1 Annual Report, including identifying what data is available for

analysis related to Settlement Agreement areas such as Use of Force, Training, CIT,

Community Engagement and Recruitment.

### 9.    2017 CDP Use of Force Report.

The Settlement Agreement provides that:

> Within 150 days of the development of the protocol, and annually thereafter,

CDP, working with the FRB, will analyze the prior year's force data, including the force-related data listed above, to determine trends; identify and correct deficiencies revealed by this analysis; and document its findings in a public report. The FRB's data analysis responsibilities are outlined in paragraph 129. (Dkt. 7-1, ¶ 266).

Progress towards this objective includes the successful populating of the Use of Force data fields in IAPro and the ability of the Acting Data Coordinator to access, download, analyze and report out on the vast majority of these data points. Mr. Thomas has been trained on IAPro software and is now able to access, download and analyze all available Use of Force data in IAPro and Blueteam databases.

### 10.    CD Dashboard Data on City/CDP website

The Settlement Agreement provides that:

To ensure transparency in the implementation of this Agreement, all CDP audits, reports, and outcome analyses related to the implementation of this Agreement will be made publicly available, including at the City and CDP websites, to the extent permitted by law. The Commission will work to make paper copies of these documents available to the community. The Commission also may recommend that CDP make additional documents, data, and reports publicly available. (Dkt. 7-1, ¶ 267).

Progress towards this objective includes the initial meeting of the Data Planning Committee consisting of the Chief Information Officer for the City, the Crime Analysis for CDP, the Acting Data Coordinator, the IT Program Coordinator for the City Department of Public Safety, and a Data Analyst for the City Department of Public Safety. This committee is addressing the process for the regular posting of data analysis runs, data briefs, reports, and other relevant documentation on the City/CDP website. When necessary, paper copies of documents will be made available to interested parties.

### H.    **Bias Free Policing**

The CDP had submitted a proposed Bias Free Policing Policy for further

discussion and review in June, 2016. The Monitor and DOJ have now both provided feedback. In February, 2017 the Monitor filed a "Motion Recommending Approval of Community Engagement Framework for Community and Problem Oriented Policing Plan and Bias-Free Policing Policy." (Dkt. 111).  As noted above the proposed framework involves extensive community and stakeholder engagement with a final policy envisioned being submitted to the Court for approval in late November.

**I.        Compliance and Outcome Assessments and Reporting**

The City's ability to collect and provide the data required by the Consent Decree is an important element in documenting compliance and allowing for meaningful outcome assessment by the Monitor team.  As noted above the City has made great strides during the most recent reporting period to address the mechanisms that will allow the necessary data to be collected, categorized, and assessed.

**III.       Assessment of the Status of Cleveland Division of Police's Progress**

The City has made substantial progress in completing important bedrock requirements associated with the reforms agreed to in the Consent Decree. The final approval of CDP's Use of Force and Crisis Intervention Policies, along with approval of the training curriculums developed for training all officers is a major milestone in assessing CDP's progress. The CDP's hard work in these areas was well recognized in the Monitor's Third Semiannual Report.  Training on these policies has begun and it is anticipated that both policies will be effective by the end of the current calendar year. While the Court's approval of the final OPS and PRB manuals is a significant step for the future, the City recognizes that reducing the investigation backlog remains a primary and

necessary focus going forward to ensure community confidence in the City's civilian complaint review process.

The CDP's ongoing work and community engagement efforts in formulating a successful CPOP Plan and bias free policy should ensure both are completed within the framework and time line established by the Monitor and approved by the Court. Much progress has been made in the data collection and analysis area. While the hiring of a full time data analysis coordinator has proven somewhat more difficult than initially anticipated, the City's current agreement with the Begun Center at Case Western Reserve University and the hard work accomplished by Mr. Thomas as the Acting Data Analysis Coordinator has resulted in substantial progress toward meeting data collection and analysis requirements.

### IV.  Plans to Correct Any Problems

The City continues to work cooperatively with the Monitoring Team and the DOJ on a daily basis. Seeming potential problems have usually been addressed and worked out within the give and take allowed for and designed into the First and Second Year Monitoring Plans.

The City remains focused on substantially reducing the backlog of OPS complaints and working to ensure timely and thorough investigations of civilian complaints are completed. The City has now hired six experienced investigators as temporary employees to assist in this area. The City and the OPS will continue to work with the Monitor Team and the DOJ in accomplishing this necessary goal.

The CDP has experienced difficulty in filling the civilian IA Superintendent

position. The agreed upon revised qualifications for the position should prove helpful. Interviews for the position should begin in the near future.

**V.**     **Response to Concerns Raised in the Monitor's Semi-Annual Report**

The Monitor recommended approval in part of the CDP's submitted Equipment and Resource Plan.  CDP's Plan reflected a great deal of study, discussion, and followed substantive interactions with the Monitor, DOJ, CPC, and CDP officers. The City continues to work with the Monitor and DOJ in a collaborative fashion to meet the terms of the Settlement Agreement.

The City recognizes data collection is critical to assessing compliance with the Consent Decree. Because of the importance of data in evaluating the CDP within the context of the many performance variables presented in the Consent Decree the City entered into the contract with Case Western Reserve University to ensure there was no delay in establishing the basis for collecting and analyzing data.

As noted above the City has expanded its investigative staff and continues to work with the Monitor and DOJ in a collaborative effort to reduce the existing backlog of investigations.

CDP is presently reviewing the Monitor's recent review of IA investigatory reports. CDP has been working collaboratively with the Monitor in this area and continues to address those areas where improvements can be made.

**VI.**     **Conclusion**

Major policy milestones in the critical areas of Use of Force and Crisis Intervention have been met, with the necessary officer training in both areas being conducted and scheduled to be completed this year.  The City and CDP continue to work with the Monitor,

DOJ, CPC, and community members to ensure that the agreed upon reforms addressed in the

Consent Decree are achieved.

<div style="margin-left: 40%">

Respectfully submitted,

Barbara A. Langhenry (0038838)
Director of Law

By:     /s/ Gary S. Singletary
         Gary S. Singletary (0037329)
         Chief Counsel
         City of Cleveland
         601 Lakeside Avenue, Room 106
         Cleveland, Ohio  44114-1077
         Tel: (216) 664-2737
         Fax: (216) 664-2663
         E-mail: gsingletary@city.cleveland.oh.us

         Counsel for the City of Cleveland

</div>

## CERTIFICATE OF SERVICE

The undersigned certifies that the City of Cleveland's Fourth Status Report was filed electronically on July 19, 2017.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system. Pursuant to the requirements of the Consent Decree the Monitor Team has been separately delivered a copy of this filing.

/s/ Gary S. Singletary
Gary S. Singletary (0037329)
Counsel for the City of Cleveland