IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | |
| CITY OF CLEVELAND | ) | **NOTICE SUBMITTING MONITORING** |
| | ) | **TEAM'S FOURTH SEMIANNUAL** |
| Defendant. | ) | **REPORT** |

The Cleveland Police Monitoring Team submits its Fourth Semiannual Report.


Respectfully submitted,


/s/  Matthew Barge
MATTHEW BARGE
Monitor
234 5th Avenue, Suite 314
New York, New York 10001
Tel: (202) 257-5111
Email:  matthewbarge@parc.info



Cleveland
Police
Monitoring
Team

# Fourth Semiannual Report

January 2018

# TABLE OF CONTENTS

I.      A NOTE FROM THE MONITORING TEAM ..................................................................1

II.     AN INTRODUCTION TO THE ROLE OF THIS REPORT & THE MONITORING TEAM ...3
    A.  The Updated Second-Year Monitoring Plan and Compliance Schedules.........................3
    B.  The Purpose and Form of This Report.............................................................6

III.    COMMUNITY ENGAGEMENT AND BUILDING TRUST ...................................................9
    A.  Community Police Commission ("CPC").............................................................9
    B.  District Policing Committees ...................................................................11
    C.  The Monitoring Team's Community Engagement & Outreach ...........................................13

IV.     COMMUNITY & PROBLEM-ORIENTED POLICING............................................................14
    A.  The Community and Problem-Oriented Policing ("CPOP") Plan........................................16
    B.  The Community Engagement Process ...............................................................17
    C.  Status of CPOP Plan ...........................................................................20
    D.  Mission Statement .............................................................................22

V.      BIAS-FREE POLICING .................................................................................23

VI.     USE OF FORCE .......................................................................................25
    A.  Officer Use of Force Principles & Policy.......................................................25
    B.  Officer Use of Force Training .................................................................26
    C.  Use of Force Reporting, Investigations, and Review ............................................32

VII.    CRISIS INTERVENTION ................................................................................36
    A.  Background Information .........................................................................38
        1.  Mental Health Response Advisory Committee .................................................38
        2.  Revising CDP Crisis Intervention Policies and Procedures ..................................38
        3.  Crisis Intervention Data..................................................................39
        4.  Crisis Intervention Training..............................................................40
        5.  Selection of CIT Officers ................................................................40
    B.  Current Implementation Status .................................................................41
        1.  Transition ...............................................................................42
        2.  MHRAC's Second Annual Workplan ...........................................................42
        3.  Quality Assurance Subcommittee............................................................43
        4.  Crisis Intervention Plan .................................................................43
        5.  CIT Selection Process ....................................................................44
        6.  Training..................................................................................45
        7.  Diversion.................................................................................46
        8.  Community Engagement .....................................................................47
        9.  Data Integration: CDP CAD System .........................................................47
    C.  Conclusion ....................................................................................47

VIII.   SEARCH AND SEIZURE.................................................................................49

IX.     ACCOUNTABILITY ...................................................................................................51
   A.   Internally Discovered Misconduct ................................................................52
       1.   Status of Compliance - Ongoing Policy Work .........................................54
       2.   IA Superintendent Recruitment & Hiring................................................55
   B.   Office of Professional Standards ("OPS") ....................................................56
       1.   Current State of OPS ...............................................................................60
       2.   2014 Cases Assigned for "Supervisory Review" ....................................66
       3.   OPS Budget and Resourcing ...................................................................67
       4.   City Negotiations with Police Union Regarding OPS Practices..............68
       5.   OPS Annual Report ................................................................................69
       6.   Public Awareness Plan ..........................................................................70
       7.   Training for OPS Investigators ...............................................................71
   C.   Police Review Board ("PRB")........................................................................72
       1.   PRB Manual ............................................................................................72
       2.   PRB Training Plan ...................................................................................73
       3.   Documentation of PRB Decision-Making................................................74
       4.   Quality of PRB Recommendations & Processes.....................................75
   D.   Discipline and Disciplinary Hearings ...........................................................76
       1.   Disciplinary Matrix.................................................................................77
       2.   Current Status of Imposition of Discipline and Disciplinary Findings............79

X.      TRANSPARENCY & OVERSIGHT ..........................................................................81
   A.   Police Inspector General ..............................................................................81
   B.   Data Collection and Analysis .......................................................................81
   C.   Public Availability of CDP-Related Information ...........................................83

XI.     OFFICER ASSISTANCE & SUPPORT .....................................................................85
   A.   Training..........................................................................................................85
       1.   In-Service Training..................................................................................86
       2.   Academy Training and Field Training Program.......................................90
   B.   Equipment & Resources ................................................................................91
   C.   Recruitment & Hiring.....................................................................................95
   D.   Performance Evaluations and Promotions ...................................................96
   E.   Staffing ..........................................................................................................97

XII.    SUPERVISION .....................................................................................................100
   A.   First-Line Supervisors .................................................................................100
   B.   Officer Intervention Program ......................................................................101
   C.   Body-Worn Cameras ...................................................................................102

XIII.   COMPLIANCE & OUTCOME ASSESSMENTS.......................................................106
   A. Outcome Measures......................................................................................106
   B. Consent Decree Survey Requirements ......................................................108
   C. Compliance Reviews & Audits ...................................................................109

## I.     A NOTE FROM THE MONITORING TEAM

The Monitoring Team has previously noted that the Consent Decree is not an "on/off" switch – instead, it is a long, comprehensive process requiring diligent, daily efforts at reimagining policing in Cleveland.

The authors of Cleveland's progress to date are too numerous to mention here, as the process of working toward compliance has been a comprehensive community effort to date.  Nevertheless, we thank some individuals in particular for their contributions.  First, Mayor Frank Jackson continues to provide steadfast support of police reform that makes Cleveland's communities safer and their relationship with the police stronger.  Chief Calvin Williams has remained critically engaged in his organization's progress under the Consent Decree – making sometimes difficult decisions to ensure effective, efficient implementation of critical reforms.  City Council President Kevin Kelley continues to provide invaluable assistance, support, and critical guidance throughout the reform process, and Public Safety Chair Matt Zone continues to be an invaluable ally in ensuring effective and constitutional policing.  U.S. Attorney Justin Herdman has been notably involved in the day-to-day work of reform under the Consent Decree, and the Monitoring Team appreciates his substantial commitment to making policing work for the men and women of Cleveland and the Division of Police.

The Monitoring Team calls out for special mention and thanks Consent Decree Coordinator and Former U.S. Magistrate Judge Greg White.  Judge White has provided decades of service to Cleveland, and his present oversight of the Consent Decree process on behalf of the City is a critical, if sometimes thankless, function.  All stakeholders benefit from his pragmatism and commitment to duty.

Finally, the Monitoring Team thanks the many members of the community – CPC commissioners, CDP officers, community organizations, and members of the public – who continue to contribute substantively to a new approach to policing in Cleveland.  The adoption of new public safety approaches will continue to require the contributions and dedication of all these stakeholders going forward.

\* \* \*

Close readers of this Fourth Semiannual Report will note some changes in formatting and visual style.  The Monitoring Team heard the type size of prior reports was uncomfortably small for some.  It is optimistic that the changes implemented in the present report will make the report more accessible to all.

\* \* \*

From early on, the Monitoring Team has benefitted from the expertise and counsel of New York University School of Law's Policing Project, which is currently working on major community and democratic policing projects in Camden, New Jersey; Chicago, Illinois; Nashville, Tennessee; Tampa, Florida; Tucson, Arizona; and other jurisdictions across the country.

The Team is pleased that the Policing Project is detailing Brian Chen to the monitoring effort in Cleveland.  Until joining the Policing Project in September 2017, Brian worked in the Office of the Mayor of New Orleans, where he managed criminal justice and law enforcement issues.  Previously, Brian worked as an Associate at the law firm of Fried Frank in New York where, among other things, he provided support to the firm's team monitoring the federal consent decree addressing policing in the U.S. Virgin Islands.  The Monitoring Team is pleased to have Brian's expertise available to further assist the City and the Division of Police in the progress toward compliance.

***

The Cleveland Police Monitoring Team wishes to express our sadness at the death of Valeria Harper, Chief Executive Officer of the Alcohol, Drug and Mental Health Services Board of Cuyahoga County.  The Monitoring Team appreciated Ms. Harper's hard and critical work on behalf of the Mental Health Response Advisory Committee.  We knew her as a kind and gentle person who devoted her life to improving services for those in need.  Her caring and compassion for individuals and families recovering from mental illness and addictive disorders will be sorely missed.  Although her time as CEO of the ADAMHS board was much too short, her leadership and advocacy for change has made Cleveland a stronger community.

*Cleveland Police Monitoring Team*
*January 24, 2018*

## II.    AN INTRODUCTION TO THE ROLE OF THIS REPORT & THE MONITORING TEAM

Under the terms of the Consent Decree between the United States and the City of Cleveland (the "City") (collectively, the "Parties") involving the Cleveland Division of Police ("CDP," the "Division of Police," or the "Division"[1]), the Court-appointed Monitoring Team must "assess and report" to the Court whether the Decree's requirements "have been implemented, and whether this implementation is resulting in constitutional and effective policing, professional treatment of individuals, and increased community trust . . . . "[2]  This is the Monitoring Team's fourth semiannual report.[3]  It addresses the reporting period of July 2017 through January 2018.

The Monitoring Team is an "agent of the Court" that is "subject to the supervision and orders of the Court."[4]  The task of the Team is to assess, independently and on behalf of Judge Solomon Oliver, Jr., whether CDP and the City of Cleveland have reached compliance with the various and diverse requirements of the Consent Decree.  Thus, as the Monitoring Team has previously outlined, it "is not an employee, contractor, or any other type of agent" of either the City of Cleveland or the United States Department of Justice ("DOJ").[5]  Instead, it works for the Court.

As part of that charge, the Team assists in facilitating Consent Decree implementation by providing technical assistance and Counsel to the Division of Police and City of Cleveland.  Thus, although the ultimate task is to inform the Court and DOJ about the City's compliance with the Consent Decree, it provides ongoing, substantial assistance geared at ensuring effective, efficient, and expeditious progress.

### A.    The Updated Second-Year Monitoring Plan and Compliance Schedules

The current, Second-Year Monitoring Plan addresses the period of February 1, 2017 through January 31, 2018.[6]  Pursuant to that Plan, the Monitoring Team submitted "an updated monitoring plan for the second year" in August 2017 that adjusted various timetables, where necessary, to reflect the actual pace of progress made during the first part of 2017.[7]

---

[1] The Division's personnel variably refer to the organization as "CPD" or "CDP."  Because the Consent Decree uses the abbreviation "CDP," this report primarily uses that abbreviation.

[2] Dkt. 7-1 ¶ 350.

[3] *Id.* ¶ 375 (requiring semiannual reports).

[4] First Semiannual Report at 14.

[5] *Id.*

[6] *See* Dkt. 120.

[7] *Id.* at 7.

The Monitoring Team's Third Semiannual Report noted that, as Consent Decree implementation proceeds, it will be:

> [P]assing the baton to the City and Division going forward with respect to the fashioning of a project implementation plan that will ensure, among other things, that: the Monitor reviews all "CDP policies, procedures, practices, training curricula, and programs developed and implemented under this agreement"; the Department of Justice has the ability to review the same; that the Community Police Commission, police officer organizations, rank-and-file officers, other community stakeholders, and Cleveland residents all have appropriate opportunity to provide input to and feedback on reforms generally and on specific proposed changes to policies, practices, training, and procedures; and that the Court, as always, be in a position to consider reforms of the Consent Decree and order them effective before being implemented within the City or Division.[8]

Neither this Court nor any member of the public should interpret this as a signifier that the Monitoring Team is stepping back from its active role in ensuring compliance with all terms of the Consent Decree.  It is not.  Instead, for all of the Consent Decree's provisions to become effective in practice, across time, the Division of Police needs to have ensured that it has developed the internal capacity to manage the risk of unconstitutional policing and to respond strategically to emerging community and officer needs.  Project management capacity is part and parcel of doing so across a large, dynamic institution like CDP.  Consequently, transitioning the duties of generating a first draft of the plan for reform in the upcoming year is geared toward ensuring that CDP develops the capacity to implement and maintain reforms well after the Consent Decree is done.  The Team will remain active in reviewing CDP's draft Third-Year Monitoring Plan and ensure that the ultimate plan meaningfully advances progress in the coming year.

The Consent Decree provides that the City and CDP will "hire and retain, or reassign current city employees to form a unit with the skills and abilities necessary to facilitate compliance" with the Decree.[9]  Among other things, this unit must "coordinate . . . compliance and implementation activities"; facilitate access to information, facilities, and personnel; "ensure that all data, documents and records are maintained as provided in this Agreement"; and assist in assigning implementation and compliance related tasks to CDP personnel."[10]

---

[8] Third Semiannual Report at 8.

[9] Dkt. 7-1 ¶ 385.

[10] *Id.*

Nearly all other jurisdictions that have or are proceeding through federal reform efforts have established dedicated units, with full-time personnel, tasked with guiding the day-to-day project management and substantive work that is at the core of the implementation process. Baltimore, Cincinnati, Los Angeles, New Orleans, Pittsburgh, Seattle, and Washington, D.C. all established units within the police department with staff devoted full-time to Consent Decree implementation.

The City indicates, in good faith, that it has a compliance team, with full-time personnel dedicated to every aspect of compliance and investing significant resources and hours. Indeed, personnel from IT, Finance, Law, Safety, the Public Department, and the Mayor's Office remain active and dedicated to implementing necessary reforms under the Consent Decree. To be sure, the Monitoring Team has the pleasure of working with this cadre of CDP and City personnel whose responsibilities and work is impacted by or relates directly to significant areas of the Consent Decree. Similarly, the Monitoring Team enjoys a strong working relationship with Judge Greg White (ret.), who tirelessly convenes a cross-functional group of CDP and City employees on at least a bi-weekly basis to discuss the status of Consent Decree implementation and drive progress. Conversation among the Parties and Monitoring Team has focused, over the last several months, on the formation of what the Division has called a "Bureau of Compliance" which would house, among other things, the Inspections Unit, policy, and other functions – but would not introduce individuals expressly dedicated to the day-to-day work of compliance with the terms of the Consent Decree.

However, it is unlikely that any of these things can be a substitute for "form[ing] a unit . . . to facilitate compliance . . . . "[11] The Monitoring Team discussed that none of these things is a substitute for "form[ing] a unit . . . to facilitate compliance" with the City in a meeting in March 2017. [12] Since that time, no progress appears to have been made on "hir[ing] and retain[ing], or reassign[ing] current City employees, to form a unit with the skills and abilities necessary to facilitate compliance . . . . "[13] Instead, CDP command staff and City employees with significant other responsibilities have been forced to substantially shoulder the additional burden of Consent Decree implementation. Despite the dedication and hard work of these individuals, the process of managing organizational change is difficult and complex – and warrants the type of centralized compliance function that a vast majority of other cities who have charted these same waters have used to make progress.

Especially in light of additional City resources that voters made available for Consent Decree reforms as of the start of 2017,[14] the City will be substantially aided by assigning current employees full-time,

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *See* Peter Krouse, "Cleveland Income-Tax Hike to Take Effect Jan. 1," *Cleveland Plain Dealer* (Dec. 30, 2016), http://www.cleveland.com/metro/index.ssf/2016/12/cleveland_income_tax_hike_to_t.html (noting that "income-tax increase was needed to . . . help fund the implementation of a federal consent decree on police use of force").

and hiring additional civilian personnel, to focus on the type of systemic, fundamental reforms to which the City agreed when it entered into the Consent Decree. The Monitoring Team looks forward to discussing the details of the City coming into compliance with paragraph 385 in the near future so that the pace of progress can be accelerated in 2018.

## B.    The Purpose and Form of This Report

In its Third Semiannual Report, the Monitoring Team began summarizing the status of the City's compliance with each paragraph of the Consent Decree. Although providing "a paragraph-by-paragraph accounting of the general state of the City's compliance . . . runs the risk of being an over-simplification," the Team continues to conclude that these summary characterizations are useful markers for understanding progress over time.[15]

Thus, each major section of this Fourth Semiannual Report summarizes the Monitoring Team's generalized conclusions about the status of compliance by describing the state of each area as one of the following:

> **Non-Compliance.** The City or Division has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or Division's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement.

> **Evaluation Deferred.** This category reflects those limited instances where work in a given area has been intentionally and affirmatively deferred in order to work on other, necessary prerequisites. In these areas, the City or Division could have made more progress in a given area but, for project management reasons, have appropriately focused attention on other areas. Although this still means that the City has a distance to travel to reach General Compliance with the term of the Consent Decree, the intentional and affirmative decision to postpone focus on a given area for project management and implementation purposes is sufficiently different to warrant a separate designation in some cases.

> **Partial Compliance.** The City or Division has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the provision of the Consent Decree – but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice.

---

[15] Third Semiannual Report at 9.

It may capture a wide range of compliance states or performance, from the City or Division having taken only very limited steps toward operational compliance to being nearly in operational compliance.

**Operational Compliance.**  The City or Division has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Decree such that it is in existence or practice operationally – but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents.  This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

**General Compliance.**  The City or Division has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents.  This includes instances where it can be shown that the City or Division has effectively complied with a requirement fully and systemically.

The same caveats that applied to the use of these summary categories remain applicable here.  First, and most importantly, "Non-Compliance" or "Partial Compliance" does not automatically mean that the City or CDP have not made good-faith efforts or commendable strides toward compliance.  It might, instead, signify that initial work has either not yet begun or reached a sufficiently critical point where progress can be considered to have been made.

Second, and relatedly, "Partial Compliance" requires more than taking some limited, initial steps toward compliance with a requirement.  It instead requires that the City or Division have made "sufficient, material progress toward compliance" that "has graduated from the stages of initial work to more well-developed and advanced refinement of various reforms."[16]

Third, these summary terms do not appear in the Consent Decree.  The Team employs them in order to synthesize and summarize the report's conclusions.  Relatedly, compliance with individual paragraphs of the Decree is necessary for the larger, overall "Substantial and Effective Compliance" with the whole of the Consent Decree but it is not the same thing.  Ultimately, "Substantial and Effective Compliance" with the Consent Decree will be reached when "the City either has complied with *all* material requirements of this Agreement, or has achieved sustained and continuing

---

[16] *Id*. at 10.

improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures"[17] "by a preponderance of the evidence."[18]

Fourth, the charts that summarize progress in each area also condense the requirements of each paragraph rather than reprinting the entire Consent Decree in the context of this report. As the Third Semiannual Report noted, "[a]ny imprecision detected or confusion created by these condensed or summarized requirements is unintended and, in any event, can be cured with reference to the original Consent Decree language itself.[19]  The charts primarily cover paragraphs 14 through 340 of the Consent, but other paragraphs also contain requirements that the City must meet.[20]

Following the release of our last report, some community members, and CDP members, inquired about the basis for some of our summary conclusions.  **We reiterate that these overall conclusions do not take the place of the more rigorous quantitative and qualitative assessments, including the yearly outcome assessments that the Monitoring Team conducts:**

> [T]he Monitoring Team bases its assessments on its current understandings, knowledge, and information gained through ongoing work and discussion with CDP, the Parties, and other stakeholders.  The assessments are informal to the extent that not all of them are necessarily informed by the type of exhaustive compliance and outcome measurements that are a critical component of the Consent Decree – and the summary determinations do not take the place of these more structured, systemic analyses.  The intent is to provide a bottom line sense of where the Division is on the road to compliance.  Ongoing, rigorous quantitative and qualitative assessments will provide a more comprehensive picture as work under the Consent Decree proceeds.[21]

The Team's characterizations of progress should ultimately be viewed as a synthesis or bottom-line accounting of the substantive discussions of each major Consent Decree area contained within this report.

---

[17] Dkt. 7-1 ¶ 456 (emphasis added).

[18] *Id.* ¶ 397.

[19] *See generally* Dkt. 7-1, *available at* https://www.justice.gov/crt/case-document/file/908536/download.

[20] *See* Third Semiannual Report at 10.

[21] *Id.* at 11.

### III.     COMMUNITY ENGAGEMENT AND BUILDING TRUST

| Paragraph | Status of Compliance |
|---|---|
| 14.   CDP creation of "formal and informal mechanisms that facilitate ongoing communication between CDP and the many Cleveland communities it serves." | **PARTIAL COMPLIANCE** |

### A.     Community Police Commission ("CPC")

| Paragraph | Status of Compliance |
|---|---|
| 15.   Creation of CPC to make recommendations, work with Cleveland communities to develop recommendations, and "report to the City and community as a whole and to provide transparency" on reforms | **GENERAL COMPLIANCE** |
| 16.   Establishment of CPC Selection Panel to select CPC Commissioners; composition of CPC; and periodic meetings with Chief of Police to "provide recommendations." | **GENERAL COMPLIANCE** |
| 17(a).  "[H]old public meetings across the City, complete an assessment of CDP's bias-free policing policies, practices, and training, and make recommendations." | **GENERAL COMPLIANCE** |
| 17(b).  "[A]ssist as appropriate in . . . development of training related to bias-free policing and cultural competency." | **PARTIAL COMPLIANCE** |
| 17(c).  "[O]n an ongoing basis, assess CDP's community activities" and "make recommendations" related to "community engagement" and "community confidence" | **PARTIAL COMPLIANCE** |
| 17(d).  "[O]n an ongoing basis, review CDP's civilian oversight structure to determine if there are changes it recommends for improving CDP's accountability and transparency" | **PARTIAL COMPLIANCE** |
| 17(e).  "[P]erform other function[s] as set out in this Agreement." | **PARTIAL COMPLIANCE** |
| 18(a).  "[R]eview and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention." | **PARTIAL COMPLIANCE** |
| 18(b).   [R]eview and comment on CDP's implementation of initiative, programs, and activities that are intended to support reform." | **PARTIAL COMPLIANCE** |
| 18(c).  "[H]old public meetings to discuss the Monitor's reports and to receive community feedback concerning CDP's compliance with this Agreement." | **OPERATIONAL COMPLIANCE** |
| 19.   "The City will provide access to all information requested by the Commission related to its mandate, authority, and duties unless it is law enforcement sensitive, legally restricted, or would disclose a personnel action." | **PARTIAL COMPLIANCE** |

| 20.  CPC "will issue [at least annual] reports," which "City will post . . . to the City's website." | OPERATIONAL COMPLIANCE |
| 21.  "The City will consider and timely respond in writing to the Commission's recommendations for improvements," which "will be posted to the City's website." | NON-COMPLIANCE |
| 22.  CPC budget listed as "separate line item" to ensure "sufficient independence and resources." | GENERAL COMPLIANCE |

Entering its third year of operation, the Cleveland Community Police Commission ("CPC" or "Commission"), charged under the Consent Decree with being the conduit between the Cleveland community and the Consent Decree implementation process, is gaining momentum with the onboarding of dedicated, full-time staff. The Commission now has five full-time staff members, which include its new Executive Director, Jason Goodrick; two Community Engagement Coordinators; a Senior Policy Analyst, Bethany Studenic; and an Administrative Assistant.

This new staff have made immediate strides toward building public awareness of the Commission and deepening community participation in the CPC's engagement activities. This progress is evident in the CPC's new website, which is well-designed and routinely updated. The staff has similarly expanded the Commission's social media activity. This digital presence, combined with traditional outreach methods such as building connections with existing organizational networks and attending routine community gatherings throughout the city, appears to have increased attendance at the Commission's most recent public meetings.

During this reporting period, the CPC experienced a change in leadership. The former co-chairs, Dr. Rhonda Y. Williams and Mario Clopton-Zymler, separately resigned. Dr. Yvonne Conner and LaToya Logan were chosen by their peers to assume the responsibilities of co-chairs on the Commission. While Mr. Clopton-Zymler remains a Commissioner, Dr. Williams' resignation left one of the CPC's ten civilian positions vacant. As required by the Consent Decree, a selection panel worked to identify an individual from a pool of applicants. The Selection Panel, after considering applications and conducting interviews, selected Richard Knoth to fill the vacant Commissioner position. Mr. Knoth has been sworn in and begun serving in this position.

The Monitoring Team commends Dr. Williams and Mr. Clopton-Zymler for shepherding the CPC through its nascent stages and tackling numerous critical challenges. Their commitment, leadership, and administrative contributions were essential to the Commission's productivity in the absence of a full-time staff.

The Commissioners are currently revising the CPC's bylaws so that the organization and its members will have clear guidelines on how to govern themselves. The CPC has received feedback from the

Parties.  The Monitoring Team understands that the Commissioners are continuing to discuss the proper scope of the bylaws and will adopt them once finalized.

Among other accomplishments in the reporting period, the CPC coordinated two community roundtables devoted to bias-free policing on the east and west sides of Cleveland.  The Commission has created an initial draft of its Community Engagement Assessment Plan and will continue to refine the plan based on the Parties' feedback.  The Commission also promptly gathered community feedback on the Division's proposed bias-free policing policy and submitted its recommendations to the CDP on October 16, 2017.  The CPC currently awaits the completion of additional CDP draft policies so that it can process community feedback and provide its recommendations.

In short order, the new CPC staff has familiarized themselves with the City of Cleveland's budgeting and accounting processes.  As a city entity, the Commission is on a stable path to working collaboratively with city leadership to ensure adherence to the procedural and financial regulations related to the expenditure of public dollars.

Through a collaborative process with the City's Finance Department, the CPC has leased office space that is centrally located at 3631 Perkins Avenue.  The CPC has also, with the help of the City, established a relationship with TV 20 to meet the videography needs of the Commission – which are aimed at furthering outreach with ever-broader and more diverse segments of Cleveland.

The Commission has secured an organizational development consultant, who will assist the CPC in expanding upon its existing strengths and growing its reach and capacity.  It appears that both staff and commissioners are energized about what they can achieve now that they are operating near full capacity.

In short, the CPC remains on a positive and productive trajectory – achieving much in the past six months on which it may continue to build, including growing attendance at its public meetings, an active digital presence, a committed and passionate staff, and a track record for meeting its Consent Decree deliverables.

## B.    District Policing Committees

| Paragraph | Status of Compliance |
|---|---|
| 23.  Facilitation of "regular communication and cooperation between CDP and community leaders at the local level," with District Policing Committees meeting "at minimum, every quarter." | **PARTIAL COMPLIANCE** |
| 24.  CPC, CDP, and Community Relations Board ("CRB") will "develop a mechanism to recruit and expand" Committee membership."   CDP "will | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| work with [Community Police] Commission to select officers for each District Policing Committee." | |
| 25. CDP "will work closely with District Policing Committees to identify strategies to address crime and safety issues in their District," considering and addressing identified priorities. | **PARTIAL COMPLIANCE** |
| 26. "At least annually, each District Policing Committee will present its identified strategies, concerns, and recommendations" to the CPC, with CDP officer who is Committee member presenting to CPC "CDP's assessment of ways to address" the recommendations. | **NON-COMPLIANCE** |

The Consent Decree requires the City of Cleveland to expand the District Policing Committees ("DPC"s) that work with the Community Relations Board, the Division of Police, and the CPC to "recruit and expand DPC membership," "identify strategies to address crime and safety issues," and annually "present its identified strategies, concerns and recommendations" to the CPC.[22]

The DPCs continue to be a work in progress. A personnel change for the Director of Community Relations has postponed the City's ability to ensure that each DPC "present its identified strategies, concerns, and recommendations" to the CPC.[23] Prior to the change, the City had committed to regularly report the DPCs' strategies, concerns, and recommendations to the CPC. The City has assured the Monitoring Team that it anticipates meeting these requirements by April 2018 or prior to the Monitor's next Semiannual Report. Accordingly, the Monitoring Team expects the City to work to ensure that each DPC maintain an open line of communication with the Commission. Collaboration between the District Policing Committees and the CPC is an untapped synergy that promises to better promote effective community and problem-oriented policing in Cleveland.

Although DPC membership has grown modestly, membership needs to reflect the diverse makeup of each District. To this end, in July, the Division provided the Monitoring Team with an "Enhancement Strategy" for the District Policing Committees. The document was an admirable plan to build trust and collaboration between the Division and the many communities of Cleveland. It is clear that the Division values the DPCs and seeks to make them an integral part of its Community and Problem-Oriented Policing Plan. Nevertheless, the Division's "Enhancement Strategy" could benefit from additional detail for many of its proposed strategies. The Monitoring Team will continue to provide technical assistance at the City's request so that an "Enhancement Strategy" of sufficient quality to conform to the Consent Decree's requirements may be finalized.

---

[22] Dkt. 7-1 ¶ 24-26.

[23] *Id.* ¶ 26.

## C.　　The Monitoring Team's Community Engagement & Outreach

The Monitor's Community Engagement Team (the "Engagement Team") remains committed to strengthening the substantive and comprehensive involvement of Cleveland's diverse community stakeholders throughout the implementation process of the Consent Decree.  For more than two years, the Engagement Team has conducted extensive outreach across the community to ensure that the city's many ethnic, religious, cultural, professional, and socioeconomic groups and individuals have been able to participate substantively in the reform process.  Since implementation of the Decree began, the Engagement Team has conducted or participated in numerous forums and public gatherings to share information about the reform process, receive public feedback on proposed policies and practices of the Division, and listen to citizens' complaints.

The Engagement Team aims to ensure ongoing visibility and accessibility, so that Cleveland residents can easily express their thoughts, feelings, and lived experiences regarding the Cleveland Division of Police. At the same time, in both formal and informal settings, officers have discussed the reform process, provided individual feedback to the Monitoring Team on proposed CDP policies, and recommended specific topics of discussion, i.e., equipment, working conditions, training, supervision.

In the Third Semiannual Report, the Monitoring Team emphasized that it "remains very interested in those opinions and experiences of persons whose normal daily activities do not provide the time, ability, or impetus to participate directly in the reform process."[24]  To that end, the Engagement Team will be continuing to look for ways of increasing the participation of Cleveland residents in the reform process.  Over the next reporting period, the Engagement Team will increase the frequency of visits to local barber shops, salons, shopping areas, public housing, and other areas where residents regularly interact.  Especially as the Division continues to shape its Community and Problem-Oriented Policing Plan and its Search and Seizure policies, this broader community input will be invaluable in finalizing policies that accurately reflect community values and priorities.

It remains relatively easy for some community residents, leaders, and police officers to dismiss the possibility of policing in Cleveland being more effective, safer, constitutional, and consistent with community values, and the Monitoring Team continues to understand such skepticism.  However, perhaps more than any other major-city reform effort to date, all individuals across Cleveland will continue to be able to participate directly and substantively in the transformation of the Division of Police and its relationship with the community.  The Engagement Team continues to extend its sincere thanks to the many residents, officers, and public officials of Cleveland who continue to dedicate themselves to the hard work of guiding the implementation process toward successful completion.

---

[24] Third Semiannual Report at 18.

## IV.  COMMUNITY & PROBLEM-ORIENTED POLICING

| Paragraph | Status of Compliance |
|---|---|
| 27.  Implementation of "comprehensive and integrated community and problem-oriented policing model" and consultation with CPC regarding the model. | **NON-COMPLIANCE** |
| 28.  Ensuring that "mission statement reflects [the Division's] commitment to community oriented policing" / "integrat[ing] community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **OPERATIONAL COMPLIANCE / NON-COMPLIANCE** |
| 29.  Ensuring "that officers are familiar with the geographic areas they serve," "engage in problem identification," and "work proactively . . . to address quality of life issues." | **NON-COMPLIANCE** |
| 30.  Initial and annual in-service community and problem-oriented policing training "adequate in quality, quantity, type, and scope" that addresses specifically-identified areas. | **NON-COMPLIANCE** |
| 31.  Maintenance of "collaborative partnerships with a broad spectrum of community groups," including CDP meetings with community organizations and District Policing Committees. | **PARTIAL COMPLIANCE** |
| 32.  CDP "meet[ing] with members of the community in each District on a monthly basis and "solic[itation of] participation from a broad cross-section of community members in each District" to "identify problems and other areas of concern . . . and discuss responses and solutions." | **PARTIAL COMPLIANCE** |
| 33.  Development and implementation of "systems to monitor officer outreach to the community" that CDP "will use . . . to analyze . . . whether officers are partnering with a broad cross-section of community members to develop and implement cooperative strategies that build mutual respect and identify and solve problems." | **NON-COMPLIANCE** |
| 34.  "At least annually, CDP will present the results" of paragraph 33 analysis "broken out by District in a publicly-available community policing report" that describes problems, solutions, and obstacles.  Report provided to Commission and posted on CDP website. | **NON-COMPLIANCE** |

The Consent Decree requires that the Division develop and implement a "comprehensive and integrated community and problem-oriented policing model" to "promote and strengthen partnerships with the community . . . and increase community confidence in the CDP."[25]  This section refers to policing according to this model as "community and problem-oriented policing" or "CPOP."

---

[25] Dkt. 7-1 ¶ 27.

Community policing involves the police and the community working as partners to "co-produce" public safety and neighborhood well-being. The core principle behind community policing is that the police and the community must share jointly in the responsibility for promoting public safety, with each playing an important role.

Although "community policing" often is associated with specific programs or strategies – such as the police participating in athletic leagues or mounting sporadic foot patrol – community policing cannot be implemented as effectively as possible unless it is a fundamental philosophy and vision for doing business that is embraced by the organization as a whole. As countless law enforcement professionals have recognized, community policing principles must inform decision-making at all levels of the agency, including decisions about hiring, deployment, and evaluation.[26] A Division-wide commitment to community policing will help promote trust and legitimacy, improve the quality of police-citizen encounters, and address persistent public safety issues in Cleveland communities.

The Decree defines "community and problem-oriented policing" as a "policing philosophy that promotes and relies on collaborative partnerships between law enforcement agencies and the individuals and organizations they serve to develop solutions to problems, increase trust in police, and improve the effectiveness of policing efforts."[27] The Decree also requires the CPC to "assess CDP's community activities, and make recommendations for additional strategies for CDP□."[28]

Specifically, the Consent Decree mandates that CDP implement numerous fundamental reforms related to community policing, including:

- "[E]nsur[ing] that its mission statement reflects its commitment to community oriented policing"[29];
- "[E]nsur[ing] that its officers are familiar with the geographic areas they serve . . . and engage in problem identification and solving activities with the community. . . ."[30]
- "[P]rovid[ing] initial and annual in-service community and problem-oriented policing training," to include problem-solving with the community, as well as concepts such as leadership and communication; procedural justice; conflict resolution and verbal de-escalation; and cultural competency sensitivity training;[31]

---

[26] *See, e.g.*, Police Executive Research Forum (PERF), *Community Policing: Past, Present, and Future* at 4 (2004) ("Community Policing"); Presidential Task Force On 21st Century Policing, *Final Report* at 43 (2015).

[27] Dkt. 7-1 ¶ 414

[28] *Id.* ¶ 17.

[29] *Id.* ¶ 28.

[30] *Id.* ¶ 29.

[31] *Id.* ¶ 30.

- "[M]aintain[ing] collaborative relationships with a broad spectrum of community groups"[32];
- "[C]ontinu[ing] to meet with members of the community in each District on a monthly basis" and "actively solicit[ing] participation from a broad cross-section of community members in each District"[33];
- "[D]eveloping and implementing systems to monitor officer outreach to the community"[34]; and
- "Analyze" the quality and nature of its, and individual officers', community policing efforts, "broken out by District, in a publicly available community policing report."[35]

As the following sections describe in greater detail, the Division has continued to work closely with the Monitoring Team, the City, and the CPC in the current reporting period to organize and execute a streamlined and coordinated community engagement process around community and problem-oriented policing.[36]  In this first step of the development of the CPOP plan, the Division, working with the Monitoring Team, solicited substantive community input with the goal of incorporating that input into a new CPOP plan.  The Parties collaborated to reach as many Cleveland residents as possible and learn what community members would like to see in the Division's plan.  The Monitoring Team analyzed and summarized the broad solicitation of community input in a report provided to the CDP in July 2017 entitled *Community and Problem-Oriented Policing: Summary of Community Feedback and Recommendations* ("Community Feedback Report").   The Bureau of Community Policing Commander Johnny Johnson was then tasked with drafting the Division's CPOP plan and incorporating the community feedback.   The drafting process continues to proceed in a positive direction.

### A.  The Community and Problem-Oriented Policing ("CPOP") Plan

The Third Semiannual Report described in great detail the theory and principles underlying effective community and problem-oriented policing[37] that need to be part of the Division's CPOP plan.  While this Report will not reiterate that exhaustive discussion, it is worth highlighting the principles—both the core components as well as the institutional features of community and problem-oriented policing—that were explained in the previous Report.  These principles are that: (1) there are three core components of community policing – collaborative problem solving, community engagement around policing policy and practice, and opportunities for officers to get to know their communities;

---

[32] *Id.* ¶ 31.

[33] *Id.* ¶ 32.

[34] *Id.* ¶ 33.

[35] *Id.* ¶ 33-34.

[36] Third Semiannual Report at 20–24.

[37] Id.

and (2) there are institutional features that must be incorporated into the CPOP plan in order to implement the plan effectively, including staffing and deployment, recruitment and hiring, officer training, and officer and department evaluation.

## B.  The Community Engagement Process

As stated above, the stakeholders completed the first phase of the process to develop the CPOP Plan—soliciting and reviewing community input—in the summer of 2017.  This collaborative engagement process consisted of at least 18 community meetings between March 2017 and June 2017, which included: two Cleveland-wide roundtables, a CPC meeting, each of the five District Policing Committee's meetings, a Community Relations Board meeting, meetings with various community groups throughout the city, and partnerships with over 40 community organizations with strong ties to the diverse populations of Cleveland.

The Monitoring Team commends the Division of Police for its strong commitment to this outreach effort.  Each District Commander attended every meeting in their districts, and Commander Johnson attended nearly every community event.

At each event, the Monitoring Team provided paper questionnaires for each community member present.  The questionnaire could also be completed online, and without attending an event, throughout the engagement process.  All in all, more than 1,000 Cleveland community members attended the community meetings, and the Monitoring Team received more than 600 online and paper responses.  The Team was tremendously pleased by the thoughtful participation of individuals from across Cleveland's diverse communities.

The Monitoring Team analyzed and synthesized the community's responses and notes from the extensive discussions at the meetings, and prepared a 42-page Community Feedback Report, which it provided to the CDP in July 2017.[38]  The key themes of the Report are summarized below.

---

[38] The Community Feedback Report also incorporated the results of two other engagement mechanisms conducted in the period since the Consent Decree was first implemented, both of which were designed to assess the Cleveland community's trust and confidence in the CDP and individual perceptions of public safety and policing.  These are the Biennial Community Survey ("Biennial Community Survey" or "BCS") from June 2016 and the Community Focus Groups ("Community Focus Groups" or "CFGs") from June 2017.  The quantitative Biennial Community Survey captured the Cleveland community's perceptions about safety and policing.  The findings reflect the content of telephone interviews conducted by Interviewing Service of America, an independent research firm, between May 4 and May 31, 2016, with a sample of 1,400 adults, 18 years of age or older, living in Cleveland.  The qualitative Community Focus Groups research reflect the content of six focus groups consisting of 8 to 11 adults living in six Cleveland neighborhoods—Glenville, Central, Clark-Fulton, Cudell, Puritas-Longmead, and South Broadway.  Although neither of these surveys was designed specifically around the CPOP engagement process, they provided important insight into community views of public safety and policing in Cleveland that the CDP should incorporate as it develops its CPOP Plan.

As a general matter, although the Cleveland community is overall critical of the CDP and its relationships and interactions with the public, participants also offered specific ways to improve the relationship – and expressed strong interest in being involved in the efforts to do so.

- **Community members believe that a community policing plan should incorporate mechanisms for officers to get to know and understand their communities better.** A number of community members participating in the CPOP outreach process believe that CDP officers are often not familiar with local residents and their problems. Although the CDP hosts a number of community engagement events, many respondents have not participated in them.

- **Community members would like to see more ways for officers to get to know them personally and more ways to promote more positive interactions between officers and the public.** Cleveland residents generally would like officers to use bike patrols or foot patrols as ways for officers to get to know community members better and to promote more positive interactions between officers and the public. Community members also are more interested in seeing the same officers who patrol their neighborhoods at police-community events rather than specialized community policing officers or command officers. In order to better understand the community, Cleveland residents suggested officers receive additional training in cultural awareness and local Cleveland history.

- **Community members believe that the CDP and CDP officers are under-resourced.** Although Cleveland residents expressed a preference for alternatives to motorized patrol, community members noted that CDP does not appear to be adequately staffed to have extensive foot or bike patrols. There also is an understanding by community members that it is difficult for CDP to adequately serve the City of Cleveland due to funding and staffing limitations. CDP officer salary was a frequently-cited challenge for the Division; many community members suggested salaries should be increased—not only to attract the best talent but also to compensate officers for the work expected of them.

- **While there are existing formal structures in Cleveland for community members to discuss policing concerns—namely, the DPCs and the CPC—few people are aware of them or comfortable with them.** There are five DPCs in Cleveland—one per policing district—with the goal of "facilitat[ing] regular communication and cooperation between CDP and community leaders at the local

level."[39]  The CPC was established in 2015 by the Consent Decree and is mandated to "work with the many communities that make up Cleveland for the purpose of developing recommendations for police practices that reflect an understanding of the values and priorities of Cleveland residents."[40]  Based on community feedback, however, few Cleveland residents attend either DPC or CPC meetings.  Additionally, few residents are aware of the purpose of these groups and whether they are productive.

- **Community members expressed trust and confidence in many existing local institutions and organizations, especially Community Development Corporations (CDCs) and block clubs.**  A number of the questions in the questionnaire asked community members to state who they would turn to in their community for a public safety or community problem or who the CDP should turn to when seeking community input.  For a variety of questions, community members suggested the Division work closely with CDCs, block clubs, and other existing local organizations.

- **Community members are interested in providing input on CDP policies and training.**  A substantial majority of community members who provided formal feedback believe it is "very important" for the Division to solicit community input on use of force, crisis intervention training, and bias-free policing policies, as well as on new community outreach programs.  Community members also expressed a desire to participate in police training by either talking to recruits or attending a pilot training and providing feedback.  With regard to officer and Division evaluation, many community members urged the Division to award community policing awards to officers based on community feedback.  Community members also thought resident surveys and focus groups with residents are the most effective ways to evaluate the Division.  To this end, it appears that there is broad support for the type of substantive, community-wide deliberation on new police policies, practices, and programs that has been central to the Consent Decree implementation so far to be institutionalized into CDP's general approach to policing going forward – and well after the Consent Decree concludes.

- **Community members would like the CDP's CPOP Plan to specifically address racial disparities.**  Many community members expressed a desire for racial equity or diversity officer training.  Community members suggested a variety of ideas for topics to incorporate into such training, such as implicit bias, the history of economic and

---

[39] Dkt. 7-1 ¶ 23.

[40] *Id.* ¶ 14.

housing bias, and the cultural traditions of new Cleveland immigrants, and they also suggested specific courses CDP officers could take.

- **Community members would like the CDP to better utilize social media and technology.** A number of community members highlighted what they believe to be CDP's inadequate online presence in a number of instances. Residents suggested hard-to-reach communities could be better contacted through improved social media efforts and a stronger online presence. Community members also suggested using social media to attract applicants from a cross section of the Cleveland community. They also expressed a desire to evaluate officers through a web-based application or platform, which members of the public could use to file complaints or comment on an interaction.

## C.  Status of CPOP Plan

Since receiving the Community Feedback Report in July 2017, the CDP has been tasked with drafting its CPOP Plan to reflect the principles laid out above about community and problem-oriented policing as well as the community feedback summarized in the July 2017 report. Once the Division prepared a draft of its plan, the Parties were to work together to share CDP's proposed draft plan and solicit community input, with CDP taking the lead in hosting and presenting the proposed draft plan to the Cleveland community. Based on the schedule set forth in the Second-Year Revised Monitoring Plan, the CDP was to share a draft plan with the other stakeholders by October 13, 2017; and the Monitoring Team, working with the CDP, the CPC, and other stakeholders was to share that draft with the community, and obtain community and stakeholder input, between October 13 and November 10, 2017.[41] Following this second round of community input, the CDP was then to revise its draft plan in light of specific feedback and make changes, where appropriate, and provide a final draft plan by December 1, 2017.[42]

Progress in completing a satisfactory CPOP Plan is somewhat behind this schedule, with the current draft Plan still undergoing revisions. Since the Community Feedback Report was provided to the CDP in July 2017, the CDP has produced three draft plans to the Monitoring Team and DOJ: the first in August; the second, after a round of comments from the Monitoring Team and DOJ, in October; and the third in December. The Division has worked diligently and in good faith on multiple iterations of the CPOP Plan – meeting with the Monitoring Team and Department of Justice and closely considering comments.

---

[41] Dkt. 147-1 at 1-2.

[42] *Id.* at 2.

Nonetheless, more time is necessary to ensure that the Division's CPOP Plan can be the dynamic, new template and philosophy for minute-to-minute policing in the City of Cleveland going forward that all stakeholders believe it must be.

As noted above, the Decree requires that the CDP develop and implement a "comprehensive and integrated community and problem-oriented policing model."[43]  The CPOP Plan is to provide the roadmap for how the Division will operationalize this directive.  The Draft Plan lays out the core principles and institutional requirements of a successful community and problem-oriented plan described above well, and also extensively recounts many of the community outreach activities done by the CDP and its Bureau of Community Policing ("BCP").  However, as the Monitoring Team and DOJ both noted in their feedback to the Division, a restatement of general theory and a report on past and current activities do not constitute the type of comprehensive and integrated plan contemplated by the Consent Decree.

For example, the Draft Plan proposes a block of instruction regarding community policing in training, rather than ensuring ongoing infusion of the principles of community policing across all lessons; provides insufficient information on how recruitment will be integrated with community policing principles; and offers insufficient details about what qualities will be the basis for evaluations that will drive a new departmental community-oriented outlook.  The Draft Plan also does not yet indicate how the Division will incorporate and address the community input obtained to date or how it plans to continue to engage the community going forward.

The Draft Plan also does not yet fully provide a roadmap for how this new vision of community and problem-oriented policing will be integrated department-wide.  Much of the discussion of community outreach, for example, still revolves around specialized bureaus or units such as the BCP or the Community Services Unit or bike patrols in specific districts.  The CDP needs to think critically about how to ensure that these discrete units or efforts are not balkanized and seen as the only units within CDP that are responsible for CPOP.  CDP must ensure that community and problem-oriented policing is in fact an operative philosophy across the department that fundamentally reorients the relationship between the Division and the residents of Cleveland.

While the Draft Plan contains a number of admirable ideas about how the Division may better engage community residents, a Plan that can be considered in compliance with the Consent Decree must engage with how CPOP principles are reflected across all CDP personnel and activities, including by integrating it into promotion, training, monitoring, and recruitment practices as well as the day-to-day conduct and mindset of all officers.

---

[43] Dkt. 7-1 ¶ 27.

The Monitoring Team and the Department of Justice have provided further comments to the Draft Plan and will work directly with the Division to ensure that a final CPOP Plan can be the dynamic, transformative template for policing in Cleveland for years to come.

### D.  Mission Statement

The Division of Police's new mission statement has been the subject of instruction and focus during the Division's recently-completed use of force training, discussed elsewhere in this report.  Now that the mission statement has been revised, with community and officer input, and all CDP officers have received specific training on that new statement, it can be considered operationally effective.

## V.    BIAS-FREE POLICING

| Paragraph | Status of Compliance |
|---|---|
| 35.  Delivery of "police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias," among other things. | **EVALUATION DEFERRED** |
| 36.  "CDP will integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **EVALUATION DEFERRED** |
| 37.    CDP will ensure that it "administer[s] all activities without discrimination" on basis of various protected classes | **EVALUATION DEFERRED** |
| 38.  "CDP will develop a bias-free policing policy" incorporating CPC recommendations "that provides clear guidance to officers" | **EVALUATION DEFERRED** |
| 39–40.   Bias-free policing and procedural justice training "adequate in quality, quantity, scope, and type" covering specific areas | **EVALUATION DEFERRED** |
| 41.  Supervisor training on bias-free policing and procedural justice issues covering specific areas | **EVALUATION DEFERRED** |
| 42.  Annual in-service training on bias-free policing "adequate in quality, quantity, type, and scope" | **EVALUATION DEFERRED** |
| 43.  Analysis of paragraph 265 data ("including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination (¶ 265)) | **NON-COMPLIANCE** |
| 44.  Consideration of "bias-free policing and equal protection" principles in hiring, unit assignment, promotion, and performance assessments. | **EVALUATION DEFERRED** |

Using feedback from the CPC's Bias-Free Workgroup Roundtables conducted in early 2016, CDP drafted a bias-free policing policy to ensure that the Division's policing is "equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in CDP[.]"[44]

The draft policy was developed with the assistance and input of the Department of Justice, Monitoring Team, and the CPC.  Specifically, the Department of Justice provided comments on CDP's first draft. The CPC provided the Division with written recommendations based on community feedback it received through town hall meetings, online input, research conducted by students at Cleveland Marshall College of Law, and written correspondence from partner organizations.  The Monitoring Team and DOJ have also suggested revisions for the draft policy based on best practices and the policies of similarly-situated jurisdictions throughout the country.  The Monitoring Team anticipates that the bias-free policing policy will be finalized and submitted to the Court soon.

---

[44] Dkt. 7-1 ¶ 35.

Bias-free policing reform within the Cleveland Division of Police also requires all of the Division's employees to undergo comprehensive training aimed at ensuring that police services are delivered in a manner that is "equitable, respectful, and free of unlawful bias."[45]  These efforts require a training curriculum that accounts for the specific needs of the City of Cleveland and addresses issues related to bias in a thoughtful, nuanced, and pragmatic manner.  Additionally, bias-free policing principles must be operationally integrated into CDP's "management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."[46]

Although the bias-free policing policy needs to be completed before bias-free policing training can occur, efforts have already been underway in establishing the general training framework.  The Division, DOJ, and Monitoring Team have engaged in productive discussions about external vendors that might provide applicable training using an existing curriculum that might be adapted for the specific needs of Cleveland.  The City and the Division are currently working on an approach for an outside vendor to design and implement the core components of the Division's bias-free policing training.  These details should be finalized imminently.

The Monitoring Team applauds CDP for identifying and engaging with an outside program to provide the required bias-free training.  That kind of proactive thinking will continue to be necessary as the Division furthers its active implementation efforts.

---

[45] *Id.* ¶¶ 35-36.
[46] *Id.* ¶¶ 35-36.

## VI.    USE OF FORCE

### A.    Officer Use of Force Principles & Policy

| Paragraph | Status of Compliance |
|---|---|
| 45.  "CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force" complies with the Constitution, federal law, and the Consent Decree "and that any use of unreasonable force is promptly identified and responded to appropriately." | **PARTIAL COMPLIANCE** |
| 46.  "The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers . . . will comply" with at least twelve major, listed principles. | **PARTIAL COMPLIANCE** |
| 47.  Division "will ensure that the [use of force] incident is accurately and properly reported, documented, and investigated." | **PARTIAL COMPLIANCE** |
| 48.  "CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends." | **PARTIAL COMPLIANCE** |
| 49.  Development of use of force policies "that comply with applicable law[,] . . . are adequate to achieve the goals described in paragraph 45," and "specify that unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability." | **OPERATIONAL COMPLIANCE** |
| 50.  "CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons." | **OPERATIONAL COMPLIANCE** |
| 51.  Weapon-specific policies "will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon." | **OPERATIONAL COMPLIANCE** |
| 52.  "No officer will carry any weapon that is not authorized or approved by CDP." | **OPERATIONAL COMPLIANCE** |
| 53.  "Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of weapon is imminent, and allow the subject an opportunity to comply." | **OPERATIONAL COMPLIANCE** |
| 54–83  "CDP will implement policies" for firearms, ECWs (Tasers), and OC (pepper) spray that comply with a host of specific, expressly listed provisions. | **OPERATIONAL COMPLIANCE** |

A well-functioning and effective police department is one that ensures that its officers have a clear sense of what is expected of them when it comes to use of force.  Policies must be pragmatic and specific in articulating when officers may and may not use force, and training must provide specific opportunities for officers to practice the application of the policies in situations that might translate to encounters that they have in the real world.

The Second Semiannual Report described, in detail, the process throughout 2016 of updating the Division's officer use of force policy – including the significant role that CDP officers, Cleveland residents, and community organizations played in the formulation of the revised policy.[47]  The Court approved the new use of force policies, subject to some specific conditions, on January 17, 2017.[48]

The Division's work over this reporting period has appropriately rested primarily on ensuring that all officers receive high-quality instruction on the Court-approved use of force policies.  Consequently, the compliance status with respect to force policies is unchanged.

The use of force policies will become effective within the Division on January 1, 2018.  Starting on that day, CDP officers will be expected to adhere to the new policies on which they have received the in-depth, scenario-based training discussed in the next section of this report.  At the same time, supervisors will begin to hold officers accountable for performance that does not meet the standards and requirements of the new force policies.  Thus, 2018 will represent a critical, new phase of Consent Decree implementation – where the shift of the Division will be from laying the groundwork for new expectations about force to active implementation of those new expectations.

## B.    Officer Use of Force Training

| Paragraph | Status of Compliance |
|---|---|
| 84.  CDP "will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes" a number of specific, expressly-listed elements. | **OPERATIONAL COMPLIANCE** |
| 85.  CDP "will provide the use of force training described in paragraph 84 to all new officers." | **OPERATIONAL COMPLIANCE** |
| 86.  "CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |

The existence of policies on paper cannot alone transform a police department.  The efficacy of the Division's new policies on force ultimately depend on officers adhering to their requirements.  Consequently, the manner in which the practical significance of the concepts of necessity, proportionality and de-escalation are communicated to the officers who will be called upon to both understand and carry out these important considerations is critical.  Training must translate the sometimes-legalistic formalism necessary in the Division's policies into actionable skills and tactics that officers use on a day-to-day basis on the streets of Cleveland.

---

[47] Dkt. 97 at 27–35.

[48] Dkt. 101.

Between May and December 2017, the Division of Police provided all sworn CDP personnel with use of force training on the Division's new use of force policies (the "2017 Use of Force Training" or "use of force training"). The Consent Decree requires that such training be "adequate in quality, quantity, scope, and type" and include instruction, among other things, on:

- Proper use of force decision-making;
- Use of force reporting requirements;
- The Fourth Amendment and related law;
- De-escalation techniques, both verbal and tactical, that empower officers to make arrests without using force and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, using cover, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;
- Role-playing scenarios and interactive exercises that illustrate proper use of force decision-making, including training on the importance of peer intervention;
- The proper deployment and use of all intermediate weapons or technologies;
- The risks of prolonged or repeated ECW exposure, including that exposure to ECWs for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious physical injury;
- The increased risks ECWs may present to a subject who is pregnant, elderly, a child, frail, has low body mass, or is in medical crisis;
- That when using an ECW the drive stun mode is generally less effective than the probe mode and, when used repeatedly, may exacerbate the situation; and
- Firearms training . . . .[49]

All sworn CDP personnel needed to receive the 2017 Use of Force Training. CDP identified 1,431 officers as eligible to receive the new use of force training. Of this total, 1,364 officers (or 95% of eligible officers) received and successfully have completed the training. Of the officers not completing the training, 62 officers were unable to complete the training because they were on extended illness, military leave, on restricted duty, or retiring before January 1, 2018. The required use of force training will be scheduled and completed by those officers as they return to fully active status. The Monitoring Team understands that the reasons for non-completion by the remaining five (5) untrained officers are being reviewed.

---

[49] Dkt. 7-1 ¶ 84. In addition to initial training on use of force covering the topics listed above, the Division must provide its officers with "annual use of force in-service training that is adequate in quality, quantity, type, and scope" going forward.[49] CDP supervisors must also receive specialized training, as discussed elsewhere in this report, relating both to force and broader supervisory skills.

The 2017 Use of Force Training consisted of two days (16 hours) of integrated, interactive scenario-based instruction aimed at giving officers repeated opportunities to apply the new use of force policy provisions in a real-world context. Forty-eight (48) officers completed each two-day training session offered, with nearly all of the training occurring in small groups of approximately twelve (12) officers.

Over the two days, officers proceeded through eight modules of instruction, all of which included either interactive or scenario-based elements. Those modules included instruction on:

- De-escalation;
- Contact and cover;
- Subject control and handcuffing;
- Intermediate weapons;
- Decision-making scenarios;
- Threat assessment; and
- Officer performance assessments (video-based) (two modules).

Day One consisted of a formal introduction of the instructors, safety rules, attendance requirements, and expectations. The class was then divided into smaller groups to maximize safety and facilitate close observation and evaluation of each officer attending the training. The officers then proceeded through four modules of training. Day Two consisted of a substantial review of the four modules learned on Day One, and then proceeded into the four remaining modules.

Importantly, within each module, officers needed to meet certain performance benchmarks in order to be considered as having satisfactorily met the training. Training instructors evaluated how officers applied relevant use of force skills and tactics, used sufficient de-escalation tactics, used necessary and proportional force in a manner consistent with the Division's policy, complied with specific requirements relating to particular force instruments, and performed in a manner consistent with CDP's expectations. Each officer in each training was evaluated on a host of specific dimensions, with instructors logging performance. Officers who failed to obtain a sufficient overall score received specific feedback on areas that their performance should improve and were required to proceed through the scenario again. Because role players could act and react in different ways, both to vary the scenario organically and to respond directly to officer performance, this was not simply going through the exercise again in order to obtain a known, identified result. That is, even with knowledge about the scenario, officers needed to think and react dynamically because the contours of the scenario and of a subject's response in that scenario changed each time that it was run.

The Monitoring Team observed numerous sessions and was impressed not only by the quality of the instructors and curriculum but also by most officers' positive response. The Department of Justice separately observed a number of training sessions. Role players called upon their experiences as patrol

officers, supervisors, and training specialists to provide real-world situations where officers could practice application of the new force policies in a controlled environment. Training instructors evaluating officer performance provided constructive feedback to officers – offering areas for improvement even when performance was generally sufficient and identifying areas of strength even when officers needed to proceed through the scenario again to attain a sufficient level of performance. Officers generally took the training seriously, engaged thoughtfully with other officers and instructors, and appeared to authentically appreciate the opportunity to practice real-world skills and learn from other police professionals.

The training was not without its challenges and implementation of necessary refinements – but these were by and large handled effectively and professionally by the Division. For instance, in late June, during observation of an intermediate weapon scenario, the officer who was conducting the training – a substitute instructor – reviewed applicable policy material at the start of the module in a manner that was difficult to understand. Attending officers challenged two portions of the use of force policy. One particularly insistent officer asked if the specific prohibition on using the taser in "stun mode" – which causes pain but does not incapacitate the subject as it does in "dart" or "cartridge" mode – meant that officers were now required to shoot someone instead. He dismissed correct representations by the instructor that studies challenged the efficacy of using tasers for pain compliance. Although a Lieutenant present for the training eventually stepped in, this was not before a Sergeant suggested that there was both "good" and "bad" portions of the policy. Subsequent observations of these same modules appeared to address these issues in a manner that did not dismiss or discount the Division's ownership of its own policies.

The Monitoring Team also observed some of the limitations of scenario-based instruction. Specifically, in one class, students who were judged by evaluating instructors as inappropriately escalating the scenarios needed to go through the scenarios on three separate occasions before performing adequately. Both officers appeared irritated at having to participate in three separate scenarios. However, Training Bureau personnel directly and meaningfully addressed what they characterized as the officers' unwillingness to accept critique. During these conversations, one of the officers noted that he was having a hard time keeping up with Divisional policy changes and indicated that he would be retiring soon.

This report cites the above instances to describe in a realistic fashion the process of change and adaptation that the Division has needed to embrace in the training and implementation of the new force policies – and to underscore the extent to which the Training Bureau capably addressed challenges and adapted approaches to achieve the overall training objectives, even when faced with what might have been more challenging circumstances. To the Monitoring Team, the preceding observations, including CDP's response to poorly performing officers, affirms the Division's commitment to high-quality use of force training.

Perhaps most positive of all, it was not just the Monitoring Team or CDP command staff who were enthusiastic about the use of force training – it was the CDP's rank and file. The Division's commitment to receive officer feedback on its 2017 Use of Force Training has greatly impressed the Monitor Team. CDP designed an evaluation form to be completed anonymously by each officer at the conclusion of the in-class training.

The Division is assessing the evaluation responses and will incorporate officers' feedback into future training curricula to ensure that the training is as effective as possible. While it has yet to decide how it will augment future curricula, CDP compiled and analyzed officer feedback that it received through November 27, 2017 from 1,290 respondents. The initial findings are promising and highlight the strengths of both the training curriculum and the Division's training instructors.

When asked if the training instructor increased the officer's "understanding of course material" in each of the eight training "modules," the majority of respondents answered "Agree" or "Strongly Agree" for each module. In fact, no fewer than 87% of respondents selected "Agree" or "Strongly Agree" for any of the eight modules. Respondents had similar positive assessments when asked if their instructor "encouraged critical engagement with the material[,]" if their instructor "accomplished the learning objective" for each module, and if the scenarios "were realistic and practical[.]"

Overall, 79% of officers agreed or strongly agreed that they found the training to be valuable. One officer commented that the training was "[o]ne of the best in-class services I have attended in my career." Another stated that the training "made me think differently at how to look at situations that I may have got lazy in[.]"

Similarly, nearly three-quarters (71%) of officers agreed or strongly agreed that they "would welcome more training of this type." One officer wrote, "I believe that this has been the best in-service training I have had so far. I retained much more information than I have in the past just listening to lectures." Another said, "I hope all future in-service training is done this way."

Many comments focused specifically on the quality of the in-class scenario exercises. While a few found some of mock scenarios to be less realistic than they would have liked – feedback that the Division should consider when designing future exercises – many officers nonetheless thought that the scenarios were critical in learning the new Use of Force Policies. One officer wrote, "The scenario-based training engaged us and reminded us of the importance of our tactics." Another reported, "The format allowed more interaction and role play instead of the traditional model of just reading a GPO and calling it training."

Officers also remarked on the preparation and dedication of the training instructors. The instructors were "excellent[,]" "outstanding[,]" and "top notch[.]" One officer commented, "The instructors all

took the time to clarify the policy to everyone and it is apparent that they took an extensive amount of time to be able to translate the important lessons into the scenarios we performed[.]" Similarly, another officer said, "It seems to me that all the instructors put a lot of time preparing the lesson plans on these subjects." Yet another said that the instructors were "[e]xtremely professional and informative" and "were able to break down all the training and policy[.]" The Monitoring Team, based on its observations and monitoring of the use of force training initiative, emphatically agrees.

The feedback from the Division's affirms the tremendous quality and utility of the 2017 Use of Force Training on CDP's new force policies. That officers – who, as we saw and like any number of other professionals, can enter mandated training initiatives like this with an understandable lack of enthusiasm – embraced the training, found it valuable, and indicate that they would like to have more of it is a testament to the Division's progress under the Consent Decree to date. The 2017 training establishes a strong foundation for ongoing, follow-up training provided on an annual basis on additional and in-depth force topics.

All said, the CDP's sustained and focused efforts to design and implement the 2017 Use of Force Training program has yielded substantial results. From the development of the curriculum to the logistics of providing high-quality training to so many officers, the 2017 Use of Force Training was no small task. **The Monitoring Team applauds the Division's Training Unit for their hard work and dedication – and commends CDP for designing, implementing, and completing a critical element of reform.**

As noted above, the completion of the use of force training by all officers has allowed the Division's new use of force policies to become effective, in the field and on the streets of Cleveland, on January 1, 2018. However realistic and in-depth the 2017 Use of Force Training was, there can be no classroom or simulation that is a substitute for needing to apply the new force policies in the real world. The Monitor expects that officers may make some good-faith errors or mistakes in the first few months that the new force policies are in effect. The new policies represent a significant, new day when it comes to force in Cleveland, and the public should expect that at least some time may be necessary for officers to adapt and adjust to new expectations and requirements. To be clear, the Division must hold officers accountable for policy violations early on in 2018 – but sufficiently systemic adherence to the new policies, like perfect compliance with any new requirements, is unlikely to occur overnight.

In the coming months, the Monitoring Team will be reviewing statistically-significant sets of force incidents on a rolling basis so that it can report – to the Parties, the Court, and the public – how CDP and its officers are doing in fully implementing the new force policies across incidents and time.

## C.    Use of Force Reporting, Investigations, and Review

| Paragraph | Status of Compliance |
|---|---|
| 87.  "CDP will develop and implement a single, uniform reporting system pursuant to a Use of Force reporting policy" that complies with the force Level categorization set forth in the paragraph. | OPERATIONAL COMPLIANCE |
| 88.  Requiring "[a]ll officers using or observing force" to complete a Use of Force Report including a number of specific features and avoiding "conclusory statements, 'boilerplate', or 'canned' language." | OPERATIONAL COMPLIANCE |
| 89.   "Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports." | OPERATIONAL COMPLIANCE |
| 90.  "Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable." | OPERATIONAL COMPLIANCE |
| 91.  Requirement to "notify . . . supervisors . . . as soon as practical following any use of force" and if becoming aware of "an allegation of unreasonable or unreported force by another officer." | OPERATIONAL COMPLIANCE |
| 92.  "Use of Force Reports will be maintained centrally." | PARTIAL COMPLIANCE |
| 93.   "A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval." | NON-COMPLIANCE |
| 94.  Setting specific requirements relating to the investigation of low-level, Level 1 force. | NON-COMPLIANCE |
| 95–109.   Setting specific requirements relating to the investigation by supervisors and/or CDP chain of command for investigation and review of Level 2 force. | NON-COMPLIANCE |
| 110.   "CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP." | EVALUATION DEFERRED |
| 111.  Creation and design of dedicated Force Investigation Team (FIT) that "will conduct administrative investigations . . . and criminal investigations" of serious force, "force involving potential criminal conduct," in-custody deaths, and cases assigned to it by the Chief. | NON-COMPLIANCE |
| 112.  Composition of FIT Team. | NON-COMPLIANCE |
| 113.   "FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type" on a host of specific, expressly-listed topics both initially and annually thereafter. | NON-COMPLIANCE |
| 114.  "CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement." | NON-COMPLIANCE |
| 115.  Response of FIT to use of force scenes.  FIT notification of prosecutor's office.   Notification of designated outside agency to conduct criminal investigation if City elects to use external agency for such investigations. | PARTIAL COMPLIANCE |

| | |
|---|---|
| 116. "CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation." | **NON-COMPLIANCE** |
| 117. Memorandum of understanding required between CDP and outside agency containing specific, expressly-listed provisions. | **EVALUATION DEFERRED** |
| 118. Setting forth various, specific, and expressly-listed responsibilities of FIT during its investigations. | **NON-COMPLIANCE** |
| 119. Monitor's duty to annually review any "criminal investigations conducted by the outside agency" to ensure that they "are consistently objective, timely, and comprehensive." | **EVALUATION DEFERRED** |
| 120. Providing for delay of compelled interview if "case has the potential to proceed criminally" but otherwise requiring that "[n]o other part of the investigation . . . be held in abeyance" unless "specifically authorized by the Chief" in consultation with investigating agency and prosecutor's office. | **EVALUATION DEFERRED** |
| 121. Requiring completion of preliminary report presented to Chief or Chief's designee "as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force." | **EVALUATION DEFERRED** |
| 122. Completion of investigation within 60 days. Preparation of FIT investigation report. Review of FIT investigative report by head of Internal Affairs who "will approve or disapprove FIT's recommendations, or request . . . additional investigation." | **NON-COMPLIANCE** |
| 123. Revision of FIT manual to ensure "consisten[cy] with the force principles" and several specific, expressly-listed provisions. | **NON-COMPLIANCE** |
| 124–30. Establishment and operation of Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." | **NON-COMPLIANCE** |

Just as officers must have clear expectations set forth in policy on when to use and not use force, the Division must have clear processes and procedures for the administrative investigation and review of force incidents.[50] The Monitoring Team's prior reports have described that "[m]uch of the public feedback regarding the policies on when officers may and may not use force understandably also began to address issues relating to how the Division of Police would respond to, investigate, and review force incidents – affirming that [a]n important goal of the Consent Decree is to ensure that all uses of force administered by CDP officers are, after being promptly and uniformly reported, meaningfully examined and reviewed."[51]

---

[50] First Semiannual Report at 36-37; Dkt. 97 at 35-36.

[51] Dkt. 97 at 35–36.

The Court-approved Second-Year Revised Monitoring Plan anticipated that finalized policies and manuals relating to the investigation of force incidents would be submitted to the Court by November 15, 2017.[52] As the Monitor explained in its Second Semiannual Report:

This includes establishing policies on lower-level force inquiries and, for serious uses of force, policies and protocols for a dedicated Force Investigation Team ("FIT") that must be specially trained to handle comprehensive and objective administrative reviews of force incidents. After policies are finalized, supervisors will need training on the many new requirements relating to investigating and reviewing force, and the membership of FIT will need to be determined and trained.[53]

Shortly thereafter, and not later than December 20, 2017,[54] policies and a procedural manual were to be finalized for the Division's eventual Force Review Board ("FRB"), which will "serve as a quality control mechanism for uses of force and force investigations" by "apprais[ing] use of force incidents from a tactics, training, policy, and agency improvement perspective."[55] FRB must also "asses the quality of the investigations it reviews, including whether investigations are objective and comprehensive and recommendations are supported by a preponderance of the evidence."[56] It will "examine . . . data related to use of force . . . to detect any patterns, trends, and training deficiencies . . . ."[57] "During the first significant span of time in which the Board is operating, the Monitoring Team will provide in-depth, active, and real-time technical assistance by participating in meetings of the Board and, where necessary, asking questions or probing unexplored issues if the Board is not otherwise considering material issues that it must under CDP policies and the Consent Decree."[58]

The City and CDP have indicated that they are willing to consider and implement new structures and processes for reviewing the use of force so that it aligns with the requirements of the Consent Decree and builds from the insights, best practices, and lessons learned from other jurisdictions that have previously implemented force review boards and other similar mechanisms.[59] This means that, because the men and women of the Division are professionals, first and foremost, their performance will be subject to after-action analysis – not on the assumption that they necessarily did anything

---

[52] Dkt. 147-1 at 3.

[53] Dkt. 97 at 36.

[54] Dkt. 147-1 at 4.

[55] Dkt. 7-1 ¶ 124.

[56] *Id.* ¶ 128.

[57] *Id.* ¶ 129.

[58] Dkt. 97 at 36.

[59] *See, e.g.,* District of Columbia Metropolitan Police, General Orders, Use of Force Review Board (Mar. 30, 2016), *available at* https://go.mpdconline.com/GO/GO_901_09.pdf; New Orleans Police Department Operations Manual, Chapter 1.3.7, Use of Force Review Board (Dec. 6, 2015), *available at* http://www.nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Chapter-1-3-7-Use-of-Force-Review-Board.pdf; Philadelphia Police Department, Directive 10.4, Use of Force Review Board (UFRB) (Sep. 18, 2015), *available at* https://www.phillypolice.com/assets/directives/PPD-Directive-10.4.pdf.

wrong, to uncover trivial policy violations, or to second-guess officers but instead to ensure that the Division generally and involved officers specifically are able to learn and improve from each interaction.  This process will require that the Division and its personnel become comfortable with the notion that saying that an officer's performance should or could have been better during the course of an incident, even where an officer had no other choice than to apply force consistent with policy at the instant that it was applied, is not only possible but vital.  After all, even winning teams watch the game tapes to identify what went right, what went wrong, and what can be learned.

Over the course of the current reporting period, CDP has worked diligently with DOJ and the Monitoring Team to develop the required policies and procedural manuals.  Nevertheless, these policies and manuals continue to be the subject of discussion and revision.  This process has taken longer than any stakeholder originally contemplated or desired.  The Monitoring Team would be substantially more concerned about the timelines on these important set of interrelated policies if it did not appear, as it does, that the Division and City are proceeding in good faith to work through some challenging issues and meaningfully overhaul existing structures, systems, and processes to ensure compliance with the Consent Decree.  As the Monitoring Team has previously indicated, taking more time to get things right the first time may ultimately mean that more time is expended upfront so that less time can be expended on the back end to realize fully the outcomes that the Consent Decree requires.

The Monitor anticipates that, by the next Semiannual Report, CDP will at least have in place the policies, procedures, and mechanisms that will allow it to comprehensively analyze the application of force so that officer training, professional development, and risk management may all be continually enhanced.

## VII. CRISIS INTERVENTION

| Paragraph | Status of Compliance |
|---|---|
| 131. "CDP will build upon and improve its Crisis Intervention Program" in furtherance of four specific, expressly-listed goals, which "will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health system and create a context for sustainable change." | **PARTIAL COMPLIANCE** |
| 132. Establishment of Mental Health Response Advisory Committee (the "Advisory Committee") "to foster relationships and build support between the police, community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis." | **OPERATIONAL COMPLIANCE** |
| 133. Composition of Advisory Committee. | **OPERATIONAL COMPLIANCE** |
| 134. "The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program." | **OPERATIONAL COMPLIANCE** |
| 135. Advisory Committee will conduct an annual "analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers" and communications "are appropriately responding to people in crisis," and will also "recommend appropriate changes." | **EVALUATION DEFERRED** |
| 136. "The Advisory Committee's reports and recommendations will be provided" to CPC, "be publicly available, and will be posted on the City's website." | **PARTIAL COMPLIANCE** |
| 137. CDP will designate a Crisis Intervention Coordinator for specific, expressly-identified purposes. | **OPERATIONAL COMPLIANCE** |
| 138. "Coordinator will develop and maintain partnerships with program stakeholders and serve as point of contact" and "resource" for other stakeholders. | **OPERATIONAL COMPLIANCE** |
| 139. "Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, call-takers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program." | **PARTIAL COMPLIANCE** |
| 140. "Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate." | **PARTIAL COMPLIANCE** |
| 141. "Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers" and "to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls." | **PARTIAL COMPLIANCE** |

| 142. "Coordinator will create ways to recognize and honor specialized CIT officers, call-takers, and dispatchers." | **EVALUATION DEFERRED** |
| 143. Initial and annual crisis intervention training to all officers and recruits that is "adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |
| 144. Initial and annual crisis intervention training for dispatchers and call-takers. | **OPERATIONAL COMPLIANCE** |

The Consent Decree indicates that the CDP should build and enhance its Crisis Intervention Program with the following goals:

- Assisting individuals in crisis;
- Improving the safety of officer, consumers, family members, and others within the community;
- Providing the foundation necessary to promote community and statewide solutions to assist individuals with mental illness; and
- Reducing the need for individuals with mental illness to have further involvement with the criminal justice system.[60]

The Consent Decree also requires several types of training related to crisis intervention:

- All officers must receive eight hours of annual training on crisis intervention issues.
- New recruits must receive 16 hours of training in the Academy on crisis issues.
- CDP dispatchers and call-takers must receive appropriate training on identifying signs of behavioral crisis.
- CDP must provide 40 hours of enhanced training to designated, specialized Crisis Intervention Team ("CIT") officers who will be specifically dispatched to the scene of incidents involving individuals experiencing a behavioral crisis.[61]

A building block for change in the Division's crisis intervention program was the requirement to develop a forum for effective problem solving regarding the interaction between the criminal justice and the mental health care system as well as creating a context for sustainable change.[62] Over the past 24 months, the Mental Health Response Advisory Committee ("MHRAC") has continued to provide an impressive, effective forum for addressing issues regarding the interaction between the criminal justice system and mental health care. Representatives from the police, social service providers,

---

[60] Dkt. 7-1 ¶ 131.

[61] *Id.* ¶ 143-146.

[62] *See generally* Dkt. 7-1 ¶¶ 131-59.

mental health and substance abuse professionals, the judiciary, advocates, and individuals in recovery continue to meet regularly to work on ways to improve services to those in need of care.[63]

During the current reporting period, the Division has continued to improve its crisis intervention program. CDP, MHRAC, and the MHRAC Training Subcommittee developed an excellent basic training curriculum on behavioral health issues for all officers that was approved by the Court.[64] CDP and MHRAC, with assistance from the Alcohol, Drug Addiction, and Mental Health Services Board of Cuyahoga County ("ADAMHS") and Cleveland area mental health providers, have since successfully trained all officers, as required by the Consent Decree. The Monitor is confident that the new CIT training provides a strong foundation for meaningful, measurable impacts across the Cleveland community.

## A.  Background Information

### 1.  Mental Health Response Advisory Committee

During the initial phase of the Consent Decree, several key tasks were accomplished that included the formation of the Mental Health Response Advisory Committee, completion of a needs assessment and work plan, and the appointment of Captain James Purcell as the CDP Crisis Intervention Coordinator.

### 2.  Revising CDP Crisis Intervention Policies and Procedures

The second six months of Consent Decree implementation focused on crisis intervention policy development. The MHRAC Policy Subcommittee used results from the community and officer needs assessment meetings to guide them in developing a new CDP Crisis Intervention policy. The new policy presented a comprehensive strategy for responding to individuals in a behavioral crisis. This policy document was presented at several community forums where citizens provided detailed feedback.

In the first six months of 2017, CDP and the MHRAC Policy Subcommittee went beyond what was required by the Consent Decree in establishing a best practice for crisis intervention.[65] Although the community-based Advisory Committee is required by the Consent Decree, the MHRAC has been written directly into CDP policy. The crisis intervention policy also addresses issues not included in the specific requirements of the Consent Decree, such as coordination with community resources to

---

[63] Third Semiannual Report at 56.
[64] Dkt. 129.
[65] *See generally* Third Semiannual Report at 34-35.

assist those in need and addressing the needs of youth by providing special guidance for officers interacting with them.

The CDP's extra effort applied not only to the final policy document, but also to the robust process of obtaining meaningful community input. Community members were briefed on the policy. Skilled facilitators helped with small group feedback so that all community members had a chance to discuss their reactions to the new policy. The community attendance was very good, and members of Cleveland media were present at both sessions. The process was remarkable not only for its transparency but also for the atmosphere of community pride that was apparent at each meeting. The Monitoring Team appreciates the commitment that all stakeholders and members of the public who participated exhibited during the process.

The community feedback at public forums led to further substantive changes in the policy. The revisions included a greater emphasis on the concept of respect and dignity, a focus on the importance of building relationships with community and local neighborhoods, a juvenile-specific section in the Crisis Intervention Response Policy, and guidance for the officer for responding to children who are witnesses to an event when police respond to individuals in crisis.

### 3. Crisis Intervention Data

The Consent Decree agreement requires that CDP track calls that involve individuals in crisis, collecting detailed data. Data will be reported annually and used to identify training needs, trends, successful individual officer performance, necessary changes in strategies, and systemic issues related to crisis intervention response.[66]

The current reporting system has struggled with completion rates since forms are time-intensive and must be filled out manually by the officers. CDP and the ADAMHS Board have both acknowledged that crisis intervention data collection will need to be improved. This improvement will require a technology-based solution to ensure that reporting requirements do not impede the ability of officers to efficiently and effectively provide law enforcement service.[67] Over the past two reporting periods, CDP has taken steps to integrate crisis intervention data with the Division's CAD system. The Monitoring Team is hopeful that successful technological change will improve the overall completion rate while reducing officers' workload.

---

[66] Dkt. 7-1 ¶¶ 157–58
[67] First Semiannual Report at 42.

####    4.   *Crisis Intervention Training*

The Consent Decree requires several types of training related to crisis intervention.  First, all officers must receive eight hours of annual training on crisis intervention issues.  Second, new recruits must receive 16 hours of training in the Academy on crisis issues.  Third, CDP dispatchers and call-takers must receive appropriate training on identifying signs of behavioral crisis.  Fourth, CDP must provide 40 hours of enhanced training to designated, specialized Crisis Intervention Team ("CIT") officers who will be specifically dispatched to the scene of incidents involving individuals experiencing a behavioral crisis.

In the Third Semiannual Monitoring Period, the MHRAC Training Subcommittee and CDP focused on the first year of annual training of all CDP officers.  The Committee decided that an emphasis on the quality of instruction and the ability of the training to have a meaningful impact on the officer in training were more valuable than covering a large quantity of topics.  The curriculum was the first of yearly trainings in crisis intervention that are part of the Consent Decree, and important specialized topics will be covered as the training progresses.  The final eight-hour training curriculum—a product of significant collaboration among CDP, the MHRAC Training Subcommittee, and the community—was approved by the Court.[68]

####    5.   *Selection of CIT Officers*

| Paragraph | Status of Compliance |
|---|---|
| 145. "CDP will provide enhanced specialized training in responding to individuals in crisis to certain officers ('specialized CIT officers')," who will be "called upon to respond to incidents or calls involving individuals in crisis." | **EVALUATION DEFERRED** |
| 146–47.  Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | **PARTIAL COMPLIANCE** |
| 148.  Designation of specialized CIT officers, per specific, expressly-listed requirements. | **EVALUATION DEFERRED** |
| 149.  "Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized officers." | **EVALUATION DEFERRED** |
| 150.  "All Field Training Officers" ("FTO"s) "will receive the enhanced specialized crisis intervention training described in paragraph 146," though FTOs will "not be designated as a specialized CIT officer" unless they volunteer and have been selected to do so. | **EVALUATION DEFERRED** |
| 151.  "Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene," with | **EVALUATION DEFERRED** |

---

[68] Dkt. 129.

| | |
|---|---|
| supervisors "seek[ing] the input of a specialized CIT officer . . . where it is reasonable for them to do so." | |
| 152.  "[T]he Coordinator will develop an effective specialized crisis intervention plan . . . to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis" that includes various, specific, expressly-identified requirements. The City "will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis." | **EVALUATION DEFERRED** |

After taking the lead on developing a selection process for officers and completing the formal selection process as part of the Second-Year Monitoring Plan, the CDP has developed a plan for CIT officer selection during the current reporting period.  The selection process requires that specialized CIT officers must volunteer for the role, have three years of CDP experience, undergo a CIT Fitness Assessment, complete a written application, obtain supervisory recommendations, undergo a review of the disciplinary file that includes use of force related discipline, and undergo an in-person interview.

## B.    Current Implementation Status

| Paragraph | Status of Compliance |
|---|---|
| 153.  City "will consider" crisis intervention program assessment by Ohio Criminal Justice Coordinating Center of Excellence. | **OPERATIONAL COMPLIANCE** |
| 154.  CDP "will revise its policies to make clear that a crisis intervention response may be necessary even in situations where there has been an apparent law violation." | **OPERATIONAL COMPLIANCE** |
| 155.  CDP "will revise its current crisis intervention policy to ensure that specialized CIT officers have appropriate discretion to direct individuals . . . to the health care system, rather than the judicial system . . . where it is appropriate to do so." | **OPERATIONAL COMPLIANCE** |
| 156.  CDP policies and procedures will ensure that "specialized CIT officers . . . must be dispatched to all calls or incidents that appear to involve an individual in crisis."  CDP must "track incident in which a specialized officer was not dispatched to such calls" and "identify any barriers" to ensuring dispatch of specialized CIT officer to such calls. | **EVALUATION DEFERRED** |
| 157.  "CDP will track calls and incidents involving individuals in crisis by gathering, at a minimum," specific, expressly-identified data. | **PARTIAL COMPLIANCE** |
| 158.  Public reporting of paragraph 157 data and provision to Advisory Committee. | **PARTIAL COMPLIANCE** |
| 159.  "CDP will utilize" paragraph 157 data "to identify training needs and develop case studies and teaching scenarios" for training and other expressly-identified systemic purposes. | **PARTIAL COMPLIANCE** |

### 1. Transition

MHRAC underwent significant change during the current reporting period, with MHRAC Chair and ADAMHS Board CEO William Denihan announcing his retirement.  Mr. Denihan dedicated himself to ensuring that the Decree would, first and foremost, improve the quality of life of Cleveland residents.  The Monitoring Team thanks him for his sincere effort to make the Cleveland community a caring and compassionate place for those in crisis – and for his public service to Cleveland across decades.

In the current reporting period, Valeria Harper was appointed CEO to provide direction for the ADAMHS Board and the MHRAC.  Ms. Harper took over as Chair of MHRAC and provided strong leadership in working through the issues developed for the MHRAC's Second Annual Workplan.  As the Monitoring Team notes in its introduction to this report, Ms. Harper's death is a loss for MHRAC, the ADAMHS Board, and the Cleveland community.

### 2. MHRAC's Second Annual Workplan

The MHRAC's Second Annual Workplan ("the MHRAC Workplan") was designed to support the Second-Year Monitoring Plan and to enhance the Division's ability to meet the terms of the Consent Decree.[69]  In order to address deficiencies in resources, knowledge, and infrastructure relating to crisis intervention, the MHRAC Workplan set out an ambitious set of steps.  These steps include:

- Development of a Quality Assurance Process;
- Completion of the CDP Crisis Plan;
- Completion of the CDP CIT Officer Selection Plan;
- Revision of the Specialized CIT Officer 40 Hour Curriculum;
- Development of diversion alternatives for CDP;
- Promotion of public awareness and understanding about CIT Trainings and Officers; and
- Enhancement of relationships between CDP and the community.

The MHRAC Workplan reflects a desire to use the Decree as a springboard for continuing improvements underway in the capacity of both the CDP and the ADAMHS Board's mental health partners to meet the need of individuals experiencing a behavioral crisis.  CDP and the ADAMHS Board have demonstrated their commitment to meeting the needs of the Cleveland community in a number of ways.  One concrete example was the CDP's willingness to work with the Monitoring Team

---

[69] *See* Mental Health Response Advisory Committee 2nd Year Crisis Intervention Work Plan (Aug. 18, 2017), *available at* http://adamhscc.org/pdf_adamhscc/en-US/MHRAC%20Second%20Year%20Workplan%202017.pdf.

to provide crisis intervention training for the Office of Professional Standards ("OPS") investigators. The Monitoring Team applauds this willingness to work with MHRAC on a range of issues that go beyond the specifics of the Consent Decree to improve the overall mental health system in Cleveland. The MHRAC-led cooperative community effort will pay dividends well into the future.

### 3. Quality Assurance Subcommittee

After reviewing CDP's changes to its Crisis Intervention Program, the MHRAC decided to address linkages between crisis intervention and treatment. MHRAC subsequently created a Quality Assurance Subcommittee—drawn from the MHRAC Policy and Data Subcommittees, as well as a range of subject matter experts, advocates, and individuals in recovery—to work with the Division.

The Quality Assurance Subcommittee is designed to assess not only the effectiveness of CDP's CIT policies and Crisis Intervention Plan, but also the gaps in accessing mental health and addiction services. To that end, the subcommittee is tasked with offering specific solutions to issues involving crisis care and follow-up treatment. The Quality Assurance Subcommittee has met several times and is developing strategies to identify issues and review reports on crisis intervention events.

The Monitoring Team appreciates the willingness of the ADAMHS Board and their providers to examine how their own system can provide a better system of care. MHRAC and the ADAMHS Board are leveraging changes in the CDP's strategy for crisis intervention to further improve the lives of citizens in need of support in dealing with behavioral crisis events – doing what is necessary to ensure that there are no gaps in the continuum of care, which reduces the need for individuals with mental illness to have further involvement with the criminal justice system. This constitutes the type of dynamic, cross-system problem-solving that illustrates the success of the MHRAC in becoming the hub for addressing behavioral health service delivery issues in Cleveland.

### 4. Crisis Intervention Plan

Under the Decree, the CIT "Coordinator will develop an effective specialized crisis intervention plan . . . to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis[.]"[70] CDP's Crisis Intervention Plan was developed by CIT Coordinator Captain James Purcell and was informed by an analysis of CDP Crisis calls for service by district. The plan includes:

- Assessment of the number of officers necessary to ensure coverage of all calls for an individual in crisis across all shifts and all Districts;

---

[70] Dkt. 7-1 ¶ 152.

- Description of the procedures for identification of any gaps in coverage;
- Mechanisms that the Division will use to fill gaps in coverage;
- Analysis of barriers to full coverage and possible steps to overcome these barriers; and
- Ways to identify officers who may be suitable to be specialized CIT officers.[71]

Following approval by MHRAC, the Crisis Intervention Plan was submitted to and approved by the Court during the current reporting period.

### 5. *CIT Selection Process*

Under the Consent Decree, the CIT Coordinator "will be responsible for the selection of appropriate candidates for designation as specialized CIT officers" and "to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls."[72] While it is not yet possible to ensure that officers are responding to CIT-related calls since the 40-Hour CIT training is under development, the CIT Coordinator developed a selection plan for specialized CIT officers.[73]

The selection plan outlines a three-stage process:

- Participation Request
- Personnel File Review
- Selection Board Interview Participation Request

The Participation Request provides for a systematic set of requirements that include voluntary participation, three years of experience, supervisor recommendations, a history relevant to CIT, and a willingness to handle crisis incidents and divert individuals when feasible.

The Personnel File Review aims to select officers with an impressive CDP record. The review includes an examination of the disciplinary record—including the disposition, nature, and evidence of pattern of behavior—as well as any citizen complaints. The Personnel File Review also considers annual performance evaluations, awards, commendations, and letters that reflect outstanding performance, particularly in CIT-related incidents.

The Selection Board Interview Process is designed to assess motivation, provide insight into an officer's CIT calls and reports, and offer an opportunity to review discipline, awards, and evaluations.

---

[71] Dkt. 146-2 at 3.

[72] Dkt. 7-1 ¶ 141.

[73] *See* Dkt. 146-1.

As with the Crisis Intervention Plan, the Selection Plan was reviewed and approved by MHRAC. The final CIT Selection Plan was approved by the Court.

### 6. *Training*

**Eight-Hour Training for All Officers.** In the Third Semiannual Monitoring Period, the MHRAC Training Subcommittee worked with the Division to develop an Eight-Hour Training Curriculum for all officers. This curriculum underwent extensive revisions and contains an impressive set of lesson plans, instructor manuals, and PowerPoint presentations for each of the four courses. DOJ played an instrumental role in shaping this training. The eight-hour curriculum was also reviewed several times by MHRAC and ultimately approved by the Court.[74]

Once the Eight-Hour Training Curriculum was approved by the Court, CDP began scheduling training for all officers. In order to prepare for the training, CDP, the ADAMHS Board staff, a representative of the Ohio Criminal Justice Coordinating Center for Excellence, representatives from the Department of Justice, and a member of the Monitoring Team with national expertise in crisis intervention collaborated to train both the law enforcement and mental health instructors. An evaluation instrument used in other crisis training work was modified for the Eight-Hour Training given to CDP officers. The Department of Justice and the Monitoring Team observed several training sessions to provide feedback and quality assurance.

The City reported to the Court that, as of November 27, 2017, 1,347 out of 1,435 total CDP officers had received and completed the Eight-Hour Training Curriculum. Further, the City and Division "anticipate⬚ that all of CDP's active, eligible officers will have received the required eight hours of crisis intervention training before the end of [2017]."[75]

The feedback from the Division, DOJ, and the Monitoring Team has been positive and will be used to improve future trainings. While the quantitative assessment data has not yet been compiled and analyzed, much of the qualitative feedback obtained by the CIT Coordinator has been encouraging. Perhaps more importantly, Captain Purcell has reported several case studies to MHRAC, the MHRAC Quality Assurance Subcommittee, and the Monitoring Team that suggest the officers are improving their de-escalation skills and seriously considering the process of diversion. Future, formalized assessments will explore this possibility across time, officers, and incidents.

---

[74] *See* Dkt. 129.

[75] Dkt. 165 at 3.

**40-Hour Specialized CIT Training.**  The Consent Decree indicates that "CDP will provide enhanced specialized training in responding to individuals in crisis to certain officers ('specialized CIT officers')" who will be "called upon to respond to incidents or calls involving individuals in crisis."[76]

Under the MHRAC Workplan, the Training Subcommittee's next task is to complete the 40-Hour Specialized CIT Training.  To that end, the Training Subcommittee has revised the course outline for the 40-Hour Curriculum.  It has also developed templates of the lesson plans, instructor manuals, and PowerPoint presentations needed for each course in the 40-Hour Curriculum.

The CDP and the Training Subcommittee worked with the Department of Justice and the Monitoring Team to obtain informal feedback for both the course outline and the templates of sample courses.  The MHRAC Training Subcommittee has completed both tasks and the MHRAC Committee has approved the outline of the 40-Hour Curriculum.

While the CDP and the MHRAC Training Subcommittee face a great deal of work, the 40-Hour Specialized CIT Training is on track to start during the next reporting period.  The CDP dispatch training has been developed into a basic outline, and the curriculum will be fully developed once the 40-Hour Curriculum for specialized CIT officers is completed.

### 7.  Diversion

One of the goals of the MHRAC Workplan is to increase alternatives to hospitalization or arrest for the Cleveland community.  For that reason, MHRAC is focusing on the development of a receiving facility to provide a bridge between crisis care and community-based recovery programs.  ADAMHS Board leadership has started to assess the feasibility of locations that would serve the needs of CDP and the community.  This is a complex process that involves considering the impact that a proposed facility might have on its surrounding neighborhood.

The Monitoring Team is optimistic that a dedicated facility that would serve as the entry point for community-based programs would better divert individuals from the hospital or the criminal justice system – and, crucially, provide a dedicated social service site for police to steer individuals, rather than needing to spend repeated time and resources addressing the same individuals with the same problems.  A dedicated facility is not the only course of action available when it comes to diversion.  However, because high-quality diversion programs are good for officers and subjects, the Monitoring Team looks forward to seeing progress on this front in the next reporting period.

---

[76] Dkt. 7-1 ¶¶ 144–46.

### 8. *Community Engagement*

While community awareness of crisis intervention is not a specific requirement of the Decree, the MHRAC Community Engagement Subcommittee is committed to ensuring that community members are well-informed about the CIT Program.  This committee has previously developed a resource card for officers to use to refer individuals in crisis to alternative resources.  The Community Engagement Subcommittee is now developing a Speakers Bureau and working with the CPC to enhance the MHRAC's outreach efforts.

### 9. *Data Integration: CDP CAD System*

Major changes in the data collection process necessitate a technology-based solution to ensure that reporting requirements do not impede the ability of officers to efficiently and effectively provide law enforcement services.  CDP has taken the Crisis Intervention Data form developed with the MHRAC Data Subcommittee and integrated it into proposed changes in the Division's CAD system.  This system will gather incident information seamlessly and decrease the need for CDP officers to enter and re-enter basic data.

## C. Conclusion

In the current reporting period, CDP and MHRAC have acted to build the foundation necessary to promote community solutions to the assistance of individuals with mental illness.  This foundation will eventually reduce the need for individuals with mental illness to interact with police and the criminal justice system.

**The Division's new CIT policy has been recognized as a national model of crisis intervention.**[77]  Indeed, the Monitoring Team has begun to represent to other jurisdictions that Cleveland's crisis policies are the best and most-forward looking policies in the country.

This strong start on policy continued with a well-developed crisis intervention in-service curriculum for all CDP officers.  The focus on training has continued with the partnership with the MHRAC Training Subcommittee and work on the new 40-Hour CIT Specialist Curriculum.  Through this subcommittee, CDP has obtained hours of volunteer assistance from subject matter experts, advocates, and those in recovery.  The Monitoring Team applauds the subcommittee members'

---

[77] Ballard, C. and Purcell, J. (2017, August). *Cleveland Division of Police; Opportunities to Transform Responses to the Community.*  Presentation at the CIT International Annual Meeting, Ft. Lauderdale, FL.

willingness to step forward and provide assistance as the Division continues to improve its crisis intervention program.

The Monitoring Team commends the CDP and MHRAC on their progress to date. Indeed, the Team believes that the progress that the City has made in the area of crisis intervention is the strongest and most significant of any area of the Consent Decree to date. The collaboration of a diverse group of stakeholders from across the City, a genuine willingness to critically appraise prior practices, and the strategic adoption of new approaches geared at new outcomes are having tangible benefits for individuals in crisis, police officers, social service providers, and Cleveland residents.

## VIII.  SEARCH AND SEIZURE

| Paragraph | Status of Compliance |
|---|---|
| 160. "CDP will revise, develop, and implement search and seizure policies that comply with applicable law, . . . include the requirements below," and conform to expressly-identified principles. | **EVALUATION DEFERRED** |
| 161–65.  Policy requirements for officers for stops, searches, and detentions. | **EVALUATION DEFERRED** |
| 166.  "Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assault an officer and no other substantive violation is alleged," and "the supervisor will respond to the scene." | **EVALUATION DEFERRED** |
| 167.  "Officers will not use 'canned' or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests." | **EVALUATION DEFERRED** |
| 168.  "Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports."  CDP "will train officers" on documenting stops.  "Supervisors will review all documentation of investigatory stops, searches, and arrests." | **EVALUATION DEFERRED** |
| 169.  Supervisor will review of "each arrest report by officers under their command," with supervisors reviewing reports for specific, expressly-identified deficiencies. | **EVALUATION DEFERRED** |
| 170–72.  Supervisory review of investigatory stops, searches, and arrests. | **EVALUATION DEFERRED** |
| 173.  Provision of "initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements" of the Consent Decree that "will address the requirements of Fourth Amendment and related law, CDP policies," and specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 174–75.  Provision of "annual search and seizure in-service training that is adequate in quality, quantity, type, and scope" incorporating specific, expressly-identified topics. | **EVALUATION DEFERRED** |

The Consent Decree requires that CDP "revise, develop, and implement" policies on how its officers "conduct all investigatory stops, searches, and arrests with the goal" that such actions comply with the "Constitution, state and federal law."[78]  In addition to ensuring that officers enforce these legal requirements, the policies also will prohibit officers from relying on a subject's "race, ethnicity, gender, and perceived sexual orientation" as a reason to stop, search, or arrest an individual.[79]

---

[78] Dkt. 7-1 ¶ 160.

[79] *Id.* ¶ 161; Dkt. 97 at 42.

The Monitoring Team's Third Semiannual Report noted that, under the Consent Decree, CDP "[o]fficers will be required to use specific details in reports documenting the events that led to an investigatory stop, search, or arrest" – a change from past practice, where CDP did not systematically capture information about officer performance in this area.[80]  During this reporting period, the Division has made progress on updating its Computer-Aided Dispatch ("CAD") platform.  It is currently contemplated that, not too long from now, officers will use CAD to provide this information.  Because CAD is a platform that the Division uses to log and address a vast array of law enforcement information, logging stops in CAD will allow officers to navigate these reporting requirements in a context with which they are already familiar and, indeed, must already navigate for other purposes.

In June 2017, the Parties and Monitoring Team agreed on a working data template, informed by the requirements of the Consent Decree, that would be captured so that necessary work on the CAD upgrade could continue.  The routine capturing of stop data awaits policies on stops, searches, and arrests being finalized and training completed on those new policies and procedures for conducting and logging information about such encounters.

The Court-approved Second-Year Monitoring Plan provided that "the timetable for working on policies relating to stops, searches, and seizures as between September 2017 and March 2018."[81]  The Division, Parties, and Monitoring Team have been discussing draft iterations of policies consistent with this timeline.  At the same time, the CPC has begun to plan for an in-depth community engagement and outreach effort for the first quarter of 2018 to address final draft policies.  As this report describes elsewhere, the Division has also been working on identifying training relating to bias-free policing and search and seizure so that officer training on new expectations for stops, searches, seizures, and arrests does not lag too far behind completion of new policies.

The Monitoring Team anticipates that, by the end of the next reporting period, these policies will have been the subject of sustained community discussion and finalized and training related to them will have begun.  Thus, the Monitoring Team notes that the "status of compliance" for the various paragraphs relating to search, seizure, and arrests is, for the current reporting period, "evaluation deferred," in recognition of the ongoing, collaborative work being undertaken by the Division, Parties, and Monitoring Team on these issues.

---

[80] First Semiannual Report at 44.
[81] Third Semiannual Report at 39.

IX.    ACCOUNTABILITY

| Paragraph | Status of Compliance |
|---|---|
| 176.    "The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process." | **NON-COMPLIANCE** |

When entering into the Consent Decree, the City of Cleveland agreed that it will:

> [E]nsure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process.[82]

To do so, the City is needing to make comprehensive changes to a host of distinct but overlapping structures and processes: Internal Affairs ("IA"), which will conduct or oversee all investigations of officer performance initiated by individuals within the Division; the Office of Professional Standards ("OPS"), which conducts all investigations of complaints made by individuals outside the Division; the Citizen Police Review Board ("CPRB" or "PRB"), which reviews all OPS investigations and makes recommendations on adjudication and discipline to the Chief of Police; and the process that the Division and City elect to use for reviewing misconduct investigations and imposing discipline, where appropriate.  Whether investigated by IA or OPS, and whether involving the PRB or not, all allegations of officer misconduct proceed through the same system of adjudication and discipline. Together, all of these mechanisms – IA, OPS, PRB, the Chief's Office, the Public Safety Department – constitute what might be called Cleveland's "back-end" system of accountability for its officers: the system for addressing problems that have already occurred or misconduct that has previously taken place.

When considering these components together, the accountability system does not seem to be working for anyone.  It is not working for civilians, who cannot know whether complaints brought to the City's attention via OPS will be fairly, comprehensively, and timely investigated.   The accountability system is not working for the men and women of the Division of Police who at least believe that discipline is arbitrarily imposed through a system, from the start of an investigation to the

---

[82] Dkt. 7-1 ¶ 196.

hearing of a case on grievance to an arbitrator, that is a game of chance that can be swayed only by "who you know" rather than the propriety of performance under scrutiny. At the same time, CDP command staff and other officials in Cleveland lament that the system makes separation from an officer who has performed inconsistent with the Division's policies and values too difficult and day-to-day supervision and management of the Division overly complicated.

During this reporting period, some important progress has been made – namely, a revised Disciplinary Matrix, setting out in detail the ramifications that officers can expect for various classes and types of policy violations, has been finalized. The use of this Matrix should enhance the quality of the Division's process for imposing discipline where warranted.

In the civilian complaint process, far less progress has been made. This Consent Decree ultimately demands outcomes and results. Per the Court's instructions, the City provided a Plan on December 15, 2017 for how the City might begin to come into compliance with the many provisions of the Consent Decree involving the investigation of civilian complaints about the Division's performance. This section outlines the enormous progress that must be made for the City to comply with the core provisions of the Consent Decree involving accountability.

## A.    Internally Discovered Misconduct

| Paragraph | Status of Compliance |
|---|---|
| 177.  "Internal Affairs will conduct objective, comprehensive, and timely investigations of all internal allegations," with "findings . . . based on the preponderance of the evidence standard" that must "be clearly delineated in policies, training, and procedures and accompanied by detailed examples to ensure proper application by investigators." | **EVALUATION DEFERRED** |
| 178.  "Internal Affairs will be headed by a qualified civilian" who "will report directly to the Chief of Police. | **EVALUATION DEFERRED** |
| 179.  Qualifications for IA investigators. | **EVALUATION DEFERRED** |
| 180.  Initial training for IA investigators "that is adequate in quality, quantity, scope, and type on conducting misconduct investigations" that addresses specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 181.  "[A]nnual training" for IA investigators "that is adequate in quality, quantity, type and scope" | **EVALUATION DEFERRED** |
| 182.  "In each investigation, Internal Affairs will collect and consider" all evidence. "[N]o automatic preference for an officer's statement over a non-officer's statement." No disregard of a "witnesses' statement solely because of" connection to the complainant or criminal history. IA investigators must "make all reasonable efforts to resolve material inconsistencies between witness statements." | **EVALUATION DEFERRED** |

| | |
|---|---|
| 183.  IA "will evaluate all relevant police activity and any evidence of potential misconduct uncovered during the course of the investigation." | **EVALUATION DEFERRED** |
| 184.  IA will not consider guilty plea or verdict as "determinative of whether a CDP officer engaged in misconduct" or justification for "discontinuing the investigation." | **EVALUATION DEFERRED** |
| 185.  IA "will complete its administrative investigations within 30 days from the date it learns of the alleged misconduct." | **EVALUATION DEFERRED** |
| 186–87.  IA investigative report requirements. | **EVALUATION DEFERRED** |
| 188.  Forwarding of completed IA investigations "to the officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator." | **EVALUATION DEFERRED** |
| 189.  "CDP will require any CDP employee who observes or becomes aware of any" potential misconduct to "report the incident to a supervisor or directly to" IA. | **EVALUATION DEFERRED** |
| 190.  "CDP will develop a system that allows officers to confidentially an anonymously report potential misconduct by other officers." | **EVALUATION DEFERRED** |
| 191.  "CDP will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." | **EVALUATION DEFERRED** |
| 192. "Officers who retaliate . . . will be subject to the disciplinary process." | **EVALUATION DEFERRED** |

"Internal Affairs" ("IA") is the entity within a police department that investigates potential employee misconduct.[83]   The Monitoring Team has previously described what IA does in other police departments, which is different from what Cleveland's Internal Affairs Unit has done in the past.[84] Specifically, before the Consent Decree, IA conducted nearly exclusively criminal investigations. Some combination of the Division's Inspections Unit, IA, and chain of command conducted administrative investigations – that is, investigations of employee performance to determine whether, even if not criminal in severity, police deficiencies warrant the Division's formal response through discipline or termination.

The Department of Justice's 2014 investigation concluded that the CDP internal investigation structure did not "adequately investigate and hold officers accountable for misconduct."[85]   It concluded that the CDP's IA Unit did not conduct thorough and objective investigations of alleged officer misconduct.[86]

---

[83] *See* Dkt. 97 at 43-44.

[84] First Semiannual Report at 45-56; Second Semiannual Report at 41-42.

[85] 2014 Findings Letter at 34.

[86] *Id.* at 35-36.

The Monitoring Team's Third Semiannual Report summarized the results of its independent inquiry into the quality of IA investigations, which were largely consistent with the DOJ's 2014 findings. Specifically, the Monitoring Team assessed the Division's IA investigations in light of the provisions of the Consent Decree and generally-accepted law enforcement practices.[87] IA investigations were found to be wanting. After consultation with the Division and the DOJ, the Monitoring Team agreed that the most productive way of improving IA investigations in the long term was to ensure that IA is guided by policies and procedures that will bring "best practices" from other police agencies throughout the United States.

Consequently, the Consent Decree required a reformed Internal Affairs function that would have more robust requirements for investigations and that would also serve as a primary engine for the Division's administrative (non-criminal) investigations, as well as internal and citizen-generated criminal investigations.

### 1. Status of Compliance - Ongoing Policy Work

The Consent Decree requires CDP and the City to have in place both the mechanisms and defined policies pertaining to the investigation of misconduct that is discovered within the Department.  As noted above, the entity within the Division tasked with conducting administrative investigations of allegations of CDP misconduct is the IA unit.

The work of the current reporting period has focused on creating policies and procedures to guide Internal Affairs investigations. Because the Force Investigation Team ("FIT") is part of the IA structure, the Monitoring Team, the Division, and the Department of Justice have collaborated to finalize the structure of the FIT and how it will relate to the IA and the proposed new Bureau of Compliance (a new bureau from which IA will be structurally and functionally separate).

It is anticipated that the IA policy manual, the FIT manual, a Force Review Board Policy, and additional IA-related policies can be completed by the end of February 2018. These IA-related policies under development include policies which will ensure compliance with paragraphs 189 (reporting of misconduct), 190 (anonymous reporting of complaints), and 191 (prohibition of retaliation) of the Consent Decree.  In addition, the IA manual is expected to bring consistency and cooperation between IA and OPS.

Upon completion and implementation of these manuals and policies, the Monitoring Team anticipates that IA personnel will become better aware of Division expectations under the Consent Decree through training and implementation may proceed expeditiously.

---

[87] Third Semiannual Report at 41-46.

Additionally, as reported in our Third Semiannual Report, during the course of the Monitoring Team's review of Internal Affairs files stemming from a civilian's complaint about officer conduct, the Monitoring Team encountered two documents which constituted artificial barriers to the submission of complaints. One document was an affidavit advising complainants of potential criminal culpability for making a false allegation against a police officer. The second document was an agreement by the complainant not to pursue their complaint any further.

For the reasons explained in its Third Semiannual Report, the Monitoring Team criticized IA's regular use of these forms.  The Monitoring Team has been informed that IA has discontinued its use of these forms, which represents a positive development in ensuring fair and objective investigations.

### 2.  IA Superintendent Recruitment & Hiring

The Consent Decree provides that "Internal Affairs will be headed by a qualified civilian who is not a current or former employee of CDP, and who is not a current or retired law enforcement officer."[88] This civilian head of IA is to report directly to the Chief of Police.  This reorganization of IA—along with a new policy and procedural manual for IA, increased cooperation between IA and OPS, and a new FIT manual—is intended to build a foundation for high-quality, fair, objective, timely, and thorough administrative investigations.

In early February 2016, CDP began the process for the selection of a civilian IA Superintendent. Unfortunately, the Division reported that no suitable candidate could be found.  The Division proceeded through multiple rounds of recruiting and interviewing but failed to find a well-qualified, satisfactory candidate.  Indeed, given that the individual will be in charge of overseeing a police operation's own investigations into its personnel, some knowledge and experience of law enforcement operations is necessary to ensure comprehensive investigations – and relatively few individuals have this in-depth knowledge into how police agencies work unless they have served within a police department or worked closely, as a prosecutor or other official, with the police.

All other qualifications equal, however, compliance with the Consent Decree's specific provisions would be most straightforward and expeditious if the IA Superintendent position is filled by a qualified person who has not previously served as a police officer at the municipal or county level. Given the practical realities, however, the City requested that it be allowed to explore individuals from outside the police department who had some experience as former law enforcement officers – including retired and former prosecutors, federal investigators, and officers from departments other than CDP.  The Parties and Monitoring Team agreed that, although the Consent Decree originally contemplated a head of IA with no law enforcement background, expanding the scope of the hiring

---

[88] Dkt. 7-1 ¶ 178.

process to attract individuals who had worked as a law enforcement officer was necessary to try to attract a qualified outsider to the role. The Parties and Monitoring Team further agreed that it would present to the Court requests to modify necessary of the Consent Decree if an otherwise-qualified candidate had former experience as a law enforcement official.

Following another intensive recruitment and interviewing process, the City identified a desired candidate with previous experience as a prosecutor, which could, under some definitions, be considered a "law enforcement officer." The Parties jointly recommended to the Court that it modify the Consent Decree in order to permit this qualified candidate to assume the responsibilities of the IA Superintendent position.[89] The Monitoring Team, having considered the motion, concurs that this limited modification is warranted in this case. Ultimately, it believes that the hiring of a former prosecutor to serve as the IA Superintendent fits within the original intent of the Settlement Agreement; to ensure that Internal Affairs and the FIT are supervised by a person who will provide an informed but independent perspective on the important issues facing IA and the Division and who will have direct access to the Chief of Police and the Division's command staff. The Team looks forward to an outside professional, skilled in investigations, leading the IA function as it adopts and implements critical new changes required by the Consent Decree in the coming months.

## B.     Office of Professional Standards ("OPS")

| Paragraph | Status of Compliance |
|---|---|
| 193.  OPS "investigate[s] all civilian complaints it receives, other than those that allege criminal conduct," which are referred to IA. Excessive force complaints generally retained by OPS. IA investigations referred back to OPS if "determination is made that no criminal conduct occurred." | PARTIAL COMPLIANCE |
| 194.  "The City will ensure that OPS is led by an administrator with the skills, expertise, and experience to effectively manage the intake, tracking, timely, and objective investigation of complaints"; implement PRB training; "assess OPS's equipment and staffing needs"; and "develop and implement performance standards for OPS." | NON-COMPLIANCE |
| 195–96.  Initial training for OPS investigators "adequate in quality, quantity, scope, and type," including specific, expressly-listed topics. | PARTIAL COMPLIANCE |
| 197.  "OPS Investigators will not be current members of the CDP, and no CDP personnel will have any active role in OPS's operations." | OPERATIONAL COMPLIANCE |
| 198.  "The City will ensure that the lawyer representing OPS does not have any actual or apparent conflicts of interest." | OPERATIONAL COMPLIANCE |

---

[89] Dkt. 172.

| | |
|---|---|
| 199.  "OPS will have its own budget, separate from . . . the Department of Public Safety" that "affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement." | **EVALUATION DEFERRED** |
| 200.  Development and implementation of OPS operations manual "made available to the public" that covers specific, expressly-listed topics. | **NON-COMPLIANCE** |
| 201.  Development and implementation of "a program to promote awareness through the Cleveland community about the process for filing complaints with OPS." | **EVALUATION DEFERRED** |
| 202.  "CDP and the City will work with the police unions . . . to allow civilian complaints to be submitted to OPS verbally or in writing; in person, by phone, or on line; by a complainant, someone acting on his or her behalf, or anonymously; and with or without a signature from the complainant," with all "complaints documented in writing." | **EVALUATION DEFERRED** |
| 203.  "CDP will post and maintain by the intake window at CDP headquarters and all District headquarters a permanent placard describing the civilian complaint process" and containing specific, expressly-listed information. | **OPERATIONAL COMPLIANCE** |
| 204.  "CDP will provide training that is adequate in quality, quantity, scope, and type to all police personnel, including dispatchers, to properly handle complaint intake, including" with respect to specific, expressly-listed topics. | **NON-COMPLIANCE** |
| 205.   CDP officers "carry complaint forms in their CDP vehicles," which officers must provide "upon request."  Supervisors will be dispatched to scene when an individual wants to make a complaint, with the supervisor providing a copy of completed complaint form "or a blank form to be completed later by the individual." | **EVALUATION DEFERRED** |
| 206.   "The City and OPS will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including a number of specific, expressly-listed locations. | **OPERATIONAL COMPLIANCE** |
| 207.   "OPS's complaint form will not contain any language that could reasonably be construed as discouraging the filing of a complaint, including warnings about the potential criminal consequences for filing false complaints." | **OPERATIONAL COMPLIANCE** |
| 208.  Availability of complaint forms in English and Spanish.  "OPS will make every effort to ensure that complainants who speak other languages . . . can file complaints in their preferred language." | **OPERATIONAL COMPLIANCE** |
| 209.   "City will ensure that civilian complaints submitted through other existing systems, including the Mayor's Action Center and the Department Action Center, are immediately forwarded to OPS for investigation." | **OPERATIONAL COMPLIANCE** |
| 210.  "OPS will establish a centralized electronic numbering and tracking system for all complaints," which "will maintain accurate and reliable data regarding the number, nature, and status of all complaints . . . including investigation timeliness and notification of the interim status and final disposition of the complaint."  It "will be used to monitor and maintain appropriate caseloads for OPS investigators." | **EVALUATION DEFERRED** |

| | |
|---|---|
| 211.  Biased policing tracked as a separate category of complaint that "are captured and tracked appropriately, even if the complainant does not so label the allegation." | **EVALUATION DEFERRED** |
| 212.  "[A]llegations of unlawful investigatory stops, searches, or arrests" tracked as a separate category of complaints. | **EVALUATION DEFERRED** |
| 213.  "[A]llegations of excessive use of force" tracked as separate category of complaints. | **EVALUATION DEFERRED** |
| 214.  "OPS will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends." | **NON-COMPLIANCE** |
| 215.  "OPS will produce, at least annually, a public report summarizing complaint trends, including" with respect several specific, expressly-identified areas. | **PARTIAL COMPLIANCE** |
| 216.  Assignment of complaints to Standard and Complex investigatory tracks. | **OPERATONAL COMPLIANCE** |
| 217.  Dismissal and/or administrative dismissal of complaint investigations. | **OPERATONAL COMPLAINCE** |
| 218.  "OPS will ensure that investigations of complaints are as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of the evidence." | **NON-COMPLIANCE** |
| 219.  "CDP will ensure that OPS has timely access to all reports related to the incident . . . ," and authority of OPS "to conduct additional investigation" of civilian complaint when CDP investigation has already taken place relating to the incident. | **EVALUATION DEFERRED** |
| 220.  "OPS investigators will attempt to interview each complainant in person" and record the interview. | **PARTIAL COMPLIANCE** |
| 221.  "The Chief will order officers who witnessed or participate in an incident that is the subject of an OPS complaint to cooperate with the OPS investigation," including by responding to written questions or sitting for an in-person interview. | **PARTIAL COMPLIANCE** |
| 222.  "OPS investigators will have access to any relevant disciplinary information in the record of an officer who is the subject of a current investigation." | **EVALUATON DEFERRED** |
| 223.  "OPS will consider all relevant evidence," with no preferences for particular witness's statements, including of officer over a non-officer, or because of connection to complainant or criminal history.  "OPS will make all reasonable efforts to resolve material inconsistencies between witness statements." | **NON-COMPLIANCE** |
| 224.  OPS findings categories. | **OPERATONAL COMPLIANCE** |
| 225.  "OPS will document in writing the investigation of each complaint, including all investigatory steps taken, and OPS's findings and conclusions," which must "be supported by a preponderance of the evidence. | **NON-COMPLIANCE** |
| 226.  Items for consideration for OPS findings. | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 227. "OPS will forward all investigations and its written conclusions to PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation." | NON-COMPLIANCE |
| 228. "OPS will send periodic written updates" to the complainant at specific, expressly-identified junctures. | NON-COMPLIANCE |
| 229. "[A] complainant may contact OPS at any time to determine the status of his/her complaint." | EVALUATION DEFERRED |

OPS investigates the complaints of civilians and Cleveland residents about Division of Police personnel. The City of Cleveland's Charter requires OPS to conduct "a full and complete investigation" of all complaints of employee misconduct.[90] Currently, the City is not in compliance with the terms of its own charter or with the Consent Decree.

In the First Semiannual Report, the Monitoring Team expressed "disappointment and frustration with the dysfunction and failed legitimacy of the Office of Professional Standards" ("OPS").[91] In the Second Semiannual Report, the Monitoring Team observed the need for the City to "drastically improve[e] the manner in which OPS delivers services to the citizens of Cleveland."[92] In the Third Semiannual Report, the Monitoring Team noted that it had "run out of words to capture the depth and breadth of the progress that needs to be made to cure the current inability of Cleveland residents to have complaints about City employees fairly and fully addressed in a timely manner – and pursuant to its own Charter."[93] The Team has not located any such words in the past six months.

Over the first three months of the current reporting period, the Monitoring Team remained frustrated by OPS's lack of progress – as well as the increasing likelihood that the systemic failures of OPS in investigating, civilian complaints in a fair, thorough, objective, and timely manner will serve as an anchor that will prevent timely, ultimate compliance with the Consent Decree. Put differently, the OPS-PRB system is lagging far behind progress made in a number of other areas, which threatens to extend the duration of the reform process.

During the middle of the reporting period, the City and CDP made a change in the leadership of OPS. Certainly, any change of leadership presents an opportunity for an organization to get on the right track. However, **systemic and long-standing problems that have festered over years still require significant time, energy, and resources to make OPS into a functioning and credible oversight agency**.

---

[90] Charter of the City of Cleveland, Section 115-4.
[91] Dkt. 97 at 44 (citing First Semiannual Report at 47–48).
[92] *Id.* at 44–45.
[93] Third Semiannual Report at 48.

In November, the Director of Public Safety committed to hiring a suitable OPS leader. The Director also instructed the interim leadership of OPS to create, ostensibly for the first time, performance measures for OPS permanent investigators in order to ensure that a solid performance foundation might greet the new OPS Administrator at the time of his/her hire.[94]

### 1. Current State of OPS

In the June 2017 Third Semiannual Report, the Monitoring Team reported a continuing unacceptable backlog of investigations and disposition letters of some 383 cases.[95] In consultation with the Court over the Summer, the Parties and Monitoring Team agreed to specific milestones for OPS to deliver by the end of the 2017 calendar year, which were filed with the Court on August 30, 2017 and formally approved.[96] The milestones were envisioned as reasonable and achievable ways of addressing the large backlog of civilian complaints not fully investigated – but mechanisms that would nonetheless require OPS to enhance its productivity and not continue "business as usual." The milestones did not "replace, supplant, or amend any obligations under the Consent Decree or the Second-Year Monitoring Plan . . . . [Rather,] the milestones [were] intended to provide specific, measurable guideposts to assist OPS in meeting existing requirements."[97]

The benchmark requirements required the OPS to achieve the following goals over the rest of the 2017 calendar year:

- Beginning on September 1, 2017, OPS will make formal, specific representations to the Parties concerning its caseload performance and process via a comprehensive bi-weekly report.[98]
- By September 15, 2017, OPS would formally identify to the Parties the number of outstanding cases pending administrative dismissal. Subsequently, all cases pending administrative dismissal would be addressed by September 25, 2017. Through the end of 2017, cases that may be resolved through administrative dismissal should be closed via the administrative dismissal process within thirty (30) calendar days of receipt.[99]

---

[94] The City observes that its "Smart Objectives" program for setting employee performance benchmarks has been in effect for a number of years. Nevertheless, the Monitoring Team is not aware that specific Smart Objectives, or other formal performance benchmarks, have been in place for any OPS personnel at any juncture – and, if there were, these benchmarks were certainly not inspiring the type of performance necessary to ensure timely, fair, thorough, and objective investigations. Indeed, the Monitoring Team's current understanding is that "Smart Objectives" were put in place for OPS personnel only as of the fourth quarter of calendar year 2017.

[95] *See* Third Semiannual Report at 48-49.

[96] *See* Dkt. 150.

[97] *Id.* at 1.

[98] *Id.* at 2.

[99] *Id.* at 3.

- By September 30, 2017, OPS would complete all pending disposition letters relating to complaints made from 2014 through 2016 (reported at 184 cases).[100]
- By October 1, 2017, OPS would complete findings letters (letters to the Chief of Police relating to cases sustained by the Police Review Board) for at least half of the identified outstanding cases, i.e. at least eleven cases. Findings letters for all such identified cases were to be completed by November 1, 2017. Going forward, any new findings letters were to be completed within fourteen (14) calendar days of the PRB issuing a finding. The letters were to be sent contemporaneously to the Chief's Office and the Parties.[101]
- By December 31, 2017, all remaining investigations of complaints that were made in 2014 and 2015 (reportedly 136) will be completed, amounting to a nearly 50% reduction in the backlog of pre-2016 complaint investigations that presently remain open.[102]
- By December 31, 2017, OPS will complete 50% of all remaining investigations of complaints that were made in 2017 as of August 30, 2017.[103]
- For all open investigations, regardless of when initiated, OPS would interview officers where it believes a sustained finding is more likely than not. The Director of Public Safety would facilitate those interviews by issuing a written standard order that OPS could use to direct officers to cooperate with its investigations and participate in such an interview.[104]
- For all open investigations, an investigation could not be certified as complete unless all identified material witnesses who are not unavailable have been interviewed, or have not responded to three contact attempts.[105]
- For all open investigations, all investigatory interviews, whether of officers, complainants, or witnesses, will be audio-recorded.[106]
- The City will promptly ensure that every investigator is provided with a digital recorder and access to video recording capabilities.[107]
- The City will immediately staff the currently-open full-time clerical position.[108]
- The City will continue to work with the Parties in evaluating the 2018 budget for OPS, which will include discussion of hiring a supervisory investigator.[109]

---

[100] *Id.*
[101] *Id.* at 4.
[102] *Id.* at 2.
[103] *Id.* at 2-3.
[104] *Id.* at 4
[105] *Id.* at 4-5.
[106] *Id.* at 5.
[107] *Id.*
[108] *Id.*
[109] *Id.*

After consultation with the Court, it was understood that any failure by OPS to achieve these benchmarks would cause the Court to require the City to provide a detailed accounting of why the various milestones were not achieved.

OPS initially struggled to complete a bi-weekly report that met the Monitoring Team's expectations. It was not until the production of the October 3, 2017 bi-weekly report that OPS started to provide the Monitoring Team with the information necessary to gauge its progress vis-à-vis the required milestones.

On September 28, 2017, four weeks after the filing of the Court-approved milestones, the Monitoring Team was advised that the OPS milestones regarding administrative dismissal and disposition letters had not been met. In addition, the October 4, 2017 bi-weekly report reported 48 cases pending administrative dismissal (although such letters were supposed to have been completed by September 25, 2017) and 216 cases pending disposition letters (although all pending letters were supposed to have been completed by September 30, 2017). The Monitoring Team also noted that the progress being made to complete pending investigations was not proceeding according to the pace necessary to achieve the end-of-year milestones as per the expectation of the Court and the Parties.

As such, on October 6, 2017, the Monitoring Team formally advised the City that the OPS did not appear to be in compliance with the milestone expectations. On October 13, 2017, after consulting with the City, the Monitoring Team reported to the Court as follows:

- In order for OPS to reach the benchmark of completing all investigations initiated in 2014 and 2015 by the end of the 2017 calendar year, the six OPS temporary investigators assigned to the OPS "backlog reduction team" would need to close out 5.1 investigations per investigator per month. According to OPS records, each investigator was actually completing only two investigations per month – far short of what was required to stay on pace with the benchmarking expectations.
- On October 13, 2017, the Monitoring Team identified nine (9) OPS investigations that had been submitted to the Police Review Board for review even though the investigations were not completed according to the requirements of OPS Manual Section 403 (relating to actions necessary before completing an investigation without interviewing a complainant).
- Based on the information provided by OPS, it was highly unlikely that OPS would be able to complete all investigations initiated in 2014 and 2015 by December 31, 2017 per the protocols of the OPS Manual.
- With respect to 2017 cases, there were 128 pending 2017-initiated complaints with a benchmark of completing 50 percent of those cases (64) before the end of the year as of August 22, 2017. The OPS had reported that, as of October 13, 2017, 19 of those

investigations have been completed and approved by the OPS Administrator. As such, the six permanent OPS investigators (assigned to handle 2017 initiated complaints) were completing approximately 2.7 investigations per week per investigator, or 19 investigations over a period of 7 weeks. The Monitoring Team noted that, at this rate, OPS would only complete an additional 30 investigations by the end of the year which would result in the completion of approximately 50 cases. Consequently, OPS was on track to address only three-quarters of the benchmark – which, in itself, only addressed half of the complaints received by OPS as of August 22, 2017 (and necessarily did not include any complaint investigations initiated in the final third of calendar year 2017).

- Therefore, it did not appear that OPS would be able to complete the benchmark for 2017 cases by the end of December 2017.

- With respect to the administrative dismissals, the August 30 filing required OPS to report the number of pending administrative dismissals by September 15, 2017. All letters relating to those pending administrative dismissals were to be completed by September 25, 2017. OPS reported that it "seriously undercounted the actual volume" of administrative dismissals when it reported 43 pending administrative dismissals to the Monitoring Team on September 15, 2017. In fact, the number of pending administrative dismissals should have been reported as 109. The fact that OPS substantially underreported the number of pending administrative dismissals does not excuse or mitigate its failure to address the administrative dismissals. Moreover, OPS's lack of certainty about the actual number of pending administrative dismissals was troubling.

- The City was required pursuant to the August 30 filing to complete *disposition* letters for 184 completed cases by September 30, 2017. According to OPS, as of October 10, only 19 of those disposition letters had been completed. OPS informed the Monitoring Team that additional resources had been allocated to address the missed benchmark but did not provide the nature of those additional resources or why those resources were not allocated shortly after the filing of the benchmark memorandum.

- With respect to the *findings* letters, OPS acknowledged that it had failed to contemporaneously send completed findings letters to the Monitoring Team and the DOJ when it submitted them to CDP. OPS's failure to do so was contrary to the express terms of the August 30 filing, which indicated that "OPS will forward copies of these [findings] letters contemporaneously to the Chief's Office, Parties, and Monitoring Team."[110]

Further, the Monitoring Team conducted a qualitative review of 38 OPS investigations completed between September 1, 2017 and October 13, 2017 and determined that only thirteen (13) of the investigations were completed in accordance with the requirements set forth by the OPS manual and in accordance with investigative best practices. Accordingly, OPS complied with the Court's and

---

[110] *Id.* at 4.

Monitor's expectations in only 38% of its completed investigations. In nine (9) cases, OPS failed to follow its own policies with respect to attempting to make contact with the complainant. In fourteen (14) cases, OPS failed to interview the involved officers as required by the benchmarking order. Of six total witness interviews conducted after September 1, 2017, OPS recorded only one by audio. Accordingly, OPS failed to comply with the requirement that "all investigatory interviews, whether of officers, complainants, or witnesses, will be audio-recorded."[111]

The Court convened a hearing regarding OPS's lack of progress on the Court-approved milestones on November 21, 2017. At the same time as the Monitoring Team requested a hearing on this issue, the Monitoring Team was advised that the OPS Administrator had separated from his employment with OPS.

At the hearing, the Court received a report from the Monitoring Team on OPS's lack of progress. The Monitoring Team noted that the agreed-upon milestones were rationale, achievable goals based upon legitimate community and police expectations for OPS. The Monitoring Team reported that as of the date of the hearing, there was no reasonable expectation that OPS would reach its goals with respect to completion of 2014-15-initiated investigations before the end of 2017. Similarly, OPS would not be able to complete 50% of the 2017-initiated investigations that had been identified as of August 30, 2017. In fact, the number of pending 2017-initiated OPS investigations had actually *increased* since the date of the milestone order. The Monitoring Team also noted that over the course of the prior month (October 3, 2017 through November 14, 2017), the total number of open investigations had gone from 385 to 383 – a reduction of only two cases. In addition, over the course of a two and a half-month period, there had been a reduction of pending investigations of only 4.4% (from 401 to 383). At that rate, there was no possibility that the court-ordered milestones for OPS investigations would be achieved.

Additionally, the Monitoring Team reported additional violations of the milestone order:

- Only 28% of interviewed conducted since August 30, 2017 were documented as audio-recorded;
- In 26% of its investigations, OPS failed to comply with its own policies regarding what actions needed to be taken before a complainant could be considered unavailable. In addition, 45% of the investigations submitted to the PRB for its October 2017 meeting were not compliant with OPS policy in that regard;
- In an additional 26% of its investigations, OPS failed to give subject officers the opportunity to be interviewed prior to an OPS investigator recommending sustained findings, a violation of CDP officers' right to due process;
- OPS had still not provided its investigators with access to video recording capabilities; and

---

[111] *Id.* at 5.

- OPS had still not staffed a currently-open full-time clerical position which has been vacant since April 2017.

Although the Monitoring Team noted that OPS had eliminated its backlog of disposition letters, administrative dismissal letters, and findings letters, it also noted that:

- The letters were not completed until after the Monitor notified the court of OPS's non-compliance in this regard;
- In order to complete this task, OPS needed to bring in additional resources, in the form of a CDP Sergeant to complete 186 backlogged disposition letters; and
- 39% of the disposition letters relating to "supervisorial reviews" failed to provide an explanation for the Division's decision to take no action on the OPS complaint.

At the hearing, the Monitor again expressed significant concerns about the scope of the progress that OPS must still make and the lack of swift action and urgency to date. Indeed, only now is the City setting forth formal expectations (the "Smart Objectives") for its OPS investigators relating to the conduct of investigations – even though this is a process available to all City managers across departments to set and hold employees accountable for specific performance expectations. Only now is an outside entity being sought for assistance in working through the backlog of incomplete civilian complaint investigations.

At the November hearing, the Court heard from the City and the Director of Public Safety as to the actions being taken to bring OPS into compliance with the Decree. These actions included bringing on a Deputy Safety Director to supervise OPS during its leadership transition and efforts to conduct a national search for a new OPS Administrator. The City also reported on the creation of two new full-time positions at OPS in the form of a Supervising Investigator and a Community Relations Ombudsman. The City acknowledged the need for OPS to perform up to expectations and agreed to create updated milestones to ensure OPS is able to appropriately reduce its backlog of investigations. The Court ordered the City to create, in collaboration with the Monitoring Team and the Department of Justice, updated milestones and expectations by December 15, 2017.

Subsequent to the November 21 court hearing, OPS submitted 14 cases to be reviewed by the PRB on December 9, 2017. DOJ reviewed the cases to determine if the quality of investigations was sufficient. It found that 5 of the cases (35%) were completed with no significant concerns; another 5 (35%) were completed with significant problems that would not be considered acceptable for future consideration; and 4 cases (30%) required additional investigation. Because these cases had been reviewed and approved by OPS *after* the November 21 court hearing, the lack of improvement was particularly problematic and troubling to the Monitoring Team.

After the November 21 court hearing, OPS appeared to rectify its deficiencies with respect to the lack of access of OPS investigators to video recording capabilities. Effective December 13, 2017, OPS investigators were equipped with, and trained to use, their own Body Worn Cameras. As such, OPS investigators should be conducting video recorded interviews of witnesses and officers, on a regular basis, now and in the future.

On December 15, 2017, the City submitted an updated plan for dealing with the ongoing backlog as ordered by the Court. The City acknowledged that additional staffing for the OPS has been included in the OPS budget for 2018, to include a two news positions: a Supervisory Investigator and a Community Engagement Coordinator.  The City has also represented its intent to hire "a qualified private vendor" (or vendors) to complete all OPS investigations initiated in 2015 through 2017 over the course of the 2018 calendar year. The City further indicated its intent to use the current staff of permanent and temporary OPS investigators to keep all complaints received since December 1, 2017 current.  Ultimately, only time will tell whether the City's attempt to address this issue by assigning only current cases to OPS investigators and contracting out backlogged cases will be successful. Nevertheless, the Monitoring Team finds the City's present willingness to engage outside resources to be an encouraging sign that the underlying dynamics surrounding the investigation of civilian complaint investigations may be changing.

### 2. 2014 Cases Assigned for "Supervisory Review"

In its Third Semiannual Report, the Monitoring Team noted that there were 96 cases, all initiated in 2014, which had been identified by OPS and PRB in 2016 for "supervisory review" by the CDP.  This means that OPS identified cases that it would not handle and instead forwarded them along to the Division's supervisors to complete and address.

The Court and the public should not mistake what transpired in these cases, or what would transpire going forward, by utilizing "supervisory review."  It entails shifting work and responsibility from one City agency and set of employees within the Department of Public Safety to another – in this case, an agency, the Division of Police, with supervisors who are already overworked and overburdened. "Supervisory review" is an acknowledgement that OPS cannot handle its work and is an increase in supervisor workload.  "Supervisory review" takes first-line supervisors off of Cleveland's streets and prevents them from responding to the scenes of emerging incidents because other City employees and supervisors have failed to do their jobs.

It is possible that the review of comparatively lower-level complaints may be suitable for first-line supervisor inquiry.  Other cities, in fact, have established successful processes that incorporate elements of the police department's supervisors.  However, this has become an ongoing responsibility

– not something unceremoniously dumped in supervisor laps in order to clear out cases. There is a substantial difference.

Even when OPS decided to rid itself of cases via "supervisory referral," it took almost one year for those cases to be completed and disposition letters sent to complainants.[112] Of those complaints, one case was referred by CDP to Internal Affairs for further investigation (1%); ten (10%) were reported as closed despite the Division's inability to identify the involved officers; thirteen (13%) involved employees who had previously resigned or retired; thirty-seven (37%) involved cases where the Division reported that it had "counseled" the involved officers; and thirty-nine (39%) were cases where CDP supervisors determined that "no further action" was warranted.

Unfortunately, the OPS disposition letters in the 39 cases where the Division determined that no further action was warranted failed to explain the rationale behind the Division's decision-making. Transparency and accountability in oversight requires that complainants be provided an objective and reasonable explanation for the failure of OPS/PRB or CDP to sustain or take action on a complaint. OPS must change its practices to meet reasonable expectations.

### 3. OPS Budget and Resourcing

As previously reported, the Monitoring Team initially declined to either approve or disapprove of the full OPS budget for 2017, instead providing short-term, provisional approval of the budget through the first quarter of the year. The Monitoring Team was concerned that the proposed OPS budget failed to provide for a permanent solution to OPS resource issues, instead relying substantially on "temporary investigators" to reduce the backlog of cases.

During the first six months of 2016, the City approved the hiring of two new permanent investigators and six new temporary investigators. By the end of April 2017, all investigative positions had been hired. The Monitor reported this as "an encouraging development that gives OPS more resources than it has had during the past several years to both address the backlog of incomplete investigations and ensure that new complaints brought to the office are fully and fairly investigated in a timely manner."[113]

The 2018 draft budget submitted by OPS requests that the temporary investigator positions be funded through at least the first half of 2018. In addition, the draft budget includes two new full-time positions: a Community Relations Ombudsman and a Supervising (or Chief) Investigator. The

---

[112] *See* Third Semiannual Report at 50.

[113] *Id.* at 51-52.

Monitoring Team believes that both positions are essential to the success of the OPS model of oversight.

OPS can benefit substantially from a supervisor with experience and expertise in administrative complaint investigations. Although there are investigators at OPS with a substantial amount of experience, many of the investigative practices used by OPS have been determined by the DOJ investigation and the Monitoring Team to be deficient and not in accord with investigative best practices. Over the years, OPS has appeared to develop a culture of confirmation bias that has led investigators to jump to conclusions due, in part, to what investigators at least perceive lack of cooperation from subject and witness officers and CDP command staff. The hiring of a qualified Supervising Investigator would provide OPS with the opportunity to interrupt what has become an unfortunate cycle of lack of cooperation and lack of information resulting in poor investigations and poor decision-making.

In addition, the hiring of a Community Relations Ombudsman would allow OPS to create a long-term community engagement plan (as required by the Consent Decree) which would assist OPS in becoming a true bridge between the community and the Division.

Unfortunately, administrative support staffing continued to be ineffective over this reporting period. As of the end of October 2017, the position of Chief Clerk continued to go unfilled as the City was unable to provide a backfill appointment due to a temporary long-term vacancy (since April 2017). This position has, however, been posted and, according to the City, will soon be filled, which will constitute important progress. On the positive side, a Private Secretary position for the CPRB was filled in August after a lengthy delay.

### 4. City Negotiations with Police Union Regarding OPS Practices

As previously reported and identified in the DOJ's investigation of the CDP, the current, voluntary agreement between the City and the Cleveland Police Patrolmen's Association ("CPPA") provides that "[a]ll complaints filed by a citizen against [officers] shall be submitted by the complainant in his or her own handwriting." The Decree requires that the City "work with the police unions . . . to allow civilian complaints to be submitted to OPS verbally or in writing; in person, by phone, or on[-]line; by a complainant, someone acting on his or her behalf, or anonymous; and with or without a signature . . . . "[114] The Court-approved OPS Manual provides that "[a] signed complaint form is NOT required for any further action to be taken by OPS in an effort to resolve the constituent's complaint . . . . "[115]

---

[114] Dkt. 7-1 ¶ 217.

[115] Dkt. 86-1 at 9.

As the Monitoring Team has described on numerous occasions, a vast majority of American police departments "take anonymous complaints without exception and permit such complaints to form the basis of disciplinary action."[116]  Indeed, "[a]n academic survey from nearly 30 years ago found that some 96 percent of the 101 departments surveyed 'investigate anonymous complaints, if not as a matter of routine, then if there is any other supportive information.'"[117]

Not only must the City accept unsigned complaints in order to align with the longstanding practices of most other police departments and to comply with the Consent Decree, but it also must do so given the impermissible exclusion of individuals with physical or cognitive disabilities and mobility impairment from the civilian complaint process in Cleveland.  The Monitoring Team has previously noted its "significant concerns" that the handwritten complaint "constitutes an ongoing violation of the Americans with Disabilities Act . . . and the equivalent Ohio state statute."[118]

The newly adopted OPS Manual does require OPS to investigate cases submitted without a complainant's own handwriting; however, unless and until the agreement between the City and the police union is modified, no discipline can be imposed on cases that do not involve a signed complaint.  The Monitoring Team has repeatedly stated that it expects "that the City and CPPA work expeditiously to ensure that the provisions of the Consent Decree, generally-accepted practice, and compliance with the ADA and equivalent Ohio state law are harmonized with the CPPA Contract."[119]

In late 2017, the City and CPPA reached a tentative agreement on a contract.  The City has reported that the proposed contract with the police union included a provision to rectify this deficiency.  However, that negotiated contract was not accepted by CPPA's membership.  Currently, final proposals from both the City and CPPA are being reviewed by an arbitrator.  The arbitrator will select one of those proposals in the near future, and the selected contract will become effective.  The Monitoring Team will report to the Court and the public on whether any provisions of the contract run afoul of the U.S. Constitution; federal, state, and local law; and the Consent Decree.

### 5.  OPS Annual Report

---

[116] Dkt. 86 at 16 (listing departments that accept complaints, including Mesa, Arizona; Bakersfield, California; Los Angeles, California; Long Beach, California; Aurora, Colorado; Miami-Dade, Florida; Jacksonville, Florida; Atlanta, Georgia; Honolulu, Hawaii; Baltimore County, Maryland; Montgomery Country, Maryland; Raleigh, North Carolina; Las Vegas, Nevada; Albuquerque, New Mexico; Tulsa, Oklahoma; Pittsburgh, Pennsylvania; Memphis, Tennessee; Virginia Beach, Virginia, and Washington, D.C.).

[117] Id. (quoting Paul West, Investigation of Complaints Against the Police: Summary Report of a National Survey, 7 AM. J. POLICE 101 (1988)).

[118] 104 Stat. 328, 42 U.S.C. § 12101 *et seq*; O.R.C. § 4112.99; *see* Dkt. 86 at 16 (noting that "[t]he ADA and its Ohio analogue, apply to the City of Cleveland's programs and activities, including its interactions with civilians through OPS, and require the City to make reasonable modifications in policies, practices, or procedures where the modifications are necessary to avoid discrimination on the basis of disability).

[119] Dkt. 86 at 16–17.

Paragraph 215 of the Consent Decree requires OPS to produce an annual report summarizing complaint trends and timeframes for the public. OPS completed its 2016 annual report (the first in five years) and posted it on its website on August 22, 2017. Although OPS did not publish the report within the period required by its Court-approved policy manual, the publication of the report was a positive step towards transparency with respect to OPS complaint handling practices. Unfortunately, OPS did not obtain budgetary approval to print out hard copies of the report until October 2017 and had still not distributed the manual to all identified stakeholders by the end of 2017. While the Monitoring Team certainly understands the many challenges faced by OPS administration during the course of 2017, the Monitoring Team hopes that OPS will be timelier in the completion and distribution of its next annual report.

### 6. Public Awareness Plan

The Consent Decree requires that "the City and CDP, in consultation with OPS and the CPC, will develop and implement a program to promote awareness throughout the Cleveland community about the process for filing complaints with OPS"[120] in order to enhance access to the complaint process. This program is to include a plan to post information about the civilian complaint process,[121] a plan to ensure that all CDP officers carry complaint forms in their vehicles,[122] a plan to make OPS complaint forms and other materials widely available at public locations,[123] and a plan for ensuring that civilian complaints submitted to the City via other existing systems are forwarded to OPS immediately.[124]

In order to achieve these requirements, the Second-Year Monitoring Plan required that the City and CDP would "submit a First Draft plan for a program to promote awareness of the OPS process and comply with paragraph 201 of the Agreement (the 'OPS Awareness Plan')" by April 27, 2017.[125]

As reported in the Third Semiannual Report, on April 27, 2017, the OPS Administrator submitted a first draft plan that purportedly complied with this requirement of the Second-Year Monitoring Plan but that the Monitoring Team found lacking. Specifically, there did not appear to have been any consultation among the City, CDP, OPS, and the CPC. The draft plan instead appeared to be an attempt by OPS to comply with the requirement without any support or input from any other City entity.

---

[120] Dkt. 7-1 ¶ 201.

[121] Id. ¶ 203.

[122] Id. ¶ 205.

[123] Id. ¶ 206.

[124] Id. ¶ 209.

[125] Dkt. 120-1 at 19.

Shortly after receiving the Monitoring Team's feedback on the plan, the City advised the Monitoring Team that work had begun on a coordinated approach to this deliverable. However, in mid-October, after recognizing that OPS was not achieving the Court-ordered milestones goals for handling of complaint investigations and dispositions, the Parties and Monitoring Team agreed to postpone further efforts to create a public awareness plan until the OPS program could be shown to be able to satisfy the milestones. In any event, the completion of the public awareness plan would appear to require the hiring of a Community Outreach Ombudsman, which OPS anticipates will occur within the first six months of 2018.

### 7. Training for OPS Investigators

The Monitoring Team's qualitative review of OPS investigations confirmed the DOJ investigative findings that OPS investigators had not received the training necessary to systemically conduct thorough and competent investigations. During the course of this reporting period, OPS set out to comply with the Consent Decree's requirement that initial training for OPS investigators be "adequate in quality, quantity, scope, and type."[126]

Over the course of the reporting period, the Monitoring Team identified substantial training needs for OPS investigators. The aforementioned qualitative evaluation of OPS investigations identified that OPS investigators were not aware of expectations for compliance with the Consent Decree or the OPS manual and identified a number of systemic investigative deficiencies that needed to be addressed. In addition, it became clear that OPS investigators had never been provided with basic training in best practices in conducting administrative investigations. OPS investigators also appeared to be unaware of Division training and expectations with respect to incidents involving uses of force and the use of body worn cameras.

As of the end of the year, the City appears to be on the road towards correcting these deficiencies. The Monitoring Team provided a full-day training for OPS investigators to discuss expectations for compliance with the Consent Decree and the OPS manual and to make OPS staff aware of systemic investigative deficiencies. In addition, OPS has reported that its investigators had the opportunity to observe CDP training of its officers on the new Use-of-Force policy on December 11 and 12, 2017. The Safety Department has also committed to additional Use-of-Force training for OPS investigators in January 2018 and to conducting a two-day course in "Conducting Administrative Investigations" for OPS investigators in February 2018. Finally, OPS investigators (along with members of the CPRB) received training in December 2017 relating to the use of Body Worn Cameras by Division personnel.

---

[126] Dkt. 7-1 ¶ 195-6.

## C.    Police Review Board ("PRB")

| Paragraph | Status of Compliance |
|---|---|
| 230.  "Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot" addressing PRB composition and appointment process. | GENERAL COMPLIANCE |
| 231.  "PRB members will not be current or former members of the CDP." | GENERAL COMPLIANCE |
| 232.  "PRB will have its own budget," overseen by OPS Administrator and separate from Department of Public Safety, that "affords sufficient independence and resources." | OPERATIONAL COMPLIANCE |
| 233–34.   Initial training for PRB members "that is adequate in quality, quantity, scope, and type" and that covers specific, expressly-identified topics. | PARTIAL COMPLIANCE |
| 235.  PRB meetings open to the public and posted in advance, with "case presentations and PRB votes" occurring during "open session." | OPERATIONAL COMPLIANCE |
| 236.    "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings . . . . "  PRB may "ask the investigator to conduct further investigation" as necessary. | PARTIAL COMPLIANCE |
| 237.  "PRB recommended dispositions will be based on a preponderance of the evidence.  For each case, PRB shall set forth its conclusion and an explanation of its reasons and supporting evidence in writing, including, when applicable, the justification for departing from OPS's recommended disposition." | EVALUATON DEFERRED |
| 238.  "In cases where PRB is recommending a sustained disposition, in whole or in part, PRB will include a recommendation as to disciplinary or non-disciplinary corrective action." | OPERATIONAL COMPLIANCE |
| 239.  [Timely] forwarding of PRB recommendations to Chief of Police and Director of Public Safety. | PARTIAL COMPLIANCE |

Cleveland's Police Review Board reviews and analyzes completed OPS investigations.  It makes a formal recommendation to the Chief of Police on the ultimate disposition of the case and, as necessary, the discipline that an involved officer should receive.

### 1.  PRB Manual

As previously reported, the Monitoring Team quickly identified that, since the PRB was created by a 1984 City Charter amendment, the Board had originally carried out its duties without a set of established protocols to guide its decision-making.[127]   The lack of clear processes and procedures

---

[127] Dkt. 97 at 8.

allowed the PRB to fall behind on the timely review and deliberation of cases – failing in its core duties and service to the City of Cleveland. It also made the PRB's decisions, and subsequent CDP and City decisions based on or related to them, ripe for the objections of grievance arbitrators that the process was not sufficiently fair to involved officers.

Moreover, prior to the adoption of a new PRB manual, the PRB had failed to appropriately document its decision-making processes. With the adoption of the new PRB Manual, effective April 6, 2017, and the hiring of a Private Secretary in August 2017, the Board was finally given the tools to effectively complete that portion of its work.

Since the adoption of the PRB Manual, the Board indicated that it needed to discuss Board-member decision-making in public (as permissible by law). In order to facilitate this more transparent process, the Monitoring Team and the DOJ worked with OPS and the Board to amend the PRB Manual to permit the Board to conduct its deliberations in a public setting (instead of deliberating in a private executive session). The Board voted to adopt the amended policy at its August 16, 2017 meeting. The amended policy was subsequently submitted to the Court for its approval on August 28, 2017.

### 2. PRB Training Plan

The Second-Year Monitoring Plan required that, by April 1, 2017, a draft training plan have been prepared to ensure that "PRB members will receive initial training that is adequate in quality, quantity, scope, and type and will include various specified areas, including constitutional and other relevant law related to police-citizen encounters; police tactics; investigations of police conduct; bias-free policing; policing individuals in crisis; CDP policies, procedures and disciplinary rules; and community outreach."[128] The training plan for the PRB was required to be completed by June 15, 2017 and implemented by July 1, 2017.

As previously reported, a draft outline of proposed training was provided to the Monitoring Team on April 6, 2017. The outline documented short-term training provided at a full-day training retreat for the PRB on May 13, 2017, as well as future topics to be covered in trainings either before, after, or during regular monthly CPRB meetings. Although the outline provided was not as sufficiently detailed as envisioned in the Second-Year Monitoring Plan, the Monitoring Team agreed to work with OPS to identify training needs on an ongoing basis and identify subject matter experts who can provide an appropriate, ongoing curriculum and training as required by the Consent Decree.

Over the course of the reporting period, a member of the Monitoring Team volunteered to provide training to the Board (which was also attended by OPS investigators) relating to Fourth Amendment

---

[128] Dkt. 120-1 at 20 (quoting Dkt. 7-1 ¶ 233).

issues in policing (specifically relating to federal case law on search and seizure).  Additionally, the Monitoring Team identified the need for PRB to receive training on the Division's use of force training, policies, and expectations for its officers, as well as training on the use and administration of body-worn cameras.

Although training on the use of body-worn cameras was provided to the PRB at its November 2017 meeting, the PRB still has yet to receive training on the CDP's Use of Force policies and training. Consequently, the PRB has had to review and make recommendations on citizen complaints alleging excessive force without a proper understanding of how officers are trained to use force or how the Division interprets its use of force policies.  Until such training is delivered, the PRB will not serve the needs of complainants, officers, and Command Staff who are required to review and consider PRB recommendations as well as they need to under the Consent Decree.  The Monitoring Team has advised the Department of Public Safety that it is unlikely that two hours of training in this area will suffice to ensure reliable and informed PRB recommendations.  As such, the Safety Department has agreed to evaluate the training provided in January and February and provide additional training as necessary thereafter.

Finally, the Monitoring Team has noted that a new member of the PRB has recently been appointed. The OPS administration must now create a training protocol for this member and future new members to ensure the seamless operation of the PRB going into the future.

### 3.  Documentation of PRB Decision-Making

As previously reported, the PRB has struggled with the timely documentation of the reasoning for its decisions.  Although the Board encountered challenges in this regard throughout most of the reporting period, the hiring of a Private Secretary in August 2017 to assist the PRB in the preparation of these disposition letters appears to have had an impact.  As of the end of the year, the backlog of PRB disposition and findings letters appeared to have been eliminated. The last OPS bi-weekly report of the year reported the office had completed disposition letters on all cases heard by the PRB at a December 9, 2017 meeting within two weeks.  The Monitoring Team consequently expects that the PRB can now contemporaneously prepare disposition letters (letters to complainants documenting non-sustained finings made by the PRB) and findings letters (letters to the CDP documenting sustained findings made by the PRB) for all cases considered in the upcoming year.

The next challenge will be to ensure the accuracy of these letters. In one case, involving sustained findings by the Board, the original findings letter prepared by the OPS incorrectly stated the Board's position and it took the OPS almost six weeks to correct and re-transmit the letter to the Chief of Police.

### 4. *Quality of PRB Recommendations & Processes*

By attending numerous Chief's Hearings regarding allegations that the PRB recommends as sustained, the Monitoring Team has observed that, in many cases, the Chief has either disagreed with the PRB recommendations or there have been procedural issues that result in a case's dismissal.

In some instances, the Chief advised the involved officers of his findings before the PRB could decide whether or not to controvert his findings to the Director of Public Safety. In other cases, it was determined that OPS-PRB had no jurisdiction to make recommendations where CDP command had previously informed involved officers of their decisions on complaints prior to the PRB's review. After the Monitoring Team identified this problem, the Chief agreed to defer his decision-making until the Board is able to review his decisions. In addition, OPS staff are now aware of the circumstances under which OPS-PRB loses jurisdiction over cases that have been previously adjudicated by the CDP. Those cases will now be administratively closed without a referral to the Board for their consideration.

The Monitoring Team has deferred a qualitative analysis of the cases referred by the PRB to the Chief for sustained findings. During the next reporting period, the Monitoring Team plans to conduct such an analysis to inform a training session with the PRB that will help ensure that the PRB's recommendations have a basis in fact and administrative law and are recognized by CDP command as reliable and defensible.

In the meantime, the Monitoring Team has noted some lack of communication amongst and between the PRB and the Chief's Office. Although OPS-prepared findings letters to the Chief have dramatically improved over the course of this reporting period, improvements still need to be made to ensure that the Chief (and the involved officers) are fully aware of the PRB's rationale for recommending sustained findings.

Likewise, although the Chief's Office is making efforts to explain the rationale for the Chief's decision-making (subsequent to a due-process required "Chief's Hearing,"), additional focus will be required in the coming months to ensure that the full rationale of the Chief in making decisions is clear on the basis of written documentation. In a number of cases, the PRB has voted to contravene decisions made by the Chief to the Safety Director without a full, comprehensive understanding of the rationale for the Chief's decisions. In some instances, the PRB has been making these recommendations without consistently reviewing audio recordings or transcripts of Chief's hearings.

In order to ensure informed recommendations on the part of the PRB subsequent to Chief's Hearings, the PRB needs to consistently review or be aware of information provided during these hearings and the rationale for the Chief's decision-making. It is imperative that, during the course of the next

reporting period, the PRB and the Chief's Office, with the assistance of the OPS, communicate more effectively and consistently in order to ensure that informed PRB opinions are duly considered by the Chief and that the PRB likewise fully and deliberately considers the rationale for decisions made by the Chief prior to making any referrals to the Safety Director.  Further, OPS will need to report on disagreements between the Chief, the PRB, and the Safety Director in its next annual report.  The extent to which these communications should be in-person or by means of detailed written correspondence will need to be determined during the next reporting period.

## D.    Discipline and Disciplinary Hearings

| Paragraph | Status of Compliance |
|---|---|
| 240.  "The Chief of CDP will issue a General Police Order that requires officers to (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB." | **EVALUATION DEFERRED** |
| 241.  Disciplinary hearing requirement, with officer given "opportunity to testify" and suspension of hearing if "officer provides new or additional evidence at hearing," with matter "returned to IA or PRB for consideration." | **EVALUATION DEFERRED** |
| 242.  Written justification by Chief or Director of decision to "not uphold the charges" or "does not impose the recommended discipline or non-disciplinary corrective action" where PRB previously "recommends the initiation of the disciplinary process and recommends a disciplinary level." | **PARTIAL-COMPLIANCE** |
| 243.  "CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition." | **EVALUATION DEFERRED** |
| 245.  "CDP will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented." | **EVALUATION DEFERRED** |
| 246.  "CDP will review its current matrix and will seek to amend it" "to ensure consistency" and inclusion of a number of specific, expressly-identified features. | **OPERATIONAL COMPLIANCE** |
| 247.  "All disciplinary decisions will be documented in writing." | **EVALUATION DEFERRED** |
| 248.  "CDP will provide its disciplinary matrix to the Commission, the Police Inspector General, and the police unions for comment." | **OPERATIONAL COMPLIANCE** |
| 249.  "CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years." | **EVALUATION DEFERRED** |

### 1. Disciplinary Matrix

The Consent Decree obligates CDP to "ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented."[129]  To that end, the Division "will review its current disciplinary matrix and will seek to amend it as necessary[.]"[130]  Specifically, CDP must ensure that the new disciplinary matrix:

- "[E]stablishes a presumptive range of discipline for each type of rule violation;"
- "[I]ncreases the presumptive discipline based on an officer's prior violations of the same or other rules;"
- "[P]rohibits consideration of the officer's race, gender, national origin, age, ethnicity, familial relationships, or sexual orientation" as well as "the high (or low) profile nature of the incident;" and
- "[P]rovides that CDP will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline" but may consider non-disciplinary corrective action "in a case where discipline has [already] been imposed."[131]

Along with the requirements above, CDP must document all disciplinary decisions in writing and must "work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years."[132]

During the reporting period, the Parties finalized a revised Disciplinary Matrix that sets forth the types of discipline that may be imposed with respect to violation of various Division policies.  The finalized Disciplinary Matrix was filed with the Court on December 20, 2017 and became effective on January 1, 2018.

Virtually every word in the Disciplinary Matrix was the product of comprehensive discussion and negotiation among the Parties and the Monitor.  Reaching a consensus was exacting, with the Department of Justice and Monitoring Team advising and negotiating with the City and CDP through numerous drafts.  The Parties devoted particular time and attention to determining what types of misconduct should be included in each Group Violation, the definitions of mitigating and aggravating factors, the definition and use of non-disciplinary action, and the use of the term "presumptive range of corrective action."

---

[129] Dkt. 7-1 ¶ 245.
[130] Id.
[131] Id. at ¶ 246.
[132] Id. at ¶¶ 247, 249.

Along with the views of the DOJ and Monitoring Team, the Disciplinary Matrix reflects the input of other critical stakeholders. OPS and the PRB submitted their comments on April 21, 2017. On August 22, 2017, the CPC held a community meeting for Cleveland residents to share their feedback on a draft of the disciplinary matrix. The CPC subsequently conferred with the Division to provide its comments and insights. Additionally, the Cleveland Police Patrolmen's Association expressed its concerns in an April 21, 2017 letter to CDP regarding proposed revisions to the disciplinary matrix and recommended additional changes for the Division to consider. While there are conflicting accounts on whether subsequent in-person meetings to address the matrix occurred between CDP and the CPPA, the Division appears to have held internal meetings to review the CPPA's suggestions.

The Disciplinary Matrix sets forth critical guidelines for the imposition of corrective action within the Cleveland Division of Police. It establishes three categories of violations—Groups I, II, and III—that are ranked sequentially according to the severity of the violation.[133] For example, Group I Violations ("conduct that has a negative image on the operations or professional image of the Division") include a CDP employee's failure to appear in court, failure to maintain equipment, failure to submit timely reports, and unsatisfactory performance.[134] Group III Violations ("conduct that involves a serious abuse or misuse of authority, unethical behavior, or an act that results in an actual or serious and adverse impact on officer of public safety") include discriminatory policing, firearms violations resulting in death or serious injury, false statements, and violation of training tactics.[135]

Each Group Violation has, in accordance with the Consent Decree, "a presumptive range of discipline[.]"[136] For example, an officer with his or her first sustained Group I Violation (where mitigating factors outweigh any aggravating factors) faces a presumptive corrective action ranging from non-disciplinary verbal counseling to written reprimand.[137] Moreover, the Disciplinary Matrix "increases the presumptive discipline based on an officer's violation of the same or other rules[.]"[138] For instance, whereas an officer's *first* Group II Violation with no mitigating factors results in a 7 to 8 day suspension without pay, a *second* Group II Violation with no mitigating factors results in a 9 to 10 day suspension without pay.[139] That type of successive disciplinary increase is consistent across each Group Violation.

Further, the Disciplinary Matrix provides that "[m]itigating or aggravating factors shall be considered and may result in the adjustment of the discipline administered within the disciplinary range of the

---

[133] *See* Dkt. 170-1 at 2-3.
[134] *Id.* at 2, 6.
[135] *Id.* at 3, 8.
[136] Dkt. 7-1 ¶ 246(a).
[137] Dkt. 170-1 at 8.
[138] Dkt. 7-1 ¶ 246(b).
[139] *See* Dkt. 170-1 at 9.

Group Violation identified."[140]  The definitions for Mitigating and Aggravating Factors are robust—listing numerous circumstances that exemplify each type of factor—and should reduce confusion around the situational and/or behavioral circumstances that may be considered in determining a Division employee's discipline.[141]

Moreover, the Disciplinary Matrix states that discipline "shall be decided without consideration to the member's race, religion, gender, sex, national origin, age, ethnicity, familial relationships or sexual orientation."[142] The new policy also states that discipline "shall be decided without consideration of the high or low profile nature of the incident."[143]

Additionally, the Disciplinary Matrix states that "[t]he Division will not accept non-disciplinary corrective action as a substitute for discipline where the disciplinary matrix calls for the imposition of discipline."[144]  Nonetheless, "the Division will consider whether non-disciplinary corrective action . . . is appropriate in addition to discipline being imposed."[145]

The Consent Decree requires that "[a]ll disciplinary decisions will be documented in writing."[146] Accordingly, the Disciplinary Matrix mandates that "the Case Preparation Officer in the Chief's Office shall maintain files of all disciplinary actions imposed by the Division."[147]  The documentation shall include the date of the incident, the date of the disciplinary action, the violations sustained, and the action taken.[148]  Disciplinary records "will be maintained in compliance with Ohio Public Records retentions laws."[149]

Although the process to revise CDP's Disciplinary Matrix required substantial time and effort, the Monitor is hopeful that these provisions, put together, will help the Division "ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented."[150]

## 2.  Current Status of Imposition of Discipline and Disciplinary Findings

---

[140] *See id.* at 4.
[141] *See id.* at 2.
[142] *Id.* at 1.
[143] Id.
[144] *Id.* at 11.
[145] Id.
[146] Dkt. 7-1 ¶ 247.
[147] Dkt. 170-1 at 11.
[148] See id.
[149] *Id.* at 10.
[150] Dkt. 7-1 ¶ 245.

Because it decided to focus on creating Internal Affairs policies and addressing major OPS deficiencies over the current reporting period, the Monitoring Team has deferred a systemic evaluation of the imposition of discipline and the quality and rationale for findings until next year.  Although the Monitoring Team has observed some disciplinary decisions that do not appear to appropriately hold officers to account, it has also seen the appropriate imposition of discipline in some serious cases.  A comprehensive evaluation of the imposition of discipline will be conducted upon the implementation of the new disciplinary matrix.  The Monitoring Team hopes that the new Disciplinary Matrix will give CDP the tools it needs to ensure fair and accountable discipline in the long-term.  This evaluation will also examine the extent to which CDP command staff explains its rationale for disciplinary decisions to its officers and the PRB.

## X. TRANSPARENCY & OVERSIGHT

### A. Police Inspector General

| Paragraph | Status of Compliance |
|---|---|
| 250.  "The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a Police Inspector General" ("IG").  City must seek CPC's "input in developing minimum qualifications and experience" for IG. | **PARTIAL COMPLIANCE** |
| 251.  IG work in Office of Mayor but report to Chief of Police. | **EVALUATION DEFERRED** |
| 252.  IG "will not be a current or former employee of CDP." | **EVALUATION DEFERRED** |
| 253–54.  Duties and authority of IG. | **EVALUATION DEFERRED** |
| 255.  Budget of IG must be "a separate line item" in City budget and "afford[] sufficient independence and resources" to comply with Consent Decree. | **EVALUATION DEFERRED** |
| 256.  IG "will have access to all documents and data necessary to perform the above functions, including any raw data." | **NON-COMPLIANCE** |

The Consent Decree creates "a new, internal oversight function within the Division – a Police Inspector General."[151]  "The IG's substantial duties include, but are not limited to, review of CDP policies and practices, auditing, conducting investigations, analyzing data for aggregate and systemic trends, developing specific recommendations for reform, analyzing investigations conducted by OPS to determine if they are adequate, and reviewing imposed discipline."[152]  The IG's reports and recommendations must be made public.[153]

The Second-Year Monitoring Plan projected that an Inspector General would be hired by December 1, 2017. [154]  The City and CDP proceeded diligently to develop a plan for recruiting and spreading information about the IG position on a national scope.  Applications have been received and been reviewed, and the interview process is underway – making the hiring of an IG an imminent milestone.

### B. Data Collection and Analysis

| Paragraph | Status of Compliance |
|---|---|
|  |  |

---

[151] First Semiannual Report at 49.

[152] Dkt. 7-1 ¶ 253.

[153] Dkt. 97 at 53 (quoting Dkt. 7-1 ¶ 253) (internal quotations omitted).

[154] Dkt. 120-1 at 22.

| | |
|---|---|
| 257. "CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad access to information related to CDP's decision making and activities. To achieve this outcome, CDP will designate an individual or individuals as the 'Data Collection and Analysis Coordinator.'" | **NON-COMPLIANCE** |
| 258. Coordinator "will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials," including specific, expressly-listed materials and information. | **PARTIAL COMPLIANCE** |
| 259. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents," including specific, expressly-identified data. | **PARTIAL COMPLIANCE** |
| 260. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation." The system must conform to a number of specific, expressly-identified requirements. | **PARTIAL COMPLIANCE** |
| 261. Coordinator must "routine[ly] report[] . . . relevant data to the Chief of Police, FRB, Training Review Committee, OPS, the [Community Police] Commission, and the Police Inspector General." | **EVALUATION DEFERRED** |
| 262. Coordinator "responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection." | **NON-COMPLIANCE** |
| 263. Coordinator "will develop a protocol to accurately analyze the data collected and allow for" various outcome measurements, "subject to the review and approval of the Monitor and DOJ." | **PARTIAL COMPLIANCE** |
| 264. Annually, "CDP will conduct an assessment and issue a report summarizing its investigatory stop, search, and arrest data" that addresses various specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 265. Annually, "CDP will conduct an assessment and issue a report of all activities, including use of force, arrests, motor vehicles and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race" or other listed prohibited classes or characteristics, and that addresses various specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 266. Annual analysis of "prior year's force" data with FRB. | **EVALUATION DEFERRED** |

After an initial search for a Data Collection and Analysis Director yielded no suitable candidates, CDP finalized a two-year consulting arrangement with Dr. Dan Flannery of the Begun Center at Case Western University to serve as an interim Data Collection and Analysis Coordinator.

Dr. Flannery and his team's primary activities have continued to include "meetings with key stakeholders, a review of the baseline measures compendium, an initial data scan, a comprehensive data mapping exercise, initial data analysis and quality assurance validation, development of a codebook with all data points, technical assistance on CDP data migration and integration efforts, and preliminary baseline reports for any available data related to use of force, crisis intervention, community engagement, civilian complaints, and stop, search and arrest data."[155]

Dr. Flannery's team continues to convene weekly with key stakeholders at the CDP and monthly with the Monitoring Team. Dr. Flannery and his Team have made strong contributions to date to building the capacity within the Division of police to engage in evidence-based, strategic management of public safety and the Division's daily performance. In September 2017, a full-time Data Collection and Analysis Coordinator, Rania Issa, Ph.D., began in the position. She will be working closely with Dr. Flannery and his team as efforts continue.

CDP currently enjoys the benefits of having a seasoned crime analyst. Under his supervision, CDP generates useful information about crime and crime data, which is distributed to command staff on a weekly basis. However, urban police departments across the country – especially those dealing with violent crime issues – are decentralizing the data function so that individual districts or precincts have data experts in-house to help set neighborhood-specific crime and public safety priorities and manage officer performance in real-time.[156] CDP needs to make a wholesale ramping up and upgrading of its information support functions an integral part of its strategic plans for 2018, as doing so well enhance its ability to respond to public safety issues and to manage itself in the manner that the Consent Decree requires.

## C.    Public Availability of CDP-Related Information

| Paragraph | Status of Compliance |
|---|---|
| 267.   "[A]ll CDP audits, reports, and outcome analyses related to the implementation" of the Consent Decree will be public. | NON-COMPLIANCE |
| 268.   "CDP will post its policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports on its website." | PARTIAL COMPLIANCE |

The Consent Decree requires that "policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports – be posted on CDP's

---

[155] Third Semiannual Report at 57.

[156] See, e.g., Stacy St. Clair, "CPD to Launch New Support Centers to Analyze District-Level Shootings," *Chicago Tribune* (Oct. 1, 2017), *available at* http://www.chicagotribune.com/news/local/breaking/ct-met-chicago-police-strategic-support-center-20171001-story.html.

website.[157]  Likewise, "[t]o ensure transparency in the implementation of" the Decree, "all CDP audits, reports, and outcome analyses related to the implementation of this [the Consent Decree] will be made publicly available, including at the City and CDP websites."[158]

After initially not being available, the Monitoring Team "commended CDP's efforts to ensure transparency and access" by posting material related to the Consent Decree on its website.[159]  The Third Semiannual Report reported that:

The information that the Division posts are documents that have been produced by the Cleveland Police Monitoring Team, and the Cleveland Police Commission, as well as General Police Orders, court filings, and status reports.  What is not available, or easy to find, are audits, budgets, and outcome analysis reports.  We recommend that the CDP re-double its efforts to post these materials – as well as focus on making it easier for the average user to navigate the website and find the relevant materials.[160]

The Monitoring Team has not observed any material changes in the availability of these audits, budgets, and outcome reports.  It likewise is not aware of efforts to make General Police Orders, divisional notices, and other internal documents articulating the Division's policies and processes more navigable and accessible.  In an era where police departments are increasingly making their policies more easily navigable,[161] we look forward to assisting the Division with focusing on efforts geared toward enabling the public to better understand expectations for police officers and public safety services in Cleveland.

---

[157] Dkt. 7-1 at 1; *id.* ¶ 268.

[158] *Id.* ¶ 267.

[159] Third Semiannual Report at 58.

[160] Id.

[161] *See*, *e.g.*, Seattle Police Department Manual (online), https://www.seattle.gov/police-manual; Cincinnati Police Department Procedure Manual (online), https://cincinnati-oh.gov/police/department-references/police-department-procedure-manual/; Los Angeles Police Department Manual (online), http://www.lapdonline.org/lapd_manual/; Chicago Police Department Directives System (online), http://directives.chicagopolice.org/directives/.

## XI.    OFFICER ASSISTANCE & SUPPORT

### A.    Training

| Paragraph | Status of Compliance |
|---|---|
| 269. "CDP will ensure that officers receive adequate training to understand: (a) how to police effectively and safely in accordance with CDP policy; [and] (b) the requirements of this Agreement, Ohio law, and the Constitution and laws of the United States," including in the areas of "procedural justice, bias-free policing, and community policing." | **PARTIAL COMPLIANCE** |
| 270. "CDP will expand the scope and membership of the Training Review Committee." | **PARTIAL COMPLIANCE** |
| 271–72. "[T]he Training Review Committee will develop a written training plan for CDP's recruit academy, probationary field training, and in-service training" that addresses a host of specific, expressly-identified issues. | **NON-COMPLIANCE** |
| 273. "The Training Plan and schedule will be implemented once any objections have been resolved" on a yearly basis. | **PARTIAL COMPLIANCE** |
| 274. "The Training Review Committee will annually review and updated CDP's training plan" by "conduct[ing] a needs assessment" that addresses a number of specific, expressly-identified data and information on real-world trends, needs, policy, and law. | **NON-COMPLIANCE** |
| 275. "CDP's Commander responsible for training" will be in charge of "all CDP training. | **PARTIAL COMPLIANCE** |
| 276. "CDP will designate a single training coordinator in each District. The Commander responsible for training will establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the" training Commander. | **PARTIAL COMPLIANCE** |
| 277. "CDP will develop recruit academy and in-service curricula that comport with" the Training Plan and Consent Decree requirements. | **PARTIAL COMPLIANCE** |
| 278. "[T]he training required under this Agreement . . . will be delivered within two years of the Effective Date." | **EVALUATION DEFERRED** |
| 279. "For all other substantive updates or revisions to policy or procedure, CDP will ensure and document that all relevant CDP personnel have received and read the policy or procedure.  Notification of each revision or update will include the rationale for policy changes and the difference between the old and updated policy." | **PARTIAL COMPLIANCE** |
| 280. Training Commander reviews all training materials; ensures that they use "a variety of adult learning techniques, scenario-based training, and problem-solving practices"; and "ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Review Committee." | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 281.  "CDP will ensure that instructors are qualified and use only curricula and lesson plans that have been approved by the" Training Commander. | **PARTIAL COMPLIANCE** |
| 288.  "CDP will document all training provided to or received by CDP officers," with officers "sign[ing] an acknowledgement of attendance or digitally acknowledge[ing] completion of each training course," which "will be maintained in a format that allows for analysis by training type, training date, training source, and by individual officer name." | **EVALUATION DEFERRED** |
| 289.  "CDP will develop and implement a system that will allow the Training Section to electronically track, maintain, and produce complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system." | **PARTIAL COMPLIANCE** |
| 290.  "CDP will develop and implement accountability measures . . . to ensure that all officers successfully complete all required training programs in a timely manner." | **NON-COMPLIANCE** |

### 1.  In-Service Training

This report elsewhere discusses in detail the Division's significant success in designing, implementing, and completing training for all officers on CDP's new use of force policies and on crisis intervention. Again, the completion of these major training initiatives constitute an important milestone.

Officers have also received training in addition to this force and crisis training during 2017. As the Third Semiannual Report summarized, the Division "must – like all law enforcement agencies in the State of Ohio – provide officers with training that satisfies the annual advanced training requirements of the Ohio Peace Officer Training Academy."[162]  Between Consent Decree-required and more generalized state training, CDP officers received the required "40 hours of in-service training annually."[163]

In recent months, attention has shifted to identifying the training priorities for 2018.  As the Monitoring Team did in its Third Semiannual Report, it is useful here to inventory the types of training that CDP must provide officers between now and the termination of the Consent Decree:

- Annual "use of force in-service training that is adequate in quality, quantity, type, and scope" for "all officers";[164]
- Use of force training for supervisors on "conducting use of force investigations; strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force; and supporting officers who report

---

[162] Third Semiannual Report at 60.

[163] Dkt. 7-1 ¶ 271(c).

[164] Id.  ¶ 86.

unreasonable or unreported force, or who are retaliated against for attempting to prevent unreasonable force";[165]

- Community and problem-oriented policing principles for all officers;[166]
- Initial training for all officers on bias-free policing;[167]
- Initial, supervisor-specific training on bias-free policing;[168]
- Annual follow-up "training on bias-free policing that is adequate in quality, quantity, type, and scope";[169]
- Training that "teach[es] proper techniques for unholstering, displaying, pointing, and aiming a firearm, and for determining when it is appropriate to do so";[170]
- "[A]t least 16 hours of firearms training which will include pistol, shotgun, and policy training," including "night, reduced light, and stress training" for "each firearm they are authorized to use or carry on-duty";[171]
- Annual ECW (taser) certifications that include, among other things, "scenario-based training" with the ECW;[172]
- Members of the forthcoming, dedicated Force Investigation Team ("FIT") with "FIT-specific training that is adequate in quality, quantity, scope, and type" and that covers a host of specific areas or issues;[173]
- Initial and ongoing training for members of the forthcoming Force Review Board;[174]
- Annual training on crisis intervention for all CDP officers;[175]
- Training for specialized Crisis Intervention Team officers;[176]
- Initial and annual training on search and seizure, CDP's policies on search and seizure, and the Fourth Amendment;[177]
- Initial and annual training for Internal Affairs investigators;[178]
- Initial and annual "in-service training that is adequate in quality, quantity, scope, and type, and that addresses management and supervision; community-oriented policing;

---

[165] *Id.* ¶ 84(1).

[166] *Id.* ¶ 30.

[167] *Id.* ¶¶ 39–40.

[168] *Id.* ¶ 41.

[169] *Id.* ¶ 42.

[170] *Id.* ¶ 55.

[171] *Id.* ¶ 60.

[172] *Id.* ¶ 74.

[173] *Id.* ¶ 113.

[174] *Id.* ¶ 125.

[175] *Id.* 1 ¶ 144.

[176] *Id.* ¶¶ 145–48, 150

[177] *Id.* ¶¶ 173–75.

[178] *Id.* ¶¶ 180–81.

effective problem-solving techniques; and field communication" for Field Training Officers and Field Training Sergeants;[179]

- General and ongoing "supervisory training for all new and current supervisors" that is "adequate in quality, quantity, type, and scope" and covers a number of specifically-identified topics;[180]

- All officers with training on the forthcoming, updated Officer Intervention Program ("OIP");[181] and

- All officers with training on using body-worn cameras per the Division's policy.[182]

This is a significant volume of training for any organization to conduct while ensuring that it maintains a high level of basic service delivery. However, these expanded training expectations are not a temporary "blip" or an increase confined to an isolated time period within the Division. Instead, they constitute a "new normal" – where the Division strategically and affirmatively identifies its training needs and designs and implements immersive, high-quality training for officers to better enable them to adhere to the expectations of the Division and the Cleveland community.

The recognition that ongoing, in-service training for current officers would be subject to a "new normal" is one of the reasons that the Consent Decree requires the establishment and active engagement of a Training Review Committee. This Committee, which "includes representatives from across the Division, the police officer organizations, and the CPC," is imagined to be the hub for the Division's identification of training needs and setting training priorities.[183] Under the Consent Decree, and the Court-approved policy establishing the Committee, the Committee is responsible for completing an annual Training Plan identifying what training officers will receive in the upcoming year and to meet regularly to discuss how to integrate lessons learned across the Division into training initiatives.[184]

The Third Semiannual Report in June 2017 reported that "changes in leadership in the Training Section have frustrated the Division's efforts to establish the Training Review Committee as the locus of activity with respect to identifying training needs, setting priorities, and determining what training initiatives need to happen when."[185] The Monitoring Team is disappointed that, in the current reporting period, "responsibility for planning for ongoing, in-service training" has unfortunately not been "shared much more broadly and throughout the Division," via the Committee, "rather than

---

[179] *Id.* ¶ 285.

[180] *Id.* ¶¶ 323–24.

[181] *Id.* ¶ 336.

[182] *Id.* ¶ 337.

[183] Third Semiannual Report at 61.

[184] Dkt. 7-1 ¶¶ 270–81.

[185] Third Semiannual Report at 61.

residing solely with a historically understaffed Training Section."[186]  The Monitoring Team has made repeated, formal requests to receive all communications related to the activities of the Committee. Over the past six months, the Monitoring Team received no such communications – leading it to need to assume that the Committee has not convened.  As such, the Monitoring Team changes its summary assessments involving the Training Review Committee to "non-compliance," with the exception of the requirement involving the Committee's membership, which is classified as "partial compliance" because the policy doing so is, at least technically, on the books.

The Committee must have an active role not simply because the Consent Decree requires it but because the Training Section needs to have the input and assistance of individuals from across the Division – in setting priorities, developing training, and gauging whether specific training initiatives or measures have, in fact, worked as intended.  Plans for the Division to have five recruit classes during 2018 are stretching the Training Section exceptionally thin – and potentially compromising the ability for CDP to do the full scope of training necessary to make sufficient progress on the host of initiatives outlined above.  The Monitoring Team has urged that CDP seriously consider devoting significant resources to the Training Section to ensure that it can balance both the critical and extraordinary demands of training up five recruit classes while making sufficient progress on the Consent Decree. The lack of resources may compromise the quality of recruit training and slow the rate of progress of the Consent Decree.

The Monitoring Team affirms here that, "[u]ndoubtedly[,]the scope of the training that the Division will need to provide – and that the City will need to pay for – under the agreement that the City and the United States reached is significant."[187]  As it has indicated before, this means "differences in resource allocation" and general "approach[] . . . going forward."[188]  The Team puts a finer point on it here: More money, resources, and attention need to be devoted to officer training going forward. Especially in light of the extraordinarily successful use of force and crisis intervention training initiatives completed in 2017, all stakeholders can have expanded confidence that **a dollar spent on allowing officers to develop and practice skills readily applicable to the real world is, arguably, the strongest investment that Cleveland may make in enhancing officer satisfaction, expanding community trust, and addressing public safety**.

One solid investment that CDP and the City have made recently that provides substantially greater training options for the Division is the implementation of a Learning Management System ("LMS"). Via the LMS platform, officers will be able to complete interactive, electronic training initiatives – with officer learning able to be tested and completion automatically tracked.  This represents an important

---

[186] Id.

[187] *Id.* at 61.

[188] Id.

supplement to in-class training that will no doubt prove to be an integral part of numerous training initiatives in the coming year. The active use of the LMS will allow the Division to provide customized training, tailored to the needs of officers and the City, without needing to wait many months to provide in-class instruction to officers. Although there can be no substitute, in some areas, for interactive, scenario-based training, refresher training, follow-up instruction, and smaller instructional modules are ideal for this electronic environment.

Additionally, the LMS will enable the Division to more precisely track what officers have received what training – allowing CDP and the City to have greater assurance that all officers have received the same instruction on performance expectations going forward.

Another important investment that the Division is making in its training function is the addition of eight officers to assist in in-service training in 2018 at the request of the Training Section. These eight additional instructors do not include guest instructors who conduct specific courses (such as on First Aid). These additional resources will be critical in the Division making progress in communicating new expectations to officers about revised policies, and the Monitoring Team commends Chief Williams for proactively prioritizing staffing in this area.

The Parties, CDP, and Monitoring Team have engaged in productive, collaborative discussions about officer training initiatives for the first half of 2018. Although the details are still being worked out, it is currently contemplated that training in the upcoming reporting period will involve follow-up training on use of force and crisis intervention, bias-free policing, and search and seizure.

The Monitoring Team looks forward to working with the Division and the Parties to address what this reorganization and prioritization with respect to officer training entails, especially as training is contemplated for the latter half of 2018.

### *2. Academy Training and Field Training Program*

| Paragraph | Status of Compliance |
|---|---|
| 282. "CDP will revise, as necessary, its field training program for graduates of the police academy to comport with" the Training Plan and Consent Decree. | **NON-COMPLIANCE** |
| 283. "The field training program will incorporate community and problem-oriented policing principles, and problem-based learning methods." | **NON-COMPLIANCE** |
| 284. Review and revision of Field Training Officer ("FTO") "participation policy to establish and implement a program that effectively attracts the best FTO candidates" and "revise eligibility criteria" for FTOs. | **NON-COMPLIANCE** |

| | |
|---|---|
| 285.  New FTOs and Field Training Sergeants must "receive initial and in-service training that is adequate in quality, quantity, scope, and type, and that addresses" a number of specific, expressly-listed topics and conforms to a number of additional features or requirements. | **NON-COMPLIANCE** |
| 286.  "CDP will create a mechanism for recruits to provide confidential feedback regarding the quality of their field training," and the Division "will document its response, including the rationale behind any responsive action taken or decision to take no action." | **NON-COMPLIANCE** |
| 287.  "Training Review Committee will, on an annual basis, analyze all aspects of CDP's FOT program," "consider emerging national policing practices in this area," and "recommend, and CDP will institute, appropriate changes to policies, procedures, and training related to its FTO program." | **NON-COMPLIANCE** |

The "Consent Decree . . . contains certain obligations relating to the training of new officers at the Academy."[189]   Likewise, it contains provisions relating to the Division's field training program, in which recent Academy graduates participate during their early days on the force.[190]

The Monitoring Team anticipates that attention to both academy and field training programs will be addressed by the Third-Year Monitoring Plan.  This will include consideration of whether the use of outside academies – including the Ohio State Patrol's Columbus-based Academy – is sufficient to comply with the Consent Decree.[191]

## B.    Equipment & Resources[192]

| Paragraph | Status of Compliance |
|---|---|
| 291.   "The City will implement" paragraphs regarding equipment and resources in order to allow implementation of the Consent Decree "and to allow officers to perform their jobs safely, effectively, and efficiently." | **PARTIAL COMPLIANCE** |
| 292.  "CDP will complete a comprehensive equipment and resource study to assess its current needs and priorities," and it "will develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." | **PARTIAL COMPLIANCE** |
| 293.  "CDP's Equipment and Resource Plan will provide for necessary equipment including, at least" "an adequate number of computers"; "an adequate number of operable and safe zone cars"; "zone cards with reliable, functioning computers that provide officers with up-to-date technology" including computer-aided dispatch, the records management system, and | **PARTIAL COMPLIANCE** |

---

[189] Dkt. 97 at 55; Dkt. 7-1 ¶¶ 271, 275, 277.

[190] Dkt. 7-1 ¶¶ 282–87.

[191] Id.  ¶ 55; Third Semiannual Report at 61.

[192] This discussion is adapted from Dkt. 125.

| | |
|---|---|
| various core law enforcement systems; and "zone cards equipped with first-aid kits." "This plan also will ensure that CDP properly maintains and seeks to continuously improve upon existing equipment and technology; and is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." | |
| 294. "CDP will actively seek input and feedback from the Commission, patrol officers, and supervisors regarding resource allocation, equipment needs, and technological improvements." | **NON-COMPLIANCE** |
| 295. "City and CDP" must "us[e] best efforts to implement the Equipment and Resource Plan as required." | **NON-COMPLIANCE** |
| 296. "CDP will . . . implement an effective, centralized records management system." | **PARTIAL COMPLIANCE** |
| 297. "CDP will utilize a department-wide e-mail system to improve communication and information sharing." | **PARTIAL COMPLIANCE** |
| 298. "CDP will employ information technology professionals who are trained to conduct crime and intelligence analysis, who are capable of troubleshooting and maintaining information technology systems and who can identify and suggest appropriate technological advancements." | **PARTIAL COMPLIANCE** |
| 299. "CDP will implement an effective employee assistance program that provides officers ready access to the mental health and support resources necessary to facilitate effective and constitutional policing." | **PARTIAL COMPLIANCE** |

The City of Cleveland must "develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement."[193] As the Monitoring Team has summarized on numerous occasions, the Plan must "provide for necessary equipment including, at least . . . an adequate number of computers; an adequate number of operable and safe zone cars; zone cars with reliable, functioning computers that provide officers with up-to-date technology, including" mobile computer-aided dispatch ("CAD"), access to the Division's records management system ("RMS"), and access to law enforcement databases; and "zone cars equipped with first-aid kits . . . ."[194] It must address how the Division will satisfy the other substantive requirements of the Decree.[195] It likewise must "ensure that CDP" both "properly maintains and seeks to continuously improve upon existing equipment and technology" and "is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies."[196]

The Monitoring Team disapproved of the City's Plan proposed on November 25, 2016 because, among other things, it lacked specificity, failed to address a number of Consent Decree requirements, and failed to identify a clear mechanism for ensuring the overall technology management structures were

---

[193] Dkt. 7-1 ¶ 292.

[194] *Id.* ¶ 293.

[195] *Id.* ¶ 292.

[196] *Id.* ¶ 293.

in place that would adequately ensure against the Division falling so substantially behind on the technology front again.[197]  The Monitor's Second Semiannual Report in January 2017 explained that the Monitor could not approve the Plan at that time for a number of reasons, including, but not limited to:

Between January 2017 and late April 2017, the City submitted multiple revisions of the Plan in an effort to address the concerns raised by the Monitor.  The City submitted a final proposed Plan submitted on April 17, 2017.[198]  On May 3, 2017, the Monitoring Team approved some elements of the Plan but concluded the Plan to be unsatisfactory with respect to some other elements.

Specifically, the Monitor found the Plan to be in compliance with paragraphs 293(b), (c), and (d) of the Decree involving overdue upgrades to CDP's Computer-Aided Dispatch ("CAD") platform and modernizing CDP's fleet of patrol vehicles (in terms of numbers, condition, and technology house within patrol cars).

It did not approve the Plan with respect to paragraphs 292; 293(a), (e), and (f); 294; and 298 relating, among other things, to Division-based computers; a process for prospectively identifying emerging technology and equipment needs within the Division; the hiring of additional experts; and other issues involving the documentation of crisis events, documentation of stops, investigation and review of force incidents, administrative investigations, the implementation of a modern early intervention system, and other areas.

The City asked the Monitoring Team if it could proceed during the current reporting period to focus on those areas of the Equipment and Resource Plan submitted that the Monitoring Team found acceptable – principally the implementation of the CAD upgrade and field-based reporting to the Division's learning management system, which will allow all officers to input reports directly from patrol cars rather than returning to the station – rather than continuing to work on subsequent drafts of the Plan.  The Monitoring Team agreed that resources were better focused on those efforts at critical implementation junctures in both projects.

Of particular note, the City and CDP have made significant progress in the manner in which police cruisers, and all necessary equipment to provide safe and efficient operations, were ordered, installed, tracked and deployed into police service in 2017.  The process that was used prior to 2017 was one that most municipal jurisdictions utilize.  It entails ordering the cruisers and all necessary mounts, brackets and equipment separately and assembling the components in various locations as they arrive.  This

---

[197] Dkt. 93 at 7; Dkt. 97 at 54-60.
[198] Dkt. 125-1.

results in many hands touching and impacting the various stages of completion.  It is not hard to see the potential for delays and imprecise installation of critical components.

In Cleveland, several employees from the City's Office of Radio Communications and the City/CDP vehicle maintenance division critically examined the process that Cleveland was using to outfit new vehicles.  They made suggestions that ultimately shaved months off of the time it took to order and receive, outfit and deploy the new police cruisers.

The innovations began with placing orders with Ford Motor Company earlier in the year in order to receive a guaranteed 120-day delivery window.  Staff smartly ordered the police cruisers with pre-installed mounts for computers, prisoner barriers, weapon mounts and lights and sirens-this rendered the cruisers approximately 80 percent complete.

Another process change focused on the quantity and location of the vehicles delivered by Ford.  In years past, if fifty vehicles were ordered, they would all be delivered to a specified location, and staff would have to drive the cruisers one-by-one to each stage of the installation process.  Although typical, the process is inefficient, and unduly exposes the new cruisers to the elements, theft, vandalism etc.  In 2017, Brad Handke, of the City's Office of Radio Communications, examined his responsibility for equipping new cruisers with police radios, vehicle locator technology (AVL) and other critical wiring processes, and recommended changes to the delivery process.  Those changes resulted in delivery of new city cruisers in batches of six to eight directly to the installation facility.  The cruisers were then outfitted in two days and returned to the maintenance facility, where City staff logged all of the equipment and marked the cruisers (CDP custom striping) in one additional day rendering the cruisers available for delivery to the awaiting precincts.

The bottom line is this: Due to proactive, strategic thinking by CDP and City personnel, a process that had previously taken months was reduced to a matter of days – getting much-needed new equipment out to the Districts and on to the streets of Cleveland.  In particular, Mr. Handke and Lt. Ortiz (CDP) were key in changing the process for acquiring, equipping and delivering critical tools for policing, while creating numerous efficiencies and cost savings.

The Monitoring Team continues to await the submission of a satisfactory Equipment and Resource Plan that it, DOJ, and the Court, can approve and against which the Monitoring Team can judge progress and compliance.  The process of reimagining vehicle procurement might further guide development of processes to ensure that CDP continues to develop from new technology and improved systems as time goes on.

## C.    Recruitment & Hiring

| Paragraph | Status of Compliance |
|---|---|
| 300. "CDP will review and revise . . . its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals." | **PARTIAL COMPLIANCE** |
| 301. "The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP." | **GENERAL COMPLIANCE** |
| 302. "CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community" and meets certain specific, expressly-listed requirements. | **EVALUATION DEFERRED** |
| 303. "The City will implement the recruitment plan within 60 days of it being approved by the Monitor." | **EVALUATION DEFERRED** |
| 304. "CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants," including officers with various, specific, expressly-listed skills and backgrounds. | **EVALUATION DEFERRED** |
| 305. "In developing and implementing its recruitment plan, CDP will consult with the [Community Police] Commission and other community stakeholders on strategies to attract a diverse pool of applicants." | **PARTIAL COMPLIANCE** |
| 306. "[O]bjective system for hiring and selecting recruits" that "employs reliable and valid selection criteria." | **PARTIAL COMPLIANCE** |
| 307. "CDP will report annually to the public its recruiting activities and outcomes," which will include information on various, expressly-listed areas. | **NON-COMPLIANCE** |
| 308. "[A]ll candidates for sworn personnel positions" will have "psychological and medical examination" and be subject to "drug testing." Existing officers receive "random drug testing." | **OPERATIONAL COMPLIANCE** |
| 309. "CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions" that cover various, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 310. "CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's supervisor(s)" and maintain any "salient information . . . in candidate's file." | **OPERATIONAL COMPLIANCE** |
| 311. "If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation" addressing various expressly-identified things. | **PARTIAL COMPLIANCE** |

The Consent Decree requires the City to "develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a

broad cross-section of the community . . . [and] establish[es] and clearly identif[ies] the goals of CDP's recruitment efforts."[199]

The Court-approved Second-Year Revised Monitoring Plan requires the City to submit a "revised draft Recruitment Policy and Strategic Recruitment Plan" by September 15, 2017.[200] The City, through its Department of Public Safety, has collaborated with the Monitoring Team and DOJ for months in an effort to create a recruitment plan that meets the expectations of the Decree. Although the City provided a revised recruitment plan on deadline, the plan itself remains incomplete and below expectations. Among other things, while the recruitment plan documents various City activities that relate broadly to recruitment, those activities need to be connected to clearly articulated goals and a well-defined City strategy.

While the Monitoring Team appreciates the City's and Division's ongoing willingness to consider suggestions to improve the plan, the Team believes that the City would benefit from working with an external expert from the Cleveland area who is qualified to offer expertise relating to recruitment. To that end, the Monitoring Team has secured, at no cost to the City, an individual with such expertise and anticipates that the City (working with the outside consultant) will be able to submit a fully-formed recruitment plan by the start of 2018.

Nonetheless, the Monitoring Team remains concerned that the City's recruitment plan—even if it were by itself of satisfactory quality—is not integrated with the broader reforms that are presently occurring or need to occur within the Division. A new strategic recruitment plan should incorporate, for instance, details on how the CDP will police in a manner that promotes both public safety and trust between the Division and the community, i.e. the Division's CPOP plan. The Monitoring Team hopes the City's revised recruitment plan, at a minimum, will account for the ongoing institutional reforms and will consider how they may be relevant in recruiting new applicants to a new police department. It also anticipates that the Recruitment Plan will be connected to the ultimate Staffing Study and/or Staffing Plan to the extent that the Study and Plan indicates precisely how many officers the Division needs to recruit – thereby setting the clear, overall goals for successful recruitment going forward.

## D.    Performance Evaluations and Promotions

| Paragraph | Status of Compliance |
|---|---|
| 312. "CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process" and "are | **NON-COMPLIANCE** |

---

[199] Dkt. 7-1 ¶ 302.

[200] Dkt. 147-1 at 6.

| | |
|---|---|
| identified and receive appropriate consideration for performance." Likewise, "poor performance" must be "reflected in officer evaluations." | |
| 313.  "CDP will develop and implement fair and consistent practices to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis." | **NON-COMPLIANCE** |
| 314–15.  CDP will use "a formalized system documenting the annual performance evaluations of each officer by the officer's direct supervisor," including an assessment of several expressly-listed areas.  "Supervisors will meet with the employee whose performance is being evaluated to discuss the evaluation." | **NON-COMPLIANCE** |
| 316.  "CDP will hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates." | **NON-COMPLIANCE** |
| 317.  "CDP will develop and implement fair and consistent promotion practices that comport with the requirements of this Agreement and result in the promotion of officers who are effective and professional." | **NON-COMPLIANCE** |
| 318.  In considering promotion, "appointing authority will consider" specific, expressly-listed "factors." | **NON-COMPLIANCE** |

The Monitor has previously described how "a number of policies, procedures, systems, and training that will inform changes in evaluations and promotions must still be fully implemented"[201] and how this has meant that active work in changing CDP's performance evaluation has not yet commenced. In particular, before the performance evaluation system can be addressed, information and data about officer performance must be certified as "comprehensive, complete, accurate, objective, and fair, covering the [necessary] scope of information about officer activity."[202]

The Monitoring Team expects that the Division will be well-positioned to make progress on performance evaluations and promotions in the first half of 2018.  This expectation provides a reasonable timetable for commencing work in an area that can serve to greatly enhance professional development opportunities within the Division and provide an important, non-punitive mechanism for employee management.

## E.  Staffing

| Paragraph | Status of Compliance |
|---|---|
| 319.  "CDP will complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform the functions | **EVALUATION DEFERRED** |

---

[201] Dkt. 97 at 62.

[202] Third Semiannual Report at 66.

| | |
|---|---|
| necessary for CDP to fulfill its mission, and satisfy the requirements of the" Consent Decree. / "CDP will develop an effective, comprehensive Staffing Plan that is consistent with its mission, including community and problem-oriented policing, and that will allow CDP to meet the requirements of" the Consent Decree. | |
| 320.  Requirements of CDP Staffing Plan. | **EVALUATION DEFERRED** |
| 321.  "The City and CDP will employ best efforts to implement the Staffing Plan over the period of time set forth in the approved plan." | **EVALUATION DEFERRED** |

Early on in the process, in the spring of 2016, CDP submitted to the Parties and Monitoring Team a combined Staffing Study and Plan that provided an estimate of staffing levels necessary to do all that the Division must do to ensure safe, effective, and constitutional policing.  Although it contained a great deal of useful information, active work in this area was postponed in order for the Division to focus on the Republican National Convention, finalization of use of force policies, and implementation of other core processes and policies that might significantly impact necessary or desired staffing levels.

As the Monitoring Team previously reported, the Division's June 17, 2016 Resource Study and Deployment Proposal, while a "useful guide for understanding . . . the Division's current personnel and [deployment methods]," was not a true staffing plan as contemplated in the Consent Decree.[203]  To that end, CDP committed to first develop a Staffing Study addressing the appropriate number of personnel to perform functions necessary for CDP to fulfill its mission and to satisfy the requirements of the Decree.  The CDP will subsequently use the findings from the Staffing Study to construct a Staffing Plan that likewise satisfies the Division's obligations under the Consent Decree.[204]

Per the Second-Year Monitoring Plan, the Staffing Study and Plan has received renewed focus during this reporting period.  As of December 19, 2017, CDP has maintained that it is finalizing a draft of the Staffing Study that it will submit to the Parties for comment and feedback soon.  Due to the breadth and scope of a staffing study for any organization as large as the Division, the Monitoring Team has recommended that CDP consider contracting with an outside firm with expertise in conducting staffing evaluations.  A comprehensive staffing study is a significant administrative task, and the Monitoring Team has maintained concerns about whether CDP has the available bandwidth to conduct a Staffing Study of sufficient breadth and quality.  Nevertheless, it looks forward to closely reviewing the Study, which will need to incorporate any structural changes that are contemplated or implicated by the Division's ultimate Community and Problem-Oriented Policing Plan.

---

[203] Second Semiannual Report at 61.
[204] Dkt. 120-1 at 21.

Regardless of the outcome of the pending Staffing Study and Staffing Plan, the Monitoring Team has consistently observed that "CDP will need to make changes in staffing to accommodate Consent Decree requirements.  The assertion that the Division does not have adequate or sufficient personnel for a given position is not, in a vacuum or without underlying support, adequate grounds for ignoring or bypassing a requirement of the Decree."[205]

---

[205] Third Semiannual Report at 67.

## XII.    SUPERVISION

## A.    First-Line Supervisors

| Paragraph | Status of Compliance |
|---|---|
| 322.  "CDP will ensure that first line supervisors provide close and effective supervision of officers" in a number of express, specifically-identified ways. | **NON-COMPLIANCE** |
| 323.  "CDP will develop and implement supervisory training for all new and current supervisors" that is "adequate in quality, quantity, type, and scope, and will include" a number of specific, expressly-listed topics. | **NON-COMPLIANCE** |
| 324.  "Thereafter all sworn supervisors will receive adequate in-service management training." | **NON-COMPLIANCE** |
| 325.  "CDP will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community." | **NON-COMPLIANCE** |

The Consent Decree requires "mandatory supervisory training" for "all new and current supervisors" covering an array of important topics, including:

- [T]echniques for effectively guiding and directing officers and promoting effective and constitutional police practices;
- [D]e-escalating conflict;
- [E]valuating written reports, including identification of canned or conclusory language that is not accompanied by specific facts;
- [I]nvestigating officer uses of force;
- [B]uilding community partnerships and guiding officers on this requirement;
- [U]nderstanding supervisory tools such as the Officer Intervention Program and body worn cameras;
- [R]esponding to and investigating allegations of officer misconduct;
- [E]valuating officer performance;
- [C]onsistent disciplinary sanction and non-punitive corrective action;
- [M]onitoring use of force to ensure consistency with policies; and
- [L]egal updates.[206]

The initial Second-Year Monitoring Plan called for CDP to provide to the Parties and Monitoring Team a first draft of a supervisory training program by June 30, 2017.  As of the end of this reporting period, and although work has appeared to center around designing an initial supervisory curriculum,

---

[206] Dkt. 7-1 ¶ 323.

little progress has been made on the design of a curriculum responsive to the Consent Decree's requirements in this area.

CDP will need to use the first half of 2018 to address substantively the training and professional development needs of its supervisors.  However, even when it completes an initial training of sufficient quality, the Third Semiannual Report observed that "it is likely that satisfying the terms of the Consent Decree will require a multiple-stage training consisting of in-class, electronic, and other instruction – especially given that sergeants have historically received relatively little training other than on CDP policies and other bureaucratic considerations."[207]

## B.    Officer Intervention Program

| Paragraph | Status of Compliance |
|---|---|
| 326.  CDP "will create a plan to modify its Officer Intervention Program ('OIP') to enhance its effectiveness as a management tool to promote supervisory awareness and proactive identification of potentially problematic behavior among officers. | NON-COMPLIANCE |
| 327.  "CDP supervisors will regularly use OIP data to evaluate the performance of CDP officers across all ranks, units, and shifts." | NON-COMPLIANCE |
| 328.  "The OIP will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" in a number of specific, expressly-identified areas. | NON-COMPLIANCE |
| 329.  "CDP will threshold levels for each OIP indicator that will trigger a formal review, and the thresholds will allow for peer-group comparisons between officers with similar assignments and duties." | NON-COMPLIANCE |
| 330–36.  Additional express requirements of OIP. | NON-COMPLIANCE |

The Monitoring Team has supported the City and CDP's decision to postpone the development of an Early Intervention System ("EIS"), a proactive risk assessment tool that will transform the Division's current Officer Intervention Program ("OIP").  "The City and CDP intentionally waited to initiate this work in the absence of the strong technology infrastructure which is essential to an EIS, as is a broader understanding of the range of intervention initiatives which go beyond those currently offered by the Division's OIP."[208]

The prior semiannual report inventoried "several significant strides in areas that do bear some relationship to the effective implementation of an EIS," including improvements in technology, data,

---

[207] Third Semiannual Report at 68 (quoting First Semiannual Report at 62).
[208] Third Semiannual Report at 69.

and crisis intervention response.[209]  These strides have continued and accelerated during the current reporting period, as the discussions elsewhere in this report about data platform upgrades make clear. Accordingly, it is likely that work on an EIS policy can commence in earnest sometime in 2018.

It must be emphasized here that the EIS that the Consent Decree requires is entirely non-punitive.  If an officer's performance is reviewed in the context of EIS, the most that may happen is for the officer to eventually be paired up training, mentoring, counseling, or coaching that might serve as appropriate professional development resources.  Plainly, the purpose of EIS will not be to "ding" or discipline officers – but, rather, to try to identify potentially problematic performance trends before they become bad habits or significant problems.

The Monitoring Team hears from officers that there is a widespread belief that being involved in a use of force or other activity is "bad" because it counts as "ding" against officers in the EIS.  CDP's EIS policy, training, and implementation going forward will need to establish definitively, and over time, that this is not the case.  EIS is a mechanism for non-punitive performance management and professional development – not a back door to discipline.

## C.    Body-Worn Cameras

| Paragraph | Status of Compliance |
|---|---|
| 337.  "If CDP chooses to use body worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals." | **PARTIAL COMPLIANCE** |
| 338.  "Supervisors will review recordings related to any incident involving at least a Level 2 or 3 use of force; injuries to officers; and in conjunction with any other supervisory investigation." | **PARTIAL COMPLIANCE** |
| 339.  "Supervisors will conduct adequate random and directed audits of body worn camera recordings" and "incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers." | **PARTIAL COMPLIANCE** |
| 340.  "Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy." | **PARTIAL COMPLIANCE** |

The Consent Decree indicates that, "if CDP chooses to use body-worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recording to foster transparency, increase accountability, and build trust, while

---

[209] Id.

protecting the privacy rights of individuals."[210] In December 2016, the Monitoring Team approved CDP's proposed policy on body-worn cameras but outlined three outstanding concerns:[211]

(1) The policy did not mandate that officers be required to use the cameras and be subject to the Proposed Policy when they are engaging in secondary employment, making the body-worn camera policy the only CDP policies that does not formally apply to officers while they work law-enforcement-related secondary employment jobs.

(2) The Monitor would defer approval or disapproval pending the City's subsequent work on policies and manuals related to use-of-force investigations.

(3) The Monitor found that provisions relating to public access to video are better suited for a comprehensive CDP transparency policy.[212]

The first issue – requiring officers to deploy cameras consistent with the CDP's policies while engaging in secondary employment – has not yet been entirely resolved. The City initially proposed a pilot program in which a small number of CDP officers would volunteer to use the cameras on secondary employment so that some of the practical considerations could be better gauged. The Cleveland Police Patrolmen's Association circulated a letter to members indicating that "[it] is the OFFICIAL UNION POLICY to refrain from 'VOLUNTEERING' for anything with regard to work."[213] There were no volunteers.

Subsequently, the Parties and Monitoring Team agreed that CDP would try to incentivize volunteers by indicating that no discipline would stem from the use of body-worn cameras during secondary employment and that video could be uploaded and tagged during the employee's first City shift after working secondary employment. As of December 19, 2017, there has been no video recorded by body-worn camera tagged or uploaded into Cleveland's body-worn footage storage system. Thus, Cleveland has not been able to benefit from the type of pilot project structure that is a standard component of most ordinary large-scale institutional process changes.[214]

---

[210] Dkt. 7-1 ¶ 337.

[211] Dkt. 92.

[212] Id. at 2-3.

[213] Letter from Steve Loomis to Cleveland Police Patrolmen's Association Members, Apr. 25, 2017.

[214] See Third Semiannual Report at 71 n.279 (citing Joel Winston, "How the Trump Campaign Built an Identity Database and Used Facebook Ads to Win the Election," *Medimum.com* (Nov. 18, 2016), https://medium.com/startup-grind/how-the-trump-campaign-built-an-identity-database-and-used-facebook-ads-to-win-the-election-4ff7d24269ac (describing use of social media in campaigns to "test" certain messages or communications among a smaller group of voters before disseminating them more widely); Shane Zbrodoff, *Pilot Projects: Making Innovations and New Concepts Fly* (2012) (describing basics of pilot projects).

The primary objection the City has raised about imposing such a requirement is that it would be too financially burdensome for the City because the City would have to bear the cost of overtime hours required for officers to download and tag secondary employment camera footage and ensure cameras are sufficiently charged for police duties.[215]  However, as the Third Semiannual Report summarized, "[n]ow that the Division has updated to Taser's latest, Axon 2 camera system, each officer's body-worn camera can capture up to 70 hours – nearly nine full-time shifts – of standard-definition video on each camera unit."[216]  "[B]ecause captured video is retained indefinitely on the body camera unit until uploaded to cloud-based storage," officers can upload and tag their video at the end of their next City shift – requiring no overtime.[217]

The Division already strongly regulates secondary employment.  Any secondary employment must be expressly approved.  Certain types of work are expressly prohibited, and officers cannot engage in secondary employment when on probation, sick leave, extended illness, or suspended from duty.  "[T]he Chief of Police or the Director of Public Safety may at any time revoke authorization to work secondary employment based upon the operational needs of the Division."[218]  The amount of secondary employment that an officer may work in a given time period is regulated.  When secondary employment is within the City of Cleveland, officers can wear the uniform.[219]  Use of force, civilian complaints, misconduct, and general officer performance may all be investigated as a result of secondary employment performance or activity.

The City and Division may decide, then, that when the Division's policies indicate that "[t]he rules and regulations of the Division govern its members when engaged in secondary employment," it means that the rules requiring body cameras also apply.  – and recognize that ensuring that officers are adhering to all CDP regulations during secondary employment is an important, substantive use of regularly compensated (non-overtime) officer time.[220]

An October 2017 investigation into the practices of the "top 100 most populous cities in the country" by the *Cleveland Plain Dealer* found that, of the 70 that "had body camera policies or intend to roll out policies and programs very soon," some "42 departments said their officers are required to wear their

---

[215] Dkt. 96 at 7. Separate objections about officers potentially needing to ensure that their camera system was fully charged before their next city shift have also been resolved, as "CDP officers working secondary employment are already frequently equipped with Division-issued radios and Tasers – both of which require pre- and post-shift charging."  Third Semiannual Report at 71.

[216] Third Semiannual Report at 71.

[217] *Id.*

[218] General Police Order 1.1.25, "Secondary Employment" at 1 (last revised June 29, 2010).

[219] *See generally* General Police Order 1.1.25, "Secondary Employment" at 1 (last revised June 29, 2010).

[220] General Police Order 1.1.25, "Secondary Employment" at 1 (last revised June 29, 2010).

cameras during secondary employment shifts."[221]  "Two of the largest employers of off-duty officers" – the Cleveland Cavaliers and Playhouse Square – "said they don't have a problem with officers wearing and using body cameras on their property."[222]

To the extent that other departments with this requirement centrally administer such secondary employment, with the department coordinating with employers and paying officers for their secondary work rather than having officers independently deal with employers, which Cleveland currently does not do, that need not necessarily cut against Cleveland not benefitting from cameras on secondary employment.  Instead, it merely suggests that centrally administering secondary employment – which the CPPA has advocated and which many other jurisdictions in the region have previously implemented – might be one avenue that would strengthen supervision, confidence, management, and fairness while potentially enhancing the ability of the Division to uniformly apply their rules regarding body cameras.

Finally, the Monitoring Team observes here again, as it has done consistently, that no policy or position by any stakeholder should prevent officers from working secondary employment.  The men and women of the CDP are compensated less than peers and colleagues in other jurisdictions.  Outside jobs are necessary for many officers and their families to make ends meet.

The Monitoring Team instead only observes that the City can choose to apply the longstanding rules on secondary employment to the area of body cameras by giving officers some time, at the end of their shift, to address any body camera footage from secondary employment – in the same way that the City already gives Division personnel time to ensure adherence to other regulations related to secondary employment, from approval to sick leave auditing.  Ultimately, it is simply a question of whether the priority of Cleveland is, as it has been for a majority of large cities across the country, the fair, uniform application of Cleveland's longstanding, common-sense regulation of secondary employment.

With respect to the other two areas involving body cameras – the viewing of video during some types of investigations and public access to captured video – the Monitoring Team remains confident that work on specific policies in those areas will address the outstanding concerns.  Meanwhile, all other substantive provisions of the body camera policy have been approved.

---

[221] Eric Heisig, "Cleveland's Conundrum: Should the City Require Moonlighting Officers to Wear Body Cameras?," *Cleveland Plain Dealer* (Oct. 26, 2017), http://www.cleveland.com/metro/index.ssf/2017/10/clevelands_conundrum_why_wont.html.
[222] *Id.*

## XIII.    COMPLIANCE & OUTCOME ASSESSMENTS

### A.  Outcome Measures

The Consent Decree requires various qualitative and quantitative assessments to measure whether implementation of the agreement is producing safe, effective, and constitutional policing.  As the Monitoring Team has previously reported in some detail,[223] there are 471 discrete data points on which the Consent Decree requires annual assessment.  The relevant data from the calendar year 2016 were collected, analyzed, and reported in the Outcome Measures Report filed with the Court in June 2017 ("2016 Outcome Measures Report").[224]  The 2016 Outcome Measures Report compared the 2016 outcome measures to the 2015 baseline measures, as required by Paragraph 367 of the Decree.

As discussed elsewhere in this report, due to difficulty hiring a Data Collection and Analysis Coordinator, the City hired a team from the Begun Center at Case Western Reserve University (the "Case Team").  The Case Team has convened numerous meetings and conversations with members of the Monitoring Team, DOJ, and the City around data collection and analysis.  The Case Team has created a data protocol plan which was reviewed and subsequently approved by the Monitoring Team and the Department of Justice.  The data protocol plan complies with the requirements of Paragraph 263.

After an exhaustive recruitment process, the City and CDP hired a full-time Data Collection and Analysis Coordinator who began work in September 2017.  Rania Issa, Ph.D. has joined meetings, received training, and is becoming increasingly familiar with CDP's data systems and the specific requirements of the Decree.  The Case Team is working closely with Dr. Issa to comply with the requirements of the Consent Decree relating to data collection and analysis.

The Monitoring Team has also worked closely with many of the CDP's subdivisions to create data collection plans, support compliance with the Consent Decree, and understand barriers to data collection and analysis.  Over time, the Monitoring Team expects that the Data Collection and Analysis Coordinator will take on those responsibilities.  Presently, the Monitoring Team is working with the Case Team, Dr. Issa, and technology experts from the City's Information Technology Division (together, the "Data Team") to identify priorities and achieve compliance with the requirements of the Consent Decree.

Overall, the Monitoring Team has observed improvements in the Division's collection and analysis of data.  The next step is using data *as a management tool* to improve performance – to use data and the

---

[223] Dkt. 73.
[224] Dkt. 142.

analysis of such data to identify trends, priorities, and strategies that the men and women of the Division should implement as they police Cleveland's neighborhoods.

Over the past several months, the Data Team has focused on improving use of force data in Blue Team and IAPro, the technology platforms in which officers electronically report force, force investigations are managed, and command staff review the investigations. (This process begins in Blue Team, a simpler web-based environment, before that data is extracted into the more complex IAPro software platform.) A large percentage of the use of force reports for 2017 have not been reviewed by the chain of command and moved into IAPro. The Monitoring Team, Division, and the many data experts are working to assemble data on the movement of reports through the chain of command.

This analysis will allow CDP leadership to better understand and communicate to CDP commanders and supervisors the best methods to manage a potentially troubling backlog in the review of use of force cases.

The Division's delays in reviewing force cases creates a number of potentially serious problems. Officers may be working on the street who have engaged in unacceptable performance or problematic use of force. Second, the failure to act on potential misconduct uncovered during the review of use of force cases creates both financial and managerial liability. Third, even where no misconduct may be present, supervisors and the Division more generally are not benefitting from the host of lessons learned that may be distilled from any use of force incident.

Currently, the data with which the Data Team are working will be organized and reported internally to identify the places—either ranks or individual people—where reports that require review become stuck. Presently, the reports do not appear to be reviewed on a timetable that comports with current policy. The Division does not appear to use the data to hold staff accountable.

Beyond just the use of force area, a strong understanding of technology, policy, policing, and the Decree is integral to the effective collection and analysis of the collected data. Along with the Case Team, City IT, CDP staff, the Monitoring Team is developing systems for routine review and action on the data. The Parties have begun to meet at least monthly with the Monitoring Team to discuss progress with data collection, analysis, and use. There are also more regular meetings at the City level on the collection and use of data. Progress nonetheless remains slow.

The Division will need to use data and evidence to inform the development of its forthcoming Officer Intervention Program ("OIP" or EIS"). Those who understand CDP data must be connected to those who are developing the OIP policy. The Data Team can ensure that the data is collected correctly and communicated with OIP. The Data Team is currently reviewing Paragraph 328 of the Decree to ensure that relevant information is captured in IAPro and therefore processed by the OIP. Similarly,

the Data Team has been asked to establish baselines to better inform thresholds for OIP automatic notification and review. Together, the Monitoring Team, CDP, and the Data Team will discuss these data, proposed thresholds, and the routing of information electronically and automatically to ensure the OIP operates efficiently.

Additionally, the Division's OIP will likely rely on personnel information that is currently being entered manually across multiple systems. The Monitoring Team hopes that updates to the Kronos System, CDP's timekeeping software, will alleviate the need for manual updates. The software is expected to be updated in early 2018.

In the next reporting period, the Monitoring Team will focus not only on the next Annual Outcome Measures Report, but also on the requirements set forth in Paragraph 374, which states that at "[t]wo years and six months after the Effective Date, the Monitor will conduct a comprehensive outcome assessment to determine whether and to what extent the outcomes intended by this agreement are being achieved, and whether any modifications to this Agreement are necessary for achievement in light of changed circumstances or unanticipated impact (or lack of impact) of the requirement . . . . This assessment also will address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies for accelerating Substantial and Effective Compliance."[225]

## B.  Consent Decree Survey Requirements

As described in the Third Semiannual Report, the Monitoring Team worked with the Munk School of Global Affairs at the University of Toronto to interview arrested detainees in April 2017. In October 2017, Dr. Foglesong presented the research findings to the City, CDP, and the Monitoring Team.

The interview subjects, most of whom were recently arrested detainees, discussed their experiences and interactions with police officers (not limited to the most recent arrest) and their opinions and perceptions about police behavior in the community.

Many of the interviewees hoped for interactions with police that are grounded more strongly in dignity and respect. Perhaps somewhat counter-intuitively, they said they wanted to see *more* police, especially where there are serious crime issues – but that they wanted police to be less aggressive both in language in behavior.

Indeed, the concerns of most interviewees were focused less on police violence and more on the quality of police-citizen interaction. In other words, officer use of force was not the primary concern

---

[225] Dkt. 7-1 ¶ 374.

of interviewees. Instead, they tended to discuss profiling and attitudes toward the poor and people of color. The arrested detainees had hope that both the Division's relationship with the community, as well as the actual safety and well-being of the community, could be improved.[226]

The Monitoring Team believes that the findings from these interviews can and should inform the development of the Division's forthcoming CPOP strategy.

In December 2017, the Monitoring Team conducted focus groups of police officers, as the Consent Decree requires. The Division and police officer organizations were fully supportive of this endeavor and indeed facilitated the participation of a random cross-sample of CDP. The Monitoring Team is analyzing insight gained from these sessions and will file a final, public report on its filings with the Court in the coming weeks.

Further, in accordance with Paragraphs 361 through 366, the Monitoring Team will plan and complete the next biennial community survey during the next reporting period.

## C. Compliance Reviews & Audits

Over the current reporting period, the Monitoring Team worked on the design and structure various upcoming structured compliance reviews and audits. These reviews and audits are geared toward gauging whether various new policies, practices, procedures, and training have been translated from paper or concept into practice.

Among other compliance audits that the Monitoring Team will conduct in the coming months, the Monitoring Team will begin, on January 1, ongoing evaluation of a randomized sample of use of force cases. Initially, these cases will be assessed to determine whether officers are appropriately complying with the new force policies. As soon as use of force investigation and review policies are finalized, the quality of the investigations will also be assessed. Consequently, the Monitoring Team has been developing a structured instrument for incident review, formed a plan for the sample and a subsample to test inter-rater reliability, and has trained qualified members of the Monitoring Team on the use of Blue Team and IAPro to review the reports remotely.

---

[226] *See* Dkt. 161-1.



# Cleveland Police Monitoring Team

**Matthew Barge**
Monitor

**Commissioner Charles H. Ramsey (ret.)**
Principal Deputy Monitor

**Chief Hassan Aden (ret.)**
Deputy Monitor

**Chief Timothy Longo (ret.)**
Director of Implementation

**Charles R. See**
Director of Community Engagement

**Christine Cole**
Director of Outcome Measures

**Dr. Modupe Akinola**
**Chief Joseph Brann (ret.)**
**Brian Center**
**Dr. Randolph Dupont**
**Maggie Goodrich**
**Ayesha Hardaway**
**Richard Rosenthal**
**Victor Ruiz**
**Captain Scott Sargent (ret.)**
**Dr. Ellen Scrivner**
**Sean Smoot**
**Timothy Tramble**
Monitoring Team

**Brian Chen**
**Barry Friedman**
**Maria Ponomarenko**
*NYU School of Law Policing Project*
Consultants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 24, 2017, I served the foregoing document entitled Notice Submitting Monitoring Team's Fourth Semiannual Report via the court's ECF system to all counsel of record.


/s/  Matthew Barge
MATTHEW BARGE