IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | **NOTICE SUBMITTING MONITORING** |
| CITY OF CLEVELAND | ) | **TEAM'S SIXTH SEMIANNUAL REPORT** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

The Cleveland Police Monitoring Team respectfully submits its Sixth Semiannual Report.

Respectfully submitted,

/s/  Matthew Barge

MATTHEW BARGE
Monitor
40 Washington Square South
New York, New York 10012
Tel: (202) 257-5111
Email:  matthew.barge@21cpsolutions.com



Cleveland
Police
Monitoring
Team

# Sixth Semiannual Report

March 2019

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **I.** | **A NOTE FROM THE MONITORING TEAM** | **2** |
| **II.** | **THE ROLE OF THE MONITORING TEAM & THIS REPORT** | **4** |
| **III.** | **COMMUNITY ENGAGEMENT AND BUILDING TRUST** | **7** |
| A. | Community Police Commission ("CPC") | 7 |
| B. | District Policing Committees | 11 |
| **IV.** | **COMMUNITY & PROBLEM-ORIENTED POLICING** | **14** |
| **V.** | **BIAS-FREE POLICING** | **20** |
| **VI.** | **USE OF FORCE** | **24** |
| A. | Officer Use of Force Principles & Policy | 24 |
| B. | Use of Force Investigation and Review | 30 |
| **VII.** | **CRISIS INTERVENTION** | **33** |
| **VIII.** | **SEARCH AND SEIZURE** | **39** |
| **IX.** | **ACCOUNTABILITY** | **42** |
| A. | Internally Discovered Misconduct | 42 |
| B. | Office of Professional Standards ("OPS") | 45 |
| C. | Police Review Board ("PRB") | 51 |
| D. | Discipline and Disciplinary Hearings | 53 |
| **X.** | **TRANSPARENCY & OVERSIGHT** | **56** |
| A. | Police Inspector General | 56 |
| B. | Data Collection and Analysis | 57 |
| C. | Public Availability of CDP-Related Information | 59 |
| **XI.** | **OFFICER ASSISTANCE & SUPPORT** | **61** |
| A. | Training | 61 |
| B. | Equipment & Resources | 65 |
| C. | Recruitment & Hiring | 67 |
| D. | Performance Evaluations and Promotions | 70 |
| E. | Staffing | 71 |
| **XII.** | **SUPERVISION** | **74** |
| A. | First-Line Supervisors | 74 |
| B. | Officer Intervention Program | 76 |
| C. | Body-Worn Cameras | 78 |
| **XIII.** | **UPCOMING COMPLIANCE & OUTCOME ASSESSMENTS** | **81** |

## I.      A NOTE FROM THE MONITORING TEAM

This Sixth Semiannual Report finds the Cleveland Division of Police and City of Cleveland at an important moment of transition in the Consent Decree process—with important, early outcomes evident; major policy work concluding; and the task of active implementation increasingly occupying the focus of the Division's efforts.

First, in the Division's first year under the Court-approved use of force policies, **use of force, crime, officer injuries, and subject injuries are all down**. Specifically, in 2018, the number of force incidents declined by 29 percent compared to 2017. Meanwhile, Part I crime was down in all major categories but rape. All of this happened even as the number of officer injuries occurring during force incidents decreased by 22 percent and the total number of officers injured overall decreased by nearly 20 percent. And in 2018, 20 percent of subjects were injured during use of force incidents, compared to 37 percent of subjects injured in force incidents in 2017.

This report makes clear that a decrease in force incidents alone does not establish compliance. However often officers use force, it must comply with policy and be appropriately identified and addressed by the Division. Likewise, and although the Team has no reason to believe that force is being under-reported, this Court will need separate sign-off that force is being uniformly and appropriately reported in all instances where it used.

Nevertheless, the overall data available indicate that the implementation of the Decree-required force policies coincided with notable increases in officer and public safety. The Monitoring Team commends the men and women of the Division of Police, who appear to be doing their work differently on a day-to-day-basis and applying the objectives and specific requirements of the new force policies.

At the same time, **a number of major plans and initiatives have been finalized**. As of February 2019, the Division completed, and the Court has approved, the major, Decree-required plans on community and problem-oriented policing, recruitment and hiring, and the operation of the District Policing Committees. A plan on the Division's staffing is also pending before the Court. These completed plans represent a significant amount of hard work by the Division of Police and input from the Cleveland community. Together, they provide a detailed framework for how policing will evolve over the coming years in Cleveland as the Division and City actively work to implement the vision and objectives that they set forth.

Work continues with respect to basic operating policies in some remaining areas—the most important of which relate to stops, searches, and arrests; the investigation and review of use of force incidents; and the investigation and adjudication of officer misconduct. The Parties and Monitoring Team anticipate that these various policies, operational manuals, and other materials will be completed and submitted to the Court in the upcoming reporting period. At that point, while some additional policy development will be necessary in a few remaining areas (relating, for instance, to the Division's Early Intervention System), most of the foundational policy development and process refinement work will have been completed.

Thus, this report finds the Division on the cusp of a major turning point. For purposes of continued progress and compliance with the Decree, the task shifts from establishing how the Division and its officers must operate to ensuring that they do, in fact, perform according to the expectations established by the Decree and the various Court-approved policies and plans. **This is the point at which paper must be transformed into sustained, ongoing practice**—through the completion of training, the day-to-day efforts of the Division's

personnel, and the ongoing work of CDP supervisors and command staff to ensure adherence to new expectations.

The Division still has a distance to travel until it is in Substantial and Effective Compliance with the whole of the Decree.  The words of policies and plans will need to be translated into action across time and interactions on the streets of Cleveland.  Sustained focus and work will remain critical.  Indeed, some other jurisdictions that have ultimately complied with similar settlement agreements have sometimes found this stage of ongoing, systemic implementation and compliance to be the most challenging.

Nevertheless, this Report finds the City and Division of Police arriving at a noteworthy and critical milestone that is the culmination of substantial work and community input and participation.  The remainder of the report details the progress made and measured in the past six months, the key areas of progress that remain, and where the Parties will focus in the next reporting period.

*Cleveland Police Monitoring Team*
*March 5, 2019*

## II.    THE ROLE OF THE MONITORING TEAM & THIS REPORT

As with the Monitoring Team's previous reports, the role of the Monitoring Team and of this report are useful to summarize at the outset.  Under the terms of the Consent Decree between the United States and the City of Cleveland (the "City") (collectively, the "Parties") involving the Cleveland Division of Police, the Court-appointed Monitoring Team must "assess and report" to the Court whether the Decree's requirements "have been implemented, and whether this implementation is resulting in constitutional and effective policing, professional treatment of individuals, and increased community trust . . . . "[1]  This is the Monitoring Team's sixth semiannual report.[2]  It addresses the reporting period of July 2018 through February 2019.

The Monitoring Team is an "agent of the Court" that is "subject to the supervision and orders of the Court."[3]  The role of the Team is to assess, independently and on behalf of Judge Solomon Oliver, Jr., whether CDP and the City of Cleveland have reached compliance with the various and diverse requirements of the Consent Decree.  Thus, as the Monitoring Team has previously outlined, it "is not an employee, contractor, or any other type of agent" of either the City of Cleveland or the United States Department of Justice ("DOJ").[4]  Instead, it works for the Court.

As part of that charge, the Team assists in facilitating Consent Decree implementation by providing technical assistance and Counsel to the Division of Police and City of Cleveland.  Although its ultimate task is to inform the Court and DOJ about the City's compliance with the Consent Decree, the Team provides ongoing assistance geared at ensuring effective, efficient, and expeditious progress.

### A.    The Fourth-Year Monitoring Plan

The upcoming Fourth-Year Monitoring Plan principally addresses the period of February 1, 2019 through January 31, 2020, with a handful of dates past January 31, 2020.[5]

### B.    The Purpose and Form of This Report

In its Third Semiannual Report, the Monitoring Team began summarizing the status of the City's compliance with each paragraph of the Consent Decree.  Although providing "a paragraph-by-paragraph accounting of the general state of the City's compliance . . . runs the risk of being an over-simplification," these summary characterizations remain useful markers for understanding progress over time.[6]

Thus, each major section of this Sixth Semiannual Report summarizes the Monitoring Team's generalized conclusions about the status of compliance by describing the state of each area as one of the following:

---

[1] Dkt. 7-1 ¶ 350, *available at* https://www.justice.gov/crt/case-document/file/908536/download.

[2] *Id.* at ¶ 375 (requiring semiannual reports).

[3] First Semiannual Report at 14.

[4] *Id.*

[5] The Monitoring Team anticipates that the Fourth-Year Monitoring Plan will be filed with the Court shortly after the submission of this Report.

[6] Third Semiannual Report at 9.

**Non-Compliance.** The City or Division has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or Division's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement.

**Evaluation Deferred.** This category reflects those limited instances where work in a given area has been intentionally and affirmatively deferred in order to work on other, necessary prerequisites. In these areas, the City or Division could have made more progress in a given area but, for project management reasons, have appropriately focused attention on other areas. Although this still means that the City has a distance to travel to reach General Compliance with the term of the Consent Decree, the intentional and affirmative decision to postpone focus on a given area for project management and implementation purposes is sufficiently different to warrant a separate designation in some cases.

**Partial Compliance.** The City or Division has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the provision of the Consent Decree—but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice. It may capture a wide range of compliance states or performance, from the City or Division having taken only very limited steps toward operational compliance to being nearly in operational compliance.

**Operational Compliance.** The City or Division has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Decree such that it is in existence or practice operationally—but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

**General Compliance.** The City or Division has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the City or Division has effectively complied with a requirement fully and systemically.

The same caveats that have previously applied to the use of these summary categories remain applicable. First, "Non-Compliance" or "Partial Compliance" do not automatically mean that the City or CDP have not made good-faith efforts or commendable strides toward compliance. It might, instead, signify that initial work has either not yet begun or reached a sufficiently critical point where progress can be considered to have been made.

Second, "Partial Compliance" requires more than taking some limited, initial steps toward compliance with a requirement. It instead requires that the City or Division have made "sufficient, material progress toward

compliance" that "has graduated from the stages of initial work to more well-developed and advanced refinement of various reforms."[7]

Third, these summary terms do not appear in the Consent Decree.  The Team employs them in order to synthesize and summarize the report's conclusions.  Relatedly, compliance with individual paragraphs of the Decree is necessary for the larger, overall "Substantial and Effective Compliance" with the whole of the Consent Decree but it is not the same thing.  Ultimately, "Substantial and Effective Compliance" with the Consent Decree will be reached when "the City either has complied with *all* material requirements of this Agreement, or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures,"[8] "by a preponderance of the evidence."[9]

Fourth, the charts that summarize progress in each area also condense the requirements of each paragraph rather than reprinting the entire Consent Decree in the context of this report.  Any imprecision detected or confusion created by these condensed or summarized requirements is unintended and, in any event, can be cured with reference to the original Consent Decree language itself.[10]  The charts primarily cover paragraphs 14 through 340 of the Consent, but other paragraphs also contain requirements that the City must meet.[11]

Following the release of the Third Semiannual Report, some community members, and CDP members, inquired about the basis for some of our summary conclusions.  We reiterate that these overall "compliance status" conclusions at the start of each chapter do not replace the more rigorous quantitative and qualitative assessments of how CPD is performing over time:

> [T]he Monitoring Team bases its assessments on its current understandings, knowledge, and information gained through ongoing work and discussion with CDP, the Parties, and other stakeholders.  The assessments are informal to the extent that not all of them are necessarily informed by the type of exhaustive compliance and outcome measurements that are a critical component of the Consent Decree—and the summary determinations do not take the place of these more structured, systemic analyses.  The intent is to provide a bottom-line sense of where the Division is on the road to compliance.  Ongoing, rigorous quantitative and qualitative assessments will provide a more comprehensive picture as work under the Consent Decree proceeds.[12]

The Team's characterizations of progress should ultimately be viewed as a synthesis or bottom-line accounting of the substantive discussions of each major Consent Decree area contained within this report.

---

[7] Third Semiannual Report at 10.

[8] Dkt. 7-1 ¶ 456 (emphasis added).

[9] *Id.* at ¶ 397.

[10] *See id.*

[11] *See* Third Semiannual Report at 10.

[12] *Id.* at 11.

## III.    COMMUNITY ENGAGEMENT AND BUILDING TRUST

| Paragraph | Status of Compliance |
|---|---|
| 14.  CDP creation of "formal and informal mechanisms that facilitate ongoing communication between CDP and the many Cleveland communities it serves." | **PARTIAL COMPLIANCE** |

### A.    Community Police Commission ("CPC")

| Paragraph | Status of Compliance |
|---|---|
| 15.  Creation of CPC to make recommendations, work with Cleveland communities to develop recommendations, and "report to the City and community as a whole and to provide transparency" on reforms | **GENERAL COMPLIANCE** |
| 16.  Establishment of CPC Selection Panel to select CPC Commissioners; composition of CPC; and periodic meetings with Chief of Police to "provide recommendations." | **GENERAL COMPLIANCE** |
| 17(a).  "[H]old public meetings across the City, complete an assessment of CDP's bias-free policing policies, practices, and training, and make recommendations." | **GENERAL COMPLIANCE** |
| 17(b).  "[A]ssist as appropriate in . . . development of training related to bias-free policing and cultural competency." | **GENERAL COMPLIANCE** |
| 17(c).  "[O]n an ongoing basis, assess CDP's community activities" and "make recommendations" related to "community engagement" and "community confidence" | **PARTIAL COMPLIANCE** |
| 17(d).  "[O]n an ongoing basis, review CDP's civilian oversight structure to determine if there are changes it recommends for improving CDP's accountability and transparency" | **NON-COMPLIANCE** |
| 17(e).  "[P]erform other function[s] as set out in this Agreement." | **PARTIAL COMPLIANCE** |
| 18(a).  "[R]eview and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention." | **PARTIAL COMPLIANCE** |
| 18(b).  [R]eview and comment on CDP's implementation of initiative, programs, and activities that are intended to support reform." | **PARTIAL COMPLIANCE** |
| 18(c).  "[H]old public meetings to discuss the Monitor's reports and to receive community feedback concerning CDP's compliance with this Agreement." | **OPERATIONAL COMPLIANCE** |
| 19.  "The City will provide access to all information requested by the Commission related to its mandate, authority, and duties unless it is law enforcement sensitive, legally restricted, or would disclose a personnel action." | **PARTIAL COMPLIANCE** |
| 20.  CPC "will issue [at least annual] reports," which the "City will post . . . to the City's website." | **OPERATIONAL COMPLIANCE** |
| 21.  "The City will consider and timely respond in writing to the Commission's recommendations for improvements," which "will be posted to the City's website." | **PARTIAL COMPLIANCE** |
| 22.  CPC budget listed as "separate line item" to ensure "sufficient independence and resources." | **GENERAL COMPLIANCE** |

## Background

The Community Police Commission ("CPC" or "Commission") is a mechanism created through the Consent Decree "to promote public trust and confidence in the CDP" and to "make recommendations to the Chief of Police and the City, including the Mayor and City Council" based on the "values and priorities of Cleveland residents."[13] The CPC is intended to serve as a conduit between the Consent Decree reform process and Cleveland's diverse communities, and the scope of its charge is far-reaching. Under the Decree, the Commission has the broad authority to "review and comment" on the Division's "policies and practices related to use of force, search, and seizure, and data collection and retention" as well as any "initiatives, programs, and activities that are intended to support reform."[14]

## Where the Commission Stands Now

### Community Policing, Staffing, and Recruitment & Hiring Plans

During the current reporting period, the CPC facilitated a substantial community input period for three major and interrelated CDP plans: the Community and Problem-Oriented Policing ("CPOP") Plan, the Recruitment and Hiring Plan, and the Staffing Plan. The CPC's engagement on these Plans, as well as its concurrent engagement on the Division's revised Search and Seizure policies, was arguably the largest and most significant of the Commission's numerous contributions to ensure that Cleveland residents are able to shape the ongoing implementation of the federal Consent Decree.

The Commission received drafts of the CPOP and related Plans on May 15, 2018. After the CPC and other community groups requested additional time, the Parties and Monitoring Team, in a motion to the Court, agreed to extend the close of the public input period from August 10, 2018 to September 28, 2018 given the Plans' complexity and the importance in having community values reflected in these Plans in particular.[15] The Commission thus had more than four months for planning and executing a strategy for gathering Cleveland residents' opinions and feedback.

The Commission's comments were thoughtful and helpful. They were based on research, analysis, broad-based engagement, and stakeholder-specific outreach. The preparation and work to gather, synthesize, and report on the Cleveland community's thoughts and concerns were commendable.

In parallel with the City's own survey, the CPC created a separate tool to gauge residents' opinions on the documents. The Commission ultimately received 268 completed surveys by the time it submitted its final report. In addition to hosting Commission meetings where attendees could openly discuss and comment on the substance of the three Plans, the Commission's CPOP Working Group worked with stakeholders to gather their input on the Plans.

---

[13] Dkt. 7-1. at ¶ 15.

[14] *Id.* at ¶¶ 18(a)-(b).

[15] Dkt. 209.

The CPC returned an initial report of CPOP recommendations on August 10, 2018 (the original closing date of the public comment period) to the Parties and Monitoring Team. On September 28, 2018, the Commission provided its second and final report of CPOP recommendations, building on the initial August 10 set of recommendations. The final report drew its conclusions from quantitative data collected from the completed surveys as well as from qualitative comments by community members and groups. Subsequently, Commissioners met with representatives of CDP, DOJ, the City, and the Monitoring Team to discuss the recommendations and how they might be incorporated in the final version of the three plans.

## Search and Seizure Policies

During the current reporting period, the Commission also facilitated public input on the CDP's revised Search and Seizure policies, which address police encounters and stops—a fundamental type of police interaction with residents. The Commission's Search and Seizure work group was led by Commissioner Gordon Friedman. It also benefitted from the involvement of subject matter experts from legal academia and legal advocacy groups.

In February 2018, well before drafts of the Search and Seizure policies were prepared, CPC staff conducted an educational campaign to highlights general considerations for community members. Because case law around stops, arrests, and the Fourth Amendment is notoriously complicated, the CPC elected to teach residents basic components of constitutional law and highlight specific policy choices that departments have made across the country to meeting attendees on March 27, 2018. A video of the presentation was posted on the CPC's website for those unable to attend.[16]

Once policy drafts were available on August 15, 2018, the Search and Seizure Work Group began its substantive engagement on the policies. They facilitated discussions with community members at the CPC's September and October meetings. On October 27, the CPC also hosted a separate Search and Seizure Policy Forum at Cuyahoga Community College's Jerry Sue Thornton Center.

CPC shared its final report on Search and Seizure policy recommendations to the City on November 14, with support from key stakeholder groups such as the ACLU of Ohio, the Cleveland Branch of the NAACP, and the Legal Aid Society of Cleveland. Subsequently, CPC representatives met with the Division, DOJ, and Monitoring Team to detail their recommendations, share their origins and rationale, and discuss their potential feasibility. The Parties and Monitoring Team anticipate that the Search and Seizure policies will be finalized in the upcoming reporting period.

## Ongoing Organizational Challenges

Since its creation, the Commission has regularly put forward strong work product—distilling community comment and making a number of well-informed, substantive recommendations—despite serious and ongoing organizational challenges. As reported in the Fifth Semiannual Report, the CPC has undergone significant staffing changes after a series of employment allegations among various staff members. Since the prior Semiannual Report, an attorney hired by the City, in consultation with the Commission, to conduct an investigation into

---

[16] Cleveland Community Police Commission, "Police Encounters or Search and Seizure," https://www.clecpc.org/search-seizure-18 (last visited Jan. 25, 2019).

various allegations relating to the CPC's Executive Director, concluded that none of the accusations rose to the level of violating City policies.  Not long afterward, all staff members aside from the Executive Director resigned.

Along with the full-time staff, there also has been substantial change in the volunteer commissioners.  Richard Knoth, who was sworn in as a Commissioner on December 21, 2017, became one of the CPC's two co-chairs in June 2018 alongside Reverend Dr. Yvonne Conner.  In July, two commissioners, Amanda King and Dylan Sellers, resigned from the Commission.  There are now two vacancies in the commission.  The City has taken appropriate steps to re-empanel the Decree-required Selection Committee to fill those vacancies in early 2019.  Because the Consent Decree limits the terms of service of commissioners to a four-year term,[17] the Commission and City have begun contemplating how to address the upcoming vacancies created by the expiration of commissioner terms in September 2019.

SAI, an organizational consultant hired by the City to review the Commission's operations and assist the CPC by creating a "roadmap" forward, completed a final report during the current reporting period.  In its December 11, 2018 report, SAI catalogued many organizational challenges plaguing the CPC.  Those findings included that the working relationships between and among the Commission's volunteer commissioners and full-time staff continue to be difficult – reflecting personality conflicts, unclear lines of authority, and suboptimal leadership and management.  These kinds of strains make the substantive work of the CPC's Decree-mandated charge—already a significant and involved commitment—that much more difficult.

## Progress and Tasks that Remain

Having successfully completed a substantial public comment period for a host of major CDP plans and policies, the CPC finds itself at a crossroads, both in terms of fulfilling its substantive charge and ensuring the staffing and organizational structure necessary to provide the originally-contemplated forum for bringing people of varying backgrounds, views, and opinions together to talk about what policing in Cleveland should look like going forward.

The creation of policies and plans mandated by the Decree are coming to a conclusion, and most of the core policies are slated to be completed in the upcoming reporting period.  Now that those opportunities are naturally coming to a close, it will be an open question—one that the CPC must resolve for itself—as to how it plans to fulfill its mandate to "make recommendations . . . on policies and practices related to community and problem-oriented policing, bias-free policing, and police transparency" and "to work with the many communities that make up Cleveland" to develop police practices recommendations.[18]  As this report elsewhere makes clear, the creation of policies or plans ultimately amounts to a written statement of intent by the Division and City about how it wants to police.  Now that CDP has committed itself to a certain set of expectations, the Commission will need to determine how it can best "leverage the experience and expertise of the people of Cleveland . . . to ensure that CDP recognizes and operates in a manner consistent with cooperative community understanding and engagement."[19]

---

[17] Dkt. 7-1 at ¶ 16.

[18] *Id.* at ¶ 15.

[19] *Id.*

More than that, the Commission must continue to attempt to restore public confidence in itself as an institution that facilitates community input on policing issues. As the Monitoring Team reported in its Fifth Semiannual Report, "the Commission will have to find a way to resolve internal disagreements and focus on the challenging tasks of engaging as much of the community as possible on the vital conversations about how policing will function in Cleveland in the future."[20] That entails ensuring a professional, respectful working relationship among the Commissioners and between the volunteer Commission and the full-time staff.

To that end, Commissioners have indicated that the CPC has begun to implement some of the recommendations in SAI's December report, such as the expedited hiring of new staff and the implementation of weekly calls between the Executive Director and the two co-Chairs. The Monitoring Team is hopeful that the CPC's actions will help to ensure that it has the sustained organizational capacity to perform its fundamental function: "to promote public trust and confidence in the CDP" and to "make recommendations to the Chief of Police and the City, including the Mayor and City Council" based on the "values and priorities of Cleveland residents."[21]

## B.    District Policing Committees

| Paragraph | Status of Compliance |
|---|---|
| 23.   Facilitation of "regular communication and cooperation between CDP and community leaders at the local level," with District Policing Committees meeting "at minimum, every quarter." | **PARTIAL COMPLIANCE** |
| 24. CPC, CDP, and Community Relations Board ("CRB") will "develop a mechanism to recruit and expand" Committee membership." CDP "will work with [Community Police] Commission to select officers for each District Policing Committee." | **PARTIAL COMPLIANCE** |
| 25. CDP "will work closely with District Policing Committees to identify strategies to address crime and safety issues in their District," considering and addressing identified priorities. | **PARTIAL COMPLIANCE** |
| 26. "At least annually, each District Policing Committee will present its identified strategies, concerns, and recommendations" to the CPC, with CDP officer who is Committee member presenting to CPC "CDP's assessment of ways to address" the recommendations." | **NON-COMPLIANCE** |

## Background

The Decree calls for the expansion—building on existing structures—of five District Policing Committees, or one for each of the five police districts within the city of Cleveland.[22] Those Committees, which existed long before the Consent Decree process, must work to "identify strategies to address crime and safety issues in their District."[23]  This is all the more critical given that few Cleveland residents surveyed by the Monitoring Team reported being aware of or comfortable with the District Policing Committees. Some community members

---

[20] Fifth Semiannual Report at 14.

[21] Dkt. 7-1 at ¶ 15.

[22] *Id.* at ¶¶ 23-24.

[23] *Id.* at ¶ 25.

specifically felt that DPCs functioned to serve the needs of a select few in Cleveland, not all residents of Cleveland.[24]

## Where the DPCs Stand

In the current reporting period, the Parties and Monitoring Team finalized a DPC Plan that details the Division's plans to enhance and expand the DPCs so that they are better attended, better facilitated, and ultimately reflect the true makeup of a given CDP police district.  The Monitoring Team submitted the DPC Plan for the Court's approval on February 14, 2019.[25]  The Court approved the Plan on February 20, 2019.[26]

As before (when they were known as District Community Relations Committees), DPCs will hold monthly meetings that are open to all to "communicate about topics such as crime statistics, strategies to address problems, upcoming events and initiatives, CDP policy and practices, and any matter that may arise."[27]

Consistent with the Division's shift to an organizational philosophy of community and problem-oriented policing, "District Commanders will use the DPC meetings as opportunities to identify, assess and collaboratively solve problems in their District."[28]  Further, "[t]he DPCs will assess the Division's overall performance and its CPOP activities by surveying community members."[29]

Under the approved Plan, each District's DPC is to be co-chaired by the District Commander and a civilian resident.  They will be supported by each District's three Community Engagement Officers ("CEOs"), who are not responsible for patrol and do not respond to calls for service.  Accordingly, the DPC Plan assigns them responsibilities such as participating in their respective DPC, seeking partnerships from a cross-section of the community, assisting with collaborative problem-solving initiatives, attending community meetings, and bridging officers with community members.[30]

To expand the DPCs' audience and membership, as called for by the Decree, the DPC Plan contemplates a number of activities, including use of an "asset map" to identify community groups and associations that are currently not involved with DPCs; intentional outreach to communities such as youth, homeless, and LGBTQ; and participation in events hosted by communities.  Further, the Plan acknowledges that "DPCs must also account for community members that may be unable or unwilling to participate in monthly meetings."[31]  To do so, the DPCs regularly will, among other things, add new discussion items to the agenda that are requested by community members; move

---

[24] Cleveland Police Monitoring Team, *Community & Problem-Oriented Policing: Summary of Community Feedback & Recommendations*, July 2017, available at https://docs.wixstatic.com/ugd/8a5c22_df0cbe2bc67d4e1a8ad3ac9c7098257b.pdf (last visited February 28, 2019).

[25] Dkt. 235.

[26] Dkt. 238.

[27] Dkt. 235-1 at 3.

[28] *Id.* at 4.

[29] *Id.*

[30] *Id.* at 6-7.

[31] *Id.* at 10.

the meeting time and/or location to increase accessibility and focus on different areas' concerns; and ask residents about other reasons for the lack of participation and modify meetings where possible to address those concerns.[32]

The DPC Plan also contemplates that the District Commanders, CEOs, CRB District representatives DPC co-chairs, and the Bureau of Community Policing Commander will meet bi-annually to discuss strategies to increase participation at each DPC and their effectiveness.[33]

### Progress and Tasks that Remains

#### *Selection of DPC Officers*

Under Paragraph 24 of the Consent Decree, each DPC will include "at least one CDP officer from that District" and the Division will work with the CPC "to select officers for each District Policing Committee."[34] As the DPC Plan is implemented, the Division and CPC will need to collaborate to identify and select appropriate officers.

#### *Implementation of the DPC Plan*

As described above, the Parties have completed a long process to design a new DPC Plan that outlines a number of important organizational changes. Going forward, the Monitoring Team will be attending DPC meetings regularly to assess whether the Division has implemented the contemplated changes. More than that, the Team will be looking to see if the changes, upon implementation, are having a positive impact on the attendance and participation at DPC meetings.

---

[32] *Id.*
[33] *Id.* at 13.
[34] Dkt. 7-1 at ¶ 24.

## IV.    COMMUNITY & PROBLEM-ORIENTED POLICING

| Paragraph | Status of Compliance |
|---|---|
| 27.   Implementation of "comprehensive and integrated community and problem-oriented policing model" and consultation with CPC regarding the model. | **PARTIAL COMPLIANCE** |
| 28.   Ensuring that "mission statement reflects [the Division's] commitment to community oriented policing" / "integrat[ing] community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **OPERATIONAL COMPLIANCE / PARTIAL COMPLIANCE** |
| 29.  Ensuring "that officers are familiar with the geographic areas they serve," "engage in problem identification," and "work proactively . . . to address quality of life issues." | **EVALUATION DEFERRED** |
| 30.   Initial and annual in-service community and problem-oriented policing training "adequate in quality, quantity, type, and scope" that addresses specifically-identified areas. | **EVALUATION DEFERRED** |
| 31.  Maintenance of "collaborative partnerships with a broad spectrum of community groups," including CDP meetings with community organizations and District Policing Committees. | **PARTIAL COMPLIANCE** |
| 32.   CDP "meet[ing] with members of the community in each District on a monthly basis" and "solic[itation of] participation from a broad cross-section of community members in each District" to "identify problems and other areas of concern . . . and discuss responses and solutions." | **PARTIAL COMPLIANCE** |
| 33.  Development and implementation of "systems to monitor officer outreach to the community" that CDP "will use . . . to analyze . . . whether officers are partnering with a broad cross-section of community members to develop and implement cooperative strategies that build mutual respect and identify and solve problems." | **PARTIAL COMPLIANCE** |
| 34.   "At least annually, CDP will present the results" of paragraph 33 analysis "broken out by District in a publicly-available community policing report" that describes problems, solutions, and obstacles.  Report provided to Commission and posted on CDP website. | **NON-COMPLIANCE** |

### Background

The Consent Decree requires that the Division develop and implement a "comprehensive and integrated community and problem-oriented policing model" to "promote and strengthen partnerships with the community . . . and increase community confidence in the CDP."[35]  This section refers to policing according to this model as "community and problem-oriented policing," or "CPOP."

The Decree defines "community and problem-oriented policing" as a "policing philosophy that promotes and relies on collaborative partnerships between law enforcement agencies and the individuals and organizations they serve to develop solutions to problems, increase trust in police, and improve the effectiveness of policing efforts."[36]

---

[35] Dkt. 7-1 ¶ 27.

[36] *Id.* at ¶ 414.

As countless law enforcement agencies have recognized, community policing principles must inform decision-making at all levels of the agency, including decisions about hiring, deployment, and evaluation.[37] Community policing is not an extra activity. It is not simply community engagement. It is not an unconnected array of programs or initiatives. Instead, it is an overriding philosophy of policing that recognizes that the legitimacy of the police and the effectiveness of law enforcement operations ultimately derive from the communities that the police serve.

A Division-wide commitment to community policing will help promote trust and legitimacy, improve the quality of police-citizen encounters, and address persistent public safety issues in Cleveland communities. Critically, CDP must ensure that related operational and structural changes needed to support community and problem-oriented policing—principally, staffing and recruitment—receive appropriate consideration.

### Where the Division Stands

#### CPOP Plan Finalization

Drafts of the CPOP Plan, along with related Plans on Staffing and Recruitment and Hiring, were available for public feedback throughout the summer and early fall of 2018. As described earlier in more detail, the CPC played a significant role in taking the draft Plans to the public for comment and critique. The CPC's completed report highlighted community members' concerns about the importance of CPOP training and questions about officers' ability to implement SARA, a problem-solving methodology described below.

The City also did a commendable job in engaging the community for their input on the Plans. Through the District Policing Committees and other policing organizations, the City and Division held a series of productive and well-structured community meetings in which District representatives briefed participants on the substance of the CPOP Plan, answered questions, and asked participants to complete surveys on their reactions to the plans.

After reviewing the CPC's report and considering and implementing changes as appropriate, the Parties and Monitoring Team completed a final CPOP Plan on February 5, 2019. The Monitoring Team submitted the final Plan for the Court's approval on February 14, 2019.[38] The Court approved the Plan on February 20, 2019.[39]

As the Monitoring Team has previously summarized, the approved Plan defines CPOP as "an organizational strategy that promotes community partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime. CPOP is the responsibility of all members of the CDP beginning with the Chief through the chain of command to every officer."[40] The Plan appropriately situates CPOP not as a standalone program or set of initiatives, but rather as

---

[37] *See, e.g.*, Police Executive Research Forum (PERF), *Community Policing: Past, Present, and Future* at 4 (2004) ("Community Policing"); Presidential Task Force On 21st Century Policing, *Final Report* at 43 (2015).

[38] Dkt. 234.

[39] Dkt. 237.

[40] Dkt. 234-1 at 6.

part and parcel "of how the Division recruits and hires, allocate[s] resources, trains, promote[s], and evaluate[s] officers and the Division, and collects data."[41]

Under the CPOP Plan, officers will collaborate actively and affirmatively with Cleveland residents to address public safety issues and the conditions that lead to crime.  Specifically, patrol officers assigned to CDP's neighborhood districts will be expected to spend at least 20% of their time engaging community members to address public safety concerns.  This might include participating on bike and foot patrols, attending community meetings, or creating and implementing action plans with residents to address their issues.  This 20% requirement is an intended average across time, not a mandate that officers across all assignments spend that amount of each and every shift on engagement.  The expectations may change according to where and when an officer works, as well as the types of situations that an officer needs to address.

The Plan also outlines how the Division will utilize "SARA," a well-known problem-oriented policing model that stands for Scanning-Analysis-Response-Assessment, as its cornerstone for training and encouraging officers to collaborate with community residents on public safety problems.  Under SARA, CDP officers are expected to "scan" for problems; "analyze" the conditions of the problems and understand what factors are contributing to it; "respond" by taking steps to solve the problem; and "assess" the outcome later to see if the problem in fact was resolved or only displaced.  Officers are expected to work with community members to discover problems, find out how residents would like problems to be solved, and then follow up with residents to see if the problem has been resolved in the eyes of the community.

It is essential, as the Team has heard from Cleveland residents consistently, for patrol officers to remain in neighborhoods if they are to build meaningful relationships and attempt to establish new connections with community members and groups.  To that end, the Plan stresses "zone integrity," or an officer's "ownership and accountability of assigned zones in a District."[42]  To help promote zone integrity, CDP patrol staffing and deployment will be changed to a "workload-based" model for assigning personnel (discussed in more detail in the Officer Assistance & Support Section of this Report).

The Plan also appropriately acknowledges the importance of the Division's recruitment and hiring in being able to effectuate CPOP.  "The Division strives to hire individuals who represent a cross-section of the Cleveland community who are dedicated to policing according to the CPOP model.  The CDP's Public Safety Recruitment Team (PSRT) recruits service-minded individuals who reflect the demographics and ideals of the Cleveland community. They will seek to recruit candidates who exhibit critical problem-solving skills and the ability to communicate with a cross-section of the city."[43]  The CDP's Recruitment and Hiring Plan, discussed in this Report's Officer Assistance & Support Section, contains more details on the Division's plans to adjust its recruitment activities and priorities.

Under the CPOP Plan, each CDP District will create a District Neighborhood Awareness Training for officers in the District that will include information about the residents' demographics, cultural information about the

---

[41] *Id.* at 2.
[42] *Id.* at 19.
[43] *Id.* at 21.

demographic, relevant historical events, and suggestions to improve police/community relations from the perspective of both community members and officers.[44]

The Division's CPOP Plan also includes ways that CDP will seek to measure success in its ability to effectuate CPOP and establish new, stronger relationships with Cleveland residents.  Under the Plan, the Division's Data Collection and Analysis Coordinator ("Data Coordinator") "will ensure that the data is collected and tracked."[45] Data will include "community outreach, engagement, bike and foot patrol frequency, organized/planned events and unplanned engagements" and will be input into the Division's Computer Aided Dispatch ("CAD") system.[46] The Data Coordinator will "extrapolate data associated with CPOP activities including the frequency and type of actions taken, and broken down by District.  Supervisors will use this information during the annual performance evaluations."[47]  In addition to the Division's internal collection of data, "[c]ommunity surveys will be conducted to measure public satisfaction with policing," including "officer and Division performance regarding community partnerships and CPOP activities."[48]

To incorporate collected data into management decisions, the CPOP Plan calls for CDP to create a CPOP Review Committee, consisting of the Commander of the Bureau of Community Relations, CDP's Compliance team, and the Data Coordinator.  The Committee will meet quarterly to review all community engagement data, identify gaps in the expectations that patrol officers' commit 20% of their time to engagement, review community surveys, and create a biannual report of the findings and recommendations for improvement.[49]

### *Community Engagement and Problem Solving Training*

Community policing requires officers to use a variety of skills, including interpersonal communication and problem-solving skills.  Effective community policing also requires officers to be familiar with the history, culture, and traditions of their communities.  Under the Consent Decree, CDP officers must therefore receive training on:

- Community engagement and problem-solving strategies;
- Leadership, ethics, and effective communication;
- Forming community partnerships;
- Procedural justice;
- Conflict resolution; and
- Cultural competency.[50]

The Parties and Monitoring Team collaborated to design a Community Engagement and Problem-Solving ("CEPS") curriculum throughout the first half of 2018.  On July 13, 2018, the Monitoring Team recommended that the Court approve the CEPS Training.  On July 16, 2018, the Division began in-service training, including the

---

[44] *Id.* at 28-29.

[45] *Id.* at 32.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.* at 32-33.

[50] Dkt. 7-1 at ¶ 30.

newly-approved training.  By the end of 2018, 98% of eligible CDP members had completed the CEPS Training. During the training, the Division's Training Section learned a number of important lessons that the Monitoring Team and Parties hope will improve its ability to deliver high-quality training going forward, discussed in more detail in the Officer Assistance & Support Section of this Report.

## Progress and Tasks that Remain

### *Organizational Changes*

Now that the CPOP Plan has been completed and approved by the Court, the Monitoring Team here reiterates a point that is singularly vital to CPOP: "CPOP is more than a set of rules for which officers need to be trained. CPOP is a philosophical change in policing that will affect core components that make up the Cleveland Division of Police."[51]

The Monitoring Team previously noted to the Court that it approved the Plan for what it is: a forward-looking vision of what community and problem-oriented policing can and will be in the Cleveland Division of Police.  As described, the CPOP Plan outlines significant changes, like an expectation that 20% of officers' time be committed to community engagement and problem-solving.  The CPOP and Staffing Plans jointly contemplate ways to free up patrol officers' time, such as implementing alternative crime reporting services, changing the incidents that do not require an officer's immediate response, and requiring a "verified" response to burglary or residential alarms. The CPOP Plan also contemplates changes to the way CDP conducts performance evaluations to ensure that officers are evaluated based on their use of CPOP practices.

Because the CPOP Plan "is not, and was never intended to be, a project management plan in the traditional sense, . . . the task of the Division in the coming months will be to translate the large commitments and major elements of the Plan into smaller steps and milestones that can be substantially and effectively implemented."[52]  The Plan does not include specific timelines and details on, as the Decree mandates, the integration of "community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."[53]  The Monitoring Team looks forward to seeing a precise roadmap for how these contemplated CPOP changes will occur.

### *Training*

The Division is currently preparing a 2019 in-service CEPS Training that reinforces core concepts from the 2018 training, such as the SARA problem-solving model, while also instructing officers on the now-approved CPOP Plan itself—the new expectations and requirements on how officers are staffed, use their time, and document their community engagement and problem-solving activities.  All CDP personnel—officers, supervisors, dispatchers— need to understand and receive training on the Plan.  The Monitoring Team and DOJ have been assisting the Division with the curriculum of this training.  The Division has indicated that the Training Section learned certain lessons from the 2018 CEPS Training and that it is working to address them in the upcoming 2019 training.

---

[51] Fifth Semiannual Report at 30.

[52] Dkt. 234 at 9-10.

[53] Dkt. 7-1 at ¶ 28.

*Data Collection and Tracking*

Under the approved CPOP Plan, officers will be required to enter any CPOP activity into an electronic database system.  Such data will include data on collaborative problem-solving, community outreach, bike and foot patrol frequency, organized community events, and unplanned engagements with the community.  Officers will be expected and required to enter such data regularly into a database.  The Division's Data Collection and Analysis Coordinator will ensure the proper tracking and monitoring of CDP's activities.  All of this is required by Paragraphs 32 through 34 of the Decree.

The Division is continuing to work through how the data tracking elements of CPOP will be implemented.  Even the approved CPOP Plan contains only a broad vision for collection of data.  The Monitoring Team looks forward to assisting the City and CDP to work through any technical data issues in order to ensure that data can be collected, tracked, analyzed, and presented for review to the Monitoring Team and the Cleveland public.

## V.       BIAS-FREE POLICING

| Paragraph | Status of Compliance |
|---|---|
| 35.   Delivery of "police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias," among other things. | **PARTIAL COMPLIANCE** |
| 36.  "CDP will integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **PARTIAL COMPLIANCE** |
| 37.  CDP will ensure that it "administer[s] all activities without discrimination" on basis of various protected classes | **PARTIAL COMPLIANCE** |
| 38.       "CDP will develop a bias-free policing policy" incorporating CPC recommendations "that provides clear guidance to officers" | **OPERATIONAL COMPLIANCE** |
| 39–40.  Bias-free policing and procedural justice training "adequate in quality, quantity, scope, and type" covering specific areas | **PARTIAL COMPLIANCE** |
| 41.   Supervisor training on bias-free policing and procedural justice issues covering specific areas | **EVALUATION DEFERRED** |
| 42.  Annual in-service training on bias-free policing "adequate in quality, quantity, type, and scope" | **EVALUATION DEFERRED** |
| 43.  Analysis of paragraph 265 data ("including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination") | **EVALUATION DEFERRED** |
| 44.  Consideration of "bias-free policing and equal protection" principles in hiring, unit assignment, promotion, and performance assessments. | **PARTIAL COMPLIANCE** |

### Background

The Consent Decree requires that CDP "deliver police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in CDP."[54] Bias-free policing principles must be operationally integrated into CDP's "management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."[55]  The goal is "to ensure policing and law enforcement outcomes that are as free from the effects of all bias to the greatest extent possible."[56]

### Where the Division Stands

The Court approved CDP's Bias-Free Policing Policy on March 23, 2018.  In its motion to the Court, the Monitoring Team highlighted that the Policy set "critical guidelines for the delivery of police services within the Cleveland Division of Police[,]" with clear prohibitions against "harassing, intimidating or derogatory language" and the determination of "reasonable suspicion or probable cause based upon a demographic category [unless part

---

[54] Dkt. 7-1 ¶ 35.

[55] *Id.* ¶ 35-36.

[56] First Semiannual Report at 30.

of an actual and credible suspect description][.]"[57] This policy also underwent two separate rounds of substantial public comment, facilitated by the CPC, involving numerous town hall meetings across the city.

Not long after the Division's new Bias-Free Policing policy was approved by the Court, the Parties and Monitoring Team turned to the Division's in-service training on procedural justice and bias-free policing principles.  As the Monitoring Team described in its Fifth Semiannual Report, "[s]uccessful implementation of bias-free policing principles within the Division of Police requires not only a clear policy that prohibits bias-based policing, but training that provides officers with tools and strategies to manage implicit biases and self-correct in moments of potentially biased behavior."

The Division began working with the Center for Policing Equity ("CPE"), a research center that has developed and conducted evidence-based trainings on procedural justice in policing for law enforcement agencies across the country, to design an eight-hour training to promote bias-free policing.  The Division ultimately took CPE's curriculum as a starting point from which to tailor a training specific to Cleveland.  The Monitoring Team worked with the Parties to ensure that the curriculum addressed a host of the Consent Decree's most critical requirements.

After working through numerous drafts of the curricula, the Monitoring Team requested that the Court approve the training on July 13, 2018.  Training began on July 16, 2018.  By the end of 2018, 98% of eligible CDP members had completed the Bias-Free Training.  As with the 2018 CEPS Training, the Division's Training Section learned a number of important lessons about its capabilities that will improve its ability to deliver high-quality training going forward.

## Progress and Tasks that Remain

### Bias-Free Policing Training

As the Division makes plans for conducting different and improved training in 2019, "adequate in quality, quantity, scope, and type,"[58] it must provide sufficient instruction on a host of critical topics:

- Constitutional and other legal requirements related to equal protection and unlawful discrimination, including the requirements of this Agreement;
- Strategies, such as problem-oriented policing, procedural justice, and recognizing implicit bias, to avoid conduct that may lead to biased policing or the perception of biased policing;
- Historical and cultural systems that perpetuate racial and ethnic profiling;
- Identification of racial or ethnic profiling practices, and police practices that have a disparate impact on certain demographic categories;
- Self-evaluation strategies to identify racial or ethnic profiling;
- District-level cultural competency training regarding the histories and culture of local immigrant and ethnic communities;
- Police and community perspectives related to bias-free policing;

---

[57] Dkt. 186 at 5.
[58] Dkt. 7-1 at ¶ 39.

- The protection of civil rights as a central part of the police mission and as essential to effective policing;
- Instruction in the data collection protocols required by this Agreement; and
- Methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination.[59]

The Division must also provide specific instruction to supervisors on:

- How to identify biased police practices when reviewing investigatory stop, arrest, and use of force data;
- How to respond to a complaint of biased police practices, including conducting a preliminary investigation of the complaint in order to preserve key evidence and potential witnesses;
- How to evaluate complaints of improper pedestrian stops for potential biased police practices; and
- Engaging the community and developing positive relationships with diverse community groups.[60]

As the Monitoring Team suggested in its Fifth Semiannual Report, "⟦i⟧t may be helpful for the City and CPD to establish a clear and concrete plan, with the Consent Decree a few months past its halfway point, for completing all the training requirements over the next few years."[61]  The Team reiterates that suggestion here.

### Integration of Bias-Free Policing Principles

The Decree requires that the Division "integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."[62]  The Monitoring Team expects that the Division will be well-positioned to push ongoing work on personnel evaluations, management processes, resource deployment, and accountability systems to ensure that the process of integrating bias-free policing principles continues.

### The Division's Collection, Analysis, and Proactive Uses of Data

Ultimately, bias-free policing requires not just a well-written policy and high-quality training but a robust data infrastructure and command staff's use of data as a management tool.  "To help ensure that police services are delivered in a manner free from bias," the Consent Decree requires the Division to conduct annual assessments of all police activities, "including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race, ethnicity, gender, disability, sexual orientation, or gender identity."[63]

The Division still has some distance to travel with respect to its ability to analyze data, produce reports, and conduct quantitative and qualitative assessments on subjects such as arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination—all policing practices where it is critical to assess the presence of biased or discriminatory policing.  This must be done in assessments both quantitative (analyzing

---

[59] Dkt. 7-1 at ¶ 40.

[60] *Id.* at ¶ 41.

[61] Fifth Semiannual Report at 37.

[62] Dkt. 7-1 at ¶ 36.

[63] *Id.* at ¶¶ 43, 265.

aggregate numbers to determine trends and patterns) and qualitative (driving conclusions from the analysis about the nature of police performance and interactions).  In short, the Division must collect information, affirmatively and proactively analyze the data, and respond, as appropriate, to trends or issues identified.

The quality of the Division's assessments will depend on the Division's progress in improving its data and information infrastructure and in its ability to manage itself based on lessons and insights derived from such data. Strong protocols for data collection, analysis, and reporting are necessary to monitor and assess patterns of bias-based policing.  As discussed elsewhere in this report, CDP has made progress in developing its data infrastructure, but not yet the kind of progress required to comply with the Decree's data requirements.

Ultimately, the Monitoring Team doubts that it could certify, one way or another, to the Court whether the Division's policies on bias-free and nondiscriminatory policing are actually in effect across the Division or whether they exist merely on paper unless and until the Division rigorously inventories the performance of its officers in interactions with Cleveland residents during stops, searches, and arrests.  The Decree requires that this data be collected, reported, and analyzed not simply as an academic exercise or because it might be interesting.  Instead, it is required because, without accurate and comprehensive information, the actual level and quality of the Division of Police's performance cannot be determined.

## VI.    USE OF FORCE

### A.    Officer Use of Force Principles & Policy

| Paragraph | Status of Compliance |
|---|---|
| 45. "CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force" complies with the Constitution, federal law, and the Consent Decree "and that any use of unreasonable force is promptly identified and responded to appropriately." | **PARTIAL COMPLIANCE** |
| 46. "The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers . . . will comply" with at least twelve major, listed principles. | **PARTIAL COMPLIANCE** |
| 47. Division "will ensure that the [use of force] incident is accurately and properly reported, documented, and investigated." | **PARTIAL COMPLIANCE** |
| 48. "CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends." | **PARTIAL COMPLIANCE** |
| 49. Development of use of force policies "that comply with applicable law[,] . . . are adequate to achieve the goals described in paragraph 45," and "specify that unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability." | **OPERATIONAL COMPLIANCE** |
| 50. "CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons." | **OPERATIONAL COMPLIANCE** |
| 51. Weapon-specific policies "will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon." | **OPERATIONAL COMPLIANCE** |
| 52. "No officer will carry any weapon that is not authorized or approved by CDP." | **OPERATIONAL COMPLIANCE** |
| 53. "Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of weapon is imminent, and allow the subject an opportunity to comply." | **OPERATIONAL COMPLIANCE** |
| 54–83 "CDP will implement policies" for firearms, ECWs (Tasers), and OC (pepper) spray that comply with a host of specific, expressly listed provisions. | **OPERATIONAL COMPLIANCE** |
| 84. CDP "will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes" a number of specific, expressly-listed elements. | **OPERATIONAL COMPLIANCE** |
| 85. CDP "will provide the use of force training described in paragraph 84 to all new officers." | **OPERATIONAL COMPLIANCE** |
| 86. "CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |
| 87. "CDP will develop and implement a single, uniform reporting system pursuant to a Use of Force reporting policy" that complies with the force Level categorization set forth in the paragraph. | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 88.  Requiring "[a]ll officers using or observing force" to complete a Use of Force Report including a number of specific features and avoiding "conclusory statements, 'boilerplate', or 'canned' language." | **OPERATIONAL COMPLIANCE** |
| 89.  "Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports." | **OPERATIONAL COMPLIANCE** |
| 90.  "Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable." | **OPERATIONAL COMPLIANCE** |
| 91.  Requirement to "notify . . . supervisors . . . as soon as practical following any use of force" and if becoming aware of "an allegation of unreasonable or unreported force by another officer." | **OPERATIONAL COMPLIANCE** |
| 92.  "Use of Force Reports will be maintained centrally." | **OPERATIONAL COMPLIANCE** |

## Background

As the Monitoring Team has emphasized in past Semiannual Reports, the use of force, including the manner in which officers are trained and how uses of force are documented and investigated, is "at the core of the Consent Decree."[64]  It is fitting, then, to discuss in comparatively greater detail the various requirements imposed by the Consent Decree and the progress made by the Division with respect to force policies and training.

Under the Decree, the Cleveland Division of Police must:

> [R]evise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force is used in accordance with the Constitution and laws of the United States and the requirements of the Agreement and that any use of unreasonable force is promptly identified and responded to appropriately.[65]

The Court approved the new use of force policies, subject to some specific conditions, on January 17, 2017.[66]  Five new policies, addressing (1) general use of force principles and expectations; (2) definitions used in various force policies; (3) de-escalation techniques to ensure officer and subject safety; (4) intermediate weapons, such as a Taser, oleoresin capsicum (OC) spray, and baton; and (5) reporting of force.  The policies had undergone substantial rounds of broad-based public comment, facilitated by the City, Community Police Commission, Department of Justice, and the Monitoring Team.

The Consent Decree also requires that CDP's use of force training be "adequate in quality, quantity, scope, and type" and include instruction, among other things, on:

- Proper use of force decision-making;
- Use of force reporting requirements;

---

[64] First Semiannual Report at 31.
[65] Dkt. 7-1 at ¶ 45.
[66] Dkt. 101.

- The Fourth Amendment and related law;
- De-escalation techniques, both verbal and tactical, that empower officers to make arrests without using force and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, using cover, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;
- Role-playing scenarios and interactive exercises that illustrate proper use of force decision-making, including training on the importance of peer intervention;
- The proper deployment and use of all intermediate weapons or technologies;
- The particular risks and considerations relating to using a Taser; and
- Firearms training.[67]

Between May and December 2017, the Division of Police provided all sworn CDP personnel with use of force training on the Division's new use of force policies.  The training was developed through close collaboration with the Monitoring Team and Department of Justice.  The City has certified that all eligible officers completed the training in 2017.  Feedback from CDP officers, the DOJ, and the Monitoring Team made clear that the 2017 Use of Force Training established a strong foundation for ongoing, follow-up training provided on an annual basis on additional and in-depth force topics.

In addition to policy and training, the Division must have clear processes and procedures for the administrative investigation and review of force incidents.[68]  The Decree lays out specific force reporting requirements, including the establishment of a new system of classifying force:

- Level One force is the lowest level of force.  It is force that is "reasonably expected to cause only transient pain and/or disorientation during its application as a means of gaining compliance . . . but that is not reasonably expected to cause injury, does not result in actual injury, and does not result in a complaint of injury."[69]
- Level Two force is force that "causes an injury, could reasonably be expected to cause an injury, or results in a complaint of injury."[70]
- Level Three force is force that constitutes "lethal" or "deadly" force.  It also includes any level of force which results in death or serious injury, hospital admission, or lack of consciousness.  Specific types of Level Three force include neck restraints, canine bites, and more than three applications of an Electronic Control Weapon (i.e. Taser).[71]

---

[67] Dkt. 7-1 ¶ 84.  In addition to initial training on use of force covering the topics listed above, the Division must provide its officers with "annual use of force in-service training that is adequate in quality, quantity, type, and scope" going forward.  CDP supervisors must also receive specialized training, as discussed elsewhere in this report, relating both to force and broader supervisory skills.

[68] First Semiannual Report at 36-37; Dkt. 97 at 35-36.

[69] Dkt. 7-1 at ¶ 87(a).

[70] *Id.* at ¶ 87(b).

[71] *Id.* at ¶ 87(c).

Under the Decree, all officers using or observing force have an affirmative duty to report such force in writing by the completion of their tour of duty.[72]  The Consent Decree also requires that the Division develop and implement a "single, uniform reporting system."[73]

## Where the Division Stands

With the finalization of new use of force policies, the completion of the first year of use of force training by all officers, and new policies and procedures for reporting the use of force, the Division's new use of force policies became effective, in the field and on the streets of Cleveland, on January 1, 2018.  The Monitoring Team previously cautioned that "officers may make some good-faith errors or mistakes in the first few months that the new force policies are in effect" and that "sufficiently systemic adherence to the new policies . . . is unlikely to occur overnight.[74]

**Table 1: Use of Force Trends: 2018 v. 2017, excluding Level 1: pointing of a firearm at an individual[75]**

|           | 2017 | 2018 |
|-----------|------|------|
| January   | 23   | 10   |
| February  | 19   | 9    |
| March     | 22   | 8    |
| April     | 24   | 16   |
| May       | 16   | 14   |
| June      | 23   | 18   |
| July      | 12   | 15   |
| August    | 18   | 11   |
| September | 25   | 21   |
| October   | 17   | 19   |
| November  | 16   | 11   |
| December  | 22   | 16   |
| **TOTAL** | **237** | **168** |

In the first full year that the new use of force policies were effective on the streets of Cleveland, officer use of force was down substantially compared to the prior year.  In order to make a fair, "apples to apples" comparison, and as the Monitoring Team did in its prior semiannual report, the numbers in Table 1 for 2018 consider officer use of force other than the pointing of a firearm at an individual – a low-level, reportable Level 1 use of force under the Division's new policy.  Because the Division did not previously track this information in its use of force database

---

[72] Dkt. 7-1 at ¶ 87(b).

[73] *Id.* at ¶ 87.

[74] Fourth Semiannual Report at 31.

[75] The figures in Table 1 differ slightly from the use of force incidents reported on page 49 of the Monitoring Team's Fifth Semiannual Report.  This discrepancy can be attributed to a variety of minor and infrequent scenarios, including reclassification of incidents as they proceed through chain of command review and the incorrect inputting of a single use of force incident by multiple officers (leading to an incident being counted more than once).

in 2017, the 2018 numbers need to be adjusted to exclude pointing a firearm to get a sense of how officer performance has been changing independent of the this change of force definition.

With the above caveats, the Team is tremendously impressed by the overall trends with respect to force in the first year of the new force policies. **The use of force in Cleveland by CDP officers was down in 2018 compared to 2017—by 29%.**

A 29% reduction in force incidents is no small achievement. The Monitoring Team applauds the Division's work to revise force policies. It applauds the Training Section's hard work on constructing and conducting high-quality officer training on force that incorporated new approaches and methods. Most of all, it applauds the men and women of the Division of Police who are charged with carrying out the policy while ensuring the public's, and their own, safety. The data of the first year of the Division's new approach to use of force suggest that officers are using force differently than in the past.

This significant drop in use of force has occurred at the same time that crime in Cleveland has dropped. As Table 2 details, Part I crime in Cleveland—with the exception of rape by a known assailant, a notoriously difficult crime for law enforcement to impact—was down in 2018 from 2017 across all major categories except rape.

**Table 2: Part I Crime: 2018 v. 2017**

|  | 2017 | 2018 | Change |
|---|---|---|---|
| Homicide | 130 | 124 | **−4.6**% |
| Rape | 550 | 584 | **+6.2**% |
| Robbery | 3026 | 2269 | **−25.0**% |
| Felonious Assault | 2816 | 2550 | **−9.5**% |
| Burglary | 6268 | 4943 | **−21.1**% |
| Theft | 14611 | 10767 | **−26.3**% |
| Grand Theft MV | 3561 | 3150 | **−11.5**% |
| Arson | 292 | 174 | **−40.4**% |

These numbers, reflecting a year's worth of the day-to-day work of the Division and its officers, help to establish that the Division's new use of force policies and approach are not leading to an increase in crime. Instead, **officers are using less force at the same time Cleveland experiences less crime**. This is clear, substantial, and positive progress.

Further, **force and crime are down at the same time that officer injuries are down**—both in terms of fewer officers getting injured in use of force incidents *and* fewer officers getting injured on the job overall. Specifically, there was a nearly 22 percent decrease in officer injuries in use of force incidents in 2018 and an approximately 20 percent decrease in officer injuries overall.

**Table 3: Officer Injuries: 2018 v. 2017**

|  | 2017 | 2018 | Change |
|---|---|---|---|
| Officer Injuries in Force Incidents | 55 | 43 | -21.8% |
| Total Officer Injuries | 161 | 129 | **-19.9**% |

This indicates, quite encouragingly, that officers are not less safe as a result of the revised force policies.

Not only are fewer officers getting injured, but **fewer subjects are getting injured during use of force incidents**.  In 2017, 37 percent of subjects were injured in some manner, from relatively low-level complaints of injuries alone to more significant physical injuries, during an incident where officers applied force.  In 2018, 20 percent of subjects were injured during force incidents.

Thus, the implementation of the use of force policies in 2018 marked a year when the public, officers, and even the subjects of use of force in Cleveland were, in aggregate, safer than they were in the preceding year.

The Monitoring Team has previously observed that substantial and effective compliance with the Consent Decree, and general compliance with the use of force provisions of the Decree, does not and cannot depend simply on fewer uses of force alone.  Instead, the Decree and the Court-approved policies enacted to comply with it require that force be used only when doing so is necessary, proportional, reasonable, and reasonably available de-escalation attempts have been used.  For instance, if the reduced number of use of force incidents all failed to comply with the new force policies, the Division would not be in compliance with the Decree, even if the overall number of force incidents were lower.  At the same time, it likewise would be unacceptable if officers only rarely used force and did so consistent with policy, but officer and public safety were being compromised.

Thus, the reduction in reported force incidents in 2018 is encouraging and commendable.  The Monitoring Team has begun a comprehensive review of use of force incidents that occurred in 2018 to evaluate whether those instances where officers used force were compliant with the Division's policy.  To the extent that the Monitoring Team identifies in this study that officers are performing according to standards and the requirements of the Decree, it may be possible that the Division's performance for 2018 can be certified as being in General Compliance.  The Monitoring Team will update the Court on its findings in the next reporting period.

## Progress and Tasks that Remain

### Ongoing, Annual Use of Force Training

The Division must continue to conduct use of force training on an annual basis, updating the curriculum as appropriate to address officer and community feedback, as well as what data reveals about patterns of force within CDP.  The Division's Training Section currently is developing a use of force in-service training curriculum for all CDP officers scheduled to begin on March 4, 2019.  It is contemplated that the training will build off the successful 2017 effort with additional skill-building and scenario-based instruction.

### Compliance with Policy

As noted in prior Semiannual Reports, the Division remains in the early days of actively implementing new force policies designed to comply with the Decree.  Early indicators for 2018 were encouraging.  However, more time will be necessary for the new obligations to sink in and for the Division to demonstrate that it is holding officers accountable for deviations from new force expectations.

Ultimately, even if officers are using force less often, the force that they do use needs to adhere rigorously to the Division's new policy.  Although the numbers and quantitative trends across the first year are encouraging, the Division must consistently ensure—and the Monitoring Team will be auditing—that officers who do use force are complying with law, policy, and the terms of the Decree.

A key component of ensuring compliance with policy is the Division's ability to rigorously investigate and review use of force incidents—so that good performance can be commended and deficient performance corrected.

## B.    Use of Force Investigation and Review

| Paragraph | Status of Compliance |
|---|---|
| 93.  "A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval." | **EVALUATION DEFERRED** |
| 94.  Setting specific requirements relating to the investigation of low-level, Level 1 force. | **EVALUATION DEFERRED** |
| 95–109.  Setting specific requirements relating to the investigation by supervisors and/or CDP chain of command for investigation and review of Level 2 force. | **EVALUATION DEFERRED** |
| 110.  "CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP." | **EVALUATION DEFERRED** |
| 111.  Creation and design of dedicated Force Investigation Team (FIT) that "will conduct administrative investigations . . . and criminal investigations" of serious force, "force involving potential criminal conduct," in-custody deaths, and cases assigned to it by the Chief. | **EVALUATION DEFERRED** |
| 112.  Composition of FIT Team. | **EVALUATION DEFERRED** |
| 113.  "FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type" on a host of specific, expressly-listed topics both initially and annually thereafter. | **EVALUATION DEFERRED** |
| 114.  "CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement." | **EVALUATION DEFERRED** |
| 115.  Response of FIT to use of force scenes.  FIT notification of prosecutor's office.  Notification of designated outside agency to conduct criminal investigation if City elects to use external agency for such investigations. | **EVALUATION DEFERRED** |
| 116.  "CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation." | **EVALUATION DEFERRED** |
| 117.  Memorandum of understanding required between CDP and outside agency containing specific, expressly-listed provisions. | **EVALUATION DEFERRED** |
| 118.  Setting forth various, specific, and expressly-listed responsibilities of FIT during its investigations. | **EVALUATION DEFERRED** |

| | |
|---|---|
| 119. Monitor's duty to annually review any "criminal investigations conducted by the outside agency" to ensure that they "are consistently objective, timely, and comprehensive." | **EVALUATION DEFERRED** |
| 120. Providing for delay of compelled interview if "case has the potential to proceed criminally" but otherwise requiring that "[n]o other part of the investigation . . . be held in abeyance" unless "specifically authorized by the Chief" in consultation with investigating agency and prosecutor's office. | **EVALUATION DEFERRED** |
| 121. Requiring completion of preliminary report presented to Chief or Chief's designee "as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force." | **EVALUATION DEFERRED** |
| 122. Completion of investigation within 60 days. Preparation of FIT investigation report. Review of FIT investigative report by head of Internal Affairs who "will approve or disapprove FIT's recommendations, or request . . . additional investigation." | **EVALUATION DEFERRED** |
| 123. Revision of FIT manual to ensure "consisten[cy] with the force principles" and several specific, expressly-listed provisions. | **EVALUATION DEFERRED** |
| 124–30. Establishment and operation of Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." | **EVALUATION DEFERRED** |

## Background

The Consent Decree establishes clear protocols by which the Division must investigate uses of force by the reported level of force. Under a Level One use of force, the investigation will typically be limited to a review of the involved officer's use of force report.[76] Level Two uses of force require a supervisor to respond to the scene and commence a preliminary force inquiry. If the supervisor's inquiry at any point indicates "that there may have been misconduct, the supervisor will immediately notify Internal Affairs and Internal Affairs will determine if it should respond to the scene and/or conduct or take over the investigation."[77] Level Three uses of force, the most serious incidents, may come under the purview of either CDP's Force Investigation Team ("FIT Team") or an independent outside agency.

Along with force inquiries, the Decree also requires CDP to craft policies and procedures related to supervisory review of completed force investigations. Part of this process entails the establishment of a Force Review Board ("FRB") that will "appraise use of force incidents from a tactics, training, policy, and agency improvement perspective."[78]

## Where the Division Stands

In the current reporting period, the Parties and Monitoring Team have continued to revise three important documents that will collectively set expectations and protocols for the Division's review and investigation of uses of force: (1) the Use of Force Supervisory Review Policy; (2) the Force Investigation Team Manual; and (3) the

---

[76] Dkt. 7-1 at ¶ 124.

[77] *Id.*

[78] *Id.*

FRB Policy. The Monitoring Team anticipates that these policies will be completed and ready for the Court's approval early in the upcoming reporting period.

## Progress and Tasks that Remain

### Officer Training and Policy Implementation

Once the FIT and FRB manuals are completed and approved by the Court, CDP will be able to comprehensively analyze the application of force so that officer training, professional development, and risk management may all be continually enhanced. To do so effectively, implicated Division personnel will need to receive training on the new expectations. Specifically, the Division's supervisors will all need training on how to conduct lower-level force investigations and reviews; the new FIT Team will need to receive force-investigation-specific instruction; and selected members of the newly-established FRB will likewise need to receive initial training on their duties, responsibilities, and the ways that the Board must conduct its work. The Parties and Monitoring Team have worked through several drafts of a curriculum addressing supervisory training. Over the next reporting period, the Division will need to take significant steps to design and implement these important training initiatives.

### Operation of FRB

Following the approval of policies and the training of Board members on their duties and responsibilities, the Board will begin to convene. The Monitoring Team will be closely auditing the Board's first year of operations to assess the Board's ability to effectively review force investigations.

### Compliance & Adherence to New Policies

The requirements of supervisors, FIT, FRB, and the Division's command staff when it comes to the investigation and review of force incidents are significant and critical. The Division, and Monitoring Team, will need to ensure that it is adhering to the new requirements across cases, investigations, and time. Again, short-term or sporadic compliance will be insufficient for the new policies on force investigation and review to be considered effective in practice—and for the Division to reach "general compliance."

## VII.    CRISIS INTERVENTION

| Paragraph | Status of Compliance |
|---|---|
| 131. "CDP will build upon and improve its Crisis Intervention Program" in furtherance of four specific, expressly-listed goals, which "will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health system and create a context for sustainable change." | **PARTIAL COMPLIANCE** |
| 132. Establishment of Mental Health Response Advisory Committee (the "Advisory Committee") "to foster relationships and build support between the police, community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis." | **GENERAL COMPLIANCE** |
| 133. Composition of Advisory Committee. | **GENERAL COMPLIANCE** |
| 134. "The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program." | **GENERAL COMPLIANCE** |
| 135. Advisory Committee will conduct an annual "analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers" and communications "are appropriately responding to people in crisis," and will also "recommend appropriate changes." | **EVALUATION DEFERRED** |
| 136. "The Advisory Committee's reports and recommendations will be provided" to CPC, "be publicly available, and will be posted on the City's website." | **GENERAL COMPLIANCE** |
| 137. CDP will designate a Crisis Intervention Coordinator for specific, expressly-identified purposes. | **GENERAL COMPLIANCE** |
| 138. "Coordinator will develop and maintain partnerships with program stakeholders and serve as point of contact" and "resource" for other stakeholders. | **OPERATIONAL COMPLIANCE** |
| 139. "Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, call-takers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program." | **GENERAL COMPLIANCE** |
| 140. "Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate." | **OPERATIONAL COMPLIANCE** |
| 141. "Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers" and "to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls." | **PARTIAL COMPLIANCE** |
| 142. "Coordinator will create ways to recognize and honor specialized CIT officers, call-takers, and dispatchers." | **EVALUATION DEFERRED** |
| 143. Initial and annual crisis intervention training to all officers and recruits that is "adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |
| 144. Initial and annual crisis intervention training for dispatchers and call-takers. | **OPERATIONAL COMPLIANCE** |
| 145. "CDP will provide enhanced specialized training in responding to individuals in crisis to certain officers ('specialized CIT officers')," who will be "called upon to respond to incidents or calls involving individuals in crisis." | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 146–47.  Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | **PARTIAL COMPLIANCE** |
| 148.  Designation of specialized CIT officers, per specific, expressly-listed requirements. | **EVALUATION DEFERRED** |
| 149.  "Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized officers." | **EVALUATION DEFERRED** |
| 150.  "All Field Training Officers" ("FTO"s) "will receive the enhanced specialized crisis intervention training described in paragraph 146," though FTOs will "not be designated as a specialized CIT officer" unless they volunteer and have been selected to do so. | **EVALUATION DEFERRED** |
| 151.  "Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene," with supervisors "seek[ing] the input of a specialized CIT officer . . . where it is reasonable for them to do so." | **EVALUATION DEFERRED** |
| 152.  "[T]he Coordinator will develop an effective specialized crisis intervention plan . . . to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis" that includes various, specific, expressly-identified requirements.  The City "will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis." | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires the Division to build and enhance its Crisis Intervention Program with the goals of:

- Assisting individuals in crisis;
- Improving the safety of officer, consumers, family members, and others within the community;
- Providing the foundation necessary to promote community and statewide solutions to assist individuals with mental illness; and
- Reducing the need for individuals with mental illness to have further involvement with the criminal justice system.[79]

## Where the Division Stands

As the Team noted in its Fifth Semiannual Report, "the progress that the City has made in the area of crisis intervention is [arguably] the strongest and most significant of any area of the Consent Decree to date."[80] This significant progress has continued in the current reporting period.  The Monitoring Team has been pleased to see the Mental Health Response Advisory Committee ("MHRAC")—the community problem-solving forum made up of representatives from the police, social service providers, mental health and substance abuse professionals, the judiciary, advocates, and individuals in recovery—continue to collaborate on ways to improve services to

---

[79] Dkt. 7-1 at ¶ 131.
[80] Fifth Semiannual Report at 67.

those in need of care.[81]  MHRAC and CDP also built upon a successful Crisis Intervention Training in 2017 with a high-quality follow-up training for all CDP officers.

### MHRAC Quality Improvement Subcommittee

To address linkages between crisis intervention and treatment, MHRAC in early 2018 created a Quality Improvement Subcommittee—drawn from the MHRAC Policy and Data Subcommittees, as well as a range of subject matter experts, advocates, and individuals in recovery—to work with the Division.

In the current reporting period, the Quality Improvement Subcommittee, with technical support from the Alcohol, Drug Addiction, and Mental Health Services ("ADAMHS") Board of Cuyahoga County, has met regularly and worked to assess not only the effectiveness of CDP's CIT policies and Crisis Intervention Plan, but also the gaps in accessing mental health and addiction services.  Committee members designed a data template to analyze how the CDP's crisis intervention data can be used to identify necessary ongoing treatment services by providers who work with the ADAMHS Board.  Because the work on this template relates to the ongoing upgrades to the Division's CAD system, the outcome data is preliminary and based on sampling strategies which limits the ability to draw definitive conclusions.  Still, the Subcommittee's work to develop the data template underscores MHRAC's commitment to identify underserved populations, individuals in need of innovative support, and indices that can provide an outcome measure of time to service.

### 2018 In-Service Training

The Second-Year Crisis Intervention In-Service Training ("Second-Year CIT Training" or "2018 CIT Training") curriculum for all CDP officers was submitted to the Court for final approval on July 13, 2018.  The training began on July 16, 2018. Both the lead crisis intervention expert for the Monitoring Team and the Training Committee representative from the Department of Justice noted that the Division and MHRAC took strong ownership of the 2018 CIT Training.  As of the end of the year, CDP reported that 98% of officers eligible to attend the crisis intervention training had completed it.

The training builds on the successful 2017 Crisis Intervention First-Year Training by providing a refresher on principles of the initial training, but also by providing specific guidance for officers to resolve mental health crises, including by not arresting the subject and instead referring to an appropriate mental health agency; transporting the subject voluntarily to a hospital or crisis center; transporting the subject involuntarily to a hospital or crisis center; and arresting the individual when appropriate.  The Second-Year CIT Training also addresses how trauma can impact law enforcement officers, the symptoms of post-traumatic stress disorder on officers, and how to access resources for help within the Division and in the Cleveland community.  The specific topics for this curriculum were informed by a survey completed by officers after the 2017 Crisis Intervention Training.

Officer feedback for the 2018 CIT Training was positive.  Of roughly 1100 CDP officers who completed the evaluation ratings, nearly eighty percent (79.4%) agreed or strongly agreed that the instructor accomplished the learning objectives for the course. Just under seventy percent of all officers (69.6%) agreed or strongly agreed that

the 2018 CIT Training enhanced their understanding of the course material.  Almost eighty percent of the officers (79.4%) agreed or strongly agreed that the instructor encouraged critical engagement with the material.  Just under four percent (3.6%) disagreed or strongly disagreed with the statement.  Qualitatively, the Division's CIT Coordinator, Captain James Purcell, observed strong officer engagement with the training.

Representatives of the Department of Justice attended sessions of the 2018 CIT Training and reported positive observations.  DOJ noted that the classes generated productive discussion of the issues and that the officers were actively engaged in question-and-answer sessions.  The Monitoring Team members reported similar positive feedback.

Altogether, the Monitoring Team applauds MHRAC and the Division's hard work to prepare and conduct continued high-quality officer training on principles of crisis intervention and mental and behavioral health—consistent subjects of interest for Cleveland residents engaged in the Division's ongoing reforms.

### Specialized Training

In the current reporting period, the MHRAC Training Subcommittee collaborated with CDP, the City, the Department of Justice, and the Monitoring Team to develop the final draft of the 40-Hour Specialized CIT Curriculum.

The 40-hour curriculum represents a significant amount of work, covering 11 major content areas.  Additionally, trainees will participate in three types of direct experiences which include: (1) on-site interactions with individuals with lived experiences who are recovering from mental illness and substance abuse, (2) in-depth scenarios based on CDP crisis intervention calls, and (3) realistic simulations of symptoms related to mental illness such as hearing voices while attempting to accomplish simple commands.  Volunteer faculty have provided a lesson plan, an instructor's manual, and a set of PowerPoint slides with video where appropriate.   As of February 2019, the curriculum is in the final stages of editing and approval by the Training Subcommittee and MHRAC as a whole.  A start date for the training of the Specialized CIT Officers is anticipated late in the first quarter of 2019.

### Community Engagement

MHRAC's Community Engagement Subcommittee has continued to work to ensure that community members are well-informed about the Division's CIT Program.  In the current reporting period, the subcommittee has prepared an early 2019 community update on the Division's progress in improving crisis intervention services. Previous community education efforts have required a great deal of planning and technical assistance from both the Department of Justice and the Monitoring Team.  This time, the community update has been planned and will be executed independently.  The Monitoring Team is pleased to see that MHRAC is taking ownership of the principles of the Consent Decree in an effort to ensure a continued positive impact well past the Decree's formal timeframe.

### Progress and Tasks that Remain

### MHRAC Diversion Subcommittee

As the Cleveland Division of Police completes the 40-hour Training for Specialized Crisis Intervention Officers, the MHRAC's Diversion Subcommittee will serve an important role in providing assistance to the Division. The MHRAC Third Annual Work Plan provides six goals for the Diversion Subcommittee: utilizing the Crisis Stabilization Unit as a diversion point, identifying diversion points for adolescents, exploring the need for two crisis centers in the county, promoting awareness of new diversion options, working with behavioral partners to address capacity issues, and coordinating work with the Veterans Health Administration. These goals involve a number of funding and community issues that will take additional time to resolve. However, it is clear that the ADAMHS Board and CDP are committed to having the MHRAC Diversion Subcommittee complete the tasks involved which will have an important impact on those in need of crisis services. The Diversion Subcommittee has been meeting regularly and is demonstrating new energy in tackling this ambitious agenda.

### Data & Compliance Reviews

As with a number of other areas of the Decree, the ability to more comprehensively and smoothly collect and track data depends on the Division's new electronic system for inputting crisis-related data. This will ensure that crisis-related data can be input electronically and easily. Future, formalized assessments will need to explore whether officers are improving their de-escalation skills and seriously considering the process of diversion across time, officers, and incidents. Further, CDP will need to publicly report this outcome data annually and provide it to the Advisory Committee.[82]

Separately, the Monitoring Team will need to analyze data and review a material sample of incidents involving individuals in crisis to certify that officers—across time, incidents, and subjects—are complying with the new crisis intervention policies and the requirements of the Consent Decree. As discussed earlier, while the initial efforts from the MHRAC Quality Improvement subcommittee are encouraging, the completion of a system for logging information and data about CDP interactions with individuals in crisis remains a critical factor in assessing compliance. At the current juncture, the type of analysis necessary to certify compliance with a host of requirements related to crisis intervention consequently cannot be undertaken.

### In-Service Training Assessment and Continuous Improvement

CDP and MHRAC have successfully implemented two years of in-service training for all officers. MHRAC's Quality Improvement Subcommittee has begun to review training evaluation feedback to identify potential areas of improvement and iteration, which is a good start in a process of continuous quality improvement. As more data becomes available, CDP will need to conduct formalized assessments of the outcome data to "identify training needs and develop case studies and teaching scenarios for crisis intervention training as well as primary and in-service crisis training curriculum[.]"[83]

### Selection of Specialized CIT Officers

The Division's Specialized CIT Officer Selection Plan, which outlines a three-stage process of a participation request, personnel file review, and selection board interview, was reviewed and approved by MHRAC, as well as

---

[82] Dkt. 7-1 at ¶ 158.
[83] *Id.* at ¶ 159.

by the Court, in August 2017.  Although the Selection Plan itself is complete, the actual selection process has been rescheduled pending the completion of the new 40-Hour specialized curriculum.  The Team anticipates that the selection process will be completed by the end of the first quarter.

### Dispatcher CIT Officer Training

Dispatchers will need to receive additional comprehensive and thorough training so that all CDP personnel that affect the Division's crisis responses are prepared and understand the complex issues relating to mental and behavioral health.  The Training Subcommittee has continued work on the CDP's existing CIT curriculum for dispatchers and call takers, which focuses on personnel being able to identify calls for service that may implicate crisis intervention issues and dispatching appropriate resources to the scene of such events.  To date, an outline has been developed, and the more specific curriculum will be fully finalized once the 40-Hour Curriculum for specialized CIT officers is completed. The final revision of the Dispatch Crisis Intervention Curriculum is scheduled for completion by mid-2019.

### Academy Training

Following the Consent Decree's approval and implementation by the Court, the Ohio Peace Officer Training Commission issued a new Crisis Intervention training curriculum for Ohio peace officers.[84] CDP recruits received this curriculum as part of Academy Training.  The Parties, MHRAC, CDP, and the Monitoring Team had agreed that this new training is a reasonable substitute for the Decree-required sixteen hours of Academy Training.

Now that new recruits proceeding through the Academy are back to being trained in Cleveland rather than the Ohio State Patrol Academy, MHRAC will work with CDP to assure the Ohio Peace Officer Training Commission Crisis Intervention training remains a viable part of patrol officer training.

---

[84] Ohio Peace Officer Training Commission: Education & Policy Section, Peace Officer Basic Training Crisis Intervention, 1-156 (Jan. 2016).

## VIII.    SEARCH AND SEIZURE

| Paragraph | Status of Compliance |
|---|---|
| 160.  "CDP will revise, develop, and implement search and seizure policies that comply with applicable law, . . . include the requirements below," and conform to expressly-identified principles. | **PARTIAL COMPLIANCE** |
| 161–65.  Policy requirements for officers for stops, searches, and detentions. | **PARTIAL COMPLIANCE** |
| 166.  "Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assault an officer and no other substantive violation is alleged," and "the supervisor will respond to the scene." | **EVALUATION DEFERRED** |
| 167.  "Officers will not use 'canned' or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests." | **EVALUATION DEFERRED** |
| 168.  "Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports."  CDP "will train officers" on documenting stops.  "Supervisors will review all documentation of investigatory stops, searches, and arrests." | **EVALUATION DEFERRED** |
| 169.  Supervisor will review of "each arrest report by officers under their command," with supervisors reviewing reports for specific, expressly-identified deficiencies. | **EVALUATION DEFERRED** |
| 170–72.  Supervisory review of investigatory stops, searches, and arrests. | **EVALUATION DEFERRED** |
| 173.  Provision of "initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements" of the Consent Decree that "will address the requirements of Fourth Amendment and related law, CDP policies," and specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 174–75.   Provision of "annual search and seizure in-service training that is adequate in quality, quantity, type, and scope" incorporating specific, expressly-identified topics. | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires that CDP "revise, develop, and implement" policies on how its officers "conduct all investigatory stops, searches, and arrests with the goal" that such actions comply with the "Constitution, state and federal law."[85]  In addition to ensuring that officers enforce these legal requirements, the policies also will prohibit officers from relying on a subject's "race, ethnicity, gender, and perceived sexual orientation" as a reason to stop, search, or arrest an individual.[86]

The Consent Decree requires that CDP officers use specific details in reports documenting the events that led to an investigatory stop, search, or arrest without the use of "canned or conclusory statements."[87]   Immediate

---

[85] Dkt. 7-1 ¶ 160.

[86] Dkt. 7-1 ¶ 161; Dkt. 97 at 42.

[87] *Id.* at ¶ 167.

supervisors and command staff are tasked with reviewing officer reports in a timely fashion to ensure compliance with applicable laws and CDP policies.[88]  This review is designed to address violations and deficiencies in the documentation while also authorizing supervisors to recommend corrective and disciplinary action, along with criminal investigation, where appropriate.[89]

## Where the Division Stands

On August 15, 2018, the Parties and Monitoring Team completed drafts of five related policies: Search & Seizure, Investigative Stops, Probable Cause/Warrantless Arrests, Strip and Body Cavity Searches, and Miranda Warning and Waiver.  These drafts were then shared with the Cleveland community for their comment.  This was a major milestone in a lengthy process that began in the fall of 2017.

Once the draft policies became available, the Community Police Commission, led by its Search and Seizure Work Group, gathered public feedback on the draft policies.  The CPC shared its final report on Search and Seizure policy recommendations to the City on November 14, with support from key stakeholder groups, including the ACLU of Ohio, the Cleveland Branch of the NAACP, and the Legal Aid Society of Cleveland.  The CPC's substantial efforts are described in more detail earlier in the Community Engagement section of this Report.

The City also gathered community feedback separate from the CPC, utilizing CDP's District Policing Committees and other partnerships, which yielded some valuable feedback and insight.

Following the close of the community input period on November 14, 2018, the Division has been working to finalize the five draft policies, incorporating public comments as appropriate into the final policies.  The Team anticipates that the policies will be completed and prepared for the Court's approval early in the upcoming reporting period.

The Division's Training Section has also worked to prepare early drafts of a curriculum for Search and Seizure training that will guide officers through new expectations for stops, searches, seizures, and arrests.  This training will be part of the Division's 2019 in-service training.  The City, Division, DOJ, and Monitoring Team will continue to work together to finalize training for all officers on the new policies.

## Progress and Tasks that Remain

### Approval of Policies

As described above, the Team anticipates that the process of finalizing the five related Search and Seizure policies will conclude shortly and that the policies will be submitted to the Court early in the next reporting period.

---

[88] *Id.* at ¶¶ 168-72.
[89] *Id.*

*Training*

The Monitoring Team and DOJ will continue to work with the Division to ensure that training on the revised Search and Seizure policies is high-quality, engaging, informative, and appropriately grounded in realistic scenarios.

*Policy Implementation*

After all patrol officers receive training and the policies become effective, the Monitoring Team will ① evaluate the numbers and trends with respect to who is being stopped, under what circumstances, and what the outcomes of those stops are; and ② audit a host of stops themselves to determine if officers both articulated and had in fact sufficient legal grounds for any stop, detention, search, or arrest. This will include evaluation of whether supervisors are adhering to their requirements under the Division's final policies and the Decree.

## IX.    ACCOUNTABILITY

| Paragraph | Status of Compliance |
|---|---|
| 176.  "The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process." | **EVALUATION DEFERRED** |

## A.    Internally Discovered Misconduct

| Paragraph | Status of Compliance |
|---|---|
| 177.  "Internal Affairs will conduct objective, comprehensive, and timely investigations of all internal allegations," with "findings . . . based on the preponderance of the evidence standard" that must "be clearly delineated in policies, training, and procedures and accompanied by detailed examples to ensure proper application by investigators." | **EVALUATION DEFERRED** |
| 178.  "Internal Affairs will be headed by a qualified civilian" who "will report directly to the Chief of Police. | **OPERATIONAL COMPLIANCE** |
| 179.  Qualifications for IA investigators. | **EVALUATION DEFERRED** |
| 180.  Initial training for IA investigators "that is adequate in quality, quantity, scope, and type on conducting misconduct investigations" that addresses specific, expressly-identified topics. | **GENERAL COMPLIANCE** |
| 181.  "[A]nnual training" for IA investigators "that is adequate in quality, quantity, type and scope" | **EVALUATION DEFERRED** |
| 182.  "In each investigation, Internal Affairs will collect and consider" all evidence. "[N]o automatic preference for an officer's statement over a non-officer's statement." No disregard of a "witnesses' statement solely because of" connection to the complainant or criminal history.  IA investigators must "make all reasonable efforts to resolve material inconsistencies between witness statements." | **EVALUATION DEFERRED** |
| 183.  IA "will evaluate all relevant police activity and any evidence of potential misconduct uncovered during the course of the investigation." | **EVALUATION DEFERRED** |
| 184.  IA will not consider guilty plea or verdict as "determinative of whether a CDP officer engaged in misconduct" or justification for "discontinuing the investigation." | **EVALUATION DEFERRED** |
| 185.  IA "will complete its administrative investigations within 30 days from the date it learns of the alleged misconduct." | **EVALUATION DEFERRED** |
| 186–87.  IA investigative report requirements. | **EVALUATION DEFERRED** |

| | |
|---|---|
| 188.   Forwarding of completed IA investigations "to the officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator." | **EVALUATION DEFERRED** |
| 189.  "CDP will require any CDP employee who observes or becomes aware of any" potential misconduct to "report the incident to a supervisor or directly to" IA. | **OPERATIONAL COMPLIANCE** |
| 190. "CDP will develop a system that allows officers to confidentially and anonymously report potential misconduct by other officers." | **OPERATIONAL COMPLIANCE** |
| 191. "CDP will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." | **OPERATIONAL COMPLIANCE** |
| 192. "Officers who retaliate . . . will be subject to the disciplinary process." | **OPERATIONAL COMPLIANCE** |

## Background

Under the Consent Decree, the CDP's Internal Affairs ("IA") unit "will conduct objective, comprehensive, and timely investigations of internal allegations of officer misconduct."[90]  CDP have an affirmative obligation, under CDP policy, when they "observe⬜ or become⬜ aware of any act of misconduct by another employee to report their incident to a supervisor or directly to Internal Affairs."[91]  Division policy "will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person . . . who reports misconduct[.]"[92]

The IA-related provisions are among the most urgent and pressing of the Decree's requirements.  The inadequacy of IA investigations was no surprise.  An analysis of 2015 IA investigations conducted by the Monitoring Team reaffirmed the problems with IA's performance.[93]  A majority of the Division's 2015 investigations were of either fair or poor quality, with significant pieces of relevant data missing from investigative files.  Internal Affairs must be the primary engine for the Division's administrative (non-criminal) investigations of officer misconduct and, more generally, the main oversight mechanism for ensuring that the Division's performance standards are being met.

## Where Internal Affairs Stands Now

The work of the current reporting period has focused on finalizing the policies and procedures to guide Internal Affairs investigations.  Prior to the Consent Decree, IA did not have in place the types of rigorous, codified procedures for conducting its investigations and performing its duties that analogous units in similarly-situated departments have.

---

[90] Dkt. 7-1 at ¶ 177.
[91] *Id.* at ¶ 189.  Such reporting may be confidential or anonymous.
[92] *Id.* at ¶ 191.
[93] Fifth Semiannual Report at 76-77.

The Parties are drafting several IA policies, including the IA Manual and other IA-related policies, that will establish the rules and protocols that will guide IA staff and investigators in all IA investigations going forward. The Monitoring Team anticipates that these policies will be completed and submitted for the Court's approval in the upcoming reporting period.

Along with finalizing the IA policies, IA Superintendent Bakeman began working on training and staffing Internal Affairs to ensure a solid foundation for Settlement Agreement compliant investigations in the future. The Decree requires that the Division provide initial and annual training to all new and existing personnel "that is adequate in quality, quantity, scope, and type on conducting misconduct investigations."[94]  This training must address fundamental topics including:

- "[I]nvestigative skills, including proper interrogation and interview techniques; gathering and objectively analyzing evidence; and data and case management";
- "[T]he particular challenges of administrative police misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation";
- "[P]roperly weighing the credibility of civilian witnesses against officers";
- "[U]sing objective evidence to resolve inconsistent statements";
- "[T]he proper application of the preponderance of the evidence standard"; and
- "CDP rules and policies, including the requirements of this Agreement, and protocols related to administrative investigations of alleged officer misconduct."[95]

The first step in conducting the necessary initial training took place in November 2018 with an Internal Affairs investigative training conducted by an outside vendor and attended by current Internal Affairs staff as well as select CDP officers anticipating future assignment to Internal Affairs. The Monitoring Team and DOJ representatives attended the training and were pleased to see that attendees were well engaged. The training inspired lively classroom discussions about case scenarios, techniques, legal issues, and the complexities of these types of investigations. The Monitoring Team was impressed by the curriculum and the expertise of the trainers. Informal feedback from CDP officers, detectives, supervisors, and commanders who attended the class praised the training.

The Monitoring Team still needs to give the new Superintendent the opportunity to internally improve IA processes and procedures before conducting qualitative analyses on current IA investigative practices. The Monitoring Team anticipates beginning a subsequent round of qualitative analysis in the latter part of 2019 to evaluate whether investigations conducted in the first two quarters of the year appear to represent an improvement to the 2016 evaluation of 2015 cases that the Team previously conducted.

**Progress and Tasks that Remain**

---

[94] Dkt. 7-1 at ¶¶ 180-81.

[95] Id.

## *Staffing*

As the Monitoring Team has indicated in prior Reports, Internal Affairs is woefully understaffed.  No sustainable improvements will be possible until IA receives both the quality and quantity of investigative Sergeants necessary to ensure timely and competent investigations of internal misconduct.  The Division's Staffing Plan primarily, and largely appropriately, focuses on patrol staffing considerations.  CDP will need to ensure that it subsequently addresses the specific staffing needs of various specialized units, including IA.

## *Ensuring Investigative Integrity for Cases Investigated Outside of Internal Affairs*

Some recent internal investigations have continued to take place outside of Internal Affairs.  The Division will need to work over the course of the next reporting period to identify how to best achieve compliance with Consent Decree requirements around reasonable discipline and on competent underlying investigations in this regard.  It will be helpful in this regard for the Division to delineate all City entities that handle issues relating to CDP member conduct (such as the City's Human Resources or the Department of Public Safety's Accident Investigation Unit), so that their functions can be coordinated and integrated with the Division's IA function.

## *Compliance with Policies, Protocols, and Procedures*

As with many other areas that are the focus of the reform process, sporadically high-quality investigations amid generally poor-quality investigations, or occasionally bad investigations among generally good ones, is not sufficient to establish compliance.  Instead, it is the sustained adherence to the high standards of the Decree and policy that will set the occasion for substantial and effective compliance.  As the Monitoring Team has previously outlined, it will accordingly conduct systematic audits to ensure that IA investigations—across time, investigators, and incidents—comply with the requirements of the Decree.

## B.    Office of Professional Standards ("OPS")

| Paragraph | Status of Compliance |
|---|---|
| 193.  OPS "investigate[s] all civilian complaints it receives, other than those that allege criminal conduct," which are referred to IA.  Excessive force complaints generally retained by OPS.  IA investigations referred back to OPS if "determination is made that no criminal conduct occurred." | **OPERATIONAL COMPLIANCE** |
| 194.  "The City will ensure that OPS is led by an administrator with the skills, expertise, and experience to effectively manage the intake, tracking, timely, and objective investigation of complaints"; implement PRB training; "assess OPS's equipment and staffing needs"; and "develop and implement performance standards for OPS." | **OPERATIONAL COMPLIANCE** |
| 195–96.  Initial training for OPS investigators "adequate in quality, quantity, scope, and type," including specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 197.  "OPS Investigators will not be current members of the CDP, and no CDP personnel will have any active role in OPS's operations." | **OPERATIONAL COMPLIANCE** |
| 198.  "The City will ensure that the lawyer representing OPS does not have any actual or apparent conflicts of interest." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 199. "OPS will have its own budget, separate from . . . the Department of Public Safety" that "affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement." | **OPERATIONAL COMPLIANCE** |
| 200. Development and implementation of OPS operations manual "made available to the public" that covers specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 201. Development and implementation of "a program to promote awareness through the Cleveland community about the process for filing complaints with OPS." | **EVALUATION DEFERRED** |
| 202. "CDP and the City will work with the police unions . . . to allow civilian complaints to be submitted to OPS verbally or in writing; in person, by phone, or on line; by a complainant, someone acting on his or her behalf, or anonymously; and with or without a signature from the complainant," with all "complaints documented in writing." | **OPERATIONAL COMPLIANCE** |
| 203. "CDP will post and maintain by the intake window at CDP headquarters and all District headquarters a permanent placard describing the civilian complaint process" and containing specific, expressly-listed information. | **OPERATIONAL COMPLIANCE** |
| 204. "CDP will provide training that is adequate in quality, quantity, scope, and type to all police personnel, including dispatchers, to properly handle complaint intake, including" with respect to specific, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 205. CDP officers "carry complaint forms in their CDP vehicles," which officers must provide "upon request." Supervisors will be dispatched to scene when an individual wants to make a complaint, with the supervisor providing a copy of completed complaint form "or a blank form to be completed later by the individual." | **EVALUATION DEFERRED** |
| 206. "The City and OPS will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including a number of specific, expressly-listed locations. | **OPERATIONAL COMPLIANCE** |
| 207. "OPS's complaint form will not contain any language that could reasonably be construed as discouraging the filing of a complaint, including warnings about the potential criminal consequences for filing false complaints." | **OPERATIONAL COMPLIANCE** |
| 208. Availability of complaint forms in English and Spanish. "OPS will make every effort to ensure that complainants who speak other languages . . . can file complaints in their preferred language." | **OPERATIONAL COMPLIANCE** |
| 209. "City will ensure that civilian complaints submitted through other existing systems, including the Mayor's Action Center and the Department Action Center, are immediately forwarded to OPS for investigation." | **OPERATIONAL COMPLIANCE** |
| 210. "OPS will establish a centralized electronic numbering and tracking system for all complaints," which "will maintain accurate and reliable data regarding the number, nature, and status of all complaints . . . including investigation timeliness and notification of the interim status and final disposition of the complaint." It "will be used to monitor and maintain appropriate caseloads for OPS investigators." | **OPERATIONAL COMPLIANCE** |
| 211. Biased policing tracked as a separate category of complaint that "are captured and tracked appropriately, even if the complainant does not so label the allegation." | **EVALUATION DEFERRED** |
| 212. "[A]llegations of unlawful investigatory stops, searches, or arrests" tracked as a separate category of complaints. | **EVALUATION DEFERRED** |

| | |
|---|---|
| 213. "[A]llegations of excessive use of force" tracked as separate category of complaints. | **EVALUATION DEFERRED** |
| 214. "OPS will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends." | **NON-COMPLIANCE** |
| 215. "OPS will produce, at least annually, a public report summarizing complaint trends, including" with respect several specific, expressly-identified areas. | **PARTIAL COMPLIANCE** |
| 216. Assignment of complaints to Standard and Complex investigatory tracks. | **OPERATIONAL COMPLIANCE** |
| 217. Dismissal and/or administrative dismissal of complaint investigations. | **OPERATIONAL COMPLIANCE** |
| 218. "OPS will ensure that investigations of complaints are as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of the evidence." | **PARTIAL COMPLIANCE** |
| 219. "CDP will ensure that OPS has timely access to all reports related to the incident . . . ," and authority of OPS "to conduct additional investigation" of civilian complaint when CDP investigation has already taken place relating to the incident. | **EVALUATION DEFERRED** |
| 220. "OPS investigators will attempt to interview each complainant in person" and record the interview. | **OPERATIONAL COMPLIANCE** |
| 221. "The Chief will order officers who witnessed or participate in an incident that is the subject of an OPS complaint to cooperate with the OPS investigation," including by responding to written questions or sitting for an in-person interview. | **OPERATIONAL COMPLIANCE** |
| 222. "OPS investigators will have access to any relevant disciplinary information in the record of an officer who is the subject of a current investigation." | **EVALUATION DEFERRED** |
| 223. "OPS will consider all relevant evidence," with no preferences for particular witness's statements, including of officer over a non-officer, or because of connection to complainant or criminal history. "OPS will make all reasonable efforts to resolve material inconsistencies between witness statements." | **EVALUATION DEFERRED** |
| 224. OPS findings categories. | **OPERATIONAL COMPLIANCE** |
| 225. "OPS will document in writing the investigation of each complaint, including all investigatory steps taken, and OPS's findings and conclusions," which must "be supported by a preponderance of the evidence. | **PARTIAL COMPLIANCE** |
| 226. Items for consideration for OPS findings. | **PARTIAL COMPLIANCE** |
| 227. "OPS will forward all investigations and its written conclusions to PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation." | **OPERATIONAL COMPLIANCE** |
| 228. "OPS will send periodic written updates" to the complainant at specific, expressly-identified junctures. | **EVALUATION DEFERRED** |
| 229. "[A] complainant may contact OPS at any time to determine the status of his/her complaint." | **EVALUATION DEFERRED** |

## Background

To properly ensure that officers are held to account for violations of policy and law, police departments need a credible and transparent system for investigating civilian complaints of misconduct.  In Cleveland, the Office of Professional Standards ("OPS") is the civilian-staffed office charged with investigating the complaints of civilians about Division of Police personnel.  The City Charter requires OPS to conduct "a full and complete investigation" of all citizen complaints of employee misconduct.[96]

The Consent Decree has a number of requirements—such as hiring a qualified and experienced OPS Administrator, ensuring high-quality training for investigators, establishing a separate budget for OPS, and promoting awareness throughout Cleveland about the availability of civilian complaint forms—all designed to ensure that OPS can conduct thorough and competent investigations of civilian complaints and reach findings that are supported by the preponderance of evidence.[97]

## Where OPS Stands Now

OPS has completed a number of major milestones, including developing a new OPS Operations Manual with detailed procedures for investigations, report writing, and evidence collection.  The City also hired Mr. Roger Smith as the new OPS Administrator in June 2018.

The City's hiring of Hillard Heintze has helped to reduce the backlog of uninvestigated or partially investigated civilian complaints, which was at a reported backlog of 377 cases as of the start of 2018, to approximately 75 cases. This has been a serious undertaking, and the Monitoring Team is pleased that significant progress is being made. The Team is hopeful that the current efforts at backlog reduction will develop into a long-term trend in favor of timely OPS investigations and referrals to the Police Review Board for resolution of complaints.

In the past, the lack of timely reviews of investigations has made it impossible for OPS to comply with Paragraph 227 of the Consent Decree, which requires OPS to "forward all investigations and its written conclusions to the PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation."  Starting in June 2018, however, the new OPS Administrator put new practices into place to better ensure the timely referral of completed investigations to the PRB for their consideration. The Team has observed that OPS is now completing findings letters upon the completion of PRB hearings in a generally timely manner.  That is an encouraging development.

Now that OPS has experienced leadership to implement changes in day-to-day practices on newly-received complaints, the Monitoring Team has seen some improvements in the quality of OPS investigative practices. OPS still needs to make additional progress to address some fundamental investigative deficiencies.

---

[96] Charter of the City of Cleveland, § 115-4.
[97] Dkt. 7-1 at ¶¶ 193-229.

### Staffing

OPS has staffed up considerably in the past year, most significantly with a new Administrator and Supervising Investigator working to improve OPS's investigative procedures.  OPS has worked to fill three significant vacancies for Research Analyst, General Manager, and Community Outreach Coordinator.  Recently, offers for the both the Research Analyst and Community Outreach positions were accepted by the final candidates.  The General Manager position is also in advanced discussions with a final candidate.  These hires will be critical to OPS's sustained reform and ultimate compliance with the Consent Decree.

In part due to understaffing in OPS and the many competing demands on existing OPS personnel, the Monitoring Team and the Parties agreed that the completion date for the 2018 Annual Report, summarizing complaint trends and timeframes for the public and required under Paragraph 215 of the Decree, will be extended to April 30, 2019. The Monitoring Team anticipates that the next Annual Report will contain more substantive information relating the work conducted by OPS and the PRB than in previous reports and has recommended that OPS present its next report to the City Council's Public Safety Committee in public session.

### Progress and Tasks that Remain

OPS has made commendable progress to improve its practices since the Consent Decree monitoring began in October 2015.  Given the host of foundational issues that it faced, however, OPS must still address a number of challenges.  The City and OPS Administrator will need to continue to exert significant time, energy, and resources to make OPS into a functional and credible oversight agency.

### Completing the Backlog of Open Investigations

First, the City will need to fully address and adjudicate the previously-unclosed investigations received prior to January 1, 2018 that have still not been completed or received a final disposition. The Team is pleased, as described earlier, that aggressive measures reportedly taken by the new OPS Administrator and Senior Investigator have reduced the ongoing caseload to a respectable average of 75 cases.  When divided between the current staff of nine OPS investigators, the overall caseload appears to be reasonable and would appear to support timely and competent investigations of future complaints made to the OPS.

### Case Management System/Business Mapping

As the Monitoring Team has stated before, proper case management is a basic, foundational management tool for an investigatory agency with OPS's charge to operate successfully in a city the size of Cleveland.  Under the Consent Decree, OPS will "establish a centralized electronic numbering and tracking system . . . [which] will maintain accurate and reliable data regarding the number, nature, and status of all complaints" and which can be used by OPS administration "to monitor and maintain appropriate caseloads for OPS investigators."[98]

The Monitoring Team looks forward to the hiring of a new OPS Management Analyst (anticipated to occur in the first quarter of 2019), which will allow OPS to take full advantage of IAPro as its case management software.

---

[98] Dkt. 7-1 at ¶ 210.

### Ongoing Issues of the Quality of OPS Investigations & Training Needs

Under the Consent Decree, OPS investigators need to receive "initial training that is adequate in quality, quantity, scope, and type" that addresses:

- "[I]nvestigative skills, including proper interrogation and interview techniques; gathering and objectively analyzing evidence; and data and case management;
- "[T]he particular challenges of administrative investigations of police conduct, including identifying conduct warranting investigation that is not clearly stated in the complaint or that becomes apparent during the investigation;
- "[P]roperly weighing the credibility of civilian witnesses against officers;
- "[U]sing objective evidence to resolve inconsistent statements;
- "[T]he proper application of the preponderance of the evidence standard; and
- "CDP rules and policies, including the requirements of this Agreement, and protocols related to administrative investigations of officer conduct alleged to be improper."[99]
-

Early in the Decree's implementation, OPS provided some training to its investigators. But given the deficiencies that the Team has continued to observe and has noted in the past, it was clear that what they had received had not been enough to sufficiently improve the quality of OPS investigations.

Since his hiring as the OPS Administrator, Mr. Smith has conducted weekly in-house training sessions for OPS investigators. The positive response from OPS staff has been noteworthy. The Monitoring Team intends to conduct qualitative evaluations of OPS investigations over the course of the next two reporting periods and is hopeful that significant improvements will be noted. Ultimately, the proof of the efficacy and sufficiency of training conducted to date will be in the quality and integrity of OPS's investigations.

### OPS Staff Performance Reviews

In the Fourth Semiannual Report, the Monitoring Team noted that OPS had then only recently set forth formal expectations (the "Smart Objectives") for its investigators relating to the conduct of investigations—even though this was a process available to all City managers across departments to set and hold employees accountable for specific performance expectations. Unfortunately, a Monitoring Team review of the documentation provided by OPS relative to the performance review process revealed problematic practices, with major discrepancies between scores and overall performance reviews, with minimal documentation, if any, available to support the ratings provided to both permanent and temporary investigators.

It has been the Monitoring Team's expectation that the new OPS Administrator will ensure a robust employee performance review process at OPS to ensure employee adherence to OPS Court-approved policies and best practices in investigations based on the training that has been and will continue to be received. Thus far, Mr. Smith has reported conducting ongoing performance reviews. The Monitoring Team looks forward to seeing substantive, written performance reviews coming out of OPS in the next reporting period.

---

[99] Dkt. 7-1 at ¶ 195-96.

### Complaint Forms

Under the Consent Decree, the City and OPS "will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including a number of specific, expressly-listed locations.[100] Further, all CDP officers will "carry complaint forms in their CDP vehicles."[101]

While the City and CDP have consistently maintained that they have made complaint forms available at the Decree-enumerated locations, Monitoring Team members have visited the locations and have, on occasion, not found the forms readily available. Similarly, Monitoring Team members have requested CDP officers to procure an OPS complaint form, to which officers sometimes have been unable to provide one from their vehicle. The Monitoring Team has begun working on an audit program to assess, among other things, the accessibility of complaint forms in vehicles and at CDP District stations. A recent, informal audit in January 2019 indicated that several District stations had OPS complaint forms in both English and Spanish available in the lobby as well as a poster explaining the complaint process.

### C.    Police Review Board ("PRB")

| Paragraph | Status of Compliance |
|---|---|
| 230. "Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot" addressing PRB composition and appointment process. | **GENERAL COMPLIANCE** |
| 231. "PRB members will not be current or former members of the CDP." | **GENERAL COMPLIANCE** |
| 232. "PRB will have its own budget," overseen by OPS Administrator and separate from Department of Public Safety, that "affords sufficient independence and resources." | **OPERATIONAL COMPLIANCE** |
| 233–34. Initial training for PRB members "that is adequate in quality, quantity, scope, and type" and that covers specific, expressly-identified topics. | **PARTIAL COMPLIANCE** |
| 235. PRB meetings open to the public and posted in advance, with "case presentations and PRB votes" occurring during "open session." | **OPERATIONAL COMPLIANCE** |
| 236. "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings . . . ." PRB may "ask the investigator to conduct further investigation" as necessary. | **PARTIAL COMPLIANCE** |
| 237. "PRB recommended dispositions will be based on a preponderance of the evidence. For each case, PRB shall set forth its conclusion and an explanation of its reasons and supporting evidence in writing, including, when applicable, the justification for departing from OPS's recommended disposition." | **EVALUATION DEFERRED** |
| 238. "In cases where PRB is recommending a sustained disposition, in whole or in part, PRB will include a recommendation as to disciplinary or non-disciplinary corrective action." | **OPERATIONAL COMPLIANCE** |

---

[100] Dkt. 7-1 at ¶ 206.

[101] *Id.* at ¶ 205.

| 239.  [Timely] forwarding of PRB recommendations to Chief of Police and Director of Public Safety. | OPERATIONAL COMPLIANCE |
|---|---|

## Background

Cleveland's civilian Police Review Board ("PRB" or "the Board") reviews and analyzes completed OPS investigations.  It makes a formal recommendation to the Chief of Police on the ultimate disposition of the case and, if warranted, the discipline that an involved officer should receive.  A well-functioning PRB is critical to ensuring that OPS investigations are sound and that the Chief of Police receives a well-informed recommendation on the disposition of OPS cases.

The Consent Decree has many requirements relating to the PRB, including that the "PRB will have its own budget[,]" PRB members will receive initial training, PRB meetings will be held open to the public and posted in advance, "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings[,]" "PRB recommended dispositions will be based on a preponderance of the evidence[,]" and that the PRB will, when recommending sustained disposition, "include a recommendation as to disciplinary or non-disciplinary corrective action."[102]

## Where the PRB Stands

Since the adoption of the PRB Operations Manual in 2017, which codified changes made in the November 2016 City Charter Amendment, and the subsequent adoption of an amendment to permit the PRB to have public meetings, the PRB continues to convene regularly to address cases that it receives from OPS.  However, the performance of the PRB has largely been at the mercy of OPS.  The timeliness of the PRB's review of cases, and precisely what the PRB is reviewing, depends on how well OPS has effectuated its duties in the investigatory stage.

PRB members have, in the past, received auxiliary training that did not qualify as the initial training called for in the Decree.  As the PRB has taken on new members, OPS has had to create a training protocol for new members to ensure the seamless operation of the PRB going forward; by the end of the last reporting period, OPS had successfully completed a training binder which was subsequently provided to all current members of the PRB as a resource. OPS Administrator Smith also included PRB members in OPS investigator training that took place in December 2018. The inclusion of PRB members in this type of training was a positive step forward in ensuring adequacy of PRB reviews now and in the future.

On January 8, 2019, one of the PRB's members resigned from the Board.  The City has initiated the selection process for filling the Board vacancy and expects that the selection and appointment will be finalized in early March 2019.

---

[102] Dkt. 7-1 at ¶¶ 232-38.

## Progress and Tasks that Remain

### Quality of PRB Recommendations & Processes

The Monitoring Team has observed several cases in which the Chief disagreed with PRB recommendations without providing a robust written rationale. The Team has similarly noted what appear to be largely *ad hoc* communications between the Chief and the Board, usually through the OPS Administrator.  The OPS/PRB program would benefit from a formal, written protocol between the PRB and the Chief's Office to address systemic communication issues and to ensure that the Chief and PRB understand each other's rationale for making recommendations and decisions on complaints.

### Documentation of PRB Decision-Making

The PRB has previously struggled with the timely documentation of the rationale for its decisions. In the current reporting period, OPS reported that PRB disposition letters (letters to complainants documenting non-sustained finings made by the PRB) and findings letters (letters to the CDP documenting sustained findings made by the PRB) have, on the whole, been prepared in a timely fashion. The Monitoring Team has also noted an improvement in the quality of findings letters.  In the upcoming year, the Monitoring Team will be reviewing the quality of the disposition letters to ensure that complainants are being provided sufficient information to fully understand PRB findings closing their complaints with no further action to be taken.

### Systemic Compliance

Previous Monitoring Team observations of the PRB indicated that the Board had some distance to travel until it could be certified as adhering across time, cases, and deliberations to the requirements of the Decree and the Court-approved PRB Manual.  Again, a significant reason that this scope of work remains is related to the ongoing deficiencies with OPS as, to some extent, PRB can only ever be as good as the quality and nature of the investigations that they receive.

After giving OPS more time to improve the quality of its investigations, the Monitoring Team will, once again, monitor and review the work of the PRB to ensure that improved investigations are also resulting in improved reviews and recommendations to the Chief.  Ultimately, before the performance of OPS and PRB can be found to be in compliance with the Consent Decree, the Monitoring Team and Court will need to certify that the Board is effectively and meaningfully carrying out its duties in a sufficiently thorough, fair, and timely manner.

## D.    Discipline and Disciplinary Hearings

| Paragraph | Status of Compliance |
|---|---|
| 240.  "The Chief of CDP will issue a General Police Order that requires officers to (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 241.  Disciplinary hearing requirement, with officer given "opportunity to testify" and suspension of hearing if "officer provides new or additional evidence at hearing," with matter "returned to IA or PRB for consideration." | **EVALUATION DEFERRED** |
| 242.  Written justification by Chief or Director of decision to "not uphold the charges" or "does not impose the recommended discipline or non-disciplinary corrective action" where PRB previously "recommends the initiation of the disciplinary process and recommends a disciplinary level." | **NON-COMPLIANCE** |
| 243.  "CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition." | **NON-COMPLIANCE** |
| 245.  "CDP will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented." | **EVALUATION DEFERRED** |
| 246.  "CDP will review its current matrix and will seek to amend it" "to ensure consistency" and inclusion of a number of specific, expressly-identified features. | **OPERATIONAL COMPLIANCE** |
| 247.  "All disciplinary decisions will be documented in writing." | **NON-COMPLIANCE** |
| 248.  "CDP will provide its disciplinary matrix to the Commission, the Police Inspector General, and the police unions for comment." | **OPERATIONAL COMPLIANCE** |
| 249.  "CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years." | **PARTIAL COMPLIANCE** |

## Background

The Consent Decree requires that CDP "ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented."[103]  To that end, the Division "will review its current disciplinary matrix and will seek to amend it as necessary[.]"[104]  Specifically, CDP must ensure that the new disciplinary matrix:

- "[E]stablishes a presumptive range of discipline for each type of rule violation;"
- "[I]ncreases the presumptive discipline based on an officer's prior violations of the same or other rules;"
- "[P]rohibits consideration of the officer's race, gender, national origin, age, ethnicity, familial relationships, or sexual orientation" as well as "the high (or low) profile nature of the incident;" and
- "[P]rovides that CDP will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline" but may consider non-disciplinary corrective action "in a case where discipline has [already] been imposed."[105]

---

[103] Dkt. 7-1 ¶ 245.

[104] Id.

[105] *Id.* at ¶ 246.

## Where the Division Stands

Since January 1, 2018, the Division has been operating according to the revised, Court-approved Disciplinary Matrix that establishes presumptive ranges of discipline and mitigating or aggravating factors.  Since the promulgation of the new Matrix, the Monitoring Team has begun to audit disciplinary decisions along with the underlying investigations that precipitated them in real-time.  The Parties and Team have begun to discuss various areas that require improvement with respect to the discipline process and will focus on these issues in the coming reporting period.

## Progress and Tasks that Remain

### Disciplinary Process Changes

The procedures and processes that the Division uses from the time a misconduct investigation is completed to when discipline is imposed will need to be addressed to ensure that they are fair, uniform, objective, and timely.  In December 2018, the Division provided the DOJ and Monitoring Team with a substantive draft of guidelines for the conduct of "Chief's Hearings."  While additional discussions need to take place regarding the content of the guidelines, the creation of this draft is an excellent step forward in ensuring systemic compliance with paragraph 245 of the Consent Decree.

### Relationship of Disciplinary Process to Voluntary City/Police Union Agreements

The Consent Decree requires the Division to "work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years."[106]  The City raised the issue with the police unions in recent bargaining and accepted that sustained disciplinary findings would remain in an officer's record for less than ten years.  The City has indicated that it will revisit the matter in future negotiations.

### Systemic Evaluation of Discipline

A comprehensive evaluation of the imposition of discipline will need to be conducted to determine how the Disciplinary Matrix is functioning in practice and to "ensure that . . . officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process."[107]

---

[106] *Id.* at ¶ 249.
[107] *Id.* at ¶ at ¶ 176.

## X.    TRANSPARENCY & OVERSIGHT

### A.    Police Inspector General

| Paragraph | Status of Compliance |
|---|---|
| 250.  "The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a Police Inspector General" ("IG").  City must seek CPC's "input in developing minimum qualifications and experience" for IG. | **EVALUATION DEFERRED** |
| 251.  IG work in Office of Mayor but report to Chief of Police. | **EVALUATION DEFERRED** |
| 252.  IG "will not be a current or former employee of CDP." | **EVALUATION DEFERRED** |
| 253–54.  Duties and authority of IG. | **EVALUATION DEFERRED** |
| 255.  Budget of IG must be "a separate line item" in City budget and "afford☐ sufficient independence and resources" to comply with Consent Decree. | **PARTIAL COMPLIANCE** |
| 256.  IG "will have access to all documents and data necessary to perform the above functions, including any raw data." | **EVALUATION DEFERRED** |

### Background

The Consent Decree creates a new, internal oversight function within the Division—a Police Inspector General (the "IG").  "The IG's substantial duties include, but are not limited to, review of CDP policies and practices, auditing, conducting investigations, analyzing data for aggregate and systemic trends, developing specific recommendations for reform, analyzing investigations conducted by OPS to determine if they are adequate, and reviewing imposed discipline."[108]  The IG's reports and recommendations must be made public.[109]

### Where the Division Stands

In the current reporting period, and after a lengthy process to recruit and spread information about the Inspector General position on a national scale, the City completed the interviewing process and selected a final candidate to become the Division's new IG.  The hiring of the candidate, through no fault of the City, ultimately did not work out.  This constituted a major setback, though through no apparent fault of the City.  The City reposted the Inspector General position, which closed February 22, 2019.

### Progress and Tasks that Remain

Once hired, the Police Inspector General, with his or her day-to-day responsibility in conducting assessments, reviews, and audits, will be a significant benefit to the Division and the Consent Decree process.  Again, the Team understands that the recent delays in hiring the Inspector General were largely out of the City's hands.  It

---

[108] Dkt. 7-1 ¶ 253.

[109] Dkt. 97 at 53 (quoting Dkt. 7-1 ¶ 253) (internal quotations omitted).

continues to look forward to the IG's hiring, which will be an important milestone in effectuating the kind of oversight called for by the Decree.

Once the IG is hired, the Parties and Monitoring Team must also ensure that the Police Inspector General has the resources, budget, and "sufficient independence" to successfully review practices, audit, analyze data, and provide actionable recommendations to the Division of Police.[110]  Likewise, the work of the Inspector General will need to reflect the rigor and independence that the Consent Decree contemplates.   To that end, the Monitoring Team will be evaluating his or her performance over time to ensure that such standards are being appropriately met. The ultimate goal is for the institutionalized IG to take on a role of independent auditor with respect to the Division's overall performance, systems, and processes—sustaining and driving change long after CDP has reached substantial and effective compliance with the particular provisions of the Consent Decree.

## B.     Data Collection and Analysis

| Paragraph | Status of Compliance |
|---|---|
| 257.  "CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad access to information related to CDP's decision making and activities.   To achieve this outcome, CDP will designate an individual or individuals as the 'Data Collection and Analysis Coordinator.'" | **PARTIAL COMPLIANCE** |
| 258.  Coordinator "will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials," including specific, expressly-listed materials and information. | **PARTIAL COMPLIANCE** |
| 259.  Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents," including specific, expressly-identified data. | **PARTIAL COMPLIANCE** |
| 260.  Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation."  The system must conform to a number of specific, expressly-identified requirements. | **PARTIAL COMPLIANCE** |
| 261.  Coordinator must "routine[ly] report[] . . . relevant data to the Chief of Police, FRB, Training Review Committee, OPS, the [Community Police] Commission, and the Police Inspector General." | **PARTIAL COMPLIANCE** |
| 262.  Coordinator "responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection." | **PARTIAL COMPLIANCE** |
| 263.  Coordinator "will develop a protocol to accurately analyze the data collected and allow for" various outcome measurements, "subject to the review and approval of the Monitor and DOJ." | **OPERATIONAL COMPLIANCE** |
| 264.  Annually, "CDP will conduct an assessment and issue a report summarizing its investigatory stop, search, and arrest data" that addresses various specific, expressly-identified topics. | **EVALUATION DEFERRED** |

---

[110] Dkt. 7-1 at ¶ 255.

| | |
|---|---|
| 265.  Annually, "CDP will conduct an assessment and issue a report of all activities, including use of force, arrests, motor vehicles and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race" or other listed prohibited classes or characteristics, and that addresses various specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 266. Annual analysis of "prior year's force" data with FRB. | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires that the Division collect, use, and report data on its activities and performance in a more modern and comprehensive fashion.  To effectuate this, the Decree requires that CDP hire a Data Collection and Analysis Coordinator (the "Data Coordinator" or "Coordinator") to help ensure that CDP maintains the required information in a manner that "facilitate[s] transparency and . . . broad public access to information related to CDP's decision making and activities."[111]  The Coordinator is specifically tasked with ensuring the collection and tracking of all information related to uses of force, search and seizure practices, and allegations of misconduct. The Coordinator will create and maintain "a reliable and accurate electronic system to track" use of force-related data and search and seizure information.[112]

The Coordinator also is "responsible for the routine reporting of relevant data" to various entities within the Division[113]; conducting annual assessments of both use of force and investigatory stop data[114]; and analyzing Division practices for potential disproportionate or disparate impacts with respect to "race, ethnicity, gender, disability, sexual orientation, or gender identity."[115]  These reports must "be made publicly available."[116]

## Where the Division Stands

During the current reporting period, Dr. Rania Issa, the Data Coordinator, has continued to meet regularly with CDP leadership—presenting thorough analyses of use of force data, including trends on the number of force incidents reported by month, as well as trends on the timeliness of reviews of use of force reports.  The analysis can be disaggregated by month and by CDP District, allowing the Division to identify and focus on particular areas of improvement.

Other information about officer misconduct investigations conducted by IA is substantially more robust, detailed, and up-to-date now than in the past.  This allows for enhanced accountability and the ability of IA to manage itself more efficiently and effectively.

---

[111] Dkt. 7-1 at ¶ 257.

[112] *Id.* at ¶¶ 259-60.

[113] *Id.* at ¶ 261.

[114] *Id.* at ¶¶ 263, 264, 266.

[115] *Id.* at ¶ 265.

[116] *Id.* at ¶ 267.

## Progress and Tasks That Remain

For as much progress as CDP has made in its ability to collect and analyze data in some areas, there are two substantial tasks that remain in the area of information and data.  The first is successfully establishing and implementing mechanisms for the collection of critical data on stops, searches, and arrests; crisis intervention; and community policing.  As this report discusses elsewhere, the Division originally contemplated using the Computer-Aided Dispatch ("CAD") system for logging such information.  However, for a variety of technical reasons, the City is now needing to consider other database platforms.

The collection of this data—on stops, crisis incidents, and community policing—is essential for gauging the success of new policies and programs and evaluating ultimate compliance with the Consent Decree.  With efforts still focusing on determining the system that will be used, it will take some time before personnel can be trained on using the selected electronic platform, information can be collected in real-time, and aggregate data analyzed.  Until such data can be evaluated for a sufficiently material period of time, the Division will not be able to demonstrate as definitively as it must that its performance complies with its various policies, plans, and initiatives.

The second major task with respect to data is for CDP to regularly incorporate the analysis provided by the new Coordinator into its day-to-day management decisions.  It remains unclear to the Monitoring Team how the CDP uses and acts on data beyond crime and offense statistics.  The Team looks forward to the Division continuing to commit to a culture of objective, data-informed decision-making in its ability to meet community needs, inform how it polices and organizes its activities, and gauge precisely how well it is doing to meet its strategic goals.

## C.    Public Availability of CDP-Related Information

| Paragraph | Status of Compliance |
|---|---|
| 267.  "[A]ll CDP audits, reports, and outcome analyses related to the implementation" of the Consent Decree will be public. | **NON-COMPLIANCE** |
| 268.  "CDP will post its policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports on its website." | **PARTIAL COMPLIANCE** |

## Background

The Consent Decree requires that CDP's "policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports" be posted on CDP's website.[117]  Likewise, "[t]o ensure transparency in the implementation of" the Decree, "all CDP audits, reports, and outcome analyses related to the implementation of this [the Consent Decree] will be made publicly available, including at the City and CDP websites."[118]

## Where the Division Stands

---

[117] Dkt. 7-1 at 1; *id.* ¶ 268.

[118] Dkt. 7-1 ¶ 267.

Over the last several reporting periods, the Monitoring Team has not observed any recent material changes, one way or another, in the public availability of audits, budgets, and outcome reports. The City has expressed that it plans to make General Police Orders, divisional notices, and other internal documents articulating the Division's policies and processes more navigable and accessible. Because CDP has posted some Consent Decree-related documents on its website with some regularity, the Monitoring Team concludes that the Division is in "Partial Compliance" with the Decree's requirements under Paragraph 268. Still, to reach full and Substantial Compliance with the Decree, the Division will need to bolster its commitment to provide the community with regular and transparent updates on its activities and performance.

## Progress and Tasks That Remain

As indicated above, the City must make all CDP audits, reports, and outcome analyses related to the implementation of the Consent Decree public.

Additionally, the Division must also establish a general policy for the release or provision of records, data, or information to the public. Police departments elsewhere are going to great lengths to collaborate dynamically with their communities to set clear expectations, in advance of an incident occurring or an information request arising, about what it can or will release and what it cannot or will not make available. Knowing what to expect and how to proceed in advance leads to better outcomes for community members and the Division. Having information about how the police do their work also helps the community better understand the unique challenges of law enforcement professionals. The Monitoring Team looks forward to the Division making progress on a general policy on the public availability of CDP-related information in the upcoming reporting periods.

## XI.    OFFICER ASSISTANCE & SUPPORT

### A.    Training

| Paragraph | Status of Compliance |
|---|---|
| 269.  "CDP will ensure that officers receive adequate training to understand: (a) how to police effectively and safely in accordance with CDP policy; [and] (b) the requirements of this Agreement, Ohio law, and the Constitution and laws of the United States," including in the areas of "procedural justice, bias-free policing, and community policing." | **PARTIAL COMPLIANCE** |
| 270.  "CDP will expand the scope and membership of the Training Review Committee." | **PARTIAL COMPLIANCE** |
| 271–72. "[T]he Training Review Committee will develop a written training plan for CDP's recruit academy, probationary field training, and in-service training" that addresses a host of specific, expressly-identified issues. | **NON-COMPLIANCE** |
| 273.  "The Training Plan and schedule will be implemented once any objections have been resolved" on a yearly basis. | **PARTIAL COMPLIANCE** |
| 274.  "The Training Review Committee will annually review and updated CDP's training plan" by "conduct[ing] a needs assessment" that addresses a number of specific, expressly-identified data and information on real-world trends, needs, policy, and law. | **NON-COMPLIANCE** |
| 275.  "CDP's Commander responsible for training" will be in charge of "all CDP training. | **PARTIAL COMPLIANCE** |
| 276.  "CDP will designate a single training coordinator in each District.  The Commander responsible for training will establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the" training Commander. | **PARTIAL COMPLIANCE** |
| 277.  "CDP will develop recruit academy and in-service curricula that comport with" the Training Plan and Consent Decree requirements. | **PARTIAL COMPLIANCE** |
| 278.  "[T]he training required under this Agreement . . . will be delivered within two years of the Effective Date." | **EVALUATION DEFERRED** |
| 279.  "For all other substantive updates or revisions to policy or procedure, CDP will ensure and document that all relevant CDP personnel have received and read the policy or procedure.  Notification of each revision or update will include the rationale for policy changes and the difference between the old and updated policy." | **PARTIAL COMPLIANCE** |
| 280.  Training Commander reviews all training materials; ensures that they use "a variety of adult learning techniques, scenario-based training, and problem-solving practices"; and "ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Review Committee." | **PARTIAL COMPLIANCE** |
| 281.  "CDP will ensure that instructors are qualified and use only curricula and lesson plans that have been approved by the" Training Commander. | **PARTIAL COMPLIANCE** |
| 282.  "CDP will revise, as necessary, its field training program for graduates of the police academy to comport with" the Training Plan and Consent Decree. | **EVALUATION DEFERRED** |

| | |
|---|---|
| 283.  "The field training program will incorporate community and problem-oriented policing principles, and problem-based learning methods." | **EVALUATION DEFERRED** |
| 284.  Review and revision of Field Training Officer ("FTO") "participation policy to establish and implement a program that effectively attracts the best FTO candidates" and "revise eligibility criteria" for FTOs. | **EVALUATION DEFERRED** |
| 285.  New FTOs and Field Training Sergeants must "receive initial and in-service training that is adequate in quality, quantity, scope, and type, and that addresses" a number of specific, expressly-listed topics and conforms to a number of additional features or requirements. | **EVALUATION DEFERRED** |
| 286.  "CDP will create a mechanism for recruits to provide confidential feedback regarding the quality of their field training," and the Division "will document its response, including the rationale behind any responsive action taken or decision to take no action." | **EVALUATION DEFERRED** |
| 287.  "Training Review Committee will, on an annual basis, analyze all aspects of CDP's FTO program," "consider emerging national policing practices in this area," and "recommend, and CDP will institute, appropriate changes to policies, procedures, and training related to its FTO program." | **EVALUATION DEFERRED** |
| 288.  "CDP will document all training provided to or received by CDP officers," with officers "sign[ing] an acknowledgement of attendance or digitally acknowledge[ing] completion of each training course," which "will be maintained in a format that allows for analysis by training type, training date, training source, and by individual officer name." | **EVALUATION DEFERRED** |
| 289.  "CDP will develop and implement a system that will allow the Training Section to electronically track, maintain, and produce complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system." | **OPERATIONAL COMPLIANCE** |
| 290.  "CDP will develop and implement accountability measures . . . to ensure that all officers successfully complete all required training programs in a timely manner." | **PARTIAL COMPLIANCE** |

## Background

Alongside new policies and improved accountability mechanisms, organizational change and the setting of new expectations comes from high-quality officer training.  For that reason, training is a major focus of the Consent Decree.  The Decree mandates comprehensive officer training to introduce CDP personnel to the many new requirements and expectations of Decree-required policies or initiatives—on things like use of force, crisis intervention, and search and seizure.  High-quality, immersive training is necessary to have officers understand and feel comfortable with new expectations.  To facilitate this substantial training, the Decree requires a number of changes to the Division's ongoing, structural capacity to train and educate its officers—focusing on things like the Academy curriculum used for training new personnel, the Field Training Officer program for training and overseeing newly-minted Academy graduates, and a Training Review Committee to set and coordinate training priorities based on the Division's needs.

Before the Consent Decree process, Cleveland's ongoing professional development of its officers was minimal and largely *pro forma*. It consisted of various Ohio state requirements, standard re-qualifications or re-certifications with various equipment and force instruments, and an assortment of scattered topics that did not align with strategic objectives or issues raised and lessons learned through real-world officer experience. Consequently, successful implementation of the Consent Decree requires the Division to adjust to a "new normal"—namely, the adoption of a new volume, quality, and conception of ongoing officer training consistent with the practices of numerous other urban police departments across the country. This adjustment is still very much a work-in-progress.

## Where the Division Stands

During the current reporting period, the Division's Training Section launched three major training initiatives in its 2018 in-service training: (1) a Community Engagement and Problem-Solving ("CEPS") training, (2) a training on Bias-Free Policing, and (3) the Second-Year Crisis Intervention Training.

Notwithstanding the Training Section's good faith efforts, the Decree envisions the use of a Training Review Committee ("TRC") in the development and ongoing assessment of CDP training. Under the Decree, the TRC is to include, alongside the Division's Training Section, District training coordinators, union representatives, and members of the Community Police Commission.[119] The TRC "will annually review and update CDP's training plan" by "conduct[ing] a needs assessment" that considers "trends in misconduct complaints; problematic uses of force; analysis of officer safety issues; input from members at all levels of CDP; input from members of the community, including community concerns; court decisions' research reflecting the latest in law enforcement trends; individual District needs; and any changes to Ohio or federal law, and to CDP policy."[120] The active and ongoing engagement of the TRC helps to ensure that in-service training for current officers is strategic and responsive to the emerging needs of CDP personnel and Cleveland residents. In short, the TRC was imagined to strategically quarterback and manage the Division's training efforts.

Although the CDP's Training Review Committee was formally created early in the Decree's implementation and officially put into place with a Court-approved policy in April 2016, the TRC's actual operations remain at best suboptimal. At worst, they are non-existent. The Monitoring Team's Third Semiannual Report in June 2017 reported that "changes in leadership in the Training Section have frustrated the Division's efforts to establish the Training Review Committee as the locus of activity with respect to identifying training needs, setting priorities, and determining what training initiatives need to happen when."[121]

It appears to the Monitoring Team that the TRC has played little to no meaningful role in reviewing or developing a training plan. As the Team described in its Fifth Semiannual Report:

> [T]he Training Review Committee appears to exist only on paper, despite it being the first policy that was completed and approved during the Consent Decree's implementation. . . . The Committee must play an active role not simply because the Consent Decree requires it but

---

[119] Dkt. 7-1 at ¶ 270.

[120] *Id.* at ¶ 271.

[121] Third Semiannual Report at 61.

because the Training Section needs to have the input and assistance of individuals from across the Division—in setting priorities, developing training, and gauging whether specific training initiatives or measures have, in fact, worked as intended.[122]

## Progress and Tasks that Remain

### Substantial and Effective Compliance with Training Review Committee Requirements

Practically speaking, the Training Review Committee exists only theoretically—on paper, not in practice.  As described above, the Decree contemplates a TRC that is the functional center for the Division's training activities and planning.  Although the Division appears to dismiss the TRC as one of a number of needless bureaucratic exercises codified in the Consent Decree, all of the departments in which the Monitoring Team's members with sworn experience have either worked or led have had some analogous structure.

The Monitoring Team looks forward to the Division finally taking the necessary steps to reengage the TRC, particularly as it develops its training plan for 2019 in-service training.

### Training Staffing & Resources

Notwithstanding the need to reengage the TRC, CDP's Training Section must be properly staffed in order to meet the substantial scope of training mandated by the Consent Decree.  One crucial element that stacked the deck against the 2018 training on community engagement and bias-free policing was the lack of dedicated, high-quality instructors.  Rather than pull from a pool of experienced trainers, the Division relied on representatives with comparatively minimal experience—all for trainings in subjects that can be notoriously demanding for training staff to conduct.

Elsewhere in this Report, the Monitoring Team notes that it largely approves of the City's staffing plan for the Division with respect to its treatment of patrol operations overall.  With respect to the staffing of specialized units—like Training—the Parties and Monitoring Team agree that future discussion and refinement will be necessary to identify, in the long run, what the appropriate levels should be.

The Monitoring Team has previously urged that CDP consider devoting additional resources to the Training Section to ensure that it can balance both the critical and extraordinary demands of training up five recruit classes—not a requirement of the Consent Decree but a practical reality in light of officer attrition rates and the City's public commitments—while making sufficient progress on the Consent Decree.

### Academy Training and Field Training Program

Along with requirements for annual in-service training for existing CDP officers, the "Consent Decree . . . contains certain obligations relating to the training of new officers at the Academy."[123]  Likewise, it contains provisions

---

[122] Fifth Semiannual Report at 116.
[123] Dkt. 97 at 55; Dkt. 7-1 ¶¶ 271, 275, 277.

relating to the Division's field training program, in which recent Academy graduates participate during their early days on the force.[124]

Given the scope of in-service training that the Decree requires, the City and Division's focus for the first half of the Decree's implementation has been on developing and implementing core training for current CDP officers. As the Division turns to academy and field training, especially now that new recruits are back to being trained in Cleveland, CDP will need to "review and revise" its academy and field training programs such that they are meeting the requirements of the Decree.[125]

The Monitoring Team will be very clear here: the training being offered to new recruits in the Academy and to new officers via the Field Training Program has not yet been worked on by the Consent Decree and will need to be comprehensively evaluated and revised, as necessary, in order for the Division to reach substantial and effective compliance with the Consent Decree. It must also be noted that it is not just the revision of curriculum that is necessary: it is the verified, meaningful implementation through high-quality instruction on that curriculum in the Academy that will be necessary for compliance.

## B.    Equipment & Resources

| Paragraph | Status of Compliance |
|---|---|
| 291. "The City will implement" paragraphs regarding equipment and resources in order to allow implementation of the Consent Decree "and to allow officers to perform their jobs safely, effectively, and efficiently." | **PARTIAL COMPLIANCE** |
| 292. "CDP will complete a comprehensive equipment and resource study to assess its current needs and priorities," and it "will develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." | **PARTIAL COMPLIANCE** |
| 293. "CDP's Equipment and Resource Plan will provide for necessary equipment including, at least" "an adequate number of computers"; "an adequate number of operable and safe zone cars"; "zone cards with reliable, functioning computers that provide officers with up-to-date technology" including computer-aided dispatch, the records management system, and various core law enforcement systems; and "zone cards equipped with first-aid kits." "This plan also will ensure that CDP properly maintains and seeks to continuously improve upon existing equipment and technology; and is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." | **PARTIAL COMPLIANCE** |
| 294. "CDP will actively seek input and feedback from the Commission, patrol officers, and supervisors regarding resource allocation, equipment needs, and technological improvements." | **PARTIAL COMPLIANCE** |
| 295. "City and CDP" must "us[e] best efforts to implement the Equipment and Resource Plan as required." | **PARTIAL COMPLIANCE** |

---

[124] Dkt. 7-1 ¶¶ 282–87.

[125] Id.

| 296. "CDP will . . . implement an effective, centralized records management system." | **PARTIAL COMPLIANCE** |
|---|---|
| 297. "CDP will utilize a department-wide e-mail system to improve communication and information sharing." | **PARTIAL COMPLIANCE** |
| 298. "CDP will employ information technology professionals who are trained to conduct crime and intelligence analysis, who are capable of troubleshooting and maintaining information technology systems and who can identify and suggest appropriate technological advancements." | **PARTIAL COMPLIANCE** |
| 299. "CDP will implement an effective employee assistance program that provides officers ready access to the mental health and support resources necessary to facilitate effective and constitutional policing." | **PARTIAL COMPLIANCE** |

## Background

To address the Division's equipment and resource needs, the Consent Decree requires the City of Cleveland to "develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement."[126] The Plan must "provide for necessary equipment including, at least . . . an adequate number of computers; an adequate number of operable and safe zone cars; zone cars with reliable, functioning computers that provide officers with up-to-date technology, including" mobile computer-aided dispatch ("CAD"), access to the Division's records management system ("RMS"), and access to law enforcement databases; and "zone cars equipped with first-aid kits . . . ."[127] It must address how the Division will satisfy the other substantive requirements of the Decree.[128] It likewise must "ensure that CDP" both "properly maintains and seeks to continuously improve upon existing equipment and technology" and "is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies."[129]

## Where the Division Stands

During the current reporting period, the City of Cleveland and CDP reached several important milestones with respect to technology, equipment, and resources. Previously, the City had developed an Equipment and Resource Plan in 2017 (the "2017 Plan"). The Monitoring Team approved some portions of the Plan, particularly those involving overdue upgrades to CDP's CAD platform and modernizing CDP's fleet of patrol vehicles, but declined to approve the 2017 Plan with respect to paragraphs 292; 293(a), (e), and (f); 294; and 298. Of greatest importance, the Plan needed to outline a clear process for identifying emerging technology and equipment needs within the Division in the future.

In October 2018, the City completed a subsequent Equipment and Resource Plan ("2018 Plan") that further outlined the Division's strategic goals to strengthen its equipment and information technology platforms in a manner that will enhance CDP's ability to promote officer and public safety. Critically, the 2018 Plan focuses on the mechanisms that will ensure that CDP remains up-to-date with respect to emerging technology and

---

[126] Dkt. 7-1 ¶ 292.

[127] Id. ¶ 293.

[128] Id. ¶ 292.

[129] Id. ¶ 293.

equipment.  For example, the 2018 Plan includes, among other things, an IT governance strategy that holds staff accountable for upgrading and maintaining applications, systems, and technology.  It also establishes an oversight committee to continually identify and implement new technologies and IT investments.  On November 2, 2018, in a motion to the Court, the Monitoring Team concluded that "the 2018 Plan, when and only when taken together with the previously-approved portions of the 2017 Plan, constitutes a complete and satisfactory Equipment and Resource Plan that meets the terms of the Consent Decree."[130]

The completion of the Equipment and Resource Plan is an extremely positive milestone for which the City, and especially its IT staff, should be commended.  It establishes a meaningful foundation for the hard work already being conducted toward modernizing the Division of Police and a specific playbook for technological upgrades still necessary.

## Progress and Tasks that Remain

In the coming reporting period and over the remainder of the Consent Decree's term, the Monitoring Team plans to conduct systemic assessments to evaluate whether the City's reported upgrades to equipment and technology, as well as the steps outlined in the 2018 Equipment and Resource Plan, are occurring as contemplated and whether the changes are, in fact, improving the day-to-day operations of CDP staff.   It remains critical that officers have access to modern, well-maintained, and up-to-date technological platforms so that they have the tools they need to do their jobs safely and effectively.

## C.    Recruitment & Hiring

| Paragraph | Status of Compliance |
|---|---|
| 300.  "CDP will review and revise . . . its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals." | **PARTIAL COMPLIANCE** |
| 301.  "The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP." | **GENERAL COMPLIANCE** |
| 302.  "CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community" and meets certain specific, expressly-listed requirements. | **EVALUATION DEFERRED** |
| 303.  "The City will implement the recruitment plan within 60 days of it being approved by the Monitor." | **EVALUATION DEFERRED** |
| 304.  "CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants," including officers with various, specific, expressly-listed skills and backgrounds. | **PARTIAL COMPLIANCE** |
| 305.  "In developing and implementing its recruitment plan, CDP will consult with the [Community Police] Commission and other community stakeholders on strategies to attract a diverse pool of applicants." | **PARTIAL COMPLIANCE** |

---

[130] Dkt. 226 at 6.

| | |
|---|---|
| 306.  "[O]bjective system for hiring and selecting recruits" that "employs reliable and valid selection criteria." | **PARTIAL COMPLIANCE** |
| 307.  "CDP will report annually to the public its recruiting activities and outcomes," which will include information on various, expressly-listed areas. | **EVALUATION DEFERRED** |
| 308.  "[A]ll candidates for sworn personnel positions" will have "psychological and medical examination" and be subject to "drug testing."   Existing officers receive "random drug testing." | **GENERAL COMPLIANCE** |
| 309.  "CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions" that cover various, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 310.   "CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's supervisor(s)" and maintain any "salient information . . . in candidate's file." | **OPERATIONAL COMPLIANCE** |
| 311.  "If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation" addressing various expressly-identified things. | **OPERATIONAL COMPLIANCE** |

## Background

The Consent Decree requires the City to "integrate community and problem-oriented policing principles" into its recruitment practices, and to "develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community . . . [and] establish[es] and clearly identif[ies] the goals of CDP's recruitment efforts."[131]

## Where the Division Stands Now

After holding five academy classes for recruits in 2018, the Division welcomed an academy class of 51 new police recruits on January 28, 2019.  The Division's goal is to hire an additional 100 officers in the first quarter of 2019.

The City released a proposed Recruitment and Hiring Plan to the public for review and feedback in May 2018.  The period of engagement and input, originally scheduled for August 10, 2018, was extended to September 28 following requests by several community groups for additional time.   The CPC provided its comments on September 28, together with its feedback regarding the CPOP Plan, highlighting community feedback such as educational requirements and the recruitment of individuals with social work degrees.

The Parties and Monitoring Team worked to consider and incorporate the community's concerns into the final Recruitment and Hiring Plan as appropriate.  On February 14, 2019, the Monitoring Team submitted the Plan for the Court's approval.[132]  The Court approved the Plan on February 20, 2019.[133]

The final Plan has three primary objectives: (1) "[i]ncrease staffing levels to effectively implement [the Division's] Community and Problem-Oriented Policing Plan (CPOP)"; (2) "[a]ttract and hire a diverse group of qualified

---

[131] Dkt. 7-1 ¶ 302.
[132] Dkt. 236.
[133] Dkt. 239.

applicants from a broad cross-section of the community"; and (3) "[c]reate and maintain partnerships with community stakeholders to enhance recruitment efforts."[134]

As part of the Plan's development, the City created a Public Safety Recruitment Team ("PSRT") consisting of two police officers, one firefighter, one emergency medical technician, and a CDP Sergeant who serves as the Officer-in-Charge. The Officer-in-Charge reports directly to the Assistant Director of Public Safety and leads the management and implementation of the Recruitment and Hiring Plan. PSRT team members are required to receive training on effective recruitment techniques, including ways to increase diversity in law enforcement.[135] PSRT members have already attended law enforcement recruitment conferences to enhance their understanding of recruitment best practices.

The Recruitment and Hiring Plan appropriately understands that the Division's new philosophical charge is to institute CPOP at all levels. To that end, the PSRT is specifically charged to "[i]dentify those individuals most suited with the ability to integrate the CPOP principles in the discharging of their duties."[136]

The Recruitment and Hiring Plan includes specific steps to recruit a diverse pool of applicants, including the establishment of a Hiring Process Review Committee that reviews "every aspect of the hiring process" including "applications, entry level testing, interviews, and selection process" as well as "medical and psychological testing and all aspects of training" to ensure that "minorities and women" are not being "excluded during the hiring process by unfair standards that [do] not correlate with their ability to do the job."[137]

The Plan also documents steps that the PSRT has already taken since 2018 to minimize unnecessary barriers for potential applicants, such as waiving the $25 fee for the entry-level exam, offering a second chance at the physical agility test, assigning four additional officers to conduct background investigations to shorten the wait time after an applicant's interview, and raising the pay of recruits in the Academy from $10.50 to $15/hour.[138]

Under the final Plan, the Director of Public Safety will analyze "data obtained through stakeholder outreach, the annual report from the PSRT, the statistical information gathered by the City's online application service provider, NEOGOV, the testing consultant[,] and [the CDP's Data Collection and Analysis Coordinator]" to assess "if the recruitment strategy has resulted in attracting sufficient candidates to staff CDP at levels necessary for CPOP."[139]

### Progress and Tasks that Remain

Following the Court's approval of the Recruitment and Hiring Plan, CDP must "report annually to the public its recruiting activities and outcomes," including disaggregated data on applicants, interviewees, and selectees, as well as the successes and challenges to recruiting qualified and high-quality applicants.[140] The Monitoring Team will

---

[134] Dkt. 236-1 at 7.
[135] *Id.* at 13-14.
[136] *Id.* at 15.
[137] *Id.* at 17.
[138] *Id.* at 19.
[139] *Id.* at 6.
[140] Dkt. 7-1 at ¶ 307.

continue to gauge progress by analyzing the numbers and trends with respect to applicants and hired recruits, as well as by working with the City to provide ongoing technical assistance on the Plan's implementation.

## D.    Performance Evaluations and Promotions

| Paragraph | Status of Compliance |
|---|---|
| 312.  "CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process" and "are identified and receive appropriate consideration for performance."  Likewise, "poor performance" must be "reflected in officer evaluations." | **EVALUATION DEFERRED** |
| 313.  "CDP will develop and implement fair and consistent practices to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis." | **EVALUATION DEFERRED** |
| 314–15.  CDP will use "a formalized system documenting the annual performance evaluations of each officer by the officer's direct supervisor," including an assessment of several expressly-listed areas.  "Supervisors will meet with the employee whose performance is being evaluated to discuss the evaluation." | **EVALUATION DEFERRED** |
| 316.  "CDP will hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates." | **EVALUATION DEFERRED** |
| 317.  "CDP will develop and implement fair and consistent promotion practices that comport with the requirements of this Agreement and result in the promotion of officers who are effective and professional." | **EVALUATION DEFERRED** |
| 318.  In considering promotion, "appointing authority will consider" specific, expressly-listed "factors." | **EVALUATION DEFERRED** |

### Background

CDP must address how it evaluates officer performance and must ensure that high-performing officers have access to promotional opportunities.  Under the Consent Decree, CDP must "develop and implement fair and consistent practices to accurately evaluate officers" across a number of dimensions, including 'integrity, community policing, and critical police functions.'"[141]

### Where the Division Stands

By the express agreement of the Parties and the Monitoring Team, CDP has not begun reforms to CDP's performance evaluations given the importance of first addressing policies and plans such as use of force, community and problem-oriented policing, crisis intervention, and bias-free policing.  For that reason, and through no fault of its own, the City is not yet in compliance with the provisions of this section of the Decree.

---

[141] Dkt. 7-1 at ¶ 313.

## Progress and Tasks that Remain

Now that the Parties have completed major plans and policies such as the CPOP Plan, the City and CDP need to turn their attention to officer performance evaluations in 2019. This work, which must align with the new expectations that have been set by new and Court-approved policies and plans, will greatly enhance professional development opportunities within the Division and provide an important, non-punitive mechanism for employee management.

## E.  Staffing

| Paragraph | Status of Compliance |
|---|---|
| 319.  "CDP will complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform the functions necessary for CDP to fulfill its mission, and satisfy the requirements of the" Consent Decree. / "CDP will develop an effective, comprehensive Staffing Plan that is consistent with its mission, including community and problem-oriented policing, and that will allow CDP to meet the requirements of" the Consent Decree. | **EVALUATION DEFERRED** |
| 320.  Requirements of CDP Staffing Plan. | **EVALUATION DEFERRED** |
| 321.  "The City and CDP will employ best efforts to implement the Staffing Plan over the period of time set forth in the approved plan." | **EVALUATION DEFERRED** |

## Background

The Consent Decree contemplates changes to CDP's approach to staffing, assigning, and deploying its personnel within the city of Cleveland. Under the requirements of the Decree, for example, CDP must:

- Implement a "comprehensive and integrated policing model"[142];
- Ensure rigorous investigations and reviews of force incidents[143];
- Ensure that specialized crisis intervention officers "are dispatched to an incident involving an individual in crisis" and are able to "have primary responsibility for the scene"[144];
- Provide supervisors with the ability to "review all documentation of investigatory stops, searches, and arrests"[145];
- Ensure that officers can receive the training required by the Decree[146];
- Provide necessary opportunity for "first line supervisors [to] provide close and effective supervision of officers"[147];

---

[142] Dkt. 7-1 at ¶ 27.

[143] *Id.* at ¶¶ 93-130.

[144] *Id.* at ¶ 151.

[145] *Id.* at ¶ 168.

[146] *Id.* at ¶ 271.

[147] *Id.* at ¶ 322.

- Implement the Early Intervention System[148]; and
- Provide supervisors with the ability to "conduct adequate random and directed audits of body worn camera recordings."[149]

Altogether, these provisions require changes in the way that CDP will deploy its existing personnel and in the overall number of sworn and civilian personnel.  To that end, the Consent Decree specifically envisions a Staffing Plan by which the CDP must "address and provide for each of the following:

- "[P]ersonnel deployment to ensure effective community and problem-oriented policing;
- "[A] sufficient number of well-trained staff and resources to conduct timely misconduct investigations;
- "[T]o the extent feasible, Unity of Command; and
- "[A] sufficient number of supervisors."[150]

## Where the Division Stands Now

In the current reporting period, the Division, working with the Department of Justice and Monitoring Team, completed the Decree-mandated Staffing Plan.  A draft of the Staffing Plan was released in late May 2018 for public collaboration and feedback.  The public comment period ran to September 28, 2018, following an agreed-upon extension from August 10.  The CPC provided its comments on September 28, along with its comments on the two related CDP plans.

The Parties and Monitoring Team worked to incorporate the community feedback into the Staffing Plan as appropriate.  On February 21, 2019, the Monitoring Team recommended that the Court approve the Staffing Plan.[151]

Under the Plan, CDP will adjust staffing of its Patrol Section based on a "workload-based model" that estimates future staffing needs and deployment strategies by modeling current police activity.  To do so, CDP analyzed past citizen-initiated calls for service by location, time, type, officer time spent, and priority code.[152]  Critically, the Staffing Plan allocates 20% of officers' time to community engagement and collaborative problem-solving, in line with the Division's new CPOP expectations.[153]  The Plan also addresses ways for CDP to manage demand for police services.  For example, CDP responded to 23,659 residential and business alarms in 2015—of which 98% were false.  Under the Staffing Plan, the Division will look to "control and reduce the frequency of false alarms through legislation and increasing the capacity of the Web-based Crime Reporting [an online reporting system CDP currently uses for certain no-suspect or minor crime reports for which officers need not physically respond to the scene][.]"[154]

---

[148] *Id.* at ¶ 326-36.

[149] *Id.* at ¶ 339.

[150] *Id.* at ¶ 320.

[151] Dkt. 240.

[152] Dkt. 240-1 at 20-29.

[153] *Id.* at 33.

[154] *Id.* at 44.

## Progress and Tasks that Remain

Major sections of the Decree, not least of all the Division's efforts to implement community and problem-oriented policing, depend on the Division's ability to make the operational changes contemplated in the approved Staffing Plan.  The Monitoring Team looks forward to working with the Division and City of Cleveland to ensure that implementation of the Plan proceeds so that the Division is appropriately staffed to promote public and officer safety.

## XII.    SUPERVISION

### A.    First-Line Supervisors

| Paragraph | Status of Compliance |
|---|---|
| 322.  "CDP will ensure that first line supervisors provide close and effective supervision of officers" in a number of express, specifically-identified ways. | **PARTIAL COMPLIANCE** |
| 323.  "CDP will develop and implement supervisory training for all new and current supervisors" that is "adequate in quality, quantity, type, and scope, and will include" a number of specific, expressly-listed topics. | **EVALUATION DEFERRED** |
| 324.  "Thereafter all sworn supervisors will receive adequate in-service management training." | **EVALUATION DEFERRED** |
| 325.  "CDP will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community." | **EVALUATION DEFERRED** |

**Background**

The Consent Decree requires CDP to ensure "close and effective supervision of officers."[155]  Supervisors must be held "directly accountable for the quality and effectiveness of their supervision" of officers in their command.[156]

In addition to various new policies aimed at more clearly and specifically defining the various roles and duties of supervisors, the Consent Decree requires supervisory training for "all new and current supervisors" covering an array of important topics, including:

- Techniques for effectively guiding and directing officers and promoting effective and constitutional police practices;
- De-escalating conflict;
- Evaluating written reports, including identification of canned or conclusory language that is not accompanied by specific facts;
- Investigating officer uses of force;
- Building community partnerships and guiding officers on this requirement;
- Understanding supervisory tools such as the Officer Intervention Program and body worn cameras;
- Responding to and investigating allegations of officer misconduct;
- Evaluating officer performance;
- Consistent disciplinary sanction and non-punitive corrective action;
- Monitoring use of force to ensure consistency with policies; and
- Legal updates.[157]

---

[155] Dkt. 7-1 ¶ 322.

[156] *Id.* ¶ 325.

[157] Dkt. 7-1 ¶ 323.

## Where the Division Stands

In the current reporting period, the Division completed a revised Use of Force Supervisory Review Policy that defines expectations and responsibilities for supervisors to investigate lower-level uses of force. The policy outlines how supervisors responding to the scene of a use of force will conduct investigations and how supervisors further up the chain of command will review completed investigations to ensure they are thorough, complete, and supported by the preponderance of the evidence. It provides a strong foundation for the rigorous and objective review of force incidents geared toward the Division continually learning and innovating—so that officers are safer, outcomes are consistent with law and policy, and the community receives the quality of public safety services that it needs. In light of the new policies, the Division has been working on a training curriculum to instruct new and current supervisors on the new protocols established in the policy.

Separately, the Division has developed a supervisor training curriculum that covers principles of effective supervision in policing, including how to effectively counsel officers and correct poorly written reports. The training also covers the Division's new progressive disciplinary matrix and newly-formalized philosophy of community and problem-oriented policing. The Monitoring Team submitted the curriculum for the Court's approval on February 28, 2019.[158]

## Progress and Tasks that Remain

### Continuing Professional Development

As the Division is set to launch supervisor training in the coming months, the Monitoring Team here reiterates that CDP needs to develop a clear track for supervisors to develop as professionals. Supervisors must be able to think proactively and affirmatively about how to implement the Division's mission, values, and strategic initiatives on a day-to-day basis—and how to ensure that their officers are performing at the level necessary to keep themselves and Cleveland safe.

The initial training on departmental policies and leadership skills outlined above, and occurring in the upcoming months, is a good and critical start. However, this represents only one training initiative. As many police departments across the country have increasingly recognized, the skills that make someone a good police officer—in terms of handling unfolding incidents or responding to rapidly evolving situations—is not always consistent with the skills necessary to be a good police manager—such as overseeing employees, implementing and executing on the organization's strategic goals, and the like. As with other professions, law enforcement increasingly recognizes that good leaders are more often made rather than born, and that even individuals with strong leadership skills can benefit from developing them further.

Consequently, the Monitoring Team looks forward to the development of a formalized leadership development program that will greatly enhance the quality and effectiveness of the Division's supervision. It may also help the Division retain its best supervisors, who may better identify opportunities for professional and personal growth as a result of a formalized career development pathway. The Division has previously indicated a desire and willingness to build such a comprehensive program for its supervisors, perhaps in conjunction with local

---

[158] Dkt. 243.

community partners like universities, businesses, and community organizations. The Monitoring Team looks forward to CDP's plans to create such a program.

### Data and Compliance and Outcome Measures

As indicated above, the Consent Decree requires that CDP rigorously track instances in which supervisors identify problematic performance and log supervisors' responses when such problems are identified. The Division still needs to implement a process for systematically tracking this information so that it can monitor, in aggregate, the performance of its supervisors. In the short-term, the Monitoring Team will use such information, as required by the Decree, to assist the Court in gauging compliance and outcomes. In the long-term, CDP and the City need this information to understand how the organization, as a whole, is performing.

In the coming reporting periods, the Monitoring Team will evaluate and assess supervisor performance in the context of its comprehensive reviews of use of force, crisis intervention, and Internal Affairs incidents or investigations.

### B.    Officer Intervention Program

| Paragraph | Status of Compliance |
|---|---|
| 326.  CDP "will create a plan to modify its Officer Intervention Program ('OIP') to enhance its effectiveness as a management tool to promote supervisory awareness and proactive identification of potentially problematic behavior among officers. | **EVALUATION DEFERRED** |
| 327.  "CDP supervisors will regularly use OIP data to evaluate the performance of CDP officers across all ranks, units, and shifts." | **EVALUATION DEFERRED** |
| 328.  "The OIP will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" in a number of specific, expressly-identified areas. | **EVALUATION DEFERRED** |
| 329.  "CDP will set threshold levels for each OIP indicator that will trigger a formal review, and the thresholds will allow for peer-group comparisons between officers with similar assignments and duties." | **EVALUATION DEFERRED** |
| 330–36.  Additional express requirements of OIP. | **EVALUATION DEFERRED** |

### Background

The Consent Decree requires that CDP's existing Officer Intervention Program be comprehensively transformed into an effective "early intervention system." As the Monitoring Team has previously outlined, an early intervention system ("EIS") is a proactive risk assessment tool that provides individualized supervision and support to officers in order to manage risk. An effective EIS relies on a database that logs information on officer activities—such as stops, arrests, uses of force, firearm discharges, and citizen complaints—and allows police departments to identify problematic patterns of behavior by individual officers or groups of officers who may need non-disciplinary intervention and support. It also may flag issues such as operating a vehicle under the influence.

Specifically, the Decree requires that the Division's OIP become a broader management tool that will "proactive[ly] identif[y] . . . potentially problematic behavior among officers" and provide non-punitive supervisory intervention in order to "modify officers' behavior and improve performance" before the performance gradually becomes deep-seated and difficult to resolve.[159]  The Decree requires the implementation and use of "a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" on officer performance.[160]

## Where the Division Stands

Since early on in the implementation of the Consent Decree, the Monitoring Team has supported the City and CDP's decision to postpone the development of an EIS while the City makes the information technology upgrades that are essential to an EIS.  Those upgrades have since included improvements to the Division's use of IAPro (and its related web-based interface, BlueTeam, that will serve as an online "one-stop shop" for information about officer performance in the field); developing a stronger data platform that can manage improvements in data collection methods; an enhanced focus on tracking discipline; and a successful reshaping of the crisis intervention response.[161]

In the current reporting period, the Parties and Monitoring Team have begun the first steps of planning to develop an EIS that meets the requirements of the Consent Decree.  The Fourth-Year Monitoring Plan contemplates initial work on implementing the type of early intervention process and infrastructure—informed by the broader and more reliable data being logged in the Division's IAPro and other data systems—that the Decree requires.  The transition of some of the Division's existing work in the employee assistance area to the Early Intervention System required by the Decree promises to provide CDP and its personnel with an additional professional development opportunity—especially as, contrary to the impression of some personnel currently, the Decree-required process is a non-disciplinary process aimed at enhancing an officer's performance and skills so that minor issues do not become significant problems in the future.

## Progress and Tasks that Remain

### Creation of EIS Plan

As described above, the City and Division plan to draft an EIS Plan in the upcoming reporting period.  The Monitoring Team looks forward to working with the Division to develop a plan that satisfies the Decree's requirements.

### Training & Involvement of Supervisors

As the CDP formalizes its EIP plan, supervisors must be required (and should be trained) to regularly review performance data generated by the EIP.  When an officer reaches some defined threshold in a performance

---

[159] Dkt. 7-1 at ¶¶ 326-27.

[160] *Id.* at ¶ 328.

[161] *See* Third Semiannual Report at 69.

indicator, a supervisor will be required to assess an officer's performance to determine whether it may appropriate to intervene and identify and treat any issue that may impacting the officer's work.

### *Training & Communication with Officers*

It is clear that the success of a revamped EIS will substantially hinge on the Division's communication with its officers.  As the Parties turn their attention to the Early Intervention System, communication and outreach to officers about what the system is and does—and what it is not and does not do—will be critical.  The EIS contemplated by the Consent Decree is entirely non-punitive.  If an officer's performance is reviewed in the context of EIS, the most that may happen is for the officer to eventually be paired with training, mentoring, counseling, or coaching that might serve as appropriate professional development resources.

CDP's EIS plan, policies, training, and implementation going forward will need to establish definitively that the purpose of EIS will not be to find new ways to discipline officers.  Again, however the Division ultimately crafts its plan to implement an EIS, it must properly ensure that all employees understand what an EIS is—a non-punitive system for the benefit of people's careers and professional growth—and what it is not.

### *Compliance with EIS Plan & Policies*

After an EIS plan is developed, relevant policies written and approved, and training for supervisors and officers developed and completed, the EIS will need to be implemented.  Once it is and has been actively running for a material period of time, the Monitoring Team will need to audit and evaluate whether the system is proceeding according to the requirements of policy and the Consent Decree—and whether, ultimately, it appears to be assisting the Division in identifying instances where non-disciplinary action or intervention might enhance the quality of officer performance.

### C.      Body-Worn Cameras

| Paragraph | Status of Compliance |
|---|---|
| 337.  "If CDP chooses to use body worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals." | **PARTIAL COMPLIANCE** |
| 338.  "Supervisors will review recordings related to any incident involving at least a Level 2 or 3 use of force; injuries to officers; and in conjunction with any other supervisory investigation." | **PARTIAL COMPLIANCE** |
| 339.  "Supervisors will conduct adequate random and directed audits of body worn camera recordings" and "incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers." | **PARTIAL COMPLIANCE** |
| 340.  "Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy." | **PARTIAL COMPLIANCE** |

## Background

Although the "use of body worn cameras is not required by" the Consent Decree, the Decree does contain requirements if CDP decides to institute body cameras. [162]  In 2013, the Division elected to begin using body-worn cameras.  In doing so, CDP was required to "provide clear guidance and training on their use, and . . . implement protocols for testing equipment and preservation of recording to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals."[163]  The Decree also outlines supervisor responsibilities for viewing recorded incidents and "conduct[ing] adequate random and directed audits of body worn camera recordings . . . to confirm compliance with CDP policy."[164]  CDP must also ensure that officers are "subject to the disciplinary process for intentional or otherwise unjustified failure to activate" cameras in accordance with CDP policy.[165]

Currently, all CDP patrol officers are equipped with and trained on Taser's Axon 2 camera system and are expected, under policy, to use them when working a City shift.

## Where the Division Stands

In the current reporting period, the Parties and Monitoring Team have not actively worked on issues relating to body-worn cameras.  The Division and its officers continue to use them to capture incidents and interactions.

## Progress and Tasks that Remain

### *Compliance with Policy*

The Monitoring Team will need to ensure that the Division is meaningfully holding officers accountable for complying with the various provisions of the body-worn camera policy—not just in isolated incidents, or when other problematic performance brings a certain incident to the Division's attention, but across time and officers.

Especially as the Parties and Monitoring Team have discussed issues related to staffing and supervision, it is clear that mandates related to first-line supervisors watching body-worn camera footage may be taking supervisors away from responding to incidents on the street, where they could more proactively and affirmatively shape the performance of officers under the command.  As discussed in the prior Semiannual Report, the City and Division may still wish to reconsider the "random reviews" of camera footage outlined in the approved body-worn camera policy[166] in favor of a more effective review mechanism that both ensures widespread officer compliance with the policy but does not overly burden supervisors and detract from time they should be spending supervising officers.[167]

---

[162] Dkt. 7-1 at ¶ 337.

[163] *Id.* at ¶ 337.

[164] *Id.* at ¶¶ 338-39.

[165] *Id.* at ¶ 340.

[166] Dkt. 92-1 at 7-8, Section IV-A.

[167] Fifth Semiannual Report at 141.

### General Policy for the Release of CDP Information

The Monitoring Team has previously expressed reservations about how community members, under CDP's new policy, are able to view incidents captured on body-worn cameras.[168]  The Team again encourages the City and CDP to establish a general policy for the release or provision of records, data, or information—including the footage of body-worn cameras—to the public.  For as much as body-worn cameras are associated with transparency and accountability in the national policing discourse, they can only achieve their desired purpose if appropriate protocols are in place that establish when and how the public is able to access such information.

---

[168] *See* Dkt. 92 at 16-17; Fifth Semiannual Report at 141.

## XIII.    UPCOMING COMPLIANCE & OUTCOME ASSESSMENTS

The preceding sections have summarized some of the overall aggregate data available that bears on compliance with topics such as use of force.

In the upcoming reporting period, the Monitoring Team's structured compliance reviews and audits—both qualitative and quantitative—will intensify.  In June 2019, the next year of comprehensive outcome assessment data will be available.  Likewise, as new and revised policies become finalized and move towards real world implementation, the Monitoring Team will continuously assess the Division's ability to produce safe, effective, and constitutional policing.

The Team looks forward to the City and CDP completing necessary data infrastructure improvements, which will allow the Team to review both qualitative and quantitative outcomes to observe how the terms of the Consent Decree—covering community policing, bias-free policing, stops and arrests, crisis intervention, use of force, accountability, and more—are affecting the actual day-to-day operations of the Cleveland Division of Police.



# Cleveland Police Monitoring Team

**Matthew Barge**
Monitor

**Commissioner Charles H. Ramsey (ret.)**
Principal Deputy Monitor

**Chief Hassan Aden (ret.)**
Deputy Monitor

**Chief Timothy Longo (ret.)**
Director of Implementation

**Charles R. See**
Director of Community Engagement

**Christine Cole**
Director of Outcome Measures

**Dr. Modupe Akinola**
**Chief Joseph Brann (ret.)**
**Brian Center**
**Dr. Randolph Dupont**
**Maggie Goodrich**
**Ayesha Hardaway**
**Ganesha Martin**
**Richard Rosenthal**
**Victor Ruiz**
**Captain Scott Sargent (ret.)**
**Dr. Ellen Scrivner**
**Sean Smoot**
**Timothy Tramble**
Monitoring Team

**Brian Chen**
**Barry Friedman**
**Maria Ponomarenko**
*NYU School of Law Policing Project*
Consultants

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 5, 2019, I served the foregoing document entitled Notice Submitting Monitoring Team's Sixth Semiannual Report via the court's ECF system to all counsel of record.


/s/  Matthew Barge
MATTHEW BARGE