IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | |
| CITY OF CLEVELAND, | ) | |
| | ) | **CITY OF CLEVELAND'S** |
| Defendant. | ) | **SEVENTH  STATUS  REPORT** |

## I. Introduction

The Settlement Agreement/Consent Decree entered in this matter provides that the

City is to file a semi-annual status report. Paragraph 387 of the Consent Decree

establishes:

> This report will delineate the steps taken by CDP during the reporting period to
> comply with this Agreement; CDP's Assessment of the Status of its progress; plans
> to correct any problems; and response to concerns raised in the Monitor's previous
> semi-annual report.

The City files its Seventh Status Report.

### A. Third Year Monitoring Plan

This report primarily addresses the activities undertaken during the second half of

the Third Year Monitoring Plan (Dkt. 195-1), which was approved by the Court on May

3, 2018. (Dkt. 197). Important activities undertaken during the second half of the Third-Year

Monitoring Plan included finalization and court-approval of a comprehensive Community and

Problem-Oriented Policing Plan ("CPOP"), CDP's staffing plan, CDP's equipment and resources

plan, the Department of Public Safety's recruiting and hiring plan, and the District Policing

Committee Plan. Significant effort was also undertaken during this period to complete separate CDP policies addressing "search and seizure" and officer in-service training, which should be finalized shortly. CDP is very close to finalizing new operating manuals for CDP's Force Investigation Team ("FIT") and office of Internal Affairs.

### B.  Monitor's Sixth Semi-annual Report

The Monitor Team released its "Sixth Semiannual Report and Comprehensive Re-Assessment" on March 5, 2019 recognizing that "a number of major plans and initiatives have been finalized." (Sixth Report, Dkt. 246, p. 2). The Monitor's Sixth report reviews and details the progress made by the City during the second half of the third year monitoring plan. Filing of the Monitor's most recent report coincided with a public status conference conducted by Judge Oliver that focused on the Consent Decree related accomplishments to date; while also allowing for discussion on future activities under the new Fourth Year Monitoring Plan.

In discussing the CDP's continuing hard work and progress toward full compliance with the Consent Decree, the Monitor recognizes that CDP is now "on the cusp of a major turning point." (Sixth Report, Dkt. 246, p. 2). This characterization arises from a recognition that "most of the foundational policy development and process refinement work" will soon be completed, with the focus now transitioning "from establishing how the Division and its officers must operate to ensuring that they do, in fact, perform according to the expectations established in the Decree and the various Court-approved policies and plans." (*Id*). In other words, going into the fourth year monitoring plan "the task of active implementation [will be] increasingly occupying the focus of the Division's efforts." (*Id.*).

The Monitor's Sixth Report clearly "finds the City and Division of Police arriving at a noteworthy and critical milestone that is the culmination of the substantial work and community input and participation." (*Id.* at p.3).

## II. Steps Taken by the Cleveland Division of Police and the City of Cleveland During the Reporting Period.

As with the City's previous reports, the activities and milestone events addressed during this reporting period are discussed in the City's Seventh Status Report in the following order:

A.  Community and Problem-Oriented Policing,
B.  Use of Force,
C.  Crisis Intervention,
D.  Officer Training,
E.  Accountability
F.  Equipment and Resources,
G.  Data Collection and Analysis/ Compliance and Outcome Assessments and Reporting
H.  Bias Free Policing, and
I.  Compliance and Outcome Assessments and Reporting.        .

## A. Community and Problem-Oriented Policing

## 1. Cleveland Community Police Commission ("CPC")

The Monitor's Sixth Semi-Annual Report provides the reader with a detailed and nuanced look at the role of the CPC in the Consent Decree process and activities that the Commission undertook in the last half of the third year monitoring plan. (*Id.* at pp. 7-11).

### a. CPC Review of CDP Policies

The Consent Decree provides that the CPC is to "make recommendations for additional strategies for the CDP to consider to increase community engagement with and community confidence in CDP." (Dkt. 7-1, ¶ 17(c). The Monitor notes particularly that during the reporting period "the CPC facilitated a substantial community input period for

three major and interrelated CDP plans: the Community and Problem-Oriented Policing ("CPOP") Plan, the Recruitment and Hiring Plan, and the Staffing Plan." (Dkt. 246 at p. 8).

Additionally, the Consent Decree provides the CPC with authority to "review and comment on CDP's policies and practices related to …search and seizure…" (Dkt.7-1, at para. 18(a).  The CPC actively undertook to 'review and comment" as the CDP worked to finalize new Division-wide "Search and Seizure" related policies. After engaging with outside legal resources and community stakeholders, the CPC provided the City and CDP with comments and recommendations that addressed the proposed new policies. Representatives from the City and CDP, the Monitor Team and DOJ, met on two occasions with CPC representatives and individuals associated with the different legal and community stakeholder groups that had assisted the CPC in preparing its Search and Seizure policy recommendations. These meetings involved direct, give and take discussions that allowed for a considered exchange of ideas between those in attendance. Following the discussions the CDP incorporated a number of the proposed recommendations. The Search and Seizure policies are close to being finalized and the City anticipates the policies will be filed for approval of the Court in the immediate near future.

b. **CPC Organization**

The Consent Decree provides that "[v]acancies within the original four year term will be filled in the same fashion as the original appointments." ((Dkt. 7-1, at para. 16). In July two of the original appointed commissioners, Amanda King and Dylan Sellers, resigned from the Commission. As was done following the departure of three other

Commissioners, the Selection Panel established pursuant to the Consent Decree was reconvened to review applications, conduct interviews, and recommend replacements for appointment to the CPC. As a result of the Selection Panel's work Tiffany Artis and Christopher Brown were selected for appointment to finish the remaining terms for the two positions...

In December the CPC received a consulting report from Strategic Applications International ("SAI"). SAI, in its role as an organizational consultant, provided the Commission with a variety of administrative and operational recommendations, characterized by SAI as a "roadmap," for the Commission as work relating to the Consent Decree transitions into the activities outlined in the Fourth Year Monitor Plan.

**2.**     **Community and Problem-Oriented Policing Work Plan**

By way of background and as noted in the Monitor's most recent report:

> The Consent Decree requires that the Division develop and implement a "comprehensive and integrated community and problem-oriented policing model" to "promote and strengthen partnerships with the community . . . and increase community confidence in the CDP." This section refers to policing according to this model as "community and problem-oriented policing," or "CPOP." (Dkt. 246, at p. 14)

The CDP's Bureau of Community Policing Commander Johnny Johnson was tasked with drafting a CPOP Plan that incorporated community feedback. An initial draft of the CPOP Plan was initially released for community input back in May 2018. During the last half of 2018 efforts were undertaken to ensure the various communities in Cleveland had a voice in helping to shape what would be contained in the final Plan.

CDP coordinated a series of well attended public meetings through coordination with the City's long-standing District Policing Committees to discuss with members of

the community the substance of the proposed CPOP Plan and to receive direct feedback from residents in each of the five CDP Districts. The CPC also undertook efforts to receive community feedback on the Plan and provided recommendations for CDP review in late September.

After receiving input from the community, CDP participated in meetings and discussions with representatives from the Monitor Team, DOJ, and CPC to ensure the adoption of a CPOP Plan that incorporated community ideas and feedback. CDP completed and presented a final CPOP Plan in early February, 2019. On February 14, 2019 the Monitor filed a motion with the Court recommending that the new CPOP Plan be approved. (Dkt. 234). In describing the Plan, the Monitor concluded:

> "The CPOP Plan is an important, much-needed document that sets out necessary organizational changes and new expectations for all CDP members. It was the subject of substantial community engagement. It is a strong foundation about which the Division and community can be proud."

(*Id.* at p. 9). The Court issued an Order approving the submitted Plan on February 20, 2019.

### a. The CPOP Plan

The basic community partnership, problem solving philosophy, and commitment underlying the importance of CPOP is found in the opening paragraph of the Executive Summary of the Plan:

> Police cannot produce a safe community by their efforts alone. Partnerships and relationship building are tantamount to safe neighborhoods. The Community and Problem-Oriented Policing Plan or CPOP is an organizational strategy that promotes community partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime. It is the responsibility of all members of the Cleveland Division of Police (CDP) beginning with the Chief thru the chain of command to every officer. All officers are responsible for

       engaging in community and problem-oriented policing without regard to where
       they are assigned. It is not the sole responsibility of any single bureau or unit.

(Dkt. 234-1, at p. 2).  The CPOP Plan is a comprehensive and collaborative effort that has

been designed (1) to increase participation from a cross section of the community in each

of the five District Policing Committees, (2) to build community confidence and trust, (3)

to continuously engage the community in its policing policies and procedures, and (4) to

increase the positive public perceptions of the CDP.  Parallel with the development of the

CPOP Plan, CDP also created an aggressive Recruitment Plan, and completed a Staffing

Study to better address efficiency and gaps. The CPOP Plan, the Recruitment Plan, and

the Staffing Study take into account the goal of enhanced community engagement, while

ensuring ongoing public safety. In reaching these community goals the CPOP Plan creates

expectations for all officers and supervisors.

      All officers are required to incorporate CPOP principles in their daily duties, to

strengthen relationships while also building engagement opportunities between CDP and

the communities being served, to actively participate in community meetings and events,

to incorporate bias-free and procedural justice principles into their interactions with

citizens, and to proactively learn about and engage the communities where they are

assigned.

      CDP supervisors are required to: support and guide officers about CPOP, ensure

Patrol officers devote at least 20 % of their workdays to community engagement

opportunities, recognize officers who excel in using CPOP principles while remediating

those that do not, ensure officers actively participate in community meetings and events,

and ensure that officers incorporate CPOP, Bias-Free, and Procedural Justice Principles during their interactions with members of the community.

i.    **SARA Model**

Collaborative engagement of CDP officers with the community to better address local safety conditions is a hallmark of the new CPOP Plan.  One model adopted with the Plan to provide better engagement with the community in addressing public safety is referred to with the acronym **SARA**. SARA stands for **S**canning, **A**nalysis, **R**esponse, and **A**ssessment.  SARA assists officers in looking at encountered problems beyond the immediacy of a single call for service and completion of a report. Rather, the SARA model encourages a deeper probe into what is behind recurring circumstances and provides officers with an enhanced approach to interacting with members of the community in attempting to resolve the underlying condition that is causing a problem.

The first step in the SARA model — *Scanning*, refers to the identification of problems and the potential consequences associated with the identified problem. After the initial recognition comes the *Analysis*, which refers to identifying and understanding the conditions and elements of the perceived problem, and identifying relevant data and available resources. *Response* refers to what steps are undertaken to solve a problem, while *Assessment* involves an evaluation of the strategy that was used in resolving the problem. It is contemplated that SARA will result in enhanced collaborative problem solving. Officers will input problem-solving data into the CDP's Computer Aided Dispatch ("CAD") system.[1]   In tackling a particular problem using the SARA model

---

[1] CAD is the Division's computer program that is designed and employed to assist dispatchers to assign calls for service. The program will also be used to store SARA data.

officers will develop where feasible a "work plan" in collaboration with community members.

### ii.     20% of Workday Committed to Community Engagement

Under the CPOP Plan patrol officers will be required to dedicate a portion of their day to performing CPOP activities. The goal is to have officers spending dedicated time engaging in problem solving while developing relationships in the community being served. Officers will be expected to spend on the average 20 % of their time on CPOP activities. Examples of Ways to meet this goal include the use of bike/foot patrols, officer attendance at community meetings, meetings with business leaders, and creating action plans with community members to address their concerns. Community engagement also results from impromptu informal interactions with community members, such as engaging in casual conversations, making random community visits, playing ball with neighborhood children, and other non-enforcement related interactions.

### iii.     Officer Wellness and Increased Officer Efficiency

The CPOP Plan takes into account the recognition that healthy officers are generally more safe, productive, compassionate, and responsive to the community being served.  The Plan identifies CDP's ongoing commitment to assisting officers maintain their mental, emotional, physical, social, and spiritual 'well-being."

The CDP has created "District Business Cards" to increase accessibility and promote engagement. These cards can be used to provide follow-up information to citizens in connection with calls for service, and they can also be used simply to help officers build relationships with citizens they interact with during engagement activities.

The CPOP Plan takes into account that alleviating the workload of frontline officers will assist in making the Division more efficient while fully protecting public safety.  By this the Plan envisions freeing officers from certain non-emergency tasks so that they have more time to focus on their immediate duties and to provide the officers with more time to directly engage with the community. One way that the City has attempted to reduce having officers run from one call for service to the next is through implementation of an Online Crime Reporting System referred to as "Coplogic."  This system is intended to allow community members to complete reports online for certain incidents such as petty theft, bicycle theft, property damage, and lost property without having to confer directly with an officer on scene.

### 3.    District Policing Committees

Local organizations now referred to as District Policing Committees ("DPC") have long been established in each of the five CDP Districts.  Prior to the Consent Decree the DPC's had been known as "District Community Relations Committees."  In this guise, the DPC's had been in existence since 1974 and had worked closely with both the CDP and the City's Community Relations Board ("CRB").  An ongoing role of the DPC's is to "to facilitate communication and cooperation between CDP and community leaders at the local level." (Dkt. 7-1 at ¶ 23).

During the period of the Third Year Monitoring Plan the CDP successfully completed its work on a "District Policing Committee Plan" ("DPC Plan").  An important goal in the development of the plan was to ensure the DPC's going forward were a continuing and effective voice in facilitating the CDP's commitment to Community and Problem Oriented Policing."  After working with the Monitor and DOJ, the CDP

completed a first draft of the new DPC Plan in May, 2018. The Plan was then released

for public review and input, with work on the final DPC Plan being completed in late

January. The DPC's are an integral element of the CDP's new CPOP Plan. The new DPC

Plan acknowledges that:

> DPCs are an essential part of the Division's CPOP plan because they are one of the tools at the Division's disposal for engaging the community and conducting problem-solving. District Commanders will use the DPC meetings as opportunities to identify, assess and collaboratively solve problems in their District. They will also use the sessions to solicit input on the Divisions policies and procedures. The DPCs will assess the Divisions overall performance and its CPOP activities by surveying community members. Officers will use the DPCs as an opportunity to know better and understand the members of the community that they patrol and create relationships and partnerships.
>
> DPCs will be a crucial component for CDP Officers to act as "guardian of the community." One of the important aspects of the "guardian" mission is to understand the communities within the city. To fulfill this mission, officers must engage the community outside of a typical law enforcement action and have a basic knowledge of the communities in their assigned area. The DPCs will be one of the many methods that officers will use to engage and learn about the community. (Dkt. 235-1, pp. 4-5)

The Monitor submitted the DPC Plan to the Court for approval on February 14,

2019. (Dkt. 235). On February 20, 2019 the Court issued an order approving the DPC

Plan, concluding that it "meets the terms of the Consent Decree." (Dkt. 238, Order).

**B.**     **Use of Force**

**1.**     **Use of Force Policies**

As was addressed in previous City reports, one of the major early focuses of the

CDP in complying with the agreed upon terms of the Consent Decree was the revision

and development of the Division's use of force policies. In January 2017 the Court

approved five new "use of force" policies that addressed: (1) Use of Force -General, (2)

Use of Force-Definitions, (3) De-Escalation (4) Use of Force-Intermediate Weapons, and

(5) Use of Force-Reporting. (Dkt. 101). These policies became effective in January 2018 following the training of all CDP officers in the second half of 2017.  It is of note in discussing the impact of the new policies, that the Monitor's Fifth Status Report had documented that CDP's use of force when compared to use of force in prior years was down, while crime overall and reports of officer injuries were down in comparison to recent years. (Dkt. 214, pp. 48-51).

The Monitor's Sixth Status Report reviewed trends regarding CDP use of force using data gathered for the 2018 calendar year.[2] The Monitor noted that CDP officer use of force was down by 29 % in 2018 when compared to 2017.  The Monitor further noted:

> A 29% reduction in force incidents is no small achievement. The Monitoring Team applauds the Division's work to revise force policies. It applauds the Training Section's hard work on constructing and conducting high-quality officer training on force that incorporated new approaches and methods. Most of all, it applauds the men and women of the Division of Police who are charged with carrying out the policy while ensuring the public's, and their own, safety. The data of the first year of the Division's new approach to use of force suggest that officers are using force differently than in the past.

(Dkt. 246, p. 28). The City understands the Monitor is presently reviewing the 2018 use of force incidents to determine whether the 2018 use of force data reflects that CDP was in "General Compliance" with the compliance standards established in the Consent decree. The Consent Decree establishes that the Monitor is to conduct reviews or audits as necessary "to determine whether the City and CDP have complied with the requirements of this Agreement." (Dkt. 7-1, ¶ 360). Given the approval of the policies

---

[2] One caveat in comparing the 2018 reported use of force statistics to previous years was a change to what would constitute a reportable use of force under the new policies beginning in 2018. Unlike previous years, in 2018 the "pointing of a firearm" at an individual would constitute a low Level 1 use of force under the new policies. In comparing 2018 to 2017 use of force data, the Monitor in constructing an "apples to

and the completion of training, the final element associated with the Monitor's compliance review is defined in the Consent Decree as whether the City and CDP "are carrying out the requirement in actual practice." (*Id.*).  The specific measurement standards to be used by the Monitor for its "use of force" compliance review are found in the Consent Decree. (Dkt. 7-1, ¶ 367 "Outcome Measurements" at (a)(1)-(7)).

2.    **Investigation and Review**

The Consent Decree addresses the creation of two new entities within the CDP relating to the Division's internal investigation and review of officer uses of force. A Force Investigation Team ("FIT") under the auspices of CDP's Internal Affairs is to be established for the purpose of conducting administrative reviews of all Level 3 (the most serious) uses of force, force involving potential criminal conduct, instances where an individual dies while in or as the result of being in CDP custody, and any uses of force assigned to FIT by the Chief. (Dkt. 7-1, ¶ 111).  Additionally, the City is to create a Force Review Board ("FRB"). The Chief will chair the FRB which is envisioned in the Consent Decree to serve "as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." (Dkt. 7-1, ¶ 124).

Final work on the separate, new CDP policies that will govern FIT investigations, the creation and activities of the FRB, and address supervisory investigations of Level 1 and 2 uses of force has been underway in the current reporting period. As was noted by the Monitor in its recent Sixth Report:

---

apples" comparison did not include pointing a firearm within the comparative data. (Dkt. 246, p. 27).

> In the current reporting period, the Parties and Monitoring Team have continued to revise three important documents that will collectively set expectations and protocols for the Division's review and investigation of uses of force: (1) the Use of Force Supervisory Review Policy; (2) the Force Investigation Team Manual; and (3) the FRB Policy. The Monitoring Team anticipates that these policies will be completed and ready for the Court's approval early in the upcoming reporting period.

(Dkt. 246, pp. 31-32). The City anticipates that the three new policies will be finalized shortly for filing with the Court.

## C.   Crisis Intervention

The Monitor's Sixth Report documents that the City has made much substantive and continued progress during the period of the Consent Decree in addressing Crisis Intervention issues.

> As the Team noted in its Fifth Semiannual Report, "the progress that the City has made in the area of crisis intervention is [arguably] the strongest and most significant of any area of the Consent Decree to date."80 This significant progress has continued in the current reporting period. The Monitoring Team has been pleased to see the Mental Health Response Advisory Committee ("MHRAC")—the community problem-solving forum made up of representatives from the police, social service providers, mental health and substance abuse professionals, the judiciary, advocates, and individuals in recovery—continue to collaborate on ways to improve services to those in need of care.81 MHRAC and CDP also built upon a successful Crisis Intervention Training in 2017 with a high-quality follow-up training for all CDP officers.

(Dkt. 246, pp. 34-35).

The Consent Decree establishes that all CDP officers are to receive annual crisis intervention training. (Dkt. 7-1, ¶ 143). The 2018 annual in-service training was accomplished in the second half of 2018. Almost all officers who were eligible for the training (98%) successfully completed the eight hours of Crisis Intervention training. In addition to further training on the principles of crisis intervention, the second year training also focused on how trauma can affect officers in the course of performing their

duties and the resources that were available to officers for help. Internal surveys measuring Officer responses to the 2018 Crisis Intervention training were exceedingly positive and reflective of strong officer interest and engagement.

The Consent Decree required that the City and CDP develop a Mental Health Response Advisory Committee ("MHRAC") for the purpose of foster[ing] relationships and build[ing] support between the police, the community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis." (Dkt 7-1, ¶ 132). A was noted by the Monitor, MHRAC has established a Quality Improvement Subcommittee that during 2018 worked to design "a data template to analyze how the CDP's crisis intervention data can be used to identify necessary ongoing treatment services by providers who work with the ADAMHS Board." (Dkt. 246, p. 35).

The Consent Decree establishes that CDP is to provide enhanced specialized training in responding to individuals in crisis to certain officers who will be identified as "specialized CIT officers." (Dkt. 7-1, ¶ 145). CDP, in collaboration with MHRAC, DOJ, and the Monitoring Team, have worked during the reporting period that just ended to finalize the 40-Hour curriculum to be used for such training. The curriculum should be completed and ready for final review and approval shortly. The process for the selection of officers to receive the specialized CIT officer training will go forward in the next reporting period.

**D.** **Officer Training and Recruitment**

**1.** **Officer Training**

In addition to the use of force and crisis intervention in-service training discussed

above, CDP also began initial in-service CPOP related training of officers in the second half of 2018.  This training was undertaken pursuant to a Community Engagement and Problem-Solving ("CEPS") curriculum that was developed in the first-half of 2018. This initial CEPS training involved instruction on the SARA problem-solving model that forms a key element of the new CPOP community engagement strategy. As with the crisis intervention training, fully 98% of eligible officers had received the CEPS training by the end of the year.

Utilizing the experience gained from the initial 2018 CEPS training, CDP is in the process of providing the 2019 in-service CEPS training.  As the Monitor noted, the 2019 training will reinforce "core concepts from the 2018 training, such as the SARA problem-solving model, while also instructing officers on the now-approved CPOP Plan itself—the new expectations and requirements on how officers are staffed, use their time, and document their community engagement and problem-solving activities. (Dkt. 246, p. 18).

The Consent Decree also requires that personnel assigned to Internal Affairs receive initial and annual training that "is adequate in quality, quantity, scope, and type in conducting misconduct investigations." (Dkt. 7-1, ¶¶ 180-181). This training was undertaken in November 2018, with the Monitor noting:

> "The training inspired lively classroom discussions about case scenarios, techniques, legal issues, and the complexities of these types of investigations. The Monitoring Team was impressed by the curriculum and the expertise of the trainers. Informal feedback from CDP officers, detectives, supervisors, and commanders who attended the class praised the training."

(Dkt. 246, p.44).

## 2.  **Recruitment**

The Consent Decree requires that CDP "develop a recruitment policy and a

strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community." (Dkt. 7-1, ¶ 302). The CDP has been engaged from the beginning of the Consent Decree in establishing a recruiting plan that will "ensure that CDP successfully attracts and hires a diverse group of qualified individuals." (*Id*. at ¶ 300). The Consent Decree identifies the diverse group of applicants being sought as those "who are familiar with the different neighborhoods of Cleveland, who possess strategic thinking and problem solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community." (*Id*. at ¶ 304).

        **a.**    <u>**Recruitment and Hiring Plan**</u>

Working in a cooperative manner with the Monitor Team and the DOJ, the City released a draft Recruitment and Hiring Plan for public review and feedback in May 2018. After taking into account community feedback that was received in the last reporting period, a final version of the Recruitment and Hiring Plan was completed. On February 14, 2019 the Monitor filed the Plan and requested Court approval. (Dkt. 236). The Court approved the Recruitment and Hiring Plan on February 20, 2019. (Dkt. 239).

The Recruitment and Hiring Plan establishes:

> The City of Cleveland's primary goal is to implement a recruitment plan that ensures we attract the best candidates from a cross section of the community to reflect the diverse make up of our city and adequately staff our divisions to provide the best service to our citizens. To accomplish this, we must recruit not only qualified individuals but those who exhibit an understanding and familiarity with the neighborhoods that are uniquely Cleveland.

(DKT. 236-1, p. 7). In meeting this primary goal, the Recruitment and Hiring Plan identifies three (3) programmatic goals to attract qualified recruits:

1. Increase staffing levels to effectively implement our Community and Problem Oriented Policing plan (CPOP).

2. Attract and hire a diverse group of qualified applicants from a broad cross-section of the community.

3. Create and maintain partnerships with community stakeholders to enhance recruitment efforts.

(*Id.*, p. 7).

### b.  Public Safety Recruitment Team

To maximize the efficiency of its recruitment efforts for all safety forces (Police, Fire, and EMS) under the new Recruitment and Hiring Plan, the City established a combined Public Safety Recruitment Team ("PSRT") in the Department of Public Safety. CDP Sergeant Charmin Leon serves as the Officer-in-Charge ("OIC") for the PSRT, which also includes two CDP officers, one firefighter, and one EMT.

In meeting the goals set with the Consent Decree the PSRT is very active in the community. The PSRT has consistently worked to increase the public's confidence in the CDP through its efforts to highlight the positive aspects of policing as a career, while ensuring residents are informed of ongoing accomplishments of individual officers and their contributions to the community.   The PSRT communicates with the community through the use of radio, billboards, and other social media, in addition to attending meetings and directly interacting with individual community members throughout the City. The City's previous status report (Dkt. 219) provided a detailed list of actions that described the numerous and varied efforts of the PSRT which remain ongoing.

One particularly successful community initiative undertaken by the PSRT involves a program called "Beauty, Badges and Barbershop Talks."  On a regular basis

the PSRT members schedule visits to urban barbershops and salons. Through relaxed and open discussions with the PSRT, community members can share their experiences with the CDP; discuss their expectations concerning the role of the CDP in the community, while also hearing about the CDP's commitment to the community through programs such as the newly approved CPOP Plan.

The PSRT continued its innovative and dynamic recruiting activities throughout the most recent reporting period, while also working to achieve finalization of the CDP's newly approved Recruitment and Hiring Plan.

3.  **Hiring**

Two CDP recruit classes are currently in training: Police Academy Classes 143 and 144. Three recruit classes that started their training in 2018 graduated 136 new patrol officers in the most recent period covered by this report. Police Academy Class 140 graduated 49 new patrol officers on August 24, 2018; Police Academy Class 141 graduated 37 new officers on January 18, 2019, with Police Academy Class 142 graduating 47 new patrol officers on February 8, 2019.

CDP continues its efforts to recruit officers that "reflect the diverse make up of our city." It is notable that the percentage of minority and women recruits increased from 31 % in the recently graduated Police Academy Class 140 to 61% in the current Police Academy Class 143.

E.  **Accountability**

Paragraph 196 of the Consent Decree requires that allegations of police misconduct be "fully, fairly and efficiently investigated", irrespective of whether the allegations are internally discovered or brought by a civilian. (Dkt. 7-1, ¶ 196).

19

1.      **Internal Affairs**

Retired Federal Prosecutor Ronald Bakeman has now served as the civilian Superintendent of Internal Affairs for a little over one year. Much work has been focused on pursuant to ensuring requirements established in the Consent Decree are incorporated into a revised IA Manual, the preparation of a manual for the newly created FIT, and other revised policies relating to IA investigations. The City believes, after a period of continuous review, discussion, and negotiation with both the Monitor and DOJ during the most recent reporting period, that CDP's work on the revised IA Manual, the new FIT Manual, and IA policies is largely completed. As was noted in the Monitor's Sixth Report in discussing IA's work in this respect, "[t]he Monitoring Team anticipates that these policies will be completed and submitted for the Court's approval in the upcoming reporting period." (DKT. 246, p. 44).

2.      **Discipline**

CDP addressed with the Monitor the issue of officer discipline during the most recent completed reporting period, and continues to work with the Monitor and the DOJ to better ensure "that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, [and] fair…" as required by the Consent Decree. (See Dkt. 7-1, ¶ 245).  CDP has operated with a revised Court approved Disciplinary Matrix since January, 2018.  One specific area addressed in this reporting period was the creation of written guidelines for the conduct of officer discipline hearings conducted by the Chief. After substantive ongoing discussions, CDP provided the DOJ and Monitoring Team with what is characterized by the Monitor as "a substantive draft of guidelines for the conduct of 'Chief's Hearings'." (Dkt 246, p. 55). While the draft guidelines remain

20

subject to further review and discussion the City agrees with the Monitor's assessment that the proposed guidelines are "an excellent step forward in ensuring systematic compliance with paragraph 245 of the Consent Decree." (*Id*.).

While understanding that the compliance summaries "do not automatically mean that the City or CDP have not made good faith efforts or commendable strides toward compliance" (Dkt. 246, p.5), the  City disagrees with the Monitor's assessment  of "non-compliance"  with regard to paragraphs 242, 243, and 247 of the Consent decree.

Paragraph 242 of the Consent Decree basically requires that the Chief provide the Civilian Police Review Board with a written justification when the Chief does not uphold the CPRB's recommended charges or does not impose the discipline or non-disciplinary corrective action that has been recommended by the CPRB.  While there have been and continues to be fair discussion on this issue between the Monitor and CDP, the City's position is that the Chief's disagreements with CPRB recommendations have been documented in writings to the CPRB that provide requisite justification for the Chief's decision. The City understands that CDP and the Monitor have differences of opinion concerning the degree of detail required by paragraph 242 and the topic continues to be addressed.  Paragraph 243 of the Consent Decree requires that CDP tracks the number of instances the Chief departs from the CPRB's recommended discipline disposition.  CDP has tracked such instances in Excel format, and is undertaking to alternatively track such instances in IA Pro. Such Chief departures are further noted in the bi-weekly reports now being produced by OPS.  The City also disagrees with the Monitor's assessment that it does not document disciplinary decisions in writing as required by paragraph 247 of the Consent Decree.

3. **Office of Professional Standards**[3]

The Office of Professional Standards is responsible for receiving and investigating non-criminal complaints filed by members of the public against sworn and non-sworn Cleveland Division of Police employees. Following its investigations, OPS makes findings and recommends action to the Civilian Police Review Board ("CPRB"). A primary goal established by the City and OPS going into 2018 was to have OPS remain timely in completing the investigation of complaints received on and after December 1, 2017, while having an outside investigative contractor address an identified backlog of unfinished OPS investigations remaining from complaints made by the public to OPS in 2015, 2016, and through November, 2017.

a. **2018 OPS Investigations**

OPS received 227 complaints in 2018. This represents a reduction of six percent (6 %) from the 241 complaints received by OPS in 2017, and a reduction of fourteen percent (14%) from the 263 complaints received in 2016. Of the 227 complaints received in 2018, 181 have now been closed, with 37 of the 2018 complaints remaining currently active. Of the 2018 cases that have been closed, 101 received a full investigation, 65 were administratively dismissed, with the remaining 15 being administratively closed.[4]

---

[3] A separate report, "City of Cleveland's Status Report Re: Office of Professional Standards," was filed with the Court on March 4, 2019. (See Dkt. 245). The report herein updates the prior statistics related to the status of OPS complaints received in 2018.

[4] An "*administrative dismissal*" occurs when (a) a complaint is made against an individual who is not a CDP employee; (b) allegations have been made against a CDP employee who cannot be identified despite the best efforts of the OPS investigators; (c) when the allegations are of a civil nature and only address an employee's off-duty conduct; and (d) when the allegations only concern the receipt of a traffic or parking citation, with no other allegations being made. An "*administrative closure*" occurs when

In fourteen of the 2018 cases, it appeared that potential criminal conduct was alleged. OPS does not investigate criminal conduct and the fourteen OPS files were forwarded to Internal Affairs to conduct a thorough investigation.[5] Nine of these referrals remain open.

### b.    **Administrative Staff**

As was noted in the City's prior status report, a new OPS Administrator, Mr. Roger Smith, and an OPS Supervisory Investigator, Mr. Henry Roney, were hired by the City in the first half of 2018. The Monitor's Sixth Report notes regarding their time with OPS that "[n]ow that OPS has experienced leadership to implement changes in day-to-day practices on newly-received complaints, the Monitoring Team has seen some improvements in the quality of OPS investigative practices." (Dkt. 246, P. 48).

OPS maintains a current staff of eight permanent investigators and one temporary hire investigator. These investigators are tasked with investigating and staying current on complaints received by OPS on and after December 1, 2017. The OPS Administrator conducts weekly training classes for the investigators to assist in the continued improvement of investigations being undertaken.

OPS has now filled three positions that the Monitor characterizes as being

---

(a) a new complaint against a CDP employee contains the same allegations that were made in a previous complaint received by OPS or, (b) a new complaint filed with OPS against a CDP employee is determined by OPS to raise new, but similar allegations in an already existing case involving the same CDP employee.

[5] During an OPS investigation, if facts suggest that criminal conduct may have occurred, a copy of the file is forwarded to IA so that the unit can conduct a thorough investigation of the officer's conduct. OPS investigation is stayed pending completion of the IA investigation. Regardless of the IA investigatory results, the case will be returned to OPS to conclude its separate investigation of the non-criminal conduct or administrative violations.

"critical" to sustained reform going forward. Spyridon Kodellas was hired to fill the vacant Research Analyst position and started with OPS on February 19, 2019. The vacant general manager position was filled with the hire of George Coulter. Mr. Coulter began his duties with OPS on March 4, 2019. Natasha Stewart has been hired to fill the Community Engagement Coordinator position and she will start with the agency on May 6, 2019.

  **c.**   **Backlog Investigation Plan**

  In early 2018 the City first contracted with Hillard Heintze LLC for the purpose of addressing the existing backlog of OPS investigations that accrued during the period 2015-November, 2017. This was accomplished to allow OPS to focus its efforts on remaining current with its investigation and completion of complaints received on and after December, 2017. A total of 281 backlogged investigations were provided for Hillard Heintze's review. Hillard Heintze's work to complete the existing backlog was planned to be undertaken in three separate contractual phases.

  Phase One, involved Hillard Heintze conducting a comprehensive review and assessment of the 281 backlogged complaints remaining from the 2015-2017ı time period. This first phase was addressed in the City's August 2018 Status Report to the Court. (Dkt.215). The Phase Two period involved Hillard Heintze evaluating each of the backlogged cases it had received to determine case by case whether sufficient evidence actually existed that would warrant further investigation. The nature of the evaluative work to be accomplished in Phase Two was generally addressed in the City's December 2018 Status Report. (Dkt. 228). Phase Two was completed by Hillard Heintze during the reporting period addressed in this report.

Hillard Heintze's Phase Two work resulted in the closure of 137 files where sufficient evidence did not exist to proceed further, the completion of backlogged investigations for files that had been almost completed when the files were received by Hillard Heintze, and the establishment of an investigatory road map to be used where the Phase Two review had established that there was sufficient evidence for proceeding. Hillard Heintze completed its Phase Two work in January, 2019. As a result of the Phase Two review and work, 137 cases were closed for lack of evidence or were completed and returned to OPS. Of this number, 23 of the cases involved completed investigations that were returned to OPS and heard by the Cleveland Police Review Board ("CPRB") at its February 12, 2019 meeting. At the completion of Phase Two, Hillard Heintze had identified 144 backlogged cases that remained for its further investigation and completion.

Hillard Heintze is now in the process of beginning its work to complete the investigations on the remaining 144 backlogged complaints.  Investigations to be completed by Hillard Heintze in Phase Three will include interviews, obtaining the locally sourced evidence that was identified in Phase Two, and, completion of all investigative steps that are necessary to close an OPS handled investigation. Hillard Heintze investigators will be present and on the ground in Cleveland to conduct the necessary investigative work. Office space has been provided to Hillard Heintze at the same building location where OPS is housed. During Phase Three OPS will continue to retain final approval authority for each of the investigations undertaken by Hillard Heintze.

**3.      Civilian Police Review Board**

The CPRB reviews misconduct complaints investigated by OPS and makes recommendations for resolution to the Chief of Police. Upon making its decisions, the CPRB submits its findings and recommendations to the Chief of Police and notifies the

complainant of the disposition. The CPRB lost two of its members in 2018 – one when an appointed term expired and one as the result of a board member's resignation. The two vacant positions have been filled with the appointment of Ms. Ashley Mostella and Mr. Kenneth J. Mountcastle, with their terms expiring on August 8, 2022. A third resignation occurred in January of this year. Interviews of interested applicants have been conducted and it is anticipated that the remaining vacant position will be filled in the immediate future. Members of the CPRB receive training to assist them in their role of reviewing the completed OPS investigations. The PRB heard 225 cases in 2018. By comparison the PRB heard 183 cases in the full year of 2017.

**F.**     **Equipment and Resources and Staffing**

**1.**     **Equipment and Resources**

The Consent Decree requires "an effective, comprehensive Equipment and Resource Plan that is consistent with its [CDP's] mission and that will allow it to satisfy the requirements of this Agreement." (Dkt. 7-1, Section 292). On November 2, 2018, the Monitor filed a motion informing the Court that "the 2018 [Equipment and Resources] Plan, when and only when taken together with the previously-approved portions of the 2017 Plan, constitutes a complete and satisfactory Equipment and Resource Plan that meets the terms of the Consent Decree." (Dkt. 226). On November 18, 2018 the Court approved the Plan.

"The completion of the Equipment and Resource Plan is an extremely positive milestone for which the City, and especially its IT staff, should be commended. It establishes a meaningful foundation for the hard work already being conducted toward

modernizing the Division of Police and a specific playbook for technological upgrades still necessary." (Dkt. 246, p. 67)

**2.**     <u>**Staffing**</u>

The CDP finalized and released for comment in May 2018 the "Cleveland Division of Police Staffing Report," with public comments having been received in September 2018. CDP worked with the Monitor and DOJ to incorporate appropriate public input while ensuring the finalization of a staffing plan that was based on a "workload-based model." The Plan was drafted to take into account CDP's commitment to CPOP and community engagement, and was filed with the Court for approval by the Monitor on February 21, 2019. (Dkt. 240).

**G.**     <u>**Data Collection and Analysis/ Compliance and Outcome Assessments and Reporting**</u>

During the past six months, the Cleveland Division of Police (CDP) has made numerous advancements in the area of data collection and analysis. First, the End of Year 2017 Use of Force Report was approved by the Monitoring Team and the Department of Justice and is now available on the City of Cleveland website. Second, the monthly COMPSTAT meetings which began in October 2017 and are held with the Monitoring Team and the Department of Justice have expanded beyond Use of Force. COMPSTAT meetings now also include statistics for the Early Officer Intervention Program, Officer Injury and Internal Affairs.

The data team is working closely with CDP officials to not only use but also apply the data being collected by officers. Over the last few months, there have been several meetings to develop district data briefs, which are going through several iterations before

the content and format are finalized.  Third, CDP held five meetings across the city to gain community feedback across the Community and Problem Oriented Policing (CPOP), Recruitment and Staffing plans. The data team developed the survey which was disseminated to attendees and was also posted online for those unable to attend. Additionally, CDP is collecting officer feedback on the three plans. Currently, the data team is analyzing the survey results and will be finalizing its report shortly.

The data team is looking forward to the improved data instruments in the areas of CIT, CPOP and investigatory stops. As the Division of Police continues to expand its data collection systems, the data team continues collaborating with staff members to improve the use and quality of the data.

**H.      Bias Free Policing**

The Consent Decree requires that CDP "deliver police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in CDP. (Dkt. 7-1, 35). The CDP's new Bias Free Policing Policy was approved in March 2018. The focus during the most reporting period has involved providing bias-free training to all officers based on a curriculum that had been developed with the Center for Policing Equity in the previous reporting period.  The new curricula was approved in July.  By the end of the year 98% of eligible CDP members had completed the Bias-Free Training. The CDP learned some important lessons during the instruction phase and will work to incorporate needed improvements in the upcoming year.

**I.      Compliance and Outcome Assessments and Reporting.**

The City believes the Monitor's most recent Sixth Report evidences the

continuing progress being made by the CDP to become fully compliant with the reforms agreed upon with the Consent Decree. As the policies adopted to date become fully trained upon and implemented, the focus for measuring assessment and documenting compliance will be placed on ensuring the collection of valid performance data.

### III.   Assessment of the Status of Cleveland Division of Police's Progress

As detailed in the Monitor's Sixth Report, the City has continued to make significant and sustainable progress toward meeting the reforms agreed to in the Consent Decree. Of note during the most recent reporting period was the finalization and completion of the City's CPOP Plan, Recruiting and Hiring Plan, and District Policing Committee Plan, and the documented improvements made by OPS.  Such progress is expected to continue as the City and CDP meet the goals established with the Fourth Year Monitoring Plan.

### IV.   Response to Concerns Raised in the Monitor's Semi-Annual Report

The Monitor's most recent report allows that "CDP has made progress in developing its data infrastructure, but not yet the kind of progress required to comply with the Decree's data requirements." (Dkt. 246, p. 23). As major new CDP plans and policies have been approved and put into place, the City continues to work with the Monitor and outside providers to ensure a responsive data infrastructure that can reliably collect and document the relevant data required for the structured compliance reviews and audits required in the Consent Decree. Facilitating and improving data collection constitutes a major emphasis as the City enters the Fourth Year Monitoring Plan.

The Monitor's Report indicated that Because CDP posts some Consent Decree-related documents on its website with some regularity the Monitoring Team concludes

that the Division is in "Partial Compliance" with the Decree's requirements under

Paragraph 268." (Dkt. 246, p. 60). CDP is currently taking steps to become fully

compliant by enhancing the disclosure of Consent Decree related information to the

public. CDP has worked with the City's IT office to improve its website. Upcoming

changes to better facilitate public access to information concerning the Consent Decree

include:

- A new website framework and webpage to improve the end user(s) experience;
- Reorganization of documents as displayed to improve user navigation on the site;
-  Improved organization of the documents as placed on the site to maximize user understanding  of  Consent Decree requirements and CDP accomplishments;
- Clear and permanent place holders for items mandated (CDP Audits, reports, and outcome analyses).
- Improved search capabilities being added to allow users to find specifically sought items.
-

The framework for the website upgrades has been completed and is currently in the

testing phase. After testing has established the new website framework is reliable and

stable, the new webpage will be introduced for public use.

**V.**     **Conclusion**

That the City remains committed to achieving the reforms contained in the Consent

Decree is well documented by the work undertaken by the CDP in the most recent reporting

period. Most of the major new policies and plans required by the Consent Decree are now

either in place or soon to be finalized.  The completion and approval of both the Division's

new Community and Problem Oriented Policing Plan and the Department of Public Safety's

Recruiting and Hiring Plan are milestone accomplishments as the City enters the Fourth Year

Monitoring Plan.

Respectfully submitted,

Barbara A. Langhenry (0038838)
Director of Law

By:    /s/ Gary S. Singletary
       Gary S. Singletary (0037329)
       Chief Counsel
       City of Cleveland
       601 Lakeside Avenue, Room 106
       Cleveland, Ohio  44114-1077
       Tel: (216) 664-2737
       Fax:(216) 664-2663
       E-mail: gsingletary@city.cleveland.oh.us

       Counsel for the City of Cleveland

## CERTIFICATE OF SERVICE

The undersigned certifies that the City of Cleveland's Seventh Status Report was filed electronically on April 8, 2019.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system. Pursuant to the requirements of the Consent Decree the Monitor has been electronically delivered a copy of this filing.

/s/ Gary S. Singletary
Gary S. Singletary (0037329)
Counsel for the City of Cleveland