IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | **NOTICE SUBMITTING MONITORING** |
| CITY OF CLEVELAND | ) | **TEAM'S SEVENTH SEMIANNUAL** |
| | ) | **REPORT** |
| Defendant. | ) | |
| | ) | |
| | ) | |

The Cleveland Police Monitoring Team respectfully submits its Seventh Semiannual Report.

Respectfully submitted,


/s/  Hassan Aden
_____

HASSAN ADEN
Monitor
The Aden Group LLC
8022 Fairfax Road
Alexandria, VA 22308
Tel: (571) 274-7821
Email:  aden@theadengroup.com



Cleveland
Police
Monitoring
Team

**Seventh Semiannual Report**

September 2019

**TABLE OF CONTENTS**

I.      A NOTE FROM THE MONITORING TEAM                                                    1

II.     THE ROLE OF THE MONITORING TEAM & THIS REPORT                                      4

III.    COMMUNITY ENGAGEMENT AND BUILDING TRUST                                            8
        A.    Community Police Commission ("CPC")                                          8
        B.    District Policing Committees                                                11

IV.     COMMUNITY & PROBLEM-ORIENTED POLICING                                             13

V.      BIAS-FREE POLICING                                                                18

VI.     USE OF FORCE                                                                      21
        A.    Officer Use of Force Principles & Policy                                    21
        B.    Use of Force Training                                                       26
        C.    Use of Force Investigation and Review                                       27

VII.    CRISIS INTERVENTION                                                               31

VIII.   SEARCH AND SEIZURE                                                                37

IX.     ACCOUNTABILITY                                                                    41
        A.    Internally Discovered Misconduct                                            41
        B.    Office of Professional Standards ("OPS")                                    44
        C.    Police Review Board ("PRB")                                                 51
        D.    Discipline and Disciplinary Hearings                                        53

X.      TRANSPARENCY & OVERSIGHT                                                          56
        A.    Police Inspector General                                                    56
        B.    Data Collection and Analysis                                                57
        C.    Public Availability of CDP-Related Information                              59

XI.     OFFICER ASSISTANCE & SUPPORT                                                      61
        A.    Training                                                                    61
        B.    Equipment & Resources                                                       65
        C.    Recruitment & Hiring                                                        67
        D.    Performance Evaluations and Promotions                                      68
        E.    Staffing                                                                    70

XII.    SUPERVISION                                                                       72
        A.    First-Line Supervisors                                                      72
        B.    Officer Intervention Program                                                74
        C.    Body-Worn Cameras                                                           76

XIII.   COMPLIANCE & OUTCOME ASSESSMENTS                                                  78

## I.      A NOTE FROM THE MONITORING TEAM

This Seventh Semiannual Report focuses on ongoing progress of the Cleveland Division of Police ("CDP") under the Consent Decree.  It reports not only on the continued development of critical policies and procedures for the Division under the Consent Decree but also on the delivery of several important trainings – including Use of Force, Community Engagement and Problem-Solving ("CEPS"), Bias-Free Policing, Crisis Intervention, and Search and Seizure – aimed at translating those policies into practice.  It also addresses the creation of critical partnerships within the community and City for ensuring that the Division is expanding its capacity to be inclusive and transparent with its activities, engaging constructively with stake-holders, and remaining accountable to the communities of Cleveland.

**Through partnerships, the Division is delivering high-quality training.**  Effective training to new policies is a key ingredient to ensure that the Division's officers clearly understand the revised policies and expectations that the Decree requires.  Such trainings, backed by firm, but fair, and even-handed accountability systems providing correction when officers do not follow policy, will lead the Division further towards consistent application of Consent Decree requirements in practice.

The Community and Problem-Oriented Policing Policy and associated training provide guidance and structure to promote officer direct engagement with community – including talking with community members about any public safety problems, conducting outreach to a particular group, and identifying and solving problems in ways other than enforcement or arrest.  The CPOP policy encourages interaction at the officer level, while the implementation of the recently court-approved District Committee Plan codifies clear mechanisms for the community identifying and addressing public safety concerns at the District level in partnership with the police.

The Division's partnership with the Mental Health Response Advisory Committee ("MHRAC") and its Training Committee has led to development of the third-year Crisis Intervention Training, the Specialized CIT, and CIT training for call-takers, dispatchers, and supervisors.  Tapping into the expertise and experience of community advocates, individuals with lived experience, and mental health, substance abuse, and developmental service providers ensures that CDP is providing relevant and effective training in this critical area.

The Division has also continued to work with the Community Police Commission, considering the group's feedback on required Search and Seizure training.  Similarly, the Monitoring Team welcomed the Division's decision to include City Prosecutors in the Search and Seizure training, which allows a real-time legal perspective as officers grapple with what can admittedly be difficult concepts.

As the Division continues to draw on external experience for policy development, delivery of training, and setting policing priorities, the Monitoring Team hopes to see ever-increasing openness to new ideas, approaches, and community engagement at all levels of the Division.

Additionally, while the training programs delivered to date have been high-quality, there is evident strain on the capacity of the training unit to independently generate training curriculums of the quality and volume required moving forward.  The Monitoring Team believes this is not for lack of purpose but simply a result of the training unit trying to do too much with too few resources.  The Monitoring Team looks forward to collaborating with the Division to ensure the training unit has what it needs to drive a holistic training program – one consistent with the Consent Decree and, even more importantly, one that can be sustained long after the Decree has concluded.

**Use of force, crime, officer injuries, and subject injuries remain down.**  In 2019, the number of force incidents declined by 32 percent compared to 2017 year to date.  While this was a slight increase over 2018 (up 15 percent YTD), the overall trend remains down.  Meanwhile, Part I crime was stable or down in all major categories but rape.  Officer injuries during uses of force have dropped 65 percent since 2017; and down 48 percent since 2018.  And, as the Monitoring Team has previously reported, since 2017, subject injuries have also trended down.

These metrics continue to suggest that officers are effectively implementing the new use of force policies on a daily basis, with no compromise with respect to crime or increased officer safety concerns.  However, the Consent Decree requires that, whenever force is used, it comply with CDP's new use of force policies and be appropriately investigated and reviewed by the Division.  The development of three key policies during this review period – (1) the Use of Force Supervisory Review Policy; (2) the Force Investigation Team Manual; and (3) the Force Review Board Policy – will allow the Division, once they are approved by the Court, to critically self-assess use of force.

More robust data systems are required in order to assess the state of the Division.  As the Division moves from policy development, through training, and toward sustained implementation of new requirements across a material span of time and formal assessment of its progress, the Division must devote significant energy to ensuring data-collection in all areas of police service, particularly "use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race, ethnicity, gender, disability, sexual orientation, or gender identity."[1]

The Division has made notable progress on developing the data collection and analytic systems needed to understand operational realities and track officer activities.  Nevertheless, continued focus on developing the connected infrastructure for all subject areas is required if the Division is to become a dynamic, learning organization – monitoring and proactively applying data and information to drive better performance and continuing improvement into the future.  Indeed, without the necessary information and data, the Parties and Monitoring Team will be unable to effectively conduct audits and assessments of the Division's progress.

**Progress continues in the development of accountability systems.**  The Division created an Investigative Structure Matrix to map the agencies and units that investigate officer conduct and worked to develop an Internal Affairs policy and manual, which should be submitted for Court review in the next reporting period.  The Division also amended the Disciplinary Matrix to clarify that dishonesty carries a presumption of termination.

The Office of Professional Standards added much-needed staff, including an Administrator, Supervising Investigator, Research Analyst, and General Manager.  OPS also continued to address its significant backlog of cases, which the Monitoring Team expects to be eliminated by end of September 2019.  The City hired a Police Inspector General, and the Monitoring Team looks forward to collaborating with him as he gets up to speed in his new role.

Overall, while progress continues in the area of accountability, work remains as these systems mature and evolve to work together.  At every level of review, it is critical that the accountability and disciplinary systems are coherent, fair, and transparent – with every decisionmaker owning and explaining the reasoning behind their decisions as to whether officers are adhering to the Division's expectations.

---

[1] Dkt. 7-1 ¶ 265, *available at* https://www.justice.gov/crt/case-document/file/908536/download.

In sum, this Report continues to find substantial progress with the Division's implementation of the Consent Decree requirements.  The available data suggests that the men and women of the Division are engaging meaningfully with the new policies and trainings as they do their work on a daily basis.  However, the City and the Division still have a ways to travel before in-depth quantitative and qualitative assessments to measure full and effective compliance with the Consent Decree will be possible.

*Cleveland Police Monitoring Team*
*September 16, 2019*

## II.     THE ROLE OF THE MONITORING TEAM & THIS REPORT

As with the Monitoring Team's previous reports, the role of the Monitoring Team and of this report are useful to summarize at the outset.  Under the terms of the Consent Decree between the United States and the City of Cleveland (the "City") (collectively, the "Parties") involving the Cleveland Division of Police, the Court-appointed Monitoring Team must "assess and report" to the Court whether the Decree's requirements "have been implemented, and whether this implementation is resulting in constitutional and effective policing, professional treatment of individuals, and increased community trust . . . ."[2]  This is the Monitoring Team's seventh semiannual report.[3]  It addresses the reporting period of March through August 2019.

The Monitoring Team is an "agent of the Court" that is "subject to the supervision and orders of the Court."[4]  The role of the Team is to assess, independently and on behalf of Judge Solomon Oliver, Jr., whether CDP and the City of Cleveland have reached compliance with the various and diverse requirements of the Consent Decree.  Thus, as the Monitoring Team has previously outlined, it "is not an employee, contractor, or any other type of agent" of either the City of Cleveland or the United States Department of Justice ("DOJ").[5]  Instead, it works for the Court.

As part of that charge, the Team assists in facilitating Consent Decree implementation by providing technical assistance and Counsel to the Division of Police and City of Cleveland.  Although its ultimate task is to inform the Court and DOJ about the City's compliance with the Consent Decree, the Team provides ongoing assistance geared at ensuring effective, efficient, and expeditious progress.

### A.     The Fourth Year Monitoring Plan

The Fourth Year Monitoring Plan principally addresses the period of February 1, 2019 through January 31, 2020, with a handful of dates past January 31, 2020.[6]

### B.     The Purpose and Form of This Report

In its Third Semiannual Report, the Monitoring Team began summarizing the status of the City's compliance with each paragraph of the Consent Decree.  Although providing "a paragraph-by-paragraph accounting of the general state of the City's compliance . . . runs the risk of being an over-simplification," these summary characterizations remain useful markers for understanding progress over time.[7]

Thus, each major section of this Seventh Semiannual Report summarizes the Monitoring Team's generalized conclusions about the status of compliance by describing the state of each area as one of the following:

---

[2] Dkt. 7-1 ¶ 350.

[3] *Id.* at ¶ 375 (requiring semiannual reports).

[4] First Semiannual Report at 14.

[5] *Id.*

[6] Dkt. 249.

[7] Third Semiannual Report at 9.

**Non-Compliance.** The City or Division has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or Division's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement.

**Evaluation Deferred.** This category reflects those limited instances where work in a given area has been intentionally and affirmatively deferred in order to work on other, necessary prerequisites. In these areas, the City or Division could have made more progress in a given area but, for project management reasons, have appropriately focused attention on other areas. Although this still means that the City has a distance to travel to reach General Compliance with the term of the Consent Decree, the intentional and affirmative decision to postpone focus on a given area for project management and implementation purposes is sufficiently different to warrant a separate designation in some cases.

**Partial Compliance.** The City or Division has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the provision of the Consent Decree—but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice. It may capture a wide range of compliance states or performance, from the City or Division having taken only very limited steps toward operational compliance to being nearly in operational compliance.

**Operational Compliance.** The City or Division has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Decree such that it is in existence or practice operationally—but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

**General Compliance.** The City or Division has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the City or Division has effectively complied with a requirement fully and systemically.

The same caveats that have previously applied to the use of these summary categories remain applicable. First, "Non-Compliance" or "Partial Compliance" do not automatically mean that the City or CDP have not made good-faith efforts or commendable strides toward compliance. It might, instead, signify that initial work has either not yet begun or reached a sufficiently critical point where progress can be considered to have been made.

Second, "Partial Compliance" requires more than taking some limited, initial steps toward compliance with a requirement. It instead requires that the City or Division have made "sufficient, material progress toward

compliance" that "has graduated from the stages of initial work to more well-developed and advanced refinement of various reforms."[8]

Third, these summary terms do not appear in the Consent Decree. The Team employs them in order to synthesize and summarize the report's conclusions. Relatedly, compliance with individual paragraphs of the Decree is necessary for the larger, overall "Substantial and Effective Compliance" with the whole of the Consent Decree but it is not the same thing. Ultimately, "Substantial and Effective Compliance" with the Consent Decree will be reached when "the City either has complied with *all* material requirements of this Agreement, or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures,"[9] "by a preponderance of the evidence."[10]

Fourth, the charts that summarize progress in each area also condense the requirements of each paragraph rather than reprinting the entire Consent Decree in the context of this report. Any imprecision detected or confusion created by these condensed or summarized requirements is unintended and, in any event, can be cured with reference to the original Consent Decree language itself.[11] The charts primarily cover paragraphs 14 through 340 of the Consent, but other paragraphs also contain requirements that the City must meet.[12]

Following the release of the Third Semiannual Report, some community members, and CDP members, inquired about the basis for some of our summary conclusions. We reiterate that these overall "compliance status" conclusions at the start of each chapter do not replace the more rigorous quantitative and qualitative assessments of how CPD is performing over time:

> [T]he Monitoring Team bases its assessments on its current understandings, knowledge, and information gained through ongoing work and discussion with CDP, the Parties, and other stakeholders. The assessments are informal to the extent that not all of them are necessarily informed by the type of exhaustive compliance and outcome measurements that are a critical component of the Consent Decree—and the summary determinations do not take the place of these more structured, systemic analyses. The intent is to provide a bottom-line sense of where the Division is on the road to compliance. Ongoing, rigorous quantitative and qualitative assessments will provide a more comprehensive picture as work under the Consent Decree proceeds.[13]

The Team's characterizations of progress should ultimately be viewed as a synthesis or bottom-line accounting of the substantive discussions of each major Consent Decree area contained within this report.

Finally, the Monitoring Team notes that the City of Cleveland's implementation of the Consent Decree—and the various subprojects comprising it—is a substantial task. Many areas of the Decree require significantly more time than one reporting period for the City to achieve—and for the Monitoring Team to report on—major

---

[8] Third Semiannual Report at 10.

[9] Dkt. 7-1 ¶ 456 (emphasis added).

[10] *Id.* at ¶ 397.

[11] *See id.*

[12] *See* Third Semiannual Report at 10.

[13] *Id.* at 11.

breakthroughs of progress.  Accordingly, the Team's semiannual reports, including this current report, reprint content from prior semiannual reports in instances where there has not been enough material progress to warrant an update.  In such cases, the Monitoring Team has elected to not cite to prior semiannual reports in the interest of readability.

## III.    COMMUNITY ENGAGEMENT AND BUILDING TRUST

| Paragraph | Status of Compliance |
|---|---|
| 14.   CDP creation of "formal and informal mechanisms that facilitate ongoing communication between CDP and the many Cleveland communities it serves." | **PARTIAL COMPLIANCE** |

## A.    Community Police Commission ("CPC")

| Paragraph | Status of Compliance |
|---|---|
| 15.  Creation of CPC to make recommendations, work with Cleveland communities to develop recommendations, and "report to the City and community as a whole and to provide transparency" on reforms | **GENERAL COMPLIANCE** |
| 16.  Establishment of CPC Selection Panel to select CPC Commissioners; composition of CPC; and periodic meetings with Chief of Police to "provide recommendations." | **GENERAL COMPLIANCE** |
| 17(a).  "[H]old public meetings across the City, complete an assessment of CDP's bias-free policing policies, practices, and training, and make recommendations." | **GENERAL COMPLIANCE** |
| 17(b).  "[A]ssist as appropriate in . . . development of training related to bias-free policing and cultural competency." | **GENERAL COMPLIANCE** |
| 17(c).  "[O]n an ongoing basis, assess CDP's community activities" and "make recommendations" related to "community engagement" and "community confidence" | **PARTIAL COMPLIANCE** |
| 17(d).  "[O]n an ongoing basis, review CDP's civilian oversight structure to determine if there are changes it recommends for improving CDP's accountability and transparency" | **PARTIAL COMPLIANCE** |
| 17(e).  "[P]erform other function[s] as set out in this Agreement." | **PARTIAL COMPLIANCE** |
| 18(a).  "[R]eview and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention." | **PARTIAL COMPLIANCE** |
| 18(b).  [R]eview and comment on CDP's implementation of initiative, programs, and activities that are intended to support reform." | **PARTIAL COMPLIANCE** |
| 18(c).  "[H]old public meetings to discuss the Monitor's reports and to receive community feedback concerning CDP's compliance with this Agreement." | **OPERATIONAL COMPLIANCE** |
| 19.  "The City will provide access to all information requested by the Commission related to its mandate, authority, and duties unless it is law enforcement sensitive, legally restricted, or would disclose a personnel action." | **PARTIAL COMPLIANCE** |
| 20.  CPC "will issue [at least annual] reports," which the "City will post . . . to the City's website." | **OPERATIONAL COMPLIANCE** |
| 21.  "The City will consider and timely respond in writing to the Commission's recommendations for improvements," which "will be posted to the City's website." | **PARTIAL COMPLIANCE** |

| 22.  CPC budget listed as "separate line item" to ensure "sufficient independence and resources." | **GENERAL COMPLIANCE** |
| --- | --- |

## Background

The Community Police Commission ("CPC" or "Commission") is the mechanism created through the Consent Decree "to promote public trust and confidence in the CDP" and to "make recommendations to the Chief of Police and the City, including the Mayor and City Council," based on the "values and priorities of Cleveland residents."[14] The Commission is intended to serve as a conduit between the Consent Decree reform process and Cleveland's diverse communities, and the scope of its charge is far-reaching.  CPC has the authority to "review and comment" on the Division's "policies and practices related to use of force, search, and seizure, and data collection and retention," as well as any "initiatives, programs, and activities that are intended to support reform."[15]

## Where the Commission Stands Now

### Full-Time Staff

During the current reporting period, the CPC completed three new full-time staff hires: a Senior Policy Analyst, a Community Engagement Coordinator, and an Assistant Administrator.  The Monitoring Team is pleased to see that the Commission has onboarded new staff following staff departures in 2018.  As the Monitoring Team has observed since the beginning of the process, the presence of full-time staff to help the all-volunteer Commission conduct its work better positions the Commission to live up to its important Decree mandate.

### Change in Commissioner Leadership

On May 28, Sergeant Richard Jackson of the Black Shield Association and LaToya Logan were elected as CPC Co-Chairs.  The two Co-Chairs will lead the Commission through September 2019, when the original four-year terms expire for all currently-serving Commissioners.  The Monitoring Team has confidence that Mr. Jackson and Ms. Logan will assist the Commission in carrying out the important, substantive duties that the Consent Decree requires.

### Search and Seizure

The Commission's Search and Seizure work group initially provided generally high-quality, substantive, and well-supported recommendations on the Division's draft Search and Seizure policies to the Parties in November 2018.  The CPC continued to be engaged in ongoing discussions with the Parties as the Division finalized its revisions of the policies, which were approved by the Court on May 16, 2019.[16]   Although not all of the CPC's recommendations were incorporated into the final policies submitted by the Division and ultimately approved by the Court, the Monitoring Team is satisfied that all areas of CPC feedback were discussed thoughtfully and considered carefully.  As with the its earlier involvement on other policies, such as use of force, the Commission's

---

[14] Dkt. 7-1 at ¶ 15.

[15] *Id.* at ¶¶ 18(a)-(b).

[16] Dkt. 261.

contributions to the Search and Seizure policy development process resulted in stronger policies. The Monitoring Team commends the work of the CPC's Search and Seizure work group for its dedication and willingness to engage in a series of productive discussions directly with the Division on substantive issues in this area.

Following the focus on the Search and Seizure policies, the Commission reviewed drafts of the Search and Seizure training curricula and provided formal feedback in early June 2019. The feedback on the training was likewise constructive and helpful, including discussion of the training content and the method of delivery. A major component of officer training, the Search and Seizure training will directly influence when, how, and under what circumstances CDP officers detain individuals and conduct investigatory stops. Here, too, the Monitoring Team is pleased that the Commission and City have worked collaboratively on such an important training initiative that directly affects how CDP officers interact with members of the public.

### *New CPC Initiatives*

The Commission has initiated conversations with the Parties and Monitoring Team about new activities aimed at ensuring that the community continues to be involved in the ongoing implementation of the Decree's reforms. The CPC has discussed hiring a short-term consultant to evaluate ongoing training initiatives. It also has begun early discussions around CDP's accountability mechanisms aimed at ensuring that officers and members of the public are able to efficiently resolve citizen complaints.

The Monitoring Team will continue to be involved in these discussions and is pleased to see that the Commission, at a moment when the Consent Decree's implementation evolves from creating policies on paper to the Division and City executing all of the organizational and cultural changes that the policies require, is exploring ways that it can best contribute and serve as the community's voice during this process.

### Progress and Tasks that Remain

### *Commissioner Transition*

The Consent Decree limits the terms of service of commissioners to four years.[17] Accordingly, the initial commissioner terms expire in September 2019. The Commission and City have been proactively addressing the upcoming vacancies. In May 2019, the City took steps to re-empanel the Decree-required selection panel, made up of faith-based organizations, civil rights advocates, the business/philanthropic community, and advocacy organizations, among others, to fill those vacancies. The panel will accept applications from the community to serve on the Commission from July 15 to August 30. It will ultimately make recommendations to fill ten Commission seats by September 15.

---

[17] Dkt. 7-1 ¶ 16.

## B.        District Policing Committees

| Paragraph | Status of Compliance |
|---|---|
| 23.    Facilitation of "regular communication and cooperation between CDP and community leaders at the local level," with District Policing Committees meeting "at minimum, every quarter." | **PARTIAL COMPLIANCE** |
| 24. CPC, CDP, and Community Relations Board ("CRB") will "develop a mechanism to recruit and expand" Committee membership."  CDP "will work with [Community Police] Commission to select officers for each District Policing Committee." | **PARTIAL COMPLIANCE** |
| 25. CDP "will work closely with District Policing Committees to identify strategies to address crime and safety issues in their District," considering and addressing identified priorities. | **PARTIAL COMPLIANCE** |
| 26. "At least annually, each District Policing Committee will present its identified strategies, concerns, and recommendations" to the CPC, with CDP officer who is Committee member presenting to CPC "CDP's assessment of ways to address" the recommendations." | **NON-COMPLIANCE** |

### Background

The Decree calls for the expansion—building on existing structures—of five District Policing Committees, or one for each of the five police districts within the city of Cleveland.[18]  Those Committees, which existed long before the Consent Decree process, must work to "identify strategies to address crime and safety issues in their District."[19]

### Where the DPCs Stand

The DPC Plan, which sets forth the CDP's strategy to modify and improve the five DPCs to meet the terms of the Consent Decree, was approved by the Court on February 20, 2019.[20]  This Plan lays out the contemplated steps that the Division will take to expand the attendance of the District Policing Committees and ensure that they are working well with community members to identify and resolve public safety problems.  Such steps include empowering Community Engagement Officers ("CEOs"), a set of officers who have no patrol duties and can focus their efforts on engaging the community, to take a lead in the DPCs and implementing strategies for ensuring that underrepresented communities are invited and present at the meetings.

It is too soon yet to formally assess the progress of the DPC Plan implementation.  Still, the Team has directly observed, and heard anecdotally from Cleveland residents, that the DPCs have been inconsistent—with some DPCs improving but others seeing little to no difference.  Some DPCs continue to use their former name, the

---

[18] *Id.* at ¶¶ 23-24.

[19] *Id.* at ¶ 25.

[20] Dkt. 238.

District Community Relations Committee, from before the Consent Decree mandated their name change.  One DPC meeting featured no set agenda, while meetings in other Districts featured a set agenda.

These anecdotes are no substitute for hard evidence on how the DPCs have made progress.  Each DPC must submit a written annual report describing recommendations to address crime.  Under the DPC Plan, the first report was due "by the end of the first quarter of 2019."  The Monitoring Team has not seen such a report.  The Team expects that the DPCs will have prepared a thorough and comprehensive report by the end of 2019.

The DPC Plan also contemplates that the District Commanders, CEOs, CRB District representatives DPC co-chairs, and the Bureau of Community Policing Commander will meet bi-annually to discuss strategies to increase participation at each DPC and their effectiveness.[21]  CDP has expressed to the Monitoring Team that such meetings have or are being scheduled.  The Team looks forward to seeing the outcomes and activities of such meetings.

### Progress and Tasks that Remains

#### *Survey of Participation*

As described in the Division's DPC Plan, in order to expand participation in the DPCs to include a cross-section of community members, each DPC must identify and reach out to community members who do not attend DPC meetings.  Under the DPC Plan, each DPC will survey existing attendees to determine any gaps in attendee representation, and the DPC co-chairs will then attempt to reach out to underrepresented groups and organizations to encourage their participation.  To the Monitoring Team's understanding, this has yet to occur.

#### *DPC Auditing*

Going forward, and as noted previously, the Monitoring Team will be attending DPC meetings regularly going forward to assess whether the Division has implemented the DPC Plan's contemplated changes.  More than that, the Team will be looking to see if the changes, upon implementation, are having a positive impact on the attendance and participation at DPC meetings – and are better allowing community residents to have a say in identifying and resolving neighborhood public safety issues.

#### *Annual Report*

As described above, the DPC Plan contemplates that each DPC will create an annual report summarizing problem-solving strategies and recommendations, as well as ways to implementing the identified strategies.  The Team looks forward to seeing these reports on an annual basis, to assess whether the DPCs have been able to successfully collaborate with residents, working in tandem with residents to identify the problem, design a solution, and assess the efficacy.  As mandated by the Decree, the DPCs will need to submit these annual reports to the Community Police Commission.[22]

---

[21] *Id.* at 13.
[22] Dkt. 7-1 at ¶ 26.

## IV.    COMMUNITY & PROBLEM-ORIENTED POLICING

| Paragraph | Status of Compliance |
|---|---|
| 27.  Implementation of "comprehensive and integrated community and problem-oriented policing model" and consultation with CPC regarding the model. | **PARTIAL COMPLIANCE** |
| 28.  Ensuring that "mission statement reflects [the Division's] commitment to community oriented policing" / "integrat[ing] community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **OPERATIONAL COMPLIANCE** / **PARTIAL COMPLIANCE** |
| 29.  Ensuring "that officers are familiar with the geographic areas they serve," "engage in problem identification," and "work proactively . . . to address quality of life issues." | **EVALUATION DEFERRED** |
| 30.  Initial and annual in-service community and problem-oriented policing training "adequate in quality, quantity, type, and scope" that addresses specifically-identified areas. | **PARTIAL COMPLIANCE** |
| 31.  Maintenance of "collaborative partnerships with a broad spectrum of community groups," including CDP meetings with community organizations and District Policing Committees. | **PARTIAL COMPLIANCE** |
| 32.  CDP "meet[ing]" with members of the community in each District on a monthly basis and "solic[itation of] participation from a broad cross-section of community members in each District" to "identify problems and other areas of concern . . . and discuss responses and solutions." | **PARTIAL COMPLIANCE** |
| 33.  Development and implementation of "systems to monitor officer outreach to the community" that CDP "will use . . . to analyze . . . whether officers are partnering with a broad cross-section of community members to develop and implement cooperative strategies that build mutual respect and identify and solve problems." | **PARTIAL COMPLIANCE** |
| 34.  "At least annually, CDP will present the results" of paragraph 33 analysis "broken out by District in a publicly-available community policing report" that describes problems, solutions, and obstacles.  Report provided to Commission and posted on CDP website. | **NON-COMPLIANCE** |

## Background

The Consent Decree requires that the Division develop and implement a "comprehensive and integrated community and problem-oriented policing model" to "promote and strengthen partnerships with the community . . . and increase community confidence in the CDP."[23]  The Decree refers to policing according to this model as "community and problem-oriented policing," or "CPOP."

---

[23] Dkt. 7-1 ¶ 27.

"Community and problem-oriented policing" is defined as a "policing philosophy that promotes and relies on collaborative partnerships between law enforcement agencies and the individuals and organizations they serve to develop solutions to problems, increase trust in police, and improve the effectiveness of policing efforts."[24]  A Division-wide commitment to community policing helps promote trust and legitimacy, improve the quality of police-citizen encounters, and address persistent public safety issues in Cleveland communities.  CDP must ensure that related operational and structural changes needed to support community and problem-oriented policing—principally, staffing and recruitment—receive appropriate consideration.

### Where the Division Stands

### *CPOP Plan Implementation*

As the Monitoring Team has previously noted, the CDP's Court-approved CPOP Plan "situates CPOP not as a standalone program or set of initiatives, but rather part and parcel of how the Division recruits and hires, allocates resources, trains, promotes, and evaluates officers and the Division, and collects data."[25]  It is a milestone undertaking.

In the current reporting period, the Division has taken important initial steps to better position itself toward executing the Plan in a way that successfully restructures and reorients the Division towards community and problem-oriented policing.  Work this important and far-reaching cannot be accomplished in a matter of six months.  The Division will need to continue and advance its efforts toward implementing the CPOP Plan in the manner that the Decree requires.

### *Training*

The Division began its second year of Community Engagement and Problem-Solving ("CEPS") Training on March 4, 2019.  The eight-hour curriculum was approved by the Court on April 23, 2019.[26]

The eight-hour 2019 Community Engagement and Problem-Solving Training built on the initial CEPS training provided in 2018, introducing new officer expectations and responsibilities that are part of the Division's CPOP Plan.  The training introduced to officers the CDP's goal that patrol officers commit 20% of their time to community engagement and provided examples of community engagement activities that will count toward this 20% goal, such as bike and foot patrols, spending time talking with community members about any public safety problems, conducting outreach to a particular group, and identifying and solving problems in ways other than enforcement or arrest. The training also discussed activities that would not constitute CPOP activity, such as brief casual encounters or interactions that would ordinarily occur during a response to a call for service or during an investigation.  The training noted that officers would receive additional, in-depth instruction on the 20% goal following the completion of a new departmental policy on community policing, as required by the Court-approved CPOP Plan.

---

[24] *Id.* at ¶ 414.
[25] Dkt. 246 at 14-15 (internal quotation marks omitted).
[26] Dkt. 257.

The CEPS Training also includes instruction on communication and behavioral skills that officers will use to positively engage community members and build community partnerships.  Officers are provided with guidance to form partnerships with, among others, community organizations, youth, religious and ethnic communities, the homeless, and mental health organizations.

The CEPS Training also dedicates substantial time to the "SARA" model, a methodology that officers are expected to use to identify and address community problems.  Short for "scanning-analysis-response-assessment," the SARA model gives specific direction for officers to tackle what can seem like an ambiguous or difficult-to-implement creed of "problem-solving."  The training includes a substantial role-playing scenario that touches upon public safety problems such as vacant buildings, a pattern of burglaries, and environmental elements affecting the issue.

More than just the curriculum, the delivery of the training was well-received.  A number of Monitoring Team members observed the training and assessed that it was conducted in a manner that was consistent with the curriculum and adult learning guidelines.  The training built on lessons learned from the Division's 2018 CEPS Training, utilizing instructors who were appropriately selected.

As of August 8, 2019, 1,330 officers (or 98.9% of officers not on extended illness leave or on restricted duty status) completed the 2019 CEPS Training.

## CPOP Policy

In the current reporting period, as a first step towards implementing the CPOP Plan, the Division finalized a policy memorializing the expectations for all CDP members that were only initially and broadly outlined in the CPOP Plan.  The policy was submitted to the Court on August 2, 2019.[27]  The CPC contributed to the development of this CPOP Policy, offering feedback and recommendations that the City considered in its development.

The CPOP Policy makes clear officers' expectations to actively collaborate with Cleveland residents to address public safety issues and the conditions that lead to crime.  Specifically, patrol officers assigned to CDP's neighborhood districts "are expected to spend an average of 20% of their time engaging with community members to build relationships, partnerships, and trust, and collaboratively solve community concerns."[28]  The policy also includes examples of formal and informal activities that count as CPOP activities, such as bike and foot patrols, participating in community events and meetings, checking in with community organizations about problems they have encountered, and "identifying and solving problems in ways other than arrest, such as connecting community members to services that provide assistance such as mental health and homeless services[.]"[29]

A key component of the Division's commitment to community engagement will be in its ability to effectively create and strengthen active partnerships with community stakeholders.  Under the CPOP Policy, officers "shall form partnerships with all communities" including community organizations, community development

---

[27] Dkt. 273.

[28] Dkt. 273-1 at 2.

[29] *Id.* at 3-4.

corporations, youth advocates, LGBTQ individuals, religious and ethnic communities, block clubs, the homeless community, and community members with mental illness or other behavioral health issues.[30]

Under the CPOP Policy, officers will not be subject to discipline "based solely on their inability to meet CPOP expectations.  However, meeting or not meeting expectations about engaging in community engagement and problem-solving activities shall be used in the evaluation process in determining promotions, assignments, and evaluations."[31]

Supervisors will have significant responsibilities under the CPOP Policy to ensure that line officers are taking seriously the duty to engage with Cleveland residents in a positive manner, providing guidance to officers, commending officers who excel at positively engaging the community, and remediating those who are not effectively implementing CPOP.

### Progress and Tasks that Remain

#### 1.   *20% Goal for Community Engagement*

In the upcoming reporting period, the Division plans to conduct additional, in-depth officer training that formally instructs officers on the goal that 20% of patrol officers' time is dedicated to engaging the community.  As CDP officers are trained on it and the data systems go live to record officers' activity, the Division will have started to operationalize the core expectation that patrol officers make good faith efforts to engage with community members and residents for 20% of their day.

#### 2.   *Data Collection Training*

Under the approved CPOP Plan and Policy, officers will be required to enter any CPOP activity into an electronic database system.  The Division's new CPOP Policy outlines the data collection protocols in greater detail.  The next step now is for CDP to train all members to understand their individual responsibilities to input data timely and regularly.  This will include data on collaborative problem-solving, community outreach, bike and foot patrol frequency, organized community events, and unplanned engagements with the community.  Officers will be expected and required to enter such data regularly into the database.  The Division's Data Collection and Analysis Coordinator will ensure the proper tracking and monitoring of CDP's activities.  All of this is required by Paragraphs 32 through 34 of the Decree.

It should also be noted, however, that the data tracking is far more than just a compliance tracking or accountability mechanism.  It is also hoped that systematically logging information about community contacts will help to establish even more robust, long-term community networks and relationships between CDP and the residents that it serves.

In the upcoming reporting period, CDP intends to have trained all CDP officers on the data collection through in-person instruction.

---

[30] *Id.* at 4-5.
[31] *Id.* at 7-8.

### 3.  CPOP Review Committee

A critical component of the Division's ability to improve upon its CPOP efforts, the CPOP Review Committee will need to be developed and inaugurated by the Division.  The CPOP Review Committee is made up of the BCR Commander, the CDP's Compliance Team, and the Data Coordinator.[32]  Once constituted, the committee will take on important responsibilities in the Division's ability to execute the CPOP Plan.  Among other things, the Review Committee will need to meet quarterly, review all community engagement and problem-solving data, identify gaps in officers' ability to meet the 20% expectation, and create a biannual report of the findings and recommendations for improvement.[33]

### 4.  CPOP in Evaluations and Promotions

In the upcoming reporting period, CDP intends to identify specific ways of incorporating CPOP principles into its evaluations and promotions – helping to ensure that those who assume supervisory and leadership roles best exemplify the Division's commitment to community engagement and collaborative problem-solving.  This will be significant to the Division's overall ability to meet CPOP expectations by helping to ensure that leadership meets the Division's mission statement and guiding principles and that rank officers are appropriately supervised in real-time to prioritize community engagement as part of their core day-to-day functions.

### 5.  Verified Alarm Response

CDP has stated that it intends to determine the feasibility of the "Verified Alarm" response and increasing incidents that can be reported online.  The CDP's Court-approved Staffing Plan discussed the substantial amount of time that the Division spends on responding to false alarms.  To take back that time and allocate it to more impactful uses, such as allowing officers to meet their goal of spending 20% of their time engaging positively with the community, CDP has committed to exploring a "Verified Alarm" response that can ensure that only certain alarms require an on-scene response from CDP officers. Residential alarms have high false alarm rates resulting from human error.  Verified alarm programs help homeowners to become more aware of how their alarms operate and result in lower false alarm rates.  The resulting decrease in alarm calls ends up freeing up officers' time to work on community policing activities and more quickly address emergency calls.

### 6.  Annual Community Policing Report

The Decree requires that the Division prepare a public community policing report that identifies community policing problems, solutions, and obstacles.  To date, the Division has not been in a position to generate the type of comprehensive report that the Decree contemplates.  Another part of the implementation of the CPOP Plan will be establishing a process for completing this important public accountability document and beginning to comply with the Decree's annual obligations.

---

[32] *Id.* at 32-33.
[33] *Id.* At 33.

## V.    BIAS-FREE POLICING

| Paragraph | Status of Compliance |
|---|---|
| 35.   Delivery of "police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias," among other things. | **PARTIAL COMPLIANCE** |
| 36.  "CDP will integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **PARTIAL COMPLIANCE** |
| 37.  CDP will ensure that it "administer[s] all activities without discrimination" on basis of various protected classes | **PARTIAL COMPLIANCE** |
| 38.    "CDP will develop a bias-free policing policy" incorporating CPC recommendations "that provides clear guidance to officers" | **OPERATIONAL COMPLIANCE** |
| 39–40.  Bias-free policing and procedural justice training "adequate in quality, quantity, scope, and type" covering specific areas | **PARTIAL COMPLIANCE** |
| 41.  Supervisor training on bias-free policing and procedural justice issues covering specific areas | **EVALUATION DEFERRED** |
| 42.  Annual in-service training on bias-free policing "adequate in quality, quantity, type, and scope" | **EVALUATION DEFERRED** |
| 43.  Analysis of paragraph 265 data ("including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination") | **EVALUATION DEFERRED** |
| 44.  Consideration of "bias-free policing and equal protection" principles in hiring, unit assignment, promotion, and performance assessments. | **PARTIAL COMPLIANCE** |

### Background

The Consent Decree requires that CDP "deliver police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in CDP."[34] Bias-free policing principles must be operationally integrated into CDP's "management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."[35]  The goal is "to ensure policing and law enforcement outcomes that are as free from the effects of all bias to the greatest extent possible."[36]

### Where the Division Stands

During the current reporting period, the Division began its second year of required Bias-Free Policing Training. The four-hour 2019 Bias-Free Policing Training builds on prior training from 2018.  It seeks to provide guidance

---

[34] Dkt. 7-1 ¶ 35.

[35] *Id.* ¶ 35-36.

[36] First Semiannual Report at 30.

for CDP officers on better understanding how implicit bias operates, the ways in which biased policing obstructs the goals of procedural justice and legitimacy, and how officers can minimize the occurrence of biased policing by identifying and managing moments where decision-making may be susceptible to errors attributable to implicit bias.  The training curriculum was approved by the Court on July 29, 2019.[37]

As with all Decree-related training initiatives, the Monitoring Team will attend sessions of the 2019 Bias-Free Policing Training to ensure that instructors are actively encouraging officers to engage in critical implicit bias concepts and to approach day-to-day policing in ways that minimize the effects of implicit bias—all in a manner that can be certified to the Court as "adequate in quality, quantity, scope, and type[.]"[38]

## Progress and Tasks that Remain

### Integration of Bias-Free Policing Principles

The Decree requires the Division to "integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."[39]  With the approval of the Bias-Free Policing Policy more than one year ago, CDP is well-positioned to accelerate ongoing work on personnel evaluations, management processes, resource deployment, and accountability systems to ensure that the process of integrating bias-free policing principles continues in a timely fashion and across the Division's functions.

### District Neighborhood Trainings

CDP is in the process of developing District Neighborhood Trainings to provide officers with guidance as to some of the unique cultural characteristics of neighborhoods and communities within each district. This effort aligns with the Decree's requirement that "CDP will ensure that officers are familiar with the geographic areas they serve, including their assets, challenges, problems, business, residential and demographic profiles, and community groups and leaders[.]" This will allow officers to "engage in problem identification and solving activities…regarding the community's priorities." CDP must continue to revise and finalize these trainings.

### The Division's Collection, Analysis, and Proactive Uses of Data

The Consent Decree requires that the Division conduct annual assessments of all police activities, "including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race, ethnicity, gender, disability, sexual orientation, or gender identity."[40]

---

[37] Dkt. 272.
[38] Dkt. 7-1 at ¶¶ 39-40.
[39] Dkt. 7-1 at ¶ 36.
[40] *Id.* at ¶¶ 43, 265.

CDP must make progress on developing its data and information infrastructure and in its ability to manage itself based on lessons and insights derived from such data.  The Division ultimately will need to be able to analyze data, produce reports, and conduct quantitative and qualitative assessments on subjects such as arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination—all policing practices where it is critical to assess the presence of biased or discriminatory policing.  As discussed elsewhere in this report, while CDP has made progress to develop the infrastructure necessary for tracking and analyzing the Division's performance in this area, much more progress is needed to comply with the Decree's requirements on the collection, analysis, and proactive use of data.

## VI.    USE OF FORCE

### A.    Officer Use of Force Principles & Policy

| Paragraph | Status of Compliance |
|---|---|
| 45.  "CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force" complies with the Constitution, federal law, and the Consent Decree "and that any use of unreasonable force is promptly identified and responded to appropriately." | **PARTIAL COMPLIANCE** |
| 46.  "The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers . . . will comply" with at least twelve major, listed principles. | **PARTIAL COMPLIANCE** |
| 47.  Division "will ensure that the [use of force] incident is accurately and properly reported, documented, and investigated." | **PARTIAL COMPLIANCE** |
| 48.  "CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends." | **PARTIAL COMPLIANCE** |
| 49.  Development of use of force policies "that comply with applicable law[,] . . . are adequate to achieve the goals described in paragraph 45," and "specify that unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability." | **OPERATIONAL COMPLIANCE** |
| 50.  "CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons." | **OPERATIONAL COMPLIANCE** |
| 51.  Weapon-specific policies "will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon." | **OPERATIONAL COMPLIANCE** |
| 52.  "No officer will carry any weapon that is not authorized or approved by CDP." | **OPERATIONAL COMPLIANCE** |
| 53.  "Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of weapon is imminent, and allow the subject an opportunity to comply." | **OPERATIONAL COMPLIANCE** |
| 54–83 "CDP will implement policies" for firearms, ECWs (Tasers), and OC (pepper) spray that comply with a host of specific, expressly listed provisions. | **OPERATIONAL COMPLIANCE** |
| 84.  CDP "will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes" a number of specific, expressly-listed elements. | **OPERATIONAL COMPLIANCE** |
| 85.  CDP "will provide the use of force training described in paragraph 84 to all new officers." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 86.  "CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |
| 87.  "CDP will develop and implement a single, uniform reporting system pursuant to a Use of Force reporting policy" that complies with the force Level categorization set forth in the paragraph. | **OPERATIONAL COMPLIANCE** |
| 88.  Requiring "[a]ll officers using or observing force" to complete a Use of Force Report including a number of specific features and avoiding "conclusory statements, 'boilerplate', or 'canned' language." | **OPERATIONAL COMPLIANCE** |
| 89.  "Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports." | **OPERATIONAL COMPLIANCE** |
| 90.  "Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable." | **OPERATIONAL COMPLIANCE** |
| 91.  Requirement to "notify . . . supervisors . . . as soon as practical following any use of force" and if becoming aware of "an allegation of unreasonable or unreported force by another officer." | **OPERATIONAL COMPLIANCE** |
| 92.  "Use of Force Reports will be maintained centrally." | **OPERATIONAL COMPLIANCE** |

## Background

Under the Consent Decree, the Cleveland Division of Police must:

> [R]evise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force is used in accordance with the Constitution and laws of the United States and the requirements of the Agreement and that any use of unreasonable force is promptly identified and responded to appropriately.[41]

The Court approved CDP's new use of force policies, subject to some specific conditions, on January 17, 2017.[42] These five new policies address: (1) general use of force principles and expectations; (2) definitions used in various force policies; (3) de-escalation techniques to ensure officer and subject safety; (4) intermediate weapons, such as a Taser, oleoresin capsicum (OC) spray, and baton; and (5) reporting of force.  The policies were the subject of substantial rounds of public comment across the Cleveland community, facilitated by the City, Community Police Commission, Department of Justice, and the Monitoring Team.

The Consent Decree also requires that CDP's training on use of force be "adequate in quality, quantity, scope, and type" and include instruction, among other things, on:

- Proper use of force decision-making;

---

[41] Dkt. 7-1 at ¶ 45.
[42] Dkt. 101.

- Use of force reporting requirements;
- The Fourth Amendment and related law;
- De-escalation techniques, both verbal and tactical, that empower officers to make arrests without using force and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, using cover, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;
- Role-playing scenarios and interactive exercises that illustrate proper use of force decision-making, including training on the importance of peer intervention;
- The proper deployment and use of all intermediate weapons or technologies;
- The particular risks and considerations relating to using a Taser; and
- Firearms training.[43]

In 2017, the Division of Police provided all sworn personnel with training on the new use of force policies.  The 2017 Use of Force Training established a strong foundation for ongoing, follow-up training that is required to be provided on an annual basis on additional and in-depth force topics.

Beyond policy and training with respect to using force, the Division must have clear processes and procedures for the administrative investigation and review of force incidents.[44]  The Decree lays out specific force reporting requirements, including the establishment of a new system of classifying force, which the Monitoring Team has described in previous reports:

- *Level One* force is the lowest level of force.  It is force that is "reasonably expected to cause only transient pain and/or disorientation during its application as a means of gaining compliance . . . but that is not reasonably expected to cause injury, does not result in actual injury, and does not result in a complaint of injury."[45]
- *Level Two* force is force that "causes an injury, could reasonably be expected to cause an injury, or results in a complaint of injury."[46]
- *Level Three* force is force that constitutes "lethal" or "deadly" force.  It also includes any level of force which results in death or serious injury, hospital admission, or lack of consciousness. Specific types of Level Three force include neck restraints, canine bites, and more than three applications of an Electronic Control Weapon (i.e. Taser).[47]

---

[43] Dkt. 7-1 ¶ 84.  In addition to initial training on use of force covering the topics listed above, the Division must provide its officers with "annual use of force in-service training that is adequate in quality, quantity, type, and scope" going forward.  CDP supervisors must also receive specialized training, as discussed elsewhere in this report, relating both to force and broader supervisory skills.

[44] First Semiannual Report at 36-37; Dkt. 97 at 35-36.

[45] Dkt. 7-1 at ¶ 87(a).

[46] *Id.* at ¶ 87(b).

[47] *Id.* at ¶ 87(c).

Under the Decree, all officers using or observing force have an affirmative duty to report such force in writing by the completion of their tour of duty.[48]  To do so, the Division has needed to develop and implement a "single, uniform reporting system[.]"[49]

## Where the Division Stands

### Use of Force Trends

Data from the first half of 2019 finds the Division of Police continuing to use force less than before the Decree-required use of force policies and training were implemented.  This continues to occur even as crime, across most major categories, is down and officer injuries are likewise down.

In the first six months of 2019, there were 86 use of force incidents.  (As with previous reports, for the sake of consistency with prior years' data, this number excludes incidents where the only force that an officer used was the pointing of a firearm at an individual.)  That represents a 32 percent reduction compared to the first six months of 2017—the last comparable time period before all officers completed in-service training on the Division's revised Use of Force policies.  Although use of force was up slightly in 2019 compared to 2018, by 11 incidents or about 15 percent, the 32 percent reduction in force from 2017 remains significant.

**Table 1:**    **Use of Force Trends: January through June, 2017-2019, excluding Level 1: pointing of a firearm at an individual**

|          | 2017 | 2018 | 2019 |
|----------|-----:|-----:|-----:|
| January  |   23 |   10 |   10 |
| February |   19 |    9 |    9 |
| March    |   22 |    8 |   17 |
| April    |   24 |   16 |   16 |
| May      |   16 |   14 |   16 |
| June     |   23 |   18 |   18 |
| **TOTAL** | **127** | **75** | **86** |

These reduced counts of uses of force occurred at the same time that Cleveland generally saw fewer reported major crimes.  As Table 2 details, through the first six months of 2019, there were fewer Part I crimes in 2019 than in 2017 across all categories with the exception of rape.  There also were fewer Part I crimes in 2019 compared to 2018 in all categories but rape and burglary. CDP should study, including outreach to sexual assault advocacy organizations, whether the increase in rape reporting is due to an increase in occurrences or rather an increase in reporting, which could be an indicator of increased community confidence.

---

[48] *Id.* at ¶ 87(b).

[49] *Id.* at ¶ 87.

**Table 2:        Part I Crime: January through June, 2017-2019**

|  | 2017 | 2018 | 2019 |
|---|---|---|---|
| Homicide | 56 | 54 | 47 |
| Rape | 244 | 274 | 283 |
| Robbery | 1451 | 1145 | 929 |
| Felonious Assault | 1298 | 1230 | 1215 |
| Burglary | 3094 | 2196 | 2204 |
| Theft | 6941 | 5228 | 4745 |
| Grand Theft MV | 1745 | 1569 | 1381 |
| Arson | 149 | 79 | 73 |

At the same time that officers are using force less and crime is generally down in Cleveland, the data suggests that officers are substantially safer on the job now than they were before the new use of force policies and training went into effect.  As detailed in Table 3, the first six months of 2019 saw significant reductions in the number of CDP officers who sustained an injury.  This is an important metric as officer safety must not be sacrificed during the reform process. Successful reform efforts in other jurisdictions have shown that officer injuries should decline as dynamic incidents are stabilized through crisis intervention and de-escalation initiatives. As such, the decrease in officer injuries is promising and may suggest that CDP's new approaches to use of force are paying off.

Specifically, during incidents where officers used force, 19 officers sustained an injury in the first half of 2019—down from 36 in the first half of 2018 and 54 in the first half of 2017.  This is a 65 percent reduction comparing 2019 with 2017.

**Table 3:        Officer Injuries: January through June, 2017-2019[50]**

|  | 2017 | 2018 | 2019 |
|---|---|---|---|
| Use of Force Incidents in which ≥ 1 officer was injured | 54 | 36 | 19 |
| Total Officer Injuries | 167 | 138 | 87 |

Another important metric for evaluation is the proportion of overall use of force incidents in which an officer is injured.  Halfway through 2017, 43% of force incidents resulted in an injury to at least one officer.  Halfway through 2019, 22% of force incidents resulted in an injury to at least one officer.

Indeed, overall officer injuries—regardless of whether they occurred during a use of force incident or in another context—also continued to fall.  In 2019, there were 48 percent fewer officer injuries than in 2017 and 38 percent fewer injuries than in 2018.

---

[50] Due to minor changes in data accounting, the numbers in Table 3 for 2017 and 2018 differ slightly from those reported in the Monitoring Team's Sixth Semiannual Report.  Because they are so minor, the changes did not affect, in one way or another, the Monitoring Team's conclusions around CDP's use of force trends.

As the Monitoring Team has noted previously, the numbers alone do not establish, on their own, whether the Division is in compliance with the terms of the Decree that address use of force.  The Decree does not expressly mandate that CDP use less force but that, when CDP uses force, it is constitutional and lawful.  To that end, the Team will be conducting in-depth substantive reviews of use of force incidents to determine whether, when CDP officers use force, they are doing so in a manner that complies with the Division's new policies, the terms of the Consent Decree, and the law.  At the same time, the Division still must implement a host of systems and practices relating to the review and investigation of use of force incidents to ensure appropriate internal oversight of force. Nevertheless, the overall trends remain an encouraging sign that CDP's new Use of Force policies and training are having a positive impact on the streets, and forwarding the goals of improved safety for both CDP officers and the residents of Cleveland.

## B.    Use of Force Training

The 2019 annual Use of Force Training began on March 4, 2019.  The curriculum, developed by the Division's Training Section in consultation with the Department of Justice and Monitoring Team, was approved by the Court on April 23, 2019.[51]

The 2019 training built upon the Division's prior Use of Force Training in 2017, which was well-received by CDP officers and by observers from the Monitoring Team and Department of Justice.[52]  During the recent training, officers were expected to apply what they learned from the 2017 training to new scenarios, refreshing students on appropriate tactics and de-escalation strategies.

Like the earlier training, the scenarios in the 2019 training were interactive and dynamic, reflecting a variety of real-world situations in which officers may find themselves dealing with unpredictable subjects.  The scenarios were well-designed and required officers to engage critically with concepts such as the proportionality, reasonableness, and necessity of using force.  The scenarios also tested officers' ability to use appropriate communication styles and other tactical methods to de-escalate a subject, consistent with CDP policy, such that an officer use of force may be avoided entirely.

In addition to interactive scenarios and traditional classroom instruction, the Use of Force Training included videos for students to watch and review, analyzing the appropriateness of the officer response, noting moments where officers could have de-escalated the situation, and identifying proper reporting requirements.

CDP needs to keep developing its training delivery, including engaging high-ranked officers, reducing reliance on reading PowerPoint slides, ensuring working technology, and not shying away from concluding that officers in the video scenarios used excessive force or employed escalating tactics. As discussed below, an on-going and significant investment in training capacity by the City will be required as this process moves forward.

As of August 8, 2019, 1,330 officers (or 98.9% of officers not on extended illness leave or restricted duty status) completed the required 2019 Use of Force training.

---

[51] Dkt. 257.

[52] Officer in-service training in 2018 did not include instruction on general Use of Force policies or tactics but did instruct officers on Division- and OPOTA-approved usage of firearms, Tasers, and ASP batons.

**Progress and Tasks that Remain**

### 1. Ongoing, Annual Use of Force Training

Throughout the Consent Decree process, the Division must continue to conduct use of force training on an annual basis, updating the curriculum as appropriate to address officer and community feedback, as well as what data reveals about patterns of force within CDP.

### 2. Monitoring Team Audits

As noted above, notwithstanding the positive trend indications from 2018 and the first half of 2019, it is not simply that officers must use less force quantitatively—it is that the force that they *do* use needs to adhere rigorously to the Division's new policy.  Therefore, although the numbers and quantitative trends with respect to the use of force have been encouraging since early 2018, the Monitoring Team will be auditing the Division's use of force data, reports, investigations, and body-worn camera footage to ensure that those officers who do use force are complying with law, policy, and the terms of the Decree.

In the most recent reporting period, the Monitoring Team has engaged in substantial discussions with the Parties about the methodological approach that the Team might use to evaluate use of force incidents.  This has occurred at the same time that the Team has worked with the City to address a number of logistical issues with respect to file access and review process.  With the Parties recently in agreement on the approach, the Team anticipates conducting the audit in earnest in the upcoming reporting period.

## C.    Use of Force Investigation and Review

| Paragraph | Status of Compliance |
|---|---|
| 93.  "A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval." | **EVALUATION DEFERRED** |
| 94.  Setting specific requirements relating to the investigation of low-level, Level 1 force. | **PARTIAL COMPLIANCE** |
| 95–109.  Setting specific requirements relating to the investigation by supervisors and/or CDP chain of command for investigation and review of Level 2 force. | **PARTIAL COMPLIANCE** |
| 110.  "CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP." | **PARTIAL COMPLIANCE** |
| 111.  Creation and design of dedicated Force Investigation Team (FIT) that "will conduct administrative investigations . . . and criminal investigations" of serious force, "force involving potential criminal conduct," in-custody deaths, and cases assigned to it by the Chief. | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 112.  Composition of FIT Team. | **PARTIAL COMPLIANCE** |
| 113.  "FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type" on a host of specific, expressly-listed topics both initially and annually thereafter. | **EVALUATION DEFERRED** |
| 114.  "CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement." | **EVALUATION DEFERRED** |
| 115.  Response of FIT to use of force scenes.  FIT notification of prosecutor's office. Notification of designated outside agency to conduct criminal investigation if City elects to use external agency for such investigations. | **EVALUATION DEFERRED** |
| 116.  "CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation." | **PARTIAL COMPLIANCE** |
| 117.  Memorandum of understanding required between CDP and outside agency containing specific, expressly-listed provisions. | **OPERATIONAL COMPLIANCE** |
| 118.  Setting forth various, specific, and expressly-listed responsibilities of FIT during its investigations. | **PARTIAL COMPLIANCE** |
| 119.  Monitor's duty to annually review any "criminal investigations conducted by the outside agency" to ensure that they "are consistently objective, timely, and comprehensive." | **EVALUATION DEFERRED** |
| 120.  Providing for delay of compelled interview if "case has the potential to proceed criminally" but otherwise requiring that "[n]o other part of the investigation . . . be held in abeyance" unless "specifically authorized by the Chief" in consultation with investigating agency and prosecutor's office. | **PARTIAL COMPLIANCE** |
| 121.  Requiring completion of preliminary report presented to Chief or Chief's designee "as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force." | **PARTIAL COMPLIANCE** |
| 122.  Completion of investigation within 60 days.  Preparation of FIT investigation report.  Review of FIT investigative report by head of Internal Affairs who "will approve or disapprove FIT's recommendations, or request . . . additional investigation." | **EVALUATION DEFERRED** |
| 123.  Revision of FIT manual to ensure "consisten[cy] with the force principles" and several specific, expressly-listed provisions. | **PARTIAL COMPLIANCE** |
| 124–30.  Establishment and operation of Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." | **PARTIAL COMPLIANCE** |

## Background

The Consent Decree establishes clear protocols by which the Division must investigate uses of force by the reported level of force.  For a Level One use of force, the investigation will typically be limited to a review of the

involved officer's use of force report.[53] Level Two uses of force require a supervisor to respond to the scene and commence a preliminary force inquiry. If the supervisor's inquiry at any point indicates "that there may have been misconduct, the supervisor will immediately notify Internal Affairs and Internal Affairs will determine if it should respond to the scene and/or conduct or take over the investigation."[54] Level Three uses of force, the most serious incidents, may come under the purview of either CDP's Force Investigation Team ("FIT Team") or an independent outside agency.

Along with force inquiries, the Decree requires CDP to craft policies and procedures related to supervisory review of completed force investigations. Part of this process entails the establishment of a Force Review Board ("FRB") that will "appraise use of force incidents from a tactics, training, policy, and agency improvement perspective."[55]

## Where the Division Stands

In the current reporting period, the Division worked to finalize three important documents that will collectively set expectations and protocols for the Division's review and investigation of uses of force: (1) the Use of Force Supervisory Review Policy; (2) the Force Investigation Team Manual; and (3) the Force Review Board Policy. The Monitoring Team expects that these policies will be ready to be submitted for the Court's approval early in the upcoming reporting period.

## Progress and Tasks that Remain

### 1. Officer Training and Policy Implementation

Once the FIT and FRB manuals are completed and approved by the Court, CDP will be able to comprehensively analyze the application of force so that officer training, professional development, and risk management may all be continually enhanced. To do so effectively, relevant Division personnel will need to receive training on the new expectations. Specifically, CDP supervisors will need training on how to conduct lower-level force investigations and reviews; the new FIT Team will need to receive force-investigation-specific instruction; and selected members of the newly-established FRB will likewise need to receive initial training on their duties, responsibilities, and the ways that the Board must conduct its work.

### 2. Operation of FRB

Following the approval of policies and the training of Board members on their duties and responsibilities, the Board will begin to convene. The Monitoring Team will be auditing the Board's first year of operations to assess the Board's ability to fully, fairly, and effectively review force investigations.

---

[53] Dkt. 7-1 at ¶ 124.

[54] *Id.*

[55] *Id.*

### 3. Compliance & Adherence to New Policies

Finally, it is critical that CDP supervisors, command staff, FIT, and the FRB are adhering to the requirements across cases, investigations, and time.  As in all areas of the Consent Decrees, compliance must be sustained, beyond mere short-term or sporadic adherence, for the new policies on force investigation and review to be considered effective in practice.

## VII.    CRISIS INTERVENTION

| Paragraph | Status of Compliance |
|---|---|
| 131. "CDP will build upon and improve its Crisis Intervention Program" in furtherance of four specific, expressly-listed goals, which "will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health system and create a context for sustainable change." | **PARTIAL COMPLIANCE** |
| 132.  Establishment of Mental Health Response Advisory Committee (the "Advisory Committee") "to foster relationships and build support between the police, community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis." | **GENERAL COMPLIANCE** |
| 133.  Composition of Advisory Committee. | **GENERAL COMPLIANCE** |
| 134. "The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program." | **GENERAL COMPLIANCE** |
| 135.  Advisory Committee will conduct an annual "analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers" and communications "are appropriately responding to people in crisis," and will also "recommend appropriate changes." | **EVALUATION DEFERRED** |
| 136. "The Advisory Committee's reports and recommendations will be provided" to CPC, "be publicly available, and will be posted on the City's website." | **GENERAL COMPLIANCE** |
| 137.  CDP will designate a Crisis Intervention Coordinator for specific, expressly-identified purposes. | **GENERAL COMPLIANCE** |
| 138. "Coordinator will develop and maintain partnerships with program stakeholders and serve as point of contact" and "resource" for other stakeholders. | **GENERAL COMPLIANCE** |
| 139. "Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, call-takers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program." | **GENERAL COMPLIANCE** |
| 140. "Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate." | **OPERATIONAL COMPLIANCE** |
| 141.  "Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers" and "to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls." | **PARTIAL COMPLIANCE** |
| 142. "Coordinator will create ways to recognize and honor specialized CIT officers, call-takers, and dispatchers." | **EVALUATION DEFERRED** |
| 143.  Initial and annual crisis intervention training to all officers and recruits that is "adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 144.  Initial and annual crisis intervention training for dispatchers and call-takers. | **OPERATIONAL COMPLIANCE** |
| 145. "CDP will provide enhanced specialized training in responding to individuals in crisis to certain officers ('specialized CIT officers')," who will be "called upon to respond to incidents or calls involving individuals in crisis." | **PARTIAL COMPLIANCE** |
| 146–47.  Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | **PARTIAL COMPLIANCE** |
| 148.    Designation of specialized CIT officers, per specific, expressly-listed requirements. | **EVALUATION DEFERRED** |
| 149. "Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized officers." | **EVALUATION DEFERRED** |
| 150. "All Field Training Officers" ("FTO"s) "will receive the enhanced specialized crisis intervention training described in paragraph 146," though FTOs will "not be designated as a specialized CIT officer" unless they volunteer and have been selected to do so. | **EVALUATION DEFERRED** |
| 151. "Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene," with supervisors "seek[ing] the input of a specialized CIT officer . . . where it is reasonable for them to do so." | **EVALUATION DEFERRED** |
| 152. "[T]he Coordinator will develop an effective specialized crisis intervention plan . . . to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis" that includes various, specific, expressly-identified requirements.  The City "will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis." | **EVALUATION DEFERRED** |

### Background

The Consent Decree requires the Division to build and enhance its Crisis Intervention Program, which addresses how the Division interacts with individuals experiencing behavioral crises, with the goals of:

- Assisting individuals in crisis;
- Improving the safety of officers, consumers, family members, and others within the community;
- Providing the foundation necessary to promote community and statewide solutions to assist individuals with mental illness; and
- Reducing the need for individuals with mental illness to have further involvement with the criminal justice system.[56]

---

[56] Dkt. 7-1 at ¶ 131.

## Where the Division Stands

During the current reporting period, the City and CDP have continued to work productively with the Mental Health Response Advisory Committee ("MHRAC")—the community problem-solving forum including representatives from the Division, social service providers, mental health and substance abuse professionals, the judiciary, advocates, and individuals in recovery with lived experience—to collaborate on ways to improve services to those in need of care.

### Curriculum Development and Training

In the current reporting period, MHRAC's Training Subcommittee spearheaded a number of significant initiatives relating to crisis intervention training.  The Training Subcommittee includes CDP members, community advocates such as the National Alliance on Mental Illness ("NAMI"), individuals with lived experience, and mental health, substance abuse, and developmental service providers.  Under the current leadership of Shannon Jerse of St. Vincent Hospital and with important contributions from past chairs Dr. Richard Cirillo of the Cuyahoga County Board of Developmental Disabilities, and Kyle Miller of the Sisters of Charity Health System, a wide variety of local experts volunteered significant time and effort in the development of the training curricula.

Karen Kearney with Mental Health & Addiction Advocacy Coalition is chair of the Community Engagement Subcommittee and Christina Kalnicki with CareSource is chair of Diversion.

The Training Subcommittee finished curriculum work on three major training initiatives: (1) the Third-Year Crisis Intervention In-Service Training ("Third-Year CIT Training"); (2) the Specialized Crisis Intervention Team Officer Training ("Specialized CIT Training"); and (3) the Call-Takers, Dispatchers, and Supervisors Training ("Telecommunicator Training").

### Third-Year Crisis Intervention In-Service Training

The Third-Year Crisis Intervention In-Service Training curriculum for all CDP officers was approved by the Court on July 8, 2019.[57]  The four-hour Training Curriculum consists of a comprehensive overview of how adverse experiences impact brain development and behavior involving youth, along with strategies for successful crisis intervention.  The curriculum also includes instruction on a new program developed by the Alcohol, Drug Addiction and Mental Health Services Board ("ADAMHS Board") called CIT Plus, which provides CDP officers with a broader range of disposition options when attempting to help individuals in crisis.

The Training Subcommittee and the ADAMHS Board worked with Gabriella Celeste of the Schubert Center for Child Studies at Case Western Reserve University to obtain the training without cost to the City from Strategies for Youth, a national organization devoted to improving police/youth interactions.  Strategies for Youth CEO Lisa Thurau worked with the Training Subcommittee to ensure the workshop was customized to the needs of the Cleveland community and provided a train-the-trainer workshop for local area experts.  These local mental health and substance abuse professions committed significant blocks of time to assisting CDP.  Their time is

---

[57] Dkt. 264.

paying significant dividends to the City of Cleveland in the form of a stronger connection between the police and the Cleveland system of care for those in need.

A Policy Update module of the training reviews policy and procedures for CDP officers including guidance on emergency hospitalization as well as the form used for tracking crisis event outcomes.  Importantly, this module also guides officers on a new CDP/ADAMHS pilot project called CIT Plus.  This project makes use of both mental health professionals and peer support specialists, expanding the range of disposition options available to the officer.

The training began on July 29, 2019.

## Specialized Training

In addition to requiring annual crisis intervention in-service for all CDP officers, the Consent Decree requires the Division to "provide enhanced specialized training in responding to individuals in crisis to certain officers" known as Specialized CIT Officers.  These officers will remain in the patrol division and will maintain their standard patrol duties, except when called upon to respond to certain incidents involving individuals in crisis.[58]  While such intensive training would be unrealistic and unfeasible for all CDP officers to undergo, receiving such detailed training will allow these specialized officers to be particularly well-equipped to respond appropriately to individuals undergoing a behavioral health crisis.

In the current reporting period, the MHRAC Training Subcommittee collaborated with CDP, the City, the Department of Justice, and the Monitoring Team to develop a curriculum for the 40-hour Specialized Crisis Intervention Team Officer Training.  Specialized CIT officers taking the training will participate in three types of direct experiences which include: (1) on-site interactions with individuals with lived experiences who are recovering from mental illness and substance abuse; (2) in-depth scenarios based on CDP crisis intervention calls; and (3) realistic simulations of symptoms related to mental illness and substance abuse.

The Specialized CIT Curriculum was approved by the Court on July 22, 2019.[59]  The training is anticipated to begin during the final quarter of 2019.

## Dispatcher, Call Taker and Supervisor Training

The Training Subcommittee has continued work on a CIT curriculum for dispatchers and call takers, which focuses on personnel being able to identify calls for service that may relate to crisis events and dispatching appropriate resources to the scene.  The curriculum is being revised to include a range of topics such as an introduction to basic mental illness and substance abuse, strategies for intervening during a crisis event during a 911 call, scenario-based applications of the lecture material, and the impact of vicarious trauma.  Volunteer consultants with experience at state-level dispatch training were also engaged in the curriculum development process.

---

[58] Dkt. 7-1 at ¶ 145-46.
[59] Dkt. 270.

## Community Engagement Subcommittee

MHRAC's Community Engagement Subcommittee has continued to broaden its mission and impact.  Overall, the committee continues to work hard to engage the Cleveland community across an impressive range of offerings.  The subcommittee is maintaining CDP Officer resource cards, which provide officers a concise guide to Cleveland-area social services and programs.  These cards are customized for each CDP District.  The Community Engagement Subcommittee is now examining strategies to create an electronic version of the card that can be updated on an ongoing basis.  The subcommittee has not limited itself to electronic versions of the card but instead has worked with the ADAMHS Board to share content developed around the Division's CIT initiatives on their social media platforms.

MHRAC's Community Engagement Subcommittee also has taken a strong interest in alerting the public about when to call 911 in the event of a mental health crisis.  The subcommittee has worked with CDP and the ADAMHS Board to develop a training seminar in the area which is now available as part of the ADAMHS Board workshop offerings.  The Community Engagement Subcommittee also has worked with the City, CDP, and the ADAMHS Board to present status updates on MHRAC to the Community Police Commission.

## MHRAC Diversion Subcommittee

The Monitoring Team's prior semiannual report observed that, as the Cleveland Division of Police completes the 40-hour Training for Specialized Crisis Intervention Officers, the MHRAC's Diversion Subcommittee will serve an important role in assisting the Division.[60]  The committee has been examining diversion options both in Ohio and throughout the nation.  They are taking on the role of interfacing with Cuyahoga County on diversion efforts in the broader Cleveland area.  Additionally, the Diversion Subcommittee reported that the Crisis Stabilization Unit has capacity to provide respite crisis services to both the 1st and 2nd Districts.  This builds on a pilot program developed last year.

Further, the City of Cleveland, CDP, and the ADAMHS Board have obtained funding for a new pilot project to involve peer counselors to assist with referring individuals in crisis to appropriate resources.  The Diversion Subcommittee similarly has been examining opportunities for pre-arrest diversion when a crisis call comes into the 911 system.  This strategy is part of a national interest in involving 911 and Emergency Medical Services ("EMS") in the diversion process.

## Progress and Tasks that Remain

## Selection of Specialized CIT Officers

With the 40-hour curriculum for the Division's Specialized CIT Officers now completed and approved by the Court, the Division will next need to turn to recruiting and selecting officers who will serve as the inaugural set of Specialized CIT Officers.  To do so, the Division has completed a Selection Plan, which outlines a three-stage process of a participation request, personnel file review, and selection board interview.  CDP has worked with the

---

[60] Sixth Semiannual Report at 37.

Monitoring Team to further refine the selection plan and develop an ongoing strategy.  The Monitoring Team anticipates that the initial selection process will be underway by the fall of this year.

### Academy Training

Following the Consent Decree's approval by the Court, the Ohio Peace Officer Training Commission issued a new Crisis Intervention training curriculum for Ohio peace officers.[61]  CDP recruits received this curriculum as part of Academy Training.  The Parties, MHRAC, CDP, and the Monitoring Team had agreed that this new training was a reasonable substitute for the Decree-required sixteen hours of Academy Training.  Recently, new recruits proceeding through the Academy are back to being trained in Cleveland rather than the Ohio State Patrol Academy.  MHRAC's Training Subcommittee will need to formally review the Academy Training and report to the Parties, the Monitoring Team, and the Court on whether the Ohio Peace Officer Training Commission Crisis Intervention Curriculum remains a meaningful and satisfactory part of patrol officer training.

### Data & Compliance Reviews

As discussed in previous reports, the ability to more comprehensively and effectively collect and track information on how officers are interacting with individuals in crisis depends on the Division's new electronic system for inputting crisis-related data.  CDP indicates that it is close to reaching the goal of an electronic data entry system.  To ensure that crisis-related data can be input easily, CDP has worked to make sure the data form developed by the MHRAC Data Subcommittee will be available as the system comes online.

After data is gathered by CDP officers for a material period of time, various stakeholders must conduct formalized assessments to explore whether officers are improving their de-escalation skills and seriously considering the process of diversion across time, officers, and incidents.  First and foremost, CDP will need to publicly report and analyze this outcome data annually and provide it to the Advisory Committee.[62]

The MHRAC's Quality Improvement Subcommittee, which is designed to continuously improve the Division's crisis intervention program and related training initiatives, also will benefit from the availability of high-quality data on crisis events.  As data becomes available, CDP and MHRAC will need to work together to conduct formalized assessments of the outcome data to "identify training needs and develop case studies and teaching scenarios for crisis intervention training as well as primary and in-service crisis training curriculum[.]"[63]

Separately, the Monitoring Team will need to analyze data and review a material sample of incidents involving individuals in crisis to certify that officers—across time, incidents, and subjects—are complying with the new crisis intervention policies and the requirements of the Consent Decree.

---

[61] Ohio Peace Officer Training Commission: Education & Policy Section, Peace Officer Basic Training Crisis Intervention, 1-156 (Jan. 2016).

[62] Dkt. 7-1 at ¶ 158.

[63] Id. at ¶ 159.

## VIII.    SEARCH AND SEIZURE

| Paragraph | Status of Compliance |
|---|---|
| 160.  "CDP will revise, develop, and implement search and seizure policies that comply with applicable law, . . . include the requirements below," and conform to expressly-identified principles. | **PARTIAL COMPLIANCE** |
| 161–65.  Policy requirements for officers for stops, searches, and detentions. | **PARTIAL COMPLIANCE** |
| 166.  "Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assault on an officer and no other substantive violation is alleged," and "the supervisor will respond to the scene." | **EVALUATION DEFERRED** |
| 167.  "Officers will not use 'canned' or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests." | **EVALUATION DEFERRED** |
| 168.  "Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports."   CDP "will train officers" on documenting stops.  "Supervisors will review all documentation of investigatory stops, searches, and arrests." | **EVALUATION DEFERRED** |
| 169.  Supervisor will review of "each arrest report by officers under their command," with supervisors reviewing reports for specific, expressly-identified deficiencies. | **EVALUATION DEFERRED** |
| 170–72.  Supervisory review of investigatory stops, searches, and arrests. | **EVALUATION DEFERRED** |
| 173.  Provision of "initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements" of the Consent Decree that "will address the requirements of Fourth Amendment and related law, CDP policies," and specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 174–75.  Provision of "annual search and seizure in-service training that is adequate in quality, quantity, type, and scope" incorporating specific, expressly-identified topics. | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires that CDP "revise, develop, and implement" policies on how its officers "conduct all investigatory stops, searches, and arrests with the goal" that such actions comply with the "Constitution, state and federal law."[64]  In addition to ensuring that officers adhere to these legal requirements, the policies also must prohibit officers from relying on a subject's "race, ethnicity, gender, and perceived sexual orientation" as a reason to stop, search, or arrest an individual.[65]

---

[64] Dkt. 7-1 ¶ 160.

[65] Dkt. 7-1 ¶ 161; Dkt. 97 at 42.

The Consent Decree requires that CDP officers use specific details in reports documenting the events that led to an investigatory stop, search, or arrest without the use of "canned or conclusory statements."[66]  Immediate supervisors and command staff are tasked with reviewing officer reports in a timely fashion to ensure compliance with applicable laws and CDP policies.[67]  This review is designed to address violations and deficiencies in the documentation while also authorizing supervisors to recommend corrective and disciplinary action, along with criminal investigation, where appropriate.[68]

## Where the Division Stands

### Approval of Search and Seizure Policies

In the current reporting period, CDP, working with the Department of Justice and Monitoring Team, completed five related policies: (1) Search & Seizure; (2) Investigatory Stops; (3) Probable Cause/Warrantless Arrests; (4) Strip and Body Cavity Searches; and (5) Miranda Warning and Waiver.  As described in the Team's last semiannual report, these policies received substantial community feedback facilitated by both the Community Police Commission's Search and Seizure workgroup and the City's additional efforts to solicit public input.

Among other areas, the revised policies lay out definitions and CDP procedures around reasonable suspicion—the standard to detain an individual—and probable cause—the standard to arrest an individual in the absence of a warrant.  These standards are notoriously vague in the law, and the revised policies attempt to provide clear guidance to officers.

Under the revised policies, officers must use accurate and specific descriptive language to articulate the justification for any search or seizure in their reports.  The articulation of reasonable suspicion and/or probable cause must be specific, clear, and based on information not influenced by bias or prejudice.  Further, CDP officers cannot use information the officer knows or reasonably suspects to be materially false, incorrect, or unreliable.  Officers also may not, when articulating the justification for a search or seizure, use "canned" or conclusory language without supporting detail.

When conducting an investigatory stop, or a "Terry" stop, CDP officers must articulate the specific facts and circumstances in support of the officer's determination that reasonable suspicion or probable cause was present and identified.  In establishing reasonable suspicion or probable cause, CDP officers may consider demographic characteristics of an individual if and only if the characteristics are part of an actual and credible description of a specific suspect in an investigation that includes other identifying factors.  Additionally, officers cannot rely exclusively on an individual's presence in a high crime area as the basis for an investigatory stop.

CDP's revised policies also make clear the violations that permit an officer to make a warrantless arrest (with requisite probable cause).  To do so, officers must have probable cause that (1) a subject has committed or is committing a felony offense; (2) a subject has committed or is committing certain misdemeanor offenses, such as

---

[66] *Id.* at ¶ 167.

[67] *Id.* at ¶¶ 168-72.

[68] *Id.*

an offense of violence, criminal child enticement, aggravated trespass, theft, and others; or (3) a subject, from the officer's own observations, has committed or is committing any other misdemeanor offense.

The completion of these policies related to stops, searches, and arrests marked an important initial milestone in the Consent Decree's implementation, providing critical guidance for officers engaging in police-citizen encounters.  The Court approved the policies on May 16, 2019.[69]

### Progress and Tasks that Remain

#### Training

Around the same time as the Search and Seizure policies were being drafted, the Division began designing a training curriculum to provide all officers with a detailed understanding of the new expectations and protocols contained within the approved, new search and seizure policies.  The Monitoring Team and DOJ are continuing to work with the Division to ensure that the training is high-quality, engaging, informative, impactful, and appropriately grounded in realistic scenarios.

As flagged in other areas of this report, the limited resources of the training unit (who appear to continue to do a lot with a little) caused significant delays in the development of the Search and Seizure curriculum. With high level of engagement by the Monitoring Team, the Department of Justice, and additional technical assistance from national experts, the Search and Seizure training has now begun. Initial reviews of the training by the Monitoring Team have been very positive. CPD partnered with the City Prosecutor's Office, which is proving prosecutors to address detailed questions from officers in real time during the training. This collaboration brings other City resources involved in the criminal justice system to ensure consistent application of law and builds valuable relationships between CPD officers and the prosecutors. Additionally, the CPD instructors observed "owned" the material and presented complex search and seizure issues effectively, both in the classroom and during the scenario-based sessions. As search and seizure is a core of constitutional policing, the successful delivery of this training is reassuring.   Nonetheless, if CPD is going to continue to deliver training of the quality and consistency that is the "new normal," the training unit needs to be enhanced to avoid further reliance on external technical assistance.

#### Policy Implementation & Assessment

After all patrol officers receive training, the policies will need to "go live" in the field.  After a material period of time during which the policies are in effect, the Monitoring Team must (1) evaluate the numbers and trends with respect to who is being stopped, under what circumstances, and what the outcomes of those stops are; and (2) audit a host of stops themselves to determine if officers both articulated and had in fact sufficient legal grounds for any stop, detention, search, or arrest.  This will include evaluation of whether supervisors are adhering to their requirements under the Division's Court-approved policies and the Decree.  In order for the Monitoring Team to be able to gauge whether the Division is complying with the terms of the Decree and the various provisions of the approved search and seizure policies, CDP will need to be rigorously tracking stop encounters in a robust and comprehensive data collection system.  It remains to be seen whether the data collection systems – those in place

---

[69] Dkt. 261.

and those in development – will be capable of collecting and analyzing the requite data on search, seizure, and arrest.

## IX.    ACCOUNTABILITY

| Paragraph | Status of Compliance |
|---|---|
| 176.  "The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process." | **EVALUATION DEFERRED** |

## A.    Internally Discovered Misconduct

| Paragraph | Status of Compliance |
|---|---|
| 177.  "Internal Affairs will conduct objective, comprehensive, and timely investigations of all internal allegations," with "findings . . . based on the preponderance of the evidence standard" that must "be clearly delineated in policies, training, and procedures and accompanied by detailed examples to ensure proper application by investigators." | **EVALUATION DEFERRED** |
| 178.  "Internal Affairs will be headed by a qualified civilian" who "will report directly to the Chief of Police. | **OPERATIONAL COMPLIANCE** |
| 179.  Qualifications for IA investigators. | **EVALUATION DEFERRED** |
| 180.  Initial training for IA investigators "that is adequate in quality, quantity, scope, and type on conducting misconduct investigations" that addresses specific, expressly-identified topics. | **GENERAL COMPLIANCE** |
| 181.  "[A]nnual training" for IA investigators "that is adequate in quality, quantity, type and scope" | **PARTIAL COMPLIANCE** |
| 182.  "In each investigation, Internal Affairs will collect and consider" all evidence. "[N]o automatic preference for an officer's statement over a non-officer's statement." No disregard of a "witnesses' statement solely because of" connection to the complainant or criminal history.  IA investigators must "make all reasonable efforts to resolve material inconsistencies between witness statements." | **EVALUATION DEFERRED** |
| 183.   IA "will evaluate all relevant police activity and any evidence of potential misconduct uncovered during the course of the investigation." | **EVALUATION DEFERRED** |
| 184.   IA will not consider guilty plea or verdict as "determinative of whether a CDP officer engaged in misconduct" or justification for "discontinuing the investigation." | **EVALUATION DEFERRED** |
| 185.  IA "will complete its administrative investigations within 30 days from the date it learns of the alleged misconduct." | **EVALUATION DEFERRED** |

| | |
|---|---|
| 186–87.  IA investigative report requirements. | **EVALUATION DEFERRED** |
| 188.  Forwarding of completed IA investigations "to the officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator." | **EVALUATION DEFERRED** |
| 189.  "CDP will require any CDP employee who observes or becomes aware of any" potential misconduct to "report the incident to a supervisor or directly to" IA. | **OPERATIONAL COMPLIANCE** |
| 190.  "CDP will develop a system that allows officers to confidentially and anonymously report potential misconduct by other officers." | **OPERATIONAL COMPLIANCE** |
| 191.  "CDP will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." | **OPERATIONAL COMPLIANCE** |
| 192.  "Officers who retaliate . . . will be subject to the disciplinary process." | **OPERATIONAL COMPLIANCE** |

## Background

To comply with the terms of the Consent Decree, the CDP's Internal Affairs ("IA") unit must "conduct objective, comprehensive, and timely investigations of internal allegations of officer misconduct."[70]  CDP members have an affirmative obligation when they "observe☐ or become☐ aware of any act of misconduct by another employee to report their incident to a supervisor or directly to Internal Affairs."[71]  Division policy "will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person . . . who reports misconduct[.]"[72]  Ultimately, Internal Affairs must be the primary engine for the Division's administrative (non-criminal) investigations of officer misconduct and, more generally, the main oversight mechanism for ensuring that the Division's performance standards are being met.

## Where Internal Affairs Stands Now

Over the past six months, work with respect to Internal Affairs has focused on finalizing the policies and procedures to guide IA investigations.  Prior to the Consent Decree, IA did not have in place the types of rigorous, codified procedures for conducting its investigations and performing its duties that analogous units in similarly-situated departments have.  Crafting those procedures, as well as codifying a clear understanding of where IA sits within the Division's structure and how it relates to other entities within the Division that review officer performance, has required significant time and effort on the part of CDP and the City.

---

[70] Dkt. 7-1 at ¶ 177.

[71] *Id.* at ¶ 189.  Such reporting may be confidential or anonymous.

[72] *Id.* at ¶ 191.

The Parties are now finalizing the drafting of IA-related policies and a Manual to guide IA investigative practices and processes.  The Team anticipates that policies will be ready to be submitted for the Court's approval early in the upcoming reporting period.

### Investigative Structure Matrix

The Monitoring Team has previously identified internal investigations taking place outside of Internal Affairs.  In the current reporting period, CDP created an Investigative Structure Matrix to identify all agencies and units in the City that conduct specialized investigations that may involve police personnel (outside of the Internal Affairs and Inspections Unit processes covered by the IA Manual).  The creation of this matrix is intended to assist the Division to achieve compliance with Consent Decree requirements around reasonable discipline and underlying investigations conducted outside the normal IA process. This will help to ensure that the functions of all City entities that handle issues relating to CDP member conduct (such as the City's Human Resources or the Department of Public Safety's Accident Investigation Unit) can be coordinated and integrated with the Division's Internal Affairs.  Part of the Monitoring Team's evaluation process going forward will be aimed at verifying whether IA is addressing all misconduct investigations or whether cases that should be addressed by IA are, for whatever reason, being inappropriately addressed by other Division or City entities.

## Tasks and Progress that Remain

### Staffing

As the Monitoring Team has consistently reported, Internal Affairs remains understaffed.  It is doubtful that sustained progress will ultimately be possible unless and until IA receives both the quality and quantity of investigative Sergeants necessary to ensure timely, high-quality investigations of internal misconduct.

The Division's Staffing Plan primarily, and largely appropriately, focuses on patrol staffing considerations.  The Monitoring Team, and Court, approved that Staffing Plan on the understanding that discussion of non-patrol staffing would occur soon thereafter.  Now is the time for CDP to ensure that it subsequently addresses the specific staffing needs of its various specialized units, including IA.

### Implementation & Assessment

With the policies relating to misconduct investigations now completed, the Monitoring Team must now necessarily give CDP's civilian IA Superintendent the opportunity to internally improve IA processes and implement new procedures before conducting qualitative analyses on current IA investigative practices.  The Monitoring Team continues to anticipate beginning a subsequent round of qualitative analysis in the latter part of 2019 to evaluate whether investigations conducted in the first two quarters of the year appear to represent an improvement to a 2016 evaluation of 2015 cases that the Team previously conducted.  As the Monitoring Team has previously noted, sporadically high-quality investigations amid generally poor-quality investigations, or occasionally bad investigations among generally good ones, are not sufficient to establish compliance.  Instead, it is the sustained adherence to the high standards of the Decree and policy that will set the occasion for substantial and effective compliance.

## B.    Office of Professional Standards ("OPS")

| Paragraph | Status of Compliance |
|---|---|
| 193.  OPS "investigate[s] all civilian complaints it receives, other than those that allege criminal conduct," which are referred to IA.  Excessive force complaints generally retained by OPS.  IA investigations referred back to OPS if "determination is made that no criminal conduct occurred." | **OPERATIONAL COMPLIANCE** |
| 194. "The City will ensure that OPS is led by an administrator with the skills, expertise, and experience to effectively manage the intake, tracking, timely, and objective investigation of complaints"; implement PRB training; "assess OPS's equipment and staffing needs"; and "develop and implement performance standards for OPS." | **OPERATIONAL COMPLIANCE** |
| 195–96.  Initial training for OPS investigators "adequate in quality, quantity, scope, and type," including specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 197. "OPS Investigators will not be current members of the CDP, and no CDP personnel will have any active role in OPS's operations." | **OPERATIONAL COMPLIANCE** |
| 198. "The City will ensure that the lawyer representing OPS does not have any actual or apparent conflicts of interest." | **OPERATIONAL COMPLIANCE** |
| 199. "OPS will have its own budget, separate from . . . the Department of Public Safety" that "affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement." | **OPERATIONAL COMPLIANCE** |
| 200.  Development and implementation of OPS operations manual "made available to the public" that covers specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 201.  Development and implementation of "a program to promote awareness through the Cleveland community about the process for filing complaints with OPS." | **EVALUATION DEFERRED** |
| 202. "CDP and the City will work with the police unions . . . to allow civilian complaints to be submitted to OPS verbally or in writing; in person, by phone, or on line; by a complainant, someone acting on his or her behalf, or anonymously; and with or without a signature from the complainant," with all "complaints documented in writing." | **OPERATIONAL COMPLIANCE** |
| 203. CDP will post and maintain by the intake window at CDP headquarters and all District headquarters a permanent placard describing the civilian complaint process" and containing specific, expressly-listed information. | **OPERATIONAL COMPLIANCE** |
| 204. "CDP will provide training that is adequate in quality, quantity, scope, and type to all police personnel, including dispatchers, to properly handle complaint intake, including" with respect to specific, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 205.  CDP officers "carry complaint forms in their CDP vehicles," which officers must provide "upon request."  Supervisors will be dispatched to scene when an individual wants to make a complaint, with the supervisor providing a copy of completed complaint form "or a blank form to be completed later by the individual." | **EVALUATION DEFERRED** |

| | |
|---|---|
| 206. "The City and OPS will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including a number of specific, expressly-listed locations. | **OPERATIONAL COMPLIANCE** |
| 207. "OPS's complaint form will not contain any language that could reasonably be construed as discouraging the filing of a complaint, including warnings about the potential criminal consequences for filing false complaints." | **GENERAL COMPLIANCE** |
| 208. Availability of complaint forms in English and Spanish. "OPS will make every effort to ensure that complainants who speak other languages . . . can file complaints in their preferred language." | **OPERATIONAL COMPLIANCE** |
| 209. "City will ensure that civilian complaints submitted through other existing systems, including the Mayor's Action Center and the Department Action Center, are immediately forwarded to OPS for investigation." | **OPERATIONAL COMPLIANCE** |
| 210. "OPS will establish a centralized electronic numbering and tracking system for all complaints," which "will maintain accurate and reliable data regarding the number, nature, and status of all complaints . . . including investigation timeliness and notification of the interim status and final disposition of the complaint." It "will be used to monitor and maintain appropriate caseloads for OPS investigators." | **EVALUATON DEFERRED** |
| 211. Biased policing tracked as a separate category of complaint that "are captured and tracked appropriately, even if the complainant does not so label the allegation." | **EVALUATION DEFERRED** |
| 212. "[A]llegations of unlawful investigatory stops, searches, or arrests" tracked as a separate category of complaints. | **EVALUATION DEFERRED** |
| 213. "[A]llegations of excessive use of force" tracked as separate category of complaints. | **EVALUATION DEFERRED** |
| 214. "OPS will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends." | **PARTIAL- COMPLIANCE** |
| 215. "OPS will produce, at least annually, a public report summarizing complaint trends, including" with respect several specific, expressly-identified areas. | **PARTIAL COMPLIANCE** |
| 216. Assignment of complaints to Standard and Complex investigatory tracks. | **OPERATIONAL COMPLIANCE** |
| 217. Dismissal and/or administrative dismissal of complaint investigations. | **OPERATIONAL COMPLIANCE** |
| 218. "OPS will ensure that investigations of complaints are as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of the evidence." | **PARTIAL COMPLIANCE** |
| 219. "CDP will ensure that OPS has timely access to all reports related to the incident . . . ," and authority of OPS "to conduct additional investigation" of civilian complaint when CDP investigation has already taken place relating to the incident. | **EVALUATION DEFERRED** |
| 220. "OPS investigators will attempt to interview each complainant in person" and record the interview. | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 221. "The Chief will order officers who witnessed or participate in an incident that is the subject of an OPS complaint to cooperate with the OPS investigation," including by responding to written questions or sitting for an in-person interview. | **OPERATIONAL COMPLIANCE** |
| 222. "OPS investigators will have access to any relevant disciplinary information in the record of an officer who is the subject of a current investigation." | **EVALUATION DEFERRED** |
| 223. "OPS will consider all relevant evidence," with no preferences for particular witness's statements, including of officer over a non-officer, or because of connection to complainant or criminal history.  "OPS will make all reasonable efforts to resolve material inconsistencies between witness statements." | **EVALUATION DEFERRED** |
| 224.  OPS findings categories. | **OPERATIONAL COMPLIANCE** |
| 225. "OPS will document in writing the investigation of each complaint, including all investigatory steps taken, and OPS's findings and conclusions," which must "be supported by a preponderance of the evidence. | **PARTIAL COMPLIANCE** |
| 226.  Items for consideration for OPS findings. | **PARTIAL COMPLIANCE** |
| 227. "OPS will forward all investigations and its written conclusions to PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation." | **OPERATIONAL COMPLIANCE** |
| 228. "OPS will send periodic written updates" to the complainant at specific, expressly-identified junctures. | **EVALUATION DEFERRED** |
| 229. "[A] complainant may contact OPS at any time to determine the status of his/her complaint." | **EVALUATION DEFERRED** |

## Background

The Office of Professional Standards ("OPS") is the civilian-staffed office charged with investigating the complaints of civilians about Division of Police personnel.  Cleveland's City Charter requires OPS to conduct "a full and complete investigation" of all citizen complaints of employee misconduct.[73]

As the Monitoring Team has regularly summarized, the Consent Decree includes a number of requirements—such as hiring a qualified and experienced OPS Administrator, ensuring high-quality training for investigators, establishing a separate budget for OPS, and promoting awareness throughout Cleveland about the availability of civilian complaint forms—all designed to ensure that OPS can conduct thorough and competent investigations of civilian complaints and reach findings that are supported by the preponderance of evidence.[74]

---

[73] Charter of the City of Cleveland, § 115-4.
[74] Dkt. 7-1 at ¶¶ 193-229.

## Where OPS Stands Now

In the current reporting period, Hillard Heintze—an outside firm hired by the City to address the backlog of uninvestigated or partially-investigated civilian complaints, which totaled 377 cases as of the start of 2018—has worked to reduce the backlog. As detailed further below, the backlog of pre-December 1, 2017 cases has been reduced by approximately 51 percent. The goal is for OPS to have an ongoing average of 75 cases, i.e. for the office to be handling 75 cases at any one time. The Monitoring Team is pleased by the progress that the City, through Hillard Heintze, has made with regards to the backlog of civilian complaints. The City anticipates that Hillard Heintze will have completed the backlog by the end of September 2019.

This has been a serious undertaking, and the Monitoring Team is pleased that significant progress is being made and that the current number of investigations being conducted appears to be sustainable given current OPS staffing. The Team continues to be hopeful that the current efforts at backlog reduction will develop into a long-term trend in favor of timely OPS investigations and referrals to the Police Review Board for prompt resolution of complaints.

While the Monitoring Team has seen improvements in the quality of OPS investigative practices, OPS still needs to make additional progress to address some fundamental investigative deficiencies. In the current reporting period, the Monitoring Team has been concerned that, in some cases, a desire for the timely completion of case investigations might have negatively impacted the quality of the work in some instances. The Monitoring Team has been providing continuing feedback to the OPS administration in an effort to ensure that OPS has the capacity to appropriately balance the need for both timely and competent investigations.

### Staffing

Since 2018, OPS has staffed up considerably, with a new Administrator, Supervising Investigator, Research Analyst, and General Manager. The hiring of a Community Engagement Coordinator suffered a setback when the final candidate was unable to start on a date acceptable to OPS administration. As such, the position was reposted and closed on June 29, 2019. The City is currently reviewing applications. Until that position is filled by a competent staff member, the OPS will be unlikely to comply with Consent Decree requirements that relate to community engagement and outreach to internal and external stakeholders.

### Annual Report

The 2018 Annual OPS Report, summarizing complaint trends and timeframes for the public and required under Paragraph 215 of the Decree, was completed and presented to the City Council's Public Safety Committee in public session as recommended by the Monitoring Team. With the hiring of the OPS's new Research Analyst, the Monitoring Team looks forward to a robust 2019 Annual Report to be delivered in early 2020.

### OPS Policy Reviews

Pursuant to Paragraph 214 of the Consent Decree, OPS is required to "conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends." In the current

reporting period, OPS has indeed worked to identify patterns and emerging trends in CDP practices, programs, and policies. Upon identification of a problematic trend or pattern, OPS works with the Police Review Board to write a policy recommendation to the Chief of Police, in the form of a memo from the OPS Administrator to the Chief.

Starting in 2018, OPS began to track the implementation history of these recommendations by the CDP.  Although there have been delays in responses received from CDP, OPS is reporting that they are now periodically receiving responses to some of the recommendations and OPS will publicly report on its recommendations and CDP responses.  The Monitoring Team looks forward to seeing OPS-Police Review Board follow-up on these recommendations which have the potential of reducing the risk of future complaints and assisting the CDP in providing improved police services over the long term.

### Progress and Tasks that Remain

### 1.  Completing the Backlog of Open Investigations

The City will need to continue to fully address and adjudicate the previously-unclosed investigations received prior to December 1, 2017 that have still not been completed or received a final disposition.  According to OPS, the backlog of investigations received prior to December 1, 2017 has been reduced from 281 cases—when Hillard Heinz began its assignment and review of OPS cases in September 2018—to 144 cases as of June 12, 2019, a reduction of the caseload by 51%.

Meanwhile, aggressive measures reportedly taken by the new OPS Administrator and Senior Investigator have reduced the continuing ongoing caseload to an average of 75 cases.  When divided between the current staff of nine OPS investigators, the overall caseload appears to be reasonable.

### 2.  Case Management System/Business Mapping

As the Monitoring Team has stated previously, proper case management is a basic, foundational management tool for an investigatory agency with OPS's charge to operate successfully in a city the size of Cleveland.  Under the Consent Decree, OPS must "establish a centralized electronic numbering and tracking system . . . [which] will maintain accurate and reliable data regarding the number, nature, and status of all complaints" and which can be used by OPS administration "to monitor and maintain appropriate caseloads for OPS investigators."[75]

Since the start of the Consent Decree, OPS and the City have indicated that they intend to fulfill this requirement of the Decree by having OPS use IAPro as its case management software – the same platform that IA investigators within the Division use to conduct their investigations.  OPS has struggled to fully adopt the system, relying on home-grown database solutions rather than merging its business practices with the IAPro platform.

---

[75] Dkt. 7-1 at ¶ 210.

With the hiring of a new OPS Management Analyst in the first quarter of 2019, OPS is now well-positioned to fully utilize IAPro.  The Monitoring Team has and will continue to assess whether OPS is effectively using IAPro to its full capacity.

### 3.  OPS Staff Performance Reviews

As described in the Monitoring Team's last semiannual report, the OPS Administrator must ensure a robust employee performance review process at OPS to ensure employee adherence to OPS Court-approved policies and best practices in investigations.  Thus far, the Administrator has reported that he and OPS supervisors continue to conduct ongoing, but informal, performance reviews in conjunction with training of OPS investigators.

Although substantive, written performance reviews were not performed in the last reporting period, as was anticipated, the Monitoring Team will be deferring its evaluation of this area of OPS compliance until the OPS is fully staffed and the OPS Administrator has the time and resources to conduct formal, substantive written performance reviews.

### 4.  Complaint Forms

Under the Consent Decree, the City and OPS "will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including "the websites of CDP, OPS and the City of Cleveland" as well as a number of other specific, expressly-listed locations.[76]  Further, all CDP officers will "carry complaint forms in their CDP vehicles."[77]

While the City and CDP have maintained that they have made complaint forms available at the Decree-enumerated locations, the Monitoring Team has not yet had the opportunity to conduct a formal audit to assess, among other things, the accessibility of complaint forms in vehicles and at CDP District stations. The OPS also reports that it will need to expand the number of locations where complaint forms are available and that such efforts will take place upon the hiring of a Community Engagement Coordinator.  It is also anticipated that, at that time, OPS will be able to begin to comply with Paragraph 201 of the Consent Decree which requires the development and implementation of "a program to promote awareness through the Cleveland community about the process for filing complaints with OPS."[78]

Although the Monitoring Team has assessed that OPS is in "Operational Compliance" with respect to making complaint forms available on its website, the Monitoring Team is concerned that OPS has not yet made it possible for members of the public to file complaints or commendations online.  Instead, a complainant must print out a hard-copy complaint form, fill it out, and then mail or fax the form to OPS.  Alternatively, a complainant can make a complaint by phone or in-person.

---

[76] Dkt. 7-1 at ¶ 206.

[77] Id. at ¶ 205.

[78] Id. at ¶ 201.

The Monitoring Team has previously noted that many cities provide community members with the ability to file their complaints online.[79] The Monitoring Team understands that while OPS has approached the City's Division of Information Technology Services to create this functionality, they have been informed that it will take between 12 and 18 months for the filing of police complaints to be available on the City's OPS website.  The Monitoring Team strongly encourages the City to find a way to implement this functionality in an expeditious fashion, as OPS appears to be one of a minority of oversight organizations of its type in the country that do not offer community members the opportunity to file police complaints online.[80]

Separately, and to its credit, OPS has been attempting to increase the functionality of its website to allow complainants to track the progress of their complaints online within the first months of the upcoming reporting period.  The Monitoring Team is hopeful that OPS will be able to add this functionality to its complaints in a timely fashion.

### 5.      Timeliness of OPS Case Adjudications

Over the course of the Consent Decree's implementation, the Monitoring Team has expressed concerns regarding the timeliness of final adjudication of sustained findings recommended by the Police Review Board ("PRB") on OPS investigations.  While there have been significant improvements and cases are now being appropriately tracked by OPS, the Monitoring Team remains concerned about the amount of time it takes for the CDP's Case Preparation Unit to schedule pre-disciplinary hearings on OPS cases where the PRB has recommended sustained findings

As of the end of the current reporting period, OPS reported that for nineteen (19) cases where pre-disciplinary hearings had been scheduled, in only one case did it take less than four weeks for a hearing to be scheduled upon receipt of a "findings letter" from the PRB.  For the remaining cases, it took anywhere from six (6) to fourteen (14) weeks for a hearing to be scheduled, with an average delay of more than 8.5 weeks from the date PRB findings letter are delivered to the Chief's Office to the date of the pre-disciplinary hearing.  In two additional cases, even

---

[79] See, e.g., Portland, Oregon, Independent Police Review Division, https://www.portlandoregon.gov/ipr/52031; Denver, Colorado, Office of the Independent Monitor, https://www.denvergov.org/content/denvergov/en/office-of-the-independent-monitor/commendations-complaints/online-complaint-commendation-form.html;  New York City, Citizen Complaint Review Board, https://www1.nyc.gov/site/ccrb/complaints/file-online.page, Washington D.C. Office of Police Complaints, https://dcforms.dc.gov/webform/office-police-complaints-online-complaint-form; New Orleans Independent Police Monitor, http://nolaipm.gov/file-a-complaint/; and San Francisco Department of Police Accountability, https://policecomplaints.sfgov.org/.

[80] The OPS program can be classified as an "investigation-focused" model of citizen oversight and is one of 34 such programs identified by a recent evaluation of civilian oversight programs in the United States. Of the five jurisdictions identified as having "investigation-focused" agencies listed in the report (San Francisco, Washington D.C., New York City, San Diego County and Pittsburgh, Pennsylvania), only one, San Diego County, also requires complainants to print out a complaint form and then email, fax or mail the form as part of the process of filing a complaint. De Angelis, Rosenthal & Buchner (2017) Civilian Oversight of Law Enforcement – Assessing the Evidence,                     pp.                     24-27,                     located                     at, https://d3n8a8pro7vhmx.cloudfront.net/nacole/pages/161/attachments/original/1481727974/NACOLE_AccessingtheEvidence_Final.pdf?1481727974.

though PRB findings letters had been submitted to the Chief's Office on March 5, 2019, the pre-disciplinary hearings remained unscheduled as of the end of the reporting period, representing a delay of almost four months for each case.

Timeliness in the handling of public complaints against the police and in the imposition of discipline on these complaints is an essential component of police accountability. The Monitoring Team is recommending that the City consider possible alternative processes that could potentially improve the timeliness of these pre-disciplinary hearings, to include dedicating additional resources to this area until improvements can be made.

## C.    Police Review Board ("PRB")

| Paragraph | Status of Compliance |
|---|---|
| 230. "Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot" addressing PRB composition and appointment process. | **GENERAL COMPLIANCE** |
| 231. "PRB members will not be current or former members of the CDP." | **GENERAL COMPLIANCE** |
| 232. "PRB will have its own budget," overseen by OPS Administrator and separate from Department of Public Safety, that "affords sufficient independence and resources." | **OPERATIONAL COMPLIANCE** |
| 233–34. Initial training for PRB members "that is adequate in quality, quantity, scope, and type" and that covers specific, expressly-identified topics. | **PARTIAL COMPLIANCE** |
| 235. PRB meetings open to the public and posted in advance, with "case presentations and PRB votes" occurring during "open session." | **OPERATIONAL COMPLIANCE** |
| 236. "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings . . . ." PRB may "ask the investigator to conduct further investigation" as necessary. | **PARTIAL COMPLIANCE** |
| 237. "PRB recommended dispositions will be based on a preponderance of the evidence.  For each case, PRB shall set forth its conclusion and an explanation of its reasons and supporting evidence in writing, including, when applicable, the justification for departing from OPS's recommended disposition." | **EVALUATION DEFERRED** |
| 238. "In cases where PRB is recommending a sustained disposition, in whole or in part, PRB will include a recommendation as to disciplinary or non-disciplinary corrective action." | **OPERATIONAL COMPLIANCE** |
| 239. [Timely] forwarding of PRB recommendations to Chief of Police and Director of Public Safety. | **OPERATIONAL COMPLIANCE** |

### Background

Cleveland's civilian Police Review Board ("PRB" or "the Board") reviews and analyzes completed OPS investigations.  It makes a formal recommendation to the Chief of Police on the ultimate disposition of the case and, if warranted, the discipline that an involved officer should receive.  A well-functioning PRB remains critical

to ensuring that OPS investigations are sound and that the Chief of Police receives a well-informed recommendation on the disposition of OPS cases.

The Consent Decree includes many requirements relating to the PRB, including that the "PRB will have its own budget[,]" PRB members will receive initial training, PRB meetings will be held open to the public and posted in advance, "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings[,]" "PRB recommended dispositions will be based on a preponderance of the evidence[,]" and that the PRB will, when recommending sustained disposition, "include a recommendation as to disciplinary or non-disciplinary corrective action."[81]

### Where the PRB Stands

Since the adoption of the PRB Operations Manual in 2017, the PRB has convened regularly to address cases that it receives from OPS.  During this time, the performance of the PRB has largely been out of the Board's hands.  The timeliness of the PRB's review of cases, and precisely what the PRB is reviewing, depends on how well OPS has effectuated its duties in the investigatory stage.

Now that OPS has had more time and additional staff to improve the quality of its investigations, the Monitoring Team will be more closely evaluating the work of the PRB to ensure that OPS's improved investigations are benefiting the Board's ability to review investigations and make recommendations to the Chief.  Ultimately, before the performance of both OPS and PRB can be found to be in compliance with the Consent Decree, the Board must be found to be effectively and meaningfully carrying out its duties in a sufficiently thorough, fair, and timely manner.

### *Documentation of PRB Decision-Making*

The PRB previously struggled with the timely documentation of the rationale for its decisions. In the prior reporting period, OPS reported that PRB disposition letters (letters to complainants documenting non-sustained finings made by the PRB) and findings letters (letters to the CDP documenting sustained findings made by the PRB) have, on the whole, been prepared in a timely fashion. The Monitoring Team too noted an improvement in the quality of findings letters.

However, during the current reporting period, the Monitoring Team learned that OPS had not been notifying officers of the resolution of complaints against them that resulted in PRB findings of "insufficient evidence," "exonerated," or "unfounded." To the credit of OPS' administrators, this procedural oversight was identified internally and brought to the attention of the Monitoring Team upon discovery.  OPS has advised it will work to correct this deficiency and will provide notice to officers in future cases and is coming up with a plan to deal with past cases where notice was not given.  The Monitoring Team plans to review the quality of the disposition letters to ensure that complainants and officers are being provided sufficient information to fully understand PRB findings closing their complaints with no further action to be taken.

---

[81] Dkt. 7-1 at ¶¶ 232-38.

**Progress and Tasks that Remain**

### 1. *Quality of PRB Recommendations & Processes*

The Monitoring Team has observed several cases in which the Chief disagreed with PRB recommendations without providing a robust written rationale. As previously reported, the Monitoring Team believes that the OPS/PRB program would benefit from a formal protocol between the PRB and the Chief's Office to help to ensure that the Chief and PRB understand each other's rationale for making recommendations and decisions on complaints. In the absence of such a protocol, the Monitoring Team will continue to monitor communications between the Chief and the PRB and will address issues or concerns as they are identified.

### 2. *Implementation & Assessment*

As noted above, with the quality and timeliness of OPS investigations improving, PRB is in a better position to adhere rigorously to the PRB Manual. The Monitoring Team, in turn, will need to assess the Board's performance.

## D.    Discipline and Disciplinary Hearings

| Paragraph | Status of Compliance |
|---|---|
| 240. "The Chief of CDP will issue a General Police Order that requires officers to (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB." | **GENERAL COMPLIANCE** |
| 241. Disciplinary hearing requirement, with officer given "opportunity to testify" and suspension of hearing if "officer provides new or additional evidence at hearing," with matter "returned to IA or PRB for consideration." | **EVALUATION DEFERRED** |
| 242. Written justification by Chief or Director of decision to "not uphold the charges" or "does not impose the recommended discipline or non-disciplinary corrective action" where PRB previously "recommends the initiation of the disciplinary process and recommends a disciplinary level." | **PARTIAL COMPLIANCE** |
| 243. "CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition." | **OPERATIONAL COMPLIANCE** |
| 245. "CDP will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented." | **EVALUATION DEFERRED** |
| 246. "CDP will review its current matrix and will seek to amend it" "to ensure consistency" and inclusion of a number of specific, expressly-identified features. | **OPERATIONAL COMPLIANCE** |
| 247. "All disciplinary decisions will be documented in writing." | **PARTIAL COMPLIANCE** |

| 248. "CDP will provide its disciplinary matrix to the Commission, the Police Inspector General, and the police unions for comment." | **OPERATIONAL COMPLIANCE** |
| 249. "CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years." | **PARTIAL COMPLIANCE** |

## Background

The Consent Decree requires that CDP "ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented."[82]

As one foundational element of that process of ensuring fair and consistent discipline, the Division has needed to "review its current disciplinary matrix and will seek to amend it as necessary[.]"[83]  Specifically, CDP must ensure that the new disciplinary matrix:

- "[E]stablishes a presumptive range of discipline for each type of rule violation;"
- "[I]ncreases the presumptive discipline based on an officer's prior violations of the same or other rules;"
- "[P]rohibits consideration of the officer's race, gender, national origin, age, ethnicity, familial relationships, or sexual orientation" as well as "the high (or low) profile nature of the incident;" and
- "[P]rovides that CDP will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline" but may consider non-disciplinary corrective action "in a case where discipline has [already] been imposed."[84]

## Where the Division Stands

Since January 1, 2018, the Division has been operating according to a revised, Court-approved Disciplinary Matrix that establishes presumptive ranges of discipline and mitigating or aggravating factors.  Since the promulgation of that new Matrix, the Monitoring Team has begun to audit disciplinary decisions along with the underlying investigations that precipitated them in real-time.  The Parties and Team have begun to discuss various areas that require improvement with respect to the discipline process and will focus on these issues in the coming reporting period.

In the current reporting period, the Division completed amendments to the Disciplinary Matrix, specifically relating to integrity-related violations of CDP policy.  Per Consent Decree requirements, a draft of the Amended Disciplinary Matrix was shared with the police unions and Community Police Commission for their input.  Under the new Matrix, dishonesty now joins false report, false statement, and untruthfulness as Group III violations (the

---

[82] Dkt. 7-1 ¶ 245.

[83] *Id.*

[84] *Id.* at ¶ 246.

most severe of violations).  Additionally, all four offenses now carry a presumption of termination.  The Court approved the Amended Disciplinary Matrix on August 27, 2019.[85]

At the conclusion of the reporting period, the CDP Case Preparation Unit has established that it has been tracking the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended dispositions, in compliance with paragraph 243. The Monitoring Team looks forward to the OPS being able to access and use this data to publicly report on patterns in this regard in its next annual report.

## Progress and Tasks that Remain

### *Relationship of Disciplinary Process to Voluntary City/Police Union Agreements*

The Consent Decree requires the Division to "work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years."[86]  The City raised the issue with the police unions in recent bargaining and accepted that sustained disciplinary findings would remain in an officer's record for less than ten years.  The City has indicated that it will revisit the matter in future negotiations.

### *Systemic Evaluation of Discipline*

A comprehensive evaluation of the imposition of discipline by the Department of Public Safety is in progress. Future evaluations will include decisions made by the Chief of Police and need to be conducted to determine how the Disciplinary Matrix is functioning in practice and to "ensure that . . . officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process."

---

[85] Dkt. 277.
[86] Dkt. 7-1 at ¶ 249.

## X.    TRANSPARENCY & OVERSIGHT

### A.    Police Inspector General

| Paragraph | Status of Compliance |
|---|---|
| 250.  "The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a Police Inspector General" ("IG").  City must seek CPC's "input in developing minimum qualifications and experience" for IG. | **EVALUATION DEFERRED** |
| 251.  IG work in Office of Mayor but report to Chief of Police. | **EVALUATION DEFERRED** |
| 252.  IG "will not be a current or former employee of CDP." | **EVALUATION DEFERRED** |
| 253–54.  Duties and authority of IG. | **EVALUATION DEFERRED** |
| 255.  Budget of IG must be "a separate line item" in City budget and "afford☐ sufficient independence and resources" to comply with Consent Decree. | **PARTIAL COMPLIANCE** |
| 256.  IG "will have access to all documents and data necessary to perform the above functions, including any raw data." | **EVALUATION DEFERRED** |

### Background

The Consent Decree creates a new, internal oversight function within the Division—a Police Inspector General (the "IG").  The IG must have the authority to review CDP policies and practices, conduct audits and investigations, analyze data for aggregate and systemic trends, develop recommendations for reform, and analyze investigations conducted, and review imposed discipline.  The IG's reports and recommendations must be made public.[87]

### Where the Division Stands

In the current reporting period, the City worked to finalize the hiring of the Inspector General position after an unexpected setback that resulted in the City being unable to hire the prior finalist.  A job posting was reposted on the City's website and closed on February 22, 2019.  After reviewing applications, the City began interviewing final candidates in June, and in August hired Christopher Viland as the first Inspector General.  The Monitoring Team looks forward to engaging with the IG as he begins his work in Cleveland.

---

[87] Dkt. 7-1 ¶ 253.

## Progress and Tasks that Remain

Once hired, the Police Inspector General, with his day-to-day responsibility to conduct various assessments, reviews, and audits, will be a significant benefit to the Division and the Consent Decree process. The Monitoring Team looks forward to the IG's hiring, which will be an important milestone in effectuating the kind of ongoing oversight called for by the Decree.

Once the IG is hired, the Parties and Monitoring Team must also ensure that the Police Inspector General has the resources, budget, and "sufficient independence" to successfully review practices, audit, analyze data, and provide actionable recommendations to the Division of Police.[88] Likewise, the work of the Inspector General must reflect the rigor and independence that the Consent Decree contemplates. To that end, to ensure that the IG's performance is consistent with the Consent Decree, the Monitoring Team will be evaluating the performance of the IG over time to ensure that such standards are being appropriately met. The ultimate goal is for the institutionalized IG to take on a role of independent auditor with respect to the Division's overall performance, systems, and processes—sustaining and driving change long after CDP has reached substantial and effective compliance with the particular provisions of the Consent Decree.

## B.    Data Collection and Analysis

| Paragraph | Status of Compliance |
|---|---|
| 257. "CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad access to information related to CDP's decision making and activities. To achieve this outcome, CDP will designate an individual or individuals as the 'Data Collection and Analysis Coordinator.'" | **PARTIAL COMPLIANCE** |
| 258. Coordinator "will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials," including specific, expressly-listed materials and information. | **PARTIAL COMPLIANCE** |
| 259. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents," including specific, expressly-identified data. | **PARTIAL COMPLIANCE** |
| 260. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation." The system must conform to a number of specific, expressly-identified requirements. | **PARTIAL COMPLIANCE** |
| 261. Coordinator must "routine[ly] report[] . . . relevant data to the Chief of Police, FRB, Training Review Committee, OPS, the [Community Police] Commission, and the Police Inspector General." | **PARTIAL COMPLIANCE** |

---

[88] Dkt. 7-1 at ¶ 255.

| | |
|---|---|
| 262.  Coordinator "responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection." | **PARTIAL COMPLIANCE** |
| 263.  Coordinator "will develop a protocol to accurately analyze the data collected and allow for" various outcome measurements, "subject to the review and approval of the Monitor and DOJ." | **OPERATIONAL COMPLIANCE** |
| 264.  Annually, "CDP will conduct an assessment and issue a report summarizing its investigatory stop, search, and arrest data" that addresses various specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 265.  Annually, "CDP will conduct an assessment and issue a report of all activities, including use of force, arrests, motor vehicles and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race" or other listed prohibited classes or characteristics, and that addresses various specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 266.  Annual analysis of "prior year's force" data with FRB. | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires that the Division collect, use, and report data on its activities and performance in a modern and comprehensive fashion.  To effectuate this, the Decree required CDP to hire a Data Collection and Analysis Coordinator (the "Data Coordinator" or "Coordinator") to help ensure that CDP maintains the required information in a manner that "facilitate[s] transparency and . . . broad public access to information related to CDP's decision making and activities."[89]  The Coordinator is specifically tasked with ensuring the collection and tracking of all information related to uses of force, search and seizure practices, and allegations of misconduct. The Coordinator must create and maintain "a reliable and accurate electronic system to track" use of force-related data and search and seizure information.[90]

The Coordinator also is "responsible for the routine reporting of relevant data" to various entities within the Division[91]; conducting annual assessments of both use of force and investigatory stop data[92]; and analyzing Division practices for potential disproportionate or disparate impacts with respect to "race, ethnicity, gender, disability, sexual orientation, or gender identity."[93]  These reports must "be made publicly available."[94]

---

[89] Dkt. 7-1 at ¶ 257.

[90] *Id.* at ¶¶ 259-60.

[91] *Id.* at ¶ 261.

[92] *Id.* at ¶¶ 263, 264, 266.

[93] *Id.* at ¶ 265.

[94] *Id.* at ¶ 267.

## Where the Division Stands

During the current reporting period, CDP's Data Coordinator has continued to meet regularly with CDP leadership to present analyses of use of force data, including trends on the number of force incidents reported by month, as well as trends on the timeliness of reviews of use of force reports. The analysis can be disaggregated by month and by CDP District, allowing the Division to identify and focus on particular areas of improvement.

## Progress and Tasks That Remain

As the Monitoring Team previously observed in prior reports, for as much progress as CDP has made in its ability to collect and analyze data in some areas, there are a number of critical tasks that remain.

The first is establishing and implementing mechanisms to collect data on stops, searches, and arrests; crisis intervention; and community policing. The collection of this data is essential—and overdue—for gauging the success of new policies and programs and evaluating ultimate compliance with the Consent Decree.

In the current reporting period, the Division has continued to work with the City's IT personnel to finalize the use of an appropriate data system, including creating initial data entry forms and scheduling system testing and end user training. Still, it will take some time before all CDP members are trained on using the selected electronic platform, information can be collected in real-time, and aggregate data analyzed. Until such data can be evaluated for a sufficiently material period of time, the Division will not be able to demonstrate that its performance complies with its various policies, plans, and initiatives.

The second major task with respect to data is for CDP to regularly incorporate analysis provided by the new Coordinator into its day-to-day management decisions. The Team remains unclear on how CDP uses and acts on data beyond crime and offense statistics. To meet the terms of the Decree, and to match the efforts of leading law enforcement agencies across the country, the Division will need to commit to a culture of data-informed decision-making to guide how it polices and organizes its activities and to gauge precisely how well it is doing to meet its strategic goals.

## C.    Public Availability of CDP-Related Information

| Paragraph | Status of Compliance |
|---|---|
| 267. "[A]ll CDP audits, reports, and outcome analyses related to the implementation" of the Consent Decree will be public. | **NON-COMPLIANCE** |
| 268. "CDP will post its policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports on its website." | **PARTIAL COMPLIANCE** |

## Background

The Consent Decree requires that CDP's "policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports" be posted on CDP's website.[95] Likewise, "[t]o ensure transparency in the implementation of" the Decree, "all CDP audits, reports, and outcome analyses related to the implementation of this [the Consent Decree] will be made publicly available, including at the City and CDP websites."[96]

## Where the Division Stands

In the current reporting period, the City has made modest changes to its website, including reorganizing available content by their relevant Consent Decree section to be more user-friendly for interested members of the public.

## Progress and Tasks That Remain

As indicated above, the City must make all CDP audits, reports, and outcome analyses related to the implementation of the Consent Decree public.

Separately, while not expressly required by the terms of the Consent Decree, the Division should establish a general policy for the discretionary release or provision of non-sensitive records, data, or information to the public.  Notwithstanding specific state and local provisions on the release of information, it is increasingly becoming the norm for police departments to open themselves up to the public, setting clear expectations, in advance of an incident occurring or an information request arising, about what it can or will release and what it cannot or will not make available.  Knowing what to expect and how to proceed in advance leads to better outcomes for community members and the Division.  Having information about how the police do their work also helps the community better understand the unique challenges of law enforcement professionals.

---

[95] Dkt. 7-1 at 1; *id.* ¶ 268.

[96] Dkt. 7-1 ¶ 267.

## XI.    OFFICER ASSISTANCE & SUPPORT

## A.    Training

| Paragraph | Status of Compliance |
|---|---|
| 269.  "CDP will ensure that officers receive adequate training to understand: (a) how to police effectively and safely in accordance with CDP policy; [and] (b) the requirements of this Agreement, Ohio law, and the Constitution and laws of the United States," including in the areas of "procedural justice, bias-free policing, and community policing." | **PARTIAL COMPLIANCE** |
| 270.   "CDP will expand the scope and membership of the Training Review Committee." | **PARTIAL COMPLIANCE** |
| 271–72. "[T]he Training Review Committee will develop a written training plan for CDP's recruit academy, probationary field training, and in-service training" that addresses a host of specific, expressly-identified issues. | **NON-COMPLIANCE** |
| 273.  "The Training Plan and schedule will be implemented once any objections have been resolved" on a yearly basis. | **PARTIAL COMPLIANCE** |
| 274.   "The Training Review Committee will annually review and updated CDP's training plan" by "conduct[ing] a needs assessment" that addresses a number of specific, expressly-identified data and information on real-world trends, needs, policy, and law. | **NON-COMPLIANCE** |
| 275.   "CDP's Commander responsible for training" will be in charge of "all CDP training. | **PARTIAL COMPLIANCE** |
| 276.   "CDP will designate a single training coordinator in each District.   The Commander responsible for training will establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the" training Commander. | **PARTIAL COMPLIANCE** |
| 277.  "CDP will develop recruit academy and in-service curricula that comport with" the Training Plan and Consent Decree requirements. | **PARTIAL COMPLIANCE** |
| 278.  "[T]he training required under this Agreement . . . will be delivered within two years of the Effective Date." | **EVALUATION DEFERRED** |
| 279.  "For all other substantive updates or revisions to policy or procedure, CDP will ensure and document that all relevant CDP personnel have received and read the policy or procedure.  Notification of each revision or update will include the rationale for policy changes and the difference between the old and updated policy." | **PARTIAL COMPLIANCE** |
| 280.  Training Commander reviews all training materials; ensures that they use "a variety of adult learning techniques, scenario-based training, and problem-solving | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| practices"; and "ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Review Committee." | |
| 281. "CDP will ensure that instructors are qualified and use only curricula and lesson plans that have been approved by the" Training Commander. | **PARTIAL COMPLIANCE** |
| 282. "CDP will revise, as necessary, its field training program for graduates of the police academy to comport with" the Training Plan and Consent Decree. | **EVALUATION DEFERRED** |
| 283. "The field training program will incorporate community and problem-oriented policing principles, and problem-based learning methods." | **EVALUATION DEFERRED** |
| 284. Review and revision of Field Training Officer ("FTO") "participation policy to establish and implement a program that effectively attracts the best FTO candidates" and "revise eligibility criteria" for FTOs. | **EVALUATION DEFERRED** |
| 285. New FTOs and Field Training Sergeants must "receive initial and in-service training that is adequate in quality, quantity, scope, and type, and that addresses" a number of specific, expressly-listed topics and conforms to a number of additional features or requirements. | **EVALUATION DEFERRED** |
| 286. "CDP will create a mechanism for recruits to provide confidential feedback regarding the quality of their field training," and the Division "will document its response, including the rationale behind any responsive action taken or decision to take no action." | **EVALUATION DEFERRED** |
| 287. "Training Review Committee will, on an annual basis, analyze all aspects of CDP's FTO program," "consider emerging national policing practices in this area," and "recommend, and CDP will institute, appropriate changes to policies, procedures, and training related to its FTO program." | **EVALUATION DEFERRED** |
| 288. "CDP will document all training provided to or received by CDP officers," with officers "sign[ing] an acknowledgement of attendance or digitally acknowledge[ing] completion of each training course," which "will be maintained in a format that allows for analysis by training type, training date, training source, and by individual officer name." | **EVALUATION DEFERRED** |
| 289. "CDP will develop and implement a system that will allow the Training Section to electronically track, maintain, and produce complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system." | **OPERATIONAL COMPLIANCE** |
| 290. "CDP will develop and implement accountability measures . . . to ensure that all officers successfully complete all required training programs in a timely manner." | **PARTIAL COMPLIANCE** |

## Background

The Consent Decree mandates comprehensive officer training that instructs CDP personnel on the many new requirements and expectations of Decree-required policies or initiatives.

To facilitate this substantial training, the Decree requires significant changes to CDP's structural capacity to train and educate its officers. It is not simply that the Division must deliver high-quality training on new policies. The Division must build the internal capacity and leadership such that training can be developed, delivered, audited, and iteratively improved, in close consultation with a Training Review Committee ("TRC") that increases the set of eyes assessing CDP training. This adjustment is still very much a work-in-progress.

### Where the Division Stands

During the current reporting period, and as detailed elsewhere in this report, the Division's Training Section launched a number of important training initiatives in its 2019 in-service training: Use of Force, Community Engagement and Problem-Solving ("CEPS"), Bias-Free Policing, Crisis Intervention, and Search and Seizure. Creation of these training curriculum required high levels of technical assistance from the Monitoring Team, DOJ, and for search and seizure, independent consultants. As set forth below, enhancing the capacity of the training unit is paramount to continued success.

Nevertheless, the Decree envisions more than a Training Section within CDP that can capably develop and deliver officer training. It mandates the use of a Training Review Committee in the development and ongoing assessment of CDP training. The TRC is designed to be the functional center for the Division's training activities and planning. Under the Decree, the TRC is to include, alongside the Division's Training Section, District training coordinators, union representatives, and members of the Community Police Commission.[97] The TRC "will annually review and update CDP's training plan" by "conduct[ing] a needs assessment" that considers "trends in misconduct complaints; problematic uses of force; analysis of officer safety issues; input from members at all levels of CDP; input from members of the community, including community concerns; court decisions' research reflecting the latest in law enforcement trends; individual District needs; and any changes to Ohio or federal law, and to CDP policy."[98] The active and ongoing engagement of the TRC helps to ensure that in-service training for current officers is responsive to the emerging needs of CDP personnel and Cleveland residents. In short, the TRC was imagined to strategically quarterback and manage the Division's training efforts.

Although the CDP's Training Review Committee was formally created early in the Decree's implementation and officially put into place with a Court-approved policy in April 2016, the TRC's actual operations have, until recently, remained mostly dormant.

In the current reporting period, the Division has made some efforts to reengage the TRC. On May 22, 2019, the TRC convened to review drafts of training plans, discuss feedback for then-ongoing training initiatives, and propose topics for CDP's 2020 in-service training. While one meeting does not begin to meet the terms of the Consent Decree, it is the Monitoring Team's expectation that the TRC will be increasingly involved and reenergized as the focus of the Decree's implementation shifts from creating policies to delivering high-quality officer training.

---

[97] Dkt. 7-1 at ¶ 270.

[98] *Id.* at ¶ 271.

## Progress and Tasks that Remain

### Substantial and Effective Compliance with Training Review Committee Requirements

While the Division has taken initial steps to reengage the Training Review Committee, the Division must ensure that the committee is actively involved in the creation of training plans, audits of training initiatives, and assessments of gaps for future areas of training instruction.  The TRC must be an active player, working affirmatively with the Division's Training Section, to drive forward new training initiatives and iteratively improve on lessons learned.

### Training Staffing & Resources

Notwithstanding the need to reengage the TRC, CDP's Training Section must be properly staffed in order to meet the substantial scope of training mandated by the Consent Decree.  The Monitoring Team has previously urged CDP to devote additional resources to the Training Section to ensure that it can balance both the critical and extraordinary demands of training five recruit classes—not a requirement of the Consent Decree but a practical reality in light of officer attrition rates and the City's public commitments—while making sufficient progress on the Consent Decree.  This may also include securing the full-time expertise of non-sworn personnel to serve as curriculum development professionals within the Training Section.  Developing the capacity of the Training Section will require the support of the City, both in concept and with budget.  The training levels established during the Consent Decree process are not anomalies—they are the new normal and the City and CDP need to ensure that the Training Section is equipped to develop and deliver high-quality trainings into the future.

### Academy Training and Field Training Program

Along with requirements for annual in-service training for existing CDP officers, the "Consent Decree . . . contains certain obligations relating to the training of new officers at the Academy."[99]  Likewise, it addresses the Division's field training program, in which recent Academy graduates participate during their early days on the force.[100]

As the Monitoring Team has previously summarized, the City and Division have to date focused on developing and implementing core training for current CDP officers.  Nevertheless, CDP will need to "review and revise" its academy and field training programs such that they are meeting the requirements of the Decree.[101]  This necessarily entails a comprehensive, top-to-bottom review of all training curricula and programs.  Subsequently, the Monitoring Team must ensure that instruction, as delivered, conforms to the curricula, and that the field training program is proceeding according to Decree-required expectations.

---

[99] Dkt. 97 at 55; Dkt. 7-1 ¶¶ 271, 275, 277.

[100] Dkt. 7-1 ¶¶ 282–87.

[101] Id.

## B.    Equipment & Resources

| Paragraph | Status of Compliance |
|---|---|
| 291. "The City will implement" paragraphs regarding equipment and resources in order to allow implementation of the Consent Decree "and to allow officers to perform their jobs safely, effectively, and efficiently." | **PARTIAL COMPLIANCE** |
| 292. "CDP will complete a comprehensive equipment and resource study to assess its current needs and priorities," and it "will develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." | **OPERATIONAL COMPLIANCE** |
| 293. "CDP's Equipment and Resource Plan will provide for necessary equipment including, at least" "an adequate number of computers"; "an adequate number of operable and safe zone cars"; "zone cards with reliable, functioning computers that provide officers with up-to-date technology" including computer-aided dispatch, the records management system, and various core law enforcement systems; and "zone cards equipped with first-aid kits." "This plan also will ensure that CDP properly maintains and seeks to continuously improve upon existing equipment and technology; and is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." | **OPERATIONAL COMPLIANCE** |
| 294. "CDP will actively seek input and feedback from the Commission, patrol officers, and supervisors regarding resource allocation, equipment needs, and technological improvements." | **OPERATIONAL COMPLIANCE** |
| 295. "City and CDP" must "us[e] best efforts to implement the Equipment and Resource Plan as required." | **OPERATIONAL COMPLIANCE** |
| 296. "CDP will . . . implement an effective, centralized records management system." | **OPERATIONAL COMPLIANCE** |
| 297. "CDP will utilize a department-wide e-mail system to improve communication and information sharing." | **OPERATIONAL COMPLIANCE** |
| 298. "CDP will employ information technology professionals who are trained to conduct crime and intelligence analysis, who are capable of troubleshooting and maintaining information technology systems and who can identify and suggest appropriate technological advancements." | **OPERATIONAL COMPLIANCE** |
| 299. "CDP will implement an effective employee assistance program that provides officers ready access to the mental health and support resources necessary to facilitate effective and constitutional policing." | **PARTIAL COMPLIANCE** |

## Background

The Consent Decree requires the City of Cleveland to "develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement."[102]  The Plan must "provide for necessary equipment including, at least . . . an adequate number of computers; an adequate number of operable and safe zone cars; zone cars with reliable, functioning computers that provide officers with up-to-date technology, including" mobile computer-aided dispatch ("CAD"), access to the Division's records management system ("RMS"), and access to law enforcement databases; and "zone cars equipped with first-aid kits . . . . "[103]  It must address how the Division will satisfy the other substantive requirements of the Decree.[104]  It likewise must "ensure that CDP" both "properly maintains and seeks to continuously improve upon existing equipment and technology" and "is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies."[105]

## Where the Division Stands

In the prior reporting period, the City completed its Equipment and Resource Plan, which outlines various upgrades to ensure that the Division of Police has the tools necessary to provide high-quality public safety services, engage meaningfully with the community, and implement the requirements of the Consent Decree.

In the current reporting period, the City's Information Technology ("IT") team has stated that it has been working to refresh the Division's PC inventory, ordering and deploying 120 new PCs to be deployed through the Division. It also states that it is working to order additional modems and mobile data computers.  In the near future, CDP's Law Enforcement Records Management System ("LERMS") will be upgraded to a more up-to-date version.

## Progress and Tasks that Remain

Given the relatively recent completion of the Equipment and Resource Plan and the scope of changes contemplated in the Plan, the Division and the City's IT staff will need additional time for the changes to manifest in ways that tangibly improve officer productivity and safety.

Since the Court's approval of the Equipment and Resource Plan, the Monitoring Team has taken occasional visits to CDP District stations to observe and assess how stations are equipped with, among other things, computers, IT networking, zone cars, and mobile technology.  Yet the Team must conduct assessments—in a systemic manner, assessing the entirety of all CDP's equipment across time and different locations—to be able to evaluate whether the City's reported upgrades to equipment and technology, as well as the specific steps outlined in the Equipment and Resource Plan, are occurring as contemplated and whether the changes are, in fact, improving the day-to-day operations of CDP staff.

---

[102] Dkt. 7-1 ¶ 292.

[103] *Id.* ¶ 293.

[104] *Id.* ¶ 292.

[105] *Id.* ¶ 293.

The Monitoring Team will systematically audit the Division's progress in enhancing its equipment, IT infrastructure, and resources in the coming months.

## C.    Recruitment & Hiring

| Paragraph | Status of Compliance |
|---|---|
| 300. "CDP will review and revise . . . its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals." | **PARTIAL COMPLIANCE** |
| 301. "The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP." | **GENERAL COMPLIANCE** |
| 302. "CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community" and meets certain specific, expressly-listed requirements. | **OPERATIONAL COMPLIANCE** |
| 303. "The City will implement the recruitment plan within 60 days of it being approved by the Monitor." | **EVALUATION DEFERRED** |
| 304. "CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants," including officers with various, specific, expressly-listed skills and backgrounds. | **PARTIAL COMPLIANCE** |
| 305. "In developing and implementing its recruitment plan, CDP will consult with the [Community Police] Commission and other community stakeholders on strategies to attract a diverse pool of applicants." | **PARTIAL COMPLIANCE** |
| 306. "[O]bjective system for hiring and selecting recruits" that "employs reliable and valid selection criteria." | **PARTIAL COMPLIANCE** |
| 307. "CDP will report annually to the public its recruiting activities and outcomes," which will include information on various, expressly-listed areas. | **EVALUATION DEFERRED** |
| 308. "[A]ll candidates for sworn personnel positions" will have "psychological and medical examination" and be subject to "drug testing." Existing officers receive "random drug testing." | **GENERAL COMPLIANCE** |
| 309. "CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions" that cover various, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 310. "CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's supervisor(s)" and maintain any "salient information . . . in candidate's file." | **OPERATIONAL COMPLIANCE** |
| 311. "If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation" addressing various expressly-identified things. | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires the City to "integrate community and problem-oriented policing principles" into its recruitment practices, and to "develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community . . . [and] establish[es] and clearly identif[ies] the goals of CDP's recruitment efforts."[106]

## Where the Division Stands Now

In the prior reporting period, the Division completed its Recruitment and Hiring Plan, which incorporates feedback from the Department of Justice, Monitoring Team, and the expressed concerns of the Cleveland public. The Plan was approved by the Court on February 20, 2019.[107]

Since then, the Monitoring Team has not actively assessed CDP's progress on implementing the Recruitment and Hiring Plan.  Indeed, CDP will need more time before it can meaningfully report on how it is accomplishing the stated goals of the Court-approved Plan.  As described below, as the CDP reports on its recruiting activities and outcomes, the Team will be positioned to say how far the CDP has come—or still needs to go—to meeting the terms of the Decree.

## Progress and Tasks that Remain

Following the Court's approval of the Recruitment and Hiring Plan, CDP must "report annually to the public its recruiting activities and outcomes," including disaggregated data on applicants, interviewees, and selectees, as well as the successes and challenges to recruiting qualified and high-quality applicants.[108]  The Monitoring Team will continue to gauge progress by analyzing the numbers and trends with respect to applicants and hired recruits, as well as by working with the City to provide ongoing technical assistance on the Plan's implementation.

## D.    Performance Evaluations and Promotions

| Paragraph | Status of Compliance |
|---|---|
| 312.   "CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process" and "are identified and receive appropriate consideration for performance."  Likewise, "poor performance" must be "reflected in officer evaluations." | **EVALUATION DEFERRED** |
| 313.   "CDP will develop and implement fair and consistent practices to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis." | **EVALUATION DEFERRED** |

---

[106] Dkt. 7-1 ¶ 302.

[107] Dkt. 239.

[108] Dkt. 7-1 at ¶ 307.

| 314–15.  CDP will use "a formalized system documenting the annual performance evaluations of each officer by the officer's direct supervisor," including an assessment of several expressly-listed areas.  "Supervisors will meet with the employee whose performance is being evaluated to discuss the evaluation." | **EVALUATION DEFERRED** |
|---|---|
| 316.  "CDP will hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates." | **EVALUATION DEFERRED** |
| 317.  "CDP will develop and implement fair and consistent promotion practices that comport with the requirements of this Agreement and result in the promotion of officers who are effective and professional." | **EVALUATION DEFERRED** |
| 318.  In considering promotion, "appointing authority will consider" specific, expressly-listed "factors." | **EVALUATION DEFERRED** |

## Background

CDP must address how it evaluates officer performance and must ensure that high-performing officers have access to promotional opportunities.  Under the Consent Decree, CDP must "develop and implement fair and consistent practices to accurately evaluate officers" across a number of dimensions, including 'integrity, community policing, and critical police functions.'"[109]

## Where the Division Stands

In the current reporting period, CDP began early work to create a policy on performance evaluations.  This policy will be critical in the Division's ability to implement major policies and plans such as use of force, community and problem-oriented policing, crisis intervention, and bias-free policing.  The Monitoring Team and Department of Justice will work with CDP in the coming reporting period to finalize a policy that satisfies the requirements of the Consent Decree.

## Progress and Tasks that Remain

Under the Fourth Year Monitoring Plan, CDP will incorporate community and problem-oriented policing principles into its promotions and evaluations by the end of 2019.  This work, which must align with the new expectations that have been set by Court-approved policies and plans, will greatly enhance professional development opportunities within the Division and provide an important, non-punitive mechanism for employee management.  As described above, early work on this initiative, through a Division policy on performance evaluations, has begun.

---

[109] Dkt. 7-1 at ¶ 313.

### E.  Staffing

| Paragraph | Status of Compliance |
|---|---|
| 319.  "CDP will complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform the functions necessary for CDP to fulfill its mission, and satisfy the requirements of the" Consent Decree. / "CDP will develop an effective, comprehensive Staffing Plan that is consistent with its mission, including community and problem-oriented policing, and that will allow CDP to meet the requirements of" the Consent Decree. | **OPERATIONAL COMPLIANCE** |
| 320.  Requirements of CDP Staffing Plan. | **EVALUATION DEFERRED** |
| 321.  "The City and CDP will employ best efforts to implement the Staffing Plan over the period of time set forth in the approved plan." | **EVALUATION DEFERRED** |

### Background

The Consent Decree contemplates changes to CDP's approach to staffing, assigning, and deploying its personnel within the city of Cleveland.  Under the requirements of the Decree, for example, CDP must:

- Implement a "comprehensive and integrated policing model"[110];
- Ensure rigorous investigations and reviews of force incidents[111];
- Ensure that specialized crisis intervention officers "are dispatched to an incident involving an individual in crisis" and are able to "have primary responsibility for the scene"[112];
- Provide supervisors with the ability to "review all documentation of investigatory stops, searches, and arrests"[113];
- Ensure that officers can receive the training required by the Decree[114];
- Provide necessary opportunity for "first line supervisors [to] provide close and effective supervision of officers"[115];
- Implement the Early Intervention System[116]; and
- Provide supervisors with the ability to "conduct adequate random and directed audits of body worn camera recordings."[117]

---

[110] Dkt. 7-1 at ¶ 27.

[111] *Id.* at ¶¶ 93-130.

[112] *Id.* at ¶ 151.

[113] *Id.* at ¶ 168.

[114] *Id.* at ¶ 271.

[115] *Id.* at ¶ 322.

[116] *Id.* at ¶ 326-36.

[117] *Id.* at ¶ 339.

These provisions require changes in the way that CDP will deploy its existing personnel and in the overall number of sworn and civilian personnel.  To that end, the Consent Decree specifically envisions a Staffing Plan by which the CDP must "address and provide for each of the following":

- "[P]ersonnel deployment to ensure effective community and problem-oriented policing;
- "[A] sufficient number of well-trained staff and resources to conduct timely misconduct investigations;
- "[T]o the extent feasible, Unity of Command; and
- "[A] sufficient number of supervisors."[118]

### Where the Division Stands Now

In the prior reporting period, the Division completed the Decree-mandated Staffing Plan after working with the Department of Justice and Monitoring Team and considering public feedback solicited by the Community Police Commission.

Since then, the Monitoring Team has not actively assessed CDP's progress on implementing the Staffing Plan. CDP will need more time to internally assess, prepare, and execute before it can report on how it is accomplishing the stated goals of the Court-approved Plan.

### Progress and Tasks that Remain

The Monitoring Team has previously observed that major requirements of the Decree, such as the implementation of CDP's new community and problem-oriented policing paradigm, are directly linked to the Division's ability to make the operational changes contemplated in the approved Staffing Plan.  The Division's efforts on this front will need to continue in order for Decree-required policies, procedures, and plans to be fully and effectively implemented.

---

[118] *Id.* at ¶ 320.

## XII.    SUPERVISION

### A.    First-Line Supervisors

| Paragraph | Status of Compliance |
|---|---|
| 322.  "CDP will ensure that first line supervisors provide close and effective supervision of officers" in a number of express, specifically-identified ways. | **PARTIAL COMPLIANCE** |
| 323.  "CDP will develop and implement supervisory training for all new and current supervisors" that is "adequate in quality, quantity, type, and scope, and will include" a number of specific, expressly-listed topics. | **EVALUATION DEFERRED** |
| 324.  "Thereafter all sworn supervisors will receive adequate in-service management training." | **EVALUATION DEFERRED** |
| 325.  "CDP will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community." | **EVALUATION DEFERRED** |

### Background

The Consent Decree requires CDP to ensure "close and effective supervision of officers."[119]  Supervisors must be held "directly accountable for the quality and effectiveness of their supervision" of officers in their command.[120]

In addition to new policies more clearly and specifically defining the various roles and duties of supervisors, the Consent Decree requires supervisory training for "all new and current supervisors" covering an array of important topics, including:

- Techniques for effectively guiding and directing officers and promoting effective and constitutional police practices;
- De-escalating conflict;
- Evaluating written reports, including identification of canned or conclusory language that is not accompanied by specific facts;
- Investigating officer uses of force;
- Building community partnerships and guiding officers on this requirement;
- Understanding supervisory tools such as the Officer Intervention Program and body worn cameras;
- Responding to and investigating allegations of officer misconduct;
- Evaluating officer performance;
- Consistent disciplinary sanction and non-punitive corrective action;
- Monitoring use of force to ensure consistency with policies; and

---

[119] Dkt. 7-1 ¶ 322.
[120] *Id.* ¶ 325.

- Legal updates.[121]

## Where the Division Stands

### Supervisor Training

In the current reporting period, the Court approved the Division's basic Supervisor training curriculum on March 7, 2019.[122] Scheduled to launch alongside other Decree-required supervisory training in the upcoming reporting period, the four-hour training includes both general leadership skills that would be valuable for any manager or supervisor, as well as CDP-specific subjects including how to promote community engagement, the CDP's current Early Intervention System, body-worn cameras, and the Division's progressive disciplinary matrix.

Critically, given the Division's formal commitment to a philosophy of community and problem-oriented policing, the Supervisor Training encourages supervisors to ensure that officers understand their roles and responsibilities as part of the Division's commitment to CPOP. Supervisors are expected to show their commitment to CPOP, model community engagement by personally engaging with community members, emphasize that frontline officers are the key component of CPOP, and publicly commend officers who have demonstrated exceptional ability to work collaboratively with members of the public.

The Curriculum also instructs supervisors on how to de-escalate situations before a use of force may be necessary, including by arriving on scene and acting as a mediator, demonstrating compassion to defuse a tense situation, and calling for specialized Crisis Intervention Team officers where the incident may involve a behavioral health crisis.

## Progress and Tasks that Remain

### *Continuing Professional Development*

In the upcoming reporting period, the Team anticipates that CDP will be positioned to launch a number of important supervisory training initiatives, including its general supervisory skills curriculum described above. Further, the Monitoring Team reiterates that CDP needs to develop a clear track for supervisors to develop as professionals. Supervisors must be able to think proactively and affirmatively about how to implement the Division's mission, values, and strategic initiatives on a day-to-day basis—and how to ensure that their officers are performing at the level necessary to keep themselves and Cleveland safe.

The supervisor training on departmental policies and leadership skills that will begin in the upcoming reporting period represents only one preliminary training initiative. As the Monitoring Team has previously noted, the skills that make someone a good police officer—in terms of handling unfolding incidents or responding to rapidly evolving situations—is not always consistent with the skills necessary to be a good police manager—such as overseeing employees, implementing and executing on the organization's strategic goals, and the like. As with other professions, law enforcement increasingly recognizes that good leaders are more often made rather than born, and that even individuals with strong leadership skills can benefit from developing them further. The

---

[121] Dkt. 7-1 ¶ 323.
[122] Dkt. 248.

Division has previously signaled an interest in developing a formal leadership development program, and the Monitoring Team looks forward to working with CDP to make this a reality.

### Data and Compliance and Outcome Measures

As indicated above, the Consent Decree requires that CDP rigorously track instances in which supervisors identify problematic performance and log supervisors' responses when such problems are identified. The Division needs to implement a process for systematically tracking this information so that it can evaluate, in aggregate, the performance of its supervisors. Separately, the Monitoring Team's evaluations of use of force and Internal Affairs incidents will touch on supervisor performance in those areas.

## B.    Officer Intervention Program

| Paragraph | Status of Compliance |
|---|---|
| 326.  CDP "will create a plan to modify its Officer Intervention Program ('OIP') to enhance its effectiveness as a management tool to promote supervisory awareness and proactive identification of potentially problematic behavior among officers. | **EVALUATION DEFERRED** |
| 327.  "CDP supervisors will regularly use OIP data to evaluate the performance of CDP officers across all ranks, units, and shifts." | **EVALUATION DEFERRED** |
| 328.  "The OIP will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" in a number of specific, expressly-identified areas. | **EVALUATION DEFERRED** |
| 329.  "CDP will set threshold levels for each OIP indicator that will trigger a formal review, and the thresholds will allow for peer-group comparisons between officers with similar assignments and duties." | **EVALUATION DEFERRED** |
| 330–36.  Additional express requirements of OIP. | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires that CDP's existing Officer Intervention Program be comprehensively transformed into an effective "early intervention system." An early intervention system ("EIS") is a proactive risk assessment tool that provides individualized supervision and support to officers in order to manage risk. An effective EIS relies on a database that logs information on officer activities—such as stops, arrests, uses of force, firearm discharges, and citizen complaints—and allows police departments to identify problematic patterns of behavior by individual officers or groups of officers who may need non-disciplinary intervention and support. It also may flag issues such as operating a vehicle under the influence.

The Consent Decree requires that the Division's OIP become a broader management tool that will "proactive[ly] identif[y] . . . potentially problematic behavior among officers" and provide non-punitive supervisory intervention in order to "modify officers' behavior and improve performance" before the performance gradually becomes deep-

seated and difficult to resolve.[123]  The Decree requires the implementation and use of "a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" on officer performance.[124]

## Where the Division Stands

The Fourth Year Monitoring Plan contemplates initial work on implementing the type of early intervention process and infrastructure—informed by the broader and more reliable data being logged in the Division's IAPro and other data systems—occurring later in the monitoring year.

## Progress and Tasks that Remain

### Creation of EIS Plan

The City and Division plan to draft an EIS Plan in the upcoming reporting period.  The Monitoring Team looks forward to working with the Division to develop a plan that satisfies the Decree's requirements.

### Training & Involvement of Supervisors

As the CDP formalizes its EIP plan, supervisors will be required to regularly review performance data generated by the EIP.  When an officer reaches a defined threshold in a performance indicator, a supervisor will be required to assess an officer's performance to determine whether it may appropriate to intervene and identify and treat any issue that may impacting the officer's work.

### Training & Communication with Officers

Officers will need to understand what the new EIS is, what it is not, and how it differs from the analogous system that the Division has had in place for a number of years.  Consequently, CDP will need to develop a meaningful training initiative.

### Compliance with EIS Plan & Policies

After relevant policies are written and approved, and training for supervisors and officers developed and completed, the EIS will need to be implemented for a material span of time.  Thereafter, the Consent Decree requires that the Monitoring Team assess whether the system is proceeding according to the requirements of policy and the Consent Decree—and whether, ultimately, it appears to be assisting the Division in identifying instances where non-disciplinary action or intervention might enhance the quality of officer performance.

---

[123] Dkt. 7-1 at ¶¶ 326-27.

[124] *Id.* at ¶ 328.

## C.    Body-Worn Cameras

| Paragraph | Status of Compliance |
|---|---|
| 337.  "If CDP chooses to use body worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals." | **PARTIAL COMPLIANCE** |
| 338.  "Supervisors will review recordings related to any incident involving at least a Level 2 or 3 use of force; injuries to officers; and in conjunction with any other supervisory investigation." | **PARTIAL COMPLIANCE** |
| 339.  "Supervisors will conduct adequate random and directed audits of body worn camera recordings" and "incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers." | **PARTIAL COMPLIANCE** |
| 340.  "Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy." | **PARTIAL COMPLIANCE** |

### Background

Although the "use of body worn cameras is not required by" the Consent Decree, the Decree does contain requirements if CDP decides to institute body cameras.[125]  In 2013, the Division began using body-worn cameras. Having elected to do so, CDP is required by the Decree to "provide clear guidance and training on their use, and . . . implement protocols for testing equipment and preservation of recording to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals."[126]  The Decree also outlines supervisor responsibilities for viewing recorded incidents and "conduct[ing] adequate random and directed audits of body worn camera recordings . . . to confirm compliance with CDP policy."[127]  CDP must also ensure that officers are "subject to the disciplinary process for intentional or otherwise unjustified failure to activate" cameras in accordance with CDP policy.[128]

Currently, all CDP patrol officers are equipped with and trained on Axon's Body 2 camera system and are expected, under policy, to use them when working a City shift.

### Where the Division Stands

In the current reporting period, the Parties and Monitoring Team have not actively worked on issues relating to body-worn cameras.  The Division and its officers continue to use them to capture incidents and interactions.

---

[125] Dkt. 7-1 at ¶ 337.

[126] *Id.* at ¶ 337.

[127] *Id.* at ¶¶ 338-39.

[128] *Id.* at ¶ 340.

**Progress and Tasks that Remain**

*Compliance with Policy*

Going forward, the Monitoring Team will still need to ensure that the Division is meaningfully holding officers accountable for complying with the various provisions of the body-worn camera policy—not just in isolated incidents, or when other problematic performance brings a certain incident to the Division's attention, but across time and officers.

*General Policy for the Release of CDP Information*

The Monitoring Team has previously predicated approval of the Body-Worn Camera policies on the understanding that the City and CDP will establish a general policy for the release of records, data, and information—including but not limited to body-worn camera footage—to the public.  The Monitoring Team looks forward to working with the Division on establishing these protocols to enhance transparency and accountability.

## XIII.    COMPLIANCE & OUTCOME ASSESSMENTS

A full accounting of 2018 outcome measures is attached to this Report as Exhibit A.



# Cleveland Police Monitoring Team

**Hassan Aden**
Monitor

**Brian Maxey**
Deputy Monitor

**Ayesha Hardaway**
Deputy Monitor

**Charles R. See**
Director of Community Engagement

**Christine Cole**
Director of Outcome Measures

**Dr. Modupe Akinola**
**Matthew Barge**
**Chief Joseph Brann (ret.)**
**Brian Center**
**Dr. Randolph Dupont**
**Maggie Goodrich**
**Chief Timothy Longo (ret.)**
**Commissioner Chuck Ramsey (ret.)**
**Richard Rosenthal**
**Victor Ruiz**
**Captain Scott Sargent (ret.)**
**Dr. Ellen Scrivner**
**Sean Smoot**
**Timothy Tramble**
Monitoring Team

**Brian Chen**
**Barry Friedman**
*NYU School of Law Policing Project*
Consultants

EXHIBIT A

2018 Measures as of Sept 2019

**EXHIBIT A: 2018 Outcome Measures**

| | Consent Decree Paragraph | Consent Decree Section | Topic | Name of Measure | Included in Baseline? (yes/no) | Source of Data | 2015 Data Collected | 2016 Data Collected | 2017 Data Collected | 2018 Data Collected | % increase or decrease from 2015 through 2016 | % increase or decrease from 2016 through 2017 | % increase or decrease from 2017 through 2018 | Compound annual growth rate (CAGR) from 2015 through 2018 | Validated by Source (yes/no) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **367** | **a** | **Use of Force (UOF)** | | | | | | | | | | | | | |
| 2 | 367 | a. 1 | UOF | UoF Charges | yes | IAPro | see below | see below | see below | see below | | | | | | |
| 3 | | | | # of UOF charges | | | 350 | 307 | 242 | 380 | -12% | -21% | 57% | 2% | yes | 2015/Baseline: Validational data from CPD captured 349 use of force cases (based on timing of data request); 2016: Validational data from CPD captured 318 use of force cases (based on timing of data request). 2017: 237 use of force cases identified by CPD, but 242 citizens involved in UoF incidents. 2018: 338 use of force cases identified by CPD, but 380 citizens involved in UoF incidents |
| 4 | | | | # of non-UoF charges | | | 38,920 | 31,968 | 33,085 | 26,707 | -18% | 3% | -19% | -9% | yes | 2015: 39,270 charges; 2016: 32275 charges |
| 5 | 367 | a. 1 | UOF | UoF Charges ending in arrests | yes | IAPro | see below | see below | see below | see below | | | | | | |
| 6 | | | | # UoF ending in arrests | | | 285 | 243 | 191 | 296 | -15% | -21% | 55% | 1% | yes | 2015 Validational data from CPD captured 289 Arrests with 609 different charge types |
| 7 | | | | Total # of non-UoF ending in arrests | | | 24,086 | 19,425 | 18,785 | 15,319 | -19% | -3% | -18% | -11% | yes | 24,371 total arrests in 2015; 19,668 total arrests in 2016; 18,976 total arrests in 2017; 15,615 total arrests in 2018 |
| 8 | 367 | a. 1 | UOF | UoF rates | yes | IAPro | see below | see below | see below | see below | | | | | | |
| 9 | | | | UoF as % of all charges | | | 0.9% | 1.0% | 0.7% | 1.4% | 7% | -24% | 93% | 12% | yes | |
| 10 | | | | UoF arrests as % of all arrests | | | 1.2% | 1.2% | 1.0% | 1.9% | 6% | -19% | 88% | 13% | yes | |
| 11 | | | | % of UoFs ending in arrest | | | 81% | 79% | 79% | 78% | -3% | 0% | -1% | -1% | yes | |
| 12 | | | | % of non-UoFs ending in arrest | | | 62% | 61% | 57% | 57% | -2% | -7% | 1% | -2% | yes | |
| 13 | 367 | a. 1 | UOF | District | yes | IAPro | see below | see below | see below | see below | | | | | | |
| 14 | | | | District 1 | | | 36 | 29 | 25 | 34 | -19% | -14% | 36% | -1% | yes | |
| 15 | | | | District 2 | | | 64 | 57 | 54 | 82 | -11% | -5% | 52% | 6% | yes | |
| 16 | | | | District 3 | | | 100 | 114 | 68 | 69 | 14% | -40% | 1% | -9% | yes | |
| 17 | | | | District 4 | | | 85 | 64 | 52 | 87 | -25% | -19% | 67% | 1% | yes | |
| 18 | | | | District 5 | | | 61 | 39 | 37 | 103 | -36% | -5% | 178% | 14% | yes | |
| 19 | | | | outside city | | | 4 | 1 | 1 | 5 | -75% | 0% | 400% | 6% | yes | |
| 20 | | | | Unknown/NULL | | | . | 3 | 5 | 0 | | 67% | -100% | . | yes | |
| 21 | 367 | a. 1 | UOF | Force type | yes | IAPro | see below | see below | see below | see below | | | | | | These data are for all officers that used force.  Multiple force types used by officers per citizen. 2015 total =1311; 2016 total=1210; 2017 total=1018; 2018 total=645 |
| 22 | | | | Balance Displacement | | | 76 | 1 | 0 | 0 | -99% | -100% | 0% | -100% | yes | |
| 23 | | | | Body Force/Body Weight | | | 477 | 176 | 191 | 64 | -63% | 9% | -66% | -39% | yes | Body force now includes body weight for 2015-2017 |
| 24 | | | | Control Hold-Restraint | | | 217 | 323 | 225 | 66 | 49% | -30% | -71% | -26% | yes | |
| 25 | | | | Control Hold-Takedown | | | 65 | 124 | 68 | 39 | 91% | -45% | -43% | -12% | yes | |
| 26 | | | | De-Escalation | | | . | . | . | 104 | . | . | . | . | yes | |
| 27 | | | | Firearm Point | | | . | . | . | 191 | . | . | . | . | yes | This category was new in 2018 |
| 28 | | | | Joint Manipulation | | | 137 | 159 | 93 | 36 | 16% | -42% | -61% | -28% | yes | This category was new in 2018 |
| 29 | | | | Tackling/Takedown | | | 142 | 63 | 46 | 43 | -56% | -27% | -7% | -26% | yes | |

2018 Measures as of Sept 2019

| # | | | | Category | | | Col1 | Col2 | Col3 | Col4 | Pct1 | Pct2 | Pct3 | Pct4 | | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | | | | Taser | | | 44 | 36 | 47 | 27 | -18% | 31% | -43% | -11% | yes | Note: Taser includes when the taser was displayed or used. From 2019 onwards, this number will only include when the taser is used |
| 31 | | | | Verbal/Physical Gestures | | | 31 | 0 | 0 | 0 | -100% | 0% | 0% | -100% | yes | Might now be captured in de-escalation category which is new in 2018 |
| 32 | | | | Pressure Point/Pressure Point Control | | | 40 | 151 | 180 | 68 | 278% | 19% | -62% | 14% | yes | This category was in other in 2015 and 2016 and has now been broken out for all 3 years |
| 33 | | | | Push | | | 4 | 90 | 83 | 36 | 2150% | -8% | -57% | 73% | yes | This category was in other in 2015 and 2016 and has now been broken out for all 3 years |
| 34 | | | | Other (1-25 instance each) | | | 48 | 77 | 78 | 41 | 60% | 1% | -47% | -4% | yes | This is a designation created by the Monitoring Team and includes several categories with fewer than 25 instances. These are not classified as "Other" in IAPro or by the CPD |
| 35 | | | | Unknown/NULL/#N/A | | | 30 | 10 | 7 | 0 | -67% | -30% | -100% | -100% | yes | |
| 36 | 367 | a. 1 | UOF | Arrest type | yes | IAPro | see below | see below | see below | see below | | | | | | These data are for all UoF (2015 total UoF=774; 2016 total UoF=1110) not arrests (2015 total arrests=285; 2016 total arrests=244) and not charge types (2015 total charge types=350; 2016 total charge types=308) |
| 37 | | | | Violence toward Police Officer | | | 7 | 105 | 66 | 34 | 1400% | -37% | -48% | 48% | yes | |
| 38 | | | | Violence toward Others | | | 158 | 156 | 73 | 107 | -1% | -53% | 47% | -9% | yes | |
| 39 | | | | Damage to Property | | | 57 | 76 | 33 | 83 | 33% | -57% | 152% | 10% | yes | |
| 40 | | | | Obstructing Justice | | | 207 | 370 | 224 | 220 | 79% | -39% | -2% | 2% | yes | |
| 41 | | | | Crisis Intervention | | | 40 | 69 | 55 | 29 | 73% | -20% | -47% | -8% | yes | |
| 42 | | | | Drugs/Alcohol | | | 47 | 31 | 30 | 39 | -34% | -3% | 30% | -5% | yes | |
| 43 | | | | Cleveland Codified Ord. - Part 6 | | | 84 | 150 | 73 | 64 | 79% | -51% | -12% | -7% | yes | This category was in other in 2015 |
| 44 | | | | Miscellaneous offense | | | 18 | 39 | 33 | 45 | 117% | -15% | 36% | 26% | yes | This category was in other in 2015 |
| 45 | | | | NULL | | | 84 | 23 | 0 | 0 | -73% | -100% | 0% | -100% | yes | This category was in other in 2015 |
| 46 | | | | Other (1-25 instance each) | | | 72 | 63 | 34 | 43 | -13% | -46% | 26% | -12% | yes | |
| 47 | 367 | a. 1 | UOF | Race | yes | IAPro | see below | see below | see below | see below | | | | | | |
| 48 | | | | Black | | | 259 | 219 | 188 | 302 | -15% | -14% | 61% | 4% | yes | |
| 49 | | | | White | | | 77 | 69 | 68 | 49 | -10% | -1% | -28% | -11% | yes | |
| 50 | | | | Hispanic | | | 9 | 12 | 11 | 18 | 33% | 0% | 64% | 19% | yes | |
| 51 | | | | Asian | | | 1 | 1 | 0 | 1 | 0% | -100% | N/A | 0% | yes | |
| 52 | | | | Other | | | 1 | 3 | 5 | 4 | 200% | 67% | -20% | 41% | yes | |
| 53 | | | | Unknown/NULL | | | 3 | 3 | 0 | 6 | 0% | -100% | N/A | 19% | yes | |
| 54 | 367 | a. 1 | UOF | Ethnicity | yes | IAPro | see below | see below | see below | see below | | | | | | |
| 55 | | | | Hispanic/Latino | | | 9 | 12 | 11 | 18 | 33% | -8% | 64% | 19% | yes | |
| 56 | | | | Non-Hispanic/Latino | | | 338 | 292 | 261 | 362 | -14% | -11% | 39% | 2% | yes | |
| 57 | | | | Unknown/NULL | | | 3 | 3 | 0 | 0 | 0% | -100% | 0% | -100% | yes | |
| 58 | 367 | a. 1 | UOF | Age | yes | IAPro | see below | see below | see below | see below | | | | | | For 2018, the categories have been changed to 17 and under (vs. under 21); then 18-29 (vs. 21-29); The data from 2015-2017 have been updated to reflect this change |
| 59 | | | | 17 and under (juveniles) | | | 31 | 36 | 16 | 28 | 16% | -56% | 75% | -3% | yes | |
| 60 | | | | 18-29 years | | | 166 | 148 | 117 | 167 | -11% | -21% | 43% | 0% | yes | |
| 61 | | | | 30-39 years | | | 68 | 59 | 86 | 96 | -13% | 46% | 12% | 9% | yes | |
| 62 | | | | 40-49 years | | | 39 | 26 | 27 | 42 | -32% | 4% | 56% | 2% | yes | |
| 63 | | | | 50-59 years | | | 18 | 16 | 11 | 27 | -11% | -31% | 145% | 11% | yes | |
| 64 | | | | 60+ years | | | 11 | 10 | 6 | 2 | -9% | -40% | -67% | -35% | yes | |
| 65 | | | | Unknown/NULL | | | 17 | 13 | 9 | 6 | -24% | -31% | -33% | -23% | yes | |
| 66 | 367 | a. 1 | UOF | Gender | yes | IAPro | see below | see below | see below | see below | | | | | | |
| 67 | | | | Male | | | 265 | 223 | 212 | 338 | -16% | -5% | 59% | 6% | yes | |
| 68 | | | | Female | | | 82 | 82 | 60 | 42 | 0% | -27% | -30% | -15% | yes | |
| 69 | | | | Unknown/NULL | | | 3 | 2 | 0 | -12 | -33% | -100% | N/A | #NUM! | yes | |
| 70 | 367 | a. 1 | UOF | Mental State | yes | IAPro | see below | see below | see below | see below | | | | | | |
| 71 | | | | Mental Crisis | | | 42 | 0 | 0 | 0 | -100% | 0% | N/A | -100% | yes | more granular data collected in 2016 and 2017 |

2018 Measures as of Sept 2019

| # | Ref | Sub | Cat | Measure | Y/N | Source | | | | | | | | | Y/N | Notes |
|---|-----|-----|-----|---------|-----|--------|---|---|---|---|---|---|---|---|-----|-------|
| 72 | | | | Behavioral Crisis Event | | | 13 | 68 | 119 | 82 | 423% | 75% | -31% | 58% | yes | more granular data collected in 2016 and 2017 |
| 73 | | | | Medical Condition | no | IAPro | | | | | | | | | | |
| 74 | | | | Drugs / ETOH | yes | IAPro | 138 | 131 | 223 | 184 | -5% | 70% | -17% | 7% | yes | Only drugs and alcohol as noted in IAPro |
| 75 | | | | Unimpaired/None Detected | yes (new) | | 67 | 102 | 150 | 309 | 52% | 47% | 106% | 47% | yes | New item CPD collects that has been added to baseline and 2016 but not specified in Consent Decree |
| 76 | | | | Unknown/NULL | yes (new) | | 90 | 3 | 23 | 24 | -97% | 667% | 4% | -28% | yes | New item CPD collects that has been added to baseline and 2016 but not specified in Consent Decree |
| 77 | | | | Known Medical Condition | yes (new) | | | 3 | 1 | 3 | | -67% | 200% | | yes | New item CPD collects that has been added to baseline and 2016 but not specified in Consent Decree |
| 78 | | | | Visible Physical Disability | yes (new) | | | | | 5 | | | | | yes | New item CPD now collects |
| 79 | | | | | | | | | | | | | | | | |
| 80 | 367 | a. 2 | UOF | Officer injuries | yes | IAPro | see below | see below | see below | see below | | | | | | |
| 81 | | | | # officers injured | yes | | 134 | 192 | 212 | 58 | 43% | 10% | -73% | -19% | yes | 2018: Officers are advised to select "yes" to injury and/or hospitalization if at least 1 involved officer was injured and/or hospitalized. Therefore, 2018 data represent the number incidents in which at least 1 officer was injured and/or hospitalized. Officer injury is defined as the number of officers who were injured AND filled out an injury packet (31 officers) as well as those who did not fill out an injury packet but selected an injury type (12 officers) under the officer condition variable. CPD is moving away from capturing officer injury at the incident level and have advised officers to select "yes" to injury and/or hospitalization only in regards themselves. This means 2018 is not apples to apples with prior years and therefore % increases and CAGR in 2018 are not an accurate reflection of changes |
| 82 | | | | rate of officer injuries change overall | no | | | -30% | -9% | 266% | | -76% | N/A | | yes | This represents the year over year rate of change. This number was incorrectly calculated for 2015-2018 and has now been updated |
| 83 | 367 | a. 2 | UOF | Officer injuries severity | yes | IAPro | | | | 640 | | | | | | New category added in 2018 |
| 84 | | | | No Injuries | | | | | | 532 | | | | | | New category added in 2018 |
| 85 | | | | Abrasion | | | | | | 18 | | | | | | New category added in 2018 |
| 86 | | | | Bodily Fluid/Exposure | | | | | | 9 | | | | | | New category added in 2018 |
| 87 | | | | Bruise | | | | | | 7 | | | | | | New category added in 2018 |
| 88 | | | | Hospital | | | | | | 22 | | | | | | New category added in 2018 |
| 89 | | | | Laceration | | | | | | 6 | | | | | | New category added in 2018 |
| 90 | | | | Refused Treatment | | | | | | 6 | | | | | | New category added in 2018 |
| 91 | | | | Soft Tissue Damage | | | | | | 9 | | | | | | New category added in 2018 |
| 92 | | | | Sprain/Strain/Twist | | | | | | 7 | | | | | | New category added in 2018 |
| 93 | | | | Treated & Released | | | | | | 13 | | | | | | New category added in 2018 |
| 94 | | | | Other/. | | | | | | 11 | | | | | | New category added in 2018 |
| 95 | 367 | a. 2 | UOF | Public/subject injuries | yes | IAPro | see below | see below | see below | see below | | | | | | |
| 96 | | | | # public/subject injuries | yes | | 77 | 69 | 98 | 75 | -10% | 42% | -23% | -1% | yes | Public injuries is citizen injuries. This was misreported as 112 in baseline, but corrected here. |
| 97 | | | | overall | no | | | -10% | -76% | 23% | | N/A | N/A | | yes | |
| 98 | 367 | a. 2 | UOF | Public/Subject injuries severity | yes | IAPro | | | | 663 | | | | | | New category added in 2018 |
| 99 | | | | No Injuries | | | | | | 242 | | | | | | New category added in 2018 |
| 100 | | | | Abrasion | | | | | | 36 | | | | | | New category added in 2018 |
| 101 | | | | Behavioral Crisis | | | | | | 28 | | | | | | New category added in 2018 |
| 102 | | | | Complaint | | | | | | 21 | | | | | | New category added in 2018 |

2018 Measures as of Sept 2019

| # | | | | Category | | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 103 | | | | EMS | | | | | | 77 | | | | | | New category added in 2018 |
| 104 | | | | Hospital | | | | | | 95 | | | | | | New category added in 2018 |
| 105 | | | | Laceration | | | | | | 14 | | | | | | New category added in 2018 |
| 106 | | | | Pre-Existing Medical Condition | | | | | | 11 | | | | | | New category added in 2018 |
| 107 | | | | Puncture | | | | | | 13 | | | | | | New category added in 2018 |
| 108 | | | | Refused Medical Treatment | | | | | | 12 | | | | | | New category added in 2018 |
| 109 | | | | Self-Inflicted/Self-Induced | | | | | | 15 | | | | | | New category added in 2018 |
| 110 | | | | Treated & Released | | | | | | 44 | | | | | | New category added in 2018 |
| 111 | | | | None Identified | | | | | | 34 | | | | | | New category added in 2018 |
| 112 | | | | Other/. | | | | | | 21 | | | | | | New category added in 2018 |
| 113 | 367 | a. 2 | UOF | Force complaints | yes | IA | see below | see below | see below | see below | | | | | | |
| 114 | | | | # of force complaints | | | 43 | 17 | 33 | 33 | -60% | 94% | 0% | -6% | yes | These data are by officer and not by case; These data are just from IA and does not include complaints through OPS |
| 115 | | | | # of non-force complaints | | | 73 | 93 | 96 | 119 | 27% | 3% | 24% | 13% | yes | These data are by officer and not by case; These data are just from IA and does not include complaints through OPS |
| 116 | 367 | a. 2 | UOF | disposition of force complaints | yes | IA | see below | see below | see below | see below | | | | | | |
| 117 | | | | Substantiated/Sustained | | | 7 | 8 | 0 | 3 | 14% | -100% | N/A | -19% | yes | Includes category "Sustained Other" from 2015 |
| 118 | | | | Not Sustained | | | 0 | 0 | 0 | 3 | 0% | 0% | N/A | N/A | yes | This category was not in the 2015-2017 data |
| 119 | | | | Administrative Closure | | | 2 | 0 | 2 | 1 | -100% | N/A | -50% | -16% | yes | |
| 120 | | | | Exonerated/Within Policy | | | | 1 | 0 | 3 | | -100% | 0% | | yes | |
| 121 | | | | Unfounded | | | 0 | 0 | 0 | 1 | 0% | 0% | N/A | N/A | yes | This category was not in the 2015-2017 data |
| 122 | | | | Open | | | 34 | 8 | 31 | 22 | -76% | 288% | -29% | -10% | yes | |
| 123 | 367 | a. 2 | UOF | source (in/ext.) force complaints | no | IA | see below | see below | see below | see below | | | | | | |
| 124 | | | | Internal (CPD) | no | | | | | 33 | | | | | yes | New data captured in 2018; prior to 2018 Incomplete information; no systematic capturing of data through IA or OPS |
| 125 | | | | External (non-CPD/Civilian) | no | | | | | 0 | | | | | yes | New data captured in 2018; prior to 2018 Incomplete information; no systematic capturing of data through IA or OPS |
| 126 | 367 | a. 2 | UOF | force type | yes | IA, IAPro | see below | see below | see below | see below | | | | | | lots of incomplete data (more than half data not present) from 2015-2017 |
| 127 | | | | Balance Displacement | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 128 | | | | Body Force | | | 8 | 0 | 15 | 4 | -100% | N/A | -73% | -16% | yes | |
| 129 | | | | Control Hold-Restraint | | | 2 | 8 | 11 | 6 | 300% | 38% | -45% | 32% | yes | |
| 130 | | | | Control Hold-Takedown | | | 0 | 3 | 5 | 3 | N/A | 67% | -40% | N/A | yes | |
| 131 | | | | De-Escalation | | | | | | 8 | | | | | yes | This category was new in 2018 |
| 132 | | | | Firearm Point | | | | | | 2 | | | | | yes | This category was new in 2018 |
| 133 | | | | Firearm | | | | | | 1 | | | | | yes | This category was new in 2018 |
| 134 | | | | Joint Manipulation | | | 1 | 2 | 13 | 2 | 100% | 550% | -85% | 19% | yes | |
| 135 | | | | Tackling/Takedown | | | 0 | 0 | 5 | 4 | 0% | N/A | -20% | N/A | yes | |
| 136 | | | | Taser | | | 1 | 0 | 6 | 4 | -100% | N/A | -33% | 41% | yes | |
| 137 | | | | Verbal/Physical Gestures | | | 0 | 0 | 0 | 0 | 0% | 0% | N/A | N/A | yes | |
| 138 | | | | Pressure Point/Pressure Point Control | | | | | 15 | 5 | | | -67% | | yes | This category was in other in 2015 and 2016 and has now been broken out 2017 |
| 139 | | | | Push | | | | | 5 | 5 | | | 0% | | yes | This category was in other in 2015 and 2016 and has now been broken out for 2017 |
| 140 | | | | Other (1-25 instance each) | | | 7 | 10 | 13 | 7 | 43% | 30% | -46% | 0% | yes | |
| 141 | | | | Unknown/NULL | | | 27 | 5 | 4 | 0 | -81% | -20% | -100% | -100% | yes | |
| 142 | 367 | a. 2 | UOF | geographic area | yes | IA | | | | | | | | | | |
| 143 | | | | District 1 | | | 2 | 0 | 4 | 0 | -100% | N/A | -100% | -100% | yes | |
| 144 | | | | District 2 | | | 0 | 4 | 3 | 6 | N/A | -25% | 100% | N/A | yes | |
| 145 | | | | District 3 | | | 4 | 4 | 5 | 7 | 0% | 25% | 40% | 15% | yes | |
| 146 | | | | District 4 | | | 4 | 3 | 1 | 2 | -25% | -67% | 100% | -16% | yes | |
| 147 | | | | District 5 | | | 3 | 0 | 4 | 1 | -100% | N/A | -75% | -24% | yes | |
| 148 | | | | outside city | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | N/A | yes | |

2018 Measures as of Sept 2019

| # | 367 | a | Category | Description | Coll | Source | | | | | | | | | yn | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 149 | | | | Unknown/NULL | | | 10 | 6 | 4 | 0 | -40% | -33% | -100% | -100% | yes | |
| 150 | 367 | a. 2 | UOF | demographics of complainant | yes | IA, IAPro | | | | | | | | | | |
| 151 | | | | Black | | | 11 | 6 | 12 | 11 | -45% | 100% | -8% | 0% | yes | |
| 152 | | | | White | | | 2 | 2 | 5 | 3 | 0% | 150% | -40% | 11% | yes | |
| 153 | | | | Hispanic | | | 0 | 3 | 0 | 1 | N/A | -100% | N/A | N/A | yes | |
| 154 | | | | Asian | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | N/A | yes | |
| 155 | | | | Other | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | N/A | yes | |
| 156 | | | | Unknown/NULL | | | 10 | 6 | 4 | 1 | -40% | -33% | -75% | -44% | yes | |
| 157 | | | | | | | | | | | | | | | | |
| 158 | 367 | a.3 | ECW usage | # ECW and changes over time | yes | IAPro | | | | | | | | | | |
| 159 | | | | # of ECW | yes | IAPro | 44 | 36 | 47 | 27 | -18% | 31% | -43% | -11% | yes | Note: Taser includes when the taser was displayed or used. From 2019 onwards, this number will only include when the taser is used |
| 160 | | | | # of non-ECW UoF | yes | IAPro | 1267 | 1174 | 971 | 688 | -7% | -17% | -29% | -14% | yes | |
| 161 | | | | changes compared to UOF | no | | | -11% | 44% | -33% | | N/A | -174% | | yes | In 2015 there were 1311 force types used. In 2016 there were 1210. This number therefore represents the change in non-taser force types between 2015 and 2016 relative to the change in taser force type; same calculation used for 2016 to 2017 |
| 162 | | | | changes compared to weapon/force instrument | no | | | | | | | | | | N/A | Data are not collected in detail to calculate this value |
| 163 | | | | | | | | | | | | | | | | |
| 164 | 367 | a.4 | UOF violating policy | # in violation | yes | Case Office | 9 | 16 | 6 | 6 | 78% | -63% | 0% | -10% | yes | |
| 165 | 367 | a.4 | UOF violating policy | force type | yes | Case Office, IAPro | see below | see below | see below | see below | | | | | | |
| 166 | | | | Balance Displacement | | | 2 | 0 | 0 | 0 | -100% | 0% | 0% | -100% | yes | |
| 167 | | | | Body Force | | | 5 | 0 | 5 | 4 | -100% | N/A | -20% | -5% | yes | |
| 168 | | | | Control Hold-Restraint | | | 0 | 7 | 6 | 2 | N/A | -14% | -67% | N/A | yes | |
| 169 | | | | Control Hold-Takedown | | | 0 | 0 | 2 | 3 | N/A | 0% | 50% | N/A | yes | |
| 170 | | | | Joint Manipulation | | | 2 | 0 | 3 | 4 | -100% | N/A | 33% | 19% | yes | |
| 171 | | | | Tackling/Takedown | | | 0 | 3 | 0 | 0 | N/A | -100% | 0% | 0% | yes | |
| 172 | | | | Taser | | | 0 | 3 | 1 | 0 | N/A | -67% | -100% | 0% | yes | |
| 173 | | | | Verbal/Physical Gestures | | | 1 | 0 | 0 | 0 | -100% | 0% | N/A | -100% | yes | |
| 174 | | | | Control | | | | | 5 | 1 | | | -80% | | yes | |
| 175 | | | | Push | | | | | 6 | 0 | | | -100% | | yes | |
| 176 | | | | Other (1-25 instance each) | | | 2 | 13 | 5 | 4 | 550% | -62% | -20% | 19% | yes | |
| 177 | | | | Unknown/NULL | | | 2 | 4 | 6 | 2 | 100% | 50% | -67% | 0% | yes | |
| 178 | 367 | a.4 | UOF violating policy | geography | yes | Case Office, IAPro | see below | see below | see below | see below | | | | | | denotes district where incident occurred |
| 179 | | | | District 1 | | | 1 | 1 | 0 | 2 | 0% | -100% | N/A | 19% | yes | |
| 180 | | | | District 2 | | | 3 | 4 | 0 | 2 | 33% | -100% | N/A | -10% | yes | |
| 181 | | | | District 3 | | | 3 | 6 | 2 | 1 | 100% | -67% | -50% | -24% | yes | |
| 182 | | | | District 4 | | | 1 | 3 | 3 | 1 | 200% | 0% | -67% | 0% | yes | |
| 183 | | | | District 5 | | | 1 | 2 | 1 | 0 | 100% | -50% | -100% | -100% | yes | |
| 184 | | | | outside city | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | N/A | yes | |
| 185 | 367 | a.4 | UOF violating policy | arrest type | yes | Case Office, IAPro | see below | see below | see below | see below | | | | | | |
| 186 | | | | Violence toward Police Officer | | | 0 | 2 | 2 | 0 | N/A | 0% | -100% | N/A | yes | |
| 187 | | | | Violence toward Others | | | 3 | 2 | 0 | 0 | -33% | -100% | 0% | -100% | yes | |
| 188 | | | | Damage to Property | | | 4 | 0 | 0 | 0 | -100% | 0% | 0% | -100% | yes | |
| 189 | | | | Obstructing Justice | | | 3 | 5 | 11 | 7 | 67% | 120% | -36% | 24% | yes | |
| 190 | | | | Crisis Intervention | | | 1 | 1 | 0 | 0 | 0% | -100% | 0% | -100% | yes | |
| 191 | | | | Drugs/Alcohol | | | 0 | 2 | 2 | 1 | N/A | 0% | -50% | N/A | yes | |
| 192 | | | | Other | | | 4 | 12 | 5 | 9 | 200% | -58% | 80% | 22% | yes | |

| # | | | | | | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 193 | 367 | a.4 | UOF violating policy | race of subject | yes | Case Office, IAPro | see below | see below | see below | see below | | | | | | 2015 data mistakenly reported the race of the officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 194 | | | | Black | | | 6 | 6 | 4 | 5 | 0% | -33% | 25% | -4% | yes | |
| 195 | | | | White | | | 1 | 2 | 1 | 1 | 100% | -50% | 0% | 0% | yes | |
| 196 | | | | Hispanic | | | 1 | 1 | 0 | 0 | 0% | -100% | N/A | -100% | yes | |
| 197 | | | | Asian | | | 0 | 0 | 0 | 0 | 0% | 0% | N/A | N/A | yes | |
| 198 | | | | Other | | | 0 | 2 | 0 | 0 | N/A | -100% | 0% | N/A | yes | |
| 199 | | | | Unknown/NULL | | | 0 | 0 | 1 | 6 | 0% | N/A | 500% | N/A | yes | |
| 200 | 367 | a.4 | UOF violating policy | ethnicity of subject | yes | Case Office, IAPro | see below | see below | see below | see below | | | | | | 2015 data mistakenly reported the ethnicity of the officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 201 | | | | Hispanic/Latino | | | 1 | 1 | 0 | 0 | 0% | -100% | 0% | -100% | yes | |
| 202 | | | | Non-Hispanic/Latino | | | 7 | 10 | 5 | 6 | 43% | -50% | 20% | -4% | yes | |
| 203 | | | | Unknown/NULL | | | 0 | 0 | 1 | 0 | 0% | N/A | -100% | N/A | | |
| 204 | 367 | a.4 | UOF violating policy | age of subject | yes | Case Office, IAPro | see below | see below | see below | | | | | | | 2015 data mistakenly reported the age of the officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 205 | | | | under 20 years | | | 3 | 0 | 0 | 1 | -100% | N/A | N/A | -24% | yes | |
| 206 | | | | 21-29 years | | | 2 | 3 | 2 | 3 | 50% | -33% | 50% | 11% | yes | |
| 207 | | | | 30-39 years | | | 0 | 4 | 2 | 2 | N/A | -50% | 0% | N/A | yes | |
| 208 | | | | 40-49 years | | | 2 | 1 | 1 | 0 | -50% | 0% | -100% | -100% | yes | |
| 209 | | | | 50-59 years | | | 0 | 1 | 0 | 0 | N/A | -100% | N/A | N/A | yes | |
| 210 | | | | 60+ years | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | N/A | yes | |
| 211 | | | | Unknown/NULL | | | 1 | 2 | 1 | 0 | 100% | -50% | -100% | -100% | yes | |
| 212 | 367 | a.4 | UOF violating policy | gender of subject | yes | Case Office, IAPro | see below | see below | see below | see below | | | | | | 2015 data mistakenly reported the gender of the officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 213 | | | | Male | | | 8 | 11 | 3 | 5 | 38% | -73% | 67% | -11% | yes | |
| 214 | | | | Female | | | 0 | 0 | 2 | 1 | 0% | N/A | -50% | N/A | yes | |
| 215 | | | | Unknown/NULL | | | 0 | 0 | 1 | 0 | 0% | N/A | -100% | 0% | yes | |
| 216 | 367 | a.4 | UOF violating policy | condition | no | Case Office, IAPro | | | | | | | | | | |
| 217 | | | | mental condition | no | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 218 | | | | medical condition | no | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 219 | | | | drugs/alcohol | no | | . | 6 | 4 | 3 | | -33% | -25% | | yes | Not collected in baseline, collected in 2016 based on 11 citizens |
| 220 | | | | Unimpaired | no | | . | 3 | 1 | 3 | | -67% | 200% | | yes | Not collected in baseline, collected in 2016 based on 11 citizens |
| 221 | | | | Unknown/NULL | no | | . | 2 | 1 | 0 | | -50% | -100% | | yes | Not collected in baseline, collected in 2016 based on 11 citizens |
| 222 | | | | presence of disability | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 223 | | | | | | | | | | | | | | | | |
| 224 | 367 | a.5 | UOF violating policy | # of officers with > 1 UOF violating policy | yes | Case Office | 0 | 1 | 0 | 0 | N/A | -100% | 0% | N/A | yes | |
| 225 | | | | | | | | | | | | | | | | |
| 226 | 367 | a.6 | UOF violating policy | force reviews/investigations resulting in | yes | IA | see below | see below | see below | see below | | | | | | |
| 227 | | | | policy deficiency | | | 5 | 11 | 3 | 1 | 120% | -73% | -67% | -33% | yes | Examination of data received shows most of the policy deficiencies were administrative/technical (i.e. late forms) and not substantive or due to tactics |
| 228 | | | | training deficiency | | | 2 | 0 | 0 | 0 | -100% | 0% | 0% | -100% | yes | |
| 229 | | | | tactics deficiency | | | 2 | 5 | 3 | 3 | 150% | -40% | 0% | 11% | yes | |
| 230 | | | | pending | | | 0 | 0 | 0 | 2 | 0% | 0% | N/A | N/A | yes | |

2018 Measures as of Sept 2019

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 231 | 367 | a. 7 | quality of | investigations | no | | in written summary | | | | | | | | | yes | Random sample selected by Monitoring Team and reviewed to capture the quality of the investigations |
| 232 | 367 | a. 7 | quality of | review | no | | in written summary | | | | | | | | | yes | Random sample selected by Monitoring Team and reviewed to capture the quality of the investigations |
| 233 | 367 | a. 7 | quality of | # of investigations returned because incomplete | no | Chief's Office | | | | | | | | | | no | Data has not been received as of June 2017 |
| 234 | **367** | **b** | **addressing individuals in crisis** | | | | | | | | | | | | | | |
| 235 | 367 | b. 1 | addressing individuals in crisis | # calls for service and incidents involving an individual in crisis | no | CI Unit | 10480 | 7890 | 8120 | 13460 | -25% | 3% | 66% | 6% | | yes | baseline, 2016, 2017, and 2018 aren't comparable. 2018: 1346 forms completed (reported quarterly) which is presumed to represent 10% of possible calls. 2017: 812 forms completed (which is 10% of total possible mental health calls); data from 11/1/16-11/30/17. 2016: 789 forms completed (which is 10% of total possible mental health calls); data from 10/1/15-10/31/16. 2015 Baseline: 1048 forms completed (which is 10% of total possible mental health calls); data from 1/1/14-9/30/15 |
| 236 | | | | Responded to by specialized CIT officer | no | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 237 | | | | Responded to by other | no | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 238 | 367 | b. 1 | addressing individuals in crisis | Direction of individuals in crisis | no | see below | see below | see below | see below | | | | | | | |
| 239 | | | | directed to healthcare system | | 1009 | 672 | 1012 | 1489 | -33% | 51% | 47% | 10% | | yes | SUBJECT DISPOSITION (pink slipped or voluntarily to SVCH, private hospital ER, referred to mental health treatment, handled by EMS); 0 referrals to mental health treatment in 2016; 19 referrals in 2015 |
| 240 | | | | directed to judicial system | | 12 | 2 | 8 | 7 | -83% | 300% | -13% | -13% | | yes | # arrested |
| 241 | | | | direction other | | 230 | 7 | 0 | 0 | -97% | -100% | 0% | -100% | | yes | other, complaint unfounded requiring no police action, subject stabilized; 0 complaint unfounded requiring no police action, subject stabilized in 2016; 18  in 2015 |
| 242 | | | | rate - directed to healthcare system | | 81% | 99% | 99% | 100% | 22% | 1% | 0% | 5% | | yes | |
| 243 | | | | rate - directed to judicial system | | 1% | 0% | 1% | 0% | -69% | 167% | -40% | -16% | | yes | |
| 244 | | | | rate - direction other | | 18% | 1% | 0% | 0% | -94% | -100% | 0% | -100% | | yes | |
| 245 | | | | | | | | | | | | | | | | | |
| 246 | 367 | b. 2 | addressing individuals in crisis | # of UOF on individuals in crisis | | 14 | | | | | | | | | | | 2015 data -"Use of non-deadly force report made" |
| 247 | | | | type of force used | | | | | | | | | | | | | poor data |
| 248 | | | | Balance Displacement | | | | | | | | | | | | | poor data |
| 249 | | | | Body Force | | | | | | | | | | | | | poor data |
| 250 | | | | Control Hold-Restraint | | 166 | | | | | | | | | | | 2015 data - "handcuffs" |
| 251 | | | | Control Hold-Takedown | | | | | | | | | | | | | poor data |
| 252 | | | | Joint Manipulation | | | | | | | | | | | | | poor data |
| 253 | | | | Tackling/Takedown | | | | | | | | | | | | | poor data |
| 254 | | | | Taser | | 5 | | | | | | | | | | | 2015 data - "taser stun" |
| 255 | | | | Verbal/Physical Gestures | | | | | | | | | | | | | poor data |
| 256 | | | | Other (1-25 instance each) | | 40 | | | | | | | | | | | 2015 data -"other, fired, OC pepper spray" |
| 257 | | | | Unknown/NULL | | 186 | | | | | | | | | | | 2015 data -"no response reported" |
| 258 | 367 | b. 2 | addressing individuals in crisis | reason for interaction | | | | | | | | | | | | |
| 259 | | | | # subject armed/not armed | | | | | | | | | | | | | |
| 260 | | | | weapon type | | | | | | | | | | | | | |
| 261 | | | | resistance offered | | | | | | | | | | | | | |

2018 Measures as of Sept 2019

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 262 | | | | description of attempts to de-escalate | | | | | | | | | | | | 809 CIT calls had a verbal de-escalation response from officers in 2015; 578 calls had a verbal de-escalation response from officers in 2016 |
| 263 | 367 | c | stop, search, arrest | | | | | | | | | | | | | |
| 264 | 367 | c. 1 | stop, search, arrest | # of investigatory stop, search, arrest | no | Compliance | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 265 | | | | # of investigatory stops | | | | | | | | | | | | |
| 266 | | | | # of investigatory searches | | | | | | | | | | | | |
| 267 | | | | # of investigatory arrests | | | | | | | | | | | | |
| 268 | 367 | c. 1 | stop, search, arrest | % of investigatory stop, search, arrest | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 269 | | | | # investigatory stops/# summons or arrest | | | | | | | | | | | | |
| 270 | | | | # investigatory searches/# summons or arrest | | | | | | | | | | | | |
| 271 | 367 | c. 1 | stop, search, arrest | District | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 272 | | | | District 1 | | | | | | | | | | | | |
| 273 | | | | District 2 | | | | | | | | | | | | |
| 274 | | | | District 3 | | | | | | | | | | | | |
| 275 | | | | District 4 | | | | | | | | | | | | |
| 276 | | | | District 5 | | | | | | | | | | | | |
| 277 | | | | outside city | | | | | | | | | | | | |
| 278 | 367 | c. 1 | stop, search, arrest | Arrest type | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 279 | | | | Violence toward Police Officer | | | | | | | | | | | | |
| 280 | | | | Violence toward Others | | | | | | | | | | | | |
| 281 | | | | Damage to Property | | | | | | | | | | | | |
| 282 | | | | Obstructing Justice | | | | | | | | | | | | |
| 283 | | | | Crisis Intervention | | | | | | | | | | | | |
| 284 | | | | Drugs/Alcohol | | | | | | | | | | | | |
| 285 | | | | Other | | | | | | | | | | | | |
| 286 | 367 | c. 1 | stop, search, arrest | Actual or perceived age | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 287 | | | | 17 and under (juveniles) | | | | | | | | | | | | |
| 288 | | | | 18-29 years | | | | | | | | | | | | |
| 289 | | | | 30-39 years | | | | | | | | | | | | |
| 290 | | | | 40-49 years | | | | | | | | | | | | |
| 291 | | | | 50-59 years | | | | | | | | | | | | |
| 292 | | | | 60+ years | | | | | | | | | | | | |
| 293 | | | | Unknown/NULL | | | | | | | | | | | | |
| 294 | 367 | c. 1 | stop, search, arrest | race | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 295 | | | | Black | | | | | | | | | | | | |
| 296 | | | | White | | | | | | | | | | | | |
| 297 | | | | Hispanic | | | | | | | | | | | | |
| 298 | | | | Asian | | | | | | | | | | | | |
| 299 | | | | Other | | | | | | | | | | | | |
| 300 | | | | Unknown/NULL | | | | | | | | | | | | |
| 301 | 367 | c. 1 | stop, search, arrest | ethnicity | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 302 | | | | Hispanic/Latino | | | | | | | | | | | | |
| 303 | | | | Non-Hispanic/Latino | | | | | | | | | | | | |
| 304 | | | | Unknown/NULL | | | | | | | | | | | | |
| 305 | 367 | c. 1 | stop, search, arrest | gender | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 306 | | | | Male | | | | | | | | | | | | |

| 307 | | | Female | | | | | | | | | | | |
| 308 | | | Unknown/NULL | | | | | | | | | | | |
| 309 | | | | | | | | | | | | | | |
| 310 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived race | no | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 311 | | | | Black | | | | | | | | | | |
| 312 | | | | White | | | | | | | | | | |
| 313 | | | | Hispanic | | | | | | | | | | |
| 314 | | | | Asian | | | | | | | | | | |
| 315 | | | | Other | | | | | | | | | | |
| 316 | | | | Unknown/NULL | | | | | | | | | | |
| 317 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived ethnicity | no | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 318 | | | | Hispanic/Latino | | | | | | | | | | |
| 319 | | | | Non-Hispanic/Latino | | | | | | | | | | |
| 320 | | | | Unknown/NULL | | | | | | | | | | |
| 321 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived gender | no | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 322 | | | | Male | | | | | | | | | | |
| 323 | | | | Female | | | | | | | | | | |
| 324 | | | | Unknown/NULL | | | | | | | | | | |
| 325 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived age | no | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 326 | | | | 17 and under (juveniles) | | | | | | | | | | |
| 327 | | | | 18-29 years | | | | | | | | | | |
| 328 | | | | 30-39 years | | | | | | | | | | |
| 329 | | | | 40-49 years | | | | | | | | | | |
| 330 | | | | 50-59 years | | | | | | | | | | |
| 331 | | | | 60+ years | | | | | | | | | | |
| 332 | | | | Unknown/NULL | | | | | | | | | | |
| 333 | | | | | | | | | | | | | | |
| 334 | 367 | c. 3 | searches finding contraband | # of searches finding contraband | no | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 335 | 367 | c. 3 | searches finding contraband | # of searches finding contraband by district | no | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 336 | | | | District 1 | | | | | | | | | | |
| 337 | | | | District 2 | | | | | | | | | | |
| 338 | | | | District 3 | | | | | | | | | | |
| 339 | | | | District 4 | | | | | | | | | | |
| 340 | | | | District 5 | | | | | | | | | | |
| 341 | | | | outside city | | | | | | | | | | |
| 342 | 367 | c. 3 | searches finding contraband | Arrest type | no | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 343 | | | | Violence toward Police Officer | | | | | | | | | | |
| 344 | | | | Violence toward Others | | | | | | | | | | |
| 345 | | | | Damage to Property | | | | | | | | | | |
| 346 | | | | Obstructing Justice | | | | | | | | | | |
| 347 | | | | Crisis Intervention | | | | | | | | | | |
| 348 | | | | Drugs/Alcohol | | | | | | | | | | |

2018 Measures as of Sept 2019

| # | ¶ | sub | Category | Description | Collected | Responsible | Y1 | Y2 | Y3 | Y4 | %1 | %2 | %3 | %4 | Tracked | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 349 | | | | Other | | | | | | | | | | | | |
| 350 | 367 | c. 3 | searches finding contraband | actual or perceived race | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 351 | | | | Black | | | | | | | | | | | | |
| 352 | | | | White | | | | | | | | | | | | |
| 353 | | | | Hispanic | | | | | | | | | | | | |
| 354 | | | | Asian | | | | | | | | | | | | |
| 355 | | | | Other | | | | | | | | | | | | |
| 356 | | | | Unknown/NULL | | | | | | | | | | | | |
| 357 | 367 | c. 3 | searches finding contraband | actual or perceived ethnicity | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 358 | | | | Hispanic/Latino | | | | | | | | | | | | |
| 359 | | | | Non-Hispanic/Latino | | | | | | | | | | | | |
| 360 | | | | Unknown/NULL | | | | | | | | | | | | |
| 361 | 367 | c. 3 | searches finding contraband | actual or perceived gender | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 362 | | | | Male | | | | | | | | | | | | |
| 363 | | | | Female | | | | | | | | | | | | |
| 364 | | | | Unknown/NULL | | | | | | | | | | | | |
| 365 | 367 | c. 3 | searches finding contraband | actual or perceived age | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 366 | | | | 17 and under (juveniles) | | | | | | | | | | | | |
| 367 | | | | 18-29 years | | | | | | | | | | | | |
| 368 | | | | 30-39 years | | | | | | | | | | | | |
| 369 | | | | 40-49 years | | | | | | | | | | | | |
| 370 | | | | 50-59 years | | | | | | | | | | | | |
| 371 | | | | 60+ years | | | | | | | | | | | | |
| 372 | | | | Unknown/NULL | | | | | | | | | | | | |
| **373** | **367 d** | | **bias free policing & community engagement** | | | | | | | | | | | | | |
| 374 | 367 | d.1 | bias free policing & community engagement | # of community partnerships | yes | District Commanders | 57 | 66 | 135 | 133 | 16% | 105% | -1% | 24% | | |
| 375 | | | | District 1 | | | | 13 | 58 | 32 | | 346% | -45% | | yes | baseline data not received for District 1; 2017 data for District 1 overestimated. Included one-off events that were not necessarily partnerships |
| 376 | | | | District 2 | | | 10 | 13 | 13 | 13 | 30% | 0% | 0% | 7% | yes | |
| 377 | | | | District 3 | | | 11 | | 12 | 13 | | | 8% | 4% | yes | 2016 data not received for District 3 |
| 378 | | | | District 4 | | | 22 | 28 | 40 | 58 | 27% | 43% | 45% | 27% | yes | |
| 379 | | | | District 5 | | | 14 | 12 | 12 | 17 | -14% | 0% | 42% | 5% | yes | |
| 380 | 367 | d. 1 | bias free policing & community engagement | # of community partnerships w/youth | yes | District Commanders | 14 | 17 | 30 | 57 | 50% | -33% | 90% | 42% | | represents partnerships specifically with youth, although youth may be included in other partnerships |
| 381 | | | | District 1 | | | | 3 | 9 | 14 | | 200% | 56% | | yes | baseline data not received for District 1; 2017 data for District 1 overestimated. Included one-off events that were not necessarily partnerships |
| 382 | | | | District 2 | | | 4 | 4 | 4 | 9 | 0% | 0% | 125% | 22% | yes | |
| 383 | | | | District 3 | | | 2 | | 2 | 2 | | | 0% | 0% | yes | 2016 data not received for District 3 |
| 384 | | | | District 4 | | | 7 | 9 | 14 | 19 | 29% | 56% | 36% | 28% | yes | |
| 385 | | | | District 5 | | | 1 | 1 | 1 | 13 | 0% | 0% | 1200% | 90% | yes | |
| 386 | 367 | d.1 | bias free policing & community engagement | variety of community partnerships | yes | District Commanders | | | | | | | | | | |
| 387 | | | | District 1 | | | | | | | | | | | | Can be calculated once adequate data for all Districts has been received |
| 388 | | | | District 2 | | | | | | | | | | | | Can be calculated once adequate data for all Districts has been received |

2018 Measures as of Sept 2019

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 389 | | | | District 3 | | | . | . | . | . | . | . | . | . | | Can be calculated once adequate data for all Districts has been received |
| 390 | | | | District 4 | | | . | . | . | . | . | . | . | . | | Can be calculated once adequate data for all Districts has been received |
| 391 | | | | District 5 | | | . | . | . | . | . | . | . | . | | Can be calculated once adequate data for all Districts has been received |
| 392 | | | | | | | | | | | | | | | | |
| 393 | 367 | d.2 | bias free policing & community engagement | homicide clearance rate | yes | Homicide Unit | 56% | 51% | 50% | 52% | -9% | -2% | 3% | -2% | yes | |
| 394 | 367 | d.2 | bias free policing & community engagement | # of homicides | yes | | 127 | 139 | 130 | 120 | 9% | -6% | -8% | -1% | yes | |
| 395 | | | | # of homicides solved | | | 71 | 71 | 65 | 62 | 0% | -8% | -5% | -3% | yes | |
| 396 | | | | # of homicides unsolved | | | 56 | 68 | 65 | 58 | 21% | -4% | -11% | 1% | yes | |
| 397 | 367 | d.2 | bias free policing & community engagement | Type of homicide | yes | | see below | see below | see below | see below | | | | | | |
| 398 | | | | # of domestic violence homicides | | | 12 | 18 | 6 | 6 | 50% | -67% | 0% | -16% | yes | |
| 399 | | | | # of non-domestic violence homicides | | | 115 | 121 | 124 | 114 | 5% | 2% | -8% | 0% | yes | |
| 400 | 367 | d.2 | bias free policing & community engagement | Homicide victims | yes | | see below | see below | see below | see below | | | | | | |
| 401 | | | | Adult male victims | | | 95 | 110 | 102 | 88 | 16% | -7% | -14% | -2% | yes | |
| 402 | | | | Adult female victims | | | 23 | 18 | 12 | 18 | -22% | -33% | 50% | -6% | yes | |
| 403 | | | | Juvenile male victims | | | 7 | 7 | 11 | 5 | 0% | 57% | -55% | -8% | yes | |
| 404 | | | | Juvenile female victims | | | 2 | 2 | 2 | 2 | 0% | 0% | 0% | 0% | yes | |
| 405 | | | | unknown | | | . | . | 3 | 7 | | N/A | 133% | . | yes | |
| 406 | | | | | | | | | | | | | | | | |
| 407 | 367 | d.3 | bias free policing & community engagement | # civilian complaints for discrimination | no | OPS | | | | | | | | | | |
| 408 | 367 | d.3 | bias free policing & community engagement | disposition of discrimination complaints | no | OPS | . | . | . | . | . | . | . | . | | |
| 409 | 367 | d.3 | bias free policing & community engagement | analysis of biennial survey | yes | ISA hired | | | | | | | | | | results are in a separate document |
| 410 | 367 | e | recruitment measures | | | | | | | | | | | | | |
| 411 | 367 | e. 1 | recruitment measures | applicants | yes | City Hall Civil Service Commission (CSC) | 1410 | 1459 | 1180 | 2260 | 3% | -19% | 92% | 13% | yes | 2018 data are only from tests taken in 2018 and includes officers with start dates in 2019; 2017 data are from the 2017 test although those hired include applicants from the 2016 list |
| 412 | | | | # of qualified recruit applicants | | | 191 | 151 | 359 | 492 | -21% | 138% | 37% | 27% | yes | Category captured in data: "Name has been certified. Candidates are being vetted for the next Academy" (category 11) and "hired/currently in the academy" (category 4) or Not Hired; Left on Eligible List (category 15); declined offer (16); received offer but deferred (17) |
| 413 | | | | # of not qualified recruit applicants | | | 1219 | 1308 | 821 | 1768 | 7% | -37% | 115% | 10% | yes | These are applicants who failed somewhere in the process |
| 414 | 367 | e. 1 | recruitment measures | applicants by race | yes | | see below | see below | see below | see below | | | | | | |
| 415 | | | | White (W) | | | 781 | 693 | 526 | 984 | -11% | -24% | 87% | 6% | yes | |
| 416 | | | | Black (B) | | | 409 | 518 | 440 | 891 | 27% | -15% | 103% | 21% | yes | |
| 417 | | | | Asian (A) | | | 13 | 11 | 12 | 23 | -15% | 9% | 92% | 15% | yes | |
| 418 | | | | Hispanic (H) | | | 154 | 148 | 127 | 204 | -4% | -14% | 61% | 7% | yes | |

2018 Measures as of Sept 2019

| # | ¶ | Item | Type | Measure | Y/N | Entity | V1 | V2 | V3 | V4 | % | % | % | % | Incl | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 419 | | | | Other (O) | | | 44 | 85 | 36 | 139 | 93% | -58% | 286% | 33% | yes | |
| 420 | | | | AI | | | 3 | 4 | 12 | 6 | 33% | 200% | -50% | 19% | yes | |
| 421 | | | | No Data (.) | | | 6 | 0 | 27 | 13 | -100% | N/A | -52% | 21% | yes | |
| 422 | 367 | e.1 | recruitment measures | applicants by gender | yes | | see below | see below | see below | see below | | | | | yes | |
| 423 | | | | Males | | | 1120 | 1163 | 873 | 1621 | 4% | -25% | 86% | 10% | yes | |
| 424 | | | | Females | | | 290 | 296 | 298 | 629 | 2% | 1% | 111% | 21% | yes | |
| 425 | | | | Unknown | | | 0 | 0 | 9 | 10 | 0% | N/A | 11% | N/A | yes | |
| 426 | | | | | | | | | | | | | | | | |
| 427 | 367 | e.2 | recruitment measures | Where applicants heard of job | no | Civil Service Commission | see below | see below | see below | see below | | | | | yes | No data on recruitment activities in baseline |
| 428 | | | | City Website | | | | 40% | 54% | 52% | | 36% | -3% | | yes | |
| 429 | | | | Friend | | | | 26% | 0% | 0% | | -100% | -100% | | yes | |
| 430 | | | | Google or other search | | | | 19% | 3% | 0% | | -85% | -100% | | yes | |
| 431 | | | | Other | | | | 14% | 14% | 17% | | -1% | 24% | | yes | |
| 432 | | | | Bulletin | | | | 2% | 0% | 4% | | -69% | 702% | | yes | |
| 433 | | | | Word of mouth | | | | 0% | 19% | 16% | | N/A | -15% | | yes | |
| 434 | | | | Social media | | | | 0% | 6% | 6% | | N/A | 3% | | yes | |
| 435 | | | | Article or blog post | | | | 0% | 0% | 0% | | 0% | 0% | | yes | |
| 436 | | | | Advertisement | | | | 0% | 4% | 4% | | N/A | 10% | | yes | |
| 437 | 367 | e.2 | recruitment measures | Recruitment Activity | no | Civil Service Commission | see below | see below | see below | see below | | | | | yes | No data on recruitment activities in baseline |
| 438 | | | | Billboards | | | | 9 | 23 | 0 | | 156% | -100% | | yes | |
| 439 | | | | Billboard Impressions | | | | 538043 | 1077439 | 0 | | 100% | -100% | | yes | |
| 440 | | | | Regional Transit Bus Posters | | | | 20 | 0 | 0 | | -100% | 0% | | yes | |
| 441 | | | | Regional Transit Stations Posters | | | | 24 | 22 | 0 | | -8% | -100% | | yes | |
| 442 | | | | Mobile/digital video banner Ads | | | | 50000 | 20000 | 200000 | | -60% | 900% | | yes | |
| 443 | | | | Facebook, Twitter, Instagram Posts | | | | 8 | 8 | 20 | | 0% | 150% | | yes | |
| 444 | | | | Blog posts/Websites | | | | 60 | 90 | 260 | | 50% | 189% | | yes | |
| 445 | | | | Social Media Viewers/Likes | no | | | | 714547 | 117925 | | | -83% | | yes | New item CPD collects that has been added to 2017 but not specified in Consent Decree |
| 446 | | | | Social Media Shares | no | | | | 1278 | | | | | | yes | New item CPD collects that has been added to 2017 but not specified in Consent Decree |
| 447 | | | | Radio Station Spots | | | | 4 | 4 | 7 | | 0% | 75% | | yes | |
| 448 | | | | Television | | | | 0 | 0 | 1 | | 0% | N/A | | yes | |
| 449 | 367 | e.2 | recruitment measures | # of Recruitment Partnerships | no | Civil Service Commission | | 17 | 19 | 44 | | 12% | 132% | | yes | No data on recruitment activities in baseline |
| 450 | | | | All Races | | | | 8 | 15 | 32 | | 88% | 113% | | yes | |
| 451 | | | | Black | | | | 7 | 3 | 9 | | -57% | 200% | | yes | |
| 452 | | | | Hispanic | | | | 2 | 1 | 2 | | -50% | 100% | | yes | |
| 453 | | | | Other | | | | | | 1 | | | | | yes | New category added (Arab American)in 2018 |
| 454 | | | | | | | | | | | | | | | | |
| 455 | 367 | e.3 | recruitment measures | # of applicants who failed initial screening | yes | City Hall Civil Service Commission | 1219 | 1294 | 821 | 1768 | 6% | -37% | 115% | 10% | yes | Same number as above (# of non-qualified applicants); considered anyone who is NOT hired (category 4) and anyone whose name has NOT been certified (category 11) |
| 456 | 367 | e.3 | recruitment measures | reason for failures | yes | City Hall Civil Service Commission | see below | see below | see below | see below | | | | | yes | |
| 457 | | | | 1- Application Rejected | | | | 339 | 282 | 390 | | -17% | 38% | | yes | Application rejected - Not collected in 2015 |
| 458 | | | | 2-Failed agility test | | | 166 | 119 | 101 | 100 | -28% | -15% | -1% | -12% | yes | |
| 459 | | | | 3-No show for the Agility test | | | 85 | 113 | 90 | 165 | 33% | -20% | 83% | 18% | yes | |
| 460 | | | | 4-Hired / Currently in the Academy | | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | | N/A | N/A | N/A | N/A | yes | |
| 461 | | | | 5-No response to certification | | | 183 | 58 | 0 | 90 | -68% | -100% | N/A | -16% | yes | |

2018 Measures as of Sept 2019

| # | | | | | | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 462 | | | | 6-Passed over | | | 13 | 8 | 0 | 108 | -38% | -100% | N/A | 70% | yes | The 2017 list reported no one who was passed over, however, the 2016 list was used to hire the 2017 class and 47 were passed over |
| 463 | | | | 7-Removed for background reason(s) | | | 66 | 39 | 0 | 15 | -41% | -100% | N/A | -31% | yes | The 2017 list reported no one who was removed for background reasons, however, the 2016 list was used to hire the 2017 class and 6 were removed for background reasons |
| 464 | | | | 8-No show for the Psychological Exam | | | 1 | . | 0 | 4 | . | . | N/A | 41% | yes | 8 (no show for psych) and 13 (no PHS) are merged in 2016 data; The 2017 list reported no one was a no show, however, the 2016 list was used to hire the 2017 class and 1 was a no show |
| 465 | | | | 9-No longer interested | | | 19 | 26 | 4 | 62 | 37% | -85% | 1450% | 34% | yes | The 2017 list reported 4 people who were no longer interested, however, the 2016 list was used to hire the 2017 class and 10 were no longer interested |
| 466 | | | | 10-Waived | | | 17 | 102 | 10 | 61 | 500% | -90% | 510% | 38% | yes | |
| 467 | | | | 11-Name has been certified. Candidates are being vetted for the next Academy | | | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A | N/A | N/A | N/A | yes | |
| 468 | | | | 12-No show for the test | | | 394 | 263 | 244 | 566 | -33% | -7% | 132% | 9% | yes | |
| 469 | | | | 13-Did not submit their Personal History Statement | | | 240 | 4 | 0 | 0 | -98% | -100% | 0% | -100% | yes | |
| 470 | | | | 14-Failed the test | | | 35 | 223 | 90 | 194 | 537% | -60% | 116% | 53% | yes | |
| 471 | 367 | e. 3 | recruitment measures | recruit failures by race | yes | City Hall Civil Service Commission | see below | see below | see below | see below | | | | | yes | |
| 472 | | | | White (W) Failures | | | 658 | 594 | 323 | 742 | -10% | -46% | 130% | 3% | yes | |
| 473 | | | | Black (B) Failures | | | 375 | 492 | 341 | 733 | 31% | -31% | 115% | 18% | yes | |
| 474 | | | | Asian (A) Failures | | | 12 | 9 | 8 | 17 | -25% | -11% | 113% | 9% | yes | |
| 475 | | | | Hispanic (H) Failures | | | 128 | 133 | 90 | 159 | 4% | -32% | 77% | 6% | yes | |
| 476 | | | | Other (O) Failures | | | 41 | 76 | 32 | 106 | 85% | -58% | 231% | 27% | yes | |
| 477 | | | | Native American (AI) Failures | | | 1 | 4 | 8 | 3 | 300% | 100% | -63% | 32% | yes | |
| 478 | | | | No Data (.) Failures | | | 4 | 0 | 19 | 8 | -100% | N/A | -58% | 19% | yes | |
| 479 | 367 | e. 3 | recruitment measures | recruit failures by ethnicity | yes | City Hall Civil Service Commission | see below | see below | see below | see below | | | | | yes | |
| 480 | | | | Hispanic/Latino (H) | | | 128 | 133 | 90 | 159 | 4% | -32% | 77% | 6% | yes | It is unclear whether this information is captured adequately |
| 481 | | | | Non-Hispanic/Latino | | | 1091 | 1161 | 731 | 1609 | 6% | -37% | 120% | 10% | yes | |
| 482 | 367 | e. 3 | recruitment measures | recruit failures by gender | yes | City Hall Civil Service Commission | see below | see below | see below | see below | | | | | yes | |
| 483 | | | | Male Failures | | | 971 | 1032 | 592 | 1274 | 6% | -43% | 115% | 7% | yes | |
| 484 | | | | Female Failures | | | 248 | 277 | 224 | 489 | 12% | -19% | 118% | 18% | yes | |
| 485 | | | | unknown gender | | | . | . | 5 | 5 | | | | 0% | yes | unknown not captured in 2015 or 2016 |
| 486 | | | | recruit failures by self identified disability | no | City Hall Civil Service Commission | . | . | . | . | | | | | N/A | Only have data on veterans;  No data collected currently; Needs to be collected in the future |
| 487 | | | | | | | | | | | | | | | | |
| 488 | 367 | e. 4 | recruitment measures | # of applicants with fluency in other language | no | City Hall Civil Service Commission | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 489 | | | | list of languages spoken by recruits | no | | . | . | . | . | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 490 | | | | | | | | | | | | | | | | |
| 491 | 367 | e. 5 | recruitment measures | # of lateral candidates | yes | City Hall Civil Service Commission | 0 | 210 | 94 | 0 | N/A | -55% | -100% | N/A | yes | The Division did not recruit laterals in 2015 or 2018 |
| 492 | 367 | e. 5 | recruitment measures | laterals by race | yes | | see below | see below | see below | see below | | | | | yes | The Division did not recruit laterals in 2015 or 2018 |

2018 Measures as of Sept 2019

| # | Item | | Category | Description | Flag | Source | V1 | V2 | V3 | V4 | P1 | P2 | P3 | P4 | Rpt | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 493 | | | | White (W) | | | 0 | 116 | 37 | 0 | N/A | -68% | -100% | 0% | yes | |
| 494 | | | | Black (B) | | | 0 | 57 | 37 | 0 | N/A | -35% | -100% | 0% | yes | |
| 495 | | | | Asian (A) | | | 0 | 1 | 1 | 0 | N/A | 0% | -100% | 0% | yes | |
| 496 | | | | Hispanic (H) | | | 0 | 18 | 7 | 0 | N/A | -61% | -100% | 0% | yes | |
| 497 | | | | Other (O) | | | 0 | 17 | 9 | 0 | N/A | -47% | -100% | 0% | yes | |
| 498 | | | | AI | | | 0 | 0 | 1 | 0 | N/A | N/A | -100% | 0% | yes | |
| 499 | | | | No Data (.) | | | 0 | 1 | 2 | 0 | N/A | 100% | -100% | 0% | yes | |
| 500 | 367 | e. 5 | recruitment measures | ethnicity | yes | | see below | see below | see below | see below | | | | | yes | The Division did not recruit laterals in 2015 or 2018 |
| 501 | | | | Hispanic/Latino | | | 0 | 18 | 7 | 0 | N/A | -61% | -100% | 0% | yes | |
| 502 | | | | Non-Hispanic/Latino | | | 0 | 192 | 87 | 0 | N/A | -55% | -100% | 0% | yes | |
| 503 | 367 | e. 5 | recruitment measures | laterals by gender | yes | | see below | see below | see below | see below | | | | | yes | The Division did not recruit laterals in 2015 or 2018 |
| 504 | | | | Male | | | 0 | 174 | 74 | 0 | N/A | -57% | -100% | 0% | yes | |
| 505 | | | | Female | | | 0 | 35 | 19 | 0 | N/A | -46% | -100% | 0% | yes | |
| 506 | | | | unknown | | | 0 | 0 | 1 | 0 | 0% | N/A | -100% | 0% | yes | |
| 507 | 367 | e. 5 | recruitment measures | Other information on laterals | yes | | see below | see below | see below | see below | | | | | yes | The Division did not recruit laterals in 2015 or 2018 |
| 508 | | | | laterals with self identified disability | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 509 | | | | list of laterals former agencies | | | 0 | 39 | 5 | 0 | N/A | -87% | -100% | 0% | yes | represents the number of PDs laterals worked for |
| 510 | | | | list of laterals years of service | | | 0 | 166 | 12 | 0 | N/A | -93% | -100% | 0% | yes | represents the number of years in which laterals worked for other PDs |
| 511 | | | | | | | | | | | | | | | | |
| 512 | 367 | e. 6 | recruitment measures | applicant qualifications | yes | City Hall Civil Service Commission | see below | see below | see below | see below | | | | | yes | |
| 513 | | | | # applicants with 2+ years college | yes | | 455 | 802 | 649 | 1172 | 76% | -19% | 81% | 27% | yes | This category captures those who attended college for 2+ years, but did not obtain a BA degree (includes those with associates degrees) |
| 514 | | | | # applicants with college degree | yes | | 240 | 247 | 189 | 370 | 3% | -23% | 96% | 11% | yes | |
| 515 | | | | # applicants with 2+ years military | no | | | | | | | | | | yes | No data collected currently; only have 180+days; Needs to be collected in the future |
| 516 | | | | # applicants with 180+ days military | yes (new) | | 161 | 89 | 55 | 91 | -45% | -38% | 65% | -13% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 517 | | | | disabled veterans | yes (new) | | 14 | 2 | 3 | 2 | -86% | 50% | -33% | -39% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree; misreported in 2015 (was reported as 1235) |
| 518 | | | | | | | | | | | | | | | | |
| 519 | 367 | e. 7 | recruitment measures | pass/fail rate in each phase of pre-employment process | yes | City Hall Civil Service Commission | see below | see below | see below | see below | | | | | yes | pass calculated |
| 520 | | | | 2-Failed agility test | | | 86.38% | 90.24% | 87.70% | 94.34% | 4% | -3% | 8% | 2% | yes | pass rate calculated |
| 521 | | | | 3-No show for the Agility test | | | 93.03% | 90.73% | 89.04% | 90.67% | -2% | -2% | 2% | -1% | yes | pass rate calculated |
| 522 | | | | 4-Hired / Currently in the Academy | | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | yes | pass rate calculated |
| 523 | | | | 5-No response to certification | | | 84.99% | 95.24% | 100.00% | 94.91% | 12% | 5% | -5% | 3% | yes | pass rate calculated |
| 524 | | | | 6-Passed over | | | 98.93% | 99.34% | 100.00% | 93.89% | 0% | 1% | -6% | -1% | yes | pass rate calculated |
| 525 | | | | 7-Removed for background | | | 94.59% | 96.80% | 100.00% | 99.15% | 2% | 3% | -1% | 1% | yes | pass rate calculated |
| 526 | | | | 8-No show for the Psychological | | | 99.92% | N/A | 100.00% | 99.77% | N/A | N/A | 0% | 0% | yes | pass rate calculated; merged with no PHS |
| 527 | | | | 9-No longer interested | | | 98.44% | 97.87% | 99.51% | 96.49% | -1% | 2% | -3% | 0% | yes | pass rate calculated |
| 528 | | | | 10-Waived | | | 98.61% | 91.63% | 98.78% | 96.55% | -7% | 8% | -2% | -1% | yes | pass rate calculated |
| 529 | | | | Candidates are being vetted for the next Academy | | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | yes | pass rate calculated |
| 530 | | | | 12-No show for the test | | | 67.68% | 78.42% | 70.28% | 67.99% | 16% | -10% | -3% | 0% | yes | pass rate calculated |
| 531 | | | | 13-Did not submit their Personal History Statement | | | 80.31% | 99.67% | 100.00% | 100.00% | 24% | 0% | 0% | 6% | yes | pass rate calculated |
| 532 | | | | 14-Failed the test | | | 97.13% | 81.71% | 89.04% | 89.03% | -16% | 9% | 0% | -2% | yes | pass rate calculated |
| 533 | 367 | e. 7 | recruitment measures | pass/fail rate by race | yes | City Hall Civil Service Commission | see below | see below | see below | see below | | | | | yes | |
| 534 | | | | White (W) pass rate | | | 15.75% | 14.29% | 38.59% | 24.59% | -9% | 170% | -36% | 12% | yes | pass rate calculated |
| 535 | | | | Black (B) pass rate | | | 8.31% | 5.02% | 22.50% | 17.73% | -40% | 348% | -21% | 21% | yes | pass rate calculated |

2018 Measures as of Sept 2019

| # | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 536 | | | | Asian (A) pass rate | | | 7.69% | 18.18% | 33.33% | 26.09% | 136% | 83% | -22% | 36% | yes | pass rate calculated |
| 537 | | | | Hispanic (H) pass rate | | | 16.88% | 10.14% | 29.13% | 22.06% | -40% | 187% | -24% | 7% | yes | pass rate calculated |
| 538 | | | | Other (O) pass rate | | | 6.82% | 10.59% | 11.11% | 23.74% | 55% | 5% | 114% | 37% | yes | pass rate calculated |
| 539 | | | | AI pass rate | | | 66.67% | 0.00% | 33.33% | 50.00% | -100% | N/A | 50% | -7% | yes | pass rate calculated |
| 540 | | | | No Data (.) pass rate | | | 33.33% | | 29.63% | 38.46% | | | 30% | 4% | yes | pass rate calculated |
| 541 | 367 | e.7 | recruitment measures | pass/fail rate by ethnicity | yes | City Hall Civil Service Commission | see below | see below | see below | see below | | | | | | |
| 542 | | | | Hispanic/Latino (H) pass rate | | | 16.88% | 10.14% | 29.13% | 22.06% | -40% | 187% | -24% | 7% | yes | pass rate calculated |
| 543 | | | | Non-Hispanic/Latino pass rate | | | 13.14% | 11.44% | 30.58% | 30.10% | -13% | 167% | -2% | 23% | yes | pass rate calculated |
| 544 | 367 | e.7 | recruitment measures | pass/fail rate by gender | yes | City Hall Civil Service Commission | see below | see below | see below | see below | | | | | | |
| 545 | | | | Male Pass Rate | | | 13.30% | 11.26% | 32.19% | 21.41% | -15% | 186% | -33% | 13% | yes | pass rate calculated |
| 546 | | | | Female Pass Rate | | | 14.48% | 6.42% | 24.83% | 22.26% | -56% | 287% | -10% | 11% | yes | pass rate calculated |
| 547 | | | | unknown gender pass rate | | | . | . | 44.44% | 50.00% | | | | 13% | | pass rate calculated |
| 548 | 367 | e.7 | recruitment measures | pass/fail rate by self identified disability | no | City Hall Civil Service Commission | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 549 | | | | | | | | | | | | | | | | |
| 550 | 367 | e.8 | recruitment measures | avg length of time to move through each phase of preemployment | no | | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 551 | | | | avg length of time to process applicants | | | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 552 | | | | | | | | | | | | | | | | |
| 553 | 367 | e.9 | recruitment measures | composition of recruit class | yes | | see below | see below | see below | see below | | | | | | |
| 554 | 367 | e.9 | recruitment measures | Initial Size of recruit class | yes | | 52 | 62 | 69 | 153 | 19% | 11% | 122% | 31% | yes | 2018 excludes names that were on the list given for 2017 report's recruit Class 140; All recruit class numbers reflect the number of officers hired based on the test taken that year even if the hire date is in the following year. So 2018 numbers reflect officers who took the police exam in 2018 even though their start date may not have been until 2019 |
| 555 | | | | Remained | yes (new) | | 44 | 51 | 65 | 140 | 16% | 27% | 115% | 34% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 556 | | | | Separated | yes (new) | | 8 | 11 | 4 | 13 | 38% | -64% | 225% | 13% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 557 | 367 | e.9 | recruitment measures | Separated by Race | yes | | see below | see below | see below | see below | | | | | | |
| 558 | | | | Black | yes (new) | | 2 | 3 | 0 | 3 | 50% | -100% | N/A | 11% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 559 | | | | White | yes (new) | | 4 | 8 | 4 | 8 | 100% | -50% | 100% | 19% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 560 | | | | Hispanic | yes (new) | | 2 | 0 | 0 | 2 | -100% | 0% | N/A | 0% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 561 | | | | Asian | yes (new) | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 562 | | | | Other | yes (new) | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 563 | 367 | e.9 | recruitment measures | Separated by Gender | yes | | see below | see below | see below | see below | | | | | | |
| 564 | | | | Male | yes (new) | | 7 | 8 | 4 | 9 | 14% | -50% | 125% | 6% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 565 | | | | Female | yes (new) | | 1 | 3 | 0 | 4 | 200% | -100% | N/A | 41% | yes | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 566 | 367 | e.9 | recruitment measures | composition of recruit classes by race | | Command Staff/ Academy | see below | see below | see below | see below | | | | | | |
| 567 | | | | Black | | | 8 | 10 | 16 | 40 | 25% | 60% | 150% | 50% | yes | |
| 568 | | | | White | | | 29 | 38 | 51 | 89 | 31% | 34% | 75% | 32% | yes | |

| # | Para | Sub | Measure | Description | Collected | Source | V1 | V2 | V3 | V4 | P1 | P2 | P3 | P4 | Met | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 569 | | | | Hispanic | | | 12 | 2 | 2 | 8 | -83% | 0% | 300% | -10% | yes | |
| 570 | | | | Asian | | | 0 | 1 | 0 | 0 | N/A | -100% | 0% | 0% | yes | |
| 571 | | | | Other | | | 3 | 0 | 0 | 3 | -100% | 0% | N/A | 0% | yes | yes |
| 572 | 367 | e.9 | recruitment measures | composition of recruit classes by ethnicity | | Command Staff/ Academy | see below | see below | see below | | | | | | yes | |
| 573 | | | | Hispanic/Latino | | | 12 | 2 | 2 | 8 | -83% | 0% | 300% | -10% | yes | |
| 574 | | | | Non-Hispanic/Latino | | | 40 | 60 | 67 | 132 | 50% | 12% | 97% | 35% | yes | |
| 575 | 367 | e.9 | recruitment measures | composition of recruit classes by gender | | Command Staff/ Academy | see below | see below | see below | see below | | | | | yes | |
| 576 | | | | Male | | | 44 | 43 | 54 | 106 | -2% | 26% | 96% | 25% | yes | |
| 577 | | | | Female | | | 8 | 19 | 15 | 34 | 138% | -21% | 127% | 44% | yes | |
| 578 | | | | composition of recruit classes by self identified disability | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| **579** | **367** | **f.1** | **training measures** | | | | | | | | | | | | | |
| 580 | 367 | f.1 | training measures | # of officers provided training pursuant to this agreement | no | | | | 1354 | 1363 | | | 1% | | yes | No data collected in 2015 or 2016; 2017 includes UoF CIT not State Re-Qual |
| 581 | 367 | f.1 | training measures | % of officers provided training pursuant to this agreement | no | | | | 94% | 96% | | | 2% | | yes | No data collected in 2015 or 2016; 2017 includes UoF CIT not State Re-Qual |
| 582 | | | | | | | | | | | | | | | | |
| 583 | 367 | f.2 | training measures | adequacy of training in type and frequency | no | Training | see below | see below | see below | see below | | | | | yes | No data collected in 2015, 2016, or 2018 |
| 584 | | | | Instructor adequacy | | | | | 87% | | | | | | yes | 2017: instructor increased my understanding of the course material (agree and strongly agree) |
| 585 | | | | Content adequacy | | | | | 87% | | | | | | yes | 2017:scenarios were practical (agree and strongly agree) |
| 586 | | | | Future performance adequacy | | | | | 63% | | | | | | yes | 2017: I will perform differently based on skills and knowledge gained (agree and strongly agree) |
| 587 | | | | Overall adequacy | | | | | 79% | | | | | | yes | 2017: Overall I found this training to be valuable (agree and strongly agree) |
| 588 | | | | | | | | | | | | | | | | |
| 589 | 367 | f.3 | training measures | training resulting from the review and analysis required by this agreement | no | | | | see written report | see written report | | | | | yes | No data collected in 2015, 2016, or 2018; 2017 includes UoF CIT not State Re-Qual. See written report for details |
| 590 | | | | | | | | | | | | | | | | |
| 591 | 367 | f.4 | training measures | prevalence of training deficiencies as reflected by problematic incidents or performance trends | no | | | | see written report | see written report | | | | | yes | No data collected in 2015, 2016, or 2018; 2017 includes UoF CIT not State Re-Qual. See written report for details |
| **592** | **367** | **g.** | **officer assistance & support efforts** | | | | | | | | | | | | | |
| 593 | 367 | g.1 | officer assistance & support efforts | availability of officer assistance & support services | yes | EAP | see below | see below | see below | see below | | | | | yes | |
| 594 | 367 | g.1 | officer assistance & support efforts | use of officer assistance & support services | yes | EAP | 11 | 209 | 221 | 241 | 1800% | 6% | 9% | 116% | yes | 2015 baseline data is underreported as the use of service was not tracked. |
| 595 | | | | | | | | | | | | | | | | |
| 596 | 367 | g.2 | officer assistance & support efforts | officer reports of adequacy of officer assistance & support svcs | no | EAP | | | 92% | 78% | | | -15% | | yes | No data collected in 2015 or 2016; 2017 includes ratings of agree and strongly agree on all items |
| 597 | 367 | g.2 | officer assistance & support efforts | survey analysis of adequacy of officer assistance & support svcs | no | EAP | | | see written report | see written report | | | | | N/A | No data collected in 2015 or 2016 |
| **598** | **367** | **h.** | **supervision measures** | | | | | | | | | | | | | |
| 599 | 367 | h. | supervision measures | supervisors initial identification of officer violations | | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 600 | 367 | h. | supervision measures | supervisors initial identification of officer performance problems | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 601 | 367 | h. | supervision measures | supervisors response to officer violations | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |

| # | 367 | | Category | Measure | yes/no | Source | | | | | | | | | yes/no | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 602 | 367 | h. | supervision measures | supervisors response to performance problems | no | | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 603 | **367 i.** | | **civilian complaints & investigations & discipline** | | | | | | | | | | | | | |
| 604 | 367 | i. 1 | civilian complaints & investigations & discipline | # of complaints | yes | IA, Inspections, OPS | 294 | 263 | 241 | 227 | -11% | -8% | -6% | -6% | yes | Of the 294 cases in 2015, only 45 were completed and only 4 went through the PRB |
| 605 | 367 | i. 1 | civilian complaints & investigations & discipline | increases/decreases related to access | no | IA, Inspections, OPS | | | | | | | | | N/A | No data collected currently; Needs to be collected in the future |
| 606 | | | | | | | | | | | | | | | | |
| 607 | 367 | i. 2 | civilian complaints & investigations & discipline | # sustained by complaint type | no | IA, Inspections, OPS | 2 | 7 | 26 | 110 | 250% | 271% | 323% | 172% | yes | PRB looked at 4 cases in 2015; 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CAGR not included |
| 608 | | | | False Report | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 609 | | | | Harassment | | | 0 | 0 | 3 | 1 | 0% | N/A | -67% | 0% | yes | |
| 610 | | | | Improper Procedure | | | 1 | 2 | 12 | 16 | 100% | 500% | 33% | 100% | yes | |
| 611 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 1 | 0 | 0% | N/A | -100% | 0% | yes | |
| 612 | | | | Lack of Service | | | 0 | 1 | 4 | 22 | N/A | 300% | 450% | N/A | yes | |
| 613 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 614 | | | | Other | | | 0 | 0 | 0 | 2 | 0% | 0% | N/A | N/A | yes | Other includes missing property in 2018 |
| 615 | | | | Physical Abuse/Excessive Force | | | 0 | 1 | 0 | 0 | N/A | -100% | 0% | 0% | yes | |
| 616 | | | | Unprofessional | | | 1 | 3 | 6 | 68 | 200% | 100% | 1033% | 187% | yes | |
| 617 | | | | Biased Policing | | | N/A | N/A | N/A | 1 | N/A | N/A | N/A | N/A | yes | New Category added in 2018 |
| 618 | 367 | i. 2 | civilian complaints & investigations & discipline | # exonerated by complaint type | no | IA, Inspections, OPS | 0 | 8 | 61 | 220 | N/A | 663% | 261% | N/A | yes | 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CARG not included |
| 619 | | | | False Report | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 620 | | | | Harassment | | | 0 | 1 | 6 | 12 | N/A | 500% | 100% | N/A | yes | |
| 621 | | | | Improper Procedure | | | 0 | 3 | 23 | 93 | N/A | 667% | 304% | N/A | yes | |
| 622 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 1 | 0 | 0% | N/A | -100% | 0% | yes | |
| 623 | | | | Lack of Service | | | 0 | 2 | 10 | 53 | N/A | 400% | 430% | N/A | yes | |
| 624 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 625 | | | | Other | | | 0 | 0 | 5 | 14 | 0% | N/A | 180% | N/A | yes | Other includes missing property in 2018 |
| 626 | | | | Physical Abuse/Excessive Force | | | 0 | 2 | 4 | 11 | N/A | 100% | 175% | N/A | yes | |
| 627 | | | | Unprofessional | | | 0 | 0 | 12 | 34 | 0% | N/A | 183% | N/A | yes | |
| 628 | | | | Biased Policing | | | N/A | N/A | N/A | 3 | N/A | N/A | N/A | N/A | yes | New Category added in 2018 |
| 629 | 367 | i. 2 | civilian complaints & investigations & discipline | # unfounded by complaint type | no | IA, Inspections, OPS | 2 | 13 | 16 | 159 | 550% | 23% | 894% | 199% | yes | 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CARG not included |
| 630 | | | | False Report | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 631 | | | | Harassment | | | 0 | 1 | 0 | 8 | N/A | -100% | N/A | N/A | yes | |
| 632 | | | | Improper Procedure | | | 1 | 3 | 5 | 12 | 200% | 67% | 140% | 86% | yes | |
| 633 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 0 | 0 | 0% | N/A | 0% | 0% | yes | |
| 634 | | | | Lack of Service | | | 0 | 2 | 4 | 42 | N/A | 100% | 950% | N/A | yes | |
| 635 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 636 | | | | Other | | | 0 | 0 | 3 | 10 | 0% | N/A | 233% | N/A | yes | Other includes missing property in 2018 |
| 637 | | | | Physical Abuse/Excessive Force | | | 0 | 3 | 2 | 12 | N/A | -33% | 500% | N/A | yes | |
| 638 | | | | Unprofessional | | | 1 | 4 | 2 | 62 | 300% | -50% | 3000% | 181% | yes | |
| 639 | | | | Biased Policing | | | N/A | N/A | N/A | 13 | N/A | N/A | N/A | N/A | yes | New Category added in 2018 |
| 640 | 367 | i. 2 | civilian complaints & investigations & discipline | # not sustained by complaint type | no | OPS | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 641 | | | | False Report | | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 642 | | | | Harassment | | | | | | | | | | | | No data collected currently; Needs to be collected in the future |

2018 Measures as of Sept 2019

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 643 | | | | Improper Procedure | | | . | . | . | . | . | . | . | No data collected currently; Needs to be collected in the future |
| 644 | | | | Infraction Notice (UTT/PIN) | | | . | . | . | . | . | . | . | No data collected currently; Needs to be collected in the future |
| 645 | | | | Lack of Service | | | . | . | . | . | . | . | . | No data collected currently; Needs to be collected in the future |
| 646 | | | | Not Provided by Complainant | | | . | . | . | . | . | . | . | No data collected currently; Needs to be collected in the future |
| 647 | | | | Other | | | . | . | . | . | . | . | . | No data collected currently; Needs to be collected in the future |
| 648 | | | | Physical Abuse/Excessive Force | | | . | . | . | . | . | . | . | No data collected currently; Needs to be collected in the future |
| 649 | | | | Unprofessional | | | . | . | . | . | . | . | . | No data collected currently; Needs to be collected in the future |
| 650 | 367 | i. 2 | civilian complaints & investigations & discipline | # of administratively dismissed | no | OPS | 39 | 90 | 126 | 58 | 131% | 40% | -54% | 10% | yes | |
| 651 | | | | False Report | | | 1 | 0 | 0 | 0 | -100% | N/A | 0% | -100% | yes | |
| 652 | | | | Harassment | | | 4 | 14 | 43 | 15 | 250% | 207% | -65% | 39% | yes | |
| 653 | | | | Improper Procedure | | | 9 | 28 | 26 | 7 | 211% | -7% | -73% | -6% | yes | |
| 654 | | | | Infraction Notice (UTT/PIN) | | | 2 | 4 | 8 | 0 | 100% | 100% | -100% | -100% | yes | |
| 655 | | | | Lack of Service | | | 2 | 13 | 17 | 14 | 550% | 31% | -18% | 63% | yes | |
| 656 | | | | Not Provided by Complainant | | | 1 | 0 | 1 | 0 | -100% | N/A | -100% | -100% | yes | |
| 657 | | | | Other | | | 2 | 1 | 3 | 4 | -50% | 200% | 33% | 19% | yes | Other includes missing property and no jurisdiction in 2018 |
| 658 | | | | Physical Abuse/Excessive Force | | | 2 | 4 | 7 | 2 | 100% | 75% | -71% | 0% | yes | |
| 659 | | | | Unprofessional | | | 16 | 23 | 21 | 16 | 44% | -9% | -24% | 0% | yes | |
| 660 | | | | Unknown | | | 0 | 3 | 0 | 0 | N/A | -100% | 0% | 0% | yes | |
| 661 | 367 | i. 2 | civilian complaints & investigations & discipline | # of insufficient evidence | no | OPS | 2 | 33 | 93 | 108 | 1550% | 182% | 16% | 171% | yes | 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CARG not included |
| 662 | | | | False Report | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 663 | | | | Harassment | | | 0 | 7 | 24 | 7 | N/A | 243% | -71% | N/A | yes | |
| 664 | | | | Improper Procedure | | | 0 | 7 | 15 | 11 | N/A | 114% | -27% | N/A | yes | |
| 665 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 4 | 0 | N/A | N/A | -100% | 0% | yes | |
| 666 | | | | Lack of Service | | | 1 | 5 | 9 | 12 | 400% | 80% | 33% | 86% | yes | |
| 667 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 668 | | | | Other | | | 0 | 0 | 4 | 3 | 0% | N/A | -25% | N/A | yes | Other includes missing property in 2018 |
| 669 | | | | Physical Abuse/Excessive Force | | | 0 | 5 | 11 | 14 | N/A | 120% | 27% | N/A | yes | |
| 670 | | | | Unprofessional | | | 1 | 9 | 26 | 49 | 800% | 189% | 88% | 165% | yes | |
| 671 | | | | | | | | | | | | | | | | |
| 672 | 367 | i. 3 | civilian complaints & investigations & discipline | # of complaint allegations supported by a preponderance of the evidence | no | OPS | . | . | . | . | . | . | . | No data collected currently; Needs to be collected in the future |
| 673 | | | | | | | | | | | | | | | | |
| 674 | 367 | i. 4 | civilian complaints & investigations & discipline | average length of time to complete by complaint type | yes | OPS | 137 | 409 | 232 | 75 | 198% | -43% | -68% | -14% | yes | Average number of days, but depends on completed cases |
| 675 | | | | False Report | | | 293 | | | | | | | | yes | |
| 676 | | | | Harassment | | | 158 | 383 | 171 | 61 | 142% | -55% | -64% | -21% | yes | |
| 677 | | | | Improper Procedure | | | 134 | 354 | 213 | 115 | 164% | -40% | -46% | -4% | yes | |
| 678 | | | | Infraction Notice (UTT/PIN) | | | 84 | 303 | 204 | 0 | | 261% | -33% | | yes | |
| 679 | | | | Lack of Service | | | 179 | 352 | 193 | 88 | 97% | -45% | -54% | -16% | yes | |
| 680 | | | | Not Provided by Complainant | | | 105 | | | | | | | | yes | |
| 681 | | | | Other | | | 35 | | 231 | 20 | | | -91% | -13% | yes | 2017 and 2018 other = missing property |
| 682 | | | | Physical Abuse/Excessive Force | | | 130 | 730 | 410 | 96 | 462% | -44% | -77% | -7% | yes | |
| 683 | | | | Unprofessional | | | 117 | 329 | 203 | 70 | 181% | -38% | -66% | -12% | yes | |

2018 Measures as of Sept 2019

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 684 | | | | | | | | | | | | | | | | |
| 685 | 367 | i. 5 | civilian complaints & investigations & discipline | # of officers w/multiple complaints | yes | OPS | 34 | 38 | 27 | 10 | 12% | -29% | -63% | -26% | yes | |
| 686 | | | | District 1 | | | 1 | 1 | 5 | 0 | 0% | 400% | -100% | -100% | yes | |
| 687 | | | | District 2 | | | 4 | 4 | 1 | 1 | 0% | -75% | 0% | -29% | yes | |
| 688 | | | | District 3 | | | 4 | 4 | 6 | 2 | 0% | 50% | -67% | -16% | yes | |
| 689 | | | | District 4 | | | 1 | 9 | 8 | 3 | 800% | -11% | -63% | 32% | yes | |
| 690 | | | | District 5 | | | 5 | 2 | 2 | 1 | -60% | 0% | -50% | -33% | yes | |
| 691 | | | | outside city/other units | | | 4 | 5 | 5 | 3 | 25% | 0% | -40% | -7% | yes | |
| 692 | | | | # of officers w/repeated sustained complaints | yes | IA, Inspections, OPS | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 693 | | | | | | | | | | | | | | | | |
| 694 | 367 | i. 6 | civilian complaints & investigations & discipline | arrests of officers for conduct | yes | IA | see below | see below | see below | see below | | | | | yes | |
| 695 | | | | on duty | | | 1 | 2 | 1 | 0 | 100% | -50% | -100% | -100% | yes | |
| 696 | | | | off duty | | | 14 | 11 | 10 | 19 | -21% | -9% | 90% | 8% | yes | |
| 697 | | | | | | | | | | | | | | | | |
| 698 | 367 | i. 7 | civilian complaints & investigations & discipline | criminal prosecutions for conduct | yes | IA | see below | see below | see below | see below | | | | | yes | |
| 699 | | | | on duty | | | 1 | 2 | 0 | 0 | 100% | -100% | 0% | -100% | yes | |
| 700 | | | | off duty | | | 11 | 10 | 8 | 18 | -9% | -20% | 125% | 13% | yes | |
| 701 | | | | not prosecuted | | | 2 | 1 | 1 | 0 | -50% | 0% | -100% | -100% | yes | |
| 702 | | | | open | | | 1 | 0 | 2 | 1 | -100% | N/A | -50% | 0% | yes | |
| 703 | | | | | | | | | | | | | | | | |
| 704 | 367 | i. 8 | civilian complaints & investigations & discipline | # of civil suits against the City or CDP for work related conduct | yes | City Law Department | 8 | 12 | 52 | 35 | 50% | 333% | -33% | 45% | yes | |
| 705 | | | | settled | | | 3 | 3 | 42 | 6 | 0% | 1300% | -86% | 19% | yes | As of April 2018 |
| 706 | | | | not yet settled | | | 5 | 9 | 10 | 29 | 80% | 11% | 190% | 55% | yes | As of April 2018 |
| 707 | 367 | i. 8 | civilian complaints & investigations & discipline | nature of the suits | yes | City Law Department | see below | see below | see below | see below | | | | | yes | There can be multiple natures of suits for each suit |
| 708 | | | | force) | | | 5 | 6 | 2 | 3 | 20% | -67% | 50% | -12% | yes | |
| 709 | | | | unlawful search & seizure | | | 1 | 1 | 4 | 3 | 0% | 300% | -25% | 32% | yes | |
| 710 | | | | false arrest | | | 1 | 2 | 5 | 3 | 100% | 150% | -40% | 32% | yes | |
| 711 | | | | discrimination/bias | | | 0 | 3 | 0 | 2 | N/A | -100% | N/A | N/A | yes | |
| 712 | | | | other violation of constitutional rights (e.g., 1st amendment) | | | 1 | 1 | 6 | 7 | 0% | 500% | 17% | 63% | yes | |
| 713 | | | | Harassment | | | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | yes | |
| 714 | | | | improper handling/disposition of property | | | 1 | 0 | 3 | 6 | -100% | N/A | 100% | 57% | yes | |
| 715 | | | | contempt of cop | | | 1 | 0 | 0 | 0 | -100% | 0% | 0% | -100% | yes | |
| 716 | | | | failure to provide medical assistance | | | 1 | 1 | 0 | 1 | 0% | -100% | N/A | 0% | yes | |
| 717 | | | | other | | | 0 | 3 | 12 | 25 | N/A | 300% | 108% | N/A | yes | |
| 718 | 367 | i. 8 | civilian complaints & investigations & discipline | amount of judgments against | yes | City Law Department | see below | see below | see below | see below | | | | | yes | |
| 719 | | | | number of judgments | | | 23 | 29 | 52 | 35 | 26% | 79% | -33% | 11% | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 720 | 367 | i. 8 | civilian complaints & investigations & discipline | | yes | City Law Department | see below | see below | see below | see below | | | | | | |

2018 Measures as of Sept 2019

| # | | | category | measure | | dept | | | | | | | | | | notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 721 | | | | number of judgments (closed) | | | | 22 | 21 | 42 | 6 | -5% | 100% | -86% | -28% | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 722 | | | | number of judgments (active) | | | | 1 | 8 | 10 | 29 | 700% | 25% | 190% | 132% | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 723 | 367 | i. 8 | civilian complaints & investigations & discipline | | yes | City Law Department | see below | see below | see below | see below | | | | | | |
| 724 | | | | amount of judgments (closed) | | | $ 20,136.82 | $ 1,822.16 | $ 9,000.00 | $ - | -91% | 394% | -100% | -100% | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 725 | | | | amount of judgments (active) | | | TBD | TBD | TBD | TBD | N/A | N/A | N/A | N/A | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 726 | 367 | i. 8 | civilian complaints & investigations & discipline | amount of settlements | yes | City Law Department | see below | see below | see below | see below | | | | | | |
| 727 | | | | settled | | | $ 20,136.82 | $ 1,822.16 | $ 9,000.00 | $ - | -91% | 394% | -100% | -100% | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 728 | | | | not yet settled | | | TBD | TBD | TBD | TBD | N/A | N/A | N/A | N/A | yes | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 16, 2019, I served the foregoing document entitled Notice Submitting Monitoring Team's Seventh Semiannual Report via the court's ECF system to all counsel of record.

/s/  Ayesha Bell Hardaway
AYESHA BELL HARDAWAY