IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | |
| CITY OF CLEVELAND, | ) | |
| | ) | **CITY OF CLEVELAND'S** |
| Defendant. | ) | **EIGHTH STATUS  REPORT** |

## I.      Introduction

The City files its Eighth Status Report pursuant to Paragraph 387 of the Consent

Decree. Section 387 provides in part:

> This report will delineate the steps taken by CDP during the reporting period to comply
> with this Agreement; CDP's Assessment of the Status of its progress; plans to correct
> any problems; and response to concerns raised in the Monitor's previous semi-annual
> report.

The City's Eighth Status Report follows the Monitor's most recent semiannual report and

addresses activities undertaken during the first half of the current Fourth Year Monitoring Plan.

(See Dkt. 249-1 for Plan).

## II.      Monitor's Seventh Semiannual Report

The Monitor Team released its "Seventh Semiannual Report" on September 16, 2019.

The Monitor's report finds "substantial progress with the Division's implementation of the

Consent Decree requirements." (Dkt. 280, Report at p. 3). The Monitor's report provides the

reader with a rather detailed view of the ongoing transition from the City's initial focus on the

development of a variety of new CDP policies and plans to the actual implementation of those

policies. The Court in approving the Fourth Year Plan had recognized that work during this

period would "include[] a shift in focus to real-world implementation of now-completed and

approved policies and plans." (*Id.* at p. 2)   While positively commenting that the "available data

suggests that the men and women of the Division are engaging meaningfully with the new policies

and trainings as they do their work on a daily basis," the Monitor recognizes the significance and

requirement for developing "in-depth quantitative and qualitative assessments to measure full

and effective compliance with the consent decree." (*Id.*, see discussion at pp. 2-3).

Filing of the Monitor's seventh semi-annual report coincided with a public status

conference in court.  Representatives from the City, Department of Justice, and the Monitoring

team updated the Court and members of the community concerning accomplishments to date

and activities to be undertaken in the second half of the Fourth Year Monitoring Plan.

## II.     Steps Taken by the Cleveland Division of Police and the City of Cleveland During the Reporting Period.

As with other reports, the City addresses activities and milestone events in the following

order:

A.     Community and Problem-Oriented Policing,
B.     Use of Force,
C.     Crisis Intervention,
D.     Recruitment
E.     Accountability
F.     Equipment and Resources,
G.     Data Collection and Analysis/ Compliance and Outcome Assessments and
        Reporting
H.     Bias Free Policing, and
I.      Compliance and Outcome Assessments and Reporting. .

2

A.    **Community and Problem-Oriented Policing**

    1.       Cleveland Community Police Commission ("CPC")

The Consent Decree provides that the CPC is to "make recommendations for additional strategies for the CDP to consider to increase community engagement with and community confidence in CDP." (Dkt. 7-1, ¶ 17(c).

    a.       New Commission Appointments

Section 15 of the Consent Decree authorized the establishment of the Community Police Commission ("CPC"). In conformance with Section 16 of the Consent Decree, ten individuals recommended by an appointed Selection Panel, along with three individuals representing the City's two police unions and the Black Shield, were appointed to the CPC on September 8, 2015. The Consent Decree established that the initial CPC appointments would be "for a term of no more than 4 years." (Dkt. 7-1, ¶ 16).  The four-year terms of the initial Commission expired at the end of September, 2019.

Following a designated application period the Selection Panel reviewed applications, conducted selected interviews, and recommended the following ten individuals for appointment to the CPC:  Dr. Terry Echols, Mr. Gordon Friedman, Ms. Harriet Hadley, Dr. Stephanie Hinnershitz, Mr. Louis Katz, Rev. Frederick Knuckles, Ms. LaToya Logan, Mr. Mayele Ngemba, and Dr. Megan Testa. The police union representatives also appointed to the CPC are Detective Jeffrey Follmer (CPPA), Lt. (Ret.) Gail Maxwell (FOP), and Sgt. Richard Jackson (Black Shield). The new Community Police Commission was sworn in by Mayor Frank Jackson at a public ceremony in City Hall on November 1, 2019.

b.     CPC Recommendations

The Consent Decree specifically provides the CPC with authority to "review and comment on CDP's policies and practices…" (Dkt.7-1, at para. 18(a).

(i)     Policies

As was detailed in the City's previous semi-annual report (Dkt. 254), the CPC involved representatives and individuals from different legal and community stakeholder groups to assist it in preparing and exchanging ideas with the City concerning a number of significant recommendations related to the CDP's proposed Search and Seizure policy.  The final court-approved version of the CDP Search and Seizure policy incorporated a variety of recommendations received from the CPC and was filed with the Court on May 10, 2109 (Dkt. 260).

In addition to providing recommendations on the search and seizure policy, the CPC also offered feedback and recommendations that were taken into account by the City in finalizing the more recently approved CPOP policy.

(ii)     Alternative Dispute Resolution-Mediation Proposal

The CPC has initiated a presently ongoing discussion with the Parties regarding a mediation process proposal to assist in resolving certain classes of complaints made to the Office of Professional Standards ("OPS").

(iii)     Staff

The CPC has filled four staff positions during the reporting period.  In addition to the ongoing Executive Director Jason Goodrick, the CPC staff now includes Senior Policy Analyst Ryan Michael Walker, Community Engagement Coordinator Shelenah Williams, Community

4

Engagement Coordinator and Assistant Administrator Junita Thomas, and Marketing & Communications Specialist Sara Anderson.

       3.       <u>District Police Committees</u>

Each of the City's five police districts has a District Policing Committee ("DPC"). The Consent Decree provides that "[w]orking jointly, the [CPC], CDP, and Community Relations Board ("CRB") will work with the District Policing Committees (formerly called District Community Relations Committees) to facilitate regular communication and cooperation between CDP and community leaders at the local level." (Dkt., 7-1, ¶ 23).

A DPC Plan was finalized and filed with the Court on February 14, 2019. (Dkt. 235-1). The Plan was approved by the Court on February 20, 2019. (Dkt. 238). In addition to "facilitating communication and cooperation," work continues to focus on broadening the cross-section of community members who participate with each of the five DPCs. Each of the DPC's is to develop and identify specific strategies before the end of the year that address crime and safety within their specific police districts.  Each DPC will publicly report to the CPC before the end of the year on the identified district strategies, and thereafter on an annual basis.

Additionally, each year the CRB holds an Annual Conference with the DPC's. These conferences are useful in addressing a wide range of local and city-wide issues, including crime prevention, police policies, race relations, and Block Clubs.[1] Attendance at the conference

---

[1] CDP officers have assisted citizens in starting local block clubs. Block clubs involve residents who live in specific neighborhood areas who have organized and work to improve the quality of life for their community: "Neighbor watching out for Neighbor."

includes non-committee representatives from a variety of community-based organizations, and

the conference assists in building the relationship

between the CDP and citizens through a variety of community-based organizations.

    4.    <u>Community and Problem-Oriented Policing</u>

    a.    <u>CPOP Plan</u>

As noted again in the Monitor's most recent report:

> The Consent Decree requires that the Division develop and implement a
> "comprehensive and integrated community and problem-oriented policing model" to
> "promote and strengthen partnerships with the community . . . and increase community
> confidence in the CDP." The Decree refers to policing according to this model as
> "community and problem-oriented policing," or "CPOP."

(Dkt. 280, at p. 13). The Monitor's most recent report describes the adopted CPOP Plan as a

"milestone undertaking" and recognizes that the CDP "has taken important initial steps to better

position itself toward executing the Plan in a way that successfully restructures and reorients the

Division towards community and problem-oriented policing." (*Id*., p. 14). Commander Johnny

Johnson led the effort that resulted in the drafting of the CPOP Plan approved by the Court in

the previous reporting period. The process for drafting the Plan ensured that the Cleveland

community had a voice in shaping the content.[2]

An important element of ensuring the success of CPOP is the training that goes along

with implementation of the Plan. The Consent Decree recognizes that CDP is to provide annual

in-service training that addresses "community and problem-oriented policing principles." (Dkt.

7-1, ¶ 30). On April 23 the Court approved CDP's eight-hour Community Engagement and

---

[2] Detail concerning the CPOP Plan was addressed in the City's previous report. (See Dkt. 254, City's Seventh Status Report.)

Problem-Solving ("CEPS") Training Curriculum to be provided officers in 2019.  The 2019 training builds on the initial CEPS training that was provided to officers in 2018.

The 2019 training reinforces the 2018 training with respect to communication and behavioral skills that are intended to assist officers in positively engaging community members and building partnerships with the City's diverse community groups and organizations. One element of the 2019 training addressed CDP's eventual goal of having patrol officers incorporate 20% of their on-duty time in direct community engagement activities. Additionally the 2019 training dedicated substantial time to the SARA  (Scanning, Analysis, Response, and Assessment) model.  SARA training assists officers in looking beyond the immediacy of an encountered problem on a single call and completion of a report. Rather, the SARA model training is designed to assist officers in analyzing recurring circumstances, and is designed to provide officers with an enhanced approach to interacting with members of the community in working to resolve an underlying condition that may be the reason for recurring problems. SARA training includes substantial role-playing scenarios that are designed to involve the officers in considering environmental circumstances that may be in play, the concerns of relevant stakeholders, community interests, and other local issues that can assist in developing responses that resolve ongoing concerns in a manner consistent with community values.

The Monitor Team observed that the 2019 training had been effectively implemented and completed by August; and that CDP in completing the training had effectively translated lessons learned from the initial 2018 CEPS training. The Monitor found the instructors were appropriately selected, the training had been conducted consistent with curriculum guidelines, and that it was well received by the officers.  (Dkt. 280, p. 15).

7

b.      CPOP Policy

An important element in reaching the goals of the approved CPOP Plan was the further

development of a CDP policy that would provide officers with specific guidelines and

expectations to be met. The identified purpose of the Policy is:

> To establish guidelines for officers of the Cleveland Division of Police relative to
> community engagement and problem solving to provide clarity in regards to the
> expectations of all members. Members of the Division are a visible, important, and
> influential segment of the entire community. Communication and collaboration among
> all segments of the community are vital.

(Dkt. 273-1).  The policy makes clear that "CPOP is at the core of how the Division recruits

and hires, allocates resources, trains, promotes, evaluates officers and the Division, and collects

data." (*Id*).

The new CPOP policy was submitted by the Monitor to the Court for approval on

August 2, 2019. (Dkt. 273). On August 6 the Court approved the new CPOP policy,

finding that the Policy meets the terms of the Consent Decree. (Dkt. 274, p.2).

**B.      Use of Force**

1.      Revised Use of Force Policies[3]

CDP initiated revisions to four of its Use of Force policies in early 2019: (a) Definitions,

(b) General, (c) Intermediate Weapons, and (d) Reporting  The policy revisions were viewed as

"reasonable" and undertaken because of "real-world lessons learned and issues that have

surfaced as the Division has proceeded to implement the policies." (Dkt. 255, "Motion to

Approve Revised Use of Force Policies", p. 4). The revisions were accomplished with

---

[3] The four Use of Force policies as originally approved were addressed in detail in the City's
Third Semi-Annual Report. (Dkt.104, see pp. 6-13).

feedback being received from the Monitor team and the DOJ and were described by the Monitor as "meet[ing] the terms of the Consent Decree." (*Id.*, at p. 5). On April 15 the Court approved the revised polices. (Dkt. 256, "Order").  The revisions to each of the four policies included:

      a.      <u>Use of Force - Definitions</u>

The definitions associated with CDP's Use of Force policies were revised to include the definition for a "Critical Firearm Discharge." The definition replaced an earlier definition for "Officer Involved Shooting." The new definition includes an officer's accidental discharges of a firearm within the definition and ensures that accidental discharges are reviewed by CDP's FIT team.

      b.      <u>Use of Force - General</u>

The General Use of Force Policy was revised to make clear that officers did not have to request that a supervisor respond to the scene where the officer's use of force was limited to pointing of a firearm. The policy makes clear that the officer is to notify a supervisor and is required to complete a proper use of force entry.

      c.      <u>Use of Force – Intermediate Weapons</u>

The Intermediate Weapons policy was revised to allow officers to deploy oleoresin capsicum ("OC" - pepper spray) and ASP baton/impact weapon where the officer has grounds for arrest and the individual to be arrested is aggressively resisting and lesser means of response would be ineffective. Prior to this revision an officer could deploy a Taser (an intermediate level electric weapon) but not   OC spray or the ASP impact weapon.

d.      Use of Force - Reporting

The Reporting policy reflected an update to the original policy regarding the requirement to report the un-holstering of a firearm. The policy as originally enacted had referenced that such "unholstering" would be addressed by way of a future data collection process. The change makes clear that an unholstering of a firearm is to be reported when an officer clears the involved assignment through the CDP's Computer Aided Dispatch System ("CADS").

2.      Use of Force Statistics

The Monitor's most recent Seventh Report (Dkt. 280) reviewed statistics for the first half of the year for the same time periods in 2017 and 2018. To ensure consistency between the years the statistics concerning the pointing of a firearm was excluded in an effort to ensure a consistent comparison — it was only in 2018 that the pointing of a firearm by an officer at an individual became a reportable use of force.[4]  The Monitor's most recent report (Dkt 280) showing figures for CDP's uses of force through the first half of 2019, though slightly up from 2018, is down 32% from the equivalent first six months of 2017. (*Id*., at p. 24). Statistics included in the Monitor's most recent Report (See Dkt 280 at p. 25) also establish that overall crime figures for the first halves 2018 and 2019 have shown a significant decline from reported crime in the equivalent 2017  period as have officer injuries when comparing the same periods. The Monitor's Report (Dkt 280) includes three instructive tables: Table 1 - Use of Force Trends January through June, 2017-2019 (at p. 24); Table 2 - Crime January through June,

---

[4] Mere un-holstering of a firearm is not a reported use of force, the firearm must be pointed by an officer at an individual to become a reportable use of force. However, as noted above, data is now also being collected by CDP on the mere un-holstering of a  firearm by an officer, even where not a reportable use of force.

2017-2019 (at p. 25); Table 3 Officer injuries January-June, 2017-2019 (at p. 25).

      3.    <u>Training</u>

The curricula for use if force training to be completed in 2019 was approved by the Court on April 23, 2019. (Dkt. 257). The curricula provided for training that incorporated both interactive and traditional classroom instruction, while utilizing recognized real-world scenarios. Concepts that were stressed in the 2019 curricula included proportionality, reasonableness, the necessity for using force, communications on scene, and using applicable methods for de-escalation of the situation.

      4.    <u>Investigation and Review</u>

A Force Investigation Team ("FIT") under the auspices of CDP's Internal Affairs section was established with the Consent Decree for the purpose of conducting administrative reviews of all Level 3 (the most serious) uses of force, force involving potential criminal conduct, instances where an individual dies while in or as the result of being in CDP custody, and any uses of force assigned to FIT by the Chief. (Dkt. 7-1, ¶ 111). Additionally, the City is to create a Force Review Board ("FRB"). The Chief will chair the FRB which is envisioned in the Consent Decree to serve "as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." (Dkt. 7-1, ¶ 124).

Work on final revisions to three new policies governing (1) FIT investigations, (2) FRB policy, and (3) supervisory investigations of Level 1 and 2 uses of force was completed in the current reporting period. It is anticipated that the new policies will be filed with the Court in the very near future.

C.     **Crisis Intervention**

1.     CIT Annual Training

The Consent Decree requires initial and annual training to CDP officers and recruits "on responding to individuals in crisis." (Dkt. 7-1, ¶ 143. CDP worked with the Mental Health Response Advisory Committee ("MHRAC") to develop the topics to be covered in the CIT annual training for the current year. The focus for 2019 was the development of a four-hour block of CIT instruction that primarily focused on youth: "Recognizing and Responding Appropriately to Traumatized Youth." The training is focused on adverse childhood experiences, trauma and the impact on brain development, behavioral responses to trauma and best practices for interacting with youth. The training was formally approved by the Court on July 8, 2019.

The four hour training also includes a 30 minute introduction to "CIT Plus," a new pilot program that is designed to provide resource for officers in their dealing with adults who are in a mental health crisis but who do not need hospitalization. The pilot project makes use of mental health professionals and peer support specialist resources that expand the range of options available to the officer.

2.     CIT Specialized Training

Consent Decree establishes that CDP is to provide enhanced specialized training in responding to individuals in crisis to certain officers who will be identified as "specialized CIT officers." (Dkt. 7-1, ¶ 145). CDP, in collaboration with MHRAC, DOJ, and the Monitoring Team, had worked during the prior and the current reporting periods to finalize the 40-Hour curriculum to be used for such training. The curriculum was completed and filed for approval on

12

July 19, 2019. On July 22, 2019 the Court entered an order approving of the specialized training. The process for the selection of officers to receive the specialized CIT officer training is underway.

**D.    Recruitment**

The Consent Decree requires that CDP "develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community." (Dkt. 7-1, ¶ 302). The Court approved the City's Recruitment and Hiring Plan on February 20, 2019. (Dkt. 239). The City's Plan includes a combined Public Safety Recruitment Team ("PSRT") that includes members from CDP, the Division of Fire, and Division of Emergency Services.

A major accomplishment during this reporting period was the PSRT's completion and release of the first year-end recruiting report for the City's Safety Forces for 2017 and 2018. The report details the efforts undertaken in the creation of the PSRT and discusses recruitment goals, objectives, and accomplishments. As noted in the report the City seeks to recruit and hire into the CDP and other safety forces individuals who "possess the compassion, team orientation, problem solving and highest ethics within their skill sets in addition to being able to successfully perform their specific job functions." [5]

As was noted in the City's prior report, the PSRT consistently works to increase the public's confidence in the CDP. The PSRT's efforts to improve the Division's public image include direct communication with the community that highlights the positive aspects of policing

---

[5] "City of Cleveland Safety Forces Year-End Report - FY 2017/2018", at p.15.

as a career by ensuring residents are kept informed of ongoing accomplishments and contributions to the community of individual officers.

The PSRT communicates in a sophisticated manner with the community through the use of radio, billboards, and other social media, in addition to personally attending meetings and directly interacting with individual community members throughout the City.
A significant example of the PSRT's innovative efforts to positively interact with the Community is its "Beauty, Badges and Barbershop Talks." The PSRT has continued during this reporting period to meet directly with community members at locations throughout the City in a relaxed and open forum through such "Talks." These interactions are relaxed and allow for an open and honest interchange between recruiters and community members concerning their experiences and their expectations concerning the role of the police in the community.  Another unique effort was the production of MLB  style baseball cards for officers that were distributed during MLB All-Star Week.

     1.    <u>Recruit Classes</u>

It was noted that two CDP recruit classes, Police Academy Classes 143 and 144, were in training at the time the City filed its Seventh Semiannual Report. The two classes have now graduated.  Police Academy Class 143 graduated 56 new officers on July 3, 2019, with Academy Class 144 graduating 41 new officers and two fire arson investigators on September 20, 2019.  The 145th Police Academy Class began its training on August 19, 2019. The class consists of 79 police recruits and one fire employee training to be an arson investigator. The class is scheduled to graduate in March 2020. It is planned that a new cadet class will begin in January 2020.

2.      Increased CDP Staff Level

The number of CDP patrol officers has increased by 5.4% over the last year. One year ago CDP had 1195 patrol officers and 86 recruit in trainings.  The Division's total staffing at the time was 1548 employees.  Currently the CDP has 1260 patrol officers and 79 recruits, with a total staffing of 1636 employees. As the size of the patrol force and supporting staff has increased, CDP has continued its efforts to recruit officers who will "reflect the diverse make up of our city."   Minority and women cadets made up 56 % of the new graduates commissioned from classes 143 and 144 as Cleveland police officers.

**E.      Accountability**

Paragraph 196 of the Consent Decree requires that allegations of police misconduct be "fully, fairly and efficiently investigated", irrespective of whether the allegations are internally discovered or brought by a civilian. (Dkt. 7-1, ¶ 196).

1.      Internal Affairs

 CDP has continued to work with the Monitor Team and DOJ to complete a revised IA Manual and related IA policies that address: (A) Retaliation Prohibited, (B) Internal Complaints of Misconduct, and (C) Public Complaints of Misconduct.  The new IA Manual and three new policies addressing (1) Retaliation, (2) Reporting Internal Misconduct, and (3) Public Complaints of Misconduct were filed with the Court for approval on November 4. (See Dkt. 290).   The new (1) Retaliation policy provides protection from retaliation to those making complaints of police misconduct. The (2)  Reporting of Internal Misconduct and separate (3) Public Complaints of Misconduct policies address CDP guidelines for receiving and handling complaints against CDP officers.   Also filed with the manual and policies is an Accountability

Structure Matrix Chart that provides a detailed chart that portrays the varieties of investigations and the responsibility for conducting and reviewing investigations of incidents  involving sworn members of CDP.

In filing the new IA manual and policies the Monitor noted that the manual and policies:

"provide a strong foundation for the Division going forward to better ensure fair, thorough, objective, and timely investigations of officer misconduct — and to ensure that officers witnessing acts of misconduct, appropriately notify IA or their supervisors without fear of retribution or retaliation."

(Dkt 290, p. 2).

2.     Discipline

The Consent Decree requires "that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, [and] fair…" as required by the Consent Decree. (See Dkt. 7-1, ¶ 245).  The City worked with the Monitor and DOJ during this period to finalize written guidelines for the conduct of officer discipline hearings conducted by the Chief.

In the last reporting period the City had disagreed with the Monitor's previous assessment of "non-compliance" with regard to paragraphs 242, 243, and 247 of the Consent decree.  Paragraph 242 of the Consent Decree basically requires that the Chief provide the Civilian Police Review Board with a written justification when the Chief does not uphold the CPRB's recommended charges or does not impose the discipline or non-disciplinary corrective action that has been recommended by the CPRB.    Paragraph 243 of the Consent Decree requires that CDP tracks the number of instances the Chief departs from the CPRB's recommended discipline disposition.  Paragraph 247 requires that CDP document disciplinary

16

decisions in writing as required by of the Consent Decree. The Monitor's motion recent report documents a status of partial or operational compliance in each of these areas during the most recent reporting period.

On August 20, 2019 the Court issued an Order approving the CDP's amended Disciplinary Guidance policy and Matrix.  As noted in the Order the amended policy and Disciplinary Matrix better address "violations involving dishonesty and integrity" and provides CDP "with better tools to meet the terms of Paragraph 245 of the Consent Decree." The amended policy succinctly sets out as a matter of policy that "*False Report, false statement, untruthfulness, or dishonesty*" are serious Group III violations *and "each of which creates a presumption of termination."* (Dkt 276, Amended Disciplinary Policy, at p. 9 of 10).

3.     Police Inspector General

The Consent Decree (Dkt. 7-1) establishes at paragraphs 250-256 the creation of the position of the new position with the CDP of Inspector General ("IG") . On August 5, 2019 Mr. Christopher Viland was appointed as CDP's first Inspector General. Mr. Viland is the former Chief of Police of the Solon Police Department and also a practicing attorney. As the IG Mr. Viland will work in the Office of the Mayor and report to the Chief of Police.

Among the duties established in the Consent Decree for the new IG are: (1) reviewing CDP policies and practices to ensure effectiveness and whether the goals of the Consent Decree are being achieved, (2) auditing compliance with policies and procedures, (3) conducting investigations, (4) analyzing trends, (5) developing recommendations for reform to improve police services and accountability, (6) analyzing investigations undertaken by CDP, (7)

analyzing and assessing CDP officer discipline to ensure consistency and fairness, and (8) to make reports and recommendations for reform publicly available. (Dkt 7-1, see ¶ 253 a.- h).

4. Office of Professional Standards[6]

The Office of Professional Standards ("OPS) receives and investigates non-criminal complaints filed by members of the public against sworn and non-sworn Cleveland Division of Police employees. OPS investigates the complaints and makes findings and provides recommendations to the Civilian Police Review Board ("PRB"). A continuing goal established by the City and OPS is to have OPS remain timely in completing the investigation of complaints received from the public from December 1, 2017 onward. OPS presently employs eight permanent investigators and one temporary investigator for this purpose. To assist OPS in remaining current, the City retained Hillard Heintze, a Chicago-based investigative firm, to complete the work deemed necessary for finalizing an identified backlog of 281 unfinished investigations related to OPS complaints that had been made against CDP members in 2015, 2016, and through November, 2017.

a. OPS Investigations

As has been discussed in prior City status reports, reforms were undertaken to improve the administration of OPS and the investigative efforts undertaken by the agency. This section provides the reader with a comparative updated overview of OPS efforts to remain current in responding to complaints it has received from December 1, 2017 to October 30, 2019.

---

[6] An separate, updated status report, "City of Cleveland's Status Report Re: Office of Professional Standards," was filed with the Court on September 9, 2019. (See Dkt. 278).

| Time Period | No. of Cases Opened | No. of Cases Completed | No. of Cases Open |
|---|---|---|---|
| December  2017 | 24 | 24 | 0 |
| | | | |
| Jan — Jun  2018 | 102 | 102 | 0 |
| Jul — Dec  2018 | 125 | 113 | 12 |
| 2018 | 227 | 215 | 12 |
| | | | |
| Jan — Jun  2019 | 105 | 73 | 32 |
| Jul — Oct  2019 | 87 | 30 | 57 |
| (To date)  2019 | 192 | 103 | 89 |
| | | | |
| Total | 443 | 342 | 101 |

OPS has completed its work (342 cases) on 77% of the complaints (443 complaints) filed since December 2017.

      b.    <u>Backlog Investigations</u>

In early 2018 the City contracted with Hillard Heintze LLC to address and resolve the existing backlog of OPS investigations that accrued during the period 2015-November, 2017. The use of a qualified outside investigative resource like Hillard Heintze to address the 2015-2017 backlog allowed the OPS investigators to focus their ongoing efforts on ensuring that the investigations of public complaints received by OPS going forward after December 1, 2017 are timely addressed, investigated, and completed. A total of 282 backlogged investigations were provided for Hillard Heintze's review. Hillard Heintze's work to complete the existing backlog was planned to be undertaken in three separate phases and has now been effectively completed.

<u>Phase One</u>:  Hillard Heintze conducted a comprehensive review and assessment of the 282 backlogged complaints remaining to be investigated from the 2015-2017l time period. This work was addressed in the City's August 2018 Status Report to the Court. (Dkt.215). Hillard Heintze identified three main issues that influenced the quality of the backlogged case files that it

received. These included (1) the professional level of management of the investigations, (2) the records documenting the investigations, and (3) whether the investigation quality was to a professional standard. This initial phase allowed Hillard Heintze to better understand the scope and quality of the investigation activities that had been completed to date in each of the cases.

Phase Two: Phase Two included a review and realistic determination of the evidentiary considerations presented in each of the backlogged case. The evidentiary evaluation allowed for the closure of case files where it is determined that evidence necessary for an investigation to proceed did not exist. Where sufficient evidence was determined to exist, Hillard Heintze developed an appropriate investigation plan to be used by its investigators. in the final Phase Three. Phase Two work resulted in the closure of 137 files where sufficient evidence did not exist to proceed further. Of this number, 23 of the cases involved completed investigations that were returned to OPS and heard by the Cleveland Police Review Board ("PRB") at its February 12, 2019 meeting. Phase Two concluded with Hillard Heintze having identified 144 backlogged cases that remained for its further investigation and completion.

Phase Three: Hillard Heintze has now effectively completed the Phase Three investigations undertaken on the 144 backlogged complaints that were identified in Phase Two. Phase Three work included interviews, obtaining the locally sourced evidence that was identified in Phase Two, and completing the investigative steps that necessary to close an OPS handled investigation.

5.      Civilian Police Review Board

The PRB reviews misconduct complaints investigated by OPS at public meetings. Upon making its decisions, the PRB submits its findings and recommendations to the

Chief of Police and notifies the complainant of the disposition. The PRB generally meets once a month, with its meetings being conducted on the second Tuesday of each month. The PRB has had eight public meetings this year through October.

The PRB has reviewed 298 files at its meetings in the first ten months of 2019. During this period it considered 113 current OPS investigation files and 185 files completed by Hillard Heintze. The increased pace of investigations and complete hearing reviews in the first ten months of 2019 is reflected by comparisons to hearings conducted in the prior two calendar years: 225 cases heard in 2018 and 183 cases heard in 2017.

**F.      Equipment and Resources and Staffing**

      1.      Equipment and Resources

The Consent Decree requires "an effective, comprehensive Equipment and Resource Plan that is consistent with its [CDP's] mission and that will allow it to satisfy the requirements of this Agreement." (Dkt. 7-1, Section 292). As previously reported, on November 2, 2018, the Monitor filed a motion informing the Court that "the 2018 [Equipment and Resources] Plan, when and only when taken together with the previously-approved portions of the 2017 Plan, constitutes a complete and satisfactory Equipment and Resource Plan that meets the terms of the Consent Decree." (Dkt. 226). On November 18, 2018 the Court approved the Plan.

Activities undertaken during the current reporting period include increasing CDP's computer availability through the deployment of 120 new personal computers, upgrading CDP's Law Enforcement Records Management System ("LERMS") with a more up to date version of the system, and continuing to improve the mobile data computers installed in the Division's zone

cars. The City's IT Services office continues to work with Tyler Technologies to finalize a software upgrade for electronic forms used by officers. The system upgrade will allow the capture of required crisis intervention and community engagement data, thereby assisting in the assessment of compliance with the reforms being undertaken.

2.     Staffing

The CDP finalized and released for comment in May 2018 the "Cleveland Division of Police Staffing Report," with public comments having been received in September 2018. CDP worked with the Monitor and DOJ to incorporate appropriate public input while ensuring the finalization of a staffing plan that was based on a "workload-based model." The Plan was drafted to take into account CDP's commitment to CPOP and community engagement, and was filed with the Court for approval by the Monitor on February 21, 2019. (Dkt. 240). The City has continued its efforts during the current reporting period to ensure implementation of the plan.

**G.     Data Collection and Analysis/ Compliance and Outcome Assessments and Reporting**

During the most recent reporting period, the Cleveland Division of Police (CDP) continued to make progress in the areas of data collection and analysis. The monthly COMPSTAT meetings held with the Monitoring Team and the Department of Justice continue to expand beyond Use of Force. COMPSTAT meetings also include statistics for the Early Officer Intervention Program, Officer Injury and Internal Affairs.

Over the last few months, the CDP's data team has worked closely with "Brazos", the software company employed to electronically capture information on four major areas:

Community Engagement, Community and Problem Oriented Policing (CPOP), Crisis

Intervention Training (CIT) and Investigatory Stop and Seizure. CDP will be piloting two of the

forms (Community Engagement and CIT) among a subsample of police officers before

conducting division wide training. After the pilot program, changes may occur to further improve

the efficiency and accuracy of officer data entry to best reflect the needs of the division and

terms of the Settlement Agreement.

The collection, analysis, and utilization of data to improve policing practices in the city

remain a priority. CDP is consistently looking for ways to utilize the data collected by officers' in

its day to day operations. CDP has used the data collected by the division in a number of new

ways during the most recent reporting period. First, the Data Collection & Analysis Coordinator

has worked closely with the training unit on developing a Use of Force and Office of

Professional Standards (OPS) data presentation for upcoming in-service officer training.

Additionally, the use of force data collected by the division is being used by the training

unit to shape its in-service training sessions. As an example, collected data shows that a majority

of use of force incidents stem from a call for service, with the most common type of service-call

type being related to domestic violence. This information was provided to the training unit with

a recommendation that domestic violence scenarios be utilized during use of force training. The

data team has also begun working with OPS in regards to the collection of data identified in the

settlement agreement.

In addition to regularly scheduled CDP meetings, command staff members have also

started meeting on a quarterly basis to review data including, but not limited to, Use of Force,

Officer Injury and Part I crimes. These quarterly meetings have started this year, but are subject

to change in scope and frequency. Next, CDP Patrol Captains have begun meeting every other month to review low level uses of force. Specifically, Patrol Captains are responsible for reviewing level 1 and 2 use of force investigations, with a focus on officer entries and the supervisory review process.

Finally, the data team routinely collaborates with CDP staff members to improve the quality of data retrieved through the data collection systems. Modifications to data measures are an ongoing process and examples can be found in the "Quality Assessment" section of the CDP's 2018 Use of Force Report (available on the city website). In summary, CDP staff continues to expand the scope of data collection, with a focus on consistently improving existing data measures to better utilize the information being collected by CDP officers.

**H.**     **Bias Free Policing**

On July 23, 2019 the Monitor filed a Motion with the Court for approval of the CDP's 2019 bias free annual training curriculum. The 2019 training builds upon review and lessons learned from the initial bias free training accomplished in 2018. The Court approved the curriculum on July 29. The curriculum provides a four-hour block of training for officers that addresses implicit bias and the concept of procedural justice. The training engages and encourages self-reflection by officers through class exercises, question and answer, and reviewing real world scenarios. The training supports the delivery of police services "with the goal of ensuring that they are equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in CDP." (Dkt. 7-1, 35).

I.       **Compliance and Outcome Assessments and Reporting.**

The Monitor's most recent Seventh Report evidences continuing progress to meet the
agreed upon reforms contained in the Consent Decree. Most of the new and revised policies to
meet the Consent Decree reforms have now been adopted. As the policies become fully trained
upon and implemented, the focus is shifting to ensuring compliance with the policies can be
assessed and documented. As noted above, CDP continues to focus on expanding its data
collection capability and improving existing data measures to better utilize the information being
collected by CDP officers. The City continues to work closely with the Monitor Team and DOJ
to ensure its efforts result in the capture of necessary data in the myriad areas to be assessed.

III.     **Assessment of the Status of Cleveland Division of Police's Progress**

As detailed in the Monitor's Seventh Report, the City has continued to make substantial
progress toward meeting the reforms agreed to in the Consent Decree.  The CDP has
developed high quality training for its officers on a number of policies that re crucial to the
success of the Division in meeting both the goals of the Consent Decree and the expectations of
the community being served by the Division.  Important areas of training in the most recent
reporting period include community engagement and problem solving, bias free policing, crisis
intervention, and search and seizure.  Progress is documented by statistics showing a decline in
crime in most major categories, a continuing decline from 2017 in use of force incidents, and a
significant drop in officer injuries. The City anticipates that the ongoing and improved data
capture capability will objectively document  going forward that that the hard work associated

with the new policies, effective training, improved equipment, and focus on community

engagement  will document continuing progress.

## IV.  Response to Concerns Raised in the Monitor's Semi-Annual Report

The Monitor's Seventh Semi-annual report notes that ensuring in depth quantitative and

qualitative assessments to measure full and effective compliance with the Consent Decree

remains a work in progress.  Much progress has been made and will continue as the City

continues to work with the Monitor and DOJ to meet the assessment goals established in the

fourth year monitoring plan.

## V.  Conclusion

The City remains committed to continuing the substantial progress it has made toward

achieving the reforms outlined in the Consent Decree.  Most of the major new policies and plans

required by the Consent Decree are now either in place or soon to be finalized.  An emphasis

going forward is ensuring the objective collection of data that will reflect the continuing effort and

progress. CDP remains committed to improving community engagement and trust, while also

continuing its commitment to ensuring public safety.

Respectfully submitted,
Barbara A. Langhenry (0038838)
Director of Law

By:  /s/ Gary S. Singletary
Gary S. Singletary (0037329)
Chief Counsel
City of Cleveland
601 Lakeside Avenue, Room 106
Cleveland, Ohio  44114-1077
Tel: (216) 664-2737  Fax:(216) 664-2663
E-mail: gsingletary@city.cleveland.oh.us

Counsel for the City of Cleveland

26

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the City of Cleveland's Eighth Status Report was filed electronically on November 13, 2019.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system. Pursuant to the requirements of the Consent Decree the Monitor has been electronically delivered a copy of this filing.

/s/ Gary S. Singletary
Gary S. Singletary (0037329)
Counsel for the City of Cleveland