MEMORANDUM

TO:        HONORABLE JUDGE SOLOMON OLIVER, US DISTRICT COURT

COPY:      KARRIE HOWARD, DIRECTOR OF PUBLIC SAFETY
           CALVIN WILLIAMS, POLICE CHIEF
           GREG WHITE, OFFICE OF THE MAYOR
           BARBARA LANGHENRY, DIRECTOR OF LAW
           GARY SINGLETARY, CHIEF COUNSEL
           JUSTIN HERDMAN, UNITED STATES ATTORNEY
           TIMOTHY MYGATT, DEPUTY CHIEF – CRT
           JONAS GEISSLER, CRT
           NICOLE PORTER, CRT
           MEHVEEN RIAZ, CRT
           LYNN BUCK, AUSA
           MICHELLE HEYER, AUSA
           HEATHER TONSING VOLOSIN, AUSA

FROM:      HASSAN ADEN, MONITOR
           CLEVELAND MONITORING TEAM

SUBJECT:   MONITORING TEAM REVIEW OF DIRECTOR OF PUBLIC SAFETY
           DISCIPLINARY DECISIONS

DATE:      JUNE 15, 2020

---

## I.        EXECUTIVE SUMMARY

Pursuant to the Consent Decree between the United States and the City of Cleveland, the

Monitoring Team has engaged in a ongoing review of the performance of the Cleveland Division

of Police's disciplinary systems. We have regularly reviewed disciplinary decisions, monitored a

number of pre-disciplinary hearings, and examined data and information relating to discipline and

accountability.

This is the first published review of CDP discipline by the Monitoring Team and is focused on whether discipline decisions by the Director of Public Safety have complied with the Consent Decree and the Disciplinary Matrices revised by the Division effective January 1, 2014, January 1, 2018 and August 12, 2019[1].

Within that context, the Monitoring Team has now reviewed and evaluated all cases in which the Director of Public Safety imposed discipline on police officers from March 2018 through May 2020. In the City of Cleveland, pursuant to Chapter 25, Section 119 of the City Charter, and unlike many other jurisdictions across the country, the Chief of Police cannot impose discipline of more than 10 working days suspension or independently fire an officer. Instead, that determination must be made by the Director of Public Safety.

As such, the Monitoring Team chose to focus on the disciplinary decisions heard and decided by the Director of Public Safety precisely because they involve the most significant incidents of misconduct by CDP employees. For officers and community members alike to have confidence in the City's ability to hold officers accountable, discipline decisions made by the Director must be consistent, transparent, reasonable, and fair.

The Monitoring Team concludes that the City of Cleveland is out of compliance with respect to paragraph 245 of the Consent Decree as it relates to discipline imposed by the Director of Public Safety during the reviewed period. Specifically, the Monitoring Team makes the following findings:

1) **Decision-making with respect to the imposition of discipline was frequently non-compliant with the Disciplinary Matrix**, demonstrating a clear failure to act in

---

[1] A separate review of CDP disciplinary processes will be required to examine the reasonableness of disciplinary decisions made by the Chief of Police, the reasonableness of decision-making as it relates to "not sustained" findings and dismissals of cases, the reasonableness of findings relating to cases referred by the Police Review Board and the timeliness of the various components of the disciplinary system.

accordance with the requirements of the Consent Decree. Unless and until the City ensures that CDP employees are fairly and consistently disciplined for serious violations of law and policy, the City will be unable to build an accountability system that guarantees fair treatment to officers and has legitimacy with the community.

2) When discipline was consistent with the Matrix, **a clear pattern of imposing discipline at the low end of the discipline range emerged**. Of particular concern, the Director generally failed to impose sufficiently serious discipline against officers for integrity-related offenses, in violation of the Consent Decree requirement that discipline be imposed "based on the nature of the allegation." Going forward, the City will need to review assignments of officers who have been sustained for integrity-related violations and ensure appropriate disclosure to criminal justice system stakeholders.

3) **The consistent lack of sufficient, written justification or explanation for the rationale for specific disciplinary decisions** frustrated an objective evaluation of whether the City of Cleveland was complying with the Consent Decree.  The Consent Decree (paragraph 245) requires that disciplinary decisions be fair and consistent "and that mitigating and aggravating factors are identified and consistently applied and documented." Not only did the Director fail to document sufficient rationale for his decision-making in any of the cases decided during the review period, he failed to do so after notice from the Monitoring Team (via a memorandum dated February 8, 2019). Any continued failure to document the rationale for decision-making in these cases will make it impossible for the Court to conclusively establish whether or not the new Director is following the requirements of the Disciplinary Matrix, which is required, per paragraph 246 of the Consent Decree, "to ensure consistency in the imposition of discipline…" Ultimately, the burden is on the City

to demonstrate compliance – the Monitoring Team and the Court should not have to search for it. If the Department of Public Safety does not immediately begin to comprehensively document the rationale, explanation, and justification for all discipline determinations made going forward (to include providing reasoning for declining to impose discipline), the Monitor will recommend that the Court issue a supplementary order of the Court compelling the City do so.

4) **The lack of timeliness in imposing discipline by the Director of Public Safety after conducting pre-disciplinary hearings, appears to be unreasonable**. The failure to impose fair, consistent, and timely discipline prevents the type of legitimacy and transparency necessary to re-establish a "strong relationship that is built on mutual trust and respect" between the Division of Police and the Cleveland community.[2]

5) **A decision by the Director of Public Safety, on August 14, 2018, to continue to employ two officers with the CDP negatively impacted the potential sustainability of reform efforts within the Cleveland Division of Police.** This decision is further discussed in Addendum A to this report, and in brief in Case No. 15 below.

The Monitoring Team stands at the ready to work with the Parties to establish a meaningful process for ensuring the fair, thorough, objective, and timely imposition of discipline going forward as the City works to comply with the Consent Decree.

## II.  INTRODUCTION & FINDINGS

Police agencies must appropriately manage officer performance to ensure constitutional and effective law enforcement. A critical aspect of this is ensuring the imposition of fair and appropriate corrective action or discipline when officers have not met an agency's performance

---

[2] Dkt. 7-1, Introduction, p. 1.

expectations. Accordingly, the Settlement Agreement between the Department of Justice and the City of Cleveland addressing the Cleveland Division of Police ("CDP") includes the following provisions:

- Paragraph 176: The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; and that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process.[3]

- Paragraph 245: CDP will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented.[4]

- Paragraph 247: All disciplinary decisions will be documented in writing.[5]

Pursuant to the aforementioned paragraphs of the Consent Decree, the Monitoring Team has for some time been reviewing the performance of the City of Cleveland's disciplinary systems. It has regularly reviewed disciplinary decisions, monitored a number of pre-disciplinary hearings, and examined data and information relating to discipline and accountability.

In the City of Cleveland, pursuant to Chapter 25, Section 119 of the City Charter and unlike many other jurisdictions across the country, the Chief of Police cannot impose discipline of more than a 10-working day suspension or independently fire an officer. Instead, that determination

---

[3] Dkt. 7-1.
[4] *Id*.
[5] *Id.*

must be made by the Director of Public Safety. Given that the disciplinary decisions made in the cases heard and decided by the Director of Public Safety involve the most significant incidents of misconduct by CDP employees, the Monitoring Team has chosen these cases for its first comprehensive review of CDP discipline to determine to what extent recently imposed discipline on CDP employees by the Department of Public Safety has complied with the above-noted provisions of the Consent Decree and in accordance with the Disciplinary Matrixes revised by the Division effective January 1, 2014, January 1, 2018, and August 12, 2019. The latter two were subsequently approved by the Court.

The Monitoring Team has now reviewed and evaluated all thirty-nine cases wherein the Director of Public Safety or his designee has imposed discipline on police officers between March 2018 and 2020. This population of cases reviewed is distinct from those cases where the Chief of Police imposed discipline upon CDP employees. Additionally, the review did not consider discipline imposed by the Director as the result of any Police Review Board appeals of findings previously made by the Chief of Police, nor does it include any cases where an officer resigned prior to the imposition of any discipline by the Director. Finally, additional cases pertaining to the discipline imposed by the Director on fifteen police recruits were not included in this evaluation, as these cases were previously reviewed by the Monitoring Team and were the subject of an informational memorandum, provided to the City on January 14, 2019, that involved issues distinguishable from the population of cases evaluated herein.

The review also excluded any cases where the Director dismissed the charges and declined to impose any discipline[6].

---

[6] However, while conducting the review, the Monitoring Team noted that, in the two cases dismissed for timeliness during the review period, both involved police Lieutenants and there was no documentation of the rationale for those findings. There were also significant internal delays, without explanation, in the forwarding of these cases from the Chief's Office to the director (a delay of almost seven months) as well as in the completion of the charging letters (a

As stated earlier, thirty-nine (39) cases were reviewed in all. These cases involved forty-six (46) officers, including one (1) Commander, two (2) Lieutenants, four (4) Detectives, eight (8) Sergeants, twenty-six (26) police officers, one (1) Traffic Control Officer and four (4) Dispatchers. Twenty-one (21) of the cases, involving twenty-seven (27) officers, were adjudicated in 2018. Another fourteen (14) cases, involving fourteen (14) officers, were adjudicated in 2019. A final group of four cases involving five officers were adjudicated in 2020.[7]

The Monitoring Team reviewed disciplinary letters and charging letters, pre-disciplinary hearing transcripts, and the Internal Affairs investigations in each of these cases. The Monitoring Team compared the discipline that was ultimately imposed to what is required by the relevant version of the CDP's Disciplinary Matrix.

From this review, the Monitoring Team was able to make several findings, which are summarized here and discussed in greater detail in the body of the report:

**Finding #1: Overall, discipline determinations were frequently inconsistent or non-compliant with the Disciplinary Matrix. When it was compliant, imposed discipline was often, without adequate explanation or justification, at the low end of the discipline range.**

Overall, the Director of Public Safety's decision-making with respect to the imposition of discipline either failed to comply with the Court-approved Disciplinary Matrix or was unreasonably lenient given the facts known to the Monitoring Team. In close to 37% of the cases reviewed (n=17), the discipline imposed was not consistent with the classifications and disciplinary ranges required by the matrix. In another 32% of the cases (n=15), while imposing discipline within the classifications and ranges called for by the matrix, the Director either exercised his discretion to impose discipline on the lower end of the disciplinary spectrum or chose

delay of almost four months). As the Monitoring Team continues its review of Cleveland disciplinary systems, it will ensure scrutiny of delayed internal processes that lead to timeliness dismissals.
[7] One 2020 case involved two officers, one of whom was disciplined in 2019, but the case was not completely adjudicated until 2020 when the second officer received his disciplinary order (Case No. 37).

to impose suspensions in lieu of termination, resulting in a pattern of reduced discipline. In all of those cases, the discipline decisions were determined without apparent justification or explanation. In one case,[8] there was insufficient written documentation for the Monitoring Team to evaluate the decision one way or another. In two other cases, the Director made his decision with insufficient information,[9] as he failed to ask for additional investigation from Internal Affairs, or wait for Internal Affairs to complete its investigation before taking action. In only 24% of the cases did the Director impose discipline that was consistent with the matrix and reasonable given the explanations provided by the Director (n=11).[10] Unless and until the City impartially applies the Court-approved Disciplinary Matrix, it cannot reach compliance with the Decree and cannot demonstrate, to CDP officers or members of the public, that it is impartially and meaningfully dealing with misconduct.

**Finding #2: The continuing failure of the Director of Public Safety to provide sufficient, written justification or explanation for the rationale for specific disciplinary decisions impedes an objective evaluation of whether the City of Cleveland is complying with the Consent Decree.**

The Monitoring Team's review of discipline was substantially hindered by the ongoing failure to provide sufficient justification or explanation for his rationale for making discipline determinations.

The Monitoring Team previously reviewed nine cases involving sustained findings for integrity-related violations.[11] It provided a memorandum to the City on February 8, 2019 for its consideration, noting that "[i]n the reviewed cases, the Director of Public Safety and the Chief of

---

[8] See Case #23.

[9] In one case (Case #21), the Director failed to order Internal Affairs to conduct additional investigation. In another case (Case #27), the Director adjudicated the case before the completion of the Internal Affairs investigation.

[10] In four of these cases, although employees were appropriately terminated, the arguments for termination were compelling.

[11] "Integrity-related violations," as defined herein, include sustained allegations that would lead a reasonable adjudicator to conclude that the case involved untruthful statements or acts that would require a court to consider whether the acts are disclosable pursuant to *Brady v. Maryland* (See discussion, infra, at p. 13).

Police consistently failed to document any clear rationale for their decision-making, in violation of paragraph 247 of the Consent Decree which requires that "all disciplinary decisions will be documented in writing." The Team further noted that:

> Although the imposition of discipline in these cases was documented in letters addressed to the subject officers, there was no documentation of the Director of Public Safety or Chief's reasoning underlying their disciplinary decisions other than general references to the Disciplinary Matrix and minimal references to the lack of prior discipline as a mitigating factor. Thus, the communication tended to outline what the decision was but did not explain precisely why that decision was made and on what facts that determination relied. In addition to being contrary to the Consent Decree, such a practice lacks transparency and accountability – the absence of which can lead the community, other officers and the Monitoring Team to question whether or not bias, interest, or some other impermissible motive was implicated in the decision-making process.

Since that memorandum, the Director continued to adjudicate cases without providing any written rationale for his decision-making. Given the lack of rationale provided, the Monitoring Team was required to conclude that the decision-making by the Director was non-compliant with the Consent Decree in the cases where discipline was imposed at any end of the spectrum without any apparent justification.

The Consent Decree requires the application of discipline that, among other things, is "based on the nature of the allegation" and that appropriately takes into account "mitigating and aggravating factors" that "are identified and consistently applied and documented."[12] Unless the new Director begins to expressly identify mitigating and aggravating circumstances and demonstrate how they are being consistently applied, per the requirements of paragraph 245, the City cannot establish that discipline decisions in individual matters are not arbitrary, capricious, intentionally biased, unfair, unfounded, insubstantially supported by evidence established during an investigation, or otherwise.  However, even more fundamentally, without discipline decisions

---

[12] Dkt. 7-1 ¶ 245

clearly explained and justified in writing, CDP officers will never be assured that they are getting a fair shake – and Cleveland community members can never have confidence that the City is impartially and comprehensively addressing instances of poor performance and officer misconduct.

**Finding #3: The Director generally failed to impose serious discipline against officers for integrity-related offenses, in violation of the Consent Decree requirement that discipline be imposed "based on the nature of the allegation." An amendment to the Disciplinary Matrix adopted by the City, in response to the Monitor's prior report, has the potential to bring CDP closer to compliance.**

Of the cases reviewed in this evaluation, half of the officers disciplined by the Director of Public Safety for misconduct (50%)[13] were sustained for violations involving deception.[14] In only three of these cases was the officer terminated from employment with the CDP.[15] However, the integrity issue did not appear to be the driving force behind the termination decision in one of the three cases.[16]

Given these findings, the Monitoring Team has concluded that the suspensions ultimately given by the Director to CDP officers who have lied to Internal Affairs, CDP supervisors, or in court proceedings, were generally inconsistent with paragraph 245 of the Consent Decree, which requires the City to "ensure that discipline for sustained allegations of misconduct…is…based on the nature of the allegations." For those integrity-related cases where suspensions were imposed, the suspensions ranged from 8 to 30 days without pay.

In all twenty-three (23) of these cases, however, there was evidence that each officer either knowingly and intentionally lied to, or withheld information from, Internal Affairs, OPS, CDP Command Staff or a judicial officer. This would lead a reasonable observer to question the

---

[13] 23 out of 46.
[14] See cases identified by an "*" in Chart 1.
[15] Case #18, Case #26 & Case 33 (involving a police dispatcher convicted of theft related crimes).
[16] Case #18.

potential truthfulness and integrity of these officers in the long-term. As previously noted, the Director did not document any specific mitigating evidence in any of these cases to explain why he chose to impose discipline less than termination.

> As we noted in our February 8, 2019 memorandum:

> Any failure on the part of a police agency to systemically and critically evaluate the impact of retaining an officer with integrity issues has the potential to not only negatively impact the agency's ability to investigate and prosecute criminal activity, but also has the potential to negatively impact the public's perception of the agency and ultimately the community's willingness to support the police department in its important work of maintaining public safety.

In the latter part of 2019, the City proposed and the Court approved an amendment to CDP's disciplinary matrix[17] which allows for the "presumptive termination" of an officer who has been sustained for making a false report or statement, untruthfulness or dishonesty. If the new Director of Public Safety follows the requirements of the new matrix, the CDP may have the opportunity to reach compliance in this area.

**Finding #4: In order to come into compliance, the CDP must identify those officers who have been sustained, but not been terminated, for integrity-related violations; confer with the appropriate prosecutorial agencies; and develop and implement a plan to mitigate future potential harm to prosecutions of criminal cases, the administration of justice, and to protect public safety.[18]**

In our February 8, 2019 memorandum, the Monitoring Team addressed the negative implications of a sustained finding for an integrity violation and its impact on the effective delivery of police services:

> When a police agency concludes that an officer has intentionally and deliberately lied about a material fact in an official capacity, any decision to impose discipline less than termination has the potential to cause operational challenges for the agency. The police agency has a responsibility to advise and confer with

---

[17] Dkt. 277, approved 8/27/19.

[18] The City has represented that it refers all sustained findings of discipline to the County Prosecutor's Office, including integrity-related cases, and that it has established clear internal protocols to ensure this occurs. There is a continuing question, however, as to what actions, if any, the Division takes to ensure that officers who are identified as having credibility issues by City or County prosecutors received appropriate assignments within in the Division.

prosecutors to determine to what extent the misconduct may be disclosable and what impact it may have on future criminal cases in which the subject officer may become involved. All of this may impact an officer's ability to fulfill his or her role as a police officer given that, as a condition of employment, an officer is expected to be able to gather and collect evidence and testify in court.

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, prosecutors have a constitutional duty to disclose to a criminal defendant any favorable, material evidence known to the prosecution team. Favorable evidence has been defined to include any evidence that would potentially help the defense because it is "exculpatory" or because it tends to impeach a material witness and is significant enough to create "a reasonable probability" of a different outcome if it is disclosed. *United States v. Bagley*, 473 U.S. 667 (1985). The Supreme Court later held in *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), that "the individual prosecutor has a duty to learn of [and disclose to a defendant] any favorable evidence known to the others acting on the government's behalf in the case, including the police."

As such, prosecutors have a Constitutional obligation to obtain and disclose evidence which tends to impeach any police officer who may be a material witness in a criminal prosecution. Where an officer's testimony is "significant," evidence that the officer has been previously untruthful in an official capacity would potentially be material and disclosable. As noted in the Introduction to this memorandum, the Monitoring Team believes that it will be necessary for the CDP to review all integrity-related cases referenced herein, where the offending officer was not terminated, to establish the impact of the failure to terminate and determine whether current assignments are consistent with the needs of the criminal justice system and public safety.

In the introduction to the Consent Decree, the City affirmed that it is "committed to ensuring that police services in Cleveland are delivered in a manner that is constitutional, effective,

and consistent with community values, while preserving officer and public safety."[19] In order to comply with these aspirations, the CDP must design and implement a plan to appropriately assign officers whose disciplinary background could negatively impact the Division's ability to support criminal prosecutions—and have a direct impact on the fairness and integrity of the criminal justice system and safety of the public.

**Finding #5: The Department is not in compliance with respect to timeliness in the imposition of discipline: specifically, the amount of time it takes to issue discipline after conducting pre-disciplinary should be generally improved.**

The Monitoring Team analyzed all discipline imposed from March 2018 through May, 2020 (as well as all pre-disciplinary hearings conducted during that period) to determine how long it takes the Director to impose discipline after having conducted a pre-disciplinary hearing.[20] As of June 1, 2020, there were four cases involving seven officers where pre-disciplinary hearings had been conducted but discipline not yet imposed.[21]

The Monitoring Team found that the average (mean) number of days for the Director to impose discipline on the officers who had pre-disciplinary hearings and findings letters delivered during the period of the review was 36.75 days.[22] Cases ranged from one case being completed in one day to one case that took 258 days to complete.

Overall, the average number of days to impose discipline (as well as the number of cases where the delays exceeded the average) is excessive, which compromises the legitimacy perceived by officers and undermines the objectives of the imposition of discipline to control officer conduct.

---

[19] Dkt. 7-1, Introduction, p. 1.
[20] The Monitoring Team did not include five cases involving 15 police recruits in the population of cases considered as those cases involved a unique set of facts and a unique resolution process.
[21] In two of those cases, pre-disciplinary hearings were conducted more than 6 months prior to the writing of this report.
[22] Eight of the officers waived their pre-disciplinary hearings; as such, those cases are not included in the population evaluated for timeliness between pre-disciplinary hearings and the imposition of discipline.

The Monitoring Team believes that it should reasonably take no more than 30 days for the Director to make a disciplinary decision and impose that discipline upon a subject officer.



III.     **THE FACTS OF THE CASES REVIEWED GENERALLY DO NOT APPEAR TO SUPPORT THE IMPOSITION OF MITIGATED DISCIPLINE AS IMPOSED BY THE DIRECTOR OF PUBLIC SAFETY.**

The remainder of this memorandum summarizes the Monitoring Team's specific findings and conclusions relating to the review of the cases noted above. Although the amended Disciplinary Matrix promises a greater likelihood of compliance, at least with respect to integrity-related cases, going forward, the issues raised by these cases suggest that substantial progress must still be made by the City to achieve compliance with the Settlement Agreement with respect to accountability, transparency, and officer discipline. The Monitoring Team will be required to conduct additional reviews of discipline cases in 2020 and beyond before it can report to the Court whether compliance has been achieved across a material number of cases, span of time, and involved officers.

Attached to the memorandum are copies of the relevant versions of the Disciplinary Matrices in place at the time that the Director considered the respective cases that were reviewed by the Monitoring Team:

   A.  General Police Order 1.11.1 (Disciplinary Guidance) (effective 1/1/14) (Attachment A)
   B.  General Police Order 1.11.1 (Disciplinary Guidance) (effective 1/1/18) and Group Violation Chart (12/5/17). (Attachment B)

C. General Police Order 1.11.1 (Disciplinary Guidance) (effective 8/12/19) (Attachment C)

The cases below are presented in chronological order (based on dates of issuance of each disciplinary letter) rather than based on gravity or relative significance. The occurrence of particularly stark fact patterns throughout the time period considered should be noted.[23]

**Case No. 1:**

A CDP Commander and two police Sergeants were sustained for neglect of duty after one of the Sergeants, while working as a Detective, failed to conduct timely investigations of 60 sex crimes cases.[24] The then-Detective's supervising Sergeant was sustained for knowingly allowing the Detective to take the cases with him when he was promoted and transferred from the Sex Crimes Unit and failing to take appropriate action to recover the case files. The Commander was sustained for knowingly allowing the newly-appointed Sergeant to take the cases with him to his new assignment, for failing to follow-up on the status of those cases, and for failing to notify the Sergeant's new chain-of-command.

On March 12, 2018, the Director of Public Safety demoted the Commander to the lesser rank of Captain, suspended the Supervising Sergeant for 15-days without pay, and demoted the newly appointed Sergeant back to Patrol Officer. Justification for the sustaining of the findings was contained in letters to the involved officers. Aggravating factors were noted, including "repeated violations over an extended period of time," and the "potential serious impact upon victims, citizens and other non-police individuals." With respect to the Commander, a letter noted

---

[23] Appendix 1 (page 64) summarizes the Monitoring Team's conclusions with respect to our case evaluations on a case-by-case basis.

[24] It was specifically alleged that from January 1, 2014 to June 2015, while assigned as a Detective in the Sex Crimes Unit, the Detective failed to property investigate sixty (60) 2014 sex crime cases assigned to him for investigation. It was further alleged that on June 27, 2015, he took those cases with him to his new assignment and failed to conduct any additional investigation from that date through March 9, 2016.

that he had previously been issued a written reprimand for allowing an employee under his command to mismanage investigations.

Although the discipline imposed on the supervising Sergeant was within the range permitted by the then-existing Disciplinary Matrix (See, Attachment "A"), the existence of unaddressed aggravating factors begs the question of why the discipline ultimately imposed was on the low side of the discipline permitted. The case involved a gross neglect of duty with the aggravating factors cited above. As such, the Matrix called for from a minimum 10-day suspension, "up to a 30-day suspension without pay, demotion or termination."

This case also involved a Detective who had been recently promoted to Sergeant and while the decision of the Director of Public Safety to demote the Sergeant to the rank of Patrol Officer was consistent with the Disciplinary Matrix, it was simply a remedial action, not additional discipline. The disciplinary letter specifically noted that the Sergeant "engaged in this course of misconduct before, and while you were being considered for promotion to your current rank of Sergeant." The discipline letter further noted that had this information been made known to the Director when he approved his promotion, "it would have been material information in making [the] promotion decision.".

## Case No. 2:

On November 13, 2014, two officers – a field training officer and a probationer – failed to request emergency medical service (EMS) assistance for a female experiencing a mental health crisis who appeared to lose consciousness while being restrained by the officers. EMS was only requested upon the arrival of a supervisor to the scene. The female later died and the manner of death was deemed to be a homicide, with the female's restraint in a prone position identified as a contributing factor in the death.

In disciplinary letters dated March 12, 2018, the Field Training Officer received a 10-day suspension; the probationer received a Written Reprimand. Although the Director recognized that the specifications needed to be classified as a Category III violation, the 10-day suspension imposed on the Field Training Officer was at the low end of the Matrix for a first offense, Group III violation where there are no aggravating factors present.

It is entirely unclear how in this case, which involved an actual in-custody death, the woman's death would not be considered to be an aggravating factor. Given the violation was a Group III violation, the penalty imposed was, in fact, the minimum penalty permitted. For the probationary officer, the Director downgraded the Offense to a Group 1 and issued a written reprimand.  Although the officer's probationary status may have been a mitigating factor for consideration in determining the appropriate discipline, it was used twice in this case – first to downgrade the incident to a Group I violation and then as mitigation in determining the penalty for the Group 1 offense. That is, the mitigating factor of the probationary officer's lack of experience was used once to make the allegation class less serious under the disciplinary matrix and then yet again to impose less significant discipline within that less-serious offense class. This double counting of mitigating factors is especially questionable where the underlying neglect of duty could reasonably run the risk of injury or death, which did, in fact, occur.

<u>**Case No. 3:**</u>

An officer was sustained for obtaining possession of a vulnerable person's debit card and making an unauthorized withdrawal of $403.50 on July 31, 2015. The victim resided at a homeless shelter where the officer worked secondary employment. The officer befriended the victim and assisted her with her finances. The officer eventually withdrew money from an ATM machine

without the victim's permission and was required to make full restitution prior to the County prosecutor agreeing not to file criminal charges.

The officer was given a 15-day suspension. The incident was classified as a "Group III offense, first offense," with no active discipline history. The suspension was given as part of a plea agreement between the Director and the subject officer, who agreed not to appeal the decision.

The imposed discipline was not consistent with the Disciplinary Matrix in place at the time of the decision. The matrix called for discipline of 10 to 30 days for first time Group III violations where there was no prior disciplinary history. As such, the 15-day suspension imposed fell at the lower end of the range for a first-time Group III violation. However, aggravating factors were clearly present: the officer inappropriately took responsibility for a particularly vulnerable person, and the payment of restitution could have been considered indicative of guilt of a criminal theft. At the least, those aggravating factors needed to be addressed when imposing discipline at the lower range of the Matrix. However, this violation could also have been fairly determined to be an offense involving gross immorality, which requires either a suspension of 30 days or termination under the Matrix.

Because the officer was sustained for taking money without authorization as part of an inappropriate relationship with a vulnerable person befriended during secondary employment and because of the possible *Brady* implications – given that theft is commonly considered a crime of moral turpitude – at the very least, a thoughtful explanation of why the Matrix was not used to impose either the maximum suspension in lieu of termination or termination was required. However, the Director of Public Safety provided no rationale, justification, or explanation for making the discipline determination. Therefore, the Director and City cannot demonstrate that the

imposed discipline was fairly based on the nature of the allegations, the content of the underlying investigation, and a fair weighing of the mitigating and aggravating factors identified.

**Case No. 4:**

On June 13, 2017, the subject officer failed to enter an arrestee's identification card that had been identified as contaminated with drug residue into evidence. This resulted in the exposure and hospitalization of another officer. On September 15, 2017, the subject officer, while off duty, was the subject of a domestic violence complaint. He was found to have been insubordinate to a superior officer, disturbed the peace, and refused to properly identify himself. On October 6, 2017, the subject officer was arrested, while off duty, for operating a vehicle while intoxicated (OVI) and for failure to secure his service weapon. The next day, shortly after being released from custody, the officer was cited for driving while under suspension and speeding.

During the course of his interview with Internal Affairs and at his pre-disciplinary hearing, the officer expressed remorse and indicated that "alcohol is a problem for me." He stated that he had stopped drinking and, as a result, "things have been going a lot smoother." The officer denied knowing that his license was immediately suspended after he failed his breath test and was arrested for OVI.

The Director of Public Safety imposed a suspension of 18 days without pay pursuant to a plea agreement with the officer, who agreed not to appeal the discipline and to cooperate with two unannounced drug tests to be administered by the City, "on a date and time solely determined by the City." As per the discipline letter, issued on March 29, 2018, the discipline imposed was identified as being imposed as a "Group III offense, first offense, multiple offenses."

The Discipline Matrix called for a minimum suspension of 10 days and up to a 30-day suspension for a first-time Group III violation with no prior discipline. The 18-day suspension that was imposed was within the range permitted by the Matrix, but the proof of guilt in this case was

compelling, and there were multiple aggravating circumstances, including numerous serious criminal violations across the span of several months that remained unaddressed. Although the officer fairly recognized he had problems with alcohol and claimed to have stopped drinking, there was no indication in the Internal Affairs file that he provided any proof of a substance abuse treatment. Additionally, although the officer agreed to two unannounced alcohol tests, there was no provision put into place for the officer to be disciplined if, in fact, he tested positive for the use of alcohol.

**Case No. 5:**

On October 3, 2017, an off-duty CDP officer was arrested by a suburban police department for domestic violence. On November 7, 2017, the officer pleaded guilty to the misdemeanor offense of disorderly conduct. According to the Internal Affairs investigative report, the victim alleged to responding officers that the off-duty CDP officer choked her, "slammed her against his vehicle on multiple occasions," "pulled on her (via a book bag)," smashed her cell phone, and threw her keys.[25] The victim was treated at a hospital the next day for "a sprained wrist."[26] During his interview with Internal Affairs on November 25, 2017, the officer denied assaulting his girlfriend but admitted to lying to a responding officer when he told the officer that he and his girlfriend had just been arguing.[27]

The Director of Public Safety entered into a plea agreement with the officer wherein the Director found the officer "guilty" of being convicted of a domestic violence related disorderly conduct charge and lying to responding police officers. According to his findings letter, dated April

---

[25] IAU Investigative Summary (dated November 16, 2017), at p. 2.
[26] *Id*.
[27] *Id*.

10, 2018, the Director determined that the officer had committed a first-time Group III violation with a "prior discipline history." The officer was suspended for 14 days without pay.

The prior discipline referenced in the findings letter involved an incident wherein the officer was sustained on findings related to having conducted an improper computer search on the domestic violence victim's boyfriend. In fact, at the time of the domestic violence incident, the officer was serving a six-day suspension for the improper computer search violation.[28]

The discipline imposed was at the low end of the disciplinary matrix, which allowed for a suspension of 10 to 30-days or demotion or termination for a first time Group III violation involving a "criminal law offense." There was no explanation why, given that this incident took place while the officer was serving his suspension for a prior offense relating to his domestic relationship, such an aggravating factor would not have warranted discipline at the higher range of the Matrix. Further, the officer's failure to cooperate with responding officers by lying about the circumstances of his contact with the victim would appear to have warranted serious consideration, in writing as part of the decision, whether termination of the officer's employment as a peace officer was appropriate.

**Case No. 6:**

Between 2016 and July 23, 2017, a CDP officer worked without Division authorization, in uniform, providing security (also known as "secondary employment") at a bar located in the City of Cleveland. On July 23, 2017, the officer used force to intervene in a bar fight, while in uniform, and subsequently lied to responding CDP officers about working at the bar, using force, or being involved in breaking up the bar fight. The officer also requested that the bar owner decline to turn

---

[28] IAU Investigative Summary (dated November 16, 2017), at p. 3; Disciplinary Letter issued to Officer by Chief Williams, dated September 27, 2017 ("Group II offense, first offense: mitigating factors: no previous active discipline history"), p. 2 of 3.

over video of the fight to CDP officers investigating the fight. Based on the facts available in the case file, this appears to have been in an attempt to avoid supervisors from becoming aware he was working at the bar without authorization and had engaged in a use-of-force while in uniform. On September 17, 2017, the officer was criminally charged with three offenses: Falsification (CCO 615.02), a misdemeanor of the first degree, Obstructing Official Business (CCO 615.06), a misdemeanor of the first degree, and Dereliction of Duty (CCO 615.12), a misdemeanor of the second degree. On January 4, 2018, the officer entered the Cleveland Municipal Court's "Selective Intervention Program."[29]

The Director of Public Safety entered into a plea agreement with the officer wherein he found the officer "guilty" of working secondary employment without authorization; failing to report a use-of-force; being untruthful in verbal statements to a supervisor regarding his secondary employment and his involvement in a use-of-force; attempting to prevent video evidence from being turned over to investigating Detectives "with the intent of concealing the fact that you were working unauthorized secondary employment;" and being criminally charged for his conduct. According to his findings letter, dated March 22, 2018, the Director determined that the officer had committed a first time Group III violation with a "no active discipline." He imposed discipline in the form of a 23-day suspension without pay.

Under the Matrix in existence at the time of the officer's false statements in 2017, a first-time Group III violation involving "criminal law offenses" called for a 10- to 30-day suspension without pay, demotion, or termination. As such, the discipline was in the mid-to-high range.

---

[29] According to the Cleveland Municipal Court, the "Selective Intervention Program (SIP), which started in 1984, is a diversionary program for criminal defendants with no prior criminal record or pending criminal cases. It was designed to keep first offenders from being fully immersed into the criminal justice system." *See* Cleveland Municipal Court, Selective Intervention Program, https://clevelandmunicipalcourt.org/judicial-services/court-programs-services/selective-intervention-program.

The circumstances of the officer's deception in this case rose to the level that he was charged with three misdemeanor violations calling into question his integrity. Although it would be possible for the Director to conclude that the officer's conduct was mitigated by the fact that he was eventually truthful with Internal Affairs and his supervisors, it is equally plausible that the officer ultimately had no choice but to come forward once the owner of the bar turned over video evidence that conclusively established that the officer was lying.

Regardless, it seems clear that the officer's conduct would result in him being classified as a "*Brady* officer" whose future testimony in court can be readily impeached by his past misconduct. As such, the Director's decision should have addressed why termination was not the appropriate remedy, where there were no concerns regarding the level of proof.

**Case No. 7:**

A Sergeant was sustained for failing to complete four injury packets for officers under his command, involving two separate incidents on August 17, 2017 and September 15, 2017. The Sergeant was suspended for 14 days, based primarily on his prior disciplinary history. Specifically, the Sergeant had four cases of active prior discipline: a 7-day suspension for failing to investigate allegations against a police officer for domestic violence against a police officer or notify Internal Affairs (2016 incident); a 3-day suspension for being late reporting for duty and failing to notify anyone he would be late (2016 incident); a 4-day suspension for creating and distributing a flier offering an award for the officer who issued the most citations during a three-day period (2015 incident); and a 6-day suspension for failing to submit use of force reviews in a similar manner (2015 incident).

Although the discipline letter indicated that the Director considered the violation to be a Group III offense with aggravating factors — "active discipline history, three or more sustained

violations in a lower category occurring within two years of the first violation" which "automatically progresses the discipline into the next higher group"— there was no other rationale provided to explain why a 14-day suspension was issued versus some other number within the permissible range. Given the administrative nature of the sustained charges, the discipline imposed in this case appeared to be reasonable and within the expectations of the Disciplinary Matrix as it existed in 2017 – but the lack of a clear explanation by the Director as to the rationale for the discipline decision is nonetheless problematic.

**Case No. 8:**

A Sergeant was sustained for multiple violations: on January 29, 2017, the officer, while off duty, entered the marked zone car of another Sergeant while in the possession of an open container of alcohol (beer); the Sergeant failed to timely complete two investigations involving subordinate officers' use of force and damage to a zone car assigned to him on September 2, 2017 and failed to take photographs of the damage to the zone car; on September 2, 2017, the Sergeant improperly ordered officers to turn off their Wearable Camera Systems to purportedly conduct an administrative review of the officers and subsequently acted in an unprofessional manner; and on September 11, 2017, the Sergeant, while off duty, was arrested for (and later convicted of) Operating a Vehicle Under the Influence (OVI).

The Director of Public Safety imposed an 11-day suspension on the officer. According to the discipline letter, dated April 6, 2018, the Director classified the violations as "Group III, first offense, no active discipline." The discipline imposed was at the low end of the 10 to 30-day range permitted by the disciplinary matrix in 2017.

However, there were multiple aggravating factors present, related to both on-duty misconduct and off-duty misconduct. The OVI arrest involved the Sergeant "swerving and

weaving all over the road" before crashing his vehicle for no apparent reason other than a high level of intoxication. The Sergeant also refused to submit to chemical or breath testing and refused to answer questions posed by the responding officers. He was eventually sentenced to 33 days in jail, with 30 days suspended. The Sergeant offered factors in mitigation at his pre-disciplinary hearing relating to challenges he was facing in his personal life. However, his rank and the significance of the other violations for which he was sustained nonetheless outweighed those mitigating factors. All of these issues should have been addressed by the Director in his decision-making.

**Case No. 9:**

On January 20, 2016, a CDP officer was detained by Las Vegas hotel security for being intoxicated in a public place. The officer was ultimately cited by the Las Vegas Police Department for urinating in public. On January 31, 2016, the officer prepared a Form 1 statement related to the incident that contained false information and attempted to minimize and justify his conduct. The officer was first interviewed by Internal Affairs on June 9, 2016 and subsequently made statements relating to the event during a pre-disciplinary hearing on November 21, 2016.

A new Internal Affairs case was initiated on August 1, 2017 wherein it was alleged that the officer was untruthful on his initial Form-1 statement and at his initial pre-disciplinary hearing. According to the Internal Affairs investigation report, the case was reviewed by the City Prosecutor on August 23, 2017 and the investigator was advised that, although no criminal charges would be filed, "due to [the officer's] dishonesty during an official hearing [the first pre-disciplinary hearing], he would be placed on a *Brady/Giglio* list and his future testimony on any cases and or

citations reviewed by [City Law] would be called into question."[30] The officer was subsequently re-interviewed by Internal Affairs on August 28, 2017.[31]

The Director of Public Safety entered into a plea bargain with the officer finding him guilty of "making false statements as it related to your arrest by the Las Vegas Police Department"; making false statements during the officer's Division Discipline Hearing on November 21, 2016; and documenting "several false statements" on a Division Form 1 report relating to the arrest. According to his findings letter, dated May 8, 2018, he determined that the officer had committed a Group III violation as a first offense "with no active discipline." He imposed discipline in the form of a 15-day suspension without pay.

The Matrix in existence at the time of the officer's false statements in 2017 called for a suspension of 10 to 30-days without pay for a first-time Group III violation."[32] Additionally, an offense involving "gross immorality" or "gross neglect of duty" called for "up to 30-days without pay, demotion [or] termination" under the Matrix. Intentionally false statements made by an officer to the Director of Public Safety or the Chief of Police during the course of a Division Disciplinary Hearing would almost certainly appear to fall within either one or both of those categories.

Given the City Prosecutor's conclusion that the officer's future testimony would be "called into question," in future cases, further explanation of the decision to engage in a plea bargain imposing 50 percent of the minimum discipline called for by the then-existing Disciplinary Matrix was called for. Even if it could be reasonable to conclude that the officer's performance since his

---

[30] Internal Affairs Unit Investigation report, at p. 27.
[31] The Internal Affairs investigator documented several instances where the officer made additional false statements during the course of his re-interview with Internal Affairs. For unknown reasons, however, no specification was put forward by Internal Affairs relating to those false statements (Internal Affairs Unit Investigation report, at pp. 27-29). A reasonable review of the report by the Director, however, would have disclosed the existence of those false statements.
[32] CDP General Police Order 1.11.1 (effective March 1, 2002).

arrest and the IA investigation was a mitigating factor, that needed to be weighed against the fact the officer was found to have lied during the course of a recent Internal Affairs investigation to determine the significance of any such mitigation.

**Case No. 10:**

On October 22, 2016, an off-duty CDP officer committed an assault at a bar on a person who he allegedly recognized as a person who had protested at the Republican National Convention. The officer struck the victim while the victim reportedly stood with his hands either by his side or in his pockets. The victim sustained facial injuries as a result of the assault.

A prosecutor declined to file criminal charges against the officer due to an uncooperative witness and the inability to technically verify the video that was available of the incident.[33] However, the officer was subsequently sustained by CDP's Internal Affairs Unit for: (1) striking the victim without lawful provocation; (2) not notifying a supervisor about the incident; and (3) failing to help the victim obtain medical attention. During his Internal Affairs interview, the officer claimed self-defense and denied knowing the victim from any prior contact. The officer did admit failing to report the incident to the CDP or a supervisor.

The Director of Public Safety entered into a plea bargain with the officer and imposed a 15-day suspension, finding in a May 11, 2018 discipline letter that the violation was a "Group III offense, first offense, no active discipline." It was noted that the officer agreed not to grieve the penalty.

In imposing discipline in this case, the Director failed to address the serious nature of the underlying offense and the officer's attempt to cover-up his misconduct by lying to Internal

---

[33] According to the Internal Affairs file, the available video evidence was a video made of the original video playing on a screen. By the time a video specialist was brought in to recover the original evidence, it had been recorded over and was no longer available. The prosecutor advised Internal Affairs that the violations should be handled administratively (Internal Affairs investigation report, p. 5).

Affairs. Where, as here, a suspension was imposed in lieu of termination, a clear explanation of why the Director did not exercise the option to terminate the officer for acts of dishonesty was required.

**Case No. 11:**

On February 8, 2016, a CDP officer responded to a domestic disturbance call. As a result of a citizen complaint, the Police Review Board (PRB) found that the officer had failed to deploy her Wearable Camera System in "event mode," as required, prior to the incident and violated CDP policy by failing to verify with dispatch the validity of a protective order and threatening to arrest the complainant without appropriate cause. In fact, the complainant had not yet been served with the order; even so, the officer threatened to arrest the complainant when she did not want to leave the area (outside of her ex-boyfriend's house) without her property.

The officer entered "no contest" pleas to the allegations that were sustained by the PRB and waived a pre-disciplinary hearing. The Director of Public Safety subsequently imposed a 12-day suspension.  His findings letter dated May 15, 2018 found that the violation was a "Group II offense, three or more sustained violations in a lower category occurring within two years of the first sustained violation automatically progresses the discipline into the next higher group."[34]

The Discipline Matrix in place at the time of the incident called for a suspension of between 10 to 30 days for a Group III violation. The imposition of a 12-day suspension was consistent with the expectations of the matrix.

However, due to the failure of the Director to document any rationale for his decision-making, outside of the conclusory comment noted above contained in the suspension letter, it is

---

[34] Although the PRB found the "unprofessional conduct" and "improper procedure" violations to be "Group II" violations, the Director found that the officer's prior disciplinary history justified increasing the violations to "Group III" offenses.

unknown why a 12-day suspension was chosen (as opposed to any other disciplinary choice between 10 and 30 days).

**Case No. 12:**

On November 14, 2017, a CPD Sergeant responded to a traffic stop involving an off-duty police officer who was operating a motor vehicle while intoxicated (OVI). After the completion of an Internal Affairs investigation, the sergeant was sustained by the CDP chain of command for: (1) failing to properly investigate and arrest an OVI offender (an off-duty CDP officer); (2) failing to supervise his subordinates by ensuring compliance with the Wearable Camera System (WCS) policy; (3) failing to notify Internal Affairs of the incident,; and (4) being untruthful when he reported that the incident involved a medical emergency as opposed to an OVI to both dispatchers and supervisors.

The Director entered into a plea bargain with the officer and imposed a 15-day suspension, finding in a May 28, 2018 discipline letter that the violation was a "Group III offense, first offense, no active discipline." The officer agreed not to grieve the penalty. For reasons that were neither documented nor explained, the Director dismissed the specification alleging that the Sergeant was untruthful when he reported the incident as having been a medical emergency.

The discipline imposed was not in accordance with the requirements of the Disciplinary Matrix. It appears that this case involved a "gross neglect of duty" that called for a penalty in the higher range of the Matrix or demotion from the rank of Sergeant.

In this case, the Sergeant attempted to cover-up an OVI involving an off-duty officer, who was found slumped in the driver's seat of his vehicle, with his CPD issued service weapon and his police uniform in his vehicle. Although, according to the Internal Affairs Unit investigation report, the case against the Sergeant was presented to a prosecutor for Obstructing Official Business and

declined for "insufficient evidence," the Monitoring Team could find no reason why that criminal charge should not have been administratively sustained. Based on the officer's admission of guilt, the appropriate *minimum* penalty that should have been imposed in this case was a 30-day suspension.  However, given the sustained allegations that the Sergeant attempted to cover-up the criminal acts of a subordinate, the decision not to terminate the Sergeant's employment should have been explained and justified.

**<u>Case No. 13:</u>**

A Detective and his supervising Sergeant were assigned to the Sex Crimes Division. Between 2014 and 2017, the Detective failed to timely process 188 sexual assault kits and was found to be "deceptive" on December 13, 2016 for failing to disclose the backlogged case investigations to his supervisors. The Detective was also sustained for failing to turn in a report on the status of the cases in a timely manner on April 13, 2017 after being ordered to do so. The supervising Sergeant was sustained for failing to appropriately supervise the Detective.

The case was fully adjudicated with no plea agreement reached. The Detective received a 25-day suspension. At his pre-disciplinary hearing, he testified that he was overwhelmed by his caseload and was being required to do a job that actually required multiple people. There was no evidence, however, that the Detective advised his supervisors of the growing backlog, and he provided no explanation for not having done so. Although the Disciplinary Matrix called for a 10- to 30-day suspension, demotion, or termination for a first Group III offense involving "gross neglect of duty," there was no explanation for the suspension was issued, especially given the substantial impact on public safety that the backlog of cases caused.[35]

---

[35] The August 1, 2018 discipline letter showed the subject officer as having the rank of "Detective." A review of the IA Pro database on July 8, 2019, however, shows the officer's current rank as: "Patrol Officer." As such, the Monitoring Team has assumed that even though the discipline letter did not reference a demotion, the officer is no longer serving at the Detective rank.

The supervising Sergeant received a 10-day suspension as part of a plea agreement with the Director of Public Safety. No rationale was provided by the Director in either the suspension letter or in any other document available. The evidence tends to establish that the violation was a "gross neglect of duty" that exposed the public to undue risk that sex offenders would be allowed to re-offend due to police inaction in detecting and stopping their offending behavior. As such, the decision needed to take into account significant aggravating factors.

**Case No. 14:**

On May 18, 2018, a police dispatcher tested positive for use of marijuana after a random drug test. Pursuant to a plea agreement with the Director of Public Safety, the dispatcher received a 3-day suspension without pay and was required to sign a "Last Chance Agreement."

The discipline appears to have been inconsistent with the Matrix adopted in 2018. While a police officer may receive a 3-day suspension and a "Last Chance Agreement" for a first-time positive test for alcohol, (*see* GPO 1.1.11 – Revised 1/1/18, at I.A.2 & I.A.3), there is no similar provision in the Matrix for an employee who tests positive for drugs. Instead, the "failure of a random drug test" is classified by the Matrix as a Group III violation requiring a minimum 10-day suspension for a first-time Group III violation where mitigating factors outweigh aggravating factors or there are no aggravating factors present. As such, if an officer's acceptance of responsibility is a mitigating factor and no other aggravating factors were present, the minimum possible penalty permitted by the Disciplinary Matrix would be a 10-day suspension without pay. (Attachment B, Group III(a)).

**Case No. 15:**

On March 4, 2017, a CDP officer's foot was injured while taking a man into custody who was either under the influence of drugs or suffering from a mental health crisis. Officer #1 was

found guilty of withholding information from supervisors and in written reports relating to how he was actually injured.[36] The officer was also found guilty of withholding information from Internal Affairs during a February 22, 2018 interview. Finally, the officer was found guilty of multiple additional violations, including using and failing to report the use of an out-of-policy force option (a "leg lock"), failing to report an injury suffered by the arrestee, and using demeaning language. The officer was also sustained for separate incidents involving engaging in a vehicular pursuit, failing to engage his Wearable Camera System, and failing to report it to a supervisor; leaking information to the media on multiple occasions; and creating offensive "memes" which demeaned another officer.

Officer #2 was found guilty of withholding information from supervisors and in written reports relating to how Officer #1 was injured and failing to report or notify supervisors of a known unreported force option and injury to the arrestee.

Officer #3 was found guilty of withholding information from supervisors and in written reports relating to how Officer #1 was injured.

In addition, the County Prosecutor, after reviewing the case against the officers, notified the CDP that both Officer #1 and Officer #2 were being classified as "*Brady* officers," meaning

---

[36] The officer reported that the arrestee kicked him and broke his toe while the officer was attempting to detain him. The Internal Affairs investigation determined that it was more likely that the officer's toe was broken when another officer threw a piece of furniture out of a closet during the struggle.  An extensive review of the Internal Affairs file was conducted by the Monitoring Team which led to the conclusion that the decision by the Director to dismiss allegations that Officer #1 was intentionally deceptive in his reporting and in his interview with Internal Affairs was unreasonable.  In addition, Officer #1's actions resulted in what amounted to the unlawful incarceration of the arrestee for a period of over 8 months on a felony charge of assaulting a police officer.  A report relating to this unreasonable decision-making was held in abeyance by the Monitoring Team pending a review of the case by federal prosecutors. That report is now attached as "Addendum A" to this Memorandum.

that the County Prosecutor is obligated to disclose to future defendants the integrity issues identified as a result of the case investigation. [37]

As a direct result of the officers' misconduct, the arrestee was inappropriately held in custody for a period of 8 months on a felony charge of assault on a police officer – which he did not commit.[38] In addition, the City became subject to civil liability, in the form of both compensatory and punitive damages, as the result of the filing of a lawsuit against the City by the arrestee.

The Director engaged in a plea bargain with the involved officers and in discipline letters dated August 14, 2018, imposed discipline as follows:

Officer #1: received a 30-day suspension (Group III offense, first offense).[39]

Officer #2: received a 12-day suspension (Group III offense, first offense).[40]

Officer #3: received an 8-day suspension (Group II offense, first offense).[41]

The aggravating factors with respect to Officer #1 were numerous and the officer was found guilty of 16 separate administrative violations. The Director did not address the substantial aggravating factors, the fact that the 2014 and 2018 Matrixes[42] permitted Officer #1 to be terminated, and that the County Prosecutor had indicated a lack of faith in Officer #1's credibility.

---

[37] Due to the extraordinary nature of the misconduct underlying this case, the Monitoring Team conducted a comprehensive and extensive review of this case and prepared an audit report which findings were shared with the City in January 2019. **That final audit report is attached hereto as Addendum A.**

[38] The Monitor notes that the defendant was also held in custody on another unrelated offense that took place before this incident. Therefore, it is unknown exactly to what extent the officers' misconduct in this case resulted in additional custodial time for the arrestee.

[39] The Matrix permitted a suspension of up to 30 days without pay for a first time Group III violation where "Mitigating factors outweigh aggravating factors or [there are] no aggravating factors present;" (Attachment B, Group III(a)) and permitted a 13 to 30-day suspension without pay and/or demotion or termination where the "Aggravating factors outweigh any mitigating factors or where there are no mitigating factors present" (Attachment B, Group III(b)).

[40] The Matrix permitted a suspension of 10 to 30 days without pay for a first time Group III violation where "Mitigating factors outweigh aggravating factors or [there are] no aggravating factors present." *Id*.

[41] The Matrix permitted a suspension of 7 to 8 days for a first time Group II violation where "Aggravating factors outweigh any mitigating factors or no mitigating factors [are] present" (Attachment B, Group II(b)).

[42] The initial incident took place in 2017, while the 2014 Matrix was in effect; Officer #1's interview with Internal Affairs took place after the 2018 Matrix took effect.

Even setting aside the Monitoring Team's conclusion that the Director unreasonably failed to sustain Officer #1 for intentionally lying, the imposition of a 30-day suspension in this case was not addressed by the Director in light of the magnitude of the misconduct and the County Prosecutor's determination with respect to the officer's integrity.

Pursuant to the 2014 Matrix, in place at the time of Officer #2's misconduct, the imposition of a 12-day suspension for Officer #2's first time Group III violation was at the low end of the 10- to 30-day suspension range permitted for any first-offense Group III violation. The Matrix also permitted termination for first-time Group III violations involving "gross neglect of duty" and "gross immorality offenses." In this case, where Officer #2 had been designated a "*Brady* officer" by the County Prosecutor and where the ultimate result of the officers having withheld the information about how Officer #1 sustained his injuries was a pending false and serious felony charge against the arrestee, once again, the Director failed to address significant issues regarding the officer's misconduct.

Officer #3 was found guilty of a first-time Group II violation. In this case, the Director found that the officer intentionally withheld information that could have exonerated a person in custody. To suggest that such a violation was not either a "neglect of duty" or a false report, warranting a Group III classification, appears to ignore the facts of the case and was wholly inexplicable.

### Case No. 16:

On the night of December 25, 2017, an off-duty CDP officer was involved in a hit-and-run accident. The occupants of the parked vehicle indicated that they spoke to the officer, who appeared to be under the influence of alcohol, and that she left without exchanging information or waiting for a police response. In addition, the officer failed to contact the Communication Control

Section to request a supervisor, as required by CDP policy. When officers appeared at her home, she failed to respond and instead called her union representative the next morning, indicating that she knew that she was under investigation. The officer was interviewed by Internal Affairs on April 19, 2018.

Command staff concluded that the officer lied to Internal Affairs regarding several material facts.  Specifically, she falsely claimed that the vehicle she struck was unoccupied when she struck it and then subsequently claimed she did not remember whether the vehicle was occupied.  She also claimed that she never spoke to the occupants of the vehicle.[43]

The Director of Public Safety found the officer "guilty" of engaging in a hit and run with alcohol being involved, failing to contact a supervisor and being untruthful during her Internal Affairs interview. According to the findings letter, dated October 10, 2018, the Director determined that the officer had committed a Group III violation as a first offense. The Director imposed discipline in the form of an 18-day suspension without pay, which is the discipline permitted by the Matrix for a "First Group III Violation" (Attachment B, Group III(a) & Group III(b)). The findings letter did not indicate any consideration of aggravating or mitigating factors, although there appear to have been substantial aggravating factors present in this case. [44] The officer either drove while intoxicated to such a degree that she did not remember that the vehicle she struck was occupied and that she spoke with the occupants (a significant factor in aggravation) or, otherwise, she intentionally and deliberately left the scene to avoid being arrested for operating a vehicle while intoxicated and causing an accident. She then avoided accountability by not

---

[43] The sustained finding for lying to Internal Affairs after the implementation of the 2018 Matrix required the Director to consider his disciplinary decision in accord with that rules of the updated Matrix.
[44] The Matrix permitted a suspension of 10 to 30 days for a first time Group III violation where "Mitigating factors outweigh aggravating factors or [there are] no aggravating factors present; the Matrix permitted a suspension of 13 to 30 days without pay and/or demotion or termination for a first time Group III violation where the "Aggravating factors outweigh any mitigating factors or where there are no mitigating factors present."

communicating with officers who responded to her home. She also lied about the events to Internal Affairs. Further, given the overall circumstances of the incident, and in the absence of any documented rationale discipline decision, there is an open question why the suspension was on the low end of the 13 to 30-day suspension or why termination wasn't considered, which would have been permitted by the Matrix (Attachment B, Group III(b)).

**Case No. 17:**

On March 5, 2018, a CDP officer appeared in civil court while on duty and in uniform on a personal dispute in which he had been sued as the defendant. He made that appearance without notice to or the permission of a CDP supervisor. The officer was ultimately held in contempt of court for lying to the presiding judge about his previously stated excuse for a continuation of his trial date, as the officer had falsely informed the judge that his mother had been rushed to the hospital on the day set for trial. The officer was fined $1,000 by the court for his deception. The judge filed a complaint with the CDP regarding the officer's conduct.

The Director of Public Safety found the officer "guilty" of being held in contempt of court, being untruthful in court, using a CDP vehicle to attend a court appearance on a personal matter, and leaving his assignment without permission from a supervisor. According to the findings letter, dated October 10, 2018, the Director determined that the officer had committed a Group III violation as a second offense. He imposed discipline in the form of a 21-day suspension without pay, and imposed an additional 4-day suspension "from previous discipline imposed on September 19, 2016."[45]

---

[45] The Matrix permitted a suspension of 15 to 30 days and/or demotion or termination for a second time Group III violations where "Mitigating factors outweigh aggravating factors or [there are] no aggravating factors present" (Attachment B, Group III(f)); the Matrix permits a suspension of 18 to 30 days without pay and/or demotion or termination for a second time Group III violation where the "Aggravating factors outweigh any mitigating factors or where there are no mitigating factors present" (Attachment B, Group III(g)); the Matrix permitted a "rebuttable presumption of termination" where the violation involves "gross immorality violations" or "gross neglect of duty" (Attachment B, Group III(h)).

The prior offense involved an incident wherein the officer was found guilty by the Director of "being uncooperative, argumentative, and unprofessional" with another jurisdiction in the investigation of an off-duty traffic collision. The subject officer had attempted in that earlier matter to use his position as a police officer "to influence the complainant not to file [a] complaint. . . or to seek law enforcement action."[46] The officer was given a 10-day suspension ("Group III offense") with four days "held in abeyance until August 29, 2018."

This case had many aggravating factors that were not fully addressed. A judicial officer had already expressly concluded that the officer, who had previously been disciplined for attempting to use his position for personal gain, had lied about a medical emergency involving the officer's mother – and the court was sufficiently aggrieved that it had in fact both fined the officer and gone so far as to complain directly to the Division about the untruthfulness. The officer's conduct in this case appears to constitute of a Group III violation (conduct which "involves any act which demonstrates a serious lack of the integrity, ethics or character related to an officer's fitness to hold the position of police officer; or involves egregious misconduct substantially contrary to the standards of conduct reasonably expected of one whose sworn duty is to uphold the law"), (Attachment A, definition of Group III violation), and therefore the decision not to use a higher level of discipline, including termination, should have been explained by the Director.

**Case No. 18:**

On December 20, 2017, an off-duty Detective was arrested for operating a vehicle while intoxicated. The Detective was convicted of the charge on May 24, 2018. A review of police reports determined that the Detective lied to the arresting officers regarding his possession of a firearm while intoxicated. The Detective had previously entered into a "Last Chance Agreement"

---

[46] Disciplinary Letter issued to Officer by Director McGrath, dated September 16, 2016, pp. 2 & 3.

based on a prior arrest for driving under the influence in 2013, for which he received a 30-day suspension.

Although the Detective was terminated by the Director, the discipline letter did not indicate where the case fell within the Disciplinary Matrix. The absence of that information is unlike almost all other letters reviewed during this audit. A review of the allegations, and consideration of other discipline imposed in 2018 for integrity-related cases, suggests that the Detective was likely terminated for his violation of his "Last Chance Agreement," not for lying to arresting officers. Based on the lack of documentation of any rationale, however, it is unknown to what extent the Detective's untruthfulness with the arresting officers may or may not have impacted the decision to terminate.

**<u>Case No. 19:</u>**

A police Lieutenant was sustained for failing to appropriately supervise a subordinate and correct an officer who conducted an unlawful search of a vehicle on December 18, 2016. The evidence established that the Lieutenant actually instructed the officer to return to the scene after making an arrest to search the vehicle in the garage without the required warrant, consent, or exigent circumstances. The Lieutenant received an 8-day suspension. Pursuant to the suspension letter, dated November 6, 2018, the violation was a Group II, second offense.

The Discipline Matrix called for a suspension of 8 to 10 days. The Director's discipline letter specifically noted that the Lieutenant was "not truthful" when he stated at his pre-disciplinary hearing that "we never got any clarity on if he [the suspect] lived there [at the residence to which the garage was attached] or not." The testimony was contradicted by the fact that the officers spoke to another resident of the home who confirmed that the suspect did, in fact, live with her at the address. However, the Lieutenant was not charged with untruthfulness and the Lieutenant's failure

to be truthful at his pre-disciplinary hearing does not appear to have been considered as an aggravating factor in the Director's decision-making.

**Case No. 20:**

In February 2018, a Detective, while on suspension for prior misconduct, made an inappropriate and insubordinate post on her Facebook account regarding two members of CDP command staff. The Detective was interviewed by the Inspections Unit regarding the posting on two occasions. Command staff concluded that the Detective lied regarding several material facts: (1) she denied that her post had anything to do with the identified members of command staff; (2) she falsely claimed that emoji's she used to identify the members of command staff were not police emoji's, claiming they were "pilot" emoji's; and (3) she falsely claimed that her use of the first name of one of the command officers was as a result of an "auto-correct" error. When confronted with facts establishing that she was being untruthful, the Detective refused to answer numerous of the investigators' questions.

The Director of Public Safety found the Detective "guilty" of being untruthful and insubordinate during her Inspections Unit interview. According to the findings letter, dated November 21, 2018, the Director determined that the Detective had committed a Group III violation.[47] He further noted that this was the Detective's second Group III violation and that she had been previously disciplined for untruthfulness.[48] He imposed discipline in the form of a 25-

---

[47] Defined in the Disciplinary Matrix effective at the time as "conduct that involves a serious abuse or misuse of authority, *unethical behavior*, or *an act that results in an actual or serious and adverse impact on* officer or public safety or to *the professionalism of the Division*. Any violation of law, rule, policy or training which foreseeably results in death or serious physical harm to another person; or *constitutes a willful and wanton disregard of Division values*; or involves *any act which demonstrates a serious lack of the integrity, ethics or character related to an officer's fitness to hold the position of police officer*; or *involves egregious misconduct substantially contrary to the standards of conduct reasonably expected of one whose sworn duty is to uphold the law*; or involves any conduct which constitutes the failure to adhere to any contractual condition of employment or requirement of certification mandated by law." (Emphasis added). (Attachment A, definition of Group III violation).

[48] The Detective had previously received a suspension of 10 days pursuant to a discipline letter dated January 31, 2018. The discipline imposed was based on the Detective's failure to adequately conduct an ongoing homicide

day suspension without pay, which is permitted by the Matrix for a "Second Group III Violation" where "Aggravating factors outweigh any mitigating factors or [there are] no mitigating factors present.[49] The Matrix also provides for "a rebuttable presumption of termination" for "Second Group III Violations" which involve "gross immorality violations" or a "gross neglect of duty" (Attachment B, Group III(h)). The Director, therefore, appears to have implicitly concluded that lying to the Inspection Unit about facts material to an investigation did not necessarily involve a "gross immorality violation" or a "gross neglect of duty," and failed to explain how this officer was deemed to have overcome the presumption of termination.

## Case No. 21:

On October 16, 2018, a police officer tested positive for amphetamines after being required to take a drug test after he backed a zone car into a pole in a police parking lot. The officer pleaded "no contest" to the allegation of a positive drug test. His lawyer suggested that the positive test was the result of the use of Adderall, a prescription drug used to treat ADHD (Attention Deficit Disorder), but offered no evidence of such a prescription or diagnosis. The officer acknowledged participating in the "Ease@work" employee assistance program and agreed to sign a "Last Chance Agreement." The officer claimed that this was "an isolated incident" that would not reoccur.

The Monitoring Team was not provided with any documentation that may have been submitted by the officer or examined by the Director, and no evidence was introduced during the course of the pre-disciplinary hearing. An Internal Affairs Unit investigation report indicated that

---

investigation. One of the sustained allegations was for "falsely document[ing] investigative follow ups with no supporting evidence or documentation to support that any investigative follow up actually occurred." There was no allegation that the Detective lied during the investigation of the allegations and the violation was classified by Chief Williams as a "Group III offense, Neglect of Duty, First Offense, no active discipline history."

[49] The Matrix permitted a suspension of 18 to 30 days without pay and/or demotion or termination in such cases. Attachment B, Group III(g)),

the officer declined to provide a voluntary statement to Internal Affairs, which failed to require the officer to provide a compelled statement, even after criminal charges were declined.

The officer was relieved from duty on October 28, 2018 until the date of the suspension letter, dated November 29, 2018 and received a 10-day suspension. While he was relieved from duty, the officer was required to use "comp," sick and "furlough" time to obtain pay.

As this was a "drug related violation" and, as such, a first-time Group III violation, the Discipline Matrix called for a suspension of between 10 and 30 days (Attachment B, Group III(a)). Although the discipline that was imposed fell within the aforementioned range of discipline, it was at the low end, and there is no indication that any investigation was conducted to determine the extent of the officer's use or abuse of amphetamines. As with all of the cases identified thus far, there was no written rationale provided to explain why the minimum amount of discipline allowable was imposed.

**Case No. 22:**

An officer was sustained for abusing his sick leave.  Specifically, the officer was accused of playing competitive softball in 2016 while on "on-duty injury work status."[50] The officer also failed on two occasions in 2016 to attend appointments with the Medical Unit and failed to attend a mandatory continuing professional training date in 2019. The officer pleaded "no contest" to the violations and received a 7-day suspension pursuant to a findings letter, dated April 3, 2019, wherein the violations were described as "Group II offense, Group I offense, multiple offenses, mitigating factor: no previous discipline."

---

[50] Although the initial allegations suggested fraudulent actions on the part of the officer, the ultimate investigation did not appear to support a finding that the officer's work-related injury and medical status was fraudulent.

The discipline imposed was consistent with a first-time Group II violation, which calls for a range of 6 to 8-day suspension). Although the discipline imposed was clearly within the range, there was no written explanation, justification, or rationale provided.

**Case No. 23:**

A police dispatcher received a 13-day suspension for multiple specifications relating to failing to work mandatory overtime (13 incidents), and one incident involving "sleeping on duty" in 2018.  The findings letter, dated April 4, 2019, indicated the violations as "Group II offense, third offense, Group I offense, multiple offenses, aggravating factor: previous discipline history." The Director dismissed five charges for failing to work mandatory overtime and found the dispatcher "guilty" of the remaining charges.

The discipline imposed was consistent with a Group III violation either where mitigating factors outweigh aggravating factors (which calls for a range of between 10 and 30 days) or where aggravating factors outweighed mitigating factors (which calls for a range of 13 to 30-day suspension) (Attachment B, Group III(a) & III(b)). The discipline letter, however, does not indicate that any of the violations were increased to a Group III offense based on the number of violations or the dispatcher's prior disciplinary history. Without some form of written rationale, the Monitoring Team cannot determine whether or not the Disciplinary Matrix was appropriately followed in this case.

**Case No. 24:**

A CDP officer was sustained for working unauthorized secondary employment while on sick leave on multiple occasions between August 2016 and April 2017. The officer was also sustained for being untruthful on May 15, 2017 to an Inspections Unit supervisor when he was confronted at the secondary employment location about whether he had obtained authorization to

work at the location. The Director imposed a 25-day suspension. The findings letter, dated April 12, 2019, indicated the offense was a "Group III offense, second offense, aggravating factor: prior discipline." The officer had previously received a 10-day suspension in 2017 for providing misleading statements to the Inspections Unit when he falsely denied being given an opportunity to seek medical treatment after exposure to a possibly toxic item and denied knowledge of negative test results.

The 2014 Discipline Matrix (which was in effect in 2016 and 2017) called for "up to 30-day suspension without pay, demotion, [or] termination" for a second Group III violation. Although the 25-day suspension that was imposed fell within the permissible range, the Monitoring Team notes that this was the officer's second integrity violation involving dishonesty and once again there was no discussion of why termination was not appropriate, as permitted under the Matrix.

**Case No. 25:**

On June 1, 2018, a CDP officer conducted a traffic stop on a female motorist. The officer was ultimately sustained by the Police Review Board and the Director of Public Safety for multiple violations relating to the traffic stop. Specifically, the officer was sustained for: (1) stopping the vehicle without reasonable suspicion, (2) inappropriately "joking" with the driver that he was going to arrest her and impound her vehicle, (3) prolonging the traffic stop without cause, (4) conducting the traffic stop based on gender and personal interest, (5) failing to activate his Wearable Camera System (WCS) during the traffic stop, (6) failing to adequately document the traffic stop in his duty report, (7) not being truthful in his written reports, (8) using a police database for personal purposes, (9) causing the deletion of WCS video by inappropriately classifying the

video, and (10) failing to cooperate with the Office of Professional Standards ("OPS") by providing misleading information.

The Director subsequently imposed a 25-day suspension, finding in an April 18, 2018 discipline letter that the violation was a "Group III offense, first offense, Multiple Group I and II offenses, aggravating factor, active disciplinary history."

The "active discipline history" referred to in the discipline letter related to a 2013 incident (although discipline was not imposed until January 5, 2017) in which the officer was sustained for being involved in an on-duty use-of-force (punching an unidentified person in the face while breaking up an altercation at a bar) but failed to write a use-of-force report or notify of supervisor of the use-of-force. The officer was also sustained for failing to notify a supervisor of an injury he sustained as a result of the use-of-force and for failing to file (on two occasions) the necessary documentation relating to an on-duty injury. The officer received a two-day suspension, with Chief Williams identifying the case as "Group 1 offense, first offense, [with] aggravating factors."

The reviewed case involved "gross immorality" violations and "gross neglect of duty" such that the Discipline Matrix called for a suspension of between 25 and 30 days and/or demotion or termination. However, without any explanation or rationale provided, the discipline imposed was at the low end of the range – even though the officer was sustained for attempting to cover-up his conduct and providing misleading information to investigators. [51]

**Case No. 26:**

A background check on a recently-hired officer disclosed that the officer had been untruthful in his 2017 employment application regarding prior arrests and a prior felony conviction overseas. The officer claimed that his prior conviction was expunged and he did not believe he

---

[51] The officer was eventually relieved of duty, on February 11, 2020, after having been indicted for felony offenses involving an attempt to intimate a witness in a later complaint filed against him.

was required to disclose it. He also claimed that good prior work as a Cleveland Police Officer and in a prior job at another police agency should be considered as factors in mitigation.

The termination decision was consistent with the Disciplinary Matrix, which permitted termination for any Group III offense. The Monitoring Team noted that this was apparently the only officer terminated by the Director for an integrity violation across the 2018 and 2019 cases reviewed by the Monitoring Team.[52]

**Case No. 27:**

On March 7, 2019, a Traffic Controller tested positive for cocaine metabolites after a random drug test. The officer subsequently admitted to Internal Affairs that he had smoked crack cocaine, two days before the test, but claimed it was for the first time.

On June 4, 2019, the officer received a 15-day suspension from the Director of Public Safety and was required to sign a "Last Chance Agreement." The pre-disciplinary hearing was conducted before Internal Affairs was able to complete its investigation, and the suspension was issued without Internal Affairs having the opportunity to fully investigate the officer's claim of one-time use. In fact, no representative from Internal Affairs even attended the pre-disciplinary hearing, an aberration from normal practice.

As this was a "drug related violation," and, as such, a first time Group III violation, the Discipline Matrix called for a suspension of between 10 and 30 days where mitigating factors outweighed aggravating factors or where no aggravating factors were present. (Attachment B, Group III(a)). Where there are aggravating factors that outweigh mitigating factors, the Matrix provides for a suspension of 13 to 30 days or termination. (Attachment B, Group III(b)). Although the discipline that was imposed fell within the aforementioned range of discipline, there was no

---

[52] The only other employee terminated for an integrity violation was a police dispatcher. (See Case No. 34).

written rationale provided to justify why the employee received discipline at the lower end of the matrix.

**Case No. 28:**

A police dispatcher was sustained for failing to report for duty as scheduled and failing to notify a supervisor of this in a timely fashion. The dispatcher pleaded "guilty" to the administrative charge. In mitigation, she stated that the had made an innocent mistake in missing her shift as she had assumed a time off request had been granted even though it had not. The Director imposed a three-day suspension without pay for "a second Group 1 offense" with prior discipline having been imposed. The Director's discipline letter ordered the dispatcher to "continue to comply with the terms and conditions of [a] July 25, 2018 Last Chance Agreement (LCA)." The Director found that "the current work rule violation" was a "de minimis violation of the LCA and, thus, not a material breach of the LCA warranting termination" of the dispatcher's employment. The Director failed to articulate what facts supported his determination that the current violation was *de minimis*, the Monitoring Team notes that the LCA was the result of a positive test for marijuana.

**Case No. 29:**

On April 9, 2018, a CPD Sergeant responded to a traffic accident involving an off-duty police officer who was operating a motor vehicle while intoxicated (OVI). After the completion of an Internal Affairs investigation, the Sergeant was sustained by the CDP chain of command for two specifications: (1) failing to properly conduct a preliminary investigation of the incident by failing to ask any questions of the involved officer relating to the crash and failing to notify the Inspections Unit of any suspicion that the officer was intoxicated even though the officer "exhibited clear signs of being intoxicated during [the Sergeant's] interactions with him"; and (2)

failing to correct the behavior of a subordinate officer who had not activated his Wearable Camera System.

The Sergeant pled "not guilty" to the first specification and "no contest" to the failure to supervise allegation. The Sergeant claimed that there was insufficient reason for him to suspect the involved officer was intoxicated. The Director sustained the Sergeant for all alleged violations, but then, without explanation, reduced the classification of the first specification from a Category III offense to a Category II offense and imposed a 7-day suspension.

The discipline imposed was in violation of the Disciplinary Matrix. Because the Sergeant was, in fact, sustained for failing to notify the Inspections Unit of the officer's state of intoxication even though the officer exhibited clear signs, there was no apparent reason (and none articulated) to reduce the classification of the offense from a Group III to a Group II violation.

The disciplinary matrix called for, at minimum, a penalty in the range of a 10 to 30-day suspension for a first-time Group III violation (assuming that mitigating factors outweighed aggravating factors). (Attachment B, Group III(a)). Given the Sergeant's rank, the multiple violations, and the appearance of a cover-up, however, discussion of this case as one in which aggravating factors outweighed mitigating factors should have occurred. In such a case, the disciplinary matrix calls for a suspension of between 13 to 30 days or demotion or termination. (Attachment B, Group III(b)). The Director should also have considered whether the violation involved a "gross neglect of duty," which would have called for a suspension of 25 to 30-days or demotion or termination (Attachment B, Group III(d)).

**Case No. 30:**

A Sergeant was sustained on charges for three violations: (1) behavior that "rose to the level that is considered violence in the workplace thus creating a hostile working environment";

(2) insubordination towards a Lieutenant who attempted to intervene in the incident; and (3) retaliating against the complainant "by using extreme control and isolation." The Sergeant was promoted to Lieutenant in the period between the issuance of the initial charging letter (December 20, 2018) and the imposition of discipline (August 2, 2019).

A pre-disciplinary hearing was conducted on June 11, 2019 and conducted by Assistant Public Safety Director Timothy Hennessy. Although the Disciplinary Matrix called for the imposition of discipline of up to 30 days for a first offense where aggravating factors outweigh mitigating factors, or no aggravating factors are present, the now-Lieutenant was suspended for the minimum period of 10 days allowed by the Matrix, with no analysis of potential aggravating factors that included the subject officer's rank, multiple violations, and subsequent retaliation against the complainant.

**Case No. 31:**

A police officer was appropriately terminated by the Director after the officer was indicted and convicted of felony conduct involving the unauthorized use of a computer. As a convicted felon, the officer would not be permitted to carry a firearm and, therefore, could no longer serve as a police officer. Therefore, the decision to terminate was non-discretionary.

**Case No. 32:**

A police detective was sustained on charges relating to multiple violations, taking place in 2017, including (1) failing to submit "trace/digital evidence and/or latent print evidence" in a timely manner (while assigned as a Crime Scene Investigator) on 42 separate occasions, failing to advise a supervisor of those actions, failing to notate such actions in duty reports, "and in many cases notat[ing] that [he] did enter evidence collected during [his] tour of duty;" and (2) failing to submit reports in a timely manner on 110 separate occasions, including failing to advise a supervisor of those actions, failing to notate such actions in duty reports, and notating that reports were completed during his tour

of duty. The Director imposed a 15-day suspension, finding that the violations fell within Group III of the Discipline Matrix but concluding that the violations were mitigated, as the Detective had no previous discipline. The Detective testified at his pre-disciplinary hearing that he was overwhelmed by the workload and had inadequate supervision. The Internal Affairs investigator noted that none of the cases was negatively impacted by the Detective's failure to follow policy and procedure with respect to the handling of the evidence.

The 2014 Matrix (which was in place in 2017) permitted a suspension of between 10 to 30 days for a first-time Group III violation. It also appears that the Detective was subsequently demoted by the Chief to the position of patrol officer.[53] There was no discussion of whether the sustained allegations should have been considered untruthfulness, as they involved inaccurate documentation that evidence had been entered into evidence, even though Internal Affairs stated that the Detective was truthful during the course of the investigation.

**Case No. 33:**

A police Lieutenant was sustained on charges relating to testing positive for alcohol in a random test. It was determined to be a Group III violation, and the Director imposed a suspension of three days and executed a Last Chance Agreement. The Director's discipline letter indicated that the discipline was imposed pursuant to "Fraternal Order of Police, Lodge 8, Addendum A."[54]  Given the nature of the offense and the rank of the involved officer, the Monitoring Team noted that, but for the above-noted contract language, the Disciplinary Matrix would have called for a suspension of between 13 and 30 days.

---

[53] The CDP IA Pro database showed the rank of the subject officer as "police officer" at the time of this review.
[54] Section 7(b) of that agreement reads as follows: "An employee who tests positive for alcohol shall be subject to discipline up to and including dismissal unless the employee agrees to participate in and satisfies the obligations of a treatment program supervised by a medical professional designated by the City and members of the Employees Assistance Unit. An employee who agrees to participate and satisfies the obligations of this treatment program will be subject to discipline up to a three (3) day suspension (but is also subject to additional discipline for other rule violations). Any employee testing positive for alcohol for a second time shall be subject to discipline up to and including dismissal."

**Case No. 34:**

A police dispatcher was terminated for multiple misdemeanor convictions involving a series of shoplifting incidents. Additionally, the dispatcher was sustained for multiple instances of sick leave abuse. The Director found that the Dispatcher had committed "multiple offenses of theft on three different dates" and classified those violations as Group III violations warranting the termination of the dispatcher's employment.

**Case No. 35:**

Multiple Group III violations were sustained against a police officer, including: (1) attempting to aid in intimidating a crime victim (on 7/7/17); (2) attempting to provide bail for an incarcerated police officer, in violation of department policy (on 7/7/17); (3) driving a vehicle, while off duty, with an expired license; operating the vehicle utilizing a license plate registered to another vehicle; and fleeing the scene of a traffic stop in violation of a direct order from the attending police officer (on 2/12/18); (4) operating police vehicles with an expired driver's license during nine different shifts (between January and February 2018); (5) losing her police identification and failing to notify a supervisor (unknown date and time); (6) making a false allegation of molestation against a police supervisor (on 3/12/18); (7) being untruthful during an Internal Affairs interview (on 5/11/18); (8) failing to safe guard a police radio and failing to report it having been stolen (on 3/12/18); and (9) making inconsistent statements to her insurance company and CDP Internal Affairs about the circumstances of the reported theft of her personal vehicle (on and before 5/11/18). The officer had received prior discipline, including a 10-day suspension in 2018 for insubordination and a 2-day suspension in 2017 for errors in report writing.

In this case, the Director imposed a 30-day suspension, noting multiple Group III violations and the officer's recent disciplinary history. Given the volume, scope, and seriousness of the underlying allegations, a thorough analysis was required as to whether the officer's violations should

be categorized as involving "gross immorality," "gross neglect of duty," or "serious misdemeanors," and, if so, why termination was not warranted.

**Case No. 36:**

On October 13, 2019, an off-duty officer was arrested for operating a vehicle while intoxicated. At the time he was stopped by an officer of the Lakewood Police Department, he immediately identified himself as a police officer, even though he was not armed. The officer also refused to complete any field sobriety tests. In other respects, the officer was cooperative with the arresting officer.

The officer pleaded guilty to Operating a Motor Vehicle While Under the Influence on November 22, 2019. Although the officer's driving privileges were otherwise suspended for a one-year period, he was permitted by the court to drive "for occupational purposes and related occupations activities" during the period of suspension.

The officer had a prior conviction for driving under the influence which occurred in 2017, for which he received an eight-day suspension in 2017; he also received a two-day suspension in 2018 for a wearable camera violation.

In mitigation, the officer stated that he was attending three to four AA meetings a week, over and above the once-a-week AA meeting ordered by the court at the time of his sentencing. He also represented himself as currently abstaining from the use of alcohol. During the officer's pre-disciplinary hearing, the Employee Assistance Unit confirmed the officer's voluntary entrance into the early intervention program and confirmed that he was actively participating in the AA program. During the course of the pre-disciplinary hearing, the officer agreed to submit to three drug and alcohol tests over 12-month period. The officer expressed remorse and plead "no contest" to the allegation against him.

On January 22, 2020, the Director suspended the officer for 18 days, identifying the violation as a Group III offense with aggravating factors to include the prior OVI offense and his prior suspension for the WCS violation.  Although three random alcohol tests were ordered, no "Last Chance Agreement" appears to have been imposed.

The disciplinary matrix in place at the time of the violation called for a suspension of between 18 and 30 days and/or termination for a second Group III violation where factors in aggravation outweigh any factors in mitigation. As such, the discipline imposed was at the low end of the matrix. Interestingly, while the officer in Case No. 18 was terminated for his second OVI conviction (apparently based on the existence of a Last Chance Agreement), the officer in this case received only an 18-day suspension for equivalent conduct and no Last Chance Agreement was imposed to ensure termination in case of a third alcohol-related violation.

Once again, the Director failed to document the rationale for his decision, so it is unknown to what extent he may have considered but rejected the officer's initial attempt to identify himself as a police officer as an attempt to influence the arresting officer or the officer's refusal to submit to a field sobriety test as an aggravating factor. Nor is it known to what extent the Director considered the officer's prior discipline for his WCS violation as additional aggravation but mitigated by the officer's willingness to accept responsibility. Ultimately, however, the discrepancies between the treatment of the officer in Case No. 18 (termination) and why the officer in this case was not presented with a LCA point to inconsistencies in outcomes that cannot be assessed as the Director did not provide rationale's in either case.

**Case No. 37:**

On February 18, 2019, an officer engaged in a foot pursuit with an aggravated robbery suspect. The officer inaccurately reported that "while trying to gain control of the male suspect's

hands, my firearm accidently struck the male suspect on the right shoulder." In fact, WCS video showed that the officer actually struck the suspect (a 15-year-old) four times in the head with his firearm. In his interview with Internal Affairs, the officer claimed that he "issued strikes" toward the suspect's shoulders, not realizing he was still holding his firearm. The officer stated that he wrote his report when he was tired (having been awake for 24 hours) and while on "an adrenaline rush." He further claimed that his use of the word "accidently" in his use-of-force report was "a poor choice of words" and that he intended to express that it was not his intention to strike the suspect with his firearm, but it was his intention to strike the suspect.

The officer was sustained for six specifications: 1) failing to clearly, thoroughly and properly report a use-of-force incident in a use-of-force report; 2) failure to contact Communications and request a supervisor to respond to the incident; 3) failure to complete a report with sufficient detail for supervisors to understand the totality of the circumstances relating to the use-of-force; 4) failing to fully and accurately report the fact that he struck the arrestee with his firearm; 5) failing to request and report to medical personnel after striking the arrestee with an impact weapon; and 6) removing his Wearable Camera System (WCS) from his person and placing it on the dash of his patrol car, in violation of WCS policy.[55]

In a letter dated November 27, 2019, the Director ordered the officer suspended for 25-days for a Group III offense, identifying the multiple violations from the same incident as a factor in aggravation. In addition, the officer was ordered to receive retraining in felony vehicle stops.

---

[55] It should be noted that the Internal Affairs Superintendent declined to sustain the officer for excessive force, concluding that the force that was used was within policy and also declined to find that the officer intentionally filed a false report. The Monitoring Team is not making a finding, at this time, on the reasonableness of those conclusions. This evaluation is instead limited to determining whether or not the discipline ultimately imposed was reasonable given the allegations that were, in fact, sustained by the Director.

A second officer was sustained for failing to report to medical personal or a supervisor that the arrestee alleged that he had been struck in the head with a firearm. That officer was on probation at the time of the incident, having been on-the-job for five months. In mitigation, the officer stated that he was unfamiliar with his responsibility to report the allegations to a supervisor, in particular because he did not observe the arrestee to be in any medical distress. In a letter dated February 19, 2020, the second officer was ordered suspended for 12-days. The Director found the violation to be a Group III offense and found mitigating factors to include that the officer was a probationary officer at the time of the offense and had no prior discipline.

The Disciplinary Matrix in existence at the time of the incident allowed for discipline of between 13 and 30 days or termination for a first time Group III offense where aggravating factors outweighed mitigating factors. The discipline imposed on the officer using the force was at the high end of the range, but the Director did not explain his reasoning as to why a 30 day suspension or termination was not imposed.

For the second officer, the discipline matrix provided for discipline of between 10 and 30 days. Due to the lack of any documentation of rationale, there is no insight into any consideration given by the Director about terminating the officer's probationary status at the time the incident was discovered or whether the officer's probationary status and lack of experience was a mitigating factor.

**<u>Case No. 38:</u>**

On November 11, 2018, an off-duty officer was arrested for driving while under the influence of alcohol in the Village of Northfield. The officer was uncooperative to the extent that the citing officers were required to use force to place him into custody and restrain him from attempting to escape from custody. Over the course of the arrest process, the officer threatened

and demeaned the involved arresting officers. As described by the Internal Affairs investigator during the course of the pre-disciplinary hearing, the officer "felt entitled, superior, and he was aggressive, vulgar, disrespectful, unapologetic and he blamed everyone else for the situation he was in. He never took responsibility for his actions and was angry he was unable to use his position to get him out of the arrest." The officer's threats included tirades about how he would no longer "cut breaks" to officers and their families, that he would "revenge" his arrest and target the arresting officers; further, the officer threatened to "f' up" the arresting officer's careers and even threatened to "fuck" the arresting officer's wife after he was released from custody. At his pre-disciplinary hearing, the officer was apologetic and blamed his behavior on his high level of intoxication. No mention was made by the officer or his representative of any alcohol addiction or any efforts on his part to enter into an Employee Assistance or alcohol related program.

In a letter dated February 10, 2020, the Director ordered the officer suspended for eight days. The Director reduced the OVI conviction from a Group III to a Group II offense such that the disciplinary matrix called for discipline in the range of seven or eight days.

The Director's unexplained decision to reduce the OVI violation from a Group III to a Group II offense stands out, as in the four other cases involving OVI convictions reviewed in this audit, all the other OVI offenses were classified as Group III offenses. Even if this were not the case, the officers conduct towards the arresting officers, which was alleged in a separate allegation, was so egregious as to warrant a Group III classification in and of itself, as conduct that "involves a serious abuse or misuse of authority, unethical behavior, or an act that results in an actual or serious and adverse impact…to the professionalism of the Division…Any violation of law, rule, policy or training which…constitutes a willful and wanton disregard of Division values; or involves any act which demonstrates a lack of the integrity, ethics or character related to an

officer's fitness to hold the position of police officer; or involves egregious misconduct substantially contrary to the standards of conduct reasonably expected of one whose sworn duty is to uphold the law;…" As such, handling this case as a Group II classification was inconsistent with the Discipline Matrix.

**Case No. 39:**

As the result of a December 28, 2018 arrest, an officer was charged with multiple specifications to include: 1) failing to place his Wearable Camera System (WCS) into "event mode" prior to taking a police action; specifically failing to place the camera into event mode even after confronting a suspect "and not until almost the end of [a] foot pursuit;" 2) removing his WCS off his person and placing it in the trunk of his zone car, preventing a recording of a conversation between himself and the arrestee and also preventing a recording of the officer disposing of the arrestee's bicycle in a vacant lot; 3) failing to secure, mark, tag and enter the bicycle into property; 4) refusing a direct order of a supervisor to surrender his WCS for inspection; 5) submitting a report "that contained untruthful, vague and inaccurate information" and falsely reporting that he placed the bicycle into a rear lot where the arrestee's aunt lived. The Director also considered an additional allegation that was brought forth by the Police Review Board on a second case wherein it was alleged that on June 3, 2018, the officer failed to activate his WCS when responding to a large fight outside of a bar.

In a letter dated April 15, 2020, the Director found the officer guilty of all the specifications except for the allegation that he refused a direct order of a supervisor. The Director then reduced the false reporting allegation from a Group III to a Group II and ordered the officer suspended for eight days, the maximum suspension allowed for a first-time Group II violation with factors in aggravation outweighing factors in mitigation. In his letter, the Director provided the following

rationale for reducing the Group III allegation to a Group II allegation: "the report should not have been approved and submitted by a supervisor if there were questions concerning the content of the report."

After reviewing the District investigation and the pre-disciplinary hearing transcript, the evidence appears compelling that the officer intentionally and deliberately lied in his report in an attempt to cover-up the fact that he disposed of the arrestee's bicycle by placing it in a vacant lot and failing to book it into property. In addition, the investigation disclosed that the officer's initial report failed to disclose that he engaged in a foot pursuit of the arrestee who was initially on a bicycle and who subsequently fell off his bicycle and continued an attempt to flee; instead, the officer only reported that the arrestee "was quickly detained."

As such, the rationale provided does not support lowering the charge to Group II and the outcome here is therefore inconsistent with the Discipline Matrix.

## IV. THE DIRECTOR OF PUBLIC SAFETY AND THE CHIEF OF POLICE MUST IMMEDIATELY BEGIN DOCUMENTING THE RATIONALE FOR FINDINGS ON ALLEGATIONS AND FOR THE IMPOSITION OF DISCIPLINE IN ALL CASES.

As the preceding section details, the City, through the Director of Public Safety, has not been sufficiently documenting the rationale for disciplinary decisions. The Director failed to do so even after notice from the Monitoring Team via a memorandum provided on February 8, 2019. The failure to provide the requisite documentation was inconsistent and does not comport with the requirements of the Consent Decree. It should also be noted that, until recently, the Chief of Police also appeared to be following the practice of not documenting the rationale for his decision-making, except with respect to cases where he departed from recommendations made by the Cleveland Police Review Board (CPRB).

For the Monitoring Team to be able to conduct effective reviews of the imposition of discipline, and for officers and members of the public to have sufficient confidence that discipline determinations are fair, the new Director and the Chief of Police must document the rationale for their discipline determinations. Any continued failure to document the rationale for decision-making in these cases will make it impossible for the Court to conclusively establish whether or not the Director and the Chief are following the requirements of the Disciplinary Matrix, which, as described in paragraph 246 of the Consent Decree, is necessary "to ensure consistency in the imposition of discipline."

## V.    CONCLUSION

The task of the Monitoring Team is to duly consider the City's compliance with the Consent Decree as it relates to the fair and impartial imposition of discipline for officers found to have violated Department policies and procedures. Because discipline determinations were often inconsistent with the Disciplinary Matrix, and almost universally insufficiently explained, the Monitoring Team concludes that the City has not complied with the Consent Decree with respect to discipline. Specifically, the Director of Public Safety consistently either ignored or failed to follow the court-approved Disciplinary Matrix, and evidenced a pattern of imposing discipline at the low end of the Matrix, without explanation.

The Court has convened a status conference in order to hear from the parties and the Monitoring Team on matters related to this Department of Public Safety Audit and discuss the overall compliance with the accountability provisions of the Consent Decree moving forward. Should the Court determine that the City is out of compliance with the Consent Decree, remedies should be discussed to re-align the City with the path to compliance.  The Monitoring Team is

looking forward to working with Mr. Karrie Howard, the new Director of Public Safety, who will take office after Director McGrath's retirement on June 19, 2020.

## Appendix 1: Case Specific Conclusions

The Monitoring Team's case-specific conclusions are summarized as follows:

| Case Review # | Date of Pre-Disc. Hearing / Date of Discipline | Officer Rank | Sustained Conduct (*=integrity related violation) | Discipline Imposed | Aggravating or Mitigating Factors | Appropriateness of Discipline | Matrix Compliant? (Y/N?) *=deficient discipline |
|---|---|---|---|---|---|---|---|
| 1a. | 2/20/18 / 3/12/18 (20 days) | Commander | Failure to supervise | Demotion | Prior discipline for similar violation; Risk of danger to the community. | Demotion only to the rank of Captain. | Yes |
| 1b. | 2/26/18 / 3/12/18 (14 days) | Sgt. #1 | Failure to Investigate | Demotion | Repeated violations; Risk of danger to the community; Gross neglect of duty. | Suspension without pay, in addition to demotion, would have been more appropriate. | Yes* |
| 1c. | 2/23/18 / 3/12/18 (17 days) | Sgt. #2 | Failure to supervise | 15-days | Risk of danger to the community; Gross neglect of duty. | Matrix allowed for a suspension of up to 30 days or demotion, or termination. | Yes* |
| 2a. | 2/26/28 / 3/12/18 (14 days) | Police Officer #1 | Failure to timely notify EMS | 10-days | In-custody death of person suffering mental health crisis; Field Training Officer. | Discipline imposed was the most lenient permitted; no indication that aggravating factor was considered. | No |
| 2b. | 2/26/18 / 3/12/18 (14 days) | Police Officer #2 | Failure to timely notify EMS | Written Reprimand | Probationary officer; In custody death of a person suffering from a mental health crisis. | Group III offense reduced to Group 1 and then further mitigated. | No |
| 3. | 3/27/18 / 3/29/18 (2 days) | Police Officer | Misdemeanor theft* | 15-days | Vulnerable victim; Inappropriate financial relationship; Integrity-related violation. | Officer should have received maximum suspension in lieu of termination or termination. | No |

| Case Review # | Date of Discipline | Officer Rank | Sustained Conduct (*=integrity related violation) | Discipline Imposed | Aggravating or Mitigating Factors | Appropriateness of Discipline | Matrix Compliant? (Y/N?) *=deficient discipline |
|---|---|---|---|---|---|---|---|
| 4. | No hearing / 3/29/18 | Police Officer | On duty insubordination; Off-duty failure to cooperate with police & disturbing the peace; Arrest for Operating Vehicle While Intoxicated (OVI) & improper storage of a firearm; Driving while under Suspension. | 18 days | Multiple violations on multiple occasions; Criminal violations. | Discipline imposed on low end of matrix range. | Yes* |
| 5. | No hearing / 4/10/18 | Police Officer | Arrest for Domestic Violence; Guilty Plea to Disorderly Conduct; Lied to Arresting Officers.* | 14 days | Integrity-related violation; evidence of domestic violence. | Discipline imposed on low end of matrix range. | Yes* |
| 6. | No hearing / 4/26/18 | Police Officer | Secondary employment without authorization; Failure to report a Use-of-Force; Untruthful to responding supervisor; Attempt to Interfere with Criminal Investigation; Diverted after being criminally charged with Falsification, Obstructing & Dereliction of Duty.* | 23 days | Charged with serious misdemeanor offenses; attempt to interfere with a criminal investigation; Integrity-related violation. | Termination would have been permitted and was warranted. | Yes* |

| Case Review # | Date of Discipline | Officer Rank | Sustained Conduct (*=integrity related violation) | Discipline Imposed | Aggravating or Mitigating Factors | Appropriateness of Discipline | Matrix Compliant? (Y/N?) *=deficient discipline |
|---|---|---|---|---|---|---|---|
| 7. | 3/5/18 / 5/3/18 (59 days) | Sergeant | Failed to complete four injury packets for officers as required. | 14 days | Prior disciplinary history; Supervisor | Prior disciplinary history appropriately used to increase Matrix Group level. | Yes |
| 8. | 4/6/18 / 5/4/18 (28 days) | Sergeant | Off duty possession of an open container in a zone car; Conviction for OVI crash (w/injury to the officer); Failure to timely investigate use-of-force incidents; Unprofessional on-duty conduct & improperly order to violate body camera policy. | 11 days | Multiple violations, multiple incidents; OVI with crash and injury; Supervisor. | Discipline on the low end of the Matrix. Failure to take into account multiple aggravating factors. | No |
| 9. | No hearing / 5/8/18 | Police Officer | False written statements regarding an off-duty arrest.* | 15 days | Multiple integrity-related violations. | Termination would have been permitted and was warranted. | Yes* |
| 10. | No hearing / 5/11/18 | Police Officer | Excessive Force; Failure to notify a supervisor of the use of force; Failure to obtain medical attention for victim.* | 15 days | Off duty assault; Uncharged integrity-related violation (lying to Internal Affairs) | Discipline imposed was at the low end of the Matrix. | Yes* |

| Case Review # | Date of Discipline | Officer Rank | Sustained Conduct (*=integrity related violation) | Discipline Imposed | Aggravating or Mitigating Factors | Appropriateness of Discipline | Matrix Compliant? (Y/N?) *=deficient discipline |
|---|---|---|---|---|---|---|---|
| 11. | No hearing / 5/15/18 | Police Officer | Failure to place WCS in "event mode" prior to incident; Inappropriate method used for verifying the validity of a protective order. | 12 days | None | Unknown why a 12-day suspension was chosen (as opposed to any other disciplinary choice between 10 and 30 days permitted by the Matrix | Yes |
| 12. | No hearing / 6/28/18 | Sergeant | Failure to properly investigate and arrest an off-duty officer for OVI; Failure to ensure subordinate's compliance with WCS policy; Failure to notify Integrity Control.* | 15 days | Supervising officer – gross neglect of duty; Multiple Violations; Integrity-related violation. | Matrix required 10 to 30 days suspension, demotion or termination for "gross neglect of duty" and "criminal law violations." Discipline in the mid-range permitted by the Matrix was unreasonable. | Yes* |
| 13a. | No hearing / 7/16/18 | Sergeant | Failure to Supervise | 10 days | Gross dereliction of duty; Danger to the community; Multiple violations. | Discipline at low end of Matrix range even though it appeared to involve a "gross neglect of duty." | Yes* |
| 13b. | 6/25/18 / 8/1/18 (37 days) | Detective | Failed to timely process 188 sexual assault kits; Deceptive in failing to disclose additional backlogged case investigations to supervisors; Failure to turn in a report after being ordered to do so.* | 25 days | Gross dereliction of duty; Danger to the community; Multiple violations; Integrity-related violation. | No explanation for why officer was not given the maximum permitted suspension of 30 days. | Yes* |

| Case Review # | Date of Discipline | Officer Rank | Sustained Conduct (*=integrity related violation) | Discipline Imposed | Aggravating or Mitigating Factors | Appropriateness of Discipline | Matrix Compliant? (Y/N?) *=deficient discipline |
|---|---|---|---|---|---|---|---|
| 14. | 7/25/18 / 7/26/18 (1 day) | Dispatcher | Positive drug test (Marijuana) | 3 days & Last Chance Agreement | Use of illegal substance. | Failure to classify as Group III offense. | No |
| 15a. | 6/26/18 / 8/14/18 (49 days) | Police Officer #1 | Incident #1: Untruthful in reporting of on-duty injury; Untruthful in Internal Affairs interview; Failure to report application of a use-of-force; Out-of-policy use of force; Failure to report injury to an arrestee; Use of demeaning language; Incident #2: Out of policy pursuit; Failure to activate WCS; Incident #3: Seven incidents of inappropriate contact with media; Incident #4: Creation and distribution of inappropriate "Memes".* | 30 days | Multiple violations; Violation of Constitutional rights; Integrity-related violations. | Termination was warranted and necessary. | No |
| 15b. | 6/26/18 / 8/14/18 (49 days) | Police Officer #2 | Withheld information about how Officer #1 was injured.* | 12 days | Violation of Constitutional rights; Integrity-related violation. | Termination was permitted and warranted. Sustained violation for Constitutional violation was dismissed without justification. | No |
| 15c. | 6/26/18 / 8/14/18 (49 days) | Police Officer #3 | Withheld information about how Officer #1 was injured.* | 8 days | Integrity-related violation. | Should have been classified as a Group III violation. | No |
| 16. | 9/21/18 / 10/10/18 (19 days) | Detective | Off duty hit & run causing injury; Driving while Impaired causing injury; False information to Internal Affairs.* | 18 days | Cover-up of an off-duty criminal act; Integrity-related violation. | No use of aggravating factors to increase penalty. | No |

| Case Review # | Date of Discipline | Officer Rank | Sustained Conduct (*=integrity related violation) | Discipline Imposed | Aggravating or Mitigating Factors | Appropriateness of Discipline | Matrix Compliant? (Y/N?) *=deficient discipline |
|---|---|---|---|---|---|---|---|
| 17. | 9/14/18 / 10/10/18 (26 days) | Police Officer | Civil court contempt of court conviction; Untruthful in a civil hearing while on duty and in uniform; Used CDP vehicle to attend court without permission; Appeared in a civil case while on-duty and in uniform without permission.* | 25 days | Integrity-related violation; Multiple violations. | Failure to consider conduct as a "serious misdemeanor offense" or "gross immorality violation." | No |
| 18. | 9/21/18 / 11/1/18 (41 days) | Police Officer | Convicted of OVI – 2nd in 10 years; Armed while intoxicated; Lied to arresting officer about possession of firearm while intoxicated; Violation of "Last Chance Agreement."* | Termination | Violation of "Last Chance Agreement;" Integrity-related violation; Criminal offense. | Appropriate. | Yes |
| 19. | 2/21/18 / 11/6/18 (258 days) | Lieutenant | Failure to supervise and correct subordinate as to unlawful search of a vehicle. Uncharged finding of falsehood made during the course of the pre-disciplinary hearing.* | 8 days | Supervisor rank; Failure to accept responsibility. | Discipline did not appropriately take into account false statement made during course of pre-disciplinary hearing. | No |

| Case Review # | Date of Discipline | Officer Rank | Sustained Conduct (*=integrity related violation) | Discipline Imposed | Aggravating or Mitigating Factors | Appropriateness of Discipline | Matrix Compliant? (Y/N?) *=deficient discipline |
|---|---|---|---|---|---|---|---|
| 20. | 9/20/18 / 11/21/18 (62 days) | Detective | Refusal to answer questions proffered by Internal Affairs; Untruthful in Internal Affairs interview.* | 25 days | Integrity-related violation with prior discipline for an Integrity-related violation. | Failure to Terminate where Matrix created a "rebuttal presumption of termination" a second Group III violation involving "gross immorality violation." | No |
| 21. | 11/26/18 / 11/29/18 (3 days) | Police Officer | Following an on-duty traffic accident officer tested positive for amphetamine. | 10 days & "Last Chance Agreement" | Positive drug test | Discipline imposed at lowest end of the range. Failure to order additional investigation. | Insufficient investigation |
| 22. | 3/25/19 / 4/3/19 (9 days) | Police Officer | Abuse of sick leave; Failed to attend required medical appointments; Failed to report new phone number to CDP. | 7 days | | Discipline imposed was within matrix expectations. | Yes |
| 23. | 3/6/19 / 4/4/19 (29 days) | Dispatcher | Multiple specifications of failure to work mandatory overtime; One instance of sleeping on duty. | 13 days | Multiple violations – multiple instances. | Lack of written justification makes evaluation impossible. | Unknown |
| 24. | 1/15/19 / 4/12/19 (87 days) | Police Officer | Untruthful to Inspections Unit regarding unauthorized secondary employment; Unauthorized secondary employment while on sick leave.* | 25 days | Prior disciplinary history for false statements; Integrity-related violation. | Termination was permitted and warranted due to a prior sustained case for making false statements to the Inspections Unit and for lying during the course of the pre-disciplinary hearing. | Yes* |

| Case Review # | Date of Discipline | Officer Rank | Sustained Conduct (*=integrity related violation) | Discipline Imposed | Aggravating or Mitigating Factors | Appropriateness of Discipline | Matrix Compliant? (Y/N?) |
|---|---|---|---|---|---|---|---|
| 25. | 3/29/19 / 4/18/19 (20 days) | Police Officer | Traffic stop without cause; Unprofessional conduct; Discrimination by gender; Failure to activate WCS; Failure to document traffic stop; Traffic stop & database use for for personal gain; Failure to cooperate with OPS.* | 25 days | Integrity-related violations – multiple attempts to cover up misconduct; Abuse of authority for personal reasons. | No apparent cause for imposing discipline at the lowest end of the range; termination was permitted and warranted. | Yes* |
| 26. | 5/29/19 / 5/31/19 (2 days) | Police Officer | Untruthful in employment application regarding prior felony arrests and convictions.* | Termination | Integrity-related violation. | Discipline was appropriate and consistent with the matrix. | Yes |
| 27. | 5/29/19 / 5/31/19 (2 days) | Traffic Controller | Positive result from random drug test for cocaine | 15-day suspension | Positive drug test; Possible drug abuse. | Case prematurely adjudicated without a complete investigation. | Incomplete investigation. |
| 28 | 6/24/19 / 6/26/19 (2 days) | Dispatcher | Failing to report for duty as scheduled and failing to notify a supervisor in a timely fashion | 3-day suspension | Previous "Last Change Agreement" for positive test for marijuana. The violation appeared to have been the result of an innocent mistake. | Although the existence of a "Last Chance Agreement" would have justified a higher penalty, the penalty imposed appears to have been reasonable. | Yes |

| Case Review # | Date of Discipline | Officer Rank | Sustained Conduct (*=integrity related violation) | Discipline Imposed | Aggravating or Mitigating Factors | Appropriateness of Discipline | Matrix Compliant? (Y/N?) |
|---|---|---|---|---|---|---|---|
| 29 | 4/5/19 / 7/30/19 (116 days) | Sergeant | Failure to conduct a proper preliminary investigation of an off-duty officer for OVI-related crash; Failure to notify Integrity Control of evidence of intoxication; Failure to ensure subordinate's compliance with WCS policy. | 7-day suspension | Supervising officer – gross neglect of duty; Multiple violations; Appearance of an Integrity-related violation. | Should have been classified as a Group III violation. | No |
| 30 | 6/11/19 / 8/20/19 (70 days) | Sergeant | Creation of hostile working environment; insubordination; retaliation against officer complainant. | 10-day suspension | Officer's rank; multiple violations; retaliation against a complainant. | Discipline was at the lowest level and did not take into account aggravating factors. | No |
| 31 | 8/26/19 / 8/30/19 (4 days) | Police Officer | Felony Conviction | Termination | Officer not permitted to carry firearm | Appropriate. | Yes |
| 32 | 9/16/19 / 10/4/19 (18 days) | Detective | Failing to submit evidence and reports in a timely manner; Failing to advise a supervisor; Inaccurate duty reports;* | 15-day suspension | Multiple violations over an extended period of time; Preparation of false reports: Detective was not provided with adequate supervision or resources. | While discipline imposed fell within the range of discipline permitted by the Matrix, the failure to provide rationale for the decision made it impossible to determine its reasonableness. | Yes |

| Case Review # | Date of Discipline | Officer Rank | Sustained Conduct (*=integrity related violation) | Discipline Imposed | Aggravating or Mitigating Factors | Appropriateness of Discipline | Matrix Compliant? (Y/N?) |
|---|---|---|---|---|---|---|---|
| 33 | 11/11/19 / 11/14/19 (3 days) | Lieutenant | Positive random drug test for alcohol. | 3-day suspension and "Last Chance Agreement" | Command rank. | Discipline imposed consistent with requirements of CBA. | Yes |
| 34 | 10/21/19 / 11/15/19 (25 days) | Dispatcher | Multiple misdemeanor convictions involving a series of incidents of shoplifting.* | Termination | Multiple crimes of theft on 3 different days. | Appropriate | Yes |
| 35 | 10/21/19 / 11/26/19 (36 days) | Police Officer | Attempting to aid in intimidation of a crime victim; Attempt to provide bail for an incarcerated officer; Driving on and off duty with an expired license; Driving an unregistered vehicle; Fleeing scene of a traffic stop; Loss of police ID without notifying the department; False allegation of molestation against a police supervisor; Untruthful statements to IA; Failure to safeguard a police radio and to report its loss; Inconsistent statements in an insurance claim.* | 30-day suspension | Multiple violations on multiple dates – including integrity-related violations and violations inconsistent with employment as a police officer. Officer previously disciplined. | Discipline failed to take into consideration seriousness of sustained violations & prior disciplinary history. | No |

| Case Review # | Date of Discipline | Officer Rank | Sustained Conduct (*=integrity related violation) | Discipline Imposed | Aggravating or Mitigating Factors | Appropriateness of Discipline | Matrix Compliant? (Y/N?) |
|---|---|---|---|---|---|---|---|
| 36 | 1/15/20 / 1/22/20 (7 days) | Police Officer | OVI conviction | 18-day suspension and 3 random chemical tests | Prior OVI & prior discipline. | Discipline imposed less than other 2d time OVI case which resulted in termination. No LCA proffered. | Yes |
| 37a | 11/4/19 / 11/27/19 (20 days) | Police Officer | False reporting; failure to notify supervisor; failure to notify EMT; WCS violation.* | 25-day suspension | Multiple violations; Integrity related violations; Force used – if reported would have resulted in a FIT roll-out. | No explanation as to why maximum 30-day suspension was not imposed. | Yes |
| 37b | 1/30/20 / 2/19/20 (12 days) | Probationary Officer | Failure to notify supervisor of use-of-force | 12-day suspension | Officer on probation – on the job 5 months only; force alleged to be used was deadly and would have resulted in a FIT roll-out. | Unknown why probationer not terminated while on probation. Unknown why 12 days within a range of 10 to 30 days. | Yes |
| 38 | 2/10/20 / 2/20/20 (10 days) | Police Officer | OVI conviction; Resisting Arrest; Threatening & Demeaning Behavior | 8-day suspension | Officer resisted arrest; failed to cooperate with investigation; threatened and demeaned arresting officers | Specification reduced from Class III to Class II without any known cause. | No |
| 39 | 3/2/20 / 4/15/20 (44 days) | Police Officer | False Reporting; WCS violations; Mishandling of property* | 8-day suspension | Integrity-related violations | False reporting specification reduced from Class III to Class II without any known cause. | No |

**DIRECTOR OF PUBLIC SAFETY DISCIPLINE AUDIT MEMORANDUM**
**ADDENDUM "A"**

## I.  INTRODUCTION

In August 2018, the Monitoring Team was made aware of a disciplinary matter involving the false arrest of a Cleveland resident (hereinafter "the complainant") on May 9, 2017. The Team carefully reviewed the investigation of the alleged misconduct and imposition of discipline on officers involved in the case.

The case involved an incident in which CDP officers responded to a call for service to the home of the complainant's mother, which was prompted by his purportedly unstable and threatening behavior. During this call for service, an altercation ensued between the complainant and CDP officers. The complainant was held in custody on felony charges of assaulting a police officer until he was finally released on bail on January 16, 2018.

Those felony charges were based on the allegation that an arresting officer (hereinafter referred to as "Officer #1") was injured while being assaulted by the complainant during the call for service. An investigation by the Division's Internal Affairs Unit ("IAU") identified evidence that Officer #1, then a four-year veteran of the Division, wrote a false report and made false statements – which resulted in the incarceration of the complainant for a period of over eight (8) months. The criminal case against the complainant was eventually dismissed, on February 8, 2018, after it was determined that the primary evidence against him was likely falsified by Officer #1.

IAU initiated charges against three officers involved in the complainant's arrest and detention. The details of those internal charges against the three officers were reviewed by the CDP Chief Calvin Williams. Chief Williams recommended that Officer #1 be terminated from his employment with the CDP as the result of his misconduct. Chief Williams also recommended that the other involved officers (hereinafter referred to as "Officer #2" and "Officer #3") receive

suspensions of up to thirty (30) days for allegedly being aware of Officer #1's misconduct and failing to report it as required by CDP policy.

In the City of Cleveland, however, and unlike many other jurisdictions across the country, the Chief of Police cannot independently fire an officer. Instead, that determination must be made by the then-Director of Public Safety, Michael McGrath.[56] In this case, the Director entered into a plea agreement with the three involved officers. That agreement was to suspend Officer #1 for a period of thirty (30) days, to suspend Officer #2 for twelve (12) days, and Officer #3 for eight (8) days.

The remainder of this addendum summarizes the Monitoring Team's specific findings and conclusions relating to the case. It then discusses the specific facts and evidence established in the Internal Affairs investigation. The Monitoring Team observes here that the serious issues raised by this case illustrates that the City has not demonstrated the necessary progress essential to move toward compliance with the Settlement Agreement. Although it is true that this addendum discusses only one case, the fact that City leadership and the Division's processes could enable what is discussed in this report leads the Monitoring Team to question whether, when it comes to accountability, anything of significance has changed since the Department of Justice's 2014 investigation of CDP.

## II.      SUMMARY OF MONITORING TEAM FINDINGS

Before providing more specific details on the facts of the case, the Monitoring Team here summarizes its overall findings. These findings are discussed in greater detail in the remainder of this addendum:

---

[56] See Charter of the City of Cleveland, Chapter 25, Section 119.

1. **The 30-day suspension ultimately given to Officer #1 by the Director of Public Safety was inconsistent with paragraph 245 of the Consent Decree.** The stipulated suspension was unreasonably lenient given the facts of the case as verified by the Monitoring Team on behalf of this Court: a CDP officer knowingly and intentionally lied, leading to an individual to be deprived of his liberty for a period of some eight (8) months. The imposed discipline was not reasonably based on the nature of the allegations as established in the Internal Affairs Investigation. There is no reason to believe there were any mitigating factors that warranted the imposition of the reduced discipline. Separately, evidence of possible racial bias and multiple additional acts of misconduct were ignored.

2. **The unreasonably lenient suspensions given to Officer #2 and Officer #3 also run contrary to paragraph 245 of the Consent Decree.** There was reasonable and appropriate cause to terminate Officer #2 from his employment with the CDP in light of the untruthful statements he made to Internal Affairs and his failure to disclose evidence of the complainant's innocence to CDP supervisors. The recommendation for a 30-day suspension by Chief Williams with respect to Officer #3 was lenient, and the suspension of Officer #3 for a mere 8 days was also unreasonable in light of the facts established by the Internal Affairs investigation.

3. **The Division inappropriately failed to pursue disciplinary action against a fourth officer** (herein after referred to as "Officer #4"). Officer #4 was Officer #1's partner. The investigation established that he inappropriately corroborated Officer #1's claims of having been injured by the complainant at the scene. No disciplinary action was brought against Officer #4.

4. **The Director of Public Safety failed to document any rationale for his decision-making, in violation of paragraph 247 of the Consent Decree which requires that "all disciplinary decisions will be documented in writing."** Although the imposition of the above-noted plea deals were documented in letters dated August 14, 2018, there was no documentation of the reasoning for why fabrications that resulted in an individual being falsely imprisoned for eight months were adequately addressed by the suspensions that were ultimately imposed.[57] In addition to violating the Consent Decree, such a practice lacks transparency and accountability – the absence of which can lead the community, other officers, and the Monitoring Team to question whether or not bias or an impermissible motive was implicated in the decision-making process.

5. **The decision by the Director of Public Safety to continue to employ Officers #1 and #2 negatively impacts the potential sustainability of reform efforts within the Cleveland Division of Police.** The Cuyahoga County Prosecutor has advised the Division that both officers are now designated as "*Brady* Officers." This means that their credibility will be subject to substantial scrutiny at future court proceedings. This almost certainly compromises their ability to have their testimony credited in criminal proceedings[58] – rendering their ability to be effective law enforcement officers vastly diminished if not entirely precluded going forward.

---

[57] The fact that no documentation of the Director's rationale for his decision-making existed within the Department of Safety was confirmed by IA Superintendent in October 4, 2018 email to Monitoring Team.

[58] As a result of the Monitoring Team's review of Disciplinary Letters issued by the Chief and the Director in the 2018 calendar year, the Monitoring Team has identified at least an additional seven cases involving issues of credibility where officers were not terminated and who will require modified assignments in order to avoid the need to rely on their testimony, because it would be subject to challenge in court.

6. **The Internal Affairs investigation into this specific incident was generally thorough, complete, and free of bias.** This was a complex investigation assigned to a Sergeant who was new to Internal Affairs. The Internal Affairs investigator's work was generally excellent, and it was clear that he was dedicated to identifying the truth and to establishing the facts fairly and impartially. Additionally, the review and evaluation of the case by the new Internal Affairs Superintendent was likewise of a high quality. Consequently, this is an instance in which the Division personnel conducting and overseeing the factual investigation have grounds to take pride in their efforts and their ultimate work product.

The review of this file leaves the Monitoring Team with serious concerns about the ability of Cleveland's Department of Public Safety to successfully reform CDP's accountability systems, a key component of the Settlement Agreement between the Department of Justice and the City of Cleveland. The Department of Public Safety's willingness to turn a blind eye to gross misconduct, which resulted in clear violations of a vulnerable person's Constitutional rights was, and is, unconscionable.

## III.  THE INVOLVED OFFICERS FILED POLICE REPORTS IN SUPPORT OF THE FILING OF FELONY CHARGES AGAINST THE COMPLAINANT

This section provides a brief summary of the incident (based on police reports written by the involved officers) that gave rise to the Internal Affairs investigation addressed here.[59]

---

[59] The facts stated herein were obtained from a 34-page Internal Affairs report, dated March 20, 2018. Members of the monitoring team confirmed the representations in the IA report through an independent review of Wearable Camera System footage available from all officers who responded to the incident as well as video recorded officer interviews with IA investigators.

On March 4, 2017, CDP officers were called to a domestic disturbance by the family of the complainant.[60] It was reported that the complainant was breaking out the windows of his mother's vehicle and throwing the contents of the car onto the driveway.

Officer #3 and Officer #2 responded to the incident. They confronted the complainant, who refused to remove his hand from his pocket. The officers attempted to subdue the complainant after he failed to follow their orders. Officer #2 deployed his Taser, but it did not appear to have any effect.

The complainant eventually retreated into his residence and dove into a hall closet. The officers followed. The complainant claimed to be armed and threatened to shoot the officers. A member of the complainant's family advised the officers that he was not armed.

Officers #1 and #4 were the first officers to respond to a request for back-up from Officers #2 and #3. Officer #1 and Officer #3 each took one of the complainant's legs and dragged him out of the closet, where he was eventually arrested. Officer #1 later advised his responding supervisor and some fellow officers that he believed his toe was broken during the course of the incident.

Officer #1 filed a police report indicating as follows:

> I walked in and observed a male (the complainant) laying down inside a closet fighting with P.O. [Officer #2] and P.O. [Officer #3]. I assisted with attempting to handcuff him. [The complainant] was on the ground and P.O. [Officer #3] told us he had a gun. I ordered him at gunpoint with my city-issued weapon to show his hands and he refused. I then put away my

---

[60] Although the complainant was initially arrested at the time of the incident, he was released and later indicted on April 10, 2017. He was subsequently rearrested and incarcerated on May 9, 2017. (Cuyahoga County Clerk of Courts Docket, Case Action & Docket Information).

weapon and attempted to pull the male out of the closet. I then used my bodyweight and attempted to pin him down to the ground. While on the ground, [he] stated "get ready to shoot me because I'm going to start shooting." He then said "soon as my hand comes out, I'm going to shoot you." I stood up in an attempt to remove him. *At this time he lifted his leg up and slammed his left heel down on my right big toe.* I continued to pull on his right leg in an attempt to gain control. I pulled on his left leg as P.O. [Officer #3] pulled on his right leg we were able to free him from the closet. Once outside I kept his legs pinned down while he was being handcuffed… Upon his arrival, I advised [the] Sgt. that I believed my toe to be broken. At that point he instructed my partner P.O. [Officer #4] to take me to the hospital for treatment, where I was treated for a broken toe and released.[61]

In corresponding police reports filed by other officers who were present during the complainant's arrest, none reported that they were in a position to see the complainant kick or injure Officer #1.[62]

On April 20, 2017, the County Prosecutor took the case against the complainant to a Grand Jury. He was indicted on six charges.[63] In addition to the charges related to the initial call for

---

[61] Officer #1 Form 1 report, dated March 4, 2017 (emphasis added). (Photo of original report in IA file).

[62] All responding officers were equipped with Wearable Camera Systems (WCS). Those cameras captured footage of officer contacts with the suspect as well as conversations amongst and between themselves. That footage was watched for the purposes of this review. The WCS footage included audio wherein Officer #1 could be heard referring to the complainant as a "fucking piece of shit" as the officers struggled to remove him from a closet where he was trying to hide. Officer #1's name-calling was particularly disconcerting given the nature of the call involving the complainant. The complainant repeatedly tried to get officers to shoot him and was reportedly suffering from the consequences of either drug use and/or mental illness. As such, this was a crisis intervention call where officers would be expected to act with discretion to any extent possible. Officer #1 attended Division "Crisis Intervention Training" on August 3, 2015. Based on his conduct during the course of the call and his comments afterwards, it appears that he did not retain necessary information from that training.

[63] Cuyahoga County Clerk of Courts Docket – Charges.

domestic violence and failure to comply, the complainant was charged with first-degree and second-degree felonies related to Officer #1's allegation that his toe was broken by the complainant. The most serious charge, Felonious Assault on an Officer, is a first-degree felony punishable by three to ten years in prison. The complainant was arrested on May 9, 2017 and incarcerated unless and until he could post a $150,000 bail.[64]

## IV. BODY-WORN CAMERA FOOTAGE, PERSONAL TEXT MESSAGES EXCHANGED BETWEEN THE INVOLVED OFFICERS, AND ADMISSIONS MADE BY ONE OFFICER TO INTERNAL AFFAIRS CONTAINED EVIDENCE INDICATING THAT OFFICER #1 LIED ABOUT THE CAUSE OF HIS INJURY

Evidence disclosed during the course of the Internal Affairs investigation supports the conclusion that Officer #1 was not injured by a kick from the complainant. Instead, the evidence supports a finding that Officer #1 was actually injured either as the result of Officer #2 throwing a mirror, while attempting to remove the complainant out of the closet, or Officer #1 kicking the mirror out of the way after it was thrown out of the closet.

### A.  Body-Worn Camera Footage

This above-noted conclusion is supported by the Wearable Camera System ("WCS") video footage of the incident and its aftermath. For one thing, the complainant was not positioned in a manner that would have allowed him to kick Officer #1's foot with enough strength to break his toe. The footage does, however, tend to be consistent with Officer #1 being injured by Officer #2 throwing items out of the closet. In fact, the videos show a bookshelf and mirror being thrown out of the closet by Officer #2. The items were thrown in Officer #1's direction and Officer #1 can be

---

[64] Cuyahoga County Clerk of Courts Docket, 5/11/17 entry: "Defendant declared indigent. Court assigned…counsel…Reading of indictment waived…Defendant plead not guilty to indictment. Bond set at 150,000.00 dollars…"

heard saying: "Get this fucking thing out of my way," before a sound is heard consistent with a mirror breaking.[65]

In fact, at the scene, Officer #1 is twice captured on WCS video clearly stating that *he did not know how he was injured*:

- WCS video footage of Witness Officer #1:

  Witness Officer #1: "Oh, you don't even know what happened?"

  Officer #1: "No idea. It hurts so fucking bad."[66]

- WCS video footage of Witness Officer #2:

  [Officer #4 asks Officer #1 how he broke his toe].

  Officer #1 replies: "I don't know. I don't know."

  [After walking away for 30 seconds, Officers #1 and #4 return and after being advised that the officer's WCS is on, another exchange takes place wherein Officer #4 suggests]: "Your foot hurts, your toe, your toe when you step on it, did he kick it?"

  Officer #1 replies: "I think he kicked it."

  Officer #4 states: "Yeah, he was flailing his legs."

  Officer #1 states: "And that's when I dove on his back half to try to hold him down."[67]

After the incident, the complainant was transported to the hospital by ambulance. Officer #1 was driven to the same hospital by another officer. In the ambulance bay, Officer #2's WCS captures Officer #2 seeing Officer #1 walking by and limping. Officer #2 asks: "Are you alright?"

---

[65] Officer #4, WCS video at 1:17.
[66] Witness Office #1, WCS Video at 3:43-3:48.
[67] Witness Officer #2, WCS at 12:37-12:47.

In response, Officer #1 first points at Officer #2 and then at his foot and says something unintelligible to Officer #2.[68] Officer #2 responds: "My fault?"[69] This suggests that, at minimum, the officers did not know how Officer #1 had been injured and that, at most, they knew or had substantial reason to believe that Officer #1 had actually been injured by Officer #2.

### B.  Text Messages

Text messages sent later between Officer #1 and other officers[70] tend to confirm that Officer #1 believed that Officer #2 caused the injury to his foot:

- May 9, 2017:[71]

    Officer #1 text to Officer #2: "Just arrested the guy who broke my foot."

    Officer #2 text: "Oh yeah, haha.  I thought some guy named [Officer #2] did."

    Officer #1 text: "Well I'm not sure only guessing."

    Officer #2 text: "Hahahaha."

- May 17, 2017:[72]

    Officer #3 text to Officer #1: "Haha, [Officer #2] just got here from court."

    Officer #1 text: "Yea but we got a Code 3 on Euclid."

    Officer #3 text: "We got a Code 3 on Euclid right now."

---

[68] Internal Affairs did report that when using higher quality listening equipment, Officer #1 can be heard saying to Officer #2: "This is your fault." Officer #2, WCS #2, at 36:40.
[69] Officer #2, WCS #2 at 36:44-36:50.
[70] Text messages sent and received from Officer #1's personal cell phone were retrieved as the result of the issuance and execution of a search warrant, based on probable cause, by Internal Affairs.
[71] Text Extraction Report, p. 2319.
[72] Text Extraction Report, p. 2274.

Officer #1 text: "Yea we got one like 20 sec b4 u took that one."

Officer #3 text: "Okay tell [Officer #2] he is writing I didn't hear it come over."

Officer #1 text: "*Well tell him to stop thinking about how to break cops toes and starting thinking about 6 zone*."

### C.  Internal Affairs Interview of Officer #2[73]

Officer #2 was interviewed by Internal Affairs on January 24, 2018. Officer #2 initially denied remembering Officer #1 making any comments that he (Officer #2) was responsible for Officer #1's injuries. Officer #2's testimony changed only after he was: (1) confronted with the WCS video of Officer #1 blaming Officer #2 for his injury, and (2) he had an opportunity to confer with his union representative. Only then did Officer #2 admit that Officer #1 blamed him for the injuries that the complainant had been accused of in Officer #1's police report. Officer #2 claimed that he initially thought Officer #1 was joking, but later admitted that Officer #1 later "went over what happened." Specifically, Officer #2 confirmed that Officer #1 told him that the mirror that Officer #2 threw out of the closet landed on his foot and broke his toe.

### D.  Internal Affairs Interview of Officer #1[74]

During his Internal Affairs interview, Officer #1 claimed that, after the adrenaline of the call wore off, he realized that the complainant had caused his injury. He claimed that "there's no other way it could have happened." Officer #1 further claimed that all his comments that blamed Officer #2 for causing his injury were jokes. Officer #1 also claimed he did not remember Officer #2 throwing a mirror or a wooden shelf out of the closet. Although he texted a friend that he put

---

[73] The Internal Affairs interview of Officer #2 was video recorded and reviewed by the Monitoring Team. The interview was also summarized in the Internal Affairs investigation report, pp. 23-25.

[74] The Internal Affairs interview of Officer #1 was video recorded and reviewed by the Monitoring Team. The interview was also summarized in the Internal Affairs investigation report, pp. 30-33.

the complainant in a "leg lock," he claimed he did not know what he was doing and he was just trying to pull the complainant's leg out of the closet. He did not recall telling Witness Officer #1 that he did not know how his toe was broken, nor did he remember saying the same to Officer #4. Although he acknowledged verbally blaming Officer #2 for his broken toe, he claimed it was because his injury was sustained on Officer #2's call and they were "picking fun at each other."

## V.    ADDITIONAL AND SIGNIFICANT MISCONDUCT WAS IDENTIFIED BY INTERNAL AFFAIRS AS THE RESULT OF THE REVIEW OF TEXT MESSAGES SENT TO AND FROM OFFICER #1'S CELL PHONE

A search warrant was sought and lawfully obtained by Internal Affairs for Officer #1's cell phone during the investigation.[75] Additional evidence of misconduct and potential racial bias was identified after Internal Affairs reviewed text messages and photographs contained on Officer #1's phone.

1.    Photos and text messages established that Officer #1 was responsible for the creation of at least one offensive "meme" about an African-American officer in his District.

- The meme was entitled: WHEN YOU ARE TOO SCARED TO DO POLICE WORK [above the photo of the victim officer carrying a box of "Manpons"] I CHOOSE MANPONS, THE SAFE, RELIABLE AND FORM-FITTING ALTERNATIVE [below the victim officer's photo].[76]

2.    In violation of privacy laws and Division policy, confidential information from police and state databases (OHLEG – Ohio Law Enforcement Gateway & LEADS – Law Enforcement Agencies Data System) regarding 76 individuals was stored on Officer #1's cell phone.[77]

---

[75] Search Warrant, Cuyahoga County Common Pleas, December 11, 2017.
[76] Text Extraction Report, at p. 93-94.
[77] Internal Affairs Investigation report, p. 14.

3.      In one text, Officer #1 described an unreported vehicular pursuit in which he was involved as a "90's style pursuit." [78] The Director ultimately concluded that he and Officer #4 had engaged in an unreported pursuit on May 17, 2017 and that he had failed to activate his WCS, as required by policy.[79]

4.      In various texts Officer #1 described that he used an unauthorized force technique on the complainant (a "leg lock") and described how he initially thought he had actually broken the complainant's leg (a fact that he did not report as required in his initial report and, potentially, a motivation for Officer #1 to lie about the cause of his own injury). The tone and language of the texts suggest that Officer #1 found the prospect of injuring the subject amusing:

- "Yeah, we fucked him up…I had him in a leg lock and I heard a crack LOL."[80]

- "I had him in a leg lock and I was like wtf why isn't this working, so I thought I wasn't doing it hard enough, and then he screamed. Haha."[81]

- "I'm pretty sure I broke his ankle…I had him in a leg lock after it happened and I kept twisting like am I doing this wrong I kept applying more pressure and I heard a crack he's like ahh get off my leg. Oh well."[82]

On the evening where he used force on the complainant, Officer #1 texted his girlfriend:[83] "about to go look for some assholes."[84] In multiple other texts, after he found out that he

---

[78] Text Extraction Report, at p. 2273.
[79] Officer #1 Discipline Letter, dated August 14, 2018.
[80] Text Extraction Report, at p. 2771.
[81] Text Extraction Report, at p. 2737.
[82] Text Extraction Report, at p. 2772.
[83] The Monitoring Team notes here that the exchanges between Officer #1 and his girlfriend are only germane here because they directly relate to the nature of his work and his state of mind on the evening of the incident.
[84] Text Extraction Report, p. 2780.

was under investigation for the incident involving the complainant, Officer #1 disparaged and complained about the complainant, referring to him as an "asshole," an "ass fuck," a "fuck face" and a "fucking dirt bag."[85]

- "[H]ow in the fuck could they even listen to that fucking dirt bag."[86]

- "[G]ot in a bad fight with a asshole that I should have just shot."[87]

- Officer #4: "I think they are going to fuck us for swearing at that asshole…I guarantee Officer #2's report sucks."[88]

- Officer #1: "how could they even listen to that fucking dirt bag?... this is why no one has any respect for IA, no one has the balls to say go fuck yourself we aren't looking into this."[89]

Included amongst the texts was the following exchange between Officer #1 and his partner, Officer #4 on December 10, 2017, after they became aware of the pending Internal Affairs investigation:

- "Such fucking bullshit. I get hurt off for 2 months and they do a fucking invest on me…for what cuz some ass fuck says he didn't do it…he didn't get hurt at all. I was the only one who got hurt."[90]

5. Text messages were found that showed that between May 12, 2017 and July 12, 2017, Officer #1 was providing information to a local television reporter.[91] Officer #1 provided the reporter with information about incidents that were occurring in his District. The leaks

---

[85] Text Extraction Report, pp. 822, 862, 853, 2761 & 2772.
[86] Text Extraction Report, at p. 822.
[87] Text Extraction Report, at p.2732.
[88] Text Extraction Report, p. 823.
[89] Text Extraction Report pp. 820, 822.
[90] Test Extraction Report, at p 853.
[91] Text Extraction Report, pp. 2102, 2052-2053, 2059, 2118-2119, 2194, 2288-2291 & 2307.

involved a number of shootings, as well as other newsworthy events. In addition, Officer #1 provided the reporter with information on the number and status of working zone cars in his District. These messages were in violation of Division policy, which requires that information be provided to the media through the Division's public information officer and not through individual officers in the field.

## VI. INTERNAL AFFAIRS AND THE CHIEF OF POLICE FOUND THAT THE INVOLVED OFFICERS VIOLATED THE COMPLAINANT'S CIVIL RIGHTS

At the conclusion of the Internal Affairs investigation, Officer #1 was "sustained" for 17 violations of CDP policy. They included: 1) Filing a False Report; 2) Lying to Internal Affairs; 3) Violating the complainant's Constitutional Rights; 4) Failure to Report a Use-of-Force against the complainant; 5) Use of an Inappropriate Force Technique; 6) Failure to report an injury to the complainant; 7) Use of Demeaning Language; 8) An out-of-policy pursuit not related to the incident involving the complainant; 9) Failure to Activate WCS – during the course of the out-of-policy pursuit; 10 – 16) Inappropriately providing information to the media; and, 17) Harassment of another Officer – not related to the incident involving the complainant.[92]

The Internal Affairs investigation revealed that Officer #2 committed misconduct relating to the arrest and incarceration of the complainant. That misconduct resulted in the County Prosecutor's Office designating Officer #2 as a "*Brady* Officer." This means that the County Prosecutor will now be compelled to disclose to any court the fact that Officer #2 was previously found to not be credible in the incident involving the complainant. Officer #2 was initially sustained by Chief Williams for three specifications: (1) being untruthful and/or withholding information about how Officer #1 sustained his injuries from his superior officers and from written reports; (2) violating the complainant's Due Process and Constitutional rights by falsely accusing

---

[92] Officer #1 Charge Letter, dated June 8, 2018.

him of felonious assault; and (3) having knowledge of an unreported use of force application (by Officer #1) and injury sustained by the complainant and failing to report it to his superior or in his written reports.[93]

The Chief also recommended that a third officer, Officer #3, be sustained for two specifications: (1) being "untruthful and/or withheld information about how Officer #1 sustained his injury from his superior officers, and from written reports," and (2) violating the complainant's Due Process and Constitutional rights while having knowledge of a false accusation and not reporting it to his supervisors, or in his written reports.[94]

Chief Williams completed his review of the Internal Affairs file on May 29, 2018. He recommended that the Director of Public Safety conduct a pre-disciplinary hearing and terminate Officer #1 from his employment with the CDP if the Director determined that the allegations should be sustained. The Chief also recommended that Officers Officer #2 and Officer #3 each be suspended for up to 30 days.[95]

The City Charter requires the Chief to forward any disciplinary matters to the Public Safety Director if he recommends discipline greater than a 10-day suspension.[96]

## VII. THE STANDARD OF PROOF FOR INTERNAL POLICE INVESTIGATIONS IS LESS THAN THE STANDARD OF PROOF FOR CRIMINAL PROSECUTIONS OF THE POLICE

Administrative investigations conducted by Internal Affairs require a lower standard of proof than criminal investigations.[97] In order for administrative discipline to be imposed by the

---

[93] Officer #2 Charge Letter, dated June 8, 2018.
[94] Officer #3 Charge Letter, dated June 8, 2018.
[95] Internal Affairs Unit Investigation Tracking Sheet, p. 11.
[96] Charter of the City of Cleveland, Chapter 25, Section 119.
[97] On February 9, 2018, the County Prosecutor declined to file criminal charges against Officer #1 based on the investigation submitted by Internal Affairs. The declination did not provide any rationale for the decision, and the Monitoring Team has no information or authority to reach conclusions regarding the reasonableness of that decision. In order to file criminal charges, however, any County prosecutor must be convinced of her/his ability to prove any criminal charges to a jury "beyond a reasonable doubt."

Chief of Police or the Director of Public Safety the evidence supporting the allegation must meet a "preponderance of the evidence" standard.[98] In other words, if CDP command staff concludes that it is "more likely than not" that an officer committed misconduct, a "sustained" finding must be made, and the officer is subject to discipline based on the nature of the conduct that has been sustained.

Applying the applicable standard to the facts outlined in Section IV, it appears to the Monitoring Team that the Chief of Police was reasonable in affirming the recommendation of Internal Affairs that Officer #1 should have been disciplined.

## VIII. THE DEPARTMENT OF PUBLIC SAFETY NEGOTIATED PLEA AGREEMENTS WITH THE INVOLVED OFFICERS INSTEAD OF CONDUCTING PRE-DISCIPLINARY HEARINGS AND IMPOSING APPROPRIATE DISCIPLINE

On June 26, 2018, a pre-disciplinary hearing was scheduled for Officer #1, Officer #2, and Officer #3 with the Director of Public Safety. Director McGrath assigned the case to be heard by Assistant Director of Public Safety Timothy Hennessy. In lieu of conducting a hearing, and after private conversations with police union representatives, Assistant Director Hennessy reached a plea agreement with all of three of the charged officers.

### A.  Officer #1 Plea[99]

Officer #1 entered a guilty plea to amended charges following private discussions with Assistant Director Hennessy. The parties then went on the record and Mr. Hennessy amended Specifications #1 and #2 to read:

---

[98] Dkt. 7-1, ¶ 176.
[99] Officer #1 Discipline Letter, dated August 14, 2018, signed by Director Michael McGrath.

- "On March 4, 2018, you (Officer #1), withheld information regarding how you sustained an on-duty injury to your sector supervisor and on reporting documents (OWC forms, Blue Team, Form 1)."[100]

- "On February 22, 2018, you (Officer #1), withheld information during your Garrity interview with Internal Affairs."[101]

Specification #3 was dismissed and all other allegations were sustained.[102] Officer #1 agreed to a 30-day suspension after admitting the amended allegations and agreed not to appeal the discipline. The plea agreement was finalized by Safety Director Michael McGrath via a formal letter dated August, 14, 2018.

### B.  Officer #2 Plea[103]

Assistant Director Hennessy also reached a plea agreement with respect to the charges against Officer #2. Officer #2 accepted a 12-day suspension and agreed not to appeal. In a discipline letter, dated August 14, 2018, Director Michael McGrath approved the plea agreement by amending specification #1 removing verbiage that alleged that Officer #2 was untruthful and instead stated that he "withheld information about how Officer #1 sustained his injury from his superior officers, and from written reports." Director McGrath also dismissed specification two, thereby exonerating Officer #2 from culpability for violating the complainant's Due Process and Constitutional rights and found him guilty of allegation 3. That charge confirmed that Officer #2

---

[100] Specification #1 originally read: "It was determined that on March 4, 2017, you [Officer #1], were untruthful in reporting how you sustained an on-duty injury to your sector supervisor, and on reporting documents (OWC forms, Blue Team, Form 1)." (June 8, 2018 Charge Letter, p. 1).

[101] Specification #2 originally read: "It was determined that on February 22, 2018, you [Officer #1] were untruthful in your Garrity Interview with Internal Affairs." (June 8, 2018 Charge Letter, p. 2).

[102] Specification #3 originally read: "It was determined that on March 4, 2017, you [Officer #1] violated [arrestee's] Due Process and Constitutional rights by falsely accusing him of Felonious Assault." (June 8, 2018 Charge Letter, p. 2).

[103] Officer #2 Discipline Letter, dated August 14, 2018, signed by Director Michael McGrath.

had knowledge of an unreported use of force application and injury sustained by the complainant and failed to report those facts to his supervisor or in written reports.

### C.  Officer #3 Plea[104]

Officer #3 accepted an 8-day suspension and also agreed to not appeal the disciplinary decision. In a discipline letter, dated August 14, 2018, Director Michael McGrath approved the plea agreement by amending specification #1, removing verbiage that alleged that Officer #3 was untruthful and instead alleged that he "withheld information about how Officer #1 sustained his injury from his superior officers, and from written reports." Director McGrath also dismissed specification two, thereby exonerating Officer #3 from culpability with respect to the violation of the complainant's Due Process and Constitutional rights.

## IX.  THE DISCIPLINARY PROCESS USED IN THIS INCIDENT FAILED TO COMPORT WITH CONSENT DECREE REQUIREMENTS.

The Consent Decree requires that disciplinary decisions be fair and consistent "and that *mitigating and aggravating factors are identified* and consistently applied and *documented*."[105] No rationale was ever documented or provided for the decision to amend the first two specifications – #1 which originally alleged that Officer #1 intentionally wrote a false report, as opposed to the allegation that he "withheld information" regarding how he sustained his injury; and #2 which originally alleged he intentionally lied to Internal Affairs, as opposed to only "withholding" information during his interview. Additionally, there was no explanation ever provided for the determination that Officer #1 should not have been sustained for violating the Due Process and Constitutional rights of the complainant.

---

[104] Officer #1 Discipline Letter, dated August 14, 2018, signed by Director Michael McGrath.
[105] Dkt. 7-1 ¶ 245 (emphasis added).

The same is true of the disciplinary decisions for Officers #2 and #3. The Department of Public Safety documented no rationale for the changes made to the recommendations and findings of Chief Williams, nor any reasoning for the imposition of the lesser penalty. Again, the respective 12-day and 8-day suspensions were confirmed by Director McGrath in letters to the officers on August 14, 2018.

It must be noted that, even after the Assistant Director reached his plea agreement with Officer #1 (and the other officers), the Safety Director was not bound by his decisions. In fact, as the ultimate decision-maker for the Department of Public Safety, the Director had the right to withdraw any plea agreement at any time prior to approving it in writing. The cases could have proceeded to full hearing with an order from the Director to his Assistant Director. As such, the Director has responsibility for the decisions ultimately made in this case, like any case addressed by the Department, and the manner in which those decisions are documented.

## X.  THE DISCIPLINARY DECISIONS WERE NOT SUPPORTED BY THE FACTS DISCOVERED BY INTERNAL AFFAIRS

After reviewing the Internal Affairs file, the Monitoring Team was unable to identify any reasonable rationale for the plea agreements reached. As detailed in Sections IV and VI, above, Chief Williams' recommendation that Officer #1 be terminated from employment with the Division of Police was reasonable, appropriate, and justified in light of the nature and gravity of the misconduct committed by that officer. The conduct of the other officers involved in this incident warranted greater attention and consideration by the Department of Public Safety. The following subparts summarize and address the details netted by the investigation of IA for the other involved officers.

### A.  #2's Employment with the CDP Should Have Been Terminated

The facts as identified by CDP's Internal Affairs investigation establish that Officer #2 was untruthful as to what he knew about the cause of the injury sustained by Officer #1. Of equal importance, Officer #2 knowingly withheld this exculpatory information from his supervisors and prosecutors. The disclosure of that information would likely have resulted in the release of the complainant from his unlawful incarceration.

Officer #2 started his Internal Affairs interview[106] by being evasive with respect to his knowledge of Officer #1's misconduct and only admitted to that knowledge after being confronted with BWC footage and texts that were inconsistent with his initial answers. Toward the end of his interview, Officer #2, appeared to admit that he understood that Officer #1's joking was with respect to Officer #2's intent when he threw the mirror out of the closet as opposed to the fact that the mirror may have broken his toe:

> "[H]e said that jokingly that I threw the mirror at him, like I did it on purpose, and broke his toe. Like I maliciously threw the mirror at him…but I think later he said that the guy kicked him or did whatever to his toe or like stomped on his toe or whatever."[107]

By remaining mute and not reporting the alternative explanation for Officer #1's injury, Officer #2 allowed a false prosecution to continue, which arguably amounted to a conspiracy between the two officers to commit false imprisonment and perjury. Finally, in an attempt to mitigate his own misconduct, Officer #2 suggested that he may have told a supervisor about Officer #1's claim.  However, there was never any information provided to corroborate this claim.

---

[106] Officer #2's Internal Affairs interview was summarized by the Internal Affairs investigator in his final report (pp 23-25) and was video recorded and reviewed by the Monitoring Team.
[107] Officer #2 Internal Affairs interview (January 24, 2018), Video #2, at 19:30-19:56.

Ultimately, the evidence against Officer #2 was as compelling and significant as against Officer #1. WCS footage shows Officer #1 blaming Officer #2 for his injury. Additionally, text messages were located on Officer #1's phone that continued to place the blame on Officer #2. On December 6, 2017, prior to the service of the search warrant on Officer #1's phone, Officer #1 and Officer #2 appeared to confirm with one another their plan to stick to their story.[108]

During his January 24, 2018 interview with Internal Affairs, Officer #2 stated he did not remember being at the hospital with Officer #1. He also claimed not to remember any conversation where Officer #1 blamed him for breaking his toe. Only after being shown the text message exchange where Officer #2 acknowledged that Officer #1 blamed him for breaking his toe did Officer #2 say that he "maybe" remembered it: "I'm not gonna say I didn't text it, obviously I did, but I can't remember."[109] Officer #2 continued being evasive when shown a photo of a DVD shelf he threw out of the closet and asked if Officer #1 ever told him that the shelf landed on his foot:

> "I mean, I don't know…I mean…he…I don't know like…I was, I was throwing stuff…I don't know…I was just trying to get to the guy…I mean, I didn't, I really don't remember when they got there…I remember, because I thought…when I think I reviewed my camera once, and it's, I saw it…umm…they arrive sooner than I thought they did. I thought I was like

---

[108] Officer #1 text: (12/6/17 @ 23:31): "Yooooo, I hope this isn't too late but I guess your internal affairs invest is about me. If get a chance give me a call."
Officer #1 text (12/6/17 @ 23:37): "IDK I'm worried that the joke about u breaking my foot might fuck me haha." (Text Extraction Report, p. 863).
Officer #2 (12/6/17 @ 23:40): "You will be fine, don't lose sleep over it. They are just looking at everything that you've gotten into because of your shooting. [Officer #1 had been previously involved in an officer-involved shooting that had not yet been administratively resolved]. A report was made to document your injuries and how they happened. You will be fine. I'm sure I said some bad words so I'm sure I will get something too."
Officer #1 (12/6/17 @ 23:41): "That's fucked up." (Text Extraction Report, p. 863-864).
Officer #2 (12/6/17 @ 23:42): "It's the city…and the doj, the city has to make it look like they have balls to stand up to their own."
Officer #1 (12/6/17 @ 23:43): "Yeah I guess"
Text Extraction Report, p. 862-864.
[109] Officer #2 Internal Affairs interview (January 24, 2018), Video #1, at 10:02-10:23.

wresting around with the guy and kinda moving things around, and but, I mean, I think that at one point, I mean, he said that like ummm, I don't know like a mirror or something fell on his toe, or I threw like, I don't know."[110]

The Internal Affairs investigator then noted that it was Officer #2 who first mentioned a mirror – he was asked again if Officer #1 mentioned a mirror in relation to his injury; he answered: "I don't know, I mean, I don't think it was a bookshelf…"[111] Officer #2 was then asked if at some point Officer #1 told him the mirror landed on his foot; he answered: "I don't know, maybe, possibly." Officer #2 then asked to confer with his union representative: "I need a second".[112]

Only after conferring with his Union representative and reviewing his BWC footage did Officer #2 verify that Officer #1 told him that the mirror had hit him and had caused the injury to his foot. While Officer #2 stated that he initially thought the Officer #1 was joking, Officer #1 went on to explain that the mirror that was thrown out of the closet by Officer #2 had broken his toe. Officer #2 then went on to attempt to justify charging the complainant with felonious assault by saying: "I was trying to get the guy under control, and his injury was because of everything that was going on."[113] Officer #2 was ultimately asked if he was "under a full understanding that the mirror broke his [Officer #1's] toe, and not the arrested male at that point?" He answered: "Well…I guess, yes. I was under the…yes, that I, because of me throwing the mirror trying to get like everything out of the way…"[114]

He then went on to claim that "I guess I just did what my supervisor told me to do," and he later suggested that he thought he told a supervisor that it was a piece of furniture that caused the

---

[110] Officer at #2 Internal Affairs interview (January 24, 2018), Video #, at 13:45-15:00.
[111] Officer #2, Internal Affairs interview (January 24, 2018), Video #1, 15:00-15:25.
[112] Officer #2, Internal Affairs interview (January 24, 2018), Video #1, at 15:40-16:05.
[113] Officer #2 Internal Affairs interview (January 24, 2018), Video #2, at 4:18.
[114] Officer #2 Internal Affairs interview (January 24, 2018), Video #1, at 7:07-7:30.

injury.[115] Upon further inquiry, however, and after it was pointed out that his police report indicated that the complainant had kicked Officer #1, Officer #2 stated: "now I guess I'm just all mixed up…I don't know, I really don't know."[116] When asked if he was certain that his Sergeant was aware of the true cause of Officer #1's injury, he said he wasn't sure, but he thought that he told him.[117]

When asked why he wouldn't put the information about the mirror in his report: "I don't know." Asked if it was normal practice to leave pertinent information out of felony reports; he answered: "No."[118]

Officer #2's supervising Sergeant was also interviewed by Internal Affairs and denied being aware of any other explanation existing for Officer #1's injury outside of the information provided by Officers #1 and #2 in their official reports.

It is clear from the evidence obtained by Internal Affairs that Officer #2 only came forward and finally told the truth about the actual cause of Officer #1's injury after he was confronted with what he interpreted to be incontrovertible evidence. The Monitoring Team can find no reasonable cause to remove language from the specifications recommended by Internal Affairs and the Chief of Police that alleged Officer #2 was, in fact, untruthful with respect to how Officer #1 sustained his injuries. Similarly, no cause has been found to dismiss the charge that he violated the complainant's Due Process and Constitutional rights. The only reasonable discipline for the proven misconduct was termination from employment with the Cleveland Division of Police.

---

[115] Officer #2, Internal Affairs interview (January 24, 2018), Video #2, at 4:45; 7:45-8:01.
[116] Officer #2 Internal Affairs interview (January 24, 2018), Video #2, at 08:08-08:45.
[117] Officer #2 Internal Affairs interview (January 24, 2018), Video #2, at 09:30, 10:18.
[118] Officer #2 Internal Affairs interview (January 24, 2018), Video #2, at 20:00-20:35

### B.  Officer #3 Should Have Received a Longer Period of Suspension

The Department of Public Safety appears to have also ignored pertinent facts related to the misconduct of Officer #3. After our review of the Internal Affairs file, the Monitoring Team was unable to identify any reasonable rationale for the plea agreement that was reached. In fact, the Monitoring Team believes that Chief William's original recommendation of a 30-day suspension would have been appropriate discipline for Officer #3.

Officer #3 was interviewed by Internal Affairs on two occasions.[119] During his first interview with Internal Affairs, on January 17, 2018, he acknowledged that he did not see the complainant kick anybody ("he was just not being cooperative – flailing his arms and legs").[120] He confirmed hearing Officer #1 blame Officer #2 for breaking his toe, but thought that it was a joke because he did not know why Officer #2 would break Officer #1's toe. He acknowledged getting a text from Officer #1 on May 17, 2017, blaming Officer #2 for breaking his toe; but he claimed, once again, that he thought it was a joke.

Officer #3 was interviewed a second time by Internal Affairs, on January 30, 2018. Officer #3 acknowledged talking to Officer #2 about the incident after Officer #3's first interview with Internal Affairs. Officer #3 claimed that he did not remember if the filed police report was for assault or if the incident was just a crisis intervention. When asked if he overheard a conversation between Officer #1 and Officer #2 about how Officer #1's toe was broken, he responded: "Possibly yeah. I mean he said Officer #2 you broke my toe, in passing."[121] In response to whether he ever heard Officer #1 talk about a mirror landing on his toe; he replied: "Possibly, I remember something like, it was either a drawer, a mirror, kicked it, something, there wasn't, there were a

---

[119] Officer #3's Internal Affairs interviews were summarized by the Internal Affairs investigator in his final report (pp 21-22) and were video recorded and reviewed by the Monitoring Team.
[120] Officer #3 Internal Affairs interview (January 17, 2018), at 07:05, 09:40.
[121] Officer #3 Internal Affairs interview (January 30, 2018), at 1:40.

couple things."[122] When he was asked if it was fair to say that Officer #1 told Officer #2 that something he threw out of the closet landed on his foot; he replied: "Yes."[123] He still claimed that he passed off these conversations as a joke. Officer #3 was unable to provide an explanation for why he did not provide Internal Affairs with this information in his first interview.

After reviewing the Internal Affairs investigation as to Officer #3, there was sufficient evidence to establish that Officer #3 had been evasive and inaccurate in his first Internal Affairs interview. Officer #2 stated in his interview with Internal Affairs that he was "almost positive" Officer #3 was present during the conversation he had with Officer #1 about the mirror hitting Officer #1's toe.[124] In his second interview, Officer #3 acknowledged being present for such a conversation. In his second interview, he also acknowledged that he had spoken to Officer #2 about the incident after his first interview with Internal Affairs. It was only thereafter that he acknowledged knowing anything about the items thrown out of the closet and that they may have provided an alternative explanation for Officer #1's injury.

Although the Monitoring Team acknowledges that more effort could have been taken into investigating whether Officer #3 actually knew that the complainant was in custody based on Officer #1's allegation of felonious assault, an eight-day suspension for failing to cooperate in the investigation appears to be unreasonable and contrary to the expectations and needs of the Cleveland Division of Police and the Department of Public Safety.

### C.  Charges Should Have Been Proffered Against Witness Officer #4

No charges were proffered against Officer #4 by Internal Affairs as they related to the incident involving the complainant and no discipline was recommended by Chief Williams in that

---

[122] Officer #3 Internal Affairs interview (January 30, 2018), at 1:50.
[123] Officer #3 Internal Affairs interview (January 30, 2018), at 2:34.
[124] Officer #2 Internal Affairs interview (January 24, 2018), Video #2, at 15.05.

regard. The Monitoring Team is concerned by the Division's failure to recommend sustained charges against Officer #4 (Officer #1's partner) relating to the incident.

During his interview with Internal Affairs, on January 30, 2018,[125] Officer #4 acknowledged that Officer #1 initially told him he did not know how he broke his toe. Officer #4 also acknowledged that he did not see how Officer #1 was injured as he was facing the other way when it happened. And yet, on two occasions at the scene, even after being told by Officer #1 that he did not know how he was injured, Officer #4 corroborated Officer #1's subsequent claim that, in fact, he was kicked by the complainant and voluntarily offered up that the suspect was "kicking" and flailing" and "slamming" Officer #1:[126]

- Witness Officer #2's WCS video shows Officer #1 first saying to Officer #4 that he did not know how he was injured; he then comes back 30 seconds later with Officer #4 and tells Witness Officer #2 on video that he was kicked by the complainant:

    o Witness Officer #2: "You all right man?"

    o Officer #1: "Yeah, yeah, I'm good."

    o Witness Officer #2: "Nothing you can do about that but tape it."

    o Officer #1: "I know. I want to go to the hospital, so may as well."

    o Officer #4: "You really think you broke it?"

    o Officer #1: "Yeah, I'm almost positive I broke it."

    o Officer #4: "Your toe?"

    o Officer #1: "Yeah."

    o *Officer #4: "How?"*

---

[125] Officer #4's Internal Affairs interviews were summarized by the Internal Affairs investigator in his final report (pp 26-28) and were video recorded and reviewed by the Monitoring Team.
[126] Witness Officer #2 WCS Video, at 11:52-12:50.

- o   *Officer #1: "I don't know. I don't know."*

- o   Officer #4: "Fuck."

- o   Officer #1: "Either my toe is broke or my nail is ripped off."

- o   [Officer #4 and Officer #1 walk away and then return after 30 seconds]

- o   [Witness Officer #2 advises his WCS is on].

- o   *Officer #4: "Your foot hurts, your toe, your toe when you step on it, did he kick it?"*

- o   *Officer #1: "I think he kicked it."*

- o   *Officer #4: "Yeah, he was flailing his legs."*

- o   Officer #1: "and that's when I dove on his back half to try to hold him down."

- Witness Officer #3's WCS shows an additional conversation between Officer #4, Officer #1, the supervising Sergeant and members of Emergency Medical Services:[127]

  - o   Officer #4: *"my partner's toe might be broke. . .the guy was flailing and kicking."*

  - o   Sergeant: "you got kicked?"

  - o   Officer #1: "yeah"

  - o   *Officer #4: "The guy was like slamming him."*

Consequently, it appears clear that Officer #4 was willing to offer false corroboration of Officer #1's claim at the scene. Even though he later acknowledged that he did not see how Officer #1 was injured, he was willing to tell a supervisor that the complainant was "slamming" Officer #1.  Officer #4 then went on to document in his own report Officer #1's claim that he was assaulted

---

[127] Witness Officer #2 WCS Video #1, at 09:24-09:35.

by the complainant, even though it was Officer #4 who first suggested to Officer #1 that his injury was caused by being kicked by the complainant.

It does not appear that either Internal Affairs, the Chief's Office or the Directory of Public Safety's Office identified this issue in their review and handling of the case. As such, Officer #4 was not subject to any discipline for actually facilitating the original false statements made by Officer #1.

## XI. THE IMPOSITION OF DISCIPLINE IN THIS CASE HIGHLIGHTED A SYSTEMIC PROBLEM REGARDING THE DIVISION'S 2018 DISCIPLINARY MATRIX.

The Division adopted a new Disciplinary Matrix, effective January 1, 2018, which was submitted by Monitor on January 10, 2018 for Court approval.[128] Although the 2018 Matrix would have allowed the Public Safety Director to impose discipline as believed appropriate by the Monitor in this case – in that the Matrix allowed for the Safety Director to either suspend, demote *or terminate* an officer for commission of a Group III violation where "aggravating factors outweigh any mitigating factors or [there are] no mitigating factors present; as well as where the conduct involves "gross immorality violations" – the Matrix did allow for a suspension to be imposed from anywhere between 13 to 30 days for such violations.[129] In fact, the only violation for which the Matrix required automatic termination was the commission of "felony offenses"[130]

---

[128] Although the use-of-force incident in this case took place on May 9, 2017, almost eight months before the adoption of the new Matrix, the involved officers were interviewed by Internal Affairs in 2018, after the adoption of the Matrix. As such, the Director would have been expected to apply the newly adopted Matrix to the allegations involving untruthfulness made during the course of these interviews. In addition, given that the complainant remained in custody until January 16, 2018 and the false charges against him were not dismissed until February 8, 2018, the continuing Constitutional rights violations continued until after the new Matrix was adopted.

[129] CDP General Police Order #1.1.11 (Section I (Table of Discipline), Paragraph.J.3.b-d.

[130] It is also arguable that Officers 1 & 2 were required to be terminated under the 2018 Matrix as they either 1) committed a federal felony of 18 U.S.C. Section 242 for violating the complainant's 14th Amendment Right not to be deprived of life, liberty, or property without due process of law while acting under color of authority or 2) committed a felony violation of Ohio Revised Statutes, Title 29, Chapter 2921, Section 2921. Tampering with evidence: (A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:…(2) Make, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose

or "any conviction resulting in a Weapons Disability" and the only cases where "a rebuttable presumption of termination" existed was for a *second* Group II violation involving "serious misdemeanor offenses, gross immorality violations, [or] gross neglect of duty."[131]

The wide range of potential discipline permitted by the 2018 Matrix was of particular concern to the Monitoring Team for violations involving untruthfulness. Given the apparent abuse of discretion that was exhibited in this case, the Monitoring Team advised the City in 2019 that the Disciplinary Matrix should make it clear that where violations involving integrity and honesty are concerned, there should be a presumption that an officer will be terminated, particularly where aggravating circumstances outweigh mitigating circumstances or where there are no mitigating circumstances present. As a result of that recommendation, the City did, in fact, update the Disciplinary Matrix (effective August 12, 2019) to call for presumptive termination of any officer sustained for "False report, false statement, untruthfulness, or dishonesty."

## XII.  A NEW LIMITATION ON PLEA BARGAINING PUT INTO PLACE BY THE MAYOR CANNOT BE USED AS AN ALTERNATIVE FOR THE GOOD JUDGEMENT OF THE DIRECTOR OF PUBLIC SAFETY

On August 27, 2018, after the Mayor's Office became aware of the plea bargains in this case, Mayor Jackson issued instructions creating a new process for settlements of pre-disciplinary hearings for the CDP. Mayor Jackson ordered that "there are to be no settlements of discipline prior to [a] disciplinary hearing" instead requiring that pre-disciplinary hearings be held even where an officer pleads guilty or no contest to one or more allegations. Further, the Mayor instructed that in all settlement discussions, the Director of Public Safety and the Police Chief are required to confer with the Law Department and then bring the matter to the Mayor's attention.[132]

---

to corrupt the outcome of any such proceeding or investigation. (B) Whoever violates this section is guilty of tampering with evidence, a felony of the third degree. (Emphasis added). Effective Date: 01-01-1974.

[131] CDP General Police Order #1.1.11 (Section I (Table of Discipline), Paragraph.J.3 e, h, i.

[132] See August 27, 2018 Memo: "Re: Disciplinary Procedures".

The decisions made in this case were made with the full knowledge that the Cleveland Division of Police is required to show substantial compliance with a federal court mandated Consent Decree. While the August 27 memo from the Mayor now requires the Director of Public Safety to confer with the Law Department before reaching a settlement agreement, that process cannot replace the use of good judgement, logic, and common sense in the making of disciplinary decisions. In fact, the memo does not actually require the Director to confer with the Law Department prior to making decisions on serious cases where a settlement agreement is not being considered. Further, the Monitoring Team notes that good practices in employment law might counsel elected officials against being directly involved in disciplinary decision-making to avoid any appearance that decisions are being inappropriately influenced by outside factors and ensure that they are, instead, based on an objective and fair evaluation of the facts uncovered during the course of a thorough Internal Affairs investigation.

## XIII.  CONCLUSION

The task of the Monitoring Team is to duly consider the City's Department of Public Safety compliance with the Consent Decree as it relates to the fair and impartial imposition of discipline with respect to officers who have violated Department policies and procedures. The Monitoring Team concludes that the City, in this case, acted in a manner contrary to the Consent Decree by failing to terminate two officers for serious misconduct and for failing to impose reasonable and appropriate discipline with respect to two other culpable officers. Further, the Department of Public Safety failed to document any rationale for its decision-making in this case. Although the Mayor has injected the Law Department into the process in order to avoid future problematic decisions, more needs to be done to ensure Consent Decree compliance.