| | |
|---|---|
| TO: | HONORABLE JUDGE SOLOMON OLIVER, US DISTRICT COURT |
| COPY: | KARRIE HOWARD, DIRECTOR OF PUBLIC SAFETY<br>CALVIN WILLIAMS, POLICE CHIEF<br>GREG WHITE, OFFICE OF THE MAYOR<br>BARBARA LANGHENRY, DIRECTOR OF LAW<br>GARY SINGLETARY, CHIEF COUNSEL<br>JUSTIN HERDMAN, UNITED STATES ATTORNEY<br>TIMOTHY MYGATT, DEPUTY CHIEF – CRT<br>JONAS GEISSLER, CRT<br>NICOLE PORTER, CRT<br>MEHVEEN RIAZ, CRT<br>LYNN BUCK, AUSA<br>MICHELLE HEYER, AUSA<br>HEATHER TONSING VOLOSIN, AUSA |
| FROM: | HASSAN ADEN, MONITOR<br>CLEVELAND MONITORING TEAM |
| SUBJECT: | **SUPPLEMENTAL** MONITORING TEAM REVIEW OF DIRECTOR OF PUBLIC SAFETY DISCIPLINARY DECISIONS |
| DATE: | JUNE 29, 2020 |

## I. INTRODUCTION

In a memorandum dated June 15, 2020, the Monitoring Team reviewed the decision-making of the Director of Public Safety with respect to the imposition of discipline on employees of the Cleveland Division of Police, from March 2018 through June 1, 2020. The Director retired from his position on June 19, 2020. Subsequent to the completion of our June 15, 2020 Memorandum, the Director made three additional disciplinary decisions. They included a case involving four officers who were sustained for drinking alcohol on duty, one involving allegations of domestic violence, and another involving allegations of insubordination.

The Monitoring Team provides the following summary and findings with respect to these additional three cases in order to provide a complete review of the cases decided before the end of

Director's tenure. As such, this is supplemental to our June 15, 2020 Memorandum and should be read in context.

**Case No. 40:**

On September 29, 2019, four Cleveland Police Officers were "sustained" for engaging in the following acts: 1) consuming alcohol at the "49th Street Tavern" in the City of Newburgh Heights while on duty (all officers); 2) submitting untruthful daily duty reports that reported the officers were at a different location than the 49th Street Tavern (all officers); 3) leaving the City and their patrol areas "without necessity and without permission;" (3 officers) 4) "engag[ing] in conduct, speech and acts that reasonably diminished the esteem of the Division" (all officers); 5) engaging in conduct that constituted "gross neglect of duty" (all officers); and 6) failing to act as a "role model" to a probationary officer (1 Field Training Officer).

One of the officers was a "Field Training Officer" (FTO) at the time of the offense. Another one of the officers was on probation and being trained by the FTO. The probationary officer told Internal Affairs that he felt pressured to consume the alcohol after his FTO ordered drinks for them both. All four officers accepted gratuitous alcohol drinks from a patron and consumed those drinks while on duty, in uniform and in full view of the public.

In letters dated June 17, 2020, the Director terminated the employment of all four officers identifying the following "aggravating factors" in all four letters: "[t]he consumption of alcohol on duty in uniform, diminishing the esteem of the Division, the existences of an actual or demonstrable risk of injury or harm to the public, *Brady-Giglio* concerns, and untruthfulness in duty report and otherwise, which carries a presumption of termination." In the letter relating to the Field Training Officer, the aggravating factor of "improper conduct while acting in the capacity of

Page 2

a Field Training Officer" was added. In addition, it was noted that the FTO had a prior 8-day suspension imposed against him for driving while under the influence.

Each of the disciplinary letters also contained the following language: "Evidence and testimony presented during the [pre-]disciplinary hearing illustrated the fact that you diminished the esteem of the Division, as well as violated the public's trust when you were seen drinking on-duty, while in full uniform and accepting gratuitous drinks in full view of the public to whom you have an obligation to protect and serve. [After consuming alcoholic beverages, you left the tavern to answer a call for service. You then returned to the tavern to continue consuming more alcohol while on duty.][1] You intentionally falsified your daily duty report in an attempt to conceal your misconduct and location of drinking on duty. You also compromised your ability to testify in court. Pursuant to the Disciplinary Guidance General Police Order 1.7.06 [made effective on August 12, 2019], falsifying documents carries a presumption of termination."

The terminations imposed by the Director followed the guidelines of the Disciplinary Matrix, as the officers filed false daily duty reports and other Group III violations, which raised issues and concerns regarding the officers' overall credibility and their ability to testify in future cases. In addition, all of the allegations were appropriately classified as "Group III" violations, given the seriousness of the underlying acts and according to the definition of a Group III offense contained in the disciplinary matrix. Finally, the Monitoring Team noted that the Director provided an explanation in each of the letters for his rationale, in compliance with the Monitoring Team's prior request as described in our June 15, 2020 Memorandum.

Some arguable mitigating factors (such as the pressure felt by the probationary officer, whether accepted or rejected as mitigating) should have been addressed, as well as why the

---

[1] The bracketed language was included in the verbiage of three of the disciplinary letters.

aggravating factors outweighed any mitigating factors. The Monitoring Team also questions why the probationary officer was not terminated from his employment by the Division while he was on probation[2] instead of waiting to handle the case through the normal disciplinary process; such an approach does not deny the employee due process, but instead appropriately frames the level of process that is due to probationary employees.

**Case No. 41:**

In a letter dated June 18, 2020, the Director sustained a CDP Sergeant for a total of eleven specifications for multiple instances of insubordination, including: in August and October, 2018, disobeying direct orders regarding the submission of secondary employment requests and requests for clarification regarding being precluded from working secondary employment (two specifications involving at least 23 separate violations); in November 2018, submitting a daily duty report "that contained inaccurate statements, representations and inflammatory language;" circumventing the chain-of-command by directly e-mailing the Traffic Commissioner regarding his compliance with verbal and written instructions; in April 2019, making insubordinate statements to a superior, sending an "insubordinate" email containing "false and derogatory [statements]" and making "disparaging and offensive comments" regarding the Traffic Commissioner (4 separate allegations); in August 2019, taking an aggressive stance to a supervisor and refusing orders to de-escalate the situation; in August, 2019, damaging an OPS complaint form and making statements inconsistent with the evidence relating to how the complaint form was damaged; in February and June 2019 making hundreds of public records requests, during his shift of duty, over a period of more twelve hours; and, in January 2019, failing to report misconduct to superiors.

---

[2] The officer was hired on November 26, 2018 and was on probation until that same date in 2019, almost two months after the date of the violation.

Page 4

The Director imposed a 20-day suspension without pay, for a first offense Group III violation with aggravating circumstances, to include "Multiple Group I, II, and III violations…and multiple occurrences involving the same incidents." The Director found that the aggravating factors outweighed the mitigating factors; as such, the disciplinary matrix called for a 13 to 30-day suspension without pay and/or demotion or termination, but did not adequately address the multiple instances of insubordination, allegations of workplace violence and false statements made during the course of the Sergeant's employment in reaching his conclusion.

**Case No. 42:**

On June 27, 2019, an off-duty CDP Homicide Detective became involved in a physical altercation with his 20-year-old daughter wherein she alleged that he physically injured her. The off-duty Detective was arrested for domestic violence and was eventually sustained by the Division for two specifications: 1) engaging in acts that "constitute the crime of domestic violence in violation of ORC Section 2919.25, in the you [] did knowingly cause or attempt to cause physical harm [to wit: Mild Buckle Fracture of the Distal End of the radius (right forearm/wrist) to a family [adult daughter] or household member, all in violation of the Manual of rules, Rule 2.01. [Group III violation]" and 2) getting "into a verbal and physical altercation with your adult daughter []. Subsequently, and still on June 27, 2019, you [] were arrested and charged with Felonious Assault. On March 13, 2020, you did plea no contest and you were found guilty of Disorderly conduct, in violation of O.R.C. Section 2911.11(A)(4) in the Cuyahoga County Court of Common Pleas…A violation of Disorderly Conduct is a Fourth Degree Misdemeanor. All in violation of the Manual of rules, Rules 2.01. [Group II violation]."

In a letter dated June 18, 2020, the Director imposed discipline in the form of a 20-day suspension without pay. The Director found aggravating circumstances to include that the victim

was a family member and that the victim was physically injured. The disciplinary letter noted that the Detective had been suspended from duty, without pay, since the time of the incident. The Director also made a finding that there was a mitigating circumstance that was identified by text messages, sent by the victim to the Detective "establishing evidence of a toxic relationship between your daughter and you." The Director specifically referenced "the words used by the daughter, which many may believe are vile and may constitute a threat." The Director also noted that the Detective had "no active discipline" as mitigation. Even so, he concluded that the aggravating factors outweighed the mitigating factor[s]. The Director also referred the Detective to the "Ease at Work" program and to "receive employment related counseling as to the impact between the stressors faced by police and their work and its impact on the family."

Given the Director's finding that the case involved a Group III violation where the aggravating factors outweigh the mitigating factors, the disciplinary matrix called for a 13 to 30-day suspension without pay and/or demotion or termination.

As previously requested by the Monitoring Team, the disciplinary letter provided the rationale for the Director's decision. Based on that rationale, the Monitoring Team questions the analysis of the daughter's text messages to her father as a possible mitigating factor. Although they were certainly insulting, the only threat made in the text messages was to "tell everyone what you did," and to publicize the Detective's acts via Cleveland.com and the CDP's Facebook page. The suggestion that the "toxic relationship" - purportedly shown by uncorroborated and undated text messages between the Detective and the victim – could somehow have mitigated his misconduct is unpersuasive. It also fails to recognize the significant restraint and enormous responsibility bestowed upon law enforcement officers. Heated exchanges via text messages, or otherwise,

should not be seen as possible mitigation for a physical encounter, and should not have been considered as such by the Director.

In addition, the Director should have addressed[3] the issue of the Detective lying to Internal Affairs given that he was sustained for causing injury to his daughter. Specifically, the subject officer denied injuring his daughter to Internal Affairs and claimed that she must have injured herself prior to his altercation with her or after she had left his residence. This integrity-related violation was implicit in the Director's findings and should have been considered an additional factor in aggravation. It also should be noted that the finding that the Detective committed domestic violence resulting in a physical injury to his daughter should have resulted in a finding that the Detective committed either a serious misdemeanor (or even a felony offense)[4] which, under the matrix could have justified the termination of his employ as a police officer.

Further, the Monitoring Team questions a decision made by CDP command staff to delay the imposition of discipline until the Detective was able to obtain a different resolution of his criminal case, with the specific intent to avoid his termination from the employ of the CDP.

Specifically, on September 30, 2019, the Detective plead "no contest" to "Disorderly Conduct," a violation of O.R.S. 2917.11(A)(1) a Fourth Degree Misdemeanor. That section makes it a crime for any person to "recklessly cause inconvenience, annoyance, or alarm to another by…engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior." The Detective was sentenced to a suspended term of 30 days in jail, put on 12 months "Community Control/probation," required to participate in an anger management program and ordered to have no contact with the victim.

---

[3] Possible actions could have included referring the case back to IA for additional investigation or finding that dishonesty during the investigation was an aggravating factor in the case.
[4] The discipline matrix requires an officer to be terminated for any "felony offense." A felony conviction is not required in order for the termination requirement to be met.

Internal Affairs was advised on November 22, 2019, that the Detective's conviction would, in fact, incur the federal imposed disability against carrying a firearm that is established by federal law (18 USD 922(g)(9). As such, the Detective would be precluded from further service as a police officer, requiring his termination from the employment of the CDP. Instead of having the case forwarded at that time to the Director for adjudication, the case was instead suspended pending further action on the part of the Detective's lawyer.

On January 20, 2020, the Detective's lawyer filed a motion to withdrawal his plea due to his lack of awareness of the consequences of the plea. That motion was ultimately granted on March 13, 2020 and the Detective plead guilty to a different subsection of 2917.11; subsection (A)(4), which makes it a crime for a person to: "recklessly cause inconvenience, annoyance, or alarm to another by…[h]indering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender." Internal Affairs served a charge letter in this case on April 27, 2020 only after the change-of-plea was granted. The pre-disciplinary hearing occurred on May 5, 2020.

At the very least, there is a reasonable inference that the Division engaged in efforts to benefit an officer who was convicted of a disqualifying event in an attempt to save that officer from the termination of his employment with the CDP[5]. This, even with an officer who was identified by the Court as having anger management issues. As noted in a prior Monitoring Team report wherein the Director failed to terminate an officer for lying to support an arrest for felony assault, the Monitoring Team is concerned that the actions taken by the Division in this case: using

---

[5] While the guilty plea would have been dispositive on the outcome of the discipline process, the withdrawal of the plea did not bind the decision-making of the Division. In this matter, the officer was originally charged with, and the facts generated during the internal investigation support that he committed, a felony-level offense.

an inappropriate factor in mitigation, failing to consider additional facts in aggravation, and delaying the imposition of discipline to avoid a mandatory termination of an officer for an act of domestic violence, "can lead the community, other officers and the Monitoring Team to question whether or not bias, interest, or some other impermissible motive was implicated in the decision-making process."[6]

## II.     CONCLUSION

Although the Monitoring Team noted that the disciplinary decision in the case involving the four officers who were drinking on duty was in accordance with the expectations of the court-approved disciplinary matrix, it was also noted that the other two cases, once again, involved decisions that were clearly inconsistent with the expectations of the Court as well as the needs of the community and the CDP.

Director Karrie Howard plans to attend the upcoming Status Conference to discuss plans to re-align the City with the path to compliance. It is anticipated that Director Howard will, in fact, ensure that future disciplinary decisions follow the important guidelines previously approved by the Court and robustly document the rationale for future decision-making. As mentioned in our June 15, 2020 Memorandum, the Division will also need to re-evaluate assignments of officers who have previously been sustained for integrity-related violations, but not terminated, to ensure current assignments do not put future criminal cases in jeopardy. Doing so is essential to the integrity of the criminal justice system and the protection of the public.

---

[6] See Monitoring Team's June 15, 2020 Memorandum, at p. 9.