IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | **NOTICE SUBMITTING MONITORING** |
| CITY OF CLEVELAND | ) | **TEAM'S EIGHTH SEMIANNUAL** |
| | ) | **REPORT** |
| Defendant. | ) | |
| | ) | |
| | ) | |

Pursuant to paragraph 375 of the Consent Decree, the Monitoring Team respectfully submits its Eighth Semiannual Report.

Respectfully submitted,

/s/  Hassan Aden

HASSAN ADEN
Monitor
The Aden Group LLC
8022 Fairfax Road
Alexandria, VA 22308
Tel: (571) 274-7821
Email:  aden@theadengroup.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 13, 2020, I served the foregoing document entitled **NOTICE SUBMITTING MONITORING TEAM'S EIGHTH SEMIANNUAL REPORT** via the court's ECF system to all counsel of record.

/s/  Ayesha Hardaway
AYESHA HARDAWAY

Cleveland
Police
Monitoring
Team

# Eighth Semiannual Report

July 2020

## Table of Contents

A NOTE FROM THE MONITORING TEAM ................................................................. 1

THE ROLE OF THE MONITORING TEAM & THIS REPORT .................................. 4

I.      COMMUNITY ENGAGEMENT AND BUILDING TRUST ...................... 7

II.     COMMUNITY & PROBLEM-ORIENTED POLICING ......................... 12

III.    BIAS-FREE POLICING ................................................................. 14

IV.     USE OF FORCE ......................................................................... 17

V.      CRISIS INTERVENTION ............................................................. 32

VI.     SEARCH AND SEIZURE .............................................................. 38

VII.    ACCOUNTABILITY ..................................................................... 42

VIII.   TRANSPARENCY & OVERSIGHT ................................................ 53

IX.     OFFICER ASSISTANCE & SUPPORT ............................................ 58

X.      SUPERVISION ........................................................................... 68

XI.     OUTCOME ASSESSMENTS ........................................................ 73

## A NOTE FROM THE MONITORING TEAM

This Eighth Semiannual Report focuses on the efforts of the Cleveland Division of Police ("CDP") to comply with the requirements of the Consent Decree between the United States and City of Cleveland. It is being issued during an unprecedented time. Even as the nation was making its way through the COVID-19 pandemic, it is now grappling with the ongoing realities of systemic racism in all its forms – especially in policing.

Many are re-examining the various types of police reforms that have been implemented or proposed previously. Some are calling for systemic changes that provide resources to community services for addressing problems and that de-prioritize police response with respect to some community problems. Even as conversations around the necessary nature, scope, and details of such changes continue, the work in Cleveland on transforming the police department according to the Consent Decree continues. And this work remains important.

The Consent Decree continues to require the type of substantive change that can, within the current police structure in Cleveland, make policing more just, equitable, effective, and safe for everyone. Even if some of the topics that the Decree covers feel mundane or removed from the day-to-day realities of Cleveland's communities, changes in critical areas like policy, training, departmental review, accountability, and officer supervision are precisely what can transform how officers perform and how CDP provides policing services today.

This report addresses the time period of September 2019 through February 2020. Consequently, this reporting period is before the Cleveland community and Division of Police needed to address the realities of COVID-19. Likewise, the report does not cover the time of uprising and social upheaval driven by the killing of George Floyd in Minneapolis in May 2020. The Monitoring Team has already informed the Court and public that the Ninth Semiannual Report will be focus predominantly on the Division's response to the national call for police transformation and the ensuing demonstrations. The Division's response is at the crossroads of First Amendment expression, demonstration management, community engagement, and many other areas at the core of the Consent Decree. Nevertheless, some updates beyond the February 2020 cutoff are included in this report where appropriate – particularly with respect to present up-to-date statistics about the Division's performance.

Of most significant note, **use of force, crime, officer injuries, and subject injuries remained down in 2019.** In 2019, use of force was 20 percent lower than 2017. Although 2019 use of force this was an increase over 2018 (by about 13 percent), the overall downward trend since the introduction of the updated policies and training pursuant to this process remains. CDP officers have been using less force even as crime was steady or down across all major categories but rape since 2017. 2018 and 2019 saw a slight uptick in homicides and felonious assaults, and recent spikes in violent crime activity – occurring since February 2020 – will be addressed by the Monitoring Team in its next semiannual report. For purposes of the most recent reporting period ending in February 2020, however, crime is down or steady across nearly every major category since the adoption of the use of force policies in 2017. This has all occurred in a context where officer injuries are down – dropping 58 percent since 2017 – and subject injuries have trended down. These metrics continue to suggest that officers are effectively implementing the new use of force policies on a daily basis, with no compromise with respect to crime or increased officer safety concerns.

The Consent Decree requires that, whenever force is used, it comply with CDP's new use of force policies and be appropriately investigated and reviewed by the Division. On May 1, 2020, the Court approved four critical documents for ensuring comprehensive investigations into use of force: (1) a Use of Force Supervisory Reviews

and Investigations Policy ("Supervisory Review Policy"); (2) a Force Investigation Team ("FIT"); (3) a FIT General Police Order ("GPO"); and (4) a Memorandum of Understanding Between the Cleveland Division of Police and the Cuyahoga County Sheriff's Department to Conduct Independent Criminal Investigations of Uses of Force by Cleveland Police That Result in the Actual or Anticipated Death of a Person ("MOU"). The Monitoring Team will be closely watching the implementation of these new policies. Additionally, the Monitoring Team submitted the Force Review Board Policy, Checklist, and Force Review Board Training Curriculum.  The finalization of three key policies during this review period – (1) the Use of Force Supervisory Review Policy; (2) the Force Investigation Team Manual; and (3) the Force Review Board Policy – will equip the Division to critically self-assess use of force. This is especially significant as the Monitoring Team's review of the timeliness of Officer Involved Shooting Investigations found extraordinary and objectively unreasonable time delays.

More robust data systems are required in order to assess the state of the Division. As the Division moves from policy development, through training, and toward sustained implementation of new requirements across a material span of time and formal assessment of its progress, the Division still must devote significant energy to ensuring data-collection in all areas of police service, particularly "use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race, ethnicity, gender, disability, sexual orientation, or gender identity."[1]

**The Division still lacks the technology and data necessary to allow officers to report basic information necessary to evaluate the Department's performance with respect to stops, searches, and arrests; interactions with individuals in behavioral crisis; and community policing and problem-solving.** Although the Division has made progress since the start of the Consent Decree, it must focus on developing the connected infrastructure for all subject areas is required if the Division is to become a dynamic, learning organization – monitoring and proactively applying data and information to drive better performance and continuing improvement into the future. Indeed, without the necessary information and data, the Parties and Monitoring Team will be unable to effectively conduct audits and assessments of the Division's progress.

Progress in the development and implementation of working accountability systems is mixed. The Division created an Investigative Structure Matrix to map the agencies and units that investigate officer conduct and worked to develop an Internal Affairs policy and manual, which was submitted for Court review and approved during this reporting period. The Division also amended its Disciplinary Matrix to clarify that officer dishonesty carries a presumption of termination. However, problems have also been identified, to include a lack of timely adjudication of internal and external allegations of misconduct and what appears to be a backlog of cases being handled by the Division's Case Preparation Unit.

The Office of Professional Standards, with the support of external consultants, was able to eliminate the backlog of uninvestigated or partially-investigated civilian complaints. Although OPS has added much-needed staff since 2018, one critical position (the General Manager) is currently unfilled. Despite the increased difficulty hiring during COVID-19 and the impacts to municipal budgets, the Monitoring Team encourages the City to make this hire a priority.

Overall, **while progress continues in the area of accountability, work remains as these systems**

---

[1] Dkt. 7-1 ¶ 265, *available at* https://www.justice.gov/crt/case-document/file/908536/download.

**mature and evolve to work together.** At every level of review, it is critical that the accountability and disciplinary systems are coherent, fair, and transparent – with every decisionmaker owning and explaining the reasoning behind their decisions as to whether officers are adhering to the Division's expectations.

In sum, this Report finds the Division and City continuing to make progress with meeting the requirements of the Consent Decree.  However, the City and the Division still have a ways to travel before in-depth quantitative and qualitative assessments to measure full and effective compliance with the Consent Decree will be possible. **Greater, redoubled urgency is necessary for the Department to reach full and effective compliance.**

*Cleveland Police Monitoring Team*
*July 15, 2020*

## THE ROLE OF THE MONITORING TEAM & THIS REPORT

As with the Monitoring Team's previous reports, we begin with summarizing the role of the Monitoring Team and of this report. Under the terms of the Consent Decree between the United States and the City of Cleveland (the "City") (collectively, the "Parties") involving the Cleveland Division of Police, the Court-appointed Monitoring Team must "assess and report" to the Court whether the Decree's requirements "have been implemented, and whether this implementation is resulting in constitutional and effective policing, professional treatment of individuals, and increased community trust "[2] This is the Monitoring Team's eighth semiannual report.[3] It addresses the reporting period of September 2019 through February 2020. However, as this report is being delivered later than expected due to the impacts of COVID-19 and because the Monitoring Team will be conducting a "special report" on the Division's response to the demonstrations stemming from the killing of George Floyd and the Black Lives Matter movement for the Ninth Semiannual report, the Monitoring Team is including significant developments through the date of this report. However, the data gathered for the report is limited to the official six-month period.

The Monitoring Team is an "agent of the Court" that is "subject to the supervision and orders of the Court."[4] The role of the Team is to assess, independently and on behalf of Judge Solomon Oliver, Jr., whether CDP and the City of Cleveland have reached compliance with the various and diverse requirements of the Consent Decree. Thus, as the Monitoring Team has previously outlined, it "is not an employee, contractor, or any other type of agent" of either the City of Cleveland or the United States Department of Justice ("DOJ").[5] Instead, it works for the Court.

As part of that charge, the Team assists in facilitating Consent Decree implementation by providing technical assistance and Counsel to the Division of Police and City of Cleveland. Although its ultimate task is to inform the Court and DOJ about the City's compliance with the Consent Decree, the Team provides ongoing assistance geared at ensuring effective, efficient, and expeditious progress.

### A.    The Fourth Year Monitoring Plan

The Fourth Year Monitoring Plan principally addresses the period of February 1, 2019 through January 31, 2020, with a handful of dates past January 31, 2020.[6]

### B.    The Purpose and Form of This Report

Since the Third Semiannual Report, the Monitoring Team has summarized the status of the City's compliance with each paragraph of the Consent Decree. Although providing "a paragraph-by-paragraph accounting of the general state of the City's compliance runs the risk of being an over-simplification," these summary characterizations remain useful markers for understanding progress over time.[7]

Thus, each major section of this Eighth Semiannual Report summarizes the Monitoring Team's generalized

---

[2] Dkt. 7-1 ¶ 350.

[3] *Id.* at ¶ 375 (requiring semiannual reports).

[4] First Semiannual Report at 14.

[5] *Id.*

[6] Dkt. 249.

[7] Third Semiannual Report at 9.

conclusions about the status of compliance by describing the state of each area as one of the following:

**Non-Compliance.** The City or Division has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or Division's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement.

**Evaluation Deferred.** This category reflects those limited instances where work in a given area has been intentionally and affirmatively deferred in order to work on other, necessary prerequisites. In these areas, the City or Division could have made more progress in a given area but, for project management reasons, have appropriately focused attention on other areas. Although this still means that the City has a distance to travel to reach General Compliance with the term of the Consent Decree, the intentional and affirmative decision to postpone focus on a given area for project management and implementation purposes is sufficiently different to warrant a separate designation in some cases.

**Partial Compliance.** The City or Division has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the provision of the Consent Decree—but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice. It may capture a wide range of compliance states or performance, from the City or Division having taken only very limited steps toward operational compliance to being nearly in operational compliance.

**Operational Compliance.** The City or Division has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Decree such that it is in existence or practice operationally—but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

**General Compliance.** The City or Division has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the City or Division has effectively complied with a requirement fully and systemically.

The same caveats that have previously applied to the use of these summary categories remain applicable. First, "Non-Compliance" or "Partial Compliance" do not automatically mean that the City or CDP have not made good-faith efforts or commendable strides toward compliance. It might, instead, signify that initial work has either not yet begun or reached a sufficiently critical point where progress can be considered to have been made.

Second, "Partial Compliance" requires more than taking some limited, initial steps toward compliance with a requirement. It instead requires that the City or Division have made "sufficient, material progress toward compliance" that "has graduated from the stages of initial work to more well-developed and advanced refinement

of various reforms."[8]

Third, these summary terms do not appear in the Consent Decree. The Team employs them in order to synthesize and summarize the report's conclusions. Relatedly, compliance with individual paragraphs of the Decree is necessary for the larger, overall "Substantial and Effective Compliance" with the whole of the Consent Decree but it is not the same thing. Ultimately, "Substantial and Effective Compliance" with the Consent Decree will be reached when "the City either has complied with *all* material requirements of this Agreement, or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures,"[9] "by a preponderance of the evidence."[10]

Fourth, the charts that summarize progress in each area also condense the requirements of each paragraph rather than reprinting the entire Consent Decree in the context of this report. Any imprecision detected or confusion created by these condensed or summarized requirements is unintended and, in any event, can be cured with reference to the original Consent Decree language itself.[11] The charts primarily cover paragraphs 14 through 340 of the Consent, but other paragraphs also contain requirements that the City must meet.[12]

We also reiterate that these overall "compliance status" conclusions at the start of each chapter do not replace the more rigorous quantitative and qualitative assessments of how CDP is performing over time:

> [T]he Monitoring Team bases its assessments on its current understandings, knowledge, and information gained through ongoing work and discussion with CDP, the Parties, and other stakeholders. The assessments are informal to the extent that not all of them are necessarily informed by the type of exhaustive compliance and outcome measurements that are a critical component of the Consent Decree—and the summary determinations do not take the place of these more structured, systemic analyses. The intent is to provide a bottom-line sense of where the Division is on the road to compliance. Ongoing, rigorous quantitative and qualitative assessments will provide a more comprehensive picture as work under the Consent Decree proceeds.[13]

The Team's characterizations of progress should ultimately be viewed as a synthesis or bottom-line accounting of the substantive discussions of each major Consent Decree area contained within this report.

Finally, the Monitoring Team notes that the City of Cleveland's implementation of the Consent Decree and the various subprojects comprising it, is a substantial task. Many areas of the Decree require significantly more time than one reporting period for the City to achieve—and for the Monitoring Team to report on major breakthroughs of progress. Accordingly, the Team's semiannual reports, including this current report, reprint content from prior semiannual reports in instances where there has not been enough material progress to warrant an update. In such cases, the Monitoring Team has elected to not cite to prior semiannual reports in the interest of readability.

---

[8] Third Semiannual Report at 10.

[9] Dkt. 7-1 ¶ 456 (emphasis added).

[10] *Id.* at ¶ 397.

[11] *See id.*

[12] *See* Third Semiannual Report at 10.

[13] *Id.* at 11.

## I.    COMMUNITY ENGAGEMENT AND BUILDING TRUST

| Paragraph | Status of Compliance |
|---|---|
| 14.    CDP creation of "formal and informal mechanisms that facilitate ongoing communication between CDP and the many Cleveland communities it serves." | **PARTIAL COMPLIANCE** |

## A.    Community Police Commission ("CPC")

| Paragraph | Status of Compliance |
|---|---|
| 15. Creation of CPC to make recommendations, work with Cleveland communities to develop recommendations, and "report to the City and community as a whole and to provide transparency" on reforms | **GENERAL COMPLIANCE** |
| 16. Establishment of CPC Selection Panel to select CPC Commissioners; composition of CPC; and periodic meetings with Chief of Police to "provide recommendations." | **GENERAL COMPLIANCE** |
| 17(a). "[H]old public meetings across the City, complete an assessment of CDP's bias-free policing policies, practices, and training, and make recommendations." | **GENERAL COMPLIANCE** |
| 17(b). "[A]ssist as appropriate in . . . development of training related to bias-free policing and cultural competency." | **GENERAL COMPLIANCE** |
| 17(c).    "[O]n an ongoing basis, assess CDP's community activities" and "make recommendations" related to "community engagement" and "community confidence." | **PARTIAL COMPLIANCE** |
| 17(d). "[O]n an ongoing basis, review CDP's civilian oversight structure to determine if there are changes it recommends for improving CDP's accountability and transparency." | **PARTIAL COMPLIANCE** |
| 17(e). "[P]erform other function[s] as set out in this Agreement." | **PARTIAL COMPLIANCE** |
| 18(a). "[R]eview and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention." | **PARTIAL COMPLIANCE** |
| 18(b). [R]eview and comment on CDP's implementation of initiative, programs, and activities that are intended to support reform." | **PARTIAL COMPLIANCE** |
| 18(c). "[H]old public meetings to discuss the Monitor's reports and to receive community feedback concerning CDP's compliance with this Agreement." | **OPERATIONAL COMPLIANCE** |
| 19. "The City will provide access to all information requested by the Commission related to its mandate, authority, and duties unless it is law enforcement sensitive, legally restricted, or would disclose a personnel action." | **PARTIAL COMPLIANCE** |
| 20. CPC "will issue [at least annual] reports," which the "City will post . . . to the City's website." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 21. "The City will consider and timely respond in writing to the Commission's recommendations for improvements," which "will be posted to the City's website." | **PARTIAL COMPLIANCE** |
| 22. CPC budget listed as "separate line item" to ensure "sufficient independence and resources." | **GENERAL COMPLIANCE** |

## Background

The City agreed to create a Community Policing Commission ("CPC" or the "Commission") in order:

- "To leverage the experience of the people of Cleveland"; and
- "[T]o ensure that CDP recognizes and operates in a manner consistent with cooperative community understanding and engagement."[14]

The CPC has a specific mandate under the Decree, including:

- "Making recommendations to the Chief of Police and the City . . . on policies and practices related to community and problem-oriented policing, bias-free policing, and police transparency";
- "Working with the many communities that make up Cleveland for the purpose of developing recommendations for police practices that reflect an understanding of the values and priorities of Cleveland residents";
- "Reporting to the City and community as a whole and to provide transparency on police department reforms."[15]

At this particular moment, engagement with the community – including and especially individuals with concerns and criticisms about policing – is more critical to the overall safety and well-being of the Cleveland community than ever.

The Monitoring Team has become concerned during the past reporting period, and especially recently, about an ongoing hesitance on the part of City and Division stakeholders to engage productively with members of the Commission.  From early in the Consent Decree process, the City of Cleveland has been skeptical and seemingly frustrated with the presence of the Commission, the Commission's requests for information, and any substantive endeavors that the group undertakes.  While the relationship is often strained, there have been many examples of productive interaction.  For instance, the development of the new use of force policies, the completion of the Search and Seizure policies and relevant training, and most recently, the soon to be completed Interaction with Youth and Transgender individuals.

In monthly meetings among stakeholders and Parties that the Monitoring Team insisted on holding from the earliest days of the Consent Decree process, the City and Division have consistently raised barriers to providing information, data, and feedback to the Commission.  City and Division representatives have demonstrated their reluctance to work with the Commission by challenging their authority, compelling them to continually articulate

---

[14] Dkt. 7-1 at ¶ 15.

[15] *Id.*

the reasons for their activities, and dismissing their input even when the substance is sound. Especially in recent months, the tone of City and Division representatives in meetings with the Commission and Parties each month has been unduly confrontational.

In its prior semiannual reports and in Court proceedings, the Monitoring Team has detailed both the important work that the Commission has accomplished and the significant growing pains and self-inflicted difficulties that CPC endured in its initial years. As the Monitoring Team has pointed out, however, establishing any new civic body is not without its challenges, difficulties, and disagreements – and time spent on trial and error with respect to how to best "to leverage the experience of the people in Cleveland" was both necessary and important.[16] The Team has been critical, at times, at distractions in which the Commission has engaged over the years – including on staff matters, membership issues, and inter-personal dynamics – for fear that they would unduly detract from the important charge of the Commission. Additionally, the Monitoring Team recognizes that the relationship between the City and the CPC relies on producing fair and balanced reports and appropriate community messaging on many reform activities-this, at times, has been a source of frustration for the City, and the Monitoring Team has served to mediate issues of concern as they arise. Nothing in the City and Division's relationship with the Commission suggests an interest in or the importance of the community substantively participating on areas of police reform and police practice. Any cooperation extended by the City and Division occurs because it is mandated, not because it is seen as beneficial to the Cleveland community or the long-term success of the Division of Police.

The City and Division may take issue with the characterization of its relationship with the Commission. The City continues to fund the Commission's activities at the minimum amount required, and as approved by the Monitoring Team and Court. Beyond this, however, the Monitoring Team sees little in the relationship with the Commission that is positive or productive.

The Monitoring Team has a fiduciary duty to the Court and an express instruction from the Court to report to it regularly as to the status of the Commission. The Team is charged, then, with being the "eyes and ears" of the Court.

The Monitor will be especially clear here: De-legitimizing or dismissing the CPC is the same as de-legitimizing and dismissing the Cleveland community. To recommend to the Court that the Division be certified in Substantial and Effective Compliance, the Team will need to see sustained, meaningful evidence that – as the Consent Decree outlines – the City "recognizes and operates in a manner consistent with cooperative community understanding and engagement."[17] There is much work to be done to improve the relationship between the Commission and the City, to include the CDP.

We understand that a retreat between the City and the CPC Commissioners is in the process of being scheduled. It is the hope of all that the participants can, between themselves, establish common ground going forward. If that fails, the Monitor Team will stand ready to advise the Court and community accordingly.

---

[16] *Id.*

[17] *Id.*

### Where the Commission Stands Now

Even as the relationship with the City and Division has devolved, the Commission has continued to make progress. This reporting period brought about the selection of new commissioners to serve on the CPC. The Consent Decree required that the selection panel recommend a new slate of volunteer commissioners at the end of its fourth year.[18] The ultimate appointment of the new members resides with the Mayor. Following an application and interview process designed by the selection panel, the CPC saw the appointment of eight new commissioners and the re-appointment of two commissioners with prior service. The City has worked diligently to ensure that the selection process is efficient and has remained flexible to address the vacancies resulting from the turnover of CPC commissioners.

The CPC is currently comprised of members who serve as representatives from various segments of Cleveland's diverse communities. These commissioners have backgrounds and expertise working in public schools, social services, veteran affairs, academia, legal services, ministry, and mental health. The three police union members previously selected by the Black Shield, Cleveland Police Patrolman's Association, and the Fraternal Order of Police continued to represent those unions. The CPC is currently led by co-chairs Rev. Frederick Knuckles and Sgt. Richard Jackson. The Monitoring Team is grateful for the leadership of the co-chairs and the generous contribution of all commissioner's time, expertise, and professionalism.

In addition to carrying forward its work on search and seizure and community engagement from the prior reporting period, the CPC expanded their work into a few new areas. Its Accountability Workgroup led by Commissioner Logan provided community updates on CDP's consent decree related training in the areas of bias free, search and seizure, and community and problem-oriented policing. The CPC also selected an outside consultant to analyze community impact and perceptions of those trainings and provide gap analysis to CDP based on community expectations.

Two new workgroups were also formed by the Commission during this reporting period. The first, a Pursuit Policy Workgroup, was formed after the tragic death of 13-year-old Tamia Chapman. The CPC also responded to community concerns by hosting a well-attended listening session that included comments from Chief Calvin Williams. The Monitoring Team finds the work of the CPC on this critical issue valuable to the community needs and, thereby, the reform process.

The Discipline Policy Workgroup is the other new workgroup created by the CPC. It is reportedly comprised of non-commissioner civilians and law enforcement experts to review CDP's current discipline policy and matrix with an eye toward making recommendations for improvements. The Monitoring Team looks forward to learning more about the processes and methodologies the workgroup anticipates using to reach its desired outcome.

### B.        District Policing Committees

| Paragraph | Status of Compliance |
| --- | --- |
|  |  |

---

[18] *Id*. at ¶ 16.

| 23.  Facilitation of "regular communication and cooperation between CDP and community leaders at the local level," with District Policing Committees meeting "at minimum, every quarter." | PARTIAL COMPLIANCE |
|---|---|
| 24. CPC, CDP, and Community Relations Board ("CRB") will "develop a mechanism to recruit and expand" Committee membership." CDP "will work with [Community Police] Commission to select officers for each District Policing Committee." | PARTIAL COMPLIANCE |
| 25. CDP "will work closely with District Policing Committees to identify strategies to address crime and safety issues in their District," considering and addressing identified priorities. | PARTIAL COMPLIANCE |
| 26. "At least annually, each District Policing Committee will present its identified strategies, concerns, and recommendations" to the CPC, with CDP officer who is Committee member presenting to CPC "CDP's assessment of ways to address" the recommendations." | NON-COMPLIANCE |

## Background

As detailed in previous semi-annual reports, the Decree calls for the expansion—building on existing structures—of five District Policing Committees, or one for each of the five police districts within the city of Cleveland.[19] Those Committees, which existed long before the Consent Decree process, must work to "identify strategies to address crime and safety issues in their District."[20]

## Where the DPCs Stand

The DPC Implementation Plan, CDP's strategy to modify and improve the five DPCs to meet the terms of the Consent Decree, was approved by the Court on February 20, 2019. The Monitoring Team is unaware of any significant updates or progress by CDP toward the implementation of the plan during this reporting period.

As of the writing of this report, the Monitoring Team has also not been made aware three significant items required under the DPC Implementation Plan. They include: the outcomes generated from bi-annual meetings required by the Plan; the results of a survey each DPC was required to conduct within their neighborhood; and the completion of annual reports required under the DPC Implementation Plan. Those reports are supposed to detail each DPC's recommendations to address crime in their respective communities. The first report under the Plan was due for submission February 2019. As mandated by the Decree, the DPCs are also required to submit these annual reports to the Community Police Commission.[21] The City's failure to adhere to the timeline and expectations of the DPC Implementation Plan leaves the Monitoring Team concerned. The Team remains ready and available to provide any technical assistance in this area.

---

[19] *Id.* at ¶¶ 23-24.

[20] *Id.* at ¶ 25.

[21] Dkt. 7-1 at ¶ 26.

## II.        COMMUNITY & PROBLEM-ORIENTED POLICING

| Paragraph | Status of Compliance |
|---|---|
| 27. Implementation of "comprehensive and integrated community and problem-oriented policing model" and consultation with CPC regarding the model. | **PARTIAL COMPLIANCE** |
| 28. Ensuring that "mission statement reflects [the Division's] commitment to community-oriented policing" / "integrat[ing] community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **OPERATIONAL COMPLIANCE/ PARTIAL COMPLIANCE** |
| 29. Ensuring "that officers are familiar with the geographic areas they serve," "engage in problem identification," and "work proactively . . . to address quality of life issues." | **EVALUATION DEFERRED** |
| 30. Initial and annual in-service community and problem-oriented policing training "adequate in quality, quantity, type, and scope" that addresses specifically identified areas. | **PARTIAL COMPLIANCE** |
| 31. Maintenance of "collaborative partnerships with a broad spectrum of community groups," including CDP meetings with community organizations and District Policing Committees. | **PARTIAL COMPLIANCE** |
| 32. CDP "meet[ing] with members of the community in each District on a monthly basis and "solic[itation of] participation from a broad cross-section of community members in each District" to "identify problems and other areas of concern . . . and discuss responses and solutions." | **PARTIAL COMPLIANCE** |
| 33. Development and implementation of "systems to monitor officer outreach to the community" that CDP "will use . . . to analyze . . . whether officers are partnering with a broad cross-section of community members to develop and implement cooperative strategies that build mutual respect and identify and solve problems." | **PARTIAL COMPLIANCE** |
| 34. "At least annually, CDP will present the results" of paragraph 33 analysis "broken out by District in a publicly-available community policing report" that describes problems, solutions, and obstacles. Report provided to Commission and posted on CDP website. | **NON-COMPLIANCE** |

## Background

The Consent Decree requires that the Division develop and implement a "comprehensive and integrated community and problem-oriented policing model" to "promote and strengthen partnerships with the community . . . and increase community confidence in the CDP."[22] The Decree refers to policing according to this model as "community and problem-oriented policing," or "CPOP."

---

[22] Dkt. 7-1 ¶ 27.

"Community and problem-oriented policing" is defined as a "policing philosophy that promotes and relies on collaborative partnerships between law enforcement agencies and the individuals and organizations they serve to develop solutions to problems, increase trust in police, and improve the effectiveness of policing efforts."[23] A Division-wide commitment to community policing helps promote trust and legitimacy, improve the quality of police-citizen encounters, and address persistent public safety issues in Cleveland communities. CDP must ensure that related operational and structural changes needed to support community and problem-oriented policing—principally, staffing and recruitment—receive appropriate consideration.

## Where the Division Stands

The Monitoring Team's Seventh Annual Semi-Annual Report articulated, in substantial detail, the various requirements with which CDP and the City must comply with respect to community and problem-oriented policing.

During this reporting period, CDP launched a preliminary, pilot data collection program with respect to community policing.  Officers were reportedly entering data related to their CPOP activities.  However, the City has indicated that this pilot process was experienced software issues.  The CPOP Review Committee has reported that it is looking into those issues and is planning to extend the pilot program until the software issues were resolved.

It is important to note that the Decree requires that the Division prepare a public community policing report that identifies community policing problems, solutions, and obstacles. To date, the Division has not generated the type of comprehensive report that the Decree contemplates.  Another part of the implementation of the CPOP Plan will be establishing a process for completing this important public accountability document and beginning to comply with the Decree's annual obligations. Finally, the Monitoring Team awaits updates on the Division's progress related to whether officers are meeting the 20 percent community engagement goal articulated in the Court-approved CPOP Plan and the status of data collection training.

---

[23] *Id.* at ¶ 414.

## III.              BIAS-FREE POLICING

| Paragraph | Status of Compliance |
|---|---|
| 35.  Delivery of "police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias," among other things. | **PARTIAL COMPLIANCE** |
| 36.  "CDP will integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **PARTIAL COMPLIANCE** |
| 37.  CDP will ensure that it "administer[s] all activities without discrimination" on basis of various protected classes | **PARTIAL COMPLIANCE** |
| 38.     "CDP will develop a bias-free policing policy" incorporating CPC recommendations "that provides clear guidance to officers" | **OPERATIONAL COMPLIANCE** |
| 39–40.   Bias-free policing and procedural justice training "adequate in quality, quantity, scope, and type" covering specific areas | **PARTIAL COMPLIANCE** |
| 41.  Supervisor training on bias-free policing and procedural justice issues covering specific areas | **EVALUATION DEFERRED** |
| 42.  Annual in-service training on bias-free policing "adequate in quality, quantity, type, and scope" | **EVALUATION DEFERRED** |
| 43.  Analysis of paragraph 265 data ("including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination") | **EVALUATION DEFERRED** |
| 44.  Consideration of "bias-free policing and equal protection" principles in hiring, unit assignment, promotion, and performance assessments. | **PARTIAL COMPLIANCE** |

### Background

The Consent Decree requires that the Division of Police "deliver police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in CDP."[24] Bias-free policing principles must be integrated into CDP's various "management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."[25]  The goal is "to ensure policing and law enforcement outcomes that are as free from the effects of all bias to the greatest extent possible."[26]

### Where the Division Stands

During July 2019 of the last reporting period, the Court approved required, annual Bias-Free Policing training for 2018.  As the Monitoring Team noted in the Seventh Semiannual Report, the four-hour training built on foundational instruction provided to all officers in 2018.  Specifically, it provided further, specific guidance to officers on implicit cultural biases, the ways that such bias can enter into decision-making, and how officers can use specific tools to reduce the unwanted and negative effects of subconscious bias.

[24] Dkt. 7-1 ¶ 35.

[25] *Id.* ¶ 35-36.

[26] *Id.* at ¶¶ 39-40.

During the Fall of 2019, Monitoring Team members audited several of the 2019 Bias-Free Policing Training sessions.  Overall, the Monitoring Team found the training sessions to be adequate. Although there was some room for improvement with respect to the use of adult learning techniques and instructor approaches, the training appropriately and meaningfully addressed the necessary content and concepts.

Because the Consent Decree requires annual training on bias-free policing, the Division of Police has begun to develop its 2020 training in the area.  The Monitoring Team is working with the Division to address some identified concerns surrounding the over-use of passive, PowerPoint instructional approaches, and it is anticipated that the training will be provided to officers later in the upcoming reporting period.

### Progress and Tasks that Remain

#### *Integration of Bias-Free Policing Principles*

As the Monitoring Team summarized in prior semiannual reports, the Consent Decree requires the Division to "integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems."[27] Consequently, simply having a policy called "Bias-Free Policing" is an important but insufficient for compliance under the Consent Decree.  Instead, for the Division to reach substantial and effective compliance, it must incorporate bias-free principles in areas where substantial work remains – including in personnel evaluations, accountability systems, community policing, and other areas.

#### *District Neighborhood Trainings*

CDP has developed initial draft District Neighborhood Trainings.  The purpose of these trainings, as the Monitoring Team has previously described, is to provide officers with guidance as to the unique cultural characteristics of neighborhoods and community assets within each district.  The training is intended to address the Consent Decree's requirement that "ensure that officers are familiar with the geographic areas they serve, including their assets, challenges, problems, business, residential and demographic profiles, and community groups and leaders[.]"[28]  The Division is continuing to respond to feedback on the curriculum from the Department of Justice and the Monitoring Team.  It is anticipated that the training can be conducted in the upcoming reporting period.

#### *Collection, Analysis, and Proactive Uses of Data*

The Consent Decree requires that CDP collect data and conduct annual assessments of all police activities, "including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race, ethnicity, gender, disability, sexual orientation, or gender identity."[29]

---

[27] *Id.* at ¶ 36.

[28] Dkt. 7-1 at ¶¶ 29, 40(f).

[29] *Id.* at ¶¶ 43, 265.

Several of the Monitoring Team's prior semiannual reports have emphasized the fundamental importance of CDP gathering the data and information necessary to make evidence-based management and operational decisions. The Consent Decree requires the Division to collect and analyze data, produce reports, and conduct comprehensive assessments of its activities through the lens of its bias-free policing policies. Although CDP has continued to make progress in developing the technological infrastructure necessary for tracking and analyzing the Division's performance in a number of critical areas, much more progress is needed to comply with the Decree's requirements on the collection, analysis, and proactive use of data.

### *Auditing of CDP Performance*

When the Division is able to produce data on activity such as stops, searches, and arrests across a material span of time, the Monitoring Team will need to evaluate that data to determine if there are any trends or patterns that are problematic with respect to bias-free policing.

# IV.        USE OF FORCE

## A.        Officer Use of Force Principles & Policy

| Paragraph | Status of Compliance |
|---|---|
| 45. "CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force" complies with the Constitution, federal law, and the Consent Decree "and that any use of unreasonable force is promptly identified and responded to appropriately." | **PARTIAL COMPLIANCE** |
| 46. "The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers . . . will comply" with at least twelve major, listed principles. | **PARTIAL COMPLIANCE** |
| 47. Division "will ensure that the [use of force] incident is accurately and properly reported, documented, and investigated." | **PARTIAL COMPLIANCE** |
| 48. "CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends." | **PARTIAL COMPLIANCE** |
| 49. Development of use of force policies "that comply with applicable law[,] . . . are adequate to achieve the goals described in paragraph 45," and "specify that unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability." | **OPERATIONAL COMPLIANCE** |
| 50. "CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons." | **OPERATIONAL COMPLIANCE** |
| 51. Weapon-specific policies "will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon." | **OPERATIONAL COMPLIANCE** |
| 52. "No officer will carry any weapon that is not authorized or approved by CDP." | **OPERATIONAL COMPLIANCE** |
| 53. "Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of weapon is imminent, and allow the subject an opportunity to comply." | **OPERATIONAL COMPLIANCE** |
| 54–83 "CDP will implement policies" for firearms, ECWs (Tasers), and OC (pepper) spray that comply with a host of specific, expressly listed provisions. | **OPERATIONAL COMPLIANCE** |
| 84. CDP "will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes" a number of specific, expressly listed elements. | **OPERATIONAL COMPLIANCE** |
| 85. CDP "will provide the use of force training described in paragraph 84 to all new officers." | **OPERATIONAL COMPLIANCE** |
| 86. "CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 87. "CDP will develop and implement a single, uniform reporting system pursuant to a Use of Force reporting policy" that complies with the force Level categorization set forth in the paragraph. | **OPERATIONAL COMPLIANCE** |
| 88. Requiring "[a]ll officers using or observing force" to complete a Use of Force Report including a number of specific features and avoiding "conclusory statements, 'boilerplate', or 'canned' language." | **OPERATIONAL COMPLIANCE** |
| 89. "Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports." | **OPERATIONAL COMPLIANCE** |
| 90. "Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable." | **OPERATIONAL COMPLIANCE** |
| 91. Requirement to "notify . . . supervisors . . . as soon as practical following any use of force" and if becoming aware of "an allegation of unreasonable or unreported force by another officer." | **OPERATIONAL COMPLIANCE** |
| 92. "Use of Force Reports will be maintained centrally." | **OPERATIONAL COMPLIANCE** |

## Background

Although the Monitoring Team's prior semiannual reports have recounted CDP's progress in the area of force, it remains useful to highlight the significant distance that the Division has traveled with respect to the Consent Decree's core reforms on when and how officers may use force.

Generally, the Consent Decree requires CDP to:

> [R]evise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force is used in accordance with the Constitution and laws of the United States and the requirements of the Agreement and that any use of unreasonable force is promptly identified and responded to appropriately.[30]

The Division first established important new rules addressing force. Approved by the Court in January 2017,[31] five separate but related policies address: (1) general use of force principles and expectations; (2) definitions used in various force policies; (3) de-escalation techniques to ensure officer and subject safety; (4) intermediate weapons, such as a Taser, oleoresin capsicum (OC) spray, and baton; and (5) reporting of force. During large, community-wide feedback sessions and separate public comment efforts undertaken by the City, Community Police Commission, Department of Justice, and Monitoring Team, members of the public provided input and comments on the policies before they were finalized.

To ensure that officers understand and abide by the expectations of the force policies, the Consent Decree requires that CDP provide use of force training that addresses:

---

[30] Dkt. 7-1 at ¶ 45.

[31] Dkt. 101.

- Proper use of force decision-making;
- Use of force reporting requirements;
- The Fourth Amendment and related law;
- De-escalation techniques, both verbal and tactical, that empower officers to make arrests without using force and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, using cover, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;
- Role-playing scenarios and interactive exercises that illustrate proper use of force decision-making, including training on the importance of peer intervention;
- The proper deployment and use of all intermediate weapons or technologies;
- The particular risks and considerations relating to using a Taser; and
- Firearms training.[32]

In 2017, the Division of Police provided all sworn personnel with training on the new use of force policies. The Division has continued to provide follow-up training to officers to reinforce core concepts and provide additional instruction on important force-related issues.

The Division's new approach to force involves categorizing the application of force into categories, or Levels – ranging from less significant Level One force to more significant Level Three force:[33]

- Level One force is the lowest level of force. It is force that is "reasonably expected to cause only transient pain and/or disorientation during its application as a means of gaining compliance . . . but that is not reasonably expected to cause injury, does not result in actual injury, and does not result in a complaint of injury."[34]
- Level Two force is force that "causes an injury, could reasonably be expected to cause an injury, or results in a complaint of injury."[35]
- Level Three force is force that constitutes "lethal" or "deadly" force. It also includes any level of force which results in death or serious injury, hospital admission, or lack of consciousness. Specific types of Level Three force include neck restraints, canine bites, and more than three applications of an Electronic Control Weapon (i.e. Taser).[36]

All officers using or observing force must report the force in writing by the completion of their tour of duty.[37] The Level of force determines how the force is investigated and reviewed.

## Where the Division Stands

---

[32] Dkt. 7-1 ¶ 84.

[33] First Semiannual Report at 36-37; Dkt. 97 at 35-36.

[34] Dkt. 7-1 at ¶ 87(a).

[35] *Id.* at ¶ 87(b).

[36] *Id.* at ¶ 87(c).

[37] *Id.* at ¶ 87(b).

## Use of Force Trends

For the second consecutive calendar year, CDP used force less than it did in 2017 – the last year before all officers had completed training on the Consent Decree policies on force and the policies became effective.  Even as they used force less than in 2017, crime in 2019 was mostly down as compared to 2017, and CDP data suggests that officers were not injured at substantially higher levels.

Specifically, in 2019, CDP used force by nearly 20 percent less often than it did in 2017.  Compared to 2018, the Division did use force more frequently in 2019, equating to 22 more incidents.  This represents a 13 percent increase from 2018 to 2019.  (As with previous reports, for the sake of consistency with prior years' data, this number excludes incidents where the only force that an officer used was the pointing of a firearm at an individual.).  Based on aggregate data alone, it is too early for the Monitoring Team to determine whether the uptick in 2019 over 2018 is related to the natural variation among encounters and interactions that officers have over time or whether 2019 saw CDP reverting to using force more frequently in instances where they should or could not have deployed it to resolve the situation.  The Monitoring Team's upcoming, detailed review of force investigations to evaluate officer use of force will be instructive in that regard.

Table 1: Use of Force Trends: 2017-2019, excluding Level 1: pointing of a firearm at an individual

|  | 2017 | 2018 | 2019 |
|---|---|---|---|
| January | 23 | 10 | 10 |
| February | 19 | 9 | 9 |
| March | 22 | 8 | 17 |
| April | 24 | 16 | 15 |
| May | 16 | 14 | 16 |
| June | 23 | 18 | 17 |
| July | 12 | 15 | 16 |
| August | 18 | 11 | 20 |
| September | 25 | 21 | 22 |
| October | 17 | 19 | 18 |
| November | 16 | 11 | 12 |
| December | 22 | 16 | 18 |
| **TOTAL** | **237** | **168** | **190** |

This reduced force in 2018 and 2019, as compared to 2017, occurred at the same time that Cleveland saw fewer reported crimes in most major categories.  In 2019, there were fewer Part I crimes[38] than in 2017 across all categories with the exception of rape.  Comparing 2019 with 2018, robbery, burglaries, theft, motor vehicle theft, and arson were all down, while there were upticks in homicides, rape, and felonious assault.[39]  Nevertheless, with the exception of rape, all Part I crimes were down – and, in many categories, down significantly – in 2019 when

---

[38] https://ucr.fbi.gov/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/offense-definitions.

[39] As the Monitoring Team has previously noted, CDP should study, with outreach to sexual assault advocacy organizations, whether the increase in reported rape is due to an increase in occurrences or, instead, an uptick in individuals reporting the crime to police.

compared to 2017, the final year before the new, Decree-required force policies became effective.

Table 2: Part I Crime, 2017-2019

|  | 2017 | 2018 | 2019 | Change, 2017 to 2019 |
|---|---|---|---|---|
| Homicide | 114 | 96 | 106 | -7.02% |
| Rape | 552 | 587 | 596 | +7.97% |
| Robbery | 3025 | 2267 | 2081 | -31.21% |
| Felonious Assault | 2816 | 2553 | 2666 | -5.33% |
| Burglary | 6268 | 4945 | 4572 | -27.06% |
| Theft | 14612 | 10777 | 10027 | -31.38% |
| Grand Theft MV | 3561 | 3146 | 2999 | -15.78% |
| Arson | 292 | 175 | 166 | -43.15% |

Even as officers use force less and crime was down, across most measures, in 2019 as compared to 2017, CDP data continues to suggest that the new force policies are not associated with substantial increases in officer injuries. First, the Monitoring Team observes that the Seventh Semiannual Report suggested that officer injuries in the first half of 2019 were down as compared to prior years. However, that comparison was confusingly based on comparing data from the first six months of 2019 with a full calendar year of data from 2017 and 2018. The Monitoring Team has worked closely with CDP to understand and ensure the accuracy of the numbers presented here.

When considering a full year's worth of data, there were more injuries among CDP officers in 2019 than in 2017 or 2018. However, there is significant reason to believe that these injuries are not related to officers being injured when they use force or from hesitating from using force. First, while 34 percent of officer injuries occurred in a use of force context in 2017, only 19 percent of injuries occurred during a force incident in 2019.

Table 3: Officer Injuries: 2017-2019

|  | 2017 | 2018 | 2019 |
|---|---|---|---|
| Use of Force Incidents in which $\geq$ 1 officer was injured | 55 | 30 | 32 |
| Total Officer Injuries | 161 | 141 | 171 |

Second, the types of injuries that officers incurred in 2019 at higher rates than 2018 tended to be in contexts not typically associated with the opportunity to use force, including exposure to bodily fluids or blood and motor vehicle collisions. Indeed, the increases from 2018 to 2019 in these two categories alone account for nearly all of the total increase.

Table 4: Officer Injury Context: 2018–2019

| Injury Context | 2018 | 2019 |
|---|---|---|
| Animal Bite | 4 | 8 |
| Arrest-Felony | 15 | 19 |
| Arrest-Misdemeanor | 4 | 11 |
| Assault on PO | 27 | 16 |
| Consensual Search-Building | 0 | 1 |
| Exposure | 20 | 29 |
| Foot Pursuit | 14 | 16 |
| Motor Vehicle Collision | 24 | 40 |
| Off-Duty | 1 | 0 |
| Other | 29 | 34 |
| Training | 20 | 21 |
| Use of Force | 30 | 32 |
| **Total*** | **188** | **227** |

*Totals reflect the possibility of officers selecting more than one description for the same incident.*

As the Monitoring Team has noted previously, the numbers alone do not establish whether the Division is in compliance with the terms of the Decree that address use of force.  The Decree does not expressly mandate that CDP use less force but that, when CDP uses force, it is constitutional and lawful.  To that end, the Team will be conducting in-depth substantive reviews of use of force incidents to determine whether, when CDP officers use force, they are doing so in a manner that complies with the Division's new policies, the terms of the Consent Decree, and the law.  At the same time, the Division still must implement a host of systems and practices relating to the review and investigation of use of force incidents to ensure appropriate internal oversight of force.

Nevertheless, the overall trends over the period of 2017 through 2019 remain an encouraging sign that CDP's new Use of Force policies and training may be having a positive impact on the streets and advancing the goals of improved safety for both CDP officers and the residents of Cleveland.

**Progress and Tasks that Remain**

*1.    Ongoing, Annual Use of Force Training*

Under the Consent Decree, CDP must provide ongoing, annual in-service training to officers on use of force that

reviews policies and expectations and provides officers with new opportunities to practice use of force decision-making skills.

### 2. Audit of Officer Compliance with Use of Force Policies

The Monitoring Team will be conducting a qualitative evaluation of use of force in the near future. The purpose of the review is to ensure that officers who do use force are doing so in a way that complies with law, the Division's policies, and the terms of the Consent Decree. The results of this review will provide critical insight as to whether the force policies can be considered to be effective in practice – across time, cases, incidents, and officers – such that, at least with respect to the provisions of the Consent Decree addressing the application of force by officers, the City may be considered to be in substantial and effective compliance.

### B. Use of Force Investigation and Review

| Paragraph | Status of Compliance |
|---|---|
| 93. "A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval." | **EVALUATION DEFERRED** |
| 94. Setting specific requirements relating to the investigation of low-level, Level 1 force. | **PARTIAL COMPLIANCE** |
| 95–109. Setting specific requirements relating to the investigation by supervisors and/or CDP chain of command for investigation and review of Level 2 force. | **PARTIAL COMPLIANCE** |
| 110. "CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP." | **PARTIAL COMPLIANCE** |
| 111. Creation and design of dedicated Force Investigation Team (FIT) that "will conduct administrative investigations . . . and criminal investigations" of serious force, "force involving potential criminal conduct," in-custody deaths, and cases assigned to it by the Chief. | **PARTIAL COMPLIANCE** |
| 112. Composition of FIT Team. | **PARTIAL COMPLIANCE** |
| 113. "FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type" on a host of specific, expressly-listed topics both initially and annually thereafter. | **EVALUATION DEFERRED** |
| 114. "CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement." | **EVALUATION DEFERRED** |

| | |
|---|---|
| 115.  Response of FIT to use of force scenes.  FIT notification of prosecutor's office. Notification of designated outside agency to conduct criminal investigation if City elects to use external agency for such investigations. | **EVALUATION DEFERRED** |
| 116.  "CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation." | **PARTIAL COMPLIANCE** |
| 117.  Memorandum of understanding required between CDP and outside agency containing specific, expressly-listed provisions. | **OPERATIONAL COMPLIANCE** |
| 118.  Setting forth various, specific, and expressly-listed responsibilities of FIT during its investigations. | **PARTIAL COMPLIANCE** |
| 119.  Monitor's duty to annually review any "criminal investigations conducted by the outside agency" to ensure that they "are consistently objective, timely, and comprehensive." | **EVALUATION DEFERRED** |
| 120.  Providing for delay of compelled interview if "case has the potential to proceed criminally" but otherwise requiring that "[n]o other part of the investigation . . . be held in abeyance" unless "specifically authorized by the Chief" in consultation with investigating agency and prosecutor's office. | **PARTIAL COMPLIANCE** |
| 121.   Requiring completion of preliminary report presented to Chief or Chief's designee "as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force." | **PARTIAL COMPLIANCE** |
| 122.  Completion of investigation within 60 days.  Preparation of FIT investigation report.  Review of FIT investigative report by head of Internal Affairs who "will approve or disapprove FIT's recommendations, or request . . . additional investigation." | **EVALUATION DEFERRED** |
| 123.  Revision of FIT manual to ensure "consisten[cy] with the force principles" and several specific, expressly-listed provisions. | **PARTIAL COMPLIANCE** |
| 124–30.  Establishment and operation of Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." | **PARTIAL COMPLIANCE** |

## Background

As prior semiannual reports have summarized, the Consent Decree establishes protocols for the Division to investigate uses of force based on the reported Level of force.  For Level One force, the investigation will typically involve review of the involved officer's use of force report by the officer's chain of command.[40]  Level Two force

---

[40] Dkt. 7-1 at ¶ 124.

requires a supervisor to respond to the scene and conduct a preliminary force inquiry. If the supervisor's inquiry at any point indicates "that there may have been misconduct, the supervisor will immediately notify Internal Affairs and Internal Affairs will determine if it should respond to the scene and/or conduct or take over the investigation."[41] Level Three uses of force may come under the purview of either CDP's Force Investigation Team ("FIT Team") or an independent outside agency.

The Decree also requires CDP to craft policies and procedures related to supervisory review of completed force investigations. One review process involves supervisors determining whether involved officer actions were consistent with policy. Another part involves the review by the Division's Force Review Board ("FRB"), which "appraise[s] use of force incidents from a tactics, training, policy, and agency improvement perspective."[42]

## Where the Division Stands[43]

On April 22, 2020, the Monitoring Team indicated to the Court its approval of four final documents from CDP relating to the investigation of use of force incidents: (1) a Use of Force Supervisory Reviews and Investigations Policy ("Supervisory Review Policy"); (2) a Force Investigation Team ("FIT") Manual; (3) a FIT General Police Order ("GPO"); and (4) a Memorandum of Understanding Between the Cleveland Division of Police and the Cuyahoga County Sheriff's Department to Conduct Independent Criminal Investigations of Uses of Force by Cleveland Police That Result in the Actual or Anticipated Death of a Person ("MOU"). The finalization of these closely-related protocols has required substantial changes from how the Division previously addressed force incidents.

Under the Consent Decree, "CDP will develop and implement a Force Review Board ('FRB') to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective.[44]

On June 30, 2020, the Court conditionally approved the proposed FRB policy for a period starting on the date the FRB holds its first meeting and extending for six months. During this time, the Monitoring Team will assess FRB operations to determine if it can effectively carry out all of the duties that the Consent Decree prescribes. At the conclusion of the six month period, the Monitoring Team will report to the Court its observations and assessment and will recommend whether the FRB policy should be permanently approved or if material changes should be considered.[45]

### *Supervisory Review Policy*

The Supervisory Review Policy identifies CDP supervisors' responsibilities in responding to an officer use of force, including reviewing Level 1 and Level 2 uses of force, referring Level 3 to FIT, and the chain of command review of investigations.

---

[41] *Id.*

[42] *Id.*

[43] This section contains some elements of prior filings to the Court. *See* Dkt. 309 and 314.

[44] Dkt. 7-1 at ¶ 124.

[45] Dkt. 317.

### Force Investigation Team Policy & Manual

To address the most serious uses of force, CDP has developed a lengthy and detailed Force Investigation Team Manual to guide operations of the Division's new FIT Team, which is tasked with a critical function of accountability for incidents of force. Under the Manual, FIT conducts administrative investigations of (1) all Level 3 uses of force; (2) uses of force involving potential criminal conduct by an officer; (3) all instances in which an individual died while in, or as an apparent result of being in, CDP custody; and (4) any uses of force reassigned to FIT by the Chief or his or her designee. FIT shall also conduct criminal investigations of the above matters where appropriate and where not assigned to an outside agency.

### Memorandum of Understanding with Cuyahoga County Sheriff's Office

CDP has elected to use the Cuyahoga County Sheriff Department to independently conduct the criminal portion of those investigations involving the actual or anticipated death of a person. A formal Memorandum of Understanding between the Division and the Sheriff's Department memorializes the protocols for such investigations.

### Force Review Board

The Force Review Board is intended to be the place where the Division dynamically analyzes how it uses and investigates force, and makes systemic changes that will improve accountability and public trust. The policy submitted to the Court provides specific details about the composition and operations of the Board.

### Progress and Tasks that Remain

#### 1.      Officer Training and Policy Implementation

As the first step in real-world implementation of the force investigation and review policies, CDP supervisors will need training on how to conduct lower-level force investigations and reviews. At the same time, the FIT Team will need to receive force-investigation-specific instruction. Selected members of the newly-established FRB will also need to receive initial training on their duties, responsibilities, and the ways that the Board must conduct its work.

#### 2.      Operation of FRB

Following the approval of policies and the training of Board members on their duties and responsibilities, the Force Review Board will begin to convene. The Monitoring Team will be auditing the Board's first sixth months of operations to assess the Board's ability to fully, fairly, and effectively review force investigations.

#### 3.      Compliance & Adherence to New Policies

It remains critical that CDP supervisors, command staff, FIT, and the FRB adhere to the requirements across cases, investigations, and time. As in all areas of the Consent Decrees, compliance must be sustained, and go beyond mere short-term or sporadic adherence, for the new policies on force investigation and review to be

considered effective in practice. Consequently, after the force investigation and review policies are approved by the Court and the Division ensures, through training, that implicated personnel understand the new expectations of those policies, CDP will need to meaningfully implement the policies and protocols for a material span of time before the Monitoring Team can evaluate whether the Division is substantially and effectively complying with those policies and protocols.

## A.    Use of Force Investigation and Review

| Paragraph | Status of Compliance |
|---|---|
| 93. "A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval." | **EVALUATION DEFERRED** |
| 94. Setting specific requirements relating to the investigation of low-level, Level 1 force. | **PARTIAL COMPLIANCE** |
| 95–109. Setting specific requirements relating to the investigation by supervisors and/or CDP chain of command for investigation and review of Level 2 force. | **PARTIAL COMPLIANCE** |
| 110. "CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP." | **PARTIAL COMPLIANCE** |
| 111. Creation and design of dedicated Force Investigation Team (FIT) that "will conduct administrative investigations . . . and criminal investigations" of serious force, "force involving potential criminal conduct," in-custody deaths, and cases assigned to it by the Chief. | **PARTIAL COMPLIANCE** |
| 112. Composition of FIT Team. | **PARTIAL COMPLIANCE** |
| 113. "FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type" on a host of specific, expressly-listed topics both initially and annually thereafter. | **EVALUATION DEFERRED** |
| 114.    "CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement." | **EVALUATION DEFERRED** |
| 115. Response of FIT to use of force scenes. FIT notification of prosecutor's office. Notification of designated outside agency to conduct criminal investigation if City elects to use external agency for such investigations. | **EVALUATION DEFERRED** |
| 116. "CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation." | **PARTIAL COMPLIANCE** |
| 117. Memorandum of understanding required between CDP and outside agency containing specific, expressly-listed provisions. | **OPERATIONAL COMPLIANCE** |
| 118. Setting forth various, specific, and expressly-listed responsibilities of FIT during its investigations. | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 119. Monitor's duty to annually review any "criminal investigations conducted by the outside agency" to ensure that they "are consistently objective, timely, and comprehensive." | **EVALUATION DEFERRED** |
| 120. Providing for delay of compelled interview if "case has the potential to proceed criminally" but otherwise requiring that "[n]o other part of the investigation . . . be held in abeyance" unless "specifically authorized by the Chief" in consultation with investigating agency and prosecutor's office. | **PARTIAL COMPLIANCE** |
| 121. Requiring completion of preliminary report presented to Chief or Chief's designee "as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force." | **PARTIAL COMPLIANCE** |
| 122. Completion of investigation within 60 days. Preparation of FIT investigation report. Review of FIT investigative report by head of Internal Affairs who "will approve or disapprove FIT's recommendations, or request . . . additional investigation." | **EVALUATION DEFERRED** |
| 123. Revision of FIT manual to ensure "consisten[cy] with the force principles" and several specific, expressly-listed provisions. | **PARTIAL COMPLIANCE** |
| 124–30. Establishment and operation of Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." | **PARTIAL COMPLIANCE** |

## Background

The Consent Decree establishes clear protocols by which the Division must investigate uses of force by the reported level of force. For a Level One use of force, the investigation will typically be limited to a review of the involved officer's use of force report.[46] Level Two uses of force require a supervisor to respond to the scene and commence a preliminary force inquiry. If the supervisor's inquiry at any point indicates "that there may have been misconduct, the supervisor will immediately notify Internal Affairs and Internal Affairs will determine if it should respond to the scene and/or conduct or take over the investigation."[47] Level Three uses of force, the most serious incidents, may come under the purview of either CDP's Force Investigation Team ("FIT Team") or an independent outside agency.

Along with force inquiries, the Decree requires CDP to craft policies and procedures related to supervisory review of completed force investigations. Part of this process entails the establishment of a Force Review Board ("FRB") that will "appraise use of force incidents from a tactics, training, policy, and agency improvement perspective."[48]

## Where the Division Stands

In the current reporting period, the Division finalized three important documents that will collectively set

---

[46] Dkt. 7-1 at ¶ 124.

[47] *Id.*

[48] *Id.*

expectations and protocols for the Division's review and investigation of uses of force: (1) the Use of Force Supervisory Review Policy; (2) the Force Investigation Team Manual; and (3) the Force Review Board Policy. Although the Monitoring Team expected that these policies were going to be ready to be submitted for the Court's approval early in the last reporting period, two factors interfered with those submissions.

First, the Monitoring Team and the Court expressed concerns regarding the timing of Force Review Board meetings and its level of involvement in determining to what extent a particular use-of-force may be "in" or "out" of policy. In lieu of a court hearing on the matter, the CDP, the DOJ and the Monitoring re-engaged in discussions relating to the FRB policy to ensure the FRB process will be consistent with best practices in other jurisdictions. As such, discussions regarding the FRB policy continued into this reporting period.

Second, towards the end of the reporting period, a tragic fatality resulted during the course of a police pursuit. The Monitoring Team noted that the FIT policy did not contain specific provisions for FIT roll-outs relating to pursuits resulting in death or serious bodily injury. As such, the parties decided to re-engage to discuss to what extent FIT investigations should be taking place as a result of such incidents.

Discussions are ongoing and new policies addressing investigations of pursuits resulting in death or serious bodily injury are anticipated to be completed during the upcoming reporting period.

### Progress and Tasks that Remain

#### 1.    Officer Training and Policy Implementation

Now that the FIT and FRB manuals are completed and approved by the Court, CDP will be able to comprehensively analyze the application of force so that officer training, professional development, and risk management may all be continually enhanced. To do so effectively, relevant Division personnel will need to receive training on the new expectations. Specifically, CDP supervisors will need training on how to conduct lower-level force investigations and reviews; the new FIT Team will need to receive force-investigation-specific instruction; and selected members of the newly-established FRB will likewise need to receive initial training on their duties, responsibilities, and the ways that the Board must conduct its work.

#### 2.    Operation of FRB

Now that the FRB policy and training has been approved, the Division can commence board training. Once trained, the Board will begin to convene. The Monitoring Team will be auditing the Board's first year of operations to assess the Board's ability to fully, fairly, and effectively review force investigations.

#### 3.    Compliance & Adherence to New Policies

Finally, it is critical that CDP supervisors, command staff, FIT, and the FRB are adhering to the requirements across cases, investigations, and time. As in all areas of the Consent Decrees, compliance must be sustained, beyond mere short-term or sporadic adherence, for the new policies on force investigation and review to be considered effective in practice.

#### 4.            *Timeliness of Officer Involved Shooting Investigations*

The Monitoring Team has been following the timelines by which fatal officer-involved shootings by CDP officers are investigated and adjudicated. While the incidents of such shootings are relatively rare, the importance of conducting timely, thorough and fair investigations of such incidents cannot be overstated.

As of the end of the reporting period, there were four fatal officer-involved shooting incidents that were still pending investigation or adjudication.

The most recent case, which occurred on November 15, 2019 is, as of the writing of this report, still pending investigation by the Cuyahoga County Sheriff's Force Investigation Team. Although it has been reported that the Sheriff is working the case, the Monitoring Team notes that four months has passed since the time of the incident without the investigation having been completed. The proposed FIT manual requires that the IA Superintendent ensure the "timely" completion of all FIT investigations.[49] While the term "timely" is not specifically defined, the Manual does require the completion of all FIT administrative investigations within 60 days of the incident.[50]

The three additional pending cases have suffered from extraordinary and objectively unreasonable time delays.

A fatal officer-involved shooting took place on January 14, 2018. As of the writing of this report, and even though more than two years has passed, that case has still not been adjudicated by the Chief of Police. The Cuyahoga County Grand Jury declined to issue an indictment on June 5, 2019; it subsequently took until July of 2019 for Internal Affairs to receive a copy of the Sheriff FIT final report. As of March 2020, even though Internal Affairs recommended the issuance of administrative charges shortly after receipt of the Sheriff FIT report, a charge letter had still not been issued and no pre-disciplinary hearing had been conducted.

With respect to an April 12, 2017 fatal officer-involved shooting involving two CDP officers, the case is still with the Ohio Attorney General. Although the Monitor was advised that the Attorney General was planning to take the case to the Grand Jury the week of February 3rd, as of the writing of this report, we have not been advised of any Grand Jury decision in that regard. That case is quickly approaching its third anniversary.

With respect to an October 25, 2017 fatal officer-involved shooting, although the Lorain County Prosecutor ruled in November 2019 that the use of force was objectively reasonable, Internal Affairs recently reported that it had been "waiting weeks" for the return of the Homicide file from Lorain County. Until possession of that file is obtained, it is impossible for Internal Affairs to determine whether any of the underlying conduct was "in" or "out" of policy and whether administrative charges would be appropriate. Almost two and a half years has passed since the date of that incident.

As indicated by the above-noted timelines, the Division's current inability to timely investigate and adjudicate these significant incidents is of considerable concern to the Monitoring Team. While the delays are attributable to outside agency review, for the CDP to come into compliance with those portions of the Consent Decree that

---

[49] Proposed FIT Manual, Section VI.D.1.e.
[50] Proposed FIT Manual, Section VI.B.3.c & Section VI.C.1.j.

require the timely investigation and adjudication of criminal and administrative allegations,[51] substantially more attention will have to be paid to the creation of processes and practices that will ensure that all aspects of the investigatory and adjudicative processes are efficiently administered.

---

[51] Dkt. 7-1 at ¶¶ 117, 119, 177 & 320.

## V.          CRISIS INTERVENTION

| Paragraph | Status of Compliance |
|---|---|
| 131. "CDP will build upon and improve its Crisis Intervention Program" in furtherance of four specific, expressly-listed goals, which "will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health system and create a context for sustainable change." | **PARTIAL COMPLIANCE** |
| 132. Establishment of Mental Health Response Advisory Committee (the "Advisory Committee") "to foster relationships and build support between the police, community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis." | **GENERAL COMPLIANCE** |
| 133. Composition of Advisory Committee. | **GENERAL COMPLIANCE** |
| 134. "The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program." | **GENERAL COMPLIANCE** |
| 135. Advisory Committee will conduct an annual "analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers" and communications "are appropriately responding to people in crisis," and will also "recommend appropriate changes." | **EVALUATION DEFERRED** |
| 136. "The Advisory Committee's reports and recommendations will be provided" to CPC, "be publicly available, and will be posted on the City's website." | **GENERAL COMPLIANCE** |
| 137. CDP will designate a Crisis Intervention Coordinator for specific, expressly-identified purposes. | **GENERAL COMPLIANCE** |
| 138. "Coordinator will develop and maintain partnerships with program stakeholders and serve as point of contact" and "resource" for other stakeholders. | **GENERAL COMPLIANCE** |
| 139. "Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, call-takers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program." | **GENERAL COMPLIANCE** |
| 140. "Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate." | **OPERATIONAL COMPLIANCE** |
| 141. "Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers" and "to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls." | **PARTIAL COMPLIANCE** |
| 142. "Coordinator will create ways to recognize and honor specialized CIT officers, call-takers, and dispatchers." | **EVALUATION DEFERRED** |
| 143. Initial and annual crisis intervention training to all officers and recruits that is "adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |
| 144. Initial and annual crisis intervention training for dispatchers and call-takers. | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 145. "CDP will provide enhanced specialized training in responding to individuals in crisis to certain officers ('specialized CIT officers')," who will be "called upon to respond to incidents or calls involving individuals in crisis." | **PARTIAL COMPLIANCE** |
| 146–47.  Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | **PARTIAL COMPLIANCE** |
| 148.  Designation of specialized CIT officers, per specific, expressly-listed requirements. | **EVALUATION DEFERRED** |
| 149.  "Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized officers." | **EVALUATION DEFERRED** |
| 150.  "All Field Training Officers" ("FTO"s) "will receive the enhanced specialized crisis intervention training described in paragraph 146," though FTOs will "not be designated as a specialized CIT officer" unless they volunteer and have been selected to do so. | **EVALUATION DEFERRED** |
| 151.  "Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene," with supervisors "seek[ing] the input of a specialized CIT officer . . . where it is reasonable for them to do so." | **EVALUATION DEFERRED** |
| 152.  "[T]he Coordinator will develop an effective specialized crisis intervention plan . . . to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis" that includes various, specific, expressly-identified requirements.  The City "will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis." | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires the Division to build and enhance its Crisis Intervention Program with the goals of:

- Assisting individuals in crisis;
- Improving the safety of officers, consumers, family members, and others within the community;
- Providing the foundation necessary to promote community and statewide solutions to assist individuals with mental illness; and
- Reducing the need for individuals with mental illness to have further involvement with the criminal justice system.[52]

## Where the Division Stands

The City and CDP has continued to demonstrate progress with the Mental Health Response Advisory Committee ("MHRAC"). - the community problem-solving forum including representatives from The Division, social service providers, mental health and substance abuse professionals, the judiciary, advocates, and individuals in recovery with lived experience – in order to develop ways to improve services to those in need of care.  This work continues to require a significant commitment on the part of the Division, the Alcohol and Drug and Mental Health Services Board ("ADAMHS") and the volunteers from the community.

---

[52] Dkt. 7-1 at ¶ 131.

This commitment is notable in light of the loss of Captain James Purcell, the CIT Coordinator for the Division. Captain Purcell died of cancer in January of this year. Captain Purcell had made a significant commitment to the crisis intervention program over the past four years and was a unifying force for all those involved in the effort. He is missed.

The Division worked hard to address his initial absence and eventual loss. Sergeant Brigitte Dorr-Guiser was asked to continue the work. More recently, Captain James McPike has been appointed take on the role of CIT Coordinator where he will continue to work with Sergeant Dorr-Guiser Deputy Chief O'Neill returned to a leadership role in MHRAC, as well as work with the Training Subcommittee, and the Quality Insurance Subcommittee. This leadership came at a critical time. While ADAMHS Board CEO Scott Osiecki has remained as steadying influence and has been very supportive of MHRAC, the committee lost long-term chair Edward Eckart, Jr. who retired from the City of Cleveland to take a position as Vice-President of the Downtown Cleveland Alliance. Mr. Eckart played an important role in addressing CDP Crisis Intervention Policy issues involving Cleveland Emergency Services. Nicole Carlton, Cleveland EMS, has taken on the role as Co-Chair.

This reporting period marks an important transition for the Division and MHRAC. As the Consent Decree reaches the fifth year, the responsibility for maintaining progress has rested more and more with the Division and MHRAC. The development of the annual plan became the work of the Division. The Department has taken on leadership and much of the technical assistance needed to complete the tasks in the plan. They have maintained strong relationships in the crisis response arena through the work with MHRAC. The relationship with the community has become increasingly a part of the crisis program and the ADAMHS Board has responded by appointing Carole Ballard as the Director of Training and Education where her role as the liaison to the CIT program has taken on greater importance. These developments bode well for the future of the Division's crisis intervention program.

### Curriculum Development and Training

As with the past several reporting periods, MHRAC's Training Subcommittee took on significant responsibility in developing CDP Crisis Intervention curriculum. The Training Subcommittee worked with CDP on three major training initiatives: (1) completion of the Third-Year Crisis Intervention In-Service Training ("Third-Year Crisis Intervention Training") on "Recognizing and Responding to Traumatized Youth", (2) the Call-Takers, Dispatchers, and Supervisors Curriculum ("Telecommunicator Training") and (3) development of the Fourth-Year Crisis Intervention In-Service curriculum ("Fourth-Year Crisis Intervention Training").

The Division is giving a high priority to early completion of the Annual Crisis Intervention Training in 2020 and has made good progress towards completing this curriculum. The Division identified Autism as an area of need and the new curriculum is titled "Autism: Support for Families in the Community." In addition to the leadership provided by CDP Deputy Chief O'Neill and subcommittee chair Shannon Jerse of St. Vincent Hospital, Dr. Richard Cirillo, chief clinical officer of the Cuyahoga County Board of Developmental Disabilities deserves recognition for his development of the curriculum. As with other curriculum efforts, the Department of Justice and the Monitoring Team have been active participants in both MHRAC and the Training Subcommittee. The work of the volunteers of the committee is highly appreciated and represents an important service to the community.

### *Community Engagement Subcommittee*

MHRAC's Community Engagement Subcommittee ("Engagement Committee") which is co-chaired by Karen Kearney, Director of the Mental Health & Addiction Advocacy Coalition Northeast Hub and Beth Zietlow-DeJesus, ADAMHS Board Director of External Affairs, has continued to find innovative ways of assisting CDP in their work to involve the community in the crisis intervention program. This work started with the Engagement Committee developed a Community Engagement strategic plan for MHRAC. The subcommittee has also completed a training workshop ("When to Call 911 in a Mental Crisis") which the ADAMHS Board has available through their Training Institute at http://adamhscc.org/en-US/when-to-call-911-training.aspx.[53] The subcommittee developed a strategy for sharing crisis intervention related content making use of the ADAMHS Board Social Media effort. Importantly, the CDP Officer resource cards which provides a concise district-by-district guide to Cleveland-area programs was revised and is now shared with the officers electronically.

### *MHRAC Diversion Subcommittee*

The role of the MHRAC's Diversion Subcommittee ("Diversion Committee:") is becoming more central to the Crisis Intervention Program now that the CIT Specialized 40-hour Training is on track for this Spring. The Diversion Committee, which is chaired by Christina Kalnicki, CareSource Behavioral Health Initiative Lead, noted several new diversion resources. The committee is in the process of reviewing a series of evidence-based diversion models that could provide additional diversion points for CDP. One of the existing diversion points, the ADAMHS Board Frontline Crisis Stabilization Unit serves as a primary receiving facility for officers needing a resource for individual's in crisis. Additionally, the City of Cleveland obtained a DOJ Grant to increase the number of mental health workers available to the police. These workers can provide additional assistance to officers needing resources for citizens of Cleveland.

Last year, the City, CDP and the ADAMHS Board have obtained funding for a new pilot project to involve peer counselors to assist with referring individuals in crisis to appropriate resources. This program is innovative and shows an interest in diversion that is broader than diversion from arrest but expands diversion to an interest in the availability of resources. Along these same lines, the Diversion Committee examined opportunities for pre-arrest diversion when a crisis call comes into the 911 system.[54] This strategy is part of a national interest in involving 911 and Emergency Medical Services ("EMS") in the diversion process. This work is important in developing diversion alternatives allowing the Specialized CIT Officers to assist in connecting individuals in crisis to community resources.

### Progress and Tasks that Remain

### *MHRAC Quality Improvement Subcommittee: Data & Compliance Reviews*

During the last reporting period, the MHRAC Quality Improvement Committee found itself limited by the lack of formal data. As this year ended, detailed data is becoming available. The hand-written sheets completed by the officers are increasing and becoming a more accurate representation of crisis intervention events. The ADAMHS

---

[53] MHRAC 2019 Annual Report at 2.
[54] Seventh Semiannual Report at 35.

Board has worked diligently to analyze these sheets and provide the committee with a picture of event dispositions, demographic data and officer response. While these results must be viewed in the context of what is a limited sample of events, the reports in the MHRAC annual report should be noted. The use of Verbal De-escalation is increasing over time and the use of handcuffs is decreasing.[55] The officer injury rates are reported to be at a rate of 1 out of over 600 events on average for the past two years. Full analysis of crisis events should wait for the soon-to-be-completed CDP automated data reporting system.

As more data becomes available, CDP will need to conduct formalized assessments of the outcome data to "identify training needs and develop case studies and teaching scenarios for crisis intervention training as well as primary and in-service crisis training curriculum[.]"[56] Further, CDP will need to publicly report this outcome data annually and provide it to the Advisory Committee.[57]

Separately, the Monitoring Team will need to analyze data and review a material sample of incidents involving individuals in crisis to certify that officers—across time, incidents, and subjects—are complying with the new crisis intervention policies and the requirements of the Consent Decree. The type of analysis necessary to certify compliance with a host of requirements related to crisis intervention consequently cannot be undertaken.[58] However, the information system work is nearing completing and the MHRAC Quality Improvements Subcommittee and CDP will be able to provide detailed reports in the near future.

### *Academy Training*

Following the Consent Decree's approval and implementation by the Court, the Ohio Peace Officer Training Commission issued a new Crisis Intervention training curriculum for Ohio peace officers.[59] CDP recruits received this curriculum as part of Academy Training. The Parties, MHRAC, CDP, and the Monitoring Team had agreed that this new training was a reasonable substitute for the Decree-required sixteen hours of Academy Training. The new recruits proceeding through the Academy are now being trained in Cleveland rather than the Ohio State Patrol Academy. The Monitoring Team has been assured the Academy Training meets the standards set at the Ohio State Patrol Academy. MHRAC, through the Training Committee will work with CDP to formally review the Academy Training and report to the Parties, the Monitoring Team and the Court that the Ohio Peace Officer Training Commission Crisis Intervention Curriculum remains a meaningful part of patrol officer training.

### *Selection of Specialized CIT Officers*

The Division's Specialized CIT Officer Selection Plan outlines a three-stage process of a participation request, personnel file review, and selection board interview. The Plan has been reviewed and approved by MHRAC, as well as by the Court. The selection process is now underway. The Division understandably faces new challenges in this recruitment and selection process. Recent results in recruiting are encouraging. The Monitoring Team

---

[55] MHRAC 2019 Annual Report at 13.

[56] *Id.* at ¶ 159.

[57] Dkt. 7-1 at ¶ 158.

[58] Seventh Semiannual Report at 36.

[59] Ohio Peace Officer Training Commission: Education & Policy Section, Peace Officer Basic Training Crisis Intervention, 1-156 (Jan. 2016).

appreciates the leadership shown by CDP in working towards the success of the Specialized Officer Selection Plan.

## VI.                    SEARCH AND SEIZURE

| Paragraph | Status of Compliance |
|---|---|
| 160. "CDP will revise, develop, and implement search and seizure policies that comply with applicable law, . . . include the requirements below," and conform to expressly-identified principles. | **PARTIAL COMPLIANCE** |
| 161–65. Policy requirements for officers for stops, searches, and detentions. | **PARTIAL COMPLIANCE** |
| 166. "Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assault on an officer and no other substantive violation is alleged," and "the supervisor will respond to the scene." | **EVALUATION DEFERRED** |
| 167. "Officers will not use 'canned' or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests." | **EVALUATION DEFERRED** |
| 168. "Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports." CDP "will train officers" on documenting stops. "Supervisors will review all documentation of investigatory stops, searches, and arrests." | **EVALUATION DEFERRED** |
| 169. Supervisor will review of "each arrest report by officers under their command," with supervisors reviewing reports for specific, expressly-identified deficiencies. | **EVALUATION DEFERRED** |
| 170–72. Supervisory review of investigatory stops, searches, and arrests. | **EVALUATION DEFERRED** |
| 173. Provision of "initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements" of the Consent Decree that "will address the requirements of Fourth Amendment and related law, CDP policies," and specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 174–75. Provision of "annual search and seizure in-service training that is adequate in quality, quantity, type, and scope" incorporating specific, expressly-identified topics. | **EVALUATION DEFERRED** |

### Background

The Consent Decree requires that CDP "revise, develop, and implement" policies on how its officers "conduct all investigatory stops, searches, and arrests with the goal" that such actions comply with the "Constitution, state and federal law."[60] In addition to ensuring that officers adhere to these legal requirements, the policies also must prohibit officers from relying on a subject's "race, ethnicity, gender, and perceived sexual orientation" as a reason to stop, search, or arrest an individual.[61]

The Consent Decree requires that CDP officers use specific details in reports documenting the events that led to

---

[60] Dkt. 7-1 at ¶ 160.
[61] *Id.* at ¶ 161; Dkt. 97 at 42.

an investigatory stop, search, or arrest without the use of "canned or conclusory statements." Immediate supervisors and command staff are tasked with reviewing officer reports in a timely fashion to ensure compliance with applicable laws and CDP policies. This review is designed to address violations and deficiencies in the documentation while also authorizing supervisors to recommend corrective and disciplinary action, along with criminal investigation, where appropriate.

## Where the Division Stands

### Approval of Search and Seizure Policies

In the prior reporting period, CDP, working with the Department of Justice, Monitoring Team, and the Community Police Commission, completed five related policies: (1) Search & Seizure; (2) Investigatory Stops; (3) Probable Cause/Warrantless Arrests; (4) Strip and Body Cavity Searches; and (5) Miranda Warning and Waiver. As described in the Team's Sixth and Seventh semiannual reports, these policies received substantial community feedback facilitated by both the Community Police Commission's Search and Seizure workgroup and the City's additional efforts to solicit public input. These policies were approved by the Court on May 16, 2019.[62]

During this period, the CDP proposed modifications to these policies to address specific, technical concerns. After review and discussion with the parties, the Monitoring Team recommended approval of the changes, including: First, in the Investigatory Stops policy, the officer identification requirement was changed from "officer's full name and badge number" to "officer's last name and badge number."  See Exhibit B at Section IV, D. 1. (a). This accommodates the requirement for the officer to identify themselves during investigative stops, without being unnecessarily burdensome or intrusive on the privacy of the officer.

Second, the Miranda policy substituted "suspect" for the terms "subject" and "individual" to clarify that Miranda is only required for a suspect in custody and not for witnesses. See Exhibit E, at Section 1.B. 1 and 2. Furthermore, the definition of "custody" in the Miranda policy is clarified to read:

> A person is in custody when one of two circumstances occurs: 1) they are verbally told that they are under arrest; or 2) when based on the totality of circumstances a person would reasonably believe there is a significant restraint on their freedom of movement and ability to end the interaction.  Factors that may be relevant in determining whether a person would reasonably believe they are in custody include the factors set forth in GPO 2.02.02, Investigatory Stops, Section IV. B.

This definition properly captures that whether a person is in custody is dependent on the belief of the person detained, not the detaining officer, and directs the officer to consider the same variables set forth in the Investigatory Stops policy that can convert a Terry stop into a de facto custodial arrest. Having the same considerations present for Miranda and Terry provides consistency between the policies and creates clarity for officers.

Third, the Probable Cause/Warrantless Arrests policy was amended to add the word "minor" to the prohibition

---

[62] Dkt. 261.

to conducting a warrantless arrest. See Exhibit C, Section I(B). Previously, the policy erroneously prohibited all misdemeanor arrests. Additionally, Sections VII (C) and (D) were revised to ensure clarity to supervisors as to what they needed to investigate when called to the scene to screen certain arrests. Id.

Last, the Strip Searches and Body Cavity Searches policy was amended at the recommendation of the Inspector General to clarify the statutory provisions on the Chief's designation for authority to approve strip and body cavity searches (Sergeant or above) pursuant to Ohio Revised Code 2933.32(B). See Exhibit D, Policy. This policy was also reworded at the recommendation of the Inspector General to account for exigent circumstances to conduct a strip search during a misdemeanor arrest, which is otherwise prohibited, "when an officer(s) have probable cause to believe that the subject is hiding a deadly weapon or dangerous ordnance and when less intrusive means of discovering a weapon or contraband are not available." Id. At III(B).

These changes were thoughtful, carefully tailored not to substantively change the effects or intent of the policies, and well-received by the Monitoring Team. The Court approved the updated Search and Seizure policies on January 23, 2020.[63]

### *Training*

Early in this review period, CDP's Search and Seizure curriculum was formally approved by the Court.[64] As described in the Seventh Semiannual Report, the Search and Seizure curriculum was a long time in development and the Monitoring Team, CDP, the Department of Justice and the Community Police Commission all worked together, for the most part collaboratively, to move towards an excellent product. Earlier in the year, the Monitoring Team arranged for external technical assistance from a consultant, using the Monitoring Team budget, to help develop the training and provide significant input on adult learning strategies. The final curriculum includes several critical concepts and lessons, including: consensual encounters, non-custodial interviews, seizure, search, reasonable suspicion, probable cause, when officers may lawfully enter private property, when Miranda should be given, warrantless arrests, and frisks for weapons. The curriculum cross-references other important training initiatives within the Division, such as the Community Engagement and Problem-Solving training, to help officers to get a better context of how the new Search and Seizure training fits within CDP's broader training schema.

Overall, the training uses a commendable variety of adult learning techniques, including question-and-answer, interactive exercises, large group discussions, and handouts. Despite the somewhat prolonged process of developing the curriculum itself, the end result is that the CDP instructors have done an excellent job translating the curriculum into an effective and valuable training for the Division. The decision to partner with the City Prosecutors' Office and have a City Attorney present to discuss and analyze complex legal issues in real-time was an excellent choice. Having observed the high quality delivery of the curriculum, the Monitoring Team is satisfied with the final product, with the caveat that the Team will continue to work with the Division to increase the capacity and resources of the training unit to ensure that CDP can create and deliver trainings with less hands-on involvement from the Monitoring Team in the future.

---

[63] Dkt. No 299.

[64] Dkt. No. 284

The struggle to develop a strong curriculum for search and seizure highlighted the need to increase the capacity of CDP's training unit. In January 2020, the Monitoring Team arranged for CDP trainers to attend the Los Angeles Police Department Academy Instructor Certification Course (AICC), which focusses on how to present to adult learners and develop effective lesson plans. CDP trainers spent a week learning at this program that will hopefully encourage more robust curriculum development. However, the nationally recognized program offered by the LAPD, was not well received by CDP trainers and it remains to be seen whether the lessons of the program will be incorporated into future trainings.

### Policy Implementation & Assessment

After all patrol officers receive training, the policies will need to "go live" in the field. After a material period of time during which the policies are in effect, the Monitoring Team must (1) evaluate the numbers and trends with respect to who is being stopped, under what circumstances, and what the outcomes of those stops are; and (2) audit a host of stops themselves to determine if officers both articulated and had in fact sufficient legal grounds for any stop, detention, search, or arrest. This will include evaluation of whether supervisors are adhering to their requirements under the Division's Court-approved policies and the Decree. In order for the Monitoring Team to be able to gauge whether the Division is complying with the terms of the Decree and the various provisions of the approved search and seizure policies, CDP will need to be rigorously tracking stop encounters in a robust and comprehensive data collection system, including associated video evidence. It remains to be seen whether the data collection systems – those in place and those in development – will be capable of collecting and analyzing the requite data on search, seizure, and arrest.

## VII.          ACCOUNTABILITY

| Paragraph | Status of Compliance |
|---|---|
| 176. "The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process." | **EVALUATION DEFERRED** |

### A.          Internally Discovered Misconduct

| Paragraph | Status of Compliance |
|---|---|
| 177. "Internal Affairs will conduct objective, comprehensive, and timely investigations of all internal allegations," with "findings . . . based on the preponderance of the evidence standard" that must "be clearly delineated in policies, training, and procedures and accompanied by detailed examples to ensure proper application by investigators." | **EVALUATION DEFERRED** |
| 178. "Internal Affairs will be headed by a qualified civilian" who "will report directly to the Chief of Police. | **OPERATIONAL COMPLIANCE** |
| 179. Qualifications for IA investigators. | **EVALUATION DEFERRED** |
| 180. Initial training for IA investigators "that is adequate in quality, quantity, scope, and type on conducting misconduct investigations" that addresses specific, expressly- identified topics. | **GENERAL COMPLIANCE** |
| 181. "[A]nnual training" for IA investigators "that is adequate in quality, quantity, type and scope" | **OPERATIONAL COMPLIANCE** |
| 182. "In each investigation, Internal Affairs will collect and consider" all evidence. "[N]o automatic preference for an officer's statement over a non-officer's statement." No disregard of a "witnesses' statement solely because of" connection to the complainant or criminal history. IA investigators must "make all reasonable efforts to resolve material inconsistencies between witness statements." | **EVALUATION DEFERRED** |
| 183. IA "will evaluate all relevant police activity and any evidence of potential misconduct uncovered during the course of the investigation." | **EVALUATION DEFERRED** |
| 184. IA will not consider guilty plea or verdict as "determinative of whether a CDP officer engaged in misconduct" or justification for "discontinuing the investigation." | **EVALUATION DEFERRED** |
| 185. IA "will complete its administrative investigations within 30 days from the date it learns of the alleged misconduct." | **EVALUATION DEFERRED** |

| | |
|---|---|
| 186–87. IA investigative report requirements. | **EVALUATION DEFERRED** |
| 188. Forwarding of completed IA investigations "to the officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator." | **EVALUATION DEFERRED** |
| 189. "CDP will require any CDP employee who observes or becomes aware of any" potential misconduct to "report the incident to a supervisor or directly to" IA. | **OPERATIONAL COMPLIANCE** |
| 190. "CDP will develop a system that allows officers to confidentially and anonymously report potential misconduct by other officers." | **OPERATIONAL COMPLIANCE** |
| 191. "CDP will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." | **OPERATIONAL COMPLIANCE** |
| 192. "Officers who retaliate . . . will be subject to the disciplinary process." | **OPERATIONAL COMPLIANCE** |

## Background

To comply with the terms of the Consent Decree, the CDP's Internal Affairs ("IA") unit must "conduct objective, comprehensive, and timely investigations of internal allegations of officer misconduct." Ultimately, Internal Affairs must be the primary engine for the Division's administrative (non- criminal) investigations of officer misconduct and, more generally, the main oversight mechanism for ensuring that the Division's performance standards are being met.

## Where Internal Affairs Stands Now

Over the past six months, Internal Affairs has been working with a court-approved IA Manual and IA-related policies that were finalized in the last Quarter of 2019 and approved by the court on December 19, 2019. Prior to the Consent Decree, IA did not have in place the types of rigorous, codified procedures for conducting its investigations and performing its duties that analogous units in similarly-situated departments have. After giving Internal Affairs sufficient time to implement these new rules and policies, the Monitoring Team will conduct a comprehensive assessment of IA case investigations using both quantitative and qualitative methodologies.

As the Monitoring Team has previously noted, sporadically high-quality investigations amid generally poor-quality investigations, or occasionally bad investigations among generally good ones, will not be sufficient to establish compliance. Instead, it will be the sustained adherence to the high standards of the Decree and policy that will set the occasion for substantial and effective compliance.

In addition, as previously indicated in the 7th Semiannual report, part of the Monitoring Team's evaluation process will be aimed at verifying to what extent IA is addressing all misconduct investigations or whether cases that should be addressed by IA are, for whatever reason, being inappropriately addressed by other Division or City

entities.

### *Staffing*

As the Monitoring Team has consistently reported, Internal Affairs remains understaffed. It is doubtful that sustained progress will ultimately be possible unless and until IA receives both the quality and quantity of investigative Sergeants necessary to ensure timely, high-quality investigations of internal misconduct.

The Division's Staffing Plan primarily, and largely appropriately, focuses on patrol staffing considerations. The Monitoring Team, and Court, approved that Staffing Plan on the understanding that discussion of non-patrol staffing would occur soon thereafter. Now is the time for CDP to ensure that it subsequently addresses the specific staffing needs of its various specialized units, including IA.

### *Implementation & Assessment*

With the policies relating to misconduct investigations now completed, the Monitoring Team must now necessarily give CDP's civilian IA Superintendent the opportunity to internally improve IA processes and implement new procedures before conducting qualitative analyses on current IA investigative practices. The Monitoring Team continues to anticipate beginning a subsequent round of qualitative analysis in the latter part of 2019 to evaluate whether investigations conducted in the first two quarters of the year appear to represent an improvement to a 2016 evaluation of 2015 cases that the Team previously conducted. As the Monitoring Team has previously noted, sporadically high-quality investigations amid generally poor-quality investigations, or occasionally bad investigations among generally good ones, are not sufficient to establish compliance. Instead, it is the sustained adherence to the high standards of the Decree and policy that will set the occasion for substantial and effective compliance.

**A.**      **Office of Professional Standards ("OPS")**

| Paragraph | Status of Compliance |
|---|---|
| 193. OPS "investigate[s] all civilian complaints it receives, other than those that allege criminal conduct," which are referred to IA. Excessive force complaints generally retained by OPS. IA investigations referred back to OPS if "determination is made that no criminal conduct occurred." | **OPERATIONAL COMPLIANCE** |
| 194. "The City will ensure that OPS is led by an administrator with the skills, expertise, and experience to effectively manage the intake, tracking, timely, and objective investigation of complaints"; implement PRB training; "assess OPS's equipment and staffing needs"; and "develop and implement performance standards for OPS." | **GENERAL COMPLIANCE** |
| 195–96. Initial training for OPS investigators "adequate in quality, quantity, scope, and type," including specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 197. "OPS Investigators will not be current members of the CDP, and no CDP personnel will have any active role in OPS's operations." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 198. "The City will ensure that the lawyer representing OPS does not have any actual or apparent conflicts of interest." | **OPERATIONAL COMPLIANCE** |
| 199. "OPS will have its own budget, separate from . . . the Department of Public Safety" that "affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement." | **OPERATIONAL COMPLIANCE** |
| 200. Development and implementation of OPS operations manual "made available to the public" that covers specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 201. Development and implementation of "a program to promote awareness through the Cleveland community about the process for filing complaints with OPS." | **EVALUATION DEFERRED** |
| 202. "CDP and the City will work with the police unions . . . to allow civilian complaints to be submitted to OPS verbally or in writing; in person, by phone, or on line; by a complainant, someone acting on his or her behalf, or anonymously; and with or without a signature from the complainant," with all "complaints documented in writing." | **OPERATIONAL COMPLIANCE** |
| 203. CDP will post and maintain by the intake window at CDP headquarters and all District headquarters a permanent placard describing the civilian complaint process" and containing specific, expressly-listed information. | **OPERATIONAL COMPLIANCE** |
| 204. "CDP will provide training that is adequate in quality, quantity, scope, and type to all police personnel, including dispatchers, to properly handle complaint intake, including" with respect to specific, expressly-listed topics. | **EVALUATION DEFERRED** |
| 205. CDP officers "carry complaint forms in their CDP vehicles," which officers must provide "upon request." Supervisors will be dispatched to scene when an individual wants to make a complaint, with the supervisor providing a copy of completed complaint form "or a blank form to be completed later by the individual." | **EVALUATION DEFERRED** |
| 206. "The City and OPS will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including a number of specific, expressly-listed locations. | **OPERATIONAL COMPLIANCE** |
| 207. "OPS's complaint form will not contain any language that could reasonably be construed as discouraging the filing of a complaint, including warnings about the potential criminal consequences for filing false complaints." | **GENERAL COMPLIANCE** |
| 208. Availability of complaint forms in English and Spanish. "OPS will make every effort to ensure that complainants who speak other languages . . . can file complaints in their preferred language." | **OPERATIONAL COMPLIANCE** |
| 209. "City will ensure that civilian complaints submitted through other existing systems, including the Mayor's Action Center and the Department Action Center, are immediately forwarded to OPS for investigation." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 210. "OPS will establish a centralized electronic numbering and tracking system for all complaints," which "will maintain accurate and reliable data regarding the number, nature, and status of all complaints . . . including investigation timeliness and notification of the interim status and final disposition of the complaint." It "will be used to monitor and maintain appropriate caseloads for OPS investigators." | **EVALUATON DEFERRED** |
| 211. Biased policing tracked as a separate category of complaint that "are captured and tracked appropriately, even if the complainant does not so label the allegation." | **EVALUATION DEFERRED** |
| 212. "[A]llegations of unlawful investigatory stops, searches, or arrests" tracked as a separate category of complaints. | **EVALUATION DEFERRED** |
| 213. "[A]llegations of excessive use of force" tracked as separate category of complaints. | **EVALUATION DEFERRED** |
| 214. "OPS will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends." | **PARTIAL-COMPLIANCE** |
| 215. "OPS will produce, at least annually, a public report summarizing complaint trends, including" with respect several specific, expressly-identified areas. | **GENERAL COMPLIANCE** |
| 216. Assignment of complaints to Standard and Complex investigatory tracks. | **OPERATIONAL COMPLIANCE** |
| 217. Dismissal and/or administrative dismissal of complaint investigations. | **OPERATIONAL COMPLIANCE** |
| 218. "OPS will ensure that investigations of complaints are as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of the evidence." | **EVALUATION DEFERRED** |
| 219. "CDP will ensure that OPS has timely access to all reports related to the incident . . ," and authority of OPS "to conduct additional investigation" of civilian complaint when CDP investigation has already taken place relating to the incident. | **EVALUATION DEFERRED** |
| 220. "OPS investigators will attempt to interview each complainant in person" and record the interview. | **OPERATIONAL COMPLIANCE** |
| 221. "The Chief will order officers who witnessed or participate in an incident that is the subject of an OPS complaint to cooperate with the OPS investigation," including by responding to written questions or sitting for an in-person interview. | **OPERATIONAL COMPLIANCE** |
| 222. "OPS investigators will have access to any relevant disciplinary information in the record of an officer who is the subject of a current investigation." | **EVALUATION DEFERRED** |
| 223. "OPS will consider all relevant evidence," with no preferences for particular witness's statements, including of officer over a non-officer, or because of connection to complainant or criminal history. "OPS will make all reasonable efforts to resolve material inconsistencies between witness statements." | **EVALUATION DEFERRED** |
| 224. OPS findings categories. | **OPERATIONAL COMPLIANCE** |

| 225. "OPS will document in writing the investigation of each complaint, including all investigatory steps taken, and OPS's findings and conclusions," which must "be supported by a preponderance of the evidence. | **GENERAL COMPLIANCE** |
|---|---|
| 226. Items for consideration for OPS findings. | **EVALUATION DEFERRED** |
| 227. "OPS will forward all investigations and its written conclusions to PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation." | **OPERATIONAL COMPLIANCE** |
| 228. "OPS will send periodic written updates" to the complainant at specific, expressly-identified junctures. | **EVALUATION DEFERRED** |
| 229. "[A] complainant may contact OPS at any time to determine the status of his/her complaint." | **EVALUATION DEFERRED** |

## Background

The Office of Professional Standards ("OPS") is the civilian-staffed office charged with investigating the complaints of civilians about Division of Police personnel. Cleveland's City Charter requires OPS to conduct "a full and complete investigation" of all citizen complaints of employee misconduct.[65]

As the Monitoring Team has regularly summarized, the Consent Decree includes a number of requirements— such as hiring a qualified and experienced OPS Administrator, ensuring high-quality training for investigators, establishing a separate budget for OPS, and promoting awareness throughout Cleveland about the availability of civilian complaint forms—all designed to ensure that OPS can conduct thorough and competent investigations of civilian complaints and reach findings that are supported by the preponderance of evidence.[66]

## Where OPS Stands Now

In the current reporting period, "Hillard Heintze"—an outside firm hired by the City to address the backlog of uninvestigated or partially-investigated civilian complaints, filed with OPS prior to December 2018, has successfully eliminated the OPS case backlog which had been a continuing barrier to bringing the OPS compliant handling process into compliance with the Consent Decree.

As of the end of the reporting period, OPS was working with an open caseload of 88 cases, with the oldest case having been received by OPS in August 2018.[67]  Given that OPS started 2018 with a backlog of 377 cases, the progress that has been made is laudable.

The Monitoring Team continues to see improvements in the quality of OPS investigative practices. The Monitoring Team is expecting to begin a comprehensive assessment of OPS case investigations using both quantitative and qualitative methodologies.

---

[65] Charter of the City of Cleveland, § 115-4.

[66] Dkt. 7-1 at ¶¶ 193–229.

[67] As reported by the OPS in its December 11, 2019 bi-weekly report.

### Staffing

Since 2018, OPS has staffed up considerably, with a new Administrator, Supervising Investigator, Research Analyst, and General Manager. The hiring of a Community Engagement Coordinator suffered a setback when the final candidate was unable to start on a date acceptable to OPS administration. As such, the position was reposted and closed on June 29, 2019.  The Monitoring Team is pleased to see that a hire was made and the new staff member started her community engagement work over the course of the last reporting period.

Unfortunately for the OPS, its high performing General Manager, George Coulter, was selected by the Public Safety Director to be one of his new Deputies-a definite gain in the bigger picture of accountability.  As such, the OPS will now have to backfill the General Manager position, which had become an essential part of the OPS Administrator's executive staff. The Monitoring Team is hopeful that a well-qualified candidate for that position case be quickly identified and hired in a timely manner.

### Annual Report

The 2019 Annual OPS Report, summarizing complaint trends and timeframes for the public and required under Paragraph 215 of the Decree, was completed on time (prior to the end of the first Quarter of 2020) and presented to the City Council's Public Safety Committee in public session.  The improvements in the quality of the report, even since the last year, have been significant and the work of the OPS Administrator and the OPS Research Analyst is praiseworthy.

### Progress and Tasks that Remain

### 1.      OPS Staff Performance Reviews

As described in the Monitoring Team's last semiannual report, the OPS Administrator must ensure a robust employee performance review process at OPS to ensure employee adherence to OPS Court-approved policies and best practices in investigations. Thus far, the Administrator has reported that he and OPS supervisors continue to conduct ongoing, but informal, performance reviews in conjunction with training of OPS investigators.

Although substantive, written performance reviews have not been performed over the course of the last few reporting periods, as was hoped, the Monitoring Team will be deferring its evaluation of this area of OPS compliance until the OPS is fully staffed and the OPS Administrator has the time and resources to conduct formal, substantive written performance reviews.

### 2.      Community Awareness

Under the Consent Decree, the City and OPS "will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including "the websites of CDP, OPS and the City of Cleveland" as well as a number of other specific, expressly-listed locations.[68]  Further, all CDP officers

---

[68] Dkt. 7-1 at ¶ 206.

will "carry complaint forms in their CDP vehicles."[69]  In addition, the Consent Decree requires that "the City and CDP, in consultation with the [CPC] and the OPS, will develop and implement a program to promote awareness throughout the Cleveland community about the process for filing complaints with OPS."[70]

While the City and CDP have maintained that they have made complaint forms available at the Decree-enumerated locations, the Monitoring Team has not yet had the opportunity to conduct a formal audit to assess, among other things, the accessibility of complaint forms in vehicles and at CDP District stations. The OPS also reported an intent to expand the number of locations where complaint forms are available upon the hiring of its new Community Engagement Coordinator.

The Fourth Year Monitoring Plan, anticipating the hiring of the new Community Engagement Coordinator, imposed a deadline on the completion of the draft Community Awareness Plan, required by the Consent Decree for November 30, 2019. Unfortunately, a draft of that plan is now significantly overdue.

In our last Semiannual Report, the Monitoring Team noted that although the OPS had been assessed to be in "Operational Compliance" with respect to making complaint forms available on its website, there were ongoing concerns that OPS had not yet made it possible for members of the public to file complaints or commendations online.  The Monitoring Team is pleased to report that the OPS, working with the City's Division of Information Technology Services, was able to create this functionality over the course of the last reporting period, bringing the OPS into the modern era for accessibility of its complaint handling processes.

### 3.    Timeliness of OPS Case Adjudications

The Monitoring Team has previously expressed concerns regarding the timeliness of final adjudication of sustained findings recommended by the Police Review Board ("PRB") on OPS investigations. With the completion of the OPS case backlog by "Hilliard Heinze," the PRB sent forty-two (42) sustained "Hillard Heinze" cases to the Chief's Office for adjudication. This was in addition to OPS cases with sustained findings that have been regularly forwarded to the Chief's Office. As such, the Monitoring Team has agreed to wait until the backlog of cases can be adjudicated by the Chief's Office prior to conducting further evaluations of timeliness. The Monitoring Team has requested that, upon the completion of this backlog of cases, the Chief's Office come up with timeliness goals for the completion of Chief's Hearings (with respect to both OPS and IA cases) in order to ensure the timely handling of both community and internal complaints as well as the timely imposition of discipline as anticipated by the Consent Decree.[71]

### A.           Police Review Board ("PRB")

| Paragraph | Status of Compliance |
|---|---|
| 230. "Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot" addressing PRB composition and appointment process. | **GENERAL COMPLIANCE** |

---

[69] *Id.* at ¶ 205.

[70] Dkt. 7-1 at ¶ 201.

[71] The Consent Decree makes multiple references to the need for timely investigations of allegations of misconduct. See, Dkt. 7-1 at ¶ 117, 119, 177, 194, 219, 253 & 320.

| | |
|---|---|
| 231. "PRB members will not be current or former members of the CDP." | **GENERAL COMPLIANCE** |
| 232. "PRB will have its own budget," overseen by OPS Administrator and separate from Department of Public Safety, that "affords sufficient independence and resources." | **OPERATIONAL COMPLIANCE** |
| 233–34. Initial training for PRB members "that is adequate in quality, quantity, scope, and type" and that covers specific, expressly-identified topics. | **GENERAL COMPLIANCE** |
| 235. PRB meetings open to the public and posted in advance, with "case presentations and PRB votes" occurring during "open session." | **OPERATIONAL COMPLIANCE** |
| 236. "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings . . . ." PRB may "ask the investigator to conduct further investigation" as necessary. | **GENERAL COMPLIANCE** |
| 237. "PRB recommended dispositions will be based on a preponderance of the evidence. For each case, PRB shall set forth its conclusion and an explanation of its reasons and supporting evidence in writing, including, when applicable, the justification for departing from OPS's recommended disposition." | **EVALUATION DEFERRED** |
| 238. "In cases where PRB is recommending a sustained disposition, in whole or in part, PRB will include a recommendation as to disciplinary or non-disciplinary corrective action." | **OPERATIONAL COMPLIANCE** |
| 239. [Timely] forwarding of PRB recommendations to Chief of Police and Director of Public Safety. | **OPERATIONAL COMPLIANCE** |

## Background

Cleveland's civilian Police Review Board ("PRB" or "the Board") reviews and analyzes completed OPS investigations. It makes a formal recommendation to the Chief of Police on the ultimate disposition of the case and, if warranted, the discipline that an involved officer should receive. A well-functioning PRB remains critical to ensuring that OPS investigations are sound and that the Chief of Police receives a well-informed recommendation on the disposition of OPS cases.

## Where the PRB Stands

Since the adoption of the PRB Operations Manual in 2017, the PRB has convened regularly to address cases that it receives from OPS. During this time, the performance of the PRB has largely been out of the Board's hands. The timeliness of the PRB's review of cases, and precisely what the PRB is reviewing, depends on how well OPS has effectuated its duties in the investigatory stage.

Now that OPS has had more time and additional staff to improve the quality of its investigations, the Monitoring Team will schedule the PRB for a qualitative and quantitative assessment to begin upon the conclusion of the scheduled assessment of OPS investigations and Consent Decree compliance. Ultimately, before the performance of both OPS and PRB can be found to be in compliance with the Consent Decree, the Board must be found to be effectively and meaningfully carrying out its duties in a sufficiently thorough, fair, and timely manner.

## Progress and Tasks that Remain

### *Quality of PRB Recommendations & Processes*

In the past, the Monitoring Team observed numerous cases in which the Chief disagreed with PRB recommendations without providing a robust written rationale.  The quality of the memos sent to the PRB by the Chief when he "departs" from a PRB recommendation, however, has improved significantly towards the end of the reporting period. The Monitoring Team will continue to review and evaluate future correspondence. The Monitoring Team will also include in its assessment of the work of the PRB, an evaluation as to the reasonableness of PRB recommendations and the reasonableness of departures on the part of the Chief of Police and/or the Manager of Safety.

## A.          Discipline and Disciplinary Hearings

| Paragraph | Status of Compliance |
|---|---|
| 240. "The Chief of CDP will issue a General Police Order that requires officers to (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB." | **GENERAL COMPLIANCE** |
| 241. Disciplinary hearing requirement, with officer given "opportunity to testify" and suspension of hearing if "officer provides new or additional evidence at hearing," with matter "returned to IA or PRB for consideration." | **EVALUATION DEFERRED** |
| 242. Written justification by Chief or Director of decision to "not uphold the charges" or "does not impose the recommended discipline or non-disciplinary corrective action" where PRB previously "recommends the initiation of the disciplinary process and recommends a disciplinary level." | **PARTIAL COMPLIANCE** |
| 243. "CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition." | **OPERATIONAL COMPLIANCE** |
| 245. "CDP will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented." | **NON-COMPLIANCE** |
| 246. "CDP will review its current matrix and will seek to amend it" "to ensure consistency" and inclusion of a number of specific, expressly-identified features. | **OPERATIONAL COMPLIANCE** |
| 247. "All disciplinary decisions will be documented in writing." | **PARTIAL COMPLIANCE** |
| 248. "CDP will provide its disciplinary matrix to the Commission, the Police Inspector General, and the police unions for comment." | **OPERATIONAL COMPLIANCE** |
| 249. "CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years." | **PARTIAL COMPLIANCE** |

## Background

The Consent Decree requires that CDP "ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented."[72]

As one foundational element of that process of ensuring fair and consistent discipline, the Division has needed to "review its current disciplinary matrix and will seek to amend it as necessary[.]"[73] Specifically, CDP must ensure that the new disciplinary matrix:

- "[E]stablishes a presumptive range of discipline for each type of rule violation;"
- "[I]ncreases the presumptive discipline based on an officer's prior violations of the same or other rules;"
- "[P]rohibits consideration of the officer's race, gender, national origin, age, ethnicity, familial relationships, or sexual orientation" as well as "the high (or low) profile nature of the incident;" and
- "[P]rovides that CDP will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline" but may consider non- disciplinary corrective action "in a case where discipline has [already] been imposed."84

## Where the Division Stands

Since January 1, 2018, the Division has been operating according to a revised, Court-approved Disciplinary Matrix that establishes presumptive ranges of discipline and mitigating or aggravating factors.  Since the promulgation of that new Matrix, the Monitoring Team has completed its first audit of disciplinary decisions along with the underlying investigations that precipitated them in real-time.  The Monitoring Team has been conducting an audit relating to disciplinary issues that will be filed separately with the Court.

Over the course of the monitoring period, the Monitor has observed concerning timelines with respect to the adjudication of both internal and external complaint investigations.  Not only does it appear that it takes far too long for cases to receive findings from command staff, extraordinary delays have been observed in the scheduling of pre-disciplinary hearings and in the imposition of discipline upon the conclusion of those hearings. It appears that the timelines that the Monitoring Team is observing, with respect to the imposition of discipline, indicate the Division has a ways to go before it can come into compliance with those portions of the Consent Decree that require the imposition of fair and timely discipline. It is hoped that the Division will re-evaluate its processes and the resources being used to come up with a solution that provides for fair and timely resolutions of incidents of misconduct, for the benefit of the community and officers alike.

---

[72] Dkt. 277.

[73] Dkt. 7-1 at ¶ 249.

## VIII.        TRANSPARENCY & OVERSIGHT

### A.        Police Inspector General

| Paragraph | Status of Compliance |
|---|---|
| 250. "The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a Police Inspector General" ("IG"). City must seek CPC's "input in developing minimum qualifications and experience" for IG. | **EVALUATION DEFERRED** |
| 251. IG work in Office of Mayor but report to Chief of Police. | **EVALUATION DEFERRED** |
| 252. IG "will not be a current or former employee of CDP." | **GENERAL COMPLIANCE** |
| 253–54. Duties and authority of IG. | **EVALUATION DEFERRED** |
| 255. Budget of IG must be "a separate line item" in City budget and "afford☐ sufficient independence and resources" to comply with Consent Decree. | **PARTIAL COMPLIANCE** |
| 256. IG "will have access to all documents and data necessary to perform the above functions, including any raw data." | **EVALUATION DEFERRED** |

### Background

The Consent Decree creates a new, internal oversight function within the Division—a Police Inspector General (the "IG"). The IG must have the authority to review CDP policies and practices, conduct audits and investigations, analyze data for aggregate and systemic trends, develop recommendations for reform, and analyze investigations conducted, and review imposed discipline. The IG's reports and recommendations must be made public.[74]

### Where the Division Stands

The City successfully hired and on-boarded the Police Inspector General as outlined in the Consent Decree. Christopher Viland is a licensed attorney with an extensive background in law enforcement.  Most immediately prior to joining the Division, Mr. Viland worked as the Chief of Police in Solon, Ohio.  The City has expressed optimism about Inspector General Viland's arrival and his ability to work with the Division to help them strive for excellence.

### Progress and Tasks that Remain

Launching and incorporating such an important, component of the Consent Decree requires methodical

---

[74] Dkt. 7-1 ¶ 253.

intention.  This is especially true considering the fact that this is an entirely new position within the Division of Police.  The Monitoring Team is pleased that Inspector General Viland has reportedly approached his new role with the requisite relationship building and planning.  It is our understanding that he has developed a multi-year plan that involves hiring the requisite staff essential to successfully performing this critical role.

**B.**　　　　　　　**Data Collection and Analysis**

| Paragraph | Status of Compliance |
|---|---|
| 257. "CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad access to information related to CDP's decision making and activities. To achieve this outcome, CDP will designate an individual or individuals as the 'Data Collection and Analysis Coordinator.'" | **PARTIAL COMPLIANCE** |
| 258. Coordinator "will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials," including specific, expressly-listed materials and information. | **PARTIAL COMPLIANCE** |
| 259. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents," including specific, expressly-identified data. | **PARTIAL COMPLIANCE** |
| 260. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation." The system must conform to a number of specific, expressly-identified requirements. | **PARTIAL COMPLIANCE** |
| 261. Coordinator must "routine[ly] report[] . . . relevant data to the Chief of Police, FRB, Training Review Committee, OPS, the [Community Police] Commission, and the Police Inspector General." | **PARTIAL COMPLIANCE** |
| 262. Coordinator "responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection." | **PARTIAL COMPLIANCE** |
| 263. Coordinator "will develop a protocol to accurately analyze the data collected and allow for" various outcome measurements, "subject to the review and approval of the Monitor and DOJ." | **OPERATIONAL COMPLIANCE** |
| 264. Annually, "CDP will conduct an assessment and issue a report summarizing its investigatory stop, search, and arrest data" that addresses various specific, expressly-identified topics. | **EVALUATION DEFERRED** |

| | |
|---|---|
| 265. Annually, "CDP will conduct an assessment and issue a report of all activities, including use of force, arrests, motor vehicles and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race" or other listed prohibited classes or characteristics, and that addresses various specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 266. Annual analysis of "prior year's force" data with FRB. | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires that the Division collect, use, and report data on its activities and performance in a modern and comprehensive fashion. To effectuate this, the Decree required CDP to hire a Data Collection and Analysis Coordinator (the "Data Coordinator" or "Coordinator") to help ensure that CDP maintains the required information in a manner that "facilitate[s] transparency and . . . broad public access to information related to CDP's decision making and activities."[75] The Coordinator is specifically tasked with ensuring the collection and tracking of all information related to uses of force, search and seizure practices, and allegations of misconduct. The Coordinator must create and maintain "a reliable and accurate electronic system to track" use of force-related data and search and seizure information.[76]

The Coordinator also is "responsible for the routine reporting of relevant data" to various entities within the Division[77]; conducting annual assessments of both use of force and investigatory stop data[78]; and analyzing Division practices for potential disproportionate or disparate impacts with respect to "race, ethnicity, gender, disability, sexual orientation, or gender identity."[79] These reports must "be made publicly available."[80]

## Where the Division Stands

Members of the Monitoring Team are supportive of the Division's efforts to use data as much as possible. In our work reviewing with them administrative data on a monthly basis, we are pleased with the increased engagement from patrol and hope that the information and data go beyond those present during the discussion. Participants at the monthly administrative data review appear increasingly knowledgeable and curious about the data presented by the Data Collection and Analysis Coordinator (Coordinator). The Monitoring Team continues to suggest ways the data can be used outside the room for managerial, supervisory, and deployment purposes. The number of topics reviewed extends now far beyond the number of use of force incidents and time to completed review. At the suggestion of Division members, other items including data from Internal Affairs, Employee Intervention, and the Medical Unit are considered. The implementation of the new record management system

---

[75] Dkt. 7-1 at ¶ 257.

[76] *Id.* at ¶¶ 259-60.

[77] *Id.* at ¶ 261.

[78] *Id.* at ¶¶ 263, 264, 266.

[79] *Id.* at ¶ 265.

[80] *Id.* at ¶ 267.

and the accompanying reports takes a significant portion of the Coordinator's time.  This is valuable and contributes to a higher quality of the report and ensures a relationship to the requirements of the consent decree. The Coordinator this year, for the first time, took the lead on data collection for the totality of Paragraph 367, Outcome Measures.  In past years, the Monitoring Team led the data collection and compilation effort and in 2019, with the Coordinator reviewed and quality checked the data. This year, the practice was reversed and signals a major shift in the Division's capacity around data collection and analysis.  The report in the Appendix may have minor adjustments in coming weeks as the Division continues to review the detail.  If any adjustments are necessary the Court and public will be informed.

## Progress and Tasks That Remain

The production of data that is informative and as such useful in the reform work appears to be very labor intensive for the Coordinator. The Monitoring Team recognizes efforts underway to improve data collection systems but at this time they continue to be siloed or independent of one another requiring extensive work by the Coordinator to turn data to information. We are unaware of efforts to move toward greater automation though minimizing the work required to share data will increase its value and usefulness.  We also look forward to the completion of policies and training, both of which precedes data collection on stops, searches, and arrests.  As the data improve in quality and other milestones are achieved, such as the Force Review Board and the implementation of the stop, search, and arrest policies, there will be increasing opportunities for public release of data – a level of transparency that the community desires and the Consent Decree expects.

## A.        Public Availability of CDP-Related Information

| Paragraph | Status of Compliance |
|---|---|
| 267. "[A]ll CDP audits, reports, and outcome analyses related to the implementation" of the Consent Decree will be public. | **NON-COMPLIANCE** |
| 268. "CDP will post its policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports on its website." | **PARTIAL COMPLIANCE** |

## Background

The Consent Decree requires that CDP's "policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports" be posted on CDP's website.[81] Likewise, "[t]o ensure transparency in the implementation of" the Decree, "all CDP audits, reports, and outcome analyses related to the implementation of this [the Consent Decree] will be made publicly available, including at the City and CDP websites."[82]

---

[81] Dkt. 7-1 at 1; *id.* ¶ 268.

[82] Dkt. 7-1 ¶ 267.

**Where the Division Stands**

The City website contains documents related to the Consent Decree.  However, navigational challenges persist for those seeking specific consent decree related policies and reports.  A section labelled "DOJ Police Settlement Agreement Data" can be found on the homepage of the City's website.  Additionally, while technically on-line, the difficulty of access to CDP policies that are presented in a single PDF document remains a barrier to transparency.

**Progress and Tasks That Remain**

While the City has devoted sections of its website to the production of policies, procedures, plans, budgets and reports, the accessibility of those items to the public remains inexplicably cumbersome. As mentioned above, there is a link to some of the related documents on the homepage but it is not prominently displayed.  Additionally, all Consent Decree-related documents are not contained within that link.  A sophisticated user would need to access a separate link "Police Settlement Forms and Publications" and perform a specific, individualized search for a document in order to find all related documents.  The Monitoring Teams is hopeful that the City will find a far more manageable and comprehensive manner for the public to access documents related to the reform process. Finally, and of tantamount importance, the Monitoring Team continues to maintain that the Division and the community it serves will benefit from a department that is open to the public and sets clear expectations of how information related to critical incidents will be shared – prior to the occurrence of such incidents.

IX.        OFFICER ASSISTANCE & SUPPORT

A.         Training

| Paragraph | Status of Compliance |
|---|---|
| 269. "CDP will ensure that officers receive adequate training to understand: (a) how to police effectively and safely in accordance with CDP policy; [and] (b) the requirements of this Agreement, Ohio law, and the Constitution and laws of the United States," including in the areas of "procedural justice, bias-free policing, and community policing." | **PARTIAL COMPLIANCE** |
| 270.     "CDP will expand the scope and membership of the Training Review Committee." | **PARTIAL COMPLIANCE** |
| 271–72. "[T]he Training Review Committee will develop a written training plan for CDP's recruit academy, probationary field training, and in-service training" that addresses a host of specific, expressly-identified issues. | **NON-COMPLIANCE** |
| 273. "The Training Plan and schedule will be implemented once any objections have been resolved" on a yearly basis. | **PARTIAL COMPLIANCE** |
| 274. "The Training Review Committee will annually review and updated CDP's training plan" by "conduct[ing] a needs assessment" that addresses a number of specific, expressly-identified data and information on real-world trends, needs, policy, and law. | **NON-COMPLIANCE** |
| 275. "CDP's Commander responsible for training" will be in charge of "all CDP training." | **PARTIAL COMPLIANCE** |
| 276. "CDP will designate a single training coordinator in each District. The Commander responsible for training will establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the" training Commander. | **PARTIAL COMPLIANCE** |
| 277. "CDP will develop recruit academy and in-service curricula that comport with" the Training Plan and Consent Decree requirements. | **PARTIAL COMPLIANCE** |
| 278. "[T]he training required under this Agreement . . . will be delivered within two years of the Effective Date." | **EVALUATION DEFERRED** |
| 279. "For all other substantive updates or revisions to policy or procedure, CDP will ensure and document that all relevant CDP personnel have received and read the policy or procedure. Notification of each revision or update will include the rationale for policy changes and the difference between the old and updated policy." | **PARTIAL COMPLIANCE** |
| 280. Training Commander reviews all training materials; ensures that they use "a variety of adult learning techniques, scenario-based training, and problem-solving practices"; and "ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Review Committee." | **PARTIAL COMPLIANCE** |
| 281. "CDP will ensure that instructors are qualified and use only curricula and lesson plans that have been approved by the" Training Commander. | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 282. "CDP will revise, as necessary, its field training program for graduates of the police academy to comport with" the Training Plan and Consent Decree. | **EVALUATION DEFERRED** |
| 283. "The field training program will incorporate community and problem-oriented policing principles, and problem-based learning methods." | **EVALUATION DEFERRED** |
| 284. Review and revision of Field Training Officer ("FTO") "participation policy to establish and implement a program that effectively attracts the best FTO candidates" and "revise eligibility criteria" for FTOs. | **EVALUATION DEFERRED** |
| 285. New FTOs and Field Training Sergeants must "receive initial and in-service training that is adequate in quality, quantity, scope, and type, and that addresses" a number of specific, expressly-listed topics and conforms to a number of additional features or requirements. | **EVALUATION DEFERRED** |
| 286. "CDP will create a mechanism for recruits to provide confidential feedback regarding the quality of their field training," and the Division "will document its response, including the rationale behind any responsive action taken or decision to take no action." | **EVALUATION DEFERRED** |
| 287. "Training Review Committee will, on an annual basis, analyze all aspects of CDP's FTO program," "consider emerging national policing practices in this area," and "recommend, and CDP will institute, appropriate changes to policies, procedures, and training related to its FTO program." | **EVALUATION DEFERRED** |
| 288. "CDP will document all training provided to or received by CDP officers," with officers "sign[ing] an acknowledgement of attendance or digitally acknowledge[ing] completion of each training course," which "will be maintained in a format that allows for analysis by training type, training date, training source, and by individual officer name." | **EVALUATION DEFERRED** |
| 289. "CDP will develop and implement a system that will allow the Training Section to electronically track, maintain, and produce complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system." | **OPERATIONAL COMPLIANCE** |
| 290. "CDP will develop and implement accountability measures . . . to ensure that all officers successfully complete all required training programs in a timely manner." | **PARTIAL COMPLIANCE** |

## Background

Training CDP personnel on the new requirements and expectations of Decree-required policies and initiatives is critical to ensuring these changes are infused into the operations of the Division.

As stated in the Seventh Semiannual Report, "the Division must build the internal capacity and leadership such that training can be developed, delivered, audited, and iteratively improved, in close consultation with a Training Review Committee ("TRC") that increases the set of eyes assessing CDP training." These efforts remain work-in-progress.

## Where the Division Stands

During the current reporting period, and as detailed elsewhere in this report, the Division's Training Section launched a number of important training initiatives in its 2019-2020 in-service training, including continuing updates on use of force, crisis intervention, and search and seizure.

Importantly, the Division developed, and the Court approved, new supervisor training on reviewing use of force. Supervisor review of force is one of three pillars of critical review of applications of force at CDP, which also include the Force Investigations Team and the Force Review Board. Training curricula for FIT and FRB were also developed and approved by the Court during this reporting period and the Monitoring Team looks forward to seeing these trainings implemented so that these crucial processes can be implemented in practice.

Finally, in January of this year, several members of the training section attended the Los Angeles Police Department Academy Instructor Certification Course. While the Division's support of this capacity-building opportunity was commendable, the training was not well-received by the training staff, which is disappointing. Much work remains to be done to ensure that CDP fully develops its training capacity.

## Progress and Tasks that Remain

The Monitoring Team has previously recounted the steps that CDP must make with respect to officer training to reach compliance with the Consent Decree.  These steps are largely unchanged from its prior semiannual report to the Court.

### *Substantial and Effective Compliance with Training Review Committee Requirements*

While the Division has taken initial steps to reengage the Training Review Committee, the Division must ensure that the committee is actively involved in the creation of training plans, audits of training initiatives, and assessments of gaps for future areas of training instruction. The TRC must be an active player, working affirmatively with the Division's Training Section, to drive forward new training initiatives and iteratively improve on lessons learned.

### *Training Staffing & Resources*

Notwithstanding the need to reengage the TRC, CDP's Training Section must be properly staffed in order to meet the substantial scope of training mandated by the Consent Decree. The Monitoring Team has previously urged CDP to devote additional resources to the Training Section to ensure that it can balance both the critical and extraordinary demands of training five recruit classes—not a requirement of the Consent Decree but a practical reality in light of officer attrition rates and the City's public commitments—while making sufficient progress on the Consent Decree. This may also include securing the full-time expertise of non-sworn personnel to serve as curriculum development professionals within the Training Section. Developing the capacity of the Training Section will require the support of the City, both in concept and with budget. The training levels established during the Consent Decree process are not anomalies—they are the new normal and the City and CDP need to ensure that the Training Section is equipped to develop and deliver high-quality trainings into the future.

*Academy Training and Field Training Program*

Along with requirements for annual in-service training for existing CDP officers, the "Consent Decree . . . contains certain obligations relating to the training of new officers at the Academy."[83] Likewise, it addresses the Division's field training program, in which recent Academy graduates participate during their early days on the force.[84]

As the Monitoring Team has previously summarized, the City and Division have to date focused on developing and implementing core training for current CDP officers. Nevertheless, CDP will need to "review and revise" its academy and field training programs such that they are meeting the requirements of the Decree.[85] This necessarily entails a comprehensive, top-to-bottom review of all training curricula and programs. Subsequently, the Monitoring Team must ensure that instruction, as delivered, conforms to the curricula, and that the field training program is proceeding according to Decree-required expectations.

## A.        Equipment & Resources

| Paragraph | Status of Compliance |
|---|---|
| 291. "The City will implement" paragraphs regarding equipment and resources in order to allow implementation of the Consent Decree "and to allow officers to perform their jobs safely, effectively, and efficiently." | **PARTIAL COMPLIANCE** |
| 292. "CDP will complete a comprehensive equipment and resource study to assess its current needs and priorities," and it "will develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." | **OPERATIONAL COMPLIANCE** |
| 293. "CDP's Equipment and Resource Plan will provide for necessary equipment including, at least" "an adequate number of computers"; "an adequate number of operable and safe zone cars"; "zone cards with reliable, functioning computers that provide officers with up-to-date technology" including computer-aided dispatch, the records management system, and various core law enforcement systems; and "zone cards equipped with first-aid kits." "This plan also will ensure that CDP properly maintains and seeks to continuously improve upon existing equipment and technology; and is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." | **OPERATIONAL COMPLIANCE** |
| 294. "CDP will actively seek input and feedback from the Commission, patrol officers, and supervisors regarding resource allocation, equipment needs, and technological improvements." | **OPERATIONAL COMPLIANCE** |
| 295. "City and CDP" must "us[e] best efforts to implement the Equipment and Resource Plan as required." | **OPERATIONAL COMPLIANCE** |

---

[83] Dkt. 97 at 55; Dkt. 7-1 ¶¶ 271, 275, 277.

[84] Dkt. 7-1 ¶¶ 282–87.

[85] *Id.*

| 296. "CDP will . . . implement an effective, centralized records management system." | OPERATIONAL COMPLIANCE |
|---|---|
| 297. "CDP will utilize a department-wide e-mail system to improve communication and information sharing." | OPERATIONAL COMPLIANCE |
| 298. "CDP will employ information technology professionals who are trained to conduct crime and intelligence analysis, who are capable of troubleshooting and maintaining information technology systems and who can identify and suggest appropriate technological advancements." | OPERATIONAL COMPLIANCE |
| 299. "CDP will implement an effective employee assistance program that provides officers ready access to the mental health and support resources necessary to facilitate effective and constitutional policing." | PARTIAL COMPLIANCE |

### Background

The Consent Decree requires the City of Cleveland to "develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement."[86] The Plan must "provide for necessary equipment including, at least . . . an adequate number of computers; an adequate number of operable and safe zone cars; zone cars with reliable, functioning computers that provide officers with up-to-date technology, including" mobile computer-aided dispatch ("CAD"), access to the Division's records management system ("RMS"), and access to law enforcement databases; and "zone cars equipped with first-aid kits . . . ."[87] It must address how the Division will satisfy the other substantive requirements of the Decree.104 It likewise must "ensure that CDP" both "properly maintains and seeks to continuously improve upon existing equipment and technology" and "is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies."[88]

### Where the Division Stands

In the current reporting period, CDP completed a significant updated to its records management system, known as LERMS.  The upgrade enhances officer access to real-time data, giving officers greater ability to quickly retrieve essential information about individuals.

Likewise, as of August 2019, CDP has implemented an enhanced, real-time information-gathering and intelligence-sharing platform called Command Analytics.  This is a web-based platform that provides various dashboards that display and analyze incidents logged into the computer-aided dispatch ("CAD") and LERMS systems.

Meanwhile, the Division has also made progress on deploying mobile handheld devices to officers, as well as ordering necessary mobile data computers and patrol vehicles.

---

[86] Dkt. 7-1 ¶ 292.

[87] *Id.* ¶ 293.

[88] *Id.* ¶ 293.

**Progress and Tasks that Remain**

The Monitoring Team is planning to audit the Division's progress in enhancing its equipment, IT infrastructure, and resources in the coming months.

**B.           Recruitment & Hiring**

| Paragraph | Status of Compliance |
|---|---|
| 300. "CDP will review and revise . . . its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals." | **PARTIAL COMPLIANCE** |
| 301. "The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP." | **GENERAL COMPLIANCE** |
| 302. "CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community" and meets certain specific, expressly-listed requirements. | **OPERATIONAL COMPLIANCE** |
| 303. "The City will implement the recruitment plan within 60 days of it being approved by the Monitor." | **EVALUATION DEFERRED** |
| 304. "CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants," including officers with various, specific, expressly-listed skills and backgrounds. | **PARTIAL COMPLIANCE** |
| 305. "In developing and implementing its recruitment plan, CDP will consult with the [Community Police] Commission and other community stakeholders on strategies to attract a diverse pool of applicants." | **PARTIAL COMPLIANCE** |
| 306. "[O]bjective system for hiring and selecting recruits" that "employs reliable and valid selection criteria." | **PARTIAL COMPLIANCE** |
| 307. "CDP will report annually to the public its recruiting activities and outcomes," which will include information on various, expressly-listed areas. | **EVALUATION DEFERRED** |
| 308. "[A]ll candidates for sworn personnel positions" will have "psychological and medical examination" and be subject to "drug testing." Existing officers receive "random drug testing." | **GENERAL COMPLIANCE** |
| 309. "CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions" that cover various, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 310.     "CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's supervisor(s)" and maintain any "salient information . . . in candidate's file." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 311. "If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation" addressing various expressly-identified things. | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires the City to "integrate community and problem-oriented policing principles" into its recruitment practices, and to "develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community . . . [and] establish[es] and clearly identif[ies] the goals of CDP's recruitment efforts."[89]

## Where the Division Stands Now

In the prior reporting period, the Division completed its Recruitment and Hiring Plan, which incorporates feedback from the Department of Justice, Monitoring Team, and the expressed concerns of the Cleveland public. The Plan was approved by the Court on February 20, 2019.[90]

Since then, the Monitoring Team has not actively assessed CDP's progress on implementing the Recruitment and Hiring Plan. Indeed, CDP will need more time before it can meaningfully report on how it is accomplishing the stated goals of the Court-approved Plan. As described below, as the CDP reports on its recruiting activities and outcomes, the Team will be positioned to say how far the CDP has come—or still needs to go—to meeting the terms of the Decree.

## Progress and Tasks that Remain

Following the Court's approval of the Recruitment and Hiring Plan, CDP must "report annually to the public its recruiting activities and outcomes," including disaggregated data on applicants, interviewees, and selectees, as well as the successes and challenges to recruiting qualified and high-quality applicants.[91] The Monitoring Team will continue to gauge progress by analyzing the numbers and trends with respect to applicants and hired recruits, as well as by working with the City to provide ongoing technical assistance on the Plan's implementation.

## C.         Performance Evaluations and Promotions

| Paragraph | Status of Compliance |
|---|---|
| 312. "CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process" and "are identified and receive appropriate consideration for performance." Likewise, "poor performance" must be "reflected in officer evaluations." | **EVALUATION DEFERRED** |

---

[89] Dkt. 7-1 ¶ 302.

[90] Dkt. 239.

[91] Dkt. 7-1 at ¶ 307.

| | |
|---|---|
| 313. "CDP will develop and implement fair and consistent practices to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis." | **EVALUATION DEFERRED** |
| 314–15. CDP will use "a formalized system documenting the annual performance evaluations of each officer by the officer's direct supervisor," including an assessment of several expressly-listed areas. "Supervisors will meet with the employee whose performance is being evaluated to discuss the evaluation." | **EVALUATION DEFERRED** |
| 316. "CDP will hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates." | **EVALUATION DEFERRED** |
| 317. "CDP will develop and implement fair and consistent promotion practices that comport with the requirements of this Agreement and result in the promotion of officers who are effective and professional." | **EVALUATION DEFERRED** |
| 318. In considering promotion, "appointing authority will consider" specific, expressly-listed "factors." | **EVALUATION DEFERRED** |

## Background

CDP must address how it evaluates officer performance and must ensure that high-performing officers have access to promotional opportunities. Under the Consent Decree, CDP must "develop and implement fair and consistent practices to accurately evaluate officers" across a number of dimensions, including 'integrity, community policing, and critical police functions.'"[92]

## Where the Division Stands

In the current reporting period, CDP began early work to create a policy on performance evaluations. This policy will be critical in the Division's ability to implement major policies and plans such as use of force, community and problem-oriented policing, crisis intervention, and bias-free policing. The Monitoring Team and Department of Justice will work with CDP in the coming reporting period to finalize a policy that satisfies the requirements of the Consent Decree.

## Progress and Tasks that Remain

Under the Fourth Year Monitoring Plan, CDP will incorporate community and problem-oriented policing principles into its promotions and evaluations by the end of 2019. This work, which must align with the new expectations that have been set by Court-approved policies and plans, will greatly enhance professional development opportunities within the Division and provide an important, non-punitive mechanism for employee management. As described above, early work on this initiative, through a Division policy on performance evaluations, has begun.

---

[92] Dkt. 7-1 at ¶ 313.

## D. Staffing

| Paragraph | Status of Compliance |
|---|---|
| 319. "CDP will complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform the functions necessary for CDP to fulfill its mission, and satisfy the requirements of the" Consent Decree. / "CDP will develop an effective, comprehensive Staffing Plan that is consistent with its mission, including community and problem-oriented policing, and that will allow CDP to meet the requirements of" the Consent Decree. | **OPERATIONAL COMPLIANCE** |
| 320. Requirements of CDP Staffing Plan. | **EVALUATION DEFERRED** |
| 321. "The City and CDP will employ best efforts to implement the Staffing Plan over the period of time set forth in the approved plan." | **EVALUATION DEFERRED** |

### Background

The Consent Decree contemplates changes to CDP's approach to staffing, assigning, and deploying its personnel within the city of Cleveland. Under the requirements of the Decree, for example, CDP must:

- Implement a "comprehensive and integrated model"[93];
- Ensure rigorous investigations and reviews of force incidents[94];
- Ensure that specialized crisis intervention officers "are dispatched to an incident involving an individual in crisis" and are able to "have primary responsibility for the scene"[95];
- Provide supervisors with the ability to "review all documentation of investigatory stops, searches, and arrests"[96];
- Ensure that officers can receive the training required by the Decree[97];
- Provide necessary opportunity for "first line supervisors [to] provide close and effective supervision of officers"[98];
- Implement the Early Intervention System[99]; and
- Provide supervisors with the ability to "conduct adequate random and directed audits of body worn camera recordings."[100]

---

[93] Dkt. 7-1 at ¶ 27.

[94] *Id.* at ¶¶ 93-130.

[95] *Id.* at ¶ 151.

[96] *Id.* at ¶ 168.

[97] *Id.* at ¶ 271.

[98] *Id.* at ¶ 322.

[99] *Id.* at ¶ 326–36.

[100] *Id.* at ¶ 339.

These provisions require changes in the way that CDP will deploy its existing personnel and in the overall number of sworn and civilian personnel. To that end, the Consent Decree specifically envisions a Staffing Plan by which the CDP must "address and provide for each of the following":

- "[P]ersonnel deployment to ensure effective community and problem-oriented policing;
- "[A] sufficient number of well-trained staff and resources to conduct timely misconduct investigations;
- "[T]o the extent feasible, Unity of Command; and
- "[A] sufficient number of supervisors."[101]

### Where the Division Stands Now

In the prior reporting period, the Division completed the Decree-mandated Staffing Plan after working with the Department of Justice and Monitoring Team and considering public feedback solicited by the Community Police Commission.

Since then, the Monitoring Team has not actively assessed CDP's progress on implementing the Staffing Plan. CDP will need more time to internally assess, prepare, and execute before it can report on how it is accomplishing the stated goals of the Court-approved Plan.

### Progress and Tasks that Remain

The Monitoring Team has previously observed that major requirements of the Decree, such as the implementation of CDP's new community and problem-oriented policing paradigm, are directly linked to the Division's ability to make the operational changes contemplated in the approved Staffing Plan. The Division's efforts on this front will need to continue in order for Decree-required policies, procedures, and plans to be fully and effectively implemented.

---

[101] *Id.* at ¶ 320.

## X.        SUPERVISION

## A.        First-Line Supervisors

| Paragraph | Status of Compliance |
|---|---|
| 322. "CDP will ensure that first line supervisors provide close and effective supervision of officers" in a number of express, specifically-identified ways. | **PARTIAL COMPLIANCE** |
| 323. "CDP will develop and implement supervisory training for all new and current supervisors" that is "adequate in quality, quantity, type, and scope, and will include" a number of specific, expressly-listed topics. | **EVALUATION DEFERRED** |
| 324. "Thereafter all sworn supervisors will receive adequate in-service management training." | **EVALUATION DEFERRED** |
| 325. "CDP will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community." | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires that CDP ensure "close and effective supervision of officers."[102]  Supervisors must be held "directly accountable for the quality and effectiveness of their supervision" of officers in their command.[103] To do so, the Decree requires that the Division establish new policies and procedures addressing supervision.  It also requires training for supervisors on a host of specific topics.[104]

## Where the Division Stands

In the last reporting period, the Court approved the Division's basic Supervisor training curriculum on March 7, 2019.  The training was scheduled to launch alongside other Decree-required supervisory training in the upcoming reporting period, the four-hour training includes both general leadership skills that would be valuable for any manager or supervisor, as well as CDP-specific subjects including how to promote community engagement, the CDP's current Early Intervention System, body-worn cameras, and the Division's progressive disciplinary matrix.

The approved training emphasizes a philosophy of community and problem-oriented policing, the Supervisor Training encourages supervisors to ensure that officers understand their roles and responsibilities as part of the Division's commitment to CPOP. Supervisors are expected to show their commitment to CPOP, model community engagement by personally engaging with community members, emphasize that frontline officers are the key component of CPOP, and publicly commend officers who have demonstrated exceptional ability to work collaboratively with members of the public. The Curriculum also instructs supervisors on how to de-escalate situations before a use of force may be necessary, including by arriving on scene and acting as a mediator, demonstrating compassion to defuse a tense situation, and calling for specialized Crisis Intervention Team

---

[102] Dkt. 7-1 ¶ 322.

[103] *Id.* ¶ 325.

[104] *Id.* ¶ 323.

officers where the incident may involve a behavioral health crisis.

The current public health crisis has contributed to the reasons for the delay that has rendered this training undelivered.  The CPOP Supervisory training curriculum, which is part of the two-day supervisory training suite, has yet to be approved by the Monitoring Team and submitted to the Court for final approval.  Drafts continue to be exchanged between the City, the Department of Justice and the Monitoring Team.  The CDP has indicated that they plan on delivering the Supervisory Training suite to all supervisors and managers beginning at the end of July 2020 with an anticipated completion date of November 2020.  The CDP plans on delivering this training primarily in-person, and in smaller groups to accommodate social distancing in order to keep their members safe. This timeline is contingent on the final approval of the CPOP Supervisory Training by the Court.

### Progress and Tasks that Remain

#### *Continuing Professional Development*

The Division has previously signaled an interest in developing a formal leadership development process.  Part of this involves enhancing processes relating to performance evaluations and the promotional process.  The Monitoring Team continues to look forward to working with the Division on these important areas, which will help the Division identify the most promising personnel for leadership opportunities and help them succeed upon receiving new responsibilities.

#### *Data*

As the Monitoring Team has previously noted, the Consent Decree requires that CDP rigorously track instances in which supervisors identify problematic performance and log supervisors' responses when such problems are identified.  The Division still needs to implement a process for systematically tracking this information so that it can evaluate, in aggregate, the performance of its supervisors.

#### *Compliance and Outcome Measures*

The Monitoring Team's evaluations of use of force and Internal Affairs incidents will touch on supervisor performance in those areas.  However, the Monitoring Team will also need to analyze the type of performance data and indicators that the Division is still progressing toward collecting.

### B.    Officer Intervention Program

| Paragraph | Status of Compliance |
|---|---|
| 326.  CDP "will create a plan to modify its Officer Intervention Program ('OIP') to enhance its effectiveness as a management tool to promote supervisory awareness and proactive identification of potentially problematic behavior among officers. | **EVALUATION DEFERRED** |
| 327.  "CDP supervisors will regularly use OIP data to evaluate the performance of CDP officers across all ranks, units, and shifts." | **EVALUATION DEFERRED** |

| | |
|---|---|
| 328.  "The OIP will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" in a number of specific, expressly-identified areas. | **EVALUATION DEFERRED** |
| 329.  "CDP will set threshold levels for each OIP indicator that will trigger a formal review, and the thresholds will allow for peer-group comparisons between officers with similar assignments and duties." | **EVALUATION DEFERRED** |
| 330–36.  Additional express requirements of OIP. | **EVALUATION DEFERRED** |

## Background

The Consent Decree requires that CDP's Officer Intervention Program be transformed into an effective "early intervention system," or "EIS."  An EIS is a non-disciplinary system for identifying and addressing potentially problematic officer performance before it becomes a problem.

Specifically, the Consent Decree requires that the Division's OIP become a broader management tool that will "proactive[ly] identif[y] . . . potentially problematic behavior among officers" and provide non-punitive supervisory intervention in order to "modify officers' behavior and improve performance" before the performance gradually becomes deep-seated and difficult to resolve.[105]  The Decree requires the implementation and use of "a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" on officer performance and that forms the basis of an EIS.[106]

## Where the Division Stands

The Division has submitted an initial draft of an OIP Policy during this reporting period, and the Parties and CDP have begun discussing the proposed revisions to the OIP program.  It is currently anticipated that the policy will be finalized in within the upcoming reporting period.

## Progress and Tasks that Remain

### Creation of EIS Plan

CDP needs to finalize its policies, manuals, and implementation materials related to the OIP/EIS to complete the establishment of an upgraded early intervention system.

### Training & Involvement of Supervisors

Under the Decree-required EIS, CDP supervisors will need to review performance data of the supervisors under their command at ongoing intervals.  In some instances, when an officer's performance data reaches a particular level or involves specific types of performance, a supervisor will be required to assess that officer's performance to determine whether some type of intervention may be beneficial.  This type of review, assessment, and potential

---

[105] Dkt. 7-1 at ¶¶ 326-27.

[106] *Id.* at ¶ 328.

intervention will all require that the Division's supervisors be well-trained and well-versed in the goals and mechanics of the EIS.

### Training & Communication with Officers

Although substantial responsibilities will fall on supervisors with respect to the enhanced EIS, officers will also need to understand what the EIS is. Specifically, officers will need to become comfortable with the notion that the EIS is, indeed, non-disciplinary and non-punitive. Instead, it is designed to assist in professional development and allow the Division to provide resources, training, and other investments to officers to ensure that officers succeed. High-quality, in-depth instruction will be necessary to surmount the understandable skepticism that officers may have that the new EIS is simply another way of disciplining officers.

### Compliance with EIS Plan & Policies

After policies and training are completed, the EIS will have to be up and running for a material span of time in order for the Court and Monitoring Team to meaningfully evaluate whether the EIS complies with the Consent Decree's requirements.

## C.          Body-Worn Cameras

| Paragraph | Status of Compliance |
|---|---|
| 337. "If CDP chooses to use body worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals." | **PARTIAL COMPLIANCE** |
| 338. "Supervisors will review recordings related to any incident involving at least a Level 2 or 3 use of force; injuries to officers; and in conjunction with any other supervisory investigation." | **PARTIAL COMPLIANCE** |
| 339. "Supervisors will conduct adequate random and directed audits of body worn camera recordings" and "incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers." | **PARTIAL COMPLIANCE** |
| 340. "Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy." | **PARTIAL COMPLIANCE** |

### Background

Prior semiannual reports have summarized the history of the Division's use of body-worn camera technology. Because CDP elected to deploy the cameras, various Consent Decree requirements relating to policies and procedures are activated.

### Where the Division Stands

Currently, all CDP patrol officers are equipped with and trained on Axon's Body 2 camera system and are

expected, under policy, to use them when working a City shift.  In the current reporting period, the Parties and Monitoring Team did not significantly address specific issues relating to body-worn cameras.  The Division and its officers continue to use them to capture incidents and interactions.

## Progress and Tasks that Remain

### *Compliance with Policy*

The Monitoring Team will still need to ensure that the Division is holding officers accountable for complying with the various provisions of the body-worn camera policy.  It is anticipated that upcoming Monitoring Team audits of use of force cases and misconduct investigations will shed meaningful light on these issues.

### *General Policy for the Release of CDP Information*

When the Monitoring Team previously approved the Division's Body-Worn Cameras policies, it conditioned that approval on the City and CDP will establish a general policy for the release of records, data, and information—including but not limited to body-worn camera footage—to the public.  The Monitoring Team continues to look forward to the Division establishing these overall protocols for ensuring meaningful transparency and accountability.

## XI.        OUTCOME ASSESSMENTS

The Consent Decree sets forth a number of specific outcome assessments – predominantly quantitative measures aimed at understanding whether the implementation of the specific policies, procedures, and ways of providing policing services that CDP is implementing under the Decree is ultimately resulting in safe, fair, effective, and constitutional policing.

These "compliance reviews" will continue to be conducted during the upcoming reporting periods – and likely at an elevated pace, consistent with the Division of Police's progress in some critical areas of officer policy and training. Other areas, such as use of force investigation and review, will not be able to be reviewed for compliance purposes until personnel have received adequate training and the various policies have been in place for a material span of time.

Whereas "compliance reviews" or audits are aimed at understanding if various policies or procedures have been transformed from paper into practice, "outcome assessments" are aimed at establishing the day-to-day realities of policing and public safety in Cleveland. Although there is some overlap between the types of data, information, and reviews necessary to understand whether CDP is complying with the terms of the Consent Decree, on the one hand, and the information necessary to gauge overall outcomes in the Cleveland community, on the other, some specific outcome measures point to metrics that go beyond what might be evaluated for purposes of "compliance." For instance, the Consent Decree does not require that CDP increase its homicide clearance rate, or the percentage of homicide cases that it solves. However, the City and United States included the clearance rate as an outcome measure in paragraph 367 of the Consent Decree on the theory that a higher clearance rate, in concert with many other measures, may reflect expanded cooperation and trust between the community and police – with potentially more crimes solved when community members are more comfortable cooperating with law enforcement.

Beginning in June 2016 and annually thereafter, the Monitoring Team, in collaboration with CDP, has provided the Court with data addressing the many outcome measures outlined in the Consent Decree. The Monitoring Team and Parties anticipate that outcome measures reflecting the Division's performance in the calendar year 2019 will be filed with the Court not later than the end of July 2020. At that time, the Monitoring Team will discuss trends and the Division's progress based on an analysis of the numbers from 2019.



# Cleveland Police Monitoring Team

**Hassan Aden**
Monitor

**Ayesha Hardaway**
Deputy Monitor

**Brian Maxey**
Deputy Monitor

**Charles R. See**
Director of Community Engagement

**Christine Cole**
Director of Outcome Measures

**Dr. Modupe Akinola**
**Matthew Barge**
**Brian Center**
**Dr. Randolph Dupont**
**Maggie Goodrich**
**Commissioner Chuck Ramsey (ret.)**
**Richard Rosenthal**
**Victor Ruiz**
**Captain Scott Sargent (ret.)**
**Sean Smoot**
**Timothy Tramble**
Monitoring Team

2019 Measures as of July 2020

**EXHIBIT A: 2019 Outcome Measures**

| # | Consent Decree Paragraph | Consent Decree Section | Topic | Name of Measure | Included in Baseline? (yes/no) | Source of Data | 2015 Data Collected | 2016 Data Collected | 2017 Data Collected | 2018 Data Collected | 2019 Data Collected | % increase or decrease from 2015 through 2016 | % increase or decrease from 2016 through 2017 | % increase or decrease from 2017 through 2018 | % increase or decrease from 2018 through 2019 | Compound annual growth rate (CAGR) from 2015 through 2019 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 367 | a | | **Use of Force (UOF)** | | | | | | | | | | | | | |
| 2 | 367 | a. 1 | UOF | UoF Charges | yes | IAPro | see below | see below | see below | see below | see below | | | | | | |
| 3 | | | | # of UOF charges | | | 350 | 307 | 242 | 380 | 379 | -12% | -21% | 57% | 0% | 2% | captured 349 use of force cases (based on timing of data request); 2016: Validational data from CPD captured 318 use of force cases (based on timing of data request). 2017: 237 use of force cases identified by CPD, but 242 citizens involved in UoF incidents. 2018: 338 use of force cases identified by CPD, but 380 citizens involved in UoF incidents 2019: 343 use of force cases identifed by CDP, but 379 citizens involved in UOF incidents |
| 4 | | | | # of non-UoF charges | | | 38,920 | 31,968 | 33,085 | 26,707 | 20,974 | -18% | 3% | -19% | -21% | -12% | 2015: 39,270 charges; 2016: 32275 charges 2019: 21,733 charges; |
| 5 | 367 | a. 1 | UOF | UoF Charges ending in arrests | yes | IAPro | see below | see below | see below | see below | see below | | | | | | |
| 6 | | | | # UoF ending in arrests | | | 285 | 243 | 191 | 296 | 303 | -15% | -21% | 55% | 2% | 1% | 2015 Validational data from CPD captured 289 Arrests with 609 different charge types 2019: 303 of 379 citizens involved in UOF were arrested |
| 7 | | | | Total # of non-UoF ending in arrests | | | 24,086 | 19,425 | 18,785 | 15,319 | 12,487 | -19% | -3% | -18% | -18% | -12% | 24,371 total arrests in 2015; 19,668 total arrests in 2016; 18,976 total arrests in 2017; 15,615 total arrests in 2018 2019: 12,790 total arrests |
| 8 | 367 | a. 1 | UOF | UoF rates | yes | IAPro | see below | see below | see below | see below | | | | | | | |
| 9 | | | | UoF as % of all charges | | | 0.9% | 1.0% | 0.7% | 1.4% | 1.8% | 7% | -24% | 93% | 28% | 15% | |
| 10 | | | | UoF arrests as % of all arrests | | | 1.2% | 1.2% | 1.0% | 1.9% | 2.4% | 6% | -19% | 88% | 27% | 15% | |
| 11 | | | | % of UoFs ending in arrest | | | 81% | 79% | 79% | 78% | 80% | -3% | 0% | -1% | 3% | 0% | |
| 12 | | | | % of non-UoFs ending in arrest | | | 62% | 61% | 57% | 57% | 98% | -2% | -7% | 1% | 71% | 10% | Formula for past "Total number of nonUOF ending in arrest/ and # of non UOF charges" individuals/charges-different units 2019-12487/12790=98% |
| 13 | 367 | a. 1 | UOF | District | yes | IAPro | see below | see below | see below | see below | see below | | | | | | |
| 14 | | | | District 1 | | | 36 | 29 | 25 | 34 | 53 | -19% | -14% | 36% | 56% | 8% | |
| 15 | | | | District 2 | | | 64 | 57 | 54 | 82 | 72 | -11% | -5% | 52% | -12% | 2% | |
| 16 | | | | District 3 | | | 100 | 114 | 68 | 69 | 79 | 14% | -40% | 1% | 14% | -5% | |
| 17 | | | | District 4 | | | 85 | 64 | 52 | 87 | 56 | -25% | -19% | 67% | -36% | -8% | |
| 18 | | | | District 5 | | | 61 | 39 | 37 | 103 | 80 | -36% | -5% | 178% | -22% | 6% | |
| 19 | | | | outside city | | | 4 | 1 | 1 | 5 | 3 | -75% | 0% | 400% | -40% | -6% | |
| 20 | | | | Unknown/NULL | | | . | 3 | 5 | 0 | 0 | | 67% | -100% | N/A | | |
| 21 | 367 | a. 1 | UOF | Force type | yes | IAPro | see below | see below | see below | see below | see below | | | | | | These data are for all officers that used force. Multiple force types used by officers per citizen. 2015 total=1311; 2016 total=1210; 2017 total=1018; 2018 total=645 |
| 22 | | | | Balance Displacement | | | 76 | 1 | 0 | 0 | 0 | -99% | -100% | 0% | 0% | -100% | |
| 23 | | | | Body Force/Body Weight | | | 477 | 176 | 191 | 64 | 86 | -63% | 9% | -66% | 34% | -29% | 2017 |
| 24 | | | | Control Hold-Restraint | | | 217 | 323 | 225 | 66 | 77 | 49% | -30% | -71% | 17% | -19% | |
| 25 | | | | Control Hold-Takedown | | | 65 | 124 | 68 | 39 | 57 | 91% | -45% | -43% | 46% | -3% | |
| 26 | | | | De-Escalation | | | . | . | . | 104 | 89 | . | . | . | . | . | This category was new in 2018 2019: De-escalation attempt-89, CDP would like to move De-escalation to another section, since it is not technically a "force type". |

2019 Measures as of July 2020

| # | | | | Measure | | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 | | | | Firearm Discharge | | | | | | 5 | | | | | | 2019: Firearm Discharge was taken out from "other" in previous years and put into separate category |
| 28 | | | | Firearm Point | | | | | 191 | 178 | | | | | | This category was new in 2018 |
| 29 | | | | Joint Manipulation | | | 137 | 159 | 93 | 36 | 58 | 16% | -42% | -61% | 61% | -16% | |
| 30 | | | | Tackling/Takedown | | | 142 | 63 | 46 | 43 | 58 | -56% | -27% | -7% | 35% | -16% | |
| 31 | | | | Taser | | | 44 | 36 | 47 | 27 | 22 | -18% | 31% | -43% | -19% | -13% | displayed or used. From 2019 onwards, this number will only include when the taser is used |
| 32 | | | | Verbal/Physical Gestures | | | 31 | 0 | 0 | 0 | 0 | -100% | 0% | 0% | 0% | -100% | Might now be captured in de-escalation category which is new in 2018 |
| 33 | | | | Pressure Point/Pressure Point Control | | | 40 | 151 | 180 | 68 | 3 | 278% | 19% | -62% | -96% | -40% | This category was in other in 2015 and 2016 and has been broken out for all 3 years |
| 34 | | | | Push | | | 4 | 90 | 83 | 36 | 38 | 2150% | -8% | -57% | 6% | 57% | This category was in other in 2015 and 2016 and has been broken out for all 3 years |
| 35 | | | | Other (1-25 instance each) | | | 48 | 77 | 78 | 41 | 112 | 60% | 1% | -47% | 173% | 18% | This is a designation created by the Monitoring Team and includes several categories with fewer than 25 instances. These are not classified as "Other" in IAPro or by the CPD |
| 36 | | | | Unknown/NULL/#N/A | | | 30 | 10 | 7 | 0 | 0 | -67% | -30% | -100% | N/A | -100% | |
| 37 | 367 | a. 1 | UOF | Arrest type | yes | IAPro | see below | see below | see below | see below | see below | | | | | | UoF=774; 2016 total UoF=1110) not arrests (2015 total arrests=285; 2016 total arrests=244) and not charge types (2015 total charge types=350; 2016 total charge types=308) |
| 38 | | | | Violence toward Police Officer | | | 7 | 105 | 66 | 34 | 49 | 1400% | -37% | -48% | 44% | 48% | |
| 39 | | | | Violence toward Others | | | 158 | 156 | 73 | 107 | 108 | -1% | -53% | 47% | 1% | -7% | |
| 40 | | | | Damage to Property | | | 57 | 76 | 33 | 83 | 107 | 33% | -57% | 152% | 29% | 13% | |
| 41 | | | | Obstructing Justice | | | 207 | 370 | 224 | 220 | 247 | 79% | -39% | -2% | 12% | 4% | |
| 42 | | | | Crisis Intervention | | | 40 | 69 | 55 | 29 | 35 | 73% | -20% | -47% | 21% | -3% | |
| 43 | | | | Drugs/Alcohol | | | 47 | 31 | 30 | 39 | 40 | -34% | -3% | 30% | 3% | -3% | |
| 44 | | | | Cleveland Codified Ord. - Part 6 | | | 84 | 150 | 73 | 64 | 56 | 79% | -51% | -12% | -13% | -8% | This category was in other in 2015 |
| 45 | | | | Miscellaneous offense | | | 18 | 39 | 33 | 45 | 69 | 117% | -15% | 36% | 53% | 31% | This category was in other in 2015 |
| 46 | | | | NULL | | | 84 | 23 | 0 | 0 | 42 | -73% | -100% | 0% | 0% | -13% | This category was in other in 2015 |
| 47 | | | | Other (1-25 instance each) | | | 72 | 63 | 34 | 43 | 48 | -13% | -46% | 26% | 12% | -8% | |
| 48 | 367 | a. 1 | UOF | Race | yes | IAPro | see below | see below | see below | see below | see below | | | | | | |
| 49 | | | | Black | | | 259 | 219 | 188 | 302 | 275 | -15% | -14% | 61% | -9% | 1% | |
| 50 | | | | White | | | 77 | 69 | 68 | 49 | 67 | -10% | -1% | -28% | 37% | -3% | |
| 51 | | | | Hispanic | | | 9 | 12 | 11 | 18 | 22 | 33% | 0% | 64% | 22% | 20% | |
| 52 | | | | Asian | | | 1 | 1 | 0 | 1 | 1 | 0% | -100% | N/A | 0% | 0% | |
| 53 | | | | Other | | | 1 | 3 | 5 | 4 | 2 | 200% | 67% | -20% | -50% | 15% | |
| 54 | | | | Unknown/NULL | | | 3 | 3 | 0 | 6 | 2 | 0% | -100% | N/A | -67% | -8% | |
| 55 | 367 | a. 1 | UOF | Ethnicity | yes | IAPro | see below | see below | see below | see below | see below | | | | | | |
| 56 | | | | Hispanic/Latino | | | 9 | 12 | 11 | 18 | 22 | 33% | -8% | 64% | 22% | 20% | |
| 57 | | | | Non-Hispanic/Latino | | | 338 | 292 | 261 | 362 | 355 | -14% | -11% | 39% | -2% | 1% | |
| 58 | | | | Unknown/NULL | | | 3 | 3 | 0 | 0 | 2 | 0% | -100% | 0% | 0% | -8% | |
| 59 | 367 | a. 1 | UOF | Age | yes | IAPro | see below | see below | see below | see below | see below | | | | | | For 2018, the categories have been changed to 17 and under (vs. under 21); then 18-29 (vs. 21-29); The data from 2015-2017 have been updated to reflect this change |
| 60 | | | | 17 and under (juveniles) | | | 31 | 36 | 16 | 28 | 28 | 16% | -56% | 75% | 0% | -2% | |
| 61 | | | | 18-29 years | | | 166 | 148 | 117 | 167 | 161 | -11% | -21% | 43% | -4% | -1% | |
| 62 | | | | 30-39 years | | | 68 | 59 | 86 | 96 | 101 | -13% | 46% | 12% | 5% | 8% | |
| 63 | | | | 40-49 years | | | 39 | 26 | 27 | 42 | 51 | -32% | 4% | 56% | 21% | 6% | |
| 64 | | | | 50-59 years | | | 18 | 16 | 11 | 27 | 11 | -11% | -31% | 145% | -59% | -9% | |
| 65 | | | | 60+ years | | | 11 | 10 | 6 | 2 | 4 | -9% | -40% | -67% | 100% | -18% | |
| 66 | | | | Unknown/NULL | | | 17 | 13 | 9 | 6 | 23 | -24% | -31% | -33% | 283% | 6% | |
| 67 | 367 | a. 1 | UOF | Gender | yes | IAPro | see below | see below | see below | see below | | | | | | | |
| 68 | | | | Male | | | 265 | 223 | 212 | 338 | 334 | -16% | -5% | 59% | -1% | 5% | |

| Row | # | a | sub | UOF | Measure | Tracked | System | Y1 | Y2 | Y3 | Y4 | Y5 | P1 | P2 | P3 | P4 | P5 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 69 | | | | | Female | | | 82 | 82 | 60 | 42 | 45 | 0% | -27% | -30% | 7% | -11% | |
| 70 | | | | | Unknown/NULL | | | 3 | 2 | 0 | -12 | 0 | -33% | -100% | N/A | N/A | -100% | |
| 71 | 367 | a | 1 | UOF | Mental State | yes | IAPro | see below | see below | see below | see below | see below | | | | | | makes a selection, there may be multiple different selections made per citizen. For example, unimpaired and under influence-alcohol |
| 72 | | | | | Mental Crisis | | | 42 | 0 | 0 | 0 | 0 | -100% | 0% | N/A | N/A | -100% | more granular data collected in 2016 and 2017 |
| 73 | | | | | Behavioral Crisis Event | | | 13 | 68 | 119 | 82 | 44 | 423% | 75% | -31% | -46% | 28% | more granular data collected in 2016 and 2017 |
| 74 | | | | | Medical Condition | no | IAPro | | | | | | | | | | | |
| 75 | | | | | Drugs / ETOH | yes | IAPro | 138 | 131 | 223 | 184 | 132 | -5% | 70% | -17% | -28% | -1% | Only drugs and alcohol as noted in IAPro |
| 76 | | | | | Unimpaired/None Detected | yes (new) | | 67 | 102 | 150 | 309 | 212 | 52% | 47% | 106% | -31% | 26% | New item CPD collects that has been added to baseline and 2016 but not specified in Consent Decree |
| 77 | | | | | Unknown/NULL | yes (new) | | 90 | 3 | 23 | 24 | 0 | -97% | 667% | 4% | -100% | -100% | New item CPD collects that has been added to baseline and 2016 but not specified in Consent Decree |
| 78 | | | | | Known Medical Condition | yes (new) | | | 3 | 1 | 3 | 0 | | -67% | 200% | -100% | | New item CPD collects that has been added to baseline and 2016 but not specified in Consent Decree |
| 79 | | | | | Visible Physical Disability | yes (new) | | | | | 5 | 0 | | | | | | New item CPD now collects |
| 80 | | | | | | | | | | | | | | | | | | |
| 81 | 367 | a | 2 | UOF | Officer injuries | yes | IAPro | see below | see below | see below | see below | see below | | | | | | 2018: Officers are advised to select "yes" to injury and/or hospitalization if at least 1 involved officer was injured and/or hospitalized. Therefore, 2018 data represent the number incidents in which at least 1 officer was injured and/or hospitalized. Officer injury is defined as the number of officers who were injured AND filled out an injury packet (31 officers) as well as those who did not fill out an injury packet but selected an injury type (12 officers) under the officer condition variable. CPD is moving away from capturing officer injury at the incident level and have advised officers to select "yes" to injury and/or hospitalization only in regards themselves. This means 2018 is not apples to apples with prior years and therefore % increases and CAGR in 2018 are not an accurate reflection of change. |
| 82 | | | | | # officers injured | yes | | 134 | 192 | 212 | 58 | 74 | 43% | 10% | -73% | 28% | -11% | |
| 83 | | | | | rate of officer injuries change overall | no | | | -30% | -9% | 266% | | | -76% | N/A | -100% | | This number was incorrectly calculated for 2015-2018 and has now been updated |
| 84 | 367 | a | 2 | UOF | Officer injuries severity | yes | IAPro | | | | 640 | 711 | | | | | 11% | New category added in 2018 |
| 85 | | | | | No Injuries | | | | | | 532 | 570 | | | | | 7% | New category added in 2018 |
| 86 | | | | | Abrasion | | | | | | 18 | 19 | | | | | 6% | New category added in 2018 |
| 87 | | | | | Bodily Fluid/Exposure | | | | | | 9 | 11 | | | | | 22% | New category added in 2018 |
| 88 | | | | | Bruise | | | | | | 7 | 11 | | | | | 57% | New category added in 2018 |
| 89 | | | | | Concussion | | | | | | | 2 | | | | | N/A | |
| 90 | | | | | Hospital | | | | | | 22 | 30 | | | | | 36% | |
| 91 | | | | | Laceration | | | | | | 6 | 5 | | | | | -17% | |
| 92 | | | | | Puncture | | | | | | | 1 | | | | | N/A | |
| 93 | | | | | Refused Treatment | | | | | | 6 | 8 | | | | | 33% | New category added in 2018 |
| 94 | | | | | Soft Tissue Damage | | | | | | 9 | 4 | | | | | -56% | New category added in 2018 |
| 95 | | | | | Sprain/Strain/Twist | | | | | | 7 | 11 | | | | | 57% | New category added in 2018 |
| 96 | | | | | Treated & Released | | | | | | 13 | 22 | | | | | 69% | New category added in 2018 |
| 97 | | | | | Unconscious | | | | | | | 1 | | | | | | |
| 98 | | | | | Other/. | | | | | | 11 | 16 | | | | | 45% | New category added in 2018 (Respiratory Distress, Human Bite, Fracture, Dislocation, Concussion, and EMS) |
| 99 | 367 | a | 2 | UOF | Public/subject injuries | yes | IAPro | see below | see below | see below | see below | see below | | | | | | |

2019 Measures as of July 2020

| # | | | | Measure | Y/N | Source | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 100 | | | | # public/subject injuries | yes | | 77 | 69 | 98 | 75 | 85 | -10% | 42% | -23% | 13% | 2% | misreported as 112 in baseline, but corrected here. |
| 101 | | | | overall | no | | | -10% | -76% | 23% | | | 631% | -131% | | | |
| 102 | 367 | a. 2 | UOF | Public/Subject injuries severity | yes | IAPro | | | | 663 | 884 | | | | 33% | | New category added in 2018 |
| 103 | | | | No Injuries | | | . | . | . | 242 | 210 | | | | -13% | | New category added in 2018 |
| 104 | | | | Abrasion | | | . | . | . | 36 | 33 | | | | -8% | | New category added in 2018 |
| 105 | | | | Behavioral Crisis | | | . | . | . | 28 | 42 | | | | 50% | | New category added in 2018 |
| 106 | | | | Complaint | | | . | . | . | 21 | 38 | | | | 81% | | New category added in 2018 |
| 107 | | | | EMS | | | . | . | . | 77 | 111 | | | | 44% | | New category added in 2018 |
| 108 | | | | Hospital | | | . | . | . | 95 | 176 | | | | 85% | | New category added in 2018 |
| 109 | | | | Laceration | | | . | . | . | 14 | 15 | | | | 7% | | New category added in 2018 |
| 110 | | | | Pre-Existing Medical Condition | | | . | . | . | 11 | 35 | | | | 218% | | New category added in 2018 |
| 111 | | | | Puncture | | | . | . | . | 13 | 21 | | | | 62% | | New category added in 2018 |
| 112 | | | | Refused Medical Treatment | | | . | . | . | 12 | 10 | | | | -17% | | New category added in 2018 |
| 113 | | | | Self-Inflicted/Self-Induced | | | . | . | . | 15 | 15 | | | | 0% | | New category added in 2018 |
| 114 | | | | Treated & Released | | | . | . | . | 44 | 95 | | | | 116% | | New category added in 2018 |
| 115 | | | | None Identified | | | . | . | . | 34 | 22 | | | | -35% | | New category added in 2018 |
| 116 | | | | Unconscious | | | . | . | . | . | 1 | | | | | | New category added in 2018 |
| 117 | | | | Other/. | | | . | . | . | 21 | 60 | | | | 186% | | New category added in 2018 |
| 118 | 367 | a. 2 | UOF | Force complaints | yes | IA | see below | see below | see below | see below | see below | | | | | | |
| 119 | | | | # of force complaints | | | 43 | 17 | 33 | 33 | 38 | -60% | 94% | 0% | 15% | -2% | These data are by officer and not by case; These data are just from IA and does not include complaints through OPS |
| 120 | | | | # of non-force complaints | | | 73 | 93 | 96 | 119 | 121 | 27% | 3% | 24% | 2% | 11% | These data are by officer and not by case; These data are just from IA and does not include complaints through OPS |
| 121 | 367 | a. 2 | UOF | disposition of force complaints | yes | IA | see below | see below | see below | see below | see below | | | | | | |
| 122 | | | | Substantiated/Sustained | | | 7 | 8 | 0 | 3 | 4 | 14% | -100% | N/A | 33% | -11% | Includes category "Sustained Other" from 2015 |
| 123 | | | | Not Sustained | | | 0 | 0 | 0 | 3 | 1 | 0% | 0% | N/A | N/A | N/A | This category was not in the 2015-2017 data |
| 124 | | | | Administrative Closure | | | 2 | 0 | 2 | 1 | 0 | -100% | N/A | -50% | -100% | -100% | |
| 125 | | | | Exonerated/Within Policy | | | . | 1 | 0 | 3 | 11 | | -100% | 0% | 0% | | |
| 126 | | | | Unfounded | | | 0 | 0 | 0 | 1 | 0 | 0% | 0% | N/A | N/A | N/A | This category was not in the 2015-2017 data |
| 127 | | | | Open | | | 34 | 8 | 31 | 22 | 6 | -76% | 288% | -29% | -73% | -29% | |
| 128 | 367 | a. 2 | UOF | source (in/ext.) force complaints | no | IA | see below | see below | see below | see below | see below | | | | | | |
| 129 | | | | Internal (CPD) | no | | | | | 33 | 38 | | | | 15% | | New data captured in 2018; prior to 2018 Incomplete information; no systematic capturing of data through IA or OPS |
| 130 | | | | External (non-CPD/Civilian) | no | | | | | 0 | 0 | | | | N/A | | New data captured in 2018; prior to 2018 Incomplete information; no systematic capturing of data through IA or OPS |
| 131 | 367 | a. 2 | UOF | force type | yes | IA, IAPro | see below | see below | see below | see below | see below | | | | | | lots of incomplete data (more than half data not present) from 2015-2017 |
| 132 | | | | Balance Displacement | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | |
| 133 | | | | Body Force | | | 8 | 0 | 15 | 4 | 6 | -100% | N/A | -73% | 50% | -6% | |
| 134 | | | | Control Hold-Restraint | | | 2 | 8 | 11 | 6 | 3 | 300% | 38% | -45% | -50% | 8% | |
| 135 | | | | Control Hold-Takedown | | | 0 | 3 | 5 | 3 | 2 | N/A | 67% | -40% | -33% | N/A | |
| 136 | | | | De-Escalation | | | | | | 8 | 8 | | | | 0% | | This category was new in 2018 2019: De-escalation attempt-8, CDP would like to move De-escalation to another ser section, since it is not technically a "force type". |
| 137 | | | | Firearm Point | | | | | | 2 | 5 | | | | 150% | | This category was new in 2018 |
| 138 | | | | Firearm | | | | | | 1 | 4 | | | | 300% | | This category was new in 2018 |
| 139 | | | | Joint Manipulation | | | 1 | 2 | 13 | 2 | 3 | 100% | 550% | -85% | 50% | 25% | |
| 140 | | | | Tackling/Takedown | | | 0 | 0 | 5 | 4 | 4 | 0% | N/A | -20% | 0% | N/A | |
| 141 | | | | Taser | | | 1 | 0 | 6 | 4 | 3 | -100% | N/A | -33% | -25% | 25% | |
| 142 | | | | Verbal/Physical Gestures | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | N/A | |
| 143 | | | | Pressure Point/Pressure Point Control | | | . | . | 15 | 5 | 0 | . | . | -67% | -100% | . | This category was in other in 2015 and 2016 and has now been broken out 2017 |

2019 Measures as of July 2020

| # | | | | | y/n | src | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 144 | | | | Push | | | | | 5 | 5 | 5 | . | | 0% | 0% | . | This category was in other in 2015 and 2016 and has now been broken out for 2017 |
| 145 | | | | Other (1-25 instance each) | | | 7 | 10 | 13 | 7 | 11 | 43% | 30% | -46% | 57% | 9% | |
| 146 | | | | Unknown/NULL | | | 27 | 5 | 4 | 0 | 2 | -81% | -20% | -100% | N/A | -41% | |
| 147 | 367 | a. 2 | UOF | geographic area | yes | IA | | | | | | | | | | | |
| 148 | | | | District 1 | | | 2 | 0 | 4 | 0 | 3 | -100% | N/A | -100% | N/A | 8% | |
| 149 | | | | District 2 | | | 0 | 4 | 3 | 6 | 4 | N/A | -25% | 100% | -33% | N/A | |
| 150 | | | | District 3 | | | 4 | 4 | 5 | 7 | 5 | 0% | 25% | 40% | -29% | 5% | |
| 151 | | | | District 4 | | | 4 | 3 | 1 | 2 | 2 | -25% | -67% | 100% | 0% | -13% | |
| 152 | | | | District 5 | | | 3 | 0 | 4 | 1 | 6 | -100% | N/A | -75% | 500% | 15% | |
| 153 | | | | outside city | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | N/A | |
| 154 | | | | Unknown/NULL | | | 10 | 6 | 4 | 0 | 2 | -40% | -33% | -100% | N/A | -28% | |
| 155 | 367 | a. 2 | UOF | demographics of complainant | yes | IA, IAPro | | | | | | | | | | | |
| 156 | | | | Black | | | 11 | 6 | 12 | 11 | 13 | -45% | 100% | -8% | 18% | 3% | |
| 157 | | | | White | | | 2 | 2 | 5 | 3 | 7 | 0% | 150% | -40% | 133% | 28% | |
| 158 | | | | Hispanic | | | 0 | 3 | 0 | 1 | 0 | N/A | -100% | N/A | -100% | N/A | |
| 159 | | | | Asian | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | N/A | |
| 160 | | | | Other | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | N/A | |
| 161 | | | | Unknown/NULL | | | 10 | 6 | 4 | 1 | 2 | -40% | -33% | -75% | 100% | -44% | |
| 162 | | | | | | | | | | | | | | | | | |
| 163 | 367 | a.3 | ECW usage | # ECW and changes over time | yes | IAPro | | | | | | | | | | | |
| 164 | | | | # of ECW | yes | IAPro | 44 | 36 | 47 | 27 | 22 | -18% | 31% | -43% | -19% | -13% | displayed or used. From 2019 onwards, this number will only include when the taser is used |
| 165 | | | | # of non-ECW UoF | yes | IAPro | 1267 | 1174 | 971 | 688 | 672 | -7% | -17% | -29% | -2% | -12% | |
| 166 | | | | changes compared to UOF | no | | | -11% | 44% | -33% | -20% | | N/A | -174% | -38% | | In 2015 there were 1311 force types used.  In 2016 there were 1210. This number therefore represents the change in non-taser force types between 2015 and 2016 relative to the change in taser force type; same calculation used for 2016 to 2017 |
| 167 | | | | changes compared to weapon/force instrument | no | | | | | | | | | | | | Data are not collected in detail to calculate this value |
| 168 | | | | | | | | | | | | | | | | | |
| 169 | 367 | a.4 | UOF violating policy | # in violation | yes | Case Office | 9 | 16 | 6 | 6 | 15 | 78% | -63% | 0% | 150% | 11% | |
| 170 | 367 | a.4 | UOF violating policy | force type | yes | Case Office, IAPro | see below | see below | see below | see below | see below | | | | | | |
| 171 | | | | Balance Displacement | | | 2 | 0 | 0 | 0 | 0 | -100% | 0% | 0% | 0% | -100% | |
| 172 | | | | Body Force | | | 5 | 0 | 5 | 4 | 2 | -100% | N/A | -20% | -50% | -17% | |
| 173 | | | | Control Hold-Restraint | | | 0 | 7 | 6 | 2 | 2 | N/A | -14% | -67% | 0% | N/A | |
| 174 | | | | Control Hold-Takedown | | | 0 | 0 | 2 | 3 | 2 | N/A | 0% | 50% | -33% | N/A | |
| 175 | | | | Joint Manipulation | | | 2 | 0 | 3 | 4 | 1 | -100% | N/A | 33% | -75% | -13% | |
| 176 | | | | Tackling/Takedown | | | 0 | 3 | 0 | 0 | 5 | N/A | -100% | 0% | 0% | 0% | |
| 177 | | | | Taser | | | 0 | 3 | 1 | 0 | 3 | N/A | -67% | -100% | N/A | 0% | |
| 178 | | | | Verbal/Physical Gestures | | | 1 | 0 | 0 | 0 | 0 | -100% | 0% | N/A | N/A | -100% | |
| 179 | | | | Control | | | . | . | 5 | 1 | 0 | | | | -80% | -100% | |
| 180 | | | | Push | | | . | . | 6 | 0 | 3 | | | | -100% | N/A | |
| 181 | | | | Other (1-25 instance each) | | | 2 | 13 | 5 | 4 | 12 | 550% | -62% | -20% | 200% | 43% | 2019: Other-pull, fee/leg kick/knee, and firearm point |
| 182 | | | | Unknown/NULL | | | 2 | 4 | 6 | 2 | 0 | 100% | 50% | -67% | -100% | -100% | |
| 183 | 367 | a.4 | UOF violating policy | geography | yes | Case Office, IAPro | see below | see below | see below | see below | see below | | | | | | denotes district where incident occurred |
| 184 | | | | District 1 | | | 1 | 1 | 0 | 2 | 3 | 0% | -100% | N/A | 50% | 25% | |
| 185 | | | | District 2 | | | 3 | 4 | 0 | 0 | 3 | 33% | -100% | N/A | 50% | 0% | |
| 186 | | | | District 3 | | | 3 | 6 | 2 | 1 | 3 | 100% | -67% | -50% | 200% | 0% | |
| 187 | | | | District 4 | | | 1 | 3 | 3 | 1 | 2 | 200% | 0% | -67% | 100% | 15% | |

| # | | | Category | Subcategory | Yes/No | Source | V1 | V2 | V3 | V4 | V5 | P1 | P2 | P3 | P4 | P5 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 188 | | | | District 5 | | | 1 | 2 | 1 | 0 | 3 | 100% | -50% | -100% | N/A | 25% | |
| 189 | | | | outside city | | | 0 | 0 | 0 | 0 | 1 | 0% | 0% | 0% | 0% | N/A | |
| 190 | 367 | a.4 | UOF violating policy | arrest type | yes | Case Office, IAPro | see below | see below | see below | see below | see below | | | | | | |
| 191 | | | | Violence toward Police Officer | | | 0 | 2 | 2 | 0 | 1 | N/A | 0% | -100% | N/A | N/A | |
| 192 | | | | Violence toward Others | | | 3 | 2 | 0 | 0 | 10 | -33% | -100% | 0% | 0% | 27% | |
| 193 | | | | Damage to Property | | | 4 | 0 | 0 | 0 | 0 | -100% | 0% | 0% | 0% | -100% | |
| 194 | | | | Obstructing Justice | | | 3 | 5 | 11 | 7 | 2 | 67% | 120% | -36% | -71% | -8% | |
| 195 | | | | Crisis Intervention | | | 1 | 1 | 0 | 0 | 2 | 0% | -100% | 0% | 0% | 15% | |
| 196 | | | | Drugs/Alcohol | | | 0 | 2 | 2 | 1 | 1 | N/A | 0% | -50% | 0% | N/A | |
| 197 | | | | Other | | | 4 | 12 | 5 | 9 | 22 | 200% | -58% | 80% | 144% | 41% | |
| 198 | 367 | a.4 | UOF violating policy | race of subject | yes | Case Office, IAPro | see below | see below | see below | see below | see below | | | | | | officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 199 | | | | Black | | | 6 | 6 | 4 | 5 | 10 | 0% | -33% | 25% | 100% | 11% | |
| 200 | | | | White | | | 1 | 2 | 1 | 1 | 3 | 100% | -50% | 0% | 200% | 25% | |
| 201 | | | | Hispanic | | | 1 | 1 | 0 | 0 | 1 | 0% | -100% | N/A | N/A | 0% | |
| 202 | | | | Asian | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | N/A | N/A | N/A | |
| 203 | | | | Other | | | 0 | 2 | 0 | 0 | 1 | N/A | -100% | 0% | 0% | N/A | |
| 204 | | | | Unknown/NULL | | | 0 | 0 | 1 | 6 | 0 | 0% | N/A | 500% | -100% | N/A | |
| 205 | 367 | a.4 | UOF violating policy | ethnicity of subject | yes | Case Office, IAPro | see below | see below | see below | see below | see below | | | | | | the officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 206 | | | | Hispanic/Latino | | | 1 | 1 | 0 | 0 | 1 | 0% | -100% | 0% | 0% | 0% | |
| 207 | | | | Non-Hispanic/Latino | | | 7 | 10 | 5 | 6 | 14 | 43% | -50% | 20% | 133% | 15% | |
| 208 | | | | Unknown/NULL | | | 0 | 0 | 1 | 0 | 0 | 0% | N/A | -100% | N/A | N/A | |
| 209 | 367 | a.4 | UOF violating policy | age of subject | yes | Case Office, IAPro | see below | see below | see below | see below | see below | | | | | | officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 210 | | | | under 20 years | | | 3 | 0 | 0 | 1 | 4 | -100% | N/A | N/A | 300% | 6% | |
| 211 | | | | 21-29 years | | | 2 | 3 | 2 | 3 | 4 | 50% | -33% | 50% | 33% | 15% | |
| 212 | | | | 30-39 years | | | 0 | 4 | 2 | 2 | 5 | N/A | -50% | 0% | 150% | N/A | |
| 213 | | | | 40-49 years | | | 2 | 1 | 1 | 0 | 2 | -50% | 0% | -100% | N/A | 0% | |
| 214 | | | | 50-59 years | | | 0 | 1 | 0 | 0 | 0 | N/A | -100% | N/A | N/A | 0% | |
| 215 | | | | 60+ years | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | |
| 216 | | | | Unknown/NULL | | | 1 | 2 | 1 | 0 | 0 | 100% | -50% | -100% | N/A | -100% | |
| 217 | 367 | a.4 | UOF violating policy | gender of subject | yes | Case Office, IAPro | see below | see below | see below | see below | see below | | | | | | the officer, not of the subject. This has been corrected in this appendix and in the 2016 report |
| 218 | | | | Male | | | 8 | 11 | 3 | 5 | 14 | 38% | -73% | 67% | 180% | 12% | |
| 219 | | | | Female | | | 0 | 0 | 2 | 1 | 1 | 0% | N/A | -50% | 0% | N/A | |
| 220 | | | | Unknown/NULL | | | 0 | 0 | 1 | 0 | 0 | 0% | N/A | -100% | N/A | 0% | |
| 221 | 367 | a.4 | UOF violating policy | condition | no | Case Office, IAPro | | | | | | | | | | | |
| 222 | | | | Behavioral Crisis Event | | | . | . | . | . | 2 | | | | | | |
| 223 | | | | mental condition | no | | . | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future 2019-CDP needs more information on this category. Was this previously used? |
| 224 | | | | medical condition | no | | . | . | . | . | 0 | | | | | | No data collected currently; Needs to be collected in the future 2019-Collected category name "Known Medical Condition" |
| 225 | | | | drugs/alcohol | no | | . | 6 | 4 | 3 | 6 | | -33% | -25% | 100% | | Not collected in baseline, collected in 2016 based on 11 citizens |
| 226 | | | | Unimpaired | no | | . | 3 | 1 | 3 | 7 | | -67% | 200% | 133% | | Not collected in baseline, collected in 2016 based on 11 citizens |
| 227 | | | | Unknown/NULL | no | | . | 2 | 1 | 0 | 0 | | -50% | -100% | N/A | | Not collected in baseline, collected in 2016 based on 11 citizens |

2019 Measures as of July 2020

| # | Ref | Item | Category | Description | Y/N | Office | V1 | V2 | V3 | V4 | V5 | P1 | P2 | P3 | P4 | P5 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 228 | | | | presence of disability | no | | | | | | 0 | | | | | | No data collected currently; Needs to be collected in the future 2019-Collected category name "Visible Physical Disability" |
| 229 | | | | | | | | | | | | | | | | | |
| 230 | 367 | a. 5 | UOF violating policy | # of officers with > 1 UOF violating policy | yes | Case Office | 0 | 1 | 0 | 0 | 1 | N/A | -100% | 0% | 0% | N/A | |
| 231 | | | | | | | | | | | | | | | | | |
| 232 | 367 | a. 6 | UOF violating policy | force reviews/investigations resulting in | yes | IA | see below | see below | see below | see below | see below | | | | | | |
| 233 | | | | policy deficiency | | | 5 | 11 | 3 | 1 | 11 | 120% | -73% | -67% | 1000% | 17% | the policy deficiencies were administrative/technical (i.e. late forms) and not substantive or due to tactics |
| 234 | | | | training deficiency | | | 2 | 0 | 0 | 0 | 1 | -100% | 0% | 0% | 0% | -13% | |
| 235 | | | | tactics deficiency | | | 2 | 5 | 3 | 3 | 3 | 150% | -40% | 0% | 0% | 8% | |
| 236 | | | | pending | | | 0 | 0 | 0 | 2 | 0 | 0% | 0% | N/A | -100% | 0% | |
| 237 | 367 | a. 7 | quality of | investigations | no | | in written summary | | | | | | | | | | Random sample selected by Monitoring Team and reviewed to capture the quality of the investigations |
| 238 | 367 | a. 7 | quality of | review | no | | in written summary | | | | | | | | | | Random sample selected by Monitoring Team and reviewed to capture the quality of the investigations |
| 239 | 367 | a. 7 | quality of | # of investigations returned because incomplete | no | Chief's Office | | | | | | | | | | | Data has not been received as of June 2017 |
| 240 | 367 | b | | addressing individuals in crisis | | | | | | | | | | | | | |
| 241 | 367 | b. 1 | addressing individuals in crisis | # calls for service and incidents involving an individual in crisis | no | CI Unit | 10480 | 7890 | 8120 | 13460 | 24330 | -25% | 3% | 66% | 81% | 18% | comparable. 2018: 1346 forms completed (reported quarterly) which is presumed to represent 10% of possible calls. 2017: 812 forms completed (which is 10% of total possible mental health calls); data from 11/1/16-11/30/17. 2016: 789 forms completed (which is 10% of total possible mental health calls); data from 10/1/15-10/31/16. 2015 Baseline: 1048 forms completed (which is 10% of total possible mental health calls); data from 1/1/14- |
| 242 | | | | Responded to by specialized CIT officer | no | | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 243 | | | | Responded to by other | no | | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 244 | 367 | b. 1 | addressing individuals in crisis | Direction of individuals in crisis | no | | see below | see below | see below | see below | see below | | | | | | |
| 245 | | | | directed to healthcare system | | | 1009 | 672 | 1012 | 1489 | 1896 | -33% | 51% | 47% | 27% | 13% | SUBJECT DISPOSITION (pink slipped or voluntarily to SVCH, private hospital ER, referred to mental health treatment, handled by EMS); 0 referrals to mental health treatment in 2016; 19 referrals in 2015 Taken from Annual ADAMHS board report |
| 246 | | | | directed to judicial system | | | 12 | 2 | 8 | 7 | 8 | -83% | 300% | -13% | 14% | -8% | # arrested Taken from Annual ADAMHS board report |
| 247 | | | | direction other | | | 230 | 7 | 0 | 0 | 0 | -97% | -100% | 0% | 0% | -100% | other, complaint unfounded requiring no police action, subject stabilized in 2016; 18 in 2015; Taken from Annual ADAMHS board report |
| 248 | | | | rate - directed to healthcare system | | | 81% | 99% | 99% | 100% | 100% | 22% | 1% | 0% | 0% | 4% | |
| 249 | | | | rate - directed to judicial system | | | 1% | 0% | 1% | 0% | 0% | -69% | 167% | -40% | -10% | -15% | |
| 250 | | | | rate - direction other | | | 18% | 1% | 0% | 0% | 0% | -94% | -100% | 0% | 0% | -100% | |
| 251 | | | | | | | | | | | | | | | | | |

| # | ID | | | Measure | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | addressing individuals in crisis | | | | | | | | | | made" 2019-30 incidents involving Use of Force and Crisis Intervention |
| 252 | 367 | b. 2 | | # of UOF on individuals in crisis | | 14 | | | 30 | | | | |
| 253 | | | | type of force used | | | | | 78 | | | | poor data |
| 254 | | | | Balance Displacement | | | | | 0 | | | | poor data |
| 255 | | | | Body Force/Body Weight | | | | | 12 | | | | poor data |
| 256 | | | | Chemical Agent-Other | | | | | 1 | | | | |
| 257 | | | | Control Hold-Restraint | | 166 | | | 11 | | | -42% | 2015 data - "handcuffs" |
| 258 | | | | Control Hold-Takedown | | | | | 10 | | | | poor data |
| 259 | | | | Feet/Leg Sweep | | | | | 2 | | | | |
| 260 | | | | Firearm Point | | | | | 6 | | | | |
| 261 | | | | Joint Manipulation | | | | | 8 | | | | poor data |
| 262 | | | | Leg Restraint | | | | | 3 | | | | |
| 263 | | | | Pull | | | | | 9 | | | | |
| 264 | | | | Push | | | | | 6 | | | | |
| 265 | | | | Tackling/Takedown | | | | | 6 | | | | |
| 266 | | | | Taser | | 5 | | | 4 | | | -4% | 2015 data - "taser stun" |
| 267 | | | | Verbal/Physical Gestures | | | | | 0 | | | | poor data |
| 268 | | | | Other (1-25 instance each) | | 40 | | | | | | -100% | 2015 data - "other, fired, OC pepper spray" |
| 269 | | | | Unknown/NULL | | 186 | | | 0 | | | -100% | 2015 data - "no response reported" |
| 270 | 367 | b. 2 | addressing individuals in crisis | reason for interaction | | | | | | | | | |
| 271 | | | | # subject armed/not armed | | | | | | | | | |
| 272 | | | | weapon type | | | | | | | | | |
| 273 | | | | resistance offered | | | | | | | | | |
| 274 | | | | description of attempts to de-escalate | | | | | | | | | response from officers in 2015; 578 calls had a verbal de-escalation response from officers in 2016 |
| 275 | **367** | **c** | **stop, search, arrest** | | | | | | | | | | |
| 276 | 367 | c. 1 | stop, search, arrest | # of investigatory stop, search, arrest | no | Compliance | | | | | | | No data collected currently; Needs to be collected in the future |
| 277 | | | | # of investigatory stops | | | | | | | | | |
| 278 | | | | # of investigatory searches | | | | | | | | | |
| 279 | | | | # of investigatory arrests | | | | | | | | | |
| 280 | 367 | c. 1 | stop, search, arrest | % of investigatory stop, search, arrest | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 281 | | | | or arrest | | | | | | | | | |
| 282 | | | | # investigatory searches/# summons or arrest | | | | | | | | | |
| 283 | 367 | c. 1 | stop, search, arrest | District | no | | | | | | | | No data collected currently; Needs to be collected in the future |
| 284 | | | | District 1 | | | | | | | | | |
| 285 | | | | District 2 | | | | | | | | | |
| 286 | | | | District 3 | | | | | | | | | |
| 287 | | | | District 4 | | | | | | | | | |
| 288 | | | | District 5 | | | | | | | | | |
| 289 | | | | outside city | | | | | | | | | |
| 290 | 367 | c. 1 | stop, search, arrest | Arrest type | no | | | | | | | | No data collected currently; Needs to be collected in the future |
| 291 | | | | Violence toward Police Officer | | | | | | | | | |
| 292 | | | | Violence toward Others | | | | | | | | | |
| 293 | | | | Damage to Property | | | | | | | | | |
| 294 | | | | Obstructing Justice | | | | | | | | | |
| 295 | | | | Crisis Intervention | | | | | | | | | |
| 296 | | | | Drugs/Alcohol | | | | | | | | | |
| 297 | | | | Other | | | | | | | | | |

| # | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 298 | 367 | c. 1 | stop, search, arrest | Actual or perceived age | no | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 299 | | | | 17 and under (juveniles) | | | | | | | | | | | | |
| 300 | | | | 18-29 years | | | | | | | | | | | | |
| 301 | | | | 30-39 years | | | | | | | | | | | | |
| 302 | | | | 40-49 years | | | | | | | | | | | | |
| 303 | | | | 50-59 years | | | | | | | | | | | | |
| 304 | | | | 60+ years | | | | | | | | | | | | |
| 305 | | | | Unknown/NULL | | | | | | | | | | | | |
| 306 | 367 | c. 1 | stop, search, arrest | race | no | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 307 | | | | Black | | | | | | | | | | | | |
| 308 | | | | White | | | | | | | | | | | | |
| 309 | | | | Hispanic | | | | | | | | | | | | |
| 310 | | | | Asian | | | | | | | | | | | | |
| 311 | | | | Other | | | | | | | | | | | | |
| 312 | | | | Unknown/NULL | | | | | | | | | | | | |
| 313 | 367 | c. 1 | stop, search, arrest | ethnicity | no | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 314 | | | | Hispanic/Latino | | | | | | | | | | | | |
| 315 | | | | Non-Hispanic/Latino | | | | | | | | | | | | |
| 316 | | | | Unknown/NULL | | | | | | | | | | | | |
| 317 | 367 | c. 1 | stop, search, arrest | gender | no | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 318 | | | | Male | | | | | | | | | | | | |
| 319 | | | | Female | | | | | | | | | | | | |
| 320 | | | | Unknown/NULL | | | | | | | | | | | | |
| 321 | | | | | | | | | | | | | | | | |
| 322 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived race | no | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 323 | | | | Black | | | | | | | | | | | | |
| 324 | | | | White | | | | | | | | | | | | |
| 325 | | | | Hispanic | | | | | | | | | | | | |
| 326 | | | | Asian | | | | | | | | | | | | |
| 327 | | | | Other | | | | | | | | | | | | |
| 328 | | | | Unknown/NULL | | | | | | | | | | | | |
| 329 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived ethnicity | no | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 330 | | | | Hispanic/Latino | | | | | | | | | | | | |
| 331 | | | | Non-Hispanic/Latino | | | | | | | | | | | | |
| 332 | | | | Unknown/NULL | | | | | | | | | | | | |
| 333 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived gender | no | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 334 | | | | Male | | | | | | | | | | | | |
| 335 | | | | Female | | | | | | | | | | | | |
| 336 | | | | Unknown/NULL | | | | | | | | | | | | |

| # | | | | | | Notes |
|---|---|---|---|---|---|---|
| 337 | 367 | c. 2 | documentable reasonable suspicion to stop and probable cause search | actual or perceived age | no | No data collected currently; Needs to be collected in the future |
| 338 | | | | 17 and under (juveniles) | | |
| 339 | | | | 18-29 years | | |
| 340 | | | | 30-39 years | | |
| 341 | | | | 40-49 years | | |
| 342 | | | | 50-59 years | | |
| 343 | | | | 60+ years | | |
| 344 | | | | Unknown/NULL | | |
| 345 | | | | | | |
| 346 | 367 | c. 3 | searches finding contraband | # of searches finding contraband | no | No data collected currently; Needs to be collected in the future |
| 347 | 367 | c. 3 | searches finding contraband | # of searches finding contraband by district | no | No data collected currently; Needs to be collected in the future |
| 348 | | | | District 1 | | |
| 349 | | | | District 2 | | |
| 350 | | | | District 3 | | |
| 351 | | | | District 4 | | |
| 352 | | | | District 5 | | |
| 353 | | | | outside city | | |
| 354 | 367 | c. 3 | searches finding contraband | Arrest type | no | No data collected currently; Needs to be collected in the future |
| 355 | | | | Violence toward Police Officer | | |
| 356 | | | | Violence toward Others | | |
| 357 | | | | Damage to Property | | |
| 358 | | | | Obstructing Justice | | |
| 359 | | | | Crisis Intervention | | |
| 360 | | | | Drugs/Alcohol | | |
| 361 | | | | Other | | |
| 362 | 367 | c. 3 | searches finding contraband | actual or perceived race | no | No data collected currently; Needs to be collected in the future |
| 363 | | | | Black | | |
| 364 | | | | White | | |
| 365 | | | | Hispanic | | |
| 366 | | | | Asian | | |
| 367 | | | | Other | | |
| 368 | | | | Unknown/NULL | | |
| 369 | 367 | c. 3 | searches finding contraband | actual or perceived ethnicity | no | No data collected currently; Needs to be collected in the future |
| 370 | | | | Hispanic/Latino | | |
| 371 | | | | Non-Hispanic/Latino | | |
| 372 | | | | Unknown/NULL | | |
| 373 | 367 | c. 3 | searches finding contraband | actual or perceived gender | no | No data collected currently; Needs to be collected in the future |
| 374 | | | | Male | | |
| 375 | | | | Female | | |
| 376 | | | | Unknown/NULL | | |
| 377 | 367 | c. 3 | searches finding contraband | actual or perceived age | no | No data collected currently; Needs to be collected in the future |
| 378 | | | | 17 and under (juveniles) | | |
| 379 | | | | 18-29 years | | |
| 380 | | | | 30-39 years | | |
| 381 | | | | 40-49 years | | |
| 382 | | | | 50-59 years | | |

2019 Measures as of July 2020

| # | 367 | sub | category | Measure | | Responsible | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 383 | | | | 60+ years | | | | | | | | | | | | | |
| 384 | | | | Unknown/NULL | | | | . | . | . | | . | . | . | . | . | |
| 385 | 367 | d | bias free policing & community engagement | | | | | | | | | | | | | | |
| 386 | 367 | d.1 | bias free policing & community engagement | # of community partnerships | yes | District Commanders | 57 | 66 | 135 | 133 | 513 | 16% | 105% | -1% | 286% | 55% | 2019: CDP calculates the number of events data for District 1 overestimated. Included one-off events that were not necessarily partnerships |
| 387 | | | | District 1 | | | . | 13 | 58 | 32 | 9 | | 346% | -45% | -72% | | |
| 388 | | | | District 2 | | | 10 | 13 | 13 | 13 | 128 | 30% | 0% | 0% | 885% | 67% | |
| 389 | | | | District 3 | | | 11 | . | 12 | 13 | 45 | | | 8% | 246% | 33% | 2016 data not received for District 3 |
| 390 | | | | District 4 | | | 22 | 28 | 40 | 58 | 157 | 27% | 43% | 45% | 171% | 48% | |
| 391 | | | | District 5 | | | 14 | 12 | 12 | 17 | 174 | -14% | 0% | 42% | 924% | 66% | |
| 392 | 367 | d.1 | bias free policing & community engagement | # of community partnerships w/youth | yes | District Commanders | 14 | 17 | 30 | 57 | 162 | 50% | -33% | 90% | 184% | 63% | represents partnerships specifically with youth, although youth may be included in other partnerships |
| 393 | | | | District 1 | | | . | 3 | 9 | 14 | 1 | | 200% | 56% | -93% | | data for District 1 overestimated. Included one-off events that were not necessarily partnerships |
| 394 | | | | District 2 | | | 4 | 4 | 4 | 9 | 43 | 0% | 0% | 125% | 378% | 61% | |
| 395 | | | | District 3 | | | 2 | . | 2 | 2 | 18 | | | 0% | 800% | 55% | 2016 data not received for District 3 |
| 396 | | | | District 4 | | | 7 | 9 | 14 | 19 | 71 | 29% | 56% | 36% | 274% | 59% | |
| 397 | | | | District 5 | | | 1 | 1 | 1 | 13 | 29 | 0% | 0% | 1200% | 123% | 96% | |
| 398 | 367 | d.1 | bias free policing & community engagement | variety of community partnerships | yes | District Commanders | | | | | | | | | | | |
| 399 | | | | District 1 | | | . | . | . | . | | . | . | . | . | . | Can be calculated once adequate data for all Districts has been received |
| 400 | | | | District 2 | | | . | . | . | . | | . | . | . | . | . | Can be calculated once adequate data for all Districts has been received |
| 401 | | | | District 3 | | | . | . | . | . | | . | . | . | . | . | Can be calculated once adequate data for all Districts has been received |
| 402 | | | | District 4 | | | . | . | . | . | | . | . | . | . | . | Can be calculated once adequate data for all Districts has been received |
| 403 | | | | District 5 | | | . | . | . | . | | . | . | . | . | . | Can be calculated once adequate data for all Districts has been received |
| 404 | | | | | | | | | | | | | | | | | |
| 405 | 367 | d.2 | bias free policing & community engagement | homicide clearance rate | yes | Homicide Unit | 56% | 51% | 50% | 52% | 61% | -9% | -2% | 3% | 18% | 2% | |
| 406 | 367 | d.2 | bias free policing & community engagement | # of homicides | yes | | 127 | 139 | 130 | 120 | 122 | 9% | -6% | -8% | 2% | -1% | |
| 407 | | | | # of homicides solved | | | 71 | 71 | 65 | 62 | 75 | 0% | -8% | -5% | 21% | 1% | |
| 408 | | | | # of homicides unsolved | | | 56 | 68 | 65 | 58 | 47 | 21% | -4% | -11% | -19% | -3% | |
| 409 | 367 | d.2 | bias free policing & community engagement | Type of homicide | yes | | see below | see below | see below | see below | | | | | | | |
| 410 | | | | # of domestic violence homicides | | | 12 | 18 | 6 | 6 | 14 | 50% | -67% | 0% | 133% | 3% | |
| 411 | | | | # of non-domestic violence homicides | | | 115 | 121 | 124 | 114 | 108 | 5% | 2% | -8% | -5% | -1% | |
| 412 | 367 | d.2 | bias free policing & community engagement | Homicide victims | yes | | see below | see below | see below | see below | | | | | | | |
| 413 | | | | Adult male victims | | | 95 | 110 | 102 | 88 | 93 | 16% | -7% | -14% | 6% | 0% | |
| 414 | | | | Adult female victims | | | 23 | 18 | 12 | 18 | 18 | -22% | -33% | 50% | 0% | -5% | |
| 415 | | | | Juvenile male victims | | | 7 | 7 | 11 | 5 | 7 | 0% | 57% | -55% | 40% | 0% | |
| 416 | | | | Juvenile female victims | | | 2 | 2 | 2 | 2 | 3 | 0% | 0% | 0% | 50% | 8% | |
| 417 | | | | unknown | | | . | . | 3 | 7 | 1 | . | N/A | 133% | -86% | | |

2019 Measures as of July 2020

| | | | | | | | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 418 | | | | | | | | | | | | | | | | | |
| 419 | 367 | d.3 | bias free policing & community engagement | # civilian complaints for discrimination | no | OPS | . | . | . | . | . | . | . | . | . | . | |
| 420 | 367 | d.3 | bias free policing & community engagement | disposition of discrimination complaints | no | OPS | . | . | . | . | . | . | . | . | . | . | |
| 421 | 367 | d.3 | bias free policing & community engagement | analysis of biennial survey | yes | ISA hired | | | | | | | | | | | results are in a separate document |
| 422 | **367 e** | | **recruitment measures** | | | | | | | | | | | | | | |
| 423 | 367 | e.1 | recruitment measures | applicants | yes | City Hall Civil Service Commission (CSC) | 1410 | 1459 | 1180 | 2260 | 2343 | 3% | -19% | 92% | 4% | 11% | 2018 data are only from tests taken in 2018 and includes officers with start dates in 2019; 2017 data are from the 2017 test although those hired include applicants from the 2016 list |
| 424 | | | | # of qualified recruit applicants | | | 191 | 151 | 359 | 492 | 486 | -21% | 138% | 37% | -1% | 21% | certified. Candidates are being vetted for the next Academy" (category 11) and "hired/currently in the academy" (category 4) or Not Hired; Left on Eligible List (category 15); declined offer (16); received offer but deferred (17) |
| 425 | | | | # of not qualified recruit applicants | | | 1219 | 1308 | 821 | 1768 | 1857 | 7% | -37% | 115% | 5% | 9% | These are applicants who failed somewhere in the process |
| 426 | 367 | e.1 | measures | applicants by race | yes | | see below | see below | see below | see below | | | | | | | |
| 427 | | | | White (W) | | | 781 | 693 | 526 | 984 | 1002 | -11% | -24% | 87% | 2% | 5% | |
| 428 | | | | Black (B) | | | 409 | 518 | 440 | 891 | 941 | 27% | -15% | 103% | 6% | 18% | |
| 429 | | | | Asian (A) | | | 13 | 11 | 12 | 23 | 26 | -15% | 9% | 92% | 13% | 15% | |
| 430 | | | | Hispanic (H) | | | 154 | 148 | 127 | 204 | 216 | -4% | -14% | 61% | 6% | 7% | |
| 431 | | | | Other (O) | | | 44 | 85 | 36 | 139 | 110 | 93% | -58% | 286% | -21% | 20% | races" |
| 432 | | | | AI | | | 3 | 4 | 12 | 6 | 11 | 33% | 200% | -50% | 83% | 30% | |
| 433 | | | | No Data (.) | | | 6 | 0 | 27 | 13 | 37 | -100% | N/A | -52% | 185% | 44% | |
| 434 | 367 | e.1 | measures | applicants by gender | yes | | see below | see below | see below | see below | | | | | | | |
| 435 | | | | Males | | | 1120 | 1163 | 873 | 1621 | 1692 | 4% | -25% | 86% | 4% | 9% | |
| 436 | | | | Females | | | 290 | 296 | 298 | 629 | 639 | 2% | 1% | 111% | 2% | 17% | |
| 437 | | | | Unknown | | | 0 | 0 | 9 | 10 | 12 | 0% | N/A | 11% | 20% | N/A | |
| 438 | | | | | | | | | | | | | | | | | |
| 439 | 367 | e.2 | recruitment measures | Where applicants heard of job | no | Civil Service Commission | see below | see below | see below | see below | | | | | | | No data on recruitment activities in baseline |
| 440 | | | | City Website | | | . | 40% | 54% | 52% | | | 36% | -3% | -100% | | |
| 441 | | | | Friend | | | . | 26% | 0% | 0% | | | -100% | 0% | 0% | | |
| 442 | | | | Google or other search | | | . | 19% | 3% | 0% | | | -85% | -100% | N/A | | |
| 443 | | | | Other | | | . | 14% | 14% | 17% | | | -1% | 24% | -100% | | |
| 444 | | | | Bulletin | | | . | 2% | 0% | 4% | | | -69% | 702% | -100% | | |
| 445 | | | | Word of mouth | | | . | 0% | 19% | 16% | | | N/A | -15% | -100% | | |
| 446 | | | | Social media | | | . | 0% | 6% | 6% | | | N/A | 3% | -100% | | |
| 447 | | | | Article or blog post | | | . | 0% | 0% | 0% | | | 0% | 0% | 0% | | |
| 448 | | | | Advertisement | | | . | 0% | 4% | 4% | | | N/A | 10% | -100% | | |
| 449 | 367 | e.2 | recruitment measures | Recruitment Activity | no | Civil Service Commission | see below | see below | see below | see below | see below | | | | | | No data on recruitment activities in baseline |
| 450 | | | | Billboards | | | . | 9 | 23 | 0 | 0 | | 156% | -100% | N/A | | |
| 451 | | | | Billboard Impressions | | | . | 538043 | 1077439 | 0 | 0 | | 100% | -100% | N/A | | |
| 452 | | | | Regional Transit Bus Posters | | | . | 20 | 0 | 0 | 0 | | -100% | 0% | 0% | | |
| 453 | | | | Regional Transit Stations Posters | | | . | 24 | 22 | 0 | 0 | | -8% | -100% | N/A | | |
| 454 | | | | Mobile/digital video banner Ads | | | . | 50000 | 20000 | 200000 | 200000 | | -60% | 900% | 0% | | |
| 455 | | | | Facebook, Twitter, Instagram Posts | | | . | 8 | 8 | 20 | 60 | | 0% | 150% | 200% | | |
| 456 | | | | Blog posts/Websites | | | . | 60 | 90 | 260 | 260 | | 50% | 189% | 0% | | |

2019 Measures as of July 2020

| # | Ref | Sub | Type | Measure | In CD | Source | Y1 | Y2 | Y3 | Y4 | Y5 | %1 | %2 | %3 | %4 | %5 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 457 | | | | Social Media Viewers/Likes | no | | | | 714547 | 117925 | | | | -83% | | | New item CPD collects that has been added to 2017 but not specified in Consent Decree |
| 458 | | | | Social Media Shares | no | | | | 1278 | | | | | | | | New item CPD collects that has been added to 2017 but not specified in Consent Decree |
| 459 | | | | Radio Station Spots | | | | 4 | 4 | 7 | 3 | | 0% | 75% | -57% | | |
| 460 | | | | Television | | | | 0 | 0 | 1 | 1 | | 0% | N/A | 0% | | |
| 461 | 367 | e. 2 | recruitment measures | # of Recruitment Partnerships | no | Civil Service Commission | | 17 | 19 | 44 | 61 | | 12% | 132% | 39% | | No data on recruitment activities in baseline |
| 462 | | | | All Races | | | | 8 | 15 | 32 | 36 | | 88% | 113% | 13% | | |
| 463 | | | | Black | | | | 7 | 3 | 9 | 10 | | -57% | 200% | 11% | | |
| 464 | | | | Hispanic | | | | 2 | 1 | 2 | 2 | | -50% | 100% | 0% | | |
| 465 | | | | Other | | | | | | 1 | 13 | | | | | | New category added (Arab American)in 2018 |
| 466 | | | | | | | | | | | | | | | | | |
| 467 | 367 | e. 3 | recruitment measures | # of applicants who failed initial screening | yes | City Hall Civil Service Commission | 1219 | 1294 | 821 | 1768 | 1857 | 6% | -37% | 115% | 5% | 9% | Same number as above (# of non-qualified applicants); considered anyone who is NOT hired (category 4) and anyone whose name has NOT been certified (category 11) |
| 468 | 367 | e. 3 | recruitment measures | reason for failures | yes | City Hall Civil Service Commission | see below | see below | see below | see below | see below | | | | | | |
| 469 | | | | 1- Application Rejected | | | | 339 | 282 | 390 | 400 | | -17% | 38% | 3% | | Application rejected - Not collected in 2015 |
| 470 | | | | 2-Failed agility test | | | 166 | 119 | 101 | 100 | 92 | -28% | -15% | -1% | -8% | -11% | 2019:Code changed from 2 to 6 |
| 471 | | | | 3-No show for the Agility test | | | 85 | 113 | 90 | 165 | 61 | 33% | -20% | 83% | -63% | -6% | 2019: Code changed from 3 to 5 |
| 472 | | | | 4-Hired / Currently in the Academy | | | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A | N/A | N/A | N/A | N/A | |
| 473 | | | | 5-No response to certification | | | 183 | 58 | 0 | 90 | 103 | -68% | -100% | N/A | 14% | -11% | 2019: Code changed from 5 to 4 |
| 474 | | | | 6-Passed over | | | 13 | 8 | 0 | 108 | 155 | -38% | -100% | N/A | 44% | 64% | The 2017 list reported no one who was passed over, however, the 2016 list was used to hire the 2017 class and 47 were passed over. 2019: Code changed from 6 to 12 |
| 475 | | | | 7-Removed for background reason(s) | | | 66 | 39 | 0 | 15 | 5 | -41% | -100% | N/A | -67% | -40% | The 2017 list reported no one who was removed for background reasons, however, the 2016 list was used to hire the 2017 class and 6 were removed for background reasons. 2019: Code changed from 7 to 8 |
| 476 | | | | 8-No show for the Psychological Exam | | | 1 | | 0 | 4 | 0 | | | N/A | -1 | -100% | merged in 2016 data; The 2017 list reported no one was a no show, however, the 2016 list was used to hire the 2017 class and 1 was a no show. 2019: Code changed from 8 to 7 (24 no PHS- row 469, no category for no show for psychological exam) |
| 477 | | | | 9-No longer interested | | | 19 | 26 | 4 | 62 | 48 | 37% | -85% | 1450% | -23% | 20% | longer interested, however, the 2016 list was used to hire the 2017 class and 10 were no longer interested |
| 478 | | | | 10-Waived | | | 17 | 102 | 10 | 61 | 115 | 500% | -90% | 510% | 89% | 47% | |
| 479 | | | | 11-Name has been certified. Candidates are being vetted for the next Academy | | | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A | N/A | N/A | N/A | N/A | |
| 480 | | | | 12-No show for the test | | | 394 | 263 | 244 | 566 | 652 | -33% | -7% | 132% | 15% | 11% | 2019: Code changed from 12 to 2 |
| 481 | | | | 13-Did not submit their Personal History Statement | | | 240 | 4 | 0 | 0 | 24 | -98% | -100% | 0% | 0% | -37% | 2019: Code changed from 13 to 7 |
| 482 | | | | 14-Failed the test | | | 35 | 223 | 90 | 194 | 170 | 537% | -60% | 116% | -12% | 37% | 2019: Code changed from 14 to 3 |
| 483 | 367 | e. 3 | recruitment measures | recruit failures by race | yes | City Hall Civil Service Commission | see below | see below | see below | see below | see below | | | | | | |
| 484 | | | | White (W) Failures | | | 658 | 594 | 323 | 742 | 750 | -10% | -46% | 130% | 1% | 3% | |
| 485 | | | | Black (B) Failures | | | 375 | 492 | 341 | 733 | 802 | 31% | -31% | 115% | 9% | 16% | 23% |
| 486 | | | | Asian (A) Failures | | | 12 | 9 | 8 | 17 | 17 | -25% | -11% | 113% | 0% | 7% | |

2019 Measures as of July 2020

| # | | | | | | | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 487 | | | | Hispanic (H) Failures | | | 128 | 133 | 90 | 159 | 159 | 4% | -32% | 77% | 0% | 4% | |
| 488 | | | | Other (O) Failures | | | 41 | 76 | 32 | 106 | 91 | 85% | -58% | 231% | -14% | 17% | races" |
| 489 | | | | Native American (AI) Failures | | | 1 | 4 | 8 | 3 | 11 | 300% | 100% | -63% | 267% | 62% | |
| 490 | | | | No Data (.) Failures | | | 4 | 0 | 19 | 8 | 27 | -100% | N/A | -58% | 238% | 47% | |
| 491 | 367 | e. 3 | recruitment measures | recruit failures by ethnicity | yes | City Hall Civil Service Commission | see below | see below | see below | see below | see below | | | | | | It is unclear whether this information is captured adequately |
| 492 | | | | Hispanic/Latino (H) | | | 128 | 133 | 90 | 159 | 159 | 4% | -32% | 77% | 0% | 4% | |
| 493 | | | | Non-Hispanic/Latino | | | 1091 | 1161 | 731 | 1609 | 1698 | 6% | -37% | 120% | 6% | 9% | |
| 494 | 367 | e. 3 | recruitment measures | recruit failures by gender | yes | City Hall Civil Service Commission | see below | see below | see below | see below | see below | | | | | | |
| 495 | | | | Male Failures | | | 971 | 1032 | 592 | 1274 | 1351 | 6% | -43% | 115% | 6% | 7% | |
| 496 | | | | Female Failures | | | 248 | 277 | 224 | 489 | 497 | 12% | -19% | 118% | 2% | 15% | |
| 497 | | | | unknown gender | | | . | . | 5 | 5 | 9 | . | . | 0% | 80% | | unknown not captured in 2015 or 2016 |
| 498 | | | | recruit failures by self identified disability | no | City Hall Civil Service Commission | . | . | . | . | . | | | | | | Only have data on veterans;  No data collected currently; Needs to be collected in the future |
| 499 | | | | | | | | | | | | | | | | | |
| 500 | 367 | e. 4 | recruitment measures | # of applicants with fluency in other language | no | City Hall Civil Service Commission | . | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 501 | | | | list of languages spoken by recruits | no | | . | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 502 | | | | | | | | | | | | | | | | | |
| 503 | 367 | e. 5 | recruitment measures | # of lateral candidates | yes | City Hall Civil Service Commission | 0 | 210 | 94 | 0 | 0 | N/A | -55% | -100% | N/A | N/A | The Division did not recruit laterals in 2015 or 2018 |
| 504 | 367 | e. 5 | recruitment measures | laterals by race | yes | | see below | see below | see below | see below | see below | | | | | | The Division did not recruit laterals in 2015 or 2018 |
| 505 | | | | White (W) | | | 0 | 116 | 37 | 0 | 0 | N/A | -68% | -100% | N/A | 0% | |
| 506 | | | | Black (B) | | | 0 | 57 | 37 | 0 | 0 | N/A | -35% | -100% | N/A | 0% | |
| 507 | | | | Asian (A) | | | 0 | 1 | 1 | 0 | 0 | N/A | 0% | -100% | N/A | 0% | |
| 508 | | | | Hispanic (H) | | | 0 | 18 | 7 | 0 | 0 | N/A | -61% | -100% | N/A | 0% | |
| 509 | | | | Other (O) | | | 0 | 17 | 9 | 0 | 0 | N/A | -47% | -100% | N/A | 0% | |
| 510 | | | | AI | | | 0 | 0 | 1 | 0 | 0 | N/A | N/A | -100% | N/A | 0% | |
| 511 | | | | No Data (.) | | | 0 | 1 | 2 | 0 | 0 | N/A | 100% | -100% | N/A | 0% | |
| 512 | 367 | e. 5 | recruitment measures | ethnicity | yes | | see below | see below | see below | see below | see below | | | | | | The Division did not recruit laterals in 2015 or 2018 |
| 513 | | | | Hispanic/Latino | | | 0 | 18 | 7 | 0 | 0 | N/A | -61% | -100% | N/A | 0% | |
| 514 | | | | Non-Hispanic/Latino | | | 0 | 192 | 87 | 0 | 0 | N/A | -55% | -100% | N/A | 0% | |
| 515 | 367 | e. 5 | recruitment measures | laterals by gender | yes | | see below | see below | see below | see below | see below | | | | | | The Division did not recruit laterals in 2015 or 2018 |
| 516 | | | | Male | | | 0 | 174 | 74 | 0 | 0 | N/A | -57% | -100% | N/A | 0% | |
| 517 | | | | Female | | | 0 | 35 | 19 | 0 | 0 | N/A | -46% | -100% | N/A | 0% | |
| 518 | | | | unknown | | | 0 | 0 | 1 | 0 | 0 | 0% | N/A | -100% | N/A | 0% | |
| 519 | 367 | e. 5 | recruitment measures | Other information on laterals | yes | | see below | see below | see below | see below | see below | | | | | | The Division did not recruit laterals in 2015 or 2018 |
| 520 | | | | disability | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | |
| 521 | | | | list of laterals former agencies | | | 0 | 39 | 5 | 0 | 0 | N/A | -87% | -100% | N/A | 0% | for |
| 522 | | | | list of laterals years of service | | | 0 | 166 | 12 | 0 | 0 | N/A | -93% | -100% | N/A | 0% | represents the number of years in which laterals worked for other PDs |
| 523 | | | | | | | | | | | | | | | | | |
| 524 | 367 | e. 6 | recruitment measures | applicant qualifications | yes | City Hall Civil Service Commission | see below | see below | see below | see below | see below | | | | | | |

2019 Measures as of July 2020

| Line | 367 | e.7 | recruitment measures | pass/fail rate in each phase of pre-employment process | yes/no | City Hall Civil Service Commission | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 525 | | | | # applicants with 2+ years college | yes | | 455 | 802 | 649 | 1172 | 1181 | 76% | -19% | 81% | 1% | 21% | college for 2+ years, but did not obtain a BA degree (includes those with associates degrees) |
| 526 | | | | # applicants with college degree | yes | | 240 | 247 | 189 | 370 | 414 | 3% | -23% | 96% | 12% | 12% | |
| 527 | | | | # applicants with 2+ years military | no | | . | . | . | . | . | | | | | | No data collected currently; only have 180+days; Needs to be collected in the future |
| 528 | | | | # applicants with 180+ days military | yes (new) | | 161 | 89 | 55 | 91 | 79 | -45% | -38% | 65% | -13% | -13% | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 529 | | | | disabled veterans | yes (new) | | 14 | 2 | 3 | 2 | 4 | -86% | 50% | -33% | 100% | -22% | New item CPD collects that has been added to baseline but not specified in Consent Decree; misreported in 2015 (was reported as 1235) |
| 530 | | | | | | | | | | | | | | | | | |
| 531 | 367 | e.7 | recruitment measures | pass/fail rate in each phase of pre-employment process | yes | City Hall Civil Service Commission | see below | see below | see below | see below | see below | | | | | | pass calculated. Question-How is this section calculated? Seems more appropriate to report this section as fail rate at every phase of pre-employment. 2019-Fail rate. FINE to do going forward |
| 532 | | | | 1-Application rejected | | | . | . | . | . | 22% | | | | | | |
| 533 | | | | 2-Failed agility test | | | 86.38% | 90.24% | 87.70% | 94.34% | 5.00% | 4% | -3% | 8% | . | | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 534 | | | | 3-No show for the Agility test | | | 93.03% | 90.73% | 89.04% | 90.67% | 3.00% | -2% | -2% | 2% | . | | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 535 | | | | 4-Hired / Currently in the Academy | | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 536 | | | | 5-No response to certification | | | 84.99% | 95.24% | 100.00% | 94.91% | 6.00% | 12% | 5% | -5% | . | | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 537 | | | | 6-Passed over | | | 98.93% | 99.34% | 100.00% | 93.89% | 8.00% | 0% | 1% | -6% | . | | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 538 | | | | 7-Removed for background reason(s) | | | 94.59% | 96.80% | 100.00% | 99.15% | 0.00% | 2% | 3% | -1% | . | | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 539 | | | | 8-No show for the Psychological Exam | | | 99.92% | N/A | 100.00% | 99.77% | 0.00% | N/A | N/A | 0% | . | | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 540 | | | | 9-No longer interested | | | 98.44% | 97.87% | 99.51% | 96.49% | 3.00% | -1% | 2% | -3% | . | | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 541 | | | | 10-Waived | | | 98.61% | 91.63% | 98.78% | 96.55% | 6.00% | -7% | 8% | -2% | . | | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 542 | | | | 11-Name has been certified. Candidates are being vetted for the next Academy | | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 543 | | | | 12-No show for the test | | | 67.68% | 78.42% | 70.28% | 67.99% | 35.00% | 16% | -10% | -3% | . | | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 544 | | | | 13-Did not submit their Personal History Statement | | | 80.31% | 99.67% | 100.00% | 100.00% | 1.00% | 24% | 0% | 0% | . | | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 545 | | | | 14-Failed the test | | | 97.13% | 81.71% | 89.04% | 67.99% | 9.00% | -16% | 9% | -24% | . | | 2015-18 pass rate calculated, 2019-fail rate calculated; 2019% change and CAGR not calculated because not apples to apples |
| 546 | | | | 17-Failed Medical or Drug Test | | | . | . | . | . | 1.00% | | | | | | 2019-fail rate calculated |
| 547 | | | | 18-Withdrew or Failed to Complete Process After Offer | | | . | . | . | . | 1.00% | | | | | | 2019-new category, fail rate |

2019 Measures as of July 2020

| # | | | Category | Description | Y/N | Entity | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 548 | 367 | e. 7 | recruitment measures | pass/fail rate by race | yes | City Hall Civil Service Commission | see below | see below | see below | see below | see below | | | | | | |
| 549 | | | | White (W) pass rate | | | 15.75% | 14.29% | 38.59% | 24.59% | 25.15% | -9% | 170% | -36% | 2% | 10% | pass rate calculated |
| 550 | | | | Black (B) pass rate | | | 8.31% | 5.02% | 22.50% | 17.73% | 14.77% | -40% | 348% | -21% | -17% | 12% | pass rate calculated |
| 551 | | | | Asian (A) pass rate | | | 7.69% | 18.18% | 33.33% | 26.09% | 34.62% | 136% | 83% | -22% | 33% | 35% | pass rate calculated |
| 552 | | | | Hispanic (H) pass rate | | | 16.88% | 10.14% | 29.13% | 22.06% | 26.39% | -40% | 187% | -24% | 20% | 9% | pass rate calculated |
| 553 | | | | Other (O) pass rate | | | 6.82% | 10.59% | 11.11% | 23.74% | 17.27% | 55% | 5% | 114% | -27% | 20% | pass rate calculated |
| 554 | | | | AI pass rate | | | 66.67% | 0.00% | 33.33% | 50.00% | 0.00% | -100% | N/A | 50% | -100% | -100% | pass rate calculated |
| 555 | | | | No Data (.) pass rate | | | 33.33% | . | 29.63% | 38.46% | 27.03% | . | . | 30% | -30% | -4% | pass rate calculated |
| 556 | 367 | e. 7 | recruitment measures | pass/fail rate by ethnicity | yes | City Hall Civil Service Commission | see below | see below | see below | see below | see below | | | | | | |
| 557 | | | | Hispanic/Latino (H) pass rate | | | 16.88% | 10.14% | 29.13% | 22.06% | 26.39% | -40% | 187% | -24% | 20% | 9% | pass rate calculated |
| 558 | | | | Non-Hispanic/Latino pass rate | | | 13.14% | 11.44% | 30.58% | 30.10% | 20.17% | -13% | 167% | -2% | -33% | 9% | pass rate calculated |
| 559 | 367 | e. 7 | recruitment measures | pass/fail rate by gender | yes | City Hall Civil Service Commission | see below | see below | see below | see below | see below | | | | | | |
| 560 | | | | Male Pass rate | | | 13.30% | 11.26% | 32.19% | 21.41% | 20.15% | -15% | 186% | -33% | -6% | 9% | pass rate calculated |
| 561 | | | | Female Pass Rate | | | 14.48% | 6.42% | 24.83% | 22.26% | 22.22% | -56% | 287% | -10% | 0% | 9% | pass rate calculated |
| 562 | | | | unknown gender pass rate | | | . | . | 44.44% | 50.00% | 25.00% | . | . | 13% | -50% | . | |
| 563 | 367 | e. 7 | recruitment measures | pass/fail rate by self identified disability | no | City Hall Civil Service Commission | . | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 564 | | | | | | | | | | | | | | | | | |
| 565 | 367 | e. 8 | recruitment measures | avg length of time to move through each phase of preemployment | no | | . | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 566 | | | | avg length of time to process applicants | | | . | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 567 | | | | | | | | | | | | | | | | | |
| 568 | 367 | e. 9 | recruitment measures | composition of recruit class | yes | | see below | see below | see below | see below | see below | | | | | | |
| 569 | 367 | e. 9 | recruitment measures | Initial Size of recruit class | yes | | 52 | 62 | 69 | 153 | 250 | 19% | 11% | 122% | 63% | 37% | 2018 excludes names that were on the list given for 2017 report's recruit Class 140; All recruit class numbers reflect the number of officers hired based on the test taken that year even if the hire date is in the following year. So 2018 numbers reflect officers who took the police exam in 2018 even though their start date may not have been |
| 570 | | | | Remained | yes (new) | | 44 | 51 | 65 | 140 | 202 | 16% | 27% | 115% | 44% | 36% | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 571 | | | | Separated | yes (new) | | 8 | 11 | 4 | 13 | 48 | 38% | -64% | 225% | 269% | 43% | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 572 | 367 | e. 9 | recruitment measures | Separated by Race | yes | | see below | see below | see below | see below | see below | | | | | | |
| 573 | | | | Black | yes (new) | | 2 | 3 | 0 | 3 | 12 | 50% | -100% | N/A | 300% | 43% | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 574 | | | | White | yes (new) | | 4 | 8 | 4 | 8 | 26 | 100% | -50% | 100% | 225% | 45% | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 575 | | | | Hispanic | yes (new) | | 2 | 0 | 0 | 2 | 6 | -100% | 0% | N/A | 200% | 25% | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 576 | | | | Asian | yes (new) | | 0 | 0 | 0 | 0 | 2 | 0% | 0% | 0% | 0% | 0% | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 577 | | | | Other | yes (new) | | 0 | 0 | 0 | 0 | 1 | 0% | 0% | 0% | 0% | 0% | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 578 | | | | Undisclosed | yes (new) | | 0 | 0 | 0 | 0 | 1 | 0% | 0% | 0% | 0% | 0% | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 579 | 367 | e. 9 | recruitment measures | Separated by Gender | yes | | see below | see below | see below | see below | see below | | | | | | |

2019 Measures as of July 2020

| # | 367 | | measure type | description | y/n | location | | | | | | | | | | | notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 580 | | | | Male | yes (new) | | 7 | 8 | 4 | 9 | 31 | 14% | -50% | 125% | 244% | 35% | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 581 | | | | Female | yes (new) | | 1 | 3 | 0 | 9 | 16 | 200% | -100% | N/A | 78% | 74% | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 582 | | | | Undisclosed | yes (new) | | . | . | . | . | 1 | . | . | . | . | N/A | New item CPD collects that has been added to baseline but not specified in Consent Decree |
| 583 | 367 | e. 9 | recruitment measures | composition of recruit classes by race | | Command Staff/ Academy | see below | see below | see below | see below | see below | | | | | | |
| 584 | | | | Black | | | 8 | 10 | 16 | 40 | 64 | 25% | 60% | 150% | 60% | 52% | |
| 585 | | | | White | | | 29 | 38 | 51 | 89 | 138 | 31% | 34% | 75% | 55% | 37% | |
| 586 | | | | Hispanic | | | 12 | 2 | 2 | 8 | 26 | -83% | 0% | 300% | 225% | 17% | |
| 587 | | | | Asian | | | 0 | 1 | 0 | 0 | 5 | N/A | -100% | 0% | 0% | 0% | |
| 588 | | | | Other | | | 3 | 0 | 0 | 0 | 13 | -100% | 0% | N/A | N/A | 34% | |
| 589 | | | | Undisclosed | | | . | . | . | . | 4 | . | . | . | . | N/A | |
| 590 | 367 | e. 9 | recruitment measures | composition of recruit classes by ethnicity | | Command Staff/ Academy | see below | see below | see below | see below | see below | | | | | | |
| 591 | | | | Hispanic/Latino | | | 12 | 2 | 2 | 8 | 26 | -83% | 0% | 300% | 225% | 17% | |
| 592 | | | | Non-Hispanic/Latino | | | 40 | 60 | 67 | 132 | 224 | 50% | 12% | 97% | 70% | 41% | |
| 593 | 367 | e. 9 | recruitment measures | composition of recruit classes by gender | | Command Staff/ Academy | see below | see below | see below | see below | see below | | | | | | |
| 594 | | | | Male | | | 44 | 43 | 54 | 106 | 177 | -2% | 26% | 96% | 67% | 32% | |
| 595 | | | | Female | | | 8 | 19 | 15 | 106 | 70 | 138% | -21% | 607% | -34% | 54% | |
| 596 | | | | Undisclosed | | | . | . | . | . | 3 | . | | | | | |
| 597 | | | | composition of recruit classes by self identified disability | | | . | . | . | . | . | . | . | . | . | . | No data collected currently; Needs to be collected in the future |
| 598 | **367 f. 1** | | **training measures** | | | | | | | | | | | | | | |
| 599 | 367 | f. 1 | training measures | # of officers provided training pursuant to this agreement | no | | . | . | 1354 | 1363 | 1369 | . | 1% | 0% | | | No data collected in 2015 or 2016; 2017 includes UoF CIT not State Re-Qual |
| 600 | 367 | f. 1 | training measures | % of officers provided training pursuant to this agreement | no | | . | . | 94% | 96% | 94% | . | 2% | -2% | | | No data collected in 2015 or 2016; 2017 includes UoF CIT not State Re-Qual |
| 601 | | | | | | | | | | | | | | | | | |
| 602 | 367 | f. 2 | training measures | students' evaluations of the adequacy of training in type and | no | Training | see below | see below | see below | see below | see below | | | | | | No data collected in 2015, 2016, or 2018; 2017 is UoF training |
| 603 | | | | Instructor adequacy | | | . | | 87% | . | . | . | . | . | . | . | 2017: instructor increased my understanding of the course material (agree and strongly agree) |
| 604 | | | | Content adequacy | | | . | | 87% | . | . | . | . | . | . | . | 2017:scenarios were practical (agree and strongly agree) |
| 605 | | | | Future performance adequacy | | | . | | 63% | . | . | . | . | . | . | . | 2017: I will perform differently based on skills and knowledge gained (agree and strongly agree) |
| 606 | | | | Overall adequacy | | | . | | 79% | . | . | . | . | . | . | . | 2017: Overall I found this training to be valuable (agree and strongly agree) |
| 607 | | | | | | | | | | | | | | | | | |
| 608 | 367 | f. 3 | training measures | modifications or improvements to training resulting from the review and analysis required by this | no | | . | | see written report | see written report | see written report | . | . | . | . | . | No data collected in 2015, 2016, or 2018; 2017 includes UoF CIT not State Re-Qual. See written report for details |
| 609 | | | | | | | | | | | | | | | | | |
| 610 | 367 | f. 4 | training measures | prevalence of training deficiencies as reflected by problematic incidents or performance trends | no | | . | | see written report | see written report | see written report | . | . | . | . | . | No data collected in 2015, 2016, or 2018; 2017 includes UoF CIT not State Re-Qual. See written report for details |
| 611 | **367 g.** | | **officer assistance & support efforts** | | | | | | | | | | | | | | |
| 612 | 367 | g. 1 | officer assistance & support efforts | availability of officer assistance & support services | yes | EAP | see below | see below | see below | see below | see below | | | | | | |

2019 Measures as of July 2020

| # | 367 | | Category | Measure | y/n | Source | 2015 | 2016 | 2017 | 2018 | 2019 | % | % | % | % | % | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 613 | 367 | g. 1 | officer assistance & support efforts | use of officer assistance & support services | yes | EAP | 11 | 209 | 221 | 241 | 316 | 1800% | 6% | 9% | 31% | 96% | 2015 baseline data is underreported as the use of service was not tracked. 2019-Number represents EAP |
| 614 | | | | | | | | | | | | | | | | | |
| 615 | 367 | g. 2 | officer assistance & support efforts | officer reports of adequacy of officer assistance & support svcs | no | EAP | . | . | 92% | 78% | | | | -15% | | | No data collected in 2015 or 2016; 2017 includes ratings of agree and strongly agree on all items |
| 616 | 367 | g. 2 | officer assistance & support efforts | survey analysis of adequacy of officer assistance & support svcs | no | EAP | . | . | see written report | see written report | see written report | | | | | | No data collected in 2015 or 2016 |
| 617 | **367 h.** | | **supervision measures** | | | | | | | | | | | | | | |
| 618 | 367 | h. | supervision measures | supervisors initial identification of officer violations | no | | . | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 619 | 367 | h. | supervision measures | supervisors initial identification of officer performance problems | no | | . | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 620 | 367 | h. | supervision measures | supervisors response to officer violations | no | | . | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 621 | 367 | h. | supervision measures | supervisors response to performance problems | no | | . | . | . | . | . | | | | | | No data collected currently; Needs to be collected in the future |
| 622 | **367 i.** | | **civilian complaints & investigations & discipline** | | | | | | | | | | | | | | |
| 623 | 367 | i. 1 | civilian complaints & investigations & discipline | # of complaints | yes | IA, Inspections, OPS | 294 | 263 | 241 | 227 | 220 | -11% | -8% | -6% | -3% | -6% | Of the 294 cases in 2015, only 45 were completed and only 4 went through the PRB |
| 624 | 367 | i. 1 | civilian complaints & investigations & discipline | increases/decreases related to access | no | IA, Inspections, OPS | | | | | | | | | | | No data collected currently; Needs to be collected in the future |
| 625 | | | | | | | | | | | | | | | | | |
| 626 | 367 | i. 2 | civilian complaints & investigations & discipline | # sustained by complaint type | no | IA, Inspections, OPS | 2 | 7 | 26 | 110 | 75 | 250% | 271% | 323% | -32% | 106% | PRB looked at 4 cases in 2015; 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CARG not included |
| 627 | | | | False Report | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | |
| 628 | | | | Harassment | | | 0 | 0 | 3 | 1 | 1 | 0% | N/A | -67% | 0% | | |
| 629 | | | | Improper Procedure | | | 1 | 2 | 12 | 16 | 12 | 100% | 500% | 33% | -25% | 64% | |
| 630 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 1 | 0 | 0 | 0% | N/A | -100% | N/A | 0% | |
| 631 | | | | Lack of Service | | | 0 | 1 | 4 | 22 | 19 | N/A | 300% | 450% | -14% | N/A | |
| 632 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | | |
| 633 | | | | Other | | | 0 | 0 | 0 | 2 | 0 | 0% | 0% | N/A | N/A | N/A | Other includes missing property in 2018 |
| 634 | | | | Physical Abuse/Excessive Force | | | 0 | 1 | 0 | 0 | 1 | N/A | -100% | 0% | 0% | | |
| 635 | | | | Unprofessional | | | 1 | 3 | 6 | 68 | 41 | 200% | 100% | 1033% | -40% | 110% | |
| 636 | | | | Biased Policing | | | N/A | N/A | N/A | 1 | 1 | N/A | N/A | N/A | 0% | | New Category added in 2018 |
| 637 | 367 | i. 2 | civilian complaints & investigations & discipline | # exonerated by complaint type | no | IA, Inspections, OPS | 0 | 8 | 61 | 220 | 126 | N/A | 663% | 261% | -43% | N/A | 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CARG not included |
| 638 | | | | False Report | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | |
| 639 | | | | Harassment | | | 0 | 1 | 6 | 12 | 5 | N/A | 500% | 100% | -58% | N/A | |
| 640 | | | | Improper Procedure | | | 0 | 3 | 23 | 93 | 12 | N/A | 667% | 304% | -87% | N/A | |
| 641 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 1 | 0 | 0 | N/A | -100% | 0% | | | |
| 642 | | | | Lack of Service | | | 0 | 2 | 10 | 53 | 37 | N/A | 400% | 430% | -30% | N/A | |
| 643 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | | |
| 644 | | | | Other | | | 0 | 0 | 5 | 14 | 1 | 0% | N/A | 180% | -93% | N/A | Other includes missing property in 2018 |
| 645 | | | | Physical Abuse/Excessive Force | | | 0 | 2 | 4 | 11 | 4 | N/A | 100% | 175% | -64% | N/A | |
| 646 | | | | Unprofessional | | | 0 | 0 | 12 | 34 | 22 | 0% | N/A | 183% | -35% | N/A | |
| 647 | | | | Biased Policing | | | N/A | N/A | N/A | 3 | 0 | N/A | N/A | N/A | N/A | | New Category added in 2018 |
| 648 | 367 | i. 2 | civilian complaints & investigations & discipline | # unfounded by complaint type | no | IA, Inspections, OPS | 2 | 13 | 16 | 159 | 86 | 550% | 23% | 894% | -46% | 112% | 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CARG not included |
| 649 | | | | False Report | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | |

2019 Measures as of July 2020

| # | | | | | | | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 650 | | | | Harassment | | | 0 | 1 | 0 | 8 | 1 | N/A | -100% | N/A | -88% | N/A | |
| 651 | | | | Improper Procedure | | | 1 | 3 | 5 | 12 | 7 | 200% | 67% | 140% | -42% | 48% | |
| 652 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 0 | 0 | 0 | 0% | N/A | 0% | 0% | 0% | |
| 653 | | | | Lack of Service | | | 0 | 2 | 4 | 42 | 37 | N/A | 100% | 950% | -12% | N/A | |
| 654 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | |
| 655 | | | | Other | | | 0 | 0 | 3 | 10 | 3 | 0% | N/A | 233% | -70% | N/A | Other includes missing property in 2018 |
| 656 | | | | Physical Abuse/Excessive Force | | | 0 | 3 | 2 | 12 | 2 | N/A | -33% | 500% | -83% | N/A | |
| 657 | | | | Unprofessional | | | 1 | 4 | 2 | 62 | 28 | 300% | -50% | 3000% | -55% | 95% | |
| 658 | | | | Biased Policing | | | N/A | N/A | N/A | 13 | 8 | N/A | N/A | N/A | N/A | N/A | New Category added in 2018 |
| 659 | 367 | i. 2 | civilian complaints & investigations & discipline | # not sustained by complaint type | no | OPS | . | . | . | 89 | . | | | | | | No data collected currently; Needs to be collected in the future |
| 660 | | | | False Report | | | . | | | . | | | | | | | No data collected currently; Needs to be collected in the future |
| 661 | | | | Harassment | | | . | | | . | | | | | | | No data collected currently; Needs to be collected in the future |
| 662 | | | | Improper Procedure | | | . | | | . | | | | | | | No data collected currently; Needs to be collected in the future |
| 663 | | | | Infraction Notice (UTT/PIN) | | | . | | | . | | | | | | | No data collected currently; Needs to be collected in the future |
| 664 | | | | Lack of Service | | | . | | | . | | | | | | | No data collected currently; Needs to be collected in the future |
| 665 | | | | Not Provided by Complainant | | | . | | | . | | | | | | | No data collected currently; Needs to be collected in the future |
| 666 | | | | Other | | | . | | | . | | | | | | | No data collected currently; Needs to be collected in the future |
| 667 | | | | Physical Abuse/Excessive Force | | | . | | | . | | | | | | | No data collected currently; Needs to be collected in the future |
| 668 | | | | Unprofessional | | | . | | | . | | | | | | | No data collected currently; Needs to be collected in the future |
| 669 | 367 | i. 2 | civilian complaints & investigations & discipline | # of administratively dismissed | no | OPS | 39 | 90 | 126 | 58 | 54 | 131% | 40% | -54% | -7% | 7% | |
| 670 | | | | False Report | | | 1 | 0 | 0 | 0 | 0 | -100% | N/A | 0% | 0% | -100% | |
| 671 | | | | Harassment | | | 4 | 14 | 43 | 15 | 0 | 250% | 207% | -65% | -100% | -100% | |
| 672 | | | | Improper Procedure | | | 9 | 28 | 26 | 7 | 0 | 211% | -7% | -73% | -100% | -100% | |
| 673 | | | | Infraction Notice (UTT/PIN) | | | 2 | 4 | 8 | 0 | 6 | 100% | 100% | -100% | N/A | 25% | |
| 674 | | | | Lack of Service | | | 2 | 13 | 17 | 14 | 0 | 550% | 31% | -18% | -100% | -100% | |
| 675 | | | | Not Provided by Complainant | | | 1 | 0 | 1 | 0 | 0 | -100% | N/A | -100% | N/A | -100% | |
| 676 | | | | Other | | | 2 | 1 | 3 | 4 | 16 | -50% | 200% | 33% | 300% | 52% | Other includes missing property and no jurisdiction in 2018 |
| 677 | | | | Physical Abuse/Excessive Force | | | 2 | 4 | 7 | 2 | 0 | 100% | 75% | -71% | -100% | -100% | |
| 678 | | | | Unprofessional | | | 16 | 23 | 21 | 16 | 0 | 44% | -9% | -24% | -100% | -100% | |
| 679 | | | | Unknown | | | 0 | 3 | 0 | 0 | 0 | N/A | -100% | 0% | 0% | 0% | |
| 680 | | | | NEW CATEGORIES | | | . | . | . | 32 | . | | | | | | Not in 2015-8, but in 2019 (new categories):  Non-CDP employee-11, Unidentifiable Officer-7, Off-Duty Officer Conduct-2, Duplicate-6, and No Misconduct Alleged-6 |
| 681 | 367 | i. 2 | civilian complaints & investigations & discipline | # of insufficient evidence | no | OPS | 2 | 33 | 93 | 108 | 71 | 1550% | 182% | 16% | -34% | 104% | 2018 represents number of allegations not complaints; no apples to apples with 2015-2017 so percent change and CARG not included |
| 682 | | | | False Report | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | |
| 683 | | | | Harassment | | | 0 | 7 | 24 | 7 | 5 | N/A | 243% | -71% | -29% | N/A | |
| 684 | | | | Improper Procedure | | | 0 | 7 | 15 | 11 | 5 | N/A | 114% | -27% | -55% | N/A | |
| 685 | | | | Infraction Notice (UTT/PIN) | | | 0 | 0 | 4 | 0 | 0 | N/A | N/A | -100% | N/A | 0% | |
| 686 | | | | Lack of Service | | | 1 | 5 | 9 | 12 | 14 | 400% | 80% | 33% | 17% | 70% | |
| 687 | | | | Not Provided by Complainant | | | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | |
| 688 | | | | Other | | | 0 | 0 | 4 | 3 | 2 | 0% | N/A | -25% | -33% | N/A | Other includes missing property in 2018 |
| 689 | | | | Physical Abuse/Excessive Force | | | 0 | 5 | 11 | 14 | 10 | N/A | 120% | 27% | -29% | N/A | |

2019 Measures as of July 2020

| # | | | Category | Measure | Y/N | Source | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 690 | | | | Unprofessional | | | 1 | 9 | 26 | 49 | 32 | 800% | 189% | 88% | -35% | 100% | |
| 691 | | | | Biased Policing | | | . | . | . | . | 3 | | | | | | |
| 692 | | | | | | | | | | | | | | | | | |
| 693 | 367 | i. 3 | civilian complaints & investigations & discipline | # of complaint allegations supported by a preponderance of the evidence | no | OPS | . | . | . | . | 75 | . | . | . | . | . | No data collected currently; Needs to be collected in the future |
| 694 | | | | | | | | | | | | | | | | | |
| 695 | 367 | i. 4 | civilian complaints & investigations & discipline | average length of time to complete by complaint type | yes | OPS | 137 | 409 | 232 | 75 | 64 | 198% | -43% | -68% | -15% | -14% | Average number of days, but depends on completed cases |
| 696 | | | | False Report | | | 293 | . | . | . | 0 | . | . | . | . | -100% | |
| 697 | | | | Harassment | | | 158 | 383 | 171 | 61 | 44 | 142% | -55% | -64% | -28% | -23% | |
| 698 | | | | Improper Procedure | | | 134 | 354 | 213 | 115 | 55 | 164% | -40% | -46% | -52% | -16% | |
| 699 | | | | Infraction Notice (UTT/PIN) | | | 84 | 303 | 204 | . | 0 | 261% | -33% | | | -100% | |
| 700 | | | | Lack of Service | | | 179 | 352 | 193 | 88 | 111 | 97% | -45% | -54% | 26% | -9% | |
| 701 | | | | Not Provided by Complainant | | | 105 | . | . | . | 0 | | | | | -100% | |
| 702 | | | | Other | | | 35 | . | 231 | 20 | 6 | | | -91% | -70% | -30% | 2017 and 2018 other = missing property |
| 703 | | | | Physical Abuse/Excessive Force | | | 130 | 730 | 410 | 96 | 123 | 462% | -44% | -77% | 28% | -1% | |
| 704 | | | | Unprofessional | | | 117 | 329 | 203 | 70 | 76 | 181% | -38% | -66% | 9% | -8% | |
| 705 | | | | Biased Policing | | | . | . | . | . | 30 | . | . | . | . | | |
| 706 | | | | | | | | | | | | | | | | | |
| 707 | 367 | i. 5 | civilian complaints & investigations & discipline | # of officers w/multiple complaints | yes | OPS | 34 | 38 | 27 | 10 | 18 | 12% | -29% | -63% | 80% | -12% | |
| 708 | | | | District 1 | | | 1 | 1 | 5 | 0 | 0 | 0% | 400% | -100% | N/A | -100% | |
| 709 | | | | District 2 | | | 4 | 4 | 1 | 1 | 6 | 0% | -75% | 0% | 500% | 8% | |
| 710 | | | | District 3 | | | 4 | 4 | 6 | 2 | 4 | 0% | 50% | -67% | 100% | 0% | |
| 711 | | | | District 4 | | | 1 | 9 | 8 | 3 | 2 | 800% | -11% | -63% | -33% | 15% | |
| 712 | | | | District 5 | | | 5 | 2 | 2 | 1 | 2 | -60% | 0% | -50% | 100% | -17% | |
| 713 | | | | outside city/other units | | | 4 | 5 | 5 | 3 | 4 | 25% | 0% | -40% | 33% | 0% | |
| 714 | | | | # of officers w/repeated sustained complaints | yes | IA, Inspections, OPS | 0 | 0 | 0 | 0 | 0 | 0% | 0% | 0% | 0% | 0% | |
| 715 | | | | | | | | | | | | | | | | | |
| 716 | 367 | i. 6 | civilian complaints & investigations & discipline | arrests of officers for conduct | yes | IA | see below | see below | see below | see below | see below | | | | | | |
| 717 | | | | on duty | | | 1 | 2 | 1 | 0 | 0 | 100% | -50% | -100% | N/A | -100% | |
| 718 | | | | off duty | | | 14 | 11 | 10 | 19 | 13 | -21% | -9% | 90% | -32% | -1% | |
| 719 | | | | | | | | | | | | | | | | | |
| 720 | 367 | i. 7 | civilian complaints & investigations & discipline | criminal prosecutions for conduct | yes | IA | see below | see below | see below | see below | see below | | | | | | |
| 721 | | | | on duty | | | 1 | 2 | 0 | 0 | 0 | 100% | -100% | 0% | 0% | -100% | |
| 722 | | | | off duty | | | 11 | 10 | 8 | 18 | 13 | -9% | -20% | 125% | -28% | 3% | |
| 723 | | | | not prosecuted | | | 2 | 1 | 1 | 0 | 0 | -50% | 0% | -100% | N/A | -100% | |
| 724 | | | | open | | | 1 | 0 | 2 | 1 | 0 | -100% | N/A | -50% | -100% | -100% | |
| 725 | | | | | | | | | | | | | | | | | |
| 726 | 367 | i. 8 | civilian complaints & investigations & discipline | # of civil suits against the City or CDP for work related conduct | yes | City Law Department | 8 | 12 | 52 | 35 | 27 | 50% | 333% | -33% | -23% | 28% | |
| 727 | | | | settled | | | 3 | 3 | 42 | 6 | 9 | 0% | 1300% | -86% | 50% | 25% | |
| 728 | | | | not yet settled | | | 5 | 9 | 10 | 29 | 18 | 80% | 11% | 190% | -38% | 29% | |
| 729 | 367 | i. 8 | civilian complaints & investigations & discipline | nature of the suits | yes | City Law Department | see below | see below | see below | see below | see below | | | | | | suit 2019-This will be initially completed by the Monitoring Team and then reviewed by CDP |

2019 Measures as of July 2020

| # | Ref1 | Ref2 | Category | Description | | Dept | D1 | D2 | D3 | D4 | D5 | P1 | P2 | P3 | P4 | P5 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 730 | | | | excessive force (including deadly | | | 5 | 6 | 2 | 3 | . | 20% | -67% | 50% | | . | |
| 731 | | | | unlawful search & seizure | | | 1 | 1 | 4 | 3 | . | 0% | 300% | -25% | | . | |
| 732 | | | | false arrest | | | 1 | 2 | 5 | 3 | . | 100% | 150% | -40% | | . | |
| 733 | | | | discrimination/bias | | | 0 | 3 | 0 | 2 | . | N/A | -100% | N/A | | . | |
| 734 | | | | other violation of constitutional rights (e.g., 1st amendment) | | | 1 | 1 | 6 | 7 | . | 0% | 500% | 17% | | . | |
| 735 | | | | Harassment | | | 0 | 0 | 0 | 0 | . | 0% | 0% | 0% | | . | |
| 736 | | | | improper handling/disposition of | | | 1 | 0 | 3 | 6 | . | -100% | N/A | 100% | | . | |
| 737 | | | | contempt of cop | | | 1 | 0 | 0 | 0 | . | -100% | 0% | 0% | | . | |
| 738 | | | | failure to provide medical assistance | | | 1 | 1 | 0 | 1 | . | 0% | -100% | N/A | | . | |
| 739 | | | | other | | | 0 | 3 | 12 | 25 | . | N/A | 300% | 108% | | . | |
| 740 | 367 | i. 8 | civilian complaints & investigations & discipline | amount of judgments against | yes | City Law Department | see below | see below | see below | see below | see below | | | | | | |
| 741 | | | | number of judgments | | | 23 | 29 | 52 | 35 | 27 | 26% | 79% | -33% | -23% | 3% | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 742 | 367 | i. 8 | civilian complaints & investigations & discipline | | yes | City Law Department | see below | see below | see below | see below | see below | | | | | | |
| 743 | | | | number of judgments (closed) | | | 22 | 21 | 42 | 6 | 9 | -5% | 100% | -86% | 50% | -16% | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 744 | | | | number of judgments (active) | | | 1 | 8 | 10 | 29 | 18 | 700% | 25% | 190% | -38% | 78% | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 745 | 367 | i. 8 | civilian complaints & investigations & discipline | | yes | City Law Department | see below | see below | see below | see below | see below | | | | | | |
| 746 | | | | amount of judgments (closed) | | | $ 20,136.82 | $ 1,822.16 | $ 9,000.00 | $ - | | -91% | 394% | -100% | N/A | | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 747 | | | | amount of judgments (active) | | | TBD | TBD | TBD | TBD | TBD | N/A | N/A | N/A | N/A | N/A | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 748 | 367 | i. 8 | civilian complaints & investigations & discipline | amount of settlements | yes | City Law Department | see below | see below | see below | see below | see below | | | | | | |
| 749 | | | | settled | | | $ 20,136.82 | $ 1,822.16 | $ 9,000.00 | $ - | | -91% | 394% | -100% | N/A | | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |
| 750 | | | | not yet settled | | | TBD | TBD | TBD | TBD | TBD | N/A | N/A | N/A | N/A | N/A | 2018 data as of March 2019; 2017 data As of April 2018; 2015 and 2016 data as of June 2017 |