IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | |
| CITY OF CLEVELAND, | ) | |
| | ) | **CITY OF CLEVELAND'S** |
| Defendant. | ) | **NINTH STATUS  REPORT** |

## I.    Introduction

Paragraph 387 of the Consent Decree. Section 387 provides that on a semi-annual basis the City is to file a status report with Court, with copies to the Monitor and Department of Justice ("DOJ"), that:

> [D]elineate[s] the steps taken by CDP during the reporting period to comply with this Agreement; CDP's Assessment of the Status of its progress; plans to correct any problems; and response to concerns raised in the Monitor's previous semi-annual report.

The City has now accomplished much of the groundwork necessary for carrying out the reform goals established with the Consent Decree. Section 360 of the Consent Decree provides in pertinent part that a determination by the Monitor on whether the City and CDP have come into compliance requires:

> [T]hat the City and CDP:  (a) have incorporated the requirement[s] into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement[s]; and (c) are carrying out the requirement[s] in actual practice.

(Dkt. 7-1, pp. 82-83).

Briefly, the Court has now reviewed and approved a number of new and revised policies for  the Cleveland Division of Police ("CDP"), to include policies addressing use of force, supervisory investigations, community engagement, bias-free policing, crisis intervention, searches and seizures, recruiting, and discipline as required by the Consent Decree.  CDP officers and supervisors have received the initial required training on the great majority of these policies, with training on several newly approved supervisory review policies being ongoing.  In the area of accountability, a large, long-standing backload of civilian complaints filed with the Office of Professional Standards ("OPS") has been eliminated, with current OPS investigations being completed in a more-timely manner for submission and review by the Police Review Board ("PRB"). The City has appointed a civilian Inspector General ("IG") who has numerous CDP oversight duties as outlined in the Consent Decree. The City's Data Analysis and Collection Coordinator and data team have worked to develop, test, and implement the use of electronic forms that allow reporting by officers in the field. Electronic reporting is intended to result in more immediate and accurate reports and will assist in the collection of the voluminous data required by the Consent Decree.  Such data will allow for required ongoing assessment to establish that the agreed upon reforms are in fact being carried out and implemented.

II.    **Monitor's Eighth Semi-annual Report**

The Monitor Team's recent Eighth Semiannual Report ("Eighth Report") (Dkt. 320) recognizes "[i]n sum, this Report finds the Division and City continuing to make progress with meeting the requirements of the Consent Decree." (Dkt. 320, p.3). The Monitor noted that its Eighth Report was being presented in the midst of "an unprecedented time" with many "re-examining the various types of police reforms that

have been implemented or proposed previously." (Id., p.1).  The Monitor recognizes, however, that "the work in Cleveland on transforming the police department according to the Consent Decree continues…[a]nd this work remains important;" further commenting:

> "Even if some of the topics that the decree covers feel mundane or removed from the day to day realities of Cleveland's communities, changes in critical areas like policy, training, departmental review, accountability, and officer supervision are precisely what can transform how officers perform and how CDP provides policing services today."

(Id.).

Much of the "*critical area*" changes in the areas of reform that may appear "*removed from the day to day realities*" have now been accomplished. Details associated with meeting these requirements have been addressed in earlier reports from the Monitor and the City.  The new and amended CDP policies and training curricula associated with the policies adopted during the period of the Consent Decree have been reviewed by the Monitor, the Department of Justice, and often by the Community Police Commission ("CPC"), before being presented for approval by the Court. The Monitor's filed requests for Court approval explain in great detail how the policies were developed, the terms of the policies, what areas of CDP operations are affected, how the training will be accomplished, and how the new policies will meet and advance the reform goals established in the Consent Decree.

It should be recalled that the Settlement Agreement resulting in the Consent Decree followed a DOJ investigation that was predicated on determining "whether CDP engages in a pattern or practice of the use of excessive force…" (Dkt. 7-1, p. 1).  The adoption of new and revised CDP use of force policies was an important and early major focus of the City's compliance efforts during the initial stages of the Consent Decree. An early example of the detailed explanation provided to the Court and Community relating

3

to the development and adoption of new CDP policies can be found in the  Monitor's "Motion Recommending Approval of Revised Use of Force Policies of the Cleveland Division of Police**."** (Dkt. 83).

The Monitor's most recent Eighth Report notes that CDP's use of force metrics over the two year period 2018-2019 "continue to suggest that *officers are effectively implementing the new use of force policies* on a daily basis, with no compromise with respect to crime or increased officer safety concerns." (Dkt 320, p.1*, emphasis added*). While recognizing the Monitor's Eighth Report also allowed that "the City and the Division still have a ways to travel before in-depth quantitative and qualitative assessments to measure full and effective compliance with the Consent Decree will be possible;"(Id., p. 3) the City believes the documented declines in officer use of force, overall crime, officer injuries, and subject injuries over the last two years should provide an assurance to the Court and the Cleveland Community of the seriousness of purpose and continuing commitment by the City and CDP to meet and carry out the many reforms agreed to in the Consent Decree.

**II.    Steps Taken by the Cleveland Division of Police and the City of Cleveland During the Reporting Period.**

The City reports on events in the following order:

A.    Community Engagement
B.    Use of Force,
C.    Crisis Intervention,
D.    Recruitment
E.    Accountability
F.    Equipment and Resources,
G.    Data Collection and Analysis/ Compliance and Outcome Assessments and Reporting
H.    Bias Free Policing

.

A.     **Community Engagement**

     1.      Cleveland Community Police Commission ("CPC")

The Consent Decree provided for the creation of the CPC "[t]o leverage the experience and expertise of the people of Cleveland, and to ensure that CDP recognizes and operates in a manner consistent with cooperative community understanding and engagement." (Dkt. 7-1, p. 5). As was noted in the City's prior Semi-Annual Report, the CPC's current commissioners were sworn in by Mayor Frank Jackson on November 1, 2019 in accordance with Section 16 of the Consent Decree following recommendation by the appointed Selection Panel.

The CPC's mandate as defined in the Consent Decree provides:

     a.      to make recommendations to the Chief of Police and the City, including the Mayor and the City Council, on policies and practices related to community and problem-oriented policing, bias-free policing, and police transparency;

     b.      to work with the many communities that make up Cleveland for the purpose of developing recommendations for police practices that reflect an understanding of the values and priorities of Cleveland residents; and

     c.      to report to the City and community as a whole and to provide transparency on police department reforms.

(*Id.,* Section 15, p. 5). Per its mandate, the CPC has often offered feedback and recommendations that were considered by the City in finalizing specified CDP policies before they were placed before the Court for approval. While the City and the CPC have had differences regarding the scope of responsibilities and duties provided by the Consent Decree, the City continues to meet and work with the CPC on a regular basis. Issues addressed by the City with the CPC during the most recent reporting period have included CPC's proposed changes to CDP's previously approved Disciplinary GPO and Discipline Matrix, a mediation process recommended by the CPC for attempting to

resolve certain kinds of citizen complaints against CDP personnel filed with the City's
Office of Professional Standards ("OPS"), and CPC recommendations for LGBTQ policy
and Youth policies that are currently being developed by CDP.

The Eighth Report  notes the Monitor's concern with the City's relationship to the
CPC. (Dkt. 320, p. 8). The Monitor's Eighth Report recognizes, however, that "the City
and Division may take issue with the characterization of its relationship with the
Commission." (Dkt. 320 at p. 9).  The City does take issue with the Monitor's extremely
negative characterization of its relationship with the CPC, and by extension the Monitor's
further comments concerning the City's relationship with the Cleveland Community (See
Dkt. 320, p. 9).

First, the City disagrees with the Monitor's characterization that it "sees  little in
the [City's] relationship with the Commission that is positive or productive." (Dkt 320,
p.9).  The City would hope that such comment was not intended to reflect an opinion of
the City's relationship with the CPC during the entirety of the five year period of the
Consent Decree.  The Monitor's Eighth Report, while characterizing  an "often strained"
relationship, also references "*many examples*" where the relationship has resulted in
positive and productive results:

> *[T]here have been many examples of productive interaction*. For instance, the
> development of the new use of force policies, the completion of the Search and
> Seizure policies and relevant training, and most recently, the soon to be
> completed Interaction with Youth and Transgender individuals.

(Dkt. 320, p. 8, emphasis added).

The City acknowledges that the relationship between the City and CDP and the
newly appointed CPC can be improved, and has taken steps to address improvement. In
this regard, the City and CDP recently engaged with the CPC in an open-ended and

facilitated retreat discussion on August 19 for the purpose of addressing and improving the perceived problematic relationship. The meeting included a lively, informative, and respectful discussion on a variety of issues and diverse points of view. The City believes the retreat was a positive step going forward toward improving communications and interactions between the City and CDP and the current CPC's commissioners.

The City cannot accept the Monitor's non-time specific and overly generalized further characterization regarding the City and CDP's relationship with the Community that "Nothing in the City and Division's relationship with the Commission suggests an interest in or the importance of the community substantively participating on areas of police reform and police practice" (Dkt.320, p.9). Such a broad negative characterization contradicts well-documented and positive City/CDP engagement and participation with the Cleveland Community during the period of the Consent Decree. The CPC is not the sole vehicle for community engagement. Beyond the Eighth Report's above noted "many examples of productive interaction" with the CPC, the City references past examples of positive Monitor comments to assure the Court of the City and CDP's documented interest in and continuing commitment to community participation and engagement.

    a.  <u>Community Engagement addressing Use of Force Policies</u>

Early on in the development of reforms required by the Consent Decree, the CDP's work on developing multiple new CDP use of force policies was a primary area of attention and involved much community engagement and participation. During this process, the City and CDP engaged directly with the Community in addition to its engagement with the CPC. The Monitor's Second Semiannual Report in January 2017

acknowledged the considerable community engagement that was involved in this area, summarizing:

> In making the proposed force policies public well before they were completed, formally reviewed by the Monitor, or circulated to the Court for approval, *the Cleveland community had an opportunity to be more involved in the substantive drafting of use of force policies than – at least to this Monitoring Team's knowledge – any other community has, to date, in other Consent Decree contexts*. After a number of important changes were made to respond to community feedback on the final proposed policies, the new-approved policies were finalized and submitted to the Court in November 2016.

(Dkt. 97, p. 5, emphasis added). Direct recognition of both the City and CDP's "*active and genuine*" engagement with the community in this instance was more specifically documented in the Monitor's "Motion Recommending Approval of Revised Use of Force Policies of the Cleveland Division of Police" wherein the Monitor noted to the Court:

> [*T]he City and CPD have actively and genuinely engaged with community stakeholders* – both "early in the process, when the Community Police Commission and Division of Police gather[ed] views, values, experiences, and expectations from the community that inform[e]d the initial drafting of new policies and processes"

(Dkt. 83, pp. 6-7, emphasis added).

b. Community Engagement addressing Community Policing

Community policing directly involves the relationship between the CDP and the community it serves. The Monitor's Fifth Semiannual Report reported to the Court in 2018 that the City and CDP had "commendably engaged" with the community in comprehensively addressing this important community based policy areas:

> As this report details elsewhere, *the City and Division of Police have commendably engaged* with the community in a comprehensive manner on plans relating to community policing, staffing, and recruitment and hiring – formally involving entities and organizations in structured dialogue on major proposed changes before they are implemented.

(Dkt. 214, p. 13, emphasis added).

The City and CDP have a documented history of engaging with the Cleveland Community during the period of the Consent Decree that continues going forward.

2.     <u>District Police Committees</u>

Each of the City's five police districts has a District Policing Committee ("DPC").

CDP continues to work with the cross-section of community members who participate with the DPCs. It goes without saying that the ongoing COVID-19 pandemic has affected and limited direct CDP- community group interaction during the current reporting period. An important goal to be met going forward is to have each of the five DPC's annually "identify strategies to address crime and safety issues in their district" while also addressing "any concerns or recommendations about specific CDP policing tactics and initiatives in their District." (Dkt. 7-1, p. 7). Each DPC would then present such "strategies, concerns, and recommendations" to the community through presentation to the CPC. (Id., p.8). The City continues its effort to meet the goals established for each of the five DPC's.

3.     <u>Community and Problem-Oriented Policing ("CPOP")</u>

As was addressed in the City's eighth semi-annual report (Dkt. 291), the Court has previously approved the CDP's CPOP Plan and the subsequently finalized CPOP policy. The CPOP Policy established "guidelines for officers of the Cleveland Division of Police relative to community engagement and problem solving to provide clarity in regards to the expectations of all members." (Dkt. 273-1, CPOP Policy). As was noted in the Monitor's Eighth Report, "[a] Division-wide commitment to community policing

helps promote trust and legitimacy, improve the quality of police-citizen encounters, and address persistent public safety issues in Cleveland's communities." (Dkt. 320, p. 13).

    a.   <u>Collecting Data for Community Engagement Documentation</u>

Notwithstanding restrictions on social engagement imposed on everyone by the COVID-19 pandemic, CDP has continued its efforts to succeed in having the capability to document its officer's community engagement efforts. In February 2020, officers began utilizing newly implemented electronic community engagement data collection forms. The City's Data Team recently began examining the community engagement data and plans to meet with the established CPOP Review Committee on a quarterly basis. While necessary restrictions on personal interactions caused by the COVID-19 pandemic has affected full implementation of the recent community engagement policy, community engagement remains an important focus of the Consent Decree.

**B.**    **<u>Use of Force</u>**

    1.   <u>2019 Use of Force Report</u>

The CDP recently finalized and released its 2019 Use of Force Report.  The report is quite comprehensive and includes a direct statistical comparison to CDP's use of force data collected in 2018. The report is posted on the City's website[1] and provides the community with a wide range of use of force statistics and other important information, including the definitions of significant terms and a brief overview of the five Use of Force policies that were finalized after significant community input and engagement in 2016: (1) Definitions, (2) De-Escalation, (3) General, (4) Intermediate Weapons, and (5) Reporting.

The use of force data collection and analysis contained in the 2019 Use of Force Report is in accord with the requirements of Section 259 of the Consent Decree which requires "the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents," with the specific data to be collected being identified in subparagraphs (a) – (m). (Dkt. 7-1, p. 60). CDP's progress towards meeting the Consent Decree's collection of data requirements results from the successful populating of all use of force data fields in "IAPro", the software program utilized by CDP for storing use of force data, and the ability of the Data Collection and Analysis Coordinator and other data staff to access, download, analyze and report out on the vast majority of these data points. The Data Collection and Analysis Coordinator works directly with CDP's IAPro administrators in identifying any inconsistencies or missing fields, with administrators consistently conducting Quality Assurance on all outgoing use of force reports.

It is of note that CDP use of force incidents make up a very small percentage of all calls for service made to the CDP in 2018 and 2019. The CDP classifies officer use of force within three levels. Level 1 is the lowest level with Level 3 being the most serious. The three levels of force are defined as follows:

> **Level 1 Use of Force:** Force that is reasonably likely to cause only transient pain and/or disorientation during its application as a means of gaining compliance, including pressure point compliance and joint manipulation techniques, but that is not reasonably expected to cause injury, does not result in an actual injury and does not result in a complaint of injury. It does not include escorting, touching, or handcuffing a subject with no or minimal resistance. Un-holstering a firearm and pointing it at a subject is reportable as a Level 1 use of force.

---

[1] The complete 2019 report can be found on the City's Website at:
http://city.cleveland.oh.us/sites/default/files/dojsettlement/2019%20Use%20of%20Force%20Report.pdf

11

**Level 2 Use of Force:** Force that causes an injury, could reasonably be expected to cause an injury, or results in a complaint of an injury, but does not rise to the level of a Level 3 use of force. Level 2 includes the use of a CEW, including where a CEW is fired at a subject but misses; OC Spray application; weaponless defense techniques (e.g., elbow or closed-fist strikes, kicks, leg sweeps, and takedowns); use of an impact weapon, except for a strike to the head, neck or face with an impact weapon or beanbag shotgun; and any canine apprehension that involves contact.

**Level 3 Use of Force:** Force that includes uses of deadly force; uses of force resulting in death or serious physical harm; uses of force resulting in hospital confinement due to a use of force injury; all neck holds; uses of force resulting in a loss of consciousness; canine bite; more than three applications of a CEW on an individual during a single interaction, regardless of the mode or duration of the application, and regardless of whether the applications are by the same or different officers; a CEW application for longer than 15 seconds, whether continuous or consecutive; and any Level 2 use of force against a handcuffed subject.

CDP officers responded to **261,372** calls for service in 2018 and **271,078** calls in 2019.  Of these total calls for service, there were **335** use of force incidents in 2018 and **344** uses of force in 2019.  While the number of calls for service increased by 9,706 in 2019, the number of 2019 use of force incidents went up by only nine (9). For each year, it can be seen that a use of force only occurred in approximately 0.13 percent (0.13%) of all calls for service in both years. Only 10 incidents of the 261,372 service calls in 2018 were defined as the most serious Level 3 uses of force, with only 14 incidents involving Level 3 uses of force being reported of the 271,078 service calls completed in 2019. The following chart provides an overview of the reported use of force incidents for each year by the levels of force involved:

## Use of Force Incidents by Level of Force

|      | Level 1 | Level 2 | Level 3 | Total |
|------|---------|---------|---------|-------|
| 2018 | 229     | 96      | 10      | 335   |
| 2019 | 196     | 134     | 14      | 344   |

The reader is encouraged to access the complete 2019 Use of Force Report on the City's website for a comprehensive review of use of force statistics for the two years.

2.    Use of Force Investigation and Review

The Consent Decree establishes requirements addressing CDP supervisory review of uses of force at sections 97 to 109 and the creation and implementation of a Force Investigation Team ("FIT") at sections 100 to 123. The Consent Decree also recognizes that CDP is authorized to enter into a memorandum of understanding allowing for the referral of "criminal   investigations of uses of force to an independent and highly competent agency outside CDP." (Dkt. 7-1, sections 110, 117).

Following a great deal of work and collective work on final revisions, the Monitor filed a "Notice Submitting Supervisory Review Policy, Force Investigation Team Manual & GPO, and a Memorandum of Understanding Between the Cleveland Division of Police and the Cuyahoga County Sheriff's Department." (Dkt. 309).  The Court approved these matters during the current reporting period on May 1, 2020. (Dkt. 311).

a.    Supervisory Review

As was noted in the Monitor's Notice, "[t]he Supervisory Review Policy sets guidelines and expectations for supervisors' force reviewing, documenting, and processing uses of force through the Division's chain of command." (Dkt. 309, p.2).  The policy establishes that a:

> Fair, thorough, timely and objective use of force reviews and investigations shall be conducted by supervisors in Level 1 and Level 2 uses of force. Supervisors shall evaluate attempts to de-escalate, objective reasonableness, and necessity of actions taken by the officer(s), along with proportionality of force used in relation to the level of resistance encountered. All Level 3 uses of force shall be investigated by the Force Investigation Team (FIT).

(Dkt 309-1, Use of Force Supervisory Reviews and Investigations, p.1). The required reviews and investigations will occur for the "use [of] any level of force while on duty, off duty (acting in an official capacity within the City of Cleveland) or while working secondary employment." (Id.). The policy establishes review of uses of force at multiple levels.

The supervisory review policy establishes that each completed use of force review or investigation is to be forwarded "through their chain of command to the District Unit Commander." (Id., p. 6). The policy establishes time lines for completion of chain of command reviews and provides that reviewing supervisors in the chain of command "will address any discrepancy and order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings." (Id.). If the Commander finds a Level 1 review is complete and supported by evidence the review "is considered complete and will be forwarded via use of force tracking software, routed to the Internal Affairs Superintendent." (Id., p. 7). When the Commander finds the Level 2 investigations to be complete the investigations are then routed to the Internal Affairs Superintendent for review. (Id.).

Internal Affairs ("IA") will review all Level 2 uses of force and will route those reviews where there has been no determination of officer misconduct to the Deputy Chief's Office for further review. Determinations of officer misconduct will be routed to CDP's Case Preparation Unit for the appropriate disciplinary process. (Id.). "Upon the completion of the Deputy Chief's review or completion of the disciplinary process, Level 2 investigations will be closed, routed to Internal Affairs and maintained in the use of force tracking software."

    b.  <u>Force Investigation Team ("FIT")</u>

The Monitor's Notice to the Court seeking approval described that the "FIT Manual

and GPO [General Police Orders establish CDP's "policies"] create procedures for the review of the most serious (Level 3) uses of force by a dedicated Force Investigation Team that must be specially trained to conduct comprehensive and objective administrative reviews of force incidents. For uses of force by CDP officers resulting in death, CDP has chosen to have an outside agency conduct independent criminal investigations of these incident." (Dkt. 309, p.2).

Creation of the FIT is primarily established by section 111 of the Consent Decree which provides in pertinent part that FIT is to be:

> comprised of personnel from various units and will not be a new unit to which officers are permanently assigned. The FIT will conduct administrative investigations in all of the following instances and, where appropriate and where not assigned to an outside agency as permitted above, will conduct criminal investigations of: (1) all Level 3 uses of force; (2) uses of force involving potential criminal conduct by an officer; (3) all instances in which an individual died while in, or as an apparent result of being in, CDP custody; and (4) any uses of force reassigned to FIT by the Chief or his or her designee. The FIT will be designed to ensure that these incidents are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified; that training, tactical, and equipment deficiencies related to the use of force are identified; and that investigations are of sufficient quality.

(Dkt. 7-1, p.27).

The approved "Force Investigations Team Investigations" policy establishes "guidelines for the reporting of all use of force responses and any incidents investigated by the Force Investigation Team (FIT) and to establish the duties, responsibilities, and authority of the FIT. FIT is designed to ensure that all incidents assigned to FIT are investigated fully and fairly." (Dkt. 309-3, p. 1).  The Document further establishes:

> It is the policy of the Division to have the FIT investigate all level 3 use of force incidents, critical firearm discharges, uses of force involving potential criminal conduct by an officer, all incidents in which an individual has died while in, or as an apparent result of being in, the Division's custody, and any uses of force assigned to FIT by the Chief. Individuals assigned to FIT will receive, at least yearly, training to ensure the appropriate expertise, independence, and

investigative skills. This will ensure that uses of force that are contrary to law or policy are identified; that training, tactical, and equipment deficiencies related to the use of force are identified; and that investigations are of sufficient quality. When the team is deployed, it shall be recognized as having been granted full investigative authority by the Chief of Police.

(Id.).  As was noted in the Monitor's Notice, "The GPO [FIT policy] highlights the type of cases FIT investigates…; FIT Notification requirements…; responsibilities of non-involved street supervisors …; FIT responsibilities at the scene …, and officer responsibilities regarding reporting for incidents falling within the jurisdiction of the FIT…". (Dkt. 309, p. 11, citing to Dkt. 309-3, GPO).

Placed before the Court for approval along with the FIT policy was the "Force Investigation Unit Procedural Manual." (Dkt. 309-2).  The Scope and Objective of the FIT Manual is set forth in the document as follows:

This Manual governs the processes and procedures used by the Force Investigation Team ("FIT"). FIT conducts administrative investigations of: (1) all Level 3 uses of force; (2) uses of force involving potential criminal conduct by an officer; (3) all instances in which an individual died while in, or as an apparent result of being in, CDP custody; and (4) any uses of force reassigned to FIT by the Chief or his or her designee. FIT shall also conduct criminal investigations of the above matters where appropriate and where not assigned to an outside agency.

FIT is designed to ensure that the classes of incidents outlined above are investigated fully and fairly by individuals with appropriate expertise, independence, training, and investigative skills to ensure that uses of force that are contrary to law or this Division's policy are identified; that training, tactical, and equipment deficiencies related to the use of force are identified; and that investigations are of sufficient quality.

This Manual carries the full weight of Division and City policy. Deviations from its provisions subject an officer to disciplinary action up to and including termination. Any changes to the Manual must be expressly approved by the Chief of Police.

(Dkt. 309-2, p. 3).  The Manual establishes the operation of a FIT to include the notification and screening of FIT required investigations, FIT integrity protocols, the

bifurcation of concurrent criminal and administrative investigations, FIT member composition and responsibilities, training requirements, scene and evidence processing, and investigation review and presentation. Among the IA Superintendent's many duties is the specific responsibility for ensuring "the overall responsiveness, professionalism and competency of the FIT and [to] ensure investigations completed by the FIT are unbiased, fair and through." (Id. p. 19).

The makeup of a FIT is not a permanent or stand-alone unit and will be customized for the necessary expertise required for an investigation with the FIT Manual establishing with regard to composition of a team:

> The Internal Affairs Unit will include CDP's Force Investigation Team (FIT). Each FIT will be a team comprised of personnel from various units and will not be a stand-alone unit to which officers are permanently assigned. The FIT will be designed to ensure that incidents under the jurisdiction of FIT are investigated fully and fairly by individuals with appropriate expertise, independence and investigative skills to ensure that uses of force that are contrary to law or policy are identified; that training, tactical, and equipment deficiencies related to the use of force are identified; and that investigations are of sufficient quality. Force Investigation personnel will be experienced investigators who have demonstrated integrity, accuracy, and thoroughness in their investigations. Force Investigation personnel must have completed all required training prior to serving in a position on the FIT.

(Dkt. 309-2, pp. 21-22).  The Manual establishes a selection process for team members and establishes the necessary required skill training for each member. (Id. Pp. 22-24).

As noted in the above Scope and Objective, the FIT has responsibilities to conduct both administrative and criminal investigations – where the criminal investigation is not assigned to an outside agency.  Given such responsibilities the FIT Manual provides that "[u]pon the arrival of FIT the investigation will be bifurcated into two separate investigations. For investigations, FIT will utilize a "criminal team" reporting to the BSI Commander and "administrative team" reporting to the IA Superintendent." (Dkt. 309—2, p.

11).  The Inspector General will review "CDP's process for conducting concurrent investigations." (Id.).  While the FIT "criminal team" is to have priority access to all witnesses and evidence such priority is not to "preclude access by the administrative investigation."  The FIT administrative investigation team is generally required to "conduct compelled interviews of involved officers within 48-72 hours unless the appropriate prosecuting attorney requests that the interview be delayed."(Id., p. 10).

    c.   <u>Memorandum of Understanding Between the Cleveland Division of Police and the Cuyahoga County Sheriff's Department</u>

As noted, the Consent Decree allows and the FIT policy and Manual takes into account that the "CDP may refer criminal investigations of uses of force to an "independent and highly competent agency outside the CDP." (Dkt. 7-1, Section 110). Before using an outside agency, however, the Consent Decree made clear that CDP was to "develop a memorandum of understanding with the outside agency." (Id., Section 117). The CDP has entered into such a Memorandum of Understanding ("MOU") with the Cuyahoga County Sheriff's Department. (See Dkt. 309-4, Memorandum of Understanding Between the City of Cleveland Division of Police in the Department of Public Safety and the Cuyahoga County Sheriff's Department.").

As was noted in the Monitor's Notice recommending Court approval of the MOU:

"When there is a use of force by a CDP officer within the jurisdictional boundaries of the City of Cleveland that results in the actual or anticipated death of a person," the Sheriff agreed to "conduct [] thorough, objective, and timely, independent investigation[s] and submit his findings to the appropriate prosecutor." Ex. D. at 1.[Dkt 309-4 at p. 1] CDP, however, will continue to "investigate non-CDP officers using non-lethal or lethal force in the jurisdictional boundaries of the City of Cleveland except when CDP determines an investigation by an independent agency is necessary." Id. at 1- 2. The MOU further provides that the Sheriff "may agree to provide other independent use of non-lethal and lethal force investigations upon the request of the CDP." Id. at 2

The MOU makes clear that the Sheriff has agreed that "the CDP Force Investigation Team (FIT) Manual shall be used as guiding principles for all Sheriff Use of Force Investigations." (Dkt. 309-4. p.2).

      d.      <u>Force Review Board</u>

      1.      <u>Approval of Policy</u>

Section 124 of the Consent Decree establishes that the CDP develop and implement a Force Review Board:

> CDP will develop and implement a Force Review Board ("FRB") to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective. The FRB will review all FIT investigations, all Level 2 investigations where there was a determination of force related misconduct, and a sample of Level 2 use of force investigations. The Force Review Board ("FRB") will be comprised of the Chief of Police or his or her designee, who will chair the FRB; a supervisor from the training section; a representative from Office of Professional Standards; and a representative from Internal Affairs. One representative from each District, to be selected by the District Commander, will participate in all Force Review Board reviews involving a use of force in that District. The Chair may include any subject matter experts the Chair feels would be helpful in reviewing particular incidents. The FRB also may consult with other advisors as necessary.

(Dkt 7-1, p.p. 31-32).

During the current reporting period, on June 17, 2020, the Monitor filed a "Notice Submitting Cleveland Division of Police Force Review Board Policy, Checklist, and Force Review Board Training Curriculum and Power Point." (Dkt. 314). While also raising several concerns (see further discussion below) the Monitor advised the Court:

> The Monitoring Team has carefully reviewed the proposed FRB policy and determined except where noted otherwise, the Proposed Policy provides sufficient guidance on the composition, duties, and protocols guiding the Board's review and adjudication of use of force investigations. The Monitoring Team recommends that the Court approve CDP's Proposed FRB Policy.

(Id., pp.1-2).  The Monitor identified that "The Board is intended to be the place where the Division dynamically analyzes how it uses and investigates force, and makes systemic changes that will improve accountability and public trust." (Id. P. 2).  The FRB policy filed with the Monitor's Notice establishes the following:

> The Cleveland Division of Police establishes a Force Review Board (FRB) to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from tactics, training, policy, and agency improvement perspectives. The FRB shall review selected use of force investigations to determine whether the force investigation was thorough and complete; determine whether there are considerations that need to be addressed regarding de-escalation, supervision, equipment, tactics, training, policy, and best practices; to determine whether the chain of command has appropriately identified and taken actions to correct deficiencies; identify trends or patterns of deficiencies; and monitor all aspects of the Division's use of force practices with the goal of continual improvement. FRB members or their designees are expected to attend all FRB meetings and be fully prepared in advance of the meetings.

(Dkt. 314-1, FRB Policy, p. 1).  The Monitor's conclusion stated:

> The task of the Monitoring Team is to duly consider whether the City's submitted FRB Policy and associated FRB Training Curriculum satisfies the terms of the Consent Decree. The Monitoring Team concludes that the FRB Policy, as drafted, appears to meet the terms of the Consent Decree. The Monitoring Team recommends that the Court approve the Proposed FRB Policy subject to the Team's ongoing evaluation of the implementation of the FRB Policy throughout the FRB's first year – in order to assess whether the Board is able to effectuate its "quality control" duties as laid out in the Consent Decree.

(Dkt. 314, pp. 10-11).

On June 30, 2020 the Court issued an Order conditionally approving the FRB policy for a period of six (6) months. (Dkt. 317, p. 2).  In issuing its Order the Court identified three concerns with the policy expressed by the Monitor with its Notice:

> First, the FRB will consider cases only "*after* the Chief of Police, or Public Safety Director, has made a final adjudication on the matter."*        *        *
> Second, the Monitor notes the potential conflict of interest arising from the

20

> Chief of Police's role as Chair of the FRB—a body that reviews cases that
> have already been through CDP's disciplinary processes—and the Chief's
> direct involvement in disciplinary decisions.* *     * Finally, "the
> Monitoring Team remains concerned that quarterly [FRB] meetings are
> inadequate to ensure a robust and complete review of every case." (*Id.*)

(Dkt. 317, pp. 1-2). The City submitted for approval a policy that is recognized to meet

the terms of the negotiated Consent Decree. The concerns have been discussed with the

Monitor and DOJ and the City believes the "quality control" issues raised by the Monitor

will be favorably resolved during the period of the Court's conditional approval.

2.    Approval of FRB Training Curriculum

The Monitor recommended approval of the FRB Training Curricula concurrent

with the Notice recommending approval of the FRB policy.  The Monitor noted the

make-up of the FRB within the context of the necessary training as follows:

> the Force Review Board, which will be comprised of, at a minimum, the
> Chief of Police, the Division's newly-created Bureau of Compliance
> ("BOC"), Internal Affairs, a supervisor from the CDP's Training Section, the
> OPS Administrator, and a supervisor from each District "when any involved
> officer(s) are assigned to their District." Ex. A. at 1. Under the Proposed
> Policy, FRB members will receive annual training "directly relevant to their
> role and service on the FRB" including, but not limited to, legal updates
> around the use of force, revisions to Division policies, best practices around
> use of force investigations, and the training curriculum used to train CDP
> officers on the use of force.

Dkt. 314, p. 5). Discussing the training placed before it by the CDP the Monitor

concluded "the training provides sufficient guidance on the FRB, including the

procedural "nuts and bolts" as well as a practical, substantive mock review session that

raises complicated issues, the Monitoring Team recommends that the Court approve the

FRB curriculum." (Dkt. 314, p. 10).

Accomplishing the necessary training for the FRB, along with the separate training requirements for selected members of the FIT, going forward remains a priority as both the FRB and FIT begin operations.

**C.**     **Crisis Intervention**

As was noted in the Monitor's Eighth Report, the City of Cleveland, Community and Cleveland Division of Police sustained a great loss with the passing of Captain James Purcell in January. Captain Purcell was the City's first appointed Crisis Intervention Coordinator. The role and responsibilities of the Coordinator undertaken by Captain Purcell were extensive and are specifically documented at sections 137-142 of the Consent Decree. (Dkt. 7-1, p.35). Captain Purcell was extraordinarily motivated and dedicated to the creation and success of the Division's CIT program, and he was quite effective in working with the Monitor, DOJ, and the mental health community in making the CDP's CIT program a successful and leading element of the City's reforms and compliance efforts. Captain Purcell and his commitment to the program will be missed. Captain James McPike has now assumed the duties of Crisis Intervention Coordinator.

1.     CIT Annual Training

The Consent Decree requires initial and annual training to CDP officers and recruits "on responding to individuals in crisis." (Dkt. 7-1, ¶ 143. The initial training has been completed and CDP continues to work with the Mental Health Response Advisory Committee ("MHRAC") to develop the topics to be covered in CIT annual training.

Training in a number of areas has been disrupted by the social gathering limitations placed on CDP and the community in general by the COVID-19 pandemic. The required CIT four hour training for 2020 is going to be delivered through CDP's

Learning Management System ("LERMS") during the balance of the year. The topics to be covered in the training include: CIT data collection form procedures, CIT policy updates, CIT program updates, and officer emergency mental health admission procedures for (referred to as a " Pink Slip") in accordance with the requirements of Ohio Revised Code Chapter 5122 and CDP's CIT policy.

       2.      <u>CIT Specialized Training</u>

The Consent Decree establishes that CDP is to provide enhanced specialized training in responding to individuals in crisis to certain officers who will be identified as "specialized CIT officers." (Dkt. 7-1, ¶ 145). CDP, in collaboration with MHRAC, DOJ, and the Monitoring Team has finalized the 40-Hour curriculum to be used for such training. On July 22, 2019 the Court entered an order approving of the specialized training.  The COVID-19 pandemic presents a training issue in this area also.  Presently CDP is scheduled to begin the first specialized training class in mid-October at the 3rd District community room.  A safety plan to take into account restrictions placed on group gatherings will be in place.  The initial will is presently envisioned to have between 15 and 20 officers who are approved for the training.

       3. <u>Telecommunicators CIT Training</u>

Section 144 of the Consent Decree established that "all CDP call-takers, dispatchers, and their supervisors [are to] receive crisis intervention telecommunicators training that is adequate to enable them to identify, dispatch, and appropriately respond to calls for service that involve individuals in crisis." (Dkt. 7-1, p. 36). An appropriate eight hour curriculum for such training has been developed and was submitted for approval of the Court on March 25, 2020. The Court approved the crisis intervention Telecommuni-

cator training curriculum on March 30, 2020. (Dkt. 304).

**D.    <u>Recruitment</u>**

The Consent Decree requires that CDP "develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community." (Dkt. 7-1, Section 302).  The City's approved Recruitment and Hiring Plan approved in 2019 includes a combined Public Safety Recruitment Team ("PSRT") that includes members from CDP, the Division of Fire, and Division of Emergency Services.

A significant accomplishment during the current reporting period was the PSRT's completion and release of the 2019 year-end recruiting report. The 2019 report details the recruiting efforts that were undertaken and discusses recruitment goals, objectives, and accomplishments. The 2019 Report identifies two primary recruiting goals:

<u>Goal No. 1</u>. Increase staffing levels to effectively implement our Community and Problem Oriented Policing plan (CPOP). Supporting this goal, the PSRT had two primary objectives:

1. To maintain a well-trained, full time, Public Safety Recruitment Team (PSRT) that can adequately respond to inquiries regarding employment within all three Divisions.

2. To identify those individuals most suited with the ability to integrate the principles of CPOP in the discharging of their duties by incorporating the tenets of CPOP in recruitment messaging.

<u>Goal No. 2</u>. Attract and hire a diverse group of qualified applicants from a broad cross-section of the community. Supporting the second goal the 2019 PSRT Report discussed five identified objectives.

1. To identify and maintain a pool of qualified potential recruits.

2. To recruit applicants from multiple disciplines at colleges and universities, in addition to those candidates enrolled in Criminal Justice Programs. The PSRT will also court applicants from disciplines such as Behavioral/Social Sciences and Health Sciences for their 'service' aspect and Urban Studies for the knowledge base students gain around inner cities and how they've developed.

3. To reduce the large gap in percentage points between the Division's demographic breakdown of minorities and women and that of the Cleveland community by 5% by the end of 2019 or the next four entry level and two lateral classes.

4. To reach segments of the community that we have not been successful in accessing through other efforts such as the information sessions, social media posts, recruitment events and job fairs.

5. To utilize various advertisement vehicles to garner interest in a public safety career across a broad cross-section of the community as evidenced by an increased number of applicants from non-traditional communities.

The PSRT's efforts to improve the Division's public image include direct communications with the community that highlight the positive aspects of policing as a career by ensuring residents are kept informed of ongoing accomplishments and contributions to the community of individual officers.  The 2019 report acknowledges that obtaining diversity in the City's safety forces to mirror the community served is an important issue across all divisions.

CDP graduated two academy classes that began in 2019: the 144th & 145th Academy Classes.  The effectiveness of the CDP recruiting efforts is shown in both classes.  The 144th academy class began with 51 recruits and 41 graduated; 20% of whom were women and 39% of whom were minorities. Class 144 graduated with a combined makeup of 49% women and minorities. The 145th academy class began with 85 recruits with 72 of them graduating; 31% of whom were women and 45% of whom minorities. Class 145 graduated with a combined makeup of 55% women and minorities. The City's last semi-annual report noted that minority and women cadets made up 56 %

of the new graduates commissioned from classes 143 and 144 as Cleveland police officers.

The City will soon be losing Sergeant Charmin Leon, the long-time leader and guiding force of the PSRT, who is moving on to other opportunities. Sgt. Leon will be missed, but her leadership and administrative skills have created a solid base as the PSRT continues its community engagement and recruiting efforts going forward.

**E.  <u>Accountability</u>**

Paragraph 196 of the Consent Decree requires that allegations of police misconduct be "fully, fairly and efficiently investigated", irrespective of whether the allegations are internally discovered or brought by a civilian. (Dkt. 7-1, ¶ 196).

**1.  <u>Internal Affairs</u>**

 A was noted in the City's last report CDP continued to work with the Monitor Team and DOJ to complete a revised IA Manual and related IA policies that address: (A) Retaliation Prohibited, (B) Internal Complaints of Misconduct, and (C) Public Complaints of Misconduct.  The initial IA Manual and three new policies addressing (1) Retaliation, (2) Reporting Internal Misconduct, and (3) Public Complaints of Misconduct had been filed with the Court by the Monitor for approval on November 4. (See Dkt. 290, Notice Submitting Internal Affairs Manual and Related Policies).

On November 15, 2019 the Court issued an Order that approved in part the submitted IA Manual commenting as follows:

> The Monitor states that the proposed IA Manual and Related Policies will ensure fair, thorough, objective, and timely investigations of officer misconduct. Having reviewed these policies, the Monitor and the Department of Justice ("DOJ") recommend that the court approve them. Pursuant to the Monitor's recommendation, the court hereby approves the IA Manual and Related Policies, except with regard to Paragraph X.A. The approved

portions meet the terms of the Consent Decree and, accordingly, the court orders them effective immediately.

(Dkt. 293, p.1). The Court's Order indicated that it had a question concerning whether a better practice might exist concerning the closing of administrative investigations when CDP employees have resigned, retired, or otherwise separated from CDP with such an investigation still pending. (Id., p.2).

Discussions addressing the Court's concerns with Paragraph X.A. were reopened between the Monitor, DOJ, the City, and CDP. An agreement between the parties involved was reached and on December 6, 2019 the Monitor filed a "Notice Submitting Updated Internal Affairs Manual." (Dkt. 295). The Monitor noted with its filing:

Since the filing of the IA Manual, discussions were reopened with the Division on the topic of completing administrative investigations and the Division redrafted the relevant language in the IA Manual to read:

A. Where a member resigns, retires, or is otherwise separated from CDP while a criminal investigation is pending, the criminal investigation shall be completed, and submitted to the appropriate prosecuting authority.

B. Where a member resigns, retires, or is otherwise separated from CDP while an administrative investigation is pending, the investigation shall be completed.

(Dkt. 295, p. 3). The Monitor noted in seeking approval of the Updated IA manual:

Taken together, the subsections of Paragraph X of the Updated IA Manual requires the Division to complete all investigations, both criminal and administrative, to identify and resolve "issues of policy, police practices, and training," and to retain the completed investigation in the IA investigative file, where it can be used to provide information to the Division or other departments about the merits and conclusions of the investigation. The Updated IA Manual resolves the previous concerns of the Monitoring Team.

(Id. At p. 4). The Court issued a subsequent Order on December 9, 2019 that recognized the revisions to Section X were effective and cancelled a hearing that had been set to discuss the matter. (Dkt. 296).

2.     Discipline

A major factor to be taken into consideration for discipline hearings during the current reporting period is the impact of the COVID-19 pandemic. As a result of the limitations imposed because of the health emergency discipline hearings were not conducted for a three month period.

Over the period of the two prior reporting periods CDP worked with the Monitor and the DOJ to finalize a set of written guidelines for the conduct of officer discipline hearings conducted by the Chief. The Monitor had previously assessed that the guidelines proposed by the City represented "an excellent step forward in ensuring systematic compliance with paragraph 245 of the Consent Decree." (Dkt 246, Monitor's Sixth Semiannual Report, p. 55). During the current reporting period the CDP Deputy Chiefs involved in conducting discipline hearings received instruction from the City's Chief Assistant Director of Law for Public Safety on the use of the hearing guidelines.  A separate set of guidelines has been adapted for use at discipline hearings conducted by the Director of Public Safety.[2]

It is anticipated that discipline hearings going forward shall occur quicker. This should result from the Case Preparation Office responsible for disciplinary matters being expanded to its present staffing level of four. Additionally, the office's work on the one-time surge of discipline cases resulting from the work of Hillard Heintze in addressing a large backlog of older, open OPS investigations has now been completed and the cases

---

[2] The City Charter limits discipline imposed by the Chief of Police to a suspension of ten days or less. Authority for discipline in excess of a ten day suspension resides with the Director of Public Safety.  The current Director of Public Safety Karrie Howard was appointed in June.

resolved with finality. Elimination of the backlog has allowed for the faster administration and completion of hearings for current OPS cases that have been heard and referred by the PRB for recommended officer discipline.

Now completed updates accomplished for CDP's BlueTeam/IAPro software programs during this period have allowed for increased efficiency, accountability and tracking of cases during the disciplinary process.

3.      Police Inspector General

The Consent Decree at Sections 250-256 (Dkt. 7-1, pp.58-59) established the new position of Inspector General ("IG"). As noted in the City's prior report, Mr. Christopher Viland serves as CDP's first Inspector General. The IG also has the authority to conduct investigations, analyze trends, and make reports and recommendations, and receive recommendations for inquiries from the Community Police Commission (CPC) as directed through the Chief of Police, the Mayor, or the Director of Public Safety.

As noted in the Monitor's most recent report IG Viland has approached the newly established position with "requisite relationship building and planning" and has focused on the development of a multi-year plan "essential to successfully performing this critical role." (Dkt. 320, p. 54). In this regard IG has created and drafted a Manual of Duties and Authorities for the Office of the Inspector General that addresses the best practices and procedures for the office as it moves into the future. In laying the ground work for effectively accomplishing his duties and establishing the "requisite relationship building" IG Viland has undertaken a busy schedule of activities since coming on board with the City. He has (a) participated in ride-alongs with patrol officers and supervisors in the various Districts, (b)  met with CDP patrol officers and supervisors at various district roll

calls and met individually with District Commanders and others in the command staff, (c) attended CDP training sessions relevant to Division policies, (d) met with the staff of the Office of Professional Standards ("OPS")  and met with the Civilian Police Review Board ("CPRB") attended scheduled hearings,[3] (e) participated in bi-weekly City compliance team meetings. (f) participated in monthly meetings with the monitoring team and D.O.J., (g) met with CDP's crime analysis unit, Data Collections and Analysis Coordinator, and members of the CWRU data team regarding current software and data management issues addressed in the Consent Decree, (h) regularly attended disciplinary hearing conducted in the offices of both the Chief and Director of Public Safety, (i) met with representatives of the CPPA, Black Shield Police Association, and the Hispanic Police Officers' Association, (j) attended Division command staff meetings.(k) met with City Finance regarding City budget and purchasing procedures, (l) met with the Secretary of the City's Civil Service Commission regarding general hiring practices and planning for onboarding of staff, (m) initiated the requisite working relationship with CDP's Internal Affairs Unit, Bureau of Compliance, Inspections Unit, and Policy and Procedures Unit, and met with CPC Commissioners and Executive Director.

A major focus of the IG during the reporting period anf going forward is to formalize participation of his office in the daily policy and procedure processes of the Division so as to recommend, review and assess compliance in accord with the terms of

---

[3] The Consent Decree mandates that the IG "analyze investigations conducted by OPS to determine whether they are timely, complete, thorough, and whether recommended dispositions are supported by the preponderance of the evidence" and make recommendations to ensure that the overarching philosophies and goals of the Decree are achieved.

the Consent Decree. (See generally Dkt 7-1, p. 58)  Consistent field work and liaison with individual neighborhood district beats and specialized units by the IG have been undertaken in this regard to obtain feedback and to identify and observe policy and compliance related issues.  Going forward the IG will continue ongoing efforts to observe and assess all applicable aspects of CDP's operations to improve transparency and efficiency, with a primary goal of ensuring the delivery of services to the community are performed in an environment that best provides for the safety of both the community and the officers.

4.      Office of Professional Standards ("OPS")

The Office of Professional Standards ("OPS) receives and investigates non-criminal complaints filed by members of the public against sworn and non-sworn Cleveland Division of Police employees. OPS investigates the complaints and make findings and provides recommendations to the Civilian Police Review Board ("PRB").

A major focus going into the current reporting period was the final resolution of an existing backlog of 281 OPS investigations that remained to be completed for the period 2015-November, 2017. In early 2018 the City contracted with Hillard Heintze LLC, a qualified outside investigation firm, to address the backlog.  Hillard Heintze has completed its work and the identified backlog of 281 cases has now been eliminated.

a.      OPS Investigations

The Monitor's Eighth Report in recognizing the completion of Hillard Heintze's efforts to eliminate the backlog noted that the backlog "had been a continuing barrier to bringing the OPS complaint handling process into compliance with the Consent Decree."

(Dkt. 320, p. 47). The Monitor further stated that the progress made by OPS since 2018 has been "laudable" and that the Monitoring Team "continues to see improvements in the quality of OPS investigative practices." (Id.). OPS has eight permanent investigators and one temporary investigator. As was addressed in the City's prior Status Report, this section is intended to provide the Court and the reader with a comparative and up to date overview of OPS investigative efforts in responding to complaints the agency has received. Comparative data for the period December 2017 to August 18, 2020.

| Time Period | | No. of Cases Opened | No. of Cases Completed | No. of Cases Open |
|---|---|---|---|---|
| December | **2017** | **24** | **24** | **0** |
| | | | | |
| Jan — Jun | 2018 | 102 | 102 | 0 |
| Jul — Dec | 2018 | 125 | 123 | 2 |
| | **2018** | **227** | **225** | **2** |
| | | | | |
| Jan — Jun | 2019 | 105 | 99 | 6 |
| Jul — Dec | 2019 | 115 | 72 | 43 |
| | **2019** | **220** | **171** | **49** |
| | | | | |
| Jan — Jun | 2020 | 132 | 50 | 82 |
| Jul — Aug | 2020 | 36 | 6 | 30 |
| (To Date) | **2020** | **168** | **56** | **112** |
| | | | | |
| | **Total** | **639** | **476** | **163** |

Any complaint requiring criminal investigation is transferred to Internal Affairs for further handling. Of the 163 cases identified above as currently open, ten (10) have been transferred to Internal Affairs for investigation.[4]  OPS investigators had 153 active investigations as of August 18, 2020.

---

[4] As noted in Section 193 of the Consent Decree: "The Office of Professional Standards ("OPS") will investigate all civilian complaints it receives, other than those that allege criminal conduct.  All complaints of apparent criminal conduct will be referred to Internal Affairs. " (Dkt. 7-1, p. 47).

As also noted in the Monitor's Eighth Report, the OPS General Manager position is vacant as its former General Manager, Mr. George Coulter, was appointed during the current reporting period to be a Deputy Director of Public Safety.

As with other agencies, OPS and its investigators have been working in an environment affected by the health related limitations on person to person contact created by the  COVID-19 pandemic.

5.  Civilian Police Review Board ("PRB")

The PRB reviews misconduct complaints investigated by OPS at public meetings. Upon making its decisions, the PRB submits its findings and recommendations to the Chief of Police and notifies the complainant of the disposition.  The PRB generally meets once a month, with its meetings being conducted on the second Tuesday of each month. The PRB has had six public meetings through August 11, 2020 during the current reporting period.  Meetings have had to adapt to the existence of the COVID-19 pandemic. Given the open and public nature of the meetings and the restrictions on social gatherings caused by pandemic health concerns, the PRB has been conducting its meetings on line with a live feed to the community made available through youtube.com by the City's communication facilities.  The PRB has heard 53 cases in 2020.

During the current reporting period the PRB amended its operating manual and procedures to change the definition of  what constitutes a PRB "quorum" to be consistent with other City boards. The amendment changed the definition of "quorum" from "two-thirds of members currently appointed to the Board" to "a majority of members currently appointed to the Board."

33

F.     **Equipment and Resources and Staffing**

      1.      Equipment and Resources

A major focus during the current reporting period has been the work of the he CDP's data team and the City's IT Services with Tyler Technologies to finalize software upgrade for electronic forms used by officers. The nature of the data system upgrades are discussed in the following Section G addressing Data Collection and Analysis.

      2.      Staffing

The CDP's staffing plan is based on a "workload-based model." The Plan was drafted to take into account CDP's commitment to CPOP and community engagement, and was filed with the Court for approval by the Monitor on February 21, 2019. (Dkt. 240). CDP has continued its internal efforts during the current reporting period to assess implementation of the plan in light of the conditions created by the COVID-19 pandemic.

G.     **Data Collection and Analysis/ Compliance and Outcome Assessments and Reporting**

During the current reporting period, the Cleveland Division of Police has made numerous advancements and progress in the area of data collection and analysis. The Monitor's most recent report identified:

> The Coordinator this year, for the first time, took the lead on data collection for the totality of Paragraph 367, Outcome Measures. In past years, the Monitoring Team led the data collection and compilation effort and in 2019, with the Coordinator reviewed and quality checked the data. This year, the practice was reversed and signals a major shift in the Division's capacity around data collection and analysis.

(Dkt. 320).

The CDP's Data Team, along with members of the City's Bureau of Compliance

and Information Technology Services, worked closely to finalize data entry and collection by way of electronic forms across four areas:

      (1) Crisis Intervention Team (CIT),

      (3) Community Engagement,

      (2) Community Problem-Oriented Policing (CPOP), and

      (4) Search & Seizure.

Direct electronic entry in these areas allows for more accurate qualitative and quantitative review of outcome date, trends, and patterns.

Patrol Officers were trained during this period on using the new updated electronic data collection system for CIT and Community Engagement, with training having been completed at the end of January 2020. Beginning in February 2020, CDP phased out the use of paper CIT statistic ("stat") sheets and officers in the field began entering required CIT data directly into the newly implemented electronic form system. With the shift from the entering of data by way of paper CIT stat sheets to the direct entry on electronic forms, CDP has taken a more active role in the CIT data collection process. On a monthly basis, CIT data is presented to the Quality Improvement (QI) Committee members at the Mental Health Response Advisory Committee (MHRAC). These meetings facilitate discussions that address gaining a better understanding of crisis intervention. The CDP staff looks to continuing to provide CIT data to members of the QI committee going forward.  As noted in the CPOP discussion above, CDP has also made progress in the area of Community Engagement. Officers have now begun utilizing the newly implemented electronic community engagement data collection forms.

35

With the near completion of Brazos[5] forms, the Cleveland Division of Information Technology Services has constructed a "Data Warehouse," or a centralized location housing all relevant policing data and information. While the division operates various data collection systems such as IAPro, Blueteam, CAD, FBR, LERMS, and Brazos, the data warehouse will function as a replicated storage server providing easy access to approved personnel within the division. All data points concerning arrests, calls for service, CIT, Community Engagement, Search and Seizure, and uses of force ("UOF") will be accessible through the Data Warehouse.

CDP continues to hold monthly CompStat meetings[6]. These meetings cover a range of topics that include, but are not limited to, use of force, officer injury data, officer early intervention data, and internal affairs. A major focus of CompStat meetings includes the close examination of monthly trends, timeliness, and data utilization. Use of force totals were consistent from 2018 to 2019. In 2018, there were 335 use of force incidents and 343 in 2019, a 2% increase. As far as data collected in the first 6 months of 2020, use of force monthly totals have been consistently on the decline. In the first 6 months of 2020, use of force incidents were down 17% compared to the first 6 months of 2018. Comparing the first 6 months of 2018 and 2020, the number of calls for service increased by 10%, while the number of arrests decreased by nearly half (47%). For that

---

[5] Brazos is a new system used by CDP that allows officers to enter, manage and report on a number of areas including community engagement, CIT, CPOP and search and seizure.

[6] Compstat is based on the original CompStat model developed in the early 1990's by the NYPD that includes regularly sharing data findings with command staff and other key stakeholders in order to identify potential trends, problems, and need for additional drilldown analyses.

same 6-month time period, level-1 pointing of firearm incidents declined by 52.6%, from 95 in 2018 to 45 in 2020.

CDP utilizes the data collected by officers in numerous ways. CDP command staff members are regularly provided with a report containing a list of all open reports division wide. This is extremely useful as a management tool. In terms of timeliness, the average days of completion improved from 2018 to 2019 across all force levels. In 2018, on average, use of force entries were completed in 99 days compared to a reduced average of 81 days in 2019.

The Data Team continues to assist various units in the collection and analysis of survey data related to various paragraphs in the Consent Decree. During the past six (6) months, the Data Team has worked closely with the Public Safety Recruitment Team on numerous projects including examining Exit Retention Survey results. The data collected will allow the Recruitment Team to improve the various processes for attracting and retaining officers within the division. This data will be analyzed on a reoccurring basis.

The Data Team has also worked with CDP's Training Section. In an effort to improve various training courses, the Data Team analyzed over 1,000 surveys completed by officers after finishing a training program. The courses included; Bias-Free, Community Engagement Problem-Solving, Crisis Intervention Team (CIT), Search and Seizure, Use of Force, and Pistol, Shotgun and Rifle Training. This data allows training officers to better capitalize on professionalism, promote critical engagement, and provide realistic scenarios for future programs.

Now that CDP will have regular access to a number of datasets, it was necessary to implement formal protocols for accessing, cleaning, validating, analyzing, and

reporting all data necessary to meet Consent Decree requirements. First, once a dataset is accessed from the Data Warehouse, it will be subjected to initial quality control measures including cleaning, recoding, and validating. Second, simple frequencies will be performed using variables listed in each dataset's codebook. Third, frequencies will be reviewed and any data errors will be identified and reconciled. Fourth, any data error patterns and trends will be identified and shared with the appropriate CDP contact to ensure data errors will be minimized going forward. Fifth, datasets using unique variables (e.g., incident number) will be merged. Not all data will have to be linked or merged depending on the outcome in question and the consent decree category. Sixth, the types of statistical analyses we need to perform for each of the Consent Decree areas and how often these analyses need to be completed will be identified. The focus and frequency of analyses will vary depending on the need of key CDP stakeholders as well as Consent Decree requirements.

As described in the first part of this section, the Data Team has already started to work closely with several CDP stakeholders to identify their needs. These collaborations include sharing initial data analyses findings with CDP stakeholders in order to receive feedback on data trends and possible data errors. Finally, the Data Team will work with CDP stakeholders to identify the format, content and frequency of regular data reports, briefs, and other products.

**H.      Bias Free Policing**

The Consent Decree establishes that CDP "deliver police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in CDP." (Dkt. 7-1, 35). As

previously recognized by the Monitor the CDP has adopted a bias-free policy that "provides sufficiently clear guidelines around, among other things: (1) the Division's expectations for its members around bias-free policing; (2) the principles of procedural justice in police-civilian interactions; and (3) protocols to report bias-based policing." (Dkt. 186, p. 1). The policy went into effect after Court approval in 2018. (Dkt. 194). As noted in the Monitor's most recent report activity in the current reporting period has focused on the annual in-service training to ensure it is "adequate in quality, quantity, type, and scope." (Dkt. 7-1, Section 42).  The Monitor's most recent report found the 2019 bias-free training to be "adequate." (Dkt. 320, p.15).  CDP has worked with the Monitor Team to address in the current reporting period in ensure the 2020 upcoming bias-free in-service training is effective and continues to meet the requirements of the Consent Decree.

The improved and expanded electronic reporting formats developed in the current reporting period addressed in the prior section represent a significant advancement in allowing for the collection of necessary data that will allow for the bias-free outcome measurement assessment addressed in the Consent Decree at Section 367 d.(1-4) "Bias Free Policing and Community Engagement Measurements." (See Dkt 7-1, p. 86).

**IV.**   **Response to Concerns Raised in the Monitor's Semi-Annual Report**

The City's response to the Monitor's concerns addressing the relationship of the City and CDP with the CPC is contained in the Community Engagement part of this Report. The City continues to meet and work with the CPC and remains committed to the principles of community policing and community engagement.

The Monitor has expressed a concern that CDP continues to lack the technology and data necessary to allow officers to report the basic information required to provide the data that is needed to analyze and assess the Department's performance.  The City

believes that much of this concern has been addressed and that the acquisition of necessary data will be collected and made available.  Insuring CDP's ability to capture relevant information by way of electronic input into an accessible data base through forms developed for used by officers has required much effort and technical work with the City's software provider. As noted above the City believes that much of the necessary work has now been completed and that the technology and data necessary for the Monitor's compliance assessment will be available.  The City will continue to work with the Monitor to ensure this capability.

## V.    Conclusion

The City believes that most of the "critical issue" policies, plans, and initial training necessary for complete implementation of the many agreed upon reform goals have now been completed and approved by the Court. The City and CDP continue to work to establish that the compliance measures outlined in the Consent Decree are being carried out and achieved.

Respectfully submitted,

Barbara A. Langhenry (0038838)
Director of Law

By:    /s/ Gary S. Singletary
Gary S. Singletary (0037329)
Chief Counsel
City of Cleveland
601 Lakeside Avenue, Room 106
Cleveland, Ohio  44114-1077
Tel: (216) 664-2737  Fax:(216) 664-2663
E-mail: gsingletary@city.cleveland.oh.us

Counsel for the City of Cleveland

## CERTIFICATE OF SERVICE

The undersigned certifies that the City of Cleveland's Ninth Status Report was filed electronically on September 3,  2020.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system. The Monitor and Department of Justice have been electronically delivered a copy of this filing.

/s/ Gary S. Singletary
Gary S. Singletary (0037329)
Counsel for the City of Cleveland
