IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | **NOTICE SUBMITTING MONITORING** |
| CITY OF CLEVELAND | ) | **TEAM'S NINTH SEMIANNUAL** |
| | ) | **REPORT** |
| Defendant. | ) | |
| | ) | |
| | ) | |

Pursuant to paragraph 375 of the Consent Decree, the Monitoring Team respectfully submits its Ninth Semiannual Report.

Respectfully submitted,

/s/  Hassan Aden

HASSAN ADEN
Monitor
The Aden Group LLC
8022 Fairfax Road
Alexandria, VA 22308
Tel: (571) 274-7821
Email:  aden@theadengroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2021, I served the foregoing document entitled

**NOTICE SUBMITTING MONITORING TEAM'S NINTH SEMIANNUAL REPORT** via

the court's ECF system to all counsel of record.


/s/  Ayesha Hardaway
AYESHA HARDAWAY



Cleveland
Police
Monitoring
Team

# Ninth Semiannual Report

February 2021

# TABLE OF CONTENTS

I.  EXECUTIVE SUMMARY ................................................................................................... 1
1.  INTRODUCTION ...................................................................................................... 1
2.  RECOMMENDATIONS ............................................................................................. 2

II. DEMONSTRATION REVIEW ...................................................................................... 6
1.  METHODOLOGY ..................................................................................................... 6
2.  TIMELINE OF MAY 30, 2020, DEMONSTRATIONS ................................................. 7
3.  CHANGES IN MODERN PROTESTING ...................................................................... 7
4.  CONSENT DECREE PROVISIONS IMPLICATED ......................................................... 9
5.  COMMUNITY EXPERIENCE ................................................................................... 11
    a.  Public Feedback Provided to the Monitoring Team ................................... 12
    i.  Police Preparation and Response ............................................................... 13
        ii.  Police Communication ......................................................................... 15
        iii. Protestor Behaviors ............................................................................. 16
        iv. Police Use of Equipment and Weapons ................................................ 16
    b.  Summary of Community Experience Feedback ........................................... 17
    c.  Community Police Commission ................................................................. 17
    d.  Recommendations from Community Experience ......................................... 18
6.  USE OF FORCE ...................................................................................................... 19
    a.  Use of force timeline .................................................................................. 19
    b.  CDP Polices on Use of Force in a Crowd Management Context ................. 31
    c.  Reported Uses of Force .............................................................................. 33
    d.  Use of Force Reporting Requirements ....................................................... 36
    e.  Force Reporting on May 30, 2020 ............................................................. 38
    f.  Policies Regarding Review of Force .......................................................... 39
    g.  Force Review ............................................................................................. 41
    h.  Recommendations regarding Use of Force Policy and Procedures ............ 43
7.  USE OF BODY WORN CAMERAS ........................................................................... 43
    a.  Body Worn Camera Policy ......................................................................... 43
    b.  Body Worn Camera Use on May 30, 2020 ................................................. 44
    c.  Recommendation ........................................................................................ 45
8.  ACCOUNTABILITY ................................................................................................ 45
9.  DISPERSAL ORDERS ............................................................................................. 46
    a.  Law and Policies Governing Dispersal Orders ......................................... 46
    b.  Timeline of Justice Center dispersal order ............................................... 47
    c.  Method of delivery ..................................................................................... 48
    d.  Directions given. ........................................................................................ 49
    e.  Time to comply. .......................................................................................... 49
10. MUTUAL AID PARTNERSHIPS ............................................................................... 50

11.    OVERVIEW OF INCIDENT COMMAND SYSTEM (ICS) ....................................... 51
        a.    *A Brief History of Incident Management* ...................................... 51
        b.    *Command and Control Learning Model* ...................................... 52
        c.    *ICS Resources in Cleveland* ...................................... 53
        D.    *Planning by the City of Cleveland* ...................................... 54
        e.    *Assessment of ICS Planning and Response* ...................................... 56
        f.    *Recommendations* ...................................... 56

III.    **UPDATE ON THE CITY OF CLEVELAND'S PROGRESS TOWARDS
COMPLIANCE WITH THE CONSENT DECREE** .................................... **63**

IV.    **COMMUNITY ENGAGEMENT AND BUILDING TRUST** ..................... **66**
        a.    *Community Police Commission ("CPC")* ...................................... 66
        i.    Background ...................................... 67
        b.    *District Policing Committees* ...................................... 68

V.    **COMMUNITY & PROBLEM-ORIENTED POLICING** ............................. **69**

VI.    **BIAS-FREE POLICING** ............................................ **70**
        a.    *Where the Division Stands* ...................................... 70

VII.    **USE OF FORCE** ............................................ **71**
        1.    OFFICER USE OF FORCE PRINCIPLES & POLICY ...................................... 71
        2.    USE OF FORCE INVESTIGATION AND REVIEW ...................................... 73
        a.    *Background* ...................................... 74
        b.    *Supervisory Review Policy* ...................................... 75
        c.    *Force Investigation Team Manual* ...................................... 75
        d.    *Progress and Tasks that Remain* ...................................... 75
        i.    Officer Training and Policy Implementation ...................................... 75
        ii.    Operation of FRB ...................................... 76
        iii.    Compliance & Adherence to New Policies ...................................... 76

VIII.    **CRISIS INTERVENTION** ...................................... **76**
        a.    *Background* ...................................... 78
        b.    *Where the Division Stands* ...................................... 78
        i.    MHRAC Subcommittees: Training, Community Engagement, Diversion, Quality
        Improvement ...................................... 79
        c.    *Progress and Tasks that Remain* ...................................... 81
        i.    Academy Training ...................................... 81
        ii.    Continued Selection and Training of Specialized CIT Officers ...................................... 82

IX.    **SEARCH AND SEIZURE** ...................................... **82**
        a.    *Background* ...................................... 83

X.    **ACCOUNTABILITY** ...................................... **84**

1.  INTERNALLY DISCOVERED MISCONDUCT ..................................................... 84
   a.  *Background* ............................................................................................. 85
   b.  *Where Internal Affairs Stands Now* ................................................... 86
   c.  *Staffing* ................................................................................................... 86
   d.  *Implementation & Assessment* ............................................................ 87
2.  OFFICE OF PROFESSIONAL STANDARDS ("OPS") ....................................... 87
   a.  *Background* ............................................................................................. 90
   b.  *Where OPS Stands Now* ....................................................................... 91
   c.  *Staffing* ................................................................................................... 91
   d.  *Progress and Tasks that Remain* ........................................................ 92
       i.   OPS Staff Performance Reviews ................................................... 92
       ii.  Community Awareness ..................................................................... 92
       iii. Timeliness of OPS Case Adjudications ....................................... 93
3.  POLICE REVIEW BOARD ("PRB") ............................................................... 93
   a.  *Background* ............................................................................................. 94
   b.  *Where the PRB Stands* ......................................................................... 94
4.  DISCIPLINE AND DISCIPLINARY HEARINGS ............................................... 95
   a.  *Background* ............................................................................................. 95
   b.  *Where the Division Stands* .................................................................. 96

**XI.   TRANSPARENCY & OVERSIGHT** ................................................. **97**
1.  POLICE INSPECTOR GENERAL ...................................................................... 97
   a.  *Background* ............................................................................................. 97
   b.  *Where the Division Stands* .................................................................. 98
   c.  *Progress and Tasks that Remain* ........................................................ 98
2.  DATA COLLECTION AND ANALYSIS ............................................................. 98
   a.  *Background* ........................................................................................... 100
   b.  *Where the Division Stands* ................................................................ 100
   c.  *Progress and Tasks That Remain* ..................................................... 101
3.  PUBLIC AVAILABILITY OF CDP-RELATED INFORMATION ......................... 101
   a.  *Background* ........................................................................................... 101
   b.  *Where the Division Stands* ................................................................ 102
   c.  *Progress and Tasks That Remain* ..................................................... 102

**XII.  OFFICER ASSISTANCE & SUPPORT** ........................................... **103**
1.  TRAINING .................................................................................................... 103
   a.  *Background* ........................................................................................... 105
   b.  *Where the Division Stands* ................................................................ 105
   c.  *Progress and Tasks that Remain* ...................................................... 105
2.  EQUIPMENT & RESOURCES ......................................................................... 106
   a.  *Background* ........................................................................................... 107
   b.  *Where the Division Stands* ................................................................ 107
   c.  *Progress and Tasks that Remain* ...................................................... 107

3. RECRUITMENT & HIRING ........................................................................... 108
   a. *Background* ................................................................................... 109
   b. *Where the Division Stands Now* .................................................... 109
   c. *Progress and Tasks that Remain* .................................................. 109
4. PERFORMANCE EVALUATIONS AND PROMOTIONS ............................ 110
   a. *Background* ................................................................................... 110
   b. *Where the Division Stands* ........................................................... 111
   c. *Progress and Tasks that Remain* .................................................. 111
5. STAFFING ................................................................................................ 111
   a. *Background* ................................................................................... 111
   b. *Where the Division Stands Now* .................................................... 112
   c. *Progress and Tasks that Remain* .................................................. 113

**XIII. SUPERVISION** ............................................................................... **113**

1. FIRST-LINE SUPERVISORS ..................................................................... 113
   a. *Background* ................................................................................... 113
   b. *Where the Division Stands* ........................................................... 114
   c. *Progress and Tasks that Remain* .................................................. 114
      i.   Continuing Professional Development ....................................... 114
      ii.  Data ............................................................................................ 114
      iii. Compliance and Outcome Measures .......................................... 114
2. OFFICER INTERVENTION PROGRAM ...................................................... 114
   a. *Background* ................................................................................... 115
   b. *Where the Division Stands* ........................................................... 115
   c. *Progress and Tasks that Remain* .................................................. 116
      i.   Creation of EIS Plan ................................................................. 116
      ii.  Training & Involvement of Supervisors ..................................... 116
      iii. Training & Communication with Officers ................................. 116
      iv.  Compliance with EIS Plan & Policies ........................................ 116
3. BODY-WORN CAMERAS ......................................................................... 116
   a. *Background* ................................................................................... 117
   b. *Where the Division Stands* ........................................................... 117
   c. *Progress and Tasks that Remain* .................................................. 117
      i.   Compliance with Policy ............................................................. 117
      ii.  General Policy for the Release of CDP Information .................. 118

# I.    EXECUTIVE SUMMARY

## 1.  Introduction

Policing is at an unprecedented crossroads. In late May 2020, catalyzed by the killing of George Floyd in Minneapolis by a white police officer, demonstrations occurred across the nation addressing issues of police brutality and systemic racism. These demonstrations have continued in the months since. Cleveland experienced its own wave of passionate demonstrations in late May and early June of this year.

Unlike prior semiannual reports, this Ninth Semiannual Report is divided into two distinct sections. The first section examines the response of the City of Cleveland – and principally the Cleveland Division of Police, through the lens of the Consent Decree with the United States Department of Justice – to the demonstrations that occurred between May 30, 2020 and June 12, 2020. This report is not a comprehensive assessment of all activities and issues relating to the demonstration response. Instead, it is a focused look at CDP's overall response to the demonstration and crowd management needs that emerged in late May.

Most importantly, this report is not an assessment of any specific use of force incident during the demonstrations.  It should not be used to conclude whether or not any particular use of force was within policy or the law. Rather, this report focuses on patterns and trends on a systemic level related to the Division's preparation, planning, deployment and follow-up or after action activities related to the protests within the timeline of this review.

Even as this report focuses on the Division's overall critical incident response rather than individual applications of force, a review of individual uses of force *will* occur to the degree possible, as part of the overall review of officer force in which the Monitoring Team is currently engaged and the Monitoring Team's review of the Internal Affairs investigations. The Monitoring Team has not engaged in a granular analysis of individual uses of force for this report as the Internal Affairs processes, including pending referrals to the Cuyahoga County Prosecutor's Office, are still underway. Additionally, CDP's After-Action report, which was a necessary document for this review, was only recently released. However, as this report discusses the lack of consistent reporting of individual uses of force, it is already a distinct possibility that the lack of comprehensive body worn video, and the lack of timely review of use of force may frustrate such review. Ultimately, the reforms of the Consent Decree around use of force are designed to ensure that the public and the City of Cleveland have the evidence, systematically collected and reviewed, to validate each use of force. If and when such policies are not followed, doubts will always remain. The Monitoring Team will have more to say on these issues in the coming months. To be clear: the Monitoring Team reviewed all available use of force reports, but did so through a lens of understanding the scope of what transpired and how the Division managed the crowd/protest

situation from an operational standpoint rather than through the lens of analyzing individual officer behavior for compliance with CDP policy.

The Division was undeniably faced with difficult circumstances on May 30, 2020. Simultaneously protecting First Amendment expression, persons (including officers), and property is often challenging in the context of impassioned or tense crowd situations – and how to most appropriately balance these varying interests is, in its own right, a subject of some disagreement among community members.  At the same time, best practices in demonstration management are evolving. Currently, they exist somewhere between art and science. As the country experienced earlier this year, when the police are both the object of demonstrations and charged with managing those demonstrations, there are inherent challenges and conflicts built into those engagements.

Consequently, CDP's actions must necessarily be judged by then-existing policy and law – especially Constitutional requirements – with future actions guided by concrete lessons learned. Where approaches to policing are properly guided by community expectations that can only be learned through direct and routine engagement with the public, failure to properly plan or draw on community resources is correctly subject to scrutiny.

Additionally, there was significant property destruction and violence on May 30, 2020, and into the morning of May 31, 2020. Similarly, there was significant use of police force by CDP and other departments, including the Cuyahoga County Sheriff's Department. In contrast – and some community voices credit CDP's preparation and different approach to subsequent demonstrations – there were no reported uses of force during demonstrations after May 31, 2020 through June 12, 2020. As such, this report focusses primarily on the May 30th events as they are of primary community concern.

The second section of this report is the more familiar update on the progress of the City of Cleveland toward achieving compliance with the Consent Decree. As much energy was devoted to examination of the demonstrations and as this is a mid-year review, this section is somewhat truncated from past reports. That being said, the Monitoring Team has realigned the reporting period to comport with the calendar year, so this update includes the time period from March 2020 through the end of the year. This means that the Tenth Semiannual report will simply include the first six months of 2021, which should improve simplicity and clarity.

## 2. Recommendations

Based on the Monitoring Team's comprehensive review, many recommendations for changes to policy and procedure are set forth below. However, a few issues warrant highlighting.

As part of the Consent Decree, the policies regarding the use, reporting, and review of force were comprehensively reconceived.  These new policies were court-approved and form the basis for

core change to the operations of CDP. However, these policies can only change behavior if they are followed and enforced.

On May 30, 2020, there was significant use of force by members of CDP. In its review, the Monitoring Team identified that the reporting of force was inadequate and often untimely, and the review of force appeared to occur outside of policy.

Similarly, despite updated policies governing the use of body-worn cameras, a large number of deployed officers did not have body-worn video evidence to support their actions.

The combination of these issues – inadequate and untimely use of force reporting and review and the lack of body-worn camera evidence – frustrates the comprehensive review of force during these events, which is a disservice to the public, the City, the Division, and the officers.

Additionally, based on its review, the Monitoring Teams recommends:

    a. **The CDP needs to improve transparency, communication, and community engagement efforts prior to major planned demonstrations.** Such improvements should include:
        i. Sharing plans and expectations for crowd and police behavior, prior to anticipated demonstrations and protests;
        ii. Regularly updating social media channels and blogs, and sharing information via other means of communication with the public;
        iii. Contacting community resources prior to similar such events, in particular the Community Policing Commission but also other community partners at non-profits, neighborhood groups, tenant associations, foundations, faith-based organizations, to discuss plans and expectations and to seek collaborative planning and response to demonstrations.
        iv. Conducting after-action meetings with these community resources, in particular the CPC, to draw from experience and wisdom to discuss lessons learned and plan for improved future response.

    b. **The Use of Force Policy and the Crowd Management Policy need to be harmonized, with clear directions for the use of all less lethal tools available to CDP.**

    c. **The Use of Force reporting policy should be reexamined, to ensure that the reporting for use of force during demonstrations is timely and consistent.**

    d. **The Use of Force review process should be reconsidered for demonstrations to ensure that all use of force is reported timely and reviewed appropriately.** This

reconsideration should incorporate lessons-learned from this event, align with how CDP intends to review force in the demonstration context, and should distinguish between discretionary force used by individual officers and strategic force ordered as part of an overall field force effort.

**e. Subject to Recommendation (d) above, CDP must ensure that the active use of force policy is complied with by each officer that uses force, each officer that observes force, and the supervisors reviewing each use of force.** This requires consistent enforcement to ensure:

   i. All officers who use any level of force, per CDP policy, report the force fully, timely and follow the instructions for how to submit the force report,

   ii. All officers who observe any level of force, per CDP policy, report the force fully, timely and follow the policy for submitting the force report,

   iii. All supervisors who review force do so in compliance with the requirements outlined in CDP policy, to include ensuring that force is reasonable, necessary and proportional, that reports are complete and do not use boilerplate language, and supervisors must conduct this review according to CDP policy-mandated timelines.

   iv. Commanders must consistently enforce use of force policy violations, to include use of force reporting and review violations, in line with CDP's disciplinary system to hold officers and supervisors accountable for policy violations.

**f. CDP must anticipate the need for BWC usage during future demonstrations and protest events, and resolve the current problem that BWCs cannot be mounted on officers' "turtle gear."**

**g. CDP should plan for future needs to issue dispersal orders by ensuring that appropriate sound equipment is available to clearly and audibly give dispersal orders.** Additionally, CDP should consider whether making a prerecorded warning that can be played every few minutes might best serve the Division in future crowd control situations. Furthermore, the Division should consider including the actual Dispersal order within policy for easy reference in training and operations.

**h. CDP should consider redrafting its Mutual Aid MOUs to clarify expectations around command structures and use of force in particular to ensure consistency.**

4

**i.  CDP should make several improvements related to its deployment of the Incident Command System.** These include:

    i.    Adopt a protocol that requires an agency-wide, blame-free examination for all aspects of major events.

    ii.    Provide at least annual training for all members that covers crowd management and control techniques.

    iii.    Conduct cross training with the City Office of Emergency Management (OEM) modify policy as needed to ensure consistency between all ICS forms used and to ensure consistency and unity of ICS organizational command.

    iv.    Review and revise their policy on MFF tactics, GPO 3.3.02 to reflect the changes that are in place in MFF assignments such as Tier 1 and Tier 2, as well as designating the rank of the Field Force Commander.

    v.    Revise policies related to ICS to ensure that positions of leadership are filled based on the incident level and individuals are fully accountable for fulfilling role-specific ICS objectives.

    vi.    Consider realigning their ICS procedural guidelines to transition responsibilities of critical incident management and planning to the Bureau of Homeland Special Operations for any incident that has the potential of encompassing multiple operational periods or cross jurisdictions such as level 2 or 1 incident.

    vii.    Use terminology, verbiage and nomenclature consistent with FEMA NIMS/ICS to include *Incident Action Plan* ('IAP') for larger scale operational incidents.

    viii.    Focus on initial response protocols including clearly identifying an operational chain of command for each incident, and timely identifying an Incident Command Post (ICP).

    ix.    Ensure consistency when developing Operational entities such as Groups or Branches along functional or geographic lines based on operational objectives, rather than just listing them to ensure they are accounted for; and designate a leader for each such entity, consistent with effective span of control objectives.

CDP has informed the Monitoring Team that they have already taken steps to incorporate many of the changes recommended by the Monitoring Team in this report and some were self-identified in CDP's After Action Report. The Monitoring Team will be assessing the implementations of these changes in upcoming reports.

## II.    DEMONSTRATION REVIEW

On May 30, 2020, Cleveland experienced demonstrations different in size and kind from any that the City has experienced in recent years, as thousands took to the streets to express their outrage over the killing of George Floyd. That night saw significant violence – both to property and persons – and high levels of use of force by the Cleveland Police Department and other law enforcement agencies who were providing Cleveland with assistance.

However, unlike many cities across the country, the levels of violence and force were not sustained across days. While demonstrations continued (and continue), there were no further incidents of property damage and no reported uses of force after the initial day and night of protests. As such, while this report examines activities from May 30, 2020 through June 12, 2020, the majority of the report is focused on May 30 itself.

This review includes a review of the CDP "May 30, 2020 Civil Unrest After-Action Review,"[1] as the Division's self-assessment is critical to understanding not only the values of the Division but its ability to self-identify areas of improvement. Full and effective compliance with the Consent Decree will not prevent critical incidents, or even bad outcomes, but ideally will provide the Division with increased tools to become a learning organization and engage in critical self-analysis. As such, the Division's After-Action Report ("AAR") serves as an effective lens through which to analyze the Division's response to May 30, 2020.

### 1.  Methodology

In order to conduct this review, the Monitoring Team requested documents and information from CDP and the City about its preparedness, response, and after-action activities related to the demonstrations between May 30, 2020 and June 12, 2020.[2] The Monitoring Team also examined the information in IA Pro and Evidence.com[3], to which the Monitoring Team has on-going access. Additionally, the Monitoring Team conducted follow-up interviews with members of CDP, the Community Police Commission, and members of the Cuyahoga and Cleveland Offices of Emergency Management. To capture community sentiment, the Monitoring Team used an on-line tool to gather perceptions and had additional conversations with community members about their experiences at the demonstrations. Finally, the Monitoring Team conducted a review of available media information, including articles and video.

---

[1] *May 30, 2020 Civil Unrest After-Action Review* ("AAR")*,* available at
https://drive.google.com/drive/folders/1zEYreZATuqr1aW3HH5HgUoefAhzJX5rG.
[2] Dkt. No. 315, Exhibit A., Memorandum to City of Cleveland re: Review of Cleveland Protests, June 17, 2020.
[3] IA Pro is the primary database for use of force reporting and review; evidence.com is the on-line body-worn camera storage system for the Axon body-worn cameras.

Once the information had been gathered, Monitoring Team members critically reviewed the available information. Their impressions and conclusions form the basis for this report.

## 2. Timeline of May 30, 2020, Demonstrations

A detailed timeline of the events surrounding the George Floyd demonstrations in Cleveland is set forth in Attachment A to this report. Pertinent details surrounding use of force incidents and incident command are set forth in those sections below. However, for general context, the timeline for demonstrations of May 30, 2020 to June 12, 2020, can be classified into five distinct phases:

1) The pre-planning stage, which includes the preparation and outreach by the Division prior to the start of the demonstrations.
2) The demonstration at the Free Stamp on May 30, 2020, which was reported by all (CDP, community, and media) to be a peaceful free speech event.
3) The demonstration at the Justice Center, which occurred after the Free Stamp event marched to the Justice Center. This was the setting in which the protest escalated in violence and less-lethal tools and munitions were deployed by CDP and mutual aid partners.
4) As the demonstrations moved into downtown, increased violence and looting occurred, and multiple arrests and uses of force similarly occurred. It was during this stage that the Mayor declared a state of emergency and imposed a curfew.
5) Finally, demonstrations that occurred May 31, 2020-June 12, 2020, were similarly reported by all (CDP, community, and media) to be peaceful free speech events, with no arrests or uses of force.

## 3. Changes in Modern Protesting

At the outset, it is useful to examine changes in modern protesting. Historically, protests have been divided between non-violent and contentious – either of which might be planned or spontaneous. However, over recent years, traditional media coverage, video recordings and social media have changed the face of protests and the protester. Whereas protests were once often organized based on word of mouth, they are often now without formal leadership and centered around social issues alone versus a particular agenda of demands. These modern protests create serious planning difficulties as even departments that reach out for community input may not be able to successfully coordinate absent clear leadership. They can be organized rapidly through social media and attract large crowds. A protest or demonstration in one part of the country can inspire crowds and instigate mobilizations elsewhere[4].

---

[4] The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned: Police Executive Research Forum, 2018 at 55,
https://www.policeforum.org/assets/PoliceResponseMassDemonstrations.pdf.

The protests that began in May 2020 are in many cases non-violent and follow the American tradition of non-violent social discourse and protected collective free speech; some participants even bring their children to protests as a lesson in social justice. However, as certainly occurred at the Justice Center on May 30 in Cleveland, at least some number of demonstrators appear to show up prepared for violence, carrying projectiles or fireworks, and did inflict injury and cause property damage. These actors can infiltrate the more traditional protest, causing confusion in the crowd and making the crowd appear more contentious than it is, thus creating extra challenges for law enforcement[5]. These actions typically cause the police to deem the protest as unlawful and assume a controlling enforcement posture which includes giving dispersal orders and using force to move the crowd. This presents two seemingly competing perceptions of the demonstration – the peaceful protesters see unlawful police action and the police believe they are under siege. Both perceptions may be accurate. But based on police reports, news accounts, and responses to the Monitoring Team's request for input, it is clear that the May 30 demonstration was comprised of both peaceful protesters and those intent on violence.

The challenge for law enforcement is to understand and anticipate the dynamics of such protests and to develop a best practices approach to crowd and protest management. Promising practices include making every effort to address the violent element of the crowd while preserving the First Amendment rights of the peaceful protesters, regardless of how raucous or loud they are or how chaotic the scene. Efforts must be made before deeming the protest to be unlawful in whole and enacting more effective control tactics such as crowd movement and targeted arrests. Moreover, a well-equipped police response, which is effectively led and well-organized should be ably skilled at identifying and targeting violent protestors and agitators, which can mitigate the need for, or amount of force used. It is critically important, though not easy, for law enforcement agencies to recognize that when they are the focus of demonstrations, an otherwise peaceful crowd is likely to engage with the police in response to real-time law enforcement actions, thus escalating the overall tenor of the event.

Modern police approaches to demonstrations require clear response planning, training, mutual aid coordination, clear incident command, and engagement with demonstration leadership, if possible. But moreover, as stated by Cleveland Deputy Police Chief Drummond in advance of the Republican National Convention in 2016, community engagement is necessary:

> We have various experts with whom we consult about the training of our officers. We are working with the Federal Emergency Management Agency (FEMA), the U.S. Department of Homeland Security, the Ohio State Patrol, and so forth in advance of the Republican National Convention. It's not just training in mobile

---

[5] https://www.wsj.com/articles/lone-wolves-self-styled-anarchists-the-disparate-actors-accused-of-protest-violence-11591608601

field forces; it's also about working with the community. I think that is extremely vital.

We're going to have police coming in from all over, various states and cities, but I think the key for us and part of the reason why we have been relatively successful in keeping things calm in the city of Cleveland is our community relationships.[6]

Community engagement and norming is something that should occur pre-incident as it is difficult to engage during a crisis. Additionally, as police legitimacy is derived from community expectations, understanding those expectations needs to be part of any planned response. Protests, many of which started peacefully, included unrest, clashes with police, and violence, began in the region on May 28 in Columbus followed on May 29 in Chicago, Detroit, Indianapolis, Milwaukee.[7]

With awareness of what was occurring across the country coupled with awareness of a planned protest at Free Stamp, there was a missed opportunity for greater and ongoing outreach to known community leaders, demonstration organizers, and the general public to set expectations around the exercise and protection of First Amendment Rights and to explain plans and anticipated responses by the Division. While it is entirely speculative whether such outreach would have provided intelligence about the level of violence that was to occur, at the very least having made comprehensive efforts would have removed doubts about whether CDP and the public could have been better informed.

### 4. Consent Decree Provisions Implicated

Overall, it is the role of the Monitoring Team to evaluate the Cleveland Division of Police's compliance with the Consent Decree and to provide ongoing technical assistance to Cleveland to achieve compliance efficiently. Several basic elements of the Consent Decree are implicated by the Division's response to the George Floyd protests.

The core finding of the Department of Justice, as incorporated into the Consent Decree, was that there was "reasonable cause to believe that, although most force used by CDP officers was

---

[6] The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned: Police Executive Research Forum, at 66.)

[7] Columbus protests in news May 29, 2020; https://www.voanews.com/usa/columbus-protest-over-george-floyds-death-turns-violent; Chicago protests, https://chicago.suntimes.com/2020/5/29/21275228/george-floyd-killing-chicago-protest-march ; Detroit protests: https://www.detroitnews.com/story/news/local/detroit-city/2020/05/29/detroit-marchers-gather-downtown-protest-police-brutality-after-george-floyd-death/5284855002/; Protests in Indianapolis, https://www.wfyi.org/news/articles/large-crowd-gathers-to-protest-police-shootings; Protests in Milwaukee, https://www.jsonline.com/story/news/2020/05/29/milwaukee-protest-george-floyd-killing-live-27th-and-center/5284428002/; Accessed 12/3//2020

reasonable, a significant amount of deadly and less lethal force was excessive and constituted an ongoing risk to the public and to CDP officers."[8] Additionally, the Department of Justice identified deficiencies that contributed to the concerns about use of force, including "accountability systems, resource deployment, community policing efforts, policies, and officer support, training, equipment, and supervision."[9]

Although there are additional areas of the Consent Decree that are implicated by the response to the May and June 2020 demonstrations, the Monitoring Team focused its attention on **Community Engagement and Building Trust**[10], **Use of Force**[11], and **Accountability**[12]. Additionally, issues relating to the use of **Body Worn Cameras**[13] and **Equipment and Resources**[14] surfaced during our review and will be addressed. Finally, the Monitoring Team provides technical assistance in the area of Incident Command System management, which combines sub-topics in the Consent Decree, such as **Supervision**[15], **Officer Assistance and Support**[16], and to some degree, **Transparency (Data Collection and Analysis).**[17] All of these topics have been the source of substantial work and focus since the start of the Consent Decree, and the Monitoring Team's prior semiannual reports have detailed the extensive changes that CDP has implemented – first and foremost regarding use of force.

The Consent Decree and its requirements were in full force and effect at the time of the protests in May 2020. In particular, CDP's Consent Decree-required use of force policies apply regardless of the context and number of officers or civilians involved.

Additionally, the Division of Police received specific and significant training and technical assistance on crowd management approaches in 2016 in preparation for the Republican National Convention (RNC) that convened in Cleveland that year. This included substantial input and assistance from federal partners on planning for and managing demonstrations and specific training for CDP personnel on crowd management. Indeed, the City's focus on the RNC prevented the swifter implementation of a number of Consent Decree priorities early in the process.[18]

Finally, at the heart of the Consent Decree is a central concept: "Constitutional policing and effective policing are interdependent and rely on a strong partnership between the police

---

[8] Dkt No. 7-1, ¶4.
[9] *Id.*
[10] Dkt. No. 7-1, ¶14 *et seq.*
[11] *Id.*, ¶45 *et seq.*
[12] *Id.*, ¶176 *et seq.*
[13] *Id.*, ¶337 *et seq.*
[14] *Id.*, ¶291 *et seq.*
[15] *Id.*, ¶322 *et seq.*
[16] *Id.*, ¶269 *et seq.*
[17] *Id.*, ¶257 *et seq.*
[18] First Semiannual Report at 17–18.

department and the communities that it serves."[19] This concept is readily discussed throughout this report.

### 5. Community Experience

Accounts from the public and the press are largely critical of the police response outside the Justice Center on May 30. This criticism was directed at CDP, the officers from other departments as part of Mutual Aid Agreements, and members of the Cuyahoga Sheriff's Department. While crowd reports need to be investigated and reviewed before condemning actions of the police, it remains important, even in the absence of a full review, to understand the perspective of the public. Having and keeping the trust of the public demands routine and consistent communication between the public and the police. Following best practice, in anticipation of demonstrations, protests, and other large-scale events, it is incumbent upon the police to review and share plans and expectations for crowd as well as police behavior. Similarly, it is prudent to speak with any leaders of planned demonstrations if possible.

In the context of the May and June protests, it appears that the Division did make some efforts to engage with the community and with protest participants. As stated in CDP's After Action Report, and in accordance with the Division Policy, the Incident Commander did make contact with the event organizer and learned that "there were several planned speakers at the Free Stamp with no plans to march." However, this information was directly contradicted by the intelligence provided by the Northeast Ohio Regional Fusion Center (NEOFRC), which as of May 29, 2020, indicated that 1,900 people were planning to attend, with an additional 4,800 interested in attending according to social media. The NEOFRC report continued

> "Over the past 24 hours social media activity for this event has increased. This is likely due to actions in Columbus on Thursday night, and continuing violence/riot in major cities across the United States on Friday Night. Organizers indicate a march (unknown start) will take place alongside Lakeside Avenue with a final destination at the Justice Center."[20]

Both before and as part of the Consent Decree, there are a number of established avenues for CDP to reach out to the public. The Division has an active social media presence on both Facebook and Twitter and updates their feeds with regularity. They also use the City's Blog at times. Additionally, there is a network of community resources, including the Community Policing Commission (CPC) and the District Policing Committees, as well as a multitude of community partners in non-profit organizations, neighborhood groups, tenant associations, and even foundations and faith-based organizations. Many of these organizations have, in one way or

---

[19] *Id.* At ¶6.
[20] AAR at 40.

another, participated in activities with the CDP and each comes with a broad network of community contacts. It seems that the CDP used the City Blog to convey a message of calm on May 29, though there was little in that message about norms and expectations for the public nor was there much detail about the CDP plans for policing. Similarly, a review of Twitter and Facebook feeds during the period of May 28 through June 2, 2020 reveal more detail about the protests in real time than they do about hoped for or expected behaviors of the Division or the public.[21] As discussed below, the Executive Director of the Community Police Commission indicated that there was no outreach to the CPC before (or after) the May 30, 2020 demonstrations.

In the After-Action Report, the CDP pleads that "Cleveland is a unique and diverse city. It cannot be assumed that our community will respond in the same was as other locations or jurisdictions when civil unrest occurs."[22] Given the intelligence provided by NEOFRC that interest was growing in the event due to violence in other cities nationally and the palpable outrage that was manifesting violently across the country, there was little reason for CDP to assume their community was somehow exempt from such violence.

The Monitoring Team has previously pointed to strained relationships between the CDP and the CPC, a lack of overall progress at overhauling the District Policing Committees under the DPC Implementation Plan, and the need for further development of CDP's "comprehensive and integrated community and problem-oriented policing model" to "promote and strengthen partnerships with the community. . . and increase community confidence in the CDP."[23] Again, while speculative, had CDP fully committed to community engagement and communication, it would have had better access to sources of information about what was likely to transpire on May 30, 2020. Whether or not those sources proved fruitful, CDP could, in retrospect, at least point to its good faith efforts to engage with the community.

### a. Public Feedback Provided to the Monitoring Team

In an effort to obtain information about the public experience during the protests that occurred between May 26 and June 12, 2020 in Cleveland, Ohio, the Monitoring Team opened a feedback

---

[21] City Blog: https://clecityhall.com/2020/05/29/city-of-cleveland-provides-general-updates-on-coronavirus-covid-19-protocols-update-83/ Twitter:
https://twitter.com/search?q=(from%3Aclepolice)%20until%3A2020-06-02%20since%3A2020-05-29&src=typed_query. Face Book:
https://www.facebook.com/ClevelandPoliceDept/posts/3000307023368050 ;
https://www.facebook.com/ClevelandPoliceDept/posts/3001174709947948 ;
https://www.facebook.com/ClevelandPoliceDept/posts/3000990063299746 ;
https://www.facebook.com/ClevelandPoliceDept/posts/3002303939835025 ;
https://www.facebook.com/ClevelandPoliceDept/posts/3004507236281362 ;
https://www.facebook.com/ClevelandPoliceDept/posts/3004649319600487
[22] *May 30, 2020 Civil Unrest After-Action Review* at 4.
[23] Eighth Semiannual Report at 10-12.

portal on its website using Google Surveys.[24] A simple feedback instrument was created to collect information from the public about direct or observed experiences of the protests. This feedback process is neither a scientific study nor a statistically significant survey. Instead, it served as a way for the Monitoring Team to hear about the particular experiences of certain respondents – which is useful for CDP to consider as it continues to improve its efforts at building trust with the public.

Aiming to reach as many individuals as possible, the Monitoring Team sent via email a request to distribute the feedback form to various Cleveland community organizations and individuals with large networks, such as the Community Police Commission. Ultimately only sixty-nine individuals provided feedback through the instrument. Furthermore, while the majority of the feedback respondents stated that they observed the protests at the Justice Center on May 30, some only did so through media or social media (as opposed to in-person), and others only observed protest activities after May 30. Observation of an event, whether on live feed or in person, is limited and idiosyncratic. Therefore, while the Monitoring Team finds it valuable to hear the feedback of engaged community members, such as those who are more likely to complete a feedback request form, the Monitoring Team, again, acknowledges that participants, and their views, may not necessarily be representative of all or even most Cleveland residents. Accordingly, while the information presented below offers a window into the experiences and viewpoints of certain community members, the Monitoring Team cannot draw definitive conclusions about the general population from this rather limited selection of respondents. Lastly, the Monitoring Team notes that each individual experiences events through a personal lens, such that different people can report different things, even seemingly conflicting accounts, and still fairly reflect their own particular experiences[25].

In reviewing the feedback received, there were several themes from across the narratives including:

- Police preparation and response
- Police communication
- Protester behavior
- Police use of equipment and weapons
- Support of police

### i. Police Preparation and Response

The feedback instrument publicly asked a series of open-ended questions to prompt respondents to describe their view of CDP's handing of the May and June protests. Thus, the responses are varying in detail. Even so, several respondents perceived that the CDP was underprepared and

---

[24] The link to the instrument and contents can be viewed at Feedback Form on the Cleveland Division of Police's Protest Response — Cleveland Police Monitor.
[25] See Attachment B, Feedback Instrument Responses.

understaffed for the crowds at the Justice Center. One observer stated "the police command seemed unprepared and basically did nothing until they felt like the crowd was growing unruly and then they called off the protest and started threatening. Teargas, shields, beanbag guns, and other weapons were used against the protesters and protesters started to run in all directions." Another stated, "The police did not have sufficient manpower and no prior planning." Yet another opined, "The CPD seemed overwhelmed by the crowds at the May 30th protest, and their actions seemed to indicate that they were afraid of the crowd."

Several observers, while critical of CDP's response, did conclude their comments with some empathy for the front line. One respondent wrote, "I believe that lack of planning on both the community and the Cleveland Police lost control of the agenda." And yet, the responses addressing the protests held on June 2 and June 6 conveyed that the CDP was better prepared for those protests, including some respondents praising CDP leadership and their willingness to interact and engage with the protestors.

Many of the respondents blamed the CDP for unnecessarily escalating the situation, and the majority of respondents expressed an overall unfavorable view of the police response. Several respondents indicated that police reaction seemed unprovoked or overly heavy-handed given the circumstances that they observed. One observer's impression is "The police escalated the situation with no good reason. People were protesting peacefully, not quietly, but peacefully. All of a sudden, without warning, tear gas bombs were being thrown into the crowd. It felt like a war zone. Any minor voilence [sic] from protesters (the throwing of water bottles at the Justice Center windows) was escalated 10-fold by police." And another respondent stated "It was clear that the police were not there to deescalate the situation – they were riling up the protesters and shooting dangerous items into the crowd."

There were also reports that the presence of multiple, seemingly uncoordinated, uniformed personnel from different agencies added to the confusion of protesters and the response. One observer in particular noted that any review by the Monitoring Team must ensure that actions attributed to the CDP were actually those of CDP officers. Another reported concerns about the behavior of representatives of the Sheriff's department writing they "behaved badly and escalated the situation."

A smaller group of respondents expressed outright support for the police, while others indicated mixed support for CDP, most indicating that the City was simply unprepared. One observer reported a more violent crowd and still had criticisms of the police preparedness.

"...CPD did not appear to have enough officers to handle the violent protestors in the crowd. Police were being hit by various types of hard, dangerous objects, and projectiles being violently thrown at them by protestors. Protestors also had bats, hockey sticks, and metal pipes that they used against police officers and businesses. The police gave multiple

14

warnings to the protestors to leave the area which were largely ignored. Police watched as protestors set cars on fire and destroyed businesses. The police did not seem to move in to make any arrests of these violent and dangerous protestors and I can only assume it was to prevent escalating the tensions in the crowd. Police waited way to [sic] long to take action when the police finally began to respond the crowd eventually dispersed. Unfortunately, it was too late as the protestors appeared to feel above the law since no action was being taken against them and they began destroying all of the businesses in area. It was a terrible day and the message of the peaceful protestors was lost due to the violent mob. ..."

One observer noted that the "police department was reserved and professional" and that "the agitators interrupted a peaceful demonstration." Several acknowledged that the police were not properly staffed, equipped or prepared for the protests on May 30, which they blame on the CDP administration and supervisors.

## ii.     Police Communication

Police communication with the crowd was problematic on May 30 – a handful of the respondents reported hearing no commands or dispersal order prior what they called "gas and flashbangs" or what others characterized as "before things escalated." At least one respondent indicated, to the contrary, that they heard multiple warnings from the police that were ignored by the protestors. These conflicting accounts highlight that individuals present at the same event can still have varying experiences.

The respondents who addressed the imposition of the curfew on May 30 expressed that communication around the imposition of the curfew was confusing. One respondents explained, "The way the City handled the announcement of a curfew (about 15 minutes before it started) and the way the police enforced it immediately exacerbated a violent situation." Another respondent echoed similar sentiments when they stated, "…when the city called curfew MINUTES before curfew was set to start, with the roads OUT of the area blockaded so anyone protesting was detained after being disallowed to go home for the curfew they had no warning about." The responses indicate that the curfew announcement's timing and the road closures offered little time and opportunity for participants to disperse and leave downtown.

There was criticism offered by one person who was listening to the police scanner. That person noted the communications via radio instructing officers to move to telephones and texting. That writer believes that the "switch from public to private communication by the police was not in the public's interest or appropriate."

15

### iii.     Protestor Behaviors

Participants overwhelmingly reported that the protest on May 30 started off peacefully at the Free Stamp as was the march towards the Justice Center. Reviewing the accounts, most respondents believe that the protesters were peaceful, non-violent, unarmed and provoked by the CDP; there were some reports that some of the protestors threw various objects at police, caused destruction of property, or were armed.

### iv.     Police Use of Equipment and Weapons

Most of the respondents believe that the weapons, equipment, and force used by the CDP was excessive and used indiscriminately for the circumstances, and others suggest that the police were understaffed and underprepared. There are clear expressions of frustration by the public in describing the heavy police show of force, with descriptions that they saw the "posting of snipers", officers dressed in "SWAT" and "military" gear and the use of horses, believing that was unnecessary and intimidating. One person's response revealed a belief that officers used force when not necessary, witnessing them "launching tear gas canisters over the crowd into the park across the street where families with children were holding signs. ... I understand that they were being hit with them [water bottles]. But they were in full riot gear, and the cops in yellow were already behind them. It's just not OK to do that. They were targeting medics, people who clearly had marking such as a cross like the one red cross uses, whom were carrying injured people away." Other respondents used similar language and believe that those providing and receiving medical care were targeted by the police.

Below is a list of equipment/resources the public believes were in use by the CDP during the protest period based on reports by observers.

- Beanbag guns*[26]
- Police on bicycles
- Chemical weapons and gases (pepper spray, tear gas*, tear gas bombs*)
- Flashbangs
- Police on horses
- Snipers on roofs
- Plain clothed police in the crowds
- Private cell phones for communication versus radio
- Rubber bullets*

---

[26] * indicates equipment/resources that CDP denies using on May 30, 2020. Specifically, CDP does not possess "sound cannons" and there is no evidence that any other agency used such tools on May 30, 2020; CDP did not use beanbag shotguns on May 30, 2020, but other agencies did, with at least one incident resulting in the loss of an eye; rubber bullets most likely refer to 40mm plastic impact rounds or Pepperball projectiles; and finally, CDP reports that it did not use CS (or tear gas) on May 30, 2020.

- Rubber grenades
- Sound cannons*
- SWAT gear

### b. Summary of Community Experience Feedback

Again, while the above accounts cannot be claimed to represent a scientifically representative sample of the experiences of all protest attendees, it offers a window into particularized experiences that should be seen as valuable to CDP in its efforts to avoid similar clashes at protests in the future. What is evident from the feedback received is that nearly all of the protest attendees and observers who responded conveyed some degree of chaos and confusion during the May 30 protest. The Monitoring Team encourages CDP to use the lessons learned during this protest, as well as the community perspectives offered, to work hard to minimize future protest-related disorder. Specific community-related recommendations are outlined at the end of the next subsection.

### c. Community Police Commission

The Community Policing Commission (CPC), established by the Consent Decree and now a well-established resource, serves many important roles for the City and CDP relative to police practice, community relationships, and communication. The CPC with its diverse network of relationships across a range of organizations and interest groups is able to live up to the expectations of the Consent Decree and yet appears to be an underutilized resource by the City and the Division of Police. The CPC Executive Director reports that neither he nor members of the CPC were contacted by the CDP to set norms, to communicate to the larger community, or to share plans for response or expectations during the planned protest of May 30.[27] Two sections, IIIA15 and IIIA15b specifically, found on pages 4 and 5 of the Consent Decree, speak to the expectations and the missed opportunity.

> IIIA15: To leverage the experience and expertise of the people of Cleveland, and to ensure that CDP recognizes and operates in a manner consistent with cooperative community understanding and engagement, (page 4)

> IIIA15b. to work with the many communities that make up Cleveland for the purpose of developing recommendations for police practices that reflect an understanding of the values and priorities of Cleveland residents; (page 5)

In the days following the protest, the CPC invited members of the public to share stories, video, and photographs with the Commission. The Commission shared those with the Monitoring Team

---

[27] Personal communication with Jason Goodrick through Christine Cole via Zoom and emails on November 23, 2020.

via a secure Google Drive. The items shared were reviewed and confirm reports by both the police and the public. Two individuals shared documents and those items provide some details from events that occurred outside the Justice Center on May 30. In the set of submitted stills and video, the viewer can see objects being thrown at the police, and at least one in the crowd is heard to say "stop throwing rocks". At the same time, the viewer can hear what sound like blasts and in several places the viewer observes what looks like smoke rising from the crowd. Many in the crowd appear peaceful and at least some express concern about the behavior of others and fear for their own safety when you hear, "we gotta get out of here." The clips from another person show a line of officers and at least one sheriff's deputy, with their backs to the Justice Center and lines of protesters facing them. Some officers are in full riot gear and others are not, but all have shields and helmets. Protesters are calling the police "f'ing pigs" but are otherwise calm and standing in lines when an officer raises his less lethal launcher and fires. There are several short video clips of the area with different views suggesting that the video clips submitted by one person could be a collection from others. Among the videos provided, there are individuals shown clearly in distress experiencing the adverse effects of chemicals. Others are rendering assistance.

### d. Recommendations from Community Experience

The Monitoring Team makes the following recommendations to address some of the concerns communicated in both the Community Experiences feedback section, as well as the Community Policing Commission section.

The Monitoring Team believes that the CDP can improve transparency, communication, and community engagement efforts prior, during and after to major planned demonstrations. Such improvements should include:

- Prior to anticipated demonstrations and protests, sharing plans and expectations for crowd and police behavior;
- Regularly updating social media and sharing information via other means of communication with the public;
- Contacting community resources prior to similar such events, in particular the Community Policing Commission but also other community partners at non-profits, neighborhood groups, tenant associations, foundations, faith-based organizations, to discuss plans and expectations and to seek collaborative planning and response to demonstrations.
- Conducting after-action meetings with these community resources, in particular the CPC, to draw from experience and wisdom to discuss lessons learned and plan for improved future response.

### 6.   Use of Force

Driven by the Consent Decree, the Parties (the City of Cleveland and the Department of Justice), in conjunction with the Monitoring Team and with significant community input,[28] developed new use of force policies that guide the use, reporting, and investigation of all force applications and also the collection of data for ongoing analysis to inform systemic improvements. General Police Order 2.1.01, which governs use of force is logically divided into three sections: use of force, reporting of force, and review of force. We address each in turn, and also consider the intersection with the Crowd Management policy.

### a.   Use of force timeline

| | |
|---|---|
| **1500 Media** | *...the crowd marches up to the Justice Center steps on Lakeside Avenue around 3 p.m. The videos show some people spray painting anti-police messages on the building's walls and windows, and crowding the doors, where a line of Cleveland police bike unit officers stand.* |
| 1507 Radio[29] | Reports that protesters are "trying to enter revolving doors" of the Justice Center. |
| 1509 Media | *What is left of the crowd – still thousands of protesters at the entrance to the Justice Center -- got louder. Someone tries to calm the mass of people.* |
| 1510 Media | *The first sign of police appear as the bicycle squad, also seen cutting down St. Clair Avenue to stay ahead of the front of the protests, carry their bikes up the steps to the Justice Center.* |
| | Bike officers remain with the crowd as they move towards the Justice Center and form the first skirmish line in front of the Lakeside doors to protect the facility. |
| 1512 Media | *The crowd chants, "No justice, no peace." Someone throws a plastic water bottle at a Justice Center window. People begin coming down the stairs, saying "back up, back up" as police use their bikes as a barrier to push the crowd away from the building. A more sustained stream of plastic bottles flies through the air toward the building. While the front-line officers tell protesters to move, the police make no amplified order to disperse.* |
| 1513 | Unknown: "Just got a call from a member in the crowd who said they are discussing breaking windows" |

---

[28] *See* Dkt. 83, Exhibits G, F.
[29] CDP radio transmission either though media video recordings or member CWS video

| | |
|---|---|
| Airship video (radio) [30] | |
| 1513 Airship video[31] | Crowd is seen growing on Lakeside. |
| | Unknown (various): <br> …*we need help up here* <br> ...*what kind of gear do you want us in* <br> …*PPE Gear* |
| 1513 Airship video | Crowd runs from the door in the video, it appears OC or PB was used[32] |
| | **Note:** PepperBall® is the company that manufactures the launcher devices and OC powder (air pressure powered) projectiles. The Terms *PepperBall* and *PB* will be used interchangeably for simplicity.[33] |
| 1514 Airship video | Unknown: "We need help now" |
| 1518-1523 Media | *By this time, several of the demonstrators come down the steps saying that the bike officers sprayed them in the face with pepper spray. Demonstrators pour water and milk on their faces to help minimize the effect of the chemicals.* |
| | *Within minutes, the first group of police officers in tactical riot gear arrives at the corner of Lakeside and West Third Street. Three officers step out of the van before they jump back in and drive north on West Third.* |
| 1524 Airship Radio | Unknown: Requesting permission to "flash bomb" "if we need to" |
| 1530 Media | *The first significant show of officers in riot gear comes south on West Third and make their way up the Justice Center lawn, on the northwest side of the building. They join the bike patrol between demonstrators and the building.* |

---

[30] Radio (audio) as heard in the Cleveland.com video of the Divisions Airship which Cleveland.com appears to have overlayed in sync with the Airship video

[31] Video from the Helicopter which was provided to Cleveland.com

[32] Pepper spray, also known as oleoresin capsicum spray or OC. spray or capsaicin spray or capsicum spray, is a lachrymatory agent (a compound that irritates the eyes to cause a burning sensation, pain, and temporary blindness) used in policing, riot control, crowd control, and self-defense. Pepper

[33] https://www.pepperball.com/

| | |
|---|---|
| 1530<br>Radio | Unknown: "Commander Todd go ahead and give the dispersal order, if they don't disperse we have the grenadiers there … we have to target specifically throwing objects at officers as well as the building." |
| 1530<br>CWS[34] | Commander Todd arrives at West 3rd Street and Lakeside, dons a helmet and prepares to give a dispersal order using a written form. |
| 1531<br>Media | *...and the bike unit forms a line and uses their bikes to push the crowd back from the doors. At 3:51 p.m., officers fire canisters that fumed chemical gas and flash grenades that explode at protester's feet, pushing them out onto the street and onto the lawn in front of the building.* |
| 1534<br>Airship video | Unknown: "Commander Todd per the Chief, break out the grenadier bag…. Pepperballs; "use as necessary to push them back"<br><br>C21 (Captain Butler) "Squad 3 and 4 when you get up there use the PBs"[35] |
| 1535<br>Media | *A second wave of police in riot gear emerge from two golf carts. One of the nine officers, at the rear of the line, point a pepper pellet gun at a group gathered on the corner of the street and say: "Move. Move. Disperse or you will be pepper sprayed." They make their way up the stairs on the northwest side of the building.*<br><br>*An unattended police cruiser sits on the southwest corner of Lakeside and West Third, next to a brick building that houses a law firm and other offices.* |
| 1536<br>Airship video | Unknown: "Tell the Sheriff's Department to Use the PBs." |
| 1537[36] | Commander Todd walking towards front of Justice Center and begins reading dispersal order (from a written form) with a handheld megaphone.<br><br>At the Justice Center, protesters approach a line of police officers and Cuyahoga County sheriff's deputies in riot gear. |
| 1537<br>Media | *Officer John Kazimer uses pepper spray on Jaleesa Bennett, which is the subject of a federal lawsuit.* |

---

[34] Commander Todd's CWS video
[35] Captain Butler had transitioned to his role as MFF (coordinator) Leader
[36] Most of the remaining timeline regarding Lakeside is based on Commander Todd's CWS

| | |
|---|---|
| 1538<br>Media | *The first signs of tear gas emerge from the steps of the Justice Center as several demonstrators leave the protest. As the police presence increases, another wave of demonstrators make their way up the stairs.* |
| 1538 | Commander Todd reads second dispersal order while still walking towards front doors. |
| 1540 | Commander Todd reads final dispersal order from in front of Justice Center and states to the crowd they have "one minute" to disperse. |
| | With seconds of the final order, Commander Todd directs a CCSO sergeant standing nearby to; "disperse the Pepperballs."[37] |
| 1542 | Commander Todd yells to supervisors, "Move them back!" |
| | (sound of compressed weapon/PB discharges) |
| 1543 | On the radio an officer is heard stating that he is sitting in a van in front of JC and a crowd is gathering around the van. |
| 1546 | Members report to Commander Todd that the PB guns do not work as a result of air canisters that are not charged. |
| | An unknown supervisor suggests, "how about Blast Balls?" |
| | **Note:** Blast balls are a hand dispersed ball that explodes and (generally) disperses OC powder universally or may be inert. |
| | (Unknown if there was a response) |
| 1547<br>Airship | Unknown: *"Squad 3 and 4 did you hear the order? Gas up put your masks on."* |
| 1548<br>Media | *Officers douse the crowd with pepper spray.* |
| 1548<br>Airship video | An order from Captain Butler (C21) to move officers to the Ontario side to help officers on that side as the crowd is growing. |

---

[37] Commander Todd CWS video

|  | Commander Todd advises on radio that PBs have been deployed but adds, "…it seems to be agitating some of them." |
|---|---|
|  | Unknown: "We need another squad over here; they are inching their way up to the building and we have no gear to push them back." |
| 1549 Todd CWS | Sheriff's deputy offers to fill the PB air tanks in the JC Jail. |
| 1549 Media/ Justice center video | Protesters kneel and don't move in front; bike line goes to them and stops. Sheriff heard stating they are dispersing handheld shields to CDP officers. |
| 1550 | Commander Todd gives direction to personnel to point PB Guns (launchers) at the crowd, but to use the MK9 OC (spray) dispersers.[38] |
| 1551 Media | *Officers begin shooting flash grenades and tear gas into the crowd. It's unclear if police broadcasted any significant order to disperse. Several demonstrators run from the scene as the loud "booms" echo through the street.* |
| 1552 Radio | Voice (C21) stating, "…as they move take ground." C21 directs to "Move up another squad," Commander Todd states we have no gear to push them back. |
| 1553 Radio | "C21 to Campbell or range staff use pepper balls "as necessary." |
| 1554 | Voice (C21) "Everything you got, you have been approved to use" …"launchers at some point in time." |
| 1555 Media | *People in Fort Huntington Park, a small park across the street from the Justice Center that includes monuments to law enforcement and famous track-and-field icon Jesse Owens, throw what appear to be water bottles* |

---

[38] https://www.defense-technology.com/product/first-defense-1-3-mk-9-stream-oc-aerosol/

*into the crowd, which now push down the stairs by the police in riot gear. Police continue to set off flash grenades in an attempt to push the crowd off the stairs. Prisoners in the Cuyahoga County Jail, part of the Justice Center, pound on the windows of their cells.*

*Police launch several canisters of tear gas into the park. The gas sends the protesters scrambling, igniting a sustained back-and-forth between demonstrators who grab the tear gas canisters and throw them back at police.*

*A handful of protesters pick up stones off the ground and throw them into the crowd. A blast on the northwest side of the jail knock one demonstrator to the ground.*

*The barrage of gas pushes most demonstrators onto the northeast lawn of the Justice Center and the sidewalk beyond. In the back-and-forth between protesters and police, a police van parked in the middle gets smashed, and one demonstrator* claimed that some of the protesters grabbed a riot shield. Police *have not confirmed whether that happened.*

*After 25 minutes of back-and-forth, continued flash grenades and more tear gas, demonstrators start to advance again toward the police. The white van appears again and drives on the northwest lawn of the Justice Center, where more officers get out.*

*A flash grenade that bounces across the street strikes a woman in the back just before it explodes. The impact knocks her to the ground as several medics scurry to help.*

*Four officers above the lobby of the Justice Center appear. At least one has a pepper pellet gun trained on the crowd below.*

| | |
|---|---|
| 1557-1600 Todd CWS/ observations and Notes | Officer comes into Justice Center blinded by PB/agent; states, "I can't see". He is taken into Justice Center. |
| | Few officers in crowd wearing face shields or masks. Bike officers on-line have no visible equipment other than bike helmet and face shield. |
| | C21:, "everything in downtown should be shut down." |
| | Commander Todd talking to various personnel, giving direction. |

24

An unknown sergeant approaches Commander Todd states, "I did what I had to do."

Commander Todd replies, "yeah that's fine."

Commander Todd states to officers on-line, "If they are not doing anything, I don't want to do anything."

Unknown supervisor approaches Commander Todd and asks, "Do you want them to move?"

Commander Todd replies, "Do you want them back, that's fine."

Todd states to officers that she wants the crowd moved to "the street."

Sergeant (9151) states to Commander Todd, "Only thing that moved anyone was blast balls."

(Several heard going off/ observed used on CWS)

|      |       |
|------|-------|
| 1600 Media | *Cameras mounted outside a guard shack on West Third Street that may have shown the incidents were broken by a bandana-clad man wielding a dolly shortly after 4 p.m., the videos show.* |
| 1600 Todd CWS | Sergeant (9151) tells Commander Todd, …we have a van full of munitions at 3rd/ Lakeside unprotected. |
|      | Cop in van in front of Justice Center states he now needs help as the protesters are attacking the van. |

| | |
|---|---|
| 1602<br>Media | *an officer fires a canister of tear gas at a small group, including three people with cameras taking pictures. A second and third canister are fired within a matter of two minutes.* |
| 1606<br>Media | Video from security kiosk shows group attack unmanned kiosk and smoke/gas nearby. |
| 1609<br>Todd CWS | Todd yells officers to, "get in a line" and help the officer in the van.<br><br>**Note:** Yellow smoke deployed in front on Lakeside. |
| 1610<br>Media | *Police said the crowd ignored a commander's repeated warnings to disperse prior to the unleashing of tear gas canisters, flash grenades and rubber and wooden bullets on the crowd.* |
| 1611<br>Todd CWS | Commander Todd to officers, "We need to clear them out."<br><br>Crowd is reduced and pushed forward away from building. |
| 1611-1615 | Commander Todd (walking the line on Lakeside checking on officers): few donning helmets or shields.<br><br>Officer on ground apparently injured.<br><br>Commander Todd, "Are you ok?"<br><br>Officer "…A cinder block is not going to stop me?" |
| 1617<br>Todd CWS | Unknown Officer from the van parked in front comes out and tells Commander Todd his equipment bag was stolen from the van. (unknown contents) |
| 1630<br>Media | *The police and the protesters remain at loggerheads on the northeast side of the Justice Center. An unattended squad car catches on fire, and* |

|  |  |
|---|---|
|  | *the fire soon spreads to a second, as well as to a telephone pole that cracks. Someone else sets fire to another Cleveland police car on the other side of the Justice Center.* |
| 1644 Tweet | ***Cory Shaffer*** |
|  | *@cory_shaffer* |
|  | *Replying to @cory_shaffer* |
|  | *Small fire set inside PNC Bank at Euclid and East 9th Street. Two @CLEpolice officers extinguished, while pointing what appears to be pepper ball gun at demonstrators. https://pic.twitter.com/iewuozilcX* |
| 1648 | *...4:48 p.m, more than an hour after police and Sheriff's deputies first begin firing pepper balls, flash grenades and canisters of tear gas into the crowd that had thrown water bottles and other items at officers at the doors of the Justice Center.* |
| 1649 | Commander Todd advises Sheriff's personnel that Ohio State Patrol is en route. |
| 1651 | Commander Todd turns off her CWS camera in JC lobby while talking to CCSO personnel. |
| 1700-1900 Media | *The group splinters off into smaller factions that then spreads across downtown from Public Square down Euclid Avenue. Some people continue demonstrating. Some smash windows, tag buildings with graffiti and loot stores. Among the hardest hit are Geiger's, a sporting goods store with multiple locations, the Heinen's grocery store and the CVS Pharmacy at East 9th Street and Euclid Avenue.* |
| 1730 Media | *Emily Forsee and Ryan Jones, say they were also shot in the street about 5:30 p.m. that day. The county did not provide the video or have an explanation on Friday as to why video from those cameras was not released.* |
| 1743 Social Media | ***Cory Shaffer*** |

*@cory_shaffer*

*Replying to @cory_shaffer*

*This appears to be set for a confrontation https://pic.twitter.com/Qja0Xfq9Z4*

*5:43 PM · May 30, 2020*

| | |
|---|---|
| 1756 Media | *The first footage of a window breaking, in the Cuyahoga County Clerk of Court's office on the first floor along Ontario Street, comes at the 5:56 p.m. mark in the video.* |
| | *A deputy in a green uniform comes to the open window and starts to fire munition rounds within minutes. The deputy remains posted by the open window for hours, firing through the shattered window.* |
| | *The video camera does not depict anyone trying to enter the building.* |
| 1800 Media | *6 p.m. when a group of people smashes the front doors of the public defender's office and sets fire to a Cleveland housing court bailiff's car that was parked in the lot beside the public defender's office. The fire then spreads to four more cars.* |
| 1800 Media | *Cleveland Mayor Frank Jackson asks Ohio Gov. Mike DeWine to activate the National Guard and deploy soldiers to Cleveland. DeWine says in a news release that Jackson expressed "serious concerns about the safety of Cleveland residents and peace officers following violent demonstrations there this afternoon. As is the case in Columbus, it is believed to be a relatively small group of violent individuals who are drowning out the voices of the many citizens who are peacefully expressing their desire for justice and change."* |
| 1821 Social Media | **Cory Shaffer** |
| | *@cory_shaffer* |
| | *Replying to @cory_shaffer* |
| | *Police are now moving down Prospect from East 9th. Flash bombs and firecrackers going off. https://pic.twitter.com/S6eQOJNSpt* |

*6:21 PM · May 30, 2020*

| | |
|---|---|
| 1927 Media | *Another crowd assembles at East 9th and Euclid Avenue, in the plaza in front of the PNC Center. The windows of the bank branch on the skyscraper's first floor are smashed and someone sets a fire on a desk inside the building. Police fire flash-bang grenades into the crowd, and two officers extinguish the fire. One officer is seen aiming a pepper ball gun on the crowd. Officers then fire a tear-gas canister toward a small group of people on Euclid Avenue. The crowd breaks up again.* |
| 1946 Media | *The City of Cleveland announces in a news release that Mayor Frank Jackson declared a state of civil emergency due to the unrest and instituted an 8 p.m. curfew. The city announces the curfew in messages posted on Twitter at 7:49 p.m., and on Facebook at 7:57 p.m.[39]* |
| | *Jackson calls some of the scenes coming out of downtown "outright lawlessness" in a statement.* |
| 2000 Media | *DeWine's office announces that the National Guard has been deployed to Cleveland.* |
| 2020 Media | *A few hundred people reassemble at East 9th and Euclid. An SUV is parked in the middle of the intersection and a woman gets out of it, climbs to its roof and hoists a poster with "I can't breathe" written on one side, and "no justice, no peace" on the other. Demonstrators walk openly throughout the intersection as cars drive gingerly around the crowds. Many of the people in the cars hold out fists in solidarity with the crowd. Others hold cellphones out of the windows to record the spectacle.* |
| | *Some people continue breaking windows, including at the Huntington Bank building. One woman takes a baseball bat to the revolving glass doors, while others throw trash cans and wine bottles through windows.* |
| | *The police presence is sparse.* |
| 2032 Media | *An emergency alert goes out to people's cellphones to announce the curfew order that has already been in effect for half an hour. Some people gather at the intersection who check their phones and can be heard reading the message aloud to one another in disbelief.* |
| 2039 Media | *A Cuyahoga County Sheriff's Department bus used mainly to transport prisoners to and from the county jail rolls up to the scene and police officers in riot gear get out and begin to line up. Some demonstrators* |

---

[39] [Mayor announces curfew](#)

|  | *grab metal fencing from Heinen's and drag it to block the northbound lanes on East 9th Street.* |
|---|---|
| 2045<br>Media | *Police march to the intersection with their riot shields up, chanting "move." Officers make no announcement about the curfew or order the crowd to disperse. A handful of people throw plastic water bottles and other items at them. A woman gets down on her knees as the officers turn east onto Euclid Avenue and the police arrest her. The officers form lines on Euclid Avenue blocking people from coming into the intersection.* |
|  | *Police on scene confirm they used tear gas and made arrests on East 9th Street south of Euclid Avenue.* |
| 2118 | *The line of police continues south along East Ninth Street past the Cuyahoga County government building. The group rushes West onto Prospect Avenue, where officers fire at least two flash grenades into a small crowd gathered near the Winking Lizard Saloon. Someone shoots off a firecracker at the Sheriff's Department bus that trails the officers in riot gear.* |
|  | *A group of police officers inside a white City of Cleveland van that had been vandalized earlier and spray-painted with the anti-cop message "f- - - 12" fires another flash grenade into a group of people gathered near the windows of the Panini's Bar and Grille at Huron and East Ninth before they drive away.* |
| 2300 | *Mr. Lertz was at a family cookout in Mayfield Heights and did not attend that day's protest, returns home and is walking from the parking garage to the Residences at 1717 when the officers come around the corner at East 9th Street and Superior Avenue.* |
|  | *Security video that Lerz provided to cleveland.com shows the 27-year-old has his back to the police and is facing the building's door, with one hand in the air and his other holding his electronic key fob at his side when the first officer fires a round at his feet. Lerz, who said he was shouting that he lived in the building, turns his head just as a ball strikes his left temple, less than an inch from his eye, and bursts into a cloud of chemical dust. His backward Cleveland Indians cap absorbs the impact.* |
|  | **Note:** CDP determined this action was an EDGE SWAT unit, with no CDP members included. The incident is under investigation and the Monitoring Team will be interested whether the issues of command/control during Mutual Aid engagements and clarity of use of force when other agencies are deployed within Cleveland. |

### b. CDP Polices on Use of Force in a Crowd Management Context

Of note, prior to the development of the updated use of force policies, the Cleveland Division of Police policy manual provided no comprehensive guidance on the use of intermediate weapons, such as OC (pepper spray) or batons, which are relevant to Crowd Management engagements.

Regarding OC Spray, relevant sections of the revised CDP policy states:

> Officers may use OC Spray "only (a) [w]hen such force is reasonable to protect the officer, the subject, or another party from physical harm and lesser means would be ineffective; or (b) [f]or crowd dispersal or protection and other means would be more intrusive or less effective."[40]

> Officers shall consider each one-second application as a separate use of force that the officer shall individually justify and report as objectively reasonable, necessary, and proportional.[41]

Similarly, the use of Riot Batons is limited to these circumstances:

> Officers are authorized to deploy the ASP baton when such force is objectively reasonable, necessary, and proportional to protect the officer or another party from physical harm and lesser means would be ineffective, and

> Officers shall consider each separate ASP baton strike as a separate use of force that officers must individually justify and report as objectively reasonable, necessary, and proportional.[42]

Additionally, although the use of force policy permits SWAT to have specialty weapons as long as their use is defined in the SWAT manual, the use of force policy itself is silent on the general use of 40mm Less Lethal Launchers, Pepperball launchers, or Blast Balls.

However, the Division's Crowd Management and Protection of Constitutional Rights Policy, which was completely overhauled during the planning process for the 2016 Republican National Convention, provides guidance on the use of force in the demonstration context.

First, the "policies and procedures in General Police Order 2.1.01[use of force policy] are applicable and fully transferable to the application of force in crowd control situations."[43] The

---

[40] Dkt. No. 83, Ex. D at 3, Procedures (III)(A)(1).
[41] Dkt. No. 83, Ex. D at 3, Procedures (III)(A)(5).
[42] Dkt. No. 83, Ex. D at 3, Procedures (II)(A)(1,2).
[43] Dkt. No. 255, Exhibit B.

Crowd Management Policy also explicitly adopts the de-escalation principles from the Use of Force Policy.[44]

Second, the Crowd Management Policy states:

> The protocol for deploying the powdered form of OC (pepper ball) shall be identical to those deploying OC spray in the large canister. OC Force against crowds shall be deployed only upon approval by the Incident Commander. Individual officers may deploy their OC in accordance with Division use of force policies in order to protect themselves or others from assaults or to overcome active resistance to arrest and when lesser means would be ineffective.

Neither the Crowd Management Policy nor the Use of Force policies provide guidance on the use of CS gas (tear gas)[45].

Third, the Crowd Management Policy also states:

> Mechanical force also encompasses less-lethal projectiles including any mechanically expelled objects such as bean bags or rubberized objects. These projectiles are specifically designed to minimize injury and avoid serious physical harm.[46]

This reference does not provide any guidance on the use of the 40mm rounds but implies that their use should be consistent with other impact devices.

Most importantly, the Crowd Management Policy sets forth the "Use of Force Options During Civil Disturbances," which includes critical specific guidance for officers around the purpose and form of a police line, the obligation not to respond to "verbal harassment or invectives directed against officers," the intent to "make every effort to identify and arrest those engaged in [assaultive behavior], but only to the extent that the integrity of the police line can be maintained and only if it can be done safely," and other specific rules of engagement.

CDP Divisional Notice 16-178 issued on June 14, 2016, in advance of the RNC, which primarily authorized the purchase and deployment of less lethal weapons, provided guidance on the use of less lethal weapons in detail. In relevant part, CDPDN 16-178 states:

- Impact Munitions are less-lethal projectiles launched through a delivery system. Their intended use is to impact a suspect who is actively engaged in criminal activity, in order to cease that suspect's actions.
- The Blast Ball is intended to divert or otherwise control the direction of a crowd's movement, especially as it relates to the safety of the officer in the face of superior numbers

---

[44] *Id.*
[45] CDP reports that it did not deploy CS gas on May 30, 2020.
[46] *Id.* at 17.

of persons causing civil disorder. Blast Ball deployment shall be controlled by the Incident Commander, but may be deployed by individual initiative to prevent imminent harm to the officer or other innocent persons or to prevent significant property damage.

- The PepperBall System shall be used only by authorized members who have been trained on the PepperBall System to protect themselves and others to gain control and/or compliance from violent aggressors or self-destructive persons when other force options appear to be less appropriate or ineffective.
- Munitions in any configuration or design are an implement whose primary function is defensive in nature.
- Munitions are an intermediate use of force and their use is considered a Use of Less Lethal Force. Head strikes with munitions are considered a Use of Deadly Force and are prohibited.
- Impact munitions shall not be deployed without authorization from the Chief of Police.

Therefore, there are cascading policies and divisional notices that relate to use of force in the demonstration and crowd management context.

### c. Reported Uses of Force

In addition to the materials provided by CDP, in an effort to review all uses of force that were related to the George Floyd protests of May 30 and 31, the Monitoring Team conducted a preliminary canvass of IAPro[47] for use of force incidents that occurred between May 30 and June 12. The narrative summaries of the reported uses of force were reviewed to determine what were protest-related cases. For cases that appeared related to the protests, the Monitoring Team conducted a preliminary review of available information to gain a better understanding of the scope of force used and the nature of CDP's organizational response. Again, the Monitoring Team will have more to say about individual applications of force during the demonstrations in the coming months.

Ultimately, five incident numbers[48] encompass 29 officers' uses of force. The CDP identified one further incident number (2020-169774), but this case remains under review in Internal Affairs and was therefore not reviewed by the Monitoring Team. Additionally, there are number of individual officer's uses of force from incident number 2020-247967 that remain under review by Internal Affairs and were also not reviewed. Additionally, the Monitoring Team identified one specific

---

[47] IA Pro is the administrative backend for Blue Team, which is the system in which officers report uses of force.
[48] 2020-157029, 2020-154915, 2020-156362, 2020-156049, and 2020-247967.

video in which an officer used force (deployment of several less lethal munitions) with no corresponding use of force report or review.

Of the 29-officer use of force reports that were reviewed, 76 specific applications of force were documented. This does not include de-escalation attempts, which are noted as a "force application" due to the structure of the data reporting system (IAPro). Applications of force included OC spray applications, bicycle pushes, pepper ball applications, blast balls, 40mm launchers (with OC, direct impact rounds, and smoke). Individuals were directly targeted with pepperball rounds (hit in abdomen) "when saturation proved ineffective."

Across use of force reports, officer reporting was generally very descriptive and attempted to capture the totality of the circumstances. However, as one officer accurately noted: "Given the nature of the situation, and length of time from incident an accurate account of the munitions used is unknown."

Similarly, the After-Action Report does not appear to fully account for the munitions used. For example, in the After-Action Report, CDP states "the use of two direct impact rounds successfully stopped the crowd from using rocks and debris thrown at officers."[49] The Monitoring Team does not know which two deployments CDP is referring to and if the implication is that only two impact rounds were fired, that is not consistent with the use of force reports:

- One officer wrote: "I then took the high ground on a ledge in front of the JC behind the field force line and ***exact impacted on multiple protestors*** that were aggressively throwing rocks and pieces of concrete at officers."
- Another stated: "During multiple hours of being mobile we continued around Euclid and Prospect Ave dispersing large groups of rioters and looters at multiple business using 40mm OC rounds, ***exact impact rounds*** and pepper ball rounds and the mark 9. These munitions were extremely successful in stopping looters and rioters from actively destroying city property and private business.
- Another: "Once authorization was received these devices [sXact iMpact munitions] were used only when necessary against unidentified protesters to stop their violent assault of throwing objects or stop them from picking up the munitions and throwing them or stop them from destroying property."
- Another officer "used 40mm ***exact impact munitions*** when I observed an individual attempting to throw the incendiary O.C. that we were deploying, back at the police," apparently at three individuals. Additionally, "[a]fter night fall, I watched protesters lighting off fireworks, throwing hand flares,

---

[49] After Action Report at 36.

using sledgehammers, bats, rocks, metal pipes, at the businesses downtown. I used more munitions to keep the residents safe and to disperse the crowds. All the munitions I deployed were by orders from a supervisor." In this context, it is unknown which munitions were deployed.

- Yet another: "After giving orders for the crowd to disperse, I deployed munitions which consisted of 40mm short range OC gas, 40mm White Smoke short range, ***direct impact***, and an OC grenade until the crowd was controlled."

Therefore, although officers were descriptive about the force they used, it is not comprehensively documented. Additionally, because there is apparently no tracking of munitions, there does not appear to be any definitive way to account for what force was actually applied.

Officers were descriptive about the threats used against them. Generally, officers reported thrown objects – plastic and glass bottles some filled with liquids (unknown, vinegar), eggs (reportedly frozen), traffic cones, rocks, concrete, bricks, aluminum bottles, frozen ice packs, wrenches, water balloons with unknown liquids, wine and beer bottles, batteries, and a railroad spike. Officers reported being hit in the head with a "chunk of concrete," "with an orange traffic cone, a piece of concrete, and a frozen orange Gatorade," a "water bottle filled with suspected vinegar," A sergeant reported being hit in the hand with a bat, causing him to drop his pepper spray (which was allegedly then used against the police line).

The Monitoring Team was able to confirm many of the officers' allegations that they were hit with a variety of hard objects prior to the initial deployment of OC spray through review of body-worn camera video. This does not mean that any particular deployment was appropriate, but that the narrative that CDP used wholly unprovoked force is not supported by the available evidence.

The available use of force reports also highlight communication issues about whether force was "authorized" in the demonstration context. For instance, when primarily bicycle officers were pinned against the Justice Center, there were repeated radio requests to use less lethal force with a significant delay in response ("I remember as a squad, Captain…requested several times to use our MK-9 pepper spray and didn't get a response back"). Confusion is understandable, as the assaultive behavior that was occurring were typically originating from people deeper in the crowd, not those immediately facing the officers. As such, any use of force in this situation would necessarily impact many in the crowd and is appropriately considered in a dispersal context rather than a direct self-defense application because officers could not respond surgically to assaults occurring in the middles of the crowd.

We raise this issue not to address the specific actions taken by officers, but to highlight that not all force during demonstrations is determined at the individual officer level. Our review of use of

force reports showed several "types" of force deployment with a combination of individual discretion and coordinated field force actions:

1. An officer individually responding to a person or persons engaged in criminal activity has the discretion to use force to make an arrest or prevent injury to persons (and property[50]);
2. An officer may be ordered to use coordinated force by supervisors or commanders to manage demonstrations that have become unlawful and violent;
3. Under CDP policy, "authorization" to use less lethal force can be given, but the individual deployments of less lethal force are still subject to individual discretion.

Of the videos available for review, with the exception of the one video of unreported use of force the Monitoring Team identified,the reviewed incidents were all found to be within policy by the Division, except for those referred to IA or OPS as discussed below, which have not been adjudicated at this time.

However, as cautioned previously, the apparent lack of consistent use of force reporting, the inconsistent use of body worn cameras, and the unconventional review of force makes any effort to comprehensively review the force applications very difficult. Of note, the CDP after-action report, while detailing demonstrator counter-tactics and the violent actions of rioters, did not address any issues concerning officer applications of force. Specifically, CDP concludes that "officers understood the precise use of force guidelines; when officers used force, injuries to citizens were minor or non-existent; the munitions team acted within their training and used munitions effectively as a crowd control measure; and the use of two direct impact sponge rounds successfully stopped the crowd from using rocks and debris thrown at officers."[51] None of these conclusory statements – in particular the argument that "injuries to citizens were minor or non-existent" – means that the use of force was within policy or lawful.

From the Monitoring Team's review, it may well be that, in at least some instances, the lack of body-worn camera video footage makes the determination of what did and did not occur challenging or impossible. This is a very unfortunate for CDP and for the Cleveland community – and precisely what the policies created by the consent decree were designed to prevent.

### d. Use of Force Reporting Requirements

The Consent Decree requires that CDP officers notify supervisors when force is used and uniformly document the details and circumstances of such force[52]. The degree and detail of the

---

[50] Again, community views about impacts to property warrant further discussion and community deliberation.
[51] AAR at 36.
[52] Id. ¶ 87.

specific reporting requirements directly correspond with the level, general degree, or outcome of the force used.

In the context of crowd management, where the primary applications of force include OC Spray and the use of impact munitions, most applications of force are quite likely to be Level 2. Level 2 force "is force that causes an injury" to a subject, "could reasonably be expected to cause any injury," or "results in a complaint of an injury" and does not rise to the severity of Level 3 force[53]. This generally includes the deployment of intermediate weapons and a variety of defensive techniques and maneuvers that do not involve weapons. *Id.*

GPO 2.01.05 is an entire policy section dedicated to setting forth the requirements of use of force reporting. Importantly, officers will report all force (other than *de minimis* force), and specifically will report Level 1 and 2 uses of force "by the end of their tour of duty" in Blue Team, the electronic reporting system[54]. Those reports must include:

> a. The reason for the initial police presence.
>
> b. A specific description of the acts that preceded the use of force, to include attempts to de-escalate.
>
> c. The level of resistance encountered.
>
> d. A complete and accurate description of every type of force used or observed.

Officers using Level 3 force shall:

> a. By the end of their tour of duty, complete an individual Blue Team Use of Force entry as directed by the Officer-in Charge of FIT (Force Investigation Team) and;
>
> b. Comply with all additional directives from the Officer-in Charge of FIT.

The policy also sets forth requirements for all officers who *witness* uses of force to report that force by end of their tour of duty.

Next, the policy details the consequences for failing to report the use or observation of force:

> a. Officers shall be subject to the disciplinary process, up to and including termination, for material (significant) omissions or misrepresentations in their Use of Force Reports, regardless of whether the force was objectively reasonable, necessary and proportional.
>
> b. Officers who use or observe force and fail to report it shall be subject to the disciplinary process, up to and including termination, regardless of whether the force was

---

[53] Id. ¶ 87(b).
[54] Dkt. No 255, Exhibit D.

objectively reasonable, necessary and proportional.

Finally, the Use of Force Reporting policy, like the Consent Decree, does not make any exceptions for reporting force used in the context of demonstrations, whether or not the use of force is directed by a superior officer or used based on individual officer discretion. Similarly, the Crowd Management policy, like the Consent Decree, does not modify the reporting obligations under the Use of Force Reporting Policy.

### e. Force Reporting on May 30, 2020

Based on its preliminary review, the Monitoring Team is concerned about the pattern of reporting and review of the use of force cases from May 30 and May 31, which appears wholly inconsistent with CDP policy and the requirements of the Consent Decree. As described above, CDP policy and the Consent Decree require officers to report every use of force by the end of their shift.

Of the 29 officers' uses of force reports that we reviewed, only 16 of those cases were documented and received into Blue Team by June 1. Consequently, the other 13 uses of force were not reported by the end of the officer's shift as required by policy. It is even more concerning that the 13 cases that were not reported by the end shift were not documented in Blue Team for many months[55] and there is no explanation as to why normal policy was not followed. Although the Monitoring Team was not provided with any emails or orders directing any deviation from the force reporting policies, it seems implausible that half of all officers reporting force would independently choose not to follow CDP policy. As such, the Monitoring Team has significant concerns that at least some officers may have been directed not to complete use of force reports, which is troubling.

Additionally, while recall and specificity is often difficult in chaotic situations, most officers who wrote use of force reports completed a comprehensive narrative about their actions, which is reassuring. However, some continue to use jargon and blanket statements, for example stating that they deployed "less lethal munitions" without specifying what tool they deployed.

Within the Use of Force cases were two unique records, called "Enforcement Bureau" and "Group Enforcement," which did not correspond to any specific officer. Per policy, use of force is reported at the officer level, so the use of catch-all categories for presumably unreported force raised questions. CDP clarified that those records were reports of other agencies' use of force.

Finally, CDP reported over 100 arrests during the protests of May 30 and 31, 2020. The reported use of force incidents that the Monitoring Team reviewed account for only two of those arrests. In both cases the force used to effect the arrests were found by CDP to be reasonable, necessary and within policy. Coupled with the non-standard reporting of force surrounding the protest, and the knowledge that force is often utilized when effecting an arrest, the Monitoring Team again

---

[55] Additional cases were received into the system between July 8 and September 3

questions whether all force was reported. Notably, none of the pending IA cases involve allegations of failure to report force.

CDP did identify confusion around reporting force in the After-Action Report. The Division noted that "[w]hen officers made an arrest and used force, they were unsure of the reporting procedures" and [w]hen officers deployed munitions, there was confusion about how and when to report the use of munitions."[56] The Division's proposed solution is to "update the current crowd management policy to include the use of force munitions reporting and deployment."[57] As set forth below, the Monitoring Team agrees that the relevant policies need to be revisited, but believe that it is the use of force policies that need updating, and harmonizing with the crowd management policy.

### f. Policies Regarding Review of Force

CDP policies for reviewing force have differing requirements based on the level of force used. For Level 1 and Level 2 uses of force, the primary review responsibility lies with supervisors and the chain of command. For Level 3 uses of force are reviewed by the Force Investigation Team (FIT), which is a specialized arm of Internal Affairs. As there were no reported uses of Level 3 force during the demonstrations, none were referred to FIT for investigation. Some uses of force were later recategorized to Level 3 due to suspected misconduct and were referred to Internal Affairs for review.

As such, the review process for Level 1 and 2 uses of force apply to the reported cases on May 30, 2020. The review policy states:

Fair, thorough, timely and objective use of force review and investigations shall be conducted by supervisors in Level 1 and Level 2 uses of force. Supervisors shall evaluate attempts to de-escalate, objective reasonableness, and necessity of actions taken by the officer(s), along with proportionality of force used in relation to the level of resistance encountered.

Specifically, GPO 2.01.03, requires officers to report "any level of force while on duty" to a supervisor and request a supervisory response. A supervisor is then required to respond "to the scene of use of force incidents."

Once on scene, the supervisor must:

> 1. Inspect and observe subjects for complaints of pain or injury resulting from the use of force response and immediately obtain necessary medical care, if not already requested.

---

[56] After Action Report at 36.

[57] Id.

2.    Determine if the force response used is a Level 1, Level 2 or Level 3 response and make the proper notifications, if needed, via CCS (e.g. FIT).

3.    If a supervisor determines that an officer's use of force reveals evidence of potential criminal conduct, the supervisor shall <u>immediately</u>:

    a.    Request FIT via CCS, and suspend any investigation.

    b.    Secure the scene pending the arrival of FIT. (Refer to GPO #TBD Force Investigation Team)

4.    Conduct a complete, thorough and impartial review/investigation of the use of force incident considering whether the force used was objectively reasonable, proportional to the level of resistance, and necessary, and whether the involved officer(s) took all reasonable measures to de-escalate the incident and reduce the likelihood or level of force.

For Level 1 uses of force, the supervisory review is required to be completed by end of tour, unless additional information is requested from the officer using force.

For Level 2 uses of force, the supervisory investigation, must be completed within five tours of duty, and the supervisor shall:

1.    Ensure that all Use of Force Reports include all the required information and review CAD to identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred.

2.    Make all reasonable efforts through the review process to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force claimed by the officer and the subject's injuries, and any inconsistencies between multiple officers.

3.    Consider all relevant evidence, including circumstantial, direct and physical evidence, as appropriate, making and explaining credibility determinations, if feasible.

4.    Review all evidence relevant to the use of force, to include WCS recordings of the use of force and evaluate that evidence to determine whether the use of force was consistent with Division policy, and/or raises any policy, training, tactical, or equipment concerns.

5.    Complete the narrative description of the use of force incident, including (if not included in the dropdown menus):

    a.    The supervisor's description of the incident, including a precise description of the evidence that either justifies or fails to justify

the officers' conduct based on the supervisor's independent review of the facts and circumstances of the incident.

b. Documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident (Use of Force Menus). In situations in which there are no known witnesses, the report will specifically state that fact. In situations in which witnesses were present but circumstances prevented the supervisor from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report shall include all available identifying information for anyone who refused to provide a statement.

c. The names of all officers who used force or witnessed the use of force.

d. The investigating supervisor's evaluation of the use of force, based on the supervisor's review of the evidence gathered, including:

1. a determination of whether the officers' actions appear to be within policy and consistent with state and federal law;

2. An assessment of the incident for policy, training, tactical or equipment concerns; and

3. Whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options.

e. Document any corrective action taken or misconduct discovered during the investigation of the use of force.

Finally, once a supervisor forwards their completed Use of Force Review or Investigation, "Each level in the chain of command will review the report within three tours of duty of receiving it to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard."

## g. Force Review

As set forth above, the normal process for reviewing use of force incidents is for the officer to complete their use of force report in Blue Team, and shortly thereafter route up their chain of command for review. Cases may be routed back to the reporting officer, sometimes many times for clarification or additional evidence such as video or pictures to be added.

While half of the protest-related cases were completed in Blue Team in a manner consistent with policy, many were not routed through the chain of command for weeks, if not months – with some not sent through to the chain of command for more than 60 days.  Only 7 force reports were routed the day the report was completed by the officer, and less than half were submitted within the first week.

At the same time, when cases were first routed to an officer's Sergeant, the review time appeared very rapid.  In some instances, cases were routed to a sergeant, fully reviewed, and found within policy within just 19 or 20 days. As the Monitoring Team has previously observed, CDP has regularly struggled to review use of force cases within a timely manner. The notably rapid speed of review here could be consistent with CDP using a non-standard and/or deliberately expedited review process for the protest-related cases of May 30 and 31, 2020.  To the extent that such a review process was more cursory than typical or required, this may be problematic.

While not completely clear, it appears to the Monitoring Team that CDP completed the reviews of the protest related uses of force in a non-standard way, outside of Blue Team and IAPro. It appears that the review may have been done in batches rather than according to the timelines set out in policy. Although the review appears not to have followed the Court-approved process, which leads to serious questions of transparency and completeness, it may be that modifying the process set forth in policy could be appropriate – it just needs to be done transparently. During the development of the Use of Force policies, the Monitoring Team and the parties specifically discussed whether CDP wished to use a modified force reporting structure for demonstrations and that suggestion was rejected, with explicit assurances that all use of force would be reported and reviewed. That does not appear to have happened here.

It appears that CDP may have reviewed video, media accounts and existing uses of force during their after-action review and identified additional uses of force through that process rather than expect officers and supervisors to report force in accordance with the policy.  During the regularly scheduled administrative CompStat meetings in June and July the UOF numbers and types reported did not seem to match what the Monitoring Team expected based on publicly available reports of UOF at the protests.  Division personnel, in  response to questions posed, indicated at different times that the UOF reporting for civil unrest was separate and that the reviews of force from the May 31 protest were incomplete or ongoing.  Based on our review of IAPro, the timing of submissions and what appears to be a batch review in September, it appears that the use of force reviews from the protest were not completed using the IAPro system and were done off line. Further, we surmise that officers were likely asked to complete use of force reports far *after the fact* and, ultimately, the incidents were reviewed in batches by the chain of command. If this is the process that was used, there is a lack of transparency, a curious avoidance of the use of an electronic system to report and review force, and an expressed need for clarification of the UOF policy vis a vis force in civil unrest.  For a large-scale event such as these protests, this may be the most efficient and effective review, though the off line review continues to be of concern. Indeed, officers at the scene, deploying OC spray, blast balls, and 40mm Less Lethal Launchers, were well

aware that they were engaging in reportable uses of force. There is no indication that the typical force reporting requirements were expressly suspended.  There is likewise no indication that officers are being held accountable for not reporting in a timely fashion, nor that supervisors who were on scene reminded officers of their duty to document all reportable use of force within a reasonable time frame. If there was no video, no citizen complaints, or any other evidence to suggest that an officer used force during the protest, there is no way to know whether officers may have used force improperly if there are no reports of the same.

### h. Recommendations regarding Use of Force Policy and Procedures

Based on this analysis, the Monitoring Team recommends that the Use of Force policies be strengthened and updated to examine better practices for use of force reporting and review in the demonstration context. Additionally, the Division needs to enforce its existing policies more consistently to ensure that when guidance is given in policy, it is followed. Specifically:

1. The Use of Force policy and the Crowd Management Policy need to be harmonized, with clear directions for the use of all less lethal tools available to CDP.
2. The Use of Force reporting policy should be reexamined, to ensure that the reporting for use of force during demonstrations is timely and consistent.
3. The Use of Force review process should be reconsidered for demonstrations to ensure that all use of force is timely and appropriately reviewed. This reconsideration should incorporate lessons-learned from this event, align with how CDP intends to review force in the demonstration context, and should distinguish between discretionary force used by individual officers and strategic force ordered as part of an overall field force effort.

### 7. Use of Body Worn Cameras

#### a. Body Worn Camera Policy

The use of Body Worn Cameras is not mandated by the Consent Decree.[58] However, because CDP long ago elected to implement a Body Worn Camera (BWC) program, the Consent Decree requires that:

> CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals.[59]

---

[58] Dkt. No. 7-1, ¶337.
[59] *Id.*

Moreover, the Consent Decree mandates that supervisors review recordings related to any incident involving Level 2 or 3 uses of force.[60]

The Body Worn Camera policy was approved by the Court in late 2016, and requires, in relevant part that:

> All officers assigned a WCS, while in the field, shall activate their camera immediately upon initiating a response to a call for service, during all investigative or enforcement contacts with the public, or other contact with the public that may or does become adversarial after the initial contact. Officers shall understand there are exceptions and prohibited times to record set forth in sections IV and V.[61]

A review of the Exceptions to Recording and Prohibited Recording does not show any reference to demonstrations. Many departments include an exception to recording for First Amendment activities, only permitting recording when criminal activity or potential adversarial contact occurs. Regardless, the direction of CDP's policy to record "contact with the public that may or does become adversarial after the initial contact" would clearly apply under these circumstances.

### b.  Body Worn Camera Use on May 30, 2020

As noted, none of the pending IA cases have available BWC evidence (although several have video evidence provided by the public) and only two-thirds (18/29 or 62%) of officers who reported force had available video evidence. The majority of BWC evidence for uses of force relates to the area of the Justice Center and primarily in the afternoon; much of the force used in the evening in downtown was not captured on video.

As discussed in this report, what BWC evidence is available with respect to the protest activity allowed the Monitoring Team to confirm assaults on officers, which informs the reasonableness of force. The absence of video in many use of force incidents is not only inconsistent with policy and the Consent Decree, but it also does a major disservice to the public (which cannot be expected to accept unsupported allegations of how force was used), the Division (which is put on the defensive without adequate evidence of why force was used), and the individual officers who are left without documentary evidence of what did or did not occur.

The Monitoring Team has been informed anecdotally that the protective gear that was obtained in advance of the 2016 RNC does not have BWC mounts and therefore there is no way to affix a BWC to the "turtle gear." This complaint was also made in several of the use of force reports explaining the lack of video (e.g., "We were advised to respond in full MFF gear and leave our wearable body cameras at the District since there is no place to secure the body camera to the MFF gear.")

---

[60] *Id.* At ¶338.
[61] Dkt. No 92, Attachment A, at 2. Note, the exceptions to recording are found in Sections C and D.

Although this equipment failure could explain why individual officers did not have available BWC evidence, it does not adequately explain why the Division had not anticipated and resolved this issue.

### c.  Recommendation

CDP must anticipate the need for BWC usage during future demonstrations and protest events, and address the possibility that BWCs cannot be, or cannot easily be, mounted on officers' "turtle gear."

### 8.  Accountability

The Office of Professional Standards (OPS) and the Division's Internal Affairs Division (IA) both received and assigned a number of protest-related cases for investigation.

The OPS reported receiving twelve citizen complaints alleging misconduct against CDP officers. Seven of those cases alleged excessive force, two involved general complaints about how the CDP reacted to the protests, two involved allegations of inappropriate comments posted to social media, and one involved a claim of lost property. The OPS classified one excessive force complaint as an allegation of criminal conduct and referred that case to IA, thus suspending its administrative investigation until the conclusion of an IA criminal investigation.

As of the writing of this report, OPS had completed full investigations of the two social media complaints with recommendations for "sustained" findings, which will be scheduled to be submitted to the Police Review Board for adjudication. The OPS had also "administratively dismissed" another three complaints.[62] The case referral to IA was still pending at IA and four cases (three excessive force cases and the case involving the allegation of lost property) remained under investigation.

Internal Affairs reported opening a total of eight case investigations, all involving allegations of excessive force (including the criminal case referral made by OPS). As of the writing of this report, IA had closed out two of the cases: 1) with a finding of "not sustained" with respect to a police use of force where plainclothes officers were not equipped with body worn cameras; and 2) with a finding of "exonerated" where it was determined that Sheriff deputies were responsible for shooting "less-than-lethal" projectiles at a complainant. The other six cases remain under investigation.

---

[62] Pursuant to OPS Manual Section 702, the OPS is permitted to "administratively dismiss" any complaint where 1) the subject of the complaint is not a CDP officer; 2) the subject of the complaint cannot be identified; 3) the complaint solely involves the issuance of a traffic citation; 4) an alleged delay in services is the result of "an unavoidable workload delay"; or 5) where the allegation involves off duty conduct of "a civil nature."

The Monitoring Team is not currently in a position to be able to opine on the quality of the investigations conducted or the findings that have been made. These cases are anticipated to be included in the population of cases to be reviewed by the Monitoring Team in the future when assessing the quality of OPS and IA investigations and the extent to which they are or have been in compliance with the Consent Decree.

The Monitoring Team does note, however, that it did not uncover publicly identified incidents that were <u>not</u> investigated by IA – in other words, all incidents that were referred to IA are being investigated. Although some people with whom the Monitoring Team spoke alleged other incidents, they were not brought to the attention of the Division.

It should be noted that the fact that that CDP officers were not wearing their Body Worn Cameras in the cases being investigated by IA is certain to have an impact on the ability of the Division to ultimately determine to what extent officers involved in uses of force over the course of the protests may or may not have committed misconduct.

### 9. Dispersal Orders

The dispersal order is a critical component of crowd control and is the foundation of most of the tactical operation and the use of force to follow. It is essentially the formal warning to persons who may otherwise be lawfully gathered to protest as a matter of constitutional right that the police have deemed the gathering to *now* be unlawful, commensurate with a formal notice and order that failure to disperse is a violation of the law and persons who remain will be subject to arrest for a specific statute. In the end it is a fair warning required by law and policy. The Division has guidelines for the use of a dispersal order within GPO 3.3.03 (§V/C).

### a. Law and Policies Governing Dispersal Orders

<u>Cleveland Statute</u>

*§ 605.02. Failure to Disperse*

*(a) Where five (5) or more persons are participating in a course of disorderly conduct in violation of Section <u>605.03</u>, and there are other persons in the vicinity whose presence creates the likelihood of physical harm to persons or property or of serious public inconvenience, annoyance or alarm, a law enforcement officer or other public official may order the participants and such other persons to disperse. No person shall knowingly fail to obey such order.*

*(b) Nothing in this section requires persons to disperse who are peaceably assembled for a lawful purpose.*

The Cleveland statute mirrors State law:

> *§ 2917.04. Failure to Disperse.*
>
> *(A) Where five or more persons are participating in a course of disorderly conduct in violation of <u>section 2917.11</u> of the Revised Code, and there are other persons in the vicinity whose presence creates the likelihood of physical harm to persons or property or of serious public inconvenience, annoyance, or alarm, a law enforcement officer or other public official may order the participants and such other persons to disperse. No person shall knowingly fail to obey such order.*
>
> *(B) Nothing in this section requires persons to disperse who are peaceably assembled for a lawful purpose.*

An effective dispersal order has tactical objectives, in that it is intended to cause the crowd to cease criminal behavior (*i.e.*, throwing items or damaging property). Also, it provides necessary, clear and concise warning to all involved that force may be used which may inflict *significant pain or result in serious injury*, which is required by case law;[63] and provides clear pre-enforcement warnings consistent with tenets of reasonableness, proportionality and de-escalation.

Moreover, both statutes state the following: *Nothing in this section requires persons to disperse who are peaceably assembled for a lawful purpose.* Which imposes a duty of police leadership to fully assess the extent of the order. For example, how far is *dispersal*, and what if the group becomes peaceful or sits down such as occurred at the Justice Center. Are they now peaceful or do they remain subject to arrest? These are questions that are beginning to be raised all over the country because of the current unrest and which the Division should consider for future planning and for training. It is important for CDP to have a clear and consistent policy supported by regular training for all members as part of the crowd control training curriculum.

### b. Timeline of Justice Center dispersal order

1535 hours.        Commander Todd arrived at the corner of 3rd and Lakeside and began walking up the Lakeside - side of the building

1537 hours.[64] Commander Todd began her first dispersal order by handheld megaphone while in entry way - alcove of the JC several yards away from the front of the building

---

[63] *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001)
[64] Times indicated on Commander Todd's CWS video are incorrect and state T19:37 beginning time. Axon calibration error.

1538 hours.      Commander Todd gave a second order as she approached the front of the building from approximately 20 feet to the rear of skirmish line

1540 hours.      Commander Todd read the final dispersal order to the crowd from the same location.

**Note**: There is no indication if a dispersal order was necessary (or was given) at the Ontario side of the Justice Center which also had a group of protesters gathered. According to media reports, protesters on the Ontario side stated that a "go-home" (dispersal) order was not given; however, officers started to tell the crowd individually that an order had been given and they needed to leave.

The dispersal order in this case did not appear to be appropriate for the size and nature of the crowd. It is likely that most protesters would not be able to hear such an order from a hand-carried PA system from the location each order was provided. This is consistent with the community feedback received, with several individuals indicating that there were no clear and audible commands provided prior to police beginning to disperse the crowds through force. This is also consistent with reports from the media stating that it was unclear whether police broadcasted any significant order to disperse.

### c.  Method of delivery.

Law and policy dictates that such an order should be provided in a manner and mode that is guaranteed to be heard by the affected crowd. For example, a vehicle PA system could have been used followed by confirmations by officers at opposing sides of the crowd that the order was audible. Some agencies, including Portland and Phoenix, apparently effectively utilized an LRAD (Long Range Acoustical Device) to give clear dispersal orders in both English and Spanish. It has also been reported that the Cuyahoga County Sheriff's Office has acquired LRAD capabilities since the May 30 event.[65] However, many consider LRADs to be sonic weapons and if such technology is acquired, clearly articulated policy should guide its use solely as a communication device.

An effective approach used by many agencies is to have a prerecorded warning that is played every few minutes which can avoid any confusion as to the instructions and warnings given to the crowd before force is used and throughout the entire tactical operation. Customized warnings can be developed to address the crowd, which also provide a command presence that can be a tactical benefit while trying to de-escalate and clear the crowd. Lastly, the Incident Commander should ensure that officers at all sides of the crowd can clearly hear and understand the orders given and

---

[65] *Julia Tullos (September 22, 2020).  "Cuyahoga County Sheriff makes changes after May 30 riot in Downtown Cleveland". Cleveland19.com*

that information should be documented (*i.e.* time stamped radio transmission or recordation at the Incident Command Post)

### d.  Directions given.

The instructions to any impacted crowd must be clear and concise. The order to go "that way" or "either way" on any street is not likely to be understood by those in the crowd who may be prone to cooperation and compliance.[66]

### e.  Time to comply.

According to GPO 3.3.03 De-escalation, communications must be clear and consistent Section V, C. 4 states:

> Absent exigent circumstances, each specific warning shall be repeated at least three times with at least five minutes between the first and second warnings, and three minutes between the second and third warnings. Additional warnings may be given as necessary at the discretion of the Incident Commander.[67]

In this case, there was approximately one minute between the first and second warning, and two minutes between the second and third warning. Force was directed to be used within one minute of giving the final dispersal order. Thus, this order did not conform with the policy's timing requirements. Although exigent circumstances would permit non-compliance with the technical aspects of the dispersal order, the fact that the Division waited between warnings, but not for the specified time period suggests that exigent circumstances were not driving the policy compliance.

The Division has well-drafted guidelines on the dispersal order within GPO 3.3.03; however, many of its mandates such as audibility, requirement for unambiguity and specific instructions to the crowd do not appear to have been complied with in this case. Additionally, the document titles of *Dispersal Order* or *Order to Disperse* do not appear to be stated within policy, which describes the order as *verbal persuasion and warning*. The Division should consider revising this section of GPO 3.3.03 to resolve or clarify these issues and consider including the actual Dispersal Order within the policy for easy reference in training and operations.

A related issue raised by several community members and discussed in the press was the timing of the curfew, which was effective as of 8:00pm, but only announced at 7:45pm. The Monitoring Team did not explore the mechanics behind this timing and is sensitive to the urgency of imposing

---

[66] The first order ended with go "that way" on Lakeside" with no clear direction to crowd, the final order directed the crowd to go "either way"

[67] No time is given on the form or in policy (GO) between the last warning and making arrests

controls in volatile situations such as these. At the same time, the Monitoring Team empathizes with the confusion that was likely caused to the protest participants by the imposition of a curfew order with extremely short notice to disperse, and what appears to be limited means to exit the area in a timely, orderly fashion. The United States Supreme Court has held that "[c]ontrol of civil disorders that may threaten the very existence of the State is certainly within the police power of government." *Stotland v. Pennsylvania*, 398 U.S. 916, 920 (1970). And importantly, "[t]he invocation of emergency powers necessarily restricts activities that would normally be constitutionally protected." *United States v. Chalk*, 441 F.2d 1277, 1280 (1971). However, it is clear that adequate notice is required before arrests can or should be made.

Reviewing the arrest logs provided by CDP, there are two charges that could relate to a curfew violation – "Minor's Curfew" and "Fail to Comply." The latter can also relate to failure to disperse. While disentangling these charges is difficult, the Monitoring Team notes that no individual was arrested solely for "Minor's Curfew," which was typically coupled with "Aggravated Riot," and three people were arrested solely for "Fail to Comply," all of which occurred after 10:00pm. Again, it is unknown whether these three "Fail to Comply" arrests were made based on a failure to disperse or because of the curfew. Nevertheless, it does not appear that CDP was making arrests based on the imposition of the curfew until several hours after it was announced.

### 10. Mutual Aid Partnerships

Some of the allegations levied at CDP were apparently the result of other agencies working in collaboration with CDP. For example, one incident where a person entering a building was shot repeatedly with Pepperball rounds was attributed to Eastside Departments Group Enforcement ("EDGE," including Cleveland, Beachwood, Cleveland Heights, Euclid, Shaker Heights, South Euclid, and the City of University Heights) SWAT. The firing of a bean bag round resulting in the loss of an eye was attributed to the Cuyahoga County Sherriff's Office. While these actions were not caused by CDP, there is ample room to provide guidance and requirements in interlocal Mutual Aid agreements to ensure that the tactics and use of force deployed by visiting agencies comply with the expectations of the people of Cleveland.

The Monitoring Team reviewed Memorandums of Understanding with EDGE SWAT, the Westshore Enforcement Bureau ("WEB", including the Cities of Bay Village, Lakewood, Rocky River, Cleveland, Fairview Park, North Olmstead and Westlake), and a draft MOU with the Southwest Enforcement Bureau (including Berea, Breckville, Broadview heights, Brooklyn, Brooklyn heights, North Royalton, Olmsted Falls, Olmsted Township, Parma, Parma Heights, Seven Hills, Strongsville and Valley View).

Although they vary slightly, all of the MOUs have similar language – "The senior officer on scene or officer in charge of the police department of the responding party shall have full charge and authority over its own personnel and/or equipment used to provide assistance under this Agreement, subject to the overall incident command of the senior officer and/or officer in charge

on scene of the requesting city/township/village." The basic premise is that the responding agency manages its own people in cooperation with the incident command for the home agency.

None of the MOUs specify any agreed terms of engagement, use of force policies, or tactical restrictions.

CDP Divisional Notice 16-178 issued on June 14, 2016, in advance of the RNC, which primarily authorized the purchase and deployment of less lethal weapons, had references to Mutual Aid. How the terms of a Divisional Notice could apply (or even be known by) outside agencies is unclear, but the language of Section IV is noteworthy:

- Tactical Teams from outside agencies shall adhere to the policies and procedures contained herein.
- Tactical Teams from outside agencies shall not act independently from the Cleveland Division of Police Incident Commander unless it is to prevent the immediate threat of serious physical harm or death to a law enforcement officer or innocent civilian.

**Recommendation:** CDP should consider redrafting its Mutual Aid MOUs to clarify expectations around command structures and use of force in particular to ensure consistency.

### 11. Overview of Incident Command System (ICS)

As part of the review, the Monitoring Team evaluated the organizational process that the Division used to plan for and manage the event from an overall operational standpoint. This Section was prepared based on available information from the State of Ohio, Cuyahoga County, the City of Cleveland and CDP resources, information from multiple media sources; insight provided by CDP members directly involved in the planning process as well as members of other regional agencies and a comprehensive review of the standardized Incident Command System (ICS) and other forms completed by the City and the Division.[68] This section is necessarily very technical and may be most useful to the CDP, rather than the public.

#### a. A Brief History of Incident Management

Over the decades, government organizations have struggled with developing effective command and control systems for agency and multi-agency response to critical incidents. While individual entities have developed systems for responding to incidents within their organizations, problems occur when multiple jurisdictions are involved, and it was consistently clear that a unified approach based on nationally established standards was needed.

---

[68] Reference information on ICS was obtained from various federal and state sources including FEMA

Based on a model developed and used widely in the 1970s by firefighters in Southern California dealing with various wildfires, ICS became a national model for command and control for other first responders when it was formally used in New York at the first attack on the World Trade Center in 1993. In response to the terrorist attacks on September 11, 2001 at the World Trade Center and Pentagon, the Department of Homeland Security (DHS), formally adopted ICS within the National Incident Management System (NIMS) in 2004, which included national mandates that all government agencies that seek federal funding must use the NIMS/ICS model through local emergency management organizations and policies. As a result of the mandate, communities across the country use versions of ICS in response to critical incidents and in planning for known or expected events. Practice and sophistication vary though it is typical to see some form of ICS across the country.

Because the components of NIMS are based on nationally adopted uniform and comprehensive incident management protocols, all stakeholders have shared expectations and practices for

- Preparedness
- Communications and Information Management
- Resource Management
- Command and Management
- Ongoing Management and Maintenance[69]

ICS is the combination of available resources such as facilities, equipment, personnel, procedures, and communications operating within a common organizational structure, designed to aid in incident management activities. Some of the more important transitional steps that are necessary to apply ICS in the incident scene environment include organizational elements, facilities to support field operations, the use of common language, and clear objectives that are the foundation of a written Incident Action Plan (IAP). A well-constructed IAP and use of ICS helps ensure clarity and shared joint communications, operations, and command.

### b.  Command and Control Learning Model

*"There are no secrets to success. It is the result of preparation, hard work, and learning from failure." Colin Powell, Secretary of State, 2001–2004"*

One consistent tenet of NIMS and ICS is a commitment to quality through continuous improvement and identifying aspects of command and control that need improvement based on experience gained during critical incidents. The collective objective of NIMS and ICS is to always

---

[69] https://ready.cuyahogacounty.us/pdf_ready/en-US/NIMS%20FAQs.pdf

be better prepared for the next event through examination of past events and addressing lessons learned in practice. [70]

Adhering to the principles of ICS, this section reviews the use of NIMS/ICS in CDP's response to the events of May 30, 2020 and provides a series of recommendations for improvement. These lessons learned enable the CDP to enhance their incident response capabilities in the future.

### c.  ICS Resources in Cleveland

The CDP has myriad assets and partner resources in the region, all of which are committed to an established federal MIMS/ICS standardized system. Each of these resources was engaged to some degree on May 30 and others for a period following May 30. The role of the state office of emergency management was most limited. The Event Action Plan (EAP) and Integrated Action Plan (IAP) created by the Cleveland Division of Police is used as the basis for the Cleveland Office of Emergency Management Emergency Operations Center (OEM EOC). The positions (ICS 204) are incorporated into the final IAP at the EOC[71] The regional partner resources available and engaged on May 30 include:

> **Cuyahoga County Office of Emergency Management (CCOEM)** is a division of the Cuyahoga County Department of Public Safety and Justice Services, located at 9300 Quincy Street in Cleveland. However, this center is primarily activated for emergencies that involve the entire county.[72] The CCOEM EOC was not activated for the May 30th protest in Cleveland though CCOEM personnel were in contact with the Cleveland OEM EOC throughout the protest of that day and embedded personnel in the City's EOC on May 31st through mid-June to monitor and provide liaison support should the need arise.[73]

> **Cleveland Office of Emergency Management - Emergency Operations Center (OEM EOC) is part of the** Cleveland Department of Public Safety and is located at 205 Saint Clair Street, adjacent to the Justice Center.

According to Fred Szabo, Emergency Manager, Cleveland Office of Emergency Management and documents available to the Monitoring Team, the EOC was partially activated to provide support to the CDP for multiple operational periods beginning on May 30.[74] On May 30, the Cleveland Emergency Operations Center (EOC) was activated at 1500 hours and consisted of positions from all city public safety agencies, (police, fire, emergency medical services), the Cleveland prosecutor's office, suburban law enforcement, Ohio National Guard and the FBI. The

---

[70] https://www.fema.gov/sites/default/files/2020-07/fema_nims_doctrine-2017.pdf

[71] Interview with Fred Szabo, OEM and Laura Palinkas, Assistant Public Safety Director

[72] https://ready.cuyahogacounty.us/en-US/About-Us.aspx

[73] *Interview with* Mark Christie, Director of Emergency Management, Cuyahoga County

[74] The Division EAP for May 30th was from 1200-1800, the EOC period was 1300-2300

multiple public information officers (PIO) from the office of the Mayor and the Division were in the EOC to meet any media needs. Other partner agencies were on call for the event.

**Ohio Emergency Management Agency (OEMA) - State Emergency Operations Center/Joint Dispatch Facility** is located in Columbus and is focused on statewide emergencies and multiagency coordination. The OEMA was not directly involved in the Cleveland protests, however, the coordination of the Ohio State Highway Patrol (OSP) was facilitated on an as needed basis through the CDP EOC, as was is for all effected cities during this period including Columbus.[75]

**Northeast Ohio Regional Fusion Center (NEORFC)** which is focused solely on the development of various levels of intelligence for the region, is located within the Cleveland Justice Center. The Cleveland NEORFC (Fusion Center) is one of eighty fusion centers designated and recognized by the Department of Homeland Security.

*The mission of the Northeast Ohio Regional Fusion Center is to facilitate and enhance the level of inter-agency communications, criminal and intelligence analysis, and information sharing among Federal, State and local stakeholders, and the public and private sectors in order to anticipate and counter criminal activity, terrorism, and other hazards in coordination with the Ohio Fusion Center Network and the Intelligence Community.[76]*

During this period, the Fusion Center was used to develop initial intelligence regarding anticipated events subsequent to the death of George Floyd. That intelligence was processed by the CDP ICS Intel Section which included personnel assigned to the NEORFC. The Fusion Center developed and provided intelligence from various sources and shared that information through the CDP ICS Intel Section,[77] as well as to the OEM EOC Intelligence Branch.[78]

### d.  Planning by the City of Cleveland

Based on information available to the Monitoring Team, the following is an approximate chronology of the development of the CDP's planning process including the ICS organizational structure in Cleveland between May 26 and June 12, 2020 with a focus on May 30.

May 26– May 29
- The assigned Special Events Coordinator (SEC) assigned to Field Operations, and others were formally briefed on the Floyd incident and the ensuing protests that occurred in

---

[75] Kelly Blackwell, Ohio Office of Emergency Management
[76] https://www.dhs.gov/fusion-center-locations-and-contact-information
[77] Intel Section per ICS Form CDP 205 for each operational period and each EAP
[78] EOC Sitrep Report #1 et al

Minnesota and elsewhere. He began informally developing plans for a response to protests although none were specifically confirmed at the time. Over the following days, Captain Butler began to developed Event Action Plans (EAP) based on the information that he received from NEORFC and other sources. [79]

<u>May 29</u>

- Based on intelligence and available information developed through NEORFC, internal sources and social media, the CDP became aware of a planned protest for the Free Stamp (Willard Park) the following day. The SEC developed an initial EAP on May 29 based on the information received. The SEC reports there was no specific information indicating that the protest would be anything other than a peaceful protest similar to several others that had occurred at that location.

  According to SEC, as with most large agency structures, the CDP EOC is minimally staffed at all times to maintain the ICS functionality and interagency interoperability; though both the EOC and ICS organization scale up to meet the needs of the incident or anticipated occurrence. The Cleveland Emergency Operations Center (EOC) activated at 1500 on Saturday May 30 at a Partial Level Activation in order to conduct situation monitoring, information analysis, and resource coordination in support of the event.

- As the planning EAP was reviewed through the Chain of Command, the Deputy Chief specifically inquired via email, "In light of what has taken place in Minneapolis and their Police buildings, are we developing a plan to secure our District buildings?"[80]  The Monitoring Team sees no reply to that email that is responsive to that question.

<u>May 30</u>

- When briefed on the deployment plan on the morning of May 30, 2020, including the overall numbers of officers, Chief Williams simply responded in an email, "That's not enough."[81] There is no response to that email.

- A relatively small crowd gathered in early afternoon at Willard Park, however, that group grew and moved towards the Justice Center. According to Captain Butler, CDP was not anticipating the large and violent crowd that manifested at the Justice Center. This was echoed by Cuyahoga County Sheriff Schilling, who said his office underestimated the number of protesters who eventually attended the event and the possibility that the protests

---

[79] Interview with Captain Butler regarding the protests and ICS in Cleveland conducted on August 25, 2020
[80] Email dated May 29, 2020.
[81] Email dated May 30, 2020.

could turn violent. "Unfortunately, and I hate to say this, I think that initially we under planned," Schilling said. "And plus the feedback we're getting back from the fusion center and the police department, we kind of took this one that it was going to be one of the usual protests." Schilling said they had no extra deputies working and no advanced scheduling to deal with the protests. The Sheriff's Department activated its SWAT team to help after the protest turned raucous.[82]

- 1500 hours, the Cleveland EOC became activated at a *Partial* Level[83]

- As the protest grew and began moving towards the Justice Center, the EOC became fully operational and the EAP was scaled up. Captain Butler advised that many were involved in the operational response to the protest at the Justice Center. Commander Todd was the designated Incident Commander (IC).

- In total, 15 EAPs were developed for protests that were planned or identified as possible or planned between May 31 and June 12. Also, the Division adjusted its response to ensure they were fully prepared should similar violence occur.

### e.  Assessment of ICS Planning and Response

Based on an assessment CDP's implementation of ICS and NIMS standardized protocols, the Monitoring Team will provide recommendations to the Division based on a series of lessons learned objectively identified from the events spanning each material operational period. While the OEM EOC was activated at a City level to provide support, this assessment will focus on the CDP's ICS process and operations.

### f.  Recommendations

### i.  Sentinel Review - Consistent with best practices in policing, the Division should adopt a protocol that requires an agency-wide, blame-free examination for all aspects of major events.

The review should include planning and preparation, communications, community engagement (pre/post), tactics, and operations as well as assessment of individual employee stress and wellness as appropriate.[84]

---

[82] https://www.cleveland.com/metro/2020/06/cuyahoga-county-sheriff-says-department-was-unprepared-for-scale-of-protests-that-turned-into-riots-in-downtown-cleveland.html
[83] EOC Situation Report Number 1
[84] IACP, Critical Incident Stress Management

The Monitoring Team appreciates that the Division created a thorough After-Action Report to assess its response to the May 30 events. While the After-Action Report is an important step, hosting debriefings Division-wide at roll calls or in scheduled meetings would permit all CDP members to benefit from the report and lessons learned. Creating a learning organization that shares successes and opportunities for improvement widely builds a foundation for best practices in policing and is an important element of organizational improvement, growth and leadership.[85][86]

For example, this overall event could have been referred to the Force Review Board for comprehensive consideration as the Division's new administrative best practices option.

Additionally, and following up on the community engagement aspect of the Consent Decree, CDP should consider expanding its debrief to include listening sessions or discussions with the public about the demonstration on May 30, 2020.

> ii. **The Division should develop a training schedule that allows at least annual training for all members that covers crowd management and control techniques.**

This training should include Mobile Field Force (MFF) tactics, Personal Protection (and safety) Equipment use and deployment and a review of related crowd management policies.

Presently, policies related to MFF appear to cover MFF-assigned personnel exclusively and as was evident on May 30, all members must be fully prepared and trained to respond to critical incidents. It is likely based on national trends in the summer of 2020 and in the aftermath of the 2020 national election that further demonstrations with opposing factions or even with bad actors are likely to occur in Cleveland. As such, it is critical that all Division personnel be adequately trained and equipped.

As the CDP aptly noted in their After-Action Report, some of the gaps that led to a less effective response on May 30 were the following:

o Some members of the Patrol Section had not received MFF training since 2015 and had not practiced donning their PPE. This deficiency was evident as the officers arrived. Many were unfamiliar with donning their gear, creating a significant delay in responding to specific locations to manage the crowds.
o Many officers arriving from the Patrol Section did not have or were not issued gas masks.

---

[85] https://www.police1.com/police-training/articles/6-steps-toward-establishing-a-debriefing-culture-in-law-enforcement-DTPn8x9u9zPxaGOi/
[86] https://www.policemag.com/373039/critique-your-debriefings

- o In 2016 in preparation for the Republican National Convention the CDP conducted mass MFF training sessions but did not include Intelligence Officers, SWAT, Counter Assault Teams (CAT), and undercover units into field force exercises.
- o Additionally, equipment failure was an issue as was the availability of equipment. Many officers who were tasked with responding to the Justice Center did not have proper protective equipment such as helmets, shields, chemical agency masks/PPE equipment.

    **iii.**    **The Division of Police and City Office of Emergency Management (OEM) should conduct cross training and modify policy as needed to ensure consistency between Divisional EAP/ICS Forms and those ICS forms that comprise the EOC IAP, as well as to ensure consistency and unity of ICS organizational command.**

On May 30 two plans were in effect, a Divisional EAP and the [OEM] EOC IAP with different persons filling different roles during different operational periods. While the EOC is focused on multi-agency response to events with the City of Cleveland, the Division is focused on executing their law enforcement objectives and rely on their own EAP (IAP). On May 30, the EOC provided effective support for the Division in coordinating response of other agencies within law enforcement and managing each mutual aid entity as well as Ohio State Police and National Guard. A similar recommendation is included in the CDP After-Action Report where it acknowledges there is an opportunity for improved response in the future if cross-training occurs with Cleveland Fire Department and Cleveland Emergency Medical Services for crowd management events. Training for major incidents with local and regional partners increases the likelihood of successful deployment, engagement and cooperation.

    **iv.**    **The Division should review and revise their policy on MFF tactics, GPO 3.3.02 to reflect the changes that are in place in MFF assignments such as Tier 1 and Tier 2, as well as designating the rank of the Field Force Commander, and provide training for all members on those changes.**[87]

The Division does have a policy of MFF deployment and operations, and has put significant effort into developing GPO 3.3.03, *Crowd Management and the Protection of Constitutional Rights*, effective June 13, 2016. However, as is the case with any policy, there must be routine training on the policies with specific refreshers in advance of known events. MFF tactics and crowd control are perishable skills that need to be incorporated into the Division's training schedule for all members.

---

[87] MFF designation were changed recently according to Captain Butler and a revised policy is underway.

     **v.**     **The Division should revise policies related to ICS to ensure that positions of leadership are filled based on the incident level and individuals are fully accountable for fulfilling role-specific ICS objectives.**

An objective of ICS is to be modular and expandable based on the incident or projected event for ensuring operational periods with the objective of being fully prepared for any eventuality. When the demands or anticipated impact of the incident expand, so should the ICS organization. The IC should provide oversight and assign an operational leader to assume control and leadership over the tactical response, regardless of where the initial ICP is, the Operations Chief needs to take full responsibility for all operational aspects of the incident including developing Branch and Group responsibilities in line with the IAP Objectives.

Although consistency in terminology is important, the focus must be on functionality of effective incident response, over mere form. The incumbents for the various roles must be trained, prepared, and capable of accomplishing mission objectives. As long as effective leadership and span of control is maintained with clear announcements stating who is in charge and in what role during each operational period then the organizational objectives can be functionally met.[88]

As CDP identified in their own After-Action report, for May 30 there were gaps in response due in part to unfilled command positions (consistent with ICS) and a demonstrated inability to expand in ICS as crowds migrated to multiple locations. There were also moves made that added to officer confusion during the protest. The Chief of Police assumed the role of Incident Commander, though it is not clear if he was in his office, at the EOC or at the Justice Center (lobby) at the time. And although Commander Todd was the identified Incident Commander of the Justice Center demonstration, Captain Butler appeared to be giving specific directions on behalf of the Chief on crowd control and use of force for the Lakeside and Ontario entrances, including giving instructions to Commander Todd. These examples show the lack of clarity on who is in charge, and the absence of a clear and well-communicated chain of command and decision-making. The confusion and miscommunication that occurred on May 30 are issues which the Incident Command System is designed to avoid.

     **vi.**     **The Division should consider realigning their ICS procedural guidelines to transition responsibilities of critical incident management and planning to the Bureau of Homeland Special Operations for any incident that has the potential of encompassing multiple operational periods or cross jurisdictions such as level 2 or 1 incident.**

---

[88] Manageable Span of Control Span of control is key to effective and efficient incident management. Supervisors must be able to adequately supervise and control their subordinates, as well as communicate with and manage all resources under their supervision. (FEMA sources)

Currently the CDP organization invests all responsibility of critical incident preparation with the Special Events Coordinator (SEC); and the CDP SEC is also the identified Mobile Field Force Coordinator. The dual set of responsibilities changes that position away from planning and towards operational leadership.[89]

The individual tasked with developing the agency's ICS and response protocols for an incident, which may span several operational periods or become cross jurisdictional, should remain consistent whenever possible. Wearing two hats, as is the practice in Cleveland, one overseeing the execution of the ICS organizational protocols at the EOC while simultaneously leading a tactical response is not a reasonable expectation or an effective strategy.

Ideally the Special Events Coordinator should be assigned from within the agency's Operational Division, this position should be limited to planned events such as sporting, festivals or other Level 4 or 5 planned events that have limited impact on local resources. When incidents are likely to expand, involve other jurisdictions, or require a multi-agency response such as in the May 30 protest response, a unit within Homeland Special Operations or Incident Command Unit, or similar specialty units relieves Operations from large scale incident planning and coordination in order for Operational personnel to focus on the tactical response plan. The Special Operations Unit should also consider and include resources from across the region, state and federal government for grants and funding opportunities and coordinate cross jurisdictional training. This unit, and its external support resources should work closely with the Cleveland EOC, CCOEM, Ohio OEM and FEMA when appropriate.[90]

> vii. **Consistent with the tenets of effective and proven NIMS/ICS practices, the Division should use terminology, verbiage and nomenclature consistent with FEMA NIMS/ICS to include Incident Action Plan ('IAP') for larger scale operational incidents such as a Level 3 or above.**

Cleveland Division of Police leadership has attended and received certification in various FEMA NIMS/ICS training sessions. A critical element of NIMS and ICS is consistency of nomenclature, and terminology. Additionally, when cross-agency cooperation may cause confusion, those conflicts are resolved with the NIMS/ICS standards. All involved agencies should essentially speak the same language, use the same forms and adhere to the same federally developed standards for incident readiness and response.

---

[89] Cleveland Division of Police GPO 1.2.01/IV
[90] The EOC was activated as a support entity for all city entities under separate IAPs

viii.   **The Division should focus on initial response protocols including clearly identifying an operational chain of command for each incident, and timely identifying an Incident Command Post (ICP) that serves as the center of decision-making and the location where mission objectives are accomplished.**

While the ICP can initially be located in an EOC for area command scale incidents or with multiple locations, the EOC generally provides a government level base of operations and support function under municipal, county, state or federal government. The flexible and often temporary ICP should provide a forward tactical base of planning and operational decision making. This can be a school, an empty facility or a command vehicle, if the ICS functions can safely be fulfilled by the appropriate general staff.[91]

In the case of May 30, an objectively ideal location for the ICP for the protests outside the Justice Center would be the lobby or other location where the IC (Commander Todd) could make reasonable situational assessments of the protest conditions away from the chaos. Based on an objective assessment of span of control, those directives could be carried out by subordinate personnel perhaps a captain at both doors who could direct officers and coordinate resources through the IC at the ICP.

While it was clear that Commander Todd was the identified (tactical) Incident Commander at the Justice Center, there objectively appears to be confusion because two protests were occurring, one on the Ontario side where the cars were eventually burned and one on Lakeside where the large portion of protesters gathered. While Commander Todd provided oversight on Lakeside, it was unclear if she or Captain Butler or another command officer were in tactical control of the protest on the Ontario side. As the two protests had different but similar dynamics, there was a conflict of direction based on radio traffic and tactical actions taken. For example, direction was given from Captain Butler on the Ontario side to Commander Todd on Lakeside regarding use of force options and moving protesters and holding ground. However, he was not on scene to ensure that his directions were based on a clear and timely situational assessment. Moreover, there were confusing directives given by various individuals during the incident (based on recordings) and no clear chain of command. Captain Butler at times stated that he gave instructions per "the Chief". However, it is not clear if the Chief referred to Chief Williams or one of the other Chiefs who may have been at the Justice Center or from where those decisions were made.

It is recommended to ensure effective cross-jurisdictional leadership and unity of command, a CCSO leader (lieutenant or above) could fill the role of Deputy Incident Commander at the Justice Center because both agencies were directly impacted at that location. For effective unity of command, ICs need to be within reach of each other ensuring communication to all parties is in sync.

---

[91] https://www.fema.gov/pdf/emergency/nims/NIMS_AppendixB.pdf

> ix. **The Division should ensure consistency when developing Operational entities such as Groups or Branches along functional or geographic lines based on operational objectives, rather than just listing them to ensure they are accounted for; and must designate a leader for each such entity, consistent with effective span of control objectives.**

Confusion can occur when multiple units from cross disciplines or functions are placed into different ICS entities and without a designated commander.[92] On the May 30, the EAP showed two groups listed within the Operations Section designated as Specialty Group and CSU/Bike/NICE Group. Additionally, the Specialty Group was comprised of the following specialized units; Bomb Unit, K9, SWAT, Intel, Traffic and Aviation. Communications leadership was listed on one form as part of Logistics but later designated as part of Operation[93,94]

---

[92]Subsequent EAPs had an Operations Chief listed and Groups incorporated in a similar manner
[93] Forms 203/204
[94] Fema training lessons learned

### III. UPDATE ON THE CITY OF CLEVELAND'S PROGRESS TOWARDS COMPLIANCE WITH THE CONSENT DECREE

Since the Third Semiannual Report, the Monitoring Team has summarized the status of the City's compliance with each paragraph of the Consent Decree. Although providing "a paragraph-by-paragraph accounting of the general state of the City's compliance runs the risk of being an over-simplification," these summary characterizations remain useful markers for understanding progress over time.[95]

Thus, each major section of this part of the Ninth Semiannual Report summarizes the Monitoring Team's generalized conclusions about the status of compliance by describing the state of each area as one of the following:

**Non-Compliance.** The City or Division has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or Division's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement.

**Evaluation Deferred.** This category reflects those limited instances where work in a given area has been intentionally and affirmatively deferred in order to work on other, necessary prerequisites. In these areas, the City or Division could have made more progress in a given area but, for project management reasons, have appropriately focused attention on other areas. Although this still means that the City has a distance to travel to reach General Compliance with the term of the Consent Decree, the intentional and affirmative decision to postpone focus on a given area for project management and implementation purposes is sufficiently different to warrant a separate designation in some cases.

**Partial Compliance.** The City or Division has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the provision of the Consent Decree—but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice. It may capture a wide range of compliance states or performance, from the City or Division having taken only very limited steps toward operational compliance to being nearly in operational compliance.

**Operational Compliance.** The City or Division has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system,

---

[95] Third Semiannual Report at 9.

or other mechanism of the Decree such that it is in existence or practice operationally—but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

**General Compliance.** The City or Division has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the City or Division has effectively complied with a requirement fully and systemically.

The same caveats that have previously applied to the use of these summary categories remain applicable and as such, are repeated here verbatim. First, "Non-Compliance" or "Partial Compliance" do not automatically mean that the City or CDP have not made good- faith efforts or commendable strides toward compliance. It might, instead, signify that initial work has either not yet begun or reached a sufficiently critical point where progress can be considered to have been made.

Second, "Partial Compliance" requires more than taking some limited, initial steps toward compliance with a requirement. It instead requires that the City or Division have made "sufficient, material progress toward compliance" that "has graduated from the stages of initial work to more well-developed and advanced refinement of various reforms."[96]

Third, these summary terms do not appear in the Consent Decree. The Team employs them in order to synthesize and summarize the report's conclusions. Relatedly, compliance with individual paragraphs of the Decree is necessary for the larger, overall "Substantial and Effective Compliance" with the whole of the Consent Decree but it is not the same thing. Ultimately, "Substantial and Effective Compliance" with the Consent Decree will be reached when "the City either has complied with *all* material requirements of this Agreement, or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures,"[97] "by a preponderance of the evidence."[98]

Fourth, the charts that summarize progress in each area also condense the requirements of each paragraph rather than reprinting the entire Consent Decree in the context of this report. Any imprecision detected or confusion created by these condensed or summarized requirements is

---

[96] Third Semiannual Report at 10.
[97] Dkt. 7-1 ¶ 456 (emphasis added).
[98] *Id.* at ¶ 397.

unintended and, in any event, can be cured with reference to the original Consent Decree language itself.[99] The charts primarily cover paragraphs 14 through 340 of the Consent, but other paragraphs also contain requirements that the City must meet.[100]

We also reiterate that these overall "compliance status" conclusions at the start of each chapter do not replace the more rigorous quantitative and qualitative assessments of how CDP is performing over time:

> [T]he Monitoring Team bases its assessments on its current understandings, knowledge, and information gained through ongoing work and discussion with CDP, the Parties, and other stakeholders. The assessments are informal to the extent that not all of them are necessarily informed by the type of exhaustive compliance and outcome measurements that are a critical component of the Consent Decree— and the summary determinations do not take the place of these more structured, systemic analyses. The intent is to provide a bottom-line sense of where the Division is on the road to compliance. Ongoing, rigorous quantitative and qualitative assessments will provide a more comprehensive picture as work under the Consent Decree proceeds.[101]

The Team's characterizations of progress should ultimately be viewed as a synthesis or bottom-line accounting of the substantive discussions of each major Consent Decree area contained within this report.

Finally, the Monitoring Team notes that the City of Cleveland's implementation of the Consent Decree and the various subprojects comprising it, is a substantial task. Many areas of the Decree require significantly more time than one reporting period for the City to achieve—and for the Monitoring Team to report on major breakthroughs of progress. Accordingly, the Team's semiannual reports, including this current report, reprint content from prior semiannual reports in instances where there has not been enough material progress to warrant an update. In such cases, the Monitoring Team has elected to not cite to prior semiannual reports in the interest of readability.

---

[99] *See Id.*
[100] *See* Third Semiannual Report at 10.
[101] *Id.* at 11.

## IV.    COMMUNITY ENGAGEMENT AND BUILDING TRUST

| Paragraph | Status of Compliance |
|---|---|
| 14. CDP creation of "formal and informal mechanisms that facilitate ongoing communication between CDP and the many Cleveland communities it serves." | **PARTIAL COMPLIANCE** |

### a.  Community Police Commission ("CPC")

| Paragraph | Status of Compliance |
|---|---|
| 15. Creation of CPC to make recommendations, work with Cleveland communities to develop recommendations, and "report to the City and community as a whole and to provide transparency" on reforms | **GENERAL COMPLIANCE** |
| 16. Establishment of CPC Selection Panel to select CPC Commissioners; composition of CPC; and periodic meetings with Chief of Police to "provide recommendations." | **GENERAL COMPLIANCE** |
| 17(a). "[H]old public meetings across the City, complete an assessment of CDP's bias-free policing policies, practices, and training, and make recommendations." | **GENERAL COMPLIANCE** |
| 17(b). "[A]ssist as appropriate in . . . development of training related to bias-free policing and cultural competency." | **GENERAL COMPLIANCE** |
| 17(c). "[O]n an ongoing basis, assess CDP's community activities" and "make recommendations" related to "community engagement" and "community confidence" | **PARTIAL COMPLIANCE** |
| 17(d). "[O]n an ongoing basis, review CDP's civilian oversight structure to determine if there are changes it recommends for improving CDP's accountability and transparency" | **PARTIAL COMPLIANCE** |
| 17(e). "[P]erform other function[s] as set out in this Agreement." | **PARTIAL COMPLIANCE** |
| 18(a). "[R]eview and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention." | **PARTIAL COMPLIANCE** |
| 18(b). [R]eview and comment on CDP's implementation of initiative, programs, and activities that are intended to support reform." | **PARTIAL COMPLIANCE** |
| 18(c). "[H]old public meetings to discuss the Monitor's reports and to receive community feedback concerning CDP's compliance with this Agreement." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 19. "The City will provide access to all information requested by the Commission related to its mandate, authority, and duties unless it is law enforcement sensitive, legally restricted, or would disclose a personnel action." | **PARTIAL COMPLIANCE** |
| 20. CPC "will issue [at least annual] reports," which the "City will post . . . to the City's website." | **OPERATIONAL COMPLIANCE** |
| 21. "The City will consider and timely respond in writing to the Commission's recommendations for improvements," which "will be posted to the City's website." | **PARTIAL COMPLIANCE** |
| 22. CPC budget listed as "separate line item" to ensure "sufficient independence and resources." | **GENERAL COMPLIANCE** |

### i.    Background

The Community Police Commission ("CPC" or the "Commission") has remained active during the reporting period despite difficulties posed by the COVID-19 crisis. The Commission held virtual meetings and participated in a "retreat-style" meeting with key City leaders to continue to work toward forging a pathway that will allow the CPC to fulfill its role and responsibilities as detailed in the Consent Decree.

Commissioners Lewis Katz and Victoria Marion were elected to serve as its next co-chairs during this reporting period. Ms. Marion is a social worker employed at the Department of Veteran's Affairs where she works in the Comprehensive Homeless Center. Mr. Katz has taught law at Case Western Reserve University for more than half a century.

At the time of this report, the parties are working to reconstitute the Selection Panel charged under paragraph 16 of the Consent Decree with reviewing applications of those interested in volunteering to serve on the Commission and then making recommendations for successful candidates to the Mayor. There is one Commissioner vacancy to be filled and a reconstituted Selection Panel is essential to filling that vacancy.

The Monitoring Team remains greatly concerned that despite the retreat session held between the City and the CPC at the beginning of this reporting period, there remains a lack of respectful, transparent and productive collaboration between the City and the CPC. A productive and professional relationship between the City and its CPC is essential to the City achieving and maintaining compliance in this area.

### b. District Policing Committees

| Paragraph | Status of Compliance |
|---|---|
| 23. Facilitation of "regular communication and cooperation between CDP and community leaders at the local level," with District Policing Committees meeting "at minimum, every quarter." | **PARTIAL COMPLIANCE** |
| 24. CPC, CDP, and Community Relations Board ("CRB") will "develop a mechanism to recruit and expand" Committee membership." CDP "will work with [Community Police] Commission to select officers for each District Policing Committee." | **PARTIAL COMPLIANCE** |
| 25. CDP "will work closely with District Policing Committees to identify strategies to address crime and safety issues in their District," considering and addressing identified priorities. | **PARTIAL COMPLIANCE** |
| 26. "At least annually, each District Policing Committee will present its identified strategies, concerns, and recommendations" to the CPC, with CDP officer who is Committee member presenting to CPC "CDP's assessment of ways to address" the recommendations." | **NON-COMPLIANCE** |

The City has made no meaningful progress in this reporting period toward creating District Policing Committees ("DPCs") that expand beyond what existed prior to the Consent Decree. Likewise, the Monitoring Team remains unaware of any strategic priorities having been identified by any of the DPCs or of any effort by the City to ensure that its DPCs and its CPC work together collaboratively. As detailed in previous semiannual reports, the Decree calls for the expansion—building on existing structures—of five District Policing Committees, or one for each of the five police districts within the City of Cleveland.[102] Those Committees, which existed long before the Consent Decree process, must work to "identify strategies to address crime and safety issues in their District."[103]

The development of the DPCs and the collaborative working relationship with the CPC will be an area of focus in the next semiannual report.

---

[102] *Id.* at ¶¶ 23-24.
[103] *Id.* at ¶ 25.

## V.     COMMUNITY & PROBLEM-ORIENTED POLICING

| Paragraph | Status of Compliance |
|---|---|
| 27. Implementation of "comprehensive and integrated community and problem-oriented policing model" and consultation with CPC regarding the model. | **PARTIAL COMPLIANCE** |
| 28. Ensuring that "mission statement reflects [the Division's] commitment to community-oriented policing" / "integrat[ing] community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **OPERATIONAL COMPLIANCE / PARTIAL COMPLIANCE** |
| 29. Ensuring "that officers are familiar with the geographic areas they serve," "engage in problem identification," and "work proactively . . . to address quality of life issues." | **EVALUATION DEFERRED** |
| 30. Initial and annual in-service community and problem-oriented policing training "adequate in quality, quantity, type, and scope" that addresses specifically identified areas. | **PARTIAL COMPLIANCE** |
| 31. Maintenance of "collaborative partnerships with a broad spectrum of community groups," including CDP meetings with community organizations and District Policing Committees. | **PARTIAL COMPLIANCE** |
| 32. CDP "meet[ing] with members of the community in each District on a monthly basis and "solic[itation of] participation from a broad cross-section of community members in each District" to "identify problems and other areas of concern . . . and discuss responses and solutions." | **PARTIAL COMPLIANCE** |
| 33. Development and implementation of "systems to monitor officer outreach to the community" that CDP "will use . . . to analyze . . . whether officers are partnering with a broad cross-section of community members to develop and implement cooperative strategies that build mutual respect and identify and solve problems." | **PARTIAL COMPLIANCE** |
| 34. "At least annually, CDP will present the results" of paragraph 33 analysis "broken out by District in a publicly-available community policing report" that describes problems, solutions, and obstacles. Report provided to Commission and posted on CDP website. | **NON-COMPLIANCE** |

CDP still has significant strides to make toward implementation of the mandates required for Community & Problem-Oriented Policing under the Consent Decree. The Monitoring Team is aware of computer software issues that initially slowed down some of the work. The current health crisis has also had an impact on the ability of officers to fully implement the Community &

Problem-Oriented Policing Plan ("the Plan"). Despite those difficulties, CDP produced a Community Engagement Analysis Report to the Monitoring Team during this reporting period. While the report is a good start, there exist concrete areas of improvement including ensuring that the time reported by officers as community encounters capture only those encounters that satisfy those contemplated by the Plan and are not cursory interactions between officers and civilians.

## VI.    BIAS-FREE POLICING

| Paragraph | Status of Compliance |
|---|---|
| 35. Delivery of "police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias," among other things. | **PARTIAL COMPLIANCE** |
| 36. "CDP will integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **PARTIAL COMPLIANCE** |
| 37. CDP will ensure that it "administer[s] all activities without discrimination" on basis of various protected classes | **PARTIAL COMPLIANCE** |
| 38. "CDP will develop a bias-free policing policy" incorporating CPC recommendations "that provides clear guidance to officers" | **OPERATIONAL COMPLIANCE** |
| 39–40. Bias-free policing and procedural justice training "adequate in quality, quantity, scope, and type" covering specific areas | **PARTIAL COMPLIANCE** |
| 41. Supervisor training on bias-free policing and procedural justice issues covering specific areas | **EVALUATION DEFERRED** |
| 42. Annual in-service training on bias-free policing "adequate in quality, quantity, type, and scope" | **EVALUATION DEFERRED** |
| 43. Analysis of paragraph 265 data ("including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination") | **EVALUATION DEFERRED** |
| 44. Consideration of "bias-free policing and equal protection" principles in hiring, unit assignment, promotion, and performance assessments. | **PARTIAL COMPLIANCE** |

### a.  Where the Division Stands

The existing training needs within CDP continue to impact the City's ability to make progress in key, substantive areas under the decree, including Bias-Free Policing. CDP is in the process of

revising its annual in-service training in this area. CDP will need to increase its training capacity in order to make substantial progress in the development of training curricula that is "adequate in quality, quantity, type and scope."[104]

## VII.  USE OF FORCE

### 1.  Officer Use of Force Principles & Policy

| Paragraph | Status of Compliance |
|---|---|
| 45. "CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force" complies with the Constitution, federal law, and the Consent Decree "and that any use of unreasonable force is promptly identified and responded to appropriately." | **PARTIAL COMPLIANCE** |
| 46. "The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers . . . will comply" with at least twelve major, listed principles. | **PARTIAL COMPLIANCE** |
| 47. Division "will ensure that the [use of force] incident is accurately and properly reported, documented, and investigated." | **PARTIAL COMPLIANCE** |
| 48. "CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends." | **PARTIAL COMPLIANCE** |
| 49. Development of use of force policies "that comply with applicable law[,] . . . are adequate to achieve the goals described in paragraph 45," and "specify that unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability." | **OPERATIONAL COMPLIANCE** |
| 50. "CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons." | **OPERATIONAL COMPLIANCE** |
| 51. Weapon-specific policies "will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon." | **OPERATIONAL COMPLIANCE** |
| 52. "No officer will carry any weapon that is not authorized or approved by CDP." | **OPERATIONAL COMPLIANCE** |
| 53. "Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that | **OPERATIONAL COMPLIANCE** |

---

[104] Paragraph 42.

| | |
|---|---|
| the use of weapon is imminent, and allow the subject an opportunity to comply." | |
| 54–83 "CDP will implement policies" for firearms, ECWs (Tasers), and OC (pepper) spray that comply with a host of specific, expressly listed provisions. | **OPERATIONAL COMPLIANCE** |
| 84. CDP "will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes" a number of specific, expressly listed elements. | **OPERATIONAL COMPLIANCE** |
| 85. CDP "will provide the use of force training described in paragraph 84 to all new officers." | **OPERATIONAL COMPLIANCE** |
| 86. "CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |
| 87. "CDP will develop and implement a single, uniform reporting system pursuant to a Use of Force reporting policy" that complies with the force Level categorization set forth in the paragraph. | **OPERATIONAL COMPLIANCE** |
| 88. Requiring "[a]ll officers using or observing force" to complete a Use of Force Report including a number of specific features and avoiding "conclusory statements, 'boilerplate,' or 'canned' language." | **OPERATIONAL COMPLIANCE** |
| 89. "Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports." | **OPERATIONAL COMPLIANCE** |
| 90. "Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable." | **OPERATIONAL COMPLIANCE** |
| 91. Requirement to "notify . . . supervisors . . . as soon as practical following any use of force" and if becoming aware of "an allegation of unreasonable or unreported force by another officer." | **OPERATIONAL COMPLIANCE** |
| 92. "Use of Force Reports will be maintained centrally." | **OPERATIONAL COMPLIANCE** |

The Monitoring Team is currently engaged in a comprehensive analysis of Use of Force cases to test whether when CDP officers use force, they are doing so in a manner that complies with the Division's new policies and the terms of the Consent Decree. The Monitoring Team will report out in the next year about the results.

For this semiannual report, the Monitoring Team is not reporting out on the quantitative data around use of force, preferring to address these statistics in the next semiannual report, when a full year of additional data that has been fully reviewed by CDP is available. That being said, the Monitoring Team continues to monitor use of force case data monthly at CDP's Compstat meetings and has no reason to believe the overall positive trends have changed, other than as

described above in the demonstration context.

## 2. Use of Force Investigation and Review

| Paragraph | Status of Compliance |
|---|---|
| 93. "A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval." | **EVALUATION DEFERRED** |
| 94. Setting specific requirements relating to the investigation of low-level, Level 1 force. | **PARTIAL COMPLIANCE** |
| 95–109. Setting specific requirements relating to the investigation by supervisors and/or CDP chain of command for investigation and review of Level 2 force. | **PARTIAL COMPLIANCE** |
| 110. "CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP." | **PARTIAL COMPLIANCE** |
| 111. Creation and design of dedicated Force Investigation Team (FIT) that "will conduct administrative investigations . . . and criminal investigations" of serious force, "force involving potential criminal conduct," in-custody deaths, and cases assigned to it by the Chief. | **PARTIAL COMPLIANCE** |
| 112. Composition of FIT Team. | **PARTIAL COMPLIANCE** |
| 113. "FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type" on a host of specific, expressly-listed topics both initially and annually thereafter. | **EVALUATION DEFERRED** |
| 114. "CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement." | **EVALUATION DEFERRED** |
| 115. Response of FIT to use of force scenes. FIT notification of prosecutor's office. Notification of designated outside agency to conduct criminal investigation if City elects to use external agency for such investigations. | **EVALUATION DEFERRED** |
| 116. "CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation." | **PARTIAL COMPLIANCE** |
| 117. Memorandum of understanding required between CDP and outside agency containing specific, expressly-listed provisions. | **OPERATIONAL COMPLIANCE** |
| 118. Setting forth various, specific, and expressly-listed responsibilities of FIT during its investigations. | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 119. Monitor's duty to annually review any "criminal investigations conducted by the outside agency" to ensure that they "are consistently objective, timely, and comprehensive." | **EVALUATION DEFERRED** |
| 120. Providing for delay of compelled interview if "case has the potential to proceed criminally" but otherwise requiring that "[n]o other part of the investigation . . . be held in abeyance" unless "specifically authorized by the Chief" in consultation with investigating agency and prosecutor's office. | **PARTIAL COMPLIANCE** |
| 121. Requiring completion of preliminary report presented to Chief or Chief's designee "as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force." | **PARTIAL COMPLIANCE** |
| 122. Completion of investigation within 60 days. Preparation of FIT investigation report. Review of FIT investigative report by head of Internal Affairs who "will approve or disapprove FIT's recommendations, or request . . . additional investigation." | **EVALUATION DEFERRED** |
| 123. Revision of FIT manual to ensure "consisten[cy] with the force principles" and several specific, expressly-listed provisions. | **PARTIAL COMPLIANCE** |
| 124–30. Establishment and operation of Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." | **PARTIAL COMPLIANCE** |

### a.  Background

As prior semiannual reports have summarized, the Consent Decree establishes protocols for the Division to investigate uses of force based on the reported Level of force.

On April 22, 2020, the Monitoring Team indicated to the Court its approval of four final documents from CDP relating to the investigation of use of force incidents: (1) a Use of Force Supervisory Reviews and Investigations Policy ("Supervisory Review Policy"); (2) a Force Investigation Team ("FIT") Manual; (3) a FIT General Police Order ("GPO"); and (4) a Memorandum of Understanding Between the Cleveland Division of Police and the Cuyahoga County Sheriff's Department to Conduct Independent Criminal Investigations of Uses of Force by Cleveland Police That Result in the Actual or Anticipated Death of a Person ("MOU").

Additionally, on June 30, 2020, the Court conditionally approved the proposed Force Review Board (FRB) Policy for a period starting on the date the FRB holds its first meeting and extending for six months. The FRB serves as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency

improvement perspective.[105] During this time, the Monitoring Team will assess FRB operations to determine if it can effectively carry out all of the duties that the Consent Decree prescribes. At the conclusion of the six-month period, the Monitoring Team will report to the Court its observations and assessment and will recommend whether the FRB policy should be permanently approved or if material changes should be considered.[106]

While the first meeting of the FRB did not occur during 2020[107], a comprehensive training occurred for the FRB members on November 6, 2020, introducing them to the forms, the concepts, and the approach to be used by the FRB. Of note, Chief Williams, who chairs the FRB, voiced a clear commitment to thoroughly analyzing each use of force that comes before the Board during the training, recognizing "this is the future of law enforcement." While the training was somewhat complicated by ongoing technical issues (which have also surfaced in other trainings), the members of the Board were engaged, and the overall content was sufficiently delivered. The Monitoring Team looks forward to observing the Board's operations in practice.

### b. Supervisory Review Policy

The Supervisory Review Policy identifies CDP supervisors' responsibilities in responding to an officer use of force, including reviewing Level 1 and Level 2 uses of force, referring Level 3 to FIT, and the chain of command review of investigations. Training for supervisors occurred during the fall of 2020 and the Monitoring Team will be interested to see any changes to supervision as the use of force reviews proceed.

### c. Force Investigation Team Manual

To address the most serious uses of force, CDP has developed a lengthy and detailed Force Investigation Team Manual to guide operations of the Division's new FIT Team, which is tasked with a critical function of accountability for incidents of high-level force.

### d. Progress and Tasks that Remain

#### i. Officer Training and Policy Implementation

Now that the FIT and FRB manuals are completed and approved by the Court, CDP will be able to comprehensively analyze the application of force so that officer training, professional development, and risk management may all be continually enhanced. This is made possible by training relevant to Division personnel on the new expectations. Having completed training on

---

[105] Dkt. 7-1 at ¶ 124.
[106] Dkt. 317.
[107] The first eight-hour meeting occurred on February 8, 2021, and members of the Monitoring Team and DOJ attended virtually.

supervisory investigations of force and having trained the FRB, the Division needs to proceed with the training of FIT so that the team can commence investigations according to the new policy.

### ii.  Operation of FRB

Now that the FRB policy and training have been completed, the Division can commence having the FRB review use of force cases. The Monitoring Team will audit the Board's first six-months of operations to assess the Board's ability to fully, fairly, and effectively review force investigations.

### iii.  Compliance & Adherence to New Policies

Finally, it is critical that CDP supervisors, Command Staff, FIT, and the FRB are adhering to the requirements across cases, investigations, and time. As in all areas of the Consent Decree, compliance must be sustained, beyond mere short-term or sporadic adherence, for the new policies on force investigation and review to be considered effective in practice.

## VIII.  CRISIS INTERVENTION

| Paragraph | Status of Compliance |
|---|---|
| 131. "CDP will build upon and improve its Crisis Intervention Program" in furtherance of four specific, expressly-listed goals, which "will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health system and create a context for sustainable change." | **PARTIAL COMPLIANCE** |
| 132. Establishment of Mental Health Response Advisory Committee (the "Advisory Committee") "to foster relationships and build support between the police, community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis." | **GENERAL COMPLIANCE** |
| 133. Composition of Advisory Committee. | **GENERAL COMPLIANCE** |
| 134. "The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program." | **GENERAL COMPLIANCE** |
| 135. Advisory Committee will conduct an annual "analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers" and communications "are appropriately | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| responding to people in crisis," and will also "recommend appropriate changes." | |
| 136. "The Advisory Committee's reports and recommendations will be provided" to CPC, "be publicly available, and will be posted on the City's website." | **GENERAL COMPLIANCE** |
| 137. CDP will designate a Crisis Intervention Coordinator for specific, expressly-identified purposes. | **GENERAL COMPLIANCE** |
| 138. "Coordinator will develop and maintain partnerships with program stakeholders and serve as point of contact" and "resource" for other stakeholders. | **GENERAL COMPLIANCE** |
| 139. "Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, call-takers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program." | **GENERAL COMPLIANCE** |
| 140. "Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate." | **OPERATIONAL COMPLIANCE** |
| 141. "Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers" and "to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls." | **PARTIAL COMPLIANCE** |
| 142. "Coordinator will create ways to recognize and honor specialized CIT officers, call-takers, and dispatchers." | **EVALUATION DEFERRED** |
| 143. Initial and annual crisis intervention training to all officers and recruits that is "adequate in quality, quantity, type, and scope." | **OPERATIONAL COMPLIANCE** |
| 144. Initial and annual crisis intervention training for dispatchers and call-takers. | **OPERATIONAL COMPLIANCE** |
| 145. "CDP will provide enhanced specialized training in responding to individuals in crisis to certain officers ('specialized CIT officers')," who will be "called upon to respond to incidents or calls involving individuals in crisis." | **PARTIAL COMPLIANCE** |
| 146–47. Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | **OPERATIONAL COMPLIANCE** |
| 148. Designation of specialized CIT officers, per specific, expressly-listed requirements. | **OPERATIONAL COMPLIANCE** |
| 149. "Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized officers." | **PARTIAL COMPLIANCE** |
| 150. "All Field Training Officers" ("FTO"s) "will receive the enhanced specialized crisis intervention training described in paragraph 146," though | **EVALUATION DEFERRED** |

| | |
|---|---|
| FTOs will "not be designated as a specialized CIT officer" unless they volunteer and have been selected to do so. | |
| 151. "Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene," with supervisors "seek[ing] the input of a specialized CIT officer . . . where it is reasonable for them to do so." | **EVALUATION DEFERRED** |
| 152. "[T]he Coordinator will develop an effective specialized crisis intervention plan . . . to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis" that includes various, specific, expressly-identified requirements. The City "will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis." | **EVALUATION DEFERRED** |

### a.  Background

The Consent Decree requires the Division to build and enhance its Crisis Intervention Program with the goals of:

- Assisting individuals in crisis;
- Improving the safety of officers, consumers, family members, and others within the community;
- Providing the foundation necessary to promote community and statewide solutions to assist individuals with mental illness; and
  Reducing the need for individuals with mental illness to have further involvement with the criminal justice system.[108]

### b.  Where the Division Stands

As has been stated in the Eighth Semiannual Report, the City and CDP have continued to demonstrate progress with the Mental Health Response Advisory Committee ("MHRAC") – the community problem-solving forum including representatives from the Division, social service providers, mental health and substance abuse professionals, the judiciary, advocates, and individuals in recovery with lived experience – in order to develop ways to improve services to those in need of care. This work continues to require a significant commitment on the part of the

---

[108] Dkt. 7-1 at ¶ 131.

Division, the Alcohol and Drug and Mental Health Services Board ("ADAMHS) and the volunteers from the community.

Captain James McPike has been appointed to take on the role of co-chair of MHRAC as well that of CDP CIT Coordinator where he works with Sergeant Dorr-Guiser. ADAMHS Board CEO Scott Osiecki and Nicole Carlton, Cleveland EMS Director, have continued in the role as co-chairs of MHRAC. Recognition is due to ADAMHS Board Training and Education Director, Carole Ballard, for her role in coordinating MHRAC functions and in providing leadership in bringing the CIT Specialized Officer Curriculum to completion. As discussed previously, as the Consent Decree reaches the end of the fifth year, the responsibility for maintaining progress has rested more and more with the Division and MHRAC. Despite the setbacks dealt by the COVID-19 pandemic, and the loss to cancer of the original CIT Coordinator, Captain James Purcell, the Division, MHRAC, the community providers, and those with lived experiences have been up to the task. Solid progress has been made and many of the key crisis intervention components are nearing completion.

### i. MHRAC Subcommittees: Training, Community Engagement, Diversion, Quality Improvement

MHRAC's Training Subcommittee under the leadership of chair Shannon Jerse of St. Vincent Hospital, Dr. Richard Cirillo, chief clinical officer of the Cuyahoga County Board of Developmental Disabilities, and Carole Ballard of the ADAMHS Board took on significant responsibilities in developing the CDP Crisis Intervention curriculum. The Division completed the Third-Year Crisis Intervention In-Service Training on (1) "Recognizing and Responding to Traumatized Youth", (2) the Call-Takers, Dispatchers, and Supervisors Curriculum ("Telecommunicator Training") and initial training of CDP Telecommunicators, (3) the development of the Fourth-Year Crisis Intervention In-Service curriculum on Autism ("Fourth-Year Crisis Intervention Training") and most importantly, the CIT Specialized CIT Officer 40 Hour Training.

This is a very time-intensive committee. The demands of this committee were made more challenging by the training challenges presented by the COVID-19 pandemic. The committee had to pivot, leave a completed curriculum on "Autism: Support for Families in the Community" until next year and develop revised curricula for both CDP In-Service and the Specialized CIT Officer 40 Hour Training. Additional detailed review of the curriculum was provided by the Department of Justice members Heather Tonsing Volosin, Michael Evanovich and the Monitoring Team. The committee worked with CDP and the ADAMHS Board staff and managed to complete all assignments. Finally, the evaluations from the CDP officers on the Third Year In-Service Training

were very encouraging. Special thanks to the Case Western University Schubert Center and Policy Director Gabriella Celeste for their work and detailed feedback on the training.[109]

The CIT 40 Hour Training is now underway. The Division's Specialized CIT Officer Selection Plan outlined a three-stage process of a participation request, personnel file review, and selection board interview. The Monitoring Team appreciates the leadership shown by CDP in working towards the success of the Specialized Officer Selection Plan.  This level of accomplishment was maintained as the CIT 40 Hour Training completed the first cycle despite the significant challenges presented by the COVID-19 pandemic.

The decision was made to conduct the training in a manner consistent with safety during the pandemic.  The critical de-escalation part was conducted in-person, using a socially-distanced strategy for all trainees as much as possible.  The class was able to meet in-person throughout the entire training.   While most instructors presented in-person, a few were presented through interactive Zoom sessions, allowing for the comfort and safety of the community volunteer instructors.  This training was observed on-site by the Department of Justice and via Zoom by the Monitoring Team in order to respect the safe room capacity limitations.

The officers in attendance as well as the members of the Department of Justice and Monitoring Team rated the training as outstanding.  It was well-received.  Importantly, ADAMHS Board Training Director Carole Ballard, CDP Captain James McPike, CDP Sgt. Brigette Dorr Guiser, members of the MHRAC Training Committee and the many volunteer instructors from the community deserve special commendation for their efforts.  The completion of the initial training and the scheduled cycle of CIT Specialized Officer trainings mark an important milestone in the Division's work to continue to improve the interaction between individuals experiencing a behavioral crisis and CDP officers.

MHRAC's Community Engagement Subcommittee co-chaired by Karen Kearney, Director of the Mental Health & Addiction Advocacy Coalition Northeast Hub and Beth Zietlow-DeJesus, ADAMHS Board Director of External Affairs found innovative ways of assisting CDP in their work with the community despite the limitations imposed by the COVID-19 pandemic. The subcommittee's work focused on community engagement activities such as a virtual "Coffee with a Cop", the CDP Officer resource cards which provide a concise district-by-district guide to Cleveland-area programs and a CIT Program Brochure. Importantly, the subcommittee is focusing on Racism as a Public Health Crisis as an area to further strengthen the relationship between the Division, MHRAC and the community.

---

[109] Recognizing and Responding to Traumatized Youth - August 2020.pdf (case.edu)

MHRAC's Diversion Subcommittee chaired by Christina Kalnicki, CareSource Behavioral Health Initiative Lead, and Rick Oliver, Director of Frontline Crisis Services, has focused on a range of diversion programs to attempt to determine what is the most effective strategy for Cuyahoga County. These diversion programs include the Crisis Stabilization Unit ("CSU"), the new Co-Responder program and the County Diversion Center. The committee worked with Frontline and CDP to encourage voluntary referrals to the CSU.

MHRAC's Quality Improvement Subcommittee, chaired by Captain McPike and ADAMHS Training Director Carole Ballard has been fortunate to take advantage of improved CDP data collection present by Dr. Rania Issa of CDP. This data is becoming more representative of CDP crisis intervention events than what has been available previously. CDP is developing an LMS automated training module to reach an acceptable level of completion. The initial data sample is encouraging. Some key aspects of the new policy are already showing results. Officers are making greater use of EMS when needed, which was one of the goals of the new CDP Crisis Intervention Policy. The arrest rate is very low, as is the injury rate to officers and citizens. The incidents of violence or the presence of weapons is also low, which helps to change the stereotypes that lead to stigma associated with behavioral health issues. While confidence in these results will increase as collection rates improve, the preliminary results are very positive.

An important element of the new data process is the ability to identify challenging situations within a short timeframe. This allows the subcommittee to be proactive. Dr. Issa is able to identify repeat calls and identify where new strategies need to be developed.  Such data has led to discussions with relevant social service agencies, CDP, the ADAMHS Board and MHRAC in order to problem-solve and offer solutions to difficult situations. This type of strategy presents the potential for better services and hope for those struggling with behavioral crisis events.

### c.  Progress and Tasks that Remain

### i.  Academy Training

The Monitoring Team and the Department of Justice have been assured the Academy Training is consistent with the standards set at the Ohio State Patrol Academy.[110]  These standards are rigorous and meet the Consent Decree requirements for CDP Academy Training. MHRAC, through the Training Committee, will work with CDP to formally review the Academy Training and report to the Parties, the Monitoring Team and the Court that the Ohio Peace Officer Training Commission Crisis Intervention Curriculum remains a meaningful part of patrol officer training in the CDP Academy Training Program.

---

[110] Ohio Peace Officer Training Commission: Education & Policy Section, Peace Officer Basic Training Crisis Intervention, 1-156 (Jan. 2016).

ii.    **Continued Selection and Training of Specialized CIT Officers**

As discussed earlier, the selection and training of Specialized CIT Officers is underway. The Division understandably still faces new challenges in this recruitment and selection process. While there are a number of future selection and training cycles planned, CDP has developed a good strategy for completing the selection process necessary to reach the goals of their original plan. It should be said this was not an easy road. CDP understood the importance of community involvement and policy change in reaching this milestone.  The Division has been responsive to community input and worked hard to make these suggestions a reality. Credit is due for this impressive work.

## IX.    SEARCH AND SEIZURE

| Paragraph | Status of Compliance |
|---|---|
| 160. "CDP will revise, develop, and implement search and seizure policies that comply with applicable law, . . . include the requirements below," and conform to expressly-identified principles. | **PARTIAL COMPLIANCE** |
| 161–65. Policy requirements for officers for stops, searches, and detentions. | **PARTIAL COMPLIANCE** |
| 166. "Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assault on an officer and no other substantive violation is alleged," and "the supervisor will respond to the scene." | **EVALUATION DEFERRED** |
| 167. "Officers will not use 'canned' or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests." | **EVALUATION DEFERRED** |
| 168. "Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports." CDP "will train officers" on documenting stops. "Supervisors will review all documentation of investigatory stops, searches, and arrests." | **EVALUATION DEFERRED** |
| 169. Supervisor will review of "each arrest report by officers under their command," with supervisors reviewing reports for specific, expressly-identified deficiencies. | **EVALUATION DEFERRED** |
| 170–72. Supervisory review of investigatory stops, searches, and arrests. | **EVALUATION DEFERRED** |
| 173. Provision of "initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements" of the Consent Decree that "will address the requirements of Fourth Amendment | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| and related law, CDP policies," and specific, expressly-identified topics. | |
| 174–75. Provision of "annual search and seizure in-service training that is adequate in quality, quantity, type, and scope" incorporating specific, expressly-identified topics. | **EVALUATION DEFERRED** |

### a. Background

The Consent Decree requires that CDP "revise, develop, and implement" policies on how its officers "conduct all investigatory stops, searches, and arrests with the goal" that such actions comply with the "Constitution, state and federal law."[111] In addition to ensuring that officers adhere to these legal requirements, the policies also must prohibit officers from relying on a subject's "race, ethnicity, gender, and perceived sexual orientation" as a reason to stop, search, or arrest an individual.[112]

Over the last few reporting periods, CDP, working with the Department of Justice, Monitoring Team, and the Community Police Commission, completed five related policies: (1) Search & Seizure; (2) Investigatory Stops; (3) Probable Cause/Warrantless Arrests; (4) Strip and Body Cavity Searches; and (5) Miranda Warning and Waiver, and appropriately updated those policies based on thoughtful considerations.[113]

Additionally, CDP has now trained officers on the new search and seizure policies. During this reporting period, the newly trained policies have "gone live" in the field. After a material period of time during which the policies are in effect, the Monitoring Team must (1) evaluate the numbers and trends with respect to who is being stopped, under what circumstances, and what the outcomes of those stops are; and (2) audit a host of stops themselves to determine if officers both articulated and had in fact sufficient legal grounds for any stop, detention, search, or arrest. This will include evaluation of whether supervisors are adhering to their requirements under the Division's Court-approved policies and the Decree. In order for the Monitoring Team to be able to gauge whether the Division is complying with the terms of the Decree and the various provisions of the approved search and seizure policies, CDP will need to be rigorously tracking stop encounters in a robust and comprehensive data collection system, including associated video evidence.

However, although the Division successfully delivered the initial search and seizure training – which was well received – the CDP training unit has submitted several draft iterations of the required annual in-service training on search and seizure to the Monitoring Team and the DOJ, none of which have been accepted. The process continues.

---

[111] Dkt. 7-1 ¶ 160.
[112] Dkt. 7-1 ¶ 161; Dkt. 97 at 42.
[113] Eighth Semiannual Report at 39.

CDP has been working on developing new data collection systems that should be capable of collecting and analyzing the requisite data on search, seizure, and arrest. The Monitoring Team and the Department of Justice have reviewed the data fields for the new systems and are cautiously optimistic that they will capture the necessary data so that comprehensive assessments may commence once sufficient time has passed.

## X.    ACCOUNTABILITY

| Paragraph | Status of Compliance |
|---|---|
| 176. "The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process." | **EVALUATION DEFERRED** |

### 1.  Internally Discovered Misconduct

| Paragraph | Status of Compliance |
|---|---|
| 177. "Internal Affairs will conduct objective, comprehensive, and timely investigations of all internal allegations," with "findings . . . based on the preponderance of the evidence standard" that must "be clearly delineated in policies, training, and procedures and accompanied by detailed examples to ensure proper application by investigators." | **EVALUATION DEFERRED** |
| 178. "Internal Affairs will be headed by a qualified civilian" who "will report directly to the Chief of Police. | **OPERATIONAL COMPLIANCE** |
| 179. Qualifications for IA investigators. | **EVALUATION DEFERRED** |
| 180. Initial training for IA investigators "that is adequate in quality, quantity, scope, and type on conducting misconduct investigations" that addresses specific, expressly- identified topics. | **GENERAL COMPLIANCE** |
| 181. "[A]nnual training" for IA investigators "that is adequate in quality, quantity, type and scope" | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 182. "In each investigation, Internal Affairs will collect and consider" all evidence. "[N]o automatic preference for an officer's statement over a non-officer's statement." No disregard of a "witnesses' statement solely because of" connection to the complainant or criminal history. IA investigators must "make all reasonable efforts to resolve material inconsistencies between witness statements." | **EVALUATION DEFERRED** |
| 183. IA "will evaluate all relevant police activity and any evidence of potential misconduct uncovered during the course of the investigation." | **EVALUATION DEFERRED** |
| 184. IA will not consider guilty plea or verdict as "determinative of whether a CDP officer engaged in misconduct" or justification for "discontinuing the investigation." | **EVALUATION DEFERRED** |
| 185. IA "will complete its administrative investigations within 30 days from the date it learns of the alleged misconduct." | **EVALUATION DEFERRED** |
| 186–87. IA investigative report requirements. | **EVALUATION DEFERRED** |
| 188. Forwarding of completed IA investigations "to the officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator." | **EVALUATION DEFERRED** |
| 189. "CDP will require any CDP employee who observes or becomes aware of any" potential misconduct to "report the incident to a supervisor or directly to" IA. | **OPERATIONAL COMPLIANCE** |
| 190. "CDP will develop a system that allows officers to confidentially and anonymously report potential misconduct by other officers." | **OPERATIONAL COMPLIANCE** |
| 191. "CDP will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." | **OPERATIONAL COMPLIANCE** |
| 192. "Officers who retaliate . . . will be subject to the disciplinary process." | **OPERATIONAL COMPLIANCE** |

### a. Background

To comply with the terms of the Consent Decree, the CDP's Internal Affairs ("IA") unit must "conduct objective, comprehensive, and timely investigations of internal allegations of officer misconduct." Ultimately, Internal Affairs must be the primary engine for the Division's administrative (non- criminal) investigations of officer misconduct and, more generally, the main oversight mechanism for ensuring that the Division's performance standards are being met.

### b.  Where Internal Affairs Stands Now

For the past year, Internal Affairs has been working with a court-approved IA Manual and IA-related policies that were finalized in the last quarter of 2019 and approved by the court on December 19, 2019. Prior to the Consent Decree, IA did not have in place the types of rigorous, codified procedures for conducting its investigations and performing its duties that analogous units in similarly-situated departments have. The Monitoring Team has just completed a preliminary assessment of a sample of IA case investigations, chosen by the IA Superintendent, using a qualitative methodology and an assessment instrument that has been reviewed and approved by the DOJ and the City. The feedback form the Monitoring Team's assessment is being provided to IA in the form of technical assistance.

CDP reports that it has made great strides in improving the timelines of Internal Affairs investigations. While still shy of the 30 day requirement – and the Monitoring Team has not independently verified the provided numbers – the reporting by the Division is very encouraging, and shows a drop of average investigation time from 274 days in 2018, to 194 days in 2019, to 68 days in 2020.

In order to independently assess these reported improvements in timeliness, the Monitoring Team will be requesting that both Internal Affairs and the Case Preparation Unit (which is responsible for scheduling pre-disciplinary hearings and preparing charging and disciplinary letters) start providing the Monitoring Team with ongoing status reports of pending cases and the status of pending adjudications. With the receipt of such status reports, the Monitoring Team will be in a better position to evaluate compliance and provide technical assistance as the Division moves forward to achieve full compliance.

### c.  Staffing

As the Monitoring Team has consistently reported, Internal Affairs has been understaffed since the time monitoring began in 2015. As we have previously noted, sustained progress will ultimately be impossible unless and until IA receives both the quality and quantity of investigative Sergeants necessary to ensure timely, high-quality investigations of internal misconduct. Over the course of the current monitoring period, the IA Superintendent has informed the Monitoring Team that he is satisfied with the quality of his current staff and he believes that IA is sufficiently staffed to achieve compliance. The Monitoring Team will be using the current preliminary assessment of cases to help discern the overall current quality of investigations and will be evaluating the timeliness of cases as well. As the Monitoring Team has discussed with the IA Superintendent, in order to reach compliance, IA investigations must be not just of a high-quality, but also completed in a timely fashion.

Over the course of the last monitoring period, the Monitoring Team has noted issues and concerns

regarding the timeliness in the investigation and/or administrative review of at least two officer involved shootings involving allegations of misconduct. The Monitoring Team will be closely evaluating these and other critical incident investigations to ensure that these cases, amongst the most significant handled by IA and the Chief's Office, are thorough, complete, fair and timely. Untimely adjudication of these types of cases will not serve the CDP, its officers or the community and would not be in compliance with the mandates of the Consent Decree.

### d.  Implementation & Assessment

With the policies relating to misconduct investigations now completed, the Monitoring Team is now giving CDP's civilian IA Superintendent the opportunity to internally improve IA processes and implement new procedures before conducting a full qualitative analysis on current IA investigative practices. Once the Monitoring Team has informed the IA Superintendent of its findings in the preliminary assessment, anticipated to be completed in the first quarter of 2021, the Monitoring Team anticipates beginning a subsequent round of qualitative analysis in the latter part of 2021 to evaluate whether investigations conducted in the first two quarters of the year appear to represent an improvement to a 2016 evaluation of 2015 cases that the Team previously conducted.

### 2.  Office of Professional Standards ("OPS")

| Paragraph | Status of Compliance |
|---|---|
| 193. OPS "investigate[s] all civilian complaints it receives, other than those that allege criminal conduct," which are referred to IA. Excessive force complaints generally retained by OPS. IA investigations referred back to OPS if "determination is made that no criminal conduct occurred." | **OPERATIONAL COMPLIANCE** |
| 194. "The City will ensure that OPS is led by an administrator with the skills, expertise, and experience to effectively manage the intake, tracking, timely, and objective investigation of complaints"; implement PRB training; "assess OPS's equipment and staffing needs"; and "develop and implement performance standards for OPS." | **GENERAL COMPLIANCE** |
| 195–96. Initial training for OPS investigators "adequate in quality, quantity, scope, and type," including specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 197. "OPS Investigators will not be current members of the CDP, and no CDP personnel will have any active role in OPS's operations." | **OPERATIONAL COMPLIANCE** |
| 198. "The City will ensure that the lawyer representing OPS does not have any actual or apparent conflicts of interest." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 199. "OPS will have its own budget, separate from . . . the Department of Public Safety" that "affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement." | **OPERATIONAL COMPLIANCE** |
| 200. Development and implementation of OPS operations manual "made available to the public" that covers specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 201. Development and implementation of "a program to promote awareness through the Cleveland community about the process for filing complaints with OPS." | **EVALUATION DEFERRED** |
| 202. "CDP and the City will work with the police unions . . . to allow civilian complaints to be submitted to OPS verbally or in writing; in person, by phone, or on line; by a complainant, someone acting on his or her behalf, or anonymously; and with or without a signature from the complainant," with all "complaints documented in writing." | **OPERATIONAL COMPLIANCE** |
| 203. CDP will post and maintain by the intake window at CDP headquarters and all District headquarters a permanent placard describing the civilian complaint process" and containing specific, expressly-listed information. | **OPERATIONAL COMPLIANCE** |
| 204. "CDP will provide training that is adequate in quality, quantity, scope, and type to all police personnel, including dispatchers, to properly handle complaint intake, including" with respect to specific, expressly-listed topics. | **EVALUATION DEFERRED** |
| 205. CDP officers "carry complaint forms in their CDP vehicles," which officers must provide "upon request." Supervisors will be dispatched to scene when an individual wants to make a complaint, with the supervisor providing a copy of completed complaint form "or a blank form to be completed later by the individual." | **OPERATIONAL COMPLIANCE** |
| 206. "The City and OPS will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including a number of specific, expressly-listed locations. | **OPERATIONAL COMPLIANCE** |
| 207. "OPS's complaint form will not contain any language that could reasonably be construed as discouraging the filing of a complaint, including warnings about the potential criminal consequences for filing false complaints." | **GENERAL COMPLIANCE** |
| 208. Availability of complaint forms in English and Spanish. "OPS will make every effort to ensure that complainants who speak other languages . . . can file complaints in their preferred language." | **OPERATIONAL COMPLIANCE** |
| 209. "City will ensure that civilian complaints submitted through other existing systems, including the Mayor's Action Center and the Department Action Center, are immediately forwarded to OPS for investigation." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 210. "OPS will establish a centralized electronic numbering and tracking system for all complaints," which "will maintain accurate and reliable data regarding the number, nature, and status of all complaints . . . including investigation timeliness and notification of the interim status and final disposition of the complaint." It "will be used to monitor and maintain appropriate caseloads for OPS investigators." | **EVALUATON DEFERRED** |
| 211. Biased policing tracked as a separate category of complaint that "are captured and tracked appropriately, even if the complainant does not so label the allegation." | **EVALUATION DEFERRED** |
| 212. "[A]llegations of unlawful investigatory stops, searches, or arrests" tracked as a separate category of complaints. | **EVALUATION DEFERRED** |
| 213. "[A]llegations of excessive use of force" tracked as separate category of complaints. | **EVALUATION DEFERRED** |
| 214. "OPS will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends." | **PARTIAL-COMPLIANCE** |
| 215. "OPS will produce, at least annually, a public report summarizing complaint trends, including" with respect several specific, expressly-identified areas. | **GENERAL COMPLIANCE** |
| 216. Assignment of complaints to Standard and Complex investigatory tracks. | **OPERATIONAL COMPLIANCE** |
| 217. Dismissal and/or administrative dismissal of complaint investigations. | **OPERATIONAL COMPLIANCE** |
| 218. "OPS will ensure that investigations of complaints are as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of the evidence." | **EVALUATION DEFERRED** |
| 219. "CDP will ensure that OPS has timely access to all reports related to the incident . . ," and authority of OPS "to conduct additional investigation" of civilian complaint when CDP investigation has already taken place relating to the incident. | **EVALUATION DEFERRED** |
| 220. "OPS investigators will attempt to interview each complainant in person" and record the interview. | **OPERATIONAL COMPLIANCE** |
| 221. "The Chief will order officers who witnessed or participate in an incident that is the subject of an OPS complaint to cooperate with the OPS investigation," including by responding to written questions or sitting for an in-person interview. | **OPERATIONAL COMPLIANCE** |
| 222. "OPS investigators will have access to any relevant disciplinary information in the record of an officer who is the subject of a current investigation." | **EVALUATION DEFERRED** |

| | |
|---|---|
| 223. "OPS will consider all relevant evidence," with no preferences for particular witness's statements, including of officer over a non-officer, or because of connection to complainant or criminal history. "OPS will make all reasonable efforts to resolve material inconsistencies between witness statements." | **EVALUATION DEFERRED** |
| 224. OPS findings categories. | **OPERATIONAL COMPLIANCE** |
| 225. "OPS will document in writing the investigation of each complaint, including all investigatory steps taken, and OPS's findings and conclusions," which must "be supported by a preponderance of the evidence. | **GENERAL COMPLIANCE** |
| 226. Items for consideration for OPS findings. | **EVALUATION DEFERRED** |
| 227. "OPS will forward all investigations and its written conclusions to PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation." | **OPERATIONAL COMPLIANCE** |
| 228. "OPS will send periodic written updates" to the complainant at specific, expressly- identified junctures. | **EVALUATION DEFERRED** |
| 229. "[A] complainant may contact OPS at any time to determine the status of his/her complaint." | **EVALUATION DEFERRED** |

### a. Background

The Office of Professional Standards ("OPS") is the civilian-staffed office charged with investigating the complaints of civilians about Division of Police personnel. Cleveland's City Charter requires OPS to conduct "a full and complete investigation" of all citizen complaints of employee misconduct.[114]

As the Monitoring Team has regularly summarized, the Consent Decree includes a number of requirements—such as hiring a qualified and experienced OPS Administrator, ensuring high-quality training for investigators, establishing a separate budget for OPS, and promoting awareness throughout Cleveland about the availability of civilian complaint forms—all designed to ensure that OPS can conduct thorough and competent investigations of civilian complaints and reach findings that are supported by the preponderance of evidence.[115]

---

[114] Charter of the City of Cleveland, § 115-4.
[115] Dkt. 7-1 at ¶¶ 193-229.

### b. Where OPS Stands Now

When monitoring first began, the OPS was suffering from an enormous backlog of uninvestigated or partially-investigated civilian complaints, which had been a continuing barrier to bringing the OPS complaint handling process into compliance with the Consent Decree. As noted in the Eighth Semiannual Report, the City hired an outside contractor to address a continuing backlog of cases filed prior to December 2018 and successfully eliminated the backlog.

As of the end of the last reporting period (December 2019), OPS was working with an open caseload of 88 cases, with the oldest case having been received by OPS in August 2018.[116] Given that OPS started 2018 with a backlog of 377 cases, the progress made in that reporting period was noted as "laudable."

By the end of November 2020, however, the OPS's open caseload had increased to 162 cases, reflecting a slow trend upwards since the beginning of the year. In addition, the OPS backlog of cases over a year old has doubled from seven cases at the beginning of 2020 to 16 cases as of the end of November.

The increase in pending and old cases is not unexpected due to the many challenges faced as a result of the COVID-19 pandemic. The pandemic initially caused a temporary suspension of investigations and then resulted in further challenges when investigators were required to work remotely.

Based on ad hoc reviews of OPS investigations, the Monitoring Team decided to begin its comprehensive assessment of OPS case investigations with a preliminary assessment, reviewing cases opened by the OPS in 2019 and 2020 and adjudicated with at least one "sustained" finding by the Police Review Board since January 1, 2019.  This preliminary assessment will be used to inform the OPS administration of any areas of concern that might impact their overall compliance with the Consent Decree and will be followed by a comprehensive review of cases, using both quantitative and qualitative methods, once the OPS Administrator believes the OPS is in full compliance. The assessment is anticipated to be completed early on in the next reporting period.

### c. Staffing

As previously noted, the Consent Decree requires that the City provide the OPS with adequate funding and staffing to achieve compliance. As indicated below, the OPS continues to struggle to complete certain Consent Decree required obligations, which the OPS has attributed to be due to executive staff vacancies. The Monitoring Team will continue to monitor and evaluate potential staffing deficiencies to the extent they appear to affect OPS Consent Decree compliance.

---

[116] As reported by the OPS in its December 11, 2019 bi-weekly report.

### d.  Progress and Tasks that Remain

### i.  OPS Staff Performance Reviews

As described in the Monitoring Team's last two semiannual reports, the OPS Administrator must ensure a robust employee performance review process at OPS to ensure employee adherence to OPS Court-approved policies and best practices in investigations. Thus far, the Administrator has reported that he and OPS supervisors continue to conduct ongoing, but informal, performance reviews in conjunction with training of OPS investigators, but has advised that due to staffing issues and challenges faced as a result of the COVID-19 pandemic substantive, written performance reviews will have to be deferred. As such, the Monitoring Team will continue to defer its evaluation of this area of OPS compliance until the OPS is fully staffed and the OPS Administrator has the time and resources to conduct formal, substantive written performance reviews.

### ii.  Community Awareness

Under the Consent Decree, the City and OPS "will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including "the websites of CDP, OPS and the City of Cleveland" as well as a number of other specific, expressly-listed locations.[117] Further, all CDP officers will "carry complaint forms in their CDP vehicles."[118] In addition, the Consent Decree requires that "the City and CDP, in consultation with the [CPC] and the OPS, will develop and implement a program to promote awareness throughout the Cleveland community about the process for filing complaints with OPS."[119]

The Monitoring Team has conducted several impromptu visits to police districts across the City and confirms that complaint forms in English and in Spanish have been available. Additionally, the Monitoring Team has conducted random vehicle checks at those Districts to see if they had complaint forms available. In every case, the Monitoring Team has found forms at the stations and in vehicles.

The OPS also reported an intent to expand the number of locations where complaint forms are available upon the hiring of its new Community Engagement Coordinator; however, these plans have been negatively impacted by both the aforementioned staffing challenges and pandemic-related issues.

The Fourth Year Monitoring Plan, anticipating the hiring of the new Community Engagement Coordinator, imposed a deadline on the completion of the draft Community Awareness Plan, required by the Consent Decree for November 30, 2019. Unfortunately, the Monitoring Team has

---

[117] Dkt. 7-1 at ¶ 206.
[118] *Id.* at ¶ 205.
[119] Dkt. 7-1 at ¶ 201.

been advised that the draft plan cannot be anticipated to be completed due to current staffing challenges, and further, that the plan has had to undergo significant changes as a result of the COVID-19 pandemic.

### iii. Timeliness of OPS Case Adjudications

The Monitoring Team has previously expressed concerns regarding the timeliness of final adjudication of sustained findings recommended by the Police Review Board ("PRB") on OPS investigations. As of the third Quarter of 2020, the Monitoring Team noted that the COVID-19 pandemic appeared to have had a negative impact on this issue due, in part, to the need for the CDP to suspend pre-disciplinary hearings on all cases over the course of the last reporting period.

By the end of 2020, however, the Monitoring Team noted what appear to be significant improvements in the timeliness of OPS pre-disciplinary hearings being conducted by the Chief's Office.. The Monitoring Team will be reporting on the timeliness in the handling of these cases as part of the ongoing preliminary assessment.[120]

### 3. Police Review Board ("PRB")

| Paragraph | Status of Compliance |
|---|---|
| 230. "Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot" addressing PRB composition and appointment process. | **GENERAL COMPLIANCE** |
| 231. "PRB members will not be current or former members of the CDP." | **GENERAL COMPLIANCE** |
| 232. "PRB will have its own budget," overseen by OPS Administrator and separate from Department of Public Safety, that "affords sufficient independence and resources." | **OPERATIONAL COMPLIANCE** |
| 233–34. Initial training for PRB members "that is adequate in quality, quantity, scope, and type" and that covers specific, expressly-identified topics. | **GENERAL COMPLIANCE** |
| 235. PRB meetings open to the public and posted in advance, with "case presentations and PRB votes" occurring during "open session." | **OPERATIONAL COMPLIANCE** |
| 236. "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings . . . . " PRB may "ask the investigator to conduct further investigation" as necessary. | **GENERAL COMPLIANCE** |

---

[120] The Consent Decree makes multiple references to the need for timely investigations of allegations of misconduct. See, Dkt. 7-1 at ¶ 117, 119, 177, 194, 219, 253 & 320.

| | |
|---|---|
| 237. "PRB recommended dispositions will be based on a preponderance of the evidence. For each case, PRB shall set forth its conclusion and an explanation of its reasons and supporting evidence in writing, including, when applicable, the justification for departing from OPS's recommended disposition." | **EVALUATION DEFERRED** |
| 238. "In cases where PRB is recommending a sustained disposition, in whole or in part, PRB will include a recommendation as to disciplinary or non-disciplinary corrective action." | **OPERATIONAL COMPLIANCE** |
| 239. [Timely] forwarding of PRB recommendations to Chief of Police and Director of Public Safety. | **OPERATIONAL COMPLIANCE** |

### a. Background

Cleveland's civilian Police Review Board ("PRB" or "the Board") reviews and analyzes completed OPS investigations. It makes a formal recommendation to the Chief of Police on the ultimate disposition of the case and, if warranted, the discipline that an involved officer should receive. A well-functioning PRB remains critical to ensuring that OPS investigations are sound and that the Chief of Police receives a well-informed recommendation on the disposition of OPS cases.

### b. Where the PRB Stands

As previously reported, since the adoption of the PRB Operations Manual in 2017, the PRB has convened regularly to address cases that it receives from OPS. During this time, the performance of the PRB has largely been out of the Board's hands. The timeliness of the PRB's review of cases, and precisely what the PRB is reviewing, depends on how well OPS has effectuated its duties in the investigatory stage.

As noted above, now that OPS has had more time and additional staff to improve the quality of its investigations, the Monitoring Team is in the process of conducting a qualitative and quantitative assessment of PRB cases involving a least one "sustained" findings made since January 1, 2019 on cases initiated by the OPS on or after that date. The Monitoring Team will use that assessment to help inform the PRB on any areas of concern prior to initiating a full assessment, to include a random sampling of all cases heard by the PRB over a specific period of time. Ultimately, before the performance of both OPS and PRB can be found to be in compliance with the Consent Decree, the Board must be found to be effectively and meaningfully carrying out its duties in a sufficiently thorough, fair, and timely manner.

### 4.   Discipline and Disciplinary Hearings

| Paragraph | Status of Compliance |
| --- | --- |
| 240. "The Chief of CDP will issue a General Police Order that requires officers to (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB." | **GENERAL COMPLIANCE** |
| 241. Disciplinary hearing requirement, with officer given "opportunity to testify" and suspension of hearing if "officer provides new or additional evidence at hearing," with matter "returned to IA or PRB for consideration." | **EVALUATION DEFERRED** |
| 242. Written justification by Chief or Director of decision to "not uphold the charges" or "does not impose the recommended discipline or non-disciplinary corrective action" where PRB previously "recommends the initiation of the disciplinary process and recommends a disciplinary level." | **PARTIAL COMPLIANCE** |
| 243. "CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition." | **OPERATIONAL COMPLIANCE** |
| 245. "CDP will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented." | **PARTIAL COMPLIANCE** |
| 246. "CDP will review its current matrix and will seek to amend it" "to ensure consistency" and inclusion of a number of specific, expressly-identified features. | **OPERATIONAL COMPLIANCE** |
| 247. "All disciplinary decisions will be documented in writing." | **PARTIAL COMPLIANCE** |
| 248. "CDP will provide its disciplinary matrix to the Commission, the Police Inspector General, and the police unions for comment." | **OPERATIONAL COMPLIANCE** |
| 249. "CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years." | **PARTIAL COMPLIANCE** |

### a.   Background

The Consent Decree requires that CDP "ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature

of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented."[121]

As one foundational element of that process of ensuring fair and consistent discipline, the Division has needed to "review its current disciplinary matrix and will seek to amend it as necessary[.]"[122] Specifically, CDP must ensure that the new disciplinary matrix:

- "[E]stablishes a presumptive range of discipline for each type of rule violation;"
- "[I]ncreases the presumptive discipline based on an officer's prior violations of the same or other rules;"
- "[P]rohibits consideration of the officer's race, gender, national origin, age, ethnicity, familial relationships, or sexual orientation" as well as "the high (or low) profile nature of the incident;" and
- "[P]rovides that CDP will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline" but may consider non-disciplinary corrective action "in a case where discipline has [already] been imposed."[84]

### b.  Where the Division Stands

Timeliness in the investigation and adjudication of internal and external complaint investigations continues to be a significant issue requiring ongoing attention from the CDP. As previously reported in the past, it has taken far too long for cases to receive findings from Command Staff, and extraordinary delays have been observed in the scheduling of pre-disciplinary hearings and in the imposition of discipline upon the conclusion of those hearings.

On a positive note, the Division has recently buttressed up the staffing of its Case Preparation Unit, which appears to have already had a positive impact on some of the Monitoring Team's continuing concerns. In addition, the Monitoring Team has been extremely impressed with some of the work product coming out of Director Howard's office wherein the rationale for decisions being made are being extensively explained and documented. Realistically, however, the Division will not be able to come into compliance in this area until all Division Command Staff, to include City and CDP leadership, treat all disciplinary cases with a true sense of urgency and ensure that any member of the Command Staff who do not handle their responsibilities in this regard are held to account for failing to perform their duties.

With respect to the conduct of the Division's pre-disciplinary hearings, the Monitoring Team has noted that the Chief's Office consistently provides officers with the opportunity to testify on their own behalf, as required by paragraph 241. Upon the completion of the pending assessment of OPS-

---

[121] Dkt. 277.
[122] Dkt. 7-1 at ¶ 279.

PRB sustained cases, the Monitoring Team anticipates being able to evaluate the additional requirement of paragraph 241 which requires the Chief, when appropriate, to "suspend" a hearing and return a case to IA or OPS where "new or additional evidence" has been provided.

## XI.    TRANSPARENCY & OVERSIGHT

### 1.  Police Inspector General

| Paragraph | Status of Compliance |
|---|---|
| 250. "The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a Police Inspector General" ("IG"). City must seek CPC's "input in developing minimum qualifications and experience" for IG. | **EVALUATION DEFERRED** |
| 251. IG work in Office of Mayor but report to Chief of Police. | **GENERAL COMPLIANCE** |
| 252. IG "will not be a current or former employee of CDP." | **GENERAL COMPLIANCE** |
| 253–54. Duties and authority of IG. | **EVALUATION DEFERRED** |
| 255. Budget of IG must be "a separate line item" in City budget and "afford[] sufficient independence and resources" to comply with Consent Decree. | **PARTIAL COMPLIANCE** |
| 256. IG "will have access to all documents and data necessary to perform the above functions, including any raw data." | **EVALUATION DEFERRED** |

### a.  Background

The Consent Decree creates a new, internal oversight function within the Division—a Police Inspector General (the "IG"). The IG must have the authority to review CDP policies and practices, conduct audits and investigations, analyze data for aggregate and systemic trends, develop recommendations for reform, and analyze investigations conducted, and review imposed discipline. The IG's reports and recommendations must be made public.[123]

---

[123] Dkt. 7-1 ¶ 253.

### b.  Where the Division Stands

As previously reported, the City previously successfully hired and on-boarded a Police Inspector General, Christopher Viland, as outlined in the Consent Decree. During this reporting period, the Inspector General had been hard at work. A review of the IG's reports indicated an impressive and professional level of work (to include the completion of an IG Manual, a 2020 workplan and thirteen memorandum and reports making a total of 126 recommendations to the Chief identifying potential areas of improvement relating to officer training (16 recommendations), data collection (21 recommendations), the disciplinary process (10 recommendations), the vehicle pursuit policy (68 recommendations), officer certification (7 recommendations) and "safe policing for safe communities" (4 recommendations). The body of work, created by the IG, was particularly impressive given that the IG has minimal resources and staff supporting him at this time.

However, the consent decree states that: "The duties of the Police Inspector General will include authority to do the following: … h. make reports and recommendations for reform publicly available."

As of the end of the 2020 calendar year, the most recent report published on the City's website was dated February 2020. The Monitoring Team noted that as of that time, the IG had issued 9 reports which had not been published by the City (4/30/20 – four reports; 5/18/20 (1), June 2020 (1), 8/7/20 (1), 8/12/20 (1), 11/2/20 (1). Best practices would suggest that, in the future, the City should be publishing the IG's reports within 30 days of receipt.[124]

### c.  Progress and Tasks that Remain

As of the beginning of 2021, Mr. Viland resigned his position and was appointed as the Sheriff of Cuyahoga County. In order to give the City time to hire a new Inspector General and the good work of Mr Viland to be continued, , the Monitoring Team has deferred its evaluation of the work of the Inspector General.

### 2.  Data Collection and Analysis

| Paragraph | Status of Compliance |
|---|---|
| | |

---

[124] A February 2021 review of the City's website showed the City as having published all completed IG reports.

| | |
|---|---|
| 257. "CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad access to information related to CDP's decision making and activities. To achieve this outcome, CDP will designate an individual or individuals as the 'Data Collection and Analysis Coordinator.'" | **PARTIAL COMPLIANCE** |
| 258. Coordinator "will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials," including specific, expressly-listed materials and information. | **PARTIAL COMPLIANCE** |
| 259. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents," including specific, expressly-identified data. | **PARTIAL COMPLIANCE** |
| 260. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation." The system must conform to a number of specific, expressly-identified requirements. | **PARTIAL COMPLIANCE** |
| 261. Coordinator must "routine[ly] report[] . . . relevant data to the Chief of Police, FRB, Training Review Committee, OPS, the [Community Police] Commission, and the Police Inspector General." | **PARTIAL COMPLIANCE** |
| 262. Coordinator "responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection." | **PARTIAL COMPLIANCE** |
| 263. Coordinator "will develop a protocol to accurately analyze the data collected and allow for" various outcome measurements, "subject to the review and approval of the Monitor and DOJ." | **OPERATIONAL COMPLIANCE** |
| 264. Annually, "CDP will conduct an assessment and issue a report summarizing its investigatory stop, search, and arrest data" that addresses various specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 265. Annually, "CDP will conduct an assessment and issue a report of all activities, including use of force, arrests, motor vehicles and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race" or other listed prohibited classes or characteristics, and that addresses various specific, expressly-identified topics. | **EVALUATION DEFERRED** |
| 266. Annual analysis of "prior year's force" data with FRB. | **EVALUATION DEFERRED** |

### a. Background

The Consent Decree requires that the Division collect, use, and report data on its activities and performance in a modern and comprehensive fashion. To effectuate this, the Decree required CDP to hire a Data Collection and Analysis Coordinator (the "Data Coordinator" or "Coordinator") to help ensure that CDP maintains the required information in a manner that "facilitate[s] transparency and . . . broad public access to information related to CDP's decision making and activities."[125] The Coordinator is specifically tasked with ensuring the collection and tracking of all information related to uses of force, search and seizure practices, and allegations of misconduct. The Coordinator must create and maintain "a reliable and accurate electronic system to track" use of force-related data and search and seizure information.[126]

The Coordinator also is "responsible for the routine reporting of relevant data" to various entities within the Division[127]; conducting annual assessments of both use of force and investigatory stop data[128]; and analyzing Division practices for potential disproportionate or disparate impacts with respect to "race, ethnicity, gender, disability, sexual orientation, or gender identity."[129] These reports must "be made publicly available."[130]

### b. Where the Division Stands

Members of the Monitoring Team are supportive of the Division's efforts to use data as much as possible in real time, for managerial purposes, and to assist with deployment and staffing decisions. The Division now organizes and schedules a monthly administrative Compstat meeting to which the Monitoring Team and the USAO/DOJ staff are invited. While this began as a method to review principally use of force cases and their review status, it has expanded and includes more details about use of force as well as several other topics. The role of the Data Collection and Analysis Coordinator is far more developed and it is clear that the Coordinator has become very knowledgeable in the Division's operations and is very skillful with data collection and analysis. The presentations now include details about use of force as compared to calls for service and total arrests, increasing the meaning of the numbers and encouraging the participant to look for patterns. Engagement from the other members of the Division is spotty – at times the Coordinator attempts to answer questions clearly meant for members of the Command Staff when they are silent. There are times when the sworn participants are curious about the data or about questions posed by the Monitoring Team or DOJ, but more typically a question is answered with a comment that suggests a present lack of awareness of the data and its critical importance in how it can be used to manage

---

[125] Dkt. 7-1 at ¶ 257.
[126] *Id.* at ¶¶ 259-60.
[127] *Id.* at ¶ 261.
[128] *Id.* at ¶¶ 263, 264, 266.

[129] *Id.* at ¶ 265.
[130] *Id.* at ¶ 267.

the Division.   The Monitoring Team continues to suggest ways the data can be used outside the room for managerial, supervisory, and deployment purposes, though it is unclear what if anything is done with the suggestions.

The assessment for paragraph 259 is partial compliance.  As pointed out in the earlier part of this report, the review of the response to the May 30 protests, it was apparent that the entry and review of some of the use of force incidents from that day were completed outside of Blue Team.  The Division reports that there will be recommendations for policy amendments that will be assessed and reviewed by the Monitoring Team and DOJ.  Those amendments could move paragraph 259 to operational complaince in the next report period.

### c.  Progress and Tasks That Remain

The production of data that is informative and as such useful in the reform work appears to be very labor intensive for the Coordinator. The Monitoring Team recognizes efforts underway to improve data collection systems, but at this time they continue to be siloed or independent of one another requiring extensive work by the Coordinator to turn data into information. The Monitoring Team is unaware of efforts to move toward greater automation though minimizing the work required to share data will increase its value and usefulness. The Monitoring Team also looks forward to the completion of policies and training, both of which precedes data collection on stops, searches, and arrests. As the data improve in quality and other milestones are achieved, such as the Force Review Board and the implementation of the stop, search, and arrest policies, there will be increasing opportunities for public release of data – a level of transparency that the community desires and the Consent Decree expects.

### 3.  Public Availability of CDP-Related Information

| Paragraph | Status of Compliance |
|---|---|
| 267. "[A]ll CDP audits, reports, and outcome analyses related to the implementation" of the Consent Decree will be public. | **NON-COMPLIANCE** |
| 268. "CDP will post its policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports on its website." | **NON COMPLIANCE** |

### a.  Background

The Consent Decree requires that CDP's "policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports" be posted

on CDP's website.[131] Likewise, "[t]o ensure transparency in the implementation of" the Decree, "all CDP audits, reports, and outcome analyses related to the implementation of this [the Consent Decree] will be made publicly available, including at the City and CDP websites."[132]

### b.  Where the Division Stands

The policies of the Division are not readily found on the City's website. The Monitoring Team understands there are plans to improve the website though in the interim the requirement for transparency and public accessibility of the policies remains. While in the past there were navigational challenges, currently, even for skilled users and those familiar with the Division and the City, it is impossible to find all the policies on the website. It is also a problem that internet searches deliver outdated and redlined policies. If the policies are technically online, the inability of internet searches to produce and skilled users to locate policies in a single PDF document remains a barrier to transparency as well as compliance.

### c.  Progress and Tasks That Remain

Access by the public, including the Monitoring Team members via the website to the CDPs policies is a persistent problem.  The Monitoring Team is hopeful that the City will find a far more manageable and comprehensive manner for the public to access documents related to the reform process. Finally, and of tantamount importance, the Monitoring Team continues to maintain that the Division and the community it serves will benefit from a department that is open to the public and sets clear expectations of how information related to critical incidents will be shared – prior to the occurrence of such incidents.  A workgroup comprised of members of the Monitoring Team, the DOJ and the City is working on quickly remedying this issue of transparency by collaborating on a webpage design, and the information it contains, to bring the City into compliance with the Consent Decree.

---

[131] Dkt. 7-1 at 1; *id.* ¶ 268.

[132] Dkt. 7-1 ¶ 267.

## XII.  OFFICER ASSISTANCE & SUPPORT

### 1.  Training

| Paragraph | Status of Compliance |
|---|---|
| 269. "CDP will ensure that officers receive adequate training to understand: (a) how to police effectively and safely in accordance with CDP policy; [and] (b) the requirements of this Agreement, Ohio law, and the Constitution and laws of the United States," including in the areas of "procedural justice, bias-free policing, and community policing." | **PARTIAL COMPLIANCE** |
| 270.  "CDP will expand the scope and membership of the Training Review Committee." | **PARTIAL COMPLIANCE** |
| 271–72. "[T]he Training Review Committee will develop a written training plan for CDP's recruit academy, probationary field training, and in-service training" that addresses a host of specific, expressly-identified issues. | **NON-COMPLIANCE** |
| 273. "The Training Plan and schedule will be implemented once any objections have been resolved" on a yearly basis. | **PARTIAL COMPLIANCE** |
| 274. "The Training Review Committee will annually review and updated CDP's training plan" by "conduct[ing] a needs assessment" that addresses a number of specific, expressly-identified data and information on real-world trends, needs, policy, and law. | **NON-COMPLIANCE** |
| 275. "CDP's Commander responsible for training" will be in charge of "all CDP training. | **PARTIAL COMPLIANCE** |
| 276. "CDP will designate a single training coordinator in each District. The Commander responsible for training will establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the" training Commander. | **PARTIAL COMPLIANCE** |
| 277. "CDP will develop recruit academy and in-service curricula that comport with" the Training Plan and Consent Decree requirements. | **PARTIAL COMPLIANCE** |
| 278. "[T]he training required under this Agreement . . . will be delivered within two years of the Effective Date." | **EVALUATION DEFERRED** |
| 279. "For all other substantive updates or revisions to policy or procedure, CDP will ensure and document that all relevant CDP personnel have received and read the policy or procedure. Notification of each revision or update will include the rationale for policy changes and the difference between the old and updated policy." | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 280. Training Commander reviews all training materials; ensures that they use "a variety of adult learning techniques, scenario-based training, and problem-solving practices"; and "ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Review Committee." | **PARTIAL COMPLIANCE** |
| 281. "CDP will ensure that instructors are qualified and use only curricula and lesson plans that have been approved by the" Training Commander. | **PARTIAL COMPLIANCE** |
| 282. "CDP will revise, as necessary, its field training program for graduates of the police academy to comport with" the Training Plan and Consent Decree. | **EVALUATION DEFERRED** |
| 283. "The field training program will incorporate community and problem-oriented policing principles, and problem-based learning methods." | **EVALUATION DEFERRED** |
| 284. Review and revision of Field Training Officer ("FTO") "participation policy to establish and implement a program that effectively attracts the best FTO candidates" and "revise eligibility criteria" for FTOs. | **EVALUATION DEFERRED** |
| 285. New FTOs and Field Training Sergeants must "receive initial and in-service training that is adequate in quality, quantity, scope, and type, and that addresses" a number of specific, expressly-listed topics and conforms to a number of additional features or requirements. | **EVALUATION DEFERRED** |
| 286. "CDP will create a mechanism for recruits to provide confidential feedback regarding the quality of their field training," and the Division "will document its response, including the rationale behind any responsive action taken or decision to take no action." | **EVALUATION DEFERRED** |
| 287. "Training Review Committee will, on an annual basis, analyze all aspects of CDP's FTO program," "consider emerging national policing practices in this area," and "recommend, and CDP will institute, appropriate changes to policies, procedures, and training related to its FTO program." | **EVALUATION DEFERRED** |
| 288. "CDP will document all training provided to or received by CDP officers," with officers "sign[ing] an acknowledgement of attendance or digitally acknowledge[ing] completion of each training course," which "will be maintained in a format that allows for analysis by training type, training date, training source, and by individual officer name." | **EVALUATION DEFERRED** |
| 289. "CDP will develop and implement a system that will allow the Training Section to electronically track, maintain, and produce complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system." | **OPERATIONAL COMPLIANCE** |
| 290. "CDP will develop and implement accountability measures . . . to ensure that all officers successfully complete all required training programs in a timely manner." | **PARTIAL COMPLIANCE** |

### a.  Background

Training CDP personnel on the new requirements and expectations of Decree-required policies and initiatives is critical to ensuring these changes are infused into the operations of the Division.

As stated in the Seventh Semiannual Report, "the Division must build the internal capacity and leadership such that training can be developed, delivered, audited, and iteratively improved, in close consultation with a Training Review Committee ("TRC") that increases the set of eyes assessing CDP training." These efforts remain work-in-progress.

### b.  Where the Division Stands

During the current reporting period, and as detailed elsewhere in this report, the Division launched a number of important training initiatives including the new supervisor training on reviewing use of force and the FRB training.

However, the Division continues to struggle to develop adequate training curricula to support the initiatives required under the Consent Decree. The 2020 training plan has now been abandoned as we move into 2021, and the updated In-Service Training for Use of Force was rejected out of hand by the Monitoring Team and Department of Justice. The District Awareness Training is similarly lacking, and the Division seems unable, or unwilling, to accept the guidance provided by the Monitoring Team and the Department of Justice. Much work remains to be done to ensure that CDP fully develops its training capacity.

### c.  Progress and Tasks that Remain

The Monitoring Team has previously recounted the steps that CDP must make with respect to officer training to reach compliance with the Consent Decree. These steps are largely unchanged from its prior semiannual report to the Court.

The Division still needs to reengage the TRC. Moreover, CDP's Training Section must be properly staffed in order to meet the substantial scope of training mandated by the Consent Decree. The Monitoring Team has previously urged CDP to devote additional resources to the Training Section, including securing the full-time expertise of non-sworn personnel to serve as curriculum development professionals within the Training Section. Developing the capacity of the Training Section will require the full support of the City, both in concept and with budget. The training levels established during the Consent Decree process are not anomalies—they are the new normal and the City and CDP need to ensure that the Training Section is equipped to develop and deliver high-quality trainings into the future.

2. **Equipment & Resources**

| Paragraph | Status of Compliance |
|---|---|
| 291. "The City will implement" paragraphs regarding equipment and resources in order to allow implementation of the Consent Decree "and to allow officers to perform their jobs safely, effectively, and efficiently." | **PARTIAL COMPLIANCE** |
| 292. "CDP will complete a comprehensive equipment and resource study to assess its current needs and priorities," and it "will develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." | **OPERATIONAL COMPLIANCE** |
| 293. "CDP's Equipment and Resource Plan will provide for necessary equipment including, at least" "an adequate number of computers"; "an adequate number of operable and safe zone cars"; "zone cards with reliable, functioning computers that provide officers with up-to-date technology" including computer-aided dispatch, the records management system, and various core law enforcement systems; and "zone cards equipped with first-aid kits." "This plan also will ensure that CDP properly maintains and seeks to continuously improve upon existing equipment and technology; and is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." | **OPERATIONAL COMPLIANCE** |
| 294. "CDP will actively seek input and feedback from the Commission, patrol officers, and supervisors regarding resource allocation, equipment needs, and technological improvements." | **OPERATIONAL COMPLIANCE** |
| 295. "City and CDP" must "us[e] best efforts to implement the Equipment and Resource Plan as required." | **OPERATIONAL COMPLIANCE** |
| 296. "CDP will . . . implement an effective, centralized records management system." | **OPERATIONAL COMPLIANCE** |
| 297. "CDP will utilize a department-wide e-mail system to improve communication and information sharing." | **OPERATIONAL COMPLIANCE** |
| 298. "CDP will employ information technology professionals who are trained to conduct crime and intelligence analysis, who are capable of troubleshooting and maintaining information technology systems and who can identify and suggest appropriate technological advancements." | **OPERATIONAL COMPLIANCE** |
| 299. "CDP will implement an effective employee assistance program that provides officers ready access to the mental health and support resources necessary to facilitate effective and constitutional policing." | **PARTIAL COMPLIANCE** |

### a. Background

The Consent Decree requires the City of Cleveland to "develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement."[133] The Plan must "provide for necessary equipment including, at least . . . an adequate number of computers; an adequate number of operable and safe zone cars; zone cars with reliable, functioning computers that provide officers with up-to-date technology, including" mobile computer-aided dispatch ("CAD"), access to the Division's records management system ("RMS"), and access to law enforcement databases; and "zone cars equipped with first-aid kits . . . ."[134] It must address how the Division will satisfy the other substantive requirements of the Decree. It likewise must "ensure that CDP" both "properly maintains and seeks to continuously improve upon existing equipment and technology" and "is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies."[135]

### b. Where the Division Stands

In the current reporting period, CDP completed a significant update to its records management system, known as LERMS. The upgrade enhances officer access to real-time data, giving officers greater ability to quickly retrieve essential information about individuals.

Likewise, as of August 2019, CDP has implemented an enhanced, real-time information-gathering and intelligence-sharing platform called Command Analytics. This is a web-based platform that provides various dashboards that display and analyze incidents logged into the computer-aided dispatch ("CAD") and LERMS systems.

Meanwhile, the Division has also made progress on deploying mobile handheld devices to officers, as well as ordering necessary mobile data computers and patrol vehicles.

### c. Progress and Tasks that Remain

The Monitoring Team is planning to audit the Division's progress in enhancing its equipment, IT infrastructure, and resources in the coming months.

---

[133] Dkt. 7-1 ¶ 292.
[134] *Id.* ¶ 293.
[135] *Id.* ¶ 293.

### 3.  Recruitment & Hiring

| Paragraph | Status of Compliance |
|---|---|
| 300. "CDP will review and revise . . . its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals." | **PARTIAL COMPLIANCE** |
| 301. "The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP." | **GENERAL COMPLIANCE** |
| 302. "CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community" and meets certain specific, expressly-listed requirements. | **OPERATIONAL COMPLIANCE** |
| 303. "The City will implement the recruitment plan within 60 days of it being approved by the Monitor." | **EVALUATION DEFERRED** |
| 304. "CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants," including officers with various, specific, expressly-listed skills and backgrounds. | **PARTIAL COMPLIANCE** |
| 305. "In developing and implementing its recruitment plan, CDP will consult with the [Community Police] Commission and other community stakeholders on strategies to attract a diverse pool of applicants." | **PARTIAL COMPLIANCE** |
| 306. "[O]bjective system for hiring and selecting recruits" that "employs reliable and valid selection criteria." | **PARTIAL COMPLIANCE** |
| 307. "CDP will report annually to the public its recruiting activities and outcomes," which will include information on various, expressly-listed areas. | **EVALUATION DEFERRED** |
| 308. "[A]ll candidates for sworn personnel positions" will have "psychological and medical examination" and be subject to "drug testing." Existing officers receive "random drug testing." | **GENERAL COMPLIANCE** |
| 309. "CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions" that cover various, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 310. "CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's supervisor(s)" and maintain any "salient information . . . in candidate's file." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 311. "If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation" addressing various expressly-identified things. | **EVALUATION DEFFERED** |

### a.  Background

The Consent Decree requires the City to "integrate community and problem-oriented policing principles" into its recruitment practices, and to "develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community . . . [and] establish[es] and clearly identif[ies] the goals of CDP's recruitment efforts."[136]

### b.  Where the Division Stands Now

In the prior reporting period, the Division completed its Recruitment and Hiring Plan, which incorporates feedback from the Department of Justice, Monitoring Team, and the expressed concerns of the Cleveland public. The Plan was approved by the Court on February 20, 2019.[137]

The Monitoring Team is in close contact with the Recruitment Team and is looking at the demographic information for the last several recruit classes and commencing a more complete review. The Recruitment Team sends periodic reports on its achievements and activities. CDP will need more time before it can meaningfully report on how it is accomplishing the stated goals of the Court-approved Plan. As described below, as the CDP reports on its recruiting activities and outcomes, the Team will be positioned to say how far the CDP has come—or still needs to go— to meeting the terms of the Decree.

### c.  Progress and Tasks that Remain

Following the Court's approval of the Recruitment and Hiring Plan, CDP must "report annually to the public its recruiting activities and outcomes," including disaggregated data on applicants, interviewees, and selectees, as well as the successes and challenges to recruiting qualified and high-quality applicants.[138] The Monitoring Team will continue to gauge progress by analyzing the numbers and trends with respect to applicants and hired recruits, as well as by working with the City to provide ongoing technical assistance on the Plan's implementation.

---

[136] Dkt. 7-1 ¶ 302.
[137] Dkt. 239.
[138] Dkt. 7-1 at ¶ 307.

### 4. Performance Evaluations and Promotions

| Paragraph | Status of Compliance |
|---|---|
| 312. "CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process" and "are identified and receive appropriate consideration for performance." Likewise, "poor performance" must be "reflected in officer evaluations." | **EVALUATION DEFERRED** |
| 313. "CDP will develop and implement fair and consistent practices to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis." | **EVALUATION DEFERRED** |
| 314–15. CDP will use "a formalized system documenting the annual performance evaluations of each officer by the officer's direct supervisor," including an assessment of several expressly-listed areas. "Supervisors will meet with the employee whose performance is being evaluated to discuss the evaluation." | **EVALUATION DEFERRED** |
| 316. "CDP will hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates." | **EVALUATION DEFERRED** |
| 317. "CDP will develop and implement fair and consistent promotion practices that comport with the requirements of this Agreement and result in the promotion of officers who are effective and professional." | **EVALUATION DEFERRED** |
| 318. In considering promotion, "appointing authority will consider" specific, expressly- listed "factors." | **EVALUATION DEFERRED** |

### a. Background

CDP must address how it evaluates officer performance and must ensure that high-performing officers have access to promotional opportunities. Under the Consent Decree, CDP must "develop and implement fair and consistent practices to accurately evaluate officers" across a number of dimensions, including 'integrity, community policing, and critical police functions.'"[139]

---

[139] Dkt. 7-1 at ¶ 313.

### b.  Where the Division Stands

In the current reporting period, CDP continued to create a policy on performance evaluations. The Monitoring Team and Department of Justice will work with CDP in the coming reporting period to finalize a policy that satisfies the requirements of the Consent Decree.

### c.  Progress and Tasks that Remain

Under the 2021 Monitoring Team, CDP will continue to incorporate community and problem-oriented policing into its promotions and evaluations. This work, which must align with the new expectations that have been set by Court-approved policies and plans, will greatly enhance professional development opportunities within the Division and provide an important, non-punitive mechanism for employee management. As described above, early work on this initiative, through a Division policy on performance evaluations, has begun.

## 5.  Staffing

| Paragraph | Status of Compliance |
|---|---|
| 319. "CDP will complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform the functions necessary for CDP to fulfill its mission, and satisfy the requirements of the" Consent Decree. / "CDP will develop an effective, comprehensive Staffing Plan that is consistent with its mission, including community and problem-oriented policing, and that will allow CDP to meet the requirements of" the Consent Decree. | **OPERATIONAL COMPLIANCE** |
| 320. Requirements of CDP Staffing Plan. | **EVALUATION DEFERRED** |
| 321. "The City and CDP will employ best efforts to implement the Staffing Plan over the period of time set forth in the approved plan." | **EVALUATION DEFERRED** |

### a.  Background

The Consent Decree contemplates changes to CDP's approach to staffing, assigning, and deploying its personnel within the City of Cleveland. Under the requirements of the Decree, for example, CDP must:

- Implement a "comprehensive and integrated model"[140];

---

[140] Dkt. 7-1 at ¶ 27.

- Ensure rigorous investigations and reviews of force incidents[141];
- Ensure that specialized crisis intervention officers "are dispatched to an incident involving an individual in crisis" and are able to "have primary responsibility for the scene"[142];
- Provide supervisors with the ability to "review all documentation of investigatory stops, searches, and arrests"[143];
- Ensure that officers can receive the training required by the Decree[144];
- Provide necessary opportunity for "first line supervisors [to] provide close and effective supervision of officers"[145];
- Implement the Early Intervention System[146]; and
- Provide supervisors with the ability to "conduct adequate random and directed audits of body worn camera recordings."[147]

These provisions require changes in the way that CDP will deploy its existing personnel and in the overall number of sworn and civilian personnel. To that end, the Consent Decree specifically envisions a Staffing Plan by which the CDP must "address and provide for each of the following":

- "[P]ersonnel deployment to ensure effective community and problem-oriented policing;
- "[A] sufficient number of well-trained staff and resources to conduct timely misconduct investigations;
- "[T]o the extent feasible, Unity of Command; and
- "[A] sufficient number of supervisors."[148]

### b.  Where the Division Stands Now

Similar to the prior reporting period, the Division completed the Decree-mandated Staffing Plan after working with the Department of Justice and Monitoring Team and considering public feedback solicited by the Community Police Commission.

Since then, the Monitoring Team has not actively assessed CDP's progress on implementing the Staffing Plan. CDP will need more time to internally assess, prepare, and execute before it can report on how it is accomplishing the stated goals of the Court-approved Plan.

---

[141] *Id.* at ¶¶ 93-130.
[142] *Id.* at ¶ 151.
[143] *Id.* at ¶ 168.
[144] *Id.* at ¶ 271.
[145] *Id.* at ¶ 322.
[146] *Id.* at ¶ 326-36.
[147] *Id.* at ¶ 339.

[148] *Id.* at ¶ 320.

### c. Progress and Tasks that Remain

The Monitoring Team has previously observed that major requirements of the Decree, such as the implementation of CDP's new community and problem-oriented policing paradigm, are directly linked to the Division's ability to make the operational changes contemplated in the approved Staffing Plan. The Division's efforts on this front will need to continue in order for Decree-required policies, procedures, and plans to be fully and effectively implemented.

## XIII.  SUPERVISION

### 1.  First-Line Supervisors

| Paragraph | Status of Compliance |
|---|---|
| 322. "CDP will ensure that first line supervisors provide close and effective supervision of officers" in a number of express, specifically-identified ways. | **PARTIAL COMPLIANCE** |
| 323. "CDP will develop and implement supervisory training for all new and current supervisors" that is "adequate in quality, quantity, type, and scope, and will include" a number of specific, expressly-listed topics. | **EVALUATION DEFERRED** |
| 324. "Thereafter all sworn supervisors will receive adequate in-service management training." | **EVALUATION DEFERRED** |
| 325. "CDP will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community." | **EVALUATION DEFERRED** |

### a. Background

The Consent Decree requires that CDP ensure "close and effective supervision of officers."[149] Supervisors must be held "directly accountable for the quality and effectiveness of their supervision" of officers in their command.[150] To do so, the Decree requires that the Division

---

[149] Dkt. 7-1 ¶ 322.
[150] *Id.* ¶ 325.

establish new policies and procedures addressing supervision. It also requires training for supervisors on a host of specific topics.[151]

### b. Where the Division Stands

The Division completed training on supervisor review of force and the Monitoring Team looks forward to reviewing how that training is applied in practice.

### c. Progress and Tasks that Remain

### i. Continuing Professional Development

The Division has previously signaled an interest in developing a formal leadership development process. Part of this involves enhancing processes relating to performance evaluations and the promotional process. The Monitoring Team continues to look forward to working with the Division on these important areas, which will help the Division identify the most promising personnel for leadership opportunities and help them succeed upon receiving new responsibilities.

### ii. Data

As the Monitoring Team has previously noted, the Consent Decree requires that CDP rigorously track instances in which supervisors identify problematic performance and log supervisors' responses when such problems are identified. The Division still needs to implement a process for systematically tracking this information so that it can evaluate, in aggregate, the performance of its supervisors.

### iii. Compliance and Outcome Measures

The Monitoring Team's evaluations of use of force and Internal Affairs incidents will touch on supervisor performance in those areas. However, the Monitoring Team will also need to analyze the type of performance data and indicators that the Division is still progressing toward collecting.

### 2. Officer Intervention Program

| Paragraph | Status of Compliance |
|---|---|
| 326. CDP "will create a plan to modify its Officer Intervention Program ('OIP') to enhance its effectiveness as a management tool to promote | **EVALUATION DEFERRED** |

---

[151] Dkt. 7-1 ¶ 323.

| | |
|---|---|
| supervisory awareness and proactive identification of potentially problematic behavior among officers. | |
| 327. "CDP supervisors will regularly use OIP data to evaluate the performance of CDP officers across all ranks, units, and shifts." | **EVALUATION DEFERRED** |
| 328. "The OIP will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" in a number of specific, expressly-identified areas. | **EVALUATION DEFERRED** |
| 329. "CDP will set threshold levels for each OIP indicator that will trigger a formal review, and the thresholds will allow for peer-group comparisons between officers with similar assignments and duties." | **EVALUATION DEFERRED** |
| 330–36. Additional express requirements of OIP. | **EVALUATION DEFERRED** |

### a. Background

The Consent Decree requires that CDP's Officer Intervention Program (OIP) be transformed into an effective "early intervention system," or "EIS." An EIS is a non-disciplinary system for identifying and addressing potentially problematic officer performance before it becomes a problem.

Specifically, the Consent Decree requires that the Division's OIP become a broader management tool that will "proactive[ly] identif[y] . . . potentially problematic behavior among officers" and provide non-punitive supervisory intervention in order to "modify officers' behavior and improve performance" before the performance gradually becomes deep-seated and difficult to resolve.[152] The Decree requires the implementation and use of "a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" on officer performance and that forms the basis of an EIS.[153]

### b. Where the Division Stands

The Division continued to develop an OIP Policy during this reporting period, and the Parties and CDP have begun discussing the proposed revisions to the OIP program. It is currently anticipated that the policy will be finalized within the upcoming reporting period.

---

[152] Dkt. 7-1 at ¶¶ 326-27.
[153] *Id.* at ¶ 328.

### c.   Progress and Tasks that Remain

#### i.   Creation of EIS Plan

CDP needs to finalize its policies, manuals, and implementation materials related to the OIP/EIS to complete the establishment of an upgraded early intervention system.

#### ii.   Training & Involvement of Supervisors

Under the Decree-required EIS, CDP supervisors will need to review performance data of the officers under their command at ongoing intervals. In some instances, when an officer's performance data reaches a particular level or involves specific types of performance, a supervisor will be required to assess that officer's performance to determine whether some type of intervention may be beneficial. This type of review, assessment, and potential intervention will all require that the Division's supervisors be well-trained and well-versed in the goals and mechanics of the EIS.

#### iii.   Training & Communication with Officers

Although substantial responsibilities will fall on supervisors with respect to the enhanced EIS, officers will also need to understand what the EIS is. Specifically, officers will need to become comfortable with the notion that the EIS is, indeed, non-disciplinary and non-punitive. Instead, it is designed to assist in professional development and allow the Division to provide resources, training, and other investments to officers to ensure that officers succeed. High-quality, in-depth instruction will be necessary to surmount the understandable skepticism that officers may have that the new EIS is simply another way of disciplining officers.

#### iv.   Compliance with EIS Plan & Policies

After policies and training are completed, the EIS will have to be up and running for a material span of time in order for the Court and Monitoring Team to meaningfully evaluate whether the EIS complies with the Consent Decree's requirements.

### 3.  Body-Worn Cameras

| Paragraph | Status of Compliance |
|---|---|
| 337. "If CDP chooses to use body worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| accountability, and build trust, while protecting the privacy rights of individuals." | |
| 338. "Supervisors will review recordings related to any incident involving at least a Level 2 or 3 use of force; injuries to officers; and in conjunction with any other supervisory investigation." | **PARTIAL COMPLIANCE** |
| 339. "Supervisors will conduct adequate random and directed audits of body worn camera recordings" and "incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers." | **PARTIAL COMPLIANCE** |
| 340. "Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy." | **PARTIAL COMPLIANCE** |

### a.  Background

Prior semiannual reports have summarized the history of the Division's use of body-worn camera technology. Because CDP elected to deploy the cameras, various Consent Decree requirements relating to policies and procedures are activated.

### b.  Where the Division Stands

Currently, all CDP patrol officers are equipped with and trained on Axon's Body 2 camera system and are expected, under policy, to use them when working a City shift. In the current reporting period, the Parties and Monitoring Team did not significantly address specific issues relating to body-worn cameras. The Division and its officers continue to use them to capture incidents and interactions.

### c.  Progress and Tasks that Remain

### i.  Compliance with Policy

The Monitoring Team will still need to ensure that the Division is holding officers accountable for complying with the various provisions of the body-worn camera policy. It is anticipated that upcoming Monitoring Team audits of use of force cases and misconduct investigations will shed meaningful light on these issues.

Additionally, as discussed above, the failure to properly utilize body-worn cameras during the May 30, 2020 demonstrations is concerning.

### ii.    General Policy for the Release of CDP Information

When the Monitoring Team previously approved the Division's body-worn cameras policies, it conditioned that approval on the City and CDP establishing a general policy for the release of records, data, and information—including but not limited to body-worn camera footage—to the public. The Monitoring Team continues to look forward to the Division establishing these overall protocols for ensuring meaningful transparency and accountability.



Cleveland
Police
Monitoring
Team

**Hassan Aden**
Monitor

**Ayesha Hardaway**
Deputy Monitor

**Brian Maxey**
Deputy Monitor

**Charles R. See**
Director of Community Engagement

**Christine Cole**
Director of Outcome Measures

**Dr. Modupe Akinola**
**Melissa Bretz**
**Dr. Randolph Dupont**
**Lisa Fink**
**Maggie Goodrich**
**Rick Myers**
**Commissioner Chuck Ramsey (ret.)**
**Richard Rosenthal**
**Victor Ruiz**
**Captain Scott Sargent (ret.)**
**Sean Smoot**
**Timothy Tramble**
Monitoring Team