

**City of Cleveland Memorandum**
Justin M. Bibb, Mayor

| | |
|---|---|
| **To:** | Hassan Aden, Monitor |
| **From:** | Mark Griffin, Director of Law |
| **Date:** | August 2, 2022 |
| **Re:** | **Substantial Progress by Cleveland Division of Police & DOJ's Best Practices** |

From 2016 through 2018, the Cleveland Division of Police made seminal changes in its operations including the introduction and implementation of an entirely new suite of Use of Force policies, incorporating software based tracking; entirely new Crisis Intervention policies; the integration of a dedicated data collection and analysis team; implementation of an electronic learning management system to facilitate expected higher amounts and standards in training; implementation and consistent utilization of body worn cameras; and upgrades in technology and equipment including email access for all employees and implemented vehicle modernization (including CAD/RMS) all of which have been acknowledged in reports to the Court, and all of which required large changes in organizational culture in order to be as successful as they have become.

Since 2019, the Cleveland Division of Police, the Office of Professional Standards, and Internal Affairs have continued to make substantial progress in modernizing their policies, procedures and practices.  The data below sets forth this progress:

### 1. Cleveland Division of Police

- There has been a significant decrease in Use of Force incidents since 2019.
    - 42% decrease in Use of Force incidents overall.
    - Use of Force incidents are down in all districts, since 2019.
- Since 2020, the CDP has increased the use of CIT de-escalation techniques.
    - 24% overall increase in use of CIT de-escalation techniques.
        - Allowing time to comply: increased 6.3%.
        - Listening & Interacting in Conversation: increased 4.4%.
        - Requesting CIT specialist doubled (4.3% → 8.6%).
        - Use of Distance/Cover: increased 2.3%.
- CDP has created or revised 32 General Police Orders.  Only 2 GPOs remain for final review and revision.
- Community engagement has greatly increased in each district since 2020.
    - Car patrol & foot patrol engagements have increased almost 3x in 2021 and non-officer initiated engagement has increased over 4x since 2021.
    - Cleveland is the first jurisdiction in the country to provide quick response cards to citizens for feedback after interactions with officers.

- o The City hosted the first ever Public Safety Week including a Safety & Resource Fair and Public Safety Community Fest
- o Coffee with the Commander Talks continue with Commander Butler and officers where the community can talk about their neighborhood and ask questions.
- o National Night out against Crime will be hosted August 2nd.
    - ▪ 5 simultaneous events in each police district where the community is encouraged to join with local public safety officials and have a night of fun.

### 2. Office of Professional Standards

- The number of complaints alleging excessive force and improper procedure have decreased.
    - o Excessive force:
        - ▪ 2020: 13/276 complaints – 4.7%
        - ▪ 2021: 6/324 complaints – 1.9%
        - ▪ Decrease of 54%.
    - o Improper procedure:
        - ▪ 2020: 55/276 complaints – 19.9%
        - ▪ 2021: 54/324 complaints – 16.7%
        - ▪ Decrease of 2%.
- Since 2019, OPS has closed cases in a shorter amount of time.
    - o 2021: 65% of cases were closed within 60 days.
        - ▪ Only 22% of cases were closed in more than 90 days.
    - o 2020 v 2021
        - ▪ Maximum number of days to close a case decreased by 14 days.

### 3. Internal Affairs

- The average days to closure on a case has decreased 53% since 2018.
    - o Average annual decrease of 54 days every year
        - 2018: 307 days open
        - 2019: 251 days open
        - 2020: 171 days open
        - 2021: 144 days open
- The allegations made during IA investigations related to criminal misconduct have reduced by 59%.
    - o Average annual decrease of 23 allegations every year
        - 2018: 117 allegations
        - 2019: 93 allegations
        - 2020: 75 allegations
        - 2021: 48 allegations

See also Exhibit A (attached hereto).

As the City of Cleveland transitions from the policy modification phase to the data collection phase, the parties should apply the best available practices. In August 2021, the Department of Justice carefully studied the administration of consent decrees and made 19 recommendations of principles and best practices.

Although these 19 recommendations are required only for <u>future</u> consent decrees, if they are best practices, they should be applied to the fullest extent possible to the management of existing consent decrees. The people of Cleveland are entitled to equal treatment.

The 19 actions are outlined in the memo released by the DOJ (attached as Exhibit B). There are major 5 principles outlined in the Department of Justice's recommended best practices that will require monitorships of state and local governments to meet. Those principals are:

1. Monitorships should be designed to minimize cost to jurisdictions and avoid any appearance of a conflict of interest.
2. Monitors must be accountable to the court, the parties and the public.
3. Monitors should assess compliance consistently across jurisdictions.
4. Sustained, meaningful engagement with the community is critical to the success of the monitors.
5. Monitoring must be structured to efficiently move jurisdictions into compliance.

Some of the recommendations are already included in the instant consent decree. A subset of the DOJ's best practice recommendations are outlined as follows:

1. **No Double Dipping:** To dispel any perception that monitoring is a for-profit venture, and to assure that lead monitors devote their full attention to their primary assignment, lead monitors in consent decrees will no longer be able to serve on more than one monitoring team at a time. (Ex. B., p. 5)

2. **Monitors Should Prioritize Stakeholder Input:** To ensure that monitors selected are able to understand of a variety of interests and perspectives of the stakeholders in the process, including impacted communities, law enforcement and victims of official misconduct. (Ex. B., pp.5, 7)

3. **Term Limits:** To ensure that monitors are being held accountable, consent decrees will impose specific terms for monitors that can only be renewed after a process of judicial evaluation and reappointment. (Ex. B., p. 5)

4. **Amplify a Jurisdiction's Successes.** Monitors should "highlight a jurisdiction's successes just as quickly as they discuss the work that remains. Implementing the type of institutional reform that is required by a consent decree demands a substantial and sustained commitment from the entire community. If the community is not aware of the progress that is being made, that commitment risks turning into frustration. The Department should aid in this effort by publicly lauding a jurisdiction's progress as the monitorship progresses, while also being forthright about the work left to do." (Ex. B., p. 8)

5. **Termination Hearing After No More than Five Years:** To ensure that monitorships are designed to incentivize monitors and jurisdictions to move towards compliance as efficiently as possible, future consent decrees will require a hearing after five years so that jurisdictions can demonstrate the progress it has made, and if possible, to move for termination. To the extent that full compliance has not yet been reached by five years, the hearing will be used to solidify the plan for getting over the finish line in short order. (Ex. B., p. 8)

# EXHIBIT A

# Cleveland Division of Police

Use of Force Incidents Overall (2019-2021)



Use of Force Incidents by District (2019-2021)



Use of CIT De-Escalation Techniques (2020-2021)



Source: City of Cleveland Mental Health Response Advisory Committee 2021 Annual Report, pg. 23.

Community Engagement by Type of Patrol (2020-2022*) *2022 data last updated 7/28/2022



Source: Data sourced from Cleveland Division of Police Data Analyst. Dr. Rania Issa (7/28/2022).  *2022 data last updated 7/28/2022

Quick Response Cards – Types of Encounters



Source: Data sourced from Cleveland Department of Public Safety Chief Director, Karrie Howard (8/1/2022).

# Office of Professional Standards

Timeliness of Investigations (2019-2021)



Source: Office of Professional Standards 2019, 2020, & 2021 Annual Reports, pgs. 25, 26 & 26.

# Internal Affairs

Allegations related to Criminal Misconduct (2018-2021)



Timeliness of Investigations (2018-2021)



# EXHIBIT B



# Office of the Attorney General
## Washington, D. C. 20530

September 13, 2021

MEMORANDUM FOR HEADS OF CIVIL LITIGATING COMPONENTS
                              UNITED STATES ATTORNEYS

FROM:                THE ATTORNEY GENERAL

SUBJECT:        REVIEW OF THE USE OF MONITORS IN CIVIL SETTLEMENT
                         AGREEMENTS AND CONSENT DECREES INVOLVING STATE
                         AND LOCAL GOVERNMENTAL ENTITIES

      Today, the Justice Department will begin implementing a set of principles and specific recommendations regarding the use of monitors in civil settlement agreements and consent decrees involving state and local governmental entities. These actions are the result of a review conducted by the Associate Attorney General pursuant to my April 16, 2021, memorandum concerning such matters. Among other things, the April 16 memorandum noted the importance of ensuring that monitors used in these matters are independent, highly qualified, and free of conflicts of interest. To further those important aims, the memorandum directed the Associate Attorney General to conduct a review to determine if additional guidance regarding the use of monitors was warranted.

      The Associate Attorney General has now provided, and I approve, a set of principles for the use of monitors in civil settlement agreements and consent decrees involving state and local governmental entities. Those principles are accompanied by a set of recommended implementation actions, which I also approve.

      The complete memorandum is attached and will be considered operative effective immediately. Its provisions will also be incorporated into the *Justice Manual*.

      In addition, the Associate Attorney General, working with the Assistant Attorney General for Civil Rights, will carry out the implementation actions by, among other things, creating tools and resources for future monitorships.



**U.S. Department of Justice**

Office of the Associate Attorney General

*Associate Attorney General*   *Washington, D.C. 20530*

August 13, 2021

MEMORANDUM FOR THE ATTORNEY GENERAL

THROUGH:  THE DEPUTY ATTORNEY GENERAL *MM 8-20-21*

FROM:  THE ASSOCIATE ATTORNEY GENERAL

SUBJECT:  Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees involving State and Local Governmental Entities

### I. Introduction and Scope of Review

For decades, the Department of Justice has used consent decrees and settlement agreements[1] with state and local governmental entities[2] to remedy a wide variety of violations of federal law, including, for example, to ensure constitutional policing, improve access for people with disabilities, provide safe conditions of confinement, and protect the environment. On April 16, 2021, you issued a memorandum authorizing the continued use of these agreements by the civil litigating components and United States Attorneys' offices and outlining several factors to consider when employing them. *See* Memorandum from the Attorney General, Civil Settlement Agreements and Consent Decrees with State and Local Governmental Entities (Apr. 16, 2021) (the April 2021 Memorandum).

In many cases involving consent decrees and settlements with state and local governments, the use of monitors[3] is essential to the successful implementation of the decree or agreement. Monitors serve a crucial role as an independent validator of a jurisdiction's progress in implementing the reforms required by a settlement. They are generally selected after an extensive negotiation between the parties, with approval by the supervising federal court. Because they are officers of the court, monitors act as neutral arbiters of a jurisdiction's

---

[1] As used in this memorandum, the term "settlement agreement" means an out-of-court resolution, including a memorandum of agreement or memorandum of understanding, that requires performance by a state or local government entity and is enforced through the filing of a lawsuit for breach of contract. The term "consent decree" means a negotiated resolution that is entered as a court order and is enforceable through a motion for contempt. This memorandum only addresses resolutions that concern violations or alleged violations of law and does not apply to other categories of resolutions.
[2] As used in this in memorandum, the term "state and local governmental entities" includes territorial and tribal entities.
[3] As used in this memorandum, the term "monitor" includes any third party whose job is to monitor a state or local governmental entity's compliance with the terms of any settlement agreement or consent decree, whether the third party is called a "monitor," "trustee," "auditor," or other name.

compliance with a decree, a process that can increase the confidence the Court and stakeholders have in the settlement process.

Because of the important role monitors play in consent decrees and settlement agreements with state and local governments, the April 2021 Memorandum recognized that it is critical to ensure that the monitors used in these decrees and agreements are "independent, highly qualified, and free of conflicts of interest." *Id.* at 4. To ensure those standards are being met, you asked me to review the Department's use of monitors in these cases and any associated guidance and to provide you with recommendations on how to improve the use of monitorships going forward.[4]

My review proceeded in two steps. First, my office surveyed the heads of the civil litigating components and United States Attorneys to determine the extent to which they use monitors in consent decrees with state and local governments. Several civil litigating components reported regularly relying upon monitors in cases involving private defendants, but indicated that they rarely, if ever, use monitors in matters involving state and local governmental entities. These components have continued to follow an April 2016 memorandum by then-Acting Associate Attorney General Stuart Delery (the Delery Memo) regarding the selection of corporate monitors as well as subsequent component specific guidance that supplemented the Delery Memo.

For consent decrees and settlement agreements involving governmental entities, the Department's use of monitors has largely been confined to three types of cases brought by the Civil Rights Division (CRT) and United States Attorneys' offices: (1) pattern or practice matters involving unconstitutional or unlawful policing pursuant to 34 U.S.C. § 12601; (2) cases addressing conditions at corrections or other public residential facilities under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, and other statutes, and (3) lawsuits regarding for the rights of people with disabilities pursuant to Title II of the American with Disabilities Act, 42 U.S.C. § 12132, *et seq.*, and *Olmstead v. L.C.*, 527 U.S. 581 (1999). The Civil Rights Division and the United States Attorneys' offices who work with the Division were solicited for feedback on their use of monitors in these cases.

Second, my office reviewed existing Department guidance, studied consent decrees used in prior and ongoing cases, and convened over 50 listening sessions with stakeholders, including current and former monitors, state and local officials, police chiefs and national law enforcement organizations, civil rights advocates, community leaders, and academics. These conversations engaged supporters and critics of monitorships alike to provide input on steps the Department could take to improve the use of monitors in these cases.

These listening sessions revealed a remarkably consistent story. Most felt strongly that the consent decrees had acted as the primary catalyst in transforming the state and local agencies

---

[4] Because this memo, like the April 2021 Memorandum, is limited to consent decrees and settlement agreements in civil cases involving state and local governmental entities, it does not apply to the Department's selection and use of monitors in deferred and non-prosecution agreements with corporations. Guidance pertaining to corporate monitors in the criminal context is contained in two memoranda, one issued in 2008 and the other in 2009. *See* Memorandum for Heads of Department Components and United States Attorneys from Acting Deputy Attorney General Craig S. Morford (Mar. 7, 2008); Memorandum to All Criminal Division Personnel from Assistant Attorney General Lanny A. Breuer (June 24, 2009).

2

in which they were used. Many recognized that consent decrees provide state and local governments with a stable, long-term plan to reform agencies and departments, and in the law enforcement context, to rebuild trust between law enforcement agencies and the communities they serve. This qualitative input is supported by publicly available data demonstrating the effectiveness of CRT's consent decrees. For example, a 2005 study of the decree of the Pittsburgh Police Department by the Vera Institute of Justice concluded that the consent decree had been a "success story for local police management and for federal intervention" that had improved service to the community and "encourage[d] long-term improvements in police accountability."[5] And a 2009 study by the Harvard Kennedy School demonstrated that subsequent to the consent decree of the Los Angeles Police Department (LAPD), public satisfaction with the LAPD increased and the use of serious force decreased, all while the levels of serious crime fell.[6]

At the same time, stakeholders were insistent that the Department can and should do more to support the monitorships and jurisdictions tasked with implementing consent decrees going forward. In the law enforcement context in particular, the Department's monitorships have evolved significantly since the first policing pattern-or-practice investigation was initiated in 1995. Additional provisions have been added to more recent decrees to build on successful monitor practices, optimize cost-effectiveness, and increase community engagement. As the Department recognized over a decade ago,[7] it is critical that the Department continue to take stock of what has worked and what has not and ensure that monitorships are conducted consistently, efficiently, with significant community input, and with respect for the financial realities that state and local governmental entities confront.

This memorandum presents a set of principles informed by our review and proposes recommended actions to implement those principles. Because of the complexities involved in the Department's law enforcement consent decrees, these principles and recommendations were crafted specifically with monitorships of state and local law enforcement agencies in mind. The Civil Rights Division, other civil litigating components, and the United States Attorneys should consider whether these recommendations might also be useful in monitorships of non-law enforcement entities as well.[8] In addition, in implementing these recommendations, the Civil Rights Division should consider the extent to which some of these recommendations would be overly burdensome or unnecessary in smaller jurisdictions or those with more narrowly focused consent decrees. Finally, because existing consent decrees and monitorships are the product of extensive negotiation between the parties, with approval by a federal court, the specific recommendations outlined below should apply only to consent decrees and monitorships used in future cases.

---

[5] *See* Robert C. Davis et al., Vera Institute of Justice, Can Federal Intervention Bring Lasting Improvement in Local Policing? (2005), *available at* https://www.vera.org/publications/can-federal-intervention-bring-lasting-improvement-in-local-policing-the-pittsburgh-consent-decree.

[6] *See* Christopher Stone et al., *Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD* (2009), *available at* https://www.hks.harvard.edu/publications/policing-los-angeles-under-consent-decree-dynamics-change-lapd.

[7] In 2010, the Civil Rights Division and the Office of Justice Programs convened a roundtable of law enforcement officials, researchers, and consultants to discuss the pattern or practice consent decree program. *See* Office of Justice Programs, *Taking Stock: Report from the 2010 Roundtable on the State and Local Law Enforcement Police Pattern or Practice Program* (2011), *available at* https://www.ojp.gov/pdffiles1/nij/234458.pdf

[8] On July 6, 2016, as the Acting Assistant Attorney General for Civil Rights, I provided guidance regarding the selection of monitors in CRT's cases to supplement the Delery Memo. This guidance continues to apply to both law-enforcement and non-law enforcement cases, including CRT's *Olmstead*/ADA cases.

This memorandum provides internal Department guidance only. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable by law by any party in any matter or proceeding. Nor are any limitations hereby placed on otherwise lawful litigation prerogatives of the Department of Justice.

### II. Principles for Monitorships of State and Local Governmental Entities

**PRINCIPLE: Monitorships should be designed to minimize the cost to jurisdictions and to avoid any appearance of a conflict of interest.**

The benefits derived from a monitorship are substantial, as the human and financial costs of permitting unconstitutional police practices to persist are enormous. But the Department must also recognize that implementing the changes involved with a consent decree often requires expending substantial public resources as the agency puts in place new systems, training, and policies. Though the cost of a monitorship ultimately depends on how swiftly a jurisdiction comes into compliance, monitorships must nonetheless be designed and administered with awareness that every dollar spent on a monitorship is a dollar that cannot be spent on other policy priorities.

Constraining monitor costs also minimizes any actual conflict of interest between a monitor's duty to the jurisdiction and her bottom line. Monitorships should be designed to avoid even the appearance that a monitor is primarily motivated by profit. Such an appearance can undermine a community's trust in the consent decree process. Relatedly, many of the stakeholders we interviewed urged the Department to do more to dispel the perception that monitoring is becoming a cottage industry, closed to outside voices.

The Department should thus take a number of steps that will both constrain costs and ensure that monitors are not viewed, rightly or wrongly, as making their monitoring work into a career:

- *Cap Monitor Fees*: First, decrees should include an annual cap on monitors' fees. This cap will both help contain absolute costs and provide increased transparency surrounding the expenses involved in a monitorship. CRT should consider tying these caps to progress the jurisdiction makes in reaching compliance; consent decree could grant courts discretion to adjust the caps up or down depending on the level of effort expended and compliance achieved by the jurisdiction.

- *Encourage Use of Pro Bono Time, Reduced Rates, and Non-Profit Organizations and Academic Institutions:* Second, because monitoring is a public service, monitorships should be structured to encourage the use of pro bono time or reduced rates. These steps will reduce any incentive to unduly extend a monitorship for their own profit. The Department should also explore the use of partnerships with academic institutions and non-profit organizations that could either serve as the monitor, on the monitoring team, or more generally facilitate the overall goals of the decree.

- *Explore Alternative Fee Arrangements:* Third, Department attorneys should explore whether the use of alternative fee arrangements with monitors would be appropriate.

4

Over the past decade or so, the market for legal services has changed dramatically. To increase cost-effectiveness, legal services providers are increasingly experimenting with flat fee arrangements, instead of billable hours, to reduce costs and promote efficiency. Such arrangements might be similarly useful in containing the costs of monitorships.

- *Restrict Lead Monitor Participation in Multiple Monitorships:* Future consent decrees should limit the ability of the individual who serves as the lead monitor to serve on more than one monitoring team at a time. Jurisdictions should not be deprived of subject matter experts whose unique knowledge makes them an asset to multiple monitorships. But the person serving as the lead monitor should be solely committed to the jurisdiction they are serving and should not be simultaneously supporting multiple monitorships at the same time.

**PRINCIPLE: Monitors must be accountable to the court, the parties, and the public.**

When consent decrees involve state and local entities, monitors hold a position of public trust, not only as agents of the court, but also as drivers of significant change in public institutions that are central to the communities that they serve. Monitorships thus must be structured to ensure that monitors are accountable for their work. To effectuate this, the Department should take the following steps:

- *Collect Public Input during Monitor Selection*: Ensuring accountability starts with monitor selection. In cases involving law enforcement agencies, monitors are generally selected after a request for proposal is issued. The parties then screen and interview potential candidates and endeavor to make a joint recommendation to the court. In recent cases, the selection process has included an opportunity for public input. Future consent decrees should build on this process. Specifically, they should require that the selection of monitors be informed by a public process, including a publicly-posted request for proposals, public posting of the applicants' proposals, an opportunity for stakeholders to meet and ask questions of the finalists for the monitor position, and a process for the public to provide input to the parties and the court on the selection of the monitor. A more open and rigorous application and selection process will also ensure a more diverse and representative sample of monitor candidates.

- *Impose Term Limits Subject to Judicial Revaluation and Reappointment:* Consent decrees should include term limits for monitors that can be renewed through judicial evaluation and reappointment. While full implementation of a consent decree takes time, there must be an expectation from the beginning that monitors work efficiently. After the first two or three years, consent decrees should build in a procedure for assessing the monitor before any reappointment can occur. Specifically, the court should solicit input from the parties and the public as to the monitor's performance, cost-effectiveness, provision of technical assistance (if any), and engagement with the community, and then evaluate before determining whether to continue with the current monitoring team.

- *Make Monitoring Documents Publicly Accessible*: True accountability also requires that monitors' work be easily accessible and publicly digestible. Depending on the size and scope of the monitorship involved, this should include a public monitoring plan that sets forth the short- and long-term timelines by which the jurisdiction is expected to achieve

5

compliance, public disclosure of the monitor's bills and the methodologies the monitor will use to assess compliance, and routine public reporting of the monitor's assessment of the jurisdiction's progress. While these plans, reports, and assessments may need to be technical to meet legal requirements in the case, they must also be accessible and understandable to stakeholders in the case. Indeed, where governmental entities are involved, it is the monitor's duty to make their plans and assessments public facing, writing them not just for the judges, but also for the public.

**PRINCIPLE: Monitors should assess compliance consistently across jurisdictions.**

Implementing a consent decree is challenging, complex work, and monitors have employed differing approaches to the task of assessing a jurisdiction's compliance. This variation sometimes engenders frustration as monitored entities feel that they are being unfairly measured by different criteria. Over the years, however, as the number of consent decrees has grown, these differences have lessened as monitors increasingly compare notes and share effective practices.

The Department should build on this progress and invest in the development of the following set of materials that will ensure that monitorships are conducted consistently and that provide more clarity to jurisdictions about what a monitorship will entail. These materials should be made publicly accessible online so monitors can easily access them going forward and so the public can better understand the process involved in a monitorship.

- *Develop Effective Practices Guide for Monitors*: First, the Department should convene a group of stakeholders—including current and former monitors, law enforcement, and state, local, and community leaders—to create a set of effective practices. This could include protocols for the development of policies and trainings; methodologies for conducting compliance reviews and outcome assessments; guides for conducting community outreach; strategies for communications with parties, law enforcement, the public, and the court; guidelines for monitoring plans, reports, budgets and billing, and the provision of technical assistance. As the only repeat player in these cases, the Department is best situated to act as the clearinghouse for the development of these kind of materials.

- *Create Assessment Tools for Monitors to Use*: Second, CRT should work with the Bureau of Justice Assistance and outside stakeholders to develop a variety of assessment tools that can be tailored for use in particular jurisdictions. Creating a standard set of assessment tools that is available to monitors will not only increase the consistency of monitor assessments but also provide monitored entities with clearer expectations of the metrics that may be used to assess progress and thus also a clearer understanding of the kind of systems and data collection efforts they might need to implement in order to reach compliance.

- *Provide an Orientation Program for Judges:* Third, for most of the federal judges who are assigned to oversee the Department's consent decrees with state and local governmental entities, this will be their first involvement with the type of institutional reform that the Department's decrees seek to implement. The Department should work with the Federal Judicial Center to develop an orientation program for judges to educate

6

them on the consent decree process, the roles of the judge and monitor in that process, and lessons learned from other jurisdictions' implementation of prior decrees. This program should also facilitate regular meetings among the federal judges overseeing DOJ police consent decree compliance to enhance peer learning.

- *Make a Monitorship "Starter Kit" for New Monitors and Jurisdictions*: Finally, the Department should develop a "starter kit" that can be given to new monitors and jurisdictions to set expectations for what will be needed in order to reach compliance. Many stakeholders noted that valuable time can be lost at the beginning of the monitorship as new monitors and jurisdictions get up to speed on the nuts and bolts of implementing a consent decree. Well before a monitorship begins, new monitors and jurisdictions should be given a guide that might include things like checklists for the kinds of policies and systems that may need to be put in place and guidance on how compliance audits will be conducted. Such materials will also serve the Department's strong interest in encouraging a greater diversity of voices on the monitoring team by reducing barriers to entry by allowing monitor candidates without previous experience to compete for monitoring roles.

**PRINCIPLE: Sustained, meaningful engagement with the community is critical to the success of a monitorship.**

Consent decrees often involve a wide range of individuals and groups with an interest in the reform process and its outcome. To perform their duties, monitoring teams must understand these different interests and perspectives. A monitorship cannot succeed without the consistent input of those the decree is intended to benefit. There are a number of actions the Department can take to ensure that monitors take account of this input:

- *Select Monitors Who Will Prioritize Stakeholder Input*: Community engagement begins with the selection of the monitoring team. Monitors selected should be able to demonstrate an understanding of variety of interests and perspectives of the stakeholders in the process, including impacted communities, law enforcement, and victims of official misconduct.

- *Require Consistent Local Feedback:* Once the monitoring team is in place, they must continually seek the community members' input. Generally, this will require the monitoring team to include a dedicated community liaison whose responsibility it will be to make sure that the monitoring team is regularly hearing from a diverse set of community voices. In addition, monitors should report on the community's views of a jurisdiction's progress in reaching compliance in their assessments.

- *Modernize Monitor Communication Strategies*: Meaningful engagement also entails meeting community members where they are. In addition to using town halls to seek community feedback, monitors must go to the places where impacted communities actually live and work to make sure they are reaching a broader swath of people. Monitors must also use modern tools of communication, such as social media, to ensure they're reaching community members whose voices are not as regularly heard. By modernizing communication, monitors can thus enlist the voices of community members themselves.

- *Amplify a Jurisdiction's Successes*: Finally, monitors should be sure to highlight a jurisdiction's successes just as quickly as they discuss the work that remains. Implementing the type of institutional reform that is required by a consent decree demands a substantial and sustained commitment from the entire community. If the community is not aware of the progress that is being made, that commitment risks turning into frustration. The Department should aid in this effort by publicly lauding a jurisdiction's progress as the monitorship progresses, while also being forthright about the work left to do.

**PRINCIPLE: Monitoring must be structured to efficiently move jurisdictions into compliance.**

The efficacy and success of consent decrees depends on reforms being implemented in a timely manner. To be sure, the problems that lead to consent decrees with governmental entities are often systemic in nature and will invariably take significant time and leadership by the jurisdiction to correct. But monitorships must be designed to incentivize the monitor and the jurisdiction to move towards compliance as efficiently as possible. To do that, I recommend the Department take the following steps:

- *Require a Hearing to Assess Termination After No More than Five Years*: Recent law enforcement consent decrees have suggested that it is anticipated that compliance could be achieved within five years of the date of the entry, but that target has often come and gone without formal assessment. Consent decrees with state and local governmental entities should make this five-year target a meaningful opportunity for the jurisdiction to demonstrate the progress it has made on coming into compliance with the decree, and, if able, to move to terminate the monitorship. At the five-year mark, a hearing should be held in which the monitored entity will be expressly invited to provide evidence to the court of the progress it has made and, if it chooses, to demonstrate that it can be released from the decree, either in whole or in part. For work that remains, this five-year hearing should be used as an opportunity to solidify a plan and timeline for getting over the finish line.

- *Encourage Use of Partial Termination Provisions:* Even apart from this five-year hearing, the consent decree should be designed to permit monitors to no longer assess sections of the decree for which the jurisdiction has achieved and sustained compliance. To do so, decrees should encourage the parties to affirmatively recommend termination of sections of the decree for which jurisdictions achieve and sustain compliance. Compliance with a consent decree is not an all-or-nothing goal. Progress will inherently happen incrementally, and the monitorships should be designed with that in mind. By standardizing the use of partial termination provisions, the Department can reward jurisdictions that have been making efforts to come into compliance.

- *Prioritize Project Management Skills in Monitor Selection*: A monitoring team with strong project management expertise can help limit delays and increase effectiveness

8

during the implementation process. Requests for proposals for monitoring teams should emphasize the importance of having proven project management skills.

- *Transition Monitoring Responsibilities to Jurisdiction Over Time*: Monitorships should also be structured to require that responsibility for monitoring begins to shift to the agency or oversight entities within the jurisdiction to demonstrate sustained compliance. A consent decree cannot last forever, and success should be measured not only by the substantive reforms that have been made but also by the jurisdiction's ability to engage in reform and monitor itself long after the decree has ended. As CRT has long stated, "Ultimately, [CRT's] goal is for its reform agreements to leave a law enforcement agency with an enduring ability to self-correct when misconduct occurs."[9]

## III. Conclusion

Monitorships have proven to be vital tools in upholding the rule of law and promoting transformational change in the state and local governmental entities where they are used. The Department must do everything it can to guarantee that they remain so, by working to ensure that monitorships are conducted efficiently, consistently, and with meaningful input and participation from the communities they serve.

---

[9] Department of Justice Civil Rights Division, *The Civil Rights Division's Pattern and Practice Police Reform Work* (Jan. 2017), *available at* https://www.justice.gov/crt/file/922421/download.