

**January 31, 2023**

**INDEPENDENT MONITORING TEAM'S ASSESSMENT OF CLEVELAND DIVISION OF POLICE CONSENT DECREE COMPLIANCE - IMPOSITION OF DISCIPLINE BY THE CHIEF OF POLICE (March 2021 through March 2022)**

## I.     Introduction

The Independent Monitoring Team for the Cleveland Consent Decree presents this assessment into the quality of the imposition of discipline by the Office of the Chief of Police in the Cleveland Division of Police ("CDP" or "the Division"). The Consent Decree, entered into between the City of Cleveland and the United States Department of Justice on June 12, 2015, requires the City to create accountability systems that support constitutional policing throughout the City. An important requirement of that accountability system is that the Chief of Police impose discipline for employee misconduct in a consistent, fair and timely manner.

This report details the Monitoring Team's assessment of cases decided by the Chief of Police from March 2021 through March 2022. Two individuals served as Chief during that time period. Calvin

Williams served as Chief from February 10, 2014 through January 3, 2022. Chief Williams vacated his position and was replaced by Interim Chief Dornat (Wayne) Drummond. Chief Drummond was named permanent Chief in July 2022.

This is the Monitoring Team's second assessment of CDP discipline. The first assessment reviewed discipline imposed by then-Director of Public Safety Michael McGrath. It was filed with the court on November 12, 2019.[1] In that assessment, the Monitoring Team found that the City was out of compliance with paragraph 245 of the Consent Decree, which requires that disciplinary decisions be fair and consistent "and that mitigating and aggravating factors are identified and consistently applied and documented."[2] Specifically, we found that the disciplinary decisions by the then-Director of Public Safety "were often inconsistent with the Disciplinary Matrix, and almost universally insufficiently explained."[3]

This current assessment finds that, on the whole, the disciplinary decisions made by Chiefs Williams and Drummond were reasonable and consistent with the intent of the Division's most recently updated Disciplinary Matrix.[4] However, we also find that during Chief Williams' tenure, there were questionable disciplinary decisions made in a relatively small number of the cases that were reviewed (four out of 69 cases or 5.8%). In one of the cases, we found that the Chief failed to refer the case to the Director of Public Safety even though the case involved two separate allegations of untruthfulness. The Matrix called for presumptive termination but Williams suspended the officers for nine days. A second case involved evidence of a false statement made by the subject officer that was not adequately considered by the Office of Professional Standards (OPS) and the Police Review Board (PRB). The Chief failed to return this case for additional investigation. A third case, also brought by the OPS/PRB, involved a Wearable Camera violation where the Chief failed to consider as an aggravating factor the fact that officer's failure to activate their body worn camera resulted in a "not sustained" finding of a civilian complaint. In the fourth case, we found that the Chief's failure to consider separate acts of misconduct individually resulted in an illogical benefit to the employee as it dramatically decreased the level of discipline that would have been imposed had the distinct acts of misconduct been adjudged separately.

See Table 2, *infra*, for more specific information relating to these four cases.

We also found that the Division continues to have challenges with adjudicating sustained complaints in a timely manner, though the timing between the completion of investigations and discipline being imposed has improved. On average, it took 115 days to adjudicate OPS cases

---

[1] Monitoring Team Review of Director of Public Safety Disciplinary Decisions Dkt. #319.
[2] *Id.*, at 2.
[3] *Id.* at 58
[4] Disciplinary Guidance, GPO 1.07.06, Dkt. # 277, Effective August 12, 2019.

(after PRB findings letters were provided to CDP), [5] and 138 days to adjudicate Internal Affairs cases (after the IA Superintendent made his recommended findings). Nevertheless, the whole timeline for the completion of cases from the time cases were opened until fully adjudicated still continues to lag – an average of 391 days for IA cases and 402 days for OPS cases.

See Section IV. "Timeliness of Adjudication of Cases" for more specific information regarding the timeliness of the adjudication of cases by the Chief's Office.

## II. Methodology

This assessment specifically focused on whether discipline decisions by the Chief of Police have complied with Sections IX (E) and (F) of the Consent Decree[6] and the relevant Disciplinary Matrices.[7] They are key to ensuring CDP compliance with the accountability provisions of the Consent Decree.

### A. Scope of the Assessment/Compliance Review

Sections IX (E)[8] and (F)[9] of the Consent Decree outline a number of specific requirements relating to disciplinary hearings, and the actions required by the Chief, his/her designee, or the Director of Public Safety. The compliance review evaluated the CDP's Chief of Police performance as it relates to the requirements laid out in these paragraphs. Some of the paragraphs in these sub-sections have already been evaluated as having reached general compliance and will therefore not be included in this review (See, Table 1, below).

The following table lists each paragraph covered by this assessment and denotes the information that the Monitoring Team used to determine compliance in this section.

---

[5] It should be noted that timeliness of individual OPS cases can be dramatically impacted when the Chief disagrees with a recommendation made by the PRB. Under those circumstances, the Chief must send a departure letter to the PRB explaining his rationale for departing from the PRB recommendation, followed by a PRB decision on whether or not to appeal the Chief's decision to the Director of Public Safety and subsequently followed by an adjudication of the case by the Director. In the eight cases that did not involve a departure from PRB recommendations, it took the Division, on average, 78.9 days to resolve a case.
[6] ¶¶ 240 - 249
[7] Effective dates January 1, 2014, January 1, 2018 and August 12, 2019.
[8] Paragraphs 240-244 of the Consent Decree.
[9] Paragraphs 245-249 of the Consent Decree.

| Table 1 | | |
|---|---|---|
| Paragraph | Requirement | Data/Information Evaluated for Compliance |
| **IX.** | **Accountability** | |
| 176 | The Consent Decree requires that: The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process. | The assessment evaluated:<br>• Whether investigative findings made by the Chief of Police were supported by a preponderance of the evidence;<br>• If CDP officers found to have committed misconduct were held accountable in a fair and consistent manner and involving the application of due process. |
| **IX.B** | **Reporting Misconduct and Preventing Retaliation** | |
| 189 | CDP will require any CDP employee who observes or becomes aware of any act of misconduct by another employee to report the incident to a supervisor or directly to Internal Affairs. Where an act of misconduct is reported to a supervisor, the supervisor will immediately document and report the information to Internal Affairs. Failure to report an act of misconduct is an egregious offense and will subject the officer to the disciplinary process and, if sustained, will subject the officer to discipline, up to and including termination. | Not included in this assessment due to the lack of cases within the population involving this issue: To be evaluated in a subsequent assessment of Internal Affairs investigations with a more representative population of cases identified. |
| 192 | Officers who retaliate against any person who reports or investigates alleged misconduct will be subject to the disciplinary process and possible discipline, up to and including termination. | Not included in this assessment due to the lack of cases within the population involving this issue: To be evaluated at a later time, pending identification of an appropriate case population. |
| **IX.E.** | **Disciplinary Hearings** | |
| 240 | The Chief of CDP will issue a General Police Order that requires officers to: (a) cooperate with | Not included in this assessment: General |

|   |   |   |
|---|---|---|
|   | the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB. | Compliance (as of Seventh Semiannual Report)[10] |
| 241 | Where PRB or Internal Affairs recommends the initiation of the disciplinary process, the Chief of CDP, or his/her designee, or the Director of Public Safety will conduct a disciplinary hearing and will provide the officer with an opportunity to testify. If an officer provides new or additional evidence at the hearing, the hearing will be suspended and the matter will be returned to Internal Affairs or PRB for consideration, as appropriate. | This assessment considered:<br>• If an officer provides new or additional information;<br>• If the hearing is suspended and case returned to IA/PRB.<br>The first sentence of this paragraph has already been determined in general compliance. |
| 242 | If PRB recommends the initiation of the disciplinary process and recommends a disciplinary level, and the Chief or the Director of Public Safety does not uphold the charges in whole or in part after the hearing, or does not impose the recommended discipline or non-disciplinary corrective action, the Chief or the Director will set forth in writing his or her justification for doing so. | This assessment considered:<br>• If the Chief does not uphold charges;<br>• If the Chief does not impose recommended discipline;<br>• If the Chief sets forth in writing his justification for departing from recommendations made by the PRB.<br>• If the justifications set forth by the Chief are reasonable and based upon the facts and law of the case. |
| 243 | CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition. | Not included in this assessment: Operational Compliance (as of Seventh Semiannual Report)[11] |
| **IX.F** | **Discipline** |   |
| 245 | CDP will ensure that discipline for sustained allegations of misconduct comports with due | This assessment considered if these cases have: |

---

[10] 7th Semi-Annual Report, Doc. #280, filed 9/16/2019, at 53.
[11] 7th Semi-Annual Report, Dkt. #280, filed 9/16/2019, at 53 & 55.

5 | P a g e

| | | |
|---|---|---|
| | process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented. | • Comported with due process;<br>• Been consistently applied in accordance with the CDP disciplinary matrix;<br>• Been fair and based on the nature of the allegation;<br>• Consistently identified, applied and documented mitigating and aggravating factors. |
| 246 | In order to ensure consistency in the imposition of discipline, CDP will review its current disciplinary matrix and will seek to amend it as necessary to ensure that it: a. establishes a presumptive range of discipline for each type of rule violation; b. increases the presumptive discipline based on an officer's prior violations of the same or other rules; c. sets out defined mitigating and aggravating factors; d. prohibits consideration of the officer's race, gender, national origin, age, ethnicity, familial relationships, or sexual orientation; e. prohibits consideration of the high (or low) profile nature of the incident; f. provides that CDP will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and g. provides that CDP will consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed. | The assessment evaluated:<br>• If the discipline imposed by the Chief was consistent with the matrix. |
| 247 | All disciplinary decisions will be documented in writing. | The assessment evaluated:<br>• If decisions made by the Chief were documented in writing;<br>• Whether the Chief provided adequate explanations for the rationale used to make disciplinary decisions in |

|  |  |  |
|---|---|---|
|  |  | accord with the provisions of the Consent Decree. |
| 248 | If amended, CDP will provide its disciplinary matrix to the Commission, the Police Inspector General, and the police unions for comment. | Not applicable to this assessment. |
| 249 | CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years. | Not applicable to this assessment. |
| XII.C. | **Body Worn Cameras** |  |
| 340 | Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy. | The assessment evaluated:<br>• If the CDP documented discipline imposed for BWC violations;<br>• Whether discipline imposed was consistent with the disciplinary matrix. |

B.  Summary of Assessment Methodology

The Monitoring Team developed an assessment tool and methodology for reviewing the imposition of discipline by the Chief of Police. The draft tool was reviewed by the parties. After conferral with the parties, the online assessment tool and methodology were finalized.

The assessment consisted of a qualitative review of a statistically representative sample of all cases in which the Chief imposed discipline on officers from March 2021 through March 2022. The population of relevant cases (n=209) excluded cases involving solely Step 1 Sick Leave Abuse Letters of Reinstruction (n=35), Letters of Reinstruction for preventable Traffic Collisions (n=36), and cases involving a fatal officer-involved pursuit that was previously reviewed by the Monitoring Team (n=3).

These cases were identified through a review of discipline and departure letters provided to the Monitoring Team for the period of March 1, 2021 through March 31, 2022. The Monitoring Team reviewed a statistically representative sample of 66 cases, which would provide a 95% confidence interval with + 10% margin of error. The population from which the sample was drawn (n=209) consisted of cases involving sworn and unsworn personnel in the following proportions:

Makeup of Personnel in Population Rank/Role Frequency (% of n=209)
- Police Officers 151 (72%)
- Detectives 19 (9%)
- Sergeants 23 (11%)

- Lieutenants 3 (1%)
- Non-sworn Personnel (Dispatch, Safety Telephone Operator, Bilingual Communications Specialist) 13 (6%)

We are confident that our sample size sufficiently reflected the variation that occurs within the population of cases. However, as lieutenants appeared so infrequently in the population of cases, we decided to review all three, in addition to the random sample of 66 cases. As such, our total sample of reviews was n=69.[12]

The cases were selected for review using a random number generator tool in Microsoft Excel.

A structured qualitative review instrument, approved by the parties, was used to systematically assess each of the cases in the sample. Case materials included:
- Internal Affairs files and documentation contained in the IA Pro database and Blue Team;
- WCS footage (when relevant to decision making and determinations of reasonableness);
- Pre-disciplinary hearing transcripts; and,
- Police Review Board Findings Letters (in OPS cases), Charging and Discipline Letters.

Assessments were conducted using a web-based version of the qualitative template, on Alchemer.com. This ensured data was stored securely and in a format conducive to analysis. Additionally, questions incorporated logic so that follow up questions were only prompted when relevant, to streamline reviews and conserve assessment time.

Case information was accessed through the IA Pro and Evidence.com databases.

Review Process: Three members of the Monitoring Team reviewed the selected cases. Each case was randomly assigned to one reviewer, using the audit instrument, to evaluate Consent Decree compliance. Once audit instruments were completed, they were reviewed by the assessment lead to ensure consistency and inter-rater reliability. The assessment lead identified thirteen cases which warranted secondary review.[13] All of those cases were closely reviewed by the assessment lead with three of those cases being sent out for additional review and evaluation by a fourth assessor. In all three cases, the fourth assessor agreed with the initial conclusions reached by the first reviewer. This report only identifies cases as non-compliant with the Consent Decree if all

---

[12] For the purposes of our review however, we noted that eight of the cases identified in our random sample involved multiple officers who were investigated under the same case numbers; in addition, seven of the randomly selected cases involved different IA cases that were handled simultaneously by the CDP as they involved the same officer within a similar time frame. Ultimately, the Monitoring Team combined the cases involving multiple officers and combined the multiple cases involving the same officer (when handled simultaneously by the Division). This resulted in 62 distinct cases for our review.

[13] These cases involved reviewer identification of, and/or prima facie indications of, potential compliance issues.

reviewers agreed there were compliance issues. Where reviewers were not unanimous, deference was given to the Chief's decision-making.

The review considered all parts of the adjudication process including recommendations, findings and rationale provided by the chain-of-command (and in the case of community complaints, the OPS and PRB), the content of the charge letters, information obtained during pre-disciplinary hearings, and the content of findings and/or departure letters issued by the Chief.

### III.  Assessment Findings

1. Overall Findings

To achieve compliance with the Consent Decree, CDP disciplinary decisions must be both reasonable (e.g., consistent with the court-approved Disciplinary Matrix) and timely. Unless and until the CDP is able to achieve both of these objectives, substantial and effective compliance with the Consent Decree will not be reached. Compliance also requires that, in addition to the Division appropriately handling a significant portion of its cases, that the Division establish it has the capacity to appropriately adjudicate all particularly significant cases (e.g., cases involving integrity-related allegations and Group III type allegations)[14] in a timely and reasonable fashion.

The Monitoring Team ultimately concluded that only four of the sixty-two distinct cases reviewed (6.5%) negatively impacted CDP's compliance with the Consent Decree. It is important to highlight that one case was particularly egregious. That case involved two sustained integrity-related allegations; in one instance the subject officer lied to Internal Affairs[15] and, in the second instance, the officer lied to a supervisor.[16] The Chief should have referred that case to the Director of Public Safety as the discipline called for by the Disciplinary Matrix was in excess of the maximum suspension of 10-days that could be imposed by the Chief.[17]. Instead, the Chief imposed a suspension of only nine days. In a second case, the Chief imposed only a one-day suspension for

---

[14] The Discipline Matrix defines a Group III violation as: "conduct that involves a serious abuse or misuse of authority, unethical behavior, or an act that results in an actual or serious and adverse impact on officer or public safety or to the professionalism of the Division. Any violation of law, rule, policy or training which foreseeably results in death or serious physical harm to another person; or constitutes a willful and wanton disregard of Division values; or involves any act which demonstrates a lack of the integrity, ethics or character related to an officer's fitness to hold the position of police officer; or involves egregious misconduct substantially contrary to the standards of conduct reasonably expected of one whose sworn duty is to uphold the law; or involves any conduct which constitutes the failure to adhere to any contractual condition of employment or requirement of certification mandated by law."

[15] The Discipline Matrix in place at the time of this violation called for a 10 to 30-day suspension without pay for cases involving: "False Reports, False Statements, Untruthfulness," or for "Intentionally omitting or concealing information related to misconduct."

[16] The Discipline Matrix in place at the time of this violation called for presumptive termination in cases involving dishonesty or untruthfulness.

[17] In the City of Cleveland, pursuant to Chapter 25, Section 119 of the City Charter, the Chief of Police cannot impose discipline of more than 10 working day's suspension or independently fire an officer. Instead, that determination must be made by the Director of Public Safety.

a Wearable Camera System violation, but failed to consider the aggravating factor that the officer's failure to turn on his camera negatively impacted the OPS' ability to determine whether or not he committed misconduct as alleged by a civilian complainant. In a third case, the OPS failed to investigate the truthfulness of an officer's claim that he applied for secondary employment approval. Instead of forwarding the case to Internal Affairs or back to the OPS for further investigation of an allegation of untruthfulness, the Chief adjudicated the case and subsequently failed to consider the officer's prima facie false statement as an aggravating factor. In the fourth case, the Chief combined numerous allegations of misconduct into a single disciplinary decision, resulting in a significant decrease in the discipline faced by the subject employee.

**Table 2. Summary of Cases of Concern:**

| Case 1 | The subject officer was sustained for the following two integrity-related specifications, in addition to two other Group 1 violations:<br>• On August, 24, 2018,[18] the officer "made a police report [relating to an off-duty incident] stating [the officer was] struck by [a] vehicle. The Internal Affairs investigation was able to determine that [the officer's] account of the incident during [his] Garrity interview contradicted all available evidence and statements…"<br>This allegation was classified as a Group II violation,[19] even though the officer was sustained for making a false statement to Internal Affairs, which would clearly be a Group III violation.[20]<br>• On March 31, 2020, the officer was "vague, unclear and erroneously reported what property [he] had left in [his] Zone Car."<br>This allegation was classified as a Group I violation,[21] even though the officer was sustained for lying to a supervisor, when he reported that he had left a file |
|---|---|

---

[18] The disciplinary letter, dated May 24, 2021, contained the wrong date for the incident, April 24, 2019, which is contrary to the information contained in the Internal Affairs file and database, which indicated an incident date of April 24, 2018.
[19] Defined in General Police Order 1.07.06 (effective August 12, 2019) as: "conduct that is contrary to the values of the Division, or that interferes with its mission, operations or professional image, or that involves a demonstrable serious risk to officer or public safety."
[20] Defined in pertinent part in General Police Order 1.07.06 (effective August 12, 2019) as: conduct that involves…unethical behavior… Any violation of law, rule, policy or training which …constitutes a willful and wanton disregard of Division values; or involves any act which demonstrates a lack of the integrity, ethics or character related to an officer's fitness to hold the position of police officer; or involves egregious misconduct substantially contrary to the standards of conduct reasonably expected of one whose sworn duty is to uphold the law…
The Disciplinary Matrix (GPO 1.07.06) subsequently states with specificity that Group 3 violations include: "[f]alse Report, false statement, untruthfulness, or dishonesty (each of which creates a presumption of termination)."
The Matrix further defined the terms: "false statement," "untruthfulness and "dishonesty" as follows:
"Dishonesty is to act without honesty: to deliberately deceive, defraud or lie."
"False Statement is a statement that is deliberately made and meant to deceive or a statement that is intentionally untrue."
"Untruthfulness is the act of being intentionally deceitful, the willful perversion of the truth in order to deceive, cheat, or defraud."
[21] Defined in GPO 1.07.06 as: "conduct that has a negative impact on the operations or professional image of the Division or that negatively impacts relationships with other officers, agencies or the public."

| | |
|---|---|
| | in his zone car, rather than truthfully reporting that he had actually left his duty belt, with his loaded firearm, in the trunk of his zone car at the end of his shift.<br>• In the first incident, the Internal Affairs investigation was completed on February 12, 2020, but there was no finding from the Acting IA Superintendent until November 17, 2020. The charge letter was not served on the officer until March 2, 2021 and a pre-disciplinary hearing took place on April 19, 2021.<br>• In the second incident, the investigation was completed on July 31, 2020, with a finding from the Acting IA Superintendent on September 4, 2020 and a charge letter, combining both cases, served on the officer on March 2, 2021.<br>Overall, in addition to a failure to follow the Discipline Matrix and a failure to forward this case to the Director of Public Safety for adjudication as a Group III violation, there was also lack of timeliness at all stages of the handling of these incidents. Of the cases adjudicated by the Chief, this was the most serious and its handling was not in compliance with the expectations of the Consent Decree. |
| Case 2 (OPS Case) | Complainant, driver involved in a traffic collision, alleged that an officer responding to his call for service failed to complete an adequate investigation due to the officer's prior personal relationship with the other driver. Officer turned off his Wearable Camera System (WCS) prior to the end of the encounter. Due to the lack of objective evidence in support of the complainant's allegation, the OPS and PRB determined there was insufficient evidence to establish whether or not the alleged conduct took place. The officer was sustained, however, for turning off his WCS prior to the conclusion of his investigation of the traffic collision.<br>The officer received a 1-day suspension, noting that aggravating factors (issued WCS for more than one year) outweighed the mitigating factors (no active discipline).<br>The Chief did not appear to consider the impact of the WCS violation on the integrity of the department and the OPS investigation. The fact that the WCS violation directly impacted the OPS investigation and the ability of the PRB to make appropriate findings on the underlying complaint should have been considered a factor in aggravation.<br>The adjudication of the case was untimely. It took more than one year from the time of the incident for the case to be adjudicated by the PRB. Specifically, the OPS investigation of the incident took more than seven months to complete and it took another 3 months before the PRB adjudicated the case. These time delays were the result of untimely work by the OPS and PRB; however, in addition to those delays, it took a total of 10 weeks for the Chief to adjudicate the case and imposed discipline, even though the only sustained finding was a WCS violation. |
| Case 3 (OPS Case) | The subject officer was "not sustained" by the OPS and PRB for unprofessional conduct, but "sustained" for working secondary employment without authorization. The subject officer claimed to the OPS, however, that prior to the |

11 | P a g e

| | |
|---|---|
| | date of his contact with the complainant, he submitted his request to work secondary employment. He claimed that he was "not sure if [his] application had been approved" by the date of the incident under investigation. In fact, according to Division records, the request for secondary employment was not requested by the subject officer until three days after the incident in question. The OPS failed to follow up on the false information provided by the subject officer, even though the officer's statement was clearly contrary to the Division's records.<br>The Chief failed to identify this integrity-related issue and failed to forward the case to Internal Affairs for further inquiry or investigation. The Chief also failed to consider this false information as an aggravating circumstance in imposing discipline.<br>Instead, the Chief imposed a one-day suspension, finding aggravating factors ("Liability to the City, member was aware of General Police Order 1.02.13") factors outweighed mitigating factors ("accepted responsibility"). No consideration was given to the false statements made during the course of the investigation, contrary to the expectations of the Discipline Matrix. |
| Case 4 | This case involved the combination of four separate cases brought against a CDP dispatcher. The cases involved four separate calls for service as well as allegations for being tardy and refusing mandatory overtime. The dispatcher was found "guilty" of six separate specifications and received an 8-day suspension.<br>The dispatcher was found to have committed two instances of misconduct on April 13, 2021, separate violations on April 8, 2021 and April 23, 2021, as well as 16 instances of refusing mandatory overtime in the first Quarter 2021.<br>Per the Discipline Letter: "The discipline is within the First Group 1 violation and first Group II violation range of the discipline matrix where aggravating factors (multiple violations arising from the same incident, active discipline) outweigh mitigating factors (none)."<br>Because so many sustained specifications were combined and the discipline imposed involved an amalgamation of the sustained violations, the discipline imposed appeared to be significantly less than what would have been imposed had the Chief imposed separate discipline, based on each actual incident.[22] |

Generally, a Consent Decree compliance rate of 93.5% (fifty-eight cases compliant out of sixty-two distinct reviewed cases) would be considered an excellent result. And, as a result of this review, it does appear that the Division is generally compliant with respect to the imposition of discipline in cases falling within the jurisdiction of the Chief. However, with two of the four non-

---

[22] According to the City, they are bound by Civil Service Rule 9.23 (Preferring of All Charges Against Officer or Employee), which has been the subject of litigation between the City and the Cleveland Police Patrolmen's Association (CPPA). The City advises that it "abides by this rule in pre-disciplinary hearings by preferring all charges reasonably known before a hearing." (Quoting, City Response to Assessment Report, dated November 22, 2022). The City did not explain, however, why the Chief is unable to impose separate discipline for separate, unrelated, allegations.

compliant cases involving integrity-related issues, Chief Drummond and Director of Public Safety Howard will need to be vigilant in ensuring that all future cases involving integrity-related issues are appropriately adjudicated and compliant with the Consent Decree. To the extent the Division is unable to appropriately adjudicate these cases in the upcoming review period, future compliance will be in jeopardy.

In the near future, the Monitoring Team plans to conduct a second review of the discipline imposed by the Director of Public Safety and an assessment of the quality of Internal Affairs and Force Investigation Team investigations. Only upon finding the Division compliant with respect to the investigation and adjudication of all complaints and uses of force, will the Division be able to be found in compliance with Sections 241 and 245 of the Consent Decree.[23]

2. <u>OPS Case Findings</u>

Given the importance of community-initiated complaints to the overall accountability process, the Monitoring Team also considered the reasonableness of the Chief's decision-making as it related to the adjudication of OPS-PRB complaints.

Nineteen OPS-PRB cases were included in the assessment population. The Chief agreed with all PRB findings and recommendations in only 42.1% (n=8) of those cases. In the majority of the cases, however, 57.9% (n-11), the Chief disagreed with the PRB's findings and recommendations with respect to one or more allegations. In ten of those cases, the Chief dismissed allegations against one or more officers; in one case, the Chief reduced the level of discipline recommended by the PRB from Group II discipline to Group I discipline.

Significantly, the PRB chose to appeal only 3 of the Chief's Departures (27.8%). In two of those cases, the Director of Public Safety agreed with the PRB. In one case, the DPS agreed with the Chief. As such, the Chief's decision to depart from PRB recommendations stood in 81.8% of the departure cases (n=9).

As indicated above, the Monitoring Team concluded that the ultimate disciplinary decisions in all but two OPS cases were reasonable and consistent with the disciplinary matrix. However, as indicated above, neither of those cases involved departures from PRB recommendations (See Case

---

[23] It must be noted that the Monitoring Team has identified a number of continuing issues and concerns regarding the accountability mechanisms currently being used by the Division. This includes at least one shooting investigation where the investigation and adjudication of the incident was wholly deficient, at least two cases referred to the Human Resources Division which have not been investigated in a timely fashion, and an instance where an internal claim of retaliation was not investigated. The Division must establish that it has created systems to avoid these types of errors in the future to be found Operationally Compliant with respect to the Accountability provisions of the Consent Decree.

Nos. 2 & 3, above). As such, although the processes in place may not be particularly efficient,[24] it appears that the Chief has been explaining his reasoning with enough detail that the PRB has found the departure acceptable. With the implementation of new Charter Section 115, which changes the standards of review used by both the Chief and the PRB, the PRB will no longer be required to appeal a Chief's departure to the Director of Public Safety. As such, the PRB will need to create the appropriate processes to ensure that PRB decisions are consistent with law and policy and will minimize the potential for being overturned at arbitration.

IV. **Timeliness of Adjudication of Cases**

1. Overall Timeliness:

Even if the Chief's disciplinary decisions are reasonable and consistent with the Discipline Matrix, a lack of timeliness of the imposition of discipline has a negative impact on employee morale and respect for the disciplinary process overall. Untimely imposition of discipline also negatively impacts public faith in the integrity of the Division's accountability structures. As such, even if investigations are thorough, fair and professional, and disciplinary decisions are reasonable, if the adjudication of misconduct is not timely, the community and the police are not well served.

Of the cases that were assessed, the Monitoring Team noted that overall, on average, it took the Division 283 days (Median = 234.5) to impose discipline from the time a case was opened until the date the officer was notified of the Chief's disciplinary decision.

As would be expected, the average case closures differed based on the type of case being adjudicated.

| Type of Investigation: | Average (Mean) | Average (Median) | Range of days to close |
| --- | --- | --- | --- |
| Vehicular Collision Investigations | 159 days | 163 days | 59 to 261 days |
| Inspections Unit Investigations | 178 days | 202 days | 126 to 205 days |
| Vehicular Pursuit Investigations | 195 days | 187 days | 147 to 250 days |
| District Level Investigations | 202 days | 162 days | 72 to 634 days |
| Use of Force Investigations | 245 days | 247 days | 123 to 363 days |
| Internal Affairs Investigations | 391 days | 259 days | 190 to 1,044 days |
| OPS Investigations | 402 days | 364 days | 211 to 792[25] |

---

[24] The departure-PRB appeals process requires the introduction of several steps above and beyond normal case handling and has the potential to delay disciplinary decisions by weeks, if not months.

[25] As previously noted, the length of time it takes the Division to adjudicate OPS/PRB cases is primarily driven by delays in OPS conducting investigations and the PRB making its findings. In fact, on average, the Chief's Office has acted on OPS cases in a timelier fashion than Internal Affairs cases.

14 | P a g e

2. <u>Stages for Adjudication of a Sustained Complaint:</u>

Ultimately, the CDP's Case Preparation Unit is responsible for facilitating the scheduling of charging letters, pre-disciplinary hearings and discipline letters from the time that recommendations for sustained findings are received from either Internal Affairs, the CDP chain-of-command or the Police Review Board.



1. Completion of investigation with sustained finding
2. Issuance of charge letter
3. Pre-disciplinary hearing conducted
4. Discipline imposed

3.     <u>Timeliness of Various Stages of Adjudication Process</u>:

*Stage 1: Receipt of completed investigation with sustained findings recommended to the time of the charge letter.*

| Type of Investigation: | Average (Mean) | Median | Range of days |
|---|---|---|---|
| Inspections Unit Investigations | 29.00 | 20 | 16-51 |
| OPS Investigations | 32.75 | 20 | 6-154 |
| Use of Force Investigations *(data missing from 2 of 4 cases)* | 42.5 | 42.5 | 21-64 |
| District Level Investigations | 46.78 | 28.5 | 8-179 |
| Vehicular Collision Investigations | 50.00 | 35 | 2-179 |
| Vehicular Pursuit Investigations | 68.67 | 63 | 45-98 |
| Internal Affairs Investigations | 82.89 | 46 | 11-410 |

**15 | P a g e**

As of the writing of this report, the Division has not enacted into policy specific timelines for the completion of charge letters upon the recommendation of "sustained" findings from the chain-of-command. While the Case Preparation Unit should be applauded for giving priority to OPS cases (particularly when compared to Internal Affairs investigations), the new Internal Affairs Superintendent must pay close attention to the status of IA cases pending with the Case Preparation Unit to improve the timeliness of the adjudication of those important cases.

*Stage 2: Date of Charge Letter to the time of the Pre-disciplinary hearing*

| Type of Investigation: | Average (Mean) | Median | Range of days to close |
|---|---|---|---|
| Inspections Unit Investigations | 11.67 | 0 | 0-35 |
| Vehicular Pursuit Investigations | 26.67 | 27 | 11-42 |
| Use of Force Investigations | 28.00 | 28.5 | 17-38 |
| OPS Investigations | 31.55 | 26 | 11-95 |
| Vehicular Collision Investigations | 32.71 | 30 | 11-68 |
| Internal Affairs Investigations | 32.89 | 27 | 11-58 |
| District Level Investigations | 47.83 | 35 | 11-198 |

The Division has reported to the Monitoring Team an aspirational goal of 30 days from the time of the issuance of a charge letter to the time of a pre-disciplinary hearing. That general goal has, generally, been achieved for all cases except for those conducted at the District level.

*Stage 3: Date of the pre-disciplinary hearing until the date of the Discipline Letter*

| Type of Investigation: | Average (Mean) | Median | Range of days to close |
|---|---|---|---|
| Inspections Unit Investigations | 20.33 | 0 | 0-61 |
| Internal Affairs Investigations | 22.67 | 22 | 4-35 |
| Vehicular Collision Investigations | 28.00 | 18 | 6-77 |
| District Level Investigations | 37.71 | 30 | 9-232 |
| Use of Force Investigations | 39.75 | 35 | 22-67 |
| Vehicular Pursuit Investigations | 43.67 | 38 | 28-65 |
| OPS Investigations | 50.50 | 40 | 6-161 |

The Division has discussed with the Monitoring Team a goal of having disciplinary decisions on sustained cases completed within 21 days of the pre-disciplinary hearing. Chief Drummond will need to work closely with the Case Preparation Unit in order to attempt to achieve that goal. Particular attention will need to be paid to OPS cases, which tend to take the longest to adjudicate.

It must be recognized, however, that in cases where the Chief disagrees with a finding or discipline recommended by the PRB, additional steps are required. The CDP has recommended that those cases be given 60 days to adjudicate and, in general, OPS disciplinary cases have fallen within that time frame.

Overall Case Adjudication Timeliness:

Overall, the average number of days from the date sustained charges are received by the Case Preparation Unit from the Internal Affairs, the chain-of-command or the PRB are as follows, to the date that imposition of discipline was imposed is as follows:

| Type of Investigation: | Average (Mean) | Median | Range of days to close |
| --- | --- | --- | --- |
| Inspections Unit Investigations | 61.0 | 51 | 16-116 |
| Vehicular Collision Investigations | 91.1 | 83.5 | 14-230 |
| OPS Investigations | 114.8 | 96.5 | 55-348 |
| Use of Force Investigations *(data missing from 2 of 4 cases)* | 123 | 123 | 105-141 |
| District Level Investigations | 129.4 | 106.5 | 30-524 |
| Internal Affairs Investigations | 138.4 | 103 | 36-493 |
| Vehicular Pursuit Investigations | 139.0 | 155 | 84-178 |

The CDP has informed the Monitoring Team that it generally anticipates it should take up to 60 days from the time sustained charges are recommended, until the date discipline is imposed. As indicated above, the only cases where that goal has been achieved is with respect to investigations handled by the Inspections Unit.

Current issues with timeliness of adjudications:

In prior public reports, the Monitoring Team has identified a lack of timeliness in the scheduling of OPS case-related pre-disciplinary hearings by the Chief of Police to be an issue of significant concern (although we have noted that some of those delays were the result of the COVID-19 pandemic, which resulted in the inability of the Division to conduct any pre-disciplinary hearings from March through May, 2020).[26] Over the past few reporting periods (as covered by the Monitor's semiannual reports), the Chief's Office increased staffing to the "Case Prep Unit" to address the Division's need to handle discipline in a more timely and effective manner.

---

[26] See, Third Semiannual Report, at p. 48 [discussing OPS failure to refer cases to Chief's Office]; Seventh Semiannual Report, at p. 50 [regarding the reported inability of the CDP to schedule timely OPS pre-disciplinary hearings]; Eighth Semiannual Report, at p. 49 [recommending that the CDP establish timeliness goals for the completion of Chief's Hearings; and, Ninth Semiannual Report, at p. 93 [noting challenges posed by COVID-19 pandemic on timeliness of Chief's Hearings].

However, in the last reporting period, the Monitoring Team learned that staffing for the Case Preparation Unit has decreased and the Unit is struggling to achieve its goals. Realistically, until that Unit is fully staffed, the CDP will be unable to achieve or maintain Consent Decree compliance by ensuring timely adjudication of cases involving the imposition of discipline.

As such, although the Monitoring Team has witnessed impressive improvements in timeliness over the course of the last few years, more needs to be done. We look forward to a fully staffed Case Preparation Unit to achieve sustainable compliance in this area in the near future.