

# 13ᵗʰ Semiannual Report

Written by:

The Independent Monitoring Team

October 2023

# The Independent Cleveland Police Monitoring Team

 **Karl Racine**
Monitor

 **Ayesha Hardaway**
Deputy Monitor

 **Stephanie Yonekura**
Deputy Monitor

 **Dr. Modupe Akinola**

 **Assistant Chief Shunta Boston**

 **Courtney Caruso**

 **Christine Cole**

 **Dr. Ronnie Dunn**

 **Dr. Randolph Dupont**

 **Lisa Fink**

 **Chief Tammy Hooper (ret.)**

 **Jay Jones**

 **Dr. Megan McDonough**

 **Rick Myers**

 **Victor Ruiz**

 **Captain Scott Sargeant (ret.)**

 **Charles R. See**

 **Sean Smoot**

 **Abby Wilhelm**



# Table of Contents

I.   Letter from the Monitor ................................................................................................4

II.  Understanding this Report ..........................................................................................6

III. Executive Summary .......................................................................................................9

IV.  Complete Findings ......................................................................................................16

    Community Engagement and Building Trust ................................................ 16

    Community and Problem-Oriented Policing ................................................ 17

    Bias-Free Policing ................................................................................................ 19

    Use of Force ........................................................................................................... 20

    Crisis Intervention .............................................................................................. 22

    Search and Seizure ............................................................................................. 24

    Accountability ...................................................................................................... 25

    Transparency and Oversight ........................................................................... 28

    Officer Assistance and Support ...................................................................... 30

    Supervision ............................................................................................................ 32

    Outcome Assessments ...................................................................................... 33

V.   Appendix .......................................................................................................................35

    Community Engagement and Building Trust ................................................ 35

    Community and Problem-Oriented Policing ................................................ 36

    Bias-Free Policing ................................................................................................ 38

    Use of Force ........................................................................................................... 39

    Crisis Intervention .............................................................................................. 43

    Search and Seizure ............................................................................................. 46

    Accountability ...................................................................................................... 47

    Transparency and Oversight ........................................................................... 53

    Officer Assistance and Support ...................................................................... 55

    Supervision ............................................................................................................ 60

# I.    Letter from the Monitor

Nearly 10.5 years ago, the Department of Justice (DOJ) opened an investigation into the Cleveland Division of Police (CDP) due to events involving CDP's use of excessive force in a car chase and shooting incident that resulted in the death of two unarmed civilian victims. After a 21-month investigation, DOJ published findings that detailed a concerning systemic and department-wide failure to adhere to constitutional policing and the core tenants of accountability, trust, and training. Rather than defend itself in Court against DOJ's findings, the City *voluntarily* settled the investigation with DOJ and entered into a binding, comprehensive Consent Decree on June 12, 2015 (over eight years ago). The Honorable Judge Solomon Oliver Jr. signed the order approving the Consent Decree and continues to preside over it to this day.

It bears remembering that DOJ previously investigated CDP for allegations of unconstitutional, excessive use of force in 2002. That investigation found serious issues with CDP's use of force and its procedures for investigating officer misconduct. As a result of that earlier investigation, CDP entered into a memorandum with DOJ in 2004 in which the City agreed to make changes to its policies and procedures. Significantly, the 2004 agreement with DOJ, was *not* Court enforceable and did *not* have a monitor assigned to ensure adherence to that agreement.

Accordingly, this <u>enforceable</u> and <u>monitored</u> Consent Decree, which the City voluntarily agreed to, represents the City of Cleveland's public commitment to make substantial change in how CDP exercises it's police powers in Cleveland. Indeed, the Consent Decree embodies the City's continued pledge to make sustained, systematic, and comprehensive changes in its police policies, trainings, and practices to ensure that Clevelanders receive police services that do not run afoul of the protections guaranteed by the United States Constitution.

Being the subject of a Consent Decree requires immense organizational discipline and a committed whole of government approach. Change is hard and it is natural to be fatigued by a process that necessarily requires years of concentrated effort and review by outside parties, (i.e. the Court, DOJ, and the Monitoring Team). This is especially so given the extraordinary confluence of events over the last several years which included the unprecedented pandemic, social justice movements spurred by George Floyd's murder, the increase in violent crime in major cities, and historic challenges in recruitment and retention of law enforcement officers. Given these circumstances, the City—with the encouragement, support, and oversight of the Court, DOJ, and the Monitoring team—has made demonstrable progress in the rewriting and finalization of division policies, improvement of the quality of training, and improvement of performance in a number of important areas.

The goal of this semiannual report, which is the product of a collaborative and iterative process involving the City, DOJ, and the Monitoring Team, is to provide the Monitor's views regarding progress made during the reporting period (January 2023 – June 2023). It must be emphasized that semiannual ratings and reviews produced in this report are but a snapshot of where the City stands. Indeed, it's not uncommon for prior progress to revert to a lower rating, as progress is rarely linear. Highlights from the snapshot provided in the instant reporting period include numerous upgrades in ratings: nine (9) in crisis intervention, ten (10) in accountability, and five (5) in use of force. Concerning downgrades include two (2) in community and problem-oriented policing—an area in which the City continues to struggle. I commend the City for continuing to build out its Police Accountability Team (PAT), led by Dr. Leigh Anderson, with the hires of two (2) additional professionals and a commitment to

complete the team with at least two (2) more hires. This staffing is necessary for obtaining new levels of compliance in the future.

Beyond the semiannual reports, the best indicator that progress and reform are taking root is through formal assessments that utilize methodologies agreed upon by the Parties. The Monitoring Team is pleased to communicate that it is preparing for a formal assessment of crisis intervention in early 2024. The Monitoring Team is also hopeful that the City's progress on use of force and search and seizure will allow for the beginning of a formal assessment of these two critical areas. Indeed, the Monitoring Team, the City, and DOJ have agreed to prioritize crisis intervention, use of force, and search and seizure in 2024—while other important work will also proceed. Formal assessments of search and seizure and use of force will require the City to provide DOJ and the Monitoring Team with important and necessary data—some of which has not been made available—in order to determine whether successful implementation on the ground are taking place

This reporting period also represents the first semiannual report drafted and filed by the new Monitor. I want to express my deep and sincere gratitude to the interim Monitor, Professor Ayesha Bell Hardaway for her powerful and grounded leadership and guidance during my transition. Like the members of the Monitoring Team who continue to work hard to bring needed reform to CDP, Professor Hardaway is deeply committed to bringing lasting change to policing and trust between Clevelanders and CDP. Unlike Professor Hardaway and other core members of the Monitoring Team, I am not a product of Cleveland, nor do I live in this great city. The issues that animate the Consent Decree, however—constitutional policing, accountability, and community trust—have been core to my 30+ years of practice, including being the twice-elected, independent Attorney General for nearly 700,000 District of Columbia residents. I pledge to work as hard as I can to lead a Monitoring Team that will be fair, transparent, and entirely dedicated to driving significant change that the residents of Cleveland and CDP will be proud of.

In this regard, I am reminded of Judge Oliver's admonition that, while the Consent Decree requires change that can be challenging and at times frustrating, the objective of the Court and Monitoring Team is to drive performance that will facilitate the City's successful termination of the Consent Decree. The Court and the Monitor look forward to the day that lasting change is accomplished by the City that no longer require it to be the subject of a Consent Decree.

Sincerely,

Karl Racine

# II.  Understanding this Report

Since the 3rd Semiannual Report, the Monitoring Team has used its semiannual reports to present a summary of the status of the City's compliance with each paragraph of the Consent Decree. Although providing "a paragraph-by-paragraph accounting of the general state of the City's compliance runs the risk of being an over-simplification," these summary representations remain useful indicators for viewing progress over time.[1]

Therefore, each section of the 13th Semiannual Report summarizes the Monitoring Team's general conclusions about compliance status by describing the state of each paragraph listed as one of the following:

- **Non-Compliance.** The City and/or Cleveland Division of Police (CDP) has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or CDP's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement.

- **Partial Compliance.** The City and/or CDP has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the provision of the Consent Decree—but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice. It may capture a wide range of compliance states or performance, from the City or CDP having taken only very limited steps toward operational compliance to being nearly in operational compliance.

- **Operational Compliance.** The City and/or CDP has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Consent Decree such that it is in existence or practice operationally—but has not yet demonstrated, or has not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

- **General Compliance.** The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the City or CDP has effectively complied with a requirement fully and systemically.

The same caveats that have previously applied to these summary categories remain applicable and are thus repeated here verbatim. First, "Non-Compliance" or "Partial Compliance" do not automatically mean that the City or CDP has not made good-faith efforts or commendable strides toward compliance. It might, instead, signify that initial work has either not yet begun or reached a sufficiently critical point where progress can be considered to have been made.

Second, "Partial Compliance" requires more than taking some limited, initial steps toward compliance with a requirement. It instead requires that the City or CDP have made "sufficient,

---

[1] 3rd Semiannual Report at 9.

material progress toward compliance" that "has graduated from the stages of initial work to more well-developed and advanced refinement of various reforms."[2]

Third, these summary terms do not appear in the Consent Decree. The Monitoring Team employs them in order to synthesize and summarize the report's conclusions. Relatedly, compliance with individual paragraphs of the Consent Decree is necessary for the larger, overall "Substantial and Effective Compliance" with the whole of the Consent Decree, but it is not the same thing. Ultimately, "Substantial and Effective Compliance" with the Consent Decree will be reached when "the City either has complied with *all* material requirements of this Agreement or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures,"[3] "by a preponderance of the evidence."[4]

Fourth, the charts within the appendix that summarize progress in each area also condense the requirements of each paragraph rather than reprinting the entire Consent Decree in the context of this report. Any imprecision or confusion created by these condensed or summarized requirements is unintended and, in any event, can be cured with reference to the original Consent Decree language itself.[5] Furthermore, the appendix charts primarily cover paragraphs 14 through 340 of the Consent Decree, but other paragraphs also contain requirements that the City must meet.[6]

Overall "compliance status" conclusions displayed in tables within the executive summary and the appendix herein do not replace the more rigorous and comprehensive quantitative and qualitative assessments of how CDP performs over time:

> [T]he Monitoring Team bases its assessments on its current understandings, knowledge, and information gained through ongoing work and discussion with CDP, the Parties, and other stakeholders. The assessments are informal to the extent that not all of them are necessarily informed by the type of exhaustive compliance and outcome measurements that are a critical component of the Consent Decree—and the summary determinations do not take the place of these more structured, systemic analyses. The intent is to provide a bottom-line sense of where CDP is on the road to compliance. Ongoing, rigorous quantitative and qualitative assessments will provide a more comprehensive picture as work under the Consent Decree proceeds.[7]

The descriptions of progress contained below should be considered as a synthesis or bottom-line reporting of substantive discussions from each major Consent Decree area contained within this report.

An additional method for capturing progress is the creation, utilization, and accountability to the Monitoring Plan, described in ¶ 369, which outlines the work to be done by the Parties within the year. The City has agreed to take ownership of filing the Monitoring Plan, but did not do so in 2023. Since the Monitoring Team underwent a transition in 2023, the new Monitor has decided to reassume the responsibilities of managing and filing the Monitoring Plan beginning in 2024. The Monitor believes this document is an important mechanism for driving progress.

---

[2] 3rd Semiannual Report at 10.

[3] Dkt. 413-1 ¶ 456 (emphasis added).

[4] *Id.* at ¶ 397.

[5] *See Id.*

[6] *See* 3rd Semiannual Report at 10.

[7] *Id.* at 11.

As is evidenced by the extensive and broad-reaching Consent Decree itself, the City of Cleveland's implementation of the Consent Decree and the many action items and projects it encompasses, is a substantial task. Many areas of the Consent Decree require multiple reporting periods for the City to achieve—and for the Monitoring Team to confirm and consequently report on—these major milestones. Therefore, at times this semiannual report, as with previous semiannual reports, reprints content from prior semiannual reports in instances where there has not been enough material progress to warrant an update. In such cases, the Monitoring Team is not citing to prior semiannual reports in the interest of readability.

Cleveland Police Monitoring Team | 13th Semiannual Report | October 2023

## III.  Executive Summary

*Community Engagement and Building Trust*



CDP continues to conduct a variety of activities designed to engage and build trust with the community. These activities communicate a commitment on the part of CDP to better connect with the community. Encompassed within the Community Engagement section of the Consent Decree is the work of District Policing Committees (DPCs) and the Community Police Commission (CPC). Importantly, forming an independent, community-driven CPC that seeks to elevate the voice of Cleveland residents is no small feat. To be successful, it will take time, resources, and considerable effort from the Commissioners, City officials, and the community. Working together as a cohesive, collaborative body must be the priority for the CPC in the next reporting period and will go a long way in building trust with the community and the institutions it will interface with.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 17a, ¶ 17b, ¶ 17c, ¶ 18a, ¶ 18b, ¶ 19, ¶ 20,  ¶ 21, ¶ 24 | ¶ 14, ¶ 16, ¶ 17d, ¶ 18c, ¶ 23, ¶ 25, ¶ 26 | | ¶ 15, ¶ 22 |

*** *Paragraphs 17(d) and 18(c) have been <u>upgraded</u> since the 12th Semiannual Report.*

*Community and Problem-Oriented Policing*



Although the Monitoring Team initially anticipated that this reporting period would reflect improvement in the area of Community and Problem-Oriented Policing (CPOP), there are no significant changes to report. CDP's Training Section did develop a comprehensive, in-service CPOP training curriculum. However, CDP regressed in its compliance, being downgraded to non-compliance, with respect to ¶ 30, because delivery of that training was inadequate. During that training, the Monitoring Team observed lack of engagement by participants, poor classroom management, and omissions of significant portions of the curriculum previously approved by the Monitoring Team.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 30, ¶ 34 | ¶ 27, ¶ 28, ¶ 29, ¶ 31, ¶ 32, ¶ 33 | | |

*** Paragraphs 28 and 30 have been <u>downgraded</u> since the 12th Semiannual Report.

### Bias-Free Policing



**Visual Representation of Compliance for:**

Bias-Free Policing

Although the City has made progress relative to bias-free policing over the last several years, substantial work remains for this area to achieve compliance. For example, CDP's District Neighborhood Awareness Trainings observed by the Monitoring Team in 2022 were identified as needing additional reinforcement given the deficiencies observed. During this reporting period, CDP has worked to develop a refresher training to address these deficiencies, but it has not yet been delivered. Furthermore, the Monitoring Team is awaiting evidence of the incorporation of bias-free policing philosophy and values into CDP's management and accountability systems, personnel recruitment, hiring, promotion and evaluation processes, and deployment of resources and community interactions.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 43 | ¶ 35, ¶ 36, ¶ 37, ¶ 41 ¶ 42, ¶ 44 | ¶ 38, ¶ 39, ¶ 40 | |

*** Paragraph 41 has been <u>upgraded</u> since the 12th Semiannual Report.

### Use of Force



**Visual Representation of Compliance for:**

Use of Force

Use of force is an area where the City has excelled, as much has been accomplished since the start of the Consent Decree. CDP continues to make progress in this area after establishing the principles and structural foundations for accountability and transparency. Implementation and adherence to the details of the policies and the language of the Consent Decree, as well as establishing systems to critically assess itself in a way that demonstrates commitment to operational excellence, will move the City closer to compliance.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 122 | ¶ 46, ¶ 47, ¶ 111, ¶ 116, ¶ 118, ¶ 120, ¶ 121, ¶ 125, ¶ 126, ¶ 128, ¶ 129 | ¶ 45, ¶ 48, ¶ 49, ¶ 50, ¶ 51, ¶ 52, ¶53, ¶ 54, ¶ 55, ¶ 56, ¶ 57, ¶ 58, ¶ 59, ¶ 60, ¶ 61, ¶ 62, ¶ 63, ¶ 64, ¶ 65, ¶ 66, | ¶ 87 |

| | | ¶ 67, ¶ 68, ¶ 69, ¶ 70, ¶ 71, ¶ 72, ¶ 73, ¶ 74, ¶ 75, ¶ 76, ¶ 77, ¶ 78, ¶ 79, ¶ 80, ¶ 81, ¶ 82, ¶ 83, ¶ 84, ¶ 85, ¶ 86, ¶ 88, ¶ 89, ¶ 90, ¶ 91, ¶ 92, ¶ 93, ¶ 94, ¶ 95, ¶ 96, ¶ 97, ¶ 98, ¶ 99, ¶ 100, ¶ 101, ¶ 102, ¶ 103, ¶ 104, ¶ 105, ¶ 106, ¶ 107, ¶ 108, ¶ 109, ¶ 110, ¶ 112, ¶ 113, ¶ 114, ¶ 115, ¶ 117, ¶ 123, ¶ 124, ¶ 127, ¶ 130 | |
|---|---|---|---|

*** Paragraphs 45, 48, 128, 129, and 130 have been <u>upgraded</u> since the 12th Semiannual Report.

*** Paragraphs 111, 122 have been <u>downgraded</u> since the 12th Semiannual Report.

---

### Crisis Intervention



**Visual Representation of Compliance for:**

Crisis Intervention

The City's strong work in crisis intervention is praiseworthy. During the reporting period, the Cleveland Department of Public Health took responsibility for continuing the work of the Mental Health Response Advisory Committee (MHRAC). This is an important step in the Consent Decree process. CDP continues to work with the MHRAC to provide training programs for CDP's officers and telecommunication specialists. As a result, training remains an impressive area of progress. The Crisis Intervention Team (CIT) Coordinator's office played an important role in bringing leadership to address a range of Consent Decree requirements, and, as a result, the City and CDP are moving closer to compliance in this area. Three primary challenges remain: (1) Specialized CIT Officers should take a key role during behavioral crisis events; (2) the MHRAC will need to develop as a positive force in providing data-driven advice to CDP; and (3) the City and CDP should work cooperatively with the DOJ and the Monitoring Team to take on greater independent leadership in the Consent Decree process, even before the City is in the final stages of compliance. The Monitoring Team expects CDP to continue to make progress in this area and for this reason, is preparing to begin a comprehensive CIT assessment in early 2024.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| | ¶ 135, ¶ 141, ¶ 151, ¶ 152, ¶ 156 | ¶ 131, ¶ 140, ¶ 142, ¶ 145, ¶ 147, ¶ 148, ¶ 149, ¶ 150, ¶ 157, ¶ 158, ¶ 159 | ¶ 132, ¶ 133, ¶ 134, ¶136, ¶ 137, ¶ 138, ¶ 139, ¶ 143, ¶ 144, ¶ 146, ¶ 153, ¶ 154, ¶ 155 |

Cleveland Police Monitoring Team | 13th Semiannual Report | October 2023

*** Paragraphs 143, 144, 145, 146, 149, 150, 154, 155, and 159 have been underlined underlined underlined underlined underlined *upgraded* since the 12th Semiannual Report.

### Search and Seizure



**Visual Representation of Compliance for:**

Search and Seizure

While the City has made important progress in this area as reflected in past reports, efforts toward assessing compliance stalled during the reporting period. The Monitoring Team's intended assessment did not occur due to the protracted period that was required to finalize the assessment process and obtain materials integral to the review. This section will remain unchanged until the City is able to provide the information required for completing the assessment. The Monitoring Team is pleased that policies in this area are in place but seeks to commence an assessment to review the implementation of and adherence to those policies as soon as possible.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
|  | ¶ 160, ¶ 161, ¶ 162, ¶ 163, ¶ 164, ¶ 165, ¶ 166, ¶ 167, ¶ 168, ¶ 169, ¶ 170, ¶ 171, ¶ 172, | ¶ 173, ¶ 174, ¶ 175 |  |

*** Paragraphs 174 and 175 have been *upgraded* since the 12th Semiannual Report.

### Accountability



**Visual Representation of Compliance for:**

Accountability

Consent Decree ¶ 176 requires the City to maintain a disciplinary system that is "fair, consistent, and provides due process." Over the course of the Consent Decree, the Monitoring Team has assessed several aspects of this system to include disciplinary decisions made by the Director of Public Safety and the Chief of Police, as well as the quality of investigations conducted by Internal Affairs (IA), the Office of Professional Standards (OPS), and the Force Investigation Team. While some progress has been noted in this reporting period in both IA and OPS, continued work is required to improve accountability processes and to demonstrate that these improvements are sustainable. The Monitoring Team continues to assess the accountability requirements and notes that the above-mentioned assessments have identified continued areas for improvement that need to be addressed in order to establish that the City is in compliance with ¶ 176, as well as other accountability-related paragraphs. With new personnel in the last year, the Monitoring Team is aware of changes in practice that have occurred that address some of the issues.

Cleveland Police Monitoring Team | 13th Semiannual Report | October 2023

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
|  | ¶ 176, ¶ 177, ¶ 179, ¶ 180, ¶ 181, ¶ 182, ¶ 183, ¶ 184, ¶ 185, ¶ 186, ¶ 187, ¶ 188, ¶ 192, ¶ 194, ¶ 200, ¶ 201, ¶ 204, ¶ 214, ¶ 215, ¶ 218, ¶ 219, ¶ 222, ¶ 223, ¶ 226, ¶ 227, ¶ 233, ¶ 234, ¶ 237, ¶ 239, ¶ 241, ¶ 245, ¶ 249 | ¶ 178, ¶ 189, ¶ 190, ¶ 191, ¶ 193, ¶ 195, ¶ 196, ¶ 198, ¶ 203, ¶ 205, ¶ 206, ¶ 208, ¶ 209, ¶ 210, ¶ 211, ¶ 212, ¶ 213, ¶ 216, ¶ 217, ¶ 220, ¶ 224, ¶ 228, ¶ 229, ¶ 232, ¶ 238, ¶ 242, ¶ 243, ¶ 246, ¶ 248 | ¶ 197, ¶ 199, ¶ 202, ¶ 207, ¶ 221, ¶ 225, ¶ 230, ¶ 231, ¶ 235, ¶ 236, ¶ 240, ¶ 247 |

*** *Paragraphs 177, 185, 188, 194, 199, 201, 202, 210, 221, 235 have been <u>upgraded</u> since the 12th Semiannual Report.*
*** *Paragraphs 215 and 239 have been <u>downgraded</u> since the 12th Semiannual Report.*

### *Transparency and Oversight*



**Visual Representation of Compliance for:**

Transparency and Oversight

The Consent Decree created a new Police Inspector General (IG) position with the authority to review CDP policies and practices, conduct audits and investigations, analyze data trends, develop reform recommendations, analyze investigations, and review discipline. The IG position has been vacant for well over two years, depriving CDP of an important oversight function that an IG would provide. Regarding data collection and analysis, the City has demonstrated that it has and uses the systems designed to collect the use of force and search and seizure data required by the Consent Decree. The City must improve its ability to analyze and interpret these and other data to evaluate its own performance, to effectively implement problem-oriented policing strategies, and to inform organizational management.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 250, ¶ 251, ¶ 252, ¶ 253, ¶ 254, ¶ 255, ¶ 256, ¶ 265 | ¶ 261, ¶ 264, ¶ 266, ¶ 267, ¶ 268 | ¶ 257, ¶ 258, ¶ 260, ¶ 262, ¶263 | ¶ 259 |

*** *Paragraphs 257, 258, 259, 262, 264 have been <u>upgraded</u> since the 12th Semiannual Report.*

*Officer Assistance and Support*



**Visual Representation of Compliance for:**

Officer Assistance and Support

The Officer Assistance and Support section speaks to essential CDP and City processes to ensure that officers are properly trained, equipped, supported, evaluated, and promoted. The Monitoring Team has reported on advances made by CDP and the City in training and equipment and resources. In terms of recruitment, hiring, evaluations, and promotions, no advancement of compliance has been demonstrated. The City must continue to concentrate efforts to recruit, hire, retain, and creatively deploy its members, despite being impacted by a staffing crisis that is being felt nationally across the law enforcement profession. In addition, the City must engage in ensuring its evaluations and promotions practices align with Consent Decree requirements, as this work has significantly lagged throughout the Consent Decree process.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 282, ¶ 283, ¶ 284, ¶ 285, ¶ 286, ¶ 287, ¶ 294, ¶ 312, ¶ 313, ¶ 314, ¶ 315, ¶ 316, ¶ 317, ¶ 318 | ¶ 269, ¶ 270, ¶ 271, ¶ 272, ¶ 275, ¶ 276, ¶ 277, ¶ 279, ¶ 280, ¶ 281, ¶ 288, ¶ 290, ¶ 291, ¶ 299, ¶ 304, ¶ 305, ¶ 306, ¶ 309, ¶ 311, ¶ 320, ¶ 321 | ¶ 273, ¶ 274, ¶ 289, ¶ 292, ¶ 293, ¶ 295, ¶ 296, ¶ 297, ¶ 298, ¶ 300, ¶ 302, ¶ 303, ¶ 307, ¶ 310, ¶ 319 | ¶ 301, ¶ 308 |

*Supervision*



**Visual Representation of Compliance for:**

Supervision

Supervision is effective when there is proper oversight in place to guide officer conduct. Additionally, effective supervision prioritizes officer wellness and support. While the Monitoring Team is eager to see completion of the Supervisor Training at the end of the year, much work remains in the area of supervision. In 2024, CDP should work towards conducting routine audits of the wearable camera system footage. Supervision and the intent of a robust Officer Intervention Program (OIP) must be viewed by the City as complementary functions that, together, support officers and reduce the risk of negative behavior. Supervision is indeed about accountability, but it also must infuse activities that mentor, coach, and care for personnel. Once CDP focuses on fully developing supervisory skills, structures, and support, not only will it send a message to personnel that risk management and accountability are important, but also that healthy employees are essential and will be cared for as a component of effective operations and supervision.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 326, ¶ 327, ¶ 328, ¶ 329, ¶ 330, ¶ 331, ¶ 332, ¶ 333, ¶ 334, ¶ 335, ¶ 336 | ¶ 322, ¶ 323, ¶ 324, ¶ 325, ¶ 339 | ¶ 337, ¶ 338, ¶ 340 | |

*** *Paragraph 339 has been* <u>*downgraded*</u> *since the 12th Semiannual Report.*

# IV.  Complete Findings

## 1.  Community Engagement and Building Trust

*Areas of Progress*

CDP continues to conduct a variety of activities designed to engage and build trust with the community. Such activities include, but are not limited to, conducting neighborhood walks; hosting safety fairs; building relationships with business owners, school representatives, or community organizations; following up with survivors of crime; and/or seeking to better understand the diverse cultures within the Police Districts where they serve and work. These important activities communicate a commitment on the part of CDP to better connect with the community.

*Community Police Commission (CPC)*

Encompassed within the community engagement section of the Consent Decree is the newly established Community Police Commission (CPC), implemented in accordance with Section 115 of the City's Charter, which was amended as a result of the November 2021 electoral process. Since being sworn-in in late 2022, the CPC's thirteen (13)) commissioners have completed orientation and training which prepared them to assume their new roles. The CPC also established six (6) committees, which meet on (at least) a monthly basis. The CPC has already begun conducting important aspects of their work, including identifying liaisons assigned to CDP's Training Review Committee and hosting public meetings around critical and timely topics. These are all important foundational steps to the CPC becoming a fully operative agency in accordance with the City's Charter and the Consent Decree.

*District Policing Committees (DPCs)*

CDP has five (5) District Policing Committees (DPCs), one operating within each of the five (5) Police Districts. As outlined in the Consent Decree ¶¶ 23 – 26, DPCs will facilitate "regular communication and cooperation between CDP and community leaders at the local level." The DPCs will also interface with the Community Relations Board (CRB), the CPC, and the CDP in an attempt to identify strategies to address crime and safety issues in various Districts.

The DPCs are building working relationships with the CRB and reaching out to the newly formed CPC. In several Districts, DPCs have a viable connection with parts of the community and they are working to expand their reach beyond their usual base of participants.

The following activities in which DPCs have engaged reflect the relationships that they have established within their Districts: routine public District meetings, District Safety Fairs, Resources Fairs, National Night Out events, pop-up events in the park, and more. These activities across Police Districts are geared toward connecting with residents, recruiting DPC participants, and exposing the public to the various resources available to them through their local law enforcement agencies and city government.

*Challenges Ahead*

*Community Police Commission (CPC)*

The collaborative success of the CPC and the City is essential to the City's compliance with the Consent Decree by ensuring that constitutional policing is a mainstay for those living, working, and visiting Cleveland. The importance of that aim cannot be forgotten nor neglected. Working together as a cohesive, collaborative body must be the priority for the CPC in the next reporting period and will go a long way in building trust with the community and the institutions it will interface with. Commissioners must also become more acquainted with the many laws which govern the CPC's work. Doing so will allow the CPC to focus on handling the important and high volume of cases it is charged with reviewing and will prevent any further setback as a result of disagreements regarding process. As the CPC continues its important work, the Monitoring Team looks forward to further assessing its systems of accountability.

*District Policing Committees (DPCs)*

While the progress of the DPCs remains steady, there are still benchmarks to achieve before this deliverable is fully compliant with Consent Decree requirements. Continued community participation in DPC meetings, increased youth involvement in those meetings, and intentional outreach to Cleveland's diverse communities to ensure all voices are represented will move DPCs much closer to compliance.

## 2. Community and Problem-Oriented Policing

*Areas of Progress*

CDP continues to develop better documentation and collect more data so members and supervisors can evaluate how well CDP is engaging in Community and Problem-Oriented Policing (CPOP) efforts. The training curriculum developed for in-service training this year was robust and contained useful tools, including the SARA (Scanning, Analysis, Response, and Assessment) model of problem solving, which is a best practice to assist in identifying and overcoming the underlying causes of problems in a sustainable way instead of just treating the symptoms. Regrettably, as identified in detail below, the Monitoring Team observed inadequate presentation of that curriculum to its in-service training classes. Furthermore, as stated in the 12th Semiannual Report, the City has not provided any description of how it has partnered or developed relationships with community groups or leaders.

*Challenges Ahead*

CDP has taken enviable steps forward in improving its relationship with community organizations and has sought to better monitor its community outreach activities by officers. Notably, the City has sought technical assistance from DOJ's Office of Community Oriented Policing Services (COPS) to further advance its work. However, CDP must focus on the biggest challenge ahead: changing the culture of the organization such that it embodies and embraces CPOP as a philosophy. As defined in ¶ 414 of the Consent Decree, CPOP is "a policing philosophy that promotes and relies on collaborative partnerships

between law enforcement agencies and the individuals and organizations they serve to develop solutions to problems, increase trust in police, and improve the effectiveness of policing efforts." CDP has not yet completed this broad culture change and has multiple challenge areas it must overcome in order to reach this achievement.

First, CDP must re-define community outreach in a way that is meaningful and not overly broad. Officers who document community outreach activities currently include activities that may or may not meet the spirit of intended outreach. For example, attending a community picnic and mingling with residents may be community engagement (to a limited degree), but it is not CPOP. CPOP is about developing mutual partnerships to identify issues and subsequently work through the problem-solving process to come up with sustainable solutions.

Second, several CPOP training participants have suggested that CPOP-related outreach activities are not being fully documented. Not only are comprehensive documentation and analysis of CDP's CPOP efforts required by the Consent Decree (see ¶¶ 33 and 34), but these practices are also important to ensure CDP and the public have a solid understanding of whether officers are indeed engaged in CPOP, the problems being tackled, the ways in which CPOP efforts are or are not resolving these problems, and whether such information or trends can inform improvements for future CPOP efforts.

Finally, CDP must focus its efforts on proper implementation of CPOP training. CPOP training observed during this reporting period omitted significant portions of the curriculum approved by the Monitoring Team, which the Monitoring Team has observed in the delivery of other training topics as well. For example, the training delivery contained too little discussion about how to engage the community in the SARA model, which is an essential part of CPOP. Additionally, the training did not adequately touch on what it means to participate in community engagement with a goal of developing partnerships with the community. Training sessions observed also lacked overall classroom management. Key components of the curriculum were in some instances rushed. Additionally, instructors struggled to meaningfully engage officers in the course curriculum and corresponding discussions. Poor classroom instruction and management demonstrates a lack of progress in terms of CPOP implementation and sends the message to officers that forging enduring community partnerships and identifying and developing strategies for sustainable solutions are not priorities for CDP.

The challenges described above are organizational in nature. It is difficult to measure sustained improvements given the absence of detailed information provided to the Monitoring Team regarding progress within each Police District, including the Commanders' advisory groups, the DPCs, as well as partnerships with local businesses, faith communities, and advocacy groups. Although there could well be more extensive progress, the Monitoring Team must be informed of that progress and CDP must document it. The lack of data coupled with analytics that may tell "what happened" but not "why" has rendered outcome measurement in this area difficult.

There is a large difference between the number of completed CPOP forms and completed community engagement forms, demonstrating that more work lies ahead for CDP to fully embrace CPOP as a philosophy and practice. Officers completed 281 CPOP forms in the first five (5) months of 2023; however, 87% of those forms did not derive from a community engagement activity (the remaining 13% did). Most of the CPOP forms arose from complaints to the Commander's office, with the second highest number coming from patrol

officers who either observed or were approached about a problem. Only eight (8) CPOP forms arose out of community meetings. This means that problems are being identified through traditional means (e.g., a community member contacting their District Commander) as opposed to through partnerships, engagement, and trust that should be occurring with officers on the street and with community members. In contrast, CDP represented through the same time period that 4,848 officers were involved in 3,012 community engagement activities as documented by community engagement forms. The 3,012 activities included: school activities (346), organized events (287), "Community Service" (1,333, with 80% of those identified as "walk and talks"), and social contact (2,008, with 80% of those arising from casual conversation).

These data appear incongruous with the activities intended to improve problem solving. For example, although CDP reports participating in many community events, those activities yield very few CPOP forms. This could be the result of inadequate training with respect to these areas: forging partnerships with community members, collaboratively identifying problems, and/or implementing a process to develop sustainable solutions. It could also reflect that these items remain a lower priority for CDP.

The dashboard CDP provides to the Monitoring Team summarizing these data did not include analysis of the numbers. In other words, CDP collects and filters many data fields but does not appear to conduct analysis or assessment concerning what the numbers mean for CPOP. Collection of data absent a method for using that data to assist with CPOP implementation has little utility in identifying positive or negative trends among officers and the community and does not reveal much about the genuine partnerships involving both the police and the community. While CDP's data collection efforts do amount to partial compliance, the lack of analysis does not demonstrate that CDP has increased and/or implemented problem solving strategies through working partnerships between police and community.

## 3. Bias-Free Policing

*Areas of Progress*

The Monitoring Team received, reviewed, and provided feedback to the City on its policy on interactions with Transgender, Intersex, and Gender Non-conforming Individuals during this reporting period (April 2023). In addition, although after the reporting period, CDP also provided the Monitoring Team a draft of its Session III in-service training, which is described as an integrated reality-based scenario training that includes use of force, search and seizure, and bias-free Policing. It is apparent that CDP worked hard on these materials, which, as of September 2023, have now been approved by the Monitoring Team. Furthermore, as reported in the 12th Semiannual Report, working in conjunction with a contractor, CDP has developed an in-service supervisory leadership training that entails elements of bias-free policing principles in several modules. The Monitoring Team looks forward to observing the delivery of this training.

*Challenges Ahead*

Although the City has made progress relative to bias-free policing, there is still substantial work to be done in this area to achieve compliance. As reported in the 12ᵗʰ Semiannual Report, the Monitoring Team reviewed and observed CDP District Neighborhood Awareness Trainings administered by CDP in early 2022, which addressed bias-free policing. Although the training curriculum was strong in most content areas and was observed to be engaging for both training instructors and the officer trainees overall, content intended to cover the more recent history of excessive use of force and critical incidents involving CDP officers was deficient. The Monitoring Team and the DOJ provided CDP feedback to address this deficiency early in this reporting period (January 2023). CDP developed the District Neighborhood Awareness Refresher training as a supplement to the initial training. The refresher should ensure that all officers receive the comprehensive District Neighborhood Awareness Training curriculum.

As of October 2023, CDP has yet to administer the revised District Neighborhood Awareness Refresher Training to members of CDP. The Parties are collaborating on an updated version of the training to ensure that it satisfies its purpose of supplementing where the initial District Neighborhood Awareness training delivery was lacking.

In addition, the Monitoring Team awaits evidence of the incorporation of bias-free policing philosophy and values into CDP's management and accountability systems, personnel recruitment, hiring, promotion and evaluation processes, and deployment of resources and community interactions, as indicated in ¶¶ 36 and 44. These can most effectively be evidenced through the critical analysis and reporting of the relevant data in regularly produced and published reports in accordance with ¶ 43 of the Consent Decree.

## 4. Use of Force

*Areas of Progress*

Impressively, a number of paragraphs in the use of force section have improved ratings in this reporting period. The City, in particular the CDP, has developed solid practices and processes regarding uses of force and demonstrated consistency in adhering to these practices over the last several quarters.

As a result of new policies, the required processes were established and now appear to be functioning at a higher level then in the past. For example, ¶ 45 requires the CDP to "revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force" complies with the Constitution, federal law, and the Consent Decree. CDP previously addressed the policies and training required and now have an operational Force Review Board (FRB), a Force Investigation Team (FIT), and standard practices for reporting use of force cases. The policies also require referring problematic or questionable use of force incidents to IA. We see this happening in practice. In conversations with the City, the Monitoring Team will determine when a formal compliance assessment can be completed to assess all these processes.

Even without formal assessments, the Monitoring Team is pleased with the City's continued efforts to reach compliance with ¶ 48 and recognizes the CDP's work to use the vast amount of use of force data collected to inform their decision making. Using a Power BI dashboard,

CDP provides district supervisors with data on use of force in the aggregate.[8] The dashboard permits a user to sort data in a variety of ways, facilitating an understanding of force at various levels of analysis. There is a standing agenda item at the start of the monthly CDPStat meeting between the Parties and the Monitoring Team where the Data Team provides reports using the dashboard. The CDPStat format combines a data presentation to the Monitoring Team and DOJ with the opportunity for discussion with CDP and District leaders about the meaning of the data, while exploring additional opportunities to use the data. The data, though presented with Power BI, relies on the IAPro system to track individual officer uses of force. Problematic uses of force are referred to the Internal Affairs Unit by the chain of command. All Level 3 and a random selection of Level 2 use of force incidents are reviewed by the FRB, as well as by the chain of command. As individual cases are reviewed and policy and training issues are identified, the appropriate unit commanders are notified by the FRB. This notification occurs in both IAPro and through the checklists completed at each FRB meeting. The next evolution of this process should include a greater depth of analysis to ensure that the Division has established systemic feedback loops and a deeper understanding of the details and patterns across force investigations.

It is noteworthy that compliance with the paragraphs governing the FRB has been upgraded in several instances. In accordance with ¶ 127, the FRB meets quarterly and has been operational since 2021. In a 2021 report, the most recent use of force report released by the City, the FRB reviewed thirty-three (33) use of force cases, most of which were Level 2 cases with seven (7) involving Level 3 uses of force, which is the most serious level. The Monitoring Team believes the operations and processes of the FRB have involved more rigor and critical analysis through engaged deliberations amongst FRB members, and encourages even more improvement in this area. In addition, the Monitoring Team and DOJ reviewed the first draft of a training intended for FRB members and found it insufficient. The Monitoring Team expects to review an updated version of the training curriculum that includes, among other requirements, content meant to enhance its members' analysis and deliberation skills. The Monitoring Team further expects the FRB to review the results of its work and ensure the referrals to the other units of the Division were acted upon. It would be instructive for the FRB to review its work on an annual basis and compare findings to prior years to assess FRB impact. These activities reflect what is necessary for the next stage of development and functioning. As called for in ¶ 128, the FRB is technically delivering on the language of the Consent Decree. Operational compliance requires a formal assessment of the process. The Monitoring Team is prepared to organize a working group for discussion regarding the FRB and to offer technical assistance, if desired and requested by the City.

### Challenges Ahead

In the last reporting period, the Monitoring Team completed its initial assessment of FIT cases and reviewed adherence to policy and the Consent Decree for several FIT-related paragraphs including ¶¶ 115 – 122. The team reviewed 28 cases that occurred and were fully investigated between July 2020 and October 2022. Of the cases identified for this assessment, seven (7) were officer-involved shootings. These incidents included: one (1) fatality; three (3) "no hit" shootings with no injury to the subject; and three (3) subjects who were injured but not killed. The FIT appears to be functioning in a manner consistent with

---

[8] Power BI is a Microsoft product that increases accessibility of data from across data sources, allows for easy analysis, and facilitates quality data visualization. Power BI is hosted on the City's internal data sharing platform (Sharepoint site) permitting access and interactive visualization to internal users.

the Consent Decree. However, timeliness and quality of FIT administrative investigations were identified as issues, and there were multiple instances where FIT failed to identify tactical or policy issues, and the CDP failed to follow up on issues identified by FIT. The forthcoming FIT Assessment report will more fully explain the findings. One issue noted in the FIT Assessment report was compelled administrative interviews were not occurring within 48-72 hours after the incident (¶ 120). It bears noting that the FIT Assessment reviewed cases closed as of October 2022. The current IA Superintendent assumed his role in July of 2022 and is not responsible for oversight of the cases reviewed in the assessment. The Monitoring Team is aware that, with this new leader, attention to detail was heightened and processes improved, including the timing for conducting of compelled administrative interviews. Some of the deficiencies noted in the FIT Assessment have been addressed during the last several months as the new IA Superintendent identified issues. To that end, the Monitor has decided to keep CDP at partial compliance where improvements appear to have been made, but have not yet been independently verified (e.g., ¶ 120).

There is a section in the CDP 2021 Use of Force report that summarizes, at a high level, the work of the FRB. Future use of force reports will rely on the template of this inaugural report, and subsequent annual reports will build on the data available in this report. Greater detail, described in ¶ 261 and ¶ 266, is necessary to achieve a higher level of compliance for ¶ 129. Specifically, per ¶ 261 (and in conjunction with ¶ 266), the FRB will "detect any patterns, trends, and training deficiencies and make recommendations for correction as appropriate" and will provide that analysis to the Monitoring Team. This sort of analysis is expected not only for use of force but also stops, searches, and arrests as indicated in ¶ 257. As indicated above, the Monitoring Team further expects the FRB to review the results of its work and ensure the referrals to the other units of the CDP were acted upon. It would be instructive for the FRB to review its work on an annual basis and compare findings to prior years to assess FRB impact.

When it comes to the City's performance regarding use of force, the foundations are set, and the practices are in place. The deepening of the work, embedding it into the fabric of the organization, creating rigorous systems, and engaging in what may feel at times as harsh self-reflection is the challenge ahead. These practices and adjustments are necessary to becoming a self-regulating, fair, and critical police agency of the 21st century.

## 5. Crisis Intervention

*Areas of Progress*

The Consent Decree calls for sustainable change regarding the City's response to behavioral health crises. Impressively, the City is making gains toward this goal. The Mental Health Response Advisory Committee (MHRAC) has been a key part of the City of Cleveland's and CDP's work to meet the requirements of the Consent Decree. This year, the Cleveland Department of Public Health took responsibility for continuing the work of the MHRAC. The Alcohol, Drug and Mental Health Services Board (ADAMHS Board) has remained actively involved with the MHRAC and the transition is going well. The Department of Public Health (Health Department) has provided proposed bylaws for the MHRAC and a structure that includes Training and Community Engagement Committees. Both committees have been active and effective in moving compliance with the Consent Decree forward. Importantly, the City and the Department of Health hired a Strategist for Public Safety and Health. The new position should help with Consent Decree compliance, and it

should also address a broader range of behavioral health issues that are critical to the Cleveland community. The Mayor's Office indicated the position would lead "the work to develop a sustainable strategy for crisis intervention."[9] Consent Decree ¶ 131 calls for CDP and the City to create a context for sustainable change, and the Department of Health and the Mayor's actions are an encouraging area of progress.

CDP has continued work with the MHRAC Training Subcommittee and CDP's Training Section to provide programs for officers and telecommunication specialists. Training remains an impressive area of progress. CDP provided targeted, in-service training for all officers on suicide intervention and prevention, training on the recently revised crisis intervention policy, and behavioral health training for all recruits. CDP continues to conduct specialized crisis intervention training and behavioral health telecommunication operator crisis intervention training. All curricula have been developed with the support of the community through work with CDP crisis intervention staff, the MHRAC Training Subcommittee, the CDP Training Section, and the CDP Telecommunications Training Staff. Each curriculum was reviewed by DOJ and reviewed and accepted by the Monitoring Team. It is important to note that many of the instructors are volunteers who provide services pro bono. Their sense of civic responsibility is admirable.

Dr. Leigh Anderson, the Director of the City's Police Accountability Team (PAT), has worked with CDP's crisis intervention staff to examine the work that lies ahead to be fully compliant with the Consent Decree paragraphs. The City's level of specificity shows that the CDP is moving toward internalizing the intent of the Consent Decree and not just checking off tasks without making substantive change. The CIT Coordinator and CDP patrol supervisors have played leadership roles in addressing CIT recruiting, community presentations, appropriate recognition of officer crisis intervention leadership, CDP notices on a range of essential topics, clarifying the protocol for hospital emergency rooms, and assisting with reaching out to members of the public in need of behavioral health services in areas throughout the City.

The Monitoring Team recognizes the significant efforts that are being made to address compliance and to create sustainable change in this area. These include the work of the City to examine the Care Response model (a community response to crisis intervention that prioritizes the health of the person experiencing a crisis), efforts by the City Health Department to re-structure the MHRAC, and the use of American Rescue Plan Act funding to provide gap funding for ADAMHS Board programming. Each of these developments is encouraging and should help establish structures that will create change for Cleveland. However, there remain several specific challenges ahead.

### Challenges Ahead

Specialized CIT Officers should be taking a leadership role during behavioral crisis events. Initial reviews of wearable camera system video (WCS) suggest this is a critical need for CDP. The Monitoring Team's prior review of WCS videos indicated that CDP officers often struggle, especially during evening and overnight shifts, to find available community resources for children and youth. Additionally, CDP should develop a strategy to involve the MHRAC in data-driven recommendations to improve the existing crisis intervention program. CDP currently has a strong data capability, but translating the data into concrete

---

[9] Three new senior strategists join Mayor Bibb's leadership team | City of Cleveland Ohio - Mayor Justin M. Bibb

improvements in training and interventions remains important, as does integrating feedback mechanisms whereby the data is utilized to make improvements and guide overall strategy in this area. The need to update the Specialized Crisis Intervention Plan required by the Consent Decree is critical and will provide the City with a mechanism to accomplish this goal.

The MHRAC must continue to grow as a positive force in providing data-driven advice to the City and CDP regarding the improvement of CDP's Crisis Intervention Program. This work will require that the Department of Health continue to develop the bylaws so that the MHRAC can make use of the data being provided. To accomplish the overall Consent Decree goals, the City will have to coordinate among several entities, including PAT, CDP, the Department of Health, the MHRAC, the CPC, and the ADAMHS Board. Each has the potential to contribute to the steps needed to reach Consent Decree compliance and to benefit Clevelanders experiencing a behavioral crisis, but coordination must be integrated and consistent.

During the next reporting period, the City and CDP should take on a larger leadership role in overseeing compliance in this area under the Consent Decree. Now is the time for the City to take over leadership of working group meetings, which have been previously led by DOJ. These important meetings are utilized to coordinate progress and strategy. This will provide a path for an important change establishing greater City autonomy over CIT-related areas. The Monitoring Team is pleased that the City has indicated it is ready to take on this increased leadership role.

Given the City's level of compliance, the Monitoring Team anticipates conducting a comprehensive assessment of crisis intervention in 2024.

## 6. Search and Seizure

*Areas of Progress*

CDP previously made important progress on policies and training related to search and seizure, which are now fully in effect. In March 2021, CDP incorporated the use of electronic stop forms to collect data on all non-consensual stops initiated by officers or calls for service. The 2023–2025 Training Plan includes the required annual training for search and seizure in accordance with ¶¶ 174 and 175 of the Consent Decree.

In early 2023, the Monitoring Team proposed a methodology and tool for assessment of compliance in the remaining areas. The City provided the requested 2022 data set from which the sample cases will be drawn.

*Challenges Ahead*

There has been no change or activity driven by CDP in this area with respect to the planned Monitoring Team assessment. The Monitoring Team intended to conduct its comprehensive assessment of search and seizure-related paragraphs during this reporting period (January 2023-June 2023), but this effort has been stalled for many months. Before launching the full assessment early in 2023, the Monitoring Team conducted a pilot test of the assessment tool (previously agreed upon by the Parties) on five incidents. The Monitoring Team

reviewers determined that the data provided by CDP lacked certain information necessary to assess each paragraph for compliance and requested additional information. The City's legal department determined the proposed method of review required access to restricted information not available to the Monitoring Team reviewers. The Monitoring Team has engaged with the City to find a work-around so that it can receive the requisite information necessary to review and commence its assessment. As of September 2023, the Monitoring Team is working toward determining whether the materials that the City provided after substantial delay will be sufficient to conduct its full assessment of this area. Once the Monitoring Team is able to determine that it can assess the quality of the supervisory and command-level stops reviews, it is likely that the data provided will need to be replaced with more recent stops. This delay also impacts the availability of WCS video necessary for the review.

The Monitoring Team expects the City to deliver its annual report on the analysis of stop forms from 2022 in October 2023 as required by ¶ 264. The report from 2021 was received in the autumn of 2022 and substantial feedback and suggestions were made with the expectation that more detailed analysis, including those on hit rates and disparities across all activities, will be included. The 2021 Stop Forms report also foreshadowed the creation of a search and seizure working group to assist the City in identifying "significant compliance trends ... and effective and efficient practices for increasing public safety and community confidence" and ideally address the recommendations in the 2021 report. The Monitoring Team looks forward to supporting the City's efforts to launch and implement this working group during the next reporting period.

## 7. Accountability

### *Areas of Progress*

Many of the past issues identified by the Monitoring Team related to leadership challenges with respect to both the Internal Affairs (IA) Division and the Office of Professional Responsibility (OPS). Previously, the Monitoring Team reported on the problematic history related to hiring an OPS Administrator, a position that remained vacant for a period of eighteen (18) months. At the time of this report, the Monitoring Team is pleased to report that OPS now has new leadership and has taken initial steps towards establishing systems that will help improve OPS operations.

Regarding IA, the Monitoring Team, along with the Parties, are discussing proposed revisions to the IA Manual to ensure practices are codified and consistent with the Consent Decree. In addition, the Monitoring Team is awaiting submission of a training curriculum for IA personnel and notice from CDP that IA is prepared for a formal assessment regarding the quality of investigations and qualifications of its investigators.

In April 2023, OPS presented the Monitoring Team with a draft "Community Awareness Plan," in compliance with ¶ 201 of the Consent Decree, that was long overdue and represents a positive step forward. The draft was returned to OPS in May 2023, and the Monitoring Team is looking forward to seeing a final version soon.

OPS has also significantly improved its reporting to DOJ and the Monitoring Team through enhanced reports and engaged workgroup conversations facilitated by the new OPS Administrator. In the recent past, OPS was unable to provide accurate data regarding its

workload and the status of ongoing investigations and adjudications. It appears that the hiring of a new Management Analyst has dramatically improved OPS's capacity in that area.

As of the end of the reporting period, there were 103 completed OPS investigations pending adjudication by the Police Review Board (PRB).[10] Laudably, the PRB has begun to conduct "special" meetings, above and beyond their traditional monthly meetings, to reduce that backlog.

In addition, the OPS Administrator has reported that he is working on improving public (and complainant) access to status reports on OPS case investigations. Upon successful implementation of such technology, OPS compliance with ¶ 229 can, potentially, be upgraded from "Operational Compliance," to "General Compliance."

These positive developments have resulted in an upgrade in the following paragraphs:

- ¶ 194, which requires that OPS be led by a "skilled" Administrator has been upgraded to "Partial Compliance."
- ¶ 177, which requires CDP to conduct "objective, comprehensive, and timely investigations of all internal allegations [of misconduct]," has been updated from Non-Compliance to Partial-Compliance due to more substantive regular reporting from the Internal Affairs Superintendent.

The City is working to update its Disciplinary Matrix, which has been reviewed by DOJ and the Monitoring Team and is making promising strides towards finalization. A sound Disciplinary Matrix is essential to ensuring consistent and fair discipline which comports with due process, as required by the Consent Decree. The Monitoring Team is hopeful that it will be put in place by the end of the next reporting period.

***Challenges Ahead***

As indicated in our prior assessments, CDP, OPS, and PRB need to improve on the timeliness of misconduct investigations and the adjudication of cases. Underpinning the lack of timeliness is persistent personnel problems and staffing shortages within these entities that forestall the City's progress.

To fully comply with ¶ 176 of the Consent Decree, the City needs to ensure that internal complaints making prima facie allegations of bias, harassment, and/or retaliation are investigated and adjudicated in a timely manner. As previously reported, at least two (2) internal complaints continue to languish in the Human Resources Division for well over two (2) years and one complaint of retaliation was simply ignored by CDP's IA Unit.[11] For the retaliation case, CDP needs to either initiate an independent investigation, as previously recommended by the Monitoring Team, or evaluate the failure to investigate that allegation and ensure that similar failures will not reoccur in the future.

The IA Division and the Case Preparation Unit, both essential to ensuring CDP accountability, continue to be understaffed, despite handling a rising number of compliant investigations. In order to be effective and ensure timely investigations, IA must be

---

[10] As reported by the OPS in its July 22, 2023 bi-weekly report to the Monitoring Team and DOJ.
[11] *See* 12th Semiannual Report, at footnote 29.

adequately staffed.[12] The IA Superintendent has reported an approximate 5% increase in IA cases from 2022 to 2023 and a 37% increase from 2021. Over the course of 2022, the number of IA investigators decreased from nine (9) to seven (7) due to transfers and promotions, (a 22% decrease), and in this reporting period, IA staffing has remained the same and "[CDP] has initiated an organization-wide staffing analysis … while it remains approximately 400 officers short of past staffing."[13]

Regarding the OPS, it continues to struggle with investigative timeliness and high, inconsistent caseloads. As of June 22, 2023, OPS reported 198 open investigations, including thirty-three (33) open for more than one (1) year. Three (3) OPS investigators reported open caseloads ranging from thirty-seven (37) to forty-three (43) cases, well in excess of the number of cases any one investigator could appropriately manage.

In addition, the OPS Administrator must skillfully address personnel issues within OPS to ensure effective investigations while maintaining a healthy working environment for OPS staff. OPS has long struggled with workplace cultural issues. In its 2014 investigation, DOJ found OPS to be an organization in crisis.[14]

Compliance with ¶ 176 is also contingent on effective operations by the PRB. The PRB, which adjudicates police complaints by the public and forwards sustained findings to CDP for consideration and the imposition of discipline, must work in a credible and timely manner. The Monitoring Team observed the full February 2023 PRB meeting and identified several deficiencies, including untimely case adjudication,[15] and failures by PRB members to provide non-conclusory rationale for their decision-making. This resulted in the Chief of Police and Director of Public Safety deviating from PRB recommendations on multiple occasions.

During this reporting period, the PRB continued to struggle with an increasing backlog of cases and a lack of transparency by sometimes not providing reasons to support decisions on findings and discipline. In addition, the Monitoring Team continues to see departures by the Chief and the Director of Public Safety from PRB recommendations at a high rate which should be further analyzed. In some cases, during PRB discussions on whether to appeal a case to the Director of Public Safety, the explanations provided by PRB members to support their vote to appeal were either non-existent or insufficient.

---

[12] *See* paragraph 177 of the Consent Decree, which requires that "Internal Affairs [] conduct objective, comprehensive, and timely investigations of all internal allegations of officer misconduct."

[13] From July 3, 2023, Monthly Status Report to Police Accountability Team.

[14] *See* December 14, 2014 DOJ Investigation Report, at p. 39.

[15] Although there were 13 cases on the agenda, the PRB only adjudicated four (4) cases as much of the meeting was dominated by a single case presentation. Further, the PRB did not establish any time limit for public comment, spending significant time discussing a return to in-person meetings. Even though the PRB did adjudicate all four (4) cases where complainants were present, one complainant waited more than four hours before his case was heard by the PRB. Further, three cases on the agenda involved OPS investigations completed between 6 and 9 months before they were set for adjudication. Another three cases were non-compliant with OPS Policy Manual Section 607, which requires that "OPS will forward all investigations and its written conclusion to the CPRB in sufficient time for CPRB to consider them no later than the second regularly scheduled CPRB meeting following the completion of the investigation."

In August of 2017, the City agreed that OPS would forward OPS-PRB "findings letters" to the Chief within 14 calendar days of the PRB issuing a sustained finding[16] to ensure timely referrals to the Chief. Although progress has been made recently, OPS did not achieve this goal during this reporting period. The OPS bi-weekly report on July 5, 2023 showed that only one half of the cases requiring "findings letters" had been sent within the required time frame. As such, compliance with ¶ 239 has been downgraded from "Operational Compliance" to "Partial Compliance." In addition, OPS has recently reported that it has identified 90 closed cases where the PRB did not sustain any allegations, but OPS failed to notify the complainants. Even so, the Monitoring Team notes that the OPS Administrator has self-identified these deficiencies and is addressing them in a systemic way. Therefore, it is fully anticipated that OPS will be able to return ¶ 239 to compliance in the near future.

Finally, there are outstanding documents that are a barrier to the City reaching compliance. This includes the manuals for OPS, PRB, and CDP's Case Preparation Unit, which need to be updated consistent with Section 115 of the City Charter. In addition, OPS has still, as of the time of this writing, not provided the Monitoring Team and the DOJ a completed Annual Report for 2022, now several months overdue. Accordingly, OPS compliance with ¶ 215, requiring said report, has been downgraded from "Operational Compliance" to "Partial Compliance." Based on the work of the new OPS Administrator and Management Analyst, the Monitoring Team is hopeful that OPS will be able to return to compliance in this area in the next reporting period.

## 8. Transparency and Oversight

***Areas of Progress***

The Inspector General (IG) position has been vacant since early 2021. The City's initial job posting from 2021 received 117 applications, with 98 of the applicants being qualified for the position. However, after reviewing the qualified applicants, the City did not identify any candidate it deemed suitable for the IG role.

In 2022, the City decided to place the IG position under the Director of Public Safety, independent of the Chief of Police. After some delay, the City finalized the job description for the new Public Safety Inspector General role and posted it, but received few applications. The City reposted the position on governmentjobs.com in November 2022. The City reported to the Monitoring Team in March 2023 that it had scheduled first round interviews with four candidates, but ultimately only one candidate advanced to the interview stage with the CPC, which occurred in May 2023. The CPC recommended to the Mayor that the candidate be hired as the Public Safety Inspector General. Unfortunately, the candidate subsequently withdrew from consideration and the hiring process will have to begin anew.

In accordance with ¶ 257, the City implemented and uses a host of electronic systems to collect critical elements of police operations including use of force and search and seizure data. They have in place qualified staff and university partners to move from data collection and reporting to engaging in a more complete and informative analysis. The Monitoring Team would like to see the data collected on use of force and stops and searches fully analyzed and shared in transparent ways.

---

[16] Dkt. #150, Filed August 30, 2017, p. 4.

In reference to the data requirements of this Consent Decree section, the Data Analysis and Collection Coordinator (DACC) along with the expanded Data Team is increasingly engaged with operational staff at the CDP. The Monitoring Team is assured that the DACC works collaboratively with the Bureau of Compliance to review data collection forms and to ensure the integrity of the data compiled. The Monitoring recommends creating and documenting a standard operating procedure that sets forth the expectations of ¶ 262 to ensure the activities are requirements of the positions and outlive any change in personnel. The activities and routine collaborative meetings, as well as any recommended changes to forms or policy through these efforts, should be documented and shared with CDP management, and, as long as the Consent Decree is in place, shared with the Monitoring Team.

Regarding the public availability of information, after the reporting period ended the Monitoring Team noted that the City recently changed its website's web platform. The new site appears more attractive, updated, and navigable. Nevertheless, while many reports and policies are indeed published on this public website, it remains very difficult for users to locate specific materials they might desire to see (for example, to determine which policies on a specific topic are current).

*Challenges Ahead*

The City has changed the IG position from a Police IG position to a Public Safety IG position which will have jurisdiction not just over the CDP, but also over the Division of Fire, Emergency Medical Services, Animal Care and Control, and Corrections. The Parties must deliberate further to ensure this expanded role is able to satisfy the requirements of the Consent Decree. Simply expanding the responsibilities of this position without the necessary staffing and supports in place could inhibit the City's ability to meet their obligations set forth in the Consent Decree. Should the City demonstrate that this expanded position can satisfy the requirements of the Consent Decree, the Consent Decree language would need to be modified accordingly.

It has been almost three years since the first IG (who now serves as the Internal Affairs Superintendent) resigned from his position. The City not only cannot come into compliance with ¶¶ 250 − 256 without hiring a competent IG, but has also missed out on the benefits of having robust oversight that an IG is intended to provide. The City will need to ensure that the IG's office is funded to be able to serve its Consent Decree required functions, regardless of the other mandates that office may have.

In order for the Division's leadership to understand the full picture of any one officer, assembly of data from across government is necessary. Compliance with ¶ 258 requires collaboration with the Office of Professional Standards (OPS) and the integration of OPS data on misconduct with the Division's IA data, as well as use of force data.

Significant work regarding data has been achieved, but the Consent Decree requires even more in-depth efforts and analysis. For example, ¶¶ 261 and 266 require more detail and greater analyses than what is currently being provided in its reports of data on force, stops, and searches. Specifically, per ¶ 261 (and in conjunction with ¶ 266), the FRB will "detect any patterns, trends, and training deficiencies and make recommendations for correction as appropriate," and will provide that analysis to the Monitoring Team. This sort of analysis is expected not only for use of force but also stops, searches, and arrests as expected in ¶ 257.

The DACC, with colleagues across CDP, tracks relevant data points for ¶ 264. The Monitoring Team acknowledges it reviewed a draft report submitted by the City that the Data Team described as containing descriptive data only. Consent Decree ¶ 264 requires more detailed analysis specifically tracking "trends in compliance with the Fourth Amendment of the Constitution and an assessment of practices that increase public safety and confidence in CDP, and the steps taken to correct problems and build on success." To accomplish these requirements, a more detailed and thorough analysis that reviews reasonable suspicion and probable cause is necessary. Analysis of these activities, along with detailed examination of the demographics of the subjects of these activities would help improve the assessment rating. We look forward to the next stage of data analysis and reviewing the next iteration of this report.

## 9. Officer Assistance and Support

*Areas of Progress*

Significant work has been completed during the reporting period on training, including the finalization of training materials on supervision and leadership, as well as Taser, CPOP, Crowd Management, and the 2023–2025 Training Plan. The Monitoring Team continues to be generally pleased with the quality of work presented through initial drafts of curricula and the willingness of CDP's Training Section staff to collaborate and incorporate the feedback it receives from the Monitoring Team and DOJ. Generally, on a bi-weekly basis, the Monitoring Team and DOJ engage in a meeting with Training Section leadership where training development and curricula are discussed in detail. There is great value in such meaningful collaboration to ensure that CDP's training aligns with the Consent Decree requirements. Nevertheless, the Monitoring Team's observations of training delivery have been mixed. The Monitoring Team had the opportunity to observe certain in-person training sessions. In certain instances, such as in the 2023 Taser and CPR trainings, the trainers were especially proficient, officer-students were engaged, and the training appeared effective. In the case of other trainings, such as CPOP, the Monitoring Team was very concerned that the training delivered did not resemble the detailed curriculum content that was approved by the Monitoring Team and DOJ during the curriculum development process. The Monitoring Team notes that ¶ 281 requires that "instructors are qualified and use only curricula and lesson plans that have been approved by the Commander responsible for training." In addition, Monitoring Team observers also noted the student-officers, including some supervisors, were not fully engaged and often distracted by personal devices. The Training Division personnel heard this feedback from the Monitoring Team and is taking steps to ensure students are engaged and attentive. Therefore, whether or not CDP has impressive final training curricula, if trainings are not delivered effectively and consistent with approved curricula, CDP will continue to struggle to meet the Consent Decree requirements on training.

CDP continues to be supported in its technology endeavors largely by the City Information Technology Division, and this partnership seems to be working effectively. The City IT has a well-considered strategic plan which it reviews, modifies, and implements with fidelity. The City recently supported the budget for additional staff, numbering eight (8), who are focusing on police records, the computer aided dispatch (CAD) system, project management, and data analysis, as well as database administration. These additional staff will help with the day-to-day operations of CDP as well as their data management capacity. The City has committed to and made progress in the implementation of in-car cameras –

those that record from the dashboard as well as in the backseat detainment area – that are triggered by speed, use of certain equipment, or backdoor opening. These units also trigger recording by the WCS. City IT is attentive to its schedules for the 5-year refresh cycle of personal computers and in-car modems. Finally, the City is exploring the use of capital funds to begin the process of a new and combined CAD and Record Management System (RMS) for police, fire, and EMS. The Monitoring Team supports this investment as the current systems appear outdated.

Regarding recruitment and hiring, the City posted its "Public Safety Recruitment Section End of Year Report 2022" in the spring of 2023.[17] The report describes the regular operations of the Recruitment Section and the regular engagement with both the wider community and the Director of Public Safety. In 2022, the participation of Recruitment Section personnel in recruitment events returned to pre-pandemic levels, and their activities increased month-to-month with an average of 20 per month. The City has streamlined some processes reducing the time for the full background and evaluation process by 40 days. The City plans to engage with a marketing firm to assist recruitment efforts, and they are providing weekly conditioning camps for aspiring officers.

*Challenges Ahead*

In terms of training, as noted above, the Training Section must prioritize the consistent and proficient delivery of training. A remarkable lesson plan can be rendered useless through poor delivery, wasting not only the significant efforts that went into the training development but also failing to achieve the purpose of the training – that officer-students learn and absorb the content so that they can apply it to their daily work. Additionally, as mentioned in previous Monitoring Team reports, the CDP must ensure that the Training Section provides oversight to all training conducted for CDP's officers, as required by ¶ 275. The Training Section reports that there are some practices in place to address this requirement, yet it has not been formalized or documented. The Monitoring Team is encouraged to learn that this process is in development and looks forward to reviewing draft guidance in the future to solidify this requirement.

With respect to recruitment and hiring, as with many police agencies across the nation, recruiting and hiring qualified personnel is a significant challenge. The CDP actual number of officers is far below the budgeted strength (1,294 vs 1,640) and as of December 31, 2022, there was a net loss of 136 over the year. Losses have increased dramatically since a net gain in 2018.[18] While the City has adopted a recruitment plan, work remains to be done on the execution and improvement of the plan that is reflective of current day realities. On behalf of the City, the PAT has recently requested Technical Assistance on this issue which is promising as it suggests an openness to brainstorming innovative and different strategies.

The sub-section on performance evaluations and promotions remains in a status of "non-compliance" due to the lack of work being advanced on these topics. While progress had been made during the previous reporting period on developing comprehensive matrices for performance evaluations, the work stalled during this reporting period due to changes in personnel, as reported by the City. Therefore, to the Monitoring Team's knowledge, no

---

[17]
https://www.clevelandohio.gov/sites/clevelandohio/files/2022%20Recruitment%20End%20of%20Year%20Report.pdf
[18] Ibid, page 16.

significant progress has been made in this area during this reporting period. The Monitoring Team has not received sufficient information about any efforts that the City is taking to "implement fair and consistent promotion practices" as required by ¶ 317 of the Consent Decree. The Monitoring Team made attempts in 2022 to collaborate with the City on this work, but the City was nonresponsive. The City must prioritize improvements to evaluations and promotions and tackle these topics thoroughly in order to advance and demonstrate that consistent and fair evaluations and promotions, which incorporate various factors listed in the Consent Decree, are in compliance with their relevant requirements.

Regarding staffing as noted above, per a recent monthly report provided by the IA Superintendent, CDP remains approximately 400 officers short of past staffing. Therefore, simply put, the City must work diligently to implement its Staffing Plan and to provide evidence of this work. If the City does not believe that the Staffing Plan appropriately addresses its current needs, then it should revisit the plan to ensure that it is relevant for today's needs and then work in earnest to figure out how to function effectively given its current staffing crisis, which notably, is not a situation unique to Cleveland.

As it relates to equipment and technology, the biggest challenge for the City is that its current operational capacity is limited by the now outdated systems. These systems require repeated manual data entry by officers, creating opportunities for inadvertent error by busy patrol officers, and an onerous process for data analysts to review, clean, and analyze the data.

## 10. Supervision

### *Areas of Progress*

During this reporting period, CDP worked with a third-party vendor to complete and refine its curriculum for the supervisory training. The effort to create this two-day training for supervisors has been intense and valuable. The materials submitted for review endeavor to develop a common language and set of practices embraced by CDP as best practice for supervisors that emphasizes the "5E's" – empower, expect, entrust, enact, and evaluate – as critical skills to inform supervisors' actions as leaders. Similarly, the skill development and practice for on-scene recognition of critical decisions related to legal, administrative, tactics, ethical, and social provides not only the handy acronym, "LATES," but also the reminder to include the full range of issues in consideration of supervisory activities. It is essential that CDP ensure quality delivery of the training with fidelity to the curriculum and repeating the modules at appropriate intervals using the same standards.

The Division continues to ensure that newly promoted supervisors participate in timely in-service training on their roles and responsibilities as first-line supervisors. In the future, the Monitoring Team will invite CDP to file a certification of completion of training once all required training is complete – as evidence of achieving this important milestone in the Consent Decree. In the Monitoring Team's review of use of force cases occurring in 2022, WCS footage shows that supervisors are more engaged and active on scenes than in the initial review of 2018 cases.

CDP must continue to hold all levels of supervision accountable and to prepare them adequately for their role. The training for new supervisors is a critical element to the overall development of effective supervisors.

### Challenges Ahead

According to the City, all supervisors are expected to complete the new supervisor training by the end of calendar year 2023. The Monitoring Team looks forward to observing and assessing that training at its commencement. This training, which provides clear guidance to supervisors both on how to implement specific mandates of the Consent Decree, as well as generally how to mentor, coach, and oversee officers to promote positive performance and accountability, is essential for CDP's continued progress toward becoming an accountable, self-regulating police department.

As also reported in the 12th Semiannual Report, efforts on finalizing and implementing performance evaluations to ensure that front-line supervisors provide close and effective supervision, as required under the Consent Decree, appear to be stalled. The Monitoring Team continues to seek opportunities to review the work of supervisors in practice; it has and will continue to do so as Monitoring Team members engage in topic-specific assessments such as use of force, discipline, and searches and seizures. These reviews permit further assessment of adherence to ¶¶ 322 − 325.

At the conclusion of 2022, the Parties discussed the status of the OIP and requested that the Monitoring Team offer suggestions and technical assistance to CDP. CDP personnel identified potential data collection and tracking of certain items. During the assessment period, there have been no updates from CDP on the OIP process or policy. The Monitoring Team would like to see this work prioritized by CDP in the next assessment period. An important deliverable would be for the City to address the action items discussed in a December 2022 meeting on OIP. At that meeting, the City was tasked with reviewing the requirements of the OIP-relevant paragraphs in the Consent Decree against the draft policy to ensure that the policy addresses the requirements of the Consent Decree, as well as ensuring that the draft policy (and/or its accompanying procedural manual) provide sufficient guidance to ensure the program is properly implemented.

Random audits of the videos from the WCS are a critical audit function that seems not to occur in a formal way within CDP. Random audits invariably find undocumented activities that require reporting such as use of force, frisks, or searches. A recent disciplinary letter on which the Monitoring Team was copied alleged that a supervisory officer failed to conduct random audits, and in violation of policy and permitted officers and himself, without permission, not to activate their WCS. Were a formal audit function or a reporting system in place for all supervisors, CDP management would have known that this supervisor was neither using his WCS nor conducting audits of his subordinates' WCS. CDP must demonstrate the process by which supervisors are held accountable to ¶ 339 and describe the method by which management knows those audits are occurring and conducted with fidelity to the policy.

## 11. Outcome Assessments

The Consent Decree contains specific outcome assessments − mostly covered in ¶ 367 − to ensure robust measures of data for various benefits to CDP and the City. Since 2019, CDP

has taken responsibility of assembling these data, and it continues to collect the information diligently. The CDP has delivered these outcome measures to the Monitoring Team consistently. The Monitoring Team marvels at the trove of valuable information that CDP has at its fingertips within these data sets. The Monitoring Team urges CDP to consider how it can mine and apply this information, not only to understand the status of their current work, but also to improve their provision of policing services to the Cleveland community. These data present a precious opportunity that the Monitoring Team hopes CDP will take advantage of to enhance its practices.

# V. Appendix

## 1. Community Engagement and Building Trust

| PARAGRAPH  # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 14 | CDP creation of "formal and informal mechanisms that facilitate ongoing communication between CDP and the many Cleveland communities it serves." | PARTIAL COMPLIANCE |
| 15 | Creation of CPC to make recommendations, work with Cleveland communities to develop recommendations, and "report to the City and community as a whole and to provide transparency" on reforms. | GENERAL COMPLIANCE |
| 16 | CPC members "will be appointed and vacancies will be filled in accordance with the City's Charter"; and periodic meetings with Chief of Police to "provide recommendations." | PARTIAL COMPLIANCE |
| 17(a) | "[H]old public meetings across the City, complete an assessment of CDP's bias-free policing policies, practices, and training, and make recommendations." | NON-COMPLIANCE |
| 17(b) | "[A]ssist as appropriate in . . . development of training related to bias-free policing and cultural competency." | NON-COMPLIANCE |
| 17(c) | "[O]n an ongoing basis, assess CDP's community activities" and "make recommendations" related to "community engagement" and "community confidence." | NON-COMPLIANCE |
| 17(d) | "[O]n an ongoing basis, review CDP's civilian oversight structure to determine if there are changes it recommends for improving CDP's accountability and transparency." | PARTIAL COMPLIANCE |
| 18(a) | "[R]eview and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention." | NON-COMPLIANCE |
| 18(b) | [R]eview and comment on CDP's implementation of initiative, programs, and activities that are intended to support reform." | NON-COMPLIANCE |
| 18(c) | "[H]old public meetings to discuss the Monitor's reports and to receive community feedback concerning CDP's compliance with this Agreement." | PARTIAL COMPLIANCE |
| 19 | "The City will provide access to all information requested by the Commission related to its mandate, authority, and duties unless it is legally restricted." | NON-COMPLIANCE |
| 20 | CPC "will issue [at least annual] reports," which the "City will post . . . to the City's website." | NON-COMPLIANCE |

| PARAGRAPH  # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 21 | "The City will consider and timely respond in writing to the Commission's recommendations for improvements," which "will be posted to the City's website." | **NON-COMPLIANCE** |
| 22 | CPC budget listed as "separate line item" to ensure "sufficient independence and resources." | **GENERAL COMPLIANCE** |
| 23 | Facilitation of "regular communication and cooperation between CDP and community leaders at the local level," with District Policing Committees meeting "at minimum, every quarter." | **PARTIAL COMPLIANCE** |
| 24 | CPC, CDP, and Community Relations Board ("CRB") will "develop a mechanism to recruit and expand" Committee membership." CDP "will work with [Community Police] Commission to select officers for each District Policing Committee." | **NON-COMPLIANCE** |
| 25 | CDP "will work closely with District Policing Committees to identify strategies to address crime and safety issues in their District," considering and addressing identified priorities. | **PARTIAL COMPLIANCE** |
| 26 | "At least annually, each District Policing Committee will present its identified strategies, concerns, and recommendations" to the CPC, with CDP officer who is Committee member presenting to CPC "CDP's assessment of ways to address" the recommendations." | **PARTIAL COMPLIANCE** |

## 2.  Community and Problem-Oriented Policing

| PARAGRAPH  # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 27 | Implementation of "comprehensive and integrated community and problem-oriented policing model" by the City. | **PARTIAL COMPLIANCE** |
| 28 | Ensuring that "mission statement reflects [the Division's] commitment to community-oriented policing" / "integrat[ing] community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **PARTIAL COMPLIANCE** |
| 29 | Ensuring "that officers are familiar with the geographic areas they serve," "engage in problem identification," and "work proactively . . . to address quality of life issues." | **PARTIAL COMPLIANCE** |

Cleveland Police Monitoring Team | 13th Semiannual Report | October 2023

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 30 | Initial and annual in-service community and problem-oriented policing training "adequate in quality, quantity, type, and scope" that addresses specifically identified areas. | NON-COMPLIANCE |
| 31 | Maintenance of "collaborative partnerships with a broad spectrum of community groups," including CDP meetings with community organizations and District Policing Committees. | PARTIAL COMPLIANCE |
| 32 | CDP "meet[ing] with members of the community in each District on a monthly basis and "solic[itation of] participation from a broad cross-section of community members in each District" to "identify problems and other areas of concern . . . and discuss responses and solutions." | PARTIAL COMPLIANCE |
| 33 | Development and implementation of "systems to monitor officer outreach to the community" that CDP "will use . . . to analyze . . . whether officers are partnering with a broad cross-section of community members to develop and implement cooperative strategies that build mutual respect and identify and solve problems." | PARTIAL COMPLIANCE |
| 34 | "At least annually, CDP will present the results" of paragraph 33 analysis "broken out by District in a publicly-available community policing report" that describes problems, solutions, and obstacles. Report provided to Commission and posted on CDP website. | NON-COMPLIANCE |

## 3.  Bias-Free Policing

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 35 | Delivery of "police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias," among other things. | PARTIAL COMPLIANCE |
| 36 | "CDP will integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | PARTIAL COMPLIANCE |
| 37 | CDP will ensure that it "administer[s] all activities without discrimination" on basis of various protected classes | PARTIAL COMPLIANCE |
| 38 | "CDP will develop a bias-free policing policy" incorporating CPC recommendations "that provides clear guidance to officers" | OPERATIONAL COMPLIANCE |
| 39-40 | Develop bias-free policing and procedural justice training "adequate in quality, quantity, scope, and type" covering specific areas within 18 months of the Effective Date. | OPERATIONAL COMPLIANCE |
| 41 | Supervisor training on bias-free policing and procedural justice issues covering specific areas | PARTIAL COMPLIANCE |
| 42 | Annual in-service training on bias-free policing "adequate in quality, quantity, type, and scope" | PARTIAL COMPLIANCE |
| 43 | Analysis of paragraph 265 data ("including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination") | NON-COMPLIANCE |
| 44 | Consideration of "bias-free policing and equal protection" principles in hiring, unit assignment, promotion, and performance assessments. | PARTIAL COMPLIANCE |

## 4. Use of Force

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 45 | "CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force" complies with the Constitution, federal law, and the Consent Decree "and that any use of unreasonable force is promptly identified and responded to appropriately." | OPERATIONAL COMPLIANCE |
| 46 | "The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers . . . will comply" with at least twelve major, listed principles. | PARTIAL COMPLIANCE |
| 47 | Division "will ensure that the [use of force] incident is accurately and properly reported, documented, and investigated." | PARTIAL COMPLIANCE |
| 48 | "CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends." | OPERATIONAL COMPLIANCE |
| 49 | Development of use of force policies "that comply with applicable law[,] . . . are adequate to achieve the goals described in paragraph 45," and "specify that unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability." | OPERATIONAL COMPLIANCE |
| 50 | "CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons." | OPERATIONAL COMPLIANCE |
| 51 | Weapon-specific policies "will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon." | OPERATIONAL COMPLIANCE |
| 52 | "No officer will carry any weapon that is not authorized or approved by CDP." | OPERATIONAL COMPLIANCE |
| 53 | "Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of weapon is imminent, and allow the subject an opportunity to comply." | OPERATIONAL COMPLIANCE |
| 54-83 | "The City will implement policies" for firearms, ECWs (Tasers), and OC (pepper) spray that comply with a host of specific, expressly listed provisions. | OPERATIONAL COMPLIANCE |
| 84 | CDP "will provide all current officers use of force training that is adequate in quality, quantity, scope, | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| | and type and that includes" a number of specific, expressly listed elements. | |
| 85 | CDP "will provide the use of force training described in paragraph 84 to all new officers." | OPERATIONAL COMPLIANCE |
| 86 | "CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope." | OPERATIONAL COMPLIANCE |
| 87 | "CDP will develop and implement a single, uniform reporting system pursuant to a Use of Force reporting policy" that complies with the force Level categorization set forth in the paragraph. | GENERAL COMPLIANCE |
| 88 | Requiring "[a]ll officers using or observing force" to complete a Use of Force Report including a number of specific features and avoiding "conclusory statements, 'boilerplate', or 'canned' language." | OPERATIONAL COMPLIANCE |
| 89 | "Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports." | OPERATIONAL COMPLIANCE |
| 90 | "Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable." | OPERATIONAL COMPLIANCE |
| 91 | Requirement to "notify . . . supervisors . . . as soon as practical following any use of force" and if becoming aware of "an allegation of unreasonable or unreported force by another officer." | OPERATIONAL COMPLIANCE |
| 92 | "Use of Force Reports will be maintained centrally." | OPERATIONAL COMPLIANCE |
| 93 | "A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval." | OPERATIONAL COMPLIANCE |
| 94 | Setting specific requirements relating to the investigation of low-level, Level 1 force. | OPERATIONAL COMPLIANCE |
| 95-109 | Setting specific requirements relating to the investigation by supervisors and/or CDP chain of command for investigation and review of Level 2 force. | OPERATIONAL COMPLIANCE |
| 110 | "CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP." | OPERATIONAL COMPLIANCE |
| 111 | Creation and design of dedicated Force Investigation Team (FIT) that "will conduct administrative investigations . . . and criminal investigations" of serious force, "force involving potential criminal conduct," in-custody deaths, and cases assigned to it by the Chief. | PARTIAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 112 | Composition of FIT Team. | OPERATIONAL COMPLIANCE |
| 113 | "FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type" on a host of specific, expressly-listed topics both initially and annually thereafter. | OPERATIONAL COMPLIANCE |
| 114 | "CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement." | OPERATIONAL COMPLIANCE |
| 115 | Response of FIT to use of force scenes. FIT notification of prosecutor's office. Notification of designated outside agency to conduct criminal investigation if City elects to use external agency for such investigations. | OPERATIONAL COMPLIANCE |
| 116 | "CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation." | PARTIAL COMPLIANCE |
| 117 | Memorandum of understanding required between CDP and outside agency containing specific, expressly-listed provisions. | OPERATIONAL COMPLIANCE |
| 118 | Setting forth various, specific, and expressly-listed responsibilities of FIT during its investigations. | PARTIAL COMPLIANCE |
| 119 | N/A | N/A |
| 120 | Providing for delay of compelled interview if "case has the potential to proceed criminally" but otherwise requiring that "[n]o other part of the investigation . . . be held in abeyance" unless "specifically authorized by the Chief" in consultation with investigating agency and prosecutor's office. | PARTIAL COMPLIANCE |
| 121 | Requiring completion of preliminary report presented to Chief or Chief's designee "as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force." | PARTIAL COMPLIANCE |
| 122 | Completion of investigation within 60 days. Preparation of FIT investigation report. Review of FIT investigative report by head of Internal Affairs who "will approve or disapprove FIT's recommendations, or request . . . additional investigation." | NON-COMPLIANCE |
| 123 | Revision of FIT manual to ensure "consisten[cy] with the force principles" and several specific, expressly-listed provisions. | OPERATIONAL COMPLIANCE |
| 124 | "The City will develop and implement a Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 125 | Requiring "training on legal updates, updates on CDP's policies, and CDP training curriculum related to the use of force" for each member. | PARTIAL COMPLIANCE |
| 126 | Mandating "comprehensive and reliable reviews of investigations within 90 days of submission to the FRB," and encompassing officer's decision-making at the moment force was used as well asl "the circumstances leading up to the use of force, tactical decisions, information sharing and communication, adequacy of supervision, equipment, training, CDP's medical response, when applicable, and any commendable actions" and actions and inactions of all involved members. | PARTIAL COMPLIANCE |
| 127 | Description of reviews, which will: ensure objective and complete investigations and findings supported by preponderance of the evidence; be presented by the investigator or District representative (for supervisors); review written records and discuss the case with the presenter; order additional investigation when needed; determine whether the case raises concerns about policing, training, equipment, supervision, medical response, communication, or tactics and referral to appropriate unit; recommending non-disciplinary action; and documenting FRB findings and recommendations within 15 days of each presentation. | OPERATIONAL COMPLIANCE |
| 128 | "The FRB will assess the quality of the investigations," including whether they are "objective and comprehensive and recommendations are supported by a preponderance of evidence. The FRB will identify and document any deficiencies that indicate a need for corrective action" | PARTIAL COMPLIANCE |
| 129 | "Annually, the FRB will examine the data related to use of force" provided by the DACC per ¶261 (and in conjunction with ¶266) "to detect any patterns, trends, and training deficiencies and make recommendations for correction as appropriate" and will provide the analysis to the Monitor. | PARTIAL COMPLIANCE |
| 130 | The FRB will work with the DACC to "develop a tracking system to ensure that each of its recommendations has been forwarded to the appropriate personnel. The Chief or his or her designee will ensure that the FRB's recommendations, including non-disciplinary corrective action, are implemented as appropriate." | OPERATIONAL COMPLIANCE |

## 5.  Crisis Intervention

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 131 | "CDP will build upon and improve its Crisis Intervention Program" in furtherance of four specific, expressly-listed goals, which "will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health system and create a context for sustainable change." | OPERATIONAL COMPLIANCE |
| 132 | Establishment of Mental Health Response Advisory Committee (the "Advisory Committee") "to foster relationships and build support between the police, community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis." | GENERAL COMPLIANCE |
| 133 | Composition of Advisory Committee. | GENERAL COMPLIANCE |
| 134 | "The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program." | GENERAL COMPLIANCE |
| 135 | Advisory Committee will conduct an annual "analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers" and communications "are appropriately responding to people in crisis," and will also "recommend appropriate changes." | PARTIAL COMPLIANCE |
| 136 | "The Advisory Committee's reports and recommendations will be provided" to CPC, "be publicly available, and will be posted on the City's website." | GENERAL COMPLIANCE |
| 137 | CDP will designate a Crisis Intervention Coordinator for specific, expressly-identified purposes. | GENERAL COMPLIANCE |
| 138 | "Coordinator will develop and maintain partnerships with program stakeholders and serve as point of contact" and "resource" for other stakeholders. | GENERAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 139 | "Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, call-takers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program." | GENERAL COMPLIANCE |
| 140 | "Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate." | OPERATIONAL COMPLIANCE |
| 141 | "Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers" and "to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls." | PARTIAL COMPLIANCE |
| 142 | "Coordinator will create ways to recognize and honor specialized CIT officers, call-takers, and dispatchers." | OPERATIONAL COMPLIANCE |
| 143 | Initial and annual crisis intervention training to all officers and recruits that is "adequate in quality, quantity, type, and scope." | GENERAL COMPLIANCE |
| 144 | Initial and annual crisis intervention training for dispatchers and call-takers. | GENERAL COMPLIANCE |
| 145 | "The City will provide enhanced specialized training in responding to individuals in crisis to certain officers ('specialized CIT officers')," who will be "called upon to respond to incidents or calls involving individuals in crisis." | OPERATIONAL COMPLIANCE |
| 146 | Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | GENERAL COMPLIANCE |
| 147 | Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | OPERATIONAL COMPLIANCE |
| 148 | Designation of specialized CIT officers, per specific, expressly-listed requirements. | OPERATIONAL COMPLIANCE |
| 149 | "Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized officers." | OPERATIONAL COMPLIANCE |
| 150 | "All Field Training Officers" ("FTO"s) "will receive the enhanced specialized crisis intervention training described in paragraph 146," though FTOs will "not be designated as a specialized CIT officer" unless they volunteer and have been selected to do so. | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 151 | "Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene," with supervisors "seek[ing] the input of a specialized CIT officer . . . where it is reasonable for them to do so." | PARTIAL COMPLIANCE |
| 152 | "[T]he Coordinator will develop an effective specialized crisis intervention plan . . . to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis" that includes various, specific, expressly-identified requirements. The City "will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis." | PARTIAL COMPLIANCE |
| 153 | City "will consider" crisis intervention program assessment by Ohio Criminal Justice Coordinating Center of Excellence. | GENERAL COMPLIANCE |
| 154 | CDP "will revise its policies to make clear that a crisis intervention response may be necessary even in situations where there has been an apparent law violation." | GENERAL COMPLIANCE |
| 155 | CDP "will revise its current crisis intervention policy to ensure that specialized CIT officers have appropriate discretion to direct individuals . . . to the health care system, rather than the judicial system . . . where it is appropriate to do so." | GENERAL COMPLIANCE |
| 156 | CDP policies and procedures will ensure that "specialized CIT officers . . . must be dispatched to all calls or incidents that appear to involve an individual in crisis." CDP must "track incidents in which a specialized officer was not dispatched to such calls" and "identify any barriers" to ensuring dispatch of specialized CIT officer to such calls. | PARTIAL COMPLIANCE |
| 157 | "CDP will track calls and incidents involving individuals in crisis by gathering, at a minimum," specific, expressly-identified data. | OPERATIONAL COMPLIANCE |
| 158 | Public reporting of paragraph 157 data and provision to Advisory Committee. | OPERATIONAL COMPLIANCE |
| 159 | "The City will utilize" paragraph 157 data "to identify training needs and develop case studies and teaching scenarios" for training and other expressly-identified systemic purposes. | OPERATIONAL COMPLIANCE |

## 6. Search and Seizure

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 160 | "CDP will revise, develop, and implement search and seizure policies that comply with applicable law, . . . include the requirements below," and conform to expressly-identified principles. | PARTIAL COMPLIANCE |
| 161-165 | Policy requirements for officers for stops, searches, and detentions | PARTIAL COMPLIANCE |
| 166 | "Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assault on an officer and no other substantive violation is alleged," and "the supervisor will respond to the scene." | PARTIAL COMPLIANCE |
| 167 | "Officers will not use 'canned' or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests." | PARTIAL COMPLIANCE |
| 168 | "Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports." CDP "will train officers" on documenting stops. "Supervisors will review all documentation of investigatory stops, searches, and arrests." | PARTIAL COMPLIANCE |
| 169 | Supervisor will review of "each arrest report by officers under their command," with supervisors reviewing reports for specific, expressly-identified deficiencies. | PARTIAL COMPLIANCE |
| 170-172 | Supervisory review of investigatory stops, searches, and arrests. | PARTIAL COMPLIANCE |
| 173 | Provision of "initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements" of the Consent Decree that "will address the requirements of Fourth Amendment and related law, CDP policies," and specific, expressly-identified topics. | OPERATIONAL COMPLIANCE |
| 174-175 | Provision of "annual search and seizure in-service training that is adequate in quality, quantity, type, and scope" incorporating specific, expressly-identified topics. | OPERATIONAL COMPLIANCE |

## 7. Accountability

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 176 | The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process." | PARTIAL COMPLIANCE |
| 177 | "Internal Affairs will conduct objective, comprehensive, and timely investigations of all internal allegations," with "findings . . . based on the preponderance of the evidence standard" that must "be clearly delineated in policies, training, and procedures and accompanied by detailed examples to ensure proper application by investigators." | PARTIAL COMPLIANCE |
| 178 | "Internal Affairs will be headed by a qualified civilian" who "will report directly to the Chief of Police. | OPERATIONAL COMPLIANCE |
| 179 | Qualifications for IA investigators. | PARTIAL COMPLIANCE |
| 180 | Initial training for IA investigators "that is adequate in quality, quantity, scope, and type on conducting misconduct investigations" that addresses specific, expressly- identified topics. | PARTIAL COMPLIANCE |
| 181 | "[A]nnual training" for IA investigators "that is adequate in quality, quantity, type and scope" | PARTIAL COMPLIANCE |
| 182 | "In each investigation, Internal Affairs will collect and consider" all evidence. "[N]o automatic preference for an officer's statement over a non-officer's statement." No disregard of a "witnesses' statement solely because of" connection to the complainant or criminal history. IA investigators must "make all reasonable efforts to resolve material inconsistencies between witness statements." | PARTIAL COMPLIANCE |
| 183 | IA "will evaluate all relevant police activity and any evidence of potential misconduct uncovered during the course of the investigation." | PARTIAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 184 | IA will not consider guilty plea or verdict as "determinative of whether a CDP officer engaged in misconduct" or justification for "discontinuing the investigation." | PARTIAL COMPLIANCE |
| 185 | IA "will complete its administrative investigations within 30 days from the date it learns of the alleged misconduct." | PARTIAL COMPLIANCE |
| 186-187 | IA investigative report requirements. | PARTIAL COMPLIANCE |
| 188 | Forwarding of completed IA investigations "to the officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator." | PARTIAL COMPLIANCE |
| 189 | "CDP will require any CDP employee who observes or becomes aware of any" potential misconduct to "report the incident to a supervisor or directly to" IA. | OPERATIONAL COMPLIANCE |
| 190 | "CDP will develop a system that allows officers to confidentially and anonymously report potential misconduct by other officers." | OPERATIONAL COMPLIANCE |
| 191 | "CDP will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." | OPERATIONAL COMPLIANCE |
| 192 | "Officers who retaliate . . . will be subject to the disciplinary process." | PARTIAL COMPLIANCE |
| 193 | OPS investigates "all complaints of misconduct it receives" and will confer with IA "to develop policies and procedures for handling matters over which they both have investigative jurisdiction." | OPERATIONAL COMPLIANCE |
| 194 | "The City will ensure that OPS is led by an administrator with the skills, expertise, and experience to effectively manage the intake, tracking, timely, and objective investigation of complaints"; implement PRB training; "assess OPS's equipment and staffing needs"; and "develop and implement performance standards for OPS." | PARTIAL COMPLIANCE |
| 195-196 | Initial training for OPS investigators "adequate in quality, quantity, scope, and type," including specific, expressly-listed topics. | OPERATONAL COMPLIANCE |
| 197 | "OPS Investigators will not be current members of the CDP, and no CDP personnel will have any active role in OPS's operations." | GENERAL COMPLIANCE |
| 198 | "The City will ensure that the lawyer representing OPS does not have any actual or apparent conflicts of interest." | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 199 | "OPS will have its own budget, separate from . . . the Department of Public Safety" that "affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement." | GENERAL COMPLIANCE |
| 200 | Development and implementation of OPS operations manual "made available to the public" that covers specific, expressly-listed topics. | PARTIAL COMPLIANCE |
| 201 | Development and implementation of "a program to promote awareness through the Cleveland community about the process for filing complaints with OPS." | PARTIAL COMPLIANCE |
| 202 | "CDP and the City will work with the police unions . . . to allow civilian complaints to be submitted to OPS verbally or in writing; in person, by phone, or on line; by a complainant, someone acting on his or her behalf, or anonymously; and with or without a signature from the complainant," with all "complaints documented in writing." | GENERAL COMPLIANCE |
| 203 | CDP will post and maintain by the intake window at CDP headquarters and all District headquarters a permanent placard describing the civilian complaint process" and containing specific, expressly-listed information. | OPERATIONAL COMPLIANCE |
| 204 | "CDP will provide training that is adequate in quality, quantity, scope, and type to all police personnel, including dispatchers, to properly handle complaint intake, including" with respect to specific, expressly-listed topics. | PARTIAL COMPLIANCE |
| 205 | CDP officers "carry complaint forms in their CDP vehicles," which officers must provide "upon request." Supervisors will be dispatched to scene when an individual wants to make a complaint, with the supervisor providing a copy of completed complaint form "or a blank form to be completed later by the individual." | OPERATIONAL COMPLIANCE |
| 206 | "The City and OPS will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including a number of specific, expressly-listed locations. | OPERATIONAL COMPLIANCE |
| 207 | "OPS's complaint form will not contain any language that could reasonably be construed as discouraging the filing of a complaint, including warnings about the potential criminal consequences for filing false complaints." | GENERAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 208 | Availability of complaint forms in English and Spanish. "OPS will make every effort to ensure that complainants who speak other languages . . . can file complaints in their preferred language." | **OPERATIONAL COMPLIANCE** |
| 209 | "City will ensure that civilian complaints submitted through other existing systems, including the Mayor's Action Center and the Department Action Center, are immediately forwarded to OPS for investigation." | **OPERATIONAL COMPLIANCE** |
| 210 | "OPS will establish a centralized electronic numbering and tracking system for all complaints," which "will maintain accurate and reliable data regarding the number, nature, and status of all complaints . . . including investigation timeliness and notification of the interim status and final disposition of the complaint." It "will be used to monitor and maintain appropriate caseloads for OPS investigators." | **OPERATIONAL COMPLIANCE** |
| 211 | Biased policing tracked as a separate category of complaint that "are captured and tracked appropriately, even if the complainant does not so label the allegation." | **OPERATIONAL COMPLIANCE** |
| 212 | "[A]llegations of unlawful investigatory stops, searches, or arrests" tracked as a separate category of complaints. | **OPERATIONAL COMPLIANCE** |
| 213 | "[A]llegations of excessive use of force" tracked as separate category of complaints. | **OPERATIONAL COMPLIANCE** |
| 214 | "OPS will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends." | **PARTIAL COMPLIANCE** |
| 215 | "OPS will produce, at least annually, a public report summarizing complaint trends, including" with respect several specific, expressly-identified areas. | **PARTIAL COMPLAINCE** |
| 216 | Assignment of complaints to Standard and Complex investigatory tracks. | **OPERATIONAL COMPLIANCE** |
| 217 | Dismissal and/or administrative dismissal of complaint investigations. | **OPERATIONAL COMPLIANCE** |
| 218 | "The City will ensure that investigations of complaints are as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of the evidence." | **PARTIAL COMPLIANCE** |
| 219 | "CDP will ensure that OPS has timely access to all reports related to the incident . . ," and authority of OPS "to conduct additional investigation" of any complaint of police misconduct when CDP investigation has already taken place relating to the incident. | **PARTIAL COMPLIANCE** |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 220 | "OPS investigators will attempt to interview each complainant in person" and record the interview. | OPERATIONAL COMPLIANCE |
| 221 | "The Chief will order officers who witnessed or participate in an incident that is the subject of an OPS complaint to cooperate with the OPS investigation," including by responding to written questions or sitting for an in-person interview. | GENERAL COMPLIANCE |
| 222 | "OPS investigators will have access to any relevant disciplinary information in the record of an officer who is the subject of a current investigation." | PARTIAL COMPLIANCE |
| 223 | "OPS will consider all relevant evidence," with no preferences for particular witness's statements, including of officer over a non-officer, or because of connection to complainant or criminal history. "OPS will make all reasonable efforts to resolve material inconsistencies between witness statements." | PARTIAL COMPLIANCE |
| 224 | OPS findings categories. | OPERATIONAL COMPLIANCE |
| 225 | "OPS will document in writing the investigation of each complaint, including all investigatory steps taken, and OPS's findings and conclusions," which must "be supported by a preponderance of the evidence. | GENERAL COMPLIANCE |
| 226 | "In addition to determining whether an officer committed the conduct alleged in the complaint and whether it violated policy, OPS may consider whether: (a) the police action was in compliance with training and legal standards; (b) the incident indicates a need for additional training, counseling, or other corrective measures; and (c) the incident suggests that CDP should revise its policies, strategies, tactics, or training. OPS may include recommendations on these topics in its investigation." | PARTIAL COMPLIANCE |
| 227 | "OPS will forward all investigations and its written conclusions to PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation." | PARTIAL COMPLIANCE |
| 228 | "OPS will send periodic written updates" to the complainant at specific, expressly- identified junctures. | OPERATIONAL COMPLIANCE |
| 229 | "[A] complainant may contact OPS at any time to determine the status of his/her complaint." | OPERATIONAL COMPLIANCE |
| 230 | "Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot" addressing PRB composition and appointment process. | GENERAL COMPLIANCE |

Cleveland Police Monitoring Team | 13th Semiannual Report | October 2023

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 231 | "PRB members will not be current or former members of the CDP." | GENERAL COMPLIANCE |
| 232 | "PRB will have its own budget," overseen by OPS Administrator and separate from Department of Public Safety, that "affords sufficient independence and resources." | OPERATIONAL COMPLIANCE |
| 233-234 | Initial training for PRB members "that is adequate in quality, quantity, scope, and type" and that covers specific, expressly-identified topics. | PARTIAL COMPLIANCE |
| 235 | PRB meetings open to the public and posted in advance, with "case presentations and PRB votes" occurring during "open session." | GENERAL COMPLIANCE |
| 236 | "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings . . . ." PRB may "ask the investigator to conduct further investigation" as necessary. | GENERAL COMPLIANCE |
| 237 | "PRB recommended dispositions will be based on a preponderance of the evidence. For each case, PRB shall set forth its conclusion and an explanation of its reasons and supporting evidence in writing, including, when applicable, the justification for departing from OPS's recommended disposition." | PARTIAL COMPLIANCE |
| 238 | "In cases where PRB is recommending a sustained disposition, in whole or in part, PRB will include a recommendation as to disciplinary or non-disciplinary corrective action." | OPERATIONAL COMPLIANCE |
| 239 | [Timely] forwarding of PRB recommendations to Chief of Police and Director of Public Safety. | PARTIAL COMPLIANCE |
| 240 | "The Chief of CDP will issue a General Police Order that requires officers to (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB." | GENERAL COMPLIANCE |
| 241 | Disciplinary hearing requirement, with officer given "opportunity to testify" and suspension of hearing if "officer provides new or additional evidence at hearing," with matter "returned to IA or PRB for consideration." | PARTIAL COMPLIANCE |
| 242 | Disciplinary recommendations by PRB to proceed through the City's disciplinary process. Written justification by Chief or Director of their disagreement with PRB's recommendations. | OPERATIONAL COMPLIANCE |
| 243 | "CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition." | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 245 | "The City will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented." | PARTIAL COMPLIANCE |
| 246 | "[T]he City will review its current matrix and will seek to amend it" "to ensure consistency" and inclusion of a number of specific, expressly-identified features. | OPERATIONAL COMPLIANCE |
| 247 | "All disciplinary decisions will be documented in writing." | GENERAL COMPLIANCE |
| 248 | "[T]he City will provide its disciplinary matrix to the PRB, Commission, the Police Inspector General, and the police unions for comment." | OPERATIONAL COMPLIANCE |
| 249 | "CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years." | PARTIAL COMPLIANCE |

## 8. Transparency and Oversight

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 250 | "The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a Police Inspector General" ("IG"). City must seek CPC's "input in developing minimum qualifications and experience" for IG. | NON-COMPLIANCE |
| 251 | "The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a Police Inspector General" ("IG"). City must seek CPC's "input in developing minimum qualifications and experience" for IG. | NON-COMPLIANCE |
| 252 | IG work in Office of Mayor but report to Chief of Police. | NON-COMPLIANCE |
| 253 | IG "will not be a current or former employee of CDP." | NON-COMPLIANCE |
| 254 | Duties and authority of IG. | NON-COMPLIANCE |
| 255 | Budget of IG must be "a separate line item" in City budget and "afford[] sufficient independence and resources" to comply with Consent Decree. | NON-COMPLIANCE |
| 256 | IG "will have access to all documents and data necessary to perform the above functions, including any raw data." | NON-COMPLIANCE |
| 257 | "CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| | broad access to information related to CDP's decision making and activities. To achieve this outcome, CDP will designate an individual or individuals as the 'Data Collection and Analysis Coordinator.'" | |
| 258 | Coordinator "will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials," including specific, expressly-listed materials and information. | **OPERATIONAL COMPLIANCE** |
| 259 | Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents," including specific, expressly-identified data. | **GENERAL COMPLIANCE** |
| 260 | Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation." The system must conform to a number of specific, expressly-identified requirements. | **OPERATIONAL COMPLIANCE** |
| 261 | Coordinator must "routine[ly] report[] . . . relevant data to the Chief of Police, FRB, Training Review Committee, OPS, the [Community Police] Commission, and the Police Inspector General." | **PARTIAL COMPLIANCE** |
| 262 | Coordinator "responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection." | **OPERATIONAL COMPLIANCE** |
| 263 | Coordinator "will develop a protocol to accurately analyze the data collected and allow for" various outcome measurements, "subject to the review and approval of the Monitor and DOJ." | **OPERATIONAL COMPLIANCE** |
| 264 | Annually, "CDP will conduct an assessment and issue a report summarizing its investigatory stop, search, and arrest data" that addresses various specific, expressly-identified topics. | **PARTIAL COMPLIANCE** |
| 265 | Annually, "CDP will conduct an assessment and issue a report of all activities, including use of force, arrests, motor vehicles and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race" or other listed prohibited classes or characteristics, and that addresses various specific, expressly-identified topics. | **NON-COMPLIANCE** |
| 266 | Annual analysis of "prior year's force" data with FRB. | **PARTIAL COMPLIANCE** |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 267 | "[A]ll CDP audits, reports, and outcome analyses related to the implementation" of the Consent Decree will be public. | PARTIAL COMPLIANCE |
| 268 | "CDP will post its policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports on its website." | PARTIAL COMPLIANCE |

## 9. Officer Assistance and Support

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 269 | "The City will ensure that officers receive adequate training to understand: (a) how to police effectively and safely in accordance with CDP policy; [and] (b) the requirements of this Agreement, Ohio law, and the Constitution and laws of the United States," including in the areas of "procedural justice, bias-free policing, and community policing." | PARTIAL COMPLIANCE |
| 270 | "CDP will expand the scope and membership of the Training Review Committee." | PARTIAL COMPLIANCE |
| 271-272 | "[T]he Training Review Committee will develop a written training plan for CDP's recruit academy, probationary field training, and in-service training" that addresses a host of specific, expressly-identified issues. | PARTIAL COMPLIANCE |
| 273 | "The Training Plan and schedule will be implemented once any objections have been resolved" on a yearly basis. | OPERATIONAL COMPLIANCE |
| 274 | "The City, including the Training Review Committee, will annually review and update CDP's training plan" by "conduct[ing] a needs assessment" that addresses a number of specific, expressly-identified data and information on real-world trends, needs, policy, and law. | OPERATIONAL COMPLIANCE |
| 275 | "CDP's Commander responsible for training" will be in charge of "all CDP training." | PARTIAL COMPLIANCE |
| 276 | "CDP will designate a single training coordinator in each District. The Commander responsible for training will establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the" training Commander. | PARTIAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 277 | "CDP will develop recruit academy and in-service curricula that comport with" the Training Plan and Consent Decree requirements. | PARTIAL COMPLIANCE |
| 279 | "For all other substantive updates or revisions to policy or procedure, the City will ensure and document that all relevant CDP personnel have received and read the policy or procedure. Notification of each revision or update will include the rationale for policy changes and the difference between the old and updated policy." | PARTIAL COMPLIANCE |
| 280 | Training Commander reviews all training materials; ensures that they use "a variety of adult learning techniques, scenario-based training, and problem-solving practices"; and "ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Review Committee." | PARTIAL COMPLIANCE |
| 281 | "CDP will ensure that instructors are qualified and use only curricula and lesson plans that have been approved by the" Training Commander. | PARTIAL COMPLIANCE |
| 282 | "CDP will revise, as necessary, its field training program for graduates of the police academy to comport with" the Training Plan and Consent Decree. | NON-COMPLIANCE |
| 283 | "The field training program will incorporate community and problem-oriented policing principles, and problem-based learning methods." | NON-COMPLIANCE |
| 284 | Review and revision of Field Training Officer ("FTO") "participation policy to establish and implement a program that effectively attracts the best FTO candidates" and "revise eligibility criteria" for FTOs. | NON-COMPLIANCE |
| 285 | New FTOs and Field Training Sergeants must "receive initial and in-service training that is adequate in quality, quantity, scope, and type, and that addresses" a number of specific, expressly-listed topics and conforms to a number of additional features or requirements. | NON-COMPLIANCE |
| 286 | "CDP will create a mechanism for recruits to provide confidential feedback regarding the quality of their field training," and the Division "will document its response, including the rationale behind any responsive action taken or decision to take no action." | NON-COMPLIANCE |
| 287 | "The City and the Training Review Committee will, on an annual basis, analyze all aspects of CDP's FTO program," "consider emerging national policing practices in this area," and "recommend, | NON-COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| | and CDP will institute, appropriate changes to policies, procedures, and training related to its FTO program." | |
| 288 | "CDP will document all training provided to or received by CDP officers," with officers "sign[ing] an acknowledgement of attendance or digitally acknowledge[ing] completion of each training course," which "will be maintained in a format that allows for analysis by training type, training date, training source, and by individual officer name." | PARTIAL COMPLIANCE |
| 289 | "CDP will develop and implement a system that will allow the Training Section to electronically track, maintain, and produce complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system." | OPERATIONAL COMPLIANCE |
| 290 | "The City will develop and implement accountability measures . . . to ensure that all officers successfully complete all required training programs in a timely manner." | PARTIAL COMPLIANCE |
| 291 | "The City will implement" paragraphs regarding equipment and resources in order to allow implementation of the Consent Decree "and to allow officers to perform their jobs safely, effectively, and efficiently." | PARTIAL COMPLIANCE |
| 292 | "CDP will complete a comprehensive equipment and resource study to assess its current needs and priorities," and it "will develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." | OPERATIONAL COMPLIANCE |
| 293 | "CDP's Equipment and Resource Plan will provide for necessary equipment including, at least" "an adequate number of computers"; "an adequate number of operable and safe zone cars"; "zone cards with reliable, functioning computers that provide officers with up-to-date technology" including computer-aided dispatch, the records management system, and various core law enforcement systems; and "zone cars equipped with first-aid kits." "This plan also will ensure that CDP properly maintains and seeks to continuously improve upon existing equipment and technology; and is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 294 | "CDP will actively seek input and feedback from the Commission, patrol officers, and supervisors regarding resource allocation, equipment needs, and technological improvements." | NON-COMPLIANCE |
| 295 | "City and CDP" must "us[e] best efforts to implement the Equipment and Resource Plan as required." | OPERATIONAL COMPLIANCE |
| 296 | "CDP will . . . implement an effective, centralized records management system." | OPERATIONAL COMPLIANCE |
| 297 | "CDP will utilize a department-wide e-mail system to improve communication and information sharing." | OPERATIONAL COMPLIANCE |
| 298 | "CDP will employ information technology professionals who are trained to conduct crime and intelligence analysis, who are capable of troubleshooting and maintaining information technology systems and who can identify and suggest appropriate technological advancements." | OPERATIONAL COMPLIANCE |
| 299 | "CDP will implement an effective employee assistance program that provides officers ready access to the mental health and support resources necessary to facilitate effective and constitutional policing." | PARTIAL COMPLIANCE |
| 300 | "The City will review and revise . . . its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals." | OPERATIONAL COMPLIANCE |
| 301 | "The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP." | GENERAL COMPLIANCE |
| 302 | "CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community" and meets certain specific, expressly-listed requirements. | OPERATIONAL COMPLIANCE |
| 303 | "The City will implement the recruitment plan within 60 days of it being approved by the Monitor." | OPERATIONAL COMPLIANCE |
| 304 | "CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants," including officers with various, specific, expressly-listed skills and backgrounds. | PARTIAL COMPLIANCE |

Cleveland Police Monitoring Team | 13th Semiannual Report | October 2023

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 305 | "In developing and implementing its recruitment plan, CDP will consult with the [Community Police] Commission and other community stakeholders on strategies to attract a diverse pool of applicants." | PARTIAL COMPLIANCE |
| 306 | "[O]bjective system for hiring and selecting recruits" that "employs reliable and valid selection criteria." | PARTIAL COMPLIANCE |
| 307 | "CDP will report annually to the public its recruiting activities and outcomes," which will include information on various, expressly-listed areas. | OPERATIONAL COMPLIANCE |
| 308 | "[A]ll candidates for sworn personnel positions" will have "psychological and medical examination" and be subject to "drug testing." Existing officers receive "random drug testing." | GENERAL COMPLIANCE |
| 309 | "CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions" that cover various, expressly-listed topics. | PARTIAL COMPLIANCE |
| 310 | "CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's supervisor(s)" and maintain any "salient information . . . in candidate's file." | OPERATIONAL COMPLIANCE |
| 311 | "If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation" addressing various expressly-identified things. | PARTIAL COMPLIANCE |
| 312 | "CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process" and "are identified and receive appropriate consideration for performance." Likewise, "poor performance" must be "reflected in officer evaluations." | NON-COMPLIANCE |
| 313 | "The City will develop and implement fair and consistent practices to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis." | NON-COMPLIANCE |
| 314–315 | CDP will use "a formalized system documenting the annual performance evaluations of each officer by the officer's direct supervisor," including an assessment of several expressly-listed areas. "Supervisors will meet with the employee whose performance is being evaluated to discuss the evaluation." | NON-COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 316 | "CDP will hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates." | NON-COMPLIANCE |
| 317 | "The City will develop and implement fair and consistent promotion practices that comport with the requirements of this Agreement and result in the promotion of officers who are effective and professional." | NON-COMPLIANCE |
| 318 | In considering promotion, "appointing authority will consider" specific, expressly- listed "factors." | NON-COMPLIANCE |
| 319 | "CDP will complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform the functions necessary for CDP to fulfill its mission and satisfy the requirements of the" Consent Decree. / "CDP will develop an effective, comprehensive Staffing Plan that is consistent with its mission, including community and problem-oriented policing, and that will allow CDP to meet the requirements of" the Consent Decree. | OPERATIONAL COMPLIANCE |
| 320 | Requirements of CDP Staffing Plan. | PARTIAL COMPLIANCE |
| 321 | "The City and CDP will employ best efforts to implement the Staffing Plan over the period of time set forth in the approved plan." | PARTIAL COMPLIANCE |

## 10.  Supervision

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 322 | "CDP will ensure that first line supervisors provide close and effective supervision of officers" in a number of express, specifically-identified ways. | PARTIAL COMPLIANCE |
| 323 | "CDP will develop and implement supervisory training for all new and current supervisors" that is "adequate in quality, quantity, type, and scope, and will include" a number of specific, expressly-listed topics. | PARTIAL COMPLIANCE |
| 324 | "Thereafter all sworn supervisors will receive adequate in-service management training." | PARTIAL COMPLIANCE |
| 325 | "CDP will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community." | PARTIAL COMPLIANCE |
| 326 | CDP "will create a plan to modify its Officer Intervention Program ('OIP') to enhance its effectiveness as a management tool to promote supervisory awareness and proactive identification of potentially problematic behavior among officers. | NON-COMPLIANCE |

| PARAGRAPH  # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 327 | "CDP supervisors will regularly use OIP data to evaluate the performance of CDP officers across all ranks, units, and shifts." | NON-COMPLIANCE |
| 328 | "The OIP will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" in a number of specific, expressly-identified areas. | NON-COMPLIANCE |
| 329 | "CDP will set threshold levels for each OIP indicator that will trigger a formal review, and the thresholds will allow for peer-group comparisons between officers with similar assignments and duties." | NON-COMPLIANCE |
| 330-336 | Additional express requirements of OIP. | NON-COMPLIANCE |
| 337 | "If CDP chooses to use body worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals." | OPERATIONAL COMPLIANCE |
| 338 | "Supervisors will review recordings related to any incident involving at least a Level 2 or 3 use of force; injuries to officers; and in conjunction with any other supervisory investigation." | OPERATIONAL COMPLIANCE |
| 339 | "Supervisors will conduct adequate random and directed audits of body worn camera recordings" and "incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers." | PARTIAL COMPLIANCE |
| 340 | "Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy." | OPERATIONAL COMPLIANCE |

Alicante
Amsterdam
Baltimore
Beijing
Birmingham
Boston
Brussels
Budapest*
Colorado Springs
Denver
Dubai
Dublin
Dusseldorf
Frankfurt
Hamburg
Hanoi
Ho Chi Minh City
Hong Kong
Houston
Jakarta*
Johannesburg
London
Los Angeles
Louisville
Luxembourg
Madrid
Mexico City
Miami
Milan
Minneapolis
Monterrey
Munich
New York
Northern Virginia
Paris
Philadelphia
Riyadh*
Rome
San Francisco
São Paulo
Shanghai
Shanghai FTZ*
Silicon Valley
Singapore
Sydney
Tokyo
Warsaw
Washington, D.C.

*Our associated offices
Legal Services Center: Berlin

# www.hoganlovells.com

"Hogan Lovells" or the "firm" is an international legal practice that includes Hogan Lovells International LLP, Hogan Lovells US LLP and their affiliated businesses.

The word "partner" is used to describe a partner or member of Hogan Lovells International LLP, Hogan Lovells US LLP or any of their affiliated entities or any employee or consultant with equivalent standing. Certain individuals, who are designated as partners, but who are not members of Hogan Lovells International LLP, do not hold qualifications equivalent to members.

For more information about Hogan Lovells, the partners and their qualifications, see www. hoganlovells.com.

Where case studies are included, results achieved do not guarantee similar outcomes for other clients. Attorney advertising. Images of people may feature current or former lawyers and employees at Hogan Lovells or models not connected with the firm.

© Hogan Lovells 2023. All rights reserved. WG-REQ-1124