

Hogan
Lovells

# 2022 Use of Force Compliance Assessment - Quarter 4

# Written by the Independent Monitoring Team

August, 2023

**Background**

Pursuant to the 2022 Monitoring Plan, the Monitoring Team is conducting quarterly compliance assessments of Section VI of the Consent Decree.  This effort is to ensure that the intent of the specific reforms detailed in Paragraphs 46-83, 87-92, and 93-109 have been met by the Cleveland Division of Police ("CDP").  The report that follows details the methodology and findings of the fourth quarterly compliance assessment of 2022.

This assessment follows a preliminary review of use of force cases in which a select team of Monitoring Team members reviewed CDP use of force incidents that occurred between 2018 and 2019 to determine whether officers had been applying force in a manner that complies with the Division's new policies and terms of the Consent Decree.  The findings from this assessment were summarized in a memorandum filed with the Court on March 22, 2022.

In the preliminary review, the Monitoring Team assessed a sample of 130 use of force incidents.  The sample consisted of all Level 3 force cases, and a statistically representative sample of Level 1 and Level 2 cases from 2018 and 2019, with an oversample of non-firearm Level 1 cases.  Each of the Level 2 and Level 3 cases in the sample were assessed by two Monitoring Team reviewers, while the Level 1 cases were each assessed by one reviewer.  The Monitoring Team created, tested, and refined a qualitative assessment instrument that was endorsed by the City and Department of Justice ("DOJ").

The Monitoring Team found that the uses of force reviewed were generally within policy, in most cases the chain of command reviews appropriately identified and addressed problematic uses of force by referring cases to Internal Affairs or the Training Section, and supervisors on scene engaged with officers.  That said, the Monitoring Team's preliminary review revealed several deficiencies in tactics, and the ability to deescalate, both of which at times created the need for more force[1].  Further, the Monitoring Team concluded that the Division needed to create processes and structures for issues identified during use of force events, such as inadequate de-escalation or problematic tactics, to be addressed in training.

The Monitoring Team was also concerned by the duration of the use of force reviews by the chain of command, which could take several months.  In the time since the review was conducted and filed, Police 2.01.06, which dictates that "each level in the chain of command shall review the [use of force] report within three tours of duty" was enacted. The officer's behavior created an opportunity for the subject to reach for the officer's arm.

During the preliminary review, the Monitoring Team found that due to the length of time between when uses of force took place and when the Monitoring Team reviews occurred, the value and utility of the feedback provided to CDP was limited.  As such, the Monitoring Team transitioned to a rolling, quarterly assessment model, reflected here, endeavoring to provide more timely feedback to the Division.  This ongoing approach also provides the Division with the opportunity to address issues raised by the Monitoring Team, and then be re-assessed soon after. Our hope is that this quarterly approach not only provides more actionably and useful feedback, but also streamlines the process for CDP to make changes necessary to reach full compliance in this area.  While there are limitations to this approach as well, including limitations in Monitoring Team resources and review time by the City, the Monitoring Team still believes this is a superior approach to providing timely and helpful feedback on this important area of the Consent Decree.  This report is the fourth submitted following this new methodology and addressed use of force reviews completed by the CDP in the fourth quarter of 2022.

---

[1] Cleveland Monitoring Team.  (2022).  *Monitor's 2020-2021 Use of Force Review.*

**Methodology**

To assess compliance with Section VI of the Consent Decree, the Monitoring Team commenced an ongoing review process, in which all Level 1 and Level 2 use of force incidents, as detailed in CDP reports, investigation documents, and wearable camera systems ("WCS") footage, are reviewed on a quarterly basis using a standardized assessment instrument. The assessment instrument was developed for the preliminary use of force review conducted by the Monitoring Team and revised slightly to streamline questions.  The methodology and review instrument were both reviewed and approved by the City and the DOJ ("the parties") in advance of the assessment.

The sample for this assessment included all Level 1 and Level 2 use of force investigations that were completed between October 1 and December 31, 2022.  There were two Level 3 cases included in the data set for the fourth quarter, both of which the reviewers noted had previously been reviewed by the Force Investigation Team (FIT) and as such are not included in the analysis.  The data from those reviews by the Monitoring Team appear in the raw data provided to CDP, but those Level 3 case reviews are *not* included in this analysis.  All uses of force were assessed by randomly assigned Monitoring Team subject matter experts each of whom bring significant experience as sworn law enforcement officers.

All Level 1 uses of force were reviewed by a single subject matter expert.  In this quarterly review, there were two Level 2 uses of force that were only reviewed by one reviewer.  Those single reviews indicated no concerning conduct, therefore, for timeliness reasons were not reassigned for a second review.  Each pair of Level 2 assessments were compared to ensure that subject matter experts had no major disagreements on key indicators such as proportionality, necessity, objective reasonableness of the use of force.

A total of twenty one Level 1 and eighteen Level 2 uses of force were closed in the fourth quarter of 2022.  These reviews indicate far fewer completed incidents that the second or third quarter.

**Results**

***Timeliness***

Reviews of both Level 1 and Level 2 incidents continue to take an extensive amount of time by the Division's chain of command.  The average time required to close Level 1 cases decreased between the third and fourth quarter, which is progress.  The decrease in time is due in large part to fewer outliers of extended duration for the chain of command to review.  Eliminating or reducting outliers positively impacts the average.  Level 2 cases, on average, took about the same amount of time to close in the fourth quarter as in the third.  Time to close is a metric that CDP should continue to monitor in real time to eliminate outliers and to manage the duration of the reviews.  As with the Level 1 cases, the range of time to close for Level 2 cases has narrowed, which is a positive indicator.

**Table One: Timeliness of Case Review and Closure**

| Duration (in days) | Level 1 ($n$ = 21) | Level 2 ($n$ =18) |
|---|---|---|
| Shortest | 4 | 35 |
| Longest | 176 | 192 |
| Average | 29 | 75 |

### *Necessary, Proportional and Objectively Reasonable*

In the fourth quarter reviews, the Monitoring Team determined that three cases failed to meet the necessary, proportional and objectively reasonable standard: one Level 1 case (2022-129863), and two Level 2 cases (2022-126337 and 2022-226668).

In the Level 1 case (2022-129863), officers responded to a subject blocking traffic and aggressively panhandling.  The officer immediately put hands on the subject and pushed him away.  The chain of command identified the failure to de-escalate and offered verbal counseling to the officer, however the Monitoring Team reviewer concludes that the purpose of the contact was to remove the subject from traffic, and questions the ultimate decision to arrest the subject as it appears no crime was committed, and the goal of the contact was met when the subject moved.

In Level 2 case 2022-126337, two officers were responding to a single vehicle crash with officers from a neighboring jurisdiction who were already on scene.  The first officer who approached the situation was deemed out of control based on review of the WCS.  He was fast, loud, and aggressive toward the members of the public on scene and did not attempt to de-escalate or understand the scene.  This officer was also very aggressive toward two subjects at the scene who were exercising their first amendment rights to video the interaction and electing not to answer questions posed by the officer.  The force utilized on these subjects was not necessary, proportional or reasonable.  The second officer properly arrested an intoxicated subject thought to be the driver.

The chain of command addressed these failures and the officer was suspended for 30 days and sent for re-training.  The Monitoring Team notes that this is the third disciplinary action against this officer for insubordination and unprofessionalism in three years and sincerely hopes that CDP is seeking evidence that the officer has, in fact incorporated the re-training into everyday practice.  The Monitoring Team is also concerned that none of the other officers on scene intervened with an officer who was clearly acting in a manner contrary to policy and training.[2]

In Level 2 case 2022-226668 officers responded to a domestic violence call and after failed attempts to talk the subject out of the house, a foot pursuit ensued and ultimately the subject jumped a fence.  The officer ordered the subject to stay down, but the officer, due to fatigue could not follow the subject over the fence.  When the subject got up and attempted to flee, the officer applied a taser through the chain link fence.  At this point, the subject was known to the officers.  The officers should have pursued an arrest of the subject later and because the

---

[2] The Monitoring Team also reviewed this case at a FRB meeting in February and learned that officers at the scene included those from another jurisdiction.  The FRB seemed satisfied with the discipline and retraining.  This case would benefit from more probing discussion, including at the FRB about the actions of the officers on scene who didn't attempt to remove the offending officer from the area. He was clearly not able to control his temper/physicality with subjects.  MOUs that regulate behavior of officer's from elsewhere should include expectations for their intervention when any officer is out of control.

application of force is meant to bring a subject into custody, and the officer could not accomplish that goal from the opposite side of a fence, the officer should not have applied the taser.  The policy violation was not initially identified by the chain of command, instead the case was simply referred to Internal Affairs, where the lieutenant was the first to identify the violations.  At that point, all other reviewers in the chain of command reversed their positions.

### *Key Elements and Tactics*

Monitoring Team reviewers assessed various tactical questions and de-escalation practices. Overall, the Monitoring Team determined that officers do generally make attempts to de-escalate the situation prior to using force.  In the majority of cases reviewed in the fourth quarter, officers conducted appropriate threat assessments, utilized appropriate tactics and reduced force as the threat level receded.

The Monitoring Team continues to track the unnecessary use of or over-use of profanity when interacting with subjects.  We noted in our second and third quarter reviews that in nearly a third of cases reviewed officers used profanity during the incident. In the overall percentage of cases reviewed, the issue seems consistent, but the Monitoring Team reviewers did not specifically call out the issue in their narrative concerns in the fourth quarter, with reviewers pointing out just a few of instances on concern (2022-290537 and 2022-336981).

In a particularly estimable use of de-escalation tactics in a very difficult incident (2022-300514) officers contacted an armed and non-compliant subject who said that he wanted the officers to shoot him.  The officers remained engaged and tried to reassure the subject, and when the subject moved to use the firearm, the officers appropriately retreated and sought cover.

A second example of de-escalation tactics is seen in 2022-237778 where officers stepped in physically, touching the subject's torso, rather than stepping back and creating space potentially allowing the subject to remain calm. The officer's behavior created an opportunity for the subject to reach for the officer's arm.

Generally, Monitoring Team reviewers found officers acted appropriately in a very high percentage of the incidents reviewed (see Table Two below).  In nearly all cases officers maintained sufficient distance, made safe approaches to the scene, used appropriate tactics and communicated well with each other.

**Table Two: Compliance with Key Tactical Provisions**

| Did the Officers: | Level 1 (*n* =21 ) | Level 2 (*n* =34 ) | | |
|---|---|---|---|---|
| | | Yes | No | Unable to Determine |
| Conduct an appropriate threat assessment | 86% | 79% | 12% | 9% |
| Maintain sufficient distance | 86% | 82% | 13% | 6% |
| Make a safe approach | 86% | 82% | 9% | 9% |
| Employ clearly inappropriate tactics | 14% | 12% | 85% | 3% |
| Use profanity | 38% | 24% | 65% | 12% |
| Appear to use effective communications between officers | 76% | 76% | 9% | 15% |
| Reduce the level of force applied as the nature of the threat diminished | 90% | 91% | 6% | 3% |

For Level 2 cases, n=the number of reviews rather than the number of cases.  This quarter, there were two Level 2 cases that had only one reviewer, therefore, while there were 18 cases, there were only 34 reviews.

### General Requirements and Prohibited Force

Reviewers found that in most use Level 1 use of force cases, officers adhered to general requirements, including identifying themselves as police officers, providing verbal warnings, and avoiding unnecessary risks to others (see Table Three below).  That said, there were still some instances flagged in which these basic requirements were not meet.  Table Three below indicates that in the majority of Level 2 cases, officers did not clearly identify themselves or their intentions, or provide a warning before using force.

**Table Three: Compliance with General Force Principles**

| Did the Officers: | Level 1 (*n* =21 ) | Level 2 (*n* = 34) | | | |
|---|---|---|---|---|---|
| | | Yes | No | Unable to Determine | Not Applicable |
| Identify themselves as police officers and advise of their intent | 90% | 47% | 26% | 15% | 12% |
| Provide a verbal warning | 90% | 53% | 9% | 15% | 24% |
| Avoid unnecessary risk to others | 90% | 82% | 12% | 6% | |

For Level 2 cases, n=the number of reviews rather than the number of cases.  This quarter, there were two Level 2 cases that had only one reviewer, therefore, while there were 18 cases, there were only 34 reviews.

### Chain of Command Review

In addition to the concerns regarding timeliness of the review process described earlier, the Monitoring Team also found on several occasions that the chain of command review either did not proceed as expected or was not as thorough in scope as required.  In a number of cases the chain of command did not address missing information such as details about the applied force, injuries sustained, or follow-up regarding complaints of injuries from involved subjects.  In a particularly concerning review (2022-253063), the officer's use of force was within policy, but the sergeant's review was highly problematic.  The sergeant did not obtain necessary security video footage, and did not canvass for, or interview witnesses.  This oversight made the review of the incident difficult, but was ultimately addressed by the chain of command.

The CDP should continue to emphasis the importance of thorough and complete articulation of facts and circumstances in use of force report across the board.  The chain of command should continue to be mindful of uncovering a range of important details in the investigation of use of force from the initial review to the final approval.  The quality of the chain of command review is key in the Division's ability to demonstrate they have internal accountability and self regulation.

### Select Cases for Review

Monitoring Team reviewers noted a number of cases that should be brought to CDP's attention for a number of issues, not necessarily directly related to the use of force, or investigation of the use of force:

- Incident number 2022-321643 is a case where officers entered the home of violent, felony domestic violence suspect in response to the victim filing a report at a police precinct.  As officers arrived on the scene they found the door of the house open, and entered.  The Monitoring Team reviewers feel a search warrant should have been considered prior to entering the residence.

-  In incident number 2022-320055, there is nothing remarkable about the force or the review, but the CDP may wish to review the use of magnetic mounts for the body worn video as they do not appear to be effective for retaining the camera.  This case is an example of the problem with the mounts.

*Conclusion*

This quarterly review pertaining to use of force was a mix for the Monitoring Team reviewers. While there were three incidents where the Monitoring Team reviewers deemed the force not to be reasonable, necessary or proportional (see 2022-129863, 2022-126337 and 2022-226668 above), in each of those cases the chain of command identified and addressed deficiencies. While it is concerning that there were this many questionable uses of force in a single quarter, it was also positive to find that the chain of command recognized and addressed the issues.  The Monitoring Team is concerned about the incident (2022-126337) where other officers on scene did not de-escalate, or intervene with the officer that approached the situation clearly out of control.  Failure to intervene and provide peer-level control of the situation can have very harmful effects.

*Monitoring Team*

 **Karl Racine**
Monitor

 **Dr. Ronnie Dunn**

 **Dr. Richard Rosenthal**

 **Ayesha Hardaway**

 **Dr. Randolph Dupont**

 **Victor Ruiz**

 **Stephanie Yonekura**

 **Lisa Fink**

 **Captain Scott Sargent (ret.)**

 **Dr. Modupe Akinola**

 **Chief Tammy Hooper (ret.)**

 **Charles R. See**

 **Assistant Chief Shunta Boston**

 **Jay Jones**

 **Sean Smoot**

 **Courtney Caruso**

 **Dr. Megan McDonough**

 **Abby Wilhelm**

 **Christine Cole**

 **Rick Myers**

Alicante

Amsterdam

Baltimore

Beijing

Birmingham

Boston

Brussels

Budapest*

Colorado Springs

Denver

Dubai

Dublin

Dusseldorf

Frankfurt

Hamburg

Hanoi

Ho Chi Minh City

Hong Kong

Houston

Jakarta*

Johannesburg

London

Los Angeles

Louisville

Luxembourg

Madrid

Mexico City

Miami

Milan

Minneapolis

Monterrey

Munich

New York

Northern Virginia

Paris

Philadelphia

Riyadh*

Rome

San Francisco

São Paulo

Shanghai

Shanghai FTZ*

Silicon Valley

Singapore

Sydney

Tokyo

Warsaw

Washington, D.C.

*Our associated offices

Legal Services Center: Berlin

www.hoganlovells.com

"Hogan Lovells" or the "firm" is an international legal practice that includes Hogan Lovells International LLP, Hogan Lovells US LLP and their affiliated businesses.

The word "partner" is used to describe a partner or member of Hogan Lovells International LLP, Hogan Lovells US LLP or any of their affiliated entities or any employee or consultant with equivalent standing. Certain individuals, who are designated as partners, but who are not members of Hogan Lovells International LLP, do not hold qualifications equivalent to members.

For more information about Hogan Lovells, the partners and their qualifications, see www. hoganlovells.com.

Where case studies are included, results achieved do not guarantee similar outcomes for other clients. Attorney advertising. Images of people may feature current or former lawyers and employees at Hogan Lovells or models not connected with the firm.

© Hogan Lovells 2023. All rights reserved. WG-REQ-1043