**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO.:** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE:** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF CLEVELAND,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**SETTLEMENT AGREEMENT <span style="color:red">(SECOND MODIFICATION)</span>**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND ................................................................................................... 1̶2̶

III.    COMMUNITY ENGAGEMENT AND BUILDING TRUST ........................................ 4

        A.  Community Police Commission ..................................................................... 4̶5̶

        B.  District Policing Committees ............................................................................ 7

IV.     COMMUNITY AND PROBLEM-ORIENTED POLICING .................................... 7̶8̶

V.      BIAS-FREE POLICING ....................................................................................... 9̶1̶0̶

VI.     USE OF FORCE .................................................................................................. 11̶1̶2̶

        A.  Use of Force Principles ............................................................................... 12̶1̶3̶

        B.  Use of Force Policies ................................................................................... 13̶1̶4̶

            1.  Firearms ....................................................................................... 14̶1̶5̶

            2.  Electronic Control Weapons ....................................................... 15̶1̶6̶

            3.  Oleoresin Capsicum Spray ("OC Spray") .................................. 18̶1̶9̶

        C.  Use of Force Training .................................................................................. 19̶2̶0̶

        D.  Use of Force Reporting Policy and Use of Force Reports ..................... 20̶2̶1̶

        E.  Use of Force Investigations ........................................................................ 22̶2̶3̶

            1.  Investigations of Level 1 Uses of Force ................................... 22̶2̶3̶

            2.  Investigations of Level 2 Uses of Force ................................... 22̶2̶3̶

            3.  Force Investigation Team and Investigations of Level 3 Uses of Force .......... 26̶2̶7̶

        F.  Force Review Board ..................................................................................... 31̶3̶2̶

VII.    CRISIS INTERVENTION .................................................................................... 33̶3̶4̶

        A.  Mental Health Response Advisory Committee ...................................... 33̶3̶4̶

        B.  Crisis Intervention Coordinator .............................................................. 34̶3̶5̶

i

C.  Crisis Intervention Training ................................................................. 35~~36~~

D.  Specialized Crisis Intervention Trained Officers ................................... 35~~36~~

E.  Crisis Intervention Policies and Procedures ......................................... 37~~38~~

VIII.  SEARCHES AND SEIZURES ....................................................................... 39~~40~~

IX.  ACCOUNTABILITY ..................................................................................... 42~~43~~

A.  Internally Discovered Misconduct ....................................................... 42~~43~~

B.  Reporting Misconduct and Preventing Retaliation ............................... 46~~47~~

C.  Investigation of Civilian Complaints .................................................... 46~~47~~

1.  The Office of Professional Standards ............................................ 46~~47~~

2.  Filing and Tracking of Civilian Complaints .................................. 48~~49~~

3.  Classification of Civilian Complaints ............................................ 50~~52~~

4.  Investigation of Civilian Complaints ............................................ 52~~53~~

5.  Communication with the Complainant ........................................... 53~~55~~

D.  Police Review Board ............................................................................ 54~~55~~

E.  Disciplinary Hearings .......................................................................... 55~~57~~

F.  Discipline ............................................................................................. 56~~58~~

X.  TRANSPARENCY AND OVERSIGHT ........................................................ 57~~58~~

A.  ~~Police~~ Public Safety Inspector General ............................................... 57~~58~~

B.  Data Collection and Analysis .............................................................. 58~~60~~

XI.  OFFICER ASSISTANCE AND SUPPORT ................................................... 62~~63~~

A.  Training ............................................................................................... 62~~63~~

1.  Training Plan ................................................................................. 62~~64~~

2.  Field Training Program .................................................................. 65~~66~~

3.  Documentation of Training ............................................................ 66~~68~~

B.  Equipment and Resources .................................................................... 67~~68~~

C.  Recruitment and Hiring..............................................................................69~~70~~

D.  Performance Evaluations and Promotions ...............................................71~~72~~

    1.  Performance Evaluations ...................................................................71~~72~~

    2.  Promotions ..........................................................................................72~~73~~

E.  Staffing...........................................................................................................72~~74~~

XII.    SUPERVISION........................................................................................................73~~75~~

A.  Duties, and Training of First Line Supervisors......................................73~~75~~

B.  Officer Intervention Program ....................................................................74~~76~~

C.  Body Worn Cameras....................................................................................77~~78~~

XIII.   POLICIES.................................................................................................................77~~79~~

XIV.  IMPLEMENTATION, ASSESSMENT, OUTCOMES, AND ENFORCEMENT ......79~~81~~

A.  Role of the Independent Monitor................................................................79~~81~~

B.  Selection and Compensation of the Monitor ...........................................80~~82~~

C.  Compliance Reviews ...................................................................................82~~83~~

D.  Biennial Community Survey........................................................................82~~84~~

E.  Outcome Measurements..............................................................................83~~85~~

F.  Monitoring Plan and Review Methodology...............................................87~~89~~

G.  Monitor Recommendations and Technical Assistance ...........................88~~90~~

H.  Comprehensive Reassessment ...................................................................89~~91~~

I.  Monitor Reports...........................................................................................89~~91~~

J.  Coordination with the ~~Police~~ Public Safety Inspector General ............90~~92~~

K.  Communication between Monitor, Parties, and Public ..........................91~~92~~

L.  Public Statements, Testimony, Records, and Conflicts of Interest........91~~93~~

M.  CDP Consent Decree Implementation Unit .............................................92~~94~~

N.  Implementation Assessment and Report...................................................92~~94~~

O.   Access and Confidentiality ...................................................................... 9394

P.   Court Jurisdiction, Modification of this Agreement, and Enforcement.................. 9496

Q.   Termination of this Agreement ................................................................ 9697

XV.   DEFINITIONS AND ABBREVIATIONS ................................................................ 9798

## I.    INTRODUCTION

The United States of America and the City of Cleveland (collectively "Parties") are committed to ensuring that police services in Cleveland are delivered in a manner that is constitutional, effective, and consistent with community values, while preserving officer and public safety.  To further these goals, the Cleveland Division of Police ("CDP") and the Cleveland community must have a strong relationship that is built on mutual trust and respect. The provisions of this Agreement are designed to bolster this relationship and ensure that it endures.  The Constitution requires the City to prevent excessive force, to ensure that searches and seizures are reasonable, and to ensure that police services are delivered free from bias. These precepts also are fundamental to a strong community-police relationship.  To further these goals, the City has agreed to provide clear guidance to officers; increase accountability; provide for civilian participation in and oversight of the police; provide officers with needed support, training, and equipment; and increase transparency.

The Parties acknowledge that nothing in this Agreement alters the fact that the City of Cleveland is a governmental entity organized under the laws of Ohio and governed in accordance with its Municipal Charter ("Charter"), which was amended effective November 2, 2021.  Those amendments, inter alia, established within the City a chartered Community Police Commission ("CPC") with responsibilities and authority broader than those outlined for the CPC as originally established under this Agreement.  Those amendments do not conflict in any substantive way with this Agreement; rather, they impact how the City will carry out its responsibilities under it. This Agreement does not alter any existing Charter provisions, including but not limited to those regarding the Community Police Commission and those regarding control and supervision of the police force.  The City retains authority over CDP as expressed in its Charter.

For these reasons, and noting the general principle that settlements are to be encouraged, particularly settlements between government entities, the Parties agree to implement this Agreement under the following terms and conditions.

## II.    BACKGROUND

1.    On March 14, 2013, at the request of the Mayor of Cleveland and others, the United States Department of Justice ("DOJ") announced the beginning of its investigation into

1

CDP's policies and practices to determine whether CDP engages in a pattern or practice of the use of excessive force in violation of the Fourth Amendment of the United States Constitution and the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141").

2. As part of its investigation, DOJ, in consultation with experts in police practices, conducted a comprehensive assessment of officers' use of force and CDP's policies, procedures, training, systems of accountability, and community engagement.  The investigation included multi-day onsite tours of CDP's facilities, District command stations, and ride-alongs with officers in every police District; interviews with Cleveland officials, CDP's command staff, members of CDP's specialized units, supervisors, and police officers; an extensive review of documents; and numerous meetings with residents, community groups, members of religious communities, the Office of Professional Standards, the Civilian Police Review Board, and other stakeholders.

3. The City and CDP cooperated during the investigation and provided access to documents, facilities, and personnel.  Many members of Cleveland's diverse communities, including community advocates, religious leaders, and members of CDP's patrol officer and management unions, took an active interest in the investigation and played a critical role in providing information and facilitating a thorough investigation.

4. On December 4, 2014, the Department of Justice publicly announced that it had reasonable cause to believe that CDP engages in a pattern or practice of using excessive force.  DOJ announced that it had reasonable cause to believe that, although most force used by CDP officers was reasonable, a significant amount of deadly and less lethal force was excessive and constituted an ongoing risk to the public and to CDP officers.  DOJ also determined that systemic deficiencies contribute to the pattern or practice of excessive force.  These deficiencies relate to operational and structural areas of CDP, including its accountability systems, resource deployment, community policing efforts, policies, and officer support, training, equipment, and supervision.  Although DOJ did not specifically investigate CDP's search, seizure, and arrest practices, DOJ's force review revealed Fourth Amendment concerns in those areas as well.

5.      The City agrees that DOJ's findings raise issues of importance to the City and the community that should be addressed.  To that end, and simultaneous with the release of DOJ's findings, the Parties issued a Joint Statement of Principles agreeing to begin negotiations with the intention of reaching a court-enforceable settlement agreement, to include the appointment of an outside independent monitor to ensure compliance with the terms of this Agreement.  In agreeing to address these important issues, the City is not agreeing with the findings.

6.      Constitutional policing and effective policing are interdependent, and rely on a strong partnership between the police department and the communities that it serves.  To ensure that the reforms embodied in this Agreement are responsive to community and officer concerns, the Parties consulted extensively with community leaders, police officers, advocates, residents, and other concerned individuals who offered meaningful recommendations and insights on reform.  This Agreement reflects the broad input received by the Parties from the diverse communities that make up the City of Cleveland.  The Parties are committed to ongoing engagement with community stakeholders to foster continued participation and long-term sustainability of the reforms created by this Agreement.

7.      This Agreement was reached as a result of the authority granted to the Department of Justice under Section 14141 to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or federal law.

8.      This Agreement is not intended to limit the lawful authority of the Mayor of Cleveland over the CDP, or of the Chief of Police or any other City entity with lawful authority to oversee the operations of CDP.

9.      The Parties acknowledge the appropriation authority of Cleveland City Council under the Ohio Revised Code and the Cleveland Charter and Codified Ordinances.  This Agreement is not intended to override the lawful authority of the Cleveland City Council to appropriate funds.

10.     This Agreement is not intended to limit the lawful authority of CDP officers to use objectively reasonable force or otherwise fulfill their law enforcement obligations under the Constitution and laws of the United States and the State of Ohio.

11.     This Agreement will not be construed as an admission or evidence of liability under any federal, State, or municipal law including 42 U.S.C. § 1983. Nor is the City's entry into this Agreement an admission by the City, CDP, or its officers and employees that they have engaged in any unconstitutional, illegal, or otherwise improper activities or conduct. The Parties acknowledge the many CDP officers who have continued to work diligently and with integrity despite challenging circumstances.

12.     This Agreement will constitute the entire integrated agreement of the Parties. No prior drafts or prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding, except the Department of Justice's December 4, 2014 Findings Letter.

13.     This Agreement is binding upon all Parties hereto, by and through their officials, agents, employees, and successors. If the City establishes or reorganizes a government agency or entity whose function includes overseeing, regulating, accrediting, investigating, or otherwise reviewing the operations of CDP or any aspect thereof, the City agrees to ensure that these functions and entities are consistent with the terms of this Agreement and will incorporate the terms of this Agreement into the oversight, regulatory, accreditation, investigation, or review functions of the government agency or entity as necessary to ensure consistency.

## III.     COMMUNITY ENGAGEMENT AND BUILDING TRUST

14.     This Agreement recognizes the importance of community input into the way police services are delivered. Ongoing community input into the development of reforms, the establishment of police priorities, and mechanisms to promote community confidence in CDP will strengthen CDP and the police-community relationship that is necessary to promote public safety. To promote public trust and confidence in CDP, constitutional and effective policing, officer and public safety, and the sustainability of reforms, CDP will create, in accordance with this Agreement, formal and informal mechanisms that facilitate ongoing communication between CDP and the many Cleveland communities it serves.

### A.     Community Police Commission

4

15.  To leverage the experience and expertise of the people of Cleveland, and to ensure that CDP recognizes and operates in a manner consistent with cooperative community understanding and engagement, there will be within the City a Community Police Commission ("Commission") consisting of 13 members who represent the many and diverse communities in Cleveland.  The Commission will have the following mandate with respect to this Agreement:

  a.  to make recommendations to the Chief of Police and the City, including the Mayor and the City Council, on policies and practices related to community and problem-oriented policing, bias-free policing, and police transparency;

  b.  to work with the many communities that make up Cleveland for the purpose of developing recommendations for police practices that reflect an understanding of the values and priorities of Cleveland residents; and

  c.  to report to the City and community as a whole and to provide transparency on police department reforms.

16.  The CPC will be broadly representative of Cleveland's diverse communities.  Members will be appointed and vacancies will be filled in accordance with the City's Charter. Until at least seven members are appointed pursuant to the provisions of Charter Section 115-5, however, CPC members currently serving will continue to carry out the CPC's duties as set forth under this Agreement prior to any amendments thereto, and prior.to the November 2, 2021 amendments to the City's Charter. Throughout the pendency of this Agreement, the Cleveland Police Patrolmen's Association, the Fraternal Order of Police, and the Black Shield will each recommend one qualified member to be appointed to serve on the Commission.  The Commission will meet periodically with the Chief of Police and provide recommendations and reports to him or her, but remain independent from the Chief of Police, the Mayor, and the City Council.

17.  The Commission will:

  a.  on an ongoing basis, hold public meetings across the City, complete an assessment of CDP's bias-free policing policies, practices, and training, and make recommendations;

5

b.  on an ongoing basis, including through its membership on the Training Review Committee, assist as appropriate in CDP's development of training related to bias-free policing and cultural competency;

c.  on an ongoing basis, assess CDP's community activities, and make recommendations for additional strategies for CDP to consider to increase community engagement with and community confidence in CDP**;**

d.  on an ongoing basis, review CDP's civilian oversight structure to determine if there are changes it recommends for improving CDP's accountability and transparency; and

e.  perform other function as set out in this Agreement.

18.  In addition to the above, the Commission has the authority to:

a.  review and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention;

b.  review and comment on CDP's implementation of initiatives, programs, and activities that are intended to support reform; and

c.  hold public meetings to discuss the Monitor's reports and to receive community feedback concerning CDP's compliance with this Agreement.

19.  The City will provide access to all information requested by the Commission related to its mandate, authority, and duties unless it is legally restricted.

20.  At least annually, the Commission will issue reports, including any recommendations for improvement, related to each activity that it undertakes.  The City will post the Commission's reports and recommendations to the City's website.

21.  The City will consider and timely respond in writing to the Commission's recommendations for improvements.  Those responses also will be posted to the City's website.

22.  The budget for the Commission will be visible as a separate line item in the budget proposal that is submitted annually pursuant to the Charter to the Cleveland City Council with the appropriations ordinance.  The Parties will endeavor to secure private funding for the Commission as appropriate.  The Monitor will analyze the Commission's budget and advise the Parties and the Court as to whether it affords sufficient independence and resources to meet the terms of this Agreement.

**B.     District Policing Committees**

23.    Working jointly, the Commission, CDP, and Community Relations Board ("CRB"), will work with the District Policing Committees (formerly called District Community Relations Committees) to facilitate regular communication and cooperation between CDP and community leaders at the local level.  These District Policing Committees should meet, at a minimum, every quarter.

24.    Working jointly, the Commission, CDP, and CRB will develop a mechanism to recruit and expand the membership of the District Policing Committees, each of which should include a representative cross-section of community members, including, for example, representatives of social services providers, faith leaders, local business owners, youth, etc., from that District.  Each District Policing Committee also will include at least one CDP officer from that District.  CDP will work with the Commission to select officers for each District Policing Committee.

25.    CDP will work closely with the District Policing Committees to identify strategies to address crime and safety issues in their District.  In developing appropriate strategies, the District Policing Committees should consider and address law enforcement priorities and community policing strategies in their District, and should address any concerns or recommendations about specific CDP policing tactics and initiatives in their District.

26.    At least annually, each District Policing Committee will present its identified strategies, concerns and recommendations to the Commission.  At the same time, an officer who is a member of the District Policing Committee will present to the Commission CDP's assessment of ways to address, and barriers to, implementing the strategies, concerns and recommendations of the Committee.

## IV.    COMMUNITY AND PROBLEM-ORIENTED POLICING

27.    The City will develop and implement a comprehensive and integrated community and problem-oriented policing model in order to promote and strengthen partnerships within the community, engage constructively with the community to ensure collaborative problem-solving, and increase community confidence in CDP.

28.    CDP will ensure that its mission statement reflects its commitment to community

oriented policing and will integrate community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems.

29.  CDP will ensure that officers are familiar with the geographic areas they serve, including their assets, challenges, problems, business, residential and demographic profiles, and community groups and leaders; engage in problem identification and solving activities with the community groups and members regarding the community's priorities; and work proactively with other city and county departments to address quality of life issues.

30.  CDP will provide initial and annual in-service community and problem-oriented policing training that is adequate in quality, quantity, type, and scope, and will incorporate into its training of all officers, including supervisors, commanders, and executives, community and problem-oriented policing principles, including:

   a.  methods and strategies to improve public safety and crime prevention through community engagement;

   b.  training that promotes the development of new problem-solving partnerships between the police and community, targeting problem-solving and crime prevention;

   c.  leadership, ethics, and effective communication and interpersonal skills;

   d.  community engagement, including how to establish partnerships and actively engage civilians and community organizations, including youth, LGBT, homeless, and mental health organizations and communities;

   e.  principles of procedural justice and its goals;

   f.  conflict resolution and verbal de-escalation of conflict; and

   g.  cultural competency and sensitivity training.

31.  The City and CDP will maintain collaborative partnerships with a broad spectrum of community groups.  CDP representatives will meet, as appropriate, with residential, business, religious, civic, educational, and other community-based groups in each District, and with the District Policing Committees, to proactively maintain these relationships and identify and address community problems and challenges.

32.  CDP will continue to meet with members of the community in each District on a

monthly basis.  CDP will actively solicit participation from a broad cross-section of community members in each District.  Among other things, these community meetings will be used to identify problems and other areas of concern in the community and discuss responses and solutions.  During these meetings, CDP may discuss, when appropriate, summaries of relevant audits and reports assessing CDP as well as any policy changes completed during the preceding quarter.

33. Within 365 days of the Effective Date, CDP will develop and implement systems to monitor officer outreach to the community.  CDP will use this method to analyze, among other things, whether officers are partnering with a broad cross-section of community members to develop and implement cooperative strategies that build mutual respect and identify and solve problems.  The Monitor will review whether the systems developed by the City are effective.

34. At least annually, CDP will present the results of this analysis, broken out by District, in a publicly-available community policing report detailing its community policing efforts in each District.  This report will describe the problems and solutions identified in the analysis above.  The report also will identify obstacles encountered in community and problem-oriented policing and recommendations for future improvement.  In developing this report, CDP will consider, as appropriate, available results from the biennial survey.  The community policing report will be provided to the Commission, posted on CDP's website, and a summary of the report will be provided at each District community meeting following the report's publication.

## V.    BIAS-FREE POLICING

35. CDP will deliver police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias, in a manner that promotes broad community engagement and confidence in CDP.  CDP expects all officers to treat all members of the Cleveland community with courtesy, professionalism, and respect, and not to use harassing, intimidating, or derogatory language.

36. CDP will integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems.

37.    CDP will administer all activities without discrimination on the basis of race, ethnicity, national origin, religion, gender, disability, age, sexual orientation, or gender identity.

38.    Within 18 months of the Effective Date, CDP will develop a bias-free policing policy that incorporates, as appropriate, the recommendations developed by the Commission pursuant to paragraph 17, and that provides clear guidance to officers that biased policing, including deciding to detain a motorist or pedestrian based solely on racial stereotypes, is prohibited.

39.    Within 18 months of the Effective Date, the City will continue to develop training that incorporates the principles of procedural justice and that is designed to ensure that police services are delivered free from bias.  The Monitor will review the training to assess whether it is adequate in quality, quantity, scope, and type.

40.    The training will be provided to all officers and will include:

   a.   constitutional and other legal requirements related to equal protection and unlawful discrimination, including the requirements of this Agreement;

   b.   strategies, such as problem-oriented policing, procedural justice, and recognizing implicit bias, to avoid conduct that may lead to biased policing or the perception of biased policing;

   c.   historical and cultural systems that perpetuate racial and ethnic profiling;

   d.   identification of  racial or ethnic profiling practices, and police practices that have a disparate impact on certain demographic categories;

   e.   self-evaluation strategies to identify racial or ethnic profiling;

   f.   District-level cultural competency training regarding the histories and culture of local immigrant and ethnic communities;

   g.   police and community perspectives related to bias-free policing;

   h.   the protection of civil rights as a central part of the police mission and as essential to effective policing;

   i.   instruction in the data collection protocols required by this Agreement; and

   j.   methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination.

41.    Supervisor training will include:

a.  how to identify biased police practices when reviewing investigatory stop, arrest, and use of force data;

b.  how to respond to a complaint of biased police practices, including conducting a preliminary investigation of the complaint in order to preserve key evidence and potential witnesses;

c.  how to evaluate complaints of improper pedestrian stops for potential biased police practices; and

d.  engaging the community and developing positive relationships with diverse community groups.

42.  Officers also will receive annual in-service training on bias-free policing that is adequate in quality, quantity, type, and scope.

43.  To help ensure that police services are delivered in a manner free from bias, CDP will analyze data pursuant to paragraph 265.

44.  Within 18 months of the Effective Date, the appointing authority will consider principles of bias-free policing and equal protection in its hiring; unit assignment, as applicable; promotion; and performance assessment processes, including giving consideration to an individual's record of bias-related violations, as well as using interviews or other methods to assess the individual's ability to effectively practice bias-free policing.

## VI.  USE OF FORCE

45.  DOJ acknowledges that CDP recently has made important changes to some of its force policies.  Building on these improvements, CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force is used in accordance with the Constitution and laws of the United States and the requirements of this Agreement and that any use of unreasonable force is promptly identified and responded to appropriately.  The force policies, training, supervision, and accountability systems will be designed with the goal of ensuring that officers use techniques other than force to effect compliance with police orders whenever feasible; use force only when necessary, and in a manner that avoids unnecessary injury to officers and civilians; de-escalate the use of force at the earliest

11

possible moment; and accurately and completely report all uses of force.

### A.    Use of Force Principles

46.    The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers, regardless of the type of force, tactics, or weapon used, will comply with the following requirements:

    a.    officers will allow individuals the opportunity to submit to arrest before force is used wherever possible;

    b.    officers will use de-escalation techniques whenever possible and appropriate, before resorting to force and to reduce the need for force.  De-escalation techniques may include verbal persuasion and warnings and tactical de-escalation techniques, such as slowing down the pace of an incident, waiting out subjects, creating distance (and thus the reactionary gap) between the officer and the threat, and requesting additional resources (e.g. specialized CIT officers or negotiators).  Officers will be trained to consider the possibility that a subject may be noncompliant due to a medical or mental condition, physical or hearing impairment, language barrier, drug interaction, or emotional crisis;

    c.    if force becomes necessary, officers will be limited to using only the amount of force objectively reasonable as necessary to control the person.

    d.    in applying force, officers will reduce the level of force as the threat diminishes;

    e.    officers normally will not use force against persons who are handcuffed or otherwise restrained, unless it is objectively reasonable and necessary under the circumstances to stop an assault, escape, or as necessary to fulfill other law enforcement objectives;

    f.    officers will not use force against persons who only verbally confront them and do not impede a legitimate law enforcement function;

    g.    CDP will explicitly prohibit the use of retaliatory force by officers. Retaliatory force includes, for example, force in excess of what is objectively reasonable to prevent an escape to punish individuals for fleeing or otherwise

resisting arrest; and force used to punish an individual for disrespecting officers;

h.  officers will not use head strikes with hard objects, except where lethal force is justified.  Officers will be trained that a strike to the head with any impact weapon could result in death;

i.  other than to protect an officer's or other person's safety, officers will not use force to subdue an individual who is not suspected of any criminal conduct;

j.  CDP's policy will expressly provide that using a firearm as an impact weapon is never an authorized tactic.  Officers will be trained that use of a firearm as an impact weapon could result in death to suspects, bystanders, and themselves;

k.  officers will not use neck holds;

l.  CDP will continue to limit vehicle pursuits to those in which the need to capture the suspect outweighs the danger to the public.  CDP will continue to limit the number of CDP vehicles that may be involved in a vehicle pursuit; and

m.  immediately following a use of force, officers and, upon arrival, a supervisor will inspect and observe subjects for injury or complaints of pain resulting from the use of force, and immediately obtain any necessary medical care.  As necessary, officers will provide emergency first aid until professional medical care providers are on scene.

47.  As soon as practical following a use of force, CDP will ensure that the incident is accurately and properly reported, documented, and investigated.  A fundamental goal of the revised use of force policy will be to account for, review, and investigate every reportable use of force and reduce any improper uses of force.

48.  CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends.

**B.    Use of Force Policies**

49.  The City will develop and implement use of force policies that comply with applicable

13

law and are adequate to achieve the goals described in paragraph 45.  The use of force policies will incorporate the use of force principles above, and will specify that the unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability.

50.    CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons that are available to CDP officers, including standard-issue weapons that are made available to all officers and weapons that are made available only to specialized units.  The policies will clearly define and describe each force option and the circumstances under which use of such force is appropriate.

51.    CDP's policies related to specific weapons will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon.

52.    No officer will carry any weapon that is not authorized or approved by CDP.

53.    Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of the weapon is imminent, and allow the subject an opportunity to comply.

54.    The City will implement policies for each of the following weapons using the following guidelines.

### 1. Firearms

55.    Officers will not unholster and display a firearm unless the circumstances create a reasonable belief that lethal force may become necessary.  CDP's policies will require and training will teach proper techniques for unholstering, displaying, pointing, and aiming a firearm, and for determining when it is appropriate to do so.  The Monitor will review CDP's policies and training to ensure that they comply with this paragraph.  If an officer unholsters a firearm during an incident, interaction, or event that would otherwise trigger a reporting or data collection requirement, officers will document that a firearm was unholstered.  CDP will annually collect and analyze this data.

56.    Unholstering a firearm and pointing it at a subject constitutes a Level 1 reportable use of force and will be reported and investigated as such.  The following exceptions to this reporting requirement will apply:

14

a. SWAT Team Officers will not be required to report the pointing of a firearm at a subject as a use of force during the execution of SWAT Team duties;

b. officers who are deputized and assigned to a Federal Task Force will not be required to report the pointing of a firearm at a subject as a use of force when conducting federal task force operations during which a supervisor is present. Reports or forms regarding any such incidents that are otherwise prepared by a Task Force supervisor will be provided to CDP;

c. officers assigned to the Gang Impact, Narcotics, Homicide, Sex Crimes, Domestic Violence, and Financial Crimes Units will not be required to report the pointing of a firearm at a subject as a use of force if done solely while entering and securing a building in connection with the execution of an arrest or search warrant and a supervisor prepares a report detailing the incident.

57. Officers will not fire warning shots.

58. Officers will consider their surroundings before discharging their firearms and will avoid unnecessary risk to bystanders, victims, and other officers.

59. Officers will not discharge a firearm from or at a moving vehicle, unless use of lethal force is justified by something other than the threat from the moving vehicle; officers will not intentionally place themselves in the path of or reach inside a moving vehicle; and, where possible, officers will attempt to move out of the path of a moving vehicle.

60. CDP annually will provide at least 16 hours of firearms training which will include pistol, shotgun, and policy training.  In consultation with the Monitor, the City will develop a plan to provide appropriate night, reduced light, and stress training for officers.  Officers will successfully qualify with each firearm they are authorized to use or carry on-duty at least annually.  Officers will be required to qualify using proficiency standards and will not be permitted to carry any firearm on which they failed to qualify.

## 2. Electronic Control Weapons

61. Officers will use Electronic Control Weapons ("ECWs") only where:  (1) grounds for arrest or detention are present and the subject is actively or aggressively resisting, and lesser means would be ineffective; or (2) such force is necessary to protect the officer, the subject, or another party from immediate physical harm, and lesser means would be

ineffective or have been tried and failed.

62. Each standard 5-second ECW application is a separate use of force that officers must individually justify as reasonable. After the first ECW application, the officer will reevaluate the situation to determine if subsequent cycles are reasonable. In determining whether any additional application is reasonable, officers will consider that a subject may not be able to respond to commands during or immediately following an ECW application. Officers will not employ more than three cycles of an ECW against a subject during a single incident.

63. Officers will consider transitioning to alternative control measures if the subject does not respond to ECW applications.

64. Officers will not use ECWs in drive stun mode solely as a pain compliance technique. Officers may use ECWs in drive stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option.

65. Officers will determine the reasonableness of ECW use based upon all the relevant circumstances, including the subject's apparent age, size, physical, and mental condition, and the feasibility of lesser force options.

66. Except where lethal force is authorized, officers will not use ECWs where: (1) a deployment may cause serious physical injury or death from situational hazards, including falling, losing control of a moving vehicle, or becoming ignited from the presence of potentially explosive or flammable materials or substances; or (2) the subject is visibly pregnant, apparently elderly, a child, visibly frail, has obviously low body mass, or is in apparent medical crisis.

67. Officers will not use ECWs on fleeing persons who do not pose a threat of physical harm to officers, other civilians, or themselves.

68. Officers will not intentionally target ECWs to a subject's head, neck, or genitalia.

69. Officers will not normally use ECWs on handcuffed or restrained persons. ECWs will be used on handcuffed or restrained persons only where the subject is displaying aggressive physical resistance and lesser means would be ineffective or have been tried and failed.

70. Officers will carry ECWs in a weak-side holster to reduce the chances of accidentally

16

drawing and/or firing a firearm.

71.     Officers will be trained in and follow protocols developed by the City, in conjunction with the City's EMS professionals, on the officer's responsibilities following ECW use, including:

  a.  restrictions on removing ECW probes, including the requirements described in the next paragraph;

  b.  understanding the risks of positional asphyxia, and using restraint techniques that do not impair the subject's respiration following a ECW application;

  c.  monitoring all subjects who have received an ECW application while in police custody; and

  d.  informing medical personnel of all subjects who have been subjected to multiple ECW applications, including prolonged applications (more than 15 seconds); or who appear to be under the influence of drugs or exhibiting symptoms associated with excited delirium; or who were kept in prone restraints after ECW use.

72.     The City will ensure that all subjects who have been exposed to an ECW application receive a medical evaluation by emergency medical responders in the field or at a medical facility.  Absent exigent circumstances, probes will be removed from a subject's skin only by medical personnel or properly trained officers.

73.     In addition to the force reporting requirements outlined in paragraph 88, officers will clearly articulate and justify the following regarding their ECW use in a written narrative:

  a.  each and every ECW cycle used on a subject or attempted against a subject;

  b.  use of the ECW in drive stun mode;

  c.  ECW application for more than 15 seconds;

  d.  continuous cycling of an ECW;

  e.  ECW application on a fleeing person; and

  f.  ECW application by more than one officer.

74.     Officers who have been issued ECWs will receive annual ECW certifications, which will consist of physical competency; weapon retention; CDP policy, including any policy changes; technology changes; and scenario-based training.

75.    The City will develop and implement integrity safeguards on the use of ECWs to ensure compliance with CDP policy.  CDP will conduct quarterly downloads of all ECWs.  The City will conduct random and directed audits of ECW application data, which will be provided to the Monitor for review.  The audits should include a comparison of the downloaded data to the officer's Use of Force Reports. Discrepancies within the audit should be addressed and appropriately investigated.

76.    ECW application data will be tracked and analyzed in CDP's Officer Intervention Program.

### 3.  Oleoresin Capsicum Spray ("OC Spray")

77.    Officers will apply OC spray only:  (1) when such force is reasonable to protect the officer, the subject, or another party from physical harm and lesser means would be ineffective; or (2) for crowd dispersal or protection and other means would be more intrusive or less effective.

78.    After one standard OC spray (one second), each subsequent application is a separate use of force that officers must individually justify as reasonable.

79.    Officers will not normally use OC spray on handcuffed or restrained persons. OC spray will be used on handcuffed or restrained persons only where the subject is displaying aggressive physical resistance and lesser means would be ineffective or have been tried and failed.

80.    Officers will be trained in and follow protocols developed by the City in conjunction with the City's EMS professionals, on the officer's responsibilities following OC spray use, including:

   a.  decontaminating every subject exposed to chemical spray by using cool water to flush the subject's face and eyes within 20 minutes of gaining control of the scene.  Officers need not decontaminate subjects who were only secondarily exposed to OC spray, for example, when OC spray is used for crowd control, unless requested by the subject;

   b.  understanding the risks of positional asphyxia, and using restraint techniques that do not impair the subject's respiration following an OC spray application;

18

      c.   requesting medical response or assistance for subjects exposed to OC spray when they complain of continued effects after having been decontaminated, or they indicate that they have a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, heart ailment, etc.) that may be aggravated by OC spray.

81.   Officers will carry only CDP issued OC spray.

82.   CDP will maintain documentation of the number of OC spray canisters distributed to and utilized by each officer.

83.   OC spray application data will be tracked and analyzed in CDP's Officer Intervention Program.

### C.   Use of Force Training

84.   As part of its training requirements in Section XI of this Agreement, within 365 days of the Effective Date, CDP will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes:

      a.   proper use of force decision-making;

      b.   use of force reporting requirements;

      c.   the Fourth Amendment and related law;

      d.   de-escalation techniques, both verbal and tactical, that empower officers to make arrests without using force and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, using cover, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;

      e.   role-playing scenarios and interactive exercises that illustrate proper use of force decision-making, including training on the importance of peer intervention;

      f.   the proper deployment and use of all intermediate weapons or technologies;

      g.   the risks of prolonged or repeated ECW exposure, including that exposure to ECWs for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious physical injury;

    h.  the increased risks ECWs may present to a subject who is pregnant, elderly, a child, frail, has low body mass, or is in medical crisis;

    i.  that when using an ECW the drive stun mode is generally less effective than the probe mode and, when used repeatedly, may exacerbate the situation;

    j.  firearms training, as described in paragraph 60;

    k.  factors to consider in initiating or continuing a vehicle pursuit; and

    l.  for supervisors of all ranks, as part of their initial and annual in-service supervisory training, training in conducting use of force investigations; strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force; and supporting officers who report unreasonable or unreported force, or who are retaliated against for attempting to prevent unreasonable force.

85.    CDP also will provide the use of force training described in paragraph 84 to all new officers as part of its training Academy.

86.    CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope.

### D.    Use of Force Reporting Policy and Use of Force Reports

87.    Within 365 days of the Effective Date, CDP will develop and implement a single, uniform, reporting system pursuant to a Use of Force Reporting policy.  CDP uses of force will be divided into three levels.  The three levels for the reporting, investigation, and review of use of force correspond to the amount of force used and/or the outcome of the force.  This Agreement's categorization of these types of uses of force is based on the following factors:  potential of the technique or weapon to cause injury; degree of injury caused; degree of pain experienced; degree of disability experienced by the subject; complaint by the subject; degree of restraint of the subject; impairment of the functioning of any organ; duration of force; and physical vulnerability of the subject.  Each level of force will require increasingly rigorous reporting, investigation, and review.  The levels of force are defined as follows:

    a.  Level 1 is force that is reasonably expected to cause only transient pain and/or disorientation during its application as a means of gaining compliance,

including pressure point compliance and joint manipulation techniques, but that is not reasonably expected to cause injury, does not result in an actual injury, and does not result in a complaint of injury.  It does not include escorting, touching, or handcuffing a person with no or minimal resistance. Unholstering a firearm and pointing it at a subject is reportable as a Level 1 use of force with the exceptions set forth in paragraph 56.

b. Level 2 is force that causes an injury, could reasonably be expected to cause an injury, or results in a complaint of an injury, but does not rise to the level of a Level 3 use of force.  Level 2 includes the use of an ECW, including where an ECW is fired at a person but misses; OC Spray application; weaponless defense techniques (e.g., elbow or closed-fist strikes, kicks, leg sweeps, and takedowns); use of an impact weapon, except for a strike to the head, neck or face with an impact weapon; and any canine apprehension.

c. Level 3 is force that includes:  (1) uses of lethal force; (2) uses of force resulting in death or serious physical injury; (3) uses of force resulting in hospital admission; (3) all neck holds; (4) uses of force resulting in a loss of consciousness; (5) canine bites; (6) more than three applications of an ECW on an individual during a single interaction, regardless of the mode or duration of the application, and regardless of whether the applications are by the same or different officers, or an ECW application for longer than 15 seconds, whether continuous or consecutive; and (7) any Level 2 use of force against a handcuffed subject.

88. All officers using or observing force will report in writing, before the end of their shift, the use of force in a Use of Force Report.  The Use of Force Report will include:  (1) a detailed account of the incident from the officer's perspective; (2) the reason for the initial police presence; (3) a specific description of the acts that led to the use of force; (4) the level of resistance encountered; and (5) a complete and accurate description of every type of force used or observed.  The use of force reporting policy will explicitly prohibit the use of conclusory statements, "boilerplate," or "canned" language (e.g., "furtive movement" or "fighting stance"), without supporting detail.

89. Officers will be subject to the disciplinary process for material omissions or

misrepresentations in their Use of Force Reports.

90. Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable.

91. Officers who use or observe force will notify their supervisors, or ensure that their supervisors have been notified, as soon as practical following any use of force.   An officer who becomes aware of an allegation of unreasonable or unreported force by another officer must immediately notify his or her supervisor of that allegation.

92. Use of Force Reports will be maintained centrally.

### E.  Use of Force Investigations

93. A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval.

#### 1.  Investigations of Level 1 Uses of Force

94. The direct supervisor of the officer(s) employing a Level 1 use of force will review and approve the use of force in writing, return the Use of Force Report to the officer for revision, or elevate the Level 1 use of force before the end of the supervisor's shift following the shift on which the Level 1 force was used.  If the Use of Force Report is returned to the officer for revision, all revisions and additional reviews will be completed within 5 days of the use of force.  It is not mandatory for supervisors to report to the scene of a Level 1 use of force.  Supervisors will elevate and investigate any Level 1 use of force that appears to have violated policy or was improperly categorized as a Level 1 use of force.  If a supervisor determines that an officer's report reveals evidence of a use of force involving potential criminal conduct, he or she will immediately notify Internal Affairs.

#### 2.  Investigations of Level 2 Uses of Force

95. The direct supervisor of the officer(s) using force, upon notification of a Level 2 use of force incident or allegation of excessive force, will respond to the location of the occurrence.  Where the force is a Level 1 but the subject has alleged excessive force,

the supervisor will respond to the scene to determine whether a Level 1 or Level 2 investigation should be conducted.

96. If a CDP supervisor uses a Level 2 use of force, a supervisor of a higher rank will respond to the location of the occurrence and comply with the requirements of this section.

97. For all Level 2 uses of force, the direct supervisor will:

    a. respond to the scene, examine the subject of the force for injury, and interview the subject for complaints of pain after advising the subject that the interview pertains only to the use of force and not to any underlying alleged crime and that the subject need not answer questions;

    b. where appropriate, ensure that the subject receives medical attention from an appropriate medical provider;

    c. obtain an identifying number that allows CDP to track the use of force;

    d. identify and collect all evidence relevant to the use of force and evaluate that evidence to determine whether the use of force: (1) was consistent with CDP policy; and/or (2) raises any policy, training, tactical, or equipment concerns;

    e. ensure that all evidence that could establish material facts related to the use of force, including audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;

    f. ensure that a canvass for civilian witnesses is conducted and interview all civilian witnesses.  Supervisors will either record the interview or encourage civilian witnesses to provide and sign a written statement in their own words;

    g. ensure that all officers witnessing a use of force incident by another officer complete a Use of Force Report.  Supervisors will ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;

    h. ensure that involved officers are interviewed separately from one another. Group interviews will be prohibited.  Supervisors will not ask officers or other witnesses leading questions that suggest legal justifications for the officers' conduct, where such questions are contrary to appropriate law enforcement techniques; and

23

    i.   each investigating supervisor will provide a brief written synopsis to their immediate supervisor, which will be forwarded through the chain of command to the District Commander by the end of the shift on which the force occurred, documenting the supervisor's preliminary determination of the appropriateness of the use of force.

98.   The investigating supervisor will ensure that all Use of Force Reports include the information required by this Agreement and CDP policy; consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate; and make credibility determinations, if feasible.  Supervisors will make all reasonable efforts through the investigation to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force claimed by the officer and the subject's injuries, and inconsistencies between multiple officers.  CDP will train all investigating supervisors on how to effectively complete these tasks.

99.   Whenever a supervisor determines that there may have been misconduct, the supervisor will immediately notify Internal Affairs and Internal Affairs will determine if it should respond to the scene and/or conduct or take over the investigation.

100.   Within five days of learning of the use of force, each supervisor will complete and document his/her investigation using a supervisor's Use of Force Report.  Any extension to this deadline must be authorized by a District Commander.  This Report will include the following:

    a.   the supervisor's narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officers' conduct based on the supervisor's independent review of the facts and circumstances of the incident;

    b.   documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state that fact.  In situations in which witnesses were present but circumstances prevented the supervisor from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report should also

include all available identifying information for anyone who refused to provide a statement;

c.  the names of all CDP employees who used force or witnessed the use of force;

d.  the investigating supervisor's evaluation of the use of force, based on the supervisor's review of the evidence gathered, including a determination of whether the officers' actions appear to be within CDP policy and consistent with state and federal law; and an assessment of the incident for policy, training, tactical or equipment concerns, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options; and

e.  documentation of any non-disciplinary corrective action taken.

101. Investigatory supervisors will be subject to the disciplinary process for failing to adequately investigate and document a use of force and material omissions or misrepresentations in the supervisory investigation.  An investigatory supervisor's failure to adequately investigate a use of force will be addressed in their performance review.

102. Upon completion of the supervisor's Use of Force Report, the investigating supervisor will forward the report through their chain of command to the District Commander, who will review the report to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard.  Each level in the chain of command will review the report within 72 hours of receiving it.  Reviewing supervisors in the chain of command will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings.

103. Where the findings of the Use of Force Report are not supported by a preponderance of the evidence, the investigating supervisor's chain of command will document the reasons for this determination and will include this documentation as an addendum to the original investigation.  The investigating supervisor's superior will counsel the investigating supervisor regarding the inadequately supported determination and of any investigative deficiencies that led to it.  The District Commander will be responsible for the accuracy and completeness of Use of Force Reports prepared by supervisors under

their command.

104.  Where an investigating supervisor conducts deficient investigations, the supervisor will receive the appropriate corrective action, including training or demotion, in accordance with performance evaluation procedures and/or the disciplinary process.

105.  Whenever an investigating supervisor, reviewing supervisor, or District Commander finds evidence of a use of force involving potential criminal conduct by an officer, he or she will suspend the force investigation immediately and notify Internal Affairs. Internal Affairs will immediately notify FIT, which will take over both the criminal and administrative investigation.

106.  When the District Commander finds that the investigation is complete and the findings are supported by the evidence, the investigation file will be promptly forwarded to Internal Affairs.  Internal Affairs will review the investigation to ensure that it is complete and that the findings are supported by the evidence.

107.  When Internal Affairs completes its review, it will forward the complete file to the Chief of CDP for disposition.

108.  At the discretion of the Chief, his or her designee, or Internal Affairs, a use of force investigation may be assigned or re-assigned for investigation to FIT or to another supervisor, whether within or outside of the District in which the incident occurred, or may be returned to the District for further investigation or analysis.  This assignment or re-assignment will be explained in writing.

109.  Where, after investigation, a use of force is found to be out of policy, the City will ensure the appropriate disciplinary process.  Where the use of force indicates policy, training, tactical, or equipment concerns, the Chief will ensure also that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

### 3.  Force Investigation Team and Investigations of Level 3 Uses of Force

110.  CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP where appropriate to ensure the fact and/or appearance of impartiality of investigations.

111.  The Internal Affairs Unit will include CDP's Force Investigation Team ("FIT").  Each FIT will be a team comprised of personnel from various units and will not be a new unit

to which officers are permanently assigned.  The FIT will conduct administrative investigations in all of the following instances and, where appropriate and where not assigned to an outside agency as permitted above, will conduct criminal investigations of:  (1) all Level 3 uses of force; (2) uses of force involving potential criminal conduct by an officer; (3) all instances in which an individual died while in, or as an apparent result of being in, CDP custody; and (4) any uses of force reassigned to FIT by the Chief or his or her designee.  The FIT will be designed to ensure that these incidents are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified; that training, tactical, and equipment deficiencies related to the use of force are identified; and that investigations are of sufficient quality.

112.	FIT will be comprised of personnel who have specialized training and expertise.  The FIT membership will be tailored to the circumstances of each investigation, but will normally include one or more FIT detectives, the FIT sergeant, an Office of Professional Standards investigator, an Internal Affairs investigator, and a Homicide Unit supervisory officer, who will serve as the Team's leader.  OPS investigators will not participate in criminal investigations.  At least one member of the FIT will be available at all times to evaluate potential referrals from CDP supervisors.

113.	Prior to performing FIT duties, FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type, including FIT procedures, including callout and investigative protocols; the differences between administrative and criminal investigations and how each should be conducted; investigations of officer-involved shootings; investigative equipment and techniques; and proper roles of the following: on-scene counterparts, such as crime scene technicians; the Monitor; any outside investigating agency; the prosecutor's office; and OPS.  The training also will address techniques for objective fact-gathering and evaluation and the factors to consider when evaluating credibility.  FIT investigators also will receive annual in-service training that is adequate in quantity, quality, type, and scope.

114.	Within 365 days from the Effective Date, CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement.

115.	FIT will respond to the scene of every incident involving a use of force for which it is

required to conduct an investigation.  The FIT leader will immediately notify the appropriate prosecutor's office.  If the City elects to utilize an outside agency to conduct the criminal investigation, the FIT leader will notify the designated outside agency to respond to the scene to conduct the criminal investigation.

116. CDP will develop and implement policies to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation.

117. Before using an outside agency to conduct criminal investigations, CDP will develop a memorandum of understanding with the outside agency to ensure that, after an appropriate prosecutor review, completed criminal investigations are provided to FIT and the Monitor, and that information obtained from or as a result of any compelled interviews of officers is not provided to criminal investigators.  The memorandum of understanding also will delineate responsibilities between the two agencies and establish investigative protocols to ensure, to the extent possible, thorough, objective and timely administrative and criminal investigations.

118. FIT will:

   a. assume control of the use of force investigation upon their arrival, unless an outside agency is conducting the criminal investigation and control of the scene by the criminal investigating body is appropriate;

   b. ensure that a canvass for, and interview of, civilian witnesses is conducted by FIT team members.  FIT members will either record the interview or encourage civilian witnesses to provide and sign written statements in their own words, but will take information from civilian witnesses who have pertinent information even if they refuse to be recorded or refuse to complete or sign a formal statement;

   c. arrange for photographing and processing of the scene;

   d. ensure that all evidence that could establish material facts related to the use of force, including audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;

   e. examine the subject for injury, photograph areas of injury or complaint of injury, interview the subject for complaints of pain after advising the subject

that the interview pertains only to the use of force and not to any underlying alleged crime and that the subject need not answer questions, and ensure that the subject receives medical attention from an appropriate medical provider;;

f.  ensure that all officers witnessing the use of force by another officer complete a use of force report regarding the incident;

g.  review all use of force reports to ensure that they include the information required by CDP policy;

h.  consistent with applicable law, interview all officers who witness or are otherwise involved in the incident.  To the extent possible, officers will be separated until interviewed.  Group interviews will be prohibited.  FIT will not ask officers or other witnesses leading questions that suggest legal justifications for the officers' conduct, when such questions are contrary to appropriate law enforcement techniques.  FIT will record all interviews.  FIT will ensure that all FIT investigation reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;

i.  arrange for body worn camera video downloads;

j.  provide an initial briefing to a training representative at the start of the investigation to ensure that any training issues that require immediate attention are identified, and continue to consult as appropriate with the training representative; and

k.  make all reasonable efforts through the investigation to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force claimed by the officer and the subject's injuries.

119.  On at least an annual basis, the Monitor will determine whether the criminal investigations conducted by the outside agency are consistently objective, timely, and comprehensive.  If the Monitor determines that they are not and the City disagrees, the Court will resolve the disagreement.  If a determination is made that the investigations are not consistently objective, timely, and comprehensive, the memorandum of understanding will be terminated and the FIT will assume responsibility for conducting

29

all criminal investigations of uses of force.

120.   If the FIT leader determines that a case has the potential to proceed criminally, compelled interviews of the subject officer(s) will be delayed.  No other part of the investigation will be held in abeyance unless specifically authorized by the Chief in consultation with the agency conducting the criminal investigation and the appropriate prosecutor's office.

121.   The FIT leader will complete a preliminary report that will be presented to the Chief of Police or the Chief's designee as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force.

122.   With the exception of compelled interviews as described in paragraph 120, FIT will complete its administrative investigation within 60 days.  Any request for an extension of time must be supported by a written justification and approved in writing by the Chief or the Chief's designee.  CDP's inability to complete the investigation because it is awaiting information from an outside agency, such as the medical examiner's office, will constitute sufficient basis for such an extension for that portion of the investigation.  Within seven days of the conclusion of each use of force investigation, FIT will prepare an investigation report and recommend whether the preponderance of the evidence establishes that the involved officer(s) violated CDP policy, and whether any training or policy concerns are presented.  FIT's investigative report and recommendations will be reviewed by the head of Internal Affairs.  Within three business days, the head of Internal Affairs will approve or disapprove FIT's recommendations, or request that FIT conduct additional investigation.  Any request for additional investigation and the FIT's response will be documented and maintained in the investigatory file.  Internal Affairs will forward the investigative report to the Chief of Police for review and approval.

123.   CDP will revise the FIT manual to ensure that it is consistent with the force principles outlined in this Agreement and includes the following:

   a.  guidance on an appropriate approach when providing *Garrity* warnings and protections to officers for answering questions regarding their uses of force;

    b.   clear procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled subject officer statements;

    c.   definitions of all relevant terms;

    d.   clear statements of the mission and authority of FIT;

    e.   procedures for report writing;

    f.   procedures for objective fact-gathering and evaluation and the factors to consider when evaluating credibility;

    g.   procedures for collecting and processing evidence;

    h.   procedures for consulting with the law department, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending; and

    i.   scene management procedures.

### F.    Force Review Board

124.   The City will develop and implement a Force Review Board ("FRB") to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective. The FRB will review all FIT investigations, all Level 2 investigations where there was a determination of force related misconduct, and a sample of Level 2 use of force investigations. The Force Review Board ("FRB") will be comprised of the Chief of Police or his or her designee, who will chair the FRB; a supervisor from the training section; a representative from Office of Professional Standards; and a representative from Internal Affairs. One representative from each District, to be selected by the District Commander, will participate in all Force Review Board reviews involving a use of force in that District. The Chair may include any subject matter experts the Chair feels would be helpful in reviewing particular incidents. The FRB also may consult with other advisors as necessary.

125.   Each member will receive training on legal updates, updates to CDP's policies, and CDP training curriculum related to the use of force.

126.   The Force Review Board will conduct comprehensive and reliable reviews of

investigations within 90 days of submission to the FRB.  The scope of the Board's review will not be limited to assessing an officer's decision-making at the moment the officer employed force.  Rather, the FRB's review will include the circumstances leading up to the use of force, tactical decisions, information sharing and communication, adequacy of supervision, equipment, training, CDP's medical response, when applicable, and any commendable actions.  The review will include the actions and inactions of all officers, supervisors, commanders, and dispatchers involved in the incident, as appropriate.

127.   In conducting these reviews, the Force Review Board will:

    a.   ensure that it is objective and complete and that the findings are supported by a preponderance of the evidence.  Where the findings are not supported by a preponderance of the evidence, the FRB will document the reasons for this determination, including the specific evidence or analysis supporting its conclusions, and forward its determination to the Chief of Police;

    b.   hear the case presentation from the lead investigator, or for supervisory investigations, the representative from the District where the force occurred;

    c.   review any written or recorded statements from the officer, and discuss the case as necessary with the investigator or District representative to gain a full understanding of the facts of the incident;

    d.   order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the force investigation;

    e.   determine whether the incident raises concerns regarding policy, training, equipment, supervision, medical response by officers on the scene, communication, or tactics, and refer such incidents to the appropriate unit within CDP to ensure they are resolved;

    f.   recommend non-disciplinary corrective action to enable or encourage an officer to improve his/her performance; and

    g.   document its findings and recommendations in a report within 15 days of each FRB case presentation.

128.   The FRB will assess the quality of the investigations it reviews, including whether

investigations are objective and comprehensive and recommendations are supported by a preponderance of the evidence.  The FRB will identify and document any deficiencies that indicate a need for corrective action.

129.  Annually, the FRB will examine the data related to use of force provided by the Data Collection and Analysis Coordinator pursuant to paragraph 261, to detect any patterns, trends, and training deficiencies and make recommendations for correction, as appropriate.  The analysis will be provided to the Monitor.  To avoid duplication of effort in developing the public report required by paragraph 266, this analysis will be conducted in conjunction with the Data Collection and Analysis Coordinator.

130.  The FRB will work with the Data Collection and Analysis Coordinator to develop a tracking system to ensure that each of its recommendations has been forwarded to the appropriate personnel.  The Chief and his or her designee will ensure that the FRB's recommendations, including non-disciplinary corrective action, are implemented as appropriate.

## VII.  CRISIS INTERVENTION

131.  CDP will build upon and improve its Crisis Intervention Program with the goal of:   (a) assisting individuals in crisis; (b) improving the safety of officers, consumers, family members, and others within the community; (c) providing the foundation necessary to promote community and statewide solutions to assist individuals with mental illness; and (d) reducing the need for individuals with mental illness to have further involvement with the criminal justice system.  The Crisis Intervention Program will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health care system and create a context for sustainable change.

### A.  Mental Health Response Advisory Committee

132.  Within 180 days of the Effective Date, CDP and the City will ensure that a Mental Health Response Advisory Committee ("Advisory Committee") is developed to foster relationships and build support between the police, the community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis.

133. The Advisory Committee will include the Crisis Intervention Coordinator and representation from specialized CIT officers. CDP also will seek representation from the Cleveland Municipal Court's Mental Health Docket, the Ohio Criminal Justice Coordinating Center of Excellence, Cuyahoga County's Alcohol, Drug Addiction, and Mental Health Services Board ("ADAMHS Board"), FrontLine Services, and any other relevant Cuyahoga County mental health organizations, such as advocacy organizations, homeless service providers, area hospitals, and interested community members.

134. The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program.

135. On an annual basis, the Advisory Committee will conduct an analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers, call-takers, and dispatchers are appropriately responding to people in crisis, and will recommend appropriate changes to policies, procedures, and training regarding police contact with individuals in crisis.

136. The Advisory Committee's reports and recommendations will be provided to the Commission, will be publicly available, and will be posted on the City's website.

### B. Crisis Intervention Coordinator

137. Within 180 days of the Effective Date, CDP will designate an officer, at the rank of captain or above, to act as a Crisis Intervention Coordinator to better facilitate communication between CDP and members of the mental health community and to increase the effectiveness of CDP's Crisis Intervention Program.

138. The Coordinator will develop and maintain partnerships with program stakeholders and serve as a point of contact for advocates, individuals, families, caregivers, professionals, and others associated with the mental health community. The Coordinator will be available as a resource at all times during normal business hours.

139. The Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, call-takers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program.

140.    The Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate.

141.    The Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers.  The Coordinator also will be required to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls.

142.    The Coordinator will create ways to recognize and honor specialized CIT officers, call-takers, and dispatchers, where appropriate.

### C.    Crisis Intervention Training

143.    The City will provide training on responding to individuals in crisis to all of its officers and recruits.  Within 365 days of the Effective Date, officers will be provided with at least eight hours of initial training, and all officers will receive annual in-service training thereafter.  The initial and annual training will be adequate in quality, quantity, type, and scope, and will include the circumstances in which a specialized CIT officer should be dispatched or consulted and how situations involving individuals in crisis should be addressed if a specialized CIT officer is not immediately available.  All new recruits will receive at least 16 hours of training in the academy that meets these same requirements.

144.    Within 365 days of the Effective Date, and annually thereafter, all CDP call-takers, dispatchers, and their supervisors will receive crisis intervention telecommunicators training that is adequate to enable them to identify, dispatch, and appropriately respond to calls for service that involve individuals in crisis.  The training will include identification of individuals in crisis; telephonic suicide intervention; crisis management, de-escalation and scenario-based exercises; interactions with individuals with mental illness; information that should be gathered when the call-taker suspects that the call involves an individual in crisis; and the types of calls that require a specialized CIT response.  Any crisis intervention training that already has been provided to call-takers, dispatchers, and their supervisors may be considered to fulfill training requirements under this Agreement for those individuals, if appropriate.

### D.    Specialized Crisis Intervention Trained Officers

145.     The City will provide enhanced specialized training in responding to individuals in crisis to certain officers ("specialized CIT officers"). Specialized CIT officers will continue to be assigned to the patrol division and will maintain their standard patrol duties, except when called upon to respond to incidents or calls involving individuals in crisis.

146.     The enhanced training for specialized CIT officers will be at least 40 hours. This enhanced training will be adequate in quality, scope, and type and will include how to conduct a field evaluation, suicide intervention, community mental health resources, common mental health diagnoses, the effects of drug and alcohol abuse, perspectives of individuals with mental health issues, family members, the rights of persons with mental illness, civil commitment criteria, crisis de-escalation, and scenario-based exercises. This training must include on-site visitation to mental health and substance abuse facilities and interaction with individuals with mental illness and substance abuse disorders. Officers who are designated as specialized CIT officers who already have received 40 hours of appropriate crisis intervention training may be considered to have fulfilled these training requirements.

147.     Specialized CIT officers do not have to receive the initial eight hours of training provided to all officers, but must receive eight hours of annual in-service crisis intervention training, which can be the same training provided to all officers, if appropriate.

148.     Training and designation as a specialized CIT officer will be voluntary. To be eligible for consideration, officers must have at least three years of experience as a CDP officer. CDP will provide an in-depth assessment of each applicant to determine the applicant's fitness to serve as a specialized CIT officer. This assessment will include an examination of the officer's written application, supervisory recommendations, disciplinary file, and an in-person interview. Officers with a history of complaints of, or who have been disciplined for, excessive use of force against individuals in crisis will be presumptively ineligible to be specialized CIT officers.

149.     Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized CIT officers.

150.     All Field Training Officers will receive the enhanced specialized crisis intervention

training described in paragraph 146.  Despite having received this training, an FTO will not be designated as a specialized CIT officer unless that FTO has volunteered to be a specialized CIT officer and has been selected by the Coordinator.

151.   Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene.  If a supervisor has assumed responsibility for the scene, the supervisor will seek the input of a specialized CIT officer regarding strategies for resolving the crisis where it is reasonable for them to do so.

152.   Within 365 days of the Effective Date, the Coordinator will develop an effective specialized crisis intervention plan ("Specialized Crisis Intervention Plan").  The goal of the Specialized Crisis Intervention Plan will be to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis.  The Specialized Crisis Intervention Plan will include an assessment of the number of officers necessary to achieve this goal; identification of gaps in coverage of particular shifts or Districts and development of mechanisms to fill those gaps; identification of any barriers to ensuring full coverage and steps to overcome those barriers; and ways to identify qualified officers and to encourage them to apply. CDP will continually review and revise this plan as barriers to full coverage are identified and addressed.  The Specialized Crisis Intervention Plan will take into account the seniority provisions of the Collectively Bargaining Agreement and that CDP may not immediately be able to ensure that a specialized CIT officer is available to respond to all calls or incidents that appear to involve an individual in crisis.  Within these constraints, the City will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis. The Monitor will assess the Specialized Crisis Intervention Plan and report to the Parties whether it is appropriate and effective, and whether the City is using its best efforts to implement it.

   **E.   Crisis Intervention Policies and Procedures**

153.   The Ohio Criminal Justice Coordinating Center of Excellence currently is conducting a peer review of the crisis intervention program in Cuyahoga County.  The results of the

37

peer review assessment will be provided to the Advisory Committee, DOJ, and the Monitor. In developing its policies and procedures and the plan required by paragraph 152, the City will consider this assessment and any recommendations contained within it.

154. CDP, with recommendations from the Advisory Committee, will revise its policies to make clear that a crisis intervention response may be necessary even in situations where there has been an apparent law violation.

155. CDP, with recommendations from the Advisory Committee, will revise its current crisis intervention policy to ensure that specialized CIT officers have appropriate discretion to direct individuals with mental health and substance abuse issues to the health care system, rather than the judicial system, in those instances where it is appropriate to do so.

156. CDP's policies and procedures will make clear that specialized CIT officers, when available, must be dispatched to all calls or incidents that appear to involve an individual in crisis. CDP will track incidents in which a specialized officer was not dispatched to such calls. In developing and revising the plan required by paragraph 152, CDP will identify any barriers to ensuring that specialized CIT officers were dispatched to these calls, and will include steps to overcome these barriers.

157. CDP will track calls and incidents involving individuals in crisis by gathering, at a minimum, the following data:

    a. date, time, and location of the incident;

    b. subject's name, age, gender, race, ethnicity, and address;

    c. whether the subject was armed, and the type of weapon;

    d. whether the subject is a United States military veteran;

    e. name and address of individual calling for service;

    f. the reason for the interaction, i.e., suspected criminal conduct or call for assistance;

    g. name(s) and badge number(s) of the officer(s) on the scene;

    h. whether a supervisor responded to the scene;

    i. techniques or equipment officers used;

    j. any injuries to officers, subject, or others;

       k.  disposition of the incident (e.g., defuse, arrest, citation, referral); and

       l.  brief narrative of the event (only if not included in another document).

158.    CDP must publicly report this outcome data annually and provide it to the Advisory Committee, aggregated as necessary to protect privacy.

159.    The City will utilize this outcome data to identify training needs and develop case studies and teaching scenarios for crisis intervention training as well as primary and in-service crisis training; to make changes to the crisis training curriculum; to identify safety issues and trends; to recognize and highlight successful individual officer performance; to develop new response strategies for repeat calls for service; and to identify systemic issues that impede CDP's ability to provide an appropriate response to an incident involving an individual in crisis.

## VIII.  SEARCHES AND SEIZURES

160.    CDP will conduct all investigatory stops, searches, and arrests with the goal of ensuring that they are conducted in accordance with the rights secured and protected by the Constitution and state and federal law.  CDP will conduct investigatory stops, searches, and arrests fairly and respectfully as part of an effective overall crime prevention strategy that takes into account community values.  To achieve this goal, CDP will revise, develop, and implement search and seizure policies that comply with applicable law, and include the requirements below.

161.    Officers will not use an individual's gender, race, ethnicity, national origin, or perceived sexual orientation as a factor, to any extent or degree, in establishing reasonable suspicion or probable cause, unless such information is part of an actual and credible description of a specific suspect in an investigation that includes other identifying factors.

162.    Officers will not conduct investigatory stops when they lack reasonable suspicion.

163.    Officers will not conduct pat down searches without specific and articulable facts to reasonably suspect that a particular person is armed and dangerous.  This does not restrict an officer's ability to conduct a search incident to arrest or prior to transport.

164.    Where an officer seeks consent for a search, the officer will inform the person of his or her right to refuse and to revoke consent at any time and document the person's

consent.

165.     CDP officers will not rely solely upon an individual's geographic location, or presence in a high crime area without any other specific and articulable facts indicating that the individual has been, is, or is about to engage in criminal activity, as the basis for an investigatory stop.

166.     Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assaulting an officer and no other substantive violation is alleged.  Upon notification, the supervisor will respond to the scene.

167.     Officers will not use "canned" or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests.

168.     Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports.  CDP will train officers to use specific and individualized descriptive language in reports when documenting investigatory stops, searches, and arrests.  Supervisors will review all documentation of investigatory stops, searches, and arrests for completeness and adherence to law and CDP policy.

169.     CDP supervisors will review each arrest report by officers under their command, whether or not they involve the seizure of contraband, and will sign off on those reports to memorialize their review within 24 hours of the arrest, absent exceptional circumstances.  Supervisors will review reports and forms for deficiencies including:

    a.  "canned" or conclusory language without supporting detail, inconsistent information, insufficient articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not correct or complete;

    b.  arrests following stops that were not supported by reasonable suspicion;

    c.  arrests that are not supported by probable cause, or are otherwise in violation of the law or CDP policy; and

    d.  for every search or arrest involving the recovery of contraband evidence, whether the circumstances by which the evidence was recovered and/or probable cause for arrest was established are plausible and complete.

170.     Within seven days, CDP supervisors will separately document and report:
(1) investigatory stops and pat-down searches that appear unsupported by reasonable

suspicion, or that are otherwise in violation of CDP policy; (2) arrests unsupported by probable cause or that are in violation of CDP policy; or (3) investigatory stops, searches, and arrests that, while comporting with law and policy, indicate a need for corrective action or review of agency policy, strategy, tactics, or training.

171.  CDP supervisors will take appropriate action to address all apparent violations or deficiencies in investigatory stops, searches, and arrests.  Appropriate action may include recommending non-disciplinary corrective action for the involved officer, or referring the incident for administrative or criminal investigation.  The supervisor will ensure that each violation or deficiency is addressed in the officer's performance evaluations.

172.  A command-level official will review, within seven days of their completion, all supervisory reports of investigatory stops and pat-down searches not supported by reasonable suspicion, all searches and arrests not supported by probable cause, and all investigatory stops, searches, and arrests that were in violation of CDP policy, or that indicated a need for corrective action or review of agency policy, strategy, tactics, or training.  The commander will evaluate the supervisor's assessment and recommendations and ensure that all appropriate corrective action is taken, including referring the incident to Internal Affairs for investigation, if warranted.  The commander also will take appropriate non-disciplinary corrective action and/or will initiate the disciplinary process against supervisors who fail to conduct complete, thorough, and accurate reviews of officers' investigatory stops, searches, and arrests.  CDP will take into account the quality and completeness of these supervisory and commander reviews of officers' investigatory stops, searches, and arrests, in supervisory and commander performance evaluations.

173.  The City will provide all officers with initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements of this Agreement.  The training will be taught by a qualified instructor with significant experience in Fourth Amendment issues.  The training will address the requirements of Fourth Amendment and related law, CDP policies, and this Agreement, including:

    a.  the difference among the scope and degree of intrusion associated with different types of police contacts; the difference between probable cause, reasonable suspicion, and mere speculation; and the difference between voluntary consent and the mere acquiescence to police authority;

    b.  the types of facts and circumstances that may be considered in initiating, conducting, terminating, and expanding an investigatory stop;

    c.  the level of permissible intrusion when conducting searches, such as "pat-downs" or "frisks";

    d.  the permissible nature and scope of searches incident to an arrest;

    e.  procedures for executing searches, including handling, recording, and taking custody of seized property and evidence; and

    f.  the principles of procedural justice and the effect that differing approaches to investigatory stops, searches, and arrests can have on community perceptions of police legitimacy and public safety.

174. The City also will provide officers with annual search and seizure in-service training that is adequate in quality, quantity, type, and scope.

175. The City will incorporate the following elements in its training of officers:  (1) if possible, introducing themselves at the initiation of contact with a civilian; (2) stating the reason for an investigatory stop as soon as practicable; (3) ensuring that an investigatory stop is no longer than necessary to take appropriate action; and (4) acting with professionalism and courtesy throughout the interaction.

## IX.    ACCOUNTABILITY

176. The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process.  To achieve these outcomes, CDP and the City will implement the requirements set out below.

### A.    Internally Discovered Misconduct

177. Internal Affairs will conduct objective, comprehensive, and timely investigations of all internal allegations of officer misconduct. All findings will be based on the preponderance of the evidence standard. This standard will be clearly delineated in policies, training, and procedures and accompanied by detailed examples to ensure proper application by investigators.

178. Internal Affairs will be headed by a qualified civilian who is not a current or former employee of CDP, and who is not a current or retired law enforcement officer. The civilian head of Internal Affairs will report directly to the Chief of Police.

179. CDP will ensure that misconduct investigators and commanders possess excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an officer committed misconduct. Officers with a sustained history of civilian complaints of, or who have been disciplined for, excessive use of force, discrimination, or dishonesty will be presumptively ineligible for assignment to Internal Affairs.

180. Within 365 days of the Effective Date, CDP will provide all new personnel assigned to Internal Affairs with initial training and verify that all existing personnel received training within 365 days prior to the Effective Date that is adequate in quality, quantity, scope, and type on conducting misconduct investigations. This training will include instruction in:

    a. investigative skills, including proper interrogation and interview techniques; gathering and objectively analyzing evidence; and data and case management;

    b. the particular challenges of administrative police misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation;

    c. properly weighing the credibility of civilian witnesses against officers;

    d. using objective evidence to resolve inconsistent statements;

    e. the proper application of the preponderance of the evidence standard; and

    f. CDP rules and policies, including the requirements of this Agreement, and protocols related to administrative investigations of alleged officer misconduct.

181. Internal Affairs investigators also will receive annual training related to conducting

misconduct investigations that is adequate in quality, quantity, type and scope.

182.    In each investigation, Internal Affairs will collect and consider all relevant circumstantial, direct, and physical evidence, including officer-recorded video as it becomes available through CDP's implementation of body worn cameras or other recording devices.  There will be no automatic preference for an officer's statement over a non-officer's statement.  Internal Affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the officer or because the witness or complainant has a criminal history.  In conducting the investigation, Internal Affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.  Internal Affairs investigators will make all reasonable efforts to resolve material inconsistencies between witness statements.

183.    Internal Affairs will evaluate all relevant police activity and any evidence of potential misconduct uncovered during the course of the investigation, including each use of force, and any investigatory stops, searches, or seizures that occurred during the incident.

184.    If the person involved in the encounter with the police pleads guilty or is found guilty of an offense, Internal Affairs will not consider that information alone to be determinative of whether a CDP officer engaged in misconduct, nor will it justify discontinuing the investigation.

185.    Internal Affairs will complete its administrative investigations within 30 days from the date it learns of the alleged misconduct.  Any request for an extension of time must be approved in writing by the Chief or the Chief's designee.

186.    At the conclusion of each investigation, Internal Affairs will prepare an investigation report. The report will include:

   a.   a narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on Internal Affairs' independent review of the facts and circumstances of the incident;

    b.  documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the author of the report from determining the identification, phone number, or address of those witnesses, the report will state the reasons why.  The report also will include all available identifying information for anyone who refuses to provide a statement;

    c.  documentation of whether officers were interviewed, and a transcript or recording of those interviews;

    d.  the names of all other CDP employees who witnessed the incident;

    e.  Internal Affairs' evaluation of the incident, based on its review of the evidence gathered, including a determination of whether the officer's actions appear to be within CDP policy, procedure, regulations, orders, or other standards of conduct required of City employees; and an assessment of the incident for policy, training, tactical, or equipment concerns;

    f.  if a weapon was used, documentation that the officer's certification and training for the weapon were current; and

    g.  documentation of recommendations for initiation of the disciplinary process.

187. In addition to determining whether an officer committed alleged misconduct, investigations will include an assessment of whether:

    a.  the police action was in compliance with training and legal standards;

    b.  the use of different tactics should or could have been employed;

    c.  the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and

    d.  the incident suggests that CDP should revise its policies, strategies, tactics, or training.

188. CDP will ensure that all relevant information from the completed investigation is provided electronically to the officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator while ensuring that sensitive information is adequately protected.

**B.    Reporting Misconduct and Preventing Retaliation**

189.    CDP will require any CDP employee who observes or becomes aware of any act of misconduct by another employee to report the incident to a supervisor or directly to Internal Affairs.  Where an act of misconduct is reported to a supervisor, the supervisor will immediately document and report the information to Internal Affairs.  Failure to report an act of misconduct is an egregious offense and will subject the officer to the disciplinary process and, if sustained, will subject the officer to discipline, up to and including termination.

190.    CDP will develop a system that allows officers to confidentially and anonymously report potential misconduct by other officers.

191.    CDP will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

192.    Officers who retaliate against any person who reports or investigates alleged misconduct will be subject to the disciplinary process and possible discipline, up to and including termination.

**C.    Investigation of Civilian Complaints**

**1.  The Office of Professional Standards**

193.    The Office of Professional Standards ("OPS") will investigate all complaints of police misconduct it receives.  OPS will confer with the Internal Affairs Unit to develop policies and procedures for handling matters over which they both have investigative jurisdiction.

194.    The City will ensure that OPS is led by an administrator with the skills, expertise, and experience to effectively manage the intake, tracking, timely, and objective investigation of complaints; identify and implement appropriate training for investigators and PRB members from sources outside of CDP; assess OPS's equipment and staffing needs, including administrative staff, investigators, and supervisor(s); and ensure that OPS operates in a manner that is transparent and accountable to the community it serves.  The administrator also will have the skills, expertise, and

experience to develop and implement performance standards for OPS.

195. OPS investigators will receive initial training that is adequate in quality, quantity, scope, and type and will include:

    a. investigative skills, including proper interrogation and interview techniques; gathering and objectively analyzing evidence; and data and case management;

    b. the particular challenges of administrative investigations of police conduct, including identifying conduct warranting investigation that is not clearly stated in the complaint or that becomes apparent during the investigation;

    c. properly weighing the credibility of civilian witnesses against officers;

    d. using objective evidence to resolve inconsistent statements;

    e. the proper application of the preponderance of the evidence standard; and

    f. CDP rules and policies, including the requirements of this Agreement, and protocols related to administrative investigations of officer conduct alleged to be improper.

196. The training will be provided by sources both inside and outside of CDP, in order to ensure the highest quality training on investigative techniques and CDP policies, procedures, and disciplinary rules. Within 365 days of the Effective Date, OPS investigators will receive training that is adequate in quality, quantity, type, and scope, both initially and annually, in how to conduct administrative investigations.

197. OPS Investigators will not be current members of the CDP, and no CDP personnel will have any active role in OPS's operations.

198. The City will ensure that the lawyer representing OPS does not have any actual or apparent conflicts of interest.

199. OPS will have its own budget, separate from the administrative budget for the Department of Public Safety. The OPS Administrator will oversee the budget. The Monitor will analyze OPS's budget and advise the Parties and the Court as to whether it affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement.

200. Within 180 days of the Effective Date, OPS will develop a revised operations manual that will be made available to the public. The manual will, at a minimum, include the following:

    a.  a mission statement that defines OPS and PRB's core values, mission, and authority;

    b.  definitions of all relevant terms;

    c.  investigative procedures, including procedures for objective fact-gathering and evaluation and the factors that will be considered when evaluating credibility; procedures on report writing; and procedures for collecting and processing evidence;

    d.  procedures outlining when complaints may be administratively dismissed and the process with which OPS must comply to ensure that complaints are not prematurely or unnecessarily dismissed;

    e.  outlines the duties and practices of PRB, including how PRB will review OPS findings, how cases will be presented to PRB by OPS, the standard of review PRB will apply to reviewing complaints, how disciplinary recommendations will be determined, and a description of the types of information PRB will make available to the public; and

    f.  an explanation of possible dispositions and outcomes of complaints.

### 2. Filing and Tracking of Civilian Complaints

201. Within 365 days of the Effective Date, the City and CDP, in consultation with the Commission and OPS, will develop and implement a program to promote awareness throughout the Cleveland community about the process for filing complaints with OPS.

202. CDP and the City will work with the police unions, as necessary, to allow civilian complaints to be submitted to OPS verbally or in writing; in person, by phone, or on line; by a complainant, someone acting on his or her behalf, or anonymously; and with or without a signature from the complainant.  All complaints will be documented in writing.

203. CDP will post and maintain by the intake window at CDP headquarters and all District headquarters a permanent placard describing the civilian complaint process that includes relevant OPS contact information, including telephone numbers, email addresses, and Internet sites.

204. Within 365 days of the Effective Date, CDP will provide training that is adequate in

quality, quantity, scope, and type to all police personnel, including dispatchers, to properly handle complaint intake, including how to provide complaint materials and information; the consequences for failing to take complaints; and strategies for turning the complaint process into a positive police-civilian interaction.

205. CDP will require all officers to carry complaint forms in their CDP vehicles. Officers will provide complaint forms to individuals upon request. Officers will provide their name and badge number upon request. If an individual indicates to an officer that he or she would like to make a complaint about that officer, the officer will immediately inform his or her supervisor who will respond to the scene to assist the individual in filing a complaint. The supervisor will provide the individual a copy of the completed complaint form or a blank form to be completed later by the individual.

206. The City and OPS will make complaint forms and other materials outlining the complaint process and OPS's contact information widely available at locations including:  the websites of CDP, OPS and the City of Cleveland; the lobby of OPS's building; CDP headquarters and Districts; and City Hall.  OPS will ask locations such as public library branches and the offices and gathering places of community groups to make these materials available.

207. OPS's complaint form will not contain any language that could reasonably be construed as discouraging the filing of a complaint, including warnings about the potential criminal consequences for filing false complaints.

208. Within 180 days of the Effective Date, complaint forms and related informational materials will be made available, at a minimum, in English and Spanish.  OPS will make every effort to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language.  The fact that a complainant does not speak, read, or write English, or is deaf or hard of hearing will not be grounds to decline to accept or investigate a complaint.

209. The City will ensure that civilian complaints submitted through other existing systems, including the Mayor's Action Center and the Department Action Center, are immediately forwarded to OPS for investigation.

210. Within 150 days of the Effective Date, OPS will establish a centralized electronic

49

numbering and tracking system for all complaints.  Upon receipt of a complaint, OPS will promptly assign a unique identifier to the complaint, which will be provided to the complainant at the time the complaint is made.  OPS's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the complaint.  The system will be used to determine the status of complaints, as well as for periodic assessment of compliance with relevant OPS policies and procedures and this Agreement, including requirements of timeliness of investigations.  The system also will be used to monitor and maintain appropriate caseloads for OPS investigators.

211. OPS will track, as a separate category of complaints, allegations of biased policing, including allegations that an officer conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's demographic category.  OPS will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.

212. OPS will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, or arrests.

213. OPS will track, as a separate category of complaints, all allegations of excessive use of force received through OPS's intake process.

214. OPS will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.

215. OPS will produce, at least annually, a public report summarizing complaint trends, including the number and types of complaints received, the disposition of complaints by complaint type, the number and types of complaints administratively dismissed, and the average length of complaint investigations.

### 3.  Classification of Civilian Complaints

216. Within 90 days of the Effective Date, OPS will determine criteria for assigning complaints to one of two tracks:  standard and complex.  Investigation of complaints

assigned to the standard track will be completed within 45 days.  Investigation of complaints assigned to the complex track will be completed within 90 days during the first 6 months following the Effective Date and within 75 days thereafter.  OPS will undertake a staffing analysis to determine how many investigators are required to meet these targets and, if necessary, the City will use best efforts to expand OPS staff in accordance with the results of the analysis.  The staffing analysis will be provided to the Monitor, which will review it for adequacy.  The Monitor will advise the Parties as to whether OPS and PRB's budget affords sufficient independence and resources to meet the terms of this Agreement, and whether the City is using best efforts to expand its staff, if indicated by the analysis.  The Monitor will include this assessment in its reports.

217.  OPS will not terminate an investigation simply because the complainant seeks to withdraw the complaint or is unavailable, unwilling, or unable to cooperate with an investigation.  OPS will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.  In its annual report, OPS will include the number and types of complaints administratively dismissed and the reasons for closure.  Only the following types of complaints may be assigned the disposition of administratively dismissed:

    a.  complaints disputing traffic citations, except that allegations of improper conduct contained in such complaints (e.g., racial profiling, illegal search, excessive force) will be classified and investigated according to their merits;

    b.  complaints alleging a delay in police services where the preliminary investigation demonstrates that the delay was due to workload, or otherwise unavoidable;

    c.  complaints regarding off duty officer conduct of a civil nature, unless the alleged conduct, or its effects, constitute misconduct or have a substantial nexus to the officer's City employment; and

    d.  complaints in which the preliminary investigation demonstrates that the officer does not work for CDP, or where the identity of the officer cannot be determined despite the best efforts of OPS.

### 4. Investigation of Civilian Complaints

218.    The City will ensure that investigations of complaints are as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of the evidence.

219.    CDP will ensure that OPS has timely access to all reports related to the incident, including incident reports, supervisory investigations, completed Internal Affairs' investigations, and Force Review Board reports.  OPS has the authority to conduct additional investigation of any complaint of police misconduct.

220.    OPS investigators will attempt to interview each complainant in person, and where appropriate, this interview will be recorded in its entirety, absent a specific, documented objection by the complainant.

221.    The Chief will order officers who witnessed or participated in an incident that is the subject of an OPS complaint to cooperate with the OPS investigation, including by responding to written questions submitted by OPS or in-person interviews, as request by OPS.

222.     OPS investigators will have access to any relevant disciplinary information in the record of an officer who is the subject of a current investigation.

223.    In each investigation, OPS will consider all relevant evidence, including circumstantial, direct, and physical evidence.  There will be no automatic preference for an officer's statement over a non-officer's statement.  OPS will not disregard a witness's statement solely because the witness has some connection to either the complainant or the officer or because the witness or complainant has a criminal history.  OPS will make all reasonable efforts to resolve material inconsistencies between witness statements.

224.    At the conclusion of its investigation, OPS will explain its findings using one of the following categories:

    a.  Sustained:  the preponderance of the evidence establishes that the violation of policy occurred.  A complaint may be "sustained in part" if the investigation revealed sufficient evidence to support a finding of a policy violation on one or more, but not all of the complainant's allegations.  A complaint may also be "sustained for a violation not based on original complaint" if the investigation

reveals evidence of misconduct that was not included in the complainant's original allegation.

b.  Exonerated:  the preponderance of the evidence fails to establish a finding of a policy violation and does not warrant any further investigation or action.

c.  Unfounded: the preponderance of the evidence fails to establish whether a policy violation occurred or did not occur.

d.  Not Sustained:  the preponderance of the evidence establishes that the alleged conduct did occur, but did not violate CDP policies, procedures, or training.

e.  Administratively dismissed.

225.  OPS will document in writing the investigation of each complaint, including all investigatory steps taken, and OPS's findings and conclusions.  The recommended findings will be supported by a preponderance of the evidence.

226.  In addition to determining whether an officer committed the conduct alleged in the complaint and whether it violated policy, OPS may consider whether:  (a) the police action was in compliance with training and legal standards; (b) the incident indicates a need for additional training, counseling, or other corrective measures; and (c) the incident suggests that CDP should revise its policies, strategies, tactics, or training. OPS may include recommendations on these topics in its investigation.

227.  OPS will forward all investigations and its written conclusions to PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation.

### 5.  Communication with the Complainant

228.  OPS will send periodic written updates to the complainant including:

a.  within seven days of receipt of a complaint, OPS will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint.  The notice will inform the complainant how s/he may contact OPS to inquire about the status of a complaint.

b.  when OPS concludes its investigation, OPS will notify the complainant that the investigation has been concluded and forwarded to PRB, and inform the complainant when PRB will hear the complaint.

       c.   when PRB reaches a determination, OPS will notify the complainant of PRB's determination and inform the complainant that the case will proceed through the City's disciplinary process for further action.  Upon a conclusion of the matter, OPS will notify the complainant of the result.

229.    Notwithstanding the above notices, a complainant may contact OPS at any time to determine the status of his/her complaint.

### D.    Police Review Board

230.    Within 120 days of the Effective Date, in consultation with the Commission, the Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would ensure that the members of PRB are appointed in a transparent manner, are representative of the diverse communities within Cleveland, and allow the chair and a vice chair of PRB, to each serve for a term of one year, to be selected from among the members by majority vote of PRB's membership.

231.    PRB members will not be current or former members of the CDP.

232.    PRB will have its own budget, separate from the administrative budget for the Department of Public Safety.  The OPS Administrator will oversee the budget.  The Monitor will analyze PRB's budget and advise the Parties and the Court as to whether it affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement.

233.    PRB members will receive initial training that is adequate in quality, quantity, scope, and type and will include:

       a.   constitutional and other relevant law on police-citizen encounters, including law on the use of force and stops, searches, and arrests;

       b.   police tactics;

       c.   investigations of police conduct;

       d.   bias-free policing;

       e.   policing individuals in crisis;

       f.   CDP policies, procedures and disciplinary rules; and

       g.   community outreach.

234.    The training will be provided by sources both inside and outside of CDP, in order to

ensure the highest quality training on investigative techniques, and CDP policies, procedures, and disciplinary rules.

235.  PRB's meetings will be open to the public.  The schedule and location of meetings will be designed to ensure easy public access and will be posted on OPS's website, as will agendas for upcoming PRB meetings.  PRB members may vote to go into executive session for their deliberations, but case presentations and PRB votes will take place in open session.

236.  OPS investigators will attend PRB meetings at which their investigations are being considered and present their investigation, findings, and conclusions to PRB, whose members can direct questions about cases to them.  If PRB determines that it needs additional information before considering a matter, it may ask the investigator to conduct further investigation.

237.  PRB's recommended dispositions will be based on a preponderance of the evidence. For each case, PRB shall set forth its conclusion and an explanation of its reasons and supporting evidence in writing including, when applicable, the justification for departing from OPS's recommended disposition.

238.  In cases where PRB is recommending a sustained disposition, in whole or in part, PRB will include a recommendation as to disciplinary or non-disciplinary corrective action.

239.  PRB will forward all of its recommendations regarding dispositions and discipline to the Chief of Police or Director of Public Safety for further review or action under the City's disciplinary process.  PRB may include an assessment of whether:  (a) the police action was incompliance with training and legal standards; (b) the incident indicates a need for additional training, counseling, or other corrective measures; and (c) the incident suggests that CDP should revise its policies, strategies, tactics, or training.

### E.  Disciplinary Hearings

240.  The Chief of CDP will issue a General Police Order that requires officers to: (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB.

241.  Where PRB or Internal Affairs recommends the initiation of the disciplinary process,

the Chief of CDP, or his/her designee, or the Director of Public Safety will conduct a disciplinary hearing and will provide the officer with an opportunity to testify.  If an officer provides new or additional evidence at the hearing, the hearing will be suspended and the matter will be returned to Internal Affairs or PRB for consideration, as appropriate.

242.  If PRB recommends the initiation of the disciplinary process and recommends a disciplinary level, the matter will proceed through the City's disciplinary process.  If the Chief or the Director disagree with the PRB's recommendations, they will set forth in writing his or her justification for doing so.

243.  CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition.

244.  At least annually, the Monitor will review this data and assess whether PRB is achieving its mission.

### F.  Discipline

245.  The City will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented.

246.  In order to ensure consistency in the imposition of discipline, the City will review its current disciplinary matrix and will seek to amend it as necessary to ensure that it:

   a.  establishes a presumptive range of discipline for each type of rule violation;

   b.  increases the presumptive discipline based on an officer's prior violations of the same or other rules;

   c.  sets out defined mitigating and aggravating factors;

   d.  prohibits consideration of the officer's race, gender, national origin, age, ethnicity, familial relationships, or sexual orientation;

   e.  prohibits consideration of the high (or low) profile nature of the incident;

   f.  provides that CDP will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and

g.  provides that CDP will consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed.

247.  All disciplinary decisions will be documented in writing.

248.  If amended, the City will provide its disciplinary matrix to the PRB, the Commission, the ~~Police~~ Public Safety Inspector General, and the police unions for comment.

249.  CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years.

## X.    Transparency and Oversight

### A.    ~~Police~~ **Public Safety** Inspector General

250.  The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a ~~Police~~ Public Safety Inspector General.  The City will seek the Commission's input in developing the minimum qualifications and experience for an Inspector General.  The ~~Police~~ Public Safety Inspector General will be appointed by the Mayor into the classified service of the City.

251.  The ~~Police~~ Public Safety Inspector General will work in the Office of the Mayor of the City of Cleveland, but will report to the Chief Director of Public Safety~~Chief of CDP~~.

252.  The ~~Police~~ Public Safety Inspector General will not be a current or former employee of CDP.

253.  The duties of the ~~Police~~ Public Safety Inspector General will include authority to do the following:

a.  review CDP policies and practices to determine compliance with state and federal law, effectiveness, consistency with principles of bias-free and community policing and procedural justice; whether they promote public and officer safety, and whether they are achieving the goals of this Agreement;

b.  audit compliance with policies and procedures;

c.  conduct investigations;

d.  analyze trends;

e.  develop specific recommendations for reform concerning policies, procedures, practices, training, and equipment to improve police services and accountability;

    f.   analyze investigations conducted by OPS to determine whether they are timely, complete, thorough, and whether recommended dispositions are supported by the preponderance of the evidence;

    g.   collect and analyze all sustained findings and the discipline imposed, including the use of mitigating and aggravating factors, to assess disciplinary trends and to determine whether discipline is consistently applied, fair, and based on the nature of the allegation; and

    h.   make reports and recommendations for reform publicly available.

254.   The ~~Police~~ Public Safety Inspector General also will have authority to conduct investigations, analyze trends, and make reports and recommendations, as appropriate, at the request of the Chief of CDP or the Mayor. The Commission may recommend to the Chief of CDP, the Director of Public Safety, or the Mayor additional areas of inquiry for the Inspector General.

255.   The budget for the Inspector General will be visible as a separate line item in the budget proposal that is submitted annually pursuant to the Charter to the Cleveland City Council with the appropriation ordinance.  The Monitor will analyze the Inspector General's budget and advise the Parties whether it affords sufficient independence and resources to meet the terms of this Agreement.   The Monitor will include this assessment in its reports.

256.   The ~~Police~~ Public Safety Inspector General will have access to all documents and data necessary to perform the above functions, including any raw data collected by the Data Collection and Analysis coordinator.

**B.    Data Collection and Analysis**

257.   CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad public access to information related to CDP's decision making and activities.  To achieve this outcome, CDP will designate an individual or individuals as the "Data Collection and Analysis Coordinator".  The Data Collection and Analysis Coordinator will have the responsibilities below.

258.   The Data Analysis and Collection Coordinator will ensure the collection and tracking

of all documents related to uses of force and allegations of misconduct and related materials, including:

    a.  officers' use of force reports;

    b.  supervisor's use of force investigations;

    c.  force investigations by the Force Investigation Team;

    d.  force investigations by the Office of Professional Standards;

    e.  force reviews conducted by the Force Review Board;

    f.  investigations conducted by Internal Affairs; and

    g.  all supporting documentation and materials, including relevant ECW downloads, supporting audio-visual recordings, including witness and officer interviews, and any relevant camera downloads, including from body worn cameras.

259.   The Data Analysis and Collection Coordinator will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents, including:

    a.  the type(s) of force used;

    b.  whether an officer unholstered a firearm;

    c.  the actual or perceived race, ethnicity, age, and gender of the subject;

    d.  the name, shift, and assignment of the officer(s) who used force;

    e.  the District where the use of force occurred;

    f.  whether the incident occurred during an officer-initiated contact or a call for service;

    g.  the subject's perceived mental or medical condition, use of drugs or alcohol, or the presence of a disability, if indicated at the time force was used;

    h.  the subject's actions that led to the use of force, including whether the subject was in possession of a weapon;

    i.  whether the subject was handcuffed or otherwise restrained during the use of force;

    j.  any injuries sustained by the officer or the subject or complaints of injury, and whether the officer or subject received medical services;

    k.  whether the subject was charged with an offense, and, if so, which offense(s);

l.   for deadly force incidents, the number of shots fired by each involved officer, the accuracy of the shots, and whether the subject was armed or unarmed; and

m.  the length of time between the use of force and the completion of each step of the force investigation and review.

260.   The Data Collection and Analysis Coordinator will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation.  This system will allow the information to be searched and summarized electronically.  Data is not required to be collected for social contacts and encounters that are voluntary and consensual.  CDP's stop and search data collection system will be subject to review and approval by the Monitor and DOJ, and will require officers to document the following:

a.   the officer's name and badge number;

b.   date and time of the stop;

c.   location of the stop;

d.   duration of the stop;

e.   subject(s)'s actual or perceived race, ethnicity, age, and gender;

f.   if a vehicle stop, the presence and number of any passengers;

g.   if a vehicle stop, whether the driver or any passenger was required to exit the vehicle, and the reason for doing so;

h.   reason for the stop, including a brief description of the facts creating reasonable suspicion;

i.   whether any individual was asked to consent to a search and whether such consent was given;

j.   whether a pat-down, frisk, or other non-consensual search was performed on any individual or vehicle, including a brief description of the facts justifying the action;

k.   a full description of any contraband or evidence seized from any individual or vehicle; and

l.   disposition of the investigatory stop, including whether a citation or summons was issued to, or an arrest made of any individual, including the charge(s).

261.     The Data Analysis and Collection Coordinator will be responsible for the routine reporting of relevant data to the Chief of Police, FRB, Training Review Committee, OPS, the Commission, and the ~~Police~~ Public Safety Inspector General.

262.     The Data Analysis and Collection Coordinator will be responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection. This assessment will be provided to the Monitor.

263.     Within 365 days of the Effective Date, the Data Collection and Analysis Coordinator will develop a protocol to accurately analyze the data collected and allow for the assessments required below. This protocol will be subject to the review and approval of the Monitor and DOJ.

264.     Within 90 days of development of the protocol, and annually thereafter, CDP will conduct an assessment and issue a report summarizing its investigatory stop, search, and arrest data. The report will identify significant trends in compliance with the Fourth Amendment of the Constitution, identify which practices are most effective and efficient in increasing public safety and community confidence in CDP, and the steps taken to correct problems and build on successes. The report will be publicly available.

265.     Within 150 days of development of the protocol, and annually thereafter, CDP will conduct an assessment and issue a report of all activities, including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race, ethnicity, gender, disability, sexual orientation, or gender identity. This report will be based on data the City is obligated to collect, and is not an independent data collection requirement. CDP's report will identify which practices are most effective and efficient in increasing public safety and community confidence in CDP, and identify steps taken to correct problems and build on successes. CDP will make this report publicly available.

266.     Within 150 days of the development of the protocol, and annually thereafter, CDP, working with the FRB, will analyze the prior year's force data, including the force-related data listed above, to determine trends; identify and correct deficiencies revealed by this analysis; and document its findings in a public report. The FRB's data analysis responsibilities are outlined in paragraph 129.

61

267.    To ensure transparency in the implementation of this Agreement, all CDP audits, reports, and outcome analyses related to the implementation of this Agreement will be made publicly available, including at the City and CDP websites, to the extent permitted by law.  The Commission will work to make paper copies of these documents available to the community.  The Commission also may recommend that CDP make additional documents, data, and reports publicly available.

268.    To ensure transparency in its ongoing work, to the extent permitted by law, CDP will post its policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports on its website.

## XI.    OFFICER ASSISTANCE AND SUPPORT

### A.    Training

269.    The City will ensure that all officers receive adequate training to understand:  (a) how to police effectively and safely in accordance with CDP policy; (b) the requirements of this Agreement, Ohio law, and the Constitution and laws of the United States.  CDP training will reflect CDP's commitment to procedural justice, bias-free policing, and community policing, and will instill agency expectations that officers police diligently, and have an understanding of and commitment to the constitutional rights of the individuals they encounter.

#### 1.    Training Plan

270.    CDP will expand the scope and membership of the Training Review Committee.  The Training Review Committee, headed by the Commander responsible for Training, will include Training Section staff members, the District training coordinators, union representatives, and members of the Commission.

271.    Within 365 days of the Effective Date, the Training Review Committee will develop a written training plan for CDP's recruit academy, probationary field training, and in-service training to ensure that recruits, and officers are trained to effectively and lawfully carry out their duties in accordance with CDP policy, the requirements and goals of this Agreement, Ohio law, and the Constitution and laws of the United States. The plan will:

    a.   identify training priorities and broad training goals;

    b.   require at least 960 hours of recruit training;

    c.   fulfill all of the in-service training required by this Agreement, which will require at least 40 hours of in-service training annually;

    d.   develop instructional strategies that incorporate active learning methods such as problem-solving and scenario-based activities, based on current theories of learning; and

    e.   establish the frequency and subject areas for recruit and in-service training.

272. The Training Plan need not apply to personnel in the Communication Control Section.

273. Following approval by the City, including specifically the Chief, the City will submit the training plan and schedule of all training required by this Agreement to the Monitor and DOJ.  The Monitor will review the training plan and provide the Parties with written comments within 30 days of receipt thereof.  DOJ will have 30 days from receipt of the Monitor's comments on the training plan to determine whether the training plan is consistent with the requirements of this Agreement and to provide comments.  Both the Monitor and DOJ will comment specifically on whether the proposed training is adequate in quantity, scope and type.  If the Monitor or DOJ objects to any aspect of the training plan and schedule, they will note their objections to all Parties in writing.  The City will have 15 days to resolve any objections to its training plan and schedule.  If after this 15 day period has run, the Monitor or DOJ maintains its objection, then the Monitor will have an additional 15 days to resolve the objection.  If either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter.  The training plan and schedule will be implemented once any objections have been resolved.

274. The City, including the Training Review Committee, will annually review and update CDP's training plan.  To inform this update, the  City and its Training Review Committee will conduct a needs assessment, taking into consideration:  trends in misconduct complaints; problematic uses of force; analysis of officer safety issues; input from members at all levels of CDP; input from members of the community, including community concerns; court decisions; research reflecting the latest in law enforcement trends; individual District needs; and any changes to Ohio or federal law,

and to CDP policy.  The needs assessment also will identify trends and document officer reaction to and satisfaction with the training they received and officer learning as a result of training, including the extent to which officers are applying the knowledge and skills acquired in training to their jobs.

275.  CDP's Commander responsible for training will continue to be responsible for overseeing and coordinating all CDP training, including recruit academy; probationary field training; in-service training, including firearms and other use of force training; roll-call training; supervisory training; and all elective training.

276.  CDP will designate a single training coordinator in each District.  The Commander responsible for training will establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the Commander responsible for training.

277.  Within 180 days of the Effective Date, CDP will develop recruit academy and in-service curricula that comport with CDP's training plan and that comprehensively address the requirements of this Agreement.

278.  Unless otherwise noted, the training required under this Agreement, including training on all policies revised or developed pursuant to this Agreement, will be delivered within two years of the Effective Date.  Any training provided to CDP officers beginning in January 2015 may be considered to fulfill training requirements under this Agreement for individual officers, if appropriate.

279.  For all other substantive updates or revisions to policy or procedure, the City will ensure and document that all relevant CDP personnel have received and read the policy or procedure.  Notification of each revision or update will include the rationale for the policy changes and the difference between the old and updated policy.  Training beyond roll-call may be necessary for many policy updates and revisions to ensure officers understand and can perform their duties pursuant to the policy.

280.  The Commander responsible for training will review all training curricula, lesson plans, and procedures for consistency, quality, accuracy, currency, completeness, and compliance with applicable law and CDP policy, and ensure that they effectively teach CDP personnel to understand and follow CDP policies.  The Commander responsible for training will ensure that a variety of adult learning techniques, scenario-based

training, and problem-solving practices, in addition to traditional lecture formats, are incorporated into all training.  The Commander responsible for training also will ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Review Committee and, where appropriate, persons external to CDP with expertise in the relevant lesson areas.

281.    CDP will ensure that instructors are qualified and use only curricula and lesson plans that have been approved by the Commander responsible for training.  CDP will actively seek out and retain qualified instructors from outside CDP to supplement the skills of its in-house training staff and adjunct instructors.  As appropriate, CDP will incorporate experts and guest speakers, including judges, prosecutors, crime victims, and community members, to participate in relevant courses.

### 2.  Field Training Program

282.    Within 270 days of the Effective Date, CDP will revise, as necessary, its field training program for graduates of the police academy to comport with CDP's training plan and this Agreement.  The field training program will follow academy training and will continue to be at least 26 weeks.

283.    The field training program will incorporate community and problem-oriented policing principles, and problem-based learning methods.

284.    Within 270 days of the Effective Date, CDP will review and revise as necessary its Field Training Officer ("FTO") participation policy to establish and implement a program that effectively attracts the best FTO candidates.  CDP's policies and procedures on field training will delineate the criteria and methodology for selecting FTOs and field training sergeants.  The City will work with the unions to allow only highly qualified officers to serve as FTOs and Field Training Sergeants.  Taking into account the collective bargaining agreements with the unions, CDP will revise its eligibility criteria to select FTOs and Field Training Sergeants based on their written applications, performance evaluations, previous performance as police officers, and complaint and disciplinary histories.

285.    The City will ensure that all new FTOs and Field Training Sergeants receive initial and in-service training that is adequate in quality, quantity, scope, and type, and that

addresses management and supervision; community-oriented policing; effective problem solving techniques; and field communication.  If current FTOs and Field Training Sergeants have received initial training that is sufficient to fulfill the requirements of this Agreement, they will not have to repeat the initial training.  FTOs and Field Training Sergeants will receive the required in-service training at least every three years.  FTOs and Field training Sergeants will be trained on any substantive changes to FTO policies and practices during the interim period.  FTOs and Field Training Sergeants will be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, practicing and teaching community and problem-oriented policing, and solving problems effectively.  CDP will maintain current documentation of FTOs' evaluations and training.

286.  Within 270 days of the Effective Date, CDP will create a mechanism for recruits to provide confidential feedback regarding the quality of their field training, including the extent to which their field training was consistent with what they learned in the academy, and suggestions for changes to academy training based upon their experience in the FTO program.  CDP will document its response, including the rationale behind any responsive action taken or decision to take no action.

287.  The City and the Training Review Committee will, on an annual basis, analyze all aspects of CDP's FTO program and consider emerging national policing practices in this area.  Based on this research and analysis, the City and the Training Review Committee will recommend, and CDP will institute, appropriate changes to policies, procedures, and training related to its FTO program.

### 3.  Documentation of Training

288.  CDP will document all training provided to or received by CDP officers, whether required or otherwise.  Officers will sign an acknowledgement of attendance or digitally acknowledge completion of each training course (whether provided through CDP or outside sources) as well as completion of annual training requirements and training on any new or substantially revised policies.  These acknowledgements will be maintained in a format that allows for analysis by training type, training date, training source, and by individual officer name.

289.  Within 540 days of the Effective Date, CDP will develop and implement a system that will allow the Training Section to electronically track, maintain, and produce complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system.

290.  The City will develop and implement accountability measures, including disciplinary and non-disciplinary corrective action, to ensure that all officers successfully complete all required training programs in a timely manner.

### B.  Equipment and Resources

291.  With the goal of ensuring that CDP is provided with the resources, equipment, and updated technology necessary to implement the terms of this Agreement and to allow officers to perform their jobs safely, effectively, and efficiently, the City will implement the paragraphs below.

292.  Within 365 days of the Effective Date, CDP will complete a comprehensive equipment and resource study to assess its current needs and priorities to perform the functions necessary for CDP to fulfill its mission and satisfy the requirements of this Agreement. Within six months of completion of this study, CDP will develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement.

293.  Among other items, CDP's Equipment and Resource Plan will provide for necessary equipment including, at least the following:

    a.  an adequate number of computers;

    b.  an adequate number of operable and safe zone cars;

    c.  zone cars with reliable, functioning computers that provide officers with up-to-date technology, including:

        i.  a mobile computer-aided dispatch system that allows officers and supervisors to access real time information received from call-takers and dispatchers;

        ii.  the ability to access CDP's records management system; and

        iii.  access to law enforcement databases that allow officers to learn basic information about the civilians with whom they interact and the call

history associated with the locations to which they are responding, as well as warrant and driver's license checks, and information concerning restraining orders; and

d.  zone cars equipped with first-aid kits that would allow police officers to perform life-saving measures, and equipment necessary to decontaminate persons exposed to OC spray.

This plan also will ensure that CDP:

e.  properly maintains and seeks to continuously improve upon existing equipment and technology; and

f.  is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies.

294.  CDP will actively seek input and feedback from the Commission, patrol officers, and supervisors regarding resource allocation, equipment needs, and technological improvements.

295.  Upon the Chief's approval of the Equipment and Resource Plan, CDP will submit it to the Monitor and DOJ.  The Monitor will assess the Equipment and Resource Plan and report to the Parties whether it is appropriate, effective, and consistent with the requirements of this Agreement.  DOJ may independently review and assess whether the Equipment and Resource Plan is appropriate, effective, and consistent with the requirements of this Agreement.  The City and CDP will employ best efforts to implement the Equipment and Resource Plan over the period of time set forth in the approved plan.  The Monitor will report to the Parties whether the City and CDP are using best efforts to implement the Equipment and Resource Plan as required.

296.  Within 365 days of the Effective Date, CDP will develop or revise, as appropriate, and implement an effective, centralized records management system that will enhance crime analysis, improve responsiveness and transparency, allow for effective and efficient data collection, promote information sharing within CDP and throughout the law enforcement community, aid in developing crime-fighting solutions, and assist CDP in effectively deploying its personnel.

297.  Within 180 days of the Effective Date, CDP will utilize a department-wide e-mail system to improve communication and information sharing among all department

personnel, including command staff, supervisors, and patrol officers.  Patrol officers will not have access to information regarding allegations of misconduct.

298.   CDP will employ information technology professionals who are trained to conduct crime and intelligence analysis, who are capable of troubleshooting and maintaining information technology systems and who can identify and suggest appropriate technological advancements.

299.   CDP will implement an effective employee assistance program that provides officers ready access to the mental health and support resources necessary to facilitate effective and constitutional policing.

### C.   Recruitment and Hiring

300.   To maintain high-level, quality service, ensure officer safety and accountability, and promote constitutional, effective policing, the City will review and revise as necessary its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals.

301.   The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP.

302.   Within 180 days of the Effective Date, CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community.  The recruitment plan will establish and clearly identify the goals of CDP's recruitment efforts and the duties of officers and staff implementing the plan.  CDP will regularly review its recruitment and hiring procedures and the effects of those procedures to ensure that those, and other requirements, reflect the needs of the job and do not create artificial or unnecessary barriers to selection.  The recruitment plan will be provided to the Monitor and DOJ.

303.   The City will implement the recruitment plan within 60 days of it being approved by the Monitor.

304.   CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants, including officers who are familiar with the different neighborhoods of

69

Cleveland, who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community.

305.  In developing and implementing its recruitment plan, CDP will consult with the Commission and other community stakeholders on strategies to attract a diverse pool of applicants.  CDP will create and maintain sustained relationships with community stakeholders to enhance recruitment efforts.

306.  The City will continue to utilize an objective system for hiring and selecting recruits. The system will continue to employ minimum qualification for candidates and an objective process for selecting recruits that employs reliable and valid selection criteria that comport with the Charter and anti-discrimination laws.

307.  CDP will report annually to the public its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, broken down by gender, race, ethnicity, and national origin, the extent to which CDP has been able to recruit qualified applicants, and a discussion of any challenges to recruiting high-quality applicants.

308.  CDP will continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological and medical examination to determine their fitness for employment.  CDP will continue to maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers.  The program will continue to be designed to detect the use of illegal substances, including steroids.

309.  CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions in accordance with federal anti-discrimination laws. CDP's suitability determination will include assessing a candidate's criminal history, employment history, use of controlled substances, and ability to work with diverse communities.  CDP also will determine, to the extent possible, whether the candidate has been named in a civil action in either Cuyahoga County and/or in the County where the officer lives.

310.  As part of the hiring process, consistent with applicable law, CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's previous supervisor(s).  This review, and any salient

information obtained, will be documented in the candidate's file.

311.    If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation that includes requesting a candidate's history of using lethal and less lethal force, use of force training records, and complaint history.  This review, and any salient information obtained from this review, will be documented in the candidate's file.

**D.    Performance Evaluations and Promotions**

312.    CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process, and that officers who lead professionally and effectively are identified and receive appropriate consideration for promotion. CDP will further ensure that poor performance or policing that otherwise undermines public safety and community trust is reflected in officer evaluations so that CDP can identify and effectively respond.

**1.    Performance Evaluations**

313.    The City will develop and implement fair and consistent practices to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis.

314.    As part of this program, within 18 months of the Effective Date, CDP, working with human resources and the police unions as necessary, will continue to utilize a formalized system documenting the annual performance evaluations of each officer by the officer's direct supervisor.  The annual performance evaluation will be augmented to include an assessment of:

   a.    community engagement and communication with the public as appropriate to assignment;

   b.    use of community and problem-oriented policing and problem-solving strategies as appropriate to assignment;

   c.    de-escalation strategies;

   d.    techniques for dealing with individuals in crisis;

   e.    civilian commendations and complaints;

   f.    disciplinary actions;

g.  compliance with policy;

h.  safety (e.g., officer safety standards and vehicle operations);

i.  training;

j.  report writing; and

k.  decision-making skills.

315.  As part of the annual performance review process, supervisors will meet with the employee whose performance is being evaluated to discuss the evaluation.  In addition, on an ongoing basis, supervisors will discuss with their subordinates their performance and will document as appropriate the supervisor's ongoing communications regarding officer performance and areas of growth.

316.  CDP will hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates.

**2.  Promotions**

317.  The City will develop and implement fair and consistent promotion practices that comport with the requirements of this Agreement and result in the promotion of officers who are effective and professional.

318.  In determining whether the officer is likely to be effective and appropriate for the position to which he or she is being considered for promotion, the appointing authority will consider the following factors, where relevant:

a.  effective use of community and problem-oriented policing strategies;

b.  the number and circumstances of uses of force;

c.  an officer's service as an FTO or Field Training Sergeant;

d.  disciplinary record;

e.  problem-solving skills;

f.  interpersonal skills;

g.  support for departmental integrity measures; and

h.  pending disciplinary process.

**E.  Staffing**

319.  Within 365 days of the Effective Date, CDP will complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform the

functions necessary for CDP to fulfill its mission, and satisfy the requirements of this Agreement.  Within 180 days of completion of this study, CDP will develop an effective, comprehensive Staffing Plan that is consistent with its mission, including community and problem-oriented policing, and that will allow CDP to meet the requirements of this Agreement.

320.     Among other items, CDP's Staffing Plan will address and provide for each of the following:

     a.  personnel deployment to ensure effective community and problem-oriented policing;

     b.  a sufficient number of well-trained staff and resources to conduct timely misconduct investigations;

     c.  to the extent feasible, Unity of Command; and

     d.  a sufficient number of supervisors.

321.     Upon the Chief's approval of the Staffing Plan, CDP will submit it to the Monitor and DOJ.  The Monitor will assess the Staffing Plan and report to the Parties whether it is appropriate, effective, and consistent with the requirements of this Agreement.  DOJ independently will review and assess whether the Staffing Plan is appropriate, effective, and consistent with the requirements of this Agreement.  The City and CDP will employ best efforts to implement the Staffing Plan over the period of time set forth in the approved plan.  The Monitor will report to the Parties whether the City and CDP are using best efforts to implement the Staffing Plan as required.

## XII.    SUPERVISION

### A.    Duties, and Training of First Line Supervisors

322.     CDP will ensure that first line supervisors provide close and effective supervision of officers.  This close and effective supervision includes responding to, investigating, and documenting force as required by this Agreement; ensuring that officers are working actively to engage the community with the goal of increasing public trust; monitoring, commanding, and controlling incidents and calls for service; reviewing arrest reports for compliance with law and this Agreement; identifying training and professional development needs; and providing leadership, counseling, redirection, and support to

73

officers as needed.

323.   Within 365 days of the Effective Date, CDP will develop and implement mandatory supervisory training for all new and current supervisors.  This training for new and current supervisors may be different, but both will be adequate in quality, quantity, type, and scope, and will include the following topics:

   a.   techniques for effectively guiding and directing officers and promoting effective and constitutional police practices;

   b.   de-escalating conflict;

   c.   evaluating written reports, including identification of canned or conclusory language that is not accompanied by specific facts;

   d.   investigating officer uses of force;

   e.   building community partnerships and guiding officers on this requirement;

   f.   understanding supervisory tools such as the Officer Intervention Program and body worn cameras;

   g.   responding to and investigating allegations of officer misconduct;

   h.   evaluating officer performance;

   i.   consistent disciplinary sanction and non-punitive corrective action;

   j.   monitoring use of force to ensure consistency with policies; and

   k.   legal updates.

324.   Thereafter all sworn supervisors will receive adequate in-service management training, which may include updates and lessons learned related to the topics covered in the supervisor training and other areas covered by this Agreement.

325.   CDP will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community.

### B.    Officer Intervention Program

326.   Within 365 days of the Effective Date, CPD will create a plan to modify its Officer Intervention Program ("OIP") to enhance its effectiveness as a management tool to promote supervisory awareness and proactive identification of potentially problematic behavior among officers.

327.    CDP supervisors will regularly use OIP data to evaluate the performance of CDP officers across all ranks, units, and shifts.  Non-medical CDP supervisors will not have access to confidential medical or mental health information or treatment plans.  CDP supervisors will be trained to interpret OIP data; understand and utilize the range of non-disciplinary corrective action they can take to modify officers' behavior and improve performance; manage risk and liability; promote constitutional policing; and address underlying stressors to promote officer well-being.  The intent of OIP is to intervene before discipline is required.

328.    The OIP will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide and for each officer regarding:

   a.   all uses of force;

   b.   all ECW applications and accidental discharges involving a subject;

   c.   all injuries and deaths to persons in custody;

   d.   all critical firearm discharges;

   e.   incidents involving the reportable pointing of a firearm at a person;

   f.   the number of OC spray applications;

   g.   canine bites;

   h.   vehicle pursuits and traffic collisions involving CDP equipment;

   i.   civilian complaints, whether filed with CDP, OPS, or the Mayor's office;

   j.   judicial proceedings where an officer is the subject of a protective or restraining order, other than a temporary restraining order dealing solely with financial matters.  Officers will be required to report to their supervisors if they become the subject of a protective or restraining order, other than a temporary restraining order dealing solely with financial matters;

   k.   failures to record incidents with CDP's body worn cameras that are required to be recorded under CDP's body worn camera policy;

   l.   instances in which CDP is informed that a court has made a negative credibility determination regarding a CDP officer, or that a  motion was granted on the grounds of a constitutional violation by a CDP officer;

   m.  all disciplinary action taken against officers;

   n.   all documented non-disciplinary corrective action required of officers;

o.  sick leave usage, especially in concert with regular days off and holidays; and

p.  all criminal proceedings initiated against an officer, and all civil lawsuits served upon the City and/or its officers or agents, resulting from the actions of CDP officers.

329.  CDP will set threshold levels for each OIP indicator that will trigger a formal review, and the thresholds will allow for peer-group comparisons between officers with similar assignments and duties.  The Monitor and DOJ will review and approve the OIP threshold levels.

330.  CDP will implement rolling thresholds so that, once a review of a particular officer has been triggered as a result of a specific criteria that resulted in an intervention, each subsequent event involving that same criteria will trigger a review for a specified period of time.

331.  CDP will collect and, at least quarterly, analyze OIP information related to supervisor, District, squad, and unit trends.

332.  OIP will include appropriate identifying information for each involved employee (i.e., name, badge number, shift, and supervisor) and, where appropriate, each involved civilian (e.g., race, ethnicity, national origin, and gender).

333.  CDP will develop and implement a comprehensive protocol for using the updated OIP information that will include data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation, audits, access to the system, and confidentiality of personally identifiable information, medical and mental health records and treatment plans.

334.  Supervisors will review OIP data other than confidential medical or mental health records and treatment plans, for all officers under their direct command at least monthly, and whenever an employee first comes under their supervision.  At least quarterly, supervisors will review broader, pattern-based reports.

335.  Interventions in response to threshold triggers will be timely implemented and designed to assist officers in avoiding potentially problematic behavior.  All interventions will be documented in writing and entered into OIP.  Supervisors will review the progress and evaluate the effectiveness of the intervention strategy except for those interventions that relate to confidential medical and mental health treatment plans.

336.     CDP will enter information into OIP in a timely, accurate, and complete manner, and will securely and confidentially store all data.  CDP will maintain all officer specific information in OIP for at least five years following the officer's separation from CDP, unless prohibited by law.  Information necessary for aggregate statistical analyses will be maintained indefinitely.  CDP will provide in-service training to all employees, including officers, supervisors, and commanders, regarding the updated OIP within 180 days of the system improvements specified in this section to ensure proper understanding and use of the system.  CDP supervisors will be trained to use OIP as designed to help improve the performance of officers under their command. Commanders and supervisors will be trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns.

### C.     Body Worn Cameras

337.     CDP's use of body worn cameras is not required by this Agreement.  If CDP chooses to use body worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals.

338.     Supervisors will review recordings related to any incident involving at least a Level 2 or 3 use of force; injuries to officers; and in conjunction with any other supervisory investigation.

339.     Supervisors will conduct adequate random and directed audits of body worn camera recordings created by officers under their command to confirm compliance with CDP policy and to identify areas where additional training or guidance is needed. Supervisors will incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers.

340.     Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy.

## XIII.  POLICIES

341.     To maintain high quality service, ensure officer safety and accountability, and promote constitutional, effective policing, the City will ensure that its policies and procedures

reflect and express CDP's commitment to building community trust, utilizing community and problem-oriented policing, ensuring bias-free policing, and incorporating the concept of procedural justice.

342. As needed, the City will develop, revise, and implement policies and procedures to fully incorporate the terms of this Agreement and comply with applicable law.  The City will ensure that its policies and procedures are plainly written, logically organized, and use terms that are clearly defined.  Unless otherwise noted, the City will develop all policies and procedures pursuant to this Agreement within 365 days of the Effective Date.

343. The City will ensure that officers from all varying ranks and units have a meaningful opportunity to review and comment on new or existing policies and procedures.

344.  Deleted

345. The City will submit all policies, procedures, manuals, and other administrative orders or directives related to this Agreement to the Monitor and DOJ prior to publication and implementation.  If the Monitor or DOJ objects to the proposed policy, procedure, manual, or other administrative order or directive because they do not incorporate the requirements of this Agreement or are inconsistent with this Agreement or law, the Monitor or DOJ will note this objection in writing to all Parties within 15 business days of the receipt of the policy, procedure, manual, or directive.  The City will have 15 business days to resolve any objections to its policies, procedures, manuals, or directives.  If, after this 15 day period has run, the Monitor or DOJ maintains its objection, then the Monitor will have an additional 15 business days to resolve the objection.  If either party disagrees with the Monitor's resolution of the objection, either party may ask the Court to resolve the matter.  The policies will not be published or implemented until any objections have been resolved.  The Monitor will determine whether an additional amount of time is necessary to ensure full and proper review of policies.  Factors to consider in making this determination include:  (a) complexity of the policy; (b) extent of disagreement regarding policy; (c) number of policies provided simultaneously; or (d) extraordinary circumstances delaying review by the DOJ or the Monitor.  In determining whether these factors warrant additional time for review, the Monitor will fully consider the importance of prompt implementation of policies and

will allow additional time for policy review only where it is clear that additional time is necessary to ensure full and proper review.  Any extension to the above timelines by the Monitor will also toll CDP's deadline for policy completion.

346.  The City will post approved policies and procedures on the City's website to ensure public accessibility.  There will be reasonable exceptions for policies, procedures, and administrative orders that are law enforcement sensitive, such as procedures regarding undercover officers or operations.

347.  The City will review each policy or procedure related to this Agreement six months after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to CDP personnel and remains consistent with this Agreement, and current law.  The City will review and revise policies and procedures as necessary upon notice of a significant policy deficiency during audits or reviews.

348.  CDP will maintain a complete, up-to-date manual of all CDP policies and procedures that is indexed and maintained in an organized manner using a uniform numbering system for ease of reference.  Officers and employees will have access to the manual, in hard copy or electronic format.  Revisions and updates to CDP policies and procedures will be incorporated into the manual.

349.  The City will ensure that changes in case law and statutes that are relevant to the work of CDP are disseminated to appropriate CDP personnel in a timely manner and incorporated, as needed, into CDP policies, procedures, and training.

## XIV.  IMPLEMENTATION, ASSESSMENT, OUTCOMES, AND ENFORCEMENT

### A.    Role of the Independent Monitor

350.  The Parties will jointly select an Independent Monitor ("Monitor") who will assess and report whether the requirements of this Agreement have been implemented, and whether this implementation is resulting in constitutional and effective policing, professional treatment of individuals, and increased community trust of CDP.  The Monitor will work with the Parties to identify and address any barriers to compliance.

351.  The Monitor will only have the duties, responsibilities, and authority conferred by this Agreement.  The Monitor will not, and is not intended to, replace or assume the role and duties of any CDP employee, including the Chief, or any other City official.

Nothing in this Agreement alters the fact that the Mayor of Cleveland retains authority over the CDP and the Chief of CDP maintains the authority to oversee the operations of CDP.  As an agent of the Court, the Monitor will be subject to the supervision and orders of the Court, consistent with this Agreement and applicable law.

352. In order to assess and report on CDP's implementation of this Agreement and whether the goals of this Agreement are being achieved, the Monitor will conduct the reviews specified in this Agreement, and will review CDP policies, procedures, practices, training curricula, and programs developed and implemented under this Agreement.

### B.    Selection and Compensation of the Monitor

353. Within 90 days of the Effective Date, or additional time if agreed to by the Parties, the City and DOJ will together select a Monitor, acceptable to both Parties, to assess and report on CDP's implementation of this Agreement.  The Parties have agreed to use an open Request for Information process in selecting the Monitor.  This process will be implemented in a manner consistent with this Agreement, including the requirement that the Monitor be jointly selected and acceptable to both DOJ and the City.  The Parties' Monitor selection will be subject to the approval of the Court with jurisdiction over this Agreement.  The Monitor will be comprised of individuals of the highest ethics.

354. If the Parties are unable to agree on a Monitor or an alternative method of selection within the timeframe agreed to by the Parties, each Party will submit the names of three candidates, or three groups of candidates, along with resumes and cost proposals, to the Court, and the Court will select a Monitor from among the qualified candidates/candidate groups.

355. The Monitor will be appointed for a period of five years from the Effective Date and will have its appointment extended automatically should the City and CDP not demonstrate Substantial and Effective Compliance at the end of this five-year period. The extension of the Monitor beyond seven years will be allowed only if the Court determines that it is reasonably necessary in order to assess and facilitate Substantial and Effective Compliance with this Agreement.  The Monitor's appointment will terminate prior to five years if the City has achieved Substantial and Effective

Compliance for the time specified in paragraph 401.

356. The City will bear all reasonable fees and costs of the Monitor.  DOJ and the City recognize the importance of ensuring that the fees and costs borne by the City are reasonable, and accordingly fees and costs will be one factor to be considered in selecting the Monitor.  In the event that any dispute arises regarding the reasonableness or payment of the Monitor's fees and costs, the City, DOJ, and the Monitor will attempt to resolve such dispute cooperatively prior to seeking the assistance of the Court.  If the City and DOJ agree, and the Court approves, an independent third party with no financial interest in the case may pay some or all of the fees and costs of the Monitor.

357. The City will provide the Monitor with permanent office space and reasonable office support such as office furniture, telephones, Internet access, secure document storage, and photocopying.

358. The Monitor, at any time after its initial selection, may request to be allowed to hire, employ, or contract with such additional persons or entities as are reasonably necessary to perform the tasks assigned to the Monitor by this Agreement.  Any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Agreement will be subject to the provisions of this Agreement.  The Monitor will notify the City and DOJ in writing if the Monitor wishes to select such additional persons or entities.  The notice will identify and describe the qualifications of the person or entity to be hired or employed and the monitoring task to be performed.  If the City and DOJ agree with the Monitor's proposal, the Monitor will be authorized to hire or employ such additional persons or entities.  The City and the DOJ have ten business days to disagree with any such proposal.  If the City and DOJ are unable to reach agreement within ten business days of receiving notice of the disagreement, the Court will resolve the dispute.

359. Should any of the Parties to this Agreement determine that the Monitor's individual members, agents, employees, or independent contractors have exceeded their authority, or failed to satisfactorily perform the duties required by this Agreement, the Party may petition the Court for such relief as the Court deems appropriate, including replacement of the Monitor, and/or any individual members, agents, employees, or independent contractors.

81

### C.    Compliance Reviews

360.   The Monitor will conduct reviews or audits as necessary to determine whether the City and CDP have complied with the requirements of this Agreement.  Compliance requires that the City and CDP:  (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice.  Compliance reviews and audits will contain the elements necessary for reliability and comprehensiveness.  Compliance reviews and audits may be conducted using sampling and compilation data where appropriate.

### D.    Biennial Community Survey

361.   Within 180 days of the Effective Date, and every two years thereafter, the Monitor will conduct a reliable, comprehensive, and representative survey of members of the Cleveland community regarding their experiences with and perceptions of CDP and of public safety.  Analysis of the results of this survey will be included in the outcome assessments that are described in paragraph 367 and that may be used to demonstrate sustained compliance with this Agreement.

362.   The City and DOJ will endeavor to secure private funding for the biennial community survey.

363.   To conduct the biennial community survey, the Monitor will:

   a.   develop a baseline of measures on public satisfaction with policing, attitudes among police personnel, and the quality of police-citizen encounters;

   b.   design, conduct, and analyze baseline and subsequent biennial surveys of a representative sample of City residents, police personnel, and detained arrestees;

   c.   review and consider prior law enforcement surveys in Cleveland and other cities, as well as current or recent concerns in Cleveland, in designing the survey;

   d.   observe community meetings and engage in informal conversations with Cleveland residents, CDP officers and command staff, and other relevant

individuals, including DOJ representatives during the pendency of this Agreement;

e.  ensure that the resident and arrestee surveys are designed to capture a representative sample of Cleveland residents, including members of each demographic category;

f.  conduct the survey in English, Spanish, and other languages, as necessary, to ensure representation of the entire Cleveland community; and

g.  formally discuss the survey methodology with CDP supervisors and DOJ representatives, throughout the pendency of this Agreement, and consider these opinions in the development of the initial survey and in making improvements to subsequent surveys.

364.  CDP and the City agree to cooperate with the design and performance of the survey.

365.  The report of the baseline survey and subsequent biennial surveys will be posted to the City's website, and publicly distributed.

366.  CDP will analyze the results of the survey and will use this analysis to modify and improve CDP policies, procedures, practices, and protocols, as needed.

### E.  Outcome Measurements

367.  In addition to compliance reviews and audits, the Monitor will conduct qualitative and quantitative assessments to measure whether implementing this Agreement has resulted in constitutional policing.  The measurements relating to use of force; addressing individuals in crisis; and stop, search, and arrest are not intended to expand the City's data collection requirements set forth elsewhere in the Agreement.  These outcome assessments will include collecting and analyzing, at least annually, the following outcome data, trends, and patterns:

a.  Use of force measurements, including:

1.  number of use-of-force incidents as compared to number of arrests, with use-of-force incidents broken down by force type, District, type of related arrest (if any); actual or perceived race, ethnicity, age, and gender of the subject; and, if indicated at the time force was used, the subject's mental

or medical condition, use of drugs or alcohol, or the presence of a disability;

2. number of injuries to officers and public, the rate at which officer and subject injuries decrease or increase overall and by severity of injury; number of force complaints, disposition of complaints, source of complaint (internal or external), force type, geographic area, and any identified demographic category of complainant;

3. the rate at which ECW usage decreases or increases compared to the use of force overall and by weapon;

4. number of uses of force found to violate policy, broken down by force type, geographic area, type of arrest; actual or perceived race, ethnicity, age, and gender of the subject; and, if indicated at the time force was used, the subject's mental or medical condition, use of drugs or alcohol, or the presence of a disability;

5.  number of officers who have more than one instance of use of force in violation of policy;

6. force reviews or investigations indicating a policy, training, or tactical deficiency; and

7. quality of use of force investigations and reviews; and number and rate of use of force administrative investigations which are returned for lack of completeness.

b. Addressing individuals  in crisis measurements, including:

1. number of calls for service and incidents that appear to involve an individual in crisis, broken down by whether specialized CIT officers responded to the calls; and the rate of individuals in crisis directed to the healthcare system, rather than the judicial system;

2. number of police interactions where force was used on individuals in crisis, including the type of force used; the reason for the interaction, i.e., suspected criminal conduct or a call for assistance; the threat to public safety, including whether the person was armed and if so, with what; a

description of the type of resistance offered, if any; and a description of any attempts at de-escalation.

c.  Stop, Search, and Arrest measurements, including:

1.  total number of investigatory stops, searches and arrests overall and broken down by District (understanding that different Districts may have inherently different demographic compositions), type of arrest, actual or perceived age, race, gender, and ethnicity of subject, and the rate at which the encounters resulted in a summons or arrest;

2.  data related to the documented reasonable suspicion to stop and probable cause search or arrest, broken down by the actual or perceived race, gender, age, and ethnicity of the person(s) stopped/searched/arrested;

3.  number of searches that resulted in a finding of contraband, overall and broken down by District (understanding that different Districts may have inherently different demographic compositions), type of arrest, and the actual or perceived age, race, gender, and ethnicity of subject.

d.  Bias-Free Policing and Community Engagement measurements, including:

1.  number and variety of community partnerships, including partnerships with youth;

2.  homicide clearance rate;

3.  number of civilian complaints regarding police services related to discrimination and their disposition; and

4.  analysis of results of biennial community survey, when available.

e.  Recruitment measurements, including:

1.  number of qualified recruit applicants;

2.  detailed summary of recruitment activities, including development and leveraging of community partnerships;

3.  number and race, ethnicity, gender, and any self-identified disability of applicants who failed the initial screening and the reasons for their failure;

4.  number of applicants with fluency in languages other than English, and the specific languages spoken;

5. number and race, ethnicity, gender, or self-identified disability of lateral candidates, and a list of their former agencies and years of service;

6. number of applicants with at least two years of college, a college degree, or at least two years of military service;

7. pass/fail rate in each phase of the pre-employment process by race, ethnicity, gender, and self-identified disability of applicants;

8. the average length of time to move applicants through each phase of the pre-employment process and average amount of time to process applicants; and

9. composition of recruit classes by race, ethnicity, gender, and self-identified disability.

f. Training measurements, including:

1. number and percentage of officers provided training pursuant to this Agreement, broken down by the type of training provided;

2. students' evaluations of the adequacy of training in type and frequency;

3. modifications or improvements to training resulting from the review and analysis required by this Agreement; and

4. prevalence of training deficiencies as reflected by problematic incidents or performance trends.

g. Officer assistance and support measurements, including:

1. availability and use of officer assistance and support services; and

2. officer reports or surveys of adequacy of officer assistance and support.

h. Supervision measurements, including supervisors' initial identification of officer violations and performance problems, and the supervisors' responses to those violations and problems;

i. Civilian complaints, internal investigations, and discipline, including:

1. number of complaints, and whether any increase or decrease in this number appears related to access to the complaint process;

2. number of sustained, exonerated, unfounded, not sustained, and administratively dismissed complaints by type of complaint;

86

3.   number of complaint allegations supported by a preponderance of the evidence;

4.   average length of time to complete investigations by complaint type;

5.   number of officers who were subjects of multiple complaints or who had repeated instances of sustained complaints;

6.   arrests of officers for on- and off-duty conduct;

7.   criminal prosecutions of officers for on-or off-duty conduct; and

8.   other than vehicle accidents not involving a pursuit, number and nature of civil suits against the City or CDP officers for work related conduct, and the amount of judgments against or settlements resulting from those civil suits.

j.   In conducting these outcome assessments, the Monitor may use any relevant data collected and maintained by CDP or the City (e.g., crime trend pattern analysis), provided that the Monitor has determined, and the Parties agree, that this data is reasonably reliable and complete.

**F.    Monitoring Plan and Review Methodology**

368.  Within 90 days of assuming the duties as the Monitor, the Monitor will review and recommend any changes to the outcome measures detailed above that the Monitor deems useful in assessing whether implementation of this Agreement is resulting in constitutional policing.  Recognizing that the above outcome measures have been negotiated and agreed to by the Parties, the Parties will move the Court to adopt any recommendations upon which they agree.

369.  Within 120 days of assuming the duties as the Monitor, the Monitor will develop a plan for conducting the compliance reviews and outcome assessments, and will submit this plan to the Parties for review and approval.  This plan will:

a.   clearly delineate the requirements of this Agreement to be assessed for compliance, indicating which requirements will be assessed together;

b.   set out a schedule for conducting outcome measure assessments for each outcome measure at least annually, except where otherwise noted, with the first assessment occurring within 365 days of the Effective Date; and

    c.   set out a schedule for conducting a compliance review or audit of each requirement of this Agreement within the first two years of this Agreement, and a compliance review or audit of each requirement at least annually thereafter, unless the Monitor no longer assesses that requirement as provided in the next paragraph.

370.    Where the Monitor recommends and the Parties agree, the Monitor may refrain from conducting a compliance review of a requirement previously found to be in compliance by the Monitor, or where outcome assessments indicate that the outcome intended by the requirement has been achieved.  The City and CDP will be deemed to have achieved Substantial and Effective Compliance on those requirements and the City's obligations under those provisions will be deemed to have been met for the purpose of seeking termination of this Agreement, without considering the one or two year sustained compliance requirement.

371.    At least 90 days prior to the initiation of any outcome measure assessment, compliance review, or audit, the Monitor will submit a proposed methodology for the assessment, review, or audit to the Parties.  The Parties will submit any comments or concerns regarding the proposed methodology to the Monitor no later than 45 days prior to the proposed date of the assessment, review, or audit.  The Monitor will modify the methodology as necessary to address any concerns or will inform the Parties in writing of the reasons it is not modifying its proposed methodology.  Any unresolved disputes involving the Monitor's methodology may be submitted to the Court for resolution.

### G.    Monitor Recommendations and Technical Assistance

372.    The Monitor may make recommendations to the Parties regarding actions necessary to ensure timely Substantial and Effective compliance with this Agreement and its underlying objectives.  Such recommendations may include a recommendation to change, modify, or amend a provision of this Agreement, a recommendation for additional training in any area related to this Agreement, or a recommendation to seek technical assistance.  In addition to such recommendations, the Monitor may also, at the request of DOJ or the City and based on the Monitor's reviews, provide technical assistance consistent with the Monitor's responsibilities under this Agreement.

373.    In the event that Substantial and Effective Compliance with this Agreement requires technical assistance beyond the scope of the Monitor's duties, DOJ, CDP, and/or the Monitor will inform the Parties of the need for technical assistance and its relation to compliance with this Agreement.  The Monitor, with assistance from the City, will arrange for the prompt initiation of the required technical assistance, to be performed by the Monitor, its agent, independent contractor, or a separate entity.  The cost for the technical assistance will be borne by the City.  If any Party disagrees with the need for the requested technical assistance, the Party will, within 15 days of being informed in writing of the requested technical assistance, inform the Court, which will resolve the dispute.

### H.    Comprehensive Reassessment

374.    Two years and six months after the Effective Date, the Monitor will conduct a comprehensive outcome assessment to determine whether and to what extent the outcomes intended by this Agreement are being achieved, and whether any modifications to this Agreement are necessary for achievement in light of changed circumstances or unanticipated impact (or lack of impact) of the requirement.  The Monitoring Plan will provide that this comprehensive outcome assessment will coincide with an annual outcome assessment as required in paragraph 367.  This assessment also will address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies for accelerating Substantial and Effective Compliance.  Based upon this comprehensive assessment, the Monitor will recommend any modifications to this Agreement necessary to achieve and sustain intended outcomes.  Where the Parties agree with the Monitor's recommendations, the Parties will move the Court to modify this Agreement accordingly.  This provision in no way diminishes the Parties' ability to stipulate to modifications to this Agreement as set out below.  Nothing in this Assessment will enable the Monitor to unilaterally modify the terms of this Agreement.

### I.    Monitor Reports

375.    The Monitor will file with the Court, every six months, written, public reports that include the following:

    a.   a description of the work conducted by the Monitor during the reporting period;

    b.   a list of each Agreement requirement, indicating which requirements have been:

        1.   incorporated into policy;

        2.   the subject of sufficient training for all relevant CDP officers and employees; and

        3.   carried out in actual practice.

    c.   the methodology and specific findings for each compliance review conducted, where appropriate, and redacted as necessary for privacy concerns.  An unredacted version will be filed under seal with the Court and provided to the Parties.  The underlying data for each compliance review will not be publicly available but will be retained by the Monitor and provided to either or both Parties upon request;

    d.   for any requirements that were reviewed or audited and found not to have been implemented, the Monitor's recommendations regarding necessary steps to achieve compliance;

    e.   the methodology and specific findings for each outcome assessment conducted; and

    f.   a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to compliance with this Agreement.

376.    The Monitor will provide a copy of the six-month reports to the Parties in draft form within 15 business days after the end of each reporting period.  The Parties will have 15 business days upon receipt of the report to informally comment on the draft report.  The Monitor will consider the Parties' responses and make appropriate changes, if any, before issuing the report.

      **J.**    **Coordination with the ~~Police~~ Public Safety Inspector General**

377.    In conducting its assessments, reviews, and audits, and in developing its monitoring plan and review methodologies, the Monitor may coordinate and confer with the ~~Police~~

Public Safety Inspector General to avoid duplication of effort and expenses.

### K. Communication between Monitor, Parties, and Public

378. The Monitor will maintain regular contact with the Parties in order to ensure effective and timely communication regarding the status of CDP's compliance with this Agreement. To facilitate this communication, the Monitor will conduct monthly meetings, which will include participation by the Chief, counsel for the City, CDP's Consent Decree Implementation Unit (described below), and DOJ. The Monitor also will meet at least twice each year with the Mayor.

379. The Monitor will hold public meetings with community stakeholders, including the Commission and the Cleveland City Council, to explain the Monitor's reports and inform the public about this Agreement's implementation process, as well as to hear community perspectives of police interactions. The Monitor will notify the Parties when such meetings are scheduled.

### L. Public Statements, Testimony, Records, and Conflicts of Interest

380. Except as required or authorized by the terms of this Agreement or with the Parties acting together: the Monitor, including any agent, employee, or independent contractor thereof, will not make any public statements or issue findings with regard to any act or omission of the City or CDP, or their agents, representatives, or employees; or disclose non-public information provided to the Monitor pursuant to this Agreement. Any press statement made by the Monitor regarding its employment or monitoring activities under this Agreement first will be approved by DOJ and the City.

381. The Monitor, including any agent, employee, or independent contractor thereof, may testify as to its/their observations, findings, and recommendations before the Court with jurisdiction over this matter. However, the Monitor, including any agent, employee, or independent contractor thereof, will not testify in any other litigation or investigative or pre-litigative proceeding with regard to any act or omission of the City, CDP, or any of their agents, representatives, or employees related to this Agreement or regarding any matter or subject of which the Monitor may have received knowledge as a result of his/her performance under this Agreement. This paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for

monitoring this Agreement.

382.  Unless such conflict is waived by the Parties, the Monitor will not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the City or its departments, officers, agents or employees.

383.  The Monitor is not a state or local agency, or an agent thereof, and accordingly, the records maintained by the Monitor will not be designated as public records subject to public inspection.

384.  The Monitor will not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Agreement brought by non-parties to this Agreement.

**M.  CDP Consent Decree Implementation Unit**

385.  The City and CDP agree to hire and retain, or reassign current City employees to form a unit with the skills and abilities necessary to facilitate compliance with this Agreement. At a minimum, this unit will coordinate the City's and CDP's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the City's and CDP's personnel to the Monitor and DOJ, as needed; ensure that all data, documents and records are maintained as provided in this Agreement; and assist in assigning implementation and compliance related tasks to CDP personnel, as directed by the Chief or the Chief's designee.

**N.  Implementation Assessment and Report**

386.  The City and CDP agree to collect and maintain all data and records necessary to:  (1) document compliance with this Agreement, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) to allow CDP or other City entities to perform ongoing quality assurance in each of the areas addressed by this Agreement.

387.  Within 180 days of the Effective Date, the City will file with the Court, with a copy to the Monitor and DOJ, a status report.  This report will delineate the steps taken by CDP

during the reporting period to comply with this Agreement; CDP's assessment of the status of its progress; plans to correct any problems; and responses to any concerns raised in the Monitor's previous semi-annual report.  Following this initial status report, the City will file a status report every six months thereafter while this Agreement is in effect.

### O.    Access and Confidentiality

388.    To facilitate its work, the Monitor may conduct on-site visits and assessments without prior notice to the City and CDP.  CDP will notify the Monitor as soon as practicable, and in any case within 12 hours, of any critical firearms discharge, in-custody death, or arrest of any officer.

389.    The Monitor will have timely, full, and direct access to all Agreement related individuals, facilities, trainings, meetings, disciplinary hearings, reviews, and the scene of any occurrence that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement.  The Monitor will cooperate with the City and CDP to access people, scenes, and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations.

390.    The City and CDP will ensure that the Monitor will have full and direct access to all City and CDP documents and data related to the Agreement that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement, except any documents or data protected by work product or the attorney-client privilege (together "privilege").  Privilege may not be used to prevent the Monitor from observing trainings, disciplinary hearings, or reviews, other than reviews with City lawyers in anticipation of litigation or for litigation.  Should the City and CDP decline to provide the Monitor with access to documents or data based on privilege, the City and CDP will inform the Monitor and DOJ that it is withholding documents or data on this basis, and will provide the Monitor and DOJ with a log describing the documents or data and the basis of the privilege .  If DOJ objects to the City's classification, DOJ may seek resolution of the propriety of the assertion of the privilege from the Court.

391.    DOJ and its consultants and agents will have full and direct access to all City and CDP

staff, employees, facilities, documents, and data related to the Agreement, in coordination with the Law Department of the City of Cleveland, except any documents or data protected by work product or the attorney-client privilege (together "privilege). DOJ and its consultants and agents will coordinate with the Law Department of the City of Cleveland to access involved personnel, facilities, and documents in a reasonable manner that, consistent with DOJ's right to seek enforcement of this Agreement, minimizes interference with daily operations.  Should the City or CDP decline to provide DOJ with access to personnel, documents, or data based on privilege, the City and CDP will inform DOJ that it is withholding personnel, documents, or data on this basis, and will provide DOJ with a log describing the documents or data and the basis for withholding.  If DOJ objects to the City's classification, DOJ may seek resolution of the propriety of the assertion from the Court.

392. While an administrative or criminal investigation into the conduct of an officer or officers is ongoing, neither the Monitor nor DOJ will ask the subject officer(s) or witness officer(s) questions related to the conduct that is under investigation.

393. The Monitor and DOJ will provide the City and CDP with reasonable notice of a request for copies of documents.  Upon such request, the City and CDP will provide copies in a timely manner (electronic, where readily available) of the requested documents to the Monitor and DOJ, unless withheld as privileged or otherwise withheld pursuant to law as described above.

394. The Monitor will have access to all records and information relating to criminal investigations of CDP officers as permitted by law.  The Monitor will have access to all documents in criminal investigation files that have been closed by CDP after the Effective Date.

395. The Monitor and DOJ will maintain all confidential or non-public information provided by the City and CDP in a confidential manner.  Other than as expressly provided in this Agreement, this Agreement will not be deemed a waiver of any privilege or right the City and CDP may assert, including those recognized at common law or created by statute, rule, or regulation, against any other person or entity with respect to the disclosure of any document.

### P.    Court Jurisdiction, Modification of this Agreement, and Enforcement

396.    This Agreement will become effective upon entry by the Court.

397.    The Court will retain jurisdiction of this action for all purposes until such time as the City and CDP have achieved Substantial and Effective Compliance with this Agreement and maintained such compliance for no less than two consecutive years.  At all times, the City and CDP will bear the burden of demonstrating by a preponderance of the evidence its Substantial and Effective Compliance with this Agreement.  DOJ acknowledges the good faith of the City of Cleveland in trying to address actions that are needed to promote police integrity and ensure constitutional policing.  DOJ, however, reserves its right to seek enforcement of the provisions of this Agreement if it determines that the City and CDP have failed to substantially comply with any provision of this Agreement.  DOJ will consult with officials from the City before instituting enforcement proceedings.

398.    The City and DOJ may jointly agree to make changes, modifications, and amendments to this Agreement, which will be effective if approved by the Court.  Such changes, modifications, and amendments to this Agreement will be encouraged when the Parties agree, or where the Monitor's reviews, assessments, and/or audits demonstrate that an Agreement provision as drafted is not furthering the purpose of this Agreement or that there is a preferable alternative that will achieve the same purpose.  Where the Parties or the Monitor are uncertain whether a change to this Agreement is advisable, the Parties may agree to suspend the current Agreement requirement for a time period agreed upon at the outset of the suspension.  During this suspension, the Parties may agree to temporarily utilize an alternative requirement.  The Monitor will assess whether the suspension of the requirement, and the use of any alternative provision, is as effective, or more effective at achieving the purpose as was the original/current Agreement requirement, and the Parties will consider this assessment in determining whether to jointly stipulate to make the suggested change, modification, or amendment.

399.    The Parties agree to defend the provisions of this Agreement including in collective bargaining.  The Parties will notify each other of any court, union, or administrative challenge to this Agreement.  In the event any provision of this Agreement is challenged in any city or state court, the Parties will seek removal to Federal Court.

400.    The City agrees to require compliance with this Agreement by their respective officers,

employees, agencies, assigns, or successors.

**Q.     Termination of this Agreement**

401.    This Agreement will terminate when the City has been in Substantial and Effective
Compliance with the search and seizure provisions for one year and with all of the
remaining provisions for two consecutive years.   "Substantial and Effective
Compliance" means that the City either has complied with all material requirements of
this Agreement, or has achieved sustained and continuing improvement in
constitutional policing, as demonstrated pursuant to this Agreement's outcome
measures.

402.    If the Parties disagree whether the City has been in Substantial and Effective
Compliance with the search and seizure provisions for one year and with all of the
remaining provisions for two consecutive years, the City may seek to terminate this
Agreement.  Prior to filing a motion to terminate, the City agrees to notify DOJ in
writing when the City has determined that they are in Substantial and Effective
Compliance with this Agreement and that such compliance has been maintained for the
required time periods.    Thereafter, the Parties will promptly confer as to the status of
compliance.  If, after a reasonable period of consultation and the completion of any
audit or evaluation that DOJ and/or the Monitor may wish to undertake, including on-
site observations, document review, or interviews with the City and CDP's personnel,
the Parties cannot resolve any compliance issues, the City may file a motion to
terminate this Agreement. If the City moves for termination of this Agreement, DOJ
will have 60 days after the receipt of the City's motion to object to the motion.  If DOJ
does not object, the Court may grant the City's motion without a hearing.  If DOJ does
object, the Court will hold a hearing on the motion, and the burden will be on the City
to demonstrate by the preponderance of the evidence that it is in Substantial and
Effective Compliance with this Agreement and has maintained such compliance for the
required time periods.

403.    This Agreement is enforceable only by the Parties.  No person or entity is intended to
be a third-party beneficiary of the provisions of this Agreement for purposes of any
civil, criminal, or administrative action.  Accordingly, no person or entity may assert

any claim or right as a beneficiary or protected class under this Agreement.

## XV.    DEFINITIONS AND ABBREVIATIONS

404.    "Active physical resistance" means the subject's physical actions are intended to prevent an officer from placing the subject in custody and taking control, but are not directed at harming the officer.  Examples include:  breaking the officer's grip or hiding from detection.  Verbal statements alone do not constitute active resistance.

405.    "Aggressive physical resistance" means the subject poses a threat of harm to the officer or others, such as when a subject attempts to attack or does attack an officer; exhibits combative behavior (e.g., lunging toward the officer, striking the officer with hands, fists, kicks, or any weapon).

406.    "Arrest" is the taking of one person into custody by another.  To constitute arrest there must be an actual restraint of the person.  The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him.  An arrest is a restraint of greater scope or duration than an investigatory stop or detention.  An arrest is lawful when supported by probable cause.

407.    Bias-free policing means policing that is accomplished without the selective enforcement or non-enforcement of the law, including the selection or rejection of particular policing tactics or strategies, based on the subject's membership in a demographic category.

408.    "Canine apprehension" means any time a canine is deployed and plays a clear role in the capture of a person. The mere presence of a canine at the scene of an arrest or use of a canine solely to track a subject will not count as a canine apprehension.

409.    "CDP" refers to the Cleveland Division of Police and its agents, officers, supervisors, and employees (both sworn and unsworn).

410.    "Chief" means the Chief of Police of the Cleveland Division of Police or his or her properly designated Acting Chief.

411.    "CIT" means crisis intervention trained.

412.    "City" means the City of Cleveland, including its agents, officers, and employees.

413.    "Crisis Intervention Program" is a first responder model of police-based crisis intervention that involves a dynamic collaboration of community, health care, and

advocacy partnerships committed to improving the way law enforcement and the community respond to individuals in crisis.

414.  "Community and problem-oriented policing" is a policing philosophy that promotes and relies on collaborative partnerships between law enforcement agencies and the individuals and organizations they serve to develop solutions to problems, increase trust in police, and improve the effectiveness of policing efforts.

415.  "Complainant" means any person who makes a complaint against CDP or an officer or employee of CDP.

416.  "Court" will refer to the United States District Judge for the Northern District of Ohio presiding over this case.

417.  "Critical firearm discharge" means a discharge of a firearm by a CDP officer, including accidental discharges; discharges at animals, other than to euthanize an animal under controlled circumstances; and discharges at persons where no one is struck, with the exception of recreational activities, range, discharges into a weapons clearing trap, and training discharges that do not result in a person being struck.

418.  "Days" means calendar days unless otherwise modified.

419.  "Demographic category" means race, ethnicity, national origin, age, gender, gender expression or identity, sexual orientation, disability, religion, or limited English proficiency.

420.  "Department of Justice" or "DOJ" refers jointly to the United States Department of Justice's Civil Rights Division and the United States Attorney's Office for the Northern District of Ohio.

421.  "Developmental disability" is a condition that begins during the developmental period and that negatively affects the trajectory of the individual's physical, intellectual, and/or emotional development.  A developmental disability is often a lifelong condition that results in substantial functional limitations in areas such as self-care, mobility, self-direction and capacity for independent living.  It can also be characterized by problems with both intellectual functioning or intelligence, which include the ability to learn, reason, problem solve, and other skills; and adaptive behavior, which includes everyday social and life skills.

422.  "Discipline" or "disciplinary action" means a personnel action for violation of an

established law, regulation, rule, administrative rule, or CDP policy, including a verbal reprimand, written reprimand, suspension, or dismissal.

423.    "District" refers to one of the service areas of CDP, which together cover the entire geographic area of the City of Cleveland. Each District is led by a District Commander.

424.    "ECW" means Electronic Control Weapon, a weapon, including those manufactured by TASER International, designed primarily to discharge electrical charges into a subject that will cause involuntary muscle contractions and override the subject's voluntary motor responses.

425.    "ECW application" means the contact and delivery of an electrical impulse to a subject with an Electronic Control Weapon.

426.    "Effective Date" means the day this Agreement is approved and entered as an order of the Court.

427.    "Firearm" means any instrument capable of discharging a bullet or shot, including a pistol, revolver, rifle or shotgun.  Bean bag shot guns used as such are not firearms for the purposes of this Agreement.

428.    "Implement" or "implementation" means the putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure in actual practice through the regular use of audit tools.

429.    "Including" means "including, but not limited to."

430.    "Investigatory stop" or "investigatory detention" means a temporary restraint where the subject of the stop or detention reasonably believes that she or he is not free to leave within the meaning of *Terry v. Ohio*.  An investigatory stop or detention may be a pedestrian, vehicle, or bicycle stop.

431.    "Individual in crisis" means a person in a mental health crisis or who appears to be significantly under the influence of opioids or PCP.

432.    "Less lethal force" means a force application not likely to cause death or serious physical injury.  Use of less lethal force can nonetheless result in death or serious physical injury.

433.    "Lethal force" means any use of force likely to cause death or serious physical injury, including the critical discharge of a firearm, or strike to the head, neck, or throat with a

hard object.

434. "Mental health crisis" means an incident in which someone with an actual or perceived mental illness or developmental disability is experiencing intense feelings of personal distress (e.g., anxiety, depression, anger, fear, panic, hopelessness), obvious changes in functioning (e.g., neglect of personal hygiene, unusual behavior) or catastrophic life events (e.g., disruptions in personal relationships, support systems, or living arrangements; loss of autonomy or parental rights; victimization; natural disasters), which may, but not necessarily, result in an upward trajectory of intensity culminating in thoughts or acts that are dangerous to his- or herself and/or others.

435. "Mental Health community" includes individuals and professionals from the mental health, alcohol and drug addition, developmentally disabled, and child and adolescent development communities.

436. "Mental Health provider" includes professionals from the mental health, alcohol and drug addiction, developmentally disabled, and child and adolescent development communities, who have the appropriate training and education in their respective fields and who are currently licensed in the State of Ohio to deliver the services he or she has undertaken to provide.

437. "Mental illness" is a medical condition that disrupts an individual's thinking, perception, mood, or ability to relate to others such that daily functioning and coping with the ordinary demands of life are diminished.  Mental illness includes, but is not limited to, serious mental illnesses such as major depression, schizophrenia, bipolar disorder, obsessive compulsive disorder ("OCD"), panic disorder, posttraumatic stress disorder ("PTSD"), and borderline personality disorder.  Mental illness includes individuals with dual diagnosis of mental illness and another condition, such as drug and/or alcohol addiction.

438. "Misconduct" means any improper conduct by an officer, including an alleged violation of CDP policy, procedure, regulations, orders, or other standards of conduct required of City employees including the improper use of force.  Solely for purposes of this Agreement, misconduct does not include minor infractions, such as uniform violations, routine motor vehicle accidents, or violations unrelated to the terms of this Agreement.

439. "Mobile Computer-Aided Dispatch System" is a computerized method of dispatching

police officers on a service call. It can also be used to send messages to the dispatcher and store and retrieve data (i.e., radio logs, field interviews, schedules, etc.).

440. "Monitor" means a team of people who will be jointly selected to monitor and report on the implementation of this Agreement.

441. "Neck hold" refers to one of the following types of holds:  (1) carotid restraint hold; (2) a lateral vascular neck constraint; or (3) a hold with a knee or other object to a subject's neck.

442. "Non-disciplinary corrective action" refers to action other than discipline taken to enable or encourage an officer to improve his or her performance.

443. "OC Spray application" means the deployment of Oleoresin Capsicum Spray on a known subject.  It does not include the deployment of OC Spray to clear a room when there are no visible subjects.

444. "Office of Professional Standards" or "OPS" means the City agency responsible for the intake and investigation of civilian complaints of police misconduct.

445. "OIP" means the Officer Intervention Program.

446. "Passive resistance" means non-compliance with officer commands that is non-violent and does not pose an immediate threat to the officer or the public.  Bracing, tensing, linking arms, or verbally signaling an intention to avoid or prevent being taken into custody constitute passive resistance.

447. "Personnel" means all CDP employees.

448. "Police officer" or "officer" means any sworn law enforcement agent employed by or volunteering for CDP, including supervisors and reserve officers.

449. "Policies and procedures" means written regulations or directives, regardless of the name of the regulation or directive, describing the duties, functions, and obligations of CDP personnel, and providing specific direction on how to fulfill those duties, functions, or obligations.  These include general orders, special orders, policies, procedures, and standard operating procedures.

450. "Procedural justice" refers to a concept involving four central principles designed to build public confidence in the police:  1) treating people with dignity and respect; 2) giving individuals a chance to be heard during encounters; 3) making decisions fairly and transparently, based on facts; and 4) conveying goodwill and trustworthiness.

451. "Reasonable force" means force that complies with the Fourth Amendment's requirement of objective reasonableness under *Graham v. Connor.*

452. "Records Management System" means an agency-wide system that provides for the storage, retrieval, retention, manipulation, archiving, and viewing of information, records documents, or files pertaining to law enforcement operations.

453. "Seizure" occurs when an officer's words or actions convey to a reasonable person that he or she is not free to leave.

454. "Serious physical injury" means injury that creates a probability of death, or which causes significant serious permanent or protracted disfigurement, or which causes a significant permanent or protracted loss or impairment of the function of any body part or organ.

455. "Specialized unit" means a designated law enforcement component with specialized training, skills, and mission.

456. "Substantial and Effective Compliance" means that the City either has complied with all material requirements of this Agreement, or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures.

457. "Supervisor" means sworn CDP personnel at the rank of sergeant or above (or anyone acting in those capacities) and non-sworn CDP personnel with oversight responsibility for other personnel.

458. "Unity of Command" means that all officers are assigned to a consistent, clearly identified first-line supervisor and that first-line supervisors are assigned to work the same days and hours as the officers they are assigned to supervise.

459. "Use of force" means any physical coercion used by an officer in performance of official duties that is a Level 1, 2, or 3 use of force.

460. "Use of force involving potential criminal conduct" means force that a reasonable and trained supervisor would conclude could result in criminal charges due to the apparent circumstances of the use of force.

461. "Use of Force Report" means a written report documenting all force at Level 1 or above.

462. "Will" or "Shall" or "agrees to" means that the provision imposes a mandatory duty.

Respectfully submitted this 26th day of May, 2015.

Amended this XX day of March, 2022

For Plaintiff UNITED STATES OF AMERICA:

_____

STEVEN M. DETTELBACH
United States Attorney
Northern District of Ohio


CAROLE S. RENDON
First Assistant U.S. Attorney
Northern District of Ohio


MICHELLE HEYER
HEATHER TONSING VOLOSIN
Assistant U.S. Attorneys
Northern District of Ohio
United States Court House
801 West Superior Avenue
Cleveland, Ohio  44113-1852
Tel. (216) 622-3600
Email:  Carole.Rendon@usdoj.gov
Email:  Michelle.Heyer@usdoj.gov
Email:  Heather.Tonsing.Volosin@usdoj.gov

_____

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division


MARK KAPPELHOFF
Deputy Assistant Attorney General
Civil Rights Division


JUDY C. PRESTON
Acting Chief
Special Litigation Section

EMILY A. GUNSTON
Special Counsel
RASHIDA OGLETREE
T. JACK MORSE
Trial Attorneys
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel.  (202) 514-6255; Fax. (202) 514-4883
Email:  Emily.Gunston@usdoj.gov
Email:  Rashida.Ogletree@usdoj.gov
Email:  Jack.Morse@usdoj.gov

For Defendant CITY OF CLEVELAND:

_____

FRANK G. JACKSON
Mayor

_____

BARBARA A. LANGHENRY
Director of Law
GARY S. SINGLETARY
Chief Counsel
JOSEPH F. SCOTT
Chief Assistant Director of Law
601 Lakeside Avenue, Room 106
Cleveland, Ohio 44114