IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | **MONITOR'S MARCH 20, 2024** |
| CITY OF CLEVELAND | ) | **STATUS CONFERENCE STATEMENT** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

The Monitor, Karl Racine, respectfully submits the below Status Conference Statement.

**I.   BACKGROUND**

On March 20, 2024, at 2:00 pm ET, the Parties and the Monitoring Team will participate in a status conference before Judge Solomon Oliver, Jr.  The Court issued a notice on March 15, 2024 indicating that "the Parties should be prepared to discuss the billing disputes regarding the Monitoring Team's invoices, as well as an update regarding the CPC document request process per the court's discussion with the parties at the close of last Thursday's Status Conference."

The City Law Department has objected to each bill the Monitor has submitted since assuming the role on April 12, 2023.  *See* Order Approving Monitor Karl Racine, ECF No. 474. The Monitor has made every attempt to resolve or otherwise reach an agreement with the City Law Department regarding its objections to the Monitoring Team's bills.  Notwithstanding these efforts, the one remaining objection that the City Law Department and the Monitor cannot resolve relate to an issue that the City Law Department calls "billing for billing."  Rather than address this

1

specific issue in a direct manner during the March 20, 2024 telephonic hearing, the City Law Department has elected to file a public notice that alleges everything but the kitchen sink. This effort to shift public attention away from the important work of the Consent Decree, is respectfully, a waste of time and resources. The City agreed to take on Monitorship costs when it reached a settlement agreement with the Department of Justice (hereinafter "DOJ") and filed a Motion to Approve Selection of the Monitor. *See* Settlement Agreement, ECF No. 413-3, Order, ECF No. 469, and Joint Sealed Motion to Approve Selection of Monitor, ECF No. 470.

Re-litigating disputes that were resolved through good-faith discussion and raising concerns around unfinalized budgets are not issues that have been brought before the Court. Nor are they referenced in the Court's March 15, 2024 notice. Therefore, the Court should not consider these issues at this time.

## II. HISTORY OF OUTSTANDING DISPUTE

Meg Olsen is a billing consultant for the Monitoring Team. Meg is responsible for managing the billing process from start to finish. First, she collects time entries from more than a dozen Monitoring Team members. She then reviews and quality checks time entries to ensure they comport with the City Law Department's demands. When she finds time entries that need to align with the City Law Department's requests, she calls individual Monitoring Team members to make recommended changes. After corrections are made, Meg then sends those time entries to Hogan Lovells to review and input into our system for payment. Once the bill has been processed through Hogan Lovells' payment system, Meg then liaises with the City Law Department and the DOJ for their review and approval, following up as necessary when Hogan Lovells does not receive a response. Finally, once a bill is approved, she liaises with the City's Department of Finance and Court to ensure payments are processed, keeping Hogan Lovells informed along the way.

The City has been paying for Meg Olsen's time and talent since 2016. Meg offers her services to the Monitoring Team at $63.75 per hour ($75 with 15% discount). Before Karl Racine assumed the role as Monitor, the payment structure was such that Monitoring Team members charged the City $250 per hour, but only took home $210 per hour. That $40 difference collected from the City was used to cover Meg Olsen's payment. When Karl Racine became Monitor, Hogan Lovells shifted that structure so that the amount charged to the City and the amount paid to Monitoring Team members would be exactly the same.

To be clear, the City has been paying for Meg's services for eight (8) years without seeing the details regarding the work she performed. Upon receiving detailed accounting of the work Meg performs, the City Law Department decided, beginning in September 2023, that it should not be required to pay for her time because the duties she performs relate to billing—or as they say "billing for billing."

The dispute at issue relates to September, October, and November 2023 time entries entered by Meg Olsen. Together, they total $2,237.12 ($2,632.50 minus 15% discount). The outstanding payments due to the Monitoring Team now exceed $100,000, with payment pending resolution of this $2,237.12 dispute. Notwithstanding the City's failure to pay its bills, Hogan Lovells has used its own resources to pay individual Monitoring Team members for their hard work. Had Hogan Lovells not done so, Monitoring Team members may have elected to leave the Monitoring Team. Hogan Lovells is not the City's bank and requires timely payment.

## III.  FLAWED LEGAL REASONING IN THE CITY'S STATEMENT

In support of its arguments, the City cites only two cases, both without clear authority or application to this case. *Fuller v. Fiber Glass Sys., LP*, No. 4:07-CV-01120-WRW, 2009 WL 3067031 (E.D. Ark. Sept. 23, 2009) and *D'Lil v. Best Western Encina Lodge & Suites*, No. CV

3

02-9506, 2010 WL 11655476 (C.D. Cal. April 13, 2010) both concern motions for attorney's fees filed by plaintiff counsel seeking to recover costs and fees under discreet statutory schemes awarding prevailing parties costs and fees in civil rights cases.

The frameworks dictating recovery of attorney's fees and costs under those statutory regimes are wholly inapplicable in this context. The fees owed to the Monitoring Team in this matter derive from the contractual agreement with the Parties to serve as an Independent Monitor overseeing the City's compliance with the court-ordered Consent Decree. That contractual agreement expressly stated that Hogan Lovells would bill the City for the time and efforts of Hogan Lovells attorneys and non-attorney professionals. The City was put on clear notice as early as June 2023 that it would be billed for work performed by non-attorney staff. *See* Exhibit A, at 2 ("As discussed, *the Monitor team* will include lawyers *and staff employed by the Firm* and certain individuals engaged by the Firm. We will provide our services *on an hourly basis at rates for attorneys and other professionals* that may be periodically revised after consultation with the Parties . . . Staffing needs change on many matters over time; we will adjust assignments to respond to those needs. Any additional staff that the Firm seeks to add to this appointment will follow the process set forth in Paragraph 358 of the Modified Settlement Agreement.") (emphasis added).

Moreover, the City mischaracterizes the caselaw in its assertion that "courts generally disfavor billing by law firms for time spent preparing invoices." Again, the two cases cited by the City apply narrowly to post-judgment requests for attorney's fees in civil rights cases—not to contracted-for services under a court-ordered monitorship. For example, *Fuller* concerned a court's decision to reduce fees awarded to prevailing plaintiffs on the basis that they prevailed on some, but not all, of their claims. The court's one sentence discussion around "billing for billing" comes in the form of a footnote, providing only that "$250 per hour is inappropriate." *Fuller*, 2009

4

WL 3067031, at *3. Moreover, it appears that the case concerned attorneys billing for non-legal work, rather than non-attorney staff billing for clerical work at non-attorney rates as in this case. *D'Lil* likewise concerns attorneys billing for time spent billing, not billing specialists billing time spent ensuring the accuracy of bills at far lower rates than attorneys' rates.

## IV. FACTUAL ERRORS IN THE CITY'S NARRATIVE

There are several factual errors that must be corrected in light of the City's Notice.

*First*, the City states in its notice that "Cleveland would disagree that audits are somehow unnecessary or inappropriate, or that mark-downs based on the audits are *de minimis*." *See* City's Status Conference Statement, ECF No. 515, at 3. To be clear, the Monitor would also disagree. At no time has the Monitor rejected careful review or reasonable and necessary corrections to Hogan Lovells' bills—nor will that ever be the case. Indeed, in a December 22, 2023 email to the Parties, Hogan Lovells self-identified errors the City Law Department had failed to catch during their auditing process. The additional costs owed to Hogan Lovells by the City as a result of Hogan Lovells' review were waived. *See* Exhibit B.

The Monitor does, however, disagree with unreasonable and unnecessary corrections that have been raised by the City. For example, on January 5, 2024, the City indicated that Hogan Lovells' bills should be sorted by date as opposed to timekeepers. *See* Exhibit B, at 2. In this same exchange, the City complained about Hogan Lovells' invoice columns "not lin[ing] up evenly." *Id*. In another example, from an August 22, 2024 email, the City Law Department objected to a Monitoring Team member spending time monitoring the Cleveland Division of Police's Force Review Board. *See* Exhibit C at 5. In this same exchange, the DOJ indicates "we do not understand the City's concern with a monitoring team member attending a Force Review Board. Furthermore, observing the FRB is necessary to assessing the City's compliance with the

5

Settlement Agreement." The DOJ goes on to cite to several Settlement Agreement paragraphs which state, "The Monitor will conduct reviews or audits as necessary to determine whether the City and CDP have complied with the requirements of this Agreement." *Id.* at 2; Settlement Agreement, ECF No. 413-3, ¶ 360; *see also Id.* ¶¶ 389, 440. DOJ further noted that "continuing to provide observations and comments on the monitoring team's invoices is not necessary for [the City] to determine that the invoices are reasonable. We hope that the City will move forward with its obligation under paragraph 356 of the Settlement Agreement because the monitor team's invoices do not suffer from "block billing" and provide sufficient detail and information for the City to confirm that the costs and fees detailed on the invoices are reasonable." *See* Exhibit C at 2.

*Second*, re-litigating these disputes has taken substantial time and resources.[1] The City Law Department will often repeat the same objections over and over again across each new invoice, agree to withdraw its objection, and then re-raise an identical objection on a subsequent invoice only to withdraw it again after further argument. Indeed, the dispute being brought before the Court on March 20, 2024 relates to an objection which the City raised in the Monitoring Team's August bill. While the City Law Department eventually agreed to pay for Meg Olsen's time on the August bill and raised no objection to her time on the June and July bills, it has decided—arbitrarily—that it will no longer pay for her time beginning September 1, 2023.[2]

---

[1] Between August and December alone, Hogan Lovells has spent more than 200 hours—at no cost to the City—attempting to satisfy duplicative and *de minis* demands, such as those referenced above, through manual calculations, re-formatting, discussions, and email exchanges.
[2] Hogan Lovells' invoices are on par with industry standards and are used for *thousands* of clients across the world, but they do not comport with the City Law Department's stylistic and arbitrary preferences.

6

*Third*, the City is correct that Hogan Lovells has not yet issued invoices for December, January, or February. What it fails to mention is that its refusal to pay for Meg Olsen's time is causing a bottleneck into a system already riddled with delay. Since assuming the role of Monitor, Hogan Lovells has only been paid for five (5) out of eleven (11) months of work. As of March 20, 2024, the Monitoring Team has been paid $384,931.70. Payments for June, July and August 2023 were received on February 23, 2024.

## V. CONCLUSION

The Monitor requests that the Court order the City to pay the Monitor for Meg Olsen's time billed in September, October, and November, 2023, and that objections pertaining to Meg Olsen's work being considered "billing for billing" be rejected going forward.

Respectfully submitted,

/s/ Karl A. Racine

KARL A. RACINE
Monitor
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-5861
karl.racine@hoganlovells.com

7

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2024, I served the foregoing document entitled **Monitor's March 20, 2024 Status Conference Statement** via the court's ECF system to all counsel of record.

/s/ Karl A. Racine
KARL A. RACINE