

# 14th Semiannual Report

Written by:

The Independent Monitoring Team

April 2024

# The Independent Monitoring Team


**Karl Racine**
Monitor


**Courtney Caruso**


**Stephanie Yonekura**
Deputy Monitor


**Christine Cole**


**Assistant Chief Shunta Boston**


**Dr. Ronnie Dunn**


**Dr. Randolph Dupont**


**Lisa Fink**


**Melissa Giangrande**


**Chief Tammy Hooper (ret.)**


**Rick Myers**


**Katie O'Brien**


**Rory Pulvino**


**Victor Ruiz**


**Charles R. See**


**Captain Scott Sargeant (ret.)**


**Abby Wilhelm**

# Table of Contents

I.    Letter from the Monitor ........................................................................................................................ 1

II.   Understanding this Report ................................................................................................................... 3

III.  Executive Summary ............................................................................................................................... 6

IV.   Complete Findings ............................................................................................................................... 13

      1.    Community Engagement and Building Trust .................................................................... 13

            Areas of Progress ........................................................................................................................ 13

            Challenges Ahead ....................................................................................................................... 13

      2.    Community and Problem-Oriented Policing .................................................................... 14

            Areas of Progress ........................................................................................................................ 14

            Challenges Ahead ....................................................................................................................... 14

      3.    Bias-Free Policing ....................................................................................................................... 15

            Areas of Progress ........................................................................................................................ 15

            Challenges Ahead ....................................................................................................................... 15

      4.    Use of Force .................................................................................................................................. 16

            Areas of Progress ........................................................................................................................ 16

            Challenges Ahead ....................................................................................................................... 17

      5.    Crisis Intervention ...................................................................................................................... 18

            Areas of Progress ........................................................................................................................ 18

            Challenges Ahead ....................................................................................................................... 19

      6.    Search and Seizure ..................................................................................................................... 20

            Areas of Progress ........................................................................................................................ 20

            Challenges Ahead ....................................................................................................................... 20

      7.    Accountability .............................................................................................................................. 22

            Areas of Progress ........................................................................................................................ 22

            Challenges Ahead ....................................................................................................................... 22

      8.    Transparency and Oversight .................................................................................................. 23

            Areas of Progress ........................................................................................................................ 23

            Challenges Ahead ....................................................................................................................... 24

      9.    Officer Assistance and Support ............................................................................................ 25

            Areas of Progress ........................................................................................................................ 25

            Challenges Ahead ....................................................................................................................... 26

      10.   Supervision ................................................................................................................................... 27

Areas of Progress .......................................................................................................27

Challenges Ahead .......................................................................................................28

11.   Outcome Assessments............................................................................................28

V.  Appendix .......................................................................................................................29

1.   Community Engagement and Building Trust.......................................................29

2.   Community and Problem-Oriented Policing .......................................................30

3.   Bias-Free Policing ................................................................................................31

4.   Use of Force .........................................................................................................32

5.   Crisis Intervention ...............................................................................................36

6.   Search and Seizure ..............................................................................................39

7.   Accountability......................................................................................................40

8.   Transparency and Oversight ...............................................................................46

9.   Officer Assistance and Support ..........................................................................48

10.   Supervision ..........................................................................................................53

# I.     Letter from the Monitor

This 14th Semiannual Report provides the Monitoring Team's view regarding the progress made during the reporting period: June 2023—December 2023.

Before I begin, I want to share my observation that most of the men and women in uniform I have had the privilege to work with have demonstrated a commitment to improve the manner in which residents of Cleveland are policed. Indeed, union leaders with whom the Monitoring Team regularly meets, have been reasonable and have indicated a willingness to work together towards achieving progress.

The City's leadership would do well to follow suit.

First, the reporting period was unfortunately marked by little progress. In fact, all ratings from the prior reporting period remain the same with the exception of one downgrade. By any measure, this static performance—akin to running in place—is insufficient. This is especially so given the urgency that the Cleveland community understandably demands.

Second, the reporting period was marked by unwarranted delay and denial of access to documents and databases that the Monitoring Team and Department of Justice (DOJ) need to fulfill their respective responsibilities under the Consent Decree. The City Law Department first started rolling back the Monitoring Team and DOJ's data access in April 2023. Then, in December 2023, the City cited unfounded reasons for suddenly ceasing all access to documents and databases that are plainly required by the Consent Decree. It was not until Judge Solomon Oliver Jr. specifically ruled on the issue on March 7, 2024 that the Monitoring Team and the DOJ were able to continue their duties. These delays cost the City and its taxpayers time, money, and progress in fulfilling the Consent Decree's mandate that it police in a constitutional manner.

I implore the City to fully cooperate with the Monitoring Team and DOJ. The alternative—delay and legal squabbles—takes away from the work that needs to get done. For example, the City has cited numerous grounds, including lack of resources, for delaying the production of documents and files to the Community Police Commission (CPC). The Monitor is closely monitoring this issue to report on it in the next Semiannual Report. How the City proceeds with its responsibilities relative to the CPC will ultimately demonstrate whether it intends on continuing down a path of resisting or embracing oversight.

Going forward, the Monitoring Team is preparing to conduct its first formal assessment of three (3) distinct aspects of the Consent Decree: (1) crisis intervention, (2) search and seizure, and (3) use of force. Completing these assessments in 2024 will require substantial resources and the full cooperation of City leaders.

The Consent Decree has been ongoing for nearly a decade. Simply put, this City can and should do much better. The residents of Cleveland deserve no less.

Understandably, these words will be hard for certain leaders within the City to read and come to grips with. However, the Monitoring Team—representing over 200 collective years of law enforcement, government, and community engagement experience—has an obligation to report the facts as it sees them.

Sincerely,

Karl Racine

# II.    Understanding this Report

Since the 3rd Semiannual Report, the Monitoring Team has used its Semiannual Reports to present a summary of the status of the City's compliance with each of the 340 paragraphs of the Consent Decree. Although providing "a paragraph-by-paragraph accounting of the general state of the City's compliance runs the risk of being an over-simplification," these summary representations remain useful indicators for viewing progress over time.[1]

Therefore, each section of the 14th Semiannual Report summarizes the Monitoring Team's general conclusions about compliance status by describing the state of each paragraph listed as one of the following:

- **Non-Compliance:** The City and/or Cleveland Division of Police (CDP) has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or CDP's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement.

- **Partial Compliance:** The City and/or CDP has made sufficient initial strides or sufficient partial progress toward a material number of key components of the provision of the Consent Decree— but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice. It may capture a wide range of compliance states or performance, from the City or CDP having taken only very limited steps toward operational compliance to being nearly in operational compliance.

- **Operational Compliance:** The City and/or CDP has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Consent Decree such that it is in existence or practice operationally—but has not yet demonstrated, or has not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

- **General Compliance:** The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the City or CDP has effectively complied with a requirement fully and systemically.

The same caveats that have previously applied to these summary categories remain applicable and are thus repeated here verbatim. First, "Non-Compliance" or "Partial Compliance" do not automatically mean that the City or CDP has not made good-faith efforts or commendable strides toward compliance. It might, instead, signify that initial work has either not yet begun or reached a sufficiently critical point where progress can be considered to have been made.

---

[1] 3rd Semiannual Report at 9.

Second, "Partial Compliance" requires more than taking some limited, initial steps toward compliance with a requirement. It instead requires that the City or CDP have made "sufficient, material progress toward compliance" that "has graduated from the stages of initial work to more well-developed and advanced refinement of various reforms."[2]

Third, these summary terms do not appear in the Consent Decree. The Monitoring Team employs them in order to synthesize and summarize the report's conclusions. Relatedly, compliance with individual paragraphs of the Consent Decree is necessary for the larger, overall "Substantial and Effective Compliance" with the whole of the Consent Decree, but it is not the same thing. Ultimately, "Substantial and Effective Compliance" with the Consent Decree will be reached when "the City either has complied with *all* material requirements of this Agreement or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures,"[3] "by a preponderance of the evidence."[4]

Fourth, the charts within the appendix that summarize progress in each area also condense the requirements of each paragraph rather than reprinting the entire Consent Decree in the context of this report. Any imprecision or confusion created by these condensed or summarized requirements is unintended and, in any event, can be cured with reference to the original language of the Consent Decree itself.[5] Furthermore, the appendix charts primarily cover paragraphs 14 through 340 of the Consent Decree, but other paragraphs also contain requirements that the City must meet.[6]

Overall "compliance status" conclusions displayed in tables within the executive summary and the appendix herein do not replace the more rigorous and comprehensive quantitative and qualitative assessments of how CDP performs over time:

> [T]he Monitoring Team bases its assessments on its current understandings, knowledge, and information gained through ongoing work and discussion with CDP, the Parties, and other stakeholders. The assessments are informal to the extent that not all of them are necessarily informed by the type of exhaustive compliance and outcome measurements that are a critical component of the Consent Decree—and the summary determinations do not take the place of these more structured, systemic analyses. The intent is to provide a bottom-line sense of where CDP is on the road to compliance. Ongoing, rigorous quantitative and qualitative assessments will provide a more comprehensive picture as work under the Consent Decree proceeds.[7]

The descriptions of progress contained below should be considered as a synthesis or bottom-line reporting of substantive discussions from each major Consent Decree area contained within this report.

An additional method for capturing progress is the creation, utilization, and accountability to the Monitoring Plan, described in ¶ 369, which outlines the work to be done by the Parties within the year.

As is evidenced by the extensive and broad-reaching Consent Decree itself, the City of Cleveland's implementation of the Consent Decree and the many action items and projects it encompasses, is a substantial task. Many areas of the Consent Decree require multiple reporting periods for the City to achieve—and for the Monitoring Team to confirm and consequently report on—these major milestones. Therefore, at times this Semiannual Report, as with previous Semiannual Reports, reprints content from

---

[2] 3rd Semiannual Report at 10.

[3] Dkt. 413-1 ¶ 456 (emphasis added).

[4] *Id.* at ¶ 397.

[5] *See Id.*

[6] *See* 3rd Semiannual Report at 10.

[7] *Id.* at 11.

prior Semiannual Reports in instances where there has not been enough material progress to warrant an update. In such cases, the Monitoring Team is not citing to prior Semiannual Reports in the interest of readability.

# III.  Executive Summary

### *Community Engagement and Building Trust*



**Visual Representation of Compliance for:**

Community Engagement and Building Trust

The City appears committed to establishing greater trust with the community. However, much work remains to engage Cleveland's diverse communities, especially those who do not attend community meetings or otherwise regularly engage with law enforcement officials. District Policing Committees (DPCs) continue to meet on a regular basis, but—like broader CDP efforts—lack consistent attention to ensuring that participants reflect the diversity of Cleveland at-large. The Monitoring Team notes that the Community Police Commission (CPC) successfully allocated funding to support violence reduction efforts, all while maintaining regular contact with the community. As stated in the 13th Semiannual Report, operating as a cohesive, collaborative body must continue to be the priority for the CPC in the months ahead.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 17a, ¶ 17b, ¶ 17c, ¶ 18a, ¶ 18b, ¶ 19, ¶ 20, ¶ 21, ¶ 24 | ¶ 14, ¶ 16, ¶ 17d, ¶ 18c, ¶ 23, ¶ 25, ¶ 26 | | ¶ 15, ¶ 22 |

*\*\*\* No changes recommended since the 13th Semiannual Report.*

### *Community and Problem-Oriented Policing*



**Visual Representation of Compliance for:**

Community and Problem-Oriented Policing

There are no significant changes to report in the area of Community and Problem-Oriented Policing (CPOP). Notably, the City's updated CPOP Report for the reporting period covered here does not warrant an upgrade to the City's compliance rating at this time. The Monitoring Team would re-emphasize that the City must provide evidence of having promoted and relied on community partnerships in order to see upgrades in its CPOP compliance ratings.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 30, ¶ 34 | ¶ 27, ¶ 28, ¶ 29, ¶ 31, ¶ 32, ¶ 33 | | |

*\*\*\* No changes recommended since the 13th Semiannual Report.*

### Bias-Free Policing



While CDP made incremental progress relative to bias-free policing, a considerable amount of work remains to be done in this area. CDP delivered an online and interactive, in-person in-service training during this reporting period, both of which were infused with bias-free policing principles. There is, however, evidence that CDP needs to make additional efforts toward enhancing officers' internalization or "buy in" of this content. It was also anticipated that the Supervisory Leadership Training and the revised District Neighborhood Awareness Training, both of which entail bias-free policing, would be delivered during this reporting period. They were not. The Monitoring Team continues to stress the vital need for compelling evidence of the incorporation of bias-free policing philosophies and values throughout all aspects of CDP's organization and operations.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 43 | ¶ 35, ¶ 36, ¶ 37, ¶ 41 ¶ 42, ¶ 44 | ¶ 38, ¶ 39, ¶ 40 | |

*** No changes recommended since the 13th Semiannual Report.*

### Use of Force



In order for the City to receive an upgrade in its compliance score, the City must produce specific evidence of progress. With an interest in supporting and focusing the City's efforts to achieve compliance, the Monitoring Team recently scheduled working groups on specific topics within use of force. The hope is that these regular meetings will provide opportunities for the City to engage with DOJ and the Monitoring Team on these issues and receive support that will enable the City to achieve higher levels of compliance. The Monitoring Team is working with the Parties to launch compliance assessments in the next year on use of force chain of command reviews and the Force Review Board (FRB). The Monitoring Team also anticipates re-assessing the Force Investigation Team at some point in the future when a significant sample of cases can be assessed.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 122 | ¶ 46, ¶ 47, ¶ 111, | ¶ 45, ¶ 48, ¶ 49, ¶ 50, ¶ 51, ¶ 52, ¶53, ¶ 54, | ¶ 87 |

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| | ¶ 116, ¶ 118, ¶ 120, ¶ 121, ¶ 125, ¶ 126, ¶ 128, ¶ 129 | ¶ 55, ¶ 56, ¶ 57, ¶ 58, ¶ 59, ¶ 60, ¶ 61, ¶ 62, ¶ 63, ¶ 64, ¶ 65, ¶ 66, ¶ 67, ¶ 68, ¶ 69, ¶ 70, ¶ 71, ¶ 72, ¶ 73, ¶ 74, ¶ 75, ¶ 76, ¶ 77, ¶ 78, ¶ 79, ¶ 80, ¶ 81, ¶ 82, ¶ 83, ¶ 84, ¶ 85, ¶ 86, ¶ 88, ¶ 89, ¶ 90, ¶ 91, ¶ 92, ¶ 93, ¶ 94, ¶ 95, ¶ 96, ¶ 97, ¶ 98, ¶ 99, ¶ 100, ¶ 101, ¶ 102, ¶ 103, ¶ 104, ¶ 105, ¶ 106, ¶ 107, ¶ 108, ¶ 109, ¶ 110, ¶ 112, ¶ 113, ¶ 114, ¶ 115, ¶ 117, ¶ 123, ¶ 124, ¶ 127, ¶ 130 | |

*** No changes recommended since the 13th Semiannual Report.

*Crisis Intervention*



**Visual Representation of Compliance for:**

Crisis Intervention

With respect to crisis intervention, this year has been one of both progress and change for the City, CDP, and the community-based Mental Health Response Advisory Committee (MHRAC). The Health Department worked with CDP to help MHRAC transition into the role of a more permanent community partner. The City in turn has demonstrated strong leadership in assisting CDP in making progress towards compliance. This work has successfully moved CDP to a position where a compliance assessment is scheduled for the first half of 2024. Many of the requirements for compliance in this area are already in place, but the challenge remains in continuing to grow the consistency with which specialized CIT Officers respond to crisis events.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| | ¶ 135, ¶ 141, ¶ 151, ¶ 152, ¶ 156, | ¶ 131, ¶ 140, ¶ 142, ¶ 145, ¶ 147, ¶ 148, ¶ 149, ¶ 150, ¶ 157, ¶ 158, ¶ 159 | ¶ 132, ¶ 133, ¶ 134, ¶ 136, ¶137, ¶ 138, ¶ 139, ¶ 143, ¶ 144, ¶ 146, ¶ 153, ¶ 154, ¶ 155 |

### *Search and Seizure*



**Visual Representation of Compliance for:**

Search and Seizure

Search and seizure progress has disappointingly stalled. Following a productive data system walkthrough with the Monitor's search and seizure assessment team, CDP's data collection team, the City's Police Accountability Team (PAT), and experienced sworn members, the City formally requested that the Monitoring Team pause its planned search and seizure assessment. In support of its request for a delay in the planned assessment, the City informed the Monitoring Team and DOJ that it discovered several material deficiencies in CDP's data management system that impaired the ability of patrol officers to input necessary information about stops, searches, and seizures and the ability of supervisors to review the actions of the patrol officers. After careful consideration and extensive discussions with the Parties, the Monitor decided to proceed with the assessment on or after June 1, 2024. In the interim, the City is conducting an internal self-audit on search and seizure and has pledged to keep the Monitoring Team apprised of progress.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
|  | ¶ 160, ¶ 161, ¶ 162, ¶ 163, ¶ 164, ¶ 165, ¶ 166, ¶ 167, ¶ 168, ¶ 169, ¶ 170, ¶ 171, ¶ 172 | ¶ 173, ¶ 174, ¶ 175 |  |

*** No changes recommended since the 13th Semiannual Report.*

### *Accountability*



**Visual Representation of Compliance for:**

Accountability

The City is required to maintain a disciplinary system that is "fair, consistent, and provides due process" per ¶ 176. As stated in the 13th Semiannual Report, CDP's Internal Affairs (IA) continues to diligently improve upon practices as they work towards compliance goals. The IA's relatively new leadership, including the leadership of Superintendent Viland, delivers a hands-on approach to taking needed steps to achieve Consent Decree compliance. The impending finalization and implementation of the IA Manual, as well as the in-house IA investigator training, will move the City closer to compliance. The Monitoring Team is hopeful that the continued improvement efforts being put in place by Superintendent Viland will warrant upgrades in future reports.

The Office of Professional Standards (OPS) is charged with investigating all public complaints, except criminal allegations. The

Case: 1:15-cv-01046-SO  Doc #: 524-1  Filed:  04/15/24  14 of 59.  PageID #: 12225

Cleveland Police Monitoring Team | 14th Semiannual Report | April 2024

new OPS Administrator has been making strides to formalize processes and reduce backlogs. However, OPS has not filed an annual report since calendar year 2021. OPS must submit an annual report for the Monitoring Team to have insight into OPS's self-evaluation. Further the Administrator was on voluntary leave during a significant portion of the reporting period, but received little to no communication regarding OPS processes and progress during his absence.

The Police Review Board (PRB) reviews OPS investigations and determines if alleged violations are sustained, and if so, what appropriate discipline should result. Notably, the PRB has progressed toward clearing their backlog of cases and should continue to work to conduct more detailed and documented deliberations to support its findings. Paragraph 242 of the Consent Decree requires, among other things, that the PRB submit recommended discipline which then must "proceed through the City's disciplinary process." The final authority over discipline was shifted to the CPC pursuant to Charter Section 115-5. The Monitoring Team has not been informed of any steps the City has taken to formalize or operationalize changes to its prior process in light of the shift of authority to the CPC.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 194 | ¶ 176, ¶ 177, ¶ 179, ¶ 180, ¶ 181, ¶ 182, ¶ 183, ¶ 184, ¶ 185, ¶ 186, ¶ 187, ¶ 188, ¶ 192, ¶ 200, ¶ 201, ¶ 204, ¶ 214, ¶ 215, ¶ 218, ¶ 219, ¶ 222, ¶ 223, ¶ 226, ¶ 227, ¶ 233, ¶ 234, ¶ 237, ¶ 239, ¶ 241, ¶ 245, ¶ 249 | ¶ 178, ¶ 189, ¶ 190, ¶ 191, ¶ 193, ¶ 195, ¶ 196, ¶ 198, ¶ 203, ¶ 205, ¶ 206, ¶ 208, ¶ 209, ¶ 210, ¶ 211, ¶ 212, ¶ 213, ¶ 216, ¶ 217, ¶ 220, ¶ 224, ¶ 228, ¶ 229, ¶ 232, ¶ 238, ¶ 242, ¶ 243, ¶ 246, ¶ 248 | ¶ 197, ¶ 199, ¶ 202, ¶ 207, ¶ 221, ¶ 225, ¶ 230, ¶ 231, ¶ 235, ¶ 236, ¶ 240, ¶ 247 |

*** Paragraph 194 has been downgraded since the 13th Semiannual Report.*

*Transparency and Oversight*



**Visual Representation of Compliance for:**
Transparency and Oversight

The City has three (3) main challenges in this area of work. First, the City must fill the critically-important position of Inspector General, which has been vacant since early 2021. Second, the City must improve the quality of its analysis of the treasure trove of data available and report on those analyses internally and externally. Analysis of the extensive data collected by the requirements of ¶ 367 would be an important starting point. Finally, the City must improve the ease of access to information required by ¶ 268. The Monitoring Team is pleased to learn that command staff is using data to inform operational and managerial decisions. Additionally, the City reports that it intends to make data available publicly, which the Monitoring Team applauds and is eager to see this put into practice.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 250, ¶ 251, ¶ 252, ¶ 253, ¶ 254, ¶ 255, ¶ 256, ¶ 265 | ¶ 261, ¶ 264, ¶ 266, ¶ 267, ¶ 268 | ¶ 257, ¶ 258, ¶ 260, ¶ 262, ¶263 | ¶ 259 |

*** No changes recommended since the 13th Semiannual Report.*

*Officer Assistance and Support*



**Visual Representation of Compliance for:**
Officer Assistance and Support

CDP has made significant progress on its overall training program. Commander Mark Maguth is responsible for leading the training unit, and he continues to shine in this role. Under his leadership, the training unit regularly seeks to identify and deploy best practices, drafts detailed and thoughtful training curricula, and is open to receiving constructive criticism from DOJ and the Monitoring Team. CDP's ongoing work with Polis Solutions, a highly regarded law enforcement consulting group, is contributing to the development of curricula inspired by best practices across the country. We note the observable commitment of the training team to perform at the highest standard. CDP will need to keep up this level of rigor, ensuring each Consent Decree paragraph is being addressed as intended, to achieve compliance on training requirements.

Regarding equipment and resources, the connection between the City and Public Safety Information Technology (IT) sections seems strong and effective based on the City IT's documented efforts to continue to replace equipment and update technology to ensure an effective police agency.

Cleveland Police Monitoring Team | 14th Semiannual Report | April 2024

Furthermore, the City has adopted new strategies to tackle its long-term recruitment and retention crisis but can do more to incentivize longer retention among its newest employees. Lastly, there has been too little progress on employee assistance and performance systems, both of which are critical to providing CDP employees with the support that they need to fulfill their responsibilities.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 282, ¶ 283, ¶ 284, ¶ 285, ¶ 286, ¶ 287, ¶ 294, ¶ 312, ¶ 313, ¶ 314, ¶ 315, ¶ 316, ¶ 317, ¶ 318 | ¶ 269, ¶ 270, ¶ 271, ¶ 272, ¶ 275, ¶ 276, ¶ 277, ¶ 279, ¶ 280, ¶ 281, ¶ 288, ¶ 290, ¶ 291, ¶ 299, ¶ 304, ¶ 305, ¶ 306, ¶ 309, ¶ 311, ¶ 320, ¶ 321 | ¶ 273, ¶ 274, ¶ 289, ¶ 292, ¶ 293, ¶ 295, ¶ 296, ¶ 297, ¶ 298, ¶ 300, ¶ 302, ¶ 303, ¶ 307, ¶ 310, ¶ 319 | ¶ 301, ¶ 308 |

*** No changes recommended since the 13th Semiannual Report.*

---

### Supervision



**Visual Representation of Compliance for:**

Supervision

First line supervisors remain the primary drivers of meaningful culture change in police organizations. CDP has developed a new training to impart improved supervisory skills and policies to provide expectational clarity for first line supervisors. The Monitoring Team has observed improvements in supervision generally as it has reviewed specific incidents and will need to conduct a more comprehensive review of supervisors' work to ensure they are providing and being held accountable for effective supervision. Regarding the Officer Intervention Program (OIP), CDP demonstrated some progress toward the end of 2023, but more is needed to develop and integrate a robust process that not only complies with the Consent Decree but also serves to support officers and reduce negative behavioral outcomes. Finally, CDP submitted revisions of their Wearable Camera System (WCS) policies that addressed issues regarding supervisory audits of WCS.

| Non-Compliance | Partial Compliance | Operational Compliance | General Compliance |
|---|---|---|---|
| ¶ 326, ¶ 327, ¶ 328, ¶ 329, ¶ 330, ¶ 331, ¶ 332, ¶ 333, ¶ 334, ¶ 335, ¶ 336 | ¶ 322, ¶ 323, ¶ 324, ¶ 325, ¶ 339 | ¶ 337, ¶ 338, ¶ 340 | |

*** No changes recommended since the 13th Semiannual Report.*

# IV.  Complete Findings

## 1.  Community Engagement and Building Trust

***Areas of Progress***

Community Engagement: CDP continues to demonstrate a commitment to earning trust, cooperation, and respect from the community. Patrol officers and command staff attend monthly Ward meetings to hear firsthand about community complaints and offer community members opportunities to participate in Division-led programs (*i.e.*, Citizens' Police Academy, District Policing Committee meetings, and other informal social gatherings with patrol officers around the community). These efforts are consistent with efforts that the Monitoring Team has reported in previous Semiannual Reports.

CPC: During the reporting period, the CPC successfully allocated funding in the amount of one million dollars across twenty-six (26) community groups to provide violence reduction programming in Cleveland. The CPC has continued to sharpen the focus of its work groups to address areas of training, policy development, equipment acquisition, and deployment. In the 13th Semiannual Report, the Monitoring Team indicated that Commissioners must become more acquainted with the many laws which govern the CPC's work. While there is still much work to be done, the Monitoring Team has observed a concerted effort on the part of CPC to seek to clarify its internal rules of operation and procedures, all while maintaining regular contact with the community. For example, the Monitoring Team was pleased to learn that the CPC met with the Chief of Police in December 2023 and the new Chief in March 2024. Should this occur on a more routine basis, this will warrant a careful review and consideration of an upgrade for ¶ 16. Additionally, the CPC met with the Community Police Review Board (CPRB) in February 2024 to identify greater opportunities for collaboration and coordination. Ensuring that the Monitoring Team is kept informed as to how the CPC and CPRB are working together to make improvements in CDP's accountability and transparency structures will be incredibly important to demonstrate progress towards complying with ¶ 17(d).

DPC: CDP has five (5) DPCs, operating within each District. DPCs are one of the essential ways CDP seeks to communicate with and engage residents across Cleveland. Through a variety of avenues, *i.e.* community service organizations, city safety groups (Fire Department, EMS), and other governmental bodies, CDP attempts to inform residents about its work, its crime reduction success, and opportunities for community involvement. CDP continues to build relationships with the Community Relationships Board (CRB) and the CPC. During the reporting period, the CPC hosted the DPCs at one of its public full commission meetings where DPCs from each district reported to the community on its work, services, successes, and challenges within its district. We note that this presentation would have been more effective had it been co-led with community.

***Challenges Ahead***

Community Engagement: There is no mechanism by which the City regularly informs the Monitoring Team as to its community engagement efforts. The Monitoring Team is eager to learn about the strategies the City is employing to engage members of Cleveland's diverse communities. From the Monitoring Team's observations and independent engagement with the community, it appears that the City is successfully reaching residents who already have a positive relationship with the law-enforcement community. The City should also focus its energy on engaging community members who, heretofore, have had less than

positive, or negative relationships with the police, and those residents who historically have not engaged with law enforcement. The Monitoring Team suggests prioritizing proactive engagement with young adults, persons under eighteen (18) years old, as well as persons who have previously been involved in the criminal justice system. Partnering with social service agencies, recreational centers, job fairs and non-traditional community organizations who serve lower income populations would result in deeper engagement with the community.

CPC: The Commission continues to face internal divisions among its members. These divisions lead to conflicts rendering the body, at times, unable to reach consensus on vital issues. Such divisions have created barriers to building trust among some members and have continued to distract the CPC from its important mission. The Commission continues to work on fulfilling its oversight for GPOs, policy review, and other responsibilities. As stated in the 13th Semiannual Report, working together as a cohesive, collaborative body must be the priority for the CPC in the next reporting period and will go a long way in building trust with the community and the institutions it will interface with. We also note that the CPC is now led by two (2) new co-Chairs and the commission appears to be less fractured than before. There have been substantial discussions that occurred between the Parties in early 2024 related to CPC's document requests that have led to the creation of a CPC working group. However, because those discussions occurred outside of the reporting period, those will be reported on in the next Semiannual Report.

DPC: DPC meetings provide important opportunities for CDP to connect and build positive relationships with community members who do not regularly engage with law-enforcement officials. While DPC meetings are occurring regularly within each District, there is much work to be done to improve the quality and inclusivity of those meetings consistent with ¶ 24. The Consent Decree requires that "the [CPC], CDP, and [Community Relations Board] will develop a mechanism to recruit and expand the membership of the [DPCs], each of which should include a representative cross-section of community members." Diversifying community participation will give CDP a broader understanding of the needs of Cleveland community members.

## 2.    Community and Problem-Oriented Policing

*Areas of Progress*

In the 13th Semiannual Report, the Monitoring Team favorably noted that the City had sought technical assistance from DOJ's Office of Community Oriented Policing Services (COPS) to improve its CPOP efforts. The Monitoring Team was pleased to learn that the City has continued to seek CPOP technical assistance, both through partnering with the Collaborative Reform Initiative Technical Assistance Center (CRI-TAC) and attending the 31st Problem-Oriented Policing Conference. The Monitoring Team is cautiously optimistic that improvement in CPOP is near. These activities demonstrate that the City is listening to the Monitoring Team's constructive criticism and taking action. Taking initiative to learn about CPOP principles is important and commendable. The Monitoring Team looks forward to being kept apprised of how the City seeks to incorporate the lessons learned from these experiences.

*Challenges Ahead*

In the 13th Semiannual report, the Monitoring Team reported a downgrade in compliance for ¶ 30 due to poor delivery of CPOP training that omitted significant portions of the curriculum approved by the Monitoring Team. This compliance rating will remain until the Monitoring Team observes and the City

delivers high-quality training consistent with the approved curriculum. Additionally, in order to move towards operational compliance in ¶ 31 and ¶ 32, the City must provide evidence that it is maintaining collaborative partnerships. The Monitoring Team stated in the 12th Semiannual Report and 13th Semiannual Report that the City has not provided any description of how it has partnered or developed relationships with community groups or leaders. In November, the City provided the Monitoring Team with a list of meetings conducted by the CPOP Review Committee, but these did not demonstrate or outline any CPOP-related strategies. For this reason, the Monitoring Team would re-emphasize in this 14th Semiannual Report that the City must provide evidence of having promoted and relied on community partnerships.

The City has also not progressed as it relates to ¶ 33 and ¶ 34. This lack of progress can be attributable to the City's 2022 CPOP Report falling short of Consent Decree requirements. To reach compliance, the City needs to be responsive to comments and feedback provided by the DOJ and the Monitoring Team. The Monitoring Team dedicated significant subject matter expertise, time, and—in turn—City resources, to provide meaningful feedback that would help the City move forward. Unfortunately, that feedback was only superficially addressed or ignored all together. The City's updated CPOP Report drafts continue to be deficient.

## 3.     Bias-Free Policing

*Areas of Progress*

During this reporting period, the Monitoring Team received, reviewed, and observed CDP's Session III in-service training, which utilized integrated reality-based scenarios that included use of force, search and seizure, and bias-free policing content. Two (2) members of the Monitoring Team observed two (2) of the three (3) Session III in-service modules in December. Prior to attending the in-person training session, officers were required to take an online training that included content on bias-free policing concepts. During the in-person training, bias-free policing was properly contextualized within the framework of procedural justice, with the trainer explicitly addressing principles like dignity and respect, voice, transparency, and trustworthiness.

*Challenges Ahead*

Despite the inclusion of procedural justice principles in the training, the Monitoring Team observers noted that participants struggled to recall these principles during scenario debriefings. It is recommended that instructors consider employing a mnemonic device, like DRVTT (Dignity and Respect, Voice, Transparency, and Trustworthiness), to aid officers in memorizing and better understanding these principles.

As highlighted in the 13th Semiannual Report, CDP collaborated with a contractor to develop in-service Supervisory Leadership Training incorporating bias-free policing. This training was postponed and has not yet been rescheduled to the Monitor's knowledge. In early 2022, CDP conducted District Neighborhood Awareness Trainings to address bias-free policing requirements. While the curriculum was sound, Monitoring Team observers noted that its delivery lacked content covering recent critical incidents involving excessive and deadly force by CDP officers, despite that content being included in the curriculum. Substantive feedback from the Monitoring Team and the DOJ prompted the development of the District Neighborhood Awareness Refresher training, which was to be distributed to all officers through the CDP's Learning Management System (LMS) to supplement the initial training and ensure all officers received the comprehensive curriculum. The revised training has yet to be administered, as the

Training Section awaits renewal of the software contract needed to make the necessary changes in the LMS.

The Monitoring Team re-emphasizes the imperative for clear evidence of the integration of bias-free policing philosophies and values across all facets of CDP's community interactions and policing practices. This integration should be reflected in the comprehensive analysis of data covering all CDP activities, including the use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination on the basis of race, ethnicity, gender, disability, sexual orientation, or gender identity. This information should be published annually in a publicly accessible report, as specified in ¶ 265 of the Consent Decree.

Furthermore, the Consent Decree requires that bias-free policing and equal protection permeate all aspects of CDP's organizational operations, including recruitment and hiring, unit assignments, promotions, performance evaluations, resource deployments, accountability systems, among others. We encourage CDP to provide the Monitoring Team with specific evidence that the culture change envisioned by bias-free policing and equal treatment under law is taking root. At various points in the past, the City has been unwilling to engage with the Monitoring Team regarding promotions in order for the Monitoring Team to assess, among other things, whether bias-free and equal protection principles are embedded through CDP personnel processes. For example, starting on March 23, 2022, the Monitoring Team asked for the City's then-current promotions-related materials (forms, evaluations, tests, etc.) which the City uses in its promotions process. The Monitoring Team followed up on at least eight (8) occasions thereafter, via email and during meetings, requesting this information, with the most recent request sent on April 11, 2023. To date, the Monitoring Team has not received these materials, and therefore is not able to provide technical assistance nor assess compliance on these requirements. Furthermore, while some headway was made on the subject of evaluations on this topic, that effort has been stalled for some time. The Monitoring Team stands ready to assist the City in reaching this important objective.

## 4. Use of Force

### *Areas of Progress*

In the last quarter of 2023, reports written by the Monitoring Team on the chain of command review of CDP's use of force cases were filed for each of the four (4) quarters of calendar year 2022. The Monitoring Team is in discussion with the Parties on the next phase of assessment of the chain of command reviews for uses of force. The most critical aspects of the use of force – necessity, objective reasonableness, proportionality, and use of de-escalation – are generally in line with expectations and when not, are generally detected by the chain of command reviews. In recent months, there has been effort to demonstrate that supervisors are connecting the collection of data with operational personnel. The December 2023 CDP Stat Meeting brought district commanders in to describe how they use the data in their operational capacity. Recent conversations that included operational personnel in plans for the upcoming compliance assessments have been advantageous. Continued efforts on the part of the City to link operational and data personnel will strengthen the importance and role of data in use of force specifically and constitutional policing generally.

Even before the Monitoring Team's Force Investigation Team (FIT) assessment was delivered and filed in October 2023, the Internal Affairs (IA) Superintendent instituted changes to comply with policy and the

Consent Decree addressing concerns surrounding the timeliness of notifications, administrative hearings, and other issues identified by the FIT assessment.[8]

FIT leadership also implemented the necessary procedures, per the FIT Manual, requiring administratively compelled interviews be scheduled and completed within seventy-two (72) hours, as required by the FIT Manual.

Per ¶ 121, when FIT is deployed, a preliminary report must be presented to the Chief or the Chief's designee no later than twenty-four (24) hours after learning of the use of force. The Monitoring Team's last assessment noted that this notification was not consistently being made within twenty-four (24) hours. FIT leadership reports that it now consistently makes such notifications, per the FIT Manual.

Paragraph 122 requires the completion of FIT Investigations within sixty (60) days unless there was an authorized extension. While the Monitoring Team's FIT assessment found cases completed beyond sixty (60) days, it was not able to determine whether an extension was requested and approved. FIT leadership reports that these procedures have been updated and now documentation of extensions are maintained in the IAPro file.

CDP also reports that in August 2023, FIT specific training was provided to the members of FIT for their annual training. The attention to detail and process by the IA Superintendent to improve FIT's operations is laudable and critical to efforts to achieve compliance in this area. Another FIT assessment will be required to confirm the implementation of these improvements and whether they have been successful.

Additionally, the CDP has developed routines for the FRB, with planned meetings quarterly and adding more as needed. In 2023, the FRB met eight (8) times to review all Level 3 cases and samples of Level 2 cases. With the creation of a working group, the Monitoring Team hopes that frequent and consistent feedback and communication with FRB leadership can advance its progress even further. The Monitoring Team is pleased to see a degree of openness to these exchanges to further strengthen the practices around the FRB, its training, and the analysis of available data.

***Challenges Ahead***

The challenges set forth in the 13th Semiannual Report in the area of use of force remain the same. The practices and policies are in place, and there is consensus that the policies are generally followed. Yet the Monitoring Team further expects the City to show that it has created processes that allow it to identify issues arising from IA/CPC/FRB review that have training or policy or supervisory implications and to document and report on how the Division responds to those issues and then continuously assesses its responses. The aforementioned working groups, through direct and respectful conversation and the presentation of intermediate deliverables by the City, will help the City improve and move toward assessments to occur in 2024.

The chain of command reviews of use of force continue to take longer than expected and longer than is useful for effective accountability and management. Consent Decree ¶ 102 contemplates a review within seventy-two (72) hours for each rank level after five (5) days for the immediate supervisory review (¶ 94, ¶ 100). The entire process now takes longer than that roughly twenty (20) day period. The Monitoring Team appreciates that using data, CDP is looking more closely at the time to completion. Additional

---

[8] Dkt. #490-1, Filed October 24, 2023.

focused attention on those metrics is important for the officers, management, and members of the community who may be the subject of inappropriate uses of force.

During this rating period, the FIT leadership reports that it has made corrections since the Monitoring Team's last assessment, through training, procedures, and documentation. Another FIT assessment will be required to confirm the implementation of these changes and whether they have been successful. The Monitoring Team is aware that few FIT cases have occurred since its last assessment (which is very positive for the City). Yet the Monitoring Team encourages the FIT to ensure these updated procedures are ingrained for each FIT case so that once the Monitoring Team does conduct a future FIT assessment, it will see that these procedures are sustained in FIT's practices.

In accordance with ¶ 125, the voting members of the FRB are required to have regular updates on legal issues, policy, and curriculum on use of force. Because of the nature of the FRB as an internal accountability mechanism designed for critical self-review and analysis, the Monitoring Team expects to see the training include details of the ethos and philosophy of the FRB so that all voting members have a detailed understanding of their role and expectations as well as the FRB's value to the organization. The FRB is distinct from a use of force review – it is an opportunity for reflection and discussion beyond the actual use of force; an examination of decision making, an interrogation of tactics and response; and an assessment of the City's adherence to policies. CDP has assembled a wide-ranging group to improve on its draft FRB training curriculum and has made this a priority for 2024.

After three (3) years of operation, the FRB must spend time assessing its own work and effectiveness and ensuring that referrals it made are acted on in both timely and impactful ways. While recent use of force reports provide data on the number of cases and the types of referrals made, a more comprehensive review by the FRB to understand its efficacy and influence is warranted. The analysis described in ¶ 129, combined with work done by the Data Collection Analyst Coordinator to comply with ¶ 261 and ¶ 266, is necessary to achieve a higher level of compliance. As stated in the 13th Semiannual report, "the Monitoring Team further expects the FRB to review the results of its work and ensure the referrals to the other units of the CDP were acted upon. It would be instructive for the FRB to review its work on an annual basis and compare findings to prior years to assess FRB impact."[9]

## 5.    Crisis Intervention

### *Areas of Progress*

The Crisis Intervention Program aims to promote community solutions that assist individuals in crisis through effective problem solving and sustainable change.[10] MHRAC is a community vehicle for partnering with the CDP to implement this goal. This year, MHRAC demonstrated strength and autonomy through a period of change, moving it toward a clear path for sustainability. Under the leadership of the City of Cleveland's Health Department, MHRAC ratified bylaws that will govern the organization. The Health Department also brought in new members and created two new subcommittees. The Youth Subcommittee has the potential to build on CDP's innovative Youth Policy to make a difference in the lives

---

[9] Semiannual report at 22.
[10] *See* ¶ 131 of the Consent Decree.

of Cleveland's residents.[11] The second subcommittee, Data and Growth, makes use of data-informed outcomes to analyze crisis events and improve outcomes.

During the reporting period, MHRAC and CDP leveraged the strengths of the MHRAC Training Subcommittee to maintain critical in-service training and curriculum work for all officers. They also revised curricula for dispatcher training as well as the 40-hour training for specialized Crisis Intervention Team (CIT) officers. Additionally, MHRAC's Training Subcommittee identified a strategy for coordinating the development of new curriculum across a range of stakeholders, including the CDP CIT Program, the CDP Training Section, the CPC Training Committee, the DOJ, and the Monitoring Team. This strategy is paying dividends and has the potential to serve as a model of cooperation across other subject areas of the Consent Decree. These changes have also brought in new membership, which in turn energizes the MHRAC.

The City's Police Accountability Team (PAT) and CDP have also demonstrated skill and commitment to compliance in this area by organizing and leading the Crisis Intervention Program working group, which meets monthly. This group is led by CDP's Crisis Intervention Coordinator and includes members of the DOJ, the Monitoring Team, the Health Department, the City Law Department, the Alcohol, Drug and Mental Health Service Board of Cuyahoga County (ADAMHS Board), and CDP. The working group focuses on establishing compliance with the terms of the Consent Decree, and ensuring cohesion where areas of compliance intersect with and involve multiple agencies and stakeholders. The City's leadership has formalized this group into a self-sufficient entity. Most recently, the group worked together to achieve consensus with respect to the Monitoring Team's methodology for assessing outcomes in this area. Accordingly, the Monitoring Team's assessment will begin during the next reporting period.

Finally, during the reporting period, CDP revised its Specialized Crisis Intervention Plan. The revised plan includes call volume information and a plan for recruitment of specialized CIT officers. It also proactively anticipates barriers and identifies potential solutions. Overall, the City, CDP, and the Health Department have demonstrated strong leadership in this area that is necessary for continued progress with respect to Consent Decree compliance.

### Challenges Ahead

Despite CDP's progress, the challenges in this area remain twofold. First, the City and CDP must continue to demonstrate to the public the City's progress and accomplishments in this area. It is difficult to create newfound confidence in the police response to individuals involved in a behavioral crisis. The Monitoring Team encourages the City to build out its CPOP practices in order to support the efforts being made with respect to crisis intervention, and continue to show the community firsthand the progress being made. Results from the upcoming Crisis Intervention Assessment—which will demonstrate the progress made over seven (7) years of work designed to improve behavioral crisis events—will also aid in public perception. Of course, the Monitoring Team will report on areas on improvement as well, but recognizes that positive informal feedback from involved community members has been encouraging and assessment results will aid in demonstrating progress made to date.

Second, CDP must ensure consistent implementation with policies governing on-scene leadership during crisis events. It is important that efforts to expand the recruitment of CIT officers continue to be successful

---

[11] *See* Case Western Reserve University Schubert Center for Child Studies "Youth and Policing: A Look at Cleveland's New Child Policy."

and that supervisors be held accountable for following the crisis intervention policy. These efforts are key to ensuring CIT officers are being called to crisis events whenever possible and consistent with CDP policy.

Finally, the Monitoring Team notes that it is critical for officers to have the ability to access community resources. Officers should continue to make use of de-escalation techniques and to show empathy, concern, and respect for those in crisis, but available resources, especially late at night, are necessary for encouraging officers to take additional time to find meaningful options for individuals in need of care. The Health Department is currently exploring the Care Response model (a community response to crisis intervention that prioritizes the health of the person experiencing a crisis). This is encouraging and could make greater use of the 988 behavioral health crisis services phone number. A broader range of community services is desirable and will provide officers with the ability to access services beyond arrest or mental health involuntary commitment to a hospital emergency room.

## 6.    Search and Seizure

### *Areas of Progress*

During the reporting period, search and seizure has unfortunately stagnated. The search and seizure compliance efforts have been beset with a series of starts and stops. During this reporting period, the search and seizure working group, mentioned in the 13th Semiannual Report, convened twice. The first meeting served as an introductory conversation, and the second meeting, in early November, involved a walkthrough of the Monitoring Team's search and seizure assessment tool with the Monitoring Team. The purpose of the walkthrough was to identify data sources and demonstrate where information that would be reviewed and assessed by the Monitoring Team could be found. The City provided a detailed presentation that will inform the Monitoring Team's assessment process. This second meeting was productive and insightful.

### *Challenges Ahead*

Although informative, the second meeting revealed that the Monitoring Team would face difficulty accessing data needed for supervisory and command level reviews. As a result, questions arose about the CDP's implementation of certain aspects of the supervisory review process required by the Consent Decree. On November 29, 2023, after digging deeper into the data accessibility questions raised, the PAT formally requested a delay of the Monitoring Team's planned search and seizure assessment. The PAT informed the Monitoring Team that CDP intends to conduct a comprehensive self-audit of the search and seizure protocols, administrative review processes, and data collection and management systems. The City further indicated that the self-audit will utilize an eight-step process, comprised of both qualitative and quantitative research methods, and will take approximately three (3) to six (6) months to complete. The City promised that it would make its findings available to the public when complete. The City may also require additional time to implement the necessary corrective actions.

On December 19, 2023, the PAT requested to meet with the Monitoring Team and DOJ to discuss deficiencies identified in the data caused by technological glitches in the Brazos system (which is used to record and track stop, search, and seizure data). During the meeting, the PAT reported that it had identified the following three (3) sources of deficiencies in the data:

1. Between June 1 – 30, 2023, the narrative text box in which officers enter justification for the stop (*i.e.*, probable cause or reasonable suspicion analysis) was not available on the stop form. Seventy-four (74) forms were affected by this issue during this time period.

2. Since November 1, 2023, CDP has been unable to enter new officers into the Brazos system, which in turn means those officers have been unable to complete the stop forms. This issue has persisted for newly hired cadets, lateral hires, and officers that have been rehired by CDP.

3. A group of supervisors are unable to approve the stop forms as required by the Consent Decree. There are currently 620 stop forms pending supervisor approval.

PAT informs us that it is working closely with the Public Safety Division's Office of Information Technology ("IT Division") in an effort to resolve these issues. The IT Division reported it has requested a root cause analysis of each problem as well as a comprehensive report from the vendor to assess the scope and magnitude of the deficiencies and to reconcile and rectify the discrepancies in the data.

After extensive deliberations with the Parties and among the Monitoring Team, the Monitor decided to proceed with the search and seizure assessment in 2024, but will allow CDP time to complete its self-audit. Accordingly, the Monitoring Team's assessment is set to commence on or before June 1, 2024. The Monitor further notes that the Brazos System issues discussed above concern 2023 data. As reported in the 13th Semiannual Report, the Monitoring Team is looking to conduct an assessment on 2022 data, which does not appear to have been affected by the Brazos issued discussed above. However, as of April 8, 2024, the City has not yet delivered its annual report analyzing stop forms from 2022. Weighing these factors, initiating the assessment after June 1, 2024 will ensure the Monitoring Team can review the City's analysis and reports and the City can complete its self-audit prior to commencement of the assessment. It is worth noting that the Monitoring Team had been prepared to conduct this assessment in 2023, which would have allowed for the City to have feedback on its more recent data. Now that the Monitoring Team is conducting this assessment in June 2024, the data is roughly two (2) years old.

The most significant challenge to providing a rating on search and seizure has been the City's failure to provide the Monitoring Team and DOJ access to its databases for nearly a year. This culminated in the City formally terminating the Monitoring Team and DOJ's access to critical data and systems beginning December 29, 2023 – alleging concerns that such access may violate Ohio State Law. For more than eight (8) years, the City has provided the Monitoring Team and DOJ access to CDP documents and databases as required by the Consent Decree, including IAPro, Blue Team, Evidence.com, Brazos, and CDP's Records Management System. However, due to a recent decision by the City Law Department, the Monitoring Team and DOJ were denied access to information and systems needed in order complete their responsibilities under the Consent Decree. Specifically the Monitoring Team and DOJ were denied access to body-worn camera footage; incident reports; use of force reports; taser deployment information; stop, search, and arrest reports; supervisor review of stop, search, arrest, and use of force reports; complaints; and IAPro files. While the City has claimed that it appreciates the importance of the Monitoring Team and DOJ receiving access to core documents, its action have not been consistent with its words. The City's actions caused the Court to hold a hearing to consider DOJ's motion to enforce the Consent Decree that was based on the City's refusal to provide the Monitoring Team and DOJ access to its systems and data. The Court agreed with DOJ and ordered the City to provide access.

Over the course of the next reporting period, the Monitoring Team looks forward to receiving the internal audit reports from PAT, bi-weekly updates on resolution of the IT issues, assurances as to the integrity

and reliability of the stop data being collected, and the 2022 search and seizure report which was expected at the end of quarter four (4) 2023. And, importantly, the Monitoring Team looks forward to regaining access to necessary databases and systems. This information is critical to assessing CDP's compliance with search and seizure provisions of the Consent Decree.

## 7.    Accountability

*Areas of Progress*

<u>Internal Affairs</u>: The IA team reports that it is close to finalizing a draft training with an outside vendor to ensure all IA investigators have received adequate initial training, per ¶ 180. They expect to have a draft to the Training Review Committee, Monitoring Team, and DOJ by mid-February. Upon approval, all IA team members will be provided this same training.

During this reporting period, IA reports that its investigators attended a one-and-a-half-hour webinar from an outside vendor regarding developing a timeline for use-of-force incidents. They also report that a different vendor presented a full day's training on 1st Amendment, Social Media, Use of Force, Qualified Immunity, and Civil Liability Legal updates, attended by IA investigators and investigators from other units. However, these trainings were not vetted through the Training Section, nor were the Monitoring Team or the DOJ informed about the trainings beforehand, given the opportunity to review the curricula, or given the chance to observe the in-person training. Per the Consent Decree, the Commander of the Training Section is responsible for reviewing all training received by CDP's members for consistency, quality, accuracy, currency, completeness, compliance with law and policy, and effectiveness of the teaching modality. In addition, to the extent that CDP would like to apply training toward Consent Decree compliance, CDP must inform the Monitoring Team and DOJ about it beforehand to allow the team to review the curriculum and/or observe the training delivery. The IA team indicated plans to host a training in February on Human Factors and Interviewing for Use of Force investigations from an outside vendor. While the Monitoring Team has been provided with the initial course plan, the training must be vetted through the Training Section, and the Monitoring Team and DOJ must be given the opportunity to observe the training delivery.

The IA team is to be commended for working to expedite the completion of the IA Manual. It was approved by the Monitoring Team and DOJ on February 12, 2024 (outside of the reporting period).

Lastly, IA leadership reports that it held a full unit meeting during this period to cover how to properly enter allegations into IAPro, with the goal of having consistent reporting related to allegations.

<u>Office of Professional Standards</u>: No progress to report.

<u>Police Review Board</u>: No progress to report.

<u>Discipline</u>: During this reporting period, CDP spent time collaborating with the Monitoring Team and DOJ on updating its disciplinary matrix, the title of which CDP has now changed to "Corrective Action Guidance." The Monitoring Team feels optimistic that this will be finalized in the next reporting period.

*Challenges Ahead*

<u>Internal Affairs</u>: IA will need to ensure that its IAPro data is consistent as supervisors work to follow the procedures required for entering allegations correctly.

Additionally, as the IA Manual update is completed, IA will continue to face the challenge of implementing its requirements with fidelity to ensure timely investigations of all internal allegations of officer misconduct that comport with ¶¶ 182-187 of the Consent Decree. Since some internal investigations are delegated to other units, IA leadership will also be challenged with overseeing the completeness and timeliness of all delegated investigations. Ultimately, the Monitoring Team will need to conduct an assessment of IA's work to be able to determine whether it will move toward Operational Compliance on many paragraphs of this section.

Office of Professional Standards: In the last reporting period, ¶ 194 was moved from Non-Compliance to Partial Compliance with the hiring of a new Administrator. However, complaints regarding the Administrator's leadership style and his leave of absence, which began during the period covered by this report, jeopardize compliance with this paragraph. The Monitoring Team notes that it received the City's annual report required by ¶ 215 (on analysis required by ¶ 214) in February 2024. We had not previously received a report since 2021. Because this report was received outside of the reporting period, it will be addressed in the next Semiannual Report. Between November 27, 2023 and January 3, 2024, the OPS Administrator took voluntary leave. He returned in a limited capacity—without full access to the materials needed to fulfill the duties of his role—from January 3, 2023 to February 27, 2024. The Monitoring Team was notified when the Administrator went on voluntary leave, but received little to no communication regarding OPS processes and progress during his absence. Regularly scheduled OPS working group meetings that occur every two weeks were canceled during the Administrator's voluntary leave and did not resume until March 21, 2024. The Monitoring Team had no visibility into the skills, expertise, or experience of the interim Administrator, nor did the Monitoring Team have visibility into how the City determined who would serve as interim Administrator. It is for all of these reasons that the City has been downgraded for ¶ 194.

Police Review Board: Overall timelines, particularly waiting for the Chief or Director's final decisions, continue to extend beyond reasonable lengths. The City must provide updated documentation to advance compliance in several paragraphs pertaining to PRB. Further, the Monitoring Team has not received a PRB manual from the City since it provided comments in October 2022—more than a year ago.

Discipline: Monitoring Team members have spent substantial time this reporting period reviewing disposition letters from disciplinary hearings. Ultimately, a discipline assessment will allow the Monitoring Team to determine whether discipline is being applied consistently, fairly, and per the matrix, but the Monitoring Team will first seek to have discussions with CDP's Chief and the City's Public Safety Director to discuss more recent disciplinary decisions and better understand their decision-making processes prior to initiating such an assessment in the future.

## 8.    Transparency and Oversight

*Areas of Progress*

While the City has not yet filled the position of Inspector General (IG), vacant since early 2021, the Monitoring Team recognizes and applauds the City's reconsideration of its plan to expand the IG position to include all City Public Safety agencies. A joint filing to amend the Consent Decree consistent with this expanded role was filed on January 12, 2024. We are eager to see the position posted and filled. It is imperative that the City work with focused attention and employ creative mechanisms to recruit, hire, and retain an IG. Over the last eight (8) years the position was filled for less than 1.5 years.

The Monitoring Team notes the improvement in the manner in which street-level supervisors and district commanders are using data. There have been meetings with the Data Team and command staff personnel to demonstrate that supervisors are connecting the collection of data with needs and strategies of operational personnel. The December 2023 CDP Stat Meeting brought district commanders in to describe how they use the data in their managerial capacity. Additionally, recent conversations included operational personnel in the plans for the upcoming compliance assessments. Continued efforts on the part of the City to link operational and data personnel will strengthen the importance and role of data in constitutional policing.

Increased transparency of data seems to be on the horizon as a City initiative. Mayor Bibb has announced an open data initiative through the newly created Office of Urban Analytics and Innovation (Urban AI). According to the Urban AI website, the section will include an Urban Data Lab and a section that will "establish a culture of continuous improvement."[12] When the Monitoring Team recommended the City post and share the raw data prepared by the CDP data team in response to ¶ 367, they elected to do so on the forthcoming Urban AI space. The Monitoring Team very much looks forward to that reality.

In recent months the Parties, with the Monitoring Team, have discussed the expectations around reports relative to ¶¶ 257-268. There will be ongoing conversations in that regard.

***Challenges Ahead***

The City created and experienced protracted delays and changes to plans around the IG position. This important position remains vacant and the progress to fill this position seems slow. All paragraphs, ¶¶ 250-256, that relate to the IG remain in non-compliance.

CDP identified irregularities with the Brazos reporting system in its capture of detailed information in the area of stops and searches. Brazos is on the online reporting solution for these types of activities in accordance with ¶ 260. CDP and the PAT are working closely with the City IT Department and the Brazos help desk to remedy the issue. The issue was identified in early November, and the Monitoring Team was briefed in December. It is imperative that personnel in CDP understand the urgency of some data collection efforts and invoke senior assistance more urgently.

For increased compliance to be achieved with ¶¶ 261- 263, the City must demonstrate there are job requirements or a standard operating procedure for the Data Analysis and Collection Coordinator to conduct the routine tasks of those paragraphs.

¶¶ 264-266 require extensive reporting and analyses. Over time, the Monitoring Team has reviewed reports and find they generally lack the expected level of analysis. After extensive conversation with CDP and PAT in the latter part of 2023, it is clear that additional conversation is required for clarity on the number and types of reports required by these paragraphs. The Monitoring Team looks forward to ongoing conversations and responding to proposals by the City to achieve a greater level of compliance with these paragraphs. There is agreement and recognition that the current systems of data collection can be cumbersome not only for officers but also for the necessary level of quality assurance for reliable reporting by the Data Team. It is gratifying to learn from the City IT Department that there are conversations with outside entities that could address that reality in the near term.

---

[12] https://www.clevelandohio.gov/city-hall/office-mayor/urban-ai

Paragraphs 267 and 268 relate to sharing data with the public and essentially requires the CPC to be engaged in that process. The Monitoring Team is unaware of the extent to which the Data Team liaises with the CPC to increase the reach of their hard work. There continue to be challenges with ease with which users can easily locate specific information relative to policies on the City of Cleveland websites. There is a table of contents and specific areas. However, to effectively search policies, the user must have a detailed knowledge of CDP and the language of CDP. Using the search tool does not bring the user to a specific page or policy, making all policies difficult to find, access, and review. Reorganizing the website in a way that makes it easier for members of the public, and likely members of CDP, to find what they need should be established as a task for the coming year. Not only does ¶ 268 require the posting of policies and procedures, but also requires training plans, community policing initiatives, community meeting schedules, budget, and internal audit reports on its website. It is not evident where members of the public should go for these items. When one searches for "community policing meetings" or "district policing meetings," nothing relevant appears in the search bar.

## 9. Officer Assistance and Support

*Areas of Progress*

<u>Training</u>: Commander Mark Maguth of the Training Section has aggressively pushed for all training curriculum development and instructor assessments to come through the CDP's Training Section in an attempt to hold all training to CDP's standards. While there has been progress in these efforts to comply with ¶¶ 275 and 280, the Monitoring Team is still seeing evidence that certain trainings have not been reviewed by the Training Section as needed. The Monitoring Team continues to urge CDP toward compliance on this requirement by requiring all trainings be reviewed, coordinated, and approved by the Training Section.

In addition, it appears that other lesson plans are regularly being reviewed by the Training Review Committee, including representation from the CPC, which is a positive step toward their more substantive involvement in training development.

On December 16, 2023, the CDP and CPC partnered to provide an experiential presentation to the community of some of CDP's training, allowing the community to participate in select training scenarios. The presentation was very informative, and the community was engaged and pleased with the opportunity to observe and participate in CDP-created simulations and training scenarios.

During this reporting period, the Monitoring Team reviewed multiple training documents, to include a District Awareness Refresher course, an interactive reality-based training covering many Consent Decree topics, and CDP's 2024 Needs Assessment and Training Plan. In addition, during this period the Monitoring Team observed Session III of CDP's in-service training. The Monitoring Team believes that this training reflected a holistic approach to combining hands-on scenarios with multiple learning objectives on search and seizure, de-escalation, and use of force, bias-free policing, and crisis intervention, among others.

<u>Equipment</u>: The City's IT Department is increasingly connected to daily operational needs of the CDP. City IT has been involved in meetings with the Monitoring Team, CDP operations personnel, the PAT, and the Data Team, discussing emerging issues around record collection and retention. In July 2023, the City established a Police IT Board that meets with Public Safety IT on a biweekly basis. Also importantly, consistent with ¶ 294, City IT met with the CPC for the first time on January 4, 2024 (after the reporting period). The City IT Department continues to follow the expectation of ¶¶ 291-298 with its annual

assessment, planning, and appropriation process. The replacement plan for equipment purchased is followed and as new technologies emerge, City IT and Public Safety IT make improvements. In-car dash cameras have been installed in one hundred twenty-five (125) vehicles, and the remaining one hundred seventy-five (175) will be completed by the end of June 2024. Other upgrades and updates in portable radios, IAPro, along with the PC refresh and in-car modem refresh are or will be completed in the next few months. The City appropriated additional funds to support the hiring of eight (8) additional staff to further support the increasing and ongoing IT needs. City IT reports exploring what could be significant improvements to the Computer Aided Dispatch and Records Management Systems. Such changes would limit redundant entry and improve workflows significantly.

Recruitment and Retention: With near historic staff shortages caused by voluntary departures and retirements and the national crisis in recruiting police officers experienced across the nation, the Recruitment and Retention Section at the Department Public Safety (DPS), along with the PAT, have embarked on novel approaches. With support from the Administration, the City revised its recruitment strategy to conduct a weekend-long recruitment effort affording candidates a one-stop experience to apply and participate in the preliminary testing center. The weekend event produced over six hundred (600) interested persons and yielded approximately three hundred (300) pre-qualified recruits. To generate further interest within the public, the City changed the maximum age, implemented hiring bonuses, emphasized changes in the collective bargaining agreement, increased wages for existing officers, and instituted shift changes. All this incentivized new applicants and prior CDP officers to express interest. It is hoped that the CDP can host sufficient academy classes in 2024 to field up to one hundred fifty (150) new officers.

Since the 2022 compliance assessment of ¶¶ 308-311 by the Monitoring Team, CDP requested some technical assistance and made changes to its processes and record keeping. These policies appear to be promising. A subsequent assessment was neither requested nor conducted.

***Challenges Ahead***

Training: CDP delayed its Supervisor Training, which is now scheduled for the next reporting period. The Monitoring Team looks forward to observing the in-person portion of the training. A persistent challenge is that the Training Division needs to make certain that participants are engaged in the training program, for example, by ensuring that participants are alert, non-disruptive, and not distracted by personal mobile devices. Thus, not only is the training material important, but so too is the effectiveness of the training delivery. In addition, CDP must continue to ensure that all trainings provided to CDP officers are vetted by the Training Section to ensure the quality of training is up to par with what has become CDP's standard in-house training quality. The Monitoring Team continues to eagerly await an updated version of the FRB Training, which it last saw in February of 2023 and which required significant upgrades. In addition, CDP has been working for some time on updating their Field Training Program, but the Monitoring Team has yet to review an updated version. While the Monitoring Team acknowledges that the workload of the Training Section is heavy, CDP must continue to stay apace, and keep the Monitoring Team apprised of its work, to ensure that it is fulfilling its duties under the Consent Decree.

CPC's review of training materials has been a critical focal point of recent conversations and is expected to be discussed in the next Semiannual Report.

Recruitment and Retention: Voluntary terminations, both retirements and departures, continue to outnumber new hires. While the Recruitment and Retention Section endeavors to conduct exit surveys of

all personnel who leave, based on shared reports, the exit surveys capture only a small percentage of those who leave. DPS needs to establish systems to strengthen the necessary communication and connections between CDP's Human Resources and the DPS's Recruitment and Retention Section to improve the data collection from those leaving in ways that might inform management on retention strategies. The survey results that were shared with the Monitoring Team show there remain issues within the control of management – specific plans to address them should be made.

As described above, the recruitment fair held on a December weekend was very impressive and produced record numbers of applicants. Numbers alone should not drive the effort. Paragraph 304 directs the recruitment plan to "include specific strategies for attracting a diverse group of applicants…." The Monitoring Team has not seen a plan that connects specific strategies to specific goals. It would also be helpful for the plan to articulate the goals the CDP wants to meet such as gender parity in the CDP, a percent of Spanish speakers, or other demographic or skill based on analysis of the current composition of personnel. The Recruitment Plans demonstrate that those in the DPS Recruitment and Retention Section have deep connections to segments of the Cleveland community such as local media, neighborhood-based gathering places, and more. The Monitoring Team is not aware of the degree to which the Recruitment and Retention Section engages with the CPC in accordance with ¶ 305.

Among the concerns the initial assessment of background investigations (¶¶ 308-311) revealed was the finding that there does not appear to be objective criteria for the ultimate selection of those recruits who are hired. With the successful recruitment effort this winter and the large number of anticipated recruits that effort will produce, CDP leadership and the DPS are urged to create assessment criteria and to document decisions around the selection process.

Employee Assistance: In the last six (6) months, the City has failed to provide the Monitoring Team any evidence of its efforts to provide mental health and other support to its law enforcement personnel. It has been many months since a revised policy was reviewed, and it is unclear at this time if there is an active policy or operations manual for Employee Assistance.

Performance & Promotions: There appears to have been no effort or activity to address the non-compliance of ¶¶ 312-318 which concern performance evaluation process. A performance evaluation policy and matrix being drafted in previous reporting periods did not appear to progress, to the Monitoring Team's knowledge, during this period. Similarly, as previously reported, the Monitoring Team made several efforts in the past to engage the City in collaborative discussions around promotions to better understand the City's compliance with these paragraphs. The City remains unresponsive to the Monitoring Team's various past requests for documentation and additional working sessions.

## 10.  Supervision

*Areas of Progress*

The approved curriculum for Supervisor Training reflects an emphasis on supervisor intervention and oversight. The Monitoring Team looks forward to the opportunity to observe the delivery of this training.

After a period of inactivity, in late 2023, CDP presented an update of their work on its Officer Intervention Program (OIP) that included their current research of OIPs in other jurisdictions that they intend to review for possible integration into their program. The presentation also included a demonstration of the Power BI dashboards that will be used for tracking of officers who trigger the system.

CDP submitted comprehensive policy revisions on their WCS for review by the Monitoring Team and DOJ. The revisions address the previously identified issues regarding supervisory audits and include a requirement for command reviews to ensure supervisory accountability. Once approved and implemented, CDP should re-acquire a higher level of compliance on ¶ 329. The Monitoring Team looks forward to reviewing these enhanced supervisory and command audits and CDP's assessment of those audits.

***Challenges Ahead***

The Monitoring Team will need to have a fuller picture of whether supervisors are achieving their requirements for close and effective supervision (¶ 322), and whether CDP is in fact holding officers directly accountable for the quality and effectiveness of their supervision (¶ 325). CDP should identify metrics for holding supervisors accountable and document ongoing supervisory performance to show progress toward compliance. The Monitoring Team will continue to gain insight into supervisory performance through its topic-specific assessments on use of force, search & seizure, and accountability.

The presentation of CDP's aspirations regarding OIP was helpful and it appeared that some progress was being made. However, CDP stated that they were still in "data collection mode," and has yet to establish a timeline for deliverables related to the OIP Consent Decree requirements. Further, the Power BI dashboards are not yet accessible to supervisors for tracking of their officers nor has the draft OIP policy (and its accompanying procedural manual) been completed to provide sufficient guidance to ensure the program is properly implemented. The Monitoring Team would like to see CDP prioritize this area in the next assessment period. A robust OIP should be viewed as an integral part of achieving and maintaining a healthy workforce.

## 11.    Outcome Assessments

CDP has continued to compile its data for the outcome assessment chart. The Monitoring Team has advised CDP to post this data on its website and make the data publicly available. The City recently informed the Monitoring Team that they plan to do so as part of their Urban AI initiative mentioned above. The Monitoring Team is greatly interested in this Initiative becoming a reality, as this trove of data can be used for many purposes, including to advance the narrative about change in the Cleveland community. CDP data show positive changes have occurred over the consent decree years – and it has earned the right to celebrate those changes – but they have not yet taken the opportunity to dynamically share them to inform the public and help researchers. The Monitoring Team encourages the City to take every opportunity to use the outcome measures data to demonstrate its changes over time and to allow the public to see for itself, by way of the data, the positive impact of these changes.

# V.    Appendix

## 1.    Community Engagement and Building Trust

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 14 | CDP creation of "formal and informal mechanisms that facilitate ongoing communication between CDP and the many Cleveland communities it serves." | PARTIAL COMPLIANCE |
| 15 | Creation of CPC to make recommendations, work with Cleveland communities to develop recommendations, and "report to the City and community as a whole and to provide transparency" on reforms. | GENERAL COMPLIANCE |
| 16 | CPC members "will be appointed and vacancies will be filled in accordance with the City's Charter"; and periodic meetings with Chief of Police to "provide recommendations." | PARTIAL COMPLIANCE |
| 17(a) | "[H]old public meetings across the City, complete an assessment of CDP's bias-free policing policies, practices, and training, and make recommendations." | NON-COMPLIANCE |
| 17(b) | "[A]ssist as appropriate in . . . development of training related to bias-free policing and cultural competency." | NON-COMPLIANCE |
| 17(c) | "[O]n an ongoing basis, assess CDP's community activities" and "make recommendations" related to "community engagement" and "community confidence." | NON-COMPLIANCE |
| 17(d) | "[O]n an ongoing basis, review CDP's civilian oversight structure to determine if there are changes it recommends for improving CDP's accountability and transparency." | PARTIAL COMPLIANCE |
| 18(a) | "[R]eview and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention." | NON-COMPLIANCE |
| 18(b) | [R]eview and comment on CDP's implementation of initiative, programs, and activities that are intended to support reform." | NON-COMPLIANCE |
| 18(c) | "[H]old public meetings to discuss the Monitor's reports and to receive community feedback concerning CDP's compliance with this Agreement." | PARTIAL COMPLIANCE |
| 19 | "The City will provide access to all information requested by the Commission related to its mandate, authority, and duties unless it is legally restricted." | NON-COMPLIANCE |
| 20 | CPC "will issue [at least annual] reports," which the "City will post . . . to the City's website." | NON-COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 21 | "The City will consider and timely respond in writing to the Commission's recommendations for improvements," which "will be posted to the City's website." | NON-COMPLIANCE |
| 22 | CPC budget listed as "separate line item" to ensure "sufficient independence and resources." | GENERAL COMPLIANCE |
| 23 | Facilitation of "regular communication and cooperation between CDP and community leaders at the local level," with District Policing Committees meeting "at minimum, every quarter." | PARTIAL COMPLIANCE |
| 24 | CPC, CDP, and Community Relations Board ("CRB") will "develop a mechanism to recruit and expand" Committee membership." CDP "will work with [Community Police] Commission to select officers for each District Policing Committee." | NON-COMPLIANCE |
| 25 | CDP "will work closely with District Policing Committees to identify strategies to address crime and safety issues in their District," considering and addressing identified priorities. | PARTIAL COMPLIANCE |
| 26 | "At least annually, each District Policing Committee will present its identified strategies, concerns, and recommendations" to the CPC, with CDP officer who is Committee member presenting to CPC "CDP's assessment of ways to address" the recommendations." | PARTIAL COMPLIANCE |

## 2. Community and Problem-Oriented Policing

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 27 | Implementation of "comprehensive and integrated community and problem-oriented policing model" by the City. | PARTIAL COMPLIANCE |
| 28 | Ensuring that "mission statement reflects [the Division's] commitment to community-oriented policing" / "integrat[ing] community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | PARTIAL COMPLIANCE |
| 29 | Ensuring "that officers are familiar with the geographic areas they serve," "engage in problem identification," and "work proactively . . . to address quality of life issues." | PARTIAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 30 | Initial and annual in-service community and problem-oriented policing training "adequate in quality, quantity, type, and scope" that addresses specifically identified areas. | **NON-COMPLIANCE** |
| 31 | Maintenance of "collaborative partnerships with a broad spectrum of community groups," including CDP meetings with community organizations and District Policing Committees. | **PARTIAL COMPLIANCE** |
| 32 | CDP "meet[ing] with members of the community in each District on a monthly basis and "solic[itation of] participation from a broad cross-section of community members in each District" to "identify problems and other areas of concern . . . and discuss responses and solutions." | **PARTIAL COMPLIANCE** |
| 33 | Development and implementation of "systems to monitor officer outreach to the community" that CDP "will use . . . to analyze . . . whether officers are partnering with a broad cross-section of community members to develop and implement cooperative strategies that build mutual respect and identify and solve problems." | **PARTIAL COMPLIANCE** |
| 34 | "At least annually, CDP will present the results" of paragraph 33 analysis "broken out by District in a publicly-available community policing report" that describes problems, solutions, and obstacles. Report provided to Commission and posted on CDP website. | **NON-COMPLIANCE** |

## 3.   Bias-Free Policing

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 35 | Delivery of "police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias," among other things. | **PARTIAL COMPLIANCE** |
| 36 | "CDP will integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **PARTIAL COMPLIANCE** |
| 37 | CDP will ensure that it "administer[s] all activities without discrimination" on basis of various protected classes | **PARTIAL COMPLIANCE** |
| 38 | "CDP will develop a bias-free policing policy" incorporating CPC recommendations "that provides clear guidance to officers" | **OPERATIONAL COMPLIANCE** |

Cleveland Police Monitoring Team | 14th Semiannual Report | April 2024

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| **39-40** | Develop bias-free policing and procedural justice training "adequate in quality, quantity, scope, and type" covering specific areas within 18 months of the Effective Date. | **OPERATIONAL COMPLIANCE** |
| **41** | Supervisor training on bias-free policing and procedural justice issues covering specific areas | **PARTIAL COMPLIANCE** |
| **42** | Annual in-service training on bias-free policing "adequate in quality, quantity, type, and scope" | **PARTIAL COMPLIANCE** |
| **43** | Analysis of paragraph 265 data ("including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination") | **NON-COMPLIANCE** |
| **44** | Consideration of "bias-free policing and equal protection" principles in hiring, unit assignment, promotion, and performance assessments. | **PARTIAL COMPLIANCE** |

## 4.  Use of Force

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| **45** | "CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force" complies with the Constitution, federal law, and the Consent Decree "and that any use of unreasonable force is promptly identified and responded to appropriately." | **OPERATIONAL COMPLIANCE** |
| **46** | "The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers . . . will comply" with at least twelve major, listed principles. | **PARTIAL COMPLIANCE** |
| **47** | Division "will ensure that the [use of force] incident is accurately and properly reported, documented, and investigated." | **PARTIAL COMPLIANCE** |
| **48** | "CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends." | **OPERATIONAL COMPLIANCE** |
| **49** | Development of use of force policies "that comply with applicable law[,] . . . are adequate to achieve the goals described in paragraph 45," and "specify that unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability." | **OPERATIONAL COMPLIANCE** |
| **50** | "CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons." | **OPERATIONAL COMPLIANCE** |
| **51** | Weapon-specific policies "will include training and certification requirements that each officer must | **OPERATIONAL COMPLIANCE** |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
|  | meet before being permitted to carry and use the authorized weapon." |  |
| 52 | "No officer will carry any weapon that is not authorized or approved by CDP." | OPERATIONAL COMPLIANCE |
| 53 | "Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of weapon is imminent, and allow the subject an opportunity to comply." | OPERATIONAL COMPLIANCE |
| 54-83 | "The City will implement policies" for firearms, ECWs (Tasers), and OC (pepper) spray that comply with a host of specific, expressly listed provisions. | OPERATIONAL COMPLIANCE |
| 84 | CDP "will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes" a number of specific, expressly listed elements. | OPERATIONAL COMPLIANCE |
| 85 | CDP "will provide the use of force training described in paragraph 84 to all new officers." | OPERATIONAL COMPLIANCE |
| 86 | "CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope." | OPERATIONAL COMPLIANCE |
| 87 | "CDP will develop and implement a single, uniform reporting system pursuant to a Use of Force reporting policy" that complies with the force Level categorization set forth in the paragraph. | GENERAL COMPLIANCE |
| 88 | Requiring "[a]ll officers using or observing force" to complete a Use of Force Report including a number of specific features and avoiding "conclusory statements, 'boilerplate', or 'canned' language." | OPERATIONAL COMPLIANCE |
| 89 | "Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports." | OPERATIONAL COMPLIANCE |
| 90 | "Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable." | OPERATIONAL COMPLIANCE |
| 91 | Requirement to "notify . . . supervisors . . . as soon as practical following any use of force" and if becoming aware of "an allegation of unreasonable or unreported force by another officer." | OPERATIONAL COMPLIANCE |
| 92 | "Use of Force Reports will be maintained centrally." | OPERATIONAL COMPLIANCE |
| 93 | "A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval." | OPERATIONAL COMPLIANCE |
| 94 | Setting specific requirements relating to the investigation of low-level, Level 1 force. | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 95-109 | Setting specific requirements relating to the investigation by supervisors and/or CDP chain of command for investigation and review of Level 2 force. | **OPERATIONAL COMPLIANCE** |
| 110 | "CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP." | **OPERATIONAL COMPLIANCE** |
| 111 | Creation and design of dedicated Force Investigation Team (FIT) that "will conduct administrative investigations . . . and criminal investigations" of serious force, "force involving potential criminal conduct," in-custody deaths, and cases assigned to it by the Chief. | **PARTIAL COMPLIANCE** |
| 112 | Composition of FIT Team. | **OPERATIONAL COMPLIANCE** |
| 113 | "FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type" on a host of specific, expressly-listed topics both initially and annually thereafter. | **OPERATIONAL COMPLIANCE** |
| 114 | "CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement." | **OPERATIONAL COMPLIANCE** |
| 115 | Response of FIT to use of force scenes. FIT notification of prosecutor's office. Notification of designated outside agency to conduct criminal investigation if City elects to use external agency for such investigations. | **OPERATIONAL COMPLIANCE** |
| 116 | "CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation." | **PARTIAL COMPLIANCE** |
| 117 | Memorandum of understanding required between CDP and outside agency containing specific, expressly-listed provisions. | **OPERATIONAL COMPLIANCE** |
| 118 | Setting forth various, specific, and expressly-listed responsibilities of FIT during its investigations. | **PARTIAL COMPLIANCE** |
| 119 | N/A | **N/A** |
| 120 | Providing for delay of compelled interview if "case has the potential to proceed criminally" but otherwise requiring that "[n]o other part of the investigation . . . be held in abeyance" unless "specifically authorized by the Chief" in consultation with investigating agency and prosecutor's office. | **PARTIAL COMPLIANCE** |
| 121 | Requiring completion of preliminary report presented to Chief or Chief's designee "as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force." | **PARTIAL COMPLIANCE** |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 122 | Completion of investigation within 60 days. Preparation of FIT investigation report. Review of FIT investigative report by head of Internal Affairs who "will approve or disapprove FIT's recommendations, or request . . . additional investigation." | **NON-COMPLIANCE** |
| 123 | Revision of FIT Manual to ensure "consisten[cy] with the force principles" and several specific, expressly-listed provisions. | **OPERATIONAL COMPLIANCE** |
| 124 | "The City will develop and implement a Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." | **OPERATIONAL COMPLIANCE** |
| 125 | Requiring "training on legal updates, updates on CDP's policies, and CDP training curriculum related to the use of force" for each member. | **PARTIAL COMPLIANCE** |
| 126 | Mandating "comprehensive and reliable reviews of investigations within 90 days of submission to the FRB," and encompassing officer's decision-making at the moment force was used as well asl "the circumstances leading up to the use of force, tactical decisions, information sharing and communication, adequacy of supervision, equipment, training, CDP's medical response, when applicable, and any commendable actions" and actions and inactions of all involved members. | **PARTIAL COMPLIANCE** |
| 127 | Description of reviews, which will: ensure objective and complete investigations and findings supported by preponderance of the evidence; be presented by the investigator or District representative (for supervisors); review written records and discuss the case with the presenter; order additional investigation when needed; determine whether the case raises concerns about policing, training, equipment, supervision, medical response, communication, or tactics and referral to appropriate unit; recommending non-disciplinary action; and documenting FRB findings and recommendations within 15 days of each presentation. | **OPERATIONAL COMPLIANCE** |
| 128 | "The FRB will assess the quality of the investigations," including whether they are "objective and comprehensive and recommendations are supported by a preponderance of evidence. The FRB will identify and document any deficiencies that indicate a need for corrective action" | **PARTIAL COMPLIANCE** |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 129 | "Annually, the FRB will examine the data related to use of force" provided by the DACC per ¶261 (and in conjunction with ¶266) "to detect any patterns, trends, and training deficiencies and make recommendations for correction as appropriate" and will provide the analysis to the Monitor. | PARTIAL COMPLIANCE |
| 130 | The FRB will work with the DACC to "develop a tracking system to ensure that each of its recommendations has been forwarded to the appropriate personnel. The Chief or his or her designee will ensure that the FRB's recommendations, including non-disciplinary corrective action, are implemented as appropriate." | OPERATIONAL COMPLIANCE |

## 5. Crisis Intervention

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 131 | "CDP will build upon and improve its Crisis Intervention Program" in furtherance of four specific, expressly-listed goals, which "will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health system and create a context for sustainable change." | OPERATIONAL COMPLIANCE |
| 132 | Establishment of Mental Health Response Advisory Committee (the "Advisory Committee") "to foster relationships and build support between the police, community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis." | GENERAL COMPLIANCE |
| 133 | Composition of Advisory Committee. | GENERAL COMPLIANCE |
| 134 | "The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program." | GENERAL COMPLIANCE |
| 135 | Advisory Committee will conduct an annual "analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers" and communications "are appropriately responding to people in crisis," and will also "recommend appropriate changes." | PARTIAL COMPLIANCE |
| 136 | "The Advisory Committee's reports and recommendations will be provided" to CPC, "be publicly available, and will be posted on the City's website." | GENERAL COMPLIANCE |

Cleveland Police Monitoring Team | 14th Semiannual Report | April 2024

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 137 | CDP will designate a Crisis Intervention Coordinator for specific, expressly-identified purposes. | GENERAL COMPLIANCE |
| 138 | "Coordinator will develop and maintain partnerships with program stakeholders and serve as point of contact" and "resource" for other stakeholders. | GENERAL COMPLIANCE |
| 139 | "Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, call-takers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program." | GENERAL COMPLIANCE |
| 140 | "Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate." | OPERATIONAL COMPLIANCE |
| 141 | "Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers" and "to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls." | PARTIAL COMPLIANCE |
| 142 | "Coordinator will create ways to recognize and honor specialized CIT officers, call-takers, and dispatchers." | OPERATIONAL COMPLIANCE |
| 143 | Initial and annual crisis intervention training to all officers and recruits that is "adequate in quality, quantity, type, and scope." | GENERAL COMPLIANCE |
| 144 | Initial and annual crisis intervention training for dispatchers and call-takers. | GENERAL COMPLIANCE |
| 145 | "The City will provide enhanced specialized training in responding to individuals in crisis to certain officers ('specialized CIT officers')," who will be "called upon to respond to incidents or calls involving individuals in crisis." | OPERATIONAL COMPLIANCE |
| 146 | Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | GENERAL COMPLIANCE |
| 147 | Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | OPERATIONAL COMPLIANCE |
| 148 | Designation of specialized CIT officers, per specific, expressly-listed requirements. | OPERATIONAL COMPLIANCE |
| 149 | "Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized officers." | OPERATIONAL COMPLIANCE |

Cleveland Police Monitoring Team | 14th Semiannual Report | April 2024

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 150 | "All Field Training Officers" ("FTO"s) "will receive the enhanced specialized crisis intervention training described in paragraph 146," though FTOs will "not be designated as a specialized CIT officer" unless they volunteer and have been selected to do so. | **OPERATIONAL COMPLIANCE** |
| 151 | "Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene," with supervisors "seek[ing] the input of a specialized CIT officer . . . where it is reasonable for them to do so." | **PARTIAL COMPLIANCE** |
| 152 | "[T]he Coordinator will develop an effective specialized crisis intervention plan . . . to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis" that includes various, specific, expressly-identified requirements. The City "will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis." | **PARTIAL COMPLIANCE** |
| 153 | City "will consider" crisis intervention program assessment by Ohio Criminal Justice Coordinating Center of Excellence. | **GENERAL COMPLIANCE** |
| 154 | CDP "will revise its policies to make clear that a crisis intervention response may be necessary even in situations where there has been an apparent law violation." | **GENERAL COMPLIANCE** |
| 155 | CDP "will revise its current crisis intervention policy to ensure that specialized CIT officers have appropriate discretion to direct individuals . . . to the health care system, rather than the judicial system . . . where it is appropriate to do so." | **GENERAL COMPLIANCE** |
| 156 | CDP policies and procedures will ensure that "specialized CIT officers . . . must be dispatched to all calls or incidents that appear to involve an individual in crisis." CDP must "track incidents in which a specialized officer was not dispatched to such calls" and "identify any barriers" to ensuring dispatch of specialized CIT officer to such calls. | **PARTIAL COMPLIANCE** |
| 157 | "CDP will track calls and incidents involving individuals in crisis by gathering, at a minimum," specific, expressly-identified data. | **OPERATIONAL COMPLIANCE** |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 158 | Public reporting of paragraph 157 data and provision to Advisory Committee. | OPERATIONAL COMPLIANCE |
| 159 | "The City will utilize" paragraph 157 data "to identify training needs and develop case studies and teaching scenarios" for training and other expressly-identified systemic purposes. | OPERATIONAL COMPLIANCE |

## 6.    Search and Seizure

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 160 | "CDP will revise, develop, and implement search and seizure policies that comply with applicable law, . . . include the requirements below," and conform to expressly-identified principles. | PARTIAL COMPLIANCE |
| 161-165 | Policy requirements for officers for stops, searches, and detentions | PARTIAL COMPLIANCE |
| 166 | "Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assault on an officer and no other substantive violation is alleged," and "the supervisor will respond to the scene." | PARTIAL COMPLIANCE |
| 167 | "Officers will not use 'canned' or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests." | PARTIAL COMPLIANCE |
| 168 | "Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports." CDP "will train officers" on documenting stops. "Supervisors will review all documentation of investigatory stops, searches, and arrests." | PARTIAL COMPLIANCE |
| 169 | Supervisor will review of "each arrest report by officers under their command," with supervisors reviewing reports for specific, expressly-identified deficiencies. | PARTIAL COMPLIANCE |
| 170-172 | Supervisory review of investigatory stops, searches, and arrests. | PARTIAL COMPLIANCE |
| 173 | Provision of "initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements" of the Consent Decree that "will address the requirements of Fourth Amendment and related law, CDP policies," and specific, expressly-identified topics. | OPERATIONAL COMPLIANCE |
| 174-175 | Provision of "annual search and seizure in-service training that is adequate in quality, quantity, type, | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| | and scope" incorporating specific, expressly-identified topics. | |

## 7.     Accountability

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 176 | The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process." | PARTIAL COMPLIANCE |
| 177 | "Internal Affairs will conduct objective, comprehensive, and timely investigations of all internal allegations," with "findings . . . based on the preponderance of the evidence standard" that must "be clearly delineated in policies, training, and procedures and accompanied by detailed examples to ensure proper application by investigators." | PARTIAL COMPLIANCE |
| 178 | "Internal Affairs will be headed by a qualified civilian" who "will report directly to the Chief of Police. | OPERATIONAL COMPLIANCE |
| 179 | Qualifications for IA investigators. | PARTIAL COMPLIANCE |
| 180 | Initial training for IA investigators "that is adequate in quality, quantity, scope, and type on conducting misconduct investigations" that addresses specific, expressly- identified topics. | PARTIAL COMPLIANCE |
| 181 | "[A]nnual training" for IA investigators "that is adequate in quality, quantity, type and scope" | PARTIAL COMPLIANCE |
| 182 | "In each investigation, Internal Affairs will collect and consider" all evidence. "[N]o automatic preference for an officer's statement over a non-officer's statement." No disregard of a "witnesses' statement solely because of" connection to the complainant or criminal history. IA investigators must "make all reasonable efforts to resolve material inconsistencies between witness statements." | PARTIAL COMPLIANCE |
| 183 | IA "will evaluate all relevant police activity and any evidence of potential misconduct uncovered during the course of the investigation." | PARTIAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 184 | IA will not consider guilty plea or verdict as "determinative of whether a CDP officer engaged in misconduct" or justification for "discontinuing the investigation." | PARTIAL COMPLIANCE |
| 185 | IA "will complete its administrative investigations within 30 days from the date it learns of the alleged misconduct." | PARTIAL COMPLIANCE |
| 186-187 | IA investigative report requirements. | PARTIAL COMPLIANCE |
| 188 | Forwarding of completed IA investigations "to the officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator." | PARTIAL COMPLIANCE |
| 189 | "CDP will require any CDP employee who observes or becomes aware of any" potential misconduct to "report the incident to a supervisor or directly to" IA. | OPERATIONAL COMPLIANCE |
| 190 | "CDP will develop a system that allows officers to confidentially and anonymously report potential misconduct by other officers." | OPERATIONAL COMPLIANCE |
| 191 | "CDP will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." | OPERATIONAL COMPLIANCE |
| 192 | "Officers who retaliate . . . will be subject to the disciplinary process." | PARTIAL COMPLIANCE |
| 193 | OPS investigates "all complaints of misconduct it receives" and will confer with IA "to develop policies and procedures for handling matters over which they both have investigative jurisdiction." | OPERATIONAL COMPLIANCE |
| 194 | "The City will ensure that OPS is led by an administrator with the skills, expertise, and experience to effectively manage the intake, tracking, timely, and objective investigation of complaints"; implement PRB training; "assess OPS's equipment and staffing needs"; and "develop and implement performance standards for OPS." | NON-COMPLIANCE |
| 195-196 | Initial training for OPS investigators "adequate in quality, quantity, scope, and type," including specific, expressly-listed topics. | OPERATONAL COMPLIANCE |
| 197 | "OPS Investigators will not be current members of the CDP, and no CDP personnel will have any active role in OPS's operations." | GENERAL COMPLIANCE |
| 198 | "The City will ensure that the lawyer representing OPS does not have any actual or apparent conflicts of interest." | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 199 | "OPS will have its own budget, separate from . . . the Department of Public Safety" that "affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement." | GENERAL COMPLIANCE |
| 200 | Development and implementation of OPS operations manual "made available to the public" that covers specific, expressly-listed topics. | PARTIAL COMPLIANCE |
| 201 | Development and implementation of "a program to promote awareness through the Cleveland community about the process for filing complaints with OPS." | PARTIAL COMPLIANCE |
| 202 | "CDP and the City will work with the police unions . . . to allow civilian complaints to be submitted to OPS verbally or in writing; in person, by phone, or on line; by a complainant, someone acting on his or her behalf, or anonymously; and with or without a signature from the complainant," with all "complaints documented in writing." | GENERAL COMPLIANCE |
| 203 | CDP will post and maintain by the intake window at CDP headquarters and all District headquarters a permanent placard describing the civilian complaint process" and containing specific, expressly-listed information. | OPERATIONAL COMPLIANCE |
| 204 | "CDP will provide training that is adequate in quality, quantity, scope, and type to all police personnel, including dispatchers, to properly handle complaint intake, including" with respect to specific, expressly-listed topics. | PARTIAL COMPLIANCE |
| 205 | CDP officers "carry complaint forms in their CDP vehicles," which officers must provide "upon request." Supervisors will be dispatched to scene when an individual wants to make a complaint, with the supervisor providing a copy of completed complaint form "or a blank form to be completed later by the individual." | OPERATIONAL COMPLIANCE |
| 206 | "The City and OPS will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including a number of specific, expressly-listed locations. | OPERATIONAL COMPLIANCE |
| 207 | "OPS's complaint form will not contain any language that could reasonably be construed as discouraging the filing of a complaint, including warnings about the potential criminal consequences for filing false complaints." | GENERAL COMPLIANCE |

Cleveland Police Monitoring Team | 14th Semiannual Report | April 2024

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 208 | Availability of complaint forms in English and Spanish. "OPS will make every effort to ensure that complainants who speak other languages . . . can file complaints in their preferred language." | OPERATIONAL COMPLIANCE |
| 209 | "City will ensure that civilian complaints submitted through other existing systems, including the Mayor's Action Center and the Department Action Center, are immediately forwarded to OPS for investigation." | OPERATIONAL COMPLIANCE |
| 210 | "OPS will establish a centralized electronic numbering and tracking system for all complaints," which "will maintain accurate and reliable data regarding the number, nature, and status of all complaints . . . including investigation timeliness and notification of the interim status and final disposition of the complaint." It "will be used to monitor and maintain appropriate caseloads for OPS investigators." | OPERATIONAL COMPLIANCE |
| 211 | Biased policing tracked as a separate category of complaint that "are captured and tracked appropriately, even if the complainant does not so label the allegation." | OPERATIONAL COMPLIANCE |
| 212 | "[A]llegations of unlawful investigatory stops, searches, or arrests" tracked as a separate category of complaints. | OPERATIONAL COMPLIANCE |
| 213 | "[A]llegations of excessive use of force" tracked as separate category of complaints. | OPERATIONAL COMPLIANCE |
| 214 | "OPS will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends." | PARTIAL COMPLIANCE |
| 215 | "OPS will produce, at least annually, a public report summarizing complaint trends, including" with respect several specific, expressly-identified areas. | PARTIAL COMPLAINCE |
| 216 | Assignment of complaints to Standard and Complex investigatory tracks. | OPERATIONAL COMPLIANCE |
| 217 | Dismissal and/or administrative dismissal of complaint investigations. | OPERATIONAL COMPLIANCE |
| 218 | "The City will ensure that investigations of complaints are as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of the evidence." | PARTIAL COMPLIANCE |
| 219 | "CDP will ensure that OPS has timely access to all reports related to the incident . . ," and authority of OPS "to conduct additional investigation" of any complaint of police misconduct when CDP investigation has already taken place relating to the incident. | PARTIAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 220 | "OPS investigators will attempt to interview each complainant in person" and record the interview. | OPERATIONAL COMPLIANCE |
| 221 | "The Chief will order officers who witnessed or participate in an incident that is the subject of an OPS complaint to cooperate with the OPS investigation," including by responding to written questions or sitting for an in-person interview. | GENERAL COMPLIANCE |
| 222 | "OPS investigators will have access to any relevant disciplinary information in the record of an officer who is the subject of a current investigation." | PARTIAL COMPLIANCE |
| 223 | "OPS will consider all relevant evidence," with no preferences for particular witness's statements, including of officer over a non-officer, or because of connection to complainant or criminal history. "OPS will make all reasonable efforts to resolve material inconsistencies between witness statements." | PARTIAL COMPLIANCE |
| 224 | OPS findings categories. | OPERATIONAL COMPLIANCE |
| 225 | "OPS will document in writing the investigation of each complaint, including all investigatory steps taken, and OPS's findings and conclusions," which must "be supported by a preponderance of the evidence. | GENERAL COMPLIANCE |
| 226 | "In addition to determining whether an officer committed the conduct alleged in the complaint and whether it violated policy, OPS may consider whether: (a) the police action was in compliance with training and legal standards; (b) the incident indicates a need for additional training, counseling, or other corrective measures; and (c) the incident suggests that CDP should revise its policies, strategies, tactics, or training. OPS may include recommendations on these topics in its investigation." | PARTIAL COMPLIANCE |
| 227 | "OPS will forward all investigations and its written conclusions to PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation." | PARTIAL COMPLIANCE |
| 228 | "OPS will send periodic written updates" to the complainant at specific, expressly- identified junctures. | OPERATIONAL COMPLIANCE |
| 229 | "[A] complainant may contact OPS at any time to determine the status of his/her complaint." | OPERATIONAL COMPLIANCE |
| 230 | "Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot" addressing PRB composition and appointment process. | GENERAL COMPLIANCE |

Cleveland Police Monitoring Team | 14th Semiannual Report | April 2024

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 231 | "PRB members will not be current or former members of the CDP." | GENERAL COMPLIANCE |
| 232 | "PRB will have its own budget," overseen by OPS Administrator and separate from Department of Public Safety, that "affords sufficient independence and resources." | OPERATIONAL COMPLIANCE |
| 233-234 | Initial training for PRB members "that is adequate in quality, quantity, scope, and type" and that covers specific, expressly-identified topics. | PARTIAL COMPLIANCE |
| 235 | PRB meetings open to the public and posted in advance, with "case presentations and PRB votes" occurring during "open session." | GENERAL COMPLIANCE |
| 236 | "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings . . . ." PRB may "ask the investigator to conduct further investigation" as necessary. | GENERAL COMPLIANCE |
| 237 | "PRB recommended dispositions will be based on a preponderance of the evidence. For each case, PRB shall set forth its conclusion and an explanation of its reasons and supporting evidence in writing, including, when applicable, the justification for departing from OPS's recommended disposition." | PARTIAL COMPLIANCE |
| 238 | "In cases where PRB is recommending a sustained disposition, in whole or in part, PRB will include a recommendation as to disciplinary or non-disciplinary corrective action." | OPERATIONAL COMPLIANCE |
| 239 | [Timely] forwarding of PRB recommendations to Chief of Police and Director of Public Safety. | PARTIAL COMPLIANCE |
| 240 | "The Chief of CDP will issue a General Police Order that requires officers to (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB." | GENERAL COMPLIANCE |
| 241 | Disciplinary hearing requirement, with officer given "opportunity to testify" and suspension of hearing if "officer provides new or additional evidence at hearing," with matter "returned to IA or PRB for consideration." | PARTIAL COMPLIANCE |
| 242 | Disciplinary recommendations by PRB to proceed through the City's disciplinary process. Written justification by Chief or Director of their disagreement with PRB's recommendations. | OPERATIONAL COMPLIANCE |
| 243 | "CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition." | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 245 | "The City will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented." | PARTIAL COMPLIANCE |
| 246 | "[T]he City will review its current matrix and will seek to amend it" "to ensure consistency" and inclusion of a number of specific, expressly-identified features. | OPERATIONAL COMPLIANCE |
| 247 | "All disciplinary decisions will be documented in writing." | GENERAL COMPLIANCE |
| 248 | "[T]he City will provide its disciplinary matrix to the PRB, Commission, the Police Inspector General, and the police unions for comment." | OPERATIONAL COMPLIANCE |
| 249 | "CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years." | PARTIAL COMPLIANCE |

## 8. Transparency and Oversight

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 250 | "The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a Police Inspector General" ("IG"). City must seek CPC's "input in developing minimum qualifications and experience" for IG. | NON-COMPLIANCE |
| 251 | IG work in Office of Mayor but report to Chief of Police. | NON-COMPLIANCE |
| 252 | IG "will not be a current or former employee of CDP." | NON-COMPLIANCE |
| 253 | Duties and authority of IG. | NON-COMPLIANCE |
| 255 | Budget of IG must be "a separate line item" in City budget and "afford[] sufficient independence and resources" to comply with Consent Decree. | NON-COMPLIANCE |
| 256 | IG "will have access to all documents and data necessary to perform the above functions, including any raw data." | NON-COMPLIANCE |
| 257 | "CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad access to information related to CDP's decision making and activities. To achieve this outcome, CDP will designate an individual or individuals as the 'Data Collection and Analysis Coordinator.'" | OPERATIONAL COMPLIANCE |
| 258 | Coordinator "will ensure the collection and tracking of all documents related to uses of force and | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
|  | allegations of misconduct and related materials," including specific, expressly-listed materials and information. |  |
| 259 | Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents," including specific, expressly-identified data. | GENERAL COMPLIANCE |
| 260 | Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation." The system must conform to a number of specific, expressly-identified requirements. | OPERATIONAL COMPLIANCE |
| 261 | Coordinator must "routine[ly] report[] . . . relevant data to the Chief of Police, FRB, Training Review Committee, OPS, the [Community Police] Commission, and the Police Inspector General." | PARTIAL COMPLIANCE |
| 262 | Coordinator "responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection." | OPERATIONAL COMPLIANCE |
| 263 | Coordinator "will develop a protocol to accurately analyze the data collected and allow for" various outcome measurements, "subject to the review and approval of the Monitor and DOJ." | OPERATIONAL COMPLIANCE |
| 264 | Annually, "CDP will conduct an assessment and issue a report summarizing its investigatory stop, search, and arrest data" that addresses various specific, expressly-identified topics. | PARTIAL COMPLIANCE |
| 265 | Annually, "CDP will conduct an assessment and issue a report of all activities, including use of force, arrests, motor vehicles and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race" or other listed prohibited classes or characteristics, and that addresses various specific, expressly-identified topics. | NON-COMPLIANCE |
| 266 | Annual analysis of "prior year's force" data with FRB. | PARTIAL COMPLIANCE |
| 267 | "[A]ll CDP audits, reports, and outcome analyses related to the implementation" of the Consent Decree will be public. | PARTIAL COMPLIANCE |
| 268 | "CDP will post its policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports on its website." | PARTIAL COMPLIANCE |

## 9.    Officer Assistance and Support

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 269 | "The City will ensure that officers receive adequate training to understand: (a) how to police effectively and safely in accordance with CDP policy; [and] (b) the requirements of this Agreement, Ohio law, and the Constitution and laws of the United States," including in the areas of "procedural justice, bias-free policing, and community policing." | PARTIAL COMPLIANCE |
| 270 | "CDP will expand the scope and membership of the Training Review Committee." | PARTIAL COMPLIANCE |
| 271-272 | "[T]he Training Review Committee will develop a written training plan for CDP's recruit academy, probationary field training, and in-service training" that addresses a host of specific, expressly-identified issues. | PARTIAL COMPLIANCE |
| 273 | "The Training Plan and schedule will be implemented once any objections have been resolved" on a yearly basis. | OPERATIONAL COMPLIANCE |
| 274 | "The City, including the Training Review Committee, will annually review and update CDP's training plan" by "conduct[ing] a needs assessment" that addresses a number of specific, expressly-identified data and information on real-world trends, needs, policy, and law. | OPERATIONAL COMPLIANCE |
| 275 | "CDP's Commander responsible for training" will be in charge of "all CDP training." | PARTIAL COMPLIANCE |
| 276 | "CDP will designate a single training coordinator in each District. The Commander responsible for training will establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the" training Commander. | PARTIAL COMPLIANCE |
| 277 | "CDP will develop recruit academy and in-service curricula that comport with" the Training Plan and Consent Decree requirements. | PARTIAL COMPLIANCE |
| 279 | "For all other substantive updates or revisions to policy or procedure, the City will ensure and document that all relevant CDP personnel have received and read the policy or procedure. Notification of each revision or update will include the rationale for policy changes and the difference between the old and updated policy." | PARTIAL COMPLIANCE |
| 280 | Training Commander reviews all training materials; ensures that they use "a variety of adult learning techniques, scenario-based training, and | PARTIAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
|  | problem-solving practices"; and "ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Review Committee." |  |
| 281 | "CDP will ensure that instructors are qualified and use only curricula and lesson plans that have been approved by the" Training Commander. | PARTIAL COMPLIANCE |
| 282 | "CDP will revise, as necessary, its field training program for graduates of the police academy to comport with" the Training Plan and Consent Decree. | NON-COMPLIANCE |
| 283 | "The field training program will incorporate community and problem-oriented policing principles, and problem-based learning methods." | NON-COMPLIANCE |
| 284 | Review and revision of Field Training Officer ("FTO") "participation policy to establish and implement a program that effectively attracts the best FTO candidates" and "revise eligibility criteria" for FTOs. | NON-COMPLIANCE |
| 285 | New FTOs and Field Training Sergeants must "receive initial and in-service training that is adequate in quality, quantity, scope, and type, and that addresses" a number of specific, expressly-listed topics and conforms to a number of additional features or requirements. | NON-COMPLIANCE |
| 286 | "CDP will create a mechanism for recruits to provide confidential feedback regarding the quality of their field training," and the Division "will document its response, including the rationale behind any responsive action taken or decision to take no action." | NON-COMPLIANCE |
| 287 | "The City and the Training Review Committee will, on an annual basis, analyze all aspects of CDP's FTO program," "consider emerging national policing practices in this area," and "recommend, and CDP will institute, appropriate changes to policies, procedures, and training related to its FTO program." | NON-COMPLIANCE |
| 288 | "CDP will document all training provided to or received by CDP officers," with officers "sign[ing] an acknowledgement of attendance or digitally acknowledge[ing] completion of each training course," which "will be maintained in a format that allows for analysis by training type, training date, training source, and by individual officer name." | PARTIAL COMPLIANCE |
| 289 | "CDP will develop and implement a system that will allow the Training Section to electronically | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| | track, maintain, and produce complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system." | |
| 290 | "The City will develop and implement accountability measures . . . to ensure that all officers successfully complete all required training programs in a timely manner." | PARTIAL COMPLIANCE |
| 291 | "The City will implement" paragraphs regarding equipment and resources in order to allow implementation of the Consent Decree "and to allow officers to perform their jobs safely, effectively, and efficiently." | PARTIAL COMPLIANCE |
| 292 | "CDP will complete a comprehensive equipment and resource study to assess its current needs and priorities," and it "will develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." | OPERATIONAL COMPLIANCE |
| 293 | "CDP's Equipment and Resource Plan will provide for necessary equipment including, at least" "an adequate number of computers"; "an adequate number of operable and safe zone cars"; "zone cards with reliable, functioning computers that provide officers with up-to-date technology" including computer-aided dispatch, the records management system, and various core law enforcement systems; and "zone cars equipped with first-aid kits." "This plan also will ensure that CDP properly maintains and seeks to continuously improve upon existing equipment and technology; and is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." | OPERATIONAL COMPLIANCE |
| 294 | "CDP will actively seek input and feedback from the Commission, patrol officers, and supervisors regarding resource allocation, equipment needs, and technological improvements." | NON-COMPLIANCE |
| 295 | "City and CDP" must "us[e] best efforts to implement the Equipment and Resource Plan as required." | OPERATIONAL COMPLIANCE |
| 296 | "CDP will . . . implement an effective, centralized records management system." | OPERATIONAL COMPLIANCE |
| 297 | "CDP will utilize a department-wide e-mail system to improve communication and information sharing." | OPERATIONAL COMPLIANCE |

Cleveland Police Monitoring Team | 14th Semiannual Report | April 2024

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 298 | "CDP will employ information technology professionals who are trained to conduct crime and intelligence analysis, who are capable of troubleshooting and maintaining information technology systems and who can identify and suggest appropriate technological advancements." | OPERATIONAL COMPLIANCE |
| 299 | "CDP will implement an effective employee assistance program that provides officers ready access to the mental health and support resources necessary to facilitate effective and constitutional policing." | PARTIAL COMPLIANCE |
| 300 | "The City will review and revise . . . its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals." | OPERATIONAL COMPLIANCE |
| 301 | "The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP." | GENERAL COMPLIANCE |
| 302 | "CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community" and meets certain specific, expressly-listed requirements. | OPERATIONAL COMPLIANCE |
| 303 | "The City will implement the recruitment plan within 60 days of it being approved by the Monitor." | OPERATIONAL COMPLIANCE |
| 304 | "CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants," including officers with various, specific, expressly-listed skills and backgrounds. | PARTIAL COMPLIANCE |
| 305 | "In developing and implementing its recruitment plan, CDP will consult with the [Community Police] Commission and other community stakeholders on strategies to attract a diverse pool of applicants." | PARTIAL COMPLIANCE |
| 306 | "[O]bjective system for hiring and selecting recruits" that "employs reliable and valid selection criteria." | PARTIAL COMPLIANCE |
| 307 | "CDP will report annually to the public its recruiting activities and outcomes," which will include information on various, expressly-listed areas. | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 308 | "[A]ll candidates for sworn personnel positions" will have "psychological and medical examination" and be subject to "drug testing." Existing officers receive "random drug testing." | GENERAL COMPLIANCE |
| 309 | "CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions" that cover various, expressly-listed topics. | PARTIAL COMPLIANCE |
| 310 | "CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's supervisor(s)" and maintain any "salient information . . . in candidate's file." | OPERATIONAL COMPLIANCE |
| 311 | "If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation" addressing various expressly-identified things. | PARTIAL COMPLIANCE |
| 312 | "CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process" and "are identified and receive appropriate consideration for performance." Likewise, "poor performance" must be "reflected in officer evaluations." | NON-COMPLIANCE |
| 313 | "The City will develop and implement fair and consistent practices to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis." | NON-COMPLIANCE |
| 314–315 | CDP will use "a formalized system documenting the annual performance evaluations of each officer by the officer's direct supervisor," including an assessment of several expressly-listed areas. "Supervisors will meet with the employee whose performance is being evaluated to discuss the evaluation." | NON-COMPLIANCE |
| 316 | "CDP will hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates." | NON-COMPLIANCE |
| 317 | "The City will develop and implement fair and consistent promotion practices that comport with the requirements of this Agreement and result in the promotion of officers who are effective and professional." | NON-COMPLIANCE |
| 318 | In considering promotion, "appointing authority will consider" specific, expressly- listed "factors." | NON-COMPLIANCE |
| 319 | "CDP will complete a comprehensive staffing study to assess the appropriate number of sworn and | OPERATIONAL COMPLIANCE |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| | civilian personnel to perform the functions necessary for CDP to fulfill its mission and satisfy the requirements of the" Consent Decree. / "CDP will develop an effective, comprehensive Staffing Plan that is consistent with its mission, including community and problem-oriented policing, and that will allow CDP to meet the requirements of" the Consent Decree. | |
| 320 | Requirements of CDP Staffing Plan. | **PARTIAL COMPLIANCE** |
| 321 | "The City and CDP will employ best efforts to implement the Staffing Plan over the period of time set forth in the approved plan." | **PARTIAL COMPLIANCE** |

## 10. Supervision

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 322 | "CDP will ensure that first line supervisors provide close and effective supervision of officers" in a number of express, specifically-identified ways. | **PARTIAL COMPLIANCE** |
| 323 | "CDP will develop and implement supervisory training for all new and current supervisors" that is "adequate in quality, quantity, type, and scope, and will include" a number of specific, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 324 | "Thereafter all sworn supervisors will receive adequate in-service management training." | **PARTIAL COMPLIANCE** |
| 325 | "CDP will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community." | **PARTIAL COMPLIANCE** |
| 326 | CDP "will create a plan to modify its Officer Intervention Program ('OIP') to enhance its effectiveness as a management tool to promote supervisory awareness and proactive identification of potentially problematic behavior among officers. | **NON-COMPLIANCE** |
| 327 | "CDP supervisors will regularly use OIP data to evaluate the performance of CDP officers across all ranks, units, and shifts." | **NON-COMPLIANCE** |
| 328 | "The OIP will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" in a number of specific, expressly-identified areas. | **NON-COMPLIANCE** |
| 329 | "CDP will set threshold levels for each OIP indicator that will trigger a formal review, and the thresholds will allow for peer-group comparisons between officers with similar assignments and duties." | **NON-COMPLIANCE** |
| 330-336 | Additional express requirements of OIP. | **NON-COMPLIANCE** |

| PARAGRAPH # | DESCRIPTION | STATUS OF COMPLIANCE |
|---|---|---|
| 337 | "If CDP chooses to use body worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals." | OPERATIONAL COMPLIANCE |
| 338 | "Supervisors will review recordings related to any incident involving at least a Level 2 or 3 use of force; injuries to officers; and in conjunction with any other supervisory investigation." | OPERATIONAL COMPLIANCE |
| 339 | "Supervisors will conduct adequate random and directed audits of body worn camera recordings" and "incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers." | PARTIAL COMPLIANCE |
| 340 | "Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy." | OPERATIONAL COMPLIANCE |

Alicante
Amsterdam
Baltimore
Beijing
Birmingham
Boston
Brussels
Budapest*
Colorado Springs
Denver
Dubai
Dublin
Dusseldorf
Frankfurt
Hamburg
Hanoi
Ho Chi Minh City
Hong Kong
Houston
Jakarta*
Johannesburg
London
Los Angeles
Louisville
Luxembourg
Madrid
Mexico City
Miami
Milan
Minneapolis
Monterrey
Munich
New York
Northern Virginia
Paris
Philadelphia
Riyadh*
Rome
San Francisco
São Paulo
Shanghai
Shanghai FTZ*
Silicon Valley
Singapore
Sydney
Tokyo
Warsaw
Washington, D.C.

*Our associated offices
Legal Services Center: Berlin

# www.hoganlovells.com

"Hogan Lovells" or the "firm" is an international legal practice that includes Hogan Lovells International LLP,
Hogan Lovells US LLP and their affiliated businesses.

The word "partner" is used to describe a partner or member of Hogan Lovells International LLP, Hogan Lovells
US LLP or any of their affiliated entities or any employee or consultant with equivalent standing. Certain
individuals, who are designated as partners, but who are not members of Hogan Lovells International LLP, do not
hold qualifications equivalent to members.

For more information about Hogan Lovells, the partners and their qualifications, see www.hoganlovells.com.

Where case studies are included, results achieved do not guarantee similar outcomes for other clients. Attorney
advertising. Images of people may feature current or former lawyers and employees at Hogan Lovells or models
not connected with the firm.

© Hogan Lovells  2024. All rights reserved.