IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15CV1046 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO ENFORCE THE MONITOR'S
OBLIGATIONS NECESSARY FOR SETTLEMENT AGREEMENT COMPLIANCE
WITH SUPPORTING MEMORANDUM**

Defendant City of Cleveland ("the City") respectfully requests that the Court order the Monitor to comply with ¶ 375 of the Settlement Agreement ("SA" or "Consent Decree") and provide the City with the standards, methodologies and/or data that support its conclusions in the 16th Semiannual Report. Not only is this information required by the text of the Consent Decree, but the City must have it to further implement reform and achieve constitutional policing beyond the Consent Decree. The City cannot be expected to ascertain its current level of compliance nor achieve future compliance when the Monitor has failed to explain how and by what standards it draws its conclusions. This puts the City in an untenable situation that this Court must rectify.

The City humbly requests an Order enforcing the Monitor's obligations pursuant to ¶ 375. Specifically, the City asks that the Court order the Monitor to: (1) provide the Parties, within 14 calendar days, the methodology and data that support its conclusions in the 16th Semiannual Report for SA paragraphs 16, 17(b), 18(a), 18(b), 19, 23, 26, 29, 42, 116, 121, 126, 179, 198, 199, 200, 201, 223, 226, 232, 255, 293, 295, 297, 299, 323, and 328; and (2) henceforth comply with similar requests for methodologies and data from the Parties within 14 calendar days of the request.

The Monitoring Team has not complied with ¶ 375 and has withheld necessary and vital information in direct contradiction of the requirements set forth in the Consent Decree. The Parties must analyze the methodologies and data that support the Monitoring Team's conclusions in the 16th Semiannual Report, in order to facilitate the free flow of information the Consent Decree describes, to ensure a transparent review process, to efficiently remove barriers the City may have in achieving full compliance, and to follow the language the Parties agreed to in the SA.

A proposed Order is attached hereto as Exhibit 1.

I. **BACKGROUND**

On June 12, 2015, the City entered into the Settlement Agreement with the United States. A key purpose of this agreement is to ensure that the City achieves substantial compliance with its provisions.[1] To measure progress toward compliance, the Consent Decree requires the Court-appointed Monitor to perform regular compliance reviews or audits, assessing the City's adherence to the Consent Decree's terms and to explain the grounds for evaluations.[2]

Paragraph 375 of the Consent Decree specifically mandates that the Monitor submit semiannual public reports to the Court detailing, among other things, compliance review methodologies and findings. Paragraph 375 explicitly states:

> The Monitor will file with the Court, every six months, written, public reports that include the following: (a) a description of the work conducted by the Monitor during the reporting period; (b) a list of each Agreement requirement, indicating which requirements have been: (1) incorporated into policy; (2) the subject of sufficient training for all relevant CDP officers and employees; and (3) carried out in actual practice; (c) ***the methodology and specific findings for each compliance review conducted***, where appropriate, and redacted as necessary for privacy concerns. An unredacted version will be filed under seal with the Court and provided to the Parties. The underlying data for each compliance review will not

---

[1]   *See* Settlement Agreement between the United States and the City of Cleveland, Dkt #: 413-1, ¶ 401.

[2]   *See id.*, par. 369.

be publicly available but will be retained by the Monitor and ***provided to either or both Parties upon request***.[3]

Additionally, ¶ 376 of the Consent Decree requires the Monitor to provide draft copies of these semiannual reports to the Parties within 15 business days after the end of each reporting period, allowing the Parties another 15 business days to provide comments.

Starting with the 15th Semiannual Report, the City's Police Accountability Team ("PAT") began sending the Monitoring Team an "Advocacy Document" in advance of the deadline for the semiannual reports. These Advocacy Documents contain recommendations and data that the City believes the Monitoring Team should consider before making final compliance review determinations in its semiannual reports. For the reporting period ending December 31, 2024, the PAT sent its Advocacy Document to the Monitoring Team and DOJ on January 31, 2025.[4]

The Monitoring Team provided the Parties its draft of the 16th Semiannual Report on March 17, 2025, approximately 38 business days after the deadline the SA outlines for a semiannual report in ¶ 376. The deadline for the Monitoring Team to provide the Parties with the draft 16th Semiannual Report expired on approximately January 21, 2025.[5] The Monitoring Team

---

[3] *Emphasis added*.

[4] *See generally* Ex. 2 — City of Cleveland July–December 2024, Advocacy Document. (The deadline for the City to send the Monitoring Team its 16th Semiannual Advocacy Document was stipulated to during the January site visit with the Monitoring Team.)

[5] The Monitoring Team failed to provide the Parties with the draft report by January 21, 2025, without explanation. Unfortunately, untimely Semiannual reports are a common occurrence with the Monitoring Team, which has not provided the Parties with a single timely Semiannual Report since being appointed in April 2023. Instead, it provided the Parties its draft of the 16th Semiannual Report approximately 38 business days after the deadline the SA outlines for a semiannual report in ¶ 376. The Court should not overlook the Monitoring Team's consistent late production of reports, which delays Consent Decree progress, compounds into further future delays, and makes it difficult for the City to enact change in real time.

then instructed the City to provide its feedback no later than April 7, 2025.[6] Upon review, the City immediately observed critical omissions from the Monitoring Team's draft report—specifically, pursuant to ¶ 375(c), the draft completely omitted any methodologies underlying the compliance findings associated with the following Consent Decree paragraphs: SA ¶¶ 16, 17(b), 18(a), 18(b), 19, 23, 26, 29, 42, 116, 121, 126, 179, 198, 199, 200, 201, 223, 226, 232, 255, 293, 295, 297, 299, 323, and 328.

Consequently, on March 19, 2025, the City formally inquired with the Monitoring Team, pursuant to ¶ 375(c), about the omission of the underlying data and methodologies utilized in formulating the compliance determinations it presented in the 16th Semiannual Report.[7] Subsequently, in a joint meeting on March 25, 2025, the Monitoring Team explicitly refused the City's request for the Monitoring Team to comply with ¶ 375(c), and stated, affirmatively, that despite the requirements of the SA, the Monitoring Team would not provide the City any underlying methodologies and data that they utilized in formulating their compliance determinations in the 16th Semiannual.[8]

Undeterred, the City requested for the Monitoring Team to comply with ¶ 375(c) in writing on March 28, 2025, and established a deadline of April 3, 2025, for the Monitoring Team to supplement the draft 16th Semiannual Report with this information.[9] The Monitoring Team failed to meet this deadline and has yet to comply with the terms of the Consent Decree. The City, therefore, respectfully requests that the Court enforce the explicit terms of ¶ 375(c) of the Consent

---

[6] The Monitoring Team later provided the Parties an extension until April 9, 2025.

[7] *See* Ex. No. 3 — City Request for 16th Semiannual Data & Methodologies E-Mail.

[8] *See* id.

[9] *See* id.

4

Decree and compel the Monitoring Team to promptly provide the City with the methodologies and underlying data used in its compliance determinations for the 16th Semiannual Report so that the City may have the information it needs to comply with the terms of the Consent Decree.

## II. ARGUMENT

Having a definite methodology for assessing compliance is understood to be a basic requirement of consent decrees. *See, e.g., U.S. v. State of Michigan*, 62 F.3d 1418, 1995 WL 469430, *3 (6th Cir. 1995) (comparing a prisoner-rights consent decree methodology based on fixed percentages of compliance versus "a utilization methodology (simulation modeling)"); *U.S. v. City of Seattle*, No. C12-1282JLR, 2019 WL 5190922, *2 (W.D. Wash. Oct. 15, 2019) (requiring a "substantive response" on the "City's proposed methodology" for measuring police accountability under a consent decree).

The Court should grant the City's Motion to Enforce, requiring the Monitor to comply with its Methodology and Data obligations regarding the 16th Semiannual Report because: (1) the Monitoring Team Performed Compliance Reviews in the 16th Semiannual Report; (2) the Monitor failed to comply with ¶ 375(c) when it omitted methodologies and data to support its Compliance Reviews in the 16th Semiannual Report; and (3) impartial, transparent, and thorough methodologies support City police reform efforts.

### A. The Monitoring Team Performed Compliance Reviews in the 16th Semiannual Report

The Monitoring Team's justification for its failure to provide the Parties with the methodologies and data that support the 16th Semiannual Report, pursuant to ¶ 375(c), center on its argument *that it did not conduct any Compliance Reviews when creating the 16th Semiannual Report*. Shockingly, the Monitoring Team stated they used information they obtained outside of a

5

formal Compliance Review to inform its conclusions in the Semiannual.[10] For the City to hear that the Monitoring Team is not using Compliance Reviews or Audits to judge the City's compliance progress in Semiannual Reports leads the City to be perplexed as to what the Monitoring Team is actually doing to derive its compliance conclusions.

The Monitoring Team asserts that the "informal review" process it performed when creating the 16th Semiannual permits it to not classify its reviews of compliance as Compliance Reviews or Audits, and thus not be subject to ¶ 375(c). ***The City cannot permit the Monitor to misinterpret its duties under the Consent Decree in this manner***. The City pays millions of dollars to the Monitoring Team to use Compliance Reviews and Audits to fairly determine its progress in an open and transparent manner—not to use unsanctioned informal methods that allow the Monitoring Team to arbitrarily change compliance ratings based on a whim.

There are numerous reasons why the Court should not permit the Monitoring Team to support the 16th Semiannual with informal reviews, and instead, deem the work the Monitoring Team completed as Compliance Reviews or Compliance Audits.

1. *Paragraph 375(b) Requires the Monitoring Team to Support Its Compliance Ratings with Compliance Reviews in Semiannual Reports*

First, ¶ 375 details how the Monitoring Team's work under the Semiannual ***must*** contain Compliance Reviews. Specifically, ¶ 375 describes,

> [t]he Monitor will file with the Court, every six months, written, public reports that include the following... (b) ***a list of each Agreement requirement, indicating which requirements have been: (1) incorporated into policy; (2) the subject of sufficient training for all relevant CDP officers and employees; and (3) carried out in actual practice***.[11]

---

[10]  These conclusions were determinations of "non-compliance," "partial compliance," "operational compliance," and "general compliance."
[11]  *Emphasis added*.

If this language seems familiar to the Court, that is because this language is analogous to the language the SA uses later to describe what comprises a Compliance Review. Paragraph 360 states:

> The Monitor will conduct reviews or audits as necessary to determine whether the City and CDP have complied with the requirements of this Agreement. Compliance requires that the City and CDP: *(a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice*. Compliance reviews and audits will contain the elements necessary for reliability and comprehensiveness. Compliance reviews and audits may be conducted using sampling and compilation data where appropriate.[12]

This analogous language clearly demonstrates the Parties' intent to have the Monitoring Team support its compliance designations in Semiannuals with Compliance Reviews. The Monitoring Team complied with ¶ 375(b) in the 16th Semiannual when it listed a compliance rating, supported by a Compliance Review, for each requirement in the SA. It should not be able to claim alternatively to unjustly withhold its methodologies and data. The City needs to know—and has a right to know—how it is being judged.

### 2. The SA Does Not Permit the Monitoring Team To Perform "Informal Compliance Reviews"

Second, the Monitoring Team has posited that its conclusions contained in the 16th Semiannual are supported by work that is less than a Compliance Review, i.e. an "Informal Compliance Review." However, that is merely a fiction. *The SA does not provide the Monitoring Team with a review mechanism less than a Compliance Review to assess the City's compliance with the Consent Decree, and ¶¶ 351 & 352 restrict the Monitoring Team to only functioning within the authority that the Parties have given it in the SA*. The SA only provides the Monitoring

---

[12] Emphasis added.

Team three mechanisms to analyze compliance: Compliance Audits (¶ 360), Compliance Reviews (¶ 360), and Outcome Measurement Assessments (¶ 367).

The SA's Semiannual requirements recognize these three exclusive methods of assessment by specifically requiring Semiannuals to be comprised of their results: Compliance Audits (¶ 375(b)), Compliance Reviews (¶ 375(b)), and Outcome Measurement Assessments (¶ 375(e)). The other subsections of ¶ 375 (¶ 375(a)(c)(d) & (f))) require the Monitoring Team to supplement the results of these review methods with overall progress narratives, methodologies, suggestions, and descriptions of the work ahead.

The Monitoring Team may only work within the duties and authorities that the Parties have given it, pursuant to ¶¶ 351 and 352, and the SA is explicit with the review methods it prescribes the Monitoring Team. Neither the Monitoring Team nor the DOJ have been able to point to any paragraph in the SA that supports their claim for an alternative, lesser, or informal method to review the City's compliance. The Court should deem the work the Monitoring Team performed in the 16th Semiannual Report to be Compliance Reviews or Compliance Audits because there are no lesser methods the Consent Decree allocates to the Monitoring Team to evaluate the City's compliance with the SA.

### 3. *The Monitoring Team Has Previously Admitted That It Completes Compliance Reviews in Semiannual Reports*

Finally, the Court should deem the work the Monitoring Team completed in the 16th Semiannual Report to be Compliance Reviews because the Monitoring Team has previously admitted that the work it completes in Semiannuals is in fact a Compliance Audit or Review. An example of this previous admission can be seen in its April 19, 2024, "Notice of Crisis Intervention

Compliance Assessment" letter ("CIT Assessment Notification Letter").[13] The Monitoring Team sent the CIT Assessment Notification Letter, and others like it, to the City in order to notify the City of its intent to conduct a Compliance Assessment.

The CIT Assessment Notification Letter, signed by Head Independent Monitor, Karl Racine, describes the scope and timeline of the assessment and alerts the City to the Monitoring Team's intention to build off of Compliance Audits and Compliance Reviews that it conducted in previous Semiannuals to inform its assessment's conclusions:

> The Monitoring Team evaluates compliance with sections of the Consent Decree throughout the year and communicates its observations, assessments, and findings twice each year through its semi-annual reports (¶¶ 360, 375). ***These compliance reviews*** consider the totality of evidence presented and observed with respect to each provision of the Consent Decree, including review of policies and annual reports, interviews and meetings with the City and CDP as well as Cleveland community groups, and observation of trainings and internal meetings. As the City and CDP progress through the implementation phase of the Consent Decree, the Monitoring Team will conduct Compliance Assessments ***that build upon reviews conducted in advance of each semi-annual report***.[14]

The Monitoring Team sent a letter regarding the Search and Seizure Assessment, with similar admissions, to the City on July 9, 2024.[15] Clearly, the Monitoring Team, in its own words, also considers its conclusions in Semiannuals to be derived from Compliance Audits and Reviews. The Court should not permit the Monitoring Team to double back on this designation now so it can simply argue its way out of its duties. No matter which way the Monitoring Team argues its position, the work it completed that informed its conclusions in the 16th Semiannual was based on Compliance Reviews—all performed without including the methodologies and data required.

---

[13] *See* Ex. No. 4 — CIT Assessment Notification Letter.
[14] Id., pg. 1-2 (*Emphasis added*).
[15] *See* Ex. No. 5—Search and Seizure Assessment Notification letter—at 1-2.

B.   **The Monitor Failed to Comply with ¶ 375 When It Omitted Methodologies And Data to Support Its Compliance Reviews in the 16th Semiannual Report**

The City has established that the Court should deem the work the Monitoring Team performed in the 16th Semiannual Report as Compliance Reviews. Paragraph 375(c) of the Consent Decree then clearly requires the Monitoring Team to disclose the methodologies and underlying data it used in its compliance assessments, explicitly stating:

> The Monitor will file with the Court, every six months, written, public reports that include the following: ...(c) *the methodology and specific findings for each compliance review conducted*, where appropriate, and redacted as necessary for privacy concerns. An unredacted version will be filed under seal with the Court and provided to the Parties. The *underlying data for each compliance review* will not be publicly available but will be retained by the Monitor and provided to either or both Parties upon request.[16]

The Monitoring Team's refusal to comply with this clear obligation, despite the City's formal requests issued on March 19, 2025, and reaffirmed on March 28, 2025, directly violates the explicit terms of the Consent Decree. This refusal not only undermines the integrity of the review process but also directly impacts the City's ability to respond meaningfully and effectively to the Monitoring Team's compliance assessments. The City is better able to focus on accountability and change when the Monitoring Team provides the Parties with the methodologies and data that support its conclusions. The City currently believes it is further along in the compliance process than the Monitoring Team recognizes and without quantifiable, measurable metrics, the City is left otherwise guessing where it stands in terms of its progress towards compliance. The City cannot properly analyze its alleged shortcomings and adjust its practices without analyzing the Monitoring Team's methodologies and data that support its compliance conclusions.

C.   **Impartial, Transparent, and Thorough Methodologies Support City Police Reform Efforts**

---

[16]   *Emphasis added*.

Compliance is a critical reason that the SA requires the Monitoring Team to provide methodologies and data. The SA requires the Monitoring Team to inform the City and the public about the reasons for non-compliance, the methods used to assess the City, and the steps the City must take to achieve compliance. The Monitoring Team's failure to follow this requirement obstructs the City's ability to understand and comply with the SA.

The ¶ 375(c) requirement ensures transparency, procedural fairness and furthers institutional change by allowing the City to independently assess and validate compliance determinations, protecting against arbitrary or incorrect findings, and replicate methodologies to identify areas of concern. This need for procedural fairness and a transparent review process is further evidenced by the open-book procedure the Parties stipulated to in ¶ 371. Ignoring the Parties' intent to now favor the Monitoring Team's closed door "informal review" method would work contrary to the SA's established framework.

Transparency in compliance review methodologies and data aligns directly with the central goal of the Consent Decree—building and maintaining public trust in constitutional policing practices.[17] When the Monitoring Team withholds the mechanics of its review process and the data that supports it, it impairs public confidence in its reporting and the broader objectives of accountability and reform that the Consent Decree intends to promote.

The City's PAT provides detailed advocacy documents demonstrating progress and advocating for compliance upgrades in various areas of the Consent Decree. The PAT's Advocacy Document specifically highlights 34 paragraphs of the Consent Decree for which the City believes substantial progress warrants increased compliance ratings.[18] The Monitoring Team's refusal to

---

[17] *See generally* SA, Introduction, at pg. 1.

[18] *See generally* Ex. No. 2.

provide methodologies and underlying data significantly inhibits the City's ability to substantiate, validate, and effectively advocate for these compliance upgrades. Without access to such critical information, the City's ability to present thorough and informed arguments in support of compliance improvements is severely compromised.

The City agrees with guidance the Department of Justice (DOJ) developed on this matter. In 2024, the DOJ developed the *Monitoring Law Enforcement Consent Decrees: An Introduction & Starter Toolkit* in collaboration with independent monitors, which emphasizes the critical importance of clearly articulated methodologies in evaluating compliance with consent decrees. The DOJ states, on pages 88-89 of the Toolkit*:*

> *Defaulting to the Monitor's Ill-Defined Sense of Compliance*. One approach to consent decree oversight is to ground a compliance determination on the monitor's expertise—leaving the monitor to assess progress and determine whether the law enforcement agency is in or out of compliance based on ***unclear, insufficiently transparent, and/or insufficiently rigorous methodology***. This approach positions the monitor as an expert who makes a determination about compliance based on ***unspecified, or insufficiently detailed, factors, approaches, or methodologies***.
>
> The monitor may simply assert that, based on their knowledge and work on the decree, it appears that the agency or jurisdiction is or is not in compliance— citing a constellation of reasons or evidence. ***This type of approach has sometimes been criticized as "wise person," "finger-in-the-wind," or "I-know-it-when-I-see-it" monitoring because it appears to ground the compliance determination in a single person's subjective impressions rather than transparent, objective criteria. This type of monitoring—in which how compliance is determined remains vague and amorphous—is usually unsatisfactory, for at least a few major reasons***.[19]

The City agrees with the DOJ that unspecified approaches or methodologies are wholly unsatisfactory. The City also agrees with the DOJ that the failure of a monitor to share its methodologies and data in an open and transparent manner undermines procedural justice, ruins public acceptance, hinders compliance and obstructs continued constitutional policing:

---

19     *Emphasis added.*

First, as noted, it is insufficiently transparent. If law enforcement agency personnel, jurisdiction stakeholders, and community members cannot see and understand, for themselves, what is going into a determination that police are or are not doing what they should, they are unlikely to defer automatically to the judgment of monitors—especially when conclusions about progress may differ from individual experiences or views. Indeed, a central pillar of *procedural justice*—which many consent decrees expressly address—is that "decisions are . . . guided by transparent reasoning."

Second, the approach differs from what is expected in other kinds of court proceedings, where judges and their agents apply standards and rules to evidence that comes before them. If monitors make a determination about compliance based on ill-defined parameters, community stakeholders—including the law enforcement agency—are *unlikely to accept the determination*.

Third, consent decree compliance requires the ongoing efforts of law enforcement personnel, including those at the top of the organization and patrol officers alike. If law enforcement agencies do not have some idea about how their performance will be assessed, they are unlikely to be as *effective and efficient in guiding their practices to meet those aims*—and may well become discouraged by the sense that they are seeking to travel somewhere unclear and uncertain. At the same time, if monitors can provide more clarity about how progress may be evaluated, monitored agencies can take a more direct, efficient path to get there.

Finally, most decrees expressly contemplate that changes made should, and will, endure long after monitoring and the decree have concluded. Reforms are intended to be sustainable and operationalizable—establishing a new way for a law enforcement agency and its officers to perform their duties. *If law enforcement agency and jurisdiction personnel do not understand how they can continue to assess their own performance, long after the monitor and court are gone, to ensure continued adherence to lawful policing practices and ongoing progress, sustainable change is far less likely. A monitor who does not articulate the basis of their decision-making does not cultivate this type of enduring change.*[20]

The DOJ is correct that detailed methodologies are essential not only for accuracy and reliability but also to enable jurisdictions to independently verify progress and validate compliance findings even after the monitoring of the City's progress has concluded. The City needs methodologies and data from the Monitoring Team so this type of assessment and reform effort can continue internally post Consent Decree. It is hard not to see how the Monitoring Team is

---

20 *Emphasis added*.

falling victim to the same problem that the DOJ describes in this document by failing to provide the methodologies and data that support their conclusions in the 16th Semiannual.

### III.   CONCLUSION

As demonstrated, (1) the Monitoring Team Performed Compliance Reviews in the 16th Semiannual Report; (2) the Monitor failed to comply with ¶ 375(c) when it omitted methodologies and data to support its Compliance Reviews in the 16th Semiannual Report; and (3) impartial, transparent, and thorough methodologies support City police reform efforts.

The Parties, through what they have implemented in ¶ 375 and other similar paragraphs, have determined methodologies to be crucial to implementing reform efforts. Currently, reform centers on the City making changes and improvements to systems, policies, and practices in order to address problems and/or threats to compliance with the Consent Decree and constitutional policing. Transparent methodologies will ensure that the Monitoring Team's conclusions on police accountability are grounded in evidence, regardless of whether they suggest implementing new training programs or changing reporting procedures. By requiring the Monitor to provide evidence-based insights, its findings would become effective in improving the design, implementation, and long-term success of the Consent Decree, ultimately helping to foster accountability, transparency, and trust in Cleveland.

Therefore, the City respectfully requests an order that: (1) requires the Monitor to provide the City, within 14 days, the methodology and data that support at least their Compliance Reviews in the 16th Semiannual Report for Settlement Agreement Paragraphs 16, 17(b), 18(a), 18(b), 19, 23, 26, 29, 42, 116, 121, 126, 179, 198, 199, 200, 201, 223, 226, 232, 255, 293, 295, 297, 299, 323, and 328; and (2) requires the Monitor to henceforth comply with similar requests for methodologies and data from the Parties within 14 days of the request.

A proposed order to this effect is attached hereto as Exhibit 1.

Respectfully submitted,

**FOR THE CITY OF CLEVELAND**

MARK D. GRIFFIN (OH: 0064141)
Director of Law
City of Cleveland

By: */s/ Martin Bielat*
Delante Spencer Thomas (OH: 0096349)
Chief Assistant Director of Law–Ethics Officer
Carlos Johnson Jr (OH: 0097062)
Assistant Director of Law–PAT
Martin Bielat (OH: 0098052)
Assistant Director of Law–PAT
City of Cleveland
601 Lakeside Avenue, Room 106
Cleveland, Ohio 44114-1077
Tel: (216) 664-2737
mgriffin@clevelandohio.gov
dthomas3@clevelandohio.gov
cjohnson2@clevelandohio.gov
mbielat@clevelandohio.gov

## CERTFICATE OF SERVICE

I certify that on April 8, 2025, I electronically filed the foregoing document(s) and that they are available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: */s/ Martin Bielat*
Martin Bielat (OH: 0098052)
Assistant Director of Law–PAT