Case: 1:15-cv-01046-SO Doc #: 596-2 Filed: 04/08/25 1 of 20. PageID #: 13901

EXHIBIT 2



January 2025

# Settlement Agreement Compliance
## July – December 2024

City of Cleveland | Police Accountability Team



City of Cleveland Police Accountability Team

# I | Introduction

The Police Accountability Team (PAT) is charged with assisting the City of Cleveland in reaching compliance with the reform measures of the Settlement Agreement. The PAT is submitting this Advocacy Document for the July through December 2024 reporting period to the Cleveland Police Monitoring Team (Monitoring Team). The purpose of this document is to advocate for compliance upgrades in the Consent Decree paragraphs where the City has demonstrated sufficient progress to warrant an increased rating from the previous reporting period.

The PAT submits this Advocacy Document to the Monitoring Team not only to advocate for upgrades but to also prompt a written response for each paragraph where the Monitoring Team does not believe a compliance upgrade is deserved. The PAT believes that understanding the Monitoring Team's perspective on the City's alleged shortcomings is crucial for assessing and, if needed, redirecting the City's compliance efforts. The PAT humbly requests a written response to this Advocacy Document from the Monitoring Team within sixty (60) days of their release of the 16th Semi-Annual Report.

# II | Reporting on Areas of Improvement

PAT is taking a proactive approach as it comes to compliance with the Settlement Agreement. To better inform the Monitoring Team of the work conducted during the July through December 2024 reporting period, the PAT submits the below to advocate for increases in compliance in a number of areas.

## A. Advocacy for Compliance Upgrades

To determine where the PAT believes the City should receive upgrades, the PAT utilized the same compliance status descriptions from the Monitoring Team's 3rd Semiannual Report:

- Non-Compliance: The City and/or Cleveland Division of Police (CDP) has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or CDP's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement.

- Partial Compliance: The City and/or CDP has made sufficient initial strides or sufficient partial progress toward a material number of key components of the provision of the Consent Decree— but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice. It may capture a wide range of compliance states or performance, from the City or CDP having taken only very limited steps toward operational compliance to being nearly in operational compliance.

- Operational Compliance: The City and/or CDP has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Consent Decree such that it is in existence or practice operationally—but has not yet demonstrated, or has not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

- General Compliance: The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the City or CDP has effectively complied with a requirement fully and systemically.

Figure 1: Total Number of Projected Upgrades by Focus Area

| Focus Area | Number of Projected Upgrades |
| --- | --- |
| Community Engagement | 7 |
| Community & Problem-Oriented Policing | 2 |
| Bias-Free Policing | 1 |
| Use of Force | 5 |
| Accountability | 5 |
| Transparency & Oversight | 6 |
| Officer Assistance & Support | 4 |
| Supervision | 4 |

In reviewing the work conducted by the City during the reporting period, the PAT would like to highlight 34 paragraphs suitable for upgrades across eight sections. The PAT also acknowledges that the Monitoring Team can and will conduct their own assessment of the Settlement Agreement paragraphs independent of the City's review which may contain paragraphs not identified in this document. The omission of such paragraphs is not an indication that the City does not believe additional paragraphs do not merit upgrades, rather the City focused efforts on highlighting growth that occurred this reporting period and considered areas that may not have been reassessed recently.

Some of these upgrades are straightforward, given the substantial work observed by the Monitoring Team during this time. However, there are other paragraphs that the PAT intends to present in detail within this report. Below is a list of the paragraphs that the City believes warrant a compliance upgrade from the previous reporting period, with notes on which will be further explained in this report:

City of Cleveland Police Accountability Team

## Figure 2: July – December 2024 Projected Upgrades

| ¶ | Paragraph Description | Upgrade Level |
|---|---|---|
| 16* | CPC membership | Partial → Operational Compliance |
| 17b* | CPC collaboration with CDP TRC | Partial → Operational Compliance |
| 18a* | CPC authority to review/comment on CDP policies and practices | Partial → Operational Compliance |
| 18b | CPC authority to review/comment on CDP initiatives | Non-Compliance → Partial Compliance |
| 19* | CPC Access to Information | Partial → Operational Compliance |
| 23* | Quarterly DPC meetings; regular communication between CDP and community leaders | Partial → Operational Compliance |
| 26* | Annual DPC Presentation | Partial → Operational Compliance |
| 29* | Officers are familiar with the geographic areas they serve | Partial → Operational Compliance |
| 30* | CPOP Annual In-service Training | Non-Compliance → Partial |
| 42* | Annual In-service Bias-Free Training | Partial → Operational Compliance |
| 116* | Force Investigation Team administrative investigations | Partial → Operational Compliance |
| 121* | Force Investigation Team preliminary report | Partial → Operational Compliance |
| 122* | Force Investigation Team administrative investigation procedure | Non-Compliance → Operational Compliance |
| 126* | Force Review Board procedure | Partial → Operational Compliance |
| 128* | Force Review Board review of investigation quality | Partial → Operational Compliance |
| 179* | Internal Affairs investigator qualifications | Partial → Operational Compliance |
| 200 | OPS Manual | Partial → Operational Compliance |
| 201* | Promotion of Complaint Filing | Partial → Operational Compliance |
| 223* | OPS consideration of all evidence | Partial → Operational Compliance |
| 226* | OPS determination of policy violation | Partial → Operational Compliance |
| 250 | Public Safety Inspector General minimum qualifications and experience | Non-Compliance → General Compliance |
| 251 | Public Safety Inspector General Reporting Structure | Partial → General Compliance |
| 252 | No CDP Employment History | Partial → General Compliance |

* Paragraphs that will be further explored in this document

Settlement Agreement Compliance 2024              Page 3

| 253* | Public Safety Inspector General duties | Partial → Operational Compliance |
| 254* | Public Safety Inspector General investigations, analysis, and reports | Partial → Operational Compliance |
| 255* | Public Safety Inspector General budget | Partial → General Compliance |
| 293* | Equipment and Resources Plan | Operational → General Compliance |
| 295* | Implementation of Equipment and Resources Plan | Operational → General Compliance |
| 297 | Email System | Operational → General Compliance |
| 299* | Employee Assistance Program | Partial → Operational Compliance |
| 323* | Supervisor Training | Partial → Operational Compliance |
| 326 | Officer Intervention Program Plan | Non-Compliance → Partial Compliance |
| 328* | Officer Intervention Program database | Non-Compliance → Partial Compliance |
| 339* | Supervisor Body Camera Audits | Partial → Operational Compliance |

## B. Summaries of Projected Upgrades

The City elaborates on the upgrades described in Figure 2 as follows:

### 1. Paragraph 16, CPC Membership

Paragraph 16 requires (1) the Community Police Commission (CPC) to be broadly representative of Cleveland's diverse communities, (2) seated per the terms of the City's Charter, (3) have three police unions recommend a candidate for the Commission, and (4) for the CPC to meet periodically with the Chief of Police to provide recommendations and reports. Like during the last reporting period, the City believes it has again achieved at least "Operational Compliance" under Paragraph 16. For the months of July through December, 2024, (1) the Commissioners broadly represented Cleveland's diverse communities, (2) they were seated per the terms of the City's Charter, (3) police unions were contacted for their candidate recommendations to the Mayor and (4) the Commission communicated frequently with CDP and the Chief of Police.

In January 2023, the 13 members of the CPC were seated based on criteria established in Cleveland Charter Section ¶115-5 and were representative of a broad cross section of Cleveland's diverse communities. The Mayor and City Council selected the candidates after soliciting recommendations from the police unions mentioned in Paragraph 16. Specifically, Black Shield, Hispanic Police Officers Association, CPPA, and FOP representatives participated in the City's Resident Review Committee and submitted candidate recommendations.

The chosen 13 candidates remained in place on the Commission until three four-year term Commissioners resigned and six two-year term Commissioners had their terms expire on December 5, 2024. Per the City Charter, the City has 60 days to fill the vacancies. Although there were vacancies in Commission seats, the City has not violated the timeline requirements for filling these positions. The deadlines for filling these vacancies are determined by the dates of resignation, and they do not expire until after this reporting period. Consequently, the City cannot be considered out of compliance in this regard. While the transition between Commissions has faced challenges, the Charter and the Consent Decree do not mandate a seamless process.

Further, the Commission maintained regular meetings with the Chief of Police throughout 2024. The Co-Chairs of the Commission reviewed Officer Discipline files in IA Pro with the Chief, participated in several CPC Bi-Weekly meetings together (in the presence of the Monitoring Team), and engaged in discussions about various policing topics through informal phone calls. The Chief consistently received input from the Commission through their work in policy and training reviews.

The City's consistent work under this paragraph aligns more closely with the Monitoring Team's definition of "Operational Compliance." This is because the key elements of Paragraph 16 are actively practiced by the City, rather than simply being on paper as defined by the "Partial Compliance" designation.

### 2. Paragraph 17b, CPC Review of CDP Trainings

Paragraph 17b requires that "The Commission will, on an ongoing basis, including through its membership on the Training Review Committee [TRC], assist as appropriate in CDP's development of training related to bias-free policing and cultural competency."

During the reporting period, the CPC's training subcommittee chair participated as the CPC representative on the TRC and maintained regular communication with CDP's Commander who oversees training. CDP trainings are also routinely sent to the CPC training subcommittee for review before trainings are reviewed and approved by the full Commission. Of note, the Commission completed a review and approved CDP's Integrated Reality-Based Training for use of force, search & seizure, and bias-free policing (7/1/24), eLearning Assignment for use of force, search & seizure, and bias-free policing (10/23/24), and Bias-Free Policing for supervisors (11/20/24).

The Commission's work merits an increase in compliance for this paragraph to Operational Compliance because of its frequent and diverse community meetings, work in reviewing bias-free policing trainings, and its overall commitment to bias-free policing oversight.

### 3. Paragraph 18a, CPC Authority to Review CDP Policies and Practices

Paragraph 18a provides that the Commission has the authority to "review and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention." On November 2, 2021, Cleveland voters passed Ballot Initiative 24, which amended the Cleveland Charter to include Section 115-5. Under this new provision, the Community Police Commission "shall have final authority over police policies, procedures, and training regimens," thereby extending the Commission's authority beyond mere review and commentary. Since the Commission's authority now surpasses the requirement of Paragraph 18a, the City submits that the current Partial Compliance status should be upgraded to General Compliance.

### 4. Paragraph 19, CPC Access to Information

Through ongoing CPC workgroup meetings between the City, Monitoring Team, and Department of Justice, the City has decreased the amount of time to fulfill requests for information from the CPC. Additionally, this work group has created a better working relationship between the City and CPC and allows for more communication between the entities regarding the specifications and expectations of the CPC's requests and the City's ability to fulfill their requests. Based on the above definition of Operational Compliance, the City believes the reform measures of Paragraph 19 are practiced operationally within the CPC and merit an upgrade.

### 5. Paragraph 23, Quarterly District Policing Committee Meetings

This paragraph requires multiple stakeholders within the City to work with the DPCs to ensure that regular communication occurs between CDP and local community leaders. Further, these DPCs are required to meet on a quarterly basis as a minimum.

The DPCs are led in partnership by a community member and a CDP representative, often the District Commander or their designee. The organization and structure of these DPCs is consistently supported by district liaisons from the Community Relations department. There are regular presentations from various City and County departments, including Building & Housing, Prosecutor's Office, Crime Stoppers, Fire, and EMS.

Each DPC meets on a monthly basis: District 1 meets on the first Tuesday of the month, District 2 meets on the second Tuesday of the month, District 3 meets on the third Tuesday of the month, District 4 meets on the fourth Wednesday of the month, and District 5 meets on the third Wednesday of the month.

| District 1 | District 2 | District 3 | District 4 | District 5 |
|---|---|---|---|---|
| 7/2/24 | 7/9/24 | 7/16/24 | 7/24/24 | 7/17/24 |
| 8/6/24 | 8/13/24 | 8/20/24 | 8/28/24 | 8/21/24 |
| 9/5/24 | 9/10/24 | 9/17/24 | 9/25/24 | 9/18/24 |
| 10/3/24 | 10/8/24 | 10/15/24 | 10/23/24 | 10/16/24 |
| 11/7/24 | 11/12/24 | 11/19/24 | No meeting | 11/20/24 |
| No meeting | 12/10/24 | No meeting | No meeting | No meeting |

Based on the above definition of Operational Compliance, the City believes the reform measures of Paragraph 23 are practiced operationally within the City and merit an upgrade.

### 6. Paragraph 26, Annual DPC Presentation

Paragraph 26 requires each DPC to annually present to the CPC on strategies to address crime and safety issues within their respective districts.

Members from CDP, CPC, and Community Relations worked to plan this meeting for the end of the 2024 calendar year. However, a decision was made to postpone the meeting to January 2025 to give an opportunity for the incoming commissioners to be part of the meeting. Although this meeting did not occur before the end of 2024 and occurred before only four Commissioners, the City appreciates the Monitoring Team's promise to consider these matters compliant for this meeting.

CDP worked closely with the Community Relations district liaisons to prepare for the presentations while the CPC assisted in identifying a location for the meeting and coordinating with TV20 so a live stream of the event was possible. The event took place on 1/29/25 and drew a crowd of a mix of City representatives, including CDP, PAT, CPC, Community Relations, OPS, City Council, and community members.

Based on the above definition of Operational Compliance, the City believes the reform measures of Paragraph 26 are practiced operationally within the City and merit an upgrade.

### 7. Paragraph 29, Officer Familiarity with Geographic Location

CDP is committed to ensuring that officers become familiar with the districts and zones in which they serve. Built into the Division's FTO program, these supervising officers are expected to teach, test, and evaluate their probationary patrol officer's knowledge in a number of areas. One to note is location testing where FTOs will ask their PPOs where specific locations within the area they patrol are or how to get to certain places within the district.

Further, FTOs are expected to evaluate and rate PPOs based on certain guidelines outlined in the FTO manual. Within the "Patrol Procedures" portion of these evaluations, PPOs are evaluated on their ability to properly orient themselves within their assigned District on a 3 point scale from "Needs Improvement" to "Exceeds Expectations". To meet the "Exceeds Expectations" rating, PPOs must demonstrate their knowledge in main & secondary roads, zones and sector boundaries, changing traffic patterns, and not need to rely on a map or GPS to navigate.

Separate from FTO training, officers are able to utilize readily available resources, called "street cards" that detail services for behavioral health support, veterans support, homelessness support, and more. Officers also have cards designed to help communication between themselves and deaf or hard of hearing citizens. Based on the above definition of Operational Compliance, the City believes the reform measures of Paragraph 29 are practiced operationally within CDP.

### 8.   Paragraph 30, CPOP Annual In-service Training

The City believes an upgrade in compliance for Paragraph 30 from Non-Compliance to at least Partial Compliance is warranted as CDP continues to satisfy the key components of this paragraph annually. CDP completed the initial Community and Problem Oriented Policing training of its officers in 2018. The training was approved by the Monitoring Team and known as the "Community Engagement and Problem Solving (CEPS)" training. CDP delivered the training again to its members in 2019, 2023, and to all new recruits as they are trained in the police academy.

In addition to the initial CPOP training, CDP also worked on revamping the annual CPOP in-service training for its members during this reporting period. CDP's Training Section worked extensively with the Division's technical assistance partners, Jensen Hughes, and the Monitoring Team to develop a draft of the 2025 in-service training that is scheduled to be delivered to the officers in the third or fourth quarter of 2025. A final draft of this training will be circulated among the DOJ and Monitoring Team be the end of the first quarter of 2025.

This commitment to initial and annual in-service CPOP training should not go unnoticed by the Monitoring Team. CDP's efforts under this paragraph meet at least the Monitoring Team's definition of Partial Compliance because the Division made significant strides to implement key components of the paragraph into their draft 2025 lesson plan, which has already received feedback from two Monitoring Team subject matter experts.

### 9. Paragraph 42, Annual In-Service Bias Free Training

This paragraph requires CDP to provide annual in-service training on bias-free policing. The Division has consistently provided bias-free policing training to officers through both eLearning assignments and in-person training sessions, which included reality-based scenario training.

In-service training has routinely occurred since 2019. This training was delivered on its own through 2021. In 2022, there was an addition of a cultural humility curriculum developed by the State. To ensure that officers do not think of bias-free policing as a stand-alone topic, bias-free policing principles are embedded throughout other training topics, such as use of force and search & seizure. This is especially evident through the scenario trainings. The Division's bias-free policing policy is additionally reinforced through the eLearning assignments.

Based on the above definition of Operational Compliance, the City believes the reform measures of Paragraph 42 are practiced operationally within the City and merit an upgrade.

### 10. Paragraph 116, Force Investigation Team Administrative Investigations

The City is in Operational Compliance with the requirements of Paragraph 116 because it has an active policy that requires FIT to conduct a parallel administrative investigation if it refers a criminal investigation to an outside agency. The 2018 Court-approved FIT Manual explicitly states in (IV)(C)(6) and (V)(A)(2)(a) that the FIT conducts the administrative investigation even if an outside agency conducts the criminal:

> The BSI Commander will be responsible for ensuring that the criminal investigation is conducted by a "criminal team" which shall be led by the Homicide Unit OIC or their designee or investigators from an outside agency. <u>The FIT administrative team, led by the IA OIC will retain responsibility for the concurrent administrative investigation.</u>

There is no need for the Monitoring Team to conduct an assessment to judge compliance with this paragraph because its language is not subjective. The key language in Paragraph 116 hinges on whether CDP has implemented a policy of this type. Specifically, "<u>CDP will develop and implement policies</u> to ensure that…" A strict reading of the paragraph means that compliance for this paragraph should be based on whether or not the City has implemented the policy — which it has.

The City deserves a compliance upgrade from Partial Compliance to Operational Compliance with paragraph 116 because it has done exactly what the paragraph demands. It has implemented a policy that requires FIT to conduct an administrative investigation, even if it refers its criminal investigation to an outside agency.

## 11. Paragraph 121, Force Investigation Team Preliminary Report

The City's work under Paragraph 121 merits a compliance upgrade from Partial Compliance to Operational Compliance. This paragraph requires the FIT Leader to complete a preliminary report for the Chief as soon as possible, no later than 24 hours after learning of the use of force (absent exigent circumstances).

This language can be found in section (C)(1)(f) of the current FIT manual. During the reporting period, there were 6 FIT cases. For 5 of the 6 cases, a preliminary report was sent to the Chief through the IA Superintendent within 24 hours of the incident. One case was a delayed notification to IA, for which a preliminary report was sent to the Chief within 24 hours of learning of the use of force.

CDP has operationalized this requirement and has included language in Section (C)(1)(F) of the FIT Manual in conformity therewith.

## 12. Paragraph 122, Force Investigation Team administrative investigation procedure

The City's work under Paragraph 122 merits a compliance upgrade from Non-Compliance to Operational Compliance. This paragraph requires that FIT investigations be completed within 60 days or have a written justification for an extension approved by the Chief of Police, especially when awaiting information from an outside agency. This provision allows for case investigations of indefinite length with sufficient explanation and authorization.

As the Monitoring Team is aware, operational changes were made in August 2023 following the 2023 FIT Assessment to address procedural shortcomings. FIT administrative investigations prior to the implementation of these changes frequently extended past the 60 day requirement without an approved extension. Since the changes implemented in August 2023, only 2 of 31 FIT investigations did not meet the requirements of this paragraph.

Based on this self-assessment, there is sufficient evidence to demonstrate that a Non-compliance rating does not accurately reflect the work completed by the FIT. Operational changes were made to allow FIT to technically comply with the requirements of the paragraph and is clearly practiced operationally within the Division.

### 13. Paragraph 126, Force Review Board Procedure

The City's work under Paragraph 126 merits a compliance upgrade from Partial Compliance to Operational Compliance. This paragraph requires the FRB to conduct comprehensive and reliable reviews, which are not limited in scope to just assessing an officer's decision-making during the use of force but serves as a holistic review of the incident through the supervisory review of the investigation.

As observed by the Monitoring Team, the FRB checklist completed by the board after their review of a case methodically works through the requirements of this paragraph. Board members are asked to answer specific questions regarding the circumstances leading up to the use of force, including whether or not de-escalation tactics were used, whether tactics and decision making negatively impacted the need to use force, and if tactics and decision making were in line with CDP training.

Board members are also required to administratively approve or disapprove multiple aspects of the investigation, including decision making and tactics, the objectivity, reasonableness, necessity, and proportionality of the use of force, the incident supervision, and the reporting and investigation. The checklist also requires board members to answer whether or not the medical response by the officer complied with division policy, and to identify any potential deficiencies with the response when applicable.

Lastly, board members do not complete a review of a case without considering whether there were any actions by involved personnel that warrant commendations.

### 14. Paragraph 128, Force Review Board Review of Investigation Quality

This paragraph requires FRB to assess the quality of investigations which they review as well as identify and document any deficiencies. During the reporting period, there were 5 FRB hearings with 19 cases reviewed. A checklist is completed after the review of every case, which include the following questions: "Was the final investigation objective and complete?" & "Were the investigation's conclusions supported by a preponderance of the evidence?". Following these questions, the Board is required to administratively approve or disapprove the incident reporting and investigation.

Further, the board is asked to list any policy, training, equipment, supervisory, or medical deficiencies that were raised by the incident, as well as identify any issues with the underlying investigation. To ensure that these deficiencies are followed up, the board creates referrals that are assigned to specific personnel to address as well as when a response is due.

These referrals are tracked via a PowerBI dashboard available to board members which lists the total incidents and referrals, separates the referrals by category, and highlights the actions taken as tracked in IAPro. This thorough approach guarantees that all investigations meet the highest standards of integrity and effectiveness and deficiencies noted are appropriately routed and followed-up on. As demonstrated, the City's work under Paragraph 128 demonstrates a compliance upgrade from Partial Compliance to Operational Compliance.

### 15. Paragraph 179, Internal Affairs Investigator Qualifications

The City has engaged with the Monitoring Team to determine how to best showcase compliance with the requirements of this paragraph. A memo detailing the process for selecting IA investigators was produced and included three Divisional Notices which advertised the open IA positions.

Following this memo, the Monitoring Team requested additional information to accurately assess the City's compliance with the objectives of this paragraph. The City provided a guiding document detailing the responsive documents produced for the request as well as additional documentation for review.

Based on the supporting documentation previously produced, the City believes that the requirements of this paragraph are practiced operationally within the Division when vacancies arise within the IA unit.

### 16. Paragraph 201, Promotion of Complaint Filing

The City's efforts to comply with Paragraph 201 of the Consent Decree go beyond what the Monitoring Team has designated as "Partial Compliance." CDP, OPS, and CPC ensure that OPS Complaint Forms are available at every police district, as well as at both the OPS and the CPC headquarters. Citizens also have various options for filing complaints: they can do so through the City's website, via phone, email, in person, or by fax. The OPS brochure, which is distributed at community meetings and events, explains the complaint filing process, outlines OPS' authority, provides information about the Civilian Police Review Board, and presents the complaint process in a way that is easy to understand for those unfamiliar with the City's police discipline procedures.

Specifically, this past reporting period OPS has presented materials and met with community members at events like Cleveland Pride (Jun. 1, 2024), Larchmere Rock the Blocks Festival (Jun. 9, 2024), VegFest (Jun. 22, 2024), the Mayor's Night Out Against Crime (Aug. 6, 2024), the Third District Touch-a-Truck Safety Fair (Aug. 12, 2024), the Family, Fun, & Fitness Fair (Sept. 14, 2024), and the Grandparents' Family Day Fair (Sept. 21, 2024). Further,

the CPC hired a Community Engagement Coordinator during this reporting period, and she frequently attends events alongside the OPS and CDP community engagement teams to inform community members on how to file a police complaint.

The demonstrated partnership between CDP, OPS, and the CPC demonstrates Operational Compliance with Paragraph 201 of the Consent Decree. These efforts exceed the Monitoring Team's definition of "Partial Compliance," which refers to policies and procedures that exist only on paper. CDP, OPS, and CPC are actively engaging the community, rather than just developing policies to promote awareness of the complaint process. While improvements are still needed, the City's actions align more closely with Operational Compliance due to the inter-agency planning, visible complaint processes, and community engagement work at events that effectively promote the police complaint process.

### 17. Paragraph 223, OPS Consideration of All Evidence

The City is anticipating a significant number of paragraph compliance upgrades due to the Court's recent approval of the new OPS and CPRB Manuals. Paragraph 223 is an example of an OPS paragraph the Monitoring Team should upgrade to Operational Compliance from Partial Compliance. Not only does the Court-approved OPS Manual contain the verbatim language of this paragraph as a requirement at (406), OPS has also operationalized this requirement in its OPS Inspection Plan and created a training manual that incorporates it.

Further, the CPRB ensures investigations they believe to be missing relevant evidence are sent back to OPS for further investigation. Examples of this can be seen during CPRB meetings whereby the CPRB sends back OPS cases to ask for more relevant evidence. Like other OPS paragraphs in Operational Compliance, the Monitoring Team does not need a formal assessment before upgrading the compliance rating for 223 when the City's progress is evident in Court-approved policies and on display in publicly accessible CPRB hearings. "Partial Compliance" no longer adequately describes the City's work under Paragraph 223.

### 18. Paragraph 226, OPS Determination of Policy Violation

The Monitoring Team should upgrade the compliance rating for Paragraph 226 from Partial Compliance to Operational Compliance because OPS has a court-approved policy that affirms the requirements of the paragraph and demonstrates them in an open forum. There is no need for the Monitoring Team to perform a formal assessment before upgrading the compliance rating for this paragraph because they can see the policy in action during recorded CPRB hearings. (406) of the OPS Manual states,

> [i]n addition to determining whether a CDP employee engaged in the conduct alleged in the complaint, and whether that conduct violated policy, procedure, or training,

> OPS may include recommendations on the following: 1) Is there a need for additional training, counseling, or other corrective measures? 2) Should CDP revise its policies, strategies, tactics, or training?

Incorporating key language from Paragraph 226 into the OPS Manual demonstrates the City's significant progress in technically meeting the requirements of this paragraph, similar to what the Monitoring Team defines as Operational Compliance.

The Monitoring Team does not need a formal assessment to upgrade the compliance rating for Paragraph 226. They can observe OPS implementing this requirement by simply watching CPRB Meetings. For instance, at the 2:06:00 mark of the December 10, 2024, meeting, an OPS Investigator proposed that officers activate their WCS when making phone calls to the public about police matters. This would change the current policy, which only requires WCS activation for investigative calls.

The Court-approved manual, this observable example, and others in CPRB meetings prove OPS investigators can and do consider whether (a) the police action complied with training and legal standards, (b) the incident indicates a need for additional training, counseling, or other corrective measures; and (c) the incident suggest that CDP should revise its policies, strategies, tactics, or training. Labeling the compliance rating as Partial Compliance is not appropriate for work that the City is effectively executing under a Court-approved policy aligned with the key language of a paragraph. Therefore, the City requests an upgrade to at least Operational Compliance.

### 19. Paragraph 253 & 254, Public Safety Inspector General Duties, Investigations, Analysis, and Reports

Paragraphs 253 and 254 require that the Police Inspector General has authority to conduct investigations, analyze trends, and issue reports and recommendations at the request of the Chief of CDP or the Mayor, while permitting the Commission to recommend additional areas of inquiry. In accordance with these requirements, the City of Cleveland filled the Public Safety Inspector General (PSIG) position, with the PSIG beginning on December 16, 2024. The official job posting details the investigative and oversight functions inherent in the position, and the Office of Inspector General webpage includes past reports issued by previous Inspectors General, reflecting the breadth of the PSIG's authority being practiced. These steps support an upgrade from Partial Compliance to Operational Compliance for Paragraphs 253 and 254.

City of Cleveland Police Accountability Team

## 20. Paragraph 255, Public Safety Inspector General Budget

Paragraph 255 of the Consent Decree requires that the Inspector General's budget appear as a separate line item in the annual budget proposal and mandates the Monitor's assessment of whether the allocated funding affords sufficient independence and resources. Since 2023, the City of Cleveland has included the Inspector General's budget as a discrete line item in the official budget book (See City of Cleveland 2023 Budget Book & City of Cleveland 2024 Budget Book). The City also filled the Public Safety Inspector General position, and the PSIG began working on December 16, 2024. These actions represent a significant advancement toward meeting the obligations set forth in Paragraph 255, and warrant a revision of the City's current compliance status from Partial Compliance to General-Compliance.

## 21. Paragraphs 284, Field Training Program

CDP's Field Training Program has historically been left in the Non-Compliance or the Evaluation Deferred classifications since the implementation of the Consent Decree. These designations are unfounded and misrepresent CDP's robust Field Training Program. CDP's Field Training Program meets the Consent Decree's standards and continues to improve with each iteration.

CDP's efforts in updating GPO 1.1.24 — Field Training Program (Jan. 4, 2014) this quarter are clear examples of the Division's focus on continuously improving the program. The update to the GPO will further cement the program within the confines of the Consent Decree and will be sent to the Monitoring Team and DOJ in the first quarter of 2025 for their review. While the City acknowledges there is more work to be done under the program, it seeks upgrades to at least Partial Compliance for all of the paragraphs that concern the Field Training Program.

Partial Compliance is an appropriate compliance rating because CDP outlines the essential elements of the relevant paragraphs in the program's policies, manuals, and evaluation documentation, and the program is fully operational. Non-Compliance is an inappropriate rating for a program that is fully operational and materially meets the elements of Consent Decree. Its GPO's and annual implementation demonstrate "sufficient initial strides or sufficient partial progress toward a material number of key components of the provision of the Consent Decree."

CDP implemented the latest update to GPO 1.1.24 — Field Training Program (Jan. 4, 2014) and its accompanying manual in January 2014. The GPO and manual describe the Field Training program as a five-phase training process for probationary employees ("PPO's") to shadow

and have their initial performance overseen by a certified Field Training Officer ("FTO.") This structure is further supervised by a Field Training Sergeant ("STO.")

Paragraph 284, as an example, focuses heavily on the attraction and selection of FTO's for the program. It requires CDP's policies to (1) delineate criteria and methodology for FTO & STO selections; (2) account for Collective Bargaining Agreements with unions when selecting FTO's & STO's; and (3) have the selection criteria and methodology for FTO's & STO's include (a) written applications, (b) performance evaluations, (c) previous performance as police officers, and (d) complaint and disciplinary histories. CDP's G.P.O. 1.1.24 meets these requirements and is being further improved to clarify compliance.

Specifically, Part II of GPO 1.1.24 outlines the selection process for FTO's at CDP. According to the policy, CDP issues a DN for FTO candidates at least once a year. Interested candidates must submit a written application, along with two references from their direct supervisors, and recommendations for their appointment, which should be approved through their chain of command.

The Field Training Coordinator presents the applications, along with relevant background information about each candidate, such as their disciplinary history, sick leave usage, and performance evaluations, to the Field Training Committee for review. This Committee is composed of the Field Training Coordinator, a member from Field Operations, a representative from Training, and representatives from both the Fraternal Order of Police and the Cleveland Police Patrolmen's Association.

As demonstrated, the GPO encapsulates all of the key elements contained in paragraph 284. The GPO: (1) describes criteria and methodology, (2) incorporates two union representatives into the Committee, and (3) includes specific review criteria like written applications, performance evaluations, past performances and discipline history for FTO and STO selections. As way of an example, the City has provided an Officer's supporting documentation to provide the Monitoring Team insight into how a candidate moves through the FTO approval process.

CDP's FTO recruitment and selection process merits at least a Partial Compliance designation because the selection process is operational and meets all the material elements of Paragraph 284. It (1) has criteria and a methodology for selection, (2) partners with unions to select the best candidates, (3) and includes a review of the materials identified in the paragraph: (a) written applications, (b) performance evaluations, (c) past performances, and (d) discipline history. As described, a Non-Compliance designation does not adequately reflect the years of work CDP has put into this program and affects overall morale.

## 22. Paragraph 293, Equipment and Resource Plan

The City completed an Equipment and Resources Strategic Plan that was previously filed with the Court. This Plan assessed CDP's needs and priorities to perform the routine functions of a police department and address the requirements of the Settlement Agreement. Specifically, the plan reviews the records management system, computer aided dispatch, technology governance, mobile technology, district technology, administrative/management applications, and the potential for a patrol vehicle modernization plan. Furthermore, the City has created summaries to continuously update the plan as more steps are implemented and time has passed.

Based on the above definition of General Compliance, the City believes the reform measures of Paragraph 156 are practiced operationally and sustained over time within CDP.

## 23. Paragraph 295, Implementation of Equipment and Resource Plan

The Equipment and Resource Plan has previously been reviewed and approved by the Monitoring Team and DOJ. The City has implemented the plan and is now focusing on sustainability and analyzing where future improvements can be made. Based on the above definition of General Compliance, the City believes the reform measures of Paragraph 156 are practiced operationally within CDP.

## 24. Paragraph 299, Employee Assistance Program

Paragraph 299 of the Consent Decree mandates that CDP implements an effective Employee Assistance Program (EAP) to ensure officers have access to mental health and support resources for the promotion of effective and constitutional policing. Paragraph 299 merits an upgrade from Partial Compliance to Operational Compliance because CDP has established an Employee Assistance Unit (EAU) that encompasses a wide range of initiatives aimed at supporting officers' mental health and overall wellness.

Key offerings include department-wide peer support, equine therapy, a support K9 named Apollo who attends weekly roll calls at various districts, and a First Responders Peer Support program. Additionally, the EAU provides a post-traumatic stress program, as well as other services and resources regularly communicated to officers through pamphlets that are distributed across districts.

Further enhancing its commitment to officer well-being, the City of Cleveland has partnered with Affinity Empowering to launch the "Ready" app. This health and wellness app, designed specifically for first responders, incorporates features such as education,

progress tracking, and goal-setting to further promote the physical and mental health of CDP officers.

Given these substantial steps taken by the City in the creation and operationalization of the Employee Assistance Unit and its innovative partnership with Affinity Empowering, the City has made significant progress in meeting the requirements of Paragraph 299. Based on the above definition of Operational Compliance, the City believes the reform measures of Paragraph 299 are practiced operationally within CDP. As such, the City requests an upgrade from Partial Compliance to Operational Compliance.

### 25. Paragraph 323, Supervisor Training

This paragraph requires mandatory supervisory training for all new and current supervisors. A supervisor training was provided in 2020 called "Foundations of Leadership" to all Division supervisors. This training was approved by the Monitoring Team in 2019 and is consistently provided to all newly promoted supervisors during in-person sessions.

The Division also developed a "Coaching Police Leaders" eLearning assignment to refine the understanding of the role of a supervisor, effective coaching and communication techniques, and recognizing the need to coach officers. The Division has also worked closely with POLIS Solutions to develop supervisory training. They have assisted the Division in this training development since 2023.

Over the years, CDP has worked to not only provide supervisory training, but consistently improve the quality and comprehensiveness of this training. The work the Division has completed should merit an increase in compliance from Partial to Operational Compliance because the Division operationally practices Paragraph 323's requirements.

### 26. Paragraph 328, Officer Intervention Program Database

The City seeks an upgrade in the compliance rating for Paragraph 326 from Non-Compliance to Partial Compliance. In 2024 the City began a partnership with Benchmark Analytics, an entity that uses a series of predictive models and algorithms that identify patterns of officer conduct that lead to at-risk behavior in policing, to comply with the requirements outlined in Paragraph 328.

Benchmark's system uses estimates from a data-driven algorithm to predict risk of on-duty and off-duty misconduct. More specifically, it predicts an officer's future risk of serious misconduct based on their past record of activity and complaints against them. The system will help CDP identify supportive resources like training and mental health services that should be made available to those officers before problems manifest.

Since signing the contract in September of 2024, the City and Benchmark hosted a preliminary meeting on November 6, 2024, and have met weekly since then. Per the proposal, Benchmark has predicted the go-live date for the program to be in September 2025. The signing of the contract, the preliminary and weekly meetings, and the scheduled go-live date puts the City into Partial Compliance with the paragraph's requirements because they evidence sufficient initial strides towards meeting a material number of the paragraph's key elements.

As described in the contract, this OIP will comply with all the requirements of Paragraph 328 and its implementation is underway. Non-Compliance no longer accurately describes the City's progress towards complying with this paragraph.

### 27. Paragraph 339, Supervisor Body Camera Audits

The City's efforts in addressing Paragraph 339 exceed the Monitoring Team's Partial Compliance designation. The issuance, implementation, and rigorous practice of supervisory Wearable Camera System (WCS) review, as specified in G.P.O 4.06.04 – Wearable Camera System (Jan. 1, 2020), clearly illustrates that CDP has not only made initial strides but has significantly advanced fulfilling the critical components of the paragraph. The consistent supervisory review and auditing of Officer WCS footage establishes that the compliance classification for this paragraph now reaches at least the Operational Compliance level.

As required by Paragraph 339, Supervisors (1) randomly and, by direction, audit WCS of subordinate officers; (2) and use the WCS audits to (a) confirm policy compliance, (b) identify areas for additional training, (c) and evaluate their officers. G.P.O 4.06.04(V)(A) specifies, "[s]upervisors shall conduct adequate and direct reviews of WCS recordings created by officers under their command to confirm compliance with Cleveland Division of Police policy and to identify areas where additional training or guidance is needed."

The GPO outlines a quarterly review of the WCS that Lieutenants and Captains must complete. During this review, officers—including Patrol Officers, Sergeants, and Lieutenants—have thirty minutes of their client-facing WCS recordings assessed for compliance with policies, disciplinary issues, and potential retraining. To further improve this procedure, starting in 2025, the City will transition these reviews to BlueTeam to reduce paper usage, better organize reports, and enable quicker access to completed reports.

The City consistently operationalizes the requirements set out in Paragraph 339. To illustrate this, the City provides a copy of the quarterly 2024 WCS audits for Lieutenants and Captains that have been finalized to date. These documents, alongside G.P.O 4.06.04, prove that the Monitoring Team has misclassified the City's progress in addressing Paragraph 339 as Partial Compliance.