UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 1:15 CV 1046 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, | ) | |
| | ) | |
| Defendant | ) | ORDER |

Currently pending before the court in the above-captioned case is the Monitor's Notice Regarding Outstanding Billing Disputes from 2024 (ECF Nos. 580, 587), and the City of Cleveland's Motion for Adoption of Plaintiff's Proposed Timeline for Handling Invoices ("Timeline Motion") (ECF No. 582.) Having issued an Order (ECF No. 583) on February 4, 2025, establishing the timeline for handling invoices agreed to by the Parties and Monitor, the City's Motion is denied as moot. With regard to the Monitor's Notices regarding outstanding billing disputes, the court overrules the City's objections to the billing entries directly related to the Monitor's work from March to June 2024. The court also orders the City to compensate the Monitor for 75 percent of the total amount objected to on the basis of "billing for billing" for the reasons discussed herein.

## I. BACKGROUND

On June 12, 2015, the court approved the Consent Decree entered between the United States of America and the City of Cleveland (the "City") (collectively, the "Parties"). (ECF No. 9.) Upon entering the Settlement Agreement ("Agreement"), the Parties jointly selected an Independent Monitor pursuant to Paragraph 353 on October 1, 2015. (ECF No. 25.) Since April 12, 2023, the law

firm, Hogan Lovells LLP ("Hogan"), has served as Independent Monitor with one of its partners, Karl Racine, acting as Lead Monitor. (ECF No. 474.) Hogan is the fourth Monitor to assess the City's compliance with the Consent Decree, but it is the first law firm to hold the position. In selecting Hogan, the Parties appreciated the firm's depth and breadth of experience, as well as its commitment to continuity through the retention of some of the members of the previous Monitoring team. (*Id.* at PageID 10560.) On June 13, 2023, the Parties and Monitor memorialized the terms of the Monitor's work in a letter of understanding. (*See* Feb. Not. Ex. D at PageID 13794, ECF No. 587-4.) The letter reflected the City and United States' agreement to compensate Hogan's Monitoring team members at $750.00 per hour, and Hogan's agreement to have its monitoring team members provide 20 percent of their monthly hours pro bono.[1]

Between April 2023 and February 2024, Hogan submitted, and the Parties approved, invoices totaling $868,166.71 for services rendered and related costs. (*See* Orders of Disbursement, ECF Nos. 496, 503, 520, 530, 531, 551.) However, in early December, 2024, it came to the court's attention that significant issues had arisen regarding the process for the billing and payment of the Monitoring team's fees. (*See* ECF No. 573.) It appeared to the court that the City and Monitor had reached an impasse with regard to the City's objections to approximately nine percent of the Monitor's invoiced billing entries for services rendered between March and June 2024. (Feb. Not. Ex. A at PageID

---

[1]    "We will provide our services on an hourly basis at rates for attorneys and other professionals that may be periodically revised after consultation with the Parties. We expect Karl Racine to serve as Lead Monitor, with assistance from Stephanie Yonekura, Courtney Caruso, Jay Jones, and Abby Wilhelm, whose discounted hourly rates for this matter are $750. Hogan Lovells Monitoring team members agree to, on a monthly basis, offer 20% of our overall hours pro bono. Monitoring team members engaged by the Firm, and who served the previous Monitor, shall be billed at rates no higher than $250/hr." (Feb. Not. Ex. D at PageID 13795.)

-2-

13654, ECF No. 587-1.) Notably, the City's objections pertained solely to entries related to the Monitoring team's work, not to the hourly fee amount agreed to in June 2023.

To address the disagreement, the court held a telephonic status conference with the Parties and Monitor on the record via Zoom on December 16, 2024. During the teleconference, the Parties and Monitor discussed developing a process that would expedite submission and payment of the Monitor's bills. (Order at PageID 13441, ECF No. 575.) The court also directed the Parties and Monitor to meet and confer about the remaining objections in an attempt to reach a resolution without further court intervention. (*Id.*) If they were unable to agree on a resolution for the rest of the objections, the Monitor was ordered to file a notice with the court the week of January 13, 2025, informing it of the remaining issues. (*Id.* at PageID 13442.)

On January 27, 2025, the Monitor filed a Notice Regarding Outstanding Billing Disputes from 2024 ("January Notice") (ECF No. 580.) The City filed a Response ("City Response") (ECF No. 581) to the January Notice on January 30, 2025, along with a Motion for Adoption of Plaintiff's Proposed Timeline for Handling Billing Disputes (ECF No. 582). On February 21, 2025, the United States filed a Response ("DOJ Response") (ECF No. 585) to the City's Timeline Motion, to which the City Replied ("Reply") (ECF No. 586) on February 24, 2025. The Monitor then filed another Notice ("February Notice") (ECF No. 587) about the Outstanding Billing Disputes on February 24, 2025.

The court held a Zoom status conference on the record with the United States, the City, and the Monitor on February 25, 2025, to address the outstanding billing issues raised in the Monitor's and City's filings. (Order at PageID 13804, ECF No. 589.) During the conference, the Parties and the Monitor reached an agreement on a schedule for processing future invoices; however, numerous

objections to specific billing entries in the Monitor's March through June 2024 invoices, remained. (*Id.* at PageID 13805.) The Parties and Monitor agreed to have the court resolve the remaining billing objections.

## II. DISCUSSION

### A.    Billing Standard

Subsections A and B of Section Fourteen of the Settlement Agreement detail the role of the independent monitor, the monitor's selection, and compensation of the monitor. (*See* Modified Agreement at PageID 11666–11668, ECF No. 502-1.) Paragraph 351 makes clear that the monitor is an agent of the court, and as such is "subject to the supervision and orders of the Court, consistent with this Agreement and applicable law." (*Id.* at PageID 11667.) With regard to compensation, Paragraph 356 governs what fees and costs the City pays the Monitor. It reads:

> The City will bear all reasonable fees and costs of the Monitor. DOJ and the City recognize the importance of ensuring that the fees and costs borne by the City are reasonable, and accordingly fees and costs will be one factor to be considered in selecting the Monitor. In the event that any dispute arises regarding the reasonableness or payment of the Monitor's fees and costs, the City, DOJ, and the Monitor will attempt to resolve such dispute cooperatively prior to seeking the assistance of the Court. If the City and DOJ agree, and the Court approves, an independent third party with no financial interest in the case may pay some or all of the fees and costs of the Monitor.

(*Id.* at PageID 11668.) In Paragraph 357, the Agreement directs the City to provide the Monitor "with permanent office space and reasonable office support such as office furniture, telephones, Internet access, secure documents storage, and photocopying." (*Id.*) Nowhere else does the Agreement discuss Monitor compensation or elaborate on what "reasonable fees and costs" are or the timeline for processing Monitor invoices.

-4-

In its briefings and oral arguments during the February 25 status conference, the City principally relies on three sources to justify its objections based on reasonableness to some of the Monitor's billing entries. These sources include: (1) a declaration by Laura S. Johnson, Esq. of Sterling Analytics, with whom the City engaged to review the Monitor's March through June 2024 invoices and the City's objections ("Sterling Declaration"); (2) a guide called *Monitoring Law Enforcement Consent Decrees: An Introduction & Starter Toolkit* authored by the Policing Project at NYU School of Law with support from the Bureau of Justice Assistance ("Monitoring Guide"); and (3) out-of-circuit case law addressing reasonable attorneys fees outside the consent decree/monitor context.

The Monitor also relies on a number of outside resources to support its arguments that its billing entries are reasonable pursuant to Paragraph 356. These include two cases, one in-circuit and one out, addressing similar objections to a consent decree monitor's invoices, specifically *U.S. v. Puerto Rico*, 460 F.Supp. 3d 159 (D. Puerto Rico, 2020) and *U.S. v. City of Detroit*, No. 03-72258, 2011 WL 767230 (E.D. Mich. Feb. 28, 2011). Additionally, the Monitor refers back to Paragraph 350 of the Agreement, previous disbursement orders by the court, a letter of understanding agreed to by the parties and the Monitor (Monitor Ex. D at PageID 13793, ECF No. 587-4), as well as comparisons to previous invoices where the City had approved the same type of entries to which it was now objecting. (Feb. Not. at PageID 13649–50, ECF No. 587; Monitor Exs. B, C, ECF Nos. 587-2, 587-3.)

In its Response (ECF No. 585), the United States does not give an opinion on whether the challenged fees are reasonable or if the City's objections should be sustained; however, it does confirm the court's authority to resolve billing disputes, as it has done before. (DOJ Response at

PageID 13620.) Thus, the court will consider the City's and Monitor's exhibits, as well as its own knowledge and experience on resolving billing disputes in this Consent Decree to decide on the outstanding objections. The court also looks specifically to the Monitoring Guide co-authored by Matthew Barge, who the court notes, was the first Lead Monitor of the Cleveland Consent Decree.

**B.**     **Summary of Objections**

The Monitor's Notice summarizes 88 objections by the City to the Monitor's March through June 2024 invoices. Currently before the court are 82 objections as the Monitoring team agreed four of the City's objections were reasonable[2]. (Jan. Not. Ex. A at PageID 13514.) Most of the remaining objections fall into three categories: 1) not paralegal-level work; 2) vague, lacks detail, or duplicative; and 3) billing for billing. Those not placed into these three categories fall into "other." The court addresses each category of objections in turn.

  *1.*     *"Not Paralegal-Level Work"*

The City makes 24 objections to billing entries made by Katie O'Brien between March and June 2024, on the basis that the activity performed is "not paralegal-level work." (Jan. Not. Ex. B at PageID 13534–13542.) Three of those also list "block billing, vague" as a basis for the objection. (*Id.* at PageID 13534–35.) As part of its "not paralegal-level work" objections, the City references

---

[2]     The following entries were credited by the Monitor to the City:
  1)     1/10/24 - Lisa Fink - 0.5 hrs - $115.00: Draft condolence letter to Director Howard, Chief Drummond and the union presidents regarding a police officer who died while on duty.
  2)     4/22/24 - Stephanie Yonekura - n/a hrs - $2.00: $2 tip for hotel cleaning service.
  3)     4/12/24 - Karl Racine - 0.6 hrs - $360.00: Call with Hogan Lovells General Counsel regarding hiring of P. McHugh.
  4)     4/12/24 - Abby Wilhelm - 0.6 hrs - $360.00: Call with Hogan Lovells General Counsel regarding hiring of P. McHugh.

a December 18, 2023 email, from the Monitor defining Ms. O'Brien's scope of work. According to the City[3], the Monitor wrote in the December email that, "Consistent with her title, Katie [O'Brien] would serve on the team as a Senior Paralegal. She would be responsible for filing, organizing, and shepherding the review of materials and otherwise keeping the team and the Parties organized." (*Id.* at PageID 13527–28.)

The Monitor concedes that Ms. O'Brien's scope of work involves the responsibilities discussed in the December 18, 2023 email. However, he asserts that the City's objection of "not paralegal-level work" "encroaches on the Monitoring Team's independence." (Jan. Not. Ex. A at PageID 13514.) Further, the Monitor notes that Ms. O'Brien's billing rate is lower than any other Monitoring Team member's, and thus having her perform certain tasks reduces costs to the City. (*Id.*)

The City defends its objections to Ms. O'Brien's entries stating that it is "unreasonable for her to perform at this level and bill so many hours." (Jan. Not. Ex. B at PageID 13528.) The City also rejects the Monitor's assertion that use of Ms. O'Brien lowers costs to the City, arguing that, "[t]he Monitoring Team seemed to function well prior to her joining the team. The project management time of Abby Wilhelm and Stephanie Yonekura has not been eliminated; seemingly, the Monitor is now billing the City for administrative tasks even more than substantive work." (*Id.*) Finally, the City compares Ms. O'Brien's hourly rate of $200 to that of other administrative assistants in other Consent Decree cities, the administrative work rate under the last Cleveland Monitor ($40/hr), and

---

[3]     Neither the City nor the Monitor provided a copy of the December 18, 2023 email, referenced in the City's objections.

to the pay rates of City and Department of Justice paralegals, all to support its objections to Ms.

O'Brien's current level of participation and billing. (*Id.*)

      After reviewing Ms. O'Brien's billing entries, comparing her level of participation to that of

other paralegals supporting previous Monitors, and consulting outside guidance materials, the court

overrules the City's objections. First, the court reminds the City that the Monitor is an agent of the

court, not the City. *See* Matthew Barge et al., *Monitoring Law Enforcement Consent Decrees: An*

*Introduction and Starter Toolkit* 74 (2024). As such, it is the Monitor's responsibility to "ensure that

the right, and right number of, team members conduct necessary work and activities[,]" while also

managing resources, such as people, time, and financial resources, effectively and efficiently. *Id.* at

79, 77. Here, the court finds that Ms. O'Brien's time entries reasonably fall within the scope of work

articulated in December 2023, when she initially joined the team. Accordingly, the court concludes

that the City must compensate the Monitor for Ms. O'Brien's time previously objected to in the

March through June 2024 invoices.

      2.    *"Vague, Lacks Detail, Duplicative"*

      The City makes more than two dozen objections to billing entries it claims are vague, lacking

detail, or are duplicative. In response, the Monitor maintains that its descriptions supporting each

time entry are sufficiently detailed, especially given that the Monitor's invoices are publicly available

and that many of the meetings described involve at least one party to the case. (Jan. Not. Ex. A at

PageID 13515.) The Monitor also notes that providing more detail may run afoul with Paragraph 395

of the Consent Decree, which states "[t]he Monitor and DOJ will maintain all confidential or non-

public information provided by the City and CDP in a confidential manner." (*Id.* quoting Agreement

Second Modification at PageID 11681, ECF No. 502-1.)  With regard to the entries the City deems

-8-

duplicative, the Monitor explains that it regularly checks for duplicates and removes them before submitting invoices to the City, and that the challenged entries reflect billing for the same or similar tasks that may be performed on a routine basis. (*Id.* at PageID 13515.)

The City contests the Monitor's arguments, asserting that it would be unreasonable for the City to pay "a vague or non-descriptive charge that cannot be confirmed as related to the Settlement Agreement[,]" or to pay for those that appear duplicative. (City Response at PageID 13586.) The City supports its argument by referencing to the Monitoring Guide and two out-of-circuit district court cases dealing with attorneys' fees generally. (Jan. Not. Ex. B at PageID 13527.) Further, the City explains that more detailed descriptions are needed because the City was not in every meeting, nor does it "necessarily keep[] track of the subject matter and duration of every conference" since it does not bill anyone. (*Id.*) Lastly, the City notes that it has made similar objections to past invoices and the Monitoring team has corrected or withdrawn the entry. (*Id.*)

After reviewing the billing entries the City claims are vague, lacking detail, or duplicative, the court overrules the City's objections. First, the court finds that the disputed entries are consistent with the "Specificity in billing" guidelines discussed in the Monitoring Guide. In addition to the language cited by the City about billing entries that are overly vague and incomplete, such as "reviewed documents," the Monitoring Guide advises that:

> [C]are must be taken not to reveal confidential information in billing invoices. For instance, the monitoring team, as part of its duties, may meet with a small group of community members or even law enforcement agency personnel who want assurance that what they discuss will remain confidential. A monitor team invoice reflecting that certain members **"met with community members regarding various consent decree issues" is likely sufficient.** Likewise, it is unlikely that detailing all topics that the monitor and a court discussed in a one-on-one discussion between the court and its agent is

appropriate, while an entry indicating that the monitor "met with the court to discuss consent decree implementation progress and various related topics" may likely be sufficient.

Barge, *supra*, at 76–77 (emphasis added). The challenged billing entries meet that standard, as is seen through the following examples:

- March 11, 2024 - Katie O'Brien - 3.5 hrs: Coordinate regarding additional subject matter expert potential team members, access to data systems, scheduling of Brazos issues walk through, community survey meeting, and correction action updates.

- June 4, 2024 - Tammy Hooper - 2.0 hrs: Continue conducting use of force assessments.

- June 4, 2024 - Abby Jae Wilhelm - 0.9 hrs: Participate in call with both parties covering multiple issue areas.

- June 11, 2024 - Karl Racine - 0.3 hrs: Participate in call with DOJ and Monitoring Team members to discuss multiple issues of the Consent Decree.

- June 17, 2024 - Shunta Boston - 1.0 hrs: Participate in Monitoring Team meeting regarding multiple issues from Consent Decree.

- June 12, 2024 - Tammy Hooper - 1.4 hrs: Review files pertaining to office of professional standards document redactions.

(Jan. Not. Ex. B at PageID 13535, 13539, 13641, 13642.) Indeed, these billing descriptions indicate the action taken and its subject matter much like the example from the Monitoring Guide ("met with community members regarding various consent decree issues").

With regard to the objections based on duplication, the court finds it is wholly reasonable for the Monitor or a member of his team to work on a single task, on different days, or at different times of the day, without the entry being duplicative. For example, multiple team members recorded billing

-10-

entries dealing with the same subject matter on back-to-back days or at different times during the day:

- March 5, 2024 - Katie O'Brien - 1.7 hrs: Prepare materials for court status conference relating to data access and prepare hard copies for A. Wilhelm and K. Racine.

- March 6, 2024 - Katie O'Brien - 1.3 hrs: Analyze materials for Court status conference relating to access and prepare hard copies for A. Wilhelm and K. Racine.

- April 20, 2024 - Abby Jae Wilhelm - 1.5 hrs: prepare for status conference.

- April 20, 2024 - Abby Jae Wilhelm - 4.5 hrs: prepare for status conference.

(*Id.* at PageID 13534, 13536.) Another clear example of a timekeeper working on the same subject across multiple days is Ronnie Dunns' entries in June regarding search and seizure data requests and the associated methodology memorandum. (*Id.* at PageID 13540.)  Others performed more routine tasks throughout a day or on back-to-back days, such as Stephanie Yonekura who spent 0.1 hours on emails regarding semiannual report and next status conference on March 10 and March 11, 2024. (*Id.* at PageID 3535.)

Concluding that these entries are duplicative merely because they appear to pertain to the same subject matter ignores the more reasonable explanation that people occasionally step away from a task before returning to it a few hours or days later. Requiring Monitoring team members to conduct their work on a particular project all in one sitting would not only violate the Monitor's independence, but more simply, it lacks common sense.

It is also worth noting that this Monitor's billing entries are as descriptive, if not sometimes more, than those provided by previous monitors. A review of the previous monitor's invoices from

2022 and early 2023 shows the lead monitor and other team members only making one entry per day that listed multiple activities. Below is an example from the previous monitor's April 2022 invoice.

| Date | Client | Project | Task | Roles | Hours |
|------|--------|---------|------|-------|-------|
| Aden Hassan | | | | | 57.20 |
| 04/01/2022 | City of Cleveland | Cleveland December 2021 - November 2022 | CLE MT Member Rate | Senior Advisor | 1.00 |
| | | Email and correspondence. Review and approval of the CIT handcuffing review methodology and instrument. | | | |
| 04/04/2022 | City of Cleveland | Cleveland December 2021 - November 2022 | CLE MT Member Rate | Senior Advisor | 3.00 |
| | | Weekly MT logistics meeting. Review of multiple documents, assessment methodologies and filings. Email and correspondence. | | | |
| 04/05/2022 | City of Cleveland | Cleveland December 2021 - November 2022 | CLE MT Member Rate | Senior Advisor | 1.00 |
| | | Email and correspondence re CD related matters. | | | |
| 04/06/2022 | City of Cleveland | Cleveland December 2021 - November 2022 | CLE MT Member Rate | Senior Advisor | 1.50 |
| | | Email and correspondence and logistics for upcoming calls and meetings. | | | |

Without opining on whether the bills submitted by the previous monitor were sufficient, these entries arguably constitute "block billing" and lack detail, which are both objections the City raised to the current Monitor's invoices. But, as seen in the April 2022 Order of Disbursement, the City paid for 100 percent of these time entries without objection. (ECF No. 428.) This inconsistency in when the City objects on the grounds of vague, lacks detail, or duplicative between this Monitor and the former begs the question: why object now, but not then?

Accordingly, the court overrules the City's objections to entries on the grounds that the entry is vague, lacks detail, or is duplicative.

3.       *"Billing for Billing"*

The City's "billing for billing" objections attach to entries dealing with the Monitor's work on the instant billing dispute. Chiefly, the City argues that it should not have to pay for any time the

Monitor and Ms. Wilhelm spend reviewing monthly invoices and responding to the City's objections. (City Response at PageID 13587.) Such charges, the City contends, are inconsistent with the standard applicable to all professional billing. (*Id.*) The Monitor argues that this time is billable because it relates to time preparing for arguments before the court, and "the Monitor should not be required to incur any costs for the administration of its Monitorship duties." (Jan. Not. Ex. A at PageID 13516.)

As the City outlines in its Response to the Monitor's January Notice, attorneys are generally unable to charge a client for the time spent preparing a bill for services rendered. (City Response at PageID 13587, n. 6.) But, the activity underlying the disputed entries here is vastly different from the type of overhead work an attorney does preparing bills for clients. Indeed, two of the cases referenced discuss reasonable attorneys fees in the context of a party moving for an award of attorney's fees, litigation expenses, and costs pursuant to state and/or federal statute. *See D'Lil v. Best Western Encina Lodge & Suites*, No. CV 02-9506 DSF, 2010 WL 11655476, at *1 (C.D. Cal. April 13, 2010) (Plaintiff sought attorney fee award pursuant to California Code of Civil Procedure § 1021.5; California Civil Code §§ 52, 54.3, and 55; California Health and Safety Code § 19953; and 42 U.S.C. § 12205), *Fuller v. Fiber Glass Systems, LP*, No. 4:07-CV-01120-WRW, 2009 WL 3067031, at *1–3 (E.D. Ark. Sept. 23, 2009) (calculating attorneys fees under 42 U.S.C. § 1988 and 28 U.S.C. § 1920). The third case, *Att'y Grievance Comm'n of Maryland v. Kreamer*, 946 A.2d 500, 534 (Md. Ct. App. 2008), is also unpersuasive as it discusses reasonable billing practices solely through the lens of the attorney-client relationship. Again, the relationship between the Monitor and the City is *not* that of an attorney-client.

-13-

The time for which the Monitor and Ms. Wilhelm seek compensation is for work separate and apart from recording tasks in a time sheet. Rather, it is for time spent responding to the City's objections and arguing before the court why such objections should be overruled and the fees paid. Indeed, such work is more analogous to an attorney who is awarded attorneys fees and then must spend time filing motions and arguing before the court to recover those already awarded fees. To not compensate an attorney for time spent recovering fees that were already ordered recoverable would unfairly burden the prevailing party.

With regard to the "billing for billing" entries, the court finds that the Monitor can recover 75 percent of the fees associated with the "billing for billing" objections in the March through June 2024 invoices. As noted by the Monitor in its January Notice, some of the City's objections to billing entries during this four-month period were reasonable, and the Monitor credited the City for those costs. (*See supra* at n. 2.) However, all remaining objections before the court have been overruled. Thus, withholding all fees for the time the Monitor spent trying to recover fees the court deems recoverable is unduly burdensome on the Monitor as the prevailing party.

Resultantly, the court orders the City to compensate the Monitor for 75 percent of its time spent litigating the billing disputes in its March through June 2024 invoices.

4.     *Other Objections*

The City's remaining objections fall into a few different groups: (a) no corollary biller; (b) hotel rates; and (c) generally not billable. The court addresses each in turn.

a)     **No Corollary Biller**

The City objects to a March 22, 2024 entry, by Ms. Wilhelm for 0.3 hours to "confer with R. Dupont regarding CIT communications practices," on the basis that there is "no entry from Dr.

Dupont mentioning a conference with A. Wilhelm[.]" (Jan. Not. Ex. B at PageID 13534.) Upon review of the full March 2024 invoice, the court finds that Dr. Dupont did record 0.3 hours for a conference with Ms. Wilhelm. (March 2024 Invoice at PageID 33.)

| Date | Name | Hours | Amount | Description |
|------|------|-------|--------|-------------|
| 03/22/24 | Randy Dupont | 0.3 | 69.00 | Discuss Cleveland Division of Police Crisis Intervention Trauma in-service training |

The only difference that may have led the City to not identify this entry as the one related to Ms. Wilhelm's is that Ms. Wilhelm abbreviated Crisis Intervention Trauma to CIT. Thus, the City's objection to Ms. Wilhelm's March 22, 2024 billing entry, regarding a conference with Dr. Dupont is overruled.

The City raises a similar objection to March 26, 2024 billing entries, by Ms. Wilhelm and Mr. Racine. These entries state the following:

- March 26, 2024 - Abby Jae Wilhelm - 0.5 hrs: "Confer with C. Cole, R. Pulvino, and K. Racine regarding history and context surrounding the decision to not proceed with the community survey in prior years."

- March 26, 2024 - Karl Racine - 0.5 hrs: Confer with C. Cole, R. Pulvino, and A. Wilhelm regarding history and context surrounding the decision to not proceed with the community survey in prior years."

(Jan. Not. Ex. B at PageID 13534–35.) The court agrees with the City that the March 2024 invoice does not include parallel entries by Ms. Cole and Mr. Pulvino. However, the court also notes that the City did not object to the March 27, 2024 entries, by Mr. Racine, Ms. Cole, Mr. Pulvino, and Ms. O'Brien for a similar meeting when Ms. Wilhelm did not record the conference.

-15-

| Date | Name | Hours | Amount | Description |
|------|------|-------|--------|-------------|
| 03/27/24 | Katie O'Brien | 0.4 | 80.00 | Participate in meeting with C. Cole, K. Racine, A. Wilhelm, R. Pulvino regarding strategy for community survey |
| 03/27/24 | Karl Racine | 0.5 | 375.00 | Confer with C. Cole, A. Wilhelm, R. Pulvino, K. O'Brien regarding community survey strategy and planning |
| 03/27/24 | Christine Cole | 0.5 | 115.00 | Confer with K. Racine, A. Wilhelm, R. Pulvino, K. O'Brien regarding community survey strategy and planning |
| 03/27/24 | Rory Pulvino | 0.5 | 115.00 | Confer with C. Cole, A. Wilhelm, K. Racine, K. O'Brien regarding community survey strategy and planning |

The Monitor explains that some team members "independently forgo billing for their time spent working on this project[,]" thus, sometimes when three people are in a meeting, only two will bill the City. (Jan. Not. Ex. A at PageID 13516.) The City does not appear to contest this explanation in its filings with the court or in those letters attached to the Monitor's filings. As such, the court overrules the City's objections to the March 26, 2024 billing entries, by Ms. Wilhlem and Mr. Racine.

The court also overrules the following objection given the Monitor's reasonable explanation for the occasional lack of a parallel billing entry by a meeting participant:

| Date | Name | Hours | Amount | Description |
|------|------|-------|--------|-------------|
| 03/20/24 | Karl Racine | 0.5 | 375.00 | Confer with C. See regarding status conference |

-16-

While the court overrules the instant objections related to the absence of a corollary biller, the court urges the Monitor to explicitly indicate in its invoices when a meeting participant is not billing going forward. This small adjustment should ensure future ease of review.

### b) Hotel Rates

In addition to specific billing entries, the City also objects to the Monitor's hotel expenses that exceed $159.00 per night. The City asserts that lodging charges should not exceed the agreed-upon rate of $159.00 per night plus tax unless any rooms in the City are unavailable at that rate. (City Response at PageID 13588.) The Monitor contends that it is complying with the agreed-upon rate, but defends the higher rates because standard rooms at the hotels where the Monitor negotiated reduced rates were unavailable. (Jan. Not. Ex. A at PageID 13517.)

Both the City and Monitor point to th June 13, 2023 letter, in which the Monitor set out the understanding between the Parties and the Monitor under the Modified Settlement Agreement. (Feb. Not. Ex. D at PageID 13794, ECF No. 587-4.) Included in the letter is a discussion of the Monitoring teams billing rates as well as the rate for travel expense reimbursements. With regard to hotel expenses, the letter reads:

> Monitoring team hotel stays will be no more than the current negotiated hotel rate for the Monitoring team ($159 plus tax), unless standard rooms are unavailable, in which case rates may be higher.

(*Id.* at PageID 13795.) However, the City and Monitor differ in their interpretations of this section. The City maintains that when the rate is higher than the cost negotiated with a specific hotel, the Monitor should stay at a hotel where no prior-negotiated rate exists, so long as it is at the standard $159.00 per night rate or lower. (Jan. Not. Ex. E at PageID 13566.) The Monitor's interpretation is that it has negotiated hotel rates with two outfits—the Westin and Roost—which agreed to a standard

-17-

room rate of $159.00 per night, but more may be charged when standard rooms are unavailable. (*Id.* Ex. D at PageID 13551.) Further, the Monitor justifies contracting with these two local hotels, especially Roost, because it provides conference space at no charge. (*Id.*) The Monitor's position is well-taken.

A common sense reading of the hotel rate section in the June 13, 2023 letter, is that the Monitor will stay at hotels where it has a pre-negotiated rate, not that the Monitor will stay at any hotel where the rate is $159.00 per night or less when the hotel with the negotiated rate is unavailable. The Monitor pre-negotiated a rate of $159.00 per night plus tax with the Westin and Roost. In reviewing prior invoices, these rates have been available, or these hotels have charged even less. For example, for Mr. Racine's stay at Roost in February 2024, the hotel rate before tax was $152.00 per night, and for Ms. Cole's stay at the Westin in February 2024, the hotel rate before tax was $156.00 per night. When the negotiated rate was unavailable at the Roost or Westin, the cost per night increased only $40.00 to a total of $199.00. It is true that the Monitor could have selected different hotels to negotiate rates with, but it was able to reach the agreed-to amount of $159.00 per night with the Westin and Roost. And when the negotiated rate is less than $159.00, it appears from past invoices, the Monitoring team takes advantage of that.

Accordingly, the court overrules the City's objections to the Monitor's hotel expenses that exceeded the rate negotiated with the Westin and Roost due to the unavailability of standard rate rooms. However, the court urges the Monitor to confer with the two hotels it has negotiated rates with to ensure future nights do not exceed the agreed-to rate. If the increased amount per night at either of these hotels becomes more permanent, the court recommends the Monitor contract with a different hotel able to maintain the $159.00 per night negotiated rate.

### c)    Not Billable

The court similarly overrules the City's objections to entries by Monitoring team members about accessing relevant data systems. The City contends that Paragraph 357 of the Agreement prevents the Monitoring team from billing for time spent reconnecting to the City's police data systems after access ceased in December 2023. (*See* Jan. Not. Ex. B at PageID 13539.) Paragraph 357 reads: "The City will provide the Monitor with permanent office space and reasonable office support such as office furniture, telephones, Internet access, secure document storage, and photocopying." (Mod. Agreement at PageID 11668.) The Monitor argues that the challenged time entries do not fall under Paragraph 357 as non-billable because the work billed for relates to Paragraph 390, which says in relevant part: "The City and CDP will ensure that the Monitor will have full and direct access to all City and CDP documents and data related to the Agreement that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement[.]" (*Id.* at PageID 11680.) The Monitor's argument is well-taken.

In May 2024, four Monitoring team members billed between 0.5 and 2.0 hours for the following activities:

- May 10, 2024 - Scott Sargent - 2.0 hrs: Receive new laptop, set up and connectivity with three Cleveland Division of Police systems

- May 15, 2024 - Tammy Hooper - 0.9 hrs: Set up new Cleveland Division of Police laptop including signing into relevant data systems

- May 12, 2024 - Ronnie Dunn - 1.0 hrs: Register, log into, and familiarize with data systems on new laptop

-19-

- May 20, 2024 - Ronnie Dunn - 0.5 hrs: Login and access various Cleveland Division of Police Data systems on new City issued laptop with assistance from Sgt. Cook

(Jan. Not. Ex. B at PageID 13539.) The court interprets these entries to fall more within the Monitoring team's need to access necessary City and CDP documents and data than merely receiving "tech support" under Paragraph 357. Additionally, the City does not appear to contest the Monitor's explanation that these entries do not fall under Paragraph 357. Thus, the court overrules the City's objections to these May 2024 charges.

### III. CONCLUSION

For the foregoing reasons, the court overrules the City's objections to the billing entries directly related to the Monitor's work from March to June 2024. The court also orders the City to compensate the Monitor for 75 percent of the total amount objected to on the basis of "billing for billing" for the reasons previously discussed. In closing, the court strongly urges the Parties and the Monitor to use the court's decisions on these objections to guide future billing disputes. A good deal of time has been spent working through these issues, and the court believes that resolution of these objections will help the Parties and the Monitor return all of their attention to reaching full compliance with the Consent Decree.

IT IS SO ORDERED.

_/s/ SOLOMON OLIVER, JR._
UNITED STATES DISTRICT JUDGE

April 25, 2025

-20-