UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNTIED STATES OF AMERICA, | ) | Case No.: 1:15 CV 1046 |
| Plaintiff | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| CITY OF CLEVELAND, | ) | |
| Defendant | ) | <u>ORDER</u> |

Currently pending before the court in the above-captioned case is Defendant City of Cleveland's (the "City") Motion to Enforce the Monitor's Obligations Necessary for Settlement Agreement Compliance ("First Motion") (ECF No. 596), and the City's Motion to Enforce the Monitor's Compliance with the Plain Text of the Settlement Agreement Paragraph 371 ("Second Motion") (ECF No. 600). For the following reasons, the court denies the City's Motions.

**I. BACKGROUND**

On June 12, 2015, the court approved the Settlement Agreement ("Agreement") entered between the United States of America and the City of Cleveland (collectively, the "Parties"). (ECF No. 9.) The Agreement provides that an Independent Monitor ("Monitor"), jointly selected by the Parties and approved by the court, will "assess and report whether the requirements of this Agreement have been implemented, and whether this implementation is resulting in constitutional and effective policing, professional treatment of individuals, and increased community trust of CDP." (Modified Agreement at ¶ 350, ECF No. 502-1.) Among the Monitor's duties are reviewing Cleveland Division of Police ("CDP") policies and procedures, conducting compliance reviews or

audits, conducting qualitative and quantitative assessments to measure whether implementing the Agreement has resulted in constitutional policing, and filing with the court, every six months, written, public reports detailing the work conducted by the Monitor during the reporting period. (*Id.* at ¶¶ 352, 360, 367, 375.)

On April 8, 2025, the City filed the First Motion to Enforce. (ECF No. 596.) The Monitor filed a Response (ECF No. 601) on April 22, 2025, and the United States submitted its Opposition (ECF No. 608) to the City's First Motion on May 6, 2025. The City filed the Second Motion to Enforce (ECF No. 600) on April 22, 2025, to which the Monitor filed a Notice in Response (ECF No. 609) on May 6, 2025, and the United States filed a Response (ECF No. 613) on May 20, 2025. Having heard from the Parties and Monitor, the City's Motions are now ripe for review.

## II. DISCUSSION

**A.** **First Motion to Enforce**

The City contends that the Monitor's most recent semiannual report does not comply with Paragraph 375 of the Agreement because the Monitor did not give the City the standards, methodologies and/or data that the Monitor used to reach the report's conclusions. (First Motion at PageID 13884.) The Monitor argues the City misreads Paragraph 375 with regard to methodology requirements, and warns that interpreting the paragraph in the way advanced by the City would raise inconsistences with past reports. (Resp. at PageID 14050.) Largely in agreement with the Monitor, the United States asserts that the Monitor's Sixteenth Semiannual Report complies with how the parties have interpreted the Agreement since its inception, and it "does not require separate methodologies or compliance reviews for every substantive paragraph in each semiannual report." (Opp'n at PageID 14083.) The Monitor's and United States's arguments are well-taken.

Since approval of the Agreement, the Monitor has filed 16 semiannual reports. (*See* ECF Nos. 64, 97, 135, 179, 214, 246, 280, 320, 345, 386, 440, 471, 488, 523, 563, 597.) In its Third Semiannual Report (ECF No. 135), the Monitor transitioned its reporting style to a "paragraph-by-paragraph accounting of the general state of the City's compliance with the specific requirements of the Consent Decree." (3d Semiannual Report at PageID 2810.) This change introduced the compliance grading scale[1] that the Monitor uses to this day: Non-Compliance, Partial Compliance, Operational Compliance, and General Compliance.[2] (*Id.* at 2810–11.) After introducing these categories and explaining what each one meant, the Monitor discussed the information and data on which each rating was based:

> [T]he Monitoring Team bases its assessments on its current understanding, knowledge, and information gained through ongoing work and discussion with CDP, the Parties and other stakeholders. *The assessments are informal to the extent that not all of them are necessarily informed by the type of exhaustive compliance and outcome measurements that are a critical component of the Consent Decree - and the summary determinations do not take the place of these more structured, systemic analyses.* The intent is to provide a bottom line sense of where the Division is on the road to compliance. Ongoing, rigorous quantitative and qualitative assessments will provide a more comprehensive picture as work under the Consent Decree proceeds.

(*Id.* at PageID 2812) (emphasis added). The Monitor has submitted 14 semiannual reports informally

---

[1] The *Monitoring Law Enforcement Consent Decrees: An Introduction and Starter Toolkit* ("Monitoring Toolkit") provides this grading scale as an example of how monitors can summarize or characterize work in progress. Matthew Barge et al., *Monitoring Law Enforcement Consent Decrees: An Introduction and Starter Toolkit* 86 (2024).

[2] The Third Semiannual Report also included an "Evaluation Deferred" category. The Monitoring Team retired this category in the Tenth Semiannual Report. (*See* 10th Semiannual Report at PageID 8193, ECF No. 386.)

discussing the City's progress using the format outlined in its Third Semiannual Report. It is only to the most recent report, the Sixteenth Semiannual (ECF No. 597), that the City now objects on the grounds it was not provided the methodology and data to support the Monitor's conclusions. (First Motion at PageID 13884.) Moreover, its objections pertain solely to those sections where the Monitor did not adopt the rating advocated for by the City, or where the Monitor reduced a rating. For example, in the Use of Force summary, the Monitor upgraded Paragraphs 122 and 128, but left all others unchanged. (16th Semiannual Report at PageID 13952.) The City did not ask for methodology or data supporting the Monitor's decision to upgrade these paragraphs, but did request such information for Paragraphs 116, 121, and 126, which the Monitor did not change, but the City thought should be upgraded. (*Id. See also* First Motion at PageID 13884, Ex. 2 at PageID 13904.) The same pattern appears in the Accountability section of the report where the City only requested data for the unchanged or downgraded paragraphs, but not for those the Monitor upgraded. (16th Semiannual Report at PageID 13954; First Motion at PageID 13884.) Such selectivity, it appears, pertains more to the City's objections to the Monitor's ratings, than to the City's instant complaint about missing methodology and data. But the proper mechanism for making those objections is while the report is being written, not through motions to enforce. Indeed, Paragraph 376 requires the Monitor to give the Parties 15 days to review and comment on the draft semiannual report, and the Monitor must consider the Parties' responses and make appropriate changes, if any, before issuing the report.[3] (Modified Agreement at PageID 11677.)

---

[3] To the extent that the City raises issues pertaining to the Monitor's late delivery of draft semiannual reports for the Parties' review, the court encourages the Monitor to remain cognizant of the Agreement's timelines. If additional time is needed, the Monitor should work with the Parties to establish a schedule which provides for sufficient time to respond to the draft report.

Furthermore, the Monitoring Toolkit acknowledges that formal compliance reviews and outcome assessments requiring transparent methodology, "does not preclude a monitor from making ongoing characterizations of progress in reports, court hearings, or discussions with community members." Barge, *supra* at 112. Such characterizations do not replace formal compliance reviews or outcome assessments, but a Monitor should detail the basis for its impressions and conclusions–i.e., "that they are based on day-to-day interactions and not any systematic analysis of data or structured review across time." *Id.* Here, the Monitor does detail the basis for its conclusions and informal ratings in the Sixteenth Semiannual Report, and makes clear to the City and other Consent Decree stakeholders that the ratings, "do not take the place of these more structured, systemic analyses." (16th Semiannual Report at PageID 13948, ECF No. 597-1.) Accordingly, the court concludes that the Monitor's Sixteenth Semiannual Report complies with Paragraph 375's requirements, and therefore denies the City's First Motion to Enforce.

**B.      Second Motion to Enforce**

In its Second Motion to Enforce, the City argues that the Monitor's March 7, 2025 memorandum titled, "Monitor Review of City of Cleveland Process for Reporting, Investigating, and Adjudicating Internal Reports of Misconduct" (the "Review") is a compliance review triggering Paragraph 371.[4] The Review implicates Paragraph 371, the City asserts, because the Monitor cites

---

[4] Paragraph 371 provides, in relevant part that, "[a]t least 90 days prior to the initiation of any outcome measure assessment, compliance review, or audit, the Monitor will submit a proposed methodology for the assessment, review, or audit to the Parties." (Modified Agreement at PageID 11675, ECF No. 502-1.)

Paragraph 360[5] as its authority, the Review's purpose aligns with the Agreement's description of a compliance review, and the Agreement only authorizes the Monitor to analyze the City's compliance through the mechanisms listed in Paragraph 360. (Second Motion at 14018-20, ECF No. 600.)

The Monitor contends that the Agreement provides it "with a range of methods to fully exercise its authority in reviewing the City's efforts to achieve compliance," and not all require the Monitor to present and negotiate with the Parties a formal methodology. (Notice to Second Motion at PageID 14088–89, ECF No. 609.) With regard to the Review described in its March 7 memorandum, the Monitor argues it is not a "compliance review" triggering Paragraph 371 because the substance of the request does not align with the characteristics of the type of compliance review requiring Paragraph 371 methodology. (*Id.* at PageID 14092.) Instead, the request is responsive to the Community Police Commission's ("CPC") information release showing that misconduct cases may be in the hands of the City's Human Resources ("HR") Department, rather than with Internal Affairs as directed by Paragraph 177 and CDP policy 1.07.05. (*Id.*) Thus, the request for documents and interviews helps the Monitor "more fully understand the policies and practices of the Cleveland Division of Police and the City in accepting, investigating, and adjudicating [internal misconduct] cases." (*Id.*) The United States appears to agree with the Monitor, stating in its Response that the City's Second Motion is "moot because the Monitor has conceded that its planned assessment 'is [n]ot a Compliance Review' within the meaning of Paragraph 360, thus Paragraph 371 does not

---

[5] Paragraph 360 provides, in relevant part that, [t]he Monitor will conduct reviews or audits as necessary to determine whether the City and CDP have complied with the requirements of this Agreement. Compliance requires that the City and CDP: (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice. (*Id.* at PageID 11669.)

require a methodology." (Gov't Resp. at 14165.)

The court agrees with the Monitor that the Agreement does not strictly limit its authority to review the City's work toward compliance to only those techniques requiring methodology pursuant to Paragraph 371. First, Paragraph 352 under the Role of the Independent Monitor subsection provides two categories of reviews the Monitor conducts "[i]n order to assess and report on CDP's implementation of this Agreement and whether the goals of this Agreement are being achieved[.]" (Modified Agreement at PageID 11667.) One is the "reviews specified in this Agreement," and the other requires the Monitor to "review CDP policies, procedures, practices, training curricula, and programs developed and implemented under this Agreement." (*Id.*) Indeed, the Monitor's proposed "Review of City of Cleveland Process for Reporting, Investigating, and Adjudicating Internal Reports of Misconduct" by its plain language fits neatly into the second category of reviews articulated in Paragraph 352. Furthermore, the March 7 memorandum notifying the City of the review explains how the review will be conducted, and what the Monitor plans to do after the review—specifically, produce a report of its findings and recommendations. (Second Motion, Ex. 2 at PageID 14028.) In fact, Paragraph 372 contemplates the Monitor making such recommendations. (Modified Agreement at PageID 11675.)

Second, the Monitor's proposed Review and report is similar to others that responded to specific incidents and were produced by the Monitor without invoking Paragraph 371. In 2020, the Monitor notified the Parties and the court of its intention to review the CDP's preparedness, response, and after-action activities related to planned and unplanned protests that occurred after the killing of George Floyd. (*See* ECF Nos. 315, 331.) As part of its notice, the Monitor attached a memorandum detailing the scope of its review, the documents needed from the City to complete it,

and the rationale for it. (ECF No. 315-1 at PageID 6851.) The findings and recommendations of this incident-specific review were released as part of the Monitor's Ninth Semiannual Report (ECF No. 345) and later responded to by the City (ECF No. 346). Notably, the Monitor's "methodology" for this review appears to have been solely developed by the Monitoring team, a position the Parties did not challenge. (9th Semiannual Report at PageID 7301.) Although the Parties did not challenge how the Monitor conducted the review or its authority to do so, the City was still able to share with the Monitor and the court where it agreed and disagreed with the Monitor's findings and recommendations. (Resp. to 9th Semiannual Report at PageID 7509-15, ECF No. 346.)

This exchange of evaluations between the Monitor and City related to specific incidents implicating many parts of the Consent Decree was repeated in 2021 when the Monitor reviewed the processes used by the City agencies responsible for conducting administrative investigations of a police pursuit that ended with the death of Tamia Chapman. (*See* ECF Nos. 396, 397.) Like the 2020 review related to the George Floyd protests, this review's "methodology" appears solely developed by the Monitoring team. (ECF No. 396 at Page 3.) Even so, the City timely filed a Response to the Monitor's review discussing where it disagreed and why. (ECF No. 397.)

Lastly, the City and Monitor exchanged evaluations in 2022 and 2023 pertaining to an officer involved shooting that occurred on July 20, 2020. (ECF No. 475.) Through these reviews, the Monitor and City communicated their respective positions on the incident, how the City's relevant agencies responded, and how their findings affected the City's compliance status with certain Agreement requirements. Like the two reviews before it, it appears Paragraph 371 was not implicated despite the term "review" being used to describe what the Monitor's activities were

following the specific incident.[6]

The instant proposed Review is a response to a specific incident—namely, that despite CDP policy and Paragraph 177 requiring Internal Affairs to "conduct objective, comprehensive, and timely investigations of all internal allegations of officer misconduct," it appears such allegations were directed to the City's HR Department. (Second Motion, Ex. 2 at PageID 14026.) Moreover, the way in which the Monitor plans to conduct the review mirrors the methods employed in prior incident-specific reviews. (*Compare Id.* at PageID 14027 with 9th Semiannual Report at PageID 7301.) Accordingly, prior practice by the Monitor and City indicates the Monitor can conduct the proposed review without implicating Paragraph 371.

The court concludes that the Agreement does allow the Monitor to conduct the type of incident-specific review proposed in its March 7 memorandum without triggering Paragraph 371. This finding does not give the Monitor carte blanche to request information or evaluate procedures and processes undertaken by the City and CDP without explanation or clear goals. In this case, the Monitor provided a sufficient explanation for the data request, clearly articulated how it would conduct the review, and how the review would allow the Monitor to determine any recommended next steps. (*See* Second Motion, Ex. 2 at PageID 14027–28.) Thus, the court denies the City's Second Motion to Enforce.

### III. CONCLUSION

---

[6] The Monitoring Toolkit anticipates the Monitor conducting incident-specific reviews when a critical incident occurs during the consent decree. The Toolkit acknowledges that, "[d]epending on the nature of the critical incident, it may be necessary or useful for the monitoring team to report (e.g.. in a court hearing, via a special or standalone written report, or as part of a regular monitoring report) on their observations or findings related to a particular incident." Barge, *supra* at 82–83.

For the foregoing reasons, the court denies the City's Motions to Enforce (ECF Nos. 569, 600.) The court appreciates the City's desire to demonstrate its compliance with the many requirements of the Consent Decree. As the 2025 Monitoring Plan (ECF No. 590) indicates, the Parties and Monitor have agreed to conduct or prepare to conduct nine comprehensive compliance assessments covering paragraphs under the Search and Seizure, Crisis Intervention, Use of Force, Officer Assistance and Support, and Community and Problem Oriented Policing sections. (2025 Monitoring Plan at PageID 13820–21, ECF No. 590-1.) The Plan also includes time for the Parties and Monitor to develop the necessary methodology for each compliance assessment. (*Id.*)

Completing all of these comprehensive assessments requires focus from the Parties and Monitor. Unfortunately, the instant Motions to Enforce, along with the City's prior objections to the Monitor's invoices—most of which the court overruled last month (*see* ECF No. 606)—and the City's withholding of documents and data requested by the CPC and Office of Professional Standards in late 2023 to mid-2024, have amounted to time-consuming distractions. Whatever the motivation, this conduct stifles progress toward the goal of substantial and effective compliance, which is the same goal the Parties have had since day 1. Hopefully, we may all being the second-half of 2025 with an eye toward cooperation, and a renewed sense of purpose of ensuring constitutional policing in Cleveland.

IT IS SO ORDERED.

> */s/ SOLOMON OLIVER, JR.*
> UNITED STATES DISTRICT JUDGE

June 3, 2025