Cleveland Division of Police Consent Decree Monitoring Team

# 2025 CRISIS INTERVENTION ASSESSMENT

September 26, 2025

**TABLE OF CONTENTS**

**I. EXECUTIVE SUMMARY .......... 3**
- **A. Summary of Findings .......... 3**

**II. SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW .......... 4**
- **A. Scope of Review .......... 4**
- **B. Methodology .......... 4**
- **C. Standard of Review .......... 5**

**III. Crisis Intervention Assessment Findings .......... 10**
- **● Data Sources .......... 30**

# I. EXECUTIVE SUMMARY

Paragraphs 131 to 159 and 367(b) of the Consent Decree outline the requirements relating to Cleveland Division of Police's ("CDP") Crisis Intervention Program ("CIP"), crisis data collection, analysis, and reporting. The Monitoring Team conducted a Compliance Assessment to determine compliance with the Consent Decree's goals of improving the CDP CIP in assisting individuals in crisis, improving the safety of the community, promoting community solutions to assist individuals with mental illness, reducing the need for individuals with mental illness to have further involvement with the criminal justice system, and providing a forum for the effective problem solving regarding the interaction between the criminal justice and mental health care system (CD ¶¶ 131-159, 367(b)). To carry out this assessment, the Monitoring Team conducted case study reviews of responses to CDP and crisis events, audited training data, reviewed Specialized Crisis Intervention ("SCIT") recruitment and selection processes, and analyzed other documentation related to CDP's CIP.

## A. Summary of Findings

The Monitoring Team's first comprehensive Crisis Intervention Compliance Assessment finds that the Cleveland Division of Police (CDP) has achieved General or Substantial and Effective Compliance across all Crisis Intervention Team (CIT) related paragraphs of the Consent Decree (¶¶ 131-159, 367(b)). Through systematic review of 111 crisis intervention incidents from 2023, examination of training curricula, and evaluation of policy implementation, the Monitoring Team determined that CDP has successfully established a robust crisis intervention program that meets or exceeds the foundational requirements established in the Consent Decree. The Mental Health Response Advisory Committee has functioned effectively as a collaborative forum between police, community stakeholders, and mental health providers, while the Crisis Intervention Coordinator has demonstrated strong leadership in program implementation and community engagement.

The assessment reveals no serious gaps in CIT training or policy development. CDP's crisis intervention training curricula for all officers, recruits, specialized CIT officers, and telecommunications personnel have been developed collaboratively with community partners and approved by all parties and the court. The 40-hour specialized CIT officer training and the comprehensive telecommunications training programs represent best practices in the field and have been recognized as national models. Policy development has been thorough and responsive to community input, with clear guidance on crisis response protocols, officer discretion in diverting individuals to healthcare rather than criminal justice systems, and appropriate deployment of specialized resources.

The Monitoring Team strongly approves of both the direction and current strength of CDP's CIT program. The program demonstrates sustained commitment to continuous improvement, with regular data analysis informing training modifications and operational adjustments. Officers

consistently demonstrate appropriate de-escalation techniques, calm demeanor, and professional conduct when responding to individuals in crisis. The extremely low rates of arrest (1.5-2.1%) and use of force (0.32-0.42%) in crisis incidents, combined with high rates of hospital transport (85.5%), indicate that the program successfully achieves its core goals of connecting individuals to appropriate care while minimizing criminal justice involvement.

## II. SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW

### A. Scope of Review

The Monitoring Team reviewed CDP's compliance, between January 1, 2023 and December 31, 2023, with Crisis Intervention Paragraphs 131 to 159 and 367(b) of the Consent Decree. This represents the Monitoring Team's first formal and comprehensive assessment completed in the area of Crisis Intervention.

### B. Methodology

#### 1. Case Study Reviews

To assess compliance with Crisis Intervention paragraphs of the Consent Decree, generally, and the specific provisions of Paragraphs 135, 143, 151, 157, and 367(b), the Monitoring Team reviewed a random sample of 111 Computer-Aided Dispatch ("CAD") calls across seven specific call types.

The random sample was drawn from CAD calls dated January 1, 2023 – December 31, 2023 with a disposition code of "dispatched and arrived" entered into CDP's CAD system and with one of the following call types: (1) crisis intervention – nonviolent; (2) crisis intervention – violent; (3) mental – nonviolent; (4) mental – violent; (5) suicide threats; (6) suicide in progress; or (7) serve probate.[1] Calls were selected through a simple random sampling in which every call was numbered sequentially and a random selection process was applied. Review of these calls included review of wearable camera system ("WCS") footage, CAD, Brazos and LERMS[2] call and reporting data, and any other related CIT or incident reports available for each of the events. The Monitoring Team utilized the survey instrument attached as **Appendix A** to assess CDP's response to each behavioral crisis call for service.

[1] The "mental – nonviolent" and "mental – violent" call types were replaced in 2023 with the "crisis intervention – nonviolent" and "crisis intervention – violent" call types.

[2] Brazos and LERMS are third-party applications used by CDP to collect data regarding calls for service and incidents. LERMS is the department's regular report management system. Brazos is a separate system for the collection of more detailed data for specific incidents, including CIT incidents.

After a review of each call, Monitoring Team subject matter experts assessed whether the goals of the CIP were achieved in the field. These goals include, among other things, the ability to:

1. assist and respond appropriately to individuals in crisis;
2. de-escalate crises and reduce the unnecessary use of force;
3. conduct a field evaluation;
4. improve the safety of patrol officers and individuals in crisis and their families;
5. promote community solutions to assist individuals with mental illness; and
6. reduce the need for individuals with mental illness to have further involvement with the criminal justice system.

2. Data and Documentation Audit

The Monitoring Team reviewed training curriculum and associated data, the CIT Coordinator's records, and documentation pertaining to recruitment and selection of SCIT officers in order to assess compliance with Paragraphs 137-150. With respect to officer applications for the CIT program, the Monitoring Team's analysis focused on completeness, thoroughness, and suitability, based on a random sample of 10% of all SCIT officer applications from January 1, 2023 – December 31, 2023 (i.e., reviewers assessed if all requisite components were included in the application, if the questions were fully addressed, and whether recommendations, complaints, force history and other application contents reflected suitability for the SCIT role).

## C. Standard of Review

Pursuant to Consent Decree Paragraphs 360, 367, the Monitoring Team must conduct qualitative and quantitative Compliance Assessments to determine the extent to which the City and CDP have complied with the requirements of the Consent Decree resulting in constitutional policing.

This Crisis Intervention Compliance Assessment includes a review of Paragraphs 131 to 159 of the Consent Decree. Every provision in this area has been given a Compliance Grade from 0 to 6, with 0 indicating that the City/CDP has not yet begun working on the provision and 6 indicating that the City/CDP has achieved substantial and effective compliance with that provision. Although Compliance Assessments draw upon information and evidence gathered during semiannual reports,[3] they represent a much more detailed and specific analysis completed by numerous Subject

[3] The Monitoring Team regularly evaluates compliance with sections of the Consent Decree throughout the year and communicates its observations, assessments, and findings twice each year through its semiannual reports (¶¶ 360, 375). These compliance reviews consider the totality of evidence presented and observed with respect to each provision of the Consent Decree, including review of policies and annual reports, interviews and meetings with the City and CDP as well as Cleveland community groups, and observation of trainings and internal meetings.

Matter Experts ("SMEs") on the Monitoring Team who have evaluated calls for service, data, reports, records, documents, and video/images associated with the assessment. The Monitoring Team has utilized the Compliance Grading system (detailed below), recognizing that the ultimate goal is for the City and CDP to achieve substantial and effective compliance for each provision.

In order to incorporate and build upon prior semiannual compliance reviews and reports, the Monitoring Team reviewed the four most recent semiannual reports published prior to the commencement of the Crisis Intervention Compliance Assessment.; here, the Tenth, Eleventh, Twelfth, and Thirteenth Semiannual Reports. Any provision that had been graded "general compliance" for more than two years (i.e., four consecutive reports) was presumptively considered in substantial and effective compliance. For any such provision, the purpose of the Monitoring Team's Compliance Assessment was to validate this rating. Once validated as substantially and effectively compliant, further reassessments of that provision will not be incorporated into future Crisis Intervention Compliance Assessments, although the Monitoring Team will continue to review and report on those provisions in its semiannual reports. If those reviews or reports suggest a downgraded change in status at any point, the provision will once again be incorporated into future Compliance Assessments. As part of a Compliance Assessment, the Monitoring Team may assign a score for an individual provision that is lower than the score given in a prior semiannual report, if appropriate to do so.

1. Determining Compliance Status

Crisis Intervention SMEs reviewed data, records, and documents pertaining to each CIT-related Consent Decree provision. Following this review and analysis, the SMEs compared findings and collectively award Compliance Grades using the following framework:

| Grade | Definition |
|---|---|
| **0** | **Non-Compliant, Not Started**: The City/CDP has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City/CDP's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement. |
| **1** | **Partial Compliance, Not Assessed:** The City/CDP has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/CDP's progress in implementation.[4] |
| **2** | **Partial Compliance, Planning/Policy Phase:** The City and/or CDP has made sufficient initial strides or sufficient partial progress toward compliance with key components of the provision of the Consent Decree pertaining to drafting or creating |

[4] All CIT-related provisions (¶¶ 131-159; 367(b)) were assessed as part of the Crisis Interventional Compliance Assessment.

| | |
|---|---|
| | policies, processes, protocols, trainings, systems, or the like that exist on paper but do not exist or function in day-to-day practice. |
| **3** | **Partial Compliance, Implementation Phase:** The City and/or CDP has made sufficient initial strides or sufficient partial progress toward compliance with key components of the provision of the Consent Decree pertaining to initiating training and implementing systems intended to affect day-to-day practice, but that the Monitoring Team has not yet observed in practice. It may capture a wide range of compliance states or performance, from the City or CDP having taken only very limited steps toward operational compliance to being nearly in operational compliance. |
| **4** | **Operational Compliance:** The City and/or CDP has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Consent Decree such that it is in existence or practice operationally—but has not yet demonstrated, or has not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner. Operational compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |
| **5** | **General Compliance:** The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented such that the Monitoring Team will begin tolling according to Consent Decree ¶ 401. This includes instances where it can be shown that the City or CDP has effectively complied with a requirement fully and systemically. General compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |
| **6** | **Substantial and Effective Compliance:** The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents in accordance with Consent Decree ¶ 370 or ¶ 401. This includes instances where it can be shown that the City/CDP has effectively complied with a requirement fully and systemically. Substantial and effective compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |

Additionally, the Monitoring Team recognizes that much of the City and CDP's work includes systemic changes implemented over a long-term trajectory. As such, the Monitoring Team has incorporated the following considerations more appropriate for work that is ongoing, which will

advance or ebb over time, into its Compliance Assessment:

- **The quality of the City/CDP's performance across a material span of time.** Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer. Instead, it requires that the City/CDP adhere to Consent Decree requirements across a material span of time, number and/or portion of incidents, and number of officers. In this way, neither isolated compliance nor isolated non-compliance is determinative. The issue is whether, across time, events, and people, the City/CDP is, in aggregate, sufficiently accomplishing that which the Consent Decree requires. For some requirements that are applicable to only a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

- **The severity or significance of deviations from Consent Decree requirements, City/CDP policy, and/or law.** Where there is deviation in compliance, the Monitoring Team considers the severity or significance of that deviation. Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field. Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

- **The extent to which the City/CDP has identified and appropriately addressed deviations.** In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within the City/CDP, the Consent Decree expressly contemplates that there be mechanisms to engage with and correct deficient departmental and officer performance. When personnel have deviated from policy, law, or Consent Decree requirements, the Monitoring Team reviews whether the City/CDP has identified the deviation and, if so, if it has appropriately addressed the issue.

- **The City/CDP's progress over time.** Where possible, the Monitoring Team aims to situate its evaluation of the City/CDP's performance in terms of progress over time. Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.[5]

[5] Barge, M., Friedman, B., McGough, M., Monitoring Law Enforcement Consent Decrees: An Introduction and Starter Toolkit. 2024 at pp. 91-99, https://bja.ojp.gov/library/publications/monitoring-law-enforcement-consent-decrees-introduction-starter-toolkit.

The Monitoring Team notes that Courts regularly apply multi-factor tests where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or implicate competing considerations.[6] Such multi-factor tests are "objective" as they require clear explanations as to "how they derived their conclusions from the verifiable facts."[7]

As explained above, the Monitoring Team's Compliance Assessments consider a range of factors, as well as both quantitative and qualitative measures for each provision. Where quantitative metrics are appropriate for assessing the City/CDP's performance, the Monitoring Team will consider a compliance rate of 85% or above as "passing" for this Compliance Assessment. Where there is a relatively small number of incidents for review, or where the analysis requires different, more qualitative considerations, the Monitoring Team may set different expectations to be considered passing. The result is that each provision is graded upon a range of measures, and the Monitoring Team's rating of the City/CDP's performance is balanced against the severity of any deviations, the response to such violations, and progress over time.

Compliance Assessments are not only about policy—they are fundamentally about *performance* and *adherence* to policy. Accordingly, to sustain "substantial and effective" compliance pursuant to Paragraph 397, the City/CDP must demonstrate not only that it has adopted the pertinent policies, but also that its personnel, including officers, consistently comply with those policies. The multi-factor test for compliance set forth above works to ensure that all relevant objective factors are reasonably weighed and the Monitoring Team's ratings are clearly conveyed.

---

[6] *See, e.g.*, *Murr v. Wisconsin*, 582 U.S. 383 (2017) (adopting a multi-factor test for determining whether governmental regulations effectuated a decline in the value of private property so as to be considered a government taking under the Fifth Amendment); *EBay v. MercExchange*, 547 U.S. 388 (2006) (applying four-factor test to determinations about permanent injunctive relief in disputes arising under the Patent Act); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (articulating three factors for courts to consider when determining whether additional governmental and/or judicial procedures are necessary to satisfy the Due Process Clause).

[7] James G. Wilson, "Surveying the 'Forms of Doctrine' on the Bright Line Balancing Test Continuum," 27 *Ariz. St. L.J.* 773, 802 (1995).

## III. Crisis Intervention Assessment Findings

| CONSENT DECREE PARAGRAPH | | RATING |
| --- | --- | --- |
| **Program Goals and Advisory Committee** | | |
| 131 | CDP will build upon and improve its Crisis Intervention Program with the goal of: (a) assisting individuals in crisis; (b) improving the safety of officers, consumers, family members, and others within the community; (c) providing the foundation necessary to promote community and statewide solutions to assist individuals with mental illness; and (d) reducing the need for individuals with mental illness to have further involvement with the criminal justice system. The Crisis Intervention Program will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health care system and create a context for sustainable change. | **General Compliance 5** |
| 132 | Within 180 days of the Effective Date, CDP and the City will ensure that a Mental Health Response Advisory Committee ("Advisory Committee") is developed to foster relationships and build support between the police, the community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis. | **Substantial & Effective 6*[8]** |
| 133 | The Advisory Committee will include the Crisis Intervention Coordinator and representation from specialized CIT officers. CDP also will seek representation from the Cleveland Municipal Court's Mental Health Docket, the Ohio Criminal Justice Coordinating Center of Excellence, Cuyahoga County's Alcohol, Drug Addiction, and Mental Health Services Board ("ADAMHS Board"), FrontLine Services, and any other relevant Cuyahoga County mental health organizations, such as advocacy organizations, homeless service providers, area hospitals, and interested community members. | **Substantial & Effective 6*** |
| 134 | The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program. | **Substantial & Effective 6*** |
| 135 | On an annual basis, the Advisory Committee will conduct an analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers, call-takers, and dispatchers are appropriately responding to people in crisis, and will recommend appropriate changes to policies, procedures, and training regarding police contact with individuals in crisis. | **General Compliance 5** |

[8] An asterisk indicates that the Monitoring Team's Crisis Intervention Compliance Assessment has validated the general compliance ratings of this provision reported in each of the Tenth – Thirteenth Semiannual Reports. *See infra* Section II(C). As such, the Monitoring Team finds these provisions to continue to be in substantial and effective compliance.

| 136 | The Advisory Committee's reports and recommendations will be provided to the Commission, will be publicly available, and will be posted on the City's website. | **Substantial & Effective 6*** |
|---|---|---|

The following is a paragraph-by-paragraph assessment of CDP's implementation of Consent Decree paragraphs 131 – 159, 367(b)(1) and 367(b)2i).

## 1. Paragraph 131 Crisis Intervention Program

Paragraph 131 sets out the goals for the CDP Crisis Intervention program as well as the overall objective of the program to serve as a forum for effective problem solving and creating a mechanism for long-term change. The specific actionable steps needed to provide the structure for meeting the goals and objectives are provided in the next series of paragraphs 132-136.

Anticipating the need for a community response to the Department of Justice initial investigation and the resulting Consent Decree, the local mental health authority (ADAMHS Board) formed a task force to make recommendations for the Consent Decree. The Task Force focused on issues related to training, continued practice, and oversight, and presented their results to the City and DOJ.[9] Additionally, The State of Ohio Criminal Justice Coordinating Center of Excellence ("CJCCOE") conducted a voluntary CIT Peer Review and presented a number of recommendations which also guided the process of response to the goals and objectives of Paragraph 131.[10] These reports provided guidance for the Advisory Committee steps required by the Consent Decree and resulted in policy, training, and operational changes documented in Paragraph 132 through Paragraph 135. Taken as a whole, this work supports a compliance finding of **General Compliance (5).**

## 2. Paragraph 132 Mental Health Response Advisory Committee

In the Monitoring Team's First Annual Report, it was noted that Advisory Committee partnership would serve as a foundation of an integrated system to meet the real-time needs of individuals experiencing a behavioral crisis.[11] This partnership was formalized in a Memorandum of Understanding between the ADAMHS Board, the City of Cleveland and the CDP.[12] In recent years, the formal management of the Advisory Committee was undertaken by the City of Cleveland Department of Public Health with the participation of the ADAMHS Board. The

---

[9] Alcohol, Drug Addiction and Mental Health Service Board of Cuyahoga County Mental Health Task Force, "Mental Health Task Force Recommendations for the Consent Decree Between the US Department of Justice and the City of Cleveland Division of Police," 1-5 (March 2015).

[10] Woody M, Futo J, and Lilley P, Criminal Justice Coordinating Center of Excellence, "Cleveland Division of Police CIT Peer Re view" (Apr. 2015) at 1-13.

[11] Cleveland Monitoring Team, First Semiannual Report, June, 2016. First+Semiannual+Report--2016-06-02--FOR+RELEASE.pdf

[12] Memorandum of Understanding between the City of Cleveland Department of Public Safety and The Alcohol, Drug Addiction and Mental Health Services Board of Cuyahoga County 1–4 (Sept. 2015).

Advisory Board has stood the test of time, providing policy, training and recommendations based on the data analytics for the entire period of the Consent Decree. The ADAMHS Board and the City Department of Public Health have provided on-going annual reports[13], and a working subcommittee structure resulting in review and approval by CDP, the City of Cleveland, the US Department of Justice, the Monitoring Team, and the Federal Court. Since the Advisory Committee has served as a forum building support between the police, the community, and mental health providers, these results support a rating of **Substantial and Effective Compliance (6).**

### 3. Paragraph 133 Advisory Committee Representation

The Monitoring Team's First Semiannual Report noted the Advisory Committee had over fifty members representing the Cleveland community. These included representatives from the Cleveland Municipal Court's Mental Health Docket, Front Line Services, the Ohio Criminal Justice Coordinating Center for Excellence, and individuals with lived experience. The Mental Health Advisory Committee currently has over 50 members representing Cleveland's judiciary, social service providers, mental health specialists, CDP personnel, and crisis intervention experts, an array of mental and behavioral health social service providers, advocates, and individuals with lived experience. The diversity of membership supports the recommended compliance finding as **Substantial and Effective Compliance (6).**

### 4. Paragraph 134 Advisory Committee Meeting

The First Monitoring Semiannual Report noted that the Advisory Committee conducted numerous formal meetings, as well as a day-long retreat to develop a structure and working relationships. The Advisory committee met regularly since 2015. A review of the history of the Advisory Committee (Mental Health Response Advisory Committee – MHRAC) was developed for the 2023 MHRAC Annual Report.[14] The on-going meetings and functions of the Advisory Committee warrant a compliance finding of **Substantial and Effective Compliance (6).**

### 5. Paragraph 135 Advisory Committee Analysis and Recommendations

This paragraph addresses two issue areas. First, it addresses general issues related to crisis intervention incidents and the need to recommend appropriate changes to policies, procedures, and training. Next, the paragraph addresses specific issues related to the specialized CIT Program such as the complement and deployment of specialized CIT officers.

The Advisory Committee (MHRAC) working with CDP has responded to the general issues in this paragraph in a number of ways to meet the requirements of the Consent Decree. Given the

---

[13] Mental Health Response Advisory Annual Report 2024 https://clevelandhealth.org/assets/documents/health/MHRAC/MHRAC_2024_Annual_Report.pdf

[14] City of Cleveland Public Health. The Cleveland Division of Police Mental Health Advisory Committee Annual Report 2023 https://www.clevelandhealth.org/MHRAC/

role of the advisory group as a body without formal funding or permanent staffing, preliminary analysis of available CDP Data was provided by the ADAMHS Board and volunteer members. MHRAC formed volunteer subcommittees (Policy, Data, Training and Quality Assurance) to provide review and advice to CDP on appropriate changes to policies, procedures, and training regarding police contact with individuals in crisis. The CDP Crisis Intervention Policies and CDP Trainings were developed based on available feedback concerning the CDP crisis intervention program at the time with significant input by MHRAC (see Paragraph 131, footnotes 8 & 9).

As CDP developed improved electronic data collection capacity and corresponding data analytic capability, MHRAC relied on CDP's Data Division working with Case Western University to provide data analysis of crisis intervention incidents and these data analytics guided broader analysis and useful recommendations. In the initial phase of the Consent Decree work, MHRAC worked with CDP to completely revise the department's crisis intervention policies and then the crisis intervention training for all officers, specialized CIT officers, and communications staff.

The policies and training were developed through several drafts that involved the community at large, reviewed and accepted by CDP, and then approved by DOJ, the Monitoring Team, and the Court. This MHRAC and CDP work continued with a second revision of the Crisis Intervention policy and on-going crisis intervention training (See Paragraphs 142-145 and Paragraphs 154-156).

As CDP automated reporting, the work shifted to target items such as the specific re-deployment of officers and the complement of CIT officers. These issues became part of the work on the specialized crisis intervention plan (see Paragraph 152). However, the work accomplished in revising the specialized crisis intervention plan was done in cooperation with the ADAMHS Board and MHRAC through the permanent ADAMHS Board staff as well as the volunteer MHRAC subject matter experts. As QA issues became even more focused, the execution of recommendations for improvement became the responsibility of both CDP and ADAMHS Board staff (see Paragraph 140). In addressing the more specific parts of Pargagraph 135, the Cleveland Division of Police has conducted an analysis of crisis intervention incidents to evaluate the deployment of CIT officers. This same information is also part of the requirements for Paragraph 152. This analysis was first completed in 2017, approved by the parties, and submitted to the court by the Monitoring Team. The analysis has been revised several times and is now part of a report submitted regularly and presented to MHRAC at large and the Parties' CIT Compliance Work Group.[15] Each report recommends changes in communications policy, deployment of CIT officers, and recruitment, as necessary. The analysis and recommendations have resulted in improvements in CIT officer recruitment and deployment.

[15] Acting Captain Mullin & Sgt. Brown, Cleveland Division of Police Specialized Crisis Intervention Plan. June 2025.

The general parts of Paragraph 135 items addressed QA meetings include items such as the recommendations for training to reduce reliance on police services on the part of several social service agencies, the need to improve intervention strategies for specific individuals, better understand of ethnic and racial issues in police crisis intervention events, as well as the importance of department assistance in asset mapping, prioritization, and program development with behavioral health agencies. This work has continued with the recent revitalization of the QA Subcommittee as the Data and Growth Subcommittee, The MHRAC work to use data to advise CDP in areas such as general crisis intervention strategies has been captured in the MHRAC annual reports and on-going committee notes and in the confidential informal case reports to the Monitoring Team throughout the period of the Consent Decree. Overall, the MHRAC (Advisory Committee) work to provide advice on the general crisis intervention issues in order to improve the CDP response as well as the MHRAC review of more specific issues such as those covered in the CDP specialized crisis intervention plans support a recommendation of **General Compliance (5).**

### 6. Paragraph 136 Advisory Committee Reports Availability

The advisory committee's reports and recommendations are publicly available through the ADAMHS website[16] (prior to 2023) and the City of Cleveland Department of Public Health website[17] (starting with 2023). Given the on-going public availability, the Monitoring Team recommends a compliance finding of **Substantial and Effective Compliance (6).**

| | **Crisis Intervention Coordinator** | |
|---|---|---|
| 137 | Within 180 days of the Effective Date, CDP will designate an officer, at the rank of captain or above, to act as a Crisis Intervention Coordinator to better facilitate communication between CDP and members of the mental health community and to increase the effectiveness of CDP's Crisis Intervention Program | **Substantial & Effective 6*** |
| 138 | The Coordinator will develop and maintain partnerships with program stakeholders and serve as a point of contact for advocates, individuals, families, caregivers, professionals, and others associated with the mental health community. The Coordinator will be available as a resource at all times during normal business hours | **Substantial & Effective 6*** |
| 139 | The Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, calltakers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program. | **Substantial & Effective 6*** |

[16] ADMMHS website: https://www.adamhscc.org/about-us/current-initiatives/task-forces-and-coalitions/mental-health-response-advisory-committee-mhrac/mhrac-annual-reports

[17] City of Cleveland Department of Public Health website: https://www.clevelandhealth.org/MHRAC/

| | | |
|---|---|---|
| 140 | The Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate. | **General Compliance 5** |
| 141 | The Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers. The Coordinator also will be required to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT related calls. | **General Compliance 5** |
| 142 | The Coordinator will create ways to recognize and honor specialized CIT officers, calltakers, and dispatchers, where appropriate | **General Compliance 5** |

### 7. Paragraph 137 Crisis Intervention Coordinator

The Monitoring Team's First Semiannual Report noted "CDP moved quickly to comply with this provision." Captain James Purcell's efforts on crisis intervention issues assisted the Division in fully integrating the Advisory Committee structure. Captain Purcell served with distinction before his premature death due to cancer. The current CIT Officer of the Year Award is named in his honor. In 2023, Lt. Mullin was appointed to the role. Given his time-at-rank, the division was not able to promote him to Captain but appointed him as an Acting Captain. Lt. Mullin's chain of command is the same as if he were a Captain and he has an experienced sergeant directly reporting to him. His appointment was discussed with the Parties and the Monitoring Team. His performance meets or exceeds previous captains or higher ranks appointed to the position. His work to increase the effectiveness of CDP's Crisis Intervention Program was highlighted in the MHRAC 2024 Annual Report.[18] Given his established track record of success since 2023, the Monitoring Team recommends a compliance finding of **Substantial and Effective Compliance (6).**

### 8. Paragraph 138 Coordinator Partnerships

Both Captain Purcell and Acting Captain Mullin (A/Capt.) received recognition for their work to maintain partnerships and service as a point of contact for the CDP's Crisis Intervention Program. Naming the CDP Crisis Intervention Officer of the Year after Captain Purcell and the review of A/Capt. Mullin's work in the MHRAC 2024 Annual Report, and the CIT Accomplishment Reports (2023-2025) speak volumes. This work extends to multiple Cleveland area planning sessions and informational presentations to a wide range of behavioral health and civic organizations. The Monitoring Team recommends a compliance finding of **Substantial and Effective Compliance (6).**

---

[18] City of Cleveland Public Health. The Cleveland Division of Police Mental Health Advisory Committee Annual Report 2024, pages 7-8. https://www.clevelandhealth.org/MHRAC/

**9. Paragraph 139 Coordinator Participation and Soliciting Feedback**

Acting Captain Mullin is a key member and presenter to the Advisory Committee. As noted in the MHRAC 2024 Annual Report, the Coordinator works closely with the Communications Control Section (CCS) and road supervisors. Regular interactions with the Communications Unit and district leadership help monitor calls and identify any emerging issues. This has led to a strategy of CIT Officer and call-takers meetings that has fostered better intra-agency communication. Additionally, Acting Captain Mullin surveys the specialized CIT Officers regarding their response to in-service and view of additional training needs. He has provided a summary of CIT Accomplishments for his tenure of 2023-2025. Such work fulfills the intent behind this Consent Decree Paragraph and warrants a compliance finding of **Substantial and Effective Compliance (6).**

**10. Paragraph 140 Coordinator Implementing Change**

The on-going Quality Assurance function of MHRAC has led to a number of recommendations from the Advisory Committee and community members. Acting Captain Mullin has taken responsibility for implementing change. In conjunction with ADAMHS Training Director, Carole Ballard, Acting Captain Mullin has provided training to several agencies that led to a decrease in their crisis calls to 911. Acting Captain Mullin was an invited speaker to the Cleveland area Community Needs Assessment Summit providing background on the CIT Unit and assisting in asset mapping, prioritization, and program development with behavioral health agencies. He has presented at the Department of Urban Analytics and Innovation Meeting on "Crisis Intervention Behind the Numbers." This work is a critical part of the CDP Crisis Intervention Program and supports a compliance finding of **General Compliance (5).**

**11. Paragraph 141 Coordinator Selection of Specialized CIT Officers**

The Monitoring Team was provided access to all individuals selected for the specialized CIT Training in 2023. Additional records for all individuals selected for classes from 2024 – 2025 were also provided. Training records include the class sign-in sheets, CIT certificates, application forms, interview records, recommendations forms, and disciplinary records. The Monitoring Team reviewed in excess of the planned 10% review of the records and included all records from 2023. A review based on a random selection of over 30% of the 2024 -2025 records was also conducted. The applications form, recommendations and disciplinary records strongly support the appropriateness of the candidates as specialized CIT officers.

It should be noted that the 2023 records for one class in 2023 lacked the interview and disciplinary records. Acting Captain Mullin was not appointed until February of 2023. This class was conducted in March of 2023. It is likely he was not responsible for record keeping for this class since the selection process likely preceded his tenure by several months. Records for both October and December of 2023 were complete as well as the records reviewed for 2024 and 2025.

Consideration should be given to the completeness of the record keeping from the beginning of Acting Captain Mullins' tenure until the present time. It was noted that the Interview Record lacked detail. Despite this note about the Interview Record and the incomplete record from one of three trainings in 2023, the overall record keeping and attention paid to the disciplinary file provide adequate evidence for a compliance finding of **General Compliance (5).**

**12. Paragraph 142 Coordinator Recognition of Specialized CIT officers**

The MHRAC 2024 Annual Report noted a number of awards which recognize specialized CIT officers as well as outstanding work by patrol officers and communications specialists. The CIT Coordinator took responsibility for Blue Team entries for officer awards, the CDP Captain James Purcell Crisis Intervention Award, as well as specific commendations for individual exceptional work on crisis intervention calls. Additionally, CDP Officers have been nominated for the prestigious National Alliance for Mental Illness Officer of the Year. This attention to recognizing CDP officers provides evidence for a compliance finding of **General Compliance (5).**

| **Crisis Intervention Training** | | |
|---|---|---|
| 143 | The City will provide training on responding to individuals in crisis to all of its officers and recruits. Within 365 days of the Effective Date, officers will be provided with at least eight hours of initial training, and all officers will receive annual in-service training thereafter. The initial and annual training will be adequate in quality, quantity, type, and scope, and will include the circumstances in which a specialized CIT officer should be dispatched or consulted and how situations involving individuals in crisis should be addressed if a specialized CIT officer is not immediately available. All new recruits will receive at least 16 hours of training in the academy that meets these same requirements. | **General Compliance 5** |
| 144 | Within 365 days of the Effective Date, and annually thereafter, all CDP call-takers, dispatchers, and their supervisors will receive crisis intervention telecommunicators training that is adequate to enable them to identify, dispatch, and appropriately respond to calls for service that involve individuals in crisis. The training will include identification of individuals in crisis; telephonic suicide intervention; crisis management, de-escalation and scenario-based exercises; interactions with individuals with mental illness; information that should be gathered when the call-taker suspects that the call involves an individual in crisis; and the types of calls that require a specialized CIT response. Any crisis intervention training that already has been provided to call-takers, dispatchers, and their supervisors may be considered to fulfill training requirements under this Agreement for those individuals, if appropriate. | **General Compliance 5** |

## 13. Paragraph 143 Training on Responding to Individuals In Crisis For All Officers and Recruits

The Consent Decree requires that all officers receive at least eight hours of initial training in responding to individuals in crisis and annual training thereafter. CDP submitted to the Monitoring Team a curriculum for providing an eight-hour training for all officers in responding to individuals experiencing a behavioral crisis – including mental health, substance abuse, and other behavioral health challenges. As with all CDP behavioral health training, this curriculum was developed by CDP and the MHRAC Training Subcommittee, reviewed and approved by the MHRAC Committee, US Department of Justice, and the Monitoring Team. In the memorandum to the court, the Monitoring Team noted the curriculum covered the CDP Crisis Intervention Policy and addressed the circumstances in which a specialized CIT officer should be dispatched or consulted and addresses how situations involving individuals in crisis should be addressed if a specialized CIT officer is not immediately available. The Monitoring Team also concluded the curriculum followed best practice strategies concerning effective adult learning and covered a range of new policy directives, which include the role of EMS in the crisis event and crisis resources available to the officer on the scene including the circumstances in which a specialized CIT officer should be dispatched or consulted. The Monitoring Team viewed the curriculum as "exceptionally high-quality" and recommended court approval of the curriculum (May, 2017).

Following the initial approval of the eight-hour curriculum by the court, CDP developed a four-hour annual crisis intervention in-service training for all officers. The number of hours for ensuring crisis intervention in-service was reviewed and approved by all parties and the Monitoring Team. Each of the yearly curricula were developed by CDP and the MHRAC Training Committee, reviewed by the MHRAC Committee, the Department of Justice, and the Monitoring Team. Over the years, additional work to review and approve of the curriculum included the expanding role of the CDP Training Division, the Cleveland Police Commission, the CPC Training Committee, and the City of Cleveland Department of Public Health. The annual in-service training included a review of the CDP Crisis Intervention Policy, data requirements for CDP crisis intervention, requirements of the State of Ohio Emergency Petition process, mental health crisis events involving youth, officer wellness, special populations, homelessness, suicide prevention, autism, trauma-informed care, and behavioral and social service resources. Each time the annual in-service training for all officers was reviewed by the Monitoring Team and approved by the court.

The Consent Decree also requires that new recruits receive at least 16 hours of training in the academy. CDP exceeded that requirement and required a course that was taught over twenty-four hours. CDP presented the use of the State of Ohio Peace Officer Training Commission (OPOTC) course for review by the Mental Health Response Advisory Committee's (MHRAC), the MHRAC Training Subcommittee. The MHRAC Training Subcommittee is comprised of members of the Division, community advocates, individuals with lived experience, as well as mental health,

substance abuse and developmental service providers. The US Department of Justice and the Monitoring Team also reviewed the curriculum. The Monitoring Team noted that the curriculum provides important understanding of basic crisis intervention skills and allows officers to identify and appropriately respond to calls for service that involve individuals experiencing a behavioral crisis. The Monitoring Team submitted the curriculum for Court approval (April, 2022). The curriculum is well respected by experts and regarded as a national model. The Monitoring Team reviews the training roster for officers as well and finds that officers complete the necessary training. CDP's efforts to maintain a high level of CIT training for staff warrant a compliance finding of **General Compliance (5).**

### 14. Paragraph 144 Crisis Intervention Telecommunicators Training

The Consent Decree requires that call-takers, dispatchers, and their supervisors receive crisis intervention telecommunications training. The decree indicates that existing training may be considered to fulfill training requirements. The existing CDP telecommunication training was revised and expanded by CDP and the MHRAC Training Committee and submitted to both the MHRAC Committee and the Department of Justice for review and approval.

The Proposed Curriculum consisted of eight hours of training. The material covered several topics integral to CDP Crisis Intervention Policies. These included an introduction to crisis intervention, facts about mental illness and substance abuse, issues regarding calls from youth, details on suicidal behaviors, trauma informed interviewing, a review of crisis de-escalation practice in using communications skills, self-care for telecommunicators and an examination of community resources for care. The training made novel use of high intensity videos, practical examples of symptoms relevant to behavioral issues, a number of interactive exercises to integrate lecture material with life experiences, scenario-based practice in de-escalation and opportunities to respond to audio tapes of 911 calls. The Monitoring Team concluded the course provided in-depth training for CDP 911 call takers and dispatchers and met the terms of the Consent Decree (January, 2020). The curriculum was updated in 2023. In addition to this training, CDP reserves seats for call takers and dispatchers for each specialized CIT training. To date, 15 dispatchers have completed this additional training. The Monitoring Team finds that the training provided to new call-takers, dispatchers, and their supervisors prepares them to receive crisis intervention telecommunications and a finding of **General Compliance (5).**

| **Specialized Crisis Intervention Trained Officers** | | |
|---|---|---|
| 145 | The City will provide enhanced specialized training in responding to individuals in crisis to certain officers ("specialized CIT officers"). Specialized CIT officers will continue to be assigned to the patrol division and will maintain their standard patrol duties, except when called upon to respond to incidents or calls involving individuals in crisis. | **General Compliance 5** |

| | | |
|---|---|---|
| 146 | The enhanced training for specialized CIT officers will be at least 40 hours. This enhanced training will be adequate in quality, scope, and type and will include how to conduct a field evaluation, suicide intervention, community mental health resources, common mental health diagnoses, the effects of drug and alcohol abuse, perspectives of individuals with mental health issues, family members, the rights of persons with mental illness, civil commitment criteria, crisis de-escalation, and scenario-based exercises. This training must include on-site visitation to mental health and substance abuse facilities and interaction with individuals with mental illness and substance abuse disorders. Officers who are designated as specialized CIT officers who already have received 40 hours of appropriate crisis intervention training may be considered to have fulfilled these training requirements. | **General Compliance 5** |
| 147 | Specialized CIT officers do not have to receive the initial eight hours of training provided to all officers but must receive eight hours of annual in-service crisis intervention training, which can be the same training provided to all officers, if appropriate. | **General Compliance 5** |
| 148 | Training and designation as a specialized CIT officer will be voluntary. To be eligible for consideration, officers must have at least three years of experience as a CDP officer. CDP will provide an in-depth assessment of each applicant to determine the applicant's fitness to serve as a specialized CIT officer. This assessment will include an examination of the officer's written application, supervisory recommendations, disciplinary file, and an in-person interview. Officers with a history of complaints of, or who have been disciplined for, excessive use of force against individuals in crisis will be presumptively ineligible to be specialized CIT officers. | **General Compliance 5** |
| 149 | Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized CIT officers. | **General Compliance 5** |
| 150 | All Field Training Officers will receive the enhanced specialized crisis intervention training described in paragraph 146. Despite having received this training, an FTO will not be designated as a specialized CIT officer unless that FTO has volunteered to be a specialized CIT officer and has been selected by the Coordinator. | **General Compliance 5** |
| 151 | Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene. If a supervisor has assumed responsibility for the scene, the supervisor will seek the input of a specialized CIT officer regarding strategies for resolving the crisis where it is reasonable for them to do so. | **General Compliance 5** |
| 152 | Within 365 days of the Effective Date, the Coordinator will develop an effective specialized crisis intervention plan ("Specialized Crisis Intervention Plan"). The goal of the Specialized Crisis Intervention Plan will be to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis. The Specialized Crisis Intervention Plan will include an assessment of the number of officers necessary to achieve this goal; identification of gaps in coverage of particular shifts or Districts and development of mechanisms to fill those gaps; identification of any | **General Compliance 5** |

| | | |
|---|---|---|
| | barriers to ensuring full coverage and steps to overcome those barriers; and ways to identify qualified officers and to encourage them to apply. CDP will continually review and revise this plan as barriers to full coverage are identified and addressed. The Specialized Crisis Intervention Plan will take into account the seniority provisions of the Collectively Bargaining Agreement and that CDP may not immediately be able to ensure that a specialized CIT officer is available to respond to all calls or incidents that appear to involve an individual in crisis. Within these constraints, the City will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis. The Monitor will assess the Specialized Crisis Intervention Plan and report to the Parties whether it is appropriate and effective, and whether the City is using its best efforts to implement it. | |

### 15. Paragraph 145 Specialized CIT Officers

CDP worked with the MHRAC Policy Subcommittee to develop a policy that would meet the requirements of the Consent Decree from March, 2016 to December, 2016. The policy has undergone minor revisions but retains the original intent. The policy is divided into three parts. The Crisis Intervention Team Program Section (5.11.02) describes the working of the Crisis Intervention Team (CIT). Section V.A.3.c states the specialized CIT Officer will "Handle all crisis incidents assigned or self-identified while also handling standard patrol duties."

Upon review of CIT related calls and regular CIT planning policy documents, the Monitoring finds that CIT specialized officers are consistently assigned to patrol divisions. Based on CDP planning documents, CDP continues to focus on training patrol officers as specialized CIT officers in accordance with Paragraph 145. In addition, CDP offers specialized CIT training to call dispatchers as noted in Paragraph 144. The policy is consistent with the requirements of the Consent Decree and warrants a rating of **General Compliance (5).**[19]

### 16. Paragraph 146 Enhanced Training for Specialized CIT Officers

The Crisis Intervention Team Program Section (5.11.02) describes the working of the Crisis Intervention Team (CIT). Section VI.B. states the enhanced CIT training will consist of a 40-hour training (p.6). The primary version of the 40-hour Training Curriculum was approved by the court in July, 2019. In the memorandum to the court, the Monitoring Team provided a summary of Consent Decree Requirements regarding the Specialized Crisis Team Officer Training. After a comprehensive review of the curriculum, the Monitoring Team concluded "the

[19] Cleveland Division of Policy General Police Order 5.11.02 Crisis Intervention Team Policy https://www.clevelandohio.gov/sites/clevelandohio/files/Public%20Safety/Police/5.11.02%20Crisis%20Intervention%20Team%20Program.pdf

Proposed Training Curriculum meets the terms of the Consent Decree." As a result, the Monitoring Team recommends a rating of **General Compliance (5).**

**17. Paragraph 147 Specialized CIT Officers Annual In-service Crisis Intervention Training**

CDP originally chose to have CIT officers attend the in-service crisis intervention training described in Paragraph 143. In 2023, the department began to provide in-service training for the specialized CIT officers that was responsive to their requests for a more targeted training. The 2023 targeted in-service Training for CIT officers training included OPOTA Effective Communication and Safe Interaction with Persons in Crisis (2.5 hours) and Mental Health Response (1.5 hours). The 2024 training focused on Personality Disorders and the 2025 training focused on Engaging the Elderly Population.

All three training courses were completed by all Specialized CIT officers certified at the time of the workshop. This effort goes beyond the requirements of the Consent Decree and supports a rating of **General Compliance (5).**

**18. Paragraph 148 Designation as a Specialized CIT Officer**

The Crisis Intervention Team Program Section (5.11.02) describes the working of the Crisis Intervention Team (CIT). Section V.A.3.a states the specialized CIT Officer shall be voluntary and section V.A.3.b states they will have a minimum of three years of experience. Additionally, CDP submitted the document titled the "Selection Process for the City of Cleveland Division of Police Specialized Crisis Intervention Team Officers" to the Parties and the Monitoring Team that was approved by the court in August, 2017.

The Monitoring Team reviewed the document and reported to the court that it "complies with the necessary Consent Decree requirements." The document specifically addressed the assessment of each applicant and the factors listed (fitness, written application, supervisory recommendations, disciplinary file, interview, history of complaints and disciplinary for excessive use of force against individuals in crisis). These factors were considered in assessing the CIT officer selection process reported in Paragraph 141 - Coordinator Selection of Specialized CIT Officers. As a result of CDP GPO 5.11.02, the court-approved document on the Selection Process and the review of specialized CIT Officer records for Paragraph 141, the Monitoring Team finds support for a rating of **General Compliance (5).**

**19. Paragraph 149 Supervisor Identification of Qualified Officers**

The CDP GPO 5.11.2 Crisis Intervention Team Program policy states in section III.B.3 that the CIT Plan will include ways of identifying and recruiting qualified Specialized CIT Officers. The original CIT Specialized Plan was submitted to the court after review by the Parties and the Monitoring Team in August, 2017. In the memorandum to the court, the Monitoring Team noted

the Specialized Plan reiterated "the ways to identify appropriate officers for assessment for suitability to be trained as specialized CIT office" and that the document "complied with the necessary Consent Decree requirements." The document itself noted that among other strategies, the CIT Coordinator would contact Basic Patrol Supervisors to request names of officers who have shown an aptitude for handling crisis-related calls and/or special training or education that would make them good candidates for training. The Specialized Crisis Intervention Plan, as it is now known, has been updated most recently in 2023, 2024 and 2025 and provides guidance on strategies for identification of qualified officers and specifically mentions the need to contact patrol supervisors. The CDP success at recruiting specialized CIT Officers has been documented earlier in this compliance report. For these reasons, the Monitoring Team finds support for a rating of **General Compliance (5).**

**20. Paragraph 150 Field Training Officers' Enhanced Specialized Crisis Intervention Training**

All Field Training Officers (FTO) will receive the enhanced specialized crisis intervention training described in paragraph 146. Despite having received this training, an FTO will not be designated as a specialized CIT officer unless the FTO has volunteered to be a specialized CIT officer and has been selected by the Coordinator. CDP has included FTO personnel in the 40-hour Crisis Intervention Training since its inception. Currently, CDP has 133 field training officers (FTO). Eighty-eight FTOs have completed the specialized CIT training (66.1%). FTO training can be challenging since the roster of FTOs changes each year. CDP has made a meaningful effort to train the FTOs in crisis intervention while balancing this requirement with the important challenge of increasing the number of patrol-based specialized officers available to respond to calls involving individuals in crisis. In the 2025 Annual Crisis Intervention Plan, CDP noted that District Commander were provided with a list of FTOs who needed specialized CIT training and committed to continuing to get all FTOs trained. Given that yearly CIT classes have a capacity of sixty officers per year, CDP has managed to reach both a reasonable number of FTOs with specialized CIT Training (88). CDP has and is continuously growing their complement of specialized CIT patrol officers. Currently, there are 168 CDP patrol officers designated as specialized CIT officers --over 32% of the patrol division. This result was accomplished without sacrificing the quality training that is part of maintaining small classes which focus on intensive scenario-based training. For these reasons, the Monitoring Team finds support for a rating of **General Compliance (5).**

**21. Paragraph 151 Specialized CIT Officers Primary Responsibilities for the Scene**

The CDP GPO 5.11.2 Crisis Intervention Team Program policy states in section V.A.1 that the Specialized CIT Officers shall have the primary responsibility for handling a crisis incident when on scene unless a supervisor has assumed responsibility. The CDP GPO 5.11.3 Crisis Intervention Team Response policy states in section IX.B on Supervisor Responsibilities if a supervisor has assumed responsibility for the scene, and a Specialized CIT Officer is on scene, the supervisor

shall seek the input of the Specialized CIT Officer regarding strategies for resolving the crisis, where it is reasonable for them to do so. The Monitoring Team's review of CIT related incidents clearly finds that where a specialized CIT officer responded to the incident, they nearly always asserted control over the scene in line with GPO 5.11.2. Clearly, CDP has made these two requirements on specialized CIT officer scene responsibility a part of their policy for responding to an individual in crisis. All supervisors and officers receive training on this policy. As described in the evaluation of Paragraph 367b., CDP should consider continued training and auditing to ensure that a single specialized CIT officer take charge of a CIT incident where necessary. Based on CDP policy and the observed compliance, the Monitoring Team finds CDP in **General Compliance (5).**

## 22. Paragraph 152 Specialized Crisis Intervention Plan

The Specialized Crisis Intervention Team Plan (sometimes identified as the SCIP) has been mentioned in the compliance review of several paragraphs. Paragraph 148 and Paragraph 149 note that the original Specialized CIT Crisis Intervention Team Plan was submitted to the court after review by the Parties and the Monitoring Team in August 2017. The Specialized Crisis Intervention Plan has been updated in 2023, 2024 and 2025. Each version has been reviewed by the Parties and the Monitoring Team. The Monitoring Teams' original memorandum to the court noted that the Specialized Crisis Intervention Plan satisfies the Consent Decree requirements and outlines "the information, analysis, training and implementation necessary" to "ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis."

The 2023, 2024 and 2025 plans meet the same standard. All plans include five sections. The first section, "Number Of Specialized CIT Officers Necessary To Cover All Crisis-Related Calls Throughout The City Of Cleveland," provides a breakdown of the number of patrol officers for each shift in each Police District and "shows the number of specialized CIT officers needed for each shift to reach a minimum of 25% of all officers assigned three to a shift." The second section, "Procedures For Identification For Gaps In Coverage," provides the specific procedures that will be "established to identify gaps in coverage of crisis-related calls handled by specialized CIT officers once a sufficient number of specialized CIT officers have been trained and deployed." The third section, "Mechanisms The Division Of Police Will Use To Fill Gaps In Coverage," discusses the mechanisms the Division will utilize to identify, vet, and train officers, as well the steps "to ensure that the specialized CIT officers are distributed properly throughout the Division on an ongoing basis." The fourth section, "Barriers To Full Coverage And Steps To Overcome Those Barriers," elaborates on the identified barriers "to the Division reaching full coverage of all crisis-related incidents by specialized CIT officers." The fifth section, "List of Ways to Identify Officers who are Appropriate to be Assessed for Suitability to be Specialized CIT Officers," reiterates "the ways to identify appropriate officers for assessment for suitability to be trained as specialized CIT officers." Despite the significant barriers to in-person training during the pandemic, CDP has

managed to increase the number of specialized CIT Officers each year and improve the percentage of specialized CIT Officers available for crisis events.

The number of specialized CIT Officers has reached over 30% of the patrol division and the presence of specialized CIT Officers at the scene has exceeded 50%. In review of over 100 CIT related calls, the Monitoring Team found over 60% of the calls studied had a specialized CIT Officer on the scene. The Monitoring Team noted that several of the officers who performed well during crisis events later qualified and became certified as specialized CIT Officers within one year of the time focused on by the compliance assessment (2023). This portends well for a continued improvement in the percentage of time the specialized CIT officers are available when needed. The revised SCIP and the Annual CIT Report each discuss this issue. The analysis provided is well thought out and legitimate. Clearly CDP has provided a set of quality Specialized CIT Intervention Plans.

The question the Consent Decree raises is one of effort. The Consent Decree noted "CDP may not immediately be able to ensure that a specialized CIT officer is available to respond to all calls or incidents that appear to involve an individual in crisis." The Consent Decree uses a standard of "best efforts" in attempting to reach this goal of the Consent Decree. The extent to which CDP has pursued having specialized CIT Officers on the scene, the attention paid to the issue over time, the willingness to persist despite the genuine limitations imposed by the pandemic on intensive in-person training, and finally the increasing rate of success in this area over time led the Monitoring Team to evaluate this area as supporting a rating of **General Compliance (5).**

| **Crisis Intervention Policies and Procedures** | | |
|---|---|---|
| 153 | The Ohio Criminal Justice Coordinating Center of Excellence currently is conducting a peer review of the crisis intervention program in Cuyahoga County. The results of the peer review assessment will be provided to the Advisory Committee, DOJ, and the Monitor. In developing its policies and procedures and the plan required by paragraph 152, the City will consider this assessment and any recommendations contained within it. | **Substantial & Effective Compliance 6*** |
| 154 | CDP, with recommendations from the Advisory Committee, will revise its policies to make clear that a crisis intervention response may be necessary even in situations where there has been an apparent law violation. | **General Compliance 5** |
| 155 | CDP, with recommendations from the Advisory Committee, will revise its current crisis intervention policy to ensure that specialized CIT officers have appropriate discretion to direct individuals with mental health and substance abuse issues to the health care system, rather than the judicial system, in those instances where it is appropriate to do so. | **General Compliance 5** |
| 156 | CDP's policies and procedures will make clear that specialized CIT officers, when available, must be dispatched to all calls or incidents that appear to involve an individual in crisis. CDP will track incidents in which a specialized officer was not dispatched to | **General Compliance 5** |

| | | |
|---|---|---|
| | such calls. In developing and revising the plan required by paragraph 152, CDP will identify any barriers to ensuring that specialized CIT officers were dispatched to these calls, and will include steps to overcome these barriers. | |
| 157 | CDP will track calls and incidents involving individuals in crisis by gathering, at a minimum, the following data:<br>a. date, time, and location of the incident;<br>b. subject's name, age, gender, race, ethnicity, and address;<br>c. whether the subject was armed, and the type of weapon;<br>d. whether the subject is a United States military veteran;<br>e. name and address of individual calling for service;<br>f. the reason for the interaction, i.e., suspected criminal conduct or call for assistance;<br>g. name(s) and badge number(s) of the officer(s) on the scene;<br>h. whether a supervisor responded to the scene;<br>i. techniques or equipment officers used;<br>j. any injuries to officers, subject, or others;<br>k. disposition of the incident (e.g., defuse, arrest, citation, referral); and<br>l. brief narrative of the event (only if not included in another document). | **General Compliance 5** |
| 158 | CDP must publicly report this outcome data annually and provide it to the Advisory Committee, aggregated as necessary to protect privacy. | **General Compliance 5** |
| 159 | The City will utilize this outcome data to identify training needs and develop case studies and teaching scenarios for crisis intervention training as well as primary and in-service crisis training; to make changes to the crisis training curriculum; to identify safety issues and trends; to recognize and highlight successful individual officer performance; to develop new response strategies for repeat calls for service; and to identify systemic issues that impede CDP's ability to provide an appropriate response to an incident involving an individual in crisis. | **General Compliance 5** |
| 367(b)(1) | b1. Addressing individuals in crisis measurements, including: number of calls for service and incidents that appear to involve an individual in crisis, broken down by whether specialized CIT officers responded to the calls; and the rate of individuals in crisis directed to the healthcare system, rather than the judicial system; | |
| 367(b)(2) | b2. Addressing individuals in crisis measurements, including: number of police interactions where force was used on individuals in crisis, including the type of force used; the reason for the interaction, i.e., suspected criminal conduct or a call for assistance; the threat to public safety, including whether the person was armed and if so, with what; a description of the type of resistance offered, if any; and a description of any attempts at de-escalation. | |

**23. Paragraph 153 Ohio Criminal Justice Coordinating Center of Excellence Peer Review**

The State of Ohio Criminal Justice Coordinating Center of Excellence ("CJCCOE") conducted a voluntary CIT Peer Review and presented a number of recommendations which also guided the

process of response to the goals and objectives of Paragraphs 131 and Paragraph 132.[20] This report and other reports that analyzed the CDP crisis intervention program provided guidance for the Advisory Committee steps required by the Consent Decree and resulted in policy, training, and operational changes documented in Paragraph 132 through Paragraph 135. The City, CDP and MHRAC gave meaningful consideration to the CJCCOE report which supports a rating of **Substantial and Effective Compliance (6).**

**24. Paragraph 154 Necessity of a Crisis Intervention Response**

Paragraph 145 reviewed the CDP's Crisis Intervention Policy development work with MHRAC and the MHRAC Policy Subcommittee. Care was taken by the MHRAC Policy Subcommittee to develop a policy that would meet the requirements of the Consent Decree. The policy has undergone minor revisions but retains the original intent. The policy is divided into three parts. The Crisis Intervention Team Response Section (5.11.03) states the Communications Control Section (CCS) dispatchers shall, when available, dispatch a Specialized CIT Officer to known or possible crisis incidents. Calls that appear to involve an individual in crisis shall be dispatched immediately. This same section (V.A.2.) guides patrol officers to Assess the situation to determine whether the individual may be in crisis, and if so, request a Specialized CIT Officer if one is not on scene and (V.A.4.) treat each crisis as unique. Section (III.A.7.) guides the Specialized CIT Officer to use discretion to direct individuals in crisis to the health care system, rather than the criminal justice system, in those instances in which it is appropriate to do so. This policy makes it clear that a crisis intervention response is necessary even when the event involved a possible felony or misdemeanor (III.A.7.a-b) and supports a rating of **General Compliance (5).**

**25. Paragraph 155 Specialized CIT Officer Appropriate Discretion**

As discussed in the supporting information for Paragraph 145 and Paragraph 154, care was taken by the MHRAC Policy Subcommittee to develop a policy that would meet the requirements of the Consent Decree. The policy is divided into three parts. The Crisis Intervention Team Response (5.11.03) guides the Specialized CIT Officer in Section III.A.7. to use discretion to direct individuals in crisis to the health care system, rather than the criminal justice system, in those instances in which it is appropriate to do so. Furthermore, the Crisis Intervention Team Crisis Intervention Team Program (5.11.02) and the Crisis Intervention Team Response (5.11.03) notes that the Crisis Intervention Policy covering all patrol officers has the goal of having a peaceful resolution of the crisis and connecting the individual to the appropriate community resources for a sustainable recovery. The Crisis Intervention Team Program (5.11.02) also sets a further goal (1.B.4) for all patrol officers of reducing the need for individuals in crisis to have further involvement with the criminal justice system. These goals and guidance in the crisis intervention policy supports a rating of **General Compliance (5).**

---

[20] Woody M, Futo J, and Lilley P, Criminal Justice Coordinating Center of Excellence, "Cleveland Division of Police CIT Peer Re view" (Apr. 2015) at 1-13.

**26. Paragraph 156 Specialized CIT Officer, When Available, Dispatched to All Calls**

Paragraph 156 covers issues similar to Paragraph 152 in that both paragraphs address the need to dispatch Specialized CIT Officers to calls that appear to involve an individual in crisis. Paragraph 152, in requiring the Specialized Crisis Intervention Plan, highlights the importance of the City using its best efforts to ensure that a Specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis. The work to address the issue of having a Specialized CIT Officer on the scene is best addressed in Paragraph 152.

After a discussion of the CDP response in this area, the compliance report noted the Consent Decree indicates "CDP may not immediately be able to ensure that a specialized CIT officer is available to respond to all calls or incidents that appear to involve an individual in crisis." The Consent Decree then uses a standard of "best efforts" in attempting to reach this goal. The extent in which CDP has pursued having specialized CIT Officers on the scene, the attention paid to the issue over time, the willingness to persist despite the genuine limitations imposed by the pandemic on intensive in-person training, and finally the increasing rate of success in this area over time led the Monitoring Team to evaluate this area as supporting a rating of **General Compliance (5).**

**27. Paragraph 157 Tracking Calls and Incident Involving Individuals in Crisis**

CDP worked with the ADAMHS Board in 2015 to develop a CIT Data Form in anticipation of the requirements of the Consent Decree. This paper-and-pencil form was expanded by CDP and the MHRAC Data Subcommittee in 2016 and completed in 2017. A careful review was made to ensure the data form met the requirements of the Consent Decree. All items listed in Paragraph 157 were included (a – l). This data was initially collected manually but has now been fully converted to an electronic format for both data entry and analysis beginning with work in 2017. The Parties and the Monitoring Team reviewed the development and collection process throughout each stage. For these reasons, the CDP work in this area supports a rating of **General Compliance (5).**

**28. Paragraph 158 Public Report of Outcome Data**

As noted in the report on Paragraph 157, CDP developed electronic data systems to report on crisis events. As CDP developed improved data systems to report on crisis events, the report was converted to an electronic reporting system in 2017. Eventually, CDP developed increased Information System capacity and contracted with Case Western University to analyze the data and report to MHRAC and the MHRAC Quality Insurance process on the analysis. The analysis

continues to be part of the ongoing MHRAC Annual Report.[21] The recent 2024 MHRAC Report devoted thirty-five pages to reporting on the CDP data on interactions with individuals in crisis. All data was reported in aggregate form to preserve confidentiality. As noted in the 2024 MHRAC report, "as of May 2024, CDP in collaboration with the City of Cleveland's Department of Urban Analytics and Innovation has published a dashboard on the City of Cleveland's Website"[22] to visually showcase data related to CDP response to CIT calls. Since the dashboard's launch, data from 2023 has been publicly available while newer data is continually added. In addition, CDP has added older data to the available dataset after a period of review. The report on the data in the MHRAC Annual Report and the extensive data reporting in the City of Cleveland dashboard provides support for a rating of **General Compliance (5).**

## 29. Paragraph 159 Utilizing Outcome Data

CDP has provided outcome data to the CDP CIT Coordinator, the MHRAC Quality Insurance Subcommittee, and the MHRAC Data and Growth Subcommittee. The MHRAC Annual Reports have cited a series of topics related to the outcome data presentations to the subcommittee.

Initial presentations were influential in work to improve data collection strategies and data analytic capacity. Later presentations were noted as important in the development of electronic data collection and improvements to the Crisis Data form. Discussion on outcome data rates were noted in relation to the topic choice for CDP In-service Training on Officer Data Completion. The subcommittee noted year-to-year review of demographics helped lead to other choices for in-service training topics. These reviews include the reports on Youth and Homelessness as being factors in the choice of these topics for annual CDP in-service for all officers.

Examination of data trends for patterns such as location cluster analysis, led to an awareness of repeat calls for service. In turn, CDP and the ADAMHS Board staff met several times and eventually conducted training with four key social services agencies. These agencies were reported as having a much lower number of crisis intervention calls to 911 for the next year. Case examples led to confidential case conferences led by the ADAMHS Board and other behavioral health agencies working with CDP to provide successful targeted interventions in the area of developmental disabilities and violence abatement. It was also noted that the CDP Data Analytic team was very responsive to providing additional analysis on trends noted in demographic trends. The Quality Insurance subcommittee eventually constructed a task force to help develop the 2022 Crisis Intervention Policy revisions. Compliance reports on Paragraph 139 and Paragraph 140 reviewed the role of the CIT Coordinator in making use of crisis intervention data to provide

[21] Mental Health Response Advisory Annual Report 2024 https://clevelandhealth.org/assets/documents/health/MHRAC/MHRAC_2024_Annual_Report.pdf
[22] See City of Cleveland Department of Urban Analytics and Innovation link at; Crisis Intervention Team Dashboard | City of Cleveland Open Data

feedback to the community at large and influencing the overall behavioral health system of care. Taken together, these results support a rating of **General Compliance (5).**

**30. Paragraphs 367.b.1 and 367.b.2**

Based upon review of data related to crisis incidents as well as a review of a random sample of 111 incidents, the Monitoring Team finds CDP in **General Compliance (5)** of achieving the desired outcomes of the Consent Decree with respect to handling CIT incidents. The Monitoring Team bases this assessment on a systematic review of both administrative data regarding CIT incidents and a qualitative review of a random sample of incidents by Subject Matter Experts. That analysis is further described below.

- **Data Sources**

Data for this assessment is from 2023. Crisis intervention incidents are identified in three separate databases - CAD, LERMS, and Brazos. Using these three data sources, the Monitoring Team reviewed a random sample of incidents gathered from all three data sources and completed a survey for each incident.

CAD data is the initial call for service where crisis intervention incidents are initially identified by a call-taker. While any call for service *could* be a crisis intervention incident, CDP has previously analyzed what call types are most frequently determined to be a crisis intervention incident by the officer. The top seven call types that are crisis intervention incidents are the vast majority of crisis intervention incidents. CDP provided CAD data regarding these calls and information regarding whether an officer was dispatched, whether an SCIT officer arrived on the scene, whether a supervisor arrived on the scene, and whether force was used in the incident. This dataset includes calls for service where the caller cancelled the call, the officer could not find the individual, incidents that were later determined to not be crisis intervention incidents, and true crisis intervention incidents.

LERMS data is the police report management system where officers record incident information. Where an officer responds to a call for service and finds an individual in crisis, the officer can mark the incident as involving crisis intervention. CDP provided LERMS data regarding all such incidents and information regarding whether an officer was dispatched, whether a SCIT officer arrived on the scene, whether a supervisor arrived on the scene, whether force was used in the incident, whether an arrest was made, and whether there was a Brazos CIT form filled out for the incident.

Brazos CIT form data is created by officers after identifying an incident involving crisis intervention. When an officer identifies an incident as involving crisis intervention they are

required to complete an additional form regarding the incident. CDP provided data from all Brazos CIT forms.

The Monitoring Team used each of these data sources to draw an initial representative sample of 111 incidents - Survey Data. These incidents were reviewed by a team of Subject Matter Experts (SMEs). After completing review of these incidents, the Monitoring Team was not able to complete surveys for twenty-two incidents because records regarding the incidents had been deleted in line with record retention policy. To account for this, the Monitoring Team reviewed a further sample of nineteen incidents for the Survey Data.

**a. Identifying Crisis Calls and SCIT Officer Response Rate**

There were 10,397 calls for service after removing cancelled and duplicate calls in the CAD data. Given that calls may not involve an individual in crisis or that the officer may not be able to locate an individual, not all calls will have an associated Brazos CIT form. In this initial assessment, the Monitoring Team examined twenty calls for service where a CIT form was not completed to examine whether officers were correctly identifying crisis incidents and filling out the appropriate form. This is important to determine the "number of calls for service and incidents that appear to involve an individual in crisis."

Fifteen of the twenty calls did not contain sufficient information for a review because of data retention policies of the CDP software vendor. Of the remaining five incidents, two were situations where a Brazos form should have been completed but were not and three incidents that did not require a Brazos form because it was not a crisis incident. Because of this limited sample, the Monitoring Team also evaluated the percentage of cases labeled as CIT in LERMS and whether these contained a Brazos CIT Form. Review of these incidents finds that 84.6% of such incidents had a completed Brazos CIT form. This high completion rate indicates that when an officer does respond to a true crisis incident, they overwhelmingly complete the Brazos CIT form and the Monitoring Team finds that CDP officers generally, correctly assess whether there is a crisis incident.

Limiting the CAD data to calls where a Brazos CIT form was completed, a SCIT officer responded in 38.1% of calls (1,140 calls). Review of LERMS data there is a similar SCIT officer response rate of 39.3% (1,811 incidents)[23] for all crisis intervention incidents. Monitoring Team Survey Data finds that SCIT officers responded in 62.5% of reviewed incidents. The difference between the response rate from the CAD data and the survey data may be partially due to Monitoring Team reviewers being able to check every responding officer to a call whereas Brazos CIT Forms may only include the primary and secondary officers. Based upon this response rate, CDP is not able

[23] Note that there are more CIT incidents within the LERMS data as compared to the CAD data. This is because the CAD data only includes calls for service from the top seven CIT related call types.

to ensure that "a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis." (¶ 152). CDP is aware of this challenge, noting in the Dec. 31, 2023 Specialized Crisis Intervention Plan (SCIP) that 24.81% of patrol officers were designated SCIT officers.[24] The CDP data team is working to identify SCIT officers who responded to CIT incidents, but were not noted on the Brazos CIT Form. Though an SCIT officer did not respond to every crisis intervention related call, the Monitoring Team did not find that the lack of available SCIT officers led to notable or pervasive issues in properly responding to crisis intervention related calls.

**b. Handling of Crisis Intervention Incidents**

Survey Data results show that the responding primary officer - whether SCIT designated or not - properly assessed whether the individual was in crisis in 96.4% of incidents (n=84). SMEs consistently found that officers approached individuals calmly and asked appropriate questions in assessing the individual. In four incidents SMEs found that the officers were initially aggressive with the individual and their behavior escalated tensions. These result show that CDP officers consistently approach crisis incidents in accordance with policy.

In responding to crisis incidents, SCIT designated officers are expected to assess whether they need to take control of the incident, or if the primary responding officer is appropriately handling the situation, then to defer and support the officer. According to Survey Data, an SCIT officer took command of the incident in 73.3% of incidents in which an SCIT officer responded. In the majority of incidents where the SCIT officer did not take control of the scene, the responding SCIT officer arrived after the subject was already secured, EMS had already secured the individual, or a supervisor took control of the scene. In 5% of incidents a SCIT officer did not take control and the incident escalated beyond control of officers. Based upon Survey Data, SCIT officers typically, appropriately take control of crisis incidents. Incidents where SCIT officers failed to take control involved highly erratic individuals and many officers, including multiple SCIT officers, which may create confusion as to which officer should assume control.

Survey Data finds that the majority of individuals were transported to the hospital as a result of the incident (85.5%, n=103), often at the request of the individual. SMEs found that the majority of individuals were in an active crisis and in need of hospitalization or had committed a crime and should be arrested.

Based on Survey Data, officers, regardless of whether officers were designated SCIT officers or not, introduced themselves (55.3%), spoke in a calm voice (87.2%) while asking questions rather than orders (74.5%) and actively listened (72.3%) to individuals. Officers did not use intimidating

[24] This assessment concerns data from 2023. It is worth noting that according to the most recent SCIP from February 2025, the percentage of patrol officers that are designated as SCIT officers has increased to 29.30%.

body language (77.7%) while demonstrating empathy (74.5%) and repeating simple instructions (73.4%) while giving individuals time to comply (62.8%). These responses demonstrate that officers use multiple de-escalation techniques in crisis incidents.

In 91.4% of incidents (n=94), SMEs found that there were not additional de-escalation techniques that the officers should have employed. In the nine incidents where SMEs determined that the officers should have performed additional de-escalation, officers needed to introduce themselves and maintain a calm, non-threatening demeanor while asking additional questions to elicit more information.

According to LERMS data and Brazos CIT form data, individuals in crisis incidents are arrested between 1.5% - 2.1% of the time (82-105 incidents). Survey Data specifically sampled incidents involving an arrest in order to evaluate practices when an individual was arrested. Based on a review of incidents involving an arrest, the primary officer properly assessed risk for the incident in eleven of thirteen applicable incidents and attempted to de-escalate the situation in all applicable incidents. In nine of fifteen of the incidents the arrested individual was hospitalized as well. Among incidents involving an arrest, SMEs did not find any arrest to be the result of retaliatory or discriminatory conduct by the officer.

According to LERMS data and Brazos CIT form data, force is used in 0.32% - 0.42% of crisis incidents (15-21 incidents). Survey Data included incidents involving force in order to evaluate officer use of force. Based on a review of those incidents involving the use of force, the primary officer properly assessed risk for the incident in seventeen of twenty-one applicable incidents. Officers attempted to de-escalate the situation in all applicable incidents. In use of force incidents, eight of twenty-four individuals were ultimately arrested and twenty-one of twenty-four were hospitalized. Among incidents involving use of force, SMEs did not find any arrest to be the result of retaliatory or discriminatory conduct by the officer.

Survey Data of incidents involving a use of force included five incidents where the individual had a weapon - one involving a firearm, three involving a knife, and one incident where officers were told the individual was armed, but was not. Eleven of the incidents involved a domestic partner (family member or co-resident). SME review found that officers responded appropriately in all but one incident where the individual was armed and a large number of officers responded to the scene leading to confusion and a lack of cohesion as to who was responsible.

Based upon SMEs review of 111 crisis intervention incidents, the Monitoring Team finds that CDP officers predominantly respond in a calm and appropriate manner, regardless of whether the responding and primary officer is a SCIT designated officer. Officers typically attempt to de-escalate crisis situations, defer to SCIT officers when they are on the scene, and hospitalize individuals when needed. On rare occasions when there were multiple responding officers,

including multiple designated SCIT officers there was confusion as to which officer was in charge of the incident that led to a lack of control that should be addressed.

#### c. Data Entry Quality

SME review of LERMS, Brazos, and Body Worn Camera (BWC) systems finds that officers typically completely and correctly fill out data forms, but that there are compliance issues with respect to proper BWC use. Review of BWC found that officers turn on BWC late, turn BWC off early, or never activate BWC. Despite these issues, SMEs were able to complete reviews because incidents involved multiple officers where review of all BWC allowed a reviewer to get the full context of the incident.