Cleveland Division of Police Consent Decree Monitoring Team

2025 Search and Seizure Assessment

December 5, 2025

**TABLE OF CONTENTS**

I.  EXECUTIVE SUMMARY                                                                                      4

    A.  Key Findings                                                                                      4

        1.  Legal Justification and Articulation of Stops                                             4

        2.  Training, Supervision, and Accountability Mechanisms                                       4

        3.  Racial Disparities in Stops, Searches, and Arrests                                        5

        4.  Enforcement Outcomes Reflecting Disparities                                               5

        5.  Administrative Systems                                                                    5

    B.  Path Forward                                                                                     5

II.  BACKGROUND                                                                                            6

    A.  DOJ's Investigative Findings Regarding Stop, Search, and Seizure                              7

    B.  Consent Decree Requirements                                                                   7

III.  SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW                                                 8

    A.  Scope of Review                                                                                8

    B.  Compliance Assessment Methodology                                                             9

    C.  Standard of Review                                                                            10

IV.  UNDERSTANDING THE DATA                                                                               16

    A.  Overview of Data Sources and Limitations                                                     16

V.  COMPLIANCE ASSESSMENT                                                                                 17

    A.  Search and Seizure Assessment Survey Findings (¶¶160 - 175)                                  17

VI.  SEARCH AND SEIZURE RELATED OUTCOME ASSESSMENTS                                                       26

    A.  Comparing Stop, Search, & Arrest Outcome Data to Population Demographic Data                  26

    B.  Community Setting and Demographics                                                           27

        1.  City Demographics                                                                        28

        2.  Police District Demographics                                                             29

    C.  Total Stops, Searches, and Arrests (¶367.c.1)                                                 30

        1.  Investigatory Stops                                                                      30

        2.  Investigatory Searches                                                                   33

        3.  Investigatory Arrests                                                                    33

    D.  Traffic Stops by Documented Legal Justification (¶367.c.2)                                    34

        1.  Overview of Traffic Stops by Demographic Factors                                         34

        2.  Traffic Search Patterns by Violation Type                                                36

        3.  Traffic Arrest Patterns by Violation Type                                                37

    E.  Investigatory Stops                                                                           37

|  | 1. | Overview of Investigatory Stops | 37 |
|---|---|---|---|
|  | 2. | Investigatory Search Rates | 38 |
|  | 3. | Investigatory Arrest Rates | 38 |
| F. |  | Search Hit Rates (¶367.c.3) | 39 |
|  | 1. | Traffic Stop Search Hit Rates | 39 |
|  | 2. | Investigatory Stop Search Hit Rates | 40 |
| G. |  | Outcome Measure Assessment Findings Summary (¶367.c) | 41 |
| VII. | | COMPLIANCE ASSESSMENT RATINGS | 42 |
| A. |  | NOACA Travel Forecasting Model: Daily Vehicular Trips (Scenario 2022) | 45 |
| B. |  | City of Cleveland Wards and Police Districts | 51 |
| C. |  | Cleaning and Aggregating Administrative Datasets | 51 |
| D. |  | Total Crime and Police Stops by Race and Police District | 52 |
|  | 1. | Outcome Tables for 367.c.1 | 52 |
|  | 2. | Outcome Tables for 367.c.2 | 58 |
|  | 3. | Outcome Tables for 367.c.3 | 77 |

## I.      EXECUTIVE SUMMARY

This is a report of the Monitoring Team's first formal comprehensive assessment of the Cleveland Division of Police's (CDP) progress toward achieving compliance relative to Search and Seizure with the federally mandated Consent Decree, which was entered into following the U.S. Department of Justice's (DOJ) 2014 findings of a pattern or practice of excessive force in violation of the legal protections under the Fourth Amendment to the US Constitution. The investigation, launched in March 2013, not only identified systemic issues regarding the use of force but also illuminated broader questions regarding the constitutional integrity of the Division's stop, search and seizure practices.

This report specifically assesses CDP's compliance with the Consent Decree provisions governing stops, searches, and seizures and the respective outcome measures, which constitute core aspects of everyday police work that directly bear on individuals' constitutional rights and the community's perceptions of the legitimacy and trust of CDP officers and law enforcement in general. While the assessment determined that considerable progress has been made in several key areas, this analysis reveals disparities, particularly along racial and gender lines, along with deficiencies in other areas that underscore the need for further analysis, sustained oversight, targeted training, and as determined, corrective actions, and further structural reforms. Though the Monitoring Team studied each incident ,without the full context of deployment strategies of the Division, the assessment reports on the existence of disparities not the cause of those disparities.

### A.  Key Findings

1. Legal Justification and Articulation of Stops

   The vast majority of stops reviewed were supported by sufficient articulation of reasonable suspicion (95.24%), and probable cause in 90.8% of arrests. There were isolated incidents involving insufficient articulation or lack of supporting detail were identified. In an additional handful of incidents, the officers' decision-making may have been influenced by the individual's ethnicity, race, or gender. These cases were concentrated among a small number of officers, suggesting these are isolated, officer-centered decision making or in response to a particular data point. The absence of rote or canned language in 94% of the cases suggests improved documentation of officer observations.

2. Training, Supervision, and Accountability Mechanisms

   CDP has revised its search and seizure policies and implemented sound training protocols on search and seizure, offered through both CDP Police Academy classes and the mandatory annual in-service training. The review, although limited in this area as discussed in detail in the report, found variability in the quality of supervisory review processes, which are essential for ensuring quality articulation of probable cause or reasonable

4

suspicion, identifying problematic patterns, correcting officer conduct, and reinforcing department standards.

3. Racial Disparities in Stops, Searches, and Arrests

This assessment found racial disparities in CDP's stop, search, and arrest data. In 2024, Blacks comprised 62.9% of individuals subjected to traffic stops and 67.3% of those subjected to investigatory stops—figures that exceed their representation in the city's population. Moreover, Blacks made up 72% of all searches conducted during traffic stops and 72.5% of stops resulting in arrests. These are data points that the Division and City can investigate more fully to understand better the source of the disparities.

4. Enforcement Outcomes Reflecting Disparities

The data illustrate that the racial disparities observed in stops extend throughout the enforcement encounter, including searches and arrests. Blacks were not only more likely to be stopped, but also disproportionately subjected to searches and arrests, suggesting disparate impacts that warrant further critical examination. Men in general experienced higher rates of stops, searches, and arrests than women.

5. Administrative Systems

There are structural limitations in CDP's current data collection systems that made accessing the full supervisory review difficult. The readily available supervisory review data lacked detail and failed to provide sufficient feedback and corrective instruction to the officer completing the form or report. Within the subset of cases with supervisory reports, the quality and consistency of supervisory oversight varied widely. For audits to have instructive value and reveal any process gaps, the full complement of reports of incidents must be easily accessible for review. The Division is in the process of changing its management systems that with hope, will remedy these documentation retrieval issues.

**B. Path Forward**

The Cleveland Division of Police has made measurable progress in meeting the technical requirements of aspects of the Consent Decree in the area of Stop, Search and Seizure, particularly relative to the required training and adherence to the articulation of the legal basis for all non-consensual stops. However, achieving fair, equitable, and constitutional policing remains an ongoing endeavor. This report makes clear that while the Division has come some distance from where it was in 2015, the journey is incomplete. The evidence of racial and, to a lesser degree, gender disparities in police stops, searches, and arrests requires deeper analysis by the Division to determine if there is a constitutionally justifiable explanation for the disparities.

To fully realize the aims of the Consent Decree, CDP must continue to invest in culturally competent training, ensure meaningful and timely supervisory oversight, and adopt rigorous accountability mechanisms that foster transparency and build community trust. Regular analysis by the Division of the impact of its deployments on the community, transparency with those findings, and a description of planned follow up actions seems important.     The legitimacy of the Cleveland Division of Police, and the safety and dignity of all Clevelanders, depend on the collective resolve to investigate and confront any findings.

A summary of some recommendations includes:

- Improve the quality of written justifications: Enhance training and supervisory review to ensure officers consistently provide detailed, fact-based articulation of reasonable suspicion and probable cause in accordance with ¶¶162-168. Examine if a revision of the stop form is necessary and possible to prompt officers to provide more detailed information.
- Strengthen notification and documentation of consent: Mandate clear articulation and documentation of informed consent and right to refuse consent on all non-custodial searches in compliance with ¶164.
- Standardize and expand supervisory oversight: Improve access to supervisory review and approval records across all arrest types and implement quality control mechanisms to ensure timely, substantive reviews in adherence to ¶¶169, 170, and 171.
- Enhance data infrastructure and audit functions: Expand the stop audit function to identify and address data gaps, track supervisory feedback, and monitor patterns of officer performance. Chief Todd has initiated conversation with the Monitoring Team for episodic reviews and feedback conversations around stop data.


As a first assessment, after only two years following the initiation of data collection, the training and work of the Division's members is strong. CDP has made noteworthy progress in compliance in accordance with nearly all provisions of the Consent Decree's Search and Seizure requirements, particularly in regard to the sufficiency of officers' articulation of reasonable suspicion and probable cause, and the provision of sound foundational search and seizure training.

## II.    BACKGROUND

In March 2013, the U.S. Department of Justice Civil Rights Division launched an investigation into the Cleveland Division of Police (CDP) following a series of incidents that raised concerns about the excessive use of force. After an 18-month investigation, the DOJ found "reasonable cause to believe that CDP had engaged in a pattern or practice of the use of excessive force," in violation of the Fourth Amendment of the U.S. Constitution. These findings led to the Consent Decree, the agreement signed by the Department of Justice and the City of Cleveland and entered by the U.S. District Court for the Northern District of Ohio on May 26, 2015. This Compliance

Assessment reviews the adherence to the language of the paragraphs relating to Search and Seizures, paragraphs 160-175, and the outcome measures identified in paragraph 367c.

### A.  DOJ's Investigative Findings Regarding Stop, Search, and Seizure

The Department of Justice's pattern and practice investigation did not specifically examine the Cleveland Division of Police's search, seizure, and arrest procedures. However, in reviewing documents related to CDP's use of force practices, investigators frequently encountered descriptions of stops, searches, and arrests by some CDP officers that appeared to violate individuals' Fourth Amendment protection against unreasonable search and seizure. This included records of individuals being detained on suspicion of having committed a crime, which lacked any or adequate articulation of the officer's suspicion or justification for the stop, as well as searches "for officer safety" without any explanation of the perceived threat. In the course of the investigation, the DOJ noted in many cases officers used vague or boilerplate language in articulating the basis for detentions and searches. Supervisors often approved these inadequate reports without requesting further details from the officers about the circumstances that justified and led to the use of force. Given the strong likelihood that CDP's stop, search, and seizure practices violated the Constitution and contributed to the erosion of community trust that undoubtedly results, the DOJ and the CDP committed to address these issues through the specified provisions included in the Joint Statement of Principles.[1]

### B.  Consent Decree Requirements

Paragraphs 160 through 175 of the Consent Decree outline the manner in which the Cleveland Division of Police (CDP) must conduct all stops, searches, and seizures in accordance with constitutional standards. Paragraph 160 specifically mandates that CDP carry out all investigatory stops, searches, and arrests in a manner that upholds the rights guaranteed by the Constitution and both state and federal law. These actions must be conducted fairly and respectfully, aligning with community values and forming part of an effective crime prevention strategy. To meet this standard, CDP is required to revise, develop, and implement search and seizure policies that comply with applicable law, as detailed in paragraphs 161 through 175. In addition to this compliance review, Paragraph 367c requires the Monitor to conduct qualitative and quantitative outcome assessments that analyze outcome data trends and patterns of Stop, Search, and Arrest measurements, at least once per year. Analysis of those data using CDP materials is included in this assessment.

In response to these Consent Decree requirements, CDP developed five related policies and launched the 2021 Search and Seizure in-service training, as documented in the Tenth Semiannual Report (October 2021). The Division also created a Stop Form Policy (GPO 2.02.05) and

---

[1] US Department of Justice Findings Letter for Investigation of the Cleveland Division of Police, US Attorney's Office, Northern District of Ohio, December 4, 2014.

7

accompanying Stops Data Collection Training to instruct officers on how to use the Brazos[2] data system to accurately record all vehicle stops, investigatory stops, and searches.

As foreshadowed in the Tenth Semiannual Report, the current Assessment began after these policies and training programs were in effect for a significant period of time. This Assessment includes: (1) analyzing data and trends related to who is being stopped, the context of these stops, and their outcomes; and (2) auditing a sample of stops to assess whether officers provided adequate legal justification for each stop, detention, search, or arrest.  The Assessment also reviews whether supervisory review processes are meeting the standards set forth in CDP policy and the Consent Decree.

## III.    SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW

### A.  Scope of Review

In accordance with Paragraphs 160 through 175 and 367(c) of the Consent Decree and CDP General Police Orders (GPOs) 2.02.01 for Traffic Stops and 2.02.02 for Investigatory Stops, this assessment by the Monitoring Team examines the CDP's stop, search, and seizure activities and compliance with the legal standards established under the Fourth Amendment of the US Constitution, federal and state law, and CDP policies governing search and seizure (¶¶160-175). Officers must follow these standards in conducting all nonconsensual stops of persons in public spaces, including the requirement to articulate probable cause for traffic stops or reasonable suspicion for investigatory stops. The assessment includes the review and approval process by supervisors and command-level officials overseeing all stop, search, and arrest reports. In accordance with Paragraph 367c, this assessment analyzes the data trends and patterns of the most recent annual Stop, Search, and Arrest outcome measures available.

In conducting this assessment, the Monitoring Team's Subject Matter Experts (SME) with significant law enforcement and investigative experience, examined a sample of CDP reports of both investigatory and traffic stops. The team reviewed Stop Forms, the available corresponding wearable camera system (WCS) footage, and all related incident reports in the Brazos, LERMS, IAPro, IAPro/Blue Team, and Evidence.com data collection systems.[3] When WCS footage was not available, such as when the officer failed to activate WCS or the camera dislodged during a physical altercation, the reviewers relied only on the written reports and the associated chain of command review (as relevant). A standardized assessment instrument was created by the Monitoring Team and approved by the Parties as part of the methodology submitted in accordance

---

[2] Brazos is the trade name of the field-based reporting system used at the time these data were collected by CDP officers to complete Stop Forms in the field.

[3] LERMS is the Law Enforcement Records Management System used by CDP to create, store, retrieve and manage records and documents. IAPro/Blue Team is the data management system utilized for supervisory oversight, Use of Force investigations and Internal Affairs investigations. Evidence.com is the data management system used to store, retrieve, archive and review Body Worn Camera video footage.

with the Consent Decree. Every reviewer was trained on the use of the instrument and the CDP hosted web meetings to demonstrate how to access and to troubleshoot issues with their systems. The standard instrument was used by all reviewers to score the stop incidents in accordance with each of the requirements articulated in Paragraphs 160 – 172.

### B.  Compliance Assessment Methodology

This assessment utilizes the methodology developed by the Monitoring Team and agreed to by the Parties to evaluate the CDP's compliance with Paragraphs 160 through 175 of the Consent Decree, which govern the constitutionality and professionalism of the Division's stop, search, and seizure practices. This assessment focuses on whether CDP officers are conducting investigatory stops, searches, and arrests in a manner consistent with constitutional legal standards and departmental policies.

In accordance with requirements of the Consent Decree, CDP has developed and implemented in-service training related to Stop & Searches, Investigatory Stops, and Probable Cause/Warrantless Arrests. Additionally, as of July 2021, the Division enacted General Police Order 2.02.05, which requires officers to complete a standardized "Stop Form" after all non-consensual, officer-initiated stops.[4] Now that a material period has elapsed since these policies have been in effect, the Monitoring Team has conducted its first formal compliance assessment to determine whether CDP officers are meeting the legal and procedural requirements of the Consent Decree and related departmental policies during traffic and investigatory stops, searches, and arrests.

Using standard sampling procedures, the Monitoring Team drew a statistically representative sample of Stop Forms completed by CDP in 2024 using a 95% confidence interval and a 5% margin of error. Seven Monitoring Team Subject Matter Experts (SMEs) with significant law enforcement and legal expertise reviewed 376 traffic stops and 255 investigatory stops utilizing a structured qualitative instrument developed by the Monitoring Team and shared with the Parties, to evaluate compliance. The SMEs assessed whether each stop, search, and arrest was supported by reasonable suspicion or probable cause as required. In addition to reviewing the Stop Forms, the reviewers examined supporting materials, which included the available wearable camera system (WCS) footage and incident reports housed in CDP data systems, including Brazos, Evidence.com, LERMS, and IAPro/Blue Team. The reviewers also assessed the supervisory review and approval of each Stop Form and any related search and arrest, as well as a command-level review when necessary.

In accordance with Paragraph 367 (c) of the Consent Decree, the Monitoring Team also received the administrative datasets for all traffic and investigatory stops conducted in 2023 and 2024. These data—complementing the Stop Form information—were analyzed to assess patterns in stop

---

[4] The Stop Form is accessed through the Brazos Field Based Reporting system.

practices, search outcomes (i.e., yield or "hit rates"), and arrest rates. The analysis also examined the sociodemographic characteristics of those subjected to stops and searches, offering critical insights into the broader social context of these police-civilian interactions. These findings are presented first in Section IV of this report.

This inaugural comprehensive assessment will serve as a baseline that enables the evaluation of the extent to which CDP's Search and Seizure practices aligns with constitutional standards, CDP policy, and the requirements of the Consent Decree, particularly with respect to the execution, legal justification, documentation, and supervision of stops, searches, and arrests, over time.

### C. Standard of Review

Pursuant to Paragraphs 367 and 369, the Monitoring Team conducts compliance reviews which are "qualitative and quantitative assessments to measure whether implementing this Agreement has resulted in constitutional policing."[5]

Each Compliance Assessment includes a review of each related provision of the Consent Decree. The Monitoring Team gives every provision a Compliance Grade from 0 to 6, with 0 indicating that the City/CDP has not yet begun working on the provision and 6 indicating that the City/CDP has achieved substantial and effective compliance with that provision. Compliance Assessments will draw upon information and evidence gathered during semi-annual reports. A Compliance Assessment will include an overall grade for the Consent Decree section based upon the Compliance Grading system (detailed below) with the goal of the City/CDP achieving substantial and effective compliance for each provision.

In order to incorporate and build upon prior semi-annual reports, the Monitoring Team will review the four most recent semi-annual reports in advance of the Compliance Assessment. Any related provision that has been graded "general compliance" for more than two years (i.e., four consecutive reports) will be presumptively considered in substantial and effective compliance. For any such provision presumptively considered in substantial and effective compliance, the Monitoring Team will review the provision as part of its formal Compliance Assessment in order to validate its compliance grade. If the Compliance Assessment validates that provision as substantially and effectively compliant, the Monitoring Team will not re-assess that provision in future Compliance Assessments. The Monitoring Team will, however, continue to review and report on that provision in its semi-annual reports; if those reviews or reports suggest a downgraded

---

[5] *United States v. City of Cleveland*, No. 1:15-cv-01046, Consent Decree (N.D. Ohio June 12, 2015). In addition to assessments, the Monitoring Team evaluates compliance with sections of the Consent Decree throughout the year and communicates its observations, assessments, and findings twice each year through its semi-annual reports (¶¶360, 375). These compliance reviews consider the totality of evidence presented and observed with respect to each provision of the Consent Decree, including review of policies and annual reports, interviews and meetings with the City and CDP as well as Cleveland community groups, and observation of trainings and internal meetings.

change in status at any point, the provision will once again be incorporated into future Compliance Assessments.

There were no paragraphs in the Search and Seizure section, 160-175 that were rated as General Compliance in any of the four prior reports. As such, none of the paragraphs are presumptively in General Compliance at the start of this Assessment.

As part of the Compliance Assessment, the Monitoring Team SMEs will review data, records, and documents pertaining to each Search and Seizure-related Consent Decree provision (¶¶160-175; 367(c)). Following this review and analysis, the Monitoring Team will compare findings and award Compliance Grades using the following framework:

| Grade | Definition |
|---|---|
| 0 | **Non-compliant, Not Started**: The City/CDP has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City/CDP's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement. |
| 1 | **Partial Compliance, Not Assessed:** The City/CDP has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/CDP's progress in implementation.[6] |
| 2 | **Partial Compliance, Planning/Policy Phase:** The City and/or CDP has made sufficient initial strides or sufficient partial progress toward compliance with key components of the provision of the Consent Decree pertaining to drafting or creating policies, processes, protocols, trainings, systems, or the like that exist on paper but do not exist or function in day-to-day practice. |
| 3 | **Partial Compliance, Implementation Phase:** The City and/or CDP has made sufficient initial strides or sufficient partial progress toward compliance with key components of the provision of the Consent Decree pertaining to initiating training and implementing systems intended to affect day-to-day practice, but that the Monitoring Team has not yet observed in practice. It may capture a wide range of compliance states or performance, from the City or CDP having taken only very limited steps toward operational compliance to being nearly in operational compliance. |
| 4 | **Operational Compliance:** The City and/or CDP has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Consent Decree such that it is in existence or practice operationally—but has not yet demonstrated, or has not yet been able to demonstrate, meaningful adherence to or effective |

[6] If the Monitoring Team believes a provision cannot be assessed for a particular reason (e.g., lack of access to data/information required for evaluation, etc.), it will inform the City in advance of any planned Compliance Assessment.

11

|  | implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.<br><br>Operational compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |
|---|---|
| 5 | **General Compliance:** The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented such that the Monitoring Team will begin tolling according to ¶401. This includes instances where it can be shown that the City or CDP has effectively complied with a requirement fully and systemically.<br><br>General compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |
| 6 | **Substantial and Effective Compliance:** The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents in accordance with ¶401 or ¶370. This includes instances where it can be shown that the City or CDP has effectively complied with a requirement fully and systemically.<br><br>Substantial and effective compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |

As additional considerations, more appropriate for work that is ongoing and advances or ebbs over time, the Monitoring Team offers the following details used in making final assessments.

1. **The quality of CDP's performance across a material span of time.** Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer. Instead, it requires that CDP adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers. In this way, isolated compliance does not establish "Initial Compliance" in practice. At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance. The issue is whether, across time, events, and people, CDP is, in aggregate, sufficiently doing what the Decree requires. For some requirements that are applicable only to a relatively small absolute

number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

2. **The severity or significance of deviations from Consent Decree requirements, CDP policy, and/or law.** The Monitoring Team considers not simply whether CDP's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation. Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field. Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

3. **The extent to which CDP is identifying and appropriately addressing problematic performance.** In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within CDP, the Consent Decree expressly contemplates that a CDP in compliance with the Decree will have mechanisms in place to engage with departmental and officer performance that is deficient in some way. Therefore, the Monitoring Team's compliance reviews consider whether, when CDP personnel have deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it has appropriately addressed the issue. With respect to Consent Decree implementation and meaningful organizational change, the Department is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **CDP's progress over time.** Where possible, the Monitoring Team aims to situate its evaluation of CDP's performance in terms of progress over time. Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.[7]

Courts regularly apply multi-factor approaches where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or

---

[7] Barge, M., Friedman, B., McGough, M. Monitoring Law Enforcement Consent Decrees: An Introduction and Starter Toolkit. 2024. Pages 91-9.

implicate competing considerations.[8] Such multi-factor tests are "objective" as they require clear explanations as to "how they derived their conclusions from the verifiable facts."[9]

In applying this multi-factor test for compliance, the first factor – the quality of CDP's performance across a material span of time– is the initial, threshold inquiry. In assessing this factor, the Monitoring Team will consider a range of both quantitative and qualitative measures for each provision and determine both CDP's baseline and current level of performance. If CDP and/or its officers' performance is not at a certain level with regard to the relevant metric, then things like progress over time or CDP's identification of the issues are unlikely to cure the basic deficiencies with performance, regardless of improvement over time.

The Monitoring Team will develop a number of quantitative metrics in assessing performance. For such metrics that are rates, the Monitoring Team will consider a compliance rate of 90% or above as "passing". For some non-rate metrics, where there is a relatively small number of incidents for review, or where the rate requires different considerations, the Monitoring Team may set different expectations to be considered passing. The result is such that each provision is graded upon a range of measures and that strong performance on any given quantitative measure must be balanced against the severity of any deviations, the department's response to such violations, and the department's progress over time.

The multi-factor test for compliance works to ensure that all relevant objective factors are reasonably weighed and the Monitoring Team's written findings provides guidance to the Department and to the community about the benchmarks that it expects and CDP's current performance level.

Finally, the Monitoring Team may assign a score for an individual provision that is lower than the score given in a prior report based upon the weighing of factors and current CDP performance.

Compliance Assessments are not only about policy; they are also about *performance*—about CDP demonstrating *adherence* to policy. Accordingly, meeting the requirements of Paragraph 160 means CDP must do more than just put new policies in place—it must also show that those policies are being followed in day-to-day policing. Without clear evidence that officers are applying the

---

[8] *See, e.g.*, *Murr v. Wisconsin*, 582 U.S. __ (2017) (adopting a multi-factor test for determining whether governmental regulations effectuated a decline in the value of private property so as to be considered a government taking under the Fifth Amendment); *EBay v. MercExchange*, 547 U.S. 388 (2006) (applying four-factor test to determinations about permanent injunctive relief in disputes arising under the Patent Act); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (articulating three factors for courts to consider when determining whether additional governmental and/or judicial procedures are necessary to satisfy the Due Process Clause).
[9] James G. Wilson, "Surveying the 'Forms of Doctrine' on the Bright Line Balancing Test Continuum," 27 *Ariz. St. L.J.* 773, 802 (1995).

policies in the field, the reforms risk being performative rather than producing real, constitutional change.

IV.    UNDERSTANDING THE DATA

This section summarizes the Monitoring Team's evaluation, using the methodology outlined in Section III to assess compliance with paragraphs 160-175 and 367 (c) 1-3 of the Consent Decree.

A.  Overview of Data Sources and Limitations

Following the formal notice of Search and Seizure Assessment Plan and Data Request dated July 9, 2024, the Monitoring Team received the full dataset of 2023 Stop Forms in August 2024. After conducting a CDP-facilitated walkthrough of the relevant data systems and piloting a sample of test cases, the Monitoring Team officially launched its formal Search and Seizure Assessment on January 2, 2025. However, the initial reviews encountered data integrity challenges, including issues with the 2023 Search and Seizure Stops data sample and the unavailability of some of the related WCS videos. As a result, the Monitoring Team requested the 2024 Stops data, which was subsequently provided and utilized for the Search and Seizure Assessment that commenced on February 26, 2025.

As noted, the Cleveland Division of Police (CDP) provided administrative datasets for all traffic and investigatory stops conducted in 2023 and 2024. These datasets include demographic information (race, ethnicity, age, and gender) of the individuals stopped, as well as the officer-reported legal justification for each stop. Traffic stops are based on probable cause, while investigatory stops must be supported by reasonable suspicion.

Officers are required to document each stop using a "Stop Form" (i.e., Brazos Form), which captures details regarding the stop including the subject's demographic information and the legal justification for the stop. Officers are required, with some limited exceptions by policy 2.02.05 to submit a separate Stop Form for each individual involved in a stop and each stop is to be associated with a unique incident number. This should allow each unique stop and the individuals involved to be readily identified. However, the Monitoring Team SMEs' review of the Stop Forms revealed that CDP frequently employs "stop operations" (e.g., specialized units or details, drunk driving checkpoints) in which a single incident number is used to document multiple stops in the operation – either conducted by several officers across different locations or by an individual officer conducting multiple stops over time. This practice compromises the integrity of incident-level data as the inconsistencies in data entry undermined the reliability of the incident identifiers. As a result, in analyzing the data it was not always possible to determine the precise number of distinct stops or the total number of individuals involved with each stop. Therefore, for this analysis the unit of observation is individual people involved in a stop – regardless of whether those individuals were involved in the same stop or in different stops.

The following section of this report presents the analysis and findings of the survey data from the Monitor Team SMEs' review of the sample of Stop Forms completed by CDP officers after police-

initiated stops in 2024, in accordance with ¶¶160 - 172 of the Consent Decree. Also included are the results of a review of documentation provided by CDP in accordance with ¶¶173 - 175.

## V.  COMPLIANCE ASSESSMENT

As described above in the Methodology section, the Monitoring Team reviewed a variety of reports and WCS images to collect data about the traffic and investigatory stops. Using the survey tool as described, officers' narrative reports and observations of the images were collected through a series of questions designed to aggregate and analyze the data in a more quantitative fashion. The Monitoring Team's review of these reports and videos allows the Monitoring Team to assess the Division's compliance with the various individual provisions of the Consent Decree around policies and procedures, and with the data as collected in accordance with ¶367, identify patterns and trends related to stops, searches, and arrests over time. A discussion and analysis of the Monitoring Team's assessment of the individual incidents resulting in searches and seizures follows.

## A.  Search and Seizure Assessment Survey Findings (¶¶160 - 175)

The analysis of the Search and Seizure survey data from the Monitoring Team's SME's review of police stops from 2024 revealed that CDP officers provided sufficient articulation of probable cause in 90.80% of traffic stops and reasonable suspicion in 95.24% of investigatory stops. The survey data revealed that there was insufficient reasonable suspicion or probable cause in less than 2% of investigatory stops and traffic stops respectively. The reviewers noted in 1.96% (8 incidents) that the stated probable cause was not sufficiently detailed. In those instances, the stated probable cause used non-descriptive language such as "speeding," or "expired plate." However, a consensus was later reached by the reviewers that these brief descriptors, while succinct, were sufficient legal justifications, although additional factual details in documenting stops is optimal. Language such as "traveling 45 mph in a 30-mph zone" or "plate expired over 12 months ago" are examples of more complete descriptions. Overall, the SMEs review determined that CDP officers did not act in accordance with the requirements of the Consent Decree or CDP policy in 1.00% of traffic stops and 6.93% of investigatory stops.

Among the 20 problematic encounters, the deficiencies observed primarily entailed (1) inadequate articulation of reasonable suspicion or probable cause, (2) missing or incorrect data entries, and (3) misuse of the "exigent circumstances" exception as the legal basis for conducting warrantless searches. Six officers were involved in at least two of these problematic incidents, and four of the officers were repeatedly involved in the same type of incidents, indicating these issues may be concentrated among a small group of officers.

As described below, SMEs identified few problematic stops. Among these stops, certain officers are involved in multiple such incidents, underscoring the need for a deeper dive into the data and possibly targeted remedial and corrective measures, continued training in Search and Seizure and

17

Bias-Free Policing, and strong supervisory oversight, accountability, and performance evaluation. Overall, CDP officers generally adhered to constitutional standards and departmental policies governing traffic and investigatory stops (¶160; GPOs 2.02.01 and 2.02.02).

While CDP has revised, developed, and implemented search and seizure policies consistent with federal and state laws, and officers articulated probable cause in 90.80% of traffic stops and reasonable suspicion in 95.24% of investigatory stops in 2024, significant racial disparities in investigatory stops, searches, and arrests persist. Blacks accounted for 67.3% of stops, 65.6% of searches, and 69.5% of arrests. The disproportionately in stops then extends to searches and seizures and calls for investigation to determine whether this pattern of stops is part of an "effective overall crime prevention strategy that takes into account community values." A challenge to analyzing this is a lack of documentation or WCS as part of these stops as well with SMEs determining that reviews could not be completed in 8.46% of traffic stops and 9.09% of investigatory stops for lack of information.

To further advance compliance with search and seizure related paragraphs, CDP should consider compiling regular stop strategy plans similar to the Specialized Crisis Intervention Plan(s) (SCIPs). Such documentation and planning would demonstrate how CDP is responding in real time to crime and accounting for community values. Such plans would also show CDPs commitment to addressing any policing that does not adhere to CDP policy and encourage officers to fully and properly document stops.

- **Paragraph 161** – Officers will not use an individual's gender, race, ethnicity, national origin, or perceived sexual orientation as a factor, to any extent or degree, in establishing reasonable suspicion or probable cause, unless such information is part of an actual or credible description of a specific suspect in an investigation that includes other identifying factors.

In the detailed review of the sample cases SMEs identified a handful of stops where officers appeared to be influenced by an individual's gender, race, ethnicity, national origin, or perceived sexual orientation as a factor in establishing reasonable suspicion or probable cause. For example, in one traffic stop, while the officer had probable cause to make the stop, the reviewer indicated that once it was determined the male subject was from Mexico, the SME noted a change in the officer's demeanor and differences in treatment compared to other reviewed incidents.

In another traffic stop, the officers stopped a Black female after observing her make a turn at a red-light. The Stop Form did not indicate whether the turn was illegal. During the stop, the officers asked the driver if she had guns or weapons in the vehicle, although there was no documented or observed reason to suspect weapons or a threat to officer safety. The driver was released with a verbal warning. There was a lack of documentation or evidence of a perceived threat and the required specific, objective articulable evidence.

18

The details from the above referenced stops *could* be concerning, because only a small number cases from a sample of 631 could involve biased decision-making, as the broader racial, and to a lesser extent gender and age, disparities observed in the Search and Seizure Outcome Assessment below indicates, a determination **that ¶161 meets the standard for Operational Compliance – 4** - is warranted**.**

As a recommendation, CDP should give attention to the Bias Free requirements of the Consent Decree, particularly ¶¶43 and 265, and deliver fulsome analysis to the community of the data required by paragraphs 43 and 265. Further, as described above, using the model of the SCIPs, the Division can create frequent and regular checkpoints to ensure police services are being delivered without bias.

- **Paragraph 162** – Officers will not conduct investigatory stops when they lack reasonable suspicion.

For 95.24% of all investigatory stops reviewed, SMEs found that the officer had sufficient reasonable suspicion to execute an investigatory stop. SMEs noted only one incident for not having sufficient reasonable suspicion to justify the stop, and were unable to evaluate the reasonable suspicion for nine other incidents. The Monitoring Team determines that CDP officers recognize when there is sufficient reasonable suspicion for an investigatory stop and is in **Operational Compliance – 4, relative to ¶162.**

- **Paragraph 163 –** Officers will not conduct pat-down searches without specific and articulable facts to reasonably suspect that a particular person is armed and dangerous. This does not restrict an officer's ability to conduct a search incident to arrest or prior to transport.

SMEs identified 176 individuals subjected to pat-down searches. Of those, 64 individuals were arrested, and the Monitoring Team assumes that the pat-down search was conducted as part of the arrest and thus does not require the officer to have "specific and articulable facts to reasonably suspect that a particular person is armed and dangerous." Another eight individuals consented to a search. Of the remaining 104 individuals, SMEs identified at least 15 individuals who were subject to a pat-down were not arrested and for which the officer did not have "specific and articulable facts to reasonably suspect that a particular person is armed and dangerous." In about 85% of the cases, the required articulable facts were provided. Therefore, the Monitoring Team finds the City in **Operational Compliance – 4 -** with Paragraph 163.

To increase compliance with ¶163, supervisors and the Training Section must be attentive to officer reports and ensure that officers can adequately articulate the reason the officer "reasonably suspect[s] that a particular person is armed and dangerous." Further, the Division must demonstrate that it can "meaningful adherence to or effective implementation, including across time, cases, and/or incidents" as cited in the Monitoring Team's grading scale on pages 11 and 12 of this report.

It may be prudent to provide officers and supervisors with refresher training on what constitutes specific and articulable facts to reasonably suspect a person is armed and dangerous.

- **Paragraph 164** – Where an officer seeks consent for a search, the officer will inform the person of his or her right to refuse and to revoke consent at any time and document the person's consent.

In reviewing WCS and stop forms, SMEs identified 12 individuals involved in 12 stops where officers sought consent for a search. Of these, officers documented the consent for six individuals. SMEs also found that officers      notified only one individual of their right to refuse consent and in no instances is there available documentation that the officers informed the individual of their right to revoke consent. SMEs also identified 14 stops where the officer sought consent to search a vehicle or other property.[10] In these cases, officers documented consent nine stops. In three stops, officers informed the subject of the right to refuse consent, and in one incident, the officer informed the subject of the right to revoke consent. Finding that officers are inconsistent in their documentation of requesting consent, and informing individuals of their right to refuse or revoke in about half the individual searches and half the vehicle searches, the Monitoring Team finds the City in **Partial Compliance – 3 -** with Paragraph 164.

To advance to Operational Compliance for ¶164, the Monitoring Team suggests additional training on the legal standards on the requirements for conducting a consent search with a focus on when such searches are appropriate, how to properly inform an individual of their rights, and the necessary documentation would be helpful. Establishing routine data quality oversight practices to ensure that officers are properly documenting consent searches would be useful and will reinforce the culture of continuous improvement.

- **Paragraph 165** - CDP officers will not rely solely upon an individual's geographic location, or presence in a high crime area, without any other specific and articulable facts indicating that the individual has been, is, or is about to engage in criminal activity, as the basis for an investigatory stop.

SMEs identified only one investigatory stop (out of 221) that relied solely on the individual's presence in a particular location, e.g., a high drug area, without other articulable facts to provide a

---

[10] During a stop, generally only one vehicle is stopped, but there may be multiple passengers. Where officers seek consent to search an individual during a stop then, multiple individuals may be searched and consent sought for each person. By comparison, typically only a single instance of consent is needed to search the vehicle since typically only one vehicle is searched. For this reason, the Monitoring Team reports consent searches for people at a per person level, whereas consent searches for vehicles are reported at the stop level.
Note that CDP uses the same incident number for multiple stops at times and that the SME survey did not permit clear differentiation for SMEs for such layered incidents. These data reporting and survey design issues will be addressed in future assessments.

legal basis for the stop. Because of this high level of compliance, the Monitoring Team finds the City in **Operational Compliance – 4 -** with respect to ¶165.

- **Paragraph 166** – Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assaulting an officer, and no other substantive violation is alleged. Upon notification, the supervisor will respond to the scene.

Based on SMEs' reviews, there were no stops where officers made a "custodial arrest [solely] for obstructing official business, resisting arrest, or assaulting an officer, and no other substantive violation is alleged." SMEs did, however, identify     four custodial arrests for obstructing official business, resisting arrest, or assaulting an officer that involved at least one other substantive violation. There were     five individuals involved in these incidents. For each of these incidents, a supervisor was notified as soon as practicable. Given the high compliance with ¶166—requiring supervisor notification for custodial arrests involving obstructing official business, resisting arrest, or assault on an officer (four cases)—the Monitoring Team finds the City in **Operational Compliance - 4**.

- **Paragraph 167** – Officers will not use "canned" or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests.

Among the reviewed investigatory stops, SMEs identified 16 stops that used "canned" or conclusory language. Within these incidents, nine involved a search and three involved an arrest. Encouragingly, this indicates that 94.04% of reviewed arrest reports, officers refrained from using rote or conclusory language, demonstrating strong adherence to articulating the basis for their actions. The Monitoring Team finds that the City is in **Operational Compliance – 4, relative to ¶167.**

- **Paragraph 168** – Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports. CDP will train officers to use specific and individualized descriptive language in reports when documenting investigatory stops, searches, and arrests. Supervisors will review all documentation of investigatory stops, searches, and arrests for completeness and adherence to law and CDP policy.

SMEs found that 93.11% of reviewed investigatory stops included articulated justification for the stop. Among investigatory stops where an individual was searched, 97.22% included articulated justification, and among stops with an arrest, 97.22% included articulated justification. The Monitoring Team finds the City in **Operational Compliance – 4 with ¶168.**

- **Paragraph 169** – CDP supervisors will review each arrest report by officers under their command, whether or not they involve the seizure of contraband, and will sign off on those reports to memorialize their review within 24 hours of the arrest, absent exceptional circumstances. Supervisors will review reports and forms for deficiencies, including:

  1. "canned" or conclusory language without supporting detail, inconsistent information, insufficient articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not correct or complete;
  2. arrests following stops that were not supported by reasonable suspicion;
  3. arrests that are not supported by probable cause, or are otherwise in violation of the law or CDP policy; and
  4. for every search or arrest involving the recovery of contraband evidence, whether the circumstances by which the evidence was recovered and/or probable cause for arrest was established are plausible and complete.

The Monitoring Team was able to confirm supervisory review of stops, including an arrest within the required 24-hour window, in 61.11% of incidents. In an additional 27.78% of cases, the Monitoring Team was unable to determine whether this standard was met due to inadequate documentation. While these findings suggest that supervisors meet the review timeline more than half the time, they also highlight the need for more reliable tracking mechanisms to ensure accountability and full compliance. In that only 61.11% of incidents were reviewed within the required 24-hour timeframe, and inadequate documentation hindered a complete assessment of this requirement, **¶169 is determined to be in Partial Compliance – 3**.

To achieve Operational Compliance in ¶169, CDP must enhance its tracking and retrieval of supervisory review and approval of arrest reports. Currently, supervisors are required to review and approve arrest reports within 24 hours. When supervisors do not approve a report, the report is returned to the reporting officer for revision. Based on current Report Management System (RMS) data collection, SMEs were not able to assess why a report may not have been approved and thus whether it was for a reason as outlined in ¶169. SMEs also could not determine what, if any, edits an officer made based on supervisor feedback. Finally, SMEs noted that for stops involving an arrest, multiple reports/forms may need to be completed and filed leading to confusion as to what specific information was reviewed properly. Some of these challenges may be addressed with the transition to a unified RMS in November 2025. CDP will need to develop further training, oversight, and accountability systems for this new system to ensure that supervisors understand their duties to *review* reports (not to necessarily approve) within 24 hours and that they document and the system properly records for audit purposes any supervisor comments. The Division reports that most of these reports were completed on time but the inability of the SMEs to ascertain the timeliness in those cases may indicate a document retrieval issue that should be addressed.

- **Paragraph 170** – Within seven days, CDP supervisors will separately document and report:

    > (1) Investigatory stops and pat-down searches that appear unsupported by reasonable suspicion, or that are otherwise in violation of CDP policy; (2) arrests unsupported by probable cause or that are in violation of CDP policy: or (3) investigatory stops, searches, and arrests that, while comporting with law and policy, indicate a need for corrective action or review of agency policy, strategy, tactics, or training.

The Monitoring Team's evaluation of the quality of supervisory review was constrained by the limitations of the current data management systems, which do not allow SMEs to directly access supervisory review and approval records for Stop Forms and arrest reports. To help facilitate this aspect of the review, the City's Police Accountability Team (PAT) provided an alternative method by supplying screenshots of supervisory approvals for arrests in which the supervisor had identified issues. The PAT also offered to retrieve and provide additional information to help determine whether supervisors reviewed and provided feedback, or whether initial disapprovals were properly documented and corrected. While this offer was appreciated, this method would require an individual reviewer to halt the process, request data, anticipate the return of data, and return to the review later. This was both impractical and demonstrates the inability of auditors or Monitoring Team reviewers to access required information for a complete review.

Given the data system limitations and the challenge to review the necessary data from supervisory reviews and approval records during the assessment, the Monitoring Team is **compelled to rate ¶170 in Partial Compliance – 3.**

- **Paragraph 171**- CDP supervisors will take appropriate action to address all apparent violations or deficiencies in investigatory stops, searches, and arrests. Appropriate action may include recommending non-disciplinary corrective action for the involved officer, or referring the incident for administrative or criminal investigation. The supervisor will ensure that each violation or deficiency is addressed in the officer's performance evaluations.

The review of paragraph 171 was limited in the same way as paragraph 170. The reviewers' inability to have ready access to the necessary data compromised its ability to review the requirements of this paragraph. In two instances where the SMEs did have questions regarding some aspect of a police encounter, the PAT referred the case to CDP. CDP responded promptly and explained what had occurred in the incident in question, what follow-up actions were taken and, in one instance, initiated a Divisional investigation. In addition, the PAT provided the Monitoring Team with Divisional Notices for three cases in which violations of the Stop Form policy resulted in remedial corrective and disciplinary actions ranging from retraining and a Letter of Reinstruction being placed in the officers' personnel files, to one officer receiving a 20-day

suspension for multiple infractions. While those additional pieces of information suggest the Division is addressing deficiencies, the current RMS did not allow the SMEs to efficiently review the full extent to which CDP supervisors reviewed and took appropriate corrective action when they identified deficiencies in the reports, therefore, ¶171 is also rated in **Partial Compliance - 3**.

To achieve compliance with ¶170 and ¶171, CDP will need to enhance data collection and retrieval regarding supervisor feedback to officers and tracking of officer edits based on supervisor feedback. CDP is currently developing data quality oversight for these issues along with the transition to a new RMS such that the Monitoring Team expects improvement in the next assessment. As suggested in the Monitoring Team's review of ¶160, CDP should consider documenting regular stop reviews into a scheduled report that demonstrates clear supervisor oversight.

- **Paragraph 172** – A command level official will review, within seven days of their completion, all supervisory reports of investigatory stops and pat-down searches not supported by reasonable suspicion, all searches and arrests not supported by probable cause, and all investigatory stops, searches, and arrests that were in violation of CDP policy, or that indicated a need for corrective action or review of agency policy, strategy, tactics, or training. The commander will evaluate the supervisor's assessment and recommendations and ensure that all appropriate corrective action is taken, including referring the incident to Internal Affairs for investigation, if warranted. The commander also will take appropriate non-disciplinary corrective action and/or will initiate the disciplinary process against supervisors who fail to conduct complete, thorough, and accurate reviews of officers' investigatory stops, searches, and arrests. CDP will take into account the quality and completeness of these supervisory and commander reviews of officers' investigatory stops, searches, and arrests in supervisory and commander performance evaluations.

As noted above, the current data collection systems made it such that SMEs were not able to readily or accurately ascertain what actions, if any, CDP took when an incident was flagged by a supervisor. Furthermore, restricted access for SMEs to data systems that required SMEs to request additional information from PAT that took time to compile would have constrained SMEs ability to fully review incidents described in ¶172 and conduct this work in accordance with the timeline.

Given the Monitoring Team's inability to fully assess the complete process of supervisory review due to the current RMS and retrieval of supervisory forms, **we are compelled to rate ¶172 as in Partial Compliance - 3.**

To assess compliance with ¶¶173–175 of the Consent Decree, the CDP Training Section provided the Monitoring Team with training materials and documentation for 2024. This included the Ohio Attorney General's Peace Officer's Basic Training curriculum and training records for 73 CDP

24

officer recruits from two Police Academy Classes - #155 and #156, which completed the Academy in 2024 (¶173). The OPOTA training included 36 hours of foundational legal education on the constitutional principles and operational standards governing arrest, search and seizure, use of force, and procedural justice. This training contained 26 student performance objectives, which included the legal definition of a seizure, the levels of suspicion required for specific police actions, and the legal standards governing an investigative stop under Terry v. Ohio as areas of focus.

- **Paragraph 173** – CDP will provide all officers with initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements of this Agreement. The training will be taught by a qualified instructor with significant experience in Fourth Amendment issues. The training will address the requirements of the Fourth Amendment and related law, CDP policies, and this Agreement, including:

  a. the difference among the scope and degree of intrusion associated with different types of police contacts; the difference between probable cause, reasonable suspicion, and mere speculation; the difference between voluntary consent and the mere acquiescence to police authority;
  b. the types of facts and circumstances that may be considered in initiating, conducting, terminating, and expanding an investigatory stop;
  c. the level of permissible intrusion when conducting searches, such as "pat-downs" or "frisks";
  d. the permissible nature and scope of searches incident to arrest;
  e. procedures for executing searches, including handling, recording, and taking custody of seized property and evidence; and
  f. principles of procedural justice and the effect that differing approaches to investigatory stops, searches, and arrests can have on community perceptions of police legitimacy and public safety.

Given CDP's provision of comprehensive Search and Seizure training, approved by the Monitoring Team and DOJ to officers across the Division, delivered through its Police Academy, the Monitoring Team assesses **¶¶173 to be in General Compliance - 5**

- **Paragraph 174** – CDP also will provide officers with annual search and seizure in-service training that is adequate in quality, quantity, type, and scope.

The Division provided training curriculum and records for 16 hours of annual in-service Continuing Professional Training Session II, which covers search and seizure. The training was completed over the course of two-days by 1,165 officers in 2024 in accordance with CDP's 2024 - 2026 Training Plan and ¶174 of the Consent Decree.

Given CDP's provision of annual in-service Continuing Professional Training required of all officers, the Monitoring Team assesses **¶174 to be in Operational Compliance - 4.** Pending continued training and subsequent reviews by the Monitoring Team's this rating will easily be upgraded to General Compliance in a subsequent review.

- **Paragraph 175** – CDP will incorporate the following elements in its training of officers: (1) if possible, introducing themselves at the initiation of contact with a civilian; (2) the reason for an investigatory stop as soon as possible; (3) ensuring that an investigatory stop is no longer than necessary to take appropriate action; and (4) acting with professionalism and courtesy throughout the interaction.

With the exception of about 20 cases, from a sample of 631, the SMEs' reviews of WCS videos and case summaries, in general, did not identify behavior that would be classified as discourteous or unprofessional. Indeed, reviewers called out, particularly in traffic stops, routine helpful and kind behavior of officers. In more than 90% of the stops reviewed, officers sufficiently articulated probable cause and reasonable suspicion as stipulated in ¶175 (2). The SMEs noted data on the duration of the stops to ensure that stops were no longer than necessary to execute the appropriate police action. There were no reported findings of investigatory stops that exceeded the time reasonably necessary to conduct the appropriate police action. The officer training required by ¶175 contained all the elements of the paragraph and the training itself is satisfactory and complete. In that CDP's officer training entails all of the required elements in accordance with ¶175 the Division is determined to be in **Operational Compliance - 4 with ¶175** of the Consent Decree.

## VI.    SEARCH AND SEIZURE RELATED OUTCOME ASSESSMENTS

Paragraph 367 (c) 1, 2, and 3 of the Consent Decree requires that at least once a year, the Monitor will gather and analyze outcome data to identify trends and patterns to help evaluate whether policing practices are being carried out fairly and consistent with constitutional standards. This includes:

367 c.1. The total number of investigatory stops, searches, and arrests—broken down by police district, type of arrest, and the subject's actual or perceived age, race, gender, and ethnicity—as well as how often these encounters led to a summons or arrest.

367 c.2. Data on the justification for stops and arrests (reasonable suspicion or probable cause), also broken down by demographic factors.

367 c.3. The number of searches that found contraband, again broken down by district, type of arrest, and subject demographics.

### A.  Comparing Stop, Search, & Arrest Outcome Data to Population Demographic Data

26

A central issue in the analysis of the distribution of police outcomes—such as traffic and investigatory stops by race and ethnicity—is the definition and measurement of the relevant population. In the context of traffic stops, the relevant population refers to the driving population, or the pool of individuals eligible to be stopped within a specific jurisdiction. This population serves as the basis for comparison with traffic stop, investigatory stop or other outcome data to assess the presence of disparities in enforcement practices. Because the demographic composition of the driving population, within the context of traffic stops, which are the most frequent contact the average citizen has with law enforcement, in a given area is not typically known, it must be estimated. Comparing the estimated demographic composition of the driving population with the demographic characteristics of those stopped provides a "benchmark" for evaluating whether the observed stop rates reflect what would be expected in the absence of any type of bias in enforcement, all other factors being equal (Dunn, R. A., 2009; Engel & Calnon, 2004; Fridell, 2004).[11]

Although various approaches have been used in empirical studies to estimate the driving population, scholars have not reached a consensus on the most appropriate or accurate method for defining this population (Farrell et al., 2003). To contextualize racial disparities in stop, search, and arrest outcomes within the city of Cleveland, it is critical to first define and measure the relevant population. To that end, demographic estimates derived from the 2020 U.S. Census American Community Survey (ACS) for residents aged 15 to 84 (i.e., driving-age) were used in conjunction with a 2020 Travel Demand or "Gravity" Model developed by the Northeast Ohio Areawide Coordinating Agency (NOACA), the regional planning agency for Greater Cleveland. This model was imputed with race- and age-specific demographic data from the 160 municipality/6-county region—including external motor vehicle trips from contiguous states—that constitutes the broader geographic area from which Cleveland's driving population is drawn (Dunn, 2004, 2016; Dunn & Reed, 2010; see Appendix A).[12]

## B.  Community Setting and Demographics

---

[11] Source: Dunn, R. A., (2009). Measuring racial disparities in traffic ticketing with large urban jurisdictions. Public Performance & Management Review, 32(4), 537-561.; Engel, R. S., & Calnon, J. M., (2004). Examining the Influence of Drivers' Characteristics During Traffic Stops with Police: Results from a National Survey. Justice Quarterly, 21(1), 49–90.; Fridell, L., (2004). By the Numbers: A Guide for Analyzing Race Data from Vehicle Stops. Washington, DC: Police Executive Research Forum.

[12] Dunn, R. A. (2004) Thesis: Spatial profiling: To what extent do the Cleveland Police Department's traffic ticketing patterns target blacks? (Cleveland State University); Dunn, R. A. (2016). Racial Profiling: A Persistent Civil Rights Challenge Even in the Twenty-First Century, Case Western Reserve Law Review, 66(4), 958–991.; Dunn, R. A., & Reed, W. (2011). Racial Profiling: Causes & Consequences. Dubuque, IA: Kendall Hunt Publishing. The research methods used in these studies served as the scientific foundation for the City of Cleveland's Traffic Camera Program, which operated from 2005 to 2014. It was also employed in a 2009 study commissioned by former Cuyahoga County Prosecutor Bill Mason that contributed to the repeal of the City's drug paraphernalia ordinance, commonly referred to as the "crack pipe" policy. Additionally, this method informed the development of the Ohio Collaborative Community-Police Relations Board's statewide standard on Bias-Free Policing.

1.  City Demographics

Cleveland, the second-largest city in Ohio, had a population of 365,379 as of the 2020 Census. Notably, it also is the most racially and ethnically diverse major city in the state. No single racial or ethnic group constitutes a majority of the city's residents. While Black residents were the majority in 2010, they now represent a plurality at 48.4%. White residents make up 34.5% of the city's population, Asian are 2.8%, Pacific Islanders are less than 1%, and individuals identifying as two or more races represent 13.9% of the population. Hispanics, which may be of any race, are 13.1% of the city's population.

Cleveland not only reflects significant internal diversity but also functions as the economic, cultural, and transportation hub of Ohio's largest metropolitan region. The Combined Statistical Area (CSA) of Cleveland-Akron-Canton has a population exceeding 3.6 million, making it the most populous and interconnected urban corridor in the state. As the core city of this CSA, Cleveland plays a pivotal role in shaping the region's identity, economic flows, and mobility patterns.

Using the research methods described above to measure the driving population, Cleveland has an estimated 2,843,432 motorists traversing its city streets within a 24-hour period. The racial demographics of this driving population or those at-risk of being stopped by CDP officers are estimated to be 58.77% White, 31.81% Black, 3% Asian, 0.33% Native American/Alaska Native, and 6.05% Some Other/Two or More Races. It should also be noted that approximately 17% of Black households, 14% of Hispanic households, 8% of Asian households and 5% of White households in Cuyahoga County—of which Cleveland is the county seat—do not own or have access to a motor vehicle further influencing each groups' risk of being stopped respectively (American Community Survey 2017-2021 5-year data; Table B08201). In Cuyahoga County's approximately 556,000 households, 57% are White, 29% Black, 4% Asian, 7% Hispanic and the remaining 5-7% are of other races (US Census Bureau 2020 QuickFacts, Cuyahoga County, Ohio).

Despite its demographic diversity and regional significance, Cleveland remains one of the most racially segregated large cities in the United States. The Black–White Dissimilarity Index for the city is approximately 79.4, indicating that nearly 79% of either Black or White residents would have to relocate to different neighborhoods to achieve full racial integration (CensusScope.org). This pattern of segregation is not confined to the city limits. Cuyahoga County registers a similarly high Dissimilarity Index of 69.8, indicating that racial segregation persists throughout the surrounding suburbs and the broader metropolitan area (Center for Community Solutions).

These demographic and spatial dynamics are crucial for understanding the context in which police-initiated actions such as stops, searches, and arrests occur. The population of drivers on the roads, the areas they are drawn from and where they travel within a geographic region influences the likelihood of being stopped by police. In Cleveland, drivers on the road come from the city,

28

surrounding suburbs and outlying areas beyond the region, and the vast majority of all police-initiated stops were traffic stops, with investigatory stops making up a much smaller share.

However, it is important to emphasize that the presence of racial disparities in stop, search, or arrest outcomes—while certainly warranting further scrutiny—does not in itself constitute definitive evidence of racial bias or discriminatory behavior or intent on the part of the Division or individual officers. These disparities may also be influenced by a range of underlying socioeconomic and structural factors, such as community crime rates, housing segregation patterns, poverty, unemployment, and substance abuse. Further, the deployment activities of the Division of Police which rely on members of the public calling for service, responses to victims of crime, and strategies designed to prevent and respond to crime patterns and trends. As such, careful, evidence-based analysis is essential to distinguish between disparities that reflect broader social inequities and those that may point to disparate treatment or impact, regardless of intent, which may stem from police actions, policies, or practices—both formal and informal. This report does not examine the full context of each stop and search, rather is reporting on the raw data available from the Division's record management systems.

2.  Police District Demographics

Investigatory stops, which are more likely to entail a pedestrian stop within the context of a public place such as a city street, a business establishment or some other type of public venue, are less influenced by the factors that help define the driving population. Therefore, Table 1 below presents estimates of the percentage of residents of each racial group within each Police District that were used as a reference or benchmark in analyzing the extent of racial differences in stops by police district. For example, the racial demographics of the 4th and 5th Districts are estimated to be more than 80% African American, while the 1st and 2nd Districts are each roughly 60% White. These racial dynamics and any observed disproportionalities should be understood within this context.

### Table 1: Persons 15 to 84 by Police District

| Police District | White | African American | American Indian | Asian | NH/PI | Other | Multiple | Hispanic |
|---|---|---|---|---|---|---|---|---|
| 1 | 60.4% | 19.6% | 0.3% | 3.2% | 0.0% | 9.6% | 6.9% | 18.3% |
| 2 | 59.0% | 16.4% | 0.4% | 1.5% | 0.0% | 13.0% | 9.8% | 25.6% |
| 3 | 33.3% | 50.3% | 0.2% | 9.4% | 0.0% | 2.1% | 4.7% | 6.0% |
| 4 | 10.5% | 85.1% | 0.1% | 0.6% | 0.0% | 0.8% | 2.8% | 2.4% |
| 5 | 11.5% | 84.6% | 0.1% | 0.3% | 0.0% | 0.6% | 2.9% | 2.1% |

Based on ACS2020 Estimate of 18-84 Population as a Proportion of Total Population at the Census Tract Level[13]

---

[13] Source: 2020 US Census American Community Survey and Police District race/age demographic data produced by the Northern Ohio Data and Information Service (NODIS) in the Levin College of Public Affairs and Education at Cleveland State University.

To further contextualize the socioeconomic milieu within which CDP officers work and police-initiated stops occur, ward-level crime totals were apportioned to 2020 Census blocks according to each block's share of the ward's total population. Each block was then assigned to a ward and police district based on the location of the block's geographic center (centroid). The estimated block-level crime values were aggregated to produce police district-level totals. Table 2 below provides estimated percentages of the city's overall violent crimes and property crimes per 100,000 residents by police district in 2023.[14]

**Table 2: Police District's Share of Citywide Violent & Property Crimes in 2023**

| Police District | % of Citywide Violent Crimes | % of Citywide Property Crimes |
|---|---|---|
| District 1 | 14% | 19% |
| District 2 | 21% | 26% |
| District 3 | 22% | 21% |
| District 4 | 26% | 20% |
| District 5 | 17% | 14% |

Source: Cleveland 2020 Census Blocks and Ward-level Violent Crime and Property Crime Data, NEOCANDO (Northeast Ohio Community and Neighborhood Data for Organizing at Case Western Reserve University) (https://neocando.case.edu/neocando/index.jsp); Police District crime estimates and GIS map produced by NODIS (the Northeast Ohio Data and Information Service at Cleveland State University).[15]

The results indicate the majority of Cleveland's violent and property crimes are concentrated in the 2nd, 3rd, and 4th Police Districts, which collectively account for approximately 70 percent of the city's total estimated crime. The 4th District shows the highest proportion of violent crime at 26%, followed by the 3rd District with 22%, and 21% in the 2nd District. The 1st and 5th Districts exhibit fewer overall violent crime and property crime incidents relative to their population size.

### C.     Total Stops, Searches, and Arrests (¶367.c.1)

1. Investigatory Stops

In 2024, CDP conducted 796 investigatory stops[16]—a pedestrian, vehicle or bicycle stop or detention where individuals reasonably believe they are not free to leave. This is a 5.3% increase

---

[14] Seventeen Census blocks with a total of 26 residents in 2020 were not assigned to either a ward or a police district because their centroids fell outside the available boundary files. This minor geographic mismatch has a negligible effect on the citywide or district-level estimates.
[15] See City of Cleveland Wards and Police Districts in Appendix B
[16] See Table 367c1-0 in Appendix D

from 757 in 2023.[17] Racial disproportionalities were evident with Blacks representing 67.5% of investigatory stops in 2024, and Whites representing 25.7% of these stops.[18]

In that investigatory stops are likely to occur on a city street or a public venue, residential demographic data is the more appropriate benchmark to assess police-initiated investigatory stops. The percentage of stops for each racial group compared to their percentage of the relevant population represents their proportional share of stops. A ratio of one reflects parity or a group's expected share of stops relative to their proportion of the relevant population.

Across the city, Blacks are stopped by police for investigatory stops at 1.4 times the rate you would expect based on their share of the residential population—making up 67.5% of investigatory stops but only 48.4% of residents.[19]  Whites, on the other hand, are stopped far less often—accounting for 25.7% of investigatory stops while being 34.5% of the residential population.[20] Overall, this means Blacks are 1.9 times as likely to be stopped by Cleveland police for investigatory stops as Whites.

The number of investigatory stops among other racial groups were nominal, as Asians were 0.63% of investigatory stops, Native American/Alaska Natives were 0.13%, Native Hawaiian/Pacific Islanders were 0.13% and the race of 5.90% of persons stopped was reported as Unknown.[21] Hispanics, which may be of any race, comprised 7.65% of investigatory stops in 2024.[22] None of the other racial groups were stopped at rates exceeding their proportional share of the population.

While keeping in mind the caveat regarding the use of the residential population to examine disparities in investigatory stops in particular,[23] calculating proportional shares of stops by race at the Police District-level reveals racial disproportionalities at the police district-level as well.

The figures in the 5th District generally reflect the underlying population demographics, where Blacks are 84.6% of the residential population and 90.2% of investigatory stops.[24,25] That means that Blacks were stopped at 1.06 (90.2% / 84.6%) or 6% above parity for investigatory stops in the

---

[17] See Table 367c1-0 in Appendix D
[18] See Table 367c1-6a in Appendix D
[19] See Table 367c1-6a in Appendix D
[20] See Table 367c1-6a in Appendix D
[21] See Table 367c1-6a in Appendix D
[22] See Table 367c1-5 in Appendix D
[23] The limitations of using residential demographic population data to calculate disparities in investigatory stops should be considered when interpreting this and similar results of investigatory stops at the District-level. This is provided for information purposes and to acknowledge the symmetry in investigatory stops and the underlying population demographics.
[24] See Table 1 on page 29
[25] See Table 367c1-6b in Appendix D

5th District. Whereas Whites are stopped at 38.8% (4.5% / 11.5%) of their proportional share for investigatory stops in the 5th District. [26,27]

Yet, the 2nd District, which is majority White, exhibited the largest per capita racial disparity, where Blacks made up only 16.4% of the district's population but accounted for nearly half of investigatory stops.[28] Whites are 59% of the residential population and were involved in 38.6% or 65.4% of their proportional share of investigatory stops.[29,30] Blacks, as noted, are 16.4% of the residents in the 2nd District, yet represent 50.4% or three times their share of investigatory stops. [31,32]

**Table 3: Mean Age of Investigatory Stop Subject by Police District**

| Police District | Investigatory Stops 2023 | Investigatory Stops 2024 | Investigatory Searches 2023 | Investigatory Searches 2024 | Investigatory Arrests 2023 | Investigatory Arrests 2024 |
|---|---|---|---|---|---|---|
| 1 | 33.0 | 36.0 | 32.1 | 37.3 | 30.1 | 35.1 |
| 2 | 32.8 | 34.2 | 33.5 | 32.4 | 32.8 | 32.9 |
| 3 | 36.8 | 43.9 | 39.1 | 35.5 | 36.0 | 36.1 |
| 4 | 35.2 | 36.5 | 33.4 | 33.1 | 31.9 | 32.7 |
| 5 | 31.3 | 36.3 | 27.2 | 33.4 | 29.3 | 34.4 |
| **Mean Age** | **33.9** | **38.0** | **33.2** | **33.7** | **32.2** | **34.1** |

The average age of individuals stopped, searched, and arrested during an investigatory stop by CDP across the five police districts in 2023 and 2024 was also analyzed (Table 3). These data provide further insight into the demographics of those involved in police-initiated stops and may reflect broader patterns of neighborhood enforcement focus, crime, and officer discretion. Citywide the average ages remained stable across the two-year period at approximately 36 years of age for investigatory stops and roughly 33 for searches and arrests, but there was substantial variation between the police districts.

The 3rd District generally reported the highest average age of persons stopped, searched and arrested across the two-year period, particularly seen in investigatory stops in 2024 (43.9), suggesting encounters with older individuals, which is understandable in that the district includes downtown. The 5th District, on the other hand, had the youngest average ages across the stop categories in 2023, indicating younger individuals were being more heavily policed in the district.

---

[26] See Table 367c1-6b in Appendix D
[27] See Table 1 on page 29
[28] See Table 1 on page 29
[29] See Table 1 on page 29
[30] See Table 367c1-6b in Appendix D
[31] See Table 1 on page 29
[32] See Table 367c1-6b in Appendix D

But by 2024, District 5 had average ages closer to the citywide mean. The correlation between age, gender, and race were not analyzed in this assessment.

District-level disparities in age profiles may serve as a proxy for understanding enforcement intensity, targeted strategies, and the broader social impact of policing in the city. Collectively, these demographic distribution findings reinforce the need to examine whether certain populations, particularly Blacks and younger individuals, in certain districts are being disproportionately subjected to more invasive policing practices and the need for sustained oversight, training, and structural reforms.

2.  Investigatory Searches

Police search activity for investigatory stops declined from 2023 to 2024. Investigatory stop searches fell by 7.9%, from 443 to 408.[33] In 2024, Blacks accounted for 65.9% of investigatory stop searches—more than twice the proportion for Whites (27.7%).[34]

The Police District-level search patterns generally reflect the overall demographic distribution of stops, with the 5th District exhibiting the greatest racial disparity between searches of Blacks and Whites, and the 2nd District, which as noted, has a relatively small Black population, showing the smallest. However, when adjusting for population demographics and examining the data on a per capita basis, the 1st and 2nd Districts have the largest racial disparities, with significantly higher per capita search rates for Blacks compared to the 4th and 5th Districts.

In the 5th District, Blacks were 93.9% of searches during an investigatory stop, reflecting 1.11 times their proportional share of the population.[35] Whites, who are 11.5% of the residential population in the 5th District, were 3.1% of investigatory stop searches, which represents 26.8% of their proportional share of the population in the District.[36,37] In contrast, in the 2nd District where Whites are 59% of the residential population, they represented 41.5% of investigatory searches.[38,39] This constitutes 70.3% of their proportional share of post-stop searches. In comparison, Blacks, who represent 16.4% of the residents in the 2nd District, were 50.4% of individuals searched during an investigatory stop.[40,41] This represents 3.1 times their proportional share of the residential population in the district.

3.  Investigatory Arrests

---

[33] See Table 367c1-0 in Appendix D
[34] See Table 367c1-6a in Appendix D
[35] See Table 367c1-6b in Appendix D
[36] See Table 1 on page 29
[37] See Table 367c1-6b in Appendix D
[38] See Table 1 on page 29
[39] See Table 367c1-6b in Appendix D
[40] See Table 1 on page 29
[41] See Table 367c1-6b in Appendix D

Investigatory arrests remained largely unchanged from 2023 to 2024, at 214 compared to 215, respectively.[42] However, racial disparities in post-stop arrests persisted in 2024. Blacks comprised 68.8% of investigatory stop arrests, while Whites represented only 23.2%, reflecting an almost 3-fold disparity.[43]

District-level arrest patterns exhibit similar racial differences as trends in overall stops and searches. In the 3rd, 4th, and 5th Districts, Blacks accounted for the overwhelming majority of arrests—over 90% in every category, with the highest rates in the 5th District (92.7% investigatory arrests).[44] Meanwhile, Whites were arrested at significantly lower rates in these same districts.[45]

As with stops and searches, per capita analyses provide critical insight. The most significant disparities emerge in the 1st and 2nd Districts, where Blacks constitute a smaller share of the population but are arrested at disproportionate rates.[46]

While some of these disparities may reflect differences in community demographics or crime distribution, the consistency and magnitude of the racial disparities across investigatory stop, search, and arrest outcomes demand a closer examination. Particularly in districts where Blacks are stopped, searched or arrested at rates significantly exceeding their representation in the population, questions arise regarding the equity and constitutionality of law enforcement practices. These findings underscore the ongoing need for enhanced transparency, community engagement, and data-informed policy reforms and training to ensure that public safety is administered fairly, objectively, and without bias.

## D.    Traffic Stops by Documented Legal Justification (¶367.c.2)

This analysis includes both traffic and investigatory stops. Comparisons across these types of stops are possible but should be interpreted carefully, as the CDP Traffic Unit conducts most traffic stops while patrol and other regular division units are responsible for most investigatory stops. This means that findings regarding traffic stops may not be attributable to the police district in which the stop occurred. Despite this, the findings described herein reflect CDP decisions regarding officer deployment and what to emphasize in policing.

1.  Overview of Traffic Stops by Demographic Factors

In 2024, CDP conducted 15,530 traffic stops, declining 4% from 16,148 in 2023.[47] Racial disproportionalities were evident with Blacks representing 62.7% of traffic stops, and Whites represented 30.9% of these stops.[48]

---

[42] See Table 367c1-0 in Appendix D
[43] See Table 367c1-6a in Appendix D
[44] See Table 367c1-6b in Appendix D
[45] See Table 367c1-6b in Appendix D
[46] See Table 367c1-6b in Appendix D
[47] See Table 367c1-9 in Appendix D
[48] See Table 367c1-15a in Appendix D

As noted above, the percentage of stops for each racial group compared to their percentage of the relevant population represents their proportional share of stops. A ratio of one reflects parity or a group's expected share of stops relative to their proportion of the driving population.

Citywide, Black drivers are stopped by police at nearly twice (1.97 or 197%) the rate you would expect based on their share of the driving population—making up 62.7% of traffic stops but only 31.8% of drivers.[49] White drivers, on the other hand, are stopped far less often than expected—accounting for 30.9% of stops despite being 58.8% of the driving population.[50] Overall, this means Black drivers are more than 3.7 times as likely as White drivers to be stopped by Cleveland police.

Consistent with the observation of investigatory stops, the number of traffic stops among other racial groups were nominal, as Asians were 0.65% of traffic stops, Native American/Alaska Natives were 0.10%, Native Hawaiian/Pacific Islanders were 0.78% and the race of 4.81% of persons stopped was reported as Unknown.[51] Hispanics, which may be of any race, comprised 8.66% of traffic stops.[52] None of the other racial groups were stopped at rates exceeding their proportional share of the driving population. Asians were stopped at 21.7% of their proportional share, Native Americans/Alaska Natives were stopped at 29.3% of their proportional share, and combining Native Hawaiian/Pacific Islanders with motorists of unknown race and other races (5.59% / 6.05%) they were stopped at 92.4% of their proportional share of the driving population.[53] Although estimates of the percentage of the driving population that are Hispanic were not included in the gravity model, using the 13.1% of the city's population that are Hispanic as the benchmark or denominator (8.66% / 13.1%), Hispanics were stopped at approximately 66.1% of their proportional share of the driving population.[54]

Examining the reason for the traffic stop, "speeding" was the most commonly cited justification for traffic stops in both 2023 and 2024, although its prevalence declined across all racial groups.[55] There were pronounced racial differences in the reasons for traffic stops. Asians had the highest concentration of speeding violations, followed by Whites. Stops for red light violations and vehicle registration issues increased sharply during this period, with Black drivers experiencing the largest increase in stops related to license plates and registration issues. The percentage of Blacks stopped for issues related to registration and license plates in 2024 was 20.3%, twice the rate for Whites (9.2%) and Asians (7.9%).[56] Similar racial patterns were found in stops for window tint violations with 7.3% of Blacks cited for window tint violations compared to 3.5% of Whites and 3.0% of

---

[49] See Table 367c1-15a in Appendix D
[50] See Table 367c1-15a in Appendix D
[51] See Table 367c1-15a in Appendix D
[52] See Table 367c1-14a in Appendix D
[53] See Table 367c1-15a in Appendix D
[54] See Table 367c1-14a in Appendix D
[55] See Table 367c2-1 in Appendix D
[56] See Table 367c2-5 in Appendix D

Asians.[57] Violations related to equipment and driving behavior were more evenly distributed between Black and White motorists.[58]

Gender analysis revealed speeding was the most frequent violation for both genders.[59] Men were more frequently stopped for window tint, equipment and lane violations.[60]

Blacks were overrepresented in all violations types, particularly non-moving violations such as window tint violations, which involve higher levels of officer discretion, with a proportional share of 2.3 (Blacks received 73.3% of window tint violations / Blacks are 31.8% of the driving population), compared to 0.29 for Whites (Whites received 17.2% of window tint violations / Whites are 58.8% of the driving population), and 0.10 for Asians (Asians received 17.2% of window tint violations / Asians are 58.8% of the driving population).[61] Where, as noted, Whites and Asians are more concentrated in moving violations such as speeding, which are among the most conspicuous and dangerous traffic offenses, and involve lower levels of discretion. The gap in proportional shares narrows slightly, with 0.58 for Whites and 0.26 for Asians, compared to 1.95 for Blacks.

Search rates were consistently higher for Blacks across nearly all traffic violation types. Arrest rates showed a similar pattern, although the racial disparity narrowed from 2023 to 2024 in most categories. For example, arrest rates for window tint violations, which were most pronounced for Black drivers, dropped from 5.0% to 4.2%, while rising for White drivers from 1.3% to 3.6%.[62]

2. Traffic Search Patterns by Violation Type

The likelihood of a search being conducted during a traffic stop varied markedly depending on the stated reason for the stop. Notably, stops for window tint violations consistently yielded the highest search rates across all racial groups, whereas stops for speeding resulted in the lowest.[63] Between 2023 and 2024, the most substantial decline in search activity—five percentage points—occurred in connection with tint-related violations.[64] This trend reinforces a broader observation that certain categories of stops, particularly those involving perceived equipment or administrative infractions, tend to be more closely associated with subsequent searches.[65]

Significant variation was also evident within racial groups. For example, in 2023, search rates among White drivers ranged from 1.3% for speeding to 10.6% for tint violations.[66] Among Black

---

[57] See Table 367c2-5 in Appendix D
[58] See Table 367c2-5 in Appendix D
[59] See Table 367c2-11 in Appendix D
[60] See Table 367c2-11 in Appendix D
[61] See Table 367c2-5 in Appendix D
[62] See Table 367c2-7 in Appendix D
[63] See Table 367c2-1 in Appendix D
[64] See Table 367c2-1 in Appendix D
[65] See Table 367c2-1 in Appendix D
[66] See Table 367c2-6 in Appendix D

drivers, the range was even more pronounced—from 2.2% for speeding to a striking 22.0% for tint violations.[67]

Gender-based disparities in search rates also persisted across both years. Male drivers were searched at more than twice the rate of female drivers across all categories. This gap was most prominent in stops for tint violations, where in 2023, the search rate for males was 25.2% compared to just 5.1% for females.[68] These disparities warrant further investigation regarding deployment and enforcement practices or the role of discretionary decision-making.

3.  Traffic Arrest Patterns by Violation Type

Arrest rates resulting from traffic stops experienced a modest increase over the study period, rising from 2.5% in 2023 to 2.6% in 2024.[69] Speeding and red light violations accounted for the most notable increases, while the largest reduction was observed in arrests related to stop sign violations.[70] Stops categorized under "other" violations consistently produced the highest arrest rates across both years.[71]

Racial disparities were observed in arrests. In 2023, Black drivers were arrested at a rate of 3.2%, more than twice the 1.5% arrest rate for White drivers.[72] By 2024, this disparity narrowed somewhat, with Black drivers arrested in 3.0% of stops compared to 2.0% of stops involving White drivers.[73] The most pronounced racial gap was recorded in 2023 window tint violations, where 5.0% of Black drivers were arrested compared to 1.3% of White drivers for the same offense.[74]

Gender differences in arrest rates also emerged, with male drivers consistently arrested at higher rates than female drivers. Although these differences decreased slightly in 2024, they remained particularly evident in stops for window tint and general traffic violations.[75] These findings point to the need for ongoing monitoring of enforcement outcomes to ensure that traffic stop practices align with principles of fairness, impartiality, and constitutional policing.

**E.  Investigatory Stops**

1.  Overview of Investigatory Stops

A review of investigatory stop data reveals that the most commonly cited justification for initiating stops was classified as "other," illustrating the broad discretion officers often exercise when articulating the basis for these encounters.[76] While predefined categories such as suspicion of drug

---

[67] See Table 367c2-6 in Appendix D
[68] See Table 367c2-12 in Appendix D
[69] See Table 367c2-1 in Appendix D
[70] See Table 367c2-1 in Appendix D
[71] See Table 367c2-1 in Appendix D
[72] See Table 367c2-7 in Appendix D
[73] See Table 367c2-7 in Appendix D
[74] See Table 367c2-7 in Appendix D
[75] See Table 367c2-13 in Appendix D
[76] See Table 367c2-14 in Appendix D

activity, weapons possession, or involvement in property crimes are used as justifications for investigatory stops, the frequency of their application varies across racial groups. Black individuals were more frequently stopped under suspicion of weapons possession, property crimes, or because they were perceived to match a suspect's description.[77] By contrast, White individuals were more often stopped for suspected drug offenses, outstanding warrants, or for broadly defined "suspicious behavior."[78] These differences in stop justification warrant further scrutiny to determine whether discretionary enforcement practices are being applied equitably.

2.  Investigatory Search Rates

Search rates during investigatory stops declined from 58.6% in 2023 to 51.5% in 2024.[79] Despite the overall reduction, stop justification continued to influence search likelihood. Drug-related investigatory stops consistently produced the highest search rates, rising from 86.7% in 2023 to 92.7% in 2024.[80] In contrast, searches resulting from public order violation declined significantly, while those associated with "matched description" stops increased.[81]

Search rates for drug-related stops were similarly high across racial groups, but pronounced disparities were evident in weapons-related stops. In 2024, 75.8% of Blacks stopped on suspicion of weapons possession were searched, compared to just 40% of Whites. This finding merits closer scrutiny given the magnitude of this disparity and the ostensible officer safety concerns.[82]

Gender-based differences remained significant across both years, with men searched at far higher rates than women. The most pronounced gap occurred in 2023 stops with warrant-related stops, where men were searched in 80.9% of encounters, compared to 26.7% of women.[83] While the gender gap narrowed slightly in 2024, these patterns underscore the continued disparities in the criteria used to conduct a search based on race and gender.

3.  Investigatory Arrest Rates

Arrest rates resulting from investigatory stops decreased modestly, from 28.2% in 2023 to 26.7% in 2024.[84] However, arrest outcomes varied substantially by stop category. The most notable increases occurred in stops related to property crimes and vehicle crimes, while drug-related stops and stops for public order saw a significant decline in arrests.

Racial disparities in investigatory stop arrests were more nuanced than those observed in traffic stops. While Blacks experienced higher overall arrest rates in both years, some categories showed

---

[77] See Table 367c2-18 in Appendix D
[78] See Table 367c2-18 in Appendix D
[79] See Table 367c2-14 in Appendix D
[80] See Table 367c2-14 in Appendix D
[81] See Table 367c2-14 in Appendix D
[82] See Table 367c2-19 in Appendix D
[83] See Table 367c2-25 in Appendix D
[84] See Table 367c2-14 in Appendix D

comparable or even reversed trends. For example, in 2023, Whites had higher arrest rates than Black individuals for arrests for drug-related crimes, but this pattern reversed in 2024.[85]

Gender disparities in arrest rates narrowed substantially between 2023 and 2024. Men were arrested at a much higher rate than women (31% vs. 18%) in 2023.[86] By 2024, that difference had nearly disappeared, with arrest rates converging at 26.9% for men and 26.1% for women. [87] Of particular note, women experienced higher arrest rates than men for drug-related investigatory stops in 2023—an uncommon finding in traditional policing trends. [88]

## F.  Search Hit Rates (¶367.c.3)

Search hit rates are defined as the percentage of searches that result in the recovery of contraband. Hit rates are an important indicator as to whether police are able to consistently ascertain the need to search an individual. In interpreting police efficacy based on hit rates, it is important to note that police may search an individual or a vehicle for several different reasons — as part of an arrest, based on probable cause, or as part of a consensual search. Full tables for all breakdowns of hit rates are available in the Appendix except for breakdowns by 'type of arrest.' This data was not available at the time of analysis.

In this analysis, data was not available regarding the circumstances leading to the search, and ¶367.c.3 does not call for such an analysis. It is also worth noting that hit rates differ from search rates — defined as the percentage of stops involving a search. Search rates are similar to hit rates and are an important indicator as to whether police are more or less likely to search certain groups than others.

It is also worth noting, as mentioned in the previous section, that this analysis does not account for whether the officers in question are assigned to the Cleveland Division of Police's traffic unit or to other patrol units.

### 1.  Traffic Stop Search Hit Rates

Search hit rates declined notably for traffic stops, dropping from 33.8% in 2023 to 24.2% in 2024.[89] This 9.6 percentage point decrease may indicate a decline in search efficiency or a broader use of searches in stops less likely to yield evidence of criminal activity.

The difference in hit rates during traffic stops between White and Black drivers decreased in 2024 to 0.6%.[90] The hit rate for White drivers remained nearly constant — 25.7% in 2023 compared to 25.3% in 2024, whereas the hit rate for Black drivers decreased 11.1 percentage points from 35.8%

---

[85] See Table 367c2-20 in Appendix D
[86] See Table 367c2-26 in Appendix D
[87] See Table 367c2-26 in Appendix D
[88] See Table 367c2-26 in Appendix D
[89] See Table 367c3-1 in Appendix D
[90] See Table 367c3-2 in Appendix D

to 24.7%. Where one race consistently has a lower hit rate than other races, this can indicate the possibility of the use of race or ethnicity by police in deciding who to search. In this instance, while there is a large difference in 2023 between White and Black drivers, this difference is negligible in 2024.[91] While the differences in the hit rate between White and Black drivers are not a definitive indication of racially biased police practices, over three times as many Black drivers were searched compared to White drivers, yet their hit rates are relatively the same. More years of data and additional analyses are needed to determine whether this racial disproportionality in hit rates and the direction of any difference persists, and whether there are other contributing factors that influence these outcomes.

In 2023, male drivers had higher hit rates than female drivers. However, by 2024, this trend reversed slightly, with women exhibiting a marginally higher hit rate.[92] Despite this shift, men continued to comprise the majority of individuals searched. In terms of race, Black drivers had higher search hit rates than White drivers in 2023 (35.8% vs. 25.7%), but this disparity nearly disappeared in 2024 (24.7% for Black drivers vs. 25.3% for White drivers).[93] Hispanics consistently had lower search hit rates than non-Hispanics.[94]

## 2. Investigatory Stop Search Hit Rates

In contrast to traffic stops, investigatory stop hit rates increased modestly from 43.1% in 2023 to 45.3% in 2024.[95] This suggests that investigatory searches may be more targeted, resulting in a higher likelihood of recovering contraband. Racial disparities narrowed as well, with Blacks and Whites showing nearly equivalent hit rates by 2024.[96]

Hit rates during investigatory stops are similar for White and Black drivers in 2023 and 2024,[97] which suggests that officers may be more consistent in applying the criteria for conducting a search during investigatory stops than traffic stops. It also might be driven by the difference in the legal justification underlying investigatory stops compared to traffic stops or differences in the police units involved in traffic stops versus investigatory stops.

Gender and ethnicity-related trends in search hit rates also shifted. In 2023, women had higher hit rates, but this reversed in 2024, with men regaining a slight lead.[98] Hispanic drivers experienced a substantial 11.4 percentage point increase in search hit rates from 2023 to 2024, surpassing non-Hispanic drivers.[99] However, due to relatively small sample sizes for Hispanics and Asians, caution should be used in interpreting these findings as conclusive.

---

[91] Note that the evidence from hit rates from 2023 of any racial bias indicates that police are more likely to incorrectly profile White drivers for search.
[92] See Table 367c3-3 in Appendix D
[93] See Table 367c3-2 in Appendix D
[94] See Table 367c3-4 in Appendix D
[95] See Table 367c3-1 in Appendix D
[96] See Table 367c3-2 in Appendix D
[97] See Table 367c3-2 in Appendix D
[98] See Table 367c3-3 in Appendix D
[99] See Table 367c3-4 in Appendix D

This analysis highlights the importance of monitoring investigatory stop practices not only for adherence to constitutional and departmental standards but also for patterns that may indicate systemic disparities by race, gender, or ethnicity.

### G.  Outcome Measure Assessment Findings Summary (¶367.c)

The analysis of the CDP administrative stops data for 2023 and 2024 revealed racial disparities wherein Blacks were stopped, searched, and arrested at disproportionately higher rates than Whites. Particularly for traffic stops, where Black drivers accounted for 67.5% of all stops despite representing only 31.8% of the driving-age population.

To some extent, the patterns of these racial disparities resemble the residential demographics within each Police District given the racially segregated housing patterns across the city. That is with the exception of majority-White Districts like the 2nd District, where the per capita disparities were most pronounced for Blacks.

Consistent with national criminal justice data trends, there were gender differences found in the stop data as well. Men, who are the majority of persons involved in the criminal justice system, were more likely to be stopped, searched, and arrested across most categories, although the gap narrowed in 2024. Meanwhile, female search and arrest hit rates improved, with the female arrest rate increasing by 8 percentage points in 2024, suggesting more targeted enforcement practices.[100]

Investigatory stops remained more targeted year-to-year, with higher overall hit rates than searches stemming from traffic stops. The declining search hit rate in traffic stops raises questions about the effectiveness and justification for certain search practices. Blacks were almost two-thirds (71.9%) of all motorists searched after a traffic stop in 2024, and were 3.38 times as likely to be searched than White motorists.[101] Though the hit rate for Black drivers was higher in 2023 than for Whites and the difference in 2024 is nearly 0, the difference in the volume of stops and searches experienced by Black drivers compared to White drivers is large. Given that the majority of nonconsensual police interactions with the public are during traffic stops, it is notable that Black drivers are much more likely to have contact with police through a traffic or investigatory stop. These differences are likely the result of departmental decisions about where enforcement is directed and how resources are deployed. Understanding of these patterns is essential for guiding policy and practice toward equitable outcomes for all members of the community.

---

[100] See Table 367c1-7 in Appendix D
[101] See Table 367c1-6a in Appendix D

## VII.    COMPLIANCE ASSESSMENT RATINGS

| ¶ | Consent Decree Provision | Compliance Rating |
|---|---|---|
| 160 | CDP will conduct all investigatory stops, searches, and arrests with the goal of ensuring that they are conducted in accordance with the rights secured and protected by the Constitution and state and federal law. CDP will conduct investigatory stops, searches, and arrests fairly and respectfully as part of an effective overall crime prevention strategy that takes into account community values. To achieve this goal, CDP will revise, develop, and implement search and seizure policies that comply with applicable law, and include the requirements below. | **Not assessed** |
| 161 | Officers will not use an individual's gender, race, ethnicity, national origin, or perceived sexual orientation as a factor, to any extent or degree, in establishing reasonable suspicion or probable cause, unless such information is part of an actual or credible description of a specific suspect in an investigation that includes other identifying factors. | **Operational Compliance – 4** |
| 162 | Officers will not conduct investigatory stops when they lack reasonable suspicion. | **Operational Compliance – 4** |
| 163 | Officers will not conduct pat down searches without specific and articulable facts to reasonably suspect that a particular person is armed and dangerous. This does not restrict an officer's ability to conduct a search incident to arrest or prior to transport. | **Operational Compliance – 4** |
| 164 | Where an officer seeks consent for a search, the office will inform the person of his or her right to refuse and to revoke consent at any time and document the person's consent. | **Partial Compliance – 3** |
| 165 | CDP officers will not rely solely upon an individual's geographic location, or presence in a high crime area without any other specific and articulable facts indicating that the individual has been, is, or is about to engage in criminal activity, as the basis for an investigatory stop. | **Operational Compliance – 4** |
| 166 | Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assaulting an officer and no other substantive violation is alleged. Upon notification, the supervisor will respond to the scene. | **Operational Compliance – 4** |
| 167 | Officers will not use "canned" or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches or arrests. | **Operational Compliance – 4** |

| 168 | Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports. CDP will train officers to use specific and individualized descriptive language in reports when documenting investigatory stops, searches, and arrests. Supervisors will review all documentation of investigatory stops, searches, and arrests for completeness and adherence to law and CDP policy. | **Operational Compliance – 3** |
|---|---|---|
| 169 | CDP supervisors will review each arrest report by officers under their command, whether or not they involve the seizure of contraband, and will sign off on those reports to memorialize their review within 24 hours of the arrest, absent exceptional circumstances. Supervisors will review reports and forms for deficiencies including:<br>1. "canned" or conclusory language without supporting detail, inconsistent information, insufficient articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not correct or complete;<br>2. arrests following stops that were not supported by reasonable suspicion;<br>3. arrests that are not supported by probable cause, or are otherwise in violation of the law or CDP policy; and<br>4. for every search or arrest involving the recovery of contraband evidence, whether the circumstances by which the evidence was recovered and/or probable cause for arrest was established are plausible and complete. | **Partial Compliance – 3** |
| 170 | Within seven days, CDP supervisors will separately document and report: **(1)** Investigatory stops and pat-down searches that appear unsupported by reasonable suspicion, or that are otherwise in violation of CDP policy; (2) arrests unsupported by probable cause or that are in violation of CDP policy: or (3) investigatory stops, searches, and arrests that, while comporting with law and policy, indicate a need for corrective action or review of agency policy, strategy, tactics, or training. | **Partial Compliance – 3** |
| 171 | CDP supervisors will take appropriate action to address all apparent violations or deficiencies in investigatory stops, searches, and arrests. Appropriate action may include recommending non-disciplinary corrective action for the involved officer, or referring the incident for administrative or criminal investigation. The supervisor will ensure that each violation or deficiency is addressed in the officer's performance evaluations. | **Partial Compliance – 3** |
| 172 | A command level official will review, within seven days of their completion, all supervisory reports of investigatory stops and pat-down searches not supported by reasonable suspicion, all searches and arrests not supported by probable cause, and all investigatory stops, searches, and arrests that were in violation of CDP policy, or that indicated a need for corrective action or review of agency policy, strategy, tactics, or training. The commander will evaluate the supervisor's assessment and recommendations and ensure that all appropriate corrective action is taken, including referring the incident to Internal Affairs for investigation, if warranted. The commander also will take appropriate non-disciplinary corrective action and/or will initiate the disciplinary process against supervisors who fail to conduct complete, thorough, and accurate reviews of officers' investigatory stops, searches, and arrests. CDP will take into account | **Partial Compliance – 3** |

| | | |
|---|---|---|
| | the quality and completeness of these supervisory and commander reviews of officers' investigatory stops, searches, and arrests in supervisory and commander performance evaluations. | |
| 173 | CDP will provide all officers with initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements of this Agreement. The training will be taught by a qualified instructor with significant experience in Fourth Amendment issues. The training will address the requirements of the Fourth Amendment and related law, CDP policies, and this Agreement, including:<br><br>1. the difference among the scope and degree of intrusion associated with different types of police contacts; the difference between probable cause, reasonable suspicion, and mere speculation; the difference between voluntary consent and the mere acquiescence to police authority;<br>2. the types of facts and circumstances that may be considered in initiating, conducting, terminating, and expanding an investigatory stop;<br>3. the level of permissible intrusion when conducting searches, such as "pat-downs" or "frisks";<br>4. the permissible nature and scope of searches incident to arrest;<br>5. procedures for executing searches, including handling, recording, and taking custody of seized property and evidence; and<br>**6.** principles of procedural justice and the effect that differing approaches to investigatory stops, searches, and arrests can have on community perceptions of police legitimacy and public safety**.** | **General Compliance – 5** |
| 174 | CDP also will provide officers with annual search and seizure in-service training that is adequate in quality, quantity, type, and scope. | **Operational Compliance – 4** |
| 175 | CDP will incorporate the following elements in its training of officers: if possible, introducing themselves at the initiation of contact with a civilian; (2) the reason for an investigatory stop as soon as possible; (3) ensuring that an investigatory stop is no longer than necessary to take appropriate action; and (4) acting with professionalism and courtesy throughout the interaction. | **Operational Compliance – 4** |

# VII.   APPENDICES

## A.  NOACA Travel Forecasting Model: Daily Vehicular Trips (Scenario 2022)

| Community Number | Originating Community Name | Destination Cleveland City | % | 2020 Census (ACS 5-yr estimate) Driving Age (15-84 years) Populations by race for each city in model | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | White | Black or African American | American Indian or Alaska Native | Asian | Native Hawaiin or Other Pacific Islander | Other (Some Other + Two or More) | Total |
| 1 | Amherst city | 653 | 0.07% | 8,839 | 171 | 25 | 220 | 0 | 473 | 9,728 |
| 2 | Amherst township | 384 | 0.04% | 5,705 | 2 | 0 | 0 | 0 | 238 | 5,945 |
| 3 | Auburn township | 513 | 0.05% | 5,207 | 1 | 0 | 53 | 0 | 52 | 5,353 |
| 4 | Avon city | 4,327 | 0.45% | 15,550 | 809 | 50 | 522 | 0 | 226 | 17,157 |
| 5 | Avon Lake city | 3,265 | 0.34% | 18,075 | 156 | 16 | 388 | 0 | 583 | 19,218 |
| 6 | Bainbridge township | 1,311 | 0.14% | 8,326 | 284 | 0 | 75 | 0 | 140 | 8,825 |
| 7 | Bay Village city | 3,599 | 0.38% | 10,998 | 147 | 0 | 79 | 5 | 482 | 11,651 |
| 8 | Beachwood city | 7,408 | 0.78% | 6,313 | 913 | 0 | 1,139 | 8 | 228 | 8,601 |
| 9 | Bedford city | 3,023 | 0.32% | 4,332 | 4,915 | 0 | 78 | 0 | 390 | 9,685 |
| 10 | Bedford Heights city | 3,463 | 0.36% | 1,371 | 7,174 | 0 | 37 | 0 | 481 | 9,063 |
| 11 | Bentleyville village | 101 | 0.01% | 594 | 14 | 0 | 3 | 0 | 2 | 613 |
| 12 | Berea city | 5,545 | 0.58% | 13,263 | 1,200 | 25 | 356 | 18 | 584 | 15,446 |
| 13 | Bratenahl village | 1,276 | 0.13% | 944 | 209 | 1 | 16 | 0 | 108 | 1,278 |
| 14 | Brecksville city | 3,537 | 0.41% | 10,196 | 260 | 0 | 459 | 0 | 149 | 11,064 |
| 15 | Brighton township | 40 | 0.00% | 598 | 20 | 0 | 0 | 0 | 9 | 627 |
| 16 | Broadview Heights city | 4,105 | 0.43% | 13,927 | 815 | 57 | 783 | 0 | 223 | 15,585 |
| 17 | Brook Park city | 11,129 | 1.17% | 13,470 | 814 | 67 | 421 | 25 | 507 | 15,104 |
| 18 | Brooklyn city | 15,002 | 1.57% | 6,561 | 847 | 0 | 634 | 12 | 749 | 8,803 |
| 19 | Brooklyn Heights village | 2,387 | 0.25% | 1,124 | 13 | 0 | 26 | 0 | 8 | 1,171 |
| 20 | Brownhelm township | 110 | 0.01% | 6,358 | 138 | 1 | 26 | 0 | 172 | 6,675 |
| 21 | Brunswick city | 3,039 | 0.32% | 26,576 | 537 | 0 | 333 | 0 | 637 | 28,083 |
| 22 | Brunswick Hills township | 1,051 | 0.11% | 7,401 | 103 | 0 | 145 | 0 | 329 | 7,978 |
| 23 | Burton township | 116 | 0.01% | 3,390 | 46 | 0 | 0 | 0 | 19 | 3,455 |
| 24 | Burton village | 42 | 0.00% | 3,390 | 46 | 0 | 0 | 0 | 19 | 3,455 |
| 25 | Camden township | 145 | 0.02% | 1,260 | 0 | 0 | 0 | 0 | 259 | 1,519 |
| 26 | Carlisle township | 776 | 0.08% | 6,141 | 60 | 4 | 15 | 0 | 28 | 6,248 |
| 27 | Chagrin Falls township | 54 | 0.00% | 2,879 | 70 | 0 | 86 | 0 | 53 | 3,088 |
| 28 | Chagrin Falls village | 383 | 0.04% | 2,879 | 70 | 0 | 86 | 0 | 53 | 3,088 |
| 29 | Chardon city | 326 | 0.03% | 4,007 | 57 | 0 | 0 | 0 | 25 | 4,089 |
| 30 | Chardon township | 240 | 0.03% | 4,007 | 57 | 0 | 0 | 0 | 25 | 4,089 |
| 31 | Chatham township | 79 | 0.01% | 2,000 | 0 | 0 | 4 | 0 | 100 | 2,104 |
| 32 | Chester township | 895 | 0.09% | 7,796 | 128 | 0 | 129 | 0 | 87 | 8,140 |
| 33 | Chippewa Lake village | 14 | 0.00% | 641 | 17 | 0 | 6 | 0 | 0 | 664 |
| 34 | Claridon township | 118 | 0.01% | 2,376 | 34 | 0 | 14 | 0 | 149 | 2,573 |
| 35 | Cleveland city | 475,277 | 49.76% | 190,654 | 141,871 | 1,425 | 8,239 | 142 | 25,253 | 306,824 |
| 36 | Cleveland Heights city | 21,290 | 2.22% | 18,092 | 13,576 | 53 | 2,258 | 8 | 2,049 | 36,016 |
| 37 | Columbia township | 741 | 0.08% | 5,883 | 5 | 0 | 15 | 0 | 174 | 6,077 |
| 38 | Concord township | 1,299 | 0.14% | 14,256 | 22 | 0 | 268 | 0 | 334 | 14,680 |
| 39 | Cuyahoga Heights village | 6,886 | 0.72% | 448 | 0 | 3 | 22 | 0 | 0 | 473 |
| 40 | East Cleveland city | 6,758 | 0.52% | 1,062 | 11,363 | 73 | 80 | 8 | 127 | 12,713 |
| 41 | Eastlake city | 3,288 | 0.34% | 14,278 | 812 | 11 | 77 | 2 | 304 | 15,484 |
| 42 | Eaton township | 714 | 0.07% | 4,906 | 72 | 0 | 30 | 0 | 40 | 5,085 |
| 43 | Elyria city | 3,940 | 0.41% | 33,912 | 6,129 | 132 | 294 | 0 | 2,341 | 42,808 |
| 44 | Elyria township | 289 | 0.03% | 2,412 | 111 | 0 | 6 | 0 | 87 | 2,616 |
| 45 | Euclid city | 21,282 | 2.23% | 13,710 | 22,386 | 31 | 254 | 3 | 1,231 | 37,575 |
| 46 | Fairport Harbor village | 184 | 0.02% | 10,536 | 1,743 | 32 | 133 | 11 | 2,096 | 14,491 |
| 47 | Fairview Park city | 6,758 | 0.92% | 12,129 | 225 | 59 | 373 | 0 | 287 | 13,073 |
| 48 | Garfield Heights city | 16,009 | 1.68% | 9,566 | 11,158 | 18 | 341 | 11 | 708 | 21,600 |
| 49 | Gates Mills village | 309 | 0.03% | 1,567 | 5 | 0 | 78 | 0 | 46 | 1,694 |
| 50 | Glenwillow village | 286 | 0.03% | 280 | 289 | 0 | 85 | 0 | 35 | 669 |
| 51 | Grafton township | 165 | 0.02% | 2,242 | 0 | 0 | 49 | 0 | 26 | 2,317 |
| 52 | Grafton village | 83 | 0.01% | 3,574 | 1,636 | 32 | 11 | 0 | 437 | 5,690 |
| 53 | Grand River village | 25 | 0.00% | 10,536 | 1,743 | 32 | 133 | 11 | 2,096 | 14,491 |
| 54 | Granger township | 308 | 0.03% | 3,717 | 21 | 0 | 31 | 0 | 100 | 3,869 |
| 55 | Guilford township | 93 | 0.01% | 2,685 | 0 | 0 | 22 | 0 | 25 | 2,732 |
| 56 | Hambden township | 186 | 0.02% | 3,633 | 52 | 0 | 25 | 0 | 188 | 3,898 |
| 57 | Harrisville township | 81 | 0.01% | 1,372 | 0 | 0 | 0 | 0 | 0 | 1,372 |
| 58 | Henrietta township | 84 | 0.01% | 1,449 | 11 | 0 | 0 | 0 | 55 | 1,515 |
| 59 | Highland Heights city | 2,205 | 0.23% | 6,154 | 134 | 0 | 572 | 0 | 81 | 6,741 |
| 60 | Highland Hills village | 1,070 | 0.11% | 58 | 597 | 0 | 0 | 0 | 45 | 700 |
| 61 | Hinckley township | 773 | 0.08% | 6,433 | 4 | 104 | 97 | 0 | 150 | 6,788 |
| 62 | Homer township | 38 | 0.00% | 1,145 | 0 | 0 | 0 | 0 | 0 | 1,145 |
| 63 | Hunting Valley village | 150 | 0.02% | 580 | 4 | 0 | 14 | 0 | 5 | 603 |
| 64 | Huntington township | 54 | 0.01% | 1,115 | 0 | 0 | 0 | 0 | 15 | 1,130 |
| 65 | Huntsburg township | 34 | 0.00% | 2,738 | 0 | 5 | 0 | 0 | 5 | 2,748 |
| 66 | Independence city | 11,642 | 1.22% | 5,612 | 0 | 0 | 163 | 0 | 103 | 5,878 |
| 67 | Kirtland city | 875 | 0.09% | 5,019 | 39 | 0 | 31 | 0 | 184 | 5,273 |
| 68 | Kirtland Hills village | 33 | 0.00% | 483 | 4 | 0 | 4 | 0 | 11 | 502 |
| 69 | Lafayette township | 126 | 0.01% | 4,371 | 24 | 0 | 0 | 0 | 109 | 4,504 |
| 70 | LaGrange township | 247 | 0.03% | 4,876 | 2 | 3 | 0 | 0 | 117 | 4,998 |
| 71 | LaGrange village | 209 | 0.02% | 4,876 | 2 | 3 | 0 | 0 | 117 | 4,998 |
| 72 | Lakeline village | 13 | 0.00% | 180 | 13 | 0 | 0 | 0 | 5 | 198 |
| 73 | Lakewood city | 55,436 | 3.50% | 36,391 | 2,784 | 96 | 1,068 | 0 | 1,685 | 42,024 |
| 74 | Leroy township | 190 | 0.02% | 2,380 | 149 | 0 | 0 | 0 | 0 | 2,529 |
| 75 | Linndale village | 62 | 0.01% | 62 | 16 | 0 | 0 | 0 | 195 | 273 |
| 76 | Litchfield township | 150 | 0.02% | 2,899 | 18 | 0 | 1 | 0 | 53 | 2,971 |
| 77 | Liverpool township | 367 | 0.04% | 4,234 | 22 | 0 | 0 | 0 | 70 | 4,326 |
| 78 | Lodi village | 56 | 0.01% | 2,245 | 13 | 11 | 0 | 0 | 39 | 2,308 |
| 79 | Lorain city | 3,059 | 0.32% | 34,804 | 8,048 | 408 | 422 | 77 | 5,404 | 49,163 |
| 80 | Lyndhurst city | 2,874 | 0.30% | 8,822 | 1,284 | 21 | 167 | 0 | 211 | 10,605 |
| 81 | Madison township | 424 | 0.04% | 14,791 | 220 | 13 | 107 | 0 | 173 | 15,304 |
| 82 | Madison village | 143 | 0.01% | 14,791 | 220 | 13 | 107 | 0 | 173 | 15,304 |
| 83 | Maple Heights city | 6,620 | 0.69% | 5,609 | 11,705 | 1 | 42 | 0 | 229 | 17,584 |

45

| Community Number | Originating Community Name | Destination Cleveland City | % | White | Black or African American | American Indian or Alaska Native | Asian | Native Hawaiin or Other Pacific Islander | Other (Some Other + Two or More) | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 84 | Mayfield Heights city | 3,524 | 0.41% | 10,846 | 2,238 | 35 | 653 | 0 | 890 | 14,462 |
| 85 | Mayfield village | 1,807 | 0.19% | 2,795 | 39 | 0 | 63 | 0 | 8 | 2,905 |
| 86 | Medina city | 1,908 | 0.11% | 19,154 | 484 | 66 | 164 | 0 | 354 | 20,222 |
| 87 | Medina township | 768 | 0.08% | 7,099 | 0 | 27 | 174 | 0 | 58 | 7,356 |
| 88 | Mentor city | 6,251 | 0.65% | 36,161 | 271 | 25 | 686 | 26 | 1,003 | 38,172 |
| 89 | Mentor-on-the-Lake city | 640 | 0.07% | 5,974 | 104 | 0 | 36 | 0 | 94 | 6,208 |
| 90 | Middleburg Heights city | 9,641 | 1.01% | 10,596 | 390 | 4 | 1,119 | 0 | 479 | 12,584 |
| 91 | Middlefield township | 49 | 0.01% | 3,175 | 35 | 0 | 0 | 0 | 17 | 3,227 |
| 92 | Middlefield village | 109 | 0.01% | 2,130 | 79 | 0 | 14 | 0 | 14 | 2,237 |
| 93 | Montville township - Geauga | 63 | 0.01% | 1,537 | 53 | 0 | 13 | 0 | 89 | 1,672 |
| 94 | Montville township - Medina | 606 | 0.06% | 8,527 | 174 | 0 | 248 | 0 | 367 | 9,316 |
| 95 | Moreland Hills village | 507 | 0.05% | 2,607 | 8 | 0 | 148 | 0 | 59 | 2,822 |
| 96 | Munson township | 309 | 0.03% | 5,219 | 30 | 0 | 0 | 0 | 68 | 5,317 |
| 97 | New Russia township | 204 | 0.02% | 1,964 | 42 | 0 | 4 | 0 | 63 | 2,073 |
| 98 | Newburgh Heights village | 1,185 | 0.12% | 1,229 | 332 | 0 | 0 | 0 | 31 | 1,592 |
| 99 | Newbury township | 199 | 0.02% | 4,605 | 21 | 51 | 20 | 0 | 30 | 4,727 |
| 100 | North Olmsted city | 10,323 | 1.08% | 23,009 | 693 | 5 | 627 | 10 | 1,016 | 25,360 |
| 101 | North Perry village | 138 | 0.01% | 6,482 | 48 | 55 | 27 | 0 | 441 | 7,053 |
| 102 | North Randall village | 1,044 | 0.11% | 195 | 684 | 0 | 0 | 0 | 17 | 896 |
| 103 | North Ridgeville city | 4,027 | 0.42% | 24,402 | 549 | 21 | 228 | 12 | 945 | 26,157 |
| 104 | North Royalton city | 4,016 | 0.42% | 22,244 | 770 | 25 | 1,110 | 0 | 577 | 24,726 |
| 105 | Oakwood village | 779 | 0.08% | 1,184 | 1,632 | 7 | 0 | 0 | 189 | 3,012 |
| 106 | Oberlin city | 347 | 0.04% | 5,199 | 711 | 33 | 454 | 0 | 576 | 6,973 |
| 107 | Olmsted Falls city | 1,291 | 0.14% | 6,810 | 137 | 0 | 138 | 0 | 211 | 7,296 |
| 108 | Olmsted township | 2,871 | 0.30% | 9,291 | 283 | 19 | 199 | 0 | 145 | 9,897 |
| 109 | Orange village | 1,353 | 0.15% | 1,947 | 526 | 0 | 78 | 0 | 27 | 2,578 |
| 110 | Painesville city | 1,498 | 0.15% | 10,536 | 1,743 | 52 | 133 | 11 | 2,036 | 14,491 |
| 111 | Painesville township | 1,131 | 0.12% | 16,060 | 113 | 27 | 75 | 0 | 579 | 16,854 |
| 112 | Parkman township | 81 | 0.01% | 2,652 | 1 | 0 | 7 | 0 | 62 | 2,722 |
| 113 | Parma city | 27,539 | 2.88% | 57,413 | 2,548 | 90 | 1,780 | 0 | 5,149 | 65,500 |
| 114 | Parma Heights city | 4,524 | 0.47% | 13,292 | 1,371 | 37 | 495 | 25 | 580 | 15,798 |
| 115 | Penfield township | 86 | 0.01% | 1,431 | 42 | 0 | 0 | 0 | 0 | 1,473 |
| 116 | Pepper Pike city | 1,110 | 0.12% | 3,743 | 314 | 32 | 641 | 0 | 200 | 4,930 |
| 117 | Perry township | 321 | 0.03% | 6,482 | 55 | 48 | 27 | 0 | 441 | 7,053 |
| 118 | Perry village | 139 | 0.01% | 6,482 | 55 | 48 | 27 | 0 | 441 | 7,053 |
| 119 | Pittsfield township | 147 | 0.02% | 1,162 | 10 | 0 | 0 | 0 | 9 | 1,181 |
| 120 | Richmond Heights city | 2,800 | 0.29% | 3,138 | 4,892 | 17 | 212 | 0 | 211 | 8,270 |
| 121 | Rittman city | 6 | 0.00% | 96 | 0 | 0 | 0 | 0 | 0 | 96 |
| 122 | Rochester township | 32 | 0.00% | 697 | 0 | 0 | 0 | 0 | 27 | 724 |
| 123 | Rocky River city | 9,815 | 1.03% | 14,606 | 205 | 17 | 278 | 0 | 213 | 15,319 |
| 124 | Russell township | 419 | 0.04% | 4,075 | 4 | 0 | 0 | 0 | 185 | 4,242 |
| 125 | Seven Hills city | 3,353 | 0.35% | 9,152 | 108 | 8 | 118 | 0 | 53 | 9,677 |
| 126 | Seville village | 95 | 0.01% | 1,956 | 12 | 0 | 0 | 0 | 78 | 2,046 |
| 127 | Shaker Heights city | 12,520 | 1.31% | 11,540 | 7,685 | 27 | 899 | 0 | 806 | 20,917 |
| 128 | Sharon township | 270 | 0.03% | 3,886 | 0 | 0 | 104 | 0 | 1 | 3,991 |
| 129 | Sheffield Lake city | 881 | 0.09% | 7,358 | 52 | 0 | 0 | 0 | 280 | 7,690 |
| 130 | Sheffield township | 237 | 0.02% | 2,200 | 438 | 0 | 20 | 0 | 200 | 2,856 |
| 131 | Sheffield village | 767 | 0.08% | 3,344 | 134 | 0 | 121 | 0 | 64 | 3,663 |
| 132 | Solon city | 5,758 | 0.60% | 13,002 | 1,884 | 12 | 2,181 | 45 | 648 | 17,752 |
| 133 | South Amherst village | 27 | 0.00% | 5,705 | 0 | 2 | 0 | 0 | 238 | 5,945 |
| 134 | South Euclid city | 6,290 | 0.66% | 8,204 | 8,429 | 15 | 212 | 9 | 642 | 17,501 |
| 135 | South Russell village | 226 | 0.02% | 2,987 | 0 | 0 | 0 | 0 | 16 | 3,003 |
| 136 | Spencer township | 49 | 0.01% | 1,462 | 0 | 0 | 0 | 0 | 0 | 1,462 |
| 137 | Spencer village | 7 | 0.00% | 497 | 8 | 0 | 0 | 0 | 5 | 510 |
| 138 | Strongsville city | 8,870 | 0.93% | 32,284 | 523 | 107 | 1,793 | 7 | 929 | 35,643 |
| 139 | Thompson township | 98 | 0.01% | 1,821 | 9 | 0 | 0 | 0 | 16 | 1,846 |
| 140 | Timberlake village | 90 | 0.01% | 601 | 3 | 0 | 2 | 10 | 2 | 618 |
| 141 | Troy township | 166 | 0.02% | 2,057 | 1 | 0 | 0 | 0 | 82 | 2,140 |
| 142 | University Heights city | 6,465 | 0.47% | 7,169 | 2,620 | 4 | 257 | 0 | 366 | 10,416 |
| 143 | Valley View village | 3,861 | 0.40% | 1,630 | 8 | 0 | 16 | 0 | 21 | 1,675 |
| 144 | Vermilion city | 219 | 0.02% | 3,401 | 0 | 0 | 0 | 0 | 21 | 3,422 |
| 145 | Wadsworth city | 446 | 0.05% | 18,280 | 339 | 56 | 107 | 0 | 318 | 19,080 |
| 146 | Wadsworth township | 109 | 0.01% | 3,509 | 14 | 0 | 2 | 0 | 13 | 3,538 |
| 147 | Waite Hill village | 88 | 0.01% | 407 | 0 | 0 | 0 | 0 | 4 | 411 |
| 148 | Walton Hills village | 564 | 0.06% | 1,652 | 289 | 0 | 22 | 0 | 17 | 1,980 |
| 149 | Warrensville Heights city | 5,552 | 0.58% | 572 | 8,895 | 0 | 44 | 0 | 222 | 9,733 |
| 150 | Wellington township | 54 | 0.01% | 4,413 | 4 | 0 | 0 | 0 | 154 | 4,571 |
| 151 | Wellington village | 214 | 0.02% | 4,413 | 4 | 0 | 0 | 0 | 154 | 4,571 |
| 152 | Westfield Center village | 41 | 0.00% | 991 | 0 | 0 | 0 | 0 | 12 | 1,003 |
| 153 | Westfield township | 129 | 0.01% | 2,074 | 59 | 0 | 0 | 0 | 15 | 2,148 |
| 154 | Westlake city | 11,396 | 1.19% | 22,732 | 683 | 35 | 1,321 | 0 | 595 | 25,366 |
| 155 | Wickliffe city | 3,744 | 0.39% | 9,318 | 567 | 0 | 89 | 0 | 266 | 10,240 |
| 156 | Willoughby city | 4,850 | 0.51% | 17,058 | 1,112 | 16 | 248 | 0 | 364 | 18,798 |
| 157 | Willoughby Hills city | 2,830 | 0.21% | 5,672 | 1,940 | 9 | 511 | 0 | 87 | 8,219 |
| 158 | Willowick city | 2,591 | 0.27% | 10,715 | 498 | 0 | 70 | 0 | 149 | 11,430 |
| 159 | Woodmere village | 1,156 | 0.12% | 175 | 273 | 0 | 24 | 0 | 104 | 576 |
| 160 | York township | 220 | 0.02% | 2,874 | 49 | 15 | 13 | 0 | 113 | 3,064 |
| 161 | Summit County | 15,509 | 1.62% | 344,145 | 59,482 | 847 | 15,303 | 59 | 13,192 | 433,028 |
| 162 | Portage County | 3,504 | 0.37% | 122,431 | 5,992 | 155 | 2,857 | 51 | 4,319 | 135,205 |
| 163 | Wayne County | 199 | 0.02% | 85,332 | 1,222 | 147 | 965 | 11 | 2,380 | 90,057 |
| 164 | Externals | 37,573 | 3.93% | 184,938,073 | 37,255,161 | 2,000,158 | 14,580,905 | 359,410 | 23,277,278 | 257,519,985 |
| | Totals | 955,189 | 100.00% | | | | | | | |

| Community Number | Originating Community Name | Destination Cleveland City | % | % White | % Black or African American | % American Indian or Alaska Native | % Asian | % Native Hawaiian or Other Pacific Islander | % Other (Some Other + Two or More) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Amherst city | 853 | 0.07% | 90.86% | 1.76% | 0.26% | 2.28% | 0.00% | 4.86% |
| 2 | Amherst township | 364 | 0.04% | 95.96% | 0.03% | 0.00% | 0.00% | 0.00% | 4.00% |
| 3 | Auburn township | 513 | 0.05% | 97.27% | 0.02% | 0.00% | 1.74% | 0.00% | 0.97% |
| 4 | Avon city | 4,127 | 0.45% | 90.63% | 4.72% | 0.29% | 3.04% | 0.00% | 1.32% |
| 5 | Avon Lake city | 3,265 | 0.34% | 94.05% | 0.81% | 0.08% | 2.02% | 0.00% | 3.03% |
| 6 | Bainbridge township | 1,311 | 0.14% | 94.35% | 3.22% | 0.00% | 0.85% | 0.00% | 1.59% |
| 7 | Bay Village city | 3,599 | 0.38% | 93.88% | 1.26% | 0.00% | 0.68% | 0.04% | 4.14% |
| 8 | Beachwood city | 7,408 | 0.78% | 74.00% | 10.37% | 0.00% | 12.94% | 0.09% | 2.59% |
| 9 | Bedford city | 3,023 | 0.32% | 44.73% | 50.75% | 0.00% | 0.81% | 0.00% | 3.72% |
| 10 | Bedford Heights city | 3,463 | 0.36% | 15.13% | 79.16% | 0.00% | 0.41% | 0.00% | 5.31% |
| 11 | Bentleyville village | 501 | 0.01% | 96.90% | 2.28% | 0.00% | 0.49% | 0.00% | 0.33% |
| 12 | Berea city | 5,545 | 0.58% | 85.87% | 7.77% | 0.19% | 2.30% | 0.12% | 3.78% |
| 13 | Bratenahl village | 1,276 | 0.13% | 73.87% | 16.35% | 0.08% | 1.25% | 0.00% | 8.45% |
| 14 | Brecksville city | 3,937 | 0.41% | 92.15% | 2.35% | 0.00% | 4.15% | 0.00% | 1.35% |
| 15 | Brighton township | 40 | 0.00% | 95.37% | 3.19% | 0.00% | 0.00% | 0.00% | 1.44% |
| 16 | Broadview Heights city | 4,105 | 0.43% | 89.36% | 3.95% | 0.24% | 5.02% | 0.00% | 1.43% |
| 17 | Brook Park city | 11,129 | 1.17% | 89.18% | 4.07% | 0.44% | 2.79% | 0.17% | 3.36% |
| 18 | Brooklyn city | 15,002 | 1.57% | 74.53% | 9.62% | 0.00% | 7.20% | 0.14% | 8.51% |
| 19 | Brooklyn Heights village | 2,387 | 0.25% | 95.09% | 1.11% | 0.00% | 2.22% | 0.00% | 0.68% |
| 20 | Brownhelm township | 110 | 0.01% | 94.95% | 2.07% | 0.01% | 0.39% | 0.00% | 2.58% |
| 21 | Brunswick city | 5,039 | 0.52% | 94.63% | 1.91% | 0.00% | 1.19% | 0.00% | 2.27% |
| 22 | Brunswick Hills township | 1,051 | 0.11% | 92.77% | 1.29% | 0.00% | 1.82% | 0.00% | 4.12% |
| 23 | Burton township | 116 | 0.01% | 98.12% | 1.33% | 0.00% | 0.00% | 0.00% | 0.55% |
| 24 | Burton village | 42 | 0.00% | 98.12% | 1.33% | 0.00% | 0.00% | 0.00% | 0.55% |
| 25 | Camden township | 145 | 0.02% | 82.95% | 0.00% | 0.00% | 0.00% | 0.00% | 17.05% |
| 26 | Carlisle township | 776 | 0.08% | 98.29% | 0.96% | 0.06% | 0.24% | 0.00% | 0.45% |
| 27 | Chagrin Falls township | 54 | 0.00% | 93.23% | 2.27% | 0.00% | 2.78% | 0.00% | 1.72% |
| 28 | Chagrin Falls village | 383 | 0.04% | 93.23% | 2.27% | 0.00% | 2.78% | 0.00% | 1.72% |
| 29 | Chardon city | 326 | 0.03% | 97.99% | 1.39% | 0.00% | 0.00% | 0.00% | 0.61% |
| 30 | Chardon township | 240 | 0.03% | 97.99% | 1.39% | 0.00% | 0.00% | 0.00% | 0.61% |
| 31 | Chatham township | 79 | 0.01% | 95.06% | 0.00% | 0.00% | 0.19% | 0.00% | 4.75% |
| 32 | Chester township | 895 | 0.09% | 95.77% | 1.57% | 0.00% | 1.58% | 0.00% | 1.07% |
| 33 | Chippewa Lake village | 54 | 0.00% | 96.54% | 2.56% | 0.00% | 0.90% | 0.00% | 0.00% |
| 34 | Clarkson township | 118 | 0.01% | 92.94% | 1.32% | 0.00% | 0.54% | 0.00% | 5.79% |
| 35 | Cleveland city | 475,277 | 49.76% | 42.58% | 45.98% | 0.46% | 2.69% | 0.05% | 8.24% |
| 36 | Cleveland Heights city | 21,190 | 2.22% | 50.25% | 37.89% | 0.09% | 6.27% | 0.02% | 5.89% |
| 37 | Columbia township | 741 | 0.08% | 96.81% | 0.08% | 0.00% | 0.25% | 0.00% | 2.86% |
| 38 | Concord township | 1,299 | 0.14% | 95.75% | 0.15% | 0.00% | 1.83% | 0.00% | 2.28% |
| 39 | Cuyahoga Heights village | 6,886 | 0.72% | 94.71% | 0.00% | 0.63% | 4.65% | 0.00% | 0.00% |
| 40 | East Cleveland city | 8,756 | 0.92% | 8.35% | 89.38% | 0.57% | 0.63% | 0.06% | 1.80% |
| 41 | Eastlake city | 3,288 | 0.34% | 92.21% | 5.24% | 0.27% | 0.50% | 0.01% | 1.96% |
| 42 | Eaton township | 714 | 0.07% | 96.48% | 1.42% | 0.73% | 0.59% | 0.00% | 0.79% |
| 43 | Elyria city | 3,940 | 0.41% | 79.22% | 14.32% | 0.31% | 0.69% | 0.00% | 5.47% |
| 44 | Elyria township | 269 | 0.03% | 92.20% | 4.24% | 0.00% | 0.23% | 0.00% | 3.33% |
| 45 | Euclid city | 21,282 | 2.23% | 36.49% | 55.58% | 0.08% | 0.57% | 0.01% | 3.28% |
| 46 | Fairport Harbor village | 184 | 0.02% | 72.71% | 12.03% | 0.22% | 0.92% | 0.08% | 14.05% |
| 47 | Fairview Park city | 8,758 | 0.92% | 92.76% | 1.72% | 0.45% | 2.85% | 0.00% | 2.20% |
| 48 | Garfield Heights city | 16,009 | 1.68% | 44.29% | 51.66% | 0.08% | 0.65% | 0.05% | 3.27% |
| 49 | Gates Mills village | 309 | 0.03% | 92.50% | 0.30% | 0.00% | 4.49% | 0.00% | 2.72% |
| 50 | Glenwillow village | 286 | 0.03% | 41.85% | 40.21% | 0.00% | 12.71% | 0.00% | 5.23% |
| 51 | Grafton township | 165 | 0.02% | 98.76% | 0.00% | 0.00% | 2.11% | 0.00% | 1.12% |
| 52 | Grafton village | 83 | 0.01% | 62.81% | 28.75% | 0.56% | 0.19% | 0.00% | 7.68% |
| 53 | Grand River village | 25 | 0.00% | 72.71% | 12.03% | 0.22% | 0.92% | 0.08% | 14.05% |
| 54 | Granger township | 308 | 0.03% | 98.07% | 0.54% | 0.00% | 0.80% | 0.00% | 2.58% |
| 55 | Guilford township | 99 | 0.01% | 98.29% | 0.00% | 0.00% | 0.81% | 0.00% | 0.92% |
| 56 | Hambden township | 166 | 0.02% | 92.25% | 2.34% | 0.00% | 0.63% | 0.00% | 4.77% |
| 57 | Harrisville township | 81 | 0.01% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 58 | Henrietta township | 84 | 0.01% | 95.64% | 0.73% | 0.00% | 0.00% | 0.00% | 3.63% |
| 59 | Highland Heights city | 2,205 | 0.23% | 91.29% | 1.99% | 0.00% | 5.52% | 0.00% | 1.20% |
| 60 | Highland Hills village | 1,070 | 0.11% | 8.29% | 85.29% | 0.00% | 0.00% | 0.00% | 6.43% |
| 61 | Hinckley township | 773 | 0.08% | 94.77% | 0.06% | 1.53% | 1.43% | 0.00% | 2.21% |
| 62 | Homer township | 38 | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 63 | Hunting Valley village | 150 | 0.02% | 96.19% | 0.66% | 0.00% | 2.32% | 0.00% | 0.83% |
| 64 | Huntington township | 54 | 0.01% | 98.67% | 0.00% | 0.00% | 0.00% | 0.00% | 1.33% |
| 65 | Huntsburg township | 34 | 0.00% | 99.64% | 0.00% | 0.18% | 0.00% | 0.00% | 0.18% |
| 66 | Independence city | 11,642 | 1.22% | 95.47% | 0.00% | 0.00% | 2.77% | 0.00% | 1.75% |
| 67 | Kirtland city | 879 | 0.09% | 95.18% | 0.74% | 0.00% | 0.59% | 0.00% | 3.49% |
| 68 | Kirtland Hills village | 33 | 0.00% | 96.22% | 0.80% | 0.00% | 0.80% | 0.00% | 2.19% |
| 69 | Lafayette township | 126 | 0.01% | 97.05% | 0.53% | 0.00% | 0.00% | 0.00% | 2.42% |
| 70 | LaGrange township | 247 | 0.03% | 97.56% | 0.04% | 0.00% | 0.00% | 0.00% | 2.34% |
| 71 | LaGrange village | 209 | 0.02% | 97.56% | 0.04% | 0.00% | 0.00% | 0.00% | 2.34% |
| 72 | Lakeline village | 13 | 0.00% | 90.91% | 6.57% | 0.00% | 0.00% | 0.00% | 2.53% |
| 73 | Lakewood city | 33,436 | 3.50% | 86.60% | 6.62% | 0.29% | 2.54% | 0.00% | 4.01% |
| 74 | Leroy township | 190 | 0.02% | 94.11% | 5.89% | 0.00% | 0.00% | 0.00% | 0.00% |
| 75 | Linndale village | 165 | 0.02% | 22.71% | 5.86% | 0.00% | 0.00% | 0.00% | 71.43% |
| 76 | Litchfield township | 150 | 0.02% | 97.58% | 0.61% | 0.00% | 0.03% | 0.00% | 1.78% |
| 77 | Liverpool township | 367 | 0.04% | 97.87% | 0.51% | 0.00% | 0.00% | 0.00% | 1.62% |
| 78 | Lodi village | 56 | 0.01% | 97.27% | 0.58% | 0.48% | 0.00% | 0.00% | 1.69% |
| 79 | Lorain city | 3,059 | 0.32% | 70.79% | 16.37% | 0.85% | 0.86% | 0.16% | 10.99% |
| 80 | Lyndhurst city | 2,874 | 0.30% | 84.15% | 12.11% | 0.20% | 1.57% | 0.00% | 1.99% |
| 81 | Madison township | 424 | 0.04% | 96.65% | 1.44% | 0.08% | 0.70% | 0.00% | 1.13% |
| 82 | Madison village | 143 | 0.01% | 96.65% | 1.44% | 0.08% | 0.70% | 0.00% | 1.13% |
| 83 | Maple Heights city | 6,620 | 0.69% | 31.90% | 66.55% | 0.01% | 0.24% | 0.00% | 1.30% |

| Community Number | Originating Community Name | Destination Cleveland City | % | % White | % Black or African American | % American Indian or Alaska Native | % Asian | % Native Hawaiian or Other Pacific Islander | % Other (Some Other + Two or More) |
|---|---|---|---|---|---|---|---|---|---|
| | | 2020 Census (ACS 5-yr estimate) Driving Age (15-84 years) Population Proportions by race for each city in model | | | | | | | |
| 84 | Mayfield Heights city | 5,924 | 0.41% | 75.00% | 15.48% | 0.24% | 4.52% | 0.00% | 4.77% |
| 85 | Mayfield village | 1,807 | 0.19% | 96.21% | 1.34% | 0.00% | 2.17% | 0.00% | 0.28% |
| 86 | Medina city | 1,008 | 0.11% | 94.72% | 2.39% | 0.35% | 0.81% | 0.00% | 1.75% |
| 87 | Medina township | 766 | 0.08% | 96.51% | 0.00% | 0.37% | 2.37% | 0.00% | 0.76% |
| 88 | Mentor city | 6,251 | 0.85% | 94.79% | 0.71% | 0.07% | 1.80% | 0.07% | 2.63% |
| 89 | Mentor-on-the-Lake city | 640 | 0.07% | 96.29% | 1.88% | 0.00% | 0.58% | 0.00% | 1.51% |
| 90 | Middleburg Heights city | 9,641 | 1.01% | 84.20% | 3.10% | 0.05% | 8.89% | 0.00% | 3.77% |
| 91 | Middlefield township | 49 | 0.01% | 98.39% | 1.08% | 0.00% | 0.00% | 0.00% | 0.53% |
| 92 | Middlefield village | 109 | 0.01% | 95.22% | 3.53% | 0.00% | 0.63% | 0.00% | 0.63% |
| 93 | Montville township - Geauga | 63 | 0.01% | 91.99% | 3.17% | 0.00% | 0.78% | 0.00% | 4.13% |
| 94 | Montville township - Medina | 696 | 0.08% | 91.53% | 1.87% | 0.00% | 2.68% | 0.00% | 3.94% |
| 95 | Moreland Hills village | 507 | 0.05% | 92.38% | 0.28% | 0.00% | 5.24% | 0.00% | 2.09% |
| 96 | Munson township | 309 | 0.03% | 98.16% | 0.56% | 0.00% | 0.00% | 0.00% | 1.28% |
| 97 | New Russia township | 204 | 0.02% | 94.74% | 2.03% | 0.00% | 0.19% | 0.00% | 3.04% |
| 98 | Newburgh Heights village | 1,185 | 0.12% | 77.20% | 20.85% | 0.00% | 0.00% | 0.00% | 1.95% |
| 99 | Newbury township | 199 | 0.02% | 97.42% | 0.44% | 1.08% | 0.42% | 0.00% | 0.63% |
| 100 | North Olmsted city | 10,323 | 1.08% | 90.75% | 2.73% | 0.02% | 2.47% | 0.04% | 4.01% |
| 101 | North Perry village | 118 | 0.01% | 91.90% | 0.68% | 0.78% | 0.38% | 0.00% | 6.25% |
| 102 | North Randall village | 1,044 | 0.11% | 21.76% | 76.54% | 0.00% | 0.00% | 0.00% | 1.90% |
| 103 | North Ridgeville city | 4,027 | 0.42% | 93.29% | 2.10% | 0.08% | 0.87% | 0.05% | 5.61% |
| 104 | North Royalton city | 4,016 | 0.42% | 89.96% | 3.11% | 0.10% | 4.49% | 0.00% | 2.53% |
| 105 | Oakwood village | 775 | 0.08% | 39.31% | 54.18% | 0.23% | 0.00% | 0.00% | 6.27% |
| 106 | Oberlin city | 347 | 0.04% | 74.56% | 10.20% | 0.47% | 6.51% | 0.00% | 8.26% |
| 107 | Olmsted Falls city | 1,291 | 0.14% | 93.34% | 1.88% | 0.00% | 1.89% | 0.00% | 2.89% |
| 108 | Olmsted township | 2,871 | 0.30% | 93.88% | 2.86% | 0.19% | 1.61% | 0.00% | 1.47% |
| 109 | Orange village | 1,393 | 0.15% | 75.52% | 20.40% | 0.00% | 3.03% | 0.00% | 1.05% |
| 110 | Painesville city | 1,458 | 0.15% | 72.71% | 12.03% | 0.22% | 0.92% | 0.08% | 14.05% |
| 111 | Painesville township | 1,131 | 0.12% | 95.29% | 0.67% | 0.16% | 0.44% | 0.00% | 3.44% |
| 112 | Parkman township | 81 | 0.01% | 97.43% | 0.04% | 0.00% | 0.28% | 0.00% | 2.28% |
| 113 | Parma city | 27,535 | 2.88% | 87.92% | 4.51% | 0.14% | 2.60% | 0.00% | 4.82% |
| 114 | Parma Heights city | 4,524 | 0.47% | 84.14% | 8.68% | 0.25% | 3.13% | 0.15% | 3.67% |
| 115 | Penfield township | 86 | 0.01% | 97.15% | 2.85% | 0.00% | 0.00% | 0.00% | 0.00% |
| 116 | Pepper Pike city | 1,110 | 0.12% | 75.92% | 6.37% | 0.65% | 13.00% | 0.00% | 4.06% |
| 117 | Perry township | 321 | 0.03% | 91.90% | 0.76% | 0.68% | 0.38% | 0.00% | 6.25% |
| 118 | Perry village | 139 | 0.01% | 91.90% | 0.78% | 0.68% | 0.38% | 0.00% | 6.25% |
| 119 | Pittsfield township | 147 | 0.02% | 98.59% | 0.85% | 0.00% | 0.00% | 0.00% | 0.76% |
| 120 | Richmond Heights city | 2,800 | 0.29% | 37.94% | 56.74% | 0.21% | 2.56% | 0.00% | 2.55% |
| 121 | Rittman city | 6 | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 122 | Rochester township | 52 | 0.00% | 96.27% | 0.00% | 0.00% | 0.00% | 0.00% | 3.73% |
| 123 | Rocky River city | 9,815 | 1.03% | 95.35% | 1.34% | 0.11% | 1.81% | 0.00% | 1.39% |
| 124 | Russell township | 419 | 0.04% | 96.02% | 0.09% | 0.00% | 0.00% | 0.00% | 3.89% |
| 125 | Seven Hills city | 3,353 | 0.35% | 94.57% | 1.10% | 0.08% | 3.29% | 0.00% | 0.96% |
| 126 | Seville village | 95 | 0.01% | 95.60% | 0.59% | 0.00% | 0.00% | 0.00% | 3.81% |
| 127 | Shaker Heights city | 12,520 | 1.31% | 55.17% | 36.74% | 0.13% | 4.11% | 0.00% | 3.85% |
| 128 | Sharon township | 270 | 0.03% | 97.37% | 0.00% | 0.00% | 2.61% | 0.00% | 0.03% |
| 129 | Sheffield Lake city | 881 | 0.09% | 95.68% | 0.68% | 0.00% | 0.00% | 0.00% | 3.64% |
| 130 | Sheffield township | 257 | 0.02% | 77.03% | 15.27% | 0.00% | 0.70% | 0.00% | 7.00% |
| 131 | Sheffield village | 767 | 0.08% | 91.29% | 3.66% | 0.00% | 3.30% | 0.00% | 1.75% |
| 132 | Solon city | 5,758 | 0.60% | 73.24% | 10.50% | 0.07% | 12.29% | 0.25% | 3.65% |
| 133 | South Amherst village | 27 | 0.00% | 95.96% | 0.00% | 0.05% | 0.00% | 0.00% | 4.00% |
| 134 | South Euclid city | 6,290 | 0.66% | 46.88% | 48.11% | 0.09% | 1.21% | 0.05% | 3.67% |
| 135 | South Russell village | 226 | 0.02% | 99.47% | 0.00% | 0.00% | 0.00% | 0.00% | 0.53% |
| 136 | Spencer township | 49 | 0.01% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 137 | Spencer village | 7 | 0.00% | 97.45% | 1.57% | 0.00% | 0.00% | 0.00% | 0.98% |
| 138 | Strongsville city | 8,870 | 0.93% | 90.58% | 1.47% | 0.36% | 5.03% | 0.02% | 2.61% |
| 139 | Thompson township | 98 | 0.01% | 98.65% | 0.49% | 0.00% | 0.00% | 0.00% | 0.87% |
| 140 | Timberlake village | 90 | 0.01% | 97.25% | 0.49% | 0.00% | 0.32% | 1.62% | 0.32% |
| 141 | Troy township | 166 | 0.02% | 96.12% | 0.05% | 0.00% | 0.00% | 0.00% | 3.83% |
| 142 | University Heights city | 4,465 | 0.47% | 68.65% | 25.15% | 0.04% | 2.47% | 0.00% | 3.51% |
| 143 | Valley View village | 3,861 | 0.40% | 97.31% | 0.48% | 0.00% | 0.98% | 0.00% | 1.25% |
| 144 | Vermilion city | 219 | 0.02% | 99.39% | 0.00% | 0.00% | 0.00% | 0.00% | 0.61% |
| 145 | Wadsworth city | 448 | 0.05% | 95.81% | 1.78% | 0.19% | 0.56% | 0.00% | 1.67% |
| 146 | Wadsworth township | 109 | 0.01% | 99.16% | 0.40% | 0.00% | 0.04% | 0.00% | 0.37% |
| 147 | Waite Hill village | 88 | 0.01% | 95.03% | 0.00% | 0.00% | 0.00% | 0.00% | 0.37% |
| 148 | Walton Hills village | 564 | 0.06% | 84.29% | 13.72% | 0.00% | 1.12% | 0.00% | 0.87% |
| 149 | Warrensville Heights city | 5,552 | 0.58% | 5.86% | 91.39% | 0.00% | 0.45% | 0.00% | 2.28% |
| 150 | Wellington township | 54 | 0.01% | 96.54% | 0.09% | 0.00% | 0.00% | 0.00% | 3.37% |
| 151 | Wellington village | 214 | 0.02% | 96.54% | 0.09% | 0.00% | 0.00% | 0.00% | 3.37% |
| 152 | Westfield Center village | 41 | 0.00% | 98.80% | 0.00% | 0.00% | 0.00% | 0.00% | 1.20% |
| 153 | Westfield township | 129 | 0.01% | 96.55% | 2.75% | 0.00% | 0.00% | 0.00% | 0.70% |
| 154 | Westlake city | 11,396 | 1.19% | 89.62% | 2.89% | 0.14% | 5.21% | 0.00% | 2.35% |
| 155 | Wickliffe city | 3,744 | 0.39% | 91.00% | 5.54% | 0.00% | 0.87% | 0.00% | 2.60% |
| 156 | Willoughby city | 4,850 | 0.51% | 90.74% | 5.92% | 0.09% | 1.32% | 0.00% | 1.94% |
| 157 | Willoughby Hills city | 2,030 | 0.21% | 69.01% | 25.80% | 0.11% | 6.22% | 0.00% | 1.06% |
| 158 | Willowick city | 2,591 | 0.27% | 93.76% | 4.34% | 0.00% | 0.61% | 0.00% | 1.30% |
| 159 | Woodmere village | 1,156 | 0.12% | 30.58% | 47.40% | 0.00% | 4.17% | 0.00% | 18.06% |
| 160 | York township | 220 | 0.02% | 53.80% | 1.60% | 0.49% | 0.42% | 0.00% | 3.89% |
| 161 | Summit County | 15,509 | 1.62% | 79.47% | 13.74% | 0.20% | 3.53% | 0.01% | 5.05% |
| 162 | Portage County | 5,504 | 0.57% | 90.55% | 4.14% | 0.11% | 1.97% | 0.04% | 3.19% |
| 163 | Wayne County | 199 | 0.02% | 94.75% | 1.38% | 0.16% | 1.07% | 0.01% | 2.64% |
| 164 | Externals | 37,533 | 3.93% | 71.83% | 13.53% | 0.76% | 5.66% | 0.14% | 9.08% |
| | **Totals** | **955,169** | **100.00%** | | | | | | |

| | | | | Total Daily Trips in Cleveland By Race | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Community Number | Originating Community Name | Destination Cleveland City | % | White2 | Black or African American3 | American Indian or Alaska Native4 | Asian5 | Native Hawaiian or Other Pacific Islanders6 | Other (Some Other + Two-or More)7 | Total 8 |
| 1 | Amherst city | 653 | 0.07% | 599.33 | 11.48 | 1.68 | 14.77 | 0.00 | 31.75 | 653 |
| 2 | Amherst township | 564 | 0.04% | 549.31 | 0.12 | 0.00 | 0.00 | 0.00 | 14.57 | 564 |
| 3 | Auburn township | 513 | 0.05% | 499.01 | 0.10 | 0.00 | 8.91 | 0.00 | 4.98 | 513 |
| 4 | Avon city | 4,327 | 0.45% | 3,921.71 | 204.03 | 12.81 | 131.65 | 0.00 | 57.00 | 4,327 |
| 5 | Avon Lake city | 3,285 | 0.34% | 3,070.81 | 26.50 | 2.72 | 65.92 | 0.00 | 99.05 | 3,285 |
| 6 | Bainbridge township | 1,311 | 0.14% | 1,236.87 | 42.19 | 0.00 | 11.14 | 0.00 | 20.80 | 1,311 |
| 7 | Bay Village city | 3,599 | 0.38% | 3,376.75 | 45.41 | 0.00 | 24.40 | 1.54 | 148.89 | 3,599 |
| 8 | Beachwood city | 7,408 | 0.78% | 5,482.54 | 768.49 | 0.00 | 958.72 | 6.73 | 191.91 | 7,408 |
| 9 | Bedford city | 5,023 | 0.52% | 1,352.16 | 3,594.13 | 0.00 | 24.35 | 0.00 | 112.37 | 5,023 |
| 10 | Bedford Heights city | 5,463 | 0.36% | 523.86 | 2,741.21 | 0.00 | 14.14 | 0.00 | 183.79 | 5,463 |
| 11 | Bentleyville village | 101 | 0.01% | 97.87 | 2.31 | 0.00 | 0.49 | 0.00 | 0.33 | 101 |
| 12 | Berea city | 5,545 | 0.58% | 4,761.32 | 450.79 | 8.97 | 127.80 | 6.46 | 209.85 | 5,545 |
| 13 | Bratenahl village | 1,276 | 0.13% | 942.52 | 208.67 | 1.00 | 15.97 | 0.00 | 107.83 | 1,276 |
| 14 | Brecksville city | 5,537 | 0.41% | 3,628.13 | 92.52 | 0.00 | 163.33 | 0.00 | 53.02 | 5,537 |
| 15 | Brighton township | 40 | 0.00% | 38.15 | 1.28 | 0.00 | 0.00 | 0.00 | 0.57 | 40 |
| 16 | Broadview Heights city | 4,105 | 0.43% | 3,666.29 | 161.99 | 9.75 | 206.24 | 0.00 | 58.74 | 4,105 |
| 17 | Brook Park city | 11,129 | 1.17% | 9,925.03 | 652.41 | 49.37 | 310.20 | 18.42 | 573.57 | 11,129 |
| 18 | Brooklyn city | 15,002 | 1.57% | 11,181.20 | 1,443.45 | 0.00 | 1,080.46 | 20.45 | 1,276.44 | 15,002 |
| 19 | Brooklyn Heights village | 2,387 | 0.25% | 2,291.19 | 26.50 | 0.00 | 53.00 | 0.00 | 16.31 | 2,387 |
| 20 | Brownhelm township | 110 | 0.01% | 104.45 | 2.27 | 0.02 | 0.43 | 0.00 | 2.83 | 110 |
| 21 | Brunswick city | 5,039 | 0.52% | 2,875.52 | 58.11 | 0.00 | 56.04 | 0.00 | 68.53 | 5,039 |
| 22 | Brunswick Hills township | 1,051 | 0.11% | 974.99 | 13.57 | 0.00 | 19.10 | 0.00 | 43.34 | 1,051 |
| 23 | Burton township | 116 | 0.01% | 113.82 | 1.54 | 0.00 | 0.00 | 0.00 | 0.64 | 116 |
| 24 | Burton village | 42 | 0.00% | 41.21 | 0.56 | 0.00 | 0.00 | 0.00 | 0.23 | 42 |
| 25 | Camden township | 145 | 0.02% | 120.28 | 0.00 | 0.00 | 0.00 | 0.00 | 24.72 | 145 |
| 26 | Carlisle township | 776 | 0.08% | 762.71 | 7.45 | 0.50 | 1.86 | 0.00 | 3.48 | 776 |
| 27 | Chagrin Falls township | 14 | 0.00% | 13.05 | 0.32 | 0.00 | 0.39 | 0.00 | 0.24 | 14 |
| 28 | Chagrin Falls village | 383 | 0.04% | 357.08 | 8.68 | 0.00 | 10.67 | 0.00 | 6.57 | 383 |
| 29 | Chardon city | 326 | 0.03% | 319.46 | 4.54 | 0.00 | 0.00 | 0.00 | 1.99 | 326 |
| 30 | Chardon township | 240 | 0.03% | 235.19 | 3.35 | 0.00 | 0.00 | 0.00 | 1.47 | 240 |
| 31 | Chatham township | 79 | 0.01% | 75.10 | 0.00 | 0.00 | 0.15 | 0.00 | 3.75 | 79 |
| 32 | Chester township | 895 | 0.09% | 857.18 | 14.07 | 0.00 | 14.18 | 0.00 | 9.57 | 895 |
| 33 | Chippewa Lake village | 14 | 0.00% | 13.52 | 0.36 | 0.00 | 0.13 | 0.00 | 0.00 | 14 |
| 34 | Claridon township | 116 | 0.01% | 108.97 | 1.56 | 0.00 | 0.64 | 0.00 | 6.83 | 116 |
| 35 | Cleveland city | 475,277 | 49.76% | 202,385.87 | 238,522.02 | 2,207.98 | 12,762.39 | 219.98 | 33,179.40 | 475,277 |
| 36 | Cleveland Heights city | 21,190 | 2.22% | 10,644.42 | 7,987.43 | 19.42 | 1,328.49 | 4.71 | 1,205.53 | 21,190 |
| 37 | Columbia township | 741 | 0.08% | 717.34 | 0.81 | 0.00 | 1.83 | 0.00 | 21.22 | 741 |
| 38 | Concord township | 1,293 | 0.14% | 1,245.78 | 1.95 | 0.00 | 23.71 | 0.00 | 29.55 | 1,293 |
| 39 | Cuyahoga Heights village | 6,886 | 0.72% | 6,522.05 | 0.00 | 43.67 | 320.28 | 0.00 | 0.00 | 6,886 |
| 40 | East Cleveland city | 8,756 | 0.92% | 731.45 | 7,826.20 | 50.28 | 55.10 | 5.51 | 87.47 | 8,756 |
| 41 | Eastlake city | 3,288 | 0.34% | 3,031.91 | 172.43 | 2.34 | 16.35 | 0.42 | 64.55 | 3,288 |
| 42 | Eaton township | 714 | 0.07% | 688.87 | 10.11 | 5.20 | 4.21 | 0.00 | 5.62 | 714 |
| 43 | Elyria city | 5,940 | 0.41% | 3,121.22 | 564.11 | 12.15 | 27.08 | 0.00 | 215.46 | 5,940 |
| 44 | Elyria township | 289 | 0.03% | 248.02 | 11.41 | 0.00 | 0.62 | 0.00 | 8.95 | 289 |
| 45 | Euclid city | 21,282 | 2.23% | 7,765.17 | 12,679.14 | 17.56 | 121.21 | 1.70 | 697.22 | 21,282 |
| 46 | Fairport Harbor village | 184 | 0.02% | 153.78 | 22.13 | 0.41 | 1.89 | 0.14 | 25.85 | 184 |
| 47 | Fairview Park city | 8,758 | 0.92% | 8,125.99 | 150.73 | 39.53 | 249.88 | 0.00 | 192.27 | 8,758 |
| 48 | Garfield Heights city | 16,009 | 1.68% | 7,089.91 | 8,269.83 | 13.34 | 104.50 | 8.15 | 523.26 | 16,009 |
| 49 | Gates Mills village | 309 | 0.03% | 285.63 | 0.91 | 0.00 | 13.86 | 0.00 | 8.39 | 309 |
| 50 | Glenwillow village | 286 | 0.03% | 119.70 | 115.00 | 0.00 | 56.34 | 0.00 | 14.96 | 286 |
| 51 | Grafton township | 165 | 0.02% | 159.66 | 0.00 | 0.00 | 3.49 | 0.00 | 1.85 | 165 |
| 52 | Grafton village | 83 | 0.01% | 52.13 | 25.86 | 0.47 | 0.16 | 0.00 | 6.37 | 83 |
| 53 | Grand River village | 25 | 0.00% | 18.58 | 3.01 | 0.06 | 0.23 | 0.02 | 3.51 | 25 |
| 54 | Granger township | 308 | 0.03% | 295.90 | 1.67 | 0.00 | 2.47 | 0.00 | 7.96 | 308 |
| 55 | Guilford township | 99 | 0.01% | 97.30 | 0.00 | 0.00 | 0.80 | 0.00 | 0.91 | 99 |
| 56 | Hambden township | 166 | 0.02% | 153.14 | 5.88 | 0.00 | 1.05 | 0.00 | 7.92 | 166 |
| 57 | Harrisville township | 81 | 0.01% | 81.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 81 |
| 58 | Henrietta township | 84 | 0.01% | 80.34 | 0.61 | 0.00 | 0.00 | 0.00 | 3.05 | 84 |
| 59 | Highland Heights city | 2,205 | 0.23% | 2,012.99 | 43.83 | 0.00 | 121.68 | 0.00 | 26.50 | 2,205 |
| 60 | Highland Hills village | 1,070 | 0.11% | 86.66 | 912.56 | 0.00 | 0.00 | 0.00 | 68.79 | 1,070 |
| 61 | Hinckley township | 773 | 0.08% | 732.57 | 0.46 | 11.84 | 11.05 | 0.00 | 17.08 | 773 |
| 62 | Homer township | 38 | 0.00% | 38.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 38 |
| 63 | Hunting Valley village | 150 | 0.02% | 144.28 | 1.00 | 0.00 | 3.48 | 0.00 | 1.24 | 150 |
| 64 | Huntington township | 54 | 0.01% | 53.28 | 0.00 | 0.00 | 0.00 | 0.00 | 0.72 | 54 |
| 65 | Huntsburg township | 34 | 0.00% | 33.88 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 34 |
| 66 | Independence city | 11,642 | 1.22% | 11,115.36 | 0.00 | 0.00 | 322.84 | 0.00 | 204.00 | 11,642 |
| 67 | Kirtland city | 875 | 0.09% | 832.85 | 6.47 | 0.00 | 5.14 | 0.00 | 30.53 | 875 |
| 68 | Kirtland Hills village | 53 | 0.00% | 31.75 | 0.26 | 0.00 | 0.28 | 0.00 | 0.72 | 53 |
| 69 | Lafayette township | 126 | 0.01% | 122.28 | 0.67 | 0.00 | 0.00 | 0.00 | 3.05 | 126 |
| 70 | LaGrange township | 247 | 0.03% | 240.97 | 0.10 | 0.15 | 0.00 | 0.00 | 5.78 | 247 |
| 71 | LaGrange village | 209 | 0.02% | 203.90 | 0.08 | 0.13 | 0.00 | 0.00 | 4.89 | 209 |
| 72 | Lakeline village | 13 | 0.00% | 11.82 | 0.85 | 0.00 | 0.00 | 0.00 | 0.33 | 13 |
| 73 | Lakewood city | 53,436 | 5.50% | 28,954.16 | 2,215.06 | 76.58 | 849.74 | 0.00 | 1,340.85 | 53,436 |
| 74 | Leroy township | 190 | 0.02% | 178.81 | 11.19 | 0.00 | 0.00 | 0.00 | 0.00 | 190 |
| 75 | Linndale village | 165 | 0.02% | 57.47 | 9.67 | 0.00 | 0.00 | 0.00 | 117.86 | 165 |
| 76 | Litchfield township | 150 | 0.02% | 146.36 | 0.91 | 0.00 | 0.05 | 0.00 | 2.68 | 150 |
| 77 | Liverpool township | 367 | 0.04% | 359.20 | 1.87 | 0.00 | 0.00 | 0.00 | 5.94 | 367 |
| 78 | Lodi village | 56 | 0.01% | 54.47 | 0.32 | 0.27 | 0.00 | 0.00 | 0.95 | 56 |
| 79 | Lorain city | 5,059 | 0.52% | 2,165.56 | 500.76 | 25.39 | 26.26 | 4.79 | 336.25 | 5,059 |
| 80 | Lyndhurst city | 2,874 | 0.30% | 2,417.90 | 347.97 | 5.89 | 45.26 | 0.00 | 57.18 | 2,874 |
| 81 | Madison township | 424 | 0.04% | 406.79 | 6.10 | 0.38 | 2.96 | 0.00 | 4.79 | 424 |
| 82 | Madison village | 143 | 0.01% | 138.21 | 2.08 | 0.12 | 1.00 | 0.00 | 1.82 | 143 |
| 83 | Maple Heights city | 6,820 | 0.89% | 2,111.67 | 4,405.93 | 0.38 | 15.81 | 0.00 | 86.21 | 6,820 |

| | | | | Total Daily Trips in Cleveland By Race | | | | | | |
| | | | | | | American | | Native Hawaiin | Other (Some | |
| | | | | | Black or African | Indian or Alaska | | or Other Pacific | Other + Two or | |
| Community Number | Originating Community Name | Destination Cleveland City | % | White2 | American3 | Native4 | Asian5 | Islander6 | More)7 | Total 8 |
|---|---|---|---|---|---|---|---|---|---|---|
| 84 | Mayfield Heights city | | 0.41% | 2,942.86 | 607.24 | 9.50 | 177.18 | 0.00 | 187.22 | 5,924 |
| 85 | Mayfield village | | 0.19% | 1,738.58 | 24.26 | 0.00 | 39.19 | 0.00 | 4.98 | 1,807 |
| 86 | Medina city | | 0.11% | 954.76 | 24.13 | 3.29 | 8.17 | 0.00 | 17.65 | 1,008 |
| 87 | Medina township | | 0.08% | 739.24 | 0.00 | 2.81 | 18.12 | 0.00 | 5.83 | 766 |
| 88 | Mentor city | | 0.65% | 5,921.68 | 44.38 | 4.09 | 112.34 | 4.26 | 164.25 | 6,251 |
| 89 | Mentor-on-the-Lake city | | 0.07% | 615.88 | 10.72 | 0.00 | 3.71 | 0.00 | 9.69 | 640 |
| 90 | Middleburg Heights city | | 1.01% | 8,117.93 | 298.79 | 5.06 | 857.30 | 0.00 | 363.91 | 9,641 |
| 91 | Middlefield township | | 0.01% | 48.21 | 0.53 | 0.00 | 0.00 | 0.00 | 0.26 | 49 |
| 92 | Middlefield village | | 0.01% | 103.79 | 5.85 | 0.00 | 0.68 | 0.00 | 0.68 | 109 |
| 93 | Montville township - Geauga | | 0.01% | 57.91 | 2.00 | 0.00 | 0.49 | 0.00 | 2.60 | 63 |
| 94 | Montville township - Medina | | 0.08% | 554.68 | 11.32 | 0.00 | 16.13 | 0.00 | 23.87 | 606 |
| 95 | Moreland Hills village | | 0.05% | 468.37 | 1.44 | 0.00 | 26.59 | 0.00 | 10.60 | 507 |
| 96 | Munson township | | 0.03% | 303.30 | 1.74 | 0.00 | 0.00 | 0.00 | 3.95 | 309 |
| 97 | New Russia township | | 0.02% | 193.27 | 4.13 | 0.00 | 0.39 | 0.00 | 6.20 | 204 |
| 98 | Newburgh Heights village | | 0.12% | 914.80 | 247.12 | 0.00 | 0.00 | 0.00 | 23.07 | 1,185 |
| 99 | Newbury township | | 0.02% | 193.86 | 0.88 | 2.15 | 0.84 | 0.00 | 1.26 | 199 |
| 100 | North Olmsted city | | 1.08% | 9,366.01 | 282.09 | 2.04 | 255.23 | 4.07 | 413.57 | 10,323 |
| 101 | North Perry village | | 0.01% | 108.45 | 0.80 | 0.52 | 0.45 | 0.00 | 7.38 | 118 |
| 102 | North Randall village | | 0.11% | 227.21 | 796.98 | 0.00 | 0.00 | 0.00 | 19.81 | 1,044 |
| 103 | North Ridgeville city | | 0.42% | 3,756.81 | 84.52 | 3.23 | 35.10 | 1.85 | 145.49 | 4,027 |
| 104 | North Royalton city | | 0.42% | 3,612.87 | 125.06 | 4.06 | 180.29 | 0.00 | 93.72 | 4,016 |
| 105 | Oakwood village | | 0.08% | 306.22 | 422.09 | 1.81 | 0.00 | 0.00 | 48.88 | 779 |
| 106 | Oberlin city | | 0.04% | 258.72 | 35.38 | 1.64 | 22.59 | 0.00 | 28.66 | 347 |
| 107 | Olmsted Falls city | | 0.14% | 1,205.00 | 24.24 | 0.00 | 24.42 | 0.00 | 37.34 | 1,291 |
| 108 | Olmsted township | | 0.30% | 2,695.21 | 82.09 | 5.51 | 46.12 | 0.00 | 42.06 | 2,871 |
| 109 | Orange village | | 0.15% | 1,052.04 | 284.22 | 0.00 | 42.15 | 0.00 | 14.59 | 1,393 |
| 110 | Painesville city | | 0.15% | 1,058.62 | 175.13 | 3.22 | 13.36 | 1.11 | 204.57 | 1,456 |
| 111 | Painesville township | | 0.12% | 1,077.72 | 7.58 | 1.81 | 5.03 | 0.00 | 38.85 | 1,131 |
| 112 | Parkman township | | 0.01% | 78.92 | 0.03 | 0.00 | 0.21 | 0.00 | 1.84 | 81 |
| 113 | Parma city | | 2.88% | 24,212.81 | 1,248.26 | 37.96 | 716.94 | 0.00 | 1,528.03 | 27,539 |
| 114 | Parma Heights city | | 0.47% | 3,806.37 | 392.61 | 10.60 | 141.75 | 6.59 | 166.09 | 4,524 |
| 115 | Penfield township | | 0.01% | 83.55 | 2.45 | 0.00 | 0.00 | 0.00 | 0.00 | 86 |
| 116 | Pepper Pike city | | 0.12% | 842.74 | 70.70 | 7.20 | 144.32 | 0.00 | 45.03 | 1,110 |
| 117 | Perry township | | 0.03% | 295.01 | 2.50 | 2.18 | 1.23 | 0.00 | 20.07 | 321 |
| 118 | Perry village | | 0.02% | 127.75 | 1.08 | 0.95 | 0.53 | 0.00 | 8.69 | 139 |
| 119 | Pittsfield township | | 0.02% | 144.64 | 1.24 | 0.00 | 0.00 | 0.00 | 1.12 | 147 |
| 120 | Richmond Heights city | | 0.29% | 1,062.44 | 1,588.59 | 5.76 | 71.78 | 0.00 | 71.44 | 2,800 |
| 121 | Rittman city | | 0.00% | 6.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6 |
| 122 | Rochester township | | 0.00% | 30.81 | 0.00 | 0.00 | 0.00 | 0.00 | 1.19 | 32 |
| 123 | Rocky River city | | 1.03% | 9,358.18 | 131.35 | 10.89 | 178.12 | 0.00 | 136.47 | 9,815 |
| 124 | Russell township | | 0.04% | 402.31 | 0.40 | 0.00 | 0.00 | 0.00 | 16.30 | 419 |
| 125 | Seven Hills city | | 0.35% | 3,171.09 | 96.73 | 2.77 | 110.18 | 0.00 | 32.22 | 3,353 |
| 126 | Seville village | | 0.01% | 90.82 | 0.56 | 0.00 | 0.00 | 0.00 | 3.62 | 95 |
| 127 | Shaker Heights city | | 1.31% | 6,907.34 | 4,599.90 | 16.16 | 514.16 | 0.00 | 482.44 | 12,520 |
| 128 | Sharon township | | 0.03% | 262.90 | 0.00 | 0.00 | 7.04 | 0.00 | 0.07 | 270 |
| 129 | Sheffield Lake city | | 0.09% | 842.96 | 5.96 | 0.00 | 0.00 | 0.00 | 32.08 | 881 |
| 130 | Sheffield township | | 0.03% | 182.58 | 36.18 | 0.00 | 1.66 | 0.00 | 16.60 | 237 |
| 131 | Sheffield village | | 0.08% | 700.20 | 28.06 | 0.00 | 25.34 | 0.00 | 13.40 | 767 |
| 132 | Solon city | | 0.60% | 4,217.30 | 604.80 | 5.89 | 707.42 | 14.60 | 210.18 | 5,758 |
| 133 | South Amherst village | | 0.00% | 25.91 | 0.00 | 0.01 | 0.00 | 0.00 | 1.08 | 27 |
| 134 | South Euclid city | | 0.69% | 2,948.58 | 3,025.86 | 5.39 | 76.19 | 3.23 | 230.74 | 6,290 |
| 135 | South Russell village | | 0.02% | 224.80 | 0.00 | 0.00 | 0.00 | 0.00 | 1.20 | 226 |
| 136 | Spencer township | | 0.01% | 49.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 49 |
| 137 | Spencer village | | 0.00% | 6.82 | 0.11 | 0.00 | 0.00 | 0.00 | 0.07 | 7 |
| 138 | Strongsville city | | 0.93% | 8,094.09 | 130.15 | 26.63 | 446.20 | 1.74 | 231.19 | 8,870 |
| 139 | Thompson township | | 0.01% | 96.67 | 0.48 | 0.00 | 0.00 | 0.00 | 0.85 | 98 |
| 140 | Timberlake village | | 0.01% | 87.52 | 0.44 | 0.00 | 0.29 | 1.46 | 0.29 | 90 |
| 141 | Troy township | | 0.02% | 159.56 | 0.08 | 0.00 | 0.00 | 0.00 | 6.36 | 166 |
| 142 | University Heights city | | 0.48% | 3,075.12 | 1,125.11 | 1.71 | 110.17 | 0.00 | 156.89 | 4,485 |
| 143 | Valley View village | | 0.40% | 3,757.27 | 16.44 | 0.00 | 36.88 | 0.00 | 48.41 | 3,861 |
| 144 | Vermilion city | | 0.02% | 217.66 | 0.00 | 0.00 | 0.00 | 0.00 | 1.34 | 219 |
| 145 | Wadsworth city | | 0.05% | 427.30 | 7.92 | 0.84 | 2.50 | 0.00 | 7.43 | 448 |
| 146 | Wadsworth township | | 0.01% | 108.11 | 0.43 | 0.00 | 0.08 | 0.00 | 0.40 | 109 |
| 147 | Waite Hill village | | 0.01% | 87.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.86 | 88 |
| 148 | Walton Hills village | | 0.06% | 475.37 | 77.41 | 0.00 | 6.33 | 0.00 | 4.89 | 564 |
| 149 | Warrensville Heights city | | 0.58% | 326.29 | 5,073.98 | 0.00 | 25.30 | 0.00 | 126.64 | 5,552 |
| 150 | Wellington township | | 0.01% | 52.13 | 0.05 | 0.00 | 0.00 | 0.00 | 1.82 | 54 |
| 151 | Wellington village | | 0.02% | 206.60 | 0.19 | 0.00 | 0.00 | 0.00 | 7.21 | 214 |
| 152 | Westfield Center village | | 0.00% | 40.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.49 | 41 |
| 153 | Westfield township | | 0.01% | 124.58 | 5.54 | 0.00 | 0.00 | 0.00 | 0.90 | 129 |
| 154 | Westlake city | | 1.19% | 10,212.64 | 306.85 | 15.72 | 593.48 | 0.00 | 267.31 | 11,396 |
| 155 | Wickliffe city | | 0.39% | 3,406.89 | 207.31 | 0.00 | 32.54 | 0.00 | 97.26 | 3,744 |
| 156 | Willoughby city | | 0.51% | 4,401.07 | 286.90 | 4.13 | 63.99 | 0.00 | 93.91 | 4,850 |
| 157 | Willoughby Hills city | | 0.21% | 1,400.92 | 479.16 | 2.22 | 126.21 | 0.00 | 21.49 | 2,030 |
| 158 | Willowick city | | 0.27% | 2,426.92 | 112.44 | 0.00 | 15.87 | 0.00 | 33.78 | 2,591 |
| 159 | Woodmere village | | 0.12% | 951.22 | 547.90 | 0.00 | 48.17 | 0.00 | 208.72 | 1,756 |
| 160 | York township | | 0.02% | 206.36 | 3.52 | 1.08 | 0.53 | 0.00 | 8.11 | 220 |
| 161 | Summit County | | 1.62% | 12,325.63 | 2,150.36 | 30.34 | 548.08 | 2.11 | 472.47 | 15,509 |
| 162 | Portage County | | 0.37% | 3,177.95 | 144.92 | 4.02 | 66.86 | 1.32 | 111.93 | 3,504 |
| 163 | Wayne County | | 0.02% | 150.66 | 2.16 | 0.26 | 1.70 | 0.82 | 4.20 | 159 |
| 164 | Externals | | 3.93% | 26,956.28 | 4,701.29 | 291.53 | 2,125.21 | 52.39 | 3,407.31 | 37,533 |
| | Totals | | 100.00% | 561,305.95 | 393,879.83 | 5,150.51 | 28,611.68 | 393.75 | 57,828.66 | 955,169 |

**B.  City of Cleveland Wards and Police Districts**



**C.  Cleaning and Aggregating Administrative Datasets**

The following steps outline the process used to clean and aggregated the administrative datasets provided by CDP.

1. Use duplicate incident list provided by CDP to drop duplicates
2. Define the mapping of categorical variables
   a. Race
      i. 'W': 'White',
      ii. 'B': 'Black',
      iii. 'AI': 'American Indian',
      iv. 'A': 'Asian',
      v. 'PI': 'Pacific Islander',
      vi. 'U': 'Unknown',
   b. Gender
      i. 'M': 'Male',
      ii. 'F': 'Female'
   c. Ethnicity
      i. 'H': 'Hispanic',
      ii. 'NH': 'Non-Hispanic',
      iii. 'U': 'Unknown'
   d. Age Groups
      i. Under 18
      ii. 18-24
      iii. 25-34

51

         iv.  35-44
          v.  45-54
        vi.  55-64
      vii.  65 and over
     viii.  Unknown

3. Add columns to combine search types and contraband seized types
   a. Any Search: *esubjectsearchperformedflag* = Y OR *evehiclesearchperforedflag* = Y
   b. Any Contraband Found: *esubjectcontrabandevidenceseizedflag* OR *evehiclecontrabandevidenceseizedflag*= Y
4. Create Stop Year
   a. Year of *edate*
5. Review probable cause and reasonable suspicion reasons and group into meaningful categories
6. For aggregated tables, use count distinct on *brazosformpk*.

### D.  Total Crime and Police Stops by Race and Police District

1. Outcome Tables for 367.c.1

*367.c "Stop, Search, and Arrest measurements, including:"*

*1. "total number of investigatory stops, searches and arrests overall and broken down by District (understanding that different Districts may have inherently different demographic compositions), type of arrest, actual or perceived age, race, gender, and ethnicity of subject, and the rate at which the encounters resulted in a summons or arrest;"*

**Table 367c1-0: People stopped, searched or arrested during an investigatory stop for 2023 and 2024 in total.**

|  | 2023 | 2024 |
|---|---|---|
| Investigatory Stops | 757 | 796 |
| Investigatory Searches | 443 | 408 |
| Investigatory Arrests | 214 | 215 |

In Table 367c1-1, we provide all 'groups' with 15 or more investigatory stops across 2023 and 2024. These groups represent nearly 35% of all people stopped in an investigatory stop across 2023 and 2024. A group is defined by the police district, race, ethnicity, sex, and age of the stopped individual. A complete table for all groups with at least one stop can be provided upon request.

**Table 367c1-1: People stopped during an investigatory stop for 2023 and 2024 by Police District, Race, Ethnicity, Sex, and Age.**

| Race | Ethnicity | Sex | Age | 2023 Stops | 2024 Stops |
|---|---|---|---|---|---|
| Police District 1 | | | | | |

| Black | Non-Hispanic | Male | 35-44 | 14 | 5 |
|---|---|---|---|---|---|
| Black | Non-Hispanic | Male | 25-34 | 10 | 5 |
| White | Non-Hispanic | Male | 35-44 | 10 | 7 |
| Police District 2 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 13 | 25 |
| Black | Non-Hispanic | Male | Under 18 | 17 | 18 |
| Black | Non-Hispanic | Male | 35-44 | 15 | 19 |
| Black | Non-Hispanic | Male | 18-24 | 6 | 16 |
| White | Non-Hispanic | Female | 25-34 | 8 | 7 |
| White | Non-Hispanic | Male | 35-44 | 4 | 11 |
| Police District 3 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 21 | 25 |
| Black | Non-Hispanic | Male | 35-44 | 7 | 32 |
| Black | Non-Hispanic | Male | 55-64 | 4 | 30 |
| Black | Non-Hispanic | Male | 45-54 | 9 | 21 |
| Black | Non-Hispanic | Male | 18-24 | 11 | 13 |
| Police District 4 | | | | | |
| Black | Non-Hispanic | Male | 35-44 | 14 | 8 |
| Black | Non-Hispanic | Male | 25-34 | 13 | 7 |
| Black | Non-Hispanic | Male | 18-24 | 13 | 3 |
| Police District 5 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 14 | 20 |
| Black | Non-Hispanic | Male | Under 18 | 17 | 10 |
| Black | Non-Hispanic | Male | 35-44 | 9 | 13 |
| Black | Non-Hispanic | Male | 18-24 | 10 | 8 |

In Table 367c1-2, we provide all groups with 10 or more searches across 2023 and 2024. These groups represent 49% of all people searched during an investigatory stop across 2023 and 2024. A complete table for all groups with at least one search can be provided upon request.

**Table 367c1-2: People searched during an investigatory stop for 2023 and 2024 by Police District, Race, Ethnicity, Sex, and Age.**

| Race | Ethnicity | Sex | Age | 2023 Searches | 2024 Searches |
|---|---|---|---|---|---|
| Police District 1 | | | | | |
| Black | Non-Hispanic | Male | 35-44 | 8 | 4 |
| Black | Non-Hispanic | Male | 25-34 | 7 | 4 |
| Black | Non-Hispanic | Male | Under 18 | 9 | 2 |

| White | Non-Hispanic | Male | 35-44 | 7 | 6 |
|-------|-------------|------|-------|---|---|
| Police District 2 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 11 | 18 |
| Black | Non-Hispanic | Male | Under 18 | 10 | 18 |
| Black | Non-Hispanic | Male | 35-44 | 13 | 13 |
| Black | Non-Hispanic | Male | 18-24 | 6 | 14 |
| Black | Non-Hispanic | Male | 45-54 | 6 | 4 |
| White | Hispanic | Male | 25-34 | 4 | 8 |
| White | Non-Hispanic | Male | 35-44 | 3 | 9 |
| White | Non-Hispanic | Female | 25-34 | 7 | 4 |
| White | Hispanic | Male | 35-44 | 5 | 5 |
| Police District 3 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 9 | 8 |
| Black | Non-Hispanic | Male | 18-24 | 7 | 8 |
| Black | Non-Hispanic | Male | 35-44 | 3 | 11 |
| Black | Non-Hispanic | Male | 45-54 | 7 | 4 |
| Police District 4 | | | | | |
| Black | Non-Hispanic | Male | 18-24 | 12 | 1 |
| Black | Non-Hispanic | Male | 25-34 | 9 | 4 |
| Black | Non-Hispanic | Male | 35-44 | 8 | 5 |
| Black | Unknown | Male | 25-34 | 7 | 4 |
| Black | Unknown | Male | 18-24 | 8 | 2 |
| Black | Unknown | Male | 45-54 | 9 | 1 |
| Black | Unknown | Male | Under 18 | 4 | 6 |
| Police District 5 | | | | | |
| Black | Non-Hispanic | Male | Under 18 | 15 | 10 |
| Black | Non-Hispanic | Male | 25-34 | 9 | 15 |
| Black | Non-Hispanic | Male | 35-44 | 5 | 7 |
| Black | Non-Hispanic | Male | 18-24 | 5 | 5 |

In Table 367c1-3, we provide all groups with 6 or more arrests across 2023 and 2024. These groups represent 45% of all people arrested during an investigatory stop across 2023 and 2024. A complete table for all groups with at least one arrest can be provided upon request.

**Table 367c1-3: People arrested during an investigatory stop for 2023 and 2024 by Police District, Race, Ethnicity, Sex, and Age.**

| Race | Ethnicity | Sex | Age | 2023 Arrests | 2024 Arrests |
|------|-----------|-----|-----|--------------|--------------|

| Police District 1 | | | | | |
|---|---|---|---|---|---|
| Black | Non-Hispanic | Male | 25-34 | 4 | 3 |
| Black | Non-Hispanic | Male | Under 18 | 6 | 1 |
| White | Non-Hispanic | Male | 35-44 | 4 | 5 |
| Police District 2 | | | | | |
| Black | Non-Hispanic | Male | 35-44 | 9 | 5 |
| Black | Non-Hispanic | Male | Under 18 | 7 | 6 |
| Black | Non-Hispanic | Male | 25-34 | 6 | 6 |
| Black | Non-Hispanic | Male | 18-24 | 2 | 5 |
| Black | Unknown | Male | 25-34 | 3 | 3 |
| White | Non-Hispanic | Female | 25-34 | 4 | 2 |
| Police District 3 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 5 | 6 |
| Black | Non-Hispanic | Male | 45-54 | 6 | 5 |
| Black | Non-Hispanic | Male | 35-44 | 1 | 8 |
| Police District 4 | | | | | |
| Black | Non-Hispanic | Male | 18-24 | 7 | 1 |
| Black | Non-Hispanic | Female | 25-34 | 1 | 6 |
| Black | Non-Hispanic | Male | 35-44 | 4 | 3 |
| Black | Unknown | Male | 18-24 | 5 | 2 |
| Black | Unknown | Male | 25-34 | 4 | 3 |
| Black | Unknown | Male | 45-54 | 7 | 0 |
| Black | Non-Hispanic | Male | 25-34 | 5 | 1 |
| Police District 5 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 5 | 10 |
| Black | Non-Hispanic | Male | 35-44 | 4 | 3 |
| Black | Non-Hispanic | Male | 18-24 | 3 | 3 |
| Black | Non-Hispanic | Male | Under 18 | 0 | 6 |

As a further breakdown of investigatory, stops, searches, and arrests, below are tables per demographic listed in paragraph 367c1 for 2023 and 2024. Tables are organized per demographic.

**Table 367c1-4: People stopped, searched, and arrested during an investigatory stop by age for 2023 and 2024**

| Age | 2023 Stops | 2024 Stops | 2023 Searches | 2024 Searches | 2023 Arrests | 2024 Arrests |
|---|---|---|---|---|---|---|
| 18-24 | 115 | 106 | 76 | 65 | 36 | 33 |
| 25-34 | 198 | 189 | 115 | 110 | 64 | 58 |

| | | | | | |
|---|---|---|---|---|---|
| 35-44 | 155 | 188 | 89 | 93 | 42 | 51 |
| 45-54 | 84 | 112 | 53 | 54 | 30 | 31 |
| 55-64 | 55 | 85 | 28 | 23 | 10 | 13 |
| 65 and over | 25 | 40 | 10 | 7 | 1 | 3 |
| Under 18 | 103 | 60 | 66 | 49 | 29 | 23 |
| Unknown | 22 | 16 | 6 | 7 | 2 | 3 |
| Total | 757 | 796 | 443 | 408 | 214 | 215 |

**Table 367c1-5: People stopped, searched, and arrested during an investigatory stop by ethnicity for 2023 and 2024**

| Ethnicity | 2023 Stops | 2024 Stops | 2023 Searches | 2024 Searches | 2023 Arrests | 2024 Arrests |
|---|---|---|---|---|---|---|
| Hispanic | 61 | 61 | 44 | 42 | 14 | 20 |
| Non-Hispanic | 503 | 581 | 278 | 285 | 135 | 147 |
| Unknown | 193 | 155 | 121 | 81 | 65 | 48 |
| Total | 757 | 797 | 443 | 408 | 214 | 215 |

**Table 367c1-6a: People stopped, searched, and arrested during an investigatory stop by race for 2023 and 2024**

| Race | 2023 Stops | 2024 Stops | 2023 Searches | 2024 Searches | 2023 Arrests | 2024 Arrests |
|---|---|---|---|---|---|---|
| American Indian | 4 | 1 | 1 | 1 | 0 | 0 |
| Asian | 1 | 5 | 0 | 2 | 0 | 0 |
| Black | 512 | 538 | 311 | 269 | 155 | 148 |
| Pacific Islander | 1 | 1 | 0 | 0 | 0 | 0 |
| Unknown | 48 | 47 | 24 | 23 | 11 | 17 |
| White | 191 | 205 | 107 | 113 | 48 | 50 |
| Total | 757 | 797 | 443 | 408 | 214 | 215 |

**Table 367c1-6b: People stopped, searched, and arrested during an investigatory stop by race and police district for 2023 and 2024**

| Race | 2023 Stops | 2024 Stops | 2023 Searches | 2024 Searches | 2023 Arrests | 2024 Arrests |
|---|---|---|---|---|---|---|
| Police District 1 | | | | | | |
| American Indian | 1 | | | | | |
| Asian | 1 | | | | | |
| Black | 79 | 29 | 45 | 21 | 21 | 11 |

56

| | | | | | | |
|---|---|---|---|---|---|---|
| Pacific Islander | | | | | | |
| Unknown | 13 | 7 | 5 | 4 | 2 | 3 |
| White | 61 | 48 | 31 | 31 | 14 | 15 |
| **Total** | **155** | **84** | **81** | **56** | **37** | **29** |
| Police District 2 | | | | | | |
| American Indian | 2 | | 1 | | | |
| Asian | | 2 | | 2 | | |
| Black | 92 | 128 | 62 | 90 | 36 | 40 |
| Pacific Islander | | | | | | |
| Unknown | 14 | 26 | 9 | 11 | 4 | 10 |
| White | 79 | 98 | 57 | 73 | 27 | 29 |
| **Total** | **187** | **254** | **129** | **176** | **67** | **79** |
| Police District 3 | | | | | | |
| American Indian | | 1 | | 1 | | |
| Asian | | 3 | | | | |
| Black | 109 | 187 | 53 | 43 | 25 | 27 |
| Pacific Islander | 1 | 1 | | | | |
| Unknown | 4 | 3 | | 2 | | 1 |
| White | 23 | 44 | 4 | 3 | 2 | 2 |
| **Total** | **137** | **239** | **57** | **49** | **27** | **30** |
| Police District 4 | | | | | | |
| American Indian | 1 | | | | | |
| Asian | | | | | | |
| Black | 134 | 77 | 90 | 48 | 49 | 29 |
| Pacific Islander | | | | | | |
| Unknown | 7 | 4 | 6 | 3 | 4 | 1 |
| White | 13 | 7 | 6 | 4 | 3 | 2 |
| **Total** | **155** | **88** | **102** | **55** | **56** | **32** |
| Police District 5 | | | | | | |
| American Indian | | | | | | |
| Asian | | | | | | |
| Black | 92 | 101 | 57 | 61 | 24 | 38 |
| Pacific Islander | | | | | | |
| Unknown | 7 | 6 | 3 | 2 | 1 | 1 |
| White | 9 | 5 | 4 | 2 | | 2 |
| **Total** | **108** | **112** | **64** | **65** | **25** | **41** |
| Outside City | | | | | | |
| American Indian | | | | | | |
| Asian | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Black | 6 | 16 | 4 | 6 | 3 |
| Pacific Islander | | | | | |
| Unknown | 3 | 1 | 1 | 1 | 1 |
| White | 6 | 3 | 5 | | 2 | |
| **Total** | **15** | **20** | **10** | **7** | **2** | **4** |

**Table 367c1-7: People stopped, searched, and arrested during an investigatory stop by sex for 2023 and 2024**

| Sex | 2023 Stops | 2024 Stops | 2023 Searches | 2024 Searches | 2023 Arrests | 2024 Arrests |
|---|---|---|---|---|---|---|
| Female | 161 | 156 | 58 | 66 | 29 | 41 |
| Male | 596 | 640 | 385 | 342 | 185 | 174 |
| Total | 757 | 796 | 443 | 408 | 214 | 215 |

**Table 367c1-8: People stopped, searched, and arrested during an investigatory stop by police district for 2023 and 2024**

| Police District | 2023 Stops | 2024 Stops | 2023 Searches | 2024 Searches | 2023 Arrests | 2024 Arrests |
|---|---|---|---|---|---|---|
| 1 | 155 | 84 | 81 | 56 | 37 | 29 |
| 2 | 187 | 254 | 129 | 176 | 67 | 79 |
| 3 | 137 | 239 | 57 | 49 | 27 | 30 |
| 4 | 155 | 88 | 102 | 55 | 56 | 32 |
| 5 | 108 | 112 | 64 | 65 | 25 | 41 |
| Outside City | 15 | 20 | 10 | 7 | 2 | 4 |
| Total | 757 | 796 | 443 | 408 | 214 | 215 |

2. Outcome Tables for 367.c.2

*367.c "Stop, Search, and Arrest measurements, including:"*

*2. "data related to the documented reasonable suspicion to stop and probable cause search or arrest, broken down by the actual or perceived race, gender, age, and ethnicity of the person(s) stopped/searched/arrested;"*

Given that making an investigatory stop requires reasonable suspicion while making a traffic stop requires probable cause and that both reasonable suspicion and probable cause are referenced in paragraph 367c2, we include data regarding both investigatory and traffic stops. For each demographic, we report separate tables for number of stops, searches, and arrests by the reason – probable cause or reasonable suspicion – provided by the officer. Reasons were

aggregated based on common descriptions and words. Any given reason may be categorized into multiple categories, thus counts sum to more than the total number of people stopped, searched, or arrested.

**Traffic Stops**

A. In Total

**Table 367c2-1: People stopped, searched, or arrested during a traffic stop for 2023 and 2024**

| Reason | 2023 Traffic Stops | 2024 Traffic Stops | 2023 Traffic Searches | 2024 Traffic Searches | 2023 Traffic Arrests | 2024 Traffic Arrests |
|---|---|---|---|---|---|---|
| Speeding | 6436 | 4784 | 119 | 118 | 67 | 60 |
| Stop Sign | 1992 | 2117 | 111 | 119 | 48 | 40 |
| Red Light | 1352 | 1795 | 80 | 107 | 27 | 43 |
| Plates Registration | 2136 | 2556 | 296 | 304 | 98 | 96 |
| Window Tint | 910 | 973 | 174 | 135 | 37 | 38 |
| Equipment Violation | 273 | 281 | 22 | 17 | 7 | 7 |
| Driving Lane | 1981 | 2007 | 175 | 159 | 58 | 58 |
| Other | 2065 | 2423 | 289 | 269 | 104 | 110 |
| Total | 16201 | 15588 | 1135 | 1079 | 413 | 410 |

B. By Age

**Table 367c2-2: People stopped during a traffic stop by age for 2023 and 2024**

| Reason | 18-24 Count | 25-34 Count | 35-44 Count | 45-54 Count | 55-64 Count | 65 and over Count | Under 18 Count | Unknown Count | Total Count |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 2023 Traffic Stops | | | | | |
| Speeding | 1191 | 2154 | 1308 | 791 | 629 | 293 | 60 | 10 | 6436 |
| Stop Sign | 409 | 710 | 390 | 216 | 158 | 79 | 19 | 11 | 1992 |
| Red Light | 222 | 415 | 279 | 188 | 149 | 81 | 10 | 8 | 1352 |
| Plates Registration | 418 | 814 | 373 | 227 | 168 | 99 | 28 | 9 | 2136 |
| Window Tint | 227 | 371 | 174 | 85 | 13 | 23 | 14 | 3 | 910 |
| Equipment Violation | 32 | 61 | 45 | 62 | 38 | 33 | 0 | 2 | 273 |
| Driving Lane | 292 | 603 | 395 | 281 | 218 | 143 | 39 | 10 | 1981 |
| Other | 324 | 677 | 429 | 271 | 204 | 106 | 38 | 16 | 2065 |

| | 18-24 | 25-34 | 35-44 | 45-54 | 55-64 | 65 and over | Under 18 | Unknown | Total |
|---|---|---|---|---|---|---|---|---|---|
| Total | 2882 | 5497 | 3235 | 2009 | 1507 | 818 | 191 | 62 | 16201 |
| 2024 Traffic Stops | | | | | | | | | |
| Speeding | 869 | 1559 | 965 | 587 | 486 | 256 | 55 | 7 | 4784 |
| Stop Sign | 377 | 801 | 428 | 213 | 158 | 107 | 27 | 6 | 2117 |
| Red Light | 254 | 575 | 381 | 263 | 194 | 111 | 13 | 4 | 1795 |
| Plates Registration | 444 | 989 | 500 | 273 | 230 | 90 | 23 | 7 | 2556 |
| Window Tint | 220 | 367 | 260 | 62 | 34 | 13 | 13 | 4 | 973 |
| Equipment Violation | 48 | 70 | 59 | 42 | 33 | 26 | 3 | 0 | 281 |
| Driving Lane | 331 | 615 | 421 | 266 | 209 | 132 | 24 | 9 | 2007 |
| Other | 391 | 777 | 541 | 318 | 226 | 114 | 40 | 16 | 2423 |
| Total | 2667 | 5292 | 3274 | 1877 | 1452 | 796 | 184 | 46 | 15588 |

**Table 367c2-3: People searched during a traffic stop by age for 2023 and 2024**

| Reason | 18-24 Count | 25-34 Count | 35-44 Count | 45-54 Count | 55-64 Count | 65 and over Count | Under 18 Count | Unknown Count | Total Count |
|---|---|---|---|---|---|---|---|---|---|
| 2023 Traffic Searches | | | | | | | | | |
| Speeding | 24 | 46 | 22 | 14 | 8 | 3 | 2 | 0 | 119 |
| Stop Sign | 38 | 37 | 20 | 7 | 6 | 1 | 1 | 1 | 111 |
| Red Light | 8 | 35 | 18 | 9 | 5 | 2 | 0 | 3 | 80 |
| Plates Registration | 64 | 116 | 46 | 28 | 20 | 9 | 11 | 2 | 296 |
| Window Tint | 49 | 79 | 30 | 6 | 3 | 2 | 4 | 1 | 174 |
| Equipment Violation | 5 | 7 | 5 | 2 | 1 | 2 | 0 | 0 | 22 |
| Driving Lane | 26 | 51 | 43 | 23 | 14 | 9 | 6 | 3 | 175 |
| Other | 65 | 105 | 52 | 32 | 19 | 7 | 7 | 2 | 289 |
| Total | 249 | 432 | 214 | 106 | 67 | 29 | 29 | 9 | 1135 |
| 2024 Traffic Searches | | | | | | | | | |
| Speeding | 20 | 39 | 28 | 16 | 14 | 1 | 0 | 0 | 118 |
| Stop Sign | 28 | 46 | 27 | 8 | 9 | 0 | 0 | 1 | 119 |
| Red Light | 15 | 37 | 26 | 16 | 9 | 2 | 0 | 2 | 107 |
| Plates Registration | 56 | 119 | 66 | 27 | 23 | 4 | 7 | 2 | 304 |
| Window Tint | 42 | 48 | 29 | 7 | 4 | 1 | 4 | 0 | 135 |
| Equipment Violation | 6 | 5 | 3 | 0 | 3 | 0 | 0 | 0 | 17 |
| Driving Lane | 23 | 47 | 46 | 21 | 15 | 3 | 2 | 2 | 159 |
| Other | 45 | 91 | 66 | 36 | 11 | 5 | 13 | 2 | 269 |
| Total | 208 | 375 | 259 | 116 | 75 | 14 | 25 | 7 | 1079 |

**Table 367c2-4: People arrested during a traffic stop by age for 2023 and 2024**

| Reason | 18-24 Count | 25-34 Count | 35-44 Count | 45-54 Count | 55-64 Count | 65 and over Count | Under 18 Count | Unknown Count | Total Count |
|---|---|---|---|---|---|---|---|---|---|
| 2023 Traffic Arrests | | | | | | | | | |
| Speeding | 14 | 28 | 10 | 9 | 4 | 2 | 0 | 0 | 67 |
| Stop Sign | 15 | 19 | 8 | 4 | 2 | 0 | 0 | 0 | 48 |
| Red Light | 4 | 8 | 8 | 3 | 2 | 1 | 0 | 1 | 27 |
| Plates Registration | 16 | 40 | 20 | 11 | 6 | 3 | 1 | 1 | 98 |
| Window Tint | 11 | 13 | 7 | 3 | 0 | 0 | 3 | 0 | 37 |
| Equipment Violation | 0 | 1 | 2 | 1 | 2 | 1 | 0 | 0 | 7 |
| Driving Lane | 4 | 16 | 20 | 9 | 5 | 1 | 2 | 1 | 58 |
| Other | 18 | 33 | 27 | 12 | 8 | 3 | 2 | 1 | 104 |
| Total | 76 | 149 | 94 | 47 | 27 | 9 | 8 | 3 | 413 |
| 2024 Traffic Arrests | | | | | | | | | |
| Speeding | 8 | 20 | 12 | 10 | 10 | 0 | 0 | 0 | 60 |
| Stop Sign | 9 | 17 | 10 | 3 | 1 | 0 | 0 | 0 | 40 |
| Red Light | 3 | 16 | 11 | 6 | 5 | 1 | 0 | 1 | 43 |
| Plates Registration | 16 | 37 | 23 | 7 | 8 | 1 | 3 | 1 | 96 |
| Window Tint | 10 | 13 | 8 | 3 | 2 | 0 | 2 | 0 | 38 |
| Equipment Violation | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 0 | 7 |
| Driving Lane | 7 | 18 | 18 | 10 | 4 | 1 | 0 | 0 | 58 |
| Other | 15 | 33 | 28 | 20 | 6 | 2 | 5 | 1 | 110 |
| Total | 64 | 140 | 103 | 53 | 34 | 4 | 10 | 2 | 410 |

C.  By Race

**Table 367c2-5: People stopped during a traffic stop by race for 2023 and 2024**

| Reason | American Indian Count | Asian Count | Black Count | Pacific Islander Count | Unknown Count | White Count | Total Count |
|---|---|---|---|---|---|---|---|
| 2023 Traffic Stops | | | | | | | |
| Speeding | 6 | 64 | 4023 | 27 | 219 | 2097 | 6436 |
| Stop Sign | 0 | 13 | 1103 | 9 | 61 | 805 | 1991 |
| Red Light | 2 | 11 | 797 | 2 | 27 | 512 | 1351 |
| Plates Registration | 2 | 9 | 1635 | 14 | 33 | 443 | 2136 |
| Window Tint | 3 | 1 | 687 | 41 | 19 | 159 | 910 |
| Equipment Violation | 0 | 0 | 168 | 0 | 7 | 98 | 273 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Driving Lane | 1 | 9 | 1205 | 10 | 55 | 701 | 1981 |
| Other | 3 | 13 | 1190 | 9 | 85 | 764 | 2064 |
| Total | 17 | 111 | 10195 | 109 | 471 | 5295 | 16198 |
| 2024 Traffic Stops | | | | | | | |
| Speeding | 3 | 37 | 2964 | 51 | 89 | 1640 | 4784 |
| Stop Sign | 3 | 17 | 1122 | 19 | 283 | 673 | 2117 |
| Red Light | 1 | 10 | 1088 | 5 | 105 | 586 | 1795 |
| Plates Registration | 2 | 8 | 1990 | 6 | 107 | 443 | 2556 |
| Window Tint | 1 | 3 | 713 | 26 | 63 | 167 | 973 |
| Equipment Violation | 0 | 0 | 136 | 0 | 22 | 123 | 281 |
| Driving Lane | 2 | 18 | 1203 | 8 | 91 | 685 | 2007 |
| Other | 4 | 18 | 1434 | 10 | 107 | 850 | 2423 |
| Total | 15 | 101 | 9779 | 121 | 752 | 4820 | 15588 |

**Table 367c2-6: People searched during a traffic stop by race for 2023 and 2024**

| Reason | American Indian Count | Asian Count | Black Count | Pacific Islander Count | Unknown Count | White Count | Total Count |
|---|---|---|---|---|---|---|---|
| 2023 Traffic Searches | | | | | | | |
| Speeding | 0 | 1 | 89 | 0 | 1 | 28 | 119 |
| Stop Sign | 0 | 0 | 73 | 0 | 4 | 34 | 111 |
| Red Light | 0 | 0 | 57 | 0 | 3 | 20 | 80 |
| Plates Registration | 0 | 1 | 233 | 1 | 3 | 58 | 296 |
| Window Tint | 3 | 0 | 151 | 0 | 4 | 16 | 174 |
| Equipment Violation | 0 | 0 | 20 | 0 | 0 | 2 | 22 |
| Driving Lane | 0 | 1 | 132 | 0 | 4 | 38 | 175 |
| Other | 1 | 1 | 189 | 0 | 14 | 83 | 289 |
| Total | 4 | 3 | 842 | 1 | 29 | 255 | 1135 |
| 2024 Traffic Searches | | | | | | | |
| Speeding | 0 | 0 | 92 | 0 | 6 | 20 | 118 |
| Stop Sign | 0 | 0 | 83 | 1 | 16 | 19 | 119 |
| Red Light | 0 | 0 | 77 | 0 | 5 | 25 | 107 |
| Plates Registration | 0 | 0 | 221 | 1 | 16 | 66 | 304 |
| Window Tint | 0 | 1 | 104 | 0 | 9 | 21 | 135 |
| Equipment Violation | 0 | 0 | 10 | 0 | 0 | 7 | 17 |
| Driving Lane | 0 | 1 | 117 | 0 | 6 | 35 | 159 |
| Other | 0 | 1 | 183 | 0 | 19 | 66 | 269 |
| Total | 0 | 3 | 776 | 2 | 69 | 229 | 1079 |

**Table 367c2-7: People arrested during a traffic stop by race for 2023 and 2024**

| Reason | American Indian Count | Asian Count | Black Count | Pacific Islander Count | Unknown Count | White Count | Total Count |
|---|---|---|---|---|---|---|---|
| 2023 Traffic Arrests | | | | | | | |
| Speeding | 0 | 1 | 57 | 0 | 1 | 8 | 67 |
| Stop Sign | 0 | 0 | 34 | 0 | 1 | 13 | 48 |
| Red Light | 0 | 0 | 23 | 0 | 0 | 4 | 27 |
| Plates Registration | 0 | 0 | 79 | 0 | 1 | 18 | 98 |
| Window Tint | 0 | 0 | 34 | 0 | 1 | 2 | 37 |
| Equipment Violation | 0 | 0 | 5 | 0 | 0 | 2 | 7 |
| Driving Lane | 0 | 0 | 49 | 0 | 1 | 8 | 58 |
| Other | 0 | 1 | 68 | 1 | 4 | 30 | 104 |
| Total | 0 | 2 | 323 | 1 | 8 | 79 | 413 |
| 2024 Traffic Arrests | | | | | | | |
| Speeding | 0 | 0 | 50 | 0 | 1 | 9 | 60 |
| Stop Sign | 0 | 0 | 26 | 1 | 2 | 11 | 40 |
| Red Light | 0 | 0 | 26 | 0 | 3 | 14 | 43 |
| Plates Registration | 0 | 0 | 70 | 0 | 3 | 23 | 96 |
| Window Tint | 0 | 0 | 30 | 0 | 2 | 6 | 38 |
| Equipment Violation | 0 | 0 | 4 | 0 | 0 | 3 | 7 |
| Driving Lane | 0 | 1 | 44 | 0 | 2 | 11 | 58 |
| Other | 0 | 0 | 78 | 0 | 4 | 28 | 110 |
| Total | 0 | 1 | 297 | 1 | 14 | 97 | 410 |

D. By Ethnicity

**Table 367c2-8: People stopped during a traffic stop by ethnicity for 2023 and 2024**

| Reason | Hispanic Count | Non-Hispanic Count | Unknown Count | Total Count |
|---|---|---|---|---|
| 2023 Traffic Stops | | | | |
| Speeding | 444 | 4360 | 1632 | 6436 |
| Stop Sign | 314 | 1055 | 622 | 1991 |
| Red Light | 138 | 850 | 363 | 1351 |
| Plates Registration | 151 | 1514 | 471 | 2136 |
| Window Tint | 129 | 567 | 213 | 909 |
| Equipment Violation | 12 | 74 | 187 | 273 |
| Driving Lane | 225 | 1117 | 639 | 1981 |
| Other | 250 | 1277 | 537 | 2064 |
| Total | 1568 | 10238 | 4391 | 16197 |
| 2024 Traffic Stops | | | | |

| | | | | |
|---|---|---|---|---|
| Speeding | 324 | 3538 | 922 | 4784 |
| Stop Sign | 248 | 1113 | 756 | 2117 |
| Red Light | 169 | 1228 | 398 | 1795 |
| Plates Registration | 158 | 1545 | 853 | 2556 |
| Window Tint | 110 | 654 | 209 | 973 |
| Equipment Violation | 25 | 76 | 180 | 281 |
| Driving Lane | 183 | 1417 | 407 | 2007 |
| Other | 245 | 1399 | 779 | 2423 |
| Total | 1349 | 10066 | 4173 | 15588 |

**Table 367c2-9: People searched during a traffic stop by ethnicity for 2023 and 2024**

| Reason | Hispanic Count | Non-Hispanic Count | Unknown Count | Total Count |
|---|---|---|---|---|
| 2023 Traffic Searches | | | | |
| Speeding | 10 | 84 | 25 | 119 |
| Stop Sign | 19 | 69 | 23 | 111 |
| Red Light | 3 | 42 | 35 | 80 |
| Plates Registration | 22 | 202 | 72 | 296 |
| Window Tint | 12 | 109 | 52 | 174 |
| Equipment Violation | 1 | 10 | 11 | 22 |
| Driving Lane | 15 | 107 | 53 | 175 |
| Other | 24 | 194 | 70 | 289 |
| Total | 99 | 740 | 294 | 1135 |
| 2024 Traffic Searches | | | | |
| Speeding | 9 | 85 | 24 | 118 |
| Stop Sign | 9 | 63 | 47 | 119 |
| Red Light | 8 | 71 | 28 | 107 |
| Plates Registration | 25 | 209 | 70 | 304 |
| Window Tint | 10 | 96 | 29 | 135 |
| Equipment Violation | 3 | 4 | 10 | 17 |
| Driving Lane | 7 | 109 | 43 | 159 |
| Other | 35 | 186 | 48 | 269 |
| Total | 96 | 726 | 257 | 1079 |

**Table 367c2-10: People arrested during a traffic stop by ethnicity for 2023 and 2024**

| Reason | Hispanic Count | Non-Hispanic Count | Unknown Count | Total Count |
|---|---|---|---|---|
| 2023 Traffic Arrests | | | | |

| | | | |
|---|---|---|---|
| Speeding | 2 | 58 | 7 | 67 |
| Stop Sign | 4 | 33 | 11 | 48 |
| Red Light | 0 | 22 | 5 | 27 |
| Plates Registration | 5 | 72 | 21 | 98 |
| Window Tint | 2 | 24 | 10 | 37 |
| Equipment Violation | 0 | 1 | 6 | 7 |
| Driving Lane | 1 | 42 | 15 | 58 |
| Other | 6 | 72 | 26 | 104 |
| Total | 20 | 297 | 95 | 413 |
| 2024 Traffic Arrests | | | |
| Speeding | 4 | 45 | 11 | 60 |
| Stop Sign | 4 | 23 | 13 | 40 |
| Red Light | 4 | 30 | 9 | 43 |
| Plates Registration | 9 | 70 | 17 | 96 |
| Window Tint | 1 | 31 | 6 | 38 |
| Equipment Violation | 0 | 3 | 4 | 7 |
| Driving Lane | 3 | 40 | 15 | 58 |
| Other | 14 | 80 | 16 | 110 |
| Total | 36 | 295 | 79 | 410 |

E.  By Gender

**Table 367c2-11: People stopped during a traffic stop by gender for 2023 and 2024**

| Reason | Female Count | Male Count | Total Count |
|---|---|---|---|
| 2023 Traffic Stops | | | |
| Speeding | 2794 | 3641 | 6435 |
| Stop Sign | 839 | 1152 | 1991 |
| Red Light | 487 | 864 | 1351 |
| Plates Registration | 862 | 1274 | 2136 |
| Window Tint | 276 | 634 | 910 |
| Equipment Violation | 42 | 231 | 273 |
| Driving Lane | 697 | 1284 | 1981 |
| Other | 679 | 1384 | 2063 |
| Total | 6358 | 9838 | 16196 |
| 2024 Traffic Stops | | | |
| Speeding | 1984 | 2800 | 4784 |
| Stop Sign | 811 | 1306 | 2117 |
| Red Light | 617 | 1178 | 1795 |
| Plates Registration | 1029 | 1527 | 2556 |
| Window Tint | 316 | 657 | 973 |

| | | | |
|---|---|---|---|
| Equipment Violation | 46 | 235 | 281 |
| Driving Lane | 699 | 1308 | 2007 |
| Other | 835 | 1588 | 2423 |
| Total | 5876 | 9712 | 15588 |

**Table 367c2-12: People searched during a traffic stop by gender for 2023 and 2024**

| Reason | Female Count | Male Count | Total Count |
|---|---|---|---|
| 2023 Traffic Searches | | | |
| Speeding | 19 | 100 | 119 |
| Stop Sign | 13 | 98 | 111 |
| Red Light | 8 | 72 | 80 |
| Plates Registration | 71 | 225 | 296 |
| Window Tint | 14 | 160 | 174 |
| Equipment Violation | 1 | 21 | 22 |
| Driving Lane | 14 | 161 | 175 |
| Other | 50 | 238 | 289 |
| Total | 180 | 954 | 1135 |
| 2024 Traffic Searches | | | |
| Speeding | 22 | 96 | 118 |
| Stop Sign | 21 | 98 | 119 |
| Red Light | 15 | 92 | 107 |
| Plates Registration | 89 | 215 | 304 |
| Window Tint | 23 | 112 | 135 |
| Equipment Violation | 2 | 15 | 17 |
| Driving Lane | 27 | 132 | 159 |
| Other | 50 | 219 | 269 |
| Total | 224 | 855 | 1079 |

**Table 367c2-13: People arrested during a traffic stop by gender for 2023 and 2024**

| Reason | Female Count | Male Count | Total Count |
|---|---|---|---|
| 2023 Traffic Arrests | | | |
| Speeding | 18 | 49 | 67 |
| Stop Sign | 7 | 41 | 48 |
| Red Light | 6 | 21 | 27 |
| Plates Registration | 20 | 78 | 98 |
| Window Tint | 3 | 34 | 37 |
| Equipment Violation | 1 | 6 | 7 |
| Driving Lane | 6 | 52 | 58 |

| | | | |
|---|---:|---:|---:|
| Other | 16 | 88 | 104 |
| Total | 73 | 340 | 413 |
| 2024 Traffic Arrests | | | |
| Speeding | 10 | 50 | 60 |
| Stop Sign | 7 | 33 | 40 |
| Red Light | 4 | 39 | 43 |
| Plates Registration | 25 | 71 | 96 |
| Window Tint | 3 | 35 | 38 |
| Equipment Violation | 0 | 7 | 7 |
| Driving Lane | 13 | 45 | 58 |
| Other | 22 | 88 | 110 |
| Total | 77 | 333 | 410 |

**Investigatory Stops**

F.  In Total

**Table 367c2-14: People stopped, searched, or arrested during an investigatory stop for 2023 and 2024**

| Reason | 2023 Investigatory Stops | 2024 Investigatory Stops | 2023 Investigatory Searches | 2024 Investigatory Searches | 2023 Investigatory Arrests | 2024 Investigatory Arrests |
|---|---:|---:|---:|---:|---:|---:|
| Drug Related | 98 | 109 | 85 | 101 | 33 | 24 |
| Weapon Offense | 110 | 69 | 82 | 51 | 28 | 27 |
| Vehicle Crime | 22 | 12 | 14 | 10 | 5 | 6 |
| Property Crime | 60 | 54 | 40 | 34 | 11 | 22 |
| Suspicious Behavior | 67 | 66 | 34 | 36 | 15 | 10 |
| Violent Assault | 91 | 86 | 51 | 57 | 25 | 37 |
| Wanted Warrant | 83 | 58 | 59 | 37 | 39 | 36 |
| Matched Description | 65 | 46 | 42 | 33 | 20 | 23 |
| Public Order | 36 | 106 | 11 | 21 | 6 | 7 |
| Other | 308 | 342 | 149 | 137 | 81 | 78 |
| Total | 759 | 804 | 445 | 414 | 214 | 215 |

G.  By Age

**Table 367c2-15: People stopped during an investigatory stop by age for 2023 and 2024**

| Reason | 18-24 Count | 25-34 Count | 35-44 Count | 45-54 Count | 55-64 Count | 65 and over Count | Under 18 Count | Unknown Count | Total Count |
|---|---|---|---|---|---|---|---|---|---|
| 2023 Investigatory Stops | | | | | | | | | |
| Drug Related | 16 | 25 | 24 | 17 | 9 | 3 | 4 | 0 | 98 |
| Weapon Offense | 30 | 29 | 10 | 3 | 6 | 0 | 23 | 9 | 110 |
| Vehicle Crime | 6 | 4 | 2 | 1 | 1 | 0 | 8 | 0 | 22 |
| Property Crime | 7 | 9 | 9 | 6 | 5 | 10 | 12 | 2 | 60 |
| Suspicious Behavior | 5 | 18 | 11 | 13 | 5 | 1 | 12 | 2 | 67 |
| Violent Assault | 21 | 25 | 14 | 5 | 6 | 3 | 11 | 6 | 91 |
| Wanted Warrant | 14 | 26 | 20 | 7 | 7 | 5 | 3 | 1 | 83 |
| Matched Description | 12 | 13 | 9 | 8 | 4 | 2 | 13 | 4 | 65 |
| Public Order | 4 | 8 | 11 | 5 | 5 | 2 | 0 | 1 | 36 |
| Other | 41 | 91 | 69 | 35 | 16 | 6 | 45 | 5 | 308 |
| Total | 116 | 199 | 155 | 84 | 55 | 25 | 103 | 22 | 759 |
| 2024 Investigatory Stops | | | | | | | | | |
| Drug Related | 17 | 21 | 40 | 12 | 5 | 2 | 9 | 3 | 109 |
| Weapon Offense | 14 | 27 | 12 | 6 | 2 | 0 | 8 | 0 | 69 |
| Vehicle Crime | 4 | 0 | 2 | 2 | 1 | 0 | 3 | 0 | 12 |
| Property Crime | 12 | 10 | 12 | 3 | 1 | 4 | 11 | 1 | 54 |
| Suspicious Behavior | 17 | 26 | 6 | 11 | 4 | 1 | 1 | 0 | 66 |
| Violent Assault | 16 | 27 | 20 | 10 | 3 | 2 | 8 | 0 | 86 |
| Wanted Warrant | 2 | 21 | 17 | 10 | 7 | 0 | 1 | 0 | 58 |
| Matched Description | 7 | 10 | 11 | 9 | 3 | 2 | 4 | 0 | 46 |
| Public Order | 5 | 20 | 30 | 22 | 19 | 10 | 0 | 0 | 106 |
| Other | 44 | 75 | 68 | 49 | 44 | 22 | 27 | 13 | 342 |
| Total | 106 | 191 | 189 | 116 | 85 | 40 | 60 | 17 | 804 |

**Table 367c2-16: People searched during an investigatory stop by age for 2023 and 2024**

| Reason | 18-24 Count | 25-34 Count | 35-44 Count | 45-54 Count | 55-64 Count | 65 and over Count | Under 18 Count | Unknown Count | Total Count |
|---|---|---|---|---|---|---|---|---|---|
| 2023 Investigatory Searches | | | | | | | | | |
| Drug Related | 13 | 22 | 21 | 17 | 7 | 2 | 3 | 0 | 85 |
| Weapon Offense | 24 | 22 | 7 | 2 | 3 | 0 | 19 | 5 | 82 |
| Vehicle Crime | 5 | 1 | 1 | 1 | 1 | 0 | 5 | 0 | 14 |
| Property Crime | 4 | 7 | 7 | 5 | 3 | 7 | 7 | 0 | 40 |
| Suspicious Behavior | 3 | 10 | 6 | 10 | 3 | 0 | 2 | 0 | 34 |

| Reason | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Violent Assault | 13 | 16 | 6 | 5 | 4 | 0 | 6 | 1 | 51 |
| Wanted Warrant | 11 | 19 | 13 | 5 | 6 | 1 | 3 | 1 | 59 |
| Matched Description | 8 | 9 | 7 | 6 | 3 | 1 | 8 | 0 | 42 |
| Public Order | 1 | 1 | 8 | 1 | 0 | 0 | 0 | 0 | 11 |
| Other | 22 | 47 | 31 | 15 | 4 | 1 | 29 | 0 | 149 |
| Total | 77 | 116 | 89 | 53 | 28 | 10 | 66 | 6 | 445 |
| 2024 Investigatory Searches | | | | | | | | | |
| Drug Related | 17 | 20 | 35 | 11 | 5 | 1 | 9 | 3 | 101 |
| Weapon Offense | 10 | 18 | 7 | 6 | 2 | 0 | 8 | 0 | 51 |
| Vehicle Crime | 3 | 0 | 2 | 1 | 1 | 0 | 3 | 0 | 10 |
| Property Crime | 8 | 5 | 7 | 3 | 0 | 2 | 9 | 0 | 34 |
| Suspicious Behavior | 10 | 16 | 1 | 7 | 1 | 0 | 1 | 0 | 36 |
| Violent Assault | 11 | 19 | 9 | 9 | 3 | 0 | 6 | 0 | 57 |
| Wanted Warrant | 1 | 11 | 14 | 7 | 3 | 0 | 1 | 0 | 37 |
| Matched Description | 6 | 7 | 6 | 7 | 1 | 2 | 4 | 0 | 33 |
| Public Order | 1 | 5 | 6 | 8 | 0 | 1 | 0 | 0 | 21 |
| Other | 22 | 40 | 23 | 16 | 10 | 2 | 20 | 4 | 137 |
| Total | 65 | 112 | 93 | 58 | 23 | 7 | 49 | 7 | 414 |

**Table 367c2-17: People arrested during an investigatory stop by age for 2023 and 2024**

| Reason | 18-24 Count | 25-34 Count | 35-44 Count | 45-54 Count | 55-64 Count | 65 and over Count | Under 18 Count | Unknown Count | Total Count |
|---|---|---|---|---|---|---|---|---|---|
| 2023 Investigatory Arrests | | | | | | | | | |
| Drug Related | 3 | 13 | 10 | 4 | 1 | 0 | 2 | 0 | 33 |
| Weapon Offense | 6 | 9 | 3 | 2 | 1 | 0 | 6 | 1 | 28 |
| Vehicle Crime | 4 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 5 |
| Property Crime | 1 | 2 | 3 | 3 | 1 | 1 | 0 | 0 | 11 |
| Suspicious Behavior | 2 | 4 | 1 | 7 | 0 | 0 | 1 | 0 | 15 |
| Violent Assault | 7 | 8 | 3 | 4 | 3 | 0 | 0 | 0 | 25 |
| Wanted Warrant | 7 | 15 | 6 | 3 | 4 | 0 | 3 | 1 | 39 |
| Matched Description | 6 | 1 | 4 | 5 | 2 | 0 | 2 | 0 | 20 |
| Public Order | 2 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 6 |
| Other | 10 | 26 | 18 | 10 | 1 | 0 | 16 | 0 | 81 |
| Total | 36 | 64 | 42 | 30 | 10 | 1 | 29 | 2 | 214 |
| 2024 Investigatory Arrests | | | | | | | | | |
| Drug Related | 4 | 3 | 15 | 1 | 0 | 0 | 0 | 1 | 24 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Weapon Offense | 5 | 12 | 3 | 3 | 2 | 0 | 2 | 0 | 27 |
| Vehicle Crime | 3 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 6 |
| Property Crime | 6 | 4 | 3 | 2 | 0 | 1 | 6 | 0 | 22 |
| Suspicious Behavior | 1 | 5 | 0 | 4 | 0 | 0 | 0 | 0 | 10 |
| Violent Assault | 8 | 14 | 5 | 4 | 2 | 0 | 4 | 0 | 37 |
| Wanted Warrant | 2 | 12 | 11 | 6 | 4 | 0 | 1 | 0 | 36 |
| Matched Description | 4 | 7 | 3 | 4 | 0 | 1 | 4 | 0 | 23 |
| Public Order | 1 | 1 | 2 | 3 | 0 | 0 | 0 | 0 | 7 |
| Other | 10 | 21 | 14 | 12 | 5 | 1 | 13 | 2 | 78 |
| Total | 33 | 58 | 51 | 31 | 13 | 3 | 23 | 3 | 215 |

H.  By Race

**Table 367c2-18: People stopped during an investigatory stop by race for 2023 and 2024**

| Reason | American Indian Count | Asian Count | Black Count | Pacific Islander Count | Unknown Count | White Count | Total Count |
|---|---|---|---|---|---|---|---|
| 2023 Investigatory Stops | | | | | | | |
| Drug Related | 1 | 0 | 55 | 0 | 8 | 34 | 98 |
| Weapon Offense | 0 | 0 | 88 | 0 | 11 | 11 | 110 |
| Vehicle Crime | 0 | 0 | 18 | 0 | 0 | 4 | 22 |
| Property Crime | 0 | 0 | 51 | 0 | 2 | 7 | 60 |
| Suspicious Behavior | 0 | 0 | 50 | 0 | 3 | 14 | 67 |
| Violent Assault | 1 | 0 | 64 | 0 | 6 | 20 | 91 |
| Wanted Warrant | 0 | 0 | 57 | 0 | 1 | 25 | 83 |
| Matched Description | 1 | 0 | 51 | 0 | 8 | 5 | 65 |
| Public Order | 0 | 0 | 28 | 0 | 2 | 6 | 36 |
| Other | 2 | 1 | 200 | 1 | 18 | 86 | 308 |
| Total | 4 | 1 | 514 | 1 | 48 | 191 | 759 |
| 2024 Investigatory Stops | | | | | | | |
| Drug Related | 0 | 2 | 67 | 0 | 4 | 36 | 109 |
| Weapon Offense | 0 | 0 | 62 | 0 | 2 | 5 | 69 |
| Vehicle Crime | 0 | 0 | 6 | 0 | 1 | 5 | 12 |
| Property Crime | 0 | 0 | 39 | 0 | 3 | 12 | 54 |
| Suspicious Behavior | 0 | 0 | 37 | 0 | 3 | 26 | 66 |
| Violent Assault | 0 | 0 | 57 | 0 | 4 | 25 | 86 |
| Wanted Warrant | 0 | 1 | 34 | 0 | 8 | 15 | 58 |
| Matched Description | 0 | 0 | 35 | 0 | 4 | 7 | 46 |
| Public Order | 0 | 0 | 78 | 1 | 5 | 22 | 106 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Other | 1 | 2 | 226 | 0 | 21 | 92 | 342 |
| Total | 1 | 5 | 541 | 1 | 47 | 209 | 804 |

**Table 367c2-19: People searched during an investigatory stop by race for 2023 and 2024**

| Reason | American Indian Count | Asian Count | Black Count | Pacific Islander Count | Unknown Count | White Count | Total Count |
|---|---|---|---|---|---|---|---|
| 2023 Investigatory Searches | | | | | | | |
| Drug Related | 0 | 0 | 50 | 0 | 4 | 31 | 85 |
| Weapon Offense | 0 | 0 | 67 | 0 | 7 | 8 | 82 |
| Vehicle Crime | 0 | 0 | 13 | 0 | 0 | 1 | 14 |
| Property Crime | 0 | 0 | 35 | 0 | 1 | 4 | 40 |
| Suspicious Behavior | 0 | 0 | 25 | 0 | 2 | 7 | 34 |
| Violent Assault | 1 | 0 | 38 | 0 | 2 | 10 | 51 |
| Wanted Warrant | 0 | 0 | 43 | 0 | 1 | 15 | 59 |
| Matched Description | 1 | 0 | 33 | 0 | 4 | 4 | 42 |
| Public Order | 0 | 0 | 8 | 0 | 1 | 2 | 11 |
| Other | 0 | 0 | 105 | 0 | 7 | 37 | 149 |
| Total | 1 | 0 | 313 | 0 | 24 | 107 | 445 |
| 2024 Investigatory Searches | | | | | | | |
| Drug Related | 0 | 2 | 60 | 0 | 4 | 35 | 101 |
| Weapon Offense | 0 | 0 | 47 | 0 | 2 | 2 | 51 |
| Vehicle Crime | 0 | 0 | 6 | 0 | 0 | 4 | 10 |
| Property Crime | 0 | 0 | 24 | 0 | 2 | 8 | 34 |
| Suspicious Behavior | 0 | 0 | 18 | 0 | 2 | 16 | 36 |
| Violent Assault | 0 | 0 | 40 | 0 | 3 | 14 | 57 |
| Wanted Warrant | 0 | 0 | 24 | 0 | 3 | 10 | 37 |
| Matched Description | 0 | 0 | 25 | 0 | 2 | 6 | 33 |
| Public Order | 0 | 0 | 10 | 0 | 3 | 8 | 21 |
| Other | 1 | 0 | 89 | 0 | 8 | 39 | 137 |
| Total | 1 | 2 | 271 | 0 | 23 | 117 | 414 |

**Table 367c2-20: People arrested during an investigatory stop by race for 2023 and 2024**

| Reason | American Indian Count | Asian Count | Black Count | Pacific Islander Count | Unknown Count | White Count | Total Count |
|---|---|---|---|---|---|---|---|
| 2023 Investigatory Arrests | | | | | | | |
| Drug Related | 0 | 0 | 19 | 0 | 2 | 12 | 33 |
| Weapon Offense | 0 | 0 | 24 | 0 | 2 | 2 | 28 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Vehicle Crime | 0 | 0 | 5 | 0 | 0 | 0 | 5 |
| Property Crime | 0 | 0 | 9 | 0 | 0 | 2 | 11 |
| Suspicious Behavior | 0 | 0 | 13 | 0 | 0 | 2 | 15 |
| Violent Assault | 0 | 0 | 18 | 0 | 2 | 5 | 25 |
| Wanted Warrant | 0 | 0 | 29 | 0 | 1 | 9 | 39 |
| Matched Description | 0 | 0 | 17 | 0 | 2 | 1 | 20 |
| Public Order | 0 | 0 | 4 | 0 | 1 | 1 | 6 |
| Other | 0 | 0 | 57 | 0 | 4 | 20 | 81 |
| Total | 0 | 0 | 155 | 0 | 11 | 48 | 214 |
| 2024 Investigatory Arrests | | | | | | | |
| Drug Related | 0 | 0 | 17 | 0 | 1 | 6 | 24 |
| Weapon Offense | 0 | 0 | 25 | 0 | 1 | 1 | 27 |
| Vehicle Crime | 0 | 0 | 4 | 0 | 0 | 2 | 6 |
| Property Crime | 0 | 0 | 15 | 0 | 2 | 5 | 22 |
| Suspicious Behavior | 0 | 0 | 9 | 0 | 0 | 1 | 10 |
| Violent Assault | 0 | 0 | 28 | 0 | 2 | 7 | 37 |
| Wanted Warrant | 0 | 0 | 23 | 0 | 4 | 9 | 36 |
| Matched Description | 0 | 0 | 17 | 0 | 3 | 3 | 23 |
| Public Order | 0 | 0 | 4 | 0 | 2 | 1 | 7 |
| Other | 0 | 0 | 47 | 0 | 6 | 25 | 78 |
| Total | 0 | 0 | 148 | 0 | 17 | 50 | 215 |

I. By Ethnicity

**Table 367c2-21: People stopped during an investigatory stop by ethnicity for 2023 and 2024**

| Reason | Hispanic Count | Non-Hispanic Count | Unknown Count | Total Count |
|---|---|---|---|---|
| 2023 Investigatory Stops | | | | |
| Drug Related | 15 | 55 | 28 | 98 |
| Weapon Offense | 10 | 68 | 32 | 110 |
| Vehicle Crime | 2 | 16 | 4 | 22 |
| Property Crime | 1 | 39 | 20 | 60 |
| Suspicious Behavior | 4 | 49 | 14 | 67 |
| Violent Assault | 3 | 56 | 32 | 91 |
| Wanted Warrant | 5 | 65 | 13 | 83 |
| Matched Description | 9 | 39 | 17 | 65 |
| Public Order | 1 | 23 | 12 | 36 |

| | | | | |
|---|---|---|---|---|
| Other | 25 | 216 | 67 | 308 |
| Total | 62 | 504 | 193 | 759 |
| 2024 Investigatory Stops | | | | |
| Drug Related | 9 | 90 | 10 | 109 |
| Weapon Offense | 2 | 55 | 12 | 69 |
| Vehicle Crime | 1 | 8 | 3 | 12 |
| Property Crime | 4 | 32 | 18 | 54 |
| Suspicious Behavior | 14 | 41 | 11 | 66 |
| Violent Assault | 8 | 62 | 16 | 86 |
| Wanted Warrant | 6 | 37 | 15 | 58 |
| Matched Description | 2 | 32 | 12 | 46 |
| Public Order | 10 | 82 | 14 | 106 |
| Other | 17 | 251 | 74 | 342 |
| Total | 61 | 588 | 155 | 804 |

**Table 367c2-22: People searched during an investigatory stop by ethnicity for 2023 and 2024**

| Reason | Hispanic Count | Non-Hispanic Count | Unknown Count | Total Count |
|---|---|---|---|---|
| 2023 Investigatory Searches | | | | |
| Drug Related | 15 | 48 | 22 | 85 |
| Weapon Offense | 10 | 43 | 29 | 82 |
| Vehicle Crime | 1 | 10 | 3 | 14 |
| Property Crime | 1 | 25 | 14 | 40 |
| Suspicious Behavior | 3 | 18 | 13 | 34 |
| Violent Assault | 2 | 27 | 22 | 51 |
| Wanted Warrant | 2 | 47 | 10 | 59 |
| Matched Description | 7 | 23 | 12 | 42 |
| Public Order | 1 | 9 | 1 | 11 |
| Other | 14 | 104 | 31 | 149 |
| Total | 45 | 279 | 121 | 445 |
| 2024 Investigatory Searches | | | | |
| Drug Related | 9 | 82 | 10 | 101 |
| Weapon Offense | 2 | 39 | 10 | 51 |
| Vehicle Crime | 0 | 7 | 3 | 10 |
| Property Crime | 3 | 19 | 12 | 34 |

| | | | | |
|---|---|---|---|---|
| Suspicious Behavior | 10 | 19 | 7 | 36 |
| Violent Assault | 8 | 38 | 11 | 57 |
| Wanted Warrant | 5 | 24 | 8 | 37 |
| Matched Description | 2 | 22 | 9 | 33 |
| Public Order | 5 | 12 | 4 | 21 |
| Other | 8 | 98 | 31 | 137 |
| Total | 42 | 291 | 81 | 414 |

**Table 367c2-23: People arrested during an investigatory stop by ethnicity for 2023 and 2024**

| Reason | Hispanic Count | Non-Hispanic Count | Unknown Count | Total Count |
|---|---|---|---|---|
| 2023 Investigatory Arrests | | | | |
| Drug Related | 5 | 17 | 11 | 33 |
| Weapon Offense | 5 | 10 | 13 | 28 |
| Vehicle Crime | 0 | 4 | 1 | 5 |
| Property Crime | 1 | 7 | 3 | 11 |
| Suspicious Behavior | 1 | 7 | 7 | 15 |
| Violent Assault | 1 | 13 | 11 | 25 |
| Wanted Warrant | 1 | 32 | 6 | 39 |
| Matched Description | 3 | 8 | 9 | 20 |
| Public Order | 0 | 6 | 0 | 6 |
| Other | 4 | 55 | 22 | 81 |
| Total | 14 | 135 | 65 | 214 |
| 2024 Investigatory Arrests | | | | |
| Drug Related | 2 | 20 | 2 | 24 |
| Weapon Offense | 0 | 23 | 4 | 27 |
| Vehicle Crime | 0 | 5 | 1 | 6 |
| Property Crime | 3 | 13 | 6 | 22 |
| Suspicious Behavior | 1 | 8 | 1 | 10 |
| Violent Assault | 6 | 26 | 5 | 37 |
| Wanted Warrant | 4 | 24 | 8 | 36 |
| Matched Description | 2 | 14 | 7 | 23 |
| Public Order | 2 | 5 | 0 | 7 |

| | | | |
|---|---|---|---|
| Other | 5 | 50 | 23 | 78 |
| Total | 20 | 147 | 48 | 215 |

J.  By Gender

**Table 367c2-24: People stopped during an investigatory stop by gender for 2023 and 2024**

| Reason | Female Count | Male Count | Total Count |
|---|---|---|---|
| 2023 Investigatory Stops | | | |
| Drug Related | 15 | 83 | 98 |
| Weapon Offense | 14 | 96 | 110 |
| Vehicle Crime | 1 | 21 | 22 |
| Property Crime | 14 | 46 | 60 |
| Suspicious Behavior | 14 | 53 | 67 |
| Violent Assault | 20 | 71 | 91 |
| Wanted Warrant | 15 | 68 | 83 |
| Matched Description | 10 | 55 | 65 |
| Public Order | 5 | 31 | 36 |
| Other | 83 | 225 | 308 |
| Total | 161 | 598 | 759 |
| 2024 Investigatory Stops | | | |
| Drug Related | 20 | 89 | 109 |
| Weapon Offense | 11 | 58 | 69 |
| Vehicle Crime | 1 | 11 | 12 |
| Property Crime | 10 | 44 | 54 |
| Suspicious Behavior | 17 | 49 | 66 |
| Violent Assault | 17 | 69 | 86 |
| Wanted Warrant | 14 | 44 | 58 |
| Matched Description | 7 | 39 | 46 |
| Public Order | 11 | 95 | 106 |
| Other | 73 | 269 | 342 |
| Total | 157 | 647 | 804 |

**Table 367c2-25: People searched during an investigatory stop by gender for 2023 and 2024**

| Reason | Female Count | Male Count | Total Count |
|---|---|---|---|
| 2023 Investigatory Searches | | | |
| Drug Related | 10 | 75 | 85 |

| | | | |
|---|---:|---:|---:|
| Weapon Offense | 10 | 72 | 82 |
| Vehicle Crime | 0 | 14 | 14 |
| Property Crime | 7 | 33 | 40 |
| Suspicious Behavior | 6 | 28 | 34 |
| Violent Assault | 11 | 40 | 51 |
| Wanted Warrant | 4 | 55 | 59 |
| Matched Description | 6 | 36 | 42 |
| Public Order | 0 | 11 | 11 |
| Other | 20 | 129 | 149 |
| Total | 58 | 387 | 445 |
| 2024 Investigatory Searches | | | |
| Drug Related | 16 | 85 | 101 |
| Weapon Offense | 5 | 46 | 51 |
| Vehicle Crime | 1 | 9 | 10 |
| Property Crime | 5 | 29 | 34 |
| Suspicious Behavior | 10 | 26 | 36 |
| Violent Assault | 10 | 47 | 57 |
| Wanted Warrant | 7 | 30 | 37 |
| Matched Description | 4 | 29 | 33 |
| Public Order | 1 | 20 | 21 |
| Other | 24 | 113 | 137 |
| Total | 67 | 347 | 414 |

**Table 367c2-26: People arrested during an investigatory stop by gender for 2023 and 2024**

| Reason | Female Count | Male Count | Total Count |
|---|---:|---:|---:|
| 2023 Investigatory Arrests | | | |
| Drug Related | 7 | 26 | 33 |
| Weapon Offense | 1 | 27 | 28 |
| Vehicle Crime | 0 | 5 | 5 |
| Property Crime | 1 | 10 | 11 |
| Suspicious Behavior | 3 | 12 | 15 |
| Violent Assault | 4 | 21 | 25 |
| Wanted Warrant | 4 | 35 | 39 |
| Matched Description | 2 | 18 | 20 |

| | | | |
|---|---|---|---|
| Public Order | 0 | 6 | 6 |
| Other | 13 | 68 | 81 |
| Total | 29 | 185 | 214 |
| 2024 Investigatory Arrests | | | |
| Drug Related | 4 | 20 | 24 |
| Weapon Offense | 3 | 24 | 27 |
| Vehicle Crime | 1 | 5 | 6 |
| Property Crime | 3 | 19 | 22 |
| Suspicious Behavior | 4 | 6 | 10 |
| Violent Assault | 7 | 30 | 37 |
| Wanted Warrant | 7 | 29 | 36 |
| Matched Description | 3 | 20 | 23 |
| Public Order | 1 | 6 | 7 |
| Other | 16 | 62 | 78 |
| Total | 41 | 174 | 215 |

3.   Outcome Tables for 367.c.3

*367.c "Stop, Search, and Arrest measurements, including:"*

*3. "number of searches that resulted in a finding of contraband, overall broken down by District (understanding that different Districts may have inherently different demographic compositions), type of arrest, and the actual or perceived age, race, gender, and ethnicity of subject."*

The following search 'hit' rates – where contraband is found during a search – includes both a search of an individual or of a vehicle.

**Table 367c3-1: Hit rates for investigatory and traffic stops by age**

| Age | Searches | Hits | Hit Rate | Searches | Hits | Hit Rate |
|---|---|---|---|---|---|---|
| | 2023 | | | 2024 | | |
| Investigatory Stops | | | | | | |
| Under 18 | 66 | 16 | 24.2% | 49 | 21 | 42.9% |
| 18-24 | 76 | 35 | 46.1% | 65 | 33 | 50.8% |
| 25-34 | 115 | 60 | 52.2% | 110 | 46 | 41.8% |
| 35-44 | 89 | 37 | 41.6% | 93 | 43 | 46.2% |
| 45-54 | 53 | 26 | 49.1% | 54 | 28 | 51.9% |
| 55-64 | 28 | 12 | 42.9% | 23 | 8 | 34.8% |
| 65 and over | 10 | 2 | 20.0% | 7 | 3 | 42.9% |
| Unknown | 6 | 3 | 50.0% | 7 | 3 | 42.9% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total | 443 | 191 | 43.1% | 408 | 185 | 45.3% |
| Traffic Stops | | | | | | |
| Under 18 | 29 | 13 | 44.8% | 25 | 8 | 32.0% |
| 18-24 | 248 | 85 | 34.3% | 206 | 61 | 29.6% |
| 25-34 | 430 | 137 | 31.9% | 375 | 75 | 20.0% |
| 35-44 | 214 | 84 | 39.3% | 259 | 69 | 26.6% |
| 45-54 | 104 | 32 | 30.8% | 115 | 27 | 23.5% |
| 55-64 | 67 | 17 | 25.4% | 71 | 15 | 21.1% |
| 65 and over | 29 | 10 | 34.5% | 14 | 1 | 7.1% |
| Unknown | 9 | 4 | 44.4% | 7 | 3 | 42.9% |
| Total | 1130 | 382 | 33.8% | 1072 | 259 | 24.2% |

**Table 367c3-2: Hit rates for investigatory and traffic stops by race**

| Race | Searches | Hits | Hit Rate | Searches | Hits | Hit Rate |
|---|---|---|---|---|---|---|
| | 2023 | | | 2024 | | |
| Investigatory Stops | | | | | | |
| American Indian | 1 | 0 | 0.0% | 1 | 0 | 0.0% |
| Asian | 0 | 0 | 0.0% | 2 | 1 | 50.0% |
| Black | 311 | 132 | 42.4% | 269 | 120 | 44.6% |
| Pacific Islander | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| Unknown | 24 | 8 | 33.3% | 23 | 10 | 43.5% |
| White | 107 | 51 | 47.7% | 113 | 54 | 47.8% |
| Total | 443 | 191 | 43.1% | 408 | 185 | 45.3% |
| Traffic Stops | | | | | | |
| American Indian | 4 | 0 | 0.0% | 0 | 0 | 0.0% |
| Asian | 3 | 1 | 33.3% | 3 | 0 | 0.0% |
| Black | 839 | 300 | 35.8% | 769 | 190 | 24.7% |
| Pacific Islander | 1 | 0 | 0.0% | 2 | 0 | 0.0% |
| Unknown | 29 | 15 | 51.7% | 69 | 11 | 15.9% |
| White | 253 | 65 | 25.7% | 229 | 58 | 25.3% |
| Total | 1130 | 382 | 33.8% | 1072 | 259 | 24.2% |

**Table 367c3-3: Hit rates for investigatory and traffic stops by sex**

| Sex | Searches | Hits | Hit Rate | Searches | Hits | Hit Rate |
|---|---|---|---|---|---|---|
| | 2023 | | | 2024 | | |
| Investigatory Stops | | | | | | |
| Female | 58 | 27 | 46.6% | 66 | 29 | 43.9% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Male | 385 | 164 | 42.6% | 342 | 156 | 45.6% |
| Total | 443 | 191 | 43.1% | 408 | 185 | 45.3% |
| Traffic Stops | | | | | | |
| Female | 179 | 49 | 27.4% | 222 | 57 | 25.7% |
| Male | 950 | 332 | 34.9% | 850 | 202 | 23.8% |
| Total | 1130 | 382 | 33.8% | 1072 | 259 | 24.2% |

**Table 367c3-4: Hit rates for investigatory and traffic stops by ethnicity**

| Ethnicity | Searches | Hits | Hit Rate | Searches | Hits | Hit Rate |
|---|---|---|---|---|---|---|
| | 2023 | | | 2024 | | |
| Investigatory Stops | | | | | | |
| Hispanic | 44 | 17 | 38.6% | 42 | 21 | 50.0% |
| Non-Hispanic | 278 | 129 | 46.4% | 285 | 138 | 48.4% |
| Unknown | 121 | 45 | 37.2% | 81 | 26 | 32.1% |
| Total | 443 | 191 | 43.1% | 408 | 185 | 45.3% |
| Traffic Stops | | | | | | |
| Hispanic | 99 | 28 | 28.3% | 96 | 20 | 20.8% |
| Non-Hispanic | 739 | 248 | 33.6% | 720 | 198 | 27.5% |
| Unknown | 291 | 105 | 36.1% | 256 | 41 | 16.0% |
| Total | 1130 | 382 | 33.8% | 1072 | 259 | 24.2% |

**Table 367c3-5: Hit rates for investigatory and traffic stops by police district**

| Police District | Searches | Hits | Hit Rate | Searches | Hits | Hit Rate |
|---|---|---|---|---|---|---|
| | 2023 | | | 2024 | | |
| Investigatory Stops | | | | | | |
| 1 | 81 | 37 | 45.7% | 56 | 19 | 33.9% |
| 2 | 129 | 66 | 51.2% | 176 | 99 | 56.3% |
| 3 | 57 | 18 | 31.6% | 49 | 20 | 40.8% |
| 4 | 102 | 49 | 48.0% | 55 | 14 | 25.5% |
| 5 | 64 | 17 | 26.6% | 65 | 31 | 47.7% |
| Outside City | 10 | 4 | 40.0% | 7 | 2 | 28.6% |
| Total | 443 | 191 | 43.1% | 408 | 185 | 45.3% |
| Traffic Stops | | | | | | |
| 1 | 279 | 104 | 37.3% | 263 | 79 | 30.0% |
| 2 | 263 | 89 | 33.8% | 233 | 60 | 25.8% |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3 | 160 | 50 | 31.3% | 158 | 30 | 19.0% |
| 4 | 322 | 101 | 31.4% | 307 | 66 | 21.5% |
| 5 | 91 | 34 | 37.4% | 101 | 18 | 17.8% |
| Outside City | 15 | 4 | 26.7% | 10 | 6 | 60.0% |
| Total | 1130 | 382 | 33.8% | 1072 | 259 | 24.2% |

In Table 367c3-6, we provide all 'groups' with 6 or more hits across 2023 and 2024 investigatory stops involving a search. These groups represent nearly 49% of all people found with contraband in an investigatory stop across 2023 and 2024. A group is defined by the police district, race, ethnicity, sex, and age of the stopped individual. A complete table for all groups with at least one stop can be provided upon request.

**Table 367c3-6: Searches, hits, and hit rate by police district, race, ethnicity, sex, age for investigatory stops**

| Race | Ethnicity | Sex | Age | 2023 Hits | 2024 Hits |
|---|---|---|---|---|---|
| Police District 1 | | | | | |
| White | Non-Hispanic | Male | 35-44 | 3 | 6 |
| Black | Non-Hispanic | Male | 35-44 | 5 | 1 |
| Police District 2 | | | | | |
| Black | Non-Hispanic | Male | 35-44 | 10 | 8 |
| Black | Non-Hispanic | Male | 25-34 | 8 | 9 |
| Black | Non-Hispanic | Male | 18-24 | 3 | 11 |
| Black | Non-Hispanic | Male | Under 18 | 4 | 9 |
| White | Non-Hispanic | Female | 25-34 | 7 | 4 |
| White | Non-Hispanic | Male | 35-44 | 2 | 7 |
| White | Hispanic | Male | 25-34 | 3 | 3 |
| White | Non-Hispanic | Male | 45-54 | 2 | 4 |
| Police District 3 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 5 | 4 |
| Black | Non-Hispanic | Male | 18-24 | 3 | 3 |
| Black | Non-Hispanic | Male | 45-54 | 2 | 4 |
| Black | Non-Hispanic | Male | 35-44 | 1 | 5 |
| Police District 4 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 7 | 1 |
| Black | Unknown | Male | 25-34 | 5 | 2 |
| Black | Unknown | Male | 45-54 | 6 | 0 |
| Black | Non-Hispanic | Male | 18-24 | 5 | 1 |
| Police District 5 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 3 | 7 |
| Black | Non-Hispanic | Male | Under 18 | 2 | 7 |

| Black | Non-Hispanic | Male | 35-44 | 2 | 7 |
| Black | Non-Hispanic | Male | 45-54 | 2 | 4 |

In Table 367c3-7, we provide all 'groups' with 6 or more hits across 2023 and 2024 traffic stops involving a search. These groups represent nearly 55% of all people found with contraband in a traffic stop across 2023 and 2024. A group is defined by the police district, race, ethnicity, sex, and age of the stopped individual. A complete table for all groups with at least one stop can be provided upon request.

**Table 367c3-7: Searches, hits, and hit rate by police district, race, ethnicity, sex, age for traffic stops**

| Race | Ethnicity | Sex | Age | 2023 Hits | 2024 Hits |
|------|-----------|-----|-----|-----------|-----------|
| Police District 1 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 17 | 17 |
| Black | Non-Hispanic | Male | 35-44 | 12 | 13 |
| Black | Non-Hispanic | Male | 18-24 | 14 | 5 |
| Black | Unknown | Male | 25-34 | 7 | 0 |
| White | Non-Hispanic | Male | 35-44 | 5 | 4 |
| White | Hispanic | Male | 35-44 | 3 | 5 |
| Police District 2 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 22 | 10 |
| Black | Non-Hispanic | Male | 18-24 | 10 | 7 |
| Black | Non-Hispanic | Male | 35-44 | 7 | 5 |
| Black | Unknown | Male | 25-34 | 6 | 1 |
| White | Non-Hispanic | Male | 35-44 | 4 | 4 |
| Police District 3 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 13 | 7 |
| Black | Non-Hispanic | Male | 35-44 | 9 | 4 |
| Police District 4 | | | | | |
| Black | Non-Hispanic | Male | 18-24 | 17 | 14 |
| Black | Non-Hispanic | Male | 25-34 | 17 | 10 |
| Black | Unknown | Male | 25-34 | 11 | 6 |
| Black | Unknown | Male | 35-44 | 12 | 3 |
| Black | Unknown | Male | 18-24 | 4 | 7 |
| Black | Non-Hispanic | Male | 35-44 | 6 | 4 |
| Black | Unknown | Male | 45-54 | 5 | 3 |
| Police District 5 | | | | | |
| Black | Non-Hispanic | Male | 25-34 | 10 | 2 |
| Black | Non-Hispanic | Male | 18-24 | 7 | 2 |
| Black | Non-Hispanic | Male | 35-44 | 4 | 3 |