IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | NOTICE SUBMITTING THE MONITORING |
| CITY OF CLEVELAND | ) | TEAM'S 2025 RECRUITMENT AND HIRING |
| | ) | ASSESSMENT REPORT |
| Defendant. | | |

The Monitoring Team hereby submits the Report of its 2025 Recruitment and Hiring Assessment.

Respectfully submitted,

/s/ Christine M. Cole

CHRISTINE M. COLE
Independent Monitor
464 Common Street  Unit #231
Belmont, MA 02478
ccole@clevelandpolicemonitor.com

CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2025, I served the foregoing Notice Submitting the Monitoring Team's 2025 Recruitment and Hiring Assessment via the court's ECF system to all counsel of record.

/s/ Melody J. Stewart
MELODY J. STEWART
Deputy Monitor


Cleveland Division of Police Consent Decree Monitoring Team

## 2025 RECRUITMENT AND HIRING ASSESSMENT

December 11, 2025

**TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY ................................................................. 3

II.     SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW ............ 4

    A.     Scope of Review ..................................................................... 4

    B.     Methodology .......................................................................... 4

    C.     Standard of Review ................................................................ 5

        1.     Determining Compliance Status ................................... 5

III.    RECRUITMENT AND HIRING ASSESSMENT FINDINGS ....................... 10

    A.     Paragraph 300 ..................................................................... 10

    B.     Paragraph 301 ..................................................................... 11

    C.     Paragraph 302 ..................................................................... 11

    D.     Paragraph 303 ..................................................................... 12

    E.     Paragraph 304 ..................................................................... 12

    F.     Paragraph 305 ..................................................................... 13

    G.     Paragraph 306 ..................................................................... 14

    H.     Paragraph 307 ..................................................................... 15

    I.     Paragraph 308 ..................................................................... 16

    J.     Paragraph 309 ..................................................................... 17

    K.     Paragraph 310 ..................................................................... 18

    L.     Paragraph 311 ..................................................................... 19

IV.     OUTCOME ASSESSMENTS ......................................................... 21

V.      COMPLIANCE ASSESSMENT CONCLUSIONS ................................. 32

## I.    EXECUTIVE SUMMARY

Pursuant to the 2025 Monitoring Plan, the Monitoring Team completed a compliance assessment of Paragraphs 300 and 302-311 of the Consent Decree which pertain to Recruitment and Hiring practices (Paragraph 301 has been in General Compliance since at least 2017 and not in need of further assessment).  The Consent Decree contains only one additional outcome assessment related to these Paragraphs, as set forth in Paragraph 367e.  A quantitative review of recruitment measures as described in that section of Paragraph 367 was included as part of this assessment.

**Summary of Findings**

The Monitoring Team's comprehensive assessment finds that the Cleveland Division of Police (CDP) has achieved Substantial and Effective Compliance in six, General Compliance in four and Operational Compliance in two of the Recruitment and Hiring related Paragraphs of the Consent Decree (¶¶ 300-311; 367(e)).  Through systematic review of the Recruitment Plan, Recruitment Reports, job announcements, policies, procedures, and analysis of 187 individual background investigation files the Monitoring Team has concluded that the CDP has met or exceeded all requirements for Recruitment and Hiring established in the Consent Decree.

A previous formal assessment of Paragraphs 308-311 was conducted in 2022.  Reports pertaining to that assessment were filed with the Court in June 2022.  Those reports indicated a number of shortcomings in the completion and documentation of background investigations of police candidates and resulted in Non-Compliance ratings for Paragraphs 309-311.  These deficiencies emanated from a lack of documentation in the background investigation files relating to criminal and civil records checks, requests for previous employment files and interviews of former employers, and, for Paragraph 311 which governs candidates who have former law enforcement experience, checks of prior use of force, training and discipline histories.

Since the 2022 assessment, the CDP has automated the background investigation process utilizing the eSOPH[1] software system.  This software system streamlined the process of collecting applicant information, such as criminal records, credit history, and employment references, to assess a candidate's suitability.  Further, documents pertaining to these investigations are now collected and can be accessed through that system.  The use of this software, along with standardized summaries by investigators and an eight-week time limit to complete investigations has contributed greatly to the substantial improvement of compliance ratings for these Paragraphs.

---

[1] eSOPH is a web based application used by public safety agencies to collect an electronic statement of personal history on applicants.  eSOPH is a platform that allows agencies to create customizable questionnaires and task lists, manage applicant information, and store records electronically.

## II.    SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW

### A.    Scope of Review

The Consent Decree between the US Department of Justice and the City of Cleveland requires the Cleveland Division of Police ("Division", "CDP") to develop a recruitment policy and strategic recruitment plan with specific requirements.  Furthermore, the agreement sets forth that in order for the Division "to maintain high-level, quality service, ensure officer safety and accountability, and promote constitutional, effective policing, the City will review and revise as necessary its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals."[2]

This assessment reviewed CDP's compliance with all recruitment and hiring related Paragraphs in the Consent Decree, 300, 302-311, and performance with regard to the relevant outcome measures described in Paragraph 367e.  This assessment is the first formal assessment for compliance on Paragraphs 300 and 302-307.  Paragraphs 308-311 were previously reviewed in 2022.

### B.    Methodology

The Monitoring Team conducted a qualitative and quantitative review of the requirements of Paragraphs 300, 302-311 and 367(e).  The assessment of Paragraphs 300 and 302-307 included review of the Recruitment Plan, Annual Recruitment Reports, job announcements, policies, and procedures to determine compliance with the criteria listed in each Paragraph.

An updated assessment of background investigation files pursuant to Paragraphs 308-311 was conducted on-site at the Cleveland Division of Police Training Academy on September 22-23, 2025.  Five members of the Monitoring Team were granted limited access to the eSOPH software system to review candidate histories and background investigations.  CDP personnel, including two background investigators, observed the reviews and assisted with answering questions and producing documents that were not otherwise accessible to the Monitoring Team reviewers.  In all, 187 background files from CDP Academy Classes 157, 158 and 159 were reviewed by Monitoring Team members using a standard instrument previously approved by the Parties.

The outcome measures listed in Paragraph 367(e) were assessed using multi-year outcome measures data provided to the Monitoring Team by the Police Accountability Team.

---

[2] Consent Decree Paragraph 300

## C.  Standard of Review

Pursuant to Consent Decree Paragraphs 360 and 367, the Monitoring Team conducts qualitative and quantitative Compliance Assessments to determine the extent to which the City of Cleveland ("City") and Cleveland Division of Police ("CDP") have complied with the requirements of the Consent Decree resulting in constitutional policing.[3]

The Recruitment and Hiring Assessment is a review of each related provision of Paragraphs 300 and 302-311 of the Consent Decree.  Every provision is given a Compliance Grade from 0 to 6, with 0 indicating that the City/CDP has not yet begun working on the provision and 6 indicating that the City/CDP has achieved substantial and effective compliance with that provision. Compliance Assessments will draw upon information and evidence gathered during semi-annual reports.  A Compliance Assessment will include an overall grade for the Consent Decree section based upon the Compliance Grading system (detailed below) with the goal of the City/CDP achieving substantial and effective compliance for each provision.

In order to incorporate and build upon prior semiannual compliance reviews and reports, the Monitoring Team will review the four most recent semiannual reports in advance of the Compliance Assessment.  Any related provision that has been graded "general compliance" for more than two years (i.e., four consecutive reports) will be presumptively considered in substantial and effective compliance.  For any such provision presumptively considered in substantial and effective compliance, the Monitoring Team will review the provision as part of its formal Compliance Assessment in order to validate its compliance grade.  If the Compliance Assessment validates that provision as substantially and effectively compliant, the Monitoring Team will not re-assess that provision in future Compliance Assessments.  The Monitoring Team will, however, continue to review and report on that provision in its semiannual reports; if those reviews or reports suggest a downgraded change in status at any point, the provision will once again be incorporated into future Compliance Assessments.

### 1.  Determining Compliance Status

As part of the Compliance Assessment, Subject Matter Experts ("SMEs") on the Monitoring Team will review data, records, and documents pertaining to each Recruitment and Hiring related

---

[3] In addition to assessments, the Monitoring Team evaluates compliance with sections of the Consent Decree throughout the year and communicates its observations, assessments, and findings twice each year through its semi-annual reports (¶¶ 360, 375).  These compliance reviews consider the totality of evidence presented and observed with respect to each provision of the Consent Decree, including review of policies and annual reports, interviews and meetings with the City and CDP as well as Cleveland community groups, and observation of trainings and internal meetings.

Consent Decree provision (¶¶ 300-311; 367(e)).  Following this review and analysis, the SMEs will compare findings and collectively award Compliance Grades using the following framework:

| Grade | Definition |
|---|---|
| 0 | **Non-compliant, Not Started**: The City/CDP has not yet complied with the relevant provision of the Consent Decree.  This includes instances in which the City/CDP's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement. |
| 1 | **Partial Compliance, Not Assessed:** The City/CDP has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/CDP's progress in implementation.[4] |
| 2 | **Partial Compliance, Planning/Policy Phase:** The City and/or CDP has made sufficient initial strides or sufficient partial progress toward compliance with key components of the provision of the Consent Decree pertaining to drafting or creating policies, processes, protocols, trainings, systems, or the like that exist on paper but do not exist or function in day-to-day practice. |
| 3 | **Partial Compliance, Implementation Phase:** The City and/or CDP has made sufficient initial strides or sufficient partial progress toward compliance with key components of the provision of the Consent Decree pertaining to initiating training and implementing systems intended to affect day-to-day practice, but that the Monitoring Team has not yet observed in practice.  It may capture a wide range of compliance states or performance, from the City or CDP having taken only very limited steps toward operational compliance to being nearly in operational compliance. |
| 4 | **Operational Compliance:** The City and/or CDP has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Consent Decree such that it is in existence or practice operationally—but has not yet demonstrated, or has not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents.  This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.<br>Operational compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |

---

[4] If the Monitoring Team believes a provision cannot be assessed for a particular reason (e.g., lack of access to data/information required for evaluation, etc.), it will inform the City in advance of any planned Compliance Assessment.  With respect to the Recruiting and Hiring Compliance Assessment, the Monitoring Team anticipates assessing all related provisions (¶¶ 300;302-311; 367(e)) such that none are expected to be graded as "Partial Compliance, Not Assessed (1)."

| | |
|---|---|
| **5** | **General Compliance:** The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented such that the Monitoring Team will begin tolling according to ¶ 401.  This includes instances where it can be shown that the City or CDP has effectively complied with a requirement fully and systemically.<br><br>General compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |
| **6** | **Substantial and Effective Compliance:** The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents in accordance with ¶ 401 or ¶ 370.  This includes instances where it can be shown that the City or CDP has effectively complied with a requirement fully and systemically.<br><br>Substantial and effective compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |

As additional considerations, more appropriate for work that is ongoing and advances or ebbs over time, the Monitoring Team offers the following details used in making final assessments.

1. **The quality of CDP's performance across a material span of time.**  Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer.  Instead, it requires that CDP adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers.  In this way, isolated compliance does not establish "Initial Compliance" in practice.  At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance.  The issue is whether, across time, events, and people, CDP is, in aggregate, sufficiently doing what the Decree requires.  For some requirements that are applicable only to a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

2. **The severity or significance of deviations from Consent Decree requirements, CDP policy, and/or law.**  The Monitoring Team considers not simply whether CDP's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation.  Several minor or more technical

deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field.  Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

3. **The extent to which CDP is identifying and appropriately addressing problematic performance.**  In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within CDP, the Consent Decree expressly contemplates that a CDP in compliance with the Decree will have mechanisms in place to engage with departmental and officer performance that is deficient in some way.  Therefore, the Monitoring Team's compliance reviews consider whether, when CDP personnel have deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it has appropriately addressed the issue.  With respect to Consent Decree implementation and meaningful organizational change, the Department is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **CDP's progress over time.**  Where possible, the Monitoring Team aims to situate its evaluation of CDP's performance in terms of progress over time.  Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.[5]

Courts regularly apply multi-factor approaches where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or implicate competing considerations.[6]  Such multi-factor tests are "objective" as they require clear explanations as to "how they derived their conclusions from the verifiable facts."[7]

In applying this multi-factor test for compliance, the first factor – the quality of CDP's performance across a material span of time – is the initial, threshold inquiry.  In assessing this factor, the Monitoring Team will consider a range of both quantitative and qualitative measures for each

---

[5] Barge, M., Friedman, B., McGough, M.  Monitoring Law Enforcement Consent Decrees:  An Introduction and Starter Toolkit.  2024.  Pages 91-9.  https://bja.ojp.gov/library/publications/monitoring-law-enforcement-consent-decrees-introduction-starter-toolkit

[6] See, e.g., Murr v. Wisconsin, 582 U.S. __ (2017) (adopting a multi-factor test for determining whether governmental regulations effectuated a decline in the value of private property so as to be considered a government taking under the Fifth Amendment); EBay v. MercExchange, 547 U.S. 388 (2006) (applying four-factor test to determinations about permanent injunctive relief in disputes arising under the Patent Act); Mathews v. Eldridge, 424 U.S. 319 (1976) (articulating three factors for courts to consider when determining whether additional governmental and/or judicial procedures are necessary to satisfy the Due Process Clause).

[7] James G. Wilson, "Surveying the 'Forms of Doctrine' on the Bright Line Balancing Test Continuum," 27 Ariz. St. L.J. 773, 802 (1995).

provision and determine both CDP's baseline and current level of performance.  If CDP and/or its officers' performance is not at a certain level with regards to the relevant metric, then things like progress over time or CDP's identification of the issues are unlikely to cure the basic deficiencies with performance, regardless of improvement over time.

The Monitoring Team will develop a number of quantitative metrics in assessing performance. For such metrics that are rates, the Monitoring Team will consider a compliance rate of 85% or above as "passing".  For some non-rate metrics, where there is a relatively small number of incidents for review, or where the rate requires different considerations, the Monitoring Team may set different expectations to be considered passing.  The result is such that each provision is graded upon a range of measures and that strong performance on any given quantitative measure must be balanced against the severity of any deviations, the department's response to such violations, and the department's progress over time.

The multi-factor test for compliance works to ensure that all relevant objective factors are reasonably weighed and the Monitoring Team's written findings provides guidance to the Department and to the community about the benchmarks that it expects and CDP's current performance level.

Finally, the Monitoring Team may assign a score for an individual provision that is lower than the score given in a prior report based upon the weighing of factors and current CDP performance.

Compliance Assessments are not only about policy; they are also about *performance*—about CDP demonstrating *adherence* to policy.  Accordingly, to establish initial compliance with these provisions and ultimately to sustain "full and effective" compliance pursuant to Paragraph 397, CDP not only must show that it has adopted the pertinent policies, but also that its personnel, including officers, consistently comply with those policies.  The multi-factor test for compliance set forth above works to ensure that all relevant objective factors are reasonably weighed and the Monitoring Team's ratings are clearly conveyed.

9

## III.    RECRUITMENT AND HIRING ASSESSMENT FINDINGS

This section summarizes the Monitoring Team's evaluation, using the methodology outlined in Section II, assessing compliance with Paragraphs 300 and 302-311; of the Consent Decree.

### A.  Paragraph 300

*To maintain high-level, quality service, ensure officer safety and accountability, and promote constitutional, effective policing, the City will review and revise as necessary its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals.*

On February 14, 2019, the Court approved a motion by the Monitor to accept a comprehensive Recruitment Plan submitted by the CDP that appropriately identified the recruitment activities necessary for CDP to meet its strategic goals and objectives.[8] Since that time, the CDP has continued to revise and improve its recruitment and hiring program.  This includes a strategy shift in early 2024 that moved recruitment from the Department of Public Safety (DPS) to CDP and now includes a full-time CDP recruitment team (previously this was a Public Safety Recruiting Team that covered all DPS Divisions).   Additionally, the Bibb Administration's Raising Investment in Safety for Everyone (RISE) Initiative added a $5,000 hiring bonus, increased pay and benefits, and raised the recruit age limit from 40 to 55.  CDP recruiters have also held multiple expedited hiring events that simplify the hiring process for candidates by permitting them to complete several of the initial phases in one or two days.

These changes have resulted in a substantial increase in applications, job offers, academy recruits, and CDP graduates in 2024 and 2025.  Significantly, more than two-thirds of the total applications received during 2024 came from individuals who self-identified as multi-racial or belonged to racial minority groups and nearly 25 percent of the total applicants were women.[9]  The data from 2025 is not yet available.

Based on the initiative of the CDP to regularly review and revise the recruitment and hiring program to attract a diverse and qualified workforce, the Monitoring Team rates this Paragraph as **Substantial and Effective Compliance - 6.**

---

[8] DKT 236 – Motion to Approve CDP Recruitment and Hiring Plan filed 02/14/2019
[9] Cleveland Division of Police 2024 Annual Recruitment Report

## B.  Paragraph 301

*The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP.*

This Paragraph was not included in the current assessment as it has been in General Compliance since 2017.  It is being listed in this report to document elevating the rating to **Substantial and Effective Compliance - 6.**

## C.  Paragraph 302

*CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community.  The recruitment plan will establish and clearly identify the goals of CDP's recruitment efforts and the duties of officers and staff implementing the plan.  CDP will regularly review its recruitment and hiring procedures and the effects of those procedures to ensure that those, and other requirements, reflect the needs of the job and do not create artificial or unnecessary barriers to selection.  The recruitment plan will be provided to the Monitor and DOJ.*

As stated previously, on February 14, 2019, the Court approved a motion by the Monitor to accept a comprehensive Recruitment Plan submitted by the CDP.  In its filing, the Monitor stated:

> The Monitoring Team has carefully reviewed the proposed Recruitment and Hiring Plan.  The Team has determined that the Plan appropriately identifies the recruitment activities that will be necessary for CDP to meet its strategic goals and objectives, not least of which is the Division's newly formalized commitment to implement community and problem-oriented policing ("CPOP") as a foundational organizational philosophy.  The Monitoring Team therefore recommends that the Court approve CDP's Recruitment and Hiring Plan.[10]

In reviewing that plan, the Monitor determined that it met all of the Consent Decree requirements contained in Paragraphs 302, 304, and 305.

Each year since the Plan was filed, an annual year-end report has been posted to the CDP website that documents recruitment outcomes from the previous reporting year as well as a review and summary of plans for the following year.  The exception is that the 2023 report is posted on the Department of Public Safety website.  In each report through 2023, the CDP information is

---

[10] DKT 236 – Motion to Approve CDP Recruitment and Hiring Plan filed 02/14/2019, p.1

contained within a more comprehensive Department of Public Safety Annual Recruitment Report. Beginning in 2024, the CDP began publishing a stand-alone report.

The approved Recruitment Plan was intended to be a five-year plan for the Department of Public Safety and is overdue for review and revision to reflect current recruitment and hiring practices, including the realignment of the recruitment section under CDP.

Based on the Recruitment Plan filed with the Court in 2019 that met the requirements of this Paragraph as well as the annual review and update reports, the Monitoring Team rates this Paragraph as **General Compliance - 5.**

### D.  Paragraph 303

*The City will implement the recruitment plan within 60 days of it being approved by the Monitor.*

As stated above in the section on Paragraph 302, the approved Recruitment Plan provided by the City to the Monitor and filed with the Court has been fully implemented since 2019.  As such, the Monitoring Team rates this Paragraph as **Substantial and Effective Compliance - 6.**

### E.  Paragraph 304

*CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants, including officers who are familiar with the different neighborhoods of Cleveland, who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community.*

As referenced, in 2019 the Court approved the CDP's comprehensive Recruitment Plan after the Monitor confirmed it met all Consent Decree requirements in Paragraphs 302, 304, and 305. Analysis of the approved Recruitment Plan shows multiple references that demonstrate compliance with the requirements of this Paragraph.  These include three programmatic goals designed to attract qualified applicants:

1.  Increase staffing levels to effectively implement our Community and Problem Oriented Policing plan (CPOP).
2.  Attract and hire a diverse group of qualified applicants from a broad cross-section of the community.
3.  Create and maintain partnerships with community stakeholders to enhance recruitment efforts.[11]

---

[11] DKT 236-1 – Public Safety Recruitment & Hiring Plan, p.7

Along with these goals, the Plan lays out specific strategies, as reported in the Monitor's filing.

The year end reports posted on the website document the outcomes and evolving strategies to recruit a diverse workforce, such as marketing through directed advertisements and social media platforms.  The 2024 report also cites the importance of personal communication and support by members of the Recruitment Team to help applicants of all backgrounds understand and navigate the hiring process.

Based on the Recruitment Plan filed with the Court in 2019 that met the requirements of this Paragraph as well as the annual review and update reports, the Monitoring Team rates this Paragraph as **Substantial and Effective Compliance - 6.**

### F.  Paragraph 305

*In developing and implementing its recruitment plan, CDP will consult with the Community Police Commission (CPC) and other community stakeholders on strategies to attract a diverse pool of applicants.  CDP will create and maintain sustained relationships with community stakeholders to enhance recruitment efforts.*

The motion filed by the Monitor in 2019 for acceptance of the Recruitment Plan documents the efforts of the CDP to engage community stakeholders in the development of the plan.  The motion states:

> The City released a proposed Recruitment and Hiring Plan to the public for review and feedback on May 15, 2018.  The CPC and City hosted meetings and collected surveys to discuss the Plan with community members and to seek their input.  The period of engagement and input ended on September 28, 2018, at which time the Commission submitted a report with its recommendations.  Among other things, the CPC highlighted a desire for the City to strategically recruit individuals with social work backgrounds.  Subsequently, Commission stakeholders met with representatives of CDP, DOJ, the City, and Monitoring Team to discuss the recommendations and whether and how they might be incorporated in the final version of the Recruitment and Hiring Plan.  On February 8, 2019, the CDP incorporated the final round of feedback from the Department of Justice and Monitoring Team and submitted the final draft of the Recruitment and Hiring Plan.[12]

---

[12] DKT 236 – Motion to Approve CDP Recruitment and Hiring Plan filed 02/14/2019, p.3

The subsequent annual reports that have been completed since implementation of the 2019 Recruitment Plan briefly document continued community engagement efforts around recruiting for CDP, including the intention to enhance these efforts moving forward.

Based on the Recruitment Plan filed with the Court in 2019 that met the requirements of this Paragraph as well as the annual review and update reports, the Monitoring Team rates this Paragraph as **Substantial and Effective Compliance - 6.**

### G. Paragraph 306

*The City will continue to utilize an objective system for hiring and selecting recruits. The system will continue to employ minimum qualification for candidates and an objective process for selecting recruits that employs reliable and valid selection criteria that comport with the Charter and anti-discrimination laws.*

To assess compliance with this Paragraph, the Monitoring Team reviewed 2024 and 2025 City of Cleveland Job Postings for entry level police officers, City of Cleveland policies on Medical Standards and Drug and Alcohol Testing, CDP Statement of Hiring Standards, and the year-end annual reports posted on the website.

The Job Postings produced by the Civil Service Commission of Cleveland, Ohio list the minimum candidate qualifications and outline each step of the hiring and selection process. This process is also described in detail in the 2024 Annual Recruitment Report along with the outcomes of the hiring during that year. The process begins with a written examination administered by the National Testing Network followed by a physical agility test and a preliminary background interview. These three phases are completed during the expedited hiring events in one or two days. Applicants who successfully pass those steps are given a conditional job offer which leads to an in-depth background investigation as well as medical (including drug screening) and psychological assessments. Final selections of candidates who successfully complete all phases of the process are made by the Director of Public Safety. The Job Postings are consistent with anti-discrimination laws and specifically state that the City does not discriminate on the basis of race, color, sex, national origin/ancestry, military status, disability, age and religion.

In addition to the Job Postings, Annual Reports and policies governing the hiring process, there is also a CDP Statement of Hiring Standards that is intended to provide guidance to background investigators and Screening Committee members by listing objective standards to assist in the selection of applicants for hire. In addition to basic minimum qualifications, it contains a comprehensive list of disqualifiers related to criminal history, driving records, job history, military history, financial responsibility and other disqualifying conduct. This is a valuable document in that it lists objective behaviors, histories and actions that disqualify individuals from consideration.

14

Unfortunately, the document provided to the Monitoring Team for this review is dated May 1, 2009 and in need of review and revision to ensure that the minimum qualifications and criteria are consistent with current practices and requirements.

Even given the outdated Hiring Standards document, the Monitoring Team finds that the City's system for hiring and selecting recruits to be in **Substantial and Effective Compliance - 6.**

### H.  Paragraph 307

*CDP will report annually to the public its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, broken down by gender, race, ethnicity, and national origin, the extent to which CDP has been able to recruit qualified applicants, and a discussion of any challenges to recruiting high-quality applicants.*

Each year since the Recruitment Plan was filed in 2019, an annual year-end report has been posted to the CDP website that documents recruitment outcomes from the previous reporting year as well as a review and summary of challenges and plans for the following year.  The exception to this is the 2023 report posted on the Department of Public Safety website.

The Monitoring Team reviewed all the publicly posted reports from 2020 to 2024.  This assessment found that the 2020-2023 reports detail the required activities and outcomes listed in this Paragraph with some exception.  Those reports include the demographic breakdown of *applicants* by gender, race and ethnicity, but do not include that information for *interviewees and selectees*.  This oversight was corrected in the published 2024 CDP Annual Recruitment Report in which all of the required demographic information for *applicants, interviewees and selectees* is reported.  As such, the Monitoring Team rates this Paragraph as **General Compliance – 5.**

### Review of Paragraphs 308-311

Paragraphs 308-311 pertain primarily to background investigations, psychological and medical suitability and drug screening.  An on-site assessment of these files was conducted at the Cleveland Division of Police Training Academy on September 22-23, 2025.  Five members of the Monitoring Team were granted limited access to the eSOPH software system to review candidate histories and background investigations.  CDP personnel, including two background investigators, observed the reviews and assisted with answering questions and producing documents that were not otherwise accessible to the Monitoring Team reviewers.

Monitoring Team assessors were tasked with reviewing files for applicants who successfully made it past the initial screening phases and entered the background investigation phase of the process.

CDP provided a list of candidates for each Academy Class being reviewed.  Academy Class 157 was limited to 13 candidates all of whom had prior employment in law enforcement or security. Monitoring Team assessors reviewed the background files of all 13 of the applicants for Class 157. For classes 158 and 159, a list of 173 and 157 candidates respectively was provided.   Of the 330 total, it was found that several names were repeated due to certain candidates participating in more than one hiring process.  The repeat names were removed because there is only one file per name regardless of the number of times a candidate applies.  Out of the remaining names a random sample of 174 was pulled for review.  In all, 187 background files from CDP Academy Classes 157, 158 and 159 were reviewed by Monitoring Team members using a standard instrument previously approved by the Parties.

Analysis of the 187-file sample found that a substantial number of candidates either voluntarily withdrew or were disqualified from the hiring process prior to full completion of the background investigations.  In fact, some withdrew before providing the required personal history information in the eSOPH background investigation software.  As such, these files were excluded from the full analysis resulting in 106 files to be analyzed against the requirements of Paragraphs 308-310.

## I.  Paragraph 308

*CDP will continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological and medical examination to determine their fitness for employment.  CDP will continue to maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers.  The program will continue to be designed to detect the use of illegal substances, including steroids.*

A list of candidates who completed the medical and psychiatric evaluations is kept separate from the background investigation files due to medical privacy requirements.  The list is a spreadsheet provided to CDP from Civil Service that names each candidate and states the findings or status of each test.  For some candidates who voluntarily withdrew or were otherwise disqualified or not selected before either scheduling or completing the medical, psychological or both, the list indicated that the tests were not complete.  The current practice is to schedule and administer the tests while the background investigation is ongoing.  The medical and psychiatric tests are normally completed prior to the selection for hire by the Public Safety Director, who does not know the results of these tests prior to his selection.  All candidates in the reviewed sample who were hired as police recruits were found psychologically suitable and passed the medical examinations including the drug screening.

Drug screening is completed as part of the medical examination, but the drug test results are not separately reported.  All candidates are informed in the job posting as well as in other stages of the

process that failing the pre-employment drug test disqualifies them from further consideration. Drug testing, as well as all of the medical testing requirements, are governed by City of Cleveland Medical Standards for Pre-Placement Medical Evaluations of Police and Fire Candidates Policy, last updated December 1, 2023.  Drug testing is further regulated in the Human Resources Policies and Procedures Workplace Policies Drug and Alcohol Testing Policy dated December 7, 2023. The Monitoring Team Review found that all but two or 98.11% of candidates had their controlled substance use reviewed during the background investigation.  Of the two remaining, one was unable to determine and the other was left blank (likely a withdrawal).

Based upon these findings, the Monitoring Team rates this Paragraph as **General Compliance - 5.**

## J.  Paragraph 309

*CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions in accordance with federal anti-discrimination laws.  CDP's suitability determination will include assessing a candidate's criminal history, employment history, use of controlled substances, and ability to work with diverse communities.  CDP also will determine, to the extent possible, whether the candidate has been named in a civil action in either Cuyahoga County and/or in the County where the officer lives.*

Monitoring Team assessors responded separately to each of the above requirements during the on-site review.  The background investigations were found to be thorough and objective in 91.51% of files.  For the files rated as not thorough at least one was because the candidate was found unsuitable on the psychological exam before completion of the background investigation.

Background investigations timeliness was found in 98.11% of the files.  Criminal history checks were completed in 97.17%, employment history 97.17%, and controlled substance use 98.11%. At least one of the candidates rated as "no" or "unable to determine" was found unsuitable on the psychological exam before completion of the background investigation.  All background investigations for candidates in the reviewed sample who were hired as police recruits were found to be timely and included criminal history, employment history and use of controlled substance assessments.

Ability to work with diverse communities is an area that was found to be deficient in the 2022 assessment of this area.  In addition to the psychological examination, the CDP now asks candidates to respond to specific questions when completing their personal history statements regarding their experience working in urban communities as well as their experience working or interacting with others outside their own culture or community.  Assessors found that CDP reviewed the candidates' ability to work in diverse communities in 92.45% of the files examined.

Finally, information regarding civil actions was another area of deficiency in the 2022 assessment, which found that these checks were not completed before hiring.  In the current review, the only information on civil actions readily available to the assessors was that which the candidates self-reported in their personal history statements.  Because the Monitoring Team assessors were granted limited access to the eSOPH software, reviewers did not have the ability to review documents attached as part of the background information found by investigators.  The only attachment that could be reviewed was a narrative summary completed by the investigator.  The template for this summary ensures that the summaries are consistent in the information reported, but there is no heading requiring the investigator to report the results of a civil check.  Upon discussing this with CDP staff who were observing the assessment, it was determined that the staff members on-site had full access to the software and could locate the attached documents showing that the civil checks had been completed.  As a result, the Monitoring Team was able to directly confirm the civil check documents for each of the candidates who were eventually hired and verify that all of the checks were completed during the background investigation and prior to any hiring decisions being made.

The difficulty of determining this one minor issue could be easily eliminated in future assessments or even supervisory reviews by simply including a category for civil checks on the summary template.

As a result of the assessment of each of the elements of this Paragraph, the Monitoring Team rates these findings as **General Compliance - 5.**

**K.  Paragraph 310**

*As part of the hiring process, consistent with applicable law, CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's previous supervisor(s).  This review, and any salient information obtained, will be documented in the candidate's file.*

The requirements of this Paragraph were broken down into four specific questions for the purpose of the review survey:

1-  Did CDP request to review personnel files from candidate's previous employment? Monitoring Team assessors were only able to find an affirmative response to this question in 68.87% of files.  As stated previously, the only attachment that could be reviewed as a result of the limited eSOPH access was a narrative summary completed by the investigator.  The template for this summary ensures that the summaries are consistent in the information reported, but there is no place within the summary that asks investigators to provide an affirmative answer to the question of whether they

18

requested to review personnel files.  As such, only those investigators who specifically noted in their narrative that the request was made could be credited.  The difficulty of determining this issue could be easily eliminated in future assessments or even supervisory reviews by simply requiring a yes/no response in the summary template.

2- If salient information was obtained from prior employer, was it documented in the candidate's file?  In this case, assessors found that 95.28% of the files documented the information.  This lends credence to the lower percentage in question 1 above being more an issue of investigators documenting than in actually meeting the requirement.

3-  Did CDP speak with candidate's previous supervisor(s)? Assessors found that 90.57% of files documented this requirement.

4- If salient information was obtained from prior supervisor, was it documented in the candidate's file? Assessors found that 93.4% of files documented this requirement.

Based on the above findings, the Monitoring Team rates this Paragraph as **Operational Compliance.  - 4**

## L.  Paragraph 311

*If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation that includes requesting a candidate's history of using lethal and less lethal force, use of force training records, and complaint history.  This review, and any salient information obtained from this review, will be documented in the candidate's file.*

The assessment of this Paragraph applies to the candidates listed for Academy Class 157 as well as several others in Academy Classes 158 and 159 with prior law enforcement or security experience.  After excluding candidates who withdrew, there were a total of twelve files evaluated for these candidates.  Among the twelve files, some of the candidates may have been security guards with no prior law enforcement employment and therefore some of the requirements of this Paragraph would not be applicable to them.

In evaluating if these background investigations were thorough, objective and timely, assessors responded "yes" regarding nine of the twelve files.  Of the three remaining files it appears that two of the three did not pass either the medical or psychological test and one was disqualified due to criminal behavior.  As a result, those background investigations were likely not completed once the candidates were disqualified and are therefore not part of the sample for this test.

Of the remaining nine, it appears that six of those files contained the required information regarding use of force, training records and complaint history.  The percentage (67%) of files containing all the required information seems unacceptably low.  However, in the case of Academy Class 157, only one of the original 13 candidates was hired, and two others did not finish that process but were listed as repeat applicants for Academy Class 160.

The reviewed files that did contain the required information were very thorough, and in some cases, involved the investigator traveling to the prior agency to obtain information not given over the phone or email.  In at least one case, the candidate applied multiple times, was eventually not selected and found to have failed the psychological test.  In another, the candidate had a long disciplinary history in several prior departments and was not suitable for hire.  Still, there were several files where assessors were unable to determine the salient criteria.

Given the totality of findings on the review of this Paragraph, the Monitoring Team rates it as **Operational Compliance – 4.**

## IV.    OUTCOME ASSESSMENTS

**Paragraph 367(e)**

*In addition to compliance reviews and audits, the Monitor will conduct qualitative and quantitative assessments to measure whether implementing this Agreement has resulted in constitutional policing.  The measurements relating to use of force; addressing individuals in crisis; and stop, search, and arrest are not intended to expand the City's data collection requirements set forth elsewhere in the Agreement.  These outcome assessments will include collecting and analyzing, at least annually, the following outcome data, trends, and patterns:*

Subsection (e) of this Paragraph pertains to recruitment measures.

For the outcome measures detailed in Paragraph 367e of the Consent Decree, the Monitoring Team relied upon the CDP Outcome Measure data report.  The data in the report is sourced from various stakeholders including CDP, City departments, and the Monitoring Team.  The Monitoring Team compiled data from 2015 through 2021 and data was sourced from the appropriate and relevant City departments.  Beginning in 2022, the CDP data team began managing the compiling of data from the City for all of Paragraph 367.

### 1.    Number of qualified recruit applicants:

| Year | No.  of Applicants | No.  of Qualified Applicants | Percent of Applicants that were Qualified |
|------|------|------|------|
| 2015 | 1410 | 191 | 13.5% |
| 2016 | 1459 | 151 | 10.3% |
| 2017 | 1180 | 359 | 30.4% |
| 2018 | 2260 | 492 | 21.8% |
| 2019 | 2343 | 486 | 20.7% |
| 2020 | 893 | 200 | 22.4% |
| 2021 | 837 | 49 | 5.9% |
| 2023 | 1262 | 545 | 43.2% |
| 2024 | 1467 | 650 | 44.3% |

Data for this measure starts in 2015 with one year (2022) missing data regarding the number of qualified applicants.  The data indicates that while the total number of applicants has declined in recent years from highs in 2018 and 2019, the percent of qualified applicants increased in the last two years – 2023 and 2024.

2. **Detailed summary of recruitment activities, including development and leveraging of community partnerships:**

CDP collects data for recruitment activities based on (1) where applicants heard of the job, (2) where recruitment advertisements were placed, and (3) the number of recruitment partnerships. Year over year data on recruitment activities has varied significantly.

*Table 1: Where applicants heard of the job by percent referral:*

| Referral Source | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| City Website | 40% | 54% | 52% | 49% | 49% | 49% | 50% | 42% | 50% |
| Friend | 26% | 0% | 0% | 17% | 0% | 0% | N/A | 0% | 0% |
| Google or other search | 19% | 3% | 0% | 0% | 0% | 0% | N/A | 0% | 0% |
| Other | 14% | 14% | 17% | 17% | 33% | 34% | 19% | 18% | 19% |
| Bulletin | 2% | 0% | 4% | 0% | 0% | 0% | N/A | 0% | 0% |
| Word of mouth | 0% | 19% | 16% | 0% | 0% | 0% | N/A | 0% | 0% |
| Social media | 0% | 6% | 6% | 10% | 16% | 13% | 10% | 13% | 10% |
| Article or blog post | 0% | 0% | 0% | 0% | 0% | 0% | N/A | 0% | 0% |
| Career Board | | | | | | | 2% | 3% | 3% |
| Employee Referral | | | | | | | 15% | 19% | 15% |
| Missing Data | | | | | | | 0% | 0% | 0% |
| Advertisement | 0% | 4% | 4% | 8% | 2% | 4% | 3% | 5% | 3% |

CDP's tracking of referral source is logical though certain categories do not give complete information. For instance, what is indicated by "NA" values or the "Missing Data" category. The City Website is consistently the greatest source for applicant referral.

*Table 2: Placement of recruitment materials:*

| Recruitment medium | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| Billboards | 9 | 23 | 0 | 0 | 0 | 6 | 75 | 75 | 75 |
| Billboard Impressions | 538043 | 1077439 | 0 | 0 | 0 | 598195 | 602,991 | 602,991 | 602,991 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Regional Transit Bus Posters | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Regional Transit Stations Posters | 24 | 22 | 0 | 0 | 0 | 0 | 34 | 34 | 34 |
| Mobile/digital video banner Ads | 50000 | 20000 | 200000 | 200000 | 50000 | 50000 | 50000 | 50000 | 50000 |
| Facebook, Twitter, Instagram Posts | 8 | 8 | 20 | 60 | 0 | 14 | 52 | 50 | 50 |
| Blog posts/Websites | 60 | 90 | 260 | 260 | 0 | 6 | 8 | 7 | 7 |
| Social Media Viewers/Likes | . | 714547 | 117925 | . | . | | 0 | 0 | 0 |
| Social Media Shares | . | 1278 | . | . | . | | 0 | 0 | 0 |
| Radio Station Spots | 4 | 4 | 7 | 3 | 9 | 3 | 9 | 5 | 4 |

Elements of Table 2 are repeated year over year indicating that the data is based upon assumptions. Comparing Table 1 and Table 2, it appears that billboards have little effect in recruiting applicants. Furthermore, it is unclear if mobile/digital ads, blog posts, or regional transit posters resulted in any applicants.

*Table 3: The number of recruitment partnerships:*

| Recruitment Partnerships | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| All Races | 8 | 15 | 32 | 36 | 14 | 36 | 70 | 58 | 61 |
| Black | 7 | 3 | 9 | 10 | 24 | 12 | 18 | 13 | 15 |
| Hispanic | 2 | 1 | 2 | 2 | 2 | 2 | 4 | 5 | 6 |
| Other | . | . | 1 | 13 | 30 | 1 | 1 | 1 | 3 |

Table 3 indicates a rise in "all races" partnerships, especially since 2022.

**3. Number and race, ethnicity, gender, and any self-identified disability of applicants who failed the initial screening and the reasons for their failure:**

Data regarding self-identified disability is not currently collected.

23

Data regarding the demographics of applicants in 2022 is not listed in the CDP Outcome Measure data report, thus that year is excluded in all tables.  Examining trends for why individuals fail the screening process is difficult given that type of data regarding failure has changed over time and because the application process is not a strictly linear process.

*Table 1: Number of candidates who failed screening and the reason for failure:*

| Reason Failed | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| Total | 1219 | 1294 | 821 | 1768 | 1857 | 693 | 788 | 550 | 486 |
| 1- Application Rejected | . | 339 | 282 | 390 | 400 | 85 | 82 | 31 | N/A |
| 2-Failed agility test | 166 | 119 | 101 | 100 | 92 | 133 | 72 | N/A | N/A |
| 3-No show for the Agility test | 85 | 113 | 90 | 165 | 61 | 31 | 46 | N/A | N/A |
| 4-Hired / Currently in the Academy | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | 49 | 73 | 85 |
| 5-No response to certification | 183 | 58 | 0 | 90 | 103 | 23 | 25 | 72 | 152 |
| 6-Passed over | 13 | 8 | 0 | 108 | 155 | 0 | 35 | 62 | N/A |
| 7-Removed for background reason(s) | 66 | 39 | 0 | 15 | 5 | 0 | 30 | N/A | N/A |
| 8-No show for the Psychological Exam | 1 | . | 0 | 4 | 0 | 0 | 4 | 3 | 50 |
| 9-No longer interested | 19 | 26 | 4 | 62 | 48 | 10 | 24 | 8 | 166 |
| 10-Waived | 17 | 102 | 10 | 61 | 115 | 42 | 44 | N/A | N/A |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 11-Name has been certified. Candidates are being vetted for the next Academy | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A to reason for failures | N/A | 50 |
| 12-No show for the test | 394 | 263 | 244 | 566 | 652 | 258 | 306 | 717 | 817 |
| 13-Did not submit their Personal History Statement | 240 | 4 | 0 | 0 | 24 | 0 | 0 | 27 | 48 |
| 14-Failed the test | 35 | 223 | 90 | 194 | 170 | 111 | 120 | 35 | 62 |

The totals for the number of failed applicants do not equal the sum from the reasons an applicant was failed.  This discrepancy indicates that the total number of failed applicants and the reasons for failure may count differently due in part to the non-linear process, thus drawing conclusions as to common reasons for failure is challenging.

*Table 2: Number of failed applicants by race of applicant:*

| Race | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| White (W) Failures | 658 | 594 | 323 | 742 | 750 | 253 | 277 | 112 | 207 |
| Black (B) Failures | 375 | 492 | 341 | 733 | 802 | 317 | 358 | 135 | 203 |
| Asian (A) Failures | 12 | 9 | 8 | 17 | 17 | 3 | 10 | 8 | 6 |
| Hispanic (H) Failures | 128 | 133 | 90 | 159 | 159 | 66 | 84 | 42 | 51 |
| Other (O) Failures | 41 | 76 | 32 | 106 | 91 | 36 | 52 | 27 | 39 |
| Native American (AI) Failures | 1 | 4 | 8 | 3 | 11 | 4 | 1 | 2 | 0 |
| Native Hawaiian/Other Pacific Islander | | | | | | | | 0 | 2 |
| No Data (.) Failures | 4 | 0 | 19 | 8 | 27 | 14 | 6 | 8 | 2 |

*Table 3: Number of failed applicants by ethnicity of applicant:*

| Ethnicity | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| Hispanic/Latino (H) | 128 | 133 | 90 | 3 | 159 | 66 | 84 | 42 | 51 |
| Non-Hispanic/Latino | 1091 | 1161 | 731 | 87 | 1698 | 123 | 753 | 292 | 459 |

*Table 4: Number of failed applicants by gender of applicant:*

| Gender | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| Male Failures | 971 | 1032 | 592 | 1274 | 1351 | 486 | 591 | 266 | 396 |
| Female Failures | 248 | 277 | 224 | 489 | 497 | 199 | 192 | 68 | 113 |
| unknown gender | . | . | 5 | 5 | 9 | 8 | 5 | 0 | 0 |
| Not Disclosed | | | | | | | | 0 | 1 |

**4. Number of applicants with fluency in languages other than English, and the specific languages spoken:**

Data regarding applicants' fluency in languages other than English is not currently listed in the CDP Outcome Measure data report.

**5. Number and race, ethnicity, gender, or self-identified disability of lateral candidates, and a list of their former agencies and years of service:**

Data regarding self-identified disability is not currently collected.

Data regarding the demographics of lateral applicants in 2022 is not listed in the CDP Outcome Measure data report, thus that year is excluded in all applicable tables.

*Table 1: Number of lateral applicants by race:*

| Race | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| White (W) | 0 | 116 | 37 | 0 | 0 | 0 | 22 | 4 | 24 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Black (B) | 0 | 57 | 37 | 0 | 0 | 0 | 13 | 9 | 23 |
| Asian (A) | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Hispanic (H) | 0 | 18 | 7 | 0 | 0 | 0 | 1 | 2 | 2 |
| Other (O) | 0 | 17 | 9 | 0 | 0 | 0 | 1 | 6 | 4 |
| AI | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| No Data (.) | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 1 |

*Table 2: Number of lateral applicants by ethnicity:*

| Ethnicity | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| Hispanic/Latino | 0 | 18 | 7 | 0 | 0 | 0 | 1 | 2 | 2 |
| Non-Hispanic/Latino | 0 | 192 | 87 | 0 | 0 | 0 | 36 | 19 | 53 |

*Table 3: Number of lateral applicants by gender:*

| Gender | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| Male | 0 | 174 | 74 | 0 | 0 | 0 | 33 | 13 | 48 |
| Female | 0 | 35 | 19 | 0 | 0 | 0 | 4 | 8 | 7 |
| unknown | 0 | 0 | 1 | 0 | 0 | 0 | 0 | | |

*Table 4: Number of lateral applicants by other factors:*

| Factors | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| Laterals with self identified disability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| List of lateral's former agencies | 0 | 39 | 5 | 0 | 0 | 0 | 0 | 0 | 2 |
| List of lateral's years of service | 0 | 166 | 12 | 0 | 0 | 0 | 0 | N/A | 27 |

6. **Number of applicants with at least two years of college, a college degree, or at least two years of military service:**

| Years of Education | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| Applicants with 2+ years college | 455 | 802 | 649 | 1172 | 1181 | 459 | 376 | | 164 | 197 |
| Applicants with college degree | 240 | 247 | 189 | 370 | 414 | 143 | 104 | | 274 | 339 |
| Applicants with 180+ days military | 161 | 89 | 55 | 91 | 79 | 52 | 52 | | N/A | N/A |
| Veteran | | | | | | | | 14 | 3 | 3 |
| Disabled veterans | 14 | 2 | 3 | 2 | 4 | 0 | 1 | 0 | N/A | N/A |

7. **Pass/fail rate in each phase of the pre-employment process by race, ethnicity, gender, and self-identified disability of applicants:**

Data for 2022-2024 was not listed in the CDP Outcome Measure data report and thus those years are excluded from all applicable tables.

*Table 1: Pass rate by application process:*

| Pass/Fail rate by application stage | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| Application rejected | | 23.2% | 23.9% | 17.3% | 17.1% | 9.5% | 9.8% |
| Failed agility test | 11.8% | 8.2% | 8.6% | 4.4% | 3.9% | 14.9% | 8.6% |
| No show for the Agility test | 6.0% | 7.7% | 7.6% | 7.3% | 2.6% | 3.5% | 5.5% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hired / Currently in the Academy | 13.5% | 10.3% | 30.4% | 21.8% | 20.7% | 22.4% | 5.9% |
| No response to certification | 13.0% | 4.0% | 0.0% | 4.0% | 4.4% | 2.6% | 3.0% |
| Passed over | 0.9% | 0.5% | 0.0% | 4.8% | 6.6% | 0.0% | 4.2% |
| Removed for background reason(s) | 4.7% | 2.7% | 0.0% | 0.7% | 0.2% | 0.0% | 3.6% |
| No show for the Psychological Exam | 0.1% | N/A | 0.0% | 0.2% | 0.0% | 0.0% | 0.5% |
| No longer interested | 1.3% | 1.8% | 0.3% | 2.7% | 2.0% | 1.1% | 2.9% |
| Waived | 1.2% | 7.0% | 0.8% | 2.7% | 4.9% | 4.7% | 5.3% |
| Name has been certified. Candidates are being vetted for the next Academy | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| No show for the test | 27.9% | 18.0% | 20.7% | 25.0% | 27.8% | 28.9% | 36.6% |
| Did not submit their Personal History Statement | 17.0% | 0.3% | 0.0% | 0.0% | 1.0% | 0.0% | 0.0% |
| Failed the test | 2.5% | 15.3% | 7.6% | 8.6% | 7.3% | 12.4% | 14.3% |
| Failed Medical or Drug Test | | | | 0.5% | 0.7% | 0.0% | 0.4% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Withdrew or Failed to Complete Process After Offer | | | 0.0% | 0.7% | 0.0% | 0.5% |

*Table 2: Pass rate by race:*

| Pass Rate | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| White (W) pass rate | 15.7% | 14.3% | 38.6% | 24.6% | 25.1% | 27.9% | 8.3% |
| Black (B) pass rate | 8.3% | 5.0% | 22.5% | 17.7% | 14.8% | 17.2% | 2.5% |
| Asian (A) pass rate | 7.7% | 18.2% | 33.3% | 26.1% | 34.6% | 40.0% | 0.0% |
| Hispanic (H) pass rate | 16.9% | 10.1% | 29.1% | 22.1% | 26.4% | 26.7% | 10.6% |
| Other (O) pass rate | 6.8% | 10.6% | 11.1% | 23.7% | 17.3% | 20.0% | 7.1% |
| AI pass rate | 66.7% | 0.0% | 33.3% | 50.0% | 0.0% | N/A | N/A |
| Native Hawaiian / Other Pacific Islander pass rate | | | | | | | |
| No Data (.) pass rate | 33.3% | . | 29.6% | 38.5% | 27.0% | 0.0% | N/A |

*Table 3: Pass rate by ethnicity:*

| Pass rate by ethnicity | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| Hispanic/Latino (H) pass rate | 16.9% | 10.1% | 29.1% | 22.1% | 26.4% | 26.7% | 10.6% |
| Non-Hispanic/Latino pass rate | 13.1% | 11.4% | 30.6% | 30.1% | 19.8% | 21.0% | 4.5% |

*Table 4: Pass rate by gender:*

| Pass rate by Gender | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| Male Pass Rate | 13.3% | 11.3% | 32.2% | 21.4% | 20.2% | 24.5% | 5.6% |
| Female Pass Rate | 14.5% | 6.4% | 24.8% | 22.3% | 22.2% | 17.1% | 6.3% |
| unknown gender pass rate | . | . | 44.4% | 50.0% | 25.0% | 11.1% | 16.7% |

**8. The average length of time to move applicants through each phase of the pre-employment process and average amount of time to process applicants:**

Data regarding the average length of time to move applicants through each phase of the application process is not available. Data regarding the average amount of time to process applicants is available for 2023 and 2024. In 2023, the average application time was 9 months and in 2024 the average application time was 4 months.

**9. Composition of recruit classes by race, ethnicity, gender, and self-identified disability:**

*Table 1: Composition of recruit classes by race for all recruits (remained and separated):*

| Race | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| Black | 8 | 10 | 16 | 40 | 64 | 16 | 15 | 9 | 10 | 56 |
| White | 29 | 38 | 51 | 89 | 138 | 35 | 31 | 12 | 11 | 54 |
| Hispanic | 12 | 2 | 2 | 8 | 26 | 5 | 10 | 9 | 1 | 19 |
| Asian | 0 | 1 | 0 | 0 | 5 | 1 | 0 | 0 | N/A | N/A |
| Other | 3 | 0 | 0 | 0 | 13 | 1 | 4 | 0 | 0 | 8 |
| Undisclosed | | | | | 4 | 0 | 1 | 0 | N/A | N/A |

*Table 2: Composition of recruit classes by gender for all recruits (remained and separated):*

| Gender | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| Male | 44 | 43 | 54 | 106 | 177 | 42 | 44 | 26 | 57 | 77 |
| Female | 8 | 19 | 15 | 106 | 70 | 16 | 16 | 4 | 15 | 8 |
| Undisclosed | | | | | 3 | 0 | 1 | 0 | 0 | 0 |

*Table 3: Composition of recruit classes by ethnicity for all recruits (remained and separated):*

| Ethnicity | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| Hispanic/Latino | 12 | 2 | 2 | 8 | 26 | 1 | 10 | 9 | 1 | 19 |
| Non-Hispanic/Latino | 40 | 60 | 67 | 132 | 224 | 57 | 51 | 21 | 20 | 118 |

31

## V.    COMPLIANCE ASSESSMENT CONCLUSIONS

| Consent Decree Paragraph | | Compliance Score |
|---|---|---|
| **II.  Section of Consent Decree by Name** | | |
| **¶** | **Requirement** | **Rating** |
| 300 | To maintain high-level, quality service, ensure officer safety and accountability, and promote constitutional, effective policing, the City will review and revise as necessary its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals. | **Substantial and Effective Compliance 6** |
| 301 | The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP. *This Paragraph was not included in the current assessment as it has been in General Compliance since 2017.  It is being listed to document elevating the rating to* **Substantial and Effective Compliance.** | **Substantial and Effective Compliance 6** |
| 302 | CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community.  The recruitment plan will establish and clearly identify the goals of CDP's recruitment efforts and the duties of officers and staff implementing the plan.  CDP will regularly review its recruitment and hiring procedures and the effects of those procedures to ensure that those, and other requirements, reflect the needs of the job and do not create artificial or unnecessary barriers to selection.  The recruitment plan will be provided to the Monitor and DOJ. | **General Compliance 5** |
| 303 | The City will implement the recruitment plan within 60 days of it being approved by the Monitor. | **Substantial and Effective Compliance 6** |
| 304 | CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants, including officers who are familiar with the different neighborhoods of Cleveland, who possess strategic thinking and problem-solving skills, emotional maturity, interpersonal skills, and the ability to collaborate with a diverse cross-section of the community. | **Substantial and Effective Compliance 6** |
| 305 | In developing and implementing its recruitment plan, CDP will consult with the (Community Police) Commission and other community stakeholders on strategies to attract a diverse pool of applicants.  CDP will create and maintain sustained relationships with community stakeholders to enhance recruitment efforts. | **Substantial and Effective Compliance 6** |

| | | |
|---|---|---|
| 306 | The City will continue to utilize an objective system for hiring and selecting recruits.  The system will continue to employ minimum qualification for candidates and an objective process for selecting recruits that employs reliable and valid selection criteria that comport with the Charter and anti-discrimination laws. | **Substantial and Effective Compliance 6** |
| 307 | CDP will report annually to the public its recruiting activities and outcomes, including the number of applicants, interviewees, and selectees, broken down by gender, race, ethnicity, and national origin, the extent to which CDP has been able to recruit qualified applicants, and a discussion of any challenges to recruiting high-quality applicants. | **General Compliance 5** |
| 308 | CDP will continue to require all candidates for sworn personnel positions, including new recruits and lateral hires, to undergo a psychological and medical examination to determine their fitness for employment.  CDP will continue to maintain a drug testing program that provides for reliable and valid pre-service testing for new officers and random testing for existing officers.  The program will continue to be designed to detect the use of illegal substances, including steroids. | **General Compliance 5** |
| 309 | CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions in accordance with federal anti-discrimination laws.  CDP's suitability determination will include assessing a candidate's criminal history, employment history, use of controlled substances, and ability to work with diverse communities.  CDP also will determine, to the extent possible, whether the candidate has been named in a civil action in either Cuyahoga County and/or in the County where the officer lives. | **General Compliance 5** |
| 310 | As part of the hiring process, consistent with applicable law, CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's previous supervisor(s).  This review, and any salient information obtained, will be documented in the candidate's file. | **Operational Compliance 4** |
| 311 | If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation that includes requesting a candidate's history of using lethal and less lethal force, use of force training records, and complaint history.  This review, and any salient information obtained from this review, will be documented in the candidate's file. | **Operational Compliance 4** |