IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | <u>NOTICE SUBMITTING THE MONITORING</u> |
| CITY OF CLEVELAND | ) | <u>TEAM'S 2025 USE OF FORCE</u> |
| | ) | <u>ASSESSMENT REPORT</u> |
| Defendant. | | |

The Monitoring Team hereby submits the Report of its 2025 Use of Force

Assessment.

Respectfully submitted,

/s/ Christine M. Cole

CHRISTINE M. COLE
Independent Monitor
464 Common Street, Unit #231
Belmont, MA 02478
ccole@clevelandpolicemonitor.com

CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2026, I served the foregoing Notice Submitting the Monitoring Team's 2025 Use of Force Assessment via the court's ECF system to all counsel of record.

/s/ Melody J. Stewart
MELODY J. STEWART
Deputy Monitor

Cleveland Division of Police Consent Decree Monitoring Team


2025 Compliance Assessment & Outcome Measures Regarding the Use of Force


February 4, 2026

**TABLE OF CONTENTS**

I.     **EXECUTIVE SUMMARY** ................................................................. **5**

       **Summary of Findings** ........................................................ **6**

II.    **SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW** ......... **7**

       **A.**     **Scope of Review** .................................................... **7**

       **B.**     **Methodology** ....................................................... **8**

       **C.**     **Standard of Review** ........................................... **10**

III.   **COMPLIANCE ASSESSMENT** ............................................. **14**

       **A.**     **USE OF FORCE PRINCIPLES** ........................... **14**

           Paragraph 46 ...................................................... 15

           Paragraph 47 ...................................................... 25

           Paragraph 48 ...................................................... 27

       **B.**     **USE OF FORCE POLICIES** ............................... **28**

           Paragraph 49 ...................................................... 28

           Paragraph 50 ...................................................... 31

           Paragraph 51 ...................................................... 32

           Paragraph 52 ...................................................... 32

           Paragraph 53 ...................................................... 33

           Paragraph 54 ...................................................... 33

           1.    Firearms ................................................... 33

           Paragraph 55 ...................................................... 33

           Paragraph 56 ...................................................... 34

           Paragraph 57 ...................................................... 35

           Paragraph 58 ...................................................... 36

           Paragraph 59 ...................................................... 36

           Paragraph 60 ...................................................... 37

           Paragraph 61 ...................................................... 38

           Paragraph 62 ...................................................... 39

           Paragraph 63 ...................................................... 40

           Paragraph 64 ...................................................... 40

           Paragraph 65 ...................................................... 41

           Paragraph 66 ...................................................... 41

           Paragraph 67 ...................................................... 42

           Paragraph 68 ...................................................... 43

           Paragraph 69 ...................................................... 43

           Paragraph 70 ...................................................... 44

           Paragraph 71 ...................................................... 44

           Paragraph 72 ...................................................... 45

           Paragraph 73 ...................................................... 45

Paragraph 74 ................................................................................... 46
Paragraph 75 ................................................................................... 47
Paragraph 76 ................................................................................... 47
Paragraph 77 ................................................................................... 48
Paragraph 78 ................................................................................... 48
Paragraph 79 ................................................................................... 49
Paragraph 80 ................................................................................... 49
Paragraph 81 ................................................................................... 50
Paragraph 82 ................................................................................... 50
Paragraph 83 ................................................................................... 50

**C.**     **USE OF FORCE TRAINING** .................................................... **51**
Paragraph 84 ................................................................................... 51
Paragraph 85 ................................................................................... 52
Paragraph 86 ................................................................................... 53

**D.**     **USE OF FORCE REPORTING POLICY & USE OF FORCE REPORTS. 53**
Paragraph 87 ................................................................................... 53
Paragraph 88 ................................................................................... 54
Paragraph 89 ................................................................................... 55
Paragraph 90 ................................................................................... 55
Paragraph 91 ................................................................................... 56
Paragraph 92 ................................................................................... 57

**E.**     **USE OF FORCE INVESTIGATIONS** ...................................... **57**
Paragraph 93 ................................................................................... 57
1.     Investigations of Level 1 Uses of Force ................................... 57
Paragraph 94 ................................................................................... 57
2.     Investigation of Level 2 Uses of Force .................................... 59
Paragraph 95 ................................................................................... 59
Paragraph 96 ................................................................................... 59
Paragraph 97 ................................................................................... 60
Paragraph 98 ................................................................................... 61
Paragraph 99 ................................................................................... 62
Paragraph 100 ................................................................................. 63
Paragraph 101 ................................................................................. 64
Paragraph 102 ................................................................................. 65
Paragraph 103 ................................................................................. 65
Paragraph 104 ................................................................................. 66
Paragraph 105 ................................................................................. 67
Paragraph 106 ................................................................................. 67
Paragraph 107 ................................................................................. 68
Paragraph 108 ................................................................................. 68

3

Paragraph 109 ................................................................................. 69

    3.     Force Investigation Team and Investigations of Level 3 Uses of Force ...... 70

Paragraph 110 ................................................................................. 70

Paragraph 111 ................................................................................. 70

Paragraph 112 ................................................................................. 72

Paragraph 113 ................................................................................. 73

Paragraph 114 ................................................................................. 74

Paragraph 115 ................................................................................. 74

Paragraph 116 ................................................................................. 75

Paragraph 117 ................................................................................. 75

Paragraph 118 ................................................................................. 76

Paragraph 119 ................................................................................. 79

Paragraph 120 ................................................................................. 79

Paragraph 121 ................................................................................. 80

Paragraph 122 ................................................................................. 81

Paragraph 123 ................................................................................. 82

**F.     FORCE REVIEW BOARD ......................................................... 82**

Paragraph 124 ................................................................................. 82

Paragraph 125 ................................................................................. 83

Paragraph 126 ................................................................................. 84

Paragraph 127 ................................................................................. 85

Paragraph 128 ................................................................................. 87

Paragraph 129 ................................................................................. 87

Paragraph 130 ................................................................................. 88

**IV.    COMPLIANCE ASSESSMENT CONCLUSIONS ................................................ 90**

**V.     USE OF FORCE DATA: OVERALL ANALYSIS AND TRENDS, YEARS AND**

                 **RELATED OUTCOME ASSESSMENTS ................................................ 110**

## I. EXECUTIVE SUMMARY

Paragraphs 45 to 130 and 367(a) of the Consent Decree outline the requirements relating to Cleveland Division of Police's (CDP) Use of Force principles, policies, training, reporting, investigations, and the Force Review Board.  The Monitoring Team conducted a Compliance Assessment to determine adherence to the Consent Decree's requirements that the CDP

> "revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force is used in accordance with the Constitution and laws of the United States…and that any use of unreasonable force is promptly identified and responded to appropriately"; That those policies and systems "be designed with the goal of ensuring that officers use techniques other than force to effect compliance …whenever feasible; use force only when necessary, and in a manner that avoids unnecessary injury to officers and civilians; de-escalate the use of force at the earliest possible moment; and accurately and completely report all uses of force."[1]

This Compliance Assessment reviewed and determined the City's level of compliance with each of the 85 paragraphs in the Use of Force section of the Consent Decree.  Because of the Department of Justice's (DOJ) investigation and emphasis on use of force, updating policies and revising training in this area was one of the first areas of work embarked upon by the City and the Monitoring Team.

The CDP has worked in earnest since 2017 on use of force.  The CDP first revised its Use of Force policies in 2016 after discussions and a collaborative process with CDP officers, command staff, the DOJ, the Community Police Commission (CPC), community organizations, a number of City residents, and members of the Monitoring Team.  As detailed in the filing by the Monitoring Team recommending approval of the revised Use of Force policies[2], the revisions clarified definitions and expectations for officers; included requirements for de-escalation to increase both officer and subject safety and reduce the severity of force required, guidance on intermediate weapons, and a clear use of force reporting policy.  Policies have been updated over time with appropriate revisions including adding specific policies on supervision and the Force Investigation Team (FIT), with the most recent updates to the policy suite occurring in 2022.  Earlier Monitoring Team records and filings describe the process that engaged the community for input, as well as the policy development and training work and the changes incorporated over time to the Use of Force policies, force instrument-specific policies (firearms and intermediate weapons), and reporting.

---

[1] Docket Case: 1:15-cv-01046-SO Doc #: 502-2 Filed: 01/12/24, ¶45, page 11.
[2]
https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/582c54ac59cc685797341239/1479300270095/Dkt.+83--Use+of+Force+Policies+with+Exhibits.pdf

Since the implementation of policies and the completion of training, the Monitoring Team has seen the work of the Force Review Board (FRB) and the Force Investigation Team (FIT) develop and mature.  A section on www.clevelandpolicemonitor.net, maintained by the Monitoring Team, is dedicated to documenting the work of the Division as they created and updated use of force policies and the FRB and FIT procedures.

Previous reviews or observations conducted by the Monitoring Team, including a review of a sample of use of force cases from 2018 and 2019, presented in 2021, a review of FIT cases closed between July 2020-October 2022, a review of Level 1 and Level 2 use of force cases from 2022, and ongoing observations of the FRB, indicated that the CDP was well poised for an exhaustive Compliance Assessment of use of force.  The following report provides a detailed discussion of the Monitoring Team's findings from this Compliance Assessment.

**Summary of Findings**

Based on the compliance ratings in the 17th Semiannual Report, filed on September 10, 2025, in this assessment 74 paragraphs were upgraded, five remained the same, and four were downgraded. There remain two paragraphs that are unassessed as the Monitoring Team reads them as introductory or overview paragraphs, and one paragraph that had not previously been assessed and was included and rated in this assessment  Those 74 upgrades can be further described as moving to Substantial and Effective Compliance in 22, to General Compliance for 51, and to Operational Compliance in one paragraphs.  For four paragraphs that were downgraded, when the Monitoring Team reviewed the evidence provided by the City for those paragraphs, it found that the specific requirements were not addressed as required.  In those four paragraphs, it is worth noting that the requirements are administrative in nature and not reflective of officer interactions with the public.

Policies are complete, reviewed, and updated as needed.  Paragraphs that require only a policy be enacted are largely deemed to be in Substantial and Effective Compliance.  There are several paragraphs that require not only the policy but adherence to the policy.  In those cases, if adherence has not been observed for at least two years, those paragraphs are found typically in General Compliance.

When it comes to interacting with the public, the reviewers found that officers are generally following policies, supervisors are engaged, and when policy violations occur, there is internal identification of those issues, and the systems designed to address those violations are in place and working.  This assessment does not review specific discipline decisions related to violations of policy, rather it assesses the recognition by the chain of command that action ranging from counseling or retraining to referrals to the Internal Affairs Unit is in fact occurring.

In 97% of the Level 1 and Level 2 cases reviewed, the officer's use of force was necessary, proportional, and objectively reasonable.  These standards are part of the use of force policies and the standard by which officer actions are assessed.  Across all cases, reviewers found that in 53% of them, de-escalation was not feasible and in only 5% of the cases did the reviewers find that officers failed to take reasonable efforts to de-escalate prior to using force.  While adherence to all paragraphs and the specific language throughout the Consent Decree is key to compliance, these data tell an important story about the CDP members' interactions with the public relative to force.  The following report provides a detailed discussion of the Monitoring Team's findings from this Compliance Assessment.

## II.     SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW

### A.     Scope of Review

The current assessment reviewed each of the paragraphs, prior approvals of the Monitoring Team, and specific activities of the CDP.  In order to determine if the CDP in practice adhered to the actual requirements of their policies and the Consent Decree, the Monitoring Team established a methodology to review reports, investigations, and the actual use of force and supervisory behavior through the Division's reporting and wearable camera system (WCS) images.  Though not a specific requirement of the Consent Decree, in the latter part of 2016 the CDP issued and began requiring all on duty officers to use body-worn cameras, termed the CDP Wearable Camera System.  The use of this equipment affords supervisors and the Monitoring Team members the opportunity to review actions of officers and supervisors on scene before, during, and following a use of force action.

This comprehensive Compliance Assessment will review all paragraphs in the Use of Force section of the Consent Decree – paragraphs 45-130.  The report is arranged by sections that mirror the Consent Decree.  All prior filings and in person reviews of training sessions are incorporated into the current assessment.

Additionally, this assessment will summarize and report on data collected by the CDP in accordance with paragraph 367a, Outcome Measures.  The Outcome Measures are reported by the CDP to the Monitoring Team and represent the best available data at the time of reporting.

This comprehensive Compliance Assessment represents the Monitoring Team's first formal and assessment of all paragraphs in the Use of Force section of the Consent Decree.

B.      **Methodology**

In January 2025 the Monitoring Team shared its methodology with the City and the DOJ (Parties) for the comprehensive review of all paragraphs in the Use of Force section of the Consent Decree – paragraphs 45-130.  That document included by reference methodologies already approved for the review of 12 months of all Level 1 and Level 2 use of force incidents, 2023 and 2024 FIT Investigations, and the discussions and decisions of the Force Review Board and its decision-making processes.  Also included in this assessment are paragraphs related to use of force training, policies, and supervision that work together to achieve the culture and practice change described in paragraph 45.

<u>Use of Force Principles</u>:  To assess adherence to the language of the Consent Decree for paragraphs 46-48, the Monitoring Team reviewed policies filed and revised since 2016, court documents related to those revisions, training plans, lesson plans, documented reviews of in person training, IAPro and Blue Team reports[3], images from the Division's WCS retained in Evidence.com, and Crisis Intervention Tracking reports.

<u>Use of Force Policies</u>:  To evaluate compliance with the use of force policies, paragraphs 49-83, in addition to the policies and court filings on policies referenced above, the Monitoring Team requested and reviewed evidence of officers' training certifications, any disciplinary actions for carrying unapproved weapons, data and analysis of members unholstering firearms for those situations that require a report, discipline for firing warning shots, firearms qualification records, downloads of electronic control weapons (ECW) use, audit plans and reports of ECW application, Oleoresin Capsicum (OC) spray issue logs, and analysis of OC spray application,

<u>Use of Force Training</u>:  For the review of use of force training, the Monitoring Team requested and reviewed the previously mentioned training plans, lesson plans, and training materials as well as the dashboard showing completions in order to ensure that all personnel received the training as required by the Consent Decree.  To that end, the Monitoring Team requested training records for all sworn personnel and compared those records to a list of all sworn personnel.  The Monitoring Team reviewed new officer or recruit training plans, lesson plans, and training materials as well as training records and certifications.  The Team reviewed supervisor training records, and at several intervals, observed training.

<u>Use of Force Reporting</u>:  For paragraphs 87-92, the Monitoring Team requested and reviewed materials provided on policies and the IAPro/Blue Team system.  The Team conducted detailed reviews of all Level 1 and Level 2 uses of force by reviewing IAPro and Blue Team reports as well

---

[3] IAPro and Blue Team are part of the software system that allows for online reporting of use of force incidents and the review of supervisors.

as images from officers' WCS.  For paragraph 88 in particular, the reviews, described in more detail below, directed the Monitoring Team SMEs to capture and record the behaviors described in the enumerated specifics in the paragraph as well as paragraphs 90 and 91.

<u>Investigations of Level 1 and Level 2 Uses of Force:</u>  To assess compliance with paragraphs 94-109, the Monitoring Team reviewed all Level 1 and Level 2 incidents for which the chain of command completed reviews in 2024.  The sample was predicated on the date of closure, not the date of the incident.  The Monitoring Team used a structured survey tool to collect responses from its Subject Matter Experts (SMEs) to review completed use of force cases.   Monitoring Team SMEs were asked to review both the force that was used as well as the officer's reporting, and the chain of command review.  CDP provided a list of cases to the Monitoring Team quarterly that included all Level 1 and Level 2 cases where the chain of command completed their review in the previous quarter.  The completed cases were randomly assigned to the SMEs and upon completion of their review, results were compiled, and exceptional cases were discussed with the City on approximately a bi-monthly cadence.

The Monitoring Team reviewed a total of 272 cases, including 181 Level 1 cases and 91 Level 2 cases.  The majority of cases (245) occurred in calendar year 2024, while the remaining 27 cases occurred in calendar year 2023.   The Monitoring Team believes this is an adequate sample size to assess CDP's compliance with the use of force principles detailed in the Consent Decree.

To conduct these reviews, the SMEs relied on use of force policies, use of force reports in IA Pro and Blue Team, the CDP WCS in Evidence.com, documentation to Internal Affairs Unit, training and lesson plans, supervisor training records, memoranda, reports, or other documents addressing actions taken by supervisors, and any investigatory materials as needed.

<u>Force Investigation Team and Investigations of Level 3 Uses of Force:</u>  To assess compliance with paragraphs 110-123, the Monitoring Team's SMEs reviewed all FIT investigations from 2023 and 2024.  Review of these paragraphs was conducted previously and filed with the Court on October 24, 2023.[4]  That review included cases initiated and completed between July 2020 and October 2022, covering 28 incidents.  As a result of that review and subsequent changes in personnel in the Internal Affairs Unit (IAU), significant process and procedure changes occurred in the IAU, some of which were made with the specific intent to adhere more fully to the FIT manual and requirements of the Consent Decree.  This comprehensive assessment required SMEs, using a structured survey tool, to review all files, images, and reports related to all of the FIT call outs and investigations from 2023 and 2024 (N=47).   The survey was amended, with significant input from the City's Police Accountability Team (PAT) and required SMEs to assess officer and supervisor

---

[4]

https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/65847dac15550c0278e40ae4/1703181741424/Assessment+of+CDP+Force+Investigation+Team.pdf

actions throughout the investigation in accordance with the FIT Manual and Consent Decree requirements.

Force Review Board:  To assess the Force Review Board requirements as set forth in paragraphs 124-130, the Monitoring Team reviewed policies, training, FRB minutes or worksheets, as well as observed the quarterly FRB meetings.  Observations allowed the SMEs to understand more fully the quality of the conversations at the meetings and the process through which the FRB made its determinations.  The observations were critical to a fair assessment of paragraph 126, in particular, which requires, among other things, that the Board assess an "officer's decision making at the moment the officer employed force" and that it reviews the "actions and inactions of all officers, supervisors, commanders, and dispatchers involved in the incident...."  In addition, paragraph 127 requires specific reviews and membership and the observation, both in person and as necessary remote, enabled a fair review of those requirements.  These requirements cannot be sufficiently assessed through the review of written documentation alone.

## C.     Standard of Review

Pursuant to Consent Decree paragraphs 360, 367, the Monitoring Team must conduct qualitative and quantitative Compliance Assessments to determine the extent to which the City and CDP have complied with the requirements of the Consent Decree resulting in constitutional policing.

This Use of Force Compliance Assessment includes a review of paragraphs 45-130 of the Consent Decree.  Every provision in this area has been given a Compliance Grade from 0 to 6, with 0 indicating that the City/CDP has not yet begun working on the provision and 6 indicating that the City/CDP has achieved Substantial and Effective Compliance with that provision. Although Compliance Assessments draw upon information and evidence gathered during semiannual reports,[5] they represent a much more detailed and specific analysis completed by numerous SMEs on the Monitoring Team who have evaluated calls for service, data, reports, records, documents, and video/images associated with the assessment.  The Monitoring Team utilizes the Compliance Grading system (detailed below), recognizing that the ultimate goal is for the City and CDP to achieve Substantial and Effective Compliance for each provision.

In order to incorporate and build upon prior semiannual compliance reviews and reports, the Monitoring Team reviewed the four most recent semiannual reports published prior to the

---

[5] The Monitoring Team regularly evaluates compliance with sections of the Consent Decree throughout the year and communicates its observations, assessments, and findings twice each year through its semiannual reports (¶¶ 360, 375). These compliance reviews consider the totality of evidence presented and observed with respect to each provision of the Consent Decree, including review of policies and annual reports, interviews and meetings with the City and CDP as well as Cleveland community groups, and observation of trainings and internal meetings.

commencement of the Use of Force Compliance Assessment; here, the Fourteenth, Fifteenth, Sixteenth and Seventeenth Semiannual Reports.   Any provision that was graded "General Compliance" for more than two years (i.e., four consecutive reports) was presumptively considered in Substantial and Effective Compliance.  For any such provision, the purpose of the Monitoring Team's Compliance Assessment was to validate this rating.  Once validated as substantially and effectively compliant, further reassessments of that provision will not be incorporated into future Use of Force Compliance Assessments, although the Monitoring Team will continue to review and report on those provisions in its semiannual reports.  If those reviews or reports suggest a downgraded change in status at any point, the provision will once again be incorporated into future Compliance Assessments.  As part of a Compliance Assessment, the Monitoring Team may assign a score for an individual provision that is lower than the score given in a prior semiannual report, if appropriate to do so.

  1. <u>Determining Compliance Status</u>

Use of Force SMEs reviewed data, records, and documents pertaining to each Use of Force-related Consent Decree provision. Following this review and analysis, the SMEs compared findings and collectively award Compliance Grades using the following framework:

| Grade | Definition |
|---|---|
| 0 | **Non-Compliant, Not Started**: The City/CDP has not yet complied with the relevant provision of the Consent Decree.  This includes instances in which the City/CDP's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement. |
| 1 | **Partial Compliance, Not Assessed:** The City/CDP has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/CDP's progress in implementation. |
| 2 | **Partial Compliance, Planning/Policy Phase:** The City and/or CDP has made sufficient initial strides or sufficient partial progress toward compliance with key components of the provision of the Consent Decree pertaining to drafting or creating policies, processes, protocols, trainings, systems, or the like that exist on paper but do not exist or function in day-to-day practice. |
| 3 | **Partial Compliance, Implementation Phase:** The City and/or CDP has made sufficient initial strides or sufficient partial progress toward compliance with key components of the provision of the Consent Decree pertaining to initiating training and implementing systems intended to affect day-to-day practice, but that the Monitoring Team has not yet observed in practice.  It may capture a wide range of compliance states or performance, from the City or CDP having taken only very limited steps toward operational compliance to being nearly in operational compliance. |

11

| | |
|---|---|
| 4 | **Operational Compliance:** The City and/or CDP has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Consent Decree such that it is in existence or practice operationally—but has not yet demonstrated, or has not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner. Operational compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |
| 5 | **General Compliance:** The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented such that the Monitoring Team will begin tolling according to Consent Decree ¶ 401. This includes instances where it can be shown that the City or CDP has effectively complied with a requirement fully and systemically. General compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |
| 6 | **Substantial and Effective Compliance:** The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents in accordance with Consent Decree ¶ 370 or ¶ 401. This includes instances where it can be shown that the City/CDP has effectively complied with a requirement fully and systemically. Substantial and effective compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |

Additionally, the Monitoring Team recognizes that much of the City and CDP's work includes systemic changes implemented over a long-term trajectory. As such, the Monitoring Team has incorporated the following considerations more appropriate for work that is ongoing, which will advance or ebb over time, into its Compliance Assessment:

- **The quality of the City/CDP's performance across a material span of time.** Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer. Instead, it requires that the City/CDP adhere to Consent Decree requirements across a material span of time, number and/or portion of incidents, and number of officers. In this way, neither isolated compliance nor isolated non-compliance is determinative. The issue is whether, across time, events, and people, the City/CDP is, in aggregate, sufficiently accomplishing that

12

which the Consent Decree requires.  For some requirements that are applicable to only a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

- **The severity or significance of deviations from Consent Decree requirements, City/CDP policy, and/or law.** Where there is deviation in compliance, the Monitoring Team considers the severity or significance of that deviation. Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field.  Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

- **The extent to which the City/CDP has identified and appropriately addressed deviations.** In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within the City/CDP, the Consent Decree expressly contemplates that there be mechanisms to engage with and correct deficient departmental and officer performance.  When personnel have deviated from policy, law, or Consent Decree requirements, the Monitoring Team reviews whether the City/CDP has identified the deviation and, if so, if it has appropriately addressed the issue.

- **The City/CDP's progress over time.** Where possible, the Monitoring Team aims to situate its evaluation of the City/CDP's performance in terms of progress over time.  Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.[6]

The Monitoring Team notes that Courts regularly apply multi-factor tests where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or implicate competing considerations.[7]  Such multi-factor tests are

---

[6] Barge, M., Friedman, B., McGough, M., <u>Monitoring Law Enforcement Consent Decrees: An Introduction and Starter Toolkit</u>. 2024 at pp. 91-99, https://static1.squarespace.com/static/58a33e881b631bc60d4f8b31/t/671bf35ce2cf8a70d2a5c3cb/1729885020813/Monitoring+Law+Enforcement+Consent+Decrees.pdf

[7] *See, e.g.*, *Murr v. Wisconsin*, 582 U.S. 383 (2017) (adopting a multi-factor test for determining whether governmental regulations effectuated a decline in the value of private property so as to be considered a government taking under the Fifth Amendment); *EBay v. MercExchange*, 547 U.S. 388 (2006) (applying four-factor test to determinations about permanent injunctive relief in disputes arising under the Patent Act); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (articulating three factors for courts to consider when determining whether additional governmental and/or judicial procedures are necessary to satisfy the Due Process Clause).

"objective" as they require clear explanations as to "how they derived their conclusions from the verifiable facts."[8]

As explained above, the Monitoring Team's Compliance Assessments consider a range of factors, as well as both quantitative and qualitative measures for each provision.  Where quantitative metrics are appropriate for assessing the City/CDP's performance, the Monitoring Team will consider a compliance rate of 90% or above "passing."  Where there is a relatively small number of incidents for review, or where the analysis requires different, more qualitative considerations, the Monitoring Team may set different expectations to be considered passing. The result is that each provision is graded upon a range of measures, and the Monitoring Team's rating of the City/CDP's performance is balanced against the severity of any deviations, the response to such violations, and progress over time.

Compliance Assessments are not only about policy—they are fundamentally about *performance* and *adherence* to policy.  Accordingly, to sustain "Substantial and Effective Compliance" pursuant to paragraph 397, the City/CDP must demonstrate not only that it has adopted the pertinent policies, but also that its personnel, including officers, consistently comply with those policies. The multi-factor test for compliance set forth above works to ensure that all relevant objective factors are reasonably weighed and the Monitoring Team's ratings are clearly conveyed.

## III.    COMPLIANCE ASSESSMENT

The Monitoring Team conducted an in-depth, structured qualitative review of CDP officer Level 1 and Level 2 use of force incidents occurring in 2024 and Level 3 uses of force through the CDP's FIT call out and investigation reports from 2023 and 2024, and observed Force Review Board meetings for all of 2023, 2024, and the first half of 2025.  For the purposes of this study, the level of review is at the incident level meaning the Monitoring Team reviewed all uses of force in each encounter.  As described in the Methodology Section above, the Monitoring Team also reviewed updated policies, training plans, lesson plans, and training sessions.

### A.  USE OF FORCE PRINCIPLES

This section of the Consent Decree sets forth the minimal expectations for the operational philosophy of use of force in the Division.  Paragraph 45, basically a general statement, has been rated as Operational Compliance in past semiannual reports.  It is more appropriately recognized as a summary statement – when all paragraphs in the Use of Force section are in compliance, this too will advance to General Compliance.  Consequently, this assessment does not include a ranking for paragraph 45.

---

[8] James G. Wilson, "Surveying the 'Forms of Doctrine' on the Bright Line Balancing Test Continuum," 27 *Ariz. St. L.J.* 773, 802 (1995).

*Paragraph 46*

*The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers, regardless of the type of force, tactics, or weapon used, will comply with the following requirements:*

    a.  *Officers will allow individuals the opportunity to submit to arrest before force is used wherever possible.*

    b.  *Officers will use de-escalation techniques whenever possible and appropriate, before resorting to force and to reduce the need for force. De-escalation techniques may include verbal persuasion and warnings and tactical de-escalation techniques, such as slowing down the pace of an incident, waiting out subjects, creating distance (and thus the reactionary gap) between the officer and the threat, and requesting additional resources (e.g. specialized CIT officers or negotiators). Officers will be trained to consider the possibility that a subject may be noncompliant due to a medical or mental condition, physical or hearing impairment, language barrier, drug interaction, or emotional crisis.*

    c.  *If force becomes necessary, officers will be limited to using only the amount of force objectively reasonable as necessary to control the person.*

    d.  *In applying force, officers will reduce the level of force as the threat diminishes.*

    e.  *Officers normally will not use force against persons who are handcuffed or otherwise restrained, unless it is objectively reasonable and necessary under the circumstances to stop an assault, escape, or as necessary to fulfill other law enforcement objectives.*

    f.  *Officers will not use force against persons who only verbally confront them and do not impede a legitimate law enforcement function.*

    g.  *CDP will explicitly prohibit the use of retaliatory force by officers. Retaliatory force includes, for example, force in excess of what is objectively reasonable to prevent an escape to punish individuals for fleeing or otherwise resisting arrest; and force used to punish an individual for disrespecting officers.*

    h.  *Officers will not use head strikes with hard objects, except where lethal force is justified. Officers will be trained that a strike to the head with any impact weapon could result in death.*

    i.  *Other than to protect an officer's or other person's safety, officers will not use force to subdue an individual who is not suspected of any criminal conduct.*

    j.  *CDP's policy will expressly provide that using a firearm as an impact weapon is never an authorized tactic. Officers will be trained that use of a firearm as an impact weapon could result in death to suspects, bystanders, and themselves.*

    k.  *Officers will not use neck holds.*

15

     *l.*  *CDP will continue to limit vehicle pursuits to those in which the need to capture the suspect outweighs the danger to the public. CDP will continue to limit the number of CDP vehicles that may be involved in a vehicle pursuit.*

     *m.*  *Immediately following a use of force, officers and, upon arrival, a supervisor will inspect and observe subjects for injury or complaints of pain resulting from the use of force, and immediately obtain any necessary medical care. As necessary, officers will provide emergency first aid until professional medical care providers are on scene.*

The policies enacted by the CDP set forth expectations for officers and supervisors as required by paragraph 46. This compliance assessment, and as part of the regular oversight process, the Monitoring Team reviewed all reports and WCS images to assess if officers and supervisors are behaving in practice in accordance with the requirements of the Consent Decree and the CDP policies. To do so, the Monitoring Team reviewed all Level 1 and Level 2 cases where the chain of command review was completed in 2024. Using a structured survey tool to collect responses, the Monitoring Team reviewed the force that was used as well as the officer's reporting, and the chain of command review. Monitoring Team SMEs also included in their reviews the actions taken by officers before force was used and relied on their own experience to assess officer tactics, and where force was used, its necessity, objective reasonableness, and proportionality of the force.

For this comprehensive assessment, CDP provided a list of cases to the Monitoring Team quarterly that included all Level 1 and Level 2 cases where the chain of command had completed their review in the previous quarter. The completed cases were randomly assigned to the SMEs and upon completion of their review, results were compiled, and exceptional cases were discussed with the City on approximately a bi-monthly cadence. CDP Chief Todd was personally involved and engaged in these discussions and welcomed the feedback. In a few instances, the Chief provided context to help understand the situation, and in others, the Chief took initiative to institute procedure changes, special training, or individual coaching to forestall future similar issues.

The results of this review process were analyzed and are used to assess CDP's compliance with the Use of Force Principles required by paragraphs 46, 47, and 48 of the Consent Decree.

The Monitoring Team reviewed a total of 272 cases that had been completely investigated by the CDP. These cases included 181 Level 1 cases and 91 Level 2 cases. The majority of cases (245) occurred in calendar year 2024, while the remaining 27 cases occurred in calendar year 2023. The Monitoring Team believes this is an adequate sample size to assess CDP's compliance with the use of force principles detailed in the Consent Decree.

The majority of the cases reviewed (71%) resulted from a 911 call for service, while another 15% resulted from an officer observation. The remaining cases resulted primarily from follow-up activities, officers assisting other agencies or units, and officers working on secondary

employment.  The cases were distributed throughout the CDP districts, as indicated in Graph 1 below.  While this distribution may not perfectly match the distribution of crime, or calls for service, it indicates for this review that all districts, and district chains of command, are adequately represented.



Above all else, the SMEs are asked to determine whether the totality of the evidence surrounding a particular force incident is necessary, proportional, and reasonable.  In addition, the Monitoring Team also closely monitors the efforts of CDP officers to de-escalate a situation, when feasible, prior to using force.  Chart 1 below indicates the Monitoring Team's determination of CDP's compliance with these critical questions that justify force.

| Chart 1: CDP Justified in Use of Force | | | | |
|---|---|---|---|---|
| | Yes | No | Unable to Determine | Not Feasible |
| Was the officer's use of force *necessary* to achieve a lawful objective in accordance with Cleveland Division of Police General Police Order 2.01.03? | 97% | 2% | 1% | |
| Was the officer's use of force *proportional* to the level of the subject's resistance and/or severity of the threat posed by the subject? | 97% | 2% | 1% | |

17

| | | | | |
|---|---|---|---|---|
| Was the officer's use of force **objectively reasonable** under the totality of the circumstances? | 97% | 2% | 1% | |
| Did the involved officer(s) take reasonable efforts to de-escalate prior to using force in accordance with Cleveland Division of Police General Police Orders? | 38% | 5% | 4% | 53% |

As evidenced in Chart 1, the vast majority of CDP's force is deemed to be within policy and within the limitations provided in the Consent Decree.  Likewise, to the extent it is feasible, officers are using appropriate de-escalation techniques prior to resorting to force.

There are six incidents that the Monitoring Team deemed to be outside of policy and were deemed unnecessary.  Of the six unnecessary cases, five were also determined to be not proportional to the threat, and not objectively reasonable given the circumstances.  In all six cases, at least one reviewer in the chain of command also determined the force to be outside of policy and referred officers for discipline or re-training.  That the chain of command recognized the out of policy force is a critically important factor in the Division's use of force and demonstrates an ability to self-regulate and hold itself accountable.  Though the chain of command recognized the major policy failures, the chain of command did not always thoroughly document tactical deficiencies or note what specific retraining efforts may have been directed in response to observations.

The Monitoring Team's review tool also included numerous structured questions used to assess the twelve specific use of force principles (lettered a through m) outlined in paragraph 46 of the Consent Decree.  Chart 2 details CDP's compliance with the individual principles of the paragraph.

18

| | Chart 2: CDP Paragraph 46 Compliance | | | |
|---|---|---|---|---|
| Paragraph Reference | | Yes | No | N/A or Unable to Determine |
| ¶46(a) | Did the officers identify themselves as an officer and advise of their intent to detain, arrest or search a subject before using force? | 44% | 23% | 33% |
| | Did officers give a verbal warning to submit prior to using force? (if safe and feasible) | 57% | 8% | 35% |
| ¶46(c) | Was the officer's use of force objectively reasonable under the totality of the circumstances? | 97% | 2% | 1% |
| ¶46(d) | Did the officer(s) reduce the level of force applied as the nature of the threat diminished? | 92% | 0% | 8% |
| ¶46(e) | Did officer use force against subject(s) who were handcuffed or otherwise restrained? | 1% | 97% | 2% |
| ¶46(f) | Did officers use force against subject(s) who only verbally confront officers and are not involved in criminal conduct? | 0% | 98% | 1% |
| | Did officers use force to overcome passive resistance? | 1% | 98% | 1% |
| | Did officers use force against subject(s) who are exercising their First Amendment Right? | 0% | 99% | 1% |
| ¶46(g) | Did officers use retaliatory force? | 1% | 97% | 3% |
| ¶46(h) | Did officers use head strikes with hard objects? | 0% | 99% | 1% |
| ¶46(i) | Did officers use force to subdue a subject who is not suspected of any criminal conduct, other than to protect an officer's or another person's safety? | 0% | 99% | 1% |

# Chart 2: CDP Paragraph 46 Compliance (Continued)

| Paragraph Reference | | Yes | No | N/A or Unable to Determine | |
|---|---|---|---|---|---|
| ¶46(j) | Did officers use a firearm as an impact weapon? | 0% | 98% | 2% | |
| ¶46(k) | Did officers use something that could be reasonably considered to be a neck hold? | 0% | 98% | 2% | |
| ¶46(m) | Did the involved officer, immediately following the use of force, and when the scene was secure, inspect and observe subject(s) for injury or complaints of pain resulting directly or indirectly from the use of force? | 67% | 33% | | |
| | Should EMS have been requested? | 31% | 64% | 5% | |
| | Was EMS requested? | 30% | 0% | 70% | |

| | | Yes | No | Unable to Determine | Not Feasible |
|---|---|---|---|---|---|
| ¶46(b) | Did the officer(s) take reasonable efforts to de-escalate prior to using force? | 38% | 5% | 4% | 53% |

| | | Yes | No | Unable to Determine | Aid Not Needed |
|---|---|---|---|---|---|
| ¶46(m) | Did officers and supervisors provide any necessary medical care while providing emergency first aid until professional medical care providers could arrive? | 10% | 13% | 2% | 75% |

a. *Officers will allow individuals the opportunity to submit to arrest before force is used wherever possible:*

The majority of the cases completed in 2024 that were reviewed by the Monitoring Team indicate that officers identified themselves as a Cleveland Police Officer prior to engaging in force. Monitoring Team SMEs differentiated between situations where the officer affirmatively identified themselves, and situations where it's not applicable, or they are unable to determine given the video and written evidence available.

Additionally, in 93% of cases reviewed by the Monitoring Team, officers gave a verbal warning prior to engaging in force. In the small percentage of cases where verbal warnings were not provided, the Monitoring Team SMEs found that the situation was evolving so quickly, or it was clear that weapons were involved, and officers needed to respond so quickly that providing a warning was not feasible.

b. *Officer will use de-escalation techniques whenever possible and appropriate, before resorting to force and to reduce the need for force. De-escalation techniques may include verbal persuasion and warnings and tactical de-escalation techniques such as slowing down the pace of an incident, waiting out subjects, creating distance (and thus the reactionary gap) between the officer and the threat, and requesting additional resources (e.g. specialized CIT officers or negotiators). Officers will be trained to consider the possibility that a subject may be noncompliant due to a medical or mental condition, physical of hearing impairment, language barrier, drug interdiction, or emotional crisis;*

The Monitoring Team found that in the vast majority of use of force cases reviewed, CDP officers engaged in de-escalation of the situation before resorting to force. The Monitoring Team found in only five percent of cases did officers not engage in some de-escalation technique prior to using force.

Officers successfully used a number of different de-escalation techniques. The most commonly utilized de-escalation techniques were the good use of communications with subjects. Officers engaged in verbal persuasion, continuing communications with subjects, and speaking calmly and clearly with subjects before resorting to force. Officers also regularly called for additional and specialized resources, and created time and space barriers between officers and subjects.

c. *Officers will be limited to using only the amount of force objectively reasonable as necessary to control the person.*

Of the 272 cases that the Monitoring Team reviewed, only five cases, or one percent, were determined to not be objectively reasonable. The chain of command, through their reviews of these cases, noted the policy violations and intervened, either through re-training or discipline. The Monitoring Team agreed with the review and intervention of the CDP in these cases and articulated in their own reviews that these were dynamic situations, and the determination of objectively reasonable force hinged on the timing of specific applications of force which amounted to tactical or training deficiencies rather than misconduct on the part of the involved officers.

The Monitoring Team recognizes that there are instances of force where officers make tactical or decisional mistakes, or where they do not follow their training, leading to situations where force may be determined to be outside of policy. Across all cases reviewed where force was not objectively reasonable, the force did not lead to additional injuries to subjects. These cases were also appropriately investigated and adjudicated by the chain of command. The Monitoring Team has no expectation that there will be zero problematic cases, but that they are appropriately reviewed and that the chain of command will intervene when necessary is an indicator of the Division's growth and ability to self-correct.

21

d. *In applying force, officers reduce the level of force as the threat diminishes;*

In only one case reviewed did the Monitoring Team determine that officers did not reduce their level of force commensurate with a reduction in the level of resistance encountered. Conversely, in 92% of cases, SMEs agreed that officers reduced force as required by CDP policy and the Consent Decree.  In the one case that was determined to be out of compliance with the requirements of the Consent Decree, officers applied a taser three times.  In this incident, SMEs determined that the first application was reasonable and in line with the resistance encountered.  In the second and third application, the SMEs believed the subject to be under control, had dropped his weapon and was only exhibiting minimal resistance making the subsequent use of the taser not reasonable.

e. *Officers normally will not use force against persons who are handcuffed or otherwise restrained, unless it is objectively reasonable and necessary under the circumstances to stop an assault, escape, or as necessary to fulfill other law enforcement objectives;*

In only two cases reviewed by the Monitoring Team did officers use force on a subject that was already handcuffed.  In one case, the subject was in handcuffs and being escorted to the zone car when he became highly agitated, yelling, resisting and knocking an officer to the ground.  A second officer used a joint manipulation technique to control the subject and safely secure him in the vehicle.  While the subject was indeed already handcuffed, the SMEs note that in this case, officers had no safe option *not* to use minimal force on this handcuffed subject.

Similarly, in the other case where force was used on a handcuffed individual, officers were attempting to place a handcuffed suspect in the back of a zone car when he began resisting and refusing to pull his feet inside the car.  An officer pulled slightly on the suspect's arms from behind in order to get the suspect safely inside the car.  Under the circumstances, the use of force on a handcuffed subject makes sense and that the officer reported this is very indicative of a changing culture at the CDP.

f. *Officers will not use force against persons who only verbally confront them and do not impede a legitimate law enforcement function;*

In none of the cases that the Monitoring Team reviewed for this assessment did CDP officers use force on individuals who were only exercising their First Amendment rights. There were two cases that were reviewed where officers did not respond well to subjects who were verbally confrontational with officers, to the point where officers in both situations ultimately put hands on the subject when the Monitoring Team SMEs felt that it was not warranted.  In neither case was the suspect injured by the actions of the officers, but SMEs noted that officers must endeavor to remain calm in the face of taunts and

berating by members of the public who are not actively resisting or engaged in criminal activity.

g. *CDP will explicitly prohibit the use of retaliatory force by officers.  Retaliatory force includes, for example, force in excess of what is objectively reasonable to prevent an escape to punish individuals for fleeing or otherwise resisting arrest; and force used to punish an individual for disrespecting officers;*

Review of cases by the Monitoring Team reveals that CDP officers are not using retaliatory force.  In 97% of the cases reviewed, the Monitoring Team can affirmatively say that officers did not use retaliatory force.  SMEs indicated in only two cases did officers use what might be deemed retaliatory force.  These two instances derive from the same case mentioned in the paragraph above where officers were deemed to have used force only when verbally confronted by the subjects.  In those cases, force used against subjects who were being highly disrespectful to officers, but who were not actively resisting or engaging in criminal activity is deemed to be retaliatory as it appears to be force used to punish an individual for that disrespect.

h. *Officer will not use head strikes with hard objects, except where lethal force is justified.  Officers will be trained that a strike to the head with any impact weapon could result in death;*

Officers in this review of cases did not use heads strikes in their uses of force.  In four cases, Monitoring Team SMEs did not have enough information or evidence to say affirmatively that officers did *not* use a head strike but also could not definitively say that they did.  CDP also does not record any head strikes amongst the Level 1 and Level 2 use of force cases provided for review.

i. *Other than to protect an officer's or other person's safety, officers will not use force to subdue an individual who is not suspected of any criminal conduct;*

Only one of the cases reviewed by the Monitoring Team indicates that officers used force on a subject not suspected of any crime.  In this case, officers were on scene talking to the 911 caller when a male, reported by the property owner as not allowed to be in the building, approached the officers.  The man refuted the property owner's claim and informed the officers that he was allowed to be in the building and then began walking away.  The officer pursued the man and he attempted to climb a fence to leave.  The officers then engaged the man, arced their taser, and used joint manipulation and pressure to the back to handcuff him.  The SMEs note that at the point where force was applied, officers had not identified the man or determined that he was engaged in any criminal conduct that would warrant force.

j.  *CDP's policy will expressly provide that using a firearm as an impact weapon is never an authorized tactic.  Officers will be trained that use of a firearm as an impact weapon could result in death to suspects, bystanders, and themselves;*

Officers in this review of cases did not use their firearms as impact weapons.  In three cases, SMEs did not have enough information or evidence to say affirmatively that officers did *not* use their firearms as impact weapons, but also could not definitively say that they did.  CDP also does not record any use of the firearm as an impact weapon amongst the Level 1 and Level 2 use of force cases provided for review.

k.  *Officers will not use neck holds;*

Officers in this review of Level 1 and Level 2 cases did not use neck holds.  There were five cases where SMEs were unable to determine whether neck holds were used, but they also were not able to say definitively that they were.  CDP also does not record any neck holds amongst the cases provided for review.

l.  *CDP will continue to limit vehicle pursuits to those in which the need to capture the suspect outweighs the danger to the public.  CDP will continue to limit the number of CDP vehicles that may be involved in a vehicle pursuit;*

The Monitoring Team is aware of the CDP pursuit policy, GPO 3.2.02, that has been in place since May 22, 2015.  The CDP has reviewed this policy, and in February of 2024 it was provided to the Community Police Commission (CPC) for its review and approval.  The CPC has not yet approved the policy.  This is an important policy update to finalize and the CPC must prioritize its review.   The 2015 policy recognizes the dangers associated with pursuits and limits pursuits to two police vehicles in pursuits without specific permission from the controlling supervisor. Importantly the policy requires caution and asks for the policy to be interpreted and followed in a restrictive way. It further lists specific criteria that must be in place for the initiation of a pursuit. Additionally, the policy acknowledges the necessity to balance the "need to carry out its law enforcement mission against the duty to protect the general public."

m.  *Immediately following a use of force, officers and, upon arrival, a supervisor will inspect and observe subjects for injury or complaints of pain resulting from the use of force, and immediately obtain any necessary medical care.  As necessary, officers will provide emergency first aid until professional medical care providers are on scene.*

Not all use of force incidents require medical attention, but upon inspection by officers and supervisors, medical attention shall be provided if warranted.  In the cases reviewed by the Monitoring Team, medical attention was requested in 67% of incidents.  The Monitoring Team SMEs also assessed if officers and supervisors provided emergency medical care in the intervening time between the incident and EMS being requested and arriving.  In the

majority of cases (75%), SMEs determined that emergency medical care was not needed. While this question is asked as a way to determine whether officers and supervisors are following the parameters of the Consent Decree and CDP policy, it is also a good proxy measure to understand whether officers are using overly aggressive force that may lead to undue injury. This measure is a good indication that officers are using enough force to bring subjects into compliance, but not so much as to result in serious injuries to the public.

The SMEs also indicated that in 31% of the cases reviewed, they believed the EMS should have been summoned to the scene. In all but one of those cases, SMEs indicate that EMS *was* requested.

Based on the review of 272 cases from a single year of review, and the results of the reviews as recorded in a detailed survey, the Monitoring Team finds that the CDP is in **General Compliance - 5** with all of paragraph 46. There have been changes, and this success demonstrates a year of good work. As police experts, the Monitoring Team recognizes that one year of compliance is not sufficient to demonstrate the behaviors are "meaningfully adhered to...across time, cases, and/or incidents.[9]"

*Paragraph 47*
*As soon as practical following a use of force, CDP will ensure that the incident is accurately and properly reported, documented, and investigated. A fundamental goal of the revised use of force policy will be to account for, review, and investigate every reportable use of force and reduce any improper uses of force.*

The policies and practices of the CDP require officers to enter their use of force reports into IAPro and to do so by the end of their shift for Level 1 and Level 2 uses of force. For Level 3 uses of force, the policy requires the completion of the IAPro report, as well as notification to the supervisor and to the Force Investigation Team (FIT). Policy 2.01.05 governs the reporting of use of force and any officer witnessing use of force.

The responses to those prompts are provided in Chart 3 below.

| Chart 3: CDP Use of Force Internal Reporting | | | |
|---|---|---|---|
| | Yes | No | N/A or Unable to Determine |
| Was force immediately reported to a supervisor? | 84% | 5% | 11% |
| Was the investigation of the use of force objective and complete? | 90% | 7% | 3% |

---

[9] See chart on page 12 with Standard of Review definitions.

| | | | |
|---|---|---|---|
| Were the investigation's findings supported by a preponderance of the evidence? | 98% | 2% | 0% |
| Did each of the command ranks in fact review the case, or was the review/adjudication responsibility delegated? | 98% | 1% | 1% |

In the majority of Level 1 and 2 cases reviewed by the Monitoring Team, the force was immediately reported to a supervisor.  In 11% of the incidents reviewed, the SMEs could not determine whether the force was reported immediately, though in 84% of the incidents, force was clearly reported immediately.  In the five percent of instances where force was not reported immediately, officers provided documentation and justification in half of those incidents.  The lack of documentation for all cases where force was not reported immediately is an area for improvement.  While the Monitoring Team recognizes that there are dynamic and extenuating circumstances that may prevent officers from reporting force immediately to a supervisor, and does not expect 100% compliance, 5% to 16% of cases not being reported and possibly as many as 16% of the cases missing the reporting timeline is concerning and is also an area for improvement; either in the reporting or the documentation for the lack of timely reporting.

In the vast majority of cases, the investigations were thorough and were supported by the evidence provided by written documentation from officers, or accompanying video.  Evidence also suggests that those in the chain of command are taking their responsibility for reviewing cases seriously and completing the reviews at each level rather than delegating to lower ranks.

Finally, the Monitoring Team also reviewed quantitative data to determine the timeliness of review.  Date and times are available for the instances of force, as well as when reports are first submitted to Blue Team by officers.  In 90% of the incidents reviewed, use of force reports were submitted by officers within the first day after force was used.  In most of the remainder of the cases, force was reported within a few days.  In a few outlier cases, force was not reported until civilian complaints were received; sometimes months after the force.  CDP reviewed those cases and took appropriate corrective action; however, regular reminders and roll-call training of officers of what constitutes reportable force is encouraged to correct for these few outliers.

Force review by the chain of command should endeavor to be swift so that corrective action, when necessary, can be taken in a timely manner.  At the same time, quality and completeness of the review should not be sacrificed for speed.  A quarter of the cases reviewed by the Monitoring Team were investigated and adjudicated by the chain of command within two weeks of receipt in Blue Team.  The average case resolution was 44 days for the Level 1 and 2 cases reviewed by the Monitoring Team.  Ten percent of the cases took more than 100 days to investigate, the longest of which took well over a year.  CDP should consider a quality assurance reporting process to regularly examine cases that seem to be stalled in the review process and determine if there are factors that could be addressed to accelerate completion of review as a part of strengthening the governance and management of cases.

As mentioned above, in prior reviews, the reporting and review took much longer.  The current timelines, even considering the outliers, generally were reported in a timely manner.  CDP should establish a quality assurance mechanism, create back up reviewers to account for furlough time or extended absences of supervisors, and to get cases "unstuck" from the review process to hold supervisors accountable to the review timetable.  In light of the review of the data, and the adherence to the timelines in the majority of the incidents, the Monitoring Team finds the CDP in **General Compliance - 5** with paragraph 47**.**

> ### Paragraph 48
> *CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends.*

CDP began using IAPro for the reporting and analysis of use of force incidents in 2016.  This system facilitates the online reporting and review through the chain of command.  The Division also uses IAPro to capture an individual officer's referrals for training needs discovered through the chain of command review or the FRB processes.  In late 2024, the Division's Data Collection Team with the support of the City's Urban Analytics & Innovation began using PowerBI and the City's Data Portal to share the data with the public.  It is an interactive platform that allows the user to view the use of force data in various ways such as by district, time of day, or type of force as just a few examples.

In its use of force review, the Monitoring Team SMEs also examined CDP efforts to hold officers accountable when necessary, and whether the chain of command were noting tactical issues and referring them to the Training Unit.  The results of those questions are included in Chart 4 below.

| Chart 4: CDP Tactics and Training | | | |
|---|---|---|---|
| | Yes | No | N/A or Unable to Determine |
| Did the Monitoring Team identify any notable issues or concerns regarding tactics or training? | 25% | 75% | |
| Of the tactical or training issues noted by the Monitoring Team, was the issue(s) identified during the department's investigation or chain of command review? | 32% | 59% | 9% |
| Of the tactical or training issues noted by the Monitoring Team, did the chain of command refer those issues to the Training Unit? | 14% | 70% | 16% |

In the clear majority of cases (75%), the Monitoring Team SMEs did not note any tactical issues that would need to be addressed by the chain of command or referred to the Training Unit. However, of the 25% of cases reviewed where the Monitoring Team SMEs did determine that there were tactical issues that should be referred to the Training Unit, only one third of those cases were identified by the Division as tactical issues, and only 14% of those cases were referred to the Training Unit.  This is a clear opportunity for improvement.  The lack of referral to the Training Unit of easily identified tactical issues can create a safety issue for the public as well as for members of the CDP.  During the review of the use of force cases, the Monitoring Team SMEs met with Chief Todd on a roughly bi-monthly basis to discuss findings.  When SMEs identified training or tactical issues, the Chief was quick to investigate, discuss specifics with commanders, and inform training or individual members for remediation.  The Monitoring Team has found Chief Todd to be committed to addressing issues and be responsive to feedback.

An internal process that prioritizes the identification of tactics that can be improved, without activating a discipline system unnecessarily, should be established.  In the absence of the Monitoring Team reviews, the Division must have a stronger system to identify areas for general improvement.

With the implementation of IAPro, the analysis demonstrated by PowerBI and as shown on the City's Data Portal, and the responsiveness of Chief Todd, the Monitoring Team determines paragraph 48 to be in **General Compliance - 5.**

## B.  USE OF FORCE POLICIES

The Consent Decree required the development and implementation of new policies that define use of force, the legal basis for using force, de-escalation requirements and strategies, reporting and investigation of force, and regulation of equipment and tools, including firearms and intermediate weapons.  With input from a variety of community stakeholders and CDP members, as well as the DOJ and the Monitoring Team, the CDP created those policies.  The Monitoring Team and DOJ reviewed and approved those policies and the ensuing updates at various points over time.  Paragraphs 49-92 are all related to use of force policies.

*Paragraph 49*
*The City will develop and implement use of force policies that comply with applicable law and are adequate to achieve the goals described in paragraph 45. The use of force policies will incorporate the use of force principles above and will specify that the unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability.*

28

Since 2017, CDP has proceeded to revise its policies on the use of force; provide training to all officers on uses of force generally and on any new expectations of updated force policies specifically; and make changes to the processes and procedures that it uses for the investigation, review, supervision, and oversight of force.

The current suite of use of force policies developed in consultation with and approved by the Monitoring Team and DOJ includes:

- **2.01.01 – Definitions**

Effective since July 1, 2019, the purpose of this policy is "to define terminology used in the Cleveland Division of Police Use of Force Policies."  Across its three pages the policy defines the three levels of force, de-escalation, levels of resistance, and defines the guiding principles of necessary, proportional, and objectively reasonable.

- **2.01.02 –De-escalation**

Effective from January 1, 2018, this policy requires officers to use de-escalation tactics and strategies when safe under the totality of the circumstances and as time and circumstances permit.  The policy further describes de-escalation tactics and techniques as well as training requirements.

- **2.01.03 - Use of Force – General**

The most recent revision of this policy has been in effect since March 20, 2023.  The purpose of this comprehensive policy is to establish "guidelines for officers of the Cleveland Division of Police relative to the use of force, and to provide direction and clarity, in those instances when a subject's actions require an appropriate use of force response."  This policy mandates and holds officers accountable to ensure that all uses of force are necessary, proportional and objectively reasonable.  It further describes each of those elements in detail and reiterates the requirement that officers use de-escalation when safe and feasible.  The policy defines when the use of deadly force is authorized, lists specifically prohibited force and addresses use of force in crowd management situations.  This policy also includes the requirement of officers to intervene in situations where they witness other officers using unauthorized force (Duty to Intervene) and the duty to provide medical attention to persons in need or by request.

- **2.01.04 - Use of Force – Intermediate Weapons**

This policy, effective since July 1, 2019, governs the use of intermediate weapons which include batons, Oleoresin Capsicum (OC) Spray, Conducted Electrical Weapon (CEW or Taser), and bean bag shotgun.  For each intermediate weapon, the policy provides specific guidelines for use; when the use of each weapon is authorized or prohibited; and requirements for medical attention following use on a subject.

- **2.01.05 - Use of Force - Reporting**

29

The most recent revision of this policy has been in effect since March 20, 2023. The policy establishes requirements for reporting all uses of force, including documenting the objective reasonableness, necessity and proportionality of the force used.  The policy also defines the levels of force and reporting requirements for each, includes a section for Crowd Management use of force reporting, and consequences for failing to report a use of force.

- **2.01.06 - Use of Force – Supervisory Reviews and Investigations**

The most recent revision of this policy has been in effect since March 20, 2023.  This policy requires supervisors to conduct thorough, timely and objective investigations of all Level 1 and 2 uses of force and further establishes guidelines for notifying the Force Investigation Team regarding Level 3 uses of force.  The policy further requires a Chain of Command review of all investigations and establishes timelines for completion.

- **2.01.07 - Force Investigation Team**

This policy, in effect since July 8, 2020, establishes the duties, responsibilities and authority of the Force Investigation Team (FIT) to investigate all Level 3 uses of force, which include critical firearm discharges, uses of force that involve potential criminal conduct by an officer, in-custody deaths, and any other use of force case assigned to FIT by the Chief of Police.

- **2.01.08 - Force Review Board**

Effective since February 18, 2020, this policy establishes a Force Review Board to function as a quality control mechanism for evaluating uses of force and force investigations to determine any need to address issues regarding de-escalation, supervision, equipment, tactics, training, policies, and command reviews and to provide direction on correcting deficiencies.  The policy further identifies the composition of the FRB, the requirement to meet, member responsibilities and procedures for reviews.

- **2.01.09 - Animal Incidents**

The most recent revision of this policy has been in effect since February 2, 2024.  The policy establishes guidelines for officers involved in animal incidents, including when critical discharges of firearms are authorized and the reporting requirements for such incidents.

- **FIT Manual**

This manual, in effect since November 6, 2018, establishes the processes and procedures for Force Investigation Team (FIT) investigations of all Level 3 uses of force, including critical firearm discharges, uses of force that involve potential criminal conduct by an officer, in-custody deaths, and any other use of force case assigned to FIT by the Chief of Police.  The purpose of the FIT is to ensure that thorough, fair and objective investigations of serious uses of force are conducted by individuals with appropriate expertise, skills and training.

30

A review by the Monitoring Team confirms that the established Use of Force policies are compliant with the law, have achieved all of the requirements of paragraph 45 and have been effective across a substantial period of time with review and update as needed.  As such, the Monitoring Team rates this paragraph as being in **Substantial and Effective Compliance –6.**

> ### Paragraph 50
> *CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons that are available to CDP officers, including standard-issue weapons that are made available to all officers and weapons that are made available only to specialized units.  The policies will clearly define and describe each force option and the circumstances under which use of such force is appropriate.*

As documented previously, General Police Order (GPO) 2.01.03 - Use of Force – General, in effect since March 20, 2023, establishes "guidelines for officers of the Cleveland Division of Police relative to the use of force, and to provide direction and clarity, in those instances when a subject's actions require an appropriate use of force response."  This policy mandates and holds officers accountable to ensure that all uses of force be necessary, proportional and objectively reasonable. It further describes each of those elements in detail and reiterates the requirement that officers use de-escalation when safe and feasible.  The policy defines when the use of deadly force is authorized, lists specifically prohibited force and addresses use of force in crowd management situations.

Additional policies applicable to paragraph 50 are:

- **2.01.01 – Definitions**

Effective since July 1, 2019, the purpose of this policy is "to define terminology used in the Cleveland Division of Police Use of Force Policies."  Across its three pages the policy defines the three levels of force, de-escalation, levels of resistance, and defines the guiding principles of necessary, proportional, and objectively reasonable.

- **2.01.04 - Use of Force – Intermediate Weapons**

This policy, effective since July 1, 2019, governs the use of intermediate weapons which include batons, Oleoresin Capsicum (OC) Spray, Conducted Electrical Weapon (CEW or Taser), and bean bag shotgun.  For each intermediate weapon, the policy provides specific guidelines for use; when the use of each weapon is authorized or prohibited; and requirements for medical attention following use on a subject.  It also includes the requirement that only officers who are trained and qualified may carry the respective weapons.

31

- **4.06.02 - Firearms and Ammunition Regulations**

The current policy, effective since September 13, 2022, identifies all approved firearms (including shotguns, but not rifles), holsters and ammunition carried by members of the CDP and includes the requirement that members carrying any of the weapons qualify annually in compliance with the Ohio Peace Officer Training Commission (OPOTC).

- **4.06.02 - Patrol Rifle**

Effective since March 20, 2023, this policy governs the issuance, required training and deployment of Patrol Rifles.

- **4.07.06 - Grenadier Protocol**

This policy, effective since March 20, 2023, establishes guidelines and requirements for the training, qualification, equipment, munitions, deployment, storage and maintenance pertaining to the use of grenadier munitions primarily during crowd management events.

Review of the above policies by the Monitoring Team confirms that the CDP has achieved all of the requirements of this paragraph and that these policies have been effective over a substantial period of time, with review and update as needed.  As such, the Monitoring Team rates this paragraph as being in **Substantial and Effective Compliance - 6.**


> ### *Paragraph 51*
> *CDP policies related to specific weapons will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon.*

The policies previously identified that govern specific issued weapons, GPO 2.01.04- Use of Force – Intermediate Weapons, GPO 4.06.02 - Firearms and Ammunition Regulation, GPO 4.06.08 - Patrol Rifle, and GPO 4.07.06 - Grenadier Protocol all include training and certification requirements that each officer must meet in order to carry and utilize each weapon.

Based on review of those policies by the Monitoring Team, it concludes that the CDP has achieved all of the requirements of this paragraph and the policies have been effective over a substantial period of time, with review and update as needed.  As such, the Monitoring Team rates this paragraph as being in **Substantial and Effective Compliance - 6.**


> ### *Paragraph 52*
> *No officer will carry any weapon that is not authorized or approved by CDP.*

32

General Police Order (GPO) 2.01.04 - Use of Force – Intermediate Weapons, specifically states that "Officers shall carry only weapons that are issued by the Division."  GPO 4.06.02 - Firearms and Ammunition Regulations specifically identifies the only approved firearms (including shotguns), holsters and ammunition that may be carried by members of the CDP.  GPO 4.06.08 - Patrol Rifles specifically states that members shall only carry the Patrol Rifle authorized by the Division.

Review of the above policies by the Monitoring Team confirms that the CDP has achieved all of the requirements of this paragraph and the policies have been effective over a substantial period of time, with review and update as needed.  As such, the Monitoring Team rates this paragraph as being in **Substantial and Effective Compliance - 6.**

> ### Paragraph 53
> *Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of weapon is imminent, and allow the subject an opportunity to comply.*

GPO 2.01.04 - Use of Force – Intermediate Weapons, section 1, subsection B.2, states: "Prior to the use of any approved intermediate weapon, when feasible and    appropriate,  the  officer  shall communicate to the subject, other officers and bystanders that the use of the weapon is imminent and allow the subject an opportunity to comply."

Based on the above policy language that has been effective since July 1, 2019, the Monitoring Team finds this paragraph to be in **Substantial and Effective Compliance - 6.**

> ### Paragraph 54
> *The City will implement policies for each of the following guidelines.*

This is an introduction to sections on firearms, electronic control weapons, and oleoresin capsicum spray (OC spray) and is not assessed independently.

> ### 1.  Firearms

> ### Paragraph 55
> *Officers will not unholster and display a firearm unless the circumstances create a reasonable belief that lethal force may become necessary. CDP's policies will require and training will teach proper techniques for unholstering, displaying, pointing, and aiming a firearm, and for determining when it is appropriate to do so. The Monitor will review CDP's policies and training to ensure that they comply*

*with this paragraph. If an officer unholsters a firearm during an incident, interaction, or event that would otherwise trigger a reporting or data collection requirement, officers will document that a firearm was unholstered. CDP will annually collect and analyze this data.*

GPO 2.01.03 Use of Force – General, Section VIII, subsection A.5. states that officers shall not "(u)nholster and display or unholster and point a firearm unless the circumstances surrounding the incident create an objectively reasonable belief that the situation may escalate to the point at which deadly force would be authorized." GPO 2.01.05 Use of Force – Reporting Section V, subsection C.1, states that unholstering a firearm is subject to the data collection process and shall be documented.

Additionally, all officers are required by the Ohio Peace Officers Training Academy (OPOTA) and GPO 4.06.02 Firearms to attend training on and qualify with all firearms that they are authorized to carry. Use of force reporting requires the report of firearm points as a Level 1 use of force. The Division collects and analyzes those data on a regular basis. The CDP also reports publicly on all use of force. The training lesson plans are reviewed and approved annually by the Monitoring Team and the DOJ and include training on the requirements listed in this paragraph.

In the Monitoring Team's review of 273 incidents from 2024, there were 154 instances where a pistol point occurred, and in eight instances, SMEs determined the pistol points were not necessary. In only one of those cases did the SME note that the supervisory chain of command appropriately addressed and referred the issue.

Based on review of the above-referenced policies, the Monitoring Team confirms that the CDP has achieved all of the requirements of this paragraph relative to the policy. A review of actions of CDP demonstrates general adherence to the policy. As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.** Review of additional cases to demonstrate adherence over time is necessary for the entire paragraph to be considered in Substantial and Effective Compliance.

### Paragraph 56
*Unholstering a firearm and pointing it at a subject constitutes a Level 1 reportable use of force and will be reported and investigated as such. The following exceptions to this reporting requirement will apply:*

   *a. Unholstering a firearm and pointing it at a subject constitutes a Level 1 reportable use of force and will be reported and investigated as such. The following exceptions to this reporting requirement will apply:*

   *b. SWAT Team Officers will not be required to report the pointing of a firearm at a subject as a use of force during the execution of SWAT Team duties; officers who are deputized and assigned to a Federal Task Force*

34

> will not be required to report the pointing of a firearm at a subject as a
> use of force when conducting federal task force operations during which
> a supervisor is present. Reports or forms regarding any such incidents
> that are otherwise prepared by a Task Force supervisor will be provided
> to CDP;
>
> c. officers assigned to the Gang Impact, Narcotics, Homicide, Sex Crimes,
> Domestic Violence, and Financial Crimes Units will not be required to
> report the pointing of a firearm at a subject as a use of force if done solely
> while entering and securing a building in connection with the execution of
> an arrest or search warrant and a supervisor prepares a report detailing
> the incident.

GPO 2.01.05 Use of Force – Reporting Section V., subsection C.2, specifically states that the unholstering and pointing of a firearm at a subject is considered a Level 1 reportable use of force. It further goes on to specifically list the reporting exceptions for SWAT, Federal Task Force Officers, and certain specialized unit members under the circumstances permitted by this paragraph.

The use of force reporting policy, GPO 2.01.05 defines unholstering and pointing a firearm as a reportable Level 1 use of force.  With the Consent Decree, reporting firearm points became a new requirement and consequently, the Division continues to report Level 1 firearms points as a separate category.  In the review of 2024 incidents, the Monitoring Team reviewed 273 use of force cases and found that in 56.4% of incidents (n=154) there was a firearm point.  In the 154 incidents examined, the Monitoring Team SMEs noted only eight cases where, in their view, a reasonable officer would not have believed the situation may escalate to create an imminent threat to serious bodily injury or death to the officer or another person.  Any noted differences in review by the Monitoring Team SMEs or any question on an officer's failure to report firearm points were communicated to the Chief in the regular meetings.  One of the procedural changes the Chief instituted as a result of the Monitoring Team's meetings was to begin regular reviews of the WCS of Level 1 use of force incidents.  The Monitoring Team plans to review additional cases to assess continued and expanded compliance, particularly when multiple officers are on scene and not all officers report their own firearm points.

Review of the GPO 2.01.05 and the reporting evidenced in the review conducted by the Monitoring Team confirms that the CDP has achieved all of the requirements and has updated the policies as needed.  The review of the 2024 cases also demonstrates that the CDP is adhering to the policy. As such, the Monitoring Team finds paragraph 56 in **General Compliance - 5.**  Additional review of cases to demonstrate adherence over time is necessary for the entire paragraph to be considered in Substantial and Effective Compliance.

*Paragraph 57*

35

*Officers will not fire warning shots.*

GPO 2.01.03 Use of Force – General, Section VIII, subsection A.9 specifically prohibits the firing of warning shots.  During the course of reviewing use of force incidents, the Monitoring Team found no cases of warning shots being fired by CDP officers.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph relative to creating and implementing the policy which has been effective over a substantial period of time.  Additional review of cases to demonstrate adherence over time is necessary for the entire paragraph to be considered in Substantial and Effective Compliance.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**  There have been changes, and this success demonstrates a year of good work.  As police experts, the Monitoring Team recognizes that one year of compliance is not sufficient to demonstrate the behaviors are "meaningfully adhered to...across time, cases, and/or incidents"[10] and not regressing.

### *Paragraph* **58**
*Officers will consider their surroundings before discharging their firearms and will avoid unnecessary risk to bystanders, victims, and other officers.*

GPO 2.01.03 Use of Force – General, Section VI., subsection D. states, "Officers shall consider their surroundings when unholstering or before discharging their firearm and shall avoid unnecessary risk to bystanders, victims, and other officers."

In the Monitoring Team review of use of force incidents, any time safety issues or potential tactical improvements were observed, that information was shared with the CDP.  The Monitoring Team also observed during Force Review Board meetings that FRB members addressed such lapses and required additional training as appropriate.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph relative to the policy.  Additional review of cases to demonstrate adherence over time is necessary for the entire paragraph to be considered in Substantial and Effective Compliance.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

### *Paragraph 59*
*Officers will not discharge a firearm from or at a moving vehicle, unless use of lethal force is justified by something other than the threat from the moving vehicle; officers will not intentionally place themselves in the path of or reach inside a*

---

[10] See chart on page 12 with Standard of Review definitions.

*moving vehicle; and, where possible, officers will attempt to move out of the path of a moving vehicle.*

GPO 2.01.03 Use of Force – General, Section VIII, subsections A. 12 and 13 prohibit officers from discharging a firearm from or at a moving vehicle unless deadly force is justified by something other than the threat of the moving vehicle and forbids reaching into or placing themselves in the path of a moving vehicle.

In review of the 273 incidents closed in 2024 plus the 47 Level 3 cases from 2023 and 2024, the Monitoring Team found only one instance of a violation of this policy.  This incident of an officer shooting at a moving vehicle was classified appropriately as a Level 3 use of force and was investigated by the FIT team.  Discipline was appropriately ordered.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph and the policy has been effective over a substantial period of time, with review and update as needed.  Additional review of cases to demonstrate adherence over time is necessary for the entire paragraph to be considered in Substantial and Effective Compliance.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

> **Paragraph 60**
> *CDP annually will provide at least 16 hours of firearms training which will include pistol, shotgun, and policy training. In consultation with the Monitor, the City will develop a plan to provide appropriate night, reduced light, and stress training for officers. Officers will successfully qualify with each firearm they are authorized to use or carry on-duty at least annually. Officers will be required to qualify using proficiency standards and will not be permitted to carry any firearm on which they failed to qualify.*

The Monitoring Team and DOJ review and approve the annual use of force training of the CDP before its instruction.  The Inservice Training (IST) curriculum includes instruction on pistol, shotgun, and policy training.  The content of the training and the delivery is consistent with the requirements of the Consent Decree.  Over time, the Monitoring Team has observed the use of force training improve – moving from class members' discussion resembling justification of force to a critical review and discussion of how force could be avoided.  Additionally, the CDP provides state mandated training on firearm use.  The 2025 IST training for requalification of pistol requalification includes shooting from the hip, one-handed shooting, emergency reloading of the pistol, and distance shooting (2 hours).  For the shotgun training, the instruction covers shooting the shotgun at various distances and loading and unloading the shotgun (2 hours).  A one-hour training block called Use of Force recertifies officers in ECW – the Division issued Taser.  In calendar year 2024, the CDP members participated in requalification of pistol and shotgun training

37

plus firearms training that consisted of scenario-based training including firearms policy.  The Training Section is unable to document 16 hours of firearms training in 2024.

The Monitoring Team reviewed the LMS training documentation dashboard with CDP assistance and determined that in 2024, 1091 members attended firearm training.  The internal system of the CDP involves a designated member of the Training Section who is responsible for running an episodic "incomplete" report to identify members how have not attended the required training.  The "incomplete" report run during the Monitoring Team's online review demonstrated that all CDP members who were required to attend training in 2024, attended training.  Following each in-service session, the Division offers an additional week for members who did not attend their scheduled session to attend a make-up session and ensures every member has attended the required training.  Additionally, the Division provides an "End of the Year" firearm training session to ensure that members who were unable to attend for various reasons, are trained.  This includes those members returning from an approved leave of absence.

There is no evidence that the CDP provided 16 hours of firearms-related training.  However, based on the review of the LMS Dashboard during a live demonstration, which provided evidence that all required members received training, the Monitoring Team finds paragraph 60 in **General Compliance – 5.**

> *Paragraph 61*
> *Officers will use Electronic Control Weapons ("ECWs") only where: (1) grounds for arrest or detention are present and the subject is actively or aggressively resisting, and lesser means would be ineffective; or (2) such force is necessary to protect the officer, the subject, or another party from immediate physical harm, and lesser means would be ineffective or have been tried and failed.*

CDP policy refers to Electronic Control Weapons as Conducted Electrical Weapons (CEW).[11] GPO 2.01.04 Intermediate Weapons Section A., subsections 1a. and b. state that CEWs shall only be used in either of the following situations:

    a.  Where grounds for arrest or detention are present and the subject is actively or aggressively resisting, and lesser means would be ineffective; or

    b.  Where such force is objectively reasonable, necessary, and proportional to protect the officer, the subject, or another party from immediate physical harm, and lesser means  would be ineffective or have been tried and failed.

---

[11] In this document, the phrase "Electronic Control Weapon" is used when referencing the language of the Consent Decree.  When referencing CDP policies, actions, and reviews, "Conducted Electrical Weapons" (CEW) will be used.

The review of the 2024 closed cases indicates that the CEW was used 20 times and that its use was in policy for 17 of those incidents.  In the out-of-policy incidents, the chain of command identified the issue and managed it appropriately.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this part of the paragraph and it has been effective over a substantial period of time.  The recent review also demonstrates adherence to the policy 17 of 20 times (85%) and when the policy was violated, the chain of command appropriately addressed the issue.   Additional review of cases to demonstrate adherence over time is necessary for the entire paragraph, in particular the adherence to policy, to be considered in Substantial and Effective Compliance.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

> ### *Paragraph 62*
> *Each standard 5-second ECW application is a separate use of force that officers must individually justify as reasonable. After the first ECW application, the officer will reevaluate the situation to determine if subsequent cycles are reasonable. In determining whether any additional application is reasonable, officers will consider that a subject may not be able to respond to commands during or immediately following an ECW application. Officers will not employ more than three cycles of an ECW against a subject during a single incident.*

GPO 2.01.04 Intermediate Weapons Section IV., subsection A.2.f. states that officers will consider each 5-second CEW cycle a separate use of force that they must individually justify and report as objectively reasonable**,** necessary, and proportional.  Subsection A.2.i. states that officers must reevaluate the situation after each CEW application to determine if subsequent cycles are reasonable, considering a subject may not be able to respond to commands during or immediately following a CEW application.   Subsection C.1. states that absent rare and exceptional circumstances, officers shall not exceed three 5-second CEW cycles in total on any one subject during a single incident.

In the review of the 2024 cases, the Monitoring Team found that CEW was used in 20 incidents. In all incidents, it was used three times or less. In one incident, a cycle was more than 5 seconds. In 13 of the 20 incidents, the officer reevaluated the situation after each CEW application to determine if subsequent cycles were reasonable, considering a subject may not have been able to respond to commands during or immediately following a CEW application.  Of the remaining seven incidents, in three the SME did not find a reevaluation before each subsequent use.  In the other four cases, the SME could not determine if a reevaluation was made.  In one case, the chain of command required additional training, in another, the SMEs note that due to the heavy outer layers of clothing the subject may not have been responsive, in another, the subject fled in a vehicle.  In two cases, the SME found the use was out of policy based on the totality of the circumstances.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph's policy requirements.  The Division is generally adhering to the policy and a review of additional cases is necessary to demonstrate adherence over time for the entire paragraph to be considered in Substantial and Effective Compliance.  In the review of the 20 instances, in only 65% of the incidents (13 of 20) can the Monitoring Team, with confidence, report the officer reevaluated the situation after each use. As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

### Paragraph 63
*Officers will consider transitioning to alternative control measures if the subject does not respond to ECW applications.*

GPO 2.01.04 Intermediate Weapons Section IV., subsection A.2.j. states that if after three CEW applications the subject has not become compliant, even temporarily, the officer shall assume that the CEW is ineffective and shall reassess and seek to transition to alternative control measures.

In the review of the 2024 closed cases, the Monitoring Team found that CEW was used in 20 incidents. In all incidents, it was used three times or less.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with the policy requirements of this paragraph.  In order for this paragraph to reach Substantial and Effective Compliance, additional review of cases to demonstrate adherence over time is necessary. As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.** There have been changes, and this success demonstrates a year of good work.  As police experts, the Monitoring Team recognizes that one year of compliance, and across a small number of cases, is insufficient to demonstrate the behaviors are "meaningfully adhered to...across time, cases, and/or incidents."[12]

### Paragraph 64
*Officers will not use ECWs in drive stun mode solely as a pain compliance technique. Officers may use ECWs in drive stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option.*

GPO 2.01.04 Intermediate Weapons Section IV., subsection B.1.a. prohibits officers from using the CEW in drive stun mode solely for pain compliance and further directs that drive stun mode

---

[12] See Standard of Review definitions in the chart on page 12 of this document.

only to be used to supplement the probe mode in order to complete the incapacitation circuit or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option.

In the review of the 2024 cases, the Monitoring Team found that CEW was used in 20 incidents, and none of those were in drive stun mode.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with the policy requirements of the paragraph.  In order for this paragraph to reach Substantial and Effective Compliance, additional review of cases to demonstrate adherence over time is necessary.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

> ### Paragraph 65
> *Officers will determine the reasonableness of ECW use based upon all the relevant circumstances, including the subject's apparent age, size, physical, and mental condition, and the feasibility of lesser force options.*

GPO 2.01.04 Intermediate Weapons Section IV., subsection A.2.c. states that officers shall determine the reasonableness of the CEW use and probe placement based on all the relevant circumstances, including the subject's apparent age, size, physical, and mental condition and the feasibility of lesser force options.

In the review of the 2024 closed cases, the Monitoring Team found that CEW was used in 20 incidents.  In 15 incidents, the CEW application was deemed objectively reasonable based on relevant circumstances, including the subject's apparent age, size, physical and mental condition, and the feasibility of lesser force options.  In two incidents, the CEW applications were deemed not reasonable, necessary, or proportional.  The Monitoring Team found in one of the incidents the subject was exhausted and exhibiting symptoms of physical or mental distress when the CEW was applied and in one of the incidents, the subject was of low body mass when the CEW was applied.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with the policy requirements of the paragraph.  Additional review of cases to demonstrate adherence over time is necessary for the next level of compliance.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

> ### Paragraph 66
> *Except where lethal force is authorized, officers will not use ECWs where: (1) a deployment may cause serious physical injury or death from situational hazards, including falling, losing control of a moving vehicle, or becoming ignited from the presence of potentially explosive or flammable materials or substances; or (2) the*

*subject is visibly pregnant, apparently elderly, a child, visibly frail, has obviously low body mass, or is in apparent medical crisis.*

GPO 2.01.04 Intermediate Weapons Section IV., subsection 3.B.a. prohibits officers from any CEW deployment that may cause serious physical injury or death from situational hazards, including but not limited to: falling, losing control of a moving vehicle, or becoming ignited from the presence of potentially explosive or flammable materials or substances, including OC spray unless deadly force is authorized. Subsection 3.B.b. includes the same prohibition for CEW use against any subject with obviously low body mass or in apparent medical crisis.

Further, GPO 2.01.04 Section I, subsection C.3. prohibits officers from using any intermediate weapons against small children, the elderly, individuals who are visibly frail, or women visibly or known to be pregnant, except where deadly force is authorized.

In the review of the 2024 cases, the Monitoring Team found that CEW was used in 20 incidents. A thorough review of those uses reveals the CDP is adhering to the policy. Where deployment could cause injury due to situational hazards as defined by the Consent Decree in section 1 of this paragraph, in two of the 20 incidents, the subject was in danger of falling when the CEW was applied. In no cases was the subject exposed to flammable material (such as gasoline or an alcohol-based pepper spray) when the CEW was applied, and in no cases was the subject in physical control of a moving vehicle when the CEW was applied. Adhering to the limited use based on individual characteristics as described in the paragraph, in one case the subject was of low body mass when the CEW was applied and in one incident, the subject was in an apparent medical crisis when the CEW was applied. In 0 of the 20 incidents, was CEW used against small children, the elderly, individuals who are visibly frail, or women visibly or known to be pregnant.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with policy requirements of the paragraph and additional case reviews to confirm that the CDP is adhering to the policy over time are necessary to demonstrate a higher level of compliance. As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

> ### *Paragraph 67*
> *Officers will not use ECWs on fleeing persons who do not pose a threat of physical harm to officers, other civilians, or themselves.*

GPO 2.01.04 Intermediate Weapons Section IV., subsection B.1.b. prohibits officers from using a CEW on fleeing subjects who do not pose a threat of physical harm to the officer, bystanders, or themselves.

In the review of the 2024 cases, the Monitoring Team found that CEW was used in 20 incidents. In 3 of the 20 incidents, the subject was fleeing from officers when the CEW was applied. In two

of the three incidents where the subject was fleeing, the subject posed a threat of physical harm to the officer, bystanders, or themselves when the CEW was used.  In the remaining incident, the use of the CEW on a fleeting subject was out of policy and identified by the chain of command with appropriate results.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with the policy requirements of the paragraph.  Additional review of cases to assess adherence to the policy over time is necessary to advance to the next level of compliance.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**


### Paragraph 68
*Officers will not intentionally target ECWs to a subject's head, neck, or genitalia.*

GPO 2.01.04 Intermediate Weapons Section IV., subsection B.2. specifically prohibits officers from intentionally targeting the CEW at a subject in sensitive tissue areas, such as the head, neck, or genitalia.

In the review of CEW use, there were no instances observed of CEW to a subject's head, neck, or groin area.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with the policy requirements of the paragraph.  A review of additional cases is needed to demonstrate CDP compliance with the policy over time is necessary for the higher rating.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**


### Paragraph 69
*Officers will not normally use ECWs on handcuffed or restrained persons. ECWs will be used on handcuffed or restrained persons only where the subject is displaying aggressive physical resistance and lesser means would be ineffective or have been tried and failed.*

GPO 2.01.04 Intermediate Weapons Section I., subsection C.4. prohibits officers from using any intermediate weapon on subjects who are handcuffed or otherwise restrained unless the subject is displaying aggressive physical resistance AND lesser means would be ineffective or have been tried and failed.

In the review of the 2024 cases, the Monitoring Team found that CEW was used in 20 incidents, and none of those were used on subjects who are handcuffed or otherwise restrained.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph and with demonstration of adherence over a longer time period will bring the paragraph to Substantial and Effective Compliance.  At this time, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

> ### Paragraph 70
> *Officers will carry ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm.*

GPO 2.01.04 Intermediate Weapons Section IV. Subsection 2.a. states that officers shall carry the CEW in a Division issued holster, on the opposite side of the firearm, to reduce the chances of accidentally drawing and/or firing a firearm.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph and it has been effective over a substantial period of time.  As such, the Monitoring Team rates this paragraph as being in **Substantial and Effective Compliance - 6.**

> ### Paragraph 71
> *Officers will be trained in and follow protocols developed by the City, in conjunction with the City's EMS professionals, on the officer's responsibilities following ECW use, including:*
>   a. *restrictions on removing ECW probes, including the requirements described in the next paragraph;*
>   b. *understanding the risks of positional asphyxia, and using restraint techniques that do not impair the subject's respiration following a ECW application;*
>   c. *monitoring all subjects who have received an ECW application while in police custody; and*
>   d. *informing medical personnel of all subjects who have been subjected to multiple ECW applications, including prolonged applications (more than 15 seconds); or who appear to be under the influence of drugs or exhibiting symptoms associated with excited delirium; or who were kept in prone restraints after ECW use.*

The Monitoring Team reviewed the LMS records with CDP assistance and determined that in 2024, all CDP members attended CEW training.  Additionally, in 2024, all recruits were required to attend and did complete the required CEW training in accordance with both the state as well as the Division's requirements.  To confirm attendance of all members at the required training, CDP has a designated member who is responsible for running an "incomplete" report to determine who has not attended the required training.  The "incomplete" report determined that CDP members who were required to attend training in 2024, attended training.  Following each in-service session,

44

the Division offers an additional week for members who did not attend their scheduled session to ensure everyone has attended the required training.  The Division also provides an "End of the Year" training session to ensure that members who were unable to attend for various reasons, including approved leave of absence, are able to attend.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph and the policy has been effective across a substantial period of time.  As such, the Monitoring Team rates this paragraph as being in **Substantial and Effective Compliance - 6.**

> ### Paragraph 72
> *The City will ensure that all subjects who have been exposed to an ECW application receive a medical evaluation by emergency medical responders in the field or at a medical facility.  Absent exigent circumstances, probes will be removed from a subject's skin only by medical personnel or properly trained officers.*

GPO 2.01.04 Intermediate Weapons Section IV., subsection D.1.a. requires officers to call EMS without delay to evaluate any subject exposed to a CEW deployment.  That subsection also requires that CEW probes be removed only by EMS, medical personnel at a medical facility or a CEW qualified officer.

In the review of the 2024 cases, the Monitoring Team found that CEW was used in 20 incidents. In 13 of the 20 incidents, after deployment, the involved officer(s) notified EMS to respond and convey the subject(s) to the hospital for medical treatment and evaluation per GPO 2.01.04.  In five incidents, no notification to EMS is apparent.  In three of those cases the subject fled, and in one, the subject was not impacted due to heavy clothing.  In the other two cases, the SMEs were unable to be determined if calls were made for EMS.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with the policy requirements of the paragraph.  Additional reviews are necessary to demonstrate adherence to the entire paragraph over time.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

> ### Paragraph 73
> *In addition to the force reporting requirements outlined in paragraph 88, officers will clearly articulate and justify the following regarding their ECW use in a written narrative:*
> > a.  *each and every ECW cycle used on a subject or attempted against a subject;*
> > b.  *use of the ECW in drive stun mode;*
> > c.  *ECW application for more than 15 seconds;*
> > d.  *continuous cycling of an ECW;*
> > e.  *ECW application on a fleeing person; and*

45

> *f.  ECW application by more than one officer.*

The requirements of this paragraph are listed in GPO 2.01.05 Section V, subsection A.1-6 which states:

> Officers deploying their *conducted electrical weapon* (CEW) shall clearly articulate in their use of force entry justification for the following:
>
> > 1. Each CEW cycle of any length used on a subject or attempted on a subject.
> > 2. Use of the CEW in drive stun mode.
> > 3. Each CEW cycle in excess of three, five second CEW cycles in total on any one subject during a single incident.
> > 4. Continuous cycling of the CEW beyond five seconds.
> > 5. Use of the CEW on a fleeing subject.
> > 6. CEW application by more than one officer.

In the review of the 2024 cases, the Monitoring Team found that CEW was used in 20 incidents. In only one incident, the involved officer's use of force reporting did not include justification for every use of force and in one incident the CEW was used on a fleeing subject.  All other incidents were in compliance.  In the two instances, the chain of command identified out of policy actions and took appropriate actions.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph as it relates to the completeness of the policy, and the policy has been effective over a substantial period of time.  Review of the cases also demonstrates that CDP members adhere to the policy the vast majority of the time.  In two instances, the chain of command identified out of policy actions and took appropriate actions.  To achieve a higher level of confidence in continued compliance, additional review of cases over time is necessary.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

> **Paragraph 74**
> *Officers who have been issued ECWs will receive annual ECW certifications, which will consist of physical competency; weapon retention; CDP policy, including any policy changes; technology changes; and scenario-based training.*

With CDP assistance, the Monitoring Team reviewed the LMS documentation online and determined that in 2024, 1091 members attended CEW recertification.  There were no members on the list that were required to attend, who did not attend the required training.  When the number trained is not precisely the same as the current complement of sworn personnel, the CDP is able to explain that difference with long term leaves such as family, injury, medical, or military leaves.

46

The Training Section supports a designated member who is responsible for running an "incomplete" report to determine who has not attended the required training. The "incomplete" report determined that CDP members who was required to attend training in 2024, attended training. Following each in-service session, the Division offers an additional week for members who did not attend their scheduled session to ensure everyone has attended the required training. The Division also provides an "End of the Year" training session to ensure that members who were unable to attend for various reasons, including approved leave of absence, complete their required training. This is an annual requirement and as such, necessitates ongoing review. The Monitoring Team finds the CDP is in **General Compliance - 5** with this paragraph.

### Paragraph 75
*The City will develop and implement integrity safeguards on the use of ECWs to ensure compliance with CDP policy. CDP will conduct quarterly downloads of all ECWs. The City will conduct random and directed audits of ECW application data, which will be provided to the Monitor for review. The audits should include a comparison of the downloaded data to the officer's Use of Force Reports. Discrepancies within the audit should be addressed and appropriately investigated.*

CDP transitioned to a new Taser (CEW) model in quarter 4 of 2022. The CEW data is downloaded each time the device charges. The information is stored in Evidence.com under individual officers assigned to each device. CDP reports that it does not currently have the ability to provide the documentation of quarterly downloads of all CEW use. As such, the Division is not conducting random and directed audits of CEW application data, nor are the data being provided to the Monitor. Specifically, CDP could neither provide CEW download information in one document nor provide an audit that showed comparison data related to CEW uses versus what was documented in use of force reports as required. While there may be data in Evidence.com, the CDP is not compiling it in a way that this paragraph requires. The Monitoring Team rates this paragraph as being **Non-compliant – 0.**

### Paragraph 76
*ECW application data will be tracked and analyzed in CDP's Officer Intervention Program.*

CDP reports that CEW application is tracked by individual use only in IAPro/Blue Team and combined with other uses of force it is tracked at Employee Assistance along with other indicators that trigger the Officer Intervention Program (OIP). CDP is currently working on a revision of its

OIP processes, policies and procedures as a result of the Benchmark[13] implementation.  As such, the Monitoring Team rates this paragraph as **Partial Compliance-Planning/Policy Stage - 2.**

> *Paragraph 77*
>
> *Officers will apply OC spray only: (1) when such force is reasonable to protect the officer, the subject, or another party from physical harm and lesser means would be ineffective; or (2) for crowd dispersal or protection and other means would be more intrusive or less effective.*

GPO 2.1.04 Intermediate Weapons Section III., subsection A.1. states that officers are only authorized to deploy OC spray where grounds for an arrest or detention are present and the subject is actively or aggressively resisting and lesser means would be ineffective; or where such force is objectively reasonable, necessary, and proportional to protect the officer, the subject, or another party from immediate physical harm, and lesser means would be ineffective; or for crowd dispersal or protection and other means would be more intrusive or less effective.

In the Monitoring Team's review of 273 incidents from 2024, there were only two instances of OC spray. Both incidents followed this policy.  CDP has reported a lower use of OC spray during the review period.  The Monitoring Team needs to determine if this is a new baseline of OC spray, and if the Team determines that it is, then continued compliance will need to be found in future reviews. If the Monitoring Team determines that this low frequency of OC Spray usage was an anomaly in 2024, then future years will need to also demonstrate consistent compliance over the greater number of usages.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph and is following the policy in current practice.  Both incidents were found to be reasonable, necessary, and proportional.  Additional reviews over time or number of cases is necessary for the Monitoring Team to determine ongoing adherence to the policy.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

> *Paragraph 78*
>
> *After one standard OC spray (one second), each subsequent application is a separate use of force that officers must individually justify as reasonable.*

GPO 2.1.04 Intermediate Weapons Section III., subsection A.5. states that officers shall consider each one-second application as a separate use of force that the officer shall individually justify and report as objectively reasonable, necessary, and proportional.

---

[13] Benchmark Analytics is the provider for online solutions being implemented for both the Officer Intervention Program and the Performance System.

In the Monitoring Team's review of 273 incidents from 2024, there were only two instances of OC spray.  Both incidents followed this policy.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph and is following the policy in current practice.  Additional reviews over time or number of cases are necessary for the Monitoring Team to determine ongoing adherence to the policy.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

> **Paragraph 79**
>
> *Officers will not normally use OC spray on handcuffed or restrained persons. OC spray will be used on handcuffed or restrained persons only where the subject is displaying aggressive physical resistance and lesser means would be ineffective or have been tried and failed.*

GPO 2.01.04 Intermediate Weapons Section I., subsection C.4. prohibits officers from using any intermediate weapon on subjects who are handcuffed or otherwise restrained unless the subject is displaying aggressive physical resistance AND lesser means would be ineffective or have been tried and failed.

In the Monitoring Team's review of 273 incidents from 2024 there were only 2 instances of OC spray.  Both incidents followed this policy.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph and is following the policy in current practice.  Additional reviews over time or number of cases are necessary for the Monitoring Team to determine ongoing adherence to the policy.  As such, the Monitoring Team rates this paragraph as being in **General Compliance - 5.**

> **Paragraph 80**
>
> *Officers will be trained in and follow protocols developed by the City in conjunction with the City's EMS professionals, on the officer's responsibilities following OC spray use, including:*
>
>     *a. decontaminating every subject exposed to chemical spray by using cool water to flush the subject's face and eyes within 20 minutes of gaining control of the scene. Officers need not decontaminate subjects who were only secondarily exposed to OC spray, for example, when OC spray is used for crowd control, unless requested by the subject;*
>
>     *b. understanding the risks of positional asphyxia, and using restraint technique that do not impair the subject's respiration following an OC spray application;*

      *c. requesting medical response or assistance for subjects exposed to OC spray when they complain of continued effects after having been decontaminated, or they indicate that they have a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, heart ailment, etc.) that may be aggravated by OC spray.*

In the review of the cases closed in 2024, the Monitoring Team found only two instances of the use of OC spray.  The review of the two instances revealed in one case those affected by the OC spray left the scene immediately and in the other incident, those subjects refused treatment.  In both incidents, the Monitoring Team found that the use of OC spray was reasonable, necessary, and proportional.  All other conditions of this paragraph were met in practice.  The Monitoring Team finds the CDP in **General Compliance - 5.**

### Paragraph 81
*Officers will carry only CDP issued OC spray.*

GPO 2.1.04 Intermediate Weapons Section I., subsection A.1. states that Officers shall carry only weapons that are issued by the Division.

Review of this policy by the Monitoring Team confirms that the CDP is in compliance with this paragraph and the policy has been effective over a substantial period of time.  As such, the Monitoring Team rates this paragraph as being in **Substantial and Effective Compliance - 6.**

### Paragraph 82
*CDP will maintain documentation of the number of OC spray canisters distributed to and utilized by each officer.*

CDP indicated that since 2018 they maintain documentation of the number of OC canisters distributed to each officer in OP IQ software.  Provided in PDF format as evidence of compliance, the materials are incomplete and unclear.  The report lists officer names and with multiple canisters issued, it is impossible to discern the documentation of the spent canisters' return.  The list contains names of employees, units of assignment, locations where the OC spray was distributed, check-in and check-out date/time and check-in notes.  There are many blank lines without explanation.  The documentation provided by CDP does not meet the requirements of paragraph 82.  As such, the Monitoring Team rates this paragraph as **Partial Compliance-Planning/Policy Stage - 2.**

### Paragraph 83
*OC spray application data will be tracked and analyzed in CDP's Officer Intervention Program.*

50

CDP reports that OC spray application is tracked by individual use only in IAPro/Blue Team and combined with other uses of force, it is tracked at the CDP's Employee Assistance Unit (EAU) with other indicators that trigger the Officer Intervention Program (OIP).  CDP is currently working on a revision of its OIP processes, policies and procedures as a result of the Benchmark implementation.  As such, the Monitoring Team rates this paragraph as **Partial Compliance-Planning/Policy Stage - 2.**

### C.  USE OF FORCE TRAINING

*Paragraph 84*

*As part of its training requirements in Section XI of this Agreement, within 365 days of the Effective Date, CDP will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes:*

    *a.  proper use of force decision-making;*

    *b.  use of force reporting requirements;*

    *c.  the Fourth Amendment and related law;*

    *d.  de-escalation techniques, both verbal and tactical, that empower officers to make arrests without using force and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, using cover, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;*

    *e.  role-playing scenarios and interactive exercises that illustrate proper use of force decision-making, including training on the importance of peer intervention;*

    *f.  the proper deployment and use of all intermediate weapons or technologies;*

    *g.  the risks of prolonged or repeated ECW exposure, including that exposure to ECWs for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious physical injury;*

    *h.  the increased risks ECWs may present to a subject who is pregnant, elderly, a child, frail, has low body mass, or is in medical crisis;*

    *i.  that when using an ECW the drive stun mode is generally less effective than the probe mode and, when used repeatedly, may exacerbate the situation;*

    *j.  firearms training, as described in paragraph 60;*

    *k.  factors to consider in initiating or continuing a vehicle pursuit; and*

    *l.  for supervisors of all ranks, as part of their initial and annual in-service supervisory training, training in conducting use of force investigations; strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force; and supporting officers who report unreasonable or unreported force, or who are retaliated against for attempting to prevent unreasonable force.*

The Monitoring Team and DOJ reviewed and approved a comprehensive training curriculum for Use of Force in April 2019.  This 8-hour Use of Force Training curriculum improved upon the 2017 training by using exercises and scenarios focused on both officer and public safety while following the requirements of CDP policy and the Constitution of the United States.  This 2019 training addressed the list of topics required by this paragraph including decision-making, reporting, de-escalation techniques, the proper use of intermediate weapons, and did so with realistic and engaging scenarios.  Training for supervisors pursuant to the paragraph requirements was also completed.[14]  The Monitoring Team reviews and approves all Consent Decree related training annually, including use of force training.

Annually, CDP provides a Training Needs Assessment as well as a Training Plan available on both the Division's and Monitoring Team websites from 2022.  In 2023, CDP began submitting a three-year plan which includes the schedule and content overview for all training contemplated for a rolling three-year period.  The plan submitted in 2023 covered 2023-2025, the 2024 plan includes 2025 and 2026.

During an on-site visit, the Monitoring Team confirmed that all training, to include Use of Force training, is tracked in the CDP Learning Management System (LMS).  Within LMS, each officer is identified using their employee identification number, hire date, current assignment and rank.  As of 2023, all training received throughout the year is captured beginning with recruit academy and moving forward.  Prior to 2023, recruit academy training was not captured in LMS; however, CDP training staff is retroactively entering this information for all employees.

The Monitoring Team finds this paragraph to be in **Substantial and Effective Compliance - 6.**

> ### *Paragraph 85*
> *CDP also will provide the use of force training described in Paragraph 84 to all new officers as part of its training Academy.*

During an on-site visit, the Monitoring Team confirmed that all training, including Use of Force training, is tracked within the CDP LMS.  Within LMS, each officer, including new officers, is identified using their employee identification number, hire date, current assignment and rank.  As of 2023, all training received throughout the year is captured beginning with recruit academy and moving forward.  Prior to 2023, recruit academy training was not captured in LMS; however, CDP training staff is retroactively entering this information for all employees.

The Monitoring Team finds this paragraph to be in **General Compliance - 5.**

---

[14] 2019 UOF Training
https://static1.squarespace.com/static/5651f9b5e4b08f0af890bd13/t/5d810947c8bd9f71b9021868/1568737607993/Ex+A+UOF.pdf

*Paragraph 86*
*CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope.*

The Monitoring Team and DOJ reviewed and approved a comprehensive Use of Force training curriculum in April of 2019.  This training included annual Use of Force in-service training.  The training provided was adequate in quality, quantity, type and scope as required by this paragraph.

During an on-site visit, the Monitoring Team confirmed that all in-service related to Use of Force is tracked within the CDP LMS.  Within LMS, each officer is identified using their employee identification number, hire date, current assignment and rank.  The CDP must ensure that the annual training received meets the Consent Decree requirement of "adequate quality, quantity, type, and scope" which includes 16 hours in accordance with paragraph 60 .

Because this is an annual training requirement, adherence will be assessed annually. The Monitoring Team finds this paragraph to be in **General Compliance - 5.**

### D.  USE OF FORCE REPORTING POLICY & USE OF FORCE REPORTS

*Paragraph 87*
*Within 365 days of the Effective Date, CDP will develop and implement a single, uniform, reporting system pursuant to a Use of Force Reporting policy. CDP uses of force will be divided into three levels. The three levels for the reporting, investigation, and review of use of force correspond to the amount of force used and/or the outcome of the force. This Agreement's categorization of these types of uses of force is based on the following factors: potential of the technique or weapon to cause injury; degree of injury caused; degree of pain experienced; degree of disability experienced by the subject; complaint by the subject; degree of restraint of the subject; impairment of the functioning of any organ; duration of force; and physical vulnerability of the subject. Each level of force will require increasingly rigorous reporting, investigation, and review. The levels of force are defined as follows:*

> *a.  Level 1 is force that is reasonably expected to cause only transient pain and/or disorientation during its application as a means of gaining compliance, including pressure point compliance and joint manipulation techniques, but that is not reasonably expected to cause injury, does not result in an actual injury, and does not result in a complaint of injury. It does not include escorting, touching, or handcuffing a person with no or minimal resistance. Unholstering a firearm and pointing it at a subject is reportable as a Level 1 use of force with the exceptions set forth in paragraph 56.*

53

      b.   *Level 2 is force that causes an injury, could reasonably be expected to cause an injury, or results in a complaint of an injury, but does not rise to the level of a Level 3 use of force. Level 2 includes the use of an ECW, including where an ECW is fired at a person but misses; OC Spray application; weaponless defense techniques (e.g., elbow or closed-fist strikes, kicks, leg sweeps, and takedowns); use of an impact weapon, except for a strike to the head, neck or face with an impact weapon; and any canine apprehension.*

      c.   *Level 3 is force that includes: (1) uses of lethal force; (2) uses of force resulting in death or serious physical injury; (3) uses of force resulting in hospital admission; (3) all neck holds; (4) uses of force resulting in a loss of consciousness; (5) canine bites; (6) more than three applications of an ECW on an individual during a single interaction, regardless of the mode or duration of the application, and regardless of whether the applications are by the same or different officers, or an ECW application for longer than 15 seconds, whether continuous or consecutive; and (7) any Level 2 use of force against a handcuffed subject.*

The requirements of this paragraph have been in General Compliance since 2022.  It is being listed in this report to document elevating the rating to **Substantial and Effective Compliance - 6.**

      ***Paragraph 88***
      *All officers using or observing force will report in writing, before the end of their shift, the use of force in a Use of Force Report. The Use of Force Report will include: (1) a detailed account of the incident from the officer's perspective; (2) the reason for the initial police presence; (3) a specific description of the acts that led to the use of force; (4) the level of resistance encountered; and (5) a complete and accurate description of every type of force used or observed. The use of force reporting policy will explicitly prohibit the use of conclusory statements, "boilerplate," or "canned" language (e.g., "furtive movement" or "fighting stance"), without supporting detail.*

GPO 2.01.05 Use of Force – Reporting states officers, "by the end of their tour of duty, complete and forward to the reviewing/investigating supervisor an individual use of force entry in the use of force tracking software, providing a detailed account of the incident from the officer's perspective and including all of the following information:

      a. The reason for the initial police presence.
      b. A specific description of the acts that preceded the use of force including attempts to de-escalate.
      c. The level of resistance encountered.
      d. A complete and accurate description of every type of force used or observed."

Additionally, GPO 2.01.05, in accordance with paragraph 88, specifically prohibits the use of "conclusory statement, 'boilerplate' or 'canned language (e.g., furtive movement, fighting stance, etc.) without supporting details that are well articulated...."  The policy language complies with the requirements of the Consent Decree.

The assessment of the 273 cases closed in 2024 included a review of actual adherence to the policy requirements.  Specifically for this paragraph, the SMEs examined the timeliness of officers' submitting their use of force reports based on when the incident occurred and the date an officer's report is entered into Blue Team.  The data in the SME's possession was limited to the date of the incident and the date the report was entered.  The Monitoring Team is using the one day filing as a proxy for the end of shift recognizing that some shifts begin and end on different days.  The assessment determined that 250 of 273 Use of Force Reports were completed by officers within one day.  Based on the 91% adherence to the policy, the Monitoring Team finds paragraph 88 to be in **General** **C**ompliance **- 5**.

> ### Paragraph 89
> *Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports.*

GPO 2.01.05 Use of Force– Reporting states, "Officers shall be subject to the disciplinary process, up to an including termination, for material (significant) omissions or misrepresentations in their use of force reports, regardless of whether the force was objectively reasonable, necessary and proportional."

To assess paragraph 89, the Monitoring Team requested evidence demonstrating that when officers have material omissions or misrepresentations in their Use of Force Reports or failed to report a use of force, the officers are subjected to the disciplinary process.  The responsive documents included a listing of 23 Use of Force Investigations from 2018-2025 with GPO 2.01.05 violations.  The Monitoring Team reviewed the corresponding Use of Force Reports in IAPro.  The review revealed that two of the Use of Force Investigations, one from 2018 and the other from 2025, supported the fact that officers were subjected to the disciplinary process when material omissions or misrepresentations of a Use of Force occurred.  Based on these findings, the Monitoring Team deems paragraph 89 to be in **General Compliance - 5**.

> ### Paragraph 90
> *Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable.*

GPO 2.01.05 Use of Force – Reporting Section VII., subsection B. states, "Officers who use or observe force and fail to report it shall be subject to the disciplinary process, up to and including termination, regardless of whether the force was objectively reasonable, necessary and proportional."

To assess paragraph 90, the Monitoring Team requested evidence demonstrating that officers who use or observe force and then fail to report it are subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable.  The responsive documents included a listing of 23 Use of Force Investigations from 2018-2025 with GPO 2.01.05 violations. The Monitoring Team reviewed all 23 cases in IAPro.  Of the 23 cases, 20 involved members who were subjected to the disciplinary process for failure to report a use of force.  Of the 20 cases, three were from 2022, eight were from 2023, seven were from 2024 and two were from 2025.  The review supports that officers are subjected to the disciplinary process when they use or observe force and then fail to report it.  It is worth noting that in the Monitoring Team review of the cases closed in 2024, the Team identified unreported pistol points and brought those to the attention of the Chief in the regular meetings.

Based on the review, CDP continues to hold officers accountable through the disciplinary process when they fail to report a use of force; therefore, the Monitoring Team deems paragraph 90 to be in **General Compliance - 5**.  The Monitoring Team recommends that the CDP include in their random reviews of the WCS a specific requirement to review unreported uses of force as well as other policy violations related to use of force.


> ### *Paragraph 91*
> *Officers who use or observe force will notify their supervisors, or ensure that their supervisors have been notified, as soon as practical following any use of force. An officer who becomes aware of an allegation of unreasonable or unreported force by another officer must immediately notify his or her supervisor of that allegation.*

GPO 2.01.05 – Use of Force- Reporting Section I, subsections A. and B. requires that officers who use or witness force shall request that a supervisor respond to the scene as soon as practical following any use of force, except for de minimis force.  It further states that an officer who becomes aware of an allegation of unreported, unreasonable, unnecessary or disproportionate force by another officer shall immediately notify their supervisor of that force or allegation.

Of the cases reviewed, 230 of 273 cases were immediately reported to a supervisor.  Of those not reported immediately, officers in seven cases provided justification for failure to immediately report.

Based on the review, CDP reports use of force incidents to supervisors in accordance with policy and the requirements of the Consent Decree; therefore, the Monitoring Team deems paragraph 91 to be in **General Compliance - 5**.

### Paragraph 92
*Use of Force Reports will be maintained centrally.*

Use of Force Reports are maintained centrally in the IAPro software system.  This software has been utilized by CDP for tracking Use of Force Investigations and documentation since 2016. Multiple reviews of Use of Force Reports by the Monitoring Team find that the IAPro software system provides accurate and detailed tracking of use of force and other internal investigation cases. Based on the consistent use of this software over a substantial period of time, the Monitoring Team rates this paragraph as being in **Substantial and Effective Compliance - 6.**

### E.  USE OF FORCE INVESTIGATIONS

### Paragraph 93
*A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval.*

GPO 2.01.06 Use of Force Supervisory Reviews & Investigations states, "A supervisor who was involved in any Level 1 or 2 use of force by witnessing, participating in, or ordering the use of force shall not review or investigate the incident and shall not review the Use of Force entries for approval or disapproval."

Of the 273 incidents reviewed there were 25 incidents in which supervisors used force. The assessment revealed that contrary to policy, in 14 of those 25 cases, a supervisor who was involved in a use of force investigated the incident or reviewed the Use of Force Reports for approval or disapproval.  Strict attention and adherence to the requirement that an uninvolved supervisor review the use of force is required to raise the compliance assessment for this paragraph.  Based on the review and, in a clash with policy, over 50% of involved supervisors investigated a use of force incident in which they were involved, the Monitoring Team deems paragraph 93 to be in **Operational Compliance - 4.**

### 1.  Investigations of Level 1 Uses of Force

### Paragraph 94

57

> *The direct supervisor of the officer(s) employing a Level 1 use of force will review and approve the use of force in writing, return the Use of Force Report to the officer for revision, or elevate the Level 1 use of force before the end of the supervisor's shift following the shift on which the Level 1 force was used. If the Use of Force Report is returned to the officer for revision, all revisions and additional reviews will be completed within 5 days of the use of force. It is not mandatory for supervisors to report to the scene of a Level 1 use of force. Supervisors will elevate and investigate any Level 1 use of force that appears to have violated policy or was improperly categorized as a Level 1 use of force. If a supervisor determines that an officer's report reveals evidence of a use of force involving potential criminal conduct, he or she will immediately notify Internal Affairs.*

GPO 2.01.06 Use of Force – Supervisory Reviews and Investigations states that supervisors shall "address any concerns with the use of force entry, returning the use of force entry to the officer for needed revisions.  If a use of force entry is returned to the officer for revision, all revisions and additional reviews will be completed within 5 days of the use of force."  This policy further states that, "within five tours of duty of the use of force, the investigating supervisor shall complete and document his/her investigation within the use of force entry.  Any extension to this deadline must be authorized by a commander via email"

In accordance with the policy, officers use the IAPro interface to report uses of force in Blue Team.  Once entered, the system queues the supervisor to review the submitted force report.  Once approved, the chain of command is triggered to review the report in IAPro.  Any issues with completion or required revisions are returned to the officer using this system and the report does not advance for further review.

If a supervisor is not already on scene, GPO 2.01.06 requires the officer using force to request a supervisor.  The supervisor is required to conduct a "complete, thorough, and impartial review/investigation...."  This same policy requires supervisors to report any evidence of potential criminal conduct to FIT immediately.

To assess whether reports were submitted within the mandated time period, the Monitoring Team determined that 84.75% of cases were received by the supervisor within 1 day of the report being submitted based on the date of the incident and the date the investigation was received by the supervisor.

The assessment did not have the means to assess whether supervisors quickly return inadequate reports to officers and whether officers quickly address supervisor comments.  SMEs described four incidents where the reviewing supervisor identified conduct that deserved elevating the level of force or there were other issues with the initial report.  In each instance, the report was returned to the officer in a timely fashion for correction.

Based on the review of policy and behavior, the Monitoring Team finds this paragraph in **General Compliance - 5.**

### 2. *Investigation of Level 2 Uses of Force*

***Paragraph 95***
*The direct supervisor of the officer(s) using force, upon notification of a Level 2 use of force incident or allegation of excessive force, will respond to the location of the occurrence. Where the force is a Level 1 but the subject has alleged excessive force, the supervisor will respond to the scene to determine whether a Level 1 or Level 2 investigation should be conducted.*

GPO 2.01.06 Use of Force – Supervisory Reviews and Investigations states, "(f)or all Level 2 use of force responses and Level 1 use of force responses alleging excessive force, the responding supervisor shall, as soon as practical and no later than by the end of their tour of duty."

The assessment revealed that there were 93 cases that were determined to be Level 2 use of force incidents or allegations of excessive force.  Of those, a supervisor was notified immediately in 94.62% of cases and there was a supervisor on the scene at the time the force was applied in 23.66% of cases.  The assessment did not specifically review whether a supervisor responded to the scene, though a review of Monitoring Team SME comments regarding supervisor responses finds that no comments describe supervisors not responding to the scene and 14 noting specifically that the supervisor did respond to the scene.

Based on the fact that supervisors respond to the location of a use of force when it is a Level 2 use of force or an allegation of excessive force, the Monitoring Team finds cause for paragraph 95 to be elevated to **General Compliance - 5.**

***Paragraph 96***
*If a CDP supervisor uses a Level 2 use of force, a supervisor of a higher rank will respond to the location of the occurrence and comply with the requirements of this section.*

GPO 2.01.06, effective March 2023 states, "If a supervisor uses Level 2 force, a supervisor of a higher rank shall respond to the location of occurrence and comply with the requirements of this section.  If necessary, supervisors from neighboring districts may be contacted for this purpose."

The assessment revealed that eight use of force Level 2 cases involved supervisors.  Of those cases, there was an on-scene supervisor in all eight cases though it was not assessed as to whether the

supervisor was of a higher rank. In addition, the SME positively determined that a supervisor of higher rank reviewed the facts of the case in all eight cases.

Based on the assessment of paragraph 96, when a supervisor uses Level 2 force, an additional supervisor responded to the location and a superior reviewed the facts of the case, the Monitoring Team finds paragraph 96 to be in **General Compliance - 5.**

> ### *Paragraph 97*
> *For all Level 2 uses of force, the direct supervisor will:*
> a. *respond to the scene, examine the subject of the force for injury, and interview the subject for complaints of pain after advising the subject that the interview pertains only to the use of force and not to any underlying alleged crime and that the subject need not answer questions;*
> b. *where appropriate, ensure that the subject receives medical attention from an appropriate medical provider;*
> c. *obtain an identifying number that allows CDP to track the use of force;*
> d. *identify and collect all evidence relevant to the use of force and evaluate that evidence to determine whether the use of force: (1) was consistent with CDP policy; and/or (2) raises any policy, training, tactical, or equipment concerns;*
> e. *ensure that all evidence that could establish material facts related to the use of force, including audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;*
> f. *ensure that a canvass for civilian witnesses is conducted and interview all civilian witnesses. Supervisors will either record the interview or encourage civilian witnesses to provide and sign a written statement in their own words;*
> g. *ensure that all officers witnessing a use of force incident by another officer complete a Use of Force Report. Supervisors will ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;*
> h. *ensure that involved officers are interviewed separately from one another. Group interviews will be prohibited. Supervisors will not ask officers or other witnesses leading questions that suggest legal justifications for the officers' conduct, where such questions are contrary to appropriate law enforcement techniques; and*
> i. *each investigating supervisor will provide a brief written synopsis to their immediate supervisor, which will be forwarded through the chain of command to the District Commander by the end of the shift on which the force occurred, documenting the supervisor's preliminary determination of the appropriateness of the use of force.*

All of the requirements of paragraph 97 are outlined in GPO 2.01.06 Use of Force – Supervisory Reviews and Investigations. The policy indicates the required duties of an investigating supervisor

who responds to a use force that is determined to be Level 2.  An assessment was conducted on paragraph 97 and revealed the following:

a. In 83 of 93 incidents identified as Level 2 by the reporting officer, the officer inspected the subject for injury or complaints of pain as a result of the force.  SMEs also evaluated if "another officer or supervisor" inspected the subject for injuries or complaints of pain resulting from the use of force.  The SMEs note four cases where the additional inspection was conducted.

b. In 15 cases, officers or supervisors provided necessary medical care while awaiting professional medical care providers.  In the other cases, SMEs noted that emergency first aid was not necessary or, as in one incident, the SME could not determine if care was needed or provided.  In addition, of the 50 cases where the SME determined an EMS should have been requested, EMS was requested in 49 incidents.

c. CDP tracks all use of force incidents in IAPro by assigning an individual report number to each use of force report.  A single use of force is numbered as an incident, which may include multiple use of force numbers.  There are also different tracking numbers for the same incident created by FIT, the FRB, and District Based Investigations (DBI).  IA tracking relies on the IAPro CDP number.

d. In 84 of 93 cases (90.23%) SMEs determined that the supervisor investigation was objective and complete.  Furthermore, in 89 of 93 cases (95.70%), SMEs determined that the investigation's findings were supported by a preponderance of the evidence.

e. In 86 of 93 cases (92.5%), SMEs determined that all relevant evidence that could assist in resolving inconsistencies or improving the reliability or credibility of the investigation was collected.

f. SMEs noted that supervisors on scene often instructed officers to look for witnesses and additional video (non WCS) around the scene.

g. In 82 of 93 cases (90.32%), SMEs reported that officers present completed the required narrative statement.

h. SMEs reported that there were two cases where supervisors failed to interview officers separately.

i. The SMEs noted that as part of the regular process, supervisors did complete a synopsis and forward it via the chain of command.  The review did not specifically consider the timeliness of the completion of the synopsis and did not include specific questions regarding the timely compliance of supervisor review.

The Monitoring Team finds paragraph 97 to be in **General Compliance - 5.**

***Paragraph 98***
*The investigating supervisor will ensure that all Use of Force Reports include the information required by this Agreement and CDP policy; consider all relevant*

*evidence, including circumstantial, direct, and physical evidence, as appropriate; and make credibility determinations, if feasible. Supervisors will make all reasonable efforts through the investigation to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force claimed by the officer and the subject's injuries, and inconsistencies between multiple officers. CDP will train all investigating supervisors on how to effectively complete these tasks.*

GPO 2.01.05 Use of Force – Supervisory Reviews and Investigations, Section V., subsection B. requires that supervisors ensure use of force reports include all required information; make all reasonable efforts through the review process to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force claimed by the officer and the subject's injuries, and any inconsistencies between multiple officers; consider all relevant evidence, including circumstantial, direct and physical evidence as appropriate; review all relevant evidence to determine whether the use of force was consistent with Division policy, and/or raises any policy, training, tactical, or equipment concerns.

Monitoring Team SMEs determined that the investigation's findings for the use of force were supported by a preponderance of the evidence in 95.70% of Level 2 use of force cases (89 of 93). SMEs identified 7 cases (7.53%) where there appeared to be additional relevant evidence that could assist in resolving inconsistencies or improve the reliability or credibility of the investigation.  Furthermore, Monitoring Team SMEs identified eight cases (8.60%) where the officer's use of force report did not contain an important element that supervisors should be addressing.

The Monitoring Team finds this paragraph in **General Compliance - 5.**

### Paragraph 99
*Whenever a supervisor determines that there may have been misconduct, the supervisor will immediately notify Internal Affairs and Internal Affairs will determine if it should respond to the scene and/or conduct or take over the investigation.*

GPO 1.07.05 Internal Complaints of Misconduct states, "All members who observe or become aware of any act(s) of misconduct by another member shall...immediately verbally report the incident to a supervisor or Internal Affairs."  This requirement is further defined in GPO 2.01.06 Use of Force – Supervisory Reviews and Investigations Section II, subsection A.3.  This provision mandates that supervisors responding to a use of force that reveals potential criminal conduct must immediately request FIT, suspend any investigation and secure the scene pending the arrival of FIT.

62

To evaluate paragraph 99, the Monitoring Team spoke with the Internal Affairs (IA) Superintendent to determine how notifications are made to IA when a supervisor determines that there may have been misconduct.  When a supervisor determines that there may have been misconduct, the supervisor notifies Internal Affairs to determine next steps.   The IA Superintendent was able to provide supporting documents that show when calls were made to Internal Affairs.  In some cases, IA would respond and in other cases the supervisor was provided with documentation instructions.  Additionally, as part of the assessment of Level 2 use of forces, the Monitoring Team evaluated how the use of force investigation went through the chain of command to determine if any misconduct was observed and not reported.  Of the 93 Level 2 cases that were assessed, it was determined that in 78 cases, the chain of command properly addressed and referred identified issues.   The review of incidents did not include examining whether supervisors properly notified Internal Affairs of any misconduct though SMEs identified seven incidents where misconduct was alleged and the investigator referred the case to IA.   The assessment did not reveal that there was misconduct associated with any use of force that a supervisor failed to report to Internal Affairs.  The Monitoring Team deems this paragraph to be in **Substantial and Effective Compliance - 6.**

> ### *Paragraph 100*
> *Within five days of learning of the use of force, each supervisor will complete and document his/her investigation using a supervisor's Use of Force Report. Any extension to this deadline must be authorized by a District Commander. This Report will include the following:*
> > a. *the supervisor's narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officers' conduct based on the supervisor's independent review of the facts and circumstances of the incident;*
> > b. *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state that fact. In situations in which witnesses were present but circumstances prevented the supervisor from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report should also include all available identifying information for anyone who refused to provide a statement;*
> > c. *the names of all CDP employees who used force or witnessed the use of force;*
> > d. *the investigating supervisor's evaluation of the use of force, based on the supervisor's review of the evidence gathered, including a determination of whether the officers' actions appear to be within CDP policy and consistent with state and federal law; and an assessment of the incident for policy, training, tactical or equipment concerns, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options; and*

      *e.  documentation of any non-disciplinary corrective action taken.*

The requirements of paragraph 100 are outlined in GPO 2.01.06 Use of Force – Supervisory Reviews and Investigations.  When supervisors are unable to complete their review within five tours of duty, an extension must be authorized by the District Commander.  These extensions must be documented in the IAPro software.  The extension requests are made via email, with the appropriate Use of Force Report number, and the required information for extension can be viewed in IAPro before an authorization is granted.

SMEs found that 84 of 93 Level 2 cases resulted in an objective and complete investigation and in 89 of 93 Level 2 cases that the investigation's findings were supported by a preponderance of the evidence.   The SMEs do determine, however, that generally the review is timely and appropriate.  Supervisors, when they are on scene, are observed and engaged.  Based on the findings of this assessment, the Monitoring Team finds the paragraph in **General Compliance - 5.**  Further assessment is needed to determine whether supervisor reports consistently contain all necessary information over time.

      *Paragraph 101*
      *Investigatory supervisors will be subject to the disciplinary process for failing to adequately investigate and document a use of force and material omissions or misrepresentations in the supervisory investigation. An investigatory supervisor's failure to adequately investigate a use of force will be addressed in their performance review.*

GPO 2.01.06 states that, "(s)upervisors failing to adequately review/investigate and document use of force incidents, and/or having material omissions or misrepresentations in their review/investigation when completing use of force reviews/investigations, shall be subject to the disciplinary process."

SMEs analyzed discipline cases as provided by the PAT relating to use of reporting for calendar years 2018-2024.  Across these years there were zero instances where an investigatory supervisor was subjected to the disciplinary process, let alone experience retraining or discipline for failing to adequately investigate and document any omissions or misrepresentations in the supervisory review.  The absence of disciplinary review could be equally indicative of unaddressed action or inadequate documentation as it could be the assurance of compliance.   The City has not demonstrated that investigatory supervisors are subjected to the disciplinary process – including re-training or discipline – when inadequacies are identified by a higher level in the chain of command.  As an example of concern, in one case, there is evidence that an officer received discipline and training and the supervisor who did not address the issues received no consequences.  It is important that supervisory inadequacies are addressed with similar attention as officer failures.

In order to more fully evaluate adherence to this policy, additional review of more incidents in greater detail is necessary.   The Monitoring Team finds this paragraph in **Operational Compliance - 4.**

> ### Paragraph 102
> *Upon completion of the supervisor's Use of Force Report, the investigating supervisor will forward the report through their chain of command to the District Commander, who will review the report to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard. Each level in the chain of command will review the report within 72 hours of receiving it. Reviewing supervisors in the chain of command will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings.*

GPO 2.01.06 Use of Force – Supervisory Reviews and Investigations Section VI governs the chain of command review for use of force investigations.   It requires supervisors to forward their completed use of force investigations through their chain of command to the District/Unit Commander and requires each level in the chain of command to review the report within three tours of duty of receiving it to ensure it is complete and that the findings are supported using the preponderance of the evidence standard.   This policy also requires reviewers in the chain of command to address any discrepancy and order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings.

The assessment of this paragraph required the Monitoring Team to determine how the Use of Force Report moved through the chain of command in the IAPro system.   Each member of command is required to review the report to ensure that it is complete and that the findings are supported.   The SMEs were not able to ascertain how long each level in the chain of command required to review each report.   However, the reviews revealed that supervisors did review reports in a timely fashion consistent with the paragraph requirements.   As such, the Monitoring Team deems paragraph 102 to be in **General Compliance - 5**

> ### Paragraph 103
> *Where the findings of the Use of Force Report are not supported by a preponderance of the evidence, the investigating supervisor's chain of command will document the reasons for this determination and will include this documentation as an addendum to the original investigation. The investigating supervisor's superior will counsel the investigating supervisor regarding the inadequately supported determination and of any investigative deficiencies that led to it. The District Commander will be responsible for the accuracy and*

*completeness of Use of Force Reports prepared by supervisors under their command.*

GPO 2.01.06 Use of Force – Supervisory Reviews and Investigations Section VI, subsection D states, "(w)here the findings of the use of force investigation are not supported by a preponderance of the evidence, the investigating supervisor's chain of command shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.  The reviewing supervisor shall counsel the investigating supervisor regarding the inadequately supported determination and of any investigative deficiencies that led to it, returning the investigation to the investigating supervisor for revision." Subsection F. states that commanders are responsible for the accuracy and completeness of use of force investigations prepared by supervisors under their command.

The Monitoring Team's review of 2024 Use of Force Reports revealed three Level 2 incidents when use of force findings were not supported by a preponderance of evidence.  For two of those incidents, there was not sufficient documentation from the chain of command about the findings.  The investigating superior officer counseled the investigating supervisors regarding the inadequately supported determination and other deficiencies and ensured that corrections and follow-up were conducted.  The District Commander was held accountable for the completeness of the Use of Force Report and the proper forwarding to Internal Affairs.

The Monitoring Team finds this paragraph in **General Compliance - 5.**

### *Paragraph 104*
*Where an investigating supervisor conducts deficient investigations, the supervisor will receive the appropriate corrective action, including training or demotion, in accordance with performance evaluation procedures and/or the disciplinary process.*

GPO 2.01.06 Use of Force – Supervisory Reviews and Investigations Section VI, subsection D.2. states, "(s)ignificant or repeated failures in the adequacy of Use of Force investigations may result in additional training or the imposition of discipline up to and including demotion or termination."

A conversation with the IA Superintendent revealed that the District Commander forwards completed use of force reports to IA for further review.  The IA review considers the quality of the investigation and any indicators of training needs.  If needed, IA returns the case with comments to the district for action.  It is clear in IAPro that during the chain of command review higher levels of command may refer cases back for changes.

There is no evidence provided by the City that any supervisor has received corrective action or disciplinary action for a deficient investigation.  The Monitoring Team identified issues in cases

where tactics could have been improved and in those cases, the issues were not identified by the supervisor. Though this is not the same as a "deficient investigation," the absence of disciplinary review could be equally indicative of unaddressed action or inadequate documentation as it could be the assurance of compliance. The City has not demonstrated that investigatory supervisors are subjected to the disciplinary process – including re-training or discipline – when inadequacies are identified by a higher level in the chain of command or by the FRB. When the issues were brought to the attention of Chief Todd by the Monitoring Team, the Chief was very responsive and took action. Additional case reviews over a period of time are necessary to increase the compliance level of this paragraph. The Monitoring Team finds this paragraph in **Operational Compliance - 4.**

 

       *Paragraph 105*
       *Whenever an investigating supervisor, reviewing supervisor, or District Commander finds evidence of a use of force involving potential criminal conduct by an officer, he or she will suspend the force investigation immediately and notify Internal Affairs. Internal Affairs will immediately notify FIT, which will take over both the criminal and administrative investigation.*

GPO 2.01.06 Use of Force - Supervisor Reviews and Investigations requires a supervisor who "determines that an officer's use of force reveals evidence of potential criminal conduct, the supervisor shall immediately request FIT and suspend any investigation."

To evaluate paragraph 105, the Monitoring Team reviewed use of force cases that had associated Internal Affairs case numbers. Following the review of those cases, the Monitoring Team determined that when a CDP supervisor found evidence in the use of force that could potentially be criminal conduct, proper notifications were made to Internal Affairs and Internal Affairs responded as required. The Monitoring Team finds paragraph 105 to be in **Substantial and Effective Compliance - 6.**

 

       *Paragraph 106*
       *When the District Commander finds that the investigation is complete and the findings are supported by the evidence, the investigation file will be promptly forwarded to Internal Affairs. Internal Affairs will review the investigation to ensure that it is complete and that the findings are supported by the evidence.*

GPO 2.01.06 Use of Force- Supervisory Review and Investigation states that, "(w)hen the commander finds that the Level 1 review is complete and the evidence supports the findings, the review shall be considered complete and shall be promptly forwarded via use of force tracking software, routed to and maintained by the Internal Affairs Unit." The policy further states that, "When the commander finds that the Level 2 investigation is complete and the evidence supports

the findings, the investigation file shall be promptly forwarded via use of force tracking software, routed to the Internal Affairs Superintendent.  Internal Affairs shall review Level 2 investigations to ensure they are complete and that the evidence supports the findings."

As part of the assessment, Use of Force Investigations were reviewed by the Monitoring Team using the IAPro software.  The assessment revealed that the chain of command reviewed Use of Force Investigations that were complete and supported by evidence and forwarded those to Internal Affairs.  IA then reviewed the investigations to determine if the findings were supported by the evidence.  If they were not supported, the investigation was returned to the commander and, when appropriate, referred for training or discipline.

Based on review of these requirements, the Monitoring Team finds paragraph 106 to be in **General Compliance - 5.**

### Paragraph 107
 *When Internal Affairs completes its review, it will forward the complete file to the Chief of CDP for disposition.*

GPO 2.01.06 Use of Force-Supervisory Review and Investigation states that, "(w)hen Internal Affairs completes its review, it shall route Level 2 investigations via the use of force tracking software as follows:
> 1. Level 2 investigations without a determination of misconduct shall be routed to the appropriate Deputy Chief's Office for review.
> 2. Level 2 investigations with a determination of misconduct shall be routed to the Case Preparation Unit and copying the appropriate Deputy Chief and Commander.

After investigation, if a use of force is found to be out of policy, the Case Preparation Unit shall direct and ensure the appropriate disciplinary process.  Upon the completion of the Deputy Chief's review or completion of the disciplinary process, Level 2 investigations shall be closed, routed to Internal Affairs and maintained in the use of force tracking software."

As part of the assessment, cases were reviewed using the IAPro software.  The review revealed that after Internal Affairs completed its review, the completed Use of Force Investigation file is forwarded to the Office of the Chief of CDP for final disposition.   Based on the findings of this review, the Monitoring Team finds paragraph 107 to be in **Substantial and Effective Compliance - 6.**

### Paragraph 108
*At the discretion of the Chief, his or her designee, or Internal Affairs, a use of force investigation may be assigned or re-assigned for investigation to FIT or to another*

*supervisor, whether within or outside of the District in which the incident occurred, or may be returned to the District for further investigation or analysis. This assignment or re-assignment will be explained in writing.*

GPO 2.01.06 Use of Force – Supervisory Reviews and Investigations requires that, "at the discretion of the Chief, Chief's designee, or Internal Affairs, a use of force investigation may be assigned or re-assigned for investigation to the FIT or to another supervisor, whether within or outside of the district in which the incident occurred, or may be returned to the district for further investigation or analysis; this assignment or reassignment shall be explained in writing and routed via the Division tracking software."

The Monitoring Team review of Use of Force Investigations during the assessment period revealed that when required, Use of Force Investigations were re-assigned for investigation to FIT or another supervisor.  The re-assignment was documented and updated in the IAPro system. Based on the findings of this review, the Monitoring Team finds paragraph 108 to be in **General Compliance - 5.**

> ### *Paragraph 109*
> *Where, after investigation, a use of force is found to be out of policy, the City will ensure the appropriate disciplinary process. Where the use of force indicates policy, training, tactical, or equipment concerns, the Chief will ensure also that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

As part of the assessment, Use of Force cases reviewed, which were closed during 2024 but may have occurred in a prior year, were examined using the IAPro system and Evidence.com to review the WCS images.  These reviews determined that when a use of force was deemed to be out of policy, the CDP ensured the appropriate disciplinary process was applied.  When the disposition of the case indicated that additional training was necessary, the training was delivered.  In addition, CDP provided a document in response to the Monitoring Team's request for evidence demonstrating that the out-of-policy use of force cases went through the appropriate disciplinary process.

During the Use of Force assessments, the Chief of Police and various members of CDP met with the Monitoring Team on an approximate bi-monthly basis to discuss cases deemed by the SMEs to be of importance regarding adherence to policy, tactics or training.  The Monitoring Team highlighted cases of concern as well as those that were examples of good work.  Prior to these meetings, the Monitoring Team sent a list of cases for discussion as well as a summation of the specific issues, concerns or commendations for each individual case.  The Chief of Police personally reviewed each of the cases, as well as assigned cases to the respective commanders to review and evaluate the concerns.  The responses by CDP to these reviews included additional

training on policies and tactics as well as equipment improvements and general practice changes at times. The regular and frequent meetings ensured that the concerns were resolved quickly and efficiently instead of awaiting the outcome of this compliance assessment report.

Most out-of-policy uses of force – those that were not reasonable, necessary, or proportional – were identified and appropriately investigated through the disciplinary process. However, supervisors did not routinely identify areas for policy, tactical, or training improvements. When the Monitoring Team brought policy, training, tactical or equipment concerns to the attention of the Chief, they were addressed and resolved. The Monitoring Team finds this paragraph to be in **General Compliance - 5.**

### 3. *Force Investigation Team and Investigations of Level 3 Uses of Force*

#### *Paragraph 110*
*CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP where appropriate to ensure the fact and/or appearance of impartiality of investigations.*

On July 8, 2019, the CDP, with the authority of the Department of Public Safety, and the Cuyahoga County Sheriff's Department signed a Memorandum of Understanding (MOU) agreeing that the Sheriff's Department will conduct independent criminal investigations of all CDP uses of lethal force resulting in the actual or anticipated death of a person within the City of Cleveland. Further, GPO 2.01.07 Force Investigation Team states that, "(i)ncidents involving a fatality are investigated by an outside agency per a signed memorandum of understanding."

For the assessment of paragraph 110, the Monitoring Team requested records of all use of force cases that were referred to an outside agency to conduct the corresponding criminal investigation. CDP provided a document demonstrating the referral of three use of force criminal investigations in 2024 to the Cuyahoga County Sheriff's. All of the incidents were fatal incidents. There were no cases referred to the external agency in 2023.

CDP continues to refer criminal use of force investigations to an independent outside agency, the Cuyahoga County Sheriff Department, Therefore, the Monitoring Team finds this paragraph to be moved to **Substantial and Effective Compliance - 6.**

#### *Paragraph 111*
*The Internal Affairs Unit will include CDP's Force Investigation Team (FIT). Each FIT will be a team comprised of personnel from various units and will not be a new unit to which officers are permanently assigned. The FIT will conduct administrative investigations in all of the following instances and, where*

*appropriate and where not assigned to an outside agency as permitted above, will conduct criminal investigations of: (1) all Level 3 uses of force; (2) uses of force involving potential criminal conduct by an officer; (3) all instances in which an individual died while in, or as an apparent result of being in, CDP custody; and (4) any uses of force reassigned to FIT by the Chief or his or her designee. The FIT will be designed to ensure that these incidents are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified; that training, tactical, and equipment deficiencies related to the use of force are identified; and that investigations are of sufficient quality.*

CDP FIT Unit Procedural Manual (FIT Manual), updated November 6, 2018, states the "manual carries the full weight of Division and City policy."  The manual provides the definition of the Force Investigation Team (FIT) as a "team within the Internal Affairs Unit comprised of personnel with specialized training and expertise from various units."

GPO 2.01.07 Force Investigation Team, effective July 8, 2020, in accordance with the Consent Decree, sets out the responsibilities of the FIT.  The policy requires that "FIT shall conduct administrative and criminal investigations, where appropriate and not assigned to another agency, in all of the following instances:

(1) All law enforcement critical firearm discharges occurring within the jurisdiction assigned to the Cleveland Division of Police, regardless of the on-duty or off-duty status of the officer involved, except:
   a. Incidents involving a fatality are investigated by an outside agency per a signed memorandum of understanding.
(2) All Level 3 use of force incidents.
(3) Any use of force involving potential criminal conduct by an officer.
(4) Incidents that result in death while in or as an apparent result of being in custody.
(5) Use of force investigations as reassigned by the Chief of Police or Chief's designee."

Among the requirements of paragraph 111 is the requirement for the Internal Affairs Unit to assemble a Force Investigation Team with a specific composition.  To assess this requirement, the Monitoring Team reviewed the CDP supplied list of the assigned FIT members for the assessed years (2023-2024).  The Monitoring Team determined that the assigned personnel were from various units who had specialized training and expertise.  Secondly, paragraph 111 requires the FIT to conduct criminal investigations not being investigated by an outside agency.  To assess this requirement, while conducting assessments of the 2023 and 2024 FIT cases the Monitoring Team confirmed that the FIT conducted criminal investigations that were not being investigated by an outside agency.  The Monitoring Team was able to verify that the FIT did conduct criminal investigations not investigated by an outside agency.

71

Third, the FIT is to be designed to ensure fair, sufficient quality and complete investigations by individuals with appropriate expertise, and to identify any training, tactical or equipment deficiencies related to use of force and specifically to review all Level 3 uses of force.  This portion of the assessment considered to what extent FIT investigations were fair and sufficient to ensure identification of policy, training, tactical and equipment issues.  The Monitoring Team examined all reports and WCS images for all FIT cases from 2023 and 2024, including the supervisory review process for each FIT investigation.  The Monitoring Team review endeavored to identify any issues with the actions taken by the Internal Affairs Superintendent and the reviews at the Chief's office.

The assessment determined that in only one case did the IA Superintendent disapprove the investigation.  The Chief did not approve that same case.  In the case that was not approved, the Monitoring Team SME noted it was a good example of how the accountability system is supposed to work with all "entities working together" which based on the comments included the Training Section, the FRB, and the Department of Public Safety.  The officer was held accountable.  In addition, there are two cases that did not include a CDP member, and as such, those cases did not include an administrative investigation.

Based on the fact the FIT is comprised of personnel from various units, FIT conducted potential criminal Use of Force Investigations not referred to other agencies, and 100% of the FIT investigations assessed from 2023 and 2024 went through an approval process that assured full and fair investigations, the Monitoring Team deems that paragraph 111 is now in **Substantial and Effective Compliance - 6.**

> *Paragraph 112*
> *FIT will be comprised of personnel who have specialized training and expertise. The FIT membership will be tailored to the circumstances of each investigation, but will normally include one or more FIT detectives, the FIT sergeant, an Office of Professional Standards investigator, an Internal Affairs investigator, and a Homicide Unit supervisory officer, who will serve as the Team's leader. OPS investigators will not participate in criminal investigations. At least one member of the FIT will be available at all times to evaluate potential referrals from CDP supervisors.*

The FIT Manual, updated on November 6, 2018, defines the Force Investigation Team (FIT) as "a team within the Internal Affairs Unit comprised of personnel with specialized training and expertise from various units.  FIT membership shall be tailored to the circumstances of each investigation, but will normally include one or more FIT detectives, a FIT sergeant, one or more Office of Professional Standards investigators, one or more Internal Affairs investigators, and a Homicide Unit supervisory officer and an Internal Affairs supervisory officer, who will serve as the FIT Officers in Charge (OIC).  OPS investigators will not participate in criminal investigations.

At least one supervisory member of FIT will be available at all times to evaluate potential referrals from Division supervisors."

To evaluate paragraph 112, the Monitoring Team requested a roster that included all members of the FIT who were assigned during the assessment period (2023-2024).  The responsive document included a FIT Call Up List for 2023-2025.  The FIT Call Up list included unit names, team members' names, their ranks, assigned responsibilities and phone numbers.  The Monitoring Team review determined that the FIT Call Up list, provided by IAU, included the appropriate personnel to ensure a tailored call up based on the circumstances of each investigation.  The Monitoring Team deems paragraph 112 to be in **Substantial and Effective Compliance - 6**.

> ### Paragraph 113
> *Prior to performing FIT duties, FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type, including FIT procedures, including callout and investigative protocols; the differences between administrative and criminal investigations and how each should be conducted; investigations of officer-involved shootings; investigative equipment and techniques; and proper roles of the following:  on-scene counterparts, such as crime scene technicians; the Monitor; any outside investigating agency; the prosecutor's office; and OPS. The training also will address techniques for objective fact-gathering and evaluation and the factors to consider when evaluating credibility. FIT investigators also will receive annual in-service training that is adequate in quantity, quality, type, and scope.*

In the FIT Manual under the Mandatory Training section, the operating standard requires that prior to performing FIT duties, assigned FIT members will receive the following training: Basic Officer Involved Shooting course; Basic Scene and Evidence Processing course; Crisis Intervention training (8 hour course and annual training); Administrative Investigation training (8 hours); Bio-mechanics of Force Incident training; and Cognitive and Other Interview Techniques training (12 hours).

To assess paragraph 113, the Monitoring Team requested training records of members who served in the FIT Unit during 2023 and 2024, including initial training and in-service training.  The documents provided in response to the Monitoring Team request included "Call Up Rosters" for 2023 and 2024 showing who was assigned to the FIT.  The Monitoring Team determined that the FIT annual training was held in August 2023 and February 2024.  The Monitoring Team compared the training attendees to the Call Up Roster to determine if all required members attended the annual training.  Based on the responsive documents, the Monitoring Team could not confirm that all the assigned FIT members attended the required introductory training as well as the annual FIT training.

73

Although it has been determined FIT mandatory training for initial and annual training is occurring, the Monitoring Team is unable to determine if all required to attend attended, therefore, paragraph 113 remains in **Operational Compliance - 4**.

### Paragraph 114
*Within 365 days from the Effective Date, CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement.*

To assess paragraph 114 the Monitoring Team requested documentation to show that CDP identified, assigned, and trained personnel for FIT duties as required.  Review of the responsive documents determined that CDP has been assigning members and training them annually to fulfill the requirements of the Consent Decree.  However, based on the inconsistent language in the documents, the Monitoring Team is unable to confirm from the provided documentation that every member was trained both initially and annually.  It is recommended that a clear notice of required training be created listing all of the members who are required to attend and add the date the training is completed.  Additionally, the Monitoring Team recommends that each training module be uniformly titled to assist in ascertaining that all officers have completed the same required, minimum training.

Review of the requirements of this paragraph determined that CDP has identified, assigned and trained personnel for FIT duties; however, the Monitoring Team was unable to determine all FIT assigned members attended the minimum required training, therefore this paragraph remains in **Operational Compliance - 4.**

### Paragraph 115
*FIT will respond to the scene of every incident involving a use of force for which it is required to conduct an investigation. The FIT leader will immediately notify the appropriate prosecutor's office. If the City elects to utilize an outside agency to conduct the criminal investigation, the FIT leader will notify the designated outside agency to respond to the scene to conduct the criminal investigation.*

The assessment of paragraph 115 evaluated the timeliness of notification and the extent to which FIT responded to the scene in cases that met the FIT criteria for a response.  In 100% of cases, the FIT responded to incidents involving a use of force in which FIT is required to conduct an investigation.  In all three of the cases where the City elected to utilize an outside agency to conduct the criminal investigation, the outside agency did respond to the scene to conduct the criminal investigation.

Based on the fact that FIT responded to every scene when a FIT call up was initiated, the Monitoring Team deems paragraph 115 to be rated as in **Substantial and Effective Compliance - 6.**

> *Paragraph 116*
> *CDP will develop and implement policies to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation.*

Assessment of paragraph 116 considered what FIT policies have been developed to ensure that FIT conducts thorough administrative investigations concurrently with criminal investigations conducted by an outside agency and whether those policies have properly been implemented and adhered to by CDP.

CDP developed and implemented the FIT Manual in 2018.  The FIT Manual states, "FIT has primary responsibilities for the investigation of the use of force.  The administrative investigation shall be conducted concurrently with the criminal investigation even if compelled interviews are delayed.  No part of the administrative investigation will be held in abeyance unless specifically authorized by the Chief or designee in consultation with the agency conducting the criminal investigation and the responsible prosecuting attorney."

Additionally, as previously mentioned, in 2019 the CDP signed a memorandum of understanding (MOU) with the Cuyahoga County Sheriff's Department to conduct independent criminal investigations of uses of force by Cleveland Police that result in the actual or anticipated death of a person.  Further, the MOU states that, "the Sheriff acknowledges that CDP's FIT members may conduct a concurrent and through administrative investigation in regard to the incident the Sheriff is investigating."

To determine if CDP has adhered to these policies, the Monitoring Team reviewed three 2024 cases in which an outside agency conducted the criminal investigation in use of force incidents. An assessment of those three cases determined that the FIT did conduct concurrent and thorough administrative investigations while the criminal investigations were conducted by the Cuyahoga County Sheriff's Department.

Based on the fact that the policies required by this paragraph have been developed and implemented and further that CDP has shown consistent adherence, albeit for only three cases in one calendar year, the Monitoring Team finds paragraph 116 to be in **General Compliance - 5.**

> *Paragraph 117*

> *Before using an outside agency to conduct criminal investigations, CDP will develop a memorandum of understanding with the outside agency to ensure that, after an appropriate prosecutor review, completed criminal investigations are provided to FIT and the Monitor, and that information obtained from or as a result of any compelled interviews of officers is not provided to criminal investigators. The memorandum of understanding also will delineate responsibilities between the two agencies and establish investigative protocols to ensure, to the extent possible, thorough, objective and timely administrative and criminal investigations.*

Noted earlier in this document, in July of 2019, the City and the Cuyahoga County Sheriff's Department signed an MOU agreeing that the Sheriff Department will conduct independent criminal investigations of all CDP uses of lethal force resulting in the actual or anticipated death of a person within the City of Cleveland. The MOU directs that the Sheriff shall "provide CDP Internal Affairs Superintendent, with any investigative reports, interview recordings, or other documentation relating to the Sheriff's investigation that will assist CDP Internal Affairs in conducting a timely, concurrent, administrative investigation."

Supporting documentation from CDP showed that three cases in 2024 were referred to the Cuyahoga County Sheriff Department for criminal investigation of a use of force. The criminal investigations were shared with FIT after appropriate prosecutorial review and uploaded to the IAPro system to which the Monitoring Team has access.

Based on the fact that a signed MOU has been in effect since 2019 that delineates the responsibilities of the CDP and the Cuyahoga County Sheriff's Department and that the Sheriff's Department has conducted criminal investigations governed by the MOU during the assessment period, the Monitoring Team finds paragraph 117 to be in **Substantial and Effective Compliance - 6.**

*Paragraph 118*
*FIT will:*
  a. *assume control of the use of force investigation upon their arrival, unless an outside agency is conducting the criminal investigation and control of the scene by the criminal investigating body is appropriate;*
  b. *ensure that a canvass for, and interview of, civilian witnesses is conducted by FIT team members. FIT members will either record the interview or encourage civilian witnesses to provide and sign written statements in their own words, but will take information from civilian witnesses who have pertinent information even if they refuse to be recorded or refuse to complete or sign a formal statement;*
  c. *arrange for photographing and processing of the scene;*

    d.   *ensure that all evidence that could establish material facts related to the use of force, including audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;*

    e.   *examine the subject for injury, photograph areas of injury or complaint of injury, interview the subject for complaints of pain after advising the subject that the interview pertains only to the use of force and not to any underlying alleged crime and that the subject need not answer questions, and ensure that the subject receives medical attention from an appropriate medical provider;*

    f.   *ensure that all officers witnessing the use of force by another officer complete a use of force report regarding the incident;*

    g.   *review all use of force reports to ensure that they include the information required by CDP policy;*

    h.   *consistent with applicable law, interview all officers who witness or are otherwise involved in the incident. To the extent possible, officers will be separated until interviewed. Group interviews will be prohibited. FIT will not ask officers or other witnesses leading questions that suggest legal justifications for the officers' conduct, when such questions are contrary to appropriate law enforcement techniques. FIT will record all interviews. FIT will ensure that all FIT investigation reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;*

    i.   *arrange for body worn camera video downloads;*

    j.   *provide an initial briefing to a training representative at the start of the investigation to ensure that any training issues that require immediate attention are identified, and continue to consult as appropriate with the training representative; and*

    k.   *make all reasonable efforts through the investigation to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force claimed by the officer and the subject's injuries.*

The assessment of 2023 and 2024 FIT investigations evaluated FIT compliance with various responsibilities defined by the Consent Decree and the FIT Manual.  Paragraph 118 has 11 specific duties that the FIT team must do upon being assigned.

The assessment revealed the following regarding the 47 total cases reviewed:

    a.   In 37 of the cases, the FIT investigator took control of the use of force upon arrival when an outside agency was not conducting the criminal investigation.  In the remaining 10 cases, the files provide reasonable explanations for the gap.  Those included delayed reporting to FIT, and the SME's categorization of shared leadership with other parts of the CDP.  In those cases, the SME should have identified that FIT affirmatively assumed control.

    b.   In 45 of the cases, FIT ensured a canvass was conducted and civilian witnesses were interviewed as was possible and appropriate.  In one case, the SME could not determine,

and in one case, there no documentation of a canvass being conducted.  In 41 of 45, the cases where there were civilian witnesses, FIT members did either record the interview or encouraged civilian witnesses to provide and sign written statements.

c.  In 41 cases, FIT arranged for photographing and processing of the scene.  In the remaining cases an adequate explanation was provided for the FIT not processing the scene.

d.  In 46 cases, FIT ensured that all evidence was collected that could establish material facts related to the use of force, including audio and video recordings, photographs, and other documentation of injuries or the absence of injuries.

e.  In 30 cases, FIT examined the subject for injury.  In the remaining cases, there were six involving an animal.  In six other cases, the SME indicated the subject was receiving medical attention or deceased, in one case, the explanation provided was that there were no injuries, in one case there was an accidental discharge in a patrol vehicle with no injury, and one was a late report.  In one case, there was no explanation provided for the failure to examine the subject.  In 27 cases the FIT interviewed the subject for complaints of pain after advising the subject that the interview pertains only to the use of force and not to any underlying alleged crime and that the subject need not answer questions.  In 23 cases, FIT ensured that the subject received medical attention from an appropriate medical provider. In the remaining cases, adequate explanations were provided.

f.  In all cases where there were witness officers, documentation was provided as a witness statement, or the details were included in their own use of force report.

g.  In 42 cases, FIT conducted a thorough review of the use of force reports.  In the remaining five cases, there were two with no CDP officer on scene, two were completed by IA, and one involved a dog.

h.  In 40 cases, the Monitoring Team SMEs indicated that yes, all officers were interviewed. Of the remaining cases, in one case, the officers had not yet returned to work from injuries, and in three others the officers provided written statements.  In the other four cases, there were no witness officers or CDP officers on scene.  In all cases, the potential witnesses were separated by FIT.  In no cases did FIT allow for group interviews.  In only one case did an SME note the use of leading questions.  In 43 cases interviews were recorded.  In one case the SME could not locate videos, and in two others there were only written statements.  In all but one case, the FIT investigation reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred. One case indicates an officer from another jurisdiction and a security guard on the WCS of a detective and no indication that those individuals were interviewed.

i.  In 42 of the cases, FIT arranged for body worn camera video (WCS) downloads.  In the remaining cases, WCS was not activated or not available from out of jurisdiction officers.

j.  In 33 cases, the FIT provided an initial briefing to a training representative at the start of the investigation and all those instances continued to consult as appropriate with the training representative.  In the remaining cases, there were sound explanations for why the FIT did not conduct the training briefing.

k.  In all cases, FIT made all reasonable efforts through the investigation to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force claimed by the officer and the subject's injuries.

Based on the above outcomes of the assessment of paragraph 118, the Monitoring Team finds reasons for this paragraph to be moved to **General Compliance - 5.**

> ### Paragraph 119
> *On at least an annual basis, the Monitor will determine whether the criminal investigations conducted by the outside agency are consistently objective, timely, and comprehensive. If the Monitor determines that they are not and the City disagrees, the Court will resolve the disagreement. If a determination is made that the investigations are not consistently objective, timely, and comprehensive, the memorandum of understanding will be terminated and the FIT will assume responsibility for conducting all criminal investigations of uses of force.*

In 2023, there were no cases that were referred to an outside agency for investigation.  In 2024, there were three cases that were referred to and investigated by Cuyahoga County Sheriff's Department.  One was a Level 3 officer involved shooting that was fatal, one was a Level 3 incident officer involved shooting, and the third as an in-custody death.

In one instance, case 2024-0160 or FIT case 24-22, the in-custody death case, the Monitoring Team was unable to complete a full review.  During the assessment period, which ran from July 2025 through October 2025, this case was not visible in IAPro or the Law Enforcement Records Managements System (LERMS).  The assigned SME learned that cases are not visible in IAPro for review until the entire investigation is complete.  As such, the Monitoring Team cannot address the completeness or objectivity of the investigation.  Without more information we cannot discern timeliness.

The other two FIT cases referred externally were reviewed and no issues were identified.  While the CDP is following the requirements of the Consent Decree in referring cases to an external party for review, it is not clear if the cases are completed by the Sheriff's Department in a timely manner.  The Monitoring Team requires a further review of externally referred cases.  It is recommended that the CDP and City Law review the MOU with the Sheriff to ensure it meets expectations and reflects the current administration's expectations for timeliness, consistency, and comprehensiveness.  Based on all of the above, the Monitoring Team finds this paragraph in **Operational Compliance - 4**.

> ### Paragraph 120
> *If the FIT leader determines that a case has the potential to proceed criminally, compelled interviews of the subject officer(s) will be delayed. No other part of the*

*investigation will be held in abeyance unless specifically authorized by the Chief in consultation with the agency conducting the criminal investigation and the appropriate prosecutor's office.*

The Monitoring Team review of all FIT cases evaluated the FIT timeliness in obtaining compelled interviews of officers.  The FIT manual states "the FIT OIC (administrative) in consultation with the IA Superintendent, shall conduct compelled interviews of involved officers within 48-72 hours unless the appropriate prosecuting attorney requests that the interview be delayed.  The prosecutor's request will be memorialized in writing."  The assessment revealed that in all but nine cases, the compelled interviews were conducted with involved officers within the required time period.  Of the nine that were not in the time period, five of the interviews were delayed due to documented exemption.  In the remaining four cases, reasonable explanations were provided for the delay or lack of interview; in two of those cases the subject officer was injured and unavailable due to the injury; in one case it was initially considered a Level 2 case with a complaint of excessive use of force bringing the case to FIT; and in the final remaining case, the interviews were conducted prior to the arrival of FIT.

In all cases, except with exemptions or reasonable explanation, the compelled interviews were conducted within the required 48–72-hour window.  As such, the Monitoring Team finds paragraph 120 in **General Compliance - 5.**

### Paragraph 121
*The FIT leader will complete a preliminary report that will be presented to the Chief of Police or the Chief's designee as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force.*

The assessment evaluated the timeliness of the completion of preliminary reports and their delivery to the Chief of Police or the Chief's designee and the OPS Administrator.  Compliance with this paragraph and CDP FIT Manual Section VI.D.1.d requires the named recipients to receive these reports within 24 hours.  The assessment found that for 41 out of the 47 cases, the FIT leader presented a preliminary report no later than 24 hours after learning of the use of force.  In the remaining six cases, all occurred in 2023 before changes in the operations and personnel in IA occurred.  In three of those cases, the reports were delivered to the Chief within 72 hours, which is more than the 24 hours required by the policy and the Consent Decree.  In one case the SME noted the report was "not required by the IA Superintendent" and in the final case, the preliminary report was in the file but documentation of the delivery to either the Chief or the OPS Administrator was absent.  The delivery to the OPS Administrator occurred only twice in the six cases.  In one of the cases the file indicated that there was "no contact information for the new OPS Administrator who starts today."  In the remaining three cases there was no indication that the report was sent to the OPS Administrator.

Based on the assessment findings, the Monitoring Team finds paragraph 121 to be moved to **General Compliance - 5.**

> *Paragraph 122*
> *With the exception of compelled interviews as described in paragraph 120, FIT will complete its administrative investigation within 60 days. Any request for an extension of time must be supported by a written justification and approved in writing by the Chief or the Chief's designee. CDP's inability to complete the investigation because it is awaiting information from an outside agency, such as the medical examiner's office, will constitute sufficient basis for such an extension for that portion of the investigation. Within seven days of the conclusion of each use of force investigation, FIT will prepare an investigation report and recommend whether the preponderance of the evidence establishes that the involved officer(s) violated CDP policy, and whether any training or policy concerns are presented. FIT's investigative report and recommendations will be reviewed by the head of Internal Affairs. Within three business days, the head of Internal Affairs will approve or disapprove FIT's recommendations, or request that FIT conduct additional investigation. Any request for additional investigation and the FIT's response will be documented and maintained in the investigatory file. Internal Affairs will forward the investigative report to the Chief of Police for review and approval.*

The assessment evaluated the timeliness of FIT investigations and approvals by the Internal Affairs chain of command.  Paragraph 122 requires administrative investigations to be completed within 60 days and any request for extension of time be placed in writing with a justification and then approved in writing by the Chief or Chief's designee.   The assessment determined that 18 administrative investigations were completed within the required 60 days.[15]  Of the 27 that were not completed within the required 60 days, the assessment identified which phase appeared to be delayed: six at the investigator stage, two at the Chief's office, and 10 reported "other" which in all cases was an "external actor."

Paragraph 122 also requires compliance with other timelines, including that within seven days of the conclusion of an administrative investigation, the investigator will report findings and recommendations on the compliance with CDP policy and identify any training or policy concerns. Further, the head of IA must approve or disapprove the recommendations within three days.  The SME determined that in 34 out of 42 cases, the head of IA approved or disapproved within required period of time.  In the remaining cases, the decision was rendered within two weeks, with the exception of one case where the SME noted that there was no clear timeline or way to discern the timeline in the file.

---

[15] In two of the 47 cases, the end date of the investigation was not clear and those two cases are not reflected in the assessment of this paragraph.

Based on the assessment of timeliness of FIT investigations and timelines of approvals through the Internal Affairs chain of command, the Monitoring Team finds paragraph 122 to be in **Operational Compliance - 4.**

> **Paragraph 123**
> *CDP will revise the FIT manual to ensure that it is consistent with the force principles outlined in this Agreement and includes the following:*
>> a. *guidance on an appropriate approach when providing Garrity warnings and protections to officers for answering questions regarding their uses of force;*
>> b. *clear procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled subject officer statements;*
>> c. *definitions of all relevant terms;*
>> d. *clear statements of the mission and authority of FIT;*
>> e. *procedures for report writing;*
>> f. *procedures for objective fact-gathering and evaluation and the factors to consider when evaluating credibility;*
>> g. *procedures for collecting and processing evidence;*
>> h. *procedures for consulting with the law department, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending; and*
>> i. *scene management procedures.*

The current FIT Manual was revised and updated as of November 6, 2018.[16]  The FIT Manual, in conjunction with the CDP GPO 2.01.07 - Force Investigation Team, governs the processes and procedures used by the FIT.  A document review of the FIT manual dated November 6, 2018, reveals that all required components of paragraph 123 are contained within the FIT manual.  The manual notes, the "Manual carries the full weight of Division and City policy...Any changes to the Manual must be expressly approved by the Chief of Police."

Based on the fact that the FIT Manual has been revised and contains all of the force principles outlined in the Consent Decree and includes all of the required procedures and the Monitoring Team finds paragraph 123 to be moved to **Substantial and Effective Compliance - 6.**

## F.  FORCE REVIEW BOARD

### Paragraph 124

---

[16] FIT Manual

*The City will develop and implement a Force Review Board ("FRB") to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective. The FRB will review all FIT investigations, all Level 2 investigations where there was a determination of force related misconduct, and a sample of Level 2 use of force investigations. The Force Review Board ("FRB") will be comprised of the Chief of Police or his or her designee, who will chair the FRB; a supervisor from the training section; a representative from Office of Professional Standards; and a representative from Internal Affairs. One representative from each District, to be selected by the District Commander, will participate in all Force Review Board reviews involving a use of force in that District. The Chair may include any subject matter experts the Chair feels would be helpful in reviewing particular incidents. The FRB also may consult with other advisors as necessary.*

GPO 2.01.08, effective since February 18, 2020, governs the Force Review Board (FRB).  The policy clearly states all requirements as written in paragraph 124 pertaining to the Board composition and the level of cases that will be reviewed.  The FRB is generally chaired by a CDP commander with a deputy chief and other required members of the Board present and participating. Additionally, the Monitoring Team has been observing FRB meetings for over two years and can confirm the Board is comprised appropriately and that cases are being reviewed as required in paragraph 124.

Review of the FRB requirements by the Monitoring Team confirms that the CDP is in compliance with this paragraph and its requirements have been effective over a substantial period of time.  As such, the Monitoring Team rates this paragraph as being in **Substantial and Effective Compliance - 6.**

**Paragraph 125**
*Each member will receive training on legal updates, updates on CDP's policies, and CDP training curriculum related to the use of force.*

CDP provided the Monitoring Team with 2024 Training Records for FRB members, which reflect that each member of the FRB has been appropriately trained.  The training provided was reviewed by the Monitoring Team, DOJ and the CPC prior to being implemented.  The training for 2024 was delivered by E-Learning and specifically addressed the following topics: legal updates; analyzing use of force incidents; accountability and transparency; officer and subject behavior; post incident procedures; community impact and relations; recommendations and follow-up; case studies and identifying training and policy needs.   The Monitoring Team confirmed the requirements of paragraph 125 are being delivered.

Due to the routine addition and modification of members of the FRB, it is necessary for the CDP to demonstrate consistently that all members present at every meeting have completed the introductory and updated training prior to joining the FRB meeting that day.  The Monitoring Team finds this paragraph to be in **General Compliance - 5.**

> ### Paragraph 126
> *The Force Review Board will conduct comprehensive and reliable reviews of investigations within 90 days of submission to the FRB. The scope of the Board's review will not be limited to assessing an officer's decision-making at the moment the officer employed force. Rather, the FRB's review will include the circumstances leading up to the use of force, tactical decisions, information sharing and communication, adequacy of supervision, equipment, training, CDP's medical response, when applicable, and any commendable actions. The review will include the actions and inactions of all officers, supervisors, commanders, and dispatchers involved in the incident, as appropriate.*

The Force Review Board is conducted quarterly within the Division to meet the ninety-day requirement outlined in paragraph 126.  Each year's meetings are scheduled in advance, and an FRB Chair is designated at that time.  The FRB reviews only cases that have been closed.  The cases selected for review include all FIT investigations, all Level 3 uses of force, any Level 2 use of force with a finding of force related misconduct and a random sample of all Level 2 use of force cases with no finding of force related misconduct.  The selections are shared using a Power BI[17] report entitled Force Review Board Case Selection Report, which is maintained by the Data Analysis and Collection Coordinator (DACC).  This report continually updates as new data is entered and is regularly reviewed by the Bureau of Compliance Commander, the DACC, and the IAPro Administrator for compliance and quality assurance.

For this assessment, the Monitoring Team observed  consecutive FRB meetings for 2023 and 2024, and noticed gradual, but not always steady, improvement in the quality of discussions. Nevertheless, in late 2024, the presentation observed slipped in quality. Though the Monitoring Team confirmed that the areas are being discussed and voted upon by FRB members as required, the implementation of the Board was inconsistent during the observation period.  Recent changes have occurred in establishing structure and standards that should lead to continued and steady improvements in the FRB. Observed areas include information sharing, tactics and decision making, supervision, equipment, training, policy, medical response, post incident investigations, possible commendable actions and possible disciplinary actions.   The Monitoring Team had periodic conversations with the Chair of the FRB to improve the quality of deliberations,

---

[17] Power BI is Microsoft's business analytics platform that assists in turning data into actionable insights.

presentations by investigators, the requirement to provide training to new participants, and to ensure that review of uses of force include a discussion of the preceding tactics and decision-making, and that the force incidents are reviewed objectively. Over time, the Monitoring Team has witnessed the quality of the discussions and review deepen and reflect the goal of learning and improvement.

The Monitoring Team finds this paragraph to be in **General Compliance - 5.**  To advance to Substantial and Effective Compliance, the Monitoring Team must observe a continuation of the quality discussion observed in the recent months.  The Monitoring Team also encourages the CDP to create a desk manual or standard operating procedure for the FRB that ensures smooth transitions and a transfer of knowledge to minimize disruptions and new learning that accompany the inevitable changes in personnel in a police department.

> ### Paragraph 127
> *In conducting these reviews, the Force Review Board will:*
> a. *ensure that it is objective and complete and that the findings are supported by a preponderance of the evidence. Where the findings are not supported by a preponderance of the evidence, the FRB will document the reasons for this determination, including the specific evidence or analysis supporting its conclusions, and forward its determination to the Chief of Police;*
> b. *hear the case presentation from the lead investigator, or for supervisory investigations, the representative from the District where the force occurred;*
> c. *review any written or recorded statements from the officer, and discuss the case as necessary with the investigator or District representative to gain a full understanding of the facts of the incident;*
> d. *order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the force investigation;*
> e. *determine whether the incident raises concerns regarding policy, training, equipment, supervision, medical response by officers on the scene, communication, or tactics, and refer such incidents to the appropriate unit within CDP to ensure they are resolved;*
> f. *recommend non-disciplinary corrective action to enable or encourage an officer to improve his/her performance; and*
> g. *document its findings and recommendations in a report within 15 days of each FRB case presentation.*

GPO 2.01.08 governs the Force Review Board (FRB).  This policy clearly states all requirements as written in paragraph 127.  Additionally, the Monitoring Team has observed nearly two years of FRB meetings and can provide reliable and impartial feedback on each subsection of paragraph 127:

a. The majority of the time, cases presented to the FRB are objective and complete. On occasion, some presentations can appear truncated, leaving observers with unanswered questions.  The Monitoring Team provides comments following or during the FRB meetings on missing data.  The presenter, typically the assigned case investigator, must consistently provide details of information sharing between officers prior to the use of force, including civilian, officer, or officer witness statements (particularly in Level 3 uses of force cases).

The Board members themselves are generally objective and thorough when holding discussions and voting.  The Board members rely on the preponderance of evidence when making their decisions.  Previously, the CDP worksheet or assessment tool being used by the FRB caused confusion among Board members.  In the past year, with some changes to the FRB members, there has been a focus on clarity and instruction and the confusion about the way questions are asked has subsided.  The Monitoring Team has observed quality discussion among Board members over the course of time.  It is clear CDP has made great effort to build a robust review of use of force into their culture.

b. The lead investigator consistently presents each use of force incident to the FRB in compliance with paragraph 127.

c. The FRB could be more consistent in ensuring officer statements are presented for every case and presented accurately.  The Monitoring Team has observed FRB meetings in which cases were discussed and voted on without hearing officers' full statements.  Also in some cases, inaccurate memories from individual preparation for the FRB are relied upon and used as the basis for discussion.  This is an area the FRB must improve upon as the law and CDP policy both dictate that in use of force situations, the officers' perception must be taken into consideration.

d. The Monitoring Team has not observed a time where the FRB has had to require additional investigation.  During the course of observing FRB meetings, the Monitoring Team has not felt further investigation was required in order to comply with the Consent Decree or CDP policy.  This speaks to the quality of the investigations that are approved through the chain of command.

e. Through observations as well as review of the assessment tool used by the FRB, the Monitoring Team can confirm that policy, training, equipment, supervision, medical response by officers on the scene, communication, tactics and decision

making are all being consistently reviewed by the FRB and referred to the appropriate section within the Division for follow-up as required by paragraph 127.

f.  Through observations as well as a review of the assessment tool used by the FRB, the Monitoring Team can confirm that the Board consistently recommends non-disciplinary corrective action to enable or encourage an officer to improve his/her performance and recommends commendable actions when appropriate as required by paragraph 127.

g.  The FRB consistently documents its findings and recommendations in a report within 15 days of the Board meetings. The Monitoring Team has observed and can confirm this requirement has been met over the past two years.

The Monitoring Team finds this paragraph to be in **General Compliance - 5.**

### Paragraph 128
*The FRB will assess the quality of the investigations," including whether they are objective and comprehensive and recommendations are supported by a preponderance of evidence. The FRB will identify and document any deficiencies that indicate a need for corrective action.*

The Monitoring Team has observed the FRB process for nearly two years and can confirm that part of the FRB's assessment includes discussing and voting on the quality of the investigations and whether they are objective and comprehensive and the recommendations are supported by a preponderance of the evidence presented. The Monitoring Team has observed the FRB identify and document deficiencies as well as follow up with corrective action. CDP has documented all referrals in Power BI since 2023. The quality of those discussions about the investigation as well as the tactics and decision making before and during force have been inconsistent across time.

To advance to Substantial and Effective Compliance the Monitoring Team must observe a continuation of the quality discussion observed in the recent months because in the assessment period, the quality of discussions was inconsistent. The Monitoring Team finds this paragraph to be in **General Compliance - 5.**

### Paragraph 129
*Annually, the FRB will examine the data related to use of force" provided by the DACC per ¶261 to detect any patterns, trends, and training deficiencies and make recommendations for correction as appropriate. The analysis will be provided to the Monitor. To avoid duplication of effort in developing the public report required*

*by paragraph 266, this analysis will be conducted in conjunction with the Data*
*Collection and Analysis Coordinator.*

The DACC created a report in Power BI that captures patterns, trends, and training deficiencies in 2023 and continues to use that system to record findings of the FRB.  Specifically, the report documents:

- Total number of FRB meetings and total number of incidents reviewed
- All referrals to include commander referrals
- Training referrals at both the Division and officer level
- Equipment, policy and procedure referrals

Discipline for individual officers is captured in IAPro.  The PowerBI report also captures FRB actions taken in IAPro.  This report is thorough in its report of force data.  Additionally, training deficiencies that are forwarded from the FRB to the Training Review Committee (TRC) are included in the Training Needs Assessment.  In the 2024 Needs Assessment, the CDP reported that in 2023, twenty-seven incidents were forwarded to the TRC from the FRB.  Those referrals resulted in nine recommendations for training.  Those are included in the 2024 Training Needs Assessment.  The paragraph also calls for the FRB annually to "examine the data related to use of force …to detect patterns and trends …and make recommendations for correction…."  This analysis is to be reported to the Monitor.  While the Monitoring Team believes the data are being collected and maintained, the analysis has not been consistently reported.  The Monitoring Team looks forward to reviewing at least two consecutive years of quality reports to advance the rating to Substantial and Effective Compliance.

The Monitoring Team finds this paragraph to be in **General Compliance - 5.**

> ### *Paragraph 130*
> *The FRB will work with the Data Collection and Analysis Coordinator. to develop a tracking system to ensure that each of its recommendations has been forwarded to the appropriate personnel. The Chief and his or her designee will ensure that the FRB's recommendations, including non-disciplinary corrective action, are implemented as appropriate.*

The DACC created a report in Power BI that captures patterns, trends, and training deficiencies related to use of force reviews beginning in 2023.  This report documents recommendations for discipline or retraining made by the FRB at all levels: division, commander, and officer levels as well as any failures of equipment, or recommendations for policy and procedure adjustments.  The report also captures FRB actions documented in IAPro related to discipline.  Each recommendation is given a timeline for completion by the FRB.  The Monitoring Team confirmed that all recommendations made by the FRB have been appropriately implemented for the last two years.

The implementation of some recommendations took longer than the assigned timeline due, at times, to the lengthy review process that requires CPC approval.

The Monitoring Team finds this paragraph to be in **Substantial and Effective Compliance - 6.**

## IV.    COMPLIANCE ASSESSMENT CONCLUSIONS

| Consent Decree Paragraph | Compliance Rating |
|---|---|
| A.  **Use of Force Principles** | |
| 46 | The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers, regardless of the type of force, tactics, or weapon used, will comply with the following requirements:<br>a.  Officers will allow individuals the opportunity to submit to arrest before force is used wherever possible.<br>b.  Officers will use de-escalation techniques whenever possible and appropriate, before resorting to force and to reduce the need for force. De-escalation techniques may include verbal persuasion and warnings and tactical de-escalation techniques, such as slowing down the pace of an incident, waiting out subjects, creating distance (and thus the reactionary gap) between the officer and the threat, and requesting additional resources (e.g. specialized CIT officers or negotiators). Officers will be trained to consider the possibility that a subject may be noncompliant due to a medical or mental condition, physical or hearing impairment, language barrier, drug interaction, or emotional crisis.<br>c.  If force becomes necessary, officers will be limited to using only the amount of force objectively reasonable as necessary to control the person.<br>d.  In applying force, officers will reduce the level of force as the threat diminishes.<br>e.  Officers normally will not use force against persons who are handcuffed or otherwise restrained, unless it is objectively reasonable and necessary under the circumstances to stop an assault, escape, or as necessary to fulfill other law enforcement objectives.<br>f.  Officers will not use force against persons who only verbally confront them and do not impede a legitimate law enforcement function.<br>g.  CDP will explicitly prohibit the use of retaliatory force by officers. Retaliatory force includes, for example, force in excess of what is objectively reasonable to prevent an escape to punish individuals for fleeing or otherwise resisting arrest; and force used to punish an individual for disrespecting officers.<br>h.  Officers will not use head strikes with hard objects, except where lethal force is justified. Officers will be trained that | **General Compliance 5** |

90

| | | |
|---|---|---|
| | a strike to the head with any impact weapon could result in death.<br><br>i.   Other than to protect an officer's or other person's safety, officers will not use force to subdue an individual who is not suspected of any criminal conduct.<br><br>j.   CDP's policy will expressly provide that using a firearm as an impact weapon is never an authorized tactic. Officers will be trained that use of a firearm as an impact weapon could result in death to suspects, bystanders, and themselves.<br><br>k.   Officers will not use neck holds.<br><br>l.   CDP will continue to limit vehicle pursuits to those in which the need to capture the suspect outweighs the danger to the public. CDP will continue to limit the number of CDP vehicles that may be involved in a vehicle pursuit.<br><br>m.   Immediately following a use of force, officers and, upon arrival, a supervisor will inspect and observe subjects for injury or complaints of pain resulting from the use of force, and immediately obtain any necessary medical care. As necessary, officers will provide emergency first aid until professional medical care providers are on scene. | |
| 47 | As soon as practical following a use of force, CDP will ensure that the incident is accurately and properly reported, documented, and investigated. A fundamental goal of the revised use of force policy will be to account for, review, and investigate every reportable use of force and reduce any improper uses of force. | **General Compliance 5** |
| 48 | CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends. | **General Compliance 5** |
| **B.  Use of Force Policies** | | |
| 49 | The City will develop and implement use of force policies that comply with applicable law and are adequate to achieve the goals described in paragraph 45. The use of force policies will incorporate the use of force principles above, and will specify that the unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability. | **Substantial and Effective Compliance 6** |
| 50 | CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons that are available to CDP officers, including standard-issue weapons that are made available to all officers and weapons that are made available only to specialized units.  The policies will clearly | **Substantial and Effective Compliance 6** |

| | | |
|---|---|---|
| | define and describe each force option and the circumstances under which use of such force is appropriate. | |
| 51 | CDP policies related to specific weapons will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon. | **Substantial and Effective Compliance 6** |
| 52 | No officer will carry any weapon that is not authorized or approved by CDP. | **Substantial and Effective Compliance 6** |
| 53 | Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of weapon is imminent, and allow the subject an opportunity to comply. | **Substantial and Effective Compliance 6** |
| 54 | The City will implement policies for each of the following guidelines | **Not Assessed** |
| | 1. **Firearms** | |
| 55 | Officers will not unholster and display a firearm unless the circumstances create a reasonable belief that lethal force may become necessary. CDP's policies will require and training will teach proper techniques for unholstering, displaying, pointing, and aiming a firearm, and for determining when it is appropriate to do so. The Monitor will review CDP's policies and training to ensure that they comply with this paragraph. If an officer unholsters a firearm during an incident, interaction, or event that would otherwise trigger a reporting or data collection requirement, officers will document that a firearm was unholstered. CDP will annually collect and analyze this data. | **General Compliance 5** |
| 56 | Unholstering a firearm and pointing it at a subject constitutes a Level 1 reportable use of force and will be reported and investigated as such. The following exceptions to this reporting requirement will apply:<br>    a. Unholstering a firearm and pointing it at a subject constitutes a Level 1 reportable use of force and will be reported and investigated as such. The following exceptions to this reporting requirement will apply:<br>    b. SWAT Team Officers will not be required to report the pointing of a firearm at a subject as a use of force during the execution of SWAT Team duties; officers who are deputized and assigned to a Federal Task Force will not be required to report the pointing of a firearm at a subject as a use of force when conducting federal task force operations during which a supervisor is present. Reports or forms regarding any such incidents that are otherwise prepared by a Task Force supervisor will be provided to CDP; | **General Compliance 5** |

| | | |
|---|---|---|
| | c.  officers assigned to the Gang Impact, Narcotics, Homicide, Sex Crimes, Domestic Violence, and Financial Crimes Units will not be required to report the pointing of a firearm at a subject as a use of force if done solely while entering and securing a building in connection with the execution of an arrest or search warrant and a supervisor prepares a report detailing the incident. | |
| 57 | Officers will not fire warning shots. | **General Compliance 5** |
| 58 | Officers will consider their surroundings before discharging their firearms and will avoid unnecessary risk to bystanders, victims, and other officers. | **General Compliance 5** |
| 59 | Officers will not discharge a firearm from or at a moving vehicle, unless use of lethal force is justified by something other than the threat from the moving vehicle; officers will not intentionally place themselves in the path of or reach inside a moving vehicle; and, where possible, officers will attempt to move out of the path of a moving vehicle. | **General Compliance 5** |
| 60 | CDP annually will provide at least 16 hours of firearms training which will include pistol, shotgun, and policy training. In consultation with the Monitor, the City will develop a plan to provide appropriate night, reduced light, and stress training for officers. Officers will successfully qualify with each firearm they are authorized to use or carry on-duty at least annually. Officers will be required to qualify using proficiency standards and will not be permitted to carry any firearm on which they failed to qualify. | **General Compliance 5** |
| | 2.  **Electronic Control Weapons (ECW)** | |
| 61 | Officers will use Electronic Control Weapons ("ECWs") only where: (1) grounds for arrest or detention are present and the subject is actively or aggressively resisting, and lesser means would be ineffective; or (2) such force is necessary to protect the officer, the subject, or another party from immediate physical harm, and lesser means would be ineffective or have been tried and failed. | **General Compliance** |
| 62 | Each standard 5-second ECW application is a separate use of force that officers must individually justify as reasonable. After the first ECW application, the officer will reevaluate the situation to determine if subsequent cycles are reasonable. In determining whether any additional application is reasonable, officers will consider that a subject may not be able to respond to commands during or immediately following an ECW application. Officers will not employ more than three cycles of an ECW against a subject during a single incident. | **General Compliance 5** |

93

| 63 | Officers will consider transitioning to alternative control measures if the subject does not respond to ECW applications. | **General Compliance 5** |
|---|---|---|
| 64 | Officers will not use ECWs in drive stun mode solely as a pain compliance technique. Officers may use ECWs in drive stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option. | **General Compliance 5** |
| 65 | Officers will determine the reasonableness of ECW use based upon all the relevant circumstances, including the subject's apparent age, size, physical, and mental condition, and the feasibility of lesser force options. | **General Compliance 5** |
| 66 | Except where lethal force is authorized, officers will not use ECWs where: (1) a deployment may cause serious physical injury or death from situational hazards, including falling, losing control of a moving vehicle, or becoming ignited from the presence of potentially explosive or flammable materials or substances; or (2) the subject is visibly pregnant, apparently elderly, a child, visibly frail, has obviously low body mass, or is in apparent medical crisis. | **General Compliance 5** |
| 67 | Officers will not use ECWs on fleeing persons who do not pose a threat of physical harm to officers, other civilians, or themselves. | **General Compliance 5** |
| 68 | Officers will not intentionally target ECWs to a subject's head, neck, or genitalia. | **General Compliance 5** |
| 69 | Officers will not normally use ECWs on handcuffed or restrained persons. ECWs will be used on handcuffed or restrained persons only where the subject is displaying aggressive physical resistance and lesser means would be ineffective or have been tried and failed. | **General Compliance 5** |
| 70 | Officers will carry ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm. | **Substantial and Effective Compliance 6** |
| 71 | Officers will be trained in and follow protocols developed by the City, in conjunction with the City's EMS professionals, on the officer's responsibilities following ECW use, including: a. restrictions on removing ECW probes, including the requirements described in the next paragraph; b. understanding the risks of positional asphyxia, and using restraint techniques that do not impair the subject's respiration following a ECW application; c. monitoring all subjects who have received an ECW application while in police custody; and d. informing medical personnel of all subjects who have been subjected to multiple ECW applications, including | **Substantial and Effective Compliance 6** |

94

| | | |
|---|---|---|
| | prolonged applications (more than 15 seconds); or who appear to be under the influence of drugs or exhibiting symptoms associated with excited delirium; or who were kept in prone restraints after ECW use. | |
| 72 | The City will ensure that all subjects who have been exposed to an ECW application receive a medical evaluation by emergency medical responders in the field or at a medical facility. Absent exigent circumstances, probes will be removed from a subject's skin only by medical personnel or properly trained officers. | **General Compliance 5** |
| 73 | In addition to the force reporting requirements outlined in paragraph 88, officers will clearly articulate and justify the following regarding their ECW use in a written narrative:<br>    a. each and every ECW cycle used on a subject or attempted against a subject;<br>    b. use of the ECW in drive stun mode;<br>    c. ECW application for more than 15 seconds;<br>    d. continuous cycling of an ECW;<br>    e. ECW application on a fleeing person; and<br>    f. ECW application by more than one officer. | **General Compliance 5** |
| 74 | Officers who have been issued ECWs will receive annual ECW certifications, which will consist of physical competency; weapon retention; CDP policy, including any policy changes; technology changes; and scenario-based training. | **General Compliance 5** |
| 75 | The City will develop and implement integrity safeguards on the use of ECWs to ensure compliance with CDP policy. CDP will conduct quarterly downloads of all ECWs. The City will conduct random and directed audits of ECW application data, which will be provided to the Monitor for review. The audits should include a comparison of the downloaded data to the officer's Use of Force Reports. Discrepancies within the audit should be addressed and appropriately investigated. | **Non-compliant, Not Started 0** |
| 76 | ECW application data will be tracked and analyzed in CDP's Officer Intervention Program. | **Partial Compliance – Planning/Policy Stage 2** |
| | 3.  **Oleoresin Capsicum Spray ("OC Spray")** | |
| 77 | Officers will apply OC spray only: (1) when such force is reasonable to protect the officer, the subject, or another party from physical harm and lesser means would be ineffective; or (2) for crowd dispersal or protection and other means would be more intrusive or less effective. | **General Compliance 5** |
| 78 | After one standard OC spray (one second), each subsequent application is a separate use of force that officers must individually justify as reasonable. | **General Compliance 5** |

| 79 | Officers will not normally use OC spray on handcuffed or restrained persons. OC spray will be used on handcuffed or restrained persons only where the subject is displaying aggressive physical resistance and lesser means would be ineffective or have been tried and failed. | **General Compliance 5** |
|---|---|---|
| 80 | Officers will be trained in and follow protocols developed by the City in conjunction with the City's EMS professionals, on the officer's responsibilities following OC spray use, including:<br>    a. decontaminating every subject exposed to chemical spray by using cool water to flush the subject's face and eyes within 20 minutes of gaining control of the scene. Officers need not decontaminate subjects who were only secondarily exposed to OC spray, for example, when OC spray is used for crowd control, unless requested by the subject;<br>    b. understanding the risks of positional asphyxia, and using restraint technique that do not impair the subject's respiration following an OC spray application;<br>    c. requesting medical response or assistance for subjects exposed to OC spray when they complain of continued effects after having been decontaminated, or they indicate that they have a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, heart ailment, etc.) that may be aggravated by OC spray. | **General Compliance 5** |
| 81 | Officers will carry only CDP issued OC spray. | **Substantial and Effective 6** |
| 82 | CDP will maintain documentation of the number of OC spray canisters distributed to and utilized by each officer. | **Partial Compliance – Planning/Policy Stage 2** |
| 83 | OC spray application data will be tracked and analyzed in CDP's Officer Intervention Program. | **Partial Compliance – Planning/ Policy Stage 2** |
| | **C. Use of Force Training** | |
| 84 | As part of its training requirements in Section XI of this Agreement, within 365 days of the Effective Date, CDP will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes:<br>    a. proper use of force decision-making;<br>    b. use of force reporting requirements;<br>    c. the Fourth Amendment and related law;<br>    d. de-escalation techniques, both verbal and tactical, that empower officers to make arrests without using force and | **Substantial and Effective Compliance 6** |

96

| | | | |
|---|---|---|---|
| | | instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, using cover, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;<br>e. role-playing scenarios and interactive exercises that illustrate proper use of force decision-making, including training on the importance of peer intervention;<br>f. the proper deployment and use of all intermediate weapons or technologies;<br>g. the risks of prolonged or repeated ECW exposure, including that exposure to ECWs for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious physical injury;<br>h. the increased risks ECWs may present to a subject who is pregnant, elderly, a child, frail, has low body mass, or is in medical crisis;<br>i. that when using an ECW the drive stun mode is generally less effective than the probe mode and, when used repeatedly, may exacerbate the situation;<br>j. firearms training, as described in paragraph 60;<br>k. factors to consider in initiating or continuing a vehicle pursuit; and<br>l. for supervisors of all ranks, as part of their initial and annual in-service supervisory training, training in conducting use of force investigations; strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force; and supporting officers who report unreasonable or unreported force, or who are retaliated against for attempting to prevent unreasonable force. | |
| 85 | CDP also will provide the use of force training described in paragraph 84 to all new officers as part of its training Academy. | | **General Compliance 5** |
| 86 | CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope. | | **General Compliance 5** |
| | **D.  Use of Force Reporting Policy and Use of Force Reports** | | |
| 87 | Within 365 days of the Effective Date, CDP will develop and implement a single, uniform, reporting system pursuant to a Use of Force Reporting policy. CDP uses of force will be divided into three levels. The three levels for the reporting, investigation, and review of use of force correspond to the amount of force used and/or the outcome of the force. This Agreement's categorization of these types of uses of force is based on the | | **Substantial and Effective Compliance 6** |

97

| | | |
|---|---|---|
| | following factors: potential of the technique or weapon to cause injury; degree of injury caused; degree of pain experienced; degree of disability experienced by the subject; complaint by the subject; degree of restraint of the subject; impairment of the functioning of any organ; duration of force; and physical vulnerability of the subject. Each level of force will require increasingly rigorous reporting, investigation, and review. The levels of force are defined as follows: <br><br>    a. Level 1 is force that is reasonably expected to cause only transient pain and/or disorientation during its application as a means of gaining compliance, including pressure point compliance and joint manipulation techniques, but that is not reasonably expected to cause injury, does not result in an actual injury, and does not result in a complaint of injury. It does not include escorting, touching, or handcuffing a person with no or minimal resistance. Unholstering a firearm and pointing it at a subject is reportable as a Level 1 use of force with the exceptions set forth in paragraph 56. <br><br>    b. Level 2 is force that causes an injury, could reasonably be expected to cause an injury, or results in a complaint of an injury, but does not rise to the level of a Level 3 use of force. Level 2 includes the use of an ECW, including where an ECW is fired at a person but misses; OC Spray application; weaponless defense techniques (e.g., elbow or closed-fist strikes, kicks, leg sweeps, and takedowns); use of an impact weapon, except for a strike to the head, neck or face with an impact weapon; and any canine apprehension. <br><br>    c. Level 3 is force that includes: (1) uses of lethal force; (2) uses of force resulting in death or serious physical injury; (3) uses of force resulting in hospital admission; (3) all neck holds; (4) uses of force resulting in a loss of consciousness; (5) canine bites; (6) more than three applications of an ECW on an individual during a single interaction, regardless of the mode or duration of the application, and regardless of whether the applications are by the same or different officers, or an ECW application for longer than 15 seconds, whether continuous or consecutive; and (7) any Level 2 use of force against a handcuffed subject. | |
| 88 | All officers using or observing force will report in writing, before the end of their shift, the use of force in a Use of Force Report. The Use of Force Report will include: (1) a detailed account of the incident from the officer's perspective; (2) the reason for the initial police presence; (3) a specific description of | **General Compliance 5** |

| | | |
|---|---|---|
| | the acts that led to the use of force; (4) the level of resistance encountered; and (5) a complete and accurate description of every type of force used or observed. The use of force reporting policy will explicitly prohibit the use of conclusory statements, "boilerplate," or "canned" language (e.g., "furtive movement" or "fighting stance"), without supporting detail. | |
| 89 | Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports. | **General Compliance 5** |
| 90 | Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable. | **General Compliance 5** |
| 91 | Officers who use or observe force will notify their supervisors, or ensure that their supervisors have been notified, as soon as practical following any use of force. An officer who becomes aware of an allegation of unreasonable or unreported force by another officer must immediately notify his or her supervisor of that allegation. | **General Compliance 5** |
| 92 | Use of Force Reports will be maintained centrally. | **Substantial and Effective Compliance 6** |
| E. **Use of Force Investigations** | | |
| 93 | A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval. | **Operational Compliance 4** |
| 1. **Investigations of Level 1 Uses of Force** | | |
| 94 | The direct supervisor of the officer(s) employing a Level 1 use of force will review and approve the use of force in writing, return the Use of Force Report to the officer for revision, or elevate the Level 1 use of force before the end of the supervisor's shift following the shift on which the Level 1 force was used. If the Use of Force Report is returned to the officer for revision, all revisions and additional reviews will be completed within 5 days of the use of force. It is not mandatory for supervisors to report to the scene of a Level 1 use of force. Supervisors will elevate and investigate any Level 1 use of force that appears to have violated policy or was improperly categorized as a Level 1 use of force. If a supervisor determines that an officer's report reveals evidence of a use of force involving potential criminal conduct, he or she will immediately notify Internal Affairs. | **General Compliance 5** |
| 2. **Investigations of Level 2 Uses of Force** | | |
| 95 | The direct supervisor of the officer(s) using force, upon notification of a Level 2 use of force incident or allegation of excessive force, will respond to the location of the occurrence. | **General Compliance 5** |

99

| | | |
|---|---|---|
| | Where the force is a Level 1 but the subject has alleged excessive force, the supervisor will respond to the scene to determine whether a Level 1 or Level 2 investigation should be conducted. | |
| 96 | If a CDP supervisor uses a Level 2 use of force, a supervisor of a higher rank will respond to the location of the occurrence and comply with the requirements of this section. | **General Compliance 5** |
| 97 | For all Level 2 uses of force, the direct supervisor will:<br>　a. respond to the scene, examine the subject of the force for injury, and interview the subject for complaints of pain after advising the subject that the interview pertains only to the use of force and not to any underlying alleged crime and  that the subject need not answer questions;<br>　b. where appropriate, ensure that the subject receives medical attention from an appropriate medical provider;<br>　c. obtain an identifying number that allows CDP to track the use of force;<br>　d. identify and collect all evidence relevant to the use of force and evaluate that evidence to determine whether the use of force: (1) was consistent with CDP policy; and/or (2) raises any policy, training, tactical, or equipment concerns;<br>　e. ensure that all evidence that could establish material facts related to the use of force, including audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;<br>　f. ensure that a canvass for civilian witnesses is conducted and interview all civilian witnesses. Supervisors will either record the interview or encourage civilian witnesses to provide and sign a written statement in their own words;<br>　g. ensure that all officers witnessing a use of force incident by another officer complete a Use of Force Report. Supervisors will ensure that all Use of Force Reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;<br>　h. ensure that involved officers are interviewed separately from one another. Group interviews will be prohibited. Supervisors will not ask officers or other witnesses leading questions that suggest legal justifications for the officers' conduct, where such questions are contrary to appropriate law enforcement techniques; and<br>　i. each investigating supervisor will provide a brief written synopsis to their immediate supervisor, which | **General Compliance 5** |

| | | |
|---|---|---|
| | will be forwarded through the chain of command to the District Commander by the end of the shift on which the force occurred, documenting the supervisor's preliminary determination of the appropriateness of the use of force. | |
| 98 | The investigating supervisor will ensure that all Use of Force Reports include the information required by this Agreement and CDP policy; consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate; and make credibility determinations, if feasible. Supervisors will make all reasonable efforts through the investigation to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force claimed by the officer and the subject's injuries, and inconsistencies between multiple officers. CDP will train all investigating supervisors on how to effectively complete these tasks. | **General Compliance 5** |
| 99 | Whenever a supervisor determines that there may have been misconduct, the supervisor will immediately notify Internal Affairs and Internal Affairs will determine if it should respond to the scene and/or conduct or take over the investigation. | **Substantial and Effective Compliance 6** |
| 100 | Within five days of learning of the use of force, each supervisor will complete and document his/her investigation using a supervisor's Use of Force Report. Any extension to this deadline must be authorized by a District Commander. This Report will include the following:<br>  a. the supervisor's narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officers' conduct based on the supervisor's independent review of the facts and circumstances of the incident;<br>  b. documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state that fact. In situations in which witnesses were present but circumstances prevented the supervisor from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report should also include all available identifying information for anyone who refused to provide a statement;<br>  c. the names of all CDP employees who used force or witnessed the use of force;<br>  d. the investigating supervisor's evaluation of the use of force, based on the supervisor's review of the evidence gathered, including a determination of whether the | **General Compliance 5** |

101

| | | |
|---|---|---|
| | officers' actions appear to be within CDP policy and consistent with state and federal law; and an assessment of the incident for policy, training, tactical or equipment concerns, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options; and<br>e. documentation of any non-disciplinary corrective action taken. | |
| 101 | Investigatory supervisors will be subject to the disciplinary process for failing to adequately investigate and document a use of force and material omissions or misrepresentations in the supervisory investigation. An investigatory supervisor's failure to adequately investigate a use of force will be addressed in their performance review. | **Operational Compliance 4** |
| 102 | Upon completion of the supervisor's Use of Force Report, the investigating supervisor will forward the report through their chain of command to the District Commander, who will review the report to ensure that it is complete and that the findings are supported using the preponderance of the evidence standard. Each level in the chain of command will review the report within 72 hours of receiving it. Reviewing supervisors in the chain of command will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings. | **General Compliance 5** |
| 103 | Where the findings of the Use of Force Report are not supported by a preponderance of the evidence, the investigating supervisor's chain of command will document the reasons for this determination and will include this documentation as an addendum to the original investigation. The investigating supervisor's superior will counsel the investigating supervisor regarding the inadequately supported determination and of any investigative deficiencies that led to it. The District Commander will be responsible for the accuracy and completeness of Use of Force Reports prepared by supervisors under their command. | **General Compliance 5** |
| 104 | Where an investigating supervisor conducts deficient investigations, the supervisor will receive the appropriate corrective action, including training or demotion, in accordance with performance evaluation procedures and/or the disciplinary process. | **Operational Compliance 4** |
| 105 | Whenever an investigating supervisor, reviewing supervisor, or District Commander finds evidence of a use of force involving potential criminal conduct by an officer, he or she will suspend the force investigation immediately and notify Internal Affairs. Internal Affairs will immediately notify FIT, which will take over both the criminal and administrative investigation. | **Substantial and Effective Compliance 6** |

102

| | | |
|---|---|---|
| 106 | When the District Commander finds that the investigation is complete and the findings are supported by the evidence, the investigation file will be promptly forwarded to Internal Affairs. Internal Affairs will review the investigation to ensure that it is complete and that the findings are supported by the evidence. | **General Compliance 5** |
| 107 | When Internal Affairs completes its review, it will forward the complete file to the Chief of CDP for disposition. | **Substantial and Effective Compliance 6** |
| 108 | At the discretion of the Chief, his or her designee, or Internal Affairs, a use of force investigation may be assigned or re-assigned for investigation to FIT or to another supervisor, whether within or outside of the District in which the incident occurred, or may be returned to the District for further investigation or analysis. This assignment or re-assignment will be explained in writing. | **General Compliance 5** |
| 109 | Where, after investigation, a use of force is found to be out of policy, the City will ensure the appropriate disciplinary process. Where the use of force indicates policy, training, tactical, or equipment concerns, the Chief will ensure also that necessary training is delivered and that policy, tactical, or equipment concerns are resolved. | **General Compliance 5** |
| | **3.   Force Investigation Team and Investigations of Level 3 Uses of Force** | |
| 110 | CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP where appropriate to ensure the fact and/or appearance of impartiality of investigations. | **Substantial and Effective Compliance 6** |
| 111 | The Internal Affairs Unit will include CDP's Force Investigation Team (FIT).  Each FIT will be a team comprised of personnel from various unites and will not be a new unit to which officers are permanently assigned. The FIT will conduct administrative investigations in all of the following instances and, where appropriate and where not assigned to an outside agency as permitted above, will conduct criminal investigations of: (1) all Level 3 uses of force; (2) uses of force involving potential criminal conduct by an officer; (3) all instances in which an individual died while in, or as an apparent result of being in, CDP custody; and (4) any uses of force reassigned to FIT by the Chief or his or her designee. The FIT will be designed to ensure that these incidents are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified; that training, tactical, and equipment deficiencies related to the use of force are identified; and that investigations are of sufficient quality. | **Substantial and Effective Compliance 6** |

| | | |
|---|---|---|
| 112 | FIT will be comprised of personnel who have specialized training and expertise. The FIT membership will be tailored to the circumstances of each investigation, but will normally include one or more FIT detectives, the FIT sergeant, an Office of Professional Standards investigator, an Internal Affairs investigator, and a Homicide Unit supervisory officer, who will serve as the Team's leader. OPS investigators will not participate in criminal investigations. At least one member of the FIT will be available at all times to evaluate potential referrals from CDP supervisors. | **Substantial and Effective Compliance 6** |
| 113 | Prior to performing FIT duties, FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type, including FIT procedures, including callout and investigative protocols; the differences between administrative and criminal investigations and how each should be conducted; investigations of officer-involved shootings; investigative equipment and techniques; and proper roles of the following: on-scene counterparts, such as crime scene technicians; the Monitor; any outside investigating agency; the prosecutor's office; and OPS. The training also will address techniques for objective fact-gathering and evaluation and the factors to consider when evaluating credibility. FIT investigators also will receive annual in-service training that is adequate in quantity, quality, type, and scope. | **Operational Compliance 4** |
| 114 | Within 365 days from the Effective Date, CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement. | **Operational Compliance 4** |
| 115 | FIT will respond to the scene of every incident involving a use of force for which it is required to conduct an investigation. The FIT leader will immediately notify the appropriate prosecutor's office. If the City elects to utilize an outside agency to conduct the criminal investigation, the FIT leader will notify the designated outside agency to respond to the scene to conduct the criminal investigation. | **Substantial and Effective Compliance 6** |
| 116 | CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation. | **General Compliance 5** |
| 117 | Before using an outside agency to conduct criminal investigations, CDP will develop a memorandum of understanding with the outside agency to ensure that, after an appropriate prosecutor review, completed criminal investigations are provided to FIT and the Monitor, and that information obtained from or as a result of any compelled interviews of officers is not provided to criminal investigators. The memorandum of understanding also will delineate responsibilities between the two agencies and establish | **Substantial and Effective Compliance 6** |

104

| | | |
|---|---|---|
| | investigative protocols to ensure, to the extent possible, thorough, objective and timely administrative and criminal investigations. | |
| 118 | FIT will:<br>    a. assume control of the use of force investigation upon their arrival, unless an outside agency is conducting the criminal investigation and control of the scene by the criminal investigating body is appropriate;<br>    b. ensure that a canvass for, and interview of, civilian witnesses is conducted by FIT team members. FIT members will either record the interview or encourage civilian witnesses to provide and sign written statements in their<br>own words, but will take information from civilian witnesses who have pertinent information even if they refuse to be recorded or refuse to complete or sign a formal statement;<br>    c. arrange for photographing and processing of the scene;<br>    d. ensure that all evidence that could establish material facts related to the use of force, including audio and video recordings, photographs, and other documentation of injuries or the absence of injuries is collected;<br>    e. examine the subject for injury, photograph areas of injury or complaint of injury, interview the subject for complaints of pain after advising the subject that the interview pertains only to the use of force and not to any underlying alleged crime and that the subject need not answer questions, and ensure that the subject receives medical attention from an appropriate medical provider;<br>    f. ensure that all officers witnessing the use of force by another officer complete a use of force report regarding the incident;<br>    g. review all use of force reports to ensure that they include the information required by CDP policy;<br>    h. consistent with applicable law, interview all officers who witness or are otherwise involved in the incident. To the extent possible, officers will be separated until interviewed. Group interviews will be prohibited. FIT will not ask officers or other witnesses leading questions that suggest legal justifications for the officers' conduct, when such questions are contrary to appropriate law enforcement techniques. FIT will record all interviews. FIT will ensure that all FIT investigation reports identify all officers who were involved in the incident, witnessed the incident, or were on the scene when it occurred;<br>    i. arrange for body worn camera video downloads; | **General Compliance 5** |

| | | |
|---|---|---|
| | j. provide an initial briefing to a training representative at the start of the investigation to ensure that any training issues that require immediate attention are identified, and continue to consult as appropriate with the training representative; and<br>k. make all reasonable efforts through the investigation to resolve material inconsistencies between the officer, subject, and witness statements, as well as inconsistencies between the level of force claimed by the officer and the subject's injuries. | |
| 119 | On at least an annual basis, the Monitor will determine whether the criminal investigations conducted by the outside agency are consistently objective, timely, and comprehensive. If the Monitor determines that they are not and the City disagrees, the Court will resolve the disagreement. If a determination is made that the investigations are not consistently objective, timely, and comprehensive, the memorandum of understanding will be terminated and the FIT will assume responsibility for conducting all criminal investigations of uses of force. | **Operational Compliance 4** |
| 120 | If the FIT leader determines that a case has the potential to proceed criminally, compelled interviews of the subject officer(s) will be delayed. No other part of the investigation will be held in abeyance unless specifically authorized by the Chief in consultation with the agency conducting the criminal investigation and the appropriate prosecutor's office. | **General Compliance 5** |
| 121 | The FIT leader will complete a preliminary report that will be presented to the Chief of Police or the Chief's designee as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force. | **General Compliance 5** |
| 122 | With the exception of compelled interviews as described in paragraph 120, FIT will complete its administrative investigation within 60 days. Any request for an extension of time must be supported by a written justification and approved in writing by the Chief or the Chief's designee. CDP's inability to complete the investigation because it is awaiting information from an outside agency, such as the medical examiner's office, will constitute sufficient basis for such an extension for that portion of the investigation. Within seven days of the conclusion of each use of force investigation, FIT will prepare an investigation report and recommend whether the preponderance of the evidence establishes that the involved officer(s) violated CDP policy, and whether any training or policy concerns are presented. FIT's investigative report and recommendations will be reviewed by the head of Internal Affairs. Within three business days, the head of Internal Affairs will approve or disapprove FIT's recommendations, or request that FIT conduct | **Operational Compliance 4** |

106

| | | |
|---|---|---|
| | additional investigation. Any request for additional investigation and the FIT's response will be documented and maintained in the investigatory file. Internal Affairs will forward the investigative report to the Chief of Police for review and approval. | |
| 123 | CDP will revise the FIT manual to ensure that it is consistent with the force principles outlined in this Agreement and includes the following:<br>    a. guidance on an appropriate approach when providing Garrity warnings and protections to officers for answering questions regarding their uses of force;<br>    b. clear procedures to ensure appropriate separation of criminal and administrative investigations in the event of compelled subject officer statements;<br>    c. definitions of all relevant terms;<br>    d. clear statements of the mission and authority of FIT;<br>    e. procedures for report writing;<br>    f. procedures for objective fact-gathering and evaluation and the factors to consider when evaluating credibility;<br>    g. procedures for collecting and processing evidence;<br>    h. procedures for consulting with the law department, including ensuring that administrative investigations are not unnecessarily delayed while a criminal investigation is pending; and<br>    i. scene management procedures. | **Substantial and Effective Compliance 6** |
| **F.** | **Force Review Board** | |
| 124 | The City will develop and implement a Force Review Board ("FRB") to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective. The FRB will review all FIT investigations, all Level 2 investigations where there was a determination of force related misconduct, and a sample of Level 2 use of force investigations. The Force Review Board ("FRB") will be comprised of the Chief of Police or his or her designee, who will chair the FRB; a supervisor from the training section; a representative from Office of Professional Standards; and a representative from Internal Affairs. One representative from each District, to be selected by the District Commander, will participate in all Force Review Board reviews involving a use of force in that District. The Chair may include any subject matter experts the Chair feels would be helpful in reviewing particular incidents. The FRB also may consult with other advisors as necessary. | **Substantial and Effective Compliance 6** |

| 125 | Each member will receive training on legal updates, updates on CDP's policies, and CDP training curriculum related to the use of force. | **General Compliance 5** |
|---|---|---|
| 126 | The Force Review Board will conduct comprehensive and reliable reviews of investigations within 90 days of submission to the FRB. The scope of the Board's review will not be limited to assessing an officer's decision-making at the moment the officer employed force. Rather, the FRB's review will include the circumstances leading up to the use of force, tactical decisions, information sharing and communication, adequacy of supervision, equipment, training, CDP's medical response, when applicable, and any commendable actions. The review will include the actions and inactions of all officers, supervisors, commanders, and dispatchers involved in the incident, as appropriate. | **General Compliance 5** |
| 127 | In conducting these reviews, the Force Review Board will:<br>a. ensure that it is objective and complete and that the findings are supported by a preponderance of the evidence. Where the findings are not supported by a preponderance of the evidence, the FRB will document the reasons for this determination, including the specific evidence or analysis supporting its conclusions, and forward its determination to the Chief of Police;<br>b. hear the case presentation from the lead investigator, or for supervisory investigations, the representative from the District where the force occurred;<br>c. review any written or recorded statements from the officer, and discuss the case as necessary with the investigator or District representative to gain a full understanding of the facts of the incident;<br>d. order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the force investigation;<br>e. determine whether the incident raises concerns regarding policy, training, equipment, supervision, medical response by officers on the scene, communication, or tactics, and refer such incidents to the appropriate unit within CDP to ensure they are resolved;<br>f. recommend non-disciplinary corrective action to enable or encourage an officer to improve his/her performance; and<br>g. document its findings and recommendations in a report within 15 days of each FRB case presentation. | **General Compliance 5** |
| 128 | The FRB will assess the quality of the investigations," including whether they are objective and comprehensive and | **General Compliance 5** |

108

| | | |
|---|---|---|
| | recommendations are supported by a preponderance of evidence. The FRB will identify and document any deficiencies that indicate a need for corrective action. | |
| 129 | Annually, the FRB will examine the data related to use of force" provided by the DACC per ¶261 to detect any patterns, trends, and training deficiencies and make recommendations for correction as appropriate. The analysis will be provided to the Monitor. To avoid duplication of effort in developing the public report required by paragraph 266, this analysis will be conducted in conjunction with the Data Collection and Analysis Coordinator. | **General Compliance 5** |
| 130 | The FRB will work with the Data Collection and Analysis Coordinator. to develop a tracking system to ensure that each of its recommendations has been forwarded to the appropriate personnel. The Chief and his or her designee will ensure that the FRB's recommendations, including non-disciplinary corrective action, are implemented as appropriate. | **Substantial and Effective Compliance 6** |

## V.    USE OF FORCE DATA: OVERALL ANALYSIS AND TRENDS, YEARS AND RELATED OUTCOME ASSESSMENTS

For the outcome measures detailed in paragraph 367a of the Consent Decree, the Monitoring Team relies upon the CDP outcome measure data report.  The data in the report is sourced from various stakeholders including CDP and the City.  Values across tables should not be expected to match since an incident can involve multiple people, reasons for the incident, and crimes.  The Monitoring Team compiled data from 2015 through 2020. Beginning in 2021, the CDP data team began managing compiling data for paragraph 367a.  Furthermore, since 2020, some key definitions have been updated and reporting practices have changed such that comparisons over time may not be applicable for some measures.

Paragraph 367.a. – "Use of force measurements, including":

1.  "number of use-of-force incidents as compared to number of arrests, with use-of-force incidents broken down by force type, District, type of related arrest (if any); actual or perceived race, ethnicity, age, and gender of the subject; and, if indicated at the time force was used, the subject's mental or medical condition, use of drugs or alcohol, or the presence of a disability;"

|  | 2018* | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Total # of UOF incidents | 335 | 342 | 266 | 195 | 210 | 283 | 334 |
| # UOF ending in arrests | 262 | 274 | 203 | 146 | 183 | 217 | 255 |

*On January 1st, 2018, the Cleveland Division of Police implemented new use of force levels. With such substantial changes made to the use of force definition, 2018 data onward will not be compared to previous years; instead, 2018 will serve as the baseline.

While the number of use of force incidents in 2024 increased for the third year in a row, the total number of incidents is a return to pre-2020 levels.  The decrease in incidents in 2020 and 2021 was likely related to Covid-19 and its consequential reduction of activity generally in public places.  The increase in incidents represents a return to pre-Covid-19 trends.  Though the increase may be a return to pre-Covid-19 levels, the distribution across police districts is not equal, with Districts 3 and 4 rising to levels higher than pre-Covid levels while District 5 has seen a continued lower-level than pre-Covid.  The increase in reporting can suggest that officers are active and engaged in policing activities with no evidence of de-policing.

**Table 1: Number of Use of Force Incidents by District**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| District 1 | 34 | 52 | 34 | 23 | 31 | 47 | 31 |
| District 2 | 77 | 71 | 71 | 41 | 62 | 66 | 88 |
| District 3 | 69 | 79 | 48 | 56 | 44 | 60 | 97 |
| District 4 | 71 | 57 | 58 | 34 | 33 | 60 | 82 |
| District 5 | 82 | 80 | 49 | 39 | 37 | 47 | 43 |
| outside city | 2 | 3 | 1 | 1 | 4 | 4 | 4 |
| Unknown/NULL | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 335 | 342 | 261 | 194 | 211 | 284 | 345 |

**Table 2: Number of Use of Force Incidents by Force Type**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Balance Displacement | 0 | 0 | 7 | 10 | 9 | 10 | 5 |
| Body Force/Body Weight | 64 | 86 | 78 | 55 | 60 | 72 | 88 |
| Control Hold-Restraint | 68 | 77 | 51 | 44 | 30 | 44 | 49 |
| Control Hold-Takedown | 40 | 57 | 30 | 24 | 19 | 44 | 31 |
| De-Escalation | 82 | 89 | 149 | 140 | 129 | 167 | 272 |
| Firearm Discharge | 2 | 5 | 5 | 5 | 0 | 1 | 4 |
| Firearm Point | 187 | 169 | 113 | 77 | 106 | 151 | 178 |
| Joint Manipulation | 36 | 58 | 38 | 39 | 20 | 27 | 46 |
| Tackling/Takedown | 44 | 58 | 52 | 30 | 43 | 52 | 48 |
| Taser | 17 | 23 | 20 | 18 | 8 | 16 | 17 |
| Verbal/Physical Gestures | 0 | 0 | 5 | 8 | 14 | 5 | 8 |
| Pressure Point/Pressure Point Control | 1 | 3 | 3 | 5 | 3 | 5 | 6 |
| Push | 37 | 36 | 40 | 24 | 9 | 16 | 25 |
| Other (1-25 instance each) | 83 | 87 | 77 | 59 | 43 | 44 | 77 |
| Unknown/NULL/#N/A | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

It is noteworthy that the number of de-escalations continues to increase, with the second largest year to year increase from 2023 to 2024 – 62.9%.  The increase in de-escalations could be the result of improved training or a greater emphasis on accurate data entry.

**Table 3: Number of Use of Force Incidents by Arrest Type**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Violence toward Police Officer | 35 | 49 | 42 | 48 | 36 | 41 | 75 |
| Violence toward Others | 114 | 109 | 91 | 63 | 76 | 104 | 145 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Damage to Property | 92 | 100 | 55 | 41 | 70 | 96 | 132 |
| Obstructing Justice | 236 | 242 | 213 | 179 | 175 | 275 | 349 |
| Crisis Intervention | 32 | 35 | 28 | 22 | 13 | 18 | 14 |
| Drugs/Alcohol | 42 | 39 | 20 | 29 | 34 | 42 | 42 |
| Cleveland Codified Ord. - Part 6 | 64 | 55 | 33 | 25 | 22 | 39 | 46 |
| NULL | 31 | 41 | 0 | 0 | 0 | 0 | 0 |
| Other (1-25 instance each) | 97 | 111 | 70 | 52 | 54 | 70 | 76 |

There has been a notable increase from 2023 to 2024 in the number of force incidents involving violence toward the police officer and for obstructing justice.  The increase in these two categories is concerning and should be closely monitored and reviewed.  It is possible that the increase is the result of changes in data entry practices.  But the increase could also be an indication of changes in how the public perceives and behaves toward police officers or how officers are responding in those situations.

**Table 4: Number of Use of Force Incidents by Race**

| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** |
|---|---|---|---|---|---|---|---|
| Black | 290 | 267 | 202 | 147 | 163 | 211 | 282 |
| White | 44 | 60 | 62 | 35 | 45 | 53 | 68 |
| Hispanic | 21 | 26 | 28 | 14 | 17 | 28 | 19 |
| Asian | 1 | 1 | 0 | 1 | 0 | 1 | 0 |
| Other | 8 | 1 | 2 | 5 | 1 | 6 | 6 |
| Unknown/NULL | 0 | 0 | 0 | 5 | 2 | 3 | 6 |
| Total | 364 | 355 | 294 | 207 | 228 | 302 | 381 |

Black people are the majority of subjects in use of force incidents each year and the number of such incidents has returned to pre-Covid-19 levels.  Given that Black people make up the majority of people stopped by police and then arrested, this distribution is expected.

**Table 5: Number of Use of Force Incidents by Ethnicity**

| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** |
|---|---|---|---|---|---|---|---|
| Hispanic/Latino | 21 | 26 | 28 | 14 | 17 | 28 | 19 |
| Non-Hispanic/Latino | 343 | 329 | 266 | 188 | 209 | 271 | 356 |
| Unknown/NULL | 0 | 0 | 0 | 5 | 2 | 3 | 6 |
| Total | 364 | 355 | 294 | 207 | 228 | 302 | 381 |

**Table 6: Number of Use of Force Incidents by Age Group**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| 17 and under (juveniles) | 37 | 28 | 23 | 22 | 27 | 52 | 51 |
| 18-29 years | 158 | 160 | 117 | 74 | 88 | 100 | 111 |
| 30-39 years | 91 | 96 | 71 | 63 | 56 | 60 | 98 |
| 40-49 years | 42 | 44 | 43 | 25 | 31 | 41 | 60 |
| 50-59 years | 24 | 12 | 14 | 13 | 9 | 16 | 24 |
| 60+ years | 2 | 2 | 4 | 3 | 4 | 8 | 8 |
| Unknown/NULL | 0 | 1 | 3 | 0 | 3 | 0 | 0 |
|  | 354 | 343 | 275 | 200 | 218 | 277 | 352 |

**Table 7: Number of Use of Force Incidents by Gender**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Male | 323 | 313 | 261 | 183 | 210 | 270 | 322 |
| Female | 40 | 42 | 33 | 24 | 18 | 28 | 56 |
| Unknown/NULL | 1 | 0 | 0 | 0 | 0 | 4 | 3 |
| Total | 364 | 355 | 294 | 207 | 228 | 302 | 381 |

**Table 8: Number of Use of Force Incidents by Mental State**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Mental Crisis | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Behavioral Crisis Event | 39 | 43 | 41 | 27 | 23 | 34 | 39 |
| Medical Condition* | - | - | - | - | - | - | - |
| Drugs / ETOH | 97 | 128 | 95 | 71 | 75 | 69 | 129 |
| Unimpaired/None Detected | 231 | 205 | 174 | 116 | 137 | 201 | 234 |
| Unknown/NULL | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Known Medical Condition | 3 | 0 | 2 | 3 | 2 | 0 | 1 |
| Visible Physical Disability | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 374 | 376 | 312 | 217 | 237 | 304 | 403 |

*CDP does not track 'mental condition'

2. "number of injuries to officers and public, the rate at which officer and subject injuries decrease or increase overall and by severity of injury; number of force complaints, disposition of complaints, source of complaint (internal or external), force type, geographic area, and any identified demographic category of complainant;"

113

**Table 9: Number of Injuries to Officers, and the rate at which they decrease or increase**

| Officer injuries | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| # officers injured | 62 | 74 | 36 | 37 | 34 | 29 | 37 |
| rate of officer injuries change overall | -51% | 19% | -51% | 3% | -8% | -15% | 28% |

It is notable that though the total number of use of force incidents has increased to pre-Covid-19 levels, the number of officers injured has stayed at lower-levels than pre-Covid-19.  This could be explained as improved or a change in tactics by officers or a decrease in the severity of the conduct of the person being arrested.

**Table 10: Number of Injuries to Officers by Severity of Injury**

| Officer injuries severity | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| No Injuries | 538 | 568 | 450 | 302 | 313 | 426 | 569 |
| Abrasion | 18 | 19 | 15 | 11 | 13 | 16 | 15 |
| Bodily Fluid/Exposure | 9 | 11 | 9 | 15 | 5 | 2 | 0 |
| Bruise | 7 | 11 | 8 | 6 | 8 | 3 | 4 |
| Concussion | 2 | 2 | 0 | 0 | 0 | 0 | 0 |
| Hospital | 22 | 31 | 19 | 22 | 9 | 0 | 0 |
| Laceration | 6 | 5 | 2 | 4 | 9 | 2 | 2 |
| Puncture | 0 | 1 | 0 | 0 | 2 | 1 | 0 |
| Refused Treatment | 7 | 8 | 6 | 2 | 1 | 0 | 0 |
| Soft Tissue Damage | 9 | 4 | 4 | 2 | 4 | 3 | 5 |
| Sprain/Strain/Twist | 7 | 11 | 4 | 9 | 8 | 11 | 5 |
| Treated & Released | 13 | 22 | 16 | 20 | 8 | 0 | 0 |
| Unconscious | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Other | 5 | 8 | 4 | 9 | 9 | 0 | 11 |

**Table 11: Number of Injuries to Public, and the rate at which they decrease or increase**

| Public/subject injuries | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| # public/subject injuries | 142 | 153 | 194 | 181 | 198 | 139 | 161 |
| rate of subject injuries change overall | -29% | 8% | 27% | -7% | 9% | -30% | 16% |

The number and percent change in public/subject injuries increased from 2023 to 2024 and is higher than the pre-Covid-19 levels.  This data point may be worth a deeper examination.

**Table 12: Number of Injuries to Public by Severity of Injury**

| Public/Subject injuries severity | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| No Injuries (No injuries noted) and None Identified | 266 | 214 | 181 | 95 | 137 | 213 | 285 |
| Abrasion | 36 | 32 | 39 | 21 | 33 | 38 | 41 |

114

| Behavioral Crisis | 28 | 41 | 31 | 24 | 12 | 0 | 0 |
|---|---|---|---|---|---|---|---|
| Complaint | 21 | 38 | 31 | 37 | 43 | 49 | 70 |
| EMS | 77 | 111 | 77 | 72 | 23 | 0 | 0 |
| Hospital | 95 | 176 | 119 | 110 | 44 | 0 | 0 |
| Laceration | 14 | 15 | 18 | 10 | 17 | 19 | 11 |
| Pre-Existing Medical Condition | 11 | 35 | 21 | 30 | 9 | 0 | 0 |
| Puncture | 13 | 21 | 14 | 11 | 8 | 0 | 0 |
| Refused Medical Treatment | 12 | 10 | 11 | 11 | 4 | 0 | 0 |
| Self-Inflicted/Self-Induced | 15 | 15 | 12 | 15 | 9 | 10 | 4 |
| Treated & Released | 44 | 95 | 92 | 76 | 29 | 0 | 0 |
| Unconscious | | 1 | 0 | 2 | 0 | 1 | 0 |
| Other | 21 | 60 | 36 | 33 | 36 | 35 | 37 |

**Table 13: Number of Force Complaints**

| Force complaints | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| # of force complaints | 33 | 38 | 36 | 15 | 12 | 16 | 15 |
| # of non-force complaints | 84 | 85 | 97 | 112 | 151 | 146 | 152 |

The number of use of force complaints is at much lower levels than pre-Covid-19, despite the increase in use of force incidents.  This could indicate a change in tactics with respect to use of force, an improved handling of the subject at the scene, or the quality of the interaction between the officer and the subject and public.  The number of non-force complaints though has increased beyond pre-Covid-19 levels.  When taken together, this could be the result of changes in data collection and categorization as well.

**Table 14: Number of Force Complaints by Disposition**

| Disposition of force complaints | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Substantiated/Sustained | 3 | 4 | 2 | 1 | 1 | 1 | 0 |
| Not Sustained | 3 | 1 | 1 | 0 | 1 | 1 | 0 |
| Administrative Closure | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exonerated/Within Policy | 3 | 11 | 24 | 11 | 8 | 8 | 13 |
| Unfounded | 1 | 0 | 4 | 0 | 0 | 1 | 0 |
| Sustained-Other | | | | | 2 | 5 | 0 |
| Not Within-Policy | | | | | 0 | 0 | 2 |
| Open | 22 | 6 | - | 3 | 0 | 0 | 0 |

**Table 15: Number of Force Complaints by Source**

| Source (internal/external) force complaints | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Internal (CDP) | 33 | 38 | 27 | 13 | 12 | 14 | 15 |
| External (non-CDP/Civilian) | 0 | 0 | 9 | 2 | 0 | 2 | 0 |

It is commendable that the CDP identified and appropriately referred 15 instances of misconduct.

**Table 16: Number of Force Complaints by Force Type**

| Force type | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Balance Displacement | 0 | 0 | 0 | 3 | 2 | 0 | 1 |
| Body Force | 4 | 6 | 0 | 0 | 3 | 3 | 3 |
| Control Hold-Restraint | 6 | 3 | 3 | 0 | 1 | 1 | 2 |
| Control Hold-Takedown | 3 | 2 | 3 | 0 | 4 | 3 | 2 |
| De-Escalation | 8 | 8 | 11 | 9 | 5 | 9 | 11 |
| Firearm Point | 2 | 5 | 2 | 1 | 2 | 2 | 4 |
| Firearm Discharge | 1 | 4 | 2 | 2 | 0 | 1 | 4 |
| Joint Manipulation | 2 | 3 | 1 | 0 | 2 | 1 | 1 |
| Tackling/Takedown | 4 | 4 | 6 | 0 | 2 | 5 | 3 |
| Taser | 4 | 3 | 1 | 2 | 3 | 1 | 1 |
| Verbal/Physical Gestures | 0 | 0 | 0 | 3 | 0 | 0 | 0 |
| Pressure Point/Pressure Point Control | 5 | 0 | 0 | 0 | 0 | 1 | 0 |
| Push | 5 | 5 | 4 | 3 | 0 | 2 | 1 |
| Other (1-25 instance each) | 7 | 11 | 9 | 14 | 4 | 5 | 7 |
| Unknown/NULL | 0 | 2 | 0 | 0 | 0 | 0 | 0 |

**Table 17: Number of Force Complaints by Geographic Area**

| Geographic area | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| District 1 | 0 | 3 | 2 | 2 | 1 | 3 | 1 |
| District 2 | 6 | 4 | 10 | 4 | 5 | 5 | 2 |
| District 3 | 7 | 5 | 14 | 4 | 1 | 4 | 2 |
| District 4 | 2 | 2 | 5 | 2 | 3 | 2 | 4 |
| District 5 | 1 | 6 | 3 | 2 | 2 | 0 | 4 |
| outside city | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Unknown/NULL | 0 | 2 | 2 | 1 | 0 | 0 | 0 |

**Table 18: Number of Force Complaints by Demographic Category of the Complainant**

| Demographics of complainant | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Black | 11 | 13 | 21 | 10 | 8 | 10 | 7 |
| White | 3 | 7 | 6 | 3 | 6 | 6 | 6 |
| Hispanic | 1 | 0 | 2 | 0 | 0 | 0 | 0 |
| Asian | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Unknown/NULL | 1 | 2 | 0 | 3 | 0 | 0 | 0 |

3. "the rate at which ECW usage decreases or increases compared to the use of force overall and by weapon;"

**Table 19:  Number of CEW Uses and Changes Over Time**

| # CEW and changes over time | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| # of CEW | 17 | 23 | 20 | 18 | 8 | 16 | 17 |
| # of non-CEW UOF | 318 | 319 | 241 | 176 | 201 | 266 | 318 |
| Total Incidents Taser Used/Total Use of Force Incidents | 5% | 7% | 8% | 10% | 4% | 6% | 5% |

4. "number of uses of force found to violate policy, broken down by force type, geographic area, type of arrest; actual or perceived race, ethnicity, age, and gender of the subject; and, if indicated at the time force was used, the subject's mental or medical condition, use of drugs or alcohol, or the presence of a disability;"

**Table 20: Number of Uses of Force Found to Violate Policy**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| # in violation | 6 | 15 | 17 | 11 | 20 | 26 | 26 |

The number of uses of force found to violate policy has remained relatively stable since 2022. Taken together with the increase in the number of use of force incidents, this means that the percentage of incidents found to be in violation of policy have decreased year over year.  Note that the increase in violations compared to pre-Covid levels could be an increase in the number of violations, the result of changes to policy, or improved review processes that better catch violations.

**Table 21: Number of Use of Forces in Violation by Force Type**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Balance Displacement | 0 | 0 | 0 | 0 | 3 | 2 | 1 |
| Body Force | 4 | 2 | 2 | 1 | 8 | 11 | 9 |
| Control Hold-Restraint | 2 | 2 | 2 | 4 | 4 | 3 | 9 |
| Control Hold-Takedown | 3 | 2 | 2 | 2 | 3 | 7 | 6 |
| Joint Manipulation | 4 | 1 | 6 | 0 | 4 | 3 | 3 |
| Tackling/Takedown | 0 | 5 | 2 | 0 | 7 | 9 | 7 |
| Taser | 0 | 3 | 1 | 1 | 2 | 5 | 4 |
| Verbal/Physical Gestures | 0 | 0 | 0 | 0 | 3 | 1 | 0 |
| Pressure Point/Pressure Point Control | 1 | 0 | 0 | 0 | 1 | 0 | 2 |

117

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Push | 0 | 3 | 2 | 1 | 3 | 2 | 3 |
| Other (1-25 instance each) | 4 | 12 | 22 | 9 | 12 | 14 | 16 |
| Unknown/NULL | 2 | 0 | 0 | 0 | 0 | 0 | 0 |

**Table 22: Number of Use of Forces in Violation by Geography**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| District 1 | 2 | 3 | 6 | 1 | 3 | 2 | 7 |
| District 2 | 2 | 3 | 3 | 1 | 5 | 3 | 2 |
| District 3 | 1 | 3 | 3 | 2 | 6 | 6 | 7 |
| District 4 | 1 | 2 | 3 | 3 | 2 | 10 | 4 |
| District 5 | 0 | 3 | 2 | 4 | 2 | 4 | 6 |
| outside city | 0 | 1 | 0 | 0 | 2 | 1 | 0 |

**Table 23: Number of Use of Forces in Violation by Arrest Type**

| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** |
|---|---|---|---|---|---|---|---|
| Violence toward Police Officer | 0 | 1 | 3 | 1 | 15 | 14 | 11 |
| Violence toward Others | 0 | 10 | 5 | 4 | 12 | 10 | 7 |
| Damage to Property | 0 | 0 | 0 | 1 | 12 | 13 | 7 |
| Obstructing Justice | 7 | 2 | 3 | 10 | 25 | 34 | 38 |
| Crisis Intervention | 0 | 2 | 0 | 0 | 0 | 2 | 3 |
| Drugs/Alcohol | 1 | 1 | 2 | 3 | 3 | 0 | 5 |
| Cleveland Codified Ord. - Part 6 | | | | | 4 | 3 | 6 |
| Other | 9 | 22 | 28 | 4 | 6 | 7 | 10 |

The number of violations by arrest type indicates that violence toward police officers and obstructing justice result in the greatest number of violations.

**Table 24: Number of Use of Forces in Violation by Race**

| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** |
|---|---|---|---|---|---|---|---|
| Black | 5 | 10 | 11 | 9 | 20 | 23 | 23 |
| White | 1 | 3 | 6 | 2 | 2 | 2 | 8 |
| Hispanic | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| Asian | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| Unknown/NULL | 6 | 0 | 0 | 0 | 0 | 0 | 3 |

**Table 25: Number of Use of Forces in Violation by Ethnicity of Subject**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Hispanic/Latino | 0 | 1 | 1 | 0 | 0 | 2 | 0 |
| Non-Hispanic/Latino | 6 | 14 | 13 | 7 | 22 | 26 | 34 |
| Unknown/NULL | 0 | 0 | 3 | 4 | 0 | 0 | 0 |

**Table 26: Number of Use of Forces in Violation by Age Group**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| under 20 years | 1 | 4 | 1 | 2 |  |  |  |
| 17 and under (juveniles) |  |  |  |  | 2 | 6 | 6 |
| 18-29 years |  |  |  |  | 14 | 14 | 8 |
| 21-29 years | 3 | 4 | 8 | 3 |  |  |  |
| 30-39 years | 2 | 5 | 6 | 3 | 4 | 4 | 13 |
| 40-49 years | 0 | 2 | 2 | 1 | 3 | 1 | 2 |
| 50-59 years | 0 | 0 | 0 | 2 | 0 | 2 | 1 |
| 60+ years | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Unknown/NULL | 0 | 0 | 0 | 0 | 0 | 0 | 4 |

**Table 27: Number of Use of Forces in Violation by Gender of Subject**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Male | 5 | 14 | 15 | 10 | 22 | 24 | 27 |
| Female | 1 | 1 | 2 | 1 | 0 | 3 | 7 |
| Unknown/NULL | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Table 28: Number of Use of Forces in Violation by mental or medical condition, use of drugs or alcohol, or the presence of a disability**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Behavioral Crisis Event | - | 2 | 1 | 0 | 2 | 2 | 6 |
| Mental condition* | - |  |  |  |  |  |  |
| Medical condition | - | 0 |  |  | 0 | 0 | 0 |
| Drugs/alcohol | 3 | 6 | 6 | 3 | 10 | 8 | 16 |
| Unimpaired | 3 | 7 | 10 | 1 | 17 | 18 | 14 |
| Unknown/NULL | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Presence of disability | - | 0 |  |  | 0 | 0 | 0 |

* CDP does not track 'mental condition'

119

5.  "number of officers who have more than one instance of use of force in violation of policy;"

**Table 29: Number of Officers with More than UOF Violating Policy**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| # of officers with > 1 UOF violating policy | 0 | 1 | 1 | 0 | 0 | 3 | 2 |

6.  "force reviews or investigations indicating a policy, training, or tactical deficiency; [and]"

**Table 30: The number of Force Reviews or Investigations Resulting in Policy, Training, or Tactical Deficiency**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Policy deficiency | 1 | 11 | 17 | - | 0 | 0 | 0 |
| Training deficiency | 0 | 1 | 1 | - | 14 | 1 | 0 |
| Tactics deficiency | 3 | 3 | 1 | - | 0 | 1 | 4 |
| Pending | 2 | 0 | 0 | - | 2 | 0 | 2 |
| Officer error |  |  |  |  | 17 | 31 | 24 |
| Unknown |  |  |  |  | 1 | 0 | 0 |

7.  "quality of use of force investigations and reviews; and number and rate of use of force administrative investigations which are returned for lack of completeness."

CDP data practices are to return incomplete reports to officers for revision immediately upon review.  Once reports are revised and resubmitted, the supervisor may approve or send back for additional revisions.  Data logging revisions are not retrievable thus there is not data responsive to identifying incomplete investigations.