IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15CV1046 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, | ) | JOINT MOTION TO TERMINATE |
| | ) | SETTLEMENT AGREEMENT |
| Defendant. | ) | |
| | ) | |

The United States of America and the City of Cleveland jointly move to terminate the

Settlement Agreement regarding the Cleveland Division of Police (CDP) and dismiss this matter

with prejudice, pursuant to Paragraph 401 of the Agreement and Federal Rule of Civil Procedure

60(b).  The City and CDP have achieved substantial compliance and a durable remedy to address

the conduct alleged in the Complaint.  A memorandum in support of this Joint Motion and a

proposed Order dismissing the case with prejudice is attached hereto.

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

R. JONAS GEISSLER
Deputy Assistant Attorney General
Civil Rights Division

PATRICK MCCARTHY
Chief
Special Litigation Section

SURAJ KUMAR
Trial Attorney
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel: (202) 202-598-1211
Email: Suraj.Kumar@usdoj.gov

*Attorneys for the United States*

DAVID M. TOEPFER
United States Attorney
Northern District of Ohio

*/s/ Patricia M. Fitzgerald*
PATRICIA M. FITZGERALD
Chief, Civil Division

SARA E. DECARO (OH: 0072485)
Assistant U.S. Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3779 (Fitzgerald)
(216) 622-3670 (DeCaro)
(216) 522-2404 (FAX)
Patricia.Fitzgerald2@usdoj.gov
Sara.DeCaro@usdoj.gov

2

MARK D. GRIFFIN
Director of Law
City of Cleveland

*/s/ Mark D. Griffin*
MARK D. GRIFFIN (OH: 0064141)
DELANTE SPENCER THOMAS (OH: 0096349)
City Hall Room 106
Cleveland, OH 44114
(216) 664-2800
mgriffin@clevelandohio.gov
dthomas3@clevelandohio.gov

*Attorneys for the City of Cleveland*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15 CV 1046 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, | ) | MEMORANDUM IN SUPPORT OF |
| | ) | JOINT MOTION FOR TERMINATION |
| Defendant. | ) | OF SETTLEMENT AGREEMENT |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

QUESTIONS PRESENTED ................................................................................................ 1

SUMMARY OF THE ARGUMENT ................................................................................... 1

I.      INTRODUCTION ...................................................................................................... 2

II.     BACKGROUND ....................................................................................................... 4

        A.      INVESTIGATION AND SETTLEMENT AGREEMENT ................................... 4

                1.      Use of Force ....................................................................................... 5

                2.      Searches and Seizures ....................................................................... 5

                3.      Crisis Intervention ............................................................................ 5

                4.      Additional Remedies ......................................................................... 6

        B.      IMPLEMENTATION AND COMPLIANCE ASSESSMENTS ........................... 6

III.    LEGAL STANDARD ............................................................................................... 7

IV.    DISCUSSION .......................................................................................................... 9

        A.      THE CITY HAS ACHIEVED SUBSTANTIAL COMPLIANCE AND A DURABLE REMEDY REGARDING USE OF FORCE ..................................... 10

        B.      THE CITY HAS ACHIEVED SUBSTANTIAL COMPLIANCE AND A DURABLE REMEDY REGARDING CRISIS INTERVENTION. .................... 17

        C.      THE CITY HAS ACHIEVED SUBSTANTIAL COMPLIANCE AND A DURABLE REMEDY REGARDING SEARCHES AND SEIZURES. .............. 22

        D.      THE CITY HAS IMPLEMENTED ADDITIONAL SETTLEMENT AGREEMENT REMEDIES BEYOND THOSE STRICTLY REQUIRED TO REMEDY ALLEGED FEDERAL LAW VIOLATIONS. ................................... 25

                1.      Officer Assistance and Support ....................................................... 25

                2.      Accountability .................................................................................. 29

                3.      Supervision ...................................................................................... 31

                4.      Community Engagement; Community and Problem-Oriented Policing; and Bias-Free Policing ................................................................. 33

5.      Transparency and Oversight ......................................................36

E.      THE CITY IS WELL-POSITIONED TO MAINTAIN CONSTITUTIONAL
        POLICING WITHOUT CONTINUING FEDERAL OVERSIGHT. ...................37

F.      THE PARTIES ARE ENTITLED TO RELIEF BECAUSE THE SETTLEMENT
        AGREEMENT IS VOID. ...................................................................37

V.   CONCLUSION...................................................................................39

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Antoine v. Atlas Turner, Inc.*, 66 F.3d 105 (6th Cir. 1995) ........................................................ 39

*Brumfield v. Louisiana State Bd. of Educ.*, 806 F.3d 289 (5th Cir. 2015) ................................... 38

*Doe v. Univ. of Mich.*, 78 F.4th 929  (6th Cir. 2023) .................................................................. 38

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004)  ...................................................... 25, 26, 38

*Horne v. Flores*, 557 U.S. 433 (2009)  .......................................................................... 8, 9, 10, 31

*In re G.A.D. Inc.*, 340 F.3d 331 (6th Cir. 2003)  ....................................................................... 39

*John B. v. Emkes*, 710 F.3d 394 (6th Cir. 2013) ................................................................. 9, 10, 28

*Johnson v. Heffron*, 88 F.3d 404 (6th Cir. 1996) ............................................................................ 9

*Lambert v. Turner*, 525 F.2d 1101 (6th Cir. 1975) ...................................................................... 38

*Northeast Ohio Coalition for Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012)  ....................... 7

*Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606 (6th Cir. 2011) ........................ 37

*United States v. Michigan*, 131 F.4th 409 (6th Cir. 2025) ............................................................. 8

*United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) ............................................. 37

**Rules**

Federal Rule of Procedure 60  ................................................................................ *passim*

## QUESTIONS PRESENTED

Whether the Court should terminate the Settlement Agreement regarding the Cleveland Division of Police (CDP) pursuant to Paragraph 401 of the Agreement and Federal Rules of Procedure 60(b)(5) and 60(b)(4).

## SUMMARY OF THE ARGUMENT

The Court should terminate the Settlement Agreement because the City and CDP have achieved substantial compliance with the Agreement and a durable remedy to address the federal-law violations that gave rise to this case.  Working with the United States and the Monitor, the City and CDP have developed and implemented Court-approved policies and training covering use of force, searches and seizures, misconduct investigations, community policing, and other areas.  The City and CDP have institutionalized these policies through General Police Orders, City Ordinances and the City Charter.  The Monitor's assessments show that the vast majority of CDP's uses of force, searches, and seizures are constitutional; the City and CDP's behavioral health crisis response minimizes unnecessary uses of force and arrests; and the City and CDP have established systems to prevent and address unconstitutional conduct. Continued enforcement of the Agreement beyond the achievement of a durable remedy would exceed the Court's jurisdiction.

## I.     INTRODUCTION

The United States of America and the City of Cleveland (City) jointly move to terminate the Settlement Agreement regarding the Cleveland Division of Police (CDP) and dismiss this matter with prejudice, pursuant to Paragraph 401 of the Agreement and Federal Rules of Civil Procedure 60(b)(5) and 60(b)(4).  The City and CDP have achieved substantial compliance and a durable remedy to address the conduct alleged in the Complaint.

In 2015, the United States filed a Complaint alleging that the City and CDP engaged in a pattern or practice of excessive force and unlawful searches and seizures in violation of the Fourth Amendment.  The Parties negotiated a Settlement Agreement, entered as an order by this Court, requiring the City and CDP to change policies, training, and systems of supervision and accountability.  Over the last eleven years, the City and CDP have made significant progress, as this Court and the Court-appointed Monitor have repeatedly recognized.  Working with the United States and the Monitor, the City and CDP have developed and implemented Court-approved policies and training covering use of force, searches and seizures, misconduct investigations, community policing, and other areas.  The City and CDP have institutionalized these policies through General Police Orders, City Ordinances and the City Charter.

In 2025, the Monitor began publishing a series of formal compliance assessments to measure CDP's performance against the Agreement's requirements—including assessments of CDP's use of force, crisis intervention practices, and searches and seizures.  These assessments found that:

- In 2024, 97% of CDP's Level 1 and Level 2 uses of force were constitutional, and in the remaining six incidents, CDP's chain of command identified and addressed policy violations.  The Monitor found that CDP's Force Investigation Team conducted thorough, objective investigations into Level 3 uses of force.  From 2018 to 2024, force-related complaints decreased by 55%, and officer injuries decreased 40%.

- In 2023, CDP officers used force in fewer than 0.5% of behavioral crisis incidents, and the Monitor's "systematic review" of 111 randomly selected incidents showed that officers "consistently use de-escalation techniques, calm demeanor, and professional conduct when responding to individuals in crisis." CDP's crisis intervention policies and training, developed collaboratively with community partners, "have been recognized as national models."

- In 2024, CDP officers had reasonable suspicion or probable cause for a stop in 98% of encounters, and 85% of pat-downs were based on reasonable suspicion that the subject was armed and dangerous. For investigatory stops that included a search, officers articulated their justification 97% of the time.

In addition to these positive results, the City and CDP have implemented other remedies required by the Settlement Agreement, including Court-approved policies and procedures regarding training, supervision, and accountability.

Based on this record of successful reform, the Parties agree that the Court should terminate the Settlement Agreement and end this case. Paragraph 401 of the Settlement Agreement provides that the Agreement will terminate when the City has been in substantial and effective compliance with the search and seizure provisions for one year and with the remaining provisions for two consecutive years. Federal Rule of Civil Procedure 60(b)(5) provides that termination is warranted when defendants have achieved the decree's objective by implementing a durable remedy to address federal-law violations. The Parties agree that the City and CDP have met that standard here and respectfully request that the Court grant the motion. Alternatively, for largely the same reasons, the fact that defendants have achieved the decree's object by implementing a durable remedy to address federal-law violations renders the Settlement Agreement void and requires this Court to terminate the Settlement Agreement under Federal Rule of Civil Procedure 60(b)(4). A proposed order is attached.

II.    **BACKGROUND**

A.  **Investigation and Settlement Agreement**

In 2014, after a comprehensive investigation by the Justice Department's Civil Rights Division and the U.S. Attorney's Office for the Northern District of Ohio, the United States found reasonable cause to believe that CDP engaged in a pattern or practice of use of excessive force by law enforcement officers that violated the Constitution and federal law.  Findings Report, ECF No. 1-1, PageID# 9.  The United States' Complaint alleged that CDP used excessive force, including against people experiencing behavioral health crises, and conducted unlawful searches and seizures.[1]  ECF No. 1, PageID# 2-5, ¶¶ 9, 12-16.  The United States alleged that deficiencies in CDP's policies, training, supervision, and accountability systems contributed to these violations.  ECF No. 1, PageID# 5, ¶¶ 17-18.

To resolve the United States' Complaint, the Parties entered into a Settlement Agreement.  The Court entered the Settlement Agreement as an Order of the Court.  ECF No. 7-1.  Since 2015, the City and CDP have worked to implement the Agreement's requirements with assistance and oversight from the United States and the Court-appointed Monitoring Team.  The Agreement includes sections on use of force, searches and seizures, crisis intervention, and additional remedies to support CDP's implementation of constitutional policing.

---

[1] The Department of Justice's findings report stated that the Department "did not investigate CDP's search, seizure, and arrest practices."  ECF No. 1-1, PageID# 6.  Notwithstanding the lack of a finding of a pattern or practice of unconstitutional search, seizure, or arrest practices, the City and the United States agreed to include obligations for searches and seizures in the Settlement Agreement.  ECF No. 7-1.

### 1.  Use of Force

The Settlement Agreement requires CDP to make comprehensive changes to ensure officers' uses of force comply with the Fourth Amendment.  Specifically, it requires CDP to revise its policies and training, improve its reporting of uses of force, investigate uses of force, and create a Force Review Board to review investigations of more serious uses of force.  ECF No. 7-1, PageID# 384-405, ¶¶ 45-130.

### 2.  Searches and Seizures

CDP agreed to revise and implement policies consistent with the requirements of the Fourth Amendment, including appropriate articulation of the justification for officers' stops, frisks, searches, and arrests.  The Agreement also includes provisions related to training and supervisory review of searches and seizures.  ECF No. 7-1, PageID# 411-15, ¶¶ 160-175.

### 3.  Crisis Intervention

The Agreement also includes requirements aimed at improving CDP's crisis intervention programs.  ECF No. 7-1, PageID# 406-411, ¶¶ 131-159.  The Agreement required the development of a Mental Health Response Advisory Committee (MHRAC) "to foster relationships and build support between the police, the community, and mental health providers" and "identify problems and develop solutions designed to improve outcomes for individuals in crisis."  ECF No. 7-1, PageID# 406, ¶ 132.  The Agreement further mandates crisis intervention training for officers, dispatch personnel, and supervisors; enhanced training for Specialized Crisis Intervention Trained officers; and the development of crisis intervention policies and procedures.  ECF No. 7-1, Page ID# 407-411, ¶¶ 143-159.

### 4.  Additional Remedies

The Settlement Agreement includes additional remedies to support CDP's implementation of constitutional policing practices.  For example, the Agreement requires CDP to support officers through improved training, updated technology, and effective recruitment and staffing practices. ECF No. 7-1, PageID# 435-446, Sec. XI.  The Agreement includes provisions related to accountability and supervision, including thorough and objective investigations of misconduct allegations, body-worn camera policies, and supervisory training.  ECF No. 7-1, PageID# 415-29 & 446-450, Secs. IX & XII.  The Agreement requires the City and CDP to strengthen its community engagement and integrate principles of bias-free policing into its practices.  ECF No. 7-1, PageID# 376-83, Secs. IV-V.  Finally, the Agreement includes provisions to promote transparency and oversight. ECF No. 7-1, PageID# 430-35, Sec. X.

### B.  Implementation and Compliance Assessments

Since 2015, there has been demonstrable progress in the implementation of the Settlement Agreement through the collaborative effort of the City, Monitoring Team, and the United States. This includes finalization of CDP policies and delivery of improved training for officers.  In addition, the City and CDP have developed accountability mechanisms, including systems of critical self-analysis like the Force Review Board and systematic data collection of important officer activities.  In November 2021, the voters of the City of Cleveland approved amendments to the City's Municipal Charter that established a Community Police Commission (CPC) and Civilian Police Review Board (CPRB) with responsibilities and authority broader than those in the Agreement.  City of Cleveland Charter § 115-5.  The Charter authorizes CPC and CPRB to provide civilian oversight of CDP.  *Id*.  The Parties sought, and the Court approved, modifications to the Agreement to ensure the City's ability to fully implement the Charter amendments.  ECF No. 416.

The Monitoring Team recently completed compliance assessments of three key areas of the Agreement: Crisis Intervention, Use of Force, and Search and Seizure.  ECF Nos, 661-1, 685, 672-1.  The Monitoring Team also assessed CDP's implementation of additional remedies in the Agreement, including those related to Officer Assistance and Support.  ECF Nos. 673, 674, 678, 680.  As discussed below, the assessments show that the City and CDP have sustained compliance with the Agreement's key provisions and achieved the Agreement's core objective of constitutional policing.

## III.    LEGAL STANDARD

Paragraph 401 provides that the Agreement "will terminate when the City has been in Substantial and Effective Compliance with the search and seizure provisions for one year and with all of the remaining provisions for two consecutive years."  The Agreement defines "Substantial and Effective Compliance" as either the City's compliance with the Agreement's "material requirements" or "sustained and continuing improvement" in the Agreement's "outcome measures."  ECF No. 7, PageID# 468-69, ¶ 401.[2]

Consent decrees are subject to Federal Rule of Civil Procedure 60(b)(5).  *Northeast Ohio Coalition for Homeless v. Husted*, 696 F.3d 580, 601 (6th Cir. 2012) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992)).  Pursuant to Rule 60(b)(5), courts may grant relief from a judgment where "the judgment has been satisfied" or "applying it prospectively is no longer equitable."

---

[2] Because the Agreement provides two alternative grounds for termination—compliance with material requirements and outcome measures—the Parties cite outcome measures only as needed for various sections of the Agreement.

Further, the Supreme Court recognized that "institutional reform" decrees "often raise federalism concerns" and instructed courts to "take a 'flexible approach' to Rule 60(b)(5) motions addressing such decrees." *Horne v. Flores*, 557 U.S. 433, 448, 450 (2009). "In applying this flexible approach, courts must remain attentive to the fact that 'federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.'" *Id.* (citing *Milliken* v. *Bradley,* 433 U.S. 267, 282 (1977)). The *Horne* Court recognized three general "features and risks of institutional reform litigation." *Horne*, 557 U.S. at 447 n.3. *First*, institutional-reform decrees often freeze policy judgments "for many years," without regard for "changes in the nature of the underlying problem . . . and new policy insights." *Id.* at 448. *Second*, institutional-reform decrees "often raise sensitive federalism concerns," by asserting federal control over "areas of core state responsibility." *Id.* These concerns are heightened where such a decree "has the effect of dictating state or local budget priorities" or enshrines policies on which state officials "have taken contrary positions." *Id.* at 448, 452. *Third*, institutional-reform decrees may "bind state and local officials to the policy preferences of their predecessors." *Id.* at 448-49. Given these features and risks, the Supreme Court observed that Rule 60(b)(5) "serves a particularly important function in . . . 'institutional reform litigation.'" *Id.* at 447.

If "the objective" of a decree "has been achieved" and "a durable remedy has been implemented," then "continued enforcement of the order is not only unnecessary, but improper." *Id.* at 450 (citing *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)); *see also United States v. Michigan*, 131 F.4th 409, 428-29 (6th Cir. 2025) ("A decree is no longer equitable if the conditions giving rise to the initial violation of federal law no longer exist.") (citing *Horne*, 557 U.S. at 470). "[W]hen the objects of the decree have been attained . . . responsibility for discharging the State's

obligations *must be* returned promptly to the State and its officials."  *Horne*, 557 U.S. at 452 (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004)) (cleaned up, emphasis added).

Under Rule 60(b)(5), courts "must answer two questions" in evaluating whether a "durable remedy" exists: "first, whether the [defendant] has achieved compliance with the federal-law provisions whose violation the decree sought to remedy; and second, whether the [defendant] would continue that compliance in the absence of continued judicial supervision."  *John B. v. Emkes*, 710 F.3d 394, 412 (6th Cir. 2013) (citations omitted).  The Sixth Circuit has made clear that *Horne* requires courts to "go beyond 'an inquiry into whether the original order [*i.e.,* the decree] ha[s] been satisfied.'"  *Id.* at 413 (quoting *Horne*, 557 U.S. at 454).  The crux of the inquiry is instead "'whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law.'"  *Id.* (quoting *Horne*, 557 U.S. at 454).  As mentioned already, if a defendant has implemented a durable solution to remedy violations of federal law, "'continued enforcement of the [decree] is not only unnecessary, but improper.'"  *Id.* at 413 (quoting *Horne,* 557 U.S. at 450).  And, if a defendant has achieved a durable remedy, then a mere "technical violation" does not provide "any lawful basis to continue enforcement of the decree." *Id.* at 413.  Where defendants have "substantially succeeded in meeting their obligations" under a consent decree, "[j]udicial oversight must, at some point, draw to a close."  *Johnson v. Heffron*, 88 F.3d 404, 407 (6th Cir. 1996).

## IV.    DISCUSSION

The City and CDP have achieved substantial and effective compliance with the Settlement Agreement and established a durable remedy to address excessive force and unlawful searches and seizures.  The record in this case, including this Court's findings and the Monitor's assessments, shows that the City and CDP have satisfied the core requirements of the Use of Force, Crisis

9

Intervention, and Searches and Seizures sections of the Settlement Agreement.  In addition, the City and CDP have implemented other durable remedies required by the Agreement, including measures related to Officer Assistance and Support, Accountability, Supervision, Community Engagement, and Transparency and Oversight.  Pursuant to Supreme Court and Sixth Circuit precedent, the Court should terminate the Settlement Agreement under Rule 60(b)(5) and end this case.  *See Horne*, 557 U.S. at 450; *John B.*, 710 F.3d at 412.  Alternatively, the Court should terminate the Agreement under Rule 60(b)(4) because the judgment is void.

**A. The City Has Achieved Substantial Compliance and a Durable Remedy Regarding Use of Force.**

CDP has implemented durable reforms to prevent and address excessive force.  Working with the United States and the Monitor, CDP revised its use-of-force policies to satisfy the Agreement's requirements.  The Court approved the first set of these policies nine years ago, and CDP has refined them over time.  CDP trained officers on the new policies, delivering lessons reviewed and approved by the United States and the Monitoring Team.  And CDP established review and accountability mechanisms required by the Agreement, including a Force Investigation Team and Force Review Board.  The Monitoring Team has repeatedly assessed CDP's use-of-force practices over the past four years; these assessments found that the vast majority of CDP's uses of force were constitutional and that CDP has improved its review of force incidents. ECF Nos. 418-1, 497-500, 685.  The Monitoring Team's latest assessment confirms these trends: 97% of CDP's Level 1 and Level 2 uses of force in 2023-2024 were constitutional; CDP's chain of command identified and addressed policy violations; officer injuries decreased by 40% from 2018 to 2024; and force-related complaints decreased by 55%.  ECF No. 685, PageID# 14869, 14976, 14977.  Based on this record, the Parties agree that CDP has achieved substantial compliance and a durable remedy regarding excessive force.

10

### 1. Updated Policies

The Settlement Agreement requires CDP to "revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force is used in accordance with the Constitution and laws of the United States."  ECF No. 7-1, PageID# 384, ¶ 45. The updated force policies and systems must be "designed with the goal of ensuring that officers use techniques other than force to effect compliance with police orders whenever feasible; use force only when necessary, and in a manner that avoids unnecessary injury to officers and civilians; de-escalate the use of force at the earliest possible moment; and accurately and completely report all uses of force."  *Id*.  CDP's force policies must address the use of firearms and other intermediate weapons, as well as requirements for the uniform reporting of force incidents.  ECF No. 7-1, PageID # 386-94, ¶¶ 47, 50-83, 87-92.  Further, the policies must allow CDP "to account for, review, and investigate every reportable use of force and reduce any improper uses of force."  ECF No. 7-1, PageID # 386, ¶ 47.  Any uses of excessive force "will subject officer to the disciplinary process, possible criminal prosecution, and/or possible civil liability."   ECF No. 7-1, PageID # 386, ¶ 49.

The Parties and the Monitoring Team revised CDP use of force policies with input from CDP officers, Cleveland residents, and community organizations. The Monitoring Team sought Court approval of the policies after concluding that "the policies are consistent with the Consent Decree because they promote officer and public safety, enhance effective and proactive law enforcement, and advance constitutional policing in a manner consistent with the values of Cleveland's communities."  *See* ECF No. 83, PageID# 1131.  In January 2017, the Court approved the new use of force policies, subject to some specific conditions that were subsequently satisfied.

ECF Nos. 101, 103.  The Court approved revisions to these policies in 2019, and the Monitor approved additional changes in 2022.  ECF Nos. 255, 256, 454.

### 2.  Training

The Agreement requires that CDP "provide all current officers use of force training that is adequate in quality, quantity, scope, and type."  ECF No. 7-1, PageID# 391-92, ¶ 84. Generally, the training must cover decision-making, reporting requirements, Fourth Amendment and related law, de-escalation techniques, the importance of peer intervention, proper use of all intermediate weapons or technologies, firearms training, and factors to consider in initiating or continuing a vehicle pursuit.  *Id*.  CDP's Academy recruits must also receive this use of force training.  ECF No. 7-1, PageID# 392, ¶ 85.  Supervisors must receive this general force training as well as specialized training relating to supervisor-specific force issues and broader supervisory skills. ECF No. 7-1, PageID# 392, ¶ 84.  CDP must "provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope."  ECF No. 7-1, PageID# 392, ¶ 86.

The Monitoring Team worked closely with CDP's training unit to develop the initial use of force training module.  In 2017, the Monitoring Team reported to the Court that CDP had "crafted a training program that meaningfully addresses the requirements of the Decree and provides high-quality instruction to officers on the [Court-approved] use of force policy."  ECF No. 133, PageID # 2666.

In 2019, the Court approved CDP's annual use of force in-service training curriculum. ECF No. 257.  The training included interactive scenarios and traditional classroom instruction. ECF No. 253-1, PageID 4949-4998.  In 2023, the Monitor approved updated policies and training related to use of force and crowd management.  ECF Nos. 454, 466.

### 3. Force Investigations and Reviews

The Agreement requires that CDP officers notify supervisors when they use force and document the details and circumstances of such force. ECF No. 7-1, PageID# 394, ¶ 88. The Agreement classifies force into three levels, with "[e]ach level of force . . . requir[ing] increasingly rigorous reporting, investigation, and review." ECF No. 7-1, PageID# 393, ¶ 87. Supervisors review Level 1 and Level 2 uses of force, while CDP's Force Investigation Team (FIT) reviews more serious Level 3 uses of force. ECF No. 7-1, PageID# 392-99, ¶¶ 87, 94, 96, 111. These reviews assess whether officers' conduct was consistent with law and CDP policy.

In 2020, the Monitoring Team approved CDP's Supervisory Review Policy, FIT Manual, FIT General Police Order, and Memorandum of Understanding with the Cuyahoga Sheriff's Department to conduct criminal investigations of deadly force incidents. ECF No. 309. The Monitor determined that these policies "provide appropriate guidance on the thorough and complete investigation of uses of force by CDP personnel" and "satisfy the terms" of the Agreement. ECF No. 309, PageID# 6674, 6686. The Court agreed that the policies met the terms of the Agreement and ordered them effective immediately. ECF No. 311.

In 2021, The Monitoring Team reviewed the FIT Training curriculum and determined that it met the terms of the Agreement. ECF No. 361. The Court approved the FIT training in June 2021. ECF No. 362.

### 4. Force Review Board

The Agreement requires CDP to "develop and implement a Force Review Board ('FRB') to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." ECF No. 7-1, PageID# 403-04, ¶ 124. The FRB's duties include reviewing force investigations,

assessing the quality of these investigations, and analyzing data related to use of force to "detect any patterns, trends, and training deficiencies and make recommendations for correction, as appropriate."  ECF No. 7-1, PageID# 403-05, ¶¶ 124, 128-29.

In 2020, the Monitoring Team submitted the FRB Policy and Training Curriculum to the Court.  The Monitoring Team recommended that the Court approve the Training Curriculum and recommended approval of the FRB Policy subject to further evaluation of its implementation by the Monitoring Team.  ECF No. 314.  The Court approved the FRB Training and conditionally approved the FRB Policy for a six-month period, during which the Monitoring Team would "assess FRB operations" to determine whether the FRB satisfies the Agreement's requirements.  ECF No. 317, PageID# 6856.  The Monitoring Team's subsequent Semiannual Reports indicate high-level approval of the FRB meetings, while noting some issues regarding timeliness and objectivity.  ECF No. 386-1 (Tenth Semiannual Report), PageID# 8247 ("The MT was generally impressed with the robust discussion"); ECF No. 440 (Eleventh Semiannual Report), PageID# 9736 (noting "concerns" with timeliness and bias but finding that "most [FRB] cases are being done in a manner consistent with policy and the Consent Decree").

     *5.  The Monitoring Team's Assessments*

The Monitoring Team has conducted several reviews of the use of force provisions of the Agreement, including the 2026 Use of Force Assessment.  The Monitoring Team has concluded that CDP officers rarely use excessive force, and that CDP has established systems to review, identify, and address policy violations related to uses of force.

**Review of 2018-2019 Force Incidents.**  In 2022, the Monitoring Team reviewed a random, representative sample of 130 use-of-force incidents from 2018 and 2019.  ECF No. 418-1.  The Monitoring Team determined that in the "vast majority of the cases" reviewed, "officers

appropriately exercised force consistent with policy." ECF No. 418-1, PageID# 9017.  CDP's field supervisors "were engaged and responding within policy mandates to use of force incidents," and, "[f]or the most part," CDP's chain of command identified and addressed "problem behavior appropriately with education or discipline." *Id.*  According to the Monitoring Team, CDP "officers and chain of command reviews [were] correct in their assessments of necessity, proportionality, objective reasonableness, and the officers' ability and efforts to de-escalate." *Id.*

*Reviews of 2022 Force Incidents*.  The Monitoring Team assessed all 185 Level 1 and 2 use-of-force investigations closed by CDP in 2022.  ECF Nos. 497-500.  Across these reviews, the Monitoring Team rarely identified excessive force.  ECF No. 497-1, PageID# 11309 (95% of cases reviewed were necessary and objectively reasonable, 92% proportional); ECF No. 498-1, PageID# 11323 (98.5% necessary, 100% proportional and objectively reasonable); ECF No. 499-1, PageID# 11336 ("The force applied in all but one incident was . . . necessary, proportional and objectively reasonable"); ECF No. 500-1, PageID# 11349 (36 of 39 cases were constitutional). Officers also "took reasonable efforts to deescalate" before using force.  ECF No. 497-1, Page ID# 11309; *see also* ECF No. 498-1 at 4.  And the Monitoring Team found that when officers violated policy, CDP's chain of command identified the policy violations and held them accountable.  *See, e.g.,* ECF No. 500-1, PageID# 11353 (noting that CDP "identified and addressed deficiencies" in each case deemed problematic).

*2026 Use of Force Assessment.*  The Monitoring Team's 2026 assessment examined CDP's use-of-force policies and training; Level 1 and Level 2 force incidents; Level 3 investigations conducted by CDP's Force Investigation Team; and CDP's Force Review Board's analysis of certain force incidents.  ECF No. 685.  The Monitoring Team confirmed that CDP has adopted policies and delivered training consistent with the Agreement's requirements.  ECF No.

685, PageID# 14890-93.  The Monitoring Team reviewed 272 Level 1 and Level 2 incidents from 2023 and 2024, and found that 97% were objectively reasonable, necessary, and proportional.  *Id.*, PageID#14871, 14879-80.  In all six cases that the Monitoring Team identified as unnecessary, CDP's chain of command "also determined the force to be outside of police and referred officers for discipline or re-training"— "a critically important factor [that] . . . demonstrates [CDP's] ability to self-regulate and hold itself accountable."  *Id.*, PageID# 14880.  In addition, the Monitoring Team found that 90% of Level 2 cases "resulted in an objective and complete investigation" and the findings in 96% of such cases "were supported by a preponderance of the evidence."  *Id.*, PageID# 14923.

The Monitoring Team also reviewed all 47 investigations completed by CDP's Force Investigation Team into serious, Level 3 force incidents.  *Id.*, PageID# 14871.  The Monitoring Team did not identify any major deficiencies in these investigations.  *Id.*, PageID# 14934 ("100% of the FIT investigations assessed from 2023 and 2024 went through an approval process that assured full and fair investigations").  The Force Investigation Team responded to the scene consistent with policy, interviewed involved officers, "conducted a thorough review of the use of force reports," and "made all reasonable efforts" to resolve any "material inconsistencies."  *Id.*, PageID# 14939-41.  CDP also referred cases for criminal investigation consistent with the Agreement.  *Id.*, PageID# 14932.

The 2026 assessment confirmed CDP's successful implementation of a Force Review Board for critical analysis of use-of-force practices.  The Monitoring Team "observed consecutive FRB meetings for 2023 and 2024," "confirmed that the required areas are being discussed and voted upon," and "witnessed the quality of the discussions and review deepen and reflect the goal of learning and improvement."  *Id.*, PageID# 14946-47.  The meetings often reflect "the quality of

16

the investigations that are approved through the chain of command." *Id.*, PageID# 14948.  The Monitoring Team observed the Force Review Board reviewing and documenting policy, training, and tactical issues in regular discussions.  *Id.*, PageID# 14948-49.  CDP also tracks implementation of the Force Review Board's recommendations; the Monitoring Team "confirmed that all recommendations made by the FRB have been appropriately implemented for the last two years." *Id.*, PageID# 14949.  CDP's development of a mechanism for self-analysis and improvement further supports termination of the Agreement.

Finally, and in addition to CDP's substantial compliance with the Agreement's material requirements regarding use of force, the 2026 assessment highlights positive outcomes that reflect "sustained and continuing improvement in constitutional policing."  ECF No. 7-1, PageID# 469, ¶ 401; *id.*, PageID# 456-57, ¶ 367(a)(1) (use-of-force outcome measures).  The Monitoring Team found that, from 2018 to 2024, force-related complaints decreased by 55% and officer injuries decreased by 40%.  *Id.*, PageID# 14976-77.  Officers' reported uses of de-escalation increased by 232% from 2018 to 2024.  *Id.*, PageID# 14973 ("The increase in de-escalations could be the result of improved training or a greater emphasis on accurate data entry").  These trends are additional evidence of CDP's substantial compliance and durable remedy regarding excessive force.

The record confirms CDP's sustained compliance and a durable remedy in the area of use of force.  The Parties agree that the Use of Force section of the agreement should be terminated under Paragraph 401 and Federal Rule of Civil Procedure 60(b).

**B. The City Has Achieved Substantial Compliance and a Durable Remedy Regarding Crisis Intervention.**

The City and CDP have strengthened their response to people experiencing behavioral health crises.  Pursuant to the Settlement Agreement, the City and CDP have developed systems for oversight and community input, new policies and procedures, and effective training.  The

Monitor's 2025 assessment shows that the City and CDP are achieving the core objectives and outcomes of this section: crisis responses that minimize unnecessary uses of force and arrests.

### 1. Mental Health Response Advisory Committee

Pursuant to Paragraphs 132 through 134 of the Agreement, the City established a Mental Health Response Advisory Committee (MHRAC).  ECF No. 97, PageID # 1644-1645.  MHRAC consists of members of the community, including mental health professionals, advocates, individuals recovering from mental illness and addiction disorders, Cleveland's Municipal Court, the State of Ohio Criminal Justice Coordinating Center of Excellence as well as representatives from the City and CDP.  ECF No. 7-1, PageID# 406, ¶ 133.  MHRAC provides important technical assistance to CDP, including development of nationally recognized crisis intervention policies and trainings.  ECF. No. 658-1, PageID # 14456.

### 2. Updated Policies

In early 2017, the Monitoring Team approved CDP's Crisis Intervention Policy, which was created through the cooperative efforts of CDP and MHRAC.  ECF No. 103.  The Monitoring Team found that the policy "goes well beyond what is required by the Consent Decree in establishing a best practice for crisis intervention."  *Id.* at PageID # 1697.  Furthermore, the policy addressed the needs of the individual in crisis without compromising the safety of the officer or the community.  *Id.* at PageID # 1694.  The Court approved the policy and ordered it effective upon completion of training by all officers.  ECF No. 115.

To address changes in Ohio law concerning emergency hospitalizations, CDP and MHRAC revised the CIT policy in 2022.  The Monitoring Team determined that the policy met to terms of the Agreement and recommended approval by the Court.  ECF No. 445.

18

### 3. Training

Following the Court's approval of CDP's Crisis Intervention Policy in 2017, CDP, MHRAC, and members of the Cleveland community developed a set of training curricula that met the requirements of Paragraph 143 of the Agreement.  ECF No. 129.  The courses cover the new CDP Crisis Intervention Policy, an Orientation to Mental Illness, an introduction to Communication and Active Listening, and an explanation of the Command-and-Control Paradox. (ECF No. 129-1 - 129-15.)  The Monitoring Team determined that the curriculum "reflects an exceptionally high-quality curriculum that follows best practice strategies concerning effective adult learning," "covers an impressive but reasonable quantity of material," and "will strengthen the officers' capacity to respond to individuals experiencing a behavioral crisis."  ECF No. 129, PageID # 2352.  In addition, the Monitoring Team notes, the training addresses when a specialized CIT officer should be dispatched or consulted and addresses how situations involving individuals in crisis should be addressed if a specialized CIT officer is not immediately available as required by Paragraph 143.  *Id.*  The Court approved the training in 2018.  ECF No. 183.

Beyond the initial training, CDP and MHRAC developed annual in-service trainings that addressed topics including a review of the CDP Crisis Intervention Policy, data requirements for CDP crisis intervention, requirements of the State of Ohio Emergency Petition process, mental health crisis events involving youth, officer wellness, special populations, homelessness, suicide prevention, autism, trauma-informed care, and behavioral and social service resources.  ECF No. 263, 350, 422, 477, 571.

CDP and MHRAC also developed Specialized CIT Officer training.  In 2019, the Monitoring Team reviewed this 40-hour curriculum and determined that it provides "significant, in-depth guidance on crisis events for the Division's Specialized CIT Officers and provides

instruction on a wide range of mental health, addiction, and social service issues." ECF No. 269, PageID# 5348. The Monitoring Team further noted that the training "includes a review of policy and procedures for Specialized CIT Officers encountering crisis events during patrol duties [and] is designed to equip officers with practical de-escalation skills and improve communication and understanding with individuals experiencing behavioral crisis events." *Id.*

### 4. Semiannual Reports

The Monitor's Semiannual Reports have recounted the City's impressive gains toward sustainable change in how CDP responds to behavioral health crisis. The Monitoring Team recognized MHRAC and CDP's collaboration throughout 2023 to develop critical behavioral health and crisis intervention trainings. ECF No. 488-1, PageID # 11131; ECF No. 524-1, PageID# 12234. This collaboration, with assistance from other City departments, the Monitoring Team, and the United States, led to the development of a "detailed strategy for maintaining a sustainable CIT program." ECF No. 563-1, PageID# 12926. The strategy includes recruitment, dispatch, and a tracking system, which the Monitoring Team praised in 2024. ECF No. 563-1, PageID# 12926. The strategy resulted in the increased on-scene presence of a CIT officer at crisis events. *Id.* Notably, as the Monitoring Team acknowledged, the number of CIT-trained officers is increasing, which leads to higher CIT scene response rates. ECF No. 597-1, PageID# 13964.

In April 2025, the Monitoring Team praised the City and CDP's approach to crisis intervention as "cooperative" and community oriented," observing that this approach has "shown initial results" like "a very low rate of arrest and use of force for those experiencing a behavioral health crisis" and "injury rate[s] for both civilians and officers." ECF No. 597-1, PageID# 13964. The Monitoring Team also reported that "changes in CDP policies in this area have led to an improved relationship with EMS and resulted in improved transportation options for those in a

behavioral crisis event." *Id.* Five months later, in anticipation of the now-completed CIT Assessment, the Monitoring Team stated that it "is confident that impressive work on the part of the Community, the City, and CDP will lead to full compliance with the terms of the Consent Decree and will continue to improve the lives of those in the Cleveland community." ECF No. 658-1, PageID # 14457.

5. *2025 Crisis Intervention Assessment*

The Monitoring Team's 2025 Crisis Intervention Compliance Assessment determined that CDP has achieved General or Substantial and Effective Compliance across all Crisis Intervention related paragraphs of the Agreement. ECF No. 661-1, PageID# 14513. The Monitoring Team concluded that CDP has "successfully established a robust crisis intervention program that meets or exceeds the foundational requirements established in the Consent Decree." ECF No. 661-1, PageID# 14513. The Monitoring Team found "no serious gaps in CIT training or policy development." ECF No. 661-1, PageID# 14513. CDP's policies and training, developed collaboratively with community partners, "represent best practices in the field and have been recognized as national models." ECF No. 661-1, PageID# 14513. Policies provide "clear guidance" to officers and dispatchers on "crisis response protocols, officer discretion in diverting individuals to healthcare rather than criminal justice systems, and appropriate deployment of specialized resources." ECF No. 661-1, PageID# 14513. And, based on a "systematic review" of crisis 111 intervention incidents from 2023, the Monitoring Team found that "[o]fficers consistently use de-escalation techniques, calm demeanor, and professional conduct when responding to individuals in crisis." ECF No. 661-1, PageID# 14513-14. Indeed, "the extremely low rates of arrest (1.5-2.1%) and use of force (0.32-0.42%) in crisis incidents, combined with high rates of hospital transport (85.5%), indicate that CDP's program successfully achieves its core

21

goals of connecting individuals to appropriate care while minimizing criminal justice involvement." ECF No. 661-1, PageID# 14514.

Importantly, the record confirms CDP's sustained compliance in this area: the Monitoring Team made these findings after reviewing 2023 incidents, and the assessment describes positive trends regarding CDP's systems for oversight and continuous improvement. ECF No. 661-1, PageID# 14526 (review of 2024-2025 records "strongly supports" selection of specialized CIT officers), 14534 (approval of 2023, 2024, and 2025 crisis intervention plans), 14538-39 (describing data analysis and dashboard).

Accordingly, the Parties agree that CDP has demonstrated compliance with the Crisis Intervention section of the Agreement and those paragraphs should be terminated under Paragraph 401 of the Agreement and Federal Rule of Civil Procedure 60(b).

### C. The City Has Achieved Substantial Compliance and a Durable Remedy Regarding Searches and Seizures.[3]

The Settlement Agreement requires CDP to revise, develop, and implement policies and training regarding constitutional searches and seizures. ECF No. 7-1, PageID# 411-15, ¶¶ 160-65, 173-75. The Agreement also requires appropriate documentation, supervisory review, and corrective action related to stops, searches, and arrests. ECF No. 7-1, PageID# 412-14, ¶¶ 166-172. In addition to these provisions, the Agreement identifies outcome measures that may supply additional evidence of compliance, like how often searches recovered contraband, data related to "reasonable suspicion to stop and probable cause [to] search or arrest," and aggregate data

---

[3] As noted above, the Department of Justice "did not investigate CDP's search, seizure, and arrest practices." ECF No. 1-1, PageID# 6. Nonetheless, the Parties had agreed to remedies more extensive than the constitutional findings. Consistent with that agreement, the City has delivered on promised reforms to address concerns with search and seizures that did not rise to the level of constitutional findings.

regarding stops broken down by demographic categories and whether "the encounters resulted in a summons or arrest."  ECF No. 7-1, PageID# 457-58, ¶ 367(c).

CDP has developed and implemented the policies and training required by the Agreement. Since 2019, the United States and the Monitor have reviewed and approved these policies and training materials, and the Court has ordered them effective.  *See* ECF Nos. 260, 261, 283, 284, 298, 299, 359, 360, 378, 380, 424.  In 2021, for example, this Court approved CDP's in-service training related to searches and seizures, finding that the curriculum "'meets the terms of the Consent Decree'" based on the Monitor's recommendation that the training "'provides sufficient guidance for CDP officers to understand the Division's revised Search and Seizure policies through effective adult learning techniques.'"  ECF No. 380.  The Monitor also approved, and this Court ordered, training related to CDP's implementation of forms for officers to document the legal basis for stops and searches, describing this achievement as "an important step" that gives officers "technical support . . . on how to record their activities" and allows CDP "to conduct future critical self-analysis."  ECF Nos. 359, 360.  Moreover, the Monitor's 2025 assessment confirms that CDP's training includes the elements required by the Settlement Agreement.  ECF No. 672-1, PageID# 14665-67.

The Monitor's 2025 assessment found that CDP officers regularly follow constitutional standards governing searches and seizures.  The Monitor reviewed available body-worn camera video and documentation for a random sample of 631 traffic stops from 2024.  ECF No. 672-1, PageID# 14650.  The Monitor found that officers articulated reasonable suspicion in 95% of investigatory stops and probable cause in 91% of traffic stops, and 85% of pat-downs were based on reasonable suspicion that the subject was armed and dangerous.  ECF No. 672-1, PageID# 14658, 14660.  The Monitor found "insufficient reasonable suspicion or probable cause in less

23

*(sic)* than 2% of investigatory stops and traffic stops."  ECF No. 672-1, PageID# 14658.  Of the 631 stops reviewed, the Monitor did not identify any "that exceeded the time reasonably necessary to conduct the appropriate police action."  ECF No. 672-1, PageID# 14667.  For investigatory stops that included a search, officers articulated their justification 97.22% of the time. ECF No. 672-1, PageID# 14662.  The Monitor's review of arrests found that officers avoided conclusory language in 94.04% of arrest reports, "demonstrating strong adherence to articulating the basis for their actions" and supervisors were notified as soon as practicable for custodial arrests.  ECF No. 672-1, PageID# 14662.

The City and CDP have also taken corrective action to address deficiencies in searches and seizures.  Out of 661 incidents reviewed, the Monitor identified only 20 (3%) that it deemed "problematic."  ECF No. 672-1 at 17.  Moreover, while the Monitor was unable to review the timeliness of all CDP supervisor reviews, the Monitor reported that the City provided "screenshots of supervisory approvals for arrests in which the supervisors had identified issues."  ECF No. 672-1, PageID# 14664.  The Monitor also recounted several incidents where CDP took "remedial corrective and disciplinary actions" related to searches and seizures, which "suggest[s] [CDP] is addressing deficiencies."  ECF No. 672-1, PageID# 14664-65.  In addition to supervisory review, the Monitor reports that CDP has established "internal data auditing of traffic and investigatory stops, pulling randomized samples of stop incidents for monthly review by CDP sergeants."  ECF No. 658-1, PageID# 14461.  These audits "allow CDP to quickly identify issues in data entry, areas of need for training or policy changes, and problematic policing practices."  ECF No. 658-1, PageID# 14461.  Accordingly, the Parties agree that the City has overall achieved substantial and effective compliance and a durable remedy regarding searches and seizures.  ECF No. 7-1, PageID# 468-69, ¶ 401; Fed. R. Civ. P. 60(b)(5).

**D. The City Has Implemented Additional Settlement Agreement Remedies Beyond Those Strictly Required to Remedy Alleged Federal Law Violations.**

In addition to the remedies in the Use of Force, Searches and Seizures, and Crisis Intervention sections of the Agreement, the City and CDP have implemented additional remedies set forth in other sections. While these improvements are requirements of the Settlement Agreement, compliance with the Fourth Amendment does not require these reforms. Moreover, the Parties agree that the City and CDP have satisfied these requirements, and continued enforcement of any areas deemed non-compliant is inequitable now that the underlying constitutional issues are resolved. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004) (stating that if a federal consent decree is not limited to reasonable and necessary implementations of federal law, it may improperly deprive future officials of their designated legislative and executive powers.)

The City and CDP have provided more support and resources to officers, strengthened accountability and supervision, and adopted community policing principles. These measures are further evidence of CDP's significant progress since 2015, and they show that the City has achieved a durable remedy to address the constitutional violations that gave rise to this case.

**1. Officer Assistance and Support**

The City and CDP have taken significant steps to recruit, hire, train, equip, and support officers. The Monitor's recent assessments and semiannual reports confirm this progress. Accordingly, the Parties agree that termination is warranted for the Officer Assistance and Support section of the Agreement.

***Training.*** Since entering the Settlement Agreement, CDP has revamped its training program to support constitutional policing, as indicated by the trainings this Court has approved since 2017. The Agreement requires CDP to create and regularly update a training plan, deliver

academy and in-service training on constitutional policing, and establish an effective field training officer program for new officers.  ECF No. 7-1, PageID# 435, ¶¶ 269-290.

CDP has achieved compliance with the training provisions, as shown by the Monitor's recent comprehensive assessment and approval of numerous training materials.  ECF No. 680 (assessment); *see also* ECF Nos. 57, 243, 257, 264, 360, 380, 420, 422, 465, 571.  For example, CDP has developed and updated training plans in collaboration with a Training Review Committee.  ECF No. 680, PageID# 14830-32.[4]  The Monitoring Team found that CDP uses "reality-based training scenarios" and "adult learning methods"—giving officers the tools they need to engage in constitutional and effective policing. ECF No. 680, PageID# 14829; *see also id.*, PageID# 14834 (noting that training curricula have "met and sustained" requirements "over a period of time").  Moreover, the Monitoring Team concluded that CDP regularly assesses its training needs and adjusts curricula accordingly, including based on trends in misconduct complaints and community input.  ECF No. 680, PageID# 14830-32.  CDP also ensures that qualified instructors teach all classes and that officers complete their training requirements.  ECF No. 680, PageID# 14837.  As to field training, the Monitoring Team found that CDP's selection of field training officers complies with the Agreement, and probationary officers can submit confidential feedback on their training officers.  ECF No. 680, PageID# 14840, 14842. Accordingly, the Parties agree that the City and CDP have achieved substantial and effective compliance with the training requirements.  ECF No. 7-1, PageID# 468-69, ¶ 401; Fed. R. Civ. P. 60(b)(5).

---

[4] The Monitoring Team approved CDP's latest training plan in 2026.  ECF No. 686.

*Equipment and Resources.* CDP also has taken significant steps—approved by the United States and the Monitor—to enhance equipment, technology, and other resources for officers. The Monitor found that CDP "maintains adequate computer and vehicle inventories, reliable and up-to-date mobile data systems, and functioning records management and email systems that promote information sharing and transparency." ECF No. 678, PageID# 14781. The Monitor approved CDP's Equipment and Resources Plan and "systematic implementation and legitimate efforts to remain in compliance." ECF No. 678, PageID# 14796. CDP's records management system "produce[s] effective crime and intelligence analysis" to support "data driven deployments." ECF No. 678, PageID# 14799. And CDP maintains critical resources to support officers' health and wellness, including a full-time psychologist and a confidential peer support program. ECF No. 678, PageID# 14802. The Parties therefore agree that the City and CDP have achieved substantial and effective compliance with the equipment and resources requirements. ECF No. 7-1, PageID# 468-69, ¶ 401; Fed. R. Civ. P. 60(b)(5).

*Recruitment and Hiring.* The Monitor's recent assessment found that CDP "has met or exceeded all requirements" for this section of the Agreement. ECF No. 674, PageID# 14743. In 2019, the Court approved CDP's comprehensive recruitment plan. ECF No. 239. The Monitor notes that the City and CDP's efforts "have resulted in a substantial increase in applications, job offers, academy recruits, and CDP graduates in 2024 and 2025." ECF No. 674, PageID# 14750. Specifically, the Monitoring Team acknowledges the impact of the Bibb Administration's Raising Investment in Safety for Everyone (RISE) Initiative, which added a $5,000 hiring bonus, increased pay and benefits, and raised the recruit age limit from 40 to 55. *See id.* Based on a review of 187 officer candidate files, the Monitor concluded that CDP's background investigations were "thorough and objective" in more than 90% of the files. ECF No. 674, PageID# 14755. CDP data

shows a significant increase in the share of qualified applicants, from 13.5% in 2015 to 44.3% in 2024.  ECF No. 674, PageID# 14761.  Taken together, the record shows that the City and CDP have achieved substantial and effective compliance with the recruitment and hiring provisions. ECF No. 7-1, PageID# 468-69, ¶ 401; Fed. R. Civ. P. 60(b)(5).

*Performance Evaluations and Promotions*.  The Agreement requires the City and CDP to adopt new procedures for performance evaluations and promotions.  ECF No. 7-1, PageID# 443-45, ¶¶ 312-18.  The City has established a new promotions policy, and although the Monitor has not yet approved the policy, the Parties agree that it satisfies Paragraph 318 of the Agreement. Ex. A (Promotions Policy).  The City and CDP have taken meaningful steps towards compliance for performance evaluations by procuring a Performance Evaluation Module Officer Intervention Program ("OIP") from Benchmark Analytics ("Benchmark").  *See* Decl. of Chief Dorothy Todd at ¶ 17-22; *see also* ECF No. 658-1, PageID# 14464-65.  This system will provide CDP with an Early Intervention System ("EIS") and a Performance Evaluation module.  *See* Decl. of Chief Dorothy Todd at ¶¶ 17-22.  The implementation of the Benchmark system is still underway, but this does not undermine the durable remedy that the City and CDP have established regarding use of force and searches and seizures.  *See John B. v. Emkes*, 710 F.3d 394, at 413-14 (6th Cir. 2013) (state's "technical violation" did not provide "any lawful basis to continue enforcement of the decree").  Therefore, the Parties agree that the Court should terminate the performance evaluations and promotions requirements.

*Staffing.*  CDP has achieved substantial and effective compliance with the staffing paragraphs of the Agreement.  These paragraphs require CDP to complete a staffing study and staffing plan, and to employ best efforts to implement the plan.  ECF No. 7-1, PageID# 445-46, ¶¶ 319-21.  In 2019, CDP completed the required study, and the United States, the Monitor, and

the Court have approved the staffing plan. ECF No. 673, PageID# 14734; ECF No. 242. In its recent assessment, the Monitor found that CDP regularly evaluates its staffing needs, "developed more partnerships between civilian staff and sworn staff," and uses a workload-based model to determine patrol assignments. ECF No. 673, PageID# 14733, 14737. The Parties therefore agree that the City and CDP have achieved substantial and effective compliance with the Agreement's staffing provisions. ECF No. 7-1, PageID# 468-69, ¶ 401; Fed. R. Civ. P. 60(b)(5).

## 2. Accountability

The Settlement Agreement requires the City and CDP to "fully, fairly, and efficiently" investigate allegations of officer misconduct. ECF No. 7-1, PageID# 415, ¶ 176. The Parties agree that the City and CDP have achieved this core objective by taking steps to improve CDP's Internal Affairs Unit, the City's Office of Professional Standards, and the disciplinary process. Internal Affairs investigates internal allegations of officer misconduct. The Monitor reports that "Internal Affairs is onboarding investigators who possess excellent investigative skills, have a reputation for integrity, can write clear and comprehensive reports, are fair and objective in determining whether a member committed misconduct, do not have a sustained history of civilian complaints, and have not been disciplined for excessive Use of Force, discrimination, or dishonesty." ECF No. 658-1, PageID# 14459. CDP has finalized a manual and training curriculum for investigators. ECF No. 597-1, PageID# 13966; ECF No. 548, PageID# 12591 (Monitor's approval in 2024 of updated manual "without reservation"). And as to performance, the Monitor reports that Internal Affairs "applies a systematic approach to each case to ensure that implemented processes are consistently followed," including monthly reports, tracking to ensure timeliness, and identification of policy violations. ECF No. 597-1, PageID# 13966; *see also* ECF No. 658-1, PageID# 14459

(noting that "Internal Affairs appears to be fulfilling requirements" in the Accountability section based on "monthly reports of unit activity").

The City's Office of Professional Standards (OPS) investigates civilian complaints of officer misconduct.  In 2024, OPS finalized a manual and provided documentation of training for investigators.  ECF Nos. 561, 569; ECF No. 658-1, PageID# 14461 (noting that OPS training "aligns with the requirements of paragraphs 195 and 196").  The Monitor recently reported that OPS investigations "receive three independent reviews," investigators "have consistently supported their findings by a preponderance of the evidence" consistent with Paragraphs 218 and 225 of the Agreement, and productivity among OPS investigators "has increased significantly, accompanied by a reduction in the case backlog." ECF No. 658-1, PageID# 14447, 14460.

The City and CDP have also strengthened the disciplinary process. In 2024, the Monitor and the Court approved an updated manual for the City's independent Civilian Police Review Board (CPRB), which recommends discipline in civilian complaint cases.  ECF Nos. 561, 569. The Monitor reports that the CPRB's findings "consistently reflect decisions based on a preponderance of the evidence," consistent with Paragraph 237 of the Agreement.  ECF No. 597-1 at 28.  In 2018, the Monitor and the Court approved CDP's disciplinary matrix.  ECF Nos. 170, 173, 182.  The Monitor has also found that the Chief of Police's disciplinary decisions are consistent with the Agreement's requirements.  In 2023, the Monitor found that "on the whole," the "disciplinary decisions" by two prior Chiefs "were reasonable and consistent with the intent of [CDP's] most recently updated Disciplinary Matrix."  ECF No. 462-1, PageID# 10210. In September 2025, the Monitor "conclude[d] that the Chief of Police's decision making in discipline cases appears consistent and aligned with CDP policy."  ECF No. 658-1, PageID# 14460.  The

Monitor's consistent compliance findings for years and across multiple Chiefs are evidence of a durable remedy.  *See Horne*, 557 U.S. at 450.

The Monitor's assessments of other sections provide additional evidence that the City and CDP have achieved the objective of the Accountability section: identifying and addressing misconduct.  *See* Decl. of Chief Dorothy Todd at ¶¶ 33-36; *see also* Decl. of Interim Administrator Michael Hess at ¶¶ 5-11.  In the Searches and Seizures assessment, for example, the Monitor discussed several cases in which CDP imposed "remedial corrective and disciplinary actions" to address "violations of the Stop Form policy."  ECF No. 672-1, PageID# 14664-65.  In the November 2023 Use of Force assessment, the Monitor noted that in each of the three incidents involving unreasonable force (out of 39 reviewed), CDP's "chain of command identified and addressed deficiencies."  ECF No. 500-1, PageID# 11353.  And in the 2026 Use of Force assessment, the Monitor found that five cases, or one percent of the 272 cases reviewed, involved unreasonable force; in each case, "[t]he chain of command . . . noted the policy violations and intervened, either through re-training or discipline."  ECF No. 685, PageID# 14883.

**3.  Supervision**

In the Complaint and findings report, the United States alleged that deficient supervision contributed to CDP's pattern or practice of unlawful conduct.  ECF No. 1 at 5; ECF No. 1-1 at 28, 55.  The Settlement Agreement requires CDP to provide ongoing training for all supervisors, implement an officer intervention program, and ensure that supervisors regularly review officers' body-worn camera video footage.  ECF No. 7-1, PageID# 446-50, ¶¶ 322-340.

The Parties agree that CDP has achieved compliance with the Supervision section.  The section's core objective is "close and effective supervision of officers," including for uses of force. ECF No. 7-1, PageID# 446, ¶ 322.  The Monitor reports that CDP patrol sergeants "provid[e]

effective supervision when they are on scene with officers," "are increasingly comfortable and thorough in their on-scene reviews," and "consistently provide a policy driven and thoughtful approach to alternatives when posed with a problem by an officer."  ECF No. 658-1, PageID# 14464-65; *see also* ECF No. 563-1, PageID# 12918 ("[S]upervisors on scene are generally engaged and conducting appropriate and expected reviews of officer performance").

CDP has taken specific steps to bolster supervision, including those required by the Supervision section of the Agreement.  For example, CDP developed a supervisory training curriculum in collaboration with the United States and the Monitor; the Monitor and the Court approved this curriculum as consistent with the Agreement in 2019.  ECF Nos. 243, 248.  The Monitor also approved CDP's leadership development training in 2023, observing that this training "provides specific and interactive guidance on supervisory and decision-making skills." ECF No. 478, PageID# 10764-65.  As to CDP's officer intervention program, the Monitor and the City report that the City continues to make progress on the development of a database for the program, which has included engagement with a vendor and integration of comprehensive datasets for each CDP officer.  *See* ECF No. 658-1, PageID# 14465; *see also* Decl. of Chief Dorothy Todd at ¶¶ 17-22.  The Agreement requires CDP supervisors to conduct random audits of officers' body-worn camera video for compliance with policy and to identify areas for additional training or guidance. ECF No. 7-1, PageID# 450, ¶ 339.  After reviewing documentation of CDP's supervisory and command-level audits of body-worn camera video, the Monitor found CDP in compliance with this requirement.  ECF No. 597-1, PageID# 13956.

Thus, although the Monitor has not completed a standalone assessment of the Supervision section, the Monitor has reviewed CDP's implementation of specific reforms required by the section.  Critically, the Monitor has assessed CDP's supervisory practices through comprehensive

assessments of Crisis Intervention, Searches and Seizures, and Use of Force.  The Monitor found that supervisors received training in crisis intervention and scene responsibility, and that specialized CIT officers who responded to crisis incidents "nearly always asserted control over the scene," consistent with CDP policy.  ECF No. 661-1, PageID# 14533.  The Monitor found that supervisors responded to the scene of every custodial arrest reviewed in the assessment, and the vast majority of arrest reports included clear narratives and omitted conclusory language—the expected result where supervisors carefully review such reports.  ECF No. 672-1, PageID# 14662. As to use of force, the Monitor found that supervisory reviews of force were "objective and complete" in 90% of cases reviewed, and the findings were supported by a preponderance of the evidence in 95.7% of cases reviewed.  ECF No. 685, PageID# 14923.

Accordingly, the Parties agree that termination is warranted for the Supervision section of the Agreement.

### 4. Community Engagement; Community and Problem-Oriented Policing; and Bias-Free Policing

In the Complaint and findings report, the United States alleged that CDP's failure to "implement effective community policing strategies" contributed to the pattern or practice of unlawful conduct.  ECF No. 1, PageID# 5, ¶ 18; ECF No. 1-1, PageID# 56-60.  The Settlement Agreement includes provisions related to Community Engagement; Community and Problem-Oriented Policing; and Bias-Free Policing.  ECF No. 7-1, PageID# 376-83, ¶¶ 14-44.

The City and CDP have made positive strides in implementing community engagement and community policing principles.  *See* Doc. 563-1, PageID# 12911 ("CDP remains committed to its outreach efforts to build lasting, trusting relationships with the Cleveland community.").  In 2021, the City incorporated the duties of the Community Police Commission into the City Charter,

showing the durability of this oversight mechanism.[5]  ECF No. 413 (Joint Motion to Modify Settlement Agreement); ECF No. 416 (Order); ECF No. 658-1, PageID# 14451.  The Commission is not the only mechanism for community feedback.  In 2019, the Court approved the City's District Policing Committee Plan.  ECF No. 238.  These Committees, along with other City entities, seek to "facilitate regular communication and cooperation between CDP and community leaders at the local level."  ECF No. 7-1, PageID# 379, ¶ 23.  Moreover, for at least the last six years, CDP has taken steps to integrate community policing principles into its policies and systems: the Court approved CDP's Community and Problem-Oriented Policing Plan, and CDP has developed policies and training approved by the United States and the Monitor.  ECF Nos. 234, 238, 273, 395, 408, 410.  CDP has also established Community and Problem-Oriented Policing Coordinators in every patrol District.  ECF No. 658-1, PageID# 14452-53.  The Monitor reports that these Coordinators are "collaborating with community members to develop problem-solving strategies" to reduce crime.  ECF No. 658-1, PageID# 14453.  CDP has received "reports expressing appreciation by business[es]/schools [that] have struggled with long-term unresolved issues."  ECF No. 597-1 at 22.

CDP has developed and implemented policies and training related to bias-free policing as well.  ECF No. 186, 271, 272, 381, 424, 453.  In 2025, for example, the Monitor reported that CDP developed an "interactive, scenario-based training curriculum" that "includes practical steps to help supervisors address and reduce bias" and "create a unit-level and organizational culture of Bias-free policing."  ECF No. 597-1, PageID# 13962.  The City also retained a data analytics company to examine CDP's 2024 traffic stop and search data for evidence of racial bias; the

---

[5] There are currently CPC vacancies which the City is seeking to fill.  The City cannot control the attrition of CPC members but takes reasonable steps to address vacancies as they occur.

analysis did not find statistically significant racial disparities in how often officers' searches recovered contraband.[6]  Despite the fact that the United States' Complaint did not allege that CDP engaged in unlawful discriminatory policing, CDP has demonstrated a commitment to bias-free policing by implementing policies and training approved by the United States and the Monitor.

Moreover, other data points—including the outcome measures in Paragraph 367(d)— support compliance and termination of these sections.  *See* ECF No. 7-1, PageID# 458, 469, ¶¶ 367(d), 401.  For example, the City's community engagement report identifies dozens of partnerships with local groups, including youth organizations.[7]  The Monitor reports that CDP officers "attend community-sponsored meetings," "participate in the planning and facilitation of such meetings," and "engage with community residents in non-law enforcement settings"— activities that "increase trust and strengthen relationships between CDP and many in the community." ECF No. 658-1, PageID# 13961. Another outcome measure is CDP's homicide clearance rate, or how often the police solve homicides, which may require community cooperation.  ECF No. 7-1, PageID# 458, ¶ 367(d)(2).  In 2015, CDP's homicide clearance rate was reportedly 39%.[8]  In 2024, the City reported the homicide clearance rate was over 80%.[9]

---

[6] City of Cleveland, *City Hires Independent Firm, Led by Nationally-Renowned Harvard Economist, Who Finds No Evidence of Systemic Racial Bias in Police Searches* (Oct. 23, 2025), https://www.clevelandohio.gov/news/city-hires-independent-firm-led-nationally-renowned-harvard-economist-who-finds-no-evidence.

[7] Cleveland Division of Police & City of Cleveland, 2022 Community Engagement Report at 35, https://www.clevelandohio.gov/sites/clevelandohio/files/Community%20Engagement%20Report%209-6-2022.pdf; Settlement Agreement, ¶¶ 367(d)(1).

[8] David Molpus, *Cleveland 'Clearance Rate' for Homicide Higher than Columbus*, Ideastream Public Media (Mar. 31, 2015), https://www.ideastream.org/health-science/2015-03-31/cleveland-clearance-rate-for-homicide-higher-than-columbus.

[9] *See* Decl. of Chief Dorothy Todd at ¶ 28; *see also* Olivia Mitchell, *Cleveland's Mayor Justin Bibb attributes crime reduction, more police applicants to his safety initiatives*, Cleveland.com (Mar. 28, 2024), https://www.cleveland.com/news/2024/03/clevelands-mayor-justin-bibb-

Pursuant to Rule 60(b)(5), the City's implementation of key reforms required by the Agreement, and additional evidence from outcome measures, the Parties agree that termination is warranted for the Bias-Free Policing, Community Engagement, and Community and Problem-Oriented Policing sections.

### 5. Transparency and Oversight

The Settlement Agreement requires the City to hire a police-focused Inspector General to conduct oversight activities, and it requires CDP to collect and maintain necessary data. ECF No. 7-1, PageID# 430-34, ¶¶ 250-268. The City and CDP have met these requirements. The City hired its current Inspector General in December 2024, and the Monitor determined that she "was provided the necessary resources and support to begin her work." ECF No. 658-1, PageID# 14448, 14461; ECF No. 597-1, PageID# 13969. As to data collection and analysis, the Monitor reports that CDP "maintains various public datasets and dashboards," including data related to use of force, crisis intervention, and traffic stops. ECF No. 658-1, PageID# 14461. Moreover, CDP has used data for "regular audits" of traffic and investigatory stops, "pulling randomized samples of stop incidents for monthly review"; according to the Monitor, these audits "allow CDP to quickly identify issues in data entry, areas of need for training or policy changes, and problematic policing practices." ECF No. 658-1, PageID# 14461.

Pursuant to Rule 60(b)(5) and the City's implementation of key reforms required by the Agreement, the Parties agree that termination is warranted for the Transparency and Oversight section.

---

attributes-crime-reduction-more-police-applicants-to-his-safety-initiatives.html; YouTube, *The 2024 State of the City with Mayor Justin M. Bibb* at 28:35-24:58, https://www.youtube.com/watch?v=ds6m0fV6hGM.

### E. The City Is Well-Positioned to Maintain Constitutional Policing Without Continuing Federal Oversight.

The City of Cleveland has enacted the reforms required by the Settlement Agreement, to ensure constitutionally compliant policing by the Division of Police.  *See generally* Decl. of Mayor Justin Bibb, Decl. of Council President Blaine Griffin, Decl. of Executive Director Leigh Anderson, Decl. of Chief Dorothy Todd.  The record shows that the City has enacted durable remedies to prevent and address the federal-law violations that gave rise to this case.  The City invested in safety and oversight infrastructure throughout the lifetime of the Settlement Agreement.  *See id.*  In 2025 alone, that investment was over $10,000,000.  *See* Decl. of Mayor Justin Bibb at ¶¶ 16-17.  The City also committed funds to service and facilitate the Agreement above and beyond funds spent to ensure durable remedies.  The City will continue its investment in constitutional policing and is committed to ensuring that the remedies effectuated by the Settlement Agreement remain in place.

### F. The Parties Are Entitled to Relief Because the Settlement Agreement Is Void.

Alternatively, the Parties are entitled to relief because the Settlement Agreement is void.  Consent decrees are also subject to Rule 60(b)(4), i.e., relief from a void judgment.  *See* Fed. R. Civ. P. 60(b)(4).  The Supreme Court has interpreted Rule 60(b)(4) to apply only in "the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard."  *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010).  Though the *Espinosa* Court did not elaborate on what "certain type[s] of jurisdictional error" could result in voidness (*id.* at 270) the Sixth Circuit has suggested that "Rule 60(b)(4) would be the proper vehicle" for arguing that a district court's order exceeded its equitable jurisdiction (*Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 612 (6th Cir. 2011)).  Overbroad institutional consent decrees exceed a

district court's equitable jurisdiction for substantially the same equitable considerations discussed above in connection with Rule 60(b)(5).  *See Frew*, 540 U.S. at 441 (holding institutional reform decrees should be "limited to reasonable and necessary implementations of federal law" to preserve, as much as possible, the "designated legislative and executive powers" of "future officials"); *accord* Order Granting the United States' Motion to Dismiss, *United States v. Louisville Jefferson Cty. Metro Gov't.*, 3:24-cv-00722 No. 98 (W.D. Ky. Dec. 31, 2025) ("To order such a remedy—unconnected to any identifiable alleged violation of federal law—surely lies beyond the broadest notions of the Court's equitable authority . . .").  Because any remaining conditions of the Settlement Agreement are unconnected to any identifiable alleged violation of federal law, continuing to enforce the Settlement Agreement would exceed this Court's equitable authority, thus rendering the Settlement Agreement void under Rule 60(b)(4).  *See Brumfield v. Louisiana State Bd. of Educ.*, 806 F.3d 289, 298 (5th Cir. 2015) ("The district court's order exceeded the constitutional infirmity on which this case was predicated and is therefore void.").

Relatedly, there is no longer a case or controversy on which to base jurisdiction; thus, the Agreement now is void.  Though this case originated as a valid cause of action, the Parties are now in agreement that their original dispute has been satisfied by a durable remedy and, therefore, there is no longer any controversy between the Parties.  Continued exercise of jurisdiction would violate Article III.  *See Lambert v. Turner*, 525 F.2d 1101, 1102-03 (6th Cir. 1975) (Article III requirements must be satisfied to sustain consent decree).  An active case or controversy between the Parties "must be present not only at the time the complaint is filed, but through all stages of the litigation, lest the case become moot."  *Doe v. Univ. of Mich.*, 78 F.4th 929, 942 (6th Cir. 2023) (citing *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) and *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (internal quotation marks omitted)).  Because there is no longer an active case or

controversy, the Settlement Agreement is void under Rule 60(b)(4).  *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 108 (6th Cir. 1995).  Accordingly, the Court should grant relief from the Settlement Agreement under Rule 60(b)(4).[10]

## V.    CONCLUSION

For the foregoing reasons, the Parties respectfully request that the Court enter an order terminating the Settlement Agreement.

---

[10] This case is distinct from the timing concerns for a Rule 60(b)(4) motion in *In re G.A.D. Inc.*, 340 F.3d 331 (6th Cir. 2003).  Here, the timing of this motion coincides with the Parties' agreement that no case or controversy exists.  "Motions under subsections (4), (5), and (6) may be made within a 'reasonable time,'" which depends upon "the facts in a case, including length and circumstances of delay in filing, prejudice to opposing party by reason of the delay, and circumstances warranting equitable relief."  340 F.3d at 334 (quoting *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 365 (6th Cir.1990)).

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

R. JONAS GEISSLER
Deputy Assistant Attorney General
Civil Rights Division

*/s/ Patrick McCarthy*
PATRICK MCCARTHY
Chief
Special Litigation Section

SURAJ KUMAR
Trial Attorney
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel: (202) 202-598-1211
Email: Suraj.Kumar@usdoj.gov

*Attorneys for the United States*

DAVID M. TOEPFER
United States Attorney
Northern District of Ohio

*/s/ Patricia M. Fitzgerald*
PATRICIA M. FITZGERALD
Chief, Civil Division

SARA E. DECARO (OH: 0072485)
Assistant U.S. Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3779 (Fitzgerald)
(216) 622-3670 (DeCaro)
(216) 522-2404 (FAX)
Patricia.Fitzgerald2@usdoj.gov
Sara.DeCaro@usdoj.gov

*/s/ Mark D. Griffin*
MARK D. GRIFFIN
Director of Law
City of Cleveland
MARK D. GRIFFIN (OH: 0064141)

*/s/ Delante Spencer Thomas*
DELANTE SPENCER THOMAS (OH: 0096349)
City Hall Room 106
Cleveland, OH 44114
(216) 664-2800
mgriffin@clevelandohio.gov
dthomas3@clevelandohio.gov

*Attorneys for the City of Cleveland*

*/s/ Sanford E. Watson*
SANFORD E. WATSON (0040862)
McDonald Hopkins LLC
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
swatson@mcdonaldhopkins.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15CV1046 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, | ) | [PROPOSED] ORDER GRANTING JOINT |
| | ) | MOTION TO TERMINATE |
| Defendant. | ) | SETTLEMENT AGREEMENT |
| | ) | |

Pending before the Court is the Parties' Joint Motion to Terminate the Settlement Agreement and dismiss this matter with prejudice, pursuant to Paragraph 401 of the Agreement and Federal Rule of Civil Procedure 60(b).  After considering the facts, legal arguments, and the language of the Settlement Agreement, the Court finds that the City and CDP have achieved substantial compliance and a durable remedy to address the conduct alleged in the Complaint.

It is hereby ORDERED as follows:

The Complaint is dismissed with prejudice; and

The Settlement Agreement is terminated.

IT IS SO ORDERED.

_____
JUDGE SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

# City of Cleveland – Department of Public Safety

### Administration Division – Procedures
### Public Safety Promotional Selection Process

**PURPOSE:** To establish a comprehensive, fair, and consistent promotional practice that will result in the promotion of members who are effective and professional.  To ensure full transparency and compliance with applicable provisions of state and federal law, including compliance with any effective federal Settlement Agreement provisions.

**PROCEDURES:**

I.  **Preparation / Notice**

   A.  Prior to any Public Safety promotional testing, the below processes will be disseminated to all eligible test candidates as part of the notice of testing or other notice sent by the Civil Service Commission or Division.  This is to ensure that all candidates are aware of the factors that will be considered by the Appointing Authority during the one for three candidate selections pursuant to Charter Section 133.

II.  **Civil Service Testing**

   A.  As part of the vetting and selection of vendors providing promotional testing services to the City for any Public Safety Division, the Requests for Proposals ("RFP") will include instructions that vendors are to submit proposals to include objective testing of candidates in the following categories:

   1.  Effective use of community and problem-oriented policing strategies (for police candidates only)
   2.  Problem Solving Skills
   3.  Interpersonal Skills
   4.  Support for Integrity measures

   These items are to be separately identified and reported by the vendor.

   B.  Public Safety and Division leaders assigned to vet RFP responses and vendors will ensure that the items in Section II (A) above are considered during RFP creation and vendor selection.

III.  **Promotional Committee**

   A.  Once notified by the Civil Service Commission that an eligible list for promotions has been certified, the Appointing Authority will ensure that a Division Promotion Committee is empaneled.  The Promotion Committee ("Committee") will be made up of no fewer than three members. The applicable Division Chief or Commissioner ("Chief") will appoint members to the Committee among the ranks of the Command Staff of the Division. The Executive Officer of the Division shall be among the members of the Committee.

   B.  The Executive Officer will be responsible for the following:



GOVERNMENT
EXHIBIT

A

     1.     Scheduling the Committee meetings;
     2.     Collecting employee recommendation forms;
     3.     Notifying the Chief of the Committee's recommendations.

C.     The Chief will be responsible for providing the recommendation forms to the Appointing Authority prior to the one for three selections.

D.     The Division member charged with overseeing personnel will ensure that the eligible list, specific information or documents that reflect the criteria below, and each candidate's personnel file is forwarded to all members of the Committee. The Committee will review all relevant information on each candidate. The Committee will produce a summary report for each candidate that will include:

     1.     Problem solving skills;
     2.     Interpersonal skills;
     3.     Support for Divisional integrity measures;
     4.     Completed training;
     5.     Sustained complaints;
     6.     Effective use of community and problem-oriented policing (for Police candidates);
     7.     The number and circumstances of uses of force (for Police candidates);
     8.     Review of WCS Review Reports involving the candidate from the past three years (for Police candidates);
     9.     Assignment as a Field Training Officer or an equivalent position;
     10.     Discipline, including pending discipline;
     11.     Performance evaluation scores for the last three years;
     12.     Awards/commendations; and
     13.     Substantiated findings of dishonesty, false statements, bias, and/or untruthfulness.

E.     Items 1, 2, 3 and 6 above may be obtained from the reports generated by the promotional testing vendor's testing process and incorporated into the summary.

F.     When the Committee has completed its review of all eligible candidates, they will use the factors enumerated in Section D to designate the candidate as Recommended, No Recommendation, or Recommend for Removal. The designation of Recommended shall require a majority vote and the designation of Recommend for Removal shall require a unanimous vote, except that the Committee shall automatically designate a candidate as Recommend for Removal if the candidate is a member of the Division of Police and has received any formal disciplinary suspension greater than or equal to 168 hours for a violation of a Group III or above offense or; if the candidate is a member of the Division of Fire or Division of EMS, any formal disciplinary suspension greater than or equal to 14 work shifts for a violation of a Group IV or above offense.  The Committee may designate a candidate as Recommend for Removal if removal is supported in Civil Service Rule 5.30.  If the previously described voting thresholds cannot be met, then the Committee shall designate the candidate as No Recommendation.

G.     The Committee will meet as often as the workload requirement necessitates as determined by the Executive Officer, or as directed by the Chief.

H.    Additional factors may be considered but must be published in writing to all candidates, prior to the commencement of the corresponding promotional exam.

## IV.   Request for Removal from the Eligible List

A.    Prior to the one for three selection process as described in Section V, the Appointing Authority will request that the Civil Service Commission remove all candidates from the eligible list pursuant to Civil Service Rule 5.30 that the Committee has designated as Recommend for Removal, unless the Appointing Authority overrules the Committee's designation.

B.    If the Appointing Authority overrules the Committee's designation, then the Appointing Authority must list, in writing, which factors from the factors enumerated in Section III (D) were considered in making the decision to overrule along with an explanation.

## V.   One for Three Selection Process

A.    The Appointing Authority will select for promotion to each vacancy from the highest three scoring candidates from the eligible list ("Group of Three") pursuant to Charter Section 133.

B.    The Appointing Authority will first select among the candidates with a Recommended designation. If no candidate has a Recommended designation, then the Appointing Authority has the discretion to pick any candidate among the three. In no case will the Appointing Authority pick a candidate with No Recommendation or an overruled Recommendation for Removal in favor of a candidate with a Recommended designation.

C.    If there is more than one promotional vacancy, then the Appointing Authority will add the next highest scoring candidate to the Group of Three and repeat the above process.

D.    If a candidate fails to be selected for promotion after being considered three (3) times, then the Appointing Authority will remove the candidate from the Group of Three and replace him with the next highest scoring candidate. The Appointing Authority may then request that the candidate be removed from the eligible list pursuant to Civil Service Rule 5.30. Alternatively, the candidate may remain on the eligible list until the list is abolished by the Civil Service Commission.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No: 1:15 CV 1046 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | DECLARATION OF BLAINE A. GRIFFIN |
| CITY OF CLEVELAND, | ) | IN SUPPORT OF JOINT MOTION FOR |
| | ) | TERMINATION OF SETTLEMENT |
| Defendant. | ) | AGREEMENT |

Blaine A. Griffin, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration and have personal knowledge of the matters set forth herein.

2. I am President of the Cleveland City Council and Council Member representing Ward 6 of the City of Cleveland, Ohio ("Cleveland").

3. I have served as President of the Cleveland City Council since 2022 and as Council Member for Ward 6 since 2017, previously serving as Executive Director of Cleveland's Community Relations Board from 2006 to 2017.

4. I submit this Declaration in support of the United States and Cleveland's Joint Motion for Termination of Settlement Agreement in *United States v. City of Cleveland*, Case No. 1:15 CV 1046, pending before the Hon. Solomon Oliver, Jr. in the U.S. District Court for the Northern District of Ohio.

5. Specifically, I am writing to advocate for the transition of the Cleveland Division of Police ("CDP") away from federal oversight and toward a model of local accountability.

6. My history with the matters that underly this case and the transition for which I advocate are long and personal.

1

7. As Executive Director of Community Relations, I was at the table when the U,S. Department of Justice first identified the need for change, and I was an active participant in the difficult work of structuring the Settlement Agreement—I know where we started; I know how far we have come; and I know what it takes to keep Cleveland moving forward.

8. Now as President of Cleveland City Council, I view the Settlement Agreement through the lens of legislative and fiscal responsibility.

9. Cleveland City Council is the watchdog of Cleveland's budget, ensuring that reform is not just a set of ideals but a fully funded reality.

10. As a body, Cleveland City Council scrutinizes every dollar, from body-camera contracts to training modules, to ensure CDP has the resources to meet—and exceed—state and federal constitutional standards.

11. Cleveland City Council has shown that through the power of the purse and deliberate legislation, we can exert the strenuous oversight required to protect our citizens.

12. CDP has evolved: Cleveland City Council has adopted rigorous new policies on the use of force and bias-free policing that are now foundational to CDP.

13. However, the Settlement Agreement has become a bottleneck to progress. Cleveland needs to be nimble and responsive to the challenges of the 21st century.

14. For example, Cleveland City Council's attempts to integrate drone technology to support the work of CDP has been slowed by the bureaucratic requirements of the Settlement Agreement even when CDP officers and Cleveland residents are calling for those tools today.

15. Another example is Tanisha's Law—a recent piece of Cleveland legislation that creates a Bureau of Community Crisis Response within the Division of Emergency Medical Service

2

staffed by behavioral health professionals, social workers, experienced peers, and clinicians who, going forward, will be tasked with responding to non-violent behavioral health crises, wellness checks, substance-use crises, and quality-of-life calls instead of police.

16. To make Tanisha's Law truly effective, Cleveland needs the flexibility to adapt its response models in real-time. Cleveland cannot allow a decade-long legal framework to prevent us from implementing the very local solutions our community is demanding.

17. Cleveland is ready to take the lead; we are fully committed to working with our community partners to institutionalize the progress already made by codifying the lessons and experiences from the Settlement Agreement into our permanent city operations so that the progress outlasts any single administration or mandate.

18. Cleveland is ready to take the lead to maintain high standards of discipline and transparency; we have the legislative will and the budgetary commitment to do this ourselves.

19. The lessons of the federal Monitor have been well learned; it is now time for Cleveland to build on that foundation through local, democratic accountability.

3

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is true and correct.

Date of Execution: 2/18/26

Blaine A. Griffin

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15 CV 1046 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | DECLARATION OF DOROTHY TODD |
| CITY OF CLEVELAND, | ) | IN SUPPORT OF JOINT MOTION FOR |
| | ) | TERMINATION OF SETTLEMENT |
| Defendant. | ) | AGREEMENT |

Dorothy Todd, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration and have personal knowledge of the matters set forth herein.

2. I am the Chief of Police for the City of Cleveland ("Cleveland") Division of Police ("CDP"), a position I have held since 2024 and I have served with CDP since 2000.

3. I submit this Declaration in support of the United States and Cleveland's Joint Motion for Termination of Settlement Agreement in *United States v. City of Cleveland*, Case No. 1:15 CV 1046, pending before the Hon. Solomon Oliver, Jr. in the U.S. District Court for the Northern District of Ohio.

4. Since joining the Cleveland Division of Police 26 years ago, I have witnessed substantial improvements in policing—and especially within CDP

5. Chief among those changes are those CDP has implemented since 2015, when Cleveland entered into the Settlement Agreement with the United States.

6. Take the impetus for the Settlement Agreement—CDP's use of force— CDP declared a new use of force policy in 2018 that promotes de-escalation measures to reduce the likelihood and level of force that will become necessary and, when necessary, employ only

1

that force that is necessary, proportional, and objectively reasonable based the circumstances confronting the officer.

7. CDP's parallel use of force mandatory reporting policies gives credence to the efficacy of CDP's use of force policy, as well as use of force training and supervision, with only a 0.1% average instances in which force is employed in response to calls for service and an average 2.9% for arrests between 2018 and 2024.

8. The data shows a strong correlation between the level of resistance exhibited and the level of force employed by CDP officers, with no instance in which an officer employed the highest level of force to a subject who was not resisting.

9. Data from Internal Affairs investigations also gives credence to the efficacy of CDP's use of force policies and trainings, showing a 55% reduction in the number of complaints related to use of force since 2018.

10. This data makes clear that CDP has addressed the impetus for the Settlement Agreement, as CDP does not engage in a pattern or practice of excessive use of force.

11. Success in the area of use of force is due to multifaceted changes in the way CDP operates. One CDP's relationship with the community, which CDP has transformed for the better by creating mechanisms to facilitate ongoing communication between CDP and Cleveland residents through, among other things, District Policing Committees ("DPCs").

12. DPCs meet monthly (more frequently than the Settlement Agreement's quarterly meeting requirement) and organize and execute community engagement events with local residents and youth, of which there have been over 27,000 since 2015; DPCs therefore meet the measure of serving as the bridge between CDP and the community it serves through interactive dialogue.

13. A related factor is the evolution of CDP's mission, from crime enforcement to an emphasis on community partnerships and crime prevention through initiatives such as Community and Problem-Oriented Policing ("CPOP"). These approaches recognize that lasting public safety is built through collaboration, trust, and shared responsibility.

14. Another related factor is CDP's revised policy on bias-free policing, the most recent iteration of which has been in place since 2018, which CDP has implemented through training and the promotion of a culture that strives to deliver equitable, respectful, and bias-free police services in ways that promote broad community engagement and confidence in CDP.

15. Eminent among CDP's efforts to achieve constitutional policing is the assistance, support, and supervision it provides to its officers. CDP has a training section that produces a "Needs Assessment," which identifies any apparent shortcomings in CDP's training curriculum. And since 2015, CDP engages in regular use of force training on the appropriate use of firearms and intermediate weapons, high stress critical thinking with firearms, subject control, investigating uses of force, policy refreshers, crisis intervention, and integrated reality scenario-based training, including those related to search and seizure and bias-free policing.

16. Separate from training and policy is CDP's internal reporting systems, which enable CDP to track and build upon its efforts for continued improvement without the need for external monitoring.

17. One such notable reporting system is the Officer Intervention Program ("OIP"); Cleveland entered into a professional services contract with Benchmark Solutions LLC, dba Benchmark Analytics ("Benchmark"), on September 6, 2024.

3

18. The contract was executed to provide Cleveland with the professional services necessary to implement and host a First Sign Early Intervention System ("EIS"), Case Action Response Engine, and Performance Evaluation Module ("PE") to function as the OIP.

19. CDP believes the professional services it contracted for with Benchmark will satisfy the City's obligations to implement Early Intervention and Performance Evaluation systems, pursuant to ¶¶ 326 – 336 (OIP) and ¶¶ 312 – 316 (PE) of the Settlement Agreement in this matter.

20. The current targeted go-live date for the PE is February 27, 2026.

21. The current targeted go-live date for the OIP is April 6, 2026.

22. CDP will begin drafting the General Police Orders, Divisional Notices, and other policies necessary to implement both the OIP and PE modules shortly thereafter.

23. In the meantime CDP maintains a robust reporting system to keep track of community engagement partnerships and events, outstanding CPOP concerns, use of force incidents, and traffic and investigatory stops. This is part of a greater effort to ensure that CDP has the internal tools necessary to self-diagnose and improve the quality of police services and ensure compliance with state and federal constitutional requirements.

24. CDP has separately made great strides in criminal investigation of homicide cases.

25. Historically, the homicide solve rates in Cleveland hovered around 50%. These rates did not provide justice for the victims and answers to the families.

26. CDP has since prioritized technology and the hiring of civilian Investigative Research Specialists.

27. Having an IRS imbedded in the Homicide Unit to assist in reviewing available camera footage and digital evidence has had a significant impact in our solve rates.

4

28. In 2024, the homicide solve rates in Cleveland were at 83%, well above the national average.

29. In 2025, the homicide solve rates in the City of Cleveland were at 80%, still well above the national average.

30. The open investigations are still active, and we are committed to finding justice for the victims and their families.

31. Since becoming Chief, my primary focus has been transparency and accountability. Ensuring that training and policies related to Procedural Justice, Duty to Intervene, and Reporting Misconduct are not just written standards, but embedded in our culture, has been essential to that effort.

32. For example, the Division of Police maintains and analyzes IA complaint and investigation numbers frequently.

33. As of 2025, the City reported 367(i) Outcome Measurement data on arrests for officer conduct on duty as: 2015 (1); 2016 (2); 2017 (1); 2018 (0); 2019 (0); 2020 (0); 2021 (2); 2022 (0); 2023 (1); 2024 (0).

34. As of 2025, the City reported 367(i) Outcome Measurement data on arrests for officer conduct off duty as: 2015 (14); 2016 (11); 2017 (10); 2018 (19); 2019 (13); 2020 (22); 2021 (9); 2022 (3); 2023 (3); 2024 (10).

35. As of 2025, the City reported 367(i) Outcome Measurement data on the number of prosecutions for officer conduct as: 2015 (15); 2016 (13); 2017 (11); 2018 (19); 2019 (13); 2020 (44); 2021 (22); 2022 (8); 2023 (10); 2024 (11).

36. As of 2025, the City reported 367(i) Outcome Measurement data on the number of civil suits against the City or CDP for work related to officer conduct as: 2015 (8); 2016 (12); 2017 (52); 2018 (35); 2019 (27); 2020 (30); 2021 (34); 2022 (28); 2023 (6); 2024 (11).

37. I am proud of the work our men and women do every day in service to our community and of the changes I have witnessed throughout this Division. This is a different Cleveland Division of Police—one that continues to evolve and improve.

38. The assessments completed by the Monitoring Team over the past year in areas such as Crisis Intervention, Use of Force, Search and Seizure, Recruitment and Hiring, Training and Equipment, and more are a testament to the hard work, dedication, and commitment of our members. These evaluations reflect meaningful progress and reinforce our responsibility to continue moving forward.

39. We have also made substantial improvements in data-driven and evidence-based policing through the hiring of crime analysts who work in close partnership with our command staff and frontline officers. This collaboration allows us to make informed decisions that enhance effectiveness and accountability.

40. The creation of our Technology and Compliance Unit represents another important step forward, ensuring our members are equipped with the right tools to perform their duties efficiently, effectively, and in accordance with our policies and values.

41. As we continue to build on these changes, I remain committed to prioritizing officer wellness and early intervention. Supporting the physical and mental well-being of our officers is critical to serving our community with professionalism and compassion.

42. I am confident in the systems we have in place to identify issues, address them appropriately, and ensure accountability. Continuous improvement remains our responsibility—to our officers, and to the community we serve.

43. However, CDP's ability to keep pace with that responsibility is now limited by the very instrument intended to promote it—the now decade-plus old Settlement Agreement.

44. The Settlement Agreement's requirements are based on outdated policing models that no longer reflect current best practices, with CDP expending resources attempting to interpret the contemporary application of the Settlement Agreement's terms.

45. Time and resources spent on adapting the Settlement Agreement to a new context would be better spent addressing the needs of the moment—developing policies, metrics, and systems for the deployment of unmanned arial systems that have the potential of saving lives; incorporating artificial intelligence tools to assist with evidence management, pattern detection, and resource allocation; and working with community partners for new innovative solutions that address community needs and wants.

46. I hope we are no longer defined by past perceptions but instead recognized for the changes we have made and who we are today.

47. Today, we have a sustainable and durable system of policies, practices, training and implementation that have achieved constitutional policing.

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is true and correct.

Dated: 2.17.26

Dorothy Todd
City of Cleveland, Chief of Police

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No: 1:15 CV 1046 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | DECLARATION OF JUSTIN M. BIBB |
| CITY OF CLEVELAND, | ) | IN SUPPORT OF JOINT MOTION FOR |
| | ) | TERMINATION OF SETTLEMENT |
| Defendant. | ) | AGREEMENT |

Justin M. Bibb, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration, and I have personal knowledge of the matters set forth herein based

1. I am the Mayor of the City of Cleveland, Ohio ("Cleveland"), and have served in that capacity since 2022.

2. I submit this declaration in support of the United States and Cleveland's Joint Motion for Termination of the Settlement Agreement filed in in *United States v. City of Cleveland*, Case No. 1:15 CV 1046, pending before the Hon. Solomon Oliver, Jr. in the U.S. District Court for the Northern District of Ohio.

3. The Settlement Agreement has been a success. The Settlement Agreement has done what it was meant to do: it catalyzed change. Today, Cleveland has achieved a durable, self-sustaining system of constitutional policing.

4. This achievement is due to the efforts of this Court, the Federal Monitoring Team, the United States Department of Justice ("DOJ") and the men and women of the Cleveland Division of Police ("CDP").

5. The original complaint by the DOJ alleged a pattern or practice of unconstitutional policing.  While I cannot tell you whether such a pattern or practice may have existed ten years ago, I can tell you – and swear and affirm – that no such pattern or practice exists today.

6. Today, the City has best-in-class policies, training and practices and has eliminated any pattern and practice of unconstitutional policing. We have durable remedies that we are committed to, and now we need local control because the existence of the Settlement Agreement inhibits a flexible response to new policies. Ending the decree does not mean ending oversight; it means Cleveland owns its own future and remains accountable to its residents.

7. Independent federal monitors—over multiple years— have found:

   a. 97% of uses of force are constitutional, and when force was improper, the City identified and corrected it itself.
   b. Force-related complaints are down 55%.
   c. Officer injuries are down 40%.
   d. Crisis intervention responses are nationally recognized best practices.

8. As discussed in greater detail below, Cleveland has built permanent accountability, not temporary compliance. This reform is locked into local law and institutions, and is no longer dependent on a federal oversight. Cleveland now has one of the most comprehensive accountability ecosystems in the country.

   a. A Charter-enacted Community Police Commission, approved by voters
   b. A Police Accountability Team
   c. A Civilian Police Review Board
   d. A civilian Office of Professional Standards
   e. A Public Safety Inspector General
   f. A fully modernized Internal Affairs Unit

9. These bodies are institutionalized, redundant, and provide independent oversight. No single failure can undo reform.

10. Cleveland entered the Settlement Agreement to ensure that the Cleveland Division of Police ("CDP") delivers constitutional policing and to rebuild trust through clear standards, effective supervision, and meaningful accountability. We have done so. From the start of my administration, I have treated this work as more than as a mandate for institutionalizing constitutional policing—it is part of how we govern.

11. The City's response to the Monitor's Seventeenth Semiannual Report describes meaningful progress across multiple areas of the Settlement Agreement, including acknowledgment of twenty compliance upgrades and no downgrades in the reporting period. Beyond any single rating, my focus has been on whether reforms are being institutionalized—whether they are taught, supervised, measured, and reinforced in daily practice.

12. Training is a clear example. In its comprehensive training assessment, the Monitoring Team reviewed CDP's training plans (including the 2023–2025 and 2024–2026 plans), the recruit academy, the field training program, in-service training, and documentation of training conducted. The Monitoring Team found that CDP has substantially complied with the Settlement Agreement's training requirements and confirmed through a site visit that core training plans exist and are being followed. The assessment also describes CDP's expectation that members complete required training annually, and it emphasizes active learning methods such as problem-solving and scenario-based activities.

13. Our Crisis Intervention Program is another example of durable change. The Monitoring Team's crisis intervention assessment describes a structured program focused on helping officers respond appropriately to people in crisis, de-escalate crises, reduce unnecessary

uses of force, and connect individuals to community-based resources. The assessment notes that the crisis intervention training curriculum was developed with the Mental Health Response Advisory Committee and reviewed by the U.S. Department of Justice and the Monitoring Team. The Monitoring Team noted that the curriculum provides important understanding of basic crisis intervention skills, that the curriculum is regarded as a national model, and that officers complete the necessary training.

14. The Monitoring Team's equipment and resources assessment reflects practical improvements that support safe, effective policing. The assessment describes measurable progress and upgrades in compliance in six of nine provisions, including adequate computer and vehicle inventories, reliable and up-to-date mobile data systems, and functioning records management and email systems that promote information sharing and transparency. The assessment also notes that the Employee Assistance Unit is staffed with dedicated members and accessible services, while identifying priorities for continued improvement, including modernization of policy and governance and departmentwide supervisor training.

15. Looking forward, my administration is focused on sustaining reforms for the long term. I created the Police Accountability Team ("PAT") to keep implementation disciplined, coordinated, and outcome-focused, and I plan to institutionalize that work by moving it into my office as a cabinet-level function. I have also supported the passage of Issue 24, which amended the City Charter to institutionalize Cleveland's police accountability system by enshrining the Community Police Commission, the Office of Professional Standards, and the Civilian Police Review Board and expanding their duties and

responsibilities. These steps are designed to ensure the progress made under the Settlement Agreement is permanent and continues to improve over time.

16. The City invested in safety and oversight infrastructure throughout the lifetime of the Settlement Agreement to meet its terms and institutionalize the reforms needed in our community. In 2025 alone, the approximation of that investment was over $10,000,000, which includes the Mayor's Police Accountability Team, City civilian oversight entities, and other reforms directly related to the Settlement Agreement, like recruiting, training, independent monitor review, personnel, and IT needs.

17. In addition to the City's annual $10,000,000 investment in public safety and oversight infrastructure, the City invested approximately $27,000,000 in technology improvements. This includes, but is not limited to body worn cameras, records management systems, officer intervention systems, modernized training hardware/software and internal auditing/bias detection software.

18. As Mayor of the City of Cleveland, it is my responsibility to ensure the City can operate to meet the needs of our community, see that all ordinances of the City are enforced, and keep City Council apprised of the financial condition and future needs of the City.

19. The City is now at a point where the Settlement Agreement limits our ability to appropriately fund critical programs that serve the community. In recent years, the City has budgeted over $ 2 million per year on the Settlement Agreement monitoring activities. Every dollar spent on the Settlement Agreement cannot be invested in other matters, including comprehensive violence prevention programs, Care Response programming like the City's new Tanisha's Law, School Safety programs, and more.

20. The Settlement Agreement has driven real, durable improvements in how policing is delivered in Cleveland. Our goal is to sustain the tremendous progress that has been made, strengthen accountability, and continue building public trust through constitutional, professional policing—regardless of the posture of federal oversight.

21. Modern policing requires iterative policy updates, not static, court-controlled approval pipelines.

22. The Settlement Agreement's requirement of Monitor, DOJ and federal court approval introduces delays—incompatible with technological reality and the need to adapt to new constitutional issues.  As every year passes, the Settlement Agreement becomes more of a barrier to the need for flexible and rapid responses.

23. Under these circumstances, continuing federal oversight infringes on basic principles of autonomy, democracy and citizens' right to govern their own lives through local control. The City has democratically accountable leadership (Mayor, City Council, Charter-based CPC).

24. Local control is superior because oversight is now embedded in local law.  Moreover, local actors can respond faster to adopt new policies and tailor solutions, and correct course in real time.

25. At one time, Federal oversight may have been appropriate to catalyze reform. It is now a structural impediment to innovation, efficiency, and responsiveness.

26. The City has achieved compliance with the federal-law provisions whose violation the Agreement sought to remedy.

27. The City will continue that compliance in the absence of continued judicial supervision and has achieved a durable remedy.

28. The City has substantially succeeded in meeting its obligations under the Agreement.

29. The Settlement Agreement is now an impediment to expanding on its own progress.

30. The parties all agree that the Settlement Agreement should be dismissed.  The Settlement Agreement has achieved its objectives.  It has been a success.  The City joins the United States Department of Justice in supporting dismissal of the Settlement Agreement.

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is true and correct.

Dated: 2/17/26

Justin M. Bibb
Mayor, City of Cleveland

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15 CV 1046 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | DECLARATION OF LEIGH ANDERSON |
| CITY OF CLEVELAND, | ) | IN SUPPORT OF JOINT MOTION FOR |
| | ) | TERMINATION OF SETTLEMENT |
| Defendant | ) | AGREEMENT |
| | ) | |

------------------------------------------------------

Leigh R. Anderson, PhD., pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration and have personal knowledge of the matters set forth herein.

2. In November 2022, I joined the City of Cleveland as the Executive Director of the Mayor's Police Accountability Team.

3. As the Executive Director of the Police Accountability Team, I oversee the assessment and evaluation of police reform initiatives, accountability systems, and policy implementation.

4. I manage an office of four (4) full-time employees, and together, we manage compliance with the Settlement Agreement, closely monitor its implementation, outcomes, and long-term impact on policing practices, accountability structures, and organizational culture.

Successes

5. The Settlement Agreement assisted the Cleveland Division of Police (CDP) in establishing clear standards and practices for constitutional policing and institutionalizing meaningful, measurable durable reforms.

6. Under the Settlement Agreement, CDP has revised and implemented new policies, facilitated robust training programs, and evaluated effectiveness, resulting in tangible benefits for the entire Cleveland community including but not limited to a substantial decrease in excessive use of force, increase in constitutional searches and seizures, and implementation of a best-in-class crisis intervention program.

7. As evidenced by the Independent Monitor's Search and Seizure Assessment (2025), CDP officers now conduct investigatory stops in strict adherence to constitutional standards; a testament to the successful implementation of comprehensive policy revisions, targeted training, and enhanced supervisory oversight mandated by the decree.

8. These reforms are the culmination of sustained, collaborative efforts among law enforcement leadership, city officials, and community stakeholders over more than a decade.

9. This partnership has driven significant transformation in critical areas of policing practice and accountability, reinforcing CDP's commitment to delivering just, equitable, and community-centered policing for all Cleveland residents.

10. The City has implemented comprehensive changes to policies including critical areas governing use of force, bias-free policing, investigations, supervision, training, and officer accountability, all of which are now clearly articulated, consistently applied, and aligned with nationally recognized best practices.

11. Importantly, many reforms initiated under the Settlement Agreement have been fully institutionalized and embedded into routine operations, including standard procedures, training curricula, supervisory review processes, and performance evaluation systems. It is a fact that constitutional policing reforms implemented pursuant to the Cleveland

Settlement Agreement have resulted in substantial organizational, policy, and cultural transformation within CDP.

12. CDP has evolved significantly from the Division examined during the U.S. Department of Justice investigation initiated in 2014.

13. Comprehensive policy overhauls have institutionalized constitutional standards and best practices across the organization, ensuring consistent application through training, supervision, and performance evaluation.

14. Analysis of various sets of compliance data, policy revisions, and the implementation and exercise of accountability mechanisms indicates that CDP has achieved meaningful progress across numerous provisions of the decree, including reforms.

15. A key indicator of reform sustainability is CDP's demonstrated ability to engage in self-assessment and corrective action.

16. The Division has shown a consistent willingness to identify deficiencies, both through community feedback and internal monitoring systems, and to address those deficiencies proactively. This capacity reflects the maturation of internal accountability structures and reduces reliance on external oversight.

17. Further, the institutionalization of initiatives such as the Crisis Intervention Teams and the Force Review Board represents a material shift in how CDP manages use of force and accountability.

18. The Decree has also strengthened internal accountability mechanisms through enhanced data collection, early intervention systems, and supervisory review protocols, enabling timely identification of risks and effective reinforcement of professional standards. Cleveland's police reform system is the result of years of sustained effort to address accountability, transparency, and community trust within CDP.

19. These reforms were implemented under federal oversight and in collaboration with community members, legal experts, and independent monitors.

20. At the core of Cleveland's reform system are strengthened use-of-force policies, expanded officer training, and clear mechanisms for accountability.

21. Officers receive enhanced training in de-escalation, bias awareness, and crisis intervention, while supervisory review of critical incidents has been formalized to ensure consistency and fairness.

22. The city has increased transparency by making data on use of force, stops, and complaints more accessible to the public.

23. Moreover, it has contributed to a broader cultural shift emphasizing transparency, consistency, and responsibility across all levels of command.

24. Police reform in Cleveland is an ongoing system of evaluation and improvement.

25. Independent monitoring, public reporting, and regular policy updates are designed to inform routine assessments of progress and potential areas of concern.

26. While challenges remain and public trust must continue to be earned, Cleveland's police reform system represents a shift to placing constitutional policing, accountability, and transparency at the center of public safety for the City of Cleveland.

27. Overall, the Settlement Agreement illustrates how sustained collaboration, structured oversight, and organizational commitment can produce durable policing reform. The evidence supports the conclusion that CDP has completed significant reform and has developed the internal systems necessary to maintain constitutional and effective policing practices over time.

28. In my professional judgment, the Settlement Agreement has achieved its core objectives by establishing durable systems that ensure constitutional policing, enhancements to public

trust, and support for continuous improvement, thereby positioning CDP to sustain progress independent of ongoing court supervision.

29. CDP is now well-positioned to sustain these advancements and continue progress independently, without the need for ongoing court supervision.

<u>Limitations to the Effective Implementation of Emerging and Best Practices and the Suppression of Necessary Policy Innovation</u>

30. As Director of the Police Accountability Team, and drawing on extensive experience in evaluating police policies, operational reforms, and accountability frameworks, I have conducted a thorough review and analysis of the City of Cleveland's Settlement Agreement and established and formal reform results.

31. This review has included a detailed examination of requirements for policy development, approval processes, ongoing monitoring, and compliance reporting.

32. While the Settlement Agreement has been instrumental in driving constitutional reform and elevating standards of practice, its current structure presents certain limitations that impair the efficiency and responsiveness of policy innovation.

33. Specifically, the decree's multiple layers of review, approval, and external oversight have introduced procedural complexities and delays, which have impeded the timely adoption of updated or innovative policing policies.

34. This has been the case even when such policies are designed to enhance officer performance, community safety, or accountability outcomes.

35. These types of procedural requirements have constrained the City's ability to respond swiftly to evolving public safety challenges, emerging best practices, and insights gained from internal assessments or community feedback.

36. Sustained police reform requires a careful balance between robust accountability and operational agility.

37. In its present form, the Settlement Agreement places significant emphasis on compliance and documentation, sometimes at the expense of timely decision-making and proactive efforts and innovation.

38. The extensive compliance obligations necessitate the allocation of considerable personnel time and resources to reporting and monitoring activities, which may inadvertently limit the capacity for policy development, training, evaluative work, and most critically, building and sustaining public trust.

39. In summary, while the Settlement Agreement has produced substantial and enduring improvements in constitutional policing for the City of Cleveland, its current implementation has inhibited the necessary efficiency and adaptability needed for ongoing policy advancement and reform modernization.

40. Addressing these structural constraints is essential to ensuring that the accountability systems now in place can support sustainable, adaptive, and effective policing for the long term.

41. Reform is no longer a future tense in Cleveland; it is a standard we are required to meet.

42. Throughout and before my tenure as Executive Director of the Police Accountability Team, I have developed profound expertise in the oversight of federal Settlement Agreements, with particular emphasis on the City of Cleveland's agreement.

43. In this role, my work has involved close monitoring of the decree's implementation, rigorous analysis of its outcomes, and ongoing evaluation of its long-term effects on policing practices, accountability mechanisms, and organizational culture.

44. I lead the comprehensive assessment and evaluation of police reform initiatives, accountability frameworks, and policy implementation.

45. The Settlement Agreement has proven to be highly effective in establishing clear, enforceable standards for constitutional policing and in being a significant catalyst for the implementation of measurable reforms within CDP.

46. Under its guidance, the City has made profound changes to policies governing use of force, bias-free policing, internal investigative protocols, supervision, training, and officer accountability.

47. These reforms are aligned with nationally recognized best practices, codified in policy, and consistently enforced.

48. Many of the improvements initiated under the Settlement Agreement have been fully institutionalized, effectively governing daily operations.

49. Furthermore, the decree has substantially strengthened internal accountability by advancing data-driven oversight, implementing an early warning intervention system, and refining supervisory review protocols.

50. These measures have enabled the timely identification of emerging risks and the effective reinforcement of professional standards.

51. The Settlement Agreement has fostered a broader cultural transformation within the Division, promoting transparency, consistency, and a heightened sense of responsibility at every level of command.

## Advancing Cleveland's Reform Path Forward

52. The City of Cleveland is committed to its own independent continuation of constitutional policing, with or without federal control, oversight and expense.

53. The City of Cleveland is independently committed to local control for the purposes of ensuring public safety, enhancing community trust, and delivering police services that are constitutional, effective, and aligned with community values.

54. The Police Accountability Team shall remain as the central coordinating entity within the Mayor's Office responsible for oversight and advancement of the values including constitutional policing, accountability, and reform efforts throughout the City of Cleveland.

55. Ensuring effective and constitutional policing remains a core priority of the Police Accountability Team.

56. The work of The Police Accountability Team will entail continued modernization and reform progress through the existence of heightened standard operating procedures, enhanced training curricula, robust supervisory review processes, and improved disciplinary practices.

57. The Police Accountability Team will continue to be led by an Executive Director, who shall serve as a member of the Mayor's Cabinet and report directly to the Mayor.

58. The Executive Director will continue to have the authority to convene, coordinate, and consult with all City departments, divisions and personnel.

59. The Police Accountability Team remains dedicated to supporting the community, the City, and CDP as they continue to advance, refine, and institutionalize reforms.

60. Public accountability, transparency, and continued civilian oversight are critical to sustaining constitutional policing, promoting officer wellness and professionalism, and building durable public trust and will remain a core focus of the Police Accountability Team

61. The Police Accountability Team will continue to coordinate and oversee City efforts to achieve the goals and values of constitutional policing and reform across several core areas including developing, promoting, monitoring, evaluating and reporting out.

62. While no oversight system is without challenges, Cleveland's civilian oversight structure represents a commitment to shared responsibility for public safety, while recognizing that trust in policing depends on transparency, accountability, and ongoing community involvement.

63. Community members have exercised defined roles in policy review and discipline recommendations, namely through the Community Police Commission and the Civilian Police Review Board.

64. The system includes these civilian-led bodies that participate in reviewing police policies, assessing officer conduct, and making recommendations related to discipline and Division practices.

65. These entities operate separately from CDP, providing an added layer of independence and public accountability.

66. Cleveland's civilian oversight system was created to ensure that residents have a meaningful role in police accountability, transparency, and reform. It is designed to give the community an independent voice in how policing policies are shaped, reviewed, and evaluated. Civilian oversight and involvement maintain a meaningful role through the oversight structures in the City of Cleveland, that allow residents to review policies, raise concerns, and participate in the reform process.

67. While residents are able to raise concerns, file complaints, and engage directly with oversight representatives, helping ensure that policing standards reflect community expectations and constitutional principles – that is not enough. Civilian oversight and involvement maintain a meaningful role through oversight structures that allow residents to review policies, raise concerns, and participate in the reform process.

68. The Police Accountability Team's priority will imperatively include the further implementation of Community Engagement and Trust.

69. All departments, divisions, boards, commissions, and agencies of the City of Cleveland shall cooperate fully with the Police Accountability Team and provide any support or information necessary to carry out its mission.

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is true and correct.

Dated: 2/17/26

Dr. Leigh R. Anderson
Executive Director, Police
Accountability Team
City of Cleveland

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15 CV 1046 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | DECLARATION OF MICHAEL HESS |
| CITY OF CLEVELAND, | ) | IN SUPPORT OF JOINT MOTION FOR |
| | ) | TERMINATION OF SETTLEMENT |
| Defendant. | ) | AGREEMENT |

Michael Hess, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration and have personal knowledge of the matters set forth herein.

2. I am the Interim Administrator for the City of Cleveland ("Cleveland") Office of Professional Standards ("OPS"), a position I have held since 2026, and I previously served with the Civilian Police Review Board as a member from 2017 to 2024.

3. I submit this Declaration in support of the United States and Cleveland's Joint Motion for Termination of Settlement Agreement in *United States v. City of Cleveland*, Case No. 1:15 CV 1046, pending before the Hon. Solomon Oliver, Jr. in the U.S. District Court for the Northern District of Ohio.

4. The Office of Professional Standards collects and maintains Civilian Complaint Data.

5. As of 2025, the City reported 367(i) Outcome Measurement data on the number of Civilian Complaints as: 2015 (294); 2016 (263); 2017 (241); 2018 (227); 2019 (220); 2020 (276); 2021 (324); 2022 (317); 2023 (298); 2024 (310).

6. As of 2025, the City reported 367(i) Outcome Measurement data on the number of sustained civilian complaints as: 2015 (2); 2016 (7); 2017 (26); 2018 (110); 2019 (75); 2020 (80); 2021 (90); 2022 (115); 2023 (210); 2024 (41).

7. As of 2025, the City reported 367(i) Outcome Measurement data on the number of exonerated civilian complaints as: 2015 (0); 2016 (8); 2017 (61); 2018 (220); 2019 (126); 2020 (95); 2021 (94); 2022 (131); 2023 (228); 2024 (107).

8. As of 2025, the City reported 367(i) Outcome Measurement data on the number of unfounded civilian complaints as: 2015 (2); 2016 (13); 2017 (16); 2018 (159); 2019 (86); 2020 (69); 2021 (101); 2022 (233); 2023 (228); 2024 (111).

9. As of 2025, the City reported 367(i) Outcome Measurement data on the number of administratively dismissed civilian complaints as: 2015 (39); 2016 (90); 2017 (126); 2018 (58); 2019 (54); 2020 (72); 2021 (75); 2022 (130); 2023 (75); 2024 (28).

10. As of 2025, the City reported 367(i) Outcome Measurement data on the number of civilian complaints with insufficient evidence as: 2015 (2); 2016 (33); 2017 (93); 2018 (108); 2019 (71); 2020 (42); 2021 (28); 2022 (63); 2023 (43); 2024 (30).

11. As of 2025, the City reported 367(i) Outcome Measurement data on the average length of time to complete the civilian complaint investigation as: 2015 (137); 2016 (409); 2017 (232); 2018 (75); 2019 (64); 2020 (78); 2021 (58); 2022 (N/A); 2023 (82); 2024 (193).

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is true and correct.

Dated: 2/17/26

Michael Hess
Interim Administrator, Office of
Professional Standards
City of Cleveland