IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | NOTICE SUBMITTING THE |
| | ) | MONITORING TEAM'S |
| CITY OF CLEVELAND | ) | EIGHTEENTH SEMIANNUAL REPORT |
| | | |
| Defendant. | | |

The Monitoring Team hereby submits its Eighteenth Semiannual Report pursuant to

Paragraph 375 of the Consent Decree.

Respectfully submitted,

/s/ Christine M. Cole

CHRISTINE M. COLE
Independent Monitor
464 Common Street, Unit #231
Belmont, MA 02478
ccole@clevelandpolicemonitor.com

CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2026, I served the foregoing Notice Submitting the Monitoring Team's Eighteenth Semiannual Report via the court's ECF system to all counsel of record.

/s/ Melody J. Stewart
MELODY J. STEWART
Deputy Monitor



Cleveland
Police
Monitoring
Team

# Eighteenth Semiannual Report

March 2026

## Table of Contents

I.  LETTER FROM THE MONITOR ......................................................................... 2

II.  UNDERSTANDING THIS REPORT .................................................................... 5

III.  EXECUTIVE SUMMARY ................................................................................. 8

    1.  COMMUNITY ENGAGEMENT AND BUILDING TRUST ................................................. 8

    2.  COMMUNITY AND PROBLEM-ORIENTED POLICING (CPOP) ....................................... 9

    3.  BIAS-FREE POLICING .......................................................................... 9

    4.  USE OF FORCE .............................................................................. 10

    5.  CRISIS INTERVENTION ........................................................................ 10

    6.  SEARCHES & SEIZURES ....................................................................... 11

    7.  ACCOUNTABILITY ............................................................................ 12

    8.  TRANSPARENCY AND OVERSIGHT .............................................................. 13

    9.  OFFICER ASSISTANCE AND SUPPORT .......................................................... 13

    10.  SUPERVISION ............................................................................. 14

    11.  POLICIES ................................................................................ 15

IV.  COMMUNITY ENGAGEMENT AND BUILDING TRUST ....................................... 16

    1.  COMMUNITY POLICE COMMISSION (CPC) ...................................................... 16

    2.  DISTRICT POLICING COMMITTEES .............................................................. 18

V.  COMMUNITY & PROBLEM-ORIENTED POLICING ........................................... 20

VI.  BIAS-FREE POLICING .............................................................................. 22

VII.  USE OF FORCE ..................................................................................... 25

VIII.  CRISIS INTERVENTION ........................................................................... 35

IX.  SEARCHES AND SEIZURES ...................................................................... 40

X.  ACCOUNTABILITY .................................................................................. 43

    1.  INTERNALLY DISCOVERED MISCONDUCT ....................................................... 43

    2.  INVESTIGATION OF CIVILIAN COMPLAINTS & POLICE REVIEW BOARD ........................... 47

    3.  DISCIPLINE AND DISCIPLINARY HEARINGS ..................................................... 51

XI.  TRANSPARENCY & OVERSIGHT ................................................................ 54

    1.  PUBLIC SAFETY INSPECTOR GENERAL ......................................................... 54

    2.  DATA COLLECTION AND ANALYSIS ............................................................ 55

XII.  OFFICER ASSISTANCE & SUPPORT ........................................................... 58

    1.  TRAINING .................................................................................. 58

    2.  EQUIPMENT & RESOURCES ................................................................... 61

    3.  RECRUITMENT & HIRING ..................................................................... 64

    4.  PERFORMANCE EVALUATIONS AND PROMOTIONS ............................................... 66

    5.  STAFFING .................................................................................. 68

XIII.  SUPERVISION ..................................................................................... 70

XIV.  POLICIES .......................................................................................... 72

XV.  OUTCOME MEASUREMENTS ................................................................... 73

## I.      LETTER FROM THE MONITOR

Dear Cleveland Community,

The Eighteenth Semiannual Report covers the most recent reporting period, which spans from July 1, 2025, to December 31, 2025. The Semiannual Report is a requirement placed on the Monitor in paragraph 375 of the Consent Decree. That paragraph delineates the requirements of the report, and this report will follow those requirements. The Semiannual Report is filed with the Court and is a written public document. Overall, to adhere to the Consent Decree, the report must describe the work of the Monitor during the reporting period, achievements by the City on training and policy, remaining work necessary for compliance, and a projection of the work and challenges anticipated for the next reporting period.[1] Additionally, the paragraph requires that an explanation or a methodology used for assessing compliance be shared. Each of those requirements are followed in this report by section. In several cases, the report links to a more fulsome Monitoring Team report with further findings and complete methodologies.

This most recent reporting period can be described best with two words: **Changes** and **Assessments**. First, the changes. In August of 2025 when the Court learned of the then-Monitor's plan to withdraw, the Court appointed a new Monitor, who in turn selected and named a Deputy Monitor. The transition to a new team began in earnest. The former and current Monitors worked together with the City and the Department of Justice (DOJ) to ensure a smooth transition. On September 30, 2025, the Parties -- the City and DOJ -- agreed jointly to a six-month term with former Ohio Supreme Court Justice Melody Stewart as Deputy Monitor and me as Monitor. We added a few members to our team and retained the very experienced and committed subject matter experts, all of whom have been engaged in the Consent Decree in Cleveland now for several years.

Over the course of the reporting period, our changes are evidenced in the focus and the style of our work, and with hope, the results of our work. Our work is concentrated on the City and the Cleveland Division of Police (CDP) achieving compliance and steering efforts of working groups with stakeholders from the CDP, the Community Policing Commission (CPC), the Office of Professional Standards (OPS), the Community Police Review Board (CPRB), and the Police Accountability Team (PAT) toward that same goal. All these players have been doing good and important work for the residents of Cleveland. Our change in strategy is to ensure the focus, documentation, and individual and group efforts are supporting compliance specifically.

---

[1] At the time of this writing, there is pending before the Court a joint motion filed by the Parties to terminate the Consent Decree. Because that motion has not yet been ruled on by the Court and the Court has instructed the Monitoring Team and the Parties to proceed with all activities toward compliance, this letter and referenced 2026 plans are written with that instruction in mind.

As part of the transition process, the Monitor with members of the Team appeared before the City Council Safety Subcommittee on September 30, 2025. This was an important opportunity for exchange, discussion, and a deeper exploration of the content of the Seventeenth Semiannual Report. The Team looks forward to future presentations and discussion with that committee.

Continuing the work begun under the leadership of the former Monitor, we initiated or completed seven assessments in this reporting period. The second descriptor of the period – Assessments – form the basis for the Monitor, and as such the Court, to evaluate compliance. Much of the remaining time of the Consent Decree in Cleveland will be focused on assessments. It takes time to achieve change and readiness for assessments. Cleveland is now at that point. What every assessment reveals is the work accomplished and spells out specifically what remains to be done.

Assessments are a comprehensive and detailed review of every paragraph in a section or major subsection of the Consent Decree. The exhaustive reviews encompass a range of activities including review of policy language and the adherence in practice to those policies, observations of training sessions to ensure quality and consistency with Consent Decree requirements, and review of data including quantitative data points, officers' wearable camera system images, and countless reports. More details of those assessments are found in this Semiannual Report. In short, the arduous process for both the City and the Monitoring Team of preparing for, conducting, and then writing about each assessment resulted in several significant upgrades to paragraphs and in two sections, Crisis Intervention and Staffing, findings of Substantial and Effective Compliance.

While the compliance rating is important, equally important is the demonstration of critical culture change derived from the change in practice. Adherence to new policies and procedures must be observed across cases and across a significant period. For example, the Monitoring Team found that through the Crisis Intervention work with the Mental Health Response Advisory Committee (MHRAC) operating as a facilitator among the CDP, community stakeholders, and mental health providers with the Crisis Intervention Coordinator, the CDP has established "a robust crisis intervention program that meets or exceeds the foundational requirements…." The review of over 100 cases reveals that the dynamics of response have changed greatly since the new policies and training materials were created in 2016. Yet policy and operational changes that create a new culture must be evidenced across a range of topics and is not limited to Crisis Intervention.

Of the seven assessments started, the Monitoring Team completed and filed six with the Court by the end of the reporting period. The seventh assessment was filed with the Court on February 4, 2026. The Monitoring Team had countless meetings with government stakeholder groups by Consent Decree topics – meetings with the Training Section, the Law Department and the PAT, MHRAC and Crisis Intervention Coordinators, CDP Chief Todd on use of force reviews and findings from the search and seizure reviews, OPS, CPC, CPRB, the Force Review Board, and the Data Team at CDP – to stay abreast of current work. We hosted or attended meetings with clergy, police officers, community groups, the District Police Commissions, the Community Relations Board, and the CPC.

Continued work on assessments, working directly with stakeholders in the CDP, OPS, CPRB, and CPC toward compliance, categorizes the efforts moving forward. The focus for 2026 is on the civilian oversight apparatus, accountability, and discipline. The Monitoring Team has shared an ambitious plan for assessments for the 2026 calendar year that, with sufficient resources, will enable the Monitoring Team to assess every remaining section of the Consent Decree. We look forward to greater and more regular engagement with members of the CDP to share with them directly the successes we observe. We will continue to share updates with the Safety Subcommittee and regularly through the engagement of our local team, with members of the Cleveland community.

As completion of the Consent Decree appears closer, the Monitoring Team will focus on supporting the maturation of the very important civilian oversight functions built into the Consent Decree and the Charter. With a CPC, now operating with a permanent director, a Public Safety Inspector General, and OPS and CPRB working in tandem, the members of the CDP and the public can be more confident they are being served. The CDP members and the public deserve expeditious, fair fact finding in the adjudication of cases. The foundations are established; maturation, achieved over time, and through resources and support, is necessary for these systems to achieve the necessary level of confidence from all.

CDP members, both officers and supervisors, are demonstrating adherence to use of force policies and when there is a policy violation in use of force cases, the chain of command identifies the issues and deals with them appropriately. In the review of the search and seizure paragraphs, when the Monitoring Team reviewed the wearable camera system and the written reports of members together, only then could we with confidence report that the stops were conducted in compliance with policy because often the written explanation on its own was insufficient. The Monitoring Team sees the need for increased training in and supervisory review of the written articulation for stops and searches. This is an important gap that must be addressed and still, the Monitoring Team sees the work of officers as greatly changed. Notwithstanding the Division's ability to identify and correct problems with use of force, adherence to consistent and reasonable discipline in other areas remains an area of concern.

In the coming year, the Monitoring Team looks forward to working cooperatively with City stakeholders to prepare for and conduct additional assessments with a focus on civilian oversight and all aspects of accountability – areas that are today still in need of work. Our shared goal is to reach substantial and effective compliance across the Consent Decree in an expeditious manner.

Best regards,

*CMCole*

Christine M. Cole
Monitor

## II.    UNDERSTANDING THIS REPORT

Since the Third Semiannual Report, the Monitoring Team has used its semiannual reports to present a summary of the status of the City's compliance with each of the 336 paragraphs of the Consent Decree. Although providing "a paragraph-by-paragraph accounting of the general state of the City's compliance runs the risk of being an over-simplification," these summary accountings remain useful indicators for viewing progress over time.[2] A paragraph by paragraph review is able to report on mostly outputs and not the changes in attitude, culture, or operational changes to philosophy. The Monitoring Team looks for evidence of durable and meaningful change, demonstration that requirements have been implemented and adhered to those requirements across time, cases, or incidents.

Therefore, each section of the Eighteenth Semiannual Report summarizes the Monitoring Team's general conclusions about compliance status by describing the state of each paragraph listed as one of the following:

- **Non-Compliance.** The City and/or Cleveland Division of Police (CDP) has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or Division's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement.

- **Partial Compliance.** The City and/or Division has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the provision of the Consent Decree—but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice. It may capture a wide range of compliance states or performance, from the City or Division having taken only very limited steps toward operational compliance to being nearly in operational compliance.

- **Operational Compliance.** The City and/or Division has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Decree such that it is in existence or practice operationally—but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

- **General Compliance.** The City and/or Division has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or

---

[2] Third Semiannual Report at 9.

effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the City or Division has effectively complied with a requirement fully and systemically.

- **<u>Substantial and Effective Compliance.</u>** The City and/or CDP has complied fully with the requirement and the requirement has been meaningfully adhered to and effectively implemented across time, cases, or incidents. Substantial and Effective Compliance is realized when there is a high and not random reliability in outcomes. Deviations from the requirement are rare, explainable, and non-systemic, and detected and corrected internally. The hallmark of substantial and effective compliance is stability – the same patterns of compliance are demonstrated across multiple periods of time, and across different districts and units. It is not episodic.

The same caveats that have previously applied to these summary categories remain applicable and are thus repeated here verbatim. First, "Non-Compliance" or "Partial Compliance" do not automatically mean that the City or CDP has not made good-faith efforts or commendable strides toward compliance. It might, instead, signify that initial work has either not yet begun or reached a sufficiently critical point where progress can be considered to have been made.

Second, "Partial Compliance" requires more than taking some limited, initial steps toward compliance with a requirement. It instead requires that the City or Division have made "sufficient, material progress toward compliance" that "has graduated from the stages of initial work to more well-developed and advanced refinement of various reforms."[3]

Third, these summary terms do not appear in the Consent Decree. The Team employs them in order to synthesize and summarize the report's conclusions. Relatedly, compliance with individual paragraphs of the Decree is necessary for the larger, overall "Substantial and Effective Compliance" with the whole of the Consent Decree, but it is not the same thing. Ultimately, "Substantial and Effective Compliance" with the Consent Decree will be reached when "the City either has complied with *all* material requirements of this Agreement or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures,"[4] "by a preponderance of the evidence."[5]

Fourth, the charts that summarize progress in each area also condense the requirements of each paragraph rather than reprinting the entire Consent Decree in the context of this report. Any imprecision or confusion created by these condensed or summarized requirements is unintended and, in any event, can be cured with reference to the Consent Decree language itself.[6] Furthermore,

---

[3] Third Semiannual Report at 10.
[4] Dkt. 413-1 ¶ 456 (emphasis added).
[5] *Id.* at ¶ 397.
[6] *See Id.*

the charts primarily cover paragraphs 14 through 340 of the Consent Decree, and other paragraphs contain requirements that the City must meet.[7]

We also repeat here that the overall "compliance status" conclusions displayed in tables at the beginning of each section herein do not replace the more rigorous and comprehensive quantitative and qualitative assessments of how CDP performs over time:

> [T]he Monitoring Team bases its assessments in the Semiannual Report on its current understanding, knowledge, and information gained through ongoing work and discussion with CDP, the Parties, and other stakeholders. The ratings are informal to the extent that not all of them are necessarily informed by the type of exhaustive methodologies and compliance and outcome measurements that are a critical component of the Consent Decree—and the summary determinations do not take the place of these more structured, systemic analyses. The intent is to provide a bottom-line sense of where the Division is on the road to compliance. Ongoing, rigorous quantitative and qualitative assessments will provide a more comprehensive picture as work under the Consent Decree proceeds.[8]

The descriptions of progress contained below should be considered as a synthesis or bottom-line reporting of substantive discussions from each major Consent Decree area contained within this report as required by paragraph 375.

An additional method for capturing progress is the creation, utilization, and accountability of the Monitoring Plan, described in paragraph 369, which outlines the work to be done by the Parties within the year.

Finally, as is evidenced by the extensive and broad-reaching Consent Decree itself, the City of Cleveland's implementation of the Consent Decree and the many action items and projects it encompasses, is a substantial task. Many areas of the Decree require multiple reporting periods for the City to achieve—and for the Monitoring Team to confirm and consequently report on—these major milestones. Therefore, at times this semiannual report, as with previous semiannual reports, reprints content from prior semiannual reports in instances where there has not been enough material progress to warrant an update. In such cases, the Monitoring Team does not cite to prior semiannual reports in the interest of readability.

---

[7] *See* Third Semiannual Report at 10.
[8] *Id.* at 11.

## III.    EXECUTIVE SUMMARY

### 1.  Community Engagement and Building Trust

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 17th SAR | 18 | 0 | 5 | 9 | 2 | 2 | 0 |
| 18th SAR | 18 | 1 | 3 | 4 | 5 | 5 | 0 |

During the reporting period, the Community Police Commission (CPC) staffed its sub-committees and the assigned commissioners worked through much of the previous backlog of CDP policy and training reviews. The Interim Executive Director resigned during the period as the search for a permanent Executive Director was being conducted. An Executive Director candidate was selected by the CPC in November 2025 and sworn in by the Mayor on January 19, 2026. At the end of the reporting period, there was one vacancy for CPC commissioners, which is the Black Shield representative. For optimal functionality of the Commission and its subcommittees, all vacancies must be filled in a timely manner. In addition, the City must create a process for filling vacancies that occur outside of the end of term. Further, the CPC dealt with an extreme staffing shortage during the reporting period, as it was determined that only the Executive Director has authority to hire staff positions. At the time of this report, only two of eight staff member positions have been filled. The filling of these staff vacancies must be a priority for the new Executive Director.

The District Policing Committees (DPCs) have established effective working relationships with many community service organizations within each CDP district including City Public Safety agencies (Fire Department, EMS), and other City services available to the public. Through the DPCs, the CDP keeps members of the public apprised of its crime reduction efforts and successes it has had improving safety in the community and in turn, gathers information and feedback from the community. Public attendance and participation in DPC's meetings continue to lack diversity (race, age, gender and background). This lack of diversity has been an ongoing challenge for the DPCs and has been identified by the City as an area of focus moving forward. In the coming months, the Monitoring Team, in collaboration with the City, will be conducting a series of DPC working group meetings to aid in achieving compliance with the Consent Decree, including working with the DPCs, the CDP and the Community Relations Board (CRB) to develop ways to expand community participation.

## 2. Community and Problem-Oriented Policing (CPOP)

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 17th SAR | 8 | 0 | 1 | 7 | 0 | 0 | 0 |
| 18th SAR | 8 | 0 | 1 | 6 | 1 | 0 | 0 |

Through the effort of the CDP's CPOP team that includes a captain and sergeants, the Neighborhood Response Group, and district-based CPOP coordinators, the foundation and structure of CPOP is stronger than in previous years. There has been a steady increase in problem-solving activities and the documentation of efforts. During this period, the CDP has consistently expressed interest in and demonstrated effort to making CPOP an organization-wide philosophy for all employees.

According to data provided by the City, the CDP documented 3,893 community engagement activities in the second half of 2025, as well as completing 310 original CPOP forms and just over 6,000 updates to CPOP forms during the reporting period. The Monitoring Team's upcoming 2026 CPOP assessment will allow for deeper review and analysis of these data to gain further understanding regarding the context for and efficacy of the CDP's CPOP model. The forthcoming assessment will provide more complete analysis of the compliance of the CPOP paragraphs.

## 3. Bias-Free Policing

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 17th SAR | 10 | 0 | 1 | 6 | 3 | 0 | 0 |
| 18th SAR | 10 | 0 | 1 | 6 | 3 | 0 | 0 |

The CDP continued to make incremental progress in the area of Bias-Free Policing during this reporting period. Of particular note, the Office of Professional Standards (OPS) launched its public-facing activity dashboard, which provides important transparency on the status of non-criminal citizen complaints filed against members of the CDP. Because Consent Decree paragraph 211 requires the OPS to track allegations of biased policing, and paragraph 367(d)(3) requires these data to be collected and analyzed, having the ability to sort final dispositions in the dashboard by this allegation is necessary for compliance.

The CDP has been integrating the topic of bias-free policing into its Integrated Reality Based Training that includes scenarios covering various topics. Going forward, the Monitoring Team will conduct additional observations of this training to confirm whether it sufficiently covers the Consent Decree bias-free policing requirements in order to assess compliance. Furthermore, the

City reports that all members of the Division completed a required review of the Bias-Free Policing General Police Order (1.07.08) in 2025.

In addition, as noted in prior semiannual reports, the CDP has not yet produced the comprehensive annual report required under paragraphs 43 and 265, which is intended to assess whether CDP's operations are being conducted in a fair and unbiased manner. The Monitoring Team anticipates that establishing a Bias-Free Policing working group will help facilitate the CDP's development and completion of this report, as well as assist with the development of the Monitoring Team's methodology for conducting its first comprehensive assessment of the bias-free policing requirements.

## 4.  Use of Force

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 17th SAR | 86 | 1 | 0 | 9 | 75 | 1 | 0 |
| 18th SAR | 86 | 2 | 1 | 3 | 7 | 51 | 22 |

During this reporting period, the Monitoring Team completed its comprehensive assessment of all Use of Force paragraphs. This exhaustive review of 85 paragraphs included a review of all Level 1 and Level 2 use of force reports for which the command review was completed in 2024, along with the related wearable camera system images, all Force Investigation Team investigations from 2023 and 2024, and observations of the quarterly Force Review Boards in 2023 and 2024. With 74 upgrades achieved through this assessment, forthcoming activities will focus on the remaining paragraphs that require additional administrative work from the CDP and planning a subsequent case review, allowing the Monitoring Team to confirm whether the CDP continues to adhere to its policies over a longer period and across more cases.

## 5.  Crisis Intervention

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 17th SAR | 29 | 0 | 0 | 3 | 13 | 13 | 0 |
| 18th SAR | 29 | 0 | 0 | 0 | 0 | 21 | 8 |

As noted in the 2025 Crisis Intervention Assessment report, the CDP achieved General or Substantial and Effective Compliance across all Crisis Intervention Team (CIT) related paragraphs of the Consent Decree. The Monitoring Team's assessment revealed no gaps in crisis intervention training or policy development. The Monitoring Team, through its assessment, confirmed that both

the direction and strength of the CDP's CIT Program and overall crisis intervention strategy are effectively addressing the Consent Decree requirements. The CIT Program demonstrates sustained commitment to continuous improvement, with regular data analysis informing training modifications and operational adjustments.

## 6.  Searches & Seizures

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 17th SAR | 16 | 0 | 0 | 13 | 3 | 0 | 0 |
| 18th SAR | 16 | 1 | 0 | 5 | 9 | 1 | 0 |

Important progress was made during this reporting period, with the Monitoring Team's completion of its first comprehensive assessment of paragraphs 160–175. This included the annual analysis of administrative outcome data on all stops, searches, and arrests required by paragraph 367(c), to identify trends and patterns to help determine whether policing practices are being carried out fairly and in accordance with constitutional standards.

Overall, the assessment revealed meaningful advancement of several provisions, as evidenced by eight compliance upgrades: seven improving from Partial to Operational Compliance, and one advancing from Operational to General Compliance. Most notably, more than 90 percent of police-initiated stops reviewed during the assessment were supported by objective and individualized articulation of reasonable suspicion or probable cause. The Division's comprehensive delivery of search and seizure training through police academy classes and its mandatory annual in-service training, both warranted upgrades. There were no downgrades.

While the majority of the stops assessed were, to varying degrees, in accordance with Consent Decree standards, the analysis of outcome data in accordance with paragraph 367(c) revealed racial disparities in stops, searches, and arrests. Blacks were stopped, searched, and arrested at a higher rate than other groups. Over three times as many Black drivers were searched as white drivers, yet the hit rates are relatively the same. For example, for every 60 searches of Black drivers, there were about 20 searches of White drivers resulting in the same success rate for contraband. These findings merit further critical analysis of the details of the police encounters and deployment practices to understand the nature of disparities, which alone are not evidence of intentional bias. The City has retained an outside expert who may be in a position to provide further analysis on the disparities.

## 7. Accountability

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 17th SAR | 74 | 1 | 0 | 28 | 33 | 12 | 0 |
| 18th SAR | 74 | 2 | 0 | 21 | 37 | 14 | 0 |

Internal Affairs (IA) has made notable progress in implementing and delivering both the initial and annual training modules for all members assigned to IA. Based on the submitted training materials as supporting evidence, the training is adequate in quality, type, and scope. The initial training, as required by Paragraph 180, was delivered on November 17, 2025. The annual training, as required by Paragraph 181, was delivered October 20-22, 2025.

The Office of Professional Standards (OPS) Administrator was replaced shortly before this reporting period, with an internal Interim Administrator overseeing OPS for the entirety of this period. Significant progress was made with the new leader's focus. Productivity within OPS almost doubled over 2024's rate, vacancies are filled as quickly as possible, notwithstanding what seems like an unnecessarily long process through the City's system. In addition, while the original Community Engagement Coordinator left unexpectedly, OPS sustained outreach efforts and hired a new Coordinator during this period. Areas to watch continue to be OPS's access to outside legal counsel when requested and appropriate budget independence with the approved budget. Another area of concern is the growing backlog of cases that are awaiting a CPRB hearing, and we note that the CPRB heard significantly more cases in 2025 than it did in 2024. A new OPS Administrator is expected to be appointed in the next reporting period, though while awaiting the appointment of a new Administrator, the City named an Interim Administrator.

During the reporting period, the Monitoring Team continued its review of discipline disposition letters issued by the Chief of Police and the Chief Director of the Department of Public Safety (DPS) while beginning preparation for a comprehensive assessment of discipline hearings (paragraphs 240-244) and discipline (paragraphs 245-249) in 2026. These discipline reviews were not as in-depth as required by a formal compliance assessment. While the City appeared largely compliant with applicable policies and the Consent Decree requirements in the majority of cases, the Team has observed some variability in decision-making between the CDP and DPS that will require deeper review to understand more fully the City's adherence to the requirements of paragraph 176 and other parts of the Accountability section. These observations do not constitute formal findings, though the Monitoring Team has plans for a full assessment of the discipline subsection in 2026.

## 8.  Transparency and Oversight

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 17th SAR | 19 | 0 | 1 | 7 | 10 | 1 | 0 |
| 18th SAR | 19 | 0 | 1 | 7 | 6 | 5 | 0 |

During the reporting period, the office of the Inspector General (IG) conducted a process for hiring, and hired, a Deputy Inspector General to lead investigations conducted by the office. The IG has requested further funding to hire an Office Administrator. To date there has been no effort by the City to establish the authority of the IG or define how audits and investigations are to be conducted, as indicated by the language in paragraph 253. Likewise, the City has not established how those audits and investigations may integrate or differ from those of other oversight or investigative entities, such as IA or OPS.

Regarding data collection and analysis, the City and CDP have made substantial efforts to create an analytical reporting environment, employing four to five full-time and three part-time persons for compliance. The team has built public datasets and dashboards for use of force and crisis intervention, as well as internal reporting regarding data integrity. The team recently lost an experienced analyst and must fill that position while continuing to build additional reports for stops data and Force Review Board results. The CDP will also face significant challenges this year because a primary repository of data, the Record Management System (RMS), is being replaced with an entirely new product.

## 9.  Officer Assistance and Support

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 17th SAR | 53 | 1 | 7 | 25 | 17 | 3 | 0 |
| 18th SAR | 53 | 2 | 5 | 4 | 7 | 12 | 23 |

In this reporting period, the Monitoring Team completed a comprehensive assessment of all training paragraphs, filed with the Court on December 30, 2025. There were 20 paragraphs assessed, with 19 of those resulting in upgrades. This level of compliance with the requirements leaves the forthcoming focus on making improvements to policy and the manual related to the Field Training Program and oversight of all training to include specialized units.

The City and the CDP have engaged in notable efforts to comply with the requirements of the Equipment and Resources subsection. A comprehensive assessment was completed during this period and filed with the Court on December 24, 2025. The Monitoring Team found that CDP has

established the equipment, technology, and resources required well beyond baseline implementation, resulting in six upgrades out of the nine paragraphs in this section and no downgrades. With continued focus in this area, the Team believes that the CDP is well positioned to sustain the progress that it has made and achieve further upgrades in a future assessment.

During the reporting period, the Monitoring Team completed a comprehensive formal assessment of all paragraphs pertaining to Recruitment and Hiring (paragraphs 300-311; 367(e)). Through systematic review of the Recruitment Plan, Recruitment Reports, job announcements, policies, procedures, and analysis of 187 individual background investigation files, the Monitoring Team concluded that the CDP has met or exceeded all requirements for Recruitment and Hiring established in the Consent Decree. The assessment report was filed with the Court on December 11, 2025.

Most paragraphs within the subsection of Performance Evaluations and Promotions continue to be rated as non-compliant due to the limited progress and changing plans during the last two reporting periods. During this reporting period, the City facilitated a demonstration of a new Performance Evaluation Module being completed by the vendor Benchmark Analytics. The new module is scheduled to go live in the first quarter of 2026. The City also implemented a new promotional selection policy without addressing the Monitoring Team's feedback that was provided during an earlier review, and without the Monitoring Team's approval of the promotions policy. In addition, the City selected a vendor to develop upcoming promotional processes. The City bears the burden of demonstrating to the Monitoring Team that its policies and training are in compliance with the Consent Decree. A formal assessment scheduled for the second half of 2026 will be significant, given the current compliance status of Paragraphs 312-318, as it will evaluate the City's achievement of demonstrable and sustainable compliance across evaluation and promotion processes.

For this reporting period, the Monitoring Team completed its first comprehensive assessment of the three paragraphs on Staffing (paragraphs 319-321). The paragraphs focus on the creation of the Staffing Plan and an examination of the City's efforts in implementing the Plan. The Monitoring Team concludes that the CDP has met the requirements of these Consent Decree paragraphs and upgraded the compliance ratings for all three paragraphs to Substantial and Effective Compliance. The assessment report was filed with the Court on December 10, 2025.

## 10.    Supervision

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 17th SAR | 19 | 0 | 9 | 6 | 4 | 0 | 0 |
| 18th SAR | 19 | 0 | 10 | 3 | 4 | 2 | 0 |

Over this reporting period, the CDP has continued work with a vendor, Benchmark Analytics, on the development of the Officer Intervention Program (OIP) (paragraphs 326-336). Earlier in the year, the CDP reported September 2025 as the target completion date, but that was not achieved. This should be an area of focused attention and effort in the coming period. Because of the in-depth review of supervisory activities during the Crisis Intervention, Use of Force, and Search and Seizure assessments concurrent with this reporting period, the Monitoring Team is able to ascertain that supervisors appear to be engaged in incidents and most supervisory reviews are conducted appropriately and are consistent with expectations. Individual topic assessments indicated areas for improvements and a forthcoming assessment of all supervision paragraphs will provide more insight into the paragraphs related to the Supervision section. Relying on a thorough review of the Wearable Camera System (WCS) General Police Order, 4.06.04 and the resulting reports, paragraph 337 was upgraded. In addition, based on the use of force assessment, paragraph 338 was upgraded. In the next reporting period, the methodology and data request for a comprehensive assessment of the Supervision section will be completed in anticipation of a full assessment being completed in mid-2027.

## 11.    Policies

During the next reporting period, the Monitoring Team will begin meeting with the City and CDP to discuss a strategy for assessing these Consent Decree requirements (paragraphs 341-349), which have not previously been assessed or addressed in the Monitor's semiannual reports (therefore, no ratings chart is provided here or below for this report). The Monitoring Team recognizes that the City and CDP have achieved various milestones regarding policy requirements dictated in other sections of the Consent Decree, and those have been described in many previous editions of the Monitoring Team's semiannual reports.

## IV.    COMMUNITY ENGAGEMENT AND BUILDING TRUST

### 1.  Community Police Commission (CPC)

#### a.  Monitoring Team's Work during Report Period

During the reporting period, members of the Monitoring Team attended nine public meetings of the CPC, including six full Commission meetings. Monitoring Team members also attended bi-weekly CPC working group meetings with the co-chairs, City's Police Accountability Team (PAT), and the Department of Justice (DOJ) to facilitate ongoing discussions pertaining to document requests and other items of interest to the Parties. Currently, the Court-approved document request process, which is facilitated by PAT, and includes the Monitoring Team and DOJ, has been generally effective; however, some of the documents are not produced by the City within the prescribed time limits. In an effort to improve the efficiency and compliance of document requests, representatives from the CPC and PAT began conducting weekly meetings to update the current process. Once any proposed changes to the currently approved process are agreed upon, the Monitoring Team and DOJ will review the changes, and the amended process will be presented to the Court.

#### b.  Status of Policies and Training

There are no policy or training requirements for this section.

#### c.  Compliance Reviews and Findings

While no formal assessments have been conducted for this section of the Consent Decree, in preparing this report, the Monitoring Team participated in careful review of the paragraphs and made the following determinations:

- Paragraph 16 is upgraded to Operational Compliance. The current commissioners represent the diverse communities of Cleveland as required by the Charter as well as the Consent Decree. One exception involves the required representative from Black Shield, who was selected in 2025 but not permitted to participate due to being on extended medical leave. As such, a new representative is expected to be appointed in the next reporting period. The Monitoring Team recommends that the City establish a process or procedure to govern instances in which any Charter-required representative is unable to participate for an extended time.

- Paragraph 17(a) is upgraded to Operational Compliance as the CPC has held public meetings throughout the City. Further, the CPC Training Sub-Committee has reviewed and approved the required bias-free training.

- Paragraph 17(b) is upgraded to Operational Compliance. A representative from CPC is a member of the Training Review Committee (TRC) and provides input on the development of bias-free training.

- Paragraphs 18(a), 18(b) and 18(c) are upgraded to General Compliance. The authority of CPC to review and comment on CDP policies, practices, initiatives and programs is granted by City Charter Amendment 115-5. Further, the CPC has held public meetings to discuss the Monitor's reports and receive community feedback.

- Paragraph 19 is upgraded to Operational Compliance. As previously stated, the Court-approved document request process has been generally effective although some challenges remain. The Monitoring Team is encouraged that the weekly meetings between PAT and CPC will result in improved and mutually beneficial update to the current process.

A comprehensive formal assessment of this section is planned for later in 2026.

### d. Anticipated Work and Challenges for Next Reporting Period

During the next reporting period, the Monitoring Team will utilize the CPC working group meetings to communicate the expectations and evidence needed to demonstrate compliance with paragraphs 15-22. In addition, the Monitoring Team will closely observe the progress of filling the current CPC Commissioner vacancies as well as the multiple staff vacancies needed to ensure that the Commission can complete its work. The Monitoring Team looks forward to working with the new Executive Director on achieving the goals and timelines of the Monitoring Plan for 2026.

| Community Police Commission Paragraphs[9] | Status of Compliance |
|---|---|
| 15. Creation of CPC to make recommendations, work with Cleveland communities to develop recommendations, and "report to the City and community as a whole and to provide transparency" on reforms | **GENERAL COMPLIANCE** |
| 16. CPC members "will be appointed and vacancies will be filled in accordance with the City's Charter"; and periodic meetings with Chief of Police to "provide recommendations." | **OPERATIONAL COMPLIANCE** |
| 17(a). "[H]old public meetings across the City, complete an assessment of CDP's bias-free policing policies, practices, and training, and make recommendations." | **OPERATIONAL COMPLIANCE** |

---

[9] Please see the Consent Decree for the full and exact requirements. The excerpts here are incomplete and abbreviated in the interest of space.

| | |
|---|---|
| 17(b). "[A]ssist as appropriate in . . . development of training related to bias-free policing and cultural competency." | **OPERATIONAL COMPLIANCE** |
| 17(c). "[O]n an ongoing basis, assess CDP's community activities" and "make recommendations" related to "community engagement" and "community confidence" | **NON-COMPLIANCE** |
| 17(d). "[O]n an ongoing basis, review CDP's civilian oversight structure to determine if there are changes it recommends for improving CDP's accountability and transparency" | **PARTIAL COMPLIANCE** |
| 17(e). "perform other function as set out in this Agreement" | **NOT ASSESSED** |
| 18(a). "[R]eview and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention." | **GENERAL COMPLIANCE** |
| 18(b). [R]eview and comment on CDP's implementation of initiative, programs, and activities that are intended to support reform." | **GENERAL COMPLIANCE** |
| 18(c). "[H]old public meetings to discuss the Monitor's reports and to receive community feedback concerning CDP's compliance with this Agreement." | **GENERAL COMPLIANCE** |
| 19. "The City will provide access to all information requested by the Commission related to its mandate, authority, and duties unless it is legally restricted." | **OPERATIONAL COMPLIANCE** |
| 20. CPC "will issue [at least annual] reports," which the "City will post . . . to the City's website." | **PARTIAL COMPLIANCE** |
| 21. "The City will consider and timely respond in writing to the Commission's recommendations for improvements," which "will be posted to the City's website." | **NON-COMPLIANCE** |
| 22. CPC budget listed as "separate line item" to ensure "sufficient independence and resources." | **GENERAL COMPLIANCE** |

## 2. District Policing Committees

### a. Monitoring Team's Work during Report Period

During this reporting period, Monitoring Team members attended DPC meetings around the City to observe the public's involvement and interaction with DPC officials (Police Officers, Committee Co-Chairs and other DPC office holders). Monitoring Team members also attended a number of DPC special events in the community including Night Out Against Crime, Coffee with a Cop, CDP Officer Awards ceremonies, a neighborhood social event between CDP and residents, and special holiday gatherings. In addition, Monitoring Team members conferred individually with

DPC officials, as well as Community Relations Board (CRB) staff, in response to requests for assistance with improving DPC and City relationships.

### b.  Status of Policies and Training

There are no policy or training requirements for this section.

### c.  Compliance Reviews and Findings

There was no compliance assessment conducted for this section. While no formal assessment was conducted, Monitoring Team members did attend DPC meetings and make the following observations. The DPCs have established effective working relationships with many community service organizations within each CDP District, including City Public Safety agencies (Fire Department, EMS), and other City services available to the public. Through the DPCs, CDP keeps members of the public apprised of its crime reduction efforts and successes it has had improving safety in the community and in turn, gathers information and feedback from the community. Public attendance and participation in DPC meetings continue to lack diversity (race, age, gender and background). This lack of diversity has been an ongoing challenge for the DPCs and has been identified by the City as an area of focus moving forward. In the coming months, the Monitoring Team, in collaboration with the City, will be conducting a series of DPC working group meetings to aid in achieving compliance with the Consent Decree, including working with the DPCs, the CDP and the CRB to develop ways to expand community participation.

### d.  Anticipated Work and Challenges for Next Reporting Period

The Monitoring Team, in conjunction with the City, is planning to conduct a series of working group meetings for the purpose of refining and reaching consensus on compliance expectations for paragraphs 23-26 of the Consent Decree.

The Monitoring Team has concerns regarding a historical lack of coordination and shared vision between the five DPCs and other City entities, including the CPC, CRB, and CDP. The Monitoring Team is hopeful that the new working group structure will address these concerns by encouraging collaboration between the five DPCs to adjust their work around best practices and the requirements of the Consent Decree.

| District Policing Committees Paragraphs | Status of Compliance |
|---|---|
| 23.  Facilitation of "regular communication and cooperation between CDP and community leaders at the local level," with District Policing Committees meeting "at minimum, every quarter." | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 24. CPC, CDP, and Community Relations Board ("CRB") will "develop a mechanism to recruit and expand" Committee membership." CDP "will work with [Community Police] Commission to select officers for each District Policing Committee." | **NON-COMPLIANCE** |
| 25. CDP "will work closely with District Policing Committees to identify strategies to address crime and safety issues in their District," considering and addressing identified priorities. | **PARTIAL COMPLIANCE** |
| 26. "At least annually, each District Policing Committee will present its identified strategies, concerns, and recommendations" to the CPC, with CDP officer who is Committee member presenting to CPC "CDP's assessment of ways to address" the recommendations." | **OPERATIONAL COMPLIANCE** |

## V.    COMMUNITY & PROBLEM-ORIENTED POLICING

### a.  Monitoring Team's Work during Report Period

The Monitoring Team sustained regular communication with the previous commander of CPOP development. Now that CPOP has shifted to a new commander, the Monitoring Team's communications with CDP regarding CPOP have continued with the new commander. The Monitoring Team has observed CPOP training (two CPOP training sessions) as well as provided some technical assistance for its development.

In addition, the Monitoring Team reviewed CDP-provided community engagement data as well as DPC meeting minutes. The Monitoring Team also engaged with the City (PAT and CDP's CPOP Coordinator) to contribute ideas regarding the development of the methodology for the upcoming CPOP assessment.

### b.  Status of Policies and Training

The Monitoring Team approved an initial CPOP policy under the Consent Decree in 2019, and approved a revised version of that policy, along with CPOP Data Collection Training, in 2022. Furthermore, CDP patrol officers receive annual CPOP training as well as District geographic familiarity training.

### c.  Compliance Reviews and Findings

The Monitoring Team has not yet done a formal assessment of the CPOP section of the Consent Decree. For the last three months of this semiannual reporting period, the Monitoring Team worked on developing the methodology for the initial CPOP assessment with input from

representatives of the City and CDP. It is anticipated that the Monitoring Team's CPOP assessment will be conducted in 2026. Methodology development includes working with CDP on identifying all data sources needed to allow the Monitoring Team's reviewers to conduct a comprehensive assessment of the Consent Decree requirements.

Though the formal assessment is still pending, the Monitoring Team did receive some community engagement and CPOP data from CDP for this reporting period. According to data provided by the City, the CDP documented 3,893 community engagement activities in the second half of 2025. The Third District originated most of the forms with 28% and is followed by the Second District with about 24%, and then the First District, with about 20% of the forms. The majority, 83% of the community engagement encounters, were officer-initiated and by officers conducting foot patrol. The data provided do not offer any details on the purpose or result of the engagement activities.

Additional data provided show that there were 310 original CPOP forms in the reporting period with just over 6,000 updates to existing CPOP forms. The materials show that CPOP activities address a range of quality-of-life concerns across all districts and across all hours of the day. The report provided does not present any outcome data or description of the resolution of the CPOP effort, its success, the type of intervention or which partners were involved. The CDP may possess those data, which would be helpful for the Monitoring Team's formal assessment. Indeed, with the upcoming assessment of CPOP scheduled for 2026, the Monitoring Team will gain a greater understanding of CPOP and its efficacy.

### d. Anticipated Work and Challenges for Next Reporting Period

The Monitoring Team will invest a significant amount of time and energy in completing the CPOP assessment methodology drafting. It will also be focusing on identifying data needed and working with the City to ensure the data are responsive and sufficient to conduct the CPOP assessment, which may well extend past the next semiannual period.

| Community and Problem-Oriented Policing Paragraphs | Status of Compliance |
|---|---|
| 27. Implementation of "comprehensive and integrated community and problem-oriented policing model" by the City. | **PARTIAL COMPLIANCE** |
| 28. Ensuring that "mission statement reflects [the Division's] commitment to community-oriented policing" / "integrat[ing] community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **PARTIAL COMPLIANCE** |
| 29. Ensuring "that officers are familiar with the geographic areas they serve," "engage in problem identification," and "work proactively . . . to | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| address quality of life issues." | YELLOW |
| 30. Initial and annual in-service community and problem-oriented policing training "adequate in quality, quantity, type, and scope" that addresses specifically identified areas. | **OPERATIONAL COMPLIANCE** |
| 31. Maintenance of "collaborative partnerships with a broad spectrum of community groups," including CDP meetings with community organizations and District Policing Committees. | **PARTIAL COMPLIANCE** |
| 32. CDP "meet[ing] with members of the community in each District on a monthly basis and "solic[itation of] participation from a broad cross-section of community members in each District" to "identify problems and other areas of concern . . . and discuss responses and solutions." | **PARTIAL COMPLIANCE** |
| 33. Development and implementation of "systems to monitor officer outreach to the community" that CDP "will use . . . to analyze . . . whether officers are partnering with a broad cross-section of community members to develop and implement cooperative strategies that build mutual respect and identify and solve problems." | **PARTIAL COMPLIANCE** |
| 34. "At least annually, CDP will present the results" of paragraph 33 analysis "broken out by District in a publicly-available community policing report" that describes problems, solutions, and obstacles. Report provided to Commission and posted on CDP website. | **NON-COMPLIANCE** |

## VI.  BIAS-FREE POLICING

### a.  Monitoring Team's Work during Report Period

As with other topic areas of the Consent Decree, the Monitoring Team has formed internal teams to collaborate with the Parties in establishing a bias-free policing working group. The internal team members met during this reporting period and began drafting a document to identify the specific expectations of each paragraph of the Consent Decree relative to Bias-Free Policing and the data and other evidence needed to achieve compliance in accordance with each paragraph. The Monitoring Team will coordinate with the Parties to schedule and convene regularly scheduled meetings of the bias-free policing working group, during the next reporting period.

### b.  Status of Policies and Training

As reported in the Seventeenth Semiannual Report, the Monitoring Team is still awaiting notification of CDP's finalization and approval of the Supervisor's Bias-Free Policing Training

curriculum, which the Monitoring Team and DOJ have provided feedback on and received full CPC approval in November 2024.

For the last couple of years, CDP has submitted a training curriculum for an Integrated Reality Based Training (IRBT) that incorporates the topic of bias-free policing, as well as search and seizure and use of force. While the Monitoring Team has reviewed this curriculum and has observed some iterations of this training in-person, the Team cannot confirm at this time whether the topic of bias-free policing has been addressed with sufficient "quality, quantity, type and scope", as required by paragraph 42, without additional observation.

In addition, per this City, in 2025, 1204 personnel (which consists of all sworn personnel, including recruit classes) completed a review of the Bias-Free Policing General Police Order (1.07.08) as required.

Moreover, a revised version of CDP's Bias-Free Policing Policy was updated and approved by the Monitoring Team in 2022. In navigating CDP's website, however, the Monitoring Team is only able to locate the 2018 version of the policy.

### c.  Compliance Reviews and Findings

A comprehensive assessment of Bias-Free Policing, paragraphs 35-44, has yet to be conducted. The Monitoring Team plans to begin developing a methodology for this assessment later in 2026.

Despite the absence of a formal assessment as of now, the Monitoring Team did make some observations regarding the CDP's work on the bias-free policing requirements of the Consent Decree.

CDP continued to make incremental progress during this reporting period. Of particular note, the Office of Professional Standards (OPS) launched its public-facing activity dashboard, which provides the status of non-criminal citizen complaints filed against members of the CDP. This represents an important step toward enhanced transparency, accountability, and community trust, and serves as a critical tool in assessing and analyzing the integrity and efficiency of the complaint process. While the dashboard provides valuable insight into the administering of the citizen complaint process, it should also be used to assess the veracity and consistency of the Civilian Police Review Board's (CPRB) standard of review and resulting complaint outcomes as well.

A review of the citizen complaints closed during this reporting period reveals there were 18 bias complaints with final disposition reported. None of the bias complaints were sustained, two were determined to have insufficient evidence, one was dismissed, one was exonerated, and one was recorded as unidentifiable.

Although the OPS Activity Dashboard provides annual counts of complaint types, it does not report final dispositions by complaint category. As a result, the proportion of bias complaints that are sustained, exonerated, or administratively dismissed cannot be readily determined in

accordance with paragraph 367(d)(3). Consistent with the recommendation in the Fifteenth Semiannual Report, a comprehensive longitudinal analysis spanning multiple years (e.g., two to three years) is necessary to more reliably assess trends in bias-free policing within CDP and to evaluate potential concerns regarding the objectivity and consistency of the CPRB's review of bias-policing complaints relative to other complaint categories.

Furthermore, as noted in prior semiannual reports, the CDP has not yet produced the comprehensive annual report required by paragraphs 43 and 265 of the Consent Decree, which is intended to assess whether the CDP's operations are being conducted in a fair and unbiased manner. The Monitoring Team anticipates that the establishment of a bias-free policing working group will help facilitate the CDP's development and completion of this report in accordance with paragraphs 43 and 265.

### d.  Anticipated Work and Challenges for Next Reporting Period

The bias-free policing working group will collaborate on developing the methodology for assessment of the bias-free policing provisions of the Consent Decree during the next reporting period.

| Bias-Free Policing Paragraphs | Status of Compliance |
|---|---|
| 35. Delivery of "police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias," among other things. | **PARTIAL COMPLIANCE** |
| 36. "CDP will integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **PARTIAL COMPLIANCE** |
| 37. CDP will ensure that it "administer[s] all activities without discrimination" on basis of various protected classes | **PARTIAL COMPLIANCE** |
| 38. "CDP will develop a bias-free policing policy" incorporating CPC recommendations "that provides clear guidance to officers" | **OPERATIONAL COMPLIANCE** |
| 39–40. Develop bias-free policing and procedural justice training "adequate in quality, quantity, scope, and type" covering specific areas within 18 months of the Effective Date. | **OPERATIONAL COMPLIANCE** |
| 41. Supervisor training on bias-free policing and procedural justice issues covering specific areas | **PARTIAL COMPLIANCE** |
| 42. Annual in-service training on bias-free policing "adequate in quality, quantity, type, and scope" | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 43. Analysis of paragraph 265 data ("including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination") | **NON-COMPLIANCE** |
| 44. Consideration of "bias-free policing and equal protection" principles in hiring, unit assignment, promotion, and performance assessments. | **PARTIAL COMPLIANCE** |

## VII.  USE OF FORCE

### a.  Monitoring Team's Work during Report Period

During this period, the Monitoring Team focused on completing a comprehensive assessment of all Use of Force paragraphs. This assessment included a detailed review and analysis, conducted and compiled by the Monitoring Team, of the data and case files provided by CDP. The reviews of 272 Level 1 and Level 2 incidents, as well as 47 Level 3 FIT cases, involved exhaustive analysis of reports and images from the CDP's WCS to assess the use of force incidents – officers' actions before, during, and following the use of force. In addition, each review of case files involved examination of the reviews and approvals conducted by the entire chain of command for each incident.

As the Monitoring Team's final use of force assessment report shows, in 97% of the Level 1 and Level 2 cases reviewed, the officer's use of force was necessary, proportional, and objectively reasonable. These are the standards that must be followed when CDP officers use force, in accordance with CDP's use of force policies and are the standard by which officer actions are assessed. Across all assessed cases, Monitoring Team reviewers found that de-escalation was not feasible in 53% of them, and officers took reasonable efforts to de-escalate in 38% of the cases. In only 5% of the cases did the Monitoring Team's reviewers find that officers failed to make reasonable efforts to de-escalate prior to using force.

While adherence to all paragraphs and the specific language throughout the Consent Decree is key to compliance, the data tell an important story about CDP members' interactions with the public relative to force. The Monitoring Team's full assessment report provides a detailed discussion of the Monitoring Team's findings from the assessment.

The assessment also required review of all sworn members' attendance at the required relevant use of force and weapons training. Moreover, the Monitoring Team continued to monitor compliance with the Force Investigation Team (FIT) requirements regarding notification in real time, and observed the Force Review Board (FRB) at its quarterly meetings.

With 74 upgrades achieved through this assessment, forthcoming activities will be focused on the remaining paragraphs that require additional administrative work from the CDP and on planning for a subsequent case review, allowing the Monitoring Team to confirm whether the CDP continues to adhere to the policies over a longer period of time and across more cases.

### b.  Status of Policies and Training

All policies in this section of the Consent Decree are complete, and the CDP has received and continues to receive training on the use of force. The Monitoring Team's assessment describes the degree of adherence to each use of force policy and, in a few areas, requires additional review to confirm that the practice continues across cases and over time.

CDP training on the use of force is required annually, and the Monitoring Team will continue to review training materials in advance of training delivery and provide comments where appropriate. Training records must show that all sworn members receive the training, that supervisors and newly appointed supervisors are trained, and that training across a range of subjects – including force policy, standards and considerations – totals 16 hours.

### c.  Compliance Reviews and Findings

As previously mentioned, this reporting period focused on the Monitoring Team's compliance assessment of CDP's use of force. The full assessment includes the methodology used both to review the evidence, as well as the methods for assessing compliance. That assessment reports not only on the achievements of the CDP and City but also highlights any further required actions to advance the compliance level.

In the four paragraphs that were downgraded in the assessment, administrative systems must be designed or created and then actively reviewed, as in audits or reports for management, to achieve a higher level of compliance.

### d.  Anticipated Work and Challenges for Next Reporting Period

In the coming period, the Monitoring Team plans to collaborate with one or more working groups of CDP and City personnel to address the use of force paragraphs that require additional work for compliance. In those groups, CDP and City stakeholders, working with the Monitoring Team, will also identify the specific paragraphs that require a future assessment, and the possible timing of that assessment. The Monitoring Team recognizes that only eleven paragraphs remain in less than Substantial and Effective Compliance in this category.

| Use of Force Paragraphs | Status of Compliance |
|---|---|
| 45. "CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that | **NOT ASSESSED** |

| | |
|---|---|
| force" complies with the Constitution, federal law, and the Consent Decree "and that any use of unreasonable force is promptly identified and responded to appropriately." | |
| 46. "The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers . . . will comply" with at least twelve major, listed principles. | **GENERAL COMPLIANCE** |
| 47. Division "will ensure that the [use of force] incident is accurately and properly reported, documented, and investigated." | **GENERAL COMPLIANCE** |
| 48. "CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends." | **GENERAL COMPLIANCE** |
| 49. Development of use of force policies "that comply with applicable law[,] . . . are adequate to achieve the goals described in paragraph 45," and "specify that unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 50. "CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 51. Weapon-specific policies "will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 52. "No officer will carry any weapon that is not authorized or approved by CDP." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 53. "Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of weapon is imminent, and allow the subject an opportunity to comply." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 54. "The City will implement policies for each of the following guidelines." | **NOT ASSESSED** |
| 55. "Officers will not unholster and display a firearm unless the circumstances create a reasonable belief that lethal force may become necessary." Policies will require and training will teach proper "unholstering, displaying, pointing, and aiming a firearm, and for determining when it is appropriate to do so." And "If an officer unholsters | **GENERAL COMPLIANCE** |

| | |
|---|---|
| a firearm during an incident, interaction, or event that would otherwise trigger a reporting or data collection requirement, officers will document that a firearm was unholstered. CDP will annually collect and analyze this data." | |
| 56. "Unholstering a firearm and pointing it at a subject constitutes a Level 1 reportable use of force and will be reported and investigated as such." Includes specific exceptions for SWAT officers executing SWAT duties; officers deputized and assigned to a Federal Task Force when conducting task force operations and a supervisor is present; officers assigned to certain units if done solely while entering and securing a building during warrant execution. | **GENERAL COMPLIANCE** |
| 57. "Officers will not fire warning shots." | **GENERAL COMPLIANCE** |
| 58. "Officers will consider their surroundings before discharging their firearms and will avoid unnecessary risk to bystanders, victims, and other officers." | **GENERAL COMPLIANCE** |
| 59. "Officers will not discharge a firearm from or at a moving vehicle, unless use of lethal force is justified by something other than the threat from the moving vehicle; officers will not intentionally place themselves in the path of or reach inside a moving vehicle; and, where possible, officers will attempt to move out of the path of a moving vehicle." | **GENERAL COMPLIANCE** |
| 60. "CDP annually will provide at least 16 hours of firearms training which will include pistol, shotgun, and policy training…develop a plan to provide appropriate night, reduced light, and stress training for officers. Officers will successfully qualify with each firearm they are authorized to use or carry on-duty at least annually…and will not be permitted to carry any firearm on which they failed to qualify." | **GENERAL COMPLIANCE** |
| 61. "Officers will use Electronic Control Weapons ("ECWs") only where: (1) grounds for arrest or detention are present and the subject is actively or aggressively resisting, and lesser means would be ineffective; or (2) such force is necessary to protect the officer, the subject, or another party from immediate physical harm, and lesser means would be ineffective or have been tried and failed." | **GENERAL COMPLIANCE** |
| 62. "Each standard 5-second ECW application is a separate use of force that officers must individually justify as reasonable. After the first ECW application, the officer will reevaluate the situation to determine if subsequent cycles are reasonable…Officers will not employ more than three cycles of an ECW against a subject during a single incident." | **GENERAL COMPLIANCE** |
| 63. "Officers will consider transitioning to alternative control measures if the subject does not respond to ECW applications." | **GENERAL COMPLIANCE** |

| | |
|---|---|
| 64. "Officers will not use ECWs in drive stun mode solely as a pain compliance technique. Officers may use ECWs in drive stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option." | **GENERAL COMPLIANCE** |
| 65. "Officers will determine the reasonableness of ECW use based upon all the relevant circumstances, including the subject's apparent age, size, physical, and mental condition, and the feasibility of lesser force options." | **GENERAL COMPLIANCE** |
| 66. "Except where lethal force is authorized, officers will not use ECWs where: (1) a deployment may cause serious physical injury or death from situational hazards, including falling, losing control of a moving vehicle, or becoming ignited from the presence of potentially explosive or flammable materials or substances; or (2) the subject is visibly pregnant, apparently elderly, a child, visibly frail, has obviously low body mass, or is in apparent medical crisis." | **GENERAL COMPLIANCE** |
| 67. "Officers will not use ECWs on fleeing persons who do not pose a threat of physical harm to officers, other civilians, or themselves." | **GENERAL COMPLIANCE** |
| 68. "Officers will not intentionally target ECWs to a subject's head, neck, or genitalia." | **GENERAL COMPLIANCE** |
| 69. "Officers will not normally use ECWs on handcuffed or restrained persons…only where the subject is displaying aggressive physical resistance and lesser means would be ineffective or have been tried and failed." | **GENERAL COMPLIANCE** |
| 70. "Officers will carry ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 71. Officers will be trained on and follow ECW duties, including: (a) restrictions on removing ECW probes, (b) understanding risks of positional asphyxia and using restraint techniques that do not impair respiration, (c) monitoring subjects after ECW while in police custody, (d) informing medical personal of all subjects subjected to multiple ECW applications and other risk factors. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 72. "The City will ensure that all subjects who have been exposed to an ECW application receive a medical evaluation by emergency medical responders…Absent exigent circumstances, probes will be removed from a subject's skin only by medical personnel or properly trained officers." | **GENERAL COMPLIANCE** |
| 73. "In addition to the force reporting requirements outlined in paragraph 88, officers will clearly articulate and justify" specific information regarding ECW use in a written narrative. | **GENERAL COMPLIANCE** |

| | |
|---|---|
| 74. "Officers who have been issued ECWs will receive annual ECW certifications, which will consist of physical competency; weapon retention; CDP policy, including any policy changes; technology changes; and scenario-based training." | **GENERAL COMPLIANCE** |
| 75. "The City will develop and implement integrity safeguards on the use of ECWs to ensure compliance with CDP policy. CDP will conduct quarterly downloads of all ECWs… [and] random and directed audits of ECW application data, which will be provided to the Monitor for review." Audits will compare downloaded data to the officer's Use of Force Reports, and discrepancies should be addressed and appropriately investigated. | **NON-COMPLIANCE** |
| 76. "ECW application data will be tracked and analyzed in CDP's Officer Intervention Program." | **PARTIAL COMPLIANCE** |
| 77. "Officers will apply OC spray only: (1) when such force is reasonable to protect the officer, the subject, or another party from physical harm and lesser means would be ineffective; or (2) for crowd dispersal or protection and other means would be more intrusive or less effective." | **GENERAL COMPLIANCE** |
| 78. "After one standard OC spray (one second), each subsequent application is a separate use of force that officers must individually justify as reasonable." | **GENERAL COMPLIANCE** |
| 79. "Officers will not normally use OC spray on handcuffed or restrained persons…only where the subject is displaying aggressive physical resistance and lesser means would be ineffective or have been tried and failed." | **GENERAL COMPLIANCE** |
| 80. "Officers will be trained in and follow" OC spray protocols, including: (a) decontaminating those exposed using cool water to flush face and eyes within 20 minutes of gaining control of scene, (b) understanding the risks of positional asphyxia and using restraint techniques that do not impair respiration, (c) requesting medical assistance for certain exposed subjects. | **GENERAL COMPLIANCE** |
| 81. "Officers will carry only CDP issued OC spray." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 82. "CDP will maintain documentation of the number of OC spray canisters distributed to and utilized by each officer." | **PARTIAL COMPLIANCE** |
| 83. "OC spray application data will be tracked and analyzed in CDP's Officer Intervention Program." | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 84. CDP "will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes" a number of specific, expressly listed elements. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 85. CDP "will provide the use of force training described in paragraph 84 to all new officers." | **GENERAL COMPLIANCE** |
| 86. "CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope." | **GENERAL COMPLIANCE** |
| 87. "CDP will develop and implement a single, uniform reporting system pursuant to a Use of Force reporting policy" that complies with the force Level categorization set forth in the paragraph. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 88. Requiring "[a]ll officers using or observing force" to complete a Use of Force Report including a number of specific features and avoiding "conclusory statements, 'boilerplate', or 'canned' language." | **GENERAL COMPLIANCE** |
| 89. "Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports." | **GENERAL COMPLIANCE** |
| 90. "Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable." | **GENERAL COMPLIANCE** |
| 91. Requirement to "notify . . . supervisors . . . as soon as practical following any use of force" and if becoming aware of "an allegation of unreasonable or unreported force by another officer." | **GENERAL COMPLIANCE** |
| 92. "Use of Force Reports will be maintained centrally." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 93. "A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval." | **OPERATIONAL COMPLIANCE** |
| 94. Setting specific requirements relating to the investigation of low-level, Level 1 force. | **GENERAL COMPLIANCE** |
| 95. "The direct supervisor of the officer(s) using force, upon notification of a Level 2…or allegation of excessive force, will respond to the location of the occurrence. Where the force is a Level 1 but the subject has alleged excessive force, the supervisor will respond to the scene to determine whether a Level 1 or Level 2 investigation should be conducted." | **GENERAL COMPLIANCE** |

31

| | |
|---|---|
| 96. "If a CDP supervisor uses a Level 2 use of force, a supervisor of a higher rank will respond to the location" and comply with this section. | **GENERAL COMPLIANCE** |
| 97. "For all Level 2 uses of force, the direct supervisor will" comply with an expressed list of duties. | **GENERAL COMPLIANCE** |
| 98. "The investigating supervisor will" ensure all Use of Force Reports contain all required information; consider all relevant evidence; and make credibility determinations, if feasible. Supervisors will make all reasonable efforts to resolve material inconsistencies. CDP will train all investigating supervisors on how to effectively complete these tasks. | **GENERAL COMPLIANCE** |
| 99. "Whenever a supervisor determines that there may have been misconduct, the supervisor will immediately notify Internal Affairs and Internal Affairs will determine if it should respond to the scene and/or conduct or take over the investigation." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 100. "Within five days of learning of the use of force, each supervisor will complete and document his/her investigation...Any extension …must be authorized by a District Commander. This Report will include" a specific list of required information. | **GENERAL COMPLIANCE** |
| 101. "Investigatory supervisors will be subject to the disciplinary process for failing to adequately investigate and document a use of force and material omissions or misrepresentations in the supervisory investigation." Such failures will be addressed in the supervisor's performance review. | **OPERATIONAL COMPLIANCE** |
| 102. "Upon completion of the supervisor's Use of Force Report, the investigating supervisor will forward the report through their chain of command to the District Commander…Each level in the chain of command will review the report within 72 hours of receiving it." Reviewing supervisors will order additional investigation when there may be additional relevant evidence to assist resolving inconsistencies or improve the reliability or credibility of the findings. | **GENERAL COMPLIANCE** |
| 103. "Where the findings of the Use of Force Report are not supported by a preponderance of the evidence," the chain of command will document the reasons and will append it to the original investigation. The investigating supervisor's superior will counsel the investigating supervisor. The District Commander is responsible for accurate and complete Use of Force Reports supervisors under their command. | **GENERAL COMPLIANCE** |
| 104. "Where an investigating supervisor conducts deficient investigations, the supervisor will receive the appropriate corrective action, including training or demotion, in accordance with performance evaluation procedures and/or the disciplinary process." | **OPERATIONAL COMPLIANCE** |
| 105. Whenever evidence of a use of force involving potential criminal conduct is found, the superior "will suspend the force investigation | **SUBSTANTIAL AND** |

| | |
|---|---|
| immediately and notify Internal Affairs [which will]…notify FIT, which will take over both the criminal and administrative investigation." | **EFFECTIVE COMPLIANCE** |
| 106. "When the District Commander finds that the investigation is complete and…supported by the evidence, the investigation file will be promptly forwarded to Internal Affairs." Internal Affairs will ensure investigation is completed and supported by the evidence. | **GENERAL COMPLIANCE** |
| 107. "When Internal Affairs completes its review, it will forward the complete file to the Chief of CDP for disposition." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 108. "At the discretion of the Chief, his or her designee, or Internal Affairs, a use of force investigation may be assigned or re-assigned for investigation to FIT or to another supervisor, whether within or outside of the District in which the incident occurred, or may be returned to the District for further investigation or analysis. This assignment or re-assignment will be explained in writing." | **GENERAL COMPLIANCE** |
| 109. Ensuring appropriate disciplinary process for out-of-policy force, and that necessary training, policy, tactical, or equipment concerns are addressed where the need is discovered through the force review. | **GENERAL COMPLIANCE** |
| 110. "CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 111. Creation and design of dedicated Force Investigation Team (FIT) that "will conduct administrative investigations . . . and criminal investigations" of serious force, "force involving potential criminal conduct," in-custody deaths, and cases assigned to it by the Chief. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 112. Composition of FIT Team. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 113. "FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type" on a host of specific, expressly-listed topics both initially and annually thereafter. | **OPERATIONAL COMPLIANCE** |
| 114. "CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 115. Response of FIT to use of force scenes. FIT notification of prosecutor's office. Notification of designated outside agency to conduct criminal investigation if City elects to use external agency for such investigations. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 116. "CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation." | **GENERAL COMPLIANCE** |
| 117. Memorandum of understanding required between CDP and outside agency containing specific, expressly-listed provisions. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 118. Setting forth various, specific, and expressly-listed responsibilities of FIT during its investigations. | **GENERAL COMPLIANCE** |
| 119. At least annually, "the Monitor will determine whether the criminal investigations conducted by the outside agency are consistently objective, timely and comprehensive." If they are found not to be, the memorandum of understanding will terminate and FIT will assume responsibility. | **OPERATIONAL COMPLIANCE** |
| 120. Providing for delay of compelled interview if "case has the potential to proceed criminally" but otherwise requiring that "[n]o other part of the investigation . . . be held in abeyance" unless "specifically authorized by the Chief" in consultation with investigating agency and prosecutor's office. | **GENERAL COMPLIANCE** |
| 121. Requiring completion of preliminary report presented to Chief or Chief's designee "as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force." | **GENERAL COMPLIANCE** |
| 122. Completion of investigation within 60 days. Preparation of FIT investigation report. Review of FIT investigative report by head of Internal Affairs who "will approve or disapprove FIT's recommendations, or request . . . additional investigation." | **OPERATIONAL COMPLIANCE** |
| 123. Revision of FIT manual to ensure "consisten[cy] with the force principles" and several specific, expressly-listed provisions. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 124. "The City will develop and implement a Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 125. Requiring "training on legal updates, updates on CDP's policies, and CDP training curriculum related to the use of force" for each member. | **GENERAL COMPLIANCE** |

| | |
|---|---|
| 126. Mandating "comprehensive and reliable reviews of investigations within 90 days of submission to the FRB," and encompassing officer's decision-making at the moment force was used as well asl "the circumstances leading up to the use of force, tactical decisions, information sharing and communication, adequacy of supervision, equipment, training, CDP's medical response, when applicable, and any commendable actions" and actions and inactions of all involved members. | **GENERAL COMPLIANCE** |
| 127. Description of reviews, which will: ensure objective and complete investigations and findings supported by preponderance of the evidence; be presented by the investigator or District representative (for supervisors); review written records and discuss the case with the presenter; order additional investigation when needed; determine whether the case raises concerns about policing, training, equipment, supervision, medical response, communication, or tactics and referral to appropriate unit; recommending non-disciplinary action; and documenting FRB findings and recommendations within 15 days of each presentation. | **GENERAL COMPLIANCE** |
| 128. "The FRB will assess the quality of the investigations," including whether they are "objective and comprehensive and recommendations are supported by a preponderance of evidence. The FRB will identify and document any deficiencies that indicate a need for corrective action" | **GENERAL COMPLIANCE** |
| 129. "Annually, the FRB will examine the data related to use of force" provided by the DACC per ¶261 (and in conjunction with ¶266) "to detect any patterns, trends, and training deficiencies and make recommendations for correction as appropriate" and will provide the analysis to the Monitor | **GENERAL COMPLIANCE** |
| 130. The FRB will work with the DACC to "develop a tracking system to ensure that each of its recommendations has been forwarded to the appropriate personnel. The Chief or his or her designee will ensure that the FRB's recommendations, including non-disciplinary corrective action, are implemented as appropriate." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

## VIII. CRISIS INTERVENTION

### a. Monitoring Team's Work during Report Period

During this semiannual period, the Monitoring Team conducted a compliance assessment to determine compliance with the Consent Decree's goals of improving the CDP in assisting individuals in crisis, improving the safety of the community, promoting community solutions to assist individuals with mental illness, reducing the need for individuals with mental illness to have

further involvement with the criminal justice system, and providing a forum for effective problem solving regarding the interaction between the criminal justice and mental health care system (paragraphs 131-159, 367(b)). To carry out this assessment, the Monitoring Team conducted case reviews of CDP's responses to crisis events, audited training data, reviewed Specialized Crisis Intervention Team ("SCIT") recruitment and selection processes, and analyzed other documentation related to CDP's Crisis Intervention Program.

### b.  Status of Policies and Training

The Monitoring Team's assessment revealed no serious gaps in CIT training or policy development. The CDP revised the Crisis Intervention Policy (General Police Order 5.11.02, Crisis Intervention Team Policy) which was approved by the Court in December of 2016. This suite of Crisis Intervention policies has been updated twice. In addition, the Monitoring Team submitted the main Crisis Intervention Team (CIT) curriculum for Court approval in April of 2022. The curriculum is respected by experts and regarded as a national model. The Court also approved the curriculum provided for 911 call takers and dispatchers in January of 2020.

### c.  Compliance Reviews and Findings

The Monitoring Team's first comprehensive Crisis Intervention Compliance Assessment found that CDP has achieved General or Substantial and Effective Compliance across all Crisis Intervention related paragraphs of the Consent Decree (paragraphs 131-159, 367(b)). The full assessment includes the methodology used both to review the evidence and the methods for assessing compliance. Through systematic review of 111 crisis intervention incidents from 2023, examination of training curricula, and evaluation of policy implementation, the Monitoring Team determined that CDP has successfully established a robust Crisis Intervention Program that meets or exceeds the foundational requirements established in the Consent Decree. The Mental Health Response Advisory Committee (MHRAC) has functioned effectively as a collaborative forum between police, community stakeholders, and mental health providers, while the Crisis Intervention Coordinator has demonstrated strong leadership in program implementation and community engagement.

The Monitoring Team, through its assessment, confirmed that both the direction and current strength of CDP's CIT Program, and the overall crisis intervention strategy, are effectively addressing the Consent Decree's requirements. The program demonstrates sustained commitment to continuous improvement, with regular data analysis informing training modifications and operational adjustments. Officers consistently demonstrate appropriate de-escalation techniques, calm demeanor, and professional conduct when responding to individuals in crisis. The extremely low rates of arrest (1.5-2.1%) and use of force (0.32-0.42%) in crisis incidents, combined with high rates of hospital transport (85.5%), indicate that the program successfully achieved its core

goals of connecting individuals to appropriate care while minimizing criminal justice involvement.

### d.  Anticipated Work and Challenges for Next Reporting Period

The recent Monitoring Team's Crisis Intervention Compliance Assessment details progress made in meeting the requirements of the Consent Decree and points to adjustment needed in the level of the Monitoring Team's engagement in the day-to-day operations. Discussions are underway to re-define that role from one of active monitoring and formal assessment to that of reviewing the ability of the City and the Division to sustain the gains. The Monitoring Team anticipates that the ongoing report from CDP in the Specialized Crisis Intervention Plan (SCIP), the annual report and activities of the MHRAC and its subcommittees, along with the Crisis Intervention Team Data Collection Dashboard, will take on an important role in providing publicly available methods of assessing the sustained progress.[10]

The CDP's SCIP provides an in-depth examination of the Crisis Intervention Program. CIT Officer coverage is listed for each district, along with the status of Field Officer training in Crisis Intervention. The Division's community partner in examining the Division's behavioral health strategies, MHRAC, will continue to work through the volunteer subcommittees to examine and improve policy, use CDP behavioral response data to ensure quality assurance, provide outstanding curricula using subject matter experts including those with lived experience, and continue to expand the Division's reach with young people and the community as a whole.

| Crisis Intervention Paragraphs | Status of Compliance |
|---|---|
| 131. "CDP will build upon and improve its Crisis Intervention Program" in furtherance of four specific, expressly-listed goals, which "will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health system and create a context for sustainable change." | **GENERAL COMPLIANCE** |
| 132. Establishment of Mental Health Response Advisory Committee (the "Advisory Committee") "to foster relationships and build support between the police, community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 133. Composition of Advisory Committee. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

---

[10] https://data.clevelandohio.gov/apps/ClevelandGIS::crisis-intervention-team-dashboard/explore

| | |
|---|---|
| 134. "The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 135. Advisory Committee will conduct an annual "analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers" and communications "are appropriately responding to people in crisis," and will also "recommend appropriate changes." | **GENERAL COMPLIANCE** |
| 136. "The Advisory Committee's reports and recommendations will be provided" to CPC, "be publicly available, and will be posted on the City's website." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 137. CDP will designate a Crisis Intervention Coordinator for specific, expressly-identified purposes. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 138. "Coordinator will develop and maintain partnerships with program stakeholders and serve as point of contact" and "resource" for other stakeholders. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 139. "Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, call-takers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 140. "Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate." | **GENERAL COMPLIANCE** |
| 141. "Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers" and "to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls." | **GENERAL COMPLIANCE** |
| 142. "Coordinator will create ways to recognize and honor specialized CIT officers, call-takers, and dispatchers." | **GENERAL COMPLIANCE** |
| 143. Initial and annual crisis intervention training to all officers and recruits that is "adequate in quality, quantity, type, and scope." | **GENERAL COMPLIANCE** |
| 144. Initial and annual crisis intervention training for dispatchers and call-takers. | **GENERAL COMPLIANCE** |

| | |
|---|---|
| 145. "The City will provide enhanced specialized training in responding to individuals in crisis to certain officers ('specialized CIT officers')," who will be "called upon to respond to incidents or calls involving individuals in crisis." | **GENERAL COMPLIANCE** |
| 146. Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | **GENERAL COMPLIANCE** |
| 147. Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | **GENERAL COMPLIANCE** |
| 148. Designation of specialized CIT officers, per specific, expressly-listed requirements. | **GENERAL COMPLIANCE** |
| 149. "Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized officers." | **GENERAL COMPLIANCE** |
| 150. "All Field Training Officers" ("FTO"s) "will receive the enhanced specialized crisis intervention training described in paragraph 146," though FTOs will "not be designated as a specialized CIT officer" unless they volunteer and have been selected to do so. | **GENERAL COMPLIANCE** |
| 151. "Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene," with supervisors "seek[ing] the input of a specialized CIT officer . . . where it is reasonable for them to do so." | **GENERAL COMPLIANCE** |
| 152. "[T]he Coordinator will develop an effective specialized crisis intervention plan . . . to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis" that includes various, specific, expressly-identified requirements. The City "will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis." | **GENERAL COMPLIANCE** |
| 153. City "will consider" crisis intervention program assessment by Ohio Criminal Justice Coordinating Center of Excellence. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 154. CDP "will revise its policies to make clear that a crisis intervention response may be necessary even in situations where there has been an apparent law violation." | **GENERAL COMPLIANCE** |
| 155. CDP "will revise its current crisis intervention policy to ensure that specialized CIT officers have appropriate discretion to direct individuals . . . to the health care system, rather than the judicial system . . . where it is appropriate to do so." | **GENERAL COMPLIANCE** |
| 156. CDP policies and procedures will ensure that "specialized CIT officers . . . must be dispatched to all calls or incidents that appear to involve an individual in crisis." CDP must "track incidents in which a specialized | **GENERAL COMPLIANCE** |

| officer was not dispatched to such calls" and "identify any barriers" to ensuring dispatch of specialized CIT officer to such calls. | |
|---|---|
| 157. "CDP will track calls and incidents involving individuals in crisis by gathering, at a minimum," specific, expressly-identified data. | **GENERAL COMPLIANCE** |
| 158. Public reporting of paragraph 157 data and provision to Advisory Committee. | **GENERAL COMPLIANCE** |
| 159. "The City will utilize" paragraph 157 data "to identify training needs and develop case studies and teaching scenarios" for training and other expressly-identified systemic purposes. | **GENERAL COMPLIANCE** |

## IX.    SEARCHES AND SEIZURES

### a.  Monitoring Team's Work during Report Period

The Monitoring Team conducted and completed its first Search and Seizure Assessment during this reporting period, which commenced in January 2025. A diverse team of Subject Matter Experts (SMEs) with significant law enforcement and legal expertise reviewed 376 traffic stops and 255 investigatory stops to evaluate CDP's compliance with paragraphs 160–175. The data were analyzed and a draft report was sent to the Parties on August 15, 2025. Substantial feedback on the draft was provided by both the DOJ and the City. Meetings were held with both Parties to discuss the feedback and suggested edits, and after careful consideration and considerable revisions, the final Search and Seizure Assessment Report was filed by the Monitor with the Court on December 5, 2025.

### b.  Status of Policies and Training

As reported in the Tenth Semiannual Report (October 2021), CDP developed five policies related to search and seizure and implemented the topic into its in-service training in 2021. The Division also developed and implemented its Stop Form Policy (GPO 2.02.05) during the Tenth Semiannual Report reporting period.

In addition, as part of the 2025 assessment, the Monitoring Team confirmed that Training Section has included the topic of search and seizure in its annual Continuing Professional Trainings, with its recent analysis confirming that 1,165 members completed annual in-service training in 2024. The Monitoring Team will continue to monitor CDP's compliance with in-service training requirements, as this is an annual requirement.

### c.  Compliance Reviews and Findings

As noted, the 2025 Search and Seizure Assessment was completed and filed with the Court on December 5, 2025. The full assessment includes the methodology used both to review the evidence and the methods for assessing compliance. Through this assessment, the Monitoring Team determined that CDP achieved upgrades on eight paragraphs. In addition, most notably, the Monitoring Team's Search and Seizure Assessment found that more than 90 percent of police-initiated stops reviewed were supported by sufficient and individualized articulation of reasonable suspicion or probable cause. Moreover, the assessment found that the Division's comprehensive delivery of search and seizure training through Police Academy classes and its mandatory annual in-service training, both warranted upgrades.

While the majority of the stops assessed were, to varying degrees, compliant with the standards of paragraphs 160–175, the analysis of outcome data revealed racial disparities in stops, searches, and arrests. Blacks were stopped, searched, and arrested at a higher rate than other groups. Over three times as many Black drivers were searched as white drivers, yet the hit rates are relatively the same. For example, for every 60 searches of Black drivers, there were about 20 searches of White drivers resulting in the same success rate for contraband. These findings merit further critical analysis of the details of the police encounters and deployment practices to understand the nature of disparities, which alone are not evidence of intentional bias. The City has retained an outside expert who may be in a position to provide further analysis on the disparities.

### d.  Anticipated Work and Challenges for Next Reporting Period

During the next reporting period, the search and seizure working group, including the Monitoring Team and the Parties, will reconvene and meet regularly, reach consensus on the criteria and evidence to achieve compliance in each paragraph in this section of the Consent Decree and begin working towards that end. In addition, the working group will refine the assessment methodology and the survey instrument to address any issues or deficiencies identified from the initial assessment.

| Searches and Seizures Paragraphs | Status of Compliance |
|---|---|
| 160. "CDP will revise, develop, and implement search and seizure policies that comply with applicable law, . . . include the requirements below," and conform to expressly-identified principles. | NOT ASSESSED |
| 161. "Officers will not use an individual's gender, race, ethnicity, national origin, or perceived sexual orientation… in establishing reasonable suspicion or probable cause, unless…part of an actual or credible description of a specific suspect in an investigation that includes other identifying factors." | OPERATIONAL COMPLIANCE |

| | |
|---|---|
| 162. "Officers will not conduct investigatory stops when they lack reasonable suspicion." | **OPERATIONAL COMPLIANCE** |
| 163. "Officers will not conduct pat down searches without specific and articulable facts to reasonably suspect that a particular person is armed and dangerous. This does not restrict an officer's ability to conduct a search incident to arrest or prior to transport." | **OPERATIONAL COMPLIANCE** |
| 164. "Where an officer seeks consent for a search, the officer will inform the person of his or her right to refuse and to revoke consent at any time and document the person's consent." | **PARTIAL COMPLIANCE** |
| 165. "CDP officers will not rely solely upon an individual's geographic location, or presence in a high crime area without any other specific and articulable facts indicating that the individual has been, is, or is about to engage in criminal activity, as the basis for an investigatory stop." | **OPERATIONAL COMPLIANCE** |
| 166. "Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assault on an officer and no other substantive violation is alleged," and "the supervisor will respond to the scene." | **OPERATIONAL COMPLIANCE** |
| 167. "Officers will not use 'canned' or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests." | **OPERATIONAL COMPLIANCE** |
| 168. "Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports." CDP "will train officers" on documenting stops. "Supervisors will review all documentation of investigatory stops, searches, and arrests." | **OPERATIONAL COMPLIANCE** |
| 169. Supervisor will review of "each arrest report by officers under their command," with supervisors reviewing reports for specific, expressly-identified deficiencies. | **PARTIAL COMPLIANCE** |
| 170–72. Supervisory review of investigatory stops, searches, and arrests. | **PARTIAL COMPLIANCE** |
| 173. Provision of "initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements" of the Consent Decree that "will address the requirements of Fourth Amendment and related law, CDP policies," and specific, expressly-identified topics. | **GENERAL COMPLIANCE** |
| 174–75. Provision of "annual search and seizure in-service training that is adequate in quality, quantity, type, and scope" incorporating specific, expressly-identified topics. | **OPERATIONAL COMPLIANCE** |

## X.  ACCOUNTABILITY

| Accountability Paragraph | Status of Compliance |
|---|---|
| 176. "The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process." | **NOT ASSESSED** |

### 1.  Internally Discovered Misconduct

#### a.  Monitoring Team's Work during Report Period

The Monitoring Team and the Internal Affairs Unit (IAU) Superintendent continue to meet monthly to discuss items to be achieved during the reporting period. The continued collaboration has resulted in the development of actionable and achievable steps and processes for obtaining data that demonstrate compliance with the Consent Decree.

During the last reporting period, sufficient evidence was found to support an upgrade related to paragraph 179. During this reporting period, due to personnel changes, IA continued to onboard investigators who possess excellent investigative skills, have a reputation for integrity, can write clear and comprehensive reports, are fair and objective in determining whether a member committed misconduct, do not have a sustained history of civilian complaints, and have not been disciplined for excessive use of force, discrimination, or dishonesty. The Monitoring Team assessed the new members' onboarding process and found the same consistency with Paragraph 179 during this reporting period.

IA consistently submits monthly reports detailing the unit's activities and adherence to paragraphs 177 and 182-188. Based on these reports, IA's self-assessments meet the requirements outlined in these paragraphs. Further adjustments to compliance levels across the IA paragraphs will be made after a comprehensive assessment is completed. In the upcoming rating period, the Monitoring Team and IA will continue collaborating on developing a methodology for the Monitoring Team to assess paragraphs 177 and 182-192. It is anticipated that the assessment will begin in the summer of 2026, with the final report completed by the end of the year.

### b.  Status of Policies and Training

All policies and procedures in this section are complete. General Police Order 1.07.05, Internal Complaints of Misconduct, became effective February 21, 2020. The Internal Affairs Manual was updated in July of 2024, and the changes were filed with the Court.

IAU personnel have received the required training in this area. Every new unit member receives training in conducting misconduct investigations. All members also receive annual training in conducting misconduct investigations. Training records must continue to document who is required to attend the training and when it was delivered. The Monitoring Team will continue to collaborate with IA, review the required training curriculum, and provide comments where appropriate.

### c.  Compliance Reviews and Findings

To assess compliance with paragraphs 179, 180, and 181, the Monitoring Team completed document reviews. During this review period, IA added five members to their team and utilized a relatively new IA-created guiding document to ensure adherence to and consistency with paragraph 179. To monitor the IAU's member onboarding, the Monitoring Team followed the guiding document and reviewed supporting documentation, including resumes, evaluations, and completed IA cases, to verify that the onboarding for two of those candidates was consistent with the procedure. Due to the timing of the others joining IA, toward the end of the reporting period, the Monitoring Team did not have the opportunity to review the new practice relating to the other three candidates. The Monitoring Team found evidence that the implementation of the guiding document results in the onboarding of investigators who: 1.) possess excellent investigative skills, 2.) have a reputation for integrity, 3.) can write clear and comprehensive reports, 4.) are fair and objective in determining whether a member committed misconduct, and 5.) do not have a sustained history of civilian complaints or have been disciplined for excessive use of force, discrimination, or dishonesty.

Regarding paragraph 180, on November 17, 2025, all assigned members of the IAU attended the approved IAU Initial Investigator Training. The training was a one-day, 8-hour session. In accordance with the Consent Decree's requirements, the training's objective and outline included instruction on conducting misconduct investigations. The curriculum underwent the mandated approval process and was formally approved, indicating that, when properly implemented, the training meets the required quality, quantity, type, and scope. The Monitoring Team reviewed the IAU Personnel Roster of assigned members as of November 17 and found that all personnel assigned as of November 17 have completed the IAU Initial Investigator Training as required by paragraph 181. The next step is for the Monitoring Team to observe the IAU Initial Investigator Training to assess whether it is conducted in accordance with the training curriculum.

Regarding paragraph 181, from October 20, 2025 through October 22, 2025, all assigned members of the IAU attended the approved IAU Annual Training. The training was conducted over three days, totaling twenty-four hours. In accordance with the Consent Decree's requirements, the training objectives and outline included instruction on conducting misconduct investigations. The curriculum underwent the mandated approval process and was formally approved, indicating that, when properly implemented, the training meets adequate quality, quantity, type, and scope standards. The Monitoring Team reviewed the IAU Personnel Roster of assigned members as of October 2025, the Annual Training Attendance Sheets dated October 20, 21, and 22, 2025, and compared the documents. The Monitoring Team found that, as of October 2025, all personnel assigned to the IAU have completed the annual training required by paragraph 181. The next step is for the Monitoring Team to observe the IAU Annual Training to assess whether it is conducted in accordance with the training curriculum.

Paragraphs 177, 182-192 will require a comprehensive assessment of the IA paragraphs. This will include a detailed review and analysis of quantitative and qualitative data, conducted by the Monitoring Team, to review IA investigative cases.

### d. Anticipated Work and Challenges for Next Reporting Period

During the next review period, the Monitoring Team anticipates continuing to work collaboratively with CDP and the City to develop a methodology for assessing the IA paragraphs, which will require a comprehensive assessment to inform further adjustments to compliance levels. These collaborations will occur during the IA monthly meetings with the Monitoring Team, as well as during the IA working group meetings that are being developed in order to come to mutual understanding of the required supporting evidence to show compliance. In addition, the Monitoring Team anticipates starting a comprehensive assessment of paragraphs 177-192 during the next review period. The Monitoring Team recognizes the importance and urgency of this assessment to show compliance.

| Internally Discovered Misconduct Paragraphs | Status of Compliance |
|---|---|
| 177. "Internal Affairs will conduct objective, comprehensive, and timely investigations of all internal allegations," with "findings . . . based on the preponderance of the evidence standard" that must "be clearly delineated in policies, training, and procedures and accompanied by detailed examples to ensure proper application by investigators." | PARTIAL COMPLIANCE |
| 178. "Internal Affairs will be headed by a qualified civilian" who "will report directly to the Chief of Police. | OPERATIONAL COMPLIANCE |
| 179. Qualifications for IA investigators. | OPERATIONAL COMPLIANCE |

| | |
|---|---|
| 180. Initial training for IA investigators "that is adequate in quality, quantity, scope, and type on conducting misconduct investigations" that addresses specific, expressly- identified topics. | **OPERATIONAL COMPLIANCE** |
| 181. "[A]nnual training" for IA investigators "that is adequate in quality, quantity, type and scope" | **OPERATIONAL COMPLIANCE** |
| 182. "In each investigation, Internal Affairs will collect and consider" all evidence. "[N]o automatic preference for an officer's statement over a non-officer's statement." No disregard of a "witnesses' statement solely because of" connection to the complainant or criminal history. IA investigators must "make all reasonable efforts to resolve material inconsistencies between witness statements." | **PARTIAL COMPLIANCE** |
| 183. IA "will evaluate all relevant police activity and any evidence of potential misconduct uncovered during the course of the investigation." | **PARTIAL COMPLIANCE** |
| 184. IA will not consider guilty plea or verdict as "determinative of whether a CDP officer engaged in misconduct" or justification for "discontinuing the investigation." | **PARTIAL COMPLIANCE** |
| 185. IA "will complete its administrative investigations within 30 days from the date it learns of the alleged misconduct." | **PARTIAL COMPLIANCE** |
| 186–87. IA investigative report requirements. | **PARTIAL COMPLIANCE** |
| 188. Forwarding of completed IA investigations "to the officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator." | **PARTIAL COMPLIANCE** |
| 189. "CDP will require any CDP employee who observes or becomes aware of any" potential misconduct to "report the incident to a supervisor or directly to" IA. | **OPERATIONAL COMPLIANCE** |
| 190. "CDP will develop a system that allows officers to confidentially and anonymously report potential misconduct by other officers." | **OPERATIONAL COMPLIANCE** |
| 191. "CDP will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." | **OPERATIONAL COMPLIANCE** |
| 192. "Officers who retaliate . . . will be subject to the disciplinary process." | **PARTIAL COMPLIANCE** |

## 2.  Investigation of Civilian Complaints & Police Review Board

### a.  Monitoring Team's Work during Report Period

The Monitoring Team has an assigned liaison to the OPS and the Civilian Police Review Board (CPRB) to help drive work towards compliance and effective governance. The Monitoring Team Liaison held almost monthly phone meetings with the prior OPS Administrator and subsequent Interim Administrator throughout this reporting period, and in-person meetings whenever in Cleveland. In addition, the former and current chairs of the CPRB have met with Monitoring Team members in person 2-3 times during this reporting period. In the fall, two members of the Monitoring Team attended a full CPRB meeting, to observe the hearing process. The Monitoring Team members watched for compliance with applicable paragraphs of the Consent Decree as well as adherence to the two manuals and provided feedback for accelerating the hearing process due to the backlog. Attending the CPRB meeting in person was highly instructive and will hopefully be incorporated into every semiannual reporting period.

### b.  Status of Policies and Training

OPS has adopted, with multiple updates and modifications, a working OPS Manual that provides detailed instructive materials for every aspect of OPS operations and conduct. Similarly, the CPRB has also adopted, with multiple updates and modifications, a working CPRB Manual that provides detailed instructional materials for every aspect of CPRB operations and conduct. Additionally, the OPS Interim Administrator provided all CPRB Board Members with a procedural notebook providing guidance on the various procedures of the Board. In reviewing minutes of the CPRB meetings, it was not uncommon for a brief training presentation to be included on the agenda for the CPRB, indicating that ongoing training for Board members was being provided.

### c.  Compliance Reviews and Findings

An overall assessment is scheduled for the second reporting period in 2026, with the methodology slated to be developed in the first reporting period of 2026. A working group comprised of Monitoring Team members, the City's Police Accountability Team, internal employees of the OPS and CPRB members will soon be formed and begin working on developing a methodology for the subsequent OPS and CPRB assessment later in 2026.

### d.  Anticipated Work and Challenges for Next Reporting Period

The Monitoring Team will continue to review CPRB meetings as well as maintain contact with the Administrator of OPS and the chair of the CPRB. Monitoring Team members will continue to participate in the monthly OPS briefings as well. Development of the OPS/CPRB Assessment will require input from several Monitoring Team members.

| Investigation of Civilian Complaints and Police Review Board Paragraphs | Status of Compliance |
|---|---|
| 193. OPS investigates "all complaints of misconduct it receives" and will confer with IA "to develop policies and procedures for handling matters over which they both have investigative jurisdiction." | **OPERATIONAL COMPLIANCE** |
| 194. "The City will ensure that OPS is led by an administrator with the skills, expertise, and experience to effectively manage the intake, tracking, timely, and objective investigation of complaints"; implement PRB training; "assess OPS's equipment and staffing needs"; and "develop and implement performance standards for OPS." | **PARTIAL COMPLIANCE** |
| 195–96. Initial training for OPS investigators "adequate in quality, quantity, scope, and type," including specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 197. "OPS Investigators will not be current members of the CDP, and no CDP personnel will have any active role in OPS's operations." | **GENERAL COMPLIANCE** |
| 198. "The City will ensure that the lawyer representing OPS does not have any actual or apparent conflicts of interest." | **OPERATIONAL COMPLIANCE** |
| 199. "OPS will have its own budget, separate from . . . the Department of Public Safety" that "affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement." | **PARTIAL COMPLIANCE** |
| 200. Development and implementation of OPS operations manual "made available to the public" that covers specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 201. Development and implementation of "a program to promote awareness through the Cleveland community about the process for filing complaints with OPS." | **OPERATIONAL COMPLIANCE** |
| 202. "CDP and the City will work with the police unions . . . to allow civilian complaints to be submitted to OPS verbally or in writing; in person, by phone, or on line; by a complainant, someone acting on his or her behalf, or anonymously; and with or without a signature from the complainant," with all "complaints documented in writing." | **GENERAL COMPLIANCE** |
| 203. CDP will post and maintain by the intake window at CDP headquarters and all District headquarters a permanent placard describing the civilian complaint process" and containing specific, expressly-listed information. | **GENERAL COMPLIANCE** |
| 204. "CDP will provide training that is adequate in quality, quantity, scope, and type to all police personnel, including dispatchers, to properly handle complaint intake, including" with respect to specific, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 205. CDP officers "carry complaint forms in their CDP vehicles," which officers must provide "upon request." Supervisors will be dispatched to scene when an individual wants to make a complaint, with the supervisor providing | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| a copy of completed complaint form "or a blank form to be completed later by the individual." | |
| 206. "The City and OPS will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including a number of specific, expressly-listed locations. | **GENERAL COMPLIANCE** |
| 207. "OPS's complaint form will not contain any language that could reasonably be construed as discouraging the filing of a complaint, including warnings about the potential criminal consequences for filing false complaints." | **GENERAL COMPLIANCE** |
| 208. Availability of complaint forms in English and Spanish. "OPS will make every effort to ensure that complainants who speak other languages . . . can file complaints in their preferred language." | **OPERATIONAL COMPLIANCE** |
| 209. "City will ensure that civilian complaints submitted through other existing systems, including the Mayor's Action Center and the Department Action Center, are immediately forwarded to OPS for investigation." | **OPERATIONAL COMPLIANCE** |
| 210. "OPS will establish a centralized electronic numbering and tracking system for all complaints," which "will maintain accurate and reliable data regarding the number, nature, and status of all complaints . . . including investigation timeliness and notification of the interim status and final disposition of the complaint." It "will be used to monitor and maintain appropriate caseloads for OPS investigators." | **GENERAL COMPLIANCE** |
| 211. Biased policing tracked as a separate category of complaint that "are captured and tracked appropriately, even if the complainant does not so label the allegation." | **OPERATIONAL COMPLIANCE** |
| 212. "[A]llegations of unlawful investigatory stops, searches, or arrests" tracked as a separate category of complaints. | **OPERATIONAL COMPLIANCE** |
| 213. "[A]llegations of excessive use of force" tracked as separate category of complaints. | **OPERATIONAL COMPLIANCE** |
| 214. "OPS will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends." | **OPERATIONAL COMPLIANCE** |
| 215. "OPS will produce, at least annually, a public report summarizing complaint trends, including" with respect several specific, expressly-identified areas. | **PARTIAL COMPLIANCE** |
| 216. Assignment of complaints to Standard and Complex investigatory tracks. | **OPERATIONAL COMPLIANCE** |
| 217. Dismissal and/or administrative dismissal of complaint investigations. | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 218. "The City will ensure that investigations of complaints are as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of the evidence." | **OPERATIONAL CCOMPLIANCE** |
| 219. "CDP will ensure that OPS has timely access to all reports related to the incident . . ," and authority of OPS "to conduct additional investigation" of any complaint of police misconduct when CDP investigation has already taken place relating to the incident. | **OPERATIONAL COMPLIANCE** |
| 220. "OPS investigators will attempt to interview each complainant in person" and record the interview. | **OPERATIONAL COMPLIANCE** |
| 221. "The Chief will order officers who witnessed or participate in an incident that is the subject of an OPS complaint to cooperate with the OPS investigation," including by responding to written questions or sitting for an in-person interview. | **GENERAL COMPLIANCE** |
| 222. "OPS investigators will have access to any relevant disciplinary information in the record of an officer who is the subject of a current investigation." | **OPERATIONAL COMPLIANCE** |
| 223. "OPS will consider all relevant evidence," with no preferences for particular witness's statements, including of officer over a non-officer, or because of connection to complainant or criminal history. "OPS will make all reasonable efforts to resolve material inconsistencies between witness statements." | **OPERATIONAL COMPLIANCE** |
| 224. OPS findings categories. | **OPERATIONAL COMPLIANCE** |
| 225. "OPS will document in writing the investigation of each complaint, including all investigatory steps taken, and OPS's findings and conclusions," which must "be supported by a preponderance of the evidence. | **GENERAL COMPLIANCE** |
| 226. "In addition to determining whether an officer committed the conduct alleged in the complaint and whether it violated policy, OPS may consider whether: (a) the police action was in compliance with training and legal standards; (b) the incident indicates a need for additional training, counseling, or other corrective measures; and (c) the incident suggests that CDP should revise its policies, strategies, tactics, or training. OPS may include recommendations on these topics in its investigation." | **PARTIAL COMPLIANCE** |
| 227. "OPS will forward all investigations and its written conclusions to PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation." | **PARTIAL COMPLIANCE** |
| 228. "OPS will send periodic written updates" to the complainant at specific, expressly- identified junctures. | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 229. "[A] complainant may contact OPS at any time to determine the status of his/her complaint." | **OPERATIONAL COMPLIANCE** |
| 230. "Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot" addressing PRB composition and appointment process. | **GENERAL COMPLIANCE** |
| 231. "PRB members will not be current or former members of the CDP." | **GENERAL COMPLIANCE** |
| 232. "PRB will have its own budget," overseen by OPS Administrator and separate from Department of Public Safety, that "affords sufficient independence and resources." | **PARTIAL COMPLIANCE** |
| 233–34. Initial training for PRB members "that is adequate in quality, quantity, scope, and type" and that covers specific, expressly-identified topics. | **PARTIAL COMPLIANCE** |
| 235. PRB meetings open to the public and posted in advance, with "case presentations and PRB votes" occurring during "open session." | **GENERAL COMPLIANCE** |
| 236. "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings . . . . " PRB may "ask the investigator to conduct further investigation" as necessary. | **GENERAL COMPLIANCE** |
| 237. "PRB recommended dispositions will be based on a preponderance of the evidence. For each case, PRB shall set forth its conclusion and an explanation of its reasons and supporting evidence in writing, including, when applicable, the justification for departing from OPS's recommended disposition." | **OPERATIONAL COMPLIANCE** |
| 238. "In cases where PRB is recommending a sustained disposition, in whole or in part, PRB will include a recommendation as to disciplinary or non-disciplinary corrective action." | **OPERATIONAL COMPLIANCE** |
| 239. [Timely] forwarding of PRB recommendations to Chief of Police and Director of Public Safety. | **OPERATIONAL COMPLIANCE** |

## 3. Discipline and Disciplinary Hearings

### a. Monitoring Team's Work during Report Period

During the reporting period, the Monitoring Team reviewed discipline disposition letters. Recommendations to initiate the disciplinary process can come from IA or the CPRB. Disposition letters are issued upon the conclusion of administrative pre-disciplinary hearings, which can be held by the CDP or the DPS. The letters list the allegations of misconduct and the decisions and imposition of discipline by the Chief of Police and the Chief Director of the DPS. In addition to allegations of misconduct, the Team also reviewed letters documenting the results of Sick Reviews

and investigations into minor vehicle accidents involving CDP members. Where conduct allegations were egregious, potentially illegal, or resulted in significant discipline, the Monitoring Team thoroughly reviewed internal and criminal investigations to evaluate timelines, consistency, due process issues, and decision-making.

While the Team noted that the City was largely compliant with its policies and the administrative requirements of the Consent Decree, there appear to be some patterns around disciplinary decisions that raise questions, including some variability in decision-making between the CDP and DPS. These observations do not constitute formal findings, and will be evaluated through a formal assessment to ensure compliance with paragraph 176 and the other paragraphs in the discipline subsection of the Consent Decree.

The discipline reviews have provided the Team an in-depth perspective of the discipline process, which will used to inform upcoming comprehensive assessments of Discipline Hearings (paragraphs 240-244), Discipline (paragraphs 245-249), and other Accountability sections, currently scheduled for mid-2026.

### b.  Status of Policy and Training

This section of the Consent Decree has three paragraphs that require policies. Those policies are complete. The upcoming assessment will review them in detail as well as assess the City's adherence to them in practice.

There are no required trainings in this section.

### c.  Compliance Reviews and Findings

No formal assessment has been completed during this reporting period. Nevertheless, as detailed above, the Monitoring Team did continue to conduct regular reviews of discipline letters to maintain a general understanding of the status of discipline in anticipation of the Monitoring Team's upcoming formal compliance assessment.

### d.  Anticipated Work and Challenges for Next Reporting Period

In the next reporting period, the Monitoring Team will work with the City to develop a methodology for a comprehensive assessment of discipline hearings (paragraphs 240-244) and discipline (paragraphs 245-249). The assessment will be executed in the second half of the year with an estimated final report date in October 2026.

| Discipline and Disciplinary Hearings Paragraphs | Status of Compliance |
|---|---|
| 240. "The Chief of CDP will issue a General Police Order that requires officers to (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB." | GENERAL COMPLIANCE |
| 241. Disciplinary hearing requirement, with officer given "opportunity to testify" and suspension of hearing if "officer provides new or additional evidence at hearing," with matter "returned to IA or PRB for consideration." | PARTIAL COMPLIANCE |
| 242. Disciplinary recommendations by PRB to proceed through the City's disciplinary process. Written justification by Chief or Director of their disagreement with PRB's recommendations. | OPERATIONAL COMPLIANCE |
| 243. "CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition." | OPERATIONAL COMPLIANCE |
| 244. "At least annually, the Monitor will review this data and assess whether PRB is achieving its mission." | NOT ASSESSED |
| 245. "The City will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented." | PARTIAL COMPLIANCE |
| 246. "[T]he City will review its current matrix and will seek to amend it" "to ensure consistency" and inclusion of a number of specific, expressly-identified features. | OPERATIONAL COMPLIANCE |
| 247. "All disciplinary decisions will be documented in writing." | GENERAL COMPLIANCE |
| 248. "[T]he City will provide its disciplinary matrix to the PRB, Commission, the Public Safety Inspector General, and the police unions for comment." | OPERATIONAL COMPLIANCE |
| 249. "CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years." | PARTIAL COMPLIANCE |

## XI.    TRANSPARENCY & OVERSIGHT

### 1.  Public Safety Inspector General

#### a.  Monitoring Team's Work during Report Period

Members of the Monitoring Team met with the members of the IG office several times during the reporting period. In addition, the Monitoring Team participated in an HR Audit leadership check-in led by the IG regarding an audit requested by the Office of the Mayor. Description of that meeting is discussed in subsection "c" below.

Also, the Monitoring Team observed that the IG conducted a process for and hired a Deputy IG to lead investigations conducted by the office during this reporting period. The Monitoring Team is aware that the IG has requested further funding to hire an office administrator.

#### b.  Status of Policy and Training

To date, no communication, policy, or procedure has been developed to govern how the Mayor or Chief of Police will communicate requests to the IG for investigations, analyses, audits, etc. Policies and procedures must be developed to ensure compliance with the requirements of the paragraph. Additional work by the City – DPS, HR, and the Mayor's Office – is necessary for the IG to become ensconced as a viable oversight entity in the City.

#### c.  Compliance Reviews and Findings

No compliance assessment was conducted during this reporting period. The Monitoring Team intends to conduct a formal compliance assessment in 2026. Yet, the Monitoring Team did make some observations that bear on its evaluation of the current status of two Consent Decree paragraphs.

The Monitoring Team has downgraded Paragraph 253 to Partial Compliance for the following reasons. On July 30, 2025, Monitoring Team members attended an HR Audit leadership check-in led by the IG regarding an audit requested by the Office of the Mayor. The meeting was intended to advise leadership from HR, CDP, Public Safety, and City Law on the IG's preliminary findings and likely recommendations. Representatives from the PAT and the CPC co-chairs were also in attendance. During the presentation, the Chief Director of Public Safety abruptly interrupted the IG and took her into an offline discussion. After approximately 20 minutes, they returned and the IG informed the group that the meeting was ending, with a potential resumption at a later date. No follow-up on the report or the meeting occurred during the remainder of the reporting period. The Monitoring Team was highly concerned by this interaction. The information being presented fell directly within the IG's authority as delineated in Paragraph 253. The manner in which the Chief Director of Public Safety, to whom the IG reports, interrupted the briefing calls into question

whether City leadership is respecting the independence of the IG. Furthermore, this incident underscores the need for the City to formally memorialize the authority of the IG beyond the Consent Decree and existing job descriptions to ensure its independence.

In addition, because no policy has been developed governing the IG's procedures, as indicated above, the Monitoring Team is downgrading Paragraph 254 to Partial Compliance because of the apparent lack of independence. Again, policies and procedures must be developed to ensure compliance with the requirements of this paragraph.

### d.  Anticipated Work and Challenges for Next Reporting Period

In the coming reporting period, the Monitoring Team will work with the IG, PAT and DOJ to develop a methodology for the forthcoming compliance assessment.

| Police Inspector General Paragraphs | Status of Compliance |
|---|---|
| 250. "The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a Public Safety Inspector General" ("IG"). City must seek CPC's "input in developing minimum qualifications and experience" for IG. | GENERAL COMPLIANCE |
| 251. IG work in Office of Mayor but report to Chief Director of Public Safety. | OPERATIONAL COMPLIANCE |
| 252. IG "will not be a current or former employee of CDP." | GENERAL COMPLIANCE |
| 253. Duties and authority of IG. | PARTIAL COMPLIANCE |
| 254. Duties and authority of IG to "conduct investigations, analyze trends, and make reports and recommendations, as appropriate, at the request of the Chief of CDP or the May | PARTIAL COMPLIANCE |
| 255. Budget of IG must be "a separate line item" in City budget and "afford[] sufficient independence and resources" to comply with Consent Decree. | PARTIAL COMPLIANCE |
| 256. IG "will have access to all documents and data necessary to perform the above functions, including any raw data." | PARTIAL COMPLIANCE |

## 2.  Data Collection and Analysis

### a.  Monitoring Team's Work during Reporting Period

During this reporting period, the Monitoring Team provided an outline of the paragraph-by-paragraph Consent Decree requirements for this section to the City to identify what materials

would be considered evidence of compliance. The City submitted materials that it considered responsive. The Monitoring Team reviewed the materials, which included online materials, internal and external facing dashboards, and internal and external facing reports. The Monitoring Team also held meetings with the Office of Information Technology (OIT) and the CDP data team to discuss technology, data collection, data integrity, and planning for reporting in 2026.

### b. Status of Policy and Training

The City has reached operational compliance with respect to employing a Data Analysis and Collection Coordinator (DACC) with responsibility to oversee and produce reports defined within paragraphs 257-268. There is a CDP GPO from October 2025 directing the DACC to engage in regular data integrity reviews and to improve the quality and collection of data for the Division. There are no specific training requirements for this section.

### c. Compliance Reviews and Findings

The activities under subsection 'a' above describe the review that the Monitoring Team conducted for this semiannual report to determine the current status of compliance with this section's paragraphs.

In 2026, the Monitoring Team plans to conduct a formal assessment of paragraphs 257-268.

### d. Anticipated Work and Challenges for Next Reporting Period

During the next period, the Monitoring Team will continue to meet with City OIT, the CDP data team and PAT on a monthly basis to discuss and review changes to and challenges with data collection and analysis.

The Monitoring Team, the CDP data team, and PAT will form an additional working group to provide technical assistance to improve CDP's data analysis and reporting regarding stops and force reviews. This working group will focus on creating code and dashboards that will lead the City to operational compliance of paragraphs 264 and 265. The group will also work with the Force Review Board (FRB) to improve analysis for an annual report in line with paragraph 266. While current analysis from the FRB is captured in annual reports such as the Training Needs Assessment, which is a strong development, the Monitoring Team will work with the City to develop protocols for more comprehensive analysis and reporting for the FRB.

An ongoing challenge for the City is to improve the usability of the CDP's website. Policies are not easily located on the website, the most recent policies are not available in some instances, and others are not found at all. The Monitoring Team also recommends linking directly to the Public Safety page for the Cleveland Open Data Portal and highlighting this connection more prominently.

The Monitoring Team will prepare an assessment methodology and share it with the Parties for its 2026 compliance assessment of this area of the Consent Decree.

| Data Collection and Analysis Paragraphs | Status of Compliance |
|---|---|
| 257. "CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad access to information related to CDP's decision making and activities. To achieve this outcome, CDP will designate an individual or individuals as the 'Data Collection and Analysis Coordinator.'" | **GENERAL COMPLIANCE** |
| 258. Coordinator "will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials," including specific, expressly-listed materials and information. | **GENERAL COMPLIANCE** |
| 259. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents," including specific, expressly-identified data. | **GENERAL COMPLIANCE** |
| 260. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation." The system must conform to a number of specific, expressly-identified requirements. | **OPERATIONAL COMPLIANCE** |
| 261. Coordinator must "routine[ly] report[] . . . relevant data to the Chief of Police, FRB, Training Review Committee, OPS, the [Community Police] Commission, and the Public Safety Inspector General." | **OPERATIONAL COMPLIANCE** |
| 262. Coordinator "responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection." | **OPERATIONAL COMPLIANCE** |
| 263. Coordinator "will develop a protocol to accurately analyze the data collected and allow for" various outcome measurements, "subject to the review and approval of the Monitor and DOJ." | **OPERATIONAL COMPLIANCE** |
| 264. Annually, "CDP will conduct an assessment and issue a report summarizing its investigatory stop, search, and arrest data" that addresses various specific, expressly-identified topics. | **PARTIAL COMPLIANCE** |
| 265. Annually, "CDP will conduct an assessment and issue a report of all activities, including use of force, arrests, motor vehicles and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race" or other listed prohibited classes or characteristics, and that addresses various specific, expressly-identified topics. | **NON-COMPLIANCE** |

57

| | |
|---|---|
| 266. Annual analysis of "prior year's force" data with FRB. | **PARTIAL COMPLIANCE** |
| 267. "[A]ll CDP audits, reports, and outcome analyses related to the implementation" of the Consent Decree will be public. | **PARTIAL COMPLIANCE** |
| 268. "CDP will post its policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports on its website." | **OPERATIONAL COMPLIANCE** |

## XII.    OFFICER ASSISTANCE & SUPPORT

### 1.  Training

#### a.  Monitoring Team's Work during Report Period

The Monitoring Team focused on completing a comprehensive assessment of all training paragraphs during this period. This included a detailed review and analysis of quantitative and qualitative data provided by CDP, several site visits by the Monitoring Team to observe training courses, and review of the Learning Management System (LMS). The Monitoring Team confirmed that CDP is in General Compliance or in Substantial and Effective Compliance with 17 of the 20 assessed training paragraphs. The Monitoring Team made these determinations by reviewing the policies and procedures, scope and substance of training curricula, leadership, and accountability measures required by the training paragraphs. With only one paragraph not being upgraded, the forthcoming focus will be on updating both the policy and manual for the Field Training Program and the other four paragraphs that remain in less than General Compliance.

#### b.  Status of Policy and Training

All policies required by the training paragraphs have been completed. However, the assessment found that the policy related to the Field Training Program was last updated on January 4, 2014, and needs to be reviewed and updated to be consistent with paragraph 347 as well as the current CDP practices. Additionally, paragraph 283, which requires the Field Training Program to "incorporate community and problem-oriented policing principles, and problem-based learning methods," is the only paragraph not upgraded during the assessment. The CDP's Training Needs Assessment acknowledges the need for changes to the curriculum including the integration of CDP's Community and Problem-Oriented Policing strategy.

### c.  Compliance Reviews and Findings

As previously mentioned, this reporting period focused on the Monitoring Team's Training Compliance Assessment. The full assessment includes the methodology used both to review the evidence and the methods for assessing compliance. The assessment not only focused on the achievements of CDP but also highlighted further action to advance the compliance level. As a result, the CDP needs to update the Field Training policy and manual to reflect contemporary practices with a specific focus on the requirement to include community and problem-oriented policing principles into the program. Additionally, as it pertains to paragraph 275, the Chief needs to ensure that the Training Commander, in accordance with best practice, reviews all specialized training such as SWAT, Canine, Bomb Squad, and Marine Patrol to confirm alignment with overarching CDP policy and values, and consistency with other Division-wide training.

### d.  Anticipated Work and Challenges for Next Reporting Period

In the coming period, the Monitoring Team will work with one or more groups from CDP and the City to ensure that the paragraphs from the training portion of the Consent Decree needing additional work are brought into a higher level of compliance. Specifically, paragraphs related to the Field Training Program and oversight of all CDP training, to include specialized units.

| Training Paragraphs | Status of Compliance |
|---|---|
| 269. "The City will ensure that officers receive adequate training to understand: (a) how to police effectively and safely in accordance with CDP policy; [and] (b) the requirements of this Agreement, Ohio law, and the Constitution and laws of the United States," including in the areas of "procedural justice, bias-free policing, and community policing." | NOT ASSESSED |
| 270.  "CDP will expand the scope and membership of the Training Review Committee." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 271–72. "[T]he Training Review Committee will develop a written training plan for CDP's recruit academy, probationary field training, and in-service training" that addresses a host of specific, expressly-identified issues. | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 273. "The Training Plan and schedule will be implemented once any objections have been resolved" on a yearly basis. | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |

| | |
|---|---|
| 274. "The City, including the Training Review Committee, will annually review and update CDP's training plan" by "conduct[ing] a needs assessment" that addresses a number of specific, expressly-identified data and information on real-world trends, needs, policy, and law. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 275. "CDP's Commander responsible for training" will be in charge of "all CDP training." | **GENERAL COMPLIANCE** |
| 276. "CDP will designate a single training coordinator in each District. The Commander responsible for training will establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the" training Commander. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 277. "CDP will develop recruit academy and in-service curricula that comport with" the Training Plan and Consent Decree requirements. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 278. "Unless otherwise noted, the training required under this agreement… will be delivered within two years of the Effective Date." | **NOT ASSESSED** |
| 279. "For all other substantive updates or revisions to policy or procedure, the City will ensure and document that all relevant CDP personnel have received and read the policy or procedure. Notification of each revision or update will include the rationale for policy changes and the difference between the old and updated policy." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 280. Training Commander reviews all training materials; ensures that they use "a variety of adult learning techniques, scenario-based training, and problem-solving practices"; and "ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Review Committee." | **GENERAL COMPLIANCE** |
| 281. "CDP will ensure that instructors are qualified and use only curricula and lesson plans that have been approved by the" Training Commander. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 282. "CDP will revise, as necessary, its field training program for graduates of the police academy to comport with" the Training Plan and Consent Decree. | **OPERATIONAL COMPLIANCE** |
| 283. "The field training program will incorporate community and problem-oriented policing principles, and problem-based learning methods." | **PARTIAL COMPLIANCE** |
| 284. Review and revision of Field Training Officer ("FTO") "participation policy to establish and implement a program that effectively attracts the best FTO candidates" and "revise eligibility criteria" for FTOs. | **GENERAL COMPLIANCE** |

| | |
|---|---|
| 285. New FTOs and Field Training Sergeants must "receive initial and in-service training that is adequate in quality, quantity, scope, and type, and that addresses" a number of specific, expressly-listed topics and conforms to a number of additional features or requirements. | **GENERAL COMPLIANCE** |
| 286. "CDP will create a mechanism for recruits to provide confidential feedback regarding the quality of their field training," and the Division "will document its response, including the rationale behind any responsive action taken or decision to take no action." | **GENERAL COMPLIANCE** |
| 287. "The City and the Training Review Committee will, on an annual basis, analyze all aspects of CDP's FTO program," "consider emerging national policing practices in this area," and "recommend, and CDP will institute, appropriate changes to policies, procedures, and training related to its FTO program." | **OPERATIONAL COMPLIANCE** |
| 288. "CDP will document all training provided to or received by CDP officers," with officers "sign[ing] an acknowledgement of attendance or digitally acknowledg[ing] completion of each training course," which "will be maintained in a format that allows for analysis by training type, training date, training source, and by individual officer name." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 289. "CDP will develop and implement a system that will allow the Training Section to electronically track, maintain, and produce complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 290. "The City will develop and implement accountability measures . . . to ensure that all officers successfully complete all required training programs in a timely manner." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

## 2. Equipment & Resources

### a. Monitoring Team's Work during Reporting Period

During the reporting period, the Monitoring Team worked with CDP and PAT to develop a methodology and completed the first comprehensive assessment of the Equipment and Resources section. Prior to the assessment, all paragraphs in this section were at some level of compliance. Establishing the methodology, data, information, observations, and site visit activities necessary to complete the assessment, was a collaborative process between the City and the Monitoring Team. Planning with CDP members, PAT, and a representative from the Department of Law prior to assessment activities to discuss data and information requests, building and vehicle access, personnel to be interviewed, and on-site activities, facilitated clarity and efficiency throughout the

execution of the assessment itself. As indicated above, the assessment resulted in six upgrades out of nine paragraphs.

### b. Status of Policy and Training

This section requires an updated Employee Assistance Unit (EAU) policy. While CDP has an active EAU policy currently, it was last revised in 2010, prior to the implementation work under the Consent Decree. As noted in the Monitoring Team's assessment, CDP will need to update this policy to ensure that it reflects current and modern practices.

In addition, as stated in the Monitoring Team's assessment of this topic, it is important for CDP to train supervisors on how to recognize wellness indicators, conduct employee interventions, and understand the referral processes and resources available. Well-trained and engaged supervisors are an essential component to effective employee assistance and wellness programs.

### c. Compliance Reviews and Findings

The Monitoring Team completed a comprehensive assessment of the Equipment and Resources section in September and October 2025. The assessment describes the methodology for the assessment and found the CDP to be in Operational Compliance, General Compliance, or Substantial and Effective Compliance in eight of nine paragraphs, including having completed and implemented an Equipment and Resources Plan, an adequate number of computers, operable and properly equipped zone cars, a functional Records Management System, qualified analysts and Information Technology personnel, and an effective Employee Assistance Program. Areas requiring additional work to achieve higher levels of compliance include the implementation of processes to actively solicit input from CDP members and the CPC on equipment and technology needs, enhancements to preventive fleet maintenance, and modernization of the EAU policy.

Based on the specific findings of the assessment, effectively implementing the Monitoring Team's recommendations regarding paragraphs 293, 294, 296, and 299, as outlined in the assessment, can advance provisions from Partial or Operational Compliance to General or Substantial and Effective Compliance.

### d. Anticipated Work and Challenges for Next Reporting Period

During the next reporting period, the Monitoring Team will focus on working with the City to support its efforts in achieving higher levels of compliance by establishing a working group to collaborate on equipment, technology, and resources, and a separate group with key stakeholders to the EAU. The Team believes that continued discussions and focused attention on formalized processes, EAU policy updates, and supervisor training will support sustained performance and higher levels of compliance in a future assessment. In addition to addressing compliance issues, the Monitoring Team and the working groups will discuss a methodology and the data and

information required to complete another Equipment and Resources assessment during the first half of 2027.

| Equipment and Resources Paragraphs | Status of Compliance |
|---|---|
| 291. "The City will implement" paragraphs regarding equipment and resources in order to allow implementation of the Consent Decree "and to allow officers to perform their jobs safely, effectively, and efficiently." | OPERATIONAL COMPLIANCE |
| 292. "CDP will complete a comprehensive equipment and resource study to assess its current needs and priorities," and it "will develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 293. "CDP's Equipment and Resource Plan will provide for necessary equipment including, at least" "an adequate number of computers"; "an adequate number of operable and safe zone cars"; "zone cards with reliable, functioning computers that provide officers with up-to-date technology" including computer-aided dispatch, the records management system, and various core law enforcement systems; and "zone cards equipped with first-aid kits." "This plan also will ensure that CDP properly maintains and seeks to continuously improve upon existing equipment and technology; and is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." | OPERATIONAL COMPLIANCE |
| 294. "CDP will actively seek input and feedback from the Commission, patrol officers, and supervisors regarding resource allocation, equipment needs, and technological improvements." | PARTIAL COMPLIANCE |
| 295. "City and CDP" must "us[e] best efforts to implement the Equipment and Resource Plan as required." | GENERAL COMPLIANCE |
| 296. "CDP will . . . implement an effective, centralized records management system." | OPERATIONAL COMPLIANCE |
| 297. "CDP will utilize a department-wide e-mail system to improve communication and information sharing." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 298. "CDP will employ information technology professionals who are trained to conduct crime and intelligence analysis, who are capable of troubleshooting and maintaining information technology systems and who can identify and suggest appropriate technological advancements." | GENERAL COMPLIANCE |
| 299. "CDP will implement an effective employee assistance program that provides officers ready access to the mental health and support resources necessary to facilitate effective and constitutional policing." | OPERATIONAL COMPLIANCE |

### 3.  Recruitment & Hiring

####  a.  Monitoring Team's Work during Reporting Period

The Monitoring Team conducted its assessment of the Consent Decree's Recruitment and Hiring paragraphs during this reporting period. It first developed the methodology for this formal assessment with input from CDP and PAT. The methodology described the specific data, files, reports and information required to complete the review. All requested information was provided by CDP and PAT. The assessment of paragraphs 300-307 included reviews of the Recruitment Plan, Annual Recruitment Reports, job announcements, policies, and procedures to determine compliance with the criteria listed in each paragraph. An updated assessment of background investigation files pursuant to paragraphs 308-311 was conducted on-site at the CDP Training Academy on September 22-23, 2025. The outcome measures listed in paragraph 367(e) were assessed using multi-year outcome measures data provided to the Monitoring Team by the PAT. As a result of this assessment, the Monitoring Team found that CDP has made substantial improvements in all areas of Recruitment and Hiring required by the Consent Decree.

####  b.  Status of Policy and Training

The policies reviewed as part of the formal assessment included the City of Cleveland policies on Medical Standards and Drug and Alcohol Testing, CDP Statement of Hiring Standards, and Civil Service policies applicable to the CDP hiring process. All of these policies are well established and govern the hiring and requirements of police applicants. There are no training requirements for this section.

####  c.  Compliance Reviews and Findings

As previously noted, a comprehensive formal assessment of all paragraphs pertaining to Recruitment and Hiring was conducted during the reporting period. The full assessment includes the methodology used both to review the evidence and the methods for assessing compliance. The Monitoring Team concluded that the CDP has met or exceeded all requirements for Recruitment and Hiring established in the Consent Decree. The assessment report was filed with the Court on December 11, 2025. Of the twelve paragraphs that received compliance ratings, six of the paragraphs were rated as in Substantial and Effective Compliance, four paragraphs were rated as in General Compliance and two rated as in Operational Compliance.

Since the completion of the assessment report, CDP made two improvements to the summary template that were recommended in the assessment findings for paragraphs 309 and 310. As such, the Monitoring Team is elevating the rating for paragraph 310 to General Compliance.

### d. Anticipated Work and Challenges for Next Reporting Period

For CDP to achieve Substantial and Effective Compliance in all of the paragraphs currently rated in General and Operational Compliance, several actions are required. First, the CDP must produce an updated Recruitment Plan. The plan that was filed with the Court in 2019 was intended to be a five-year plan for the Department of Public Safety and is overdue for review and revision to reflect current recruitment and hiring practices, including the realignment of the recruitment section under CDP. Failure to complete an updated Recruitment Plan could result in a reduction of the current rating of General Compliance for Paragraph 302.

In addition, although compliance with paragraph 311 is considerably improved compared to the Monitoring Team's 2022 assessment, CDP still needs to ensure that the hiring of lateral law enforcement officers includes and documents the request for a candidate's history of using lethal and less lethal force, use of force training records, and complaint history. The Monitoring Team will work with CDP in the coming review period to support them in achieving these goals.

| Recruitment and Hiring Paragraphs | Status of Compliance |
|---|---|
| 300. "The City will review and revise . . . its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 301. "The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 302. "CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community" and meets certain specific, expressly-listed requirements. | GENERAL COMPLIANCE |
| 303. "The City will implement the recruitment plan within 60 days of it being approved by the Monitor." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 304. "CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants," including officers with various, specific, expressly-listed skills and backgrounds. | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 305. "In developing and implementing its recruitment plan, CDP will consult with the [Community Police] Commission and other community stakeholders on strategies to attract a diverse pool of applicants." | SUBSTANTIAL AND EFFECTIVE |

| | COMPLIANCE |
|---|---|
| 306. "[O]bjective system for hiring and selecting recruits" that "employs reliable and valid selection criteria." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 307. "CDP will report annually to the public its recruiting activities and outcomes," which will include information on various, expressly-listed areas. | GENERAL COMPLIANCE |
| 308. "[A]ll candidates for sworn personnel positions" will have "psychological and medical examination" and be subject to "drug testing." Existing officers receive "random drug testing." | GENERAL COMPLIANCE |
| 309. "CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions" that cover various, expressly-listed topics. | GENERAL COMPLIANCE |
| 310. "CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's supervisor(s)" and maintain any "salient information . . . in candidate's file." | GENERAL COMPLIANCE |
| 311. "If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation" addressing various expressly-identified things. | OPERATIONAL COMPLIANCE |

## 4.  Performance Evaluations and Promotions

### a.  Monitoring Team's Work during Reporting Period

In August, the City facilitated a demonstration of a new Performance Evaluation Module being completed by the vendor Benchmark Analytics to members of the Monitoring Team and DOJ. In a December meeting, the City reported that the new Performance Evaluation process will begin in early 2026. It is important for the City to ensure that all needed policies and training for the new performance evaluation process are completed and approved prior to this implementation. In a separate December 2025 meeting, Monitoring Team members met with the City to discuss the promotion processes. The City reports that it has updated its process and is working with a vendor to implement it. While the request for proposals for the promotions process vendor contained Consent Decree requirements, the City reported to the Monitoring Team that none of the vendor submissions explicitly addressed the Consent Decree requirements. Nonetheless, the City reported that Civil Service selected and hired a vendor.

### b.  Status of Policy and Training

The Monitoring Team learned in December that the City's new Administrative Division Procedure – Public Safety Promotional Selection Process – was implemented without input from the CPC, as required by the City Charter and per the authority granted by paragraph 18 of the Consent Decree, and without addressing feedback or input from the Monitoring Team that was provided during an earlier review. The City reports that the new policy will be applied to promotion processes in 2026, even though the City did not address the concerns the Monitoring Team noted in its review. The City bears the burden of demonstrating to the Monitoring Team that its policies and training are in compliance with the Consent Decree.

### c.  Compliance Reviews and Findings

An assessment is scheduled for the second half of 2026, which will be significant, as most paragraphs in this subsection are currently rated as Non-Compliant. The Monitoring Team is hopeful that the assessment will demonstrate substantial progress toward compliance for these paragraphs.

### d.  Anticipated Work and Challenges for Next Reporting Period

During the next period, the Monitoring Team will conduct an assessment of Paragraphs 312-318, Officer Assistance and Support – Performance Evaluations and Promotions. The methodology is scheduled to be presented to the parties by May 30, 2026, and the assessment completed by November.

| Performance Evaluations and Promotions Paragraphs | Status of Compliance |
|---|---|
| 312. "CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process" and "are identified and receive appropriate consideration for performance." Likewise, "poor performance" must be "reflected in officer evaluations." | **NON-COMPLIANCE** |
| 313. "The City will develop and implement fair and consistent practices to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis." | **PARTIAL COMPLIANCE** |
| 314. CDP will use "a formalized system documenting the annual performance evaluations of each officer by the officer's direct supervisor." The system will be augmented to include an assessment of several expressly-listed areas. | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 315. "As part of the annual performance evaluation process, supervisors will meet with the employee whose performance is being evaluated to discuss the evaluation." Supervisors will also discuss performance with subordinates on an ongoing basis and document these ongoing communications. | **NON-COMPLIANCE** |
| 316. "CDP will hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates." | **NON-COMPLIANCE** |
| 317. "The City will develop and implement fair and consistent promotion practices that comport with the requirements of this Agreement and result in the promotion of officers who are effective and professional." | **NON-COMPLIANCE** |
| 318. In considering promotion, "appointing authority will consider" specific, expressly- listed "factors." | **NON-COMPLIANCE** |

## 5. Staffing

### a. Monitoring Team's Work during Reporting Period

In October and November of 2025, the Monitoring Team conducted its review of the Staffing Plan (the Plan) that CDP created and the Court approved in 2019, past semiannual reports that discussed the Staffing paragraphs of the Consent Decree and corresponded with the CDP Chief of Police. Although the Plan was approved six years ago, more recent correspondence with the Chief of Police revealed how the Plan was being implemented and what updates to the Plan were made in practice.

### b. Status of Policy and Training

The Staffing Plan is the document that governs CDP's staffing implementation, as opposed to a policy or training. Acquiring and maintaining desired levels of CDP staffing is still a challenge for the City. Although budgeted for 1,350 sworn officers, the current complement of CDP sworn officers is approximately 1,153. The Monitoring Team recognizes that the Staffing aspect of the Consent Decree is naturally linked to other sub-sections of the Decree like Recruitment and Hiring and Community and Problem-Oriented Policing (CPOP). Therefore, the Monitoring Team concludes that the City is implementing best efforts to achieve, and subsequently maintain, desired staffing levels.

### c. Compliance Reviews and Findings

As previously noted, an assessment of all three paragraphs pertaining to Staffing took place during this reporting period. The full assessment includes the methodology used both to review the evidence and the methods for assessing compliance. All paragraphs received upgraded compliance

ratings. Each paragraph was assessed in reference to its requirements, and the actions the City took to achieve compliance were evaluated. The Monitoring Team noted the prior compliance ratings for each paragraph and described the City's work the Monitoring Team reviewed to upgrade the compliance ratings. The Monitoring Team found that, as required by the Consent Decree, the City had completed a comprehensive staffing study and subsequent Staffing Plan; that the Plan contained specific provisions to address, among other things, personnel deployment and certain operations; and last, that the City was using best efforts to implement the Staffing Plan. The Assessment Report was filed with the Court on December 10, 2025. All three paragraphs were upgraded to Substantial and Effective Compliance from Operational and Partial Compliance.

### d.   Anticipated Work and Challenges for Next Reporting Period

Because the City is found to be in Substantial and Effective Compliance with all three paragraphs of the Staffing sub-section of the Consent Decree, the Monitoring Team will no longer actively assess paragraphs 319-321. As noted earlier, the City created its Staffing Plan over six years ago. This Plan established the blueprint for how the City would address acquiring and maintaining desired staffing levels in the CDP. There have been updated practices to the Plan, therefore, the City should consider incorporating these, and any other changes that may be warranted, in an updated Plan.

The Consent Decree requires the City to sustain its compliance for two years. The Monitoring Team remains committed to helping the City do so.

| Staffing Paragraphs | Status of Compliance |
|---|---|
| 319. "CDP will complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform the functions necessary for CDP to fulfill its mission and satisfy the requirements of the" Consent Decree. In addition, "CDP will develop an effective, comprehensive Staffing Plan that is consistent with its mission, including community and problem-oriented policing, and that will allow CDP to meet the requirements of" the Consent Decree. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 320. Requirements of CDP Staffing Plan. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 321. "The City and CDP will employ best efforts to implement the Staffing Plan over the period of time set forth in the approved plan." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

## XIII.  SUPERVISION

### a.  Monitoring Team's Work during Reporting Period

Based on a meeting held between the Monitoring Team, CDP and the City, steady progress is being made toward the creation and implementation of the Officer Intervention Program (OIP), as required by paragraphs 326-336. Forthcoming activities will focus on development of the methodology for a comprehensive assessment of the Supervision section. The Monitoring Team hopes to engage more consistently with the OIP development through more frequent meetings.

### b.  Status of Policy and Training

With the exception of the OIP, policies related to supervisory expectations are in place. Many such policies fall within other areas of the Consent Decree, such as search and seizure, community and problem-oriented policing, or use of force. Training of supervisors is taking place and in the future supervision assessment, the Monitoring Team will ensure that training is provided at the required intervals and that all supervisors, including recently promoted supervisors, are trained as required.

### c.  Compliance Reviews and Findings

No compliance assessment was conducted expressly related to the supervision paragraphs during this reporting period. However, several on-site visits by the Monitoring Team include observations of supervisors' training courses and other Monitoring Team assessments included opportunities for the Team to observe supervisors' actions and documentation habits.

In the Search and Seizure Assessment, the Monitoring Team looked specifically at the review and approval process conducted by supervisors. In that assessment, the Monitoring Team found that the supervisory review and documentation of their review of officer articulation of reasonable suspicion and probable cause should be a focus of training and should undergo ongoing review. Supervisors are conducting the reviews, but they are often cursory and qualitatively insufficient to provoke changes in officer behavior. A future assessment of the supervisory review, with the new Record Management System, may demonstrate that part of the problem with the initial review was the difficulty of the CDP with City IT to retrieve the necessary forms from the data warehouse.

In the Use of Force Assessment, the Monitoring Team found that generally supervisors are engaged on scene and are identifying and addressing most issues noted with force. As previously mentioned, a comprehensive assessment of Supervision is scheduled to begin in 2026 and conclude in mid-2027.

### d.  Anticipated Work and Challenges for Next Reporting Period

During the next reporting period, the Monitoring Team will develop the methodology and data request to be presented to CDP and the City for assessing Paragraphs 322-340.

In addition, the Monitoring Team will create and implement a working group with members of CDP and the City to monitor progress focused on the creation and implementation of the OIP, paragraphs 326-336.

| Supervision Paragraphs | Status of Compliance |
|---|---|
| 322. "CDP will ensure that first line supervisors provide close and effective supervision of officers" in a number of express, specifically-identified ways. | **OPERATIONAL COMPLIANCE** |
| 323. "CDP will develop and implement supervisory training for all new and current supervisors" that is "adequate in quality, quantity, type, and scope, and will include" a number of specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 324. "Thereafter all sworn supervisors will receive adequate in-service management training." | **PARTIAL COMPLIANCE** |
| 325. "CDP will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community." | **PARTIAL COMPLIANCE** |
| 326. CDP "will create a plan to modify its Officer Intervention Program ('OIP') to enhance its effectiveness as a management tool to promote supervisory awareness and proactive identification of potentially problematic behavior among officers. | **PARTIAL COMPLIANCE** |
| 327. "CDP supervisors will regularly use OIP data to evaluate the performance of CDP officers across all ranks, units, and shifts." | **NON-COMPLIANCE** |
| 328. "The OIP will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" in a number of specific, expressly-identified areas. | **NON-COMPLIANCE** |
| 329. "CDP will set threshold levels for each OIP indicator that will trigger a formal review, and the thresholds will allow for peer-group comparisons between officers with similar assignments and duties." | **NON-COMPLIANCE** |
| 330–36. Additional express requirements of OIP. | **NON-COMPLIANCE** |

| | |
|---|---|
| 337. "If CDP chooses to use body worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals." | **GENERAL COMPLIANCE** |
| 338. "Supervisors will review recordings related to any incident involving at least a Level 2 or 3 use of force; injuries to officers; and in conjunction with any other supervisory investigation." | **GENERAL COMPLIANCE** |
| 339. "Supervisors will conduct adequate random and directed audits of body worn camera recordings" and "incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers." | **OPERATIONAL COMPLIANCE** |
| 340. "Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy." | **OPERATIONAL COMPLIANCE** |

## XIV.  POLICIES

The section of the Consent Decree covering the topic of policies has not been previously assessed, nor directly addressed in prior semiannual reports, by the Monitoring Team. Nevertheless, this section contains several provisions that convey requirements to be implemented by the City or the CDP.

Therefore, during the next reporting period, the Monitoring Team will begin meeting with the City and CDP to discuss a strategy for assessing these Consent Decree requirements. Given that these discussions are still at a very early stage, the Monitoring Team will not outline any compliance statuses for paragraphs 341-349 in this report.

Despite no formal evaluation or assessment of these paragraphs up until now, the Monitoring Team recognizes that the City and CDP have achieved milestones regarding policy requirements dictated in other sections of the Consent Decree, that have been described above and in many previous iterations of the Monitoring Team's semiannual reports. Those previously-approved policies have undergone collaborative reviews in which both the Monitoring Team and the DOJ have actively participated, and those approved policies have been filed with the Court.

## XV.    OUTCOME MEASUREMENTS

Since the Seventeenth Semiannual Report, the Monitoring Team completed and filed assessments for Search and Seizure, Use of Force, Training, Crisis Intervention, Staffing, Recruitment and Hiring, and Equipment and Resources. For each assessment, the Monitoring Team gathered and analyzed data from the CDP, interviewed and observed CDP staff, and reviewed materials submitted by the CDP as responsive to the requirements of the Consent Decree. From those assessments, the Monitoring Team has made a number of recommendations to CDP and continues to work with the CDP to improve data collection and address areas where the Monitoring Team believes the CDP can improve to achieve compliance with the Consent Decree.

While completing the Use of Force assessment, the Monitoring Team examined data collection and reporting processes for the CDP. The review demonstrated that the CDP needs to establish clear protocols for collecting, reviewing, and reporting on Use of Force incidents. The Monitoring Team found that a lack of annual reporting timelines led to issues whereby the final annual number of use of force incidents fluctuated as CDP identified data discrepancies. CDP should create protocols for the timing of annual reporting of final numbers and detailing documentation for how use of force incidents are tracked.

During this reporting period, the CDP submitted the annual Outcome Measures report as required by Paragraph 367. These data were included in the Monitoring Team's assessments and will continue to be used moving forward. The Monitoring Team will collaborate with the CDP over the next six months to institute additional reporting capabilities for data related to stops, searches, and arrests, use of force, and data integrity.

The CDP made significant strides in 2025 to build capacity and monitoring for data quality and integrity. This work will need to be redoubled in 2026 since the Division is transitioning to a new Records Management System. While the transition will enable better, more complete data collection, it also requires reconfiguring prior reporting and identifying where new gaps in data collection exist.

Finally, the CDP engaged an outside expert to examine racial bias in police traffic stops, searches, and arrests. Engaging an outside expert to independently review and report findings regarding bias is a positive step towards sustainable review. The initial report from the outside expert has not been released to the Monitoring Team or the public though reported to the media by the City.



# Cleveland Police Monitoring Team

**Christine Cole**
Monitor

**Honorable Melody Stewart (ret.), PhD**
Deputy Monitor

Assistant Chief Shunta Boston (ret.)
Chief Dan Brennan (ret.)
Dr. Ronnie Dunn
Dr. Randolph Dupont
Lisa Fink
Chief Terrence Gordon (ret.), PhD
Chief Tammy Hooper (ret.)
Deputy Chief Kelly McMahill (ret.)
Chief Rick Myers (ret.)
Meg Olsen
Shanthi  Pierce
Rory Pulvino, JD
Captain Scott Sargent (ret.)
Charles R. See
Monitoring Team Members