UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No: 1:15 CV 1046 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, | ) | |
| | ) | |
| Defendant | ) | ORDER |

Currently pending before the court in the above-captioned case is Plaintiff the United States of America ("Department of Justice," "Department," or "DOJ") and Defendant City of Cleveland's (the "City") Joint Motion to Terminate Settlement Agreement ("Motion") (ECF No. 688). For the following reasons, the court denies the Motion.

**I. BACKGROUND**

On February 19, 2026, the parties filed the Joint Motion to Terminate Settlement Agreement considered herein. At the court's regular monthly status conference with the parties the following day, the court expressed extreme surprise at the Motion, and the Cleveland Community Police Commission appeared surprised by it too. The court explained that he would need time to fully review the Motion and the case's extensive record.[1] (Order, ECF No. 690.) Given the Motion was filed jointly, meaning no party would be filing a brief in opposition, the court considered asking the

---

[1]     The parties' Motion represented the 688th document in the record.

Monitor to file a response objectively stating where the City stood on the road to substantial and effective compliance with the Agreement.[2] The court ultimately did not request the Monitor file such a response. Nor did the court accept a proposed amicus brief from the Cleveland Community Police Commission. (Order, ECF No. 702.) Thus, the court's decision on the instant Motion flows from his careful examination the record as it stood through the 18th Semiannual Status Conference on March 18, 2026.

Before addressing the parties' arguments, the court recounts the Department of Justice's findings (Findings Letter, ECF No. 1-1) from its 20-month investigation that led to the Decree.

## A.    Department of Justice Investigation

### 1.    *The City Asks the DOJ to Investigate*

In March 2013, the United States Department of Justice began investigating the Cleveland Division of Police ("CDP" or the "Division"). This was not the Department's first investigation into CDP. More than a decade earlier, the Department provided initial observations regarding CDP's use of force and accountability systems, and in 2004, the Department recommended changes to address some of the identified deficiencies. (Findings Letter at PageID 13, ECF No. 1-1.) The Division entered into an agreement with the Department through which CDP was required to make a variety of changes including revising its use of force policy and establishing new procedures for reviewing officer-involved shootings. (*Id.*) In 2005, the Department found the Division had complied by the agreement, and so it was terminated. (*Id.*) The changes, however, did not last.

---

[2]    The court uses Settlement Agreement, Agreement, Consent Decree, and Decree interchangeably throughout this Order.

When the Department returned to Cleveland in March 2013, it did so at the request of numerous community and religious leaders, civil rights and community groups, a member of the U.S. Congress, and of then-Cleveland Mayor, Frank Jackson. Their collective calls for action arose "after a series of incidents of potential excessive force revealed a rift between CDP and certain segments of the communities it serves." (*Id.* at PageID 9.) One such incident in January 2011 involved officers using excessive force, including kicks to the head, against an unarmed man who officers had already handcuffed and moved to the ground following a chase. (*Id.* at PageID 15.) Another occurred on November 29, 2012, when more than 100 Cleveland police officers engaged in a high speed car chase, in violation of CDP policies, and fatally shot two unarmed civilians. (*Id.* at PageID 16.) It was later revealed that thirteen CDP officers fired 137 shots at the car, with both occupants suffering more than 20 gunshots wounds. (*Id.*)

Following the November 29, 2012 incident, the Ohio Attorney General and its Ohio Bureau of Criminal Investigation and Identification conducted an investigation into it. (*Id.*) The resulting report raised serious questions about CDP's policies, training, supervision, communication, and technology. (*Id.*) Then-Ohio Attorney General, Mike DeWine also stated, "Our two month investigation reveals that we are dealing with a systemic failure in the Cleveland Police Department. Command failed. Communications failed. The System failed." (*Id.*)

### 2. *The Scope of the DOJ's Investigation*

The Department spent approximately 20 months investigating and evaluating the CDP. During that time, members of the Department along with subject matter experts in policing best-practices, conducted numerous multi-day onsite tours. (*Id.* at PageID 18.) Throughout these visits,

the Department met with command staff, most district commanders, officers of various ranks and leadership, and officers within the Internal Affairs Unit. (*Id.*) They also accompanied officers and supervisors in their patrol cars during various shifts and in every district. (*Id.*) The investigating team received briefings from the Division on changes to its policies and practices, and members met with representatives from the officers' and supervisors' unions. (*Id.*)

Outside the Division, members of the Department regularly engaged with community groups and individuals through one-on-one meetings, community town halls in different parts of the City, and visits to local events, recreation centers, local businesses, and public housing units. (*Id.*) The team also met with several religious leaders, community activists, and representatives from several organizations that provide services to unhoused Clevelanders or to those with a mental illness. (*Id.*) Department investigators also interviewed individuals who had either witnessed or been subjected to force by CDP officers—accounts the Department verified where possible by reviewing available documentary, photographic, and video support, and CDP records. (*Id.*)

The Department also undertook an extensive review of documents provided by the Division, including nearly 600 reports and investigations of officers' uses of force over a three-year period, policies and procedures, approximately 50 Internal Affairs investigations, more than 100 civilian complaint investigations, and spreadsheets tracking disciplinary actions. (*Id.* at PageID 18–19.) However, not all of the documents the Department requested from the Division were produced. For example, the Division did not produce deadly force investigations that occurred after April 2013, nor was CDP able to provide final dispositions for every civilian complaint, including those more than two years old. (*Id.* at PageID 19.) Also lacking from the Department's documents review was Taser

-4-

firing histories and dozens of Internal Affairs investigations conducted during the review time period. (*Id.*)

Reflecting on these absent documents, the Department noted that "CDP's inability to produce key documents raises serious concerns regarding deficiencies in the Division's systems for tracking and reviewing use of force and accountability-related documents[,]" and that the Division's "inability to track the location and critical force-related documents is itself evidence of fundamental breakdowns in its systems[.]" (*Id.*) The Department continued, saying that "[i]t also suggests that CDP does not accept that they are accountable for documenting and explaining their decisions in such matters to civilian leadership, the City, and the Community as a whole." (*Id.*)

> 3. *The DOJ Finds that CDP Officers Engage in a Pattern or Practice of Unconstitutional Force*

After the nearly two-year long investigation, the Department of Justice found that there was "reasonable cause to believe that CDP engages in a pattern or practice of using unconstitutional force in violation of the Fourth Amendment[,]" and that CDP officers "use unnecessary and unreasonable force in violation of the Constitution at a significant rate, and in a manner that is extremely dangerous to officers, victims of crimes, and innocent bystanders." (*Id.* at PageID 20.)

With regard to the CDP's pattern or practice of using unconstitutional force, the Department specifically found that:

- CDP officers shot at people who did not pose an imminent threat of serious bodily harm or death to the officers or others;
- CDP officers hit people in the head with their guns in situations where the use of deadly force was not justified;
- CDP officers used less lethal force that was disproportionate to the resistance or threat encountered, such as head and body strikes, Tasers, and OC Spray;

- CDP officers used unreasonable force, including Tasers, against individuals with mental illness, individuals in medical crisis, and individuals with impaired faculties[.]

(*Id.* at PageID 22–32.) The DOJ also discussed how CDP officers committed tactical errors endangering the Cleveland community and reducing officer safety. (*Id.* at PageID 33.) These tactical errors included officers carelessly firing their weapons, thereby placing themselves, subjects, and bystanders at unwarranted risk of serious injury or death; as well as officers employing other dangerous and poor tactics that led to officers losing control of suspects, thus requiring the officers to use force that would not have been necessary otherwise. (*Id.* at PageID 33–35.)

The Department went on to explain that, "the reasons underlying CDP's pattern of unreasonable force vary from its inadequate accountability systems to its failure to embrace and incorporate the concepts of community policing at all levels of CDP." (*Id.* at PageID 36.) For instance, the DOJ found that the Division did not ensure that officers adequately reported the force they used; nor were supervisory investigations of force adequate. (*Id.* at PageID 37–39.) Indeed, the Department's investigation revealed that none of the approximately 10 officers who participated in, or witnessed the use of force against the individual in the January 2011 incident previously discussed, filed the required written use of force report or otherwise documented using force at all. (*Id.* at PageID 38.) Furthermore, the DOJ explained that it was "almost as if the goal of the chain of command in many incidents is *not* to create a complete record of the incident that can be subjected to internal and external review, instead just the opposite." (*Id.* at PageID 39) (emphasis in the original).

Department of Justice officials also found that CDP's internal review mechanisms were inadequate. At the time of the investigation, the CDP had a Use of Deadly Force Investigation team,

an Office of Professional Standards, an Internal Affairs Unit, and an Inspection Unit. While the Division had several policies and manuals attempting to define the responsibilities of these internal review units, the DOJ found that the division of labor was unclear, and some responsibilities conferred to particular units by policy were not fulfilled in practice. (*Id.* at PageID 42.) The Department explained that this "lack of clarity regarding who is responsible for what interferes with competent investigations and consistent and fair adjudication of discipline." (*Id.*)

Elaborating on the deficiencies of CDP's internal review mechanisms, the Department reported that reviews by the Division's Use of Deadly Force Investigative Team ("UDFIT") "appeared to be biased in favor of clearing the officer as opposed to gaining a full and objective understanding of the incident." (*Id.* at PageID 43.) Similarly, the Department found that Internal Affairs investigations frequently lacked key documents, investigators failed to ask key questions and take important investigatory steps, and multiple investigators used the wrong standard in evaluating officer misconduct. (*Id.*) Such failures, the Department explained, "fundamentally undermine CDP's ability to hold officers accountable." (*Id.*)

The Department's review of CDP's practices for implementing corrective measures also revealed troubling results. For example, a number of cases remained pending for unreasonable amounts of time after the investigation was complete and administrative charges were brought. (*Id.* at PageID 45.) One case was listed as pending for nearly four years due to a pending civil case. (*Id.*) According to the DOJ, these practices "prevent[] the Division from swiftly holding officers accountable and send[] a message to other officers that they need not fear discipline for their actions." (*Id.*)

-7-

In addition to inadequate use of the above-mentioned internal review systems, the Department found that CDP failed to adequately investigate civilian complaints of officer misconduct, despite the City's Charter requiring the Office of Professional Standards ("OPS") to conduct "a full and complete investigation" of each civilian complaint of officer misconduct. (*Id.* at PageID 46.) During the Department's 2004 investigation of the Division, it noted significant concerns about the civilian complaint process, including the understaffing of OPS, the lack of guidance and resources for investigators, untimely investigations, limited civilian access to the complaint process, and some complaints not investigated when they should have been. (*Id.* at PageID 74.) When the Department returned a decade later, they found that these problems remained, and in some cases, had worsened. (*Id.*) Specifically, the Department found that:

- OPS would inappropriately reject complaints that may have warranted an investigation;
- OPS lacked a sufficient number of investigators, resulting in complaints taking on average 6 months to complete;
- The OPS manual provided little guidance on how to conduct a thorough investigation, thus investigations were frequently substandard;
- The civilian intake process was difficult given CDP's policy to only investigate those signed by the complainant;
- The Civilian Police Review Board's decisions lacked transparency, and its cases frequently lacked a final disposition, and where a disposition existed, there was no evidence of the Board's rationale for the decision.

(*Id.* at PageID 47–49.) The Department ultimately concluded that "CDP's civilian complaint system, as a whole, is disorganized and ineffective[,]" and that its "complaint process has little legitimacy in a City that would benefit greatly from an effective system for addressing the community's concerns regarding its police force." (*Id.* at PageID 50.)

Beyond CDP's internal reporting and review processes, the Department also found that the Division's officers were inadequately supported and trained, and that the Division's equipment, technology, and staff planning were deficient. (*Id.* at PageID 50, 62.) For example, the DOJ saw evidence that officers did not know how to safely and effectively control subjects, or sometimes know how to safely handle firearms. (*Id.* at PageID 50.) Furthermore, while CDP provided its recruit classes with more than the minimum number of hours required by the state, the Division had not analyzed whether the number of hours and overall content were sufficient for recruits. (*Id.* at PageID 51.) DOJ officials also reported hearing from officers that CDP did not provide sufficient and current training on new and revised policies, rather, when a policy was revised, officers were advised of it only during roll-call. (*Id.* at PageID 52.)

As for the technology and equipment available to officers, the Department determined that officers were sent out to perform dangerous jobs without the ability to effectively communicate with the Division or each other; supervisors were failing in some of the most fundamental aspects of their responsibilities due to inadequate staffing; and basic equipment, such as zone car computers or office computers, was either outdated or nonexistent. (*Id.* at PageID 63–64.) These deficiencies, the DOJ explained, "make[] it difficult for [officers] to comply with some policies and contribute[] to low officer morale." (*Id.* at PageID 64.)

The Department of Justice's investigation also showed that CDP was not engaging in community policing effectively at all levels of the division, and that the Division's approach to individuals in crises was underdeveloped. Investigators found that "CDP's method of policing contributes to the community's distrust of and lack of respect for officers[,]" and that "[a]ny attempt CDP makes to establish and maintain a positive and beneficial relationship with the community is

-9-

potentially also undermined by the frequency with which officers appear to stop and search people without meeting the requisite threshold of reasonable suspicion or probable cause." (*Id.* at PageID 57.) Department officials also shared that when interviewing community members about their interactions with CDP, "many African-Americans reported that they believe CDP officers are verbally and physically aggressive toward them because of their race." (*Id.*)

Investigators acknowledged that CDP did participate in many programs aimed at building relationships with the community, but they noted that implementation of these community policing efforts were largely superficial. (*Id.* at PageID 58.) Furthermore, the DOJ reported seeing evidence that some officers held views incompatible with community policing principles, and that those attitudes were tolerated and encouraged by at least some members of command staff. (*Id.* at PageID 59.) As one former actual Commander of community policing for CDP told the investigators, "he believes the culture within CDP is antithetical to a community policing mentality and that officer training instills in officers an 'us-against-them' mentality." (*Id.*)

Reflecting on these findings, the Department concluded that "a comprehensive community policing strategy must be a central component to any police reform in Cleveland." (*Id.* at PageID 57.) The DOJ further explained that:

> True community policing [...] must encompass a philosophy of how individual officers interact with and view the communities that they police each and every day. It is about more than attending meetings; it is about how officers talk to and act towards the people they encounter every day. That ethos needs significant improvement throughout CDP.

(*Id.* at PageID 58.)

With regard to CDP's approach to individuals in crises, investigators found that the Division's crisis intervention policies were underdeveloped, resulting in the use of unreasonable force against these individuals. (*Id.* at PageID 60.) The Department specified that CDP must change its policies and procedures to require Crisis Intervention Team ("CIT") officers "to respond to every incident involving an individual in known mental health crisis, even if a non-CIT officer who is first on scene must immediately begin addressing the situation." (*Id.* at PageID 61.) Moreover, the DOJ continued, CDP must "ensure that its personnel, including its officers and dispatchers, are adequately trained." (*Id.* at PageID 62.) In closing, the Department emphasized the importance of a robust CIT program to both preventing unconstitutional use of force and improving the safety of officers and those individuals in crises. (*Id.*)

The Department of Justice concluded its Findings Letter by recognizing that while CDP had taken initial steps to implement new policies and procedures to remedy some of the deficiencies the Department's investigation uncovered, "it is imperative that the City and Division now take more rigorous measures to identify, address, and prevent excessive force to protect the public and to rebuild the community trust." (*Id.* at PageID 66.) Accordingly, the Department stated that "the only effective mechanism to address these significant problems is to reach a consent decree that provides for a monitor to oversee the implementation of systemic reform in the CDP." (*Id.*)

**B.      Formation of the Settlement Agreement**

On May 26, 2015, the United States filed a Complaint in this court for declaratory and injunctive relief under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141. (Compl., ECF No. 1.) The Complaint summarized the Department of Justice's investigation and findings regarding the CDP's pattern or practice of unreasonable uses of force. (*Id.* ¶¶11, 15.)

The Complaint also stated that CDP, "through their acts or omissions, also appear to engage in a pattern or practice of unlawfully stopping, searching and arresting persons in Cleveland. These stops, searches, and seizures are objectively unreasonable under the totality of the circumstances." (*Id.* ¶ 16.) Lastly, the Complaint acknowledged that the cause of CDP's patterns or practice of unconstitutional conduct was "pervasive deficiencies in Defendant's systems for directing, training, supervising, and holding accountable CDP officers." (*Id.* ¶ 17.)

The same day the United States filed its Complaint, it filed with the City of Cleveland a Joint Motion and Memorandum for Entry of Consent Decree (ECF No. 3.) In the Joint Motion, the City and United States agreed that the Complaint's allegations "raise issues of concern that should be addressed." (Joint Motion at PageID 71.) To address those issues of concern, the City and United States proposed a Settlement Agreement, through which "the City commits to develop and implement new policies, training, and practices throughout CDP in the areas of community engagement, use of force, crisis intervention, search and seizure, accountability and supervision, transparency and oversight, officer assistance and support, and policies." (*Id.* at PageID 74.)

In advocating for the entry of the Settlement Agreement, the parties explained that it "will provide for broader officer support systems and will establish improved mechanisms to help ensure that accountability and investigations of any misconduct are both fair and constructive." (*Id.* at PageID 74.) The parties also stated that, "[p]erhaps most important, the Settlement Agreement seeks to address and substantively improve the relationship between CDP and the diverse communities being policed, ultimately thereby making the City of Cleveland a safer place to live and work." (*Id.* at PageID 74–75.)

The parties further represented to the court that the Agreement was fair, adequate, and reasonable, and that it resulted from six months of negotiations between the City and United States. (*Id.* at PageID 75.) Furthermore, they explained that the Agreement was informed by input from police officers, police unions, community members and leaders representing faith-based communities, mental health professionals, advocates for the unhoused, as well as representatives of the business and philanthropic communities, and civil rights organizations. (*Id.*) As such, the "nature and extent of the good faith negotiations that were undertaken in arriving at this Settlement Agreement provide the Court with additional assurances that it is fair, adequate, and reasonable to remediate the violations alleged in the Complaint[.]" (*Id.* at PageID 76.)

On June 12, 2015, the court held a hearing on the Joint Motion. After hearing from the parties and reviewing the proposed Settlement Agreement, the court found that the Agreement's terms were fair and equitable; that the requirements set forth in the Agreement were designed to achieve significant and effective reforms in the manner in which police services are provided throughout the City of Cleveland; and that those reforms were consistent with the purposes of 42 U.S.C. § 14141 and the requirements of the Constitution. (Order, ECF No. 7.) The court further remarked during the hearing that:

> My view is that this is not a document that's the enemy of any party or any person, that it should be affirmatively embraced by police and citizens because I think it is a forward step in relationships between police and community. It's a document that will protect police under circumstances if they follow their training, which will be provided. It provides protection to the City, if the City carries out its training program in a way which is effective. And it accomplishes the goals of the Department of Justice who are charged with the heavy responsibility of making sure that the laws of the United States are enforced...let the word go forward that this Judge thinks this is a good agreement, a sound agreement. It's one that we all ought to be happy

-13-

> to embrace, and let Cleveland be a model in terms of how we carry
> this out.

(June 12, 2015 Hrg. Tr. at PageID 487–88, ECF No. 10.)

Thereafter, the court granted the Joint Motion, and entered the relief set forth in the Settlement Agreement.

## C.     Relevant Procedural History

Over the last 11 years, the City and CDP have worked closely with the Department of Justice and Monitoring Team in an effort to reach substantial and effective compliance with the Agreement's numerous terms. The docket history of this case demonstrates these efforts, as most filings are policies and training curricula for the court's approval, the Monitor's Semiannual Reports, the City's Status Reports, or Monitor Assessments. That said, the procedural history also indicates necessary Agreement modifications, disagreements about what certain provisions mean, and tensions over the cost of implementing the Decree.

Prior to this instant Motion, the parties, with the Monitor's support, moved to modify small sections of the Decree. During the first year, the court granted the parties' motion to modify certain timelines related to Cleveland Community Police Commission ("CPC") deliverables, (*see* ECF Nos. 30, 33), as well as extend deadlines for specific City and CDP deliverables (*see* ECF Nos. 47, 48).

One of the most substantive modifications occurred in March 2022, when the parties moved to incorporate recent amendments to the City of Cleveland's Charter approved by voters via ballot initiative on November 2, 2021. That ballot initiative, Issue 24, created, among other things, "a chartered Cleveland Community Police Commission with broader authority and responsibilities than the CPC created under the Consent Decree; expanded the jurisdiction, authority and organizational

-14-

structure of the Office of Professional Standards and Police Review Board; and change[d] the process for adjudicating and imposing discipline for allegations of misconduct by officers." (ECF No. 413 at PageID 8563.) The Charter amendments also required the City to move the court to modify the Agreement so that it incorporated the initiative's amendments, and "ensure[d] that the voters' intention are given full effect." (*Id.*) The court granted the motion, thereby incorporating the Charter amendment into the Agreement. (Order, ECF No. 416.)

The most recent change to the Decree occurred in January 2024, and involved modifications seeking to enhance the independence of the Police Inspector General by changing the position's reporting structure and title. (ECF No. 502 at PageID 11580.) The court granted the motion on March 7, 2024, thereby re-titling the Police Inspector General to Public Safety Inspector General, and having the official report to the Chief Director of Public Safety instead of the Chief of CDP. (*Id.*) Therefore, the current version of the Settlement Agreement is docket number 502-1.

The parties have also independently moved the court to en.force various provisions of the Decree. In July 2021, the Department of Justice moved the court to enforce the CPC's right to access information under Paragraph 19 of the Agreement and to facilitate production of the information to the CPC going forward. (ECF No. 365.) The DOJ's motion followed more than two years of the City and CDP refusing to provide the CPC information such as letters to officers summarizing disciplinary hearings, CDP's memoranda of understanding with nine law enforcement agencies operating within Cleveland, and data about Internal Affairs referrals, investigations, and prosecutor referrals. (*Id.*) After interpreting the terms related to CPC's access to information, the court granted the DOJ's motion (Order, ECF No. 382), and ordered the City to produce the requested information

to CPC. However, this enforcement order regarding CPC's access to CDP and City data would not be the last.

In February 2024, the City filed a motion pursuant to the court's earlier order (ECF No. 382) requesting relief from or extension of time of its obligation to produce records in response to a CPC request to the CDP. (ECF No. 507.) The City argued that many of the requested records were restricted by state and federal rules, and that the City could not lawfully produce them in an unredacted state to the CPC without risk of penalty. (*Id.*) The DOJ opposed the motion (*see* ECF Nos. 510, 526).

One day after the City's filing, the DOJ moved to enforce the United States and Monitoring Team's access to information and databases pursuant to Agreement Paragraphs 389–91, and 394–95. (ECF No. 509.) DOJ stated that the City had provided it and the Monitor the requisite access for more than seven years, but, starting in the spring of 2023, the City failed to provide the Monitoring Team with the documents necessary to conduct its assessment of the search and seizure provisions. (*Id.* at PageID 11842.) DOJ also reported that in December 2023, the City revoked the United States and Monitoring Team's access to CPD information systems necessary to assess compliance with the Agreement's use of force and accountability provisions, among others. (*Id.* at PageID 11843.) According to the DOJ, the City withheld access because it believed unredacted access, which had long been granted, could violate Ohio state law. (*Id.*) The City filed a response to the Motion shortly thereafter. (ECF No. 511.) On March 7, 2024, the court granted DOJ's motion to enforce the United States and Monitor's access to information. (Order, ECF No. 512.)

After resolving the DOJ's motion to enforce, the court turned to the City's request for relief or extension of time of its obligations related to CPC record requests. The court heard from the

parties and Monitor on the issue during the Fourteenth Semiannual Status Conference on April 22, 2024. Ultimately, the court ordered the City to produce information to the Monitor and DOJ with respect to CPC's outstanding requests, and set forth a process for handling the current and future requests. (Order, ECF No. 527.) On July 8, 2024, the court held another status conference with the parties and Monitor regarding the document request process for CPC and OPS, at which point the court ordered the City to provide certain documents to the DOJ and Monitor, as well as continue updating the court on its new redaction policy. (Order, ECF No. 544.) Given these Orders, the court denied the City's motion for relief as moot. (*Id.* at PageID 12528.)

On September 23, 2024, during the Fifteenth Semiannual Status Conference, the parties and Monitor reported that the City had made significant progress in complying with the CPC and OPS document requests. (Order, ECF No. 566.) The DOJ also indicated that it no longer thought it was necessary for the City to produce information in respect to documents provided to OPS, but noted that it would like to see one more set of documents and corresponding redactions provided to the CPC. (*Id.* at PageID 13029.)

Since the Fifteenth Semiannual, neither party, nor the Monitor, has raised new issues regarding CPC and OPS document access. That said, new disagreements soon emerged regarding the Monitor's invoices and the Monitor's methodology as used in its semiannual reports.

In December 2024, the court began holding regular conferences with the parties and Monitor to help resolve the City's growing list of objections to the Monitor's bills. (ECF Nos. 573, 575.) These billing disputes were ultimately resolved by a 20-page Order (ECF No. 606), through which the court overruled the City's objections to the billing entries directly related to the Monitor's work from March to June 2024, and ordered the City to compensate the Monitor for 75 percent of the total

amount objected to on the basis of "billing for billing." Despite this extensive Order, the City continued challenging the Monitor's bills, first by appealing the court's decision (Not. of App., ECF No. 624), and by filing, and then withdrawing, a motion for reconsideration (ECF Nos. 625, 633.) The City then filed additional objections to the Monitor's May, June, and July 2025 Invoices. (ECF Nos. 653, 657, 666.) The City and Monitor, then Hogan Lovells, LLC, ultimately resolved the outstanding objections without the court's help upon Monitor Karl Racine's resignation, and the appointment of Christine Cole as Monitor. (*See* Order, ECF No. 670.)

Hogan Lovells' tenure as head of the Monitoring Team concluded in mid-August 2025. Karl Racine, who was appointed on recommendation of the parties, was the third person to hold the role since the Decree began. Following his resignation, the court appointed Christine Cole as Interim Monitor, who in turn asked former Ohio Supreme Court Justice Melody Stewart to serve as Interim Deputy Monitor. (Order, ECF No. 654.) The parties jointly moved to appoint Ms. Cole Monitor on September 30, 2025, for a six-month term. (ECF No. 663.) The court approved the appointment on October 9, 2025, thereby making Ms. Cole the fourth Independent Monitor. (ECF No. 665.)

On February 17, 2026, the parties jointly moved for an extension of time to provide the court with how they would like to select a Monitor following the expiration of Ms. Cole's six-month term. (ECF No. 687.) The court granted the motion the following day. Then, that Friday, February 19, 2026, the parties filed the Joint Motion to Terminate considered herein. (ECF No. 688.)

While the instant Motion was pending, the court held the Eighteenth Semiannual Status Conference (ECF No. 700), it approved the Monitor's ambitious 2026 monitoring plan (ECF Nos. 701, 703), and it granted the parties' joint motion to reappoint Ms. Cole as Monitor through June 1, 2027 (ECF Nos. 706, 707).

With this procedural history in mind, the court turns to the Motion to Terminate.

## II. LEGAL STANDARD

Consent decrees "have attributes both of contracts and of judicial decrees[.]" *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 519 (1986) (internal quotations omitted). The Supreme Court has observed that "[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). Accordingly, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Id.* at 681.

At the same time, a consent decree is "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992). As such, they are subject to Federal Rule of Civil Procedure 60(b), *id.* at 378, under which "the court may relieve a party [...] from a final judgment, order, or proceeding." Fed. R. Civ. P. 60(b).

Rule 60(b) provides six grounds upon which a court, on motion and just terms, may relieve a party from a final judgment, order, or proceeding. Relevant here are subsections (b)(5) and (b)(4). Under Rule 60(b)(5), a court may relieve a party from a final judgment, like a consent decree, if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Supreme Court has observed that "use of the disjunctive 'or' makes it clear that each of the provisions' three grounds for relief is independently sufficient[.]" *Horne v. Flores*, 557 U.S. 433,

-19-

454 (2009). Relief under Rule 60(b)(4) may be granted when "the judgment is void." Fed. R. Civ. P. 60(b)(4).

Here, the parties argue that under Supreme Court and Sixth Circuit precedent, courts should terminate consent decrees in institutional reform litigation when, "the objective of a decree has been achieved and a durable remedy has been implemented[.]" (Mot. at PageID 15083 (quoting *Horne*, 557 U.S. at 450 (internal quotation marks omitted).) The parties contend "a durable remedy" exists (1) where "the defendant has achieved compliance with the federal-law provisions whose violation the decree sought to remedy;" and (2) where "the defendant would continue that compliance in the absence of continued judicial supervision." (*Id.* at PageID 15084 (quoting *John B. v. Emkes*, 710 F.3d 394, 412 (6th Cir. 2013) (cleaned up).) Lastly, they assert "[t]he crux of the inquiry is [] 'whether ongoing enforcement of the original order is supported by an ongoing violation of federal law.'" (*Id.* at PageID 15084 (quoting *Emkes*, 710 F.3d at 413).)

Upon review of *Horne*, *Emkes*, and other relevant Supreme Court and Sixth Circuit precedent concerning the modification or termination of consent decrees pursuant to Rule 60(b), the court finds the parties' proposed legal standard should not govern its analysis here. Indeed, the parties' proposed rule statement ignores the two-step framework for resolving Rule 60(b) motions established by the Supreme Court in *Rufo*, and widely recognized in the Sixth Circuit.

*Rufo* involved a consent decree entered to correct unconstitutional conditions at the Suffolk County Jail. 502 U.S. at 371. There, the Supreme Court made clear that consent decrees are subject to Rule 60(b), especially in institutional reform cases, because "such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree increase[s]." *Id.* at 380. *Rufo* held that district courts should "exercise flexibility in

-20-

considering requests for modification of an institutional reform consent decree," but observed that a party should not be granted relief under Rule 60(b)(5) "when it is no longer convenient to live with the terms of a consent decree." *Id.* at 383. Therefore, a party seeking to modify a consent decree under Rule 60(b)(5) first "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* The party "may meet its initial burden by showing either a significant change either [sic] in factual conditions or in law." *Id.* at 384. If the party satisfies its burden, then "the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.*

Since *Rufo*, the Supreme Court has elaborated on its position that district courts should "exercise flexibility" when evaluating requests for consent decree modifications or terminations pursuant to Rule 60(b)(5). Nonetheless, it has not replaced the *Rufo* two-step framework. Indeed, *Horne*, a case central to the parties' proposed legal standard, quoted the *Rufo* test in setting out the applicable Rule 60(b)(5) legal standard. 557 U.S. at 447 ("Rule 60(b)(5) [...] provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.' The party seeking relief bears the burden of establishing that changed circumstances warrant relief[.]" (quoting *Rufo*, 502 U.S. at 383–84) (internal citations omitted).

Furthermore, Sixth Circuit courts frequently apply the *Rufo* framework to Rule 60(b)(5) motions seeking to modify or terminate consent decrees. *See e.g., Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 614 (6th Cir. 2011) (quoting *Rufo*, 502 U.S. at 383–84); *Heath v. DeCourcy*, 992 F.2d 630 (6th Cir. 1993) (vacating consent decree modification where district court did not fully consider *Rufo* factors in granting motion to modify); *Lorain NAACP v. Lorain Bd. of*

-21-

*Educ.*, 979 F.2d 1141, 1149 (6th Cir. 1992) (holding that consent decrees in school desegregation litigation are subject to *Rufo* standard). Even *Emkes*, a Sixth Circuit case upon which the parties rely, applied *Rufo*, by way of quoting its application in *Northridge*, when reviewing a Rule 60(b) motion to vacate a consent decree. *Emkes*, 710 F.3d at 402.

Courts overseeing police consent decrees like the one at issue here have also applied *Rufo* to Rule 60(b) modification motions. *See e.g.*, *United States v. City of New Orleans*, 947 F. Supp. 2d 601 (E.D. La. 2013), *aff'd*, 731 F.3d 434 (5th Cir. 2013) (applying *Rufo* standard to deny Rule 60(b)(5) motion by City to vacate consent decree six months after entering it); *United States v. City of Detroit*, No. 03-72258, 2014 WL 197730 (E.D. Mich. Jan. 16, 2014) (applying *Rufo* standard to deny Rule 60(b)(5) motion by City to terminate monitoring of use of force provisions of consent decree); *United States v. Territory of Virgin Islands*, No. 3:08-CV-00158, 2021 WL 2117372 (D.V.I. May 25, 2021) (applying *Rufo* to grant Rule 60(b)(5) motion to terminate training section of consent decree upon showing of three years in substantial compliance).

Accordingly, consistent with Supreme Court and Sixth Circuit precedent, the court evaluates the parties' arguments for relief under Rule 60(b)(5) under the two-step *Rufo* standard. The court acknowledges its responsibility to maintain a "flexible approach" to "ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Rufo*, 502 U.S. at 383; *accord Horne*, 557 U.S. at 448, *Emkes*, 710 F.3d at 412. Furthermore, the court recognizes that "modification of a consent decree is an extraordinary remedy that should not be undertaken lightly." *Northridge*, 647 F.3d at 614 (internal quotations omitted) (quoting *E. Brooks Books, Inc. v. City of Memphis*, 633 F.3d 459, 465 (6th Cir. 2011)).

### III. DISCUSSION

The United States and the City of Cleveland jointly move to terminate the Settlement Agreement, pursuant to Paragraph 401 of the Agreement and Federal Rule of Civil Procedure 60(b)(5), or in the alternative, (b)(4). They argue the City is entitled to relief from the Decree, because it and the Cleveland Division of Police "have achieved substantial compliance with the Agreement and a durable remedy to address the federal-law violations that gave rise to this case." (Mot. at PageID 15076.) Moreover, the parties contend that continued enforcement of the Agreement, in light of the durable remedy achieved "would exceed the Court's jurisdiction." (*Id.*)

Specifically, the parties claim that the City and CDP "have satisfied the core requirements of the Use of Force, Crisis Intervention, and Searches and Seizures sections of the Settlement Agreement[,]" and they have "implemented other durable remedies required by the Agreement, including measures related to Officer Assistance and Support, Accountability, Supervision, Community Engagement, and Transparency and Oversight." (*Id.* at PageID 15084–85.) With regard to Officer Assistance and Support, Accountability, Supervision, Community Engagement, and Transparency and Oversight, the parties aver that, "[w]hile these improvements are requirements of the Settlement Agreement, compliance with the Fourth Amendment does not require these reforms." (*Id.* at PageID 15100.) As such, "continued enforcement of any areas deemed non-compliant is inequitable now that the underlying constitutional issues are resolved." (*Id.*) (citing *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004)).

### A. Consent Decree Terms Overview

The goal of the Settlement Agreement negotiated by the United States and the City of Cleveland and voluntarily entered into June 12, 2015 is "ensuring that police services in Cleveland

-23-

are delivered in a manner that is constitutional, effective, and consistent with community values, while preserving officer and public safety." (Agreement at PageID 11588.) The Agreement further reads:

> To further these goals, the Cleveland Division of Police and the Cleveland community must have a strong relationship that is built on mutual trust and respect. The provisions of this Agreement are designed to bolster this relationship and ensure that it endures. The Constitution requires the City to prevent excessive force, to ensure that searches and seizures are reasonable, and to ensure that police services are delivered free from bias. These precepts also are fundamental to a strong community-police relationship. To further these goals, the City has agreed to provide clear guidance to officers; increase accountability; provide for civilian participation in and oversight of the police; provide officers with needed support, training, and equipment; and increase transparency.

(*Id.*) Consistent with this stated purpose, the Agreement details the actions the City and CDP must take across 11 topic areas: 1) Community Engagement and Building Trust; 2) Community and Problem-Oriented Policing ("CPOP"); 3) Bias-Free Policing; 4) Use of Force; 5) Crisis Intervention ("CIT"); 6) Searches and Seizures; 7) Accountability; 8) Transparency and Oversight; 9) Officer Assistance and Support; 10) Supervision; and 11) Policies.

The Agreement likewise details how it should be implemented, how compliance with its terms is assessed, as well as the conditions upon which the Agreement will terminate. Paragraphs 350 to 359 explain the role of the Independent Monitor as well as how the Monitor is selected and compensated. In the paragraphs that follow, the Agreement dictates specific Monitor responsibilities, such as "conducting reviews or audits as necessary to determine whether the City and CDP have complied with the requirements of [the] Agreement" (*id.* ¶ 360); conducting a comprehensive outcome assessment to determine whether and to what extent the outcomes intended by the

Agreement two years and six months after the Effective Date (*id.* ¶ 374); as well as "fil[ing] with the Court, every six months, written, public reports" (*id.* ¶ 375).

With regard to how the Monitor fulfills his or her responsibilities, the Agreement makes clear that the Monitor "will have timely, full, and direct access to all Agreement related individuals, facilities, trainings, meetings, disciplinary hearings, reviews, and the scene of any occurrence that the Monitor reasonably deems necessary to carry out the duties assigned[,]" and that "[t]he City and CDP will ensure that the Monitor [has] full and direct access to all City and CDP documents and data related to the Agreement that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement." (*Id.* ¶¶ 389–90.)

As for the court's oversight of this action, the court "retain[s] jurisdiction of this action for all purposes until such time as the City and CDP have achieved Substantial and Effective Compliance with this Agreement and maintained such compliance for no less than two consecutive years." (*Id.* ¶ 397.) Moreover, "the City and CDP will bear the burden of demonstrating by a preponderance of the evidence its Substantial and Effective Compliance with this Agreement." (*Id.*)

Lastly, the Agreement will terminate when:

> [T]he City has been in Substantial and Effective Compliance with the search and seizure provisions for one year and with all of the remaining provisions for two consecutive years. "Substantial and Effective Compliance" means that the City *either* has complied with all material requirements of this Agreement, *or* has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures.

(*Id.* ¶ 401) (emphasis added).

-25-

B.      **Compliance Status by the Numbers**

In 2025, the Monitoring Team began releasing formal comprehensive assessments of CDP's progress toward achieving compliance with the Agreement's terms. The development and execution of these formal assessments are governed by Paragraphs 367 and 369, which require the Monitoring Team to conduct compliance reviews which are "qualitative and quantitative assessments to measure whether implementing this Agreement has resulted in constitutional policing." Each assessment report reflects a Compliance Grade from 0 to 6, with 0 indicating that the City/CDP has not yet begun working on the provision and 6 indicating that the City/CDP has achieved substantial and effective compliance with that provision.[3] A Compliance Grade of Substantial and Effective Compliance means that "[t]he City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents in accordance with Consent Decree ¶ 370 or ¶ 401."[4] (Search and Seizure Assmt. at PageID 14653; CIT Assmt. at PageID 14517; Force Assmt. at PageID 14874;

---

[3]     The full definitions for each Compliance Grade is provided in the "Standard of Review" section of each formal assessment.

[4]     Substantial and Effective Compliance as used in the Monitor's formal assessments is fully defined as: "The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents in accordance with Consent Decree ¶ 370 or ¶ 401. This includes instances where it can be shown that the City or CDP has effectively complied with a requirement fully and systemically. Substantial and effective compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing." (Search and Seizure Assmt. at PageID 14653; CIT Assmt. at PageID 14517; Force Assmt. at PageID 14874; Staffing Assmt. at PageID 14732; Hiring Assmt. at PageID 14747; Equip. Assmt. at PageID 14787; and Training Assmt. at PageID 14825.)

-26-

Staffing Assmt. at PageID 14732; Hiring Assmt. at PageID 14747; Equip. Assmt. at PageID 14787; and Training Assmt. at PageID 14825.)

To date, the Monitoring Team has issued seven formal compliance assessments in accordance with Paragraphs 367 and 369: Crisis Intervention Assessment (ECF No. 661), Search and Seizure Assessment (ECF No. 672), Staffing Assessment (ECF No. 673), Recruitment and Hiring Assessment (ECF No. 674), Equipment and Resources Assessment (ECF No. 678), Training Assessment (ECF No. 680), and Use of Force (ECF No. 685). The following table reflects the Compliance Grades assigned in these formal assessments relative to each section.

| | 0: Non-compliant, Not Started | 1: Partial Compliance, Not Assessed | 2: Partial Compliance, Planning/Policy Phase | 3: Partial Compliance, Implementation Phase |
|---|---|---|---|---|
| CIT | 0 | 0 | 0 | 0 |
| Search & Seizure | 0 | 0 | 0 | 5 |
| Staffing | 0 | 0 | 0 | 0 |
| Recr. & Hiring | 0 | 0 | 0 | 0 |
| Equip. & Resc. | 0 | 0 | 1 | 0 |
| Training | 0 | 0 | 0 | 1 |
| Use of Force | 1 | 0 | 3 | 0 |

| | 4: Operational Compliance | 5: General Compliance | 6: Substantial & Effective Compliance |
|---|---|---|---|
| CIT | 0 | 21 | 8 |
| Search & Seizure | 9 | 1 | 0 |
| Staffing | 0 | 0 | 3 |
| Recr. & Hiring | 2 | 4 | 6 |

-27-

|  | 4: Operational Compliance | 5: General Compliance | 6: Substantial & Effective Compliance |
|---|---|---|---|
| Equip. & Resc. | 4 | 2 | 2 |
| Training | 4 | 5 | 12 |
| Use of Force | 7 | 51 | 22 |

For those sections of the Decree that have not been formally assessed pursuant to Paragraphs 367 and 369, the court refers to the informal compliance status ratings the Monitoring Team assigned in its most-recent Semiannual Report (ECF No. 697). Since the Third Semiannual Report (ECF No. 135), the Monitor has provided a paragraph-by-paragraph accounting of the general state of the City's compliance with specific Agreement requirements. The attached compliance status conclusions do not supplant more rigorous and comprehensive quantitative and qualitative assessments of how CDP performs over time. As explained by the Monitor at the start of each semiannual report since the Third, assessments in the semiannual report are based on the Monitoring Team's "current understanding, knowledge, and information gained through ongoing work and discussion with CDP, the Parties, and other stakeholders." (18th Semiannual at PageID 15172.) The Monitoring Team's "intent is to provide a bottom-line sense of where the Division is on the road to compliance." (*Id.*) Accordingly, the following table summarizes the compliance status ratings associated with each section that has not gone through a formal comprehensive assessment.[5]

_____

[5] The Semiannual Reports define the compliance status ratings as the following:

**Substantial and Effective Compliance.** The City and/or CDP has complied fully with the requirement and the requirement has been meaningfully adhered to and effectively implemented across time, cases, or incidents. Substantial and Effective Compliance is realized when there is a high and not random reliability in outcomes. Deviations from the requirement are rare, explainable, and non-systemic, and detected and corrected internally. The hallmark of substantial and

-28-

|  | Non-compliance | Partial Compliance | Operational Compliance | General Compliance | Substantial & Effective |
|---|---|---|---|---|---|
| **Community Engagement** | 3 | 4 | 5 | 5 | 0 |
| **CPOP** | 1 | 6 | 1 | 0 | 0 |

---

effective compliance is stability – the same patterns of compliance are demonstrated across multiple periods of time, and across different districts and units. It is not episodic.

**General Compliance.** The City and/or Division has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the City or Division has effectively complied with a requirement fully and systemically.

**Operational Compliance.** The City and/or Division has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Decree such that it is in existence or practice operationally—but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

**Partial Compliance.** The City and/or Division has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the provision of the Consent Decree—but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice. It may capture a wide range of compliance states or performance, from the City or Division having taken only very limited steps toward operational compliance to being nearly in operational compliance.

**Non-Compliance.** The City and/or Cleveland Division of Police (CDP) has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or Division's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement. (18th Semiannual Report at PageID 15170–71.)

| | Non-Compliance | Partial Compliance | Operational Compliance | General Compliance | Substantial & Effective |
|---|---|---|---|---|---|
| **Bias-Free Policing** | 1 | 6 | 3 | 0 | 0 |
| **Accountability** | 0 | 21 | 37 | 14 | 0 |
| **Transparency & Oversight** | 1 | 7 | 6 | 5 | 0 |
| **Performance Evals. & Promotions (Off. Asst. & Supp. Sec.)** | 5 | 2 | 0 | 0 | 0 |
| **Supervision** | 10 | 3 | 4 | 2 | 0 |

In summary, the only paragraphs rated in Substantial and Effective Compliance as that term is used in Paragraphs 370 or 401 are those evaluated through a comprehensive formal assessment. Where an Agreement section has not been through a formal compliance assessment, like Community Engagement and Building Trust, none of its paragraphs have been found to be in Substantial and Effective Compliance.

With these compliance ratings in mind, the court determines whether termination of the Agreement is warranted under the Agreement's termination clause (¶ 401), and/or Federal Rule of Civil Procedure 60(b).

**C.     Termination under Paragraph 401**

The parties argue termination of the Agreement is appropriate pursuant to Paragraph 401. As previously noted, Paragraph 401 provides:

> This Agreement will terminate when the City has been in Substantial and Effective Compliance with the search and seizure provisions for one year and with all of the remaining provisions for two consecutive years. "Substantial and Effective Compliance" means that the City *either* has complied with all material requirements of this Agreement,

-30-

>> *or* has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures.

(Agreement ¶ 401) (emphasis added). This termination clause has two parts: 1) a compliance sustainment period, and 2) methods by which the City can demonstrate Substantial and Effective Compliance.

The parties correctly argue that the City can show Substantial and Effective Compliance by "either compl[ying] with all material requirements of this Agreement," or by "achiev[ing] sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures." They then appear to mostly rely on the material requirements basis in an effort to show that the City and CDP are in Substantial and Effective Compliance. (Mot. at PageID 15082). In doing so, the parties essentially argue that the only "material requirements" of the Decree are those in the Use of Force, Crisis Intervention, and Search and Seizure sections, and that because they sustained compliance and a durable remedy in these areas, termination under Paragraph 401 is proper. The court is unpersuaded.

Nothing in the Agreement suggests that some requirements are material and some are not. On the contrary, the Agreement recognizes that furthering its goal of "ensuring that police services in Cleveland are delivered in a manner that is constitutional, effective, and consistent with community values, while preserving officer and public safety," means "provid[ing] clear guidance to officers; increas[ing] accountability; provid[ing] for civilian participation in and oversight of the police; provid[ing] officers with needed support, training, and equipment; and increas[ing] transparency." (Agreement at PageID 11588.)

Moreover, the Department of Justice's Findings Letter explained that:

> CDP's pattern or practice of excessive force is both reflected by and stems from its failure to adequately review and investigate officers' uses of force; fully and objectively investigate all allegations of misconduct; identify and respond to patterns of at-risk behavior; provide its officers with the support, training, supervision, and equipment needed to allow them to do their jobs safely and effectively; adopt and enforce appropriate policies; and implement effective community policing strategies at all levels of CDP.

(Findings Letter at PageID 11–12.) As such, the pattern or practice of excessive force the Agreement targets requires efforts beyond those stated in the Use of Force, Crisis Intervention, and Search and Seizure sections to realize the City's goal of constitutional policing.

Therefore, the court rejects the parties' position that the "material requirements" of the Decree reside in the Use of Force, Crisis Intervention, and Search and Seizure sections, and that if those requirements are met, then the City and CDP have shown Substantial and Effective Compliance for relief under Paragraph 401. As for showing Substantial and Effective Compliance pursuant to the Agreement's outcome measures, the current record does not include enough qualitative and quantitative data to demonstrate sustained and continuing improvement in constitutional policing.

Even if the court accepts the parties' position about "material requirements," they have not satisfied the first part of Paragraph 401—the one year sustainment period for the search and seizure provisions, and the two-consecutive years sustainment period for all of the remaining provisions. Without explanation, the parties omit any discussion or argument about this piece of the termination clause. Tethering termination of the Agreement to required sustainment periods is consistent with the Agreement's goals and reflects the Department of Justice's finding that the Division's "incidents of excessive force are rooted in common structural deficiencies." (Findings Letter at PageID 11.)

-32-

Moreover, it is a reasonable response to the City's inability to fully implement or maintain changes recommended by the DOJ's 2004 investigation over time. As the Department noted, "[t]he current pattern or practice of constitutional violations is even more troubling because we identified many of these structural deficience more than ten years ago during our previous investigation of CDP's use of force[,]" therefore "[i]t is critical that the City and Division now take more rigorous measures to identify, address, and prevent excessive force to protect the public and to build the community's trust." (*Id.* at PageID 13–14.)

None of this is to suggest that the City and CDP have not engaged in substantial efforts to address the constitutional violations identified by the Department of Justice. Indeed, the court has repeatedly commended the City and CDP, especially in recent years, for its progress towards substantial and effective compliance. But a remedy cannot be found durable just because its written down as policy, and outcome measures can only show sustained change in culture when assessed over time and based on complete, reliable data. Without evidence that all of the Decree's "material requirements" have been met, and no indication that the sustainment period has been satisfied, the court denies the parties' Motion to Terminate the Settlement Agreement pursuant to Paragraph 401.

Nevertheless, "[e]ven when consent decrees explicitly provide instructions for their own modification, Rule 60(b) governs." *Husted*, 696 F.3d at 602. Therefore, the court must consider whether termination is lawful "given not only the decree's terms, but also the broader legal rules that govern consent decrees." *Cleveland Firefighters*, 669 F.3d at 741.

**D.      Relief under Rule 60(b)(5)**

The court's analysis of the instant Rule 60(b)(5) Motion begins with determining whether the parties have satisfied their burden of "establishing that, [despite not being in full compliance with

the Decree], a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383. The parties may satisfy this burden by showing a significant change in factual conditions or in law. *Id.* at 384.

Here, the parties describe the changes the City and CDP have made since entering the consent decree in 2015, and provide data points from the Monitor's semiannual reports and formal compliance assessments to show the efficacy of those changes. The attached Affidavits by Cleveland Mayor Justin Bibb, Cleveland City Council President Blaine Griffin, Cleveland Police Chief Dorothy Todd, Police Accountability Team Executive Director Dr. Leigh Anderson, and OPS Interim Administrator Michael Hess reiterate many of these changes, and make assertions about how continuing federal oversight is detrimental to the City and CDP. (*See* Mot. Affs. at PageID 15120–15149, ECF No. 688-2.) These statements reflect factual changes, not legal ones. Accordingly, the court construes the parties' discussion of the City's compliance with the Agreement as an argument that a significant change in factual circumstances warrants termination of the decree under Rule 60(b)(5).

A significant change in factual conditions may warrant modification of a consent decree when the conditions make compliance with the decree: (1) "substantially more onerous[;]" (2) "unworkable because of unforeseen obstacles[;]" or (3) "when enforcement of the decree without modification would be detrimental to the public interest[.]" *Rufo*, 502 U.S. at 384 (cleaned up). For example, in *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1019 (6th Cir. 1994), the district court properly modified a consent decree governing promotions of minority firefighters to supervisory positions when slower than expected promotional rates "prevented the core objectives of the consent decree from being met." There, the parties jointly moved to extend their settlement

agreement by two years arguing that the unexpected promotion rates constituted a significant change in factual circumstances. *Id.* at 1016–17. The Sixth Circuit affirmed the lower court's modification, explaining that the unanticipated facts caused "the consent decree to become 'unworkable' as well as 'detrimental to the public interest' as a vehicle for curing the previously discriminatory promotion practices in the City's Division of Fire." *Id.* at 1019.

Conversely, if a party relies on events anticipated at the time it entered into a decree, then modification should generally not be granted. *Rufo*, 502 U.S. at 385. *Rufo* explained that,

> If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b).

*Id. United States v. Tennessee*, 986 F. Supp. 2d 921 (W.D. Tenn. 2012) illustrates this limitation.

*Tennessee* involved a series of settlement agreements and consent orders between the United States and the State of Tennessee regarding unconstitutional conditions at the State's intermediate care facility for developmentally disabled persons. 986 F. Supp. 2d at 923. In 2006, the parties entered a settlement agreement to resolve and fully settle all claims between them, and to close Arlington Developmental Center—the institution from which the constitutional violations arose. *Id.* at 924. In October 2010, the state closed Arlington, and shortly thereafter moved to vacate all outstanding injunctive relief and to dismiss the case. *Id.* at 925. Tennessee argued that "the sole violation of federal law that the Court has found in this case arises from the conditions at the Arlington Developmental Center, and with the closure of Arlington and the transition of all the residents at Arlington to community placements that were approved by the Court Monitor, that

-35-

violation has been fully and completely remedied." *Id.* at 926 (cleaned up). The United States and intervenor, People First of Tennessee, opposed the motion, asserting that constitutional violations remained ongoing, closing Arlington was not a significant change in fact rendering the court's order inequitable or unworkable, and there was no durable remedy in place. *Id.*

After an evidentiary hearing, the court denied Tennessee's motion, finding that the state had not shown relief from the court's orders was warranted under rule 60(b)(5) and the *Rufo* standard. *Id.* at 933. The court rejected the state's argument that Arlington's closure and the transfer of all its residents to monitor-approved facilities achieved the objective of the court's remedial orders and represented a durable remedy against future constitutional violations. *Id.* at 934. While the closure of Arlington was a significant milestone in the litigation, the closure was anticipated by the parties when they executed the 2006 settlement agreement, and the state did not show it had made reasonable efforts to comply with the agreement's remaining requirements. *Id.* 935–36. Ultimately, the court held that the state had not carried its "heavy burden" under *Rufo*, and it explained that:

> The 2006 Settlement Agreement made clear that the closure of Arlington and transition of its residents to community placements would not end the State's responsibilities in this action. Indeed, the State agreed in the 2006 Settlement Agreement to take many additional steps to ensure the adequacy of the care class members receive, and the State has failed to articulate a compelling reason why it should not be held to the terms of its agreement.

*Id.* at 936. *See also Northridge*, 647 F.3d at 616 (declining to modify consent decree because alleged changed circumstance, the church growing from 1,100 to 14,000 attendees per week, was not unanticipated); *Husted*, 696 F.3d at 603 (affirming denial of Rule 60(b) motion to modify a consent decree governing the counting of certain provisional ballots under Ohio law where changed circumstances appeared anticipated).

-36-

Upon review of the parties' Motion and attached affidavits, the court finds this case is more like *Tennessee* than *Vanguards*. Like in *Tennessee*, the parties do not, and cannot show, that the City and CDP have satisfied all of the Agreement's terms. Rather, the parties argue termination is warranted because City and CDP have "satisfied the core requirements of the Use of Force, Crisis Intervention, and Searches and Seizures sections[,]" and they "have implemented other durable remedies required by the Agreement, including measures related to Officer Assistance and Support, Accountability, Supervision, Community Engagement, and Transparency and Oversight." (Mot. at PageID 15084–85.) However, these accomplishments, like the closing of Arlington in *Tennessee*, were anticipated by the terms of the Agreement. Conversely, the low promotion exam passage rates for minority firefighters was not anticipated by the parties in *Vanguards*. Therefore, the City bears a "heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Rufo*, 502 U.S. at 385.[6]

---

[6]     In their Affidavits, the Mayor, President of City Council, Chief of Police, and Executive Director of the Police Accountability Team, all assert that the Settlement Agreement is inhibiting progress and City's ability to address current policing challenges and community demands. (*See* Griffin Aff. ¶¶ 13–16; Todd Aff. ¶¶ 43–45; Bibb Aff. ¶¶ 6, 19, 21–26; Anderson Aff. ¶¶ 32–35, 37–38.) However, the City provides little evidence to show how the Agreement is impeding "innovation, efficiency, and responsiveness." (Bibb Aff. ¶ 25.) Such declarations without concrete examples are self-serving. And as *Rufo* made clear, a party should not be granted relief under Rule 60(b)(5) "when it is no longer convenient to live with the terms of a consent decree." 502 U.S. at 383. Accordingly, the court finds little value in the City officials' comments on the onerousness of the Consent Decree.

### 1. *Reasonable Efforts to Comply with the Terms of the Settlement Agreement*

The terms of the Agreement do not operate in isolation. Rather, they work together to make constitutional policing the core of CDP's culture.  Thus, even if the City and CDP show reasonable efforts to comply with some of the Decree's terms, they have not necessarily demonstrated reasonable efforts to comply with all.

After considering the evidence presented by the parties and the record overall, the court finds for the following reasons that the City has not met its heavy burden to convince the court it should be relieved of the Agreement's demands under Rule 60(b).

#### a. Community Engagement & Building Trust

During its investigation, the Department of Justice found that "CDP's method of policing contributes to the community's distrust of and lack of respect for officers." (Findings Letter at PageID 57.) Specifically, DOJ found that "officers escalate situations instead of defusing them and using them as an opportunity build trust and rapport; officers draw their service weapons on people who are suspected of minor crimes or who do not otherwise pose a threat; and officers use force against people in mental health crises after family members have called the police in a desperate plea for assistance." (*Id.*) The Department also reported that CDP's efforts to establish and maintain positive and beneficial relationships with the community is "potentially also undermined by the frequency with which officers appear to stop and search people without meeting the requiesite threshold of reasonable suspicion or probable cause." (*Id.*) Based on these findings, and in recognition that constitutional policing is central to fostering trust with the community, the parties placed terms related to Community Engagement and Building Trust first in the Agreement.

-38-

In their motion, the parties characterize this section as an additional remedy, that, while required by the Settlement Agreement, is not required to show compliance with the Fourth Amendment. (Mot. at PageId 15100.) They argue that the City and CDP "have made positive strides in implementing community engagement and community policing principles," by incorporating the duties of the CPC in to the City Charter, and by enacting in 2019 a District Policing Committee Plan approved by the Monitor and court. (*Id.* at PageID 15108–09.) The parties also reference a 2022 community engagement report authored by the City to show that CDP has partnered with dozens of local groups, including youth organizations, thereby building trust and strengthening relationships between CDP and community members. (*Id.* at PageID 15110.) Lastly, they highlight the City's 2024 homicide clearance rate as evidence of improved community cooperation. (*Id.*) While these are notable achievements, the parties omit relevant evidence of the City's persistent conflicts with the CPC, and they fail to explain why relief is proper when none of the Community Engagement and Building Trust have achieved Substantial and Effective Compliance.

The Cleveland Community Police Commission bears a tremendous amount of responsibility and authority. In 2021, Cleveland voters chose to increase CPC's authority by enshrining the Commission into the City Charter. (*See generally* ECF No. 413.) With these oversight powers, CPC plays a critical role in ensuring that "CDP recognizes and operates in a manner consistent with cooperative community understanding and engagement[.]" (Agreement ¶ 15.)

Even before CPC was included in the City Charter, the Commission faced staffing challenges, and struggled to keep commissioner seats filled. It was not until this last reporting period that the CPC had a permanent Executive Director, a full complement of commissioners, and more program staff coming on board. (*See* 18th Semiannual at PageID 15173.) Despite this positive

momentum, it appears the City did not notify the CPC of its decision to jointly file with the DOJ the instant Motion to Terminate. And it appears that this lack of communication motivated the CPC to file an amicus brief expressing its position in relation to the Motion.

While the court ultimately denied the CPC's amicus motion, it cannot ignore the fact that the CPC felt compelled to make such a filing. As the court stated in its order denying the CPC's request, "allowing the CPC to enter this litigation as amicus curiae could widen existing disagreements between the City and the Commission, and place the court in the highly unusual position of managing adversarial briefings between the City and one of its own entities." (Order, ECF No. 702.) This tension is also demonstrated by the City's history denying the CPC access to documents the Agreement requires the CPC have in order to fulfill its obligations under the Decree and City's Charter. (*See* supra discussion at pg. 15–17.)

Additionally, the City's recent hiring of Jensen Hughes, a consulting firm specializing in public safety and risk consulting, to assess how CPC, Civilian Police Review Board ("CPRB"), OPS, Inspector General, and Police Accountability Team work together and allocate responsibilities, shows more work is needed to implement and sustain these community police oversight bodies. (*See* 18th Semiannual Tr. at PageID 15354–60). As the Monitoring Team commented at the Eighteenth Semiannual Status Conference, "there is currently no City policies or procedures that delineate how these three entities are intended to integrate, and how they differ in responsibility and jurisdiction. [...] The hiring of Jensen Hughes is a positive step toward that end, but not in itself an assurance of successful compliance." (*Id.* at PageID 15360.)

-40-

Thus, because none of the Community Engagement and Building Trust terms have achieved Substantial and Effective Compliance, and some are still rated as Non-Compliant, the court finds that the parties are not entitled to relief under Rule 60(b)(5).

b.      Community and Problem-Oriented Policing ("CPOP")

A consistent finding from the Department of Justice's investigation was that CDP was not engaging in community policing effectively at all levels of the Division, and that "CDP's method of policing contributes to the community's distrust of and lack of respect for officers[.]" (Findings Letter at PageID 57.) The DOJ also reported seeing evidence that some officers held views incompatible with community policing principles, and that those attitudes were tolerated and encouraged by at least some members of command staff. (*Id.* at PageID 59.) Given these findings, the parties agreed that the City would "develop and implement a comprehensive and integrated community and problem-oriented policing model in order to promote and strengthen partnerships within the community, engage constructively with the community to ensure collaborative problem-solving, and increase community confidence in CDP." (Agreement ¶ 27.)

The parties assert that the City and CDP have made "positive strides in implementing community engagement and community policing principles." (Mot. at PageID 15108.) Specific to Community and Problem Oriented Policing, the parties argue that "for at least the last six years, CDP has taken steps to integrate community policing principles into its policies and systems," by implementing the court-approved CPOP Plan, and other approved policies. (*Id.* at PageID 15109.) Furthermore, the parties highlight that CDP has established collaborative CPOP coordinators in every patrol district. (*Id.*)

The Monitor has not produced a comprehensive CPOP assessment yet; therefore, the court refers to the two more recent semiannual reports to help evaluate the parties' claims. Currently, none of the eight CPOP paragraphs is in General or Substantial and Effective Compliance. (18th Semiannual at PageID 15174.) One paragraph is in Non-Compliance, six are in Partial Compliance, and one is in Operational Compliance—an upgrade from the Seventeenth Semiannual Report. (*Id.*) In the Eighteenth Semiannual Report, the Monitor acknowledged that the City's data shows some community engagement and CPOP data, including 3,893 community engagement activities in the second half of 2025, and 310 original CPOP forms during the reporting period. (*Id.* at PageID 15186.) The City's data further indicated that many of the CPOP activities address a range of quality-of-life concerns across all districts and all hours of the day. (*Id.*) When read in a vacuum, these reporting numbers seem strong, but, as the Monitor notes, there is no data yet reported on the outcomes of those interactions, such as a description of the resolution of the CPOP effort, its success, the type of intervention, or which partners were involved. (*Id.*)

While the CDP has implemented some of the technical requirements under the CPOP section of the Decree, more data and analysis is needed to determine if the City has achieved Substantial and Effective Compliance. As the CPOP paragraphs currently stand, no paragraphs are in either General Compliance or Substantial and Effective Compliance, and most are only in Partial Compliance. Thus, the court finds that the parties are not entitled to equitable relief pursuant to Rule 60(b)(5).

<u>c.</u>      <u>Bias-Free Policing</u>

The parties represent that CDP has developed and implemented polices and training related to bias-free policing, and that outside analysis of 2024 traffic stop and search data showed no "statistically significant racial disparities in how often officers' searches recovered contraband."

(Mot. at PageID 15109–10.) As such, the parties argue, compliance with bias-free policing terms has been established and termination of federal oversight is warranted. (*Id.* at PageID 15110–11.) The court is unpersuaded.

Like the section on CPOP, the Monitor has not completed a comprehensive assessment of the paragraphs governing bias-free policing. As such, Paragraphs 35–44 are rated as being in Operational Compliance (2), Partial Compliance (6), and Non-Compliance (1). These lower ratings of course do not tell the whole story of the work the City and CDP have done in this area. Indeed, the City and CDP have created and revised policies and trainings related to bias-free policing. (*See* ECF Nos. 453, 424, 381, 271, 207, 186.) Still, crafting and continuously updating policies and training curricula does not automatically mean that bias-free policing principles are embedded in the Division.

Additionally, the parties fail to explain why CDP has not yet submitted the Supervisor's Bias Free Policing Training—a curriculum that the Monitoring Team and DOJ provided feedback on previously, and received full CPC approval in November 2024. (*See* 17th Semiannual at PageID 14453–54; 18th Semiannual at PageID 15187–88.) Nor do the parties address CDP's continued non-compliance with Paragraphs 43 and 265 of the Agreement, which require CDP to produce a comprehensive annual report assessing whether the CDP's operations are being conducted in a fair and unbiased manner. (*See* 18th Semiannual at PageID 15189.) This is the exact kind of reporting that, if regularly conducted in accordance with the Agreement's terms, might demonstrate the existence of a durable remedy in the area of bias-free policing.

The court also notes the parties' failure to discuss the persistent racial disparities in stops, searches, and arrests identified in the 2025 Search and Seizure Assessment. That Assessment showed that:

> [i]n 2024, Blacks comprised 62.9% of individuals subjected to traffic stops and 67.3% of those subjected to investigatory stops—figures that exceed their representation in the city's population. Moreover, Blacks made up 72% of all searches conducted during traffic stops and 72.5% of stops resulting in arrests.

(Search and Seizure Assmt at PageID 14646.) As the Monitor noted, these findings merit further critical analysis to understand the nature of the disparities, "which alone are not evidence of intentional bias." (18th Semiannual at PageID 15206.) Even so, the court still finds this data concerning, and is not convinced that the City and CDP has done enough of what the Agreement requires to warrant termination of the Bias-Free Policing section.

Therefore, and reflective of no paragraphs in the Bias-Free Policing section being in General or Substantial and Effective Compliance, the court finds that the parties are not entitled to relief under Rule 60(b)(5).

### d. Use of Force

Allegations of excessive use of force is what prompted the Department of Justice's 2004 investigation, and its investigation a decade later prompting the instant Settlement Agreement. Therefore, it is unsurprising that the largest section of the Decree is Use of Force. (Agreement ¶¶ 45–130.) Paragraph 45 establishes the goal of section's terms, and it reads, in relevant part:

> CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force is used in accordance with the Constitution and laws of the United States and the requirements of this Agreement and that any use of unreasonable force is promptly identified and responded to

-44-

> appropriately. The force policies, training, supervision, and accountability systems will be designed with the goal of ensuring that officers use techniques other than force to effect compliance with police orders whenever feasible; use force only when necessary, and in a manner that avoids unnecessary injury to officers and civilians; de-escalate the use of force at the earliest possible moment; and accurately and completely report all uses of force.

(*Id.* ¶ 45.) The Monitor's 2025 Use of Force Assessment ("Force Assessment") (ECF No. 685) is the most comprehensive review of the City and Division's compliance with this section of the Agreement.[7] Therefore, the court principally relies on it to evaluate the City's contentions that CDP is in compliance with the Use of Force terms.

The parties argue that CDP has achieved substantial compliance and a durable remedy regarding excessive force because 1) CDP has revised its use of force polices to satisfy the Agreement's requirements, and trained officers on the new policies; 2) CDP has established review and accountability mechanisms required by the Agreement, including a Force Investigation Team and Force Review Board; and 3) the Monitor's assessments show that the vast majority of CDP's uses of force are constitutional and that CDP has improved its review of force incidents. (Mot. at PageID 15085.) The court addresses each argument in turn.

### i.      Policies & Training (¶¶ 49–86)

The parties accurately report that CDP has updated and revised its use of force policies consistent with Paragraph 45 of the Consent Decree. Those policies have been approved by the court

---

[7]     Outcome measure assessments, compliance reviews, and audits are governed by Paragraph 371, which requires the Monitor to submit proposed methodology for the assessment, review, or audit to the parties for their review. The parties can submit any comments or concerns regarding the methodology, and "the Monitor will modify the methodology as necessary to address any concerns or will inform the Parties in writing of the reasons it is not modifying the proposed methodology." (Agreement ¶ 371.)

and many were recently rated as being in Substantial and Effective Compliance. (Force Assmt. at PageID 14890–915; Agreement ¶¶ 49–53, 70–71, 8184, 87.) Paragraph 45 of the Decree also requires the CDP to "develop and implement" those policies along with training, supervision, and accountability systems to ensure that force used by officers of the CDP is constitutionally permissible. To date, not all durable reforms in those policies have been implemented, nor have all of the system requirements. For example, Paragraphs 75, 76, 82, and 83 require audits and reviews respectively of the use of Electronic Control Weapons (ECW or Tasers) and Oleoresin Capsicum (OC) Spray. Those audits do not exist for ECW, and the Monitor reports that the existing OC Spray audits are inadequate. (Force Assmt. at PageID 14909–10, 14912–13.) Accordingly, the court finds that material requirements under the polices and training subsections of the Use of Force section remain, and must be satisfied.

### ii.  Accountability (¶¶ 87–130)

The parties assert that CDP has established review and accountability mechanisms required by the Agreement, including a Force Investigation Team ("FIT") and Force Review Board ("FRB"). They support this contention by referencing the Monitor and court's approval in 2020 of CDP's Supervisory Review Policy, FIT Manual, FIT General Police Order, and Memorandum of Understanding with the Cuyahoga Sheriff's Department to conduct criminal investigations of deadly force incidents. (Mot. at PageID 15088; *see also* Order, ECF No. 311.) Additionally, the parties reference the court's approval in 2021 of the FIT Training curriculum. (*Id.*; *see also* Order, ECF No. 362.)

Likewise, to demonstrate compliance with the Force Review Board requirements, the parties cite the Monitor and court's approval of the FRB Policy and Training Curriculum in 2020, (Order,

-46-

ECF No. 317), as well as the Monitor's Tenth and Eleventh Semiannual Reports, "indicat[ing] high-level approval of the FRB meetings, while noting some issues regarding timeliness and objectivity." (Mot. at PageID 15089; *see also* ECF Nos. 386-1, 440.)

While these accomplishments are significant, they do not necessarily reflect CDP's sustainable ability to police themselves and hold officers accountable when excessive force is found. For example, the parties characterize the Force Review Board as part of part of CDP's mechanism for self-analysis and improvement. (Mot. at PageID 15092.) That said, the FRB does not do sufficient critical self-analysis. As noted in the Monitoring Team's analysis of Paragraph 129 in its Force Assessment Report, FRB data is being collected, but the self-analysis of it is not consistently reported. (Force Assmt. at PageID 14950.)

Furthermore, the Monitoring Team has observed a severe lack of consistency when there is a change in the FRB members. Most concerning, as reported in the Use of Force Assessment discussion of Paragraph 126, with a recent change in leadership at the FRB, the rigor in the review of the totality of the circumstances and officer tactics deteriorated, pointing out that the Division has not created a system that ensures consistency with personnel changes. Discussions addressing the Monitoring Team's concerns were productive, but an upgrade to Substantial and Effective Compliance in this critical area turns on whether FRB can maintain quality discussions, even when board members and leadership change. (*See id.* at PageID 14947.) Thus, there are still material requirements within this subsection of the Use of Force provision to be satisfied.

### iii. Outcome Measures

Lastly, the parties discuss numerous data points from the Force Assessment to argue that CDP has adopted policies and delivered training consistent with the Agreement's terms. Overall, the

Monitor found that in 97% of the Level 1 and Level 2 cases reviewed, the officer's use of force was necessary, proportional, and objectively reasonable. (Force Assmt. at PageID 14869.) Monitoring Team reviewers also found that de-escalation was not feasible in 53% of assessed cases, and that officers took reasonable efforts to de-escalate in 38% of cases. (*Id.*) In only 5% of the cases reviewed, did the Monitoring Team find that officers failed to make reasonable efforts to de-escalate prior to using force. (*Id.*) As the Monitor explained, "[w]hile adherence to all paragraphs and the specific language throughout the Consent Decree is key to compliance, the data tell an important story about CDP members' interactions with the public relative to force." (*Id.*)

These findings are significant and encouraging, and the City deserves recognition for its extensive efforts to transform how officers and supervisors use and report force incidents. Even so, the parties' motion omits where gaps in compliance remain, and where the data show concerning outcomes. For example, the Monitor noted that there was a notable increase from 2023 to 2024 in the number of force incidents involving violence toward the police officer and for obstructing justice. (*Id.* at PageID 14974.) This increase could be the result of changed data entry practices, or it could be an indication of changes in how the public perceives and behaves toward police officers and how officers respond. (*Id.*)

Therefore, while the City and CDP have made measurable progress in complying with the Agreement's Use of Force provisions, only 22 paragraphs have achieved a Compliance Grade of Substantial and Effective Compliance consistent with ¶¶ 401 and 370, and thus work remains. As such, the court finds that the parties are not entitled to relief under Rule 60(b)(5).

> e. Crisis Intervention

The Department of Justice determined that CDP's crisis intervention polices and practices

were underdeveloped, and not fully integrated, resulting in the use of unreasonable force against people experiencing mental health crises. (Findings Letter at PageID 60.) As such, the parties agreed that:

> CDP will build upon and improve its Crisis Intervention Program with the goal of: (a) assisting individuals in crisis; (b) improving the safety of officers, consumers, family members, and others within the community; (c) providing the foundation necessary to promote community and statewide solutions to assist individuals with mental illness; and (d) reducing the need for individuals with mental illness to have further involvement with the criminal justice system. The Crisis Intervention Program will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health care system and create a context for sustainable change.

(Agreement ¶ 131.) To that end, the Agreement sets forth terms specific to the creation of a Mental Health Response Advisory Committee and a Crisis Intervention Coordinator position, as well as general and specialized crisis intervention training, and topic-specific policies and procedures. (*Id.* ¶¶ 132–59.)

The parties contend that the City and CDP have strengthened their response to people experiencing behavioral health crises by complying with the Agreement's terms regarding systems for oversight and community input, new policies and procedures, and effective training. (Mot. at PageID 15092.) As evidence of this compliance, the parties reference the City's successful establishment of a Mental Health Response Advisory Committee, the court's approval in 2017 and 2022 of CDP's Crisis Intervention Policy (ECF Nos. 115, 445), as well as the court's approval in 2018 of CDP's general crisis intervention training curriculum (ECF No. 183). They also cite the Monitor's positive comments in the Sixteenth and Seventeenth Semiannual Reports (ECF Nos. 597, 658). Lastly, the parties emphasize the Monitor's 2025 Crisis Intervention Compliance Assessment

-49-

(ECF No. 661), in which the Monitor reported that CDP had achieved General or Substantial and Effective Compliance across all crisis intervention paragraphs. (Mot. at PageID 15096.) Based on this evidence, the parties assert that CDP has demonstrated compliance with the Crisis Intervention section of the Agreement, and therefore federal oversight of those paragraphs should end. (*Id.* at PageID 15097.)

After reviewing the parties cited evidence, and the record at large, the court agrees that the City and CDP have made significant progress in establishing a robust crisis intervention program and embedding these practices into CDP's culture. Like the Monitor, the court applauds CDP for implementing specialized CIT training programs that "represent best practices in the field and have been recognized as national models." (CIT Assmt. at PageID 14513.) The court is also encouraged by the Monitor's findings that officers consistently demonstrate appropriate de-escalation techniques, calm demeanor, and professional conduct when responding to individuals in crisis. (*Id.* at PageID 14514.) Indeed, these practices appear to be working as there are extremely low arrest rates and use of force in crisis incidents, as well as high rates of hospital transports. (*Id.*)

Reflecting back on the City's and CDP's work in this particular area, the court notes that the City and CDP have consistently worked hard to achieve compliance with the Agreement's CIT terms. In the Fifth Semiannual Report and Comprehensive Reassessment (ECF No. 214), the Monitor remarked, that "the progress that the City has made in the area of crisis intervention is the strongest and most significant of any area of the Consent Decree to date." (5th Semiannual at PageID 4121.) Contributing to this early success, was "collaboration of a diverse group of stakeholders from across the City, a genuine willingness to critically appraise prior practices, and the strategic adoption of new approaches geared at new outcomes are having tangible benefits for individuals in crisis,

-50-

police officers, social service providers, and Cleveland residents." (*Id.*)

While all Crisis Intervention paragraphs have received Compliance Grades of either General Compliance or Substantial and Effective Compliance, the court finds that more work is needed to reach Substantial and Effective Compliance across the board. Thus the parties are not entitled to relief under Rule 60(b)(5).

        f.        Search and Seizure

During their investigation into allegations of excessive use of force by CDP officers, the Department investigators frequently encountered descriptions of stops, searches, and arrests by some CDP officers that appeared to violate individuals' Fourth Amendment protection against unreasonable search and seizure. (Findings Letter at PageID 14.) For example, there were records of individuals being detained on suspicion of having committed a crime, but there was not an adequate articulation for the officer's suspicion or justification for the stop. (*Id.*) When the officer provided a basis for the detention or search, they used canned or boilerplate language—a practice routinely approved by supervisors. (*Id.*) Given the strong likelihood that CDP's stop, search, and seizure practices violated the Constitution and "the near certainty that they breed more distrust in the community," the parties agreed to address these issues through specific search and seizure terms in the Decree. (*Id.*)

The parties argue that the City and CDP have achieved substantial compliance and a durable remedy regarding searches and seizures because CDP has developed and implemented policies and training required by the Agreement, the Monitor's 2025 Search and Seizure Assessment ("Search and Seizure Assessment") (ECF No. 672) shows that CDP officers regularly follow constitutional standards governing searches and seizures, and when there are deficiencies, CDP has shown it takes

-51-

corrective action to address them. (Mot. at PageID 15097–99.) The parties' argument is not well-taken.

Paragraphs 160 to 175 of the Agreement outline how CDP must conduct all stops, searches, and seizures in accordance with constitutional standards. Paragraph 160 provides an overall mandate, and it reads:

> CDP will conduct all investigatory stops, searches, and arrests with the goal of ensuring that they are conducted in accordance with the rights secured and protected by the Constitution and state and federal law. CDP will conduct investigatory stops, searches, and arrests fairly and respectfully as part of an effective overall crime prevention strategy that takes into account community values. To achieve this goal, CDP will revise, develop, and implement search and seizure policies that comply with applicable law, and include the requirements [in ¶¶ 161–175] below.

(Agreement ¶ 160.) Currently, none of the Search and Seizure paragraphs have achieved Substantial and Effective Compliance, and only one paragraph (¶ 173) is in General Compliance. (Search & Seizure Assmt. at PageID 14683–75.) Despite these ratings, the parties selectively choose positive analysis statements from the Search and Seizure Assessment to declare that the City and CDP are adequately addressing deficiencies. The court is not persuaded.

First, the parties do not acknowledge that in conducting the Search and Seizure Assessment, the Monitoring Team encountered data integrity challenges, such as the unavailability of some WCS videos from 2023, and incident-level analysis issues arising from CDP's frequent use of "stop operations," in which a single incident number is used to document multiple stops in the operation. (*Id.* at PageID 14657.) These data limitations and others, meant the Monitor's evaluation of supervisory review was constrained, (*id.* at PageID 14663–65), thus indicating the Assessment upon which the parties rely is perhaps not as comprehensive as it could be.

Second, and perhaps more discouraging, is the parties' omission of the Monitor's extensive discussion of apparent racial disparities in CDP's stop, search, and arrest practices. The Monitor reports that "[i]n 2024, Blacks comprised 62.9% of individuals subjected to traffic stops and 67.3% of those subjected to investigatory stops—figures that exceed their representation in the city's population. Moreover, Blacks made up 72% of all searches conducted during traffic stops and 72.5% of stops resulting in arrests." (*Id.* at PageID 14646.)

These data points, among others, raise questions regarding the equity and constitutionality of law enforcement practices, and "underscore the ongoing need for enhanced transparency, community engagement, and data-informed policy reforms and training to ensure that public safety is administered fairly, objectively, and without bias." (*Id.* at PageID 14675.) The parties' failure to address these findings in the Motion, shows a lack of accountability and willingness to continue a close working relationship with the Monitoring Team subject matter experts to address these apparent racial disparities.[8]

The parties accurately state that the City and CDP have enacted many of the Agreement's required search and seizure training programs, procedures, and policies. Whether officers and supervisors are complying with these procedures and policies over a sustained period of time is yet to be seen. It is also true that the Monitor's assessment showed that the vast majority of stops reviewed were supported by sufficient articulation of reasonable suspicion, and probable cause when

---

[8]  The City noted in the Eighteenth Semiannual Status Conference that it has engaged an independent expert, Sigma Squared, to better understand the disparities uncovered by the Monitor's assessment. (18th Semiannual Tr. at PageID 15330–31.) Those findings, while released by the City to the press on April 21, 2026, are not in the current record, and so the court does not incorporate them into its analysis of the parties' Rule 60(b)(5) arguments.

arrests occur. (*Id.* at PageID 14645.) The assessment also shows that, most of the time, officers are not using rote or canned language when documenting searches, seizures, and arrests. Nonetheless, the assessment also showed that accountability concerns persist. For example, 9% of traffic stops still lack sufficient and clear articulation of probable cause. (*Id.* at PageID 14658.) This rate is concerning whether it results from an actual lack of probable cause, or a failure to articulate the probable cause that is not being sufficiently detected or addressed through supervisory reviews. Likewise, the fact that 15% of pat-down searches lacked articulated reasonable suspicion indicates a systemic problem—whether reasonable suspicion is actually lacking, or the omitted articulation is not being addressed by supervisors. (*Id.* at PageID 14660.)

The City and CDP have made good progress in meeting the technical requirements of parts of the Search and Seizure section in the Agreement, but the work is not done and compliance has not been shown. As the Monitor explained, "[t]o fully realize the aims of the Consent Decree, CDP must continue to invest in culturally competent training, ensure meaningful and timely supervisory oversight, and adopt rigorous accountability mechanisms that foster transparency and build community trust." (*Id.* at PageID 14647.) Thus, given no Search and Seizure paragraphs have a Compliance Grade of Substantial and Effective Compliance, and only one falls under General Compliance, the court finds that the parties are not entitled to relief under Rule 60(b)(5).

g.      Accountability

In its Findings Letter, the Department of Justice wrote that, "[p]rincipal among the systemic deficiencies that have resulted in the pattern or practice we found is the Division's failure to implement effective and rigorous accountability systems." (Findings Letter at PageID 12.) For example, the Department found that CDP did not adequately investigate civilian complaints of

officer misconduct, despite the City's Charter and CDP policies requiring thorough and complete investigations. (*Id.* at PageID 46.) Furthermore, the civilian Police Review Board's review of complaint investigations were inadequate, and the Board's decisions lacked transparency. (*Id.* at PageID 49.) Ultimately, the Department concluded that "CDP's civilian complaint system, as a whole, is disorganized and ineffective." (*Id.* at PageID 50.) Given these investigation results, the parties agreed that,

> The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process.

(Agreement ¶ 176.)

The parties assert that the City and CDP have achieved the Accountability Section's core objective to "fully, fairly, and efficiently" investigate allegations of misconduct by "taking steps to improve CDP's internal Affairs Unit, the City's Office of Professional Standards, and the disciplinary process." (Mot. at PageID 15104.) The court examines each in turn.

### i. Internally Discovered Misconduct – Internal Affairs Unit

The parties contend that the City and CDP have satisfied the terms relating to internally discovered misconduct because the Monitor's report show that IA is onboarding investigators consistent with the Agreement, and that IA is applying a systematic approach to each case, thereby ensuring implemented processes are regularly followed. (*Id.*)

In the Eighteenth Semiannual Report, the Monitor confirmed that all polices and procedures within the IA subsection are complete, including training for IAU personnel. (18th Semiannual at

-55-

PageID 15209.) Additionally, the Monitor found that IA's new hiring guide for potential investigators adheres to the requirements of Paragraph 179, and results in the onboarding of investigators that meet all of the qualifications in Paragraph 179. (*Id.*) The Monitor also reported that investigators are attending the approved IAU Annual Training. (*Id.* at PageID 15210.) Given these findings, and lack of a comprehensive assessment of the IA paragraphs, the Monitor rates eight paragraphs in Partial Compliance and seven in Operational Compliance. (*Id.* at PageID 15210–11.)

The court concludes that the City and CDP have executed many of the technical requirements within the internal misconduct subsection, but the work is not finished as Substantial and Effective Compliance has not been shown.

### ii.     Investigation of Civilian Complaints and Police Review Board

Civilian complaints of officer misconduct are largely processed through CDP's Office of Professional Standards ("OPS") and the Civilian Police Review Board ("CPRB"). During its investigation, DOJ found, among other things, that OPS lacked a sufficient number of investigators, resulting in complaints taking on average 6 months to complete. (Findings Letter at PageID 47–49.) They also reported that the OPS manual provided little guidance on how to conduct a thorough investigation, thus investigations were frequently substandard. (*Id.*) Further, the civilian intake process was difficult given CDP's policy to only investigate those signed by the complainant. (*Id.*) Finally, they found that the Civilian Police Review Board's decisions lacked transparency, that its cases frequently lacked a final disposition, and where a disposition existed, there was no evidence of the Board's rationale for the decision. (*Id.*) Remedying these deficiencies and installing sustainable accountability mechanisms has been a persistent challenge, and frequently required court assistance to advance.

For example, in the First Semiannual Report (ECF No. 65), the Monitor wrote that, "[t]he foundational deficiencies with OPS are more significant and urgent than the Monitor and Parties were aware in early 2016 as the Monitor Plan for the year was constructed." (1st Semiannual at PageID 824.) Additionally, when reform efforts began, OPS had a staggering number of incomplete cases dating back to 2014. (*Id.*) Resolving this complaint backlog required substantial work from the City, DOJ, and Monitoring team, as well as intervention by the court when the City failed to meet agreed-to milestones. (*See* 5th Semiannual at PageID 4139–41.) It was not until the Monitor's Eighth Semiannual Report, released in July 2020, that it could report the initial backlog being cleared. (8th Semiannual at PageID 7061, ECF No. 320.) However, issues remained and OPS investigations continued piling up leading the Monitor to report on OPS's persistent backlog in the Ninth, Tenth, Eleventh, Twelfth, and Thirteenth Semiannual Reports. (ECF Nos. 345, 386, 440, 471, 488.)

In 2024, the tide began to turn. That year, under the leadership of a new OPS Administrator and increased collaboration between OPS, the Monitoring Team, and DOJ, the City significantly reduced its investigation backlog. (*See* 15th Semiannual at PageID 12929.) This good work continued throughout 2025, at which point the Monitor found that productivity within OPS almost doubled since 2024's rate. (18th Semiannual at PageID 15177.) The City confirmed this increase during the Eighteenth Semiannual Status Conference, reporting that OPS closed 316 investigations in 2025 compared to 150 in 2024, and that the average number of days to completion of an OPS investigation decreased from 256 days in 2024 to 85 days in 2025—a nearly 67% reduction. (18th Semiannual Tr. at PageID 15353.)

This work is laudable, especially given where OPS began. Nevertheless, two years of good progress does not, on its own, show that the City and CDP have established a durable remedy to the

-57-

civilian complaint process. Indeed, the Monitor also noted in the Eighteenth Semiannual report that there is a growing backlog of cases awaiting a CPRB hearing, and that OPS is currently being led by an Interim Administrator. (18th Semiannual at PageID 15177.) Thus, the City and CDP have more work to do to reach Substantial and Effective Compliance with these material terms.

### iii. Discipline

Continued federal oversight of the discipline subsection is likewise warranted because there "appear to be some patterns around disciplinary decisions that raise questions, including some variability in decision-making between the CDP and DPS." (18th Semiannual at PageID 15217.) The parties correctly note that the City has been largely compliant with the policies and the administrative requirements of the Agreement as they relate to discipline. Indeed, all assessed paragraphs are in General, Partial, or Operational Compliance. (*Id.* at PageID 15218.) A deeper review of disciplinary decisions are needed, however, to fully assess whether these administrative changes are durable and truly incorporated into CDP culture and policy.

In conclusion, the record shows that the City and CDP have not achieved Substantial and Effective Compliance with any of the Accountability paragraphs. Thus, these material requirements are not met and the parties are not entitled to relief under Rule 60(b)(5).

### h. Transparency & Oversight

Section X requires the City to hire a Public Safety Inspector General and requires CDP to collect and maintain all data and records necessary "to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad public access to information related to CDP's decision making and activities." (Agreement ¶¶ 250, 257.) The parties assert that the City's hiring of a police-focused Inspector General to conduct oversight,

along with its data collection and analysis efforts satisfy the Agreement's requirements, and thus warrant termination of the Transparency and Oversight section. (Mot. at PageID 15111.) The court is unpersuaded.

First, the City's current Inspector General has only held the job since the end of 2024. (16th Semiannual at PageID 13955.) Despite the City filling the IG vacancy, the Monitor reports that "[t]o date, no communication, policy, or procedure has been developed to govern how the Mayor or Chief of Police will communicate requests to the IG for investigations, analyses, audits, etc[,]" and "[a]dditional work by the City—DPS, HR, and the Mayor's Office—is necessary for the IG to become ensconsed as a viable oversight entity in the City." (18th Semiannual at PageID 15219.) Moreover, there continues to be questions about whether City leadership is respecting the independence of the IG. (*Id.* at PageID 15219–20.)

Second, the parties correctly report the Monitor's finding that CDP maintains various public datasets and dashboards. (*See* 17th Semiannual at PageID 14461.) This data, however, is not routinely analyzed as required by the Agreement, or for internal management purposes. For example, Paragraphs 264–68 require the City and CDP to share specific data with the public, and expects the CPC to be involved in that process. Another compliance gap is the organization of the Division's policies on its website. The policies online are not searchable, often out of date, or even missing. Those that are there are in essence, hiding in plain sight. This deficiency has been raised in nearly every Semiannual Report to no avail. (*See e.g.*, 18th Semiannual at PageID 15221; 17th Semiannual at PageID 14463; 16th Semiannual at 13969; 15th Semiannual at PageID 12931.)

Accordingly, work remains in the area of Transparency and Oversight. As the record currently stands, no paragraphs are in Substantial and Effective Compliance, and only five of the 19

section paragraphs are in General Compliance. Thus, the court finds that the parties are not entitled to relief under Rule 60(b)(5).

### i. Officer Assistance & Support

During its investigation into the Cleveland Division of Police's use of forces, the Department of Justice found that the Division's officers were inadequately supported and trained, and that CDP's equipment, technology, and staff planning were deficient. (Findings Letter at PageID 50, 62.) DOJ concluded that CDP's pattern or practice of excessive force was in part reflected by and stemmed from the Division's failure to provide its officers with the support, training, supervision, and equipment needed to allow them to do their jobs safely and effectively. (*Id.* at PageID 11–12.) Moreover, the Department explained that CDP's inadequate technology and equipment, such as a lack of zone car or office computers, "make[] it difficult for [officers] to comply with some policies and contribute[] to low officer morale." (*Id.* at PageID 64.) Given these findings, the parties agreed to a robust set of requirements dealing with officer assistance and support, specifically in the areas of training, equipment and resources, recruitment and hiring, performance evaluations and promotions, and staffing.

The parties contend that the City and CDP have taken significant steps to recruit, hire, train, equip, and support officers, and they point to the Monitor's recent assessments and semiannual reports as evidence of this progress. (Mot. at PageID 15100.) The court evaluates the parties' arguments and available evidence as to each subsection in turn.

### i. Training (¶¶ 269–290, 367(f))

The Agreement requires the City to "ensure that all officers receive adequate training to understand: (a) how to police effectively and safely in accordance with CDP policy; (b) the

requirements of this Agreement, Ohio law, and the Constitution and laws of the United States." (Agreement ¶ 269.) Furthermore, CDP training must reflect the Division's commitment to "procedural justice, bias-free policing, and community policing," and it "will instill agency expectations that officers police diligently, and have an understanding of and commitment to the constitutional rights of the individuals they encounter." (*Id.*)

The parties assert CDP has achieved compliance with the training provisions based on the Monitor's 2025 Training Assessment ("Training Assessment") (ECF No. 680) and the Monitor's approval of numerous training materials. Specifically, they highlight the Monitor's comments regarding CDP's use of "reality-based training scenarios" and "adult learning methods," as giving officers the tools needed to perform constitutional policing. (Mot. at PageID 15101.) They also tout the Monitor's conclusion that CDP regularly assesses and adjusts its training needs based on trends in misconduct complaints and community input. (*Id.*) Lastly, the parties emphasize the Monitor's recent finding that CDP's selection of field training officers comply with the decree. (*Id.*)

Upon review of the Training Assessment and recent semiannual reports, the court largely agrees that the City and CDP have fulfilled many of the training requirements outlined in the Agreement. Indeed, nearly all training paragraphs are rated as being in Substantial and Effective Compliance or General Compliance (Training Assmt. at PageID 14847.) Notably lacking from the parties Motion, but noted by the Monitor's Assessment, however, is that CDP's Field Training Program and Field Training Manuals were last updated in 2014. (*Id.* at PageID 14838.) As such, it appears CDP's field training programs operate, in part, on policies adopted more than a decade ago. Why these dated materials remain unchanged, when others have been updated, is unclear. Therefore, the court finds that despite making substantial gains in the training subsection of the Agreement,

additional time is needed to come into Substantial and Effective Compliance with all of this subsection's terms.

### ii. Equipment and Resources (¶¶ 291–299)

Subsection B delineates the equipment and resources the City and CDP must provide "to implement the terms of the Agreement and allow officers to perform their jobs safely, effectively, and efficiently[.]" (Agreement ¶ 291.) Principally relying on the Monitor's 2025 Equipment and Resources Assessment ("Equipment Assessment") (ECF No. 678), the parties contend that CDP has taken significant steps to enhance equipment, technology, and other officer resources. (Mot. at PageID 15102.)

Specifically, they highlight the Monitor's finding that CDP "maintains adequate computer and vehicle inventories, reliable and up-to-date mobile data systems, and functioning records management and email systems that promote information sharing and transparency." (*Id.* (quoting Equip. & Res. Assmt at PageID 14781).) The parties also emphasize the Monitor's approval of CDP's Equipment and Resources Plan, along with improvements in CDP's record management system. (*Id.* (citing Equip. & Res. Assmt at PageID 14796, 14799).) Lastly, they indicate that the Division "maintains critical resources to support officers' health and wellness, including a full-time psychologist and a confidential peer support program." (*Id.* (citing Equip. & Res. Assmt at PageID 14802).)

The court generally agrees with the parties' interpretation of the Equipment Assessment, and commends the City and CDP for reaching General or Substantial and Effective Compliance in four of the subsection's nine paragraphs. Nevertheless, the Motion omits the Monitor's finding that the Division is not consistently or systematically seeking input and feedback from the Community Police

-62-

Commission and CDP members on resource allocation, equipment needs, and technological improvements. (Agreement ¶ 294; Equip. & Res. Assmt at PageID 14797.) Furthermore, the parties' claims about supporting officers' health and wellness does not acknowledge the Monitor's recommendation about revising and modernizing GPO 1.1.41, which was last revised in December 2010, to reflect current practices and more clearly define governance structure, oversight mechanisms, well-defined team member roles, and accountability safeguards. (*Id.* ¶ 299; *Id.* at PageID 14801.) Accordingly, the court finds that more work is needed in the Equipment and Resources subsection.

### iii. Recruitment and Hiring (¶¶ 300–311, 367(e)*)*

Subsection C sets forth recruitment and hiring requirements the City and CDP must comply with to satisfy the Agreement's terms. The Monitor completed a comprehensive assessment of the recruitment and hiring paragraphs in 2025 (ECF No. 674), and the Monitor's findings in that assessment provide the basis for the parties' arguments. The 2025 Hiring Assessment was the first comprehensive review of all paragraphs in Subsection C.

As the parties note in the Motion, the Hiring Assessment concluded "that the CDP has met or exceeded all requirements for Recruitment and Hiring established in the Consent Decree." (Mot. at PageID 15102; Recruit. & Hiring Assmt at PageID 14743.) This is commendable work, and the court applauds the City and CDP for learning from the Monitor's 2022 assessment of paragraphs 308–311, which uncovered a number of shortcomings in the completion and documentation of background investigations of police candidates. (Hiring Assmt. at PageID 14743.) In the most recent assessment, the Monitor found that CDP had automated the background investigation process by utilizing the eSOPH software system. While Monitoring Team assessors had only limited access to

-63-

eSOPH during the review, they were still able to conclude that all background check-related paragraphs were in either General or Operational Compliance—a significant increase from the Non-Compliance ratings in 2022. (*Id.* at PageID 14756–60.)

With regard to the City's and CDP's recruitment efforts, the parties rightfully emphasize the Monitor's conclusion that CDP's Recruitment Plan and its initiative to regularly review and revise the program to attract a diverse and qualified workforce warrants a rating of Substantial and Effective Compliance. (*Id.* at PageID 14750.) Moreover, the City received high marks as to its job postings and statement of hiring standards. (*Id.* at PageID 14754.)

### iv.    Performance Evaluations and Promotions (¶¶ 312–318*)*

In Subsection D, the Agreement states that "CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process, and that officers who lead professionally and effectively are identified and receive appropriate consideration for promotion." (Agreement ¶ 312.) Additionally, CDP must "ensure that poor performance or policing that otherwise undermines public safety and community trust is reflected in officer evaluations so that CDP can identify and effectively respond." (*Id.*)

Unlike the four other subsections under Officer Assistance and Support, the Monitor has not completed a comprehensive assessment of these paragraphs. Even so, the parties contend that court oversight of these paragraphs should be terminated because the City and CDP "have taken meaningful steps towards compliance for performance evaluations by procuring a Performance Evaluation Module Officer Intervention Program ("OIP") from Benchmark Analytics." (Mot. at PageID 15103 (citing Todd Aff. ¶¶ 17–22; 17th Semiannual at PageID 14464–65).) The parties also argue that, while the Monitor has not approved a new promotions policy, it satisfies Paragraph 18

of the Agreement. (*Id.*)

The court is encouraged by the City and CDP's recent efforts to implement an officer early intervention program and performance evaluation module through a partnership with Benchmark Analytics; however, the record does not support the parties' contention that the City has a durable remedy regarding performance evaluation and promotions.

First, none of the seven paragraphs within this subsection are rated higher than Partial Compliance, and most (5), are rated as being in non-compliance. (18th Semiannual at PageID 15232–33, ECF No. 697.) The two paragraphs in partial compliance were just upgraded from the Seventeenth Semiannual Report, meaning that when the parties filed the instant Motion, no paragraphs in this subsection were above Non-Compliance. (*Compare* 17th Semiannual at PageID 14449, ECF No. 658-1 *with Id.* at PageID 15232.) These data points alone contradict the parties' argument that the City and CDP have taken "meaningful steps" towards compliance.

Second, and more concerning, is that the City's new Promotional Selection Process was implemented without input from the CPC, as required by the City Charter and per the authority granted by Paragraph 18 of the Agreement, and without addressing feedback or input from the Monitoring Team that was provided during an earlier review. (*See* 18th Semiannual at PageID 15232.)

Finally, the parties concede that implementation of the new Benchmark Analytics program is still underway, and thus has not been assessed by the Monitor for its compliance with the terms of the Agreement. As with any new policy or program, simply enacting it is not evidence of its efficacy. Thus, while the City may have checked a box with regard to performance evaluations, it has not demonstrated compliance with the Agreement's terms in this area.

### v.      Staffing (¶¶ 319–321)

The Staffing provisions of the Agreement require CDP to complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform CDP's necessary functions, as well as create and implement a comprehensive staffing plan. The Monitor completed its first comprehensive assessment of the Staffing paragraphs (ECF No. 673) in 2025, and the team concluded that "the CDP achieved Substantial and Effective Compliance across all three Staffing paragraphs of the Consent Decree." (Staff Assmt at PageID 14728.)

The parties point to the Monitor's conclusion as evidence of its substantial and effective compliance with Staffing provisions of the Agreement. (Mot. at PageID 15103–04.) Indeed, based on the Monitor's 2025 findings, the City and CDP's work in this subsection appears complete. However, it is important to recognize the Monitor's other comments in the assessment, which note that "the City's Staffing Plan is dated and despite urging to update it, the City has not done so." (Staff Assmt at PageID 14736.) That said, and as the Monitor acknowledged, the City's efforts in other areas of the Agreement indicate its commitment to improving staffing levels to comply with the Decree's requirements. (*Id.*)

In conclusion, the court acknowledges the good work the City and CDP have done to receive Compliance Grades of Substantial and Effective Compliance in 23 of the 51 paragraphs under Officer Assistance and Support. Some subsections, like Staffing, are further along that others. But, until Substantial and Effective Compliance is shows across all the paragraphs in this section, the parties are not entitled to relief under Rule 60(b)(5).

### j.      Supervision

The genesis of this litigation, as the parties mention, included a finding by the Department

-66-

of Justice that deficient supervision by the City contributed to CDP's pattern or practice of unlawful conduct.  The Consent Decree, therefore, requires the City and the CDP to, among other things, provide training for supervisors and implement an officer intervention program.  (*See* Agreement ¶¶ 322–40.)

The parties contend that the Supervision section's core objective is "'close and effective supervision of officers,' including for uses of force." (Mot. at PageID 15106.) They assert that the City and CDP have demonstrated this objective because the Monitor's recent semiannual reports noted that patrol sergeants are providing effective supervision, are increasingly comfortable with on-scene reviews, and provide policy-driven alternatives when faced with an officer problem. (*Id.* at PageID 15107 (citing 16th and 17th Semiannual Reports, ECF Nos. 563, 658).) Furthermore, the parties claim that CDP and the City are making progress towards implementing an Officer Intervention Program ("OIP") as required by the Decree, and that CDP is complying with the supervisory and command-level audits of body-worn camera videos requirement. (*Id.*) Lastly, the parties reemphasize the Monitor's positive findings regarding supervision as articulated in the Use of Force, Crisis Intervention, and Search and Seizure assessments. (*Id.* at PageID 15108.)

Upon review of the parties' cited evidence, and the Monitor's Eighteenth Semiannual Report, the court finds that the City and CDP have not achieved compliance with the Supervision section of the Agreement. In the most recent Semiannual Report, the Monitor rated two paragraphs in General Compliance, four in Operational Compliance, three in Partial Compliance, and four in Non-Compliance. (18th Semiannual at PageID 15236–37.) None are in Substantial and Effective Compliance.

The ten paragraphs in Non-Compliance relate to CDP's Officer Intervention Program

-67-

("OIP"). (*Id.*) While the parties correctly state that the City continues to make progress on the development of CDP's OIP, the fact that the OIP requirements are still in development shows that important work in the area of supervision remains. As stated in Paragraph 326, OIP is, among other things, "a management tool to promote supervisory awareness and proactive identification of potentially problematic behavior among officers." (Agreement ¶ 326.) Data collection is a critical part of fulfilling this purpose, but given the in-progress nature of the OIP, there is little evidence to prove CDP can do the analysis necessary to diagnose emerging issues among personnel.

Additionally, while the court commends the City and CDP for its progress in the supervision sections of Use of Force, Crisis Intervention, and Search and Seizure, more work remains, especially in Search and Seizure, and the other sections of the Decree, like Bias-Free Policing and Accountability. With regard to Search and Seizure, the Monitoring team found that "readily available supervisory review data lacked detail and failed to provide sufficient feedback and corrective instruction to the officer completing the form or report[,]" and where cases had supervisory reports, "the quality and consistency of supervisory oversight varied widely." (Search & Seizure Assmt. at PageID 14646.)

With these compliance gaps, along with the Monitor's finding that none of the paragraphs in the Supervision subsection have achieved Substantial and Effective Compliance, the court finds that the parties are not entitled to relief under Rule 60(b)(5).

2.     *Conclusion*

For the foregoing reasons, the court finds that the parties are not entitled to relief under Rule 60(b)(5) because they have not met their "heavy burden" to show why their Agreement obligations should be lifted when the City and CDP have not shown Substantial and Effective Compliance with

the Decree's material terms.

### E.    Relief under Rule 60(b)(4)

The parties argue in the alternative that they are entitled to relief under Federal Rule of Civil Procedure 60(b)(4) because the Settlement Agreement is void. (Mot. at PageID 15112–13.) Rule 60(b)(4) permits a court on motion and just terms to relieve a party from a final judgment, order, or proceeding if the judgment is void. Fed. R. Civ. P. 60(b)(4). In *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010), the Supreme Court held that, "Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard."

The parties contend that the Sixth Circuit "has suggested that 'Rule 60(b)(4) would be the proper vehicle" for arguing that a district court's order exceeded its equitable jurisdiction." (Mot. at PageID 15112) (quoting *Northridge*, 647 F.3d at 612). Their reliance on *Northridge* is misplaced. The *Northridge* court's reference to Rule 60(b)(4) being a "proper vehicle" follows its discussion of *Crosby v. Bradstreet Co.*, 312 F.2d 483, 485 (2d Cir. 1963), where a unique jurisdictional issue rendered the court entering a consent order without power to do so. *Id. Crosby*'s jurisdictional error was not about a district court's order exceeding its equitable jurisdiction. Instead, the consent order should not have been entered because it constituted a prior restraint by the "United States against the publication of facts which the community has a right to know and which [the defendant] had and has the right to publish." *Id.* at 485. That is not the situation here. Moreover, to the extent that the parties attempt to use their Rule 60(b)(5) arguments about equitable considerations to support their Rule 60(b)(4) motion, those too must fail as being already addressed and rejected by the court.

As for the parties' position that the Agreement is void because they agree "that their original

dispute has been satisfied by a durable remedy," (Mot. at PageID 15113), the court is not prepared to read Rule 60(b)(4) broader than the Supreme Court's very narrow interpretation in *Espinosa*. Thus, because the parties have not shown "a certain type of jurisdictional error or [] a violation of due process that deprives a party of notice or the opportunity to be heard[,]" *Espinosa*, 559 U.S. at 270 their Rule 60(b)(4) motion is denied.

## IV. CONCLUSION

More than 13 years have passed since then-Cleveland Mayor Frank Jackson asked the Department of Justice to investigate allegations of excessive use of force by the Cleveland Division of Police. The Department's 20-month look into CDP's policing practices resulted in "reasonable cause to believe that CDP engages in a pattern or practice of using unconstitutional force in violation of the Fourth Amendment[.]" (Findings Letter at PageID 20.) Moreover, the Department found that this pattern or practice of excessive force is,

> both reflected by and stems from [CDP's] failure to adequately review and investigate officers' uses of force; fully and objectively investigate all allegations of misconduct; identify and respond to patterns of at-risk behavior; provide its officers with the support, training, supervision, and equipment needed to allow them to do their jobs safely and effectively; adopt and enforce appropriate policies; and implement effective community policing strategies at all levels of CDP.

(*Id.* at PageID 11–12.) Therefore, the Department concluded, that "the only effective mechanism to address these significant problems is to reach a consent decree that provides for a monitor to oversee the implementation of systemic reform in the CDP." (*Id.*)

That monitoring commenced nearly 11 years ago, and since then, the City of Cleveland and CDP have made significant changes to the policies, procedures, and training that govern Cleveland's

police force. Only recently, however, has the effect of these changes been measurable.

The Consent Decree is not a check list. It is framework for systemic change. Thus, compliance with a specific paragraph may not immediately result just because a required reporting procedure or specialized training is enacted with the Monitor's and court's approval. As the Department of Justice reported in its Findings Letter, the voluntary reforms made to CDP's use of force policy, and procedures for reviewing officer-involved shootings following DOJ's 2004 investigation, "did not create the systems of accountability necessary to ensure a long-term remedy[.]" Accordingly, the City agreed to federal oversight, so that any reforms made would stick, and Cleveland residents could trust and feel that constitutional policing was a core CDP value. The parties have not demonstrated that the community trust and cultural reform envisioned by the Decree have been fully realized.

Prior to the filing of the Motion addressed herein, the parties and Monitor appeared to be working very well together. The Monitor was producing comprehensive compliance assessments in multiple areas, and was preparing to conduct at least ten more in 2026. (*See* 2026 Monitoring Plan, ECF No. 701.) Furthermore, the City's civilian oversight bodies, such as the Office of Professional Standards and the Cleveland Police Commission, were beginning to operate with adequate staff, leadership, and commissioners. For all intents and purposes, the parties, Monitor, and the court seemed on the same page with regard to where the City stood on the road to achieving substantial and effective compliance with the Decree's terms. Apparently not so.

The instant Motion to Terminate is surely premature, despite the City and DOJ's decision to seek the Decree's termination. This is not to say that the City and CDP are in the same position as they were in 2005 when the voluntary reform agreement terminated only one year after being

-71-

entered. But, on this record, neither termination pursuant to the Agreement's termination clause (¶ 401), nor equitable relief under Rule 60(b), is appropriate.

As of today, 174 paragraphs of the Agreement's material terms have been formally assessed under the standards set in Paragraphs 367 and 369. Of those 174, only 53 (30%) have achieved Substantial and Effective Compliance as that term is used in the Decree's termination provision. Nearly half of the 174 paragraphs have achieved General Compliance, indicating that significant progress has been made. But eleven still remain in Partial Compliance or Non-Compliance.

For those 152 paragraphs that have not been formally assessed by the Monitor, none have achieved Substantial and Effective Compliance, and nearly half (46%) are rated as being in Non-Compliance or Partial Compliance. Thus, despite these ratings being less formal than those from the compliance assessments, they still show that the City and CDP have more to do before the Agreement's termination clause is triggered.

With regard to equitable relief under Rule 60(b), the City and CDP have not satisfied their "heavy burden to convince [the] court that [they] agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Rufo* 502 U.S. at 385. As the Sixth Circuit recognizes, "modification of a consent decree is an extraordinary remedy that should not be undertaken lightly." *Northridge*, 647 F.3d at 614. And, while the court should maintain a "flexible approach" to "ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant[,]" *Rufo*, 502 U.S. at 383, the parties have not demonstrated the kind of changed circumstances that warrant Rule 60(b) relief here.

The court recognizes that federal oversight of the Cleveland Division of Police should not

last forever, and it is committed to working closely with the parties and Monitor to bring the Consent Decree to an end as soon as possible. Even so, the court cannot grant relief when the record before it is wanting.

The court disagrees with the parties' argument that the City and CDP have complied with all of the material terms of the Decree, and therefore the court should terminate it. First, the court finds that the three sections cited by the City (Use of Force, Crisis Intervention, and Search and Seizure), are not the only material terms of the Decree. Second, the court does not find that the City is in Substantial and Effective Compliance with respect to each of the three sections the parties address. Third, the court finds that even if the City were to be found in Substantial and Effective Compliance with those three sections, it has not satisfied the sustainment period contemplated by the Decree—a matter which the parties do not address.

In viewing the Decree as a whole, the court finds that the City has a ways to go before reaching Substantial and Effective Compliance with all of the material sections of the Agreement. Further, the parties have not shown that the City is otherwise entitled to equitable relief under Rule 60(b), because they have not established changed circumstances significant enough to warrant the extraordinary remedy sought. Accordingly, for the foregoing reasons, the court denies the Joint Motion to Terminate Settlement Agreement (ECF No. 688).

In light of this decision, the court hereby sets a status conference for June 4, 2026, at 3:00 p.m. in Courtroom 19A. Consistent with previous status conferences, the court asks the Monitor to consult with the parties on a proposed agenda for the conference. In addition to any topics raised directly with the Monitor, the parties and Monitor should be prepared to update the court on the following activities: community surveys; Jensen Hughes partnership; Sigma Squared partnership

regarding search and seizure data; Benchmark Analytics partnership; and the City's Kent State University partnership. The parties and Monitor should also be ready to discuss the City's current relationship with the CPC in light of the Commission's public disagreement with the Motion to Terminate.

IT IS SO ORDERED

/s/ *SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

May 8, 2026