IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15-CV-01046 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| vs. | ) | |
| | ) | NOTICE SUBMITTING THE |
| | ) | MONITORING TEAM'S |
| CITY OF CLEVELAND | ) | NINETEENTH SEMIANNUAL REPORT |
| Defendant. | | |

The Monitoring Team hereby submits its Nineteenth Semiannual Report pursuant to Paragraph 375 of the Consent Decree.

Respectfully submitted,

/s/ Christine M. Cole

CHRISTINE M. COLE
Independent Monitor
464 Common Street, Unit #231
Belmont, MA 02478
ccole@clevelandpolicemonitor.com

CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2026, I served the foregoing Notice Submitting the Monitoring Team's Nineteenth Semiannual Report via the court's ECF system to all counsel of record.

/s/ Melody J. Stewart
MELODY J. STEWART
Deputy Monitor



Cleveland Police Monitoring Team

# Nineteenth Semiannual Report

September 2026

## Table of Contents

I. LETTER FROM THE MONITOR ..... 2
II. UNDERSTANDING THIS REPORT ..... 6
III. EXECUTIVE SUMMARY ..... 9
1. Community Engagement and Building Trust ..... 9
2. Community and Problem-Oriented Policing (CPOP) ..... 10
3. Bias-Free Policing ..... 10
4. Use of Force ..... 11
5. Crisis Intervention ..... 11
6. Searches & Seizures ..... 12
7. Accountability ..... 12
8. Transparency and Oversight ..... 13
9. Officer Assistance and Support ..... 14
10. Supervision ..... 15
11. Policies ..... 15
IV. COMMUNITY ENGAGEMENT AND BUILDING TRUST ..... 17
1. Community Police Commission (CPC) ..... 17
2. District Policing Committees ..... 19
V. COMMUNITY & PROBLEM-ORIENTED POLICING ..... 21
VI. BIAS-FREE POLICING ..... 23
VII. USE OF FORCE ..... 26
VIII. CRISIS INTERVENTION ..... 37
IX. SEARCHES AND SEIZURES ..... 41
X. ACCOUNTABILITY ..... 44
1. Internally Discovered Misconduct ..... 44
2. Investigation of Civilian Complaints & Police Review Board ..... 48
3. Discipline and Disciplinary Hearings ..... 53
XI. TRANSPARENCY & OVERSIGHT ..... 55
1. Public Safety Inspector General ..... 55
2. Data Collection and Analysis ..... 56
XII. OFFICER ASSISTANCE & SUPPORT ..... 59
1. Training ..... 59
2. Equipment & Resources ..... 62
3. Recruitment & Hiring ..... 64
4. Performance Evaluations and Promotions ..... 67
5. Staffing ..... 68
XIII. SUPERVISION ..... 70
XIV. POLICIES ..... 72
XV. OUTCOME MEASUREMENTS ..... 75

# I. LETTER FROM THE MONITOR

Dear Cleveland Community,

As is the tradition, the Nineteenth Semiannual report covers six months of activities, commencing January 2026 and ending June 2026. The Monitor is required to submit a semiannual report in Paragraph 375 of the Consent Decree. This report is submitted in accordance with the requirements of the paragraph and will be filed with the Court, shared on the Monitoring Team's website, and presented to the City and the Department of Justice (DOJ).

The Nineteenth Semiannual Report, beginning with the Executive Summary and carrying throughout the report, is broken into sections aligning with the sections of the Consent Decree. Each of the ten sections of the Executive Summary begins with a chart that compares the ratings from the last, the Eighteenth Semiannual report, with this report, the Nineteenth. In each chart we report the number of paragraphs in that section, and illustrate the rating scale, Non-Compliance to Substantial and Effective Compliance, and the number of paragraphs in the last and the current report receiving each rating. Following the chart is a brief overview of the activities and achievements of the Consent Decree category.

Beginning with Section IV of the Semiannual Report each section is reviewed following the requirements of Paragraph 375. Different than an assessment, the Semiannual Report is primarily a report on the Monitoring Team's activities, highlights by section on the City's achievements on policy and training, and the Monitoring Team's projection of work and challenges for the next reporting period. Paragraph 375 also requires the report to include an explanation of, or a methodology used for, assessing compliance. Most compliance ratings are changed as the result of a comprehensive assessment, following the contours of a methodology to which both the City and the DOJ have agreed. In some instances, based on a single activity, such as a significant change, for example, the completion and implementation of a policy or completion of a required training, compliance ratings may be changed outside of the comprehensive assessment in the Semiannual Report. Such changes are typically explained in the subject section of the report.

It is critical to recognize that Working Groups, attended by City staff, Cleveland Division of Police (CDP), and Monitoring Team members, are ongoing efforts and continue throughout the year. The description of activities and ratings in this report are representative of work and accomplishments only through June 30, 2026. Additionally, changed ratings from the ongoing assessments, which may have been shared with the Parties in draft form, are not reflected here. Once final, any rating changes from the assessments will be reflected in the assessment itself and the next Semiannual

Report. Any other Consent Decree requirements completed since June 30 will be reflected in the next Semiannual Report.[1]

During this reporting period, the Monitoring Team filed the comprehensive assessment on Use of Force in February. The assessment was conducted during 2025 and included reviews of cases from prior years. Since January, the Monitoring Team commenced 10 comprehensive assessments. Of those 10, at the time of this writing, draft methodologies have been shared for both Performance Evaluation and Promotions and Recruitment and Hiring. Draft assessment reports have been shared for three categories, Community and Problem Oriented Policing (CPOP), Data Collection and Analysis, and Public Safety Inspector General. There remain five assessments underway. Those include three in the Accountability Section – Internal Misconduct, Investigation of Civilian Complaints and Police Relations Board, and Discipline and Discipline Hearings – and two in the Community Engagement and Building Trust Section – Community Police Commission (CPC) and District Policing Committees (DPC). There remain only three sections of the Consent Decree that have not been assessed – Bias Free Policing, Supervision, and Policies – and we anticipate sharing draft methodologies on those areas during the upcoming reporting period. In upcoming discussions for the 2027 Monitoring Plan, with the Parties we will discuss the priorities for reassessments.

Through the assessment work, site visits, and in regular Working Groups, Monitoring Team members work closely with members of the community, the City's subject experts including those from the Department of Public Safety, the Division of Police, the CPC, DPC, OPS, and the Community Police Relations Board. Members of the Police Accountability Team (PAT), and the Law Department are invited to and participate in many of our meetings with City personnel. We maintain open lines of communication with members of the public, Chief Todd, the leadership of the Fraternal Order of Police (FOP), and the Cleveland Police Patrolmen's Association (CPPA). In May 2026 the Monitor with members of the Team presented findings from the Eighteenth Semiannual report to the Public Safety subcommittee of the Cleveland City Council. There are many inputs to the Team where we learn of challenges and successes and endeavor to report those in this report. Following the outline of Paragraph 375 strictly will result inevitably in something being overlooked. That is not the intention.

As reported in the section on Community Engagement and Building Trust, the Mayor appointed a new Executive Director to the CPC. Under her leadership she has worked with the City Human Resources department to hire a deputy, refine position descriptions and commence the hiring

[1] On February 19, 2026, during the Monitoring Team's preparation of the Eighteenth Semiannual Report, the Parties in this action - the United States of America and the City of Cleveland - filed a joint motion to terminate the Settlement Agreement/Consent Decree. The motion was denied on May 8, 2026. On July 7, 2026, the United States filed a notice of appeal of the trial court's ruling and the appeal is currently pending in the United States Court of Appeals for the Sixth Circuit. As the Court instructed the Monitoring Team and the Parties to do when the joint motion to terminate was pending, here too the Court has instructed the Monitoring Team and the Parties to proceed with all activities toward compliance during the pendency of the appeal. This letter and references to all future activities under the Consent Decree are written in keeping with the Court's instruction.

process for additional staff, and worked to overcome challenges to deliver grant funds to community organizations. There remain barriers to the CPC's ability to fulfill its mandate and achieve compliance with the Consent Decree. Work of the CPC has often been stalled due to meeting disruptions resulting in members of the public and commissioners being upset and fearful. After a particularly disruptive event during a meeting in this reporting period the City's Law Department provided detailed guidance to the CPC on open meeting rules and procedures for going into executive session. Additionally, the Law Director assured the CPC that there would be CDP presence at all future CPC meetings of the full Commission, committees, subcommittees, and Working Groups. What has not yet been developed, however, is a comprehensive, documented plan with all stakeholders on the steps to be taken, and by whom, when an actual disruption occurs. There is a concern for physical safety that necessitates clarity and obviates the need for telephone calls or relies on decision makers or approvals from someone not on site.

Working together the CPC and CDP are developing an agreed upon process for policy review and approval. At times there has been both a protracted and confusing back and forth that results in operational delays for the CDP. The Working Group is an important example of the effort needed to resolve issues surrounding the review process.

The CPC with the City Law Department, the Department of Public Safety, the CDP, and the CPPA and FOP must also resolve the issues surrounding discipline. Various legal documents create confusion with current practice and procedures. Resolution may require a formal process of reconciliation but resolution is necessary for the CPC to fulfill its mandate envisioned in the Charter.

An area of the Consent Decree worthy of call out is the improvement over time of the Training Section. Training curricula are greatly improved, officers reliably attend training, and the use of Integrated Reality Based Training, along with other adult learning principles, is not only more effective but also more engaging. One ongoing limitation of the training component, in spite of efforts by the Division, is the facility. The "new" training location is an out of use school building. It lacks sufficient air conditioning and the conditions described by Monitoring Team observers was "insufferable". The discomfort for officers in full uniform with all their gear must have been worse. For the comfort of officers – trainers and trainees – as well as to optimize learning, improvements to the environment are a necessity.

Several assessments have been completed and many are currently underway. Much progress has been observed across many areas. Additional focus, while balancing accountability with independence, is needed in civilian oversight. The Executive Director of CPC has made a great deal of progress and must continue to work closely with the Law Department or the designated lawyer from that department to advance without stumbling. The new OPS Administrator, who began work on June 23, 2026, will need to cultivate relationships of trust and build out the staff at OPS. The process for a new Public Safety Inspector General is underway and that office too needs

clear lines of authority. We look forward to dedicated focus on these matters to ensure continued progress toward full compliance and durability of these important structures.

Best regards,

*CMCole*

Christine M. Cole
Monitor

## II. UNDERSTANDING THIS REPORT

Since the Third Semiannual Report, the Monitoring Team has used its semiannual reports to present a summary of the status of the City's compliance with paragraphs of the Consent Decree. Although providing "a paragraph-by-paragraph accounting of the general state of the City's compliance runs the risk of being an over-simplification," these summary accountings remain useful indicators for viewing progress over time.[2] The Nineteenth Semiannual Report follows the requirements of Paragraph 375 of the Consent Decree and reports on the Monitor's work during the reporting period, achievements of the City regarding policies, training, and the adherence to policy and training in practice. The Semiannual Report also sets forth the process for assessing compliance, the Monitor's recommendations for steps to achieve compliance, the status of assessments, and a projection of work for the upcoming reporting period.[3] Therefore, each section of the Nineteenth Semiannual Report summarizes the Monitoring Team's general conclusions about compliance status by describing the state of each paragraph listed as one of the following:

- **Non-Compliance.** The City and/or Cleveland Division of Police (CDP) has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City or Division's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement.

- **Partial Compliance.** The City and/or Division has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the provision of the Consent Decree—but has not achieved operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day-to-day practice. It may capture a wide range of compliance states or performance, from the City or Division having taken only very limited steps toward operational compliance to being nearly in operational compliance.

- **Operational Compliance.** The City and/or Division has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Decree such that it is in existence or practice operationally—but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner.

- **General Compliance.** The City and/or Division has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or

[2] Third Semiannual Report at 9.
[3] Doc 502-2 p 95

effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the City or Division has effectively complied with a requirement fully and systemically.

- **Substantial and Effective Compliance.** The City and/or CDP has complied fully with the requirement and the requirement has been meaningfully adhered to and effectively implemented across time, cases, or incidents. Substantial and Effective Compliance is realized when there is a high and not random reliability in outcomes. Deviations from the requirement are rare, explainable, and non-systemic, and detected and corrected internally. The hallmark of substantial and effective compliance is stability – the same patterns of compliance are demonstrated across multiple periods of time, and across different districts and units. It is not episodic.

The same caveats that have previously applied to these summary categories remain applicable and are thus repeated here verbatim. First, "Non-Compliance" or "Partial Compliance" do not automatically mean that the City or CDP has not made good-faith efforts or commendable strides toward compliance. It might, instead, signify that initial work has either not yet begun or reached a sufficiently critical point where progress can be considered to have been made.

Second, "Partial Compliance" requires more than taking some limited, initial steps toward compliance with a requirement. It instead requires that the City or Division have made "sufficient, material progress toward compliance" that "has graduated from the stages of initial work to more well-developed and advanced refinement of various reforms."[4]

Third, these summary terms do not appear in the Consent Decree. The Team employs them in order to synthesize and summarize the report's conclusions. Relatedly, compliance with individual paragraphs of the Decree is necessary for the larger, overall "Substantial and Effective Compliance" with the whole of the Consent Decree, but it is not the same thing. Ultimately, "Substantial and Effective Compliance" with the Consent Decree will be reached when "the City either has complied with *all* material requirements of this Agreement or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures,"[5] "by a preponderance of the evidence."[6]

Fourth, the charts that summarize progress in each area also condense the requirements of each paragraph rather than reprinting the entire Consent Decree in the context of this report. Any imprecision or confusion created by these condensed or summarized requirements is unintended and, in any event, can be cured with reference to the Consent Decree language itself.[7] Furthermore,

[4] Third Semiannual Report at 10.
[5] Dkt. 413-1 ¶ 456 (emphasis added).
[6] *Id.* at ¶ 397.
[7] *See Id.*

the charts primarily cover paragraphs 14 through 349 of the Consent Decree, and other paragraphs contain requirements that the City must meet.[8]

We also repeat here that the overall "compliance status" conclusions displayed in tables at the end of each section herein do not replace the more rigorous and comprehensive quantitative and qualitative assessments of how CDP performs over time:

> [T]he Monitoring Team bases its assessments in the Semiannual Report on its current understanding, knowledge, and information gained through ongoing work and discussion with CDP, the Parties, and other stakeholders. The ratings are informal to the extent that not all of them are necessarily informed by the type of exhaustive methodologies and compliance and outcome measurements that are a critical component of the Consent Decree—and the summary determinations do not take the place of these more structured, systemic analyses. The intent is to provide a bottom-line sense of where the Division is on the road to compliance. Ongoing, rigorous quantitative and qualitative assessments will provide a more comprehensive picture as work under the Consent Decree proceeds.[9]

The descriptions of progress contained below should be considered as a synthesis or bottom-line reporting of substantive discussions from each major Consent Decree area contained within this report as required by paragraph 375.

An additional method for capturing progress is the creation, utilization, and accountability of the Monitoring Plan, described in paragraph 369, which outlines the work to be done by the Parties throughout the year.

Finally, as is evidenced by the extensive and broad-reaching Consent Decree itself, the City of Cleveland's implementation of the Consent Decree and the many action items and projects it encompasses, is a substantial task. Many areas of the Decree require multiple reporting periods for the City to achieve—and for the Monitoring Team to confirm and consequently report on—these major milestones. Therefore, at times this semiannual report, as with previous semiannual reports, reprints content from prior semiannual reports in instances where there has not been enough material progress to warrant an update. In such cases, the Monitoring Team does not cite to prior semiannual reports in the interest of readability.

[8] *See* Third Semiannual Report at 10.
[9] *Id.* at 11.

# III. EXECUTIVE SUMMARY

## 1. Community Engagement and Building Trust

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| **18th SAR** | 18 | 1 | 3 | 4 | 5 | 5 | 0 |
| **19th SAR** | 18 | 1 | 3 | 4 | 5 | 5 | 0 |

During the reporting period, the Community Police Commission (CPC) Policy and Training Committees continued working through the previous backlog of CDP policy and training reviews. The new Executive Director was sworn in by the Mayor on January 19, 2026. The nomination process for upcoming commissioner vacancies was posted by the City. Unfortunately, the City has not established nor exercised a process to fill a vacancy that occurs during the term of a commissioner and as such, the appointment to replace a member of the Black Shield has been postponed and wrapped into the process to replace the seats of expiring commission members later this year. The Executive Director has prioritized filling vacant staff positions and is making progress. The CPC continued to deal with disruptions during its public meetings. Some interventions have been discussed, but a comprehensive strategy that includes the Commission Executive Director, the CDP, and the Law Department, including the City Prosecutor, to deal with the disruptions has not been developed or executed. Lastly, the Monitoring Team sent a draft methodology to the Parties on June 15, 2026 for an upcoming formal assessment of the CPC paragraphs.

During the reporting period, District Policing Committees (DPCs) participated in a series of DPC Working Group meetings facilitated by the Monitoring Team. In addition to DPC members, these meetings included representatives from the CDP, the CPC, and the Community Relations Board (CRB) as required by the Consent Decree, which mandates their collaborative work to achieve the objectives of Paragraphs 23-26. Maintaining the newly formed collaborative effort will have its challenges. Some stakeholders recognize the independence and uniqueness of each district, while others strive for standards and consistency. In some cases, the DPC co-chairs appreciate the leadership of the CRB, and others prefer to have the community more in the lead. However, the commitment to achieving compliance, evidenced by the participants, is obvious. The CPC is in the process of coordinating a series of district meetings to clearly delineate Consent Decree mandates for DPCs and establish communication among collaborative groups.

## 2. Community and Problem-Oriented Policing (CPOP)

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 18th SAR | 8 | 0 | 1 | 6 | 1 | 0 | 0 |
| 19th SAR | 8 | 0 | 1 | 6 | 1 | 0 | 0 |

During this reporting period, the Monitoring Team collaborated with the Police Accountability Team (PAT) and CDP supervisors to finalize the methodology for the 2026 Community and Problem-Oriented Policing (CPOP) assessment. Team members also observed Integrated Reality-Based Training (IRBT) and found that CPOP principles were incorporated into scenario instruction, debriefing, and discussion of practical field applications. The formal compliance assessment remains underway, so no changes to the current compliance ratings are being made in the present report. During the next reporting period, the Monitoring Team will complete its assessment, submit a draft report to the Parties, incorporate feedback as appropriate, and finalize the report by September 28, 2026.

## 3. Bias-Free Policing

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 18th SAR | 10 | 0 | 1 | 6 | 3 | 0 | 0 |
| 19th SAR | 10 | 0 | 1 | 6 | 3 | 0 | 0 |

As noted in the Eighteenth Semiannual Report, the Monitoring Team developed and shared with the Parties a draft Bias-Free Policing Working Group (BFPWG) framework, outlining the specific requirements of each bias-free policing paragraph (Paragraphs 35–44), along with the data, documentation, and other evidence necessary to demonstrate compliance. Scheduling the first BFPWG meeting took longer than anticipated, and the Working Group meeting is September 1, 2026. The intent of the BFPWG meetings is to collaborate on efforts to advance compliance in this area.

Nevertheless, some progress was made during this reporting period. This included the Monitoring Team's observations of CDP's Integrated Communications, Assessment and Tactics (ICAT) and IRBT scenarios, both of which incorporated elements of bias-free policing. Seven hundred and seventy-six (776) of the Division's 1,203 sworn personnel (64.5%) completed the training as scheduled during this reporting period. The remaining eligible personnel (35.5%) who have not yet completed the training are scheduled to do so during the beginning of the next reporting period.

## 4. Use of Force

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| **18th SAR** | 86 | 2 | 1 | 3 | 7 | 51 | 22 |
| **19th SAR** | 86 | 2 | 1 | 3 | 5 | 53 | 22 |

During the last reporting period, the Monitoring Team completed a comprehensive assessment of all 85 use of force (UOF) paragraphs, which was filed with the Court in February 2026. With 74 upgrades achieved through the assessment, the remaining paragraphs require additional work distinct from the behavior of officers on the street for CDP to achieve compliance. This reporting period was used to evaluate the next steps for the remaining paragraphs to achieve higher compliance, and to propose plans for CDP to reach those goals. The Monitoring Team also observed the CDP's IRBT In-Service Training covering use of force and other topics, observed CDP's Force Investigation Team (FIT) training, and attended the Force Review Boards to observe their discussions as part of its ongoing assessment.

## 5. Crisis Intervention

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| **18th SAR** | 29 | 0 | 0 | 0 | 0 | 21 | 8 |
| **19th SAR** | 29 | 0 | 0 | 0 | 0 | 16 | 13 |

As summarized in the Eighteenth Semiannual Report, the Monitoring Team, through its 2025 assessment, confirmed that both the direction and current strength of CDP's Crisis Intervention Team (CIT) Program, and the overall crisis intervention strategy, are effectively addressing the Consent Decree's requirements. The Division and its City partners have done an excellent job in maintaining the type of response capability seen in the compliance assessment last September. The Monitoring Team found that policy changes required by the Consent Decree have been implemented, initial training has been completed and on-going in-service training designed to ensure continued success is underway. The Monitoring Team's work continues to move from a role that provided periodic direct assistance to a role involving observation of the accomplishments of CDP. It is particularly important to note the hard work that is being done to reach across agency lines throughout the community in order to make important improvements in the Cleveland Crisis Intervention System.

## 6. Searches & Seizures

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| **18th SAR** | 16 | 1 | 0 | 5 | 9 | 1 | 0 |
| **19th SAR** | 16 | 1 | 0 | 5 | 9 | 1 | 0 |

In April of 2026, the City released an independent statistical analysis report from the consulting firm, Sigma Squared. Sigma Squared was retained by the City to conduct the analysis of CDP's 2024 stops. The independent analysis, which the City publicly announced in October 2025, reflects the City's stated commitment to better understand racial and gender disparities in police stops, searches, and arrests. However, the report analyzed only post-stop outcomes of searches and arrests by race and gender to determine whether disparities persisted in the analyses of contraband hit-rates and threshold tests after taking selected statistical variables into account. This, along with other factors, limits what can reasonably be discerned regarding understanding the disparities identified in the stop, search and arrests data.

Also, during this reporting period, the Monitoring Team observed CDP's ICAT and IRBT trainings. These trainings included curriculum and scenario-based exercises designed to address search and seizure standards and assess officers' understanding and application of those requirements.

## 7. Accountability

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| **18th SAR** | 74 | 2 | 0 | 21 | 37 | 14 | 0 |
| **19th SAR** | 74 | 2 | 0 | 20 | 37 | 14 | 1 |

Internal Affairs continues to work towards compliance in all areas, particularly during this rating period. The period is marked with close attention to training investigators. Additionally, the Internal Affairs Division and the Monitoring Team continued to work collaboratively to finalize the Internal Misconduct Assessment methodology and the assessment tool, and the Monitoring Team commenced the assessment for Paragraphs 177-192.

Regarding requirements for investigating civilian complaints, turnover in the Office of Professional Standards (OPS) administrator position continued, with two Interim OPS Administrators during this period and appointment of a permanent OPS Administrator at the end of the period. Additional vacancies occurred in other critical positions; some of those have been filled during the period, and the new Administrator is moving to fill the rest of the vacancies.

Attrition has slowed the ambitious project to close out older cases, but that remains a priority for the OPS Administrator. The Civilian Police Review Board (CPRB) has adjusted its hearing schedule and process to also reduce its backlog. CPRB and OPS are working closely on their shared responsibilities.

In terms of the discipline requirements, during the reporting period, the Monitoring Team attempted to continue reviewing discipline disposition letters; however, the Monitoring Team did not consistently receive discipline disposition letters from the City, which limited the depth and consistency of those reviews. January was the only full month evaluated. As a result, the Team was unable to complete its customary cursory examination of serious or potentially unlawful misconduct cases for due process and consistency with the Discipline Matrix during the first half of 2026. At the same time, the Team began a comprehensive assessment of the Disciplinary Hearings and Discipline subsection, with the final assessment report due October 8, 2026. The assessment will examine discipline hearings and decisions.

## 8. Transparency and Oversight

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| **18th SAR** | 19 | 0 | 1 | 7 | 6 | 5 | 0 |
| **19th SAR** | 19 | 0 | 1 | 7 | 6 | 4 | 1 |

During the reporting period, the Monitoring Team completed the methodology for a formal assessment of the Public Safety Inspector General section of the Consent Decree and submitted it to the Parties on February 26, 2026. Comments were not received from the City until May 25, 2026, and the formal assessment is currently in process. Also, during this period, the City's Inspector General began a leave of absence with her resignation effective on September 30, 2026. The Deputy Inspector General has been designated as Acting Inspector General and at the time of this writing, a job posting for filling the position is on the City's website.

Pertaining to the data paragraphs, during this reporting period, the Monitoring Team formed the Analytics Working Group with CDP and PAT, meeting biweekly to clarify compliance expectations and provide technical assistance for the data-related paragraphs of the Consent Decree. This collaboration has strengthened working relations between the Monitoring Team and the City and produced concrete plans for improving compliance on Paragraphs 262 and 264. In addition, the Monitoring Team is upgrading Paragraphs 259 to Substantial and Effective Compliance in this report. The Monitoring Team will complete its first formal assessment of Paragraphs 257-268 later this year. Moreover, the Monitoring Team expects to continue leading the Analytics Working Group through the next reporting period, with particular emphasis on addressing compliance requirements for Paragraphs 265 and 266.

## 9. Officer Assistance and Support

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| **18th SAR** | 53 | 2 | 5 | 4 | 7 | 12 | 23 |
| **19th SAR** | 53 | 2 | 5 | 4 | 7 | 12 | 23 |

For the training paragraphs, the Monitoring Team conducted a comprehensive compliance assessment of all training paragraphs during the last reporting period. In this reporting period, the Monitoring Team continued to review and provide feedback for several areas of training. Specifically, the Monitoring Team reviewed the following training course curricula: Integrated Reality Based Training (IRBT), Integrating Communications, Assessment and Tactics (ICAT), Taser 10, Special Crisis Intervention Training and Field Training Officer (FTO) re-certification. The Monitoring Team meets with members of the Training Section on a biweekly basis and provides feedback in real time, as well as in memos. Members of the Training Section are very responsive to suggestions for improvement offered by the Monitoring Team.

The Monitoring Team's work on the Equipment and Resources subsection was limited following the comprehensive assessment completed in late 2025 and reported in the Eighteenth Semiannual Report. No formal follow-up on the assessment recommendations occurred. However, the need to modernize the Employee Assistance Unit policy, which has not been updated since 2010, remains unresolved and does not reflect the current Employee Assistance Unit's efforts or modern employee assistance and wellness best practices. During the next rating period, the Team will work to establish a Working Group to assist the Division in achieving higher levels of compliance in the Employee Assistance Unit (Paragraph 299) and work with the Parties to establish a methodology for another comprehensive assessment in early 2027.

During the reporting period, the Monitoring Team reviewed the CDP's 2025 Recruitment and Hiring Report. The CDP continues to progress with increasing sworn member staffing through well-advertised hiring events, recruitment and retention incentives and expedited processes. An updated formal assessment of this area is scheduled to be completed in the next reporting period.

During this reporting period, the Monitoring Team developed a methodology to assess the Performance Evaluations and Promotions subsection of the Consent Decree. The Team will conduct and complete the assessment during the next reporting period. The compliance ratings remain unchanged in this report from the last report.

The Monitoring Team did not assess Paragraphs 319-321, all of which relate to Staffing, during this reporting period. The paragraphs focus on the creation of the Staffing Plan and an examination of the City's efforts in implementing the Plan. In its December 2025 Staffing Assessment Report, the Monitoring Team noted that the CDP achieved Substantial and Effective Compliance across

all three Staffing paragraphs of the Consent Decree. The Eighteenth Semiannual Report confirms this. Although the City's Staffing Plan is dated and reaching the City's desired goal of having 1,350 uniformed officers remains a challenge for the City, the Monitoring Team, through its assessment, confirmed that the direction of the CDP's Staffing Plan addresses Consent Decree requirements. The Monitoring Team also suggested the City undertake efforts to update the Plan.

## 10. Supervision

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 18th SAR | 19 | 0 | 10 | 3 | 4 | 2 | 0 |
| 19th SAR | 19 | 0 | 10 | 3 | 4 | 2 | 0 |

Throughout the Consent Decree there are clear expectations for supervisor behavior and responsibilities. In the use of force and searches and seizures assessments in particular, the Monitoring Team reviewed supervisor actions based on the specific subject area requirements. To date, however, the Monitoring Team has not conducted an assessment of the supervision section specifically. The Monitoring Team has been engaged in receiving regular updates regarding the long-delayed Officer Intervention Program (OIP) that would fulfill the requirements of Paragraphs 326-336. Forthcoming in the next reporting period, the methodology and data request for a comprehensive assessment will be completed in anticipation of a full assessment of the supervision section being conducted and completed by mid-2027.

## 11. Policies

| MT Semiannual Report (SAR) | Total # of ¶s in Section | # of ¶s Not Assessed | # of ¶s Non-Compliance | # of ¶s Partial Compliance | # of ¶s Operational Compliance | # of ¶s General Compliance | # of ¶s Substantial & Effective Compliance |
|---|---|---|---|---|---|---|---|
| 18th SAR | 8 | 8 | 0 | 0 | 0 | 0 | 0 |
| 19th SAR | 8 | 1 | 0 | 4 | 3 | 0 | 0 |

The Monitoring Team recognizes that prior semiannual reports did not address overall compliance with the paragraphs specifically related to the processes for the development, revision, implementation, and accessibility of agency policies and procedures. The Monitoring Team acknowledges that the City and CDP have worked extensively on developing, revising and implementing critical policies in many areas outlined in the Consent Decree.

During this reporting period, members of the Monitoring Team began working with the City and CDP to discuss strategies for achieving and assessing compliance with all paragraphs related to policy. These meetings have helped the Monitoring Team gather information on the routine

activities related to policies and prepare the CDP for a future assessment of these paragraphs. Working with the Division, the Monitoring Team will develop an assessment strategy for this section at a later date. The Monitoring Team acknowledges that the City and CDP have achieved compliance milestones in policy development and implementation in critical subject areas of the Consent Decree, as previously noted in other semiannual reports. This section is more focused on the input of personnel, public accessibility of policies, and the annual maintenance and review of policies in place.

# IV. COMMUNITY ENGAGEMENT AND BUILDING TRUST

## 1. Community Police Commission (CPC)

### a. Monitoring Team's Work during Report Period

During the reporting period, members of the Monitoring Team attended at least six public meetings of the CPC, including five full Commission meetings, and observed several more online. Monitoring Team members also participated in CPC Working Group Meetings with CPC staff and co-chairs, the Police Accountability Team (PAT), and DOJ to facilitate ongoing discussions pertaining to the upcoming formal assessment, document requests, and other items of interest to the Parties.

The Monitoring Team made several observations during this reporting period. The CPC Policy and Training Committees continued working through the previous backlog of CDP policy and training reviews. The new Executive Director was sworn in by the Mayor on January 19, 2026. The nomination process for upcoming commissioner vacancies was posted by the City. The City has not adopted a habit of filling vacancies on the Commission when they occur mid-term. A recent example is the recognition that the representative of the Black Shield was not able to serve, and the seat remained unfilled for months.

The Executive Director has prioritized filling vacant staffing positions and is making progress. Currently, the Court-approved document request process, which is facilitated by the PAT, has been generally effective; however, some of the documents are not produced within the prescribed time limits. In an effort to improve the efficiency and compliance of document requests, representatives from the CPC and PAT continued conducting meetings to update the current process. Once any proposed changes to the currently approved process are agreed upon, the Monitoring Team and DOJ will review the changes, and the amended process will be presented to the Court. In addition, the Monitoring Team has participated in several meetings with CPC and CDP representatives as they work collaboratively to create a policy review process manual to dictate how the entities will work together to update, review and finalize CDP policies in an effective and efficient manner. The sessions have been productive. Lastly, the Monitoring Team notes that the CPC must work with the CDP's Training Division to ensure that the timelines for its review of trainings provide sufficient time for the CPC's review while also prioritizing timely training approval based on CDP's needs to promptly deliver training.

### b. Status of Policies and Training

There are no policy or training requirements for this section, but see the above section regarding the development of a CPC-CDP policy process manual that is underway.

### c. Compliance Reviews and Findings

The methodology for a formal assessment of the paragraphs was sent to the Parties on June 15, 2026. A formal assessment of the paragraphs will be conducted during the next reporting period.

### d. Anticipated Work and Challenges for Next Reporting Period

During the next reporting period, the Monitoring Team will utilize the CPC Working Group meetings to communicate the expectations and evidence needed to demonstrate compliance with Paragraphs 15-22 for the upcoming formal assessment. In addition, the Monitoring Team will closely observe the progress of filling the current and upcoming CPC commissioner vacancies as well as the staff vacancies needed to ensure that the Commission can complete its work. Finally, the Monitoring Team will continue to work with City Law, CDP, and CPC to encourage the development of a comprehensive strategy to address ongoing meeting disruptions. City Law has provided CPC leadership with directions on conducting lawful public meetings and referred them to a special prosecutor; however, a more comprehensive strategy, to include possible civil remedies, criteria for arrests and training for officers is needed to ensure that the disruptions are dealt with to enable the CPC to meet its mandates and for the public attending the meetings to feel safe. Adherence to the conduct for lawful meetings is a necessary process and procedural requirement. However, adherence alone will not ensure the absence of disruption, nor does it describe action steps to take should a disruption occur.

| Community Police Commission Paragraphs[10] | Status of Compliance |
|---|---|
| 15. Creation of CPC to make recommendations, work with Cleveland communities to develop recommendations, and "report to the City and community as a whole and to provide transparency" on reforms | GENERAL COMPLIANCE |
| 16. CPC members "will be appointed and vacancies will be filled in accordance with the City's Charter"; and periodic meetings with Chief of Police to "provide recommendations." | OPERATIONAL COMPLIANCE |
| 17(a). "[H]old public meetings across the City, complete an assessment of CDP's bias-free policing policies, practices, and training, and make recommendations." | OPERATIONAL COMPLIANCE |
| 17(b). "[A]ssist as appropriate in . . . development of training related to bias-free policing and cultural competency." | OPERATIONAL COMPLIANCE |
| 17(c). "[O]n an ongoing basis, assess CDP's community activities" and "make recommendations" related to "community engagement" and | NON-COMPLIANCE |

[10] Please see the Consent Decree for the full and exact requirements. The excerpts here are incomplete and abbreviated in the interest of space.

| | |
|---|---|
| "community confidence" | |
| 17(d). "[O]n an ongoing basis, review CDP's civilian oversight structure to determine if there are changes it recommends for improving CDP's accountability and transparency" | **PARTIAL COMPLIANCE** |
| 17(e). "perform other function as set out in this Agreement" | **NOT ASSESSED** |
| 18(a). "[R]eview and comment on CDP's policies and practices related to use of force, search and seizure, and data collection and retention." | **GENERAL COMPLIANCE** |
| 18(b). [R]eview and comment on CDP's implementation of initiative, programs, and activities that are intended to support reform." | **GENERAL COMPLIANCE** |
| 18(c). "[H]old public meetings to discuss the Monitor's reports and to receive community feedback concerning CDP's compliance with this Agreement." | **GENERAL COMPLIANCE** |
| 19. "The City will provide access to all information requested by the Commission related to its mandate, authority, and duties unless it is legally restricted." | **OPERATIONAL COMPLIANCE** |
| 20. CPC "will issue [at least annual] reports," which the "City will post . . . to the City's website." | **PARTIAL COMPLIANCE** |
| 21. "The City will consider and timely respond in writing to the Commission's recommendations for improvements," which "will be posted to the City's website." | **NON-COMPLIANCE** |
| 22. CPC budget listed as "separate line item" to ensure "sufficient independence and resources." | **GENERAL COMPLIANCE** |

## 2. District Policing Committees

### a. Monitoring Team's Work during Report Period

The Monitoring Team has provided technical assistance to the DPCs and will continue to do so. Team members are conducting a series of DPC Working Group meetings involving collaborative partners. The meetings also provide the opportunity for the Monitoring Team to answer questions regarding the Consent Decree and provide clarification where needed. During this reporting period, the Monitoring Team primarily focused on sharing possible strategies to increase community involvement in DPCs, and ways to improve the overall cooperation among the collaborative partners.

Monitoring Team members met individually with DPC co-chairs and CPC members to help clarify Consent Decree requirements, coordinate meetings across districts, and assist with communications with City officials when appropriate or necessary.

Team members attended DPC district meetings to ensure that each DPC has access to the Monitoring Team and receives assistance as requested. The Monitoring Team will continue to support the newly developed collaborative work of the DPCs and provide any guidance necessary to aid with compliance.

### b. Status of Policies and Training

There are no policy or training requirements for this section.

### c. Compliance Reviews and Findings

An assessment methodology for the first formal assessment of Paragraphs 23-26 was sent to the Parties on June 15, 2026. The Monitoring Team will conduct and complete this assessment during the next reporting period.

### d. Anticipated Work and Challenges for Next Reporting Period

During the next reporting period, the Monitoring Team will utilize the DPC Working Group meetings to continue to build effective communications between the collaborative partners and foster cooperative ventures to achieve the goals of the DPCs – to increase participation from the districts' diverse populations, and help improve safety across the districts.

The Monitoring Team will continue to encourage the collaborative partners, including CRB, police and resident co-chairs, and others to be open and responsive to public input and concerns and to expand the DPC's outreach efforts across the community to reach those individuals who do not normally attend traditional civic meetings or engage with law enforcement agencies or personnel.

Lastly, as stated above, the Monitoring Team will conduct its formal assessment of the DPCs in the next reporting period.

| District Policing Committees Paragraphs | Status of Compliance |
|---|---|
| 23. Facilitation of "regular communication and cooperation between CDP and community leaders at the local level," with District Policing Committees meeting "at minimum, every quarter." | **PARTIAL COMPLIANCE** |
| 24. CPC, CDP, and Community Relations Board ("CRB") will "develop a mechanism to recruit and expand" Committee membership." CDP "will work with [Community Police] Commission to select officers for each District | **NON-COMPLIANCE** |

| | |
|---|---|
| Policing Committee." | |
| 25. CDP "will work closely with District Policing Committees to identify strategies to address crime and safety issues in their District," considering and addressing identified priorities. | **PARTIAL COMPLIANCE** |
| 26. "At least annually, each District Policing Committee will present its identified strategies, concerns, and recommendations" to the CPC, with CDP officer who is Committee member presenting to CPC "CDP's assessment of ways to address" the recommendations." | **OPERATIONAL COMPLIANCE** |

## V. COMMUNITY & PROBLEM-ORIENTED POLICING

### a. Monitoring Team's Work during Report Period

The Monitoring Team collaborated with the PAT and CDP supervisors in developing and finalizing a methodology for the 2026 CPOP assessment. The assessment will allow for a comprehensive analysis of data and information on community engagement and problem-solving activities, providing an understanding of the Division's implementation of its community-oriented and problem-oriented policing philosophies. The draft assessment report was due to the Parties on August 31, 2026, and the final report will be finalized by September 28, 2026.

During this reporting period, the City was awarded a grant from Kent State University to survey Cleveland residents regarding their interactions with police. The grant provided funds for Kent State faculty members and students to work with the PAT in Cleveland on the survey that will be used to inform training.

### b. Status of Policies and Training

Monitoring Team members observed CDP's Integrated Reality-Based Training (IRBT) on multiple occasions – May 29, as well as from June 30-July 2. The IRBT training included several Consent Decree topics and concepts, including CPOP.

During the IRBT scenario debriefs and towards the end of the scenario portion of the training, the instructor reinforced CPOP concepts and practical applications in the field. Instructors presented the approved curriculum and assigned independent small group work to develop a SARA (Scanning, Analysis, Response, Assessment) process for specific scenarios. Yet, on the days that different members of the Monitoring Team observed the training, the classes did not effectively use the designated time in between scenarios to develop these assigned SARA processes. During

wrap up, instructors walked through examples of what they had assigned, providing detailed instruction. The Monitoring Team provided feedback to the Training Section on this observation and suggested methods to encourage the officers to conduct their assigned tasks. While overall the Monitoring Team's impression of the training was positive, this deficiency points to some lingering concerns regarding student engagement during in-service training.

### c. Compliance Reviews and Findings

The Monitoring Team will complete its first comprehensive assessment of CPOP this summer.

### d. Anticipated Work and Challenges for Next Reporting Period

During the next reporting period, the Monitoring Team will complete its CPOP assessment, submit the CPOP assessment draft report to the Parties, incorporate feedback as appropriate, and finalize the report by September 28, 2026.

| Community and Problem-Oriented Policing Paragraphs | Status of Compliance |
|---|---|
| 27. Implementation of "comprehensive and integrated community and problem-oriented policing model" by the City. | **PARTIAL COMPLIANCE** |
| 28. Ensuring that "mission statement reflects [the Division's] commitment to community-oriented policing" / "integrat[ing] community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | **PARTIAL COMPLIANCE** |
| 29. Ensuring "that officers are familiar with the geographic areas they serve," "engage in problem identification," and "work proactively . . . to address quality of life issues." | **PARTIAL COMPLIANCE** |
| 30. Initial and annual in-service community and problem-oriented policing training "adequate in quality, quantity, type, and scope" that addresses specifically identified areas. | **OPERATIONAL COMPLIANCE** |
| 31. Maintenance of "collaborative partnerships with a broad spectrum of community groups," including CDP meetings with community organizations and District Policing Committees. | **PARTIAL COMPLIANCE** |
| 32. CDP "meet[ing] with members of the community in each District on a monthly basis and "solic[itation of] participation from a broad cross-section of community members in each District" to "identify problems and other areas of concern . . . and discuss responses and solutions." | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 33. Development and implementation of "systems to monitor officer outreach to the community" that CDP "will use . . . to analyze . . . whether officers are partnering with a broad cross-section of community members to develop and implement cooperative strategies that build mutual respect and identify and solve problems." | **PARTIAL COMPLIANCE** |
| 34. "At least annually, CDP will present the results" of paragraph 33 analysis "broken out by District in a publicly-available community policing report" that describes problems, solutions, and obstacles. Report provided to Commission and posted on CDP website. | **NON- COMPLIANCE** |

## VI. BIAS-FREE POLICING

### a. Monitoring Team's Work during Report Period

As reported in the Eighteenth Semiannual Report, the Monitoring Team's bias-free policing subject matter experts developed a draft document that outlines the requirements for each bias-free policing provision of the Consent Decree. The document also identifies the data, documentation, and other evidence needed to demonstrate compliance. The Monitoring Team provided the document to the Parties on April 16, 2026 and asked the City/CDP to identify and share the document internally with the appropriate stakeholders, after which an initial meeting date of May 20, 2026 was proposed for a Bias-Free Policing Working Group (BFPWG) to discuss the document and focus efforts on compliance with the bias-free policing paragraphs. However, scheduling the meeting took longer than anticipated and it is now September 1, 2026.

### b. Status of Policies and Training

During this reporting period, the Monitoring Team observed CDP's Integrated Communications, Assessment and Tactics (ICAT) and IRBT, both of which incorporated elements intended to reinforce bias-free policing principles. These observations reflected the Division's responsiveness to feedback previously provided by the Monitoring Team regarding the integration of bias-free policing concepts into scenario-based training.

In the feedback provided on the IRBT curriculum during this reporting period, the Monitoring Team noted that the scenarios could be strengthened by changing details of the suspects and victims. The Monitoring Team also recommended tactical changes around officer safety. For improved delivery across different officer groups, the Monitoring Team further suggested varying the demographic characteristics of suspects, witnesses, victims, to prevent any inadvertent reinforcement of negative stereotypes. These modifications were intended to strengthen the

training's ability to challenge unconscious bias while reinforcing impartial, evidence-based decision-making. The Training Section and curriculum designers were open to the feedback and incorporated many of these suggestions from the Monitoring Team.

The scenarios that the Monitoring Team observed reflected progress toward those recommendations. In both scenarios, female suspects were used to challenge traditional gender-based assumptions regarding the identity of offenders and to encourage officers to base their decisions on observed facts rather than stereotypes. Throughout the exercises, the Monitoring Team observed no conspicuous acts of bias or deficiencies in officers' investigative or tactical decision-making.

Following the observations, the Monitoring Team recommended to CDP that post-scenario debriefings more explicitly connect the scenarios to the Division's Bias-Free Policing policy and discuss the potential influence of implicit bias on officer decision-making. During a subsequent training observation, another Monitoring Team member noted that instructors did make more explicit connections between the scenarios and Bias-Free Policing during the debrief. However, the discussion remained largely instructor-driven and relied on leading questions, limiting officers' opportunities to independently analyze and articulate how implicit bias may influence their perceptions and decision-making. The Monitoring Team encourages the continued refinement of debrief facilitation skills and the incorporation of more discussion-based techniques that allow officers to critically reflect on their own decision-making processes and more actively apply bias-free policing principles to realistic policing situations. The Team was also suggested the Division consider engaging a social psychologist or a consultant with expertise in addressing unconscious or implicit bias in developing its training scenarios.

In addition, although the Supervisor's Bias-Free Policing Training curriculum was reviewed by the Monitoring Team and DOJ, and the CPC approved it, in November 2024, the curriculum has not yet been resubmitted to the Monitoring Team and DOJ for subsequent review and approval. It is the current understanding of the Monitoring Team that the City is in the process of vetting comments from the DOJ and the Monitoring Team that the City received after the CPC review of the Supervisory Training and making updates to the curriculum.

### c. Compliance Reviews and Findings

While it was anticipated that the BFPWG would collaborate on the development of the evaluation methodology for a comprehensive formal bias-free policing assessment during this reporting period, it was delayed due to scheduling challenges noted above. The assessment methodology is due to the Parties, in accordance with the 2026 Monitoring Plan, on October 31, 2026.

In addition, the Monitoring Team recognizes that the Office of Professional Standards (OPS) Activity Dashboard provides the public with a visual representation of various data points, which include allegations of bias policing. The presentation of the data is currently limited in its adequacy for data analysis in the detailed manner that is required by Paragraphs 43, 265 and 367(d)(3). As

stated in the Eighteenth Semiannual Report, a multi-year longitudinal analysis is also needed to more reliably assess bias-free policing trends and evaluate the consistency and objectivity of complaint investigations and Civilian Police Review Board (CPRB) reviews over time.

### d. Anticipated Work and Challenges for Next Reporting Period

As noted, the BFPWG is scheduled to commence during the next reporting period and is expected to inform the Monitoring Team's development of the methodology for the bias-free policing assessment. In addition, it is anticipated that the revised Supervisor's Bias-Free Policing Training curriculum will be resubmitted to the Monitoring Team and DOJ for final review and approval during the next reporting period.

| Bias-Free Policing Paragraphs | Status of Compliance |
|---|---|
| 35. Delivery of "police services with the goal of ensuring that they are equitable, respectful, and free of unlawful bias," among other things. | PARTIAL COMPLIANCE |
| 36. "CDP will integrate bias-free policing principles into its management, policies and procedures, job descriptions, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." | PARTIAL COMPLIANCE |
| 37. CDP will ensure that it "administer[s] all activities without discrimination" on basis of various protected classes | PARTIAL COMPLIANCE |
| 38. "CDP will develop a bias-free policing policy" incorporating CPC recommendations "that provides clear guidance to officers" | OPERATIONAL COMPLIANCE |
| 39–40. Develop bias-free policing and procedural justice training "adequate in quality, quantity, scope, and type" covering specific areas within 18 months of the Effective Date. | OPERATIONAL COMPLIANCE |
| 41. Supervisor training on bias-free policing and procedural justice issues covering specific areas | PARTIAL COMPLIANCE |
| 42. Annual in-service training on bias-free policing "adequate in quality, quantity, type, and scope" | PARTIAL COMPLIANCE |
| 43. Analysis of paragraph 265 data ("including use of force, arrests, motor vehicle and investigatory stops, and misconduct complaints alleging discrimination") | NON-COMPLIANCE |
| 44. Consideration of "bias-free policing and equal protection" principles in hiring, unit assignment, promotion, and performance assessments. | PARTIAL COMPLIANCE |

# VII. USE OF FORCE

## a. Monitoring Team's Work during Report Period

With 74 upgrades during the last rating period, the activities regarding use of force (UOF) in this rating period focused on the remaining paragraphs that require additional work from the CDP beyond the actual policy adherence by officers, as well as planning for a subsequent case review. Subsequent case reviews will allow the Monitoring Team to assess whether CDP continues to adhere to its UOF policies over a longer period of time and across more cases.

During this reporting period, the CDP proposed a plan to increase compliance with the requirements of Paragraph 55. While this paragraph is primarily about policies and practice surrounding firearm points, it also requires the annual collection and analysis of firearm point data. Currently, the Division shares its firearm point data through its internal UOF dashboards, Early Intervention System (EIS) software flags, and Command Staff meetings, but Paragraph 55 specifically requires CDP to annually collect and analyze these data. The CDP plans, during the next reporting period, to use a Command Staff Meeting for the Data Team to present the firearm point data and discuss the data as a group. While the Monitoring Team has no qualms about the CDP's plan to present and discuss these data at a special Command Staff meeting, the Team will be looking for some order or documented procedure as evidence that the required collection and analysis will continue annually. If this is the method chosen, the Monitoring Team requires satisfactory documentation that this will be an annual activity, what position(s) is/are responsible for the compilation of the data, and the roles of those who will participate in, and lead, this review. The analysis should be presented to the Monitoring Team.

In accordance with Paragraph 113, the Annual Force Investigation Team (FIT) In-Service training occurred on April 30, 2026, which the Monitoring Team observed. The observed FIT training was conducted consistent with the approved training curriculum. A record of the FIT training completion was provided to the Monitoring Team, which lists the names of FIT members required to attend and their signatures documenting their attendance. Out of the thirty-six FIT members required to attend, four were absent and have been directed to attend the makeup training in the fall. With the record of FIT training for April 30, 2026, the Monitoring Team was able to determine that CDP identified, assigned, and trained personnel for FIT duties per Paragraph 114.

The Monitoring Team also observed the Force Review Board (FRB) on April 20-21, 2026. This involved observing the Board conduct comprehensive reviews of investigations. The reviews included circumstances that led to the use of force, tactical decisions, supervision, equipment, training, medical response, as well as commendable actions.

During the same FRB observation, the Monitoring Team observed that the FRB ensured objectivity, reviewed recorded statements, determined whether there were any concerns in policy, training, equipment, tactics, communication, etc., and documented the findings in a report within

15 days of the presentation. The findings were reported on April 29, 2026. The FRB observation provides ongoing assessment data relative to Paragraphs 126, 127, and 128.

In addition, the Monitoring Team also observed that the FRB continues to assess the quality of the investigations to identify and document any deficiencies that indicate a need for corrective action.

### b. Status of Policies and Training

All policies in this section are complete, and the CDP has received and continues to receive training in this area. The 2025 UOF assessment describes the degree of adherence to each policy. There are a few areas that require additional review to confirm that the policy practice continues across cases and over time.

Training on UOF is required annually, and the Monitoring Team will continue to review training materials in advance and provide comments where appropriate. In the most recent CDP In-Service Training, the Monitoring Team observed both Integrated Communications, Assessment, and Tactics Training (ICAT) as well as Integrated Reality-Based Training (IRBT). The Training Section took the initiative to travel out of state and attend a train-the-trainer course with the Police Executive Research Forum in order to bring ICAT back to CDP. ICAT included classroom and scenario-based training and focused on using de-escalation tactics to bring volatile situations to a calm conclusion minimizing the use of force. IRBT was scenario-based training and focused on using force only when necessary, de-escalation techniques, search and seizure, CPOP, and bias-free policing. The Monitoring Team continues to work with the Training Section to ensure that all sworn members receive the annual training, that supervisors and newly appointed supervisors are trained, and that training across a range of subjects – force, policies, intermediate weapons – together total 16 hours.

### c. Compliance Reviews and Findings

No compliance assessment was conducted during this reporting period. Nevertheless, as noted above, the Monitoring Team conducted activities during this reporting period to assess compliance with Paragraphs 55, 113, 114, 126, 127, and 128. As a result of these activities, the Monitoring Team is increasing the compliance rating on Paragraphs 113 and 114, which address FIT member training, to General Compliance.

### d. Anticipated Work and Challenges for Next Reporting Period

The Monitoring Team recognizes that only nine paragraphs (75, 76, 82, 83, 93, 101, 104, 119, and 122) have not reached General or Substantial and Effective Compliance. The Monitoring Team will continue to collaborate with CDP to support their efforts to achieve compliance.

In the next reporting period, the Monitoring Team plans to review the documents submitted by CDP related to Paragraph 55 to determine compliance, to ensure firearm point data were made part

of the Command Staff presentation, that the presentation will be at least annual, and to identify who is responsible for the presentation's implementation.

| Use of Force Paragraphs | Status of Compliance |
|---|---|
| 45. "CDP will revise, develop, and implement force policies, training, supervision, and accountability systems with the goal of ensuring that force" complies with the Constitution, federal law, and the Consent Decree "and that any use of unreasonable force is promptly identified and responded to appropriately." | **NOT ASSESSED** |
| 46. "The City will implement the terms of this Agreement with the goal of ensuring that use of force by CDP officers . . . will comply" with at least twelve major, listed principles. | **GENERAL COMPLIANCE** |
| 47. Division "will ensure that the [use of force] incident is accurately and properly reported, documented, and investigated." | **GENERAL COMPLIANCE** |
| 48. "CDP will track and analyze officers' uses of force to hold officers accountable for unreasonable uses of force; to guide training and policy; and to identify poor tactics and emerging trends." | **GENERAL COMPLIANCE** |
| 49. Development of use of force policies "that comply with applicable law[,] . . . are adequate to achieve the goals described in paragraph 45," and "specify that unreasonable use of force will subject officers to the disciplinary process, possible criminal prosecution, and/or possible civil liability." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 50. "CDP's policies will address the use and deployment of its authorized force techniques, technologies, and weapons." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 51. Weapon-specific policies "will include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 52. "No officer will carry any weapon that is not authorized or approved by CDP." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 53. "Prior to the use of any approved weapon, the officer, when possible and appropriate, will communicate to the subject and other officers that the use of weapon is imminent, and allow the subject an opportunity to comply." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 54. "The City will implement policies for each of the following guidelines." | **NOT ASSESSED** |

| | |
|---|---|
| 55. "Officers will not unholster and display a firearm unless the circumstances create a reasonable belief that lethal force may become necessary." Policies will require and training will teach proper "unholstering, displaying, pointing, and aiming a firearm, and for determining when it is appropriate to do so." And "If an officer unholsters a firearm during an incident, interaction, or event that would otherwise trigger a reporting or data collection requirement, officers will document that a firearm was unholstered. CDP will annually collect and analyze this data." | **GENERAL COMPLIANCE** |
| 56. "Unholstering a firearm and pointing it at a subject constitutes a Level 1 reportable use of force and will be reported and investigated as such." Includes specific exceptions for SWAT officers executing SWAT duties; officers deputized and assigned to a Federal Task Force when conducting task force operations and a supervisor is present; officers assigned to certain units if done solely while entering and securing a building during warrant execution. | **GENERAL COMPLIANCE** |
| 57. "Officers will not fire warning shots." | **GENERAL COMPLIANCE** |
| 58. "Officers will consider their surroundings before discharging their firearms and will avoid unnecessary risk to bystanders, victims, and other officers." | **GENERAL COMPLIANCE** |
| 59. "Officers will not discharge a firearm from or at a moving vehicle, unless use of lethal force is justified by something other than the threat from the moving vehicle; officers will not intentionally place themselves in the path of or reach inside a moving vehicle; and, where possible, officers will attempt to move out of the path of a moving vehicle." | **GENERAL COMPLIANCE** |
| 60. "CDP annually will provide at least 16 hours of firearms training which will include pistol, shotgun, and policy training…develop a plan to provide appropriate night, reduced light, and stress training for officers. Officers will successfully qualify with each firearm they are authorized to use or carry on-duty at least annually…and will not be permitted to carry any firearm on which they failed to qualify." | **GENERAL COMPLIANCE** |
| 61. "Officers will use Electronic Control Weapons ("ECWs") only where: (1) grounds for arrest or detention are present and the subject is actively or aggressively resisting, and lesser means would be ineffective; or (2) such force is necessary to protect the officer, the subject, or another | **GENERAL COMPLIANCE** |

| | |
|---|---|
| party from immediate physical harm, and lesser means would be ineffective or have been tried and failed." | |
| 62. "Each standard 5-second ECW application is a separate use of force that officers must individually justify as reasonable. After the first ECW application, the officer will reevaluate the situation to determine if subsequent cycles are reasonable…Officers will not employ more than three cycles of an ECW against a subject during a single incident." | **GENERAL COMPLIANCE** |
| 63. "Officers will consider transitioning to alternative control measures if the subject does not respond to ECW applications." | **GENERAL COMPLIANCE** |
| 64. "Officers will not use ECWs in drive stun mode solely as a pain compliance technique. Officers may use ECWs in drive stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between officers and the subject so that officers can consider another force option." | **GENERAL COMPLIANCE** |
| 65. "Officers will determine the reasonableness of ECW use based upon all the relevant circumstances, including the subject's apparent age, size, physical, and mental condition, and the feasibility of lesser force options." | **GENERAL COMPLIANCE** |
| 66. "Except where lethal force is authorized, officers will not use ECWs where: (1) a deployment may cause serious physical injury or death from situational hazards, including falling, losing control of a moving vehicle, or becoming ignited from the presence of potentially explosive or flammable materials or substances; or (2) the subject is visibly pregnant, apparently elderly, a child, visibly frail, has obviously low body mass, or is in apparent medical crisis." | **GENERAL COMPLIANCE** |
| 67. "Officers will not use ECWs on fleeing persons who do not pose a threat of physical harm to officers, other civilians, or themselves." | **GENERAL COMPLIANCE** |
| 68. "Officers will not intentionally target ECWs to a subject's head, neck, or genitalia." | **GENERAL COMPLIANCE** |
| 69. "Officers will not normally use ECWs on handcuffed or restrained persons…only where the subject is displaying aggressive physical resistance and lesser means would be ineffective or have been tried and failed." | **GENERAL COMPLIANCE** |
| 70. "Officers will carry ECWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

| | |
|---|---|
| 71. Officers will be trained on and follow ECW duties, including: (a) restrictions on removing ECW probes, (b) understanding risks of positional asphyxia and using restraint techniques that do not impair respiration, (c) monitoring subjects after ECW while in police custody, (d) informing medical personal of all subjects subjected to multiple ECW applications and other risk factors. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 72. "The City will ensure that all subjects who have been exposed to an ECW application receive a medical evaluation by emergency medical responders…Absent exigent circumstances, probes will be removed from a subject's skin only by medical personnel or properly trained officers." | **GENERAL COMPLIANCE** |
| 73. "In addition to the force reporting requirements outlined in paragraph 88, officers will clearly articulate and justify" specific information regarding ECW use in a written narrative. | **GENERAL COMPLIANCE** |
| 74. "Officers who have been issued ECWs will receive annual ECW certifications, which will consist of physical competency; weapon retention; CDP policy, including any policy changes; technology changes; and scenario-based training." | **GENERAL COMPLIANCE** |
| 75. "The City will develop and implement integrity safeguards on the use of ECWs to ensure compliance with CDP policy. CDP will conduct quarterly downloads of all ECWs… [and] random and directed audits of ECW application data, which will be provided to the Monitor for review." Audits will compare downloaded data to the officer's Use of Force Reports, and discrepancies should be addressed and appropriately investigated. | **NON-COMPLIANCE** |
| 76. "ECW application data will be tracked and analyzed in CDP's Officer Intervention Program." | **PARTIAL COMPLIANCE** |
| 77. "Officers will apply OC spray only: (1) when such force is reasonable to protect the officer, the subject, or another party from physical harm and lesser means would be ineffective; or (2) for crowd dispersal or protection and other means would be more intrusive or less effective." | **GENERAL COMPLIANCE** |
| 78. "After one standard OC spray (one second), each subsequent application is a separate use of force that officers must individually justify as reasonable." | **GENERAL COMPLIANCE** |
| 79. "Officers will not normally use OC spray on handcuffed or restrained persons…only where the subject is displaying aggressive physical resistance and lesser means would be ineffective or have been tried and failed." | **GENERAL COMPLIANCE** |

| | |
|---|---|
| 80. "Officers will be trained in and follow" OC spray protocols, including: (a) decontaminating those exposed using cool water to flush face and eyes within 20 minutes of gaining control of scene, (b) understanding the risks of positional asphyxia and using restraint techniques that do not impair respiration, (c) requesting medical assistance for certain exposed subjects. | **GENERAL COMPLIANCE** |
| 81. "Officers will carry only CDP issued OC spray." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 82. "CDP will maintain documentation of the number of OC spray canisters distributed to and utilized by each officer." | **PARTIAL COMPLIANCE** |
| 83. "OC spray application data will be tracked and analyzed in CDP's Officer Intervention Program." | **PARTIAL COMPLIANCE** |
| 84. CDP "will provide all current officers use of force training that is adequate in quality, quantity, scope, and type and that includes" a number of specific, expressly listed elements. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 85. CDP "will provide the use of force training described in paragraph 84 to all new officers." | **GENERAL COMPLIANCE** |
| 86. "CDP will provide all officers with annual use of force in-service training that is adequate in quality, quantity, type, and scope." | **GENERAL COMPLIANCE** |
| 87. "CDP will develop and implement a single, uniform reporting system pursuant to a Use of Force reporting policy" that complies with the force Level categorization set forth in the paragraph. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 88. Requiring "[a]ll officers using or observing force" to complete a Use of Force Report including a number of specific features and avoiding "conclusory statements, 'boilerplate', or 'canned' language." | **GENERAL COMPLIANCE** |
| 89. "Officers will be subject to the disciplinary process for material omissions or misrepresentations in their Use of Force Reports." | **GENERAL COMPLIANCE** |
| 90. "Officers who use or observe force and fail to report it will be subject to the disciplinary process, up to and including termination, regardless of whether the force was reasonable." | **GENERAL COMPLIANCE** |
| 91. Requirement to "notify . . . supervisors . . . as soon as practical following any use of force" and if becoming aware of "an allegation of unreasonable or unreported force by another officer." | **GENERAL COMPLIANCE** |
| 92. "Use of Force Reports will be maintained centrally." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

| | |
|---|---|
| 93. "A supervisor who was involved in a use of force, including by participating in or ordering the force under investigation, will not investigate the incident or review the Use of Force Reports for approval or disapproval." | **OPERATIONAL COMPLIANCE** |
| 94. Setting specific requirements relating to the investigation of low-level, Level 1 force. | **GENERAL COMPLIANCE** |
| 95. "The direct supervisor of the officer(s) using force, upon notification of a Level 2…or allegation of excessive force, will respond to the location of the occurrence. Where the force is a Level 1 but the subject has alleged excessive force, the supervisor will respond to the scene to determine whether a Level 1 or Level 2 investigation should be conducted." | **GENERAL COMPLIANCE** |
| 96. "If a CDP supervisor uses a Level 2 use of force, a supervisor of a higher rank will respond to the location" and comply with this section. | **GENERAL COMPLIANCE** |
| 97. "For all Level 2 uses of force, the direct supervisor will" comply with an expressed list of duties. | **GENERAL COMPLIANCE** |
| 98. "The investigating supervisor will" ensure all Use of Force Reports contain all required information; consider all relevant evidence; and make credibility determinations, if feasible. Supervisors will make all reasonable efforts to resolve material inconsistencies. CDP will train all investigating supervisors on how to effectively complete these tasks. | **GENERAL COMPLIANCE** |
| 99. "Whenever a supervisor determines that there may have been misconduct, the supervisor will immediately notify Internal Affairs and Internal Affairs will determine if it should respond to the scene and/or conduct or take over the investigation." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 100. "Within five days of learning of the use of force, each supervisor will complete and document his/her investigation...Any extension …must be authorized by a District Commander. This Report will include" a specific list of required information. | **GENERAL COMPLIANCE** |
| 101. "Investigatory supervisors will be subject to the disciplinary process for failing to adequately investigate and document a use of force and material omissions or misrepresentations in the supervisory investigation." Such failures will be addressed in the supervisor's performance review. | **OPERATIONAL COMPLIANCE** |
| 102. "Upon completion of the supervisor's Use of Force Report, the investigating supervisor will forward the report through their chain of command to the District Commander…Each level in the chain of command will review the report within 72 hours of receiving it." | **GENERAL COMPLIANCE** |

| | |
|---|---|
| Reviewing supervisors will order additional investigation when there may be additional relevant evidence to assist resolving inconsistencies or improve the reliability or credibility of the findings. | |
| 103. "Where the findings of the Use of Force Report are not supported by a preponderance of the evidence," the chain of command will document the reasons and will append it to the original investigation. The investigating supervisor's superior will counsel the investigating supervisor. The District Commander is responsible for accurate and complete Use of Force Reports supervisors under their command. | **GENERAL COMPLIANCE** |
| 104. "Where an investigating supervisor conducts deficient investigations, the supervisor will receive the appropriate corrective action, including training or demotion, in accordance with performance evaluation procedures and/or the disciplinary process." | **OPERATIONAL COMPLIANCE** |
| 105. Whenever evidence of a use of force involving potential criminal conduct is found, the superior "will suspend the force investigation immediately and notify Internal Affairs [which will]…notify FIT, which will take over both the criminal and administrative investigation." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 106. "When the District Commander finds that the investigation is complete and…supported by the evidence, the investigation file will be promptly forwarded to Internal Affairs." Internal Affairs will ensure investigation is completed and supported by the evidence. | **GENERAL COMPLIANCE** |
| 107. "When Internal Affairs completes its review, it will forward the complete file to the Chief of CDP for disposition." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 108. "At the discretion of the Chief, his or her designee, or Internal Affairs, a use of force investigation may be assigned or re-assigned for investigation to FIT or to another supervisor, whether within or outside of the District in which the incident occurred, or may be returned to the District for further investigation or analysis. This assignment or re-assignment will be explained in writing." | **GENERAL COMPLIANCE** |
| 109. Ensuring appropriate disciplinary process for out-of-policy force, and that necessary training, policy, tactical, or equipment concerns are addressed where the need is discovered through the force review. | **GENERAL COMPLIANCE** |
| 110. "CDP may refer criminal investigations of uses of force to an independent and highly competent agency outside CDP." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

| | |
|---|---|
| 111. Creation and design of dedicated Force Investigation Team (FIT) that "will conduct administrative investigations . . . and criminal investigations" of serious force, "force involving potential criminal conduct," in-custody deaths, and cases assigned to it by the Chief. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 112. Composition of FIT Team. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 113. "FIT members will receive FIT-specific training that is adequate in quality, quantity, scope, and type" on a host of specific, expressly-listed topics both initially and annually thereafter. | **GENERAL COMPLIANCE** |
| 114. "CDP will identify, assign, and train personnel for the FIT to fulfill the requirements of this Agreement." | **GENERAL COMPLIANCE** |
| 115. Response of FIT to use of force scenes. FIT notification of prosecutor's office. Notification of designated outside agency to conduct criminal investigation if City elects to use external agency for such investigations. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 116. "CDP will develop and implement polices to ensure that, where an outside agency conducts the criminal investigation, FIT conducts a concurrent and thorough administrative investigation." | **GENERAL COMPLIANCE** |
| 117. Memorandum of understanding required between CDP and outside agency containing specific, expressly-listed provisions. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 118. Setting forth various, specific, and expressly-listed responsibilities of FIT during its investigations. | **GENERAL COMPLIANCE** |
| 119. At least annually, "the Monitor will determine whether the criminal investigations conducted by the outside agency are consistently objective, timely and comprehensive." If they are found not to be, the memorandum of understanding will terminate and FIT will assume responsibility. | **OPERATIONAL COMPLIANCE** |
| 120. Providing for delay of compelled interview if "case has the potential to proceed criminally" but otherwise requiring that "[n]o other part of the investigation . . . be held in abeyance" unless "specifically authorized by the Chief" in consultation with investigating agency and prosecutor's office. | **GENERAL COMPLIANCE** |
| 121. Requiring completion of preliminary report presented to Chief or Chief's designee "as soon as possible, but absent exigent circumstances, no later than 24 hours after learning of the use of force." | **GENERAL COMPLIANCE** |

| | |
|---|---|
| 122. Completion of investigation within 60 days. Preparation of FIT investigation report. Review of FIT investigative report by head of Internal Affairs who "will approve or disapprove FIT's recommendations, or request . . . additional investigation." | **OPERATIONAL COMPLIANCE** |
| 123. Revision of FIT manual to ensure "consisten[cy] with the force principles" and several specific, expressly-listed provisions. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 124. "The City will develop and implement a Force Review Board "to serve as a quality control mechanism for uses of force and force investigations, and to appraise use of force incidents from a tactics, training, policy, and agency improvement perspective." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 125. Requiring "training on legal updates, updates on CDP's policies, and CDP training curriculum related to the use of force" for each member. | **GENERAL COMPLIANCE** |
| 126. Mandating "comprehensive and reliable reviews of investigations within 90 days of submission to the FRB," and encompassing officer's decision-making at the moment force was used as well asl "the circumstances leading up to the use of force, tactical decisions, information sharing and communication, adequacy of supervision, equipment, training, CDP's medical response, when applicable, and any commendable actions" and actions and inactions of all involved members. | **GENERAL COMPLIANCE** |
| 127. Description of reviews, which will: ensure objective and complete investigations and findings supported by preponderance of the evidence; be presented by the investigator or District representative (for supervisors); review written records and discuss the case with the presenter; order additional investigation when needed; determine whether the case raises concerns about policing, training, equipment, supervision, medical response, communication, or tactics and referral to appropriate unit; recommending non-disciplinary action; and documenting FRB findings and recommendations within 15 days of each presentation. | **GENERAL COMPLIANCE** |
| 128. "The FRB will assess the quality of the investigations," including whether they are "objective and comprehensive and recommendations are supported by a preponderance of evidence. The FRB will identify and document any deficiencies that indicate a need for corrective action" | **GENERAL COMPLIANCE** |

| | |
|---|---|
| 129. "Annually, the FRB will examine the data related to use of force" provided by the DACC per ¶261 (and in conjunction with ¶266) "to detect any patterns, trends, and training deficiencies and make recommendations for correction as appropriate" and will provide the analysis to the Monitor | **GENERAL COMPLIANCE** |
| 130. The FRB will work with the DACC to "develop a tracking system to ensure that each of its recommendations has been forwarded to the appropriate personnel. The Chief or his or her designee will ensure that the FRB's recommendations, including non-disciplinary corrective action, are implemented as appropriate." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

## VIII. CRISIS INTERVENTION

### a. Monitoring Team's Work during Report Period

The Monitoring Team has continued to review the Division's annual Crisis Intervention Report and Specialized Crisis Intervention Plan update, examine curriculum developed for the Crisis Intervention training for officers, call-takers and dispatchers, attend the community-based Mental Health Response Advisory Committee meetings (MHRAC), and participate in briefings and discussions of the interagency Crisis Intervention Working Group which meets to assure the Division's crisis strategies remain updated. The Division has done an excellent job in maintaining the type of response capability seen in the compliance assessment last September.

### b. Status of Policies and Training

The Monitoring Team's compliance assessment found that policy changes required by the Consent Decree have been implemented. Initial training and implementation have been completed and on-going in-service training designed to ensure continued success is underway.

### c. Compliance Reviews and Findings

The Monitoring Team conducted comprehensive compliance review which was completed in September of 2025. As summarized in the Eighteenth Semiannual Report, the Monitoring Team, through its assessment, confirmed that both the direction and current strength of CDP's CIT Program, and the overall crisis intervention strategy, are effectively addressing the Consent Decree's requirements. All areas were assessed as either in General Compliance or Substantial and Effective Compliance. This is an impressive result. In this report, the Monitoring Team is

upgrading Paragraphs 143, 144, 146, 154 and 155 – which have all been in General Compliance since the Thirteenth Semiannual Report – to Substantial and Effective Compliance.

### d. Anticipated Work and Challenges for Next Reporting Period

The Monitoring Team will continue to review CDP's work to ensure that the progress found in the compliance assessment mentioned above is maintained. The Monitoring Team's work continues to move from an active role that provided periodic direct assistance to a role involving observation of the accomplishments of CDP, the City, Department of Public Health and a range of community partners such as the volunteers from MHRAC, the Alcohol, Drug Addiction and Mental Health Services (ADAMHS) Board, behavioral health providers, Case Western Reserve University consultants and many others that comprise the behavioral health system. It is particularly important to note the work that is being done to reach across agency lines to organizations such as the CPC, the hospitals that make up the Cleveland healthcare system and the newly formed City infrastructure designed to guide crisis intervention strategies through the recent passage of Tanisha's Law.[11] CDP is approaching these changes with a strategy that focuses on solid communication and problem-solving. Throughout the reporting period, the Monitoring Team tried to engage the City in discussion regarding a plan for the City to demonstrate ongoing Substantial and Effective Compliance as required by Paragraphs 401 and 402. Efforts to formulate a plan will continue in the next reporting period.

| Crisis Intervention Paragraphs | Status of Compliance |
|---|---|
| 131. "CDP will build upon and improve its Crisis Intervention Program" in furtherance of four specific, expressly-listed goals, which "will provide a forum for effective problem solving regarding the interaction between the criminal justice and mental health system and create a context for sustainable change." | GENERAL COMPLIANCE |
| 132. Establishment of Mental Health Response Advisory Committee (the "Advisory Committee") "to foster relationships and build support between the police, community, and mental health providers and to help identify problems and develop solutions designed to improve outcomes for individuals in crisis." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 133. Composition of Advisory Committee. | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |

[11] Tanisha's Law, Ord. No. 1198-2024 is a Cleveland City Ordinance passed by the City Council on February 9, 2026. It "establishes a new compassionate approach to mental health and behavioral health crisis in Cleveland." See link.

| | |
|---|---|
| 134. "The Advisory Committee will meet regularly and provide guidance to assist CDP in improving, expanding, and sustaining its Crisis Intervention Program." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 135. Advisory Committee will conduct an annual "analysis of crisis intervention incidents to determine whether CDP has enough specialized CIT officers, whether it is deploying those officers effectively, and whether specialized CIT officers" and communications "are appropriately responding to people in crisis," and will also "recommend appropriate changes." | **GENERAL COMPLIANCE** |
| 136. "The Advisory Committee's reports and recommendations will be provided" to CPC, "be publicly available, and will be posted on the City's website." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 137. CDP will designate a Crisis Intervention Coordinator for specific, expressly-identified purposes. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 138. "Coordinator will develop and maintain partnerships with program stakeholders and serve as point of contact" and "resource" for other stakeholders. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 139. "Coordinator will participate in the Advisory Committee and on a regular basis solicit feedback from the mental health community and specialized CIT officers, call-takers, and dispatchers regarding the efficacy of CDP's Crisis Intervention Program." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 140. "Coordinator will be responsible for coordinating implementation of the changes and recommendations made by the Advisory Committee, as appropriate." | **GENERAL COMPLIANCE** |
| 141. "Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as specialized CIT officers" and "to ensure that officers, call-takers, and dispatchers are appropriately responding to CIT-related calls." | **GENERAL COMPLIANCE** |
| 142. "Coordinator will create ways to recognize and honor specialized CIT officers, call-takers, and dispatchers." | **GENERAL COMPLIANCE** |
| 143. Initial and annual crisis intervention training to all officers and recruits that is "adequate in quality, quantity, type, and scope." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 144. Initial and annual crisis intervention training for dispatchers and call-takers. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

| | |
|---|---|
| 145. "The City will provide enhanced specialized training in responding to individuals in crisis to certain officers ('specialized CIT officers')," who will be "called upon to respond to incidents or calls involving individuals in crisis." | **GENERAL COMPLIANCE** |
| 146. Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 147. Outlining various requirements for the "enhanced training" for specialized CIT officers of "at least 40 hours." | **GENERAL COMPLIANCE** |
| 148. Designation of specialized CIT officers, per specific, expressly-listed requirements. | **GENERAL COMPLIANCE** |
| 149. "Supervisors will identify and encourage qualified officers across all shifts and all Districts to serve as specialized officers." | **GENERAL COMPLIANCE** |
| 150. "All Field Training Officers" ("FTO"s) "will receive the enhanced specialized crisis intervention training described in paragraph 146," though FTOs will "not be designated as a specialized CIT officer" unless they volunteer and have been selected to do so. | **GENERAL COMPLIANCE** |
| 151. "Specialized CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene," with supervisors "seek[ing] the input of a specialized CIT officer . . . where it is reasonable for them to do so." | **GENERAL COMPLIANCE** |
| 152. "[T]he Coordinator will develop an effective specialized crisis intervention plan . . . to ensure that a specialized CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis" that includes various, specific, expressly-identified requirements. The City "will use its best efforts to ensure that a specialized CIT officer responds to all calls and incidents that appear to involve an individual in crisis." | **GENERAL COMPLIANCE** |
| 153. City "will consider" crisis intervention program assessment by Ohio Criminal Justice Coordinating Center of Excellence. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 154. CDP "will revise its policies to make clear that a crisis intervention response may be necessary even in situations where there has been an apparent law violation." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 155. CDP "will revise its current crisis intervention policy to ensure that specialized CIT officers have appropriate discretion to direct individuals . . . to the health care system, rather than the judicial system . . . where it is appropriate to do so." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

| | |
|---|---|
| 156. CDP policies and procedures will ensure that "specialized CIT officers . . . must be dispatched to all calls or incidents that appear to involve an individual in crisis." CDP must "track incidents in which a specialized officer was not dispatched to such calls" and "identify any barriers" to ensuring dispatch of specialized CIT officer to such calls. | **GENERAL COMPLIANCE** |
| 157. "CDP will track calls and incidents involving individuals in crisis by gathering, at a minimum," specific, expressly-identified data. | **GENERAL COMPLIANCE** |
| 158. Public reporting of paragraph 157 data and provision to Advisory Committee. | **GENERAL COMPLIANCE** |
| 159. "The City will utilize" paragraph 157 data "to identify training needs and develop case studies and teaching scenarios" for training and other expressly-identified systemic purposes. | **GENERAL COMPLIANCE** |

## IX. SEARCHES AND SEIZURES

### a. Monitoring Team's Work during Report Period

During this reporting period, the Monitoring Team made efforts to convene a Search and Seizure Working Group with the City and CDP to focus on the remaining work that needs to occur in order for CDP to reach compliance with the paragraphs of this Consent Decree section. Despite the efforts to have a meeting scheduled by early May, the first meeting did not occur until after the reporting period.

The Monitoring Team received and reviewed the report prepared by Sigma Squared, an entity hired by the City to examine the City's 2024 stops data. Upon review, the Monitoring Team observed that the Sigma Squared analysis and the Monitoring Team's 2025 Search and Seizure Assessment were designed to address fundamentally different questions. The Monitoring Team's assessment evaluated compliance with the Consent Decree by examining whether CDP stops, searches, and arrests satisfied constitutional requirements. The assessment, provided to the Parties in draft form on August 15, 2025, revised after comments from the Department of Justice on September 5 and the City on October 1, and filed with the Court on December 5, considered perceived age, race, gender, and ethnicity of the parties stopped. It also assessed the legal adequacy of officers' articulation of reasonable suspicion and probable cause, the outcome measures required under Paragraph 367(c), and the quality of supervisory review. Although the Monitoring Team's assessment identified disproportionate racial disparities in stops, searches, and arrests, it expressly recognized that additional operational context would be necessary to determine the causes of the disparities.

In contrast, the Sigma Squared report focused on post-stop decision-making. It did not assess whether racial disparities existed in the initial decision to stop an individual or whether the stop itself met constitutional standards. Because the initial stop determines who is exposed to every subsequent enforcement action, analyses limited to post-stop outcomes cannot fully assess racial disparities across the entire enforcement encounter. Accordingly, the Monitoring Team believes the report's broader conclusions regarding the absence of race-based disparities in police decision-making extend beyond what can reasonably be supported by the analysis confined to post-stop police outcomes and the limitations cited in the research literature of the specific statistical methods used in the analysis.

The Sigma Squared report may offer useful insight into post-stop enforcement activity. However, it should not be read as establishing the absence of racial disparities in CDP's stop, search, and arrest practices. The Monitoring Team's observations are intended to ensure that each report's conclusions remain aligned with the questions its design can answer and with the inferences that can reasonably be drawn from the reported data.

### b. Status of Policies and Training

As noted in other sections of this report, the Monitoring Team observed CDP's IRBT training, which also included curriculum for search and seizure. Toward the end of this reporting period, CDP reported that 776 of the 1,203 personnel completed the training during this reporting period. The remaining eligible personnel are scheduled to complete the training by August 6 of the next reporting period.

### c. Compliance Reviews and Findings

Beyond the methodological questions identified by the Monitoring Team, important questions remain regarding the City's intended use of the Sigma Squared report or its plan to review data and operational decision-making to understand or explain existing disparities. At present, it is unclear whether the report is intended primarily as an operational management tool, evidence of Consent Decree compliance, or a broader analytical resource to inform policy and practice. The Monitoring Team expects these issues to be addressed through the Search and Seizure Working Group as the Parties work toward a shared understanding of the report's purpose.

### d. Anticipated Work and Challenges for Next Reporting Period

During the next reporting period, the Monitoring Team will convene the Search and Seizure Working Group to collaboratively identify the data, documentation, and other evidence necessary for CDP to achieve compliance with the remaining search and seizure provisions of the Consent Decree (Paragraphs 160–175 and 367(c)). The Working Group will also address outstanding questions concerning the purpose and use of the Sigma Squared report in the City's ongoing compliance and accountability efforts.

| Searches and Seizures Paragraphs | Status of Compliance |
|---|---|
| 160. "CDP will revise, develop, and implement search and seizure policies that comply with applicable law, . . . include the requirements below," and conform to expressly-identified principles. | **NOT ASSESSED** |
| 161. "Officers will not use an individual's gender, race, ethnicity, national origin, or perceived sexual orientation… in establishing reasonable suspicion or probable cause, unless…part of an actual or credible description of a specific suspect in an investigation that includes other identifying factors." | **OPERATIONAL COMPLIANCE** |
| 162. "Officers will not conduct investigatory stops when they lack reasonable suspicion." | **OPERATIONAL COMPLIANCE** |
| 163. "Officers will not conduct pat down searches without specific and articulable facts to reasonably suspect that a particular person is armed and dangerous. This does not restrict an officer's ability to conduct a search incident to arrest or prior to transport." | **OPERATIONAL COMPLIANCE** |
| 164. "Where an officer seeks consent for a search, the officer will inform the person of his or her right to refuse and to revoke consent at any time and document the person's consent." | **PARTIAL COMPLIANCE** |
| 165. "CDP officers will not rely solely upon an individual's geographic location, or presence in a high crime area without any other specific and articulable facts indicating that the individual has been, is, or is about to engage in criminal activity, as the basis for an investigatory stop." | **OPERATIONAL COMPLIANCE** |
| 166. "Officers will immediately notify a supervisor when effectuating a custodial arrest for obstructing official business, resisting arrest, or assault on an officer and no other substantive violation is alleged," and "the supervisor will respond to the scene." | **OPERATIONAL COMPLIANCE** |
| 167. "Officers will not use 'canned' or conclusory language without supporting detail in documents or reports documenting investigatory stops, searches, or arrests." | **OPERATIONAL COMPLIANCE** |
| 168. "Officers will articulate the justification for an investigatory stop, search, or arrest in a specific and clear manner in their reports." CDP "will train officers" on documenting stops. "Supervisors will review all documentation of investigatory stops, searches, and arrests." | **OPERATIONAL COMPLIANCE** |
| 169. Supervisor will review "each arrest report by officers under their command," with supervisors reviewing reports for specific, expressly-identified deficiencies. | **PARTIAL COMPLIANCE** |

| | |
|---|---|
| 170–72. Supervisory review of investigatory stops, searches, and arrests. | **PARTIAL COMPLIANCE** |
| 173. Provision of "initial training that is adequate in quality, quantity, scope, and type on investigatory stops, searches, and arrests, including the requirements" of the Consent Decree that "will address the requirements of Fourth Amendment and related law, CDP policies," and specific, expressly-identified topics. | **GENERAL COMPLIANCE** |
| 174–75. Provision of "annual search and seizure in-service training that is adequate in quality, quantity, type, and scope" incorporating specific, expressly-identified topics. | **OPERATIONAL COMPLIANCE** |

# X. ACCOUNTABILITY

## 1. Internally Discovered Misconduct

### a. Monitoring Team's Work during Report Period

The Monitoring Team and the Internal Affairs (IA) Superintendent continue to meet monthly to discuss items to be achieved during the reporting period. The continued collaboration has resulted in the development of achievable steps and processes for obtaining data that demonstrate compliance with the Consent Decree.

During this rating period, an IA Working Group was established to meet the needs of both the CDP and the Monitoring Team, as steps were taken to begin the Internal Misconduct Assessment. The IA Working Group is comprised of the IA Superintendent, members of the PAT, and Monitoring Team members. During Working Group meetings, all members share information, make follow-up data requests, and work together to meet the deadlines outlined in the methodology.

In addition, during this reporting period, the Monitoring Team developed its methodology for conducting the Internal Misconduct Assessment, and began to conduct the assessment in earnest. The assessment and report will be finalized in the next reporting period.

Furthermore, IA consistently submits monthly reports detailing the unit's activities and adherence to Paragraphs 177-188. Based on these reports, IA identifies cases where self-assessments meet the requirements outlined in these paragraphs. Further adjustments to compliance levels across the IA paragraphs will be made following the comprehensive assessment that is currently underway.

### b. Status of Policies and Training

All general policies in this section are complete; see General Police Order 1.07.05, Internal Complaints of Misconduct.

The IA Manual was updated in 2024, and the changes were filed with the Court. IA Unit personnel have received the required training in this area. Training includes conducting misconduct investigations for each new member of the unit and for all members annually. The Monitoring Team will continue to review training materials and work collaboratively with IA and the Training Section, providing comments where appropriate. Training records must continue to show who is required to attend, the training curriculum, and when it was delivered. Though a formal compliance assessment is underway, the regular communication with the IA Superintendent demonstrates a commitment to compliance and instilling high expectations on IA investigators.

### c. Compliance Reviews and Findings

Paragraph 178 requires that IA be headed by a qualified civilian who is neither a current nor a former employee of CDP, nor a current or retired law enforcement officer, and that the person must report directly to the Chief of Police. The current head of IA is a qualified civilian who is neither a current nor a former employee of CDP, nor a current or retired law enforcement officer. She reports directly to the Chief of Police. The current Superintendent has been heading Internal Affairs since November 2024. Prior to the current Superintendent, the incumbent was also a qualified civilian. To determine whether the Superintendent was qualified, the Monitoring Team reviewed the job announcement and the Superintendent's resume. The Chief of Police has indicated that she understands the importance of having a qualified civilian head of IA, and therefore, if the position should be vacated again, she has an internal policy that filling the position becomes a priority, as the position is a direct report. Therefore, the Monitoring Team is upgrading this paragraph to General Compliance.

Regarding Paragraph 179, the Superintendent reports that IA continues to implement the process for onboarding investigators who meet the Division and Consent Decree requirements. During this period, a sergeant was onboarded in accordance with the approved IA Unit Candidate Selection Process.

During this period, IA conducted another selection process for hiring new investigators. As part of the process, one candidate was disqualified for prior disciplinary issues, demonstrating adherence to the procedures in place for onboarding investigators. As part of the current comprehensive assessment, the Monitoring Team will review documents that determine the onboarding of investigators to assess Paragraph 179.

Regarding Paragraph 180, new investigators have been assigned to IA; however, the initial training is scheduled to be conducted during the next reporting period. The IA manual requires that all new IA personnel receive formal training within six (6) months of starting their new role conducting

IA investigations. The next reporting period will place the training within the required six (6) months.

Regarding Paragraph 181, IA investigators began attending the annual training through an approved online program toward the close of this reporting period. They attended one full day each week for four weeks and a day and a half in the fifth week. Two attended in June 2026, and the other IA investigator will attend throughout 2026. It is anticipated that documentation supporting attendance will be provided as part of the comprehensive assessment. Additionally, during this rating period, all assigned IA sergeants completed the following online training: "On the Razor's Edge: The Double-Edged Impact of Empathy in Use of Force Investigations," "Officer Involved Shooting: Different Perspectives," "Mastering Difficult Conversations- Advancing the Standard-Modern Use of Force," and "Video Literacy for Police Supervision."

Paragraphs 177, 182-192 are currently being assessed as part of the Internal Misconduct assessment. This will include a detailed review and analysis of quantitative and qualitative data collected by the Monitoring Team for use in IA investigative cases. The draft report of the Internal Misconduct subsection of Accountability is scheduled to be submitted to the Parties on September 30, 2026.

### d. Anticipated Work and Challenges for Next Reporting Period

The Monitoring Team recognizes the importance and urgency of completing the current Internal Misconduct Assessment to assess compliance. During the next review period, the Monitoring Team anticipates continuing to work collaboratively to share information and lessons from the comprehensive assessment. These exchanges will occur during the IA monthly meetings with the Monitoring Team and during the IA Working Group meetings, which are designed to support CDP's efforts to achieve compliance.

Information from the comprehensive assessment will be analyzed and submitted to the Parties in a draft report. The City and DOJ will have the opportunity to submit comments on the draft report. After which, the Monitoring Team will finalize the report, file it with the Court, and will post it on the Monitoring Team's website.

| Internally Discovered Misconduct Paragraphs | Status of Compliance |
|---|---|
| 176. "The City and CDP will ensure that all allegations of officer misconduct, whether internally discovered or alleged by a civilian, are fully, fairly, and efficiently investigated; that all investigative findings are supported by a preponderance of the evidence and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, and provides due process." | **NOT ASSESSED** |

| | |
|---|---|
| 177. "Internal Affairs will conduct objective, comprehensive, and timely investigations of all internal allegations," with "findings . . . based on the preponderance of the evidence standard" that must "be clearly delineated in policies, training, and procedures and accompanied by detailed examples to ensure proper application by investigators." | **PARTIAL COMPLIANCE** |
| 178. "Internal Affairs will be headed by a qualified civilian" who "will report directly to the Chief of Police. | **GENERAL COMPLIANCE** |
| 179. Qualifications for IA investigators. | **OPERATIONAL COMPLIANCE** |
| 180. Initial training for IA investigators "that is adequate in quality, quantity, scope, and type on conducting misconduct investigations" that addresses specific, expressly- identified topics. | **OPERATIONAL COMPLIANCE** |
| 181. "[A]nnual training" for IA investigators "that is adequate in quality, quantity, type and scope" | **OPERATIONAL COMPLIANCE** |
| 182. "In each investigation, Internal Affairs will collect and consider" all evidence. "[N]o automatic preference for an officer's statement over a non-officer's statement." No disregard of a "witnesses' statement solely because of" connection to the complainant or criminal history. IA investigators must "make all reasonable efforts to resolve material inconsistencies between witness statements." | **PARTIAL COMPLIANCE** |
| 183. IA "will evaluate all relevant police activity and any evidence of potential misconduct uncovered during the course of the investigation." | **PARTIAL COMPLIANCE** |
| 184. IA will not consider guilty plea or verdict as "determinative of whether a CDP officer engaged in misconduct" or justification for "discontinuing the investigation." | **PARTIAL COMPLIANCE** |
| 185. IA "will complete its administrative investigations within 30 days from the date it learns of the alleged misconduct." | **PARTIAL COMPLIANCE** |
| 186–87. IA investigative report requirements. | **PARTIAL COMPLIANCE** |
| 188. Forwarding of completed IA investigations "to the officers' supervisors, the Training Review Committee, the Force Review Board, the Officer Intervention Program, and the Data Collection and Analysis Coordinator." | **PARTIAL COMPLIANCE** |
| 189. "CDP will require any CDP employee who observes or becomes aware of any" potential misconduct to "report the incident to a supervisor or directly to" IA. | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 190. "CDP will develop a system that allows officers to confidentially and anonymously report potential misconduct by other officers." | **OPERATIONAL COMPLIANCE** |
| 191. "CDP will expressly prohibit all forms of retaliation, discouragement, intimidation, coercion, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." | **OPERATIONAL COMPLIANCE** |
| 192. "Officers who retaliate . . . will be subject to the disciplinary process." | **PARTIAL COMPLIANCE** |

## 2. Investigation of Civilian Complaints & Police Review Board

### a. Monitoring Team's Work during Report Period

During the reporting period, the Monitoring Team met regularly with the CPRB and OPS leadership, providing technical assistance as needed. The new OPS Administrator's tenure began late in the reporting period and the Monitoring Team quickly engaged. The Monitoring Team continues to participate in the monthly OPS report out meetings and in meetings between the Monitoring Team and OPS.

Moreover, during this reporting period, the Monitoring Team developed and finalized its methodology for the OPS/CPRB Assessment. The Team began to conduct the assessment at the end of the reporting period.

Lastly, the Monitoring Team reviewed a draft of OPS's report covering 2023-2025 data. Team members provided feedback on the report, which the City incorporated and will be finalizing during the next reporting period.

### b. Status of Policies and Training

Existing policies and manuals remain in effect and provide a clear direction for employees of OPS and the CPRB members.

In addition, during this reporting period, the Monitoring Team attempted to gain clarity from the Interim Administrator regarding the status of OPS Investigator Training, which is required annually per Paragraph 196 and was addressed in the 2026 Monitoring Plan. The Monitoring Team will be looking for confirmation of the required training during the next reporting period. Unfortunately, there was no transition period or orientation period at the beginning of the new Administrator's term.

### c. Compliance Reviews and Findings

The final methodology for the upcoming assessment of OPS and CPRB has been delivered to the Parties and the assessment has commenced. Many of the paragraphs of the Consent Decree may be subject to upgrade depending on the outcome of the assessment. Nevertheless, in this report, the Monitoring Team is upgrading Paragraph 197 to Substantial and Effective Compliance, since these requirements have been confirmed over many past reporting periods. In addition, Paragraph 232, which provides for PRB to have its own budget that affords sufficient independence and resources, is being upgraded to Operational Compliance.

### d. Anticipated Work and Challenges for Next Reporting Period

Most of the Monitoring Team's work in this area will be related directly to the assessment and ongoing Working Group meetings with the OPS and CPRB leadership.

| Investigation of Civilian Complaints and Police Review Board Paragraphs | Status of Compliance |
|---|---|
| 193. OPS investigates "all complaints of misconduct it receives" and will confer with IA "to develop policies and procedures for handling matters over which they both have investigative jurisdiction." | OPERATIONAL COMPLIANCE |
| 194. "The City will ensure that OPS is led by an administrator with the skills, expertise, and experience to effectively manage the intake, tracking, timely, and objective investigation of complaints"; implement PRB training; "assess OPS's equipment and staffing needs"; and "develop and implement performance standards for OPS." | PARTIAL COMPLIANCE |
| 195–96. Initial training for OPS investigators "adequate in quality, quantity, scope, and type," including specific, expressly-listed topics. | OPERATIONAL COMPLIANCE |
| 197. "OPS Investigators will not be current members of the CDP, and no CDP personnel will have any active role in OPS's operations." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 198. "The City will ensure that the lawyer representing OPS does not have any actual or apparent conflicts of interest." | OPERATIONAL COMPLIANCE |
| 199. "OPS will have its own budget, separate from . . . the Department of Public Safety" that "affords sufficient independence and resources, including sufficient staff and training to meet the terms of this Agreement." | PARTIAL COMPLIANCE |
| 200. Development and implementation of OPS operations manual "made available to the public" that covers specific, expressly-listed topics. | OPERATIONAL COMPLIANCE |
| 201. Development and implementation of "a program to promote awareness through the Cleveland community about the process for filing | OPERATIONAL COMPLIANCE |

| | |
|---|---|
| complaints with OPS." | |
| 202. "CDP and the City will work with the police unions . . . to allow civilian complaints to be submitted to OPS verbally or in writing; in person, by phone, or on line; by a complainant, someone acting on his or her behalf, or anonymously; and with or without a signature from the complainant," with all "complaints documented in writing." | **GENERAL COMPLIANCE** |
| 203. CDP will post and maintain by the intake window at CDP headquarters and all District headquarters a permanent placard describing the civilian complaint process" and containing specific, expressly-listed information. | **GENERAL COMPLIANCE** |
| 204. "CDP will provide training that is adequate in quality, quantity, scope, and type to all police personnel, including dispatchers, to properly handle complaint intake, including" with respect to specific, expressly-listed topics. | **PARTIAL COMPLIANCE** |
| 205. CDP officers "carry complaint forms in their CDP vehicles," which officers must provide "upon request." Supervisors will be dispatched to scene when an individual wants to make a complaint, with the supervisor providing a copy of completed complaint form "or a blank form to be completed later by the individual." | **OPERATIONAL COMPLIANCE** |
| 206. "The City and OPS will make complaint forms and other materials outlining the complaint process and OPS's contact information available at locations" including a number of specific, expressly-listed locations. | **GENERAL COMPLIANCE** |
| 207. "OPS's complaint form will not contain any language that could reasonably be construed as discouraging the filing of a complaint, including warnings about the potential criminal consequences for filing false complaints." | **GENERAL COMPLIANCE** |
| 208. Availability of complaint forms in English and Spanish. "OPS will make every effort to ensure that complainants who speak other languages . . . can file complaints in their preferred language." | **OPERATIONAL COMPLIANCE** |
| 209. "City will ensure that civilian complaints submitted through other existing systems, including the Mayor's Action Center and the Department Action Center, are immediately forwarded to OPS for investigation." | **OPERATIONAL COMPLIANCE** |
| 210. "OPS will establish a centralized electronic numbering and tracking system for all complaints," which "will maintain accurate and reliable data regarding the number, nature, and status of all complaints . . . including investigation timeliness and notification of the interim status and final disposition of the complaint." It "will be used to monitor and maintain appropriate caseloads for OPS investigators." | **GENERAL COMPLIANCE** |

| | |
|---|---|
| 211. Biased policing tracked as a separate category of complaint that "are captured and tracked appropriately, even if the complainant does not so label the allegation." | **OPERATIONAL COMPLIANCE** |
| 212. "[A]llegations of unlawful investigatory stops, searches, or arrests" tracked as a separate category of complaints. | **OPERATIONAL COMPLIANCE** |
| 213. "[A]llegations of excessive use of force" tracked as separate category of complaints. | **OPERATIONAL COMPLIANCE** |
| 214. "OPS will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends." | **OPERATIONAL COMPLIANCE** |
| 215. "OPS will produce, at least annually, a public report summarizing complaint trends, including" with respect several specific, expressly-identified areas. | **PARTIAL COMPLIANCE** |
| 216. Assignment of complaints to Standard and Complex investigatory tracks. | **OPERATIONAL COMPLIANCE** |
| 217. Dismissal and/or administrative dismissal of complaint investigations. | **OPERATIONAL COMPLIANCE** |
| 218. "The City will ensure that investigations of complaints are as thorough as necessary to reach reliable and complete findings that are supported by the preponderance of the evidence." | **OPERATIONAL COMPLIANCE** |
| 219. "CDP will ensure that OPS has timely access to all reports related to the incident . . ," and authority of OPS "to conduct additional investigation" of any complaint of police misconduct when CDP investigation has already taken place relating to the incident. | **OPERATIONAL COMPLIANCE** |
| 220. "OPS investigators will attempt to interview each complainant in person" and record the interview. | **OPERATIONAL COMPLIANCE** |
| 221. "The Chief will order officers who witnessed or participate in an incident that is the subject of an OPS complaint to cooperate with the OPS investigation," including by responding to written questions or sitting for an in-person interview. | **GENERAL COMPLIANCE** |
| 222. "OPS investigators will have access to any relevant disciplinary information in the record of an officer who is the subject of a current investigation." | **OPERATIONAL COMPLIANCE** |
| 223. "OPS will consider all relevant evidence," with no preferences for particular witness's statements, including of officer over a non-officer, or because of connection to complainant or criminal history. "OPS will make all reasonable efforts to resolve material inconsistencies between witness statements." | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| 224. OPS findings categories. | **OPERATIONAL COMPLIANCE** |
| 225. "OPS will document in writing the investigation of each complaint, including all investigatory steps taken, and OPS's findings and conclusions," which must "be supported by a preponderance of the evidence. | **GENERAL COMPLIANCE** |
| 226. "In addition to determining whether an officer committed the conduct alleged in the complaint and whether it violated policy, OPS may consider whether: (a) the police action was in compliance with training and legal standards; (b) the incident indicates a need for additional training, counseling, or other corrective measures; and (c) the incident suggests that CDP should revise its policies, strategies, tactics, or training. OPS may include recommendations on these topics in its investigation." | **PARTIAL COMPLIANCE** |
| 227. "OPS will forward all investigations and its written conclusions to PRB in sufficient time for PRB to consider them no later than the second regularly scheduled PRB meeting following completion of the investigation." | **PARTIAL COMPLIANCE** |
| 228. "OPS will send periodic written updates" to the complainant at specific, expressly- identified junctures. | **OPERATIONAL COMPLIANCE** |
| 229. "[A] complainant may contact OPS at any time to determine the status of his/her complaint." | **OPERATIONAL COMPLIANCE** |
| 230. "Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot" addressing PRB composition and appointment process. | **GENERAL COMPLIANCE** |
| 231. "PRB members will not be current or former members of the CDP." | **GENERAL COMPLIANCE** |
| 232. "PRB will have its own budget," overseen by OPS Administrator and separate from Department of Public Safety, that "affords sufficient independence and resources." | **OPERATIONAL COMPLIANCE** |
| 233–34. Initial training for PRB members "that is adequate in quality, quantity, scope, and type" and that covers specific, expressly-identified topics. | **PARTIAL COMPLIANCE** |
| 235. PRB meetings open to the public and posted in advance, with "case presentations and PRB votes" occurring during "open session." | **GENERAL COMPLIANCE** |
| 236. "OPS investigators will attend PRB meetings at which their investigations are being considered and present their findings . . . ." PRB may "ask the investigator to conduct further investigation" as necessary. | **GENERAL COMPLIANCE** |
| 237. "PRB recommended dispositions will be based on a preponderance of the evidence. For each case, PRB shall set forth its conclusion and an | **OPERATIONAL COMPLIANCE** |

| | |
|---|---|
| explanation of its reasons and supporting evidence in writing, including, when applicable, the justification for departing from OPS's recommended disposition." | |
| 238. "In cases where PRB is recommending a sustained disposition, in whole or in part, PRB will include a recommendation as to disciplinary or non-disciplinary corrective action." | **OPERATIONAL COMPLIANCE** |
| 239. [Timely] forwarding of PRB recommendations to Chief of Police and Director of Public Safety. | **OPERATIONAL COMPLIANCE** |

## 3. Discipline and Disciplinary Hearings

### a. Monitoring Team's Work during Report Period

While the Monitoring Team has regularly reviewed discipline disposition letters monthly, that review was difficult to conduct during this reporting period because it did not receive from the City discipline disposition letters consistently. The disposition letters list allegations of misconduct and the discipline decisions made by the Chief of Police and the Chief Director of the Department of Public Safety. Where allegations were egregious, potentially illegal, or resulted in serious discipline, these instances would be briefly reviewed for due process and decision-making consistent with the Discipline Matrix. However, the Team was not able to accomplish this review in the first half of 2026.

In addition, during this reporting period, the Monitoring Team developed and finalized its assessment methodology for these paragraphs and began its assessment of the requirements.

### b. Status of Policy and Training

This section of the Consent Decree has three paragraphs that require policies. Those policies are complete, and through the current assessment, the Monitoring Team will review the policies in detail as well as assess the City's adherence to them in practice.

There are no required trainings in this section.

### c. Compliance Reviews and Findings

While unable to complete the cursory reviews of 2026 discipline, the Team is currently in the process of conducting a comprehensive assessment of the Disciplinary Hearings and Discipline subsection. The final report is due October 9, 2026.

### d. Anticipated Work and Challenges for Next Reporting Period

During the next period, the Monitoring Team will complete its comprehensive assessment of this subsection and present the findings to the Parties in preparation for the October 9, 2026 final report.

| Discipline and Disciplinary Hearings Paragraphs | Status of Compliance |
|---|---|
| 240. "The Chief of CDP will issue a General Police Order that requires officers to (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB." | GENERAL COMPLIANCE |
| 241. Disciplinary hearing requirement, with officer given "opportunity to testify" and suspension of hearing if "officer provides new or additional evidence at hearing," with matter "returned to IA or PRB for consideration." | PARTIAL COMPLIANCE |
| 242. Disciplinary recommendations by PRB to proceed through the City's disciplinary process. Written justification by Chief or Director of their disagreement with PRB's recommendations. | OPERATIONAL COMPLIANCE |
| 243. "CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition." | OPERATIONAL COMPLIANCE |
| 244. "At least annually, the Monitor will review this data and assess whether PRB is achieving its mission." | NOT ASSESSED |
| 245. "The City will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented." | PARTIAL COMPLIANCE |
| 246. "[T]he City will review its current matrix and will seek to amend it" "to ensure consistency" and inclusion of a number of specific, expressly-identified features. | OPERATIONAL COMPLIANCE |
| 247. "All disciplinary decisions will be documented in writing." | GENERAL COMPLIANCE |
| 248. "[T]he City will provide its disciplinary matrix to the PRB, Commission, the Public Safety Inspector General, and the police unions for comment." | OPERATIONAL COMPLIANCE |
| 249. "CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years." | PARTIAL COMPLIANCE |

# XI. TRANSPARENCY & OVERSIGHT

## 1. Public Safety Inspector General

### a. Monitoring Team's Work during Report Period

Members of the Monitoring Team met with the Public Safety Inspector General (IG) several times during the reporting period. During this period, the IG began a leave of absence and submitted her resignation, effective on September 30, 2026. The Deputy IG was designated as the Acting IG and now serves in that role. The City has posted the position on its website.

Thus, Monitoring Team members met this reporting period with both the IG who is currently on leave and the Acting IG to discuss various matters and to prepare for the formal assessment. Monitoring Team members also attended some of the City's budget hearings.

In addition, during this reporting period, the Monitoring Team developed and finalized its methodology to assess the paragraphs related to the IG in the Consent Decree.

### b. Status of Policy and Training

To date, there has been insufficient effort by the City to demonstrate both the required activities and the durability of the office. The duties of the Public Safety Inspector General in Paragraph 253 are very clear and with the 2024 revisions to the Consent Decree expand the role from those defined in the 2019 Standard Operating Procedures. The Monitoring Team will complete a comprehensive assessment in the next reporting period and will look for documents that define how audits and investigations are to be conducted, and how those audits and investigations may integrate or differ from those of other oversight or investigative entities, such as Internal Affairs or the Office of Professional Standards.

### c. Compliance Reviews and Findings

Methodology for a formal assessment of the IG paragraphs was delivered to the Parties on February 26, 2026. After several delays, the City provided their comments on May 25, 2026 and the documents requested for the assessment were provided to the Monitoring Team by the City on July 8, 2026 (after the reporting period). The formal assessment is in progress at this time.

### d. Anticipated Work and Challenges for Next Reporting Period

For the next reporting period, the Monitoring Team will complete the formal compliance assessment and file a final report with the Court. The Monitoring Team will also stay abreast of progress regarding the hiring of an IG. Finally, the Monitoring Team looks forward to reviewing the outcome of technical assistance received from consultants funded by the US DOJ's Office of

Community Oriented Policing Services (COPS) department. That technical assistance is intended to, among other things, provide an examination of all the City's civilian oversight agencies. The report was due in August.

| Police Inspector General Paragraphs | Status of Compliance |
|---|---|
| 250. "The City will hire an individual or individuals with significant experience in law enforcement practices and civil rights law to serve as a Public Safety Inspector General" ("IG"). City must seek CPC's "input in developing minimum qualifications and experience" for IG. | GENERAL COMPLIANCE |
| 251. IG work in Office of Mayor but report to Chief Director of Public Safety. | OPERATIONAL COMPLIANCE |
| 252. IG "will not be a current or former employee of CDP." | GENERAL COMPLIANCE |
| 253. Duties and authority of IG. | PARTIAL COMPLIANCE |
| 254. Duties and authority of IG to "conduct investigations, analyze trends, and make reports and recommendations, as appropriate, at the request of the Chief of CDP or the May | PARTIAL COMPLIANCE |
| 255. Budget of IG must be "a separate line item" in City budget and "afford[] sufficient independence and resources" to comply with Consent Decree. | PARTIAL COMPLIANCE |
| 256. IG "will have access to all documents and data necessary to perform the above functions, including any raw data." | PARTIAL COMPLIANCE |

## 2. Data Collection and Analysis

### a. Monitoring Team's Work during Reporting Period

In February 2026, the Monitoring Team formed the Analytics Working Group with members of the CDP and PAT to help the City increase its compliance with the data-related paragraphs in the Consent Decree, with specific emphasis on Paragraphs 264, 265, and 266. The Working Group meets every other week. The Monitoring Team and involved parties have used these sessions to clarify language, agree on what compliance looks like, and provide technical assistance toward achieving it. The technical assistance has included drafting and reviewing report outlines, sharing code, and reviewing dashboards.

Feedback from the Data Analysis and Collection Coordinator and PAT confirms the Monitoring Team's appraisal that the Working Group has improved working relations between the Monitoring

Team and the other parties and has produced agreement and plans for how the City will achieve greater compliance with Paragraphs 55, 262, and 264.

In addition, during this report period, the Monitoring Team drafted and finalized its methodology for the first Data Collection and Analysis Assessment, which will assess compliance with all paragraphs of this section of the Consent Decree.

### b. Status of Policy and Training

The City employs a Data Analysis and Collection Coordinator (DACC) with responsibility to oversee and produce reports defined within paragraphs 257-266. General Police Order 25-344 entitled "Brazos - Data Quality Improvement," directs the DACC to engage in regular data integrity reviews and to improve the quality and collection of data for the department. Members of the Monitoring Team are working with the Compliance Unit as well to achieve greater levels of compliance with paragraphs 267 and 268. Defining ownership of those responsibilities is important for sustainability.

### c. Compliance Reviews and Findings

The 2026 Data Collection and Analysis Assessment, which will be conducted during the next reporting period, will be the first assessment of these paragraphs. The Monitoring Team is upgrading Paragraph 259 to Substantial and Effective Compliance in this report, though, as this paragraph has been in General Compliance since the Thirteenth Semiannual Report.

### d. Anticipated Work and Challenges for Next Reporting Period

The Monitoring Team expects to continue leading the Analytics Working Group with members of the CDP and PAT through the next reporting period, with particular emphasis on reviewing paragraphs 265 and 266.

In addition, the Monitoring Team will conduct and complete its 2026 Data Collection and Analysis Assessment, evaluating compliance with all paragraphs of this section.

| Data Collection and Analysis Paragraphs | Status of Compliance |
|---|---|
| 257. "CDP will collect and maintain all data and records necessary to accurately evaluate its use of force practices and search and seizure practices and facilitate transparency and, as permitted by law, broad access to information related to CDP's decision making and activities. To achieve this outcome, CDP will designate an individual or individuals as the 'Data Collection and Analysis Coordinator.'" | **GENERAL COMPLIANCE** |

| | |
|---|---|
| 258. Coordinator "will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials," including specific, expressly-listed materials and information. | **GENERAL COMPLIANCE** |
| 259. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents," including specific, expressly-identified data. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 260. Coordinator "will ensure the creation and maintenance of a reliable and accurate electronic system to track data on all vehicle stops, investigatory stops, and searches, whether or not they result in an arrest or issuance of a summons or citation." The system must conform to a number of specific, expressly-identified requirements. | **OPERATIONAL COMPLIANCE** |
| 261. Coordinator must "routine[ly] report[] . . . relevant data to the Chief of Police, FRB, Training Review Committee, OPS, the [Community Police] Commission, and the Public Safety Inspector General." | **OPERATIONAL COMPLIANCE** |
| 262. Coordinator "responsible for the annual assessment of forms and data collection systems to improve the accuracy and reliability of data collection." | **OPERATIONAL COMPLIANCE** |
| 263. Coordinator "will develop a protocol to accurately analyze the data collected and allow for" various outcome measurements, "subject to the review and approval of the Monitor and DOJ." | **OPERATIONAL COMPLIANCE** |
| 264. Annually, "CDP will conduct an assessment and issue a report summarizing its investigatory stop, search, and arrest data" that addresses various specific, expressly-identified topics. | **PARTIAL COMPLIANCE** |
| 265. Annually, "CDP will conduct an assessment and issue a report of all activities, including use of force, arrests, motor vehicles and investigatory stops, and misconduct complaints alleging discrimination, to determine whether CDP's activities are applied or administered in a way that discriminates against individuals on the basis of race" or other listed prohibited classes or characteristics, and that addresses various specific, expressly-identified topics. | **NON-COMPLIANCE** |
| 266. Annual analysis of "prior year's force" data with FRB. | **PARTIAL COMPLIANCE** |
| 267. "[A]ll CDP audits, reports, and outcome analyses related to the implementation" of the Consent Decree will be public. | **PARTIAL COMPLIANCE** |
| 268. "CDP will post its policies and procedures, training plans, community policing initiatives, community meeting schedules, budgets, and internal audit reports on its website." | **OPERATIONAL COMPLIANCE** |

# XII. OFFICER ASSISTANCE & SUPPORT

## 1. Training

### a. Monitoring Team's Work during Report Period

The Monitoring Team conducted two site visits to observe training during this reporting period, observed FTO re-certification via Zoom, and attended bi-weekly training meetings via Teams with the City and the CDP Training Division.

All training observations were documented and provided to the CDP. Of note, both the ICAT and IRBT were a combination of classroom and scenario-based training. ICAT was created by the Police Executive Research Forum (PERF) and is defined as being, "an innovative, evidence-based approach to use of force training." Members of the Training Division received train-the-trainer instruction and brought ICAT back to CDP members. Observations of this training by the Monitoring Team reflected well thought out scenarios that focused on using de-escalation techniques when encountering people in crisis who are either armed or unarmed.

The Monitoring Team also observed IRBT. This training was created by CDP and was primarily scenario-based with involved debriefs after the completion of each scenario. IRBT included the following areas of instruction: use of force, search and seizure, bias-free policing, and CPOP. Observations of this training by the Monitoring Team reflected real life scenarios with various use of force, de-escalation techniques and tools being required to resolve the issues presented. The debriefings in the aftermath of the scenarios offered valuable feedback on lessons learned.

Overall, the training observed was very well done. The negatives that were observed by the Monitoring Team were a lack of consistency in the debriefs based on which trainer led the scenarios, and CDP members not using down time in between scenarios as instructed by the trainers. Quite concerning was that the building used as the CDP training facility is a school building in disrepair and does not have a fully functional air conditioning system. The Monitoring Team observed CDP members training in conditions that were hot enough to be considered dangerous to members' health. There is no doubt that the conditions affected the level at which officers were able to fully participate and focus on the training being provided.

### b. Status of Policy and Training

As previously mentioned, during the last reporting period, the Monitoring Team conducted a compliance assessment of the training paragraphs. As a result, it was noted that the CDP needs to update the Field Training policy and manual to reflect modern day practices with a specific focus on the requirement to include community and problem-oriented policing principles into the program. This was not accomplished during this reporting period and remains out of compliance.

### c. Compliance Reviews and Findings

A comprehensive compliance assessment was completed during last reporting period. The next compliance assessment has not been scheduled.

Because the CPC has the responsibility to review all training before delivery, the Training Section needs to create timelines for their completion and delivery of the training materials to CPC to ensure the CPC has sufficient time for review and vote before the scheduled commencement of the training. Additional time must also be provided for DOJ and Monitoring Team reviews. The delivery of training materials to the CPC for its review, which precedes the review by the Monitoring Team and the DOJ, has at times been too compressed and must be addressed. In a similar vein, the Taser 10 implementation will require policy changes to the intermediate weapons policy. Training should include those new policy requirements. Finalizing the policy and the curriculum and securing approval from the CPC, DOJ, and Monitoring Team before training commences will require close attention to the calendar.

### d. Anticipated Work and Challenges for Next Reporting Period

In the coming period, the Monitoring Team will work with CDP and the City to ensure that the paragraphs needing additional work are brought into a higher level of compliance - specifically, paragraphs related to the Field Training Program. Additionally, the Monitoring Team will continue to review and provide feedback on all areas of training and conduct site visits to observe training in person.

| Training Paragraphs | Status of Compliance |
|---|---|
| 269. "The City will ensure that officers receive adequate training to understand: (a) how to police effectively and safely in accordance with CDP policy; [and] (b) the requirements of this Agreement, Ohio law, and the Constitution and laws of the United States," including in the areas of "procedural justice, bias-free policing, and community policing." | **NOT ASSESSED** |
| 270. "CDP will expand the scope and membership of the Training Review Committee." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 271–72. "[T]he Training Review Committee will develop a written training plan for CDP's recruit academy, probationary field training, and in-service training" that addresses a host of specific, expressly-identified issues. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 273. "The Training Plan and schedule will be implemented once any objections have been resolved" on a yearly basis. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

| | |
|---|---|
| 274. "The City, including the Training Review Committee, will annually review and update CDP's training plan" by "conduct[ing] a needs assessment" that addresses a number of specific, expressly-identified data and information on real-world trends, needs, policy, and law. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 275. "CDP's Commander responsible for training" will be in charge of "all CDP training." | **GENERAL COMPLIANCE** |
| 276. "CDP will designate a single training coordinator in each District. The Commander responsible for training will establish and maintain communications with each District training coordinator to ensure that all officers complete training as required and that documentation of training is provided to the" training Commander. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 277. "CDP will develop recruit academy and in-service curricula that comport with" the Training Plan and Consent Decree requirements. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 278. "Unless otherwise noted, the training required under this agreement… will be delivered within two years of the Effective Date." | **NOT ASSESSED** |
| 279. "For all other substantive updates or revisions to policy or procedure, the City will ensure and document that all relevant CDP personnel have received and read the policy or procedure. Notification of each revision or update will include the rationale for policy changes and the difference between the old and updated policy." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 280. Training Commander reviews all training materials; ensures that they use "a variety of adult learning techniques, scenario-based training, and problem-solving practices"; and "ensure that all curricula, lesson plans, instructor's qualifications, and testing materials are reviewed by the Training Review Committee." | **GENERAL COMPLIANCE** |
| 281. "CDP will ensure that instructors are qualified and use only curricula and lesson plans that have been approved by the" Training Commander. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 282. "CDP will revise, as necessary, its field training program for graduates of the police academy to comport with" the Training Plan and Consent Decree. | **OPERATIONAL COMPLIANCE** |
| 283. "The field training program will incorporate community and problem-oriented policing principles, and problem-based learning methods." | **PARTIAL COMPLIANCE** |
| 284. Review and revision of Field Training Officer ("FTO") "participation policy to establish and implement a program that effectively attracts the best FTO candidates" and "revise eligibility criteria" for FTOs. | **GENERAL COMPLIANCE** |

| | |
|---|---|
| 285. New FTOs and Field Training Sergeants must "receive initial and in-service training that is adequate in quality, quantity, scope, and type, and that addresses" a number of specific, expressly-listed topics and conforms to a number of additional features or requirements. | **GENERAL COMPLIANCE** |
| 286. "CDP will create a mechanism for recruits to provide confidential feedback regarding the quality of their field training," and the Division "will document its response, including the rationale behind any responsive action taken or decision to take no action." | **GENERAL COMPLIANCE** |
| 287. "The City and the Training Review Committee will, on an annual basis, analyze all aspects of CDP's FTO program," "consider emerging national policing practices in this area," and "recommend, and CDP will institute, appropriate changes to policies, procedures, and training related to its FTO program." | **OPERATIONAL COMPLIANCE** |
| 288. "CDP will document all training provided to or received by CDP officers," with officers "sign[ing] an acknowledgement of attendance or digitally acknowledg[ing] completion of each training course," which "will be maintained in a format that allows for analysis by training type, training date, training source, and by individual officer name." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 289. "CDP will develop and implement a system that will allow the Training Section to electronically track, maintain, and produce complete and accurate records of current curricula, lesson plans, training delivered, and other training materials in a centralized electronic file system." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 290. "The City will develop and implement accountability measures . . . to ensure that all officers successfully complete all required training programs in a timely manner." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

## 2. Equipment & Resources

### a. Monitoring Team's Work during Reporting Period

The Monitoring Team has not engaged with the City directly on this topic since the 2025 comprehensive assessment was completed. The City has also not reached out for any technical assistance to facilitate their efforts toward compliance.

### b. Status of Policy and Training

The need to modernize the Employee Assistance Unit (EAU) policy, which has not been updated since 2010, remains unresolved and does not reflect the current EAU's efforts or modern employee assistance and wellness best practices.

### c. Compliance Reviews and Findings

An assessment is scheduled to occur in the first half of 2027, with the methodology due to the Parties on October 31, 2026. The 2025 assessment found the Division to be in Operational Compliance, General Compliance, or Substantial and Effective Compliance in eight of the nine paragraphs. Six paragraphs received upgrades.

One of the areas identified as needing additional work to achieve a higher level of compliance was modernization of the EAU policy, which establishes a program providing essential services for CDP members, including a peer support program. The assessment found that the policy establishing the program, General Police Order 1.1.41, was established in 2010 and had not been updated since. This policy remains dated, brief in scope, and although the EAU members displayed dedication to their peers and expressed a clear understanding of their roles, the policy does not provide the governance, clearly defined roles, or safeguards characteristic of modern wellness and employee assistance policies.

### d. Anticipated Work and Challenges for Next Reporting Period

During the next rating period, the Monitoring Team will work with the Parties to establish a methodology for a comprehensive assessment of the Equipment and Resources subsection. The Monitoring Team also hopes to establish a Working Group with the Division to support efforts to achieve a higher level of compliance in the area of employee assistance and peer support.

| Equipment and Resources Paragraphs | Status of Compliance |
|---|---|
| 291. "The City will implement" paragraphs regarding equipment and resources in order to allow implementation of the Consent Decree "and to allow officers to perform their jobs safely, effectively, and efficiently." | **OPERATIONAL COMPLIANCE** |
| 292. "CDP will complete a comprehensive equipment and resource study to assess its current needs and priorities," and it "will develop an effective, comprehensive Equipment and Resource Plan that is consistent with its mission and that will allow it to satisfy the requirements of this Agreement." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

| | |
|---|---|
| 293. "CDP's Equipment and Resource Plan will provide for necessary equipment including, at least" "an adequate number of computers"; "an adequate number of operable and safe zone cars"; "zone cards with reliable, functioning computers that provide officers with up-to-date technology" including computer-aided dispatch, the records management system, and various core law enforcement systems; and "zone cards equipped with first-aid kits." "This plan also will ensure that CDP properly maintains and seeks to continuously improve upon existing equipment and technology; and is appropriately identifying equipment needs and seeking to utilize, as appropriate, emerging technologies." | **OPERATIONAL COMPLIANCE** |
| 294. "CDP will actively seek input and feedback from the Commission, patrol officers, and supervisors regarding resource allocation, equipment needs, and technological improvements." | **PARTIAL COMPLIANCE** |
| 295. "City and CDP" must "us[e] best efforts to implement the Equipment and Resource Plan as required." | **GENERAL COMPLIANCE** |
| 296. "CDP will . . . implement an effective, centralized records management system." | **OPERATIONAL COMPLIANCE** |
| 297. "CDP will utilize a department-wide e-mail system to improve communication and information sharing." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 298. "CDP will employ information technology professionals who are trained to conduct crime and intelligence analysis, who are capable of troubleshooting and maintaining information technology systems and who can identify and suggest appropriate technological advancements." | **GENERAL COMPLIANCE** |
| 299. "CDP will implement an effective employee assistance program that provides officers ready access to the mental health and support resources necessary to facilitate effective and constitutional policing." | **OPERATIONAL COMPLIANCE** |

## 3. Recruitment & Hiring

### a. Monitoring Team's Work during Reporting Period

During the reporting period, the Monitoring Team reviewed the CDP's 2025 Recruitment and Hiring Report and provided some feedback to CDP on the report. CDP will finalize the report in the next reporting period. From this review, the Monitoring Team noted that CDP continues to progress with increasing sworn member staffing through well-advertised hiring events, recruitment and retention incentives and expedited processes.

### b. Status of Policy and Training

Paragraph 302 requires the CDP to develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community. Paragraphs 303, 304, and 305 refer to different requirements of that plan. A Recruitment Plan was submitted to the Court in 2019 which resulted in CDP receiving ratings of General and Substantial and Effective Compliance in those paragraphs during the 2025 formal assessment. The Recruitment Plan filed in 2019 was intended to be a five-year plan and much has changed regarding CDP recruiting and hiring since that time. Recruitment activities are no longer centralized in the Department of Public Safety and now rest in the Administrative Services Bureau of the CDP. Total personnel and deployment activities of the Division are also different than seven years ago. For these paragraphs to achieve or remain in Substantial and Effective Compliance, the Monitoring Team will look to review an updated and current Recruitment Plan during the upcoming 2026 updated assessment.

### c. Compliance Reviews and Findings

An updated compliance assessment is scheduled for the next reporting period. The draft methodology was submitted to the Parties after the reporting period.

### d. Anticipated Work and Challenges for Next Reporting Period

The Monitoring Team will conduct its 2026 Recruitment and Hiring Assessment during the next reporting period, which will be its third assessment of these paragraphs. For the CDP to achieve Substantial and Effective Compliance in all of the paragraphs currently rated as in General and Operational Compliance, several actions are required.

First, the CDP must produce an updated Recruitment Plan. The plan that was filed with the Court in 2019 was intended to be a five-year plan for the Department of Public Safety and is overdue for review and revision to reflect current recruitment and hiring practices, including the realignment of the Recruitment Section under CDP. Failure to complete an updated Recruitment Plan could result in a reduction of the current rating of General Compliance for Paragraph 302 and Substantial and Effective Compliance for Paragraphs 303, 304 and 305.

In addition, although compliance with Paragraph 311 is considerably improved compared to the 2022 assessment, CDP still needs to ensure that the hiring of lateral law enforcement officers includes and documents the request for a candidate’s history of using lethal and less lethal force, use of force training records, and complaint history.

The Monitoring Team will be looking to review these improvements during the 2026 updated assessment.

| Recruitment and Hiring Paragraphs | Status of Compliance |
| --- | --- |
| 300. "The City will review and revise . . . its recruitment and hiring program to ensure that CDP successfully attracts and hires a diverse group of qualified individuals." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 301. "The Mayor will work with the City Council to develop an ordinance to place a Charter Amendment on the ballot that would give the appointing authority greater flexibility in the selection of candidates from the certified eligibility list for the CDP." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 302. "CDP will develop a recruitment policy and a strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community" and meets certain specific, expressly-listed requirements. | GENERAL COMPLIANCE |
| 303. "The City will implement the recruitment plan within 60 days of it being approved by the Monitor." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 304. "CDP's recruitment plan will include specific strategies for attracting a diverse group of applicants," including officers with various, specific, expressly-listed skills and backgrounds. | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 305. "In developing and implementing its recruitment plan, CDP will consult with the [Community Police] Commission and other community stakeholders on strategies to attract a diverse pool of applicants." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 306. "[O]bjective system for hiring and selecting recruits" that "employs reliable and valid selection criteria." | SUBSTANTIAL AND EFFECTIVE COMPLIANCE |
| 307. "CDP will report annually to the public its recruiting activities and outcomes," which will include information on various, expressly-listed areas. | GENERAL COMPLIANCE |
| 308. "[A]ll candidates for sworn personnel positions" will have "psychological and medical examination" and be subject to "drug testing." Existing officers receive "random drug testing." | GENERAL COMPLIANCE |
| 309. "CDP will conduct thorough, objective, and timely background investigations of candidates for sworn positions" that cover various, expressly-listed topics. | GENERAL COMPLIANCE |
| 310. "CDP will request to review personnel files from candidates' previous employment and, where possible, will speak with the candidate's supervisor(s)" and maintain any "salient information . . . in candidate's file." | GENERAL COMPLIANCE |

| | |
|---|---|
| 311. "If a candidate has previous law enforcement experience, CDP will complete a thorough, objective, and timely pre-employment investigation" addressing various expressly-identified things. | **OPERATIONAL COMPLIANCE** |

## 4. Performance Evaluations and Promotions

### a. Monitoring Team's Work during Reporting Period

The Monitoring Team developed a methodology for a comprehensive assessment of the Performance Evaluations and Promotions subsection and submitted it to the Parties on May 30, 2026. The assessment will take place during the next semiannual reporting period, with the final report due November 30, 2026.

### b. Status of Policy and Training

The City has indicated that promotional testing and new performance evaluations using a recently purchased application will be implemented in late 2026. The Monitoring Team is looking forward to reviewing the necessary policy and procedural changes accompanying the updates to these two essential processes.

### c. Compliance Reviews and Findings

The Monitoring Team submitted a methodology for a comprehensive assessment of this subsection during the reporting period. The assessment will take place during the next semiannual reporting period, with the final report due November 30, 2026. This assessment will be significant, as currently five of the seven paragraphs are non-compliant, and two are in partial compliance.

### d. Anticipated Work and Challenges for Next Reporting Period

The Monitoring Team will complete its assessment of these paragraphs during the next reporting period.

| Performance Evaluations and Promotions Paragraphs | Status of Compliance |
|---|---|
| 312. "CDP will ensure that officers who police professionally and effectively are recognized through the performance evaluation process" and "are identified and receive appropriate consideration for performance." Likewise, "poor performance" must be "reflected in officer evaluations." | **NON-COMPLIANCE** |

| | |
|---|---|
| 313. "The City will develop and implement fair and consistent practices to accurately evaluate officer performance in areas related to integrity, community policing, and critical police functions, on both an ongoing and annual basis." | **PARTIAL COMPLIANCE** |
| 314. CDP will use "a formalized system documenting the annual performance evaluations of each officer by the officer's direct supervisor." The system will be augmented to include an assessment of several expressly-listed areas. | **PARTIAL COMPLIANCE** |
| 315. "As part of the annual performance evaluation process, supervisors will meet with the employee whose performance is being evaluated to discuss the evaluation." Supervisors will also discuss performance with subordinates on an ongoing basis and document these ongoing communications. | **NON-COMPLIANCE** |
| 316. "CDP will hold supervisors of all ranks accountable for conducting timely, accurate, and complete performance evaluations of their subordinates." | **NON-COMPLIANCE** |
| 317. "The City will develop and implement fair and consistent promotion practices that comport with the requirements of this Agreement and result in the promotion of officers who are effective and professional." | **NON-COMPLIANCE** |
| 318. In considering promotion, "appointing authority will consider" specific, expressly- listed "factors." | **NON-COMPLIANCE** |

## 5. Staffing

### a. Monitoring Team's Work during Reporting Period

Because the City reached Substantial and Effective Compliance with all paragraphs in the Staffing section in the last reporting period, the Monitoring Team did not conduct any assessments in this subject area. As mentioned in the Eighteenth Semiannual report, there are other areas of the Consent Decree that touch and concern staffing matters such as Recruitment and Hiring, Performance and Promotions, and Community and Problem-Oriented Policing (CPOP).

### b. Status of Policy and Training

The Consent Decree requires the City to complete a comprehensive Staffing Plan that includes sworn and civilian personnel and addresses personnel sufficiency and deployment. The Consent Decree also requires the City to use its best efforts to successfully implement the Staffing Plan. As noted in the Eighteenth Semiannual report, the City completed this Plan which was approved by the Court in 2019. The CDP has implemented practices under the Plan including making

changes to operations and staff deployment to align with current needs of providing public safety. An example given was the change from the CDP's use of the work-load based model of assigning patrol officers to a model better suited to support front-line officers when needed. Working relationships between the CDP's sworn and civilian staff have increased and continue to do so with advances in technology.

Because the Staffing Plan was several years old when the Monitoring Team assessed the City in this area (the Plan is now more than seven years old), the Monitoring Team recommended that the City update the Plan, particularly since it appears that the CDP has in practice made modifications and additions to the original Plan. The Monitoring Team has no indication that the City has updated its Plan.

### c. Compliance Reviews and Findings

As previously mentioned, the Monitoring Team conducted no compliance assessments on the Staffing paragraphs during this reporting period. The Monitoring Team completed its first comprehensive assessment of the three Staffing paragraphs in December of 2025. At that time, the City was found to be in Substantial and Effective Compliance with all three paragraphs. Because of this, and as noted in the Eighteenth Semiannual Report, these paragraphs will no longer be actively assessed. Pursuant to the Consent Decree, the City must sustain this compliance for two years.

### d. Anticipated Work and Challenges for Next Reporting Period

Although the Monitoring Team will no longer assess the City on Staffing Paragraphs 319 to 321, the Team will naturally be made aware of any issues and concerns that might arise with regard to staffing as the Monitoring Team continues to actively assess the City in other areas of the Consent Decree, particularly those in Section XI – Officer Assistance and Support.

Achieving the City's desired goal of having 1,350 uniformed officers working in the Division remains a challenge for the City. The CDP's current complement of uniformed officers is short of this goal by more than 100 officers. This shortage is cause for concern for the CDP being able to effectively serve the City's communities, not overworking officers, and is partly responsible for the City's having to incur increasing overtime expenses, despite the fact that the CDP changed its deployment shifts a couple of years ago partly in an effort not to require as much mandated overtime work. Recognizing that officer deployment needs are fluid and dependent on many factors including crime trends and the number of special events and circumstances that take place in the city, the Monitoring Team remains committed to assisting the CDP in whatever way it can to help close the gap between its current number of uniformed officers and its desired number.

| Staffing Paragraphs | Status of Compliance |
|---|---|
| 319. "CDP will complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform the functions necessary for CDP to fulfill its mission and satisfy the requirements of the" Consent Decree. In addition, "CDP will develop an effective, comprehensive Staffing Plan that is consistent with its mission, including community and problem-oriented policing, and that will allow CDP to meet the requirements of" the Consent Decree. | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 320. Requirements of CDP Staffing Plan regarding deployment, misconduct investigations, unity of command, and supervision | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |
| 321. "The City and CDP will employ best efforts to implement the Staffing Plan over the period of time set forth in the approved plan." | **SUBSTANTIAL AND EFFECTIVE COMPLIANCE** |

# XIII. SUPERVISION

## a. Monitoring Team's Work during Reporting Period

The Monitoring Team conducted a site visit in May to attend a meeting held by Benchmark Analytics, the company developing the OIP technology for CDP. The meeting revealed that CDP still has several data sets that Benchmark cannot access which are necessary for the planned threshold assessments based on data. Once access is given to Benchmark, the OIP can begin to be built.

## b. Status of Policy and Training

Supervisory training has occurred in the past, and the Training Section is reviewing additional training modules for supervisors. Supervisory training is an ongoing training. The Training Section has reported that it is working on updating a curriculum for a Supervisor Bias-Free Policing Training that the Monitoring Team looks forward to receiving and reviewing. In addition, updates to the Wearable Camera System (WCS) policy are currently in review with the CPC. Updates were necessary because the CDP implemented dashboard camera system for the zone cars.

Forthcoming activities will include an upcoming comprehensive assessment of all supervisor training beginning in 2026 and concluding in 2027.

### c. Compliance Reviews and Findings

No formal compliance assessment was conducted related to Supervision during this reporting period. Nevertheless, the Monitoring Team has reviewed supervisor actions through its prior assessments of use of force and stops, searches and seizures. A comprehensive assessment of the Supervision section is scheduled to begin in 2027 and conclude in mid-2027.

### d. Anticipated Work and Challenges for Next Reporting Period

During the next reporting period, the Monitoring Team will develop the methodology and data request to be presented to CDP and the City for Paragraphs 322-340. The Monitoring Team will create and implement a Working Group with members of CDP and the City to monitor progress focused on the creation and implementation of the Officer Intervention Program and compliance efforts for the other paragraphs in this section.

| Supervision Paragraphs | Status of Compliance |
|---|---|
| 322. "CDP will ensure that first line supervisors provide close and effective supervision of officers" in a number of express, specifically-identified ways. | **OPERATIONAL COMPLIANCE** |
| 323. "CDP will develop and implement supervisory training for all new and current supervisors" that is "adequate in quality, quantity, type, and scope, and will include" a number of specific, expressly-listed topics. | **OPERATIONAL COMPLIANCE** |
| 324. "Thereafter all sworn supervisors will receive adequate in-service management training." | **PARTIAL COMPLIANCE** |
| 325. "CDP will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community." | **PARTIAL COMPLIANCE** |
| 326. CDP "will create a plan to modify its Officer Intervention Program ('OIP') to enhance its effectiveness as a management tool to promote supervisory awareness and proactive identification of potentially problematic behavior among officers. | **PARTIAL COMPLIANCE** |
| 327. "CDP supervisors will regularly use OIP data to evaluate the performance of CDP officers across all ranks, units, and shifts." | **NON-COMPLIANCE** |

| | |
|---|---|
| 328. "The OIP will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve data department-wide" in a number of specific, expressly-identified areas. | **NON-COMPLIANCE** |
| 329. "CDP will set threshold levels for each OIP indicator that will trigger a formal review, and the thresholds will allow for peer-group comparisons between officers with similar assignments and duties." | **NON-COMPLIANCE** |
| 330–36. Additional express requirements of OIP. | **NON-COMPLIANCE** |
| 337. "If CDP chooses to use body worn cameras, CDP will provide clear guidance and training on their use, and will implement protocols for testing equipment and preservation of recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals." | **GENERAL COMPLIANCE** |
| 338. "Supervisors will review recordings related to any incident involving at least a Level 2 or 3 use of force; injuries to officers; and in conjunction with any other supervisory investigation." | **GENERAL COMPLIANCE** |
| 339. "Supervisors will conduct adequate random and directed audits of body worn camera recordings" and "incorporate the knowledge gained from this review into their ongoing evaluation and supervision of officers." | **OPERATIONAL COMPLIANCE** |
| 340. "Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body worn cameras in violation of CDP policy." | **OPERATIONAL COMPLIANCE** |

## XIV. POLICIES

### a. Monitoring Team's Work during Reporting Period

The Monitoring Team began working with CDP's Bureau of Compliance to form a Policy Working Group to gather information on policy as it pertains to Paragraphs 341-349. The Monitoring Team has held meetings with members of CDP's Policy Unit, the PAT, and the Crime Analysis Unit to understand policy workflow processes from development through final approval and to collect data points for a future assessment. To assist the City and CDP, the Monitoring Team has shared examples of how other law enforcement agencies share their policies with the public,

as it relates to Paragraph 346. The Monitoring Team has also worked with members of CDP's Policy Unit and the CPC's Policy Committee on completing a policy process manual.

The Monitoring Team acknowledges that the City and CDP have achieved compliance milestones in policy development and implementation in critical subject areas of the Consent Decree, as previously noted in other semiannual reports. This section is more about the input of personnel and the annual maintenance and review of policies in place.

### b. Status of Policy and Training

While this specific section does not require the creation of a specific policy or training, it governs the development and dissemination of policies related to the entire Consent Decree.

Since this Consent Decree's inception, the Monitoring Team has collaborated with the Parties on the development and updating of CDP and City policies that are required by the Consent Decree's subject areas. Many such policies were approved by the Court and are posted on the Monitoring Team's website.

### c. Compliance Reviews and Findings

The Monitoring Team is in the initial stages of collecting information to develop a strategy for a future compliance assessment. Based on the cumulative work of the Division and the knowledge garnered over time by the Monitoring Team, some paragraphs are being initially assessed outside of the full assessment.

Paragraph 341: The Monitoring Team recognizes that throughout the course of this Consent Decree, the City and CDP have demonstrated a commitment to the principles outlined in Paragraph 341. The Monitoring Team acknowledges the work the City and CDP have done in aligning the principles and concepts of constitutional policing, bias-free policing, community-oriented policing, and procedural justice in the development and implementation of policies and procedures. The Monitoring Team will rate this paragraph to be in Operational Compliance.

Paragraph 342: The Monitoring Team recognizes that throughout the course of this Consent Decree, the City and CDP have developed, revised, and implemented critical policies in many areas of the Consent Decree, which have been reviewed and approved by the Monitoring Team and DOJ. The Monitoring Team will rate this paragraph to be in Operational Compliance.

Paragraph 343: The CDP gets input from some of its members including union representatives or subject matter experts but has not developed a practice to offer all members the opportunity to provide input should they desire. As such, the Monitoring Team rates this paragraph in Partial Compliance.

Paragraph 345: Over the life of the Consent Decree, the City has typically engaged with the DOJ and the Monitoring Team in ways that comport with the requirements of the paragraph. The Monitoring Team rates this paragraph to be in Operational Compliance.

Paragraphs 346 and 348: The CDP has posted most of its policies on its website, albeit in a confusing and unclear way. There are currently two manuals with different numbering systems. The organizing principles are not clear to an external user and as such, inconsistent with the requirement for them to "ensure public accessibility" and to be "indexed and maintained in an organized manner using a uniform numbering system for ease of reference." The two manuals are not uniformly numbered and other policies are absent or out of date. This is an active project with CDP's Bureau of Compliance and the Monitoring Team. The Monitoring Team rates these paragraphs in Partial Compliance until more of the work is completed.

Paragraph 347: The Division has provided some preliminary information about their system to review critical policies. The Monitoring Team is in the process of collecting additional information about this system to assess policy reviews. As such, the Monitoring Team rates this paragraph in Partial Compliance.

Paragraph 349: The Monitoring Team is aware of CDP notification to officers of changes in case law and state statutes that impact their work. A more fulsome assessment is necessary to understand the details of the practice and systems used. The Monitoring Team rates this paragraph in Partial Compliance until such time as an assessment is completed.

All paragraphs in this section will be reviewed in a future assessment.

### d. Anticipated Work and Challenges for Next Reporting Period

The Monitoring Team anticipates conducting a site visit during the next reporting period to meet with members of CDP and the City to gather information on the development, approval, implementation, and accessibility of policy with internal and external stakeholders.

| Policies Paragraphs | Status of Compliance |
|---|---|
| 341. "[T]he City will ensure that its policies and procedures reflect and express CDP's commitment to building community trust, utilizing community and problem-oriented policing, ensuring bias-free policing, and incorporating the concept of procedural justice." | OPERATIONAL COMPLIANCE |
| 342. The City is required, as needed, to develop, revise and implement policies that incorporate the terms of the Consent Decree and comply with applicable law. Policies will be plainly written, logically organized, and use clearly defined terms. | OPERATIONAL COMPLIANCE |

| | |
|---|---|
| 343. "The City will ensure that officers from all varying ranks and units have a meaningful opportunity to review and comment on new or existing policies and procedures." | **PARTIAL COMPLIANCE** |
| 344. Deleted. | **N/A** |
| 345. Requirements for the City's submission and the Monitoring Team and DOJ policy review process under this Consent Decree. | **OPERATIONAL COMPLIANCE** |
| 346. "The City will post approved policies and procedures on the City's website to ensure accessibility." Includes reasonable exceptions for law enforcement sensitive procedures. | **PARTIAL COMPLIANCE** |
| 347. "The City will review each policy or procedure related to this agreement six months after it is implemented and annually thereafter" to ensure effectiveness and consistency with the Consent Decree and law. | **NOT YET ASSESSED** |
| 348. "CDP will maintain a complete, up-to-date manual of all CDP policies and procedures…[and] officers and employees will have access to the manual…." | **PARTIAL COMPLIANCE** |
| 349. "The City will ensure that changes in case law and statutes that are relevant to the work of CDP are disseminated to appropriate CDP personnel in a timely manner and incorporated, as needed, into CDP policies, procedures, and training." | **PARTIAL COMPLIANCE** |

# XV. OUTCOME MEASUREMENTS

## a. Monitoring Team's Work during Reporting Period

In the final months of the last reporting period, the Monitoring Team filed assessments in four subject areas that require outcome measurements in Paragraph 367, specifically, Training, Recruitment and Hiring, Searches and Seizures, and Crisis Intervention. Early in this reporting period, one additional assessment was filed, covering Use of Force. Combined, those recent assessments include five of the nine areas that require annual reporting on outcome measures.

### b. Status of Policy and Training

Each of those assessments, found on the Monitoring Team's website, includes the details of the data and the analysis as well as findings and suggestions relative to data collection and reporting. There are no specific training or policy requirements for this paragraph.

### c. Compliance Reviews and Findings

The previously referenced assessments include the methodology or source of the data used in the reporting.

### d. Anticipated Work and Challenges for Next Reporting Period

In the next reporting period, the Monitoring Team plans to complete, finalize the methodology, or launch assessments for the Community Engagement, Bias-Free Policing, and Supervision sections of the Consent Decree. For each of these sections, there are outcome measurements required by Paragraph 367. Those will be included as part of the assessments. A third assessment of the Recruitment and Hiring section, which also has required reporting by Paragraph 367, will be launched. Furthermore, by the end of the period, the Monitoring Team will submit a methodology for a second assessment of the Training paragraphs.

The Monitoring Team plans analyses of the outcome measurements for Paragraph 367's subsections on Use of Force; Crisis Intervention; Stops, Searches, and Arrests; Officer Assistance and Support; and Civilian Complaints, Internal Investigations, and Discipline (subsections a, b, c, g, and i), that are not subjected to assessments or repeat assessments, in the second part of 2026. These will be individual reports. The methodology, data sources, and timeframes will be discussed with the Parties in advance.



# Cleveland Police Monitoring Team

**Christine Cole**
Monitor

**Honorable Melody Stewart (ret.), PhD**
Deputy Monitor

**Assistant Chief Shunta Boston (ret.)**
**Chief Dan Brennan (ret.)**
**Dr. Ronnie Dunn**
**Dr. Randolph Dupont**
**Lisa Fink**
**Chief Terrence Gordon (ret.), PhD**
**Chief Tammy Hooper (ret.)**
**Deputy Chief Kelly McMahill (ret.)**
**Chief Rick Myers (ret.)**
**Meg Olsen**
**Shanthi Pierce**
**Rory Pulvino, JD**
**Captain Scott Sargent (ret.)**
**Charles R. See**
Monitoring Team Members