IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO.: 1:15-CV-01046 |
| | ) |
| Plaintiff, | ) |
| | ) JUDGE SOLOMON OLIVER, JR. |
| vs. | ) |
| | ) NOTICE SUBMITTING THE MONITORING |
| CITY OF CLEVELAND | ) TEAM'S 2026 DISCIPLINE HEARINGS AND |
| | ) DISCIPLINE ASSESSMENT REPORT |
| Defendant. | |

The Monitoring Team hereby submits the Report of its 2026 Discipline Hearings and Discipline Assessment Report.

Respectfully submitted,

/s/ Christine M. Cole

CHRISTINE M. COLE
Independent Monitor
464 Common Street Unit #231
Belmont, MA 02478
ccole@clevelandpolicemonitor.com

CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2026, I served the foregoing Notice Submitting the Monitoring Team's 2026 Discipline Hearings and Discipline Assessment Report via the court's ECF system to all counsel of record.

/s/ Melody J. Stewart
MELODY J. STEWART
Deputy Monitor

Cleveland Division of Police Consent Decree Monitoring Team

# 2026 ACCOUNTABILITY – DISCIPLINE HEARINGS AND DISCIPLINE ASSESSMENT

October 26, 2026

## TABLE OF CONTENTS

I. Executive Summary ....... 2
II. Scope and Methodology ....... 3
A. Scope of Review ....... 3
B. Methodology ....... 3
C. Standard of Review ....... 6
III. Compliance Assessment ....... 11
A. Detailed Analysis ....... 11
1. Pre-disciplinary Hearings ....... 12
2. Specifications and Findings ....... 13
3. CDP and DPS Decision Making ....... 15
4. Administrative and Policy Requirements ....... 15
5. Summary of Findings ....... 16
B. Paragraph 240 ....... 17
C. Paragraph 241 ....... 17
D. Paragraph 242 ....... 18
E. Paragraph 243 ....... 18
F. Paragraph 244 ....... 18
G. Paragraph 245 ....... 18
H. Paragraph 246 ....... 19
I. Paragraph 247 ....... 19
J. Paragraph 248 ....... 20
K. Paragraph 249 ....... 20
IV. Assessment Summary and Conclusion ....... 20
V. Compliance Rating Summary ....... 22
Appendix A ....... 24
Appendix B ....... 30

# I. EXECUTIVE SUMMARY

The Monitoring Team conducted a comprehensive assessment of the Cleveland Division of Police's ("CDP" or "the Division") and Department of Public Safety's ("DPS") compliance with Section IX – Accountability, Subsection E – Discipline Hearings, Paragraphs 240–243, and Subsection F – Discipline, Paragraphs 245–249 of the Consent Decree. Paragraph 244, which establishes a responsibility of the Monitoring Team, was not separately assessed. These provisions are intended to ensure that disciplinary hearings and decisions are fair, consistent, appropriately documented, consistent with the disciplinary matrix, and comport with due process. The assessment included review of 176 disciplinary dispositions from 2025, representing 95.1% of the 185 cases initially identified for assessment, as well as applicable policies and administrative records, quantitative and qualitative analysis, and Monitoring Team observations of pre-disciplinary hearings.

The review found an effective disciplinary hearing and decision-making process in which members were consistently afforded an opportunity to be heard, discipline decisions generally conformed to the disciplinary matrix, and mitigating and aggravating factors were documented at high rates. The analysis did not identify systemic disparities in discipline based on rank. Hearing observations demonstrated a deliberative process that is not always fully reflected in the standardized written disposition letters. Additionally, a small number of specification dismissals and departures from Police Review Board ("PRB") recommendations lacked sufficiently clear explanations. This finding represents a discrete and readily correctable issue rather than evidence of a systemic failure in the processes assessed.

Overall, the assessment finds that the disciplinary hearing and decision-making processes as evaluated are functioning effectively and mostly consistent with the objectives of the Consent Decree. These findings are limited to the hearings and resulting decision-making processes and should not be interpreted as a determination regarding the effectiveness of the City's broader personnel investigations, accountability, or disciplinary systems.

## II. SCOPE AND METHODOLOGY

### A. Scope of Review

The Consent Decree between the U.S. Department of Justice ("DOJ") and the City of Cleveland ("City") requires the Cleveland Division of Police and the Department of Public Safety to implement Paragraphs 240–243, governing disciplinary hearings, and Paragraphs 245–249, governing the imposition and administration of discipline. These provisions are intended to ensure that disciplinary hearings are properly conducted when the Civilian Police Review Board and Internal Affairs ("IA") recommend initiation of the disciplinary process; that officers are provided the required opportunity to participate; and that disciplinary decisions are fair, consistent, appropriately documented, commensurate with the nature and seriousness of sustained misconduct, and consistent with due-process and the City's disciplinary matrix (Appendix B). Paragraph 244 imposes a responsibility on the Monitoring Team and therefore was not separately assessed.

This assessment evaluated the discipline decision-making portion of the City's broader accountability requirements rather than the accountability process as a whole. Specifically, the review focuses principally on the pre-disciplinary hearing and the decision-making and case dispositions after allegations have been investigated. Complaint generation, initial specification classification, investigative quality, evidentiary issues, and the accuracy of investigative findings are addressed in other sections of the Consent Decree and were not independently assessed here. The Monitoring Team evaluated disciplinary decisions based upon the information documented in pre-disciplinary hearing disposition letters and in-person hearing observations rather than independently assessing the preceding processes.

This scope of review is important to the interpretation of the assessment. A disciplinary disposition may be perceived as reasonable based upon the record before the hearing examiner even if a deficiency occurred earlier in the accountability process. Conversely, a thorough investigation and well-supported finding may still result in a disciplinary disposition that is inconsistent, inadequately explained, or otherwise deficient. The findings of this assessment therefore address the disciplinary hearing and decision-making components of the accountability system and should not be interpreted as findings regarding the entirety of all CDP and DPS accountability systems.

### B. Methodology

Prior to finalizing the methodology, the Parties collaborated to determine the specific processes, information, and observations necessary to complete the assessment. The Monitoring Team then evaluated disciplinary dispositions documented during calendar year 2025, whether or not discipline ultimately was imposed and regardless of the year in which the alleged misconduct

occurred. Monitoring Team members also attended pre-disciplinary hearings in-person, held by the Division of Police and the Department of Public Safety. The assessment of dispositions excluded sick-leave reviews and vehicle-crash investigations involving minor damage unless the matter also involved an allegation of misconduct or other issue relevant to the Consent Decree. The assessment also considered the administrative requirements supporting the disciplinary process, including policies requiring officer cooperation with IA and the Office of Professional Standards ("OPS"); documentation and tracking of departures from PRB recommendations; requirements related to amendments of the disciplinary matrix; and efforts to maintain sustained disciplinary findings in officers' records as required by the Consent Decree.

Throughout 2025 and into 2026, the City loaded all 2025 pre-disciplinary disposition letters into a shared electronic platform for Monitoring Team review. The majority of sick leave reviews and vehicle crash investigations were excluded, resulting in a near-census of 185 cases rather than a random sample. During data collection and analysis, nine cases were eventually excluded because of three repeat assignments and six that were not included because of various issues with the raw data export, resulting in a sample of 176 cases representative of the pre-disciplinary hearing process and discipline dispositions in 2025. The data derived from the sample and review of policies, processes, and other information provided by the City, and Team members observations of pre-disciplinary hearings were assessed against Paragraphs 240-243 and 244-249 of the Consent Decree for compliance.

Pursuant to Paragraphs 388-395, the Division made available and provided access to the data, documents, areas, meetings, and personnel necessary to complete the assessment, including but not limited to the specific data and information listed in the table below:

**Data and Information to Be Evaluated**

| ¶ | Requirement | Data/Information |
|---|---|---|
| 240 | The Chief of CDP will issue a General Police Order that requires officers to: (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB. | Any GPOs requiring officers to cooperate with IA and OPS investigators and submit all relevant evidence to investigators for consideration. |
| 241 | Where PRB or Internal Affairs recommends the initiation of the disciplinary process, the Chief of CDP, or his/her designee, or the Director of Public Safety will conduct a disciplinary hearing and will provide the officer with an opportunity to testify. If an officer provides new or additional evidence at the hearing, the hearing will be suspended and | • Documentation of IA and PRB recommendations regarding initiation of the disciplinary process.<br>• Documentation of all disciplinary/pre-disciplinary hearings. |

| | | |
|---|---|---|
| | the matter will be returned to Internal Affairs or PRB for consideration, as appropriate. | • Observations of pre-disciplinary hearings.<br>• Documentation of hearings suspended when officers have provided new or additional evidence. |
| 242 | If PRB recommends the initiation of the disciplinary process and recommends a disciplinary level, the matter will proceed through the City's disciplinary process. If the Chief or the Director disagree with the PRB's recommendations, they will set forth in writing his or her justification for doing so. | • Documentation of PRB-recommended discipline.<br>• Departure memos, letters, or other documentation justifying the Chief's or Director's disagreements with PRB recommendations to initiate the disciplinary process or impose a level of discipline. |
| 243 | CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition. | • Data showing the number of instances in which the Chief or the Director rejected, in whole or in part, PRB recommendations. |
| 244 | At least annually, the Monitor will review this data and assess whether PRB is achieving its mission. | Not assessed. |
| 245 | The City will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented. | • Documentation of discipline/pre-discipline hearings and discipline dispositions. |
| 246 | In order to ensure consistency in the imposition of discipline, the City will review its current disciplinary matrix and will seek to amend it as necessary to ensure that it:<br>a. establishes a presumptive range of discipline for each type of rule violation;<br>b. increases the presumptive discipline based on an officer's prior violations of the same or other rules;<br>c. sets out defined mitigating and aggravating factors;<br>d. prohibits consideration of the officer's race, gender, national origin, age, ethnicity, familial relationships, or sexual orientation;<br>e. prohibits consideration of the high (or low) profile nature of the incident;<br>f. provides that CDP will not take only non-disciplinary corrective action in cases in | • The current discipline matrix and a version history of revisions. |

| | | |
|---|---|---|
| | which the disciplinary matrix calls for the imposition of discipline; and<br>g. provides that CDP will consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed. | |
| 247 | All disciplinary decisions will be documented in writing. | • Documentation of discipline/pre-discipline hearings and discipline dispositions. |
| 248 | If amended, the City will provide its disciplinary matrix to the PRB, the Commission, the Public Safety Inspector General, and the police unions for comment. | • Documentary or other proof that any amendments of the disciplinary matrix were provided to the PRB, CPC, Inspector General and the police unions. |
| 249 | CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years. | • Documentary or other proof of CDP's efforts to work with the unions to allow sustained disciplinary findings to stay in an officer's record for 10 years.<br>• Review of current CBA language regarding retention of sustained disciplinary findings. |

## C. Standard of Review

Pursuant to Paragraphs 360 and 367 of the Consent Decree, the Monitoring Team conducted this comprehensive assessment to evaluate the extent to which the City, CDP, and DPS complied with the requirements of Paragraphs 240-243 and 245-249. The assessment considered applicable policies and administrative systems as well as actual disciplinary practices, including documentary evidence, case-level review, quantitative analysis, qualitative reviewer assessments, observations of disciplinary hearings, and information provided by City and Division personnel. Consistent with the Monitoring Team's established assessment framework, compliance was evaluated not merely by determining whether required policies, forms, or processes existed, but by examining whether the available evidence demonstrated meaningful adherence to the requirements of the Consent Decree.

Where there was inadequate compliance or compliance could not be determined, for example, in the case of missing or incomplete documentation or a lack of Monitoring Team access to the relevant people or systems, the severity of the inadequacy was weighed against the intent of the Consent Decree and the effect on organizational performance. In any assessment, minor technical issues, occasional mistakes, or incomplete efforts initiated in good faith will be considered differently than misconduct, significant and substantive instances of noncompliance, or systems and behavior not in alignment with Constitutional policing.

The Monitoring Team's compliance assessments consider a range of quantitative and qualitative factors. Where quantitative measures are appropriate, the Team will consider a compliance rate of 85% or above as sufficient when assessing a requirement of the Consent Decree. Certain requirements align with numerical measures, such as the frequency with which required actions were documented or discipline was consistent with the applicable matrix. Other requirements necessarily involve judgment concerning matters such as fairness, consistency, adequacy of explanation, treatment of mitigating and aggravating factors, and the relationship between the conduct, disciplinary classification, and ultimate disposition. Where qualitative analysis was appropriate, the Team considered the intent of the relevant requirements, the context of implementation, and the degree to which policies, practices, and observed behaviors demonstrate alignment with the objectives of the Consent Decree. Substantial and effective compliance is fundamentally about performance, requiring not only effective policy and protocols, but also consistent and systemic compliance over time.

After a comprehensive and detailed review of data, information, and interviews, compliance with requirements of the Consent Decree was rated on a scale from 0-6.

| Level | Standard |
|---|---|
| 0 | **Non-Compliant or Not Started:** The City/CDP has not yet complied with the relevant provision of the Consent Decree. This includes instances in which the City/CDP's work or efforts have begun but cannot yet be certified by the Monitoring Team as compliant with a material component of the requirement. |
| 1 | **Partial Compliance – Not Assessed:** The City/CDP has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/CDP's progress in implementation. |
| 2 | **Partial Compliance – Planning/Policy Stage:** Implementation has begun by drafting or developing policies, processes, training, or other systems, but key components of the provision(s) have not yet been implemented or are not operational. |
| 3 | **Partial Compliance – Implementation Phase:** The City and/or CDP has made sufficient initial strides or sufficient partial progress toward compliance with key components of the provision of the Consent Decree pertaining to initiating training and implementing systems intended to affect day-to-day practice, but that the Monitoring Team has not yet observed in practice. It may capture a wide range of compliance states or performance, from the City or CDP having taken only very limited steps toward operational compliance to being nearly in operational compliance. |

| Level | Standard |
| --- | --- |
| 4 | **Operational Compliance:** The City and/or CDP has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Consent Decree such that it is in existence or practice operationally—but has not yet demonstrated, or has not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents. This includes instances where a given reform is functioning but has not yet been shown, or an insufficient span of time or volume of incidents have transpired, to be effectively implemented in a systemic manner. Operational compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |
| 5 | **General Compliance:** General Compliance: The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented such that the Monitoring Team will begin tolling according to Consent Decree ¶ 401. This includes instances where it can be shown that the City or CDP has effectively complied with a requirement fully and systemically. General compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |
| 6 | **Substantial and Effective Compliance:** The City and/or CDP has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents in accordance with Consent Decree ¶ 370 or ¶ 401. This includes instances where it can be shown that the City/CDP has effectively complied with a requirement fully and systemically. Substantial and effective compliance for a provision does not require that the City/CDP "pass" every metric for that provision, rather the Monitoring Team considers the City/CDP's performance across all metrics, weighting them according to their importance to transforming CDP's policing. |

As additional considerations, more appropriate for work that is ongoing and advances or ebbs over time, the Monitoring Team offers the following details used in making final assessments.

1. **The quality of CDP's performance across a material span of time.** Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer. Instead, it requires that CDP adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers. In this way, isolated

compliance does not establish "Initial Compliance" in practice. At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance. The issue is whether, across time, events, and people, CDP is, in aggregate, sufficiently doing what the Decree requires. For some requirements that are applicable only to a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

2. **The severity or significance of deviations from Consent Decree requirements, CDP policy, and/or law.** The Monitoring Team considers not simply whether CDP's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation. Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field. Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

3. **The extent to which CDP is identifying and appropriately addressing problematic performance.** In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within CDP, the Consent Decree expressly contemplates that a CDP in compliance with the Decree will have mechanisms in place to engage with departmental and officer performance that is deficient in some way. Therefore, the Monitoring Team's compliance reviews consider whether, when CDP personnel have deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it has appropriately addressed the issue. With respect to Consent Decree implementation and meaningful organizational change, the Department is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **CDP's progress over time.** Where possible, the Monitoring Team aims to situate its evaluation of CDP's performance in terms of progress over time. Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.[1]

---

[1] Barge, M., Friedman, B., McGough, M. Monitoring Law Enforcement Consent Decrees: An Introduction and Starter Toolkit. 2024. Pages 91-9.

Courts regularly apply multi-factor approaches where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or implicate competing considerations.[2] Such multi-factor tests are "objective" as they require clear explanations as to "how they derived their conclusions from the verifiable facts."[3]

In applying this multi-factor test for compliance, the first factor – the quality of CDP's performance across a material span of time – is the initial, threshold inquiry. In assessing this factor, the Monitoring Team will consider a range of both quantitative and qualitative measures for each provision and determine both CDP's baseline and current level of performance. If CDP or its officers' performance is not at a certain level with regards to the relevant metric, then things like progress over time or CDP's identification of the issues are unlikely to cure the basic deficiencies with performance, regardless of improvement over time.

The Monitoring Team will develop a number of quantitative metrics in assessing performance. For such metrics that are rates, the Monitoring Team will consider a compliance rate of 85% or above as "passing". For some non-rate metrics, where there is a relatively small number of incidents for review, or where the rate requires different considerations, the Monitoring Team may set different expectations to be considered passing. The result is such that each provision is graded upon a range of measures and that strong performance on any given quantitative measure must be balanced against the severity of any deviations, the department's response to such violations, and the department's progress over time.

The multi-factor test for compliance works to ensure that all relevant objective factors are reasonably weighed and the Monitoring Team's written findings provides guidance to the Department and to the community about the benchmarks that it expects and CDP's current performance level.

Finally, the Monitoring Team may assign a score for an individual provision that is lower than the score given in a prior report based upon the weighing of factors and current CDP performance.

---

https://static1.squarespace.com/static/58a33e881b631bc60d4f8b31/t/671bf35ce2cf8a70d2a5c3cb/1729885020813/Monitoring+Law+Enforcement+Consent+Decrees.pdf

[2] *See, e.g.*, *Murr v. Wisconsin*, 582 U.S. __ (2017) (adopting a multi-factor test for determining whether governmental regulations effectuated a decline in the value of private property so as to be considered a government taking under the Fifth Amendment); *EBay v. MercExchange*, 547 U.S. 388 (2006) (applying four-factor test to determinations about permanent injunctive relief in disputes arising under the Patent Act); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (articulating three factors for courts to consider when determining whether additional governmental and/or judicial procedures are necessary to satisfy the Due Process Clause).

[3] James G. Wilson, "Surveying the 'Forms of Doctrine' on the Bright Line Balancing Test Continuum," 27 *Ariz. St. L.J.* 773, 802 (1995).

Compliance Assessments are not only about policy; they are also about *performance*—about CDP demonstrating *adherence* to policy. Accordingly, to establish initial compliance with these provisions and ultimately to sustain "full and effective" compliance pursuant to Paragraph 397, CDP not only must show that it has adopted the pertinent policies, but also that its personnel, including officers, consistently comply with those policies. The multi-factor test for compliance set forth above works to ensure that all relevant objective factors are reasonably weighed and the Monitoring Team's ratings are clearly conveyed.

## III. COMPLIANCE ASSESSMENT

This section contains the evaluation and findings of the Discipline Hearings and Discipline subsections of the Consent Decree, Paragraphs 240-243 and 244-249 of the Consent Decree. Additional quantitative data can be found in Appendix A.

### A. Detailed Analysis

The Monitoring Team analyzed 176 unique disciplinary dispositions. The final analysis includes 95.1% of the 185 cases initially identified for the assessment. Eight Monitoring Team members completed between 20 and 23 of the retained reviews, resulting in a balanced distribution of the review workload. The 176 dispositions involved 147 sworn members and 29 nonsworn members. The nonsworn members were assigned to Communications. Sworn members included 104 patrol officers, 18 detectives, 22 sergeants, one lieutenant, and two captains. The nonsworn group included 26 dispatchers, two safety telephone operators, and one bi-lingual communications specialist. Because the discipline provisions of the Consent Decree generally use the term "officer," the nonsworn analysis is treated as supplemental evaluation of the operation and consistency of the City's disciplinary processes and not as a basis for determining compliance, which is applicable to sworn officers.

The dispositions varied considerably in complexity and in discipline dispositions. Most involved a single investigation, case number, and specification, but others combined multiple investigations and numerous allegations into one disciplinary proceeding. Reviewers evaluated 359 specifications among the 176 dispositions. The assessment instrument permitted detailed entry of up to 10 specifications; two dispositions contained 11 specifications, resulting in 357 individual specification entries available for detailed specification-level analysis. The most frequently identified specification categories involved attendance and administrative issues, investigations and performance, professional conduct, workplace behavior, technology and equipment, alleged illegal or off-duty conduct, and use-of-force-related violations. This provided the team with a diverse sample of discipline specifications and decisions.

**1. Pre-disciplinary Hearings**

When initiation of the disciplinary process is recommended by the Civilian Police Review Board or Internal Affairs, the Consent Decree requires the Chief of Police or designee, or the Chief Director ("Director") of Public Safety or designee to conduct a disciplinary hearing (called a "pre-disciplinary hearing" in practice) and provide the officer with the chance to testify (paragraph 241). The Monitoring Team assessed the specifications, aggravating and mitigating factors, hearing examiners' decisions, and final discipline decisions against the requirements of the Consent Decree, policy, and the City's discipline matrix. Of the 176 hearing dispositions reviewed, 138 (78.4%) of the hearings were conducted by the Chief of Police or a designee, and 38 (21.6%) by the Director of Public Safety or a designee.

Hearing disposition letters provided a formulaic and consistent documentary record of the pre-disciplinary hearings, but Monitoring Team members also witnessed several hearings held by the Division and DPS during the assessment. These observations provided a richer context to the documented activities, pointing to some limitations in documentation that do not fully capture the breadth of activity occurring during the hearings. Pre-disciplinary hearing disposition letters all contained standard language stating that the member was afforded an opportunity to be heard during the hearings. The letters do not establish whether the member provided information. The resulting disposition letters, while not expected to be hearing transcripts, use standardized language and do not indicate whether the member substantively participated and affected the decision-making process. Monitoring Team members attending hearings found that members and their representatives were regularly provided the opportunity to be heard and that mitigating circumstances were often presented and considered through the employees' representatives.

On October 8, 2026, following the data and information review, members of the Monitoring Team met with the Chief of Police, Director of Public Safety, DOJ, and City representatives to clarify the disciplinary hearing practices relevant to Paragraph 241, which requires hearings to be suspended if members provide new or additional evidence and the case returned to investigators. The Chief, Director, and others reported that they had never encountered a hearing in which a member provided new or additional substantive evidence requiring a hearing suspension. They explained that members generally present mitigating circumstances rather than new evidence and that officer participation is limited, with most officers electing not to testify in accordance with guidance from their collective bargaining representatives. This was consistent with Monitoring Team members' hearing observations. In addition, in response to an information request that addressed Paragraph 241, a supervisor assisting with the request noted that he did not recall a time when a member presented new or additional evidence at a hearing.

The totality of the information provides important context for the lack of documented hearing suspensions. The absence of occurrences should not be interpreted as evidence of noncompliance.

The documentation and observations establish that members are afforded the opportunity to be heard. Although the process for suspending a hearing has not been observed, the Monitoring Team finds no evidence that the City failed to suspend a hearing when new or additional evidence was presented. Continued assessment should focus on confirming that the requirements of Paragraph 241 are followed should such a circumstance arise.

## 2. Specifications and Findings

Allegations of policy violations are listed as numbered "specifications" in the Pre-disciplinary hearing disposition letters. Of the 357 specification reviewed, 225 were initially classified as Group I, 92 as Group II, and 40 as Group III, representing minor, elevated, and serious exposure to discipline respectively. Among the 357 specifications, 299 were coded guilty (83.75%), two were coded not guilty, 42 were dismissed, and 14 were coded as "other," which largely included non-disciplinary letters of instruction. The "other" data should, therefore, not be interpreted an unresolved cases. Among the 299 guilty findings, 262 (87.6%) remained at their initial group-level classification, 27 (9%) were downgraded, while 10 (3.3%) were upgraded. Three Group III specifications, those exposing employees to the most serious discipline, were reduced to Group II, and two were reduced to Group I. No specifications in the sample were elevated from Group II to Group III. Overall, of the 176 dispositions reviewed, 103 (58.5%) resulted in suspension or termination.

At least one specification was dismissed in 32 (18.2%) of the 176 reviews, including nine dispositions in which all specifications were dismissed (5.1%). Reviewers found the explanations for dismissal sufficient in 26 of the 32 cases (81.3%). Five of the six insufficient explanations were not the result of an absence of a written explanation, but conclusions by assessors that the reasoning did not adequately address important factors, the behavior underlying the specification, or the rationale for rejecting the original investigative finding. In one case heard by a Chief's designee, the reviewer noted there was no explanation for dismissal. DPS heard 20 of the 32 cases with dismissals, of which 15 were adequately explained, versus 12 dismissals by the Chief or designee, with only one assessed as insufficient. The sample is too small to suggest that cases are systematically dismissed improperly by DPS, but the concentration (five of six) is meaningful. It also should be noted that the Director routinely hears cases containing serious Group III allegations. Overall, the pre-disciplinary hearing data demonstrates an effective, although labor-intensive, process for adjudicating cases. The concern is not that decision-makers failed to exercise proper discretion, but rather the basis for exercising discretion was not documented sufficiently in a small number of cases.

When limited to the 134 unique dispositions in which a written reprimand or more severe discipline was imposed, mitigating factors were documented in 94% of cases and aggravating factors in 94.8%. Among cases involving suspension or termination, the rates of properly documented

mitigating and aggravating factors were consistent at 93.2% and 96.1% respectively. The principal issues in the few cases in which mitigating and aggravating factors were assessed as not adequately considered were not a failure of documentation, but inconsistency in how the factors were articulated and connected to the discipline matrix; for example, facts in a disposition letter that could be mitigating or aggravating but apparently were not used to determine the discipline range. Reviewer comments also identified a few isolated cases in which potentially mitigating or aggravating facts were described in the disposition letter but the relationship between those facts, the discipline category, and the resulting discipline was not clear.

The assessment identified 11 OPS cases with PRB discipline recommendations, with six departures from PRB-recommended discipline; four by the Chief and two by the Director. Reviewers concluded that one justification from a PRB recommendation by the Director was inadequately explained, not addressing all of the underlying considerations of the PRB's recommendation. Although this is a small sample, the Monitoring Team believes that this one instance does not establish a broader deficiency in decision-making.

The quantitative data did not demonstrate a systematic rank-based disparity in the imposition of discipline. The sample contained 25 supervisors from the rank of sergeant to captain whose discipline outcomes generally followed the discipline matrix ranges. Similarly situated patrol officers and supervisors within the same matrix categories received comparable outcomes for sustained Group I and Group II specifications. The sample contained no Group III supervisor dispositions, so the assessment cannot draw conclusions about the treatment of supervisors in the most serious cases. In addition, the 18 reviews of cases involving detectives did not reveal rank-based leniency or undue severity in dispositions and were all found to be consistent with the discipline matrix, from letters of reinstruction to termination in one case. The findings suggest that decisions are consistent with discipline categories and discipline history independent of rank.

The 29 nonsworn Communications disposition were notable in that the raw data demonstrated more certain corrective action for nonsworn members than sworn members: 21 of 29 nonsworn members received suspensions (72.4%) while 79 of 147 (53.7%) sworn members were suspended and three were terminated. This results in a combined sworn suspension or termination rate of 55.8%. No nonsworn cases resulted in the complete dismissal of all specifications while nine sworn cases did. There were two of 29 cases (6.9%) involving nonsworn members in which at least one specification was dismissed compared to 30 of 147 (20.4%) involving sworn members. These differences are relevant to assessing the consistency and fairness of discipline practices under Paragraph 245 but do not establish unfair treatment. The quantitative evidence supports a limited finding that Communications personnel experience the discipline process differently, receiving higher levels of discipline and fewer specification dismissals, but the level of analysis was not sufficient to determine if the City systematically imposes more harsh discipline on nonsworn members. These differences are sufficiently different, however, to warrant a closer

examination of how Communications violations are classified, how repeat violations accumulate, and whether comparable discretion is applied to sworn and nonsworn cases.

It is important to note that this assessment evaluates whether disciplinary decision-making is consistent and appropriately documented based on the record presented to the hearing examiner and established in the disposition letters. It cannot determine the quality or consistency of personnel investigations, deliberations leading to specifications, and recommendations to initiate the discipline process.

**3. Division of Police and Department of Public Safety Decision-Making**

A direct comparison of decisions made by the Chief of Police and the Chief Director of the Department of Public Safety would not be valid. All 16 dispositions involving Group III specifications and all three terminations were heard by DPS. This distribution reflects the Director's role in hearing cases involving the most serious allegations and the possibility of demotion or termination, and the data do not demonstrate that the Director imposed more harsh discipline than the Chief in Group I and II specifications.

The more meaningful difference involves the clarity and articulation of discretionary decisions. Five of the six inadequately explained specification dismissals and two of the three inadequate PRB departure explanations were DPS decisions. These findings alone should not be characterized as evidence that DPS is more lenient or routinely noncompliant with the discipline matrix. In fact, most DPS discipline was consistent with the matrix. The concern is that DPS decisions involved greater unexplained or insufficiently explained discretionary decisions.

A discipline matrix can produce consistent discipline when allegations are accurately classified, but if similar conduct is characterized differently at the hearing stage or in prior processes, even adherence to a matrix will not establish overall process consistency. Reviewer comments concerning a small number of dispositions illustrate this distinction. In some cases, the discipline imposed fell within the range associated with the final classification, while the written record did not sufficiently explain why the specification had been reduced, dismissed, or otherwise characterized differently from the original allegation. The issue in such cases is therefore not necessarily the discipline imposed, but whether the documentation permits meaningful review of the reasoning leading to reclassification of discipline ranges.

**4. Administrative and Policy Requirements**

Several provisions of the Discipline Hearings and Discipline section concern administrative systems, policy requirements, and practices. The Monitoring Team reviewed relevant General Police Orders, tracking records, and information provided by the Division and Department of

Public Safety in response to data and information requests. The information provided demonstrates that the City has developed functioning systems supporting the disciplinary process, including a well-developed discipline matrix (Appendix B), policies requiring cooperation with OPS investigations (GPO 1.07.04), documentation and tracking of PRB discipline departures, and considering disciplinary histories when assessing new discipline. Regarding the discipline matrix, titled “Table of Discipline” in Appendix B, implemented in 2019, the City provided evidence of 2017 policy input from OPS and the CPC, and the policy is currently under internal review for potential revisions.

Paragraph 249 requires CDP to work with the unions to allow sustained disciplinary findings to remain in an officer’s record for ten years. In response to the Monitoring Team’s request for evidence of these efforts, the City reported that it maintains a tracking spreadsheet containing members’ disciplinary histories, and collective bargaining has limited consideration of prior discipline to three years when determining the imposition of new discipline. As noted in the Sixth Semiannual Report, the City raised the issue with the police unions and accepted that sustained finding would remain in an officer’s record for three years. This demonstrates that the Division retains and uses officers’ discipline histories and has met the requirement to work with the unions on the consideration of historical discipline.

The Department of Public Safety maintains a spreadsheet of OPS cases that identifies instances in which the Chief or the Director depart from PRB discipline recommendations, demonstrating an established tracking mechanism. The Chief of Police regularly documents the rationale for departures in separate written memoranda, while the Director generally includes a shorter explanation within the disciplinary disposition record. These materials demonstrate that departures are both documented and tracked.

## 5. Summary of Findings

The compliance assessment demonstrates that Cleveland has a functioning and generally consistent disciplinary system, supported by established policies, a structured discipline matrix, written hearing dispositions, and administrative tracking mechanisms. Across the 176 dispositions reviewed, members were routinely afforded an opportunity to be heard, discipline generally followed the applicable matrix, and mitigating and aggravating factors were documented in the large majority of cases. The analysis did not identify a systematic disparity in discipline based on rank, although the supplemental review of Communications personnel identified differences that warrant additional examination.

Most specification dismissals and departures from PRB recommendations were sufficiently explained, but a small number lacked adequate articulation. Qualitative reviews of dispositions flagged by assessors for additional attention similarly identified no separate systemic patterns, but

reinforced concerns about the clarity with which some classification changes, dismissals, and other discretionary decisions were documented. The City demonstrated functioning administrative systems for tracking PRB departures and maintaining discipline histories, and demonstrated efforts to work with the unions on maintaining officers' discipline histories.

Overall, the evidence reflects a mature disciplinary process with some disconnected compliance gaps rather than broad or systemic failure. Additionally, the hearing process itself reveals a more thoughtful and deliberate process than the disposition letters alone provide. Minor enhancements to these official records would improve transparency and perceptions of fairness, consistency, and due process.

### B. Paragraph 240

> *The Chief of CDP will issue a General Police Order that requires officers to: (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB.*

GPO 1.07.04 – Public Complaints of Misconduct requires members to fully cooperate with OPS investigations and to provide supporting documentation, evidence, and witness information. GPO 1.07.05 – Internal Complaints of Misconduct establishes extensive requirements for reporting and investigating internal misconduct, but during the review, the GPO did not expressly require members cooperate with IA investigators. The underlying investigative system is clearly operational and the Monitoring Team is aware that members are required to cooperate with IA, making this a narrow and easily correctable policy deficiency. In fact, during the assessment, the policy was corrected to rectify this oversight. As currently written, the GPO does satisfy the full requirement, supporting a sustained finding of **General Compliance (5).**

### C. Paragraph 241

> *Where PRB or Internal Affairs recommends the initiation of the disciplinary process, the Chief of CDP, or his/her designee, or the Director of Public Safety will conduct a disciplinary hearing and will provide the officer with an opportunity to testify. If an officer provides new or additional evidence at the hearing, the hearing will be suspended and the matter will be returned to Internal Affairs or PRB for consideration, as appropriate.*

The City has implemented a pre-disciplinary hearing process, and the documentary and observational evidence demonstrates that members are consistently afforded an opportunity to be heard. Monitoring Team observations further determined that members and their representatives routinely present mitigating factors to hearing examiners. Although the process for suspending a hearing has not been observed, the Monitoring Team finds no evidence that the City failed to

suspend a hearing when new or additional evidence was presented. The evidence supports an upgraded finding of **General Compliance (5).**

### D. Paragraph 242

> *If PRB recommends the initiation of the disciplinary process and recommends a disciplinary level, the matter will proceed through the City's disciplinary process. If the Chief or the Director disagree with the PRB's recommendations, they will set forth in writing his or her justification for doing so.*

The evidence shows that PRB recommendations proceed through the City's disciplinary process and that departures by the Chief or Director are documented in writing. Eleven OPS/PRB dispositions were identified, with six departures from PRB recommendations. Reviewers found that one decision was inadequately explained. The deficiency was not the absence of a written justification, but a lack of attention to all of the underlying considerations of the PRB's recommendation. The findings support an upgrade to **General Compliance (5).**

### E. Paragraph 243

> *CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition.*

The City maintains a spreadsheet tracking OPS cases in which the Chief or Director departed from PRB recommendations. The assessment therefore established that the tracking mechanism required by Paragraph 243 exists and is being used. Paragraph 243 is therefore upgraded to **General Compliance (5).**

### F. Paragraph 244 – Not Assessed

> *At least annually, the Monitor will review this data and assess whether PRB is achieving its mission.*

### G. Paragraph 245

> *The City will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented.*

The assessment found that the discipline hearings and discipline decision-making processes were generally fair, consistent, and aligned with the disciplinary matrix. The analysis did not identify systematic rank-based disparities, and most disciplinary decisions were consistent with the matrix. Hearing observations also demonstrated a deliberative process in which employees and representatives were allowed to present information. In the 134 dispositions in which discipline was imposed, 94% of cases adequately documented mitigating factors, 94.8% adequately documented aggravating factors, and 92% adhered to the discipline matrix. The evidence therefore supports an upgraded finding of **General Compliance (5).**

### H. Paragraph 246

*In order to ensure consistency in the imposition of discipline, the City will review its current disciplinary matrix and will seek to amend it as necessary to ensure that it:*

- *a. establishes a presumptive range of discipline for each type of rule violation;*
- *b. increases the presumptive discipline based on an officer's prior violations of the same or other rules;*
- *c. sets out defined mitigating and aggravating factors;*
- *d. prohibits consideration of the officer's race, gender, national origin, age, ethnicity, familial relationships, or sexual orientation;*
- *e. prohibits consideration of the high (or low) profile nature of the incident;*
- *f. provides that CDP will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and*
- *g. provides that CDP will consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed.*

GPO 1.07.06 – Disciplinary Guidance establishes disciplinary ranges, progressively increases discipline based on prior violations, defines mitigating and aggravating factors, prohibits consideration of protected characteristics and the profile of an incident, and provides a structured framework for Group I through III violations. It further prohibits substituting non-disciplinary action where the matrix requires discipline and directs consideration of appropriate non-disciplinary corrective action in addition to discipline. The assessment also demonstrates that the matrix is actively used in disciplinary decision-making, supporting an upgraded finding of **Substantial and Effective Compliance (6).**

### I. Paragraph 247

*All disciplinary decisions will be documented in writing.*

The Monitoring Team assessed a comprehensive sample of written pre-disciplinary hearing disposition letters and has reviewed discipline letters for several years outside of this assessments. There is no evidence to suggest that disciplinary decisions are not regularly documented in writing. Paragraph 247 is upgraded to **Substantial and Effective Compliance (6).**

### J. Paragraph 248

*If amended, the City will provide its disciplinary matrix to the PRB, the Commission, the Public Safety Inspector General, and the police unions for comment.*

This is a specific event-dependent requirement, and the assessment did not identify an amendment to the matrix during the assessment period. The current disciplinary matrix is established and in use, and the documentary evidence demonstrates prior revision efforts including the Division, OPS, and the CPC. Paragraph 248 is upgraded to **General Compliance (5).**

### K. Paragraph 249

*CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years.*

The City reported that it maintains a disciplinary history spreadsheet containing members' disciplinary records throughout their careers, demonstrating a practice that preserves and uses disciplinary history for substantially longer than ten years. The provision, however, requires CDP to work with the unions to allow sustained disciplinary findings to remain in an officer's record for ten years. The information provided established those efforts, supporting an upgraded finding of **General Compliance (5).**

## IV. Assessment Summary and Conclusion

The Discipline Hearings and Discipline assessment demonstrates that the City has established a functioning and consistent disciplinary process that largely reflect the requirements of the Consent Decree. Across the 176 disciplinary dispositions reviewed, members were routinely afforded an opportunity to be heard, discipline generally conformed to the City's disciplinary matrix, mitigating and aggravating factors were documented at high rates, and the analysis did not identify systemic disparities in discipline based on rank. The City has also established the policies, written disposition process, discipline matrix, and administrative tracking mechanisms necessary to support consistent disciplinary decision-making.

The minor issues identified in this assessment are readily correctable and not indicative of systemic failure. Additionally, although most discretionary decisions were adequately supported, a small

number of specification dismissals and one departure from PRB recommendations were not sufficiently explained. More complete articulation of the evidence and reasoning supporting specification changes, dismissals, and other uses of discretion would strengthen transparency, consistency, and meaningful review of disciplinary decisions.

Monitoring Team observations demonstrated that the pre-disciplinary hearings themselves are often more deliberative and substantive than the standardized disposition letters reflect. Employees and their representatives are afforded meaningful opportunities to present information, and hearing examiners consider mitigating circumstances in reaching decisions. The opportunity is to better document and align existing practices with specific Consent Decree requirements.

Within the scope of this assessment, the evidence demonstrates an effective disciplinary hearing and decision-making process with some minor issues requiring attention. These finding should not be interpreted as conclusions regarding the effectiveness of the City's accountability or disciplinary system as a whole, including the investigative processes, findings that precede the disciplinary hearing, and discretionary decisions made during deliberative processes that are not recorded by disposition letters. Addressing the specific minor issues identified in this assessment should position the City to demonstrate higher and more sustainable levels of substantial compliance with the Discipline Hearings and Discipline provisions of the Consent Decree in future assessments.

## V. Compliance Rating Summary

| ¶ | Requirement | Rating |
|---|---|---|
| 240 | The Chief of CDP will issue a General Police Order that requires officers to: (a) cooperate with the Internal Affairs and OPS investigators; and (b) submit all relevant evidence to the investigators such that it is available for consideration by Internal Affairs or PRB. | General Compliance 5 |
| 241 | Where PRB or Internal Affairs recommends the initiation of the disciplinary process, the Chief of CDP, or his/her designee, or the Director of Public Safety will conduct a disciplinary hearing and will provide the officer with an opportunity to testify. If an officer provides new or additional evidence at the hearing, the hearing will be suspended and the matter will be returned to Internal Affairs or PRB for consideration, as appropriate. | General Compliance 5 |
| 242 | If PRB recommends the initiation of the disciplinary process and recommends a disciplinary level, the matter will proceed through the City's disciplinary process. If the Chief or the Director disagree with the PRB's recommendations, they will set forth in writing his or her justification for doing so. | General Compliance 5 |
| 243 | CDP will track the number of instances in which the Chief or the Director of Public Safety rejects, in whole or in part, PRB's recommended disposition. | General Compliance 5 |
| 244 | At least annually, the Monitor will review this data and assess whether PRB is achieving its mission. [Not assessed.] | Not the City's Obligation |
| 245 | The City will ensure that discipline for sustained allegations of misconduct comports with due process, and is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented. | General Compliance 5 |
| 246 | In order to ensure consistency in the imposition of discipline, the City will review its current disciplinary matrix and will seek to amend it as necessary to ensure that it:<br>h. establishes a presumptive range of discipline for each type of rule violation;<br>i. increases the presumptive discipline based on an officer's prior violations of the same or other rules;<br>j. sets out defined mitigating and aggravating factors;<br>k. prohibits consideration of the officer's race, gender, national origin, age, ethnicity, familial relationships, or sexual orientation;<br>l. prohibits consideration of the high (or low) profile nature of the incident; | Substantial and Effective Compliance 6 |

| | | |
|---|---|---|
| | m. provides that CDP will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and<br>n. provides that CDP will consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed. | |
| 247 | All disciplinary decisions will be documented in writing. | Substantial and Effective Compliance<br>6 |
| 248 | If amended, the City will provide its disciplinary matrix to the PRB, the Commission, the Police Inspector General, and the police unions for comment. | General Compliance<br>5 |
| 249 | CDP will work with the unions to allow for sustained disciplinary findings to stay in an officer's record for ten years. | General Compliance<br>5 |

# APPENDIX A
# QUANTITATIVE FINDINGS

2026 Discipline Assessment, Final Sample of 176 Unique Pre-Disciplinary Hearing Dispositions

| Sworn vs Nonsworn | Percent | Responses |
|---|---|---|
| Sworn Members | 83.5% | 147 |
| Nonsworn members | 16.5% | 29 |

| Rank/Position | Percent | Responses |
|---|---|---|
| Patrol Officer | 59.1% | 104 |
| Detective | 10.2% | 18 |
| Sergeant | 12.5% | 22 |
| Lieutenant | 0.6% | 1 |
| Captain | 1.1% | 2 |
| Dispatcher | 14.8% | 26 |
| Safety Telephone Operator | 1.1% | 2 |
| Bi-Lingual Communications Specialist | 0.6% | 1 |

| Number of Cases per Disposition Letter | Percent | Responses |
|---|---|---|
| 1 | 83.0% | 146 |
| 2 | 11.4% | 20 |
| 3 | 1.7% | 3 |
| 4 | 2.3% | 4 |
| 5 | 0.6% | 1 |
| 6 or more | 1.1% | 2 |

| Pre-disciplinary Hearing Conducted By | Percent | Responses |
|---|---|---|
| Chief of Police or CDP designee | 78.4% | 138 |
| Director of Public Safety or DPS designee | 21.6% | 38 |

# APPENDIX A
# QUANTITATIVE FINDINGS

| Number of Specifications Listed | Percent | Responses |
|---|---|---|
| 1 | 58.5% | 103 |
| 2 | 20.5% | 36 |
| 3 | 6.8% | 12 |
| 4 | 4.5% | 8 |
| 5 | 4.0% | 7 |
| 6 | 2.3% | 4 |
| 7 | 0.6% | 1 |
| 8 | 0.6% | 1 |
| 10 | 1.1% | 2 |
| 11 | 1.1% | 2 |

Across 176 dispositions, reviewers identified 359 specifications (mean 2.04; range 1-11). The instrument allowed detailed entry of up to 10 specifications. Two dispositions contained 11, leaving 357 specifications available for analysis.

| Initial Specification Group (357 entries) | Percent | Responses |
|---|---|---|
| Group I | 63.0% | 225 |
| Group II | 25.8% | 92 |
| Group III | 11.2% | 40 |

| Specification finding (357 entries) | Percent | Responses |
|---|---|---|
| Guilty | 83.8% | 299 |
| Dismissed | 11.8% | 42 |
| Other | 3.9% | 14 |
| Not Guilty | 0.6% | 2 |

| Change in Final Group Classification in the 299 Specifications Coded Guilty | Percent | Responses |
|---|---|---|
| Remained at initial group | 87.6% | 262 |
| Downgraded | 9.0% | 27 |
| Upgraded | 3.3% | 10 |

# APPENDIX A
# QUANTITATIVE FINDINGS

| Were Any Specifications Dismissed? | Percent | Responses |
|---|---|---|
| Yes | 18.2% | 32 |
| No | 81.8% | 144 |

| Was the Dismissal Sufficiently Explained in the Disposition Letter? | Percent | Responses |
|---|---|---|
| Yes | 81.2% | 26 |
| No | 18.8% | 6 |

| Were All Specifications Dismissed? | Percent | Responses |
|---|---|---|
| Yes | 5.1% | 9 |
| No | 94.9% | 167 |

| Corrective Action(s) | Percent | Responses |
|---|---|---|
| Letter of reinstruction | 40.7% | 68 |
| Written reprimand | 19.2% | 32 |
| Suspension | 59.9% | 100 |
| Termination | 1.8% | 3 |
| Other corrective action | 18.6% | 31 |

Dispositions can contain more than one corrective action, so percentages do not total 100%

# APPENDIX A
# QUANTITATIVE FINDINGS

| Suspensions 100 Dispositions With Suspension Imposed | Percent | Responses |
|---|---|---|
| 1 Day | 17.0% | 17 |
| 2 Days | 17.0% | 17 |
| 3 Days | 18.0% | 18 |
| 4 Days | 1.0% | 1 |
| 5 Days | 7.0% | 7 |
| 6 Days | 13.0% | 13 |
| 7 Days | 4.0% | 4 |
| 8 Days | 6.0% | 6 |
| 9 Days | 3.0% | 3 |
| 10 Days | 4.0% | 4 |
| 13 Days | 3.0% | 3 |
| 15 Days | 3.0% | 3 |
| 19 Days | 1.0% | 1 |
| 20 Days | 3.0% | 3 |

| Final Discipline Groups and Categories | Percent | Responses |
|---|---|---|
| 1st Group I, mitigating outweigh aggravating factors | 37.6% | 62 |
| 1st Group I, aggravating outweigh mitigating factors | 18.2% | 30 |
| 2nd Group I, mitigating outweigh aggravating factors | 3.6% | 6 |
| 2nd Group I, aggravating outweigh mitigating factors | 13.3% | 22 |
| 1st Group II, mitigating outweigh aggravating factors | 9.1% | 15 |
| 1st Group II, aggravating outweigh mitigating factors | 5.5% | 9 |
| 2nd Group II, mitigating outweigh aggravating factors | 0.6% | 1 |
| 2nd Group II, aggravating outweigh mitigating factors | 2.4% | 4 |
| 1st Group III, mitigating outweigh aggravating factors | 2.4% | 4 |
| 1st Group III, aggravating outweigh mitigating factors | 6.7% | 11 |
| 2nd Group III: serious misdemeanor, gross immorality, gross neglect | 0.6% | 1 |

n = 165 valid discipline-category responses.

# APPENDIX A
# QUANTITATIVE FINDINGS

| Types of Allegations Sustained | Percent | Responses |
|---|---|---|
| Unnecessary, unreasonable, or disproportionate use of force | 1.7% | 3 |
| Other violation related to a UOF | 6.2% | 11 |
| Improper arrest | 1.7% | 3 |
| Crime or non-traffic ordinance violation (off duty only) | 4.5% | 8 |
| Traffic crime or ordinance violation (off duty only) | 6.8% | 12 |
| Constitutional/civil rights violation(on duty) | 0.6% | 1 |
| Other integrity violation | 1.1% | 2 |
| Substance use or impairment (other than OVI) | 2.3% | 4 |
| Biased behavior toward a member of the public | 0.6% | 1 |
| Unprofessional, rude, or disrespectful behavior toward the public | 13.6% | 24 |
| Unprofessional, rude, or disrespectful behavior toward another member | 4.0% | 7 |
| Failure to report a policy violation | 1.1% | 2 |
| Inadequate/Improper administrative or personnel investigation | 0.6% | 1 |
| Vehicle pursuit violation | 3.4% | 6 |
| Vehicle crash (do not include other instances of vehicle damage) | 1.7% | 3 |
| Traffic violation (on duty only) | 0.6% | 1 |
| Worn Camera System (WCS) violation | 8.5% | 15 |
| Failure to safeguard equipment, property damage, vehicle damage not while in operation | 5.1% | 9 |
| Improper use of information systems or other technology | 0.6% | 1 |
| Failure to follow a lawful order | 2.3% | 4 |
| Extra duty/Off duty employment violation | 4.0% | 7 |
| Attendance (AWOL, late for duty) | 10.2% | 18 |
| Refused mandatory overtime | 5.7% | 10 |
| Sick leave abuse | 4.5% | 8 |
| Other administrative/procedural violation(s) | 10.8% | 19 |
| Failure to monitor/supervise/search arrestee | 4.0% | 7 |
| Failure to file reports | 4.5% | 8 |
| Failure to investigate | 3.4% | 6 |
| Other competence/performance issue | 18.2% | 32 |

# APPENDIX A
# QUANTITATIVE FINDINGS

| Was Discipline Consistent With the City Discipline Matrix? | Percent | Responses |
|---|---|---|
| Yes | 92.8% | 155 |
| No | 3.6% | 6 |
| Unable to determine | 3.6% | 6 |

n = 167 valid responses.

| Was sustained Discipline Consistent With Due Process and Applied Fairly Based on the Nature of the Allegation? | Percent | Responses |
|---|---|---|
| Yes | 97.6% | 161 |
| No | 2.4% | 4 |

n = 165 valid responses.

## APPENDIX B
## TABLE OF DISCIPLINE (MATRIX)

| Group Violation | Violation Number | Mitigating or Aggravating Factors | Presumptive Corrective Action Range |
| --- | --- | --- | --- |
| I (a) | First Group I Violation | Mitigating factors outweigh any aggravating factors<br><br>OR<br><br>No aggravating factors present | **Non-disciplinary Verbal Counseling to Written Reprimand** |
| I (b) | First Group I Violation | Aggravating factors outweigh any mitigating factors<br><br>OR<br><br>No mitigating factors present | **1 to 2 day suspension without pay** |
| I (c) | Second Group I Violation | Mitigating factors outweigh any aggravating factors<br><br>OR<br><br>No aggravating factors present | **2 to 3 day suspension without pay** |
| I (d) | Second Group I Violation | Aggravating factors outweigh any mitigating factors<br><br>OR<br><br>No mitigating factors present | **3 to 5 day suspension without pay** |

**APPENDIX B**
**TABLE OF DISCIPLINE (MATRIX)**

| | | | |
|---|---|---|---|
| II<br>(a) | First Group II Violation | Mitigating factors outweigh any aggravating factors<br><br>OR<br><br>No aggravating factors present | **6 to 7 day suspension without pay** |
| II<br>(b) | First Group II Violation | Aggravating factors outweigh any mitigating factors<br><br>OR<br><br>No mitigating factors present | **7 to 8 day suspension without pay** |
| II<br>(c) | Second Group II Violation | Mitigating factors outweigh any aggravating factors<br><br>OR<br><br>No aggravating factors present | **8 to 9 day suspension without pay** |
| II<br>(d) | Second Group II Violation | Aggravating factors outweigh any mitigating factors<br><br>OR<br><br>No mitigating factors present | **9 to 10 day suspension without pay** |
| III<br>(a) | First Group III Violation | Mitigating factors outweigh aggravating factors<br><br>OR<br><br>No aggravating factors present | **10 to 30 day suspension without pay** |

## APPENDIX B
## TABLE OF DISCIPLINE (MATRIX)

| | | | |
|---|---|---|---|
| III<br>(b) | First Group III Violation | Aggravating factors outweigh any mitigating factors<br><br>OR<br><br>No mitigating factors present | **13 to 30 day suspension without pay and/or demotion**<br><br>**OR**<br><br>**termination** |
| III<br>(c) | First Group III Violation | Serious misdemeanor offenses, gross immorality violations, gross neglect of duty<br><br>AND<br><br>Mitigating factors outweigh aggravating factors<br><br>OR<br><br>No aggravating factors present | **20 to 30 day suspension without pay and/or demotion or termination** |
| III<br>(d) | First Group III Violation | Serious misdemeanor offenses, gross immorality violations, gross neglect of duty<br><br>AND<br><br>Aggravating factors outweigh mitigating factors<br><br>OR<br><br>No mitigating factors present | **25 to 30 day suspension without pay and/or demotion or termination** |

**APPENDIX B**
**TABLE OF DISCIPLINE (MATRIX)**

| | | | |
|---|---|---|---|
| III (e) | First Group III Violation | Felony offenses | **Termination** |
| III (f) | Second Group III Violation | Mitigating factors outweigh aggravating factors<br><br>Or<br><br>No aggravating factors present | **15 to 30 day suspension without pay and/or demotion or termination** |
| III (g) | Second Group III Violation | Aggravating factors outweigh any mitigating factors<br><br>OR<br><br>No mitigating factors present | **18 to 30 day suspension without pay and/or demotion or termination** |
| III (h) | Second Group III Violation | Serious misdemeanor offenses, gross immorality violations, gross neglect of duty | **Presumption of termination** |
| III (i) | Group III Violation | Any conviction resulting in a Weapons Disability | **Termination** |

## APPENDIX B
## TABLE OF DISCIPLINE (MATRIX)

| | | | |
|---|---|---|---|
| III (j) | Group III Violation | False report, false statement, untruthfulness or dishonesty | **Presumption of termination** |